IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, ex rel, )
EDWARD O'DONNELL, )
appearing QUI TAM, ) FILED UNDER SEAL
)
Plaintiff/Relator, )
)
v. ) 12 CV 1422
)
BANK OF AMERICA CORPORATION, )
successor to )
COUNTRYWIDE FINANCIAL )
CORPORATION, )
COUNTRYWIDE HOME LOANS, INC., )
and FULL SPECTRUM LENDING, ) JURY TRIAL DEMANDED
)
Defendant. )

## COMPLAINT

Relator Edward O'Donnell brings this qui tam action, and related causes of action, on behalf of the United States of America, against Defendant Bank of America Corporation, which acquired and is the successor to Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Full Spectrum Lending (collectively referred to herein as "Bank of America"), alleging as follows:

### INTRODUCTION

1. This is a qui tam action under the False Claims Act ("FCA") by the United States of America, by Relator Edward O'Donnell, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.* arising from fraud on the Federal National Mortgage Association (commonly referred to and referred to herein as "Fannie Mae"), Federal Home Loan Mortgage Corporation (commonly referred to and referred to herein as "Freddie Mac") and the United States Department of Housing and Urban Development ("HUD"), in connection with Bank of America's residential mortgage lending business.

2. As set forth more fully below, Bank of America and its predecessors have profited for years from its position as one of the nation's largest residential mortgage lenders while submitting false statements to Fannie Mae, Freddie Mac and HUD about its underwriting and its quality control. At the same time, Bank of America failed to implement quality control measures to stop the reckless lending that Bank of America engaged in. Not only has Bank of America's misconduct cost the United States millions of dollars, with additional losses expected in the future, but also it has led to mortgage defaults and home evictions and foreclosures across the country.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff/Relator Edward J. O'Donnell is a citizen of the United States and resides in the State of Texas, and pursuant to the aforementioned statutes, brings this action on behalf of the United States of America. From 2003 to 2009, Relator was employed by one of Bank of America's predecessors Countrywide Home Loans and/or an affiliated company. While employed there, Relator served as Executive Vice-President and Senior Vice-President, including reviewing and monitoring underwriting of loans and risk management relating to loans.

4. Defendant Bank of America Corporation is a bank with offices throughout the country, including New York, New York. Bank of America acquired and is the successor to Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Full Spectrum Lending.

5. Fannie Mae is a government-sponsored enterprise ("GSE") chartered by Congress with one of it purposes to help strengthen the United States housing and mortgage markets. Fannie Mae does not make home loans, but rather securitizes or buys mortgage loans, including those originated by Bank of America.

6. Freddie Mac is also a GSE chartered by Congress which also purchases mortgage

2

loans and mortgage-related securities, including loans originated by Bank of America.

7. As of 2008, Fannie Mae and Freddie Mac owned or guaranteed approximately one half of the United States of America's twelve trillion dollar mortgage market.

8. In September 2008, the Housing and Economic Recovery Act of 2008 ("HERA") created the Federal Housing Finance Agency ("FHFA"), granting the Director of FHFA discretionary authority to appoint a conservator or receiver of the GSE's "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity." 12 USC § 4617(a)(2).

9. In September 2008, FHFA exercised that authority, placing Fannie Mae and Freddie Mac (sometimes together referred to herein as "the Enterprises") into conservatorships.

10. Since being placed into conservatorship, Fannie Mae and Freddie Mac have received more than $180 billion in taxpayer support with billions more possible.

11. HUD, through its Federal Housing Administration ("FHA"), insures lenders against losses to homebuyers. FHA insures approximately one third of all new residential mortgages in the United States and is the largest mortgage insurer in the world. Under HUD's mortgage insurance program, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD incurs expenses in managing and marketing the foreclosed-upon property until it is resold.

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and the FCA, particularly 31 U.S.C. § 3732(a), which specifically confers jurisdiction over actions brought pursuant to 31 U.S.C § 3729 and § 3730, and further, personal jurisdiction, in that some or all of the acts proscribed by § 3729 as alleged herein occurred in the New York City, New

York, and further, Defendants and each of them may be found in the District and transact business in this District as set forth above.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendants are found, transact business, and committed the acts alleged herein and proscribed by 31 U.S.C § 3729 in this District. Defendant's actions in the categorization, underwriting and sale of mortgages to the Entities, to the United States or its departments or agents are continuous and systematic, and substantially occurred or continue to occur in New York City, New York.

**CONDITIONS PRECEDENT**

14. Pursuant to 31 USC § 3729 et seq, this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States Government may elect to intervene and proceed with the action within the sixty day time frame after it receives both the Complaint and the material evidence submitted to it.

15. This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

16. In the alternative, to the extent there has been a public disclosure unknown to Relator, he is an original source under the aforementioned statute. As more fully set forth in this Complaint, Relator has direct and independent knowledge of the information on which the allegations herein are

based, and witnessed directly the fraudulent actions and representations by Bank of America against the United States, its departments or agents.

17. Relator has voluntarily provided all of the material information alleged herein to the Federal government before filing this action based on said information.

18. Contemporaneous with filing this Complaint, Relator is serving a copy of same upon the United States, together with the aforementioned verbal and written disclosure statements setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

19. Relator has complied with all other conditions precedent to bringing this action.

## ALLEGATIONS COMMON TO ALL COUNTS

20. Relator incorporates by reference paragraphs 1 through 19 of his Complaint as if fully set forth herein.

21. Relator joined Countrywide Home Loans (which was acquired by Bank of America) in January of 2003 as Senior Vice President of Underwriting, and worked there until 2009.

22. Countrywide was comprised of four production divisions, each of which originated and funded residential home loans throughout the United States.

23. During Relator's time with Countrywide an intense level of competition developed across the divisions to set records for loan production volume, revenue and profits. Countrywide sold nearly all of its monthly loan production to investors including Fannie Mae, Freddie Mac and HUD (FHA).

24. During this time, Countrywide had developed underwriting guidelines used to originate loans that were sold to Fannie Mae, Freddie Mac and/or approved by HUD. Countrywide

5

was required to maintain certain underwriting standards and to conform to underwriting guidelines pursuant to its sales agreements with Fannie Mae and Freddie Mac. Additionally, Countrywide used an automated underwriting system, "Countrywide Loan Expert Underwriting System" or C.L.U.E.S. to decision loans and determine which loans were eligible for sale. CLUES was highly dependent upon the quality and accuracy of the information entered into it by Account Executives, Loan Processors or Loan Underwriters.

25. In an attempt to ensure the company was originating and funding quality loans, Countrywide developed and managed a Corporate Quality Control program that randomly sampled loans from each division on a monthly basis. A minimum sample size, deemed to be statistically valid, was identified from each division's monthly production and re-underwritten by a Corporate Quality Control (QC) underwriter against published loan program underwriting guidelines. Loans were graded as: (i) acceptable risk (ii) high risk or (iii) severely unsatisfactory risk.

26. Relator held multiple roles at Countrywide or affiliate thereof, including his initial role as Senior Vice President of Underwriting. Relator was promoted on two occasions holding the title of Executive Vice President at the time the company (Countrywide) was acquired by Bank of America. In his various roles, Relator was part of regular Quality Control meetings where he reviewed the results of Corporate QC audits for his division.

27. Countrywide regularly "benchmarked" divisions against one another to understand how quality aligned against corporate targets for defect rates (severely unsatisfactory findings). Divisions were instructed to manage to a severely unsatisfactory finding rate of no more than 3.0%.

28. During the initial years of his career with Countrywide, Relator's division maintained

6

the target standard without difficulty and in fact, ranked best in terms of quality of the four Countrywide divisions due to the strong support for quality from division Senior Executives.

29. That support began to change in the mid-2000's. With the market becoming increasingly competitive, pressure for more growth in loan production, lower expenses and faster processing times grew exponentially. Senior Executives that had long supported quality growth were pushed aside, quality control functions were relaxed and loan approval authority was given to loan processors (rather than underwriters) who lacked basic credit training and the professional credit management skills required to manage to quality objectives.

30. Relator and other were challenged to improve "flow through" rates which measured applications that later funded and reduce turn times which represented the number of days a loan remained in processing prior to funding to fifteen days or less.

31. In Relator's division, the Chief Operating Officer took control of Central Fulfillment (underwriting, processing and loan funding) and removed job aids, worksheets and underwriting approval training requirements in a strategy labeled "The Hustle".

32. This program was designed to rely solely on the automated underwriting system to decision loans and remove the long standing quality control checks that validated data, income calculations, appraisal quality and assets to be used as reserves if a borrower came under financial stress.

33. Relator personally objected to the "Hustle" on numerous occasions and worked with a division quality assurance team in an attempt to develop reporting that illustrated and terminated the rapid deterioration in loan quality, which was resulting in increasing early default rates and escalating severely unsatisfactory loan review rating across nearly all product lines.

7

34. By May of 2008, loans rated as severely unsatisfactory over the prior 90 days (Feb-April) were more than five (5) times the target level of 3% and in some loan product lines (including Conventional, FHA and Non Conforming), defect rates exceeded 25%.

35. On or about July 1, 2008. Bank of America Corporation announced that it had completed its purchase of Countrywide Financial Corporation, including Countrywide Home Loans, Inc., and Full Spectrum Lending. After the acquisition, Defendants' action continued unabated. Countrywide, and later Bank of America, continued to sell loans to Fannie Mae and Freddie Mac that they knew failed to conform to the underwriting standards required by their sales agreements.

36. Relator's concerns were dismissed and his role continued to be marginalized, and Relator became one of the lone voices within the division pointing to the loan quality issues, increase of early payment defaults and growing number of early defaulted loans.

37. Regular monthly credit risk meetings held at both the division and corporate levels included loan performance and corporate quality control audit findings. Extensive discussions took place regarding the specific finding types, potential impact on borrower's ability to pay, likelihood of investor repurchase requests and corporate losses, and Relator expressed his concerns at these meetings about the failure to maintain quality simply to increase loan volume.

38. Relator's concerns were disregarded and Countrywide continued to ignore underwriting and quality standards in an effort to increase loan volume. Billions of dollars of poor quality loans continued to be originated and sold to Fannie Mae and Freddie Mac.

## **DEFENDANT'S ACTIONS HAVE RESULTED IN LOSSES TO THE UNITED STATES OF AMERICA**

39. Fannie Mae, Freddie Mac and FHA promulgated extensive guidelines and regulations

8

to ensure that only creditworthy borrowers are being made loans, and they relied on lenders that the loans they submit for insurance comply with standards and guidelines specifically designed to mitigate the risk. Fannie Mae, Freddie Mac and FHA also rely on representations by lenders that they themselves are following requirements by operating a quality control program.

40. Bank of America and its predecessors, Countrywide entities has been an approved seller to Fannie Mae and Freddie Mac for years, and has sold billions of dollars in loans to the Entities since 2004.

41. During this time, Bank of America made substantial profits through the sale and/or securitization of the mortgages, and wrongfully sold mortgages that were not of adequate credit quality under the Entities' guidelines. Notwithstanding the poor quality of the loans, Bank of America and Countrywide represented that the loans complied with applicable underwriting standards and that its underwriters had conducted any necessary due diligence required. By misrepresenting compliance with Fannie Mae and Freddie Mac guidelines, Bank of America induced Fannie Mae and Freddie Mac to purchase loans that later went into default and caused the entities to incur losses.

42. Fannie Mae and Freddie Mac have incurred millions of dollars in losses on loans purchased from Countrywide and Bank of America and based on Bank of America and Countrywide's misrepresentations as to the quality of those loans. The Entities would not have made a financial commitment to purchase the mortgages and/or guarantee those mortgages absent the Defendants' misrepresentations.

43. Bank of America and Countrywide's msirepresentations, similar to the examples set forth in the previous section of this Complaint, were material and bore upon the likelihood that

9

borrowers would make mortgage payments.

44. As a result of Defendant's actions, Fannie Mae and Freddie Mac have been placed into receivership, and the United States of America has had to pay in excess of One Hundred Eighty Billion Dollars to Fannie Mae and Freddie Mac, with billions of dollars more of exposure. Similarly, HUD has paid millions of dollars as a result of Bank of America's actions.

45. As of February 2012, the United States of America has paid in excess of One Hundred Eighty Billion Dollars to Fannie Mae and Freddie Mac.

46. As of February 2012, HUD has paid tens of millions of dollars in FHA insurance claims and related costs arising out of Bank of America's approval of mortgages for FHA insurance. A substantial percentage of those claims resulted from loans that were ineligible for FHA insurance and never should have been insured.

47. The United States of America expects to pay billions more as additional mortgages underwritten by Bank of America and Countrywide default in the months and years ahead.

48. The costs relating to Fannie Mae, Freddie Mac, and the FHA insurance claims paid by HUD to date, are the direct result of Bank of America and Countrywide's false certifications and representations described above.

## THE FALSE CLAIMS ACT

49. The False Claims Act provides liability for any person (I) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" 31 U.S.C. § 3729(a)(1)(A)-(B). The False Claims Act further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less

10

than [$5,500] and not more than [$11,000]..., plus 3 times the amount of damages which the Government sustains because of the act of that person..." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

## FIRST CLAIM
### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1) (2006), and as amended, 31 U.S.C. § 3729 (a)(1)(A))
### Causing False Claims

50. Relator incorporates by reference paragraphs 1 through 53 of his Complaint as if fully set forth herein.

51. The Relator seeks relief against Bank of America under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

52. As set forth above, Bank of America knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its sale of mortgage loans to Fannie Mae and Freddie Mac.

53. Fannie Mae and Freddie Mac purchased loans that failed to comply with their underwriting guidelines and incurred losses when those loans defaulted.

54. By reason of the false claims of Bank of America, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## SECOND CLAIM

**Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(B)
Use of False Statements**

55. Relator incorporates by reference paragraphs 1 through 58 of his Complaint as if fully set forth herein.

56. The Relator seeks relief against Bank of America under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), or, in the alternative, under Section 3729 (a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006).

57. As set forth above, Bank of America knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with Bank of America's sale of mortgage loans to Fannie Mae and Freddie Mac.

58. Fannie Mae and Freddie Mac purchased loans and incurred losses, based on Bank of America's wrongful conduct.

59. By reason of the false records and/or statements of Bank of America, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

WHEREFORE, the Relator respectfully request that judgment be entered in its favor and against Bank of America as follows:

    a.    On Counts One and Two (False Claims Act), judgment for the United States of America, treble the Relator's damages, and civil penalties for the maximum amount allowed by law;

b.  For an award of costs pursuant to 31 U.S.C. § 3729(a);

c.  For an award of any such further relief as is proper; and

d.  Attorneys' fees, if applicable.

Respectfully Submitted,

David G. Wasinger
The Wasinger Law Group, P.C.
1401 S. Brentwood Blvd., Ste. 875
St. Louis, MO 63144
PH: 314-961-0400
FAX: 314-961-2726
dwasinger@wasingerlawgroup.com