PREET BHARARA
United States Attorney for the
Southern District of New York
By:     PIERRE G. ARMAND
          JAIMIE L. NAWADAY
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2724/2528
Fax:    (212) 637-2730
Email: Pierre.Armand@usdoj.gov
          Jaimie.Nawaday@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
EDWARD O'DONNELL,

   Plaintiff,

    v.

BANK OF AMERICA CORPORATION,
successor to COUNTRYWIDE
FINANCIAL CORPORATION,
COUNTRYWIDE HOME LOANS, INC.,
and FULL SPECTRUM LENDING,

   Defendants.

---

UNITED STATES OF AMERICA

   Plaintiff-Intervenor,

    v.

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE FINANCIAL
CORPORATION, BANK OF AMERICA
CORPORATION, and BANK OF
AMERICA, N.A.,
   Defendants.



12 Civ. 1422 (JSR)

**COMPLAINT-IN-INTERVENTION**
**OF THE UNITED STATES OF**
**AMERICA**

**JURY TRIAL DEMANDED**

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), brings this complaint-in-intervention and alleges upon information and belief as follows:

## INTRODUCTION

1.      This is a civil fraud action by the United States against Defendant Bank of America Corporation ("Bank of America") and Bank of America N.A. ("BANA"), which acquired and are the successor to Countrywide Financial Corporation ("Countrywide Financial" or "CFC") and Countrywide Home Loans, Inc. ("Countrywide Home Loans" or "CHL")  (collectively referred to herein as "Countrywide"), to recover damages and penalties arising from a scheme to defraud the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "government-sponsored enterprises" or "GSEs") in connection with Countrywide's residential mortgage lending business.  This action seeks to recover treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

2.      As set forth more fully below, in 2007, as loan default rates rose across the country and the GSEs reevaluated their loan purchase requirements, Countrywide rolled out a new "streamlined" loan origination model it called the "Hustle."  In order to increase the speed at which it originated and sold loans to the GSEs, Countrywide eliminated every significant checkpoint on loan quality and compensated its employees solely based on the volume of loans originated, leading to rampant instances of fraud and other serious loan defects, all while

2

Countrywide was informing the GSEs that it had tightened its underwriting guidelines.   When the loans predictably defaulted, the GSEs incurred more than a billion dollars in unreimbursed losses.

3.     Countrywide was once the largest mortgage lender in the United States, having originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.   In the mid-2000's, Countrywide dominated the subprime lending market, originating subprime loans principally from its Full Spectrum Lending ("FSL") division.   In early 2007, however, when the subprime market collapsed, Countrywide responded to its resulting revenue shortfall in two ways.   First, Countrywide shifted the focus of FSL to originating prime, conforming loans that qualified for sale to the GSEs.   Second, Countrywide implemented the "Hustle" in FSL, which reduced the amount of time spent processing and underwriting conventional loans, thereby boosting loan volume and revenue.

4.     According to internal Countrywide documents, the aim of the Hustle (or "HSSL," for "High Speed Swim Lane") was to have loans "move forward, never backward" and to remove unnecessary "toll gates" slowing down the loan origination process.   In furtherance of these aims, Countrywide's new origination model removed the processes responsible for safeguarding loan quality and preventing fraud.   For instance, Countrywide eliminated underwriter review even from many high risk loans.   In lieu of underwriter review, Countrywide assigned critical underwriting tasks to loan processors who were previously considered unqualified even to answer borrower questions.   At the same time, Countrywide eliminated previously mandatory checklists (or "job aids") that provided instructions on how to perform these underwriting tasks.   Under the Hustle, such instructions on proper underwriting were considered nothing more than unnecessary forms that would slow the swim lane down.

3

5.      Countrywide also eliminated the position of compliance specialist, an individual previously responsible for conducting a final, independent check on a loan to ensure that all conditions on the loan's approval were satisfied prior to funding.   Finally, to further ensure that loans would proceed as quickly as possible to closing, Countrywide revamped the compensation structure of those involved in loan origination, basing performance bonuses solely on volume. Whereas loan processors and others previously received bonuses based on a combination of the quality and volume of loans they processed, the Hustle removed any quality factor in compensation, making clear that employees should prioritize production.

6.      Although Countrywide management was repeatedly informed that the new model would have catastrophic consequences for loan quality, the Hustle began in full force in approximately August of 2007, just as the GSEs began tightening their purchase requirements due to escalating default rates across the country, and continued through 2009, well after Bank of America's acquisition of Countrywide in July 2008.   The Hustle was never disclosed to the GSEs, although the vast majority of its resulting loans were funneled to the GSEs with the knowing misrepresentation that they were investment-quality loans that complied with GSE requirements. Indeed, in late 2007, shortly after it had fully implemented the Hustle, Countrywide represented to the GSEs that it had strengthened its underwriting guidelines.

7.      Countrywide also concealed the quality control reports on Hustle loans demonstrating that instances of fraud and other material defects (*i.e.*, defects making the loans ineligible for investor sale) were legion.   Specifically, Countrywide's own quality control reports identified material defect rates of nearly 40% in certain months, rates that were nearly *ten times* the industry standard defect rate of approximately 4%.   But Countrywide failed to abandon the Hustle

4

even when it became clear that the loans were of a disastrous quality. Instead, Countrywide offered quality control employees within FSL a one-time bonus for "rebutting" defect findings made by the corporate quality control department in an attempt to make FSL's defect rates appear lower to investors.

8.      After the Hustle loans defaulted and the GSEs reviewed them for compliance with their guidelines, Countrywide and Bank of America compounded the harm to the GSEs by refusing to repurchase Hustle loans or reimburse the GSEs for losses already incurred, even where the loans admittedly contained material defects or even fraudulent misrepresentations. As a result of the Hustle, Countrywide and later Bank of America defrauded the GSEs of more than one billion dollars.

9.      The United States seeks the maximum amount of damages and the maximum amount of civil penalties allowed by law. Specifically, the United States seeks treble damages under the False Claims Act and civil penalties under FIRREA for the thousands of Hustle loans sold to the GSEs, including any losses or gains resulting from the fraud.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. § 1331, and 12 U.S.C. §1833a.

11.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because the defendants transact business in this judicial district, including by originating loans and transferring loans to investors headquartered in this district.

## PARTIES AND RELEVANT ENTITIES

12.     Plaintiff is the United States of America.

5

13.     Relator Edward J. O'Donnell is a resident of the State of Pennsylvania.   From 2003 to 2009, Relator was employed by Countrywide Home Loans, first as a Senior Vice President, and later as an Executive Vice President.

14.     Defendant Countrywide Financial is a Delaware corporation with its principal place of business in Calabasas, California.   Countrywide Financial, itself or through its subsidiary Countrywide Home Loans, was engaged in mortgage lending.   On July 1, 2008, Countrywide merged with Bank of America and is now a wholly-owned subsidiary of Bank of America. Countrywide Financial's remaining operations and employees were transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009.

15.     Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home Loans originates and services residential home mortgage loans by itself or through its subsidiaries.   Pursuant to the merger on July 1, 2008, Countrywide Home Loans was acquired by Bank of America and now operates under the trade name "Bank of America Home Loans."

16.     Defendant Bank of America is a Delaware corporation with its principal place of business in Charlotte, North Carolina and offices and branches in New York, New York. Countrywide Financial merged with Bank of America on July 1, 2008.   As explained more fully below, Bank of America is a successor-in-interest to Countrywide and has thus assumed liability for the conduct of Countrywide alleged herein.

17.     Defendant Bank of America N.A. ("BANA") is a federally chartered bank and Bank of America's principal banking subsidiary.   BANA has substantial business operations and

6

offices in New York, New York.   As explained more fully below, BANA participated in Bank of America's acquisition of substantially all of Countrywide Financial through a series of transactions that commenced on July 1, 2008.   Together with Bank of America, it is a successor-in-interest to Countrywide.

## BACKGROUND

A.   **The Conservatorships of Fannie Mae and Freddie Mac**

18.    Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.   As part of this mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from lenders.   Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.   Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

19.    The Federal Housing Finance Agency ("FHFA") is a federal agency located at Constitution Center, 400 7th Street, SW in Washington, D.C.   FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.   On September 6, 2008, pursuant to HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator.   In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs.   12 U.S.C. § 4617(b)(2).

20.    Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority

7

under HERA "to purchase any obligations and other securities" issued by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs"). As of December 31, 2011, Treasury has provided $183 billion in support to the GSEs under the PSPAs.

**B.    Civil Statutes to Combat Mortgage Fraud**

21.    The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3729(a)(1)(A)–(B).

22.    The False Claims Act further provides that for persons who violate the Act: "[such person] is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person . . ."   31 U.S.C. § 3729(a).

23.    The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended the False Claims Act to define "claim" to include:   "any request or demand, whether under a contract or otherwise, for money or property . . . made to a contractor, grantee, or other recipient, if the money or property is to be spent or used . . . to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . ." 31 U.S.C. § 3729(b)(2).

24.    Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate

8

offenses—as established by a preponderance of the evidence—that involve financial institutions and certain government agencies.  *See* 12 U.S.C. § 1833a(e).

25.    As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, two provisions of Title 18 of the United States Code that "affect" federally insured financial institutions:

- 18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution),  which proscribes the use of "the Postal Service, or ... private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . ."; and

- 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution),  which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

26.    FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $5 million or $1 million per day, whichever is less.   The statute further provides that the United States can recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.

**C.    The GSEs' Single Family Mortgage Guarantee Business**

27.    In their single family business line, GSEs buy single-family mortgages from mortgage companies and other financial institutions in order to provide liquidity to the mortgage market.   The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors.

28.     The GSEs derive revenue in their single family business line primarily from "guarantee fees," *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS.

29.     The GSEs' single family mortgage business primarily acquires loans through one of two channels: (i) the lender (or flow) channel, which obtains loans from lenders on a going-forward basis pursuant to agreements to purchase loans prior to their origination; and (ii) the investor (or bulk) channel, which acquires groups of loans that have already been originated based on certain data about the loans that the GSEs review prior to purchase.

30.     In purchasing loans, GSEs rely on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.   Specifically, loans sold to Fannie Mae must comply with its Single Family Selling Guide and purchase contracts.   Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide and purchase contracts.

31.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product.   The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

32.     The lenders' representations that they are underwriting and delivering investment-quality mortgages according to the GSEs' selling guide and contractual requirements

10

are material to the GSEs' decisions to purchase mortgage loans.   Such representations attest to the credit quality of their loans at the time of sale, the borrower's ability to repay the loan, and the accuracy of the loan data provided.   Among the most basic requirements of an investment-quality mortgage are that:   (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system; and (iii) no fraud or material misrepresentation has been committed by any party, including the borrower.   These requirements were in effect during the relevant time period and remain in effect today.

33.     A lender must also represent and warrant that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including:   (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decision and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention.   These requirements were also in effect during the relevant time period and remain in effect today.

34.     The GSE guidelines are consistent with Countrywide's own underwriting guidelines, which are set forth in two main documents:   the Loan Program Guides ("LPGs") and the Countrywide Technical Manual ("CTM").   The LPGs set limits on loan characteristics, such as loan-to-value ratios ("LTVs"), loan amounts, and reserve requirements for specific loan types. The CTM contains processes and instructions for originating loans, such as how to calculate LTVs.

35.     The CTM states that Countrywide's basic policy is to "originate and purchase investment quality loans," with such a loan defined as "one that is made to a borrower from whom

11

timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual and Loan Program Guides." CTM 0.4 Introduction —Countrywide's Underwriting Philosophy.

36.     When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss already incurred.   Where a lender identifies a material breach of a selling warranty on its own, it must self-report the loan to the GSE.

## C.     The Loan Origination Process within Countrywide's FSL Division in 2007

37. .   The loan origination process in FSL, as in other Countrywide divisions, frequently used Countrywide's automated mortgage underwriting system (called "CLUES").   CLUES was similar to other automated underwriting systems ("AUS") commonly used in the mortgage industry, such as Fannie Mae's Desktop Underwriter and Freddie Mac's Loan Prospector.   Based on data entered from a borrower's application, credit report, and appraisal, CLUES evaluated a loan's default risk and whether a loan could be approved in compliance with Countrywide's guidelines.   CLUES then generated a report with either an "Accept" for a loan, indicating that the loan had an acceptable level of risk, or a "Refer," indicating that the loan should be referred to a human being for manual underwriting because of a borrower's credit score or other risk attributes on the loan.

38.     A CLUES report on a particular loan also listed underwriting conditions that were required to be satisfied before a loan could be closed.   For example, a CLUES report might condition its "Accept" on obtaining documentation showing that certain of the borrower's debts

had been paid off, documentation of the borrower's employment and assets, or review of certain assumptions supporting an appraisal.

39.     Further, the CLUES outcome was "only as good as the data entered into the system." *See* CTM 0.3.1 Introduction—Automated Underwriting Systems, Underwriting with CLUES and CLUES Documentation Levels.   CLUES "Accepts" were thus "only valid if the data used to generate the recommendation matche[d] the true and accurate data in the file." *Id.* 0.2.1 Introduction—Countrywide's Underwriting Philosophy.   Accordingly, the quality of loans originated ultimately depended on the individuals processing and underwriting the loans.

40.     Within FSL as of early 2007, the loan origination process required the involvement of four individuals:   the loan specialist (also called a loan processor), the underwriter, the loan funder, and the compliance specialist.

41.     The loan specialist within FSL entered borrower information into CLUES and, after obtaining a result, forwarded the loan file to an underwriter for review.   Loan specialists within FSL were primarily data entry clerks, were not permitted to answer any substantive borrower questions about a loan, and did not have authority to perform any underwriting tasks.

42.   The underwriter determined the likelihood that the borrower could repay the mortgage loan, by: (i) verifying that loan documentation was true, complete, and accurate by comparing the underlying loan documentation with data entered into CLUES; (ii) evaluating documentation concerning the borrower's income, assets, employment, and credit history; (iii) evaluating the appraisal; (iv) analyzing relevant GSE requirements; and (v) reviewing and clearing any conditions listed on a CLUES report until the loan was "cleared to close."

43.     The underwriter also served a valuable fraud detection role.   Specifically, the underwriter could detect whether a loan specialist entered fraudulent data into CLUES by comparing the loan documentation with the data entered by the loan specialist.   The underwriter was also key to detecting fraud in stated income loans—those in which a borrower is not required to provide documentation supporting her income.   Where a borrower provides no supporting documentation of income, the determination as to whether the borrower's stated income is reasonable in view of her employment and other factors is best made by a qualified, experienced underwriter.

44.     The loan funder prepared the loan package for closing, coordinated the return of closing documents for review prior to funding, ensured that any unresolved funding conditions were satisfactorily met, and wired funds to title companies or closing agents.

45.     The compliance specialist acted as a final "toll gate" prior to funding, by conducting a review of the loan file to:   (i) ensure that any conditions imposed by CLUES were properly satisfied; (ii) verify borrower identification and execution of loan documents; (iii) confirm the availability of funds to be paid to the borrower or third parties; and (iv) ensure compliance with relevant state lending requirements.

46. .   As of early 2007, each of the four individuals involved in the loan origination process received a bonus based both on the quality and on the volume of loans processed.

**D.   The Shift in Focus to Prime, Conventional Lending in 2007**

47.     In the spring of 2007, the secondary market for subprime loans collapsed, and several subprime lenders announced significant losses, declared bankruptcy, or put themselves up

14

for sale.  With the collapse of the subprime market, lenders sought to originate loans that they could then sell to the GSEs.

48.     The GSEs, for their part, began to observe escalating default rates in previously-purchased loans and responded by tightening their requirements and curtailing the purchase of riskier loans.  The GSEs also communicated their tightening requirements to lenders. As one former Fannie Mae executive explained the changing expectations in mid-2007, Fannie Mae was nearly the only significant purchaser left in the secondary market and was working hard to provide liquidity to the market, so it expected lenders to pay closer attention to loan quality.

49.     Because Fannie Mae was purchasing approximately one-third of its single-family mortgage business from Countrywide in 2007, it initiated a careful review of the Countrywide portfolio beginning in May 2007, and a few months later directed its employees to "reduce[] the existing level of risk by pulling back on products and variances."

50.     Similarly, as loan default rates continued to climb, Freddie Mac re-priced, then eliminated, approximately half of Countrywide's riskier loan program products in 2007 and 2008.

51.     Well aware that the GSEs were increasingly concerned about the quality of loans they were purchasing, Countrywide represented to individuals at both Fannie Mae and Freddie Mac that it had implemented tighter underwriting guidelines in the fourth quarter of 2007.

52.     At the same time, Countrywide was seeking to generate much-needed revenue from loan sales and transition itself back into the prime, conventional lending market.  FSL thus began directing an increasing percentage of sales to the GSEs in 2007, and by early 2008 its transition was effectively complete.  FSL's production by the first quarter of 2008 consisted of more than 90% conventional loans and other GSE-approved products.  Simultaneous with its shift in focus

15

to prime lending, FSL implemented a new "streamlined" origination model designed to reduce "turn time," *i.e.*, the amount of time spent underwriting and processing loans, and thus boost volume and revenue.

53.     Countrywide did not disclose its new loan origination model to the GSEs.

**COUNTRYWIDE'S SCHEME TO DEFRAUD THE GSEs**

A.     **The Hustle Eliminated Quality Control Processes**

54.     After a pilot test in 2006 led by two senior managers transferred from Countrywide's Consumer Markets Division, FSL fully implemented its new model for loan origination—the "Hustle"—in mid-2007.   The Hustle (or "HSSL") was the term for FSL's new "High Speed Swim Lane" model for loan origination.   Operating under the motto, "Loans Move Forward, Never Backward," the Hustle aimed to reduce the amount of turn time on loans.

55.     To achieve their aim, FSL executives eliminated what they deemed to be unnecessary "toll gates" slowing down the loan origination process, which included processes necessary for originating investment-quality loans and for preventing fraud.

56.     For example, the Hustle eliminated review by underwriters for all but the riskiest loans.   Under the Hustle, if a loan processed through CLUES generated an "Accept" rating, regardless of the conditions imposed by CLUES, the loan could proceed to closing without any underwriter involvement.

57.     The Hustle's removal of underwriters and other "toll gates" extended to a variety of full and reduced documentation loan products, including such high risk loans as stated income loans.

58.     During a pilot test of the Hustle in 2006, FSL initially regarded stated income loans as too risky to be included in an underwriter-free loan origination process.   As internal Countrywide loan performance reviews indicate, stated income loans defaulted earlier and more frequently than loan products requiring full documentation of the borrower's income.   For this reason, Countrywide had imposed lower loan amount limits and other restrictions on stated income loans.

59.     The GSEs also expected that only experienced underwriters would be entrusted with review of stated income loans.   For instance, Freddie Mac guidance on preventing stated income fraud provides that "[s]tated income loans can be problematic if it is later determined that the stated income was misstated and that the originator knew or should have known about it earlier in the process . . ." and that to prevent such fraud, lenders should "[e]nsure the most seasoned underwriters on your team underwrite stated income loans."

60.     In 2007, however, stated income products still represented nearly 40% of FSL's overall volume.   Consequently, FSL was unlikely to achieve its desired production boost unless stated income loans were included in the high speed swim lane.   By the summer of 2007, therefore, FSL removed underwriters even from stated income loans.

61.     With underwriters eliminated from most loan reviews, loan specialists assumed responsibility for a variety of critical underwriting tasks on full and reduced documentation loans. Although previously regarded as unqualified even to answer borrower questions, loan specialists were suddenly entrusted with assessing the reasonableness of a borrower's stated income and evaluating the adequacy of an appraisal.

62.     Even while the Hustle gave loan specialists authority previously available only to underwriters, it provided them with less guidance in performing critical underwriting tasks.   For example, FSL previously required its underwriters to complete certain worksheets—referred to as "job aids"—that served as checklists or how-to forms on performing critical underwriting tasks.

63.     Under the Hustle, however, these job aids were regarded merely as additional, unnecessary toll gates, so they, along with underwriters, were eliminated.   Among the job aids deemed unnecessary were worksheets on how to assess the reasonableness of stated income and how to review an appraisal.

64.     The Hustle also eliminated the final toll gate in loan origination—the compliance specialist—who previously checked to ensure that any conditions on the loan were cleared prior to closing and funding the loan.   As a result, loans receiving a CLUES "Accept" were handled entirely by loan specialists and funders.

65.     Finally, to further incentivize loan specialists and funders to reduce the time spent processing the loans, FSL changed the compensation structure for both loan specialists and funders.   After a pilot test of the Hustle revealed that loan specialists were hesitant to make underwriting decisions for fear their errors would lead to higher defect rates and a correspondingly lower bonus, FSL eliminated any quality component to bonuses altogether.   As a result, loan specialists and funders earned bonus compensation based purely on loan volume and had no incentive to safeguard loan quality.

66.     Countrywide knew that its removal of toll gates violated GSE requirements, which mandated heightened scrutiny of loan quality beginning in mid-2007.   As one former Fannie

executive explained, Countrywide's revised, toll gate-free origination process drastically departed from what was deemed acceptable in the tightening market of mid-to-late 2007.

**B.    Countrywide Ignored Warnings Raised about the Hustle**

67.    As explained below, certain individuals within FSL repeatedly warned FSL executives, including FSL's President, Greg Lumsden, and FSL's Chief Operating Officer ("COO"), Rebecca Mairone, that the Hustle would generate excessive quantities of fraudulent or otherwise seriously defective loans that were ineligible for sale to the GSEs.  These warnings, however, were ignored and the Hustle was rolled out as planned.   After the roll out began, internal quality control reviews of Hustle loans were provided to FSL executives, including Lumsden and Mairone.   These reviews confirmed that, as predicted, the quality of the loans originated under the Hustle was exceptionally poor.   Again, however, FSL executives ignored this information, continued on with the Hustle as planned, and restricted dissemination of the quality reviews.

68.    Some FSL senior managers, including O'Donnell, warned that the Hustle presented a disastrous layering of risk by: (i) eliminating the toll gates (*e.g.,* underwriters, job aids, and compliance specialists) responsible for loan quality and fraud prevention; (ii) expanding the authority of loan specialists and funders, and (iii) compensating loan specialists and funders solely based on volume.

69.    Concerned about the high defect rates from the pilot tests of the Hustle and a rapid deterioration in loan quality, O'Donnell directed some of the underwriters to conduct quality checks on the Hustle loans pre-funding, in the hope that defects could be corrected.   FSL's COO permitted these quality checks as long as they were conducted on a parallel track with the loan processing, so that they would not "slow[] the swim lane down."

19

70.     The resulting pre-funding quality control reports conducted by O'Donnell's teams revealed a staggering rate of defects and predicted systemic problems in loan quality.   According to FSL's own internal reports, in January 2008, FSL's rates of materially defective loans were 57% overall, and nearly 70% for stated income loans.   The most frequently-cited defects appeared where job aids had been removed, including in the areas of stated income reasonableness and appraisal acceptability.

71.     Rather than alter or abandon the Hustle model, FSL's COO prohibited O'Donnell's teams from circulating the pre-funding quality reports outside of FSL.

**C.     Countrywide Concealed the Escalating Rates of Defects and Fraud under the Hustle**

72.     As warnings about the Hustle went unheeded, Countrywide knowingly churned out loans with escalating levels of fraud and other serious material defects and sold them to the GSEs.

**1.   Fraudulent Manipulation of Data**

73.     With loan processors and funders encouraged to focus only on the volume of loans they processed, falsification of CLUES data proceeded unchecked.   As set forth above, an "Accept" was reliable only to the extent that a loan processor had entered the data accurately into CLUES in the first instance.   Under the Hustle, however, loan processors were incentivized to, and repeatedly did, manipulate borrower information (*e.g.*, by entering a higher income for the borrower) until they received an "Accept" and the loan could enter the high speed swim lane. And no underwriter reviewed the loan to compare the CLUES data with the underlying loan documentation to detect fraudulent manipulation.   Even in post-closing audits where fraudulent manipulation of data was found, such a finding was typically recorded as another material defect finding that had no effect on the loan processor's compensation.   As a result, the number of

20

CLUES reports per loan (*i.e.*, reports generated by processing a loan through CLUES that show the result and any conditions attached to the result) escalated dramatically under the Hustle.

74.     A few CLUES reports per loan would not be atypical or suspicious because a loan processor was required to enter correct and accurate data into CLUES at all times, requiring updates (and hence additional CLUES reports) if there were changes to the borrower's information prior to closing.   More than a few CLUES reports per loan, however, is a strong indicator that a processor or underwriter is simply altering data to obtain an "Accept" and therefore engaging in fraud.

75.     Under the Hustle, and specifically between May 2007 and November 2008 (after the acquisition of Countrywide by Bank of America in July 2008), the average number of CLUES reports per FSL loan climbed from 8—already a suspiciously high number—to 14.   In 2007 alone, nearly 60% of FSL loans sold to Fannie Mae that later defaulted had 10 or more CLUES queries.

76.     Countrywide management only intensified the push to obtain a CLUES "Accept" result.   As an August 22, 2007 email to FSL management explained in discussing Countrywide's "Fast & Easy" loan product (a reduced documentation loan), "[t]here is major CHL corporate scrutiny on ensuring prime F&E's fund as Accept due to market liquidity and ensuring loan is salable to GSE-FNMA . . . all we simply have to do is … fix data pre-fund[ing,] re-run CLUES and then [] not run CLUES again so we can fund as CLUES Accept.   Please remember the F&E product is key to HSSL . . . but MUST be CLUES Accept AT FUNDING!"

77.     As one former FSL Senior Vice President explained, although manipulation of CLUES data was always a risk, it became an unmitigated risk under the Hustle and, even when

detected, loan processors manipulating data typically faced no consequences, monetary or otherwise.

### 2.   Loans Closed with Outstanding Conditions

78.     As set forth above, the GSEs require a lender to represent that automated underwriting conditions are met for all loans processed through an automated underwriting system.   Likewise, Countrywide's own underwriting guidelines provide that "[a]ll of the conditions imposed by CLUES must be completely fulfilled.   The fact that a loan has a CLUES Accept rating does not release the branch from validating that all documentation meets prescribed requirements."   CTM   0.3.1   Introduction—Automated   Underwriting   Systems   (AUSs), Underwriting with CLUES and CLUES Documentation Levels.

79.     With volume driving compensation under the Hustle, loan processors had no incentive to obtain and review necessary documents prior to closing.

80.     As a result, during the Hustle years, FSL experienced a sharp increase in the percentage of loans closed with a variety of outstanding conditions and a doubling of the percentage of loans closed without required critical documentation, such as documentation supporting income, verifying assets, and verifying employment.

### 3.   Spiking Material Defect Rates

81.     Countrywide's own post-closing quality control reports indicated that the Hustle was a disaster.   Countrywide's post-closing quality reports revealed an alarming spike in defect rates in FSL loans after the Hustle was fully implemented in or around August of 2007.   Although FSL's material defect rates had historically been lower than those in other Countrywide divisions, such as its Consumer Markets Division and Wholesale Lending Division, Countrywide's internal

reports show that FSL's material defect rates reached double the levels of those in other divisions in 2008.

82.     By the first quarter of 2008, FSL's material defect rate on loans climbed to nearly 40%, far surpassing the industry standard defect rate of 4-5%.  Put simply, according to Countrywide's own internal quality control reviews, more than one-third of the loans FSL originated were ineligible for sale to investors like the GSEs.

### 4.   Countrywide's Concealment of Defect Rates

83.     Well aware that its defect rates drastically exceeded the industry standard, Countrywide concealed them from the GSEs.   One former Fannie Mae executive responsible for Countrywide purchases explained that he could not recall ever hearing defect rates like those at Fannie Mae, and added that had he known about such defect rates, he would have asked what Countrywide was originating and whether there were any quality checkpoints at all in the origination process.   Another former Fannie Mae executive responsible for the Countrywide account commented that, whereas a lot of customers trying to sell to Fannie Mae would self-report a problem they identified, he could not recall Countrywide ever reporting a single issue as to quality to Fannie Mae.

84.     Indeed, at the same time FSL's defect rates soared to approximately 37%, Countrywide was advised that its poor loan quality could threaten the Bank of America acquisition.   A report prepared in February 2008 by Enterprise Risk Management alerted Countrywide executives that the number two credit risk that could disrupt the Bank of America acquisition was Countrywide's material defect rates, which were described across divisions as "significantly above acceptable levels, with the most common [defect] being unreasonable stated

income."    The number one credit risk cited by the report was Countrywide's high rates of early

payment defaults, *i.e.*, loans defaulting within the first six months, which are also correlated with

material defects and fraud.

85.    Despite its knowledge that its defect rates were well above acceptable levels, FSL

took no action to address the root cause of its staggering defect rates.   Instead, FSL offered its

quality control employees a one-time bonus in the first quarter of 2008 for rebutting material

defect findings down to a more standard rate.

86.    In a typical rebuttal process, an initial quality review would be conducted of a loan

by Countrywide's corporate quality control department.   Where a defect finding was made, the

quality control team within the division that originated the loan had an opportunity to address the

finding by, *e.g.*, attempting to locate a key document missing from the loan file.

87.    In FSL, however, where employees were paid to rebut the defect findings of the

corporate quality control department, FSL employees were able to "rebut" defect findings even

without taking any corrective action or showing that the finding was made in error.   For example,

FSL employees could "rebut" defect findings of "unreasonable stated income" simply by arguing

that the stated income *was* reasonable.   In such cases, unless the corporate quality control

employee could prove the stated income was false, the defect finding was overturned.

88.    Indeed, one former corporate quality control employee previously testified that she

could not recall any instances when a finding of "unreasonable stated income" was *not* overturned.

89.    The FSL bonus incentive had its desired effect.   Internal FSL quality control

reports show that the defect rate for February 2008, for example, went from approximately 37% to

purportedly 13%.

90.     Countrywide also concealed its bonus incentive from the GSEs.  As a former Fannie Mae Vice President of Credit Risk explained, he had never heard of *any* lender that incentivized a quality control team to rebut quality control findings.   Another former Fannie Mae executive commented that it was misleading for Countrywide to be representing, on the one hand, that it was tightening its underwriting controls, while simultaneously engaging in a game of "catch me if you can" on the quality control side.

**D.**     **Countrywide Misrepresented That its Loans Complied with GSE Requirements**

91.     Hustle loans sold to GSEs violated the most basic representations made at the time of sale, including:   (i) that all required loan data was true, correct, and complete; (ii) that CLUES conditions were met prior to closing; and (iii) that no fraud or material misrepresentation had been committed by any party, including the borrower.

92.      Even more fundamentally, according to Countrywide's Guidelines, "[t]he basic question every underwriter should ask on every loan is, 'Does this loan make sense?'"   CTM 0.6 Introduction—Loan Fraud.   The loans described below are just a small fraction of those that fail this basic test.   Although each of the described loans contained obvious and easily detectable material defects, each one was sold to Fannie Mae with the representation that it was an investment-quality loan and was therefore not reviewed by Fannie Mae until after its default.

**1.  The Altadena, California Property**

93.     Fannie Mae loan number 1706211714 relates to a property in Altadena, California (the "Altadena Property").   The mortgage closed on or about October 24, 2007.   Countrywide sold the loan to Fannie Mae with the representation that it complied with the applicable GSE requirements.

94.     Contrary to Countrywide's representation, the loan did not comply with the most basic GSE requirements concerning accuracy of loan data and the absence of any misrepresentations.   A post-default quality review revealed an obvious misrepresentation of income, where the loan application represented that the borrower earned $8,500 per month as the self-employed owner of a company with a name identical to that of the borrower, when no such company existed.

95.     The quality review also found a grossly inflated appraisal of the underlying property, overstating the value of the property by 31%, and an inadequate documentation of the borrower's assets.

96.     Countrywide's representation that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

97.     The loan defaulted within ten months of closing.   The loan was processed through CLUES 58 times, which by itself suggests fraudulent manipulation of data.   Further, according to Countrywide's (later Bank of America's) internal fraud tracking system, which recorded the results of internal investigations of possible cases of loan fraud, the investigation confirmed fraud in connection with the loan.

### 2.  The Miami, Florida Property

98.     Fannie Mae Loan number 1704851176 relates to a property in Miami, Florida. The mortgage closed on or about August 25, 2007.   Countrywide sold the loan to Fannie Mae with the representation that it complied with the applicable GSE requirements.

99.   Contrary to Countrywide's representation, the loan did not comply with the most basic GSE requirements concerning accuracy of loan data and the absence of any misrepresentations.   A post-default quality review revealed misrepresentations of employment and income, where the loan file stated that the borrower was a sales representative for Florida West Airlines earning $15,500 per month, but the borrower was in fact employed by a temporary agency and earned $2,666 per month.

100.   The quality review also found a misrepresentation of the borrower's credit in the form of undisclosed liabilities, where the borrower's recent credit report and bankruptcy petition revealed six debts not disclosed on the loan application.   Finally, the quality review found no documentation verifying the borrower's employment and income, as was required by CLUES conditions on the loan.

101.   Countrywide's representation that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

102.   The loan defaulted within seven months of closing.   Countrywide's (later Bank of America's) internal fraud investigation confirmed fraud in connection with the loan.

### 3.  The Athens, Alabama Property

103.   Fannie Mae loan number 1706212486 relates to a property in Athens, Alabama. The mortgage closed on or about September 27, 2007.   Countrywide sold the loan to Fannie Mae with the representation that it complied with the applicable GSE requirements.

104.   Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning accuracy of loan data and the absence of misrepresentations.   A

27

post-default quality review found misrepresentations of employment and income, where the loan file stated that the borrower was self-employed as the owner of a brokerage company earning $15,000 per month, but in fact the borrower was a former employee of the company whose employment ended nine months prior to the closing date.

105.   Countrywide's representation that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

106.   The loan was processed through CLUES 29 times and Countrywide's (later Bank of America's) internal fraud investigation confirmed fraud in connection with the loan.

### 4. The Birmingham, Alabama Property

107.   Fannie Mae loan number 1704789372 relates to a property in Birmingham, Alabama.  The mortgage closed on or about August 31, 2007.  Countrywide sold the loan to Fannie Mae with the representation that it complied with the applicable GSE requirements.

108.   Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning accuracy of loan data and the absence of misrepresentations.  A post-default quality review found inadequate documentation of income, where the loan file stated that the borrower earned $10,000 per month as a self-employed real estate investor, but contained no requisite verification of the borrower's business.

109.   The quality review also found a misrepresentation of the borrower's credit where the borrower had an undisclosed liability.  Specifically, the borrower had obtained an additional mortgage prior to closing, resulting in an additional $81,000 of undisclosed debt.  Finally, the