**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,<br><br>    Plaintiff,<br><br>        v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE,<br><br>    Defendants. | 12 Civ. 1422 (JSR)<br><br>ECF Case |

## MEMORANDUM OF LAW OF THE UNITED STATES
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y.  10007
Tel. No.:  (212) 637-2800
Fax No.:  (212) 637-2730

PIERRE G. ARMAND
JAIMIE L. NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
Assistant United States Attorneys
    -Of Counsel-

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 4
..................................................................................................................................................

    A.    The GSEs' Single Family Mortgage Guarantee Business ..................................... 5

    B.    The Effects of the Subprime Market Collapse ..................................................... 6

    C.    Countrywide's Scheme to Defraud: the HSSL ..................................................... 7

        1.    The HSSL Eliminated Underwriters and Compliance Specialists ............. 8

        2.    The HSSL Stripped Loan Specialists of Instructional "Job Aids" ............. 9

        3.    The HSSL Paid Loan Specialists and Funders Based on Volume
             Alone ........................................................................................................ 10

        4.    Despite Warnings, Mairone Expanded the HSSL to Dirty Prime
             Loans ........................................................................................................ 10

        5.    Despite Deteriorating Loan Quality, Mairone Concealed Defect Rates
             and Continued the HSSL .......................................................................... 11

        6.    Defendants' Fraud Affected Federally Insured Financial Institutions ...... 13

ARGUMENT ...................................................................................................................... 15

    I.    THE AMENDED COMPLAINT STATES CLAIMS UNDER FIRREA .................. 15

    A.    The Legal Framework ........................................................................................ 16

    B.    The Government Adequately Alleges a Scheme to Defraud and Fraudulent
        Intent ................................................................................................................. 18

        1.    The Government Alleges That the HSSL Was a Scheme to Defraud ......... 18

        2.    The Government Alleges Fraudulent Intent as to All Defendants .............. 21

        3.    Defendants' Contractual Relationship with Fannie Mae and Freddie Mac
             Does Not Provide Immunity from Mail and Wire Fraud Claims ................. 25

        4.    The Bank Defendants' Remaining Arguments Against Scheme to
             Defraud Are Meritless ............................................................................... 28

C.    The Government Alleges that Defendants' Fraud Affected Federally Insured Financial Institutions ...........................................................................29

1.    Defendants Are Liable under FIRREA for Committing Fraud that Puts Countrywide Bank's and BANA's Federally-Insured Deposits at Risk ... 29

2.    The Government Alleges that Countrywide Bank and BANA Have Been Affected by Defendants' Fraud .......................................................35

3.    Defendants May Be Held Liable Under FIRREA for Fraud Affecting Federally Insured Investors in the GSEs ................................................38

II.    THE GOVERNMENT STATES A CLAIM UNDER THE FCA .........................................43

A.    The Amended Complaint Alleges a False Claim Post-FERA..............................43

B.    The Amended Complaint Alleges That the Government Funded a Portion of the Money Claimed .......................................................................47

CONCLUSION ...........................................................................................50

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*AUSA Life Insurance Co. v. Ernst & Young*,
    206 F.3d 202, 221 (2d Cir. 2000) ................................................................. 17

*Adelphia Recovery Trust v. Bank of America, N.A.*,
    624 F. Supp. 2d 292, 320 (S.D.N.Y. 2009) ................................................... 21

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*,
    98 F.3d 13, 20 (2d Cir. 1996) ........................................................... 26, 27, 28

*Chevron Corp. v. Donziger*,
    No. 11 Civ. 0691 (LAK), 2012 WL 3223671, at *1 (S.D.N.Y. May 24, 2012) .............. 37

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105, 115 (2001) ........................................................................ 39

*Desert Palace, Inc. v. Costa*,
    539 U.S. 90, 101 (2003) ......................................................................... 32

*Dexia SA/NV v. Bear, Stearns & Co.*,
    No. 12 Civ. 4761 (JSR), __ F. Supp. 2d __ 2013 WL 856499, at *4
    (S.D.N.Y. Feb. 27, 2013) ............................................................ 17, 19, 20, 23

*Dexia SA/NV v. Deutsche Bank AG*,
    No. 11 Civ. 5672 (JSR), 2013 WL 98063, at *6 (S.D.N.Y. Jan. 4, 2013) ....................... 46

*DynCorp v. GTE Corp.*,
    215 F. Supp. 2d 308, 324 (S.D.N.Y. 2002) ................................................... 27

*Garg v. Covanta Holding Corp.*,
    478 F. App'x 736, 741 (3d Cir. May 8, 2012) ............................................... 50

*Hardt v. Reliance Standard Life Insurance Co.*,
    130 S. Ct. 2149, 2156 (2010) ................................................................... 33

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258, 268 (1992) ........................................................................ 32

*Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer District*,
    949 F. Supp. 210, 212 (S.D.N.Y. 1996) ....................................................... 39

*ING Global v. United Parcel Serv. Oasis Comp Supply Corp.*,
    No. 11 Civ. 5697 (JSR), 2012 WL 28259, at *4 (S.D.N.Y. Jan. 4, 2012). ...................... 24

*Koch Industrial, Inc. v. Aktiengesellschaft*,
    727 F. Supp. 2d 199, 214 (S.D.N.Y. 2010) ....................................................... 26

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
    928 N.Y.S.2d 229, 234 (1st Dep't 2011) ......................................................... 28

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171, 183-84 (2d Cir. 2007)...........................................................26-27

*Novak v. Kasaks*,
    216 F.3d 300, 307, 314 (2d Cir. 2000) .................................................... 17, 18

*Reynolds v. Sci. Applications Int'l Corp.*,
    No. 07 Civ. 4618, 2008 WL 2566747 (GBD), at *5-6 (S.D.N.Y. June 26, 2008)........... 47

*Russell v. United States*,
    471 U.S. 858, 862 n.8 (1985) ....................................................................... 39

*Sampson v. Medisys Health Network Inc.*,
    No. 10 Civ. 1342, 2011 WL 579155, at *6 (E.D.N.Y. Feb. 8, 2011) .............................. 26

*United States ex rel. Feldman v. City of New York*,
    808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011)................................................... 44

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180, 189-90 (5th Cir. 2009) ..................................................*passim*

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537, 543-44 (1943) ....................................................................... 48

*United States ex rel. Nathan v. Takeda Pharm. N. America, Inc.*,
    707 F.3d 451, 460 (4th Cir. 2013)................................................................ 47

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
    736 F. Supp. 2d 804, 806 (S.D.N.Y. 2010) ..................................................... 48

*United States ex rel. Sterling v. Health Insurance Plan of Greater N.Y., Inc.*,
    No. 06 Civ. 1141, 2008 WL 4449448, at *6 (S.D.N.Y. Sept. 30, 2008) ...................... 49

*United States v. $1,399,313.74 in U.S. Currency*,
    591 F. Supp. 2d 365, 371 (S.D.N.Y. 2008)..................................................... 49

*United States v. Agne,*
    214 F.3d 47, 52 (1st Cir. 2000) ............................................................................ 40, 41

*United States v. Aleynikov,*
    676 F.3d 71, 79, 81-82 (2d Cir. 2012)................................................................... 42

*United States v. Autuori,*
    212 F.3d 105, 115, 116 (2d Cir. 2000) ...........................................................*passim*

*United States v. Banco Cafetero Panama,*
    797 F.2d 1154, 1159-60 (2d Cir. 1986)................................................................. 49

*United States v. Bifulco,*
    127 F. App'x 548, 550 (2d Cir.2005)..................................................................... 24

*United States v. Bornstein,*
    423 U.S. 303, 307 (1976) ..................................................................................... 46

*United States v. Bouyea,*
    152 F.3d 192, 195 (2d Cir. 1998) ..................................................................*passim*

*United States v. Chacko,*
    169 F.3d 140, 148-49 (2d Cir. 1999)..................................................... 17, 21, 22

*United States v. Collins,*
    361 F.3d 343, 348 (7th Cir. 2004) ........................................................................ 33

*United States v. D'Amato,*
    39 F.3d 1249, 1257, 1261 n.8 (2d Cir. 1994)................................................. 17, 26

*United States v. Daugerdas,*
    No. 09 Cr. 581 (WHP), 2011 WL 6020113, at *1-2 (S.D.N.Y. Apr. 5, 2011) ................ 30

*United States v. Eghbal,*
    548 F.3d 1281, 1283-84 (9th Cir. 2008) .............................................................. 46

*United States v. Frank,*
    156 F.3d 332, 333-36 (2d Cir. 1998)............................................................ *passim*

*United States v. Ghavami,*
    No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *5-10 (S.D.N.Y. July 13, 2012) ...*passim*

*United States v. Grass,*
  274 F. Supp. 2d 648, 654 (M.D. Pa. 2003) ................................................... 33

*United States v. Guadagna,*
  183 F.3d 122, 129-30 (2d Cir. 1999) .......................................................... 17

*United States v. Hoffecker,*
  530 F.3d 137, 198, 200 (3d Cir. 2008) ....................................................... 33

*United States v. Honeywell, Int'l,*
  798 F. Supp. 2d 12, 23 (D.D.C. 2011) ........................................................ 46

*United States v. Huron Consulting Grp.,*
  843 F. Supp. 2d 464, 469 (S.D.N.Y. 2012) ................................................. 44

*United States v. Huron Consulting Grp.,*
  No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) ........ 44, 45, 46

*United States v. Martinez,*
  No. 98-1438, 1999 WL 38842, at *2 (2d Cir. Jan. 27, 1999) ........................... 31

*United States v. Mullins,*
  613 F.3d 1273, 1278-79 (10th Cir. 2010) ............................................... *passim*

*United States v. Ohle,*
  678 F. Supp. 2d 215, 228-29 (S.D.N.Y. 2010) ......................................... *passim*

*United States v. Pelullo,*
  964 F.2d 193, 216 (3d Cir. 1992) ...................................................... 38, 39, 40

*United States v. Ragosta,*
  970 F.2d 1085, 1090 (2d Cir. 1992) ........................................................... 16

*United States v. Rubin/Chambers, Dunhill Insurance Services,*
  831 F. Supp. 2d 779, 781-85 (S.D.N.Y. 2011) ........................................ *passim*

*United States v. Schwartz,*
  924 F.2d 410, 420-21 (2d Cir. 1991) .......................................................... 26

*United States v. Serpico,*
  320 F.3d 691, 693-95 (7th Cir. 2003) .................................................. *passim*

*United States v. Somerstein,*
  971 F. Supp. 736, 741 (E.D.N.Y. 1997) ....................................................... 17

*United States v. Tomicic,*
No. 3:09 Cr. 210 (WWE), 2012 WL 2116143, at *2 (D. Conn. June 2, 2012)................ 24

*United States v. Trapilo,*
130 F.3d 547, 550 (2d Cir. 1997) .................................................................................. 16

*United States v. Ubakanma,*
215 F.3d 421, 426 (4th Cir. 2000) ........................................................................... 40, 41

## STATUTES

12 U.S.C. § 1818(i)(2) .................................................................................................... 35

12 U.S.C. § 1833a .................................................................................................. *passim*

12 U.S.C. § 4617 ...................................................................................................... 14, 15

18 U.S.C. § 1341 ...................................................................................................... 15, 30

18 U.S.C. § 1343 ...................................................................................................... 15, 30

18 U.S.C. § 1344 ............................................................................................................ 36

18 U.S.C. § 3293(2) ............................................................................................... *passim*

18 U.S.C. § 844(I) .......................................................................................................... 39

18 U.S.C. § 981(a)(1)(c) ................................................................................................. 41

18 U.S.C. § 984 .............................................................................................................. 49

31 U.S.C. § 3729 ................................................................................................... *passim*

Pub. L. No. 101-73, § 951, 103 Stat. at 498 .................................................................. 33

## RULES

Fed. R. Civ. P. 9(b)......................................................................................................... 17

## LEGISLATIVE HISTORY

135 Cong. Rec. S4003 .................................................................................................... 34

H. R. Rep. 101-54(I), at 311, 1989 U.S.C.C.A.N. at 107.......................................*passim*

H.R. Rep. No. 101-54(I) at 97, 1989 U.S.C.C.A.N. 86, 98 (1989)................................. 34

H.R. Rep. No. 101-54(I), at 299, 1989 U.S.C.C.A.N. at 95........................................................34

H.R. Rep. No. 101-54(I), at 300, 1989 U.S.C.C.A.N. at 96........................................................34

S. Rep. No. 111-10, 111th Cong. 1st Sess. 10, at 430, 433 (March 23, 2009)............................48

Plaintiff the United States of America (the "Government") respectfully submits this memorandum of law in opposition to the motion filed by Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Bank of America Corporation and Bank of America, N.A.; the supplemental memorandum in support of the motion filed by Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB ("Countrywide Bank") (collectively, "Countrywide"), Bank of America Corporation and Bank of America, N.A. ("BANA") (collectively, "Bank of America," and together with Countrywide, the "Bank Defendants"); and the motion filed by Defendant Rebecca Mairone to dismiss the Government's amended complaint.[1]

## PRELIMINARY STATEMENT

To boost revenue in the tightening credit market in mid-2007, Defendants perpetrated a scheme to defraud by originating loans through a program they dubbed the "Hustle" (or "HSSL"), which had a simple purpose:  to strip away nearly every checkpoint on loan quality and sell the resulting junk loans as quality investments.  The HSSL, which stood for "high speed swim lane," reduced the time for originating loans from 45-60 days to 10-15 days by eliminating underwriters and replacing them with unqualified and inexperienced loan processors, while at the same time removing the tools to assist the processors in their new underwriting tasks.  The HSSL also revamped the compensation of loan processors, adding a bonus for "turn time" or speed of processing, removing any quality-based component to compensation, and imposing daily and monthly funding quotas, leaving no doubt that the HSSL aimed for volume alone.  When Defendants were confronted with quality reports demonstrating defect rates in HSSL loans that were ten times the industry standard, Defendants curtailed the distribution of the reports and artificially drove down and thus concealed the defect rates by offering a bonus to quality control

---

[1] The briefs in support of these motions to dismiss shall be referred to as "Br.," "Supp. Br.," and "Mairone Br." respectively.

employees for reversing defect findings on those loans.  Defendants sold the HSSL loans to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "GSEs") with the representation that the loans were quality investments, although Defendants knew they were nothing of the sort.  With defect rates as high as 40%, the loans produced by the HSSL were known to be lemons.  And when the loans defaulted, the losses affected not only the GSEs but also the federally-insured financial institutions that entrusted more than 50% of their investment capital to these supposedly safe entities.

In their motions to dismiss, Defendants nevertheless argue that the Government's amended complaint rests on a "fundamental misunderstanding" of the HSSL and that its allegations amount to mere contract breaches to be dealt with through a business-as-usual repurchase process.  But neither the contractual relationship with the GSEs nor any of the other technical defenses advanced by Defendants provides immunity from this enforcement action under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").  Defendants' private contract with a third party has no bearing on whether the Government can civilly prosecute them under FIRREA for violating the mail and wire fraud statutes.  The amended complaint alleges each of the statutory elements for mail and wire fraud and the existence of any contract addressing the same conduct is irrelevant to the viability of the Government's claim.

Defendants' erroneous contractual argument takes them further off course as they contend that the Government's allegations of a scheme to defraud are too sparse to comply with Federal Rule of Civil Procedure 9(b), while ignoring all but a handful of allegations they declare "independent of" their contractual relationship with the GSEs.  There is no legal support for Defendants' view that detailed allegations of fraud and misconduct may be disregarded for Rule 9(b) purposes simply because they could be related to a contract.  Moreover, Defendants do not even attempt to dispute that the Government's allegations, taken in their entirety, are more than

2

adequate to establish a scheme to defraud with the requisite particularity, nor could they plausibly do so.  The Government has also sufficiently pled fraudulent intent by all Defendants based on its allegations that, among other things, the necessary result of the scheme was an injury to the GSEs.

Defendants also mistakenly contend that even if they did commit mail and wire fraud, they can nevertheless escape liability under FIRREA.  Ignoring the plain text, case law and legislative history of FIRREA, Defendants wrongly assume that federally insured financial institutions cannot be held liable under FIRREA when they commit fraud that puts their own federally insured deposits at risk.  FIRREA reaches any perpetrator of mail or wire fraud affecting a federally insured financial institution and was enacted to enhance the Government's ability to prosecute fraud and other misconduct that jeopardizes federally insured deposits, including conduct by the insured institutions themselves.  Defendants additionally argue that they cannot be liable under FIRREA because the federally insured banks that failed as a result of the GSEs' collapse were not "affected" by their fraud, but cite no rule barring liability where the insured bank is not the direct target of fraud.  Instead, Defendants make hyperbolic suggestions that applying FIRREA to the facts presented here renders the statute "limitless" and "absurd."  To the contrary, applying FIRREA is both permissible and warranted where a fraud targets the two entities that ensured the liquidity and stability of the secondary mortgage market, entities whose collapse triggered billions of dollars in federal payouts to them and to those federally insured banks who failed in the wake of their collapse.

Finally, the Bank Defendants again ignore the detailed allegations concerning the HSSL in arguing that the Government fails to state a claim under the False Claims Act, 31 U.S.C. § 3729 ("FCA").  The amended complaint not only identifies over two dozen examples of HSSL loans funded in 2009 that were sold to the GSEs and that later defaulted, it also describes in detail the HSSL process that resulted in loans sold with knowing or reckless misrepresentations to the GSEs. The HSSL was not merely "a label," as the Bank Defendants assert, but rather Defendants' own

name for their scheme to defraud, through which they sold the GSEs loans with knowing or reckless misrepresentations as to their quality.  And while Defendants purport to create a new FCA pleading standard, suggesting that the Government must identify actual fraud in each loan sold to the GSEs and trace dollar-for-dollar the federal funds from the Government to individual HSSL loan purchases, no such requirements exist.  The Government has sufficiently pled its claims.  Accordingly, the Court should deny Defendants' motions to dismiss.

## FACTUAL BACKGROUND

By the summer of 2007, the subprime market had collapsed and the mortgage market as a whole was faltering.  Amended Complaint ("Am. Compl.") ¶¶ 24, 158.  Tasked with ensuring the stability and liquidity of the secondary market, Fannie Mae and Freddie Mac stood as the only significant purchasers remaining in that market.  *Id.* ¶¶ 21, 59.  As cash-starved lenders such as Countrywide rushed to sell more loans, the GSEs were tightening their purchasing requirements and demanding more rigorous underwriting of products being sold to them.  *Id.* ¶ 59.  Countrywide represented to the public and to the GSEs that it heeded the new message of the secondary market and was tightening its underwriting guidelines as well.  *Id.*  It also represented to the GSEs that every loan sold was an investment-quality loan free from material defects.  *Id.* ¶¶ 39-43.  In fact, however, Countrywide's Full Spectrum Lending division ("FSL") removed nearly every safeguard on loan quality origination in an effort to process loans as quickly as possible for sale to the GSEs.  *Id.* ¶¶ 68-70.  Defendants knew that the resulting loans were poor investments, and even after Countrywide's own quality control reports demonstrated staggering defect rates in the loans, Defendants stayed the course, refusing to shut down the HSSL and reintroduce safeguards on quality.  *Id.* ¶¶ 100-109.  To make matters worse, when the loans predictably defaulted and the GSEs discovered the material defects, Countrywide (and later, Bank of America) refused to repurchase many of the loans at issue until after the Government filed this action.  *Id.* ¶¶ 146-150.

**A.  The GSEs' Single Family Mortgage Guarantee Business**

As alleged in the amended complaint, the GSEs purchase single-family mortgages from lenders based on a "rep and warrant model," relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.  *Id.* ¶ 36.  The rep and warrant model operates on the assumption that the sellers of the loans—usually also the originators and underwriters of the loans—possess superior knowledge about the quality of those loans.  *Id.* ¶ 38.  The GSEs delegate the underwriting of the loans they purchase to the lenders and underwrite the loans themselves, if at all, only long after purchase and in the event of a default, to determine whether the loan contained a material defect entitling the GSE to a remedy.  *Id.*  A lender who sells to either GSE must therefore represent that the loans sold comply with the applicable requirements in the GSE's selling guide and any applicable contracts that (among other things) both incorporate the selling guide requirements and specify terms under which the lender is granted a variance or waiver from particular selling guide requirements. *Id.*  ¶¶ 39-43.

Although the terms under which a particular product is sold might vary from year to year, certain core requirements concerning loan quality remain constant.  Lenders represent that they employ prudent underwriting and quality assurance checks as required by the guidelines, and will self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective.  *Id.*  More specifically, Countrywide (and later Bank of America) represented to Fannie Mae at the time of sale that each loan conformed "to all the applicable requirements in [the] Guides and this [Master] Contract" and that the lender knew "of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that [could] reasonably be expected to: [i] cause private institutional investors to regard the mortgage as an unacceptable

investment; [ii] cause the mortgage to become delinquent; or [iii] adversely affect the mortgage's value or marketability." *Id.* ¶ 39. In representing to Fannie Mae that each loan sold was an acceptable investment, Countrywide (and later Bank of America) further warranted that: (i) all required loan data was true, correct, and complete; (ii) automated underwriting conditions were met for loans processed through an automated underwriting system; and (iii) no fraud or material misrepresentation had been committed by any party, including the borrower. *Id.* ¶ 41. Countrywide (and later Bank of America) made substantially similar representations to Freddie Mac. *Id.* ¶¶ 43-44.

## B.     The Effects of the Subprime Market Collapse

When the subprime market collapsed in early 2007, Countrywide, along with other lenders, sought to originate loans for sale to the GSEs, effectively the only purchasers remaining in the secondary market. *Id.* ¶ 58. Countrywide stated in its 2007 Form 10-K that in response to changes in the secondary market, it was tightening its underwriting and loan program guidelines and that the vast majority of loans it originated were eligible for sale to the GSEs. *Id.* ¶¶ 58-59. In addition to its public statements, employees in Countrywide's secondary marketing unit represented to individuals in the credit risk management groups at both Fannie Mae and Freddie Mac in the fourth quarter of 2007 that Countrywide had implemented tighter underwriting guidelines. *Id.* ¶ 59. During this period FSL transitioned from a subprime origination division to a prime lending division and by early 2008 sold more than 90% of its loans to the GSEs. *Id.* ¶ 60.

At the same time, the GSEs began to observe escalating default rates in their loan portfolio and therefore tightened their purchase requirements, phased out certain riskier loan purchases, and increased their monitoring of loan quality. *Id.* ¶¶ 61-62. Of particular concern to Fannie Mae was its relationship with Countrywide, then in financial distress. *Id.* ¶ 63. As the largest seller of single-family loans to Fannie Mae in 2007, Countrywide accounted for approximately 28% of Fannie

Mae's single-family loan purchases, and, at 21%, the delinquency rate on Countrywide's loans was two to three times the rate of other major sellers.  *Id.*  Recognizing that it could be exposed to significant losses if Countrywide failed to repurchase defective loans, Fannie Mae listed its relationship with Countrywide as a material risk to its financial condition in its 2007 Form 10-K and directed its employees to "reduce[] the existing level of risk by pulling back on products and variances."  *Id.* ¶ 64.  Freddie Mac took similar measures during this period, re-pricing and ultimately eliminating approximately half of Countrywide's riskier loan products in 2007 and 2008. *Id*.

### C.    Countrywide's Scheme to Defraud: the HSSL

Although Countrywide acknowledged the tightening underwriting requirements imposed by the increasingly conservative secondary market, it simultaneously sought to overcome its financial distress by quickly boosting loan sales volume and revenue.  *Id.* ¶ 66.  To achieve this aim, in August of 2007, FSL, under the direction of Mairone, implemented an origination model it dubbed the "HSSL," designed to reduce "turn time," *i.e.*, the amount of time spent underwriting and processing loans.  *Id.*  The extent to which FSL sought to improve the speed at which it processed loans was drastic.  Through its HSSL processing centers (called "fulfillment centers") in Chandler, Arizona; Richardson, Texas; Rosemead, California; Hatboro, Pennsylvania; and Plano, Texas, FSL reduced the number of days spent processing loans from 45-60 days to 10-15 days, with some loans in Richardson, Texas being processed in a single day.  *Id.* ¶ 69.  Operating under the slogan, "Loans Move Forward, Never Backward," the HSSL accomplished its turn time goals by both consolidating the roles of those involved in loan processing and simultaneously removing most of the so-called "toll gates" previously set up to ensure loan quality.  *Id.*

### 1.   The HSSL Eliminated Underwriters and Compliance Specialists

As described in the amended complaint, in early 2007, prior to the HSSL, FSL's loan origination process required the involvement of four individuals:  a loan specialist (also called a loan processor), an underwriter, a loan funder, and a compliance specialist.  *Id.* ¶ 49.  Each of these individuals received a bonus based on both the quality and the volume of loans processed.  *Id.* ¶ 57. Within FSL, a loan specialist was primarily a data entry clerk who entered borrower information into Countrywide's automated mortgage underwriting system (called "CLUES").  *Id.* ¶ 50.  Based on the data entered, CLUES evaluated a loan's default risk and whether a loan could be approved in compliance with Countrywide's guidelines.  *Id*.  CLUES then generated a report for a loan indicating either that the loan had an acceptable level of risk ("Accept") or that the loan should be referred for manual underwriting ("Refer"), and specified any additional conditions that had to be satisfied before FSL could fund the loan.  *Id.* ¶¶ 51-52.

After obtaining a CLUES result, the loan processor forwarded the loan file to an underwriter for review, either for a full manual underwriting (in the event of a CLUES Refer), or for a review of the CLUES conditions (in the event of a CLUES Accept).  *Id.* ¶ 52.  The underwriter then determined the likelihood that the borrower could repay the mortgage loan, by evaluating the loan documentation, comparing the documentation with data entered into CLUES, and evaluating the appraisal.  Before the loan was "cleared to close," the underwriter analyzed relevant GSE requirements and reviewed and cleared any conditions listed on a CLUES report.  *Id.* ¶ 53.  The loan funder then prepared the loan package for closing by preparing necessary paperwork and wiring funds to title companies or closing agents.  *Id.* ¶ 55.  Finally, the compliance specialist conducted a final review of the loan file to, among other things, ensure that conditions imposed by CLUES were properly satisfied and that the loan complied with relevant state lending requirements. *Id.* ¶ 56.

The HSSL kept only the two more clerical roles in the process: the loan specialist and the funder, eliminating both the underwriter and the compliance specialist.  *Id.* ¶¶ 71, 79.  In eliminating underwriters from the loan origination process, the HSSL permitted a loan processor who entered data and received an "Accept" rating to act as the "owner" of the loan from application until "cleared to close."  *Id.* ¶ 70.  The loan processor was thus never required to hand off the loan to any underwriter before the loan closed and funded.  *Id.*  Consequently, no one independent of the loan processor verified that the data entered into CLUES matched the underlying loan documentation.  Loan processors were granted ownership of even such high risk loans as stated income loans, *i.e.*, those loans that require no documentation of a borrower's income.  *Id.* ¶ 71.  During its pilot test of the HSSL in 2006, FSL regarded stated income loans as too risky to be included given that seasoned judgment is required to assess whether the borrower's stated income is reasonable in light of his or her employment.  *Id.*  Because FSL determined that these loans were the "fastest thru the swim lane," however, it added them to the HSSL in August of 2007.  *Id.* ¶ 73.

### 2.   The HSSL Stripped Loan Specialists of Instructional "Job Aids"

Even though loan specialists were granted greatly expanded underwriting authority, they were given neither the tools nor the supervision to exercise their new authority competently.  Prior to the HSSL, FSL required its underwriters to complete certain worksheets—referred to as "job aids"—that served as checklists or how-to forms on performing critical underwriting tasks, such as how to assess the reasonableness of stated income and how to review an appraisal.  *Id.* ¶ 77.  Mairone, however, eliminated these tools in 2007, having decided that they were nothing more than unnecessary toll gates that slowed the swim lane down.  *Id.* ¶ 78.  Further, loan specialists reported not to underwriting managers, but to operations managers, and ultimately to Mairone herself.  *Id.* ¶ 76.

### 3.   The HSSL Paid Loan Specialists and Funders Based on Volume Alone

To further incentivize loan specialists and funders to reduce the time spent processing the loans, FSL changed their compensation structure in two ways.  First, in August of 2007, FSL implemented a "turn time" bonus for loan specialists and funders for steadily reducing the turn time on their loans.  *Id.* ¶ 80.  It also imposed quotas on loan specialists to fund 30 loans per month and a minimum of one loan every day.  *Id.*  In a HSSL center in Richardson, Texas, loan specialists were even instructed that they were not permitted to leave at night until they cleared at least one loan for closing.  *Id.*  Second, in response to loan specialists' expressed concerns that their new authority would lead to higher defect rates and accordingly lower compensation, FSL simply eliminated any quality component to loan specialists' and funders' compensation.  *Id.* ¶ 81.  The elements of the HSSL were thus designed to push volume at the expense of quality.

### 4.   Despite Warnings, Mairone Expanded the HSSL to Dirty Prime Loans

To make matters worse, although FSL initially promoted the HSSL as a model only for low risk, "prime" loans, Mairone was soon pitching a "Dirty Prime High-Speed Swim Lane" for loans that fell between prime and subprime thresholds.  *Id.* ¶ 74.  In September of 2007, Mairone emailed, "[w]e need to start to move toward all loans into [the HSSL] process."  *Id.* ¶ 75.  As a result, the same month, even Expanded Approval loan products, Fannie Mae's version of a subprime product, were included in the HSSL.  *Id.*  As one senior vice president explained in an email, "there will be no 'exits' per se from HSSL as a swimlane . . . the original plan was to create separate lanes/teams for different 'tiers' of risk (*i.e.*, Prime "dirty" Prime, non-Prime).  Now we need to do the same thing, but within a single lane."  The senior vice president added that "[a]s of Sept. 12th the HSSL teams will get all loans, regardless of criteria!  So nothing will be excluded, including EA

[Expanded Approval]." *Id*.  When the "no exclusions" rule was confirmed, another Senior Vice President responded to a colleague in risk management, "YIKES . . . major risk issues." *Id*.

Other senior managers within FSL immediately recognized that the HSSL would lead to rampant defects.  For example, in August of 2007, a first vice president of FSL emailed colleagues outlining the reasons for his concerns about "some parts of the HSSL process . . . We are hearing the clear directive that we should improve manufacturing quality, not that we are over-manufacturing. This particular statement is in direct conflict with the current HSSL design." *Id.* ¶ 84.  Two months later, a senior vice president in risk management cautioned that "HSSL must produce compliant and quality/saleable loans to FNMA as there is no tolerance for errors" and "with the tightening of guidelines/exceptions, buy back pressure will come from poor/sloppy manufacturing." *Id.* ¶ 85.

Initial quality reports on the HSSL also foretold a systemic problem with FSL's loan quality. On October 8, 2007, FSL's quality assurance and control group presented its initial findings to the HSSL design team on a sample of loans funded in a three-week period, between August 13, 2007, and September 7, 2007. *Id.* ¶ 86.  The quality review sought to identify defects in loans at the pre-funding stage, specifically in loans that had been "cleared-to-close" by loan processors. *Id*.  Of the 42 loans in the sample, 41% were found to have defects creating a high risk, *i.e.*, one that affects the borrower's ability to repay the loan. *Id*.  However, the results of the pre-funding quality reports were ignored and resulted in no changes to the HSSL design. *Id.* ¶ 87.  Further, Mairone instructed that such pre-funding checks continue only to the extent that they did not "slow[] the swim lane down." *Id*.

### 5.  Despite Deteriorating Loan Quality, Mairone Concealed Defect Rates and Continued the HSSL

Dire predictions about defective HSSL loans were soon proved correct.  In January of 2008, when the HSSL represented a significant percentage of FSL's total loan volume, pre-funding reports revealed material defect rates of 57% overall and nearly 70% for stated income loans. *Id.* ¶ 88.  Put

11

simply, FSL's own reports showed that more than half of the loans that were "cleared to close" were ineligible for sale to any investor. *Id*. The most frequently-cited defects appeared where job aids had been removed, including in the areas of stated income reasonableness and appraisal acceptability. *Id*. Post-closing quality control reports distributed to Mairone and other FSL executives confirmed that the defects identified in pre-funding reports were not being cured prior to closing and sale to the GSEs. *Id*. ¶ 101. By the first quarter of 2008, FSL's material defect rate on closed loans climbed to nearly 40%, far surpassing the industry standard defect rate of 4-5%. *Id*. And in March of 2008, a vice president in risk management lamented to one of his colleagues that they had "the crystal ball" in August of 2007 and that their "risk assessments at that time are holding true as current quality undermines FSL." *Id*. ¶ 102.

Rather than address the spiking defect rates and the concerns they caused, Mairone pressured employees to conceal their reports and stay the course. After reviewing the pre-funding reports from January of 2008, Mairone instructed an employee who prepared the reports not to circulate them outside of FSL. *Id*. A few months later, underwriting managers in Richardson, Texas asked to meet with Mairone to express their concerns with deteriorating loan quality as a result of the HSSL. *Id*. ¶ 89. Mairone responded angrily at that meeting that the managers needed to "get with the program" and that FSL needed "to keep funding these loans to keep the lights on." *Id*. Mairone responded just as negatively to a draft slide presentation to Countrywide executives prepared by relator Edward O'Donnell (then an executive vice president) that revealed the decline in FSL's loan quality. After reviewing the presentation, Mairone instructed O'Donnell to remove critical slides. *Id*. ¶ 111. When O'Donnell refused, Mairone said that if he was not willing to follow her instructions and remove them, she would find someone who was, and thereafter excluded O'Donnell from management meetings on loan quality. *Id*.

Notwithstanding the evidence that thousands of defective loans were being sold to the GSEs as quality investments, the only evident change FSL implemented in early 2008 was to offer another perverse bonus to employees. FSL offered its new bonus, the "Sprint Incentive," to its quality control employees for successfully rebutting material defect findings on loans funded in the first quarter of 2008. *Id.* ¶ 105. However, employees could "rebut" defect findings made by the corporate quality control department even without taking corrective action or showing that the finding was made in error. *Id.* ¶ 107. For example, FSL employees could "rebut" defect findings of "unreasonable stated income" simply by asserting that the stated income *was* reasonable. *Id.* In such cases, unless the corporate quality control employee could prove the stated income was false, the defect finding was overturned. *Id.* Following the Sprint Incentive, FSL quality control reports show a purported reduction in the defect rate for February 2008 from approximately 37% to 13%. *Id.* ¶ 109.

As a result of the HSSL, FSL witnessed rising rates not only of defects but also of incidents of possible fraud. *Id.* ¶ 92. In particular, the HSSL design incentivized loan specialists to manipulate data in the CLUES system until they received an "Accept" and the loan could enter the high speed swim lane. *Id.* No underwriter reviewed the loan to compare the CLUES data with the underlying loan documentation to detect fraudulent manipulation. *Id.* Even in post-closing audits where a quality control employee detected fraudulent manipulation of data, such a finding was typically recorded as just another material defect and therefore had no effect on the loan processor's compensation. *Id.* As a result, during the HSSL the number of CLUES submissions per loan climbed from 8—already a suspiciously high number—in May 2007, to 14 in November 2008, after the merger between Countrywide and Bank of America. *Id.* ¶ 94.

13

### 6.  Defendants' Fraud Affected Federally Insured Financial Institutions

Defendants' sale of HSSL loans with knowing misrepresentations as to their quality affected not only the GSEs, but certain federally insured financial institutions as well.  *Id.* ¶ 112.  The design of the HSSL, the incentives created for loan specialists to process loans with a goal of speed above all else, and the concerns expressed about the HSSL and its resulting defect rates left no doubt that thousands of loans with poor credit quality were being sold as investment-quality loans to the GSEs. Further, Countrywide knew that the GSEs would not conduct any meaningful review of the loan files for many months, and only after the loans defaulted.  *Id.* ¶ 103.  And even after the HSSL loans defaulted and the GSEs discovered the defects that made the loans ineligible for sale, Defendants refused to repurchase them, leaving the GSEs (and their investors) to absorb the losses.  *Id.* ¶ 146.

Prior to late 2007, GSE preferred stock was assumed to be such a safe investment that federal regulators permitted banks to invest up to 100 percent of their investment capital in it. *Id.* ¶ 24.  Many community banks in fact invested substantial percentages, including certain subsidiaries of First Bank of Oak Park Corporation ("FBOP"), a privately-held bank holding company.  *Id.* ¶ 153.  As of September 30, 2007, the largest of the FBOP banks, California National Bank, held 64 percent of its core capital (approximately $434 million) in GSE preferred securities, while San Diego National Bank held 54 percent of its core capital (approximately $171 million) and Park National Bank held 38 percent of its total core capital (approximately $112 million) in GSE preferred securities.  *Id.* ¶ 154.  Another community bank, National Bank of Commerce, held 74 percent of its total investment capital (approximately $98 million) in GSE preferred securities. *Id.* ¶ 157.

In 2008 the widespread assumption about the safety of GSE investments was proved wrong. On July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), Congress created the Federal

Housing Finance Agency ("FHFA") to oversee Fannie Mae and Freddie Mac due to ever-increasing losses they suffered as mortgage default and delinquency rates continued to rise. *Id.* ¶¶ 25-26. On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. *Id.* ¶ 26. Simultaneously, the United States Department of Treasury ("Treasury") exercised its authority under HERA to purchase preferred stock in the GSEs, and since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs. *Id.* ¶¶ 27-29. As of December 31, 2012, Treasury had provided more than $187 billion in support to the GSEs, funds that were used both to purchase single-family mortgages and to cover losses from single-family mortgages previously purchased and guaranteed by the GSEs. *Id.* ¶ 29.

As a result of the insolvency of the GSEs and Treasury's purchase of GSE preferred stock, the value of the GSEs' preferred stock was eliminated and a number of federally insured financial institutions suffered material losses and ultimately failed, including California National Bank, San Diego National Bank, Park National Bank, and National Bank of Commerce. *Id.* ¶¶ 155-158. The Federal Deposit Insurance Corporation ("FDIC") stepped in as receiver for each of these failed banks and the Deposit Insurance Fund incurred billions of dollars in losses. *Id.* ¶¶ 156, 158. Additionally, BANA and Countrywide Bank, themselves federally-insured financial institutions, were affected by Defendants' fraud by virtue of the significant liabilities they faced with respect to the GSEs for, among other things, claims for repurchases of defective loans and for reimbursement of losses incurred on defaulted defective loans. *Id.* ¶¶ 159. To date, BANA and/or Countrywide Bank has directly or indirectly paid billions to settle repurchase demands from the GSEs on defective loans, including HSSL loans. *Id.*

**ARGUMENT**

## I.   THE AMENDED COMPLAINT STATES CLAIMS UNDER FIRREA

The amended complaint states claims under FIRREA, which levies civil penalties for violations of 18 U.S.C. § 1341 and § 1343—prohibiting, respectively, mail fraud and wire fraud, where the misconduct "affect[s] a federally insured financial institution."  12 U.S.C. § 1833a(c)(2).  In arguing that the Government fails to allege claims for mail and wire fraud, Defendants seek to exclude most of the pertinent allegations from the Court's consideration by suggesting that they assert nothing more than breaches of Defendants' contractual obligations to the GSEs and contending that the allegations "independent of" those contractual obligations are too meager to assert a fraud claim that comports with Rule 9(b).  In arguing against the "affecting" element of the Government's mail and wire fraud claims, Defendants maintain that: (1) a financial institution may not be prosecuted under Section 1833a(c)(2) for conduct affecting its own federally insured deposits; and (2) a financial institution may not be prosecuted under Section 1833a(c)(2) for conduct affecting federally insured financial institutions by virtue of their investments in the direct target of a fraud.  These arguments fail for the reasons set forth below.

### A.  The Legal Framework

A claim for mail or wire fraud requires allegations of a (i) a scheme to defraud; (ii) to obtain money or property; (iii) furthered by the use of interstate mail or wires. *See United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).  Asserting a scheme to defraud requires alleging (i) the existence of a scheme; (ii) the requisite scienter or fraudulent intent; and (iii) materiality of the misrepresentations and/or omissions.[2]  *Id*.  As the Second Circuit has explained, the term "scheme to defraud" is measured by a "nontechnical standard. It is a reflection of moral uprightness, of

---

[2] None of the Defendants has challenged the materiality of the alleged misrepresentations, which the Government has alleged at ¶¶ 36-38, 45, 117, 121, 126, 131, 136, 140, 203, and 212 of the amended complaint.

fundamental honesty, fair play and right dealing in the general [and] business life of members of society." *United States v. Trapilo*, 130 F.3d 547, 550 (2d Cir. 1997) (internal quotation marks omitted); *see also United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992) (a scheme to defraud is "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community" and involves "the deprivation of something of value by trick, deceit, chicane, or overreaching") (internal quotation marks and citations omitted).

Pleading the requisite fraudulent intent in many cases "poses no additional obstacle for the government" because intent may be presumed from the injurious nature of a scheme itself. *United States v. Somerstein*, 971 F. Supp. 736, 741 (E.D.N.Y. 1997); *see also United States v. Chacko*, 169 F.3d 140, 148-49 (2d Cir. 1999) (where the complaint alleges that the "'necessary result' of the scheme is to injure others," the element of fraudulent intent may be presumed) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).   In particular, such a presumption of fraudulent intent "is appropriate in circumstances . . . where a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000).   Where the requisite intent cannot be inferred from the scheme itself, it may still be shown by pleading facts that constitute circumstantial evidence of fraudulent intent, including "that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129-30 (2d Cir. 1999).

Finally, Federal Rule of Civil Procedure 9(b) requires that the "circumstances constituting fraud" be "state[d] with particularity," although fraudulent intent "may be alleged generally."  Fed. R. Civ. P. 9(b).   To plead the circumstances constituting fraud with sufficient particularity, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent." *Dexia SA/NV v. Bear, Stearns & Co.*, 12 Civ. 4761 (JSR), -- F. Supp. 2d --, 2013 WL 856499, at *4 (S.D.N.Y. Feb. 27, 2013).   A court's determination of whether a pleading satisfies 9(b)'s particularity requirements should be guided by the rule's primary purpose, which is "to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). To satisfy Rule 9(b) in pleading fraudulent intent, a plaintiff must simply allege facts that "give rise to a strong inference of fraudulent intent," which may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 307 (internal quotation marks and citations omitted).

### B. The Government Adequately Alleges a Scheme to Defraud and Fraudulent Intent

Defendants ignore most of the Government's fraud allegations based on their misguided argument, discussed *infra* at Part I.B.3, that such allegations concern contractual breaches and therefore cannot serve as the basis of a fraud claim.   Defendants then examine the few remaining fraud allegations that they deem to be independent of their contractual relationship with the GSEs and pronounce them inadequate to allege a scheme to defraud that complies with the requirements of Rule 9(b).   Defendants make no attempt to address the Government's allegations in their entirety, which more than sufficiently allege a scheme to defraud and intent as to all Defendants.

### 1. The Government Alleges That the HSSL Was a Scheme to Defraud

The amended complaint is replete with particular allegations of Defendants' scheme.   The amended complaint alleges that, in selling HSSL loans to the GSEs, Defendants knew they were selling defective loans and that the GSEs would discover the defects only long after Defendants had been paid for the loans, and only in the event that the loans defaulted and the GSEs reviewed them for potential repurchase. *Id.* ¶¶ 112-113.   Defendants perpetrated their scheme by purposefully

designing the HSSL to reduce the turn time on loans by two-thirds (or more) by removing underwriters and replacing them with loan specialists without meaningful supervision or instructional tools that could have mitigated an otherwise predictable deterioration in loan quality. Am. Compl. ¶¶ 66, 69-70, 78-79, 82.  Additionally, as alleged, the HSSL emphasized its push for volume over quality by implementing funding quotas and adding a turn-time bonus for loan specialists while simultaneously removing any negative impact on their compensation for poor loan quality.  *Id.* ¶¶ 80-81.  The scheme continued even after initial quality control reports on HSSL loans showed elevated defect rates and subsequent quality control reports showed staggeringly high defect rates.  *Id.* ¶¶ 86-88, 100-102.  In fact, Defendants' response to the increasingly negative information about the HSSL was to silence critics and conceal negative information concerning HSSL loan quality, including by introducing a bonus to artificially drive down and thus conceal the defect rates.  *Id.* ¶¶ 105-107.

Mairone, as Chief Operating Officer, was personally involved in the design of the HSSL, visited individual fulfillment centers to promote and implement the HSSL rollout, knew that the GSEs were the targeted purchasers, and made certain key decisions that she knew would lead (and did lead) to escalating defect rates, including the elimination of job aids and the expansion of the HSSL to essentially all loans.  Am. Compl. ¶¶ 68-69, 77-78, 224.  Mairone was also responsible for executing the HSSL, as the loan specialists ultimately reported up to her, and knew that the HSSL resulted in high defect rates, both from pre-funding quality reports and post-closing quality control reports showing that more than one-third of the loans sold to the GSEs were defective and ineligible for sale.  *Id.* ¶¶ 3, 69, 76. 84-88.  When presented with negative quality control reports, Mairone repeatedly sought to conceal the truth about how bad the loans were, first instructing an employee not to distribute pre-funding reports outside of FSL and later instructing O'Donnell to exclude slides reflecting the poor loan quality from a presentation to other executives.  *Id.* ¶¶ 100-101, 111.

Finally, when underwriting managers presented their concerns to Mairone (presumably because they believed she was responsible for the HSSL), she told them to "get with the program" and that the HSSL must continue in order to "keep the lights on."  *Id.* ¶ 89.

The Government's allegations thus set forth a scheme to defraud with the requisite particularity to give Defendants fair notice of the claims against them.  *See Dexia SA/NV*, 2013 WL 856499, at *4 (holding that Rule 9(b) was satisfied where plaintiffs "present[ed] a picture of defendants' unsound mortgage and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case" and alleged that those practices "materially increased the risk of poor performance of both the underlying loans and the securitizations themselves"); *Autuori*, 212 F.3d at 115 (affirming finding of sufficient evidence of scheme to defraud where defendant was "categorically advised" that private placement memorandum "contained materially misleading representations, yet . . . carried on marketing [the investments at issue] without necessary disclosure").  The Government's identification of specific representations (contained in the applicable guidelines and contracts) made to Fannie Mae and Freddie Mac at the time of each loan sale between 2006 and 2009 satisfy the time, place, speaker, and content requirements of Rule 9(b).  *See* Am. Compl. ¶¶ 39-44, 59-62; *Dexia SA/NV*, 2013 WL 856499, at *4 ("[R]eference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of the representation where, as here, defendants are . . . affiliates participating in the offer of securities.") (alterations in original).

Further, the Bank Defendants cannot dispute that they have notice of the representations at issue given that they attached one of the relevant master agreements with Fannie Mae to their original motion to dismiss and discussed the representations contained therein.  *See* Br. at 20, Ex. A. The amended complaint also identifies particular loans in 2007, 2008, and 2009 that resulted from the HSSL and were sold to the GSEs as investment quality loans.  *See* Am. Compl. ¶¶ 113-145; Ex.

A.   Finally, the Government has explained why Defendants' representations were fraudulent: because while Defendants represented compliance with applicable GSE requirements, and that they were delivering quality loans, they had in fact stripped away underwriting and other controls on quality, and knew from their own quality reports that they would be and were selling the GSEs thousands of defective loans.

Defendants do not contend that the amended complaint as a whole suffers from a lack of particularity; rather, they ignore most of the factual allegations supporting the Government's fraud claims as merely allegations of breaches of contract.  Br. at 17-28; Supp. Br. at 10-14; Mairone Br. at 9-10.  According to Defendants, the only allegations "extraneous to the contract" are "several vague allegations that Countrywide represented that it had tightened underwriting guidelines once the financial crisis began."  Supp. Br. at 12-13.  Defendants' Rule 9(b) argument is thus based on an analysis of essentially a single allegation in the Government's amended complaint and should be rejected for this reason alone.  *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 320 (S.D.N.Y. 2009) ("To determine whether the claim is pleaded with the necessary particularity this Court looks at the entirety of the Amended Complaint to determine whether there are specific enough allegations . . . .").

### 2.  The Government Alleges Fraudulent Intent as to All Defendants

The Government's allegations of the injurious nature of Defendants' scheme by themselves permit an inference of fraudulent intent.  *See Chacko*, 169 F.3d at 148-49 ("When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud.").  In *Chacko*, the Second Circuit affirmed a finding of sufficient evidence of fraudulent intent where the defendant obtained loans from a bank that he knew he was not likely to repay.  169 F.3d at 148.  Specifically, the Second Circuit found sufficient evidence of fraudulent intent based simply on the fact that the defendant "had nowhere near the assets and

21

inventory needed to back the funds he was obtaining from the Bank . . . [and failed to] present evidence at trial that he had an immediate plan to garner the inventory or cash equivalent to pay back the funds he borrowed." *Id.* at 149.  The court therefore concluded that it "would be clear to anyone in [defendant's] position that he was likely going to harm the Bank by being unable to repay what he had borrowed when such money became due . . . [G]iven the circumstances surrounding [defendant's] actions, intent to injure the Bank can be inferred." *Id.*

Likewise, the "necessary result" of the HSSL was that harm would befall the GSEs as a result of purchasing loans that Defendants knew were not likely to be repaid.  The Bank Defendants' intent can therefore be inferred based on the facts described *supra*, pp. 7-13, including that the Bank Defendants designed the HSSL to incentivize loan specialists to process loans as quickly as possible and without regard to quality, by removing tools, imposing funding quotas, and restructuring compensation to make clear that volume alone was the goal.  Moreover, Defendants knew from their own quality control reports that thousands of defective loans were sold to the GSEs as investment quality loans, did not report them to the GSEs, and even refused to repurchase many of them after the loans defaulted.  *See* Am. Compl. ¶¶ 90, 101, 146-159; *see also United States v. Frank*, 156 F.3d 332, 336 (2d Cir. 1998) (affirming conviction notwithstanding erroneous jury charge on intent because essence of scheme was to obtain money by inducing customers to pay for services that were not provided, and thus their intended gain to themselves was inextricably bound to a corresponding loss to their customers).

Even if Defendants' fraudulent intent could not be inferred from the nature of the scheme itself, the Government has alleged sufficient circumstantial evidence of fraudulent intent as to all Defendants.  That Defendants knew that the HSSL would lead to thousands of bad loans is evident from the fact that they initially restricted the HSSL to lower risk loans, particularly loans to prime borrowers and full documentation loans.  Am. Compl. ¶ 74.  Because Countrywide was cash-

starved and desperate to fund loans quickly, however, Defendants quickly abandoned restrictions on the HSSL notwithstanding warnings that such an expansion posed "major risk issues." *Id*. ¶¶ 73, 75, 83, 89.  Defendants therefore knew that the HSSL would lead to loans with higher defect rates but nevertheless rejected measures that could mitigate its disastrous result.

      Defendants' knowledge that the HSSL would produce a legion of bad loans is also evident from the concerns expressed even by loan specialists who foresaw a substantial decline in quality resulting from their expanded authority and raised this concern at a town hall meeting. *Id*. ¶ 81. Apparently recognizing the legitimacy of that concern, FSL responded by suspending its quality ratings of loan specialists, thereby encouraging the loan specialists to pursue volume at the expense of quality. *Id*.  Finally, the wave of negative pre-funding and post-closing quality reports on the HSSL loans, which were distributed to (and concealed by) Mairone and others, followed by FSL's Sprint Incentive bonus, further demonstrate that Defendants knew they were selling defective loans to the GSEs contrary to representations that such loans were investment quality. *Id.* ¶¶ 86-88, 100-102, 105-107.  Put simply, both the Bank Defendants and Mairone were faced with ever-increasing evidence that their representations to the GSEs concerning the investment quality of their loans were false, but did nothing to correct their misrepresentations or shut down the HSSL.  Such allegations suffice for an inference of fraudulent intent. *See Dexia SA/NV*, 2013 WL 856499, at \*4 (allegations "suggesting defendants knew that the certificates were backed by loans originated in violation of the stated underwriting guidelines" and confidential statements by corroborating witnesses "support a strong inference that the defendants knew that the mortgages included within the loan pools were not of the quality represented in the offering documents"); *Autuori*, 212 F.3d at 116 (holding sufficient evidence of fraudulent intent where defendant "assured investors that the PPM numbers were reliable despite his knowledge that the actual numbers were substantially below expectations").

Although Mairone attempts to negate an inference of fraudulent intent on the basis that she had no direct contact with the GSEs (Mairone Br. at 9-11), lack of direct contact with the ultimate victim does not insulate her from liability for committing mail and wire fraud. Mairone participated in the design and implementation of a process that resulted in loans that were ineligible for sale to the GSEs, and she perpetrated the continuation of that process despite knowing that materially defective loans were being sold to the GSEs as investment quality. Such allegations provide more than adequate basis for a reasonable fact-finder to conclude that Mairone possessed fraudulent intent to defraud the GSEs. *See United States v. Tomicic*, No. 3:09 Cr. 210 (WWE), 2012 WL 2116143, at *2 (D. Conn. June 2, 2012) (rejecting defendant's argument that evidence of wire fraud was insufficient where "he was not involved with procurement of the insurance, the filing of the claim at issue, or the handling and settlement of that claim" because he instructed others to take action that he knew would result in misrepresentations); *United States v. Bifulco*, 127 F. App'x 548, 550 (2d Cir. 2005) (although defendant had not been told that insured intended to file false insurance claim, specific intent to defraud insurer could be inferred from defendants' knowing participation in the destruction of leased car).

Mairone also erroneously contends that the allegations against her fail to satisfy Rule 9(b) because, "apart from the allegation concerning her alleged role in the elimination of job aids, Am. Compl. ¶ 78, Mairone is *not even mentioned by name*." Mairone Br. at 12-13 (emphasis in original). In fact, Mairone is mentioned by name in more than a dozen factual allegations, many of which are set forth in Mairone's own brief just three pages earlier. *Id.* at 10.[3] Specifically, and as

---

[3] After overlooking the allegations in which she is mentioned by name, Mairone proceeds to argue that the amended complaint's purportedly general, conclusory pleading fails to satisfy Rule 9(b), citing to *ING Global v. United Parcel Serv. Oasis Comp Supply Corp.*, 11 Civ. 5697 (JSR), 2012 WL 28259, at *4 (S.D.N.Y. Jan. 4, 2012), a readily distinguishable case. In *ING Global*, the court dismissed the complaint for lack of particularity where, unlike here, it "largely fail[ed] to provide any of the[] [required] particulars, instead simply lumping the defendants together in

set forth above, the Government has alleged that Mairone directed the implementation of the HSSL, Am. Compl. ¶ 3; visited HSSL centers to initiate the rollout of the new model, *id.* ¶ 69; expanded the HSSL to include dirty prime loans, *id.* ¶¶ 74-75; eliminated instructional tools for loan specialists, *id.* ¶¶ 77-78; permitted pre-funding quality reviews only to the extent that they did not "slow [] the swim lane down," *id.* ¶87; halted the distribution of pre-funding quality reports outside of FSL, *id.* ¶ 88; rebuffed underwriting managers in Richardson, Texas, who had expressed concerns about the HSSL, told them to "get with the program," and said that they need to keep funding the loans to "keep the lights on," *id.* ¶¶ 83, 89; pressured O'Donnell to remove slides from an FSL loan quality presentation that revealed the deterioration of the FSL's loan quality, *id.* ¶ 111; was repeatedly warned that the HSSL led to loans that were ineligible for sale, *id.* ¶¶ 86, 88, 89, 101; and reduced the responsibility of employees who criticized the HSSL, *id.* ¶¶ 83, 111.  The fact that some of these allegations reference "other unspecified" Countrywide or FSL executives along with Mairone does not, as Mairone suggests, dilute the particularity of the Government's allegations.  Mairone Br. at 13.  The Government is not required to identify by name each individual referenced in the complaint in order to give fair notice to Mairone of the claims against her, and Mairone cites no case to the contrary.  The Government has sufficiently stated both the facts constituting the fraud and the facts supportive of a "strong inference" of fraudulent intent as to all Defendants.

---

largely conclusory statements, such as that the defendants 'fraudulently induced Plaintiff ING to enter into the 2010 Primary Supplier Contract and the 2011 Price Schedule.'"

### 3. Defendants' Contractual Relationship with Fannie Mae and Freddie Mac Does Not Provide Immunity from Mail and Wire Fraud Claims

Defendants also seek to escape liability for mail and wire fraud by virtue of their contractual relationships with Fannie Mae and Freddie Mac.  Federal fraud statutes, however, are not cabined by private party contracts.  A mail or wire fraud claim is stated if the statutory elements are met, regardless of the existence of any contractual relationship between the defendant and another party. Courts thus routinely find sufficient allegations or evidence of mail or wire fraud notwithstanding a contractual relationship between a defendant and victim. *See, e.g., Frank*, 156 F.3d at 333-36 (sufficient evidence of conspiracy to commit mail fraud despite contract "for [sludge] disposal at [a] 106-mile site," because injured municipalities "paid a premium" for sludge disposal at that site, the sludge was dumped in waters short of the site, and defendants nevertheless billed the municipalities as if the disposal "had occurred at the 106-mile site"); *United States v. Schwartz,* 924 F.2d 410, 420-21 (2d Cir. 1991) (sufficient evidence of wire fraud despite contract between purchaser and manufacturer of night vision goggles and because purchaser "misled [manufacturer] as to explicit promises made in response to [manufacturer's] demands").  Although fraudulent intent cannot be inferred from a mere breach of contract, neither will the existence of a contract negate an allegation of fraudulent intent. *See D'Amato*, 39 F.3d at 1261 n.8 (explaining that failure to comply with a contract can be "fraudulent when the promisor never intended to honor the contract").  Put simply, the existence of a contract is entirely irrelevant to whether the Government has stated a claim under FIRREA predicated on mail and wire fraud, and Defendants cite nothing to the contrary.

Indeed, Defendants rely primarily on case law addressing only the circumstances in which a common law fraud claim can be asserted along with a breach of contract claim. *See* Br. at 19-25; Supp. Br. at 10-14; *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183-84 (2d Cir. 2007) (reversing dismissal of fraud claim as duplicative of breach of warranty claim); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996) (reversing

26

finding of common law fraud predicated on defendant's failure to honor contractual commitments); *Koch Indus. v. Hoechst Aktiengesellschaft*, 727 F. Supp. 2d 199, 214 (S.D.N.Y. 2010) (dismissing common law fraud claims as duplicative of breach of contract claims); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 324 (S.D.N.Y. 2002) (same); *IKEA N. Am. Servs, Inc. v. Ne. Graphics, Inc.*, 56 F. Supp. 2d 340, 342-43 (S.D.N.Y. 1999) (same).   Such cases have no bearing on whether the Government can assert a claim predicated on mail and wire fraud under FIRREA and certainly do not provide Defendants the immunity from liability that they seek.   The civil RICO cases relied on by Defendants likewise lend no support to their argument.   Br. at 21 (collecting cases).   Although courts correctly dismiss civil RICO cases where the plaintiff asserts nothing more than nonperformance of a contract, and thus fails to satisfy the elements of a civil RICO claim predicated on mail or wire fraud, none of the cases on which Defendants rely suggest that the mere existence of a contract precludes a civil RICO claim, even by a private contracting party.

Finally, Defendants' argument also misstates both the common law rule and the nature of the Government's allegations.   A misrepresentation of present fact is "collateral or extraneous to the contract" even if that misrepresentation is a breach of an express contractual warranty.   *See Merrill Lynch & Co.*, 500 F.3d at 183-84 (interpreting *Bridgestone/Firestone* and distinguishing "between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement").   Here, the amended complaint alleges misrepresentations of present fact.   At the time that they sold HSSL loans to the GSEs, Defendants falsely represented that the loans were investment quality and conformed to all applicable requirements in the selling guides and contracts.   Am. Compl. ¶ 39.   Defendants also falsely represented that they knew of nothing involving the mortgage, the property, or the mortgagor that would cause the mortgage to become delinquent, would adversely affect the mortgage's value or marketability, or would otherwise cause

an investor to regard the mortgage as an unacceptable investment.  *Id.*  Such misrepresentations as to loan quality at the point of sale are misrepresentations of present fact squarely within the *Bridgestone/Firestone* exceptions.[4]  Accordingly, even applying the standard Defendants purport to rely on, their argument fails.

### 4. The Bank Defendants' Remaining Arguments Against Scheme to Defraud Are Meritless

The Bank Defendants' remaining arguments that the Government has failed to allege a scheme to defraud attack only straw positions.  For instance, the Bank Defendants highlight isolated allegations of their failure to adhere to underwriting guidelines, their failure to conduct due diligence or quality control, and their failure to disclose the HSSL or its defect rates and then contend that none of these practices constitutes fraud.  Br. at 25-27.  In making this argument, the Bank Defendants fail to confront what the Government has alleged *was* fraudulent:  Defendants' scheme to originate loans through the HSSL and then sell the resulting loans, which they knew would be (and were) defective, to the GSEs as properly underwritten, investment-quality loans. Similarly, as to the seven loans identified in the body of the amended complaint, the Bank Defendants contend that the Government fails to connect those loans to any challenged conduct by Defendants or explain "what was *deceptive* about these loans."  Br. at 28 (emphasis in original).  As the amended complaint makes clear, however, the highlighted loans, all of which contained egregious and easily detectable misrepresentations and other defects, are HSSL loans that were sold to Fannie Mae as investment-quality loans that were free from misrepresentations or fraud

---

[4] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 234 (1st Dep't 2011) (denying motion to dismiss fraud claim where plaintiff alleged misrepresentations as to debt-to-income ratio, loan-to-value ratio, and other features of the loans in the securitizations that plaintiff insured because "[i]t simply cannot be the case that any statement, no matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract").

committed by the borrower or any other party.  Am. Compl. ¶¶ 113-145.  The Government has therefore adequately alleged a scheme to defraud.

**C. The Government Alleges that Defendants' Fraud Affected Federally Insured Financial Institutions**

Contrary to Defendants' arguments, the amended complaint also sufficiently alleges that Defendants' fraudulent scheme affected federally insured financial institutions.  Defendants' fraud affected Countrywide Bank and BANA, which are themselves federally insured financial institutions, by exposing them to actual losses and risks of additional losses stemming from repurchase obligations.  Additionally, Defendants' fraud affected certain federally insured financial institutions that invested a substantial percentage of their capital in GSE preferred stock.  Defendants' defective and delinquent loans, including HSSL loans, contributed to the insolvency of the GSEs, which, in turn, caused the failure of the federally insured financial institutions that held substantial investments in the GSEs.  Accordingly, the amended complaint states FIRREA claims against all Defendants.

**1. Defendants Are Liable Under the Plain Text of FIRREA for Committing Fraud that Puts Countrywide Bank's and BANA's Federally Insured Deposits at Risk**

Defendants first assert that they are immune from civil prosecution under FIRREA for conduct harming Countrywide Bank's or BANA's federally insured deposits, because "self-affecting" misconduct is purportedly not within the meaning of "affecting" in 12 U.S.C. § 1833a(c)(2).[5]  In seeking to manufacture restrictions on the broad, general language of § 1833a(c)(2), Defendants attempt to escape the simple text and far reach of FIRREA's enforcement

---

[5] As a threshold matter, Defendants suggest that this "self-affecting" theory of liability is asserted only against Mairone (Supp. Br. at 6), but the Government asserts it against all Defendants. Am. Compl. ¶ 159.  Further, Countrywide Bank and BANA are the only Defendants that may assert the argument that they cannot be held liable under FIRREA for conduct that affects themselves, as they are the only Defendants that are federally insured financial institutions.  Moreover, even if this argument were correct (and it is not), Countrywide Bank and BANA could still be civilly prosecuted under FIRREA for committing mail and wire fraud that affected each other or various other federally insured financial institutions that invested heavily in the GSEs.  *Id.*

provisions, and insist instead that legislators sought to spare banks from liability for their own misconduct.  Such an approach turns the principles of statutory construction on their head and subverts the stated purposes of FIRREA.

Section 951(c) of FIRREA provides, *inter alia*, that whoever commits mail or wire fraud "affecting a federally insured financial institution" shall be subject to civil penalties. 12 U.S.C. § 1833a(c)(2).[6]  The term "affecting" is a broad statutory term that in no way indicates that Congress intended to bar civil penalties when the "affected" entity is also the perpetrator of the fraud.  FIRREA itself does not define what it means to "affect[]" a federally insured financial institution, and no court has yet decided the meaning of this word as it appears specifically in section 951(c)(2) of FIRREA.  However, many courts have interpreted virtually identical language in another provision of FIRREA and consistently rejected the same argument that Defendants advance here.

In Section 961(*l*) of FIRREA, Congress extended the statute of limitations for mail and wire fraud from five to ten years where the offense "affects a financial institution."  *See* 18 U.S.C. § 3293(2).  Courts interpreting section 961(*l*) have consistently held that the word "affect" is a broad and unambiguous term meaning to "produce an effect on" or to materially or detrimentally "influence."  *See, e.g.*, *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *5 (S.D.N.Y. July 13, 2012) (finding that the "most common meaning of the verb 'affect' is 'to produce an effect upon,'" and that the term is "secondarily defined as 'to produce a material influence upon or alteration in' and tertiarily defined as 'to have a detrimental influence on'") (citation omitted).  Furthermore, courts interpreting section 3293(2) have repeatedly rejected the argument that a financial institution cannot be "affected" by a fraud that it has perpetrated, and

---

[6] There is no dispute that Defendants fall under the broad term "whoever" in 1833a(a), which sets forth who may be sued under FIRREA.  Nor is there any dispute that Defendants each may be prosecuted for violating the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, which likewise broadly apply to "whoever" violates them.

indeed have held that "affects" applies both to perpetrators and victims of fraud. *See Ghavami*, 2012 WL 2878126, at *5 (the term "affects" "is not limited to circumstances in which a financial institution is the object or victim of a scheme to defraud" but rather includes active participants); *cf. United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (observing that "Congress chose to extend the statute of limitations to a broader class of crimes" than just those "where the financial institution is the object of fraud") (internal quotation marks and citation omitted).[7]

The Seventh Circuit's decision in *Serpico* is instructive.  In that case the defendants contested the district court's application of 18 U.S.C. § 3293(2) by arguing that their mail fraud did not "affect" the financial institutions that were "willing participants" and "active perpetrator[s]" of the fraudulent scheme. *Id.* at 693-95.  The Seventh Circuit rejected this argument, holding that "the mere fact that participation in a scheme is in a bank's best interest does not necessarily mean that it is not exposed to additional risks and is not 'affected.'"  *Id.* at 695.  The court observed that the banks' involvement in the fraud did expose them to risks, such as having risky loans on their books. *Id.*  As to one of the financial institutions that pled guilty to conspiracy, the Court found "it hard to understand how a bank that was put out of business as a direct result of the scheme was not 'affected,' even if it played an active part in the scheme."  *Id.*

Likewise, relying on *Bouyea, Serpico, Ohle* and *Daugerdas*, the court in *Ghavami* observed that a financial institution may be "affected" by a fraudulent scheme, even if it was an active participant.  *Ghavami* involved a number of financial institutions that entered into civil settlements

---

[7] *See also United States v. Serpico*, 320 F.3d 691, 695 (7th Cir. 2003) (holding bank was affected by its own fraudulent scheme); *United States v. Martinez*, No. 98-1438, 1999 WL 38842, at *2 (2d Cir. 1999) ("The word 'affect[],' in the statute is not the same as 'defraud'"); *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2011 WL 6020113, at *1-2 (S.D.N.Y. Apr. 5, 2011) ("affects" applies to financial institutions that "participated in a fraud" because "[n]othing in the statute's language precludes its application to a financial institution that participated in a fraud"); *Rubin/Chambers*, 831 F. Supp. 2d at 783 (same); *United States v. Ohle*, 678 F. Supp. 215, 229 (S.D.N.Y. 2010) (same).

with the SEC and other regulators and non-prosecution agreements with DOJ in connection with a municipal bid rigging scheme. *Ghavami*, 2012 WL 2878126, at *7. The financial institutions' employees, who were subsequently prosecuted, sought to exclude evidence relating to these agreements, which the Government intended to offer to prove that the co-conspirator financial institutions had been "affected" by the crimes. *Id.* The court allowed evidence concerning the non-prosecution agreements, as well as settlement agreements with the SEC and other entities, for purposes of demonstrating that the co-conspirator financial institutions were "affected financial institutions." *Id.*[8]

Defendants attempt to sidestep the interpretation of "affects a financial institution" in the above cases by suggesting that such an interpretation is somehow unnatural (Supp. Br. at 7-8), but provide no reason to define the word "affecting" any differently in section 1833a(c)(2). To the contrary, it is "logical to assume" that where the same term is used in different parts of the same Act, the term "would carry the same meaning with respect to both provisions." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). Even where the same term is used in different pieces of legislation, the Supreme Court credits Congress with "knowing the interpretation federal courts had given the words earlier Congresses had used first" in other laws, and since "[i]t used the same words . . . we can only assume it intended them to have the same meaning that courts had already given them." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Indeed, "[w]hether a fraud does or does not 'affect a financial institution' is a recurring consideration in federal criminal

---

[8] The *Rubin/Chambers* decision in this District reached a similar conclusion. As in *Ghavami*, co-conspirator financial institutions entered into non-prosecution agreements with the Government in which they admitted that their employees knowingly and actively participated in the charged conduct, including wire fraud and conspiracy to rig bids, fix prices and manipulate the municipal derivatives market. *Rubin/Chambers*, 831 F. Supp. 2d at 781-82. The individual employee defendants were prosecuted and sought to exclude the agreements. Finding that financial institutions that participate in fraud may be "affected," the court allowed evidence of the non-prosecution agreements. *Id.* at 783-785.

jurisprudence," and cases interpreting that phrase in one context are generally applied to others. *United States v. Grass*, 274 F. Supp. 2d 648, 654 n. 5 (M.D. Pa. 2003).[9]

Where, as here, the language of the statute is clear, delving into legislative history is unwarranted. *See, e.g.*, *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2156 (2010) ("As in all such cases, we begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.' . . . We must enforce plain and unambiguous statutory language according to its terms."); *Daugerdas*, 2011 WL 6020113, at **1-2 (The word "affects" is unambiguous and its plain meaning governs); *Ghavami*, 2012 WL 2878126, at *5 (same).  Nevertheless, there is ample evidence in the legislative history establishing that Congress enacted FIRREA in part to enhance the Government's ability to prosecute any fraud and misconduct putting federally insured deposits at risk, including conduct by financial institutions themselves.

Nothing in Section 1833a(c) requires that the "affected" federally insured financial institution be the direct or intended victim.  Rather, the civil enforcement provisions subtitle of FIRREA imposes "Civil Penalties For Violations *Involving* Financial Institutions," not violations defrauding or victimizing them.  Pub. L. No. 101-73, § 951, 103 Stat. at 498 (emphasis added).[10]

---

[9] Courts have also broadly interpreted the prior version of the Sentencing Guidelines, promulgated pursuant to FIRREA, enhancing punishment for crimes that "affected a financial institution" where the financial institution itself was involved in perpetrating the fraud.  For example, in *United States v. Hoffecker*, 530 F.3d 137 (3d Cir. 2008), the defendant challenged the district court's four-level enhancement of his sentence, arguing that his offense did not affect a financial institution because the affected company was a sham company and the vehicle for the fraud.  *Id.* at 198.  Agreeing with two other circuits, the Third Circuit rejected this argument and found that the enhancement applies when the "fraud affects a financial institution that acted as the vehicle for the fraud."  *Id.* at 200; *see also United States v. Collins*, 361 F.3d 343, 348 (7th Cir. 2004) (same).

[10] *See also* H.R. Rep. 101-54(I), at 311, 1989 U.S.C.C.A.N. 86, at 107 (FIRREA "increases civil and criminal penalties for crimes *involving* financial institutions and improves methods to detect misconduct in *financial dealings*") (emphases added); *Id.* at 472, 1989 U.S.C.C.A.N. 86, 268 (Section 951 "authorizes the Attorney General to recover a civil penalty for conduct violating

One of the main purposes of FIRREA was to civilly and criminally prosecute the kinds of misconduct and abuse involving financial institutions and their officers and directors that threaten the safety and soundness of federally insured deposits, which taxpayers must pay for when financial institutions fail. *See, e.g.*, H.R. Rep. No. 101-54(I) at 301-02, 1989 U.S.C.C.A.N. 86, 97, 98 (1989) ("Without adequate supervision, thrifts were free to engage in fraudulent and risky activities, often at the expense of the FSLIC," and increased regulatory supervision "came too late; many institutions had already engaged in risky or fraudulent loan and investment activities which would lead to their ultimate failure.").

Moreover, Congress explicitly recognized that poor underwriting and loan administration—the very conduct targeted in the amended complaint—could seriously threaten a financial institution's stability. *See, e.g.*, H.R. Rep. No. 101-54(I), at 299, 1989 U.S.C.C.A.N. 86, 95 ("Failed institutions have a number of similar traits including . . . poor underwriting and loan administration standards"); H.R. Rep. No. 101-54(I), at 300, 1989 U.S.C.C.A.N. 86, 96 ("Poor loan underwriting and administration standards have proved particularly detrimental to thrift institutions. Thrift regulators have reported weaknesses related to poor loan documentation and inadequate credit analysis . . . In addition, many appraisals were found to be inaccurate or insufficiently documented.").

Finally, there is no basis for the Bank Defendants' contention that the mechanisms for penalizing federally insured financial institutions for conduct affecting their own safety and soundness exist elsewhere in FIRREA—specifically the provisions expanding the authority of

---

specified provisions of title 18, United States Code, *involving* financial institutions . . . most of the cases likely to be brought under this section will involve allegations of fraud") (emphasis added); H.R. Rep. 101-54(V), at 5, 1989 U.S.C.C.A.N. 397, 398 ("Subtitle E of Title IX contains proposed new civil penalties for certain violations *involving* financial institutions. As reported by the Committee on Banking, Finance and Urban Affairs, violations and conspiracies to violate eight sections of title 18 which *relate to* financial institutions are made the basis of civil penalties.") (emphases added).

34

federal banking agencies to impose penalties for misconduct "[t]hat causes or is likely to cause more than a minimal loss to such depository institution."  Supp. Br. at 9 (quoting 12 U.S.C. § 1818(i)(2) and citing other provisions of FIRREA).  Nothing in the statutory language or legislative history suggests that the enactment of section 1818(i) was intended to divest the Department of Justice of the authority to seek penalties for similar misconduct under sections 951(a) and (c) of the same statute.  To the contrary, the legislative history of FIRREA makes clear that the civil penalties were intended to impose a *separate* penalty for misconduct, which could be cumulative of penalties imposed by regulatory agencies.  *See* H.R. Rep. 101-54(V), at 6, 1989 U.S.C.C.A.N. 397, 398 ("In fact, the Administration states that the penalties can also be cumulative to other civil penalties, which also may be up to $1,000,000, which may be imposed by bank regulatory agencies under other provisions of this bill."); H.R. Rep. 101-54(V), at 6, 1989 U.S.C.C.A.N. 397, 399 ("Subtitle E is therefore intended to be used to impose a third monetary penalty, each of which may be up to $1 million per incident, for the same violation.").  Holding banks responsible for conduct that puts their own federally insured deposits at risk is thus consistent with and furthers the legislative purpose of FIRREA.

## 2.    The Government Alleges that Countrywide Bank and BANA Have Been Affected by Defendants' Fraud

The Government has alleged that BANA and Countywide Bank were "affected" by Defendants' fraud.  As stated in the amended complaint, loan defects were rampant under the HSSL, yet Defendants concealed these defects when they sold the loans to Fannie Mae and Freddie Mac and made false representations that their loans complied with GSE requirements. Am. Compl. ¶¶ 86, 90-150.  As a threshold matter, Countrywide Bank and BANA were exposed to substantial risks of loss when the GSEs demanded that they repurchase thousands of defective HSSL loans.  *Id.* ¶ 48.  Countrywide and later Bank of America initially stonewalled the repurchase process, refusing for years to repurchase fraudulent and otherwise defective HSSL loans that never should have been

35

sold to the GSEs in the first place. *Id.* ¶¶ 147-149.  On January 7, 2013, however, Bank of America entered into a multi-billion dollar settlement agreement with Fannie Mae to resolve these outstanding repurchase requests stemming from defective loans, including HSSL loans, originated between 2001 and 2008.  *Id.* ¶¶ 9, 146-50, 198.  BANA and/or Countrywide Bank thus have been "affected" by Defendants' fraud as a result of the payments of billions to settle repurchase demands on defective loans, including HSSL loans.  *Id.* ¶ 159.

The Bank Defendants do not contest the sufficiency of these allegations.  Indeed, courts interpreting section 961(*l*) of FIRREA have held that a financial institution is "affected" by a fraud whenever it is "exposed to a new or increased risk of loss." *See Ghavami*, 2012 WL 2878126, at *6 ("for purposes of 18 U.S.C. § 3293(2), a wire fraud may be deemed to 'affect[] a financial institution' where it exposes such institution to a new or increased risk of loss, even if there is no actual or net loss"); *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010); *Serpico*, 320 F.3d at 694-95 (financial institution is "affected" for purposes of Section 961(*l*) of FIRREA if it was "exposed . . . to a new or increased risk of loss," including by having risky loans on its books).  A "new or increased risk of loss," as the courts have reasoned, "is plainly a material, detrimental effect on a financial institution and falls squarely within the proper scope of the statute." *Mullins*, 613 F.3d at 1278-79; *see also Ghavami*, 2012 WL 2878126, at *5.  Further, because a mere risk of loss suffices to defraud a financial institution for purposes of 18 U.S.C. § 1344, "a lesser standard . . . and in any event certainly not a greater one" must suffice to "affect" a financial institution. *Mullins*, 613 F.3d at 1279; *Ghavami*, 2012 WL 2878126, at *5 n. 6.

Mairone, however, offers two meritless arguments that the allegations of repurchases by Countrywide Bank and/or BANA do not suffice to allege an "effect" on them.  Mairone Br. at 14-15.  First, Mairone argues that these allegations do not suffice to show an effect because the Government does not allege that either Countrywide Bank or BANA was actually liable to the

GSEs.  *Id.* at 15.  Although Mairone does not explain why a party must be liable for anything to be "affected" under FIRREA, the Government has in fact alleged that Countrywide Bank and BANA were liable to the GSEs for repurchases of HSSL loans.  For instance, the amended complaint alleges that Countrywide Bank originated the HSSL loans beginning in 2007, that representations to the GSEs were made by Countrywide Bank and BANA, that Countrywide Bank merged into BANA, that BANA expressly assumed liability to both Fannie Mae and Freddie Mac with respect to loans originated by Countrywide Bank as part of the merger, and that post-merger, repurchase requests by the GSEs are made directly to BANA.  *See* Am. Compl. ¶¶ 17, 39, 44, 177, 179-181. Second, although Mairone argues that the amended complaint is somehow deficient for failing to specify whether Countrywide Bank as opposed to BANA funded repurchase payments for defective loans (Mairone Br. at 15), the source of the payments is irrelevant to the Government's FIRREA claim given that both entities are federally insured financial institutions.[11]

      Finally, Mairone argues that as a matter of law, she could not be found to have "affected" Countrywide or BANA because she was employed by Countrywide Home Loans, and there is no allegation that she was a "rogue" employee.  Mairone Br. at 16.  This argument contradicts the statute, as well as *Ghavami*.  FIRREA uses the broad language "*[w]hoever* violates any provision of . . . subsection (c) . . . shall be subject to a civil penalty."  12 U.S.C. § 1833a(a) (emphasis added). There is no immunity for individuals employed by the federally insured financial institutions "affected" by their fraudulent activities.  In *Ghavami*, as discussed *supra* at 31-32, the district court admitted as evidence a settlement and a non-prosecution agreement entered into by defendants' employer (a financial institution), among others, showing that defendants' alleged fraudulent

---

[11]  The Government is not required to plead the "affecting" element of FIRREA with particularity.  *See Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK), 2012 WL 3223671, at *1 (S.D.N.Y. May 24, 2012) (explaining, in civil RICO case, that plaintiff "is required to plead with particularity only 'circumstances constituting fraud,' [which] includes only aspects of the mail and wire fraud predicate acts . . .").

conduct created an increased risk of loss for the employer and thus "affected" the employer.  2012

WL 2878126, at *9.  Accordingly, the amended complaint adequately states claims under FIRREA

against Defendants for fraudulent conduct affecting BANA and Countrywide Bank.

### 3. Defendants May Be Held Liable Under FIRREA for Fraud Affecting Federally Insured Investors in the GSEs

Defendants' mail and wire fraud also "affected" numerous other federally insured financial

institutions that invested large sums in GSE preferred stock.  As explained above, the GSEs were

driven into insolvency and conservatorship, in part, by the massive defaults on defective loans the

GSEs purchased from Countrywide and Bank of America, including HSSL loans.  Certain of the

GSEs' federally insured investors likewise became insolvent when their GSE stock lost its entire

value.  They were thus "affected" by the fraud, which is all that FIRREA requires.

It is well established that a federally insured financial institution need not be the direct or

intended victim of a fraud in order to be "affected" within the meaning of FIRREA.  The word

"affect" is a broad statutory term that embraces federally insured financial institutions that are the

direct or immediate targets of fraud, as well as those institutions that suffer loss, or a risk of loss, as

stemming from fraud directed at someone else.  *Bouyea*, 152 F.3d at 195 ("the statute is clear: it

broadly applies to any act of wire fraud that affects a financial institution"); *Mullins*, 613 F.3d at

1278 ("While Congress certainly could have extended the limitations period only when wire fraud

'causes a loss' to a financial institution, it chose instead to use the considerably broader term

'affects'."); *Ghavami*, 2012 WL 2878126, at *5.  Had Congress wanted to limit section 951(c)(2)

only to direct or immediate targets of fraud, it would have used language such as "defrauding" a

federally insured financial institution, not "affecting" a federally insured financial institution.

*Bouyea*, 152 F.3d at 195; *Martinez*, 1999 WL 38842, at *2; *United States v. Pelullo*, 964 F.2d 193,

216 (3d Cir. 1992).[12]  A federally insured financial institution may be "affected" if there is "some impact" on the institution from the fraud that is "sufficiently direct" and not "unreasonably remote." *Bouyea*, 152 F.3d at 195 (effect of the scheme to defraud was "sufficiently direct"); *Pelullo*, 964 F.2d at 216 (impact on financial institution cannot be "unreasonably remote").  Ultimately, whether or not a federally insured financial institution was affected is a question of fact.  *Ghavami*, 2012 WL 2878126, at *5.

Here the amended complaint more than adequately alleges that there was an impact on federally insured investors in the GSEs that was sufficiently direct and not unreasonably remote. Specifically, as set forth in the amended complaint, because the GSEs were considered to be financially sound, bank regulators permitted federally insured financial institutions to invest up to 100 percent of their investment capital in GSE preferred stock.  Am. Compl. ¶ 24.  For example, in the second quarter of 2008, California National Bank held approximately 64 percent of its core capital (or $434 million) invested in GSE preferred stock and National Bank of Commerce held approximately 74 percent of its core capital (or $98 million) in GSE preferred stock.  *Id.* ¶¶ 154, 157.  Defendants' fraudulent sale of bad loans, including HSSL loans, contributed to the GSEs' collapse.  *Id.* ¶¶ 26, 155.  Indeed, in 2007 Countrywide sold more loans to Fannie Mae than any other lender, and its delinquency rate was two to three times higher than those of any other lender.

---

[12] The term "affect" is likewise interpreted broadly in other governmental regulatory and enforcement contexts.  *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (explaining that when Congress uses the phrase "affecting commerce," it "indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause"); *Russell v. United States*, 471 U.S. 858, 862 n.8 (1985) (interpreting 18 U.S.C. § 844(i) arson statute and finding that the reference to "any building . . . used . . . in any activity affecting interstate or foreign commerce" expresses an intent by Congress to exercise its full power under the Commerce Clause"); *Hudson Riverkeeper Fund v. Yorktown Heights Sewer Dist.*, 949 F. Supp. 210, 212 (S.D.N.Y. 1996) ("Congress, in affording the statutory right to sue under the Clean Water Act to any 'person or persons having an interest which is or may be affected' by any violation of any state order setting an effluent standard or limitation . . . seemingly intended to confer standing on as broad a range of affected persons as is consistent with the dictates of Article III of the Constitution.")

*Id*. ¶ 63.  When the GSEs became insolvent and were placed under conservatorship, certain of the federally-insured banks lost nearly the entire value of their investments in the GSEs, could not recover from the loss, and failed.  *Id*. ¶¶ 152-58.  These bank failures ultimately cost taxpayers billions of dollars, as the FDIC was required to make depositors whole.  *Id*. ¶¶ 28, 152.  These allegations suffice to allege the requisite effect.[13]

There is no support for Defendants' position that a federally insured financial institution that sustains a catastrophic loss as a result of a fraud cannot be "affected" as a matter of law simply because it was not the direct or intended victim of the fraud, but rather an investor in the defrauded entity.  To the contrary, as noted above, *Bouyea* and *Pelullo* make clear that a financial institution can be "affected" by the fraud for purposes of FIRREA section 961(*l*), even when another entity is the direct victim of the fraud.  And nothing in *United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2000), *United States v. Agne*, 214 F.3d 47 (1st Cir. 2000), *United States v. Ubakanma*, 215 F.3d 421 (4th Cir. 2000), or *Mullins*, 613 F.3d 1273, all cited on page 10 of Defendants' initial brief, is to the contrary.  *See Ohle*, 678 F. Supp. 2d at 228-29 (reiterating that "affected" must be read broadly); *Agne*, 214 F.3d at 52 (finding, *based on evidence at trial*, that the financial institution "experienced no actual financial loss and suffered no realistic prospect of loss"); *Ubakanma*, 215 F.3d at 426 (noting that Government had conceded an "absence of facts showing that the fraud scheme in some way victimized or affected a financial institution"); *Mullins*, 613 F.3d at 1278 (noting that instead of choosing the phrase "caus[ing] a loss" in section 961(*l*), Congress chose the "considerably broader"

---

[13] To the extent Defendants allege that the effect of the fraud on the investors is too attenuated to support a FIRREA claim, *see* Supp. Br. at 4-5, such an argument raises a question of fact that cannot be resolved on a motion to dismiss.  *Ghavami*, 2012 WL 2878126, at *7 (whether a financial institution is affected under FIRREA is a question of fact).

term "affecting," which means, *inter alia*, "to have a detrimental influence on") (citing *Oxford-English and Webster's* dictionaries).[14]

Defendants also ineffectively analogize this case to shareholder derivative lawsuits, reasoning that the GSE investors suffered only "indirect" harm from the collapse of the GSEs that would not give them standing to sue in their own right, but only permit a shareholder derivative action.  Br. at 12-13.  FIRREA, unlike shareholder suits, involves the Government's enforcement power with respect to fraud affecting federally insured financial institutions and has nothing to do with whether an injured investor could, or could not, bring an action against the wrongdoer in the investor's own name.  Indeed, the Government's enforcement power is premised on the fact that a criminal fraud has been committed and that the fraud has "affected" federally insured financial institutions (not defrauded them or caused their losses), which supports a broader interpretation. *See supra* n. 12.

Defendants then cherry-pick several pieces of legislative history in an attempt to narrow section 951(c), Br. at 13-17, even though the unambiguous language of the statute forecloses such analysis.  *See Exxon Mobil Corp.*, 545 U.S. at 567.  In any event, there is no basis in the legislative history to read the statute to mean anything other than what it says and how courts have interpreted similar language in FIRREA:   the relevant federally insured financial institution need only be

---

[14] The asset forfeiture statute, which provides that "[a]ny property . . . which constitutes or is derived from proceeds traceable to a violation of . . .  section . . . 1343 of [title 18] *affecting a financial institution*" is subject to forfeiture, 18 U.S.C. § 981(a)(1)(C) (emphasis added), has been given a similar reading.  In *United States v. Approx. $25,829,681.80 in Funds*, the Court ruled that "to be 'affected,' a financial institution need not necessarily be the targeted victim of a fraud," and that Merrill Lynch was "affected" merely by having to bring an interpleader action to resolve competing claims to the funds.  No. 98 Civ. 2682 (LMM), 1999 WL 1080370, at *5 (S.D.N.Y. Nov. 30, 1999).

"affected" by the fraud; it need not be the direct or immediate target of the fraud.[15]  *See supra* Part I.C.1.

Nor is there any merit to Defendants' hyperbolic assertions that penalizing Defendants based on investor loss would lead to "limitless" liability and would otherwise be "absurd."  Br. at 8-9. Liability under FIRREA is limited to those circumstances in which the Government has established the elements of one of the statute's specifically enumerated criminal predicates.  And simply because no rule forecloses FIRREA liability based on a derivative effect on a federally insured financial institution does not mean that all alleged derivative effects would ultimately be found sufficient or even survive the pleading stage.  The Bank Defendants' argument that the Government's theory renders FIRREA's "affect" limitation superfluous is therefore misplaced.  Br. at 16-17.[16]

Finally, there is no absurdity, as Defendants claim, to penalizing Defendants on the facts presented here, where the direct targets of the HSSL were government sponsored enterprises whose sole purpose was to provide liquidity and stability to the housing market and whose federally insured financial institution investors were permitted to invest massive amounts of capital in GSE preferred stock.  Am. Compl. ¶¶ 21, 24.  When the GSEs became insolvent, Treasury paid $187

---

[15]  The Bank Defendants also wrongly contend that the "affecting a federally insured financial institution" language in Section 1833a(c)(2) should not be read "to sweep much more broadly than its neighbors" in sections 1833a(c)(1) and (3) (Br. at 14), and should instead be read to apply to situations where the fraud "directly impacts a federally insured financial institution," (*id*.). However, many of the offenses in Sections 1833a(c)(1) and (3) do not require that a financial institution be a victim at all.  Indeed, federally insured financial institutions can be prosecuted for violating some of the predicate offenses in section 1833a(c)(1), including 18 U.S.C. § 1014 and the fourth paragraph of 18 U.S.C. § 1005, which apply broadly to whoever violates them.

[16]  Moreover, the Bank Defendants' reliance on *United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012) (Br. at 17), undercuts their argument.  In *Aleynikov*, the relevant statutory language was "produced for" or "placed in" interstate commerce.  *Id*. at 79.  Rejecting the district court's broad interpretation, the Second Circuit noted that if Congress had wanted the provision to sweep broadly, it would have used the term "affecting," which indicates Congress' intent to legislate to the outer limits of its Commerce Clause power.  *Id*. at 81-82; *see supra* at 39 n.12.

billion to the GSEs themselves, then paid additional billions of dollars when the federally insured banks that assumed they had made a safe investment in GSE preferred securities saw the entire value of their investment eliminated.  *Id*. ¶¶ 24, 28, 151-152.  The amended complaint thus alleges that Defendants' fraud had a sufficiently direct effect on the federally-insured banks that failed in the wake of the GSEs' collapse.

## II.   THE GOVERNMENT STATES A CLAIM UNDER THE FCA

The Bank Defendants make two flawed arguments against the Government's well-pled FCA claims.   First, ignoring the allegations that they sold HSSL loans to the GSEs with false representations that the loans were investment quality and complied with GSE guidelines, the Bank Defendants argue that the Government has not explained "the loans' false or fraudulent nature." Supp. Br. at 16.  Second, the Bank Defendants wrongly contend that the Government is required to trace the federal funds from the GSEs to individual HSSL loan purchases.  Br. at 35.  This traceability requirement is one of the Bank Defendants' own making and finds no support in the FCA.  As set forth below, the Government has more than adequately alleged claims under the FCA against Bank of America.[17]

### A.   The Amended Complaint Alleges a False Claim Post-FERA

The Government alleges that Defendants' scheme to defraud—the HSSL—produced individual loans that, by virtue of their origination process, the Bank Defendants could not truthfully hold out as investment quality and compliant with the applicable GSE requirements. Moreover, the Government identifies more than two dozen specific examples of HSSL loans that Bank of America sold to the GSEs after May 20, 2009 with false representations.  In light of these allegations, the amended complaint amply states a claim against Bank of America under the FCA.

---

[17] Based on its allegations that Countrywide ceased performing the mortgage-related business described in the amended complaint by May 20, 2009, the Government pursues Counts I and II only against the Bank of America defendants.

43

To plead a cause of action under 31 U.S.C. § 3729(a)(1)(A), a complaint must allege that the defendant (1) made, or caused to be made, a claim, (2) that was false or fraudulent, (3) knowing of its falsity.  *See* 31 U.S.C. § 3729(a)(1)(A); *United States v. Huron Consulting Group.*, 843 F. Supp. 2d 464, 469 (S.D.N.Y. 2012).  A cause of action under 31 U.S.C. § 3729(a)(1)(B) requires that the defendant (1) made, used, or caused to be made or used, a statement, (2) that was knowingly false or fraudulent, and (3) that was material to a false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1)(B); *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655-56 (S.D.N.Y. 2011).  The "knowledge" element of the FCA is defined as (1) "deliberate ignorance of the truth or falsity of the information" provided, or (2) "reckless disregard of the truth or falsity of the information" provided to the Government.  31 U.S.C. § 3729(b)(1).  The Fraud Enforcement and Recovery Act of 2009 ("FERA"), made effective May 20, 2009, amended the FCA to, in relevant part, define an actionable "claim" under the FCA to include "any request or demand . . . for money . . . that is made to a contractor, grantee, or other recipient, if the money . . . is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money . . . requested or demanded, or will reimburse . . . any portion of the money."  31 U.S.C. § 3729(b)(2)(A)(ii)(I)-(II).

While the particularity requirements of Rule 9(b) apply to FCA complaints, the "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).  Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim[s] Act." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citation omitted); *see also United States v. Huron Consulting Group.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) (citing *Kanneganti* in denying motion to dismiss FCA complaint for alleged failure to plead with particularity).

The Government's detailed allegations in the amended complaint more than suffice to state an FCA claim against Bank of America under both § 3729(a)(1)(A) and § 3729(a)(1)(B).  As alleged in the amended complaint and as discussed *supra*, Part I.B, the Bank Defendants made knowing or reckless misrepresentations as to each of the HSSL loans that were sold to the GSEs after May 20, 2009, and the Government has identified, by seller number and funding date, individual HSSL loans that were sold to the GSEs and later defaulted.  *See* Am. Compl. ¶¶ 112, 113 & Ex. A.  At the time of sale of each of these loans, Bank of America, as seller, represented to the GSEs that, among other things, the mortgage conformed to all applicable GSE guidelines and purchase contracts, and that it knew of nothing that would cause the purchaser to regard the mortgage as an unacceptable investment or that would adversely affect the mortgage's value. *See* Am. Compl. ¶¶ 39, 40, 43-45.

In fact, however, Bank of America knew, or was reckless in not knowing, that its representations were false with respect to HSSL loans because it knew the HSSL resulted in defective loans that were poor investments.  Specifically, Bank of America knew that the HSSL eliminated underwriting, expanded loan specialist authority without meaningful supervision or instructional aids, included a revamped compensation structure for loan specialists that incentivized speed and volume above all else, and resulted in rampant defects among the resulting loans, as reflected in internal quality control reports and reviews.  *See supra* Part I.B.2; Am. Compl. ¶¶ 82, 88, 102.  Bank of America's knowledge about the entire population of HSSL loans sufficed to make its representations to the GSEs reckless, regardless of what it knew concerning particular defects in particular loan files.  *See Kanneganti*, 565 F.3d at 189-90 ("If at trial a *qui tam* plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme . . . a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular

contents of the misrepresentation.").[18]   Further, the amended complaint alleges, and Bank of America does not contest, that the representations at issue were material to the purchase decisions of the GSEs.  *See* Am. Compl. ¶¶ 45, 203, 212.   Accordingly, any demand for payment in connection with the sale of a HSSL loan is a false claim.  *See United States v. Bornstein*, 423 U.S. 303, 307 (1976) (representations that goods meet certain quality specifications when they do not serve as false claims); *United States v. Eghbal*, 548 F.3d 1281, 1283-84 (9th Cir. 2008) (false statements to induce Government to provide a loan guarantee constitute a false claim).

Similarly, the Government's FCA allegations comport with Rule 9(b) because the amended complaint specifically identifies the seller number and funding dates for individual HSSL loans, the representations and warranties that Bank of America made to the GSEs in written agreements regarding its loans at the time of sale, and a description of why such representations were false.  *See supra* Part I.B.1; Am. Compl. ¶¶ 39-45.  Rule 9(b) requires nothing more.[19]   *See Huron Consulting Grp.*, 2011 WL 253259, at *2 (finding FCA allegations sufficiently pled where complaint described a health care billing scheme); *Kanneganti*, 565 F.3d at 189-90 ("Confronting False Claims Act

---

[18]  *See also United States v. Honeywell Int'l*, 798 F. Supp. 2d 12, 23 (D.D.C. 2011) (knowledge element of FCA claim stated where government alleged that defendant "possessed a wealth of scientific data showing that [product for use in bullet proof vests] degraded quickly" and discouraged third party "from taking steps to notify the end users," including the government, about problems).

[19]  In addition, the Government has already provided a sufficient description of specific HSSL loans that were defective and ineligible for sale to the GSEs.  *See* Am. Compl. ¶¶ 112-145.  While Defendants complain that these examples were not sold to the GSEs after May 20, 2009, the Government alleges that the HSSL program continued without significant change throughout 2009. *Id*. ¶¶ 7, 105-109.  In any event, to the extent that the Government needs to provide any more detail about specific HSSL loans Bank of America sold to the GSEs after May 20, 2009, it should be permitted to amend its complaint.  *See Dexia SA/NV v. Deutsche Bank AG*, No. 11 Civ. 5672 (JSR), 2013 WL 98063, at *6 (S.D.N.Y. Jan. 4, 2013) (explaining that when more particularity is needed to comply with Rule 9(b), "a court must not deny a plaintiff leave to amend unless the plaintiff has acted in bad faith or the amendment would be futile") (internal quotation marks omitted).

defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted . . . gives defendants adequate notice of the claims.").[20]

**B.      The Amended Complaint Alleges That the Government Funded a Portion Of the Money Claimed**

Notwithstanding the Bank Defendants' argument to the contrary, the amended complaint alleges that the Government "provides or has provided," or "will reimburse" a portion of the money claimed for HSSL loans sold to the GSEs after May 20, 2009.  31 U.S.C. § 3729(b)(2)(A).  By May 2009, both Fannie Mae and Freddie Mac were under the conservatorship of the FHFA, receiving quarterly capital contributions from the Treasury totaling more than $ 187 billion.  *See* Am. Compl. ¶¶ 26, 29.  Each GSE was thus a "recipient" of Government money.  31 U.S.C. § 3729(b)(2)(A)(ii).  The Treasury also provided these billions of dollars to the GSEs "to advance a Government program or interest," 31 U.S.C. § 3729(b)(2)(A)(ii); namely, to provide liquidity, stability and affordability to the United States housing and mortgage markets, and to prevent disruptions in the availability of mortgage finance.  *See* Am. Compl. ¶¶ 21, 206, 215.  In advancing this interest, the GSEs used federal money to, among other things, purchase HSSL mortgages in 2009 and reimburse the GSEs for losses incurred as a result of guaranteeing mortgages funded in 2009.  *See* Am. Compl. ¶¶ 29, 205, 214.  The Government thus provided, or reimbursed the GSEs for, at least a

---

[20] In arguing that the Government's pleading is insufficient, the Bank Defendants draw only from easily distinguishable cases in which only a scheme, but no particular claim for payment, is identified.  *See Reynolds ex rel. United States, v. Sci. Applications Int'l Corp.*, No. 07 Civ. 4612, 2008 WL 2566747 (GBD), at *5-6 (S.D.N.Y. June 26, 2008) (in alleging that a secret United States military operation destroyed the World Trade Center on 9/11, but not identifying "a single identifiable record or billing submission that they claim to be false," plaintiffs failed to state a cause of action under the FCA but "merely allege[d] the existence of a nefarious conspiracy of epic proportion"); *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013) (dismissing relator's complaint because he identified neither particular claims for payment nor "an integrated scheme in which presentment of a claim for payment was a necessary result" such as could have stated plausible claim under the FCA).  Here, in contrast, the Government has alleged both an overall scheme and identified particular loans sold with misrepresentations as part of that scheme.

portion of the money requested by Bank of America in exchange for HSSL loans.   31 U.S.C.
§ 3729(b)(2)(A)(ii)(I).[21]

The Bank Defendants' contention that the Government must allege that Treasury funds are
traceable to particular expenditures for purchases of HSSL loans (Br. at 35; Supp. Br. at 18-19)
finds no support in the FCA or its case law.   Indeed, FCA cases are frequently premised on claims
made for funds comprised of both federal and non-federal money, and no traceability requirement is
imposed.   *See, e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943), *superseded
by statute as recognized by United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d
Cir. 2010) (request made to local entity for payment from account containing both federal and local
funds actionable under the FCA); *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp.
2d 804, 806 (S.D.N.Y. 2010) (claims for Medicaid may serve as the basis of an FCA case although
partially funded by states and localities).

The Bank Defendants' traceability requirement also runs counter to the purpose of the
FERA amendments, which extended FCA liability to, among other things, claims made to recipients
of federal funds for the purpose of "improv[ing] enforcement of mortgage fraud, securities fraud,
financial institution fraud, and other frauds related to federal assistance and relief programs, [and]
for the recovery of funds lost to these frauds."   *See* S. Rep. No. 111-10, 111th Cong. 1st Sess. 10,
2009 U.S.C.C.A.N. 430, 433 (March 23, 2009) (the "Senate Report") ("The False Claims Act must
be corrected and clarified in order to protect from fraud the Federal assistance and relief funds
expended in response to our current economic crisis.").   As the Senate Report stated, the purpose of
FERA was, among other things, to "reinvigorate [] anti-fraud measures and give law enforcement
agencies the tools and resources they need to root out fraud so that it can never again place our

---

[21] Moreover, while facts regarding the exact details of the GSEs' funding may be developed
in discovery, they need not be included in the amended complaint to survive Defendants' motions.
*See Kanneganti*, 565 F.3d at 189 (stating that plaintiff need not "plead the level of detail required to
prevail at trial").

financial system at risk." *Id.* at 431.  Put simply, FERA's expansion of FCA liability targeted the type of mortgage fraud that led to the collapse of the GSEs.  If, in bringing an FCA case based on a false claim made to federal grantees or contractors, the Government nevertheless had to meet a new pleading requirement of tracing the destination of federal funds, FERA's purpose would be defeated.

Indeed, the Bank Defendants' purported traceability requirement would exceed even what is required of the Government in tracing proceeds of criminal activity for purposes of forfeiture.  *See, e.g.*, 18 U.S.C. § 984(a)(1) (when property subject to forfeiture is "funds deposited in an account in a financial institution. . . . it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture. . ."); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986), *superseded by statute as stated in United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Exp. Bank*, 832 F. Supp. 542 (E.D.N.Y. 1993) (in showing that certain funds were "traceable proceeds" of unlawful activity for purposes of criminal forfeiture, Government afforded presumption that tainted funds remained in the account despite other withdrawals, *or* that the tainted funds were included in any withdrawal); *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 371 (S.D.N.Y. 2008) (Government need not "prove that the dollars in the Account are the same ones that are traceable to the criminal activity giving rise to the forfeiture").  The Government certainly should not face a more stringent standard in the civil context, and the inapposite cases the Bank Defendants cite involving entities that were not federal grantees lend no support for their position.[22]

---

[22] *See* Br. at 35 (citing *United States ex rel. Sterling v. Health Ins. Plan of Greater N.Y., Inc.*, No. 06 Civ. 1141 (PAC), 2008 WL 4449448, at *6 (S.D.N.Y. Sept. 30, 2008), a pre-FERA amendment FCA case where alleged false claim was made to an "independent accreditation organization" that was not "being funded by, in contract with, or related to the Government *in any way*") (emphasis added); Supp. Br. at 18 (citing *Garg v. Covanta Holding Corp.*, 478 F. App'x

49

Because the Government has alleged that Bank of America sold loans to the GSEs with knowing or reckless misrepresentations as to their compliance with applicable requirements and overall quality, that such misrepresentations were material to the GSEs' decisions to purchase the loans, and that federal funds provided to the GSEs were used for HSSL loan purchases or to reimburse GSE losses on such loans, the Government has adequately stated claims against Bank of America under both § 3729(a)(1)(A) and § 3729(a)(1)(B).

<div align="center">

**CONCLUSION**

</div>

The Defendants' motions to dismiss the Government's amended complaint should be denied in their entirety.

Dated: New York, New York
   April 1, 2013

<div style="margin-left: 40%;">

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

</div>

By:   /s/ *Jaimie L. Nawaday*     
    PIERRE G. ARMAND
    JAIMIE L. NAWADAY
    JOSEPH N. CORDARO
    CARINA H. SCHOENBERGER
    Assistant United States Attorneys
    86 Chambers Street, 3rd Floor
    New York, New York 10007
    Tel: (212) 637-2724/2528/2745/2822
    Fax: (212) 637-2730
    Email: Pierre.Armand@usdoj.gov
       Jaimie.Nawaday@usdoj.gov
       Joseph.Cordaro@usdoj.gov
       Carina.Schoenberger@usdoj.gov

---

736, 741 (3d Cir. 2012) (involving allegedly false statements made to a state agency that received no federal funds at all).