D4TTUSAA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3   ex rel, EDWARD O'DONNELL,
    appearing QUI TAM,
4
                    Plaintiff,
5
            v.                          12 Civ. 1422 (JSR)
6
    BANK OF AMERICA CORPORATION,
7
                    Defendant.
8   ------------------------------x
                                        New York, N.Y.
9                                       April 29, 2013
                                        5:00 p.m.
10  Before:

11          HON. JED S. RAKOFF
                                        District Judge
12

13          APPEARANCES

14  PREET BHARARA
        United States Attorney for the
15      Southern District of New York
        Attorney for Plaintiff
16  PIERRE ARMAND
    JAIMIE NAWADAY
17  CARINA SCHOENBERGER
    JOSEPH CORDARO
18      Assistant United States Attorneys

19  WILLIAMS & CONNOLLY LLP
        Attorneys for Defendant Bank of America
20  BY:  KANNON SHANMUGAM
         BRENDAN SULLIVAN
21

22  GOODWIN PROCTER LLP
        Attorneys for Countrywide Financial
    BY:  RICHARD M. STRASSBERG
23       WILLIAM J. HARRINGTON

24  BRACEWELL & GIULIANI
        Attorneys for Rebecca Mairone
25  BY:  MICHAEL HEFTER
         RYAN PHILIP

1          (Case called)

2          MS. NAWADAY:  Good afternoon your Honor, Jaimie

3  Nawaday, assistant U.S. attorney, for the Southern District of

4  New York for the government.

5          THE COURT:  Good afternoon.

6          MR. ARMAND:  Pierre Armand, U.S. Attorney's Office,

7  also for the government.

8          MR. SCHOENBERGER:  Carina Schoenberger from the U.S.

9  Attorney's Office.

10          MR. CORDARO:  Joe Cordaro, U.S. Attorney's Office, on

11  behalf of the government.

12          MR. SULLIVAN:  Your Honor, for Bank of America,

13  Brendan Sullivan, Enu Mainigi and Kannon Shanmugam.  I point

14  out a little footnote you might be interested in.  Kannon

15  informed me that 18 years ago while he was in school you

16  presided over a moot court competition which he was involved

17  in, and he has been working every day since then for this

18  argument.  He will be arguing for us today.

19          THE COURT:  Did you win or lose?

20          MR. SHANMUGAM:  We did win.

21          THE COURT:  So you think you that sets a precedent, do

22  you?

23          MR. SHANMUGAM:  It's a one-game winning stream.

24          MR. HARRINGTON:  For the Countrywide defendants, Bill

25  Harrington, from Goodwin Proctor.

D4TTUSAA

1          MR. HEFTER:  Your Honor, Michael Hefter for Rebecca

2     Mairone from Bracewell & Giuliani.

3          MR. PHILIP:  Ryan Philip also from Bracewell &

4     Giuliani also on behalf of Rebecca Mairone.

5          THE COURT:  Good afternoon.  I'm ready to hear

6     arguments on the motion to dismiss.

7          MR. SHANMUGAM:  Thank you, your Honor, Kannon

8     Shanmugam for the Bank of America defendants.  I'll be followed

9     by Mr. Harrington and Mr. Hefter for the Countrywide defendants

10    and for Ms. Mairone respectively.

11         May it please the Court, the overarching problem with

12    the complaint in this case is that it seeks to convert breach

13    of contract claims into claims for violations of two federal

14    states, FIRREA and the False Claims Act.

15         THE COURT:  So I agree with you that's a central

16    issue, and I was very surprised that no one cited *Bridge v.*

17    *Phoenix Bond and Indemnity Company*, an opinion of the Supreme

18    Court of the United States on June 9, 2008, and I will give the

19    parties after this argument the opportunity to submit brief

20    letter briefs regarding that case.

21         But the issue in that case was whether a RICO

22    violation predicated on mail fraud was deficient, a civil RICO

23    case, because there was no allegation that the defendants had

24    relied on the misrepresentation.  And the argument which had

25    split the lower courts was that -- it's so nice to be able to

1     refer to the Court of Appeals as a lower court -- the argument

2     was that in a civil case, a civil fraud case, there is no more

3     essential element, it is the warp and woof of civil fraud cases

4     that there be reliance, and you are out of court in every court

5     of the land if you bring a normal common law fraud claim and

6     you can't show reliance.  But the Supreme Court of the United

7     States said that doesn't apply to a RICO claim predicated on

8     mail fraud, all that has to be shown there are the elements of

9     the criminal statute.  Reliance is not an element of the mail

10    fraud statute, and therefore, the case can go forward.

11          Now why isn't that in essence the same argument that

12    the government is making here and that you seek to counter in

13    your claim that this is really a common law claim under the law

14    of New York at least?  And in many jurisdictions it would merge

15    into a breach of contract claim, that may be true, but it's

16    not, it's a RICO claim based on violation of the mail fraud,

17    and there's no such merger doctrine in mail fraud.

18          MR. SHANMUGAM:  Your Honor, I have some familiarity

19    with the *Bridge* case, so let me explain why the *Bridge* case in

20    our view doesn't foreclose application of the *Bridgestone/*

21    *Firestone* doctrine here.  The *Bridge* case, of course, was, as

22    your Honor indicated, a civil RICO case, and the question in

23    that case, as I recall, was essentially whether there has to be

24    reliance by the RICO plaintiff in order for a cause of action

25    under a civil RICO to proceed.  And the Supreme Court, as your

D4TTUSAA

1    Honor indicated, said no in that case, although I would note

2    parenthetically that it left open the question that lower

3    courts, courts of appeals, have been grappling with of whether

4    there has to be reliance by someone for a civil RICO case to

5    lie.

6         Our argument with regard to the *Bridgestone/Firestone*

7    doctrine here is a somewhat different one.  We are arguing

8    simply that the alleged misrepresentations here are breaches of

9    contractual warranties, and because all that is being alleged

10   here is a breach of contract, there can be no fraud claim.

11        Now with regard to civil RICO, because after all, this

12   is a FIRREA case, the government itself -- and I believe this

13   is on page 27 of its opposition -- concedes that with regard to

14   civil RICO cases, and I'm quoting, courts correctly dismiss

15   civil RICO cases where the plaintiff asserts nothing more than

16   non-performance of a contract.

17        THE COURT:  Well, the government may concede that, but

18   in fact is there anything other than district court cases

19   supporting that proposition?

20        MR. SHANMUGAM:  I believe there are also cases, albeit

21   from other courts of appeals, that support that proposition.

22   And in addition, we do cite two cases from this district, the

23   *Goldfine* and *Cougar Audio* case, and the *Sampson* case from the

24   Eastern District of New York for that proposition.

25        THE COURT:  I'm concerned because that was the kind of

1    reasoning, it seems to me, that certain courts of appeals had

2    used to suggest that there had to be reliance and the Supreme

3    Court said they were wrong.  Both the Sixth Circuit and the

4    Eleventh Circuit had held that a plaintiff must show that it in

5    fact relied on the defendant's misrepresentations in order to

6    bring a RICO case premised on mail fraud, and the Supreme Court

7    said they got it wrong.

8            So I'm not totally sure, notwithstanding what you just

9    told me, the government concedes that those other cases, which

10   are not binding on me, obviously -- if they were binding on me

11   that would be a different story, but I'm not sure they got it

12   right either.

13           MR. SHANMUGAM:  Judge Rakoff, let me offer a

14   principled reason above and beyond the government's indication

15   why the *Bridge* case is, I believe, inapposite here.  And, of

16   course, we will be happy to follow up with written briefing if

17   it would be helpful.

18           RICO, of course, does not require reliance as an

19   express element.  What we're talking about when talking about

20   the *Bridgestone/Firestone* doctrine is not reliance, we're

21   really talking about the fraudulent conduct, or in the words of

22   the mail or wire fraud statute, a scheme to defraud.

23           Now just to be clear, the government's claim here, and

24   I think this is really acknowledged at multiple points --

25           THE COURT:  Let me take you up on that for a minute.

1   And I agree with you, I don't want to rest solely on the *Bridge*

2   case, I just thought I would be clever and throw out a case no

3   one had cited, but it may be a bridge too far.

4          So if I sell you a cow, going back to the days when

5   the mail fraud statute was first being promulgated, 1872, so by

6   that time maybe it was a widget, but I sell you a cow and I

7   tell you the cow is in great shape when I know the cow is

8   suffering from mad cow disease, and you buy the cow and a

9   prosecutor says we can't have these fraudulent cow sellers in

10  our jurisdiction, so they bring a criminal case under -- let's

11  say a mailing occurred somewhere in the process -- under the

12  mail fraud statute.  And they assert that you falsely stated

13  the cow was in great shape when you knew darn well that it was

14  in lousy shape and did you so for the purpose of obtaining

15  money or property to the person you sold it to.  You're saying

16  that would be a different case if instead of saying those words

17  orally they put them into a written contract, I hereby sell you

18  one cow in good shape for two dollars, receipt of which is

19  hereby acknowledged, and you both sign it?  That makes a

20  difference?

21         MR. SHANMUGAM:  Judge Rakoff, our argument here turns

22  on the nature of the misrepresentation, and it does not turn

23  dispositively on whether or not it was oral or written.

24         And let me explain, if I may for a minute, why that is

25  so, because I think this goes to the heart of the second of the

D4TTUSAA

1    government's efforts to distinguish *Bridgestone/Firestone*.  The

2    first is its efforts to distinguish FIRREA from civil RICO, and

3    government really offers no principled basis for doing so.  So

4    once we put that aside, the government's other argument is

5    really an argument under the second exception to the

6    *Bridgestone/Firestone* doctrine, the exception for

7    misrepresentations that are either extraneous or collateral to

8    the contract.

9                THE COURT:  But the one I gave was not extraneous or

10   collateral.

11               MR. SHANMUGAM:  Well, the government would certainly

12   take the position, and we would concede that in your

13   hypothetical there is a misrepresentation of present fact.  And

14   the Second Circuit has indicated that when you have a

15   misrepresentation of present fact, it is by definition

16   collateral to the contract even if it could be said to be

17   contained within the contract itself.

18               In your hypothetical --

19               THE COURT:  You accurately say what they said,

20   although I don't understand it.

21               MR. SHANMUGAM:  It is a little confusing.

22               THE COURT:  But what does the fact that it's a present

23   fact have to do with whether it's collateral or non-collateral?

24   Those seem to be two different concepts.

25               MR. SHANMUGAM:  I think they kind of originated as

1    distinct concepts.  The Second Circuit rather conflated them in

2    the *Merrill Lynch* case.  But I think this idea of where the

3    misrepresentation of present fact really came from was the

4    doctrine of fraudulent inducement.  And after all, in your

5    hypothetical where you're telling me that you're selling me a

6    healthy cow and in fact the cow is riddled with mad cow

7    disease, I think it would be pretty easy to see how that

8    contemporaneous statement would induce me to enter in the deal

9    for the cow.

10            Here, by contrast -- I think this is crucially

11   important to the government's arguments -- the government is

12   relying -- is asserting a scheme to defraud based on

13   misrepresentations.  And it could not be clearer from the

14   government's amended complaint that the misrepresentations that

15   the government is talking about are breaches of contractual

16   warranties, warrants of future performance.  The government in

17   paragraph 39 relies on the MSSC, an agreement that was entered

18   into between Countrywide and Fannie in 1982.

19            THE COURT:  But that comes up against the amendment of

20   the mail fraud statute in 1909, which I'm sure you remember as

21   well as I do.  So at common law, a fraud could only involve

22   affirmative misrepresentation of present facts.  And an issue

23   arose among the courts between 1872 and 1909 that whether or

24   not future promises, estimates, predictions, representations

25   could be actionable under the mail fraud statute.  And the

D4TTUSAA

1    United States Supreme Court in the *Durland* case said yes, they

2    can, but Congress wanted to be absolutely sure, so they

3    codified that in the amendment to the mail fraud statute, which

4    had previously just read scheme to defraud, and then they added

5    or for obtaining money or property by means of false or

6    fraudulent representations, pretenses, or promises, making

7    clear that it went beyond present affirmative misrepresentation

8    of present facts.

9            So it's crystal clear from the legislative history, is

10   it not, that the mail fraud was intended to cover, as a

11   criminal matter, the kinds of things you say are not present

12   facts?

13           MR. SHANMUGAM:  I don't think it's clear, with

14   respect, your Honor, that in amending the statute to add the

15   "by promises" language Congress was intending to abrogate this

16   well-establish principle that the Second Circuit expressly

17   stated in *Bridgestone/Firestone*, which is a familiar principle

18   of common law dating back to antiquity.

19           THE COURT:  Forgive me, I totally disagree.  *Durland*

20   on its face says the mail fraud statute in this respect is not

21   governed by the common law, it goes beyond the common law,

22   whereas *Bridgestone* is an explication of what the common law

23   provides for.

24           MR. SHANMUGAM:  Well, I am not suggesting that the

25   mail fraud statute encapsulates the common law view of fraud

D4TTUSAA

more generally as reaching only misstatements of present fact.
What I am suggesting is that there are some promises that are
actionable under the mail fraud statute and others that aren't.
And the ones that aren't actionable are contractual promises,
promises of future performance like these.  And were it
otherwise, not only cases that I cited at the outset that have
applied this principle to civil RICO, but also other cases that
have stated the familiar principle that breach of contract
cannot give rise to a fraud in the context of mail or wire
fraud, such as footnote 8 of the Second Circuit's decision in
*D'Amato*, would all be incorrect.

        And again, the key here is to keep in mind that to the
extent that there is this concept of misrepresentations --

        THE COURT:  Do you know of any case where that was
actually, as you would say, the ratio decidendi, the holding of
the court as opposed to a footnote or an observation in
passing?

        MR. SHANMUGAM:  Not from the Second Circuit in the
context of substantive mail or wire fraud.  I think the Fifth
Circuit has so held in the specific context of criminal mail or
wire fraud, but I think more generally, your Honor, with
respect, that there's nothing exceptional about applying this
principle even to the statutory cause of action, if you will,
of mail or wire fraud, simply by virtue of the fact that that
statute reaches some promises.  Again, there are

1  non-contractual promises and contractual promises, and it could

2  not be clearer from the government's complaint -- and I really

3  encourage to you focus in particular --

4  THE COURT:  I'm sorry, maybe I'm still missing the

5  point a little bit, although I see why you won that moot court

6  argument.

7  So if I have a contract and it says I promise you that

8  you will get at least a ten percent return on your money next

9  year, and I know there's no way that's going to happen because

10  as soon as you give me your money I'm off to Argentina, so you

11  say you read the case saying that is not a mail fraud?

12  MR. SHANMUGAM:  I think the question would be whether

13  there can be a cause of action based essentially on the theory

14  of fraudulent inducement in those circumstances where you have

15  a representation that is contained in the contract but yet a

16  promise of future performance.

17  And I think there is actually a little bit of

18  ambiguity in the case law as to whether or not there could be a

19  cause of action under the circumstances.  But of course, I

20  think it's important to underscore the fact that the government

21  nowhere in its papers or in the original or amended complaint

22  suggested it's relying on a theory of fraudulent inducement

23  here, nor could it, given the MSSC, the relevant document on

24  which the government relies on its amended complaint, was

25  agreed in 1982.

1      Now the government rightly points out that the

2  agreement was subsequently modified and remained in effect for

3  the entirety of the time period in question, but the critical

4  point here is to the extent there is a claim here, it is simply

5  a claim that there was a subsequent breach of that warranty,

6  not fraudulent inducement ab initio.

7      And it's really for that reason that we think the

8  *Bridgestone/Firestone* doctrine applies here.  And the mere fact

9  that the warranties were effective at the time of the sale

10  doesn't in any way undercut what we're arguing today, because

11  were it otherwise, any breach of a contractual warranty could

12  in fact be transformed into a fraud claim because, after all,

13  when a party makes a warranty at time A, knowing that the

14  transaction in question is going to take place at time B, it

15  goes without saying that in the ordinary case the warranty is

16  going to be with reference to time B and not time A, the time

17  at which the goods are transacted.

18      So we really don't think the government offers any

19  valid basis for invoking the second exception to the

20  *Bridgestone/Firestone* doctrine.  And as your Honor points out,

21  at least as the Second Circuit has articulated that exception,

22  it really was, at least until the *Merrill Lynch* case, an

23  exception that applied only to representations that were

24  extraneous or collateral to the contract.

25      And I just point your Honor to page 20 of the

1    government's opposition where I think it is clearest that the

2    government is relying on breaches of the contractual warranty

3    as a misrepresentation that undergird the government's scheme

4    to defraud.

5          I'm happy to answer further questions.

6          THE COURT:  No, I think I have put you to the test

7    already.

8          MR. SHANMUGAM:  I want to circle back to our primary

9    argument on FIRREA, which is the argument about the question of

10   whether the government has a valid theory for whether the

11   alleged fraud affected a federally insured financial

12   institution.  And as your Honor will be aware, the government

13   offers two theories with regard to that effect as to my

14   clients, one of which is actually alleged in the complaint, the

15   other of which is not, at least as to the entity defendants.

16         I will start with the so-called self-affecting theory,

17   the theory that the entity defendants could be liable because

18   the alleged fraud affected them themselves on the theory that

19   the conduct they engaged in exposed them to breach of contract

20   claims.

21         THE COURT:  Now isn't that what Judge Kaplan went off

22   on in his decision last week, I guess it was?

23         MR. SHANMUGAM:  He did address it in his opinion, and

24   we respectfully disagree with his reasoning, which will come as

25   no surprise for your Honor to hear.  And that's really both as

D4TTUSAA

a matter statutory text and a matter of statutory purpose and
structure.  So let me, if I can, put on the table our
arguments, and I'll be happy to answer any questions about
Judge Kaplan's reasoning.

THE COURT:  If you're willing to take Judge Kaplan on,
you're a braver man than me.

MR. SHANMUGAM:  I have no choice but to take on Judge
Kaplan.  With respect, I really do think that his reasoning on
this point is incorrect.  And of course, this was an issue of
first impression for him, so it's an issue of second or third
impression for you, but he has four and a half pages of
analysis on this issue.  He really makes two principal points
which I will address, and I would like to explain why they're
incorrect.

First as a matter of statutory text, I think our
textual argument here is a quite straightforward one.  It is
the most natural reading of this language that the person who
committed the fraud is distinct from the person who is affected
by it.  We really do think it would strain the English language
to say that a fraud affecting a person includes a fraud
committed by that person.

Now Judge Kaplan does tackle that argument in a
footnote of his opinion where he in fact cites our reply brief
in this case, but the sum total of his analysis, and this is
footnote 133 on page 37, is that the Court is not persuaded --

D4TTUSAA

1          THE COURT:  I didn't get that far.

2          MR. SHANMUGAM:  The good stuff is always in the

3    footnotes, as your Honor is aware.

4          He says, and I'm quoting:  Nor is the Court persuaded

5    by the contention that the government's reading is unnatural

6    because it would permit two persons who are separately

7    identified in the statute to be the same person.

8          Creating an exception to whoever to support the bank's

9    reading is far more unnatural.  But we not arguing today that

10   financial institutions are excluded from the "whoever" who is

11   the subject of the sentence in 1833(a)(C)(2), rather we are

12   simply arguing that a financial institution cannot be both the

13   recipient of the effect and the perpetrator of the offense.

14   And after all, if what Congress had really intended to do in

15   this statute was to reach any mail or wire fraud perpetrated by

16   a financial institution, and not simply any mail or wire fraud

17   perpetrated by other persons that affects financial

18   institutions, it could readily have included language to that

19   effect.

20         So at a minimum, we think our reading of the statute

21   is the better one.  We, in fact, think it's unambiguously the

22   better one.  But to the extent your Honor thinks the statute is

23   at least arguably susceptible to the government's reading, we

24   really do think the statutory purpose and structure decisively

25   weigh in our favor here.  And that is for the simple reason

D4TTUSAA

1    that the relevant legislative history -- and I'm referring to

2    the statutory purpose in Section 101(10) and also to the

3    relevant portions of the House report that we cite in our

4    brief -- that legislate history really does make clear, I

5    think, that the civil penalties provision of FIRREA was

6    intended to impose penalties on other persons for defrauding or

7    otherwise harming financial institutions and not to impose

8    penalties on the financial institutions themselves.

9             To the extent that Congress intended to penalize and

10   deter misconduct by financial institutions, it did so by

11   creating a separate regime for these penalties in Section

12   1818(i) and other similar provisions.  And that regime is one

13   that is first administered by the regulating agencies, and the

14   second appropriately balances the need for penalties with the

15   need not to weaken and further weaken financial institutions

16   that may already have been injured by fraud and thereby put

17   federally insured deposits at risk.

18            And Section 1818(i) expressly directs those regulating

19   agencies to take into account the financial well-being of the

20   financial institutions in deciding whether to impose penalties.

21   I note parenthetically, and this is really down in the

22   footnote, that Judge Rakoff suggests in his fairly lengthy

23   discussion --

24            THE COURT:  You mean Judge Kaplan.

25            MR. SHANMUGAM:  Sorry, Judge Kaplan.

D4TTUSAA

1          -- in his lengthy discussion of --

2          THE COURT:  You know, there's no sense comparing me to

3     Judge Kaplan because he is much smarter, much better looking,

4     but I have got a much better beard.

5          MR. SHANMUGAM:  Well, lest I ever appear before Judge

6     Kaplan, I won't comment on that.

7          But let me say that Judge Kaplan goes on in some

8     length about Section 1818(i).  And I don't mean to be unduly

9     critical of him, but that really forms the bulk of his

10    discussion on this issue.  And he makes a lot of the fact that

11    Section 1818(i) imposes penalties on individuals as well as on

12    financial institutions.

13         But we would respectfully submit that there is nothing

14    odd about a regime under which individuals can be subject to

15    penalties under both Section 1818(i) and Section 1833(a)(C)(2)

16    but financial institutions can't.  And that's really because of

17    this valid concern that imposing penalties on financial

18    institutions could further weaken them.

19         Judge Kaplan cites a case I believe from the Central

20    District of California named *Menedez* in a footnote for the

21    proposition that even under Section 1833(a)(C)(2) you have to

22    take the financial well-being of the defendant into account in

23    deciding the appropriate penalties.  But I would note

24    parenthetically, and this is clear from the Central District of

25    California's opinion, that the government in that case somewhat

D4TTUSAA

1  ironically argued that 1833(a)(C)(2) doesn't permit a court to

2  take into account the financial well-being of the defendant in

3  imposing civil penalties under that provision.

4  But again, our principal response to Judge Kaplan on

5  this point is simply that we don't think that there is anything

6  odd about a regime that imposes greater penalties on

7  individuals, particularly given Congress's overarching purpose

8  in FIRREA to go after individuals, particularly insiders, who

9  after all were the principal villains in the savings and loan

10 crises.

11 THE COURT:  All right.  Thank you very much.  Let me

12 hear from your colleagues, then I want to hear from the

13 government.

14 MR. HARRINGTON:  Your Honor, I will not be separately

15 arguing the issues for Countrywide to the extent that there

16 aren't any separate issues, so I won't address this particular

17 issue.

18 MR. SHANMUGAM:  Your Honor, do you want us to address

19 the False Claims Act arguments now or address them after the

20 government?

21 THE COURT:  No, I will tell you -- I mean just so you

22 have a feel for where my head is at at this very preliminary

23 stage, and I don't want to overstate this because I often

24 change my mind after further review of the briefs and oral

25 argument and so forth, is that I am not particularly

D4TTUSAA

1   overwhelmed by the *Bridgestone* argument.  Forgive me for saying

2   that, but I think I'm more troubled, notwithstanding Judge

3   Kaplan's opinion, by the affect argument.  So it's really that

4   that I want to hear from the government on, but we will go to

5   the other issues later on.

6          But let me hear -- I think we should hear from counsel

7   for the individual defendant if they wish to be heard at this

8   time.

9          MR. HEFTER:  Your Honor, Michael Hefter.  I am

10  prepared to talk about the intent to defraud for the purposes

11  of the affecting point.

12         THE COURT:  We'll come back to you later on.

13         Let me hear from the government.

14         MS. NAWADAY:  Thank you, your Honor.

15         If I could return briefly to the scheme to defraud and

16  what was alleged is the essence of the scheme to defraud.

17  Through the HSSL, what defendants did was to originate loans

18  and fund loans as quickly as possible, to sell those loans to

19  Fannie May and Freddie Mac with the representation that these

20  loans were investment quality when they knew they were nothing

21  of the sort.  The loans were of terrible quality.  They sold

22  these loans to Fannie Mae and Freddie Mac with a lie about the

23  quality.  And that's the fraud, and that's the essence of the

24  government's allegations in the complaint.

25         And to go back to your Honor's cow hypothetical, I

think this case is very similar to that.  When you sell goods

with a lie as to the quality of those goods, that's a fraud, as

simple as that.  If you have an agreement to sell a cow and you

fail to deliver the cow, that's a breach of contract.  If you

make representations as to the quality of the cow when you know

these representations are false upon delivery, that's a scheme

to defraud, and that's really what this case is about.

THE COURT:  If you made a representation about

delivery, and at the time you made it you never ever intended

to deliver the cow, that would state a violation of the mail

fraud statute regardless of how it might play out under New

York common law or the like.  Yes?

MS. NAWADAY:  That's exactly right, your Honor.  And

that's what the *D'Amato* case that we cite in our brief stands

for as well, that a promise to perform that's false when made

can support a claim under the mail and wire fraud statute.

But here we additionally allege a misrepresentation of

present fact.  So under any standard we would be outside the

scope of mere breach of contract.  They were delivering the

loans saying they were good loans when in fact what the HSSL

was doing was pushing out loans with defect rates of

40 percent.  And those defects in the loans were loans that

Countrywide and defendants had internally identified as

severely unsatisfactory.  That is the worst rating that you can

give a loan.  And it means the loan is not suitable to be sold

D4TTUSAA

1    to any buyer whatsoever, and it was those loans that were being

2    sold as investment quality.

3            THE COURT:  So what about, as I indicated -- and of

4    course I reserve the right to change my mind about anything

5    before I decide this case, but I was not overly persuaded by

6    their argument on the *Bridgestone* matter, but I was more

7    troubled by the affect argument.

8            MS. NAWADAY:  And I'm happy to proceed to that part,

9    your Honor.

10           We allege two theories that defendants' fraud affected

11   a financial institution in the complaint.  The first, the more

12   obvious and direct one, is that the defendants' fraud affected

13   Countrywide Bank and Bank of America North America or BANA,

14   which are themselves federally insured financial institutions,

15   and we allege the effect on them in terms of the actual losses

16   that they incurred when they had to repurchase defective HSSL

17   loans.

18           THE COURT:  So they're saying, as I understand it, in

19   many ways their argument is a simple grammatical argument.  And

20   this is not the only prong to your bow, but they say it can't

21   be "affect" applies to the perpetrator because it's not the

22   natural meaning or the sense of a sentence in the ordinary

23   discourse that one would say that a fraudulent scheme affects

24   the perpetrator of the fraudulent scheme.

25           They're saying that's a very funny kind of way to read

1    it.  It's a little bit, it reminds me, perhaps this is a very

2    imprecise analogy, but in Section 1962(c) of RICO there's

3    liability for someone who is employed by or associated with an

4    enterprise.  And enterprising plaintiffs attempted early on to

5    say that could mean that a corporation that was typically the

6    deep pocket that a private plaintiff wanted to sue could be

7    both the enterprise and the perpetrator, the defendant, because

8    a corporation could be associated with itself.  And that was

9    rejected all the way up the line because that wasn't the

10   natural reading of that language.  And that's sort of the

11   argument they're making here, you're reading it as, they say, a

12   strained kind of reading.

13        You say well, "affect" is used elsewhere in the

14   statute, it's got a broad interpretation and so forth.  But a

15   sentence has to be looked at in the first instance in terms of

16   the sentence itself.  And the fact that a particular word in

17   the sentence may be used in a different way, because words

18   often have multiple meanings, in an entirely different sentence

19   may be neither here nor there.  So what about all that?

20        MS. NAWADAY:  There's nothing funny about the

21   government's reading, your Honor.  "Affect" as a statutory term

22   is as broad as it gets.  And Congress did use the term -- if

23   Congress had intended for the affected financial institution to

24   be an entity other than the violator, it could have used that

25   phrase precisely, which is a phrase that it uses elsewhere in

D4TTUSAA

1    1833(a).  It chose not to use that phrase here because it was

2    intended to capture even federally insured financial

3    institutions who were the perpetrators of the fraud or

4    otherwise participated in the fraud.  And numerous courts have

5    reached this conclusion looking at the plain language of the

6    text, most recently --

7         THE COURT:  If I were hypothetically to find that it

8    was ambiguous, we would then go to what, the legislative

9    history?

10        MS. NAWADAY:  We should look at the purpose of the

11   statute.  But also before proceeding there, I would point out,

12   because we have been discussing the 1818(i), which sets forth

13   certain administrative civil penalties, that there it's clear

14   that the statute contemplates imposing civil penalties on

15   federally insured financial institutions that engage in conduct

16   that harmed themselves.  And so the statute definitely

17   contemplates punishing and deterring conduct that broadly puts

18   federally insured --

19        THE COURT:  Your adversary says that that proves the

20   opposite, that because they have a provision over here dealing

21   with it, this would be duplicative if they had the sentence

22   we're concerned with.

23        MS. NAWADAY:  That's pure supposition on their part,

24   your Honor.  There's nothing that they can cite to that shows

25   that is intended as an exclusive avenue for civil penalties.

D4TTUSAA

1    And the legislative history that we cite in our brief make

2    clear that the civil penalties set forth in 1833(a) were

3    intended as a third cumulative penalty in addition to those set

4    forth in 1818(i).

5         And I want to point out further to that effect

6    defendants say in their reply brief they acknowledge that

7    Congress did intend to penalize financial institutions for

8    their own misconduct but not through 1833(a).  So they can't go

9    back and appeal to the purpose, which they argue at length in

10   their brief, that this is a statute intended only to protect

11   federally insured financial institutions and not to punish

12   them, because there's already a provision in the statute that

13   plainly contemplates and allows for penalties to punish them to

14   deter other financial institutions from similar conduct.

15        And as far as the significance of the *BoNY Mellon*

16   case, here I would just point out, your Honor, that there's

17   nothing new -- I don't want say there's nothing new in Judge

18   Kaplan's opinion, but this theory was already permitted --

19        THE COURT:  Better not tell him that.

20        MS. NAWADAY:  I apologize, I misspoke.  But the theory

21   itself was plainly permitted by the plain text of the statute

22   and the plain purpose of FIRREA.  And defendants couldn't

23   really point to anything in the text or the purpose that runs

24   counter to this theory, so they made very much of the argument

25   that no court recognized precisely this theory with respect to

1     precisely this section of FIRREA.  And now a court has, and we

2     really believe that knocks down the last of the defendant's

3     arguments against this self-affecting theory under FIRREA.

4           THE COURT:  All right.  Why don't we leave it there.

5     I think next the logical thing is to hear from the individual

6     defendant on intent, and then we'll move to the false claims

7     issue filing.

8           MR. HEFTER:  Thank you, your Honor, Mike Hefter from

9     Bracewell & Giuliani on behalf of defendant Rebecca Mairone.

10          As I was listening to the cow example, I was going to

11    come up here and try to come up with my own hypothetical of who

12    Rebecca Mairone might be in the cow example.  And she's not the

13    owner of the cow, maybe she works as the second in command in

14    the barn.  And she doesn't know that there's mad cow disease,

15    and she keeps the horse alive by feeding the horse on a daily

16    basis.  But she has no idea that the seller intends to sell the

17    cow, she has no idea that there's any misrepresentation to the

18    buyer of the cow, her only role is implement a process for

19    keeping the cow nourished.  And that is part of the essence of

20    the government's problem in pleading the case against

21    Ms. Mairone.

22          So we'll accept the allegations of the complaint as

23    true.  We vehemently disagree that the HSSL was designed for

24    the purposes that the government claims it was designed for.

25    But for the purposes of Rule 12(b)(6), we're required to accept

D4TTUSAA

1    those allegations as true.

2         And where I want to focus your Honor's attention is on

3    the specific element of intent to harm as an element of a mail

4    and wire fraud claim obviously adopted as part of the FIRREA

5    statute.  And for the purposes of the scheme to defraud and for

6    the purposes of the affecting point, we'll rely on the good

7    arguments of the banks.

8         Now we all know that in an essential element of a

9    crime to defraud is fraudulent intent.  Your Honor has written

10   on the subject.  The second Circuit has a number of different

11   decisions.  One of those decisions is the *D'Amato* case that

12   counsel for the government cited, as well as the *Starr* case and

13   the *Tomicic* case, as well as *Autuori* and the *Bifulco* case.  All

14   of those cases say you need not only to commit conduct that was

15   fraudulent, you not only had to know that it was deceptive, but

16   you also had to know that the individual defendant intended to

17   harm the victim, in which case in this case, the GSEs.

18        Now in this case the complaint, the amended complaint,

19   is completely devoid of any allegation that --

20        THE COURT:  The question is:  Harm in what sense?  For

21   example, if you obtain money or property by means of a lie, you

22   clearly have violated the mail fraud statute if you knew that

23   your lie was enabling you to obtain money or property that you

24   weren't entitled to.  So the harm was the harm in that you

25   realized an improper gain.  True?

1          MR. HEFTER:  I believe that's true, your Honor, but

2     there's no allegation in the amended complaint that Ms. Mairone

3     made any statement --

4          THE COURT:  I understand that, I just wanted to make

5     sure when you say "harm," it doesn't mean something apart from

6     the result of a fraud as long as you intend the result of the

7     fraud.  So your argument is that she didn't intend the result

8     of the fraud so there's no sufficient allegation of it.

9          MR. HEFTER:  I think the best example of that is the

10     Second Circuit's decision in *Autuori*, which we cited in our

11     brief, and that's what I call -- or maybe I'm mistaken, the

12     *Bifulco* case, which is that's the case where the individual

13     torches the car.  It's the arson case where the defense of the

14     individual was I didn't understand that my arson, my torching

15     of the car, would have resulted in a false insurance claim,

16     because the owner of the car owed some money to the leasing

17     company and that was the reason why I thought she wanted to

18     torch the car.

19          And I believe the Second Circuit said, in my reading

20     of the Second Circuit was that is sort of ridiculous.  They

21     didn't put it that way, but what they said was somebody who

22     goes out and commits an arson, which is a separate federal

23     offense which he was sentenced for, you can infer from that

24     that he in fact knew that the intent of the scheme was to bilk

25     the insurance company out of money.

1    So if your Honor is suggesting that in that scenario

2  that's the natural cause of the scheme, then I would agree with

3  you.  But what we have here is an allegation that the HSSL was

4  designed to reduce turn time, turn time on the sale of loans,

5  and they allege that.  The government alleges in the complaint

6  that with respect to the HSSL there were certain road blocks

7  that were -- toll gates removed, and that led to a risk that

8  bad loans were going to be sold to the government.  But in and

9  of itself, the notion that a company would attempt to reduce

10 turn time on the sale of loans is not fraudulent.  It's not

11 wrong.  There's nothing bad about it.  It's potentially a

12 legitimate business practice.

13    So what allegation do they have in the complaint that

14 Ms. Mairone knew that all of things that they allege was

15 intended to sell junk loans to the GSEs?  And what I'm

16 suggesting to your Honor is the allegations are purely

17 insufficient to support a claim even at the pleading stage

18 against Ms. Mairone.  What they will argue, your Honor, is that

19 they will point to two paragraphs in the complaint, two

20 paragraphs in the complaint that we focus on, paragraph 88 and

21 paragraph 111.

22    THE COURT:  Let me pull those out once again.

23    Go ahead.

24    MR. HEFTER:  So Ms. Mairone is mentioned a number of

25 different times in the complaint, but with respect to those

D4TTUSAA

allegations she's alleged to -- lumped in together with other unnamed defendants, unspecified defendants, with respect to various aspects of the HSSL. But here they alleged that there were reports internally, and Ms. Mairone instructed those who prepared the reports not to circulate them outside of HSSL, which is the subsidiary of Countrywide relevant here.

Now our position with respect to paragraph 88, your Honor, it's that it is deficient to allege any claim against Ms. Mairone. It's insufficient to allege that she knew or had any knowledge that the HSSL was implemented as a means to defraud or that it was implemented as any intent of hers to harm the GSEs.

And we briefed this in our reply brief. They say, quote, in January -- in the ensuing months, the quality reports on the HSSL loans foretold a systematic problem with loan quality. In January of 2008 when the HSSL represented a significant percentage of HSSL total loan volume, prefunding reports revealed material defect rates of 57 percent overall and nearly 70 percent for stated income loans. There's no allegation that those reports in any way indicated that there were material defect rates of any kind with respect exclusively to the HSSL loans.

Then they allege further down: Again, rather than alter or abandon the HSSL model, Mairone instructed those who prepared the reports not to circulate them outside FSL. Now I

1    will report back or cite back the case that counsel referred

2    to, *U.S. v. D'Amato*.  And there it says a person charged with

3    mail fraud under the right to control theory must intend to

4    injure the person or entity misled, and the person or entity

5    must thus be a specific target of the inaccurate or concealed

6    information.

7            They don't make any allegation that, with respect to

8    any report that Ms. Mairone saw, was somehow or any way

9    concealed from the GSEs.  And the notion that she instructed

10   somebody to not disseminate it outside of FSL, and again,

11   accepting that as true, doesn't mean that she intended that the

12   report -- or that she had a specific intent to exclude that

13   report from the GSEs.

14           THE COURT:  Well, what would have been her proper

15   motive?

16           MR. HEFTER:  Her proper motive, your Honor, would have

17   been to make sure that the information was accurate before it

18   was going to be sent to Countrywide corporate headquarters.

19   That is an equally plausible inference that you could draw from

20   the allegation.

21           Remember, your Honor, FSL was a division of

22   Countrywide.  Countrywide had its own separate set of

23   management.  It's equally plausible that what Ms. Mairone meant

24   was that she wanted to make sure it was accurate before it was

25   going to be shown to her bosses and superiors.  They don't make

1    the allegation that she did anything to make sure that these

2    reports were not disseminated to the GSEs.

3            In fact, there's no allegation in the complaint, your

4    Honor, that Ms. Mairone had any connection to the GSEs.

5    There's no allegation that she had any conduct with the GSEs,

6    much less regular conduct.  There's no allegation that she made

7    any statement to the GSEs.  There's no allegation that she was

8    aware of any of the contractual representations that were made

9    to the GSEs.  There's no allegation that she personally

10   intended or knew that anyone within the banks wanted to sell

11   junk loans to the GSEs.  She wasn't aware, and there's no

12   allegation in the complaint that the GSEs were tightening their

13   purchase requirements.  So therefore, there's absolutely no

14   connection between any alleged representation.

15           THE COURT:  Well, I mean I hear what you're saying,

16   but I'm looking at 88 and 89 together, and actually might even

17   go back to 87 as well.

18           "The purpose of doing prefunding quality reviews is to

19   identify and correct defects in the loans before they close and

20   fund.  During the HSSL, FSL had numerous underwriters with

21   little work and who could therefore have assisted with

22   prefunding quality reviews.  Mairone, however, instructed that

23   such prefunding checks be conducted only on a parallel track

24   with the loan processing so that they would not 'slow the swim

25   lane down.'  Further, the results of the prefunding quality

reports resulted in no changes to the HSSL design.  In the

ensuing months, the quality reports on the HSSL loans foretold

a systemic problem with loan quality."  I'm not quite sure

whether "foretold" is the right verb there, but in any event.

"In January of 2008 when the HSSL represented a

significant percentage of FSL's total loan volume, prefunding

reports revealed material defect rates of 57 percent overall

and nearly 70 percent for stated income loans.  In other words,

FSL's own reports show that more than half of the loans that

were cleared to close and slated for sale to the GSEs were

ineligible for sale to any investor.  The most frequently cited

defects appeared where job dates had been removed, including in

areas of stated income reasonableness and appraisal of

acceptability.  Again, rather than alter or abandon the HSSL

model, Mairone instructed those who prepared the reports not to

circulate them outside of FSL.

"In March of 2008, underwriting managers in

Richardson, Texas asked for a meeting with Mairone to address

their concerns with deteriorating loan quality as a result of

HSSL.  The meeting took place the day after Countrywide CEO

Angelo Mozilo testified before Congress concerning the mortgage

crisis stating that the company's, 'core commitment was to put

people in homes and keep them there,' and that 'it just never

serves our company to make a bad loan.'  Frustrated with the

HSSL's continued emphasis on volume at the expense of quality,

one of the underwriting managers asked Mairone how the HSSL fit

with Mozilo's statements just the day before that the company

was committed to making only good loans.  Mairone responded

angrily in sum or substance, 'Son of a bitch, you need to get

with the program.  We need to keep funding those loans to keep

the lights on.'"

Now if you take all -- and that's just three

paragraphs, and there's other references to her in the

complaint, but if you just take those three paragraphs together

and read them so that one inference builds on another, as I'm

required to do at this stage, why can't you infer that she had

fraudulent intent in the sense she knew she was contributing to

the sale of bad loans that were being masqueraded as good

loans?

MR. HEFTER:  The way I would address that, your Honor,

is to look specifically at the way that the Second Circuit in

*Autuori* and *Bifulco* and other cases that the government cites,

*Ragosta* and the other ones I cited before.  And the way I

would -- first, I would say we obviously disagree with that,

but on the 12(b)(6) we know what the standard is, and we

believe the government is mixing and matching many different

things.

But I will go again, because I don't know if I made

the point the right way, I will go back to paragraph 88, which

I think is a really critical thing here, because what they're

alleging is that Ms. Mairone had knowledge that the HSSL loans

had deteriorating quality based on these prefunding reports,

and thereafter took -- didn't do anything to stop whatever was

going to happen.

But I think if you really parse the way the government

alleged it, it's critical to understand and read this

carefully, because it says in January of 2008 when the HSSL

represented a significant percentage of FSL's total loan

volume.  So let's stop there.  It's not a hundred percent of

the FSL loan volume, and they don't say what the significant

percentage is.  Is it ten percent?  Do they think a significant

percentage is 20 percent, 40 percent?  We don't know, but we do

know it's less than a hundred percent.

THE COURT:  But significant is usually a synonym for

material, and all they would need to show is materiality.  Yes?

MR. HEFTER:  I'm not sure with respect to the intent

to defraud point, your Honor.

THE COURT:  Well, I'm not sure I'm following what

you're saying about that.  If I were able to show that you

made -- you took action to make sure that a material percentage

of bad loans were nonetheless approved for sale, the fact that

it wasn't a hundred percent of the loans wouldn't matter.  It

could be a much smaller percentage as long as there was a

material percentage, as long as it wasn't de minimus, right?

MR. HEFTER:  It could be, but there wasn't an

D4TTUSAA

1    allegation that Ms. Mairone had the role of approving the loans

2    for sale.

3            THE COURT:  I understand, but I'm not sure what your

4    point is.  They're saying in January 2008, when the HSSL

5    represented a significant percent of FSL's total loan volume,

6    meaning the loans that were being offered for sale.  Yes?

7            MR. HEFTER:  No, your Honor.

8            THE COURT:  You mean the totality of all the loans?

9            MR. HEFTER:  The totality of all the loans.  If you

10   read the next part of the sentence:  Prefunding reports

11   revealed material defect rates of 57 overall and nearly

12   70 percent for stated income loans.

13           THE COURT:  So I understand the ambiguity, and forgive

14   me for not understanding it before, I understand what you're

15   saying now.  But then isn't that clarified by the very next

16   sentence as to what "they" mean, because they say:  In other

17   words, FSL's own reports showed that more than half of the

18   loans that were cleared to close and slated for sale to the

19   GSEs were ineligible for sale to any investor.

20           So whatever uncertainty there may have been as a

21   product of the wording in the sentence that you just clarified

22   for me, it is now -- put in a different context, it's now

23   clarified in a way more relevant to the issue of fraud by the

24   following sentence.  Yes?

25           MR. HEFTER:  Respectfully, your Honor, I disagree.

1          THE COURT:  Tell me why.

2          MR. HEFTER:  I believe the following sentence

3   propounds the ambiguity in the allegation, because it says:  In

4   other words, FSL's own reports, the reports they refer to,

5   showed that more than half of the loans -- they don't say what

6   loans they're talking about.  Is it the HSSL loans, or is it

7   the other part of the -- other part of loans that were cleared

8   to close?

9          THE COURT:  No.  How could you say that if it didn't

10  relate back to the previous sentence?  They may not have put in

11  the amount of precision here that you would have liked, but in

12  the first sentence they identify material defect rates, very,

13  very high material defect rates in the total loan body.  But

14  then they say, "In other words," linking that then to the next

15  sentence, "FSL's own reports show that more than half of the

16  loans that were cleared to close and slated for sale to the

17  GSEs were ineligible for sale to any investor."

18          So they are clarifying what you thought was left

19  ambiguous in the previous sentence by linking those two

20  together.  And you may say:  How does the second follow from

21  the first?  So that's an evidentiary detail that they may have

22  to establish if the case goes to trial, but it's clear that the

23  two sentences are linked, are they not?

24          MR. HEFTER:  It's clear that the two sentences are

25  linked by virtue of the fact that one follows from the other,

1     but however --

2            THE COURT:  And the fact they say "in other words,"

3     meaning we think it follows from what we know about the data

4     that we have summarized perhaps too generally in the first of

5     those two sentences, we know how that data shows what we assert

6     in the second sentence here.

7            MR. HEFTER:  We may be struggling over semantics here,

8     your Honor.

9            THE COURT:  That's why we went to law school, right?

10           MR. HEFTER:  By the point here is the way they get to

11    the intent to defraud aspect with respect to Mairone is that

12    she was aware that there was a higher level of defects in the

13    HSSL loans.

14           And my point to your Honor is when you parse this out,

15    which is the key paragraph in the complaint which shows she was

16    aware of these prefunding reports, it is not clear, and they're

17    required to be clear, whether they're talking about whether she

18    was aware that there was a higher defect rate with respect to

19    loans that flowed through the HSSL or whether she was aware

20    there were high defect rate loans that were non-HSSL loans.

21           THE COURT:  And so they would say if there's ambiguity

22    there, it is resolved by certain of the further allegations,

23    such as her instruction to those who prepared those reports not

24    to circulate them, and her response when, later on in March of

25    2008, she was confronted with questions about the quality of

1  the loans, and she says we need to keep funding those loans to

2  keep the lights on.  No one of those things is unambiguous, but

3  the government would argue if you take all of those together,

4  they form a picture.  You say they're picking and choosing

5  little bit from here a little bit from there.  That may be.

6  That, though, I don't think is something that I can address in

7  a motion to dismiss, can I?

8        MR. HEFTER:  We're required to accept as true,

9  however, there are allegations in the complaint that we contend

10  where Ms. Mairone is lumped together with other defendants that

11  fail to satisfy Rule 9(b).

12        THE COURT:  That's a different point.  I agree with

13  you on that point.

14        MR. HEFTER:  And there are allegations that when

15  you -- that are specific to Rebecca Mairone, very few, and then

16  when you look at those allegations, we don't believe that they

17  allege that she was aware that the program itself was designed

18  to defraud anybody.

19        So the fact that she's a corporate executive telling

20  people they have got to get with the program, it's ambiguous as

21  to whether she means -- I would say it's not ambiguous.  They

22  don't allege that she meant that let's keep on going because

23  we're going to sell bad loans to the GSEs, it's equally

24  plausible that she was saying we need to continue to underwrite

25  loans.  And as far as I know --

D4TTUSAA

1      THE COURT:  Why would she respond angrily if that were

2  the case?

3      MR. HEFTER:  I don't know why she would respond

4  angrily.

5      THE COURT:  The inference from angrily is she's been

6  confronted with an accusation that they're selling bad loans,

7  and she says get with the program, we need to do this to get

8  the lights on.

9      I'm not saying there aren't alternative possibilities,

10  and especially I am a little bothered that the way this last

11  sentence is worded says Mairone responded angrily, in sum or

12  substance, then there's a quotation mark, meaning they're not

13  quoting her, meaning they are quoting their witness which told

14  them this.  And that's a different story, perhaps.

15      MR. HEFTER:  Yes, it is, your Honor.  And also they

16  don't say that's what the person said they told him, they say

17  "in sum and substance."  So as a matter of pleading, we have no

18  idea whether that's true.

19      THE COURT:  Well, we don't know whether that's an

20  exact quote, what we know is it's the allegation of the

21  substance of what she said.

22      MR. HEFTER:  But your Honor, if we don't know it's an

23  exact quote, how can we know whether she said it angrily, if

24  your Honor believes the fact that she said it angrily is

25  relevant to whether it's a fact from which fraudulent intent

D4TTUSAA

1    can be inferred?

2         THE COURT:  All right.  Let me -- I know we could

3    discuss other things, but let me hear from your adversary.

4         MR. HEFTER:  Thank you, your Honor.

5         THE COURT:  Thank you very much.

6         MS. NAWADAY:  Thank you, your Honor.  I would like to

7    go back to the point I heard that this was essentially all

8    legitimate business practice, because I think I need to go back

9    to some of the details of the scheme in order to show

10   Ms. Mairone's participation in it.

11        There are three features of the HSSL scheme to defraud

12   I would like to highlight based on what we discussed in the

13   complaint.

14        THE COURT:  To interrupt you for a second, while they

15   are trying to say that everything you've alleged could be

16   consistent with legitimate business practices, they are also

17   arguing that even if it wasn't, it doesn't show her knowledge

18   and intent with respect to the overall purpose of the fraud.

19        You could, for example, cut corners because you wanted

20   to save money or because you just thought that the requirements

21   of your boss were unreasonable or for a hundred other reasons

22   that might not be legitimate reasons but wouldn't show that you

23   knew you were, by cutting those corners, participating in some

24   overall fraud.

25        MS. NAWADAY:  Understood, your Honor.  I think they're

1    wrong on both fronts.  First, in terms of the scheme itself,

2    Mr. Hefter talked about this reduction in turn time.  What they

3    tried to do with the HSSL is speed up the processing of loans

4    from an average of two months from application to funding to

5    just two weeks.  And the way in which they did that was to

6    strip away underwriters and nearly every other checkpoint on

7    quantity.  As your Honor knows, underwriters are the

8    individuals in charge of assessing whether a borrower is likely

9    to repay a loan.  So they took away the underwriters and

10   replaced them with loan processors.

11           THE COURT:  But if, hypothetically, her purpose in

12   doing so was just to speed up loans, period, without any intent

13   to thereby increase the percentage of bad loans, she wouldn't

14   be chargeable, would she?

15           MS. NAWADAY:  That's correct, your Honor.  An

16   efficient business model would not be fraud.

17           THE COURT:  Even if it creates the conditions of

18   fraud, nevertheless, if that's not what you intend by it,

19   you're just a person whose intent to move things along rapidly,

20   the fact that it in this particular case created the conditions

21   of fraud wouldn't make you guilty, right?

22           MS. NAWADAY:  That's correct.  But here Ms. Mairone's

23   intent is clear.  She was on the design team for the HSSL.  She

24   was in charge of implementing the HSSL.  She knew what the loan

25   processors were doing because, as we allege, all the loan

1    processors reported not to underwriting managers but ultimately

2    up to Ms. Mairone.

3         And the loan processors were basically instructed:

4    You need to fund these loans as quickly as possible.  They were

5    given loan funding quotas to fund 30 loans a month, one loan

6    every day.  They had their compensation entirely revamped so

7    they were paid based purely on speed alone.  They had the

8    tools, what Mr. Hefter called the job aids, removed from them.

9    These were the tools that assisted underwriters in performing

10   basic tasks like assessing reasonableness of income and

11   evaluating an appraisal.  Those were necessary for underwriters

12   to use but deemed unnecessary for loan processors who were

13   entirely new in this role.

14        And warnings were raised about the HSSL design itself

15   immediately.  People knew this was a recipe for disaster, not

16   only the risk managers within Full Spectrum who said this

17   entire HSSL model seems to be in direct conflict with what

18   we're hearing the president of Countrywide Home Loans saying,

19   what we're seeing in the market in terms of a more conservative

20   climate.  And the warnings were raised even by the loan

21   processors themselves.  As we allege in the complaint, loan

22   processors raised their concerns with senior management, and

23   they feared they would be churning out defective loans.  And as

24   a result, their pay would take a hit because loan processors

25   previously had a quality-based component to their compensation.

1      So what was the response to this?  The response to the

2   loan processors was not:  Don't worry, you'll be properly

3   trained, quality will remain in place.  It was instead:  Don't

4   worry, we won't pay you based on quality anymore, we're going

5   to pay you on speed alone.

6      And if there was any doubt as to what the HSSL would

7   lead to, that doubt was removed as soon as the initial quality

8   reports came in in October 2007.  And we specifically allege in

9   the complaint that the reports in October 2007 were reports on

10  HSSL loans.  They were testing the HSSL pilot loans.  They were

11  shown to Mairone, and she directed that no changes be made to

12  the HSSL design.  The problems continued in these loans month

13  after month.

14      In the meantime, Mairone directed that the HSSL be

15  expanded from low risk products to all loan products.  So there

16  we have another indication that the HSSL design itself was

17  known to be risky because it was initially restricted to low

18  risk loans.  But Mairone was the one who decided that the HSSL

19  should be expanded to all loan products in Full Spectrum.

20      And that's why we also know why the defect reports in

21  January 2008, that maybe we don't specifically allege them as

22  HSSL reports, at that point the HSSL has essentially taken over

23  Full Spectrum at Ms. Mairone's direction.  So by January 2008

24  we have prefunding quality reports that show upwards of

25  50 percent in defects.  We have post-closing reports that show

D4TTUSAA

consistently 40 percent material defect rates.  And what's the
response of defendants?  What's the response of Ms. Mairone in
particular?  It's not:  We made a mistake, let's bring back the
underwriters, let's stop the HSSL.  It's:  Let's bury the bad
news, let's keep funding the loans.  And that's what we see
again and again.

          So if there was any doubt as to what the HSSL would
lead to and where the loans were going, Ms. Mairone was the
chief operating officer of Full Spectrum.  She knew about the
contractual relationships with the GSEs.  She was the one who
designed the HSSL.  And the HSSL, as we allege in the
complaint, was designed to sell loans to the GSEs.  She
certainly knew that these loans were going to Fannie Mae and
Freddie Mac, they were being tagged internally as severely
unsatisfactory, and yet they were sold to Fannie Mae and
Freddie Mac as investment quality loans.

          The only change that we allege in the complaint that
was made in response to the defect rates in early 2008 was in
fact another bonus incentive program.  So to bury essentially
the bad news in these defect reports, what defendants did was
create a new incentive plan for the quality control employees.
But the incentive was not designed to help the quality control
employees improve loan quality or cure defects that were
identified in the loans, instead they were paid a bonus just
for arguing against defect findings that were made in the loans

1    and for getting those findings overturned.

2            In terms of the meeting that we allege in Richardson,

3    Texas where the underwriting managers brought their concerns to

4    her, we believe it's clear from the allegation that the

5    underwriting managers brought their concerns to her because

6    they recognized that she was a key decision maker in the HSSL

7    process.  And again, those concerns were rebuffed.  She decided

8    we should keep funding the loans, stay the course, even though

9    at that point the result of the scheme was clear, defective

10   loans were being sold to the GSEs as investment quality loans.

11           THE COURT:  Am I right -- by the way, this is a small

12   point, but just to clarify, the quote at the end of paragraph

13   89 and is a quote of what someone who was present said, not

14   what she said?

15           MS. NAWADAY:  That's correct, your Honor.

16           THE COURT:  All right.  I'm a little concerned because

17   I have a conference call at 7:00, but I want to hear on the

18   false claims issue.  So what I think we'll do is in about three

19   minutes take a ten-minute break and come back and hear --

20   unless counsel think they can deal with it in very short order,

21   the main issue I had on the False Claim Act is the question of

22   the loans after May 20th, 2009.  And assuming arguendo that

23   what has been pled is insufficient, whether that can be cured

24   by the amended complaint on that point.  But let me hear

25   quickly from counsel, and if we have to come back after the

1    break we will.

2              MR. SHANMUGAM:  Judge Rakoff, I might propose one

3    thing.  I wonder whether I could tidy up one point on FIRREA

4    that I think is quite important, then we would be prepared to

5    come back perhaps after your conference call and briefly

6    address the False Claim Act.

7              THE COURT:  OK.

8              MR. SHANMUGAM:  I want to address one loose end on

9    FIRREA, because as I indicated in my initial presentation, the

10   government has two theories as to how that might be a relevant

11   effect here as to the financial institution.  And I didn't

12   address in my opening argument the second theory, namely the

13   theory that the entity defendants can be liable because they

14   affected other financial institutions.

15             THE COURT:  Yes, thank you for reminding me of that,

16   yes.

17             MR. SHANMUGAM:  And I think it's no coincidence that

18   this didn't come up in my friend Nawaday's submission, because

19   while this was really the sole theory that the government

20   advanced in its complaint as to the entity defendants -- and

21   you can take a look at paragraph 221 of their complaint, which

22   is Count 3 of the FIRREA count against the entity defendants --

23   it really has gradually diminished in importance in the

24   government's submissions.

25             And I respectfully submit that is for good reason,

1  because Section 1833(a)(C)(2), as government concedes, requires

2  a direct and not a remote effect on the financial institution

3  in question.  The government's theory here is that other

4  financial institutions were affected because they were

5  shareholders in Fannie and Freddie who lost their investments

6  when Fannie and Freddie went into conservatorship.

7  But the problem with that argument –– the principal

8  problem with that argument is the derivative investment

9  injuries on which the government is relying are really no

10  different in kind from the injuries suffered by any other

11  shareholder in Fannie and Freddie.  There's really nothing

12  unique to their status as financial institutions when it comes

13  to those injuries.

14  And even separate and apart from the question of

15  whether or not these sorts of derivative investment injuries

16  can ever qualify under FIRREA, we think that the derivative

17  investment injuries here can't qualify.  And that's really for

18  a reason that Judge Kaplan hinted at in his opinion.  We

19  believe that it is correct that, as Judge Kaplan indicated,

20  that the direct effect requirement imports at least some

21  notions of proximate causation.  And to the extent that

22  proximate causation is part of the direct effects inquiry, here

23  we believe that the derivative investment injuries in question

24  are indirect by any measure because there is an insufficiently

25  proximate causal connection between the loans at issue, which

D4TTUSAA

1    after all were --

2          THE COURT:  Why would -- if you wanted to talk using

3    the kind of argument you used before in a different context, if

4    you wanted to have proximate causation you would say "caused"

5    or something like that, or "by reason of," as opposed to a term

6    like "effect," which suggests more like "in connection with"

7    than a proximate causation.

8          MR. SHANMUGAM:  Well, it certainly is true, Judge

9    Rakoff, when Congress uses a phrase like "by reason of" that

10   imports a notion of causation.  But I think here when Congress

11   talks about direct effects and direct effects of the alleged

12   misconduct -- because after all, we're talking about a

13   provision that is worded in terms of mail or wire fraud

14   affecting a financial institution -- it really does require at

15   least some degree of causation.  And I don't understand the

16   government to be suggesting otherwise, perhaps they would, but

17   as Judge Rakoff indicated -- or Judge Kaplan indicated --

18          I have done it twice now, and I apologize to both of

19   you.

20          THE COURT:  That's all right.  Judge Kaplan and I were

21   classmates at law school.  Our third classmate was Judge Kimba

22   Wood.  Now if you start calling me Judge Wood, I will be

23   flattered, but she will be horrified.

24          MR. SHANMUGAM:  Last time I saw her, she didn't have a

25   beard.

D4TTUSAA

1    But in all seriousness, Judge Rakoff, because I

2 believe this is really important, we believe there is an

3 insufficient causal connection here, regardless of exactly how

4 proximate it has to be, between the alleged loans, the loans in

5 question here, which after at all, as the earlier colloquy

6 indicated, were but a percentage of the loans that were

7 originated from a particular division of the Countrywide at the

8 time, and the losses of these financial institutions which

9 really flowed directly from the complete collapse of Fannie and

10 Freddie.

11    So we certainly think that even if this Court were to

12 recognize there could be circumstances under which these sorts

13 of derivative investment injuries would qualify as satisfying

14 the direct effects requirement, and the government can't cite a

15 case for the proposition that that is sufficient, we certainly

16 believe that the injuries in this case were insufficient.

17    THE COURT:  All right.  I will hear from the

18 government in response and then we'll go to the false claims.

19 I think this conference call will take no more than ten

20 minutes.  So come back in ten minutes and it certainly won't

21 take more than fifteen, but we'll resume as soon as the call is

22 over.

23    (Recess taken)

24    THE COURT:  We're about to hear from the government on

25 the last argument.

1          MS. NAWADAY:  Your Honor, on the derivative theory, I

2     would like to make a few points in response.  One is that it's

3     clear under the Second Circuit's decision in *Bouyea* and other

4     cases that essentially an ownership interest is sufficiently

5     direct.  When you have a fraud that targets a subsidiary, there

6     can be an effect on the parent by virtue of that ownership

7     interest.  And there's no reason to permit that type of

8     connection as sufficiently direct but at the same time to

9     foreclose as a matter of law the shareholder relationship

10    alleged in the complaint.

11         Here we alleged a billion dollar fraud that caused

12    loss to the GSEs, and we've alleged that these federally

13    insured financial institutions were permitted to invest

14    essentially an unlimited percentage as their core capital in

15    Fannie Mae and Freddie Mac, and we identified specific banks

16    that invested 50, 60, 70 percent of their investment capital in

17    these institutions.  It's clear, and we clearly allege that a

18    billion dollar loss to the GSEs exposed these institutions,

19    these insured banks, to a risk of loss.  And risk of loss is

20    sufficient under the case law to show an effect under FIRREA.

21         As to the proximate cause point, we don't believe that

22    proximate cause has ever been articulated as the standard, but

23    in any event, we believe it would be satisfied in this

24    particular case based on the relationship between the billion

25    dollar loss and the institutions that invested 50, 60,

1    70 percent of their capital in the GSEs.

2         Finally, your Honor, if this type of relationship were

3    foreclosed as a matter of law, we believe --

4         THE COURT:  Proximate cause, in any event, is a

5    function of the purpose of the statute, that while in torts,

6    for example, it's typically equated with foreseeability, it

7    used to be back in the old days called legal cause as opposed

8    to proximate cause, which I think more accurately reflected the

9    fact that since but for causation can go on to very great

10   lengths, the determination of where to cut the chain is

11   essentially a policy decision.  Sometimes Congress makes it,

12   but more often it's left in the courts to decide.  But in the

13   courts deciding it, they have to look at the purpose of the

14   statute.  And the purpose here was, you would argue, a very

15   broad one, designed to be very protective over a wide swath of

16   the involved community or financial community, and therefore

17   should be broadly interpreted on the proximate cause.  Yes?

18        MS. NAWADAY:  That's exactly right, your Honor.

19        THE COURT:  I thought you might agree with that.

20        All right.  Let's hear on the False Claims Act from

21   counsel.

22        MR. SHANMUGAM:  Thank you, your Honor.

23        The government's claims under the False Claims Act in

24   our view fare no better than the government's claims under

25   FIRREA.  And I think it's important to note at the outset there

is agreement that the government's claims here are claims only

against the Bank of America defendants and not the Countrywide

defendants.  The government agrees with us that the only

relevant claims for purposes of the False Claims Act claims are

claims that were presented to Fannie or Freddie after May 20,

2009.

I want to start by saying a word about how this

amended complaint came about, because I think it illustrates

why the amended complaint in its current form is deficient, and

it also illustrates, quite frankly, why we believe it would be

inequitable to give the government an opportunity to amend.  In

the original complaint the government made no allegations

whatsoever about claims presented after May 20th, 2009, and we

naturally pointed that out in our motion to dismiss.

In response to that motion to dismiss, the government

filed its amended complaint in this case, and the government

certainly had ample time in which to amend.  And the sole thing

that the government did in response to our motion raising this

issue was to add to the complaint the two-page Exhibit A which

is the two-column spreadsheet found at the end of the

complaint.  And quite frankly, that spreadsheet is a discredit

to spreadsheets everywhere because the spreadsheet simply lists

loan numbers and dates on which loans were ultimately

transferred to Fannie and Freddie.  There are no specific

allegations in the spreadsheet or in the complaint itself that,

D4TTUSAA

1    as to those specific loans, Bank of America breached any

2    contractual representations in any particular respect.

3            And indeed, the government simply added a single

4    sentence to the body of its compliant incorporating this

5    exhibit by reference.  And in that single sentence the

6    government noted that these were simply examples of loans that

7    had defaulted.  Now, of course, the fact that a loan had

8    defaulted tells us absolutely nothing about whether or not

9    there had been breaches of contractual warranties that attended

10   those defaults.  Of course, loans can default for the most

11   benign of reasons regardless of the accuracy of representations

12   made in loan applications.

13           And so again, we simply think that this spreadsheet is

14   insufficient.  I would note parenthetically that the

15   spreadsheet lists loans that were funded before May 20th, 2009

16   as well as after, so the relevant claims are but a subset of

17   this already threadbare spreadsheet.  But, of course, our

18   fundamental submission here is that the government simply

19   failed to identify the false claims and to allege them with

20   sufficient particularity as is required under the relevant

21   precedent.

22           THE COURT:  So assuming arguendo that I agreed with

23   all that, why shouldn't they be given leave to amend?

24           MR. SHANMUGAM:  The government already had ample

25   opportunity to amend.  And, of course, these being claims under

the False Claims Act, the government had the opportunity to

take pre-complaint discovery, so the government already had a

head start here, and there are hundreds of thousands of pages

that the government was able to obtain through that discovery.

But again, critically, the government has had ample

opportunity to amend in response to precisely the argument that

we're making here today.  The argument that we made in our

supplemental motion to dismiss in response to their amended

complaint was really not very different from the argument we

made in our initial complaint where we said look, you have to

have more particularity.  And again, all the government did was

to add this two-column spreadsheet and add a single sentence to

paragraph 113 Of the complaint which says in full, and I will

quote this, "A sample of additional HSSL loans that funded in

2008 and 2009, were sold to Fannie and Freddie and later

defaulted, are identified in Exhibit A."  So again, that's the

sum total of the relevant allegations that are contained in the

amended complaint.

I want to say one word on one other issue to kind of

get this on the table.  The government in its brief relies on

the Fifth Circuit's decision in *Kanneganti* and your Honor's

unpublished memorandum in *Huron Industries* and really relies on

them I think for the proposition that the government is somehow

excepted from the requirement of making specific allegations

where the government can allege sufficiently a scheme to

1    present false claims.

2         Now I would note first and foremost that the Second

3    Circuit in its decisions has never suggested that there are

4    circumstances under which the particularity requirement can be

5    relaxed in this fashion.  But assuming arguendo that that is an

6    open question in the Second Circuit under the current state of

7    the law, we still don't believe that the government has done

8    enough here.  And that's really for a couple of different

9    reasons.

10        First of all, even if it were sufficient to allege a

11   scheme to defraud, as if a False Claims Act claim is but a

12   sequel to a mail or wire fraud claim, this complaint is

13   noticeably bare when it comes to allegations that the scheme

14   continued into the relevant time period, namely after May 20th,

15   2009.  The sole allegation in the complaint with regard to the

16   scheme continuing is a single conclusory sentence in paragraph

17   7 of the complaint which stands for the proposition that the

18   scheme continued after Bank of America merged with Countrywide.

19   And of course the relevant question is not whether or not the

20   scheme continued after that date or whether it continued after

21   May 20th, 2009.

22        But I would say a word more about this Court's

23   decision in *Huron Industries*, in particular to the extent that

24   the government relies on it.  That case is really

25   distinguishable, we would respectfully submit, for two

1    principle reasons.  First of all, it was a case in which the

2    information that the relator brought to bear was much more

3    detailed than the information provided here.  Your Honor may

4    recall that in that case there was a 54 column spreadsheet, and

5    while we are certainly not suggesting a County of Riverside

6    bright line rule to how many columns you need to have, we are

7    suggesting there was ample information in that case from which

8    the requisite strong inference could be drawn that false claims

9    were presented.

10           And second, to circle back to a point that I made

11   earlier, that was a case involving a complaint by a relator who

12   did not have the opportunity to take discovery.  And this Court

13   noted in that very brief memorandum opinion that it was a

14   circumstance in which the relator therefore didn't have the

15   opportunity to access the critical information about whether

16   the defendant was making valid outlier payments under Medicare

17   that it would need in order to assert a valid claim.

18           So to the extent that the exception that the Fifth

19   Circuit recognized in *Kanneganti* for cases in which the

20   existence of false claims can essentially be inferred is a

21   valid exception, we simply don't think that it could be

22   triggered here or else the particularity requirement would lose

23   any meaning.

24           I might as well as say a word about the False Claims

25   Act to finish up the argument, and that's the argument, of

1   course, about government funding.  I think our argument here is

2   really quite a straightforward argument that turns on the

3   deficiency of the government's pleading.  The government's sole

4   allegation about funding here is the allegation that is

5   contained in paragraph 29.  That's the allegation that says

6   that the GSEs have received federal funding since the

7   conservatorship occurred, and those federal funds, "have also

8   been used to purchase mortgages sold in 2009 from lenders,

9   including defendants, and to reimburse losses incurred by the

10  GSEs as a result of their guaranteeing their mortgages."

11          We think that bare allegation without more is

12  insufficient.  That not to say, as the government suggests,

13  that we think that this Court would have to require

14  traceability of funds in order to satisfy the requirements that

15  are set out in Section 3729(b)(2)(A)(2) which is the statute

16  that after the amendment in FIRREA specifies the narrow

17  circumstances in which a claim presented to an entity other

18  than the federal government can be actionable, but we do think

19  there has to be something more here.  And that something more

20  doesn't have to be the traceability, it could simply be an

21  allegation that the government provided some limitation on or

22  engaged in ongoing supervision of the funds at issue.

23          And so to accept the government's contention that this

24  bare allegation would be sufficient would really be to kind of

25  blow the covers off the FCA, as the Third Circuit suggested in

D4TTUSAA

1    its opinion in *Garg*, the opinion we cite in our brief.  The

2    scope of the FCA under the government's view would really be

3    enormous.  And while it is certainly true that the 2009

4    amendment to Section 3729 was intended to broaden the FCA in a

5    meaningful sense, namely to overrule the Supreme Court's

6    decision in the *Allison Engine* case which required presentment

7    to the government, we certainly don't think that the

8    requirements codified in (b)(2)(A)(2) can be read so generously

9    to prevent any level of federal funding to suffice.

10          THE COURT:  Thank you very much.  Let me hear from the

11   government.

12          MS. NAWADAY:  Your Honor, I will begin with the 9(b)

13   point.  As your Honor knows, the point of the 9(b) requirement

14   is to give fair notice to the defendants so they can prepare a

15   defense to the charges against them.  Here what we allege

16   provides them with more than fair notice.  We alleged the

17   scheme to defraud in detail.  We alleged reliable indicia as

18   the case law requires that false claims were submitted.

19          All of this grows out of allegations that we already

20   discussed, the same facts, the same loans that we alleged the

21   scheme to defraud continued through 2009.  We identified the

22   individual loan numbers of loans that were sold to Fannie Mae

23   and Freddie Mac after May 20th, 2009.  Each of those loans was

24   a HSSL loan, as we allege in the complaint.  Each was therefore

25   sold to Fannie May and Freddie Mac with the misrepresentation

1    that the loan was investment quality when in fact it was not.

2         Defendants haven't identified what more they need in

3    order to be able to prepare a defense against the claims

4    against them.  They have all of the information they need based

5    on this scheme and based on the individual loan ID numbers.

6    They themselves have the loan files.  They can learn who the

7    underwriters were, who the loan processers were involved in the

8    loan files.  This gives them more than enough for fair notice.

9         And finally, just very briefly on the government

10   funding point, there is simply no basis to impose this

11   requirement.  Courts understand --

12        THE COURT:  I'm not sure that the purpose of 9(b) is

13   simply fair notice.  My recollection, and I can't off the top

14   of my head cite you a case, but is that 9(b) grew out of a

15   concern that it was too easy in a commercial situation to

16   allege fraud without really having a basis to do so, and that

17   the result would be in the narrow sense strike suits and in the

18   broader sense a clog on the commerce, because every time two

19   parties entered into a commercial dispute one side or the other

20   would try to transform it into a claim of fraud.

21        This is similar, although not identical, to why the

22   common law developed the practice referred to in *Bridgestone* of

23   not allowing fraud claims to be -- not allowing breach of

24   contract claims to be transmogrified into fraud claims in the

25   normal course.  It wasn't so much that there couldn't be fraud

D4TTUSAA

in those situations, it was because there were dangers there.

Dangers, I might add, that are completely absent in the mail

fraud context. There were dangers that a private plaintiff

could really bog down the normal flow of commerce by taking an

everyday commercial dispute and trying to transform it into a

fraud claim. It's the same allegation that is usually made

against RICO, against private civil RICO as opposed to

government RICO.

So that's a long-winded way of saying I'm not sure

that it's only a question under 9(b) of fair notice. Do you

have case law that says that's the exclusive purpose of 9(b)?

MS. NAWADAY: I don't, your Honor, and I acknowledge

there are other purposes as well. I did not mean to suggest

it's the only purpose of 9(b), but I believe it's the purpose

that primarily would be implicated in this type of case.

And as to the traceability argument that defendants

raised, they say it's not a traceability requirement per se,

but they fail to define exactly what it is or what basis they

have for imposing this requirement in this particular case. We

have more than alleged federal funds. We have alleged one $187

billion of federal money that went to Fannie Mae and Freddie

Mac for the express purpose of buying loans to support the

secondary mortgage market. And we alleged that those funds

were used to buy loans after May of 2009. That is enough for

the FCA claim.

D4TTUSAA

1          THE COURT:  All right.  Thank you so much.

2          MR. SHANMUGAM:  Your Honor, could I make one quick

3     point in response?

4          THE COURT:  I would have been so disappointed if you

5     hadn't.

6          MR. SHANMUGAM:  And I promise it will be quick.

7          My friend Ms. Nawaday says what more could we do in

8     order to allege valid claims under the False Claims Act?  Well,

9     it is the False Claims Act, it is not the fraudulent scheme

10    act.  And we would respectfully submit that at a minimum the

11    government could identify particular claims that it believes to

12    be false or fraudulent.  That is what the government has failed

13    to do.  And with Exhibit A, all the government has done is to

14    identify loans that have been defaulted.  And so therefore, we

15    can't be --

16         THE COURT:  Let me ask the government, assuming for

17    the sake of argument that that was a requirement, and assuming

18    for the sake of argument I then agree with your adversary that

19    you shouldn't be able to amend, would you have a basis for

20    amending at this point to specify what he says is at minimum

21    necessary?

22         MS. NAWADAY:  Your Honor, if additional detail is

23    required as to particular loans, we would point out that our

24    expert disclosures are in fact due next week, so we would be

25    able -- we would be in a position to provide plenty of

additional detail about loans or about individual claims.

MR. SHANMUGAM:  And I would simply note, again, that the government has had ample opportunity already to provide that information and failed to do so.

THE COURT:  How are you prejudiced?  If, for example, let's say they amended next week by essentially putting some of the data from their expert report into their complaint, how would you be prejudiced?

MR. SHANMUGAM:  Well, my point is not that we would be prejudiced, it is simply that the government has had ample opportunity to do so.  If your Honor permits the government to amend, we will have to see if the government included specific information in order to satisfy the Rule 9(b) requirement.

And quite frankly, to the extent that the government included allegations regarding pre-2009 loans in the complaint, we believe those allegations are insufficient.  So unless the government is able not only to identify factual defects in particular loans but to actually tie those factual defects to problems in the underwriting process and alleged deceptions to those problems, we don't believe any amendment would be sufficient.

So we're certainly not afraid of the prospect of the government amending in the wake of the exchange of the expert reports, we simply don't think that the government is going to be able to allege sufficient detail to satisfy the requirement.

1    And I would make one final point by way of conclusion,

2    which is that this all really circles back to the fact that is

3    really a breach of contract claim clothed under the guise of

4    these two federal statutes.  And of course your Honor will be

5    aware of the fact that my client, Bank of America, has already

6    settled with Fannie Mae for upwards of $10 billion on precisely

7    those underlying breach of contract claims.  This is nothing

8    more than an effort by the U.S. Attorney's Office to pile on

9    that existing lawsuit.  We believe the claims are deficient and

10   should be dismissed.

11        THE COURT:  I don't know that.  When I was a defense

12   counsel there were certain clients against whom the lawsuits

13   continued for decades, and I always thought of that as a gift

14   that keeps giving.  But this is not this situation, perhaps.

15        Anyway, is there anyone else who needs to be heard on

16   any issue?

17        MR. HEFTER:  Your Honor, if I could respond 20, 30

18   seconds to Ms. Nawaday.

19        THE COURT:  Yes.

20        MR. HEFTER:  I think Ms. Nawaday's response to my

21   argument, your Honor, presents the exact problem that we face,

22   which is, if you listen carefully, it was they did this, they

23   did that, they did this, the HSSL was this, the HSSL was that.

24   All I'm suggesting to your very briefly is that if you look at

25   the complaint, Ms. Mairone is mentioned in approximately 13 --

1    I think that I counted that right -- 13 paragraphs in the

2    entire complaint, excluding the charging paragraphs and causes

3    of action.  And what they're trying to do is make broad general

4    allegations about what the HSSL is and then alleging several

5    things that she did and lumping it all together.

6           And my suggestion to you, your Honor, under 9(b) and

7    under Rule 12(b)(6), that's inappropriate.  And I don't want to

8    say anything more about that because it's late, but I think

9    that in looking at the complaint, in looking at the

10   allegations, in looking specifically at the intent to harm,

11   that the specific allegations with respect to her and what she

12   did, most of them are innocuous under any circumstance, should

13   be taken into consideration.

14          THE COURT:  Thank you very much.

15          I thank all counsel for this very helpful argument.  I

16   think I mentioned earlier if anyone wanted to write on the

17   *Bridge* case, but I think defense counsel, to my great pleasure,

18   showed great familiarity with that case and gave me the defense

19   views of it.  So let me find out if anyone feels the need to

20   submit anything on the *Bridge* case.

21          All right.  Good.  So I feel need to get you a bottom

22   line decision quickly so that we continue to move this case

23   forward as we, thanks to all counsel, have been able to do thus

24   far.

25          So I can't get you an opinion, a full opinion, that

D4TTUSAA

1    quickly, although I guarantee you my opinion, when it does

2    come, will be shorter than Judge Kaplan's.  But I will get you

3    a bottom line within two weeks to be followed, of course, by a

4    full opinion thereafter.  So let's see, today is April 29th, so

5    two weeks would be May 13th.

6                    Very good.  So I thank again everyone, and the Court

7    will take the matter under advisement.

8                                         o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25