**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,<br><br>     Plaintiff,<br><br>         v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE,<br><br>     Defendants. | 12 Civ. 1422 (JSR)<br><br>ECF Case |

**UNITED STATES OF AMERICA'S RESPONSE TO THE BANK DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS, AND COUNTERSTATEMENT OF ADDITIONAL FACTS, PURSUANT TO LOCAL CIVIL RULE 56.1**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y.  10007
Tel. No.:  (212) 637-2800
Fax No.:  (212) 637-2730

PIERRE G. ARMAND
JAIMIE L. NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN LONDON
SHANE CARGO
Assistant United States Attorneys
    -Of Counsel-

Pursuant to Civil Rule 56.1(b) of the Local Civil Rules of the United States District Court for the Southern District of New York, Plaintiff the United States of America (the "United States" or "Government"), by and through its attorney, Preet Bharara, the United States Attorney for the Southern District of New York, responds to the Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("BoA 56.1 Stmt.") submitted by defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB ("Countrywide Bank") (collectively, "Countrywide"), Bank of America Corporation and Bank of America, N.A. ("BANA") (collectively, "Bank of America," and together with Countrywide, the "Bank Defendants"), and to the Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Mairone 56.1 Stmt.") submitted by defendant Rebecca Mairone.  In responding to the Bank Defendants' 56.1 Statement and Mairone's 56.1 Statement, the United States does not concede the materiality of any of the statements and does not concede the truth or materiality of any statements made by any defendant in its headings and subheadings.  The United States responds as follows:

**DEFENDANTS' KEY FACTS SUPPORTING SUMMARY JUDGMENT**

I.    **The Record Is Devoid of Any Evidence that
      There Was Fraudulent Intent or a Scheme In This Case.**

1.    The undisputed evidence in the record is that there was no fraudulent intent in this case.  Rather, the High Speed Swim Lane (HSSL) pilot and Central Fulfillment were efforts by the Full Spectrum Lending ("FSL") Division to process low-risk prime loans more efficiently. No witness alleges that the High Speed Swim Lane (HSSL) process was designed or implemented with fraudulent intent.  To the contrary, all the evidence in the record—including the relator's own testimony—reflects that the individuals involved in the High Speed Swim Lane pilot and Central Fulfillment were honest, hard-working people who intended to do the right thing and had no "intention to commit fraud."[1]

**Response to Paragraph 1:**  The Government disputes the statements in paragraph 1 as unsupported by admissible evidence insofar as the paragraph contains multiple sentences with no citations to evidence, and the third sentence refers to "all the evidence in the record" but cites only to two lines of deposition testimony; otherwise disputes the statements in paragraph 1.  *See generally* Statement of Additional Facts Pursuant to Local Civil Rule 56.1 ("U.S. SOF").

2.    The testimony and documents of relator Ed O'Donnell—the architect of this case and a critical part of FSL management in his role as Executive Vice President of Central Services—make clear that:

Design of the High Speed Swim Lane

- O'Donnell was personally involved in the design of the HSSL process,[2] and represented the risk and underwriting groups on the HSSL design working group.[3]

- O'Donnell's intent "in participating in the working group…was certainly not to

---

[1] Mainigi Decl. Ex. 22 (O'Donnell Dep. 29:7-8).

[2] Mainigi Decl. Ex. 22 (O'Donnell Dep. 47:3-8).

[3] Mainigi Decl. Ex. 22 (O'Donnell Dep. 47:3-8).

deliver a fraudulent process.  It was to deliver a measured process that would allow [FSL] to fund good quality prime loans more quickly."[4]

- His role in the HSSL design was to ensure that quality was not compromised and to ensure that the company properly allocated its underwriting resources.[5]

- O'Donnell participated in developing the criteria for the HSSL pilot.[6]

- He agreed that it was necessary for FSL to change its origination process as the company shifted from subprime to prime[7] and believed that the processing of prime loans needed to move more quickly.[8]

- He thought that any new process should not require underwriter involvement.[9]

- He also understood that loan  processors often had additional underwriting authority in the prime lending world[10] and testified that some loan specialists in the HSSL process were former underwriters.[11]

- O'Donnell agreed with allowing loan specialists to determine stated income reasonability.[12]

- O'Donnell was comfortable with the HSSL process, because after the pilot he applied to lead Central Fulfillment,[13] and even drafted an organization chart with his name at the top of the Central Fulfillment organization.[14]

---

[4] Mainigi Decl. Ex. 22 (O'Donnell Dep. 118:18-22).

[5] Mainigi Decl. Ex. 22 (O'Donnell Dep. 49:4-18).

[6] Mainigi Decl. Ex. 22 (O'Donnell Dep. 108:16-19).

[7] Mainigi Decl. Ex. 22 (O'Donnell Dep. 40:13-18).

[8] Mainigi Decl. Ex. 22 (O'Donnell Dep. 37:22-38:17).

[9] Mainigi Decl. Ex. 75 (BANA-SDNY-E-000048777 ("Couple of notes below.  Any new process should not require "UW" involvement. We should be thinking of leveraging UW only on critical Risk related items.  Sign offs should be built to be completed within Processing and only when escalation is required should UW be injected into work flow.")).

[10] Mainigi Decl. Ex. 22 (O'Donnell Dep. 98:13-17).

[11] Mainigi Decl. Ex. 22 (O'Donnell Dep. 106:6–107:19).

[12] Mainigi Decl. Ex. 74 (BANA-SDNY-E-000020170 (noting that they discussed the topic with Cliff Kitashima and agreed to go forward with allowing loan specialists to determine income reasonability.)

Quality of Grade ("QOG")

- O'Donnell agreed to, and in fact announced to the teams, the suspension of certain elements of QOG.[15]

- He "thought that it made sense" and "wasn't concerned that the result would be a bunch of bad loans."[16]

Quality and Efforts to Improve Process

- FSL installed many "controls . . . over the years" such that its exposure was to "manufacturing quality, not fraud or unethical stuff." Indeed, O'Donnell believed that FSL had "reacted well each time we find a trend and seal the gaps." Still, late 2007 and early 2008, it was "near impossible to defend yourself in this environment when the facts are not important . . . noise is more popular."[17]

- O'Donnell had some concerns about the quality of loans produced by the HSSL pilot, so he recommended—and the company implemented—a training and certification process for loan specialists performing the HSSL process to address his concerns.[18]  This training and certification process was essentially the same as the existing training for junior underwriters and underwriting associates and was

---

[13] Mainigi Decl. Ex. 22 (O'Donnell Dep. 161:10-17).

[14] Mainigi Decl. Ex. 90 (BANA-SDNY-E-001263185 (email to Kitashima attaching spreadsheet) attachment at Mainigi Decl. Ex. 91 (BANA-SDNY-E-001263187)).

[15] Mainigi Decl. Ex. 67 (BANA-SDNY-E-003960393 ("In addition to the wrappers outlined below, we will also be suspending QOG "hits" on Prime Loans for the next two months for all monthly incentive plans.")); Mainigi Decl. Ex. 63 (BANA-SDNY-E-000086853) ("I am ok with a suspension for 90 days for certain elements of the QOG. We should keep those tied to key areas such as Responsible Lending, Fraud, Affordability and Collateral.") Mainigi Decl. Ex. 68 (BANA-SDNY-E-000210249 (explaining that for "QOG on prime loans. Fraud, Responsible Lending would still subject employees to disciplinary action.  Remember, we are talking only about Prime fundings.")).

[16] Mainigi Decl. Ex. 22 (O'Donnell Dep. 137:23-138:10).

[17] Mainigi Decl. Ex. 177 (BANA-SDNY-E-003960750 (O'Donnell email to Michael Thomas noting, in addition to the above, that it was "reassuring to see all the controls we've had in place over the years . . . we've reacted well each time we find a trend and seal the gaps, . . . but it's near impossible to defend yourself in this environment when the facts are not important . . . noise").

[18] Mainigi Decl. Ex. 22 (O'Donnell Dep. 103-104, 180-183).

adopted in response to the HSSL pilot.[19]

- When there were concerns about quality within FSL in early 2008, the highest levels of management including Drew Gissinger, then Chief Operating Officer of Countrywide Home Loans, and Greg Lumsden, then President of FSL, got involved and quickly addressed those concerns.[20]

- O'Donnell led a remediation effort within FSL that ultimately resulted in the reinstitution of underwriter signoff on every loan.[21]

- O'Donnell told Bank of America in 2009 that "the remediation enacted with legacy FSL during Q1 2008 had the desired impact of bringing quality back to the target environment."[22]

**Response to Paragraph 2:** The Government disputes the characterization of Edward O'Donnell as the "architect" of this case. The Government does not dispute that Edward O'Donnell was involved in the design of the HSSL process, represented the risk and underwriting groups on the HSSL design working group, and had concerns about the quality of the HSSL loans. The Government also does not dispute that FSL was shifting from a subprime to a prime model. The Government otherwise disputes the statements in paragraph 1. *See* U.S. SOF at ¶¶ 206, 217-20, 258-335, 338-345, 380-86; Nawaday Decl. Ex. DL (Email from O'Donnell) BANA-SDNY-E-001655912-13 at 12.

3.       The remainder of the FSL management team has also powerfully testified that FSL was focused on quality and intended to fund high-quality loans that were eligible for sale to the

---

[19] Mainigi Decl. Ex. 22 (O'Donnell Dep. 103-104).

[20] Mainigi Decl. Ex. 22 (O'Donnell Dep. 244:14-15, 19 ("[T]here was a very strong reaction from Drew [Gissinger] about the quality in general. . . . He was violently upset at the quality problems.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 228:23-229:13); Mainigi Decl. Ex. 169 (BANA-SDNY-E-003960738 (O'Donnell e-mail – "Drew was 'into' some of our suggestions, but Greg wanted more restrictive changes. In many ways, we need the subprime process reapplied to our work flows.")).

[21] Mainigi Decl. Ex. 22 (O'Donnell Dep. 299:6-300:25); Mainigi Decl. Ex. 157 (BANA-SDNY-E-008928071 at 7 (O'Donnell remediation deck)).

[22] Mainigi Decl. Ex. 161 (BANA-SDNY-E-000780338 attaching Mainigi Decl. Ex. 162 (BANA- SDNY-E-000780344)); Mainigi Decl. Ex. 22 (O'Donnell Dep. 233:20-25, 235:4-237:13).

GSEs.  Greg Lumsden, FSL former President, testified as follows:

- Quality was always a high priority at FSL.[23]

- He has never told his organization that production was more important than quality.[24]

- He would not have signed off on FSL's prime process if he thought it was going to compromise quality in any way.[25]

- The company was not trying to hide anything with the High Speed Swim Lane.[26]

**Response to Paragraph 3**:  The Government disputes the characterization of Lumsden's testimony as "powerful" and otherwise disputes the statements in paragraph 3 on the basis that, among other things, FSL failed to disclose the quality of the HSSL loans to the GSEs as well as critical information about the HSSL process.  U.S. SOF ¶¶ 388-407.  Additionally, Greg Lumsden's testimony is not credible, as it is contradicted by documents authored by him. Nawaday Decl. Ex. AR (Aug. 8, 2007, Email from Lumsden) BANA-SDNY-E-002578346 ("[T]his is the highest priority for the majority of Full Spectrum, and thus I need your direct and intense involvement.  If we do not improve our prime fundings to over 50%, the organization impact will be far beyond a few layoffs here and there."); Nawaday Decl. Ex. CB (May 16, 2007, Email from Lumsden) BANA-SDNY-E-005180366 ("I do not support expanding underwriting authority and responsibility outside of Underwriting."); Nawaday Decl. Ex. CW (Nov. 30, 2007, Email from Kitashima) BANA-SDNY-E-008979444-47 at 45 ("If we do not fund the volumes per our budget, we will not have to worry about QA and QC.").

---

[23] Mainigi Decl. Ex. 20 (Lumsden Dep. 91:9-94:5).

[24] Mainigi Decl. Ex. 20 (Lumsden Dep. 102:2-102:3).

[25] Mainigi Decl. Ex. 20 (Lumsden Dep. 144:22-145:11).

[26] Mainigi Decl. Ex. 20 (Lumsden Dep. 139:14-141:8); Mainigi Decl. Ex. 20 (Lumsden Dep. 142:11-144:10).

Finally, Lumsden's testimony is not credible because he was unable to recall basic facts about the company's business during 2007, including whether it was profitable or whether it even sold loans to the GSEs.  Nawaday Decl. Ex. S, Lumsden Tr. 26:9-15 ("[W]as Countrywide, as a whole, experiencing financial distress during the summer of 2007?  A.  Yeah.  I don't know that I can really speak to that.  I don't know what distress means.  It's a little vague."); Nawaday Decl. Ex. S, Lumsden Tr. 77:16-78:3 ("So you don't remember one way or the other if Fannie Mae and Freddie Mac were the primary purchasers of FSL loans during 2007 and 2008?  A.  I was never informed that they were specifically buying our loans.  Q.  You were never informed during the 2007, 2008 timeframe that Fannie Mae and Freddie Mac were buying FSL loans? A. No.  And I don't believe they bought any of our loans at any time in our history, to be honest with you.").

4.      Mr. Kitashima, formerly FSL's Chief Risk Officer and Ed O'Donnell's boss, testified as follows:

- Representatives from all departments participated in the design of the HSSL process, and there was no effort to hide anything about the process.[27]

- Kitashima agreed with the process as designed, and thought it was "fantastic".[28]

- It was the goal of everyone in the organization to improve credit standards.[29]

- FSL always monitored quality, so things like temporarily suspending QOG, didn't create a credit risk.[30]

- FSL "made every attempt to communicate what [it] w[as] doing" to the GSEs and "held nothing back."[31]

---

[27] Mainigi Decl. Ex. 19 (Kitashima Dep. 121:5-122:20).

[28] Mainigi Decl. Ex. 19 (Kitashima Dep. 90:23-91:2).

[29] Mainigi Decl. Ex. 19 (Kitashima Dep. 24:25-25:5).

[30] Mainigi Decl. Ex. 19 (Kitashima Dep. 53:24-54:4; 146:14-23; 171:13-16).

[31] Mainigi Decl. Ex. 19 (Kitashima Dep. 172:7-173:3).

**Response to Paragraph 4**:  The Government disputes the statements in paragraph 4 on the basis that, among other things, FSL failed to disclose the quality of the HSSL loans to the GSEs as well as critical information about the HSSL process.  U.S. SOF ¶¶ 388-407.

Additionally, Kitashima's testimony on this issue is not credible, as it conflicts with other documentary and testimonial evidence regarding his concerns.  Nawaday Decl. Ex. BV (Aug. 01, 2007, Email from Rodriguez) BANA-SDNY-E-000094539-41 at 39 (acknowledging that Kitashima told him "he's very worried about [loan specialists making determinations of stated income] reasonability, as most of our findings in UW relate to such"); Nawaday Decl. Ex. W, O'Donnell Tr. 147:7-16 ("During the pilot itself there was a push for more loans, more product, different types of product to be added to the pilot . . . So they wanted to add more stuff to that and both Cliff and I objected to that."); Nawaday Decl. Ex. Q, Kitashima Tr. 98:2-19 (testifying that the impact from the continued suspension of the QOG concerned him because "we had originally agreed to have the suspension last for a period of time.  And arguably we still had issues that were related to quality coming up at that point in time.  So I thought that it was prudent for us to go slower on extending it any further."); Nawaday Decl. Ex. BJ (Jul. 31, 2007, Email from Kitashima) BANA-SDNY-E-00009805 (suggesting that Rosemead fulfillment center be excluded from HSSL pilot "due to ongoing investigations by FSL Fraud Risk Mgmt"); Nawaday Decl. Ex. Q, Kitashima Tr. 80:5-14 (testifying that he would have had concerns about including Rosemead in central fulfillment model); Nawaday Decl. Ex. DI (Mar. 6, 2008, Email from Kitashima) BANA-SDNY-E-008959506-09 at 06 (agreeing, based on 79% of Q4 SUS ratings being attributed to income reasonability, that "the current process is in the ditch").

5.      Ms. Mairone, Chief Operating Officer of FSL, a defendant in this matter testified as follows:

- When transitioning to prime loans, FSL was focused on making sure that they transformed their process with "diligence and quality" while "taking care of" the

employees.[32]

- The goal of HSSL and Central Fulfillment was to follow the guidelines and utilize CLUES to correctly produce high quality loans.[33]

- FSL used many techniques to manage quality, including both technology and system such as CLUES as well as regular supervisor review of loan files. Individuals would lose their jobs if they did not produce quality loans.[34]

- Similarly, CLUES manipulation would lead to termination.[35]

**Response to Paragraph 5**:  The Government disputes the statements in paragraph 5 on the grounds that, among other things, numerous employees raised specific warnings that the HSSL design would lead to, and did lead to, high rates of material defects.  U.S. SOF ¶¶ 258-89, 337-38.  Mairone in particular continued to push volume over quality long after the high defect rates in HSSL loans were evident.  U.S. SOF ¶¶ 339-46.

Additionally, Mairone's testimony is not credible because it conflicts with other documentary and testimonial evidence.  Nawaday Decl. Ex. AC, Thomas Tr. 91:25-92:24 (testifying to "thinking . . .  at some point, somebody will put on the brakes and say, Okay. We've had enough.  We see there's issues.  Let's slow down or correct it.  And I just felt like we were heading towards a cliff. . . [Listening to concerns about quality] "was -- was gone.  It was volume.  It felt like a survival mode to me."); Nawaday Decl. Ex. D, Boland Tr. 38:25-39:1 ("There was considerable campaigning information when the Hustle was rolled out that loans only moved forward; they never moved back. . . . [I]t was designed to change the former status quo, which was focused on quality, and do the right thing. . . .  And the mentality changed to always move forward; never move back."); Nawaday Decl. Ex. AC, Thomas Tr. 43:25-44:13

---

[32] Mainigi Decl. Ex. 21 (Mairone Dep. 162:22-163:5).

[33] Mainigi Decl. Ex. 21 (Mairone Dep. 171:6-21).

[34] Mainigi Decl. Ex. 21 (Mairone Dep. 31:6-32:10; 113:17-113:24).

[35] Mainigi Decl. Ex. 21 (Mairone Dep. 100:14-101:2).

(Mairone "was very much pushing the [HSSL] process . . . and just didn't want to hear objections anymore"); Nawaday Decl. Ex. E, Brent Tr. 124:22-125:2; 125:14-126:5; 126:4-14 (Brent's concerns about high defect rates from the HSSL repeatedly discounted and his working relationship with Mairone became confrontational); Nawaday Decl. Ex. D, Boland Tr. 98:24-99:11 (describing a meeting in which underwriting managers expressed their concerns to "the catalyst of the—the Hustle, who was Rebecca Mairone" and she responded to concerns by becoming "visibly upset" and responding with an "expletive that sent a message to the team that questions like that were . . . not welcome").

Mairone could not recall any controls on quality for the HSSL other than the quality assurance reviews, Nawaday Decl. Ex. T, Mairone Tr. 68:16-70:3, and she ordered that those reviews be directed only to her so that others could "focus on production", Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Comeaux) BANA-SDNY-E-001115006-07 at 07, even though she had no experience in managing either underwriting or quality control, Nawaday Decl. Ex. T, Mairone Tr. 18:21-20:18.  Mairone also suspended penalties relating to poor quality, ultimately extending this "reprieve" to all FSL employees.  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Comeaux) BANA-SDNY-E-001115006 at 07 (extending QOG reprieve to all central fulfillment); Nawaday Decl. Ex. AZ (Dec. 12, 2007, Email from O'Donnell) BANA-SDNY-E-003960408-09 at 2 ("[E]ach FSL employee will have a QOG reprieve on all funded units completed through 12/31/07.").  *See also* U.S. SOF ¶¶ 285-87 (describing problems with CLUES manipulation).

6.      Mr. Comeaux, Executive Vice President of Central Fulfillment, testified as follows:

- Quality was a primary concern for Comeaux as the leader of Central Fulfillment.[36]

- Their goal, even when dealing with the QA reviews, was to "focus on the most

---

[36] Mainigi Decl. Ex. 9 (Comeaux Dep. 33:23-25).

important things that led to quality issues."[37]

- The employees processing loans wanted to do a good job and wanted to produce high-quality loans.[38]

- Ultimately, the decisions made to reform the process were not necessary because FSL's quality results were already fine,[39] but senior management was always concerned about quality and always looking for ways to improve quality.[40]

**Response to Paragraph 6**:  The Government disputes the statements in paragraph 6.

U.S. SOF ¶ 313-14, 338-40.

Additionally, Comeaux's testimony on this issue is not credible as it conflicts with documentary and testimonial evidence. Nawaday Decl. Ex. CT (Nov. 26, 2007, Email from Comeaux) BANA-SDNY-E-001114384-86 at 84 ("we have to increase velocity (fundings) with velocity . . . . While showing respect to other departments, we have to take ownership of funding 'a hell of a lot' more loans in December!"); Nawaday Decl. Ex. CV (Nov. 27, 2007, Email from Wade Comeaux) BANA-SDNY-E-001334182-85 at 82) (seeking to "to limit [QA] calls to 1 hour per week at most" so he and others could "focus on production for the next few weeks"); Nawaday Decl. Ex. AR (Aug. 8, 2007, Email from Lumsden) BANA-SDNY-E-002578346 ("[T]his is the highest priority for the majority of Full Spectrum, and thus I need your direct and intense involvement.  If we do not improve our prime fundings to over 50%, the organization impact will be far beyond a few layoffs here and there."); Nawaday Decl. Ex. CB (May 16, 2007, Email from Lumsden) BANA-SDNY-E-005180366  ("I do not support expanding underwriting authority and responsibility outside of Underwriting."); Nawaday Decl. Ex. CW (Nov. 29, 2007, Email from Kitashima) BANA-SDNY-E-008979444-47 at 45 ("If we do not fund the volumes

---

[37] Mainigi Decl. Ex. 9 (Comeaux Dep. 43:24-25).

[38] Mainigi Decl. Ex. 9 (Comeaux Dep. 44:22-45:8).

[39] Mainigi Decl. Ex. 9 (Comeaux Dep. 52:13-53:4).

[40] Mainigi Decl. Ex. 9 (Comeaux Dep. 70:9-16).

per our budget, we will not have to worry about QA and QC."); Nawaday Decl. Ex. AC, Thomas Tr. 91:25-92:24 (testifying to "thinking . . .  at some point, somebody will put on the brakes and say, Okay.  We've had enough.  We see there's issues.  Let's slow down or correct it.  And I just felt like we were heading towards a cliff . . . [Listening to concerns about quality] was – was gone.  It was volume.  It felt like a survival mode to me."); Nawaday Decl. Ex. D, Boland Tr. 38:25-39:13 ("There was considerable campaigning information when the Hustle was rolled out that loans only moved forward; they never moved back. . . . [I]t was designed to change the former status quo, which was focused on quality, and do the right thing. . . .  And the mentality changed to always move forward; never move back.").

7.      Kitashima, O'Donnell, and Mairone were each deeply involved in the design of the High Speed Swim Lane.[41]  Each of these senior managers delegated certain aspects of the HSSL process design to subject matter experts on their teams.[42]  These lower-level employees were involved in the design aspects within their areas of expertise.[43]  Along with Lumsden, the senior managers were accountable for all features of the process and signed-off on the ultimate design.[44]  Senior manager Wade Comeaux, although not involved in designing the HSSL process, was selected to lead the Central Fulfillment organization and was deeply involved in the implementation of the HSSL-like process adopted as part of the Central Fulfillment workflow.[45]

**Response to Paragraph 7**:  The Government does not dispute the statements in paragraph 7.

---

[41] Mainigi Decl. Ex. 21 (Kitashima Dep. 119:5-16).

[42] Mainigi Decl. Ex. 6 (Brent Dep. 134:6-9).

[43] Mainigi Decl. Ex. 21 (Kitashima Dep. 115:15-23).

[44] Mainigi Decl. Ex. 20 (Lumsden Dep. 145:3-6 (We . . . signed off on every aspect of the high speed swim lane test.")).

[45] Mainigi Decl. Ex. 9 (Comeaux Dep. 18:23–20:20).

8.     Inexplicably, the government declined to depose Mark Barnett – the architect of the HSSL, an aerospace engineer by training and a process engineer by trade.[46]  Mr. Barnett – who no longer works for Bank of America – has submitted a declaration, however, in this matter and states as follows:

- Barnett led a team of processing engineers and a group of subject matter experts to design the HSSL process.[47]

- Everyone's views were considered in this process.[48]

- The ultimate process was very similar to FSL's sister division CMD's process and relied on CLUES to make the underwriting decision and loan specialists to validate the information put into CLUES.[49]

- He did not intend the process to originate poor quality loans or defraud the GSEs, and, to his knowledge, all those involved in the design were honest individuals with good intentions.[50]

**Response to Paragraph 8:**  The Government does not dispute that it did not depose Mark Barnett and that he was involved in the design of the HSSL, but otherwise disputes the statements in paragraph 8.  U.S. SOF ¶¶ 206, 258-387.

9.     Messrs. Brent and Aliano, current Bank of America employees who were two of the lower-level employees involved in the design of the HSSL from their particular subject matter expert perspectives, and were identified by the government as witnesses who were involved in, but did not agree with all aspects of, the HSSL's design.

---

[46] M. Barnett Decl. ¶ 3.

[47] M. Barnett Decl. ¶¶ 4-7.

[48] M. Barnett Decl. ¶ 11.

[49] M. Barnett Decl. ¶¶ 15, 17.

[50] M. Barnett Decl. ¶ 27.

- Mr. Aliano testified, for example, that he was a risk management person involved in the design of the HSSL, from the first whiteboard session[51] through implementation.[52]   His role was to raise risk issues or concerns, ensuring that the process stayed within set "guardrails."[53]   Aliano felt that he could raise, and did raise, those concerns throughout the process to other, more senior risk-management personnel.[54] He was ultimately comfortable with the HSSL-like process in Central Fulfillment, even though not all of his recommendations were implemented, because he created, and FSL implemented, a risk/authority matrix that provided adequate guardrails around loan processing.[55]

- Similarly, Mr. Brent, an FSL quality-control and quality-assurance employee, was involved in the design of the HSSL as a subject-matter expert on quality control and quality assurance.[56]   He sometimes did not agree with others about the process, but recognized that "[i]n all business you come up with a new process. You debate it.  You get all your experts and [subject-matter experts] to opine, and then management makes a decision."[57]   That, he testified, is what happened in the High Speed Swim Lane:[58] although he sometimes disagreed with others and management did not always take his recommendations about the HSSL process, his disagreements with management were part of the normal design process, and were not indicative of fraud.[59]

**Response to Paragraph 9**:  The Government disputes the statements in paragraph 9.

Aliano's testimony on this issue is not credible as it is contradicted by documents authored by

him; Aliano singled out the HSSL as the cause of the decline in quality in FSL, congratulated

---

[51] Mainigi Decl. Ex. 1 (Aliano Dep. 14:13-19:7).

[52] Mainigi Decl. Ex. 1 (Aliano Dep. 40:20-23).

[53] Mainigi Decl. Ex. 1 (Aliano Dep. 118:8-17).

[54] Mainigi Decl. Ex. 1 (Aliano Dep. 35:1-10, 110:8-12).

[55] Mainigi Decl. Ex. 1 (Aliano Dep. 103:1-105:8).

[56] Mainigi Decl. Ex. 6 (Brent Dep. 133:21-134:19)

[57] Mainigi Decl. Ex. 6 (Brent Dep. 134:19-22).

[58] Mainigi Decl. Ex. 6 (Brent Dep. 135:9-10).

[59] Mainigi Decl. Ex. 6 (Brent Dep. 137: 18-21; 135:17-21; 89:3-5).

O'Donnell on the filing of this case, and emailed another current Bank of America employee that the Government's complaint was "[p]roof of We told ya so!"  Nawaday Decl. Ex. DF (Mar. 13, 2008, Email from Aliano re "HSSL in Aug") BANA-SDNY-E-000039008-12 at 08 ("[W]e did have the crystal ball and unfortunately our risk assessments at that time are holding true as current quality undermines FSL"); Nawaday Decl. Ex. DE (Mar. 13, 2008, Email from Aliano agreeing with Thomas's email identifying the HSSL as the cause of decline in quality) BANA-SDNY-E-001009201-205 at 201 ("Ed [O'Donnell] will tell you when we sat in the room in July these were some of the same concerns we expressed, but you hit the nail on the head with a good chunk of this"); Nawaday Decl. Ex. DG (Oct. 24, 2012, Email from Aliano) BANA-SDNY-E-001011364 ("You absolutely did the right thing regardless of $.  I have same production mentality in short sale.  All about volume and speed and fraud doesn't matter.  Same 2006 2007 battles in 2010 today.  GSEs getting hosed on fraud mods and short sales."); Nawaday Decl. Ex. DG (Oct. 24, 2012, Email from Aliano) (forwarding the Government's press release in this action) ("Proof of 'We told ya so!'") BANA-SDNY-E-001011364.

The Government does not dispute that Brent provided feedback regarding the HSSL, that he expressed his concerns about quality, but the Government disputes the statements in paragraph 9 as mischaracterizing Brent's testimony because he also testified that his warnings on the HSSL were "discounted" by Mairone, that the decisions in Mairone's November 29, 2007 email could "be putting us in harm's way," and that he believed his disagreement with Mairone regarding the HSSL factored into his termination from the Bank.  Nawaday Decl Ex. E, Brent Tr. 126:14-24; 118:18-119:55; 123:15-19.  The Government disputes that Brent opined on whether all his disagreements with management were "indicative of fraud."  Nawaday Decl. Ex. E, Brent Tr. 137:4-138:10 ("Q:  Well, do you believe the fact that your recommendations were not always followed by decision-makers, the decision-makers make the process fraudulent in some way? . . . THE WITNESS:  It could.  Q:  Did it? . . . THE WITNESS:  Yeah.  I would say yes.  Well --

there is a little bit more to that.  Can you ask again?  I'm sorry.  Q:  Sure.  Do you believe the fact

that your recommendations were not always followed by decision-makers make the process

fraudulent in some way?  A:  No. . . .  Q:  So just to clarify, did you misunderstand my question?

A.  Yes, I got lost in the question and the objections and then the question again.  Q:  Okay.

How would you -- so can there be a difference of opinion regarding quality without the end

result being fraud? . . .   THE WITNESS:  It could, so yes.   It could be different.").

      10.    Even a handful of disgruntled former employees who, in addition to Mr.

O'Donnell, must have served as the foundation for the government's complaint – failed to testify

in support of the allegations in the Amended Complaint.

- Michael Thomas, another lower-level person involved in discrete aspects of the HSSL process who reported to O'Donnell and who is currently Ed O'Donnell's direct report at Fannie Mae,[60] testified that the concept and intent behind FSL's High Speed Swim Lane process was to "create more efficiencies for . . . [t]he less risky . . . loans that should move faster,"[61] and "improve efficiency without reducing too many controls."[62]  Mr. Thomas characterized FSL's leadership as operating in "survival mode,"[63] but he did not allege that anyone at FSL had fraudulent intent.

- John Boland, a former First Vice President of Underwriting who ultimately reported up to relator O'Donnell is a current Fannie Mae employee who began cooperating with the government after Bank of America terminated him last year.[64]   He testified that the High Speed Swim Lane was "a great design," "well thought out," and "should . . . lead to some efficiencies."[65]   He thought, however, that there were "breakdowns in the way it was executed."[66]  Still, Mr. Boland believed that FSL employees were "honest," "came to work motivated and

---

[60] Mainigi Decl. Ex. 29 (Thomas Dep. 122:13-18).

[61] Mainigi Decl. Ex. 29 (Thomas Dep. 19:14-16).

[62] Mainigi Decl. Ex. 29 (Thomas Dep. 171:1-2).

[63] Mainigi Decl. Ex. 29 (Thomas Dep. 92:24).

[64] Mainigi Decl. Ex. 5 (Boland Dep. 128:22, 189:4-6).

[65] Mainigi Decl. Ex. 5 (Boland Dep. 24:22-23).

[66] Mainigi Decl. Ex. 5 (Boland Dep. 25:24-25).

generally wanted to do the right thing."[67]  He did not testify that anyone at Full Spectrum Lending ever intended to defraud the GSEs.

- Neal Ballance, an assistant underwriting manager who "never enjoyed" working at Countrywide and was not involved in the design or implementation of HSSL,[68] expressed some concerns about the HSSL process.  Ballance testified, however, that he had no role in the design or implementation of HSSL,[69] and that he respected Ed O'Donnell and would have trusted O'Donnell's judgment about whether a particular loan-origination process was appropriate and had an acceptable amount of risk.[70]

- Another former employee, David Sallis, a Senior Vice President over underwriting reporting to O'Donnell, testified that he never heard complaints from anyone about how HSSL loans were handled.[71]  Sallis referenced an investigation into fraud in certain FSL field branches, but specified that those incidents had nothing to do with HSSL.[72]  Mr. Sallis did not identify any FSL employee involved with the High Speed Swim Lane or Central Fulfillment who intended to defraud the GSEs.

**Response to Paragraph 10**:  The Government disputes the statements in paragraph 10, objects to the improper characterization of witnesses as "disgruntled former employees," and objects to testimony given in response to requests to offer legal conclusions on intent.  The Government further disputes the statements as incomplete and misleading.  U.S. SOF ¶¶ 223, 227-28, 231, 238, 258, 260, 269, 271, 300, 364; Nawaday Decl. Ex. X, Sallis Tr. 29:3-31:14 (expressing concern about loan specialists having too much authority); 36:25-41:2 (expressing concern about the number of CLUES accepts validators were going through in a day).  The Government further disputes the characterization of Boland's testimony that the Hustle was "a great design" as misleading and incomplete. Nawaday Decl. Ex. D, Boland Tr. 29:13-19 ("Q:

---

[67] Mainigi Decl. Ex. 5 (Boland Dep. 183:13-22).

[68] Mainigi Decl. Ex. 2 (Ballance Dep. 124:21).

[69] Mainigi Decl. Ex. 2 (Ballance Dep. 95:9–97:2).

[70] Mainigi Decl. Ex. 2 (Ballance Dep. 92:22–94:1).

[71] Mainigi Decl. Ex. 25 (Sallis Dep. 36:4–9).

[72] Mainigi Decl. Ex. 25 (Sallis Dep. 132:22–134:10).

You mentioned that at the outset, you thought that the Hustle was a good design.  At that point, did you know that -- that some of the underwriting functions you described would be transitioned to a processors team?  A. No, no.  We didn't know that that was part of the deal.").

Similarly, Neal Ballance was repeatedly contacted by counsel for Bank of America and asked if he wanted counsel provided by Bank of America, and he "always said, I don't need anybody.  I'm just going to tell the truth and be done with it."  Nawaday Decl. Ex. B, Ballance Tr. 146:15-147:13; *id.* at 147:7-13 ("Q.  And how many times was this offer made to you?  A.  Probably three times.  Q.  And what was your response each time?  A.  Each time it was no.").  In response to one of the contacts shortly before Ballance's deposition, Ballance contacted the Government to say that he "didn't have anything to say" to Bank of America and "frankly, [] agree[d] with the Government's position on the whole matter."  Nawaday Decl. Ex. GK (May 10, 2013, Email from Ballance) USA-E-00001902-03 at 02.

11.    Witnesses universally denied that any manager of FSL acted in bad faith in connection with their role in the High Speed Swim Lane Pilot or Centralized Fulfillment.  Rather, the undisputed evidence proves that:

      a.   Greg Lumsden acted in good faith.[73]

      b.   Rebecca Mairone acted in good faith.[74]

      c.   Wade Comeux acted in good faith.[75]

      d.   Ed O'Donnell acted in good faith.[76]

      e.   Loren Rodriguez acted in good faith.[77]

---

[73] Mainigi Decl. Ex. 22 (O'Donnell Dep. 15:17-23).

[74] Mainigi Decl. Ex. 14 (Gong Dep. 106:2-9); Mainigi Decl. Ex. 9 (Comeaux Dep. 119:12-15); Mainigi Decl. Ex. 19 (Kitashima Dep. 195:20-196:5); Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8); Mainigi Decl. Ex. 9 (Comeaux Dep. 119:12-15).

[75] Mainigi Decl. Ex. 22 (O'Donnell Dep. 155:22-156:16).

[76] Mainigi Decl. Ex. 22 (O'Donnell Dep. 120:7-121:21); Mainigi Decl. Ex. 7 (Cannon Dep. 190:22-191:2).

    f.  Cliff Kitashima acted in good faith.[78]

    g.  Mark Barnett acted in good faith.[79]

    h.  Patrick Aliano acted in good faith.[80]

    i.  James White acted in good faith.[81]

    j.  Robert Price acted in good faith.[82]

    k.  Todd Green acted in good faith.[83]

    l.  Steve Brent acted in good faith.[84]

    m.  John Boland acted in good faith.[85]

    n.  Michael Thomas acted in good faith.[86]

    o.  Javier Jaraba acted in good faith.[87]

---

[77] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8); Mainigi Decl. Ex. 7 (Cannon Dep. 193:14-194:20).

[78] Mainigi Decl. Ex. 22 (O'Donnell Dep. 27:14-29:8); Mainigi Decl. Ex.7 (Cannon Dep. 191:3-7;193:14-194:20).

[79] Mainigi Decl. Ex. 22 (O'Donnell Dep. 16:18-23); Mainigi Decl. Ex. 7 (Cannon Dep. 191:9-14-194:20).

[80] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[81] Mainigi Decl. Ex. 22 (O'Donnell Dep. 21:16-18).

[82] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[83] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[84] Mainigi Decl. Ex. 22 (O'Donnell Dep. 21:22-22:3).

[85] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8); Mainigi Decl. Ex. 5 (Boland Dep. 184:8-11).

[86] Mainigi Decl. Ex. 22 (O'Donnell Dep. 27:14-29:8); Mainigi Decl. Ex. 238 (Harris Plaintiff Exhibit 3); Mainigi Decl. Ex. 239 (BANA-SDNY-E-008985091); Mainigi Decl. Ex. 20 (BANA-SDNY-E-001751343); Mainigi Decl. Ex. 241 (BANA-SDNY-E-001342869).

[87] Mainigi Decl. Ex. 22 (O'Donnell Dep. 19:10-17).

    p.   Anson Gong acted in good faith.[88]

    q.   David Sallis acted in good faith.[89]

    r.   Ron Cannon acted in good faith.[90]

    s.   Craig Lickiss acted in good faith. [91]

    t.   Don Harris acted in good faith. [92]

    u.   Armand Massie acted in good faith. [93]

    v.   Adela Zamarippa acted in good faith. [94]

    w.  Janet Godby acted in good faith. [95]

    x.   Cheri Shine acted in good faith. [96]

**Response to Paragraph 11**.  The Government disputes the facts in paragraph 11 on the basis that, among other things, numerous witnesses testified that Mairone and others in charge of the HSSL and Central Fulfillment ignored repeated warnings that the process would lead to high rates of defects and promoted volume over quality with the knowledge that loans with high rates of defects were being sold to the GSEs.  U.S. SOF ¶¶ 258-312, 347-68.

    The Government further disputes the statements in paragraph 11 as incomplete, misleading, and not supported by the record, as the primary support cited for the statements is

---

[88] Mainigi Decl. Ex. 22 (O'Donnell Dep. 19:3-9); Mainigi Decl. Ex. 7 (Cannon Dep. 193:14-194:20).

[89] Mainigi Decl. Ex. 22 (O'Donnell Dep. 27:14-29:8).

[90] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[91] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29).

[92] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[93] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[94] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[95] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

[96] Mainigi Decl. Ex. 22 (O'Donnell Dep. 28:3-29:8).

testimony during O'Donnell's deposition in which he was asked, as to a list of two dozen individuals, including Thomas and Boland, whether, "[w]ith respect to all of these people . . . these were *generally* honest people?"  Nawaday Decl. Ex. W, O'Donnell Tr. 28:20-25 (emphasis added), and he was not specifically asked whether those people had acted in good faith with respect to the HSSL and other matters identified in the complaint.

12.    None of this testimony creates a material factual dispute as to whether any of the individuals listed in paragraph 11 acted with fraudulent intent.

**Response to Paragraph 12**:  The Government objects on the basis that paragraph 12 contains no citations to admissible evidence.  The Government also disputes the facts in paragraph 12 on the grounds that, among other things, numerous witnesses testified that Mairone and others in charge of the HSSL and Central Fulfillment ignored repeated warnings that the process would lead to high rates of defects, and they promoted volume over quality with the knowledge that loans with high rates of defects were being sold to the GSEs.  U.S. SOF ¶¶ 258-368.

The Government further disputes the statements in paragraph 12 as incomplete and misleading as the primary support cited for the statements is an exchange in O'Donnell's deposition in which he was asked, as to a list of two dozen individuals, including Thomas and Boland, whether, "[w]ith respect to all of these people . . . these were *generally* honest people?" Nawaday Decl. Ex. W, O'Donnell Tr. 28:20-25 (emphasis added), and he was not specifically asked whether those people had acted in good faith with respect to the HSSL and other matters identified in the complaint.

II.     **Background.**

      A.     **Full Spectrum Lending was a Small, Historically Subprime Division of Countrywide.**

13.     The Amended Complaint alleges that the HSSL process was a fraudulent scheme that operated in Countrywide Home Loans' Full Spectrum Lending Division.[97]   Countrywide Financial Corporation (CFC) was the parent company of Countrywide Home Loans (CHL) during the relevant time prior to CFC's acquisition by Bank of America in 2008.  CHL was Countrywide's mortgage origination vehicle through the end of 2007.  At the beginning of 2008, Countrywide's mortgage origination activity was shifted to another Countrywide subsidiary, Countrywide Bank, FSB.  CHL operated through four divisions: Consumer Markets Division (CMD); Wholesale Lending Division (WLD); Correspondent Lending Division (CLD); and Full Spectrum Lending Division (FSL).[98]

**Response to Paragraph 13**:  The Government does not dispute the statements in paragraph 13.

14.     This case is only about Full Spectrum Lending—the smallest of the four divisions of CHL.[99]   In 2006, FSL originated $35.1 billion in mortgages—which is 8.3% of the total volume of CHL during 2006 (CHL total volume of $421.1 billion).  In 2007, FSL originated $31.3 billion in mortgages (of which only 3% were originated using the HSSL process described below)—which is 8.1% of the total volume of CHL during 2007 (CHL total volume of $385.1 billion).  In the first quarter of 2008, FSL originated $5.7 billion in mortgages (of which less than 20% were originated using the HSSL process)—which is 8.4% of the total volume of CHL

---

[97] Am. Compl. ¶ 1.

[98] Mainigi Decl. Ex. 215 at 4-5 (CFC 2007 10-K).

[99] Mainigi Decl. Ex. 215 at 6 (CFC 2007 10-K).

during Q1 2008 (CHL total volume of $67.3 billion).[100]

**Response to Paragraph 14**: The Government disputes the statements in paragraph 14 concerning the percentage of FSL volume attributable to HSSL loans on the ground that, among other things, the parties dispute which FSL loans are properly classified as "HSSL loans." Declaration of Michael Thomas, dated July 30, 2013 ("Thomas Decl.") at ¶¶ 8-11; Declaration of Lars Hansen, dated July 30, 2013 ("Hansen Decl."), at ¶¶ 3-4. Defendants' own expert concedes that "the definition of HSSL loans is under dispute." Declaration of Christopher M. James, Ph.D., dated July 12, 2013 ("James Decl."), Ex. A at 8 n.40.

15.     Each division of CHL had a niche. Consumer Markets Division primarily was engaged in originating prime loans. Wholesale Lending Division primarily was engaged in funding prime loans sourced by mortgage loan brokers. Correspondent Lending Division primarily was engaged in purchasing mortgage loans funded by other lending institutions. Full Spectrum Lending Division historically was engaged in originating loans through direct-to-consumer marketing and originated primarily subprime loans but shifted to the origination of prime loans when the subprime market began to tighten up and a higher percentage of its loan applicants were prime borrowers.[101]

**Response to Paragraph 15**: The Government objects on the grounds that only the last sentence of paragraph 15 contains a citation to evidence but does not dispute the statements in paragraph 15.

### B.     Countrywide Sold Loans to Fannie Mae and Freddie Mac.

16.     In general, mortgage originators do any of three things with loans they originate: (i) hold them on their books for investment purposes; (ii) sell them to private investors and use the proceeds to fund new loans; or (iii) sell them to the Government-Sponsored Enterprises

---

[100] Mainigi Decl. Ex. 215 at 6 (CFC 2007 10-K); Mainigi Decl. Ex. 214 at 58 (CFC 2008 10-Q).

[101] Mainigi Decl. Ex. 215 at 5 (CFC 2007 10-K).

("GSEs") and use the proceeds to fund new loans.  Countrywide did all three.[102]  The GSEs—

Federal Home Loan Mortgage Corporation ("Freddie Mac") and Federal National Mortgage

Association ("Fannie Mae")—are by far the largest purchasers of mortgages in the country.

Together they were Countrywide's largest mortgage loan customers.[103]

   **Response to Paragraph 16**:  The Government does not dispute the statements in

paragraph 16.

   17.    The GSEs are chartered by the United States Congress.  Their mission is to

enhance the liquidity and stability of the mortgage market and contribute to making housing in

the United States more affordable.  They worked to fulfill that mission by purchasing trillions of

dollars of various types of mortgages from mortgage lenders, including Countrywide.  At one

time, the GSEs also guaranteed mortgage-related securities, which further facilitated the flow of

additional funds into the mortgage market.[104]

   **Response to Paragraph 17**:  The Government does not dispute the statements in

paragraph 17.

   18.    The GSEs are not federally insured financial institutions.[105]  Although the GSEs

were chartered by Congress, their businesses are funded with private capital.  The U.S.

government is not obligated to fund their mortgage purchases or financing activities or to

guarantee their securities and other obligations.[106]

---

[102] Mainigi Decl. Ex. 215 at 2, 17 (CFC 2007 10-K).

[103] Mainigi Decl. Ex. 215 at 39 (CFC 2007 10-K).

[104] Mainigi Decl. Ex. 158 at 1 (Fannie 2007 10-K (excerpt)); Mainigi Decl. Ex. 159 at 1-2
(Freddie 2007 Annual Report (excerpt)).

[105] Mainigi Decl. Ex. 158 at 2 (Fannie 2007 10-K (excerpt)); Mainigi Decl. Ex. 159 at 1-2
(Freddie 2007 Annual Report (excerpt)).

[106] Mainigi Decl. Ex. 158 at 2 (Fannie 2007 10-K (excerpt)); Mainigi Decl. Ex. 159 at 1-2
(Freddie 2007 Annual Report (excerpt)).

**Response to Paragraph 18**:  The Government does not dispute the statements in paragraph 18.

19.     Countrywide's relationship with both Fannie Mae and Freddie Mac was governed by a series of contractual agreements.  These contractual agreements are discussed in detail at paragraphs 127-135.

**Response to Paragraph 19**:  The Government does not dispute the statements in paragraph 19, but disputes numerous statement in paragraphs 127-135 as detailed in response to those paragraphs.

20.     Because of their desire to meet both the affordable housing goals and to increase profits, Fannie Mae and Freddie Mac competed for market share among top loan originators.[107]

**Response to Paragraph 20**:  The Government does not dispute the statements in paragraph 20.

21.     Both Fannie Mae and Freddie Mac viewed Countrywide as a significant mortgage lender.[108]  Accordingly, the GSEs sought to expand their relationships with Countrywide by increasing the volume of loans they purchased from Countrywide.[109]  Fannie Mae and Freddie Mac periodically negotiated contracts with Countrywide that included minimum market share provisions whereby Countrywide agreed to sell a minimum percentage of the GSE-eligible loans it originates to each of the GSEs.  From 2006–2008, Countrywide agreed to sell 70 percent of its GSE-eligible originations to Fannie Mae and up to 30 percent of its GSE-eligible originations to

---

[107] Mainigi Decl. Ex. 3 (Battany Dep. 14:21-16:2, 113:18-22).

[108] Mainigi Decl. Ex. 3 (Battany Dep. 14:10-20); Mainigi Decl. Ex. 17 (Hunter Dep. 95:18-96:11); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 21:7-11, 37:1-10).

[109] Mainigi Decl. Ex. 17 (Hunter Dep. 84:5-13, 95:18-96:11, 240:2-9); Mainigi Decl. Ex. 3 (Battany Dep. 14:10-24); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 243:13-19).

Freddie Mac.[110]   As described below, the GSEs sought to purchase from Countrywide a variety of types of loans, including stated income products, Alt-A products, and streamlined origination products.

**Response to Paragraph 21**:  The Government disputes the last sentence in paragraph 21 on the basis that it is not supported by admissible evidence.  The Government disputes the second sentence as incomplete and misleading.  U.S. SOF ¶¶ 206-12.  The Government does not dispute the remaining statements in paragraph 21.

### C.   Countrywide Used an Automated Underwriting System to Underwrite Loans, A Practice That Was Standard in the Industry.

22.   For years, Countrywide and other lenders have used Automated Underwriting Systems ("AUSs") to assist in underwriting loans.[111]  An AUS uses algorithms to render underwriting decisions based on a host of factors, including the application of underwriting guidelines to borrower and property data entered into the AUS.[112]   In fact, the GSEs encouraged lenders to use AUSs in originating loans for sale to the GSEs.[113]

**Response to Paragraph 22**:  The Government disputes the statements in paragraph 22 on the basis that, among other things, an AUS renders a "recommendation" subject to conditions rather than an "underwriting decision" on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, First

---

[110] Mainigi Decl. Ex. 42 at 3 (BANA-SDNY -C-001331458 (Strategic Alliance Agreement)); Mainigi Decl. Ex. 17 (Hunter Dep. 96:13-20, 239:9-22); Mainigi Decl. Ex. 58 at 2 (FHFA11551476 (May 15, 2007 Overview of Freddie Mac relationship with Countrywide)).

[111] Mainigi Decl. Ex. 20 (Lumsden Dep. 64:4–9 ("We always used CLUES to underwrite loans, even underwrote subprime loans but it didn't mean a person didn't look at them as well.  In the subprime case we didn't get very many approvals. We used CLUES from like 1992 on to underwrite loans.")).

[112] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 192:19-193:4); Mainigi Decl. Ex. 120 at FHFA00371988 ((FHFA00371983 (AMO report)); Mainigi Decl. Ex. 122 at FHFA11984877 (FHFA11984873 (EORM report)).

[113] Mainigi Decl. Ex. 17 (Hunter Dep. 23:6-19).

Mortgage Conventional Technical Manual) BANA-SDNY-C-00131805-29 at 05 (Countrywide

CTM 0.3.1 (describing the operation of CLUES) ("CLUES . . . delivers an underwriting

recommendation with accompanying conditions.").

The Government also disputes the last sentence in paragraph 22 and further states that the

paragraph mischaracterizes testimony, as Hunter testified that Freddie Mac may have preferred

loans run through an AUS as opposed to those that were manually underwritten because he

understood that manually underwritten loans "may not have passed an AUS" because of

"nontraditional credit" or some other feature of the loan suggesting it posed a higher credit risk.

Nawaday Decl. Ex. N, Hunter Tr. 23:21-25:2 ("Q. Do you believe or is it your understanding that

an automated underwriting system is superior to manual underwriting?  A: I'm not sure I would -

- could make that decision.  Q.  Why did Freddie prefer or encourage lenders to use an automated

underwriting system over manual underwriting?  A:  Again, this may be outside my subject

matter expertise, but my understanding would be a lot of them -- at that time, a lot of the

manually underwritten loans may not have passed an AUS.  Q.  Why was -- why was that?  A. I

don't -- there may have been some nontraditional credit.  There could have been some other

reasons, but again, that is probably outside my area of expertise.").

23.     Both GSEs developed their own AUS products, and offered them to lenders for

use in originating loans for sale to the GSEs.  Fannie Mae's AUS is called Desktop Underwriter

("DU").  Freddie Mac's is called Loan Prospector ("LP").[114]  Certain large mortgage originators

also developed their own AUSs.[115]  Countrywide also developed its own proprietary AUS called

CLUES,[116] which stood for "Countrywide Loan Underwriting Expert System."[117]  Generally, the

---

[114] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 353:15–19); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 38:1–21); Mainigi Decl. Ex. 3 (Battany Dep. 42:9-13).

[115] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 38:1–9).

[116] Mainigi Decl. Ex. 3 (Battany Dep. 27:1–7); Mainigi Decl. Ex. 17 (Hunter Dep. 22:20–23:1).

GSEs viewed loans originated using an AUS as superior from an underwriting perspective to those that were manually underwritten.[118]

**Response to Paragraph 23**: The Government disputes the last sentence in paragraph 23 as incomplete and misleading because the cited testimony is mischaracterized and/or does not address any specific type of loan or underwriting task.  Nawaday Decl. Ex. N, Hunter Tr. 23:21-25:2 ("Q.  Do you believe or is it your understanding that an automated underwriting system is superior to manual underwriting?  A: I'm not sure I would -- could make that decision.  Q.  Why did Freddie prefer or encourage lenders to use an automated underwriting system over manual underwriting?  A:  Again, this may be outside my subject matter expertise, but my understanding would be a lot of them – at that time, a lot of the manually underwritten loans may not have passed an AUS.  Q.  Why was – why was that?  A.  I don't – there may have been some nontraditional credit.  There could have been some other reasons, but again, that is probably outside my area of expertise."); Mainigi Decl. Ex. 3, Battany Tr. 41:15-22 (not specifying the types of loans or tasks for which an automated underwriting system is suitable); Mainigi Decl. Ex. 28, Tanabe Tr. 157:18-20 (not testifying that automated systems provide superior underwriting, but rather that loans that are automatically underwritten perform better, which may suggest only that lower risk loans are automatically underwritten); Mainigi Decl. Ex. 26, Sobczak Tr. 103:24-104:2 (testifying narrowly that "CLUES or any automated underwriting system was superior in the way that it eliminated subjectivity, especially on borrower credit").

24.     An AUS provides the user with an underwriting decision[119] by applying program-

---

[117] Mainigi Decl. Ex. 148 at 10 (FNM-BOA 052420 (Fannie FSL presentation)).

[118] Mainigi Decl. Ex. 17 (Hunter Dep. 23:6-19, 297:2-10); Mainigi Decl. Ex. 3 (Battany Dep. 41:11—43:25); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 157:88-20); Mainigi Decl. Ex. 26 (Sobczak Dep. 103:21-104:6).

[119] Mainigi Decl. Ex. 148 at 10(FNM-BOA 052420 (Dec. 13, 2007 FSL presentation to Fannie)); Mainigi Decl. Ex. 20 (Lumsden Dep.  64:16–21); Mainigi Decl. Ex. 28 (Freddie 30(b)(6)

specific rules to make an underwriting decision on the loan.[120] An AUS generally either "approves" a loan, or "refers" a loan to an underwriter for further analysis.[121]

**Response to Paragraph 24**:  The Government disputes the statements in paragraph 24 on the basis that, among other things, an AUS renders a "recommendation" subject to conditions rather than an "underwriting decision" on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-29 at 05 ("CLUES . . . delivers an underwriting recommendation with accompanying conditions.").  The Government further disputes that CLUES "approves" a loan, because CLUES delivers an "Accept" recommendation where the system determines that the loan presents an acceptable level of risk based on the information provided to CLUES, whether or not that information is accurate.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides) BANA-SDNY-C-00131805-29 at 6 (CLUES "Accept" valid only "if the data used to generate the recommendation matches the true and accurate data in the file.  Loan data accuracy is essential for CLUES, to correctly assess risk.").

25.    As explained by Charles Grice, an industry expert: "Countrywide's use of its Automated Underwriting System ("AUS") was consistent with best practices in the mortgage industry. Countrywide, like most large mortgage lenders, used an AUS to facilitate the flow of

---

Dep.192:19–193:4); Mainigi Decl. Ex. 120 at FHFA00371988 (FHFA00371983 (AMO review)); Mainigi Decl. Ex. 122 at FHFA11984877 (FHFA11984873 (EORM report)).

[120] Mainigi Decl. Ex. 22 (O'Donnell Dep. 35:19–23 ("The CLUES automated underwriting system 'was programmed to match the Countrywide product guide.  So to the extent that the information was correctly entered into CLUES and you got an accept, that was an outcome that let you know that the loan met standards.'")); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 192:19-193:4); Mainigi Decl. Ex. 120 at FHFA00371988 (FHFA00371983 (AMO review)); ainigi Decl. Ex. 122 at FHFA11984877 (FHFA11984873 (EORM report)); Mainigi Decl. Ex.148 at 10 (FNM-BOA 052420 (Fannie FSL presentation)).

[121] Mainigi Decl. Ex. 20 (Lumsden Dep. 64:16–21); Mainigi Decl. Ex. 16 (Ho Dep. 39); Mainigi Decl. Ex. 148 at 10 (FNM-BOA 052420 (Fannie FSL presentation)).

the applications it received, improve consistency in underwriting, and reduce human bias from the loan application review process."[122]

**Response to Paragraph 25**:  The Governments disputes the statements in paragraph 25, including that Mr. Grice is an "industry expert."  Nawaday Decl. Ex. D, Boland Tr. 56:17-20 (describing "very good reasons not to trust CLUES" when the data was both entered and validated by the same loan processor). Nawaday Decl. Ex. B, Ballance Tr. 13:11-17 ("All [CLUES] could do really is read a credit report and the data from a credit report that the bureaus report, and it'd spit out a – an accept-or-decline decision.  And there are several things that it can't read.  And a human being who's trained in underwriting loans is the only person who really knows what a good loan is or is not.").

26.    Not all loans originated using an AUS are manually underwritten.  In a prime loan environment, generally only loans that received a "refer" underwriting decision from the AUS must be referred to underwriters for manual review.[123]

**Response to Paragraph 26**:  The Government disputes the statements in paragraph 26 and Countrywide's own underwriting manual sets forth the process to be followed for "[u]nderwriting a CLUES Accept," including verifying income or determining income reasonability for a stated income loan, determining whether the borrower has any significant debt not reported on the credit report, verifying assets, ensuring the correct property valuation method

---

[122] Grice Decl. Ex. A ¶ 17 (Grice Expert Report).

[123] Mainigi Decl. Ex. 20 (Lumsden Dep. 64:16–21); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 193:6–12, 198:6–15, 205:7–206:5); Mainigi Decl. Ex. 3 (Battany Dep. 88:6–90:24, 183:4-23); Mainigi Decl. Ex. 26 (Sobczak Dep. 193:4–19); Mainigi Decl. Ex. 120 at FHFA00371988 (FHFA00371983 (AMO review)); Mainigi Decl. Ex. 122 at FHFA11984877 (FHFA11984873 (EORM report)); Mainigi Decl. Ex. 148 at 10 (FNM-BOA 052420 (Dec. 13, 2007 FSL presentation to Fannie) ("CLUES analyzes credit and financial information and after applying program-specific rules, provides the user with an underwriting decision of Accept or a recommendation of Refer (to an underwriter).")).

was used in the appraisal, and evaluating whether the appraisal conforms to the standards for soft markets.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-829 at 807 ("The underwriter is responsible for ensuring the correct valuation method is obtained and the property meets the eligibility requirements of the program and meets the standards of CTM 3 The Property.").  The Government further disputes that CLUES delivers an underwriting "decision" as opposed to a "recommendation" subject to conditions on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-829 at 805 (describing the operation of CLUES and stating that "CLUES . . . delivers an underwriting recommendation with accompanying conditions.").

27.     The GSEs were well aware that CLUES was making the underwriting decisions for prime loans (as long as there was a CLUES Accept) and in fact preferred automated underwriting to manual underwriting because there was less bias and subjectivity.[124]

**Response to Paragraph 27**:  The Government disputes the statements in paragraph 27 as incomplete and misleading because the GSEs were not aware, and thus could not have preferred, that unqualified and production-driven loan specialists in the HSSL were entering data into CLUES, responsible for validating that data, and responsible for evaluating and clearing conditions on the loan's approval.  Mainigi Decl. Ex. 13, Forlines Tr. 193:7-16; Mainigi Decl. Ex. 26, Sobczak Tr. 144:24-145:5; Mainigi Decl. Ex. 23, Padgett Tr. 205:22-206:3; U.S. SOF ¶¶ 388-96; Nawaday Decl. Ex. AC, Thomas Tr. 32:20-34:1 (summarizing compounding risk factors where loan specialists were not "trained enough to make those [underwriting] decisions[,]" were "reporting through the same [operations] structure," had "a volume incentive .

---

[124] *See, e.g.*, Mainigi Decl. Ex. 237 (Oct. 14, 2008 Fannie Mae Announcement 08-26: Comprehensive Risk Assessment Approach to Manual Underwriting)); Mainigi Decl. Ex. 17 (Hunter Dep. 23:6-19); Mainigi Decl. Ex. 26 (Sobczak Dep. 103:21-104:6); Mainigi Decl. Ex. 3 (Battany Dep. 41:11-22).

. . So that was – you know, having – having that incentive and giving them the authority to do

the quality checks on the loans that they were themselves putting together concerned me."); Nawaday Decl. Ex. AC, Thomas Tr. 77:9-14 (combining processor and underwriter roles "didn't make sense" because "you're basically checking your own work . . . The processor is the one building the file.  They're the one checking that they built the file correctly.").  The Government further disputes that CLUES delivers an underwriting "decision" as opposed to a "recommendation" subject to conditions on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-829 at 805 (describing the operation of CLUES and stating that "CLUES . . . delivers an underwriting recommendation with accompanying conditions.").

28.     The GSEs both sought to purchase loans from Countrywide that were originated using CLUES.  For example, Fannie Mae expressed its "considerable experience" with CLUES in an October 2005 Strategic Alliance Agreement between the companies: Fannie Mae appreciates Countrywide's long-term commitment to CLUES, its proprietary automated underwriting system ("AUS") … In addition, Fannie Mae has considerable experience with the acquisition and performance of CLUES-approved mortgages. Therefore, Countrywide and Fannie Mae agree on the continued acceptance of CLUES and LP mortgages . . . ."[125]

**Response to Paragraph 28**:  The Government does not dispute the statements in paragraph 28.

29.     Fannie Mae conducted an extensive evaluation of CLUES, sending its modelers onsite at Countrywide to analyze the construction of the CLUES engine and its comparability to DU.[126]  Fannie Mae also regularly assessed the performance of loans originated using CLUES.

---

[125] Mainigi Decl. Ex. 41 at 5 (BANA-SDNY-C-001331458 (Strategic Alliance Agreement)); *see also* Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 41:5–43:13).

[126] Mainigi Decl. Ex. 3 (Battany Dep. 41:23–42:8); Mainigi Decl. Ex. 26 (Sobczak Dep. 21:3-22:15 (Fannie Mae and Countrywide conducted "extensive calibrations between Fannie Mae's

Fannie Mae's efforts to evaluate CLUES dwarfed its efforts with respect to the AUSs of its other large lenders.[127]   Fannie Mae considered CLUES to be the gold standard among automated underwriting systems.[128]

**Response to Paragraph 29**:   The Government disputes the statements in paragraph 29 because no witness testified that CLUES was the "gold standard among automated underwriting systems," and the testimony cited in support of that statements says only that Countrywide had more advanced technology than Washington Mutual and Indymac. Mainigi Decl. Ex. 26, Sobczak Tr. 24:1-24.

30.     Prior to granting Countrywide a variance to use CLUES, Freddie Mac did an investigation into the calibration and competence of CLUES.[129] Modelers from Freddie Mac spoke with modelers at Countrywide to learn how the CLUES model was built and how it was tested to understand CLUES risk ratings.[130] Freddie Mac was ultimately satisfied that CLUES was built in accordance with Freddie Mac's criteria and proper statistical discipline.[131]   On a monthly basis, Freddie Mac ran loans it purchased from Countrywide through an "LP Emulator" in order to determine the degree to which the CLUES decisions corresponded to

---

automated underwriting system called Desktop Underwriter and Countrywide's CLUES")); Mainigi Decl. Ex. 26 (Sobczak Dep. 24:1-24 (calibration of CLUES by Fannie and Countrywide "dwarfed" Fannie's efforts with other lenders)).

[127] Mainigi Decl. Ex. 3 (Battany Dep. 26:15–27:7); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 150:3–156:11); Mainigi Decl. Ex. 26 (Sobczak Dep. 21:3-19, 24:1-24, 133:18–134:9); Mainigi Decl. Ex. 41 at 5 (BANA-SDNY-C-001331458 (Strategic Alliance Agreement)).

[128] Mainigi Decl. Ex. 26 (Sobczak Dep. 24:1-24).

[129] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 42:9–43:13, 191:6–10); Mainigi Decl. Ex. 17 (Hunter Dep. 25:21-26:12).

[130] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 42:14–43:7, 190:21-191:5); Mainigi Decl. Ex. 17 Hunter Dep. 121:16–122:3).

[131] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 43:8–13).

those issued by LP, Freddie Mac's own AUS.[132]   To the extent Freddie Mac was dissatisfied with the level of comparability between CLUES and LP, Freddie Mac worked with Countrywide to update and recalibrate CLUES in order to meet Freddie Mac's requirements.[133]

**Response to Paragraph 30:** The Government does not dispute that Freddie Mac was aware that Countrywide used CLUES in connection with the processing of loans, and that Freddie Mac had some knowledge of the CLUES system.  But the Government disputes the assertion that CLUES was "built in accordance with Freddie Mac's criteria and proper statistical discipline," especially given that the witness whose testimony allegedly supports that statement testified that "LP performed better," Mainigi Decl. Ex. 28, Tanabe Tr. 41:17-18, and that the default performance of the loans produced by CLUES "typically lagged LP," Mainigi Decl. Ex. 28, Tanabe Tr. 42:2-3.  The Government also disputes the allegation that CLUES was "update[d] and recalibrate[d]" to meet Freddie Mac's requirements, in light of the testimony of Freddie Mac itself, through its corporate representative, that although CLUES' performance was not problematic in 2005, "once you got to the '06, '07 and '08, CLUES performed badly."  Mainigi Decl. Ex. 28, Tanabe Tr. 42:12-14.

31.    Freddie Mac generally viewed CLUES as comparable to DU and LP and did not price loans originated through CLUES differently than loans originated using DU and LP.[134] Fannie Mae viewed CLUES as equivalent to DU during the 2004-2007 time

---

[132] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 43:15–44:6);  Mainigi Decl. Ex. 17 (Hunter Dep. 26:6–20, 27:14-21).

[133] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 43:15-44:6, 45:6-9); Mainigi Decl. Ex. 17 (Hunter Dep. 28:17-29:7; 123:2-124:9).

[134] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 38:18-39:17, 192:11-18); Mainigi Decl. Ex. 17 (Hunter Dep. 23:2-4).

period.[135]

**Response to Paragraph 31:** The Government disputes the statement in paragraph 31 that "Freddie Mac generally viewed CLUES as comparable to DU and LP."  Defendants rely on the testimony of James Hunter, but he testified that although CLUES and LP are comparable to the extent that both programs are automated underwriting systems.  Nawaday Decl. Ex. N, Hunter Tr. 23:2-4; *see also* 118:7-8 (CLUES and LP "were both AUS, but they were driven by different models").  He specifically testified that "a fair percentage" of CLUES-approved loans did not pass LP's standards when Freddie Mac ran them through the LP emulator, Nawaday Decl. Ex. N, Hunter Tr. 119:2-10, meaning that Freddie Mac could not have viewed them as comparable.  Moreover, the Freddie Mac 30(b)(6) witness testified that "some of the time the CLUES system produced loans that had what we refer to as a higher defect rate," Mainigi Decl. Ex. 28, Tanabe Tr. 39:12-14, that CLUES was not technically equivalent or as technically competent, Mainigi Decl. Ex. 28, Tanabe Tr. 40:10-20, and that "LP performed better," Mainigi Decl. Ex. 28, Tanabe Tr. 189:17-18.  With respect to the second sentence of paragraph 31, defendants claim that Fannie Mae "viewed CLUES as equivalent to DU," but John Forlines testified that although Fannie Mae had indeed approved the use of CLUES, the two systems were not comparable.  *See* Mainigi Decl. Ex. 13, Forlines Tr. 40:20-22.

## III.   FSL's Focus Changed from Subprime to Prime Lending.

### A.   Subprime Loan Processing Is Different than Prime Loan Processing.

32.   The process for originating prime loans typically is less involved than the process for originating subprime loans, given the better creditworthiness of prime borrowers.  While there is no industry-wide definition of a subprime loan, subprime borrowers typically have lower

---

[135] Mainigi Decl. Ex. 26 (Sobczak Dep. 103:10-20); Mainigi Decl. Ex. 3. (Battany Dep. 41:23-42:8, 42:14-21, 43:16-17); *see also* Mainigi Decl. 41 at 5 (BANA-SDNY-C-001331458 (Strategic Alliance Agreement)).

FICO scores than prime borrowers and subprime loans often have higher loan-to-value ratios.[136] Often, subprime loans do not conform to Fannie Mae and Freddie Mac's credit parameters and are considered higher-risk loans.[137]   To process these higher-risk loans, FSL and other lenders in the subprime space used "high-touch" origination models.[138]

      **Response to Paragraph 32**:  The Government disputes the first sentence in paragraph 32 as unsupported by admissible evidence.  The Government also disputes the last sentence in paragraph 32 as to what "other lenders" did as unsupported by any admissible evidence.

      33.    In a high-touch origination model, underwriters manually review loan files, assess ability to pay, and create conditions that borrowers must satisfy before closing.[139]   The loan file may then pass back-and-forth between the loan processor and the underwriter until the underwriter is satisfied that the loan is ready to close.[140]   Although a high-touch process is expensive and time consuming, subprime loans typically carry a higher interest rate—to compensate for the higher risk associated with the loan—and can be more profitable on a per-

---

[136] Mainigi Decl. Ex. 22 (O'Donnell Dep. 29:16–30:4 ("The [subprime] borrower's credit background, history of making timely payments, the stability of their employment or the stability of their income are generally less than perfect.")).

[137] Mainigi Decl. Ex. 22 (O'Donnell Dep. 29:16–30:4 ("Subprime loans are generally regarded as high risk transactions.")).

[138] Mainigi Decl. Ex. 20 (Lumsden Dep. 66:15–25 ("And since our organization had been high touch, our underwriters like to put their hands all over files.  In order for us to be efficient as a prime lender, we needed to do what everyone else was doing to utilize the automated underwriting systems, such as CLUES, D.U., and have the loan processors do the validation. And if the loan didn't get approved or was outside the guidelines for that assembly line, then it would go to an underwriter for an underwrite to do the 1008s, all the intense calculations.")); Mainigi Decl. Ex. 19 (Kitashima Dep. 112:9-17).

[139] Mainigi Decl. Ex. 46 (BANA-SDNY-E-003960516 (subprime processing flow)); Mainigi Decl. Ex. 20 (Lumsden Dep. 66:15–25).

[140] Mainigi Decl. Ex. 46 (BANA-SDNY-E-003960516 (subprime processing flow)).

loan basis than prime loans.[141]

    **Response to Paragraph 33**:  The Government disputes the statements in paragraph 33 as unsupported by admissible evidence to the extent they make statements about the mortgage industry as a whole.

    34.    Prime loans have "significantly less" credit risk than subprime loans.[142]  As a result, prime borrowers typically have more lending options, and thus can require fast processing.[143]  Prime processing is, and must be, more efficient than subprime processing.[144]

    **Response to Paragraph 34**:  The Government does not dispute that prime loans generally have less credit risk than subprime loans, that prime borrowers generally have more options than subprime borrowers, or that prime processing is generally more efficient than subprime processing.  Nawaday Decl. Ex. W, O'Donnell Tr. 29:15-30:4.  The Government disputes the unequivocal statement in the last sentence in paragraph 34.  Nawaday Decl. Ex. W, O'Donnell Tr. 38:13-17 ("The more you touch a file the cost goes up.  And there are certain borrowers that don't require a lot of underwriting.  I wouldn't say that is all prime loans, but certainly there is a subset."); Nawaday Decl. Ex. W, O'Donnell Tr. 38:20-39:6 ("Even within the prime space there are different tranches of risk.  So a W-2 borrower who is providing their pay

---

[141] Mainigi Decl. Ex. 22 (O'Donnell Dep. 37:16–18).

[142] Mainigi Decl. Ex. 43 (BANA-SDNY-E-000771828); *see* Mainigi Decl. Ex. 22 (O'Donnell Dep. 29:16–30:4 ("With prime borrowers, they – generally characteristics that they would display would be stronger credit profile as measured by a higher FICO score, stable employment, history of making on-time payments, and they likely would have assets that would allow them to manage any short-term financial stress.")).

[143] Mainigi Decl. Ex. 22 (O'Donnell Dep. 37:22–38:16 (recognizing that prime processing had to move more quickly than subprime processing)); Mainigi Decl. Ex. 56 (BANA-SDNY-E-003960470)

[144] *See* Mainigi Decl. Ex. 162 (BANA-SDNY-E-008979863 (noting, in March 2008, that "competitors who were unable to keep pace with the changing market close their doors and exit the industry.")).

stubs and assets and has a great credit profile and high FICO and low loan to value, there is not a

lot of risk involved in that loan, so it wouldn't require heavy underwriting.  A borrower that is at

the lower spectrum of prime product or characteristics or a borrower who would be stating their

income, that would be more complex.").

35.     To that end, prime loan processers typically have some level of underwriting

authority, and underwriters are involved on more complex transactions.[145]  Fannie and Freddie

were well aware that individuals without manual underwriting authority were used in the industry

to clear and close loans.[146]

**Response to Paragraph 35**:  The Government disputes the statements in paragraph 35

and objects to the misleading characterization of testimony.  Nawaday Decl. Ex. W, O'Donnell

Tr. 98:22-25 (limiting testimony about whether prime loan processors can have underwriting

authority to "what I know from Countrywide and Full Spectrum and Conseco, those are the only

two places that I worked at that I did prime loans"); Nawaday Decl. Ex. W, O'Donnell Tr. 90:4-

17 (explaining that FSL loan processors were less experienced than those in CMD ("In CMD

---

[145] Mainigi Decl. Ex. 22 (O'Donnell Dep. 98:13-17 (It was not "unusual for . . . loan processors to be able to earn authority of some level in the prime lending space.")); Mainigi Decl. Ex. 7 (Cannon Dep. 186:22–187:9); Mainigi Decl. Ex. 55 (BANA-SDNY-E-008669669 (FSL-CMD Operational Model Comparison)); Mainigi Decl. Ex. 72 (BANA-SDNY-E-009027916 (CMD ROC Cover MST to EO)); Mainigi Decl. Ex. 73 (BANA-SDNY-E-009027917 (CMD ROC Presentation)); Mainigi Decl. Ex. 114 (BANA-SDNY-E-000101933 (Comeaux ROC e-mail)); Mainigi Decl. Ex. 115 (BANA-SDNY-E-000101973 (ROC Roles & Responsibilities)); Mainigi Decl. Ex. 20 (Lumsden Dep. 66:15–25 ("And since our organization had been high touch, our underwriters like to put their hands all over files.  In order for us to be efficient as a prime lender, we needed to do what everyone else was doing to utilize the automated underwriting systems, such as CLUES, D.U., and have the loan processors do the validation.  And if the loan didn't get approved or was outside the guidelines for that assembly line, then it would go to an underwriter for an underwrite to do the 1008s, all the intense calculations.")).

[146] Mainigi Decl. Ex. 3 (Battany Dep. 88:6-90:24, 183:4-23); Mainigi Decl. Ex. 26 (Sobczak Dep. 71:1-15, 193:4–19); Mainigi Decl. Ex. 122 at FHFA11984886 (FHFA11984873 (EORM report)); Mainigi Decl. Ex. 148 at 10 (FNM-BOA 052420 (Fannie FSL presentation) ("CLUES analyzes credit and financial information and after applying program-specific rules, provides the user with an underwriting decision of Accept or a recommendation of Refer (to an underwriter).").

the processors generally had more experience.  They were more industry – they would better fit

the definition of a processor within the industry.  In FSL the loan specialists they were really

more clerks.  They generally did not – they were generally entry level positions.  People that

came to Full Spectrum without prior or significant mortgage experience.  And they were gathers,

they would gather documentation and they would order third-party vendor work such as

appraisals or title searches.  But they didn't do some of the traditional functions that a processor

would do.  So CMD had an edge from that regard – in that regard"); Nawaday Decl. Ex. W,

O'Donnell Tr. 78:11-22 ("Q.  You thought CMD poorly managed quality on a day-to-day basis?

A. Yes.  Q. And give me your basis for that statement?  A. Based on the QC results that I

reviewed regularly.  As you noted earlier, even though we were processing and funding

underwriting subprime loans, our quality scores were better.  Our early loan performance was

better on the subprime product than in many cases they were doing on prime.").  The

Government also disputes that Fannie and Freddie were "well aware" that individuals without

manual underwriting authority were used in the industry to clear and close loans.  Mainigi Decl.

Ex. 13, Forlines Tr. 224:12-225:8 (level of underwriting skill should be commensurate with the

level of loan risk because "you want the most experienced underwriters underwriting the loans

that are the most complex"); Mainigi Decl. Ex. 23, Padgett Tr. 94:18-95:6 ("[F]or Freddie Mac,

underwriters have to be able to take a variety of different types of income documents – for

example, verification of employment, W-2s; different types of pay . . . and determine accurately

how much money is available every month that are qualified earnings available to repay the

mortgage.  And that takes a level of skill and experience that needs to be done at an underwriter

level").

   36. **Average Processing Time**: The Amended Complaint, at paragraphs 3–4, 66, 69,

80, alleges that FSL's focus on streamlining and increasing the speed of its work flow—by

reducing its average turn time from 45-60 to 10-15 days—indicates fraud and a disregard for

quality, but the facts show that this is not true.  As relator O'Donnell observed in May 2007,
"[p]rime borrowers require faster TT [turn time] to keep them from going elsewhere."[147]  Poor
turn times "frustrate[] borrowers who have goals" and "result[] in employee dissatisfaction
because they're not able to meet their customers' expectations."[148]  But even in August 2007,
Full Spectrum Lending "continue[d] to manufacture Prime loans by sending them through a work
flow originally built for Subprime," which "add[ed] cost and time . . . and allow[ed] competitors
to 'steal' loans that languish[ed] in the pipeline."[149]  Thus, when shifting to a prime process, it
sought to "eliminate[e] unnecessary delays or 'subprime' process steps for prime
Applications."[150]

     **Response to Paragraph 36**:  The Government disputes the first sentence in paragraph 36
on the grounds that the sentence disputed allegations of the complaint based on "the facts," but
cites no admissible evidence.  The Government also disputes the statements in paragraph 36 as
incomplete and misleading as the HSSL involved the stacking of risk, of which reduced turn time
was only one of the main contributing risk ractors.  U.S. SOF ¶¶ 221-45.  Additionally, FSL
quality reports demonstrated that the layering of risk produced loans with extremely high defect
rates.  U.S. SOF ¶¶ 347-56.

     37.    Fannie's relationship manager with Countrywide agreed that speed is a perfectly
reasonable business goal in the mortgage industry.[151]  One of Fannie Mae's strategic "five-year

---

[147] Mainigi Decl. Ex. 57 at 21 (BANA-SDNY-E-008669901).

[148] Mainigi Decl. Ex. 9 (Comeaux Dep. 48:8-49:3).

[149] Mainigi Decl. Ex. 67 (BANA-SDNY-E-003960393 (O'Donnell e-mail to FSL personnel,
dated 8/1/07)).

[150] Mainigi Decl. Ex. 67 (BANA-SDNY-E-003960393 (O'Donnell e-mail to FSL personnel,
dated 8/1/07)).

[151] Mainigi Decl. Ex. 3 (Battany Dep. 82:4-83:25).

goals" is to "[h]elp lenders transform process via ease and speed of delivery."[152]

**Response to Paragraph 37**:  The Government disputes the statements in paragraph 37 as incomplete and misleading and on the basis that, among other things, the HSSL involved the stacking of risk, of which reduced turn time was only one of the many contributing risk factors. U.S. SOF ¶¶ 221-45.  Additionally, FSL quality reports demonstrated that the layering of risk produced loans with extremely high defect rates.  U.S. SOF ¶¶ 347-56.

38.     Furthermore, turn time is irrelevant to the question of fraud in the mortgage industry,[153] because it only takes about 5 days of actual work to close a loan; the rest is spent "waiting for pieces of documents to flow through or people to do their part of a process."[154]  "A 10- to 15-day process time just meant all the pieces happened in order."[155]  Thus, "[w]hen a loan takes 60 days to close, it's not 60 days of work, it's probably five days of work spread out over 60."[156]

**Response to Paragraph 38**:  The Government disputes the statements in paragraph 38 as incomplete and misleading and on the basis that, among other things, as the HSSL involved the stacking of risk, of which reduced turn time was only one of the many contributing risk factors. U.S. SOF ¶¶ 221-45.  Additionally, FSL quality reports demonstrated that the layering of risk produced loans with extremely high defect rates.  U.S. SOF ¶¶ 347-56.  Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Michael Thomas) BANA-SDNY-E-000009676- 679 at 677; ("Our initial problem statement for HSSL . . . is 'To eliminate unnecessary hand-offs and backwards

---

[152] Mainigi Decl. Ex. 205 at FHFA01739015 (FHFA01739008  (Fannie Single Family Execution Strategy)).

[153] Mainigi Decl. Ex. 3 (Battany Dep. 84:1-20 ("[I]f someone's going to be fraudulent, a borrower or a[n] institution, [it] wouldn't matter whether they did it in 50 days or 10 days.")).

[154] Mainigi Decl. Ex. 3 (Battany Dep. 84:1-14).

[155] Mainigi Decl. Ex. 3 (Battany Dep. 84:7-8).

[156] Mainigi Decl. Ex. 3 (Battany Dep. 84:8-10).

movement.  The issue is that the hand-offs are [] our control points [] and the backward movements are due to insufficient quality.  I'm concerned that our initial solution is more about removing or avoiding control points."); Nawaday Decl. Ex. D, Boland Tr. 67:8-15 (investigating fraudulent clearing of conditions in NCA resulting from turn time pressure (loan specialists "had a requirement to do—to move one loan per day per loan specialist to closing.  And if they didn't hit that goal, they couldn't leave for the night."); Nawaday Decl. Ex. D, Boland Tr. 67:16-68:3 ("And my response was, 'Well, what if you don't have the conditions?'  And the response was, 'Well, the loan is going to move.  We need that loan to move if we're going to go home, whether we have the conditions or not.'  So – so I escalated that – that situation").

### B.    The Title of "Underwriter" Was Not Required to Process Prime Loans.

39.    In 2007 and 2008, there was no industry standard for what constituted an "underwriter."[157]   In fact, some lenders did not have any individuals with that title.  The GSEs required no certification that identified someone as an underwriter, and there was no standard training across the industry for underwriters.[158]   Across the industry, the role of an "underwriter" or similar person depended on the needs of the lender and the kinds of loans the lender originated.[159]

---

[157] Mainigi Decl. Ex. 3 (Battany Dep. 306:16-307:6 (Fannie does not have definition for qualifications of lender employees other than loan officers, appraisers)); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 346:12-20 (degree of experience for underwriters is defined "differently across the spectrum of lenders")); see Mainigi Decl. Ex. 20 (Lumsden Dep. 65:24-25 ("You know, I don't know the definition of an underwriting determination.")); Mainigi Decl. Ex. 19 (Kitashima Dep. 35:19-22 ("I think underwriters, the word or the title of 'underwriters' in the subprime world is very different from the title of 'underwriter' in the prime world.")).

[158] Mainigi Decl. Ex. 3 (Battany Dep. 53:6-16, 306:16-307:6); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 346:12-20, 370:19-371:10); Mainigi Decl. Ex. 26 (Sobczak Dep. 70:20-25, 74:17-20).

[159] Grice Decl. Ex. A ¶ 73 (loans for borrowers who "easily meet[] all of the underwriting criteria for a given product" do not need senior underwriting involvement)); Mainigi Decl. Ex. 3 (Battany Dep. 87:9-89:8 (discussing reduced role of human underwriters for loans approved by AUS), 89:9-90:24 (differentiating between manual underwriting for higher risk loans and AUS), 150:22-

**Response to Paragraph 39**:  The Government disputes the statements in paragraph 39 because, although the Government does not dispute that definitions of and training for underwriters might vary across the industry, the job of the underwriter is to provide an independent and qualified review of loan files and to determine whether loans are likely to be repaid.  Mainigi Decl. Ex. 24, Price Tr. 50:12-22 ("Q.  And what was the basis for your concern?  A.  My personal opinion that the underwriting and the validation of information on a loan should be done by an underwriter.  Q.  And why should it be done by an underwriter?  A.  Again, it's my opinion, but I – I just feel that they're – they're qualified and trained for a specific task, and that task is to make sure that --you know, that the asset quality of the – of the loan, which is the manufacturing quality, is – is correct."); Nawaday Decl. Ex. B, Ballance Tr. 13:15-17 ("A human being who's trained in underwriting loans is the only person who really knows what a good loan is or is not."); Nawaday Decl. Ex. D, Boland Tr. 29:3-12 ("sole function [of underwriter] was to protect the company and the investors and safeguard the quality");  Nawaday Decl. Ex. D, Boland Tr. 65:19 (describing underwriters as "the guardians of quality").

40.     During FSL's subprime days, employees with the title "underwriter" generally were responsible for manually underwriting loan files.[160]  They evaluated credit risk, whether the borrower was likely to repay the money, and whether the loan fell within Countrywide's

---

152:18 (discussing discussing different roles for underwriters under different business models and different types of loans requiring manual underwriting)); *see also* Mainigi Decl. Ex. 13 (Forlines Dep. 196:13-198:10 (regarding underwriting tasks, Fannie doesn't "get into who has to do a particular function in the guide")); Mainigi Decl. Ex. 13 (Forlines Dep. 224:22-226:11) (discussing importance of assigning more complex loans to more senior underwriters); Mainigi Decl. Ex. 28  (Freddie 30(b)(6) Dep. 204:17-20 ("[L]ow risk loans you can process through somebody less capable, less experienced.  Higher risk loans take somebody more experienced.")); *see* Mainigi Decl. Ex. 19 (Kitashima Dep. 34:22-36:4 ("I think underwriters, the word or the title of 'underwriters' in the subprime world is very different from the title of 'underwriter' in the prime world.")); Mainigi Ex. 14 (Gong Dep. 77:18-79:6 (noting the differences between manual underwriting and validation).

[160] Mainigi Decl. Ex. 29 (Thomas Dep. 131:20-24).

guidelines.[161]   They could not rely on CLUES to make the underwriting decision because a

subprime loan would be unlikely to have received a CLUES Accept[162]   Employees with the title

"loan specialist" during FSL's subprime days were responsible for ensuring that the file

contained all the documents and information the underwriter needed to make a decision on the

file.[163]

    **Response to Paragraph 40**:  The Government does not dispute the statements

in paragraph 40.

    41.    In the prime lending industry, an AUS such as CLUES makes the underwriting

decision, which allows loan specialists to carry much of the balance of the processing workload:

> The loan specialist's responsibility throughout mortgage banking is
> to validate information on the documents that come in.  And in
> reality, it's not much different in high speed swim lane than in
> processing in general.  I mean, the processors got to prepare
> documents, make sure they are accurate, input the information to
> CLUES.  And when CLUES underwrites the loan and gives the
> answer, then they know where the loan goes next, what happens
> next.  CLUES made the underwriting decision on the file, so the
> person handling the loan needed only to ensure that the information
> put into CLUES matched the information in the file and that any
> documents or information required by CLUES was included in the
> file.[164]

    **Response to Paragraph 41:**  The Government disputes the statements in paragraph 41 as

the testimony cited in support of the statements is unreliable and inadmissible.  The Government

further disputes the statements in paragraph 41 as CLUES delivers an underwriting

---

[161] Mainigi Decl. Ex. 19 (Kitashima Dep. 43:16-19).

[162] Mainigi Decl. Ex. 20 (Lumsden Dep. 64:4–9 ("We always used CLUES to underwrite loans,
even underwrote subprime loans but it didn't mean a person didn't look at them as well.  In the
subprime case we didn't get very many approvals.")).

[163] Mainigi Decl. Ex. 22 (O'Donnell Dep. 87:5-10).

[164] Mainigi Decl. Ex. 20 (Lumsden Dep. 44:25-47:1).

"recommendation" subject to conditions on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008,

Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-

00131805-829 at 805 (describing the operation of CLUES and stating that "CLUES . . . delivers

an underwriting recommendation with accompanying conditions."). Further, Countrywide's own

underwriting manual sets forth the process to be followed for "[u]nderwriting a CLUES Accept,"

including verifying income or determining income reasonability for a stated income loan,

determining whether the borrower has any significant debt not reported on the credit report,

verifying assets, ensuring the correct property valuation method was used in the appraisal, and

evaluating whether the appraisal conforms to the standards for soft markets.  Nawaday Decl. Ex.

AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG)

BANA-SDNY-C-00131805-829 at 807 ("The underwriter is responsible for ensuring the correct

valuation method is obtained and the property meets the eligibility requirements of the program

and meets the standards of CTM 3 The Property.").

42.     It was not unusual, at Countrywide or elsewhere in the industry, in the prime

context, for someone without the title underwriter to perform these validating functions, and there

is absolutely no testimony to the contrary.[165]

**Response to Paragraph 42**: The Government disputes the statement in paragraph 42

concerning practices "elsewhere in the industry" as unsupported by admissible evidence.  The

Government further disputes the statements in paragraph 42 as incomplete and misleading in that

FSL had less experienced loan specialists than Countrywide's Consumer Markets Division.

Nawaday Decl. Ex. W, O'Donnell Tr. 90:4-17 (explaining that FSL loan processors were less

---

[165] Mainigi Decl. Ex. 14 (Gong Dep. 20:22-23:1 (testifying that loan specialists in CMD,
"especially in this context where they have CLUES accept authority, . . . can handle loans from
start to finish, from what I -- from what I remember from my visit in this presentation."));
Mainigi Decl. Ex. 14 (Gong Dep. 21:5-14 (testifying that, in CMD, a human underwriter would
not have to review a cookie-cutter prime CLUES accept loan)); *see* Mainigi Decl. Ex. 3 (Battany
Dep. 150:22-152:18 (discussing discussing different roles for underwriters under different
business models and different types of loans requiring manual underwriting)).

experienced than those in CMD) ("In CMD the processors generally had more experience.  They were more industry – they would better fit the definition of a processor within the industry.  In FSL the loan specialists they were really more clerks.  They generally did not – they were generally entry level positions.  People that came to Full Spectrum without prior or significant mortgage experience.  And they were gathers, they would gather documentation and they would order third-party vendor work such as appraisals or title searches.  But they didn't do some of the traditional functions that a processor would do.  So CMD had an edge from that regard – in that regard."); Nawaday Decl. Ex. W, O'Donnell Tr. 78:11-22 ("Q.  You thought CMD poorly managed quality on a day-to-day basis?  A. Yes.  Q. And give me your basis for that statement?  A. Based on the QC results that I reviewed regularly.  As you noted earlier, even though we were processing and funding underwriting subprime loans, our quality scores were better.  Our early loan performance was better on the subprime product than in many cases they were doing on prime."); Nawaday Decl. Ex. AC, Thomas Tr. 77:9-14 (combining processor and underwriter roles "didn't . . . make sense" because "you're basically checking your own work . . . The processor is the one building the file.  They're the one checking that they built the file correctly").

    **C.**    **FSL Shifted To Prime Lending In 2007.**

    43.    By 2007, the subprime market began to tighten up.[166]  But the volume of prime loans within FSL was increasing—as FSL told Fannie and Freddie.[167]

---

[166] Mainigi Decl. Ex. 22 (O'Donnell Dep. 31:10-15, 33:5-21 ("[T]oward the end of 2006" there was "more pressure on the subprime product," and around the beginning of summer 2007 "[s]ubprime products and pricing became harder to obtain.  Investors were not as interested.  The market began to really seize up.")); Mainigi Decl. Ex. 1 (Aliano Dep. 19:20–20:19).

[167] Mainigi Decl. Ex. 148 at FNM-BOA 052427 (FNM-BOA 052420 (Dec. 13, 2007 FSL presentation to Fannie)); Mainigi Decl. Ex. 94 at 8 (BANA-SDNY-E-002913047 (Sept. 12, 2007 FSL presentation to Freddie)).

**Response to Paragraph 43**:  The Government does not dispute the statements in paragraph 43.

44.    By the Spring of 2007, senior management at FSL, including Ed O'Donnell, recognized that if they were meaningfully going to continue to do prime business,[168] they would need to adjust their mortgage origination process.  To account for the shift in investor appetite toward prime loans, FSL began to shift its mortgage origination process.[169]  "[T]he entire industry was in flux, it was obvious that with the subprime leaving that we were going to have to come up with a prime lender."[170]  This process shift required planning and involved a large number of people at FSL.[171]  Relator Ed O'Donnell agreed that FSL needed to change its processing model to become a prime-loan-processing operation.[172]

---

[168] In 2006 FSL had some amount of prime business and had implemented a change of process called Prime CLUES Accept (PCA) to process certain prime loans that received a CLUES Accept more efficiently.  Mainigi Decl. Ex. 29 (Thomas Dep. 18:10–12); Mainigi Decl. Ex. 22 (O'Donnell Dep. 38:7–17).  CLUES made an underwriting decision; entry-level underwriters validated the data entered into CLUES; and loan specialists, who earned a low level of underwriting authority, signed off on conditions within their level of authority.  Mainigi Decl. Ex. 44 (BANA-SDNY-E-002921335 (cover e-mail for PCA process flow)); Mainigi Decl. Ex. 44 (BANA-SDNY-E-002921345 (PCA process flow)); Mainigi Decl. Ex. 22 (O'Donnell Dep. 53:16–54:11; 86:23–87:14; 105:6-18); Mainigi Decl. Ex. 29 (Thomas Dep. 18:17-22 ("Accepts would be quicker and you could have newer underwriters because, basically, for a prime CLUES accept, if the data in CLUES was correct, CLUES would give the underwriting decision and – and it would tell you what conditions needed to be satisfied in the file.")).

[169] Mainigi Decl. Ex. 22 (O'Donnell Dep. 31:19-23, 33:2-4 (testifying that FSL began the process of converting from a subprime shop into a prime shop sometime "a little earlier than" 2007)); Mainigi Decl. Ex. 16 (Ho Dep. 495:15–497:11).

[170] Mainigi Decl. Ex. 20 (Lumsden Dep. 137:7-9).

[171] Mainigi Decl. Ex. 53 (BANA-SDNY-E-003960349 (Cover e-mail to April 11, 2007 FSL Central Services Business Review)); Mainigi Decl. Ex. 54 (BANA-SDNY-E-003960351 (April 11, 2007 FSL Central Services Business Review).

[172] Mainigi Decl. Ex. 22 (O'Donnell Dep. 40:13-24); Mainigi Decl. 53 (BANA-SDNY-E-003960349 (Cover e-mail to April 11, 2007 FSL Central Services Business Review); Mainigi Decl. Ex. 54 (BANA-SDNY-E-003960351 (April 11, 2007 FSL Central Services Business Review).

**Response to Paragraph 44**:  The Government does not dispute the statements in paragraph 44.

IV.     **The High Speed Swim Lane.**

A.      **FSL Designed and Piloted a Prime Process.**

45.     After acknowledging the need for change, the leadership of FSL put together a multidisciplinary team to study and recommend the workflow changes needed to process low risk prime loans.[173]  Ultimately, this group designed a workflow that it first tested in a pilot called the High Speed Swim Lane.[174]

**Response to Paragraph 45**:  The Government disputes the statements in paragraph 45 as incomplete and misleading to the extent they suggest that the HSSL had the support and endorsement of all persons involved in its development and implementation.  U.S. SOF ¶¶ 258-90; Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Tinaglia) BANA-SDNY-E-000009676 - 679 at 676 ("We are hearing the clear directive [from Drew Gissinger] that we should improve manufacturing quality" and this directive is "in direct conflict with the current HSSL design").  Nawaday Decl. Ex. AC, Thomas Tr. 37:21-38:1 (explaining that he sent the August 8, 2007 email because "we weren't – we weren't getting anywhere.  We weren't being listened to on – on the quality concerns. . ."); Nawaday Decl. Ex. DE (Mar. 13, 2008, Email from Patrick Aliano)

---

[173] Mainigi Decl. Ex. 20 (Lumsden Dep. 43:20–44:10 ("[W]e were trying to create a path where the simpler prime loans would move through the system in order to meet the needs of customers, maintain high quality but, basically . . .  teach the group -- have the group learn how to process these -- these simpler loans like the rest of the mortgage industry. Just give them a chance to learn, since we were primarily a subprime shop, giving our groups a chance to see how prime loans should flow . . .  within our central services organization."); Mainigi Decl. Ex. 14 (Gong Dep. 13:20-22 ("The process was part of a greater effort by the division to change our processes to move to more of a prime lending model . . . .")); Mainigi Decl. Ex. 60 (BANA-SDNY-E-001416054 (Michael Thomas emails, copying Ed O'Donnell, suggesting process improvement ideas for the Prime workflow)); Mainigi Decl. Ex. 54 (BANA-SDNY-E-003960351 (FSL April 2007 Business Review)); M. Barnett Decl. ¶¶ 5, 7.

[174] M. Barnett Decl. ¶ 7.

BANA-SDNY-E-001009201-205 at 201  ("Ed [O'Donnell] will tell you when we sat in the room

in July these were some of the same concerns we expressed. . . "); Nawaday Decl. Ex. DF (Mar.

13, 2008, Email from Aliano re "HSSL August") BANA-SDNY-E-000039008-39012 at 8

("[W]e did have the crystal ball and unfortunately our risk assessments at that time are holding

true as current quality undermines FSL.").

      46.    FSL assigned the design task to Mark Barnett, an aerospace engineer by training

and a process engineer by trade, along with his process design group.[175]  Barnett's group

included Anson Gong, a PhD biologist and process engineer, who took the lead on the High

Speed Swim Lane project as project manager.[176]  The group was charged with designing a

process that would "follow the process of CMD" and would "improve productivity and turn

time, but maintain quality in supporting more of a prime-based customer base."[177]  There is no

evidence in the record that anyone in FSL management encouraged this team to sacrifice quality

for speed or production in designing the process.

      **Response to Paragraph 46**:  The Government does not dispute that Barnett and Gong

were engineers and were involved in the design of the HSSL, nor does it dispute that the HSSL

was designed to implement certain processes of CMD.  The Government disputes the remaining

statements in paragraph 46 given that CMD's quality was poor even though its loan specialists

were more experienced.  Nawaday Decl. Ex. W, O'Donnell Tr. 90:4-11 ("In CMD the processors

generally had more experience.  They were more industry – they would better fit the definition of

a processor within the industry.  In FSL the loan specialists they were really more clerks.  They

generally did not – they were generally entry level positions.  People that came to Full Spectrum

---

[175] M. Barnett Decl. ¶¶ 3, 5.

[176] M. Barnett Decl. ¶ 4; Mainigi Decl. Ex. 22 (O'Donnell Dep. 46:8-17); Mainigi Decl. Ex. 14 (Gong Dep. 10:10-11:3); Mainigi Decl. Ex. 14 (Gong Dep. 87:19-88:3).

[177] Mainigi Decl. Ex. 14 (Gong Dep. 13:1-14:3 (explaining that he and Mark Barnett were "asked to help work with a cross-functional team of people and experts to design, pilot test in 2007")).

without prior or significant mortgage experience.  And they were gathers, they would gather documentation and they would order third-party vendor work such as appraisals or title searches.  But they didn't do some of the traditional functions that a processor would do.  So CMD had an edge from that regard – in that regard"); Nawaday Decl. Ex. W, O'Donnell Tr. 78:11-22 ("Q.  You thought CMD poorly managed quality on a day-to-day basis?  A. Yes.  Q.  And give me your basis for that statement?  A.  Based on the QC results that I reviewed regularly.  As you noted earlier, even though we were processing and funding underwriting subprime loans, our quality scores were better.  Our early loan performance was better on the subprime product than in many cases they were doing on prime.").

Additionally, FSL management did in fact encourage sacrificing quality for speed in designing the process.  Nawaday Decl. Ex. AR (Aug. 8, 2007, Email from Lumsden) BANA-SDNY-E-002578346 ("[T]his is the highest priority for the majority of Full Spectrum, and thus I need your direct and intense involvement.  If we do not improve our prime funding rates to over 50%, the organization impact will be far beyond a few layoffs here and there."); Nawaday Decl. Ex. CB (May 16, 2007, Email from Lumsden) BANA-SDNY-E-005180366 ("I do not support expanding underwriting authority and responsibility outside of Underwriting.");  Nawaday Decl. Ex. CW (Nov. 29, 2007, Email from Lumsden) BANA-SDNY-E-008979444-447 at 445 ("If we do not fund the volumes per our budget, we will not have to worry about QC and QA."); Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Thomas) BANA-SDNY-E-000009676 - 679 at 676 ("We are hearing the clear directive [from Drew Gissinger] that we should improve manufacturing quality" and this directive is "in direct conflict with the current HSSL design"); Nawaday Decl. Ex. AC, Thomas Tr. 37:21-38:1 (explaining that he sent the August 8, 2007 email because "we weren't – we weren't getting anywhere.  We weren't being listened to on – on the quality concern. . ."); Nawaday Decl. Ex. DE (Mar. 13, 2008, Email from Patrick Aliano)

BANA-SDNY-E-001009201 – 205 at 201 ("Ed [O'Donnell] will tell you when we sat in the room in July these were some of the same concerns we expressed. . . ").

47.    During the summer of 2007, this process-engineering group worked with subject-matter experts within FSL to design a prime model from the ground up.[178]   The design process included several "whiteboard" brainstorming sessions beginning in July of 2007.[179]   Over the course of several additional meetings and discussions, the group designed a prime workflow and a test—or pilot—to evaluate that workflow.[180]   Mr. Barnett dubbed the pilot "the High Speed Swim Lane."[181]

**Response to Paragraph 47**:  The Government does not dispute the statements in paragraph 47 but disputes any suggestion that that the HSSL had the support and endorsement of all persons involved in its design and implementation.  U.S. SOF ¶¶ 258-90.

48.    Simultaneously, members of FSL's process-engineering group researched processes used at other companies and in FSL's sister division—CMD—to leverage the prime

---

[178] Mainigi Decl. Ex. 14 (Gong Dep. 23:3-9); Mainigi Decl. Ex. 14 (Gong Dep. 24:3-19); Mainigi Decl. Ex. 62 (BANA-SDNY-E-000702593 (Michael Thomas emails, copying Ed O'Donnell suggesting separate "designed swim lanes" for handling prime and subprime loans); Mainigi Decl. Ex. 19 (Kitashima Dep. 116:9-17 ("This was a very collaborative effort. . . . we involved almost every discipline, every department of Full Spectrum.  You can see that we had, you know, central services.  We had funding.  We had process engineering, central operations, credit quality people.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 43:25–44:10).

[179] *See* Mainigi Decl. Ex. 14 (Gong Dep. 234:14-23); Mainigi Decl. Ex. 73 (BANA-SDNY-E-000017567 (Designing the Prime High Speed Swim Lane – July 18, 2007)); Mainigi Decl. Ex. 1 (Aliano Dep. 15:9-14).

[180] Mainigi Decl. Ex. 70 (BANA-SDNY-E-000064021 (Prime High Speed Swim Lane Design Review – July 26, 2007)).

[181] Mainigi Decl. Ex. 20 (Lumsden Dep. 43:14-44:10); M. Barnett Decl. ¶ 8.

processes already in place at those entities.[182]   Greg Lumsden, FSL's President at the time,
explained: "I didn't want us to have to recreate the wheel here. . . . [Prime models] already
existed out there and they existed right next door to our sister's shop, which I ran myself for six
years."[183]

  **Response to Paragraph 48**:  The Government does not dispute that the HSSL was
designed to implement certain processes of CMD.  The Government disputes the remaining
statements in paragraph 48 as misleading given that CMD's quality was poor even though its
loan specialists were more experienced.  Nawaday Decl. Ex. W, O'Donnell Tr. 90:4-11 ("In
CMD the processors generally had more experience.  They were more industry – they would
better fit the definition of a processor within the industry.  In FSL the loan specialists they were
really more clerks.  They generally did not – they were generally entry level positions.  People
that came to Full Spectrum without prior or significant mortgage experience.  And they were
gathers, they would gather documentation and they would order third-party vendor work such as
appraisals or title searches.  But they didn't do some of the traditional functions that a processor
would do.  So CMD had an edge from that regard – in that regard."); Nawaday Decl. Ex. W,
O'Donnell Tr. 78:11-22 ("Q. You thought CMD poorly managed quality on a day-to-day basis?
A. Yes.  Q.  And give me your basis for that statement?  A.  Based on the QC results that I
reviewed regularly.  As you noted earlier, even though we were processing and funding
underwriting subprime loans, our quality scores were better.  Our early loan performance was
better on the subprime product than in many cases they were doing on prime."); Mainigi Decl.
Ex. 24, Price Tr. 24:21-25:6 (agreeing that "loan processors in Full Spectrum were less qualified
than the loan processors in the consumer markets division").

---

[182] Mainigi Decl. Ex. 14 (Gong Dep. 15:10-16:6); Mainigi Decl. Ex. 73 (BANA-SDNY-E-009027917 (presentation reporting on comparison of CMD and FSL)); Mainigi Decl. Ex. 9 (Comeaux Dep. 19:14-25).

[183] Mainigi Decl. Ex. 20 (Lumsden Dep. 137:10-14).

49.   **HSSL Design — A Collaborative Process:** "From the very, very first meeting, . . [those designing the High Speed Swim Lane pilot] involved almost every discipline, every department of Full Spectrum."[184]   As then-chief of credit risk Cliff Kitashima testified, this was "clearly a joint effort;" it was "very collaborative."[185]   Dozens of people were involved in the design.[186]   Notably, both Cliff Kitashima and relator Edward O'Donnell, then head of underwriting, played significant roles in the design.[187]   During the design process, senior managers were responsible for the overall design.[188]   And the relevant subject-matter experts made suggestions, raised concerns, and identified risks associated with various aspects of the

---

[184] Mainigi Decl. Ex. 19 (Kitashima Dep. 116:9-17 ("You can see that we had, you know, central services.  We had funding.  We had process engineering, central operations, credit quality people."); Mainigi Decl. Ex. 14 (Gong Dep. 14:8-15 ("From the initial discussion of potential designs and visiting CMD locations to pilot and implementation we were involved with all the senior groups -- I mean senior subject matter experts and executives, including sales, fulfillment, compliance, risk, underwriting, closing and funding, you know, training even and senior management.")).

[185] Mainigi Decl. Ex. 19 (Kitashima Dep. 116:9-17); *see* Mainigi Decl. Ex. 14 (Gong Dep. 25:3-6 ("It was, again, a very collaborative process for designing the High Speed Swim Lane model for, you know, pilot testing and eventual deployment.")).

[186] Several of the  individuals  involved:

> [S]enior executives, Rebecca Mairone, Greg Lumsden, Cliff Kitashima. From underwriting, Robert Price, Ed McDonnell, Michael Thomas, Jim White. Risk and compliance, Patrick Aliano, Javier Jaraba. Sales, Jim Kee. Closing, funding, Cheri Shine. Loren from operations. . . . [a]nd Steve Brent.

Mainigi Decl. Ex. 14 (Gong Dep. 14:19-15:5).

[187] Mainigi Decl. Ex. 19 (Kitashima Dep. 124:8-10 ("[W]e [Risk Management] were involved in every step of the design process up to and including moving ahead at various stages.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 47:6-8); Mainigi Decl. Ex. 64 (BANA-SDNY-E-000039874); Mainigi Decl. Ex. 63 at 3 (BANA-SDNY-E-000086853 at 3); Mainigi Decl. Ex. 74 (BANA-SDNY-E-000020170).

[188] M. Barnett Decl. ¶¶10, 12; Mainigi Decl. Ex. 19 (Kitashima Dep. 121:8-14).

suggested design.[189]   These positions were considered by the group, and ultimately the senior

manager responsible for the given area decided how to proceed.[190]   The role of people from the

quality and risk groups was to raise potential risks and concerns with the suggested design.[191]

Sometimes these concerns prompted a change in the process, and sometimes they didn't, but the

concerns were always considered,[192] and Cliff Kitashima or members of his risk and quality

groups were involved and included in the discussions and decisions relating to their area of

expertise.[193]

   **Response to Paragraph 49**:  The Government disputes the statements in paragraph 49 as

misleading in that they suggest that the views of individuals in underwriting, quality control, and

risk management were considered.  U.S. SOF ¶¶ 245, 258-60, 267, 341.

   50.   **HSSL Criteria — Low Risk Prime Loans**:  Only "the lowest risk loans . . . were

intended to go through the high speed process."[194]   To ensure that the right mix of loans flowed

through the pilot, FSL created pilot "entry criteria" that determined which loans could pass

---

[189] Mainigi Decl. Ex. 14 (Gong Dep. 25:1-3, 8-20); Mainigi Decl. Ex. 20 (Lumsden Dep. 141:1-2 ("[E]veryone who was involved in producing a mortgage loan, they were involved in the process.")); Mainigi Decl. Ex. 1 (Aliano Dep. 18:3-10); Mainigi Decl. Ex. 6 (Brent Dep. 133:21-134:22).

[190] Mainigi Decl. Ex. 64 (BANA-SDNY-E-000039874, 7/31/07 (e-mail exchange re HSSL Pilot between Loren Rodriguez & Kitashima, specifically addressing QOG)); Mainigi Decl. Ex. 79 (BANA-SDNY-E-000066296, 8/15/07 (Rodriguez wants to be ready to go "even before Cliff says yes")); M. Barnett Decl. ¶12.

[191] Mainigi Decl. Ex. 1 (Aliano Dep. 118:9-17 ("A lot of my job is asking these types of questions to raise the risk issue or concern that people do address and keep it within, in the sense of the guardrails, using that terminology, that we had either agreed to or established as part of what was HSSL at that particular point in time.")).

[192] Mainigi Decl. Ex. 14 (Gong Dep. 27:6-11).

[193] Mainigi Decl. Ex. 1(Gong Dep. 27:22-28:3); Mainigi Decl. Ex. 19 (Kitashima Dep. 124:8-10 ("[W]e were involved in every step of the design process up to and including moving ahead at various stages.")).

[194] Mainigi Decl. Ex. 22 (O'Donnell Dep. 39:22-25).

through the High Speed Swim Lane.[195]   Initially, only "full income documentation loans, [with a] 680 FICO [score] or higher [and] 80 percent loan to value [ratio] or lower" that earned a "CLUES Accept" were eligible.[196]   Loans also had to be "risk tier 1" or "risk tier 2," as determined by CLUES.[197]   Purchase transactions, transactions worth more than a million dollars, non-arm's-length transactions, and transactions related to non-owner-occupied properties, were also excluded from the High Speed Swim Lane.[198]   The process "was clearly refinance oriented,"[199] and processed almost exclusively refinancing transactions.[200]

**Response to Paragraph 50**.  The Government disputes the statements in paragraph 50 given that, among other things, stated income loans were included in the HSSL beginning in the initial pilot phase.  U.S. SOF ¶¶ 249-53; Nawaday Decl. Ex. BV (Aug. 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-541 at 539; *see* also Nawaday Decl. Ex. BV (Aug. 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-541 at 539 ("[L]ow/no-doc deals [albeit risky] are the fastest thru the swimlane . . . .") (brackets in original); Nawaday Decl. Ex. W, O'Donnell Tr. 170:16-22.

51.     These criteria changed over time,[201] but the High Speed Swim Lane's goal was

---

[195] Mainigi Decl. Ex. 22 (O'Donnell Dep. 109:3-21).

[196] Mainigi Decl. Ex. 22 (O'Donnell Dep. 109:18-21). Risk tier is a measure of risk of a loan based on inputs into CLUES.   Mainigi Decl. Ex. 16 (Ho Dep. 123:17-24).   Higher risk tiers required underwriter review.   Mainigi Decl. Ex.14 (Gong Dep. 71:9-19).

[197] Mainigi Decl. Ex. 86 (BANA-SDNY-E-000038961).

[198] Mainigi Decl. Ex. 22 (O'Donnell Dep. 147:21-25); Mainigi Decl. Ex. 19 (Kitashima Dep. 132:9–133:5).

[199] Mainigi Decl. Ex. 20 (Lumsden Dep. 188:24).

[200] Ho Decl. ¶ 9.

[201] Mainigi Decl. Ex. 1 (Aliano Dep. 22:21-24 ("We had what was in the High Speed Swim Lane at least 20 different iterations that I can seem to recall, 15 to 20 was my estimate of how many different iterations we had.")); *compare* Mainigi Decl. Ex. 77 (BANA-SDNY-E-000005442);

always the same: to process low-risk prime loans.[202]   Indeed, FSL contemplated including other swim lanes for loans with different risk profiles during the design process.[203]   Ultimately, this did not occur.

> **Response to Paragraph 51**:  The Government disputes the statements in paragraph 51. U.S. SOF ¶¶ 249-53; Nawaday Decl. Ex. BV (Aug. 1, 2007, Email from Rodriguez) BANA-SDNY-E-000094539-541 at 539; *see also* Nawaday Decl. Ex. BV (Aug. 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539 - 541 at 539 ("[L]ow/no-doc deals [albeit risky] are the fastest thru the swimlane . . . .") (brackets in original); Nawaday Decl. Ex. W, O'Donnell Tr. 170:16-22;  Nawaday Decl. Ex. D, Boland Tr. 38:25-39:13 ("There was considerable campaigning information when the Hustle was rolled out that loans only moved forward; they never moved back. . . . [I]t was designed to change the former status quo, which was focused on quality, and do the right thing. . . .  And the mentality changed to always move forward; never move back."); Nawaday Decl. Ex. AC, Thomas Tr. 80:1-21 ("[W]e saw the tightening market coming.  And we saw that our process wasn't aligned with that tightening market.  So we were going to have high finding rates at a time when we wanted low finding rates.  And we needed more control; and we were putting in a process that had less control . . . And I – I mean, my thought process was – I mean, rumors were already swirling about, you know, our corporate health and, you know, potential acquisitions and things like that.  And – and there was a sense of competition between divisions.  And I felt like, you know – you know, volume – some people perceived that volume made them look good.").

52.   Because loans that qualified for the High Speed Swim Lane were considered "very

---

*with* Mainigi Decl. Ex. 76 (BANA-SDNY-E-000094514); *and* Mainigi Decl. Ex. 84 (BANA-SDNY-E-000087774).

[202] Mainigi Decl. Ex. 20 (Lumsden 43:24–44:6); Mainigi Decl. Ex. 29 (Thomas Dep. 19:14-16, 171:1-2).

[203] Mainigi Decl. Ex. 14 (Gong Dep. 42:17–43:6).

high – high quality loans"[204] and because CLUES made the underwriting decision, it was "more or less . . . an industry standard to have processing done on these loans by a processor."[205]

**Response to Paragraph 52:**  The Government disputes the statements in paragraph 52. *See* Government's response to paragraph 50 (addressing the purported high quality of the loans); Government's response to paragraph 56 (discussing the fact that Countrywide's own underwriting manual sets forth processes to be followed in cases of CLUES Accepts).  The Government also disputes the claim in paragraph 52 regarding the "industry standard" as unsupported by admissible evidence.

53.   **Reasonability of Stated Income:** Cliff Kitashima, who had responsibility for risk and underwriting—with the support of O'Donnell and others—made the final decision to allow loan specialists in the pilot to evaluate stated-income reasonability.[206]

**Response to Paragraph 53**:  The Government does not dispute the statements in paragraph 53.

### B.   The HSSL Process Was Consistent with Industry Standards and CMD's Model.

54.   Rather than roll out process changes for high quality prime loans throughout FSL, FSL management determined that it would be more prudent to start with a pilot.  The High Speed Swim Lane[207] pilot test was conducted by two processing teams—one in FSL's Chandler,

---

[204] Mainigi Decl. Ex. 20 (Lumsden Dep. 186:8-9); Mainigi Decl. Ex. 19 (Kitashima Dep. 135:23-24).

[205] Mainigi Decl. Ex. 19 (Kitashima Dep. 136:1-3).

[206] Mainigi Decl. Ex. 74 at 1 (BANA-SDNY-E-000020170); Mainigi Decl. Ex. 19 (Kitashima Dep. 48:9–50:1).

[207] Mainigi Decl. Ex. 20 (Lumsden Dep. 43:21-43:24 ("The high speed swim lane was a nickname that folks put on our test where we were looking to create, you know, a variety of paths for loans to travel down.")); *see also* M. Barnett Decl. ¶ 9.

Arizona National Sales Center ("NSC") and  one in FSL's Richardson, Texas NSC.[208]  The test or pilot was intended "to teach the group how to implement a prime workflow," like "the rest of the mortgage banking basically does," and to let them "get used to do it in advance of us trying to roll it out into the other entities."[209]  Numerous witnesses have made clear that the pilot was not called the Hustle, as the government suggests in its complaint, but was instead called the High Speed Swim Lane or HSSL (pronounced "H" "S" "S" "L").[210]

**Response to Paragraph 54**:  The Government disputes the first sentence in paragraph 54 and the claim about the "industry standard" as unsupported by admissible evidence.  The Government further disputes the statements in paragraph 54, as witnesses testified that the pilot was called the "Hustle" and documents authored by Loren Rodriguez, who was the leader in charge of the HSSL, referred to it this way as well.  Nawaday Decl. Ex. W, O'Donnell Tr.  45:8-19; 150:5-6 ("The project was referred to as both 'HSSL' and 'Hustle'"); Nawaday Decl. Ex. D, Boland Tr. 21:22-22:15 (pilot rollout in August, 2007, in Richardson, Texas included with promotional materials, music, and dance steps demonstrating how to dance the Hustle); Nawaday Decl. Ex. AC, Thomas Tr. 17:20-21 ("Q:  Was that program also called the Hustle? A. Yes."); Nawaday Decl. Ex. FU (Aug. 4, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000086563-64 at 63 ("As you know, the team's moving 100 mph on our Prime High-Speed Swim Lane [HSSL, aka Hustle] process flow and pilot.  We don't have time for an elegant pilot

---

[208] *See* Mainigi Decl. Ex. 22 (O'Donnell Dep. 115:15-18 ("[The pilot was a] laboratory environment to test what was being developed.  With the idea that we would continually look at the process for ways to improve it or change it.")); Mainigi Decl. Ex. 1 (Aliano Dep. 22:21-24); Smith Decl. ¶ ¶ 4, 5, 13.

[209] Mainigi Decl. Ex. 20 (Lumsden Dep. 44:25-46:6).

[210] *See* Mainigi Decl. Ex. 2 (Ballance Dep. 10:14-16 ("Well, I recall that it was at – it wasn't called the Hustle.  Everyone referred to it as the High Speed Swim Lane.")).  Mainigi Decl. Ex. 1 (Aliano Dep. 17:9-11); Mainigi Decl. Ex. 24 (Price Dep. 45:3-6 (". . . I don't remember the term. I remember the High Speed Swim Lane, but the whole Hustle, whatever you want to call it, it just – it's just not ringing a bell.")).

rollout; and the manufacturing line staff will need to be prepared for the calibrate-as-we-go pilot strategy.") (brackets in original); Nawaday Decl. Ex. AT (Jul. 23, 2007, Email from Loren Rodriguez) BANA-SDNY-E-001225251 ("So, if we need to get the HSSL – Hustle, or high-speed swim lane – Pilot up and running mid next month we don't have the luxury to polish/prep."); Nawaday Decl. Ex. AU (Sept. 27, 2007, Email from Janet Godby) BANA-SDNY-E-001754418 (referring to the project as the "Hustle" and stating "Hustle is heaven if you're a hustler, and hell if you are not").

　　　　55.　　The process used in the pilot was similar to the processes used in CMD and throughout the industry.[211]  Its centerpiece was Countrywide's AUS—CLUES—which provided an underwriting decision of either "Accept" or "Refer" (to an underwriter) based on the information in the loan file.[212]

　　　　**Response to Paragraph 55**:  The Government does not dispute that the HSSL had some similarities to processes used in CMD but otherwise disputes the statements in paragraph 55 as misleading in that the HSSL was designed with a unique layering of risk.  U.S. SOF ¶¶ 221-45.

---

[211] *See* Mainigi Decl. Ex. 14 (Gong Dep. 23:3-9); Mainigi Decl. Ex. 19 (Kitashima Dep. 135:17-136:11); Mainigi Decl. Ex. 26 (Sobczak Dep. 71:1-74:15, 193:4-19); Mainigi Decl. Ex. 3 (Battany Dep. 27:1-16, 72:3-73:10); *see also* Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 171:18-174:19 (with respect to loans approved by Desktop Underwriter, "Fannie Mae would have found it acceptable for a junior underwriter or processor to verify the accuracy of the data being inputted into the [automated underwriting] system")); Grice Decl. Ex. A  ¶ 42 (Grice Expert Report ("Countrywide's business and risk-management decision to make FSL's prime origination process faster by eliminating steps that took time but did not add strength or value to the prime underwriting process was sound and consistent with industry standards.")).

[212] Mainigi Decl. Ex. 14 (Gong Dep. 19:25-20:11 ("CLUES is our corporate underwriting engine, and it takes in input from the applicant's file that's provided by the salesperson or the processor and produces a result that's either approve the loan for the particular product, and that's considered an accept, or if they did not approve the loan for a product based on the engine, then it's a refer, which means refer to a manual underwriting person for review, who can accept the loan.  So CLUES accept authority means that the loan specialist has authority to review and approve the CLUES accept decision for the file.")); Mainigi Decl. Ex. 148 at 10 (FNM-BOA 052420 (Fannie FSL presentation) ("CLUES analyzes credit and financial information and after applying program-specific rules, provides the user with an underwriting decision of Accept or a recommendation of Refer (to an underwriter).")).

The Government further disputes that CLUES delivers an underwriting "decision" as opposed to a "recommendation" subject to conditions on a loan.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-829 at 805 (describing the operation of CLUES and stating that "CLUES . . . delivers an underwriting recommendation with accompanying conditions").

56.     Six of FSL's best processing personnel were selected to participate in the pilot; each of these employees was experienced and had developed an excellent track record over time.[213]   These loan specialists did not underwrite the loan, because CLUES made the underwriting decision, but instead validated the information entered into CLUES, cleared any conditions issued by CLUES, and cleared the loan to close.[214]   Manual human underwriting of these files was not needed in the prime process—so long as the loan received a CLUES "Accept"—because CLUES made the underwriting decision.[215]   Nevertheless, underwriters were stationed near the loan specialists to provide support and answer questions as the loan specialists adapted to their new role.[216]   Relatively low-risk prime loans went through the pilot, and if a loan

---

[213] Mainigi Decl. Ex. 6 (Brent Dep. 28:21-25); Mainigi Decl. Ex. 22 (O'Donnell Dep. 130:13-15; BANA-SDNY-E-000702593).

[214] See Mainigi Decl. Ex. 20 (Lumsden Dep. 65:1-66:25 ("Now I'm not going to recall every single thing but at a 30,000-foot level was to collect the required processing documents, input CLUES and if they get a CLUES accept then validate data, confirm the information and move the loan on through the assembly line.")); Barnett Decl.

[215] Mainigi Decl. Ex. 20 (Lumsden Dep. 63:15-63:16 ("The high speed swim lane was a test. They used CLUES. CLUES did the underwriting.")); Mainigi Decl. Ex. 20 (Lumsden Dep. 47:22-51:18 (testifying that loan specialists "didn't have underwriting authority because CLUES underwrote the loan")); Mainigi Decl. Ex. 20 (Lumsden Dep. 52:2-52:2 ("CLUES was the underwriter")); Mainigi Decl. Ex. 14 (Gong Dep. 43:10-44:9); Mainigi Decl. Ex. 70(BANA-SDNY-E-000064021 ("CLUES is the Underwriter")); Mainigi Decl. Ex. 143 (BANA-SDNY-E-003960408  ("Clues is the underwriter . . . .")); Mainigi Decl. Ex. 82 (BANA-SDNY-E-000068252 ("CLUES is the underwriter . . .")).

[216] Smith Decl. ¶ 11; Mainigi Decl. Ex. 19 (Kitashima Dep. 136:22–137:2 ("[W]e set up, you know, clear lines of communication for processors to call designated underwriters if they had a question or needed clarification on what they could or could not do.")).

fell outside of the loan specialist's authority level or the High Speed Swim Lane entry criteria at any time during the process, it exited the Swim Lane.[217]   This exit ramp idea was encompassed in the design principle "loans move forward, never backward."[218]   Former relator O'Donnell agreed with the pilot criteria.[219]   The average FICO of loans flowing through the pilot was 688; the average LTV was 69.9.[220]   For context, some industry participants consider FICO scores above 600 to be prime scores.  Similarly, the GSEs do not require mortgage insurance on loans with LTV below 80%.

**Response to Paragraph 56**:  The Government disputes the last two sentences in paragraph 56 as containing no citation to admissible evidence and otherwise disputes the statements in paragraph 56.  U.S. SOF ¶¶ 249-53.  Countrywide's own underwriting manual sets forth the process to be followed for "[u]nderwriting a CLUES Accept," including verifying income or determining income reasonability for a stated income loan, determining whether the borrower has any significant debt not reported on the credit report, verifying assets, ensuring the correct property valuation method was used in the appraisal, and evaluating whether the appraisal conforms to the standards for soft markets.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides LPG) BANA-SDNY-C-00131805-829 at 807 ("The underwriter is responsible for ensuring the correct valuation method is obtained and the property meets the eligibility requirements of the program and meets the standards of CTM 3 The Property.").

---

[217] *See* Mainigi Decl. Ex. 14 (Gong Dep. 31:9-24); Mainigi Decl. Ex. 70 (BANA-SDNY-E-000064021).

[218] Mainigi Decl. Ex. 14 (Gong Dep. 39:15-20 ("[Loans move forward, never backward] was a design principle that we wanted to have the High Speed Swim Lane process follow in terms of loans keep moving forward either in the High Speed Swim Lane process or alternate process, unless it needs to be canceled, or then they'll exit the process, or it's declined at some point."))

[219] Mainigi Decl. Ex. 22 (O'Donnell Dep. 108:25–109:21, 147:6–148-19).

[220] Ho Decl. ¶ 9.

57.   All groups involved in the design, including FSL's Risk Management, supported the pilot design and encouraged employees to follow the workflow.[221]   The undisputed evidence is that the High Speed Swim Lane process was appropriately designed and approved by even those who had previously raised concerns.[222]   The highest levels of FSL's management also approved of the design.[223]

**Response to Paragraph 57**:  The Government does not dispute the last sentence of paragraph 57, but otherwise disputes the statements in paragraph 57.  U.S. SOF ¶¶ 221-346.

58.   **Temporary Suspension of Impact to Quality of Grade ("OOG")**:[224]   The design team expected that the individuals in the pilot would make some mistakes as they learned their new roles, so senior management took steps to ensure that the pilot team's compensation was not adversely impacted by anticipated errors as they learned the process.[225]   Specifically, the

---

[221] Mainigi Decl. Ex. 22 (O'Donnell Dep 125:14–128:22, 131:14, 131:21–132:4).

[222] *See, e.g.*, Mainigi Decl. Ex. 5 (Boland Dep. 24:22-23); Mainigi Decl. Ex. 29 (Thomas Dep. 170:16-20); Grice Decl. Ex. A - Rep. ¶ 49 (Grice Expert Report ("The steps and checks built into the HSSL process made it well suited to issue prime conforming loans. The ultimate efficiency goal of the HSSL process was to have loans go from 'first credit pull' (the date when the initial credit report is ordered for the applicant) to funding in 24 days, which is plenty of time for a loan application to run through a series of carefully designed risk-management processes, especially for prime conforming loans which use an AUS to help make credit decisions.")).

[223] Mainigi Decl. Ex. 19 (Kitashima Dep. 124:8-18).

[224] Quality of Grade or "QOG" was a component of bonus compensation for some FSL employees during this time period.  Individuals' bonus calculations often included several components.  One component was quality of grade, which generally provided a multiplier such that a poor quality of grade score could result in the individual receiving less than 100% of the bonus the individual had earned otherwise.  Mainigi Decl. Ex. 19 (Kitashima Dep. 19:14–20:12). Part of an individual's quality of grade score was based on corporate QC's audit findings related to that individual's loans.  Mainigi Decl. Ex. 16 (Ho Dep. 410:13–411:3).  As O'Donnell explained, QOG "was progressive action — [i]f you made mistakes that materially impacted the quality of the file, it could impact your compensation.  If you repeatedly made mistakes, you could be subject to employee action up to [and] including termination."  Mainigi Decl. Ex. 22 (O'Donnell Dep. 137:2-7).

[225] Mainigi Decl. Ex. 20 (Lumsden Dep. 72:2-73:6 (testifying that it made sense to suspend QOG "where you are implementing brand new procedures, brand new products, brand new policies and

individuals in the pilot were granted a temporary reprieve on penalties to their compensation – known as "quality of grade" – for mistakes that resulted in adverse findings by Countrywide's Quality Control department.[226] Their quality of grade ("QOG") score, the score that had the potential to reduce their compensation for quality findings, continued to be calculated, and pilot employees were punished for mistakes that were related to fraud or fair lending or were characterized as egregious.[227] The temporary reprieve from bonus impact did not extend to other consequences for loan processing mistakes, which could include a loss of underwriting authority or other discipline—up to termination.[228] Relator Ed O'Donnell and Chief of Credit Risk Cliff

---

it's not fair to the employee when they are still learning what the requirements are to have a quality of operations grade")).

[226] Mainigi Decl. Ex. 20 (Lumsden Dep. 72:2-73:6 (testifying that it made sense to suspend QOG "where you are implementing brand new procedures, brand new products, brand new policies and it's not fair to the employee when they are still learning what the requirements are to have a quality of operations grade")).

[227] Mainigi Decl. Ex. 63 (BANA-SDNY-E-000086853 ("I am ok with a suspension for 90 days for certain elements of the QOG. We should keep those tied to key areas such as Responsible Lending, Fraud, Affordability and Collateral.")); Mainigi Decl. Ex. 64 (BANA-SDNY-E-000039874 ("The QOG's will continue to be calculated however "hits" to individuals involved in the pilot (central ops, central services, production) will be suspended for August, providing they do not relate to Responsible Lending, fraud or similar issues unrelated to the objectives of the pilot.")); Mainigi Decl. Ex. 68 (BANA-SDNY-E-000210249 ("Remember we are talking only about Prime fundings here, not subprime. Our instance of QOG issues on Prime loans is very low so we're not actually giving up much. It's the message.")); Mainigi Decl. Ex. 102 at 13 (BANA-SDNY-E-000040173 at 13 (Sept. 27 Deck)); Mainigi Decl. Ex. 22 (O'Donnell Dep.137:12-13).

[228] Mainigi Decl. Ex. 19 (Kitashima Dep. 144:7-21 ("Now, the suspension also came with the caveat that all of our control processes -- including audits, both from corporate as well as our internal divisional audits, both for post-funding and in-process loans -- would continue, that we would provide feedback, that we would take appropriate steps if we found that, you know, the process had a flaw in it or that we had individuals that were not performing up to standard. We would take action on those individuals -- outside of QOGs. Forget about the QOGs. And there were obviously some findings that, you know, would definitely affect a person's bonus up to and including any fraud or responsible lending issues that might have come up.")).

Kitashima approved this compensation-hit reprieve.[229]   O'Donnell "thought that [the reprieve] made sense because we wanted the employees who were moving to new roles with new authority to be focused on executing the work flow."[230]   He "wasn't concerned that the result would be a bunch of bad loans by relaxing the QOG for 60 days," because "in the division we had traditionally done a good job managing quality."[231]   The contracts between Countrywide and the GSEs did not prescribe how lenders could compensate their employees who performed loan origination or quality control tasks.[232]

**Response to Paragraph 58**:  The Government does not dispute that there was a suspension of the QOG impact but otherwise disputes the statements in paragraph 58.  U.S. SOF ¶¶ 238-41.

59.   **Turn Time Bonus:**  The Amended Complaint alleges that FSL implemented a "new" bonus for reducing turn time in connection with the High Speed Swim Lane.[233]   In reality, FSL had always had in place a bonus that rewarded employee productivity based on efficiency. While FSL did implement some minor modifications to the existing turn time bonus in August 2007, this change had nothing to do with the High Speed Swim Lane.[234]

---

[229] Mainigi Decl. Ex. 19 (Kitashima Dep. 143:18–148:2); Mainigi Decl. Ex. 63 (BANA-SDNY-E-000086853 ("I am ok with a suspension for 90 days for certain elements of the QOG.  We should keep those tied to key areas such as Responsible Lending, Fraud, Affordability and Collateral.")); *see* Mainigi Decl. Ex. 64 (BANA-SDNY-E-000039874).

[230] Mainigi Decl. Ex. 22 (O'Donnell Dep. 137:23–138:2).

[231] Mainigi Decl. Ex. 22 (O'Donnell Dep. 139:6-10).

[232] Mainigi Decl. Ex. 23 (Padgett Dep. 203:13-17); Mainigi Decl. Ex. 3 (Battany Dep. 69:7-14); Mainigi Decl. Ex. 26 (Sobczak Dep. 201:3-7).

[233] Am. Compl. ¶ 6.

[234] Mainigi Decl. Ex. 245 (BANA-SDNY-E-000014502 (FSL information bulletin announcing modification to existing turn time bonus effective August 1, 2007)).

**Response to Paragraph 59:**  The Government does not dispute that there was a new turn time bonus implemented in August 2007, but disputes that the change had nothing to do with the HSSL.  Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment Model") Native of BANA-SDNY-E-00040414 at 3 ("Significantly Reduce TT"); *id.* at 4 (listing 24 days as the target goal); Nawaday Decl. Ex. L, Ho Tr. 224:10-228:8 (reduced turn time a goal of both HSSL and central fulfillment models); Nawaday Decl. Ex. T, Mairone Tr. 179:20-22 (turn time a "focus" of both HSSL and central fulfillment).

60.     The High Speed Swim Lane pilot never expanded beyond the initial teams.  The pilot, which began on August 13, 2007, ended on September 30, 2007.[235]  In the end, fewer than 400 loans passed through the High Speed Swim Lane pilot.[236]

**Response to Paragraph 60**: The Government disputes the statements in paragraph 60 as the HSSL never "ended" but simply expanded to all loans under a new name.  Nawaday Decl. Ex. BX (Sept. 21, 2007, Email from Mairone) BANA-SDNY-E-000050487-489 at 487 ("[W]hen can we start moving more loans to the pilot . . . ?  We need to start to move toward all loans into process."); Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8 ("The High Speed Swim Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim Lane pilot."); Nawaday Decl. Ex. T, Mairone Tr. 168:15-20 ("There weren't any exclusions.  It encaptured all of the Full Spectrum lending loans."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("What was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point."); Nawaday Decl. Ex. S, Lumsden Tr. 47:13-25 ("High speed swim lane is not different from central fulfillment, it's all the same thing."); Nawaday Decl. Ex. BY (Nov. 13, 2007,

---

[235] Mainigi Decl. Ex. 16 (Ho Dep. 165:14-16).

[236] Mainigi Decl. Ex. 16 (Ho Dep. 327:7-8).

Presentation, "New Fulfillment Model") Native of BANA-SDNY-E-000040414 at 3 (identifying

same goals as HSSL, to "Focus on FNMA/FHLMC Loans"); Nawaday Decl. Ex. BY (Nov. 13,

2007, Presentation, "New Fulfillment Model") Native of BANA-SDNY-E-000040414 at 3

("Significantly Reduce TT"); Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New

Fulfillment Model") Native of BANA-SDNY-E-000040414 at 4 (listing 24 days as the target

goal); Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment Model") Native of

BANA-SDNY-E-000040414 at 5 ("Streamline one-way fulfillment process with minimal

handoffs and delays"); Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment

Model") Native of BANA-SDNY-E-000040414 at 5 (use "Processors with UW Approval

Authority Level 2"); Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment

Model") Native of BANA-SDNY-E-000040414 at 5 (merge the funder and compliance specialist

roles); Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment Model") Native

of BANA-SDNY-E-000040414 at 8 ("Maximize UW authority level of LS staff (UW Lvl 2)");

Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation, "New Fulfillment Model") Native of

BANA-SDNY-E-000040414 at 11 ("Merge LS and UW/Validator roles"); Nawaday Decl. Ex. L,

Ho Tr. 245:12-20 (merged role of funder and compliance specialist in HSSL and central

fulfillment models); Nawaday Decl. Ex. L, Ho Tr. 224:10-228:8 (reduced turn time a goal of

both HSSL and central fulfillment models); Nawaday Decl. Ex. T, Mairone Tr. 179:20-22 (turn

time a "focus" of both HSSL and central fulfillment).

      The Government also disputes the last sentence in paragraph 60 as nearly 3,000 loans

passed through the HSSL during the timeframe specified by Defendants.  *See* Hansen Decl. ¶ 8.

**V.**      **Central Fulfillment Was Consistent with Industry Standards and Reasonable.**

      **A.**      **FSL's Central Fulfillment Model Resulted from FSL's
Reasonable Business Judgment and Was Not Fraud.**

      61.    When the HSSL pilot ended on September 30, 2007, FSL utilized the knowledge

it gained from the pilot test to implement a new workflow within what it called Central

Fulfillment.[237]  To cope with a rapidly changing lending environment, Central Fulfillment

leveraged FSL's highly-skilled employees and reorganized their roles within the company.[238] The

goals of Central Fulfillment were to follow the guidelines, utilize CLUES correctly, and "produce

high quality loans."[239]

**Response to Paragraph 61**:  The Government disputes the statements in paragraph 61,

because, for the reasons stated in the Government's response to paragraph 60, the HSSL never

"ended," nor did the goal of pushing volume over quality.  See Response to Paragraph 60.  The

Government further disputes that the loan specialists in central fulfillment were "highly skilled."

*Id.* ¶¶ 337-38.

62.    FSL President Greg Lumsden announced the move to Central Fulfillment in an

email to all of FSL on October 5, 2007.[240]  He explained:

> Several months ago, we began testing several different processing
> models to help us be more efficient with our prime loans. . . . As
> virtually all of us know by now, the processing and underwriting of
> prime loans is much different than non-prime. The original test was
> called the "High Speed Swim Lane" . . . .
>
> The new model merges processors, underwriters and funders into
> single teams that operate in a Central Fulfillment organization. This
> new operations team will have the objective of 1) Closing
> loans faster with few hand-offs and with excellent quality, 2) Working
> very closely with the sales teams to handle the customers with the
> utmost care, 3) Support the sales teams by assisting and handling
> more customer and loan processing functions -which

---

[237] Mainigi Decl. Ex. 87 (BANA-SDNY-E-000039301); Mainigi Decl. Ex. 14 (Gong Dep. 42:20-43:17).

[238] *See* Mainigi Decl. Ex. 14 (Gong Dep. 61:18-62:5); Mainigi Decl. Ex. 98 (BANA-SDNY-E-008673733 (with attachments Mainigi Decl. Ex. 99 (BANA-SDNY-E-008673749); Mainigi Decl. Ex. 101 (BANA-SDNY-E-008673751); Mainigi Decl. Ex. 100 (BANA-SDNY-E-008673750 (charts with names of individuals in Central Fulfillment)).

[239] Mainigi Decl. Ex. 21 (Mairone Dep. 171:6-21).

[240] Mainigi Decl. Ex. 109 (BANA-SDNY-E-000052243 (Greg Lumsden email announcing Central Fulfillment)).

enables sales AEs to work with more new customers each day, and
4) Funding a much higher percentage of applications. . . . .

The new processing/fulfillment model will accept a high quality
loan application from sales and drive it all the way through to
funding. . . .

There were new operations teams created on October 1st to support
the NSC sales teams. The managers and employees that were
selected to comprise these NSC teams, are very talented and
tenured employees in FSL. . . . .

. . . . Cliff Kitashima, Rebecca Mairone, Cheri Shine, Ed
O'Donnell, Loren Rodriguez, Mark Barnett, and many others, have
worked with many across our organization over the last 90 days to
develop our new fulfillment model. Thus, we are now moving into
the implementation mode. . . .[241]

**Response to Paragraph 62**:  The Government does not dispute that Lumsden made an

announcement as stated in paragraph 62 on October 5, 2007.

63.    As Lumsden's memo makes clear, Central Fulfillment was not the same thing as

the High Speed Swim Lane.[242]   The High Speed Swim Lane was a pilot designed to test a new

workflow for the lowest-risk prime loans.  Central Fulfillment was a reorganization of part of the

infrastructure of FSL to bring together multidisciplinary teams of underwriters and loan

specialists—called loan specialists within Central Fulfillment—to process low-risk prime loans,

with a separate group of additional underwriters to handle higher risk loans.[243]

---

[241] Mainigi Decl. Ex. 109 (BANA-SDNY-E-000052243 (Greg Lumsden email announcing
Central Fulfillment)).

[242] Mainigi Decl. Ex. 109 (BANA-SDNY-E-000052243 (Greg Lumsden email announcing
Central Fulfillment)); Mainigi Decl. Ex. 14 (Gong Dep. 56:16-20); Mainigi Decl. Ex. 20
(Lumsden Dep. 43:11–44:10 ("[T]he high speed swim lane was a test run in the late summer at
Full Spectrum. It was not an organization. It's not -- it's not central services or central
underwriting. It was a test so I don't know how to answer what we did in a test as what Full
Spectrum did.")).

[243] Mainigi Decl. Ex. 20 (O'Donnell Dep. 106:6–107:19); Mainigi Decl. Ex. 106 (BANA-
SDNY-E-009055288); Mainigi Decl. Ex. 105 (BANA-SDNY-E-008922635); Mainigi Decl.
Ex. 107 (BANA-SDNY-E-000039640).

**Response to Paragraph 63**:  The Government disputes the statements in paragraph 63 because "Central Fulfillment" was simply the HSSL expanded to all loans.  U.S. SOF ¶¶ 249-50; Nawaday Decl. Ex. S, Lumsden Tr. 40:13-25. ("High speed swim lane is not different from central fulfillment, it's all the same thing."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("What was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point."); Nawaday Decl. Ex. BX (Sept. 21, 2007, Email from Rebecca Mairone) BANA-SDNY-E-000050487-489 at 487 ("[W]hen can we start moving more loans to the pilot . . . ?  We need to start to move toward all loans into process"); Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8 ("The High Speed Swim Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim Lane pilot."); Nawaday Decl. Ex. T, Mairone Tr. 168:15-20 ("There weren't any exclusions.  It encaptured all of the Full Spectrum lending loans.").

64.    Central Fulfillment placed some experienced underwriters and loan specialists in a merged loan specialist/underwriter role.[244]   Former underwriters, underwriting managers, operations managers, and loan specialists sat together on teams.[245]   Former underwriting and operations managers oversaw the teams, and former underwriters and loan specialists processed loans.[246]   This model was more efficient and encouraged accountability in loan processing

---

[244] Mainigi Decl. Ex. 14 (Gong Dep. 45:12-22).

[245] *See* Mainigi Decl. Ex. 98 (BANA-SDNY-E-008673733 (with attachments Mainigi Decl. Ex. 99 (BANA-SDNY-E-008673749); Mainigi Decl. Ex. 101 (BANA-SDNY-E-008673751), and Mainigi Decl. Ex. 100 (BANA-SDNY-E-008673750 (charts with names of individuals in Central Fulfillment))).

[246] Mainigi Decl. Ex. 14 (Gong Dep. 62:15–63:6); Mainigi Decl. Ex. 102 (BANA-SDNY-E-000040173 (NSC Central Fulfillment Update with organization charts)).

because the same individuals processed most loans from start to finish.[247]   A separate

underwriting group handled loans that the teams could not process without assistance.[248]

**Response to Paragraph 64**:  The Government disputes the statements in paragraph 64

because "Central Fulfillment," like the HSSL, sought to eliminate underwriters and instead

empower loan specialists with underwriting authority.  Nawaday Decl. Ex. BY (Nov. 13, 2007,

Presentation, "New Fulfillment Model") Native of BANA-SDNY-E-00040414 at 3 ("Focus on

FNMA/FHLMC Loans"); ("Significantly Reduce TT"); 4 (listing 24 days as the target goal); at 5

("Streamline one-way fulfillment process with minimal handoffs and delays"); 5 (use

"Processors with UW Approval Authority Level 2"); 5 (merge the funder and compliance

specialist roles); at 8 ("Maximize UW authority level of LS staff (UW Lvl 2)"); and 11 ("Merge

LS and UW/Validator roles").  The central fulfillment presentation also announced that "CF

team [to] focus on fulfillment and speed to close—resolve and move on ('no returns')."

Nawaday Decl. Ex. BY (Nov. 13, 2007, Presentation "New Fulfillment Model") Native of

BANA-SDNY-E-000040414 at 11; Nawaday Decl. Ex. L, Ho Tr. 171:4-177:8 (identifying only

differences between HSSL and central fulfillment as expanded centers, expanded population of

loans, and expanding loan specialists' underwriting authority to level 2).

65.     The Central Fulfillment model was deployed in three locations on about October

1, 2007:  Chandler and Richardson (the pilot locations) and Rosemead, California.[249]   A total of

---

[247] Mainigi Decl. Ex. 14 (Gong Dep. 17:8-20 (describing the CMD's model for prime processing, on which the High Speed Swim Lane Pilot was designed, as involving "fewer hand-offs" and "more accountability and authority at the loan specialist level" than FSL's subprime processing model)); Mainigi Decl. Ex. 73 at 4 (BANA-SDNY-E-009027917 (advantages of "streamlined prime loan process" include "Fewer handoffs" and "More accountability due to increase authority / empowerment.")).

[248] Mainigi Decl. Ex. 14 (Gong Dep. 45:23-46:9).

[249] Mainigi Decl. Ex. 103 (BANA-SDNY-C-000321712 (Bulletin 07-511 NSC Central FF Model Oct 2007)); Mainigi Decl. Ex. 109 (BANA-SDNY-E-000052243 (Lumsden Email); Mainigi Decl. Ex. 118 (BANA-SDNY-E-000040414 (New Fulfillment Model Presentation)).

twenty-one teams initially processed Central Fulfillment loans.[250]   In November 2007, certain

teams working at FSL's Hatboro, Pennsylvania fulfillment center were brought online with the

new Central Fulfillment process.[251]

**Response to Paragraph 65**:  The Government does not dispute the statements in

paragraph 65.

66.     Loan specialists who had earned enough authority could clear certain low-risk

loans to close; loans beyond the loan specialist's authority had to go to another employee with a

higher authority level.[252]   This process ended April 28, 2008, when an underwriter had to clear

every Central Fulfillment loan to close.[253]

---

[250] Mainigi Decl. Ex. 98 (BANA-SDNY-E-008673733 (with attachments Mainigi Decl. Ex. 99
(BANA-SDNY-E-008673749); Mainigi Decl. Ex. 101 (BANA-SDNY-E-008673751); Mainigi
Decl. Ex. 100 (BANA-SDNY-E-008673750 (charts with names of individuals in Central
Fulfillment))).

[251] Mainigi Decl. Ex. 192 (BANA-SDNY-C-000971285 (Branch Realignment matrices)).

[252] As FSL president Greg Lumsden explained:

> [Loan specialists clearing low-risk loans to close was] an aspect of
> central fulfillment. We did a variety of loans and the loans went in
> different directions[;] . . . when loans come in the door, they don't
> all go down the same assembly line. It's no different than a . . .
> Ford Taurus doesn't go down the same assembly line as a Ford
> Flex. . . . [T]hey may do some things at the beginning of the
> process the same way but, . . . . some loans are going to have
> different issues. There is a purchase loan.  There is a refinance
> loan.  And in the prime world, you create different paths within
> your organization so you can be efficient, so you can efficiently
> process those loans based upon the quality needs that are required,
> based upon the economic needs and based upon the customer
> needs. Clearly, a purchase transaction is -- from a customer side is
> a different need than a refinance customer. And this is just one of
> the workflows within our central services fulfillment group.

Mainigi Decl. Ex. 20 (Lumsden Dep. 47:22-51:18).

[253] *Compare* Mainigi Decl. Ex. 103 (BANA-SDNY-C-000321712 (Bulletin 07-511 NSC Central
FF Model Oct 2007 (Bulletin announcing start of Central Fulfillment on October 2, 2007)), *with*

**Response to Paragraph 66**:  The Government does not dispute that FSL issued a bulletin announcing a new "clear to close" process on April 28, 2008 but otherwise disputes the statements in paragraph 66.  Loan specialists could clear nearly all loans to close, including stated income loans and Expanded Approval loans, a subprime-like product.  Nawaday Decl. Ex. L, Ho Tr. 243:14-25 ("Q: Was there any difference between the Hustle pilot and Central Fulfillment with regard to the way that the reasonability of the stated income was determined? A: In Central Fulfillment, at the beginning of Central Fulfillment, as was in the High Speed Swim Lane pilot, if the loan specialist was located at a stated income loan, then they would work on the review of the reasonableness of stated income."); Nawaday Decl. Ex. L, Ho Tr. 249:14-17 ("[T]here were expanded approval loans in the Central Fulfillment and they would have required underwriter Level 2.").

### B.      Key Employee Roles in the FSL Central Fulfillment Workflow.

67.      Based on the results of the HSSL pilot test, FSL established several key roles in the new Central Fulfillment workflow.[254]   The contracts between Countrywide and the GSEs were not prescriptive as to staffing generally or the titles, training, or qualifications of the lender employees performing various loan origination tasks.[255]

**Response to Paragraph 67:**  The Government disputes the statements in paragraph 67 as incomplete and misleading.  While the contracts with the GSEs were not prescriptive as to staffing generally, the Fannie Mae MSSC required Countrywide to "at all times, have employees who are well trained and qualified to perform the functions required of the Lender under this

---

Mainigi Decl. Ex. 175 (Bulletin 08-195 (Bulletin ending HSSL process within Central Fulfillment on April 28, 2008)).

[254] Mainigi Decl. Ex. 103 (BANA-SDNY-C-000321712 (Bulletin 07-511 NSC Central FF Model Oct 2007)).

[255] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 348:22-349:15); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 148:8-149:7, 370:22-371:6); Mainigi Decl. Ex. 13 (Forlines Dep. 196:13-197:13, 267:21-268:11); Mainigi Decl. Ex. 3 (Battany Dep. 280:14-282:13).

Contract," which Countrywide did not during the HSSL.  Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at Section II.A.2.  Countrywide also warranted to Freddie Mac that it had "not misstated or omitted any material fact about the Mortgage."  Nawaday Decl. Ex. AI (Feb. 7, 2003, Single Family Seller/Servicer Guide Excerpt) USA-00130982, 131114-115, 490 at 115, but when it sold HSSL loans to Freddie Mac, it had omitted information about its risky loan origination process.  U.S. SOF ¶¶ 388-96.  Finally, both GSEs required that loans be investment quality, which could be impacted by the training and qualification of lender employees.  U.S. SOF ¶¶ 200-03.

### 1. The Role of Central Fulfillment Loan Specialists Was Consistent With Industry Practice.

68.     The government's core allegation in its Amended Complaint is that, "In furtherance of its high speed goal, Countrywide's new origination model removed the processes responsible for safeguarding loan quality and preventing fraud. . . . In lieu of underwriter review, Countrywide assigned critical underwriting tasks to loan processors who were previously considered unqualified even to answer borrower questions."[256]

**Response to Paragraph 68**:  The Government does not dispute the statements in paragraph 68.

69.     In Central Fulfillment, people who were previously called underwriters and people who were previously called loan specialists processed loans together in a merged underwriter/loan specialist role titled "loan specialist."[257]  As with the HSSL Pilot, this was consistent with industry practice for prime loans and consistent with CMD's process.[258]  It was

---

[256] Am. Compl. ¶ 5.

[257] Mainigi Decl. Ex. 9 (Comeaux Dep. 149:10-17); Mainigi Decl. Ex. 14 (Gong Dep. 116:12-19); *see* Mainigi Decl. Ex. 14 (BANA-SDNY-E-000040173); Mainigi Decl. Ex. 88 (BANA-SDNY-E-000003620 (Michael S. Thomas e-mail re Estimating Number of UW)).

[258] Mainigi Decl. Ex. 20 (Lumsden Dep. 47:22-51:18 ("For the telemarketing groups, we began to merge processing and underwriting together, which is more how the prime world operates, and

generally accepted in the loan origination industry that qualified individuals such as loan processors could process and close AUS-approved loans.[259]   There was no requirement for a lender to obtain a variance or waiver from GSE guidelines in order to employ an individual with no manual underwriting authority to process and approve AUS-approved loans.[260]   Similarly, the contracts between Countrywide and the GSEs did not prescribe as to which employees could review the reasonableness of stated income.[261]

**Response to Paragraph 69**:  The Government does not dispute that the HSSL was designed to implement certain processes of CMD but disputes the remaining statements in paragraph 69 as misleading given that CMD's quality was poor even though its loan specialists were more experienced.  Nawaday Decl. Ex. W, O'Donnell Tr. 90:4-11 ("In CMD the processors generally had more experience.  They were more industry – they would better fit the definition of a processor within the industry.  In FSL the loan specialists they were really more clerks.  They generally did not – they were generally entry level positions.  People that came to Full Spectrum without prior or significant mortgage experience.  And they were gathers [sic], they would gather documentation and they would order third-party vendor work such as appraisals or title searches.

---

as a result of dealing with prime loans, the loan specialists' responsibilities changed, but they never had -- you wouldn't say they had underwriting authority because CLUES underwrote loans.")); Mainigi Decl. Ex. 14 (Gong Dep. 32:5-8 (testifying that, based on his knowledge of CMD, the appropriate role for a loan specialist in the prime environment "was a combination of processing the loan, combination of processing the loan and also doing an underwriting validation of prime CLUES accept files")); *see* Mainigi Decl. Ex. 14 (Gong Dep. 33:4-11).

[259] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 345:5-346:20, 347:12-20); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 173:1-174:19, 177:4-21); Mainigi Decl. Ex. 26 (Sobczak Dep. 73:13-74:15); Mainigi Decl. Ex. 3 (Battany Dep. 150:22-151:8).

[260] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 347:22-348:15); Mainigi Decl. Ex. 3 (Battany Dep. 155:4-160:17, 280:25-282:13); Mainigi Decl. Ex. 13 (Forlines Dep. 196:13-197:13, 267:21-268:11); see also Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 177:4-21).

[261] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 348:22-349:15); Mainigi Decl. Ex. 3 (Battany Dep. 77:2-16); *see also* Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 147:21-149:15, 370:22-371:6).

But they didn't do some of the traditional functions that a processor would do.  So CMD had an edge from that regard – in that regard."); Nawaday Decl. Ex. W, O'Donnell Tr. 78:11-22 ("Q. You thought CMD poorly managed quality on a day-to-day basis?  A. Yes.  Q.  And give me your basis for that statement?  A.  Based on the QC results that I reviewed regularly.  As you noted earlier, even though we were processing and funding underwriting subprime loans, our quality scores were better.  Our early loan performance was better on the subprime product than in many cases they were doing on prime."); Mainigi Decl. Ex. 24, Price Tr. 24:21-25:6 (stating that "loan processors in Full Spectrum were less qualified than the loan processors in the consumer markets division."). The Government further disputes the statements in paragraph 69 for the reasons given in its response to paragraph 67 and disputes any claim about the "industry practice" as unsupported by admissible evidence.

70.     Whether former underwriters or former loan specialists, the Central Fulfillment loan specialists were "the best of the best"; they survived several rounds of downsizing (in response to the housing crisis), and several took a demotion as part of the restructuring of FS.[262]

**Response to Paragraph 70**:  The Government disputes the statements in paragraph 70. U.S. SOF ¶¶ 337-38.  The QOG scores at the end of 2007 for loan specialists in central fulfillment were terrible.  Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.  Although loan specialists were supposedly required to maintain a minimum QOG score of 4.0 to obtain underwriting authority, the average QOG scores per central fulfillment team ranged from a high of 2.94 to a low of 1.75.  Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540 at 3.  Out of the approximately 210 loan specialists and underwriters listed, 87 had QOG scores at or below 2.00.  Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.   In fact, in October of 2007 risk management set a QOG score of 3.0 or

---

[262] Mainigi Decl. Ex. 118 at 5 (BANA-SDNY-E-000040414).

lower as a reason to *repeal* a loan specialist's authority.  Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick Aliano) BANA-SDNY-E-002220473 at 3 (listing reasons for repeal as including a QOG score of three or lower for two consecutive months).

71.     Central Fulfillment loan specialists' "job was to make sure documents were accurate and move forward with the loan file, which is really how all mortgage bankers did it out in the industry."[263]   "CLUES gave them the decision and they were able to move forward with it."[264]   They could not do this in subprime because subprime loans generally don't generate "CLUES accepts and therefore the loans had to go through a different path."[265]

**Response to Paragraph 71**:  The Government disputes the statements in paragraph 71 because they are supported solely by the testimony of Greg Lumsden, whose testimony is not credible as he was unable to recall basic facts about the company's business during 2007, including whether it was profitable or even sold loans to the GSEs.  *See* Nawaday Decl. Ex. S, Lumsden Tr. 26:9-15 ("[W]as Countrywide, as a whole, experiencing financial distress during the summer of 2007?  A.  Yeah.  I don't know that I can really speak to that.  I don't know what distress means.  It's a little vague."); Nawaday Decl. Ex. S, Lumsden Tr. 77:16-78:3 ("So you don't remember one way or the other if Fannie Mae and Freddie Mac were the primary purchasers of FSL loans during 2007 and 2008? A.  I was never informed that they were specifically buying our loans.  Q.  You were never informed during the 2007, 2008 timeframe that Fannie Mae and Freddie Mac were buying FSL loans? A.  No.  And I don't believe they bought any of our loans at any time in our history, to be honest with you.").

## 2.     Central Fulfillment Underwriters.

72.     The Amended Complaint alleges that FSL eliminated the underwriters.[266]   It is

---

[263] Mainigi Decl. Ex. 20 (Lumsden Dep. 47:22-51:18).

[264] Mainigi Decl. Ex.20  (Lumsden Dep. 47:22-51:18).

[265] Mainigi Decl. Ex. 20 (Lumsden Dep. 47:22-51:18).

undisputed that this is not true.  Many of the underwriters became loan specialists, as noted above, and others provided underwriting support to Central Fulfillment.  They underwrote the loans that fell outside of the Central Fulfillment loan specialists' authority levels and many of the loans originating in the field branches.[267]

**Response to Paragraph 72**:  The Government does not dispute the first sentence in paragraph 72 but otherwise disputes the statements in paragraph 72.  U.S. SOF ¶¶ 221-28.

### 3.   Prime Loan Funders.

73.    The government alleges that "[t]he HSSL also eliminated the final toll gate in loan origination—the compliance specialist."[268]   In the sub-prime days, FSL created a "compliance specialist" position to handle certain disclosures associated with subprime loans.[269] The compliance specialist's primary role was to cross-check executed loan files against a checklist, ensuring that all documents required by state laws and regulations had been collected, signed, and properly organized so that the loan could pass smoothly to the funder, who completed the final steps necessary to fund the loan.[270]   CMD, which then originated prime loans, did not have an equivalent position.[271]

---

[266] Am. Compl. ¶ 70.

[267] Mainigi Decl. Ex. 210 at 3  (BANA-SDNY-E-000032860 (Central Fulfillment workflow indicating that loans outside LS authority "will be escalated to Core UW Support")); Mainigi Decl. Ex. 29 (Thomas Dep. 138:6-12 ("One thing to keep in mind is there was still the old process that the branches -- the actual field branches moved through.  So they still submitted to underwriting.")); Mainigi Decl. Ex. 1 (Aliano Dep. 127:4-128:14, 129:6-17 (explaining that in the field branch model "the loan was sent in for underwriting validation")).

[268] Am Compl. ¶ 79.

[269] Mainigi Decl. Ex. 14 (Gong Dep. 22:14-23).

[270] Mainigi Decl. Ex. 14 (Gong Dep. 156:22–157:6); Mainigi Decl. Ex. 24 (Price Dep at 84:4-22).

[271] Mainigi Decl. Ex. 14 (Gong Dep. 22:10-12).

**Response to Paragraph 73**:  The Government does not dispute the statements in paragraph 73.

74.     In conjunction with the restructuring of FSL in September 2007 and its shift to prime lending, and consistent with the industry-standard prime model, FSL leadership merged the compliance-specialist duties into the responsibilities of the "funders" in the new Central Fulfillment workflow.[272]   It entrusted any prime-related compliance responsibilities to its funders.[273]   The funders were required to complete training and obtain certification to complete the compliance specialist tasks.[274]   There is no evidence in the record that necessary compliance tasks went uncompleted that a compliance specialist was necessary to process prime loans, or that the absence of a separate position called "compliance specialist" had any impact at all on the credit-worthiness of FSL loans.

**Response to Paragraph 74**:  The Government does not dispute that the roles of compliance specialist and funder were merged in the HSSL and its expanded model.  The Government otherwise disputes the statements in paragraph 74.  Nawaday Decl. Ex. D, Boland Tr. 38:18-20 (compliance specialist could "perform the healthy role of sending loans backwards

---

[272] Mainigi Decl. Ex. 14 (Gong Dep. 57:14-24 ("Central Fulfillment was reorganizing some of the key functions, such as …combining the compliance specialists and funder role")); Mainigi Decl. Ex. 16 (Ho Dep. 170:4-8, 236:4-8, 245:18-20); Mainigi Decl. Ex. 69 (BANA-SDNY-E-000064230 ("There is no Compliance Specialist role in this work flow.  The line funder will take over the responsibility")); Mainigi Decl. Ex. 81 at 1  (BANA-SDNY-E-000062260 (Separate Compliance Specialists and Funders existed for the HSSL Pilot)); Mainigi Decl. Ex. 89 at 1 (BANA-SDNY-E-003356256 ("funders also do compliance specialist work.")); Mainigi Decl. Ex. 95 (BANA-SDNY-E-000095599 ("Funders do compliance specialist role and sit with CF teams.")).

[273] Mainigi Decl. Ex. 24 (Price Dep. 84:23-85:10); Mainigi Decl. Ex. 14 (Gong Dep. 66:18-67:21 ("Yes, that is the design; that they would still keep the relevant, you know, checklist items or activities [of the compliance specialist] in the Central Fulfillment process and now reside with the funder position.")); Mainigi Decl. Ex. 104 at 5 (BANA-SDNY-E-000068080 ("Merge Funder + Compliance Specialist into one role.")).

[274] Mainigi Decl. Ex. 110 at 17 (BANA-SDNY-E-001329631 (SOX readiness narrative showing that Funder was replaced by CS)).

in the process and not allowing them to proceed to fund or to close"); Nawaday Decl. Ex. D,
Boland Tr. 36:15-37:7 (check by the compliance specialist "was one of [FSL's] checks at the end
of the process," and the removal of the compliance specialist was "a problem"); Nawaday Decl.
Ex. BQ (Oct. 5, 2007, Email from Thomas) BANA-SDNY-E-000716491-95 at 1 ("It's not a
secret that Cliff, Ed and I disagreed with having the funders report to the OM's [operations
managers]. . . . We also disagreed with the immediate combination of funder and compliance
specialist.  That transition takes time.  But we were overruled (or ignored) . . . I sent you Loren's
directive to clarify where the direction was coming from.").

### C. Loan Specialists and Underwriters Were Trained and Earned the Authority They Exercised.

75.     In Central Fulfillment, authority and condition sign-off matrices specified which
employees on a team could process which loans, regardless of the employee's current or former
title.[275]   Loan specialists who were not previously underwriters were required to complete
training in order to obtain Underwriter Level 1 ("UW1") and Underwriter Level 2 ("UW2")
authority.[276]

**Response to Paragraph 75**:  The Government disputes the statements in paragraph 75;
loan specialists were granted authority through the process of "grandfathering" without proper
training and were underwriting loans long before substantive underwriter training occurred.  U.S.
SOF ¶¶ 229-36.  *See also* Nawaday Decl. Ex. BI (Nov. 1, 2007, Email from Schuyler Yost)
BANA-SDNY-E-002316153-54 at 53 ("LSs who previously had PCA authority were given
provisional Level 1 UW authority.  However, training for these people to show them how to
actually underwrite a file is still forthcoming."); Nawaday Decl. Ex. K, Harris Tr. 53:15-54:12

---

[275] Mainigi Decl. Ex. 107 (BANA-SDNY-E-000039640); Mainigi Decl. Ex. 66 at 2  (BANA-SDNY-E-000094546) ("leverage" workflow used in NCA where loans beyond authority go to UW then back to HSSL)); Mainigi Decl. Ex. 1 (Aliano Dep. 42:5–43:5).

[276] Mainigi Decl. Ex. 7 (Cannon Dep. 181:14-182:20); Mainigi Decl. Ex. 106 (BANA-SDNY-E-009055288 (Training Matrix).

(agreeing that pursuant to Bulletin 07-515 "loan specialists were grandfathered into Underwriter Level 1 authority"); Nawaday Decl. Ex. AC, Thomas Tr. 57:10-59:7 ("[T]o handle the volume [of HSSL loans], we needed people with authority to make the decisions," but, "the problem was, How do we get them underwriting authority? . . . So . . . this was an issue to get people authority . . . [W]e had various efforts to get LSs certified and they were not successful . . . The training piece continued to be an issue . . . And my recollection is eventually everybody was just given underwriting Level 1 authority . . . To get through the volume they would have -- they had to give everybody authority.").

76.     In Central Fulfillment loan specialists were permitted to process loans within their authority level through the clear-to-close stage.[277]   Loan specialists were not permitted to perform tasks outside their authority levels.[278]   Controls in the loan processing platform prevented loan specialists from completing a task or handling a loan outside his or her level of authority.[279]   If a loan, at any time in the process, fell outside the loan specialist's authority level, the loan was sent to a separate underwriting group.[280]   This underwriting group was also available to support and answer the questions of loan specialists in Central Fulfillment.[281]

**Response to Paragraph 76**: The Government disputes the statements in paragraph 76. Nawaday Decl. Ex. AC, Thomas Tr. 60:6-61:19 (loan specialists given "open access" to classify

---

[277] Mainigi Decl. Ex. 1 (Aliano Dep. 42:17-25).

[278] Mainigi Decl. Ex. 14 (Gong Dep. 64:22-25, 71:9-19); Mainigi Decl. Ex. 210 at 3 (BANA-SDNY-E-000032860 (Central Fulfillment process flow indicating that loans outside LS authority will be "escalated to Core UW Support" for "Loan Approval, Condition Review or CTC.")); Mainigi Decl. Ex. 16 (Ho Dep. 176:2-17); Mainigi Decl. Ex. 14 (Gong Dep 71:9-19).

[279] Mainigi Decl. Ex. 21 (Mairone Dep. 91:20-93:24).

[280] Mainigi Decl. Ex. 22 (O'Donnell Dep. 175:16–176:9).

[281] Mainigi Decl. Ex. 14 (Gong Dep. 45:35–46:9 ("[Underwriters] were always designed to be available, especially for loans where the loan specialist didn't have the proper authority or had a question or wanted, you know, expert second opinion, for example.")).

and change underwriting conditions); Mainigi Decl. Ex. 9, Comeaux Tr. 142:10-146:4 (unable to specify how tasks were delegated to loan specialists pursuant to authority level).

77.     Former relator Edward O'Donnell testified that he "was comfortable with the certification process" for loan specialists.[282]  They "basically applied the existing certification process that we had in place for our junior underwriters or underwriting associates," and "said you can earn your condition sign off authority as a processor in the same manner as an underwriter associate would earn condition sign off authority."[283]  Loan specialist training courses were available as online modules through FSL's intranet and via classroom lessons designed to teach loan specialists how to handle the tasks they were assigned.[284]  After completing their classroom training, loan specialists were assigned to process loan files, which were reviewed by a senior underwriter.[285]  This process was called "file reviews," and loan specialists could only pass file reviews by processing files correctly.[286]  During Central Fulfillment, a loan specialist could not receive underwriter level 2 authority without completing thirteen file reviews successfully.[287]  After a loan specialist completed all training requirements, the employee in charge of coordinating training would recommend to FSL's Risk

---

[282] Mainigi Decl. Ex. 22 (O'Donnell Dep. 103:24–104:14).

[283]  Mainigi Decl. Ex. 22 (O'Donnell Dep. 103:24–104:14).

[284] Mainigi Decl. Ex. 22 (O'Donnell Dep. 103:24–104:14 ("[T]hey had to complete specific training modules that Countrywide had in place.  They had to take compliance and ethics testing.")).

[285] Mainigi Decl. Ex. 22 (O'Donnell Dep. 103:24–104:14 ("They had to submit test cases, in some cases their loans had to be second signed by someone with authority.")).

[286] Mainigi Decl. Ex. 7 (Cannon Dep. 123:6-19).

[287] Mainigi Decl. Ex. 208 at 3 (BANA-SDNY-E-001657218); Mainigi Decl. Ex. 7 (Cannon Dep. 121:13–122:13).

Management group that the loan specialist be given authority.[288]   Risk Management made the final decision whether the request would be granted.[289]

      **Response to Paragraph 77:**  The Government disputes the statements in paragraph 77. The Government also disputes the statements in paragraph 77 as incomplete and misleading to the extent they suggest that loan specialists were adequately trained.  U.S. SOF ¶¶ 229-36; Nawaday Decl. Ex. BI (Nov. 1, 2007, Email from Schuyler Yost) BANA-SDNY-E-002316153-54 at 1 ("LSs who previously had PCA authority were given provisional Level 1 UW authority. However, training for these people to show them how to actually underwrite a file is still forthcoming.").  Also, the number of file reviews for loan specialists to review was reduced from thirteen to six and did not constitute underwriter training, as evident by the low QOG scores for central fulfillment in 2007.  Nawaday Decl. Ex. GN (Nov. 3, 2007, Email from Gary Bell) BANA-SDNY-E-000081895-904 at 895; Nawaday Decl. Ex. GO (Nov. 22, 2007, Email from Ron Cannon) BANA-SDNY-E-001114131-35 at 35;  Nawaday Decl. Ex. B, Ballance Tr. 42:9-17 ("Q: If you were there training these loan specialists in Hatboro and you were the one reviewing the files, why weren't you comfortable with them acting as underwriters?  "A. Well, as I believe I stated earlier, I – they were compensated based on the number of loans that they got through.  And I thought that was a clear problem.  That was a conflict of interest."); Nawaday Decl. Ex. B,  Ballance Tr. 67:20-23 ("[T]he idea that a processor, who was never trained in underwriting, after just a few file reviews, could somehow have the authority to – to take – to take care of the underwriting piece, on top of doing everything else that we're tasked with doing as a processor, it – it was not reasonable."); Nawaday Decl. Ex. DA (2007 Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.  Although loan specialists were supposedly required to maintain a minimum QOG score of 4.0 to obtain underwriting authority,

---

[288] Mainigi Decl. Ex. 7 (Cannon Dep. 204:12-18).

[289] Mainigi Decl. Ex. 7 (Cannon Dep. 184:6).

the average QOG scores per central fulfillment team ranged from a high of 2.94 to a low of 1.75. Nawaday Decl. Ex. DA (2007 Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540 at 3.  Out of the approximately 210 loan specialists and underwriters listed, 87 had QOG scores at or below 2.00.  Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.  In fact, in October of 2007 risk management set a QOG score of 3.0 or lower as a reason to *repeal* a loan specialist's authority.  Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick Aliano) BANA-SDNY-E-002220473-76 at 3 (listing reasons for repeal as including a QOG score of three or lower for two consecutive months).

78.     Loan specialists assigned to participate in Central Fulfillment at the outset completed their coursework by November 7, 2007.[290]   For those loan specialists assigned to Central Fulfillment later in the process, ninety-eight percent of loan specialists had passed their file reviews as of November 30, 2007.[291]   Loan specialists who did not successfully complete their file reviews were not granted authority.[292]   Instead, FSL arranged for additional file reviews and, when necessary, remediation plans to ensure that the employees who were given signing authority were capable of handling it.[293]

**Response to Paragraph 78**:  The Government disputes the statements in paragraph 78. U.S. SOF ¶¶ 229-36; *see also* Nawaday Decl. Ex. BI (Nov. 1, 2007, Email from Schuyler Yost) BANA-SDNY-E-002316153-54 at 53 ("LSs who previously had PCA authority were given provisional Level 1 UW authority.  However, training for these people to show them how to actually underwrite a file is still forthcoming.").  Also, the number of file reviews for loan

---

[290] Mainigi Decl. Ex. 116 (BANA-SDNY-E-000038984).

[291] Mainigi Decl. Ex. 128 at 1 (BANA-SDNY-E-001240067).

[292] Mainigi Decl. Ex. 7 (Cannon Dep. 206:5-10).

[293] *See* Mainigi Decl. Ex. 129 (BANA-SDNY-E-002592327); Mainigi Decl. Ex. 146 at 1 (BANA-SDNY-E-004911052).

specialists to review was reduced from thirteen to six and did not constitute underwriter training, as evident by the low QOG scores for central fulfillment in 2007.  Nawaday Decl. Ex. GN (Nov. 3, 2007, Email from Gary Bell) BANA-SDNY-E-000081895-904 at 895; Nawaday Decl. Ex. GO (Nov. 22, 2007, Email from Ron Cannon) BANA-SDNY-E-001114131-35 at 35;  Nawaday Decl. Ex. B, Ballance Tr. 42:9-17 ("Q: If you were there training these loan specialists in Hatboro and you were the one reviewing the files, why weren't you comfortable with them acting as underwriters?  "A. Well, as I believe I stated earlier, I --they were compensated based on the number of loans that they got through.  And I thought that was a clear problem.  That was a conflict of interest."); Nawaday Decl. Ex. B,  Ballance Tr. 67:20-23 ("[T]he idea that a processor, who was never trained in underwriting, after just a few file reviews, could somehow have the authority to -- to take -- to take care of the underwriting piece, on top of doing everything else that we're tasked with doing as a processor, it -- it was not reasonable."); Nawaday Decl. Ex. DA (2007 Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.  Although loan specialists were supposedly required to maintain a minimum QOG score of 4.0 to obtain underwriting authority, the average QOG scores per central fulfillment team ranged from a high of 2.94 to a low of 1.75.  Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540 at 3.  Out of the approximately 210 loan specialists and underwriters listed, 87 had QOG scores at or below 2.00. Nawaday Decl. Ex. DA (2007, Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.  In fact, in October of 2007, risk management set a QOG score of 3.0 or lower as a reason to *repeal* a loan specialist's authority.  Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick Aliano) BANA-SDNY-E-002220473-76 at 75 (listing reasons for repeal as including a QOG score of three or lower for two consecutive months).

79.     Ultimately, all loan specialists in Central Fulfillment earned and were certified as having achieved underwriting authority --- either through earlier training to become an

underwriter or by taking essentially the same training in Central Fulfillment.  The former underwriters who became Central Fulfillment loan specialists were trained in processing tasks, as they, too, were responsible for unfamiliar tasks in Central Fulfillment.[294]  Central Fulfillment training included coursework and loan file reviews.[295]

**Response to Paragraph 79:**  The Government disputes the first sentence of paragraph 79 as unsupported by any citation to admissible evidence.  The Government disputes the statements in paragraph 79 to the extent they suggest that loan specialists were competently trained as underwriters.  U.S. SOF ¶¶ 229-36; Nawaday Decl. Ex. BI (Nov. 1, 2007, Email from Schuyler Yost) BANA-SDNY-E-002316153-54 at 1 ("LSs who previously had PCA authority were given provisional Level 1 UW authority.  However, training for these people to show them how to actually underwrite a file is still forthcoming."); Nawaday Decl. Ex. DA (2007 Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540.

### D.  In Central Fulfillment, Certain Mandatory Checklists Became Optional Job Aids.

80.    One of the Government's key allegations is that FSL eliminated mandatory checklists from the loan-origination process.[296]  That allegation is wrong.  In subprime processing, FSL required employees to fill out checklists and include them in the loan file. These checklists were not required by Fannie Mae or Freddie Mac,[297] were time consuming,[298] and

---

[294] Mainigi Decl. Ex. 97 (BANA-SDNY-E-008673757  (training schedule)).

[295] Mainigi Decl. Ex. 106 (BANA-SDNY-E-009055288).

[296] Am. Compl. ¶¶ 77-78.

[297] Mainigi Decl. Ex. 3 (Battany Dep. 77:7-10, 182:24-183:2); *see also* Mainigi Decl. Ex. 122 at FHFA11984886 (FHFA11984873 (EORM report) (discussing development of checklists not previously used)).

[298] Mainigi Decl. Ex. 21 (Mairone Dep. 290:8-10).

were not helpful to FSL's experienced employees in Central Fulfillment.[299]   As part of the shift

to a prime-processing model, FSL revised a number of its checklists.  Some "were changed or

updated to account for requirements of prime programs,"[300] others were incorporated into the

process,[301] still others became job aids.[302]   When a checklist became a job aid, it was available to

be consulted, but was not required to be included in the loan file.[303]   Each of the processing

requirements still had to be completed properly.[304]   Risk Management was consulted on, and

approved, the conversion of checklists to job aids.[305]   There is no evidence that the absence of a

mandatory checklist contributed to a decrease in the quality of FSL loans.

**Response to Paragraph 80:**  The Government does not dispute that the Amended

Complaint alleges that mandatory checklists were eliminated but otherwise disputes the

statements in paragraph 80.  U.S. SOF ¶¶ 339-42.  The checklists were eliminated primarily in

---

[299] Mainigi Decl. Ex. 24 (Price Dep. 114:21-23).

[300] Mainigi Decl. Ex. 22 (O'Donnell Dep. 319:9–320:12).

[301] Mainigi Decl. Ex. 145 (BANA-SDNY-E-002937675); *see* Mainigi Decl. Ex. 24 (Price Dep. 114:21-23).

[302] *See* Mainigi Decl. Ex. 127 (BANA-SDNY-C-000337826 (FSL 07-601 Ops Bulletin Checklists)); Mainigi Decl. Ex. 132 (BANA-SDNY-C-000338089 (FSL 07-607 Ops Bulletin Stated Income Worksheet Dec-07)); Mainigi Decl. Ex. 137 (BANA-SDNY-C-000338558 (FSL 07-617 Ops Compliance Checklist Dec-07)); Mainigi Decl. Ex. 144 (BANA-SDNY-E-005086659 (FSL 07-624 Title-Appraisal Checklists Dec-07)).

[303] *See* Mainigi Decl. Ex. 127 (BANA-SDNY-C-000337826 (FSL 07-601 Ops Bulletin Checklists Nov-07)); Mainigi Decl. Ex. 132 (BANA-SDNY-C-000338089 (FSL 07-607 Ops Bulletin Stated Income Worksheet Dec-07)); Mainigi Decl. Ex. 137 (BANA-SDNY-C-000338558 (FSL 07-617 Ops Compliance Checklist Dec-07)); Mainigi Decl. Ex. 144 (BANA-SDNY-E-005086659 (FSL 07-624 Title-Appraisal Checklists Dec-07)).

[304] Mainigi Decl. Ex. 142 (BANA-SDNY-E-001650887); Mainigi Decl. Ex. 19 (Kitashima Dep. 151:22-24).

[305] Mainigi Decl. Ex. 9 (Comeaux Dep. 78:23–79:7).

December 2007.  *Id.*  As funding pressures increased, Mairone directed that all quality reports be directed to her alone, and the QOG reprieve and the turn time bonus were in effect.  U.S. SOF ¶¶ 317-18 (funding pressures); ¶¶ 319-21 (quality reports to go only to Mairone); ¶ 321 (QOG reprieve continued); ¶ 240 (turn time bonus).  Without a checklist entered in the loan file, there was no way for someone reviewing or auditing the loan file to track whether or how the loan specialist performed the specific task.  Mainigi Decl. Ex. 24, Price Tr. 208:7-23 ("Q.  [I]f a job aid is not required to be entered into – completed and entered into the virtual loan file, how would you track whether a loan specialist actually used that job aid?  A.  Technically, I don't know that you could unless you had a – some kind of a side system in place that had them acknowledging and, you know, memorializing that they used it on this loan and it – you know, on this date and for this reason or whatever.  But normally, the uploading it to VLF was the – the normal way of acknowledging usage of a checklist or a job aid.  Q.  And that would also enable an auditor to determine whether the job aid was used; is that right?  A.  Right.  Because an auditor would only have considered what's in the virtual loan file as part of the file.").

Elimination of checklists was also cited as a root cause of FSL's loan quality issues by a loan quality remediation and action committee in early 2008.  Nawaday Decl. Ex. T, Mairone Tr. 320:17-23 (listing primary "root causes" of loan quality issues as a "Change in Centralized Model—Fulfillment" and that "controls were changed within the new model," specifically including "conversion of mandatory checklists to non-mandatory 'Job Aids'").

### E.   FSL Temporarily Suspended the Impact that Quality of Grade Had on Loan Specialists' Bonuses.

81.   In recognition of the new responsibilities being given individuals in Central Fulfillment,[306] Countrywide's senior management temporarily extended to Central Fulfillment

---

[306] Mainigi Decl. Ex. 143 (BANA-SDNY-E-003960408 (QOG Reprieve Email)); Mainigi Decl. Ex. 130 (BANA-SDNY-E-002937604 (Mairone Nov. 29 email)); Mainigi Decl. Ex. 21 (Mairone Dep. 252:12-16).

employees the relief for hits to compensation for minor mistakes that had been employed for the HSSL pilot.[307]   As in the High Speed Swim Lane pilot, this relief was limited: it did not apply to mistakes related to fraud or fair lending violations or egregious mistakes, and it applied only to front line employees.[308]   The relief did not apply to members of senior management, like Cliff Kitashima, who still had their compensation reduced for quality findings according to their individual compensation plans.[309]   Furthermore, QOG was still calculated and errors still had impacts: employees could lose their authority and be subject to discipline, including termination, for errors in loan processing.[310]

---

[307] Mainigi Decl. Ex. 9 (Comeaux Dep. 66:22-67:4 ("The way we looked at it was . . . as if we had an entire organization of new employees because everybody was taking on new responsibilities, challenging responsibilities, doing a lot of things that they hadn't done in the past . . . we wouldn't expect perfection day one.  We would give them an opportunity to work through some of the bugs while still ensuring high levels of quality.")); Mainigi Decl. Ex. 102 at 13 (BANA-SDNY-E-000040173 (NSC Central Fulfillment Update Presentation announcing QOG suspension except in cases of "Egregious SUS")); Mainigi Decl. Ex. 143 (BANA-SDNY- E-003960408); Mainigi Decl. Ex. 130 (BANA-SDNY-E-002937604 (Mairone Nov. 29 email)).

[308] Mainigi Decl. Ex. 18 (Jaraba Dep. 83:21-24 (in Central Fulfillment, QOG impact continued for "SUS findings that were considered egregious")); Mainigi Decl. Ex. 102 at 13 (BANA-SDNY-E-000040173 (no QOG suspension for "Egregious SUS")); Mainigi Decl. Ex. 207 at 1 (BANA-SDNY-E-0001606798 ("[E]gregious SUS" are defined as violations committed with "intent to defraud, mislead and/or ignore current FSL, CHL and/or State/Federal guidelines" including funding a loan without an appraisal or CLUES approval, approving full docs without income documentation, approving a loan with a credit score below 500, funding a loan outside RTC timelines, or funding a high cost loan.")).

[309] Mainigi Decl. Ex. 19 (Kitashima Dep. 53:14-19).

[310] Mainigi Decl. Ex. 9 (Comeaux Dep. 110:3-21 ("I do know for a fact that almost every month we reviewed the QOG reports to find out who we were needing to put on a verbal or written warning or even terminate.  So, there was still teeth behind the QOG reports at all times.")); Mainigi Decl. Ex. 16 (Ho Dep. 434:7-17 (QOG information "was still tracked" during the moratorium, but "there was still application of disciplinary action if folks had a significant number of SUS in terms of potentially removing or reducing their authority and possibly giving them warnings and possible termination")); Mainigi Decl. Ex. 19 (Kitashima Dep. 146:11-22 (During QOG suspension, FSL "continued to monitor and report components that fed the quality of grade rating.  So we didn't stop anything in terms of our oversight of the quality side of the business.")).

**Response to Paragraph 81:**  The Government does not dispute that the suspension on the QOG penalty was continued.  The Government otherwise disputes the statements in paragraph 81 as the QOG averages for central fulfillment employees dropped below 3.0 and even 2.0, and in the spring of 2008, loan specialists received no QOG feedback for months.  Nawaday Decl. Ex. DA (2007 Central Fulfillment Quality of Grade) Native of BANA-SDNY-E-000115540 (showing the average QOG scores per central fulfillment team ranged from a high of 2.94 to a low of 1.75); Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick Aliano) BANA-SDNY-E-002220473-76 at 3 (listing reasons for repeal as including a QOG score of three or lower for two consecutive months); Nawaday Decl. Ex. FD (May 14, 2008, Email from Wade Comeaux) BANA-SDNY-E-001652319-24 at 19 ("FYI.  LSs have been receiving no QOG feedback for months.  We also have no organized detail on SUS findings per LS or OM.").

F.      **Multiple CLUES Runs Do Not Reflect Fraud.**

82.     In paragraphs ninety-one through ninety-six of the Amended Complaint, the government alleges that loan specialists manipulated CLUES, as evidenced by an increase in the average number of CLUES runs during the HSSL process.  The government has failed to garner any evidence in the record that multiple CLUES runs had anything to do with the High Speed Swim Lane or that workflow in Central Fulfillment.

**Response to Paragraph 82**:  The Government disputes the statements in paragraph 82 as unsupported by any citation to admissible evidence.

1.      **Countrywide and the GSEs Recognized that There Were Many Legitimate Reasons for Multiple CLUES Runs.**

83.     CLUES, the automated underwriting system used in FSL and throughout Countrywide, was the backbone of FSL's prime and subprime processes.[311]  It was run by

---

[311] Mainigi Decl. Ex. 21 (Mairone Dep. 115:13-19).

account executives, loan specialists, underwriters, and funders during loan processing.[312]

Because the loan origination process is fluid, there are many legitimate reasons to run the same

loan file through an AUS multiple times.[313]   In fact, FSL's loan process required CLUES to be

run multiple times and FSL systems even caused automatic CLUES runs at certain points in the

loan origination process.[314]   The GSEs understood that there were legitimate reasons multiple

CLUES runs in the normal course of business.[315]   CLUES also had to be run if a borrower's

information changed,[316] if borrower information was entered incorrectly,[317] if a borrower's assets

changed during processing,[318] if the terms, pricing, or purpose of the mortgage changed,[319] or if a

---

[312] Mainigi Decl. Ex. 22 (O'Donnell Dep. 306:10-19 ("Processors and accounting executives were the primary people that would run CLUES.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 307:3-15 ("I knew that we required underwriters to review the number of CLUES runs and look for changes between versions.")).

[313] Mainigi Decl. Ex. 26 (Sobczak Dep. 104:16-105:11, 169:12-24); Mainigi Decl. Ex. 17 (Hunter Dep. 34:7-35:7, 125:17-18); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 358:2-359:19).

[314] Mainigi Decl. Ex. 25 (Sallis Dep. 41:7-9 ("You were rerunning it each time.  There is also some auto runs.  When you change phase codes in CLUES, in the system, it would automatically auto run.")).

[315] *E.g.,* Mainigi Decl. Ex. 17 (Hunter Dep. 34:7-19).

[316] Mainigi Decl. Ex. 21 (Mairone Dep. 85:8-86:19 ("It is not run once, it was run every single time you have a new document, a new data, a change in data, it is rerun.")); Mainigi Decl. Ex. 14 (Gong Dep. 202:9-18 ("CLUES is run a number of times during the process…to validate and get a more correct CLUES run with the latest and all correct information")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 306:3-9 ("There were reasons that CLUES would be run more than one time. If documentation or data changed.")); Mainigi Decl. Ex. 16 (Ho Dep. 205:24–206:8 ("[T]hey would rerun CLUES if anything had changed since the initial application.")).

[317]  Mainigi Decl. Ex. 3 (Battany Dep. 74:19-21 ("So multiple runs does not necessarily indicate anything wrong with the loan file, just means someone had to correct data multiple times[.]")).

[318]  Mainigi Decl. Ex. 25 (Sallis Dep. 41:3-12 ("There are many reasons why [CLUES would be run multiple times].  Changes by the borrower, changes once the rate was locked, changes in assets, changes in income.")).

[319] Mainigi Decl. Ex. 26 (Sobczak Dep. 104:16-105:4 (in responding to question regarding legitimate  reasons to run CLUES multiple times, noting that "Terms of the mortgage change.

new appraisal came in.[320]   Countrywide witnesses described the reasons for multiple CLUES

runs.[321]   In fact, the testimony in the record from GSE witnesses is that there were legitimate

reasons for a loan to be run through an AUS like CLUES multiple times.[322]   Moreover, multiple

AUS runs were contemplated by the GSEs and were not necessarily indicative of fraud or a

problem with the loan.[323]

**Response to Paragraph 83:**   The Government does not dispute that there are legitimate

reasons for multiple CLUES runs, but disputes the statements in paragraph 83 as misleading

because numerous employees recognized that a high number of CLUES runs is a potential

indicator of fraud and that the HSSL would likely increase the risk of CLUES manipulation.

U.S. SOF ¶¶ 285-86; Nawaday Decl. Ex. B, Ballance Tr. 18:16-23 ("[W]hen you get over X

number of times . . . an underwriter will look at that and say, Why was this program run ten or 15

times?  And from an underwriting perspective, no loan should be run that many times.  Because

at that point it—to me personally, I began to suspect something is wrong or someone is trying to

manipulate the data to get an accept decision."); Nawaday Decl. Ex. D, Boland Tr. 57:7-59:2

("[W]hen we would get the – the loan file in underwriting, the first run of CLUES is always

version A.  And then they had extinguished all the letters in the alphabet, it would begin to restart

---

The borrower adds another borrower to the loan.  Pricing changes.  The purpose of the loan
changes.")).

[320] Mainigi Decl. Ex. 14 (Gong Dep. 52:2-24).

[321] Mainigi Decl. Ex. 26 (Sobczak Dep. 104:19-105:4 (describing possible legitimate reasons for
multiple CLUES runs)).

[322] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 248:7-20); Mainigi Decl. Ex. 17 (Hunter Dep.
154:16-20); Mainigi Decl. Ex. 3 (Battany Dep. 74:13-75:4); Mainigi Decl. Ex. 26 (Sobczak
Dep.104:16-105:11).

[323] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 248:7-20); Mainigi Decl. Ex. 17 (Hunter Dep.
154:16-20); Mainigi Decl. Ex. 3 (Battany3 (Battany Dep. 74:13-75:4); Mainigi Decl. Ex. 26
(Sobczak Dep. 104:16-105:11).

with AA, BB, CC DD.  So when we saw a loan that had multiple letters in the version of CLUES

runs, it was – it was concerning.  It was worthy of asking the question, Why did you run the

CLUES 28 times on this loan? . . . [T]he response would be that they were trying to get a certain

result from the system.  And they would change data in the system and then look at the result and

then change it again and then look at the result . . . And when they found it, they had their

CLUES accept.  And if the loan wasn't going to pass through an underwriter looking at it, the

loan specialist could clear the conditions and questions weren't asked."); *see also* Nawaday Decl.

Ex. CH (Aug. 2, 2007, Email from Ron Gillet) BANA-SDNY-E-000097697-97701 at 1 ("One of

the biggest issues we have currently is that our Sales people will modify or manipulate data . . .

to get a CLUES Accept [], and then when Ops gets these deals and does the data set up in Edge

with the 'real' data, we end up with a CLUES Refer."); Mainigi Decl. Ex. 14, Gong Tr. 138:1-17

("That tendency  [to manipulate CLUES] will be only reinforced (at least initially) with the

introduction of the HSSL, since I would imagine AEs will want their qualifying loans to go

there."); Nawaday Decl. Ex. FC (Jan. 25, 2008, Email from Cliff Kitashima) BANA-SDNY-E-

004841093-94 at 93 (asking whether AUS system manipulation is something that should be

checked for); Nawaday Decl. Ex. FC (Jan. 28, 2008, Email from Mark D. Miller) BANA-SDNY-

E-004841093-95 at 94 ("[T]here may be a fair amount of system manipulation going on out in

the branches today . . . There are a number of former employees who make allegations similar to

what we see on excwinsider.com, and I tend to lend credibility to those allegations.").

### 2. The Average Number of CLUES Runs Per Loan Did Not Increase in the HSSL Process.

84.     Plaintiff alleges that the average number of CLUES runs under HSSL was 14:

"Under the HSSL, and specifically between May 2007 and November 2008 (after the acquisition

of Countrywide by Bank of America in July 2008), the average number of CLUES reports per

FSL loan climbed from 8—already a suspiciously high number—to 14."[324]   But Plaintiff's

numbers are inconsistent with the facts.  From 2006 through the start of HSSL, the average

number of CLUES runs at FSL was 7.5.[325]   Under HSSL, the average number of CLUES runs

was 7.2.[326] Between May 2007 and November 2008, the average number of CLUES runs at FSL

was 7.3%.[327] There is no evidence or testimony that there was anything "suspicious" about these

averages, which are about half of what Plaintiff alleged. Moreover, running CLUES multiple

times was a practice that FSL closely monitored. In two separate audits, FSL concluded that

multiple CLUES runs were a normal byproduct of loan processing in a prime model.  The

CLUES program kept track of how many times it had run and produced a report showing any

changes between versions.[328]   The average number of CLUES runs per loan for HSSL loans is

6.9.  The average number of CLUES runs per loan for non-HSSL loans is 7.5.[329]

     **Response to Paragraph 84:**  The Government disputes the statements in paragraph 84 as

several statements within paragraph 84 contain no citation to admissible evidence and thus do

not satisfy the requirements of Fed. R. Civ. P 56(c)(1) and Local Civil Rule 56.1(d).  The

Government also disputes the statements in paragraph 84 because they rely on Defendants'

definition of HSSL loans, and the Government disputes that the Bank's definition of a HSSL

loan is appropriate.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Defendants' own expert

---

[324] Am. Compl. ¶ 94.

[325] Ho Decl. ¶ 9.

[326] Ho Decl. ¶ 9.

[327] Ho Decl. ¶ 9.

[328] Mainigi Decl. Ex. 25 (Sallis Dep. 41:8-12 ("When you change phase codes in CLUES, in the system, it would automatically auto run, and then there would also be GAAP reports to see what was changes between the previous run and the current run so you know what was changed.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 307:3-15 ("I knew that we required underwriters to review the number of CLUES runs and look for changes between versions.")).

[329] Ho Decl. ¶ 9.

concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at 8 n.40.

> ### 3. FSL Investigated Multiple CLUES Runs and Concluded They Did Not Reflect Fraud.

85.      Still, FSL took steps to ensure that CLUES manipulation did not occur.  FSL had a "CLUES check in place" designed "to spot manipulation or intended fraud."[330]  FSL also conducted two separate audits of loans with multiple CLUES runs to ensure that CLUES was being used appropriately and run for legitimate reasons.[331]  First, at Ed O'Donnell's request, underwriter Todd Green reviewed stated-income loans with multiple CLUES runs to ensure that CLUES income values were not being changed in an effort to manipulate CLUES.[332]  He found that they were not.[333]  Instead, when income was changed throughout the process, more often than not, the stated income was decreased as the loan specialist followed up on aspects of the file and received additional documentation.[334]  Later in 2008, FSL's Risk Management group, a group separate from the production divisions of FSL and devoted solely to preventing and addressing fraud and quality issues, conducted a full investigation into multiple CLUES runs.[335]  It, too, concluded that the multiple CLUES runs it evaluated were not fraudulent.[336]  Still, FSL

---

[330] Mainigi Decl. Ex. 22 (O'Donnell Dep. 311:5-7); *see also* Mainigi Decl. Ex.19 (Kitashima Dep. 200:12-20); Mainigi Decl. Ex. 21 (Mairone Dep. 100:22–101:2).

[331] Mainigi Decl. Ex. 16 (Ho Dep. 441:8-25).

[332] Mainigi Decl. Ex. 178 (BANA-SDNY-E-001009859).

[333] Mainigi Decl. Ex. 178 (BANA-SDNY-E-001009859).

[334] Mainigi Decl. Ex. 178 (BANA-SDNY-E-001009859).

[335] Mainigi Decl. Ex. 186 (BANA-SDNY-E-008939301); Mainigi Decl. Ex. 16 (Ho Dep. 441:19-25); Mainigi Decl. Ex. 18 (Jaraba Dep. 11:11-12:15).

[336] Mainigi Decl. Ex. 186 (BANA-SDNY-E-008939301 ("Based on our review of 56 loans in process, the excessive AUS runs were NOT a result of an attempt to manipulate data or obtain a favorable decision.  The excessive runs were attributed to the normal course of the loan process.")); Mainigi Decl. Ex. 16 (Ho Dep. 441:19-25); Mainigi Decl. Ex. 18 (Jaraba Dep. 71:6–

drafted a bulletin reminding employees that CLUES manipulation was absolutely prohibited and would result in termination.[337]

> **Response to Paragraph 85**:  The Government disputes the statements in paragraph 85 as there were no system controls in place to prevent CLUES manipulation, which is why the underwriter provided an important checkpoint against manipulation.  U.S. SOF ¶¶ 285-89.  The Government does not dispute that in two small audits, the loans selected were determined to have high CLUES runs primarily for reasons other than fraud, but disputes any inference from these audits that CLUES manipulation was not a problem during the HSSL.  Nawaday Decl. Ex. FC (Jan. 28, 2008, Email from Cliff Kitashima) (asking whether AUS system manipulation is something that should be checked for) BANA-SDNY-E-004841092-97 at 92;  Nawaday Decl. Ex. FC (Jan. 28, 2008, Email from Mark Miller) BANA-SDNY-E-004841092-97 at 94 ("[T]here may be a fair amount of system manipulation going on out in the branches today . . . There are a number of former employees who make allegations similar to what we see on excwinsider.com, and I tend to lend some credibility to those allegations") 3.  Indeed, one of the audits on which Defendants rely reviewed loans funded as part of the "new clear to close" process that required the involvement of an underwriter on every loan and was implemented after the HSSL. Nawaday Decl. Ex. DC (Jun. 20, 2008, Email from Javier Jaraba) BANA-SDNY-E-008939201-12; Nawaday Decl. Ex. DS (May 21, 2008, "New CTC Approval Process for Field Offices and Central Fulfillment") BANA-SDNY-C-000350598-606.

## VI.    Countrywide and FSL's Quality Control Process.

73:9 ("[W]e didn't find any manipulation in the data, and the excessive runs was attributed to normal course of loan process.")).

[337] Mainigi Decl. Ex. 191 (BANA-SDNY-C-000350750); Mainigi Decl. Ex. 186 (BANA-SDNY-E-008939301 (Despite finding that "the excessive AUS runs were NOT a result of an attempt to manipulate data or obtain a favorable decision" Risk Management and Javier Jaraba remained cautious and recommended that they "[d]istribute an Alert to the field regarding our surveillance.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 317:10–318:20).

A.     **Countrywide's Longstanding Corporate QC Process
Accurately Identified Problematic Loans.**

86.     According to relator O'Donnell, FSL and Countrywide always had a focus on

quality.[338]   The GSEs required the lenders with whom they invested to have a quality control

process in place, but the contracts between Countrywide and the GSEs were not prescriptive as to

how lenders performed quality control processes.[339]   Countrywide employed a QC process that

measured quality across all of its divisions.[340]

**Response to Paragraph 86**:  The Government does not dispute that Countrywide

measured quality across all divisions, but otherwise disputes the statements in paragraph 86 as

misleading and incomplete.  Nawaday Decl. Ex. DI (Mar. 6, 2008, Email from O'Donnell)

BANA-SDNY-E-008959506-09 at 06 (stating, based on 79% of Q4 SUS ratings being attributed

to income reasonability, that "the current process is in the ditch"); Nawaday Decl. Ex. DL (Draft

email from O'Donnell) BANA-SDNY-E-001655912-13 at 12 (stating that he was "very

concerned about the way loan quality is presently being managed" and that he had "been very

vocal about the poor quality being produced" but had "not seen any evidence that our warnings

are being taken seriously" and specifically that "Central Fulfillment leadership continues to

disregard these warnings").

87.     The corporate quality control group, a separate group from the divisions, audited

---

[338] Mainigi Decl. Ex. 198 (BANA-SDNY-E-002207874  (touting FSL's quality results to Bank of America)); *see*  Mainigi Decl. Ex. 177(BANA-SDNY-E-003960750 (recognizing that FSL had checks in place)); Mainigi Decl. Ex. 22 (O'Donnell Dep. 229:23–231:9 ("My experience with Greg [Lumsden] was that he always had his eye on quality . . . it was a regular part of our monthly discussion.")).

[339] Mainigi Decl. Ex. 3 (Battany Dep. 233:25-234:21; Mainigi Decl. Ex. 83 at 4-5 (Fannie Mae Single Family 2007 Selling Guide Part I, Section 301.01 (excerpt)); Mainigi Decl. Ex. 48 at 48-1-48-2 (Freddie Mac Single Family Seller / Servicer Guide, Chapter 48.1 (excerpt)).

[340] Mainigi Decl. Ex. 22 (O'Donnell Dep. 270:20–271:7 ("I felt that there was a process in place to try to get to the right answer during the rebuttal process.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 272:10-11 ("[I]t was a valuable process to try to get to the right number.")).

loans, post-funding, from each of the divisions.[341]   When it identified potential red flags with the

loans, for example, a missing document, it issued an "initial" finding of Severely Unsatisfactory

or ("SUS").[342]   These initial findings did not necessarily indicate that the loan was poor

quality,[343] and the divisions were charged with responding to any initial findings.[344]   The

divisions could respond by, for example, pointing to or providing missing documentation,[345]

explaining underwriting rationale,[346] or correcting errors made by Corporate QC.[347]   When

Corporate QC was satisfied with the response from the division, such that it was convinced that

the loan was not of unacceptable risk, the initial finding was "overturned" and no punitive actions

were taken against the individual or division.[348]   If the division was unable to provide a

---

[341] Mainigi Decl. Ex. 19 (Kitashima Dep. 152:20–153:5).

[342] Mainigi Decl. Ex. 16 (Ho Dep. 448:4-18); Mainigi Decl. Ex. ## (BANA-SDNY-E-00900332    (Countrywide QC Division Response, Final Ratings, and Escalation Procedure)).

[343] Mainigi Decl. Ex. 22 (O'Donnell Dep. 270:20–271:7 ("[W]hile I had challenges with the initial rating given to some loans, I felt that there was a process in place to try to get to the right answer during the rebuttal process.")).

[344] Mainigi Decl. Ex. 31 (Zamarripa Dep. 31:2-5 ("Anytime an audit was triggered from corporate QC, it would come to us to respond back to the findings.")).
[345] Mainigi Decl. Ex. 22 (O'Donnell Dep. 268:2–270:7 ("The practice . . . was to look at each of the loans that was assess [sic] a rating of SUS, review it, get input from the employees that were involved in the manufacturing of that loan, and see if there was documentation that could address the identified weakness.")).

[346] Mainigi Decl. Ex. 31 (Zamarripa Dep. 31:25-32:3 ("The response would contain the underwriting merits of why -- what we based our decision on. We basically had what was our thinking when we made that decision.")); Mainigi Decl. Ex. 31 (Zamarripa Dep. 34:12-15 ("And what we did is we just basically gave them our reasoning and the decision as to why, when we approved that loan or granted and accepted that income, it was reasonable.")).

[347] Mainigi Decl. Ex. 22 (O'Donnell Dep. (noting that corporate QC was, at times, "inconsistent in how they were in their own group applying the ratings" and "using tools that were flawed")).

[348] Mainigi Decl. Ex. 31 (Zamarripa Dep. 31:18-21 ("We would provide a response to what they had found as their finding and for them to review and see if that was sufficient. So whatever their issue was, we responded.")); Mainigi Decl. Ex. ## (BANA-SDNY-E-00900332 (Countrywide QC Division Response, Final Ratings, and Escalation Procedure)).

satisfactory response, or if Corporate QC's initial finding of issues with the loan had been correct, the loan received a "final" SUS finding.[349]   A final SUS finding had additional significance:[350]  it was the measure of quality for the divisions,[351] and it could result in disciplinary action against those who made the mistake or handled the loan.[352]   The divisions had no power themselves to overturn findings of corporate QC,[353] but their responses were important in ensuring that Corporate QC came to right answer about the quality of any particular loan.[354] As a result of this process, final SUS rates were always lower than initial SUS rates.[355]

**Response to Paragraph 87**:  The Government disputes the statements in paragraph 87 as misleading because FSL employees had substantial power to argue to overturn initial SUS findings, particularly in the area of stated income reasonability.  Such a practice heavily influenced final SUS ratings because stated income reasonability comprised a significant

---

[349] Mainigi Decl. Ex. 16 (Ho Dep. 448:4-18); Mainigi Decl. Ex. (BANA-SDNY-E-00900332 (Countrywide QC Division Response, Final Ratings, and Escalation Procedure)).

[350] "[SUS] was a rating applied by our corporate QC group for loans that would be likely to be rejected by an investor if they reviewed the file."  Mainigi Decl. Ex. 22 (O'Donnell Dep. 132:10-14).

[351] Mainigi Decl. Ex. 9 (Comeaux Dep. 37:18-23 ("An SUS finding was a QC finding, which was the bottom-line way on which quality was – was graded at our division and all the divisions of Countrywide.")).

[352] Mainigi Decl. Ex. 16 (Ho Dep. 315:9-17; 434:9–435:14); Mainigi Decl. Ex. 24 (Price Dep. 176:3-12); Mainigi Decl. Ex. 21 (Mairone Dep. 31:20–32:4).

[353] Mainigi Decl. Ex. 31 (Zamarripa Dep. 31:13-14 ("I see that [overturn] is the word[] he used, but we did not have the ability to overturn anything.  We only had the ability to respond."); Mainigi Decl. Ex. 31 (Zamarripa Dep. 34:6-7 ("We did not the have ability to overturn anything. All we had the ability to do was to provide a response.")); Mainigi Decl. Ex. ## (BANA-SDNY-E-00900332(Countrywide QC Division Response, Final Ratings, and Escalation Procedure)).

[354] Mainigi Decl. Ex. 22 (O'Donnell Dep. 270:20–271:7 ("[W]hile I had challenges with the initial  rating given to some loans, I felt that there was a process in place to try to get to the right answer during the rebuttal process.")).

[355] Mainigi Decl. Ex. 6 (Brent Dep. 79:23-80:1); Mainigi Decl. Ex. 211 (BANA-SDNY-E-0031172802 (showing that final SUS rates are consistently much lower than initial SUS rates)).

percentage of initial SUS findings.  Nawaday Decl. Ex. DI (Mar. 5, 2008, Email from

O'Donnell) BANA-SDNY-E-008959506-09 at 06 (referring to 79% of Q4 SUS ratings being

attributed to income reasonability).

88.     Historically, FSL had lower SUS rates than its sister division CMD.[356] Its final

SUS rates during 2007 and 2008, as reported by O'Donnell, were:

- 2007:

    1st Quarter:  8.8%
    2nd Quarter: 6.2%
    3rd Quarter: 13.4%
    4th Quarter: 5.4%

- 2008:

    1st Quarter 2008:  9.6%
    2nd Quarter 2008:  4.4%
    3rd Quarter 2008:  4.6%[357]

**Response to Paragraph 88**:  The Government does not dispute that FSL historically had

lower SUS rates than CMD, but disputes the reliability of SUS findings at the division level prior

to the first quarter of 2008.  Nawaday Decl. Ex. FI (Feb. 29, 2008, Email from Cindy Simantel)

BANA-SDNY-E-009033594-97 at 95 (explaining that, beginning with February 2008 fundings,

there would be a change to a "truly random audit sample" which would be a more reliable

indicator of credit quality at the division level).

89.     As discussed above, Central Fulfillment, and the HSSL process within Central

Fulfillment, began in October of 2007 — the start of the 4th quarter of 2007.  As described

below, when senior management identified potential quality issues in FSL in early 2008, a

---

[356] Mainigi Decl. Ex. 22 (O'Donnell Dep. 76:16-19).

[357] Mainigi Decl. Ex. 200 (BANA-SDNY-E-000780344 (results attached to O'Donnell email
recounting quality in FSL, Mainigi Decl. Ex. 199 (BANA-SDNY-E-000780338)); *see also*
Mainigi Decl. Ex. 171 (BANA-SDNY-E-0089980528 (Kitashima email)); Mainigi Decl. Ex. 189
(BANA-SDNY-E-008989351).

remediation process was quickly implemented, and quality returned to targeted levels. O'Donnell himself touted this remediation plan and FSL's quality results in a letter to Bank of America:

> The trending illustrates that the remediation enacted with Legacy FSL during Q1 2008 had the desired impact of bringing quality back to the target environment. . . . After experiencing challenges in Q4 2007 and early Q1 2008 we made changes to work flows, training content, authority certification and compensation plans that have play [sic] an important role in returning the Divisions [sic] results to the target environment for Quality as defined by Corporate audit performance.[358]

**Response to Paragraph 89:**  The Government does not dispute that O'Donnell authored and sent the letter quoted from in paragraph 89 to Bank of America but otherwise disputes the statements in paragraph 89 as unsupported by any citation to admissible evidence.

### B.    FSL Implemented an Additional Quality Assurance Process To Assess the New Prime Origination Process.

90.    In the summer of 2007, in addition to the usual QC process, FSL management voluntarily implemented quality assurance audits as a check on its process.[359]  Fannie and Freddie did not require FSL to have a quality-assurance process; it was FSL's own initiative to improve the quality of its loan processing.[360]  "[T]he Q.A. process was put in place to help [FSL] work on its workflow, to make sure that [they] were implementing [the] prime workflow, and . . . [to] see where the opportunities were to process prime loans properly."[361]  These audits were not

---

[358] Mainigi Decl. Ex. 198 (BANA-SDNY-E-002207874 (O'Donnell emails to Bank of America)).

[359] Mainigi Decl. Ex. 6 (Brent Dep. 140:23-141:8 (testifying that the QA process was designed to measure the inline quality of the process)); Mainigi Decl. Ex.19 (Kitashima Dep. 88:18-89:22 (testifying that "QA was a new process" at the time of the High Speed Swim Lane)).

[360] Mainigi Decl. Ex. 30 (Togneri Dep. 91:9-13); Mainigi Decl. Ex. 19 (Kitashima Dep. 153:19-154:6).

[361] Mainigi Decl. Ex. 20 (Lumsden Dep. 86:19-87:17).

a predictor of corporate QC findings.[362] The initial QA findings were high but, this was not necessarily a cause for concern because both the QA process and the HSSL process were new.[363] In other words, the QA process measured whether the line employees were completing the process steps as set out in the workflows.[364]

**Response to Paragraph 90**: The Government disputes the statements in paragraph 90 as the QA process was put in place begrudgingly by Mairone on the condition that the reviews not slow down the processing of the loans and that they be distributed only to senior management; moreover, the results caused significant concern and did in fact predict high corporate QC findings. U.S. SOF ¶¶ 98-106 (high findings rates intensify warnings about HSSL), ¶¶ 354-55 (high SUS findings by corporate QC); Mainigi Decl. Ex. 24, Price Tr. 57:13-23; 57:24-58:13. Mainigi Decl. Ex. 24, Price Tr. 59:11-20 ("Q: So is it fair to say that [Mairone] gave conditional approval to the QA process? A: I remember it that way. Q: And her approval was conditioned on not widely communicating the results of QA process? A: Again, yes.").

91. The findings of the QA group were designated as "high risk" or "limited risk"

---

[362] Mainigi Decl. Ex. 19 (Kitashima Dep. 152:6-154:10 (testifying that QA and QC were not designed to measure the same things)); Mainigi Decl. Ex. 6 (Brent Dep. 140:23-141:8 (testifying that the QA process was not a predictor of corporate QC results would be and there could be a disconnect between QA and QC findings)); Mainigi Decl. Ex. 9 (Comeaux Dep. 39:18-20 ("[T]hey hoped it would be a leading indicator of future SUS findings and QC scores, but it was not a very good leading indicator.")). Former relator Ed O'Donnell testified that the QA assessments were intended to measure similar factors to the QC audits, O'Donnell Dep. 143:2-146:11, but the undisputed testimony is that the ultimate results of the QA audits did not predict QC SUS findings (one need only compare the numbers to come to that undisputed conclusion); *see also* Mainigi Decl. Ex. 6 (Brent Dep. 140:23-141:8 (testifying that the QA process was not a predictor of corporate QC findings)).

[363] Mainigi Decl. Ex. 20 (Lumsden Dep. 87:23–90:5); Mainigi Decl. Ex. 111 (BANA-SDNY-E-000656514); Mainigi Decl. Ex. 108 (BANA-SDNY-E-004220625 (reporting a 98% finding rate)); Mainigi Decl. Ex. 242 (BANA-SDNY-E-003825007; BANA-SDNY-E-003964711); Mainigi Decl. Ex. 243 (BANA-SDNY-E-003036785).

[364] Mainigi Decl. Ex. 19 (Kitashima Dep. 75:20-22 ("QA audits are designed to review . . . process-related issues, not so much quality control issues.")).

despite their lack of connection to credit risk, loan quality, or the likelihood that corporate QC would identify issues with the file.[365] High risk meant simply that there was an error within the process.[366]

**Response to Paragraph 91**:  The Government disputes the statements in paragraph 91. U.S. SOF ¶ 293.  A "High Risk" finding from a quality assurance review means "the more severe process gaps or misses, process imperfections."  Nawaday Decl. Ex. E, Brent Tr. 33:24-34:11.  A High Risk finding during the quality assurance review can lead to a severely unsatisfactory rating from Corporate Quality Control.  Nawaday Decl. Ex. E, Brent Tr. 34:24-36:3.

92.    Steve Brent managed the team of auditors who conducted the QA audits.[367] Additional auditors assisted from India.[368]   Nearly all of the loans in the High Speed Swim Lane pilot were reviewed by the QA group.[369]   Then, in Central Fulfillment, the QA process was formally rolled out as an intended check.[370]

---

[365] Mainigi Decl. Ex. 9 (Comeaux Dep. 38:5-14).

[366] Mainigi Decl. Ex. 9 (Comeaux Dep. 41:4-9).

[367] *See* Mainigi Decl. Ex. 6 (Brent Dep. 14:6-20 (testifying that he had responsibility for the QA group)).

[368] Mainigi Decl. Ex. 29 (Thomas Dep. 12:23-24).

[369] Mainigi Decl. Ex. 96 (BANA-SDNY-E-003357091 ("Audit Scope: Review 100% of all loans that go into Phase Code 3 with HSSL.")); Mainigi Decl. Ex. 65 (BANA-SDNY-E-000005628 (telling Steve Brent that "We're going to need 100% audit of loans coming through this new pipeline during the pilots (Rosemead and Chandler)," and "Regarding the need for audit during the pilot, I view this as driven from your (QC/Compliance) perspective ... it is up to you/Cliff to determine if required, but I am requesting this primarily so that your folks can gain the necessary level of comfort that will be needed to enable a QC/Compliance recommendation to release into full production at end of the pilot.")). Former relator Ed O'Donnell testified that he was concerned about the quality of the loans that had passed through the pilot based on the QA reviews, O'Donnell Dep. 180:2-181:21, but that he recommended a "robust certification process" post-pilot to address his concerns, O'Donnell Dep. 181:19-182:15.  He had input on this certification process and it was put into place.  Mainigi Decl. Ex. 22 (O'Donnell Dep. 182:25-183:5).

[370] Mainigi Decl. Ex. 113 (Bulletin 07-551); Mainigi Decl. Ex. 117 (Bulletin 07-567).

**Response to Paragraph 92**:  The Government does not dispute the statements in the text of paragraph 92 but does dispute the statements in the corresponding footnotes that O'Donnell's concerns about the quality of the loans were addressed by a purportedly robust certification process for loan specialists when in fact loan specialists were grandfathered into underwriting authority.  U.S. SOF ¶¶ 233-35.  The Government also disputes that the QA group reviewed "nearly all" of the loans in the HSSL pilot, as there were thousands of loans involved.  *See* Hansen Decl. ¶¶ 5, 8.

      1.      **The QA and QC Processes Were Not the Same and Were Intended To Measure Different Things.**

93.      The QA audits differed from the corporate-QC audits in many significant ways.[371]

- "[C]orporate QC reviewed loans from the perspective of credit quality . . . whereas the QA process reviewed loans from a process and efficiency workflow perspective."[372]   In the QA process "many of the factors were process-oriented and would never lead to an SUS finding."[373] For example, the QA process might ask, "Was a particular box checked on a checklist?  That would not cause a loan to be unsellable or necessarily mean it was not of high quality, but it would cause a QA finding."[374]

---

[371] Mainigi Decl. Ex. 19 (Kitashima Dep. 152:6-154:10 ("The difference between corporate QC and FSL's QA process is different in several ways.")).

[372] Mainigi Decl. Ex. 19 (Kitashima Dep. 152:6-154:10); *see* Mainigi Decl. Ex. 9 (Comeaux Dep. 39:21-40:2 (testifying that the QC findings were designed to measure quality)).

[373] Mainigi Decl. Ex. 9 (Comeaux 37:24-39:1); see Mainigi Decl. Ex. 9 (Comeaux Dep. 164:18-165:1 ("They were procedural. They could be that a box wasn't clicked in the right place, a form was in this page of VLF instead of this other page of VLF, all of those things which would lead to a -- which would lead to a loan that didn't follow process but would definitely not mean that it was unsellable, not high quality or that Fannie or Freddie wouldn't accept the loan.")).

[374] Mainigi Decl. Ex. 9 (Comeaux 37:24-39:1).

- Unlike the corporate QC process, which issued initial findings and took account of divisional responses in an effort to get to the "correct" conclusion on the quality of the loans,[375] there was no check on the accuracy of the QA findings.[376]

- Corporate QC audited complete files after loans had funded, while QA reviewed loans while they were still in process.[377]

- The GSEs required Countrywide to have a post-funding QC process,[378] but the in-line QA was not required by either the GSEs or Countrywide.[379]

**Response to Paragraph 93**: The Government does not dispute that QA reviewed loans while they were still in process or that there was no formal rebuttal process for QA findings. The Government does dispute any implication that the differences between QC reviews and QA reviews suggest that QA findings had nothing to do with the saleability or credit quality of loans. Nawaday Decl. Ex. AC, Thomas Tr. 16:14-21 ("[I]t was kind of an early indication for us what the QC ratings might be. So it we—we saw an issue in QA, we would, one, obviously try to correct those files before they funded. . . If we saw an uptake [sic] in QA, we knew that we might see an uptake [sic] in QC ratings."); Nawaday Decl. Ex. T, Mairone Tr. 213:12-20 (useful to see

---

[375] Mainigi Decl. Ex. 22 (O'Donnell Dep. 270:20–271:7 ("[W]hile I had challenges with the initial rating given to some loans, I felt that there was a process in place to try to get to the right answer during the rebuttal process.")).

[376] Mainigi Decl. Ex. 20 (Lumsden Dep. 91:24-25 ("There is no rebuttal process in QA.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 167:7-14 (testifying that QA findings were not subject to a rebuttal process but QC findings were)).

[377] Mainigi Decl. Ex. 19 (Kitashima Dep. 152:6-154:10 ("[C]orporate QC reviews involved loans that were funded. They went through the entire process, and the end result was what they were reviewing as opposed to QA, where reviews of loans that were in process, not yet funded, but at some point in the process.")); Mainigi Decl. Ex. 6 (Brent Dep. 14:2-5 ("Quality assurance, which is also referred to as QA, is a first-step review while a loan is still in progress; where QC is typically defined as after a loan has been funded and it's after it's been processed.")).

[378] Mainigi Decl. Ex. 3 (Battany Dep. 233:25-234:21); Mainigi Decl. Ex. 83 at 4-5 (Fannie Mae Single Family 2007 Selling Guide Part I, Section 301.01 (excerpt)); Mainigi Decl. Ex. 48 at 48-1-48-2 (Freddie Mac Single Family Seller / Servicer Guide, Chapter 48.1 (excerpt)).

[379] Mainigi Decl. Ex. 30 (Togneri Dep. 91:9-13); Mainigi Decl. Ex. 19 (Kitashima Dep. 153:19-154:6).

the same loan both pre-funding and post-funding because in "Phase Code 3, you have an opportunity to correct before you fund the loan."); Nawaday Decl. Ex. W, O'Donnell Tr. 143:2-146:11 (recalling thinking, after reviewing HSSL loans in a QA review, "if these loans were reviewed by corporate QC or an investor, we would have a severely unsat rate that is outside of a tolerance of three or four percent."). The Government also disputes the statements in paragraph 93 because QA reviewed loans *after* funding to confirm whether defects were corrected.

## 2.    Senior Management Questioned the Value of the QA Results.

94.     Although QA was intended to be an additional check on the prime process,[380] many line employees and senior management quickly came to realize that it was not furthering quality control goals.[381] Many believed that the results, as designed, were not an indicator of quality,[382] and management began to question whether the QA was providing value.[383] The

---

[380] Mainigi Decl. Ex. 65 (BANA-SDNY-E-000005628 (telling the Steve Brent that "We're going to need 100% audit of loans coming through this new pipeline during the pilots (Rosemead and Chandler)," and "Regarding the need for audit during the pilot, I view this as driven from your (QC/Compliance) perspective ... it is up to you/Cliff to determine if required, but I am requesting this primarily so that your folks can gain the necessary level of comfort that will be needed to enable a QC/Compliance recommendation to release into full production at end of the pilot.")).

[381] Mainigi Decl. Ex. 20 (Lumsden Dep. 100:19-20 ("QA is obviously not creating value . . . they are not making the QC better, not making quality better.")); Mainigi Decl. Ex. 141 (BANA-SDNY-E-003960707 (Lumsden email focused only on reporting not quality)); Mainigi Decl. Ex.9 (Comeaux Dep. 42:22-44:7 (explaining that by focusing on and communicating about everything, QA was distracting line employees from the most important error that could lead to quality)); Mainigi Decl. Ex. 20 (Lumsden Dep. 88:22-89:22 ("[W]e had a lot of issues with the whole Q.A. process from all angles. . . .")).

[382] Mainigi Decl. Ex. 19 (Kitashima Dep. 88:18-89:22 ("[I]nitially we basically looked for the – the QA process looked at every piece of detail in each file. And we found that it created a lot of findings that from a process standpoint needed to be worked out, but certainly from, you know, a quality standpoint it had really no – no obvious impact to the quality of the loan.")).

[383] Mainigi Decl. Ex. 20 (Lumsden Dep. 100:19-20 ("QA is obviously not creating value . . . they are not making the QC better, not making quality better.")); Mainigi Decl. Ex. 19 (Kitashima Dep. 87:1-87:25 (questioning whether "QA results were providing value when they included things that that were viewed by many, including myself, as sort of inane, just not important enough to raise concerns that – to the level that they were being raised to")); Mainigi Decl. Ex. 19

leader of Central Fulfillment, Wade Comeaux, in particular, was concerned that the QA process was "focused on everything, things that weren't even that relevant, instead of focusing on the most important things."[384]   Other employees, however, disagreed with this perspective.[385]   And QA became a controversial issue.[386]   Some employees, like Steve Brent, are still upset today about the disagreements related to QA.  Even Brent, however, has testified that the action taken with regard to QA did not reflect fraud.[387]

**Response to Paragraph 94**:  The Government disputes the statements in paragraph 94 and any suggestion that the "disagreements" over QA constituted an ordinary debate.  U.S. SOF ¶¶ 313-36.

95.    As expected given the new prime process, the QA process-focused reviews identified a significant number of "findings."[388]   In November 2007, management determined that many findings were related to "minuscule levels of data (a missed checked box)."[389]   These findings, often multiple findings per loan, were communicated to line-level employees in often-seriatim emails throughout the day identifying errors he or she had made in the process.[390]

---

(Kitashima Dep. 94:22-95:20 ("I felt like the QA process, as I described earlier, was a new process and was creating results that may or may not have been constructive to what we were trying to do.")).

[384] Mainigi Decl. Ex. 9 (Comeaux Dep. 42:22-44:7).

[385] Mainigi Decl. Ex. 6 (Brent Dep. 88:17–89:5).

[386] Mainigi Decl. Ex. 32 (Grice Dep. 205:1-4).

[387] Mainigi Decl. Ex. 6 (Brent Dep. 137:18-21).

[388] Mainigi Decl. Ex. 111 (BANA-SDNY-E-000656514); Mainigi Decl. Ex. 108 (BANA-SDNY-E-004220625 (reporting a 98% finding rate)); Mainigi Decl. Ex. 242 (BANA-SDNY-E-003825007); Mainigi Decl. Ex. 243 (BANA-SDNY-E-003964711); Mainigi Decl. Ex. 244 (BANA-SDNY-E-003036785).

[389] Mainigi Decl. Ex. 125 (BANA-SDNY-E-001608234 (Scott Bridges/Greg Lumsden email)).

[390] Mainigi Decl.  Ex.  9 (Comeaux Dep. 176:15-177:9 ("I felt and most of my team felt that there was a better way to distribute that information; and I felt it was better to send it to the

Management concluded the number of emails line-employees received about QA results was

overwhelming.[391] Some felt that barrage of QA emails distracted line-employees from their work,

hindering both production and quality.[392] Moreover, because the role of the QA had not been

adequately communicated to frontline employees, some managers understood that many line

employees feared that they would be disciplined, terminated, or their compensation would be hit

for these errors, all of which were consequences of final findings of severely unsatisfactory by

---

operations managers first so that they could collect it, put it in a more organized fashion and
make sure that the loan specialists addressed it with -- with great speed and urgency, not just
constantly inundated with e-mails throughout the day.")).

[391] Mainigi Decl. Ex. 9 (Comeaux Dep. 173:6-174:2 ("I don't think that I can properly articulate
the amount of e-mails that these people were receiving, but it was an incredible amount. I
constantly had frontline employees and managers telling me that it was an overwhelming
amount; and whenever I was seeing the notes going to the operations managers, I knew how
many notes would be going to the LSs and that it would be an overwhelming amount of
information.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 183:18-184:2 ("Oftentimes, we would
actually just take the 12 e-mails that were intended to go to them in a day and maybe put them all
into one so that they received them all at one time.")).

[392] Mainigi Decl. Ex. 9 (Comeaux Dep. 173:6-174:2 ("I think that they received such an
overwhelming amount of information that it was difficult to focus on the most important parts of
their job, which definitely included quality.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 42:22-44:7
("In my opinion, it was a real challenge.  I might just use an example.  If you had someone on an
assembly line and someone walked up and touched their back shoulder approximately every 30
minutes and said, 'That's' – 'you're not doing something right' or 'You didn't put that in the
right box' and you were constantly distracted from your work, you would lose confidence in
yourself, you would not be as efficient, as effective and it's really almost impossible to do your
job.  So, whenever you have a 97 percent error rate, according to the QA department, people
receiving an incredible amount of e-mails -- and even more challenging was that they might have
40 loans in their pipeline.  They would get a separate e-mail for each finding. So, they may --
they could very possibly receive five e-mails for -- for one file; and it was really putting us in a
position where our employees were completely ineffective.")); Mainigi Decl. Ex. 19 (Kitashima
Dep. 156:24-161:15 (describing and a concern by Scott Bridges "and others in the production
area that quality assurance audits or the feedback that the QA audits process was producing at the
time was being disruptive, meaning that people were taking time out to review the audits, first
and foremost")); Mainigi Decl. Ex. 19 (Kitashima Dep. 156:24-161:15 ("[T]he communication
process, the process whereby QA was immediately feeding back their findings to the processors –
was becoming unproductive within the units.").

corporate QC.[393]

**Response to Paragraph 95**.  The Government disputes the statements in paragraph 95 and any suggestion that management's dissatisfaction with QA findings was motivated by a concern for quality.  U.S. SOF ¶¶ 313-36; Nawaday Decl. Ex. GI (Sept. 13, 2007, Email from Steve Brent) BANA-SDNY-E-000019644-46 at 45 ("Need to really call out Negative findings and trends (12 of 13 reviews in September had findings and 11 had High Risk).  This is a major issue that should be really escalated immediately to the Ops Management (more than a note and attached details).").  Nawaday Decl. Ex. CM (Oct. 4, 2007, Email from Thomas) BANA-SDNY-E-002192898-901 at 899 ("Remember that little quality concern about the new process?  Doesn't look like we've solved it yet.  98.33 percent high risk on Hustle teams.  Let's see if they can take it down from 98 percent to 5 percent.").

96.     Finally, many of the QA findings were inaccurate, but there was no way for individuals to rebut the findings or correct QA's errors.[394]  For instance, one of QA's most common findings was related to actions in a software program called "frauditor" not being

---

[393] Mainigi Decl. Ex. 19 (Kitashima Dep. 156:24-161:15 ("[The QA communication] was creating a sort of a shell shock atmosphere there where processors were beginning to, lack of a better way to describe it, overreact to findings that were merely process-related findings, and it was slowing the process down.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 46:7-47:5 (testifying that within FSL "the same department dealt with QC and QA issues.  The same people's names and titles were on the e-mails.  So, I do think that those differences were blurred; and I think that some people in the QA department didn't always properly articulate what QA was that caused even more concern, not always high-level people but sometimes lower-level people. So, without question, they felt -- I heard many of them say that 'Yeah, this means I'm going to get a QC finding, and I'll potentially lose my job.'  And we had to constantly reiterate that that wasn't always the case, that those things could lead to a QC finding if not corrected or – or if it was one of the more extreme QA findings, but we had to constantly balance that out.")); Mainigi Decl. Ex. 133 (BANA-SDNY-E-009191679); Mainigi Decl. Ex. 161 (BANA-SDNY-E-005530048 (Comeaux email – LS afraid to use authority)).

[394] Mainigi Decl. Ex. 9 (Comeaux Dep. 40:21-24 ("In addition, there were often data integrity issues from the QA department whenever we -- the documents were actually in the right section; and -- and they made errors just like anyone else might make errors.")); Mainigi Decl. Ex. 20 (Lumsden Dep. 91:24-25); Mainigi Decl. Ex. 9 (Comeaux Dep. 167:7-14).

completed prior to Phase Code 3, the pre-funding stage of the process, but the standard operating procedures required it to be completed later in the process than Phase Code 3.[395]   Line-employees' anxieties were further exacerbated by their inability to respond to these incorrect findings; Corporate QC, in contrast, permitted, in fact expected, responses to its findings.[396]

**Response to Paragraph 96**:  The Government disputes the statements in paragraph 96 as incomplete and misleading because, although there was no formal rebuttal process for QA as there was for QC findings, FSL employees had an opportunity to respond to and give feedback on the QA process and its findings.  Nawaday Decl. Ex. DR (Apr. 23, 2008, Email from Price) BANA-SDNY-E-001355727-30 at 29-30.

97.    Some thought that the distribution of QA directly to line employees in Central Fulfillment was important to ensure that line employees could improve and did not question the accuracy of the QA results.[397] But, there was a concern among management that these issues with the QA process and communication were hindering both quality and production.[398]

**Response to Paragraph 97:**  The Government does not dispute the first sentence in paragraph 97 but otherwise disputes the statements in paragraph 97 because the concern among

---

[395] Mainigi Decl. Ex. 108 (BANA-SDNY-E-004220625 (email referencing discussion with Price)).

[396] Mainigi Decl. Ex. 22 (O'Donnell Dep. 271:3-7 (characterizing quality control rebuttal as "a process in place to try to get to the right answer")).

[397] Mainigi Decl. Ex. 6 (Brent Dep. 91:12–92:1).

[398] Mainigi Decl. Ex. 9 (Comeaux Dep. 49:11-50:5 ("The feedback -- the feedback was exactly what we had -- we had received from all the other centers, which was people were afraid to do their jobs.  They were double-, triple-, quadruple-checking their work because of the QA audits; and quite frankly, it was resulting in us not having a viable business.  But even more concerning to me, because I was responsible for quality as well, is that they were focused on a lot of things that would not ensure the most important quality  indicators were -- were handled.  So, as I mentioned earlier, whenever someone's focusing on all these e-mails about a box click whenever the document's already in the file, it reviewing an appraisal, really making sure the income is properly calculated, really making sure the most salient parts of the document or the – or the file are – are properly reviewed.")).

management about the QA process was that it distracted employees from focusing solely on production.  U.S. SOF ¶¶ 313-36; Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06.  Mairone herself explained that she stopped the QA communication to central fulfillment "to immediately increase the focus on funding loans" and cut senior managers out of conference calls with quality control and risk management "to completely empower them to focus on production."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06.

### 3.  Senior Management Took Action To Improve the QA Process and Temporarily Limited Communication of QA Results.

98.     Given the issues they identified with QA, Greg Lumsden, Cliff Kitashima, and Rebecca Mairone decided that the distribution of QA findings should be limited while the QA process and method of communication were improved.[399]  "[T]here were many people within [the] organization that felt like there was a better way to distribute that information that would be more effective because [the] goal was always to focus on the most important things that led to quality issues."[400]

**Response to Paragraph 98**:  The Government disputes the statements in paragraph 98.  U.S. SOF ¶¶ 313-36; Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06.  Mairone herself explained that she stopped the QA communication to central fulfillment "to immediately increase the focus on funding loans" and

---

[399] Mainigi Decl. Ex. 19 (Kitashima Dep. 156:24-161:15 (expressing approval for suspension of QA communication)); Mainigi Decl. Ex. 19 (Kitashima Dep. 186:16-188:6(discussing reasonableness of suspension of QA communication)); Mainigi Decl. Ex. 130 (BANA-SDNY-E-002937604 (Mairone Nov. 29 email)); Mainigi Decl. Ex. 126 (BANA-SDNY-E-001263585 (Cliff edits to Mairone email)); *see* Mainigi Decl. Ex. 141 (BANA-SDNY-E-003960707 (Greg email that the group has been focused on reporting instead of quality)); Mainigi Decl. Ex. 20 (Lumsden Dep. 172:19-25 ("Rebecca's decision making in this area is in participation with myself and Cliff.  So . . . all of this has been discussed and agreed upon by Cliff and myself.")).

[400] Mainigi Decl. Ex. 9 (Comeaux Dep. 42:22-44:7).

cut senior managers out of conference calls with quality control and risk management "to completely empower them to focus on production."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 6-7.

99.     As the Chief Operating Officer, Mairone sent the email communicating this change in direction to Central Fulfillment leadership.[401]  Some outside of the Central Fulfillment organization, including Steve Brent, strongly disagreed with this direction and assumed that Mairone would only distribute the results as she saw fit.[402]  Despite this disagreement, Brent testified that this difference of opinion was normal in a business environment; he did not attribute it to fraud.[403]

**Response to Paragraph 99**:  The Government does not dispute that Mairone sent the email directing all QA and QC communication to herself.  The Government otherwise disputes the statements in paragraph 99 as mischaracterizing improper testimony about a legal conclusion and as misleading as it suggests that Mairone's action were part of an ordinary debate in a business environment.  U.S. SOF ¶¶ 313-36; Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 6-7.  Mairone herself explained that she stopped the QA communication to central fulfillment "to immediately increase the focus on funding loans" and cut senior managers out of conference calls with quality control and risk management "to completely empower them to focus on production."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Mairone) BANA-SDNY-E-001115006-07 at 6-7.

---

[401] Mainigi Decl. Ex. 21 (Mairone Dep. 242:6-9 ("Because I was the leader of the organization and I wanted to make sure that I had responsibility for communication to my organization the right way" … "a focused attention on quality and making sure quality was everyone's job and that we had clear processes and procedures on how to handle quality and reports.")); Mainigi Decl. Ex. 21 (Mairone Dep. 243:5-9 ("I think you get better results when a leader takes ownership of a situation, like a quality situation, and my job was to make sure that everyone had focused attention on that.")).

[402] Mainigi Decl. Ex. 6 (Brent Dep. 88:22-90:22).

[403] Mainigi Decl. Ex. 6 (Brent Dep. 89:2-15).

100.    Notwithstanding Brent's dissatisfaction that he was not personally distributing results to line employees in Central Fulfmillment,[404] as contemplated by email, Mairone, Kitashima, O'Donnell, Comeaux, occasionally Lumsden, and others outside of Central Fulfillment continued to receive QA findings.[405]   These results were also filtered down to other managers in Central Fulfillment as appropriate so that they could more effectively share them with line staff.[406]   There is no evidence in the record that suspending communication to line employees was intended to hide anything.

**Response to Paragraph 100**:  The Government disputes the last sentence in paragraph 100 because it is not supported by any citation to admissible evidence.  The Government disputes all of the statements in paragraph 100 because Mairone tried to hide the poor quality reports out of concern that a focus on quality would distract employees from production.  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Mairone) BANA-SDNY-E-001115006-07 at 6.

101.    Instead, by stopping the constant distraction, Central Fulfillment leadership thought this change in communication structure would improve both production and quality, by

---

[404] Mainigi Decl. Ex. 6 (Brent Dep. 88:22–92:1, 96:12–97:2).

[405] Mainigi Decl. Ex. 19 (Kitashima Dep. 205:12-206:10 ("In reality the communication being generated by the QA department continued to go to all levels of management and not just Rebecca Mairone.  I received reporting on this.  Greg received reporting on this.  You know, people, you know, above the level of the processors continued to be aware of findings, and we continued to keep everyone in the loop that was not directly tied to actual processing of loans.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 57:11-16 (testifying that he "absolutely" continued to receive QA results)); Mainigi Decl. Ex. 9 (Comeaux Dep. 56:12-57 (describing distribution of QA information)); Mainigi Decl. Ex. 133 (BANA-SDNY-E-009191679) (setting meeting)); Mainigi Decl. Ex. 134 (BANA-SDNY-E-005410107 (discussing circulation of weekly reviews)); Mainigi Decl. Ex. 20 (Lumsden Dep. 171:19-23 ("[I]t has nothing to do with Cliff receiving [QA's report] or Ed receiving it or anyone else, Loren Rodriguez receiving it.  Everyone else is still going to be getting it.  It's just the folks in [Rebecca's] line of organization.")).

[406] Mainigi Decl. Ex. 9 (Comeaux Dep. 184:25-185:22 ("We still received the communication with great regularity in e-mail form, in phone calls and in meetings.  Our frontline employees also continued to receive that information.  As I mentioned earlier, we felt like we would be able to provide more of a laser focus instead of a very broad focus that just diluted the message, which we felt was most important.")).

encouraging line-staff to have "laser focus" on the most important steps for ensuring loan quality.[407] Meanwhile, Mairone worked with the QA group to modify the process and link the QA audits more closely with the factors measured by corporate QC.[408] She took a number of steps to improve the Central Fulfillment and QA processes: she reviewed results weekly with Risk Management,[409] shared results with Comeaux and senior central-fulfillment production managers,[410] required Comeaux's group to propose a quality-remediation plan,[411] and worked with Steve Brent to develop reports that would effectively convey quality issues to the field.[412]

---

[407] Mainigi Decl. Ex. 9 (Comeaux Dep. 183:18-184:2 ("Oftentimes, we would actually just take the 12 e-mails that were intended to go to them in a day and maybe put them all into one so that they received them all at one time.  That – that – there were many different ways that we approached it.  At the end of the day, as I said earlier, it was just an effort to provide more precise information and a little bit more laser focus instead of a sawed-off shotgun.")); *see also* Mainigi Decl. Ex. 9 (Comeaux Dep. 55:24–56:7 ("The . . . message that Rebecca was . . . sending out was that we did not want . . . the constant, what we considered, almost badgering of people on a – on a onstop basis about every finding throughout the day because we found like that adversely impacted not only production but also quality. . . .  So, really, it was just a different way to distribute the information that we found would be more productive for the goals of quality and production.")); Mainigi Decl. Ex. 19 (Kitashima Dep. 159:5-8 ("[T]he suspension of communication from QA directly to loan processors was going to be for a period of time to allow them to learn their jobs and focus on getting stuff done.")); Mainigi Decl. Ex. 20 (Lumsden Dep. 173:4-8 ("[S]he [Rebecca] is communicating to four or five people here . . . and she is letting them know that, basically, the QA data is not going to be flowing deep down into your organization and distracting everyone.")).

[408] Mainigi Decl. Ex. 135 (BANA-SDNY-E-005410086 (document by Steve Brent discussing which reports were produced, who should receive them)); Mainigi Decl. Ex. 155 (BANA-SDNY-E-001069073); Mainigi Decl. Ex. 149 (BANA-SDNY-E-003357979 (e-mail from Steve Brent)).

[409] Mainigi Decl. Ex. 133 (BANA-SDNY-E-009191679); Mainigi Decl. Ex. 134 (BANA-SDNY-E-005410107 (discussing circulation of weekly reviews)).

[410] Mainigi Decl. Ex. 9 (Comeaux Dep. 56:12-57:16); *see* Mainigi Decl. Ex. 9 (Comeaux Dep. 184:25-185:22).

[411] Mainigi Decl. Ex. 150 (BANA-SDNY-E-008985176 (email asking about remediation plan)).

[412] Mainigi Decl. Ex. 138 (BANA-SDNY-E-001068727); Mainigi Decl. Ex. 151 (BANA-SDNY-E-008985183 (attaching Brent email referencing relationship of QA to QC)).

This culminated in a QA and QC summit on January 23, 2008, led by the Risk Management group,[413] at which they introduced revamped processes for monitoring and reporting quality and calculating quality of grade.[414] After the summit, QA began to again communicate their reports directly to lower level managers.[415]

**Response to Paragraph 101**:  The Government disputes the statements in paragraph 101 because central fulfillment leadership was trying to hide the poor quality reports out of concern that a focus on quality would distract employees from production, not to improve quality. Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 6.  Mairone herself explained that she stopped the QA communication to central fulfillment "to immediately increase the focus on funding loans" and cut senior managers out of conference calls with quality control and risk management "to completely empower them to focus on production."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 6.

> **4.     FSL Senior Management Made Further Changes to the
> QA Process and Communication in an Effort
> To Improve Quality and Production.**

102.     Consistent with its continued effort to turn the QA process into something that was both accurate and helpful to operations teams, senior management in FSL continued to strengthen the QA process and communication to improve this process.    In January and February 2008, FSL distributed severely unsatisfactory findings to line and senior management and launched a communication campaign, holding weekly meetings to review both QA and QC

---

[413] Mainigi Decl. Ex. 154 (BANA-SDNY-E-000130896 (Agenda for Summit)).

[414] Mainigi Decl. Ex. 156 (BANA-SDNY-E-005561546 (Summary of Summit)).

[415] Mainigi Decl. Ex. 156 (BANA-SDNY-E-005561546 (Summary of Summit)).

statistics with management-level employees.[416]   FSL also began distributing final-word QA communications to address specific QA-related issues[417] and individual notices to inform employees of severely unsatisfactory findings, and initiated training based on problems apparent in the QA results.[418]

**Response to Paragraph 102**:   The Government disputes the first sentence of paragraph 102 because it is not supported by any citation to admissible evidence.   The Government disputes the statements in paragraph 102 as any remedial actions taken were put in place over the objections of Mairone and Comeaux as they continued to push volume alone by removing checklists and extending the reprieve on the QOG penalty.   U.S. SOF ¶¶ 362-67.   Quality initiatives that were promoted by others identified Mairone's changes to QC and QA communication and the QOG suspension as among the root causes of decline in loan quality.   Nawaday Decl. Ex. EH (Feb. 2008, Quality Control Ratings Powerpoint) 1-13 at 4; Nawaday Decl. Ex. T, Mairone Tr. 320:17-23 (listing primary "root causes" loan quality issues as a "Change in Centralized Model—Fulfillment" and that "controls were changed within the new model," specifically a "conversion of mandatory checklists to non-mandatory 'Job Aids'").   Other root causes listed included that "QOG's were suspended in Q3 and Q4 2007 for line staff," "QC findings were communicated only to Sr. Management during implementation of new Model," QA process launched with communication of findings restricted to Sr. Management during transition," and "FSL Risk Management addressed QC findings with Corporate without Field input to reduce distractions (only shared final results)."   Nawaday Decl. Ex. EH (Feb. 2008, Quality Control Ratings) 1-13 at 4.

### C.   FSL Management Took Immediate Action When It Became Concerned

---

[416] Mainigi Decl. Ex. 157 (BANA-SDNY-E-008928071).

[417] Mainigi Decl. Ex. 157 (BANA-SDNY-E-008928071).

[418] Mainigi Decl. Ex. 168 (BANA-SDNY-E-000158595).

**About Quality Results.**

103.    To ensure continued quality, "FSL…developed and implemented Quality focused Platform Enhancements to facilitate reductions in SUS findings, improve loan performance and ensure responsible lending."[419] These measures began as early as December 2007 and continued up to and after the end of the Central Fulfillment process that was similar to the one used in the High Speed Swim Lane pilot.  Although, in the beginning, the remediation effort focused primarily on stated-income loans,[420] it ultimately culminated in the reinstatement of some subprime process steps.[421]

**Response to Paragraph 103**:  The Government disputes the statements in paragraph 103 because Defendants had no intention of "ensuring continued quality" and continued to ignore warnings about defect rates and resist the introduction of checkpoints they eliminated as part of the HSSL.  U.S. SOF ¶¶313-36, 339-46.  In response to O'Donnell's proposal for a quality summit, for example, Comeaux forwarded O'Donnell's email to Mairone, asked whether she could attend because he thought it would be a "pivotal meeting," informed Mairone that O'Donnell's proposed plan was "counter to many of their [Mairone's and Comeaux's] goals" and stated that, based on the list of attendees, which included individuals from underwriting and quality assurance, their "team [would] be outnumbered."  Nawaday Decl. Ex. DJ (Mar. 24, 2008, Email from Comeaux) BANA-SDNY-E-000055720-23.

       1.    **FSL Added Controls Related to Stated Income Reasonableness.**

---

[419] Mainigi Decl. Ex. 168 (BANA-SDNY-E-000158595 at 46 (Kitashima March 2008 deck)).

[420] Mainigi Decl. Ex. 165 (BANA-SDNY-E-008979869 (attaching Lumsden email to Drew re: stated income); Mainigi Decl. Ex. 167 (BANA-SDNY-E-001647617 (O'Donnell email to corporate re FSL efforts on stated income)).

[421] Mainigi Decl. Ex. 169 (BANA-SDNY-E-003960738 (O'Donnell email – "in many ways we are applying subprime workflows")); Mainigi Decl. Ex. 181 (BANA-SDNY-E-001647671 (Comeaux email recounting process changes)).

104.    Stated income loans are loans for which a borrower's income as stated on the loan application is not supported by documents and, according to the guidelines for stated income loans, the lender is not permitted to verify the borrower's income.[422] Stated income loans were common in the mortgage industry in the mid-2000s, and many large lenders had proprietary stated income programs.[423] Stated income loans were not part of the typical GSE selling guides, but the GSEs granted variances to certain lenders to allow for the purchase of stated income loans.[424]

**Response to Paragraph 104**:  The Government disputes the statements in paragraph 104 and further adds that the statements mischaracterize the cited testimony because stated income products are ones for which the lender is not *required* (as opposed to "not *permitted*") to verify the borrower's income, as the testimony cited in support of the first sentence of paragraph 104 makes clear.  Nawaday Decl. Ex. N, Hunter Tr. 35:22-36:3 (stated income loan is one in which "the borrower or applicant would simply state their income on the application"); Mainigi Decl. Ex. 3, Battany Tr. 50:11-51:19 (describing Countrywide's "Fast & Easy" product as "[s]ome had reduced income, so rather than requiring two pay stubs, may require one pay stub.  Other versions required no income verification" and explaining "stated income, stated asset" products as ones in which "the borrower wouldn't have to verify with pay stubs or bank statements their income or their assets."); Mainigi Decl. Ex. 13, Forlines Tr. 62:19-63:1 ("Q:  What is – how would you define, Mr. Forlines, a stated income loan?  A.  It's essentially a loan where the borrower stated their income on the application but the information is not verified."); Mainigi

---

[422] Mainigi Decl. Ex. 17 (Hunter Dep. 35:22-36:3); Mainigi Decl. Ex. 3 (Battany Dep. 50:18-51:11); Mainigi Decl. Ex. 13 (Forlines Dep. 62:19-63:1); *see also* Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 46:9-47:1 (describing types of stated income products)).

[423] Mainigi Decl. Ex. 3 (Battany Dep. 50:18-51:5); Mainigi Decl. Ex. 26 (Sobczak Dep. 38:8-18); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 135:2-7).

[424] Mainigi Decl. Ex. 3 (Battany Dep. 47:18-51:19); Mainigi Decl. Ex. 13 (Forlines Dep. 64:22-68:18); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 118:12-121:14).

Decl. Ex. 27, Sullivan Tr. 46:9-47:1.

105.    The regulators permitted stated income loans, and both GSEs actively sought to purchase stated income loans.[425]   Stated income loans were a product offered "universally" by all major mortgage lenders during the relevant time period, including Countrywide—and Countrywide's FSL division.[426]   Before the GSEs purchased stated income loans, they modeled the criteria and confirmed that the risks associated with the product were acceptable within their criteria.[427]   Accordingly, the GSEs were aware of the risks associated with the stated income products.[428]   They mitigated the inherent risks associated with stated income products generally through favorable pricing.[429]

**Response to Paragraph 105**:  The Government disputes the statements in paragraph 105 because the GSEs could not be aware of risks that were not disclosed by lenders, and the GSEs relied on truthful lender representation and warranties, not merely pricing, to mitigate risks associated with the loans they purchased.  Mainigi Decl. Ex. 28, Tanabe Tr. 49:13-50:2 ("Q.  And how did – why did Freddie Mac continue buying loans from Countrywide during

---

[425] Mainigi Decl. Ex. 3 (Battany Dep. 50:18-51:19); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 117:15–118:11); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 48:13-49:21).

[426] Mainigi Decl. Ex. 19 (Kitashima Dep. 48:17); Mainigi Decl. Ex. 22 (O'Donnell Dep. 167–71); Mainigi Decl. Ex. 1 (Aliano Dep. 37:14 ("Stated income loans at the time were part of the product mix.")).

[427] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 118:12-17); Mainigi Decl. Ex. 13 (Forlines Dep. 64:22-66:19).

[428] Mainigi Decl. Ex. 3 (Battany Dep. 154:7-155:2); Mainigi Decl. Ex. 13 (Forlines Dep. 64:7-9); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 120:4-12); Mainigi Decl. Ex. 17 (Hunter Dep. 39:8-40:15); Mainigi Decl. Ex. 47 at 2-5 (FNM-EDOCS-BOA_00240068 (Fannie Feb. 2007 Alt-A Presentation)).

[429] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 134:22-135:8); Mainigi Decl. Ex. 3 (Battany Dep. 272:18-24); Mainigi Decl. Ex. 13 (Forlines Dep. 64:13-20); Mainigi Decl. Ex. 17 (Hunter Dep. 41:20-43:4).

that time period if Countrywide had a riskier book of business?  A.  Let's go back to the reps and warrants Countrywide makes.  They rep and warrant loans are investment quality.  They rep and warrant that they provide us accurate information.  Even though it was riskier, we're taught – it is still – we believed the – the loans are still within the – the bounds of the purchase documents.").

106.    Like the rest the industry in 2004-2007, Fannie Mae and Freddie Mac sought to increase their purchases of stated income products.[430] During 2007 and 2008, however, "[t]he entire industry was struggling with stated income . . . [T]he collapse in the housing market ended up putting an enormous amount of pressure on the stated income product."[431] Starting in December 2007, Countrywide asked all of its divisions, including FSL, "to review [their] processes and procedures to see if [they] needed to make any changes."[432] In response, FSL began making changes to its process for stated-income loans, and continued to do so "[o]ver the course of time."[433] These efforts were designed to address companywide quality issues with stated-income loans.[434] The measures FSL enacted included:

- Implementing a Stated Income Reasonability Job Aid required by Countrywide for all divisions in December 2007.[435]

- Creating an FSL-specific tool called Income Calculator, and integrating the stated-income job aid into that tool in December 2007.[436]

---

[430] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 135:2-7); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 49:7-21).

[431] Mainigi Decl. Ex. 20 (Lumsden Dep. 124:11-15); *see also* Mainigi Decl. Ex. 3 (Battany Dep. 124:12-17 (noting that stated income loans across lenders began to perform poorly at the beginning of the housing crisis)).

[432] Mainigi Decl. Ex. 19 (Kitashima Dep. 176:1-3).

[433] Mainigi Decl. Ex. 16 (Ho Dep. 244:2).

[434] Mainigi Decl. Ex. 19 (Kitashima Dep. 198:6-10).

[435] Mainigi Decl. Ex. 160 (BANA-SDNY-E-000117110 (February Root Cause Deck)).

- Revising existing stated-income training to incorporate the Income Calculator as a requirement in early January 2008.[437]

- Issuing a Stated Income Worksheet specifying which criteria should be considered when determining the reasonability of stated income in January 2008.[438]

- Again revising, and requiring completion of, stated-income reasonability training in March 2008.[439]

- Requiring underwriter review and approval of stated-income loans multiple times during the loan-approval process in March 2008.[440]

- Dedicating an advanced underwriting team from the Structured Loan Desk to perform reviews of stated-income reasonability before the loan proceeded past the first stage of processing in May 2008.[441]

**Response to Paragraph 106**:  The Government does not dispute that Fannie Mae and Freddie Mac purchased stated income products in 2004-2007 but otherwise disputes the statements in paragraph 106 as incomplete and misleading because FSL management knew as early as the summer of 2007 that permitting loan specialists to determine income reasonability was perilous and would lead to high rates of defects but continued to allow them to make such determinations.  Nawaday Decl. Ex. BV (Aug. 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-41 at 39 (acknowledging that Kitashima told him "he's very worried about [loan specialists making determinations of stated income] reasonability, as most of our findings in UW relate to such" but adding that "low/no-doc deals [albeit risky] are the fastest thru the swimlane. . ." so he wanted them included); Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from

---

[436] Mainigi Decl. Ex. 160 (BANA-SDNY-E-000117110 (February Root Cause Deck)).

[437] Mainigi Decl. Ex. 160 (BANA-SDNY-E-000117110 (February Root Cause Deck)).

[438] Mainigi Decl. Ex. 168 at 46 (BANA-SDNY-E-000158595 (Kitashima March 2008 deck)).

[439] Mainigi Decl. Ex. 168 at 46 (BANA-SDNY-E-000158595 (Kitashima March 2008 deck)).

[440] Mainigi Decl. Ex. 168 at 46 (BANA-SDNY-E-000158595 (Kitashima March 2008 deck)).

[441] Mainigi Decl. Ex. 185 (Bulletin 08-299).

Mairone) BANA-SDNY-E-001115006-07 at 07 (Mairone orders removal of mandatory checklists).

Additionally, central fulfillment management opposed checkpoints on quality that O'Donnell and others attempted to introduce.  Nawaday Decl. Ex. DH (Mar. 14, 2008, Email from Comeaux) BANA-SDNY-E-001302829-31 at 29 ("I have fought pretty aggressively . . . . We have not been able to win any process disagreements since Drew called Greg on Quality."). In response to O'Donnell's proposal for a quality summit, for example, Comeaux forwarded O'Donnell's email to Mairone asked whether she could attend because he thought it would be a "pivotal meeting," informed Mairone that O'Donnell's proposed plan was "counter to many of their [Mairone's and Comeaux's] goals" and that, based on the list of attendees, which included individuals from underwriting and quality assurance, their "team [would] be outnumbered." Nawaday Decl. Ex. DJ (Mar. 24, 2008, Email from Comeaux) BANA-SDNY-E-000055720-23 at 20.

**2.    FSL Developed an Improvement Plan To Address Other Quality Issues as They Arose, and Ultimately Made Changes that Ended the High Speed Swim Lane Workflow.**

107.    Stated-income, however, was not the only issue FSL addressed.  The division was"always working on trying to find ways to improve quality."[442]   To that end, FSL enacted quality-improvement measures related to different aspects of the loan-origination process throughout the fourth quarter of 2007 and the first two quarters of 2008.  These efforts culminated in the end of the High Speed Swim Lane workflow and re-introduced some processing steps that had previously been used for subprime lending.[443]   The steps FSL took

---

[442] Mainigi Decl. Ex. 9 (Comeaux Dep. 70:22-23); Mainigi Decl. Ex. 20 (Lumsden Dep. 96:17-20 (noting that FSL looked at quality results "constantly to improve our quality . . . no one is perfect but we are always looking to be perfect")).

[443] Mainigi Decl. Ex. 169 (BANA-SDNY-E-003960738 ("In many ways we need the subprime process reapplied to our work flows." (O'Donnell)).

included:

- Adding "coaches" to help processors perform their duties in December 2007.[444]

- Revising the Quality of Grade process in January 2008.[445]

- Initiating a communication campaign to create better awareness about SUS findings in January 2008.[446]

- Initiating an "FSL Final Word" communication campaign to alert employees about QA issues in January 2008.[447]

- Creating a Loan Manufacturing Quality Dashboard in January 2008.[448]

**Response to Paragraph 107**:  The Government disputes the statements in paragraph 107 because the self-serving statement that FSL was "always working on trying to find ways to improve quality" is supported only by the testimony of Wade Comeaux and Greg Lumsden, both of whom pushed volume over quality.  *See* Nawaday Decl. Ex. CT, (Nov. 26, 2007, Email from Comeaux) BANA-SDNY-E-001114384-86 at 84 ("[W]e have to increase velocity (fundings) with velocity . . . . While showing respect to other departments, we have to take ownership of funding 'a hell of a lot' more loans in December!"); Nawaday Decl. Ex. CV (Nov. 27, 2007, Email from Wade Comeaux) BANA-SDNY-E-001334182-85 at 82 (seeking to "to limit [QA] calls to 1 hour per week at most" so he and others could "focus on production for the next few weeks"); Nawaday Decl. Ex. AR (Aug. 8, 2007, Email from Lumsden) ("[T]his is the highest priority for the majority of Full Spectrum, and thus I need your direct and intense involvement.  If we do not improve our prime fundings to over 50%, the organization impact will

---

[444] Mainigi Decl. Ex. 168 at 46 (BANA-SDNY-E-000158595 (Kitashima March 2008 deck)).

[445] Mainigi Decl. Ex. 168 at 47 (BANA-SDNY-E-000158595 (Kitashima March 2008 deck)).

[446] Mainigi Decl. Ex.157 at 7 (BANA-SDNY-E-008928071 (O'Donnell remediation deck)).

[447] Mainigi Decl. Ex.157 at 9 (BANA-SDNY-E-008928071 (O'Donnell remediation deck)).

[448] Mainigi Decl. Ex.157 at 9 (BANA-SDNY-E-008928071 (O'Donnell remediation deck)).

be far beyond a few layoffs here and there"); Nawaday Decl. Ex. CW (Nov. 29, 2007, Email

from Lumsden) BANA-SDNY-E-008979444-47 at 45  ("If we do not fund the volumes per our

budget, we will not have to worry about QA and QC for FSL."); Nawaday Decl. Ex. AC,

Thomas Tr. 91:25-92:24 (testifying to "thinking . . .  at some point, somebody will put on the

brakes and say, Okay.  We've had enough.  We see there's issues.  Let's slow down or correct it.

And I just felt like we were heading towards a cliff. . . [Listening to concerns about quality] was

– was gone.  It was volume.  It felt like a survival mode to me.").

     Additionally, although the quality of grade process was purportedly revised in 2008, loan

specialists did not receive QOG feedback for months and QOG results were evidently not

recorded.  Nawaday Decl. Ex. FD (May 14, 2008, Email from Wade Comeaux) BANA-SDNY-

E-001652319-24 at 19 ("FYI.  LSs have been receiving no QOG feedback for months.  We also

have no organized detail on SUS findings per LS or OM.").

     108.    Despite these steps, Greg Lumsden and Drew Gissinger were concerned about the

high rate of QC findings and higher-than-expected initial corporate SUS numbers in Spring

2008.[449]  At their urging, Ed O'Donnell developed a remediation plan to address perceived

---

[449] Mainigi Decl. Ex. 163 (BANA-SDNY-E-001647585 (plus attachment) (Lumsden email on
quality presentation)); Mainigi Decl. Ex. 162 (BANA-SDNY-E-008979863 (draft loan
manufacturing quality memo)); Mainigi Decl. Ex. 165 (BANA-SDNY-E-008979869 (and
attachment) (Lumsden email to Drew re: stated income)); Mainigi Decl. Ex. 170 (BANA-SDNY-
E-008980502 (Lumsden email to Sambol – we missed a few things relative to quality); Mainigi
Decl. Ex. 169 (BANA-SDNY-E-003960738 (O'Donnell e-mail "Drew was 'into' some of our
suggestions, but Greg wanted more restrictive changes.  In many ways, we need the subprime
process reapplied to our work flows.")); Mainigi Decl. Ex. 22 (O'Donnell Dep. 244:14-15, 19
("[T]here was a very strong reaction from Drew [Gissinger] about the quality in general. . . . He
was violently upset at the quality problems.")); Mainigi Decl. Ex. 20 (Lumsden Dep. 114:15-17
("[W]hen we saw numbers that we thought were elevated, we would always react, in one form or
another.")); Mainigi Decl. Ex. 19 (Kitashima Dep. 180:6-11 ("Reports received from corporate
QC primarily raised our level of concern as we saw a trend in increasing findings.  Although this
was evident in the other divisions as well as FSL, we seemed to have a little higher rate, at least
in initial findings.  So to answer your question, yes, we had some, you know, our level of concern
was raised within that timeframe.")); Mainigi Decl. Ex. 9 (Comeaux Dep. 98:14-20 (explaining
that "an overreaction to change policy was based upon what appears to be a 24% initial SUS

---

quality issues.[450]   Although the remediation steps taken by FSL focused initially on stated-income loans, FSL also took other steps.   First, in March 2008, it required that all employees with approval authority be recertified.[451]   The next month, O'Donnell identified further process changes,[452] and FSL "introduced controls that looked similar to the subprime process"[453] and applied them to prime loans.[454] And, as of April 28, 2008, manual underwriter review was required prior to clear-to-close for every loan, regardless of the loan's risk characteristics or the skill-level of the person processing the loan.[455] This change effectively ended the workflow previously known as the High Speed Swim Lane.[456] Even so, FSL continued to refine its loan-origination process, modifying its bonus plans to remove an incentive based on turn time,[457] and further refining the clear-to-close process in May 2008.[458]

> **Response to Paragraph 108**:   The Government disputes the statements in paragraph 108.   U.S. SOF ¶¶ 362-87.   Although certain changes were implemented in the first quarter of

---

rate," even though "before Central Fulfillment was even involved, the initial SUS rates had been as high as 51 to 48 percent")).

[450] Mainigi Decl. Ex. 166 (BANA-SDNY-E-001133758).

[451] Mainigi Decl. Ex. 168 (BANA-SDNY-E-000158595 at 46 (Kitashima March 2008 deck)).

[452] Mainigi Decl. Ex. 121 (BANA-SDNY-E-003960422 (O'Donnell email identifying process improvements)); Mainigi Decl. Ex. 232 (BANA-SDNY-E-000533419 with attachment BANA-SDNY-E-000533419 (PowerPoint slide collecting O'Donnell's suggestions)).

[453] Mainigi Decl. Ex. 22 (O'Donnell Dep. 239:7-13).

[454] Mainigi Decl. Ex. 181 (BANA-SDNY-E-001647671 (Comeaux email recounting process changes)); Mainigi Decl. Ex. 175 (Bulletin 08-195).

[455] Mainigi Decl. Ex. 175 (Bulletin 08-195); Mainigi Decl. Ex. 173 (BANA-SDNY-E-000160816 (Mairone-Comeaux e-mail discussing UW involvement)).

[456] Mainigi Decl. Ex. 16 (Ho Dep. 305:23–306:14).

[457] Mainigi Decl. Ex. 176 (BANA-SDNY-E-001647661).

[458] Mainigi Decl. Ex. 182 (BANA-SDNY-E-001682180).

2008, any changes that were implemented were done over the objections of central fulfillment management.  Nawaday Decl. Ex. DH (Mar. 14, 2008, Email from Comeaux) BANA-SDNY-E-001302829-31 at 29 ("It seems as though we have not been able to win any process disagreements since Drew [Gissinger] called Greg [Lumsden] on quality.").

       Additionally, although a new process was implemented in April of 2008, underwriters were required only to complete a five issue checklist, not conduct a full underwrite of the file.  Nawaday Decl. Ex. DP (Apr. 25, 2008, CTC Checklist) BANA-SDNY-E-002085105-106 at 105.  Price emailed Comeaux in response to the new CTC process saying that "I feel that the new CTC process is not tight enough to drive a 1% SUS rate . . . . [T]o continue to allow LS's to recategorize and clear conditions while having the UW's only complete a checklist without actually clearing the doc and UW doc conditions themselves leaves us susceptible to errors and clarity around responsibility we cannot afford at this point."  Nawaday Decl. Ex. DQ (Apr. 29, 2008, Email from Price) BANA-SDNY-E-001356650.  Price added that "[i]f we're going to drive the division quality results down to 4% or a 1%, our chances of getting there immediately would be better served by confiding the key controls within the group (UW) who are ultimately more experienced and with less 'production skin in the game.'"  Nawaday Decl. Ex. DQ (Apr. 29, 2008, Email from Price to Comeaux cc: White, Sallis) BANA-SDNY-E-001356650.  An initial QC report on the loans that went through the CTC process confirmed Price's prediction and showed that "the CTC process is not providing the dramatic improvements in Quality intended."  Nawaday Decl. Ex. EQ (May 20, 2008, Email from Cliff Kitashima) BANA-SDNY-E-00898752-54 at 53.  Of the twenty loans that went through the new process, nine (45%) were rated as SUS.  Nawaday Decl. Ex. EQ (May 20, 2008, Email from Cliff Kitashima) BANA-SDNY-E-00898752-54 at 53.

109.     Relator O'Donnell found it "reassuring to see all the controls we've had in place over the years."[459]  He told fellow-cooperator Michael Thomas in May of 2008 that FSL's "exposure is to manufacturing quality, not fraud or unethical stuff" and that he thought that they had "reacted well each time we find a trend and seal the gaps  . . . . but it's near impossible to defend yourself in this environment when the facts are not important  . . . noise is more popular."[460]  Thomas agreed:  "Yes  . . .  that's what's difficult.  All of that noise cheapens the efforts everyone has made over the years in making sure we are doing the right things."[461]

**Response to Paragraph 109**:  The Government disputes the statements in paragraph 109 as incomplete and misleading as O'Donnell and Thomas both raised warnings about the HSSL leading to high rates of defects and testified that their concerns were ignored.  Nawaday Decl. Ex. DL (Draft Email from O'Donnell) BANA-SDNY-E-001655912-13 at 13 (documenting that he was "very concerned about the way loan quality is presently being managed" and that he had "been very vocal about the poor quality being produced" but had "not seen that our warnings are being taken seriously" and specifically that "Central Fulfillment leadership continues to disregard these warnings"); Nawaday Decl. Ex. AC, Thomas Tr. 91:25-92:24 (testifying to "thinking . . . at some point, somebody will put on the brakes and say, Okay. We've had enough. We see there's issues.  Let's slow down or correct it.  And I just felt like we were heading towards a cliff. . . [Listening to concerns about quality] was – was gone.  It was volume.  It felt like a survival mode to me.").  In addition, the Government disputes the description of Michael Thomas and Edward O'Donnell as "cooperator[s]."

---

[459] Mainigi Decl. Ex. 177 (BANA-SDNY-E-003960750 (Email correspondence between O'Donnell and Thomas)).

[460] Mainigi Decl. Ex. 177 (BANA-SDNY-E-003960750 (Email correspondence between O'Donnell and Thomas)).

[461] Mainigi Decl. Ex. 177 (BANA-SDNY-E-003960750 (Email correspondence between O'Donnell and Thomas)).

### D.   The Sprint Incentive Paid Bonuses to Employees for Taking on Additional Work.

110.    The Amended Complaint alleges that the Sprint Incentive, a bonus paid to underwriters working in FSL's QC department for responding to corporate QC's initial quality control findings, was an effort to hide poor quality findings, but in reality it was consistent with the longstanding QC process at Countrywide and FSL.[462]  No one has testified that it was part of any fraudulent scheme or grounded in fraudulent intention to defraud the GSEs.  In fact, everyone who has testified about the Sprint Incentive has confirmed that it was an incentive related to the normal effort to work with the corporate QC group to validate the QC findings.[463]  Relator Ed O'Donnell was involved in designing this short-term incentive and approved of its implementation,[464] and Steve Brent from FSL quality control ran the Sprint Incentive rebuttal process.[465]

**Response to Paragraph 110**:  The Government disputes the statements in paragraph 110 as incomplete and misleading.  The Sprint Incentive paid a bonus to QC personnel based on the number of overturned findings, not on the number of QC findings validated.  Nawaday Decl. Ex. AC, Thomas Tr. 100:9-11 ("[T]here was an incentive put in place to get through that volume and try to, you know, get as many overturned as possible."); Nawaday Decl. Ex. DM (May 20, 2008, FSL Quality Bi-weekly Review) (showing bonus to each of the 36 FSL QC employees corresponding to driving down final SUS rate to 4%); Nawaday Decl. Ex. FB (May 21, 2008,

---

[462]  *See* Mainigi Decl. Ex. 22 (O'Donnell Dep. 281:19-21 ("The purpose of the incentive was to complete the QC rebuttal process with corporate QC.")).

[463]  Mainigi Decl. Ex. 29 (Thomas Dep. 104:20-105:9, 109:12-110:19, 199:6-201:18); Mainigi Decl. Ex. 6 (Brent Dep. 229:23-230:6, 270:2-274:5, 276:8-278:9); Mainigi Decl. Ex. 22 O'Donnell Dep. 281:22–282:3).

[464]  Mainigi Decl. Ex. 22 (O'Donnell Dep. 282:22–286:3); Mainigi Decl. Ex. 179 (BANA-SDNY-E-003960550).

[465]  Mainigi Decl. Ex. 6 (Brent Dep. 229:23–230:3).

Email from O'Donnell) BANA-SDNY-E-000785708-10 at 08 ("The entire group has the chance to earn some extra bucks for the effort.  Let's make sure to see the direct connection – they see the direct connection between reduced random ratings and increased paychecks!!!").

111.    In May of 2008, FSL had a significant backlog of initial SUS findings to which it needed to respond — FSL was "receiving a very high number of audits to respond to and based on the staff that [it] had allocated [it] w[as] somewhat overwhelmed."[466]  Additionally, those responding to the audits were "facing pressure from Wade [Comeaux] and others who were concerned that the results weren't a true depiction of the quality."[467]  Under these circumstances, the normal response process "required extra work by the QC underwriters and [the] incentive was meant to reward that extra effort."[468]  Some underwriters were added from other groups to assist with this process, and, for them, the bonus helped make up for a pay difference.[469] The incentive lasted only for the month of May 2008.[470]

**Response to Paragraph 111**:  The Government disputes the statements in paragraph 111 as incomplete and misleading.  The Sprint Incentive paid a bonus to QC personnel based on the number of overturned findings, not on the number of QC findings validated.  Nawaday Decl. Ex.

---

[466] Mainigi Decl. Ex. 187 (BANA-SDNY-E-000218386 ("I viewed the June incentive we ran as a sprint incentive only … I believe we achieved much of what we set out to accomplish which was to get rid of the backlog of SUS loans in que [sic] and drive down the finding rate below the initial 12-15% projected." Edward O'Donnell, June 24, 2008)); Mainigi Decl. Ex. 22 (O'Donnell Dep. 283:15-20).

[467]  Mainigi Decl. Ex. 22 (O'Donnell Dep. 283:20-25).

[468] Mainigi Decl. Ex. 22 (O'Donnell Dep. 283:15–284:6).

[469] Mainigi Decl. Ex. 31 (Zamarripa Dep. 41:23-42:8 ("[T]hat compensation was provided due to the fact that they could not provide my associates the increase that they had indicated they would give them in their salary.  The compensation for that sprint incentive was nowhere near the amount that I previously received for bonuses in my previous role.")); Mainigi Decl. Ex. 31 (Zamarripa Dep. 68:8-21).

[470] Mainigi Decl. Ex. 187 (BANA-SDNY-E-000218386); Mainigi Decl. Ex. 183 (BANA-SDNY-E-000218194).

AC, Thomas Tr. 100:9-11 ("[T]here was an incentive put in place to get through that volume and try to, you know, get as many overturned as possible."); Nawaday Decl. Ex. DM (May 20, 2008, FSL Quality Bi-Weekly Review) (showing bonus to each of the 36 FSL QC employees corresponding to driving down final SUS rate to 4%); Nawaday Decl. Ex. FB (May 21, 2008, Email from Edward O'Donnell) BANA-SDNY-E-000785708- 10 at 08 ("The entire group has the chance to earn some extra bucks for the effort. Let's make sure to see the direct connection – they see the direct connection between reduced random ratings and increased paychecks!!!").

112.    The incentive was designed to cause employees to focus their attention on the files most likely to lead to a successful rebuttal and to cause employees to supply extra effort to the project. Therefore, the incentive was linked to the number of SUS findings that were reversed. This did not demonstrate any fraudulent intent.[471] In fact, relator Ed O'Donnell and government cooperator and Fannie employee Michael Thomas came up with the idea for compensating employees in the Sprint Incentive based on overturns.[472] The FSL employees who participated in the Sprint Incentive, like all FSL employees, had no power to overturn initial SUS findings.[473]

---

[471] Mainigi Decl. Ex. 22 (O'Donnell Dep. 285:23-286:3); Mainigi Decl. Ex. 31 (Zamarripa Dep. 68:15-69:6); Mainigi Decl. Ex. 29 (Thomas Dep. 99:25-100:11 ("And so there was an incentive put into place to get through that volume and try to, you know, get as many overturned as possible.")).

[472] Mainigi Decl. Ex. 22 (O'Donnell Dep. 282:22-283:4). O'Donnell testified that "[i]n retrospect [he] might have encouraged this Sprint Incentive to be structured slightly differently and be focused on the volume," Mainigi Decl. Ex. 22 (O'Donnell Dep. 284:16-18), but at the time he was focused "on completing the work and rewarding the employees that were going to go above and beyond in terms of completing the volume of work instead of the volume and the reduction in SUSs," Mainigi Decl. Ex. 22 (O'Donnell Dep. 285:2-5); Mainigi Decl. Ex. 29 (Thomas Dep. 198:21-200:19); Mainigi Decl. Ex. 180 (BANA-SDNY-E-005712123); Mainigi Decl. Ex. 179 (BANA-SDNY-E-003960550 (noting that O'Donnell is "thinking we structure so that Auditors earn a per overturn spiff beginning at audits that take us below 15%, but payout does not take place until we achieve less than 10% in total." May 15, 2008 email from Edward O'Donnell to Michael S. Thomas)).

[473] Mainigi Decl. Ex. 31 (Zamarripa Dep. 51:13-24 ("Again, as I've said, we had no power to overturn anything other than to provide a response to corporate QC, who had the ultimate say.")).

Instead, they simply provided FSL's response to Corporate QC which then decided whether the loan was unsatisfactory.[474]

**Response to Paragraph 112**:  The Government disputes the statements in paragraph 112.  U.S. SOF ¶¶ 369-80.  Additionally, Thomas testified that the Sprint Incentive was not his idea and he had no authority to introduce such a bonus plan.  Nawaday Decl. Ex. AC, Thomas Tr.  269:21-25 ("I certainly wouldn't introduce any kind of bonus plan.  I wasn't in a role to do that.  Q.  Did you have authority to introduce a bonus plan?  A. No, no.").  In addition, the Government disputes the description of Michael Thomas as a "government cooperator."

113.    Finally, there is no evidence in the record that the Sprint Incentive was related in any way to the High Speed Swim Lane or Central Fulfillment processes.

**Response to Paragraph 113:**  The Government does not dispute that the Sprint Incentive was an attempt to drive down initial SUS findings across FSL as a whole and was not limited to HSSL loans.  Nawaday Decl. Ex. DM (May 20, 2008, FSL Quality Bi-Weekly Review).

**VII.    HSSL Quality and Performance.**

114.    It turned out that the fear of quality issues in Central Fulfillment was unwarranted, and the drastic process changes were an overreaction.[475] Although the initial corporate QC findings were high, the final SUS rate for Q4 of 2007, the quarter in which Central Fulfillment

---

[474] Mainigi Decl. Ex. 31 (Zamarripa Dep. 38:22-39:3); Mainigi Decl. Ex. 31 (Zamarripa Dep. 39:24-40:3 (My responsibility as well as my team's was to respond back to the findings [from corporate QC] and provide evidence or documentation based on what they're indicating in their finding, if it was appropriate and if it was available.")).

[475] Mainigi Decl. Ex. 9 (Comeaux Dep. 97:12-98:20; 98:14-20 (explaining that "an overreaction to change policy was based upon what appears to be a 24% initial SUS rate," even though "before Central Fulfillment was even involved, the initial SUS rates had been as high as 51 to 48 percent")); Mainigi Decl. Ex. 189 (BANA-SDNY-E-008989351 ("At the end of the day, I think senior management overreacted . . . . I think the problems were close to being resolved with the process enhancements and direction we had put in place.")).

was rolled-out, was lower than any of the three prior quarters.[476]   The final SUS rate for Q1

2008 (the second quarter of Central Fulfillment) was higher than Q4 2007, but it was still

among the lower rates of the prior year.[477]   Furthermore, QA findings turned out to be an

extremely poor predictor of loan quality,[478] as the final Corporate SUS rate for the first quarter

of Central Fulfillment was only 5.1%.[479]   Only a portion of the SUS findings are attributable

to the HSSL process because HSSL was a narrow and short-lived process.

   **Response to Paragraph 114**: The Government disputes the statements in

paragraph 114.  U.S. SOF ¶¶ 98-106 (high findings rates intensify warnings about HSSL),

¶¶ 354-55 (high SUS findings by corporate QC).  Although the HSSL expanded to all loans in

October of 2007, quality control reports are based on the funding date of the loan.  Nawaday

Decl. Ex. T, Mairone Tr. 377:3-13 ("Am I right that the Quarter 4, 2007 QC results would be

tracking loans that funded in the fourth quarter of 2007; is that correct?  A: I believe that's

correct.  Q: And I believe you testified that Central Fulfillment was rolled out in October 2007; is

that right?  A: Yes.").  As a result, HSSL loans that showed up in QA reports in the fourth quarter

---

[476]  Mainigi Decl. Ex. 184 (BANA-SDNY-E-001155208 (Comeaux email comparing quarters));
Mainigi Decl. Ex. 19 (Kitashima Dep. 212:21-25 (explaining that "the SUS rates, during the
HSSL program rollout, had actually normalized during that period of time")); Mainigi Decl. Ex. 9
(Comeaux Dep. 83:19-85:24).

[477]  Mainigi Decl. Ex. 184 (BANA-SDNY-E-001155208 (Comeaux email comparing quarters));
Mainigi Decl. Ex. 9 (Comeaux Dep. 84:9-12 ("[W]hile there was some deterioration from Q4, it
still looked to be in line or better than the average of the previous three quarters.")).

[478]   Mainigi Decl. Ex. 9 (Comeaux Dep. 39:2-9) ("I felt like [the QA results] were useful, but I do
feel as if they were not a good leading indicator of future SUS findings or QC scores at all."));
Mainigi Decl. Ex. 9 (Comeaux Dep. 97:12-22 ("[I]t was proven again and again QA results were
not a leading indicator of QC results.")).

[479]   Mainigi Decl. Ex. 9 (Comeaux Dep. 166:17-24 ("[T]he statistics from the QA findings in Q4
were not very good.  They were at 80 percent or worse; and our Q -- and our QC findings were 5
percent…So, 80 percent versus 5 percent[,]…it's obvious it's not a great leading indicator."));
Mainigi Decl. Ex. 171 (BANA-SDNY-E-0089980528 (Kitashima email announcing final SUS
rate for Q4 2007 of 5.1%)).

of 2007 could show up in the quality control reports in the first quarter of 2008, where initial SUS findings were unusually high. Nawaday Decl. Ex. T, Mairone Tr. 377:14-19 ("Q: And a loan could be funded several weeks after that loan was applied for; is that correct? A: You would have to look. It is possible. You would have to look at the loans."); Nawaday Decl. Ex. GJ (Jun. 9, 2008, Email from Comeaux) BANA-SDNY-E-001155208-09, 1368107-08. Additionally, corporate QC increased the number of audits by nearly 400% in the first quarter of 2008 as a more reliable random audit methodology was employed, making the initial SUS findings more reliable. Nawaday Decl. Ex. FI (Feb. 29, 2008, Email from Cindy Simantel) BANA-SDNY-E-009033594-97 at 95 (explaining that, beginning with February 2008 fundings, the random audit population will become larger and a more reliable indicator of credit quality at the division level); Nawaday Decl. Ex. FM (Apr. 21. 2008, Quality Control Update- Divisional Comparison) (showing number of EA loans audited increased from 17 to more than 133 in the first quarter of 2008 and the number of conforming loans audited increased from 133 to more than 528); Nawaday Decl. Ex. T, Mairone Tr. 378:4-379:7. Finally, because the Sprint Incentive applied to the initial SUS findings of Q1 2008, the final SUS finding rates were artificially low. U.S. SOF ¶¶ 369-80.

A.  **The HSSL Process Was Narrow and Short-Lived—and Ended No Later Than April 2008.**

115.    The gravamen of Plaintiff's Amended Complaint is that FSL originated loans through the High Speed Swim Lane by "loan specialists" without underwriter involvement.[480] The High Speed Swim Lane was a short-lived pilot process, implemented at only a small number of processing teams within FSL, for low-risk loans. The HSSL pilot started on August 13, 2007.

---

[480]   Am. Comp. ¶ 5, 49, 52–54, 70–72, 76–78, 92–93.

It ended on September 30, 2007.[481]   It was implemented only within two processing teams—one processing team with three loan specialists in Chandler, Arizona, and one processing team with three loan specialists in Richardson, Texas.[482]   The Swim Lane loans had low-risk, prime characteristics.   Approximately 354 loans were originated through the Swim Lane. Approximately 118 of those had underwriter involvement.[483]

     **Response to Paragraph 115**:  The Government disputes the statements in paragraph 115 because the HSSL expanded, not ended, in October of 2007.  U.S. SOF ¶¶ 249-50; Nawaday Decl. Ex. S, Lumsden Tr. 47:13-25. ("High speed swim lane is not different from central fulfillment, it's all the same thing."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("What was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point."); Nawaday Decl. Ex. BX (Sept. 21, 2007, Email from Rebecca Mairone) BANA-SDNY-E-000050487-489 at 487 ("[W]hen can we start moving more loans to the pilot . . . ?  We need to start to move toward all loans into process"); Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8 ("The High Speed Swim Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim Lane pilot"); Nawaday Decl. Ex. T, Mairone Tr. 168:18-20 ("There weren't any exclusions.  It encaptured all of the Full Spectrum lending loans.").  The Government also disputes that 354 loans were originated through the HSSL, because under the Government's definition of HSSL, there were 2,986 HSSL loans with an application date

---

[481]   Mainigi Decl. Ex. 78 (BANA-SDNY-E-001228000 at 46); Mainigi Decl. Ex. 118 (BANA-SDNY-E-000040414 at 7); Mainigi Decl. Ex. 16 (Ho Dep. 165:14-16 ("The pilot, to my understanding the pilot was between August 13, 2007 and September 30, 2007.")).

[482]   Mainigi Decl. Ex. 78 (BANA-SDNY-E-001228000 at 46).

[483]   Ho Decl. ¶ 9.

between August 13, 2007, to September 30, 2007, and more than 30,000 HSSL loans under the Government's definition.  Hansen Decl. ¶¶ 3-5, 8; *see infra* Government's Response to ¶ 119.

116.    After HSSL ended on September 30, 2007, FSL implemented a "Central Fulfillment" origination process within certain processing teams.  Central Fulfillment was not the High Speed Swim Lane.  But one of its many workflows shared certain characteristics with the Swim Lane, including a prime origination model that allowed loan specialists to process certain low-risk loans without Underwriter involvement.  It too was limited.  Central Fulfillment started on October 1, 2007.[484]   The fulfillment process at issue ended on April 27, 2008.[485] Central Fulfillment initially was implemented at 8 processing teams in Chandler, Arizona; 10 processing teams in Richardson, Texas; and 3 processing teams in Rosemead, California.[486] In November 2007, 4 processing teams in Hatboro, Pennsylvania, were added to the Central Fulfillment process.[487] Although the total number of processing teams involved in Central Fulfillment fluctuated some over the next few months, it was only a fraction of the processing teams at FSL at the time.[488] The loans that flowed through the Central Fulfillment processing teams were low-risk loans and had prime characteristics: the average FICO was 689; the average LTV was 72.6.[489] Most of the loans originated through the swim lane process were refinances.[490]

---

[484] Mainigi Decl. Ex. 103 (BANA-SDNY-C-000321712 (Bulletin 07-511)).

[485] Mainigi Decl. Ex. 175 (BANA-SDNY-C-001835362 (Bulletin 08-195)).

[486] Mainigi Decl. Ex. 98 (BANA-SDNY-E-008673733); Mainigi Decl. Ex. 99 (BANA-SDNY-E-008673749); Mainigi Decl. Ex. 101 (BANA-SDNY-E-008673751).

[487] Mainigi Decl. Ex. 136 (BANA-SDNY-E-002197498).

[488] Mainigi Decl. Ex. 112 (BANA-SDNY-C-000971285).

[489] Ho Decl. ¶ 9.

[490] Ho Decl. ¶ 9.

**Response to Paragraph 116:**  The Government disputes the statements in paragraph 116 because the HSSL expanded, not ended, in October of 2007.  U.S. SOF ¶¶ 249-50; Nawaday Decl. Ex. S, Lumsden Tr. 47:13-25 ("High speed swim lane is not different from central fulfillment, it's all the same thing."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("What was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point."); Nawaday Decl. Ex. BX (Sept. 21, 2007, Email from Rebecca Mairone) BANA-SDNY-E-000050487-489 at 487 ("[W]hen can we start moving more loans to the pilot . . . ?  We need to start to move toward all loans into process"); Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8 ("The High Speed Swim Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim Lane pilot"); Nawaday Decl. Ex. T, Mairone Tr. 168:18-20 ("There weren't any exclusions.  It encaptured all of the Full Spectrum lending loans.").

The Government further disputes that the HSSL ended on April 27, 2008, as substantive underwriter involvement was not introduced until May 21, 2008.  Nawaday Decl. Ex. DS (May 21, 2008, New CTC Approval Process for Field Offices and Central Fulfillment) BANA-SDNY-C-000350598-606 at 598.

### D.    The HSSL Loan Population Is Defined By Uncontroverted Evidence.

117.    As discussed above, the HSSL pilot ended in September 2007, and the High Speed Swim Lane name was not used after that point.[491]   There was no separate name in Central Fulfillment for the workflow with the attributes the government claims were part of the allegedly fraudulent scheme.  Consequently, to make sense of the Government's allegations, Bank Defendants relied upon the characteristics identified in the Amended Complaint to identify the

---

[491] Barnett Decl. ¶ 21; Ho Decl. ¶ 9.

population of HSSL loans.  The loans processed through the High Speed Swim Lane pilot have

the following characteristics:

- The loan application was received during the High Speed Swim Lane pilot, which lasted from August 13, 2007 through September 30, 2007; and

- The loan processed by one of the two teams participating in the HSSL pilot (team 6205 in Richardson, Texas and team 6221 in Chandler, Arizona).[492]

**Response to Paragraph 117:**  The Government disputes the statements in paragraph 117

because the HSSL expanded, not ended, in October of 2007. Nawaday Decl. Ex. S, Lumsden Tr.

47:13-25. ("High speed swim lane is not different from central fulfillment, it's all the same

thing."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("What was High Speed Swim Lane at one

point ended up becoming the central fulfillment model at a later point.");  Nawaday Decl. Ex.

BX (Sept. 21, 2007, Email from Rebecca Mairone) BANA-SDNY-E-000050487-489 at 487

("[W]hen can we start moving more loans to the pilot . . . ?  We need to start to move toward all

loans into process");  Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8 ("The High Speed Swim

Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted

sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it

included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim

Lane pilot."); Nawaday Decl. Ex. T, Mairone Tr. 168:18-20 ("There weren't any exclusions.  It

encaptured all of the Full Spectrum lending loans.").  The Government also disputes the

characteristics of HSSL loans.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Indeed, Defendants'

own expert concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at

8 n.40.

118.    As discussed above, the High Speed Swim Lane pilot granted a select group of six

loan specialists in these two teams the authority to process certain low-risk loans without the

involvement of Underwriters.  But at all times Underwriters were available to assist these six

---

[492] Ho Decl. ¶ 9; Mainigi Decl. Ex. 16 (Ho Dep. 165:14-16; Ho Dep. 170:10-12).

loan specialists.  The evidence is that these loan specialists consulted with Underwriters on roughly one-third of the loans they processed during the HSSL pilot.[493]  The HSSL pilot processing teams processed 354 loans during the HSSL pilot.  Underwriters were involved in the processing of 118 of those loans.[494]

**Response to Paragraph 118:**  The Government disputes the statements in paragraph 118 because it disputes the characteristics of HSSL loans.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Indeed, Defendants' own expert concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at 8 n.40.

119.   Central Fulfillment loans flowing through the HSSL process have the following characteristics:

- the loan application was received on or after October 1, 2007 and the loan mortgage date is on or before April 27, 2008; and

- the loan was processed by one of the Central Fulfillment processing teams (i.e., by one of roughly eight teams in Chandler, ten teams in Richardson, five teams in Rosemead, California, or starting November 2007 one four teams in Hatboro, Pennsylvania) who were assigned to a process similar to the HSSL pilot which included certain exists from the HSSL workflow for underwriter review.[495]

**Response to Paragraph 119:**  The Government disputes the statements in paragraph 119 as HSSL loans have the following characteristics:  loan application received on or after August 13, 2007 and funded on or before May 21, 2008, and processed through the HSSL/central fulfillment teams in either Richardson, Texas, Chandler, Arizona, Rosemead, California, and Hatboro, Pennsylvania.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Indeed, Defendants' own expert concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at 8 n.40.

---

[493] Ho Decl. ¶ 9; Mainigi Decl. Ex. 16 (Ho Dep. 326:16-328:5).

[494] Ho Decl. ¶ 9.

[495] Ho Decl. ¶ 9; Mainigi Decl. Ex. 16 (Ho Dep. 305:23-306:14, 171:4-10).

120.    Similar to the Swim Lane pilot, loan specialists in Central Fulfillment were granted authority to process certain low-risk loans without the involvement of Underwriters, but Underwriters were available for support.  The loan specialists working on the Central Fulfillment teams consulted with Underwriters on approximately 18% of the loans they processed. Approximately 13,854 loans were originated through Central Fulfillment prior to the April 27, 2008 end date.  Approximately 2,607 of those loans had Underwriter involvement.[496]

**Response to Paragraph 120**:  The Government disputes the statements in paragraph 120 because it disputes the characteristics of HSSL loans and because the data reflecting "underwriter involvement" is not reliable and does not indicate that the loan was reviewed and approved by an underwriter.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  As the Bank Defendants' 30(b)(6) witness testified, "it's not always easy to tell what people did on the loan" by looking at the data fields, Nawaday Decl. Ex. L, Ho. Tr. 308:17-309:10, so he simply looked at multiple fields to see whether the name of someone whose job titled included the word "underwriter" appeared in any of the data fields, Nawaday Decl. Ex. L, Ho Tr. 327:9-17 ("Q:  With regard to the data, the loan data that the bank defendants may show, if any of the line items indicated a person with a title that had the word underwriter in it, that loan is in the bank defendants' view excluded from being at issue in this case?  A: Yes.  And it could be underwriter or some variation of underwriter, UW or some abbreviation.").

121.    There is no evidence to support Plaintiff's claim that "HSSL . . . continued through 2009."  Am. Comp. ¶ 7. Nor is there evidence to support the definition of "Hustle" loans that the Plaintiff has advanced:

- the loan was funded between August 1, 2007 and December 31, 2009;

- the loan was accepted by an automated underwriting system; and

---

[496] Ho Decl. ¶ 9.

- the loan was processed or funded through one of the following five centers: Chandler, AZ; Hatboro, PA; Plano, TX; Richardson, TX; or Rosemead, CA.[497]

**Response to Paragraph 121:**  The Government disputes the statements in paragraph 121 because the Government's definition is based on historical records tracking HSSL and non-HSSL loans.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  *See also* Government's response to paragraph 119.

122.    No witness supports the Plaintiff's definition.  No document supports the Plaintiff's definition.  No expert testimony supports the Plaintiff's definition.  Plaintiff's expert Charles Cowan's report is clear: the above definition was simply "provided by the United States Attorney's Office for the Southern District of New York."[498]

**Response to Paragraph 122**:  The Government disputes the statements in paragraph 122 because the Government's definition is based on historical records tracking HSSL and non-HSSL loans.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  *See also* Government's response to paragraph 119.

### C.    The Quality of HSSL Loans Was No Different Than the Quality of Non-HSSL Loans.

123.    The quality of the loans originated through the HSSL process was no different than the quality of loans not originated through the HSSL process.  In fact, based on the government's reunderwriting results of the sample of HSSL and non-HSSL loans selected by the government, the HSSL process produced defective loans at a rate lower than the non-HSSL FSL process.[499]

---

[497] Cowen Expert Report at Appx. 1

[498] Cowen Expert Report at Appx. 1.

[499] Mainigi Decl. Ex. 11 (Cowen Dep. 87:10-88:1).

**Response to Paragraph 123**:  The Government disputes the statements in paragraph 123 because Defendants have provided no basis in the record why non-HSSL loans are an appropriate point of comparison to HSSL loans, particularly given that some elements of the HSSL were incorporated across all funding centers within FSL.  *See* Nawaday Decl. Ex. C, Barnett Tr. 59:21-60:2 ("Q: But do you have any reason to believe that the non HSSL loans made for an appropriate control against which to compare HSSL loans?  A. I have no independent expertise on that question."); Nawaday Decl. Ex. C, Barnett Tr. 60:15-25 ("Q: But you yourself don't have any information to evaluate as to whether or not non[-]HSSL loans made for a relevant comparison to HSSL loans? A: No, as I said I have no expertise. . . . But I have no expertise to assess the appropriateness of such a comparison, it was beyond the scope of my assignment and my competence."); Nawaday Decl. Ex. GH (Nov. 19, 2007, Central Services Bulletin) BANA-SDNY-E-009013571-72 (expanding elements of the HSSL to the field).  The Government also disputes the statements in paragraph 123 because Defendants fail to specify the parameters of the "HSSL Process."  In addition, the Government disputes the statements in paragraph 123 because the defect rate associated with HSSL loans will likely go up.  The 31% defect rate that the Government's underwriting and statistical sampling experts found for HSSL loans was based on the assumption that the HSSL ended on December 31, 2009.  Discovery has since shown that the HSSL effectively ended on May 21, 2008, when underwriters were brought back in.  Once these loans are excluded from the pool of HSSL loans, it is likely that the 31% defect rate will increase.

124.    Defendants and the government agree that the defect rate of loans originated through the HSSL process was no worse than the defect of FSL as a whole.  While the government did not calculate the defect rate derived from its reunderwriting of the non-HSSL population, calculations based on those results show that 30.8% of the loans originated through the HSSL process contained defects, while 40.0% of the non-HSSL loans contained such

defects.[500]   These numbers may be too high, as Defendants' reunderwriting resulted in a finding that 4.3% of the HSSL loans contained defects while 6.0% of the non-HSSL loans were defective.[501]   But in any event, both sets of numbers show the HSSL loans having a *lower* defect rate than the non-HSSL loans.

**Response to Paragraph 124**:  The Government disputes the statements in paragraph 124 as misleading and incomplete, as Defendants have provided no basis in the record justifying why non-HSSL loans are an appropriate point of comparison to HSSL loans, particularly given that some elements of the HSSL were incorporated across all funding centers within FSL.  *See* Nawaday Decl. Ex. C, Barnett Tr. 59:21-60:2 ("Q: But do you have any reason to believe that the non HSSL loans made for an appropriate control against which to compare HSSL loans?  A. I have no independent expertise on that question."); Nawaday Decl. Ex. C, Barnett Tr. 60:15-25 ("Q: But you yourself don't have any information to evaluate as to whether or not nonHSSL loans made for a relevant comparison to HSSL loans? A: No, as I said I have no expertise. . . . But I have no expertise to assess the appropriateness of such a comparison, it was beyond the scope of my assignment and my competence."); Nawaday Decl. Ex. GH (Nov. 19, 2007, Central Services Bulletin) BANA-SDNY-E-009013571-72 (expanding elements of the HSSL to the field).  The Government's underwriting and sampling experts, based on a review of a statistically valid random sampling of the FSL loans sold to the GSEs, found that approximately 31% of HSSL loans had material defects rendering them not investment quality.  Nawaday Decl. Ex. GF (May 7, 2013, expert report of Ira Holt) at 4; Nawaday Decl. Ex. GP (May 2, 2013, expert report of Dr. Charles Cowan) at 29.

---

[500]   A. Barnett Decl. Ex. A ¶ 17.

[501]   A. Barnett Decl. Ex. A ¶ 40.

The Government also disputes the statements in paragraph 124 because Defendants fail to specify the parameters of the "HSSL Process."  In addition, the Government disputes the statements in paragraph 124 because the defect rate associated with HSSL loans will likely go up.  The 31% defect rate that the Government's underwriting and statistical sampling experts found for HSSL loans was based on the assumption that the HSSL ended on December 31, 2009.  Discovery has since shown that the HSSL effectively ended on May 21, 2008, when underwriters were brought back in.  Once these loans are excluded from the pool of HSSL loans, it is likely that the 31% defect rate will increase.

> **D.    The Performance of HSSL Loans Was No Different than Performance of Non-HSSL Loans.**

125.    The performance of HSSL loans was no different than the performance of non-HSSL loans.  Plaintiff's expert on HSSL loan performance conceded that the results of his own regression models show that HSSL loans are no more likely than non-HSSL loans to become delinquent when controlling for borrower credit-worthiness.[502]  Defendants' experts confirmed this result—that HSSL loans are no more likely to become delinquent than non-HSSL loans— with their own analyses.[503]

**Response to Paragraph 125**:  The Government disputes the statements in paragraph 125 as misleading and incomplete, as Defendants have provided no basis in the record justifying why non-HSSL loans are an appropriate point of comparison to HSSL loans, particularly given that some elements of the HSSL were incorporated across all funding centers within FSL.  *See* Nawaday Decl. Ex. C, Barnett Tr. 59:21-60:2 ("Q: But do you have any reason to believe that the non HSSL loans made for an appropriate control against which to compare HSSL loans?  A.

---

[502]   Mainigi Decl. Ex. 33 (McFadden Dep. 56-57, 108-09).

[503]   James Decl. Ex. 1 (James Rep. ¶¶ 69-73); Hubbard Decl. Ex. 1 (Hubbard Rep. ¶¶ 38-41).

I have no independent expertise on that question."); Nawaday Decl. Ex. C, Barnett Tr. 60:15-25

("Q: But you yourself don't have any information to evaluate as to whether or not nonHSSL

loans made for a relevant comparison to HSSL loans? A: No, as I said I have no expertise. . . .

But I have no expertise to assess the appropriateness of such a comparison, it was beyond the

scope of my assignment and my competence."); Nawaday Decl. Ex. GH (Nov. 19, 2007, Central

Services Bulletin) BANA-SDNY-E-009013571-72 (expanding elements of the HSSL to the

field).  Additionally, the Government's re-underwriting and sampling results determined that

HSSL loans had a material defect rate of approximately 31%, which is much higher than the

industry standard, so any statement that the defect rates among HSSL loans are no higher than

defect rates among non-HSSL loans cannot support an inference that HSSL loans were therefore

of investment quality.  Nawaday Decl. Ex. GF (May 7, 2013 Expert Report of Ira Holt) at 4.

The Government disputes that the statements in paragraph 125 are supported by the materials

cited as the Bank Defendants' expert Glenn Hubbard based his analysis on a non-statistical

sample with missing data and thus his conclusions are faulty, misleading and unreliable.

Nawaday Decl. Ex. ES, Hubbard Tr. 54:12-56:8; 62:15-63:9.

126.    The rate of repurchase requests is another measure of quality and performance.

Repurchase requests were *less* common for HSSL loans than for non-HSSL loans sold to the

GSEs.  The GSEs requested repurchase of 5.8% of HSSL loans and 5.9% of non-HSSL loans

purchased by the GSEs.[504]

**Response to Paragraph 126**:  The Government disputes the statements in paragraph 126

because Defendants have provided no basis in the record justifying why non-HSSL loans are an

appropriate point of comparison to HSSL loans, particularly given that some elements of the

HSSL were incorporated across all funding centers within FSL.  *See* Nawaday Decl. Ex. C,

---

[504] Walker Decl. Ex. 1 (Walker Rep. at 41, 46 & Table 13).

Barnett Tr. 59:21-60:2 ("Q: But do you have any reason to believe that the non HSSL loans made for an appropriate control against which to compare HSSL loans?  A. I have no independent expertise on that question."); Nawaday Decl. Ex. C, Barnett Tr. 60:15-25 ("Q: But you yourself don't have any information to evaluate as to whether or not non HSSL loans made for a relevant comparison to HSSL loans? A: No, as I said I have no expertise. . . . But I have no expertise to assess the appropriateness of such a comparison, it was beyond the scope of my assignment and my competence."); Nawaday Decl. Ex. GH (Nov. 19, 2007, Central Services Bulletin) BANA-SDNY-E-009013571-72 (expanding elements of the HSSL to the field).

## VIII.   GSEs

### A.    Contracts Governed the GSEs' Relationship with Countrywide.

127.    Countrywide's relationships with the GSEs were governed by contracts.[505]  These contracts stated all of Countrywide's obligations to the GSEs.[506] They span thousands of pages and were frequently updated and revised.[507]

**Response to Paragraph 127:** The Government disputes the statement that the "contracts stated all of Countrywide's obligations to the GSE's" as incomplete and misleading, because there are contractual terms that are important to the GSEs yet not defined in the contracts themselves.  With regard to Freddie Mac, Countrywide warranted with regard to each loan sold that it had "not misstated or omitted any material fact about the Mortgage," and Freddie Mac's corporate representative testified that there is no definition of the term "material" in the relevant

---

[505]   Mainigi Decl. Ex. 3 (Battany Dep. 45:1-3); Mainigi Decl. Ex. 17 (Hunter Dep. 80:14-18).

[506]   Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 144:5-8); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 355:18-356:4); Mainigi Decl. Ex. 3 (Battany Dep. 53:24-54:10).

[507] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 232:11-234:20); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 35:17-36:2); Mainigi Decl. Ex. 3 (Battany Dep. 45:4-9); Mainigi Decl. Ex. 17 (Hunter Dep. 80:19-81:20).

contracts but it nevertheless has meaning.  Mainigi Decl. Ex. 28, Tanabe Tr. 282:15-284:10;

Nawaday Decl. Ex. AI (Feb. 23, 2007, Single Family Seller/Servicer Guide Excerpt) USA-

00130972-74, 130982, 131114-15, 131490.

Fannie Mae required that all of the mortgages it bought from Countrywide be "acceptable

investments"; one Fannie Mae witness explained that lenders were expected to have in place an

"adequate process" for the "origination and creation of the loans" to ensure that the loans were

compliant with the required representations and warranties in the governing contracts.  Nawaday

Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at 86;

Mainigi Decl. Ex. 34, Grimes Tr. 115:11-116:1; Mainigi Decl. Ex. 27, Sullivan Tr. 244:9-14.

128.    Several types of contracts governed Countrywide's relationship with Fannie.

- First, Countrywide and Fannie entered into a Strategic Alliance Agreement that focused primarily on pricing and market share.[508]

- Second, as with all lenders, Countrywide signed a Mortgage Selling and Servicing Contract ("MSSC") (apparently referenced by the government in the complaint as the "Master Contract").[509]

- Third, there is the Selling Guide, a lengthy and frequently updated document containing underwriting guidelines for lenders.  When Fannie Mae wanted to change or update the terms of the Selling Guide, it sent "lender letters" informing its lenders of the changes.[510]   The Selling Guide is incorporated into the MSSC and considered a part of the contract Fannie enters into with all of its lender counterparties.[511]

- Finally, Fannie Mae entered into Master Agreements with Countrywide that included numerous variances from (or exceptions to) the requirements in the

[508]Mainigi Decl. Ex. 3 (Battany Dep. 45:16-46:23); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 234:14-20; *see generally* Mainigi Decl. Ex. 41 (BANA-SDNY-C- 001331458 (Third Amended and Restated Strategic Alliance Agreement)).

[509] Am. Compl. ¶ 39.

[510] Mainigi Decl. Ex. 3 (Battany Dep. 54:2-10); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 104:19-105:11, 233:21-234:8).

[511] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 104:19-105:18); Mainigi Decl. Ex. 147 at 1, 3 (USA-00074378 (Fannie MSSC with CWB Mortgage Ventures, LLC)).

Selling Guide.[512]   An example of a variance is the Fast & Easy variance which Fannie originally agreed to in the late 1990s and which permitted Countrywide to sell Fannie stated income loans meeting certain requirements.[513]   Notably, there was no requirement in the Fast & Easy variance (or any variance between Fannie and Countrywide) regarding staffing generally or the titles, training, or qualifications of personnel permitted to process and sign off on the loans..[514]

**Response to Paragraph 128:**  The Government does not dispute the first eight sentences in paragraph 128.  The Government disputes the last sentence of paragraph 128 as Fannie Mae required Countrywide to retain qualified staff to originate loans to be sold to Fannie Mae notwithstanding the Fast & Easy variance or any other variance.  *See* Mainigi Decl. Ex. 35, Chandler Tr. 60:1-7 (Fannie Mae's lenders needed a "strong quality control plan" and a "staff . . . capable of implementing it" to ensure that "what a lender was representing was being delivered was, in fact, what was being delivered"); Mainigi Decl. Ex. 13, Forlines Tr. 60:10-12 (the quality control process was a "very integral part of the loan origination process"); Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at 381.

128.    Fannie and Countrywide entered into the MSSC in 1982, and that contract remained in effect in 2007 and 2008.[515]   It set forth the terms and conditions for Countrywide's loan sales to Fannie, including representations and warranties regarding the quality of the

---

[512] Mainigi Decl. Ex. 3 (Battany Dep. 47:18-49:12).

[513] Mainigi Decl. Ex. 209 at 5-10 (BANA-SDNY-C-001342151 (Fannie Master Agreement, Variance 55 Amend. 2 (excerpt)); Mainigi Decl. Ex. 26 (Sobczak Dep. 17:24-18:7, 18:24-19:1); Mainigi Decl. Ex. 3 (Battany Dep. 49:5-50:8).

[514] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 348:22-349:15); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 148:16-149:7, 370:22-371:6); Mainigi Decl. Ex. 13 (Forlines Dep. 196:13-197:13, 267:21-268:11); Mainigi Decl. Ex. 3 (Battany Dep. 280:14-282:13).

[515] Mainigi Decl. Ex. 3 (Battany Dep. Ex. 2 (Countrywide Funding Corporation MSSC)). Additional divisions of Countrywide entered into the MSSC with Fannie Mae in later years, as Fannie required all lenders from which it purchased loans to sign this basic contract, but the language of the contract remained the same.  Mainigi Decl. Ex. 147 at 7 (USA-00074378 (Fannie MSSC with CWB Mortgage Ventures, LLC)); Mainigi Decl. Ex. 40 at 8 (Countrywide Funding Corporation MSSC).

mortgages that would be sold.   The MSSC also requires a lender to repurchase a mortgage if any warranty made by the lender about the mortgage is untrue. [516]

**Response to Paragraph 129:**  The Government does not dispute the statements in paragraph 129.

130.    With respect to Freddie Mac, there also existed a Seller/Servicer Guide (similar to Fannie's) which specifies Freddie Mac's guide-level credit and servicing requirements for all lenders from which it purchases mortgages.  Freddie Mac frequently amended and reissued the Seller/Servicer Guide.[517]   The Seller/Servicer Guide also set forth the representations and warranties made by lenders to Freddie Mac, including that the mortgages sold to Freddie Mac met the terms of the applicable contracts and were of investment quality.[518]  The Guide required Countrywide to repurchase those loans that did not meet Freddie Mac's eligibility criteria.[519]  Second, Freddie Mac also entered into a Master Agreement with Countrywide that was renegotiated approximately once a year.[520]   This Master Agreement incorporated the Seller/Servicer Guide and included market share requirements, pricing and credit terms, as well as variances from (or "negotiated waivers") Freddie Mac's standard guide-level requirements.[521]

---

[516] Mainigi Decl. Ex. 40 at 5-9 (Countrywide Funding Corporation MSSC)).

[517] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 34:15-35:7); Mainigi Decl. Ex. 17 (Hunter Dep. 85:15-85:22).

[518] Mainigi Decl. Ex. 51 at 6-15–6-16, 22-1 (USA-00130972 (Freddie Mac Single Family Seller / Servicer Guide, Chapter 6.11 and 22.2 (excerpt))); Mainigi Decl. Ex. 23 (Padgett Dep. 34:3-7, 85:3-9).

[519] Mainigi Decl. Ex. 49 at 72-1 – 72-3 (USA-00130972 (Freddie Mac Single Family Seller/Servicer Guide, Chapter 72 (excerpt))); Mainigi Decl. Ex. 23 (Padgett Dep. 34:3-15).

[520]  Mainigi Decl. Ex. 17 (Hunter Dep. 92:22-94:14); Mainigi Decl. Ex. 10 (Connell Dep. 49:8-10).

[521]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 34:15-36:2); Mainigi Decl. Ex. 17 (Hunter Dep. 85:15-21, 94:18-95:13).

Freddie Mac's Seller/Servicer Guide and the Master Agreement with Countrywide were collectively referred to as the "purchase documents."[522]

**Response to Paragraph 130:**  The Government does not dispute the statements in paragraph 130.

131.    Fannie and Freddie's corporate representatives testified that the GSEs did not impose upon Countrywide requirements beyond those in the contracts between Countrywide and the GSEs.[523]  The contracts between Countrywide and each of the GSEs were comprehensive.[524] To the extent the GSEs wanted to impose obligations upon Countrywide, those obligations were negotiated between the parties and specified in the contracts.[525]  Fannie Mae in particular had a clear policy that it would not have side letters or verbal agreements with Countrywide everything had to be documented in the contracts.[526]  As discussed below, the HSSL process did not violate any of Countrywide's contracts with the GSEs, and the Plaintiff does not allege that it did.

**Response to Paragraph 131:**  The Government does not dispute the first four statements in paragraph 131, but does dispute these statements as incomplete and misleading for the reasons set out above in response to paragraph 127.  The last statement in paragraph 131 is without any factual or other support and thus does not satisfy the requirements of Fed. R. Civ. P. 56(c)(1) or Local Rule 56.1; accordingly, this statement does not present an undisputed fact.  Furthermore,

---

[522]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 35:14-36:2); Mainigi Decl. Ex. 17 (Hunter Dep. 85:15-86:17).

[523]  Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 355:4-356:4); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 144:5-8, 147:21-148:6).

[524]  Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 355:4-356:4); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 144:5-8, 147:21-148:6).

[525]  Mainigi Decl. Ex. 17 (Hunter Dep. 104:4-8); Mainigi Decl. Ex. 10 (Connell Dep. 37:9-38:3); Mainigi Decl. Ex. 3 (Battany Dep. 53:17-54:24); Mainigi Decl. Ex. 13 (Forlines Dep. 247:21-248:2).

[526] Mainigi Decl. Ex. 3 (Battany Dep. 54:16-54:24, 56:25-57:2).

the Government disputes the last statement in paragraph 131.  *See* Amended Complaint, ¶ 219;

Nawaday Decl. Ex. AI (Freddie Mac Single Family Seller/Servicer Guide) USA-00130972-74,

82, 00131114-115, 131490 at 114 (Countrywide has "not misstated or omitted any material fact

about the Mortgage"); Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing

Contract) USA-00074378-401 at 381 (Countrywide required to "at all times, have employees

who are well trained and qualified to perform the functions required of the Lender under this

Contract").

  132. To the extent the contracts between Countrywide and the GSEs did not specify

particular requirements or obligations, the GSEs understood that Countrywide would exercise its

discretion and/or business judgment as a mortgage originator.[527]

  **Response to Paragraph 132:**  The Government disputes the statement in paragraph 132

as incomplete and misleading as decisions made in Countrywide's business judgment did not

relieve it of its obligation to satisfy all defined and undefined requirements in its contracts with

the GSEs.  Mainigi Decl. Ex. 34, Grimes Tr. 115:11-116:1 (Fannie Mae expected that lenders

would have an "adequate process" for the "origination and creation of the loans" to ensure that

the loans sold were "investment grade"); Mainigi Decl. Ex. 28, Tanabe Tr. 282:15-284:10 (term

"material fact" is not defined in the Freddie Mac purchase documents, but Countrywide may not

misstate or omit any "material fact about the Mortgage").

  133. In purchasing many of their loans, the GSEs relied upon a "rep and warrant"

model with its lenders, including Countrywide.[528]  Under this model, a GSE did not review each

and every loan it purchased from a lender.[529]  Rather, a GSE required lenders to make certain

---

[527] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 147:21-149:7, 323:17-324:14); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 107:7-109:2, 373:19-375:7); Mainigi Decl. Ex. 3 (Battany Dep. 117:19-118:16); Mainigi Decl. Ex. 83 at 3 (Fannie Mae Single Family 2007 Selling Guide Part  I, Section 201.01:B (excerpt)).

representations and warranties about each loan sold to the GSE, including that the loan met any

eligibility requirements for sale to the GSE specified in the contracts.[530]   The model required a

lender to self-report to a GSE any loan sold to the GSE that the lender identified as non-

compliant with contractual requirements, such as a loan involving borrower misrepresentation or

fraud.[531]   The government has suggested that Defendants' alleged failure to identify aspects of

the HSSL process to the GSEs is a breach of certain representations and warranties and that the

fact that the GSEs requested repurchase of certain loans originated via the HSSL process

confirms that breach.   However, the representations and warranties made by the lenders under

this model were loan-specific and related solely to a *loan's* compliance with requirements

explicated in the contracts, not the process by which the loan was originated.[532]   Moreover,the

GSEs did not anticipate that lenders would always originate loans that were perfectly compliant

with every contractual guideline or that lenders were representing that all loans generated would

---

[528]   Mainigi Decl. Ex. 147 at 4-8 (USA-00074378 (Fannie MSSC with CWB Mortgage Ventures, LLC)); Mainigi Decl. Ex. 51 at 6-15 – 6-16, 22-1 (USA-00130972 (Freddie Mac Single Family Seller / Servicer Guide, Chapter 6.11 and 22.2 (excerpt))); Mainigi Decl. Ex. 3 (Battany Dep. 106:11-107:6); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 279:15-280:1); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 244:1-17; 254:12-255:3).

[529]   Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 245:2-10); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 274:2-276:13, 277:12-278:19); Mainigi Decl. Ex. 10 (Connell Dep. 202:1- 203:8); Mainigi Decl. Ex. 3 (Battany Dep. 107:7-108:1).

[530]   Mainigi Decl. Ex. 3 (Battany Dep. 106:21-107:6); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 279:15-280:10).

[531]   Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 242:10-243:22); Mainigi Decl. Ex. 23 (Padgett Dep. 138:15-139:15, 194:2-195:1).

[532]   Mainigi Decl. Ex. 147 at 4 (USA-00074378 (Fannie MSSC with CWB Mortgage Ventures, LLC)) (warranties apply to "each mortgage sold to [Fannie]"); Mainigi Decl. Ex. 51 at 6-15 (USA-00130972 (Freddie Mac Single Family Seller / Servicer Guide, Chapter 6.11 (excerpt) (seller warrants and represents "for each Mortgage purchased by Freddie Mac"))); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 282:4-21); Mainigi Decl. Ex. 3 (Battany Dep. 232:15 233:24); Mainigi Decl. Ex. 23 (Padgett Dep. 84:19-85:9, 201:7-25); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 252:16-253:6 (representations are "regarding individual loans, not processes" and they are "very loan-specific")).

have zero defects.[533]   They understood that every loan manufacturing process would have an

error rate, and that the "representations" was a contractual commitment that the loss attributable

to such errors would lie with Countrywide.[534]   In other words, the GSEs used the repurchase

process built into the contractual rep and warrant model as a remedy when defects were

present.[535]

**Response to Paragraph 133:** The Government does not dispute the first four sentences

in paragraph 133. The fifth sentence, beginning with "[t]he government has suggested…" is

without any factual or other support and thus does not satisfy the requirements of Fed. R. Civ. P.

56(c)(1) or Local Rule 56.1.  The Government disputes the sixth sentence in paragraph 133.

There is testimony—including within the evidence cited by Defendants for this point—stating

that the process by which a loan was originated is material to the issue of compliance with

Countrywide's representations and warranties.  Defendants cite testimony from David Battany,

but do not acknowledge the fact that while he stated "it's not [the] norm" for lenders to notify

lenders of changes in their origination processes, he made an exception for "some material

change of [the lender's] model."  Mainigi Decl. Ex. 3, Battany Tr. 233:7-12.  Defendants also

cite testimony from Pamela Padgett in support of this point, yet she stated that lenders would

need to disclose the process by which a loan was originated if the process resulted in the loan

being in breach of contract.  Mainigi Decl. Ex. 23, Padgett Tr. 201:7-21.  Moreover, Padgett

testified that the qualifications of the individual underwriting a loan could be a material fact

about that loan.  Mainigi Decl. Ex. 23, Padgett Tr. 99:8-100:3.  Finally, Freddie Mac's corporate

representative testified that the origination process through which a loan is processed

---

[533] Mainigi Decl. Ex. 13 (Forlines Dep. 71:7-17); Mainigi Decl. Ex. 3 (Battany Dep. 312:16-313:12).

[534] Mainigi Decl. Ex. 3 (Battany Dep. 313:5-12).

[535] Mainigi Decl. Ex. 3 (Battany Dep. 312:16-313:12).

"absolutely" could be a material fact about that loan and could have an impact on whether the loan was "investment quality."  Mainigi Decl. Ex. 28, Tanabe Tr. 371:12-22.  The qualifications of the individual processing and approving loans likewise could be material and impact whether the loans were "investment quality."  Mainigi Decl. Ex. 28, Tanabe Tr. 372:2-11.  The Government disputes the seventh and eighth sentences in paragraph 133 as incomplete and misleading.  While the Government agrees that the GSEs understood that there would be repurchases, it disputes that the GSEs accepted repurchases as a normal part of the contractual relationship.  When asked whether Freddie Mac expected that a certain percentage of loans would require repurchase, Freddie Mac's corporate representative answered in the negative; he explained, "We didn't have an expectation that a certain amount of loans would require repurchase.  The repurchase event was caused by noncompliance with the terms of business."  Mainigi Decl. Ex. 28, Tanabe Tr. 55:22-56:12.  The Government disputes the final statement of paragraph 133 as incomplete and misleading.  To the extent that Defendants are implying that the option to repurchase excused Countrywide from abiding by its contractual obligations, the testimony is to the contrary.  Mainigi Decl. Ex. 28, Tanabe Tr. 290:15-19;  Mainigi Decl. Ex. 27, Sullivan Tr. 308:12-22.  Moreover, all of the statements regarding repurchases are misleading in light of the testimony that Countrywide in particular did not abide by its contractual repurchase obligations, which is discussed in further detail in response to paragraph 135.

134.    The contracts between each of the GSEs and Countrywide state that GSEs may request repurchase of any loan sold to the GSEs if the GSEs determine that the loan does not comply with the terms of the applicable contracts.[536]  The contracts included provisions allowing Countrywide to respond to repurchase requests and rebut allegations that the loan violated

---

[536] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 109:4-110:17, 287:7-18); Mainigi Decl. Ex. 3 (Battany Dep. 57:14-15); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 55:6-11); Mainigi Decl. Ex. 23 (Padgett Dep. 34:3-15).

applicable contract terms.[537] If Countrywide successfully rebutted the allegations, it was not expected to repurchase the loan, and the GSE would rescind the repurchase demand.[538]

**Response to Paragraph 134:**   The Government does not dispute the first and last sentences in paragraph 134.  The Government disputes that the second sentence in paragraph 134 is supported by the materials cited, as the Freddie Mac corporate representative did not testify regarding any contractual provisions allowing Countrywide to respond to repurchase requests and rebut allegations.  *See* Mainigi Decl. Ex. 28, Tanabe Tr. 57:11-58:5.

135.    Repurchases requests were a normal and expected part of the contractual relationship between the GSEs and the lenders from whom they purchased loans.[539] Likewise, efforts by lenders to rebut repurchase requests were also standard in the industry and a regular part of the GSEs' business relationships.[540] Indeed, the contracts gave lenders the right to appeal repurchase requests.[541] The GSEs understood that not all repurchase requests were valid, and

---

[537]Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 57:11-58:5); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 111:6-112:21).

[538] Mainigi Decl. Ex. 3 (Battany 189:12-190:21); Mainigi Decl. Ex. 26 (Sobczak Dep. 62:9-19); Mainigi Decl. Ex. 17 (Hunter Dep. 71:22-73:1); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 303:16-304:22).

[539] Mainigi Decl. Ex. 17 (Hunter Dep. 69:6-15); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 55:6-14); Mainigi Decl. Ex. 10 (Connell Dep. 72:6-12); Mainigi Decl. Ex. 3 (Battany Dep. 214:1-215:4); Mainigi Decl. Ex. 26 (Sobczak Dep. 52:14-53:8); Mainigi Decl. Ex. 13 (Forlines Dep. 71:3-17); Mainigi Decl. Ex. 49 at 72-1 – 72-8 (USA-00130972 (Freddie Seller / Servicer Guide Chapter 72 (excerpt))); Mainigi Decl. Ex. 83 at I, 208.01 (Fannie Mae Single Family 2007 Selling Guide, Part I, Section 208-208.01 (excerpt)).

[540] Mainii Decl. Ex. 27 (Fannie 30(b)(6) Dep. 111:6-112:21); Mainigi Decl. Ex. 17 (Hunter Dep. 70:6-16, 76:10-17); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 57:6-10); Mainigi Decl. Ex. 49 at 72-6 (USA-00130972 (Freddie Seller Servicer Guide Chapter 72 (excerpt))); Mainigi Decl. Ex. 83 at 7 (Fannie Mae Single Family 2007 Selling Guide, Part I, Section 208-208.01 (excerpt)).

[541] Mainigi Decl. Ex. 49 at Ch. 72-6 (USA-00130982 (Freddie Seller Servicer Guide Chapter 72 (excerpt))); Mainigi Decl. Ex. 83 at Part I, 208 (Fannie Mae Single Family 2007 Selling Guide, Part I, Section 208-208.01 (excerpt)).

they did not expect lenders to repurchase every loan submitted by the GSEs for repurchase.[542]
The issuance of a repurchase request by a GSE to a lender and the subsequent rebuttal of that
request by the lender is not indicative of fraud.[543]

**Response to Paragraph 135:**  The Government disputes the first sentence of paragraph
135.  As noted in the Government's response to paragraph 133, it is not undisputed that the
GSEs accepted repurchases as a normal part of the contractual relationship.  Mainigi Decl. Ex.
28, Tanabe Tr. 55:22-56:12.  The Government does not dispute the general premise of the
second statement of paragraph 135, but does dispute it as applied to Countrywide as there was
nothing standard about how Countrywide handled repurchases with the GSEs. Mainigi Decl. Ex.
35, Chandler Tr. 83:17-21 (Countrywide habitually refused to repurchase any loans that Fannie
Mae indicated should be repurchased, and refused to implement the repurchase of loans that it
did agree to repurchase); Mainigi Decl. Ex. 28, Tanabe Tr. 67:11-20 (Countrywide was
"unreasonably slow" and "irrational" in its refusal to repurchase stated income and other loans);
Mainigi Decl. Ex. 23, Padgett Tr. 148:3-4 (Countrywide was "absolutely the . . . worst to try to
get resolution on" repurchase requests).  The Government does not dispute the third statement of
paragraph 135.  With regard to the fourth statement of paragraph 135, the Government agrees
that the GSEs did not expect lenders to purchase every loan submitted by the GSEs for
repurchase; however, this statement is incomplete and misleading in light of testimony showing
that Countrywide did not repurchase loans even when there was no valid basis for refusing to do
so.  Mainigi Decl. Ex. 35, Chandler Tr. 83:17-21, 84:7-12.  The fifth statement of paragraph 135

---

[542] Mainigi Decl. Ex. 17 (Hunter Dep. 71:22-72:15); Mainigi Decl. Ex. 3 (Battany Dep. 57:18-58:22); Mainigi Decl. Ex. 26 (Sobczak Dep. 62:9-19, 202:18-25); Mainigi Decl. Ex. 23 (Padgett Dep. 56:12-20).

[543]  Mainigi Decl. Ex. 13 (Forlines Dep. 71:19-73:5); Mainigi Decl. Ex. 17 (Hunter Dep. 76:1-17); Mainigi Decl. Ex. 3 (Battany Dep. 90:25-93:21).

sets forth a legal conclusion, not a fact and thus does not satisfy the requirements of Fed. R. Civ. P. 56(c)(1) or Local Rule 56.1.

### B. Countrywide and GSEs Communicated Frequently in the Course of Their Relationship.

136.    The GSEs communicated extensively with Countrywide on a regular basis by telephone, email, and during in-person meetings.[544]

**Response to Paragraph 136:**  The Government does not dispute the statements in paragraph 136.

137.    In addition to regular ongoing communications, the GSEs and Countrywide frequently exchanged information about credit, loan performance, and repurchases, among other topics.[545]  Additionally, the GSEs conducted periodic onsite visits at Countrywide in order to review various aspects of Countrywide's processes, including loan origination, and otherwise evaluate Countrywide's compliance with GSE contractual requirements.[546]  The GSEs also communicated regularly with Countrywide regarding their frequently changing and evolving credit standards.[547]  For instance, during the housing market decline in 2006 and 2007 and in

---

[544]   Mainigi Decl. Ex. 3 (Battany Dep. 24:8-26:25); Mainigi Decl. Ex. 26 (Sobczak Dep. 107:4-108:5); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 291:21-292:8); Mainigi Decl. Ex. 17 (Hunter Dep. 17:7-18); Mainigi Decl. Ex. 27 (Sullivan Dep. 263:11-264:9).

[545]   Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 291:21-292:8); Mainigi Decl. Ex. 17 (Hunter Dep. 188:19-189:10); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 263:11-264:9); Mainigi Decl. Ex. 26 (Sobczak Dep. 107:9-108:19).

[546]   *See e.g.,* Mainigi Decl. Ex. 52 at 1 (FNM-EDOCS-BOA_00031444 (Countrywide Q1 2007 Quarterly Business Review) (listing customer engagement meetings between Fannie and Countrywide for the first two quarters of 2007); Mainigi Decl. Ex. 3 (Battany Dep. 69:22-71:20); Mainigi Decl. Ex. 122 (FHFA11984873 (EORM review)); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 158:12-159:3, 174:14-20); Mainigi Decl. Ex. 17 (Hunter Dep. 113:3-11612,176:21-177:21, 280:20-284:13); Mainigi Decl. Ex. 4 (Biehler Dep. 16:12-18, 25:3-18, 28:8-31:9); Mainigi Decl. Ex. 153 (FNM-EDOCS-BOA_00038515 (December 2007 Fannie Mae Onsite Review Report)).

[547]   Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 264:10-267:14); Mainigi Decl. Ex. 26 (Sobczak Dep. 136:12-19); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 296:10-297:19).

response to the increasingly declining performance of Countrywide loans, Freddie Mac worked

collaboratively with Countrywide to tighten its guidelines and improve loan performance.[548]

Similarly, there was a joint effort between Fannie Mae and Countrywide in late 2007 and early

2008 to tighten credit guidelines related to certain Countrywide loans.[549]

**Response to Paragraph 137:**  The Government disputes the first two statements in

paragraph 137 as incomplete and misleading.  See U.S. SOF ¶¶ 388-419 (Countrywide lied to the

GSEs).  The Government disputes the third statement in paragraph 137, because the testimony

cited does not support the general notion—without any timeframe provided—that the GSEs'

credit standards were "frequently changing and evolving."  The Government disputes the fourth

statement in paragraph 137, which states that "Freddie Mac worked collaboratively with

Countrywide to tighten its guidelines and improve loan performance."  Freddie Mac's corporate

representative testified that Freddie Mac instructed Countrywide (and other lenders) that it was

"time to buckle up."  Mainigi Decl. Ex. 28, Tanabe Tr. 296:10-298:7.  Further, his testimony

shows that Freddie Mac was not satisfied with the steps that Countrywide took during this time

period.  Mainigi Decl. Ex. 28, Tanabe Tr. 295:1-18.  The Government also disputes the fifth

statement in paragraph 137, because there is testimony contradicting Defendants' assertion that

there was a "joint effort between Fannie Mae and Countrywide in late 2007 and early 2008 to

tighten credit guidelines related to certain Countrywide loans."  Mainigi Decl. Ex. 26,   Sobczak

Tr. 139:21-140:10  (although Countrywide eventually worked with Fannie Mae to "recalibrate

some of the variances to be better fits for the times," Countrywide's first reaction was to debate

---

[548] Mainigi Decl. Ex. 17 (Hunter Dep. 60:17-61:1); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 156:3-13, 297:2-19); Mainigi Decl. Ex. 131 at 1 (FMBOA051928 (Nov. 30, 2007 Countrywide Credit Briefing Document)).

[549] Mainigi Decl. Ex. 26 (Sobczak Dep. 26:7-27:4).

Fannie Mae's position "Did they agree with what Fannie Mae was trying to do?  Maybe not so much.").

138.    The GSE employees who interacted most frequently with Countrywide employees characterized their interactions with Countrywide as open, honest, and normal for a business relationship.  For example, David Battany, who talked to Countrywide "multiple times a day" during his six years as Fannie Mae's Director of Marketing for the Countrywide account, described the "strong respect" he had for his contacts at Countrywide and characterized their relationship as based on "trust and respect and credibility."[550] He also described Countrywide as a "tough negotiator," but characterized the relationship between Countrywide and Fannie Mae as "very high quality in terms of …the personal interactions and the quality of the personal relationships."[551]

**Response to Paragraph 138:**  The Government disputes the first sentence of paragraph 138 as not supported by admissible evidence.  The Government further disputes the additional statements contained in paragraph 138 on the grounds that, among other things, there is evidence that a senior Countrywide employee who had frequent interactions with the GSEs lied to a Freddie Mac employee, and this evidence contradicts Defendants' assertion that Countrywide behaved in an "open, honest, and normal" manner with the GSEs.

Freddie Mac's Alternative Markets Operations group ("AMO") arranged for an on-site review of Countrywide's "Specialty Lending and Full Spectrum mortgage operations" in August of 2007 as part of a subprime initiative at Freddie Mac to investigate whether to purchase subprime loans from Countrywide.  *See* Mainigi Decl. Ex. 4, Biehler Tr. 25:3-26:6; 32:6-33:22; Nawaday Decl. Ex. EX (Apr. 12, 2007, Letter from Freddie Mac to Greg Togneri re:

---

[550]  Mainigi Decl. Ex. 3 (Battany Dep. 24:14-16, 29:4-8).

[551]  Mainigi Decl. Ex. 3 (Battany Dep. 28:5-18).

Counterparty Visit) FMBOA00113909-13 at 09.  Lauren Biehler, who was a Freddie Mac senior

risk analyst in the AMO group and who was coordinating the AMO on-site review, asked

Countrywide to provide files to Freddie Mac as part of the review. Mainigi Decl. Ex. 4, Biehler

Tr. 13:15-14:1; 37:9-19; Nawaday Decl. Ex. EX (Apr. 12, 2007, letter from Freddie Mac to

Togneri) FMBOA00113909-13.  In a series of emails sent during August 2007, Biehler

repeatedly requested that Countrywide provide the loan files.  Nawaday Decl. Ex. DX (Aug. 24,

2007, Email from Biehler to Simantel) BANA-SDNY-E-000232795-809 at 797-805.

Cindy Simantel was involved with this on-site review on behalf of Countrywide,

specifically with regard to quality-control issues.  *See* Nawaday Decl. Ex. DW (Sept. 10-13,

2007, Interview Schedule Countrywide Home Loans).  Simantel was an Executive Vice

President for Quality Control and Investor Audit, and the most senior person at Countrywide

who had direct management over quality control.  Nawaday Decl. Ex. AA, Simantel Tr. 10:2-12;

13:9-16.  On September 7, 2007, after learning that 12 of the loan files that Freddie Mac had

requested for the on-site review were rated "unacceptable," Simantel instructed Countrywide

employees to delete the unacceptable loan files from a disc that Countrywide was preparing for

Freddie Mac and then to "come up with the files" later if they were able to "cure" the

defects.  Nawaday Decl. Ex. DY (Sept. 7, 2007, Email from Simantel) BANA-SDNY-E-

009191642-45 at 45.  The number was reduced to 11 after one loan was apparently cured, and it

was added back to the disc.  Nawaday Decl. Ex. EA (Sept. 7, 2007, Email from Krystal Jones)

BANA-SDNY-E-009191647-51 at 47.

Biehler asked about the 11 missing loan files, and Simantel responded, "Lauren, per our

discussion these 11 files are not available yet for review in our imaging system.  We are working

on it."  Nawaday Decl. Ex. EB (Sept. 11, 2007, Email from Cindy Simantel) BANA-SDNY -E-

009191655-57 at 55; Nawaday Decl. Ex. AA, Simantel Tr. 161:3-13 (Q:  Okay.  Didn't you have

electronic copies of these files on a disk ready to give to Freddie Mac?  A:  I had electronic

copies of the file on a disk, yes.  Q:  And you had them removed from the disk?  A:  Yes.  So I

could do further review, yes.").  In an email to her supervisor Rod Williams the next day,

Simantel explained her reasoning for lying to Freddie Mac about these 11 loan files:

> Rod, as a FYI if it comes up as an issue with FHLMC.  We did not
> provide them with 11 loan files they requested as part of their due
> diligence review of sub-prime new originations (August
> fundings).  We did not provide all the requested loan files as our
> Q.C. group reviewed them, before providing copies, and
> determined significant discrepancies in the loans which included
> misrepresentation (income, assets and credit), flips, and
> significantly over valued properties.  It was my belief we were
> better off telling FHLMC we hadn't been able to get the loan files
> for them as they were not imaged yet than letting them look at
> them and determine they were unacceptable quality.  If you
> disagree with this I will of course provide them the files, otherwise
> I am going to continue along this path.  Thanks

Nawaday Decl. Ex. EW (Sept. 12, 2007, Email from Cindy Simantel) BANA-

SDNY-E-000234344.

Simantel never provided the loan files, and lied again to Freddie Mac by stating that the

loan files were "missing," "not yet imaged and unavailable for us to provide."  Nawaday Decl.

Ex. EC (Sept. 12, 2007, Email from Cindy Simantel) BANA-SDNY-E-009191658.  Various

Freddie Mac employees who reviewed the September 13 email from Simantel to Williams

agreed that this was a lie.  *See* Mainigi Decl. Ex. 28, Tanabe Tr. 264:10-265:2 (describing the

email as "astounding" because "[i]t's obvious deception and manipulation"); Mainigi Decl. Ex.

23, Padgett Tr. 188:13-189:7; 212:18-214:1 (testifying that the scenario described in the email

represented a lie and that she was "absolutely stunned to read [it]" and felt "violated or maybe

too trusting"); Nawaday Decl. Ex. N, Hunter Tr. 208:22-209:15 (agreeing that this represented a

lie).

The Government further disputes the statements in paragraph 138, because a Fannie Mae

employee testified that he was not aware of the HSSL until a few months prior to his deposition

in this case.  Mainigi Decl. Ex. 3, Battany Tr. 147:13-148:6.  If he was not aware that something

was being hidden from him, he would not be able to speak to whether Countrywide was honest and forthcoming about it.

139.   Michael Sobczak, a Fannie Mae employee who — at one point during his tenure on the Countrywide account — spent up to four hours a day, three to four days a week onsite at Countrywide's offices, testified that he did not work with anyone at Countrywide whom he did not believe to be honest and forthcoming.[552]   He also testified that he never felt like anyone at Countrywide hid anything from him or was untruthful.[553]

**Response to Paragraph 139:**   The Government disputes the statements in paragraph 139, because Michael Sobczak also testified that he was not aware of the HSSL until this litigation.  Mainigi Decl. Ex. 26, Sobczak Tr. 142:13-25.  If he was not aware that something was being hidden from him, he would not be able to speak to whether Countrywide was honest and forthcoming about it.

140.   Dusty Tanabe, who managed credit risk for the Countrywide account at Freddie Mac, said that "most of the people we dealt with [at Countrywide] meant well.  They tried to represent accurately.  They tried to initiate the right action."[554]

**Response to Paragraph 140:**   The Government disputes the statements in paragraph 140.  Mainigi Decl. Ex. 28, Tanabe Tr. 218:11-22 ("I think in the operating units, it was a different story. . . . So I want to make sure that there is a nuance in there that I am distinguishing sort of the intent and the willingness and the openness and the transparency of most of the people we worked with versus the actual result."); *see also* Mainigi Decl. Ex. 28, Tanabe Tr. 264:10-22 (describing the email as "astounding" because "[i]t's obvious deception and manipulation").

---

[552]  Mainigi Decl. Ex. 26 (Sobczak Dep. 60:14-16, 62:5-8).

[553]  Mainigi Decl. Ex. 26 (Sobczak Dep. 49:12-18).

[554]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 218:5-9).

141.     James Hunter, Freddie Mac's account manager in charge of the Countrywide relationship, interacted with his counterparts at Countrywide by telephone or email multiple times a week and met with them in person every four to six weeks.[555]   Mr. Hunter felt that he had an open and honest dialogue with his contacts at Countrywide and characterized his relationship with Countrywide as a normal business relationship.[556]

**Response to Paragraph 141:**  The Government does not dispute the first statement in paragraph 141.  The Government disputes the second statement in paragraph 141, in light of testimony by James Hunter that the email sent by Simantel to Williams described above in response to paragraph 138 made him "adjust that perception."  Nawaday Decl. Ex. N, Hunter Tr. 208:6-20.

### C.     The GSEs Worked With Countrywide to Tighten Underwriting Guidelines.

142.     In the 2005 and 2006 time period, both Freddie Mac and Fannie Mae sought to maintain or grow their market share by purchasing riskier loan products—such as stated income and Alt-A loans—from mortgage lenders, including Countrywide.[557]

**Response to Paragraph 142:**  The Government disputes that the statement in paragraph 142 is supported by the materials cited.  *See* Mainigi Decl. Ex. 28, Tanabe Tr. 241:19-21 ("I don't remember a program that said- that had the explicit goal of increasing our share of the Alt-A market.").  The Government disputes that the statement in paragraph 142 is a material fact within the meaning of Fed. R. Civ. P. 56.

143.     However, in late 2007, it became clear that the housing market was weakening, and the performance of stated income loans began to decline.[558]   In response, the GSEs and

---

[555]  Mainigi Decl. Ex. 17 (Hunter Dep. 17:4-18).

[556] Mainigi Decl. Ex. 17 (Hunter Dep. 19:2-7, 21:4-11).

[557] Mainigi Decl. Ex. 26 (Sobczak Dep. 38:11-39:25); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 241:22-242:2).

lenders tightened their underwriting guidelines, and by the end of 2008, most stated income

programs were eliminated.[559]   Countrywide worked cooperatively with the GSEs in this

tightening effort, and it is beyond dispute that Countrywide tightened its underwriting guidelines

beginning in the fall of 2007.[560]

**Response to Paragraph 143:**  The Government disputes the first statement in paragraph

143 as incomplete and misleading.  First, footnote 558 provides no support for the assertion that

"the performance of stated income loans began to decline."  *See* Mainigi Decl. Ex. 28, Tanabe

Tr. 292:21-293:4.  Tanabe testified about the decline of stated-income loans in this time period,

and he explained that Countrywide's stated-income produce Fast and Easy performed worse than

other stated-income products and also "[u]nderperformed expectations" based on how it was

modeled.  *See* Mainigi Decl. Ex. 28, Tanabe Tr. 120:14-124:13.  The Government does not

dispute the second statement in paragraph 143.  With regard to the third statement in paragraph

143, the Government disputes that Countrywide worked "cooperatively with the GSEs in this

tightening effort" for the reasons set forth in the response to paragraph 137.  The Government

does not dispute that Countrywide tightened some of its guidelines in the fall of 2007 at the

behest of the GSEs; however, Countrywide did the opposite with regard to the HSSL and Central

---

[558]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 292:21-293:4).

[559]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 133:2-134:22); Mainigi Decl. Ex. 13 (Forlines Dep. 104:8-12).

[560]  Mainigi Decl. Ex. 28 (Sobczak Dep. 25:19-26:15 (describing "collaborative effort between Fannie and Countrywide" to tighten Countrywide product)); Mainigi Decl. Ex. 124 at FHFA01104880-81 (FHFA01104866 (2008 Proposed Terms of Business Briefing Documents) (summarizing Countrywide's planned credit actions)); Mainigi Decl. Ex. 131 (FMBOA051928 (Nov. 30, 2007 Countrywide Credit Briefing Document) ("CW began tightening their guidelines and enhancing their processes before most other lenders and these actions led, at least in part, to the meaningful performance improvement in 2007.")); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 156:3-157:7, 249:8-250:12, 291:12-292:3, 294:11-21 (Freddie was not just relying on Countrywide's representations that it was tightening its guidelines, but by the end of November "began to see proof")); Mainigi Decl. Ex. 17 (Hunter Dep. 57:15-61:16); Mainigi Decl. Ex. 13 (Forlines Dep. 122:7-123:7).

Fulfillment.  *See, e.g.*, Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Conventional

Technical Manual CTM and Loan Program Guides LPG) BANA_SDNY-C-000131805-829

(describing CLUES); Nawaday Decl. Ex. AY (Aug. 2, 2007, FSL Prime Business Model Review)

BANA-SDNY-E-000053091-98 at 95 (listing HSSL design key features as "No more returns –

one-way traffic," "CLUES underwrites – no U/W handoff," "Expanded authority at line staff

level," "Minimal handoffs," "Simplified Condition clearing"); Nawaday Decl. Ex. B, Ballance

Tr. 10:13-24; 31:1-18 ("The High Speed Swim Lane . . . was pretty much designed to bypass

underwriting.  It was felt that underwriting was slowing things down.").

### D.    The GSEs Knew About the HSSL Process.

144.    Countrywide provided Fannie Mae and Freddie Mac with information regarding

the FSL division's use of the HSSL and Central Fulfillment process.[561]

**Response to Paragraph 144:**  The Government disputes the statement in paragraph 144.

Mainigi Decl. Ex. 26, Sobczak Tr. 142:13-25; Mainigi Decl. Ex. 27, Sullivan Tr. 278:10-19;

279:19-280:18; Mainigi Decl. Ex. 23, Padgett Tr. 69:3-5; 221:16-22; Mainigi Decl. Ex. 28,

Tanabe Tr. 213:4-10; 312:17-313:9; Mainigi Decl. Ex. 3, Battany Tr. 147:13-22; Mainigi Decl.

Ex. 35, Chandler Tr. 100:22-101:8;  Mainigi Decl. Ex. 13,  Forlines Tr. 190:10-191:4, Nawaday

Decl. Ex. Z,  Shumate Tr. 67:5-68:4.

---

[561]   Mainigi Decl. Ex. 4 (Biehler Dep. 116:18-118:21, 120:9-15); Mainigi Decl. Ex. 93
(FHFA11681864 (Freddie FSL presentation with Biehler notes)); Mainigi Decl. Ex. 94 (BANA-
SDNY-E-002913047 (Freddie FSL presentation)); Mainigi Decl. Ex. 206 (BANA-SDNY-E-
000099234 (Simantel email to Stocky and Biehler with Freddie FSL presentation)); Mainigi
Decl. Ex. 28 (Freddie 30(b)(6) Dep. 182:14-184:1, 186:2-187:11, 196:12-197:5, 209:7-213:3,
215:11-15, 314:14-19); Mainigi Decl. Ex. 120 (FHFA00371985 (AMO review)); Mainigi Decl.
Ex. 17 (Hunter Dep. 265:1-7); Mainigi Decl. Ex. 92 at 13 (FMBOA01469796 (Biehler notes
from AMO review)); Mainigi Decl. Ex. 148 (FNM-BOA-052420 (FSL presentation to Fannie));
Mainigi Decl. Ex. 26 (Sobczak Dep. 228:6-231:10); Mainigi Decl. Ex. 85 (FNM-BOA-025908
(loan file excerpts)); Mainigi Decl. Ex. 174 (FNM-EDOCS-BOA_00052467 (April 24, 2008
Manufacturing Quality Initiatives presentation); *see also* Mainigi Decl. Ex. 26 (Sobczak Dep.
72:22-73:19 (describing similar process in other Countrywide division)); Mainigi Decl. Ex. 140
(FNM-BOA 052377 (Dec. 10, 2007 CMD presentation)).

145.    In September 2007, Freddie's Alternative Market Operations ("AMO") group and its External Operations Risk Management ("EORM") group conducted onsite reviews of Countrywide.[562] In advance of those reviews, FSL prepared a PowerPoint presentation providing an overview of the division's operations, including its underwriting controls and processes.[563] The presentation disclosed FSL's transition to a centralized operations model as part of its shift from subprime to prime loan origination.[564]   That same presentation also included a description of the features of the HSSL process—identifying it as **"Prime CLUES Accept/High Speed Swim Lane CSO – PCA/HSSL"**—and noted that "CLUES analyzes credit and financial information and after applying program-specific rules, provides the user with an underwriting decision of Accept or a recommendation of Refer (to an underwriter)."[565]   The presentation indicates that Countrywide considered clearing underwriting conditions to be an operations function performed by branch and central operations employees—not just underwriters.[566]

**Response to Paragraph 145:**  The Government does not dispute the first statement of paragraph 145.  The Government disputes the second statement of paragraph 145, because the purported "overview of the division's operations, including its underwriting controls and processes" provided by this presentation was incomplete, misleading, and contained misrepresentations.  The presentation failed to disclose the various aspects of the HSSL design that those involved knew would or could undermine quality, including but not limited to the use

---

[562]  Mainigi Decl. Ex. 122 (FHFA11984873 (EORM review)); Mainigi Decl. Ex. 120 (FHFA00371985 (AMO review)).

[563] Mainigi Decl. Ex. 94 (BANA-SDNY-E-002913047 (Freddie FSL presentation)).

[564] Mainigi Decl. Ex. 94 at 8, 13-14, 26-27 (BANA-SDNY-E-002913047 (Freddie FSL presentation)).

[565] Mainigi Decl. Ex. 94 at 26-27 (BANA-SDNY-E-002913047 (Freddie FSL presentation)).

[566]  Mainigi Decl. Ex. 94 at 14 (BANA-SDNY-E-002913047 (Freddie FSL presentation)).

of inexperienced loan specialists, the "grandfathering" of loan specialists to higher authority levels, the elimination of checklists, the turn-time goal of approximately two weeks, the suspension of QOG, the turn-time bonus, or the Sprint Incentive.  Nawaday Decl. Ex. EY (Sept. 12, 2007, FHLMC Subprime Review) Native of BANA-SDNY-E-002913047 at slides 13, 14, 17 (failing to disclose aspects of HSSL design that would undermine quality, "grandfathering" of loan specialists, turn-time goals, and elimination of checklists).

The Government disputes the third statement in paragraph 145 because the pages of the presentation cited do not prove that FSL disclosed to Freddie Mac that the transition to a centralized operations model was "part of" the shift from subprime to prime loan origination. For the reasons discussed above in response to the second statement, the Government disputes the fourth statement of paragraph 145, that this presentation "included a description of the features of the HSSL process."  The presentation's only mention of the HSSL is a column (in small type) included in a chart on the last page of the presentation's appendix.  Nawaday Decl. Ex. EY (Sept. 12, 2007, FHLMC Subprime Review) BANA-SDNY-E-002913047.  This column contains no description of the "features" of the HSSL as described above, and Biehler, on whose testimony Defendants rely (as discussed in further detail in paragraph 146), admitted that her notes written on the FSL presentation itself and her separate notes contain no reference to the HSSL (even though she stated that she took notes on "all information" to have a "complete picture"); Mainigi Decl. Ex. 4, Biehler Tr. 198:1-15, 200:6-15, 200:22-201:4, 202:17-205:5; that she did not remember any discussion of the HSSL, Mainigi Decl. Ex. 4, Biehler Tr. 205:17-20; and that she did not even know what was meant by the term "high speed swim lane," or "HSSL," Mainigi Decl. Ex. 4, Biehler Tr. 118:22-119:2.  In addition, Beihler is not a credible witness. Mainigi Decl. Ex. 4, Biehler Tr. 11:12-18 (currently in a vice president role at Bank of America); Mainigi Decl. Ex. 4, Biehler Tr. 209:21-210:6 (she left Freddie Mac because she was "unhappy"); Mainigi Decl. Ex. 4, Biehler Tr. 211:17-219:18 (she spoke with Bank of America's

counsel in this case prior to her deposition); Mainigi Decl. Ex. 4, Biehler Tr. 221:18-222:6 (Bank of America is paying for her attorney); Mainigi Decl. Ex. 4, Biehler Tr. 223:15-224:21 (Bank of America's counsel in this case helped prepare her for her deposition as to her work for Freddie Mac).

The Government further disputes the fourth statement in paragraph 145 as misleading. First, the footnote citation implies that this statement is set forth on pages 26-27 of the presentation, when in fact it is set forth on page 10. Second, there is no connection made in the presentation between the reference on page 27 (the last page of the appendix) to the HSSL and the citation on page 10. Moreover, as a Fannie Mae employee testified with regard to this same phrase included in a presentation to Fannie Mae (which did not reference the HSSL), it does not provide any information as to the qualifications or compensation of the individuals entering the data, nor does it necessarily mean that an underwriter could not have been involved in clearing conditions for "Accept" decisions, depending on the "nature of the condition." Mainigi Decl. Ex. 26, Sobczak Tr. 246:12-250:6.

Finally, the Government disputes the last statement of paragraph 145. The page of the presentation cited does not contain any context for the types of loans to which this refers, whether underwriters played any role in the process, the training and experience of the operations employees who were ostensibly clearing conditions, the types of conditions covered, or any other relevant information that would have allowed Freddie Mac to have a complete (or any) understanding of the changes being implemented. Nawaday Decl. Ex. EZ (Dec. 13, 2007, Countrywide FNMA Site Review) Native of BANA-SDNY-E-000114232-255. This page also does not in any way reference the HSSL, nor does it contain any reference to the features of the HSSL referenced earlier in this response.

146.    Countrywide emailed a copy of this presentation to Freddie Mac's AMO and EORM review leaders in advance of the onsite reviews.[567]   Countrywide also provided hard copies and a verbal explanation of this presentation to Freddie Mac's AMO team during its onsite review.[568]

**Response to Paragraph 146:**  The Government disputes the first sentence in paragraph 146 as there is no evidence that the two email recipients were "AMO and EORM review leaders."  Nawaday Decl. Ex. ER (Sept. 2007, Freddie Mac Subprime Origination Operational Review) FHFA00371985-372000 at 372000 (four Freddie Mac participants in AMO review do not include Barbara Stocky and Lauren Biehler is identified only as a Risk Analyst); Nawaday Decl. Ex. AQ (Nov. 15, 2007, Freddie Mac External Operational Risk On-Site Review for Countrywide Home Loans) FHBOA00774037-4063 at 38 (nine Freddie Mac participants in EORM review do not include Lauren Biehler).  The Government disputes the second sentence in paragraph 146 as incomplete, misleading, and unsupported by the materials cited because Lauren Biehler, on whose testimony and notes Defendants solely rely, admitted that her notes written on the FSL presentation itself and her separate notes contain no reference to the HSSL (even though she stated that she took notes on "all information" to have a "complete picture"), Mainigi Decl. Ex. 4, Biehler Tr. 198:1-15; Mainigi Decl. Ex. 4, Biehler Tr. 200:6-15; Mainigi Decl. Ex. 4, Biehler Tr. 200:22-201:4; Mainigi Decl. Ex. 4, Biehler Tr. 202:17-205:5; that she did not remember any discussion of the HSSL, Mainigi Decl. Ex. 4, Biehler Tr. 205:17-20; and that she did not even know what was meant by the term "high speed swim lane," or "HSSL," Mainigi Decl. Ex. 4, Biehler Tr. 118:22-119:2; *see also* Mainigi Decl. Ex. 4, Biehler Tr. 205:17-20 ("Q:

---

[567]  Mainigi Decl. Ex. 206 (BANA-SDNY-E-000099234 (Simantel email to Stockey and Biehler with Freddie FSL presentation)).

[568]  Mainigi Decl. Ex. 93 (FHFA11681874 (Freddie FSL presentation with Biehler notes)); Mainigi Decl. Ex. 4 (Biehler Dep. 116:18-118:6).

Just to be clear, it's your testimony you don't remember any discussion about this appendix to this presentation; is that correct? A: Not that I can remember."). Finally, Biehler is not credible for the reasons listed in the Government's response to paragraph 145.

147. Freddie Mac's AMO review team took handwritten notes reflecting FSL's oral presentation about FSL's origination processes.[569] These notes state that FSL was "certifying processors on lower risk loans w/ CLUES Accept to approve/clear loans for closing."[570] A representative from the AMO team later testified that she understood FSL's presentation to mean that "loan processors would be able to—based off of a CLUES Accept, could approve and/or clear loans' conditions to get them through to closing."[571]

**Response to Paragraph 147:** The Government disputes the statements in paragraph 147 as incomplete and misleading. As explained above in the Government's response to paragraph 145, the handwritten notes on which Defendants rely contain no reference to the HSSL. Moreover, Biehler testified that as to the statement regarding loan processors approving/clearing loans for closing, her notes contain no information as to what kinds of "lower-risk loans" were covered by this statement, the training the processors received, or how they were compensated. Mainigi Decl. Ex. 4, Biehler Tr. 258:17-259:21. Biehler did not remember anything about this issue beyond this single line in her notes. Mainigi Decl. Ex. 4, Biehler Tr. 260:1-262:10. In fact, the only thing Biehler recalled about this presentation were "the participants in the room." Mainigi Decl. Ex. 4, Biehler Tr. 262:11-13. Finally, Biehler is not credible for the reasons listed in the Government's response to paragraph 145.

---

[569] Mainigi Decl. Ex. 92 at 13 (FMBOA1469796 (Biehler notes from AMO review)).

[570] Mainigi Decl. Ex. 92 at 13 (FMBOA1469796 (Biehler notes from AMO review)).

[571] Mainigi Decl. Ex. 4 (Biehler Dep. 229:2-13).

148.     Freddie's AMO team prepared a report summarizing its onsite review of Countrywide.[572]   The report notes that "FSL is moving towards a Central Operations Fulfillment Platform and will be consolidating the 300 retail branches, reduce [sic] total staff by 20%, and will centralize operations into three call centers located in Chandler, AZ, Richardson, TX, and Rolling Meadows, IL."[573] The report also discusses FSL's shift from subprime to prime loan origination.[574]

**Response to Paragraph 148:**   The Government disputes that the facts contained in paragraph 148 are material within the meaning of Fed. R. Civ. P. 56.  As to the first statement, the Government disputes it as incomplete and misleading in light of testimony that the report could potentially have changed if Countrywide had not hidden loan files from Freddie Mac as described in the Government's response to paragraph 138.  *See* Mainigi Decl. Ex. 4, Biehler Tr. 173:6-175:1.  Moreover, the Government disputes the statements because the presentation on which the report was based was incomplete, misleading, and contained misrepresentations as described in the Government's response to paragraph 145.

149.     Countrywide disclosed the key elements of the HSSL process to Fannie as well. As an initial matter, it disclosed that another Countrywide division, CMD, was employing loan specialists to clear and close certain loans that its automated underwriting system had approved, just as in the HSSL process within FSL.[575]   As Fannie executive Michael Sobczak testified, he was aware that many lenders, including Countrywide, used loan processors to "essentially underwrite" conditions in order to close loans.[576]   He understood that "as long as the loan

---

[572]  Mainigi Decl. Ex. 120 (FHFA00371983 (AMO review)).

[573]  Mainigi Decl. Ex. 120 at FHFA00371990 (FHFA00371983 (AMO review)).

[574]  Mainigi Decl. Ex. 120 at FHFA00371990 (FHFA00371983 (AMO review)).

[575]  Mainigi Decl. Ex. 140 (FNM-BOA_052390 (Dec. 10, 2007 CMD presentation)).

[576]  Mainigi Decl. Ex. 27 (Sobczak Dep. 71:1-15).

processor met the requirements of Desktop Underwriter or CLUES . . . that was sufficient" to originate a loan."[577]   In addition, during Fannie's December 2007 onsite review of Countrywide, the Full Spectrum Lending division made a presentation to Fannie personnel and informed them of its transition to from subprime to prime originations.[578]   The presentation also disclosed FSL's transition to a centralized operations model.[579]   Like Countrywide's presentation to Freddie, the Fannie PowerPoint included a description of the HSSL process and noted that "CLUES analyzes credit and financial information and after applying program-specific rules, provides the user with an underwriting decision of Accept or a recommendation of Refer (to an underwriter)."[580]   The presentation also indicates that Countrywide permitted operations employees, as opposed to underwriters, to clear certain conditions in order to close a loan.[581]

   **Response to Paragraph 149:** The Government disputes the statements in paragraph 149. First, any implication that there was a disclosure about the HSSL as part of the CMD presentation that is referenced is misleading, as the CMD presentation contains no reference to the HSSL and no description of the various aspects of the HSSL that undermined loan quality. *See* Mainigi Decl. Ex. 140 (Dec. 10, 2007, CMD Underwriter Review) FNM-BOA_052390. Second, as explained in the Government's response to paragraph 145, Sobczak testified that the phrase Defendants rely on regarding CLUES "Accept" decisions does not provide any information as to the qualifications or compensation of the individuals entering the data, nor does it necessarily mean that an underwriter could not have been involved in clearing conditions for

---

[577]  Mainigi Decl. Ex. 26 (Sobczak Dep. 73:22-74:7); Mainigi Decl. Ex. 148 at 10 (FNM-BOA-052420 (Fannie FSL presentation)).

[578]  Mainigi Decl. Ex. 148 at 7-8 (FNM-BOA-052420 (Fannie FSL presentation)).

[579]  Mainigi Decl. Ex. 148 at 13-14 (FNM-BOA-052420 (Fannie FSL presentation)).

[580]  Mainigi Decl. Ex. 148 at 10 (FNM-BOA-052420 (Fannie FSL presentation)).

[581]  Mainigi Decl. Ex. 148 at 14 (FNM-BOA-052420 (Fannie FSL presentation)).

"Accept" decisions, depending on the "nature of the condition."  Mainigi Decl. Ex. 26, Sobczak

Tr. 246:12-250:6.  Finally, the December 2007 presentation did not include a "description of the

HSSL process."  *See* Mainigi Decl. Ex. 148 (Dec. 13, 2007, FNMA Site Review) BANA-SDNY-

E-000114232.  Rather, as with the Freddie Mac presentation discussed in paragraph 145, the

presentation to Fannie Mae failed to disclose the existence of the HSSL or the various aspects of

the HSSL design that those involved knew would or least could undermine quality, including but

not limited to the use of inexperienced loan specialists, the "grandfathering" of loan specialists to

higher authority levels, the elimination of checklists, the turn-time goal of 14 days, the

suspension of QOG, the turn-time bonus, or the Sprint Incentive.  *See* Mainigi Decl. Ex. 148

(Dec. 13, 2007, FNMA Site Review) BANA-SDNY-E-000114232.  Unlike the Freddie Mac

presentation, the Fannie Mae presentation does not contain even a single reference to the HSSL.

*See* Mainigi Decl. Ex. 148 (Dec. 13, 2007, FNMA Site Review) BANA-SDNY-E-000114232.

150.     Countrywide further explained FSL's operations to Fannie in an April 24, 2008

PowerPoint presentation.[582]  In that presentation, Countrywide disclosed manufacturing quality

issues that FSL had encountered in 2007 and the quality-assurance process FSL had implemented

in the first quarter of 2008 to mitigate those issues.[583]  In addition, loan files that

Countrywide provided to Fannie in 2010 include explicit references to HSSL loan specialists and

their roles in loan origination.[584]  For example, one loan file reflects August 2007 notes by

Laurie Smith, an HSSL loan specialist, explaining her determination that the income stated by

the borrower on that loan was reasonable.[585]

---

[582]  Mainigi Decl. Ex. 174 (FNM-EDOCS-BOA_00052467 (Apr. 24, 2008 Manufacturing
Quality Initiatives presentation.)).

[583]  Mainigi Decl. Ex. 174 (FNM-EDOCS-BOA_00052467 (Apr. 24, 2008 Manufacturing Quality
Initiatives presentation.)).

[584]  Mainigi Decl. Ex. 85 at 1, 3 (FNM-BOA 025908 (loan file excerpts)).

[585]  Mainigi Decl. Ex. 85 at 1 (FNM-BOA 025908 (loan file excerpts)).

**Response to Paragraph 150:**  The Government disputes the statements in paragraph 150. *See* Mainigi Decl. Ex. 174 (Apr. 24, 2008, Countrywide Manufacturing Quality Initiatives) FNM-EDOCS-BOA-00052467 (containing only one reference to FSL Division and no description of QA results or "manufacturing quality issues"); Mainigi Decl. Ex. 85 (Aug. 28, 2007, Loan Level Notes) FNM-BOA-025908 (nowhere describing the HSSL, defining HSSL Loan Specialist, or explaining the role of a loan specialist within the HSSL); Mainigi Decl. Ex 27, Sullivan Tr. 343:8-345:2 (noting that page was contained within a loan file that was "hundreds of pages" thick and stating, on behalf of Fannie Mae, "I don't know that Fannie Mae would have known what HSSL was. I also would just say on the Bates No. 096152, that – I don't know that, you know, there is a neighborhood code ABN. There is some abbreviations that I'm not sure Fannie Mae would have knowledge of, detailed underwriting file of every abbreviation that was in a file."); Mainigi Decl. Ex 27, Sullivan Tr. 376:1-3 ("I don't think that having an abbreviation print out in a loan file would constitute notification."); Mainigi Decl. Ex. 26, Sobczak Tr. 230:5-13 ("Because the document was in the file does not necessarily mean it's acknowledged by a Fannie Mae reviewer as being in the file. And the HSSL moniker may or may not have triggered someone at Fannie Mae to ask the question what is HSSL? So I'm hesitant to say that because these notes were in the file, Fannie Mae, number one, saw it, and, number two, if it did, acknowledge the HSSL identifier."); Mainigi Decl. Ex. 26, Sobczak Tr. 239:4-240:14 (confirming that loan file excerpt with the words "HSSL Loan Specialist" does not define or describe the HSSL or give any indication of the streamlined procedures or underwriting practices involved or not involved).

### E.  Contractual Repurchase Agreements Are Inconsistent with Intent To Defraud.

151.     As loan performance declined and loan defaults increased in 2007 and 2008, the

number of repurchase requests issued by the GSEs increased to lenders generally.[586]

**Response to Paragraph 151:**  The Government does not dispute the statement in paragraph 151, but disputes that the facts it contains are material within the meaning of Fed. R. Civ. P. 56.

152.    During the 2006 to 2008 time period, both GSEs were aware that Countrywide objected to repurchase requests more than other lenders, and repurchase requests were a recognized source of tension between Countrywide and both GSEs.[587]  Countrywide explicitly stated its frequent disagreement with the GSEs' interpretations of the contracts in the context of repurchases and to the rep and warrant model generally.[588]  The GSEs had remedies they could have exercised in the face of Countrywide's refusal to repurchase certain loans that it did not agree violated the terms of the contracts.[589] These remedies included tightening up the terms of the contracts, not granting Countrywide variances or waivers, or suspending and/or terminating

---

[586] Mainigi Decl. Ex. 3 (Battany Dep. 58:23-59:9); Mainigi Decl. Ex. 26 (Sobczak Dep. 88:1-4); Mainigi Decl. Ex. 17 (Hunter Dep. 67:5-9).

[587] Mainigi Decl. Ex. 26 (Sobczak Dep. 47:24-48:3; 219:23-221:2); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 297:4-299:6); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 66:21-67:16, 69:10-70:1); Mainigi Decl. Ex. 131 (FMBOA051928 (Nov. 30, 2007 Countrywide Credit Briefing Document)); Mainigi Decl. Ex. 59 at 4 (FNM-EDOCS-BOA 00068455 (Countrywide briefing memo for D. Mudd)).

[588] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 324:6-325:16); Mainigi Decl. Ex. 26 (Sobczak Dep. 62:20-63:9); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 160:17-161:10); Mainigi Decl. Ex. 59 at 4 (FNM-EDOCS-BOA 00068455 (Countrywide briefing memo for D. Mudd)).

[589]  Mainigi Decl. Ex. 26 (Sobczak Dep. 202:15-204:4); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 70:1-16, 166:12-167:15, 225:3-17).

their contracts with Countrywide.[590]   However, neither of the GSEs exercised these remedies, and both continued to purchase loans from Countrywide.[591]

      **Response to Paragraph 152:**   The Government disputes that Countrywide's refusal to repurchase loans was based on "disagreement with the GSEs' interpretations of the contracts." *See* Mainigi Decl. Ex. 28, Tanabe Tr. 67:11-20 (explaining that Countrywide was "irrational" in its refusal to repurchase stated income and other loans from Freddie Mac); Mainigi Decl. Ex. 23, Padgett Tr. 55:3-6 (Countrywide "sought continually to find ways out on a thematic basis to avoid honoring the reps and warrants to [Freddie Mac] around the delegated underwriting model"); Mainigi Decl. Ex. 35, Chandler Tr. 83:21-84:1 ("[E]ven in the event that they [Countrywide] agreed to repurchase a loan [from Fannie Mae] or they agreed that a loan had been defective in its underwriting or fraudulently originated, they would either refuse the obligation or refuse to fulfill what – the obligation to repurchase the loan or wire money."); Mainigi Decl. Ex. 35, Chandler Tr. 86:9-16 ("The refusal to repurchase was explicitly…a tactic to try to force Fannie Mae to revise its rep and warranty model for repurchases.").   The Government disputes that the statements in paragraph 152 regarding possible remedies available to the GSEs are material within the meaning of Fed. R. Civ. P. 56.

      153.    Despite its disagreement with Freddie Mac's repurchase demands, Countrywide honored all repurchase requests that Freddie Mac did not rescind.[592]   Moreover, the percentage of loans Countrywide repurchased from Freddie Mac was comparable to the percentage of loans repurchased by other lenders.[593]

---

[590] Mainigi Decl. Ex. 26 (Sobczak Dep. 202:15-204:4); Mainigi Decl. Ex. 23 (Padgett Dep. 198:6-14).

[591] Mainigi Decl. Ex. 23 (Padgett Dep. 198:15-19); Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 69:17-71:11); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 324:6-325:16).

[592] Mainigi Decl. Ex. 17 (Hunter Dep. 75:12-21).

[593] Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 303:16-304:22).

**Response to Paragraph 153:**  The Government disputes the statements in paragraph 153.  First, Freddie Mac's corporate representative Benjamin Tanabe testified that Countrywide did not repurchase all of the loans that it was required to repurchase from Freddie Mac under the relevant contracts.  Mainigi Decl. Ex. 28, Tanabe Tr. 300:22-301:6.  Second, Tanabe also testified that he would expect Countrywide to have a higher repurchase percentage vis-à-vis the volume it was selling to Freddie Mac, as compared to other lenders.  Mainigi Decl. Ex. 28, Tanabe Tr. 302:5-22.  Finally, the Government disputes the second statement in paragraph 153 as immaterial.

154.   Fannie Mae recognized that Countrywide was a tenacious negotiator and ultimately repurchased a smaller percentage of loans than did other lenders.[594]   However, Michael Sobczak, the Fannie Mae employee whose team had primary responsibility for repurchase negotiations with Countrywide between 2006 and mid-2008, testified that Countrywide did not hide anything from Fannie Mae in terms of repurchases and argued from a thoughtful and factual perspective.[595]   He testified that Countrywide was open and fair in its repurchase dealings with Fannie Mae.[596]   Sobczak confirmed that there was a certain group of loans that Countrywide would always repurchase and that the disagreements between Fannie Mae and Countrywide with respect to other loans were based on differing interpretations of the governing contracts.[597]

**Response to Paragraph 154:**  The Government disputes the statements in paragraph 154.  *See* Mainigi Decl. Ex. 35, Chandler Tr. 83:21-84:1 ("even in the event that they [Countrywide] agreed to repurchase a loan [from Fannie Mae] or they agreed that a loan had

---

[594]  Mainigi Decl. Ex. 26 (Sobczak Dep. 108:20-109:6).

[595]  Mainigi Decl. Ex. 26 (Sobczak Dep. 49:12-50:6).

[596]  Mainigi Decl. Ex. 26 (Sobczak Dep. 49:12-50:6).

[597]  Mainigi Decl. Ex. 26 (Sobczak Dep. 61:17-63:14).

been defective in its underwriting or fraudulently originated, they would either refuse the obligation or refuse to fulfill what – the obligation to repurchase the loan or wire money."); Mainigi Decl. Ex. 35, Chandler Tr.  86:9-16 ("The refusal to repurchase was explicitly . . . a tactic to try to force Fannie Mae to revise its rep and warranty model for repurchases.").  The Government also disputes that the statements in paragraph 154 are material within the meaning of Fed. R. Civ. P. 56.

155.    Freddie's 30(b)(6) representative testified that Countrywide was "unreasonably slow and . . . irrational in their interpretation of the contract[s]" regarding repurchases.[598] Despite this testimony, Freddie's 30(b)(6) witness ultimately conceded that Countrywide repurchased loans from Freddie at a rate comparable to Freddie's other lenders.[599]

**Response to Paragraph 155:**  The Government disputes the statements in paragraph 155, for the reasons set forth in its response to paragraph 153.

156.    The GSEs never invoked their contractual repurchase remedy for process-based deficiencies of which the government complains in this case.[600]

**Response to Paragraph 156:**  The Government disputes the statement in paragraph 156 as incomplete and misleading.  The Bank Defendants concede that both GSEs made repurchase demands regarding HSSL loans, Ho Decl. ¶ 9(q); *see also* Hansen Decl. ¶ 7, and that, even under the Bank's definition of HSSL, Countrywide or its successors agreed to repurchase four loans

---

[598]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 67:9-16).

[599]  Mainigi Decl. Ex. 28 (Freddie 30(b)(6) Dep. 303:16-304:22).

[600]  Mainigi Decl. Ex. 26 (Sobczak Dep. 69:2-70:9 (Fannie Mae never requested repurchase of loans based on absence of underwriter involvement in closing of loan)); Mainigi Decl. Ex. 23 (Padgett Dep. 128:3-130:10 (listing data and documentation Freddie Mac reviewed in determining whether to request repurchase but not origination process)); Mainigi Decl. Ex. 3 (Battany Dep. 57:14-15 (Fannie Mae sought repurchase of loans that did not meet eligibility requirements in contracts)); Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 287:7-18 (during 2006-2009 time period Fannie Mae sought repurchase of loans not written in accordance with selling and servicing guidelines)).

HSSL loans that did not involve an underwriter, as discernible from available data, Ho Decl. ¶ 9(p).  Finally, the Bank Defendants' own data indicates that repurchase/makewhole requests were approved or completed with respect to 526 HSSL loans, as defined by the Government. Hansen Decl. ¶ 7.

### 1.   The GSEs Did Not Request Repurchase of HSSL or Central Fulfillment Loans at Higher Rates than Other Loans.

157.   As noted above, repurchase demands were less common for HSSL loans than for non-HSSL loans sold to the GSEs.  The GSEs made a repurchase demand regarding 5.8% of the loans originated via the HSSL process, and 5.9% of the loans originated outside of the HSSL process and purchased by the GSEs.[601]   With respect to the HSSL pilot loans, 13 out of the 235 at-issue loans were the subject of a repurchase demand by the GSEs.[602]   Countrywide or its successors agreed to repurchase 4 of those loans (approximately 31%), and disagreed-but-settled the repurchase demand with respect to an additional 3 of those loans (approximately 23%).  The GSEs rescinded their repurchase demand for the balance of the loans—6 loans (approximately 46%).[603]

**Response to Paragraph 157:**  The Government disputes the statements in paragraph 157 as they are based on a disputed definition of HSSL loans.  *See* Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4 (describing HSSL loan characteristics); James Decl. Ex. A at 8 n.40 (Defendants' expert conceding that "the definition of HSSL loans is under dispute.").  The Government disputes the statements in paragraph 157 as immaterial.  Defendants' expert Arnold Barnett, who offered opinions on this issue, testified that he could not offer any justification for why non-HSSL loans are an appropriate point of comparison to HSSL loans.  *See* Nawaday Decl. Ex. C,

---

[601]   Walker Decl. Ex. A at 41, 46 & Table 13 (Walker Expert Report); Ho Decl.

[602]   Ho Decl. ¶ 9.

[603]   Ho Decl. ¶ 9.

Barnett Tr. 59:21-60:2 ("Q: But do you have any reason to believe that the non HSSL loans

made for an appropriate control against which to compare HSSL loans?  A. I have no

independent expertise on that question."); Nawaday Decl. Ex. C, Barnett Tr. 60:15-25 ("Q: But

you yourself don't have any information to evaluate as to whether or not nonHSSL loans made

for a relevant comparison to HSSL loans? A: No, as I said I have no expertise. . . . But I have no

expertise to assess the appropriateness of such a comparison, it was beyond the scope of my

assignment and my competence.").

    The Government also disputes the statements in paragraph 157 because Defendants fail to

specify the parameters of the "HSSL Process."  In addition, the Government disputes the

statements in paragraph 157 because the defect rate associated with HSSL loans will likely go

up.  The 31% defect rate that the Government's underwriting and statistical sampling experts

found for HSSL loans was based on the assumption that the HSSL ended on December 31, 2009.

Discovery has since shown that the HSSL effectively ended on May 21, 2008, when underwriters

were brought back in.  Once these loans are excluded from the pool of HSSL loans, it is likely

that the 31% defect rate will increase.  The Government also disputes the statements in

paragraph 157 because Defendants' data indicates that the GSEs made repurchase or make-

whole requests for 1,579 HSSL loans.  Hansen Decl. ¶ 7.  Finally, the HSSL features expanded

to all of FSL.

    158.    With respect to the Central Fulfillment loans, 655 out of the 11,246 at-issue loans

were the subject of a repurchase demand by the GSEs.[604]   Countrywide or its successors agreed

to repurchase 212 of those loans (approximately 32%), and disagreed-but-settled the repurchase

demand with respect to an additional 280 of those loans (approximately 43%).  The GSEs

---

[604]  Ho Decl. ¶ 9.

rescinded their repurchase demand for the balance of the loans—163 loans (approximately 25%).[605]

**Response to Paragraph 158:**  The Government disputes the statements in paragraph 158 because they are not supported by the cited material or contain no citation to admissible evidence, and thus do not satisfy the requirements of Fed. R. Civ. P 56(c)(1) and Local Civil Rule 56.1(d).  In addition, the Government disputes the statements in paragraph 158 because they rely on Defendants' definition of a HSSL loan or Central Fulfillment loan, and the Government disputes that those definitions are appropriate.  *See* Thomas Decl. ¶¶8-11; Hansen Decl. ¶¶ 3-4.  Defendants' own expert concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at 8 n.40.

## 2.  Countrywide and the GSEs Settled Outstanding Repurchase Requests.

159.    Beginning in the mid-2000s, Countrywide and Fannie entered into a series of "bulk" settlements to resolve outstanding repurchase claims over which the parties disagreed.[606] In 2010, Countrywide entered into a settlement with Freddie that resolved all outstanding repurchase demands for loans originated before December 31, 2008.[607]   Similarly, Countrywide entered into two settlements with Fannie, one in 2010 and another in January 2013, that resolved all outstanding repurchase demands for loans originated between 2000 and 2008.[608]

**Response to Paragraph 159:**  The Government disputes the description of the settlements as resolving repurchase claims over which the parties "disagreed," as misleading in light of the testimony as to Countrywide's negotiating tactics, which involved a refusal to repurchase as a general matter as a tactic to force the GSEs to change the governing repurchase

---

[605]  Ho Decl. ¶ 9.

[606]  Mainigi Decl. Ex. 26 (Sobczak Dep. 62:24-63:9, 203:16-24).

[607]  Walker Decl. Ex. A at 24-25 (Walker Expert Report).

[608] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 183:10-184:4, 189:8-13, 294:3-296:6).

requirements.  Mainigi Decl. Ex. 35, Chandler Tr. 86:9-16 ("The refusal to repurchase was

explicitly . . . a tactic to try to force Fannie Mae to revise its rep and warranty model for

repurchases."); Mainigi Decl. Ex. 28, Tanabe Tr. 67:11-20 (explaining that Countrywide was

"irrational" in its refusal to repurchase stated income and other loans from Freddie Mac);

Mainigi Decl. Ex. 23, Padgett Tr. 55:3-6 (Countrywide "sought continually to find ways out on a

thematic basis to avoid honoring the reps and warrants to [Freddie Mac] around the delegated

underwriting model").  The Government does not dispute the second and third statements in

paragraph 159.

      160.    The 2013 settlement between Fannie Mae and Countrywide resolved all actual and

potential claims relating to loans originated by FSL using the HSSL process, but it is unrelated to

the government's litigation.  However, recognizing that the settlement threatened its ability to

bring this case, the government tried to prevent Fannie from entering into the settlement and

resolving all outstanding repurchase demands.[609]   They requested that Fannie exclude or "carve

out" loans originated through the HSSL process from the settlement because those loans were

part of the instant litigation.[610]

      **Response to Paragraph 160:**  The statements in paragraph 160 are unsupported by the

materials cited and thus do not satisfy the requirements of Fed. R. Civ. P. 56(c)(1) and Local

Civil Rule 56.1; accordingly, these statements do not present an undisputed fact.  *See* Mainigi

Decl. Ex. 27, Sullivan Tr. 184:6-188:10 ("Q:  In the context of discussions related to the most

recent settlement, the one that culminated in papers being signed in January of 2013, did the

United States – the U.S. Attorney's Office for the Southern District of New York, did they get in

touch with Fannie Mae regarding the potential settlement? THE WITNESS:  Get in touch?

Contact?  I believe so.  Q:  And what was the nature of that contact? . . .  THE WITNESS:  I

---

[609] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 186:21-187:8).

[610] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 184:6-185:9, 187:13-188:4).

haven't been prepared on that particular topic. . . . Q: What is your knowledge regarding that topic? A. I believe that the government requested that certain loans be excluded from the settlement. . . . .Q: Can you tell me everything that you do know in your corporate capacity about the contact by the United States Attorney's Office with Fannie Mae in relation to the settlement that culminated in January 2013? . . . THE WITNESS: I understand that there was contact. I understand that there was a request to not include certain loans in the settlement agreement. I also understand that there wasn't an understanding of which loans were being requested to be excluded from the settlement. Q: Do you know why the U.S. Attorney's Office requested that certain loans be excluded from the settlement?. . . . THE WITNESS: Because I believe that they are subject to an investigation. . . . Q: And why did the U.S. Attorney's Office not want the loans to be settled? . . . THE WITNESS: I don't know."). The Government disputes that the statements in paragraph 160 are material within the meaning of Fed. R. Civ. P. 56.

 **F.**  **The HSSL Did Not Cause the GSEs Conservatorship.**

  **1.  The Economic Crisis and the GSEs' Business Strategy, not HSSL, Caused the GSEs' Conservatorship.**

 161. Prior to July 30, 2008, the GSEs were subject to oversight by, *inter alia*, the Office of Federal Housing Enterprise Oversight ("OFHEO"), the Department of Housing and Urban Development ("HUD"), the Securities and Exchange Commission ("SEC"), and the Department of the Treasury.[611]  On July 30, 2008, Congress enacted the Housing and Economic

---

[611] Mainigi Decl. Ex. 158 at 1 (Fannie 2007 10-K (excerpt)); Mainigi Decl. Ex. 159 at 7 (Freddie 2007 Annual Report (excerpt)).

Reform Act ("HERA"), establishing the Federal Housing Finance Administration ("FHFA").[612] FHFA assumed oversight of the GSEs as of that date.[613]

**Response to Paragraph 161:** The Government does not dispute the statements in paragraph 161, except notes that the correct name of the statute is the Housing and Economic Recovery Act.

162.    By 2008, the collapse of the Nation's housing market and the broader economic crisis had imposed considerable stress on the GSEs' financial health.  In the first half of 2008 alone, Fannie and Freddie suffered net losses of $6.6 billion.[614]  As a result, in July 2008, FHFA began an examination into the GSEs' financial condition.[615]

**Response to Paragraph 162:** The first statement in paragraph 162 is without any factual or other support and thus does not satisfy the requirements of Fed. R. Civ. P. 56(c)(1) and Local Civil Rule 56.1(d); accordingly, this statement does not present an undisputed material fact.  The Government does not dispute that the quarterly reports for Fannie Mae and Freddie Mac for the period ended June 30, 2008, respectively state that the net loss available to common stockholders was $5.111 billion for Fannie Mae and $1.476 billion for Freddie Mac.  *See* Mainigi Decl. Ex. 188 (Jun. 30, 2008, Form 10-Q FNMA) at 2; Mainigi Decl. Ex. 193 (Aug. 6, 2008, Form 10-Q Federal Home Loan Mortgage Corp – FMCC) at 15.  The Government does not dispute that FHFA began examining the GSEs' financial condition in July 2008, but disputes that the material cited supports the statement that such examination was conducted "[a]s a result" of the

---

[612] *See* Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. 110-289 §§ 1101, 1301-1304, 122 Stat. 2654, 2661, 2794-2797.

[613] Mainigi Decl. Ex. 12 (Dickerson Dep. 19:8-13, 46:16-19).

[614] Mainigi Decl. Ex. 188 at 2 (Fannie Mae, Quarterly Report (Form 10-Q) (Aug. 8, 2008)); Freddie Mac, Quarterly Report at 15 (Form 10-Q) (Aug. 6, 2008)).

[615] Mainigi Decl. Ex. 12 (Dickerson Dep. 35:19-40:11).

losses identified in the GSEs' quarterly reports.  *See* Mainigi Decl. Ex. 12, Dickerson Tr. 35:19-40:11.

163.    After a thorough examination, FHFA decided to place Fannie and Freddie into conservatorship on September 6, 2008.[616] In contemporaneous memoranda, FHFA provided a comprehensive list of reasons for its decision to place the GSEs into conservatorship.[617]   These reasons were:

a.   inadequate capital levels and the expectation that the GSEs' capital levels would fall below regulatory requirements;

b.   the poor quality of the GSEs' capital bases and their inability to raise capital in private markets;

c.   insufficient core capital levels when adjusted to only account for tangible capital;

d.   heightened credit losses and forecasts of continued deterioration;

e.   decreased earnings capabilities and the associated implications;

f.   liquidity concerns given market conditions;

g.   system deficiencies and inability to securitize their whole loan portfolios,

h.   esulting in a decrease in liquid assets available;

i.   operational concerns, particularly dealing with risk management;

j.   aggressive operational strategies and exposures given market forecasts and conditions at the time;

k.   insufficient market risk oversight resources relative to aggressive interest rate risk limits and positions; and

---

[616] Mainigi Decl. Ex. 12 (Dickerson Dep. 41:9-47:19).

[617] Mainigi Decl. Ex. 194 at 2-3 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 2-3 (Sept. 6, 2008 Fannie conservatorship memorandum); Mainigi Decl. Ex. 12 (Dickerson Dep. 49:7-16, 92:7-94:8).

l.   operational inefficiencies and undue reliance on manually intensive processes.[618]

**Response to Paragraph 163:**  The Government disputes the statements in paragraph 163.  *See* Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie Mae conservatorship memorandum) (discussing factors contributing to the "unsafe or unsound condition"), at 2 ("[c]redit losses and related expenses are high and forecasts show significant and continuing accelerated deterioration"); *id.* at 11 ("counterparty risk . . . was becoming a larger concern amidst the deteriorating financial condition of many market participants . . ."), 13 (Fannie Mae "remains significantly exposed to the health of key counterparties, especially . . . key seller/servicers"), 23 (FHFA's specific findings of counterparty exposure included "substantial" repurchase backlog with Countrywide where "Countrywide represented 23% of the serviced book and was by far the largest seller/servicer, and is also the largest seller of Alt-A to Fannie Mae"); Mainigi Decl. Ex. 194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum) (discussing factors contributing to recommendation for conservatorship), 2 ("[a]sset quality is poor and continues to deteriorate. Single-family delinquencies, credit related losses, and real estate owned ("REO") levels have increased dramatically"), 3 ("widespread financial weakness of counterparties on which [Freddie Mac] relies for . . . loan repurchases . . . effective default management and loss mitigation . . . and other contractual safeguards . . . ."), 7 ("continued high exposure from both market and credit-related risks places pressure on [Freddie Mac]'s capital base, dangerously eroding capital levels as losses continue"), 9 ("the purchase of loans with weak underwriting had adversely impacted, and would continue to adversely impact, financial results, flexibility, and the overall strength of [Freddie Mac]"); Mainigi Decl. Ex. 12, Dickerson Tr. 107:6-10 (acknowledging that the FHFA conservatorship memoranda were not "exhaustive lists of every reason for the decision to place

---

[618] Mainigi Decl. Ex. 194 at 2-3 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 2-3 (Sept. 6, 2008 Fannie conservatorship memorandum); Mainigi Decl. Ex. 12 (Dickerson Dep. 49:17-94:8).

the Enterprises into conservatorship"); Mainigi Decl. Ex. 12, Dickerson Tr. 110:14-111:3

(testifying that increasing defaults and delinquencies on loans in 2008 negatively affected GSEs'

financial conditions).

      164.    FHFA's decision was premised upon imprudent decisions by the GSEs'

management to knowingly purchase higher risk loan products like Alt-A loans in order to

increase market share.  When housing prices and the broader economy deteriorated, the GSEs

sustained enormous losses on these higher risk loans – loans that Fannie and Freddie actively

sought to purchase based on disclosed risk characteristics and that conformed to the their own

guidelines.  In short, the overall economic crisis and the GSEs' own poor business strategy are

what triggered FHFA's decision to place the GSEs into conservatorship.[619]

**Response to Paragraph 164:**  The Government disputes the statements in paragraph

164.  *See* Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie Mae conservatorship memorandum)

(discussing factors contributing to the "unsafe or unsound condition" of Fannie Mae), 2 ("[c]redit

losses and related expenses are high and forecasts show significant and continuing accelerated

deterioration"), 11 ("counterparty risk . . . was becoming a larger concern amidst the

deteriorating financial condition of many market participants . . . ."), 13 (Fannie Mae "remains

significantly exposed to the health of key counterparties, especially . . . key seller/servicers."), 23

(FHFA's specific findings of counterparty exposure included "substantial" repurchase backlog

with Countrywide where "Countrywide represented 23% of the serviced book and was by far the

largest seller/servicer, and is also the largest seller of Alt-A to Fannie Mae"); Mainigi Decl. Ex.

194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum)  (discussing factors contributing

to recommendation for conservatorship), 2 ("[a]sset quality is poor and continues to deteriorate.

---

[619] Mainigi Decl. Ex. 195 at 6, 8, 12-14, 22 (Sept., 6, 2008 Fannie conservatorship
memorandum); Mainigi Decl. Ex. 194 at 8-9, 12-13, 19 (Sept. 6, 2008 Freddie conservatorship
memorandum); *see also* Mainigi Decl. Ex. 203 at xxvi (FCIC Final Report (excerpt)); Mainigi
Decl. Ex. 12 (Dickerson Dep. 62:11-64:20, 77:3-79:4).

Single-family delinquencies, credit related losses, and real estate owned ("REO") levels have

increased dramatically"), 3 ("widespread financial weakness of counterparties on which [Freddie

Mac] relies for . . . loan repurchases . . . effective default management and loss mitigation . . .

and other contractual safeguards . . . .), 3 ("counterparty risk has been exacerbated at a time when

financial institutions are under increasing"), 7 ("continued high exposure from both market and

credit-related risks places pressure on [Freddie Mac]'s capital base, dangerously eroding capital

levels as losses continue"), 9 ("the purchase of loans with weak underwriting had adversely

impacted, and would continue to adversely impact, financial results, flexibility, and the overall

strength of [Freddie Mac]"); Mainigi Decl. Ex. 12, Dickerson Tr. 107:6-10 (acknowledging that

the FHFA conservatorship memoranda were not "exhaustive lists of every reason for the

decision to place the Enterprises into conservatorship"); Mainigi Decl. Ex. 12, Dickerson Tr.

110:14-111:3 (testifying that increasing defaults and delinquencies on loans in 2008 negatively

affected GSEs' financial conditions).  Moreover, the first two statements in paragraph 164 are

without any factual or other support and thus do not satisfy the requirements of Fed. R. Civ. P.

56(c)(1) and Local Civil Rule 56.1(d); accordingly, these statements do not present undisputed

material facts.

     165.     Witnesses from Fannie and Freddie cited similar causes as FHFA's memoranda

for the GSEs entering conservatorship:  lack of capital, a national decline in home prices, and

incorrect assumptions about the risk of stated income loans.[620]   None testified that losses from

HSSL loans contributed to the conservatorship.

     **Response to Paragraph 165:**  The Government disputes the first statement in paragraph

165 as incomplete and misleading.  *See* Mainigi Decl. Ex. 3, Battany Tr. 300:20-23 (citing

among other things the GSEs' purchase of "huge portions of high risk product that ultimately led

---

[620] Mainigi Decl. Ex. 27 (Fannie 30(b)(6) Dep. 202:8-203:18); Mainigi Decl. Ex. 28 (Freddie
30(b)(6) Dep. 252:22-253:6); Mainigi Decl. Ex. 26 (Sobczak Dep. 106:1-107:2); Mainigi Decl.
Ex. 3 (Battany Dep. 300:10-23).

to their downfall").   The Government disputes that Fannie Mae's corporate representative testified regarding Fannie Mae's understanding of why it went into conservatorship.  *See* Mainigi Decl. Ex. 27, Sullivan Tr. 202:8-22 ("Q:  Let me ask you and you will have to indulge me on this.  Let me ask you in your personal capacity while we're sitting here, Ms. Sullivan, would it be in your personal capacity, why do you believe Fannie Mae went into conservatorship? . . . . A:  . . . So my personal belief is that there are a number of factors . . . .").   The Government disputes the materiality of the second statement in paragraph 165 because the GSE witnesses testified that the GSEs had no knowledge of the HSSL or any new loan origination process at Countrywide prior to the conservatorship.  *See* Mainigi Decl. Ex. 26, Sobczak Tr. 142:13-25;  Mainigi Decl. Ex. 27, Sullivan Tr. 278:10-19; 279:19-280:18 (Fannie Mae was not aware of the HSSL until hearing about it from representatives of the Government as part of its investigation of this case); Mainigi Decl. Ex. 23, Padgett Tr. 69:3-5; 221:16-22 (never heard of the HSSL); Mainigi Decl. Ex. 28, Tanabe Tr. 213:4-10; 312:17-313:9 (Freddie Mac Director of Credit Risk had not heard from HSSL before preparing for his deposition in this case); Mainigi Decl. Ex. 3, Battany Tr. 147:13-22;  Mainigi Decl. Ex. 35, Chandler Tr. 100:22-101:8; Mainigi Decl. Ex. 13, Forlines Tr. 190:10-191:4;  Nawaday Decl. Ex. Z, Shumate Tr. 67:5-68:4.

## 2.  The Cost of Financing Increased for the GSEs.

166.   Fannie Mae and Freddie Mac had historically relied on their ability to issue debt at relatively low interest rates due to the perception, prior to conservatorship, that there was an implicit government guarantee on their debt.[621]   While historically the GSEs had enjoyed a debt financing advantage, market confidence in the entities deteriorated during the first half of 2008 due to declining housing market conditions and poor economic outlook at the time.[622]

---

[621] James Decl. Ex. A at 48 (James Expert Report).

[622] Mainigi Decl. Ex. 194 at 3 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 24 (Sept. 6, 2008 Fannie conservatorship memorandum).

**Response to Paragraph 166:**  The Government disputes that the statements contained in paragraph 166 are material within the meaning of Fed. R. Civ. P. 56 and Local Civil Rule 56.1. The Government disputes that the second sentence in paragraph 166 is supported by the materials cited as neither discusses the cause for deterioration of market confidence in Fannie Mae or Freddie Mac.  *See* Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie Mae conservatorship memorandum) at 24; Mainigi Decl. Ex. 194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum) at 3.

167.    Spreads on Fannie Mae's and Freddie Mac's five-year bonds over U.S. Treasuries increased four-fold from roughly 25 basis points at the end of 2006 to over 100 basis points in August 2008.[623]   By the beginning of September 2008, the GSEs' spreads of short-term debt over T-bills reached historically high levels.[624]   Similarly, the average spread on GSE credit default swaps between August 9, 2007 and September 6, 2008 was more than double the average for the prior five years.[625]   The average credit default swap spread for both entities increased more than seven-fold from the end of 2006 to mid-August 2008, peaking in March 2008 at around 88 basis points.[626]   FHFA noted in the case of Fannie Mae that the lack of liquidity in the markets not only implied higher financing costs, but also that "[l]iquidity risk [was] high, and represent[ed] a critical risk to Fannie Mae and place[d] the Enterprise in an unsafe or unsound condition."[627]

---

[623] James Decl. Ex. A at 49 (James Expert Report).

[624] Mainigi Decl. Ex. 194 at 22 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 24 (Sept. 6, 2008 Fannie conservatorship memorandum).

[625] James Decl. Ex. A at 49 (James Expert Report).

[626] James Decl. Ex. A at 49 (James Expert Report).

[627] Mainigi Decl. Ex. 195 at 24 (Sept. 6, 2008 Fannie conservatorship memorandum).

**Response to Paragraph 167:**  The Government disputes that the facts contained in paragraph 167 are material within the meaning of Fed. R. Civ. P. 56 and Local Civil Rule 56.1. The Government disputes the final sentence in paragraph 167 as incomplete and misleading as liquidity risk was only one of several factors discussed by FHFA regarding Fannie Mae.  Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie conservatorship memorandum) at 2-3.

168.    According to FHFA, the decline in market perceptions reflected in GSE debt and credit default swap spreads was due in part to the GSEs' "Alt-A strategy" as investors lost confidence in the quality of the GSEs' mortgage portfolios.[628]   When recommending that the GSEs be placed under conservatorship, FHFA remarked that the GSEs would be unable to continue issuing debt to finance their operations and to meet the demands of creditors.[629]

**Response to Paragraph 168:**  The Government disputes that the statements contained in paragraph 168 are material within the meaning of Fed. R. Civ. P. 56 and Local Civil Rule 56.1. The Government disputes that the first sentence in paragraph 168 is supported by the materials cited as the material does not discuss Freddie Mac.  *See* Mainigi Decl. Ex. 195 (Sept. 6, 2008 Fannie Mae conservatorship memorandum) at 7.  The Government disputes the second sentence in paragraph 168 as incomplete and misleading as the FHFA memoranda cite numerous non-exhaustive reasons for the decision to place the GSEs into conservatorship.  Mainigi Decl. Ex. 194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum) at 3-4; Mainigi Decl. Ex. 12, Dickerson Tr. 107:6-10 (acknowledging that the FHFA conservatorship memoranda were not "exhaustive lists of every reason for the decision to place the Enterprises into conservatorship").

---

[628] Mainigi Decl. Ex. 195 at 7 (Sept. 6, 2008 Fannie conservatorship memorandum).

[629] Mainigi Decl. Ex. 194 at 3-4 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 3 (Sept. 6, 2008 Fannie conservatorship memorandum).

3.    The GSEs' Capital Levels Were Inadequate.

169.    In justifying the decision to place the GSEs into conservatorship, FHFA Director James Lockhart remarked that "the capacity of [the GSEs] to absorb further losses while supporting new business activity [was] in doubt."[630]

**Response to Paragraph 169:**  The Government disputes the accuracy of the quotation in paragraph 169.  *See* Mainigi Decl. Ex. 196 (Sept. 7, 2008, Statement of James Lockhart, FHFA) at 1 ("In particular, the capacity to raise capital to absorb further losses without Treasury Department support vanished.").  The Government disputes the statements in paragraph 169 as incomplete and misleading as the cited material contains multiple factors supporting FHFA's decision to place the GSEs into conservatorship including the credit risks of the mortgages they purchased.  Mainigi Decl. Ex. 196 (Sept. 7, 2008, Statement of James Lockhart, FHFA) at 1-2.

170.    FHFA was concerned about the GSEs' solvency, in part, because of the GSEs's high leverage.[631]   The GSEs rarely held more than 110% of their minimum capital requirements in a given year, leaving only a small cushion for potential losses.[632]   FHFA was also concerned that a substantial percentage of the GSEs' capital was composed of deferred tax assets and accumulated other comprehensive income, which are forms of intangible capital and could not be monetized if necessary to support the entities.[633]

**Response to Paragraph 170:**  The Government disputes the statements contained in paragraph 170 as incomplete and misleading as FHFA cited multiple reasons for investigating the GSEs' solvency and assets, including the Fannie Mae's "significant and continuing accelerated

---

[630] Mainigi Decl. Ex. 196 (Sept. 7, 2008 Statement of James Lockhart, FHFA).

[631] James Decl. Ex. A at 50 (James Expert Report).

[632] James Decl. Ex. A at 50 (James Expert Report).

[633] Mainigi Decl. Ex. 194 at 2 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 2 (Sept. 6, 2008 Fannie conservatorship memorandum).

deterioration [of credit losses]" and exposure to the "health of key counterparties, especially . . . key seller/servicers," Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie Mae conservatorship memorandum) at 2,13, and Freddie Mac's deteriorating asset quality caused in part by "[s]ingle-family delinquencies" and "financial weakness of counterparties on which [Freddie Mac] relies for . . . loan repurchases . . . effective default management and loss mitigation . . . and other contractual safeguards . . . .," Mainigi Decl. Ex. 194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum) at 2-3. *See also* Mainigi Decl. Ex. 12, Dickerson Tr. 110:14-111:3 (testifying that increasing defaults and delinquencies on loans in 2008 negatively affected GSEs' financial conditions).

171.    FHFA analyzed the capital position of both entities with respect to tangible capital only and found that the resulting capital levels were insufficient.[634]   In other words, FHFA expressed concern that the GSEs' core capital levels were artificially inflated by excluding large negative accumulated other comprehensive income and including large positive deferred tax assets.[635]   FHFA went on to state that Fannie Mae's "core capital, when adjusted to remove intangible capital, is insufficient to absorb the reasonable, expected losses in the current book of business and ensure the repayment of its obligations."[636]   Similarly, FHFA also stated that, on the day before conservatorship was announced, "Freddie Mac's core capital, when adjusted to remove intangible capital, [was] negative."[637]

**Response to Paragraph 171:** The Government disputes the first sentence of Paragraph 171 because the materials cited do not indicate that "FHFA analyzed the capital position of [the

---

[634] Mainigi Decl. Ex. 194 at 2 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 2 (Sept. 6, 2008 Fannie conservatorship memorandum).

[635] James Decl. Ex. A at 51 (James Expert Report).

[636] Mainigi Decl. Ex. 195 at 2 (Sept. 6, 2008 Fannie conservatorship memorandum).

[637] Mainigi Decl. Ex. 194 at 2 (Sept. 6, 2008 Freddie conservatorship memorandum).

GSEs] with respect to tangible capital only."  The Government disputes the second sentence of

Paragraph 171 because it reflects a statement in an expert report, not a statement of undisputed

material fact.  The Government does not dispute the third and fourth sentences of Paragraph 171.

172.   In light of the GSEs' deteriorating balance sheets and mounting losses, FHFA also

expressed concerns about the GSEs' inability to raise capital.[638]  On March 19, 2008, the GSEs

entered into an agreement with OFHEO in which they committed "to raise significant additional

capital."[639]  In May 2008, following this agreement, Fannie Mae raised approximately $7.4

billion in capital.[640]

**Response to Paragraph 172:**  The Government disputes that the statements in paragraph

172 are supported by the materials cited and thus do not satisfy the requirements of Fed. R. Civ.

P. 56(c)(1) and Local Civil Rule 56.1.  The first statement cites to an unsupported statement in

Defendants' expert's report.  James Decl. Ex. A at 50 (James Expert Report).  The second

statement cites to a page not included in the materials submitted in support of summary

judgment.  Mainigi Decl. Ex. 172 (Apr. 15, 2008, Report to Congress) consisting only of pages i,

ii, and 83.  The third statement cites to an exhibit that does not contain information regarding

capital raised by Fannie Mae in 2008.  Mainigi Decl. Ex. 172 (Apr. 15, 2008, Report to

Congress) at 83 (Fannie Mae balance sheet through 2007).

173.   Despite this additional funding, however, FHFA pointed out that Fannie Mae's

capital levels were "significantly offset by the continuing high credit loss provisions," and

criticized Freddie Mac for failing to raise any new capital.[641]  As market conditions continued to

---

[638] James Decl. Ex. A at 52 (James Expert Report).

[639] Mainigi Decl. Ex. 172 at 63 (OFHEO 2008 Report to Congress).

[640] Mainigi Decl. Ex. 172 at 83 (OFHEO 2008 Report to Congress).

[641] Mainigi Decl. Ex. 194 at 14-15 (Sept. 6, 2008 Freddie conservatorship memorandum);
Mainigi Decl. Ex. 195 at 18 (Sept. 6, 2008 Fannie conservatorship memorandum).

deteriorate and liquidity disappeared, it became "highly unlikely or cost prohibitive" for Freddie Mac to raise capital, which threatened the ability of the enterprise to continue operating, according to FHFA.[642]   On August 25, 2008, Fannie Mae conceded to the U.S. Treasury that it was "[i]nfeasible to raise capital from [the] private sector in [the] current market."[643]

**Response to Paragraph 173:**  The Government does not dispute the statements in paragraph 173, with the exception of the term "conceded."  The cited material uses the term "advised."  Mainigi Decl. Ex. 195 (Sept. 6, 2008 Fannie Mae conservatorship memorandum) at 12 n.3.

### 4.    FHFA Had Operational Concerns Regarding the GSEs.

174.    FHFA was also concerned about several operational issues within the GSEs that contributed to the agency's recommendation that the entities be taken into conservatorship.[644] These operational concerns included board and executive management practices, model development and validation, and accounting.[645]   FHFA concluded that "continuing failures of the Board of Directors and Management have raised serious concerns about the continuing safety and soundness" of the GSEs.[646]   Furthermore, FHFA raised concerns about enterprise risk, regarding

---

[642] Mainigi Decl. Ex. 194 at 14 (Sept. 6, 2008 Freddie conservatorship memorandum).

[643] Mainigi Decl. Ex. 195 at 12 (Sept. 6, 2008 Fannie conservatorship memorandum).

[644] James Decl. Ex. A at 54 (James Expert Report).

[645] Mainigi Decl. Ex. 194 at 3, 10-11, 15, 24-26 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 14, 16-17 (Sept. 6, 2008 Fannie conservatorship memorandum).

[646] Mainigi Decl. Ex. 194 at 15 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 18 (Sept. 6, 2008 Fannie conservatorship memorandum).

for example credit risk management, counterparty exposure, market risk management, liquidity, interest rate risk, and operational risk.[647]

**Response to Paragraph 174:** The Government disputes the first sentence of Paragraph 174 because it reflects an unsupported statement in an expert report, not an undisputed material fact.  The Government disputes the second sentence of Paragraph 174 because the concerns indicated do not reflect "operational concerns."  Mainigi Decl. Ex. 194 (Sept. 6, 2008 Freddie Mac conservatorship memorandum) at 26-27 ("Operational Risk Management" includes issues concerning outdated information technology, data quality, ineffective internal controls, and inadequate operational risk management oversight); Mainigi Decl. Ex. 195 (Sept. 6, 2008 Fannie Mae conservatorship memorandum) at 27-28 (information technology, data quality, and internal controls).  The Government does not dispute the remainder of Paragraph 174.

### 5.    The GSEs' Earnings Capabilities Decreased.

175.    In the years leading up to the crisis, the GSEs expanded the amount of subprime and Alt-A loans in their portfolios and, in doing so, assumed more risk.[648]

**Response to Paragraph 175:**  The Government disputes the statement in paragraph 175 as incomplete and misleading as GSE witnesses explained that when they took on greater risk, one step that they took to protect themselves was to price accordingly.  *See* Mainigi Decl. Ex. 28, Tanabe Tr. 76:17-21;  Mainigi Decl. Ex. 27, Sullivan Tr. 134:19-137:3.  In addition, they

---

[647] Mainigi Decl. Ex. 194 at 3, 6, 10-11, 15, 18-28 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 14, 15-18, 21-24, and 27-28 (Sept. 6, 2008 Fannie conservatorship memorandum).

[648] Mainigi Decl. Ex. 194 at 25 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 14, 22 (Sept. 6, 2008 Fannie conservatorship memorandum); Mainigi Decl. Ex. 203 at xxvi (FCIC Final Report (excerpt) ("In 2005 and 2006, they decided to ramp up their purchase and guarantee of risky mortgages, just as the housing market was peaking. . . .  They relaxed their underwriting standards to purchase or guarantee riskier loans and related securities in order to meet stock market analysts' and investors' expectations for growth, to regain market share, and to ensure generous compensation for their executives and employees—justifying their activities on the broad and sustained public policy support for homeownership)).

testified that even when variances were granted for different kinds of loans, the requirements that

the loans be "investment quality" and "acceptable investments" never changed.  Maingini Decl.

Ex. 27, Sullivan Tr. 249:6-250:10 (Fannie Mae did not give Countrywide or any lender a

variance to the warranty stating that every "Mortgage is acceptable investment. The lender

knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit

standing that can reasonably be expected to cause private institutional investors to regard the

mortgage as an unacceptable investment, cause the mortgage to become delinquent or adversely

affect the mortgage's value or marketability."); Mainigi Decl. Ex. 28, Tanabe Tr. 49:13-50:2

(explaining that Freddie Mac purchased riskier loans from Countrywide because "They rep and

warrant loans are investment quality.  They rep and warrant that they provide us accurate

information. Even though it was riskier, we're taught – it is still – we believed the – the loans are

still within the – the bounds of the purchase documents").

      176.    Beginning in 2007 and continuing through the end of 2008, the economy

experienced a severe, prolonged crisis, during which the housing market was particularly hard-

hit.[649]  Throughout this period, house prices dropped precipitously and many borrowers

experienced difficulties making their mortgage payments, resulting in an increase in loan

delinquencies and foreclosures.[650]  Given their increased level of risk and substantial exposure to

the U.S. housing market, Fannie Mae and Freddie Mac experienced steep declines in earnings in

2007 and the first half of 2008.[651]  FHFA commented that the riskier loans the GSEs had

migrated towards in the years leading up to the crisis, such as Alt-A loans, were "leading

---

[649] James Decl. Ex. A at 56 (James Expert Report).

[650] James Decl. Ex. A at 56 (James Expert Report).

[651] James Decl. Ex. A at 56 (James Expert Report).

contributors to serious delinquency rates and credit losses" for the entities' single-family business segments.[652]

**Response to Paragraph 176:**  The Government does not dispute the first two sentences in Paragraph 176. The Government disputes the third sentence in paragraph 176 because the phrase "steep decline in earnings" is vague. The Government disputes the fourth sentence in paragraph 176 because it inaccurately quotes the cited Freddie Mac conservatorship memorandum, and the quotation is not found in the Fannie Mae conservatorship memorandum *See* Mainigi Decl. Ex. 194 (Sept. 6, 2008 Freddie Mac conservatorship memorandum) ("Alt-A mortgages are leading contributors to serious delinquency rates and credit losses.") at 19; Mainigi Decl. Ex. 195 (Sept. 6, 2008 Fannie Mae conservatorship memorandum) at 14.

177.    During the first half of 2008, Fannie Mae's net income loss to common shareholders was $5.1 billion, while Freddie Mac's was $1.5 billion.[653]

**Response to Paragraph 177:**  The Government does not dispute the statements in paragraph 177, but notes that Defendants rounded up from $1.476 billion to $1.5 billion.

178.    In September 2008, FHFA rated the GSEs' future earnings risk levels as "Critical Concerns."[654]  In particular, the agency noted that Fannie Mae had "no means of correcting the past unsafe or unsound practices in time to avoid the losses that its current portfolio [would] produce over the next several years."[655]  Similarly, the agency noted that Freddie Mac was "clearly vulnerable to substantial further deterioration in capital given the current conditions in

---

[652] Mainigi Decl. Ex. 194 at 19 (Sept. 6, 2008 Freddie conservatorship memorandum); *see also* Mainigi Decl. Ex. 195 at 14 (Sept. 6, 2008 Fannie conservatorship memorandum).

[653] Mainigi Decl. Ex. 188 at 2 (Fannie Mae, Quarterly Report (Form 10-Q) (Aug. 8, 2008)); Mainigi Decl. Ex. 193 at 15 (Freddie Mac, Quarterly Report (Form 10-Q) (Aug. 6, 2008)).

[654] Mainigi Decl. Ex. 194 at 17 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 20 (Sept. 6, 2008 Fannie conservatorship memorandum).

[655] Mainigi Decl. Ex. 195 at 5 (Sept. 6, 2008 Fannie conservatorship memorandum).

the mortgage market."[656]   Due to the fact that substantial portions of both entities' portfolios by this time consisted of Alt-A and subprime mortgages, FHFA anticipated that the GSEs' assets would continue to deteriorate and, correspondingly, that the risk to their earnings was high.[657]

**Response to Paragraph 178:** The Government does not dispute the first three sentences of paragraph 178.  The Government disputes the fourth sentence of paragraph 178 because it is unsupported by the cited materials.  Mainigi Decl. Ex. 194 (Sept. 6, 2008, Freddie Mac conservatorship memorandum) at 12, 17; Mainigi Decl. Ex. 195 (Sept. 6, 2008, Fannie Mae conservatorship memorandum) at 5, 20-21.

### 6.        The GSEs Losses Were Larger than Expected.

179.  On September 6, 2008, the day prior to the conservatorship announcement, the agency estimated that the total 2008 losses for Fannie Mae and Freddie Mac could range from $18 to $50 billion and from $11 to $32 billion, respectively.[658]

**Response to Paragraph 179:**  The Government does not dispute the statements in paragraph 179.

180.     Ultimately, Fannie Mae and Freddie Mac record[ed] net losses for the year of $59.8 and $50.8 billion, respectively.[659]

**Response to Paragraph 180:**  The Government does not dispute the statements in paragraph 180.

### G.        The HSSL Loans the GSEs Purchased Did Not Trigger Conservatorship.

---

[656] Mainigi Decl. Ex. 194 at 12 (Sept. 6, 2008 Freddie conservatorship memorandum).

[657] Mainigi Decl. Ex. 194 at 12, 17 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 5, 20-21 (Sept. 6, 2008 Fannie conservatorship memorandum).

[658] Mainigi Decl. Ex. 194 at 29 (Sept. 6, 2008 Freddie conservatorship memorandum); Mainigi Decl. Ex. 195 at 29 (Sept. 6, 2008 Fannie conservatorship memorandum).

[659] Mainigi Decl. Ex. 212 at 80 (Fannie Mae, Annual Report (Form 10-K) (Feb. 26, 2009)); Mainigi Decl. Ex. 213 at 58 (Freddie Mac, Annual Report (Form 10-K) (Mar. 11, 2009)).

181.    According to the Bank's definition of an HSSL loan, at the time of conservatorship, only two HSSL loans (out of 11,481) had been foreclosed upon.[660]   Even according to the Government's wholly unsupported definition of an HSSL loan, at the time of conservatorship, only nine HSSL loans (out of 53,175) had been foreclosed upon.[661]

**Response to Paragraph 181:**  The Government disputes the statements in paragraph 181.  First, the Government disputes that the Bank's definition of a HSSL loan is appropriate.  *See* Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Indeed, Defendants' own expert concedes that "the definition of HSSL loans is under dispute."  James Decl. Ex. A at 8 n.40.  The Government further disputes that its definition of a HSSL loan is "wholly unsupported."  *See* Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4.  Finally, as to the last statement of paragraph 181, the Government disputes this statement as incomplete and misleading.  The number of loans which had actually been foreclosed upon at the time of the conservatorship is not material, in light of evidence that because HSSL loans were defective, there was a higher risk of loss to the GSEs arising from these loans.  *See* Nawaday Decl. Ex. GF (Holt report), at 4 ("a substantial percentage deviated from the GSE Guidelines in a way that materially increased the credit risk of the loan and were therefore Materially Defective"); Nawaday Decl. Ex. GG (corrected McFadden report), at 2 ("I find that HSSL loans that were approved for pre-closing by a loan specialist were more likely to become delinquent than loans cleared by other employees."); Nawaday Decl. Ex. GP (Cowan report) (HSSL loans with material defects were more likely to default than those that were investment quality).

182.    The government's loss calculation expert, Dr. Mason, presents loss calculations for HSSL loans in paragraph 13 of his Corrected Report.  Dr. Mason's "net" measure, which "represents the loss after proceeds from the sale of a property following foreclosure and related

---

[660] James Decl. Ex. A at 58 (James Expert Report).

[661] James Decl. Ex. A at 58 (James Expert Report).

costs are netted against that balance," is $146 million for Materially Defective HSSL loans. This figure includes actual losses as of December 2012 and losses Dr. Mason estimates the GSEs will incur subsequent to December 2012. This figure does not represent the actual losses through the date of conservatorship.

**Response to Paragraph 182:** The Government does not dispute the statements in paragraph 182, but notes that Defendants rounded up from $145,635,660 to $146 million.

183. Assuming this figure is correct, the combined losses projected by FHFA for the GSEs for the second half of 2008 would have declined from between $22.4 and $75.4 billion to between $22.2 and $75.3 billion.[662]

**Response to Paragraph 183:** The Government disputes the statements in Paragraph 183, which are speculative and reflect the con[c]lusions of an expert, not material facts.

184. From January 1, 2008 through September 30, 2010, the GSEs overall losses totaled $229 *billion*.[663] $110 billion in losses were recorded in 2008 alone.[664]

**Response to Paragraph 184:** The Government disputes that the first statement in paragraph 184 is supported by the materials cited. Mainigi Decl. Ex. 203 (Jan. 2011, Report of the National Commission on the Causes of the Financial and Economic Crisis) (no page 322 included and does not support $229 billion figure); James Decl. Ex. A at 60 (does not support $229 billion figure). The Government does not dispute the second statement in paragraph 184.

185. The value of Freddie Mac's mortgage assets in 2008 was approximately $2.2 trillion.[665] The value of Fannie Mae's mortgage assets in 2008 was approximately $3.1

---

[662] James Decl. Ex. A at 59-60 (James Expert Report).

[663] Mainigi Decl. Ex. 203 at 322 (FCIC Final Report); *see also* James Decl. Ex. A at 60 (James Expert Report).

[664] Mainigi Decl. Ex. 212 at 80 (Fannie Mae, Annual Report (Form 10-K) (Feb. 26, 2009)); Mainigi Decl. Ex. 213 at 58 (Freddie Mac, Annual Report (Form 10-K) (Mar. 11, 2009)); *see also* Mainigi Decl. Ex. 203 at 322 (FCIC Final Report); James Decl. Ex. A at 60 (James Expert Report).

trillion.[666] The combined value of the GSEs' guaranteed mortgage-backed securities and debt outstanding as of September 23, 2008 was $5.3 trillion, which was equal to the publicly held debt of the United States at that time.[667]

**Response to Paragraph 185:**  The Government does not dispute the statements in paragraph 185.

186.    The $146 million in alleged pecuniary losses from the HSSL process accounts for only 0.05% of the GSEs' total 2007 through 2012 losses to common shareholders or 0.17-0.42% of the GSEs' combined realized and projected losses for 2007 and 2008.  The $146 million also represents 0.17% of their combined core capital as of June 30, 3008.[668]

**Response to Paragraph 186:**  The Government disputes the statements in paragraph 186 because the Entity Defendants incorrectly describe $146 million as the "alleged pecuniary losses from the HSSL process."  This figure is only one of four loss alternative calculations in the Updated and Corrected Expert Report of Dr. Joseph R. Mason.  According to Dr. Mason's report, $145,635,660 represents the net losses to the GSEs with respect to the portion of HSSL loans estimated by Mr. Holt and Dr. Cowan to be materially defective.  Nawaday Decl. Ex. GL (May 31, 2013, expert report of Dr. Joseph R. Mason) at ¶ 55.  Dr. Mason also calculated net losses with respect to all HSSL loans in the amount of $281,693,732, and gross losses in the amount of $1,056,187,408 (all HSSL loans) and $546,048,890 (materially defective HSSL loans).  *Id.*

---

[665] Mainigi Decl. Ex. 12 (Dickerson Dep. 57:19-58:7); Mainigi Decl. Ex. 213 at 4 (Freddie Mac 10-K (Mar. 11, 2009)).

[666] Mainigi Decl. Ex. 12 (Dickerson Dep. 58:10-11); Mainigi Decl. Ex. 50 at 9 (Fannie Mae 10-Q Third Quarter 2008 (Nov. 10, 2008)).

[667] Mainigi Decl. Ex. 196 at 1 (Sept. 23, 2008 Statement of James Lockhart, FHFA).

[668] James Decl. Ex. A at 60 (James Expert Report).

187.   The addition of $146 million to GSEs' capital in September 2008 would not have affected or changed FHFA's decision to place the GSEs into conservatorship.[669]

**Response to Paragraph 187:**  The Government disputes the statement in paragraph 187. First, the testimony cited by Defendants does not support the assertion that the addition of $146 million "would not have affected" FHFA's decision; rather, the testimony is that it would not have changed the decision.  *See* Mainigi Decl. Ex. 12, Dickerson Tr. 104:5-105:4 ("Q:  Mr. Dickerson, going back to our earlier discussion about the financial reasons for FHFA's recommendation to place the GSEs into conservatorship, if the GSEs had had an additional $146 million in capital in September 2008, would the existence of that capital have had any effect on FHFA's decision to put the GSEs into conservatorship?  A:  I can answer?  $146 million? . . . That would not have had a – that would not have changed our decision.").  Second, even if the addition of $146 million would not have changed the GSEs decision, there is evidence that FHFA relied on multiple reasons for investigating the GSEs' solvency and assets.  *See* Government's response to paragraph 171 and documents cited therein.  The Government further disputes the statements in paragraph 187 because the GSEs' acquisition of high-risk loans led to a deterioration in their financial condition, ultimately leading to the conservatorship.  Nawaday Decl. Ex. GA (Sept. 6, 2008 Diskerson Memorandum memorandum regarding proposed appointment of the Federal Housing Finance Agency as Conservator for the Federal Home Loan Mortgage Corp), at 2-3, Nawaday Decl. Ex. FZ (Sept. 6, 2008, Dickerson memorandum regarding proposed appointment of the Federal Housing Finance Agency as Conservator for the Federal National Mortgage Association) at 2-3.  In addition, one of the factos supporting FHFA's decision to place the GSEs in conservatorship was the credit risks of the mortgages they purchased.  Mainigi Decl. Ex. 196 (Sept. 7, 2008, Statement of James Lockhard, FHFA), at 1-2.

**IX.   Countrywide Bank and BANA Were Not Affected by the HSSL.**

---

[669] Mainigi Decl. Ex. 12 (Dickerson Dep. 104:5-105:4).

### A.     CW Bank Did Not Sustain Any Losses From Repurchase of Bank-Defined HSSL Loans.

188.     Prior to the merger of Countrywide Bank FSB into Bank of America, N.A., Countrywide Bank did not repurchase any loans included in Defendants' definition of HSSL loans.[670]

**Response to Paragraph 188.**  The Government disputes the statement in paragraph 188 because the cited material does not define HSSL loans and contains no reference to "Defendants' definition of HSSL loans."  Moreover, the definition of HSSL loans is in dispute.  Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4; James Decl. Ex. A at 8 n.40.  Under the Government's definition of HSSL, two HSSL loans were repurchased prior to July 1, 2008.  Hansen Decl. ¶ 7.

### B.     BAC was Required to Indemnify BANA.

189.     On July 1, 2008, BAC acquired CFC.  In connection with that transaction, loans originated or acquired by CHL were transferred to BANA in two separate transactions.  To obtain OCC approval for these transactions, BANA entered into operating agreements with the OCC that mandated that BANA enter into indemnification agreements with BAC and certain non-bank affiliates related to the CHL loans covered by the transactions.  The operating agreements also granted the OCC monitoring and enforcement rights related to the indemnification agreements and made violation of the operating agreement punishable under 12 U.S.C. § 1818.  Under the terms of the June 30, 2008 and November 6, 2008 Asset Indemnification Agreements, BANA is indemnified for any liability or losses arising out of the CHL loans it received.[671]

**Response to Paragraph 189:** The Government disputes that the statements in paragraph 189 are material within the meaning of Fed. R. Civ. P. 56 or Local Civil Rule 56.1.  Subject to this objection, the Government does not dispute the truth of the first three sentences of Paragraph

---

[670] Scrivener Decl.

[671] Mainigi Decl. Ex. 204 (BANA-SDNY-C-001882254); Mainigi Decl. Ex. 197 (BANA-SDNY-C-001882261).

189.  The Government disputes the fourth sentence of Paragraph 189 because the June 30, 2008 and November 6, 2008 Asset Indemnification Agreements do not provide that BANA is indemnified for *any* liability arising out of the CHL loans it received.  For example, the Asset Indemnification Agreements do not apply to all repurchase obligations.  The agreements cover defined "Losses" related to certain defined "Assets."  Nawaday Decl. Ex. FN (Jun. 30, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882280-87 at 82-83; Nawaday Decl. Ex. FO (Nov. 6, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882261-70 at 64-65.  Pursuant to section (B) of the June 30, 2008 agreement, "Losses" include "any other expense, judgment, liability, restitution, reimbursement, indemnification, fine, penalty, or other obligation of any kind incurred by any entity referenced in 1.A.(i)b. or 1.A.(ii) whether or not related to any other Asset or Assets contributed to BANA as part of the noncash capital contribution to surplus . . . *on or after the date of transfer of the Asset or Assets from NBH to BANA*".  Nawaday Decl. Ex. FN (June 30, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882280-87 at 80-82 (emphasis added).  Accordingly, a repurchase obligation arising before the date of transfer (*i.e.*, June 30, 2008) would not constitute a defined "Loss" under the June 30, 2008 Asset Indemnification Agreement.  Nawaday Decl. Ex. FN (Jun. 30, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882280-87 at 82).

190.     On April 27, 2009, BANA acquired Countrywide Bank.  To obtain OCC approval for the merger, BANA was again required to enter into an operating agreement with the OCC that mandated that BANA enter into an indemnification agreement with BAC and certain non-bank affiliates.  The indemnification requirements are set forth in the Asset Indemnification Agreement dated June 9, 2009 between BANA, BAC, and certain other non-bank affiliates.  The agreement

provides for broad indemnification of BANA for any liability or losses with respect to assets acquired by BANA as a result of the merger of Countrywide Bank into BANA.[672]

**Response to Paragraph 190:** The Government disputes that the statements in paragraph 190 are material within the meaning of Fed. R. Civ. P. 56 or Local Civil Rule 56.1. Subject to this objection, the Government does not dispute the truth of the first three sentences of Paragraph 190. The Government disputes the fourth sentence of Paragraph 190 because the term "broad" is not reflected in the cited material, and the June 9, 2009 Asset Indemnification Agreement does not provide that BANA is indemnified for *any* liability arising out of the assets acquired by BANA in the Countrywide merger. For example, the Asset Indemnification Agreement does not apply to all repurchase obligations. The agreement covers defined "Losses" related to certain defined "Assets." Mainigi Decl Ex. 201 (June 9, 2009, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882271-79 at 74-75. Pursuant to section (B) of the June 9, 2009 agreement, "Losses" include "any other expense, judgment, liability, restitution, reimbursement, indemnification, fine[,] penalty, or other obligation or payment of any kind (collectively Obligation) incurred by or imposed on any entity within the scope of 1.A.(1)(b) or 1.A.(3) whether or not related to any other Asset or Assets to the extent BANA is responsible for such obligation . . . *on or after the date of the acquisition of the Asset or Assets from NBH to BANA."* Mainigi Decl. Ex. 201 (June 9, 2009, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882271-79 at 75 (emphasis added). Accordingly, a repurchase obligation arising before the date of transfer (i.e., April 27, 2009) would not constitute a defined "Loss" under the June 9, 2009 Asset Indemnification Agreement. Mainigi Decl. Ex. 201 (Jun. 9, 2009, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882271-79 at 75.

191.   The purpose of the indemnification agreements was to ensure that BANA be

---

[672] Mainigi Decl. Ex. 201 (BANA-SDNY-C-001882271); Wertz Decl.

protected from loss arising out of its acquisition of Countrywide-related loans as the OCC was adamant that BANA suffer no losses from Countrywide's operations.[673]

**Response to Paragraph 191:** The Government disputes that the statement in Paragraph 191 is material within the meaning of Fed. R. Civ. P. 56 and Local Civil Rule 56.1. The Government also disputes paragraph 191 on the ground that paragraph 10 of the Wertz Declaration—the paragraph to which Defendants refer in paragraph 191 of their Rule 56.1 Statement—lacks foundation with respect to the declarant's firsthand knowledge with respect to the purpose of the Indemnification Agreements from the standpoint of signatories other than Bank of America Corporation. Paragraph 10 of the Wertz Declaration similarly lacks Foundation with respect to the declarant's firsthand knowledge with respect to the position of the OCC.

192.    Accordingly, BAC has interpreted the relevant indemnification agreements to require indemnification of BANA for any losses related to repurchase, makewhole, and settlement payments made on loans transferred from CHL to BANA, as well as loans originated or acquired by Countrywide Bank through the date of the merger that were sold to the GSEs.[674]

**Response to Paragraph 192**: The Government disputes that the statement in paragraph 192 is material within the meaning of Fed. R. Civ. P. 56 and Local Civil Rule 56.1. The Government also disputes Paragraph 192 on the ground that Bank of America Corporation's interpretation of the relevant indemnification agreements is incorrect. *See supra*, Responses to ¶¶ 189-90.

193.    It has been BAC's practice to indemnify BANA for representation and warranty related expenses arising out of the CHL loans transferred to BANA, as well as the loans originated or acquired by Countrywide Bank through the date of the merger that were sold to the

---

[673] Wertz Decl.

[674] Wertz Decl.

GSEs, including the repurchase related settlements reached with Fannie Mae in January 2013 and Freddie Mac in December 2010.[675]

**Response to Paragraph 193:**  The Government disputes the statement in paragraph 193 as immaterial and disputes that the evidence cited supports the statement "including the repurchase related settlements reached with Fannie Mae in January 2013 and Freddie Mac in December 2010."  *See* Wertz Decl.¶ 6.

194.    BANA reports such indemnification payments received from BAC in its quarterly reporting to the OCC and Federal Reserve.[676]

**Response to Paragraph 194:**  The Government disputes the statement in paragraph 194 as immaterial.

195.    Under the Bank's definition of HSSL loans, BANA has been indemnified for all repurchase and makewhole related expenses and therefore suffered no financial harm from the HSSL loans.[677]

**Response to Paragraph 195:**  The Government disputes that the statement in paragraph 195 is material within the meaning of Fed. R. Civ. P. 56.  The Government disputes the Bank's definition of HSSL loans that it repurchased.  *See* Thomas Decl. ¶¶ 8-11; Hansen Decl. ¶¶ 3-4; James Decl. Ex. A, 8 at n.40 (Defendants' expert conceding that "the definition of HSSL loans is under dispute.").  The Government further disputes that BANA has suffered no financial harm from the HSSL loans.  The "Losses" suffered by BANA in connection with repurchases and make whole expenses for HSSL loans triggered Bank of America Corporation's indemnification obligations under the Asset Indemnification Agreements. See *supra* Responses to ¶¶ 189-190.

---

[675] Wertz Decl.

[676] Wertz Decl.

[677] Scrivener Decl.

**STATEMENT OF ADDITIONAL FACTS PURSUANT TO LOCAL
CIVIL RULE 56.1(B) AS TO WHICH THE UNITED STATES
CONTENDS THAT THERE IS A GENUINE ISSUE TO BE TRIED**

**A.  Countrywide's Representations and Warranties to the GSEs**

196.    The government-sponsored enterprises Federal National Mortgage Association
("Fannie Mae" or "Fannie") and Federal Home Loan Mortgage Corporation ("Freddie Mac")
(together, the "GSEs"), purchase single-family mortgages from lenders based on a "rep and
warrant model," relying on lenders' representations and warranties that their loans comply in all
respects with the standards outlined in the GSE selling guides and lender sales contracts, which
set forth underwriting, documentation, quality control, and self-reporting requirements.  Mainigi
Decl. Ex. 34, Grimes Tr. 108:5-11; Mainigi Decl. Ex. 3, Battany Tr. 105:1-11, 105:23-106:10,
211:22-212:2 (every lender is required to self-report materially defective loans).

197.    The GSEs used this model with Countrywide.  Mainigi Decl. Ex. 35, Chandler Tr.
62:10-13; Mainigi Decl. Ex. 28, Tanabe Tr. 274:5-20.

198.    Lender representations and warranties were a "key part of the business
relationship" because the GSEs could not review every loan file that they purchased, and sellers
such as Countrywide have superior knowledge of the particular loans that they originate and
ultimately sell.  Mainigi Decl. Ex. 3, Battany Tr. 107:7-18; Mainigi Decl. Ex. 35, Chandler Tr.
63:10-19; *see also* Mainigi Decl. Ex. 23, Padgett Tr. 76:4-9 (explaining that Freddie Mac relied
on Countrywide "to originate, underwrite, close and deliver . . . loans in accordance with the
contract as if [Freddie Mac was] underwriting them" itself).  *See* Mainigi Decl. Ex. 23, Padgett
Tr. 76:10-12 (Freddie Mac expected "only to receive those loan files delivered to us that [it]
would have approved" had Freddie Mac underwritten them); Mainigi Decl. Ex. 23, Padgett Tr.
77:4-78:5; Mainigi Decl. Ex. 34, Grimes Tr. 107:21-108:4 (Fannie Mae could not underwrite the

loans sold to it given the volume); Mainigi Decl. Ex. 27, Sullivan Tr. 244:18-245:18 (rep and warrant model designed to put the responsibility on lenders to ensure the quality of the loans that they were selling to Fannie Mae).

199.    The GSEs therefore delegate the underwriting of the loans they purchase to the lenders; the GSEs re-underwrite the loans only after purchase, if at all, and on a limited basis, to determine whether the loan contained a material defect entitling the GSE to a remedy. *See* Mainigi Decl. Ex. 26, Sobczak Tr. 132:3-133:10 (explaining that any re-underwriting by Fannie Mae occurred post-purchase and was "small in nature"); Mainigi Decl. Ex. 28, Tanabe Tr. 274:22-280:10 (explaining that when Freddie Mac adopted the rep and warrant model, it began conducting limited quality-control checks after delivery of the loans which happened at least 120 days after the sale and "[o]ftentimes longer than that").  In its master contract with Fannie Mae applicable to loans originated in 2007 and 2008, Countrywide represented that all loans sold to Fannie Mae would "conform[ ] to all the applicable requirements in [Fannie Mae's] guides in this contract."  Mainigi Decl. Ex. 3, Battany Tr. 111:18-112:1; Nawaday Decl. Ex. AG (Nov. 29, 1982, Mortgage Selling and Servicing Contract).  This language was a representation and warranty by Countrywide that "all loans delivered by Countrywide would meet the requirements of Fannie Mae's selling guide or [the contract]."  Mainigi Decl. Ex. 3, Battany Tr. 112:2-6. Fannie Mae's selling guide contains requirements that delivered loans must meet.  Mainigi Decl. Ex. 3, Battany Tr. 112:2-14, 233:14-18.

200.    Fannie Mae's Mortgage Selling and Servicing Contract ("MSSC") applicable to loans purchased by Fannie Mae during 2007 and 2008 required that all loans sold by lenders be "acceptable investments."  Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at 386.  The MSSC defines an "acceptable investment" to mean

that "[t]he Lender knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to: cause private institutional investors to regard the mortgage as an unacceptable investment; cause the mortgage to become delinquent; or adversely affect the mortgage's value or marketability."  Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at 386.  Fannie Mae's requirement that each mortgage sold be an acceptable investment was language included in every MSSC.  Mainigi Decl. Ex. 34, Grimes Tr. 110:21-111:12.

201.    The MSSC also required that Countrywide "must, at all times, have employees who are well trained and qualified to perform the functions required of the Lender under this Contract."  Nawaday Decl. Ex. AH (Fannie Mae Mortgage Selling and Servicing Contract) USA-00074378-401 at 381.  Fannie Mae expected that lenders would have an "adequate process" for the "origination and creation of the loans" to ensure that the loans sold were "investment grade" and thus complied with the required representations and warranties.  Mainigi Decl. Ex. 34, Grimes Tr. 115:11-116:1; Mainigi Decl. Ex. 27, Sullivan Tr. 244:9-14 ("Fannie Mae relies on representations and warranties around both the process under which the loan was underwritten as well as the eligibility and other criteria, because those lenders would have originated, closed, and now are selling to Fannie Mae, so we need lenders to represent and warranty to us that that process was done and referred to by those guidelines.").

202.    Similarly, Freddie Mac requires that lenders represent that each loan sold to Freddie Mac is "investment quality," which, under the terms of the Freddie Mac Seller/Servicer Guide applicable in 2007 and 2008, is one "made to a Borrower from whom repayment of the debt can be expected, is adequately secured by real property[,] and is originated in accordance with the requirements of the Purchase Documents."  Nawaday Decl. Ex. AI (Feb. 7, 2003, Single

Family Seller/Servicer Guide Excerpt) USA-00130972-74, 130982, 131114-15, 131490 at

131490.  With regard to each loan sold to Freddie Mac, Countrywide further warranted that it

had "not misstated or omitted any material fact about the Mortgage."  Mainigi Decl. Ex. 28,

Tanabe Tr. 282:15-283:4; *see also* Nawaday Decl. Ex. AI (Feb. 7, 2003, Single Family

Seller/Servicer Guide Excerpt) USA-00130972-74, 130982, 131114-15, 131490 at 131115.  The

term "material fact" is not defined in the purchase documents defining the obligations of

Countrywide vis-à-vis Freddie Mac, but it is a meaningful term of the contract.  Mainigi Decl.

Ex. 28, Tanabe Tr.  284:4-10.

203.    Countrywide itself also represents that its policy is to "originate . . . investment

quality loans" and defines an "investment quality" loan as a loan "that is made to a borrower

from whom timely payment of the debt can be expected, is adequately secured by real property,

and is originated in accordance with Countrywide's Technical Manual (CTM) and Loan Program

Guides (LPGs)."  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Conventional Technical

Manual, Introduction, 0.3.1) BANA-SDNY-C-000131805-29 at 805.

204.    To comply with GSE expectations, lenders such as Countrywide implemented

quality-control programs.  Mainigi Decl. Ex. 23, Padgett Tr. 138:19-139:1 (Freddie Mac required

its lenders to have quality-control programs); Mainigi Decl. Ex. 23, Padgett Tr. 91:4-12 (Freddie

Mac expected its seller servicers to retain qualified staff who were able to underwrite loans);

Mainigi Decl. Ex. 23, Padgett Tr. 94:18-95:6 (to accurately determine if a borrower has qualified

earnings available to repay a mortgage every month "takes a level of skill and experience that

needs to be done at an underwriter level").  Fannie Mae considered the quality-control process to

be a "very integral part of the loan origination process."  Mainigi Decl. Ex. 13, Forlines Tr.

60:10-12.  It was important that a lender have a "strong quality control plan" and a "staff . . .

capable of implementing it."  Mainigi Decl. Ex. 35, Chandler Tr. 60:4-7.  A strong-quality control program is one way that Fannie Mae could ensure that "what a lender was representing was being delivered was, in fact, what was being delivered."  Mainigi Decl. Ex. 35, Chandler Tr. 60:1-3.

205.    Countrywide was also required to report to Fannie Mae or Freddie Mac any loans it identified as materially defective or otherwise ineligible for sale.  Mainigi Decl. Ex. 23, Padgett Tr. 138:19-139:1 (Freddie Mac required its lenders to notify Freddie Mac "whenever they identify loans containing fraud or misrepresentation or just ineligible against the terms of business"); Mainigi Decl. Ex. 23, Padgett Tr. 193:21-194:1 ("Countrywide and all [of Freddie Mac's] lenders have an obligation to report loans that they determine to be ineligible."); Mainigi Decl. Ex. 26, Sobczak Tr. 181:2-7 (requirement to self-report materially defective loans was "part of the standard contract" with Fannie Mae); Mainigi Decl. Ex. 27, Sullivan Tr. 242:15-19 ("In the selling guide, there is a requirement that -- which would apply to all lenders, that if they become aware of breaches in the selling rep and warrants, that they are to notify Fannie Mae.").

**B.    Market Changes in 2007 Prompted Changes to GSE Purchase Requirements**

206.    In response to the collapse of the subprime market in early 2007, Countrywide's Full Spectrum Lending Division ("FSL") transitioned to a prime lending division throughout 2007 to sell a larger percentage of its loans to the GSEs.  Nawaday Decl. Ex. T, Mairone Tr. 170:11-18 (GSEs were major purchasers in secondary market around October 2007); Nawaday Decl. Ex. AK (Apr. 11, 2007, FSL Central Services Business Review) BANA-SDNY-E-005357445-59 at 46 (stating "First Change—Prime from sub-prime"); Nawaday Decl. Ex. AL (Sept. 12, 2007, FHLMC Subprime Review) BANA-SDNY-E-002913046-47 at Slide 7 ("Prime/Sub-Prime Mix of Business Has Shifted"); Nawaday Decl. Ex. Q, Kitashima Tr. 163:23-

164:12 ("[I]t was evident that the subprime market opportunities on the secondary market were

continuing to erode.  And our results production-wise was showing a shift from July of 2005,

where our prime production represented 37 percent of our total production, to the current day, at

that time July '07, where 86 percent of our business was now coming through the prime

channel."); Nawaday Decl. Ex. AM (Sept. 11, 2007, Email to Greg Lumsden) BANA-SDNY-E-

000144634-35 at 34 ("Based on our forecast and recent application trends, our business will now

be at least 95% prime.  In addition, the prime business will be 75%-85% Fannie/Freddie or

FHA.").

207.    Also in response to the subprime market collapse, the GSEs began to tighten their

purchasing requirements, phase out certain riskier loan products, and increase their monitoring of

loan quality.  Mainigi Decl. Ex. 26, Sobczak Tr. 135:19-136:7; 136:15-137:12 (Fannie Mae took

a more conservative approach in response to customer requests in determining what types of

loans were acceptable for purchase); Mainigi Decl. Ex. 28, Tanabe Tr.  131:5-10 (Freddie Mac

began "making significant changes in the '07 time frame"); Mainigi Decl. Ex. 28, Tanabe Tr.

133:10-16 (discussing "general overall policy tightening done by the lenders, done by the

investors").

208.    The GSEs' tightening requirements and renewed focus on loan quality were

communicated to Countrywide.  Tanabe explained that there were "[q]uite a few" meetings

between Freddie Mac and Countrywide about these changes in this time period.  Mainigi Decl.

Ex. 28, Tanabe Tr.  297:2-298:7. As Tanabe explained on behalf of Freddie Mac, "[i]n 2007,

particularly late in 2007, there was an expectation that everybody need[ed] to buckle down,"

Mainigi Decl. Ex. 28, Tanabe Tr.  at 293:2-6, and Freddie Mac communicated this to lenders

both by making changes to the Guide and through direct contact with lenders.  Mainigi Decl. Ex.

28, Tanabe Tr. 296:10-297:1. Freddie Mac conducted a review of Countrywide loans funded in May and June of 2007, and found that 51% of the loans were not investor quality ("NIQ"). Nawaday Decl. Ex. AN (July 11, 2007, Email from Nancy Bush) BANA-SDNY-E-004004130-32 at 31. In July 2007, Tanabe planned a meeting with Countrywide's Secondary Marketing Director Rod Williams "to discuss pricing," and one of the topics of the meeting was to be "the high NIQ rate." Nawaday Decl. Ex. AN (July 11, 2007, Email from Nancy Bush) BANA-SDNY-E-004004130-32 at 31.

209.     During 2007, Fannie Mae also expected that sellers would pay rigorous attention to their loan origination processes to achieve the expected level of quality. Mainigi Decl. Ex. 13, Forlines Tr. 182:7-21. According to John Forlines, who was vice president of the credit risk management group at Fannie Mae from 2006 to 2010, if a lender implemented a loan origination process that could have risk implications for Fannie, Forlines expected that the lender would bring that change to Fannie's attention. Mainigi Decl. Ex. 13, Forlines Tr. 186:7-16.

210.     Fannie Mae also revised its purchasing requirements by narrowing the range of loan products it was willing to buy. Mainigi Decl. Ex. 35, Chandler Tr. 71:11-25. Fannie Mae determined that narrowing the scope of eligible mortgages would reduce the risk associated with new acquisitions. Mainigi Decl. Ex. 35, Chandler Tr. 72:7-10; Mainigi Decl. Ex. 3, Battany Tr. 129:4-130:17 (Fannie Mae priced for and sought to reduce loan exposure with respect to the loans that it purchased in 2007). As Joseph Grimes, a vice president of operations at Fannie Mae, explained, "[w]e started changing what we would accept or not accept through announcements and guidelines in the latter part of 2007, and that translated into new decision rules in [Fannie Mae's Desktop Underwriter], effectively eliminating products and messaging and other types of things that were approved that would come across as approved eligible."

Mainigi Decl. Ex. 34, Grimes Tr. 25:7-21, 55:20-56:1-4; *see also* Mainigi Decl. Ex. 34, Grimes Tr. 85:10-86:4, 118:13-16, 120:8-14.

211.    Fannie Mae was particularly concerned about its counterparty exposure to Countrywide because Countrywide was one of Fannie Mae's largest counterparties.  Mainigi Decl. Ex. 3, Battany Tr. 131:6-11 (counterparty exposure to Countrywide "always a very key, top focus for Fannie Mae").  "Counterparty exposure is the risk to Fannie Mae that a lender cannot comply within the terms of their agreement; that they don't have the financial capacity or ability to honor any contractual obligations."  Mainigi Decl. Ex. 3, Battany Tr. 131:25-132:4.  In 2006 and 2007, Countrywide "w[as] probably Fannie Mae's largest volume lender, so . . . Fannie Mae had the biggest counterparty exposure."  Mainigi Decl. Ex. 3, Battany Tr. 131:13-17. "Because [Countrywide] w[as] Fannie Mae's largest delivering volume . . . if Fannie Mae had to go in and seize the servicing or ask for repurchases, there'd just be more loans to seize or more loans to repurchase than with any other lender."  Mainigi Decl. Ex. 3, Battany Tr. 132:9-15. Indeed, a failure of Countrywide not only would have a "devastating" effect on Fannie Mae, but also on the U.S. mortgage market as a whole. Mainigi Decl. Ex. 35, Chandler Tr. 65:9-66:19. Fannie Mae listed its relationship with Countrywide as a material risk to its financial condition in its 2007 Form 10-K.  Nawaday Decl. Ex. FG (Fannie Mae 2007 Form 10-K Excerpt) at 26-27.

212.    During 2007, Fannie Mae communicated to Countrywide employees Christian Ingerslev and Isa Backley that it intended to reduce the riskiness of new acquisitions.  Mainigi Decl. Ex. 35, Chandler Tr. 72:16-20, 72:24-73:19.

### C. Countrywide Acknowledged That Market Changes Required Renewed Focus on Quality

213.    Countrywide stated in its 2007 Form 10-K that in response to changes in the secondary market, it was tightening its underwriting and loan program guidelines and that the

vast majority of loans it originated were eligible for sale to the GSEs.  Nawaday Decl. Ex. FJ

(Countrywide 2007 Form 10-K Excerpt) at 106, 111, 204.

214.    In April 2007 Countrywide also acknowledged that its credit quality had

"deteriorated over the last twelve months" and sought to implement certain "modifiers" (or

"hits") to employee compensation to "reinforce [its] focus on credit quality."  Nawaday Decl.

Ex. AO (Apr. 18, 2007, CHL Credit, Fraud, and Ops Incentive Modifiers Project Overview) at 3.

The modifiers, intended to be designed by June 1, 2007, and implemented by the third quarter of

2007, were to apply to (among others) underwriting supervisors, loan specialists, and funders,

and were designed "to reduce risk" and "to align bonuses with CHL quality objectives."

Nawaday Decl. Ex. AO (Apr. 18, 2007, CHL Credit, Fraud, and Ops Incentive Modifiers Project

Overview) at 4-5.  Specifically, the modifiers were to be implemented based on the number of

Severely Unsatisfactory (or "SUS") ratings the employee received on loans they processed or

underwrote.  Nawaday Decl. Ex. AO (Apr. 18, 2007, CHL Credit, Fraud, and Ops Incentive

Modifiers Project Overview) at 7.  Among those on the steering committee tasked with designing

and implementing the modifiers were FSL's chief operating officer ("COO") Rebecca Mairone

and chief credit officer Cliff Kitashima.  Nawaday Decl. Ex. AO (Apr. 18, 2007, CHL Credit,

Fraud, and Ops Incentive Modifiers Project Overview) at 9.

215.    In August 2007, Countrywide Home Loans president Andrew Gissinger sent a

memorandum to all CHL employees outlining the changes to the secondary market since the

collapse of the subprime business and stating that "[o]ur success in the environment is absolutely

contingent on our ability to employ rigorous underwriting discipline.  We need to adapt our

business to new market realities which requires ongoing manufacturing quality enhancement and

further repeating controls." Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Andrew

Gissinger) BANA-SDNY-E-000009676-79 at 79.

216.    By September 2007, Countrywide represented to Freddie Mac that it had "taken,

and is continuing to take, a number of actions in response to changing market conditions.  These

include tightening of credit guidelines . . . ." Nawaday Decl. Ex. AQ (Nov. 15, 2007, Freddie

Mac Memorandum regarding External Operational Risk On-Site Review) FMBOA00774037-63

at 38.  Based on the information Countrywide provided, Freddie Mac noted that "[g]iven the

rapidly changing market, CHL regularly review [sic] and modifies underwriting guidelines to

reduce risk." Nawaday Decl. Ex. AQ (Nov. 15, 2007, Freddie Mac Memorandum regarding

External Operational Risk On-Site Review) FMBOA00774037-63 at 43.

### D.    Pressure to Fund Loans Quickly Led to HSSL Design

217.    While FSL was responding to secondary market changes, FSL also faced

profitability problems, and FSL President Greg Lumsden declared increasing profitability to be

the "highest priority." Nawaday Decl. Ex. AR (Aug. 8, 2007, Email from Greg Lumsden)

BANA-SDNY-E-002578346 ("[T]his is the highest priority for the majority of Full Spectrum,

and thus I need your direct and intense involvement.  If we do not improve our prime fundings to

over 50%, the organization impact will be far beyond a few layoffs here and there."). "During

2007, loan production continued to ramp down overall." Nawaday Decl. Ex. T, Mairone Tr.

164:10-13.  Mairone testified that "we were addressing that [reduced loan volume] with several

things, including employee layoffs." Nawaday Decl. Ex. T, Mairone Tr. 164:13-15; Nawaday

Decl. Ex. W, O'Donnell Tr. 118:6-8 (In 2007, FSL was "certainly under pressure to increase [its]

profitability and increase revenues and increase volume").

218.    To fund loans more quickly and thus increase profitability, FSL developed a new origination model called the High Speed Swim Lane ("HSSL") designed to reduce the amount of time spent underwriting and processing loans.  Nawaday Decl. Ex. W, O'Donnell Tr. 45:8-19.

219.    The project was called the "Hustle."  Nawaday Decl. Ex. W, O'Donnell Tr. 150:5-6 ("The project was referred to as both 'HSSL' and 'Hustle'"); Nawaday Decl. Ex. AS (Aug. 4, 2007, Email from Rodriguez) BANA-SDNY-E-000086563-64 at 63 (referring to "Prime High-Speed Swim Lane [HSSL, aka Hustle] process flow and pilot") (brackets in original); Nawaday Decl. Ex. AT (July 23, 2007, Email from Rodriguez) (referring to "the HSSL—Hustle, or high-speed swim lane") BANA-SDNY-E-001225251; Nawaday Decl. Ex. D, Boland Tr. 21:22—22:15 (HSSL pilot rollout in Richardson, Texas included promotional materials, music, and dance steps demonstrating how to dance the Hustle); Nawaday Decl. Ex. AC, Thomas Tr. 17:20-12 ("Q:  Was that program also called the Hustle?  A.  Yes."); Nawaday Decl. Ex. AU (Sept. 27, 2007, Email from Janet Godby) BANA-SDNY-E-001754418 (referring to project as the "Hustle" and stating "Hustle is heaven if you're a hustler, and hell if you're not").

220.    The HSSL was promoted as a model to allow prime loans to fund quickly by reducing the number of handoffs and checkpoints that the loan would encounter during processing.  Nawaday Decl. Ex. AV (July 25, 2007, Email from Mark Barnett) BANA-SDNY-E-000077362-82 at 66-67; Nawaday Decl. Ex. D, Boland Tr. 24:18-25:2.  The "design principles" for the HSSL were that "Loans Move Forward, Never Backward," "Minimize Waits/Delays, Maximize Parallel Tasks," "Maximize authority level of key roles, Minimize Handoffs," and "CLUES is the Underwriter."  Nawaday Decl. Ex. AW (Aug. 2, 2007, Full Spectrum Lending Divisional Strategy Session Overview) BANA-SDNY-E-000053377-415 at 382.

### a.  *The HSSL Eliminated Underwriters*

221.    By making Countrywide's automated underwriting system—CLUES—the underwriter, the HSSL was designed to eliminate human underwriters from reviewing the HSSL loans.  Nawaday Decl. Ex. AJ (Conventional Technical Manual (CTM), Introduction 0.3.1) BANA-SDNY-C-000131805-29 (describing CLUES); *id.* at 8 ("CLUES underwrites—no UW [underwriter] handoff"); Nawaday Decl. Ex. AY (Aug. 2, 2007, FSL Prime Business Model Review) BANA-SDNY-E-000053091-98 at 93; (listing one of the "design principles" of the HSSL as "CLUES is the Underwriter"); Nawaday Decl. Ex. T, Mairone Tr. 82:8-18 ("It was important that the data drive the process, not individuals who drive the process"); Nawaday Decl. Ex. S, Lumsden Tr. 42:9-44:11 ("CLUES was the underwriter"); Nawaday Decl. Ex. L, Ho Tr. 209:5-11 ("Q: What role, if any, did the underwriter have in the Hustle pilot process? A:  In the pilot process my understanding is that the underwriters were available, if needed."); Nawaday Decl. Ex. AZ (Dec. 12, 2007, Email from Mairone) BANA-SDNY-E-003960408-09 at 9 ("CLUES is the underwriter . . . trust it and validate the conditions requested").

222.    Using CLUES as "the underwriter," the HSSL aimed to achieve a "minimum set of handoffs" and therefore improve the velocity with which loans funded.  Nawaday Decl. Ex. BA (Aug. 2, 2007, FSL Prime Business Model Review) at 4-5 (listing HSSL design key features as "No more returns—one way traffic," "CLUES underwrites--no U/W handoff," "Expanded authority at line staff level," "Minimal handoffs," and "Simplified Condition clearing").

223.    As FSL underwriting manager Neal Ballance explained, the HSSL was designed "to push loans through at a high speed with fewer obstacles.  And by obstacles, underwriting." Nawaday Decl. Ex. B, Ballance Tr. 10:13-24; Nawaday Decl. Ex. B, Ballance Tr. 31:1-18. ("The

High Speed Swim Lane … was pretty much designed to bypass underwriting.  It was felt that underwriting was slowing things down.").

224.    When borrower information is entered into CLUES by a loan processor or other employee, CLUES returns either an "Accept" or "Refer" decision.  Nawaday Decl. Ex. AJ (CTM, Introduction 0.3.1) BANA-SDNY-C-000131805-29 at 06.  Prior to the HSSL, loan processors within FSL "were really more clerks. . . . [T]hey were generally entry level positions.  People that came to Full Spectrum without prior or significant mortgage experience."  Nawaday Decl. Ex. W, O'Donnell Tr. 90:7-11.  Loan processors' "interests were production.  That was the sole point of their employment was to produce loans.  And then there was an underwriting and a funding group. . .  And their sole function was to protect the company and the investors and safeguard the quality."  Nawaday Decl. Ex. D, Boland Tr. 28:17-29:12; *see also id.* at 65:19 (referring to underwriters as "guardians of quality").  As a result, prior to the HSSL, after receiving a decision from CLUES, the loan processor conveyed the loan to an underwriter so that person could validate the data entered into CLUES and review and clear conditions on the loan until the loan was cleared to close and fund.  Nawaday Decl. Ex. W, O'Donnell Tr. 86:23-87:10; s*ee also* Nawaday Decl. Ex. D, Boland Tr. 49:8-50:23, 51:7-9 (Loan specialists were typically not allowed to clear conditions on a loan's approval because "they didn't have the depth of experience or the training or the history with clearing a condition like stated doc reasonability").

225.    As part of the HSSL, however, when CLUES returned an "Accept" decision, loan processors (also referred to as "loan specialists" or "lending specialists," *see* Nawaday Decl. Ex. T, Mairone Tr. 47:7-49:19; Nawaday Decl. Ex. D, Boland Tr. 28:12-16), had the authority to validate the data they themselves entered and were responsible for clearing any conditions on the approval of the loan.  Nawaday Decl. Ex. AV (July 25, 2007, Email from Barnett) BANA-

SDNY-E-000077362–82 at 66 (indicating that loans that received a CLUES Accept can proceed "Straight Through at High Speed"); Nawaday Decl. Ex. L, Ho Tr. 212:10-22 ("Q: In the Hustle pilot what, if anything, were the underwriters required to do with regard to validating Prime CLUES Accepts loans?  A: My understanding is that the loan specialists were responsible for the validation of the data that was in the CLUES.  Q:  And the loan specialists would also be, if it got a Prime CLUES Accepts, the loan specialists would be the ones to clear it to close, as well?  A: Yes.  If it was within their approval authority."); Nawaday Decl. Ex. L, Ho Tr. 210:9-15 ("Q:  If the loan didn't get a CLUES referral, what, if any, role would the underwriting staff have in the Hustle pilot process?  A:  They were available there for consultation. . . ."); Nawaday Decl. Ex. L, Ho Tr. 212:23-213:12 ("Q:  Okay.  So unless an underwriter got a call from a loan specialist, the underwriter really didn't need to do anything with regard to a Prime CLUES Accepts loan with respect to the Hustle pilot; is that fair?  A: That if the loan was within the approval authority of the loan specialist, then the loan specialist would not have to go to the underwriter.").

226.    Underwriters were even removed from the deliberations concerning whether loan specialists should be given this new underwriting authority.  Initially, underwriting managers were asked to send emails to the production unit recommending loan specialists for a new underwriting authority level.  Nawaday Decl. Ex. BB (Aug. 9, 2007, Email from Audrey Knabe) BANA-SDNY-E-001450756-57; Nawaday Decl. Ex. D, Boland Tr. 59:9-25.  It soon became clear, however, that underwriting managers were expected to summarily bless the change.  Nawaday Decl. Ex. D, Boland Tr. 60:15-21.

227.    For instance, Boland was asked to recommend two loan specialists for "level 2 authority," but when he pointed out that he did not even know them, he was told "[t]hey are the guys assigned to the HSSL thing.  Come on… work with me! = )."  Nawaday Decl. Ex. BB

(Aug. 9, 2007, Email from Audrey Knabe) BANA-SDNY-001450756-57 at 56; Nawaday Decl. Ex. D, Boland Tr. 60:15-21 ("I wouldn't approve something without knowing the qualities or the -- or the qualifications of the individuals.  But this is implying that it's not a big deal.  It's the Hustle thing.").  As Boland explained, "the simple fact that they would even make the request for me to approve people that I didn't know tells you that their thinking was so different than it had been previously.  It was such a departure that it warranted me reaching out and -- and saying, I need help.  This is not going well.  And things are changing quickly.  Management needs to know that our vision is not the same as theirs."  Nawaday Decl. Ex. D, Boland Tr. 62:25-63:7.

228.    When Boland escalated the issue, he was informed by Edward O'Donnell that approval by an underwriter would no longer be required as a condition for a loan specialist to obtain underwriting authority.  Nawaday Decl. Ex. BC (Aug. 14, 2007, Email from Ron Cannon) BANA-SDNY-E-001451207-08.  As a result, "underwriting was no longer going to be evaluating the people who were signing off on loans," although "the reason that underwriting was involved in that recommendation previously is because we were the most intimate with the knowledge, experience, and understanding that the loan processors had."  Nawaday Decl. Ex. D, Boland Tr. 63:16-22.  Given that underwriters were "the most qualified to evaluate the knowledge of that processor . . . when management decided not to use that information or that perspective, it was a clear sign that they didn't want – [underwriters] assumed that they didn't want to know how the submission quality was or what the capability of their processors were."  Nawaday Decl. Ex. D, Boland Tr. 65:9-66:7.

### b.    The HSSL Gave Loan Specialists Underwriting Authority without Prior Training

229.    Javier Jaraba was in charge of granting underwriting authority within FSL for part of 2007 until those duties, along with quality control and assurance, were taken over by Steve

Brent.  Nawaday Decl. Ex. P, Jaraba Tr. 25:11-26:22.  Before Brent took over, the process for

obtaining a new level of underwriting authority took approximately 30 to 60 days, during which

time Jaraba reviewed the employee's recent "quality of grade" or "QOG" scores and Corporate

QC results, obtained feedback from the employee's supervisor, and determined that the requisite

training had been completed.  Nawaday Decl. Ex. P, Jaraba Tr. 26:23-28:18, 29:22-24.

230.    Additionally, to obtain or expand their underwriting authority, employees were

typically required to maintain a minimum QOG score of four on a scale of zero to five.

Nawaday Decl. Ex. P, Jaraba Tr. 28:21-29:4; Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from

Patrick Aliano) BANA-SDNY-E-002220473-76 at 75 (requirements for authority include "[a] 3-

month averaged QOG of 4 or better"); Nawaday Decl. Ex. BE (Dec. 14, 2007, Email from Todd

Green) BANA-SDNY-E-002725463-67 at 67 (listing "Maintain a[n] averaged QOG of 4 or

better" as a level requirement for PCA authority,[678] Underwriter Level 1 authority, and

Underwriter Level 2 authority).  A QOG score of three or lower for two consecutive months was

a reason for repealing authority.  Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick

Aliano) BANA-SDNY-E-002220473-76 at 75.

231.    For the HSSL, however, the typical requirements concerning training and

certification were suspended.  Nawaday Decl. Ex. AC, Thomas Tr. 57:11-59:7.  "[T]o handle the

volume [of HSSL loans], we needed people with authority to make the decisions," Nawaday

Decl. Ex. AC, Thomas Tr. 57:10-11, but, "the problem was, How do we get them underwriting

authority? . . . So my recollection is, this was -- this was an issue to get people authority.  They

were – we had various efforts to get LSs certified and they were not successful . . . The training

---

[678] "PCA authority" is authority to clear to close loans determined to be Prime CLUES
Accept by Countrywide's automated underwriting system.  Mainigi Decl. Ex. 24, Price Tr. 63:3-
12

piece continued to be an issue . . . And my recollection is eventually everybody was just given underwriting Level 1 authority . . . To get through the volume they would have -- they had to give everybody authority,"  Nawaday Decl. Ex. AC, Thomas Tr. 57:11-59:7.

232.    Without sufficient time to train and certify loan specialists to handle the sought-after HSSL volume, FSL therefore "grandfathered" loan specialists with underwriting authority so they could participate in the HSSL.  Nawaday Decl. Ex. BF (Aug. 20, 2007, Email from Steve Brent) BANA-SDNY-E-00007102-03 ("Our challenge is that to get the approximately 70+/-LS's CSO-PCA/HSSL level authority will take us too long (checking for QOG info, Fraud info, current level of authority, what training prerequisites have been completed for this level, etc).  So to get these LS's PCA/HSSL (approximately 70), [sic] we are recommending we 'grandfather' all of these into PCA today.  As time permits, we will go back and validate the authority granted against findings (and some may lose their authority at this later date."));  Nawaday Decl. Ex. E, Brent Tr. 23:13-21.

233.    On September 13, 2007, it was advised and confirmed that "all Loan Specialists included in the upcoming rollout of HSSL [would] receive Underwriting Level 1 authority, effective 10/1/2007."  Nawaday Decl. Ex. BG (Sept. 13, 2007, Email from Patricia Coryell) BANA-SDNY-E-000096088-90 at 89-90.  Brent, however, opposed this decision, stating that "grandfathering is not an option" because "if you notice in the weekly findings that we publish, 60% of the High Risk findings are in Richardson, which is the center that we 'grandfathered' in for PCA/HSSL."  Nawaday Decl. Ex. BG (Sept. 13, 2007, Email from Steve Brent) BANA-SDNY-E-000096088-90 at 88.

234.    Further, when Jaraba was asked to grandfather loan specialists from PCA authority to the next level of authority (Level 1 underwriting authority), he stated that the

employees had not yet completed their requirements for PCA authority and were "way behind" the other employees granted such authority.  Nawaday Decl. Ex. BH (Oct. 19, 2007, Email from Rodriguez) BANA-SDNY-E-001238459-67 at 59-60.  Rodriguez nevertheless asked that the employees be grandfathered per their "previous agreement" to grant Level 1 authority to all loan specialists involved in central fulfillment.  Nawaday Decl. Ex. BH (Oct. 18, 2007, Email from Rodriguez) BANA-SDNY-E-001238459-67 at 60-61.

235.    On October 4, 2007, loan specialists were grandfathered in to Underwriter Level 1 authority. Nawaday Decl. Ex. FT (Oct. 4, 2007 FSL Bulletin 07-515) (announcing that "Loan specialists who currently hold PCA loan signing authority will be granted provisional Underwriting (UW) Level 1 approval authority with validation but must qualify for it by completing the training/certification requirements by November 15th."); Nawaday Decl. Ex. K, Harris Tr. 53:15-54:12 (agreeing that pursuant to Bulletin 07-515 "loan specialists were grandfathered into Underwriter Level 1 authority").  As of November 1, 2007, loan specialists given provisional underwriting Level 1 authority had still not received substantive underwriter training.  Nawaday Decl. Ex. BI (Nov. 1, 2007, Email from Schuyler Yost) BANA-SDNY-E-002316153-54 at 53 ("LSs who previously had PCA authority were given provisional Level 1 UW authority.  However, training for these people to show them how to actually underwrite a file is still forthcoming.").

236.    Loan specialists were permitted to clear even complex conditions, like assessing reasonability of income on a stated income loan.  Nawaday Decl. Ex. D, Boland Tr. 50:9-51:12. ("And they were – they were doing things that were much more risky without supervision . . . [T]he loan specialists for years had relied on the underwriters to perform that role . . . Now they -- in the Hustle, they were given that ability to clear stated doc reasonability.").

### c.     *Loan Specialists Reported to Operations, Not Underwriting*

237.     The loan specialists within FSL reported not to any underwriting managers, but instead through the operations group and ultimately to chief operating officer Rebecca Mairone, the "executive sponsor and owner of the [HSSL] project."  Nawaday Decl. Ex. E, Brent Tr. 98:1-17 (Mairone's "name was on it.  This was the process that she was driving with her team.  She was the leader of this group pushing and putting this in place."); Nawaday Decl. Ex. E, Brent Tr. 159:10-17 (Mairone was the "executive leader of the HSSL . . . [T]he staff that [was] putting together the program all reported up through her line" and "this was her baby."); Nawaday Decl. Ex. W, O'Donnell Tr. 105:7-10 ("A loan specialist is a processor that in Full Spectrum's organization worked in the production space."); Nawaday Decl. Ex. AC, Thomas Tr. 34:6-9 ("Loan specialists reported up through the operations groups.  So they had different processing center managers, and those would report up ultimately to Rebecca as [] operations officer."); Nawaday Decl. Ex. Q, Kitashima Tr. 38:17-23; Nawaday Decl. Ex. D, Boland Tr. 31:9-12; 39:17-40:11; Nawaday Decl. Ex. AC, Thomas Tr. 23:4-13 (Mairone "was kind of driving the—the redesign of the process.  Because the Hustle was—basically, the end goal for Hustle was to create a centralized fulfillment model so everything would be under operations . . ."); Nawaday Decl. Ex. T, Mairone Tr. 71:21-72:5 (Loren Rodriquez "managed the process and the governance of the pilot implementation" and directly reported to Mairone); Nawaday Decl. Ex. T, Mairone Tr. 220:18-20, 328:2-6, 350:15-17 (Mairone charged with managing central fulfillment initiative); *id.* at 121:8-14 (Mairone had input into selecting Rodriguez for leadership role in HSSL); *id.* at 154:5-10 (Mairone had input into selecting Comeaux for leadership role in central fulfillment); Nawaday Decl. Ex. B, Ballance Tr. 83:15-18 (Mairone the one "pushing" the HSSL).

### d.   *Loan Specialists Were Paid Bonuses Based Solely on Volume*

238.   Loan specialists who participated in the HSSL faced no compensation penalty on account of the poor quality loans they processed.  Nawaday Decl. Ex. BJ (July 31, 2007, Email from Kitashima) BANA-SDNY-E-000098805 ("The QOG's will continue to be calculated however 'hits' to individuals involved in the pilot . . . will be suspended for August. . ."). Mairone stated that this suspension was designed to make loan specialists comfortable pursuing volume without being afraid of making mistakes.  Nawaday Decl. Ex. BK (July 20, 2007, Email from Mairone) BANA-SDNY-E-000085091 ("QOG—suspension … for 90 days . . . in order to get us moving faster and not afraid of mistakes"); Nawaday Decl. Ex. AC, Thomas Tr. 25:9-26:4 ("So several people I remember raised that objection.  You know, how is this going to affect my compensation? . . . And . . . I remember Rebecca saying, 'We won't hurt you for making some mistakes.  So don't worry about that.   The—the object is—is, you know, speed.'"); Nawaday Decl. Ex. AY (Aug. 2, 2007, FSL Prime Business Model Review) BANA-SDNY-E-000053091-98 at 97 (explaining HSSL pilot "Guiding Principles" as including addressing "cultural issues" with loan processors, i.e., "Get comfortable with exercising authority; Get comfortable with skipping process steps; Suspend/revisit QOG").

239.   Although loan specialists were potentially subject to a reduction in authority or other disciplinary action resulting from multiple SUS findings even during the QOG reprieve, the Bank Defendants could identify only a single instance in which a loan specialist had his or her authority reduced or was otherwise disciplined for SUS findings.  Nawaday Decl. Ex. L, Ho Tr. 224:10-228:4.

240.   At the same time the HSSL was being prepared for rollout and the QOG reprieve was put in place, FSL introduced a new "turn time" bonus effective August 1, 2007.  Nawaday

Decl. Ex. BL (Aug. 1, 2007, Incentive Plan – Information Bulletin: Turn Time (TT) Modifier—

Monthly Plans) BANA-SDNY-E-000014502-05.  As the memo announcing the bonus explained,

"TT is a critical element for future success . . . We have been focusing on this initiative for some

time in anticipation of the competitive response and will continue to do so to maintain and grow

market share."  Nawaday Decl. Ex. BL (Aug. 1, 2007, Incentive Plan – Information Bulletin:

Turn Time (TT) Modifier—Monthly Plans) BANA-SDNY-E-000014502-05 at 02.  Under the

new plan, FSL employees were given a target of processing 60% or more of their prime loans at

or below 24 days, and 47% of their subprime loans at or below 24 days, and were paid bonuses

(or received compensation hits) depending on whether or not they hit the turn-time targets.

Nawaday Decl. Ex. BL (Aug. 1, 2007, Incentive Plan – Information Bulletin: Turn Time (TT)

Modifier—Monthly Plans) BANA-SDNY-E-000014502-05 at 03-04.

     241.    The turn-time goals remained in place for loan specialists through at least the end

of 2007.  Nawaday Decl. Ex. BM (Employee Evaluation for 2007 Performance) BANA-SDNY-

000250501-03 at 02 (listing goals for loan specialist as including "Achieve and Maintain 62% of

your loans in 24 days or less").  Prior to the HSSL, it was not uncommon for a loan to take 60

days to close.  Nawaday Decl. Ex. D, Boland Tr. 43:6-10.  For HSSL loans, the goal was reduced

to around approximately two weeks; Nawaday Decl. Ex. D, Boland Tr. 81:22-24.  In some

instances, loans were closed on the same day the application was received.  Nawaday Decl. Ex.

D, Boland Tr. 79:22-24; Nawaday Decl. Ex. AW (Aug. 2, 2007, Full Spectrum Lending

Divisional Strategy Session Overview) BANA-SDNY-E-000053377-415 at 385.

     242.    The HSSL also set a monthly funding goal of 25 to 30 loans per loan specialist

per month, and one loan per day.  Nawaday Decl. Ex. BN (Aug. 16, 2007, Email from Loren

Rodriguez) BANA-SDNY-E-000030505-06 at 05; Nawaday Decl. Ex. BM (Employee

Evaluation for 2007 Performance) BANA-SDNY-000250501-03 at 02 (listing goals for loan specialist as including "Achieve and Maintain an average 30 Fundings per month" and "Achieve and Maintain a daily LS phase code movement of 5 or higher").

243.    The suspension of the QOG penalty for manufacturing severely unsatisfactory loans thus resulted in loan specialists being paid bonuses based on volume alone. Nawaday Decl. Ex. B, Ballance Tr. 20:10-21:6;22:21-23:6 ("Q: [R]eferring specifically to the time period when the High Speed Swim Lane was in effect, it was your understanding that the quality of grade rating was suspended for loan processors?  A: That's my understanding, yes. Q: So it's fair to say they were compensated solely based on volume?  A: That's my understanding.").  Mainigi Decl. Ex. 24, Price Tr. 104:10-16.  ("Q: Am I right that, as a result of the quality of grade comp hit reprieve, loan specialists were compensated purely based on volume?  A:  Basically, they—yes.")

   *e.*      ***The HSSL Eliminated the Role of the Compliance Specialist***

244.    The HSSL also eliminated the position of compliance specialist by reassigning compliance specialists' tasks to funders.  Nawaday Decl. Ex. L, Ho Tr. 236:4-8 ("Q:  In connection with the Hustle pilot what, if any, change was made to the compliance specialist position, if you know? A: The compliance specialist position was folded into the funder role."). Nawaday Decl. Ex. BO (Oct. 3, 2007, Email from Brenda Clarke) BANA-SDNY-E-002192668-70 at 69 ("The Funder and Compliance Specialist's roles have been merged into one role"). Prior to the HSSL, the processing work flow was designed so that the funder "could perform their role and then an objective party would check the work …  And it's good to have a set of--another set of eyes checking the closing documents, the data integrity, and the – in the system to make sure that the – the paperwork that's printed is matching what's in the computer and matching the approval . . . So if something changes right after the underwriter has done their check, well,

you've just wasted all that time in getting the loan right. So that end of the – end of the line check is crucial because it matches the final terms of the loan with the underwriting approval." Nawaday Decl. Ex. D, Boland Tr. 37:18-38:14.

245.   Prior to the HSSL, the compliance specialist could therefore "perform the healthy role of sending loans backwards in the process and not allowing them to proceed to fund or to close." Nawaday Decl. Ex. D, Boland Tr. 38:18-20. Because the check by the compliance specialist "was one of [FSL's] checks at the end of the process," the removal of the compliance specialist was "a problem." Nawaday Decl. Ex. D, Boland Tr. 36:15-37:7; Nawaday Decl. Ex. BQ (Oct. 5, 2007, Email from Michael Thomas) BANA-SDNY-E-000716491-95 at 91 ("It's not a secret that Cliff, Ed and I disagreed with having the funders report to the OM's [operations managers]. . . We also disagreed with the immediate combination of funder and compliance specialist. That transition takes time. But we were overruled (or ignored) . . . I sent you Loren's directive to clarify where the direction was coming from.").

### E.   HSSL Rolled Out To Move Loans Forward, Never Backward

246.   The HSSL operated in a "pilot phase" between August 13 and September 30, 2007, at funding centers in Chandler, Arizona, and Richardson, Texas. Nawaday Decl. Ex. L, Ho Tr. 165:5-16 (regarding dates); Nawaday Decl. Ex. L, Ho Tr. 170:2-12 (regarding funding centers). Although a third fulfillment center in Rosemead, California was considered as a pilot center, Kitashima suggested that Rosemead not be considered "due to ongoing investigations by FSL Fraud Risk Mgmt." Nawaday Decl. Ex. BJ (July 31, 2007, Email from Kitashima) BANA-SDNY-E-000098805.

247.   The HSSL rollout in August 2007 in Richardson, Texas, was complete with promotional materials, music, and dance steps demonstrating how to dance the Hustle. Nawaday

Decl. Ex. D, Boland Tr. 21:22-22:15; *see also id.* Nawaday Decl. Ex. BR (Aug. 4 2007, Email from Loren Rodriguez) BANA-SDNY-E-000072785-93 at 92 (referring to "our Prime High-Speed Swim Lane [HSSL, aka Hustle]") (brackets in original).  "There was considerable campaigning information when the Hustle was rolled out that loans only moved forward; they never moved back. . . . [I]t was designed to change the former status quo, which was focused on quality, and do[ing] the right thing. . . .  And the mentality changed to always move forward; never move back."  Nawaday Decl. Ex. D, Boland Tr. 38:25-39:13.

248.    Mairone attended the Richardson rollout and spoke at a large meeting and answered employees' questions about the Hustle.  Nawaday Decl. Ex. AC, Thomas Tr. 24:10-16; Nawaday Decl. Ex. T, Mairone Tr. 125:12-127:11.

249.    Although the initial pilot phase in August and September attempted to limit loans to "[p]rime CLUES Accepts" with combined loan-to-value ratios of less than or equal to 80 percent, Nawaday Decl. Ex. L, Ho Tr. 178:6-14, the HSSL was soon expanded to all loans and called the "Central Fulfillment" model, Nawaday Decl. Ex. L, Ho Tr. 169:4-170:14.  "During the pilot itself there was a push for more loans, more product, different types of product to be added to the pilot."  Nawaday Decl. Ex. W, O'Donnell Tr. 147:7-9.  Both O'Donnell and FSL's chief risk officer, Cliff Kitashima, objected to such an expansion.  Nawaday Decl. Ex. W, O'Donnell Tr. 147:14-16.

250.    On September 4, 2007, Mark Bennett stated that all loans would go into the high speed swim lane, including expanded approval loans, regardless of LTV.  Both Brent and Aliano reacted to this plan by commenting, "YIKES."  Nawaday Decl. Ex. BS (Sept. 4, 2007, Email from Steve Brent); (Sept. 4, 2007, Email from Patrick Aliano) BANA-SDNY-E-000039265-70

at 65-67.  Brent also said that this raised "major risk issues."  Nawaday Decl. Ex. BS (Sept. 4, 2007, Email from Steve Brent) BANA-SDNY-E-000039265-70 at 65.

251.    Loans with an LTV of 80% or higher are more risky and should be reviewed by underwriters as opposed to loan specialists.  Nawaday Decl. Ex. E, Brent Tr. 47:5-19; Nawaday Decl. Ex. BT (Aug. 24, 2007, Email from Steve Brent) ("To confirm, you are going to resolve the issue of the 80% LTV or above, required review by UW staff.  This is [a] hole in the process that Loren ID'ed as not being required of the line staff……………big miss.  Exposure on ALL of our agency loans (per Patrick) and the MI issues we have seen.") (ellipses in original).  Brent had a higher expectation of quality from underwriters than loan specialists due to their experience and training.  Nawaday Decl. Ex. E, Brent Tr. 48:5-22.  Brent concluded that not sending loans with 80% LTV or higher to underwriters for review was "the highest risk we have."  Nawaday Decl. Ex. BU (Aug 27, 2007 Email from Steve Brent) BANA-SDNY-E-001062203-06 at 03; Nawaday Decl. Ex. E, Brent Tr. 57:8-13.

252.    Kitashima and Rodriguez understood that including stated-income loans in the HSSL was risky, but Rodriguez nonetheless advocated the inclusion because such loans were the fastest ones to manufacture.  Nawaday Decl. Ex. BV (Aug 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-41 at 39 (acknowledging that Kitashima told him "he's very worried about [determinations of stated income] reasonability, as most of our findings in UW relate to such"); Nawaday Decl. Ex. BV (Aug 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-41 at 39; Nawaday Decl. Ex. BV (Aug 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094539-41 at 39 ("low/no-doc deals [albeit risky] are the fastest thru the swimlane . . .").  O'Donnell responded that "[i]f it's LSs making the call [on

reasonability] who don't have UW training, I think we will have issues." Nawaday Decl. Ex. BW (Aug. 1, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000094546-50 at 47.

253.    On September 21, 2007, Mairone asked Rodriguez, "[W]hen can we start moving more loans to the pilot…? We need to start to move toward all loans into process."  Nawaday Decl. Ex. BX (Sept. 21, 2007 Email from Rebecca Mairone) BANA-SDNY-E-000050487-89 at 87. As Mairone explained, "[t]he High Speed Swim Lane pilot was limited to a very small number of high quality prime loans.  And that was piloted sometime in the third and fourth quarter.  For the Centralized Fulfillment, that was a broader, it included all loans for Full Spectrum lending.  It was much broader than the High Speed Swim Lane pilot." Nawaday Decl. Ex. T, Mairone Tr. 166:22-167:8; Nawaday Decl. Ex. T, Mairone Tr.168:15-20 ("Q:  Were there any exclusions in terms of loan types from the Central Fulfillment initiative?  A:  There weren't any exclusions.  It encaptured all of the Full Spectrum lending loans."); Nawaday Decl. Ex. A, Aliano Tr. 22:11-24 ("[W]hat was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point."); Nawaday Decl. Ex. S, Lumsden Tr. 47:25. ("High speed swim lane is not different from central fulfillment, it's all the same thing."); Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-000040414.

254.    The central fulfillment model operated not only in Richardson and Chandler, but also in fulfillment centers in Rosemead, California, and Hatboro, Pennsylvania, beginning in October 2007.  Nawaday Decl. Ex. L, Ho Tr. 170:2-14; 171:4-172:3.  Under the central fulfillment model, loan specialists were to be given another expansion of underwriting authority, to underwriter authority level 2.  Nawaday Decl. Ex. L, Ho Tr. 171:4-177:8 (identifying only differences between HSSL and central fulfillment as expanded centers, expanded population of loans, and expanding loan specialists' underwriting authority to level 2).

255.     The expanded model was managed by Wade Comeaux, a sales team employee with no quality control management experience who directly reported to Mairone.  Nawaday Decl. Ex. T, Mairone Tr. 154:5-16; 155:2-156:4.  Nawaday Decl. Ex. BZ (Oct. 5, 2007, Email from Mairone) BANA-SDNY-E-000052487-90 at 87 (endorsing email from Scott Bridges saying "[o]ur objective is to leverage a senior production person such as Wade, such that he can bring true production perspective and sense of urgency. . .").  All of Comeaux's previous experience at Countrywide was focused on sales. Mainigi Decl. Ex. 9, Comeaux Tr. 123:15-19. He identified his only background in operations as his time at Norwest Financial in 1997-1999 when he "had a college internship, and then . . . was at Norwest for a year and a half after that." Mainigi Decl. Ex. 9, Comeaux Tr. 135:10-17.

256.     A presentation by Mairone and others made clear the same principles driving the HSSL pilot drove the central fulfillment model.  Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-000040414 ("Focus on FNMA/FHLMC Loans" (p. 3), "Significantly Reduce TT" (p. 3) listing 24 days as the target goal (p. 4), "Streamline one-way fulfillment process with minimal handoffs and delays" (p. 5), use "Processors with UW Approval Authority Level 2" (p. 5), merge the funder and compliance specialist roles (p. 5), and "Maximize UW authority level of LS staff (UW Lvl 2) (p. 8) and "Merge LS and UW/Validator rules" (p. 11).  The central fulfillment presentation also announced that "CF team [to] focus on fulfillment and speed to close—resolve and move on ('no returns')" Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-000040414 at 11; Nawaday Decl. Ex. L, Ho Tr. 245:12-20 (merged role of funder and compliance specialist in HSSL and central fulfillment models); Nawaday Decl. Ex. L, Ho Tr. 224:10-228:8 (reduced turn time a goal of

both HSSL and central fulfillment models); Nawaday Decl. Ex. T, Mairone Tr. 179:20-22 (turn

time a "focus" of both HSSL and central fulfillment).

257.    Loans processed through the HSSL pilot and the Central Fulfillment model were

sold primarily to the GSEs.  Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) at

3; Nawaday Decl. Ex. L, Ho Tr. 479:21-480:3; Nawaday Decl. Ex. T, Mairone Tr. 172:4-13.

### F.    Defendants Knew That the HSSL Would Produce
   Defective Loans Ineligible for Sale to the GSEs

#### a.  *Warnings That the HSSL Design Would Lead to Poor Quality*

258.    Many employees within risk management and underwriting warned that the

HSSL's combination of risky elements would lead to poor quality, but their warnings went

unheeded.  See Nawaday Decl. Ex. AC, Thomas Tr. 80:1-21; Nawaday Decl. Ex. AP (Aug. 8,

2007 email from Michael Thomas) BANA-SDNY-E-000009676-79 at 76-78.  The HSSL

immediately concerned Michael Thomas, FSL's first vice president of risk management, because

"we saw the tightening market coming.  And we saw that our process wasn't aligned with that

tightening market.  So we were going to have high finding rates at a time when we wanted low

finding rates.  And we needed more control; and we were putting in a process that had less

control . . . And I -- I mean, my thought process was -- I mean, rumors were already swirling

about, you know, our corporate health and, you know, potential acquisitions and things like that.

And -- and there was a sense of competition between divisions.  And I felt like, you know -- you

know, volume -- some people perceived that volume made them look good." Nawaday Decl. Ex.

AC, Thomas Tr. 80:1-21.  When asked who in particular thought that volume made them look

good, Thomas responded, "Rebecca [Mairone] for one[,] even Greg [Lumsden]." Nawaday Decl.

Ex. AC, Thomas Tr. 80:23-25.

259.    The architects of the HSSL were advised that the HSSL design would lead to higher volume but lower quality. Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Michael Thomas) BANA-SDNY-E-000009676-79 at 76. On August 8, 2007, Thomas told Mark Barnett and Anson Gong, two architects of the HSSL design, that he was concerned about the HSSL. Nawaday Decl. Ex. AP (Aug. 8 2007, Email from Michael Thomas) BANA-SDNY-E-000009676-78; Nawaday Decl. Ex. AC, Thomas Tr. 38:4-39:10.   Thomas said "[w]e are hearing the clear directive [from Drew Gissinger] that we should improve manufacturing quality," but the directive was "in direct conflict with the current HSSL design."  Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Michael Thomas) BANA-SDNY-E-000009676-78 at 76.   Thomas further stated that "[o]ur initial problem statement for HSSL . . . is 'To eliminate unnecessary hand-offs and backwards movement'…The issue is that the hand-offs are [] our control points [] and the backward movements are due to insufficient quality.  I'm concerned that our initial solution is more about removing or avoiding control points.  If FSL quality declines . . . I don't think we'd want Drew [Gissinger] to see this process design."  Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Michael Thomas) BANA-SDNY-E-000009676-78 at 77; Nawaday Decl. Ex. AC, Thomas Tr. 37:21-38:1 ("I sent this note to Mark and Anson kind of as an appeal.  Because I felt like, you know, we weren't—we weren't getting anywhere.  We weren't being listened to on—on the quality concern. . ."). Thomas's email was later forwarded to Rodriguez.  *See* Nawaday Decl. Ex. CA (Aug. 9, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000015396-400.

260.    Thomas believed it would have been futile to send his note to Mairone because she "was very much pushing the process . . . [T]his was kind of her end goal for the, you know, revamping, reorganizing Full Spectrum as the -- as the COO.  And I remember, you know, this

was the -- the end goal was a central fulfillment model.  And that's what she was pushing

for…[T]he reason I didn't send to her is she also – you know, we – we had butted heads as well .

. . I guess after a -- a period of time of objection, they just didn't want to hear the objections

anymore."  Nawaday Decl. Ex. AC, Thomas Tr. 43:25-44:13.  Thomas's email resulted in no

changes to the HSSL process. Nawaday Decl. Ex. AC, Thomas Tr. 48:16-17.

261.    In setting a meeting agenda for the HSSL process, O'Donnell proposed to Loren

Rodriguez that they discuss quality checkpoints within the process and Rodriguez acknowledged

that "quality" was "the code word for anti-fraud."  Nawaday Decl. Ex. BW (Aug. 1, 2007, Email

from Loren Rodriguez) BANA-SDNY-E-000094546 at 47.

### b. Warnings That Granting Underwriting Authority to Loan Specialists Would Lead to Poor Quality

262.    Even before the HSSL, individuals within FSL—including Lumsden—advised

against expanding underwriting authority to loan processors, who were outside of the

underwriting and credit risk groups and reported only to the operations group.  Nawaday Decl.

Ex. CB (May 16, 2007, Email from Lumsden) BANA-SDNY-E-005180366; Nawaday Decl. Ex.

S, Lumsden Tr. 56:23-57:16 (President and CEO of FSL in 2007 and through July 1, 2008).  *See*

Nawaday Decl. Ex. L, Ho Tr. 293:5-295:6 (loan specialists reported through the operations

group and, ultimately Rebecca Mairone, the head of operations); Nawaday Decl. Ex. CB (May

16, 2007, Email from Lumsden) BANA-SDNY-E-005180366 ("I do not support expanding

underwriting authority and responsibility outside of Underwriting.").  In May 2007, Lumsden

explained to Kitashima and Mairone that he did not support such an expansion because, among

other things, "we lose visibility to what is actually happening," the processors "don't receive

clear underwriting management" and are "harder to train."  Nawaday Decl. Ex. CB (May 16,

2007, Email from Lumsden) BANA-SDNY-E-005180366.  By August 2007, however,

notwithstanding these concerns, Lumsden approved the HSSL loan origination process even though its key design element was the expansion of underwriting authority outside of underwriting to loan processors and loan specialists.  *See* Nawaday Decl. Ex. L, Ho Tr. 212:23-213:12; Nawaday Decl. Ex. D, Boland Tr. 163:16-22.

263.    Underwriting authority was previously given to loan specialists only through a limited project known as the New Customer Acquisition ("NCA") group.  Nawaday Decl. Ex. L, Ho Tr. 208:14-23 ("Q:  Prior to the Hustle rollout, were loan specialists able to clear to close on loans?  A: I believe that the new customer acquisition teams had some loan specialists that could clear to close.  Q: Any other teams?  A: Not that I know of.").

264.    Countrywide recognized that the NCA project produced poor quality loans because of loan processors' expanded authority and relaxed safeguards on quality.  Nawaday Decl. Ex. AP (Aug. 8, 2007, Email from Michael Thomas) BANA-SDNY-E-000009676-79 at 77 ("NCA is a real life example of what happens to quality when we remove or reduce the current control points. . ."); Nawaday Decl. Ex. D, Boland Tr. 19:16-24; 23:2-8. (NCA model "was not considered a success because the quality that was produced by the group was less than industry standard or the standards of Countrywide as it had previously defined them."); Nawaday Decl. Ex. CC (Dec. 20, 2007, Email from Neal Ballance) BANA-SDNY-E-001390417-20 at 18 ("It seems we're making up for a loss in subprime by becoming overly aggressive –wreckless? [sic]—with prime.  And, haven't we already seen where this will go?  I recall the recent meltdown with NCA. Those branches were given authority to clear almost everything.  That resulted in [] [clearing to close] files that were never cleared, funding loans before they were approved by underwriting, ignoring conditions.").

265.    The NCA group imposed funding goals on loan specialists that resulted in fraudulent clearing of conditions.  Nawaday Decl. Ex. CD (June 25, 2007, Email from Cheri Shine) BANA-SDNY-E-001321911-21; Nawaday Decl. Ex. D, Boland Tr. 67:3-7 ("It was common for loan specialists to -- to clear conditions improperly").  Robert Price, a senior vice president in charge of a funding center in Richardson, Texas, asked underwriting managers he supervised to investigate loan processors' fraudulent clearing of conditions and to report back on what they learned.  Nawaday Decl. Ex. CD (June 25, 2007, Email from Cheri Shine) BANA-SDNY-E-001321911-21.  One such manager, John Boland, a first vice president of underwriting in Richardson, learned that loan specialists "had a requirement to do—to move one loan per day per loan specialist to closing.  And if they didn't hit that goal, they couldn't leave for the night."  Nawaday Decl. Ex. D, Boland Tr. 67:8-15.  When Boland asked if his source, a loan specialist, was kidding, "the response was, 'No. This is serious.  We're going to be here all night.  I've got to find a loan to move.'  And my response was, 'Well, what if you don't have the conditions?'  And the response was, 'Well, the loan is going to move.  We need that loan to move if we're going to go home, whether we have the conditions or not.'  So—so I escalated that—that situation."  Nawaday Decl. Ex. D, Boland Tr. 67:16-68:4.

266.    Boland testified that "[d]uring a period of time when it was of great uncertainty about the stability of the organization and whether or not Countrywide would continue to be a successful organization, low production numbers would—or not following management's direction would certainly be a reason to—to jeopardize your—your position if you were in processing.  I was on a different side of the house.  And so I didn't have that same concern and was more comfortable pushing back.  But people like [loan specialists] didn't have the luxury of

saying no to people like [NCA manager] Cheri Shine the way I did." Nawaday Decl. Ex. D, Boland Tr. 73:5-74:16.

267.     Price told Cheri Shine, then in charge of the NCA group, that the "overwhelming response" his managers received from the loan processors was that "the pressure to hit numbers, oftentimes before they are allowed to leave no matter what time it is, is driving some of this behavior . . . It's not uncommon for employees feeling pressure to take short cuts and make poor decisions to hit numbers." Nawaday Decl. Ex. CD (June 25, 2007, Email from Cheri Shine) BANA-SDNY-E-001390411-21 at 11. Shine claimed that they had "addressed this" and that they would "not stop the push for numbers, but [] continue to push quality as well." Nawaday Decl. Ex. CD (June 25, 2007, Email from Cheri Shine) BANA-SDNY-E-001390411-21 at 11. The loan specialist whom Boland had spoken to lost her underwriting authority, other cases were ignored. Nawaday Decl. Ex. D, Boland Tr. 68:6-70:8.

268.     Price disagreed with giving loan specialists new authority through the HSSL because "loan processors are more volume-driven employees and [] underwriters are . . . more due diligence-driven." Mainigi Decl. Ex. 24, Price Tr. 149:2-18.  Price expressed his disagreement regarding the competence of loan specialists to clear underwriting conditions to Edward O'Donnell (Mainigi Decl. Ex. 24, Price Tr. 53:1-55:10) (Price passed along concerns to O'Donnell, who reported that "Cliff shared the concerns because some of the things that were put in place as part of the process . . . Cliff had been involved in—in suggesting or—or approving"). *See also* Mainigi Decl. Ex. 24, Price Tr. 48:1-6 (he had "concerns about the loan quality based on the process and—and the fact the loan processors were being allowed to clear conditions."); Mainigi Decl. Ex. 24, Price Tr. 50:1-22 ("the majority" of his concerns centered on "allowing loan processors to clear the majority of the conditions, when, historically, within

Full Spectrum, the underwriters did that"; it is the underwriter's task to make sure "that the asset quality of the—of the loan, which is the manufacturing quality, is—is correct").

269.    Neal Ballance, an underwriting manager, "was very passionate about his feeling that underwriting authority should remain with underwriters."  Mainigi Decl. Ex. 24, Price Tr. 21:2-22; Nawaday Decl. Ex. CC (Dec. 20, 2007, Email from Ballance to Boland and Price) BANA-SDNY-E-001390417-20 at 18 ("How does adopting a policy where . . . underwriting is virtually no longer required, improve our position in an industry now riddled with and accused of low underwriting standards and shady lending practices?  Isn't now a time to rise above the rest?").  Ballance several times expressed his views to Price, and Price said he "agreed with him," and that they would do "the right thing where we could. But that, you know, the direction that was being handed down was, you know, what we needed to – what we needed to continue to – to follow." Mainigi Decl. Ex. 24, Price Tr. 21:23-22:11.

270.    Thomas, a risk-management official, also recognized that there were no system controls in place to prevent loan specialists from exceeding their levels of delegated authority. *See* Nawaday Decl. Ex. AC, Thomas Tr. at 60:6-61:12 (discussing removal or legacy controls that prevented loan specialists from clearing conditions that required underwriter involvement). A loan specialist who wanted to continue processing a loan but lacked the authority to clear a particular type of condition (such as an "underwriting doc" condition) could simply reclassify that condition in Countrywide's "Status Mart" system as one within her authority, and then clear it notwithstanding that intended roadblock.  *See* Nawaday Decl. Ex. AC, Thomas Tr. at 59:22-23 ("But ultimately, Status Mart controls were just opened up.  So the LSs could clear conditions.").

271.    John Boland also recalled concerns about loan specialists' new authority, and escalating those concerns.  Nawaday Decl. Ex. D, Boland Tr. 40:21-41:2 (loan specialists

"weren't trained as underwriters; they weren't intended to be underwriters; they weren't—their

incentive wasn't underwriting [by] nature."); Nawaday Decl. Ex. D, Boland Tr. 226:17-230:22

(discussing receiving and escalating concerns about the HSSL and loan specialists from at least

eight individuals); Nawaday Decl. Ex. D, Boland Tr. 231-12-232:6 (hearing more than 20 people

discuss concerns about the HSSL).

272.    Steve Brent, a vice president in charge of quality assurance and quality control for

FSL in 2007 and in particular quality assurance for the HSSL, was also concerned that loan

specialists were not qualified to perform the new tasks expected of them, Nawaday Decl. Ex. E,

Brent Tr. 12:8-15:1 (role in QA/QC); Nawaday Decl. Ex. E, Brent Tr. 18:2-19:1 (concerns),

especially given their levels of education and experience, Nawaday Decl. Ex. E, Brent Tr. 19:3-

22.

**c.    Warnings That the Loan Specialists Were Not Properly Trained
in the "100 mph" HSSL Timeframe**

273.    The speed of the HSSL rollout concerned Price and others because loan

specialists did not have time to be adequately trained.  Mainigi Decl. Ex. 24, Price Tr. 53:7-17;

90:16-21; Nawaday Decl. Ex. AS (Aug. 4, 2007, Email from Rodriguez) BANA-SDNY-E-

000086563-64 at 63 ("As you know, the teams' moving 100 mph on our Prime High-Speed

Swim Lane [HSSL, aka Hustle] process flow and pilot.  We don't have time for an elegant pilot

rollout; and the manufacturing line staff will need to be prepared for the calibrate-as-we-go pilot

strategy.") (brackets in original); Nawaday Decl. Ex. AT (July 3, 2007, Email from Loren

Rodriguez) BANA-SDNY-E-001225251 ("So, if we need to get the HSSL—Hustle, or high-

speed swim lane—Pilot up and running mid next month we don't have the luxury to

polish/prep."); Nawaday Decl. Ex. AY (Aug. 2, 2007, FSL Prime Business Model Review)

BANA-SDNY-E-000053091-98 at 97 ("This project has broad scope and impact, and an

aggressive timeline—the rate and magnitude of change here is drastic, and beyond most people's comfort range."); Nawaday Decl. Ex. CE (Aug. 20, 2007, Email from Rebecca Mairone) BANA-SDNY-E-000052475-76 at 75 ("I will need to make sure Loren is moving fast—while communicating and controlling the task list").

274. Price explained that underwriters in FSL had "[e]xperience in calculating income; experience in looking at an appraisal and identifying red flags. The ability to calculate assets correctly. . ." Mainigi Decl. Ex. 24, Price Tr. 51:25-52:5. His concern with having loan processors perform those tasks was "the lack of experience, for the most part, that most of them had in that area," Mainigi Decl. Ex. 24, Price Tr. 53:1-6, and that they "could not competently perform those tasks" because "at that point in time, based on what we have, you know, to work with and the changes that we were implementing . . . they would not be able to quickly do what we had underwriter[s] there to do already." Mainigi Decl. Ex. 24, Price Tr. 53:7-17; Mainigi Decl. Ex. 24, Price Tr. 48:7-25 ("[T]he authority that was being given and . . . the time in which –you know, that we had to prepare and launch it were also concerns.").

275. O'Donnell also "clearly voiced [his] concern that loan specialists were not equipped to make the assessment appropriately of income reasonability," Nawaday Decl. Ex. W, O'Donnell Tr. 172:3-5, and pointed out "the need for a robust certification and testing process that the folks we had identified to be in the pilot that we thought were stronger were struggling," Nawaday Decl. Ex. W, O'Donnell Tr. 182:8-11.

276. Whereas an underwriter would receive a few months of training between courses, followed by testing and an "apprenticeship" period in which the employee worked "hand in hand" with an underwriter, Nawaday Decl. Ex. B, Ballance Tr. 68:1-8; 69:21-70:2, the loan specialists involved in the HSSL received little formal training, and were required to process

only a few files to be "certified" to underwrite HSSL loans, Nawaday Decl. Ex. B, Ballance Tr. 72:19-73:4.  Ballance worked with loan specialists at an HSSL center in Hatboro, Pennsylvania, and after conducting file reviews there, remained uncomfortable with granting loan specialists underwriting authority.  Nawaday Decl. Ex. B, Ballance Tr. 42:2-12 (involvement in file review); Nawaday Decl. Ex. B, Ballance Tr. 67:20-25 ("[T]he idea that a processor, who was never trained in underwriting, after just a few file reviews, could somehow have the authority to — to take — to take care of the underwriting piece, on top of doing everything else that we're tasked with doing as a processor, it — it was not reasonable.").

277.    Other underwriting managers doubted whether loan specialists could competently calculate income and make determinations of income reasonability.  Nawaday Decl. Ex. B, Ballance Tr. 17:4-25. ("The processors were not trained and—to calculate income.  Calculating income was probably the biggest part of the –the loan approval process.  It dictates whether or not someone can afford the loan that they're going to get and can afford to pay it back.").  Boland considered reviewing stated income reasonability to be "a complex task that even underwriters needed considerable training and understanding to judge."  Nawaday Decl. Ex. D, Boland Tr. 26:18-20.  To be adequately trained, an employee would need "a broad perspective after seeing many, many examples," and by getting feedback from quality control and underwriting management and reviewing documentation after closing.  Nawaday Decl. Ex. D, Boland Tr. 27: 7-20; Nawaday Decl. Ex. W, O'Donnell Tr. 126:8-11 (During the HSSL, "processors were not comfortable with the work that they were being asked to assess and complete.  They didn't feel like they had the experience"); Nawaday Decl. Ex. W, O'Donnell Tr. 127:6-8 (Loan processors "didn't know how to calculate income.  They didn't know how to read an appraisal effectively.").

### d.    *Warnings Against Grandfathering Loan Specialists*

278.    Employees also warned that grandfathering would not solve the problem of inadequate training.  *See, e.g,* Nawaday Decl. Ex. E, Brent Tr. 31:9-20, 37:3-38:6; Nawaday Decl. Ex. P, Jaraba Tr. 38:15-19.  On August 23, 2007, Brent warned that "Not sure we want to just grandfather all LSs/OMs as we have to date, not a winning strategy!"  *See* Nawaday Decl. Ex. FE (Aug. 23, 2007 email from Steve Brent) BANA-SDNY-E-001062042-45 at 45.  Brent explained that while he was willing to grandfather a limited group of 70 loan specialists, he could not agree to grandfather all 643 loan specialists, which could raise loan quality issues.  *See* Nawaday Decl. Ex. E, Brent Tr. 26:18-27:23; 29:2-8.  Brent conveyed his concerns about grandfathering loan specialists to Cliff Kitashima, Edward O'Donnell, and Rebecca Mairone. Nawaday Decl. Ex. E, Brent Tr. 37:3-38:6.

279.    The proponents of grandfathering loan specialists were Mark Barnett, Loren Rodriguez, and Rebecca Mairone.  Nawaday Decl. Ex. E, Brent Tr. 30:17-23.  FSL employees in the quality and compliance departments were opposed to grandfathering, including Steve Brent, Patrick Aliano, Edward O'Donnell, and Cliff Kitashima.  Nawaday Decl. Ex. E, Brent Tr. 31:9-20.

280.    Javiar Jaraba also opposed grandfathering loan specialists into underwriter Level 1 authority.  Nawaday Decl. Ex. P, Jaraba Tr. 34:23-35:6, 36:6-39:12 ("[Y]ou wouldn't want to get a loan specialist who has minimal experience to sign off on certain items when it comes to underwriting authority," such as "income calculation [and] appraisal," because "[i]t would be just a riskier type of scenario.").

281.    In mid-September, Brent commented to Janet Godby and Todd Green that a number of the loan specialists who had been grandfathered with PCA authority had not

completed the requisite training over the last 30 days. Nawaday Decl. Ex. CF (Sept. 18, 2007, Email from Steve Brent) BANA-SDNY-E-000095649-57 at 51 ("The 30 days that we all agreed to is fast approaching. Looks like a number of employees that you two requested authority on have not completed the necessary training for PCA authority.") Loren Rodriguez responded by asking whether they could create a "Reader's Digest" version for the training, arguing that "reading the DMV book doesn't make us better drivers." Nawaday Decl. Ex. CF (Sept. 18, 2007, Email from Loren Rodriguez) BANA-SDNY-E-000095649-57 at 50. Brent replied that "even when our Underwriters drive, we have some issues with manufacturing quality and such." Nawaday Decl. Ex. CF (Sept. 18, 2007, Email from Steve Brent) BANA-SDNY-E-000095649-57 at 49.

### e.   *Warnings That Paying Bonuses Solely Based on Volume Would Lead to Poor Quality*

282.    The changes to loan specialists' compensation intensified doubts that the loan specialists would produce quality loans. Nawaday Decl. Ex. B, Ballance Tr. 42:8-24 (Loan specialists "were compensated based on the number of loans that they got through. And I thought that was a clear problem. That was a conflict of interest . . . I never believed that the underwriter function should be removed, the – the underwriter title, the human underwriter should be removed from the process. I never thought it was a prudent thing to do."); Mainigi Decl. Ex. 24, Price Tr. 105:24-106:4. ("Q: But is it fair to say that you had concerns about compensating loan specialists based solely on volume? A: I'm sure I did. And I would today.").

283.    In response to the announced compensation changes, the senior vice presidents of FSL's fulfillment centers met with their managerial team and their underwriting and funding employees and collected feedback from the employees, which they passed along to Edward O'Donnell, who, in turn, conveyed the feedback to Mairone and Kitashima. Nawaday Decl. Ex.

CG (Aug. 3, 2007, Email from O'Donnell) BANA-SDNY-E-001647488-90 at 89-90.  As

O'Donnell explained, "[t]he number one question was about Quality.  'Does the freeze of QOG

and the request to move loans mean we no longer care about quality?' . . . 'What are the

boundaries, is it just fund everything and worry about it later?'"  Nawaday Decl. Ex. CG (Aug. 3,

2007, Email from O'Donnell) BANA-SDNY-E-001647488-90 at 89.

284.     Neither Mairone nor Kitashima recalled any response being provided to the

employees.  Nawaday Decl. Ex. T, Mairone Tr. 120:6-17 ("Q: And what, if any, response did

you provide back to the groups and the SVPs in response to their questions about quality?  A: I

don't remember how we responded.  Q: Do you remember anyone responding to the questions

that were raised about quality?  A:  I don't remember how the response was done.").

### f.     Warnings against "Trusting CLUES" As the Only Underwriter

285.     Although CLUES was the underwriter for the HSSL, underwriting managers

knew there were "very good reasons not to trust CLUES" when the data was both entered and

validated by the same loan processor.  Nawaday Decl. Ex. D, Boland Tr. 56:17-20.   Without an

underwriter reviewing the CLUES data against the loan file documents or questioning

suspiciously high numbers of CLUES inputs, a safeguard against fraud was eliminated.

Nawaday Decl. Ex. B, Ballance Tr. 17:7-19:1.  ("[W]hen you get over X number of times . . . an

underwriter will look at that and say, Why was this program run ten or 15 times?  And from an

underwriting perspective, no loan should be run that many times.  Because at that point it—to me

personally, I began to suspect something is wrong or someone is trying to manipulate the data to

get an accept decision."); Nawaday Decl. Ex. D, Boland Tr. 57:7-59:2 ("[W]hen we would get

the—the loan file in underwriting, the first run of CLUES is always version A.  And then they

had extinguished all the letters in the alphabet, it would begin to restart with AA, BB, CC, DD.

So when we saw a loan that had multiple letters in the version of CLUES runs, it was—it was concerning.  It was worthy of asking the question, Why did you run the CLUES 28 times on this loan? . . . [T]he response would be that they were trying to get a certain result from the system. And they would change data in the system and then look at the result and then change it again and then look at the result . . . And when they found it, they had their CLUES accept.  And if the loan wasn't going to pass through an underwriter looking at it, the loan specialist could clear the conditions and questions weren't asked.").  *See also* Nawaday Decl. Ex. CH (Aug. 2, 2007, Email from Ron Gillet) BANA-SDNY-E-000097697-701 ("One of the biggest issues we have currently is that our Sales people will modify or manipulate data . . . to get a CLUES Accept [], and then when Ops gets these deals and does the data set up in Edge with the 'real' data, we end up with a CLUES Refer.").

286.    Mark Barnett expressed concern about manipulation of data as well, as indicated in an August 1, 2007 email to Loren Rodriguez with the subject line "'Fw: CLUES from Advantage – HSSL process questions.'"  Nawaday Decl. Ex. FF (Aug. 1, 2007 Email from Mark Barnett) BANA-SDNY-E-001226172-74 at 72-73. "[T]hat tendency will only be reinforced (at least initially) with the introduction of the HSSL, since I would imagine AEs will want their loans qualifying to go there."  *See* Nawaday Decl. Ex. FF (Aug. 1, 2007 email from Mark Barnett to Loren Rodriguez) BANA-SDNY-E-001226172-74 at 73; *see also* Mainigi Decl. Ex. 14, Gong Tr. 137:18-138:1-17 (referencing the email).

287.    Boland testified that the directive to "trust CLUES" "was a campaign to diminish people's ability to question the system.  And previous to the Hustle, there was a healthy skepticism and a widespread understanding that garbage in/garbage out . . . However, if you are someone on the quality side that says, 'Well hold on a second.  You know that that CLUES run

isn't accurate.  Someone on the production side could say, and would say, 'You guys don't trust CLUES.'"  Nawaday Decl. Ex. D, Boland Tr. 55:24-56:16

288.    Although CLUES could process the data it was given, it was unable to comprehensively analyze a loan application the way a human underwriter would.  *See* Nawaday Decl. Ex. B, Ballance Tr. 12:23-14:7  ("All [CLUES] could do really is read a credit report and the data from a credit report that the bureaus report, and it'[s] spit out a—an accept-or-reject decision . . . [and] it's only as good as the data that's put into it.  And that's—humans have to input the data and humans make errors, both intentional and unintentional.  And, therefore, it corrupts the CLUES findings.").  Nawaday Decl. Ex. T, Mairone Tr. 115:4-9 (acknowledging that CLUES cannot evaluate an appraisal or determine reasonability of income).  Thus, these residual (but extremely important) tasks, such as determining reasonability of stated income or evaluating appraisals, were left to loan processors.  *See, e.g.*, Nawaday Decl. Ex. L, Ho Tr. 212:10-2, 210:9-15, 212:23-213:12; Nawaday Decl. Ex. B, Ballance Tr. 12:23-14:7.

289.    CLUES cannot perform many functions typically performed by a human underwriter (*id*. ¶ 288), which is why Countrywide's own underwriting manual prescribed the process to be followed for "[u]nderwriting a CLUES Accept," including verifying income or determining income reasonability for a stated income loan, determining whether the borrower has any significant debt not reported on the credit report, verifying assets, ensuring the correct property valuation method was used in the appraisal, and evaluating whether the appraisal conforms to the standards for soft markets.  Nawaday Decl. Ex. AJ (Sept. 25, 2008, Countrywide Technical Manual CTM and Loan Program Guides) BANA-SDNY-C-00131805-29 at 807.

290.    The lack of experience and training of loan specialists, the reporting structure of loan specialists, the elimination of underwriters as an independent check on loan specialists'

work, and the volume-based compensation each contributed to the level of risk inherent in the

HSSL process.  Nawaday Decl. Ex. AC, Thomas Tr. 32:20-34:1 (concerned whether loan

processors were "trained enough to make those [underwriting] decisions[,]" that the loan

processors were "reporting through the same [operations] structure," that they had "a volume

incentive . . . So that was -- you know, having -- having that incentive and giving them the

authority to do the quality checks on the loans that they were themselves putting together

concerned me."); Nawaday Decl. Ex. AC, Thomas Tr. 77:5-14 (combining processor and

underwriter roles "didn't make sense" because "you're basically checking your own work . . .

The processor is the one building the file.  They're the one checking that they built the file

correctly.").

### G.       *Quality Reports on HSSL Loans Show Poor Quality, Intensify Warnings*

291.    Given the concerns about the HSSL's expected impact on loan quality, FSL

underwriting managers approached Mairone about including "backstops" in the process in the

form of realtime quality assurance reports, *i.e.*, prefunding reports on the HSSL loans.  Mainigi

Decl. Ex. 24, Price Tr. 55:11-56:12.  Mairone agreed to allow the quality assurance checks on the

loans as long as the results were distributed only to the management team and not to the "people

actually doing the work."  Mainigi Decl. Ex. 24, Price Tr. 57:13-58:13; Mainigi Decl. Ex. 24,

Price Tr. 59:11-20 ("Q: So is it fair to say that [Mairone] gave conditional approval to the QA

process? A: I remember it that way.  Q:  And her approval was conditioned on not widely

communicating the results of QA process? A: Again, yes.").

292.    As a result, Brent and others performed quality assurance reviews of HSSL during

the HSSL pilot in August and September 2007, and during its larger rollout in connection with

Central Fulfillment in October 2007.  *See* Nawaday Decl. Ex. E, Brent Tr. 13:23-15:1, 58:8-

59:17 (high-risk findings from QA review), 64:4-68:23.  Quality Assurance reviews were

completed after the loans were cleared to close (*i.e.*, at "Phase Code 3"), but before the loans

were funded (*i.e.*, at "Phase Code 4").  Nawaday Decl. Ex. AC, Thomas Tr. 14:1-4.  Thus,

problems uncovered by the quality assurance reviews could be addressed before the loans

actually closed.  Nawaday Decl. Ex. AC, Thomas Tr. 16:14-21. ("[I]t was kind of an early

indication for us what the QC ratings might be.  So if we—we saw an issue in QA, we would,

one, obviously try to correct those files before they funded. . . . If we saw an uptake [sic] in QA,

we knew that we might see an uptake [sic] in QC ratings."); Nawaday Decl. Ex. T, Mairone Tr.

213:12-20 (useful to see the same loan both pre-funding and post-funding because in "Phase

Code 3, you have an opportunity to correct before you fund the loan").

      293.     After reviewing a loan file, quality assurance reviewers would rate the loan file as

either "No Risk," "Limited Risk," or "High Risk."  Nawaday Decl. Ex. CK (HSSL Process – QA

Overview of Scope/Results Through 9/10/2007)  at 1; *see also* Nawaday Decl. Ex. AC, Thomas

Tr. 185:4-10.  A "High Risk" finding means "more severe process gaps or misses, process

imperfections."  Nawaday Decl. Ex. E, Brent Tr, 33:24-34:11.  A High Risk finding during the

quality assurance review can lead to a severely unsatisfactory rating from corporate quality

control.  Nawaday Decl. Ex. E, Brent Tr. 34:24-36:3.

      294.     Mairone herself recognized that the prefunding quality reviews were an

important tool for providing feedback on the HSSL loans.  Nawaday Decl. Ex. T, Mairone Tr.

66:15-25.  ("We had a prefunding control, we were looking at every single loan during the pilot

in great detail, so there was a lot of work done through this pilot phase on each individual loan to

ensure that quality was there, that every loan was reviewed, and that we felt like we had all of the

proper controls around that and that the employees would get the proper training and feedback

that they needed.").  Indeed, Mairone could not recall any quality controls for the HSSL other than the quality assurance reviews.  Nawaday Decl. Ex. T, Mairone Tr. 68:16-70:3.

295.    The initial production reports concerning HSSL loans (called "pipeline reports") stated that the HSSL was achieving its turn-time goal, as the average turn time on the HSSL loans was approximately two weeks.  Nawaday Decl. Ex. CI (Sept. 8, 2007, Email from Espinosa) BANA-SDNY-E-000052020-23 at 21 ("Of the loans funded since the beginning of the pilot, the average turn time from PC0 to Fund is 14.9 days with 17.8 days from PCA to Fund.").  The first HSSL loan was cleared to close in only one day, which prompted Mark Barnett to comment to Mairone and Rodriguez, "WOOO HOOO TOO! And "Keep em coming!"  Nawaday Decl. Ex. CJ (Aug. 16, 2007, Email from Mark Barnett) BANA-SDNY-E-000097230-33 at 30.

296.    Not surprisingly, the initial HSSL quality reports demonstrated that the short turn times had come at the cost of quality; the first quality assurance reviews of the HSSL process on or about August 31, 2007, indicated that 21% of the 29 HSSL loans reviewed had a rating of "High Risk."  *See* Nawaday Decl. Ex. CK (HSSL Process – QA Overview of Scope/Results through 9/10/2007) at 1.  By September 10, 2007, after 42 HSSL loans had been reviewed, the High Risk findings climbed to 41%.  Nawaday Decl. Ex. CK (HSSL Process – QA Overview of Scope/Results through 9/10/2007) at 1; Nawaday Decl. Ex. L. Ho Tr. 380:16-17.  Almost 60% of the High Risk findings related to loans processed through the Richardson funding center.  Nawaday Decl. Ex. CK (HSSL Process – QA Overview of Scope/Results through 9/10/2007) at 2.  The most common High Risk findings related to appraisals, borrower assets and income, and the fraud detector process.  Nawaday Decl. Ex. CK (HSSL Process – QA Overview of Scope/Results through 9/10/2007).  Of particular concern was the fact that 11 of the 13 files

reviewed between August 31 and September 10, 2007 had High Risk findings.  Nawaday Decl.

Ex. CK (HSSL Process – QA Overview of Scope/Results through 9/10/2007).

297.    Steve Brent, who was overseeing FSL quality assurance, believed that the High

Risk findings were a "major issue."  *See* Nawaday Decl. Ex. CK (HSSL Process – QA Overview

of Scope/Results through 9/10/2007).  Nawaday Decl. Ex. CL (Sept. 13, 2007, Email from Steve

Brent) BANA-SDNY-E-000467832 ("Need to really call out Negative findings and trends (12 of

13 reviews in September had findings and 11 had High Risk).  This is a major issue that should

be really escalated immediately to the Ops Management (more than a note and attached

details).");  Nawaday Decl. Ex. CL (Sept. 13, 2007, Email from Steve Brent) BANA-SDNY-E-

000467832; Nawaday Decl. Ex. K, Harris Tr. 43:23-44:25.  These results were communicated to

operations management, including Mairone, so that the high risk findings could be corrected

before funding.  Nawaday Decl. Ex. K, Harris Tr. 45:1-46:16.

298.    Shortly thereafter, a quality assurance review, completed on September 28, 2007,

showed that 59 of the 60 loans reviewed—98.33 percent of the HSSL loans—were rated as High

Risk, prompting Michael Thomas to email, "[r]emember that little quality concern about the new

process?  Doesn't look like we've solved it yet.  98.33 % High Risk on HSSL teams (let's see if

they can take it down from 98 % to 5 %."  Nawaday Decl. Ex. CM (Oct. 4, 2007, Email from

Thomas) BANA-SDNY-E-002192898-901 at 899; Nawaday Decl. Ex. AC, Thomas Tr. 64:11-

14.

299.    Underwriting managers who reviewed some of the HSSL files noticed that, as

with the NCA group, loan processors cleared conditions on loan files by indicating that

documents had been obtained and evaluated even when no such documentation existed in the

file.  Nawaday Decl. Ex. B, Ballance Tr. 14:10-25.  ("Ed assigned . . . the individual managers of

each group or a specific team to audit those High Speed Swim Lane loans.  And it was discovered that some of the processors were clearing conditions that were never in the file.  They signed off on them though.").

300.    Boland similarly observed loan specialists improperly clearing conditions "during the time period where penalties were reduced, incentives were increased, and messages from management encouraged it."  Nawaday Decl. Ex. D, Boland Tr. 167:11-16.  Boland explained that "the environment had gone from, That would never be okay, to, Well, we need to really move this loan tonight."  Nawaday Decl. Ex. D, Boland Tr. 78:17-19; Nawaday Decl. Ex. D, Boland Tr. 78:8-10 (giving example of discretion to close loans under conditions that would have been "unthinkable" prior to HSSL).

301.    As the HSSL expanded to all loans, the negative Quality Assurance findings continued to climb.  By early October 2007, the High Risk findings from HSSL loans had reached 98.3%.  Nawaday Decl. Ex. CN (Oct. 4, 2007, Email from Don Harris) BANA-SDNY-E-003389960-62.  The results continued to show elevated findings at centers where the HSSL process was rolled out.  Nawaday Decl. Ex. CN (Oct. 4, 2007, Email from Don Harris) BANA-SDNY-E-003389960-62 at 60.  ("Of the 59 loans deemed to be High Risk, 29 were processed in the Chandler Center (49.15%) and 30 were processed in the Richardson Center (50.85%).").  The most prevalent findings included failures to complete all screens of the "Fraud Detector" and failing to complete the Income Worksheet.  Nawaday Decl. Ex. CN (Oct. 4, 2007, Email from Don Harris) BANA-SDNY-E-003389960-62.

302.    In late October 2007, the High Risk findings from Quality Assurance reviews stood at 97%.  Nawaday Decl. Ex. CO (Oct. 24, 2007, Email from Don Harris) BANA-SDNY-E-000656514-18 at 15-16; Nawaday Decl. Ex. FV (Excel spreadsheet "Complete HSSL QA

Review 10-22-07.xls") BANA-SDNY-E-000268009.  Harris noted that "the purpose of this review is to insure[sic] that the findings identified in the PC3 [Phase Code 3] review were cured."  Nawaday Decl. Ex. CO (Oct. 24, 2007, Email from Don Harris) BANA-SDNY-E-000656514-18 at 17.  Harris further noted that "FSL QAC's role is to provide immediate awareness of any quality challenges for our Division and be a resource for all production channels."  Nawaday Decl. Ex. CO (Oct. 24, 2007, Email from Don Harris) BANA-SDNY-E-000656514-18 at 17.

303.    Brent viewed the 97% High Risk finding as a "red flag," and also an opportunity to correct problems before the loans funded.  Nawaday Decl. Ex. CO (Oct. 24, 2007, Email from Steve Brent) BANA-SDNY-E-000656514-18; Nawaday Decl. Ex. E, Brent Tr. 60:5-12 ("We have an opportunity to correct any defects or deficiencies then to make the loan sellable").  Brent further explained that the PC4 review would be a "much truer gauge of manufacturing quality."  Nawaday Decl. Ex. CO (Oct. 24, 2007, Email from Steve Brent) BANA-SDNY-E-000656514-18 at 14.

304.    O'Donnell testified that after reviewing HSSL loans in October 2007, he concluded that "if these loans were reviewed by corporate QC or an investor, we would have a severely unsat rate that is outside of a tolerance of three or four percent."  Nawaday Decl. Ex. W, O'Donnell Tr. 143:2-13.  O'Donnell also believed that including stated-income loans in the HSSL process "began to materially impact" FSL's overall quality score.  Nawaday Decl. Ex. W, O'Donnell Tr. 170:16-22.

305.    In mid-November 2007, the quality assurance reviews showed 175 of the 200 loans reviewed (87.5%) had a finding of "Action Required," while 14 (2%) had a finding of "Action Recommended," and 21 (10.5%) had a finding of "No Risk."  See Nawaday Decl.

Ex. FK (November 2007 Central Fulfillment Review Results Update) at 2. As with a High Risk finding, an Action Required meant that if the finding was not corrected before funding it could result in a SUS finding. *See* Nawaday Decl. Ex. FS (Feb. 6, 2008 email from Don Harris) BANA-SDNY-E-001069507-08 at 07 ("Action Required=Potential SUS findings").

306. At this time, the quality assurance group determined that "the vast majority of loans that have been flagged with issues at PC3 are not being rectified prior to PC4." Nawaday Decl. Ex. CP (Nov. 14, 2007, Email from Ron Cannon) BANA-SDNY-E-002721582-84 at 83; Nawaday Decl. Ex. CQ (Nov. 12, 2007, Email from Don Harris) BANA-SDNY-E-001751343-47 at 44 ("Ultimately, the suggestions/recommendations identified at PC3 were not adhered to prior to the loan funding."). Both Brent and Harris believed this was a "serious problem." Nawaday Decl. Ex. CP (Nov. 14, 2007, Email from Ron Cannon) BANA-SDNY-E-002721582-84 at 83; Nawaday Decl. Ex. E, Brent Tr. 70:15-71:11. Brent thought it affected the salability of the loans to investors. Nawaday Decl. Ex. E, Brent Tr. 70:15-71:11. Many of the Action required findings could result in SUS ratings if the required corrective action was not taken. Nawaday Decl. Ex. CQ (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-001751343-47 at 43 (indicating that "if assets are missing this would result in a SUS"); Nawaday Decl. Ex. E, Brent Tr. 64:23-65:4; Nawaday Decl. Ex. K, Harris Tr. 74:21-76:16. A severely unsatisfactory (or "SUS") finding means that the loan is "ineligible for sale," would not be acceptable to an investor, or is materially defective. Nawaday Decl. Ex. AC, Thomas Tr. 12:4-14.

307. On November 12, 2007, Steve Brent advised Wade Comeaux, Rebecca Mairone, and others that "we have some challenges with the process and need to address ASAP." Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-

93 at 91.  Specifically, Brent stated that "[i]t appears that the funded loan files for CF [Central Fulfillment] are not complete and 'could' create much higher SUS rates."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-93 at 91.  Brent also noted that "ONLY 5% of the initial findings on the PC 3 review are ultimately being completed and made part of the funded loan files."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-93 at 91.  Brent suggested that either:  (1) "The QA emails are not getting pushed down to the LS's/UW's within each CF team"; (2) "The OM's are just too busy to both forward the QA emails and followup on the findings with QA PC 3"; (3) "QA is inaccurately reviewing the files at both PC 3 and PC 4 (we are looking to validate that this is not being done and we perform our own QC of each finding before we publish to the CF Teams)"; and/or (4) "Lack of importance put on building Complete/compliant funded files."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-93 at 92.

308.    Brent also asked for suggestions on "getting better performance and attention paid to the Loan Manufacturing Quality" and noted that he had received some feedback that "QA emails should be going directly to the processing staff."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-93 at 92.  Brent observed that this was "very similar to the issue of SUS findings" and noted that "we have seen a[n] increase in our SUS findings from the UW group when we stopped sending the initial SUS finding directly to the UW'ers vs. only the Center Heads."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Steve Brent) BANA-SDNY-E-008985091-93 at 92.  Mairone forwarded Brent's comments and questions to Comeaux and said "let's discuss off-line."  Nawaday Decl. Ex. CR (Nov. 12, 2007, Email from Rebecca Mairone) BANA-SDNY-E-008985091-93 at 91.

309.     Ron Cannon acknowledged that Brent "thought that it would be a good idea to have the LSs included on the QA findings because it appears that the OMs are not able to keep up with the # of files with issues or communicating to the LSs in enough time that there are issues on a file," and that "this is an interim solution that makes sense."  Nawaday Decl. Ex. CP (Nov. 14, 2007, Email from Ron Cannon) BANA-SDNY-E-001334182-85 at 85.

310.     On November 14, 2007, Don Harris, who worked for Steve Brent, circulated a quality control report for FSL loans.  Nawaday Decl. Ex. E, Brent Tr. 78:4-21, Nawaday Decl. Ex. CS (Nov. 14, 2007, Quality Control Report).  The report showed audit findings for the third quarter of 2007 that were 87% complete.  Nawaday Decl. Ex. CS (Nov. 14, 2007, Quality Control Report) at 4.  Among other things, the report noted that 53% of the findings were "income related," which "continues to be a challenge for the Division," and that 67% of the income findings were "due to 'Unreasonable Stated income for profession/credit profile.'" Nawaday Decl. Ex. CS (Nov. 14, 2007, Quality Control Report).  Nawaday Decl. Ex. AC, Thomas Tr. 69:25-70:13 (findings "to be really concerned about are the income ones.  That was our number one finding always . . . Problems with income was -- in QC, QA, all the reviews that we would do, that was always the biggest issue.").

311.     The report also indicated that sites where the HSSL was rolled out had higher percentages of SUS findings, such as Richardson (31.3%) and Rosemead (23.1%).  Nawaday Decl. Ex. CS (Nov. 14, 2007 Quality Control Report) at 8; Nawaday Decl. Ex. E, Brent Tr. 81:15-82:10.

312.     Brent believed that the loan specialists should be included in the QA findings so that they could learn from their mistakes and produce higher-quality loans.  Nawaday Decl. Ex. E, Brent Tr. 71:15-72:7.

### H.      *Defendants Deem Quality Reports a Distraction and Order a Focus on Production*

313.     As the push for volume intensified, FSL employees were repeatedly told that they
had to fund more loans "to keep the lights on."   Nawaday Decl. Ex. D, Boland Tr. 108:21-
109:12.  The phrase was used "as a threat that production -- that was another way to encourage
people to produce loans, high volume, without regard for quality because we had to keep the
lights on.  You know, we have to keep the lights on.  So if -- if you were seen as pushing back, or
if you were seen as raising too many objections to quality or who's signing off on what, or doing
anything to slow down loans from moving forward, that -- you would hear that phrase:  We have
to keep the lights on."  Nawaday Decl. Ex. D, Boland Tr. 109:2 -109:12.

314.     Brent shared the problematic quality assurance results with executive
management and discussed it with them, including Rebecca Mairone.  Nawaday Decl. Ex. E,
Brent Tr. 72:8-73:12.  To Mairone, Brent advocated for "controls and to mitigate any kind of
deficiencies we had in our [loan] files."  Nawaday Decl. Ex.7, Brent Tr. 74:11-25.  But Mairone
"disagreed" and advocated "less controls" and "more streamlin[ing]."  Nawaday Decl. Ex. E,
Brent Tr. 75:1-11; Nawaday Decl. Ex. E, Brent Tr. 77:6-10.  Brent communicated to Mairone his
belief that further streamlining would only result in "higher defect rates."  Nawaday Decl. Ex. E,
Brent Tr. 75:12-20.

315.     On November 26, 2007, Comeaux instructed other central fulfillment employees
that "we have to increase velocity (fundings) with velocity . . . . While showing respect to other
departments, we have to take ownership of funding 'a hell of a lot' more loans in December!"
Nawaday Decl. Ex. CT (Nov. 26, 2007, Email from Comeaux) BANA-SDNY-E-001114384-86
at 84.  As a result, Comeaux sought "to limit [QA] calls to 1 hour per week at most" so he and

others could "focus on production for the next few weeks."  Nawaday Decl. Ex. CV (Nov. 27, 2007, Email from Wade Comeaux) BANA-SDNY-E-001334182-85 at 82.

316.     On November 28, 2007, FSL chief credit officer Cliff Kitashima forwarded the Corporate QC results through the third quarter 2007, highlighting that "Income related issues (reasonability of stated income and DTI issues) are the bulk of the primary findings."  Nawaday Decl. Ex. CW (Nov. 28, 2007, Email from Cliff Kitashima) BANA-SDNY-E-008979444-46 at 45-46.  Kitashima advised that he had "asked QA and QC to work more closely with Central Fulfillment management to develop corrective measures."  Nawaday Decl. Ex. CW (Nov. 28, 2007, Email from Cliff Kitashima) BANA-SDNY-E-008979444-46 at 45-46.  In response, Lumsden stated, "If we do not fund the volumes per our budget, we will not have to worry about QA and QC."  *Id.* at 45.  Lumsden claimed that Kitashima's and Brent's process was "not adding value for improving quality" while "stifling ops/processing" and further noted that "[w]e still have terrible days to close and app to funding rates."  *Id.*

317.     As funding pressures from Lumsden continued, Kitashima redefined his goals to stay "aligned" with Mairone's objectives rather than protecting the credit quality of the HSSL loans.  Nawaday Decl. Ex. CW (Nov. 30, 2007, Email from Kitashima) BANA-SDNY-E-008979444-47 at 44 ("I stay in very close communication with Rebecca and, working through her, help to facilitate change, provide data and feedback and QC/QA, compliance and operations aligned with her objectives.").

318.     On November 29, 2007, Rebecca Mairone issued a Central Fulfillment management team notice announcing "a change in process and direction."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06. Specifically, Mairone stated that "[t]he purpose of these changes is to immediately increase the

focus on funding loans and working the pipeline, as well as streamlining the processing requirements for prime loans."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06.

319.    Mairone decreed that "QA communication to Central Fulfillment will stop immediately 11/29/07.  The communications will be directed to only Rebecca Mairone for the next 30 days.  I will meet with compliance and quality groups solely . . . . I will determine, based on my meetings with compliance and QA groups how and when we will update the CF management team, and any other CF employees as necessary.  In other words, Wade, Robert, Jim and Armand will not be required to attend any conference calls with quality/risk for the next 30 days to completely empower them to focus on production."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 06-07.

320.    Mairone further ordered that "QC communication to Central Fulfillment will also be directed to myself on behalf of the CF Management team for the next 30 days" and that "[w]e will not conduct any site reviews until further notice."  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 07.

321.    Mairone's November 29, 2007 mail advised that "[w]e will prepare a note to all CFM employees to help them understand they should feel confident in using their authority and that we will have a QOG comp hit reprieve through the end of January [2008] and they will no longer receive direct QA feedback until further notice." Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 07.

322.    Mairone had no experience in managing underwriting or quality control departments.  Nawaday Decl. Ex. T, Mairone Tr. 18:21-20:18 (no experience at FSL or prior employment in managing underwriting or quality control).

323.     Brent did not agree that quality assurance communications should stop, because such communications were necessary to "ensure quality."  Nawaday Decl. Ex. E, Brent Tr. 87:16-21, 88:17-23, 89:7-22.  Brent believed Mairone's plan ran counter to the principle of involving loan specialists in the quality assurance process so that their mistakes could be communicated to them and not repeated.  Nawaday Decl. Ex. E, Brent Tr. 91:9-92:1.  For the same reason, which he communicated to Mairone, Brent did not believe that quality control information should be made known only to Mairone.  Nawaday Decl. Ex. E, Brent Tr. 96:12-97:2.  Brent also disagreed with excusing senior managers from quality/risk conference calls and the termination of site reviews, because quality assurance results showed instances of documents not being included in loan files.  Nawaday Decl. Ex. E, Brent Tr.  92:10-102:8.

324.     Robert Price had previously attended conference calls with quality control and risk management, and he viewed it as an "important part of [his] job" because he "needed to know when the groups [he] was responsible for were doing their jobs and—and manufacturing the loans in the right way."  Mainigi Decl. Ex. 24, Price Tr. 92:24-93:5.  But as a result of Mairone's directive, Price was effectively prohibited from attending these calls.  Mainigi Decl. Ex. 24, Price Tr. 197:24-198:9 ("[I]t was preferred that we not be on those calls and to focus only on the production side and let the—let Rebecca handle . . . the—the initial review and discussion around the QA, QC results.").

325.     Likewise, Boland, the first vice president of underwriting in Richardson, for no stated reason stopped receiving reports on loan quality and SUS findings.  Nawaday Decl. Ex. D, Boland Tr. 103:23—104:15; 105:23—106:4.  Besides his personal inspection of individual loan files, he had "no official way to know what the quality was."  Nawaday Decl. Ex. D, Boland Tr. 106:11-16.

326.    Brent also disagreed with extending the quality-of-grade hit reprieve and denying loan specialists direct quality assurance feedback, particularly at the same time.  Nawaday Decl. Ex. E, Brent Tr. 114:17-115:10 ("Neither one of those removals, removals of the QOG or removals of the QA, did I agree with, and I felt that they would both -- they could negatively affect our quality. Q:  Okay.  So you didn't think they were good ideas independently, and you certainly didn't think they were good ideas together?  A:  I think that's a fair statement").

327.    Kitashima was also concerned about the continued suspension of the QOG impact.  Nawaday Decl. Ex. Q, Kitashima Tr. 98:2-19 (explaining that "we had originally agreed to have the suspension last for a period of time.  And arguably we still had issues that were related to quality coming up at that point in time.  So I thought that it was prudent for us to go slower on extending it any further").

328.    According to Brent, the reason for this changed QA/QC communication was that "there was a feeling that the QA/QC information and the sharing of the information was impacting the speed at which the loans could be processed."  Nawaday Decl. Ex. E, Brent Tr. 86:1-7.  Brent testified that Rebecca Mairone and Loren Rodriguez believed that the QA process was slowing down production too much.  Nawaday Decl. Ex. E, Brent Tr. 86:22-87:9.

329.    According to Mairone, the reason she wanted all QA communication directed to her was "to better control the distribution of the reports and make sure everyone was focused on quality."  Nawaday Decl. Ex. T, Mairone Tr. 233:3-7.  But when pressed about whether she thought her decision would lead to better quality loans, Mairone refused to say that it would. Nawaday Decl. Ex. T, Mairone Tr. 236:2-9. ("Q: So my question is did you think it would help quality to control the distribution of the quality assurance reports?  A:  I don't think those two things are directly related that you are talking about.  Or I'm not clear on the question.").

330.     As for why she wanted QC communications directed to her and not her employees, Mairone claimed, "I think it's important, the message that goes with that.  Again, I was the point of contact that then filtered down the information.  I think you get better results when a leader takes ownership of a situation, like a quality situation, and my job was to make sure that everyone had focused attention on that."  Nawaday Decl. Ex. T, Mairone Tr. 242:25-243:9.  But she then undermined her status as the alleged "leader" of the "quality situation," by disavowing understanding of basic concepts and terms.  Nawaday Decl. Ex. T, Mairone Tr. 173:16-22 ("Q:  And you were aware, weren't you, that loans sold to Fannie Mae and Freddie Mac had at least to be of investment quality; is that right?  A:  I'm not sure what you mean by 'investment quality.'"); Nawaday Decl. Ex. T, Mairone Tr. 174:6-13 ("Q:  What do you understand a severely unsatisfactory finding to be?  A: In general terms, although I was not responsible for QC, SUS or the auditing thereof, a Countrywide officer would have to answer that question for you related to Countrywide business."); Nawaday Decl. Ex. T, Mairone Tr. 175:10-16 ("Q:  But you did have an understanding a loan with an SUS finding was ineligible for sale to any investor?  A: That's not my understanding.  I'm not clear on that."); Nawaday Decl. Ex. T, Mairone Tr. 264:25-265:7 ("Q:  But do you have an understanding of what an action required finding is?  A:  I'm just making a general assumption that it's a defect.  I'm not sure what 'action required SUS'able finding' is.").

331.     Mairone claimed that she favored the continued QOG reprieve because "it was important to the change management process and we had other controls and disciplinary actions in place where it backstopped the quality issues."  Nawaday Decl. Ex. T, Mairone Tr. 252:12-16.  But when asked to explain what those controls were, Mairone responded, "I don't remember specifically all the reports that we used.  There were many different ways that we managed

quality." Nawaday Decl. Ex. T, Mairone Tr. 253:6-9. And when asked to identify any reports other than the quality assurance reports and the quality control reports, Mairone responded only that there were "production reports" as well, Nawaday Decl. Ex. T, Mairone Tr. 253:19, then conceded that the production reports contained no information about loan quality, Nawaday Decl. Ex. T, Mairone Tr. 255:18-21.

332.    Pre-funding defect findings in December 2007 suggested that nearly every loan processed through central fulfillment had problems. Nawaday Decl. Ex. CY (Dec. 7, 2007, Email from Don Harris) BANA-SDNY-E-004566307. Of 72 total loan audits conducted in early December, 66 (or 91.7%) were identified with Action Required or "SUSable" findings, which if not corrected, could lead to an SUS finding by the corporate QC department. Nawaday Decl. Ex. CY (Dec. 7, 2007, Email from Don Harris) BANA-SDNY-E-004566307. The report stated that "Richardson has the highest number of Action Required SUSable' findings. Of the 45 audits on loans funded through Richardson, 41 were identified with findings 91% (41/45)." Nawaday Decl. Ex. CY (Dec. 7, 2007, Email from Don Harris) BANA-SDNY-E-004566307. The senior vice president in charge of Richardson, Robert Price, was not copied on the email delivering the QA results. Nawaday Decl. Ex. CY (Dec. 7, 2007, Email from Don Harris) BANA-SDNY-E-004566307.

333.    Approximately one week later, Price emailed Mairone concerning an initial SUS finding about which he was not notified. Nawaday Decl. Ex. CZ (Dec. 13,, 2007, Email from Price) BANA-SDNY-E-004735079-80. Price commented that "the Risk and Compliance groups have minimized/ceased contact with us (primarily Jim and I) due to the direction they have received for the time being. One thing we need to pursue are responses to our rebuttals related to Q3 SUS rated loans that were primarily tied to Reasonableness of Stated Income and that we

were originally not consulted on."  Nawaday Decl. Ex. CZ (Dec. 13,, 2007, Email from Price) BANA-SDNY-E-004735079-80 at 79.

334.    Mairone denied that she issued any direction to the risk and compliance groups in or around December 2007 to limit contact with Price or other senior vice presidents of the central fulfillment centers.  Nawaday Decl. Ex. T, Mairone Tr. 284:4-10.

335.    Brent testified that notwithstanding his efforts to do "everything that was available to him" to persuade people of his point of view, management had gone a different direction.  Nawaday Decl. Ex. E, Brent Tr. 110:1-22.  Brent believed that the decisions outlined in Mairone's November 29, 2007 email could negatively impact quality, that "it could be putting us in harm's way," and he communicated this to Mairone.  Nawaday Decl. Ex. E, Brent Tr. 118:18-119:5.  Brent shared his concerns with Mairone, but to no avail.  Nawaday Decl. Ex. E, Brent Tr. 125:14-126:5.

336.    Mairone did not recall anyone expressing disagreement with any of the changes announced in her November 29, 2007 email.  Nawaday Decl. Ex. T, Mairone Tr. 258:14-17.

### I.      As Warned, the Loan Specialists Produced Loans of Terrible Quality

337.    The QOG scores at the end of 2007 for loan specialists in central fulfillment were terrible. Nawaday Decl. Ex. DA ("2007 Central Fulfillment Quality of Grade") Native of BANA-SDNY-E-000115540.  Although loan specialists were purportedly required to maintain a minimum QOG score of 4.0 to obtain underwriting authority, the average QOG scores per team ranged from a high of 2.94 to a low of 1.75.  Nawaday Decl. Ex. DA ("2007 Central Fulfillment Quality of Grade") Native of BANA-SDNY-E-000115540 at 3.  Out of the approximately 210 loan specialists and underwriters listed, 87 had QOG scores at or below 2.00.  Nawaday Decl. Ex. DA ("2007 Central Fulfillment Quality of Grade") Native of BANA-SDNY-E-000115540.

In fact, in October 2007 risk management set a QOG score of 3.0 or lower as a reason to *repeal* a loan specialist's authority. Nawaday Decl. Ex. AX (Oct. 1, 2007, Email from Patrick Aliano) BANA-SDNY-E-002220473-76 at 75 (listing reasons for repeal as including a QOG score of three or lower for two consecutive months).

338.    After the average QOG scores per team fell below that threshold, instead of abandoning or materially reworking the HSSL, goals for loan specialists were merely readjusted; to wit, the 2007 performance evaluations for loan specialists list as the quality goal, "Achieve and Maintain a QOG of 3.0 or higher." Nawaday Decl. Ex. BM (Employee Evaluation for 2007 Performance) BANA-SDNY-E-000250501-03 at 02.

### J.    *Mairone and Comeaux Push Further Changes to Enhance Production*

339.    In response to Mairone's November 29, 2007 email, Comeaux wrote, "Great job! This is huge!  Reminder, we still have around 9 checklists and a few other friction points not yet addressed.  When will we get those removed?"  Nawaday Decl. Ex. CX (Nov. 29, 2007, Comeaux email) BANA-SDNY-E-001115006-07 at 06.  The next month, Mairone prepared a "Friction Points Memo" to all FSL, stating that "in order to improve turn time and productivity," she decided to eliminate nine required checklists and processes, including a stated income reasonability worksheet and appraisal review checklists.  Nawaday Decl. Ex. DB ("Friction Points Memo #1 to ALL FSL" from Mairone) BANA-SDNY-E-00867551-52; Nawaday Decl. Ex. GD (Dec. 4, 2007, Bulletin 07-607) BANA-SDNY-C-000338089; Nawaday Decl. Ex. GE (Dec. 12, 2007, Bulletin 07-624) BANA-SDNY-E-001682157).

340.    Elimination of the checklists meant that they were no longer required to be signed and entered into the virtual loan file. Nawaday Decl. Ex. DB (Friction Points Memo #1 to ALL FSL) BANA-SDNY-E-00867551-52 at 52.  *See also* Nawaday Decl. Ex. L, Ho Tr. 240:11-

241:15 (converting checklists to job aids meant that the checklist was no longer required to be entered into virtual loan file "VLF").  As a result, there was no way for a reviewer to discern whether or how the loan specialist completed certain tasks.  Mainigi Decl. Ex. 24, Price Tr. 208:7-23 ("Q.  [I]f a job aid is not required to be entered into -- completed and entered into the virtual loan file, how would you track whether a loan specialist actually used that job aid?  A. Technically, I don't know that you could unless you had a -- some kind of a side system in place that had them acknowledging and, you know, memorializing that they used it on this loan and it -- you know, on this date and for this reason or whatever.  But normally, the uploading it to VLF was the -- the normal way of acknowledging usage of a checklist or a job aid.  Q.  And that would also enable an auditor to determine whether the job aid was used; is that right?  A.  Right. Because an auditor would only have considered what's in the virtual loan file as part of the file.").

341.    Brent believed, and told Mairone, that the balance between production and quality was "skewed towards production."  Nawaday Decl. Ex. E, Brent Tr. 95:24-96:11; 165:24-166:6. He disagreed with the elimination of checklists because he "had a concern that removing these things – these support pieces would affect our quality."  Nawaday Decl. Ex. E, Brent Tr. 104:19-105:23; 110:24-111:16.  Given the challenges the HSSL was already having with quality, Brent opposed the further removal of safeguards. Nawaday Decl. Ex. E, Brent Tr. 107:1-109:3; 112:6-14.  Brent's viewpoint was again "discounted by Ms. Mairone," Nawaday Decl. Ex. E, Brent Tr. 126:14-24, and his working relationship with her became "confrontational," Nawaday Decl. Ex. E, Brent Tr. 124:22-125:2.

342.    Price similarly disfavored elimination of the appraisal worksheet because "aside

from ability to pay . . . the collateral's probably the second most important aspect of a loan.  And

the collateral's got to be solid. . ." Mainigi Decl. Ex. 24, Price Tr. 115:12-15, 117:1-13.

343.    Around December 2007, FSL also implemented in the field branches a revised

Prime CLUES Accept model that likewise focused on the automated underwriter and loan

specialists.  Nawaday Decl. Ex. CJ (Aug. 16, 2007, Email from Mark Barnett) BANA-SDNY-E-

000097230-33 at 30.  In a December 5, 2007 email to Greg Lumsden, Loren Rodriguez

explained the prime CLUES Accept process.  Nawaday Decl. Ex. DV (Dec. 5, 2007, Email from

Loren Rodriguez) BANA-SDNY-E-001872409-12 at 10.  Specifically, Rodriguez explained that

branch operations managers who were "concerned with quality" had created their own "Second

Review Process," where they were retracing the work of the loan specialists.  Nawaday Decl. Ex.

DV (Dec. 5, 2007, Email from Loren Rodriguez) BANA-SDNY-E-001872409-12 at 10.  This

"self-made review involved items like reviewing the credit report for payment histories, and

hawk alerts, validating the entry of REO data in EDGE, checking the title, etc.  BOMs are also

concerned that the LS may have incorrectly entered information into the Income Calculator, and

therefore come up with the wrong income on the loan."  Nawaday Decl. Ex. DV (Dec. 5, 2007,

Email from Loren Rodriguez) BANA-SDNY-E-001872409-12 at 10.  Rodriguez advised them to

"get comfortable trusting CLUES and the decision it renders and fulfilling deals based on

CLUES conditions."  Nawaday Decl. Ex. DV (Dec. 5, 2007, Email from Loren Rodriguez)

BANA-SDNY-E-001872409-12 at 10.  In response to "concern about the potential for audit

findings . . . if they aren't checking the LS work," Rodriguez advised that "there is a QOG

moratorium on QOG hits."  Nawaday Decl. Ex. DV (Dec. 5, 2007, Email from Loren Rodriguez)

BANA-SDNY-E-001872409-12 at 10.

344.     The improved funding speed of the HSSL thus soon spread throughout FSL, as Lumsden stressed that they had to make "major changes," that "time is our enemy," and that "I want us to move quickly."  Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-SDNY-E-000144634-35 at 34.  Lumsden stated that there would be two operating models, one for central fulfillment and one for field branches.  Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-SDNY-E-000144634-35.  In central fulfillment, "[p]rocessing, underwriting and funding are fully merged" and "report to one call center ops leader."  Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-SDNY-E-000144634-35 at 34.  In the field branches, "[u]nderwriting and funding groups are merged together to support processing staff still in field branches," and "[t]hese teams would operate very similar to the teams above, except that the processors would be in the field."  Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-SDNY-E-000144634-35 at 34.  Finally, Lumsden noted that "[a]ll teams for the branches would be located in the exact same facilities as the call center ops teams, and report up to the same overall leader."   Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-SDNY-E-000144634-35 at 34.

345.     A presentation announcing the key elements of central fulfillment also provided that the streamlined field branch fulfillment approach would be implemented in December 2007.  Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-00004014 at 18.  Like the central fulfillment model, the field branch model aimed to "Give UW level 2 authority" to field branch staff, Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-00004014 at 15, "Eliminate hand-offs" and achieve "Faster overall Turn Time" (Nawaday Decl. Ex. BY (Nov. 13, 2007, New Fulfillment Model) BANA-SDNY-E-00004014 at 16).  *See also* Nawaday Decl. Ex. AM (Sept. 11, 2007, Email from Greg Lumsden) BANA-

SDNY-E-000144634-35 at 34 (indicating that in the field fulfillment model, "[u]nderwriting and funding groups are merged together to support the processing staff remaining in field branches," and "[t]hese teams would operate very similar to [central fulfillment teams], except that the processors would be located in the field."); Nawaday Decl. Ex. GD (Dec. 4, 2007, Bulletin 07-607) BANA-SDNY-C-000338089; Nawaday Decl. Ex. GE (Dec. 12, 2007, Bulletin 07-624) BANA-SDNY-E-001682157.

346.    On December 12, 2007, Mairone announced a QOG reprieve for all FSL employees, not just those participating in the central fulfillment model.  Nawaday Decl. Ex. AZ (Dec. 12, 2007, Email from Mairone) BANA-SDNY-E-003960408-09.  Stating that "many of our employees are in new roles . . . we want you to know that each FSL employee will have a QOG reprieve on all funded units completed through 12/31/07.  This will be in effect for Funders, UWs, Validators, and Lending Specialists, and any other FSL employee who is monitored and scored using QOG . . . CLUES is the underwriter, we should trust it and validate the conditions requested."  Nawaday Decl. Ex. AZ (Dec. 12, 2007, Email from Mairone) BANA-SDNY-E-003960408-09 at 09.

### K.    *As Warned, FSL Sells Thousands of Defective HSSL Loans to the GSEs*

347.    The push for volume continued into 2008.  Nawaday Decl. Ex. DZ (Jan. 29, 2008, Email from Lumsden) BANA-SDNY-E-001647573-77.  In January 2008, Comeaux set forth the primary initiatives for the month of February, listing the number one item as "Fund 15,000 units" and adding "15,000 or bust!"  Nawaday Decl. Ex. DZ (Jan. 29, 2008, Email from Lumsden) BANA-SDNY-E-001647573-76 at 74, 76.  Mairone forwarded the proposed initiatives to Lumsden, noting that the "biggest topic is to fund 15,000 loans in our current pipeline and most focus will be on this initiative."  Nawaday Decl. Ex. DZ (Jan. 29, 2008, Email from Lumsden)

BANA-SDNY-E-001647573-76 at 73.  Lumsden said that the "15,000 goal is too high.  Perhaps we should discuss."  *Id.*

348.    Along with the push for volume came record high defect rates.  Nawaday Decl. Ex. FM (Cross-Divisional Loan Quality Comparison).  Quality assurance reports from January 2008 showed serious problems in both Central Fulfillment and the field branches.  *See* Nawaday Decl. Ex. FK (November 2007 Central Fulfillment Review Results Update) at 2.  Specifically, monthly QA results for January 2008 showed that out of 963 loan files reviewed from Central Fulfillment, 769 files (79.9%) percent "were identified with Action Required = Potential SUS findings."  *See* Nawaday Decl. Ex. FK (November 2007 Central Fulfillment Review Results Update) at 2.  Again, "Richardson ha[d] the highest percentage of Action Required SUSable' findings" with 428, or 83.11%.  *See* Nawaday Decl. Ex. FK (November 2007 Central Fulfillment Review Results Update) at 2.  The QA results also showed poor quality in the filed branches, with 774 of 1168 files of reviewed (66.3%) identified with Action Required = Potential SUS findings.  *See* Nawaday Decl. Ex. FK (November 2007 Central Fulfillment Review Results Update) at 2.

349.    The poor loan quality also could be seen in the quality control results.  Beginning in the third quarter of 2007, FSL experienced a significant increase in loans rated severely unsatisfactory.  Nawaday Decl. Ex. FW (Dec. 17, 2008, Email from Edward O'Donnell) BANA-SDNY-E-003960553-54.  Nawaday Decl. Ex. E, Brent Tr. 244:12-245:5.  One of the reasons for the decline in loan quality was "a model change and leadership change within FSL fulfillment that led to challenges with execution of existing risk controls."  Nawaday Decl. Ex. E, Brent Tr. 244:24-245:2

350.     In February 2008, Countrywide's executive vice president of the Enterprise Risk

Assessment group ("ERA") reported that across Countrywide divisions, "[l]oan manufacturing

quality has deteriorated as evidenced by QC Severely Unsatisfactory (SUS) rates rising

substantially in 2007 over 2006," and that "[d]ivisional preventative and corrective actions have

not been effective in improving loan manufacturing quality."  Nawaday Decl. Ex. L, Ho Tr.

419:3-7; Nawaday Decl. Ex. EE (Feb. 6, 2008, Email from David Boberg) BANA-SDNY-E-

000521269-81 at 71.  The Bank Defendants' 30(b)(6) witness did not know if the rising SUS

findings were communicated to the GSEs.  Nawaday Decl. Ex. L, Ho Tr. 422:21-23.

351.     The ERA group recommended in February 2008 that Countrywide Home Loans

"should either hire experienced underwriters . . . or centralize the underwriting of stated income

loans to offices where experienced underwriters are located." Nawaday Decl. Ex. EE (Feb. 6,

2008, Email from David Boberg) BANA-SDNY-E-000521269-81 at 71.

352.     The same month, FSL instituted a remediation and action plan addressing "root

causes" of a decline in loan quality.  Nawaday Decl. Ex. EH (Feb. 2008, Quality Control

Ratings:  Loan Performance and Quality Review Improvement) at 2; Nawaday Decl. Ex. T,

Mairone Tr. 320:17-23.  The primary listed causes were a "Change in Centralized Model—

Fulfillment" and that "controls were changed within the new model," specifically a "conversion

of mandatory checklists to non-mandatory 'Job Aids.'"  Nawaday Decl. Ex. EH (Feb. 2008,

Quality Control Ratings:  Loan Performance and Quality Review Improvement) at 4.  Changes to

FSL quality control were also listed as root causes of the decline in loan quality, including that

"QOG's were suspended in Q3 and Q4 2007 for line staff," "QC findings were communicated

only to Sr. Management during implementation of new Model," "QA process launched with

communication of findings restricted to Sr. Management during transition," and "FSL Risk

Management addressed QC findings with Corporate without Field input to reduce distractions (only shared final results)." Nawaday Decl. Ex. EH (Feb. 2008, Quality Control Ratings:  Loan Performance and Quality Review Improvement) at 4.

353.    Loan quality in FSL, and specifically in Central Fulfillment continued to decline in the first quarter of 2008.  Nawaday Decl. Ex. EI (Feb. 6, 2008 Email from John Boland) BANA-SDNY-E-001342869-70; Nawaday Decl. Ex. FM (Cross-Divisional Loan Quality Comparison).  Michael Thomas, first vice president of risk management, prepared quarterly summaries of the corporate QC reports to provide information concerning SUS ratings, and how FSL's quality compared to Countrywide's Consumer Markets Division ("CMD") and its Wholesale Lending Division ("WLD").  Nawaday Decl. Ex. AC, Thomas Tr.  16:22-17:12.

354.    Post-funding quality control reports on FSL loans for the first quarter of 2008, when Countrywide conducted four times more random audits than it conducted in the fourth quarter of 2007, showed that FSL's initial SUS findings on EA and conforming loans—those loans sold to Fannie Mae and Freddie Mac—were more than 30%, exceeding twice the rate of other Countrywide divisions.  Nawaday Decl. Ex. FM (Cross-Divisional Loan Quality Comparison); Nawaday Decl. Ex. AC, Thomas Tr. 86:8-11 (EA and conforming loans were sold to Fannie Mae and Freddie Mac); Nawaday Decl. Ex. T, Mairone Tr. 172:4-13 (aware that central fulfillment loans were being sold to Fannie Mae and Freddie Mac); Nawaday Decl. Ex. T, Mairone Tr. 175:20-24 (understanding of "unsaleable loan" as "one that's not salable to the GSEs or other investors who are looking to purchase"); Nawaday Decl. Ex. T, Mairone Tr. 331:5-11, 331:23-332:2 (aware that EA and conforming loans may be sold to Fannie Mae and Freddie Mac).

355.    A QA audit of Central Fulfillment loans that were funded from the Richardson branch in January 2008 alone identified potential SUS findings in 83% of the loans, although the goal was 3%.  Mainigi Decl. Ex. 24, Price Tr. 126:5-127:2. *See also* Mainigi Decl. Ex. 24, Price Tr. 124:22-125:1 (explaining a potential SUS finding as one in which a QA auditor "has identified something that they think the corporate auditors would identify as an SUS").

356.    Price could not recall a time when potential SUS rates anywhere approached 83%. Mainigi Decl. Ex. 24, Price Tr. 132:11-21.  In March 2008, potential SUS findings for Central Fulfillment loans at the Richardson center were 48%.  Nawaday Decl. Ex. EK (Mar. 12, 2008, Email from Robert Price) BANA-SDNY-E-003405740-41; Mainigi Decl. Ex. 24, Price Tr. 138:16-139:6.

357.    FSL employees knew that the problem-ridden loans were being sold to Fannie Mae and Freddie Mac.  Nawaday Decl. Ex. D, Boland Tr. 106:19-107:2; 107:10-13; Nawaday Decl. Ex. D, Boland Tr. 239:23-240:9 (stating that selling a loan to a GSE that did not meet the applicable representations and warranties would be a misrepresentation).

358.    In the spring of 2008, Boland and the underwriting managers who reported to him were given an opportunity to express their concerns to "the catalyst of the -- the Hustle, who was Rebecca Mairone." Nawaday Decl. Ex. D, Boland Tr. 96:2-4; 96:17-20.  At the meeting, "very specific concerns" were raised to Mairone, and in particular, Neal Ballance drew "a comparison between the statements of Angelo Mozilo to the Congress . . . the evening prior . . . about Countrywide's commitment to quality, their processes, doing the right thing . . . And Neal phrased a question to Ms. Mairone and compared the statements of Mr. Mozilo the night before to the Hustle and the initiative that she was championing and wanted a reaction from her about, If Angelo says these things to Congress and you say these things, and they're very, very

different, how do you reconcile that?"  Nawaday Decl. Ex. D, Boland Tr. 98:5-99:5.  In

response, Mairone became "visibly upset . . . . [H]er response there was an expletive that sent a

message to the team that questions like that were . . . not welcome."  Nawaday Decl. Ex. D,

Boland Tr. 99:6-11.

     359.    In early March 2008, Andrew Gissenger, who was the head of production for all

Countrywide divisions and Lumsden's boss, Nawaday Decl. Ex. S, Lumsden Tr. 19:1-9, became

involved in the high rate of SUS findings on FSL loans.    In explaining the reason for the poor

loan quality to Gissenger, Lumsden stated, "So it appears that for the high fico, low ltv, we sent

it through quickly, down the fast swim lane to help with costs and productivity . . . Did not have

enough focus on the income reasonability and a full credit profile for this borrower and ltv type."

Nawaday Decl. Ex. EL (Mar. 11, 2008, Email from Greg Lumsden) BANA-SDNY-E-

000077171-72.

     360.    On March 3, 2008, Michael Thomas re-circulated his warnings about the HSSL,

from August 2007, to O'Donnell, first vice president of risk management, Patrick Aliano, and

others, stating, "Here's my plan of attack. . . oh, wait...this is what we suggested last August. . ."

Nawaday Decl. Ex. EO (Mar. 3, 2008, Email from Michael Thomas) BANA-SDNY-E-

00220229-34 at 31; Nawaday Decl. Ex. AC, Thomas Tr. 76:3-5 ("I mean, the whole time I -- I

thought that surely at some point better heads would rule and things would be adjusted.").

Thomas received several responses expressing the same frustration.  Nawaday Decl. Ex. EN

(Mar. 5, 2008, Email from Biren Desai) BANA-SDNY-E-002200042-49 at 42 ("i agree.  is the

benefit of improved turntime due to control reduction . . . worth the cost of deteriorating quality?

at this point it seems you have your answer and it's a resounding no"); Nawaday Decl. Ex. DE

(Mar. 13, 2008, Email from Patrick Aliano) BANA-SDNY-E-001009201-05.

361.    Aliano replied to Thomas, stating that "[O'Donnell] will tell you when we sat in the room in July these were some of the same concerns we expressed, but you hit the nail on the head with a good chunk of this."  Nawaday Decl. Ex. DE (Mar. 13, 2008, Email from Patrick Aliano) BANA-SDNY-E-001009201-05.  Aliano then forwarded Thomas's email to Javier Jaraba and another employee, commenting that "we did have the crystal ball, and unfortunately our risk assessment at that time are holding true as current quality undermines FSL."  Nawaday Decl. Ex. DF (Mar. 13, 2008 Email from Patrick Aliano) BANA-SDNY-E-000039008-12 at 08. Indeed, after the Government filed its original complaint in this action, Aliano, a current employee of Bank of America, emailed congratulations to O'Donnell for doing "the right thing" and circulated the press release in this action to another current Bank of America employee commenting, "Proof of 'We told ya so.'" Nawaday Decl. Ex. DG (Oct. 24, 2012, Email from Patrick Aliano) BANA-SDNY-E-001011364; Nawaday Decl. Ex. GM (Oct. 24, 2012, Email from Patrick Aliano) SDNY_BOA_00235117.

362.    In late March 2008, FSL was preparing to hold a "manufacturing quality summit" to address potential changes to the central fulfillment process.  Nawaday Decl. Ex. DJ (Mar. 24, 2008, Email from Comeaux) BANA-SDNY-E-000055720-23.  O'Donnell proposed a meeting to discuss "3 or 4 major process areas where it's essential we have new or tighter controls being executed and then documented," and he noted that "much has changed in the market place and with regard to Quality standards since we started discussions about the HSSL last summer." Nawaday Decl. Ex. DJ (Mar. 24, 2008, Email from Comeaux) BANA-SDNY-E-000055720-23 at 21; *see also* Nawaday Decl. Ex. DI (Mar. 5, 2008, Email from O'Donnell) BANA-SDNY -E-008959506-09 at 06 (based on 79% of Q4 SUS ratings being attributed to income reasonability, "the current process is in the ditch").  Comeaux forwarded O'Donnell's meeting agenda to

Mairone asking whether she could attend because he thought (i) it would be a "pivotal meeting," (ii) that the proposed plan was "counter to many of our goals" and (iii) that, based on the list of attendees, which included O'Donnell, Kitashima, and others, it appeared that their "team [would] be outnumbered."  Nawaday Decl. Ex. DJ (Mar. 24, 2008, Email from Comeaux) BANA-SDNY-E-000055720-23 at 20; Nawaday Decl. Ex. DH (Mar. 14, 2008, Email from Comeaux) BANA-SDNY-E-001302829-31 (Comeaux "fought . . . aggressively" against quality-focused measures proposed in March 2008).

363.    Also in March 2008, Kitashima and O'Donnell were asked to make a presentation to Gissinger regarding FSL loan quality.  Nawaday Decl. Ex. W, O'Donnell Tr. 227:5-8.  The night before the presentation, Mairone "requested that [O'Donnell] remove certain slides from the deck before it was presented to Greg and before it was presented to Drew."  Nawaday Decl. Ex. W, O'Donnell Tr. 248:20-24.  Mairone stated that slides pertaining to loan quality "reflected poorly against FSL…and…would get a very strong reaction."  Nawaday Decl. Ex. W, O'Donnell Tr. 249:3-6.

364.    The next month, Thomas, Brent, and O'Donnell met with Mairone and Lumsden to discuss defects from the current loan processes, but nothing changed.  Nawaday Decl. Ex. DK (Apr. 25, 2008, Email from Thomas) BANA-SDNY-E-002201596-604; Nawaday Decl. Ex. AC, Thomas Tr. 88:2-91:24.  Thomas explained that he "kept thinking . . .  at some point, somebody will put on the brakes and say, Okay.  We've had enough. We see there's issues.  Let's slow down or correct it.  And I just felt like we were heading towards a cliff."  Nawaday Decl. Ex. AC, Thomas Tr. 91:25-92:6.  Thomas added that although in the past, Lumsden was responsive to concerns about quality, "at this point in time, it just felt like all that was -- was gone.  It was volume.  It felt like a survival mode to me."  Nawaday Decl. Ex. AC, Thomas Tr. 92:16-24.

365.     Mairone was aware of both the high SUS findings in the first quarter of 2008 and that "many of the loans originated by Full Spectrum at that time were being sold to Fannie Mae and Freddie Mac."  Nawaday Decl. Ex. T, Mairone Tr. 332:19-333:10.  Indeed, the fact that loans processed through Central Fulfillment were sold to the GSEs was "common knowledge." Mainigi Decl. Ex. 9, Comeaux Tr. 154:15-25; 155:19-23 (Comeaux aware that such loans "had to meet underwriting guideline expectations which were provided to us by Fannie, Freddie, FHA or . . . private-label originations").

366.     Mairone had no discussions with anyone within FSL in or around the first quarter of 2008 to alert the GSEs to the higher SUS findings on FSL loans.  Nawaday Decl. Ex. 30, Mairone Tr. 333:20-25.  Mairone also had no discussions with anyone at Countrywide's corporate quality control department concerning whether to alert the GSEs to FSL's high rates of severely unsatisfactory loans.  Nawaday Decl. Ex. T, Mairone Tr. 334:1-11.  Moreover, the Bank Defendants' 30(b)(6) witness did not know whether the manufacturing quality of HSSL or central fulfillment loans was ever discussed with the GSEs.  Nawaday Decl. Ex. L, Ho Tr. 422:18-424:8.

367.     In or around April 2008, O'Donnell drafted an email expressing his frustrations, which he later discussed with Kitashima.  Nawaday Decl. Ex. W, O'Donnell Tr. 292:7-19. Specifically, he stated that he was "very concerned about the way loan quality is presently being managed," that he and Kitashima had "been very vocal about the poor quality being produced," but that he had "not seen any evidence that our warnings are being taken seriously."   Nawaday Decl. Ex. DL (Draft email from O'Donnell) BANA-SDNY-E-001655912-13.  He observed that while Drew Gissinger "made it very clear about his expectations . . . with regard to Quality . . . . Central Fulfillment leadership continues to disregard these warnings."  Nawaday Decl. Ex. DL

(Draft email from O'Donnell) BANA-SDNY-E-001655912-13. Kitashima told O'Donnell that

he agreed with those concerns and would discuss them with Lumsden and Mairone.  Nawaday

Decl. Ex. W, O'Donnell Tr. 292:17-19.

368.    The Government's underwriting and sampling experts, based on a review of a

statistically valid random sampling of the FLS loans sold to the GSEs, found that approximately

31% of HSSL loans had material defects rendering them not investment quality.   Nawaday Decl.

Ex. GF (May 7, 2013, expert report of Ira H. Holt, Jr.) at 4; Nawaday Decl. Ex. GP (May 2,

2013, expert report of Dr. Charles Cowan) at 29.

### L.    FSL Tries to Create Appearance of Quality with Sprint Incentive Bonus

369.    In response to the high levels of initial SUS findings on FSL loans that funded in

the first quarter of 2008, FSL instituted in May 2008 a new bonus called the "Sprint Incentive,"

designed in part to overturn the high numbers of initial SUS findings by corporate quality

control.  Nawaday Decl. Ex. AC, Thomas Tr. 99:25-100:21; Nawaday Decl. Ex. L, Ho Tr. 447:2-

4, 449:12-16.  In an ordinary rebuttal process, quality control employees had an opportunity to

respond to an initial SUS finding by providing, for example, a missing document that had caused

the finding or advocating on behalf of the original decision.  Nawaday Decl. Ex. AC, Thomas Tr.

83:23-84:14 ("[I]t could be something like, Hey, we don't see the pay stubs in the file.  And they

could say, Oh, it's -- I put it in the wrong folder in the virtual loan file.  It's in this folder, but it's

there.  And they'd-- you know, would point them to it.  And they'd say, Okay.  I see it.  It's no

longer an SUS.  Or they could argue that, Oh, it's a finding, but it's not a serious finding.  And

they could downgrade it to a high risk.").

370.    Under the Sprint Incentive, however, there was a bonus paid to QC employees "to

rebut the QC findings to get the final rate down . . . we were focused on what the final SUS rate

would be . . ."  Nawaday Decl. Ex. AC, Thomas Tr. 100:10-22; Nawaday Decl. Ex. DL (May 20,

2008, FSL Quality Bi-Weekly Review) at 9 ("Quality Control—Proposed Sprint Incentive");

Nawaday Decl. Ex. 7, Brent Tr. 270:8-12 ("Q.  Okay.  But my question was it involved – the

sprint incentive involved compensating FSL employees with bonuses for overturning SUS

findings; correct?  A:  Yes.  Yes, that's correct."); Nawaday Decl. Ex. L, Ho Tr. 446:21-447:11

("Q:  Was it a form of bonus?  A:  I believe so.  Q:  Awarded on the basis of overturning SUS

findings?  A:  That's my understanding."); Nawaday Decl. Ex. L, Ho Tr. 449:12-23 ("Q:  But the

incentive wasn't based merely on a response, it was based on whether the SUS was overturned.

Is that correct?  A:  I believe so.").

371.    Through the Sprint Incentive, FSL quality control employees went as far back as

September 2007 to review and overturn SUS findings, even those that they had previously

agreed were severely unsatisfactory. Nawaday Decl. Ex. DN (Apr. 1, 2008, Email from Don

Harris) BANA-SDNY-E-003028268-75 at 72-73 ("As discussed on the call this morning we

have been instructed to re-review each and every agreed finalized SUS rated loan from Sept 07

thru January 08.  We are expecting each of you to re-look at these loans and then provide insight

and clarity to help overturn the SUS's we are reviewing.").

372.    Teams of reviewers were created to overturn the SUS findings, and they were

"expected/required to identify 30 loans each for escalation."  Nawaday Decl. Ex. DN (Apr. 1,

2008, Email from Don Harris) BANA-SDNY-E-003028268-75 at 70.  Cindy Simantel made the

final decision as to SUS overturns.  Nawaday Decl. Ex. DN (Apr. 1, 2008, Email from Don

Harris) BANA-SDNY-E-003028268-75 at 70.

373.    Steve Brent and the review team leaders pushed FSL quality control personnel to

overturn SUS findings by telling them, among other things, that this was becoming the "Number

1 job at FSL," that they "must" overturn SUS findings, "drive" their teams, "make it happen" and that they were being "watched very closely."  Nawaday Decl. Ex. EM (May 9, 2008, Email from Steve Brent) BANA-SDNY-E-003977029-31 at 29; *see also id.* ("Another note showing the increased focus and support to get these SUS findings overturned.  Do not be confused, this is becoming our number 1 job at FSL today.  We MUST execute, report and overturn SUS findings.  We are being watched very closely, review the loans, review the productivity of your teams and make it happen TODAY!").

374.     After auditors reviewed the loans, QC management's goal became getting the loans overturned.  Nawaday Decl. Ex. FX (May 23, 2008, Email from Steve Brent) BANA-SDNY-E-000484018-19 at 19 ("Our next focus on these loans is for our QC Management to take the ball from the auditors and get these loans overturned, ASAP.  You as auditors should expect your respective Team Managers to reach out to you as CQC [corporate quality control] responses are received and additional help is needed.  Remember, the sprint incentive is a TEAM plan so we MUST work together to accomplish our joint goals.").

375.     The Sprint Incentive offered monetary incentives for the 36 FSL QC employees, the amount depending on how closely they could reduce the final SUS rate to 4%, the standard defect rate in the industry.  Nawaday Decl. Ex. DM (May 20, 2008, FSL Quality Bi-Weekly Review); Nawaday Decl. Ex. AC, Thomas Tr. 102:5-103:2; Nawaday Decl. Ex. FB (May 21, 2008, Email from Edward O'Donnell) BANA-SDNY-E-000785708-10 at 08. ("The entire group has the chance to earn some extra bucks for the effort.  Let's make sure to see the direct connection -- they see the direct connection between reduced random ratings and increased paychecks!!!").

376.     Brent pushed quality control employees to reach a goal of "320 Overturns." Nawaday Decl. Ex. EP (May 28, 2008, Email from Steve Brent) BANA-SDNY-E-000218165-68 at 66 ("We now have 211 Overturns for Q1, for our first threshold goal of the Sprint Incentive Plan is 320 Overturns.  We have just under 260 loans in SCodes 11, 14 and 15.  Every loan is important at this point, so let's keep pushing the loans toward overturn, as well as 'completing and finalizing' all of Q1 by the end of the week.  Everyone has been truly put out great work, we just need to keep it moving towards our goals.").

377.     The Sprint Incentive resulted in hundreds of SUS findings being "overturned." Nawaday Decl. Ex. EP (May 28, 2008, Email from Steve Brent) BANA-SDNY-E-000218165-68 at 65 ("this week" there were "211 overturns," representing a 20% increase over the prior week's 176).

378.     Countrywide's corporate quality control group was also pushing hard to overturn SUS findings.  Nawaday Decl. Ex. EJ (May 28, 2008, Email from Steve Brent) BANA-SDNY-E-000218165-68 at 65 ("Would love our team to take all the credit, but CQC [Corporate Quality Control] is pushing very hard for us also.").

379.     Greg Lumsden approved of the Sprint Incentive Plan and wanted to make sure that everyone understood how to earn the bonus.  Nawaday Decl. Ex. FB (May 21, 2008, Email from Edward O'Donnell) BANA-SDNY-E-00785708-10 at 08 ("Steve and I gave Greg an update on our progress with Q1 yesterday.  He wanted us to make very certain that each of the FVPs & VPs have a firm grasp on how our Q1 incentive works and can clearly explain it to the auditor.  We want them to understand how the Team's efforts to reduce findings can be rewarded.").

380.    During 2007 and 2008, Cindy Simantel, executive vice president for quality

control and investor audit, managed the corporate quality control department at Countrywide

Home Loans, which performed quality control audits on loans for all of Countrywide's

production divisions, including FSL.  Nawaday Decl. Ex. AA, Simantel Tr. 10:2-11:13.  Steve

Brent informed Simantel of the Sprint Incentive plan via email.  Nawaday Decl. Ex. FY (May

20, 2008, Email from Steve Brent) BANA-SDNY-E-000483793-95 at 94 (forwarding message

to Simantel regarding the Sprint Incentive, including the following description: "The goal here is

to provide a short term incentive for the QC Results of Q1 2008. These audits are currently in the

review/rebuttal process by FSL QC. In order to achieve our goals for Q1 QC ratings, we require

an increase in the intensity of review and number of findings overturned. This incentive is meant

to drive to that goal.").

### M.    *Underwriters Return Through Increase in FHA Volume*

381.    In the second quarter of 2008, FSL quality began to improve as it began funding a

larger number of FHA products, which "required underwriters to be involved in the full process."

Nawaday Decl. Ex. W, O'Donnell Tr. 295:6-10.  As the FHA products "became a very high

portion of [FSL's] volume," the division's overall SUS ratings began to improve.  Nawaday

Decl. Ex. W, O'Donnell Tr. 295:6-10; Nawaday Decl. Ex. W, O'Donnell Tr. 299:15-23;

Nawaday Decl. Ex. W, O'Donnell Tr. 295:23-296:2 ("FHA has very specific underwriting

guidelines including the level and type of underwriter and the certification they have to have in

order to approve the loan.").

382.    FSL's quality control reports demonstrate that in the first quarter of 2008, FHA

loans comprised between approximately zero and 2% of FSL's total volume, whereas

conforming loans comprised between 80 and 84% of the division's total volume.  Nawaday Decl.

Ex. FL (Excerpt from FSL QC Chart) Native of BANA-SDNY-C-000844897 at tabs 4 and 6.  In May and June, FHA loans increased to approximately 19% of FSL's total volume, and conforming loan volume dropped to approximately 70%.  *Id*. In July of 2008 FHA volume increased to 34% while conforming loan volume dropped to approximately 60%.  *Id.*  At the same time, FHA loans had consistently fewer SUS ratings.  *Id.*  Initial SUS ratings on FHA loans between April and June ranged from 3% to 6% whereas initial SUS ratings on conforming loans ranged from 11-23%.  *Id.*

383.    Although FSL also implemented a new "Clear to Close" or "CTC" process in April 2008, the process required only that an underwriter complete a five-issue checklist. Nawaday Decl. Ex. DO (Apr. 28, 2008, Bulletin 08-195, New CTC Process for Field Offices and Central Fulfillment Teams) Native of BANA-SDNY-E-00293810; Nawaday Decl. Ex. DP (Apr. 25, 2008, CTC Checklist) BANA-SDNY-E-002085105-06 at 06.

384.    Price emailed Comeaux in response to the new CTC process, saying that "I feel that the new CTC process is not tight enough to drive a 1% SUS rate . . . . [T]o continue to allow LS's to recategorize and clear conditions while having the UW's only complete a checklist without actually clearing the doc and UW doc conditions themselves leaves us susceptible to errors and clarity around responsibility we cannot afford at this point."  Nawaday Decl. Ex. DQ (Apr. 29, 2008, Email from Robert Price) BANA-SDNY-E-001356650.  Price added that "[i]f we're going to drive the division quality results down to 4% or a 1%, our chances of getting there immediately would be better served by confining the key controls within the group (UW) who are ultimately more experienced and with less 'production skin in the game.'"  Nawaday Decl. Ex. DQ (Apr. 29, 2008, Email from Robert Price) BANA-SDNY-E-001356650.

385.     An initial QC report for the loans that went through the CTC process confirmed Price's prediction and showed that "the CTC process is not providing the dramatic improvements in Quality intended."  Nawaday Decl. Ex. EQ (May 20, 2008, Email from Cliff Kitashima) BANA-SDNY-008980752-54 at 53.  Of the 20 loans that went through the new process, nine (45%) were rated as SUS.  Nawaday Decl. Ex. EQ (May 20, 2008, Email from Cliff Kitashima) BANA-SDNY-008980752-54 at 53.

386.     On April 23, 2008, Price instructed his underwriting management team that "funding goals, turn time, et cetera, are out the window.  All we are concerned with right now is knowing that every file we close and fund is perfect, sellable, and at no risk of SUS."  Nawaday Decl. Ex. DR (Apr. 23, 2008, Email from Robert Price) BANA-SDNY-E-001355727-30 at 28. Price added that "[y]ou and your groups are to clamp down and feel personally responsible for the immediate success of our quality improvements and any pressures to do anything otherwise should be totally disregarded and reported to you and/or me.  One single focus.  Quality.  The daily QA reports need to be literally attacked the moment they are available.  Fix the issues, address the failures so we don't repeat them and send a note to [QA] with any concerns to questions around the data." Nawaday Decl. Ex. DR (Apr. 23, 2008, Email from Robert Price) BANA-SDNY-E-001355727-30 at 29.

387.     On May 21, 2008, more extensive underwriter involvement was required for all loans as part of a new CTC approval process, and the ability to reclassify conditions was restricted to underwriters only.  Nawaday Decl. Ex. DS (May 21, 2008, Bulletin 08-237, New CTC Approval Process for Field Offices and Central Fulfillment) BANA-SDNY-C-000350598-606 at 98.

**N.    *Countrywide Lied to the GSEs about the Quality of the Loans Sold***

388.    Countrywide did not disclose the HSSL or its resulting high defect rates to Fannie Mae or Freddie Mac.  Mainigi Decl. Ex. 26, Sobczak Tr. 142:13-25; Mainigi Decl. Ex. 27, Sullivan Tr. at 278:10-19; 279:19-280:18 (Fannie Mae was not aware of the HSSL until hearing about it from representatives of the Government as part of its investigation of this case); Mainigi Decl. Ex. 23, Padgett Tr. 47: 20-48:11 (frequently in direct contact with Countrywide employees during tenure as National Underwriting Director of Freddie Mac); Mainigi Decl. Ex. 23, Padgett Tr. 69:3-5,221:16-22 (testifying that she had never heard of the HSSL); Mainigi Decl. Ex. 28, Tanabe Tr.  213:4-10, 312:17-313:9 (Freddie Mac director of credit risk had not heard of HSSL before preparing for his deposition in this case).

389.    Fannie Mae and Countrywide exchanged telephone calls and emails several times a day and held face-to-face meetings in Pasadena once a month, on average.  Mainigi Decl. Ex. 3, Battany Tr. 25:4-26:11.  Notwithstanding this routine communication, no one at Countrywide informed Battany, Sobczak, Chandler, Forlines, or Shumate about the HSSL, or any new loan origination process in or around 2007.  Mainigi Decl. Decl. Ex . 3, Battany Tr. 147:13-22; Mainigi Decl. Ex. 35, Chandler Tr. 100:22-101:8; Mainigi Decl. Ex. 13, Forlines Tr. 190:10-191:4, Nawaday Decl. Ex. Z, Shumate Tr. 67:5-68:4; Mainigi Decl. Ex. 26, Sobczak Tr. 142:19-144:2.  Similarly, the Freddie Mac witnesses who were deposed discussed their frequent contacts with Countrywide, yet not one of them was aware of the HSSL either.  Mainigi Decl. Ex. 23, Padgett Tr. 47:20-48:11, 69:3-5, 221:16-22; Mainigi Decl. Ex. 28, Tanabe Tr. 213:4-10; 312:17-9.

390.    Additionally, both Freddie Mac and Fannie Mae conducted on-site operational reviews of Countrywide (including reviews of FSL) in the fall of 2007 but were there informed

of FSL's purported commitment to quality.  Nawaday Decl. Ex. EY (Sept. 12, 2007, FHLMC

Subprime Review presentation) Native of BANA-SDNY-E-002913047); Nawaday Decl. Ex. EZ

(Dec. 3, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232).  As part of those

operational reviews, the GSEs assess the processes and quality control systems the lender has in

place.  Nawaday Decl. Ex. N, Hunter Tr. 203:17-18 (purpose of operational review is to see if

the lender has any "issues around their underwriting or – or their quality control processes"); *see*

*also* Mainigi Decl. Ex. 26, Sobczak Tr. 14:9-15:8 (purpose of operational reviews included

"various components" including "quality control, a lender's ability to detect and prevent fraud,

lender's organization structure, who was accountable, where was underwriting accountable to the

nature of the individuals which were making underwriting decisions").  The information

provided by FSL, however, was both incomplete and misleading to the GSEs.  Nawaday Decl.

Ex. EY (Sept. 12, 2007, FHLMC Subprime Review presentation) Native of BANA-SDNY-E-

002913047); Nawaday Decl. Ex. EZ (Dec. 3, 2007, FNMA Site Review) Native of BANA-

SDNY-E-000114232).

　　　391.　　Although Freddie Mac's External Operational Risk Management ("EORM")

group "made multiple requests to review copies of post-funding quality control management

reports[,]" "CHL declined to provide the information."  Nawaday Decl. Ex. AQ (Nov. 15, 2007

Memorandum regarding External Operational Risk On-Site Review for Countrywide Home

Loans) FMBOA00774037-63 at 39; *see also* Nawaday Decl. Ex. AQ at 44 ("Management stated

that the OTS has been on-sight reviewing the operations due to the dynamic market conditions.

CHL stated that the review was ongoing and would not share the status with us.").

　　　392.　　Although FSL delivered a presentation to Freddie Mac in response to a separate

examination of its subprime business at the same time, the resulting presentation delivered

misleading information about FSL's quality.  Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) Native of BANA-SDNY-E-002913047; *see also* Mainigi Decl. Ex. 4, Biehler Tr. 25:3-26:6; 32:6-33:22; Nawaday Decl. Ex. EX (Apr. 12, 2007 letter from Freddie Mac to Togneri) FMBOA00113909-13.  For instance, the presentation trumpets "Compliance & Loan Quality" as a "PRIORITY," stating that FSL planned to "[d]evelop and promote a divisional culture in which 'doing the right thing' is second nature routinely bringing us the highest compliance and quality ratings possible."  Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 4.  But the presentation fails to mention the myriad aspects of the HSSL design that Countrywide knew would undermine quality and compound risk, such as the use of inexperienced loan specialists, giving them underwriter authority with no training, and giving them turn-time bonuses and QOG suspensions.

393.    In a section of the presentation entitled "Underwriting Controls," the presentation states that "[u]nderwriting authority levels are assigned based upon position and underwriting experience," Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 16, which ran counter to the processes implemented by the HSSL, including grandfathering loan specialists into underwriting authority the same month the presentation was delivered.  Similarly, the presentation reports that its underwriting controls include "[s]tandardized Checklists [] utilized by Funding Teams to ensure that each loan has received proper credit approval, FBW [financial benefit worksheet] approval (when required) and all required conditions have been satisfied before signing," Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 17, although those checklists were considered mere "friction points" by Mairone and Comeaux and were soon

eliminated, Nawaday Decl. Ex. DB ("Friction Points Memo #1 to ALL FSL" from Mairone) BANA-SDNY-E-00867551-52.

394.     In a section entitled, "Quality Assurance and Control," FSL reported that its focus was to "[c]ommunicate with the field on findings and recommendations on procedural and process compliance," Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 20, although shortly thereafter Mairone directed that all QA and QC results be communicated only to her so that employees could focus solely on production, *see* Paragraphs 318-321.

395.     In a section entitled, "Fraud Management," FSL stated that the "Income Worksheet is required to be completed on every loan file," explaining that "[t]he worksheet mandates review of the following:  discrepancies or alterations on the income documents, earnings ending in even dollar amount, FICA and Medicare withholdings are accurate, W-2 computer generated, the sums reflected on pay stubs match the total amounts, and pay stubs have the borrower's name, SSN & company name imprinted."  It further notes that "[i]f one or more of these flags appear, the branch must follow the written policies and procedures surrounding each flag."  Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 23.  These worksheets, however, contain the very procedures that QA audits found were not being completed, and which the Bank Defendants now attempt to brush off as mere process issues unrelated to quality.

396.     In an appendix at the last page of the presentation in fine print, a chart refers to "HSSL" as a process  in which employees with Condition Sign Off Authority for Prime CLUES Accept "may clear income related conditions [and] may CTC [clear to close] file" for loans with less than 80% LTV."  Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review

presentation) BANA-SDNY-E-002913047 at 27.  The presentation lists exclusions for loans such as expanded approval loans, although all loans entered the HSSL process by October 1, 2007. Nawaday Decl. Ex. EY (Sept. 12, 2007 FHLMC Subprime Review presentation) BANA-SDNY-E-002913047 at 27.  The presentation includes no information about the combination of risk factors that characterized the HSSL design.  *See generally id.*

397.     In the course of its examination of FSL's subprime business, Freddie Mac senior risk analyst Lauren Biehler also requested certain loan files for a quality review from Cindy Simantel, an executive vice president for quality control and investor audit, and the most senior person at Countrywide who directly managed quality control.  Nawaday Decl. Ex. AA, Simantel Tr.  10:3-11:13; 13:9-16.  Mainigi Decl. Ex. 4, Biehler Tr. 13:15-14:1; 37:9-19; Nawaday Decl. Ex. EX (Apr. 12, 2007 Letter from Freddie Mac to Togneri) FMBOA00113909-13; Mainigi Decl. Ex. 28, Tanabe Tr. 268:14-269:1 ("Cindy was an influential person, and that's why I characterize her as an important person within the Countrywide structure.  We depended on Cindy to do certain things.  Q.  What types of things?  A.  Surrounding the QC, processing the QC.  Results.  Reporting accurately to us their findings.").

398.     In a series of emails sent during August 2007, Biehler repeatedly requested that Countrywide provide the loan files.  Nawaday Decl. Ex. DX (Aug. 2007 email chain) BANA-SDNY-E-000232795-809 at 11 (Aug. 2, 2007); *id.* at 10 (Aug. 8, 2007); *id.* at 8 (Aug. 10, 2007); *id.* at 5 (Aug. 16, 2007); *id.* at 3 (Aug. 24, 2007).  On September 7, 2007, after learning that 12 of the loan files that Freddie Mac had requested for the on-site review were "unacceptable," Simantel instructed Countrywide employees to delete the unacceptable loan files from a disc that Countrywide was preparing for Freddie Mac and then to come up with the files later if they were able to "cure" the defects.  Nawaday Decl. Ex. DY (Sept. 7, 2007, Email from Krystal Jones)

BANA-SDNY-E-009191642-45 at 45.  The number was reduced to 11 after one loan was

apparently cured, and it was added back to the disc.  Nawaday Decl. Ex. EA (Sept. 7, 2007,

Email from Krystal Jones) BANA-SDNY-E-009191647-51 at 47.

399.    Biehler asked about the 11 missing loan files, and Simantel responded, "Lauren,

per our discussion these 11 files are not available yet for review in our imaging system.  We are

working on it."  Nawaday Decl. Ex. EB (Sept. 11, 2007, Email from Cindy Simantel) BANA-

SDNY-E-009191655-57 at 55; Nawaday Decl. Ex. AA, Simantel Tr. 161:3-13

("Q:  Okay.  Didn't you have electronic copies of these files on a disk ready to give to Freddie

Mac?  A:  I had electronic copies of the file on a disk, yes.  Q:  And you had them removed from

the disk?  A:  Yes.  So I could do further review, yes.").  In an email to her supervisor Rod

Williams the next day, Simantel explained her reasoning for lying to Freddie Mac about these 11

loan files:

> Rod, as a FYI if it comes up as an issue with FHLMC.  We did not provide them
> with 11 loan files they requested as part of their due diligence review of sub-
> prime new originations (Aug. fundings).  We did not provide all the requested
> loan files as our Q.C. group reviewed them, before providing copies, and
> determined significant discrepancies in the loans which included
> misrepresentation (income, assets and credit), flips, and significantly over valued
> properties.  It was my belief we were better off telling FHLMC we hadn't been
> able to get the loan files for them as they were not imaged yet than letting them
> look at them and determine they were unacceptable quality.  If you disagree with
> this I will of course provide them the files, otherwise I am going to continue along
> this path.  Thanks

Nawaday Decl. Ex. EW (Sept. 12, 2007 Email from Cindy Simantel) BANA-SDNY-E-

000234344.

400.    Simantel never provided the loan files, and lied again to Freddie Mac by stating

that the loan files were "missing," "not yet imaged and unavailable for us to provide."  Nawaday

Decl. Ex. EC (Sept. 12, 2007, Email from Cindy Simantel) BANA-SDNY-E-009191658.

401.    Various Freddie Mac employees who reviewed the September 12 email from Simantel to Williams agreed that this was a lie.  *See* Mainigi Decl. Ex. 28, Tanabe Tr.  264:10-265:2 (describing the email as "astounding" because "[i]t's obvious deception and manipulation"); Mainigi Decl. Ex. 23, Padgett Tr. 188:13-189:7; 212:18-214:1 (testifying that the scenario described in the email represented a lie and that she was "absolutely stunned to read [it]" and felt "violated or maybe too trusting"); Nawaday Decl. Ex. N, Hunter Tr. 208:22-209:15 (agreeing that this represented a lie).

402.    FSL was no more forthcoming about the HSSL process and its problems in its presentation to Fannie Mae during an on-site visit in December 2007.  *See* Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232.  As it did with Freddie Mac, FSL touted "Compliance & Loan Quality" as a "PRIORITY," stating that FSL planned to "[d]evelop and promote a divisional culture in which 'doing the right thing' is second nature routinely bringing us the highest compliance and quality ratings possible," again disclosing nothing about the persistently high QA findings.  Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232 at 5.

403.    FSL's presentation also highlights a "Quality Assurance Program Rollout 10/2007" involving communications to the field, Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232 at 13, but says nothing about the findings of that program or the fact that those findings were distributed only to Mairone, for further distribution as she deemed appropriate.  Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Comeaux) BANA-SDNY-E-001115006-07.  Additionally, FSL stated that its quality assurance program included "[o]n-site reviews launches," although those reviews had been suspended by Mairone, effective November 30, 2007.  Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site

Review) Native of BANA-SDNY-E-000114232 at 16; Nawaday Decl. Ex. CX (Nov. 29, 2007, Email from Rebecca Mairone) BANA-SDNY-E-001115006-07 at 07.

404.    FSL presented the same description of its "underwriting controls" as it did to Freddie Mac, Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232 at 16, although such controls had since been removed as "friction points." Nawaday Decl. Ex. DB ("Friction Points Memo #1 to ALL FSL" from Mairone) BANA-SDNY-E-00867551-52.

405.    The presentation further states that quality control "[r]esults are reported and used toward making adjustments due to compensation and disciplinary issues," although by this time Mairone had both ordered the continuation of the QOG reprieve and expanded it to all FSL employees.  Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232 at 20.

406.    Finally, and like the presentation to Freddie Mac, FSL's presentation to Fannie Mae described its "fraud management," as including the requirement that the "Income Worksheet . . . be completed on every loan file," explaining that "[t]he worksheet mandates review of the following:  discrepancies or alterations in the income documents, earnings ending in even dollar amount, FICA and Medicare withholdings are accurate, W-2 computer generated, the sums reflected on pay stubs match the total amounts, and pay stubs have the borrower's name, SSN & company name imprinted."  Nawaday Decl. Ex. EZ (Dec. 13, 2007, FNMA Site Review) Native of BANA-SDNY-E-000114232 at 23.  Again, FSL already knew that these procedures were not being followed by loan specialists.   See Paragraphs 299-306; 337-38.

407.    According to a Fannie Mae vice president in the credit management group, a recurring issue in Fannie Mae's relationship with Countrywide was that Countrywide was not

forthcoming on risk management issues.  Mainigi Decl. Ex. 13, Forlines Tr. 12:15-15; 242:17-243:10 (Fannie Mae "never had the kind of dialogue with them where you had discussions of risk, what their opinions of risk [*sic*], how they viewed risk, what changes that they were looking at making to assess risk.  It was just a very different dynamic with them versus some of our other customers, where it really was about a partnership around trying to manage risk.").

408.    Lenders' loan-production processes were important to the GSEs.  Fannie Mae required "a full picture of [Fannie's] business relationship with Countrywide or with any other alliance customer to make sure that [its] pricing recommendation was one that factored in the totality of [the] relationship, not just a specific price for a specific loan or a group of loans." Nawaday Decl. Ex. Z, Shumate Tr. 59:7-14.  The "full picture" included information pertaining to the risk characteristics present in loans to be sold to Fannie Mae.  Nawaday Decl. Ex. Z, Shumate Tr. 60:4-12.  When assessing the risk associated with a particular loan, Fannie Mae analyzed loan characteristics such as loan-to-value ratio, FICO score, debt-to-income ratio, occupancy, post-closing investments assets, and employment history.  Mainigi Decl. Ex. 13, Forlines Tr. 36:17-38:1; Nawaday Decl. Ex. Z, Shumate Tr. 37:12-18.  These characteristics were "metrics" that Fannie Mae could "score" or quantify.  Mainigi Decl. Ex. 13, Forlines Tr. 45:13-15.  "[T]he more risky the credit attribute, the higher the fee would be."  Nawaday Decl. Ex. Z, Shumate Tr. 44:4-7.

409.    Fannie Mae considered a lender's loan-production procedures to be important factors in assessing the risk associated with loans Fannie Mae intended to purchase.  Mainigi Decl. Ex. 13, Forlines Tr. 45:11-46:7, 50:13-51:6, 183:12-19; Nawaday Decl. Ex. Z, Shumate Tr. 66:3-10; 17:12-17, 20:1-9, 83:4-9 (describing previous change to a pricing recommendation based on information obtained about origination process).

410.    In assessing the risk of a lender's manufacturing processes, Fannie Mae considers whether the personnel performing underwriting tasks were trained and qualified for those tasks. Mainigi Decl. Ex. 35, Chandler Tr. 61:24-62:8; Mainigi Decl. Ex. 13, Forlines Tr. 196:13-13; Mainigi Decl. Ex. 13, Forlines Tr. 224:12-225:8 (level of underwriting skill should be commensurate with the level of loan risk because "you want the most experienced underwriters underwriting the loans that are the most complex"); Nawaday Decl. Ex. ED (Summary of Scorecard and Underwriting Changes) FNM-EDOCS-BOA_00057555-67.

411.    In assessing the adequacy of a lender's quality control department, Fannie Mae considers whether the individuals performing quality control tasks are independent from, and not beholden to, the production groups.  Mainigi Decl. Ex. 13, Forlines Tr. 212:13-213:2; Mainigi Decl. Ex. 13, Forlines Tr. 218:4-220:1 (Fannie Mae would have questioned a compensation system to quality control employees based on rebutting defect findings); Mainigi Decl. Ex. 13, Forlines Tr. 204:6-205:17 (Fannie Mae would have questioned compensation of "underwriting or quality control related employees . . . based on volume . . . [y]ou want them to be paid based on quality").

412.    Furthermore, changes in manufacturing processes, including removing underwriters and eliminating job aids for the loan processors, would be considered to be material, according to Sobczak.  Mainigi Decl. Ex. 26, Sobczak Tr. 144:24-151:12.  That is because such changes "would affect manufacturing quality, which ultimately might lead to differences in performance."  Mainigi Decl. Ex. 26, Sobczak Tr. 146:24-147:2.  Sobczak stated that compensation changes, such as turn-time bonuses, bonuses based purely on volume, and the bonuses for rebutting material defect findings, would be considered significant because these

changes could "erode the independence of quality control."  Mainigi Decl. Ex. 26, Sobczak Tr. 158:10-174:25.

413.    Similarly, according to Freddie Mac, the origination process "absolutely" could be a material fact about that loan and could have an impact on whether the loan was "investment quality."  Mainigi Decl. Ex. 28, Tanabe Tr.  at 371:12-22.  The qualifications of the individual processing and approving loans likewise could be material and impact whether the loans were "investment quality."  Mainigi Decl. Ex. 28, Tanabe Tr.  372:2-11.

414.    Padgett testified that if a loan was underwritten by someone who was not properly trained or qualified, that could have been a material fact about the loan.  *See* Mainigi Decl. Ex. 23, Padgett Tr. 99:8-100:3.  Padgett explained that in the industry, loan processors served a more "clerical function," *id.* 104:22, and were "compensated based on volume," *id.* 109:10-11. Padgett added that "[t]he counterbalance to that typically has been the independence of the underwriter who is not influenced by anything other than whether the production, the loans themselves, are acceptable against whoever the investor that they're selling that loan to." Mainigi Decl. Ex. 23, Padgett Tr. 109:9-14.

415.    Padgett explained her expectations on proper training of underwriters based on her experience at Freddie Mac, which involved having the employee start out with a "vanilla product where you have an employed borrower—salaried employed borrower with a down payment already established in a single bank account, or something like that, and an easy type of property, if you will, a stick-built, single-family home that's in a kind of a generic neighborhood. And one would train using that type of loan and work under the mentorship or tutorship of more experienced people to be able to move up into more complex situations, while getting industry

training through a variety of sources, large bank associations, MI companies, et cetera."  Mainigi Decl. Ex. 23, Padgett Tr. 96:1-14.

416.    According to Padgett, calculations of income should be performed by underwriters.  Mainigi Decl. Ex. 23, Padgett Tr. 94:18-95:6 ("[F]or Freddie Mac, underwriters have to be able to take a variety of different types of income documents – for example, verification of employment, W-2s; different types of pay. . . and determine accurately how much money is available every month that are qualified earnings available to repay the mortgage.  And that takes a level of skill and experience that needs to be done at an underwriter level").

417.    Padgett explained that an underwriter should make a determination of assets based on "what's available and can be used towards the down payment or reserves and especially collateral, which is more complicated even than that, and being able to desk – do underwriting desk reviews of the appraisal report to make sure that there's confidence in the value and marketability and condition of the properties."  Mainigi Decl. Ex. 23, Padgett Tr. 95:7-14.

418.    Padgett did not recall Countrywide ever discussing the qualifications of the employees performing underwriting tasks.  Mainigi Decl. Ex. 23, Padgett Tr. 222:2-9.

419.    Padgett testified that Freddie Mac would not want employees performing underwriting tasks to be compensated on volume rather than quality.  Mainigi Decl. Ex. 23, Padgett Tr. 113:1-10; 111:16-112:2 ("Most lenders would not want that lack of independence because it opens them to risk of not meeting the quality and having loans packaged for investors to come back in the form of repurchase if something is missed because the motivation becomes tainted by the influence of monetary or other compensation, and we require independence from the function.").

### O. *Countrywide Refused to Repurchase Defective and Even Fraudulent Loans from the GSEs*

420.   Theodore Chandler, then vice president of marketing in Fannie Mae's single-family mortgage group, was directly involved in negotiations with Countrywide concerning loans for which Fannie Mae requested repurchase.  Mainigi Decl. Ex. 35, Chandler Tr. 83:7-14.  Chandler described those negotiations as "almost entirely wholly unsatisfactory."  Mainigi Decl. Ex. 35, Chandler Tr. 83:12-14.  According to Chandler, Countrywide habitually refused to repurchase loans that Fannie Mae requested repurchase of, and it refused to follow through with the repurchase of loans that it did agree to repurchase.  Mainigi Decl. Ex. 35, Chandler Tr. 83:17-21.

421.   With respect to loans that Countrywide agreed to repurchase, Fannie Mae expected that Countrywide would "take the loans back and wire whatever money was due."  Mainigi Decl. Ex. 35, Chandler Tr. 97:9-10.  Instead, Fannie Mae was required "to repeatedly escalate the issue to more and more senior levels of management."  Mainigi Decl. Ex. 35, Chandler Tr. 97:18-20.  As a result, a repurchase process that should have taken 30 to 60 days took anywhere from eight to fourteen months.  Mainigi Decl. Ex. 35, Chandler Tr. 98:12-99:3.

422.   Although a loan involving fraud triggers an automatic repurchase obligation pursuant to Fannie guidelines, Mainigi Decl. Ex. 3, Battany Tr. 92:17-19, Countrywide delayed making repurchase payments even on loans that it admitted were fraudulently originated, Mainigi Decl. Ex. 35, Chandler Tr. 84:7-12.  For example, Countrywide admitted that approximately 140 loans in connection with "Land Economics" had been fraudulently originated and agreed to repurchase the loans, but "many months" elapsed before Countrywide wired the repurchase funds to Fannie Mae.  Mainigi Decl. Ex. 35, Chandler Tr. 84:15-25,119:9-18.

Chandler referred to Countrywide's habitual delays with respect to repurchases as "characteristic, not anecdotal."  Mainigi Decl. Ex. 35, Chandler Tr. 85:1.

423.    Padgett testified that Countrywide was "absolutely the . . . worst to try to get resolution on" repurchase requests.  Mainigi Decl. Ex. 23, Padgett Tr. 148:3.  Countrywide "sought continually to find ways out on a thematic basis to avoid honoring the reps and warrants to [Freddie Mac] around the delegated underwriting model."  Mainigi Decl. Ex. 23, Padgett Tr. 55:3-6.

424.    Freddie Mac's corporate representative described Countrywide's approach to repurchases as "unreasonably slow" and "irrational" in its refusal to repurchase stated income and other loans.  Mainigi Decl. Ex. 28, Tanabe Tr.  67:11-20.  Countrywide "would make up very creative stories on why borrowers' incomes were reasonable when the risk factors on the loan, the overall credit profile, wouldn't indicate that for the type of work. . . .  [T]hese themes they would come up with . . . made no rational sense."  Mainigi Decl. Ex. 23, Padgett Tr. 147:8-15.

## P.    *Defendants' Fraud Affected Federally Insured Financial Institutions*

### 1.  *Defendants' Fraud Affected BANA and Countrywide Bank*

425.    BANA is a federally insured financial institution.  (Bank Defs.' Answer ¶ 19). "On April 27, 2009, BANA acquired Countrywide Bank."  Bank Defs.' Rule 56.1 Statement at ¶ 190.  Prior to the acquisition, Countrywide Bank was a federally insured financial institution. Nawaday Decl. Ex. FJ (CFC 2007 Form 10-K) at 11.  BANA is the successor to Countrywide Bank by *de jure* merger. Bank Defs.' Answer ¶¶ 17, 199.

426.    Countrywide Bank originated "the great bulk of the loans at issue in the instant action," Bank Defs.' Answer ¶ 162.  Under the Bank Defendants' definition of "HSSL loan" or "Central Fulfillment loan," the Bank Defendants received at least 665 repurchase requests on

HSSL loans from the GSEs, and repurchased 215 of those loans and resolved approximately 285 more through settlement.  Nawaday Decl. Ex. L, Ho Tr.  506:23-507:4,508:4-19,509:21-510:3.

427.    BANA entered into an Asset Indemnification Agreement with Bank of America Corporation on June 30, 2008, as amended by a subsequent Asset Indemnification Agreement dated November 6, 2008.  Nawaday Decl. Ex. FN (June 30, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882280–87 at 80; Nawaday Decl. Ex. FO (Nov. 6, 2008, Asset Contribution Indemnification Agreement) BANA- SDNY-C-001882261-70 at 61; Wertz Decl. ¶¶ 5-6.  Pursuant to those agreements, Bank of America Corporation was obligated to reimburse BANA for certain losses incurred in connection with certain assets acquired by BANA, including certain loans originated or acquired by Countrywide Bank.  Wertz Decl. ¶ 8.

428.    Notwithstanding Bank of America Corporations' obligations under the Asset Indemnification Agreements, BANA was affected in connection with claims for indemnification arising out of loans sold to the GSEs because the triggering mechanism for any claim by BANA for reimbursement is a contractually defined *loss* to BANA.  *See* Nawaday Decl. Ex. FN (June 30, 2008, Asset Contribution Indemnification Agreement) BANA-SDNY-C-001882280-87 at 83 (providing that "[i]f, following the date of transfer of Assets from NBH to BANA, BANA incurs a Loss or Losses on any Asset or Assets as determined on a quarterly basis beginning with the quarter in which the transfer . . . occurs . . . BANA shall, within 45 days of the end of the relevant quarter . . . advise Parents of the Loss or Losses and request Parents to indemnify it for such Loss or Losses");  *see also* Wertz Decl. ¶ 8 ("In connection with BANA's acquisition of Countrywide Bank, FSB, BAC and certain non-bank affiliates agreed to indemnify BANA for *losses* arising out of loans originated or acquired by Countrywide Bank on or before September

30, 2008 . . . as well as loans originated by Countrywide Bank that were transferred to BANA for sale to the GSEs on or before the merger date." (emphasis added)).

429.     As the successor *de jure* to Countrywide Bank, *see* Bank Defs.' Answer ¶¶ 17, 199, BANA also was affected by such noncompliance because it was exposed to risk of loss arising out of Countrywide's noncompliance with federal laws and regulations, as evidenced by, *inter alia*, BANA's settlements with Fannie Mae and Freddie Mac and the instant litigation. Defendants' Statement of Undisputed Facts ¶ 159 (discussing 2010 and 2013 Fannie Mae settlements resolved outstanding repurchases of loans).

430.     Any failure to comply with federal laws or regulations would affect Countrywide Bank because such noncompliance would expose CFC and its subsidiaries, including Countrywide Bank, to risk of loss associated with "fines, penalties or potential litigation liabilities, including costs, settlements and judgments, any of which could adversely affect our earnings" and "could result in a range of sanctions and enforcement actions, including the imposition of civil money penalties, formal agreements, and cease and desist orders."  Nawaday Decl. Ex. FJ (2007 CFC Form 10-K) at 73.

431.     Countrywide also was exposed to non-monetary risk of loss arising from the sale of bad loans to the GSEs, as discussed in an email dated February 6, 2008, from Countrywide Executive Vice President David Boberg: "Loan manufacturing quality has deteriorated . . . . Poor manufacturing quality can increase costs to [Countrywide] in the form of re-work expenses, higher credit losses and worse future secondary market execution due to a reputation for poor quality loans."  Nawaday Decl. Ex. EE (Feb. 6, 2008, Email from David Boberg) BANA-SDNY-E-000521269-81 at 71.

## 2.   *Defendants' Fraud Affected Federally Insured Financial Institutions that Invested in Fannie Mae and Freddie Mac*

432.   Defendants' fraud also affected several federally insured financial institutions that invested in Fannie Mae and Freddie Mac, including banks owned by the First Bank of Oak Park Corporation ("FBOP") and the National Bank of Commerce ("NBC").  Nawaday Decl. Ex. FQ (Mar. 1, 2012, Audit Report) at 5, 13 & n.23; Nawaday Decl. I; Mainigi Decl. Ex. 17 Gauthier Tr. 30:6-9.

433.   Prior to the GSE conservatorships, there were no regulatory limits of bank investments in GSE stock.  *See, e.g.*, Nawaday Decl. Ex. EU (June 18, 2013, Expert Report of William M. Isaac) at 6 ("[B]ank regulations governing investments in securities allowed for unlimited purchases and holdings of [GSE] securities, in some instances, due to the perceived low inherent risk of the GSEs.") (citations omitted); *see also* Nawaday Decl. Ex. EU (June 18, 2013, Expert Report of William M. Isaac) at 6. ("OCC supervised banks (which held over two-thirds of the banking assets in the country) were able to hold GSE investments without limitation); Nawaday Decl. Ex. EV (Aug. 6, 2009, Audit Report Office of Inspector General, Department of Treasury, No. OIG-09-042, Safety and Soundness:  Material Loss Review of National Bank of Commerce ("OIG Audit Report")) at 5 ("[S]tatute and regulatory standards allow banks to purchase investment securities issued by Fannie Mae and Freddie Mac without limitation.").

434.   Certain insured banks also believed that these securities, although different than U.S. Treasury securities, carried the same kinds of governmental guarantees against default. Nawaday Decl. Ex. EV (Aug. 6, 2009, OIG Audit Report) at 5.  For example, a March 2007 investment policy adopted by the board of directors for the National Bank of Commerce ("NBC") stated that "while the various federal agency securities not all bear the explicit

guarantee of the U.S. Treasury, it is implicitly deemed unthinkable that the U.S. government would allow any of its agencies to default on outstanding debt."  Nawaday Decl. Ex. EV (Aug. 6, 2009, OIG Audit Report) at 5. (citation omitted).  It was for this reason that NBC did not limit its acquisition of GSE securities, Nawaday Decl. Ex. EV (Aug. 6, 2009, OIG Audit Report) at 5, a position that was taken in good faith, according to the Treasury Department's Office of Inspector General, Nawaday Decl. Ex. EV (Aug. 6, 2009, OIG Audit Report) at 2 ("All things considered, we believe that NBC acted in good faith when it invested in the GSE securities.").

435.    The high material defect rate associated with HSSL loans translated to an increased risk of loss to the GSEs in connection with those loans.  Corrected McFadden Report at 2, 11.  The GSEs' acquisition of high-risk loans led to a deterioration in their financial condition, ultimately leading to the conservatorship.  Nawaday Decl. Ex. GA (Sept. 6, 2008, Dickerson memorandum regarding proposed appointment of the Federal Housing Finance Agency as Conservator for the Federal Home Loan Mortgage Corp) at 2-3, Nawaday Decl. Ex. FZ (Sept. 6, 2008, Dickerson memorandum regarding proposed appointment of the Federal Housing Finance Agency as Conservator for the Federal National Mortgage Association) at 2-3.

436.    As a result of the GSEs' conservatorship and the diminution in value of preferred GSE shares, the FBOP banks failed and ultimately were placed in receivership by the FDIC. Nawaday Decl.  Ex. H, Fitzpatrick Tr. 31:10-24; Nawaday Decl. Ex. GB (Jan. 21, 2010, Testimony of Michael E. Kelly (FBOP Corp)) at 2; Nawaday Decl.  Ex. FQ (Mar. 1, 2012, Audit Report) at 5, 13 & n.23.

437.    As a result of the GSEs' conservatorship, NBC became severely undercapitalized very quickly.  Nawaday Decl. Ex. I, Gauthier Tr. 30:6-9 ("The bank was well capitalized in June 2008.  In the next quarter, it was critically undercapitalized, which is very unusual.").

Specifically, as a result of NBC's purchasing activities between May 2003 and November 2007, the book value of NBC's investments in GSE securities totaled $98.2 million as of June 30, 2008.  Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 3.  But after the GSEs were placed in conservatorship in September 2008, the market value had declined to approximately $4.5 million, a loss of $93.7 million.  Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 3-4.  This devaluation "essentially eliminated the bank's regulatory capital and strained its sources of liquidity," Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 4, and, again, "was the primary cause of NBC's failure," Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 3.

438.    NBC failed in January 2009, and in June 2009, the FDIC estimated that the loss of the Deposit Insurance Fund would be $92.5 million because of NBC's failure.  Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 1.  NBC's failure triggered a review by the Treasury Department's Office of Inspector General, and its August 2009 report concluded that "[t]he primary cause of NBC's failure was its significant losses from preferred stock holdings" in GSE securities.  Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 2; *See also,* Nawaday Decl. Ex. I, Gauthier Tr. 44:10-12 ("The bank failed due to the rapid capital loss due to the losses it sustained in its GSE security investment.").

439.    The Inspector General reached its conclusion after conducting field interviews and reviewing extensive reports and work papers provided by the Office of the Comptroller of the Currency ("OCC").  *See generally* Nawaday Decl. Ex. EV (Aug. 6, 2009, "OIG Audit Report") at 15-17; Nawaday Decl. Ex. I, Gauthier Tr. 19:18-20:1, 20:4-20:10, 25:20-21, Nawaday Decl. Ex. U, Maloney Tr. 24:13-25:1 (discussing team's review of OCC memos

concerning "the bank's history and eventual failure"); Nawaday Decl. Ex. U, Maloney Tr. 26:5-9

(discussing interviews with officers at FDIC and OCC).

Dated: New York, New York
      July 30, 2013

                                            Respectfully submitted,

                                            PREET BHARARA
                                            United States Attorney for the
                                            Southern District of New York

By:     /s/  *Pierre G. Armand*
                    PIERRE G. ARMAND
                    JAIMIE L. NAWADAY
                    JOSEPH N. CORDARO
                    CARINA H. SCHOENBERGER
                    ELLEN LONDON
                    SHANE CARGO
                    Assistant United States Attorneys
                    86 Chambers Street, 3rd Floor
                    New York, New York 10007
                    Tel:    (212) 637-2724/2528/2745/2822
                    Fax:    (212) 637-2730
                    Email: Pierre.Armand@usdoj.gov
                              Jaimie.Nawaday@usdoj.gov
                              Joseph.Cordaro@usdoj.gov
                              Carina.Schoenberger@usdoj.gov
                              Ellen.London@usdoj.gov
                              Shane.Cargo@usdoj.gov