UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,                    :
                                             :
            Plaintiff,                       :
                                             :
        -v-                                  :
                                             :
COUNTRYWIDE FINANCIAL CORPORATION;           :
COUNTRYWIDE HOME LOANS, INC.;                :        12 Civ. 1422 (JSR)
COUNTRYWIDE BANK, FSB; BANK OF               :
AMERICA CORPORATION; BANK OF                 :        OPINION
AMERICA, NA.; and REBECCA MAIRONE,           :
                                             :
            Defendants.                      :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        The Government, having intervened in what began as a "qui

tam" case, brings this civil fraud action against defendants

Countrywide Financial Corporation, Countrywide Home Loans, Inc.,

and Countrywide Bank, FSB (collectively, "Countrywide"), Bank of

America Corporation, and Bank of America, NA (collectively,

"BofA"), and individual defendant Rebecca Mairone, the Chief

Operating Officer of Countrywide's Full Spectrum Lending division

during the period relevant to this case. The Government alleges

that the defendants engaged in fraud and made false

representations in connection with the sale of loans by

Countrywide and BofA to the Government-sponsored entities Federal

National Mortgage Association ("Fannie Mae") and Federal Home Loan

Mortgage Corporation ("Freddie Mac"), all in violation of the

False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) & (B), and the

Financial Institutions Reform, Recovery, and Enforcement Act

("FIRREA"), 12 U.S.C. § 1833a(c)(2). The FIRREA violations, in

turn, are predicated on civil violations of the mail fraud and

wire fraud criminal statutes, 18 U.S.C. §§ 1341 and 1343. See

Amended Complaint ("Am. Compl.") ¶¶ 218-27.

On December 21, 2013, the defendants moved to dismiss the

Government's then-operative complaint on three grounds: first,

that the complaint failed to state a claim under FIRREA because

the sale of loans to Fannie Mae and Freddie Mac did not directly

"affect" a federally insured financial institution as required by

the statute; second, that the complaint also failed to state a

claim under FIRREA because the predicate mail and wire fraud

violations were premised on statements that did not, as a matter

of law, constitute fraudulent misrepresentations; and third, that

the complaint failed to state a cause of action under the False

Claims Act for false claims made after May 20, 2009, the date on

which liability under the False Claims Act was broadened to reach

false claims made to entities like Fannie Mae and Freddie Mac.[1] In

addition, individual defendant Mairone moved to dismiss the FIRREA

counts against her on the ground that the complaint failed to

adequately plead facts that would support an inference that she

acted with the requisite intent.

_____

[1] As discussed below, the Government, in its opposition to the
defendants' motions to dismiss, abandoned its False Claims Act
causes of action against all defendants except for BofA.

In response to defendants' motion, the Government, with leave of Court, amended its complaint on January 11, 2013, after which the Court permitted the defendants to renew their motions and to supplement their moving papers. There followed additional briefing by both parties, after which the Court heard oral argument on April 29, 2013. On May 8, 2013, the Court issued a "bottom-line" Order granting the defendants' motions to dismiss the False Claims Act counts but denying their motions to dismiss the FIRREA counts. This Opinion explains those rulings.

On a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court takes all well-pleaded allegations as true. Since, however, the claims here sound in fraud, the circumstances constituting fraud must be pleaded with particularity. <u>See</u> Fed. R. Civ. P. 9(b). For purposes of the instant motions, the well-pleaded factual allegations include the following:

Government-sponsored entities such as Fannie Mae and Freddie Mac purchase single-family mortgages from lenders like the defendants based on the lenders' representations and warranties that the loans comply with the standards outlined in applicable "guides" and "master" agreements. These guides and agreements set forth, among other things, underwriting, documentation, quality control, and self-reporting requirements. <u>See</u> Am. Compl. ¶ 36. The relevant requirements include, for example, the lenders' representations that they employ prudent underwriting and quality

3

assurance checks and that the lenders will self-report loans that they identify as fraudulent, noncompliant with guidelines, or otherwise materially defective. Id.

Pursuant to these requirements, when the defendants sold loans to Fannie Mae, they represented that each loan conformed "to all the applicable requirements in [the] Guides and this [Master] Contract" and that the seller knew "of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that [could] reasonably be expected to: cause private institutional investors to regard the mortgage as an unacceptable investment; cause the mortgage to become delinquent; or adversely affect the mortgage's value or marketability." Id. ¶ 39. In representing to Fannie Mae that each loan was an acceptable investment, the defendants further warranted that all required loan data was true and complete, that certain underwriting conditions were met for loans processed through automated systems, and that no fraud or material misrepresentation had been committed. Id. ¶ 41. Freddie Mac's guides and purchase contracts imposed similar requirements on loans sold to it by the defendants. Id. ¶¶ 44-45.

The Government alleges that notwithstanding these requirements -- indeed, at a time of increasingly tight underwriting requirements imposed as the secondary market for single-family loans became more conservative -- Countrywide sought

to quickly boost its loan revenue by fraudulently modifying its loan origination process. Id. ¶ 66. More specifically, the Government alleges that in order to achieve its aim of maintaining its historically high revenue despite a cratering market for subprime mortgages, Countrywide's Full Spectrum Lending division initiated, in August 2007, a loan origination program called the "High Speed Swim Lane," or "HSSL."

Ostensibly, the HSSL program was designed to reduce the number of days spent processing loans from 45-60 days to 10-15 days, with some loans processed within a single day. Id. ¶¶ 68-69. To achieve this reduction, however, the HSSL program reduced effective oversight of the loans and removed most of the so-called "toll gates" that were previously set up to ensure loan quality. For example, the HSSL program eliminated underwriter review of many riskier loans, and eliminated the position of "compliance specialist," a position intended to perform a final independent check on a loan application before the loan was funded. Id. ¶¶ 70-71, 79. Instead, under the HSSL program, a "loan processor" simply verified that the data about a given loan that were entered into an automated loan processing system actually matched the underlying loan documentation. Id. ¶¶ 50, 70. Similarly, under the HSSL system, loan processors could fully process "stated income" loans (i.e., loans that require no documentation of a borrower's income) without oversight from an underwriter or other checks that

were part of traditional mortgage processing. Id. ¶¶ 71-73. The

HSSL program also removed the requirement that the loan processors

complete underwriting checklists and how-to forms called "job

aids" that were designed to assist reviewers in performing

underwriting tasks, such as how to assess the reasonableness of

stated income and how to review an appraisal. Id. ¶¶ 77-78.

According to the Amended Complaint, the HSSL program, by

removing these, and other safeguards against originating dubious

loans, effectively guaranteed that the loans that would thus be

sold to Fannie Mae and Freddie Mac were of lower quality than

represented. Id. ¶¶ 68-69.

The Amended Complaint further alleges that the riskiness of

the HSSL program was enhanced by the introduction of compensation

incentives that increased loan approval rates at the expense of

loan quality. In particular, Countrywide introduced a "turn time"

bonus for loan specialists and funders who moved their loans

quickly, id. ¶ 80, and imposed quotas on loan specialists to fund

30 loans per month and a minimum of one loan every day. Id. In an

HSSL center in Richardson, Texas, for example, loan specialists

were instructed not to leave for the day until they cleared at

least one loan for closing. Id. Moreover, in response to loan

specialists' expressed concerns that their expanded authority

would lead to higher defect rates that would lower their

compensation, the Full Spectrum Lending division eliminated the

loan-quality variable from the equation on which the loan specialists' and funders' compensation was based. Id. ¶ 81.

Although Countrywide initially promoted the HSSL program as a model suited only for "prime" -- that is, "low-risk" -- loans, individual defendant Mairone successfully proposed that Countrywide also implement a "Dirty Prime High-Speed Swim Lane" for loans that fell somewhere between the prime and subprime risk metrics. Id. ¶ 74. Further still, in September of 2007, Mairone emailed: "[w]e need to start to move toward all loans into [the HSSL] process." Id. ¶ 75 (emphasis supplied). As a result, loans that would ordinarily be considered "subprime" by Fannie Mae were processed using the HSSL "swim lane." Id.

By January of 2008, Countrywide's internal reports revealed material defect rates of 57% in the HSSL loan pool overall and nearly 70% for stated-income loans. Id. ¶ 88. Thus internal reports showed that more than half of the loans that the HSSL processing system had "cleared to close" were ineligible for sale to any investor, even though those loans were to be sold to Government-sponsored entities. Id. Post-closing quality control reports revealed analogous problems. By the first quarter of 2008, the material defect rate found in loans after closing climbed to nearly 40%, greatly surpassing the industry-standard defect rate of 4-5%. Id. ¶ 101.

According to the Amended Complaint, Mairone responded to
these reports of high defect rates by pressuring her employees to
conceal the reports. For example, Mairone, after reviewing the
pre-funding reports from January of 2008, instructed the employee
who prepared them not to circulate them outside of her division.
Id. ¶ 88. A few months later, when underwriting managers in
Richardson, Texas asked to meet with Mairone to express their
concerns about deteriorating loan quality, she responded angrily:
"Son of a bitch. You need to get with the program. We need to keep
funding these loans to keep the lights on." Id. ¶ 89.[2] She
responded similarly to a draft presentation that the relator in
this qui tam action, Edward O'Donnell, prepared for Countrywide
executives in his capacity as Executive Vice President.
O'Donnell's presentation revealed the decline in FSL's loan
quality; but, after reviewing the presentation, Mairone instructed
O'Donnell to remove critical slides. Id. ¶ 111. When O'Donnell
refused, Mairone said that if O'Donnell was not willing to follow
her instructions and remove them, she would find someone who was,
and thereafter excluded O'Donnell from management meetings
regarding loan quality and performance. Id.

---

[2] Here, as elsewhere, the now-pending motions for summary judgment
dispute whether the evidence supports such colorful allegations;
but for purposes of a motion to dismiss, such allegations must be
taken as true.

The Government alleges that Countrywide made matters worse in the Spring of 2008 by offering employees an incentive for rebutting earlier findings that loans were defective. Id. ¶ 107. In these and other ways, Countrywide incentivized employees to manipulate data to make loans appear more acceptable or trustworthy than they actually were. Id.

To more fully particularize these allegations, the Amended Complaint details seven examples of materially defective loans that Countrywide sold to Fannie Mae, misrepresenting that they were investment-quality loans. These loans, processed through the HSSL system between and August 2007 and January 2008, misrepresented the borrowers' income (e.g., a "doorman" who listed a monthly income of $13,000), and contained obvious errors in the appraisal and occupancy status of the mortgaged property. See id. ¶¶ 114-45. They had originally been internally labeled defective by Countrywide, any were only re-labeled as acceptable following as many as 18 re-entries into the relevant computer program. Id. Yet all seven were sold to Fannie Mae with the representation that the loans were "investment-quality," and based upon these representations were not reviewed by Fannie Mae until after they had defaulted. Id. ¶ 113. Nor were any of the defects in the HSSL program disclosed to Fannie Mae and Freddie Mac. Id. ¶¶ 110, 219.

The Amended Complaint further alleges that Fannie Mae and Freddie Mac "purchased a greater percentage of loans from

Countrywide and Bank of America than from any other lender and incurred massive and disproportionate losses from those loans when they defaulted," specifically "more than a billion dollars in losses." Id. ¶¶ 2, 151. These losses, among others, caused Fannie Mae and Freddie Mac to become insolvent on September 7, 2008, after which both were placed into conservatorship. That conservatorship wiped out the investments of all preferred shareholders in Fannie Mae and Freddie Mac, a group that included a number of federally-insured community banks that had concentrated their investments in this preferred stock because of a general perception in the market that shares in Fannie Mae and Freddie Mac were safe investments. Id. ¶¶ 24, 151. The Amended Complaint recounts nine examples of local banks that held between thirty-eight and sixty-four percent of their "core capital" in preferred shares of Fannie Mae and Freddie Mac, and when these positions evaporated many were closed and taken into receivership by the Federal Deposit Insurance Corporation ("FDIC"). Id. ¶ 152. The FDIC estimates that the failure of these banks will ultimately result in a total loss to the FDIC insurance fund of at least $2.3 billion. Id. ¶ 156; see also id. ¶¶ 157-58.

Against this factual background, the Court turns to the defendants' three arguments for dismissal, the first two of which relate to the FIRREA claims. FIRREA empowers the Attorney General to bring a civil case to recover civil penalties for substantive

violations of, or conspiracies to violate, a number of criminal offenses (including mail and wire fraud) "affecting a federally insured financial institution." See 12 U.S.C. § 1833a(c)(2) & (e). The defendants first argue that they cannot be held liable under FIRREA because their sales and representations to Fannie Mae and Freddie Mac did not "affect[] a federally insured financial institution."

There is no dispute that Fannie Mae and Freddie Mac are not "federally insured financial institutions" under the statute. The Government contends, however, that the defendants' alleged fraud "affected" federally insured financial institutions in two ways, either of which would be sufficient under FIRREA. First, since Bank of America N.A. is itself a federally insured financial institution, its wrongful conduct (and the conduct of Countrywide imputed to it) "affected" a federally insured financial institution. (The parties refer to this as the "self-affecting" theory.) Second, the defendants' misconduct affected those federally insured banks whose investments in Fannie Mae and Freddie Mac were wiped out as a result of the impact of the loan defaults on Fannie Mae and Freddie Mac. (The parties refer to this as the "derivative effect" theory.)

Although the parties spend endless pages discussing each of these theories in terms of legislative history, policy considerations, and the like, in the Court's view validation of

11

the first theory -- that it is enough that the fraud affected BofA
-- requires nothing more than straightforward application of the
plain words of the statute. The key term, "affect," is a simple
English word, defined in Webster's as "to have an effect on." See
Webster's New World Collegiate Dictionary 23 (4th ed. 2002). The
fraud here in question had a huge effect on BofA itself (not to
mention its shareholders). The Amended Complaint itself alleges
that BofA has paid billions of dollars to settle repurchase claims
by Fannie Mae and Freddie Mac made a result of the fraud here
alleged. See Am. Compl. ¶¶ 149-50.

The defendants' endlessly complicated argument that this is
somehow not an effect that Congress intended to encompass within
the broad phrase "affecting a federally insured financial
institution" rests not on the plain meaning of section
1833a(c)(2), but rather on such things as extended inferences from
the omission of the "affecting" limitation from the neighboring
subparagraphs of FIRREA, speculation drawn from selected snippets
of legislative history, and the like. Though clever, the arguments
are utterly unconvincing, for the simple reason that they cannot
explain away the plain language of section 1833a(c)(2), which is
as unambiguous as it is dispositive. That, as the Supreme Court
and Second Circuit have repeatedly cautioned, ends the Court's
enquiry. See Schindler Elevator Corp. v. United States ex rel.
Kirk, 131 S. Ct. 1885, 1891 (2011) (statutory interpretation must

begin with the plain meaning and give all undefined terms their ordinary construction); <u>Collazos v. United States</u>, 368 F.3d 190, 196 (2d Cir. 2004) ("Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there.").

This is not to say that the "affecting" language of section 1833a(c)(2) is without limit. The Government's alternative theory of FIRREA applicability -- the "derivative" theory -- squarely raises the question of whether a fraud that does not directly or immediately affect federally insured financial institutions is too attenuated to give rise to a FIRREA claim. In this respect, the Amended Complaint alleges that the defendants' defrauding of Fannie Mae and Freddie Mac proximately caused their eventual receivership, which in turn wiped out the preferred securities that composed the core capital reserves of several federally insured smaller banks. <u>See</u> Am. Compl. ¶¶ 151-58.

The defendants argue that if this is enough to meet the requirements of section 1833a(c)(2), FIRREA liability is "limitless" and "contrary to case law." While clearly an overstatement, the argument is not without some force, for while "affecting" is a very broad term, Congress did not include the modifying language "directly or indirectly" that it typically employs to reach derivative effects. On the other hand, the effect

that the fraud here had on the federally insured banks that
invested in Fannie Mae and Freddie Mac was, according to the
Government's allegations, both substantial and foreseeable, the
classic components of proximate cause, let alone of mere "affect."
Fortunately, however, the Court need not resolve this issue here,
because the Court's determination that the effect of the
defendants' fraud on BofA itself is sufficient to meet the
requirements of section 1833a(c)(2) is, in turn, sufficient to
sustain the FIRREA counts of the Amended Complaint against
defendants' first argument for dismissal.

Turning to the defendants' second argument for dismissal --
that the FIRREA claims must be dismissed for failure to adequately
allege the predicate offenses of mail and wire fraud -- the Court
notes that in order to plead these predicate offenses, the
Government must allege "(1) a scheme to defraud, (2) money or
property as the object of the scheme, and (3) use of the mails or
wires to further the scheme." United States v. Shellef, 507 F.3d
82, 107 (2d Cir. 2007). A "scheme to defraud" means simply a plan
to deprive someone "of something of value by trick, deceit,
chicane or overreaching." United States v. Pierce, 224 F.3d 158,
165 (2d Cir. 2000). In addition, to satisfy Rule 9(b), the Amended
Complaint must "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the

statements were fraudulent." <u>Mills v. Polar Molecular Corp.</u>, 12
F.3d 1170, 1175 (2d Cir. 1993).

As recounted in detail above, the Amended Complaint alleges,
among much else, that the defendants knew they were selling
defective loans, that they perpetrated their scheme by designing
and implementing the HSSL program in such a way as to remove
meaningful supervision of loan underwriting, that the defendants
imposed quotas and a compensation system designed to remove the
incentive to approve loans based on quality, and that after their
own quality control reports showed high defect rates, they
concealed that information from their victims. The Amended
Complaint also describes, with the requisite particularity, seven
representative defective loans that, through the use of the mails
and interstate wires, were fraudulently sold to the Government-
sponsored entities as investment-quality loans. <u>See</u> <u>id.</u> ¶¶ 114-45.[3]

This prong of the defendants' motions principally rests,
however, not on the argument that the Amended Complaint's

---

[3] Because, on the posture of this motion, the Court accepts all
well-pleaded facts as true and draws all inferences in the
plaintiff's favor, the Court rejects the four half-hearted
arguments in the defendants' moving papers that a failure to
conduct due diligence is not fraud, that a failure to adhere to
underwriting guidelines is not fraud, that the Bank had no duty to
disclose defective loans, and that there is no evidence that data
entered in to the Bank's system was falsified. Nearly all of these
arguments were abandoned in defendants' reply papers, and, in any
event, the Court finds that the particularized allegations of the
amended complaint, taken together, evince a scheme to defraud that
renders these objections nugatory.

allegations of the mail and wire fraud were insufficiently
particular under Rule 9(b), but rather on the argument that the
allegedly fraudulent misrepresentations made to Fannie Mae and
Freddie Mac were, at worst, mere breaches of contract that cannot
separately support an action for fraud. This argument is premised,
in turn, on the fundamental error, long ago rejected by the
Supreme Court, that mail fraud and wire fraud are subject to the
same arcane limitations as common law fraud. See Durland v. United
States, 161 U.S. 306 (1896).

Under the common law, a civil action that described a breach
of contract could not, except in narrow circumstances, also
support a claim for fraud. For example, under the common law, a
failure of a vendor to make timely delivery in breach of a
contract could not support a claim for fraud, even if the
untimeliness was intentional, since it involved a false promise,
rather than a false statement of fact. See Durland, 161 U.S. at
312-13. The doctrine that a claim for breach of contract cannot
ordinarily give rise to a claim of fraud is still the common law
of several states, including New York. Consider, for example,
Bridgestone/ Firestone, Inc. v. Recovery Credit Servs., Inc., 98
F.3d 13 (2d Cir. 1996), in which the Second Circuit vacated a
judgment finding common-law fraud under New York law because the
plaintiff's claim was premised on a mere breach of contract. Id.
at 20 (quoting, among others, McKernin v. Fanny Farmer Candy

16

Shops, Inc., 176 A.D. 2d 233, 234 (N.Y. App. Div. 1991) (where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie")).

Citing Bridgestone/Firestone, the defendants argue that since the misrepresentations alleged in the Amended Complaint also constitute breaches of the representations and warranties contained in the master contracts between the defendants and the Government-sponsored entities, any such misrepresentations are actionable solely as breaches of contract. As noted, however, this argument blithely ignores Supreme Court precedent going back more than a century that holds that mail fraud is unhampered by such common law limitations. Durland, 161 U.S. at 312 ("[appellant's] contention . . . [is] that the statute reaches only such cases as, at common law . . . [in] which there must be a misrepresentation as to some existing fact, and not a mere promise as to the future. We cannot agree with counsel . . . . [T]he statute . . . includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."). Indeed, in 1909, the mail fraud statute was amended precisely to confirm that it was untrammeled by such common law limitations. See McNally v. United States, 483 U.S. 350, 357-59 (1987). See

generally, Jed S. Rakoff, The Federal Mail Fraud Statute, Part I, 18 Duq. L. Rev. 771 (1980).

Moreover, even assuming, arguendo, that the New York common law doctrine referenced in Bridgestone/Firestone applies to mail and wire fraud, it is clear that the defendants' allegedly fraudulent sale of loans to Fannie Mae and Freddie Mac would fall within one or more of the exceptions to the doctrine. Indeed, New York state courts have held in closely analogous factual circumstances to the instant case that fraud claims premised on false representations about quality of mortgages made in connection with the sale of those loans (or of securitized pools of those loans) are not impermissibly "duplicative" of common-law breach of contract claims. See, e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A.D.3d 287, 293-294 (N.Y. App. Div. 2011); First Bank of Americas v. Motor Car Funding, Inc., 257 A.D.2d 287, 291-292 (N.Y. App. Div. 1999). The Court therefore rejects defendants' second argument for dismissal of the FIRREA claims.

At this point, before turning to defendants' third argument for dismissal, which relates to the claims under the False Claims Act, the Court addresses defendant Mairone's separate motion, since it relates only to the FIRREA counts. Mairone argues that the Amended Complaint fails to "allege facts that give rise to a strong inference of fraudulent intent" on her part, as required in

18

a civil fraud action. <u>See</u> <u>First Capital Asset Mgmt., Inc. v.</u>
<u>Satinwood, Inc.</u>, 385 F.3d 159, 179 (2d Cir. 2004).

For example, Mairone argues that while the Amended Complaint
alleges that she concealed quality reports "internally," it does
not allege that she concealed those reports from Fannie Mae or
Freddie Mac. Nor does the Amended Complaint allege that she met
with the Government-sponsored entities or directly made any
representations to them. More generally, Mairone argues that the
Amended Complaint "lumps" her in with other executives and that
that none of the Amended Complaint's allegations personal to her
is sufficient to support a strong inference of intent to defraud.

This, however, is far too narrow a reading of the Amended
Complaint. Among other things, the Amended Complaint alleges that
Mairone, by eliminating oversight of loan underwriting in the HSSL
program and expanding the program to cover all loans, created a
program that she knew was calculated to deceive purchasers of the
loans. Furthermore, by instructing one or more employees not to
distribute quality control reports outside of her division,
Mairone knowingly helped conceal the information from the ultimate
purchasers of the loans. Further still, when faced with mounting
evidence that the HSSL process was producing defective loans for
sale to Fannie Mae and Freddie Mac, Mairone did nothing to rectify
the problems in the HSSL program she had designed. This and other
circumstantial evidence alleged in the Amended Complaint amply

supports an inference of the requisite intent to defraud, <u>see</u>
<u>United States v. Autuori</u>, 212 F.3d 105, 115-17 (2d Cir. 2000);
<u>United States v. Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999).

Turning finally to the defendants' third argument for
dismissal -- relating to the claims under the False Claims Act
("FCA") -- the Government, in its opposition brief, abandoned
these claims against the non-BofA defendants, thereby implicitly
conceding that false claims allegedly made by any of the
defendants to Fannie Mae and Freddie Mac before the amendment to
the False Claims Act on May 20, 2009, cannot occasion liability
under that Act. <u>See</u> Pl's Mem. in Opp. to Defs.' Mot. to Dismiss
("Pl.'s Mem.") at 43 n.17. As to what remains, Counts I and II of
the Amended Complaint allege that the BofA defendants are liable
for damages and civil penalties under either subsection (a)(1)(A)
of the FCA (which imposes liability on one who "knowingly
presents, or causes to be presented, a false or fraudulent claim
for payment or approval," 31 U.S.C. § 3729(a)(1)(A)), and/or
subsection (a)(1)(B) of the FCA (which imposes liability on one
who "knowingly makes, uses, or causes to be made or used, a false
record or statement material to a false or fraudulent claim," 31
U.S.C. § 3729(a)(1)(B)). The two FCA subsections share elements:
"[T]here must have been a 'claim'"; the claim under subsection
(a)(1)(A) or the statement material to a claim under subsection
(a)(1)(B) "must have been false or fraudulent"; and the defendant

"must have known that the claim or statement was false or fraudulent." United States ex rel. Pervez v. Beth Israel Med. Ctr., 736 F. Supp. 2d 804, 811 (S.D.N.Y. 2010).

Prior to May 20, 2009, the False Claims Act did not encompass such claims when made to entities like Fannie Mae and Freddie Mac. However, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), amended the FCA to, among other things, define the term "claim" to include "any request or demand . . . for money . . . that is made to a contractor, grantee, or other recipient, if the money . . . is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money . . . requested or demanded, or will reimburse . . . any portion of the money." 31 U.S.C. § 3729(b)(2)(A)(ii)(I)-(II). The amendment, which arguably extends the FCA to false claims made to Fannie Mae and Freddie Mac, took effect on May 20, 2009, but it did not have retroactive effect. See Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009).

Pursuant to Rule 9(b), an FCA claim must "state with particularity the specific statements or conduct giving rise to the fraud claim." Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995). While some Circuits have permitted FCA complaints to survive a Rule 9(b) motion to dismiss where they

21

allege "the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme," United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1172 (10th Cir. 2010); see also United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180 (5th Cir. 2009), others have demanded more, see United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 457 (4th Cir. 2013).

Here, the Court need not resolve this divergence regarding the application of Rule 9(b) to FCA claims in order to decide the motion before it. For even if the more "relaxed" standard of Envirocare and Kanneganti were used, the Amended Complaint includes no "particular and reliable indicia" that might permit an inference that loans tainted by the alleged vices of the HSSL process were sold to Fannie Mae and Freddie Mac after the critical date of May 20, 2009. It is true that in connection with its approach of drawing inferences from samples of loans, the Amended Complaint appends a list ("Exhibit A") of 51 loans that it represents, in paragraph 113 of the Amended Complaint, are "a sample of additional HSSL loans that funded in 2008 and 2009, . . . were sold to Fannie Mae and Freddie Mac, and later defaulted," Am. Compl. ¶ 113. About half of these bear funding dates after May 20, 2009. See Am. Compl., Ex. A. But while the Amended Complaint makes detailed allegations about seven of the pre-FERA loans, and

then identifies with particularity the aspects of the HSSL scheme as it operated at Countrywide <u>before</u> its (pre-FERA) acquisition by Bank of America that resulted in these same loans being defective, it makes no similar showing about the submission of defective loans by Bank of America to Fannie Mae and Freddie Mac after May 20, 2009. Indeed, the post-FERA loans listed in Exhibit A are of unknown quality and provenance, and no particulars are provided permitting the Court to infer that these loans bore the effects of HSSL's underwriting flaws following Countrywide's acquisition by BofA. Yet the two BofA defendants are the only defendants against whom FCA claims are now asserted. Accordingly, the Court concludes that the failed FCA claims must be dismissed for failure to meet the particularity requirements of Rule 9(b).

Furthermore, since the Amended Complaint represents the third such complaint filed in this action following extensive discovery, and since the Government was granted leave to amend its complaint after the defendants' motions put it on notice of the alleged deficiency in its FCA claims, the Court concludes that permitting the Government to have, in effect, a third bite at the apple would be futile. Counts I and II of the Amended Complaint (the FCA counts) are thus dismissed with prejudice.[4]

---

[4] The Court therefore does not reach the defendants' argument that the Government has failed to adequately plead a "nexus" between the alleged claims made to Fannie Mae and Freddie Mac and the payment of Government money.

For the foregoing reasons, the Court hereby confirms its "bottom-line" Order of May 8, 2013, granting defendants' motions to dismiss the FCA claims and otherwise denying the motions to dismiss.

JED S. RAKOFF, U.S.D.J.

Dated:     New York, NY
           August 16, 2013