PREET BHARARA
United States Attorney for the
Southern District of New York
By:    PIERRE G. ARMAND
       JAIMIE L. NAWADAY
       JOSEPH N. CORDARO
       CARINA H. SCHOENBERGER
       ELLEN M. LONDON
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2724/2528/2745/2822/2737
Fax:    (212) 637-2730
Email: Pierre.Armand@usdoj.gov
       Jaimie.Nawaday@usdoj.gov
       Joseph.Cordaro@usdoj.gov
       Carina.Schoenberger@usdoj.gov
       Ellen.London@usdoj.gov





**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE, <br><br> Defendants. | 12 Civ. 1422 (JSR) <br><br> ECF Case <br><br> **SECOND AMENDED COMPLAINT OF THE UNITED STATES OF AMERICA** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, brings this second amended complaint and alleges upon information and belief as follows:

# INTRODUCTION

1.     This is a civil fraud action by the United States against Defendants Bank of America Corporation and Bank of America N.A. ("BANA") (referred to collectively as "Bank of America"), Countrywide Financial Corporation ("Countrywide Financial" or "CFC"), Countrywide Bank, FSB ("Countrywide Bank"), and Countrywide Home Loans, Inc. ("Countrywide Home Loans" or "CHL") (collectively, with CFC and Countrywide Bank, referred to herein as "Countrywide"), and Rebecca Mairone ("Mairone") to recover damages and penalties arising from a scheme to defraud the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "government-sponsored enterprises" or "GSEs") in connection with Countrywide's residential mortgage lending business. This action seeks to recover civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

2.     As set forth more fully below, in 2007, as loan delinquency and default rates rose across the country and the GSEs tightened their underwriting guidelines and loan purchase requirements, Countrywide rolled out a new "streamlined" loan origination model it called the "Hustle." In order to increase the speed at which it originated and sold loans to the GSEs, Countrywide eliminated every significant checkpoint on loan quality and compensated its employees based solely on the volume of loans originated, leading to rampant instances of fraud and other serious loan defects, all while Countrywide was informing the GSEs (and the public) that it, too, had tightened underwriting guidelines in response to the sobering secondary market. When the loans predictably defaulted, the GSEs incurred hundreds of millions of dollars in losses.

3.     Countrywide was once the largest mortgage lender in the United States, having originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.   In the mid-2000's, Countrywide dominated the subprime lending market, originating subprime loans principally from its Full Spectrum Lending ("FSL") division.   In early 2007, however, when the subprime market collapsed, Countrywide responded to its resulting revenue shortfall in two ways.   First, Countrywide shifted the focus of FSL to originating prime, conforming loans that qualified for sale to the GSEs.   Second, under the direction of FSL Chief Operating Officer ("COO") Mairone, Countrywide implemented the "Hustle," which reduced the amount of time spent processing and underwriting conventional loans (the "turn time" on loans), thereby boosting loan volume and revenue.

4.     According to internal Countrywide documents, the aim of the Hustle (or "HSSL," for "High Speed Swim Lane") was to process loans from application to closing at lightning speed by having the loans "move forward, never backward" and by removing quality-preserving "toll gates" that slowed down the loan origination process.   Whereas the average turn time on an FSL loan was 45-60 days, the HSSL set a turn time goal of 10-15 days.   In some cases, HSSL loans moved even faster. ' One current Bank of America employee has commented that during the period of the HSSL, employees could take an application in the morning and fund the loan in the evening.

5.     In furtherance of its high speed goal, Countrywide's new origination model removed the processes responsible for safeguarding loan quality and preventing fraud.   For instance, Countrywide eliminated underwriter review even from higher risk loans such as stated income loans and "dirty prime" loans (those loans with characteristics between prime and subprime).   In lieu of underwriter review, Countrywide assigned critical underwriting tasks to

loan processors who were previously considered unqualified even to answer borrower questions. At the same time, Countrywide eliminated previously mandatory checklists (or "job aids") that provided instructions on how to perform these underwriting tasks. Under the HSSL, such instructions on proper underwriting were considered nothing more than unnecessary forms that would slow the swim lane down.

6. Countrywide also eliminated the position of compliance specialist, an individual previously responsible for conducting a final, independent check on a loan to ensure that all conditions on the loan's approval were satisfied prior to funding. Finally, to further ensure that loans would proceed as quickly as possible to closing, Countrywide revamped the compensation structure of those involved in loan origination, basing performance bonuses solely on volume. Whereas loan processors and others previously received bonuses based on a combination of the quality and volume of loans they processed, the HSSL added a new bonus for reducing turn time on loans and simultaneously removed any quality factor in compensation, making clear that employees should prioritize production.

7. Although Countrywide management, including Mairone, was informed that the HSSL posed a threat to loan quality at a time when the market would not tolerate high defect rates, and Andrew Gissinger, executive managing director of Countrywide Home Loans, stressed in August of 2007 that "new market realities" required "rigorous underwriting discipline," the HSSL began that very month and continued through May of 2008. The HSSL was never disclosed to the GSEs, although the vast majority of its resulting loans were funneled to the GSEs with the knowing misrepresentation that they were investment-quality loans that complied with GSE requirements. Indeed, in late 2007 and early 2008, after it had fully implemented the HSSL,

4

Countrywide represented to the GSEs and in public filings that it had strengthened its underwriting guidelines and scaled back on riskier loan products.

8. Countrywide also concealed the quality control reports on HSSL loans demonstrating that instances of fraud and other material defects (*i.e.*, defects making the loans ineligible for investor sale) were legion. By the first quarter of 2008, Countrywide's own quality control reports identified material defect rates of more than 30% in certain months, rates that were nearly *ten times* the industry standard defect rate of approximately 4%. In response to these reports, FSL employees commented that they had "the crystal ball" predicting the fallout from the HSSL months earlier, and that those predictions were "holding true as current quality undermines FSL." But Countrywide failed to report its spike in defect rates to the GSEs or abandon the HSSL even after it was clear that the loans were of a disastrous quality.

9. After the HSSL loans defaulted and the GSEs reviewed them for compliance with their guidelines, Countrywide compounded the harm to the GSEs by refusing for years to repurchase HSSL loans or reimburse the GSEs for losses already incurred, even where the loans admittedly contained material defects or even fraudulent misrepresentations. Although on January 7, 2013, after this action was filed, Bank of America announced that it agreed to pay Fannie Mae billions of dollars to resolve outstanding repurchase requests stemming from loans originated between 2001 and 2008, its settlement cannot repair the damage to the GSEs or the federal government from Defendants' fraudulent origination and sale of defective loans. Nor does this settlement affect Defendants' liability to the United States for their fraudulent conduct.

10.     The United States seeks the maximum amount of civil penalties allowed by law. Specifically, the United States seeks civil penalties under FIRREA for the thousands of HSSL loans sold to the GSEs, including any losses or gains resulting from the fraud.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and 12 U.S.C. §1833a.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (c) because the Defendants transact business in this judicial district.   In addition, HSSL loans included thousands of mortgages on New York properties.

## PARTIES AND RELEVANT ENTITIES

13.     Plaintiff is the United States of America.

14.     Defendant Countrywide Financial is a Delaware corporation with its principal place of business in Calabasas, California.   Countrywide Financial, itself or through its subsidiaries Countrywide Home Loans and Countrywide Bank, was engaged in mortgage lending. On July 1, 2008, Countrywide merged with Bank of America and is now a wholly-owned subsidiary of Bank of America.   Countrywide Financial's remaining operations and employees were transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009.

15.     Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home Loans originates and services residential home mortgage loans by itself or through its subsidiaries.   Pursuant to the merger on July 1, 2008, Countrywide Home Loans was

acquired by Bank of America and now operates under the trade name "Bank of America Home Loans."

16.     Defendant Countrywide Bank, a wholly-owned subsidiary of Countrywide Financial, is a federally-insured financial institution with its headquarters in Colorado.   In 2006 and 2007, Countrywide Home Loans transitioned its mortgage loan production business into Countrywide Bank.   As Countrywide Financial stated in its Form 10-K for 2007, by the end of 2007, nearly all mortgage loan production occurred in Countrywide Bank rather than Countrywide Home Loans.   Pursuant to the merger on July 1, 2008, Countrywide Bank later merged into and with BANA, with BANA as the surviving entity, effective on or about April 27, 2009.

17.     Defendant Bank of America Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina and offices and branches in New York, New York.   Countrywide Financial merged with Bank of America Corporation on July 1, 2008. As explained more fully below, Bank of America Corporation is a successor-in-interest to Countrywide and has thus assumed liability for the conduct of Countrywide alleged herein.

18.     Defendant BANA is a federally-insured financial institution and Bank of America's principal banking subsidiary.   BANA has substantial business operations and offices in New York, New York.   As explained more fully below, BANA participated in Bank of America's acquisition of substantially all of Countrywide Financial through a series of transactions that commenced on July 1, 2008.   Together with Bank of America Corporation, it is a successor-in-interest to Countrywide.

19.     Defendant Rebecca Mairone was the COO of FSL during 2007 and 2008, and, following the acquisition, was employed by BANA.   Mairone is currently a Managing Director at a banking corporation located in New York, New York.

## BACKGROUND

### A.     The Conservatorships of Fannie Mae and Freddie Mac

20.     Fannie Mae and Freddie Mac are GSEs chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets. Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.   Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

21.     As part of their mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from mortgage companies and other financial institutions, providing revenue that allows the mortgage companies to fund additional loans.   The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors.

22.     The GSEs earn revenue in their single-family business line primarily from "guarantee fees," *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS.   In general, the GSEs are profitable so long as their income from investments and guarantee fees exceeds the principal and interest that they must pay out on any defaulted loans that they guarantee.

23.     Prior to late 2007, GSE preferred stock was widely regarded to be a safe investment.   In fact, federal regulators permitted banks to invest up to 100 percent of their investment capital in GSE preferred securities.   In the second half of 2007 and the first half of

8

2008, however, as default rates on defective loans climbed, Fannie Mae lost $9.5 billion and Freddie Mac lost $4.7 billion. Accordingly, Fannie Mae's Form 10-K for 2007 reported a "material increase in mortgage delinquencies and foreclosures. . ." and expected "increased delinquencies and credit losses in 2008 as compared with 2007."

24.　　On July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), Congress created the Federal Housing Finance Agency ("FHFA"), a federal agency, to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. The FHFA is located at Constitution Center, 400 7th Street, SW in Washington, D.C.

25.　　On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. § 4617(b)(2).

26.　　Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority under HERA "to purchase any obligations and other securities" issued by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs").

27.　　On September 7, 2008, following the conservatorship of Fannie Mae and Freddie Mac and Treasury's purchase of GSE preferred stock, the value of the GSEs' stock was eliminated.

28.　　Since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs. As of December 31, 2012, Treasury has provided more than $187 billion in support to the GSEs. These federal funds have been used primarily to cover losses from

single-family mortgages purchased and guaranteed by the GSEs between 2004 and 2008, but have also been used to purchase mortgages sold in 2009 from lenders including Defendants, and to reimburse losses incurred by the GSEs as a result of their guaranteeing those mortgages. Since 2008, the GSEs have suffered net losses of $208 billion in their single-family mortgage business.

## B.    The Enactment of FIRREA

29.    Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that involve financial institutions and certain government agencies. *See* 12 U.S.C. § 1833a(e).

30.    As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, two provisions of Title 18 of the United States Code that "affect" federally insured financial institutions:

- 18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution), which proscribes the use of "the Postal Service, or . . . private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . ."; and

- 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution), which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

31.    FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $5 million or $1 million per day, whichever is less. The statute further provides that the United States can recover the amount of

any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.

**C.**     **The GSEs' Single Family Mortgage Guarantee Business**

32.     In purchasing loans for their single family business, GSEs operate on a "rep and warrant model," relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements. Specifically, loans sold to Fannie Mae must comply with its Single Family Selling Guide (the "Selling Guide") and purchase contracts. Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts.

33.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product. The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

34.     The rep and warrant model operates on the assumption that the sellers of the loans—usually also the originators of the loans—are in a superior position of knowledge about the quality of those loans. Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the guidelines, and to self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective. The GSEs also delegate

11

the underwriting of the loans they purchase to the lenders. Although the GSEs reserve the right to sample a portion of loans they purchase to ensure compliance with their guidelines, they generally conduct full file reviews only if a loan goes into default.

35. As set forth in the Mortgage Selling and Servicing Contract (the "Master Contract") between Countrywide Home Loans and Fannie Mae, the "specific warranties made by the Lender" are (among other things) that "[t]he mortgage conforms to all the applicable requirements in [the] Guides and this Contract" and that "[t]he lender knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to: [i] cause private institutional investors to regard the mortgage as an unacceptable investment; [ii] cause the mortgage to become delinquent; or [iii] adversely affect the mortgage's value or marketability." These representations were first made in a contract executed by Lee Bartlett of Countrywide and Norman Peterson of Fannie Mae in November of 1982 and were reaffirmed through addenda and new contracts executed in 2006, 2007, and 2008, by Kevin Bartlett and Gregory Togneri of Countrywide.

36. As set forth in the relevant agreements, Countrywide's representations "appl[ied] to each mortgage sold to [Fannie Mae] . . . in its entirety," were "made as of the date transfer is made," and "continue after the purchase of the mortgage."

37. In representing to Fannie Mae that the loan sold to the GSEs is an acceptable investment, Countrywide (and later Bank of America) further warranted that: (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system; and (iii) no fraud or material

misrepresentation has been committed by any party, including the borrower. These requirements were set forth in the 2007 and 2008versions of the Selling Guide, and remain in effect today.

38. Countrywide further warranted that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention. These requirements were set forth in the versions of the Selling Guide operative in 2007 and 2008.

39. Similarly, the Freddie Guide provides that "[a]s of the Delivery Date, the Funding Date and the date of any substitution of Mortgages pursuant to the Purchase Documents, the Seller warrants and represents the following for each Mortgage purchased by Freddie Mac: (1) The terms, conditions, and requirements stated in the Purchase Documents [defined to include the guidelines and contracts] have been fully satisfied; (2) All warranties and representations of the Seller are true and correct; (3) The Seller is in compliance with its agreements contained in the Purchase Documents; [and] (4) The Seller has not misstated or omitted any material fact about the Mortgage." These representations were set forth in the versions of the Freddie Guide operative in 2007 and 2008.

40. The Master Agreement between Freddie Mac and Countrywide Home Loans operative in 2007 and 2008, and signed by Kevin Bartlett and Greg Togneri of Countrywide, provides that the "Seller must comply with all requirements of the *Freddie Mac Single-Family*

13

*Seller/Servicer Guide* and the other Purchase Documents, as modified and supplemented by the terms of this Master Commitment."

41.      Countrywide's (and later Bank of America's) representations that they were underwriting and delivering investment-quality mortgages according to the GSEs' selling guides and contractual requirements were material to the GSEs' decisions to purchase mortgage loans.

42.      The GSE guidelines are consistent with Countrywide's own underwriting guidelines, which are set forth in two main documents:   the Loan Program Guides ("LPGs") and the Countrywide Technical Manual ("CTM").   The LPGs set limits on loan characteristics, such as loan-to-value ratios ("LTVs"), loan amounts, and reserve requirements for specific loan types. The CTM contains processes and instructions for originating loans, such as how to calculate LTVs.

43.      The CTM states that Countrywide's basic policy is to "originate and purchase investment quality loans," with such a loan defined as "one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual and Loan Program Guides." CTM 0.4 Introduction—Countrywide's Underwriting Philosophy.

44.   ·  When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

**C.      The Loan Origination Process Within Countrywide's FSL Division in 2007**

45.      Within FSL as of early 2007, the loan origination process required the involvement of four individuals:   the loan specialist (also called a loan processor), the underwriter, the loan funder, and the compliance specialist.

46.     The loan specialist within FSL was primarily a data entry clerk who entered borrower information into Countrywide's automated mortgage underwriting system (called "CLUES"). Based on data entered from a borrower's application, credit report, and appraisal, CLUES evaluated a loan's default risk and whether a loan could be approved in compliance with Countrywide's guidelines. CLUES then generated a report with either an "Accept" for a loan, indicating that the loan had an acceptable level of risk, or a "Refer," indicating that the loan should be referred to a human being for manual underwriting because of a borrower's credit score or other risk attributes on the loan.

47.     A CLUES report on a particular loan also listed underwriting conditions that were required to be satisfied before a loan could be closed. For example, a CLUES report might condition its "Accept" on obtaining documentation showing that certain of the borrower's debts had been paid off, documentation of the borrower's employment and assets, or review of certain assumptions supporting an appraisal.

48.     After obtaining a CLUES result, the loan processor forwarded the loan file to an underwriter for review, either for a full manual underwriting (in the event of a CLUES Refer), or for a review of the CLUES conditions (in the event of a CLUES Accept). The loan specialist was not permitted to answer any substantive borrower questions about a loan, and did not have authority to perform any underwriting tasks.

49.     The underwriter determined the likelihood that the borrower could repay the mortgage loan, by: (i) verifying that loan documentation was true, complete, and accurate by comparing the underlying loan documentation with data entered into CLUES; (ii) evaluating documentation concerning the borrower's income, assets, employment, and credit history; (iii)

evaluating the appraisal; (iv) analyzing relevant GSE requirements; and (v) reviewing and clearing any conditions listed on a CLUES report until the loan was "cleared to close."

50. The underwriter also served a valuable fraud detection role. Specifically, the underwriter could detect whether a loan specialist entered fraudulent data into CLUES by comparing the loan documentation with the data entered by the loan specialist. The underwriter was also key to detecting fraud in stated income loans—those in which a borrower is not required to provide documentation supporting his or her income. Where a borrower provides no supporting documentation of income, the determination as to whether the borrower's stated income is reasonable in view of her employment and other factors is best made by a qualified, experienced underwriter.

51. The loan funder prepared the loan package for closing, coordinated the return of closing documents for review prior to funding, ensured that any unresolved funding conditions were satisfactorily met, and wired funds to title companies or closing agents.

52. The compliance specialist acted as a final "toll gate" prior to funding, by conducting a review of the loan file to: (i) ensure that any conditions imposed by CLUES were properly satisfied; (ii) verify borrower identification and execution of loan documents; (iii) confirm the availability of funds to be paid to the borrower or third parties; and (iv) ensure compliance with relevant state lending requirements.

53. As of early 2007, each of the four individuals involved in the loan origination process received a bonus based both on the quality and on the volume of loans processed.

## D. The Shift in Focus to Prime, Conventional Lending in 2007

54. In the spring of 2007, the secondary market for subprime loans collapsed and several subprime lenders announced significant losses, declared bankruptcy, or put themselves up for sale. With the collapse of the subprime market, lenders sought to originate loans that they could then sell to the GSEs.

55. As Countrywide stated in its Form 10-K for 2007, "secondary mortgage market demand for non agency-eligible loans (nonconforming Prime Mortgage Loans, Prime Home Equity Loans and Nonprime Mortgage Loans) was substantially curtailed." Countrywide further stated that in response to changes in the secondary market, "we have tightened our underwriting and loan program guidelines, including reductions in the availability of reduced documentation loans. . ." Elsewhere in its Form 10-K, Countrywide stated that, as a "result of the changes to our underwriting and program guidelines, the vast majority of loans we now originate are eligible for sale directly to Fannie Mae, Freddie Mac or Ginnie Mae. . ." In addition to its public statements, employees in Countrywide's secondary marketing unit represented to individuals in the credit risk management groups at both Fannie Mae and Freddie Mac in the fourth quarter of 2007 that it had implemented tighter underwriting guidelines.

56. Consistent with Countrywide's shift to the prime, conventional lending market—effectively the only secondary market that remained—FSL transitioned from a subprime origination division to one that originated loans for sale to the GSEs. By early 2008 FSL's transition was complete, as FSL's production by the first quarter of 2008 consisted of more than 90% conventional loans and other GSE-approved products.

57. The GSEs, for their part, began to observe escalating default rates in previously-purchased loans and responded by tightening their requirements and curtailing the purchase of riskier loans. The GSEs also communicated these tightened requirements to lenders. For example, Fannie Mae's 2007 10-K Investor Summary lists several "Management Actions on Credit," with the top action being "Tightening underwriting standards/reduced participation in riskier segments."

58. In an attempt to mitigate its anticipated losses, Fannie Mae also stated that it was "[s]trengthening contractual protections" with lenders, placing "[n]ew limits on business with some counterparties," and "[i]ncreas[ing] depth and frequency of monitoring" of the quality of sellers' loans. As one former Fannie Mae executive explained the changing expectations in mid-2007, Fannie Mae was nearly the only significant purchaser left in the secondary market and was working hard to provide liquidity to the market, so it demanded that lenders pay closer attention to loan quality.

59. Countrywide was by far the largest seller of single-family loans to Fannie Mae in 2007, accounting for approximately 28% of Fannie Mae's single-family loan purchases. At the same time, Countrywide's loans performed far more poorly than those originated by other major lenders. Countrywide-originated loans sold to Fannie Mae in 2007 had a serious delinquency rate (loans that are three months past due or in foreclosure) of more than 21 percent, which was two to three times the rate of other major sellers during that time period.

60. In light of Countrywide's financial distress in mid-2007, Fannie Mae disclosed its relationship with Countrywide as a material risk to its financial condition in its Form 10-K for 2007. Fannie Mae knew that if Countrywide had failed to repurchase defective loans or defaulted

18

on other significant obligations, it could expose Fannie Mae to significant losses given the volume of Countrywide loans Fannie Mae held and the high serious delinquency rate on those loans. Fannie Mae therefore also initiated a thorough review of the Countrywide portfolio, and directed its employees to "reduce[] the existing level of risk by pulling back on products and variances." Similarly, as loan default rates continued to climb, Freddie Mac re-priced, then eliminated, approximately half of Countrywide's riskier loan products in 2007 and 2008.

61. Countrywide was well aware of the tightened underwriting requirements in the secondary market. On August 7, 2007, Andrew Gissinger, executive managing director of Countrywide Home Loans, sent a memo to all employees (the "Gissinger Memo") stating that "[w]e must ensure that our guidelines are fully in sync with the secondary markets, and therefore we will be continuing to announce guideline changes when we need to align ourselves to the overall market. Our success in the environment is absolutely contingent on our ability to employ rigorous underwriting discipline. We need to adapt our business to new market realities which requires ongoing manufacturing quality enhancement and further operating controls." One FSL risk manager similarly acknowledged in September of 2009 that "mfg quality is intense focus right now since FNMA delivery products is the only liquidity game in town."

62. At the same time, however, to alleviate its financial distress, Countrywide sought to quickly boost sales volume and revenue. To achieve this aim, FSL implemented a new "streamlined" origination model designed to reduce "turn time," *i.e.*, the amount of time spent underwriting and processing loans.

63. Countrywide did not disclose its new loan origination model to the GSEs.

19

# COUNTRYWIDE'S SCHEME TO DEFRAUD THE GSEs

## A.     The Hustle Eliminated Quality Control Processes

64.     After a pilot test in late 2006 and early 2007, FSL implemented its new model for loan origination—the "Hustle"—in August of 2007.   The Hustle (or HSSL) was the term for FSL's new "High Speed Swim Lane" model for loan origination.   According to an internal FSL presentation on the HSSL, the new model was to have "broad scope and impact, and an aggressive timeline," with a "rate and magnitude of change [that was] drastic, and beyond most people's comfort range."   FSL internal presentations also state that the new model would "[f]ocus on FNMA/FHLMC [Fannie/Freddie] loans."

65.     FSL executives, and in particular Mairone, rolled out the HSSL and visited the selected processing centers (called "fulfillment centers") that were to implement the HSSL in order to promote it.   Operating under the motto, "Loans Move Forward, Never Backward," the HSSL aimed to significantly reduce the amount of turn time on loans.   Whereas FSL's average turn time on a loan prior to the HSSL was 45-60 days, the HSSL aimed to have loans processed in less than half that time.   At fulfillment centers in Chandler, Arizona; Richardson, Texas; Rosemead, California; Hatboro, Pennsylvania, and Plano, Texas, the HSSL had a stated turn time goal of 10-15 days.   At the largest HSSL center in Richardson, Texas, many loans were processed much more quickly.   As a Bank of America employee has commented, FSL employees could receive an application in the morning and fund it in the evening.

66.     The HSSL streamlined the loan origination process by removing so-called unnecessary "toll gates" or handoffs, which included processes necessary for originating investment-quality loans and for preventing fraud.   First, the HSSL effectively eliminated

underwriters from the loan origination process. Under the Hustle, if a loan processed through CLUES generated an "Accept" rating, regardless of the conditions imposed by CLUES, the loan processor could act as the "owner" of the loan from application until "cleared to close." The loan processor was thus never required to hand off the loan to any underwriter before the loan closed and funded.

67. The HSSL's removal of underwriters and other "toll gates" extended to a variety of loan products, including such high risk loans as stated income loans. During a pilot test of the Hustle, FSL initially regarded stated income loans as too risky to be included in an underwriter-free loan origination process. As internal Countrywide loan performance reviews indicate, stated income loans defaulted earlier and more frequently than loan products requiring full documentation of the borrower's income. For this reason, Countrywide had imposed lower loan amount limits and other restrictions on stated income loans.

68. The GSEs also expected that only experienced underwriters would be entrusted with review of stated income loans. Without documentation of a borrower's income, an underwriter must apply seasoned judgment in determining whether the borrower's stated income is reasonable in light of the borrower's occupation, experience, and other factors. Freddie Mac guidance on preventing stated income fraud thus provides that "[s]tated income loans can be problematic if it is later determined that the stated income was misstated and that the originator knew or should have known about it earlier in the process . . ." and that to prevent such fraud, lenders should "[e]nsure the most seasoned underwriters on your team underwrite stated income loans."

69.     In 2007, however, stated income products represented nearly 40% of FSL's overall volume.   Consequently, FSL could not achieve its desired production boost unless stated income loans were included in the high speed swim lane.   As stated in an email dated August 1, 2007 from an FSL Executive Vice President, "low/no doc deals [albeit risky] are the fastest thru the swim lane, so I really don't want to cut them out. . ." (brackets in original).   FSL therefore included stated income loans in the HSSL rollout in 2007.

70.     Although the HSSL was initially promoted as a new origination model only for "prime" loans, this limitation, too, was quickly disregarded in the attempt to process as many loans as possible at high speed.   In July 2007 FSL was already pitching a new project name: the "Dirty Prime High-Speed Swim Lane," whose aim it was to create a similarly high-speed swim lane for "Dirty Prime" loans, those loans that fell between prime and subprime thresholds.   Ultimately, however, Mairone decided to add these other loans to the original HSSL.

71.     In September of 2007, Mairone emailed that "[w]e need to start to move toward all loans into [the HSSL] process."   As a result, the same month, even Expanded Approval loan products, Fannie Mae's version of a subprime product, were included in the HSSL.   As one Senior Vice President explained in an email, "there will be no 'exits' per se from HSSL as a swimlane . . . the original plan was to create separate lanes/teams for different 'tiers' of risk (*i.e.*, Prime "dirty" Prime, non-Prime).   Now we need to do the same thing, but within a single lane."   The Senior Vice President added that "[a]s of Sept. 12th the HSSL teams will get all loans, regardless of criteria!   So nothing will be excluded, including EA [Expanded Approval]."   When the "no exclusions" rule was confirmed, another Senior Vice President responded to a colleague in risk management, "YIKES . . . major risk issues."

22

72.     With underwriters eliminated from most loan reviews, loan specialists assumed responsibility for a variety of critical underwriting tasks.   Although previously regarded as unqualified even to answer borrower questions, loan specialists were suddenly granted underwriting authority, and entrusted with such tasks as assessing the reasonableness of a borrower's stated income and evaluating the adequacy of an appraisal.   At the same time, loan specialists did not report to underwriting and credit risk managers.   The HSSL centers in fact maintained no on-site underwriting manager and the loan specialists reported to operations managers and, ultimately, to Mairone.

73.     Even while the HSSL gave loan specialists authority previously available only to underwriters, it provided them with less guidance in performing critical underwriting tasks.   Prior to the HSSL, FSL required its underwriters to complete certain worksheets—referred to as "job aids"—that served as checklists or how-to forms on performing critical underwriting tasks.

74.     Countrywide executives, including Mairone, having determined that these job aids were merely additional, unnecessary toll gates, eliminated them along with the underwriters. Among the job aids deemed unnecessary were worksheets on how to assess the reasonableness of stated income and how to review an appraisal.

75.     The HSSL also eliminated the final toll gate in loan origination—the compliance specialist—who had independently checked to ensure that any conditions on the loan were cleared prior to closing and funding the loan.   As a result, loans receiving a CLUES "Accept" were handled entirely by loan specialists and funders.

76.     Finally, to further incentivize loan specialists and funders to reduce the time spent processing the loans, FSL changed the compensation structure for both loan specialists and

funders. In August of 2007, FSL implemented a "turn time" bonus for loan specialists and others for steadily reducing the turn time on their loans. The loan processors also had quotas of 30 funded loans per month and a minimum of one loan "cleared to close" every day. In a fulfillment center in Richardson, Texas, loan processors were instructed that they were not permitted to leave at night until they cleared at least one loan for closing.

77. After loan specialists expressed concerns at an FSL town hall meeting in September of 2007 that making underwriting decisions would lead to higher defect rates, and thus negatively impact their compensation, FSL addressed their concerns by eliminating any quality component to loan processors' compensation. Consistent with this decision, an internal FSL presentation on the HSSL stated that FSL "need[ed] to address cultural issues" with loan specialists, by encouraging them to "[g]et comfortable with exercising authority," "[g]et comfortable with skipping process steps," and suspending the "QOG" (quality of grade) findings on the loan specialists' funded loans that impacted their compensation. Previously, loan specialists and funders whose loan files were revealed to have material defects making their loans ineligible for sale received a reduction in their bonus compensation. Under the HSSL, however, these employees earned bonus compensation based purely on loan volume and had no incentive to safeguard loan quality by preventing defects.

78. Countrywide knew that the HSSL ran counter to both the GSEs' requirements, which mandated heightened scrutiny of loan quality, and its own professed commitment to tightened underwriting standards in mid-2007. It also knew that originating loans through such a model, *i.e.*, without quality and underwriting safeguards, made the resulting loans an unacceptable investment in the now conservative secondary market.

**B.    Countrywide Ignored Warnings Raised about the HSSL**

79.    As explained below, numerous employees within FSL repeatedly warned FSL executives and senior managers, including Mairone, that the HSSL would generate—and did generate—excessive quantities of fraudulent or otherwise seriously defective loans that were ineligible for sale to the GSEs.   In particular, employees warned that the Hustle presented a disastrous layering of risk by: (i) eliminating the toll gates (*e.g.,* underwriters, job aids, and compliance specialists) responsible for loan quality and fraud prevention; (ii) expanding the authority of loan specialists and funders, and (iii) compensating loan specialists and funders solely based on volume.   Countrywide management, including Mairone, brushed aside these warnings again and again.   Mairone, in particular, responded to such concerns by telling employees that they needed to "get with the program" and reduced the responsibility of those who persisted in criticizing the HSSL.

80.    For example, in August of 2007, Michael Thomas, a First Vice President of FSL, forwarded the Gissinger Memo to colleagues and commented that "[t]his note from Drew outlines the reasons that I'm concerned about some parts of the HSSL process . . . Guidelines are contracting and product offerings are disappearing . . . We are hearing the clear directive that we should improve manufacturing quality, not that we are over-manufacturing.   This particular statement is in direct conflict with the current HSSL design."

81.    Two months later, an SVP in risk management cautioned that "HSSL must produce compliant and quality/saleable loans to FNMA as there is no tolerance for errors" and "with the tightening of guidelines/exceptions, buy back pressure will come from poor/sloppy manufacturing."

82.     Notwithstanding the warnings that loan quality could not be compromised, initial quality reports on the HSSL made clear that defects were rampant.   On October 8, 2007, FSL's quality assurance and control group presented its initial findings to the Hustle design team on a sample of loans funded in a three-week period, between August 13, 2007, and September 7, 2007. The quality review sought to identify defects in loans at the pre-funding stage, specifically in loans that had been "cleared-to-close" by loan processors.   Of the 42 loans in the sample, 41% were found to have defects creating a high risk, *i.e.*, one that affects the borrower's ability to repay the loan.   The report further noted that loan specialists "were grandfathered in with . . . condition sign off authority without training or HSSL certification requirements.   As a result our quality was challenged."

83.     The purpose of doing pre-funding quality reviews is to identify and correct defects in the loans before they close and fund.   During the HSSL, FSL had numerous underwriters with little work and who could therefore have assisted with pre-funding quality reviews.   Mairone, however, instructed that such pre-funding checks be conducted only on a parallel track with the loan processing, so that they would not "slow[] the swim lane down."   Further, the results of the pre-funding quality reports were ignored and resulted in no changes to the HSSL design.

84.     In the ensuing months, the quality reports on the HSSL loans foretold a systemic problem with loan quality.   In January of 2008, when the HSSL represented a significant percentage of FSL's total loan volume, pre-funding reports revealed material defect rates of 57% overall and nearly 70% for stated income loans.   In other words, FSL's own reports showed that more than half of the loans that were "cleared to close" and slated for sale to the GSEs could be ineligible for sale to any investor.   The most frequently-cited defects appeared where job aids had

been removed, including in the areas of stated income reasonableness and appraisal acceptability. Again, rather than alter or abandon the HSSL model, Mairone instructed those who prepared the reports not to circulate them outside of FSL.

85.     In March of 2008, underwriting managers in Richardson, Texas asked for a meeting with Mairone to address their concerns with deteriorating loan quality as a result of the HSSL. The meeting took place the day after Countrywide CEO Angelo Mozilo testified before Congress concerning the mortgage crisis, stating that the company's "core commitment [wa]s to put people in homes and to keep them there" and that "[i]t just never serves our company to make a bad loan." Frustrated with the HSSL's continued emphasis on volume at the expense of quality, one of the underwriting managers asked Mairone how the HSSL fit with Mozilo's statements just the day before that the company was committed to making only good loans.   Mairone responded angrily, in sum or substance, "Son of a bitch.  You need to get with the program.  We need to keep funding these loans to keep the lights on."

## C.     Defendants Concealed the Escalating Rates of Defects and Fraud under the HSSL

86.     As warnings about the HSSL went unheeded, Defendants knowingly churned out loans with escalating rates of material defects and sold them to the GSEs.

### 1.     Manipulation of CLUES data

87.     As Countrywide's Technical Manual states, a CLUES outcome is "only as good as the data entered into the system." *See* CTM 0.3.1 Introduction—Automated Underwriting Systems, Underwriting with CLUES and CLUES Documentation Levels.   CLUES "Accepts" are thus "only valid if the data used to generate the recommendation matches the true and accurate data in the file." *Id.* 0.2.1 Introduction—Countrywide's Underwriting Philosophy.

88.     With loan processors and funders encouraged to focus only on the volume of loans they processed, falsification of CLUES data proceeded unchecked. Loan processors were incentivized to manipulate borrower information (*e.g.*, by entering a higher income for the borrower) until they received an "Accept" and the loan could enter the high speed swim lane. Also, no underwriter reviewed the loan to compare the CLUES data with the underlying loan documentation to detect fraudulent manipulation. Even in post-closing audits where fraudulent manipulation of data was found, such a finding was typically recorded as another material defect finding that had no effect on the loan processor's compensation.

89.     Countrywide management only intensified the push to obtain a CLUES "Accept" result. As an August 22, 2007 email to FSL management explained in discussing Countrywide's "Fast & Easy" loan product (a reduced documentation loan), "[t]here is major CHL corporate scrutiny on ensuring prime F&E's fund as Accept due to market liquidity and ensuring loan is salable to GSE-FNMA . . . all we simply have to do is ... fix data pre-fund[ing,] re-run CLUES and then [] not run CLUES again so we can fund as CLUES Accept. Please remember the F&E product is key to HSSL . . . but MUST be CLUES Accept AT FUNDING!"

90.     As one former FSL Senior Vice President has explained, although manipulation of CLUES data was always a risk, it became an unmitigated risk under the Hustle and, even when detected, loan processors manipulating data typically faced no consequences, monetary or otherwise.

## 2. Loans Closed with Outstanding Conditions

91.     As set forth above, the GSEs required Countrywide and Bank of America to represent that automated underwriting conditions are met for all loans processed through an

automated underwriting system. Likewise, Countrywide's own underwriting guidelines provide that "[a]ll of the conditions imposed by CLUES must be completely fulfilled. The fact that a loan has a CLUES Accept rating does not release the branch from validating that all documentation meets prescribed requirements." CTM 0.3.1 Introduction—Automated Underwriting Systems (AUSs), Underwriting with CLUES and CLUES Documentation Levels.

92. With volume driving compensation under the HSSL, loan processors had no incentive to obtain and review necessary documents prior to closing.

93. As a result, during the HSSL years, FSL experienced a sharp increase in the percentage of loans closed with a variety of outstanding conditions and a doubling of the percentage of loans closed without required critical documentation, such as documentation supporting income, verifying assets, and verifying employment.

### 3. Spiking Material Defect Rates

94. Countrywide's own post-closing quality control reports indicated that the HSSL was a disaster, revealing an alarming spike in defect rates in FSL loans after the HSSL was fully implemented in or around August of 2007. Although FSL's material defect rates had historically been lower than those in other Countrywide divisions, such as its Consumer Markets Division and Wholesale Lending Division, Countrywide's internal reports show that FSL's material defect rates reached double the levels of those in other divisions in 2008.

95. By the first quarter of 2008, FSL's material defect rate on loans climbed to more than 30%, far surpassing the industry standard defect rate of 4-5%. Put simply, according to Countrywide's own internal quality control reviews, more than one-third of the loans FSL

originated were ineligible for sale to investors like the GSEs. The quality control reports demonstrating the spiking defect rates were shown to Mairone and other FSL executives.

96. In March of 2008, when the HSSL had been in place for at least six months and the high defects were well known across FSL, Thomas re-sent his initial warnings about the HSSL to O'Donnell and a Vice President in Risk Management, saying "Here's my plan of attack . . . oh, wait . . . this is what we suggested last August." The Vice President, in turn, forwarded Thomas's email to one of his colleagues, commenting that "we did have the crystal ball, and unfortunately our risk assessments at that time are holding true as current quality undermines FSL."

### 4. Countrywide's Concealment of Defect Rates

97. Well aware that its defect rates drastically exceeded the industry standard, Countrywide concealed them from the GSEs with the knowledge that the GSEs would not conduct any meaningful review of the loan files for many months. Although Countrywide had a duty to self-report materially defective loans, Countrywide reported neither its defect rates in FSL nor the vast majority of defective loans to the GSEs. One former Fannie Mae executive responsible for Countrywide purchases has explained that he could not recall ever hearing instances at Fannie Mae of such high defect rates, and added that had he known about such defect rates, he would have asked what Countrywide was originating and whether there were any quality checkpoints at all in the origination process. Another former Fannie Mae executive responsible for the Countrywide account commented that, whereas many customers trying to sell to Fannie Mae would self-report a problem they identified, he could not recall Countrywide ever reporting a single issue as to quality to Fannie Mae.

98.     Indeed, at the same time FSL's defect rates soared to approximately 37%, Countrywide was advised that its poor loan quality could threaten the Bank of America acquisition.  A report prepared in February 2008 by Countrywide's Enterprise Risk Management unit alerted executives that the number two credit risk that could disrupt the Bank of America acquisition was Countrywide's material defect rates, which were described across divisions as "significantly above acceptable levels, with the most common [defect] being unreasonable stated income."   The number one credit risk cited by the report was Countrywide's high rates of early payment defaults, *i.e.*, loans defaulting within the first six months, which are also correlated with material defects and fraud.

99.     Despite its knowledge that its defect rates were well above acceptable levels, FSL took no action to address the root cause of its staggering defect rates.  Instead, FSL created a one-time bonus incentive for quality control employees to rebut material defect findings in the first quarter of 2008 down to a more standard rate.

100.     In a typical rebuttal process, an initial quality review would be conducted of a loan by Countrywide's corporate quality control department.  When a defect finding was made, the quality control team within the division that originated the loan had an opportunity to address the finding by, *e.g.*, attempting to locate a key document missing from the loan file.

101.     In FSL, however, where under the Sprint Incentive employees were paid to rebut the defect findings of the corporate quality control department, FSL employees could "rebut" defect findings even without taking any corrective action or showing that the finding was made in error.   For example, FSL employees could "rebut" defect findings of "unreasonable stated income" simply by arguing that the stated income *was* reasonable.   In such cases, unless the

corporate quality control employee could prove the stated income was false, the defect finding was overturned.

102.    Indeed, one former corporate quality control employee previously testified that she could not recall any instances when a finding of "unreasonable stated income" was *not* overturned.

103.    The FSL bonus incentive had its desired effect.   Internal FSL quality control reports show that the defect rate for February 2008, for example, went from approximately 37% to purportedly 13%.

104.    Countrywide also concealed its bonus incentive from the GSEs.   As a former Fannie Mae Vice President of Credit Risk explained, he had never heard of *any* lender that incentivized a quality control team to rebut quality control findings.   Another former Fannie Mae executive commented that it was misleading for Countrywide to be representing, on the one hand, that it was tightening its underwriting controls, while simultaneously engaging in a game of "catch me if you can" on the quality control side.

105.    Additionally, in the first quarter of 2008, Mairone instructed O'Donnell to remove certain slides from a loan quality presentation to Countrywide executives because the slides revealed the downward trend in FSL's loan quality.   After O'Donnell refused to remove the slides, Mairone said that if he was not willing to follow her instructions and remove them, she would find someone who was.   Thereafter, Mairone excluded O'Donnell from management meetings that he previously regularly attended with Countrywide senior executives relating to loan quality and performance.

**D. Defendants Misrepresented that Their Loans Complied with GSE Requirements**

106.     In selling HSSL loans to the GSEs, Defendants knew that numerous representations about the loans were false at the time of sale, including that the loan complied with all applicable guidelines and contracts, and that the lender knew of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that could reasonably be expected to: (i) cause private institutional investors to regard the mortgage as an unacceptable investment; (ii) cause the mortgage to become delinquent; or (iii) adversely affect the mortgage's value or marketability. Additionally, in many cases, Defendants knew, or were deliberately ignorant or reckless in not knowing, that numerous more specific representations about the loans were false, including that (i) all required loan data was true, correct, and complete; (ii) all CLUES conditions were met prior to closing; and (iii) no fraud or material misrepresentation had been committed by any party, including the borrower.

107.     Even more fundamentally, according to Countrywide's Guidelines, "[t]he basic question that the underwriter should ask on every loan is, 'Does this loan make sense?'" CTM 0.6 Introduction—Loan Fraud. The loans described below are just a small fraction of HSSL loans that fail this basic test. Although each of the described loans contained obvious and easily detectable material defects, each one was sold to Fannie Mae with the representation that it was an investment-quality loan and was therefore not reviewed by Fannie Mae until after its default.

**1. The Fort Lauderdale, Florida Property**

108.     Fannie Mae loan number 1706212724 relates to a property in Fort Lauderdale, Florida. The mortgage closed on or about January 31, 2008. Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

109. Contrary to Countrywide's representation, the loan did not comply with the most basic representations that the loan file contains no fraud or misrepresentation. A post-default quality review revealed a misrepresentation of income, where the loan application represented that the borrower earned $13,000 per month as a doorman, but the borrower's employer stated that he earned $5,023 per month.

110. The quality review also revealed that although the mortgage was delivered as an owner-occupied property, the borrower was not residing at the subject property.

111. Countrywide's representation at the time of sale that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

112. The loan defaulted less than eighteen months after closing. According to Countrywide's (later Bank of America's) internal fraud tracking system, which recorded the results of internal investigations of possible cases of loan fraud, the investigation confirmed fraud in connection with the loan.

### 2. The Copperas Cove, Texas Property

113. Fannie Mae loan number 1705138406 relates to a property in Copperas Cove, Texas. The mortgage closed on or about October 9, 2007. Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

114. Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning the accuracy of information and the absence of misrepresentations. The loan was run through CLUES 12 times. A post-default quality review revealed a misrepresentation of credit and undisclosed liability, as the credit report revealed three additional,

undisclosed mortgages obtained four and five months prior to the mortgage that was sold to Fannie Mae. These three additional mortgages resulted in $315,000 of undisclosed borrower debt.

115.     Countrywide's representation at the time of sale that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

116.     The loan defaulted within twenty-two months of closing. Countrywide's (later Bank of America's) internal fraud investigation confirmed fraud in connection with the loan.

### 3. The Williamstown, New Jersey Property

117.     Fannie Mae loan number 1705710735 relates to a property in Williamstown, New Jersey. The mortgage closed on or about December 11, 2007. Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

118.     Contrary to Countrywide's representation, the loan did not comply with the most basic representations that the loan file contains no fraud or misrepresentation. A post-default quality review revealed a misrepresentation of income, where the loan application represented that the borrower earned $5,600 per month as a wire operator, but a bankruptcy petition filed in 2009 reported the borrower's monthly income at the time of closing as $2,535.

119.     The quality review also revealed an unacceptable appraisal based on misrepresentations of improvements to the property and a failure to use appropriate comparable sales.

120.     Countrywide's representation at the time of sale that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

121.    The loan defaulted less than eight months after closing.

**4.  The Tampa, Florida Property**

122.    Fannie Mae loan number 1705152888 relates to a property in Tampa, Florida.   The mortgage closed on or about October 22, 2007.   Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

123.    Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning the accuracy of data and the absence of misrepresentations.    The loan was run through CLUES 10 times.    A post-default quality review revealed a misrepresentation of income, where the loan file stated that the borrower earned $8,000 per month as a nurse, but the borrower in fact earned $4,112 per month.

124.    The quality review also revealed an unacceptable appraisal based on a misrepresentation of the number of square feet of the subject property, a misrepresentation of the declining home values in the neighborhood, and a failure to use appropriate comparable sales.

125.    Countrywide's representation at the time of sale that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

126.    The loan defaulted within twenty months of closing.   Countrywide's (later Bank of America's) internal fraud investigation confirmed fraud in connection with the loan.

**5.  The Westlake Village, California Property**

127.    Fannie Mae loan number 1705144610 relates to a property in Westlake Village, California.   The mortgage closed on or about October 12, 2007.   Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

36

128. Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning the accuracy of information and the absence of misrepresentations. The loan was run through CLUES 12 times. A post-default quality review revealed a misrepresentation of credit and undisclosed liability, as the credit report revealed an additional, undisclosed mortgage that closed just one month before the mortgage that was sold to Fannie Mae. The additional mortgage resulted in approximately $287,000 of undisclosed borrower debt.

129. Countrywide's representation at the time of sale that this loan complied with GSE requirements was material to Fannie Mae's decision to purchase the loan and bore upon the likelihood that the borrower would make mortgage payments.

130. The loan defaulted within twenty months of closing. Countrywide's (later Bank of America's) internal fraud investigation confirmed fraud in connection with the loan.

**6. The Midlothian, Texas Property**

131. Fannie Mae loan number 1705909951 relates to a property in Midlothian, Texas. The mortgage closed on or about January 16, 2008. Countrywide sold the loan to Fannie Mae representing that it complied with the applicable GSE requirements.

132. Contrary to Countrywide's representation, the loan did not comply with the most basic requirements concerning the accuracy of information and the absence of misrepresentations. The loan was run through CLUES 18 times. A post-default quality review revealed a misrepresentation of occupancy, as the mortgage was represented to be an owner-occupied property but was in fact an investment property.

133. The quality report also found that, although the loan at issue—a stated income loan—required Countrywide to verify the borrower's employment through a Verification of

Employment with a minimum two-year history, the documentation in the file inadequately supported that history.

134.    As of August of 2012, Countrywide's (later Bank of America's) internal fraud department listed the status of its decision on whether there was fraud in connection with the loan as "pending."

**E.  Countrywide and Bank of America Intentionally Thwarted the Repurchase Process**

135.    Countrywide, and later Bank of America, compounded the financial harm to the GSEs by refusing to repurchase loans even where the GSEs identified obvious misrepresentations of income, unacceptable appraisals, and other material defects in HSSL loans.

136.    For example, even where Fannie Mae confirmed instances of misrepresentation of stated income, Countrywide and Bank of America refused to repurchase loans, contending that the stated income, even though fraudulently misrepresented, was reasonable.  And even where Fannie Mae's quality reviews revealed inflated or otherwise faulty appraisals on the basis of misrepresentations about the subject property, Countrywide and Bank of America refused to repurchase loans, contending that Fannie Mae failed to demonstrate that the faulty appraisal caused the loan to default.  As a former Fannie Mae senior manager during the relevant time period stated, Countrywide's attitude was one of total intransigence, refusing to repurchase loans even when it was clear that there was fraud in connection with the loan.

137.    Countrywide's refusal to repurchase materially defective loans extended well beyond HSSL loans and rendered meaningless the contractual protections that existed for the GSEs' protection in the rep and warrant model.  As a June 15, 2007 memo to the former Fannie Mae CEO noted regarding the Countrywide relationship, a "major continuing problem is

Countrywide's refusal to repurchase or make us whole on loans which have suffered losses due to their admitted defects." And as a former Fannie Mae senior manager previously testified, Countrywide had always exhibited a "blatant disregard for just ignoring the repurchase requests."

138.    While Countrywide loans comprised approximately 28% of Fannie Mae's single-family loan purchases in 2007, the high defect rates and poor performance of those loans, along with Countrywide's refusal to repurchase defective loans, saddled Fannie Mae with approximately $14 billion in outstanding repurchase requests, representing the majority of all outstanding repurchase requests to lenders.

139.    Since the filing of this lawsuit, after years of recalcitrance, Bank of America has finally begun to address the thousands of outstanding repurchase requests from the GSEs for Countrywide's and Bank of America's defective loans.   Specifically, Bank of America recently announced that it has agreed to pay Fannie Mae billions of dollars to resolve outstanding repurchase requests from Fannie Mae for loans originated between 2001 and 2008, including HSSL loans.   Bank of America, however, cannot undo the harm to the GSEs, the federally-insured financial institutions, or the federal government from Countrywide's and Bank of America's fraudulent origination and sale of defective loans.   Nor does the settlement affect Defendants' liability to the United States for their fraudulent conduct.

**F.  Defendants' Fraud Affected Federally Insured Financial Institutions**

140.    The knowing and intentional fraud perpetrated by Countrywide affected Countrywide Bank and BANA, which are federally-insured financial institutions.

141.   Defendants' fraudulent conduct has resulted in significant liabilities to the GSEs for, among other things, repurchase claims.   To date, BANA and/or Countrywide Bank has directly or indirectly paid billions to settle repurchase demands from the GSEs on defective loans, including HSSL loans.

142.   Defendants executed their scheme to defraud the GSEs through the use of interstate mail and wires, specifically through repeated mail and electronic transmission of loan files and telephonic and electronic misrepresentations of loan quality to the GSEs.

143.   Countrywide, Bank of America Corporation, and BANA are vicariously liable for the conduct of Mairone and any other employee who participated in the fraud.

## BANK OF AMERICA IS LIABLE BOTH DIRECTLY AND AS SUCCESSOR TO COUNTRYWIDE

144.   Bank of America is liable as the successor to Countrywide for the conduct alleged above that occurred prior to July 1, 2008, as a result of direct merger and under the doctrines of *de facto* merger, substantial continuity, and assumption of liabilities.

### A.   Countrywide's Merger Into Bank of America

145.   On January 11, 2008, Countrywide Financial and Bank of America announced that they had entered into a Merger Agreement.   In the six months following the announcement of the planned merger, Bank of America developed a plan to integrate Countrywide's businesses into Bank of America through a series of transactions by which Bank of America would acquire control over, then transfer to itself, all of Countrywide's productive assets, operations, and employees (the "Plan").

146.     The goal of the Plan was to consolidate as much of the mortgage business of Countrywide and Bank of America as possible.   In April of 2008, Bank of America stated before the Federal Reserve that it would "run the combined mortgage business" under the "Bank of America brand" and that Calabasas, California would "be the national headquarters for the combined mortgage business."

147.     As set forth below, the execution of the Plan began just after the July 1, 2008 merger.  The Plan continued the former Countrywide Financial stockholders' ownership over Countrywide Financial's assets, then transferred all mortgage-related assets of the Countrywide entities into Bank of America entities through a series of transactions in July and November 2008.

148.     Following the merger, the Plan was completed in several steps because some transactions required regulatory approval while others could be completed immediately.

**1.  The Red Oak Merger**

149.     On July 1, 2008, Countrywide Financial merged into a specially-formed Bank of America Corporation subsidiary named Red Oak Corporation, which was then renamed Countrywide Financial Corporation (the "Red Oak Merger").   The Red Oak Merger was a stock-for-stock transaction by which former Countrywide Financial shareholders became Bank of America Corporation shareholders.

150.     Since the Red Oak Merger, Countrywide Financial and its other wholly-owned subsidiaries have been owned by the shareholders of Bank of America Corporation (which then included former Countrywide Financial shareholders through their ownership of stock in Bank of America Corporation).   Also, as of the Red Oak Merger, both before and after the July and

November 2008 transactions, Bank of America Corporation was the sole shareholder of Countrywide Financial and its subsidiaries.

151.    Since the Red Oak Merger, Bank of America Corporation has controlled Countrywide Financial, Countrywide Home Loans, and all other former subsidiaries of Countrywide Financial.

152.    As Bank of America has acknowledged in recent briefing, it was required by Fannie Mae guidelines to obtain Fannie Mae's consent to the Red Oak Merger "[t]o ensure [its] protection in a sale of a mortgage servicer that was servicing mortgage loans that Fannie Mae . . . owned." As a condition to its consent to the Red Oak Merger, Fannie Mae required that BANA guarantee the obligations of Countrywide Home Loans Servicing LP ("CHLS"), a Countrywide Home Loans subsidiary, to service loans that Fannie Mae had purchased.

**2.  The July 2008 Transactions**

153.    Between July 1 and July 3, 2008, Countrywide Financial and Bank of America engaged in a number of transactions by which Countrywide Financial and its subsidiaries sold assets and subsidiaries to Bank of America Corporation and certain of its subsidiaries.

154.    On July 1, 2008, Countrywide Home Loans sold two pools of residential mortgage loans to NB Holdings Corporation ("NB Holdings"), a wholly-owned subsidiary of Bank of America Corporation, and novated a portfolio of derivative securities contracts to BANA, also a wholly-owned subsidiary of Bank of America Corporation, under which BANA assumed Countrywide Home Loans's positions under the contracts.

155. On July 2, 2008, Countrywide Home Loans sold to NB Holdings two entities that owned all of the partnership interests in CHLS, Countrywide's mortgage-servicing business. NB Holdings subsequently transferred CHLS to its subsidiary, BANA.

156. On July 3, 2008, Countrywide Bank sold another pool of residential mortgage loans to NB Holdings, and Countrywide Commercial Real Estate Finance ("CCREF"), a subsidiary of Countrywide Financial, sold a pool of commercial mortgage loans to NB Holdings.

### 3. The November 2008 Transactions

157. On November 7, 2008, pursuant to a Stock Purchase Agreement and an Asset Purchase Agreement, Bank of America Corporation purchased Countrywide Financial's 100% equity ownership of Effinity, a Countrywide Financial subsidiary that owned Countrywide Bank, and substantially all of Countrywide Home Loans' remaining mortgage-related assets and operations, including all assets associated with mortgage-origination operations, such as: mortgage loans; mortgage-servicing rights; the technology platform (including CLUES) used in the mortgage operations; furniture, fixtures, and equipment; contract rights with third parties; real property; mortgage servicing advance receivables; and other assets used in Countrywide's mortgage business. Bank of America Corporation subsequently transferred these assets to BANA.

158. The net result of the November 2008 transactions was a transfer of substantially all of the remaining operating assets of Countrywide Financial, including Countrywide Bank and Countrywide Home Loans, to BANA and NB Holdings. Bank of America Corporation subsequently contributed the purchased assets and subsidiaries to its non-Countrywide Financial subsidiaries, and BANA immediately contributed billions in excess capital created by the transfers

43

back to Bank of America Corporation. As Bank of America explained in recent briefing, "the remnants of Countrywide's mortgage business—including remaining managers, personnel, assets, and operations. . . are. . . in BANA."

### 4. Merger of Countrywide Bank and CHLS Into BANA

159. On April 27, 2009, Countrywide Bank converted to a national bank with the name Countrywide Bank, N.A., and merged with and into BANA with BANA as the surviving entity.

160. Also in April 2009, CHLS was renamed Bank of America Home Loans Servicing, L.P., a wholly-owned subsidiary of BANA. In July 2011, the former CHLS merged into BANA.

161. On February 13, 2009, in seeking Freddie Mac's approval for the April 2009 merger between BANA and Countrywide Bank, Bank of America stated that "CWB [Countrywide Bank] will be merged with and into BANA, with BANA as the surviving entity." Bank of America further stated to Freddie Mac that "the merger will entail the restructuring of CWB's existing retail and wholesale lending platforms under BANA" and that "CWB officers and key personnel will remain in their respective or comparable positions with BANA following the consolidation."

162. In March of 2009, Countrywide Home Loans, Countrywide Bank, BANA and Freddie Mac executed a new Master Agreement governing their seller-servicer relationship, which provides that "[f]rom and after April 27, 2009, when Countrywide Bank is merged into BANA, this [Master] Agreement will apply to Mortgages originated by BANA using the origination systems and platforms that, immediately prior to the merger, were owned by or licensed to Countrywide Bank, which include the following systems and platforms: CLUES, EDGE, ADVANT EDGE, GEMS, GRANITE, ROSS, LYNX, and any other platform or system that ties

into or is used in connection with any of the foregoing . . . BANA acknowledges that the . . . Master Commitments taken down under this Agreement were previously executed by Countrywide Bank, and that from and after the date of the merger between BANA and Countrywide Bank, BANA, as successor by merger to Countrywide Bank, is as fully obligated under such Master Commitments as Countrywide Bank had been . . . ."

163.    Similarly, an Addendum to the Mortgage Selling and Servicing Contract (the "Contract") between Fannie Mae and BANA (the "Lender") executed in April of 2009 provides that "(i) effective as of April 27, 2009, Lender has merged with Countrywide Bank, FSB (the 'Non-Surviving Corporation'); (ii) Lender is the surviving corporation in that merger, (iii) Lender is responsible for and has assumed all assets of Non-Surviving Corporation to Fannie Mae, and (iv) Lender ratifies all assignments of mortgage from each of Lender and Non-Surviving Corporation to Fannie Mae and the endorsements on the related mortgage notes by each of Lender and Non-Surviving Corporation."

164.    In October of 2010, in response to an audit request directed to Countrywide Bank from the United States Department of Housing and Urban Development ("HUD"), Office of Inspector General, a representative of Bank of America responded that "Countrywide Bank, FSB ("CWB") merged into Bank of America, N.A. ("BANA") on April 27, 2009.  As a result, BANA is the successor to the rights, obligations, and liabilities of CWB with respect to HUD and FHA [the Federal Housing Administration], including any seller/servicer numbers issued by these agencies."

165.    Through the series of transactions set forth above, Bank of America Corporation transferred all of the operating assets of Countrywide Financial, including Countrywide Bank,

Countrywide Home Loans, and other Countrywide Financial subsidiaries to itself and its non-Countrywide Financial subsidiaries.

### 5. Merged Mortgage Business

166.    At the time the HSSL was implemented, employees in FSL acted as agents for Countrywide Bank, subject to the control and management of Countrywide Bank. Countrywide Bank held customer deposits, invested in mortgage loans originated through Countrywide Home Loans, and by the end of 2007, originated and funded the vast majority of Countrywide's mortgages, including FSL mortgages. By 2007, employees in FSL became employees of Countrywide Bank.

167.    As a result of the merger of Countrywide Bank and BANA, Bank of America became successor to the rights, obligations, and liabilities of loans originated through FSL.

168.    Bank of America is also liable as successor-in-interest to Countrywide for the alleged conduct that occurred prior to July 1, 2008, because it substantially continued Countrywide's mortgage business operations, including the HSSL, using the same facilities, personnel, equipment, technology, and know-how relating to the mortgage business.

169.    Through the November 2008 transactions, Bank of America purchased substantially all of Countrywide's assets and continues to use these assets in Bank of America's mortgage business today. Countrywide Financial's core business was originating, purchasing, selling, and servicing loans, and was primarily housed within Countrywide Home Loans and Countrywide Bank. Countrywide Home Loans and Countrywide Bank owned all of the assets necessary for the operations of the mortgage business, including the non-banking financial centers,

technology platform, physical offices, call centers, and equipment used in the mortgage origination and servicing business.

170. Bank of America integrated the former mortgage-origination business of Countrywide Financial, including Countrywide Bank and Countrywide Home Loans, into its own mortgage business and externally branded it as Bank of America Home Loans. Countrywide Home Loans and Countrywide Bank employees became employees of Bank of America, and the current Bank of America CEO testified that Bank of America "ended up with the largest [mortgage] servicing platform in the country."

171. On April 27, 2009, the same day that Countrywide Bank merged with and into BANA, Bank of America announced that the combined Bank of America Home Loans mortgage operations would be based in Calabasas, California, at the former headquarters of Countrywide Financial and Countrywide Home Loans. An April 27, 2009 Bank of America press release explained, "[t]he Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008. The Countrywide brand has been retired."

172. Today, Bank of America determines whether a Countrywide-originated loan can be repurchased, and repurchase requests by the GSEs on Countrywide-originated loans are made directly to BANA. Bank of America funds repurchases on Countrywide-originated loans and absorbs losses on any such loans. Bank of America employees also control the negotiation and resolution of litigation involving Countrywide.

173. Through the due diligence that preceded the merger of Countrywide entities into Bank of America, the series of transactions that followed the announcement of the Merger

Agreement, and the substantial continuing of Countrywide's mortgage business operations, using the same personnel, technology, and business practices, Bank of America acquired notice of the HSSL and the liabilities it created. Accordingly, Bank of America is liable as a successor-in-interest to Countrywide under the test for substantial continuity.

174. Additionally, Bank of America effected, *inter alia*, a *de facto* merger with Countrywide because: (i) former Countrywide shareholders became Bank of America shareholders, and remained owners of Countrywide Financial and its subsidiaries following the merger; (ii) Bank of America assumed the ordinary business liabilities necessary for the ongoing operations of Countrywide's core businesses, including mortgage origination and servicing; and (iii) Bank of America continues to operate the combined mortgage business out of the same offices formerly occupied by Countrywide, has employed a substantial number of former Countrywide employees to continue to manage and operate the businesses, and continues to use Countrywide's operational assets in the combined business.

## B. Bank of America's Assumption of Countrywide's Liabilities

### 1. Bank of America's Public Admissions of Liability

175. In the months leading up to and following the Red Oak Merger, Bank of America's most senior executives and spokespersons made public statements admitting that Countrywide's liabilities were factored into the purchase of Countrywide Financial, and that Bank of America intended to "clean[] up" those liabilities.

176. For example, on March 1, 2008, a Bank of America spokesperson said that Countrywide's liabilities were factored into the purchase of Countrywide: "We bought the

company and all of its assets and liabilities . . . We are aware of the claims and potential claims against the company and have factored those into the purchase."

177.    In an interview with the New York Times for an article discussing the impact of mortgage-related loss exposure on banks, Bank of America's former CEO confirmed that Bank of America was aware of Countrywide Financial's legal liabilities and accepted them as part of the cost of the acquisition:  "We did extensive due diligence. . . . It was the most extensive due diligence we have ever done.  So we feel comfortable with the valuation.  We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

178.    Addressing investor questions in November 2010, Bank of America's current CEO addressed Bank of America's plans to deal with repurchase claims and lawsuits against Countrywide by stating, "[t]here's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we will pay for the things that Countrywide did."   One month later, he told a *New York Times* reporter, for an article concerning Bank of America's financial woes, that "[o]ur company bought it [Countrywide] and we'll stand up, we'll clean it up."  Finally, when deposed recently about his public statements, he testified that his comment to the *New York Times* was truthful and accurate, that "[w]e want to clean it up absolutely," and that that "was our intention then and that is our intention now."

### 2.  Bank of America Has Paid or Funded Payment of Countrywide's Liabilities

179.    Consistent with its public statements acknowledging its plan to satisfy Countrywide's liabilities, Bank of America (and/or BANA) has been actively engaged in negotiating and funding the resolution of disputes with the contingent creditors of Countrywide

Financial and Countrywide Home Loans, including funding payments to the GSEs in January of 2011 in partial settlement of repurchase claims on loans originated by Countrywide, and to the United States Department of Justice in February 2012, to settle claims that Countrywide defrauded the FHA in connection with its residential mortgage loan business.

180. Most recently, on January 7, 2013, Bank of America entered into a multi-billion dollar settlement with Fannie Mae to resolve repurchase requests stemming from loans originated by Countrywide, including many HSSL loans.

181. Bank of America has therefore assumed the liabilities of Countrywide based on its public statements by its senior officers, including its CEO, and its payment of Countrywide's contingent liabilities, contributing substantial funds to cover Countrywide's costs in connection with litigations and settlements, including the settlement of representation and warranty exposure stemming from loans originated by Countrywide Home Loans and sold to the GSEs.

## CLAIMS FOR RELIEF

### COUNT I: FOR CIVIL PENALTIES UNDER FIRREA
### (12 U.S.C. § 1833a)

182. The Government incorporates by reference the allegations in paragraphs 1-185 as if fully set forth in this paragraph.

183. For purposes of fraudulently obtaining money from the GSEs, in 2007 and 2008, the Bank Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, executed a scheme and artifice to defraud, using interstate mail carriers and interstate wires, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Bank Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, originated loans in

violation of GSE guidelines; concealed the Hustle model and the resulting defect rates on Hustle loans; and sold loans originated under the Hustle model to the GSEs while knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, misrepresenting that they complied with the guidelines.

184. The Bank Defendants have gained substantial profits from their fraudulent scheme, having originated billions of dollars in loans under the Hustle.

185. This scheme to defraud has affected numerous federally insured financial institutions, including Countrywide Bank and BANA.

186. Accordingly, the Bank Defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

### COUNT II: FOR CIVIL PENALTIES UNDER FIRREA (AGAINST REBECCA MAIRONE) (12 U.S.C. § 1833a)

187. The Government incorporates by reference the allegations in paragraphs 1-185 as if fully set forth in this paragraph.

188. For purposes of fraudulently obtaining money from the GSEs, from at least 2007 and 2008, Defendant Mairone knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Mairone knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, participated in the design and management of the HSSL model knowing that the resulting loans violated GSE guidelines; directed and/or participated in the origination of loans in violation of GSE guidelines; concealed the Hustle model and the resulting defect rates on Hustle loans; and directed the sale of loans

originated under the Hustle model to the GSEs while knowing, or acting in deliberate ignorance and/or with reckless disregard of the truth, that they would be sold with the misrepresentation that they complied with the guidelines.

189.     Defendant Mairone directed and/or participated in the fraudulent scheme in order to protect FSL's revenues, and, in turn, her own personal compensation and career advancement, which was based in significant part on boosting loan production volume.

190.     Defendant Mairone's scheme to defraud has affected numerous federally insured financial institutions, including Countrywide Bank and BANA.

191.     Accordingly, Mairone is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

WHEREFORE, the Government respectfully requests judgment against Defendants as follows:

a.     On Count One (FIRREA), a judgment against the Bank Defendants imposing civil penalties up to the maximum amount allowed by law;

b.     On Count Two (FIRREA), a judgment against Mairone imposing civil penalties up to the maximum amount allowed by law; and

c.     For such further relief that the Court deems just.

Dated:   New York, New York
         September 6, 2013

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States

                    By:    _____
                              PIERRE G. ARMAND
                              JAIMIE L. NAWADAY
                              JOSEPH N. CORDARO
                              CARINA H. SCHOENBERGER
                              ELLEN M. LONDON
                              Assistant United States Attorneys
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Tel:      (212) 637-2724/2528/2745/2822
                              Fax:      (212) 637-2730
                              Email:    Pierre.Armand@usdoj.gov
                                        Jaimie.Nawaday@usdoj.gov
                                        Joseph.Cordaro@usdoj.gov
                                        Carina.Schoenberger@usdoj.gov
                                        Ellen.London@usdoj.gov