**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,

Plaintiff,

– v. –

BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING,

Defendants.

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

– v. –

COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE,

Defendants.

**Case No. 12-cv-1422 (JSR)**

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF BANK DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CINDY SIMANTEL'S SEPTEMBER 12, 2007 EMAIL AND RELATED EVIDENCE**
**(BANK DEFENDANTS' MOTION *IN LIMINE* NO. 1)**

Brendan V. Sullivan, Jr.
Enu A. Mainigi
Malachi B. Jones
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
*Counsel for Defendants Bank of America Corporation and Bank of America, N.A.*

Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
*Counsel for Defendants Countrywide Financial Corporation, Countrywide Bank, FSB, and Countrywide Home Loans, Inc.*

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Geslak v. Suffolk Cnty.*, 06-CV-251, 2008 WL 4693336, at *3 (E.D.N.Y. Oct. 23, 2008) ............8

*Ricketts v. City of Hartford*, 74 F.3d 1397, 1413–14 (2d Cir. 1996) ............11

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ............7

*United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989) ............9

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir. 1989) ............10

*United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ............8

*United States v. Cushing*, No. S3 00 CR 1098 (WHP), 2002 WL 1339101, at *3 (S.D.N.Y. June 18, 2002) ............7

*United States v. Gordon*, 987 F.2d 902, 909 (2d Cir. 1993) ............9

*United States v. Halper,* 590 F.2d 422, 432 (2d Cir. 1978) ............7

*United States v. Hatfield*, 685 F. Supp. 2d 320, 323 (E.D.N.Y. 2010) ............7, 10, 11

*United States v. Hill*, 322 F.3d 301, 306 (4th Cir. 2003) ............11

*United States v. Sun Myung Moon*, 718 F.2d 1210, 1232 (2d Cir. 1983) ............7

## OTHER AUTHORITIES

1 C. Mueller & L. Kirkpatrick, Fed. Evid. § 4:7 (3rd ed. 2007) ............9

2 Wigmore, Evid. § 443, at 428 (3d ed. 1940) ............11

22A Fed. Prac. & Proc. Evid. § 5215 (2d ed.) ............10

22A Fed. Prac. & Proc. Evid. § 5216 (2d ed.) ............10

Fed. R. Evid. 401 ............6

Fed. R. Evid. 402 ............6

Fed. R. Evid. 403 ............9, 10, 11

Fed. R. Evid. 404 ............1, 8, 9

Fed. R. Evid. 404(b) ............8, 9

Fed. R. Evid. 404(b)(1) ............8

## INTRODUCTION

The government's sole claim in this case is that the Bank Defendants perpetrated a fraudulent scheme by selling to Fannie Mae and Freddie Mac defective prime loans that were originated by Countrywide's Full Spectrum Lending Division through the "High Speed Swim Lane" process. Yet the government proposes to introduce evidence of a Countrywide employee's supposed misrepresentation about *completely different* subprime loans that were *not* originated through the High Speed Swim Lane, *not* processed by the Full Spectrum Lending Division (but rather another division), and *not* sold to Fannie or Freddie. Specifically, the government would introduce a September 12, 2007 email,[1] and related evidence, for the purpose of showing that Countrywide employee Cindy Simantel supposedly deceived representatives of Freddie Mac by failing to provide certain subprime loan files to them. It is undisputed that Ms Simantel was not involved in the HSSL process that is the alleged fraud in this case, and the loan files she allegedly withheld were not HSSL loans.

Having no connection to the HSSL process, Ms. Simantel's alleged misrepresentation is irrelevant. Its admission in this case would serve no purpose other than to suggest to the jury that Countrywide employees had a propensity to deceive – precisely what Rule 404 forbids. At best, such evidence would be unfairly prejudicial, would mislead the jury, and would consume valuable trial time by requiring Bank Defendants to present evidence about their subprime lending processes and about Ms. Simantel's conduct to rebut the government's irrelevant accusations.

[1] The email, bearing production number BANA-SDNY-E-000234344, is quoted below and attached as Exhibit A.

**BACKGROUND**

As the government has repeatedly confirmed, its claim in this case is confined to fraud in connection with loans originated through Countrywide's HSSL process. It is crystal clear that it the government is *not* alleging fraud by Countrywide *outside of* the HSSL process. The government said as much at the summary judgment argument:

> THE COURT:  Well, you haven't charged for fraud with respect to the non-high-speed swim lines, have you?
>
> MR. ARMAND:  No, we have not.

Summ. J. Hr'g Tr. 30:4–6 (Aug. 13, 2013). The Court made clear that, at this stage in the case, the government *cannot* charge a broader fraud untethered to the HSSL process.

> THE COURT: . . .  So, for example, if the government decided tomorrow, based on some of the comments I have heard here today, to change their theory and say the whole thing was, all the loans were one great big massive fraud, the high speed was just one example of fraud that permeated everything that we're charging, we're amending our complaint and charging a fraud involving all, that, of course, would be severely prejudicial to you [the Bank Defendants] and would never be permitted.

*Id.* at 41:22–42:4.

Notwithstanding this clear definition of its claim, the government seeks to introduce evidence of an alleged deception by a Countrywide employee, Cindy Simantel, about *non*-HSSL loans. This evidence has no bearing on this case and should be excluded.

**1.    The HSSL process.**

It is undisputed that the HSSL process was a workflow developed by Countrywide's Full Spectrum Lending ("FSL") division to originate prime loans, in the context of FSL's transition from subprime to prime lending. The HSSL process began as a pilot program in August and September of 2007; as of October 1, 2007 FSL used the HSSL workflow only for certain prime loans processed through FSL's Central Fulfillment organization. There is no evidence, and no

allegation, that any Countrywide division other than FSL used the HSSL process.

The government contends that FSL's HSSL process was a fraudulent scheme to eliminate underwriting rigor and sell loans to Fannie Mae and Freddie Mac regardless of their quality. The Bank Defendants disagree. That is the central dispute in this case.

**2.     The Simantel episode.**

Cindy Simantel was, in the fall of 2007, an employee in Countrywide's Corporate Quality Control group. She did not work in the FSL Division and was not involved in underwriting HSSL loans. The evidence the government seeks to introduce about Ms. Simantel relates to a specific set of *subprime* loans, originated by the Wholesale Lending Division, a totally separate Countrywide division, and having nothing to do with FSL or the HSSL process.

In late 2007, Freddie Mac communicated to Countrywide that it was interested in increasing its investment in the American mortgage market by beginning to buy subprime whole loans. As part of this so-called "Subprime Initiative," Freddie Mac's Alternative Market Operations group ("AMO") visited various lenders, including Countrywide, to evaluate them as potential subprime counterparties.

AMO's onsite review of Countrywide began on September 10, 2007 and lasted five days. As part of the review, Freddie Mac requested access to a collection of subprime loans that Countrywide had originated in August 2007 so that Freddie Mac could compare the loans to Countrywide's subprime underwriting guidelines. *See* BANA-SDNY-E-009089941–42 (Aug. 1, 2007 email from Biehler to Togneri) (Jones Decl. Ex. B). Freddie Mac was not contractually entitled to review the loan files it requested because it did not own the underlying loans.

In August and September 2007, Lauren Biehler of Freddie Mac and Cindy Simantel of Countrywide corresponded on several occasions about Freddie's request to review the collection

of subprime loan files. Copies of these emails are attached as Exhibits B and C. The emails indicate that, even though the GSEs had no legal ownership of or entitlement to the files, Countrywide ultimately decided to allow the AMO group to review a collection of recently originated subprime loan files.

Ms. Simantel and her group, all part of Countrywide's Corporate Quality Control division (which was separate from FSL), conducted a review of the collection of 63 subprime loan files before providing them to Freddie Mac. The review was not a regular function of Countrywide's Corporate Quality Control and did not constitute a regular quality control audit, which would have required weeks to complete. Simantel Dep. 201:18–203:15 (Jones Decl. Ex. D). The review by Ms. Simantel's group identified certain discrepancies in some of the loan files, for example, missing or illegible documents or an apparent failure to verify borrower information. *See* BANA-SDNY-E-009191645 (Sept. 7, 2007 email from M. Diokno to C. Simantel) (Jones Decl. Ex. E). Ms. Simantel testified that these discrepancies called for additional research and may have been, but were not necessarily, indicative of problems with loan quality. Simantel Dep. 134:19–136:14, 205:8–206:10 (Jones Decl. Ex. D).

In particular, the collection contained 24 loans originated by Countrywide's Wholesale Lending Division; these loans had an unusually high rate (50%) of discrepancies. BANA-SDNY-E-009191645 (Jones Decl. Ex. E). Ms. Simantel considered these results to be atypical, and she wanted to investigate them before providing the loan files as part of a voluntary exchange with Freddie Mac. Simantel Dep. 145:17–25, 149:8–18 (Jones Decl. Ex. D). Accordingly, Ms. Simantel asked a member of her team to review the findings on 12 of the subprime loans from the Wholesale Lending Division to determine whether they were missing documents or supporting information that would clarify or correct the perceived discrepancies.

*Id.* at 138:14–140:13, 142:4–15. In the meantime, Ms. Simantel instructed her team to remove those 12 files from the collection of loan files for Freddie Mac's AMO review. BANA-SDNY-E-009191643 (Sept. 7 email from C. Simantel to S. Pauline) (Jones Decl. Ex. E). Ultimately, one of the files was determined not to have discrepancies and was returned to the collection.

On September 12, Ms. Simantel sent an email to Rod Williams of Countrywide's Credit Risk Management division (again, outside of the FSL organization). That email reads, in its entirety:

> Rod, as a FYI if it comes up as an issue with FHLMC [Freddie Mac]. We did not provide them with 11 loans files they requested as part of their due diligence review of sub-prime new originations (August fundings). We did not provide all the requested loan files as our Q.C. group reviewed them, before providing copies, and determined significant discrepancies in the loans which included misrepresentation (income, assets and credit), flips, and significantly over valued properties. It was my belief we were better off telling FHLMC we hadn't been able to get the loan files for them as they were not imaged yet than letting them look at them and determine they were unacceptable quality. If you disagree with this I will of course provide them the files, otherwise I am going to continue along this path. Thanks

BANA-SDNY-E-000234344 (Jones Decl. Ex. A).

**3. The government's theory.**

During the August 13 summary judgment hearing, the government conceded, as it must, that Ms. Simantel's September 12 email related to subprime loans, not prime loans, and that the 11 loans that Ms. Simantel did not provide to Freddie Mac were originated by the Wholesale Lending Division, not the Full Spectrum Lending Division, and thus could not have been HSSL loans. Summ. J. Hr'g Tr. 34:19–21 (Aug. 13, 2013). In fact, *none* of the subprime loans in the sample Ms. Simantel's group reviewed for potential production to Freddie Mac was a HSSL loan. Nonetheless, the government has included this September 12 email on its trial exhibit list, presumably in an effort to show that Ms. Simantel "lied" to representatives of Freddie Mac.

According to the government's argument at the summary judgment hearing, the Simantel episode supposedly shows that Countrywide personnel were "lying repeatedly to the same people." *Id.* at 35:1–2.

**ARGUMENT**

**I. The Simantel Evidence Is Irrelevant.**

"Irrelevant evidence is not admissible," Fed. R. Evid. 402, and evidence is relevant only if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The government claims that Ms. Simantel "lied" to Freddie Mac when she declined to provide 11 loan files for its review. Even assuming the Simantel evidence means what the government says it means (which the Bank Defendants dispute), that evidence makes no consequential fact more or less probable.

This case is about prime loans that Countrywide's *Full Spectrum Lending Division* originated through the *HSSL process* and *sold* to Fannie Mae and Freddie Mac, allegedly in violation of contractual representations and warranties. None of the 11 loans described in Ms. Simantel's email was originated through the HSSL process. None of the 11 loans was originated by the Full Spectrum Lending Division. None of the 11 loans was offered or sold to Fannie Mae or Freddie Mac. No contractual representation or warranty was violated. Rather, the loan-file review discussed in Ms. Simantel's email related to Freddie Mac's consideration whether to buy different, subprime loans.

Far from lying about HSSL loans, there is no evidence that Ms. Simantel communicated in any way with Freddie Mac about HSSL loans. Ms. Simantel worked in a separate division from FSL. She did not have anything to do with originating HSSL loans or selling them to the GSEs. She had no knowledge of the quality of any HSSL loans, and she made no

representations about their quality to Freddie or, indeed, to anyone. For Freddie Mac's part, Ms. Biehler and Freddie's AMO group asked only to review *subprime* loans as part of Freddie Mac's "Subprime Initiative." They neither requested HSSL loans for review nor evaluated their quality. The alleged "lie" is irrelevant and should be excluded. *See, e,g.*, *United States v. Sun Myung Moon*, 718 F.2d 1210, 1232 (2d Cir. 1983) ("We do not see how the submission of the false immigration papers to the Immigration and Naturalization Service in one instance is relevant to the defendant's intent to submit unrelated false papers to the IRS in another."); *United States v. Halper,* 590 F.2d 422, 432 (2d Cir. 1978) ("We fail to see, and the government has failed to demonstrate, how the alleged submission of a false income tax return is at all relevant to the question whether Halper knowingly intended to defraud the Medicaid program . . . ; nor can we understand how the wealth of evidence purportedly relating to the Medicaid fraud indictment was relevant to the question whether Halper knowingly intended to submit a false personal income tax return.").[2]

The government apparently contends that Ms. Simantel's alleged "lie" to Freddie is relevant to show Countrywide's fraudulent intent with respect to the HSSL process. That is flatly wrong. To satisfy the element of intent to defraud, the government "must prove that *an agent of the corporation committed a culpable act with the requisite scienter*, and that the act(and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (emphasis added). Ms. Simantel indisputably knew nothing fraudulent about the HSSL process. Any intent

[2] *Cf. United States v. Hatfield*, 685 F. Supp. 2d 320, 323 (E.D.N.Y. 2010) ("[E]vidence concerning the purported NASDAQ scheme is not admissible as direct evidence because the alleged NASDAQ scheme involved separate, discrete incidents of alleged fraud or deceit, not conduct that was inextricably intertwined with the Indictment's charges or necessary to complete the Indictment's story." (internal quotation marks omitted)); *United States v. Cushing*, No. S3 00 CR 1098 (WHP), 2002 WL 1339101, at *3 (S.D.N.Y. June 18, 2002).

she may have had to deceive Freddie *about something else* does not make it more likely that *different* Countrywide representatives intended to deceive Freddie about HSSL loans.

The government also suggested at the summary judgment hearing that evidence of Ms. Simantel's alleged deception is relevant to the Bank Defendants' defense that Countrywide disclosed aspects of the HSSL process to Freddie Mac. It is not. The portion of the Bank Defendants' defense to which the government apparently is referring is based on a power point and oral presentation that FSL executives (*not* Ms. Simantel) gave to Freddie Mac, which disclosed key elements of the HSSL process, including the name "High Speed Swim Lane" and the fact that loan processors cleared certain loans to close without human underwriter involvement. The government disputes the significance of these disclosures, but the evidence about Ms. Simantel has absolutely nothing to do with this. The FSL presentation to Freddie Mac said what it said, regardless of whether Ms. Simantel withheld files relating to 11 subprime, non-HSSL, non-Full Spectrum Lending loans. Ms. Simantel, who has never been a Full Spectrum Lending employee, had nothing to do with the PowerPoint slides or the oral presentation; and, vice versa, the FSL presentation had nothing to do with the 11 non-HSSL loans that Ms. Simantel allegedly lied to Freddie Mac about in separate communications.

## II. The Simantel Evidence Should Be Excluded Under Rule 404.

Rule 404(b) prohibits the government from using the Simantel evidence to prove that a defendant had a propensity to commit the alleged fraud. *See* Fed. R. Evid. 404(b)(1); *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011); *Geslak v. Suffolk Cnty.*, 06-CV-251, 2008 WL 4693336, at *3 (E.D.N.Y. Oct. 23, 2008). That is precisely what the government is seeking to do in offering this evidence. The government would have the jury conclude that, because a Countrywide employee allegedly deceived Freddie Mac about some (irrelevant) loans,

Countrywide must have intended to deceive Freddie Mac and Fannie Mae about the HSSL loans at issue in this case. Rule 404 categorically prohibits this.

The rule does permit evidence of "other acts" to be offered for a legitimate purpose other than propensity but, as explained above, the Simantel evidence is not relevant for any legitimate purpose. Simantel's alleged deception does not show anything about Countrywide's intent to deceive Freddie about HSSL loans because, among other reasons, Simantel had nothing to do with HSSL loans, so *her* intent is completely irrelevant.

Rule 404(b) precludes this evidence for yet another reason as well. Even in cases (unlike this one) where the same individual is allegedly responsible for the charged conduct and the "other act," Rule 404(b) requires that the "other act" have significant similarity to the conduct at issue in the case. *See, e.g.*, *United States v. Gordon*, 987 F.2d 902, 909 (2d Cir. 1993); *United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989). The rule thus guards against evidence of acts that "shed little or no light on the transaction in issue." 1 C. Mueller & L. Kirkpatrick, Fed. Evid. § 4:7 (3rd ed. 2007). Here, Ms. Simantel's alleged misrepresentation bears no similarity to the alleged misrepresentations on which the government's case depends. She did not purposefully breach any representation or warranty. She did not misrepresent or conceal the quality of HSSL loans, or loans that were purchased by the GSEs, or loans that were originated by the Full Spectrum Lending Division, or prime loans. She did not push bad loans through the HSSL process in order to increase Countrywide's revenue. For this reason, as well, it would be error to admit her email under Rule 404(b).

## III. The Simantel Evidence Should Be Excluded Under Rule 403.

Even if the Simantel evidence had any probative value at all (it does not), it would be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. As a leading treatise explains, "the issue is whether the evidence is capable of being used as part of an

illegitimate method of persuasion. The method may be illegitimate either because it appeals to an inappropriate logic . . . or to an undesirable emotion . . . ." 22A Fed. Prac. & Proc. Evid. § 5215 (2d ed.). Here, Ms. Simantel's email does not illuminate the merits of this case, but it would appeal both to "inappropriate logic" and "undesirable emotion." The jury would be encouraged to conclude, illogically, that because one Countrywide employee allegedly deceived one Freddie Mac employee about non-HSSL loans that Freddie did not own, other Countrywide employees intended to deceive Freddie Mac about HSSL loans sold to Freddie. And, the jury would be encouraged to punish Countrywide for an alleged misrepresentation that is unrelated to the loans and processes at issue in this case. *See Hatfield*, 685 F. Supp. 2d at 324.

Introducing the Simantel evidence also would pose an unacceptable risk of "confusing the issues, misleading the jury, [and] wasting time." Fed. R. Evid. 403. The government apparently intends to argue that Ms. Simantel's conduct supports an inference that a Countrywide officer other than Ms. Simantel intended to defraud the GSEs regarding HSSL loans. Even if that inference were tenable (it is not), the evidence should be excluded because of the unacceptable risk that a jury would confuse the issues and hold Countrywide liable for Ms. Simantel's intent regarding something other than the HSSL process. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir. 1989) (affirming exclusion because of "the danger of confusing the jury as to whose state of mind was in issue").

Finally, if the email were admitted into evidence, the parties would be compelled to expend a significant amount of time introducing proof about collateral issues. *See* 22A Fed. Prac. & Proc. Evid. § 5216 (2d ed.).[3] The government's case, and Bank Defendants' rebuttal,

[3] *See id.* ("[I]n attempting to dispute or explain away the evidence thus offered, new issues will arise as to the occurrence of the instances and the similarity of conditions, new witnesses will be needed whose cross-examination and impeachment will lead to further issues; and thus that the

would require evidence about complex matters that otherwise would be completely unnecessary, including Freddie Mac's "Subprime Initiative"; the AMO process and its purpose; the Wholesale Lending Division and its distinction from the Full Spectrum Lending Division; and the granular credit characteristics of the 11 loans referenced in the email. Bank Defendants would have to expend considerable time demonstrating that the Simantel evidence bears no relationship to the HSSL process. This would require examination and cross-examination of witnesses, including Simantel herself, who would not otherwise testify. And it would require specific analysis and discussion of the 11 non-HSSL loans and Ms. Simantel's group's review of them. All of this would unduly prolong and complicate the trial. Rule 403 guards against just that sort of confusion and waste.

## CONCLUSION

For the foregoing reasons, Bank Defendants respectfully request that the Court exclude the September 12, 2007 email from Ms. Simantel to Mr. Williams, and all related evidence.

Date: September 17, 2013

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: s/Enu A. Mainigi
Brendan V. Sullivan (admitted *pro hac vice*)
Enu A. Mainigi (admitted *pro hac vice*)

---

trial will be unduly prolonged, and the multiplicity of minor issues will be such that the jury will lose sight of the main issue, and the whole evidence will be only a mass of confused data from which it will be difficult to extract the kernel of controversy." (quoting 2 Wigmore, Evid. § 443, at 428 (3d ed. 1940))); *see also, e.g.*, *United States v. Hill*, 322 F.3d 301, 306 (4th Cir. 2003); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1413–14 (2d Cir. 1996); *Hatfield*, 685 F. Supp. 2d at 324 ("[T]he [challenged] evidence stands a good chance of confusing the jury as to the actual crimes charged, which a curative instruction may not alleviate," and "conducting a 'mini-trial' as to whether the Defendants lied to the NASDAQ will necessarily result in 'undue delay,' while adducing no evidence concerning whether the Defendants committed the charged crimes.").

Malachi B. Jones (admitted *pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Defendants Bank of America Corp. and Bank of America, N.A.*


By:  s/Richard M. Strassberg
Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333

*Counsel for Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Countrywide Bank, FSB*