UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,<br><br>                Plaintiff,<br><br>– v. –<br><br>BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING,<br><br>                Defendants.<br>UNITED STATES OF AMERICA,<br><br>                Plaintiff-Intervenor,<br><br>– v. –<br><br>COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE,<br><br>                Defendants. | **Case No. 12-cv-1422 (JSR)**<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF BANK DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE CONCERNING
FULL SPECTRUM LENDING'S "QUALITY ASSURANCE" PROCESS
(BANK DEFENDANTS' MOTION *IN LIMINE* NO. 2)**

Brendan V. Sullivan, Jr.
Enu A. Mainigi
Malachi B. Jones
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
*Counsel for Defendants Bank of America Corporation and Bank of America, N.A.*

Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
*Counsel for Defendants Countrywide Financial Corporation, Countrywide Bank, FSB, and Countrywide Home Loans, Inc.*

# TABLE OF AUTHORITIES

## FEDERAL CASES

*City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981)............................................6

*Hathaway v. Coughlin*, 99 F.3d 550, 555 (2d Cir. 1996) ...............................................................6

*United States v. Sindona*, 636 F.2d 792, 801 (2d Cir. 1980) ..........................................................8

## OTHER AUTHORITIES

Fed. R. Evid. 402 .......................................................................................................................1, 5

Fed. R. Evid. 403 .......................................................................................................................1, 5

**INTRODUCTION**

The government apparently intends to argue to the jury that the Bank Defendants knew HSSL loans were defective because of the results of the Full Spectrum Lending division's ("FSL's") voluntary, internal "quality assurance" ("QA") process. This argument is a classic red herring. It is undisputed that the QA process—by its nature and its design—did *not* measure whether the HSSL loans were suitable for sale to Fannie Mae and Freddie Mac. Rather, QA assessed only whether line employees were correctly following FSL's *processes*. Loan quality was measured by a different program, managed at the parent company level: Countrywide's internal quality control ("QC") process.

The Bank Defendants agree that certain evidence relating to the *QC* process is relevant to this case because QC measured loan quality, including criteria that mirrored in substantial part the contractual requirements for sale to Fannie and Freddie. But the government should not be permitted to confuse the jury by misdirecting its attention to *QA* results, which measured compliance with internal process, not the quality of the output. The issue in this case is whether the Bank Defendants knowingly misrepresented the quality of the loans themselves to Fannie and Freddie, not whether FSL employees were correctly following the workflow processes. Evidence of the QA process therefore should be excluded under Evidence Rules 402 and 403.

**BACKGROUND**

1. **The QA process was not a measure of loan quality, much less compliance with contractual representations and warranties.**

Historically, all of the loans FSL originated were sampled and evaluated through the long-standing, company-wide QC process. Countrywide's corporate Quality Control Group was responsible for auditing loans from all divisions, including FSL. *See* Kitashima Dep. 152:20–153:5 (Jones Decl. Ex. A).

1

Because of the nature of the QC process, however, QC results were not completed until after the loans had been funded. In addition, QC measured the quality of the loans but not employees' compliance with the particulars of FSL's processes. In 2007, FSL management implemented a new QA tool, which assessed whether line employees were completing the process steps in FSL's workflows.

FSL management designed the QA process not to replace or replicate the established corporate QC mechanism, but rather to measure compliance with process. Numerous witnesses so testified. *See* Lumsden Dep. 86:19–87:13 (Jones Decl. Ex. B) ("[T]he Q.A. process was put in place to help [FSL] work on [its] workflow, to make sure that [they] were implementing [the] prime workflow, and . . . [to] see where the opportunities were to process prime loans properly."); Brent Dep. 14:2–5 (Jones Decl. Ex. C) ("Quality assurance, which is also referred to as QA, is a first-step review while a loan is still in progress; where QC is typically defined as after a loan has been funded and it's after it's been processed."); *id.* at 141:10–20 ("QA is typically a process review. Did you move this here? Did you do this? Did you do all the steps that we require. On QC it is more decisioning. Did we make the right decision . . . ."); Kitashima Dep. 75:20–22 (Jones Decl. Ex. A) ("QA audits are designed to review audit and process -- review process-related issues, not so much quality control issues."); Comeaux 37:24–39:1 (Jones Decl. Ex. D) ("[In the QA reviews] many of the factors were process-oriented and would never lead to an SUS finding . . . .").

  **2.** **There is no evidence that QA "high risk" findings correlate to violations of any representations or warranties to Fannie or Freddie.**

The QA group initially identified a high incidence of process deficiencies, called "high risk" findings. But these findings did not mean that any loans sold to Fannie Mae or Freddie Mac were not of investment quality. First, as discussed above, the QA audits, which were not

2

required by Fannie or Freddie, measured things beyond issues relating to saleability. For instance, they evaluated whether, consistent with FSL's process, a task had been completed within 48 hours. If the task was instead completed in 72 hours, this resulted in a QA finding. Mairone Dep. 197:22–198:6 (Jones Decl. Ex. E). As FSL's Cliff Kitashima testified, "initially we basically looked for the – the QA process looked at every piece of detail in each file. And we found that it created a lot of findings that from a process standpoint needed to be worked out, but certainly from, you know, a quality standpoint it had really no – no obvious impact to the quality of the loan." Kitashima Dep. 89:11–17 (Jones Decl. Ex. A).

Second, the QA audits looked at loans pre-funding, when issues with the file could still be corrected before they were sold to the GSEs. Brent Dep. 60:5–12 (Jones Decl. Ex. C)

Third, it is undisputed that QA findings did not predict corporate QC findings. The corporate QC process was the measure of loan quality within FSL. Comeaux Dep. 39:2–9, 97:16–18 (Jones Decl. Ex. D). There was obviously no relationship between QA findings, which were often 80% or higher, and corporate QC findings, which were less than 10%. *Id.* at 166:17–24; BANA-SDNY-E-008980582 (E-mail from Cliff Kitashima on Mar. 21, 2008) (Jones Decl. Ex. F).

Fourth, FSL applied the QA process to a sample of all loans processed through Central Fulfillment, which included processing teams that did not use the HSSL workflow. A QA result expressed in the form of an overall percentage, therefore, would mean a percentage of a larger pool of loans than just the loans originated through the HSSL process. *See* O'Donnell Dep. 152:8–153:16 (Jones Decl. Ex. G) (HSSL was only one workflow within Central Fulfillment); BANA-SDNY-E-003964717 (QA results for Central Fulfillment as a whole) (Jones Decl. Ex. H).

Finally, the QA group was new, and it is undisputed that many of its findings were inaccurate, even for the purposes of measuring process problems. For example, when the QA group identified a 98.33% high risk finding rate, nearly half of its findings were blatant false positives. The most common finding, accounting for 53 of the 129 total findings, showed that loan processors had neglected to complete actions in a software program called "frauditor," but these were false positives because FSL's process mandated that the software *not* be completed until a later stage in the process. BANA-SDNY-E-004220625 (E-mail from Don Harris on Oct. 4, 2007) (Jones Decl. Ex. I).

### 3. The government's experts do not correlate QA findings to any violations of contractual representations and warranties, or to loan delinquencies or defaults, or even to underwriting failures.

There is no evidence that a QA deficiency finding denoted any problem with the quality of the loan or a breach of any contractual representation or warranty to Fannie or Freddie. Indeed, not even the government's own experts rely on the QA findings for this purpose. The government has retained multiple experts for the purpose of trying to show, in one way or another, that the HSSL loans were of poor quality. Government expert Ira Holt re-underwrote a sample of the loans; but he did not use QA criteria or rely on QA results. Government expert Daniel McFadden sought to measure a correlation between "defective" loans and delinquency rates; but he did not use QA criteria or rely on QA results to determine what loans were "defective." The reason these experts did not use QA results for this purpose is because they did not serve this purpose, and they were not designed to.

*   *   *   *   *

The government intends to introduce evidence at trial about Countrywide's QA findings, apparently in the hope that the high defect rates will be striking to the jury. The government has, in fact, sought to use QA results for precisely this misleading purpose throughout this litigation.

4

From the very beginning, the government has inappropriately linked the QA high risk findings to underlying problems in loan quality.  *See* Am. Compl. ¶ 86 (referencing a pre-funding review of HSSL loans and stating that a "high risk" finding in QA uncovers a problem that could "affect[] the borrower's ability to repay the loan.").  Again, at the summary judgment stage, the government argued that the QA process "did deal with quality."  Summ. J. Hr'g Tr. 16:3 (Aug. 13, 2013).  It also argued that "[t]he high QA findings . . . were also translating into high SUS findings from corporate quality control's review of the loan files after funding."  Opp. to Mot. for Summ. J. 19.  In response to such evidence and arguments, the Bank Defendants would be required to explain the details of the QA process, what the results really meant, and how the Bank Defendants responded appropriately to the QA findings.  If allowed, this evidence likely will consume multiple days of trial time.

## ARGUMENT

### EVIDENCE ABOUT QA RESULTS IS IRRELEVANT, PREJUDICIAL, AND WOULD CONFUSE AND MISLEAD THE JURY.

As discussed above, the QA process measured workflow compliance, not whether the loans qualified for sale to Fannie or Freddie.  The QA results therefore should be excluded under Federal Rule of Evidence 402 because they are irrelevant to show that any HSSL loans in fact violated contractual representations and warranties or that anyone at Countrywide had knowledge of such violations.  The QA results also should be excluded under Rule 403 because any probative value is substantially outweighed by the significant unfair prejudice, jury confusion, and waste of time that will arise if the jurors are misled to believe that the QA results were indicative of loan quality.  *See City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981) (affirming exclusion of a report because it "was prepared for very different purposes than those for which it was offered at trial").

Thus, in *Hathaway v. Coughlin*, 99 F.3d 550, 555 (2d Cir. 1996), in which the plaintiff alleged that the defendant doctor was deliberately indifferent to his medical condition, the Second Circuit affirmed the district court's decision to exclude evidence of the defendant's earlier negligent treatment of the plaintiff for a different medical condition. While the evidence there (unlike here) may have been probative, the court found that "the jurors easily could have been confused by *equating and interchanging* the evidence of negligence in one circumstance with evidence of deliberate indifference in another." *Id.* (emphasis added).

The QA results are of interest to the government because they purport to show a high rate of "high risk" findings. But it is undisputed that these QA rates are much higher than the *actual* rates of contractually defective loans produced by the HSSL process. *The government admits this.* The government's underwriting expert most recently estimates that 42.81% (plus or minus an undisclosed margin of error) of HSSL loans were materially defective. Amended Expert Report of Charles D. Cowan, Ph.D. ¶ 72 (Aug. 21, 2013) (Jones Decl. Ex. J).[1] Yet the government would introduce evidence of QA results showing "high risk" findings as high as *98.3%*. *See* Opp. to Mot. for Summ. J. 16. The government evidently hopes that the jurors will ignore what the QA results measured and instead equate QA findings with loan quality.

The government's repeated assertions that QA results are tied to loan quality are wholly conclusory, without any evidentiary basis. No evidence links the QA findings to any actual loan defaults, delinquencies, or (more to the point) violations of contractual representations and warranties. The government commissioned substantial expert analysis, and submitted multiple

---

[1] The Bank Defendants do not agree with this figure; it is used here only to illustrate that the QA results do not correlate even to the government's inflated view of the percentage of contractually defective HSSL loans.

expert reports discussing the HSSL loans, but not one of them purports to connect the QA results to any relevant measure of loan quality.

The best the government can offer is conjecture that a process issue revealed by the QA results might have affected the ultimate quality of the loans.  To be sure, process issues sometimes can impact quality, but the government cannot point to any evidence in this case that links the purported "high risk" findings in any reports that it will seek to introduce to the allegedly "bad" HSSL loans.  Without evidence of a meaningful correlation between QA process flags, on the one hand, and the allegedly fraudulent violations of contractual representations, on the other, the QA evidence is far more prejudicial than it is probative of any issue in the case.  The silence from the government's experts on this subject is particularly significant, as the government obviously elected *not* to try to show a relationship between QA and loan quality.

For similar reasons, testimony from relator Ed O'Donnell to the effect that the QA process contained a loan-quality component similar to the QC metrics is not probative because O'Donnell admitted that QA also measured process issues.  O'Donnell Dep. 145:23–146:11 (Jones Decl. Ex. G) ("The QA process was set up to assess the loan in two different ways.  One, were the process steps required followed. . . .  And then two, was the quality of the loan from a corporate QC assessment type of view acceptable.").  Undisputedly, therefore, a QA "high risk" finding did not necessarily indicate anything about the quality of the loan, and QA failure rates cannot fairly be used as a proxy for the rate of bad-quality loans, far less loans that breached Countrywide's contracts with Fannie and Freddie.

In addition to misleading the jury and unfairly prejudicing the Bank Defendants, the government's QA evidence would consume substantial trial time.  And the Bank Defendants would be compelled to counter the government's misuse of the QA results with additional

7

evidence and testimony to show precisely what QA did and did not measure, and what those results really meant.  The Bank Defendants would have to introduce testimony of FSL witnesses who were involved in the QA process to explain that the process was designed to measure process and had nothing to do with contractual representations and warranties.  These witnesses would have to explain, through their recollections and through the documents the Bank Defendants would have to introduce, that a QA "high risk" finding could indicate any of a number of process issues having no relation to the quality of the loan itself.  The Bank Defendants also would have to introduce significant evidence that the QA process itself had errors and that the high rate of "findings" did not reflect reality.  This QA evidence and rebuttal would needlessly confuse and distract the jury while wasting valuable trial time.  *See United States v. Sindona*, 636 F.2d 792, 801 (2d Cir. 1980) (approving exclusion of evidence when rebuttal evidence would entail delay and confusion and evidence had only slight probative value).

## **CONCLUSION**

For the foregoing reasons, the Bank Defendants respectfully request that the Court exclude all evidence and argument relating to the Full Spectrum Lending division's quality assurance process.

Date:   September 17, 2013                                  Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:  s/Enu A. Mainigi
Brendan V. Sullivan (admitted *pro hac vice*)
Enu A. Mainigi (admitted *pro hac vice*)
Malachi B. Jones (admitted *pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Defendants Bank of America Corp. and Bank of America, N.A.*


By:  s/Richard M. Strassberg
Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333

*Counsel for Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Countrywide Bank, FSB*