**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL, <br><br> Plaintiff, <br><br> − v. − <br><br> BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING, <br><br> Defendants. | |
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Intervenor, <br><br> − v. − <br><br> COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE, <br><br> Defendants. | **Case No. 12-cv-1422 (JSR)** <br><br> ECF Case |

## DECLARATION OF MALACHI B. JONES

I, Malachi B. Jones, declare as follows:

1.      I am admitted *pro hac vice* to the Bar of this Court and am an attorney at the law firm of Williams & Connolly LLP, counsel for Bank of America Corporation and Bank of America, N.A. in the above-captioned action.  I submit this declaration in support of Bank

Defendants' Motion *In Limine* To Exclude Evidence Concerning Full Spectrum Lending's "Quality Assurance" Process (Bank Defendants' Motion *In Limine* No. 2).

2.      Attached as Exhibit A is a true and correct copy of excerpts from the transcript of the deposition of Clifford K. Kitashima, taken on June 20, 2013.

3.      Attached as Exhibit B is a true and correct copy of excerpts from the transcript of the deposition of Gregory A. Lumsden, taken on June 21, 2013.

4.      Attached as Exhibit C is a true and correct copy of excerpts from the transcript of the deposition of Steve Brent, taken on May 22, 2013.

5.      Attached as Exhibit D is a true and correct copy of excerpts from the transcript of the deposition of Braddock W. Comeaux, taken on June 24, 2013.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the transcript of the deposition of Rebecca Mairone, taken on July 8, 2013.

7.      Attached as Exhibit F is a true and correct copy of an e-mail from Cliff Kitashima, dated March 21, 2008, regarding QC results and bearing Bates number BANA-SDNY-E-008980582.

8.      Attached as Exhibit G is a true and correct copy of excerpts from the transcript of the deposition of Edward J. O'Donnell, taken on April 4, 2013.

9.      Attached as Exhibit H is a true and correct copy of a document entitled "October 2007 Central Fulfillment Findings 'QA PC3,'" dated October 29, 2007, bearing Bates number BANA-SDNY-E-003964717.

10.     Attached as Exhibit I is a true and correct copy of an e-mail from Don Harris, dated October 4, 2007, regarding QA Phase Code 3 results and bearing Bates number BANA-SDNY-E-004220625.

11.     Attached as Exhibit J is a true and correct copy of the Amended Expert Report of Charles D. Cowan, Ph.D, dated August 21, 2013.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: Washington, DC
            September 10, 2013                              s/Malachi B. Jones
                                                                    Malachi B. Jones (*pro hac vice*)

# Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA ex rel,

EDWARD O'DONNELL,

        Plaintiffs,

vs.     Case No. 12 Civ. 1422 (JSR)

        ECF Case

COUNTRYWIDE FINANCIAL

CORPORATION; COUNTRYWIDE

HOME LOANS, INC.;

COUNTRYWIDE BANK, FSB;

BANK OF AMERICA CORPORATION;

BANK OF AMERICA, N.A.; and

REBECCA MAIRONE,

        Defendants.

_____

NOTICED VIDEOTAPED DEPOSITION

CLIFFORD K. KITASHIMA

TAKEN ON
THURSDAY, JUNE 20, 2013
9:17 A.M.
2600 NORTHWEST COLLEGE WAY
BEND, OREGON

Page 2

1       APPEARANCES
2
3    For the Plaintiffs, United States of America and
4    Edward O'Donnell (via videoconference):
5    JAIMIE LEESER NAWADAY, ATTORNEY
6    PIERE ARMAND, ESQUIRE
7    United States Attorney's Office
8    86 Chambers Street
9    New York, New York  10007
10   212/637-2668
11   212/416-6015 Fax
12   jaimie.nawaday@usdoj.gov
13   pierre.armand@usdoj.gov
14
15   For the Defendant, Bank of America:
16   ENU MAINIGI, ATTORNEY
17   A. JOSHUA PODOLL, ESQUIRE
18   Williams & Connolly, LLP
19   725 Twelth Street Northwest
20   Washington, D.C.  20005
21   202/434-5092
22   202/434-5029 Fax
23   emainigi@wc.com
24
25

Page 3

1    For the Defendant, Countrywide:
2    WILLIAM J. HARRINGTON, ESQUIRE
3    Goodwin Procter
4    620 Eighth Avenue
5    New York, New York  10018
6    212/813-8800
7    212/355-3333 Fax
8    wharrington@goodwin.com
9    AND
10   TAMARA H. SCHULMAN, ATTORNEY
11   (Via videoconference)
12   Goodwin Proctor
13   901 New York Avenue Northwest
14   Washington, D.C.  20001
15   202/346-4117
16   tschulman@goodwinprocter.com
17
18
19
20
21
22
23
24
25

Page 4

1    For the Defendant, Rebecca Mairone:
2    MICHAEL HEFTER, ESQUIRE
3    RYAN PHILP, ESQUIRE
4    Bracewell & Guiliani
5    1251 Avenue of the Americas, 49th Floor
6    New York, New York  10020
7    212/503-6185
8    800/404-3970 Fax
9    michael.hefter@bgllp.com
10   ryan.philp@bgllp.com
11
12   For the Witness, Cliff K. Kitashima:
13   JOEL M. ATHEY, ESQUIRE
14   NICHOLAS B. MELZER, ESQUIRE
15   Corbin, Athey & Martinez, LLP
16   601 West Fifth Street, Suite 1150
17   Los Angeles, California  90071
18   213/612-0001
19   213/612-0061 Fax
20   jathey@corbinathey.com
21   nmelzer@corbinathey.com
22
23   Also Present:   BENJAMIN SPEAR, PROFESSIONAL VIDEOGRAPHER
24
25

Page 5

1               INDEX
2                        Page
3
4    EXAMINATION BY MS. NAWADAY            8
5    EXAMINATION BY MS. MAINIGI           111
6    EXAMINATION BY MR. HEFTER            184
7    FURTHER EXAMINATION BY MS. NAWADAY       196
8    FURTHER EXAMINATION BY MS. MAINIGI       212
9
10
11              EXHIBITS
12   Exhibit               Page
13    1    Exhibit 1        12
14    2    Exhibit 2        29
15    3    Exhibit 3        51
16    4    Exhibit 4        63
17    5    Exhibit 5        71
18    6    Exhibit 6        76
19    7    Exhibit 7        80
20    8    Exhibit 8        93
21    9    Exhibit 9       101
22   10    Exhibit 10      101
23   11    Exhibit 11      115
24   12    Exhibit 12      118
25   13    Exhibit 13      128

                                    2  (Pages 2 to 5)

Page 70

1  consideration. It always involved many people, not
2  just one.
3          And I think much of what we did in the
4  High-Speed Swim Lane was done by consensus, not by
5  somebody saying "Okay, we're going to do this" or
6  "You guys are going to do that." That's not the
7  nature of our management.
8          Our management has always been a very
9  team-oriented, very collaborative, involving every
10 component that had a stake in the running of the
11 pilot.
12     Q.  Sitting here today, can you tell me any
13 steps you took to address the concerns raised about
14 quality that are set forth in this email?
15     MS. MAINIGI:  Objection to form.
16     THE WITNESS:  The steps that were taken
17 involve steps that were already in place, as I
18 mentioned earlier, that included a high focus on
19 monitoring the results of the pilot, both realtime
20 as well as post funding, and reporting those results
21 up through the management chain, including those at
22 our corporate headquarters.
23         So we were -- this is not something we
24 reacted to.  This is something that we thought
25 through, that we planned, that we discussed, that we

Page 71

1  considered many other options and went forward in a
2  -- we believe a very thoughtful way.  It was not a
3  sort of a shoot from the hip, let's do this today.
4      MS. NAWADAY:  I'd like to have marked as
5  Exhibit 5 an email chain dated September 13th, 2007,
6  Bates stamped BANA-SDNY-E-000096088.
7      (Whereupon, 9/13/07 Email was marked
8  Exhibit 5 for identification.)
9  BY MS. NAWADAY:
10     Q.  Mr. Kitashima, you've been handed Exhibit
11 5, which begins with Bates stamp BANA-SDNY-E-
12 000096088.  I'll give you a moment to review the
13 document.  You can let me know when you're finished.
14     MS. MAINIGI:  Is someone missing page 3?
15 I have two page 3s.  You guys might be.
16     THE WITNESS:  (Reading document.)
17 Okay.
18 BY MS. NAWADAY:
19     Q.  Any reason to believe you didn't receive
20 this email on or about September 13th, 2007?
21     A.  Not that I can see.
22     Q.  If I can direct your attention to the last
23 page of the email chain first, do you see where it
24 says, "Anson, Loren has advised that all loan
25 specialists included in the upcoming rollout of HSSL

Page 72

1  will receive underwriting level 1 authority
2  effective 10/1/2007."
3          Do you see that?
4      A.  Yes.
5      Q.  So there was an expansion of the High-
6  Speed Swim Lane process to be implemented October
7  1st, 2007; is that right?
8      MR. HEFTER:  Objection.  Lack of
9  foundation.  Assumes facts not in evidence.
10     THE WITNESS:  I'm not sure.  I don't know
11 what this -- what you're talking about as far as
12 "expansion."
13 BY MS. NAWADAY:
14     Q.  Well, the sentence refers to the upcoming
15 rollout of HSSL "effective 10/1/2007."  But by that
16 point, the High-Speed Swim Lane was already
17 implemented; isn't that right?
18     MR. HEFTER:  Objection.  Assumes facts not
19 in evidence.  Lack of foundation.
20     THE WITNESS:  Yeah, I don't know.  I don't
21 know what the timing was as far as the rollout was
22 concerned and what this involves.  I don't see that
23 here.
24 BY MS. NAWADAY:
25     Q.  Okay.  If I could direct your attention to

Page 73

1  the first page, the email from Steve Brent.  Can you
2  read the first two paragraphs in that email for me?
3      A.  "Good info and thanks, but grandfathered
4  in" -- "grandfathering is not an option.  We need to
5  look at the 'proposed' 'Dumbed Down Underwriting
6  Level 1' and then ID training gaps.  And if you
7  notice in the weekly findings that we publish, 60
8  percent of the High Risk findings are in Richardson,
9  which is the center that we 'grandfathered' in for
10 PCA/HSSL. "This is important for the process to be
11 effective.  We should address as soon as possible.
12 It also referenced 'extra post funding QC checks,'
13 who are performing these?  Better we get people
14 trained upfront than after they have made some
15 errors.  Hope you agree with our perspective.
16 Thanks again."
17     Q.  Thank you.  From a credit risk
18 perspective, wouldn't you agree that it's better to
19 get people trained up front than train them after
20 they have made some errors?
21     MS. MAINIGI:  Objection.
22     THE WITNESS:  Yeah, that seems reasonable
23 that you would train people who had not been
24 previously trained, who don't have the experience or
25 the expertise to do it, to ensure that they know how

19  (Pages 70 to 73)

1 to do it.
2 BY MS. NAWADAY:
3     Q.   And did you support grandfathering of loan
4 specialists as part of the High-Speed Swim Lane
5 process?
6         MR. HEFTER:  Objection.
7         THE WITNESS:  I'm not sure that this
8 actually went through.  It might have gone through.
9     Did I support -- I supported this to the
10 extent that the people who were receiving the sort
11 of this underwriting level authority that is being
12 referred to, to the extent that the people who
13 were receiving this authority had the experience and
14 the qualifications to do the work.
15         I do not support grandfathering anyone who
16 did not have the ability, experience, expertise,
17 knowledge to do this work.
18         MR. HEFTER:  Jamie, just so you know, the
19 videographer said there's four minutes left.
20         MS. NAWADAY:  I'm sorry?
21         MR. HEFTER:  There's four minutes left
22 remaining on the videotape.
23         MS. NAWADAY:  Okay.  Thank you.
24     Q.   So at this time there were weekly findings
25 published on HSSL, on the High-Speed Swim Lane

1 loans; correct?
2     A.   Yes.
3     Q.   And did you review those findings?
4     A.   No, I think what's being referred to here
5 are called "QA findings," which are audits that were
6 being done on loans in process.
7         Did I review those findings?  Yes, I did
8 review those findings.
9     Q.   And as director of credit risk, were you
10 satisfied with a 60 percent high-risk finding rate
11 in Richardson?
12     A.   No --
13         MS. MAINIGI:  Objection.
14         MR. ATHEY:  Objection.  That
15 mischaracterizes the document.
16         THE WITNESS:  No.  The findings were
17 concerning both from the standpoint of the actual
18 findings with regard to whether those findings had
19 credit risk implications -- QA findings.
20         QA audits are designed to review audit and
21 process -- review process-related issues, not so
22 much quality control issues.
23         So, for example, if a document was not in
24 a certain place in the file, that could create a
25 finding.  The document was in the file.  It was just

1 filed in the wrong place.
2         So we were struggling with trying to
3 determine really what was a significant finding
4 level and what wasn't.
5         So the 60 percent raised flags, but we
6 needed to do more analysis to ensure that the issues
7 that were being identified were, you know,
8 appropriate.
9         MS. NAWADAY:  Okay.  Why don't we go off
10 the record for a minute so the tape can be changed.
11         THE VIDEOGRAPHER:  Time is 11:34.  We're
12 off the record.
13         (Off the record.)
14         THE VIDEOGRAPHER:  The time is 11:37.  We
15 are back on the record.
16         MS. NAWADAY:  I'd like to have marked as
17 Exhibit 6 an email dated September 26th, 2007, Bates
18 stamped BANA-SDNY-E-00006314.
19         (Whereupon, 9/26/07 Email was marked
20 Exhibit 6 for identification.)
21 BY MS. NAWADAY:
22     Q.   Mr. Kitashima, you have been handed
23 Exhibit 6.
24         After you've had a moment to review, can
25 you tell me if there is any reason to believe you

1 didn't receive this email on or about September 26,
2 2007?
3     A.   (Reading document.)
4 Okay.
5     Q.   Do you see on the first page that the
6 email concerns a "Central Fulfillment Update"?
7     A.   Yes.
8     Q.   And that part of the concept behind the
9 Central Fulfillment Update is to apply High-Speed
10 Swim Lane concepts to all NSC volume?
11         MR. HEFTER:  Objection.
12         THE WITNESS:  Do I see that?  Yes, I see
13 that.
14 BY MS. NAWADAY:
15     Q.   Yes.  And do you agree that one of the
16 concepts in the High-Speed Swim Lane was to reduce
17 hand-offs and use one-way traffic flow?
18         MS. MAINIGI:  Objection to form.
19         THE WITNESS:  Well, it's under "Concept."
20 And I see that as well.
21         What's the nature -- what's your question
22 again? I'm sorry.
23 BY MS. NAWADAY:
24     Q.   My question is just:  Wasn't that one of
25 the concepts for the High-Speed Swim Lane, to reduce

Page 86

1    objectives?
2        A.   Well, you know, as I described what I
3    thought her objectives were of the pilot, they were
4    also my objectives.  You know, I shared those
5    objectives.  It wasn't necessarily her objectives.
6    It was our objectives.
7            I don't think there was a difference of
8    objectives.  We were trying to accomplish the same
9    kinds of things.
10       Q.   But wasn't your objective to manage credit
11   risk?
12       A.   My objectives included managing the
13   successful rollout of the High-Speed Swim Lane.  I
14   mean Greg makes it very clear that he doesn't want
15   me to lose sight of that.
16           So I think it included both the quality as
17   well as the production pieces of the High-Speed Swim
18   Lane.
19       Q.   And you see a little bit farther down, you
20   say, "Recent communication and execution flaws from
21   our QC/QA have not been viewed well, but I'm
22   confident the process will continue to improve."
23           Do you see that?
24       A.   Yeah, yes.
25       Q.   The recent communication execution flaws

Page 87

1    from QC and QA were not viewed well by whom?
2        A.   Well, by essentially all of us.  We
3    weren't sure how to -- how these QA results were
4    providing value when they included things that were
5    viewed by many, including myself, as sort of inane,
6    just not important enough to raise concerns that --
7    to the level that they were being raised to.
8        Q.   I'm sorry.  I'm not sure I understood your
9    answer.
10           Are you saying that you didn't think that
11   QA results provided any value?
12       A.   No, that's not what I'm saying.  I'm
13   saying QA results did provide value.  The question
14   is what results provided the values -- or what
15   results provided value and what results were noise,
16   was noise, just things that didn't provide value to
17   the process.
18           There were results on both sides of that.
19           The QA process was --
20       Q.   And who told you that the QA --
21       A.   Go ahead.
22       Q.   Go ahead.
23       A.   I was just going to say the QA process was
24   very important to the implementation of the High-
25   Speed Swim Lane.

Page 88

1        Q.   Whose view was it that the QA results
2    contained a lot of noise?
3        A.   Well, it was the view of -- I read some of
4    the results certainly.  Rebecca, Greg, others in the
5    process, Wade Como, provided feedback on the QA
6    results.  And I think it was sort of everybody
7    having a perspective on really what the value of
8    those results were.
9        Q.   Didn't you previously testify that the QA
10   process was one of the things you relied upon in
11   agreeing to certain aspects of the High-Speed Swim
12   Lane design, such as expanding underwriting
13   authority and quality of grade hit suspension?
14           MR. HEFTER:  Objection.
15           THE WITNESS:  Can you rephrase that
16   question or condense it?
17   BY MS. NAWADAY:
18       Q.   Sure.  Didn't you previously testify that
19   the QA process was one of the things that you relied
20   upon in agreeing to the High-Speed Swim Lane design?
21       A.   Yes.
22       Q.   And so wasn't it important to you that the
23   QA results were showing high rates of high-risk
24   findings?
25           MR. ATHEY:  Objection.  Mischaracterizes

Page 89

1    the testimony.
2            MR. HEFTER:  Object to the form of the
3    question.
4            THE WITNESS:  Well, QA was a new process,
5    much like the High-Speed Swim Lane, meaning that we
6    put together the QA process in response to the High-
7    Speed Swim Lane, and we were working to try to
8    refine the QA process to identify those things that
9    were relevant, relevant from a process
10   implementation standpoint.
11           And initially we basically looked for the
12   -- the QA process looked at every piece of detail in
13   each file.  And we found that it created a lot of
14   findings that from a process standpoint needed to be
15   worked out, but certainly from, you know, a quality
16   standpoint it had really no -- no obvious impact to
17   the quality of the loan.
18           So the volume of results, the 60 percent,
19   included a fairly high number, especially initially,
20   of those sorts of issues that were viewed as more
21   process-related exceptions or process-related misses
22   rather than quality-related misses.
23   BY MS. NAWADAY:
24       Q.   From a credit risk perspective in November
25   2007, did you think that the High-Speed Swim Lane

23  (Pages 86 to 89)

Page 90

1    process was working?
2        MR. HARRINGTON:  Objection to form.
3        THE WITNESS:  I never really had a problem
4    with the process.
5        The process to me was very well thought
6    through, very well designed, had input from many,
7    many people.  It wasn't done in a black box.  It
8    wasn't done in a back room. It was right out in
9    front for everyone to review and analyze.
10       The challenges that we were having in my
11   opinion with the High-Speed Swim Lane pilot had to
12   do with people and execution and people doing what
13   they're supposed to be doing.
14       You know, these are the same people that
15   for their lifetime, their careers, they were the
16   guardians of quality, the guardians of making sure
17   that quality was first and foremost, primarily
18   because of the nature of business that we were in,
19   namely, subprime business.
20       And it was very difficult for many people
21   to let go of that and to recognize that the types of
22   customers we were dealing with were different.
23       So that's mainly where my concerns lay,
24   not so much in the process.  I think the process was
25   great.  It was fantastic.  And I was very satisfied

Page 91

1    with what was going on with respect to that side of
2    the pilot.
3    BY MS. NAWADAY:
4        Q.  So you had no concerns in November 2007
5    that the High-Speed Swim Lane would lead to high
6    rates of SUS findings?
7        MS. MAINIGI:  Objection to form.
8    Misstates his testimony.
9        THE WITNESS:  That's not my view.  My view
10   was that we needed to constantly be diligent and
11   vigilant in monitoring what was going on and helping
12   people to do their jobs better.  That was my view at
13   that time.
14       It wasn't a slam-dunk by any means.  It
15   technically was harder than I thought it would be.
16       You would think that making high quality
17   prime loans was sort of an easy thing to do, but it
18   was not.  It was very, very challenging to work with
19   and to get people to understand what was important,
20   what wasn't.
21   BY MS. NAWADAY:
22       Q.  And you see that in the middle of your
23   email in the first page, you write, "I've been told
24   that my direct involvement and presence at the line
25   level were viewed as a distractions at one time."

Page 92

1        Do you see that?
2        A.  Yes.
3        Q.  Who told you that?
4        A.  I don't remember who told me that, very
5    frankly. I really don't remember.  It would be a
6    guess.  It would be a guess.
7        But I remember that because of the sort of
8    collaborative effort that we were using to get this
9    pilot off the ground.  Inevitably there would be, to
10   put it in another sort of way, there would be a lot
11   of cooks in the kitchen, a lot of people having
12   opinion, a lot of people having sort of a voice on
13   what could and should be done. And I wouldn't doubt
14   that I was one of them.
15       And there was always, you know, this
16   constant debate going on as to what should we do and
17   what shouldn't we do.
18       So I think my view, the reason for writing
19   that, may have been some feedback that I was getting
20   that "Hey, maybe he should back off."  Let the guys
21   that have responsibility for running the everyday
22   operation, which would include Rebecca and Wade and
23   others -- let them do their job.  Don't be too
24   involved from that standpoint.
25       And that's really what I think I'm

Page 93

1    referring to here (indicating), or at least that's
2    the context from which I might have written that.
3        And my next question was, "What do you
4    think, Greg?  Is that something that you have heard
5    as well?"
6        MS. NAWADAY:  I'd like to have marked
7    Exhibit 8 an email dated September 4th, 2007, Bates
8    stamp BANA-SDNY-E-001615512.
9        (Whereupon, 9/4/07 Email Chain was marked
10   Exhibit 8 for identification.)
11   BY MS. NAWADAY:
12       Q.  Mr. Kitashima, you've been handed Exhibit
13   8, an email chain which at the top is between you
14   and Steve Brent.
15       And I'll give you a moment to review, but
16   I'll tell you for convenience I'll be focusing
17   primarily on page 6 of the document.
18       A.  Okay.
19       (Reading document.)
20   Okay.
21       Q.  You see at the top of page 6, which is an
22   email from Rebecca Mairone, she says, "I have
23   discussed with both Greg and Cliff the following
24   items and a change in process and direction.  The
25   purpose of these changes is to immediately increase

Fink & Carney Reporting and Video Services
39 West 37th Street * New York, New York 10018          (800) NYC-FINK * (212) 869-3063

Page 150

1  Rosemead should not be included as part of the High-
2  Speed Swim Lane pilot?
3      A.  Yes.
4          MS. NAWADAY:  Objection to form.  Leading.
5          THE WITNESS:  Yeah.  This note dated back
6  in July had to do with the pilot.
7  BY MS. MAINIGI:
8      Q.  Do you recall ever taking a position on
9  whether Rosemead should or should not be included as
10  part of the Central Fulfillment launch?
11         MS. NAWADAY:  Objection to form.
12         THE WITNESS:  I don't specifically recall
13  taking a position.  But in retrospect, the Central
14  Fulfillment model was acceptable to me to be rolled
15  out to Rosemead because it had more underwriting
16  involvement and a lot of the controls we had in
17  place, you know, under the subprime model.
18         On top of that, loans that were being
19  processed in Rosemead would have included those
20  loans that were of lesser quality anyway.  So we did
21  have the process there already.
22         I mean it wasn't very much foreign to
23  people in Rosemead in terms of processing under the
24  new model.
25  BY MS. MAINIGI:

Page 151

1      Q.  Let me switch over to a different issue,
2  job aids and checklists.
3          Did the subprime world include a lot of
4  checklists?
5          MS. NAWADAY:  Objection to form.
6          THE WITNESS:  Subprime processing in
7  general required more documentation of review and
8  more documentation of who was doing what step in the
9  process.
10         So job aids were designed to help people
11  with that -- not so much job aids, but worksheets.
12  It was evidence that that process was being done.
13  BY MS. MAINIGI:
14     Q.  In the prime world, in your view from a
15  risk perspective, were checklists as necessary?
16         MS. NAWADAY:  Objection to form.
17         THE WITNESS:  In the prime world, my
18  understanding was that checklists were not used to
19  the extent that it was in the subprime world.
20         As far as it relates to Full Spectrum,
21  whenever we discontinued the use of a worksheet that
22  was used in the subprime world, we made it clear
23  that they could continue using it as a job aid if
24  needed.
25         So we were merely trying to align

Page 152

1  ourselves with standard operating procedures, if you
2  will, of pure prime shops like consumer markets.
3  BY MS. MAINIGI:
4      Q.  You were asked, Mr. Kitashima, a lot of
5  questions about the QA process.
6          Did the QA process that was in Full
7  Spectrum Lending measure the same types of factors
8  as the corporate QC process?
9          MS. NAWADAY:  Objection to form.  Vague.
10  BY MS. MAINIGI:
11     Q.  Let me ask it again.
12     A.  Okay.
13     Q.  The corporate QC process and the FSL QA
14  process -- were they designed to measure the same
15  things?
16     A.  No, they were not.
17     Q.  Can you explain?
18     A.  Yes.  The difference between corporate QC
19  and FSL's QA process was different in several ways.
20         First, corporate QC reviews involved loans
21  that were funded.  They went through the entire
22  process, and the end result was what they were
23  reviewing as opposed to QA, where reviews of loans
24  that were in process, not yet funded, but at some
25  point in the process.

Page 153

1          The other difference is that QC --
2  corporate QC reviewed loans from the perspective of
3  credit quality, primarily credit quality whereas the
4  QA process reviewed loans from a process and
5  efficiency workflow perspective.
6          Granted, a lot of the results seemed to
7  uncover misses in quality checks and other issues.
8  But these were more document-related, process-
9  related-type issues that were being found.
10         And in many cases the QA results helped to
11  either shore up documentation that might have been
12  there somewhere in the file but was filed in the
13  wrong place and just needed to be put in the right
14  place, or if the document was entirely missed, in
15  some cases there was an opportunity for processors
16  to obtain the documentation when possible. Wasn't
17  always possible.
18         It was designed to be in realtime.
19         I think the other difference was corporate
20  QC had a requirement, had a reporting requirement,
21  meaning that -- I mean they had to share the results
22  by virtue of mandate from corporate to various
23  levels of management -- not just internal FSL
24  management, but also to external corporate
25  management and others outside of the organization

39  (Pages 150 to 153)

Page 154

```
1    whereas QA results was really meant for more
2    internal use, if you will, although we made, you
3    know, a big effort to share results, even though it
4    wasn't required by corporate or others, of what we
5    were doing, what we were looking at, what were our
6    findings.
7        And so that was another difference: We didn't
8    have to do it, but we did it. We did share these
9    results with a broad range of people both internally
10   and externally.
11       MS. MAINIGI: The next exhibit, Jaimie, is
12   BANA-SDNY-E-001068425, and that is Kitashima Exhibit
13   18.
14       (Whereupon, Document Bates Stamped BANA-
15   SDNY-E-001068425 was marked Exhibit 18 for
16   identification.)
17       MR. ARMAND: I'm sorry. You said 68425?
18       MS. MAINIGI: 68425, yes.
19   Q. Mr. Kitashima --
20       MR. ARMAND: Actually we don't have that
21   one. Hold on one minute. It may be in the batch
22   that just came in; so give me one moment.
23       MS. MAINIGI: In the interest of time, can
24   we have Mr. Kitashima take a look at the document,
25   Mr. Athey?
```

Page 155

```
1        MR. ATHEY: That's fine with me.
2        Is there any objection by the government?
3        MS. NAWADAY: We do object. We're
4    checking now.
5        MS. MAINIGI: You object to the witness
6    looking at the document?
7        MS. NAWADAY: We object to it being marked
8    as an exhibit and reviewed by the witness before we
9    have a copy of the document.
10       MS. MAINIGI: Well, we object to you not
11   being here in person and receiving a copy of the
12   document as is your obligation.
13   Q. While we're waiting, Mr. Kitashima, for
14   the Government to find a copy of that document, do
15   you recall that there was a period of time --
16       MS. NAWADAY: I have it. I have it here.
17       MS. MAINIGI: Thank you.
18   Q. Taking a look at Kitashima Exhibit 18,
19   you're welcome to read the entire document, Mr.
20   Kitashima. I'm going to primarily focus in on
21   section 2.
22   A. Uh-huh.
23   Q. And if you could, take a moment to read
24   that, and then I'll ask you some questions.
25   A. (Reading document.)
```

Page 156

```
1    Okay.
2    Q. I think this was the issue that you
3    described as some of the noise from the field
4    before.
5        Can you tell us what was going on with
6    what's described in this email?
7        MS. NAWADAY: Objection to form.
8        THE WITNESS: In the entire email, this
9    is, you know, feedback we were getting from the head
10   of production, Scott Bridges, based on a visit that
11   he had at one of the NSCs, in particular Rosemead.
12       And this was sort of a summary of his
13   feedback that he was getting and observations he was
14   making while he was there.
15       Under item No. 2 -- is that the one you
16   wanted me to look at?
17   BY MS. MAINIGI:
18   Q. Right.
19   A. Um --
20   Q. And in particular the quality assurance
21   audits is where I'm focused.
22   A. Right. 2A?
23   Q. Yes.
24   A. His comments there reflect a concern by
25   him and others in the production area that quality
```

Page 157

```
1    assurance audits or the feedback that the QA audits
2    process was producing at the time was being
3    disruptive, meaning that people were taking time out
4    to review the audits, first and foremost.
5        Secondly, it was creating a sort of a
6    shell shock atmosphere there where processors were
7    beginning to, lack of a better way to describe it,
8    overreact to findings that were merely process-
9    related findings, and it was slowing the process
10   down.
11       So he was making it known that, you know,
12   QA was being -- not so much the QA audits, but the
13   communication process, the process whereby QA was
14   immediately feeding back their findings to the
15   processors -- was becoming unproductive within the
16   units.
17   Q. Do you remember being shown an email dated
18   November 29th that Ms. Mairone sent out after
19   consultation with you and Mr. Lumsden related to QA
20   among other things?
21   A. Yes.
22   Q. And I think the result of that memo was
23   that QA results did not go to the field staff
24   anymore; is that fair?
25   A. Yes.
```

40  (Pages 154 to 157)

# Exhibit B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____x

UNITED STATES OF AMERICA ex rel,

EDWARD O'DONNELL,

               Plaintiffs,

            vs.                  12 Civ. 1422 (JSR)

                             ECF Case

COUNTRYWIDE FINANCIAL CORPORATION;

COUNTRYWIDE HOME LOANS, INC.;

COUNTRYWIDE BANK, FSB; BANK OF AMERICA

CORPORATION; BANK OF AMERICA,

N.A.; and REBECCA MAIRONE,

               Defendants.

_____x

     Videotaped Deposition of GREGORY A. LUMSDEN,

taken by Plaintiff, at 601 South Figueroa Street,

Suite 4100, Los Angeles, California, on Friday,

June 21, 2013, commencing at 10:18 a.m. before

LorRae D. Nelson, Certified Shorthand Reporter

Number 7384.

## Page 2

APPEARANCES

COUNSEL FOR THE PLAINTIFF:

MR. PIERRE G. ARMAND
(Via Videoconference)
-and-
MS. JAIMIE LEESER NAWADAY
(Via Videoconference)
UNITED STATES ATTORNEY'S OFFICE
86 Chambers Street
New York, New York 10007
Phone: (212) 637-2724
Fax: (212) 637-2750
Email: Pierre.armand@usdoj.gov
Email: Jaimie.nawaday@usdoj.gov

COUNSEL FOR DEFENDANT BANK OF AMERICA:

MS. ENU A. MAINIGI
-and-
MS. JENNIFER WIMSATT PUSATERI
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street N.W.
Washington, DC 20005
Phone: (202) 434-5420
Fax: (202) 434-5029
Email: Emainigi@wc.com
Email: Jwimsatt.pusateri@wc.com

COUNSEL FOR DEFENDANT COUNTRYWIDE:

MR. WILLIAM J. HARRINGTON
GOODWIN PROCTER, LLP
620 Eighth Avenue
New York, New York 10018-1405
Phone: (212) 813-8800
Fax: (212) 355-3333
Email: Wharrington@goodwinprocter.com
-and-
MS. KELLY PHIPPS
GOODWIN PROCTER, LLP
901 New York Avenue, NW
Washington, DC 20001
Phone: (202) 346-4269
Fax: (202) 346-4444

## Page 3

COUNSEL FOR DEFENDANT REBECCA MAIRONE:
MR. MICHAEL HEFTER
-and-
MR. RYAN M. PHILP
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
49th Floor
New York, New York 10020-1104
Phone: (212) 508-6185
Fax: (212) 786-2791
Email: Michael.hefter@bgllp.com
Email: Ryan.philp@bgllp.com

COUNSEL FOR THE WITNESS:

MR. JOEL M. ATHEY
-and-
MR. NICHOLAS B. MELZER
CORBIN, ATHEY & MARTINEZ LLP
601 West Fifth Street
Suite 1150
Los Angeles, California 90071-2024
Phone: (213) 612-0001
Fax: (213) 786-2791
Email: Jathey@corbinathey.com
Email: Nmelzer@corbinathey.com

ALSO PRESENT:
GARRETT KIRBY, VIDEOGRAPHER

## Page 4

WITNESS INDEX

PAGE
GREGORY A. LUMSDEN:
Examination by Mr. Armand..................... 7
Examination by Ms. Mainigi.................... 120
Examination by Mr. Hefter.................... 146
Further Examination by Mr. Armand............. 166
Further Examination by Ms. Mainigi............ 183
Further Examination by Mr. Armand............. 190
Signature and Changes ........................ 193
Reporter's Certificate ....................... 194

EXHIBIT INDEX

PLAINTIFFS' EXHIBITS:          PAGE
NO.  DESCRIPTION

1  7/26/07 email from Greg Lumsden re       26
   Scoreboard Always Tells the Truth

2  8/8/07 email from Natalie Sanchez on     31
   behalf of Greg Lumsden re Additional
   Analysis - Prime Underwriting Workflow

3  5/16/07 email from Greg Lumsden re       52
   Underwriting Authority in FSL

4  4/3/07 email from Rebecca Mairone        75
   forwarding Central Services Incentive Memo

5  HSSL Process-QA Overview of Scope/Results 85
   Through 9/10/2007

6  November 2007 Central Fulfillment        85
   Findings "QA PC3" Review Results Update

## Page 5

EXHIBIT INDEX

PLAINTIFFS' EXHIBITS:          PAGE
NO.  DESCRIPTION

7  November 29, 2007 Quality Control Report  85
   by Don Harris

8  11/30/2007 email from Cliff Kitashima re  98
   Q3 Quality Results Overview - Reality

9  11/29/07 email from Rebecca Mairone      102
   re Central Fulfillment Management Team
   Notice 11/29

10 Document entitled Quality Control Update 112
   Divisional Comparison

11 3/12/08 email from Greg Lumsden re       115
   Quality Issues - Quick Read

12 5/28/08 email from Greg Lumsden re Update 119
   Rebecca Discussion/Coaching Opportunity

DEFENDANTS' EXHIBITS:          PAGE
NO.  DESCRIPTION

13 3/21/08 email from Cliff Kitashima re    126
   FSL Random QC results based on 3/19 8pm
   data

14 9/11/07 email from Natalie Sanchez re    135
   Realigning Processing, Underwriting and
   Funding Support

15 10/05/07 email from Greg Lumsden re      141
   Evolving: FSL's New Processing Model

16 September 12, 2007 FHLMC Subprime Review 147
   Countrywide's Full Spectrum Lending

17 7/20/2007 email from Rebecca Mairone re  157
   Fast Swim Lane - items/suggestions

18 8/03/07 email from Rebecca Mairone       160
   re Central Services Incentive Memo

Fink & Carney Reporting and Video Services
39 West 37th Street * New York, New York 10018     (800) NYC-FINK * (212) 869-3063

Page 82

1   people or two people.  There are 7,000 employees.
2        You know, this was a great meeting
3   where we are sitting down with the employees, give
4   them a chance to have input.  It shows that we are
5   trying to, you know, in a reasonable manner deliver,
6   you know, a new business model for processing prime
7   loans within the organization.  You know, this is
8   great feedback.
9        This is a great meeting where we
10  are giving folks a chance to comment on what is
11  happening, where we need to make adjustments, what
12  is it we need to do.
13       And I can tell you any time you touch
14  any little piece of anyone's compensation, if it
15  involves more than one employee, everyone is going
16  to become more consternated.
17       We probably did stuff like this 50
18  times.  Sit down with the folks, let's talk about
19  'em, what do you think, we are going to make
20  changes.  Let's talk about them.  Let's go through
21  them.  What's the feedback.  It helps us to know as
22  managers how we can better roll out something new
23  and different or change something so we need to know
24  who to participate.
25       Q.  (BY MR. ARMAND)  So people are concerned

Page 83

1   about the impact that the incentive compensation
2   will have on quality; is that right?
3        MR. HARRINGTON:  Objection to form.
4        MR. HEFTER:  Objection.
5        MR. ATHEY:  Objection; calls for a
6   conclusion as to what other people are concerned
7   about.
8        THE WITNESS:  Yeah, I can't -- it looks
9   like that's what they are saying but I can't speak
10  for them.  Looks to me like --
11       Q.  (BY MR. ARMAND)  Well, this is being
12  reported to you.
13       A.  Well, like I said, this is a few
14  employees.  We are making some changes and I think
15  at this time we are still in the test period so we
16  are still testing things.
17       You know, within the big context of
18  things, this would be very typical when we are
19  making a change if it's going to generate questions,
20  but at no time is there anywhere in here did we say
21  we don't care about quality.  It's just not true.
22  Quality was always the highest priority.
23       Q.  If you go to the first page of the email
24  on Exhibit 4, Miss Mairone is saying to you that
25  people need to change their behavior; is that fair?

Page 84

1        A.  Yes.
2        Q.  And because their views are based on the
3   subprime market and now the focus is on prime?
4        MR. HEFTER:  Object to the form of the
5   question.
6        Q.  (BY MR. ARMAND)  Is that right?
7        A.  Her first sentence I think is pretty
8   clear.  I mean, it's what we were going through at
9   the time.  We were taking thousands of employees,
10  clearly hundreds in the central services area, and
11  go through changing them or teaching them, training
12  them to become prime processors, and workflow
13  experts when we, you know, subprime was pretty much
14  starting to go away.
15       So we were taking folks who were
16  playing second base and now need to play third base
17  so it takes a little time.  I think she is pointing
18  out we clearly know we were going to change the
19  process.  Any time you change things with people
20  it's going to take time.
21       Q.  So the concern that's articulated about
22  whether FSL was just going to fund everything and
23  worry about it later, did you think that was a valid
24  concern?
25       A.  No, not at all.

Page 85

1        MS. MAINIGI:  Objection.
2        THE WITNESS:  That was never going to
3   happen.
4        Q.  (BY MR. ARMAND)  Would such a concern be
5   less valid if the loans are at issue are being
6   funded are prime versus subprime.
7        MS. MAINIGI:  Objection.
8        MR. HARRINGTON:  Objection to form.
9        MR. ATHEY:  Objection; vague.
10       You can answer if you understood.
11       THE WITNESS:  Well, I'm not sure I
12  understand.  Can you try to state it again or in a
13  different way?
14       MR. ARMAND:  Withdrawn.
15       I'd like to mark three exhibits, if we
16  could pull them out.  These are the stack the
17  government provided to the court reporter.  Should
18  be -- the cover pages should say Exhibits 15, 18 and
19  19.
20            (Lumsden Plaintiffs' Exhibits 5,
21            6 and 7 were marked)
22       MR. ARMAND:  So for the record, I'm
23  showing the witness what has been marked for
24  identification three exhibits.  The first is
25  Exhibit 5, which is a native printout of document

22  (Pages 82 to 85)

Page 86

1 Bates number BANE -- BANA-SDNY-E-0000470960.
2 The second exhibit -- I'm sorry the
3 sixth exhibit, which has been marked as Exhibit 6,
4 is another native printout of BANA-SDNY-E-00788092.
5 And Exhibit 7 is also a native printout
6 of BANA-SDNY-000212418.
7 Q. (BY MR. ARMAND) So if we could start
8 first with Exhibit 5, Mr. Lumsden.
9 Do you recognize Exhibit 5,
10 Mr. Lumsden?
11 A. No, I don't recognize it.
12 Q. Did you receive copies of Q.A. or quality
13 assurance results from the HSSL pilot?
14 A. I'm sure I received something. I don't
15 know whether I received something at the end, in the
16 middle, weekly, monthly, you know, I don't recall
17 but I received some stuff from time to time. I
18 don't recall this specific one but...
19 Q. If the quality assurance review of the
20 HSSL pilot was finding high levels of high-risk
21 findings, is that something that you would expect to
22 have been brought to your attention?
23 MR. HEFTER: Objection.
24 THE WITNESS: You know, the Q.A.
25 process was put in place to help us work on our

Page 87

1 workflow, to make sure that we were implementing,
2 you know, prime workflow, and this was to help us,
3 you know, see and, you know, quite honestly, it was
4 an idea of a couple of us to help us, you know, see
5 where the opportunities were to process prime loans
6 properly.
7 Yeah, I wouldn't necessarily have
8 gotten every report that said high risk or no risk
9 because it had to do with processes and procedures
10 as well as some documents, as I recall, that had
11 nothing to do with the quality of loans. If it was
12 quality, I'm going to be seeing things more
13 frequently.
14 Q. (BY MR. ARMAND) So were you concerned
15 that the quality, the quality assurance reviews,
16 were showing that the percentage of high-risk
17 findings was increasing?
18 MR. ATHEY: Well, objection.
19 MR. HEFTER: Objection.
20 MR. ATHEY: Objection; lacks
21 foundation. It's not clear that he ever saw this, I
22 think he just testified.
23 THE WITNESS: Yeah. I don't have any
24 recollection of being concerned over high risk in
25 Q.A. since it had to do with process and not with

Page 88

1 quality. I mean, I might have been a little
2 concerned.
3 Q. (BY MR. ARMAND) So the quality assurance
4 didn't have anything to do with quality?
5 A. Very little, if any, at all.
6 MR. ATHEY: And objection, that
7 mischaracterized his prior testimony.
8 MR. HARRINGTON: Objection to form too.
9 Q. (BY MR. ARMAND) So if the quality
10 assurance is showing that high-risk findings have
11 gone from 21 percent to 41 percent from August to
12 September of 2007, that wouldn't have been a concern
13 to you?
14 MS. MAINIGI: Objection.
15 MR. HARRINGTON: Objection to form.
16 THE WITNESS: Well, looking at this
17 particular document, we have got apples and oranges
18 being compared here; right? We have funded loans
19 and application loans. So I don't know that I would
20 have been at all concerned with this particular
21 page.
22 Q. (BY MR. ARMAND) Okay. Would you be
23 concerned if the high-risk findings weren't resolved
24 before the loans funded?
25 MR. HARRINGTON: Objection to form.

Page 89

1 MR. ATHEY: Objection; improper
2 hypothetical.
3 THE WITNESS: Yeah, I don't recall
4 being that concerned with the high risk with Q.A.
5 This thing was brand new and we had a lot of issues
6 with the whole Q.A. process from all angles.
7 Q. (BY MR. ARMAND) How high would the
8 percentage of high-risk findings from the Q.A.
9 reviews need to be for it to become a concern?
10 MR. HARRINGTON: Objection to form.
11 MS. MAINIGI: Objection.
12 MR. ATHEY: Objection; improper
13 hypothetical. Lacks foundation.
14 If you have an opinion, you can offer
15 it.
16 THE WITNESS: Like I said, I wasn't
17 really paying attention to the Q.A. numbers in this
18 report, this period of time while we were in a test
19 phase, just starting to roll it out. And we were
20 consistently finding issues with the Q.A. process as
21 well. So the Q.A. process was really struggling to
22 get on track.
23 Q. (BY MR. ARMAND) So you weren't paying
24 attention to the Q.A. findings during the pilot?
25 MS. MAINIGI: Objection; misstates his

23  (Pages 86 to 89)

# Exhibit C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA, ex rel, )
EDWARD O'DONNELL,                 )
                                  )
                Plaintiff,        )
                                  )
        vs.                       ) No. 12 Civ 1422 (JSR)
                                  )
COUNTRYWIDE FINANCIAL CORPORATION;)
COUNTRYWIDE HOME LOANS, INC.;     )
COUNTRYWIDE BANK, FSB; BANK OF    )
AMERICA CORPORATION; BANK OF      )
AMERICA, N.A.; and REBECCA        )
MAIRONE,                          )
                                  )
                Defendants.       )
_____)


        Deposition of STEVE BRENT, a witness

        herein, noticed by The United States

        Attorney's Office, taken at 300 North

        Los Angeles Street, Suite 7516, Los

        Angeles, California, at 10:37 a.m.,

        Wednesday, May 22, 2013, before Tammie

        Lynn Hall, CSR No. 11525.

Page 2

1   APPEARANCES OF COUNSEL
2
3   FOR PLAINTIFF:
4   U.S. DEPARTMENT OF JUSTICE
5   UNITED STATES ATTORNEY'S OFFICE
6   SOUTHERN DISTRICT OF NEW YORK
7   BY:  PIERRE G. ARMAND, ESQ.
8   BY:  JOSEPH N. CORDARO, ESQ.
9   86 Chambers Street
10  Third Floor
11  New York, New York  10007
12
13  FOR THE WITNESS:
14  LAW OFFICES OF BECKY WALKER JAMES
15  BY: BECKY WALKER JAMES, ESQ.
16  17383 Sunset Boulevard, Suite A315
17  Pacific Palisades, California  90272
18
19  FOR DEFENDANT REBECCA MAIRONE:
20  BRACEWELL & GIULIANI
21  BY:  MICHAEL HEFTER, ESQ.
22  BY:  CHRISTINA A. JARDINE, ESQ.
23  1251 Avenue of the Americas
24  49th Floor
25  New York, New York 10020

Page 3

1   APPEARANCES OF COUNSEL
2
3   FOR DEFENDANT BANK OF AMERICA:
4   WILLIAMS & CONNOLLY, LLP
5   BY:  ENU MAINIGI, ESQ.
6   BY:  JENNIFER N. WIMSATT PUSATERI, ESQ.
7   725 Twelfth Street, N.W.
8   Washington, D.C.  20005
9
10  FOR DEFENDANT COUNTRYWIDE:
11  GOODWIN PROCTER
12  BY:  MEGHAN K. SPILLANE, ESQ.
13  620 Eighth Avenue
14  New York, New York  10018
15
16  ALSO PRESENT:
17  GORDON MILLER, The Videographer
18
19
20
21
22
23
24
25

Page 4

```
1              I N D E X
2   WITNESS:      STEVE BRENT
3   EXAMINATION BY:          PAGE
4   MR. ARMAND          8, 243, 283
5   MS. MAINIGI         133, 276, 286
6   MR. HEFTER          145, 290
7
8
9           E X H I B I T S
10
11  Exhibit identification within the transcript is flagged
    with "[EXH]" as an identifier.
12
13  EXHIBIT   DESCRIPTION    IDENTIFIED   MARKED
14  1     E-mail Chain       16       16
          BANA-SDNY-E-001058512
15        [EXH-1]
16  2     E-mail Chain       20       20
          BANA-SDNY-E-000097102
17        [EXH-2]
18  3     E-mail Chain       26       26
          BANA-SDNY-E-001062042
19        [EXH-3]
20  4     E-mail Chain       31       32
          BANA-SDNY-E-000096088
21        [EXH-4]
22  5     E-mail Chain       39       39
          BANA-SDNY-E-000095649
23        [EXH-5]
24  6     E-mail Chain       46       46
          BANA-SDNY-E-001062095
25        [EXH-6]
```

Page 5

```
1
2   EXHIBIT   DESCRIPTION    IDENTIFIED   MARKED
    7     E-mail Chain       49       49
3         BANA-SDNY-E-000039265
          [EXH-7]
4   8     E-mail Chain       56       56
          BANA-SDNY-E-001062203
5         [EXH-8]
6   9     Central Fulfillment   63    64
          Initiative Review
7         Results Update [EXH-9]
8   10    Quality Control Don    77    77
          Harris Document [EXH-10]
9
10  11    E-mail Chain       58       58
          BANA-SDNY-E-000656514
11        [EXH-11]
12  12    E-mail Chain       62       62
          BANA-SDNY-E-001751343
13        [EXH-12]
14  13    E-mail Chain       69       69
          BANA-SDNY-E-002721582
15        [EXH-13]
16  14    E-mail Chain       82       83
          BANA-SDNY-E-001615503
17        [EXH-14]
18  15    Quality Control Ratings 173   173
          Loan Performance and
19        Quality Review Improvement
          Plan February 2008
20        [EXH-15]
21  16    Quality Control Ratings 173   173
          Loan Performance and
22        Quality Review Improvement
          Plan February 2008
23        [EXH-16]
24  17    E-mail Chain       193      193
          H1051RE0027.032-00001
25        [EXH-17]
```

2  (Pages  2 to 5)

Page 10

1    to make any objections they need to make.
2    Is that fair?
3    A.  Yes.
4    Q.  Are you currently employed, Mr. Brent?
5    A.  Yes.
6    Q.  Who is your employer?
7    A.  Bank of America.
8    Q.  Okay.  How long have you been employed by
9    Bank of America?
10   A.  August of 2010.
11   Q.  Were you employed by Bank of America or any
12   predecessor of Bank of America prior to that time?
13   A.  Yes.
14   Q.  During what time period?
15   A.  The first three months from June to August, I
16   was a contractor who was then, you know -- my contract
17   was with B of A, and then I was added on as full-time in
18   August.
19   Q.  Of what year?
20   A.  2010.  It would be the three months before I
21   came back with B of A, and the previous to that would be
22   when I worked for Countrywide/B of A before I was
23   terminated.
24   Q.  When were you employed by Countrywide?
25   A.  First time 1988 to 2000.  1986 to '86 -- 1986

Page 11

1    to '88.  Excuse me.  And then the second time was
2    beginning in 2000 through 2008.
3    Q.  Okay.  Can you -- I'd like to focus first on
4    the work that you did while you were employed by
5    Countrywide.  Can you briefly describe generally the
6    work that you did and the titles and positions you held
7    during the time period that you were employed by
8    Countrywide?
9    A.  Are you talking about beginning in 2000?  Would
10   that be an appropriate time to start?
11   Q.  Sure, we can start at 2000, yes.
12   A.  I first -- I had a number of positions.  Do you
13   want to go through those positions, Pierre?  Is that
14   what you are looking for?
15   Q.  If you could tell me what the -- if you could
16   explain what positions you had and tell me generally
17   what --
18   A.  Fair enough.
19   Q.  -- your duties and responsibilities were for
20   those positions, that would be great.
21   A.  Okay.  I first was -- I opened up a prime loan
22   group within FSL.  That was the first piece.  We were a
23   sub prime group, and I was asked to start making prime
24   loans out of our portfolio.  Then I centralized the
25   funding process which is basically moving the funding

Page 12

1    out of the branches and into a Centralized Fulfillment
2    for funding.
3    Q.  And when was that?
4    A.  Oh, my gosh.  I'm not really sure of the date.
5    I did the first job for about a year and a half.  So
6    maybe it was -- I'm not really sure, Pierre.  2001,
7    2002.
8    Q.  Okay.  And what did you do after that?
9    A.  Then I transitioned over to starting their
10   business-to-business division.  This is all within FSL.
11   Business-to-business would be -- we would perform
12   fulfillment for other companies.  Private branding, if
13   you will, like "Pierre Mortgage Company" and we would
14   answer the phone and process the loans for you.
15   Q.  Just so we're clear for the record, when you
16   say "FSL"?
17   A.  That would be Full Spectrum Lending.
18   Q.  And when you say "fulfillment," what do you
19   mean?
20   A.  That would be processing loans, closing the
21   loans, just like as if we were closing the loans in Full
22   Spectrum state.
23   Q.  And what was your job title during the period
24   of time when you were doing the business-to-business
25   fulfillment?

Page 13

1    A.  I'm not really sure.  Could have been a first
2    vice president.  I don't think -- yeah.
3    Q.  Okay.  Could we maybe fast-forward --
4    A.  Of course.
5    Q.  -- up to the 2007 time period.
6    A.  Okay.  So in 2007 --
7    Q.  Yes.
8    A.  -- I was asked to take over the quality control
9    department.
10   Q.  Okay.
11   A.  And I underline QC.  It was quality control
12   department.
13   Q.  And what were your duties and responsibilities
14   as being the -- being the head of the quality control
15   department?
16   A.  Would be to review findings on funded loans
17   delivered from our corporate QC group, and from that
18   reporting or listing of loans that we would get from
19   them or reporting from them, my job was to review those
20   for accuracy and then to mitigate the gaps in the loan
21   so as to make it a sellable product on the secondary
22   market.
23   Q.  Did you have -- also have any responsibilities
24   with regard to quality assurance?
25   A.  Yes.

Fink & Carney Reporting and Video Services
39 West 37th Street * New York, New York 10018          (800) NYC-FINK * (212) 869-3063

Page 14

1    Q.  What is quality assurance?
2    A.  Quality assurance, which is also referred to as
3  QA, is a first-step review while a loan is still in
4  progress; where QC is typically defined as after a loan
5  has been funded and it's after it's been processed.
6    Q.  So were -- so both QA and QC, both of those
7  functions were under your control at -- in FSL at that
8  time?
9    A.  Right.  We started off as QC, Pierre, and then
10  we transitioned and I put a QA in process in place also.
11    Q.  How many employees were under you?
12    A.  You need to be a little clearer on that.
13  Beginning?  Middle?  End?
14    Q.  Let's focus on the 2007 time frame.
15    A.  I think there was like -- I'm not really sure.
16  I'm not really sure.  I'm not sure.
17    Q.  More than ten?
18    A.  I think it was less than ten originally when I
19  went into the group.  It's right around there.  I just
20  don't remember exactly.
21    Q.  Okay.  Did there come a time when you were
22  requested to perform quality assurance where people in
23  your group were asked to perform quality assurance with
24  regard to a loan origination process known as the
25  High-Speed Swim Lane?

Page 15

1    A.  Yes, sir.
2    Q.  Okay.  And in terms of just going forward so
3  that we're clear about terminology, High-Speed Swim Lane
4  I may refer to as H-S-S-L or HSSL and use them
5  interchangeably.  Is that okay with you?
6    A.  And I will too.
7    Q.  Okay.  When did you first start doing QA work
8  for the HSSL?
9    A.  I don't remember.
10    MS. MAINIGI:  Objection to form.
11    THE WITNESS:  I don't remember.
12    MR. ARMAND:
13    Q.  Would it be -- would it have been in the August
14  of 2007 or July August of 2007 time frame?
15    MR. HEFTER:  Same objection.
16    MS. MAINIGI:  Should we -- Pierre, can we agree that
17  any objection that any of the defendants make is on
18  behalf of all the defendants?
19    MR. ARMAND:  Absolutely.  That's fine.
20    THE WITNESS:  I'm --
21    MR. HEFTER:  I can only add to that that we may have
22  different thoughts about objections, so we'll proceed
23  accordingly.
24    MS. MAINIGI:  We may make objections at the same
25  time, but if it's a form objection, if Michael makes it,

Page 16

1  I'm not going to make a separate one.
2    MR. ARMAND:  That's fine.
3    MR. HEFTER:  And just to vice versa.
4    MS. MAINIGI:  To avoid the hustle on the transcript.
5    MR. ARMAND:  I want to just quickly mark an exhibit.
6    MS. MAINIGI:  Do you have copies?
7    MR. ARMAND:  I'm sorry.  We're going to have to
8  share.  We'll try and get more at a break.
9    MS. MAINIGI:  That's fine.
10    MR. ARMAND:
11    Q.  Mr. Brent, I'm showing you for identification
12  Brent Exhibit 1, BANA-SDNY-E-1058512 to 58513.  [EXH-1]
13    (Whereupon the document referred to is marked by the
14  reporter as Exhibit 1 for identification.)
15    MR. ARMAND:
16    Q.  I'll give you a moment to look it over,
17  Mr. Brent.
18    A.  Everyone good?
19    Q.  So have you -- have you -- do you recognize
20  Exhibit 1, Mr. Brent, as an e-mail that you sent on or
21  about July 26, 2007?
22    A.  I recognize the e-mail.  I don't remember the
23  exact date.  I mean, but I recognize the perspective and
24  the note that was put in there.  Yes, I wrote that.
25    Q.  Okay.  Does this refresh your recollection as

Page 17

1  to the period of time in which you were doing work with
2  regard to the High-Speed Swim Lane loan origination
3  process?
4    A.  Yes, sir.
5    Q.  Okay.  So in or about July of 2007, you started
6  doing QA and/or QC work with regard to the HSSL?
7    A.  You need to restate that, please.
8    Q.  Okay.  Well, what work did you start doing with
9  regard to the HSSL process in or about July of 2007?
10    A.  Reviewed the documentation provided and provide
11  feedback.
12    Q.  Okay.  I guess before we go any further, can
13  you describe what the HSSL process was?
14    MR. HEFTER:  Object to the form of the question.
15    MR. ARMAND:
16    Q.  You can answer.
17    THE WITNESS:  Oh, I can still answer.
18    MR. ARMAND:
19    Q.  Yes.
20    A.  Oh, I'm sorry.  I wasn't sure what that meant.
21  Not in detail.  I mean, I'm not really --
22    Q.  Can you describe it generally?
23    A.  It was a process to -- that was focused on
24  higher-quality loans that we would then in premise and
25  practice put through a more streamlined process matching

Fink & Carney Reporting and Video Services
39 West 37th Street * New York, New York 10018          (800) NYC-FINK * (212) 869-3063

Page 58

1    A.  Okay.
2    MR. ARMAND:  Okay.  I'm showing what's been marked
3  as Exhibit 11, which is BANA-SDNY-E-656514 through
4  656518.  [EXH-11]
5    (Whereupon the document referred to is marked by the
6  reporter as Exhibit 11 for identification.)
7    MR. ARMAND:
8    Q.  So, Mr. Brent, do you recognize Exhibit 11 as
9  an e-mail from Wade Comeaux to you with a chain of
10 e-mails after on or about October 24th of 2007?
11   A.  Yes.
12   Q.  Okay.  So is it fair to say that around this
13 time frame, your QA reviews found 97 percent high-risk
14 findings at PC3?
15   MS. MAINIGI:  Objection.
16   THE WITNESS:  Yes, that is correct that we called
17 out a 97 percent high-risk finding on our QA process.
18   MR. ARMAND:
19   Q.  Okay.  And PC3 -- what does that mean?
20   A.  Phase Code 3.
21   Q.  Okay.
22   A.  We have phase codes that take the loans from
23 1 to 4.  Phase Code 3 I think is pre-funding.  I'm not
24 really sure to be honest with you, but it is one of the
25 end steps before we fund the loan.

Page 59

1    Q.  Okay.  So is a PC3 when the loan is getting
2  cleared to close but it's not funded?
3    A.  That's fair.
4    Q.  Okay.  So you have this 97 percent high-risk
5  finding, and Mr. Comeaux is saying to you "This seems
6  really high.  You know, should I be concerned about
7  this?"  Is that fair?
8    MS. MAINIGI:  Objection.
9    THE WITNESS:  That is fair.
10   MR. ARMAND:
11   Q.  Okay.  And in response, you are saying that
12 this shows deficiencies in the process but they can
13 be -- but they are easily correctible; is that right --
14   MS. MAINIGI:  Objection.
15   MR. ARMAND:
16   Q.  -- because the loans haven't been funded yet?
17   MS. MAINIGI:  Excuse me.  Objection.
18   THE WITNESS:
19   MS. JAMES:  I'm sorry.
20   MR. ARMAND:
21   Q.  Yes, directing you to Page 3 of Exhibit 11.
22 Mr. Comeaux is saying, "Should I be concerned about this
23 as it sounds high?"
24   A.  And I say --
25   Q.  You are saying "Not to be too concerned."

Page 60

1    A.  Well, okay.  So, yes, he should be concerned.
2    Q.  Okay.
3    A.  But then I helped to frame it for him on the
4  reason where he should be putting his concern towards.
5    Q.  Okay.  So it's still -- this is pre-funding, so
6  the loan hasn't closed yet, and so you can still correct
7  the mistakes that have been found in the QA finding?
8    A.  We have an opportunity --
9    MR. HEFTER:  Objection.
10   THE WITNESS:  Sorry, Mike.
11   We have an opportunity to correct any defects or
12 deficiencies than to make the loan sellable, yes.
13   MR. ARMAND:
14   Q.  Okay.  And so you are telling him PC4 is a
15 better indicator of loan quality because at that point
16 the loan has already been funded?
17   MR. HEFTER:  Pierre, could you tell me where you are
18 referring to in the document?
19   THE WITNESS:  Yes.  Yeah.
20   MR. ARMAND:  Page 3 of Exhibit 11.
21   MS. MAINIGI:  Are you on 11?
22   MR. HEFTER:  I'm on 11.
23   MR. ARMAND:  Page 3 of 11 Bates No. 656516.
24   MR. HEFTER:  Okay.
25   MS. MAINIGI:  But it's not --

Page 61

1    THE WITNESS:  It's not --
2    MR. HEFTER:  Lack of foundation.  That's Don Harris
3    MS. MAINIGI:  It's Don Harris.  Steve Brent's
4  comments are on the first page.
5    MR. ARMAND:  Okay.  I'm saying this is Mr. Harris
6  saying this.
7    MS. MAINIGI:  That's Don Harris.
8    MR. ARMAND:
9    Q.  Well, would you agree that PC4 is a better
10 indicator of quality performance?
11   MS. MAINIGI:  Objection.
12   THE WITNESS:  I'm not sure I would use "better."  I
13 might have used "truer."  But the basic premise I agree
14 with.
15   MR. ARMAND:
16   Q.  Okay.
17   MS. MAINIGI:  I think his comments are on the first
18 page.
19   MR. ARMAND:  Yes.
20   Q.  Okay.  Let's go to the first page.  And so the
21 97 percent high-risk finding at PC3 you characterize
22 that as a red flag; is that fair?
23   A.  I don't characterize it as a red flag.  Wade
24 characterized it as a red flag.
25   Q.  And you are agreeing with him?

16  (Pages 58 to 61)

Page 138

1  question?
2      A.  Yes, I got lost in the question and the
3  objections and then the question again.
4      Q.  Okay.  How would you -- so can there be a
5  difference of opinion regarding quality without the end
6  result being fraud?
7      MR. ARMAND:  Objection to form.  Vague.
8  Speculative.  Calls for legal conclusion.
9      THE WITNESS:  It could, so yes.  It could be
10  different.
11      MS. MAINIGI:
12      Q.  Let me ask you a factual question.  Did all
13  loans going through the High-Speed Swim Lane -- well,
14  sorry.  Let me take that back.
15      The process that FSL followed was called Central
16  Fulfillment; correct?
17      MR. ARMAND:  Objection to form.
18      THE WITNESS:  That was the name we used for the
19  process -- for the groups at that time was Central
20  Fulfillment.
21      MS. MAINIGI:
22      Q.  Okay.  Did all loans in Central Fulfillment go
23  through the high-speed swim lane process?
24      A.  No --
25      MR. ARMAND:  Objection to form.

Page 139

1      THE WITNESS:  -- I do not believe so.
2      MS. MAINIGI:
3      Q.  Were there other processes in place for a loan
4  to get originated and funded that it involved -- that
5  involved underwriters that clear to close.
6      MR. ARMAND:  Objection to form.
7      THE WITNESS:  At what point are you referring to,
8  Enu?
9      MS. MAINIGI:
10      Q.  At the same time there was a High-Speed Swim
11  Lane process.
12      A.  Yes, there was.
13      MR. ARMAND:  Objection to form.  Vague.
14      THE WITNESS:  There were other processes in place
15  and in cases where the underwriter signed off on the
16  CTC.
17      MS. MAINIGI:
18      Q.  Do you know what the final parameters of the
19  High-Speed Swim Lane were?
20      MR. ARMAND:  Objection to form.
21      THE WITNESS:  I don't remember all of the
22  parameters.
23      MS. MAINIGI:
24      Q.  So you are not able to tell us which loans were
25  actually put through the High-Speed Swim Lane process

Page 140

1  versus those that went through one of these other
2  processes in Central Fulfillment?
3      MR. ARMAND:  Objection to form.
4      THE WITNESS:  No, I can't.
5      MS. MAINIGI:
6      Q.  Now, you were asked about loan specialists
7  clearing loans to close.  Were you, Mr. Brent,
8  comfortable with loan specialists clearing loans to
9  close with appropriate controls in place?
10      MR. ARMAND:  Objection to form.
11      THE WITNESS:  I would say underlining with
12  appropriate controls in place, so my answer is yes to
13  your question.
14      MS. MAINIGI:
15      Q.  Is it fair to say that the QA process looks at
16  the process by which -- let me retract that.
17      Did QA look at process, in other words, whether the
18  High-Speed Swim Lane process was being followed?
19      MR. ARMAND:  Objection to form.  Vague.
20      THE WITNESS:  Well, I didn't get that question, Enu.
21      MS. MAINIGI:
22      Q.  What was QA designed to measure?
23      A.  Inlying quality of our process.
24      Q.  Okay.  Is QA necessarily a predictor of what
25  the corporate QC findings will be or should be?

Page 141

1      A.  No.
2      MR. ARMAND:  Objection to form.
3      THE WITNESS:  I'm sorry.  No.  That's okay.
4      MS. MAINIGI:
5      Q.  Is there a disconnect then sometimes between QA
6  findings and QC findings?
7      MR. ARMAND:  Objection to form.
8      THE WITNESS:  Yes, there can be disconnects.
9      MS. MAINIGI:
10      Q.  And can you explain that disconnect to us in
11  terms of the differences between measurement of the two?
12      A.  Sure.  QA is typically a process review.  Did
13  you move this here?  Did you do this?  Did you do all
14  the steps that we require.
15      On QC it is more on the decisioning.  Did we make
16  the right decision, and did we have everything
17  documented correctly, so it is a little bit more
18  involved and more around decisioning than processing.
19  That's just a typical inline or outside the line, if you
20  will, or after funding.
21      Q.  The removal of checklists and turning them into
22  job aids -- was that something that was a difference of
23  opinion among business colleagues?
24      MR. ARMAND:  Objection to form.  Vague.
25      THE WITNESS:  Yeah, there were differences of

36 (Pages 138 to 141)

Page 142

1    opinion on the values and the importance of the
2    checklists and the worksheets.
3        MS. MAINIGI:
4        Q. Did different SME's have different opinions on
5    that?
6        MR. ARMAND: Objection to form, vague.
7        THE WITNESS: Yes.
8        MS. MAINIGI:
9        Q. And the temporary suspension of QOG -- were
10   there just differences of opinions on that particular
11   issue?
12       A. Yes, ma'am.
13       Q. Amongst different SME's?
14       A. Yes, ma'am.
15       MR. ARMAND: Objection to form.
16       MS. MAINIGI:
17       Q. And would both of those, ultimately management
18   made a decision as to which way to go on that?
19       MR. ARMAND: Objection to form.
20       THE WITNESS: The decision came from management,
21   yes.
22       MS. MAINIGI:
23       Q. You mentioned something about the QA results
24   still being shared with a level that was two down from
25   Ms. Mairone. Can you elaborate on that?

Page 143

1        A. You were asking -- I think the question was in
2    context of who should be receiving that type of
3    information, and so initially it was going to Rebecca.
4    Then we were talking about her direct reports, Armand,
5    Jim White, Robert, et cetera; and then we were saying
6    that if really the people who really needed to get it
7    was two down from Rebecca, which were actually the
8    people in the trenches, if you will.
9        Q. And who -- how many people were two down from
10   Rebecca? Do you have a sense?
11       A. Oh, a number.
12       Q. Okay. And you don't know what they did with
13   that information when they received it?
14       A. When you say "they," you are talking about --
15       Q. The people two down from the trenches.
16       MR. ARMAND: Objection to form. Assumes facts not
17   in evidence.
18       THE WITNESS: We didn't -- that was the point where
19   it was being restricted, and the question to me was
20   where should that information be going to, and I said at
21   a minimum two down from Rebecca.
22       MS. MAINIGI:
23       Q. Do you know whether the folks two down from
24   Rebecca ultimately got the information through other
25   means?

Page 144

1        A. At what point?
2        Q. At some point during the High-Speed Swim Lane
3    process.
4        A. At some point --
5        MR. ARMAND: Objection form.
6        THE WITNESS: I couldn't tell you what points
7    because it would be different for different groups.
8        MS. MAINIGI:
9        Q. Okay. Do you know whether checklists and job
10   aids actually continued to be used by the field?
11       MR. ARMAND: Objection to form. Vague.
12       THE WITNESS: During or after?
13       MS. MAINIGI:
14       Q. During the High-Speed Swim Lane process.
15       A. Did they continue to be used, you said?
16       Q. Yes.
17       A. They were continued to be used. They were not
18   required.
19       Q. Just because they are not required didn't mean
20   that loan specialists and others didn't continue to use
21   them; correct?
22       A. No.
23       MR. ARMAND: Objection to form.
24       THE WITNESS: No, that does not mean that. They
25   were -- they chose because of their want. I'm surmising

Page 145

1    again.
2        MS. MAINIGI:
3        Q. Could you clarify your answer. Do you know
4    whether loan specialists and others used checklists or
5    job aids --
6        A. I know that they did -- that some of our staff
7    continued to use the checklists irrespective of them
8    being required or not.
9        Q. Okay. Thank you. I don't have anything
10   further.
11       A. Thank you.
12       MR. HEFTER: Give me a minute or two.
13       MS. MAINIGI: Why don't we go off the record.
14       THE VIDEOGRAPHER: We're going off the record at
15   4:06 p.m.
16       (Recess taken.)
17       THE VIDEOGRAPHER: We are back on the record at
18   4:07 p.m.
19
20           -EXAMINATION-
21
22   BY MR. HEFTER:
23       Q. Mr. Brent, hi. Good afternoon. Michael
24   Hefter. We've met several times before, but we've never
25   met before today; correct?

37 (Pages 142 to 145)

# Exhibit D

1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2
     UNITED STATES OF AMERICA, )
3    ex rel. EDWARD O'DONNELL, )
            Plaintiff,         )
4                              )
     vs.                       )   Case No.:
5                              )   12-cv-1422
     BANK OF AMERICA           )
6    CORPORATION SUCCESSOR TO  )
     COUNTRYWIDE FINANCIAL     )
7    CORPORATION, COUNTRYWIDE  )
     HOME LOANS, INC., AND     )
8    FULL SPECTRUM LENDING,    )
            Defendants.        )
9    _____

10   UNITED STATES OF AMERICA, )
         Plaintiff-Intervenor, )
11                             )
     vs.                       )
12                             )
     COUNTRYWIDE FINANCIAL     )
13   CORPORATION, COUNTRYWIDE  )
     HOME LOANS, INC.,         )
14   COUNTRYWIDE BANK, FSB,    )
     BANK OF AMERICA, N.A.     )
15   and REBECCA MAIRONE,      )
         Defendants.           )
16

17

18

19               ORAL VIDEOTAPED DEPOSITION

20                 BRADDOCK W. COMEAUX

21                    JUNE 24, 2013

22

23

24

25

BRADDOCK W. COMEAUX - 6/24/2013

Page 2

1    ORAL VIDEOTAPED DEPOSITION OF BRADDOCK W. COMEAUX

2    produced as a witness at the instance of the Defendant

3    Bank of America and duly sworn, was taken in the

4    above-styled and numbered cause on the 24th day of June,

5    2013, from 11:15 a.m. to 7:18 p.m., before Dana

6    Richardson, Certified Shorthand Reporter in and for the

7    State of Texas, reported by computerized stenotype

8    machine at the offices of Bracewell & Giuliani, 711

9    Louisiana Street, Suite 2300, Houston, Texas 77002,

10   pursuant to the Federal Rules of Civil Procedure and the

11   provisions stated on the record or attached hereto.

Page 3

1                  APPEARANCES
2
3    FOR PLAINTIFFS:
4        Ms. Carina Schoenberger (via video conference) and
         Mr. Pierre Armand (via video conference)
5        UNITED STATES DEPARTMENT OF JUSTICE
         UNITED STATES ATTORNEY'S OFFICE
6        86 Chambers Street
         New York, New York 10007
7        Telephone: (212) 637-2774 - Fax: (212) 637-2686
         E-mail: carina.schoenberger@usdoj.gov
8
9    FOR DEFENDANT BANK OF AMERICA:
10       Ms. Enu Mainigi and
         Ms. Jennifer N. Wimsatt Pusateri
11       WILLIAMS & CONNOLLY, L.L.P.
         725 Twelfth Street, Northwest
12       Washington, D.C. 20005
         Telephone: (202) 434-5420 - Fax: (202) 434-5029
13       E-mail: emainigi@wc.com
14
15   FOR DEFENDANT REBECCA MAIRONE:
16       Mr. Ryan M. Philp
         BRACEWELL & GIULIANI
17       1251 Avenue of the Americas
         New York, New York 10020
18       Telephone: (212) 508-6100 - Fax: (212) 508-6101
         E-mail: ryan.philp@bgllp.com
19
     FOR DEPONENT:
20
21       Mr. Joel M. Athey and
         Mr. Amir Kaltgrad
22       CORBIN, ATHEY & MARTINEZ, L.L.P.
         601 West Fifth Street, Suite 1150
23       Los Angeles, California 90071-2024
         Telephone: (213) 612-0001 - Fax: (213) 612-0061
24       E-mail: jathey@corbinathey.com
25

Page 4

1                  APPEARANCES - (cont'd)
2
3    FOR DEFENDANT COUNTRYWIDE:
4        Mr. Kelly Phipps
         GOODWIN PROCTER
5        901 New York Avenue, Northwest
         Washington, D.C. 20001
6        Telephone: (202) 346-4000 - Fax : (202) 346-4444
         E-mail: kphipps@goodwinprocter.com
7
8    ALSO PRESENT:
9        Mr. Dennis Beard, Videographer

Page 5

1                      INDEX
2                                              PAGE
3    BRADDOCK W. COMEAUX
4    Examination by Ms. Mainigi .......................11
     Examination by Mr. Philp .......................101
5    Examination by Ms. Schoenberger (video) .........120
     Further Examination by Mr. Philp ...............222
6    Signature Page  .................................225
     Court Reporter's Certificate ...................226
7
8
9                    EXHIBITS
10
11   EXHIBIT        DESCRIPTION          PAGE
12
     Exhibit 1    New NSC Central Fulfillment     22
13                Model, 10/2/2007; Bates
                  Nos. BANA-SDNY-C-000321712
14                to 715
15   Exhibit 2    October 5, 2007, e-mail from     23
                  Greg Lumsden to fsl
16                notify@countrywide, Bates
                  Nos. BANA-SDNY-E-000052243
17                to 244
18   Exhibit 3    October 30, 2007, e-mail from    23
                  Wade Comeaux to Scott Bridges
19                and Rebecca Mairone, Bates
                  Nos. BANA-SDNY-E-002283640
20                to 641
21   Exhibit 4    November 16, 2007, e-mail from   36
                  Scott Bridges to Cliff
22                Kitashima, et al.; Bates
                  Nos. BANA-SDNY-E-001608235
23                to 236
24
25

2 (Pages 2 to 5)

BRADDOCK W. COMEAUX - 6/24/2013

Page 34

1          MS. SCHOENBERGER: Object to form.
2      Q. (BY MS. MAINIGI) Had you had a focus on
3   quality and compliance issues prior to coming to this
4   role --
5          MS. SCHOENBERGER: Object to form.
6      Q. (BY MS. MAINIGI) -- in your role in sales?
7      A. Yes. I think that's one of the reasons why I
8   was chosen to move from our -- from the origination side
9   of the -- the company because we had always had
10  outstanding quality and compliance numbers within our
11  groups. Our group had a great reputation of working
12  well with -- with underwriting and funding and
13  operations. So, we've always made that a bedrock of --
14  of our group's belief.
15     Q. And by your -- "our group," you're referring
16  to --
17     A. I'm just talking about my team.
18     Q. Okay.
19     A. My team, my division, my region, whatever the
20  case may be.
21     Q. The region that you had prior to coming to
22  Central Fulfillment?
23     A. Right. It's always been a fundamental belief
24  of -- that I've held close, too. I mean, my personal
25  communication to others, it was always very important.

Page 35

1      Q. Now, to your understanding, Mr. Comeaux, as
2   head of Central Fulfillment, was -- was the whole
3   division aware of this process change that FSL was going
4   through?
5          MS. SCHOENBERGER: Object to form,
6   speculation.
7      A. So, your -- can you repeat the question?
8      Q. (BY MS. MAINIGI) Sure. Was -- was -- were all
9   the people in FSL aware of this process change called
10  Central Fulfillment, to your knowledge?
11         MS. SCHOENBERGER: Object to form, calls
12  for speculation.
13     A. Yeah, there was a memo that went out to every
14  single employee from Greg Lumsden. There was a memo
15  that went out to the high-level employees for me. We
16  had constant town-hall meetings, face-to-face meetings.
17  Greg had conference calls. I had conference calls. It
18  would have been impossible for someone not to be aware
19  of what we were doing and -- and why we were doing it.
20     Q. (BY MS. MAINIGI) Was there any effort, to your
21  knowledge, to hide this process change?
22         MS. SCHOENBERGER: Object to form, calls
23  for speculation.
24     A. No. I -- I think everybody at lower levels was
25  aware of it; and I'm very confident because I was

Page 36

1   involved in meetings where Greg's supervisors, you know,
2   Sam Ball, all the other individuals, were intimately
3   aware. And it really told us directly that you have to
4   move to a prime model to be viable. You can no longer
5   have a subprime approach to underwriting loans because
6   you're -- it will be ineffective and inefficient and not
7   a viable business.
8          MS. MAINIGI: Just bear with me one
9   second. We're just checking to see if we have our next
10  round of documents.
11         Carina, do you guys have
12  BANA-SDNY-009032240 and then --
13         MS. SCHOENBERGER: 32 --
14         MS. MAINIGI: And then I've got
15  BANA-SDNY-001608235.
16         MS. SCHOENBERGER: We'll pull those.
17         (Exhibit 4 and Exhibit 5 marked)
18         MS. SCHOENBERGER: We've got 32240.
19         MS. MAINIGI: Why don't -- why don't we go
20  off the record for a second, please.
21         MS. SCHOENBERGER: And 8 -- and we've got
22  8235.
23         THE VIDEOGRAPHER: 11:56. We're off the
24  record.
25         (Recess taken)

Page 37

1          (Exhibit 6 marked)
2          THE VIDEOGRAPHER: It's 12:00 o'clock.
3   We're on the record.
4      Q. (BY MS. MAINIGI) Mr. Comeaux, let me shift
5   over to the quality-assurance process. Was -- was there
6   a quality-assurance process that in place at the time
7   you were heading up Central Fulfillment or when you
8   began to head up Central Fulfillment?
9      A. Yes.
10     Q. What did you think of that process?
11     A. I thought the process had very good intentions.
12  I felt like there were certain parts of the QA process
13  that emphasized things that distracted my team and other
14  people from some of the most important topics that were
15  the greatest leading factors for true SUS findings, but
16  it was definitely a process with hardworking people
17  that -- that were trying to do their best.
18     Q. Now, you referred to "true SUS findings." Does
19  that have anything to do with the QC process?
20     A. Yeah. An SUS finding was a QC finding, which
21  was the bottom-line way on which quality was -- was
22  graded at our division and all the divisions of
23  Countrywide.
24     Q. Could you just step back, if you could, at a
25  high level and explain to us the difference between the

BRADDOCK W. COMEAUX - 6/24/2013

Page 38

1    FSL QA process and the corporate QC process?
2        A.  Well, there were several things.
3            MS. SCHOENBERGER:  Object to form,
4    foundation.
5        A.  There were several things that were different
6    with the QA process.  First of all, many of the factors
7    were process-oriented and would never lead to an SUS
8    finding; but they were important to measure because they
9    were -- we were trying to make sure that we had the
10   proper processes in place to avoid potential SUS
11   findings.  So, in other words, it might be:  Was a
12   particular box checked on a checklist?  That would not
13   cause a loan to be unsellable or necessarily mean it was
14   not of high quality, but it would cause a QA finding.
15           Additionally, there were several -- a
16   large portion of those audits took place at Phase
17   Code 3, and many times there were things that were
18   corrected before Phase Code 4.  Just to use laymen's
19   terms, Phase Code 3 was basically a doc-draw status.
20   Phase Code 4 was funding.
21           In fact, even after funding, in regards to
22   an SUS finding, you could collect a document and add it
23   to the file after the fact because that would still mean
24   that the document was eventually provided and that the
25   loan was of high quality; but you did not have those

Page 39

1    opportunities with QA.
2        Q.  (BY MS. MAINIGI)  So, did you find the QA
3    results at Phase Code 3 to be useful?
4        A.  I felt like --
5            MS. SCHOENBERGER:  Object to form.
6            THE WITNESS:  Sorry.
7        A.  I felt like they were useful, but I do feel as
8    if they were not a good leading indicator of future SUS
9    findings or QC scores at all.
10       Q.  (BY MS. MAINIGI)  And the QC scores, were you
11   measured ultimately on the QC scores?
12       A.  Yes, we were always measured on QC scores; but
13   those results were significantly delayed.  So, for
14   example, in the fourth quarter, we would probably not
15   begin to get results.  That would be until maybe the end
16   of January.  So, the QA, as I understood it, had two
17   primary goals.  One was to analyze the process but also
18   to be -- they hoped it would be a leading indicator of
19   future SUS findings and QC scores, but it was not a very
20   good leading indicator.
21       Q.  And what about quality in all of this?  Were
22   the QC results designed to measure the quality of the
23   loan?
24       A.  Yes.  That was -- that along with our --
25           MS. SCHOENBERGER:  Object to form.

Page 40

1        A.  That along with our compliance scores were
2    probably the two biggest indicators of quality.
3        Q.  (BY MS. MAINIGI)  And -- and how did QA do, in
4    your view, in measuring loan quality?
5            MS. SCHOENBERGER:  Object to form,
6    foundation.
7        A.  You know, I -- there were -- because there were
8    multiple goals for the QA department, I think that
9    neither of the objectives were -- were perfectly met.  I
10   mean, they were trying to identify issues before a loan
11   was funded; and then they were also trying to be a
12   leading indicator.  And I think they did a better job of
13   identifying loans with quality issues before they
14   funded, and they did not do a great job of providing a
15   leading indicator for future QC findings.  I think the
16   greatest example would be that in the first month of our
17   process we had a 97 percent QA finding; and then for the
18   fourth quarter, we actually had, like, a 5.1 or a
19   5.4 SUS finding, which was actually the best quarter
20   that we had had in the entire year.
21       Q.  (BY MS. MAINIGI)  So, the 97 percent QA finding
22   you're referring to, the -- the QA department found that
23   97 percent of the loans had a defect?  Could you explain
24   the 97 percent?
25       A.  97 --

Page 41

1            MS. SCHOENBERGER:  Object to form,
2    foundation.  Sorry.
3            THE WITNESS:  No worries.
4        A.  97 percent of the loans had some type of
5    process issue that resulted in a QA finding.  No one
6    ever claimed that that was necessarily an absolute
7    leading indicator that there would be an SUS, but it was
8    saying that there was some process for them.  And as I
9    said earlier, it could be as simple as you have
10   everything, the document is completely filled out
11   properly, but it's not in the proper section of the VLF,
12   which was a virtual loan file.  So, if you looked on
13   another tab, it would be there.  Loan quality is still
14   there, just not on the perfect tab.
15           So, we did want to do things perfectly;
16   and we always desired to correct all the QA findings.
17   It was something we were passionate about but not
18   necessarily a perfect leading indicator of the SUS or QC
19   findings.
20           In addition, there were often data
21   integrity issues from the QA department whenever we --
22   the documents were actually in the right section; and --
23   and they made errors just like anyone else might make
24   errors.
25       Q.  (BY MS. MAINIGI)  And with respect to, then,

11 (Pages 38 to 41)

BRADDOCK W. COMEAUX - 6/24/2013

Page 94

1  relatively well.  We were not as high on quality, below
2  4 percent, as we wanted to be; but it was a big
3  improvement over the previous quarters and also in line
4  with the other divisions at Countrywide.  So, it was, I
5  guess, perplexing to me why we would change a process
6  midstream.
7       Q.  And -- and you've referenced going back to a
8  subprime model.  Can you tell me what you mean by that
9  in particular?
10      A.  As we discussed earlier, we were in a subprime
11 environment with -- where far more checks and balances
12 and redundancies were necessary.  We were trying to move
13 away from that so that we could have quality and
14 quantity.  And my opinion, we were moving away from some
15 of those decisions that we made that would have resulted
16 in a viable business that produce quality and quantity.
17      Q.  At this time period in March, '08, was SFL
18 still predominantly processing prime loans or had it
19 shifted back to subprime loans?
20          MS. SCHOENBERGER:  Object to form.
21      A.  Still predominantly prime.
22      Q.  (BY MS. MAINIGI)  And the processes that you
23 were looking -- well, the processes that others in FSL
24 were considering bringing back related to the subprime
25 model?

Page 95

1       A.  They were not industry standard --
2           MS. SCHOENBERGER:  Object to form, calls
3  for speculation.
4       A.  They were not -- many of the processes used in
5  our subprime environment were not industry standard nor
6  were they used at Countrywide.  So, in our opinion, they
7  were more subprime in nature.
8       Q.  (BY MS. MAINIGI)  You can set that aside,
9  Mr. Comeaux.
10          If you could take a look at Exhibit 18,
11 please.  Could you identify Exhibit 18 for the record,
12 Mr. Comeaux?
13      A.  It is titled "New CTC Process for Field Offices
14 and Central Fulfillment Teams."
15      Q.  And it's a bulletin dated 4/25/08.  You've
16 referenced before that some of the subprime processes
17 were brought back in.  Is this or is this not an example
18 of that?
19          MS. SCHOENBERGER:  Object to form.
20      A.  This is an example of that, yes.  Basically
21 with this document, unlike industry standard or the
22 other divisions of Countrywide, we were not allowing
23 loan specialists with the proper training and
24 certification to validate CLUES; and then we had, again,
25 required all of those to go to our underwriting

Page 96

1  department.
2       Q.  (BY MS. MAINIGI)  To your understanding, as
3  head of Central Fulfillment, Mr. Comeaux, did -- the
4  directives of Exhibit 18, did those go into effect
5  immediately?
6       A.  I believe they went into effect --
7           MS. SCHOENBERGER:  Object to form.
8       A.  -- on 4/28.
9       Q.  (BY MS. MAINIGI)  Thank you.
10          Let me put Exhibit 19 in front of you.
11 You can -- you can put Exhibit 18 aside there.
12          Exhibit 19 is an e-mail from you to
13 Ms. Mairone in the July, 2008, time period.  I realize
14 the print is a little small, and I apologize for that.
15 If you could take a moment and look at it and let me
16 know when you're ready.
17      A.  (Witness reviewing document.)
18          Okay.
19      Q.  In your first -- well, your -- your top e-mail,
20 you have a paragraph that begins with "At the end of the
21 day."  Could you read that into the record, please?
22      A.  "At the end of the day, senior management
23 overreacted when you were out" last "week.  I think the
24 problems" --
25      Q.  And I don't mean to interrupt you.  Senior

Page 97

1  management overreacted when you were out last week or
2  that week?
3       A.  Oh, I'm sorry.  That week.  Sorry.
4           "I think problems" -- "I think the
5  problems were very close to being resolved with the
6  process enhancements and direction we had put in place.
7  While we were not at 4 percent or less, we were at
8  6 percent and with additional training and focus,
9  4 percent was within reach without cratering
10 production."
11      Q.  What did you mean by that, Mr. Comeaux?
12      A.  There was a time whenever Rebecca was out for
13 medical issues; and many of the Central Fulfillment
14 philosophies or processes were changed in that time
15 frame.  And in my opinion, based on the QA results,
16 those changes may have been necessary; but it was proven
17 again and again QA results were not a leading indicator
18 of QC results.  And based on the QC results, the change
19 was not -- was not absolutely necessary and it -- it
20 greatly -- had a great adverse impact in employee
21 retention, overall productivity and several other things
22 so --
23      Q.  You say here, "I think the problems were very
24 close to being resolved with the process enhancements
25 and direction we had put in place."

25 (Pages 94 to 97)

BRADDOCK W. COMEAUX - 6/24/2013

1    **Did you and your team in that spring '08**
2    **time period put into place process -- process**
3    **enhancements and some sort of change of direction?**
4            MS. SCHOENBERGER: Object to form.
5        A.  The changes were not profound, but there were
6    subtle changes based on QA results and QC findings that
7    we felt were -- were very positive changes and we needed
8    to give those a little bit more time to take hold and --
9    and have a full impact.
10       **Q.  (BY MS. MAINIGI)  Did you feel those changes**
11   **were having an impact?**
12       A.  Yes. Later --
13           MS. SCHOENBERGER: Object to form.
14       A.  Later in the note, you can see that I
15   addressed, in '07, before Central Fulfillment was even
16   involved, that the initial SUS rates had been as high as
17   51 to 48 percent and our numbers were actually
18   substantially lower than that, but an overreaction to
19   change policy was based upon what appears to be a
20   24 percent initial SUS rate.
21           MS. MAINIGI:  The next exhibit, Carina, is
22   BANA-SDNY-001304610.
23           (Exhibit 20 marked)
24           MS. MAINIGI:  Do you have it, Carina?
25           MS. SCHOENBERGER:  No, not yet.

1            MS. MAINIGI:  Why don't we go off the
2    record while we look.
3            THE VIDEOGRAPHER:  3:06. We're off the
4    record.
5            (Discussion off the record.)
6            THE VIDEOGRAPHER:  3:08. We're on the
7    record.
8            MS. MAINIGI:  Are we ready? Sorry.
9            THE VIDEOGRAPHER:  We're on the record,
10   ma'am.
11           MS. MAINIGI:  Okay.
12           MS. SCHOENBERGER:  Ready here.
13           MS. MAINIGI:  Okay. Terrific.
14       **Q.  (BY MS. MAINIGI)  Mr. Comeaux, let me put**
15   **Exhibit 20 in front of you.  Why don't you take a moment**
16   **and take a look at that document and let me know when**
17   **you're ready, please.**
18       A.  (Witness reviewing document.)
19           Okay.
20       **Q.  Exhibit 20 is a set of e-mails that you sent to**
21   **Ms. Mairone in the June 19th, 2008, time period.  Can**
22   **you tell us the context of why you were sending**
23   **Ms. Mairone this e-mail with -- with a bunch of**
24   **different topics included?**
25       A.  Sure.

1            MS. SCHOENBERGER: Object to form.
2        A.  At the end of the day, I had received some
3    feedback from Rebecca around some organizational shifts
4    that were pending; and I wanted to make sure that those
5    were going to be clearly communicated across all
6    channels.  Additionally, I had addressed with her
7    verbally and then also in this note that I felt like Ed
8    O'Donnell, in the effort to position himself for a role
9    in Bank of America over time, was saying some things to
10   me and others that may not put Rebecca in the most
11   positive light.  So, I just wanting her to be aware of
12   that and that I felt -- I felt it was important she know
13   that and that she also, when crafting her organization,
14   make wise decisions around people that support her
15   rather than may not always have her best interest at
16   heart.
17       **Q.  (BY MS. MAINIGI)  And do you -- what was your**
18   **sense as reflected in your e-mail as to why you thought**
19   **Mr. O'Donnell was doing that?**
20       A.  I think overall Ed is a good --
21           MS. SCHOENBERGER: Object to form.
22       A.  Overall, Ed's a good person; but there were
23   going to be a limited amount of opportunities in the new
24   bank and I think he was using data at times that -- like
25   QA results to maybe undermine Rebecca's credibility at

1    certain situations and then -- then also maybe just
2    not always speaking positively about her whenever he had
3    opportunity.  So, I -- I had heard about it from
4    multiple people, I had witnessed it myself and I just
5    thought it important that she know about it.
6            MS. MAINIGI:  Thank you.  At this time, I
7    have no further questions.  I know Ms. Mairone's lawyer
8    would like to question against our time; and then the
9    remainder of that time, we'll reserve.
10           MR. PHILP:  Great.
11               EXAMINATION
12   BY MR. PHILP:
13       **Q.  Mr. Comeaux, my name is Ryan Philp.  I'm an**
14   **attorney with the law firm of Bracewell & Giuliani, and**
15   **we represent Rebecca Mairone.**
16           **In your role as executive vice president**
17   **of Central Fulfillment, who did you report to directly?**
18       A.  Rebecca Mairone.
19       **Q.  And how frequent -- frequently would you say**
20   **you've communicated with Ms. Mairone in your role as**
21   **executive vice president of Central Fulfillment?**
22       A.  In e-mail, several times a day.  Verbally,
23   probably three to ten times a week.  And often
24   face-to-face.
25       **Q.  And do you have a view regarding Ms. Mairone as**

26 (Pages 98 to 101)

BRADDOCK W. COMEAUX - 6/24/2013

Page 162

1    Q.  Was this the -- was it the first time you were
2  receiving QA reports in your position as -- as EVP of
3  Central Fulfillment?
4    A.  I don't know if it was the first time I
5  received the report; but I was saying since I had only
6  been in the role, by my recollection, for approximately
7  a month, that I wanted to really understand what the
8  reports meant and what was expected to me -- of me
9  whenever I saw a number like 97 percent.
10    Q.  In your previous role at Countrywide, did you
11  have any exposure to quality assurance process?
12    A.  I do not believe that the quality assurance
13  process was in place prior to -- prior to the -- the
14  rollout.  If it was, I wasn't privy to that information.
15    Q.  And were you satisfied by Mr. Brent's
16  explanation to you about what the QA results meant?
17    A.  I think he stated here that the QA results were
18  basically not a leading indicator of QC results, in as
19  many words, and he also said that, I think -- to be
20  exact, I'll quote it.  It says:  I would not be too
21  concerned about this since it is based on our PC review.
22  "What it tells us is that there are some deficiencies in
23  the process, that are easily correctable."
24        And that's on the top of page 3.  And I
25  think that was backed up by the fact that we had a

Page 163

1  5.1 QC rating in -- in quarter four, which was in line
2  or better than the other divisions, as well as better
3  than the three previous quarters.
4    Q.  How were deficiencies correctable?
5        MS. WIMSATT PUSATERI:  Objection, vague.
6    A.  Can you be more specific?
7    Q.  (BY MS. SCHOENBERGER)  Well, in the -- in the
8  portion that you just read, you said deficiencies in the
9  process are easily correctable.  So, how -- how could
10  the deficiencies be corrected?
11    A.  I think there were two ways to correct those
12  deficiencies.  One would be on a loan-level basis.  We
13  would -- the PC3 evaluation would make us aware of -- of
14  issues in a file that we could correct by the time the
15  loan funded.  Additionally, we would use these reviews
16  to identify process or training or execution issues with
17  our frontline employees.  So, if we saw someone, for --
18  for example, that consistently did not complete a form
19  properly, then, of course, we would sit down with them,
20  coach them and then, in the future, they would start to
21  perform better or they would go through the escalated
22  counseling process.
23    Q.  What does PC3 refer to?
24    A.  I'm sorry, I didn't explain that.  That is a
25  Phase Code 3 that is a phase code that is at -- I

Page 164

1  believe -- it's been a long time, but I believe that is
2  doc draw.  So, that is whenever mortgage documents are
3  drawn.  Phase Code 4 is whenever mortgage -- that's
4  whenever the mortgage was actually funded.  But like I
5  said, it's been a long time, but that is my -- that is
6  how I remember the phase codes.
7    Q.  And where QC results in Phase Code 4 of greater
8  concern than those in Phase Code 3?
9        MS. WIMSATT PUSATERI:  Objection,
10  misstates the evidence in the record.
11    A.  I don't know that they were necessarily of
12  greater concern, but they were final.  An error in Phase
13  Code 3 could be corrected.  An error in Phase Code 4 was
14  a little bit more permanent.  But keep in mind that
15  these 97 percent high-risk findings, the lion's share of
16  them had nothing to do with a QC finding.  They were
17  procedural.  They could be --
18    Q.  (BY MS. SCHOENBERGER)  And how --
19    A.  They were procedural.  They could be that a box
20  wasn't clicked in the right place, a form was in this
21  page of VLF instead of this other page of VLF, all of
22  those things which would lead to a -- which would lead
23  to a loan that didn't follow process but would
24  definitely not mean that it was unsellable, not high
25  quality or that Fannie or Freddie wouldn't accept the

Page 165

1  loan.
2    Q.  And what's your basis for that understanding?
3    A.  My recollection of what was --
4    Q.  Specifically that --
5    A.  My recollection that --
6    Q.  And why do you --
7    A.  Why don't you go ahead and ask your question
8  and I'll --
9    Q.  Please.
10    A.  Okay.  I'm going to go ahead and go --
11    Q.  What -- what's your basis for your
12  understanding that, as you put it, the lion's share of
13  the deficiencies were procedural?
14    A.  I remember in the QA audits that a significant
15  portion of that audit was procedural.  We addressed that
16  with regularity with the QA department and we were
17  hoping to have something that was a little bit better
18  leading indicator of actual QC findings, but I'm sure
19  somewhere in the documentation there is what was
20  included in the -- in the QA analysis and I'm -- I'm
21  confident that a large portion of those items would be
22  more procedural in process, in nature, rather than a
23  leading indicator of QC findings.
24    Q.  And what's your basis for your belief that QC
25  findings were not an indicator of quality?

42 (Pages 162 to 165)

BRADDOCK W. COMEAUX - 6/24/2013

Page 166

1    A.  I -- I didn't say --
2    Q.  QC findings.  Pardon me.
3        MS. WIMSATT PUSATERI:  Objection,
4  misstates the witness's testimony.
5        MS. SCHOENBERGER:  I'll restate the
6  question.
7    Q.  (BY MS. SCHOENBERGER)  What -- what's your
8  basis for your belief that QA results were not an
9  indicator of QC findings?
10       MS. WIMSATT PUSATERI:  Objection, asked
11  and answered.
12   A.  Well, first of all, the -- the -- the things
13  being reviewed were different.  QC findings were not
14  based on procedural process evaluations.  They were
15  purely based on loan quality parameters and
16  documentation, final documentation.
17       Secondly, the statistics from the QA
18  findings in Q4 were not very good.  They were at
19  80 percent or worse; and our Q -- and our QC findings
20  were 5 percent, which I've said a few times was -- was
21  good in comparison of previous quarters and other
22  divisions within the company.  So, 80 percent versus
23  5 percent that, you know, it's obvious it's not a great
24  leading indicator.
25   Q.  (BY MS. SCHOENBERGER)  Were there ever times

Page 167

1  when the QA findings were high and the QC findings were
2  high?
3        MS. WIMSATT PUSATERI:  Objection to form.
4    A.  "High" is a relative term.  They -- there was
5  never a time when our QC findings were as high as the QA
6  findings.
7    Q.  (BY MS. SCHOENBERGER)  Were QA findings subject
8  to a rebuttal process?
9    A.  QA findings?
10   Q.  Correct.
11   A.  Not a true rebuttal process, no.
12   Q.  And were QC findings subject to a rebuttal
13  process?
14   A.  Yes, they were.
15   Q.  And what was that process?
16   A.  I don't remember the QC process perfectly, but
17  primarily because it was not underneath my group's
18  responsibility and it changed over time.  There were
19  times whenever my group was more and less involved.
20  With that said, it's my understanding that the QC
21  finding would come into risk management; and depending
22  on the process at that time, they may or my not make my
23  team aware of it.  If my team was made aware of it, we
24  would aggressively try to find out what took place,
25  speak with the person who underwrote the loan, try to

Page 168

1  make sure that there wasn't something that was missed.
2  If there was something missed, we really tried to focus
3  on not only the individual file but the process or
4  training breakdown that led to the problem.
5        Whenever it was out of our hands, I don't
6  know exactly what took place because we -- there were
7  times when we were not always made aware of that within
8  my group.
9    Q.  If your team was not following the process
10  steps that were reviewed as part of the QA procedure,
11  could that impact the loan's quality?
12       MS. WIMSATT PUSATERI:  Objection, improper
13  hypothetical.
14       MR. ATHEY:  Same objection.  That is an
15  improper hypothetical.
16       If you have a view, you can answer,
17  though.
18   A.  Could you repeat the question once more?
19   Q.  (BY MS. SCHOENBERGER)  Sure.
20       MS. SCHOENBERGER:  Could the court
21  reporter read it back, please?
22       THE REPORTER:  Just a moment.
23       (The record was read as requested.)
24       MR. ATHEY:  Same objection.
25       MS. WIMSATT PUSATERI:  Same here.

Page 169

1    A.  I believe that there was quality information
2  that came out of the QA results, and my team and I took
3  that information seriously.  All I said earlier is that
4  it was not the best leading indicator -- leading
5  indicator of QC findings, but there was definitely
6  valuable information.  And at every level of our
7  organization, we took it seriously because if we did not
8  follow processes, it could lead to QC findings; but it
9  did not necessarily mean every time that there was a QA
10  finding, it would result in a QC finding.
11   Q.  (BY MS. SCHOENBERGER)  You say it was not the
12  best indicator of QC findings, but was it an indicator
13  of QC findings?
14       MS. WIMSATT PUSATERI:  Objection to form.
15   A.  I -- I don't know that it was.  I could never
16  find a statistical correlation between the two.  I mean,
17  we -- we found the information valuable.  We used the
18  information.  But I think anyone would be challenged to
19  find any statistical correlation between QA and QC.
20   Q.  (BY MS. SCHOENBERGER)  But a high-risk finding
21  in QA could result in an SUS; isn't that right?
22       MS. WIMSATT PUSATERI:  Objection, asked
23  and answered.
24       MR. ATHEY:  Objection, calls for
25  speculation and improper hypothetical.

43 (Pages 166 to 169)

# Exhibit E

Page 150

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,          :
    Plaintiff,                     :
                                   :
  -against-          Index No.       :
                      :12 Civ. 1422
COUNTRYWIDE FINANCIAL CORPORATION;   (JSR) :
COUNTRYWIDE HOME LOANS, INC.;        :
COUNTRYWIDE BANK, FSB; BANK OF AMERICA
CORPORATION; BANK OF AMERICA, N.A.;  :
and REBECCA MAIRONE,               :
                                   :
    Defendants.                    :
                                   :
- - - - - - - - - - - - - - - - - - -x

    CONTINUED VIDEOTAPED DEPOSITION of REBECCA
MAIRONE, taken by Plaintiff, at the offices of the
U.S. Attorney for the Southern District of New York,
86 Chambers Street, New York, New York 10007, on
Monday, July 8, 2013, commencing at 12:05 o'clock
p.m., before Annette Forbes, a Certified Shorthand
(Stenotype) Reporter and Notary Public within and for
the State of New York.

Page 151

2  A P P E A R A N C E S :
3     PREET BHARARA, ESQ.
      United States Attorney for the
4     Southern District of New York
      Attorney for Plaintiff United States
5        of America
         86 Chambers Street
6     New York, New York  10007
7     BY:  PIERRE G. ARMAND, ESQ.
           JAIMIE L. NAWADAY, ESQ.
8          Assistant United States Attorneys
9
      WILLIAMS & CONNOLLY LLP
10       Attorneys for Defendants Bank of
         Bank of America Corporation and
11       Bank of America, N.A.
         725 Twelfth Street, N.W.
12       Washington, D.C.  20005
13    BY:  ENU MAINIGI, ESQ.
           JENNIFER N. WIMSATT PUSATERI, ESQ.
14
15    GOODWIN PROCTOR
         Attorneys for Defendants Countrywide
16       Financial Corporation, Countrywide
         Home Loans, Inc., Countrywide
17       Bank, FSB
         620 Eighth Avenue
18       New York, New York  10018
19    BY:  WILLIAM HARRINGTON, ESQ.
20
      BRACEWELL & GIULIANI
21       Attorneys for Defendant Rebecca
         Mairone
22       1251 Avenue of Americas, 49th Floor
         New York, New York  10020-1104
23
24    BY:  MICHAEL C. HEFTER, ESQ.
           MARC MUKASEY, ESQ.
           RYAN M. PHILP, ESQ.
25         SETH M. COHEN, ESQ.

Page 152

1
2          THE VIDEOGRAPHER:  Good
3   afternoon.
4          This is the continuation of
5   the videotaped deposition of Rebecca
6   Mairone on July 8, 2013.
7          All counsel present will be
8   noted on the transcript.
9          Will the court reporter
10  please swear in the witness.
11         MS. FORBES:  Ms. Mairone, I
12  remind you that you are still under
13  oath.
14         THE WITNESS:  Yes.
15  DIRECT EXAMINATION (Continued)
16  BY MS. NAWADAY:
17     Q   Good afternoon, Ms. Mairone.
18     A   Hi.
19     Q   Just a reminder.  This is a
20  continuation of your deposition that began on
21  June 25th, and so the same instructions that
22  applied for the first part of your deposition
23  also apply today, okay?
24     A   Okay.
25     Q   So if you don't understand a

Page 153

1          Mairone
2   question, just let me know and if you need a
3   break at any time, just let me know, okay?
4      A   Okay.
5      Q   Any reason you can't testify
6   truthfully and completely today?
7      A   No.
8      Q   I'm handing you what we have had
9   marked as Mairone Exhibit 11.
10         You can let me know when you have
11  had an opportunity to review it.
12         (Document Bates stamped
13         BANA-SDNY-E-000052487 through 90 was
14         marked as Mairone Exhibit 11 for
15         identification, as of this date.)
16     A   (Perusing document.)  Okay.
17     Q   First, do you recognize this?
18     A   No.
19     Q   Any reason to believe you didn't
20  send this email on or around October 5, 2007?
21     A   No.
22     Q   Can you tell me what the Central
23  Fulfillment model is?
24     A   Sure.  The Centralized Fulfillment
25  model was a model that we were creating in order

1  (Pages 150 to 153)

Page 194

```
1              Mairone
2  that actually distributed those reports.  They
3  would come out of the QA organization.
4      Q    Did you think it was important
5  that these reports and feedback were provided to
6  the Central Fulfillment teams?
7          MS. MAINIGI:  Objection.
8      A    Yes, it was very important to have
9  not only the feedback and the data, but also
10  understanding and learning, and we used those
11  reports at all levels.
12     Q    Why was it important that the
13  feedback be provided to the Central Fulfillment
14  teams?
15         MR. HARRINGTON:  Objection
16     to form.
17         MS. MAINIGI:  Objection.
18         MR. HEFTER:  Objection.
19     A    For which reports?
20     Q    For the quality assurance reports.
21     A    For the quality assurance reports,
22  it really was procedural in nature.  So it's a
23  very different two sets of reports.
24         QC are really credit related and
25  QA was procedure related.
```

Page 195

```
1              Mairone
2          When we talk about procedures,
3  it's important that we have an understanding of
4  that the procedure steps were followed, that the
5  timing is followed appropriately to the
6  procedure.
7          It gives us feedback around
8  whether there is a process break or whether
9  there is training needed.  I mean, these were
10  important reports, so.
11     Q    Did you think it was important
12  that the quality control reports go to the
13  Central Fulfillment teams?
14         MS. MAINIGI:  Objection.
15     A    The quality control reports were a
16  different level of detail.  And they did not go
17  all the way down to the employee level.  It
18  wasn't at a loan level reporting, but it was
19  important for the seniors and management team to
20  understand the QC reporting.
21     Q    So the only loan level quality
22  reports that went to the Central Fulfillment
23  teams were the quality assurance reports; is
24  that right?
25         MR. HEFTER:  Objection.
```

Page 196

```
1              Mairone
2      A    No, that's not right.
3          The QC reports did go down to the
4  manager level.  And if there were issues, loan
5  level issues also, feedback was given at a loan
6  level at that point in time.
7      Q    But the only quality reports that
8  went specifically to the say loan specialists
9  and underwriter level were the quality assurance
10  reports; is that right?
11         MR. HARRINGTON:  Objection.
12         MR. HEFTER:  Objection.
13     A    I'm not clear at what point in
14  time you are talking about.
15         Can you be more specific?
16     Q    In around November 2007?
17     A    I'm not a hundred percent sure
18  which reports they got, which loan level reports
19  they got and how those were distributed.
20         I do know in general terms that it
21  was important to management and to react to
22  those and to be able to produce loan level
23  research, where required.
24     Q    And did you think that the quality
25  assurance feedback should be provided to the
```

Page 197

```
1              Mairone
2  loan specialists in the Central Fulfillment
3  initiative?
4          MR. HARRINGTON:  Objection
5     to the form.
6      A    Yes.  The information was
7  important, but the other piece to note was these
8  were brand new reports that we needed to make
9  sure were giving us the right information, that
10  the definition of the metrics were correct and
11  that the employees knew how to react to them,
12  how to utilize these reports.
13         Any time you introduce a new
14  report like that into an operation, it's
15  important to give proper instruction and have
16  proper definitions and work through those so
17  they can become much more effective.
18     Q    I think you said something about
19  the quality assurance reports being procedural.
20         Can you explain what you meant by
21  that?
22     A    Sure.  Procedural, meaning follows
23  the process steps.
24         I will give you an example.
25         A field needs to be input with a
```

12  (Pages 194 to 197)

Mairone

1
2  date within 48 hours of receipt of that
3  document. If that field was input at 72 hours
4  instead of 48 hours, it would be an error.
5         So that's an example of a
6  procedure error.
7      Q    Did the quality assurance reports
8  also address credit risk issue on the loans?
9         MR. HEFTER: Objection.
10     A    Credit risk issues are really done
11 by the QC organization. That's a very different
12 type of review than the QA reports.
13        The QA reports were procedural in
14 nature, and they said did you follow the exact
15 steps, every step of the procedure and timing of
16 implementation of data.
17        On the QC side, which was handled
18 by the credit organization, that was more
19 quality, credit, SUS related.
20        So those were two different sets
21 of reports.
22     Q    So, to be clear, is it your
23 testimony that the quality assurance reports had
24 nothing to do with credit risk?
25        MS. MAINIGI: Objection.

Mairone

1
2      A    In general terms, the quality
3  assurance was just focused on procedure. And
4  the QC was related to credit SUS. So two
5  different reports.
6      Q    Can a procedural defect, if it's
7  not corrected before the loan funds, result in
8  an SUS finding?
9         MR. HEFTER: Object to form
10        of the question.
11     A    That's hard. I can't -- I'm not
12 clear on the question. I'm sorry.
13     Q    Can a procedural defect result in
14 an SUS finding?
15        MR. HEFTER: Objection.
16        Incomplete and improper
17        hypothetical.
18     A    Again, I just go back to
19 procedures or procedures in quality and SUS and
20 credit are separate.
21        So, in general terms, if you have
22 a procedure error, it would be a procedure error
23 and likely would not be a credit SUS error.
24        Two very separate metrics.
25     Q    So, to be clear, if you have a

Mairone

1
2  specific procedural finding on a loan as part of
3  a QA review, could that finding show up as a
4  defect in a QC report?
5         MR. HEFTER: Objection.
6      A    I'm not aware --
7         MR. HEFTER: Objection. I'm
8         not finished.
9         THE WITNESS: Sorry.
10        MR. HEFTER: Objection.
11        Improper and incomplete
12        hypothetical. Outside the scope of
13        this witness' knowledge.
14     Q    You can answer.
15     A    I'm not clear on that scenario at
16 all.
17     Q    If loan specialists are not
18 following the procedures in manufacturing the
19 loans, can that create a credit risk?
20        MS. MAINIGI: Objection.
21        Calls for speculation.
22     A    It depends on the error type.
23     Q    Okay, but just to be clear, is
24 that a yes, that if loan specialists are not
25 following the procedures in manufacturing the

Mairone

1
2  loans, that could create a credit risk in some
3  cases, correct?
4         MS. MAINIGI: Objection.
5         MR. HEFTER: Objection.
6      A    It depends on what procedure you
7  are talking about. There's a lot of detail in
8  those procedures. That's hard to answer
9  generally.
10     Q    If loan specialists are not
11 following the procedures in manufacturing the
12 loans, could that be, could that result in an
13 investor repurchase demand?
14        MR. HEFTER: Objection.
15        MS. MAINIGI: Objection.
16        Calls for speculation.
17        MR. HEFTER: Objection.
18        Improper and incomplete
19        hypothetical.
20     A    Can you ask your question again?
21        MS. NAWADAY: Can you read
22        the question back?
23        (The record was read.)
24        MR. HEFTER: Calls for a
25 legal conclusion.

# Exhibit F

| | |
|---|---|
| **From:** | cliff_kitashima@countrywide.com |
| **Sent:** | Friday, March 21, 2008 5:12 PM |
| **To:** | edward_o'donnell@countrywide.com; steve_brent@countrywide.com; don_harris@countrywide.com; tamara_missirian@countrywide.com; vincenzo_santucci@countrywide.com; jane_mayers@countrywide.com; chris_r_lee@countrywide.com; stephani_gibbs@countrywide.com; tracy_srock@countrywide.com; norma_silva@countrywide.com; sal_castro@countrywide.com; pauline_yu@countrywide.com; jeremy_randall@countrywide.com; dwayne_wiseman@countrywide.com; barry_weisman@countrywide.com; christina_renner@countrywide.com; michelle_featherston@countrywide.com; kim_hamdan@countrywide.com; javier_jaraba@countrywide.com; sophia_kpolleh@countrywide.com; michael_s_thomas@countrywide.com |
| **Cc:** | greg_lumsden@countrywide.com; rebecca_mairone@countrywide.com; scott_bridges@countrywide.com |
| **Subject:** | Fw: FSL Random QC results based on 3/19 8pm data |

It's official,  Q4 2007 random weighted SUS rate was finalized last night at 5.1%!   This puts FSL at or below the company average for Q4 2007 SUS!

Your time and extraordinary effort on this project are very much appreciated.

Thank you!

----- Forwarded by Cliff Kitashima/Full Spectrum/CF/CCI on 03/21/2008 08:13 AM -----

| | | |
|---|---|---|
| **Anthony Ho/Corporate Admin/CF/CCI**<br><br>03/20/2008 09:16 PM | To | Steve Brent/FSL/CF/CCI@Countrywide |
| | cc | Cliff Kitashima/Full Spectrum/CF/CCI@Countrywide, Edward O'Donnell/FSL/CF/CCI@Countrywide, Michael S Thomas/FSL/CF/CCI@Countrywide, Mark Miller/Managing Directors/CF/CCI@Countrywide, Richard Mattke/Production Support/CF/CCI@Countrywide, Sandra Miller/Cred |
| | Subject | FSL Random QC results based on 3/19 8pm data |

Hi Steve,

Confidential Treatment Requested Under FOIA                    BANA-SDNY-E-008980582

Per your request, attached is the updated Random QC audit results for FSL. The sheets for the other divisions are still being reviewed, and the entire set will be sent out on Friday.

The report is based on data as of Wed 3/19 at 8 pm. Consequently, it <u>does</u> reflect the fact that one of the 4Q07 nonconforming SUS is no longer a division responsible SUS (i.e. the 4Q nonconforming SUS number went down from 17 to 16, and thus the 4Q nonconforming SUS % went from 16.5% to 15.5%).

For the product mix weighting, I believe your funding numbers are quite close to ours now. In a separate note, we have sent the product mix grouping logic to you and Michael.



FSL Random Audits Summary as of March 19 2008 8PM v2.xls

Please let Richard or me know if you have any questions.

Thanks,

Anthony Ho
Production Risk Management
Countrywide Financial Corporation
Internal: 92-509-6076
External: (818) 223-6076

Confidential Treatment Requested Under FOIA                                      BANA-SDNY-E-008980583

# Exhibit G

UNITED STATED DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA,

                             Plaintiff,
                             Civil Action No.
       -against-             12 Civ. 1422 (JSR)
                           ECF Case

COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE
HOME LOANS, INC.; COUNTRYWIDE
BANK, FSB; BANK OF AMERICA
CORPORATION; BANK OF AMERICA
N.A.; and REBECCA MAIRONE,

                             Defendants.

------------------------------------x

                        April 4, 2013
                        8:31 a.m.

    Videotaped Deposition of EDWARD J.
O'DONNELL, taken by Defendants, pursuant to
Notice, at the offices of Goodwin Procter, 620
Eighth Avenue, New York, New York, before
William Visconti, a Shorthand Reporter and
Notary Public within and for the State of New
York.

## Page 2

```
 1
 2   A P P E A R A N C E S :
         THE WASINGER LAW GROUP P.C.
 3       Attorneys for The Relator Edward O'Donnell
             Magna Place, Suite 875
 4           1401 S. Brentwood Boulevard
             Saint Louis, MO 63144
 5
         BY:  David G. WASINGER, ESQ.
 6           dwasinger@wasingerlawgroup.com
 7   U.S. DEPARTMENT OF JUSTICE
     UNITED STATES ATTORNEY'S OFFICE
 8   SOUTHERN DISTRICT OF NEW YORK
     Attorneys for United States
 9       86 Chambers Street
         New York, NY 10007
10
     BY:  PIERRE G. ARMAND, ESQ.
11       pierre.armand@usdoj.gov
         CARINA H. SCHOENBERGER, ESQ.
12       carina.schoenberger@usdoj.gov
13   GOODWIN & PROCTER LLP
     Attorneys for Countrywide Defendants
14       620 Eighth Avenue
         New York, NY 10018-1405
15
     BY:  WILLIAM HARRINGTON, ESQ.
16       wharrington@goodwinprocter.com
         MEGHAN K. SPILLANE, ESQ.
17       mspillane@goodwinprocter.com
18   WILLIAMS & CONNOLLY LLP
     Attorneys for Bank of America
19       725 Twelfth Street N.W.
         Washington, D.C. 20005
20
     BY:  ENU MAINIGI, ESQ.
21       emainigi@wc.com
         STEVEN M. CADY, ESQ.
22       scady@wc.com
         JENNIFER N. WIMSATT PUSATERI, ESQ.
23       jwimsatt.pusateri@wc.com
         A. JOSHUA PODOLL, ESQ.
24       ajpodoll@wc.com
         MALACHI B. JONES, ESQ.
25       mbjones@wc.com
```

## Page 3

```
 1
 2   A P P E A R A N C E S :           (Continued)
 3   BRACEWELL & GIULIANI LLP
     Attorneys for Rebecca Mairone
 4       1251 Avenue of the Americas 49th Floor
         New York, NY 10020-1104
 5
     BY:  MICHAEL HEFTER, ESQ.
 6       michael.hefter@bgllp.com
         RYAN M. PHILP, ESQ.
 7       ryan.philp@bgllp.com
         MARC L. MUKASEY, ESQ.
 8       marc.mukasey@bgllp.com
 9
10
     ALSO PRESENT:
11
         MICHAEL DRENKALO, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2           IT IS HEREBY STIPULATED AND AGREED
 3   by and between the attorneys for the
 4   respective parties herein that filing and
 5   sealing the same are hereby waived.
 6           IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10           IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be signed
12   and sworn to before any officer authorized
13   to administer an oath with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1
08:31:22   2           THE VIDEOGRAPHER:  We are now
08:31:28   3   recording and on the record.  My name is
08:31:31   4   Michael Drenkalo, certified legal video
08:31:33   5   specialist from Merrill Corporation.  Today's
08:31:34   6   date is April 4th, 2013.  The time is 8:31
08:31:37   7   a.m.  We are at the offices of Goodwin
08:31:39   8   Procter, LLP, 620 Eighth Avenue, New York,
08:31:43   9   New York to take the videotape deposition of
08:31:45  10   Edward O'Donnell in the matter of United
08:31:47  11   States of America versus Countrywide
08:31:50  12   Financial Corporation, et al., in the United
08:31:52  13   States District Court Southern District of
08:31:54  14   New York.
08:31:54  15           If the questioning and defending
08:31:56  16   attorneys will please introduce themselves
08:31:58  17   for the record and all other counsel will be
08:32:00  18   noted on the record by our court reporter.
08:32:02  19           MS. MAINIGI:  Enu Maingi from
08:32:05  20   Williams & Connolly for Bank of America.
08:32:06  21           MR. HARRINGTON:  William Harrington,
08:32:08  22   from Goodwin Procter for Countrywide.
08:32:08  23           MR. HEFTER:  Michael Hefter from
08:32:11  24   Bracewell & Giuliani on behalf of Defendant
08:32:14  25   Rebecca Mairone.
```

Page 34

EDWARD J. O'DONNELL

```
09:03:23   2    to be processed in a way different than subprime
09:03:26   3    loans?
09:03:26   4        A.   Yes.
09:03:28   5        Q.   Did you agree with that assessment
09:03:30   6    at the time?
09:03:30   7        A.   I did.
09:03:31   8        Q.   Describe for me the rationale for
09:03:37   9    that?
09:03:37  10        A.   Full Spectrum had, as you noted
09:03:39  11    earlier, been primarily funding subprime loans for
09:03:42  12    a number of years.  Because of the inherent risk
09:03:46  13    of those subprime loans we had built an
09:03:49  14    underwriting and processing and funding work flow
09:03:52  15    that was meant to identify and kind of root out
09:03:56  16    unacceptable risk.  Given that with lower risk
09:04:01  17    prime borrowers, those same inherent risks don't
09:04:07  18    exist or don't always exist.  Some of the
09:04:09  19    practices that we applied to subprime loans would
09:04:11  20    not be required for prime borrowers.
09:04:14  21        Q.   Describe for me what those
09:04:15  22    practices would be, to your recollection?
09:04:18  23        A.   The product offerings between prime
09:04:21  24    and subprime was very different.  Subprime
09:04:23  25    borrowers were generally required to provide full
```

Page 35

EDWARD J. O'DONNELL

```
09:04:26   2    income documentation.  And on the prime side there
09:04:30   3    were many more products that required less
09:04:34   4    strenuous conditioning around income.  You could
09:04:37   5    even state your income or state your assets or
09:04:39   6    state both.  So, some of the checks that we had
09:04:44   7    in place and the tollgates that we had in place
09:04:48   8    for subprime borrowers didn't apply or weren't
09:04:51   9    required by prime product.
09:04:53  10        Q.   What were some of those tollgates
09:04:55  11    that were not required anymore, to your
09:04:57  12    recollection?
09:04:57  13        A.   Generally around the income
09:05:00  14    documentation.
09:05:00  15        Q.   In that situation, in the case of a
09:05:09  16    loan that was a prime loan that was going through
09:05:11  17    the CLUES automated underwriting system and got a
09:05:17  18    CLUES accept, CLUES essentially was the underwriter?
09:05:20  19        A.   CLUES was programmed to match the
09:05:22  20    Countrywide product guide.  So to the extent that
09:05:26  21    the information was correctly entered into CLUES
09:05:28  22    and you got an accept, that was an outcome that
09:05:34  23    let you know that the loan met standards.
09:05:39  24        Q.   And the standards that CLUES
09:05:41  25    applied to that loan would have been the same
```

Page 36

EDWARD J. O'DONNELL

```
09:05:46   2    standards that a manual underwriter would have
09:05:48   3    applied to that loan?
09:05:49   4        A.   For the most part.  CLUES was not
09:05:54   5    always kept contemporary.  So as product changes,
09:05:58   6    either expanding or retracting, there were periods
09:06:01   7    of time when we had manual checklists to remind
09:06:04   8    people about conditions that CLUES would not
09:06:07   9    require or would not fire that they had to add.
09:06:14  10        Q.   So there is always a need to update
09:06:20  11    CLUES, correct?
09:06:21  12        A.   Correct.
09:06:21  13        Q.   But those of you in risk management
09:06:26  14    I gather had a fairly good handle on the changes
09:06:30  15    to CLUES that had not yet been made and needed to
09:06:34  16    be made such that manual underwriting could fill
09:06:38  17    in that gap?
09:06:39  18        A.   Correct.
09:06:39  19        Q.   Who within your organization had
09:06:43  20    lead on that process?
09:06:46  21        A.   Patrick Aliano and Ron Conon were
09:06:49  22    the primary folks that focused on products in
09:06:52  23    CLUES.
09:06:59  24        Q.   Now, prime borrowers as you said
09:07:04  25    earlier are usually of lower credit risk than
```

Page 37

EDWARD J. O'DONNELL

```
09:07:07   2    subprime borrowers?
09:07:08   3        A.   Yes.
09:07:09   4        Q.   And prime loans are less profitable
09:07:11   5    for the company than subprime loans?
09:07:12   6        A.   Depends on the period of time that
09:07:14   7    we are talking about.
09:07:15   8        Q.   That is a good point.  If we focus
09:07:17   9    on 2007, 2008, were prime loans less profitable
09:07:21  10    than subprime?
09:07:22  11        A.   2008 subprime wasn't available so
09:07:24  12    there was no potential for profitability there.
09:07:26  13    2007 I would say that the revenue available or
09:07:30  14    profit available on prime and subprime was pretty
09:07:33  15    close.  Neither was extremely profitable.
09:07:35  16        Q.   How about in the 2004 to 2006 time
09:07:39  17    period?
09:07:39  18        A.   Subprime was more profitable.
09:07:44  19        Q.   Do you have an order of magnitude
09:07:45  20    in terms of profitability in your --
09:07:48  21        A.   No, I would be guessing.
09:07:51  22        Q.   Now, prime loan borrowers also they
09:07:57  23    know they're prime loan borrowers so they want a
09:08:00  24    faster turn around time for their loans; correct?
09:08:03  25        A.   For the most part.
```

Page 142

EDWARD J. O'DONNELL

```
11:36:31   1
11:36:31   2        you can answer.
11:36:34   3        A.   The pilot was different in
11:36:36   4   different elements of the pilot.  From my
11:36:36   5   perspective, from a risk perspective we saw that
11:36:40   6   loans did not meet the quality mark.  So that was
11:36:43   7   not acceptable.  From an impact on turn time
11:36:47   8   within the pilot, I think that was successful.
11:36:50   9        So loans did move more quickly
11:36:52  10   through the process from application to funding in
11:36:56  11   the Hustle pilot.  And so those are at least two
11:37:00  12   different ways to assess outcome.
11:37:06  13        Q.   At the end of the pilot you were
11:37:07  14   concerned about the quality of the work flow,
11:37:09  15   correct?
11:37:10  16        MR. WASINGER:   Objection to form.
11:37:10  17        Subject to that you can answer.
11:37:12  18        A.   I was concerned about the quality
11:37:13  19   of the loans.  Not the quality of the work flow.
11:37:19  20        Q.   What did you do about that given
11:37:20  21   your role in risk and underwriting at the end of
11:37:23  22   the pilot?
11:37:23  23        MR. WASINGER:   Objection as to form.
11:37:24  24        And that is ambiguous.  Subject to that you
11:37:27  25        can answer if you understand.
```

Page 143

EDWARD J. O'DONNELL

```
11:37:28   1
11:37:28   2        A.   I think in early October my group
11:37:32   3   built a summary of the loans that had gone through
11:37:36   4   the process in the first six weeks or so.  And we
11:37:38   5   shared the outcomes of those loans based on our
11:37:42   6   review of the funded loans with senior management.
11:37:45   7   And basically said, okay, these are the loans that
11:37:47   8   went through the pilot from a quality perspective.
11:37:51   9   These are the type of issues that we identified.
11:37:53  10   And we believe that if these loans were reviewed
11:37:56  11   by corporate QC or an investor, we would have a
11:38:00  12   severely unsat rate that is outside of a tolerance
11:38:04  13   of three or four percent.
11:38:07  14        Q.   What was the reaction?
11:38:10  15        MR. WASINGER:   Objection as to form.
11:38:11  16        Ambiguous.  Subject to that you can answer if
11:38:13  17        you understand.
11:38:16  18        A.   The reactions were different.  So,
11:38:18  19   Cliff and I were very concerned about the quality
11:38:21  20   of the loans.  The folks that ran the project and
11:38:24  21   were responsible for oversight of the team
11:38:29  22   involved in the process wanted more time.  They
11:38:31  23   felt like the two months that we had run the pilot
11:38:35  24   were insufficient to make any definitive
11:38:37  25   assessment.
```

Page 144

EDWARD J. O'DONNELL

```
11:38:38   1
11:38:38   2        Q.   Regarding the quality of the loans?
11:38:40   3        MR. WASINGER:   Same objection.
11:38:43   4        Subject to that you can answer.
11:38:44   5        A.   Regarding the processors' ability
11:38:46   6   to handle new authority and in turn the result,
11:38:50   7   the quality of the loans.
11:38:51   8        Q.   Now, the loans that were going into
11:39:02   9   the High Speed Swim Lane pilot were low risk prime
11:39:02  10   loans, correct?
11:39:03  11        MR. WASINGER:   Objection as to form.
11:39:05  12        Mischaracterizes the evidence.  Subject to
11:39:07  13        that you can answer.
11:39:07  14        A.   The pilot was designed for lower
11:39:09  15   risk prime loans, that's correct.
11:39:17  16        Q.   So, how could it be that the lower
11:39:20  17   risk prime loans had quality issues?
11:39:23  18        MR. WASINGER:   Objection to form.
11:39:24  19        Speculation.  Subject to that you can answer.
11:39:26  20        A.   If the loans were allowed to fund
11:39:28  21   with missing conditions or unacceptable
11:39:30  22   documentation, then the loan would not be
11:39:34  23   acceptable.
11:39:35  24        Q.   That doesn't speak to necessarily
11:39:43  25   to the quality of the loan, correct?
```

Page 145

EDWARD J. O'DONNELL

```
11:39:45   1
11:39:45   2        MR. WASINGER:   Objection.
11:39:46   3        Argumentative.  Subject to that you can
11:39:49   4        answer.  And objection to form.  Subject to
11:39:52   5        that you can answer.
11:39:52   6        A.   If the loan is funded with
11:39:54   7   incomplete, missing or incorrectly cleared
11:39:58   8   conditions, that would affect the quality of the
11:40:00   9   loan.  It would impact the saleability of the loan
11:40:03  10   and could also impact the performance of the loan
11:40:06  11   in terms of the borrowers' ability to repay.  It
11:40:12  12   could also open the door for a fraudulent
11:40:16  13   transaction to pass through.
11:40:17  14        Q.   The types of issues that you were
11:40:20  15   seeing in your QA process during the pilot related
11:40:24  16   to missing documentation as well as some missed
11:40:31  17   steps in the processing?
11:40:32  18        MR. WASINGER:   Objection.
11:40:33  19        Q.   Primarily.
11:40:34  20        MR. WASINGER:   Mischaracterizes the
11:40:36  21   prior testimony.  Subject to that you can
11:40:36  22   answer.
11:40:39  23        A.   The QA process was set up to assess
11:40:41  24   the loan in two different ways.  One, were the
11:40:46  25   process steps required followed.  Did someone
```

Page 146

EDWARD J. O'DONNELL

| | | |
|---|---|---|
| 1:40:49 | 2 | follow the map from point A to point B.  And then |
| 1:40:52 | 3 | two, was the quality of the loan from a corporate |
| 1:40:56 | 4 | QC assessment type of view acceptable.  Were |
| 1:41:00 | 5 | conditions properly met.  Was income properly |
| 1:41:02 | 6 | assessed and calculated.  Was an appraisal and |
| 1:41:08 | 7 | collateral itself acceptable.  Were the right |
| 1:41:11 | 8 | people vested on title.  And would that loan |
| 1:41:14 | 9 | ultimately be within guidelines and approved and |
| 1:41:19 | 10 | funded in conjunction with the conditions fired by |
| 1:41:23 | 11 | CLUES. |
| 1:41:32 | 12 | Q.    Did you and Mr. Kitashima in your |
| 1:41:34 | 13 | roles then implement changes to the central |
| 1:41:45 | 14 | fulfillment process when it kicked off in October? |
| 1:41:47 | 15 | MR. WASINGER:  Objection to form. |
| 1:41:48 | 16 | Subject to that you can answer. |
| 1:41:49 | 17 | Q.    To address the concerns that you |
| 1:41:52 | 18 | had regarding quality in the pilot. |
| 1:41:54 | 19 | MR. WASINGER:  Same objection. |
| 1:41:54 | 20 | A.    Can you repeat the question? |
| 1:41:59 | 21 | Q.    Sure, let me rephrase it.  To |
| 1:42:01 | 22 | address the quality concerns that you had in the |
| 1:42:03 | 23 | pilot, did you and Mr. Kitashima, given your roles |
| 1:42:07 | 24 | in risk and quality and underwriting, recommend |
| 1:42:13 | 25 | additional criteria for High Speed Swim Lane work |

Page 147

EDWARD J. O'DONNELL

| | | |
|---|---|---|
| 1:42:18 | 2 | flow loans for the general kickoff? |
| 1:42:20 | 3 | MR. WASINGER:  Objection, compound, |
| 1:42:21 | 4 | calls for speculation, objection to form. |
| 1:42:24 | 5 | Subject to that you can answer. |
| 1:42:26 | 6 | A.    My recollection is that two things |
| 1:42:27 | 7 | happened.  During the pilot itself there was a |
| 1:42:30 | 8 | push for more loans, more product, different types |
| 1:42:35 | 9 | of product to be added to the pilot.  That the |
| 1:42:40 | 10 | project team led my Mark Barnett had the view that |
| 1:42:43 | 11 | not enough loans were going through the process. |
| 1:42:46 | 12 | And that the conclusions about improvements in |
| 1:42:50 | 13 | turn time or loan specialists ability to follow |
| 1:42:54 | 14 | the work flow didn't involve enough loans.  So |
| 1:42:57 | 15 | they wanted to add more stuff to that and both |
| 1:42:59 | 16 | Cliff and I objected to that. |
| 1:43:06 | 17 | Q.    What did you object to be added? |
| 1:43:09 | 18 | A.    We objected to any expansion above |
| 1:43:12 | 19 | the original parameters. |
| 1:43:13 | 20 | Q.    Which were? |
| 1:43:14 | 21 | A.    I believe 680 FICO scores, full |
| 1:43:21 | 22 | doc, conforming loans, owner/occupied, non-arm's |
| 1:43:24 | 23 | length transaction, loan limits, conforming loan |
| 1:43:29 | 24 | limits.  Owner/occupied, I think I might have |
| 1:43:33 | 25 | said.  No purchase, refinance only. |

Page 148

EDWARD J. O'DONNELL

| | | |
|---|---|---|
| 1:43:46 | 2 | Q.    The loans that went through the |
| 1:43:48 | 3 | High Speed Swim Lane were refinancings only, |
| 1:43:52 | 4 | correct? |
| 1:43:52 | 5 | MR. WASINGER:  Objection as to form. |
| 1:43:53 | 6 | Calls for speculation, subject to that you |
| 1:43:53 | 7 | can answer. |
| 1:43:55 | 8 | A.    That was part of my prior answer. |
| 1:43:57 | 9 | Q.    That is what I was trying to |
| 1:43:59 | 10 | confirm.  So that is correct? |
| 1:44:01 | 11 | A.    There were purchase transactions |
| 1:44:02 | 12 | were excluded. |
| 1:44:05 | 13 | Q.    Refinancings and it was limited to |
| 1:44:08 | 14 | refinancings of owner/occupied homes, correct? |
| 1:44:13 | 15 | MR. WASINGER:  Objection as to form. |
| 1:44:14 | 16 | Asked and answered.  Subject to that you can |
| 1:44:15 | 17 | answer. |
| 1:44:16 | 18 | A.    That was also part of my prior |
| 1:44:17 | 19 | answer.  Owner/occupied. |
| 1:44:22 | 20 | Q.    Is there less risk with a |
| 1:44:27 | 21 | refinancing for an owner/occupied property than |
| 1:44:32 | 22 | there is for a new purchase? |
| 1:44:34 | 23 | MR. WASINGER:  Objection, as to form. |
| 1:44:35 | 24 | Calls for speculation.  Subject to that you |
| 1:44:37 | 25 | can answer if you know. |

Page 149

EDWARD J. O'DONNELL

| | | |
|---|---|---|
| 1:44:38 | 2 | A.    There would be a lot of qualifiers |
| 1:44:45 | 3 | on that.  So there could be or there could not be, |
| 1:44:47 | 4 | it depends on the borrower, the property, credit |
| 1:44:49 | 5 | profile.  Lots of variables could impact the level |
| 1:44:52 | 6 | of risk. |
| 1:45:12 | 7 | Q.    High Speed Swim Lane, the name High |
| 1:45:18 | 8 | Speed Swim Lane, that originated with Mark |
| 1:45:20 | 9 | Barnett, correct? |
| 1:45:21 | 10 | MR. WASINGER:  Objection, as to form. |
| 1:45:22 | 11 | Calls for speculation.  Subject to that you |
| 1:45:24 | 12 | can answer if you know. |
| 1:45:25 | 13 | A.    I don't know if Mark was the author |
| 1:45:28 | 14 | or not.  He was the project manager but I don't |
| 1:45:30 | 15 | remember exactly who came up with that . |
| 1:45:39 | 16 | Q.    Someone on the design team came up |
| 1:45:41 | 17 | with that name, presumably? |
| 1:45:44 | 18 | MR. WASINGER:  Objection to form. |
| 1:45:45 | 19 | Calls for speculation.  Subject to that you |
| 1:45:45 | 20 | can answer if you know. |
| 1:45:48 | 21 | A.    I don't remember who exactly came |
| 1:45:49 | 22 | up with the name. |
| 1:45:52 | 23 | Q.    You refer to Hustle.  Did most |
| 1:45:58 | 24 | people call it High Speed Swim Lane or HSSL? |
| 1:46:04 | 25 | MR. WASINGER:  Objection to form. |

Page 150

EDWARD J. O'DONNELL

| | |
|---|---|
| 1:46:05 | 2   Calls for speculation on what most people |
| 1:46:08 | 3   refer to it.  It could have been out of |
| 1:46:09 | 4   presence.  Subject to that asset class. |
| 1:46:10 | 5       A.   The project was referred to as both |
| 1:46:17 | 6   HSSL and Hustle. |
| 1:46:32 | 7       Q.   The High Speed Swim Lane was a name |
| 1:46:34 | 8   given to the pilot, correct? |
| 1:46:35 | 9       MR. WASINGER:   Objection, as to form. |
| 1:46:37 | 10   Calls for speculation.  Asked and answered. |
| 1:46:39 | 11   Subject to that you can answer if you know. |
| 1:46:41 | 12       A.   I recall the pilot being called the |
| 1:46:43 | 13   High Speed Swim Lane pilot. |
| 1:46:44 | 14       Q.   And when the pilot was no longer a |
| 1:46:50 | 15   pilot, ultimately the work product went into |
| 1:46:54 | 16   central fulfillment, correct? |
| 1:46:55 | 17       MR. WASINGER:   Objection, as to form. |
| 1:46:56 | 18   Mischaracterizes the prior testimony. |
| 1:46:58 | 19   Subject to that you can answer if you know. |
| 1:47:00 | 20       A.   Central fulfillment, the business |
| 1:47:02 | 21   model of central fulfillment was set up to be |
| 1:47:06 | 22   dedicated to the funding of prime loans.  So that |
| 1:47:10 | 23   is exclusively what they did. |
| 1:47:16 | 24       Q.   No one called -- let me say this. |
| 1:47:23 | 25   Is it fair to say that the pilot was primarily |

Page 151

EDWARD J. O'DONNELL

| | |
|---|---|
| 1:47:28 | 2   called High Speed Swim Lane and once central |
| 1:47:32 | 3   fulfillment was launched in October, 2007, no one |
| 1:47:37 | 4   was really calling the work flow High Speed Swim |
| 1:47:42 | 5   Lane any more? |
| 1:47:42 | 6       MR. WASINGER:   Objection to form. |
| 1:47:43 | 7   Calls for speculation as to what people |
| 1:47:45 | 8   outside of his presence may have been calling |
| 1:47:48 | 9   the Hustle.  Subject to that you can answer. |
| 1:47:50 | 10       A.   My recollection is that we had |
| 1:47:53 | 11   multiple swim lanes for loans going through Full |
| 1:47:57 | 12   Spectrum.  So, we had swim lanes for higher risk |
| 1:48:03 | 13   loans that were CLUES refers.  To the extent there |
| 1:48:06 | 14   were any subprime or loans that were not eligible |
| 1:48:09 | 15   for the Hustle process, there was a swim lane |
| 1:48:12 | 16   dedicated to them. |
| 1:48:13 | 17       So the origination flow was |
| 1:48:17 | 18   bucketed based on the risk involved. |
| 1:48:21 | 19       Q.   And were there documents launching |
| 1:48:24 | 20   those other swim lanes that you're aware of? |
| 1:48:27 | 21       MR. WASINGER:   Objection to form. |
| 1:48:28 | 22   Calls for speculation.  Subject to that you |
| 1:48:30 | 23   can answer if you know. |
| 1:48:31 | 24       A.   Those other swim lanes were the |
| 1:48:34 | 25   continuation of the normal practices within Full |

Page 152

EDWARD J. O'DONNELL

| | |
|---|---|
| 11:48:41 | 2   Spectrum. |
| 11:48:41 | 3       Q.   So NCA continued, for example? |
| 11:48:43 | 4       MR. WASINGER:   Objection to form. |
| 11:48:45 | 5   Subject to that you can answer. |
| 11:48:48 | 6       A.   I'm not specifically -- |
| 11:48:50 | 7       Q.   The NCA work flow. |
| 11:48:52 | 8       A.   I'm not referring to a business |
| 11:48:54 | 9   channel.  I'm talking more from a risk level.  The |
| 11:48:58 | 10   swim lanes were divided by risk level.  So the |
| 11:49:00 | 11   highest risk would be loans that were receiving a |
| 11:49:02 | 12   CLUES refer, or prime or subprime.  So there was a |
| 11:49:09 | 13   work flow dedicated to that.  That was carried |
| 11:49:12 | 14   forward from the Full Spectrum model. |
| 11:49:13 | 15       Q.   And that work flow involved |
| 11:49:15 | 16   underwriter approval, correct? |
| 11:49:16 | 17       A.   Yes, that's correct. |
| 11:49:18 | 18       Q.   And tell me about another work flow |
| 11:49:21 | 19   for prime loans. |
| 11:49:22 | 20       A.   Purchase transactions or loans with |
| 11:49:26 | 21   properties over a million dollars or loans that |
| 11:49:30 | 22   are non-arm's length transactions, those also |
| 11:49:33 | 23   would be routed to have greater underwriter |
| 11:49:36 | 24   involvement. |
| 11:49:36 | 25       Q.   Give me another one. |

Page 153

EDWARD J. O'DONNELL

| | |
|---|---|
| 11:49:37 | 2       A.   Give you another? |
| 11:49:41 | 3       Q.   Another work flow that existed in |
| 11:49:43 | 4   FSL. |
| 11:49:43 | 5       A.   Those are the three primary. |
| 11:49:47 | 6       Q.   So CLUES refer was one? |
| 11:49:49 | 7       A.   Correct. |
| 11:49:50 | 8       Q.   And purchase transactions for over |
| 11:49:52 | 9   a million dollars was another, correct? |
| 11:49:54 | 10       A.   I would characterize it as high |
| 11:50:00 | 11   risk which would be the subprime and CLUES refers, |
| 11:50:05 | 12   moderate risk which would be the middle swim lane |
| 11:50:08 | 13   which would be purchase transaction nonowner/occupied |
| 11:50:12 | 14   larger loans, jumbo loans.  And then the high |
| 11:50:16 | 15   speed process which would be designed to be the |
| 11:50:18 | 16   lowest risk loans. |
| 11:50:20 | 17       Q.   You were involved in the launch of |
| 11:50:26 | 18   the High Speed Swim Lane, or excuse me, you were |
| 11:50:31 | 19   involved in the launch of the central fulfillment |
| 11:50:33 | 20   in Chandler, correct? |
| 11:50:35 | 21       MR. WASINGER:   Objection as to form. |
| 11:50:37 | 22   Timeframe.  Subject to that you can answer. |
| 11:50:39 | 23       A.   I was not part of the central |
| 11:50:41 | 24   fulfillment organization.  I was part of at that |
| 11:50:46 | 25   point risk management.  I moved from central |

Page 154

EDWARD J. O'DONNELL

11:50:48  2   underwriting, a central underwriting role
11:50:51  3   overseeing underwriting and funding to a role
11:50:54  4   overseeing a structured loan desk and risk
11:50:58  5   management in the quality assurance piece.
11:51:00  6      Q.   Wade Comeaux came to run central
11:51:05  7   fulfillment, correct?
11:51:06  8           MR. WASINGER:   Objection to form.
11:51:07  9   Timeframe.  Subject to that you can answer.
11:51:08  10     A.   That's correct, Wade was appointed
11:51:10  11  as leader of central fulfillment.
11:51:16  12     Q.   Do you know Wade to be an honest
11:51:18  13  person?
11:51:19  14          MR. WASINGER:   Objection to form.
11:51:20  15  Calls for speculation.  Subject to that you
11:51:22  16  can answer to the extent that you can answer
11:51:23  17  about someone's honest -- someone being an
11:51:28  18  honest person.
11:51:28  19     A.   I worked with Wade for a long time
11:51:30  20  at two different companies.  Wade was a sales guy
11:51:35  21  for lack of a better term.  He had grown up in the
11:51:38  22  production side of the house.  My experience with
11:51:40  23  him was through that role.  He was a good business
11:51:44  24  partner to deal with.
11:51:46  25     Q.   He came over with you from Conseco,

Page 155

EDWARD J. O'DONNELL

11:51:49  2   right?
11:51:49  3      A.   He did.
11:51:50  4      Q.   You wouldn't have -- did you hire
11:51:53  5   him?
11:51:54  6      A.   I did not.
11:51:54  7      Q.   Did you recommend him for the job?
11:51:56  8      A.   I did.  I recommended him for the
11:51:58  9   branch manager job that I think he had coming
11:52:01  10  over.
11:52:01  11     Q.   I assume that you wouldn't have
11:52:03  12  recommended Mr. Comeaux for a job if you didn't
11:52:05  13  think he was an honest and truthful person?
11:52:08  14          MR. WASINGER:   Objection, compound,
11:52:09  15  speculation.  Subject to that you can answer
11:52:11  16  to the extent that understand the ambiguous
11:52:14  17  question.
11:52:14  18     A.   I recommended Wade for the branch
11:52:16  19  manager job I think in Houston where he lived
11:52:20  20  because my experience had been -- he had been a
11:52:22  21  really good production manager, sales manager.
11:52:24  22     Q.   So, Mr. O'Donnell, can you answer
11:52:26  23  my question.  My question was, did you think
11:52:29  24  Mr. Comeaux was an honest and truthful person?
11:52:32  25          MR. WASINGER:   Objection as to form.

Page 156

EDWARD J. O'DONNELL

11:52:34  2   I reassert the same statements that I made
11:52:37  3   the last time that that question was asked.
11:52:40  4   Subject to that you can answer if you know.
11:52:41  5      A.   Are we talking about at the time I
11:52:43  6   recommended him for the job.
11:52:44  7      Q.   No, we are talking about in the
11:52:47  8   time that you recommended him for the job through
11:52:49  9   2008.
11:52:50  10     A.   I thought Wade was --
11:52:53  11          MR. WASINGER:   Wait, wait.  Same
11:52:54  12  objection.  So go ahead and answer subject to
11:52:56  13  that prior objection.
11:52:57  14     A.   Based on my experience with Wade, I
11:52:59  15  thought that Wade was fair and honest in his
11:53:03  16  dealings.
11:53:04  17     Q.   Now, you and he got into it
11:53:06  18  sometimes, correct, over quality issues?
11:53:09  19          MR. WASINGER:   Objection as to form.
11:53:11  20  Argumentative, and the term got into it.
11:53:14  21  Subject to that you can answer.
11:53:16  22     A.   I don't know if I would
11:53:18  23  characterize it as got into it.  We had -- I think
11:53:21  24  we had healthy debate and frankly that was part of
11:53:25  25  my role.  To make sure that -- I think any risk

Page 157

EDWARD J. O'DONNELL

11:53:30  2   manager -- if everybody loves the risk manager
11:53:33  3   they are probably not going a good job.  I raised
11:53:36  4   issues that were often times uncomfortable for
11:53:39  5   others to hear, but that was my role.
11:53:42  6      Q.   And sometimes your view was adopted
11:53:45  7   and sometimes his view was adopted
11:53:47  8           MR. WASINGER:   Objection to form.
11:53:48  9   Timeframe and the broad nature of the
11:53:50  10  question.  Subject to that you can answer.
11:53:52  11     A.   I would like to say my view was
11:53:54  12  always adopted in everything that I do, but that
11:53:57  13  is not the case.
11:54:00  14     Q.   It doesn't work for me either.
11:54:01  15     A.   There were certainly instances
11:54:02  16  where my recommendations were not considered as
11:54:05  17  strongly as I would have liked them to have been.
11:54:08  18     Q.   But in terms of Mr. Comeaux, you
11:54:16  19  did not view his actions as being fraudulent in
11:54:19  20  any way, did you?
11:54:20  21          MR. WASINGER:   Objection as to form.
11:54:21  22  Asked and answered, calls for legal
11:54:23  23  conclusion.  Subject to that you can answer
11:54:25  24  to the extent that you know what the term
11:54:27  25  fraudulent means.

# Exhibit H

# Central Fulfillment Initiative

## Review Results Update

### October 2007
### Central Fulfillment Findings
### "QA PC3"

Quality Assurance & Control Group
Full Spectrum Lending
prepared by JMayers
10/29/2007

**1**

Confidential Treatment Requested Under FOIA

NATIVE of BANA-SDNY-E-003964717

## QA PC3 Overview of Results
### October 19 through October 25, 2007

- **Review Sample/Results**
  - Through 10/15/2007
    - 130 loans reviewed
      - 92.3% - High Risk (120 of the 130 loans reviewed)
      - 0%    - Limited Risk (0 of the 130 loans reviewed)
      - 7.7%   - No Risk (10 of the 130 loans reviewed)

- **QA Results/Most Common Findings**

  The top six most common findings are listed below along with the count of findings per checklist question.  There were 2.16 findings per loan (total number of findings 281/130 loans).

| Count | %of 241 | Q# | Short Description of Question |
|---|---|---|---|
| 103 | 36.65% | Q#33 | All Screens in Fraud Detector are complete and in VLF |
| 44 | 15.66% | Q#31 | Appraisal Assessment form is complete and in VLF |
| 31 | 11.03% | Q#6 | CLUES Accept conditions carried to Status Mart |
| 30 | 10.68% | Q#10 | Income on final CLUES Accept matches Income Worksheet |
| 25 | 8.90% | Q#11 | Income Worksheet is complete and in VLF |
| 17 | 6.05% | Q#25 | Assets in final CLUES match 1003 |

**2**

Confidential Treatment Requested Under FOIA

NATIVE of BANA-SDNY-E-003964717

# QA PC3 Overview of Results
## October 12th thru October 18th

- The Fraud Detector findings consisted of incomplete or missing the following screens:
  - Identity Theft screen + resolution screens
  - Property Flip screen + resolution screens
  - Re-verification of Employment screen

- FSL QAC will address each Center's FVP and OM's to discuss common findings and best practices.
  - If issues with a Center or Team is derived from significant trends on Findings

- Monthly Conference calls with FVP's and OM's
  - Audit reports, trending, etc
    - With recommendations that will address best practices

3

NATIVE of BANA-SDNY-E-003964717

# Exhibit I

| | |
|---|---|
| **From:** | don_harris@countrywide.com |
| **Sent:** | Thursday, October 04, 2007 3:26 PM |
| **To:** | steve_brent@countrywide.com |
| **Cc:** | Cheri Shine; Loren Rodriguez; Tamara Missirian; Javier Jaraba; Patrick Aliano; Robert Price; James White; John Boland; Todd Green; Samantha Baker; Camilo Ramirez; Edward O'Donnell; Michael S Thomas; Michael Burns; Aaron Kalosis; Mark Barnett; Rafael Patino; Donna Braaten; Barbara L Heinecke; Lacrecia Whirl |
| **Subject:** | HSSL Weekly Review Summary through Sept 16, 2007 |

Steve, below are results of our Phase Code 3 QA review performed by the India group and validated/reviewed by our US Team (Jane's group in Richardson).  Remember these results are strictly based on the HSSL Model that was piloted with our Chandler & Richardson Production Teams.

FSL Quality Assurance & Control reviewed 60 loans in Phase Code 3 with application dates beginning 09/10/07.  The files were reviewed for compliance with the General Guidelines, Income, Assets and Property.

Of the 60 loans reviewed:

    1 loan was deemed to be No Risk  (1.67%)

    59 loans were deemed to be High Risk (98.33%)

     0 loans were deemed to be Limited Risk (0.00%)

Of the 59 loans deemed to be High Risk, 29 were processed in the Chandler Center (49.15%) and 30 were processed in the Richardson Center (50.85%).

The most common finding identified was the Fraud Detector action.  Jane and I conducted a call with Audrey and Lacrecia and they assured us that they would have a meeting with their Teams to correct this issue.  Jane and I also spoke with Robert Price and informed him that the Underwriters were requiring the Fraud Detector action to be completed prior to Funding, which is contrary to our SOP's.  Robert stated that he would make sure that the Underwriters are following the SOP's , which would result in these findings being eliminated.

There are 129 separate findings.  The count of findings per checklist question is as follows:

| Count | Q# | Short Description of Question |
|---|---|---|
| 53 | Q#33 | All Screens in Fraud Detector are complete and in VLF |
| 11 | Q#11 | Income Worksheet is complete |
| 11 | Q#31 | Appraisal Assessment form is complete and in VLF |

1

Confidential Treatment Requested Under FOIA

| 9 | Q#32 | All issues on Appraisal Assessment form are addressed |
|---|------|---|
| 8 | Q#10 | Income on final CLUES Accept matches Income Worksheet |
| 7 | Q#5 | UW/Doc & Doc Conditions cleared prior to CTC |
| 5 | Q#6 | CLUES Accept conditions carried to Status Mart |
| 4 | Q#3 | HSSL PC3 requirements met (Prime CLUES Accept at PC3) |
| 4 | Q#24 | If Alt Doc (Salaried/w/ot or bonus) confirm appropriate income docs in file |
| 4 | Q#25 | Assets in final CLUES match 1003 |
| 3 | Q#4 | HSSL PC3 LTV requirements met (LTV <_ 80%)  If >80% requires sign off by UW |
| 3 | Q# 23 | If Alt Doc (Salaried/no ot, comm, bonus)) confirm appropriate income docs in file |
| 2 | Q#1 | HSSL PC0 Entry requirements met (Prime CLUES Accept at PC0) |
| 2 | Q#2 | HSSL PC0 LTV requirements met (LTV <_ 80%) |
| 1 | Q#16 | Appropriate income docs are in file |
| 1 | Q#27 | In Flood zone, flood coverage is documented |
| 1 | Q#29 | Appraised value matches final CLUES |

Attached is the loan level detail:



HSSL QA Data Analysis 9.28.07.xls

FSL QA will also provide a similar summary on these same loan numbers at phase code 4 to insure that the recommendations were adhered to.

Thanks,



Donald Harris
1st VP, Quality Assurance & Control

2

Confidential Treatment Requested Under FOIA

BANA-SDNY-E-004220626

| 626-304-8400 ext. 2223<br> 92-597-2223 Internal<br>626-685-7817 Fax | |
|---|---|

3

Confidential Treatment Requested Under FOIA                    BANA-SDNY-E-004220627

# Exhibit J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA *ex rel.*
EDWARD O'DONNELL,

      Plaintiff,

          v.

BANK OF AMERICA CORPORATION,
successor to COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., and FULL SPECTRUM
LENDING,

      Defendants.

---

UNITED STATES OF AMERICA

      Plaintiff-Intervenor,

          v.

COUNTRYWIDE FINANCIAL CORPORATION,
COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE BANK FSB, BANK OF
AMERICA CORPORATION, BANK OF
AMERICA, N.A., and REBECCA MAIRONE,

      Defendants.

12 Civ. 1422 (JSR)

**Amended Expert Report of Charles D. Cowan, Ph.D. Regarding the
Selection of a Statistically Valid Random Sample and Extrapolation Methodology for
Mortgage Loans**

August 21, 2013

## I.      Introduction

1.      I have been retained by the United States Attorney for the Southern District of New York,

counsel for the United States of America ("United States"), to develop a methodology to select a

statistically valid random sample of loans from the loans purchased by Federal National

Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation

("Freddie Mac") (collectively "government-sponsored enterprises" or "GSEs") in connection

with Defendants' residential mortgage lending practices and to extrapolate from the sample to

the population using established methods.

2.      It is my understanding that Defendants implemented a "streamlined" loan origination

program called the "Hustle," which aimed to accelerate the loan origination process by removing

specific processes responsible for ensuring the quality of the loan underwriting process and

preventing fraud.

3.      Statistical sampling is a common and scientifically accepted methodology used for

research and other purposes, including in legal proceedings.  Courts routinely rely on statistical

sampling to establish liability and damages.  Moreover, statistical sampling, as a scientific

methodology, has been generally accepted in the scientific community for over one hundred

years.  There is a wide body of peer-reviewed literature in the field of statistics that discusses the

utility of using statistical sampling to estimate results in a particular population based on results

from a sample of that population.  There have been countless applications of statistical sampling

in academia, government, and business.

4.      Statistical sampling has been used to value and assess portfolios of loans by the government and businesses alike.  For example, federal regulators often examine a sample of loans held by financial institutions to determine whether the financial institution is in compliance with its statutory and regulatory requirements.  Similarly, private businesses routinely use sampling to review and assess pools of mortgage loans, for example, to assess credit quality, compliance with regulatory requirements and other laws, and adherence to internal policies and procedures.

5.      In order to draw accurate conclusions about the underwriting quality of the loans in the Hustle program and to compare it against the underwriting practices outside the Hustle program, I decided to select a random sample of 1000 loans composed of 600[1] Hustle loans and 400 Non-Hustle loans[2].  I further divided the Hustle and Non-Hustle populations into buckets, or clusters, using the following criteria: Default/Not-Default and Loan-to-value greater than 80%, Loan-to-value equal to 80%, and Loan-to-value greater than 80%.[3]  I do this to allow for conclusions to be clearly defined across similar clusters and also to allow for different definitions of which loans were a part of the Hustle program.  A more detailed description of this process is given in the body of this report.

6.      A sample of 600 Hustle loans and 400 Non-Hustle loans is sufficiently large to draw conclusions about the population of loans purchased by the GSEs in either grouping (Hustle or Non-Hustle) and specifically to make scientifically valid comparisons of the percent deviation

---

[1] I decided to include a larger percentage of the Hustle loans in the sample to improve the reliability of the calculation of damages.

[2] For more information regarding the criteria followed to include loans under the Hustle and Non-Hustle categories please refer to Appendix 1.

[3] There are a total of twelve (12) clusters based on two (2) possible outcomes for Hustle (either Hustle or Non-Hustle loan, two (2) possible outcomes for Default (either default or not-default, and three (3) possible outcomes for Loan-to-value (LTV<80%, LTV=80%, and LTV>80%).

from the underwriting guidelines (defective rate) observed under the Hustle program.

Regardless of the number of loans in the population, the sample size is based on a 95 percent

confidence level, with, at maximum, a margin of error of +/- 5 percent, which is standard in

statistics and has been accepted by courts as scientifically valid in a number of similar actions.

In addition, prior to drawing the sample, I stratified the loans found in each of the twelve clusters

by Fair Isaac Corporation Company ("FICO") credit score, which will likely reduce the

maximum margin of error.  An increase in the sample size to reduce the margin of error further

would not significantly improve the determination of whether the residential mortgage lending

practices used by Defendants deviated from their underwriting guidelines, and any such increase

in sample size would yield diminishing returns.  Likewise, use of additional stratification

variables would not necessarily reduce the margin of error and could introduce other issues

complicating the extrapolation of the sample to the population.

**II.      Professional Qualifications and Compensation**

7.       I have over forty years of experience in statistical research and design.  I received my

Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts

degree in Economics from the University of Michigan, and my doctorate in Mathematical

Statistics from the George Washington University.  I currently consult for numerous public and

private sector entities on the design, implementation, and evaluation of research, and the

synthesis of statistical and sampling techniques for measurement.  My professional experience

and academic tenures are included in my curriculum vitae, a true and correct copy of which is

attached as Exhibit 1.

**A.      Professional Experience**

8.       I have designed some of the largest and most complex research programs incorporating

sampling that were conducted by the federal government, including:  the Post Enumeration

4

Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the

Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC")

from 1990 to 1995, and many evaluation studies conducted for the Department of Justice, the

Department of Defense, the Department of Housing and Urban Development ("HUD"), and the

Department of Treasury.

9.      I have also provided expert advice to corporations and government agencies on the

incorporation of complex research designs in demographic and economic measurement

problems.  My most significant matters include the following:

- Development of procedures used by the RTC and the Federal Deposit Insurance
  Corporation ("FDIC") for determining the value of all assets held by the RTC/FDIC
  taken from failed banks and savings and loan associations.  This involved sampling and
  reviewing 10,000 loans per quarter to determine their value.  Results from the
  extrapolation of the samples were used in quarterly reports to Congress on the loss to the
  American taxpayer that resulted from these failures.  The RTC and FDIC also used these
  estimates of anticipated recoveries on assets for financial reporting.  As a result of this
  work, the Government Accounting Office awarded these agencies their first clean
  opinions from its annual review of agency financial statements.

- Application of econometric and biometric procedures for measuring credit risk in large
  portfolios of loans for the FDIC, Regions Bank, Option One, and Providian.  Frequently
  these model-based techniques are combined with the results of sample reviews to
  improve the reliability of evaluations of portfolios.  These models are used for a variety
  of purposes within financial institutions, such as the pricing of loans, the long-term
  management of customers, decision-making on workouts for delinquent loans, and the
  establishment of economic and regulatory reserves.

- Model fitting and development of projection methods for the FDIC and
  PricewaterhouseCoopers to measure the likelihood of loss or errors in recording loans
  held by banks or put up for auction; measurement of the likelihood of fraud and/or
  noncompliance in systems, including bank holding companies, trading activities for
  brokers, and systems for compliance with health department and judicial requirements.
  These model-based techniques are combined with the results of sample reviews to
  improve the reliability of evaluations of portfolios.

- Establishment of audit and sampling methods to determine the completeness and
  accuracy of reporting and record systems.  These procedures are used to both expand and
  streamline bank examinations for safety and soundness and also compliance
  measurement for the FDIC.  These sampling techniques are applied in the audit of federal

5

agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms.

- Evaluation of sample surveys conducted for the Department of Defense, the National Institutes of Health, the Department of Agriculture, the Department of Education, and the Treasury, each in response to Congressional inquiries on the validity of results in reports to Congress on activities in these agencies.

- Development of procedures used by the Bureau of the Census to apportion the population for revenue sharing purposes and to estimate the undercount in the Decennial Census of Population and Housing. These procedures include application of sample-based, capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the accuracy of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the under-count and over-count in the Census of Egypt, the number of missing children in Chicago, Illinois, and the number of homeless persons and families needing services in several large cities with transient populations.

10. From January 2002 to the present, I have been the Managing Partner of Analytic Focus, LLC. My firm provides expert witness and consulting services in litigation. My firm also has several non-litigation projects with the federal government, and has assisted banks in evaluating the value and stability of their loan portfolios. A list of cases in which I have given expert testimony during the previous 4 years is attached as Exhibit 2. My most significant matters include the following:

- I serve as a sampling expert in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc., et al.*, Index No. 602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009), a case pending in the Supreme Court of the State of New York and involving allegations of material misrepresentations and omissions regarding loan characteristics. In *MBIA*, I constructed for Plaintiff MBIA statistically valid random samples of mortgage loans from over 368,000 loans underlying 15 securitizations. In 2010, the court accepted the sampling and extrapolation methodology that I formulated, and the samples have been used as the basis for re-underwriting review and to estimate damages.

- I serve as a statistical expert in *In re Washington Mutual Mortgage Backed Securities Litigation*, No. C09-37 MJP (W.D. Wash. July 23, 2012), which is also an RMBS action and is pending in federal court in the Western District of Washington. In *Washington Mutual*, I constructed a statistically valid random sample of mortgage loans from 13,425 mortgage loans underlying six offerings. In July 2012, the court accepted the sampling

and extrapolation methodology that I proposed on behalf of Plaintiffs Policemen's Annuity and Benefit Fund of the City of Chicago and Boilermakers National Annuity Trust.  The samples have been used as the basis for re-underwriting review, and my extrapolation was admitted as evidence of liability.

- I serve as a sampling expert in sixteen RMBS actions brought by the Federal Housing Finance Agency ("*FHFA*") pending in the United States District Court of the Southern District of New York[4] concerning allegations of material misrepresentations and omissions regarding loan characteristics.  In *FHFA*, I developed a valid random sampling methodology to draw statistically significant samples from approximately 1,172,876 loans underlying 449 securitizations. The court accepted my sampling methodology and the samples I proposed as the basis of the re-underwriting review and extrapolation analyses.

- From 2003 to 2005, for Regions Bank, I took a sample of small business loans and evaluated the safety ratings that Regions Bank had assigned to these loans.  Regions Bank relied on my work to pass an examination and review conducted by the Federal Reserve and the FDIC, in their capacity as regulators of the bank.

- For Option One, a mortgage originator, I evaluated in 2001 to 2002 their portfolio of loans and developed models to forecast prepay and default rates for residential mortgages.

- For the FDIC, from 2002 to 2006, I selected samples of depositor records from a sample of banks that had been closed between 1990 and 2002, and conducted an analysis of the amount of time and effort required to close a very large bank and the problems associated with paying off depositors.  This work was used by the FDIC to streamline the processes it used to close banks and to pay depositors.

- For the Office of Personnel Management ("OPM"), from 2004 to the present, I redesigned the sampling system used by the OPM and KPMG for the audit of the Civil Service Retirement System and the Federal Employee Retirement System.  Each year, I am responsible for sampling records from four funding systems used by OPM to determine the safety and soundness of these funds.  My reports also are used to fulfill the requirements of the Improper Payments Act.

- In 2010 and 2011, I developed a methodology for the National Institutes of Health ("NIH") for the construction of sampling frames of physicians, health workers, and others involved in health-related fields.  My report, published by the NIH, serves as guidance to all 23 NIH agencies on methods for sample frame construction, sampling, and estimation for any research conducted by the NIH.

---

[4] The case numbers are:  11 Civ. 5201 (DLC), 11 Civ. 6188 (DLC), 11 Civ. 6189 (DLC), 11 Civ. 6190 (DLC), 11 Civ. 6192 (DLC), 11 Civ. 6193 (DLC), 11 Civ. 6195 (DLC), 11 Civ. 6196 (DLC), 11 Civ. 6198 (DLC), 11 Civ. 6200 (DLC), 11 Civ. 6201 (DLC), 11 Civ. 6202 (DLC), 11 Civ. 6203 (DLC), 11 Civ. 6739 (DLC), 11 Civ. 7010 (DLC), and 11 Civ. 7048 (DLC).

- From 2006 to the present, I have maintained a staff responsible for all quality control on litigation support work done by outside vendors hired by the Department of Justice in civil cases.  This staff designs and implements sampling plans that are used to conduct the quality control assessments.

- For the Small Business Administration, I conducted a 2005 study involving a sample of banks used to determine the manner in which banks evaluate the creditworthiness of small businesses.  The data from my research has been used by the Federal Reserve in its review of credit availability to small businesses and by the House Subcommittee on Banking.

- I have been retained as an expert witness or consultant in connection with litigation involving antitrust claims, deceptive sales practices, environmental toxic tort, insurance and reinsurance, trademark and trade dress confusion, and class actions on behalf of defendants and plaintiffs.  I frequently rely on statistical sampling in cases as disparate as wrongful death cases and antitrust cases.

11.    From November 1999 to December 2001, I was a Director at the Analysis Research Planning Corporation ("ARPC"), an economic and management consulting firm that provides statistical, econometric, economic and financial analysis, strategic advice and expert testimony to a wide variety of clients facing uncertainty, potential litigation or disputes.  My work involved the development of new forecasting models for present and future claims in asbestos cases, and the analysis of alleged diminution of value in toxic tort cases.

12.    From January 1997 to November 1999, I was a Director at Pricewaterhouse Coopers, LLP responsible for managing the financial research group in the Survey Research Center ("SRC") and in the Data Mining Group.  Research efforts in the SRC were in support of business-to-business consumer research and for the federal government to research regulatory impact.  The Data Mining Group provided fraud detection services for financial services organizations, optimization research for businesses concerned with supply chain issues in production, and analysis of delivery systems for a number of major delivery companies.

13.    From 1991 to 1996, I was the Chief Statistician for the FDIC and the RTC.  During this time, I was responsible for all research on valuation of properties and assets taken in by the FDIC

and RTC in the banking crisis of the 1980's and 1990's.  I supported research concerning fraud,

optimization of contracts with servicing companies, and consumer perceptions of their

interactions with banks and savings and loans.  I designed the sampling processes used for

routine bank examinations, the sampling processes for banks under consideration for closure, and

sampling processes for bank resolutions where the bank was closed and sold to an acquiring

bank.  I prepared and jointly presented results on the FDIC's consumer research to Congress,

specifically the House Banking Committee, in hearings regarding how consumers perceive what

they are told regarding retail transactions in banks.

14.     During this time, I also served on a number of independent review committees for

different federal agencies to evaluate the quality of research conducted or proposed by the

National Institutes of Health, the Department of Health and Human Services, the Department of

Justice, the Department of Treasury, and the Department of Agriculture.  These committees were

formed specifically to determine whether research presented to the federal government could

support conclusions drawn and to consider whether research proposed in grant applications

would be adequate to study the topic in question.

15.     From 1989 to 1991, I was the Chief Statistician for the Opinion Research Corporation

(the "ORC").  At the ORC, I designed samples and analytic methods by which financial

institutions could incorporate external information in aid of their efforts to increase deposits and

marketing of non-FDIC-insured products.  I also designed the sampling and estimation

procedures used by the U.S. Postal Service to measure operational efficiency and consumer

satisfaction for all post offices in the United States.

16.     From 1986 through 1989, I was the first Chief Statistician for the National Center for

Education Statistics ("NCES"), an agency within the Department of Education.  As the Chief

Statistician, I was responsible for the design of all surveys and research conducted by NCES, for reports to Congress on the state of education in the U.S. and around the world, and for staff development in research methods.  In particular, under my guidance, NCES was one of the first federal statistical agencies to publish standards for operations and research.  These standards are still mandatory for NCES staff and for all contractors working with the NCES.

17.    I also held a variety of positions at the U.S. Bureau of the Census, including Chief of the Survey Design Branch, where I was responsible for the technical aspects of all research conducted on the evaluation of surveys and the 1980 Decennial Census.  I also designed research studies on the validity of surveys conducted by the Census Bureau and experiments to measure response validity.  I helped a number of countries develop evaluation protocols for their economic and demographic research programs.

### B.    Experience in Academia

18.    I teach graduate and undergraduate courses in sampling theory, survey methods, statistics, and computer methods for analysis.  I am currently an Adjunct Full Professor in the Department of Biostatistics in the School of Public Health at the University of Alabama in Birmingham, Alabama.

19.    I also served as an Associate Professor of Statistics at George Washington University from 1993 to 1998, and served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989.

### C.    Publications

20.    I have co-authored two books:  one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and

optimization techniques.  A listing of these publications is included at pages 3 to 7 of my curriculum vitae, attached as Exhibit 1.

21.     A number of these publications pertain to the use of statistical sampling and/or financial analysis in connection with lending institutions and loans.  *See* Adrian M. Cowan & Charles D. Cowan, *Default Correlation: An Empirical Investigation of a Subprime Lender*, J. Banking & Fin., (2004); Charles D. Cowan & Adrian M. Cowan, *A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending*, Small Bus. Res. Summary (U.S. Small Bus. Admin. Office of Advocacy, Wash. D.C.), Nov. 2006; Adrian M. Cowan & Charles D. Cowan, *The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans*, 5 Int'l J. Banking & Fin. 31 (2008).

###     D.     Professional Societies

22.     I am a member of the following professional societies:  (i) American Statistical Association ("ASA"); (ii) American Association for Public Opinion Research ("AAPOR"); and (iii) International Association of Assessment Officers.  My positions on various professional committees are listed on page 3 of my curriculum vitae, attached as Exhibit 1.

23.     I have held a number of positions with the ASA.  From 1980 to 1981, I served as the Chair of the Committee on Privacy and Confidentiality; from 1989 to 1990, I served as the Program Chair of the Section on Survey Research Methods; and from 1995 to 2000, I served as the ASA's representative to the Research Industry Coalition.  I also served as the President of the Research Industry Coalition from 1999 to 2000.

24.     I have also held a number of positions with the AAPOR.  From 1982 to 1989, I served as the Chair of the Conference Committee; from 1984 to 1985, I served as the Associate Secretary-Treasurer; from 1985 to 1986, I served as the Secretary-Treasurer; and in 1998, I served as the President of the Washington/Baltimore Chapter of AAPOR.

### E.    Compensation

25.    I am being compensated for my work on this engagement at the rate of $595 per hour for my time for non-testimony and $695 for testimony.  The payment of my fees is not contingent on the opinions I express in connection with this action.

### F.    Supporting Facts, Data, and Documentation

26.    The facts, data, and documents that I considered in forming my opinions are listed in Exhibit 3.

## III.    Summary of Opinions

27.    Use of a statistically valid sample of loans allows the unbiased and precise estimation of the degree of deviation concerning Defendants' underwriting standards.  I understand that the United States proposes the use sampling to establish that, through the Hustle program, Defendants (i) eliminated quality control processes, (ii) concealed escalating rates of defects and fraud, and (iii) misrepresented that the loans complied with certain underwriting requirements and guidelines.

28.    The sample of 600 Hustle loans and 400 Non-Hustle loans is divided into additional buckets using the following criteria: Default/Not-Default[5] and Loan-to-value lower than 80%, Loan-to-value equal to 80%, and Loan-to-value greater than 80%[6].  The segregation of the sample into subsequent categories facilitates the comparisons between groupings, allowing for conclusions to be clearly defined across similar clusters.

---

[5] Loans with a delinquency status of 90 days or more were included in the Default category.

[6] I divided the population into three LTV buckets to address definitional issues about the maximum acceptable LTV.

29.     The results of re-underwriting the sample of 1000 loans will enable the United States to estimate, at a 95 percent confidence interval with a margin of error of at most plus or minus 5 percent, the defective rate for Hustle and Non-Hustle loans.  I selected the sample size to achieve the 95 percent confidence level, which is standard in statistics, and a margin of error of, at maximum, 5 percent, because it is sufficiently precise for the purpose.  Increasing the sample size to decrease the margin of error would also result in diminishing returns.  *See infra* at paragraphs 55 to 58.

30.     I have also, where such data was available, stratified each of the twelve clusters by FICO credit score to make it possible to reduce the margin of error.  Stratifying by additional variables would not meaningfully increase the chance that the margin of error could be reduced.  *See infra* at ¶¶ 59-60.

31.     Once the analysis of the loan files is complete, I will be able to extrapolate from the sample to the population of loans using well-established methods.

## IV.     Background on Sampling

### A.     Key Concepts in Statistical Sampling:  Confidence Level, Margin of Error, and Stratification

32.     Statistical sampling is often referred to as "probability sampling."  The population refers to the group about which we wish to draw inferences, and the sample is a defined subset of that population.  When a sample is randomly selected—that is, when each member of the population from which the sample is drawn has a known chance of being included in the sample—the sample provides an unbiased view of the population.

33.     The precision—or reliability—of a sample is measured using the confidence level and the margin of error.  *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, in Fed. Judicial Ctr., Reference Manual on Scientific Evidence 229, 243 (2d ed. 2000) ("In all forms of

13

probability sampling, each element in the relevant population has a known, nonzero probability of being included in the sample.  Probability sampling offers two important advantages over other types of sampling.  First, the sample can provide an unbiased estimate of the responses of all persons in the population from which the sample was drawn; that is, the expected value of the sample estimate is the population value being estimated.  Second, the researcher can calculate a confidence interval that describes explicitly how reliable the sample estimate of the population is likely to be.").

34.    The confidence level refers to the percentage of time that the actual value for the population will be within a specified range around the sample value.  The margin of error refers to that specified range around the estimated value from the sample.  For example, if the results of testing on the sample indicate that 50 percent of the Hustle loans were not originated in accordance with the GSEs underwriting guidelines, then a confidence interval of 95 percent with a +/- 5 percent margin of error means that 95 percent of the time, the true percentage of loans not originated in accordance with the GSEs underwriting guidelines in the population will be between 45 and 55 percent.  This range is known as the confidence interval.

35.    When a sample is used to test a binary question (here, whether a loan was defective or not), the estimate of the margin of error depends on the sample value.  The estimated margin of error (for a binary question) is greatest when the sample value is at 50 percent (here, meaning that for 50 percent of the loans in the sample, Defendants' residential mortgage lending practices deviated from the underwriting guidelines required by the GSEs).  As the sample estimate deviates from 50 percent, in either direction, the margin of error for that estimate decreases.  This variation in margin of error, as sample estimate changes, is described further below at Paragraphs 53 through 58.

36.     Although a sample drawn purely at random from within a population is statistically valid, one can improve the representativeness and reliability of the sample by stratifying the population and selecting the random sample from within the strata created. *See, e.g.*, Steven K. Thompson, *Sampling* 117-27 (2d ed. 2002); Paul S. Levy & Stanley Lemeshow, *Sampling of Populations: Methods and Applications* 121-89 (3d ed. 1999); William G. Cochran, *Sampling Techniques* 89-146 (3d ed. 1977); W. Edwards Deming, *Sample Design in Business Research* 276-358, 487-93 (1960). Stratification is a process where the population of loans is divided into mutually exclusive and exhaustive subgroups of loans. Stratification can be carried out only by using variables known for the entire population prior to sampling.

37.     Stratification commonly is used in sampling for two purposes. The first purpose, which is applicable here, is to increase the precision of the estimates from the sample. What is calculated from the sample is an estimate of the value in the population. The estimate has a margin of error due to sample-by-sample variability, which is directly related to the variability of the data being examined. When using a stratified sample, this variability is partitioned into two parts. The first part is the variability between the strata, and the second part is the variability within each of the strata. Variability between strata is eliminated by forcing the sample into these separate subgroups at the outset, leaving only the second part of the variability. Stratification does not guarantee a diminution in the margin of error; it makes the diminution possible. Stratification cannot increase the margin of error.

38.     Stratification also can ensure that some subgroups in the population are included in sufficient numbers to enable separate conclusions to be drawn or separate estimates to be made for each of the subgroups.

### B.      Statistical Sampling Is Scientifically Valid

39.      A wide body of peer-reviewed literature in the field of statistics discusses the utility of statistical sampling for making reliable estimates of parameters in large populations of entities. *See*, *e.g.*, Thompson, *supra*; Fed. Judicial Ctr., Reference Manual on Scientific Evidence (2d ed. 2000); Levy & Lemeshow, *supra*; Dan M. Guy, D. R. Carmichael, & O. Ray Whittington, *Audit Sampling: An Introduction* (4th ed. 1998); Leslie Kish, *Statistical Design for Research* (1987); Herbert Arkin, *Handbook of Sampling for Auditing and Accounting* (3d ed. 1984); Statistical Sampling Subcommittee of American Institute of Certified Public Accountants, *Audit Sampling* (1983); Jaroslav Hájek, *Sampling from a Finite Population* (Václav Dupač & D.B. Owen eds., 1981); Cochran, *supra*; Des Raj, *Sampling Theory* (1968); Deming, *supra*; Price Waterhouse, *Audit Guidance Series: Audit Sampling* (1989).

40.      In addition, statistical sampling has been used successfully for hundreds of years as a research tool.  Results from statistical sampling are replicable, meaning that statistical sampling meets the basic requirements of a scientific method.

41.      There have been numerous applications of statistical sampling in academia, business, and government.  For example, the nation's largest statistical agency, the United States Census Bureau, is authorized to base its surveys, including those on the extent of unemployment and the cost of living index, on samples.

42.      Statistical sampling has also been widely employed in the American legal system.  I have testified in over 50 cases, and sampling was accepted as scientifically valid in each of those cases in which a sample was used.  Outside of my personal experience, courts routinely approve the use of sampling in cases in which claims as diverse as breach of contract, fraud, antitrust, trademark infringement, or tort are at issue.  One commentator has characterized the Census Bureau's reliance on sampling as a "great step forward" in "the law's gradual acceptance of

sampling," because Census Bureau reports "were admissible at common law and in some states by special statutes."  Hans Zeisel & David Kaye, *Prove It with Figures: Empirical Methods in Law and Litigation* 101 (1997).  Shari Seidman Diamond, who authored the "Reference Guide on Survey Research," which is part of the Federal Judicial Center's *Reference Manual on Scientific Evidence*, has identified Census Bureau data and the Standard Table of Mortality (used to present average life expectancy) as examples of sample surveys that "are so well accepted that they even may not be recognized as surveys."  Shari Seidman Diamond, "Reference Guide on Survey Research," in Fed. Jud. Ctr., Reference Manual on Scientific Evidence 359, 365 n.18 (3d ed. 2011).

43.     The development of statistical sampling is grounded in mathematics and is not focused on the type of entity being sampled, but instead applies universally across any entity that can be counted.  The accepted techniques of statistical sampling are the same regardless of the population being sampled, whether it consists of widgets, tires, people, or loan files.  This principle results in a truism regarding the precision of the sample:  The precision of the sample can always be quantified when the methodology is random sampling and the sample is random.  Indeed, the result of random sampling should be expressed only as a value accompanied by a confidence interval.  Thus, it is as accurate to sample produce for spoilage as to sample loans for non-compliance with guidelines, and the sampling range in each case will be quantifiable and reviewable in the same way.

> **C.     Statistical Sampling Has Been Used To Value and Assess Portfolios of Loans**

44.     Statistical sampling has been used by the government and private businesses to value and assess pools of loans.

45.     Federal regulators, who are charged with examining loans and other activities at the financial institutions they regulate, look at a sample of loans, as it would be impracticable to

examine the overwhelming volume of loans held by such an institution.  For example, the FDIC routinely relies on statistical samples to examine a bank's compliance with statutory and regulatory requirements.  As the FDIC describes in a manual published on its website, bank regulators use statistical sampling of a bank's loan portfolio to determine, among other things: (i) the bank's adherence to its own lending policies, (ii) the adequacy of the quality of the bank's assets and collateral, and (iii) whether the bank has charged the right interest rate and set aside the proper amount of reserves for the risk it faces.  *See* F.D.I.C., *RMS Manual of Examination Policies* §§ 1.1 & 3.2 (2012), available at *http://www.fdic.gov/regulations/safety/manual/ index.html*, a true and correct excerpt of which is attached as Exhibit 4.  Thus, the FDIC's objective in using sampling is to determine whether risks in a pool of assets have been properly presented and priced.

46.     Similarly, based on my other engagements in this industry, I understand that private businesses that purchase and securitize mortgage loans routinely use statistical sampling to price loan portfolios.  Loan originators, underwriters and investment banks, and servicers may use sampling for these and other purposes:

- Loan originators generally require the use of sampling for quality control purposes when purchasing loans from third parties, such as correspondent banks.  Loan originators often require the seller to conduct a quality control review of a sample of loans to ensure compliance with guidelines, as well as regulatory compliance.

- Underwriters and investment banks generally use sampling in fulfilling their due diligence obligations.  More specifically, underwriters and investment banks rely on third-party due diligence firms to conduct credit and compliance reviews on random or adverse samples of loans selected from the pools of loans to be included in securitizations.

- Servicers generally use sampling to assess compliance with applicable servicing requirements.

- Experian, Transunion, and Equifax use sampling—specifically samples of loans taken from a small sample of banks—to create models to calculate credit scores.

18

- Financial institutions use sampling to conduct internal audit activities to ensure that transactions are correctly recorded as part of their quality control.

47.    HUD has set forth quality control procedures that include sampling to test loan origination and servicing for FHA-insured loans.  U.S. Dep't of Housing and Urban Dev., *Quality Control for Origination and Servicing Revisions to Mortgagee Letter 89-32* (May 26, 1993), a true and correct copy of which is attached as Exhibit 5.

## V.    Sampling Methodology Proposed

### A.    Purpose of Sample

48.    I understand that the United States will use the sample to determine that during the implementation of the Hustle program, Defendants (i) eliminated quality control processes, (ii) concealed escalating rates of defects and fraud, and (iii) misrepresented that the loans complied with certain underwriting requirements and guidelines.

49.    Based on my review of the loans purchased by the GSEs, I understand that there are approximately 249,459 loans[7].

### B.    Sampling Proposal

50.    As discussed above, I divided the population into Hustle and Non-Hustle loans and identified additional categories based on the default status and the loan-to-value, using three cutoff points: LTV lower than 80%, LTV equal to 80%, and LTV greater than 80%.  I then stratified each of the twelve categories by FICO score[8] and selected a random sample of 600 Hustle loans and 400 Non-Hustle loans.[9]  The reasoning behind stratification based on Hustle,

---

[7] To the extent that Defendants supply new loan tapes, this number may change slightly.

[8] Within each cluster, loans were stratified into 5 categories according to 20, 40, 60, and 80 percentiles of FICO score.  In each stratum, the number of sample size for each cluster (see Appendix 2) was divided by 5 and loans were randomly selected.

[9] For a complete breakdown of the number of loans selected from each of the twelve clusters please refer to Appendix 2.

Default and LTV is to make reasonable and justifiable comparisons between the findings of the re-underwriting comparing similar Hustle/Non-Hustle clusters of loans, e.g., defective rate for Hustle-Default-LTV<80% loans vs. defective rate for Non-Hustle-Default-LTV<80% loans.

###   C.   The Sample Is of Sufficient Size, and a Larger Sample Would Yield Diminishing Returns

51.   The sample of 600 Hustle loans and 400 Non-Hustle loans to be re-underwritten is sufficient to allow for the computation of an estimate of different binomial (two category) statistics (such as defective or not defective) with a reliability characterized by a 95 percent confidence level with a maximum margin of error of +/- 5 percent.  In addition, stratification may improve the precision of the samples by reducing the margin of error.  These Hustle and Non-Hustle samples each are sufficiently large to draw scientifically valid conclusions about the population.

###   1.   A 95 Percent Confidence Level, with a Maximum Margin of Error of +/- 5 percent, Strikes the Correct Balance Between Cost and Accuracy

52.   A 95 percent confidence level with a maximum margin of error of +/- 5 percent is scientifically valid.  The confidence level of 95 percent is standard and well supported in statistics.  *See* Kevin D. Hoover & Mark V. Siegler, *Sound and Fury: McCloskey and Significance Testing in Economics*, 15 J. Econ. Methodology 1, 13-14, 24 (March 2008) ("The critical value is typically but not always chosen to secure a 5% probability of type I error under the null hypothesis (i.e. a 5% size of the test)" and "epidemiology or other areas of medical research . . . faithfully apply a standard of p<0.05 for reporting estimates"); Diamond, 2d ed., *supra*, at 244 ("Traditionally, scientists adopt the 95% level of confidence . . . .").

53.   The 5 percent margin of error, with a 95 percent confidence level, strikes the correct balance between cost and accuracy for two primary reasons.  The first reason is that increasing sample size would generate only marginal benefits without commensurate benefits in increased

precision.  This is because the gain in reliability due to a larger sample size increases only as the square root of the sample size.  This is demonstrated in Chart 1 below.  As the sample size increases from 1 to 100, there is a large increase in reliability (meaning smaller confidence intervals for 95 percent confidence).  As the sample size quadruples from 100 to 400, however, the increase in precision, and associated reduction in confidence interval, is only doubled, reducing the margin of error from plus or minus 10 percent to plus or minus 5 percent.  To halve the margin of error again, from plus or minus five percent to plus or minus 2.5 percent, the sample size has to quadruple again, from 400 to 1,600.

54.    For the purpose of comparisons between groups, for example between defaulted and not defaulted loans, subsets of the 400 are sufficiently large to allow a determination of differences between the groups and whether the differences are statistically significant.  This would be much more difficult to do with only 100 loans, and at the same time would be overly precise (relative to the cost incurred) for 1,600 loans.

21

**Chart 1:  Marginal Gains in Precision from Increasing the Sample Size**



55.    As shown in this chart, decreasing the margin of error below +/- 5 percent by increasing the sample size imposes large costs without commensurate benefits in increased precision.

56.    The second reason that increasing the sample size would generate only marginal benefits is because the +/- 5 percent margin of error is the maximum margin of error for this confidence level, and it occurs only when the estimated percentage of defective loans is 50 percent.  Fifty percent is the scenario where variability is at its greatest:  half defective loans and half not. When the variability decreases—that is, when the percentage deviates from 50 percent in either direction—the margin of error, and thus the confidence interval, becomes smaller.  As the interval shrinks, the marginal benefit of a larger sample size shrinks as well.

57.    As the estimated defect rate deviates from 50 percent in either direction, the difference in the margin of error for samples decreases.  This is shown in Chart 2 below, where the margins of error at a 95 percent confidence level for sample sizes of approximately 100 and 400 loans are

shown for all possible percentages of defective loans.  The maximum margins of error are +/- 9.8 percent for a 100 loan sample and +/- 4.9 percent for a 400 loan sample, and occur when the estimated percentage of defective loans is 50 percent.  As Chart 2 demonstrates, quadrupling the sample size from 100 to 400 loans does not yield a commensurate reduction in the margin of error for a 95 percent confidence level across all possible percentages of defective loans.  For example, when the estimated rate of defective loans is 20 or 80 percent, the margins of error for a 95 percent confidence level are +/- 7.84 percent for a sample size of 100 loans and +/- 3.92 percent for a sample size of 400 loans.  When the estimated defect rate is 10 or 90 percent, the margins of error for a 95 percent confidence level are +/- 5.88 percent for a sample size of 100 loans and +/- 2.94 percent for a sample size of 400 loans.  As the defect rate approaches zero or 100 percent, the margin of error for the 95 percent level must also approach zero, regardless of sample size.  Note that the sample size of 600 chosen for the review was overly large (more than the 400) to accommodate some internal comparisons should they be of interest.

**Chart 2:  95% Margin of Error for Samples of Size Approximately 100 and
          Approximately 400 for All Defect Rates**



## 2.    Stratification by FICO Score May Increase the Precision of the Estimate

58.    The only variable I used to stratify each cluster is the borrower's credit score, specifically the FICO score, which generally appears for each loan in the population.  A credit score is a number representing the creditworthiness of a person or the likelihood that person will pay his or her debts, and the FICO score can range from 300 to 850.  A borrower's credit score has shown to be predictive of the riskiness of a loan.  In my experience, lenders, including mortgage loan originators, use credit scores to determine who qualifies for a loan, at what interest rate, and to what credit limits.

59.     Although there are other factors available for stratification from the loan tapes, it is reasonable to limit the number of variables used to stratify the population.  First, there are diminishing returns to reductions in the margin of error that result from adding more stratification variables.  As the number of stratification variables increases, the margin of error tends to decrease, but at a slower and slower rate, until there are only very marginal reductions. Second, these decreases in the margin of error may not materialize if the stratifying variable is not correlated to outcomes of interest or if some of the subgroups created by the stratifying variables are empty.  Thus, there may be no benefit to stratifying by additional variables if the goal is simply to increase the number of strata without regard to the ultimate goal, which is reduction of the margin of error.  Chart 3 below illustrates the diminishing returns associated with increasing the number of strata in an effort to increase precision.

**Chart 3:  Potential Reduction in Margin of Error and Diminishing Returns from Use of Additional Strata**



59. *Example from Cochran, Sampling Techniques.  Correlation of strata with outcome is 0.5.  Correlations can be 0.0 to 1.0.*

60.    Using FICO score as a stratifying variable, I have divided the population of loans in each of the twelve clusters into five percentiles based on the range of FICO scores observed in each cluster.  Because I have sampled each of the relevant clusters separately, the set of strata boundaries that define where one stratum, or bucket, ends and where the next begins (four strata boundaries define the five strata, or buckets, for each cluster) differs from cluster to cluster. This will not be an issue for estimation from each sample, since the estimates are derived separately for each cluster, adding up across all the strata.

61.    A random number is generated for each loan in each stratum, in a manner that ensures that each loan has an equal chance of being selected.  After the random numbers are assigned, the loans are reordered (sorted) from lowest to highest random number within each stratum.  The loans then are taken from each stratum until the complete count of loans allocated for each cluster is reached.[10]

### 3.    The Sample Is Random and Unbiased

62.    The methodology described above for selecting a sample of loans from the population ensures that the sample is random and not subject to manipulation.  *See, e.g.,* Thompson, *supra,* at 117-27; Levy & Lemeshow, *supra,* at 121-89; Cochran, *supra,* at 89-146; Deming, *supra,* at 276-358, 487-93.

### D.    Extrapolating from the Results of Re-Underwriting Sampled Loans to the Population Is Straightforward

63.    Once the samples of loans have been re-underwritten and determinations are made regarding each of the inquiries as set forth above in Paragraph 48 with respect to compliance with the applicable underwriting guidelines, the next step is to extrapolate the results of such re-underwriting to the population of loans.

---

[10] For more information regarding the sample sizes for each cluster please refer to Appendix 2.

64.     Extrapolation refers to the concept of using the results from the sample to estimate the values or differences in the population.  For example, extrapolation refers to the process of using the number of Hustle loans in the sample that contained defects in their underwriting guidelines to estimate the total number of Hustle loans that contained defects in the population. There are several statistically valid methods of extrapolating the results of the re-underwriting conducted on the sample to the population of loans.  The actual method to be used depends on the availability of data and the relationships between the variables in the sample.

65.     For expository purposes only, I set forth below two examples of the extrapolation methods used in this action.  It is a relatively straightforward and uncontroversial process.

66.     The first extrapolation method applies to a simple random sample, and assumes that relationships for numbers of loans in the sample are like relationships for numbers of loans in the population.  A simple equation of this assumption is as follows:

$$\frac{\text{No. of defective loans in the Hustle sample}}{\text{Total no. of Hustle loans in the sample}} = \frac{\text{No. of defective loans in the Hustle population}}{\text{Total no. of Hustle loans in the population}}$$

67.     In this relationship, three of the four numbers are known:  (i) the number of defective loans in the Hustle sample that are defective; (ii) the total number of loans in the Hustle sample; and (iii) the total number of loans in the population.  Solving the equation for the fourth number—the number of loans in the Hustle population that are defective—is simple.  The mechanism of randomization allows us to assume that the ratio on the right for the population is like the ratio on the left for the sample.

68.     A second example is obtained by substituting the word "Dollars" for the word "Number".  This is a dollar-weighted estimate of a total.

69.     With simple random samples selected in these matters, one can calculate the proportion of Hustle loans that are defective.  Multiplying this proportion by the total number of Hustle loans purchased by the GSEs provides an estimate of the defective rates attributed to deviations from the underwriting guidelines for the Hustle population.

70.     For a stratified random sample, the same assumption is made, but specifically within each stratum in the population, and an extrapolation is made in each stratum separately.  The sample estimate from a stratified random sample is the sum (or average, depending on the type of estimate) of estimates from the individual strata.  For a stratified sample, with a simple random sample selected within each stratum, the process described in the previous paragraph is repeated within each of the strata.  The estimated number (dollars) of defective loans within each stratum is summed over all strata to give an estimate of the number (dollars) of defective loans in the population.

71.     Accordingly, it will be possible using sampling for the fact finder to determine misrepresentations and resulting liability in connection with a known level of accuracy because of the existence of the confidence level and the margin of error.  It also will be possible for the fact finder to determine misrepresentations and resulting liability in connection with the deviations in the underwriting guidelines for the Hustle loans with a much higher level of confidence.

**VI. Analysis of Re-underwriting Results**

72.    Based on the re-underwriting of 343 HSSL loans[11], the percent of HSSL loans found to be materially defective (defect rate) in the sample was 53.9%.  However, my sample was designed as a stratified sample with oversampling of defaulted loans (to facilitate comparisons that might be made).  This means that, as a result, the sub-samples were not of proportionate size to the population - there is an over-representation of defaulted loans.  In order to properly extrapolate the re-underwriting results and determine the defect rate in the population of Hustle loans, I weighted the sample so that each sub-sample extrapolates back to the sub-population from which it was selected.  After extrapolating the defect rate to the population using the correct proportionate representation, I estimate that from a total of 28,882 HSSL loans in the population, approximately 12,363 loans or 42.81% of the population contains a material defect.

73.    In order to determine whether a relationship exists between defects and default rates, I analyze the percentage of loans that defaulted in the population and how they are distributed based on the "Investment Quality" variable (the summary variable from the re-underwriting that indicates which loans had materially defective underwriting).  Data provided to me indicates that 6,011 out of HSSL loans have defaulted, a 20.81% default rate.

74.    The re-underwriting and extrapolation outcomes can be analyzed in one of two ways.  The first is to consider the proportion of materially defective loans that ultimately defaulted, relative to other loans in the sample.  The distribution of extrapolated counts of loans is given in

_____

[11] I was provided an updated date range to define the HSSL loan population: Beginning date was re-defined as the application date on or after 08/13/2007 and the ending date was re-defined as the funding date on or before 05/21/2008.  The new definition resulted in the reduction in the number of HSSL loans in the population from 53,175 to 28,882 loans. Similarly, the new definition reduced the original HSSL reviewed samples from 526 to 343. The numbers reported in this section of the report are based on the extrapolation of the 343 HSSL sampled loans to the 28,882 HSSL population.

Table 1 below.  Table 2 provides percentages based on Table 1 to show the comparison of default rates across the different defect categories. Note that the Default rate increases dramatically in the presence of defects.

**Table 1:  Extrapolation of Number of Loans by Defect Category and by Default Category**

|  | Not Defaulted | Defaulted | Total |
|---|---|---|---|
| Investment Quality | 9,848 | 1,375 | 11,223 |
| IQ with some Defects | 3,854 | 1,441 | 5,295 |
| Materially Defective | 9,168 | 3,195 | 12,363 |
| Total | 22,870 | 6,011 | 28,881 |

**Table 2:  Percentages of Defaults by Defect Category**

|  | Not Defaulted | Defaulted | Total |
|---|---|---|---|
| Investment Quality | 87.7% | 12.3% | 100.0% |
| IQ with some Defects | 72.8% | 27.2% | 100.0% |
| Materially Defective | 74.2% | 25.8% | 100.0% |
| Total | 79.2% | 20.8% | 100.0% |

**Table 3:  Percentages of Defective Loans by Default Category**

|  | Not Defaulted | Defaulted | Total |
|---|---|---|---|
| Investment Quality | 43.1% | 22.9% | 38.86% |
| IQ with some Defects | 16.9% | 24.0% | 18.33% |
| Materially Defective | 40.1% | 53.2% | 42.81% |
| Total | 100.0% | 100.0% | 100.00% |

75.    Similarly, Table 3 shows that more than half of the defaulted loans came from the Materially Defective category, proportionately more than two times as many defaults as from the category of loans that were of Investment Quality.

76.    The default rate is significantly higher for materially defective loans.  In order to test whether this difference is statically significant, I performed a chi-square test.

77.    The chi-square test is used to determine whether the distribution for categorical variables differ from one another. It compares the counts of categorical responses between two or more independent groups. In this case our independent groups are materially defective and non-materially defective loans and our responses are whether a loan defaulted or not. In order to test the chi-square statistic and decide whether a significant difference exists between the two groups, a predetermined level of significance of .05 is assigned. If the chi-square statistic is higher than .05, then no statistically significant difference exists between the groups. On the other hand any value less than .05 would show that the groups are statistically significantly different from one another. For our analysis the chi-square statistics resulted in a value lower than the critical value corresponding to a significance level of 5%.  This result shows that the HSSL materially defective loans exhibit a statistically significantly higher default rate than non-materially defective HSSL loans.

## Materially Defective Significance Test Results:

**Case Processing Summary**

| | Cases | | | | | |
|---|---|---|---|---|---|---|
| | Valid | | Missing | | Total | |
| | N | Percent | N | Percent | N | Percent |
| Default_ID * Mat_Defective | 343 | 100.0% | 0 | .0% | 343.000 | 100.0% |

**Default_ID * Mat_Defective Crosstabulation**

| | | | Mat_Defective | | Total |
|---|---|---|---|---|---|
| | | | Not Materially Defective | Materially Defective | |
| Default_ID | Not Defaulted | Count | 163 | 109 | 272 |
| | | Expected Count | 155.4 | 116.6 | 272.0 |
| | Defaulted | Count | 33 | 38 | 71 |
| | | Expected Count | 40.6 | 30.4 | 71.0 |
| Total | | Count | 196 | 147 | 343 |
| | | Expected Count | 196.0 | 147.0 | 343.0 |

**Chi-Square Tests**

| | Value | df | Asymp. Sig. (2-sided) | Exact Sig. (2-sided) | Exact Sig. (1-sided) |
|---|---|---|---|---|---|
| Pearson Chi-Square | 4.158[a] | 1 | .041 | | |
| Continuity Correction [b] | 3.627 | 1 | .057 | | |
| Likelihood Ratio | 4.121 | 1 | .042 | | |
| Fisher's Exact Test | | | | .044 | .029 |
| Linear-by-Linear Association | 4.145 | 1 | .042 | | |
| N of Valid Cases | 343 | | | | |

a. 0 cells (.0%) have expected count less than 5. The minimum expected count is 30.43.

b. Computed only for a 2x2 table

78.     There are other factors to consider besides the direct relationship between material defects and the default rate.  These would include findings that contribute to the determination of a loan being materially defective with respect to its underwriting.

79.     For example, "Risk layering" occurs where a loan has more than one risky factor; materially defective loans often had risk layering.  Extrapolating to the population, I find that Investment Quality loans had no material defects, loans that were Investment Quality with Some Defects had an average of 1.14 Defects per loan, while those deemed materially defective had an average of 1.90 material defects per loan.  Note these numbers differ slightly from the results seen when reviewing just the sample loans without extrapolation, but as I explained earlier there was oversampling of some sub-groups (like Defaulted loans).  With proper weighting, the 1.14 and 1.90 material defects for these two categories are accurate population extrapolations.

80.     In the re-underwriting review, the extrapolation of the proportion of loans that had inaccurate data entered into the AUSs, including inaccurate data as to the income, assets, type of transaction, and description of the subject property is 13.7%.  In some instances we found multiple inaccuracies per loan.  In instances in which inaccurate information was entered into an AUS, the loan was tagged as materially defective 98.1% of the time.

81.     Similarly, about 4.1% of the loans in the population had appraisal defects, but 8.9% of the loans found to be materially defective had appraisal defects.

82.     The final point to be made about the extrapolation is that the re-underwriting team was able to review 343 out of the 410 loans in the revised Hustle time range. I advised the U. S. Attorney that, with the preliminary results from the first 343 loans and the nature of the review conducted to date, the continued review of the loans remaining with full loan files would not be productive.   The defect rate in the properly weighted sample was 42.81%, the defect rate for defaulted loans was 53.14%, and more than half of the materially defective loans had two or more material defects recorded.

83.     The extrapolation I conducted used the 343 loans re-underwritten, extrapolated to the full population of 28,882 loans, computing the weights based on the stratification and presence of the 343 loans distributed across the six strata used for HSSL loans.  The exact computations are presented in my reliance materials.

84.     The U.S. Attorney also provided me with the original loan balances and the unpaid loan balances for all loans in the population.  I took the loans in the sample and appended these dollar balances to the re-underwritten sample.  Using these values and the weighting of the sample described earlier, I estimated ratios of dollars in defective loans relative to total dollars.  If the defect rate is computed as the number of defective loans divided by the total number of loans, the dollar defect rate is computed as dollars in defective loans divided by the total dollars in all loans.  I also separated out the defaulted loans and computed similar rates specific to the defaulted loans.  Table 4 below presents these rates.

**Table 4:  Defect Rates and Dollar Defective Rates**

| Rate Computations | Loan Count Basis | Original Loan Balance | Final Unpaid Balance |
|---|---|---|---|
| All Loans, Count, Defect Rate | 42.8% | | |
| Defect Rate in Defaulted Loans | 53.1% | | |
| All Loans, % Dollars in Defective Loans | | 48.0% | 49.0% |
| Defaulted Loans, % Dollars in Defective Loans | | 54.0% | 54.0% |

85.     In the top panel, defects, the computations are defective loans relative to all loans, or defective defaulted loans relative to all defaulted loans.  The same is true for the two columns to the right, except the counts in numerator and denominator are counts of dollars, not counts of loans.

86.     For the bottom panel, the computations are of default rates, not defect rates.  This gives an idea of the proportion of defaults in defective loans, instead of defects in defaulted loans as observed in the top panel.

Charles D. Cowan
San Antonio, TX

August 21, 2013