**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,<br><br>Plaintiff,<br><br>− v. −<br><br>BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING,<br><br>Defendants. | |
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>− v. −<br><br>COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE,<br><br>Defendants. | **Case No. 12-cv-1422 (JSR)**<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT REBECCA MAIRONE'S**
**MOTION *IN LIMINE* TO EXCLUDE EVIDENCE**
**THAT CENTRAL FULFILLMENT WAS THE EXPANDED FORM OF HSSL**

Marc L. Mukasey, Esq.
Michael C. Hefter, Esq.
Ryan M. Philp, Esq.
Seth M. Cohen, Esq.
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Tel:  (212) 508-6100
Fax: (800) 404-3970

*Attorneys for Defendant Rebecca Mairone*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT .............................................................................................................................3

     I.     Legal Standard ...........................................................................................................3

     II.    The Record Contradicts The Government's Position That Central
            Fulfillment Was The Same As, Or An Expansion Of, The HSSL.........................3

     III.   The Government's Attempt To Conflate HSSL And Central Fulfillment Is
            Confusing And Will Mislead The Jury ...................................................................8

CONCLUSION..........................................................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*United States v. Awadallah,*
    436 F.3d 125, 134 (2d Cir. 2006)..................................................................................................3

*United States v. Quattrone,*
    441 F.3d 153, 186 (2d Cir. 2006)..................................................................................................3

**RULES**

Fed. R. Evid. 403 .........................................................................................................................3

Defendant Rebecca Mairone ("Mairone") respectfully submits this Memorandum of Law in Support of her Motion *In Limine* to exclude the Government from presenting evidence at trial that Central Fulfillment was the same as HSSL[1] or that Central Fulfillment was the expanded form of HSSL.

## PRELIMINARY STATEMENT

The Government's sole claim in this case is that Defendants allegedly perpetrated a fraud by selling loans through FSL's HSSL process. It is crystal clear that the Government is *not* alleging fraud in connection with non-HSSL loans. Despite this clear line of demarcation, the Government seeks to present evidence that the Central Fulfillment organization within FSL was the same as or the expanded version of the HSSL process. The Government's purpose in conflating those two entirely different aspects of FSL's business is obvious – it wants a back door way for the jury to see evidence of supposed poor loan quality in non-HSSL loans.

The Government's intent to equate the two is evident from oral argument on summary judgment. At oral argument, counsel for the Government represented that Central Fulfillment "was the expanded for[m]" of the HSSL process. Declaration of Michael C. Hefter in Support of Mairone's Motion *In Limine* to Exclude Evidence That Central Fulfillment was the Expanded Form of HSSL ("Hefter Decl."), Ex. 23 (SJ Hrg. Tr.) at 76:19-77:6. This contention is without evidentiary support, substantially confuses the issues in this case and is likely to mislead the jury.

The case brought by the Government is that Defendants knowingly sold defective loans to the GSEs through the HSSL, a workflow for low-risk prime loans that was piloted by FSL from August 13 to September 30, 2007, before it was rolled out into production. As alleged by the Government, the HSSL was characterized by the removal of certain "quality-preserving 'toll

---

[1] All terms not otherwise defined herein shall have the meaning ascribed to them in Mairone's summary judgment briefing. *See* Dkt. Nos. 133, 145.

gates'" from the loan origination process, the most significant of which was the alleged removal of human underwriters from the process.  The crux of the Government's case is the alleged absence of underwriter review for loans that passed through the HSSL workflow.

The record is clear that Central Fulfillment was a separate initiative by which FSL reorganized its business (as the name Central Fulfillment suggests) to re-locate loan processors in multiple offices around the country to a central location to be together with underwriters and funders.  The HSSL was one loan processing workflow (the specific steps from origination to funding) for "low-risk" prime loans incorporated into the Central Fulfillment organization. Other, higher risk loans went through other workflows or processing steps in Central Fulfillment. Critically, it is undisputed that these other workflows required underwriter review before a loan could be cleared to close.  Thus, the Government's contention that Central Fulfillment "was the expanded for[m]" of the HSSL is plainly wrong and confuses the central issue in this case – namely, whether Defendants knowingly sold defective loans processed through the HSSL workflow.

If the Government were permitted to conflate HSSL and Central Fulfillment at trial, the jury is likely to be misled regarding the meaning of key evidence that the Government seeks to introduce to prove Defendants' fraudulent intent.  In particular, the Government relies on loan quality reports that allegedly revealed declining loan quality in FSL.[2]  However, the majority of these reports concern *all* loans originated in Central Fulfillment, not just HSSL loans.  On their face, these reports provide no basis to discern which of the alleged defects, if any, related to loans that passed through the HSSL workflow.  Yet, if the jury were misled that Central Fulfillment and HSSL were the same thing, the jury might infer Defendants' fraudulent intent

---

[2] Defendants dispute that quality assurance ("QA") reports are indicative of loan quality or the salability of loans to the GSEs.

based on these reports even though a substantial number of the loans with associated procedural defects likely were reviewed by an underwriter. This would be a perversion of the Government's case. Indeed, the Government confirmed at oral argument that it has not charged fraud with respect to loans originated through other, non-HSSL workflows. *See* Hefter Decl. Ex. 23 (SJ Hrg. Tr.) at 30:4-6 ("THE COURT: Well, you haven't charged for fraud with respect to the non-high-speed swim lines, have you? MR. ARMAND: No, we have not.").

Therefore, pursuant to Rule 403, the Government should be precluded from arguing that HSSL and Central Fulfillment were the same thing, or that Central Fulfillment was the expanded version of HSSL.

## ARGUMENT

### I.    Legal Standard

Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury. . . ." Fed. R. Evid. 403. Evidence has the potential to be unfairly prejudicial if "it could unduly inflame the passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (citations omitted). The Court has "broad discretion under Rule 403 to balance the probative value of evidence against the risk of prejudice." *United States v. Awadallah*, 436 F.3d 125, 134 (2d Cir. 2006).

### II.   The Record Contradicts The Government's Position That Central Fulfillment Was The Same As, Or An Expansion Of, The HSSL

The record is devoid of any evidence that supports the Government's attempt to conflate HSSL and Central Fulfillment. The HSSL was a pilot from August 13 to September 30, 2007, that was aimed at testing an industry-standard prime loan workflow for the lowest-risk, highest-

3

quality prime loan products that were originated by FSL.  Hefter Decl. Ex. 4 (Ho. Dep.) at

165:14-16; *id.* at 178:15-19.  By contrast, Central Fulfillment was a reorganization of FSL's

business that resulted in a reorganization of the production, underwriting and risk management

functions within FSL.  As a result of the Central Fulfillment reorganization, which began on

October 1, 2007, loan specialists and underwriters were re-located to work together in a

centralized location such as in FSL's national sales centers.[3]   Central Fulfillment was comprised

of multiple workflows or swim lanes[4] and the workflow that a loan would follow was dictated by

a detailed risk/authority matrix, which specified the level of authority and training required for a

loan specialist or underwriter to process a loan, subject to numerous criteria and exclusions.[5]

While the HSSL workflow was incorporated into Central Fulfillment, it pertained only to low-

---

[3] Hefter Decl. Ex. 4 (Ho Dep.) at 232:12-17; Hefter Decl. Ex. 3 (Gong Dep.) at 56:3-57:25
(HSSL and Central Fulfillment "were different projects and initiatives"); Hefter Decl. Ex. 1
(Aliano Dep.) at 45:1-4 ("[The] central fulfillment model was essentially the restructured change
as to how we were handling prime loans, regardless of the [] loan attribute.").

[4] *See* Hefter Decl. Ex. 1 (Aliano Dep.) at 46:18-20 ("[HSSL] was more one dimensional.  The
new [Central Fulfillment] model was everything, with levels of authority."); *see also* Hefter
Decl. Ex. 9 (8/31/07 pre-Central Fulfillment rollout email from Aliano suggesting the creation of
different swim lanes, including a "Central Funding swimlane" – where "all the above ["Prime
LOW Risk – HSSL swim lane," "Prime MODERATE Risk swim lane," "Prime HIGH Risk
swim lane," and "Subprime swim lane"] meet").

[5] *See* Hefter Decl. Ex. 13 (FSLD Underwriter Approval Authority Level Matrix); Hefter Decl.
Ex. 12 (Condition Sign-Off (CSO) and Underwriting Training Matrix); *see also* Hefter Decl. Ex.
1 (Aliano Dep.) at 120:8-16 ("It was [an] approval authority matrix. . . .  [I]t was simply approval
authority, regardless of the kind of job title."); *id.* at 42:15-43:1 ("[T]hat matrix is . . . what rolled
out in the [Central Fulfillment] model. . . . It's not just that [HSSL] bucket, it's everything, and
everything would still come in the door, and it would just be handled by whoever has the
appropriate . . . levels of authority that were determined, that also had training requirements and
other controls associated with that."); Hefter Decl. Ex. 4 (Ho Dep.) at 175:12-176:14 (HSSL
"was different in the sense that . . . [in] Central Fulfillment . . . who could approve a loan[] was
largely based off of the underwriter approval level that a particular associate had.  So there's a
scale of levels of underwriting approval authority, and depending on the level of authority that
individual had, that would determine what types of loans they could work on.").

risk prime loans.  Other, higher risk loans were processed through other workflows.[6]  It is wholly misleading for the Government to claim that the Central Fulfillment reorganization and the HSSL work flow were the same, or that Central Fulfillment was the expanded version of HSSL.

Critically, while loan specialists with proper training were permitted to clear certain low-risk loans for closing as part of the HSSL,[7] all higher risk loans processed through Central Fulfillment – namely, all loans designated a risk tier 3 or above – required underwriters to issue the final clear to close.  *See* Hefter Decl. Ex. 4 (Ho Dep.) at 176:19-177:8 ("[A]nything requiring a Level 3 and above would have to be reviewed by a underwriter for credit approval."); Hefter Decl. Ex. 13 (Underwriter Approval Authority Level Matrix defining Level 3 Underwriter Authority as an "[u]nderwriter with . . . greater than 1 year underwriting experience" and reflecting that all loans designated risk tier 3 or above needed to be reviewed by someone with Level 3 Underwriting Authority).[8]  Tellingly, the Government used the Central Fulfillment

---

[6] *See* Hefter Decl. Ex. 10 at 6 (9/26/07 PowerPoint presentation entitled NSC Centralized Fulfillment, reflecting three separate workflows for low-, medium- and high-risk loan products, and reflecting that the only workflow deemed to be an "HSSL" workflow was the low-risk swim lane; all others required "UW Level 2 Authority" or greater); Hefter Decl. Ex. 14 at 3 (Presentation regarding loan assignment process, noting that "Loans not in LS 1 or 2 Authority will be escalated to Core UW Support"); *see also* Hefter Decl. Ex. 5 (Kitashima Dep.) at 213:24-214:2 (Q. "Is it fair to say that the HSSL workflow was one of the workflows in Central Fulfillment."  A.  "Yes it was."); Hefter Decl. Ex. 3 (Gong Dep.) at 42:17-43:17 ("Well, the High Speed Swim Lane was, again, focusing on plain prime CLUES accepts, no issues, clean files, and anything that was not a prime CLUES accept or did not meet the High Speed Swim Lane criteria or had issues midway through the process of High Speed Swim Lane will go through a different process with additional steps, reviews, underwriting looks . . . .").

[7] *See* Hefter Decl. Ex. 8 (O'Donnell Dep.) at 255:24-256:23 ("Underwriters could be involved in clearing conditions at clear to close [in the HSSL process], but the loan specialists were the ones issuing the clear to close.").

[8] *See also* Hefter Decl. Ex. 12 (Condition Sign-Off (CSO) and Underwriting Training Matrix with shading reflecting that an employee must have "> 1 year underwriting experience" to attain Level 3 Underwriter Authority); Hefter Decl. Ex. 14 at 3 (presentation regarding the loan assignment process in Central Fulfillment reflecting that "Loans not in LS 1 or 2 Authority will be escalated to Core UW Support" which required Level 3 Underwriting Authority or greater);

Underwriter Approval Authority Level Matrix multiple times during depositions.  On the face of the document, it is clear that the risk of any particular loan dictated the entry criteria to the multiple workflows in Central Fulfillment.  *See* Hefter Decl. Ex. 13.

Even the witnesses that the Government intends to call at trial have unanimously testified that HSSL and Central Fulfillment were different.  Indeed, the Relator himself testified that Central Fulfillment was comprised of several swim lanes and that the HSSL process was applied to only the low-risk swim lane.  *See* Hefter Ex. 8 (O'Donnell Dep.) at 152:9-153:16 ("Those are the three primary [workflows within Central Fulfillment]. . . .  I would characterize it as high risk which would be the subprime and CLUES refers, moderate risk which would be the middle swim lane which would be purchase transaction nonowner/occupied larger loans, jumbo loans.  And then the high speed process which would be designed to be the lowest risk."); *id.* at 151:10-152:2 (Central Fulfillment's "other swim lanes were the continuation of the normal practices within Full Spectrum."); *id.* at 183:6-11; *see also* Hefter Decl. Ex. 2 (Brent Dep.) at 138:22-140:4; *id.* at 162:12-163:2; *id.* at 164:14-17; *id.* at 280:24-281:3.

---

Hefter Decl. Ex. 11 at 10 (PowerPoint regarding NSC Central Fulfillment Update, stating that "UW Support will provide approval resources for Refers and Risk Tiers 3-5 . . ."); Hefter Decl. Ex. 3 (Gong Dep.) at 64:22-65:3 (Q. "Could loan specialists in Central Fulfillment handle loans outside their authority levels?" A. "No.  They would have to . . . escalate to a higher level underwriter."); *id.* at 71:9-19 ("[I]f it was not within the authority level of that loan specialist, then it would have been kicked out to a more higher level authority underwriter . . . .  [H]igher risk tiers [] needed a higher level authority for underwriting."); *id.* at 42:17-43:17 ("Well, the High Speed Swim Lane was, again, focusing on plain prime CLUES accepts, no issues, clean files, and anything that was not a prime CLUES accept or did not meet the High Speed Swim Lane criteria or had issues midway through the process or High Speed Swim Lane will go through a different process with additional steps, reviews, underwriting looks . . . ."); Hefter Decl. Ex. 8 (O'Donnell Dep.) at 151:10-152:2 ("To the extent there were any subprime or loans that were not eligible for the Hustle process, there was a swim lane dedicated to them. . . .  Those other swim lanes were the continuation of the normal practices within Full Spectrum."); Hefter Decl. Ex. 5 (Kitashima Dep.) at 126:10-21 (Q. "And those are the other workflows [in Central Fulfillment] that you were referring to before that followed a more traditional subprime flow model; is that correct? A. Yes[.]").

In an attempt to portray Central Fulfillment as a mere expansion of the HSSL, the Government has resorted to mischaracterizing the record.  For example, the Government relies on a September 2007 email written by Mairone where she states "when can we start moving more loans to the pilot . . . ?  We need to start to move toward all loans into process. . . ."  *See* Opp. Br. at 11 (citing US SOF ¶ 253 (citing Nawaday Decl. Ex. BX)) (first ellipsis in original).  In order to bolster its mischaracterization of Central Fulfillment, the Amended Complaint omits the first sentence of the email – which clearly refers to the HSSL pilot; the Government then adds bracketed text so that the second sentence reads:  "we need to start to move toward all loans into [the HSSL] process."  Compl. ¶ 75.  This is a clear adulteration of the document.  The bracketed text appears nowhere in the original document.  *See* Nawaday Decl. Ex. BX (attached hereto as Hefter Decl. Ex. 24).  At her deposition, however, Mairone clarified that she was referring to moving "specific *eligible* loans to the pilot."  Hefter Decl. Ex. 7 (Mairone Dep.) at 131:11-132:5 (emphasis added).  The Government also cites portions of Mairone's deposition testimony out of context, ignoring that she testified unequivocally that HSSL and Central Fulfillment were two different initiatives, and that Central Fulfillment was "a fulfillment model in order to centralize fulfillment and processing . . ." on loans of all risk levels, whereas HSSL was a single workflow aimed at processing only the lowest-risk, highest-quality prime loans.  *Id.* at 166:13-168:20.

The Government also cherry picks portions of testimony from the depositions of Aliano, Lumsden and Ho in an attempt to equate HSSL and Central Fulfillment.  For example, the Government cited Aliano saying that "'What was High Speed Swim Lane at one point ended up becoming the central fulfillment model at a later point.'"  Opp. Br. at 11 n.5 (citing Nawaday Decl. Ex. A (Aliano Dep.) at 22:11-24).  However, Aliano repeatedly testified that Central

7

Fulfillment contained multiple swim lanes to process loans of varying risk levels and that HSSL was only one of those swim lanes. *See* Hefter Decl. Ex. 1 (Aliano Dep.) at 42:15-43:1; *id.* at 45:1-4; *id.* at 46:18-20.  Similarly, the Government misrepresents the testimony of Lumsden and Ho, both of whom testified that Central Fulfillment was comprised of multiple swim lanes, only one of which was the HSSL.   *Compare* Opp. Br. at 11 n.5 (citing Nawaday Decl. Ex. S (Lumsden Dep.) at 47:25), *with* Hefter Decl. Ex. 6 (Lumsden Dep.) at 47:23-49:12 (HSSL was merely one "aspect of central fulfillment," and Central Fulfillment, more broadly, was the creation of "different paths . . . [to] efficiently process those loans based upon the quality needs that are required."); *compare* US SOF ¶ 254 (citing Nawaday Decl. Ex. L (Ho Dep.) at 171:4-177:8), *with* Hefter Decl. Ex. 4 (Ho Dep.) at 172:12-176:14; *id.* at 176:19-177:8 ("And in the Central Fulfillment team, their loan specialists were trained to get to a Level 2 authority.  And then anything requiring a Level 3 and above would have to be reviewed by a underwriter for credit approval.").

III.    **The Government's Attempt To Conflate HSSL And Central Fulfillment Is Confusing And Will Mislead The Jury**

The Government's contention that Central Fulfillment was the mere expansion of the HSSL confuses the central issue in this case – namely, whether the Defendants knowingly sold bad loans to the GSEs through the HSSL process.  The Government's case is premised on Defendants' alleged layering of risk by removing quality control toll gates – in particular, the alleged removal of human underwriters from the HSSL loan process.  Yet, it is undisputed that loans that did not meet the eligibility criteria for processing through the HSSL workflow were processed using other swim lanes, albeit in the Central Fulfillment organization.  As the authority matrix makes clear, the loans processed in Central Fulfillment, but outside of the HSSL, required

8

a higher level of underwriter review.  *See* Hefter Decl. Ex. 13.  As such, it would be entirely misleading for the Government to be permitted to conflate Central Fulfillment and the HSSL.

If the Government were permitted to portray Central Fulfillment as an expanded version of the HSSL, there is a substantial risk that the jury could be misled regarding the meaning and significance of critical evidence in this case.  For example, as the Government's summary judgment submissions revealed, the Government's case against Mairone rests largely on her receipt of, and response to, certain Quality Assurance reports regarding FSL's loans.  However, the majority of these reports relate to Central Fulfillment loans at large, not just HSSL loans. *See, e.g.*, Hefter Decl. Exs. 16-22.  From the face of these reports, it is impossible to determine whether any of the reported loan defects related to HSSL loans, as opposed to loans that were originated through other workflows within Central Fulfillment that required underwriter review. The discovery record is devoid of any testimony from which the Government could argue what percentage of the defects, if any, relate to loans originated through the HSSL workflow.  As the reports cover all Central Fulfillment loans, some percentage of the defects undoubtedly relate to loans that were processed in a swim lane other than the HSSL, and thus were reviewed by underwriters.

For example, the Government relies on an October 24, 2007 email reflecting Central Fulfillment QA results to show that FSL was knowingly selling poor quality HSSL loans to the GSEs.  US SOF ¶¶ 302-03 (citing Nawaday Decl. Ex. CO (attached hereto as Hefter Decl. Ex. 15).  On its face, the document reflects a "high risk findings" rate of 97% for Central Fulfillment loans.  It is impossible to tell, however, what percentage, if any, of the loans at issue were HSSL

loans.[9]  The Government cannot point to any evidence showing a correlation between these "high risk findings" and HSSL loans.  Yet, if the Government were permitted to represent that Central Fulfillment and HSSL were the same thing, there is a substantial risk that a jury could infer Defendants' fraudulent intent based on the 97% high risk findings rate in this report even though an unidentified number of the loans may have never been eligible for processing through the HSSL and were processed through the other, non-HSSL swim lanes in Central Fulfillment.  As the Government does not allege fraud resulting from loans that required underwriter review, or, for that matter, fraud resulting from the sale of any non-HSSL loans, that would be entirely improper.

   This document provides but one example of the confusion that would ensue if the Government were permitted to mislead the jury to believe that HSSL and Central Fulfillment were, in essence, the same thing.  Indeed, a substantial percentage of the evidence that the Government intends to introduce at trial concerns Central Fulfillment.  As such, it is essential that the Government be precluded from confusing the core issues in this case by misleading the jury that Central Fulfillment was a mere expansion of the HSSL.

---

[9] Indeed, the witnesses that the Government intends to call at trial acknowledge the impossibility of distinguishing which loans reflected in Central Fulfillment reports related to HSSL loans.  *See* Hefter Decl. Ex. 8 (O'Donnell Dep.) at 254:21-255:20 (stating that "I don't know if you could distinguish [between the SUS rates that were associated with the two workflows that had underwriters involved and the one work flow that didn't]," referring to a presentation regarding Central Fulfillment quality); *see also* Hefter Decl. Ex. 2 (Brent Dep.) at 138:22-140:4 (Q. "So you are not able to tell us which loans were actually put through the High-Speed Swim Lane process versus those that went through one of these other processes in Central Fulfillment?"  A. "No, I can't.").

## CONCLUSION

For the foregoing reasons, Mairone respectfully requests that the Court grant her motion

*in limine* and preclude the Government from presenting evidence at trial that Central Fulfillment

was the same as HSSL or that Central Fulfillment was the expanded form of HSSL.

Dated:   September 10, 2013
         New York, New York

BRACEWELL & GIULIANI LLP

By:  /s/ Michael C. Hefter
     Marc L. Mukasey
     Michael C. Hefter
     Ryan M. Philp
     Seth M. Cohen

1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 508-6100
Fax:  (212) 508-6101

*Attorneys for Defendant Rebecca Mairone*

11