D903BAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              Plaintiff,

        v.                                12 CV 1422 (JSR)

BANK OF AMERICA CORPORATION,
*successor to Countrywide*
*Financial Corporation,*
*Countrywide Home Loans, Inc.,*
*and Full Spectrum Lending*, et
al.,

              Defendants.

------------------------------x

                        New York, N.Y.
                        September 24, 2013
                        10:00 a.m.

Before:

                HON. JED S. RAKOFF,

                        District Judge

D903BAN1

1                            APPEARANCES

2   PREET BHARARA
         United States Attorney for the
3        Southern District of New York
    PIERRE G. ARMAND
4   JAIMIE LEESER NAWADAY
    JOSEPH N. CORDARO
5   CARINA H. SCHOENBERGER
    ELLEN M. LONDON
6        Assistant United States Attorneys

7

    WILLIAMS & CONNOLLY
8        Attorneys for Defendant Bank of America
    BRENDAN V. SULLIVAN, JR.
9   ENU MAINIGI
    MALACHI B. JONES
10  KENNETH SMURZYNSKI
    CRAIG D. SINGER
11  ALLISON B. JONES
    STEVEN M. CADY
12  JENNIFER WIMSATT PUSATERI

13

    GOODWIN PROCTOR
14       Attorneys for Defendants Countrywide
    RICHARD M. STRASSBERG
15  WILLIAM HARRINGTON

16

    BRACEWELL & GIULIANI
17       Attorneys for Defendant Mairone
    MARC L. MUKASEY
18  MICHAEL HEFTER
    RUSSELL ZWERIN
19  RYAN M. PHILIP
    SETH M. COHEN
20  CHRISTINA JARDINE

21

22

23

24

25

D903BAN1

```
 1              (In open court)

 2              THE DEPUTY CLERK:  United States v. Bank of America,

 3     12 CV 1422.  Will everyone please be seated and will the

 4     parties please identify themselves for the record.

 5              MR. ARMAND:  Pierre Armand for the government.  With

 6     me I have Assistant United States Attorneys Jaimie Nawaday, Joe

 7     Cordaro, Carina Schoenberger, and Ellen London.

 8              THE COURT:  Who is the other individual?

 9              MR. ARMAND:  Also two paralegals at the table with me.

10     Rebecca Michaud and Victor Lam who is here.

11              MR. SULLIVAN:  Good morning, your Honor.  Brendan

12     Sullivan for Bank of America.  On the joint team defending the

13     corporate banks, that includes the Bank of America Countrywide

14     Home Loans and Countrywide Bank, I'll be do the opening for all

15     the institutions.  Those present this morning including myself

16     are Enu Mainigi, Malachi Jones, Ken Smurzynski, Craig Singer,

17     Steve Cady, Katie Hayes, Jennifer Wimsatt, Allison Jones, Rich

18     Strassberg, Bill Harrington.  We have a technical genius with

19     us this morning, Alex Rennick to assist us with all the

20     equipment.

21              THE COURT:  Good morning.  My experience has been that

22     whenever there is a technical genius, there is a glitch, but

23     hopefully that won't happen.

24              All right.  Yes, sir.

25              MR. MUKASEY:  Hi, Judge.
```

D903BAN1

1          THE COURT:  I'm sorry.  There are other lawyers here.

2     Thank you.

3          MR. MUKASEY:  Marc Mukasey with Michael Hefter, Seth

4     Cohen, Ryan Philip, and our client Rebecca Mairone.

5          THE COURT:  Good morning.

6          I'm sorry we were delayed earlier, but let's get right

7     to the motions in limine.  Incidentally, this probably goes

8     without saying, but all witnesses except for one party

9     representative and the individual defendant are hereby excluded

10    from the courtroom.  So if there are any witnesses present,

11    they need be excluded now.  That goes throughout the trial.

12         Start with the government's motion, let me also say

13    with respect to all my rulings on the motions in limine, they

14    are of course subject to being reconsidered under extraordinary

15    circumstances, the most likely of which would be if someone

16    opened a door that had otherwise been shut.  So, for example,

17    if I were to exclude any reference to someone's compensation,

18    for example, and then that witness gets on the stand and in a

19    very unlikely scenario says, you know, I'm just a poor, simple

20    barefoot investment banker, that would open the door to

21    compensation.  So, I give that absurd hypothetical just to

22    point out that my rulings are subject to reconsideration, but

23    only under extraordinary circumstances.

24         Government's first motion is to preclude defendants

25    from presenting evidence or argument that non-Hustle loans

D903BAN1

1    outperformed Hustle loans with respect to delinquency defect

2    rate.  Outperformed in the sense of being worse, so to speak.

3    That motion is granted.

4           The second government motion is to exclude evidence

5    regarding the government's knowledge or participation in

6    settlement discussions between the bank defendants and Fannie

7    Mae.  That motion is granted.

8           The third motion is the motion to exclude evidence

9    concerning the bank defendants' employees' character for

10   truthfulness and honesty.  That motion is granted, unless of

11   course, as the government recognizes, the door is opened by an

12   attack on a given witness's credibility, in which case

13   character evidence which may otherwise be inappropriate will be

14   admitted.

15          The fourth government motion is the motion to exclude

16   opinion testimony by lay witnesses which the government

17   characterizes as legal conclusions.  Some of it is also about

18   their perception that certain practices were not fraudulent or

19   the like.  That motion is granted.

20          The fifth motion is the motion to exclude evidence

21   concerning indemnification agreements with Bank of America.

22   That motion is granted.

23          The sixth motion is the motion to exclude evidence

24   regarding allegations or legal theories that the government

25   once alleged but is no longer pursuing.  That motion is

D903BAN1

1    granted.

2         The seventh motion is the motion to exclude opinions

3    of counsel about what the motivations of the government was in

4    bringing this case or the like.  That motion is granted.

5         The eighth motion is the motion to exclude the

6    proposed testimony of certain 30(b)(6) witnesses at trial.  To

7    the extent that the defense believes it can call a 30(b)(6)

8    witness to testify as a witness about what the company's

9    position is or something like that, that motion is granted.

10   That will not be permitted.

11        The ninth motion is the motion to exclude videotaped

12   deposition clips during opening statements or closing

13   arguments.  That motion is denied.

14        The final government motion is a motion to exclude the

15   proposed expert opinions of Mr. Grice.  G-R-I-C-E.  With

16   respect to all the experts who have been challenged, I'm going

17   to want to have, before they testify in each case a short

18   Daubert hearing, typically at least 24 hours before they

19   testify.  Because at least from the motion papers, I don't

20   think I can make across-the-board rulings on any of the

21   experts, though that may change after the hearing.  So that

22   motion is reserved.

23        With respect to the banks' motions, the motion to

24   exclude Cindy Simantel's e-mail, I'm going to reserve on that

25   motion.  I think we'll have to see how it comes up and we'll

D903BAN1

1    deal with it if and when it's offered.  But I will preclude the

2    government from making any reference on opening statement to

3    that e-mail.

4          With respect to the motion to exclude evidence

5    concerning Full Spectrum Lending's quality assurance process,

6    that motion is denied.

7          With respect to the motion to exclude evidence and

8    argument concerning the conservatorship of Fannie Mae and

9    Freddie Mac, that motion is granted.

10          With respect to the motion to exclude evidence and

11    argument that Bank of America itself engaged in the fraudulent

12    scheme as opposed to Countrywide, that motion is granted.

13          With respect to the motion to exclude evidence or

14    argument regarding alleged wrongdoing in the loan repurchase

15    process, that motion is granted.

16          With respect to the motion to exclude evidence and

17    arguments that a FIRREA affect is shown by any risk of loss as

18    opposed to new or increased risk of loss, I'm not sure I

19    understand that motion.  So we'll come back in a minute, that's

20    the one I think I want to hear oral argument on.

21          With respect to the motion to exclude evidence that

22    Hustle processes impacted the quality of Countrywide's

23    non-Hustle loans, that motion is granted.

24          With respect to the motion to exclude hypothetical

25    questions to lay witnesses, it of course turns on the question

D903BAN1

1    and the reason the question is put.  But, hypothetical

2    questions to establish, for example, materiality, would be

3    permitted.  So, the motion is denied as a general matter, but

4    there may still be objections to particular questions that the

5    Court will deal with on an item-by-item basis.

6         With respect to the motion to exclude evidence and

7    argument blaming defendants for the global economic issues and

8    public harms, that motion is granted.

9         With respect to the motion to exclude argument and

10   evidence about fraud and subprime lending, that motion is

11   granted.

12        With respect to the motion to exclude evidence

13   regarding Countrywide field branches, as a general matter that

14   motion is granted.  But there may be, and we'll have to deal on

15   an item-by-item basis, there may be some particularized showing

16   that the government may can make at any given situation.  That

17   may be an exception to that general ruling.

18        With respect to the motion to exclude reference to the

19   bank defendants' payment of an employee's attorneys' fees, that

20   motion is denied.

21        With respect to the motion to exclude certain e-mails

22   by Patrick Aliano and related evidence, that motion is granted.

23        With respect to the motion to exclude evidence of

24   employees' compensation or wealth, that motion is granted.

25        With respect to the motion to exclude evidence that

D903BAN1

1    central fulfillment was the expanded form of Hustle, that

2    motion is denied.

3          With respect to the motion to exclude the opinions and

4    testimony of Dr. Mason, again we'll have a Daubert hearing.

5    However, since the question of penalty is for the Court, not

6    the jury, I'm not sure why he would be testifying until after

7    the jury verdict is in.  But we can discuss that.

8          With respect to the motion to exclude the expert

9    testimony of Charles Cowen, we will have a brief Daubert

10   hearing, but I should flag that I think it's likely that some

11   of his testimony at least will be admitted.

12         With respect to the motion to exclude the expert

13   testimony by Ira Holt, again, we'll have a brief Daubert

14   hearing, but I think it is likely his testimony will in part or

15   whole be admitted.

16         With respect to the motion to partially exclude the

17   expert testimony of Daniel McFadden, that motion is now moot as

18   I understand it.

19         With respect to the motions from Ms. Mairone, her

20   first motion is the motion to exclude evidence of compensation

21   or net worth.  That motion is granted.

22         Her second motion is the motion to exclude evidence

23   that central fulfillment was the same as Hustle or an expanded

24   form of Hustle.  That motion is denied.

25         Now, that finishes all the motions except for the one

D903BAN1

1    that I want oral argument on.  This is the defendant's motion

2    to exclude evidence and argument that a FIRREA affect is shown

3    by any risk of loss as opposed to any new or increased risk of

4    loss.  I did not understand this motion.

5            MS. MAINIGI:  Allison Jones from our office will be

6    doing the argument for us.

7            MS. JONES:  Good morning, your Honor.  Allison Jones

8    for Bank of America.

9            So the government has argued that it can show an

10   affect on a federally insured financial institution by showing

11   a new or increased risk of loss.

12           THE COURT:  The two institutions -- by the way, I

13   don't know if the government is even still pursuing its sort of

14   indirect affect argument.  They're shaking their head no.  But

15   in any event, in my summary judgment opinion which I still owe

16   you but which I promise you I'll give you the bottom line in

17   this respect, I'm going to deny that prong of the government's

18   approach.

19           So it comes down to the two institutions being

20   affected are Countrywide and Bank of America.  As it has now

21   played out, since we're only concerned with the fraud

22   perpetrated allegedly by Countrywide, the impact on Bank of

23   America was really not the self-affecting.  It is really a

24   direct impact.  They merged with Countrywide and therefore

25   assumed the risk that had been increased or whatever by

D903BAN1

1   Countrywide.

2           So, to some extent this whole big debate about

3   self-inflicting or not seems to me to have been largely

4   dissipated by the way this case has now played out.

5           But with respect to Countrywide, the impact or the

6   affect was because they took actions to defraud, allegedly,

7   Fannie Mae and Freddie Mac.  So I don't understand what your

8   argument is.

9           MS. JONES:  To be clear, your Honor, this argument is

10  not tied to the self-affect arguments that we've made before.

11  So, the government is claiming that an affect can be a mere

12  risk of loss.  Not an actual loss, just a risk.  So, their

13  argument previously has been that because Countrywide sold

14  loans to Fannie and Freddie, that created a risk of repurchase,

15  that, therefore, Countrywide exposed itself and possibly Bank

16  of America to a risk of loss, because there was this risk that

17  Fannie Mae and Freddie Mac would ask the loans be repurchased.

18  Now that --

19          THE COURT:  That's not the approach I took in the

20  motion to dismiss.  So, I'm still missing the point.

21          MS. JONES:  Our argument here, your Honor, is just

22  that the government should not be allowed to argue to the jury

23  the incorrect legal theory that the fact of making a loan makes

24  a risk that is an affect on a financial institution, because

25  Countrywide was in the business of making loans and selling

D903BAN1

1   them to Fannie and Freddie, and every loan they made created

2   this risk.

3          THE COURT:  Let me just see, because, as I say, I

4   think because of the way in the second amended complaint this

5   has now played out, assuming, as I must for this purpose, that

6   the government is able to show that Countrywide lied to Fannie

7   Mae and Freddie Mac and thereby induced them to purchase loans

8   that they otherwise would not have purchased.

9          When Bank of America, a federally insured bank, then

10  acquired Countrywide, they were impacted, were they not, by

11  that fraud, by any liabilities that could arise from that

12  fraud?  Civil, criminal, or whatever.

13         MS. JONES:  So you're correct, your Honor, but the

14  comparison here is between the fraud --

15         THE COURT:  I don't understand what the issue is.

16  What issue is left for the jury?

17         MS. JONES:  The question is the affect on BofA from

18  the fraud versus the affect from non-fraudulent loans.  So when

19  they took over Countrywide's business, they took on loans that

20  the government claims were affected by fraud, and loans that

21  the government claims weren't affected by fraud.  So this risk

22  of repurchase from non-fraudulent loans and this risk of

23  repurchase from allegedly fraudulent loans.

24         So the government has to show under the case law,

25  numerous circuits, that the risk that Bank of America was

D903BAN1

 1    exposed to was a new or increased risk.  That it wasn't the

 2    same risk that was carried by the non-fraudulent activities of

 3    Countrywide.  So the government has to show that comparing the

 4    fraud --

 5             THE COURT:  When Bank of America acquired Countrywide,

 6    there was no disclosure to Bank of America, was there, that

 7    Countrywide had committed violations of federal criminal

 8    statutes under the government's hypothesis?

 9             MS. JONES:  Well, your Honor --

10             THE COURT:  So how can you say that they weren't

11    affected?

12             MS. JONES:  There are two federally insured financial

13    institutions at issue here.  Not only Bank of America N.A., but

14    also Countrywide Bank.

15             THE COURT:  I'll get back to Countrywide in a minute.

16    But I'm just focusing for the moment.  This was not the way it

17    was presented in the original complaint.  The original

18    complaint, the allegation was that Bank of America was itself

19    engaged in fraud.  That has now been eliminated by the second

20    amended complaint and the various motion practice in prior

21    proceedings.

22             So, under the present setup, it seems to me, that at

23    least as to Bank of America, it clearly was affected,

24    undisputedly.

25             What is the claim to the contrary?

D903BAN1

1              MS. JONES:  I don't believe the government has asked

2    you to rule as a matter of law on whether Bank of America N.A.

3    was affected.  The law of this circuit clearly says that is an

4    issue for the jury.  Our motion here --

5              THE COURT:  In any civil case, if there is no genuine

6    dispute about an issue, then it is no longer an issue for the

7    jury.

8              MS. JONES:  To be clear, Bank of America disputes they

9    were affected by the fraud, your Honor.

10             THE COURT:  Pardon?

11             MS. JONES:  Bank of America disputes that they were

12   affected by the fraud.

13             THE COURT:  The words are "genuine disputes," so now I

14   know you dispute it, what is the basis for that?

15             MS. JONES:  The indemnification agreements actually

16   prevent Bank of America N.A. from being affected by the fraud.

17             THE COURT:  I don't understand how that can be.  Of

18   course, if that is what you want to present to the jury, then

19   of course, which I have excluded, then of course the other side

20   of that will be they get to put in their business about how

21   Bank of America refused to repurchase and blah, blah, blah, we

22   go down that route.  I've thrown that out on the present

23   status.

24             But that's not the point.  My question to you was, if

25   unknowingly a bank merges with a company that has criminal

D903BAN1

 1    liability, how is it not affected?

 2              MS. JONES:  I believe it would be --

 3              THE COURT:  The indemnification wouldn't mean beans,

 4    for example, with respect to criminal penalties that would be

 5    imposed.

 6              MS. JONES:  It does, your Honor.  The indemnification

 7    agreement as Mr. Wertz testified in his deposition just last

 8    week, covers penalties, fines, settlements, attorneys' fees.

 9              THE COURT:  I don't see how that can be a legal

10    agreement.  That you would pay someone else's criminal fines?

11              MS. JONES:  I don't know about criminal fines.  This

12    certainly isn't a criminal case so he was testifying --

13              THE COURT:  The heart of this FIRREA is in effect, so

14    far as the provisions relevant to this case are concerned, is

15    that civil liability for criminal acts.

16              MS. JONES:  Yes, your Honor.

17              THE COURT:  Therefore, by definition there would be a

18    potential criminal liability, and I think it is well-settled

19    law that no one can indemnify another person or another entity

20    for criminal penalties.

21              MS. JONES:  But if we're talking about actual affects

22    in this case, not hypothetical affects that possibly could

23    occur in another case.

24              THE COURT:  But it is the risk.  We're never concerned

25    these situations with anything but the risk.  The increased

D903BAN1

1    risk as you said.

2            MS. JONES:  Right.  I'm struggling to understand the

3    point here, your Honor.  Our motion is much more limited, just

4    to make sure that the government is only allowed to argue to

5    the jury that an increased risk or a new risk could satisfy

6    this affect prong.  Your Honor is saying that Bank of America

7    was exposed to a new risk.  That's an argument that the

8    government certainly will be allowed to make.  The argument

9    they're not allowed to make is because --

10           THE COURT:  I am questioning whether there is any

11   genuine dispute about that.  But go ahead, I interrupted you.

12   Go ahead.

13           MS. JONES:  I was going to say for purposes of this

14   motion, your Honor, the government is not allowed to argue to

15   the jury that because Countrywide issued creative loans and

16   sold them to Fannie Mae and Freddie Mac, and those loans

17   created a risk of default or repurchase, just like any other

18   loan, that therefore they were affected for purposes of FIRREA.

19           THE COURT:  Why is that?

20           MS. JONES:  Because the courts have required a new or

21   increased risk, which the government agrees is the standard.

22   In cases where a bank is in the business of making loans, which

23   naturally carried a risk, courts both in Stargel and in

24   Mullens, the Ninth Circuit and the Tenth Circuit.

25           THE COURT:  I've heard of those.

D903BAN1

1            MS. JONES:  They've looked at the comparison of the

2    loans that the bank makes that are allegedly affected by the

3    fraud and loans that aren't.  Because they know the loans

4    always carry risk.  So <u>Stargel</u> when the court was asked is

5    there sufficient evidence of an affect, it looked for and found

6    testimony in the record comparing the rate of default with

7    loans affected by fraud versus the rate of default of loans not

8    affected by the fraud.

9            THE COURT:  Explain to me if, because of fraudulent

10   misrepresentations, you purchase loans that you would not

11   otherwise have purchased.  Even with an indemnification

12   provision, because you never know what the economic situation

13   is going to be subsequently, why isn't that by its very nature

14   an increased risk?  It is a risk you would not have otherwise

15   assumed.

16           MS. JONES:  So the relevant risk here, your Honor, is

17   the risk to the banks that issued and sold the loans, not the

18   risk to the purchaser.

19           THE COURT:  That's right.

20           MS. JONES:  So in this instance, it is the risk of

21   repurchase.  The risk that Fannie Mae or Freddie Mac will

22   decide that this loan has --

23           THE COURT:  The risk that you will be subject to

24   liability for fraud in one sense or another.

25           MS. JONES:  I don't know that's the risk that the

D903BAN1

1      government is relying on.

2                  THE COURT:  I'll hear from the government.  But isn't

3      that the obvious risk?  If the allegation is you committed

4      fraud, that clearly is the allegation, there is no question

5      about that.  And as a result of the fraud, Fannie Mae and

6      Freddie Mac purchase stuff they wouldn't otherwise have

7      purchased, thereby exposing you, the seller, to any and all

8      liabilities that would arise as a result of fraud.

9                  MS. JONES:  And that's a legitimate argument if you

10     compare that risk of liability resulting from fraud to the risk

11     of liability that would arise out of non-fraudulent loans.  If

12     I understand you correctly, your Honor, you are saying that's a

13     new or increased risk.

14                 THE COURT:  But, there are all sorts of liabilities

15     arising from fraud that don't arise otherwise.

16                 MS. JONES:  Right.

17                 THE COURT:  The other loans you only have your

18     contractual remedies.  In fraud, you don't need any contractual

19     remedies.  You have all the other remedies afforded by law.

20     And there is also, as I mentioned, the criminal possibility as

21     well.  So, I'm still having trouble with your argument.

22                 Let me hear from the government.  We'll come right

23     back to you.

24                 MS. JONES:  I think we're agreeing with each other,

25     your Honor.

D903BAN1

1          THE COURT:  That's always a good thing.

2          MS. JONES:  Thank you.

3          MR. ARMAND:  Good morning, your Honor.  The

4     government's position with regard to affect is that Countrywide

5     Bank and BANA were both affected from all loss, liabilities,

6     risk that flow from the fraud.  So, to the extent that the

7     government demonstrates that the fraud has occurred, I believe

8     we would essentially at the end of the case move for a directed

9     verdict on affect.

10         THE COURT:  That's really my view.  Directed verdict

11     may be the wrong word.  But, I don't think there is a separate

12     issue for the jury.  I think that if a fraud is proven, you

13     don't have to show affect, because it follows on the facts of

14     this case automatically.  If the fraud is not shown, of course

15     you lose, so they don't have to worry about whether or not you

16     showed affect.

17         We can take this up further I suppose as we move

18     forward.  But for the moment the motion in limine that we've

19     just heard is denied.

20         I mentioned, and let me make sure that no one

21     disagrees that the question of penalties, what is sometimes

22     referred to as damages, but really is a subsetting of how

23     penalties are computed, would be for the Court.  Is there a

24     separate claim for damages here?

25              (Continued on next page)

D9OTBAN2

1              MR. ARMAND:  No, your Honor.

2              THE COURT:  So I think then in that case -- I want to

3    hear from defense counsel in a minute, but I think then that

4    any testimony or evidence relating to penalty/damages should be

5    heard by the Court after the jury has returned its verdict.

6    Immediately after, not after any delay.

7              MR. ARMAND:  Your Honor, just on at that issue, the

8    one caveat is that loss resulting from fraudulent conduct is

9    still admissible to show intent.

10             THE COURT:  I don't know about that.  Why is that?

11             MR. ARMAND:  It's circumstantial evidence.

12             THE COURT:  Is it?  Loss can occur for hundreds of

13   reasons in this kind of a market.  There are certain

14   circumstances where the only rational or plausible reason for

15   assuming loss is a fraud, and then it might be admissible.  But

16   here there are multiple market reasons why loss could occur for

17   other reasons.  If I were to allow you to put in evidence of

18   loss as shown by intent, then of course it would open the door,

19   would it not, to putting in all the defense stuff about how the

20   other loans did even worse.  In fact, I think it would be

21   impossible for the defense to defend against your argument

22   without showing that.  I think the whole thing is irrelevant on

23   the facts of this case, so far as the jury is concerned.  It

24   may bear on my computation of damages if we get there.

25             So anything from the defense?

D9OTBAN2

1          MS. MAINIGI:  No, your Honor, we're in agreement.

2          Your Honor, with respect to motion in limine, the

3    government motion in limine one, are you willing to hear

4    argument on that for reconsideration or not?

5          THE COURT:  I don't know if I want to open that door.

6    I will hear you very briefly because the jury panel is ready

7    and we need to pick our jury, but I'll give you a couple of

8    minutes.

9          MS. MAINIGI:  Thank you.

10         MR. SINGER:  Craig Singer.  I'll be very quick.  I

11   think your Honor just stated the Court's views on whether

12   evidence of loss can be relevant to the element of intent, and

13   that therefore goes to whether evidence that there was no loss

14   would also go to the element of intent.

15         THE COURT:  Seems equally irrelevant to me.

16         MR. SINGER:  Our principal argument is if you get to

17   one you exclude the other.

18         THE COURT:  I agree with that, therefore I'm excluding

19   them both.

20         MR. SINGER:  I understand your Honor's ruling on that.

21         The same evidence, though, would also be relevant to

22   three other elements of the supposed effects.  The effects

23   element may depend on the outcome of your exchange with my

24   colleague a few minutes ago, but it would also be relevant to

25   the element of scheme because we believe that there is evidence

D9OTBAN2

1   that there's no deception of the purchaser if the loan that the

2   purchaser is buying is the same as the loan that the purchaser

3   intended to buy.  That's not deceptive.

4           THE COURT:  To take an extreme hypothetical, if I

5   concocted a scheme to deceive you into buying a loan, and by

6   chance the loan that you bought and another loan that wasn't

7   part of the scheme that you bought were so lousy that they all

8   went down, would have gone down even without the scheme, you're

9   still guilty of fraud.

10          MR. SINGER:  In your hypothetical I think I would

11  agree, but we're not talking about one loan that happened

12  turned out to be different than expected, we're talking about

13  thousands of loans.  We're talking about many loans.  So in the

14  aggregate, if all of the loans turned out to be no worse than

15  the loans that were conceded not to be fraudulent, that to me

16  is evidence of --

17          THE COURT:  That's not the way the mail fraud and wire

18  fraud statutes are constructed, they're constructed on the

19  basis of the scheme, that in effect your argument comes down to

20  no harm, no foul.  That's not the law of mail fraud and wire

21  fraud.

22          MR. SINGER:  I entirely agree that no harm, no foul is

23  not the law.  The argument I'm making is a little different.

24  The fact that the loans that the purchaser was buying were the

25  loans that the purchaser expected to buy means that the

D9OTBAN2

1    purchaser was not deceived.  That doesn't mean I'm not saying

2    that your Honor should throw out the case for that reason, but

3    I think there is relevant evidence to show to the jury that

4    there's no deception.

5            THE COURT:  Well, I hear your argument.

6            MR. SINGER:  Let me give you one more element,

7    materiality, because the argument is very similar on

8    materiality, because if the loan that the purchaser -- the

9    supposedly defrauded purchaser is buying has the same value or

10   better and is the same loan or better than the purchaser

11   believed that he or she was buying then there's no material

12   misrepresentation about that loan.  And if we could show that

13   is true --

14           THE COURT:  Materiality, is it not, in this situation

15   is if you had known X, would you have purchased?  And if the

16   answer is no, that shows it's material.  That's the kind of

17   hypothetical I will allow, by the way.

18           MR. SINGER:  I think, your Honor, that would be a

19   securities fraud-type standard of materiality for purposes of

20   purchase of a security.  For the purpose of mail and wire

21   fraud, I think if you look at the cases that we have cited, the

22   *Rigas* case is one, the Court looks at more than just whether

23   the buyer would have bought the loan or not, the Court looks at

24   whether it affected the underlying value of what the buyer was

25   purchasing.

D9OTBAN2

 1          THE COURT:  You've made that argument before, and it's

 2   a very clever one.  Unfortunately, it doesn't persuade me.

 3          MR. SINGER:  I have done my best, your Honor.

 4          THE COURT:  Very good.  Now to all the folks in the

 5   audience, with apologies, when the jury panel comes in in about

 6   a minute you're all going to have to either stand or there's an

 7   overflow room in 9B, but you'll need to vacate the seats until

 8   we pick the jury.

 9          MS. MAINIGI:  Your Honor, apologies for interrupting.

10   We have a pending letter on the issue of the ability to do

11   contemporaneous jury research.

12          THE COURT:  Yes.  Unless the government wanted to be

13   heard, I'm prepared to grant that.

14          MR. ARMAND:  The government doesn't have a position on

15   it, your Honor.

16          THE COURT:  OK.  That's permitted.

17          MR. MUKASEY:  Judge, Marc Mukasey on behalf of

18   Ms. Mairone.

19          THE COURT:  I recognize you from your hair.

20          MR. MUKASEY:  Those were the days.

21          Judge, a couple of times in ruling on the in limine

22   motions your Honor referred to the High Speed Swim Lane as the

23   "Hustle."

24          THE COURT:  I won't refer to it that way in my

25   statements to the jury.  Whether there will be evidence to

D9OTBAN2

1   whether it was referred to as that or not is a different

2   question.  But I was just doing that for brevity sake.  The

3   complaint, of course, refers to it that way, but I will refer

4   to it as the HSSL, and you can all translate that as you see

5   fit.

6          MR. MUKASEY:  Thank you, your Honor.  The second quick

7   issue is there are a couple of jury consultants in the

8   courtroom.  We understand your Honor's practice with respect to

9   jury consultants, and if your Honor is inclined to introduce

10  them as quote, unquote, jury consultants.

11         THE COURT:  You're going to introduce them as jury

12  consultants.  I'm going to call on each side to introduce

13  everyone, and you will introduce -- when the lawyers introduce

14  themselves they will say I'm a lawyer so and so, my name is

15  such and such, my law firm is such and such, I represent such

16  and such, here is my colleague lawyer so and so, here is my

17  colleague paralegal so and so, and here is so and so, who is a

18  jury consultant who works for a separate company named such and

19  such who here to help us select the jury.

20         MR. MUKASEY:  And your Honor will require them to be

21  referred to as a jury consultant?

22         THE COURT:  Absolutely, because I believe in truth.

23         MR. MUKASEY:  I'm with you on that one.

24         THE COURT:  Very good.

25         MR. HEFTER:  One more issue, Michael Hefter, on behalf

D9OTBAN2

```
 1    defendant Mairone.  When you laid out the procedure for jury
 2    selection you were clear about when the parties will exercise
 3    peremptory or not exercise a peremptory.
 4              THE COURT:  Thank you for raising that.  I am going to
 5    pick a jury of ten, and therefore, give four challenges to each
 6    side.
 7              MR. HEFTER:  My question to your Honor is I think you
 8    explained to us once there are jurors in the box and the
 9    parties are prepared to exercise their peremptories, we will
10    then replace that person if the parties so choose.  Is it your
11    Honor's practice that the parties, with respect to, for
12    example, after round one where each party hypothetically still
13    has two or three challenges left in this case, that you could
14    then back challenge against other members who were already in
15    round one?
16              THE COURT:  Yes.
17              MR. HEFTER:  Thank you.
18              THE COURT:  The fact that you used your challenge to
19    for juror number two doesn't mean you can't challenge juror
20    number three who you didn't challenge in the first round, you
21    can challenge on the second round or whatever.
22              MR. HEFTER:  Thank you.
23              MS. MAINIGI:  Your Honor, for clarification, when the
24    jury comes in, we, on behalf of the bank defendants, will not
25    be using a jury consultant to help select the jury.
```

D9OTBAN2

```
 1              THE COURT:  All right.  Too expensive, I guess.
 2              MR. ARMAND:  Sorry, your Honor, one last housekeeping
 3    issue.  The parties entered into a voluntary -- stipulation of
 4    voluntary dismissal for certain of the entity defendants, just
 5    to make things a little easier.
 6              THE COURT:  Let me see it.
 7              MR. MUKASEY:  Judge, we're going to dismiss our jury
 8    consultant as well.
 9              THE COURT:  OK.
10              MR. ARMAND:  May I approach?
11              THE COURT:  Yes.
12              So just so that I'm clear, the remaining defendants,
13    now that you have dismissed Countrywide Financial Corporation
14    and Bank of America Corporation, are Countrywide Bank,
15    Countrywide Home Loans, Inc., Bank of America NFA, and Rebecca
16    Mairone, yes?  Those are the remaining defendants?
17              MR. ARMAND:  Yes, your Honor.
18              THE COURT:  OK.  Very good.  By the way, am I
19    pronouncing that right, Mairone?
20              MR. MUKASEY:  You got it.
21              THE COURT:  Very good.  Ladies and gentlemen, if you
22    will all, with apologies, leave your seats, and we'll bring in
23    the jury.
24              MR. ARMAND:  Your Honor, to the extent there are
25    issues about demonstratives, demonstrative exhibits for the
```

D9OTBAN2

1    statements, is that something that you wanted to hear now?

2             THE COURT:  We'll take a break before that.

3             (Voir dire proceedings commenced, recorded,

4    transcribed, and contained in separate transcript)

5             (Trial transcript contained on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9o3ban3

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Will the jurors please rise and |
| 2 | raise their right hands. |
| 3 | (A jury of 10 was impaneled and sworn) |
| 4 | THE DEPUTY CLERK:  Please follow me into the jury |
| 5 | room. |
| 6 | (Jury not present) |
| 7 | THE COURT:  So to the other jury members who dodged |
| 8 | the bullet, you're not totally off the hook yet.  We're going |
| 9 | to send your cards down and you should go down right now to the |
| 10 | same room you came up from on the first floor.  And of course |
| 11 | you may still be called for duty in another jury.  But I want |
| 12 | to thank you all very much for being available for jury |
| 13 | service. |
| 14 | Anything counsel needs to raise with the Court? |
| 15 | MR. SULLIVAN:  One issue, yes.  Yesterday at 1 we |
| 16 | submitted our demonstratives for opening for the government. |
| 17 | They indicated the first three are okay.  They said they would |
| 18 | not agree to the last demonstratives.  They don't give a reason |
| 19 | why. |
| 20 | THE COURT:  Let me see it. |
| 21 | MR. SULLIVAN:  In fact, your Honor, if you'd like to |
| 22 | look at it over lunch and tell me afterwards -- |
| 23 | THE COURT:  We might as well deal with it right now. |
| 24 | So, let me hear from the government. |
| 25 | MR. ARMAND:  Your Honor, I think we can actually pare |

D9o3ban3

1   some of this down.  I think it is really the first six are not

2   in issue.  With regard to seven, the underlying of

3   underwriting, the argument is that CLUES was their automatic

4   underwriting system --

5           THE COURT:  You need to speak louder.

6           MR. ARMAND:  I'm sorry.  Their argument is that the

7   automated underwriting system replaces this performing the role

8   of the human underwriter.  And so, these exhibits

9   demonstratives they're essentially misleading from the

10  government's perspective.

11          THE COURT:  You're saying that the ones that deal with

12  CLUES which are numbers seven through 14.

13          MR. ARMAND:  I shouldn't say misleading, but they're

14  argumentative is really the -- and the suggestion being that

15  the automated underwriting system is replacing the role of the

16  human underwriting.  But the underlying of underwriting and

17  CLUES analyzes in paren underwrites the loan.  That's on page

18  10.

19          THE COURT:  So, you're saying what, that this is

20  irrelevant?

21          MR. ARMAND:  No, just that it is argumentative, your

22  Honor.

23          THE COURT:  Argumentative in what respect?

24          MR. ARMAND:  Well, it's the government's position that

25  the automated underwriting system is a tool but it doesn't

D9o3ban3

```
 1    replace the human underwriters.

 2              THE COURT:  So they are going to be presenting

 3    evidence, if I understand what you're saying, that it is a tool

 4    that they use that they think does the job or affords adequate

 5    protection or whatever they're going to argue from that.

 6    Assuming that's admissible, then why shouldn't they be able to

 7    explain on opening statement how that system works?

 8              MR. ARMAND:  I don't have a problem with that.  Just

 9    having it on a demonstrative.

10              THE COURT:  Oh.  Overruled.

11              MR. ARMAND:  The last page, page 19, this is really

12    the same issue is that it is just argumentative.  And it is one

13    thing to say it, but to place it on a demonstrative before all

14    this has been in evidence.

15              THE COURT:  If the argument is that something that

16    they would be permitted without objection to say in opening

17    statement can't be said visually through a chart, that

18    objection is overruled.  I see no basis for that.  So the

19    objection is overruled.

20              Anything else that anyone wants to raise?

21              MR. SULLIVAN:  Nothing further.

22              THE COURT:  I go ahead.

23              MR. ARMAND:  The government does have a few

24    housekeeping issues.

25              THE COURT:  Go ahead.
```

D9o3ban3

1          MS. SCHOENBERGER:  Yesterday afternoon the government

2     submitted a marked up transcript for the deposition testimony.

3          THE COURT:  Yes, thank you very much for that.

4          MS. SCHOENBERGER:  And we just ask for the Court's

5     rulings with respect to the objections, only because we'll need

6     to wait on those before we can finalize the video that will be

7     played for the jury.

8          THE COURT:  Let's talk about that.  What is the

9     government's order of witnesses?

10          MS. SCHOENBERGER:  The order is affected by a second

11     application that the government needs to make.

12          THE COURT:  All right.  First of all, who is your

13     first witness?  Have you determined that?

14          MS. SCHOENBERGER:  Yes, it's Michael Thomas.

15          THE COURT:  How long is he going to take on direct?

16          MS. SCHOENBERGER:  I imagine he'll take the rest of

17     today.

18          THE COURT:  Okay.  So, at the end of each day, I need

19     to know which depositions are likely to be introduced by either

20     side two days hence.  Because my experience is that I should

21     not rule on the deposition objections until relatively close to

22     the time when they are presented because it may be affected by

23     other rulings and other testimony that comes in in the

24     meantime.  But I know that you need at least 24 hours in

25     advance to do the editing.

D9o3ban3

1              So, you need to tell me 48 hours before, I will get it

2       back to you the next morning, and you'll have essentially a day

3       and a half to make your edits.

4              So is there any deposition that's coming up in the

5       first two days?

6              MS. SCHOENBERGER:  Mr. Price's deposition will be a

7       part of the first two days I believe.  And the second

8       application is that the government would make is to present

9       testimony from John Boland by video deposition.  Mr. Boland was

10      originally planning to attend trial live.  The government'

11      first found out this weekend and it was confirmed yesterday,

12      Mr. Boland will not be attending trial.  We've not designated

13      his testimony previously.

14             THE COURT:  Where is he residing?

15             MS. SCHOENBERGER:  He lives in Texas and he is a

16      former Countrywide employee.

17             THE COURT:  And he did not accept a subpoena

18      voluntarily at the time when he was in agreement to testify?

19             MS. SCHOENBERGER:  That is correct.

20             THE COURT:  You didn't serve him?  You didn't try to

21      give him one or he just didn't accept it?

22             MS. SCHOENBERGER:  We did not think a subpoena was

23      necessary and didn't serve him one.

24             THE COURT:  Because that might have given me

25      jurisdiction over him that I don't have now.  Because he would

D9o3ban3

1    have voluntarily accepted the subpoena if he was willing at

2    that time to voluntarily appear.  So, if he's outside the

3    Court's ability to order him here, I'll hear from your

4    adversary in a minute, but that would be a reason to put in his

5    deposition.

6               Now, before we deal with that, remind me who Mr. Price

7    is.

8               MS. SCHOENBERGER:  Mr. Price is also -- I believe he

9    may be a former employee now.  At the time the government

10   deposed him, he was a current employee of Bank of America.

11              THE COURT:  Is if he is a current employee of Bank of

12   America, then why is he not here live?

13              MS. SCHOENBERGER:  I don't believe he is a current

14   employee today.

15              THE COURT:  Pardon?

16              MS. SCHOENBERGER:  I don't believe today that he is a

17   current employee.

18              THE COURT:  He is a former employee?

19              MS. SCHOENBERGER:  Yes.

20              THE COURT:  Where is he residing?

21              MS. SCHOENBERGER:  He's also in Texas.

22              THE COURT:  Okay.  I will get to his deposition then,

23   make the rulings tonight.  That's the best I can do for you

24   obviously.

25              Let me hear from the defense if there is any objection

D9o3ban3

 1    to this fellow who is no longer willing to appear.

 2                MS. MAINIGI:  With respect to Mr. Boland, we have two

 3    related issues.  First, with respect to Mr. Boland, the

 4    government found out this weekend that Mr. Boland might not be

 5    coming.  We have of course, because he was supposed to be the

 6    second live witness for the government, spent hours and hours

 7    preparing for his deposition.  And it was only at --

 8                THE COURT:  Preparing for his testimony.

 9                MS. MAINIGI:  Excuse me.  Preparing for his testimony,

10    your Honor.  It was only at 7 o'clock last night that the

11    government sent us an e-mail indicating that Mr. Boland would

12    not be coming to trial and they'd already prepared their

13    deposition designations and sent them along to us.

14                So we do have an issue two fold with Mr. Boland.  One

15    is notice, but second it upsets the schedule that we have,

16    because they want to do some shuffling of the other witnesses.

17    And we have an application of our own, your Honor.  I hate to

18    detour you off on another issue, but I think all of these

19    issues could be considered together.  We have an application

20    related to Ed O'Donnell that we would like to make.  Do you

21    want me to --

22                THE COURT:  Well --

23                MS. MAINIGI:  -- explain that to you right now?

24                THE COURT:  Let me just tell you now.  That no matter

25    what you convince me variously of, there will never in the next

D9o3ban3

five weeks be any time when we're not going to have the jury

here because, quote, the next witness is not available or

anything like that.  If at any time a party on whose case we're

on is not ready with their next witness, that will end that

party's case with prejudice and without further argument.

Understood?

            MS. MAINIGI:  Yes, your Honor.

            THE COURT:  So, what is the story with Mr. O'Donnell

is his name?

            MS. MAINIGI:  Mr. O'Donnell, we only found out last

week, your Honor, that Mr. O'Donnell, who had previously been a

relator in the false claim act portion of the case, that he is

also a FIRREA whistle blower.  That was information that the

government has had all along that has never been disclosed to

us.  It was not disclosed to us prior to his deposition.  We

were never provided with a copy of the FIRREA declaration.

            Last week we received an update to the privileged log

and we're told that the government had inadvertently left off

the entry related to Mr. O'Donnell's FIRREA declaration.  We

inquired as to why that document was privileged in the first

place.  We had some exchanges with the government.  Ultimately

the government ended up producing that document to us on

Thursday evening.

            Since that time -- and that document is dated

February 24, 2012, your Honor.  Or excuse me, February 23,

D9o3ban3

1  2012, the same time the false claims act suit was filed by

2  Mr. O'Donnell.  Since that time we have asked repeatedly

3  whether we could take a brief deposition of Mr. O'Donnell to

4  inquire as to the declaration, because that should have been

5  produced prior to his deposition, and the government has turned

6  us down in that regard.

7        So, the O'Donnell issue is somewhat related to

8  Mr. Boland in that now that Mr. Boland is not coming live,

9  there will be a desire on the part of the government to move up

10  Mr. O'Donnell's testimony.  We would like to get his deposition

11  in prior to that.

12        MR. MUKASEY:  If I can just add a quick footnote to

13  that.  We join in the bank's application to depose

14  Mr. O'Donnell on the basis of his previously withheld

15  affidavit.  Primarily because the affidavit specifically refers

16  to Ms. Mairone in her professional capacity as the former chief

17  operating officer of Countrywide FSL division.  It is an issue

18  that we did not know about.

19        THE COURT:  This is not a criminal case.  There is not

20  a Brady obligation.  Did any of the parties here subpoena

21  Mr. O'Donnell with a subpoena, a duces tecum or other request

22  that would have required him to produce this document?

23        MS. MAINIGI:  At the time, your Honor, the government

24  had possession of this document and the document is responsive

25  to defendant's document request number two.  All documents the

D9o3ban3

```
 1   government received from the relator concerning the subject
 2   matter of this action.  And that document request is dated
 3   November 2, 2012.  So it was very much responsive to existing
 4   document requests prior to Mr. O'Donnell's deposition.
 5          THE COURT:  How long a deposition do you want?
 6          MS. MAINIGI:  I don't need more than a couple hours,
 7   your Honor.
 8          THE COURT:  That's collective?
 9          MR. MUKASEY:  Agreed.  Yes.
10          THE COURT:  Let me hear from the government.
11          MR. ARMAND:  I think one thing that's being left out
12   is the declaration is essentially cut and pasted, or the
13   complaint that -- the relator's complaint that the false claims
14   act complaint cuts and pastes from the declaration, the FIRREA
15   declaration.  There is no new information in there.  We can
16   provide the Court with a copy both the declaration and the
17   complaint.
18          THE COURT:  I will give the defense a one-hour
19   deposition limited to the FIRREA matter to be conducted -- when
20   does the government want to call Mr. O'Donnell?
21          MR. ARMAND:  If we were able to play Mr. Boland's
22   testimony after Mr. Thomas, the thought was we would -- most
23   likely tomorrow.  Depending how fast Mr. Thompson's testimony
24   goes.  The other point, your Honor, is Mr. O'Donnell has his
25   own counsel.  The government doesn't control him.
```

D9o3ban3

```
 1              THE COURT:  Mr. O'Donnell's deposition, he will have a
 2     one-hour deposition at a time set by the Court, regardless of
 3     his counsel's schedule.  I'm sure counsel will be make himself,
 4     him or herself available.  Thomas is today.  How long is he
 5     going to be on direct?
 6              MR. CORDARO:  Your Honor, I would expect two to three
 7     hours.  Probably for the rest of today and into early tomorrow.
 8              THE COURT:  This is not binding, but if someone can
 9     give me a ballpark from the defense of how long cross you think
10     will be.
11              MR. SULLIVAN:  Probably about the same.
12              THE COURT:  Okay.  So that takes us to probably mid to
13     late morning tomorrow.  And how long is Mr. Price?
14              MS. SCHOENBERGER:  Mr. Price is video.
15              THE COURT:  That's the one I've got to do tonight.
16     Lucky me.  So, how long is that video?
17              MS. SCHOENBERGER:  I think it will be in the range of
18     two hours.  The only hiccup is that it will need to be edited
19     before we can play it based on the Court's rulings with respect
20     to objections.
21              THE COURT:  I think we should do the following:  I
22     think after the midafternoon break, I would like to have
23     separate telephone conferences with Mr. Boland and Mr. Price to
24     find out why they're not willing to make themselves available.
25     If they're represented by counsel, obviously, we'll need
```

D9o3ban3

1    counsel on those calls and of course I would want the counsel

2    for the parties here on those calls.  If I'm unsuccessful in

3    persuading them to come here, then I will decide on how we will

4    proceed.

5           I think, though, one should assume that the O'Donnell

6    deposition will should either occur tonight or early tomorrow.

7    You may recall that we all had our arm twisted to begin at

8    9:30, rather than 9, and I didn't hear any protest to that.

9    So, you could do his deposition, for example, tomorrow morning

10   between 8 and 9.  But, tonight would be preferrable if you can

11   arrange it tonight.  Then let's talk about where we stand with

12   Boland and Price after we've talked to them.

13          MR. SULLIVAN:  Excuse me, your Honor.  And one more

14   thing.  You allotted 30 minutes on opening for Bank of America

15   and 10 for Countrywide.  Since I'm doing them all, can I have

16   the extra 10 if I need it?

17          THE COURT:  Yes.  I actually thought about that a

18   little bit.  I am going to give the government 40 minutes

19   instead of 35.  I'm going to give the banks collectively 40

20   minutes as well.  And then 15 minutes if I recall is what

21   counsel for Ms. Mairone, yes?

22          MR. MUKASEY:  Yes.

23          THE COURT:  Okay.

24          MR. ARMAND:  Just with regard to the Court's rulings

25   on the motions in limine.  I just wanted to verify since now

D9o3ban3

1    the losses are not something that's going to be presented to

2    the jury, we still think that what happened to the loans in

3    terms of default rates for High-Speed Swim Lane loans are still

4    relevant to whether or not they're quality loans, so we plan to

5    put on evidence at least of what the percentage are of the

6    defaults and how many ended up in foreclosure.  That sort of

7    thing.

8              THE COURT:  That's slightly different from the issue

9    before which dealt with losses.

10             MR. ARMAND:  Correct.

11             THE COURT:  Yes.

12             MS. MAINIGI:  Your Honor, we don't see any reason why

13   losses would in any way be or foreclosure --

14             THE COURT:  I've already ruled out losses.  This is a

15   little bit different though.  But, I'm not sure it is really

16   different in kind is what you are saying.

17             Here's what the government has never been able to

18   explain to me.  In the economic situation of the time, there

19   are all sorts of reasons why these mortgages would have gone

20   into default.  And so, I don't know what it is probative of.

21   The jury has no rational way of determining that the reason

22   that any given loan or group of loans went into default was

23   because of fraud as opposed to a million other things.  Plus,

24   if I did admit that evidence, then it seems to me, I would have

25   to admit what the government already moved successfully to have

D9o3ban3

1    me exclude, which is what happened to other loans that were not

2    part of this program.  And then, the government, if I get that,

3    will come back and say well those other loans shared some of

4    the characteristics of the HSSL loans.  So, we would now take a

5    quite straightforward case that has been appropriately

6    narrowed, and turn it into a gigantic mess.  All on the basis

7    of speculation.  So I do not see why the government should be

8    able to introduce that.

9            So I'll see you at 2 o'clock.

10           MS. SCHOENBERGER:  Your Honor, with the Court's

11   permission, we have a two paragraph letter that attaches the

12   Boland deposition and describes the situation, and also brings

13   to the Court's attention potential discrepancy in the testimony

14   of the witness.  With your permission we can submit that to you

15   at this time.

16           THE COURT:  Sure.  It's been 24 hours and you haven't

17   phoned, you haven't written, I was feeling so deprived.  So

18   sure, that's fine.

19           (Recess)

20           (Continued on next page)

21

22

23

24

25

D9OTBAN4

```
1                        AFTERNOON SESSION

2                          (2:15 p.m.)

3              MR. ARMAND:  Your Honor, a quick point of

4    clarification before we bring in the jury.  I want to make sure

5    it's appropriate, one of the major issues is whether or not the

6    loans were investment quality.  And investment quality, the

7    government's position will be in the case, that the borrower

8    needs to be able to repay the loan.  So I am intending to say

9    during the opening statement that the investment quality is

10   that borrowers were able to repay the loan.

11             THE COURT:  That you can say.

12             MR. ARMAND:  Thank you.

13             THE COURT:  All right.  We were held up, by the way,

14   because one of the jurors was in one of those long lines.  So I

15   flag that for counsel because this courthouse unfortunately,

16   when there are so many trials going on, the line tends to be

17   quite long.  So bear that in mind.

18             Please be seated, let's bring in the jury.

19             (Continued on next page)

20

21

22

23

24

25
```

D9OTBAN4

1          (Jury present)

2          THE COURT:  So ladies and gentlemen, we're going to

3    now hear the opening statements of counsel.  I want to tell you

4    at the outset that nothing that counsel says is evidence.  The

5    evidence will come from only three places, from the testimony

6    of witnesses, from exhibits that are received in evidence, such

7    as documents, and occasionally there will be what is called a

8    stipulation where the parties agree on some fact.  Those are

9    the only sources of evidence.

10         So you may ask why we even have opening statements.

11   Well, it's because the evidence is going to come in one little

12   bit at a time, and so it will be a while before you have the

13   overall picture, but it may be useful for do you know what each

14   side believes the evidence will or will not show, as the case

15   may be.  In other words, this is kind of an overview, but from

16   the perspective of the two competing sides.  They're obviously

17   going to have very different views of what the evidence will

18   show or not show, but by hearing those you'll have a little bit

19   of a road map, a little bit of a feeling for what the evidence

20   is all about as we go forward.  In addition, probably by the

21   end of this week I may give you a little bit an overview of

22   some of the legal issues to help you focus on that as well.

23         The government has what we call the burden of proof,

24   which means that they have to prove that it is more likely than

25   not that the facts are as they say they are.  So for that

D9OTBAN4                    Opening - Mr.Armand

1    reason, the government goes first.

2            So counsel.

3            MR. ARMAND:  Thank you, your Honor.

4            Good afternoon.  My name is Pierre Armand.  I'm an

5    Assistant United States Attorney for the Southern District of

6    New York.

7            Ladies and gentlemen, this case is about how in 2007,

8    when the mortgage industry was in turmoil, a bank that was

9    blinded by greed and focused solely on profits sold thousands

10   and thousands of bad mortgage loans, loans that knew that were

11   bad, with lies.  That bank is Countrywide Bank, the defendant

12   in this case, now a part of Bank of America.

13           At the very time that it needed to be focused on the

14   quality of its loans, making sure that the loans were quality,

15   it did the exact opposite.  It started a new process for making

16   loans to borrowers buying homes at super high speed.  It made

17   the loan application process so fast that a person could get a

18   loan for hundreds of thousands of dollars for a house in a

19   single day.  And at the same time, Countrywide gutted the

20   quality checks to ensure that the loans that they were making

21   were loans that borrowers could actually afford to pay back.

22   The process was called the High-Speed Swim Lane or HSSL, or for

23   short, the Hustle.

24           Now the person at Countrywide back who was pushing the

25   Hustle was defendant Rebecca Mairone, the chief operating

D9OTBAN4                    Opening - Mr.Armand

 1  officer of Countrywide's Full Spectrum Lending division.

 2  Through the Hustle, Countrywide made thousands and thousands of

 3  terrible quality mortgage loans, loans that were not likely to

 4  be paid back.

 5          And what did Countrywide do with those loans?  It sold

 6  them to Fannie Mae and Freddie Mac with lies that they were

 7  quality loans.

 8          Now who are Fannie Mae and Freddie Mac?  They sound

 9  like people but they are actually government-sponsored

10  organizations.  Congress created them in order to help support

11  the mortgage market.

12          Now Fannie Mae and Freddie Mac are nicknames.  Fannie

13  Mae stands for the Federal National Mortgage Association, and

14  Freddie Mac stands for the Federal Home Loan Mortgage

15  Corporation.

16          Now Fannie and Freddie, as I said, were created to buy

17  mortgage loans from banks so that the banks would be able to

18  get their money back from the loans they just issued and they

19  would have more money in their pockets to make more loans for

20  borrowers so more people could have homes.  But the system only

21  works if the loans that are being sold to Fannie Mae and

22  Freddie Mac are quality loans, loans that borrowers are able to

23  afford to repay.  They can't be lemons.

24          And the way that Fannie and Freddie try to ensure that

25  the loans that they're buying are ones that are likely to be

paid back, are not lemons, is by making the banks -- requiring

them to make what lawyers like to call representations and

wanties.  And that's basically a promise.  It's a promise that

each and every loan is an investment quality loan, not a lemon,

a loan that is likely to be paid back.

            And another thing, Fannie and Freddie, they're not --

they have to do this because Fannie and Freddie are not

involved directly with the borrowers when the borrowers are

getting the loans.  They're buying them from the banks.  And

also Fannie and Freddie are buying so many different loans for

so many different banks they can't look at the loans

themselves, review them personally, all of them, before they

buy them.  So they have to rely on the representation, the

promise from the banks that they're investment quality.  And

there's a term you're going to hear quite a bit during the

trial.  It means it's a loan, not a lemon, a loan that's likely

to be paid back.

            And Countrywide made that promise to Fannie and

Freddie thousands and thousands of times for each loan.  And

those promises were lies because the bank knew that the loans

that it was selling to Fannie and Freddie were terrible quality

loans.  They were rush job, slap dash, Hustle loans that they

knew were bad and they sold them as good.

            But the deception didn't stop with the lies when they

were sold.  In addition to that, Fannie and Freddie required

D9OTBAN4                    Opening - Mr.Armand

 1   the banks to report to them if they find out that any loan that

 2   they sold is a lemon.  Do you know how many of the terrible

 3   quality High-Speed Swim Lane loans that Countrywide reported to

 4   Fannie and Freddie out of thousands that they knew about?  Six,

 5   six loans out of thousands that they knew about.

 6           And why did Countrywide do this?  For the money.

 7   Because the Hustle loans provided short term revenues, a quick

 8   boost of revenues, about $165 million worth.  And that is why

 9   we're here today, ladies and gentlemen, because of this massive

10   fraud by Countrywide Bank and Ms. Mairone.

11           Now let me explain to you briefly the legal claim that

12   the United States has brought.  Now in 1989 Congress created a

13   law call FIRREA.  It stands for the Financial Institutions

14   Reform Recovery and Enforcement Act.  And that law authorizes

15   the United States to bring a lawsuit against people or

16   corporations that commit fraud.  And the fraud that the

17   government will prove to you occurred in this case is a

18   violation of the mail and wire fraud laws.  And very simply,

19   that's just a fraud that involved the use of U.S. mails or

20   wires, meaning telephones or emails.  But to be clear, this is

21   a civil case.  It's not a criminal prosecution.  At the end, if

22   you find by a preponderance of the evidence, which is more

23   likely than not, that a fraud has been committed, then the

24   judge can order the defendants to pay money in the form of

25   civil penalties.

1          Now I would like to tell you a little bit about what

2     the evidence will show during the trial, and then I would also

3     like to tell you about some of the kinds of evidence that

4     you're going to see during the trial.  And what we'll prove to

5     you is that Countrywide Bank and Ms. Mairone knew that they

6     were selling bad quality loans to Fannie and Freddie with lies.

7          So I'm not going to walk you through all of the

8     evidence, everything that's going to be presented to you, but I

9     do want to preview for you some of the evidence that is

10    important.  Before I start doing that, let me give you a little

11    bit of background information about mortgages and loans to help

12    put this all in context.

13         So banks lend money to borrowers so they can buy

14    houses if they think that the borrowers will be able to pay the

15    loan back, and banks make money by charging the borrowers

16    interest on those loans.  Now banks can also make money by

17    taking that loan and selling it to somebody else.  The bank

18    gets its money back and the person who buys the loan, they'll

19    make money if the borrower continues to pay.

20         And so not surprisingly, banks -- responsible banks

21    will lend money to people that they think will be able to pay

22    them back.  And the way they do that is by using a person

23    called an underwriter.  An underwriter is the person whose job

24    it is to look at your finances, to look at your income, your

25    employment, your credit history, and make a determination about

D9OTBAN4                    Opening - Mr.Armand

1    whether or not you're able to pay the loan back.  And you'll

2    hear that these are skilled employees.  They have the

3    experience, they have the know how to make these

4    determinations.  And as the evidence will show, this isn't how

5    things worked at Countrywide, the Hustle.

6            Now time and again Countrywide promises that the loans

7    that it was selling was quality loans, loans that borrowers

8    could repay.  And time and again those promises were broken.

9            Let me set the scene for you.  The evidence will show

10   it's August of 2007, the mortgage industry is in turmoil, the

11   financial crisis is looming, Countrywide's profits are down,

12   and they're looking for a way to get quick profits fast.  So

13   what do they do?  They come up with the Hustle, the High-Speed

14   Swim Lane.  The High-Speed Swim Lane make as many loans as

15   possible with little regard to the quality of the loans.

16           So there are five basic parts of the evidence about

17   the Hustle that I want to preview for you.  Number one, the

18   Hustle was not about quality, it was about speed, it was about

19   volume, it was about profits.  The evidence will show that in

20   August of 2007 Countrywide's Full Spectrum Lending division

21   suddenly sped up the rate at which it was making loans to

22   people buying homes.  And at the same time, they gutted the

23   quality safeguards that were there specifically to ensure that

24   the loans they were making were ones the borrowers would be

25   able to pay back.

1          So why didn't Countrywide care about the quality of

2     the loans?  Because the evidence will show that Countrywide

3     didn't intend to keep the loans on their own books.  The plan,

4     you'll see, was to sell these loans to Fannie Mae and Freddie

5     Mac.  And as I said earlier, Fannie and Freddie, they're not

6     able to review all of the loans before they buy them, and

7     they're relying on the promises from banks like Countrywide

8     these are investment quality loans, not lemons, loans that

9     people can afford to repay.

10         So how did Countrywide execute this scheme?  Well,

11    you'll hear that the first thing they took away, first thing

12    they got rid of was the underwriter.  The underwriter,

13    remember, that's the person whose job it is to make sure, look

14    at all of your financial information, look at your credit

15    history, and make sure that you can afford to pay back the

16    loan.

17         And the evidence will show that underwriters in the

18    Full Spectrum Lending division, they were experienced people,

19    generally had years of experience.  They are trained.  They had

20    the know how.  And they also were independent from the people

21    who were making the loans, the people on the assembly line

22    making these loans.  They were part of a separate department,

23    and their job was to ensure the quality of the loans.  They

24    were an independent safeguard for quality.

25         Now you'll hear that Countrywide also had an automated

D9OTBAN4                         Opening - Mr.Armand

underwriting system, a computer program that would assist the

underwriters doing their job.  But it was a tool.  It didn't

replace the human beings.  It was the underwriters who were

doing the work with the experience and know how to determine

whether or not the borrowers could afford to repay the loans.

So before the Hustle, underwriters were used, and they

performed the task of looking at all of these income

information, looking all the documents in the file to determine

whether or not they could afford to pay.  But Countrywide took

these people away.  They took the experience veterans and sat

them on the bench and they put inexperienced rookies in the

field.

Who did they replace the underwriters with?  They

replaced the underwriters with clerks.  Clerks were called loan

specialists, but as you'll see and hear from the evidence the

loan specialists were not specialists at all.  These were

generally entry level jobs for folks that didn't have very much

of any experience in the mortgage industry, and they weren't

considered qualified enough even to answer questions in

connection with their loan.  Instead, their job had been mainly

to enter financial information from the loans, the loan

applications, into the automated computer system, and to also

gather the documents that the underwriters would review, people

who were actually making the determination about whether or not

the borrowers could repay the loan.

D9OTBAN4                    Opening - Mr.Armand

1           Now you'll hear that when the underwriters were taken

2     away and quality is in the back seat to profit, the loan

3     specialists were also pushed to make as many loans as possible

4     as quickly as possible.  And you'll hear that they set speed

5     quotas.  You'll hear in addition to the speed quotas, that was

6     not enough, they also changed their pay, they gave them

7     financial incentives to move as quickly as possible and not

8     care about quality.

9           You'll see that Spectrum first gave a 25 percent bonus

10    for volume.  When I say "volume," I mean producing a lot of

11    loans.  They also gave a bonus for hitting speed targets.  If

12    you were fast, you got a bigger bonus.  In addition to that,

13    they stopped docking employees' pay for making bad loans.  See,

14    before the Hustle, if you made bad quality loans, your pay got

15    docked, which is a reasonable thing to do if you're trying to

16    minimize bad quality loans, but after the Hustle you'll see you

17    could make bad quality loans and your pay would be secure.

18          And you'll also hear from the evidence that

19    Countrywide made matters worse by sending the loan specialists,

20    the clerks, out in the field to make underwriting decisions

21    without giving them proper training first.  And you'll also

22    hear that the underwriters, the loan specialists, were simply

23    given underwriting authority, and any training that they got

24    was done on the fly, because, as I said, the Hustle was about

25    speed and volume, it wasn't about quality.

1          And as you'll hear, Countrywide knew that the Hustle

2     would lead to poor quality loans because their own employees

3     told them it would.  You'll hear the evidence will show that

4     employees at Countrywide warned that the Hustle would lead to

5     poor quality loans.  The evidence will show that those warnings

6     fell on deliberately deaf ears.  As I said, the Hustle was

7     about speed and volume and profit, not about quality.

8          That brings us to number two.  The bank knew that it

9     was producing bad quality loans.  So after the Hustle began in

10    August of 2007, did Ms. Mairone and others in Countrywide know

11    that the loans they were making were bad quality loans?  Of

12    course they did.  The evidence will show that underwriting

13    managers were so concerned about the impact that the High-Speed

14    Swim Lane would have on the quality of the loans that they

15    insisted on having a quality assurance process, a review of the

16    loans to see and test the quality of the loans as they were

17    being made.  And you'll hear that Ms. Mairone only allowed the

18    quality assurance reviews to occur if they didn't slow down the

19    assembly line and the results of the reviews didn't go directly

20    to the clerks, the loan specialists who were making the loans.

21         And predictably, you'll see from the results of these

22    quality reviews, that immediately -- almost immediately after

23    the Hustle began, quality began to decline.  You'll see the

24    quality assurance reports showing that in August, September,

25    October of 2007 there were problems with the loans.  The

1    percentages of loans that Countrywide, the Full Spectrum

2    Lending unit identified as high risk first were 21 percent,

3    then 41 percent, then 97 percent, then the 98 percent.  And

4    high risk, as you will hear, meant there was a problem with the

5    loan that, if it was not corrected, could result in the loan

6    being severely unsatisfactory.  "Severely unsatisfactory" was

7    an internal bank term that meant bad, not investment quality, a

8    lemon.

9        So think about that for a minute.  Countrywide's own

10   internal documents were saying that over 90 percent of the

11   loans were being identified as high risk, yet at the same time

12   they're selling -- Countrywide is selling loans to Fannie and

13   Freddie and promising that they're investment quality and not

14   lemons.

15       That brings us to number three.  The Hustle was

16   expanding despite the poor quality.  So the evidence will show

17   that despite the warnings from employees, despite the red

18   flags, despite the 90 percent defect rates, the defendants

19   actually expanded the High-Speed Swim Lane.  They expanded the

20   Hustle in October of 2007.  They expanded it.  They pushed for

21   more volume.  They pushed for more loans.  They added more

22   centers, funding centers they called them, to produce more

23   Hustle loans.  They have more types of loans.  And they

24   continued to have riskier loans in the High-Speed Swim Lane by

25   stating income levels where the borrowers aren't required to

D9OTBAN4                    Opening - Mr.Armand

1    provide documentation of their income.  So all of those loans

2    were going through the High-Speed Swim Lane and going to the

3    clerks, the loan specialists, to make underwriting

4    determinations for those folks to determine whether or not the

5    people could repay the loans.

6         And you'll hear that after the High-Speed Swim Lane

7    was expanded, the quality reports continued to show problems

8    with the quality.  Month after month after month you'll see

9    reports from November, from December, from January, from

10   February of 2008.  And those reports, Countrywide's own

11   reports, showed that 80 and 90 percent of the loans reviewed

12   had been flagged as action required.  "Action required," like

13   "high risk" meant there was a problem with the loan, if it

14   wasn't corrected, resulting in the loan being severely

15   unsatisfactory.  Again, "severely unsatisfactory" means the

16   loan was bad, not investment quality.

17        And so you'll hear that Countrywide personnel advised

18   Ms. Mairone and told her in November of 2007 that only a very

19   small percentage of the loans that had been found that had

20   problems were actually being corrected before they were going

21   out the door, before the loans were closing and being sold to

22   Fannie and to Freddie.  So a very large portion of them had

23   problems that could make them severely unsatisfactory, not

24   investment quality.

25        So did Countrywide stop the Hustle and try to fix the

D9OTBAN4                          Opening - Mr.Armand

1    quality problem then?  Did Ms. Mairone or anyone else at

2    Countrywide pick up the phone and call Fannie Mae and Freddie

3    Mac and tell them there were problems with the quality of the

4    loans they were selling to them?  No.  You'll hear they pushed

5    for more speed and more volume.

6           By March of 2008, you'll hear the problems that Full

7    Spectrum Lending division, where the Hustle was launched, the

8    problems they were seeing in the loans were now starting to

9    show up in quality reviews that were being done outside of Full

10   Spectrum Lending division.  See, the corporate quality control

11   group at Countrywide, they would do quality reviews for all the

12   divisions of Countrywide, including Full Spectrum, and they

13   found in March of 2008, 2008, which was the first time there

14   was a significant volume of Hustle loans that were included in

15   the reviews, that nearly one out of every three loans was

16   severely unsatisfactory, meaning it was bad, not investment

17   quality.  And you'll hear that 30 percent was eight times the

18   industry standard defect rate.  And again, that meant that one

19   out of every three loans they had been selling to Fannie and

20   Freddie coming from Full Spectrum Lending division were not

21   investment quality.

22          Now because the 30 percent defect rate was so

23   embarrassingly high, you'll hear that Full Spectrum Lending

24   division did everything they could to make that number

25   disappear, at least make it look like it was lower.  And so

D9OTBAN4                      Opening - Mr.Armand

1    what did they do?  They created a new bonus called the sprint

2    incentive.  And what this bonus did was it paid extra money to

3    employees in Full Spectrum if they could get the quality people

4    in the corporate quality department who had found the

5    30 percent defect rate to lower the rate.  So what they did was

6    they paid a bonus to their employees to make the rate go down.

7           Now you will also hear that eventually, after about

8    nine months of the Hustle, even Countrywide began to recognize

9    that what they were doing was a terrible idea, people outside

10   of the Full Spectrum, and they said that it had to stop.  What

11   did they do?  They brought back the quality checks they had

12   taken out, such as the underwriters.  But by then it was too

13   late, they had already sold upwards of 30,000 Hustle loans to

14   Fannie and Freddie as investment quality loans but they were

15   lemons.

16          That brings us to number four.  Countrywide, the

17   defendants, they never told Fannie and Freddie about the bad

18   loans.  So as I mentioned, the evidence will show that while

19   all this was going on, Countrywide did not tell Fannie and

20   Freddie what they were really up to.  You'll hear that between

21   August of 2007 and March of 2008 Countrywide sold 30,000 Hustle

22   loans to Fannie and Freddie, each one with a promise that it

23   was investment quality loan.  You'll also hear that more than

24   40 percent of those loans were not investment quality.

25          Now you'll hear testimony from Fannie, from witnesses

D9OTBAN4                    Opening – Mr.Armand

1    from Fannie and Freddie, and none of them will testify that

2    they were told about the High-Speed Swim Lane or they knew

3    about the combination of risky lending practices that were so

4    troubling, like the fact they had benched the underwriters,

5    they were approving loans at such high speeds and paying

6    employees based solely on volume regardless of quality, and

7    that their own internal quality reviews were showing that

8    90 percent of the loans were high risk and 30 percent were

9    severely unsatisfactory.  And the evidence will show that

10   Countrywide told Fannie and Freddie none of that.  You also

11   won't hear that Countrywide reported the loans that they knew

12   were not investment quality to Fannie and Freddie.  As I said,

13   they reported only six loans out of thousands.

14          Now you may be asking yourself:  What does a bad,

15   defective loan look like?  And we're going to talk about some

16   during the trial.  And I can talk about an example that you'll

17   hear about now.  This one was for a property in Fort

18   Lauderdale, Florida, where the borrower –- the loan file said

19   that the borrower earned $13,000 a month as a doorman.  And

20   this was a Hustle loan that was sold to Fannie Mae as an

21   investment quality loan.  But some basic underwriting would

22   have found, looking on salary.com, that a doorman in that area

23   of the country wouldn't have been making more than about $6,000

24   a month.  And if they had done some basic underwriting in terms

25   of getting a verification of employment, they would have found

D9OTBAN4                        Opening - Mr.Armand

1    that this actual the borrower only earned about $5,000 a month.

2    So that is not an investment quality loan because the

3    borrower's income was so much lower than what it said in the

4    loan file that was sold to Fannie and Freddie.  Well, in this

5    case, just to Fannie.

6            So that brings us to number five.  Countrywide made

7    quick cash through the Hustle.  So why did the defendants

8    engage in the scheme?  The money.  You'll hear that from

9    selling Hustle loans to Fannie and Freddie, Countrywide earned

10   revenues --

11           MR. SULLIVAN:  Objection, your Honor, I believe the

12   Court ruled that out.

13           MR. ARMAND:  These are --

14           THE COURT:  Hold on.

15           No, I don't agree with the objection.  Overruled.

16           MR. ARMAND:  Countrywide earned about $165 million

17   from selling Hustle loans to Fannie Mae and Freddie Mac.

18           Now as I talked about the Hustle and the loans, the

19   lemons that were created by the Hustle, I mentioned a number of

20   different percentages.  But you don't have to worry right now

21   what they all signify, they're all measurements of the poor

22   quality of the Hustle loans.  And one thing that will be clear

23   to you at the end of the trial is that no matter how you slice

24   it, the Hustle loans were bad, not investment quality.

25           So just to sum up the five points, the Hustle is about

D9OTBAN4                      Opening - Mr.Armand

speed, volume, profit, not about quality.  The defendants knew

from their own quality reports that the loans they were making

were bad loans, despite the poor quality.  Number three, they

expanded the Hustle.  Number four, they never told Fannie and

Freddie about it.  And number five, Countrywide made profits.

        So now that I have given you a preview of what the

evidence will show, I would like to tell you a little bit about

the kinds of evidence you will see.

        First, you're going to see documents, and they will be

called exhibits during the trial.  You'll see internal emails

from Countrywide where employees raised concerns about the

impact that the Hustle would have on loan quality.  You'll see

the quality assurance reports I was just talking about showing

how month after month after month the problems with the loans

were getting worse.

        (Continued on next page)

D9o3ban5                    Opening – Mr. Armand

1          MR. ARMAND:  You'll also see internal e-mail to

2     Ms. Mairone where she was told that only a small percentage of

3     the loans that had been identified as having problems were

4     actually being corrected before the loans were closing and

5     being sold.

6          And the e-mails and other documents will show that

7     instead of stopping the High-Speed Swim Lane, they pushed for

8     more speed, more volume, more profit.  And you'll see one

9     e-mail that says, and I quote, they wanted to make a hell of a

10    lot of loans.

11         You'll also hear testimony from witnesses.  You'll

12    hear testimony from former Countrywide employees, who worked at

13    Full Spectrum Lending division, we'll explain the concerns that

14    they had about the quality, how they raised those concerns.

15         And you'll also hear from witnesses from Fannie Mae

16    and Freddie Mac who will talk to you about the representations

17    and warranties, the promises, and how they expected to be

18    buying investment quality loans and how they weren't told about

19    the Hustle.

20         So, in a nutshell, what the documents and the

21    testimony collectively will show is that the promise of quality

22    was largely a joke.  That in the pursuit of profits, the

23    defendants, they benched the underwriters, they rushed

24    approvals, they removed controls, they ignored red flags, and

25    they withheld facts.  When the defects began to show up in

1    droves, they turned a blind eye, they kept Fannie and Freddie

2    in the dark, and they continued to sell them lemon loans.

3          That's fraud.  That's why we're here.

4          Before I sit down, there are three things that we ask

5    you to do.  First, to listen carefully to the witnesses when

6    they testify and pay close attention to the other evidence as

7    it comes in.  The exhibits will come in or the evidence will

8    come in one exhibit at a time and the witnesses will testify

9    one at a time.  But it may not always be in perfect

10   chronological order.  We'll have an opportunity at the end of

11   the trial to tie everything up together in a closing argument.

12   But until that time, we just ask that you pay close attention

13   to the evidence as it comes in.

14         Secondly, please pay close attention to the judge's

15   instructions.  At the end of the evidence before you

16   deliberate, the judge will give you detailed instructions on

17   what you're supposed to do, and we ask that you listen

18   carefully at that time.

19         And then third, we ask that you use your common sense.

20   The same common sense that you exercise in making important

21   decisions in your everyday lives.  It's one of the most

22   important assets that you can bring to your service as a juror.

23         If you do those three things, at the end of the

24   evidence we'll stand before you again and request that you

25   return a verdict that's consistent with the evidence in this

1    case, that the defendants are liable for fraud.  Thank you.

2            THE COURT:  Thank you very much.  Now we'll hear from

3    counsel for the banks.

4            MR. SULLIVAN:  No fraud.  Two words.  That's the heart

5    and soul and body of the defense.  No fraud.  And that's what

6    the evidence will show.

7            Now, I could sit down now and save us 39 minutes and

8    just let you think about that, but what lawyer can resist using

9    up all the time to tell you more about what the defense will

10   be.

11           My name is Brendan Sullivan.  I'm going to speak for

12   the three corporate defendants that are on trial here.  One

13   woman Rebecca Mairone, and three companies.

14           So let me talk about no fraud for a second.  There are

15   lots of ways to say no fraud.  No intent to deceive, no scheme

16   to defraud, no intent to misrepresent, no misrepresentation, no

17   violation of the mail fraud statute, which is a criminal

18   statute.  No violation of the wire fraud statute, which is a

19   criminal statute.  And of course no criminals.

20           So if there is no fraud, and I turn out to be right,

21   remember what the Court says, what lawyers say is not

22   important.  You disregard everything I say if it doesn't match

23   the evidence from the witness stand and the documents.  Just

24   forget it.  But if the evidence doesn't match what they say,

25   then I trust you'll forget what they say.

D9o3ban5                        Opening - Mr. Sullivan

1          So if there is no fraud in this case, and I mean none,

2     what will the evidence show?  It will show very decent, normal

3     people getting up in the morning, putting the kids out to

4     school, going to work, working in a mortgage application

5     business, where there are thousands of mortgages coming through

6     their offices.  All of them bright people, doing a very

7     difficult and tedious job, each mortgage itself is said to be

8     more than 100 pages, picture it in a file.

9          Think about the data that would be in a mortgage file.

10    Of course, files are now on computers, but it is the same data.

11    This data about who the person is that's borrowing, about their

12    spouse, about their earnings history, about their credit, about

13    their background, about their prior mortgages, about their

14    payment histories.  There is data in there about the property

15    they're buying.  What is the property, where is it.  Is it

16    appraised, is it valued.  There is data about the loan that

17    they are going to take.  What kind of loan is it?  How much is

18    the interest?  How long will it be?  Literally hundreds of data

19    points that go into a loan.

20         These people, all these normal, well-intentioned

21    people that were involved in that business, you are going to

22    see many of them from the witness stand.  I ask you to just ask

23    yourself each time you see a witness, hear a witness, ask the

24    question, what fraud?  Where is the fraud?  Because there will

25    be none.  Normal, well-intentioned people working in the

D9o3ban5                    Opening - Mr. Sullivan

1    mortgage industry.

2            That's what the evidence will show.  Not one moment

3    did any of them believe that they were deceiving Fannie Mae,

4    engaging in a scheme to defraud, and certainly not this

5    individual defendant Rebecca Mairone, who has been picked out

6    of hundreds of employees to sit with us in this court for the

7    next five weeks.

8            Let's talk quickly about who's here.  First off is

9    Bank of America.  I can't run my own TV but I am going to take

10   a chance.  There it is.  Bank of America.  That's the

11   corporation that's here.  Everybody knows, you go by five of

12   them on the way home.  The company that's here is called Bank

13   of America N.A.  BANA.  The initials will drive you crazy in

14   this case.  They speak in a language in the mortgage industry

15   that drives you nuts.  I am going to do the best I can to use

16   English words, but even I can't do it all the time.  BANA, Bank

17   of America.  Employees, 167,000 employees, retail locations

18   5400.

19           Now, I said no fraud to begin with.  Even the

20   government doesn't say that Bank of America committed fraud.

21   They don't say that.  They're not arguing it.  They're not

22   saying Bank of America was in a scheme to defraud.  Bank of

23   America is here for the simple reason that they came along

24   after this so-called fraud, and bought Countrywide.  I'll show

25   you dates in a minute.  They came along afterward, after all

D9o3ban5                    Opening – Mr. Sullivan

the relevant facts here, and they bought the bank, of course in

good faith, merged it into itself, took in the employees, took

in their assets, and ran the mortgage business afterwards.

          So, you'll never hear a word in this courtroom about

Bank of America being engaged in a fraud.  I told you the

defense was no fraud.  Bank of America, they're not even saying

there was a fraud.

          More cast of characters here.  Countrywide.

Countrywide was one of the biggest mortgage application or

producers in America.  Just to give you an idea of the scope of

it, we'll just quickly look at it, 50,000 employees, almost 800

branches.  This is, by the way, in 2007.  You've got to back

with me in time.  We are not talking about today.  The problem

with litigation is it brings us all together to focus on the

past.  Five and six years ago.  That's what we're looking at.

Not yesterday, not last year.  We are going back five and six

years to look at what happened at the time.

          In 2007 alone, there were 2.1 million mortgages given

to home owners across America.  2.1 million.  It shows you the

volume of mortgages that are going through various offices that

are worked on by normal, well-intended people.  The total

amount is staggering.  Who knows what amount that is.

$385 billion worth of loans.

          But the important thing is here we're not talking

about all that.  We are talking about just this one division

D9o3ban5                    Opening – Mr. Sullivan

1    over here, Full Spectrum Lending.  That's what we are focusing

2    on six and seven years ago.

3        Let's look at Full Spectrum Lending.  This is a

4    division of Countrywide.  There is where we're focusing.  It is

5    back to 2007.

6        Now, Rebecca Mairone was one of 4,000 employees.  94

7    branches, almost 200,000 loans that they pushed through their

8    system, 2007, to the extent of $31 billion worth.  That is the

9    size of the business that the government's been talking about

10   today.

11       Let's look at one more slide.  This is a bit of a

12   corporate chart and it shows you where Rebecca worked.  There

13   are all these people going to work.  She worked up here.  She

14   had bosses.  She had people on the same stature virtually.  She

15   was called chief operating officer.  But what you'll find from

16   the evidence, ladies and gentlemen, is that this was a group of

17   people who worked together.  They had work plans, they had

18   meetings, they worked to produce loans with the highest

19   possible quality.  And when you see the documents and you hear

20   the witnesses, the focus on quality and correcting quality

21   problems is almost overwhelming from what was going on in those

22   days.

23       Now, it is also important, now these people are not

24   here.  Fannie Mae you heard a little bit about that before.

25   This is the Federal National Mortgage Association called Fannie

D9o3ban5                    Opening - Mr. Sullivan

1   Mae.  Another initial, Fannie Mae, Freddie Mac, where they come

2   from, who knows.  But that's what we call them.  What is the

3   objective?  This is the victim, says the government to you.

4   Fannie Mae and Freddie Mac bought loans that were processed

5   through Countrywide.  They gut the loans.  The government says

6   that they did not get the quality loans that they were

7   expecting.

8           Let's understand who Fannie Mae and Freddie Mac are.

9   Fannie Mae founded in 1938.  It is a creature of Congress.

10  Congress passed it because their job in America is to provide

11  stability, liquidity, and affordability to America's housing

12  markets.

13          This is Freddie Mac.  These are enormous companies.

14  5,000 people -- this is back in 1970.  The Fannie Mae, 5,700

15  personnel in their offices.  Their reason for being is to buy

16  mortgages.  The phrase "born to ride" or something for

17  motorcycles, or "born to fly."  These companies were born to

18  buy.  That's what they did.  They're created by the government,

19  they buy mortgages because of the crucial importance they play

20  in the housing market in America.  If they weren't in

21  existence, there would be no money for anybody to buy

22  mortgages.  That's what their function is.

23          They are the world's leading experts in the housing

24  market.  And they had a relationship with Countrywide and they

25  know the market as well as anybody.  They know what the risks

D9o3ban5                    Opening - Mr. Sullivan

1    are, they know what the procedures are, Fannie Mae has the

2    experience and Freddie Mac has the experience to understand

3    what is being produced by Countrywide and other companies that

4    are producing mortgages to them.

5         Now, you've heard a little bit about the mortgage

6    business.  It is worth pausing just to get the basics.  A home

7    owner wants to buy a house.  He goes to Countrywide or some

8    other company or some other bank, that person then presents the

9    financial information, and the process starts at that time.

10   And it is a process that does take time.  It takes a lot of

11   detail.  And you have to build a file that contains accurate

12   information.  Of course, they rely upon the borrower to tell

13   the truth.  In fact, on all the forms the buyer has to sign

14   under penalties of perjury that they are telling the truth

15   about such things as income.

16        So you have a borrower, and you bring it to the

17   company, and the company then starts to build a file.  Now,

18   once a file is built, it has to be a quality file.  How do you

19   get a loan?  Someone has to evaluate that loan.  The term

20   "underwriter" will come up many times.  What is an underwriter?

21   It is a little strange term.  What it really means is, it is a

22   person who analyzes or evaluates an application for a loan or

23   part of an application, to make a judgment about quality.

24   That's the whole function of the mortgage process.  People come

25   for loans, they present their data, it's put in a file, and

D9o3ban5                        Opening - Mr. Sullivan

1    someone makes a judgment is this a worthy borrower.  That's

2    what Countrywide does.  That's what their job was.

3          What is interesting to know in this day and age, you

4    wouldn't be surprised to find out, there are now automated

5    underwriters.  In other words, years ago, if we were talking 20

6    years ago, 25 years ago, it would be human being that worked on

7    each application.  They still have human beings working on it,

8    but they would make judgments.  Now computer programs are so

9    sophisticated, you can take the data and put it into a machine.

10   This is called CLUES.  Here's one of those initials that drive

11   you crazy, but I must say CLUES is easier to say than the real

12   name.  The real name is Countrywide Loan Underwriting Expert

13   System.  You are going to hear that 250 times at least.  CLUES.

14   It means it is a computer program that acts as an underwriter.

15   In other words, it does the job of evaluating what data is in

16   there, so that it can determine whether this is a good loan or

17   not.

18         Let's quickly look what does it do.  Automated

19   underwriting, and it has been around since 1993.  The purpose

20   is to increase the production capacity and productivity of

21   Countrywide branches, to improve the consistency of

22   underwriting quality, reduce the cost of originating a loan.

23         So what happens here?  You enter the data into the

24   computer, just I will go through these quickly.  The computer

25   known as CLUES then analyzes the data.  In other words, it

D9o3ban5                       Opening - Mr. Sullivan

1  underwrites it.  Not a human underwriter, but a computer

2  underwriter.  It looks at the credit, looks at the ability to

3  pay, looks at the property, and so forth.  It analyzes it.

4  Then it make a decision.

5         There are two decisions CLUES can make.  One is it can

6  accept the loan.  In other words, it's been programmed to say,

7  okay, this is a borrower that's worthy, the loan is reasonable,

8  the prospect of paying it back is reasonable, so CLUES can

9  either accept or refer.  "Refer" means send it to a human

10  being.  Send it to an underwriter.  These are just steps.  Here

11  is this is a loan where it had an "accept."  When there is an

12  accept, the machine will actually print out what conditions.

13  It will say, yes, this is a good loan, but make sure the

14  following is done, or check the following to make sure that

15  it's confirmed.  If the machine says that it is not a good loan

16  or it can't fulfill all of its terms, it then puts a "refer."

17  So it can do an "accept" or a "refer."  Refer means send it up.

18  All right.  Now, that's called automated underwriting.

19         Now, you know how the mortgage industry works.  After

20  the underwriting process is done, then the decision is made

21  about whether this is a worthy loan, and the borrower gets the

22  money, the borrower goes and buys the house.  And what does

23  Countrywide do with that mortgage?  Countrywide with that

24  mortgage, and the 200,000 other mortgages that you see, they

25  sell it.  They can't hold it because they'll have no money for

1    the next borrower.  So they sell it to Fannie Mae and Freddie

2    Mac, the experts in the industry whose purpose it is to buy

3    loans.  That's what Congress and all our government wants to

4    happen.  They want a buyer of these loans, so there is a

5    continual funnel of money to borrowers, so borrowers can buy

6    homes.

7           We know some of the basics.  What actually happened

8    here?  What actually happened?  The facts will show you that in

9    2007, subprime mortgages were no longer being written in the

10   industry.  And the division we're talking about, Full Spectrum

11   Lending, was going to start working only with basically only

12   with prime mortgages.  There is a big difference.  Subprime

13   mortgages are all generally considered to be risky.  As you

14   might imagine, the word prime mortgage is the top –- the top --

15   the cream so to speak.  The better mortgages.  The ones that

16   have less risk.  The borrowers that are more likely to pay the

17   loan back in the long run.

18          So there was a dramatic change that occurred in this

19   division.  And that was that they started to focus on dealing

20   with prime loans, whereas for years in the past they had been

21   dealing with subprime loans.

22          So what did management do?  This required different

23   handling.  With subprime loans, for example, human contact on

24   the loan file by underwriters was virtually mandatory.  There

25   was so many difficulties with subprime loans that underwriters

D9o3ban5                    Opening - Mr. Sullivan

 1   had to be analyzing each of those files.  But with respect to

 2   prime loans, that was not the case.  Prime loans, it was

 3   accepted in the industry, could be run through automated

 4   process like we've just seen.

 5          So, the people, all well-intended at Full Spectrum

 6   Lending, devised a process that got to be known as the

 7   High-Speed Swim Lane.  They call it the HSSL, back to initials.

 8   And naturally, letters like HSSL got turned into Hustle.  Not a

 9   bad word, the Hustle is a word you hear in every Little League

10   game, isn't it, with the coach saying get out there, Johnny,

11   get out there and hustle.  You are going to hustle the Court

12   many times in the next few weeks, trying to beat traffic.  The

13   word "hustle" was not a bad word, and neither was the concept

14   of High-Speed Swim Lane.

15          It was developed because this change in the product.

16   And there was a new design, and so people say could we have a

17   better program to move loans faster.  Speedier because of our

18   different product.  And the answer was yes.  And all the

19   witnesses that will come to this witness stand will tell you

20   this was a good idea.  What they basically were doing was

21   taking from this enormous river of loans, take the best ones

22   from the river, and put them up on a High-Speed Swim Lane so

23   they could be processed faster, so that they could be processed

24   with automated underwriting, so it would take less human

25   contact on the loan, and you would get an "accept" out of the

1    computer program we've just looked at.  Hustle.  That was the

2    program.

3              People thought it was a great idea.  It was a very

4    simple idea.  Don't let this good prime loan be stuck in a pile

5    of other loans.  Get the good ones out, put them on a

6    high-speed track, and move them through the system.

7              They'll all tell you they thought it was a good idea.

8    Rebecca Mairone didn't design this thing.  There were people in

9    the company, many people, 20 people that would have input into

10   how to design this new process that would handle prime loans.

11   That's what this was about.  No one thought misrepresentation

12   or fraud.  No one.

13             When they had established a new program, let me --

14   rather complex in a way.  They put this as a matter in their

15   policy books, you can actually see it.  They have various

16   loans, and they had this in their policy book, straight through

17   at high speed.  Loans that were deserving of going through at

18   high speed.  They enter from here.  They are not prime, they go

19   off somewhere else.  It was a concept to design a program that

20   would work.

21             Were they concerned with quality?  Every time the

22   evidence that you see a reference to a quality assurance

23   program or a quality control program, naturally, you'll see

24   that's a focus on maintaining quality.  There were two things

25   you'll hear from the witnesses, and it will be interesting for

D9o3ban5                        Opening - Mr. Sullivan

you to understand what it is.  Quality assurance looked at the
process itself.  Think about this.  It is an assembly line of
sorts.  File comes in, it builds here, it builds there, it is
moved along in the chain and it has quality assurance.  Quality
assurance looks at the steps along the way.  Say it was an
automobile going along an assembly line.  Looks at this stage.
It looks at this stage.  If there is something wrong, it's
pointed out and it's fixed.  If there is something wrong, it is
pointed out and it is fixed.

          Quality control, a very different name.  Quality
assurance looks at the process along the way, but quality
control is the final determination of whether it was a quality
product.  They had both programs.

          In the quality control, for example, in the fourth
quarter of 2007, they had a defect rate of 5.4 percent.  In the
first quarter of 2008, they had a defect rate of 9.8 percent.
And in the second quarter of 2008, they had a defect rate of
4.4 percent.  The figures you heard originally from the
government are quality assurance along the way.  But the final
product was within industry averages.

          In order to have a product at the end of the line,
which is a quality product, not a severely unsatisfactory
product, it requires a lot of effort by these same men and
women that are working there, to find the problems and correct
them.

D9o3ban5                          Opening - Mr. Sullivan

 1        There was a process called "rebuttal" you'll hear

 2   about.  A rebuttal process.  When there was a problem found

 3   with the mortgages, people turned to, they looked at the

 4   mortgage, and to see if they could fix it.  Is there something

 5   missing from the file.  The fact that it is severely

 6   unsatisfactory does not mean, as you'll see from the evidence,

 7   that it can't be paid or the borrower is no good or the

 8   property wasn't valued at the place.  It might be that there

 9   was a piece of paper missing from it.  There was a crucial

10   piece of paper in the file.

11        So keep in mind, quality assurance is one thing.

12   Checks along the way.  But the final quality control process

13   tells the story.  Quality assurance is looking at the early

14   innings.  What happened in the fourth inning, in the seventh

15   inning.  But you know you don't take the score in the seventh

16   inning, you wait until the ninth.

17        Were people concerned about the quality?  They

18   certainly were concerned about the quality.  They took

19   extraordinary steps to make sure that the quality was at a

20   level which warranted its sale to Fannie Mae and Freddie Mac.

21   That's what they were doing.  Not one of the people you see

22   from this witness stand, and there may be 20, 25 of them, will

23   say to you that they intended to deceive, to misrepresent, to

24   commit a fraud, or have any notion that someday, five and six

25   years later, that someone might come along and say, let's look

D9o3ban5                    Opening - Mr. Sullivan

1    back at this process and see whether this process somehow

2    facilitated a scheme to defraud.

3              It is important for you to know that there was a

4    extremely close relationship between Countrywide, the producer

5    of all these mortgages, and Fannie Mae and Freddie Mac.  Those

6    expert, the buyers that were born to buy, they knew the

7    industry and what problems there were in the industry.  They

8    knew the mortgages.  They had their own quality system.  They

9    talked frequently, they met frequently.  Fannie Mae and Freddie

10   Mac did their own surveys on these mortgages.  Fannie Mae and

11   Freddie Mac never complained about this process in 2007 and

12   2008.

13             But the interesting thing is that there were enough

14   quality concerns that these same people that the evidence will

15   show are decent, normal people, going to work, doing their job,

16   they decided to change the system themselves.  They weren't

17   satisfied with their own quality ratings.  And so they got

18   together as a group, in their company, and in accord with the

19   bulletin 08-195, on April 25, 2008, they changed the policy and

20   they brought underwriters, human underwriters back into the

21   process.  Even though Fannie Mae and Freddie Mac were perfectly

22   satisfied to have automated processing of loans through CLUES.

23   Fannie and Freddie knew this business inside and out.  They

24   knew CLUES as well as they knew their own automated processes.

25   You can't run a mortgage company without automated underwriting

D9o3ban5                    Opening – Mr. Sullivan

1    as part of the work.

2           But nonetheless, when the company found it was hard to

3    control the quality, even though their final quality scores

4    were within range, their defect rate was within the industry

5    range, they went and said, okay, let's do what we can to assure

6    quality by bringing humans back into the process and require

7    that they were there.

8           Let's take a look.  By the way, see, I forgot

9    sometimes to tell you some things.  This, which you cannot

10   possibly read, is the work flow, the steps that are taken to

11   process a mortgage.  People in the company sit down and they

12   take it step by step by step, so they can tell their hundreds

13   of employees this is how you do it.  This is what you do here

14   and this is what you do here.  You'll see plenty of that.

15          Look at this bulletin I just mentioned.  What happens

16   here?  They're bringing underwriters back into the process.

17   All loans must be submitted to underwriting for a clear close

18   approval.  Even though they had the CLUES, this amazing

19   computer that does the underwriting for prime loans, they

20   brought people back themselves.

21          About a month later on May 21, in bulletin 08-237,

22   they issued a further proclamation that basically said that all

23   loans are submitted to underwriting for initial cleared and

24   closed decision and approval.

25          That's the evidence.  So concerned about quality they

1    struggled with this process, they -- and by the way, in any

2    company you'll see that people have different views.  Anybody

3    that's ever been to work somewhere knows that people have

4    different views about how to do the job, right?  They have

5    underwriters who have one view of doing the job, supervisors

6    have another view of doing the job.  But not one of them had in

7    their mind doing something to defraud anybody.

8            It is important you keep your eye on the timeline.

9    Let me show you this.  I'm just going to hold this up.  Look,

10   this is the High-Speed Swim Lane timeline.  Couple of things.

11   It existed only for half of 2007 up to half of 2008.  What is

12   important here?  What did these people do when they developed

13   the High-Speed Swim Lane?

14           Look, start of the design, new work flow called the

15   High-Speed Swim Lane.  They didn't just pull out of the air how

16   to have a new and better process.  They studied it.  There are

17   people that work at the company that actually do these things.

18   That know work process, know work flow.

19           The start of the High-Speed Swim Lane started in

20   August 13, 2007.  What did they do?  They had a pilot program.

21   Good thing for well-intended people.  Is this going to work or

22   not?  For 48 days, they had a pilot program to see how the new

23   system worked.  It was done in two branches, in Chandler,

24   Arizona and Richardson, Texas.  Once they saw that this program

25   was something that would be productive, they then put it into

1    effect.  And it ran from October 1st, until this date I just

2    told you about, when they issued a bulletin and said bring

3    human underwriters back into the process.

4           Now, the evidence will show you what steps they took

5    all along the way struggling to make this among the best

6    quality products they can.  Some of them were listed here of

7    the efforts to assure quality.  In December they added coaches.

8    They started an income reasonability test to determine, for

9    example, to take that issue of the doorman.  Does the doorman

10   make 13,000.  By the way, he probably does on undeclared tips.

11   They struggled on how to get accurate figures on stated income

12   loans.  By the way, stated income loans are loans that are

13   throughout the industry well accepted, wanted by Fannie Mae and

14   Freddie Mac.  Everybody knows the problem of stated loans and

15   how it's more difficult to assure accuracy in stated loans.

16          But look at the rest of the efforts to assure quality

17   here.  Training on stated income.  Reinstated a quality of

18   grade.  Income calculator revised.  Quadruple the number.  They

19   themselves quadruple the numbers of audits to check their own

20   system.  In February efforts to ensure quality.  Training based

21   on quality assurance.  Communication of quality assurance.

22   Back into March.  Further things.  Mandatory stated income

23   reasonability test, and then the process ends by their own

24   choice.  No one came to the door and said we don't like your

25   products.  No one came to the door and said you're cheating us,

1   you are defrauding us, you're in a scheme to defraud us.

2          These are human, decent, normal, hard-working people,

3   many with different view, many who didn't like the system.  But

4   it was the system.

5          She didn't put the system in.  She was a person in the

6   company that was high enough up to try to encourage people to

7   follow the system.  But to think that she did anything alone?

8   She didn't do one thing.  You'll see the evidence.

9          THE COURT:  Mr. Sullivan, you have five minutes left.

10          MR. SULLIVAN:  Thank you.  It is actually a little

11   interesting thing for you to focus on in the evidence.  A case

12   about mortgages is not going to exactly be like TV or the great

13   classic movie "My Cousin Vinny" when we try to figure out what

14   crime was committed in the Sac-O-Suds restaurant.

15          There is a little interesting thing for you to focus

16   on.  One of the government witnesses here who worked closely in

17   this process was a person that was involved in the every day

18   process.  For example, he was involved in a process called

19   rebutting the severely unsatisfactory loans.  Rebutting the

20   severely unsatisfactory loans.  What that means is, if you've

21   got a severely unsatisfactory loan, look at it, figure out what

22   the problem is, fix it, and eliminate the severely

23   unsatisfactory status.  That's what that's about.  Their

24   witnesses were the ones that designed that program and provided

25   compensation for people to work night and day to undo severely

1   unsatisfactory.

2           This particular gentleman, you'll see him, his name is

3   Ed O'Donnell.  It's fascinating because he kind of lived one

4   life there, as one of those normal people coming to work and

5   doing the job, he decided to enter into a little bit of a

6   get-rich-quick scheme.  He had read about the fact maybe as a

7   whistleblower he might collect some money by going back five or

8   six years and saying that, you know what, this is a fraud.  He

9   didn't live it as a fraud, but when he decided to come here, go

10  to the government, and cash in to make some money under the

11  so-called whistleblower program, then he characterizes that

12  life five or six years ago very differently.  You'll see him.

13  That's your job to evaluate the testimony.  A lot of his

14  testimony is supportive of the defense, strangely enough.

15          But, a bottom line is that you've got two Countrywide

16  companies here that were not involved in a fraud, and you'll

17  see it from the evidence, and this woman never for a moment

18  thought that she was involved in a fraud.  She didn't do

19  anything that her bosses didn't know about or her colleagues

20  didn't know about.  And none of them thought that they were

21  engaged in wrongdoing.  And the bottom line, you are going to

22  see from this evidence, that there was no fraud.

23          Thank you.

24          THE COURT:  Thank you.  And now we'll hear briefly

25  from counsel for Ms. Mairone.

1           MR. MUKASEY:  Ladies and gentlemen, this is Rebecca

2      Mairone.  She's one of the decent and hard-working people that

3      Mr. Sullivan was just talking about.

4           Rebecca Mairone moved to California about seven years

5      ago to go work for Countrywide.  She packed up two kids, and a

6      dog named Bear, and she went to start a job as a chief

7      operating officer in Countrywide's Full Spectrum Lending

8      Division.

9           As you heard, the business was changing, they needed

10     someone to help with the change.  They chose Rebecca.  And

11     Rebecca was a terrific choice.  She wasn't from California,

12     she's not even from New York.  Rebecca is a West Virginia girl.

13     She grew up in Charles Town, West Virginia.  She had three

14     sisters.  She ran track in high school, she played some

15     basketball.

16          The truth be told -- don't get angry at me -- she was

17     kind of a science nerd, and she grew up wanting to be an

18     engineer.  And after all, an engineer, as some of you know, is

19     really a problem solver.  And growing up in a small house with

20     three sisters, you better be somewhat of a problem solver.

21          And so, Rebecca paid her own way through college and

22     she worked during the day while she went to graduate school at

23     night, and she became an engineer.

24          Rebecca was a thinker, who focused on a problem,

25     gathered information from the people around her, and tried to

1    achieve a solution that worked for everybody.  And she always

2    did it by the book.  And that's exactly what Countrywide's FSL

3    division needed seven years ago.

4         Now, Rebecca didn't really know anyone when she first

5    got to the FSL division.  And truth be told, it was not the

6    most comfortable situation for her.  She was joining a group of

7    guys that had worked together in the industry for years.  And

8    she was an outsider, kind of a new kid, new girl on the block.

9    But there is no question that Rebecca was up to the challenge.

10        So every morning, Rebecca got up early, she went to

11   the office, she stayed late, in between she got dozens of phone

12   calls, hundreds of e-mails, she traveled on behalf of

13   Countrywide's FSL division about a week every month.  She got

14   pulled in a thousand different directions every day.  She

15   managed about 10 different projects at a time.

16        If she knew she had to jump on a plane somewhere or

17   she had to work until midnight one night, she would try to

18   sneak out of the office for an hour and take her daughter to

19   the Girl Scouts or watch her son at karate.  Seven years ago,

20   that was a day in the life of Rebecca Mairone.

21        But the government, ladies and gentlemen, in this

22   case, wants you to believe that seven years ago, Rebecca

23   Mairone woke up every day and went to work to commit fraud.

24   Went to work with the intent to commit mail fraud and wire

25   fraud.  Went to work every day specifically for the purpose of

D9o3ban5                    Opening – Mr. Mukasey

1    defrauding Fannie Mae and Freddie Mac.

2              Rebecca is fighting this case all by herself because

3    the allegations against her are false.  They are fictitious,

4    they're fictional.  They're based on government witnesses who

5    are rewriting history.  Witnesses who said one thing about the

6    Swim Lane project seven years ago, and are saying a whole other

7    thing now.  Witnesses who hold a grudge or maybe want something

8    and are taking out that grudge or trying to get that thing by

9    picking on an easy target.  The outsider.  The new girl on the

10   block.

11             But the government is not going to be able to prove

12   this case.  Mr. Sullivan is right.  There was no fraud.

13   Rebecca didn't get up and go to work every day to commit fraud.

14   She didn't intend to defraud anyone.  She didn't intentionally

15   deceive anyone.  She didn't hide anything from anyone.  She

16   didn't participate in any scheme to defraud, because there was

17   no scheme to defraud.  And the government unfortunately has it

18   dead wrong.

19             My name is Marc Mukasey.  My colleagues over there

20   helping to work with Rebecca are Michael Hefter, Seth Cohen and

21   Ryan Philp, and together it is our privilege and our

22   responsibility to represent Rebecca in this case.

23             So I want to jump quickly into what Rebecca's

24   responsibilities were as a chief operating officer at FSL.  She

25   was mainly responsible for figuring out how information flowed

1    from one person to another, and how a loan got from a

2    salesperson at the beginning of the process to closing and

3    funding at the end of the process.  They have a fancy corporate

4    name for it.  They called it process design.  But the judge

5    talked about speaking in simple English earlier.  So, instead

6    of process design, you can think of Rebecca's responsibility as

7    making sure stuff gets done.  That was her responsibility.

8         So when senior executives at Countrywide agreed on a

9    plan, Rebecca helped get it done.  She helped it run smoothly.

10   She made sure all the necessary links were in the chain.  And

11   if the chain got tangled up, she untangled the knot.  She found

12   the solution.

13        There are a couple of other things she was responsible

14   for.  She was responsible for technology at FSL, making sure

15   when you walk into your office in the morning, you turned on

16   your computer, you had the proper programs there, you had the

17   proper loan guidelines there.

18        She was responsible for recruiting and for staffing,

19   and she was responsible for hiring, training, and coaching

20   people who needed extra help.

21        All these responsibilities, by the way, meant, as any

22   of you who have worked in any business know, that sometimes

23   Rebecca had to make difficult choices.  Sometimes she had to

24   make tough decisions.  Sometimes people didn't agree with her.

25   But bottom line is they always knew where they stood with her,

D9o3ban5                          Opening - Mr. Mukasey

1   and she was always trying to be fair.

2            She worked with people in all levels of the company,

3   she worked with people above her, she worked with people below

4   her.  She was a leader, but she was also a listener.  She was a

5   strong person, but also a good teammate.  She was a loud voice,

6   but also a member of a much, much larger chorus.

7            Now, what about Rebecca's role in the High-Speed Swim

8   Lane.  Let's get a few things straight right off the bat.

9   Rebecca did not propose the High-Speed Swim Lane.  Rebecca did

10  not design the High-Speed Swim Lane.  Rebecca was not in charge

11  of the High-Speed Swim Lane.  We're going to show you through

12  the proof that the idea to design a Swim Lane for prime loans

13  was made before Rebecca even got to FSL.  And when she got

14  there, what she did was lend her expertise to the executives

15  that were working together on the project.

16           They all had good intentions, and Mr. Sullivan said it

17  correctly and I'll say it again.  Everybody had the best of

18  intentions.  They decided that customers who were good credit

19  risks would be served better if certain steps in the process

20  that were unnecessary or confusing or duplicative were removed

21  from the process and it was made simpler.

22           Rebecca and all her colleagues, including the

23  government's key witness, studied, they debated it, they tested

24  it, they believed in it, and they wanted to try it.

25           The proof will show that Rebecca's intentions were

D9o3ban5                           Opening – Mr. Mukasey

1    simple.  Her intention was to work collaboratively with her

2    colleagues.  Make sure that once senior management had decided

3    on a plan, make sure that the technology was in place, make

4    sure the computer programs were there, make sure people were

5    trained and staffed to do what they had to do.

6            So she led in some of these area, she followed others

7    in some of these areas, and she worked hand in hand with the

8    people on this chart every day.

9            Every day, for example, she spoke to her boss.  He

10   supported the High-Speed Swim Lane.  Every day she spoke to the

11   head of underwriting, she supported the High-Speed Swim Lane.

12   Every day she spoke to the head of credit quality and risk, he

13   supported the High-Speed Swim Lane.

14           Right from the get-go, the notion that Rebecca was

15   committing a fraud through the High-Speed Swim Lane is pretty

16   preposterous.

17           When the different people in management talked about

18   the High-Speed Swim Lane project, did everybody agree?  No.

19   Were there people who voiced yeses and nos here and there?  Of

20   course.  That's professional debate.  It's professional

21   disagreements.  But there is one way you know it is not part of

22   a fraud.  And that is it was all done out in the open.

23   Meetings, e-mails, telephone calls, conversations, you will

24   hear no evidence in this case that Rebecca went to any secret

25   meeting in the middle of the night in the dark alley, you will

D9o3ban5                    Opening – Mr. Mukasey

1  hear no evidence that Rebecca was up to some covert operation

2  in the shadows.  Everything here was done in the sunlight.

3          By the way, in an organization of this size and this

4  complexity, even if Rebecca had wanted to do something that

5  nobody else wanted to do and everybody else was against, she

6  couldn't have done it.  She just didn't have the authority to

7  do it.

8          It is important to remember that the High-Speed Swim

9  Lane was also not Rebecca's full-time focus.  Right.  She still

10  had the technology and the staffing and the training, and she

11  was also part of putting together what you are going to hear

12  referred to as the central fulfillment model.  That's really

13  making sure the links in the chains were working together,

14  working in the proper order, for an efficient and a safe

15  process.  Everything you are going to hear she did was the

16  opposite of somebody who wanted to sell bad loans to Fannie Mae

17  and Freddie Mac.

18          THE COURT:  Mr. Mukasey, keep in mind you have three

19  minutes.

20          MR. MUKASEY:  Three minutes.  Thank you, Judge.

21          You may hear a little bit about a government e-mail --

22  an e-mail from the government that Rebecca sent.  I want you to

23  make sure that the government tells you the whole story about

24  that e-mail.  Keep in mind you, the government's going to try

25  to make it seem like Rebecca was trying to cover up issues

D9o3ban5                    Opening – Mr. Mukasey

1    about quality.  I want you to know, I want you to remember,

2    that quality reports under Rebecca's direction went to every

3    member of senior management.  That's not a cover up.  That's

4    evidence not of fraud, but of good management.

5          Now, you're not going to hear a single witness in this

6    trial who says that Rebecca's goal was to commit fraud.

7    Rebecca, by the way, never even spoke to anyone at Fannie Mae

8    or Freddie Mac.  Forget about defrauding them.  You are not

9    going to hear from a single witness in this trial that Rebecca

10   ignored directions she got from her bosses.  Not a single

11   witness who said Rebecca went off on her own, acted behind

12   people's back.

13         Let me suggest to you as you listen to testimony from

14   Mr. O'Donnell and a couple of the other government witnesses.

15   If you were disgruntled by the way you were handled at

16   Countrywide or Bank of America, who is easier to blame?  Blame

17   it on the new girl.  Blame it on the outsider.  If you got

18   passed over for a job when Bank of America merged with

19   Countrywide, who is easier to blame than the new girl.  If you

20   have sour grapes over your financial situation, who is easier

21   to blame than the outsider, the new girl.  If you are looking

22   for a payout, well, might as well try to get it from the new

23   girl.

24         You are going to hear from Rebecca.  Rebecca's got

25   nothing to hide.  She is going to stand face to face against

D9o3ban5                       Opening – Mr. Mukasey

1    these government prosecutors and answer every question and tell

2    her side of the story.

3            Judge Rakoff mentioned earlier on about the glory and

4    the power of justice.  That's in your hands right now.  At the

5    end of this case, we are going to ask you to say loud and clear

6    with your verdict that Rebecca Mairone did not act, ever, with

7    bad intent, did not participate in any scheme.  We'll ask you

8    to say the government is wrong, she's not responsible for any

9    fraud, because there was no fraud.  Thank you.

10           THE COURT:  Ladies and gentlemen, we're going to give

11   you a 15-minute break at this time.  And we'll come back to

12   start with the first witness.

13           (Jury excused)

14           THE COURT:  Please be seated.  All right.  I need one

15   lawyer from each party to come with me to the robing room so we

16   can call Mr. Boland and Mr. Price.  Someone have their phone

17   numbers?

18           MS. SCHOENBERGER:  I have Mr. Boland's phone number.

19           THE COURT:  We'll start with him.

20           MS. SCHOENBERGER:  To clarify with respect to

21   Mr. Price, we only had one brief conversation with him after he

22   left the bank and invited him to contact the government again

23   and he did not.  We did not ask him to come to trial at that

24   time.  So a call asking him why he's not at trial will come as

25   a surprise to him.

D9o3ban5

1          THE COURT:  Well, I guess a surprise is always a

2     wonderful thing.  Let's go in the robing room.

3          (In the robing room)

4          THE COURT:  I would prefer not to do this on record

5     because it will be a lot easier to talk with him if I don't put

6     him on the speakerphone.  But if anyone has any objection,

7     we'll put it on the record.

8          MS. MAINIGI:  I have no objection to that.

9          THE COURT:  I was saying that I think it would be

10    better to do this off the record so I don't have to put either

11    of these people on the speakerphone.  Defense counsel are in

12    agreement.  Are you in agreement?

13         MS. SCHOENBERGER:  Yes, of course.

14         THE COURT:  Then we'll excuse our court reporter.

15         (Recess)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

D9OTBAN6

1                    (In open court, jury not present)

2              THE COURT:  So the record should reflect that in the

3      presence of counsel I had a very nice telephone conversation

4      with Mr. Boland and explained to him why it would be in

5      everyone's interest, most particularly the jury's, for him to

6      testify live.  He said he would reconsider his position and

7      wanted to talk about it with his wife, and he would let us know

8      by a call to my chambers sometime this evening.

9              I also attempted to reach Mr. Price, but there was no

10     answer and no voice mail at the number the government had for

11     him.  So the incredible pleasure of surprising him that I was

12     looking forward to will have to wait for another occasion.

13             Now there was an issue that counsel for the back

14     started to raise in the robing room, and I asked for her to put

15     it on the record regarding the letter that was sent earlier

16     today by the government, to the Court and counsel regarding

17     Mr. Boland's deposition.

18             Just so the record is clear, after explaining that

19     Mr. Boland had informed the government that he was not going to

20     appear, the letter in the second paragraph states, quote:

21             In an abundance of caution, the government also brings

22     to the Court's attention an apparent discrepancy between

23     Mr. Boland's deposition testimony and a document identified on

24     defendant's trial exhibit listed as DX 01155.  The response to

25     the question, "The application process didn't require you to

D9OTBAN6

1    divulge to Fannie Mae the nature of termination of your last

2    employment."  Mr. Boland responded "Correct."

3         Boland transcript 186, line 18-21.

4         Exhibit DX 01155, which appears to be Mr. Boland's

5    employment application to Fannie Mae, including a field for

6    "reason for leaving position."  Exhibit DX 01155 at 261279

7    attached, the government only recently learned of this document

8    and it was not shown to Mr. Boland during his deposition.

9         The government has not designated as evidence any of

10   Mr. Boland's testimony regarding his employment application to

11   Fannie Mae.  That's the end of the paragraph.

12        Let me just look for one second at the relevant page

13   of the testimony 186.  The full question really is by Mr. Cady,

14   "I take it then that the application process -- I think what

15   you're telling me, correct me if I'm wrong -- the application

16   process didn't require you to divulge to Fannie Mae the nature

17   of termination of your last employment."  Answer, "Correct."

18        I note in passing that had there been an objection to

19   form, the Court would have sustained that objection to what

20   seems to me to be a very poorly-worded question, but there was

21   no such objection.  And the exhibit has a field under the

22   general heading "work experience, reason for leaving position,"

23   and apparently the response was, "role and responsibilities."

24        Now I see no indication that this form required the

25   applicant to divulge to Fannie Mae the nature of termination of

D9OTBAN6

1    your last employment.  There's nothing on the face of this

2    portion of the application that requires anything.  There's an

3    apparent request for information.  The answer that was given to

4    the question was "role and responsibilities."  So it sounds to

5    me like pretty minor stuff, but let me hear from defense

6    counsel.

7            MS. MAINIGI:  Thank you, your Honor.  I think that

8    certainly there are a variety of inferences that could be drawn

9    from the combination of the deposition testimony as well as

10   this particular exhibit.  The chronology is such that

11   Mr. Boland's deposition was taken in late May, he has provided

12   certain answers as it related to what he told his current

13   employer, Fannie Mae, as to the reasons why he left, why he

14   actually did leave.  Subsequently we sought through subpoena

15   his employment file which contained part of --

16           THE COURT:  When did you receive that?

17           MS. MAINIGI:  We received that June 1st or 2nd, and I

18   believe the government was provided with a simultaneous copy by

19   Fannie Mae.

20           THE COURT:  Wait a minute.  If you received it on

21   June 1st or 2nd, then of course if you thought he had misstated

22   something in his deposition that needed further questioning,

23   you could have requested that from the Court.

24           MS. MAINIGI:  Your Honor, we didn't feel that it

25   needed further questioning.  He provided a response at his

1    deposition.  It was a deposition that the government chose to

2    take.

3              THE COURT:  Wait a minute.  My point is -- my question

4    is:  What is your specific application?

5              MS. MAINIGI:  The specific application, your Honor, is

6    obviously I don't know the sum and substance of the reasons why

7    Mr. Boland, in light of this information, chose to not come to

8    trial after indicating that he would come to trial, but all we

9    ask is that if in fact Mr. Boland makes a determination that he

10   is not coming to trial and there's nothing that could be done

11   to bring him here, that the Court consider an appropriate

12   remedy in that regard.

13             THE COURT:  Remedy for what?

14             MS. MAINIGI:  It would be to extent -- for example, if

15   Mr. Boland's deposition is played, it would be then for the

16   opportunity to get us -- to allow us to get in the employment

17   application of Fannie Mae.  We were going to utilize that

18   document for impeachment of Mr. Boland.

19             Now the jury obviously would be able to draw their own

20   inferences as to whether they would then conclude that

21   Mr. Boland had been less than truthful in his deposition or in

22   his employment application or whichever, but it was the point

23   of it was that we gathered that document, we didn't know what

24   it was going to say when we saw it, the government got it at

25   the same time, and we were prepared to use it at trial.

D9OTBAN6

1          THE COURT:  What do you say was his reason for leaving

2     the employment?

3          MS. MAINIGI:  He was terminated, your Honor.

4          THE COURT:  For what reason?

5          MS. MAINIGI:  Breach of code of ethics, your Honor.

6          THE COURT:  Breach of code of ethics in what respect?

7          MR. SULLIVAN:  Do you mind if my colleague --

8          MR. CADY:  Steve Cady.

9          Mr. Boland was terminated for breach of Bank of

10     America's code of ethics.  The finding was by Bank of America's

11     internal investigation that he had lent apparently a user name

12     or password, either his own user name or password or sanctioned

13     the lending of someone else's user name and password to someone

14     who didn't rightfully own that.

15          THE COURT:  So did you question him about that in his

16     deposition?

17          MR. CADY:  I did question him, yes.

18          THE COURT:  So that's been explored.

19          MR. CADY:  That's been explored.  So the reason why he

20     left Bank of America has been explored, but when I asked him at

21     his deposition whether he was asked by Fannie Mae why he left

22     Bank of America he said no.

23          THE COURT:  If the question we're talking about is the

24     one that I just read, that's not what it says.  What the

25     question was, I will read it again, "I take it then that the

D9OTBAN6

application process -- I think what you're telling me, but

correct me if I'm wrong -- the application process didn't

require you to divulge to Fannie Mae the nature of termination

of your last employment."  Answer, "Correct."

        Now I see nothing in this document which you've had

since June that shows that he was required to divulge anything

in regard to the nature of his termination, and I also don't

know why -- and this objection, of course, is preserved, even

though the objection to form is not -- I don't know that he is

in a position to have any knowledge admissible in evidence as

to what the Fannie Mae application process required.

        So I would probably not allow this question even to be

read into evidence, this question and answer.

        MS. MAINIGI:  Your Honor, if I may return, I think in

our view it is potentially classic impeachment testimony.

        THE COURT:  Not if I don't let it in.

        MS. MAINIGI:  That is absolutely right.  Obviously

those chips fall where they do in the height of testimony.  But

the point is the government was also equally aware as of June

that Mr. Boland, perhaps in the eyes of some people, had been

less than truthful in his deposition testimony or his Fannie

application or both, and that that was something that could, in

the eyes of other people, bring his truthfulness as to other

matters into question.

        THE COURT:  I understand how all this might constitute

D9OTBAN6

1  Brady.  Where is the obligation in a civil case for the

2  government to bring to your attention the fact that a document

3  that you already possess might have impeachment value with

4  respect to a deposition answer given in -- deposition that you

5  took?

6          MS. MAINIGI:  Your Honor, I apologize, because that

7  certainly was not the import of what I was trying to explain.

8  We were aware -- we sent away for the document.  We had some

9  concerns about his testimony after we took his deposition.  We

10  then sent a subpoena for his employment application.  When we

11  got the employment application, it was immediately apparent to

12  us that perhaps Mr. Boland had been less than truthful in some

13  way, shape or form.  The government should have also arrived at

14  that conclusion.  They chose not to correct his testimony.

15          THE COURT:  I don't find that conclusion follows from

16  what I read, but let's assume arguendo for the moment, contrary

17  to any finding I am prepared to make at this moment, that

18  that's what it shows.

19          MS. MAINIGI:  Arguendo, if that is what it shows, your

20  Honor, Mr. Boland was advertised to us -- was represented to us

21  by the government in their witness list and through

22  conversations as coming here live.

23          THE COURT:  And when was that?

24          MS. MAINIGI:  When they filed their witness list, your

25  Honor.

D9OTBAN6

```
 1              THE COURT:  Few weeks ago.

 2              MS. MAINIGI:  And their final joint pretrial, which

 3    was provided last week.

 4              THE COURT:  So up until then, even though you had this

 5    since June and had no idea whether Mr. Boland would be called

 6    live by deposition since he was outside the territorial

 7    jurisdiction of the Court, you did nothing.

 8              MS. MAINIGI:  Correct, your Honor.  There was no

 9    reason for us to do anything.

10              THE COURT:  I will hear whatever else you want to say

11    on this at 5 o'clock.  Let's bring in the jury and get the

12    witness on the stand.

13              MS. MAINIGI:  Thank you, your Honor.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

1            (Jury present)

2            THE COURT:  Ladies and gentlemen, we're now ready to

3    begin the taking of testimony in this case.  We're sorry for

4    that little extra delay, we had to take up a legal issue, but

5    that does not need to detain us any further.

6            Please call your first witness.

7            MR. CORDARO:  The United States calls Michael Thomas,

8    your Honor.

9     MICHAEL THOMAS,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. CORDARO:

14           DEPUTY CLERK:  Please state your name and spell it for

15   the record.

16           THE WITNESS:  Michael Thomas, M-I-C-H-A-E-L

17   T-H-O-M-A-S.

18   Q.  Mr. Thomas, where do you live, sir?

19   A.  In the Dallas, Texas area.

20   Q.  Does anyone live with you in the Dallas, Texas area?

21   A.  My wife and my three-year-old son.

22   Q.  Please summarize your educational history, starting with

23   college.

24   A.  Sure.  I have a bachelor's degree in chemical engineering

25   from Georgia Tech that I received in 1997, and then a master's

1   in business administration from UCLA in 2001.

2   Q.  What is your occupation?

3   A.  I'm a director of credit risk at Fannie Mae.

4   Q.  Did you ever work at Countrywide Home Loans?

5   A.  I did.

6   Q.  When did you first become employed at Countrywide Home

7   Loans?

8   A.  In 2001.

9   Q.  Would you tell us the circumstances that led to your

10  employment at Countrywide?

11  A.  Sure, I had just finished my MBA in mid 2001, tried to

12  start a little technology company, and then folded that after

13  we couldn't get investors, so then I found a job at

14  Countrywide.

15  Q.  What position did you hold when you started at Countrywide?

16  A.  Manager of global markets.

17  Q.  Where were you based?

18  A.  In Calabasas, California.  I would spend half the time in

19  Dartmouth, England as well.

20  Q.  What were your duties as manager of global markets at

21  Countrywide?

22  A.  We had kind of back office operations in the UK, which

23  basically was processing underwriting and funding of loans for

24  banks in the United Kingdom.  So I would go out and do process

25  improvement projects or analytics, staffing modeling, things

1   like that for that business.

2   Q.  Mr. Thomas, I want to ask you about a few of the terms you

3   used in the description.  You referred to loans?

4   A.  Yes.

5   Q.  Could tell us if there is a specific type of loan that you

6   worked with?

7   A.  Mortgage loans.

8   Q.  What is a mortgage loan?

9   A.  A mortgage loan is basically when a customer wants to buy a

10  house they'll ask for funds from a bank or a mortgage lender.

11  The bank or mortgage lender will provide the funds to buy the

12  house in exchange for monthly payments plus interest.

13  Q.  And how does someone get a mortgage?

14  A.  So you could go into a bank or call the mortgage lender,

15  now you can do it online, but eventually you get to a loan

16  officer that takes an application.

17  Q.  In your experience, does the bank simply hand over the

18  money without any process?

19  A.  No, they have to assess the risk of the loan.

20  Q.  And is there a name given to the process of assessing the

21  risk of the loan?

22  A.  Sure, underwriting is typically what we call it.

23  Q.  You referred to underwriting as part of your job

24  description as a manager of global markets, is that correct?

25  A.  Yes.

1    Q.  And what interaction did you have with underwriting in that

2    position?

3    A.  It would depend on the project we were working on, but

4    basically I would -- underwriting or any of the other

5    functions, we would interview the individuals doing the role

6    and we were either looking for certain controls or looking for

7    process improvement areas depending on what the project was.

8    Q.  At the time you were employed by Countrywide, were you

9    familiar with the underwriting process that Countrywide used

10   for certain loans?

11   A.  At the time when I first started Countrywide, no, I had no

12   mortgage experience when I started.

13   Q.  And you testified that underwriting pertains to risk?

14   A.  Yes.

15   Q.  Could you just explain what the term "risk" means?

16   A.  Sure.  So basically you're trying to determine -- basically

17   I think of two types of risk, the borrower's risk or their

18   ability to pay the loan, and the risk of the property itself,

19   is it -- would it be a risker property to sell, is it rural

20   property or is it something that would be in high demand?  So

21   you kind of assess both layers of risk.

22   Q.  Are some mortgages risker than others to the bank?

23   A.  Yes.  Both borrowers would have different types of risk and

24   then properties would have different types of risk as well.

25   Q.  Please explain to us what you mean by borrowers had

1    different types of risk.

2    A.   So a borrower could have a different credit score, a high

3    credit score versus a low credit score.  And typically your

4    credit score reflects your previous payment history, so on

5    other debt that you had, if you made your payments consistently

6    you would have a higher credit score.  The underwriter would

7    also look if you had a mortgage previously, they would look

8    have you made the mortgage payments on the previous mortgage on

9    time, things like that.  Income level also, they would assess

10   income level.  Steady job history, that kind of thing.

11   Q.   I believe you referred to property, that has risk as well,

12   correct?

13   A.   Yes.

14   Q.   Could you explain to us what that means?

15   A.   Sure.  So different properties would have different levels

16   of risk, meaning some properties are a lot more desirable and

17   easier to sell if the bank had to sell than if the property was

18   rural or very unique, that might be more difficult, more high

19   risk loan.

20   Q.   Mr. Thomas, why do banks make mortgages, in your

21   experience?

22   A.   To make money on the interest.

23   Q.   What do you mean by "interest?"

24   A.   So the borrower would pay back -- in the monthly payments

25   would pay back part of the loan amount and part would be

1    interest to the bank.

2    Q.   In your experience, does the mortgage lender charge every

3    borrower the same rate of interest?

4    A.   No, it depends on the risk.

5    Q.   Could you explain that to us, please.

6    A.   Sure.  It would depend on let's say a good borrower would

7    have a prime loan, what we called a "prime loan," which may

8    have a lower interest rate.  Subprime loans may have a higher

9    interest rate.  And it also depended on what type of loan the

10   borrower would receive, too.  There's different 30-year loan,

11   you could get a 15-year loan, different fixed rate or

12   adjustable rate kind of thing.

13   Q.   Let's get back to your work history at Countrywide.  How

14   long were the manager of global markets?

15   A.   For a little over a year.

16   Q.   What was your next position?

17   A.   I moved over as vice president of central services in the

18   Full Spectrum Lending division of Countrywide.

19   Q.   Would you explain to us what the Full Spectrum Lending

20   division at Countrywide was?

21   A.   Sure.  There were three main lending divisions in

22   Countrywide, Consumer Markets Division, which we called CMD,

23   Full Spectrum Lending, which we called FSL, and the Wholesale

24   Lending Division, which we called WLD.  And Full Spectrum

25   Lending -- Consumer Markets Division there was kind of the

1    bigger division in Countrywide, and they had a lot of builder

2    relationships.  So if you went out and bought a house, you

3    might end up at CMD division.  Full Spectrum Lending dealt a

4    lot with people who wanted to refinance their mortgage, so they

5    needed to pay off the old mortgage, get a new mortgage and take

6    some of that money back.  And they did subprime loans

7    originally.  So that's kind of how they got the name Full

8    Spectrum Lending, they served the full spectrum of borrowers.

9    Q.  If you haven't told us, when you obtain the position of

10   vice president?

11   A.  February 2003, I believe.

12   Q.  You said February 2003?

13   A.  Yes.

14   Q.  What were your duties as vice president of central service

15   analytics?

16   A.  So in that role I supported the underwriting and funding

17   divisions of Full Spectrum.  So we had centralized underwriting

18   and centralized funding, and so I did a lot of reports,

19   analytics, staff modeling again, productivity reports, things

20   like that.

21   Q.  What was your next position?

22   A.  So that position kind of grew and matured over time.  We

23   had developed a more robust reporting platform, things like

24   that.  I grew out a team of individuals there.  And then in

25   2005 I left Countrywide and joined Washington Mutual.

D9OTBAN6                         Thomas - direct

1    Q.   Why did you leave Countrywide?

2    A.   I had a very long commute.  I was commuting two and a half

3    hours each way every day.  I had just gotten married.  So that

4    was a little stressful for the first year and a half of our

5    marriage.  Washington Mutual had an office like five minutes

6    from the house, so that's why I went there.

7    Q.   What were your duties at Washington mutual?

8    A.   So there I came on as a project manager.  Washington Mutual

9    had kind of grown significantly through buying other banks and

10   mortgage lenders.  So they had a lot of different systems that

11   they processed and originated loans on.  So they had a lot of

12   projects to kind of get everything onto one system, and my

13   project was to optimize that system after it was all done.

14   Q.   I should ask you, what is Washington Mutual?

15   A.   Washington Mutual is another bank.

16   Q.   How long did you remain at Washington Mutual?

17   A.   About five months.

18   Q.   What happened next?

19   A.   So basically I determined that it was going to be extremely

20   costly and time consuming to do what they wanted to do in that

21   project, so I kind of wrote myself out of a job there.  So

22   things got very slow, and I emailed my old boss Jim Key at

23   Countrywide and Ed O'Donnell as well and said do you have

24   anything going on over there.  So they suggested if I wanted to

25   come back I could come back to Countrywide.

1    Q.  You mentioned a couple of names.  Could you tell the jury

2    who Jim Key was?

3    A.  Sure.  He was -- at the time when I left first left to

4    Washington Mutual, he was my boss.  He was also Ed O'Donnell's

5    boss and Cheri Shine's boss, and he did kind of central

6    services support basically.

7    Q.  Do you remember what position Mr. Key held?

8    A.  I don't remember his title off the top of my head.

9    Q.  Did he work at FSL?

10   A.  He did, yes.

11   Q.  And you mentioned Ed O'Donnell.

12   A.  Yes.

13   Q.  What was your relationship to Mr. O'Donnell prior to your

14   departure to Washington Mutual?

15   A.  Sure.  Ed O'Donnell ran the central underwriting function,

16   so I supported him, and a lot of my reports and things like

17   that would support Ed.

18   Q.  You testified that you had some communication with

19   Mr. O'Donnell and Mr. Key.  Would you explain to us the nature

20   of that communication?

21   A.  Sure.  I think I sent him an email that said, you know, do

22   you have any spreadsheets for me to work on, or something like

23   that, and I got a note back pretty quickly saying:  Are you

24   interested in coming back to Countrywide?  And then I think it

25   was within a week or two I got an interview with Cliff

1    Kitashima, who was the chief credit officer, who I then

2    worked -- basically that is who Jim Key and Ed O'Donnell and

3    Cheri Shine and everybody reported up to, the chief credit

4    officer.  So I talked to Cliff about coming back.

5    Q.  You mentioned Cheri Shine a couple of times.  Who is

6    Ms. Shine?

7    A.  She ran the centralized funding organization at the time.

8    Q.  Can you explain to us what the centralized funding

9    organization was?

10   A.  Sure.  So after the underwriter assessed the risks and

11   everything and basically the loan is ready to go, the

12   centralized funding organization, the funders would basically

13   get the money ready to wire to the customer, make sure the

14   title, everything is -- all the compliance things, everything

15   is signed appropriately, that kind of thin.

16   Q.  Was centralized funding part of the FSL or some other

17   division of the company?

18   A.  Part of FSL.

19   Q.  Did Countrywide ultimately rehire you?

20   A.  Yes.

21   Q.  When did that happen?

22   A.  I believe it was kind of end of 2005.

23   Q.  And what happened to your commute?

24   A.  So I decided when I came back that I eventually would

25   relocate to one of Countrywide's other locations, primary

D9OTBAN6                        Thomas - direct

1    locations, which is either Texas or Arizona.  And while I

2    considered that, we had an insurance office in Irvine, which is

3    where my house was, so they let me work out of that office

4    until I decided where to move.

5    Q.  Sorry if I missed it, did you tell us where you actually

6    moved to?

7    A.  I ended up choosing Texas.

8    Q.  What position did you hold in Texas?

9    A.  So it was first vice president, central services, and I

10   think eventually changed it to risk management.

11   Q.  Was this a position within FSL?

12   A.  Yes.

13   Q.  What were your job responsibilities?

14   A.  It was very similar stuff.  When I first started back I

15   reported to Cheri Shine, who ran the funding organization.  I

16   still supported both Cheri and Ed's operations, so both

17   underwriting and funding.  I did a lot of reports, analytics,

18   staff modeling.  I had a process improvement team as well, did

19   a lot of quality reports, things like that.

20   Q.  You talked about supporting Cheri Shine and Ed O'Donnell's

21   operations.  Could you explain to us what you mean by "those

22   operations?"

23   A.  Sure.  So as head of centralized funding, Cheri would

24   have -- we had three main centers where we had a lot of funders

25   and compliance specialists that worked in the funding

1   organization, and so I supported that organization.  And then

2   Ed O'Donnell's organization had a lot of underwriters in the

3   same locations, but that was basically the centralized

4   underwriting funding groups.

5   Q.  How long were you in the position of first vice president

6   of risk management?

7   A.  I stayed in that position -- I got a promotion along the

8   way.  I stayed in that position up until I left.  It was Bank

9   of America in 2009.

10  Q.  Could you explain to us why you started or you were rehired

11  into Countrywide and then left Bank of America?

12  A.  Sure.  So around 2008 when Bank of America took over there

13  was a lot of reorganization, transition teams, people trying to

14  find places in the new organization.  And as that process

15  unfolded, I wanted to make sure my employees all found jobs in

16  the new organization, so I basically found them all jobs.  And

17  then basically I was looking to see if there was a spot in the

18  new organization for my role or whether I would take a

19  severance package and leave.

20  Q.  And which choice did you make?

21  A.  I took a severance package.

22  Q.  You said in that explanation that Bank of America took

23  over, and I will ask you to explain what you mean by that.

24  A.  So they acquired Countrywide in 2008.

25  Q.  What happened after you took the severance package?

1    A.  So that's when my wife got pregnant, and in that time we

2    were trying to start a family, so we took some time off.  And

3    then about the time my severance package was up, I got a call

4    from the first person that hired me into Countrywide asking if

5    I wanted to come back.

6    Q.  Do you recall the time period in which you received that

7    call?

8    A.  That would have been mid 2010.

9    Q.  Do you recall who contacted you?

10   A.  Yes, David Swain.

11   Q.  Who is Mr. Swain?

12   A.  So David -- at this point he was working in the loan

13   modification side, the servicing side of Countrywide.  When I

14   previously had worked for him he was part the FSL in the past,

15   and actually global markets, he hired me in the management of

16   global markets as well.

17   Q.  Could you explain what you mean by loan modification?

18   A.  Sure.  So if a borrower can't -- misses some payments, and

19   let's say that they miss three payments in a row, the bank will

20   try to find a way to modify that loan, so either change the

21   interest rate terms or maybe forgive what they haven't paid and

22   move it to the back end of the loan, something like that to get

23   the borrower back on track paying the mortgage.  So that's

24   called a modification.

25   Q.  What was your position at Bank of America?

1  A.  So I again did a lot of capacity planning.  It was really

2  more focused on capacity planning in that role.  As you can

3  imagine, there was a lot of modification volume at the time in

4  2010.  And so we had about 2,500 employees, and I was trying to

5  forecast the volume, try to predict how much volume was going

6  to need to go through the process and how many people it would

7  take to do that.  So by the end -- kind of at the peak we had

8  about 10,000 employees, so I was trying to figure out how many

9  people we needed and when, and also where to put the people in

10  office space in locations throughout the country.

11  Q.  Could you explain what you mean by volume through the

12  process?  What are you referring to there?

13  A.  Basically customers that needed a modification.

14  Q.  Did your position at Bank of America have a title?

15  A.  I believe it was senior vice president, loan modification,

16  capacity planning or something like that.

17  Q.  How long did you hold that position?

18  A.  For a little over a year.

19  Q.  What was your next position?

20  A.  Then I joined Fannie Mae as director of credit risk.

21  Q.  Did you leave Bank of America voluntarily?

22  A.  Yes.

23  Q.  Are you still employed at Fannie Mae?

24  A.  Yes.

25  Q.  What is your position?

1   A.  The same position, director of credit risk.

2   Q.  Could you describe your job duties in that position?

3   A.  Sure.  So we have a team called credit portfolio risk.  And

4   so Fannie Mae is basically an investor where they buy loans

5   from mortgage lenders and other banks.  And so when you have

6   all those loans, it's called your portfolio.  So my role again

7   does a lot of reporting and analytics around assessing the risk

8   of the overall portfolio.

9   Q.  What were the circumstances that led you to depart Bank of

10  America and then ultimately take employment with Fannie Mae?

11  A.  I had gotten a call from Ed O'Donnell, who I worked with

12  significantly at Full Spectrum and for period of time I worked

13  with him, and told him if he ever had any job openings that I

14  would definitely be interested in what he had.  So he was

15  building out a group there that -- credit portfolio risk was a

16  fairly new group, and he was building out his group, so he

17  wanted to see if I was interested in interviewing.

18  Q.  Did you interview with anyone at Fannie Mae?

19  A.  Yeah, I met with Ed first, then I met with two of his

20  directors, Lena Vann and Paul Marcolongo.  And then ultimately,

21  I had to interview with Ed's boss, Gwen Muse-Evans.

22  Q.  Mr. Thomas, why don't we talk briefly about Fannie Mae.

23  Could you explain to us what Fannie Mae is?

24  A.  Sure.  It's a government-sponsored enterprise, which is

25  basically it had a charter from Congress that was essentially

1    to provide funding to banks, mortgage lenders, so they could

2    continue to make loans.  If a bank had to make loans on its

3    own, they have a limited amount of money to do that, so

4    essentially they won't be able to make more loans.  So Fannie

5    and Freddie, another similar company, they basically buy loans

6    from the banks and the mortgage lenders, give the banks money

7    for that loan, and they can go make more loans.  So we call it

8    providing liquidity in the market.

9    Q.  Do Fannie Mae and Freddie Mac have any relationship with

10   each other?

11   A.  They're similar but separate companies.  Same charter from

12   Congress.

13   Q.  While you were employed at FSL, did Fannie Mae and Freddie

14   Mac purchase loans from Countrywide?

15   A.  Yes.

16   Q.  Now if we can, I would like take a few minutes to talk

17   about Countrywide.  What was Countrywide?

18   A.  Countrywide was a mortgage lender started by Angelo Mozilo

19   in Pasadena, California as a small company and grew to the

20   biggest mortgage lender in the country.

21   Q.  And how did Countrywide get to be one of the biggest

22   mortgage lenders in the country?

23   A.  By making the most loans, more loans than anybody else.  I

24   don't how they did it better than the others, but --

25   Q.  Did they sell loans too?

1    A.  Yes, they did.

2    Q.  Now were some of these loans mortgages?

3    A.  Yes, it was a mortgage lender, so they were all mortgages.

4    They were a little different than a regular bank would have

5    credit cards and other things, and Countrywide was just

6    mortgages.

7    Q.  Could you explain -- while you were at FSL, could you

8    explain the process whereby Countrywide made a mortgage?

9    A.  Sure.  So once the borrower submitted an application or

10   went to a loan officer and submitted an application, or maybe

11   over the phone, then what we call a processor or loan

12   specialist would work with the borrower to collect all the

13   necessary documentation, so pay stubs, sometimes tax returns,

14   all those kinds of things.  So the processor would put -- what

15   we call build the file, so they would build the file and get it

16   ready for submission to underwriting.  And then an underwriter

17   would look at that information and kind of assess -- like we

18   said, assess the risk of the loan.  And once they were

19   comfortable with it, approved it, everything was done, then the

20   funders would provide the money to the borrower.

21   Q.  Were all loans in Countrywide originated by -- did they all

22   have the same quality level?

23   A.  No.

24   Q.  Could you explain the distinction in quality?

25   A.  Sure.  Again, borrowers and properties have different

1    valuations, so a lot of times we had prime loans, which was

2    like a prime borrower, good credit history.  And subprime was

3    somebody who maybe missed payments in the past, had a

4    bankruptcy or something in the past, and so those loans are --

5    the lower quality would be called subprime.

6    Q.  Did Countrywide ever sell subprime loans?

7    A.  Yes.

8    Q.  And while you were employed at FSL, did that change at any

9    point?

10   A.  Yeah, when I started with Full Spectrum 2003 they were

11   already kind of migrating more towards prime.  Full Spectrum

12   was originally more of a subprime lender, but they started

13   doing more prime loans.  So that trend kind of continued

14   through until they were doing majority of prime loans kind of

15   2006, '7-ish.

16   Q.  Was FSL part of that emphasis on prime loans?

17   A.  Yeah.  That's where the shift primarily occurred, because

18   the other divisions didn't really do much subprime.

19   Q.  Now you mentioned that Countrywide sold loans during 2007

20   and 2008 time period.  Who bought the loans?

21   A.  So primarily Fannie Mae and Freddie Mac would buy loans.

22   Also other banks would be loans.  So it varied, sometimes

23   Countrywide would even buy loans.

24   Q.  Could Countrywide sell Fannie Mae and Freddie Mac any kinds

25   of loans that it wanted?

D9OTBAN6                         Thomas - direct

1    A.  No, they had to be of a certain quality, so typically we

2    call that bucket of loans conforming, so they conformed to the

3    guidelines or the requirements of Fannie Mae and Freddie Mac.

4    Then there were other products as well that were kind of

5    specialized.  Fannie Mae, for example, had an expanded approval

6    loan, which was kind of in between prime and subprime, but it

7    was a loan product specific to them that we could also sell to

8    them.

9    Q.  Now did Fannie Mae and Freddie Mac underwrite every loan

10   that it purchased or that they purchased from Countrywide?

11   A.  No, no.

12   Q.  Why not?

13   A.  Fannie and Freddie wouldn't have the capacity to underwrite

14   every loan, so they relied on the banks and the mortgage

15   lenders to do the underwriting of the lobbies.

16   Q.  When you say they wouldn't have the capacity --

17   A.  The volume of loans is huge.  Fannie Mae has over 12

18   million loans I think right now, so it's a huge portfolio.  So

19   they had to rely on the lenders themselves to do the

20   underwriting and guarantee the quality that they delivered.

21   Q.  And if you were aware, did that guarantee have a name?

22   A.  Yeah, we typically call it rep and warrant, or

23   representations and warranties, which means that we represent

24   and warranty that the loan is of the sufficient quality to be

25   sold to them.

D9OTBAN6                           Thomas - direct

1    Q.  Are you aware if Countrywide made representations and

2    warranties to Fannie Mae and Freddie Mac in connection with the

3    sale of loans?

4    A.  It's a requirement to sell loans.

5    Q.  At the time you were employed at FSL but prior to the

6    advent of the High-Speed Swim Lane I would like you to go

7    through the various stages of the loan origination process.

8    And you touched on it already, but I wanted you take us through

9    that.

10   A.  Sure.  As I mentioned, the processor kind of builds the

11   loan file.  And I should probably mention that there's a tool

12   that they could use as well called CLUES.  It was an automated

13   underwriting system is what we called it.  So they would input

14   information into CLUES, and that was part of the package that

15   they had to get ready for underwriting.  So they would submit

16   that to underwriting, underwriting would assess the risk and

17   make sure everything was ready, which we called "cleared to

18   close," and then that meant it was ready for the funder to

19   close the loan, provide the funds to the borrower.

20   Q.  Let's talk for a bit about CLUES, please.

21   A.  Sure.

22   Q.  Prior to the High-Speed Swim Lane, could you explain what

23   CLUES was or is?

24   A.  Sure.  So CLUES is basically a set of business rules that

25   an underwriter would normally go through in assessing whether

the parameters of the borrower and the property fit the

guidelines of a particular product.  So CLUES basically would

use the information that you would put into the system, run

through those rules, and say it's an accept, which means it's

acceptable, it's a refer, which means you need to refer it to

an underwriter for a manual underwriting, or it would not have

enough information to make a decision.

Q.  Mr. Thomas, is CLUES a human being with a funny name?

A.  No, it's Countrywide Loan Underwriting Expert System.

Q.  What kind of system is that?

A.  It's just a database basically with rules, so again you put

in information and it would run through the scenarios and

basically come up with a decision.

Q.  Now was it common in the mortgage industry for lenders to

use equipment like CLUES?

A.  Yes, that was very common.  Everybody had their own

systems, and Fannie Mae even had their own system called

Desktop Underwriter that you would use for their loans.  But

essentially it would say:  Does it fit guidelines?  And then it

will tell you all the things that you needed to have in that

file for it to be officially approved.  So "accept" meant that

it was conditionally approved.  So it would provide conditions

that would say like if you said the borrower made $50,000 a

year, you would have to have some documentation to support

that, and that's how a condition would be cleared.

1    Q.  Mr. Thomas, generally speaking, is there a generic name for

2    a system like CLUES?

3    A.  Automated underwriting system.

4    Q.  Now at FSL, prior to the High-Speed Swim Lane, did CLUES --

5    the use of CLUES mean there was no underwriter associated with

6    the origination of the mortgage?

7    A.  No.  So an underwriter would always make the decision and

8    clear the conditions, and basically what we called cleared to

9    the close, which means they made the decision and they cleared

10   all the conditions that CLUES would initiate or print out on

11   the report, and that's when it was officially approved.

12   Q.  Did CLUES clear those conditions?

13   A.  No.

14   Q.  Could you explain to us what you mean by "conditions?"

15   A.  Sure.  Good example is the pay stubs.  You have to have a

16   certain number of pay stubs to support the income that was put

17   into CLUES, otherwise you could put anything into the system

18   you wanted to, but you had to have some documentation to

19   support it.  So there would be conditions around title,

20   appraisal, lots of different things depending on the program

21   and depending on the information that you put in.

22   Q.  Then if CLUES indicated certain conditions, prior to the

23   High-Speed Swim Lane, what would happen next in the process?

24   A.  So when the processor would get the required documentation,

25   if it was a documentation kind of condition, so processors

D9OTBAN6                          Thomas – direct

1    would get the borrower to send in the documents but the

2    underwriter would review the documents, or whatever the

3    condition was, and they would clear it.  In the old days it was

4    kind of checking off the actual report and initialing that they

5    cleared the condition.

6    Q.  And who had the ultimate responsibility for ensuring all

7    the conditions were cleared?

8    A.  The underwriter.

9              THE COURT:  All right.  Counsel, I think this probably

10   a good place to break for today.

11             So ladies and gentlemen, we're off to a good start,

12   but we want to have a full day tomorrow, so of course we're

13   starting at 9:30.  But please all be in the jury room at 9:30,

14   and then we'll start promptly.  We can't start, obviously,

15   until you're all here.  And tomorrow, we will go to 5 o'clock.

16   There will be later days this week when we'll only go to 4, but

17   tomorrow we'll go to 5.

18             So have a great evening, and I'll see you tomorrow.

19             (Continued on next page)

20

21

22

23

24

25

D9OTBAN6

```
 1              (Jury not present)

 2              THE COURT:  Please be seated.

 3              Mr. Thomas, you can step down, we'll see you tomorrow

 4   morning at 9:30.

 5              Is there anything further that counsel wanted to

 6   raise?

 7              MR. HEFTER:  Your Honor, I think there is one other

 8   issue on Mr. Boland's testimony, and that is with respect to

 9   the designation itself.  So I will start off by saying in the

10   event that Mr. Boland calls chambers back and says he's coming

11   to New York, my comment is moot.  But if he's not, and given

12   the videotape issue, I wanted to raise the issue with the

13   designations for you.

14              I believe the government has submitted now to you

15   designations for Mr. Boland.  They have not designated

16   testimony relating to his termination from Bank of America.  We

17   believe that it's appropriate to have that counter designated.

18   I believe they're taking the position that because they are not

19   designating that portion of the testimony, we're not entitled

20   to counter designate as to his termination, which I do believe,

21   from Bank of America, one of the defendants in the case, I

22   think does go to his credibility and his motivation and

23   testimony.

24              THE COURT:  Yeah, that's a separate question from

25   whether he gave perjured testimony or anything like that.  What
```

D9OTBAN6

```
 1   you're saying is the testimony he did give you believe has --
 2   is evidence that could be used as impeachment evidence.
 3             MR. HEFTER:  Correct, your Honor.
 4             THE COURT:  So go ahead and designate that.  If there
 5   are objections from the government I will deal with them as
 6   well.
 7             MR. HEFTER:  Fair enough.
 8             MR. CORDARO:  Your Honor, just one other housekeeping
 9   matter.  I know counsel made an application to the Court
10   concerning Mr. Boland, and I think the application involved the
11   application or the résumé.  I don't know if the Court was
12   reserving on that at this point.
13             THE COURT:  That's why I asked whether there was
14   anything further.
15             MS. MAINIGI:  Your Honor, on that point, I think all
16   we're simply looking for, if Mr. Boland does not come live, is
17   a stipulation to what the document says.  But we were expecting
18   he would come live and expecting to cross-examine him on it, so
19   we were essentially looking for a stipulation to what the
20   document says.  Anyone can draw whatever inference they choose.
21             THE COURT:  I don't have the power to force a
22   stipulation on anyone.  If the government wants to stipulate to
23   something with you, that's fine.  If they don't, and you feel
24   that you have a basis for getting it before the jury, I will
25   deal with that then.  I remain of the view, based on the
```

D9OTBAN6

1      arguments so far made, that the document does not constitute

2      material impeachment of anything he said in the question and

3      answer that was referred to.  I also remain of the view that

4      that question and answer could not come into evidence anyway

5      because it calls for speculation on his part about matters as

6      to which no foundation has been made as to his knowledge and

7      which is extremely unlikely he would have knowledge, along with

8      other difficulties, but I will start with that one.

9              So at the moment, I don't see any basis, even if there

10     were a stipulation -- well, if there's a stipulation to

11     admissibility, of course, the parties, within extremely broad

12     limits, could stipulate into evidence anything they want, and

13     unless it's a waste of time or incredibly confusing or

14     something like that, I'll allow it.  So if they want to

15     stipulate to the admissibility of that document or to the

16     admissibility of that question and answer, they're free to, but

17     if they prefer not to, at the moment I have heard nothing that

18     would suggest that I should allow in the question and answer,

19     let alone the document.

20             MS. MAINIGI:  OK.  Thank you, your Honor.

21             THE COURT:  Anything else?

22             MR. ARMAND:  Another housekeeping issue, your Honor.

23     There are thousands of documents in this case, and we really

24     don't want to bore the jury to tears, and so to the extent --

25             THE COURT:  You want to bore them, but just not to

D9OTBAN6

1    tears.

2              MR. ARMAND:  That's right.  But to the extent the

3    parties can resolve objections, I want to clarify whether we

4    can publish documents to the jury without using them with a

5    live witness, if the parties have so stipulated.

6              THE COURT:  So here's the extent that documents can

7    come in by stipulating without any witness.  That, of course,

8    is fine with me, but I think it makes sense to offer them at a

9    time when you can at least -- when at least it will make sense

10   to the jury what they are.  I'm not requiring that, but what

11   good is it to say to the jury, as I have sometimes seen, by

12   stipulation Exhibits 10, 29, 45, 37, 243 AAA, GGG and ZZZ are

13   received.  That means nothing to them.  Zilch.

14             So if you want to, by stipulation, put in document X,

15   which you then want to publish to the jury, that's fine.  If

16   you are going to put in a document which is there for some sort

17   of mundane purpose that has nothing really to do with the jury,

18   I suppose that's fine, too.  If both of you want to agree to

19   put in hundreds of documents by stipulation that will never be

20   referred to anything but numbers, I won't say no, but I think

21   that surely will bore the jury to tears and maybe the Court to

22   anger.

23             So that's my views on that.

24             MR. ARMAND:  Understood, your Honor.

25             THE COURT:  Very good.  OK.

D9OTBAN6

```
 1              MS. SCHOENBERGER:  Your Honor, procedurally with

 2     respect to Boland transcript, there's no suggestion that the

 3     designations that the government put in include counter

 4     designations from the defendant that was circulated last night

 5     soliciting --

 6              THE COURT:  I'm not going to get to that, I'm going to

 7     work tonight on Mr. Price.  My plans for tonight are I have to

 8     teach at Columbia until 8:30, then as always on Monday, I have

 9     to take my wife dancing.  But at midnight it will be my

10     pleasure to turn to Mr. Price's deposition, and I will get you

11     those rulings first thing in the morning.  And I'm not going to

12     look at Mr. Boland.  So why don't you prepare a new copy with

13     the cross designations and cross objections and the whole

14     megillah.

15              MS. SCHOENBERGER:  On the issue of getting the video

16     editing process moving forward, in the event Mr. Boland does

17     not appear live, is there a time that the Court would want to

18     receive all the designations and counter designations?

19              THE COURT:  If you give it to me in the morning I will

20     try to work on it during the day, because I'm already bored by

21     the testimony, so this will give me something to do.  But as

22     soon as you give it to me I will try to turn to it.

23              MS. SCHOENBERGER:  Thank you, your Honor.

24              THE COURT:  Very good.  Thanks a lot.

25              (Adjourned to September 25, 2013 at 9:45 a.m.)
```

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    MICHAEL THOMAS

4    Direct By Mr. Cordaro  . . . . . . . . . . . 102

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25