D9PTBAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5         v.                                12 CV 1422 (JSR)

6    BANK OF AMERICA CORPORATION,
7    *successor to Countrywide*
     *Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                   Defendants.

11   ------------------------------x
                                         New York, N.Y.
12                                       September 25, 2013
                                         10:00 a.m.
13
     Before:
14
                        HON. JED S. RAKOFF,
15
                                         District Judge
16

17

18

19

20

21

22

23

24

25

D9PTBAN1

1                                     APPEARANCES

2      PREET BHARARA
            United States Attorney for the
3           Southern District of New York
       PIERRE G. ARMAND
4      JAIMIE LEESER NAWADAY
       JOSEPH N. CORDARO
5      CARINA H. SCHOENBERGER
       ELLEN M. LONDON
6           Assistant United States Attorneys

7

       WILLIAMS & CONNOLLY
8           Attorneys for Defendant Bank of America
       BRENDAN V. SULLIVAN, JR.
9      ENU MAINIGI
       MALACHI B. JONES
10     KENNETH SMURZYNSKI
       CRAIG D. SINGER
11     ALLISON B. JONES
       STEVEN M. CADY
12     JENNIFER WIMSATT PUSATERI

13

       GOODWIN PROCTOR
14          Attorneys for Defendants Countrywide
       RICHARD M. STRASSBERG
15     WILLIAM HARRINGTON

16

       BRACEWELL & GIULIANI
17          Attorneys for Defendant Mairone
       MARC L. MUKASEY
18     MICHAEL HEFTER
       RUSSELL ZWERIN
19     RYAN M. PHILIP
       SETH M. COHEN
20     CHRISTINA JARDINE

21

22

23

24

25

                           SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300

D9PTBAN1

1              (Jury not present)

2              THE COURT:  Let's get the witness on the stand.  Two

3    jurors were late but they have now arrived.

4              Get the witness on the stand.

5              (Jury present)

6              THE COURT:  Good morning, ladies and gentlemen.  I

7    know it's very hard to predict commutes in the City of New

8    York, but it's really important that we have all of you here at

9    9:30 if we're going to keep this case on schedule.  The last

10   thing I want ever be in a position of is telling you it is

11   going to last for more than five weeks because we didn't get

12   started on time.  So if you come from a distance, you need to

13   allow a little more time to be sure you're here at 9:30.  But

14   thank you for all being here now, and we're ready to start.

15             Counsel.

16    MICHAEL THOMAS,

17        having been previously sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. CORDARO:

20   Q.  Good morning, Mr. Thomas.

21   A.  Good morning.

22   Q.  When we left off yesterday we were speaking about

23   underwriters.  While you were on your second tour of duty at

24   FSL, did you have occasion to become familiar with any of the

25   training procedures of underwriters?

D9PTBAN1                          Thomas − direct

1    A.  Somewhat, yes.

2    Q.  Could you explain that process to us?

3    A.  Sure.  Typically when a new underwriter would join the team

4    they would have training modules they would have to go through

5    among different topics.  And typically their work would be

6    reviewed by a senior underwriter, and we called it second

7    signing, so the first underwriter would do the work and the

8    second underwriter would second sign.  And that would go for a

9    period of time until there was a comfort level that the new

10   underwriter was performing well.

11   Q.  As part of the training process, were there any levels of

12   seniority or certification?

13   A.  Sure.  We had junior underwriters and later on we called

14   that underwriting validators.  We had different levels,

15   different authority levels they could attain, so level one

16   authority level, level two and level three, and their titles

17   would be junior underwriter, underwriter one and two, senior

18   underwriter.

19   Q.  What did the authority levels represent?

20   A.  Basically what types of files they could look at, what kind

21   of decision−making authority they have.

22   Q.  And as the underwriter became more senior, how did that

23   impact the kinds of files they looked at?

24   A.  Yes, so basically like a level two underwriter could look

25   at more complex files than a level one underwriter.

1   Q.  And when you say a more complex file, could you give us a

2   thumbnail sketch of what you mean?

3   A.  Sure, a higher risk file that may be different product

4   types or different loan amounts, a very high loan amount, for

5   example, or different things like that, anything that would

6   take more senior underwriter to evaluate that file.

7   Q.  And why was it important that the seniority of the

8   underwriter was matched to the complexity of the file?

9   A.  Because the files had different risk levels, so you had to

10   have the right expertise to look at that file so you wanted to

11   make sure you were making the appropriate decisions.

12   Q.  And what would be the -- what could be the potential impact

13   of an inappropriate decisions?

14   A.  If you -- let's say junior underwriter had a more complex

15   file that they didn't understand the requirements or something,

16   they could make an incorrect decision.  That file could be

17   approved when it really shouldn't have been, and that could

18   lead to higher risk file or a file that is not good quality

19   making it through the system and being funded.

20   Q.  Mr. Thomas, during your second stint at FSL, did you have

21   occasion to become familiar with the position known as loan

22   specialist?

23   A.  Sure.

24   Q.  And to clarify at the outset, did you also become familiar

25   with what is known as loan processors?

D9PTBAN1                          Thomas - direct

1   A.  It's the same position.  I think loan specialist was the

2   actual title we had, but it's basically a processor, someone

3   processing.  We would call it step processing.

4   Q.  I will try to refer to them as loan specialists.

5   A.  OK.

6   Q.  Prior to the High-Speed Swim Lane, could you describe to us

7   the typical duties of a loan specialist?

8   A.  Sure.  The loan specialist would typically be the one

9   contacting the borrower saying I need this documentation, pay

10  stubs, bank statements, that kind of thing, and basically

11  putting together the file.  They would run CLUES.  They would

12  pull all that information into the CLUES system, run CLUES and

13  determine, if it was ready for underwriting, they would submit

14  to underwriting.

15  Q.  And again, I'm speaking now prior to the High-Speed Swim

16  Lane, did the loan specialists conduct any of the analysis

17  typically in the bailiwick of the underwriter?

18  A.  Yes, all the risk analysis was in underwriting.

19  Q.  Mr. Thomas, I would like to talk about the reporting chains

20  in the organization for loan specialists and then underwriters.

21  Could you give us a quick of idea of where the loan specialist

22  stood in the chain of FSL?

23  A.  Sure.  So the processors typically reported up through

24  operations, so the chief operations officer.  And underwriting

25  and funding were kind of risk organizations, so they reported

D9PTBAN1                          Thomas - direct

```
 1   up to the chief credit officer, and then both of those reported
 2   up to the CEO of Full Spectrum.
 3   Q.  So let's talk about loan specialists first.  You said they
 4   reported up through operations.  Could you explain what
 5   operations is?
 6   A.  Sure.  So operations --
 7           MR. HEFTER:  Objection, your Honor.
 8           THE COURT:  Ground?
 9           MR. HEFTER:  Foundation, your Honor.
10           THE COURT:  No, I think he's in a position to testify
11   about that.  Overruled.
12   A.  Can you repeat the question.
13   Q.  Certainly.  Could you explain what you meant when you said
14   operations?
15   A.  Sure.  So operations was basically what we call the
16   processing side of the business.  So you had a sales
17   organization, those were the loan officers, those people taking
18   the applications, operations was the processing getting files
19   ready, and then the credit organization was underwriting and
20   funding.
21   Q.  You said you made reference to the chief operations
22   officer?
23   A.  Yes.
24   Q.  Who was the chief operations officer in 2007, 2008?
25   A.  2007, 2008, it would have been Rebecca Mairone.
```

D9PTBAN1                          Thomas – direct

1   Q.  Now you also discussed the reporting chain for

2   underwriters.  Could you speak to that again, please?

3   A.  So underwriting reported up to Ed O'Donnell, and he

4   reported up to Cliff Kitashima, who is the chief credit

5   officer.

6   Q.  Did the underwriting reporting chain mix with the

7   operations reporting chain?

8   A.  No, completely separate organizations reporting up to the

9   CEO.

10   Q.  Do you know why those organizations were kept separate?

11            MR. HEFTER:  Objection, your Honor.

12            THE COURT:  Without telling us why they were kept

13   separate, as a foundation, how did you come to know if –– how

14   did you come to know why they were separate, if you did?

15            THE WITNESS:  Sure.  As part of my –– when I first

16   joined Full Spectrum, as I think I mentioned yesterday, it was

17   a subprime organization, and so we had a little bit different

18   structure than let's say the CMD division, and the structure

19   was set up so ––

20            THE COURT:  No, how –– was it someone who told you?

21   Was it what you observed?  Was it common knowledge?

22            THE WITNESS:  For me, it was common knowledge.

23            THE COURT:  All right.  The objection is overruled.

24   Q.  Mr. Thomas, were you in either of those lines of reporting

25   yourself?

D9PTBAN1                      Thomas - direct

1   A.   I reported up through the chief credit officer line, so the

2   risk.

3   Q.   That was the underwriting line?

4   A.   Correct.

5   Q.   You were in that line?

6   A.   I was well -- I supported underwriting and funding, so you

7   also had the funding organization that reported up to, at the

8   time I believe Cheri Shine, and then those two reported up to

9   the chief credit officer.

10  Q.   So to get back to my question, why was it important?  Why

11  were the two organizations separated, as far as the reporting

12  chain, the underwriters and the operators?

13  A.   Full Spectrum's beginnings came from the subprime industry,

14  so you had to have -- because these were lower risk borrowers,

15  you had to have very tight controls on the process.  We found

16  that having a specialized operating and funding group that was

17  separate from the processing side or sales side provided that

18  control.  So you always had somebody in a different

19  organization checking the work of the other and assessing the

20  risk.  And that was also a good counter to any potential fraud,

21  because you didn't have just one organization making the

22  decision, you actually had -- so if you wanted to perpetrate

23  fraud you would have to get both organizations to agree to

24  something like that.  So it's a good check and balance.

25  Q.   Now within the loan origination process you spoke yesterday

D9PTBAN1                         Thomas - direct

1   about underwriting, then there was some discussion about

2   conditions, am I correct about that?

3   A.   Yes.

4   Q.   Then the clearing to close conditions, could you explain

5   what that is?

6   A.   Sure.  So to clear the condition meant just to satisfy what

7   that condition was, so if it was getting some documentation or

8   reviewing some documentation, things like that.  And so you

9   would clear each of the conditions, and then ultimately, when

10  all the conditions are cleared, the underwriter would say it's

11  cleared to close, so all the conditions are completed and it's

12  ready to move forward.

13  Q.   Could some of those conditions come from CLUES?

14  A.   Yes, most of the conditions do come from CLUES.

15  Q.   And what kind of decisions could CLUES make on the loan

16  that was fed into it?

17  A.   So it could either give an accept, what we call a CLUES

18  accept, a CLUES refer, or no decision at all.

19  Q.   And if loans were CLUES refer, what would happen to it?

20  A.   That would make -- CLUES couldn't make the determination

21  whether it was acceptable quality, so an underwriter would do a

22  manual underwriting of the loan.  In those cases an underwriter

23  could actually add conditions to the file and say I could get

24  comfortable with it if you had those things and you could add

25  conditions to those.

D9PTBAN1                          Thomas - direct

1   Q.  Let's talk about if CLUES came out with an accept.  Could

2   there be conditions attached to that accept?

3   A.  Yes.

4   Q.  Would those conditions have to be closed before the law

5   enforcement went to funding?

6   A.  Yes.

7   Q.  Who was ultimately responsible for clearing those

8   conditions and making sure they were cleared prior to funding?

9   A.  The underwriter.

10  Q.  If we could talk about funding for a second, what do we

11  mean by funding?

12  A.  Funding is basically making sure all the documentation is

13  ready, all the compliance, things are correct, forms are

14  signed, waivers, addendums, anything that is part of the loan

15  file, then they would set up the wiring of the money to -- for

16  the customer to purchase the house.

17  Q.  Prior to the High-Speed Swim Lane, was anybody else -- who

18  was involved in the funding process?

19  A.  So we had a funder and a compliance specialist.  So the

20  funder would do some of the work.  And the compliance

21  specialist's job was to make sure that everything complied, so

22  they had -- they were looking for actual signatures, even

23  making sure their wet signature is not a photocopy or something

24  like that, so they go through all that stuff and make sure

25  everything is correct before going to funding.

D9PTBAN1                          Thomas - direct

1    Q.  Now while you were in your tour as a first vice president

2    at FSL, did you become familiar with the process known as prime

3    CLUES accept?

4    A.  Yes.

5    Q.  Can you explain the prime CLUES accept process?

6    A.  Sure.  So as we were moving more and more towards prime

7    loans, one of the -- we always wanted to find efficiency in the

8    underwriting process, making sure that we were positioning

9    things in appropriate timelines and things like that.  So one

10   of the process enhancements we put into place was to kind of

11   segregate prime CLUES accept loans, so prime loans that got an

12   accept from CLUES versus prime CLUES refer loans, and we could

13   move those loans to a different level of underwriters.  And we

14   could make sure their list of loans they were to work that day

15   was of the same type.  So if you mix them up, you may have -- a

16   referred may take half a day to underwrite when you could have

17   done an accept that is sort of waiting there and those go

18   through faster.  So we separated those out and had prime CLUES

19   accept loans go through a separate process within underwriting.

20   Q.  Let's take the process step by step.  What if a prime loan

21   goes to CLUES and CLUES says refer?

22   A.  It would go to a more senior level underwriter and they

23   would do a manual underwriting.

24   Q.  What if the prime loan went into CLUES -- let's step back.

25   Who was responsible for gathering the data in prime CLUES

1   accept before the loan went into CLUES?

2   A.  The processor, the loan specialist.

3   Q.  The loan specialist?

4   A.  Yes.

5   Q.  And then if the loan went into CLUES and CLUES rendered an

6   accept with conditions, what would happen next?

7   A.  So the loan specialist would still make sure everything is

8   ready in the file, and then they would submit to underwriting.

9   And a junior underwriter or underwriting validator would

10  basically go through and validate all the information that put

11  into CLUES was supported and documented properly in the file.

12  So their job was basically if the processor said the borrower

13  makes $50,000, they had documentation to support the income is

14  indeed $50,000.

15  Q.  What you were referring to the junior underwriter and

16  underwriting validator, is somebody from that chain of command

17  we were talking about before for underwriters?

18  A.  Yes, they would be on underwriting teams.

19  Q.  And the processors, you said before, were in operations?

20  A.  Correct.

21  Q.  Once the underwriter or underwriting validator looked at

22  all those conditions, was there still a clear to close step for

23  prime CLUES accept?

24  A.  Yes.

25  Q.  And who handled the clear to close step?

D9PTBAN1                          Thomas - direct

1    A.  The underwriter.

2    Q.  And would that be an actual underwriter?

3    A.  Yes.

4    Q.  And then next step would be funding, correct?

5    A.  Correct.

6    Q.  Was there a compliance specialist in that step with prime

7    CLUES accept?

8    A.  Yes.

9    Q.  Now is prime CLUES accept the Hustle?

10   A.  No, it is before the Hustle.

11   Q.  Now in your position at FSL, were you tasked with

12   trafficking the quality of loans that originated in prime CLUES

13   accept?

14   A.  Yeah, I would review quality of all the loans that came

15   through.

16   Q.  And did you voice any concerns about low quality specific

17   to prime CLUES accept?

18   A.  No, we found the prime CLUES accept -- we did get some

19   efficiencies in production, but we didn't see any degradation

20   of quality, so we felt like it was a tightly controlled

21   process.

22   Q.  If you remember, was there a particular time period when

23   FSL began using prime CLUES accept or put it into play?

24   A.  I think it was 2006.

25   Q.  During your employment with FSL, did you ever become aware

1   of something known the High-Speed Swim Lane?

2   A.   Yes.

3   Q.   Did the High-Speed Swim Lane go by any other names that you

4   with aware of?

5   A.   Yes, HSSL and also Hustle.

6   Q.   Did you have any involvement in the development of the

7   Hustle?

8   A.   Yeah, I was on the original kind of design team that was

9   coming up with ideas of how to improve efficiency.  So I was

10  kind of a central services -- we call it subject matter expert,

11  but basically I would bring to the table thoughts and ideas or

12  concerns from the central services or the underwriting and

13  funding perspective.

14  Q.   And can you give us a run down of who else was involved in

15  the development of the Hustle?

16  A.   Sure.  The kind of operations design group was led by Loren

17  Rodriguez, who reported to Rebecca Mairone.  And then on the

18  specific project, Mark Barnett was kind of a process engineer,

19  he was kind of facilitating from a project management

20  standpoint.  Anson Gong I think was on the team, Peter

21  Tenaglia.  And then we have, like I said, subject matter

22  experts from the different groups that would come in like

23  myself, and then at times we would have some of the executives

24  like Ed O'Donnell, Rebecca, Cliff, we would at least present

25  some things to them on our progress, that kind of thing.

D9PTBAN1                          Thomas - direct

1   Q.   Did Rebecca Mairone have a role in the development of the

2   Hustle?

3   A.   As the chief operations officer she was kind of directing

4   what should be done.

5   Q.   Now at the outset of the Hustle or at least -- withdrawn.

6        In the design phase of the Hustle were there certain

7   loans that were slated to go through the Hustle?

8   A.   Yes, my recollection was prime CLUES accept loans was what

9   we designated for the Hustle.

10  Q.   Now I would like you to take me through, quickly, the steps

11  for the Hustle one step at a time.

12  A.   OK.

13  Q.   So the first step in all the loan origination processes was

14  application, correct?

15  A.   Correct.

16  Q.   And then what would be the next step in the Hustle?

17  A.   So the next step would be the processing, or loan

18  specialist would again pull all the information together and

19  run CLUES, and then --

20  Q.   Let's stop there for a second.

21  A.   Sure.

22  Q.   Was that gathering of documents by the loan specialist, was

23  that any different from any of the other processes we have

24  discussed?

25  A.   No, that was the same.

D9PTBAN1                        Thomas - direct

1    Q.  And then you started to talk about CLUES.  So what would

2    happen next?

3    A.  So they would run CLUES, and then if they got a prime CLUES

4    accept, which was the initial population or maybe another

5    program later on, they would -- it was deemed to go through the

6    Hustle process.

7    Q.  And with respect to running the loan through CLUES, was

8    that any different from some of the different processes we have

9    been discussing?

10   A.  No, that was the same.

11   Q.  And then I believe you said when it came through CLUES, if

12   it came in as a prime CLUES accept it would be designated for

13   the Hustle, what did you mean by that?

14   A.  It meant it normally went to underwriting at that point.

15   So the processor, the loan specialist would clear the

16   conditions and clear the file to close.

17   Q.  So just to step back again, in prime CLUES accept,

18   pre-Hustle, who was responsible for checking the data put into

19   the system by the loan processor was accurate?

20   A.  The underwriting validator or junior underwriter.

21   Q.  Someone in a separate reporting chain?

22   A.  Correct.

23   Q.  In the Hustle, who was responsible for performing the task?

24   A.  The loan specialist, the same person that put in the

25   information.

D9PTBAN1                          Thomas - direct

1    Q.  Who, if anyone, in that separate chain of reporting was

2    checking the loan specialist's work?

3    A.  No one.

4    Q.  Now the back to the Hustle.  The loan went through, got a

5    prime CLUES accept, and there were conditions attached to it,

6    in the Hustle, who analyzed those conditions?

7    A.  In the Hustle, the loan specialist, the processor.

8    Q.  And in prime CLUES accept, who was the looking at those

9    conditions?

10   A.  The underwriter.  And conditions had different types, so

11   the processor could be responsible for some conditions, putting

12   it in, and in the underwriter could be responsible for clearing

13   some conditions, and ultimately the underwriter was responsible

14   for clearing to close.

15   Q.  Who was responsible for all the conditions in the Hustle?

16   A.  The processor.

17   Q.  And in the prime CLUES accept, who was responsible for

18   making the determination that the conditions had been cleared

19   and now the loan is ready to close?

20   A.  The underwriter.

21   Q.  And in the Hustle, who had that responsibility?

22   A.  The processor.

23   Q.  And who from that independent line of reporting was

24   checking the loan processor's work on that particular step?

25   A.  No one.

D9PTBAN1                          Thomas - direct

1   Q.  Was anybody checking the loan processor's work?

2   A.  No, theoretically their manager could, but it would be in

3   that team.

4   Q.  Does the manager underwrite?

5   A.  No.

6   Q.  I'm not sure if I asked you this.  Why is it that all the

7   conditions have be cleared out before a loan gets funded?

8   A.  Because that means the conditions -- basically CLUES accept

9   is a conditional approval, so you have to make sure that all

10  the documentation is correct before you actually get an

11  approval.  If you don't, you're not validating that the

12  information is correct, that it's supported by the proper

13  documentation, that everything is in the file.  And so that's

14  part of what is required when you sell a loan is the loan is

15  complete, it has everything validated, and it's correct.

16  Q.  Could some of those conditions -- well, why don't you

17  explain to us very briefly, what are some of the conditions

18  we're talking about here?  What kind of conditions?

19  A.  Sure.  The one that always comes to mind, there's a lot of

20  documentation-type conditions that support the information that

21  you have in the file.  So you support the income, you

22  support -- you have bank statements, sometimes tax returns, you

23  could be looking at the title, making sure the title is clear,

24  which means that nobody else has claim to that property.  You

25  look at the appraisal and make sure that you have certain

D9PTBAN1                    Thomas - direct

1   review of the appraisal.  So sometimes it was that you did a

2   certain worksheet for the file, you did some analysis, and

3   sometimes it was you looked at the proper documentation and it

4   was in the right place in the file.  There were numerous

5   conditions that could come out.

6   Q.  And prior to the High-Speed Swim Lane, as you testified, an

7   underwriter would have to look at at least some of those

8   conditions, correct?

9   A.  That's correct.

10              MR. HEFTER:  Objection, leading your Honor.

11              THE COURT:  Sustained.

12  Q.  Now once the conditions were closed, in prime CLUES accept,

13  what would happen next?

14  A.  So once the conditions were closed, and the underwriter

15  validated the conditions were all closed, they would mark it

16  cleared to close.

17  Q.  And then who would it go to next?

18  A.  The funding team.

19  Q.  And who was on the funding team?

20  A.  The funder and a compliance specialist.

21  Q.  And in the High-Speed Swim Lane, who was on the funding

22  team?

23  A.  The funder and compliance specialist roles were combined,

24  and they were -- they were part of the processing team.

25  Q.  So what happened to the separate compliance specialist in

D9PTBAN1                          Thomas - direct

1   funding?

2   A.   There was none.

3   Q.   So who was checking the funder's work in the Hustle?

4   A.   Just the funder.

5   Q.   Now at any time during your tenure as first vice president,

6   did you have any concerns about the shifts in roles to certain

7   employees within the Hustle?

8   A.   I did.

9   Q.   And did you voice those concerns?

10  A.   I did, yes.

11  Q.   What were those concerns?

12  A.   I had some concerns about the separate reporting structure,

13  for one, there's nobody checking the work, and even if there

14  was somebody checking the work, if you separate those roles and

15  kept them on one team, that was still not as a controlled

16  environment as having two separate organizations.  I had

17  concerns that the loan specialist wasn't trained or wasn't

18  experienced in some of the underwriting skills to be able to

19  make those decisions.  But it just -- especially with the

20  validating of data, you could have the scenario where I could

21  put whatever I wanted in CLUES --

22                MR. SULLIVAN:  Objection.

23                THE COURT:  Sorry?

24                MR. SULLIVAN:  Objection.

25                THE COURT:  Sustained.

D9PTBAN1                          Thomas - direct

1    Q.  Let's step back for a second.  We were talking about the

2    training and loan specialists while you were at FSL.  Did you

3    have occasion to become familiar with the training of loan

4    specialists prior to the High-Speed Swim Lane?

5    A.  Prior to the High-Speed Swim Lane, no.

6    Q.  And once the High-Speed Swim Lane started, did you have

7    occasion to become familiar the training of loan specialists?

8    A.  Yes, I was familiar with the certification requirements.

9    Q.  So we'll leave that for a second.

10            And were there other things that the High-Speed Swim

11   Lane changed besides the changing of personnel who were doing

12   certain tasks?

13   A.  Sure.  So some of the other changes in the process itself

14   were elimination, some of the job aids or check lists that were

15   required in the file.  So as an example, an appraisal

16   assessment may be one of the worksheets that you would do and

17   you would go through and ensure that you hit all the steps of

18   reviewing that appraisal.  And typically some of those

19   processes we put into job aids or check lists and required that

20   those were marked up or signed and put in the file to verify

21   those steps had been done.  A lot of those steps were removed

22   in the Hustle process.

23   Q.  Did you have an understanding as to why they were removed?

24   A.  The concept was to improve speed, to make it faster.  You

25   don't have to put it in the file, nobody has to look for it,

1   that kind of thing.  But my experience was if you didn't

2   require something to be in or require somebody to sign it and

3   put it in the file, if your objective is to get through as many

4   loans as you can that day, it's probably not going to get done.

5                   MR. HEFTER:  Objection.

6                   MR. SULLIVAN:  Objection.

7                   MR. HEFTER:  Move to strike, your Honor.

8                   THE COURT:  The last sentence will be stricken.

9   Q.  You testified about the loan specialists training.  Could

10  we talk about that for a second?

11  A.  Sure.

12  Q.  Prior to the High-Speed Swim Lane, would it have been

13  necessary to train loan specialists on tasks that typically

14  would have been assigned to underwriters?

15  A.  No.

16  Q.  And once the High-Speed Swim Lane was initiated, did the

17  approach to training loan specialists change?

18  A.  So there were requirements for the loan specialists in the

19  High-Speed Swim Lane that kind of -- I remember one comparison

20  to what an underwriting validator would have to go through for

21  a prime CLUES accept process.  So there were certain training

22  modules, and then there was kind of a file requirement, so

23  the -- I think the original plan was to go through the training

24  requirements and then have ten files go through without

25  problems.

D9PTBAN1                     Thomas - direct

1   Q.  And how did you become familiar with the loan specialist

2   training?

3   A.  So I was familiar with it with some of my reporting, but

4   also Ron Cannon, who kind of managed that certification

5   process, I knew him from work before, so we had conversations

6   about that certification process.

7   Q.  And were there any issues that you became aware of with

8   respect to the training of those specialists?

9           MR. SULLIVAN:  Objection, hearsay from Ron Cannon.

10          MR. CORDARO:  I could ask a few more foundational

11  questions.

12          THE COURT:  All right.

13  Q.  Who is Ron Cannon?

14  A.  Ron Cannon, he was an underwriting manager at one point.  I

15  think at the time he moved into the centralized fulfillment

16  team, which was part of this new organization, and again, he

17  was responsible for the certification of the loan specialists

18  in the Hustle process.

19  Q.  Did Ron Cannon have knowledge of the training of the loan

20  specialists?

21  A.  Yes.

22  Q.  He had knowledge -- did he have knowledge of the

23  certification process?

24  A.  Yes.

25  Q.  Did you and Mr. Cannon ever discuss any issues concerning

D9PTBAN1                         Thomas – direct

1   the training of loan specialists?

2   A.  Yes.

3   Q.  And what, if any, issues do you recall discussing with

4   Mr. Cannon?

5            MR. SULLIVAN:  Hearsay.

6            THE COURT:  Who was Mr. Cannon an employee of?

7            THE WITNESS:  Full Spectrum, the operations team.

8            THE COURT:  And Full Spectrum was part of?

9            THE WITNESS:  Countrywide.

10           THE COURT:  Overruled.

11  A.  So Ron had expressed concerns with certification process,

12  specifically the file review requirements.  So when we were

13  moving from pilot to roll out of this process, it was

14  imperative that we had a lot of loan specialists that could

15  handle the volume.  And he wasn't getting as many loan

16  specialists through that file requirement as he needed, so --

17           MR. SULLIVAN:  Objection, your Honor.  Cannon will be

18  a witness, I believe.

19           THE COURT:  So?

20           MR. SULLIVAN:  Conversation is hearsay.

21           THE COURT:  No.  Come to the side bar so we can get on

22  the same line.

23           (Continued on next page)

24

25

D9PTBAN1                        Thomas - direct

1           (At side bar)

2           THE COURT:  So it's a statement of a party adversary.

3           MR. SULLIVAN:  It's introduced to prove the truth of

4   the matter stated, I believe.

5           THE COURT:  Right.

6           MR. SULLIVAN:  And let's let Mr. Cannon testify to it.

7           THE COURT:  No, the fact that Mr. Cannon will be

8   testifying is no reason why his statement, as a statement of a

9   party adversary, can't be admitted over a hearsay objection at

10  any point in the trial.

11          MR. SULLIVAN:  But he's stating it in order to prove

12  the truth of what was said.

13          THE COURT:  Yes, that's why it's not hearsay.  I'm

14  really surprised why -- this is like basic fundamental rules of

15  evidence.  The statement of an agent of a party adversary

16  overcomes the hearsay objection.

17          MR. SULLIVAN:  He's just another employee who has a

18  different specialist.  This is water cooler talk.

19          THE COURT:  But it doesn't matter.  If the objection,

20  which is hearsay, and if this was a statement about an

21  employee, an agent of a party adversary made in the course of

22  his employment, it overcomes the hearsay objection.

23          MR. HEFTER:  Your Honor, it couldn't come in as an

24  admission against Rebecca Mairone though.

25          THE COURT:  Well, that may be true.  I didn't hear you

D9PTBAN1                          Thomas – direct

1    make an objection, however.  So if you want to make that

2    objection in the future, you may, but it's waived for now.

3              MR. STRASSBERG:  Your Honor ––

4              THE COURT:  I thought I made it clear only one lawyer

5    will speak for a party.  When we had that telephone

6    conversation I don't know if you were on it, Mr. Strassberg.

7              MR. STRASSBERG:  I was.

8              THE COURT:  Good.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9PTBAN1                        Thomas - direct

1             (In open court)

2             THE COURT:  The objection is overruled.  You may

3    answer the question.  Do you want the question put again?

4             THE WITNESS:  Yes, please.

5             THE COURT:  Go ahead.

6    BY MR. CORDARO:

7    Q.  I think -- I believe I asked you in your discussions with

8    Mr. Cannon, do you have any -- were there any issues with the

9    loan specialists that you discussed?

10   A.  Yes.  So I was saying that he expressed concerns that he

11   wasn't getting enough loan specialists through that ten-file

12   review process that fulfilled the certification than he would

13   like or really anybody would like.  So there was pressure to

14   get those loan specialists certified and it wasn't going well.

15   Q.  And did you become aware of any action that FSL took in

16   response to that issue?

17   A.  My recollection was there were a couple of things.  I

18   believe the file review requirements were reduced to three

19   files, and then at some point a group that -- the initial group

20   of loan specialists involved in the Hustle were basically given

21   authority, grandfathered into underwriting level one authority.

22   Q.  And what do you mean by "grandfathered?"

23   A.  Meaning they could do -- they were certified now.  There

24   may have still been requirements to complete the training and

25   stuff later, but they were certified now so they could do the

1   volume.

2   Q.  And by volume, are you referring to the High-Speed Swim

3   Lane or something else?

4   A.  High-Speed Swim Lane loans.

5   Q.  Mr. Thomas, could you put a time frame on this for us?

6   A.  Sure.  So the pilot was I think July, August, time frame,

7   and then the full roll out was September-ish 2007, I believe.

8   Q.  Mr. Thomas, who is Andrew Gissinger?

9   A.  Andrew Gissinger, I believe he was the head of Countrywide

10  Home Loans.  I can't remember his exact title.

11  Q.  Was he an officer of Countrywide?

12  A.  Yes.

13  Q.  Was he an officer within FSL?

14  A.  No, Countrywide the global, Countrywide Home Loans.

15  Q.  Would that be over FSL?

16  A.  Correct, FSL, CMD, Wholesale.

17          MR. CORDARO:  Your Honor, if I may approach the

18  bench -- I'm sorry, may I approach the witness with an exhibit

19  binder?  That I think will make the exhibits go faster.

20          THE COURT:  OK.

21          MR. CORDARO:  May I approach the witness, your Honor?

22          THE COURT:  Yes.

23  Q.  Mr. Thomas, I'm sorry, we'll have to go out of order here,

24  but could you turn to the tab 46?

25  A.  46.  OK.  Is it -- I see it.

D9PTBAN1                         Thomas - direct

1   Q.  It would be after the tab.

2            MR. CORDARO:  Excuse me, your Honor, I think I forgot

3   the most important.

4            THE COURT:  Not the most important, but it would be

5   useful if there are any objections to know what the witness is

6   referring to.

7            MR. CORDARO:  I knew I had an extra.

8            THE COURT:  I thought you wanted to sell it on eBay.

9   Q.  Mr. Thomas, looking at what has been marked for

10  identification as Plaintiff's Exhibit 46, without getting into

11  the substance of what is in here, could you just tell us what

12  these documents are?

13  A.  Sure.  This looks like it originated with an email from

14  Andrew Gissinger, kind of broadcast email to all employees, and

15  then my response to that email to Anson Gong and Mark Barnett

16  and then some follow ups from others in the operations design

17  team.

18  Q.  Could you just tell me, who is Loren Rodriguez again?

19  A.  Loren Rodriguez reported to Rebecca Mairone, and Mark

20  Barnett reported to Loren who was head of operations design,

21  operations support.

22  Q.  Was Loren an employee of Full Spectrum?

23  A.  Yes.

24  Q.  Who is Anson Gong?

25  A.  Anson Gong worked for Loren.

D9PTBAN1                        Thomas - direct

1   Q.  Did Mr. Gong have a role in High-Speed Swim Lane?

2   A.  He was one of the process design managers.

3   Q.  Did Loren Rodriguez have a role?

4   A.  Yes, he ran that team.

5   Q.  Now these emails, were they all sent from accounts within

6   Countrywide?

7   A.  Yes.

8   Q.  And did Countrywide have an email system that was used only

9   by employees?

10  A.  Yes.

11      MR. CORDARO:  Your Honor, at this point I would move

12  the admission of Exhibit 46.

13      MR. SULLIVAN:  No objection.

14      MR. HEFTER:  No objection.

15      THE COURT:  Received.

16      (Plaintiff's Exhibit 46 received in evidence)

17      MR. CORDARO:  May I publish the exhibit, your Honor?

18      THE COURT:  Yes.

19  Q.  If we could turn to pages 4 and 5.

20  A.  OK.

21      MR. CORDARO:  Ms. Michaud, if could you bring up page

22  4 of the exhibit, please.

23  Q.  This is an email from Mr. Gissinger dated August 7, 2007,

24  is that correct?

25  A.  That's correct.

D9PTBAN1                        Thomas - direct

1  Q.  Could you place this email within the time frame of the

2  High-Speed Swim Lane?

3  A.  So this is kind of the tail end of the pilot and as we were

4  getting ready to roll out High-Speed Swim Lane.

5  Q.  And could you look at the second -- let me go to the next

6  page, page 5.

7          MR. CORDARO:  Blow up the paragraph that begins, "Our

8  success."

9  Q.  Could you read that first sentence, please?

10 A.  Sure.  He says our success in the environment is absolutely

11 contingent on our ability to employ rigorous underwriting

12 discipline.

13 Q.  Were you copied on this email?

14 A.  I was.  It went to everybody.

15 Q.  You called it a broadcast email?

16 A.  Yes.

17 Q.  And that means?

18 A.  It went to everybody in the organization.

19 Q.  Now in your capacity as a vice president, would it have

20 been necessary for you to take any action in response to this

21 statement by Mr. Gissinger?

22 A.  I was responsible for the quality side of the organization,

23 so I did take that seriously, yes.

24 Q.  And did you do anything in response to this statement of

25 Mr. Gissinger?

1   A.  I did.  I sent an email, the email before that, the next

2   morning.

3   Q.  So let's -- I guess we'll have to go backwards in the

4   exhibit to go forward in time, so could we go back.

5            MR. CORDARO:  Could you bring up page 2, please.

6   Q.  About halfway down the page, is that the email you are

7   referring to?

8   A.  Yes.

9   Q.  What is the date on that email?

10  A.  August 8, 8:04 a.m.

11  Q.  Now could we read the first line, please?

12  A.  This note from Drew outlines the reasons that I'm concerned

13  about some parts of the Hustle process.

14           MR. CORDARO:  And could we go to the next page, too.

15  Could we blow up the very top paragraph on that page.

16  Q.  You write there:  We are hearing the clear directive that

17  we should improve manufacturing quality, not that we are

18  over-manufacturing.

19  A.  Correct.

20  Q.  Could you explain what you mean by that?

21  A.  Sure.  As kind of the design of the Hustle process, a lot

22  of the terminology that we use, we called it over-

23  manufacturing, meaning we're doing too much on the file and we

24  wanted to speed up the process.  That was the design of the

25  High-Speed Swim Lane.  So that was kind of the concept of

D9PTBAN1                         Thomas – direct

1    Hustle was reduce the manufacturing, we shouldn't over-

2    manufacture files.  In Drew's email he's saying guidelines are

3    contracting, we need more focus on manufacturing quality.  So

4    I'm saying here the clear directive is we should improve

5    manufacturing quality, not that we're overdoing it.

6    Q.  And what did you say in the next sentence?

7    A.  This particular statement is in direct conflict with the

8    current Hustle design.

9              MR. CORDARO:  Now could we blow up the paragraph that

10   begins, "Our initial problem."

11   Q.  I want to focus on the last sentence of that paragraph.  It

12   says:  I don't think we want Drew to see this process design.

13              What were you referring to?

14   A.  The Hustle process.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  You have further on in the e-mail, you have a few

2    paragraphs here with numbers attached to them.  Can you explain

3    what those are?

4    A.  Those were the -- laid out my specific concerns.

5    Q.  Could you just take us through those specific concerns one

6    at a time, please.

7    A.  Sure.  You want me to explain each one as I go?

8    Q.  Yes.

9    A.  So the first one was contracting guidelines.  And so, as I

10   mentioned, we're kind of in the market kind of contracting

11   guidelines.  We are trying to do better quality loans and Drew

12   pointed out a need for more manufacturing quality.  So as

13   spelled out here, we're eliminating the current check and

14   balance of a separate centralized quality review and putting

15   all of the responsibility on the loan specialist.

16   Q.  Why was that problematic for you?

17   A.  There was no check.  So and I felt like without that check,

18   bad quality meant bad manufacturing quality loans could get

19   through.  There was no separate organization, it also when

20   guidelines change, you have -- there is training aspects to

21   that.  You are putting all that responsibility on to the loan

22   specialist.

23   Q.  Based on your experience as someone who is involved with

24   the High-Speed Swim Lane design, why was Full Spectrum Lending

25   doing that?  What was the point?

1      MR. HEFTER:  Objection, your Honor.

2      THE COURT:  Sustained.

3 Q.  Mr. Thomas, did you ever have any discussions with anyone

4 about this particular concern?

5 A.  Did I have discussions about these concerns, yes.

6 Q.  About this particular concern?

7 A.  Yes.

8 Q.  Who did you discuss it with?

9 A.  This was a concern that I had already brought up prior to

10 this e-mail with the design team and others, Ed, anybody who

11 would listen.

12 Q.  Were you ever told anything by anyone at FSL about the

13 purpose of the High-Speed Swim Lane?  Without getting into what

14 that may have been.  But did you ever discuss the purpose of

15 the High-Speed Swim Lane with anyone?

16 A.  Sure, yes.

17 Q.  Who?

18 A.  The design team, the executives, we had a directive at the

19 beginning of the design of whatever process improvements we

20 came up with.

21      MR. HEFTER:  Objection, your Honor.

22      THE COURT:  I think you need to take it one

23 conversation or one item at a time.  When you say directive,

24 are you talking about conversation, or an e-mail or what?

25      THE WITNESS:  I would say conversation.

D9P3BAN2                          Thomas - direct

1           THE COURT:  With whom?

2           THE WITNESS:  With the executives, and so it --

3           THE COURT:  Do you have a specific recollection of

4   those conversations?

5           THE WITNESS:  Only at the design meetings, the kind of

6   kick off the design meetings when we started looking at process

7   enhancements.

8           THE COURT:  So do you have a recollection of a

9   particular meeting at which this directive was given?

10          THE WITNESS:  I do.  I also do now --

11          THE COURT:  Excuse me.  So the answer is "yes"?

12          THE WITNESS:  Yes.

13          THE COURT:  Who was present at that meeting?

14          THE WITNESS:  I remember Loren Rodriguez, Anson,

15  myself, I think Peter Tinaglia was there as well.

16          THE COURT:  Who gave what you have referred to as a

17  directive?

18          THE WITNESS:  Loren Rodriguez.

19          THE COURT:  Loren Rodriguez was who?

20          THE WITNESS:  He was kind of the head of operations

21  support design team.

22          THE COURT:  What did he say?

23          THE WITNESS:  The objective is turn time.  Speed.

24          THE COURT:  Okay.  Go ahead, counsel.

25          MR. CORDARO:  Thank you, your Honor.

D9P3BAN2                     Thomas - direct

1   Q.  Mr. Thomas, you made reference to a meeting.  Could we

2   discuss that meeting?

3   A.  Sure.

4   Q.  When did that meeting take place?

5   A.  So, that meeting that I'm recalling is kind of the

6   beginning of the design, so I think it would have been kind of

7   July-ish timeframe.  2007.

8   Q.  Were there any subsequent meetings after the Hustle began?

9   A.  Oh, yeah, we had several meetings.

10  Q.  Was there a kickoff meeting?

11  A.  Yes, yes.

12  Q.  Could you explain when the kickoff meeting took place?

13  A.  So September 2007 as we kind of moved from pilot to full

14  rollout there was a kind of town hall meeting in Texas, in

15  Plano, Texas.

16  Q.  Who attended this meeting?

17  A.  It was all the process loan specialist organization, others

18  were there.  Rebecca Mairone was speaking.  I was there, I

19  think everybody involved.  It was a large room.

20  Q.  If you recall, who have the most senior officer present at

21  the meeting?

22  A.  Rebecca Mairone.

23  Q.  You were present at that meeting?

24  A.  Yes, I was.

25  Q.  What was discussed at the meeting?

D9P3BAN2                           Thomas - direct

1   A.  The rollout of the Hustle process.

2   Q.  Did anyone voice any concerns at the meeting about the

3   High-Speed Swim Lane?

4   A.  I do remember at kind of the Q and A session following the

5   prepared remarks there were a couple of processors that brought

6   up some concerns about, you know, the quality --

7              MR. HEFTER:  Objection, your Honor.

8              THE COURT:  Ground?

9              MR. HEFTER:  Vague, your Honor, lacks specificity,

10  hearsay.

11             THE COURT:  I don't think it is hearsay.  But, vague

12  and lacks specificity, although synonyms of each other, is a

13  valid objection.  Sustained.

14             MR. HEFTER:  Thank you.

15  Q.  When you say processors, what are you referring to?

16  A.  I remember two loan specialists standing up and asking a

17  question.

18             MR. HEFTER:  Objection, your Honor.  I believe the

19  witness is actually attempting to give the answer and the

20  counsel is just trying to lay a foundation.  He's launching

21  into the answer.

22             THE COURT:  He just said standing up and asking a

23  question.

24             Just to move it along, explain again what this meeting

25  is.

D9P3BAN2                              Thomas - direct

1              THE WITNESS:  This was a kickoff meeting.

2              THE COURT:  What is a kickoff meeting?

3              THE WITNESS:  It's a meeting to kind of present what

4     the new organization, what the new process would be.

5              THE COURT:  Who presided over this meeting?

6              THE WITNESS:  Rebecca Mairone.

7              THE COURT:  How many people approximately were

8     present?

9              THE WITNESS:  There were a lot.  I would say over --

10    probably over 100.

11             THE COURT:  Okay.  They were all employees of

12    Countrywide?

13             THE WITNESS:  Correct.

14             THE COURT:  Ms. Mairone made a presentation?

15             THE WITNESS:  Yes.

16             THE COURT:  Then were some questions raised?

17             THE WITNESS:  There were.

18             THE COURT:  What do you mean by processors?

19             THE WITNESS:  Loan specialists.

20             THE COURT:  Do you recall a conversation that any

21    particular loan specialist, or excuse me, a question or concern

22    that any given loan specialist raised?

23             THE WITNESS:  I do.

24             THE COURT:  Do you know what was the name of that loan

25    specialist?

D9P3BAN2                           Thomas – direct

```
 1              THE WITNESS:  I don't know their name, no.

 2              THE COURT:  Taking it one at a time, what is the first

 3  one you remember?

 4              THE WITNESS:  The first question?

 5              THE COURT:  Yes.  The first question that was

 6  responsive to the previous question from government counsel

 7  about concerns being raised.

 8              THE WITNESS:  The first question raised was around

 9  will my income be hurt if I make some mistakes.

10              THE COURT:  Who answered that?

11              THE WITNESS:  Rebecca Mairone.

12              THE COURT:  What did she say?

13              THE WITNESS:  We're not going to hit you for a couple

14  of quality mistakes.

15              THE COURT:  What was the next one that was raised that

16  you can recall?

17              THE WITNESS:  My recollection is a very similar

18  question.  Actually I remember a question about can we wear

19  jeans as well.

20              THE COURT:  Very improper to wear jeans in Texas.

21              All right, counsel, go ahead.  I'm trying to give you

22  the idea of how you should proceed.

23              MR. CORDARO:  Thank you, your Honor.

24  Q.  Mr. Thomas, were there any documents distributed during

25  that meeting?
```

D9P3BAN2                          Thomas - direct

1   A.  There was, yes.

2   Q.  What, if you recall, were those documents?

3   A.  It was what we called a dagger presentation, a series of

4   slides about what the Hustle process was and what it meant to

5   the loan specialists.

6   Q.  I'd like you to turn to Exhibit 160 in the binder.

7   A.  160?

8   Q.  Yes.  Mr. Thomas --

9           MR. HEFTER:  Excuse me, your Honor.  I may be missing

10  it, but I don't seem to have that document.  I think we can

11  pull it quickly.

12          MR. CORDARO:  129.

13          MR. HEFTER:  I go from 129 to 190.

14          MR. CORDARO:  Sorry about that.

15          MR. HEFTER:  Sorry about that.

16  Q.  Mr. Thomas, the document that's been marked for

17  identification as Exhibit 160, have you ever seen this document

18  before?

19  A.  Yes.

20  Q.  When did you see this document?

21  A.  At that kickoff meeting.

22  Q.  How did you come to receive Exhibit 160?

23  A.  This was the cover page of that presentation material for

24  the kickoff meeting.

25  Q.  Was it the regular practice for Countrywide to distribute

1   promotional materials to its employees?

2   A.  Yes.

3   Q.  Was it the regular practice for promotional materials to be

4   issued with new initiatives?

5   A.  Yes.

6   Q.  Would Countrywide generally keep such promotional materials

7   in its ordinary course of business?

8   A.  Yes.

9        MR. CORDARO:  Your Honor, move for admission of

10  Government's Exhibit 160.

11       MR. SULLIVAN:  Your Honor, it appears only to be the

12  cover with some dancing on it.  I don't see anything else.

13       MR. HEFTER:  And hearsay as well, your Honor, as to

14  Ms. Mairone.

15       THE COURT:  I don't think it is hearsay because I

16  don't think it is offered for its truth.  And indeed, from my

17  experience, it is not really a very accurate way of the way

18  that dances are done.  But, the objection sustained.

19  Q.  Mr. Thomas, you spoke about questions posed by loan

20  specialists and concerning compensation, is that correct?

21  A.  Yes, correct.

22  Q.  What was Ms. Mairone's response to those questions at the

23  meeting?

24  A.  We're not going to hit you for a couple of quality

25  mistakes.

D9P3BAN2                          Thomas - direct

```
1    Q.  Subsequent to the High-Speed Swim Lane, did you become

2    aware of any alteration of compensation of loan specialists

3    working in the High-Speed Swim Lane process?

4    A.  Yes.

5    Q.  How did you become aware of that?

6    A.  As part of the rollout, and those concerns -- we had some

7    of those same concerns in the pilot, that the decision was made

8    to kind of remove the quality incentive to the bonus plan, the

9    compensation plan.

10             MR. HEFTER:  Your Honor, strike as non-responsive.

11             THE COURT:  Well, it is non-responsive, but I will

12   allow this to move things along.

13             I will instruct the witness just listen carefully to

14   the question put and just answer that question.

15             THE WITNESS:  Okay.  Sorry.

16   Q.  Could you explain what you meant by what you were referring

17   to when you were discussing compensation.

18   A.  Sure.  So as part of the normal compensation plans that we

19   had for underwriters and loan specialist, when you had a

20   mistake on a file that was audited, we had something called Q

21   of G, quality of grade measure for individuals and teams.  And

22   so when a file was audited, you had made a mistake on it, you

23   would get a deduction from that score.  That score was used in

24   the compensation plan.  So, if you had a lower score, lower

25   quality, you got less compensation.
```

1  Q.  Did you become aware of a change to that process?

2  A.  Yes.

3  Q.  What was the change?

4  A.  The change was to eliminate that quality component of the

5  compensation plan.

6  Q.  Mr. Thomas, were you in a position to monitor the volume of

7  loans that were going into the High-Speed Swim Lane?

8  A.  Yes.

9  Q.  Did you have any concerns at the outset with volume?

10 A.  Yeah.  In the pilot specifically, you knew exactly how many

11 loans should be eligible to go through because we knew whether

12 it was a prime CLUES accept loan, we knew which teams were part

13 of the pilot.  One of the concerns initially was there is not a

14 lot of volume going through the new process.  The loan

15 specialists are choosing to send the files into the

16 underwriting.

17 Q.  Did you discuss those concerns with anyone?

18 A.  Yeah, we had lots of discussions of why that would happen.

19 Q.  Do you recall specifically who you had discussions with?

20 A.  Yeah, it would have been Peter Tinaglia, Loren Rodriguez,

21 Hansen, same folks.  Mark Barnett.

22 Q.  Who is Peter Tinaglia?

23 A.  He was on the process design team as well.  He moved on

24 into a different role by the time we rolled out, I believe.

25 Q.  As a result of those discussions, did you form a view as to

D9P3BAN2                          Thomas - direct

1   the reason for this issue?

2   A.   The consensus was that it was a kind of a fear of making

3   decisions.  This was unknown to the loan specialist.  They

4   hadn't had this authority before.  The underwriters did, they

5   were comfortable with it.  And the loan specialists preferred

6   to send it to the underwriter.

7   Q.   To your knowledge, were any steps taken to address this

8   issue?

9   A.   There was.  My recollection is that was one of factors in

10  considering removal of the quality concerns or quality impact

11  to the compensation.  And I think some of the training

12  requirements, certification, I think that's about when we

13  started talking about, you know, what requirements will we need

14  to get the skill level up for the loan specialist.

15  Q.   Mr. Thomas, are you familiar with a term central

16  fulfillment?

17  A.   Yes.

18  Q.   What was central fulfillment?

19  A.   Central fulfillment was basically the reorganization of

20  Full Spectrum around this new Hustle process.

21  Q.   Could you explain the interrelation between the Hustle

22  process and central fulfillment?

23  A.   Sure.  The way I described it is central fulfillment is the

24  organization that employed the Hustle process.

25           THE COURT:  Counsel, I wonder since we want to give

D9P3BAN2                          Thomas – direct

1    the jury a midmorning break, maybe before we get into this new

2    area this would be a good time.

3              MR. CORDARO:  Yes, your Honor.

4              THE COURT:  So ladies and gentlemen, we'll take a

5    15-minute break at this time.

6              (Jury excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9P3BAN2                        Thomas - direct

1          THE COURT:  Please be seated.  So, I have a number of

2     matters to take up.  First, I want to remind defense counsel

3     that you indicated in the telephone conference we had last week

4     that after I had made the rulings on the motion in limine, you

5     would revise your witness list and furnish it to the Court and

6     counsel.  So, you should do that in the next day or so.

7          Secondly, it is my practice at a trial of this length

8     to give a jury a kind of brief overview of what the legal

9     issues are, not all the legal issue, not at any great length,

10    but kind of here are the elements that you'll be asked to find

11    and here is where maybe the primary or some of the primary

12    disputes are.

13         So, would each party take a stab at that, and it

14    should not exceed two double spaced pages, and let me have it

15    no later than Friday morning so we can discuss it Friday

16    afternoon and then I'll give it to the jury sometime Monday

17    morning.

18         Next, Mr. Price, do I understand he is now going to be

19    able to testify live?

20         MS. NAWADAY:  We do expect he will be attending live.

21    We do not have confirmation of that, but we do expect it

22    shortly.

23         THE COURT:  Mr. Boland left a message saying he would

24    not be attending live, which is very disappointing to the

25    Court, but there it is.  So, I will need to see the marked up

D9P3BAN2                          Thomas – direct

1      deposition transcript to go over and make rulings.

2              I think even though it may be moot in terms of

3      Mr. Price, I think we ought to spend a few minutes going over

4      the deposition markings and objections for Price, because I

5      think it will bear on other deposition transcripts.

6              So, who was it that made the objections for the

7      defense?

8              MR. JONES:  Malachi Jones, your Honor.

9              THE COURT:  It was Ms. Nawaday who took the

10     deposition, yes?

11             MS. NAWADAY:  Yes, your Honor.

12             THE COURT:  So, do you have a copy of your marked up

13     transcript there?

14             MS. NAWADAY:  I do, your Honor.

15             MR. JONES:  Yes, your Honor.

16             THE COURT:  You can be seated.  So, we begin, the

17     first thing that's designated in beginning on page nine is line

18     22.  So, that's the first thing played for the jury.  They will

19     have no idea who this fellow is, or who is asking the questions

20     or anything else.  So, for example, you might have wanted to

21     designate on page seven, lines 10 through 17, there might have

22     been other things like that.  That's for you to decide.  But I

23     think it will be confusing to the jury that the very first

24     thing they see on the videotape is someone saying "And you

25     joined, and am I right you joined Full Spectrum Lending in

D9P3BAN2                        Thomas - direct

1    2004" and someone answering "yes."

2              There is then after several pages of unobjected-to

3    markings from the government, there are markings in green.  I

4    assume that's what the defense wanted to include, is that

5    right?

6              MR. JONES:  That's correct, your Honor.  The defense

7    counter designations are in green.

8              THE COURT:  So why is on page 11, lines three through

9    12, marked by both sides?  It was already marked by the

10   government.  There was no need to mark it by the defense.  The

11   government raised no objections or no objections noted to any

12   of the defense designations.

13             So the first objections, and they continue virtually

14   unstopped thereafter, begins on page 20.  The question is:  "Do

15   you remember receiving any kind of complaints at all around

16   this timeframe about pressure on loan processors from either

17   Mr. Green or Mr. Kalosis or Mr. Boland."

18             The first objection is irrelevant.  Why is that

19   irrelevant?

20             MR. JONES:  Well, your Honor, Mr. Price was receiving

21   complaints from these individuals.  There is no basis for why

22   that would be relevant.  What Mr.  --

23             THE COURT:  Excuse me?  Why isn't it relevant to the

24   government's assertion that this was a defective program?

25             MR. JONES:  Well, these are -- there is no foundation

D9P3BAN2                          Thomas - direct

1   for this, but Mr. Green, Mr. Kalosis and Mr. Boland aren't

2   employees, and there is no foundation that they would have

3   anything relevant to do with the High-Speed Swim Lane or why

4   their concern would matter.

5          THE COURT:   Is your objection lack of foundation?

6   We'll get to that in a minute.

7          Your next objection is immaterial, for which you cite

8   Rules 401, 402, although rules 401 and 402 never use the word

9   immaterial at any place.  But, assuming relevance, why would it

10  be immaterial?

11         MR. JONES:   That objection is similar to the relevance

12  objection, your Honor.

13         THE COURT:   It is either a separate objection or it

14  shouldn't have been made.  Immaterial means that relevant

15  evidence that is relevant nevertheless should not be received

16  because it is immaterial.  I think here that is a completely

17  misplaced objection.

18         The next objection is prejudicial.  Why is it

19  prejudicial?

20         MR. JONES:   Well, your Honor, the question was were

21  there complaints around this time about pressure on loan

22  processors.

23         THE COURT:   Right.  Which would make it why it's

24  relevant.  So the Rule 403, which you correctly cite there, is

25  as that evidence that's otherwise relevant can nevertheless be

1  excluded if the prejudice substantially outweighs the

2  relevance.  What is prejudicial about this question?

3           MR. JONES:  I don't think it is probative of any

4  allegation that the government is making.

5           THE COURT:  That's relevance.  You made your relevance

6  objection.  Assuming it's relevant, where is the prejudice?

7           MR. JONES:  Well, the prejudice is that it is not very

8  probative of --

9           THE COURT:  You don't understand Rule 403.

10          The next objection you raise is lack of foundation,

11 assumes facts not in evidence.  What is the facts not in

12 evidence that this assumes?

13          MR. JONES:  That they had any conversations with

14 Mr. Green, Mr. Kalosis, or Boland, or they had any basis for

15 knowledge about there being pressure on loan processors.

16          THE COURT:  What was Mr. Green's position?

17          MR. JONES:  I believe Mr. Green was an underwriter in

18 Full Spectrum Lending.

19          THE COURT:  What was Mr. Kalosis' position?

20          MR. JONES:  I believe he had a position in funding,

21 overseeing funders.

22          THE COURT:  What was Mr. Boland's position?

23          MR. JONES:  Mr. Green and Mr. Boland were underwriting

24 managers.

25          THE COURT:  If they had put pressure on the loan

D9P3BAN2                          Thomas - direct

1    processors, why wouldn't that be highly relevant?

2              MR. JONES:  Well, it doesn't say what type of -- what

3    the pressure is or --

4              THE COURT:  This is the question.  If they had put

5    what you just said into the question, you would have objected

6    as leading.

7              Now, your next objection is confusing, ambiguous and

8    vague, which for which you cite Rule 611(a).  Rule 611(a) says

9    nothing about confusing, ambiguous or vague.  However, that is

10   and would have been a perfectly valid objection, but it is an

11   objection as to form.  Fortunately for you, there was an

12   objection as to form.

13             So let me ask the government, why shouldn't I sustain

14   that objection on the grounds of confusing, ambiguous and

15   vague?  There was an objection to form, and you chose not to

16   revise your question.

17             MS. NAWADAY:  Well, your Honor, the question was

18   phrased generally because Mr. Price was having some difficulty

19   recalling some specific instances of complaints, and we needed

20   to back up somewhat to ask him if he remembered any complaint

21   from any of these direct report underwriting managers.

22             THE COURT:  The question is:  "Do you remember

23   receiving any kind of complaints at all around this time about

24   pressure on loan processors from either Mr. Green or

25   Mr. Kalosis or Mr. Boland?"

D9P3BAN2                          Thomas – direct

1            I will reserve on the moment on the question of

2     whether that objection to form should be sustained.

3            The final objection was hearsay.  Why is it hearsay?

4            MR. JONES:  There's no foundation that these

5     statements were made by these employees in the scope of their

6     employment.

7            THE COURT:  What else would they be making them in the

8     course of?

9            MR. JONES:  There is no foundation.  Like I said,

10    Mr. Green, Mr. Boland were underwriting managers.  Mr. Kalosis

11    I believe were funding managers.

12           THE COURT:  Those were all employees of Countrywide,

13    right?

14           MR. JONES:  They had no oversight of loan processors.

15           THE COURT:  The question was were they putting

16    pressure on loan processors.  The question was not whether they

17    were loan processors.  The question was were they, the

18    underwriters, putting pressure on loan processors, which would

19    have been of course arguably improper.  But clearly would have

20    been in the course of their business.

21           MR. JONES:  That goes to my prior objection that this

22    question was vague and ambiguous.

23           THE COURT:  That may be.  I'm talking about the

24    hearsay objection, which I think was not well placed.

25           Let me get to the answer.  The answer was:  "I --

D9P3BAN2                        Thomas - direct

1   specifically know, I remember getting, you know, having

2   conversations of concerns with various people, but not specific

3   conversations."

4          And I think an objection could have been raised to

5   anything after the first three words as being non-responsive.

6   But that's not the objection you raised.  You raise confusing,

7   ambiguous, vague, and you raise hearsay.

8          Then there was a question really directly responsive

9   to your -- confusing, ambiguous and vague is a objection to

10  form.  And so anyway, the next question was in an attempt to

11  clarify what you say was vague.  "Question:  Okay.  Concerns

12  about what?"  And Mr. Cohen.  Who is Mr. Cohen?  Is Mr. Cohen

13  here?

14          MR. COHEN:  Yes, sir.

15          THE COURT:  You objected to the form.  On what

16  possible ground did you object to the form?

17          MR. COHEN:  As it being vague and ambiguous.  As to

18  what concern --

19          THE COURT:  In other words, when the witness says

20  "Concerns were raised with me," and a question is put,

21  "Concerns about what," in an attempt to clarify, you object to

22  the question, not the answer, you object to the question on the

23  grounds of form, that the question is ambiguous?  Give me a

24  break.

25          All right.  On to the next page.  Page 21.

D9P3BAN2                         Thomas - direct

1    "A.   Just about the process itself.

2    "Q.   What process?

3    "A.   The process of at that time, if I remember correctly, it

4    was that the processors were, you know, basically had, had the

5    authority to, to, to put, to clear loans and clear conditions

6    on loans that we prior within Full Spectrum had not had in our

7    environment."

8            I think this one would have been objected to on

9    grounds of vague and confusing, but the objections that were

10   raised were lack of personal knowledge, calls for speculation.

11           Lack of personal knowledge I'll get to in a minute

12   because I think that may be well placed.  In what respect does

13   it call for speculation?

14           MR. JONES:  From his prior answer the witness didn't

15   recall the specifics about the conversations, and so what the

16   concerns would be.  So, here he's being asked to speculate what

17   the concerns about the process --

18           THE COURT:  No, I don't think that's fair.  He was

19   asked originally did you receive any kind of complaints.  He

20   said specifically no.  But he said I had conversations about

21   concerns.  Then the question was what concerns.  And the answer

22   was just about the process itself.  And then the question was

23   what process.  And the answer was this one we're dealing with

24   now.  So I don't see how it calls for speculation at all.

25           But lack of personal knowledge, what about that,

D9P3BAN2                        Thomas - direct

1    Ms. Nawaday?

2             MS. NAWADAY:  Mr. Price had direct personal knowledge

3    as to two separate processes in the relevant timeframe he was

4    questioned about at his deposition.  The first was the new

5    customer acquisition process which involved loans that were

6    routed through the center that he managed.  And the NCA process

7    was later merged into the High-Speed Swim Lane.  So I was

8    attempting to explore whether he was referring to -- because

9    one process merged into the other, whether he might be

10   referring to the NCA process or the High-Speed Swim Lane

11   process, both of which he had involvement with.

12            THE COURT:  All right.  I'll think about that.  The

13   next question was:

14   "Q.  And when did that process begin?"  And the objections were

15   lack of personal knowledge.  We in effect have talked about

16   that.  Calls for speculation, I don't really see that, if he

17   had personal knowledge.  If he didn't, of course it might.

18   Confusing, ambiguous and vague.

19            How was it confusing ambiguous and vague?  He

20   describes the process, and the question is when did that

21   process begin?  What is confusing about that?

22            MR. JONES:  Which process, your Honor?

23            THE COURT:  The process he just described in the last

24   answer.

25            MR. JONES:  Ms. Nawaday just explained he had

 1    knowledge regarding two processes.

 2              THE COURT:  Excuse me?

 3              MR. JONES:  Ms. Nawaday just explained --

 4              THE COURT:  No, but in his answer.  She asked him what

 5    process in line two.  He then says, he then describes a

 6    particular process to clear loans and clear conditions on

 7    loans, etc.  And it is that process that is being referred to.

 8    And the question, very simple question, and when did that

 9    process begin.  And you think that's confusing, ambiguous and

10    vague.  I don't see that.

11              Mr. Jones, you objected to that on grounds of form on

12    what possible basis?

13              MR. JONES:  The objection that the question was --

14              THE COURT:  I'm sorry.  Was that you?

15              MR. JONES:  I had made the objection.

16              THE COURT:  You made that objection.  What was the

17    objection to form?

18              MR. JONES:  The form objection was that the question

19    was ambiguous and vague about which process.

20              THE COURT:  I do not see that at all.  So the answer

21    was "I don't remember exactly."

22              Of course, it is very interesting to me that the

23    government is marking all this stuff, most of which consists of

24    the witness indicating what a lousy memory he has.  But in any

25    case, the next question is "And who do you remember having

D9P3BAN2                          Thomas - direct

1    these conversations with?"  And at the time you objected to the

2    form.

3              What was the nature of the objection to the form?

4              MR. JONES:  It was just that was vague and ambiguous,

5    what conversation was Ms. Nawaday asking about.

6              THE COURT:  I don't see how it is vague or ambiguous.

7    It might have suffered from a grammatical defect in that it

8    should have been "whom" rather than "who," but that's not

9    presumably what you had in mind.  Here, in your objections that

10   you've indicated in the column you say "hearsay."

11             What is the basis for your hearsay objection to that

12   question?

13             MR. JONES:  Well, this question is calling for

14   hearsay.

15             THE COURT:  How is it calling for hearsay?

16             MR. JONES:  It is asking who he was having the

17   conversations with.

18             THE COURT:  It's already been clear that the

19   conversations are with people at Countrywide.

20             I'm not going to continue this, although I assure you

21   that last night I had these endless concerns as I trod my way

22   through misplaced and often completely erroneous objections to

23   largely worthless testimony offered by the government.

24             So here is what I want you all to do.  I will not

25   spend my time on another deposition and objections to it unless

D9P3BAN2                         Thomas - direct

1    you go back, I want the government to limit what they're

2    offering to things that will make sense and advance the ball.

3    And I want the defense to limit its objections to ones that

4    have at least a ballpark chance of being applicable.  And I

5    will look at it only when you've given me new streamlined and

6    hopefully much better deposition transcripts.

7              We'll take a five-minute break and we'll continue with

8    the witness.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9P3BAN2                          Thomas – direct

```
 1              (In open court; jury present).

 2              THE COURT:  All right, counsel.

 3    BY MR. CORDARO:

 4    Q.  Mr. Thomas, I would ask you to turn in your binder to

 5    Exhibit 19, please.

 6    A.  Okay.

 7    Q.  Looking at what's been marked for identification as Exhibit

 8    19.

 9              MR. CORDARO:  Your Honor, I believe this is an exhibit

10    where I believe there have been no objections, but I'll pause

11    for a moment.

12              THE COURT:  All right.

13              MR. SULLIVAN:  That's correct.

14              MR. CORDARO:  I move the admission of Plaintiff's

15    Exhibit 19.

16              THE COURT:  Received.

17              (Plaintiff's Exhibit 19 received in evidence)

18    Q.  Mr. Thomas, do you recognize Plaintiff's Exhibit 19?

19    A.  Yes.

20    Q.  What do you recognize it as?

21    A.  It is the presentation of the prime business model.

22    Q.  What is the date of the presentation?

23    A.  August 2nd, 2007.

24    Q.  Where does that date stand in relation to the Hustle?

25    A.  This would have been in the pilot phase.
```

D9P3BAN2                          Thomas – direct

1   Q.  If I could ask you to turn to page seven.

2              MR. CORDARO:  Ms. Michaud, if you can put page seven

3   on the screen.  Can you just blow up the first half of that

4   page.  The top.

5   Q.  Mr. Thomas, this document says pilot approach targets start

6   week of August 13.  What is that referring to?

7   A.  This would have been the date we actually started putting

8   files through that pilot.

9   Q.  By that pilot, what do you mean?

10  A.  The Hustle pilot.

11  Q.  I would like you to focus on about halfway above that

12  horizontal line in the middle of the page, there is a heading

13  that says pilot guiding principles.  Do you see that?

14  A.  Yes.

15  Q.  There are four bullet points there underneath need to

16  address cultural issues.

17  A.  Correct.

18  Q.  Could you explain if you know what is meant by cultural

19  issues?

20  A.  Sure.  This would be behavioral issues, or, you know,

21  things that the processor or loan specialist may not have been

22  used to.

23  Q.  The first bullet point says get comfortable with exercising

24  authority.

25  A.  Yes.

1   Q.  Do you have an understanding as to what that means?

2   A.  So this was what we were talking about earlier, kind of the

3   fear of making decisions.  So this was saying get the loan

4   specialist comfortable with making those decisions.

5   Q.  What was motivating that fear to make decisions?

6              MR. HEFTER:  Objection.

7              THE COURT:  Sustained.

8   Q.  Could we look at the second bullet point, please.

9   A.  Sure.

10  Q.  It says get comfortable with skipping process steps.

11  A.  Yes.

12  Q.  Do you have an understanding as to what that means?

13  A.  That --

14             MR. HEFTER:  Objection.  Lack of foundation.

15             THE COURT:  No.  Overruled.

16  A.  This would have been things like job aids or checklists.

17  Things that we -- steps that had been eliminated from the

18  process.

19  Q.  The third bullet says suspend revisit QoG.  Do you have an

20  understanding as to what that means?

21  A.  Yes.

22  Q.  What is that understanding?

23  A.  That's -- QoG is that quality of grade score that -- so

24  somebody made a mistake, they would get a lower quality of

25  grade score.  This was saying suspend that, so that doesn't

D9P3BAN2                          Thomas - direct

1    impact their compensation.

2    Q.  What about the final bullet point, keep pull relative to

3    compensation?

4    A.  Meaning don't impact the compensation.

5    Q.  Whose compensation?

6    A.  The loan specialist.

7    Q.  If we blow up the second half the page.  There is another

8    reference there to the pilot.  Which pilot is being referenced

9    here?

10   A.  The Hustle pilot.

11   Q.  Could we look at the final paragraph where it says this

12   project has broad scope and impact and an aggressive timeline.

13           Do you have an understanding of what was meant by

14   aggressive timeline?

15   A.  Yes.

16   Q.  What was meant?

17   A.  I remember an e-mail from Greg Lumsden, who was the CEO of

18   Full Spectrum, basically saying we need to roll something out

19   fast, and I believe it was like five days was quoted in the

20   e-mail.

21   Q.  It goes on to say the rate and magnitude of change here is

22   drastic and beyond most people's comfort range.

23   A.  Yes.

24   Q.  Do you have an understanding of what that means?

25   A.  This was a significant process change.  So, normally you

D9P3BAN2                         Thomas - direct

1    would make incremental process changes, and people would be

2    comfortable with those changes and could absorb those changes.

3    This was a big change.

4    Q.  Why was it a big change?

5    A.  It was, you know, a whole new role for the loan specialist.

6    They had significantly different job duties.  There was -- the

7    controls were removed, some process steps were removed.  This

8    was a big change.  And I think the comment about beyond most

9    people's comfort level, I think, you know, people are

10   uncomfortable with that much change.  Especially when you

11   haven't -- analyzed each -- the impact of each piece of that

12   change.

13   Q.  Mr. Thomas, I would like to turn now to an interaction you

14   had with quality analysis.

15   A.  Yes.

16   Q.  Did the Countrywide -- or withdrawn.

17          Did FSL measure the quality of its loans?

18   A.  Yes, both Full Spectrum measured quality of loan,

19   corporate -- the corporate quality control of Countrywide

20   measured the quality of the loans as well.

21   Q.  What how did Full Spectrum Lending measure quality?

22   A.  A couple of ways.  We had a process called quality

23   assurance that was as the process -- as the file moved through

24   the process, we could analyze certain parts of the process or

25   certain parts of the file along the way.  So we called it in

D9P3BAN2                          Thomas - direct

1   line QA, quality assurance.  We had -- the files were

2   electronic and they're all imaged, so you could do that even as

3   the file moved through the process.

4   Q.  While you were working at FSL, did you have any familiarity

5   with the QA process?

6   A.  Yes.

7   Q.  How did you obtain that familiarity?

8   A.  So one of my employees, Michael Burns, ran the QA process.

9   Q.  One of your employees?

10  A.  Yes, one of my employees.

11  Q.  Mr. Thomas, could you place the quality assurance process

12  in that scheme of loan origination that we talked about from

13  application to funding.  Where does quality assurance fall in

14  that?

15  A.  Sure.  One of the things I don't think I mentioned before,

16  but as the loan moved through the process, we had terms for

17  that kind of progression of the loan.  So application we called

18  phase code zero.  That code is just where it was in the system.

19  That's why we termed it that.  You had application.  Then phase

20  code one was submission to underwriting.  Phase code two was an

21  approval by underwriting originally.  Phase code three was

22  cleared to close.  And phase code four was fund.

23      Typically, you could do QA at different spots, but

24  typically phase code three was a spot that a lot of the QA

25  audits took place.  Kind of that cleared to close.  You could

D9P3BAN2                              Thomas - direct

1    look at everything, make sure everything was done properly.

2    Q.  Was this generally before or after CLUES?

3    A.  This was after CLUES.

4    Q.  Would this be before or after funding?

5    A.  This is before funding.

6    Q.  When you talk about doing QA, who does QA?

7    A.  We had auditors that would do the quality assurance checks.

8    We had some offshore auditors as well.  So that was beneficial

9    because an underwriter could make a decision in the day, we had

10   resources in India that could look at the files at night.  The

11   process was quick.  We also had auditors onshore as well.

12   Q.  Did FSL perform QA on Hustle loans?

13   A.  Yes.

14   Q.  Who was in charge of the QA process?

15   A.  The in line QA process was Michael Burns.  And I think the

16   quality -- FSL also had a quality assurance and control group

17   that was also involved too.

18   Q.  Did anybody on the operations side have any role in the QA

19   process with respect to Hustle loans?

20   A.  No.  They would be engaged with, if there were issues with

21   those loans.  But they didn't do the audits themselves.

22   Q.  Did anybody in the operations side as a matter of policy

23   set any rules or parameters for QA with respect to Hustle

24   loans?

25   A.  Not that I remember.  There might have been discussions

D9P3BAN2                        Thomas - direct

1    with operations on what -- if a question was valid, let's say

2    you get a lot of issues with the particular part of the

3    process, there may be some back and forth, maybe we should ask

4    that question differently or look at it differently.

5    Q.  As part of QA review of the loan, what kind of findings

6    could be made?

7    A.  So typically, there were individual questions about was --

8    did this happen.  Was this in the file.  So it would either be

9    a yes or no kind of answer.  So it would be a finding or not a

10   finding.

11   Q.  Could you give us some examples of -- I think when you were

12   saying did this happen, did that happen.

13   A.  Right.

14   Q.  What's this or that?

15   A.  So was the income worksheet complete and in the file.  That

16   would have been a check.  So the auditor would look to make

17   sure that worksheet was in the file.

18   Q.  Why would it be important for that worksheet to be in the

19   file?

20   A.  That's evidence that the loan specialist went through the

21   income calculation.

22   Q.  Would it be important for that piece of documentation to be

23   in the file before it closed and funded?

24   A.  Oh yeah, absolutely.

25   Q.  Why?

D9P3BAN2                        Thomas – direct

1   A.  Because that's how you determine income.  That's one of the

2   key factors in determining the risk of the loan.  So, that

3   would have been critical.

4   Q.  Could you give us another example.

5   A.  The appraisal assessment worksheet.  Whether that was

6   complete in the file.

7   Q.  Why would that be important?

8   A.  There you are assessing the quality or the risk of the

9   property itself.  So it is important that that's completed.

10  Q.  Would that have to be completed before funding?

11  A.  Oh, yes.

12  Q.  Any other examples?

13  A.  There were -- my recollection is there are probably like 30

14  questions in the QA audit.  I can't remember all the specifics.

15  Q.  Would it have been important to resolve all these questions

16  before the loan funded?

17  A.  Yes.

18          MR. HEFTER:  Objection, your Honor.  Leading.

19          THE COURT:  Overruled.

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

D9PTBAN3                         Thomas – direct

1   BY MR. CORDARO:

2   Q.  The folks who were performing the QA, how would they record

3   what they found?  Were there numbers?  Were there grades?  How

4   did they do that?

5   A.  Each question was basically an access database, if I

6   remember correctly, and the auditors would go through and

7   answer each question.  And then those results would be compiled

8   into various reports.  We would look at how many total issues

9   there were, how many files we reviewed, what were the top

10  issues we would see, and the goal being to either correct the

11  issues and maybe look what the process breakdown was.

12  Q.  Who prepared those reports?

13  A.  Michael Bernstein, and I think the quality assurance

14  control group also did some reports on that.

15  Q.  Were the reports distributed to anyone?

16  A.  They were distributed to our management, so Ed O'Donnell,

17  operations management, so Rebecca.  I'm sure we presented it to

18  Greg as well.  So we had regular kind of reporting

19  distributions to executives, but especially around the

20  operations side because we were trying to assess the quality of

21  the operations.

22  Q.  So what would happen if the loan came back with quality

23  assurance findings?

24  A.  So first we would correct that loan.  That was one of the

25  reasons for auditing it before funding so we could correct that

1    individual loan.  The other thing that we tried to do was look

2    at themes, or if one issue just continued to happen, then is

3    our procedure -- are our procedures correct, are our people not

4    following the procedures for some reason.  So you try to

5    correct the process.

6    Q.  Mr. Thomas, were you aware of any standard within

7    Countrywide or FSL with respect to what would be appropriate

8    for a QA rate with respect to loans?

9    A.  I don't remember any standard for QA.  QA was kind of an

10   internal thing.  We might have expectations for what we thought

11   it might should be, but there was nothing requiring us to be at

12   a certain level.

13   Q.  Did you have expectations?

14   A.  I did.  Typically I would see that about half of the

15   findings you could kind of argue away with just normal

16   processing, either the auditor messed up or maybe the document

17   was there but just in a different part of the file, that kind

18   of thing.  I remember wanting to have somewhere around a ten

19   percent level of findings so that if you could argue half of

20   them away you're kind of in a five percent range.

21   Q.  Mr. Thomas, I'm going to ask you to turn to Exhibit 58.

22   A.  OK.

23   Q.  Now Mr. Thomas, Plaintiff's Exhibit 58 for identification,

24   without getting into the substance, could you just tell me what

25   these documents are?

D9PTBAN3                    Thomas - direct

1   A.   So this is a series of emails between -- it starts off with

2   an email from quality assurance control group, and then looks

3   like I forwarded to Biren Desai with some comments.

4   Q.   So let's talk about who the senders are.  Who is Don

5   Harris?

6   A.   Don Harris worked in the quality assurance control group.

7   He reported to Javier Jaraba who reported to Steve Brent.

8   Q.   Are those FSL employees?

9   A.   Yes, those are FSL.

10  Q.   And who is Biren Desai?

11  A.   Biren Desai was kind of a project manager on the sales side

12  of the organization, so he worked for Jim Key.

13  Q.   Did Mr. Harris have any role with respect to High-Speed

14  Swim Lane loans?

15  A.   Yes, he would review loans.

16  Q.   And what about Mr. Desai?

17  A.   From -- he was, from a sales perspective, so he didn't deal

18  with the operations side of things, but he was interested in

19  how it was going and things like that.

20  Q.   Were all of these emails sent from Countrywide work

21  accounts?

22  A.   Yes.

23          MR. CORDARO:  Your Honor, I move the admission of

24  Plaintiff's Exhibit 58.

25          MR. SULLIVAN:  No objection.

1           MR. HEFTER:  No objection.

2           THE COURT:  Received.

3           (Plaintiff's Exhibit 58 received in evidence).

4    BY MR. CORDARO:

5    Q.  Mr. Thomas, if you could turn to -- it will be the third

6    page of the exhibit, and the page number ends with 900 in the

7    lower right-hand corner.  Do you see that?

8    A.  Yes, I do.

9    Q.  This is an email from Don Harris, is that correct?

10   A.  Correct.

11   Q.  And it was sent on September 16, 2007, is that correct?

12   A.  I think it's a summary through September 16, 2007.

13   Q.  You're correct, I'm looking at the wrong page.

14   A.  Looks like the email was October 4, 2007.

15   Q.  Thank you.  And could you place that date within the

16   High-Speed Swim Lane?

17   A.  October would have been or the full roll out.

18   Q.  Now in the first paragraph of the email on page 900

19   Mr. Harris makes a reference to a phase code three QA review.

20   Which loans were subject to this QA review?

21   A.  We did QA on all loans, and this is specifically for Hustle

22   loans.

23   Q.  And how many Hustle loans were reviewed?

24   A.  60.

25   Q.  And if you go down to the third paragraph, the one with the

D9PTBAN3                         Thomas - direct

1    numbers in it?

2    A.  Yes.

3    Q.  It says one loan was deemed to be no risk, is that correct?

4    A.  Correct.

5    Q.  59 loans were deemed to be high risk, is that correct?

6    A.  Yes.

7              MR. HEFTER:  Objection, your Honor.

8              THE COURT:  Ground?

9              MR. HEFTER:  Foundation.

10             THE COURT:  Lay a foundation.

11   BY MR. CORDARO:

12   Q.  Mr. Thomas, do you have any familiarity with this

13   particular QA review?

14   A.  Yes.

15   Q.  And how are you familiar with it?

16   A.  Again, Michael Burns reported to me, so he would have done

17   the initial review.  And then Don Harris' team, looks like they

18   did a review of those loans of those audits.

19   Q.  And are you copied on this email from Don Harris?

20   A.  I am.

21   Q.  And was it part of your job at FSL to be made aware of

22   analyses such as quality assurance?

23   A.  Yes.

24   Q.  Now can you explain briefly how these numbers -- without

25   getting into the numbers themselves, how did these numbers come

1   into existence?  Who generated them?

2   A.  So the QA team that reported to me, Michael Burns who

3   reported to me did the audits, and then Don Harris and his

4   team, Jane Myers I believe was the one, did a review of those

5   audits to make sure that they were correct.

6   Q.  And this email indicates 59 loans are deemed high risk?

7   A.  Yes.

8               MR. HEFTER:  Objection, your Honor, foundation.

9               THE COURT:  Overruled.

10  Q.  Do you have an understanding as to what is meant by high

11  risk in the quality assurance context?

12  A.  So my recollection is that maybe certain questions could

13  have been deemed more risk than others.  I remember findings

14  and no findings, because I usually just looked at all the

15  questions.  But basically high risk would have meant more risk

16  than limited risk.

17  Q.  And there's of a percentage next to this, next to high risk

18  98.33 percent.  Do you know what stands for?

19  A.  That meant that 98 percent of the loans reviewed were

20  deemed high risk.

21  Q.  Now in the next paragraph there's a reference to Chandler

22  and Richardson.  Do you see that?

23  A.  Yes.

24  Q.  Could you explain to the jury what Chandler and Richardson

25  is, the significance of those two?

D9PTBAN3                    Thomas - direct

1   A.  Those were two of the locations where we had central

2   fulfillment operations that employed the Hustle.  The other

3   ones were -- we had Chandler, Richardson, Hatboro, Pennsylvania

4   and Rosedale, California.

5   Q.  Would have you considered 98.33 percent a high amount of

6   loans with high risk findings?

7   A.  Yes.

8   Q.  Now let's take a look at your email on page 899, so let's

9   go one page back.  You sent this email on October 4, 2007?

10  A.  Yes.

11  Q.  Was this the same day as the email -- that Don Harris

12  email?

13  A.  Yes.

14          MR. CORDARO:  Could we blow up the text of the two

15  paragraphs of that email.

16  Q.  The first paragraph says:  Remember that little quality

17  concern about the new process?  Doesn't look like we've solved

18  it yet.

19          What did you mean by that?

20  A.  So I was talking to Biren saying that this is -- remember

21  that quality concern, do you remember the issues that we

22  thought we were going to see with the Hustle process, doesn't

23  look like we fixed it yet.  This would have been after the full

24  roll out, so we hadn't fixed it yet.

25  Q.  How long after the full roll out?

D9PTBAN3                          Thomas - direct

1   A.   I can't remember the exact date of the roll out, but it
2   would have been about a month or so.
3   Q.   Now you say in second paragraph:  Let's see if they can
4   take it down.  You say "done," did you mean "down?"
5   A.   Yes.
6   Q.   From 98 percent to 5 percent?
7   A.   Yes.
8   Q.   Did you suggest five percent?
9   A.   That was the number that I thought would be acceptable.
10  Q.   Could we turn backwards to the page ending 898.
11  A.   Sure.
12        MR. CORDARO:   Could we just blow up Mr. Desai's email
13  on the bottom of the page.
14  Q.   When did Mr. Desai send this email?
15  A.   He sent it the same day, October 4th, 2007.
16  Q.   What is he asking you for there?  It seems like there's a
17  word missing.  What is the, blank, for normal process?  Do you
18  have an understanding what he was asking you for there?
19  A.   He was asking what should it be normally, what should that
20  level of high risk be normally.
21  Q.   What is meant by "normally?"
22  A.   In the old process.
23  Q.   The old process.  In other words, not the High-Speed Swim
24  Lane?
25  A.   Correct.

D9PTBAN3                          Thomas – direct

1    Q.  Could we go to the top of the page to your answer?

2    A.  Yes.

3    Q.  You say:  I think it should be less than ten percent.

4    A.  Correct.

5    Q.  And then you say:  I think a lot will be rebutted away, but

6    we'll see.

7            Could you explain what you mean by that?

8    A.  Sure.  When you get to the initial audits, there's always

9    back and forth with whoever had processed the loan or made the

10   decision was this really an issue.  So there were always some

11   rebuttals and some downgrading of findings or oh, yeah, that

12   document is in the file somewhere else.  Specifically for this

13   audit there was a mention by Don in the original email that the

14   fraud detector screens being required at phase code three

15   wasn't consistent with our standard operating procedure.  So

16   technically those screens could have been done after phase code

17   three, so that is the ones I was referring to Biren saying I

18   think some of those will get rebutted away.

19   Q.  If you look down to the bottom of page 900, how many of the

20   loans of the 60 had that fraud detector issue?

21   A.  53 of the 60 loans.

22   Q.  Could a loan have more than one high risk finding

23   associated with it?

24   A.  Absolutely, yeah.

25   Q.  So let's just say take away those 53, are there still high

D9PTBAN3                        Thomas - direct

1   risk findings on the bottom of the page that you're left with?

2   A.  Yes.

3   Q.  And would those be the findings that are eleven of them,

4   income worksheet is incomplete?

5   A.  Correct.

6   Q.  And then I'm not going to read them all, but further down

7   the page?

8   A.  Yes.  Those would have been the ones that I was most

9   concerned about.

10  Q.  Mr. Thomas, notwithstanding any rebuttal, did that 98.33

11  number concern you?

12  A.  Yes.

13  Q.  Why did it concern you?

14  A.  Because again, I think you could rebut some of them away or

15  maybe half of them away, but when you look at all the other

16  issues, there were still a significant percentage that had

17  issues that it was higher than what I would expect.

18  Q.  And these were high risk findings?

19  A.  Yes, that's what it was determined.

20  Q.  And could a loan fund with a high risk finding associated

21  with it?

22  A.  Yeah, I mean these were QA audits, so there was nothing

23  stopping these loans from funding.

24  Q.  And if such a loan were to fund, how would that affect the

25  risk associated with that loan?

1              MR. SULLIVAN:  Objection.

2              THE COURT:  Ground?

3              MR. SULLIVAN:  Hypothetical.  No basis at all to know

4    whether these were improved later by the quality control

5    process or if they were all corrected.

6              THE COURT:  No, I think that goes to

7    cross-examination.  I will allow it the question to be

8    answered.

9    A.  Could you repeat the question?

10   Q.  If the loan funded with high risk funding associated with

11   it, how, if at all, could that affect the quality of the loan

12   or the risk associated with the loan?

13   A.  The risk would be higher.  If the loan is funded with an

14   issue, the risk would be higher.  It just means that something

15   wasn't done correctly on that file.

16   Q.  And if that something that was not done correctly was not

17   corrected, how could that affect the quality of the loan, if at

18   all?

19             MR. SULLIVAN:  Objection.

20             THE COURT:  Same ruling.

21   A.  So if it wasn't corrected, it would affect the quality of

22   the loan.  It could make a loan outside the guidelines for

23   selling to investors.

24             MR. SULLIVAN:  Objection, ask that it be stricken.

25             MR. HEFTER:  Objection.

1          THE COURT:  Overruled.

2     Q.  Mr. Thomas, you -- I think you mentioned quality control as

3     well?

4     A.  Yes.

5     Q.  So could you explain to us what quality control was?

6     A.  Yes, quality control was a different process that was

7     conducted at the corporate level, so the Countrywide level,

8     they would look at loans that were funded and go back and

9     review those loans to determine if they were of acceptable

10    quality or not.

11    Q.  And again, as we did before, at what point in the grand

12    process, from application to funding, when does quality control

13    happen?

14    A.  This is after funding.

15    Q.  After funding?

16    A.  Correct.

17    Q.  And do all loans that get funded get a quality control

18    analysis?

19    A.  No, it's a small percentage.

20    Q.  Why is it a small percentage?

21    A.  It's a lot of loans, so you do a sampling.  There would be

22    a random sample that was kind to intended to be the kind of

23    significant statistical sample, and could you expand that out

24    and say if ten percent has issues, then ten percent of the

25    whole population has issues, then do targeted audits as well on

D9PTBAN3                          Thomas - direct

1    other numbers, but the final number that you usually see is the

2    random sample.

3    Q.  Mr. Thomas, while you were at FSL did you have any occasion

4    to become involved at all with the quality control process?

5    A.  Yes.

6    Q.  And could you explain your involvement to us?

7    A.  Sure.  So I would look at the quality control results from

8    the corporate quality control group and prepare reports to look

9    at different slices of the business and look at the quality of

10   different program types or different divisions different groups

11   within our division, that kind of thing.

12   Q.  You said, Mr. Thomas, that the quality control would be

13   performed after funding.  Could quality control conceivably be

14   performed also not after funding but also after sale of a loan?

15   A.  Yes.

16   Q.  Mr. Thomas, who performed quality control?

17   A.  It was a corporate quality control group at Countrywide

18   quality control.

19   Q.  Was that a group within FSL?

20   A.  No, it was above FSL.

21   Q.  Who was in charge of that group, if you know?

22   A.  I don't know, I can't remember.

23   Q.  Now were you familiar with the quality control analyses and

24   findings of quality control group?

25   A.  Yes.

1    Q.  Could you explain to the jury what those findings were, the

2    grades and numbers?

3    A.  Sure.  So the quality control auditor would assign either a

4    rating to the finding, so if they had a finding they would

5    say -- they would call it SUS, which meant severely

6    unsatisfactory, then below that was high risk, and then I think

7    no finding.  I can't remember if there was one in between there

8    as well.

9    Q.  Could we talk about severely unsatisfactory?

10   A.  Yes.

11   Q.  Could you explain to us what severely unsatisfactory means

12   in this context?

13   A.  So severely unsatisfactory basically meant that it was

14   ineligible for sale.

15   Q.   Ineligible to sale for who?

16   A.  To an investor like Fannie Mae, Freddie Mac, or another

17   bank.

18   Q.  Why would a loan have a severely unsatisfactory associated

19   with it?

20   A.  Basically it had a material defect in the loan itself, so

21   whatever was missing in the file may have caused an error that

22   made the loan parameters go outside the guidelines, for

23   example, income wasn't documented correctly, it wasn't the

24   income we said it was, that kind of thing.

25   Q.  And you said a severely unsatisfactory loan was ineligible

1    for sale to an investor, is that correct?

2    A.  Yes.

3    Q.  What do you mean by ineligible?

4    A.  It means that that is not a loan of the quality that could

5    be sold to an investor.

6    Q.  But in fact, the timing of the quality control process is

7    when?

8    A.  It's after funding and sometimes after sale.  So that's

9    what -- you measure that to make sure you had a certain -- a

10   low percentage of issues that were going to be sold.

11   Q.  And when you talk about material defect, would explain

12   that, please?

13   A.  I use those terms interchangeably, so a severely

14   unsatisfactory loan would have had a material defect or where

15   those loans were materially defective.

16   Q.  Were there any reports that memorialized the quality

17   control findings?

18   A.  Sure.  So corporate control had reporting, and I would have

19   had access to all the database and all the findings and all the

20   data from those audits, and I would go through that data and

21   put together reports for my management and Full Spectrum

22   executives.  And I also did a report where I compared Full

23   Spectrum's quality to CMD's, to Wholesale's, and I would send

24   those out to executives in those divisions as well.

25   Q.  Now Mr. Thomas, if you know, during the 2007/2008 time

D9PTBAN3                    Thomas - direct

1    frame, what were some of the most common findings in the QC

2    process?

3    A.   Most commonly findings related to income and appraisal.

4    Those were usually the two that stood out.

5    Q.   And if we could just step back in time a little bit, what

6    were the -- if you know, what were the most common findings in

7    the quality assurance process, the QA process?

8    A.   The same kind of findings.  So it would be finings related

9    to income being done properly in the process or appraisal

10   reviews.

11   Q.   Now was there any -- if you know, was there any

12   relationship between QA numbers and QC numbers either directly

13   or inversely?

14   A.   I would look at trends when I would look at the data.  So I

15   wouldn't try to compare the actual QA number to a QC number,

16   but if I saw QA results, if I saw more issues in QA, I would

17   expect to see more issues in QC just later in time, because I'm

18   doing QA audits in line and then I'm doing QC audits

19   afterwards.

20   Q.   Mr. Thomas, was there any internal expectation at FSL

21   concerning QC and appropriate QC rates?

22              MR. HEFTER:  Objection.

23              MR. SULLIVAN:  Objection.

24              THE COURT:  Sustained.

25   Q.   Mr. Thomas, in your capacity at FSL, did you have to

D9PTBAN3                          Thomas - direct

1   conduct any analysis of QC findings?

2   A.  Yes.

3   Q.  And what was that analysis?

4   A.  I would look at the finding rates, so the percentage of

5   findings, I would look at the percentage findings by different

6   categories and groupings.

7   Q.  And did you have any discussions with anybody at FSL

8   concerning quality control rates?

9   A.  Yes.

10  Q.  Who did you have discussions with?

11  A.  So with those reports I would have discussions with my

12  management, Ed O'Donnell, Cliff Kitashima, I would have

13  discussions with others as well.  I also used those same

14  numbers to put together bonus reports for bonus admin.  So I

15  measure it for impact on bonuses.  Usually we had a QC rating

16  factor in our bonus plans.

17  Q.  And those names that you gave me, are those FSL employees?

18  A.  Yes.

19  Q.  Were they aware of quality control as well?

20  A.  Yes.

21  Q.  And were you ever told by anyone at FSL what the

22  appropriate level of quality control should be?

23  A.  Yes.

24  Q.  Who told you?

25  A.  Cliff Kitashima, Ed O'Donnell.  It was also a goal in the

1    bonus plans, so we had a goal associated with where we should

2    be in quality control.

3    Q.  Who is Cliff Kitashima?

4    A.  The chief credit officer.

5    Q.  And what did he tell you, if anything, about the

6    appropriate level of -- withdrawn.

7         Would Cliff Kitashima in his position be in a position

8    to interact with QC findings?

9    A.  Yes.

10   Q.  And what, if anything, did he tell you about the

11   appropriate level of QC for FSL?

12        MR. HEFTER:  Your Honor, I raise an objection on

13   behalf of Ms. Mairone on that question.

14        THE COURT:  Are you talking about you want a limiting

15   instruction?

16        MR. HEFTER:  Yes, please.

17        THE COURT:  So this evidence will be received as to

18   the bank defendants but not as to Ms. Mairone.

19        Go ahead, counsel.

20   A.  Four percent was the number I remember.

21   Q.  Mr. Thomas, I would like you to turn your attention to

22   Exhibit 129, please.

23   A.  OK.

24   Q.  Do you recognize Exhibit 129?

25   A.  I do.

1   Q.  What do you recognize that as?

2   A.  This is a slide where I put a report that I generated on

3   the -- I called it the QC divisional comparison.  This was the

4   comparison of the quality control rates between the divisions.

5   Q.  Who generated this report?

6   A.  I did.

7   Q.  Why did you generate it?

8   A.  To monitor quality control rates for Full Spectrum and in

9   relation to the other divisions.

10  Q.  And is there a date on the report that indicates when it

11  was generated?

12  A.  April 21st, 2008.

13  Q.  And what time periods does the report refer to?

14  A.  It has results from quarter one through quarter four of

15  2007, as well as quarter one of 2008.

16  Q.  Was it your typical practice to generate reports such as

17  Exhibit 129?

18  A.  Yes.

19  Q.  Was that one of your requirements of your job duties to

20  generate such reports?

21  A.  Yes.

22  Q.  How would Exhibit 129 be kept by Countrywide?

23  A.  I would keep copies of this and it was distributed via

24  email.

25          MR. CORDARO:  Your Honor, at this at this time I move

D9PTBAN3                          Thomas - direct

1    the admission of Exhibit 129.

2              MR. SULLIVAN:  No objection.

3              MR. HEFTER:  Your Honor, this document is a -- appears

4    to be a one-page document out of a --

5              THE COURT:  I'm sorry, it's a one page document out

6    of?

7              MR. HEFTER:  Your Honor, I'll withdraw the objection.

8              THE COURT:  OK.  Received.

9              (Plaintiff's Exhibit 129 received in evidence)

10             THE COURT:  The question I have is whether someone

11   with 20/20 vision can read this in the form that is given to

12   the Court.

13             MR. CORDARO:  Your Honor, hopefully we can blow it up

14   for the Court on your monitor, but I take the Court's point, I

15   guess we'll have to see what the blow up does.

16             THE COURT:  Blowing up a document is, I believe, an

17   act of terrorism.  Do the best you can.

18             MR. CORDARO:  Thank you, your Honor.

19   BY MR. CORDARO:

20   Q.  Why don't we hold this blow up for a second, and

21   Mr. Thomas, do you see on this document there are three white

22   boxes over in that left-hand column?

23   A.  Yes.

24   Q.  And could you just read what those white boxes say?

25   A.  Sure, CMD, WLD and FSL.

D9PTBAN3                           Thomas – direct

1    Q.   And what did those initials stand for?

2    A.   Those were the divisions of Countrywide Home Loan, so

3    Consumer Markets Division are Wholesale Lending Division, and

4    Full Spectrum Lending.

5    Q.   Now could you go to the bullet point on the top of the page

6    it says FSL SUS rate are more than twice CMD or WLD in both

7    completed audits and completed plus initial SUS for Q1 2008.

8    So I'm going to ask you some questions about the words in that

9    sentence.

10            So first of all, FSL SUS rate means what?

11   A.   That is the rate of severely unsatisfactory files that were

12   audited by QC.

13   Q.   And more than twice CMD or WLD means what?

14   A.   So Full Spectrum's rates were twice as high as or more than

15   twice as high as CMD's division or Wholesale Lending Division's

16   are at the same time period.

17   Q.   Were Hustle loans in CMD or WLD?

18   A.   No.

19   Q.   Completed audits, what does that mean?

20   A.   So when QC would do an audit they would give an initial

21   rating first, so they would have their initial ratings and then

22   they would also go through a rebuttal period similar to what we

23   did in quality assurance.

24   Q.   And could you just describe that rebuttal period?

25   A.   So basically once we got a list of what the initial rating

1    was, a corporate QC would engage, in this case, the loan

2    specialist that had the issue, and management, and go back and

3    forth to determine if you could -- either the issue was valid

4    or it was not valid.

5    Q.  And it then later says completed plus initial SUS.  Could

6    you explain to us what that means?

7    A.  Sure.  So we looked at -- I would generate this report I

8    think on every two weeks.  So it was a live look at the audits

9    that were being done.  So I measured both what was completed,

10   so what was ultimately decided on as the rate, also I would

11   look at ones that were still in progress of that rebuttal

12   period, then some audits that may have not yet had an initial

13   rating yet.  So I kind of looked at it all the way through the

14   process, so you're getting the results much later in time, so

15   you want as much information as you can get.

16   Q.  And what does Q1 2002 mean?

17   A.  Quarter one, so January through March 2008.

18   Q.  Was that during the High-Speed Swim Lane period?

19   A.  Yes.

20       MR. CORDARO:  Now Ms. Michaud, I don't know if you can

21   do this, but I will ask it in way, is it possible to blow up

22   the blow up and just highlight the FSL portion of it?

23   Q.  Now there's a -- on the left-hand column there, there are

24   several names.  And without going through them all, could you

25   just explain to us generally what those words stand for?

D9PTBAN3                          Thomas – direct

1   A.   Sure.  So those are different groupings of loans, so

2   different product types or different categories of loans.

3   Q.   And were any of those loans eligible for High-Speed Swim

4   Lane?

5   A.   Yes.

6   Q.   Which ones?

7   A.   Expanded approval, which there is EA, and conforming.

8   Q.   Were any of those loans eligible for sale to Fannie Mae or

9   Freddie Mac?

10  A.   Both of those categories were eligible for sale.

11  Q.   Any of those other categories eligible, to your knowledge?

12  A.   I don't know for sure about second liens, some of those may

13  have been eligible for sale, but non-conforming meant it was

14  outside of the guidelines to be sold to Fannie and Freddie.

15  Q.   Let's focus on EA and conforming then.

16  A.   OK.

17  Q.   If you look over at the second quarter of 2007, we have

18  percentage SUS 5.9 percent, 4.9 percent.  Do you see that?

19  A.   Yes.

20  Q.   Would you explain that numbers mean?

21  A.   For the EA or expanded approval program, the loans that

22  were funded in the second quarter of 2007, there was

23  5.9 percent SUS rate.

24  Q.   And again, was this a review of all of the loans?

25  A.   No, you -- if you look just to the left of the 5.9 percent,

1    there were 17 loans audited and one had a finding.

2    Q.  Now if we look to the -- let's go to the right in the

3    document and look on the same rows to 2008, quarter one, all

4    the way over on the right, completed SUS only.

5    A.  OK.

6    Q.  And what does that mean, completed SUS only?

7    A.  That means the rebuttal process was completed and this was

8    the ones that had a final rating.

9    Q.  And if we move to the left, completed plus initial SUS,

10   what does that mean?

11   A.  That included those that are in the completed, plus ones

12   that had an initial rating but had not been finalized.

13   Q.  In other words, ones that might be rebutted?

14   A.  Correct.

15   Q.  Now could you give me the EA and conforming SUS rates for

16   completed plus initial in the first quarter of 2008?

17   A.  So completed plus initial for quarter one 2008, expanded

18   approval had a 27.8, I believe, error rate and conforming

19   31.8 percent error rate.

20   Q.  And these are severely unsatisfactory, right?

21   A.  Yes.

22   Q.  And then could you read over to the completed severely

23   unsatisfactory rate for that quarter?

24   A.  Sure.  So for completed, we had 20 percent error rate for

25   expanded approval and 5 percent for conforming.

1   Q.  You're calling it an error rate.  What do you mean by that

2   in this context?

3   A.  Sorry, an SUS rate.

4   Q.  Now Mr. Thomas, are these statistics here frozen in time or

5   do they evolved as time goes by?

6   A.  They evolved.

7   Q.  And as far as EA and conforming goes, is there any way from

8   this particular document to isolate only Hustle loans?

9   A.  No, this is all loans.

10  Q.  And this is -- we're concentrating on FSL?

11  A.  Yes, only FSL.

12  Q.  And I'm sorry, where do these numbers fall in relationship

13  to that baseline rate that you were talking about before?

14  A.  They are much higher.

15  Q.  Now could we go to Exhibit 296.

16  A.  OK.

17  Q.  Do you recognize this document?

18  A.  I do.

19  Q.  And what do you recognize it as?

20  A.  This is a bi-weekly review quality.

21  Q.  Who generated this document?

22  A.  I did.  It says Ed O'Donnell on the title, but I usually

23  built the presentations for both Ed and Cliff.

24  Q.  Does this document -- sorry, could you turn to the second

25  page of the document, please.

1    A.  Yes.

2    Q.  Does it have a date on it?

3    A.  The date of the report has a corporate QC report on

4    May 20th, 2008.

5    Q.  And again, was it part of your job duties to generate

6    Exhibit 296?

7    A.  Yes.

8    Q.  And was this particular exhibit stored in the ordinary

9    course of business at Countrywide?

10   A.  Yes.

11          MR. CORDARO:  Your Honor, I move into admission

12   Exhibit 296.

13          MR. SULLIVAN:  No objection.

14          THE COURT:  And?

15          MR. HEFTER:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 296 received in evidence)

18   Q.  Could we look at FSL again, please?

19   A.  Yes.

20   Q.  Page 2 of the exhibit.  Could we look at EA conforming the

21   percentage SUS?

22   A.  Yes.  For EA quarter one 2008, completed SUS only was

23   6.6 percent.  Completed plus initial for quarter one 2008 for

24   EA was 25.9 percent -- sorry, I read the unit percentage for EA

25   on the first number.  So 15.6 percent was the SUS rate for EA

D9PTBAN3                    Thomas - direct

1  in quarter one 2008 for completed only, and 25.9 percent for

2  completed plus initial.

3  Q.  Mr. Thomas, were these divisional comparisons distributed

4  within FSL?

5  A.  Yes.

6  Q.  And were they distributed -- to whom were they distributed

7  at FSL?

8  A.  They were distributed to executives Rebecca, Ed, Cliff,

9  Greg, Wade Comeaux, managers.  It started as kind of a small

10  distribution and it grew.  I would also send it to different

11  executives at CMD or Wholesale.

12  Q.  And did there come any time when the distribution of this

13  report changed?

14  A.  Yes.

15  Q.  Could you explain the circumstances of that change?  How

16  did you become aware of that change?

17  A.  I can't remember the specific -- how I got the direction,

18  whether it was a response to one of the emails or verbal, but I

19  was told to not send this report out any longer.

20  Q.  And did you take any action in response to that?

21  A.  I did.  I stopped the distribution.  I remember, because a

22  Wholesale Lending Division executive, somebody I knew from Full

23  Spectrum, asked for me to continue the report.

24  Q.  Who was that?

25  A.  Steven Riley.

D9PTBAN3                         Thomas - direct

1  Q.  And Mr. Riley was in the wholesale division?

2  A.  He was at the time.  And their numbers looked good, so he

3  wanted to continue watching and monitoring the numbers.

4  Q.  Mr. Thomas, during your employment at FSL, did you become

5  aware of something called the sprint incentive?

6  A.  Yes.

7  Q.  Could you explain what the sprint incentive was?

8  A.  Sure, for quarter one 2008 we had a large number of audits,

9  and you could see in the report we had a significant larger

10  number of audits than we did in the past, and our initial

11  ratings were high.  So incentive was designed for the quality

12  assurance and control group folks that were helping rebut those

13  initial SUS findings to get through that volume and overturn as

14  many initial SUS findings as possible.

15  Q.  And could you just explain the process of rebutting SUS

16  findings?  What do you mean by that?

17  A.  So the corporate QC would have their initial rating and if

18  document wide they were rated severely unsat, the person

19  responsible may be able to provide some context for that or

20  show something that would contradict what the auditor found,

21  and the FSL's quality and assurance control person would be

22  kind of that liaison between the two groups trying to determine

23  what the final rating should be.

24  Q.  And did you express any opinion on the sprint incentive at

25  FSL?

1   A.  I was supportive of the sprint incentive at the time.  I

2   designed the metrics around it.  I had to measure it, so I

3   designed the metrics.

4   Q.  And what was the sprint incentive designed to do?

5   A.  It was designed to get through the volume of audits and

6   overturn as many as possible to get down to our goal of four

7   percent.

8   Q.  And what do you mean by overturn as many as possible?

9   A.  So to basically take -- bring down the initial SUS rating

10  down to final SUS rating of below four percent.

11  Q.  And could you turn to -- could you turn back to Exhibit 96,

12  please.

13  A.  Yes.

14  Q.  Could you turn to the last page.

15  A.  OK.

16  Q.  Do you recognize this chart?

17  A.  Yes.

18  Q.  And could you explain what this page shows and what this

19  chart indicates?

20  A.  Yes.  So this is the original proposal for the sprint

21  incentive, and it shows -- on the left-hand side the chart

22  shows what the final estimated SUS rate would be, and then the

23  right-hand side shows how many initial SUSs would have to be

24  overturned to get to that rating.

25  Q.  When you say initial SUSs, what does that mean?

D9PTBAN3                       Thomas - direct

1    A.   The files that had been initially graded as severely

2    unsatisfactory by corporate QC.

3    Q.   Was this chart distributed to anybody?

4    A.   Yes.

5    Q.   To whom was it distributed?

6    A.   Well, in this deck it was part of our quality review, and

7    it was also distributed to bonus administration.  I explained

8    to bonus administration how the levels worked.  And I believe

9    ultimately it was distributed to the FSL quality control and

10   quality assurance and control employees that were part of the

11   incentive.

12              THE COURT:  Counsel, find a spot in the next few

13   minutes so we can break for lunch.

14              MR. CORDARO:  Thank you, your Honor.

15              Actually, your Honor, I think we could probably break

16   now.

17              THE COURT:  All right.  So ladies and gentlemen, we'll

18   take our lunch break now, and we'll resume at 2 o'clock.

19              (Jury not present)

20              THE COURT:  How much more do you have on direct?

21              MR. CORDARO:  I think maybe another half hour to an

22   hour, your Honor.

23              THE COURT:  Well, then --

24              MR. CORDARO:  Half hour.

25              THE COURT:  Half hour sounds better to me than an

1    hour.

2             Anything that counsel need to bring to the Court?

3             Very good, we'll see you at 2 o'clock.

4             (Luncheon recess taken)

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2                        2:10 p.m.

3           (In open court; jury present)

4           MR. CORDARO:  May I proceed, your Honor?

5           THE COURT:  Yes.

6   BY MR. CORDARO:

7   Q.  Good afternoon, Mr. Thomas.

8   A.  Good afternoon.

9   Q.  Could we turn back to the last page of Exhibit 296, please.

10  A.  Sure.  Okay.

11  Q.  Mr. Thomas, was the Sprint incentive designed to provide

12  compensation incentive for volume of processing?

13  A.  It was based on what SUS rating could get to, so it was

14  overturns.  It was based on how many initial SUS findings we

15  could overturn.

16  Q.  Is that strictly a volume-based compensation?

17  A.  No, it would be actual results based on the final result.

18  Q.  At the time did you have any concern with the results-based

19  compensation?

20  A.  I didn't have any concerns at the time.  I didn't -- the QC

21  employees that we had doing these rebuttals were kind of

22  trusted employees in that risk area.  So I didn't -- I mean,

23  hindsight is 20/20, but at the time I didn't have any concerns.

24  Q.  Could we go to Exhibit 297, please.

25  A.  Okay.

D9p3ban4                          Thomas - direct

1    Q.   What is Exhibit 297?

2    A.   This is another FSL quality review presentation we put

3    together.

4    Q.   What is the date of this presentation?

5    A.   June 20, 2008.

6    Q.   Could you turn to page two of this presentation, please.

7    A.   Yes.

8    Q.   What is page two?

9    A.   Page two is another one of the divisional comparisons,

10   quality control divisional comparison reports.

11   Q.   What is the date of this comparison report?

12   A.   June 9, 2008.

13   Q.   Did you prepare this report?

14   A.   Yes.

15   Q.   Was this report kept in the ordinary course of business at

16   Countrywide?

17   A.   Yes.

18            MR. CORDARO:  Your Honor, I move for the admission of

19   Exhibit 297.

20            MR. SULLIVAN:  No objection.

21            MR. HEFTER:  No objection.

22            THE COURT:  Received.

23            (Plaintiff's Exhibit 297 received in evidence)

24   Q.   Could you turn to page two, please.

25   A.   Yes.

1              MR. CORDARO:  I think we have a technology glitch,

2     your Honor.  But I'll continue questioning.

3     Q.  Mr. Thomas, what does page two represent?

4     A.  Page two is the quality control divisional comparison

5     report.

6     Q.  Does it contain quality control divisional comparison for

7     FSL?

8     A.  It does.

9     Q.  Does it contain any quality control rate for EA loans?

10    A.  It does.

11    Q.  Does it contain a quality control rate for conforming

12    loans?

13    A.  It does.

14    Q.  Is there a SUS percentage for the first quarter of 2008?

15    A.  Yes.  So for expanded approval loans, Quarter 1 2008

16    completed.  SUS only was 16 percent.  Completed plus initial

17    for EA was 18.2 percent.  For conforming loans, the completed

18    SUS rate for Quarter 1 was 8.2 percent, and completed plus

19    initial was 9.5 percent.

20    Q.  In the middle of the page there is a line that says

21    completed plus initial SUS worst case scenario down to

22    10.3 percent.

23    A.  Correct.

24    Q.  Do you have an understanding of what that means?

25    A.  Yes.  So the completed plus initial rating would always be

D9p3ban4                          Thomas - direct

1    the worst case scenario.  So it is the ones you agreed upon.

2    So the completed SUS plus any initial findings.  So if you

3    couldn't overturn anymore, that would be the worst case

4    scenario.

5    Q.  Could we just turn back to the last page of Exhibit 296 for

6    a second.

7    A.  Sure.

8    Q.  On the first line of the chart, it says less or equal to

9    4 percent, 460.  Do you see that?

10   A.  Yes.

11   Q.  Since we don't have the visual up, unfortunately, could you

12   explain to the jury what that means again?

13   A.  Sure.

14   Q.  Hold on one second.  I think we may now have it resolved,

15   hopefully.  Yes, we do.  We did.  If you can put it up.

16            MR. CORDARO:  I'm sorry, your Honor.

17   Q.  So it would be the last page of Exhibit 296.  Very good.

18   What does that 4 percent number represent in the first line?

19   A.   So that was the goal that we wanted to have to be -- that

20   was kind of a requirement for Fannie and Freddie to be below

21   4 percent.

22   Q.  Could we just talk for a moment about EA loans.  We've

23   thrown that term around a couple of times.  What is an EA loan?

24   A.  So EA or expanded approval was a special product that

25   Fannie Mae offered.  It was kind of in between prime and

 1   subprime.  So they had expanded approval, expanded just means
 2   it is beyond the normal approval, their normal conforming
 3   guidelines.  So, they had expanded approval, expanded approval
 4   one, two and three I think.  But it is a special program that
 5   was sold only to Fannie Mae.
 6   Q.  What is a stated income loan?
 7   A.  A stated income loan is a loan where you simply ask the
 8   borrower what their income is, and they tell you, and you don't
 9   do any verification of that.
10   Q.  Does a stated income loan, to your knowledge, pose any
11   special risks that might not be present in the loan when a
12   borrower has stated it with verification of their income?
13   A.  Yes.  Sometimes it was nicknamed a liar's loan.
14   Q.  When the Hustle first started, what kinds of loans were in
15   the High-Speed Swim Lane?
16   A.  When the pilot?
17   Q.  Yes.
18   A.  The pilot it was prime CLUES accepts.
19   Q.  Later on, did any other kinds of loans get into the
20   High-Speed Swim Lane?
21   A.  Yes.  EA loans and stated income loans were included.
22   Q.  Mr. Thomas, I think you mentioned before a couple of cities
23   throughout the country, and I want to talk about those.
24   A.  Okay.
25   Q.  There were four states.  So, could you explain to me as a

1    geographical matter how did the High-Speed Swim Lane work in

2    terms of geography.  Was it associated with any particular

3    cities or towns?

4    A.   Sure.  So the central fulfillment centers that employed the

5    Hustle process were located in Rosemead, California; Chandler,

6    Arizona; Richardson, Texas; and Hatboro, Pennsylvania.

7    Q.   What happened at these central fulfillment centers?

8    A.   That's where the central fulfillment teams were located

9    that would do the processing and the funding of those loans.

10   Q.   When you say those loans, are you referring to High-Speed

11   Swim Lane loans?

12   A.   Yes, correct.

13   Q.   To your knowledge, did the processing and funding of

14   High-Speed Swim Lane loans take place in any other centers

15   besides those four?

16   A.   Those are the four that I recall.  I don't think anywhere

17   else.

18   Q.   Mr. Thomas, I'd like to refer you to Exhibit 10, please, in

19   your binder.

20   A.   Okay.

21   Q.   Mr. Thomas, who is Peter Tinaglia?

22   A.   Peter Tinaglia was on the process design team.  Especially

23   during the pilot phase.

24   Q.   Actually Mr. Thomas, I am going to step back one second.

25   Let me go back to the last subject.

1          Those four cities that you mentioned, Richardson,

2    Chandler, Hatboro, and the other one that I always forget?

3    A.  Rosemead.

4    Q.  Rosemead, yes.  Would there have been data that Countrywide

5    kept associated with loans in those centers?

6    A.  Yes.

7    Q.  Are you aware of whether that data that Countrywide kept

8    associated any particular codes with those centers?

9    A.  They had branch numbers, processing branch numbers.  So

10   everything that was through the system had some kind of

11   numbers.  So there may be multiple branch numbers in one

12   location.  But, yeah.

13   Q.  Now I'm sorry, we'll step back to Exhibit Number 10.  We

14   can pick it up.  Who is Peter Tinaglia?

15   A.  Peter Tinaglia was on the process design team during the

16   Hustle pilot.

17   Q.  Who is Mark Barnett?

18   A.  Mark Barnett was kind of the project manager, the

19   facilitator, design engineer, on the Hustle pilot.  Peter I

20   believe worked for Mark.  I'm not -- I can't remember if he

21   reported directly or not.

22   Q.  Without getting into any of the substance, what is

23   Plaintiff's Exhibit 10?

24   A.  This is an e-mail, the same e-mail I had sent to Anson and

25   Mark that followed up Drew Gissinger's e-mail.  It looks like

1   Anson forwarded it to Peter.

2   Q.  Is the top e-mail from Mr. Tinaglia?

3   A.  Yes.  It is from Mr. Tinaglia to Mark Barnett.

4   Q.  Is it from his Countrywide e-mail account?

5   A.  Yes.

6           MR. CORDARO:  I move for the admission of Plaintiff's

7   Exhibit 10.

8           MR. SULLIVAN:  No objection.

9           MR. HEFTER:  No objection.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 10 received in evidence)

12          MR. CORDARO:  Can we just blow up the top paragraph of

13  the Tinaglia e-mail, please.

14  Q.  Did you ever receive this e-mail?

15  A.  I don't recall receiving this e-mail.

16  Q.  Thank you.  I think we can take that one down.

17          Mr. Thomas, I'd like you to turn to Exhibit Number

18  109.

19  A.  Okay.

20  Q.  Who is Pamela Richards?

21  A.  Pamela Richards worked for me.  She ran the reporting and

22  analytic side of my team.

23  Q.  She was an employee of FSL?

24  A.  Yes.

25  Q.  Without getting into the substance, what is Exhibit 109?

D9p3ban4                          Thomas - direct

1    A.   It looks -- it is an e-mail again generated originally from

2    my response to Drew's e-mail and then forwarded along sometime

3    later with some comments.

4    Q.   These are all from Countrywide e-mail accounts?

5    A.   Yes.

6              MR. CORDARO:  I move for the admission of Exhibit 109.

7              MR. SULLIVAN:  No objection, your Honor.

8              MR. HEFTER:  No objection, your Honor.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 109 received in evidence)

11   Q.   Mr. Thomas, could you turn to the third page of the e-mail.

12   A.   Okay.

13   Q.   Can you blow up "here's my plan of attack" language,

14   please.

15             When did you send this e-mail?

16   A.   I sent this e-mail on March 3, 2008.

17   Q.   You write "Here's my plan of attack.  Oh, wait, this is

18   what we suggested last August."  What are you referring to?

19   A.   So I forwarded the original e-mail from August.  And

20   obviously at this point we had seen some quality issues.  And

21   the question had come up what do we do about it.  So I wrote

22   "Here's my plan of attack.  Oh, wait, that's what we said last

23   August."

24   Q.   Could we go to the first page of the exhibit.

25   A.   Yes.

D9p3ban4                    Thomas - direct

1   Q.  If we blow up the bottom e-mail.  Is that an e-mail you

2   received from Ms. Richards?

3   A.  Yes.

4   Q.  Did you respond to that e-mail from Ms. Richards?

5   A.  I did.

6   Q.  Could we blow up the top e-mail, please.  Your response to

7   Ms. Richards was, "I thought about sending it to more, but at

8   the time I thought it would be too controversial."

9           Did I read that correctly?

10  A.  Yes.

11  Q.  What did you mean by that?

12  A.  So, these concerns that I brought up in the e-mail I had

13  raised at different points in time throughout the preparing to

14  rollout the Hustle.  So, at the time, you know, I thought if I

15  sent it to Anson and Mark specifically, because I felt like

16  they would listen.  So they were, you know, on the process

17  design team.  But they had typically shown some concern for

18  getting things correct.  So, I thought they would listen.

19          I didn't send it to Rebecca or Loren or others because

20  I didn't think that they would listen to those concerns.

21  Because we had raised it a number of times and had been kind of

22  told no.

23          MR. HEFTER:  Your Honor, objection.  We move to strike

24  that last sentence as non-responsive.

25          THE COURT:  Yes.  The jury will disregard the last

D9p3ban4                        Thomas - direct

1    sentence.

2    Q.  Could you turn to Exhibit 108, please.

3    A.  Okay.

4    Q.  Could you just remind us who Biren Desai was?

5    A.  Biren Desai worked to support the sales organization.  He

6    was a project manager supporting the sales organization.

7    Q.  What is Exhibit 108?

8    A.  So again a forwarded e-mail of my original response to

9    Drew's e-mail.

10   Q.  Are these all e-mails from Countrywide accounts?

11   A.  Yes.

12          MR. CORDARO:  I move for the admission of Plaintiff's

13   Exhibit 108.

14          MR. SULLIVAN:  No objection.

15          MR. HEFTER:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 108 received in evidence)

18   Q.  Could we go to the second page.

19   A.  Okay.

20   Q.  At the bottom of the page.

21   A.  Okay.

22   Q.  You write, "Well, I just heard we are doing a complete

23   about face and will resurrect the original PCA process that we

24   had."

25          What did you mean by the original PCA process?

1   A.  That was the process before Hustle.

2   Q.  Did you have anything specific in mind when you said you

3   were doing the PCA process?

4   A.  I remember my recollection is that because of the quality

5   concerns, there was some discussion that should we just go back

6   to the old process.

7   Q.  What do you mean by the old process?

8   A.  The PCA process.  The process before Hustle.

9   Q.  Could we go to the first page, please.

10  A.  Okay.

11  Q.  Can we blow up the paragraph on the bottom half of the

12  page.  You say "I remember that's why I was so frustrated

13  because it wasn't rocket science to see what was coming or

14  potentially coming."

15          What did you mean by that?

16  A.  So, that's -- I was expressing my frustration that, you

17  know, we knew that the contracting market was coming.  And our

18  process was going in the opposite direction.  Loosening

19  controls.  So I was like, you know, we knew this was coming

20  back in August.

21  Q.  What did you mean when you said a contracting market?

22  A.  Meaning that investors wanted higher quality loans, so they

23  were contracting guidelines, making a smaller box of potential

24  programs for borrowers to get loans.

25  Q.  Are you able to put a time period around this contracting?

D9p3ban4                           Thomas - direct

1   A.  Well, it was in that late 2007, Drew's e-mail was in

2   August 2007 where he spelled out the same concerns.

3            MR. CORDARO:  If I may, I have an exhibit that did not

4   make it into the binder.  So may I approach the bench?

5            THE COURT:  Yes.

6            MR. CORDARO:  Thank you.

7   Q.  Mr. Thomas, I'm showing you what has been marked as

8   Plaintiff's Exhibit 74.  Who is Patrick Aliano?

9   A.  Patrick Aliano was in our quality assurance and control

10  group.  So he did a lot with the risk, quality control, fraud,

11  that kind of thing.

12  Q.  Did Mr. Aliano have any involvement with the High-Speed

13  Swim Lane?

14  A.  He wasn't involved in the design of it.  But he was

15  involved in looking at quality overall, so he would look at the

16  quality of High-Speed Swim Lane.

17           MR. CORDARO:  Your Honor, I move for the admission of

18  Plaintiff's Exhibit 74.

19           MR. SULLIVAN:  No objection.

20           MR. HEFTER:  We ask for a limiting instruction.

21           THE COURT:  Yes.  Ladies and gentlemen, this is

22  received as to the bank defendants, but not as to Ms. Mairone.

23  Received.

24           (Plaintiff's Exhibit 74 received in evidence)

25  Q.  Could we just blow up that top paragraph, please.  This is

1   an e-mail from Mr. Aliano, correct?

2   A.  Correct.

3   Q.  It is dated March 13, 2008, correct?

4   A.  Yes.

5   Q.  There is a reference to Ed.  Do you know who he's talking

6   about?

7   A.  That would be Ed O'Donnell.

8   Q.  There is a reference to sitting in a room in July.  Do you

9   know what that is a reference to?

10  A.  Not specifically.  I'm not sure what meeting he was in.

11  Q.  Do you know what he's referring to with some of the same

12  concerns we expressed?

13  A.  Yes, he's talking about quality concerns with --

14          MR. HEFTER:  Objection, your Honor.  Lack of

15  foundation.

16          MR. CORDARO:  I can withdraw the question and lay some

17  additional foundation.

18          THE COURT:  All right.

19  Q.  Did you and Mr. O'Donnell have any discussions about the

20  High-Speed Swim Lane?

21  A.  Yes.

22  Q.  Mr. O'Donnell's your superior at FSL?

23  A.  He is.

24  Q.  Did Mr. O'Donnell ever express concerns to you about the

25  High-Speed Swim Lane?

D9p3ban4                         Thomas - direct

1    A.  He did.

2    Q.  Do you recall when those conversations took place?

3    A.  Many times.  In one-on-one meetings with him and various

4    scenarios.

5    Q.  Do you recall any of the concerns that Mr. O'Donnell

6    expressed to you during the course of those conversations?

7    A.  He had the same kind of concerns we've outlined already.

8    The contracting guidelines, the lack of separate organizations,

9    the checks and balances, the job aids disappearing.

10   Q.  Mr. O'Donnell, can you turn to Exhibit 80, please.

11   A.  Okay.

12   Q.  Mr. O'Donnell, without getting into the substance, can you

13   tell us what Exhibit 80 is?

14   A.  This looks like an e-mail from me to Ed O'Donnell with some

15   other subsequent e-mails attached.

16   Q.  If you review this document, are there any e-mails on here

17   involving anyone who did not work for Countrywide?

18   A.  Not that I see, no.

19          MR. CORDARO:  Your Honor, I would move for the

20   admission of Plaintiff's Exhibit 80.

21          MR. SULLIVAN:  No objection.

22          MR. HEFTER:  No objection.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 80 received in evidence)

25   Q.  Mr. Thomas, if you look at this third page.

1    A.   Okay.

2    Q.   Actually we should look down at the bottom of the second

3    page.  This is an e-mail from you to whom?

4    A.   To Ed O'Donnell.

5    Q.   What is the date of the e-mail?

6    A.   April 25, 2008.

7    Q.   On that first line, you say, "So you are telling me that

8    there are technology issues causing findings too.  Hmm.  Who

9    runs technology?"

10        What did you mean by who runs technology?

11   A.   Technology reported up through the chief operations

12   officer.

13   Q.   Who was the chief operating officer?

14   A.   Rebecca Mairone.

15   Q.   On the next page, could we blow up the top paragraph,

16   please.  There is a reference there to a Greg meeting.  Do you

17   see that?

18   A.   I do.

19   Q.   Who is Greg?

20   A.   Greg Lumsden.  He was the CEO of Full Spectrum.

21   Q.   Do you have a specific recollection of the Greg meeting?

22   A.   I do.

23   Q.   Do you remember who attended that meeting?

24   A.   I don't remember all of the attendees, but Greg, Rebecca, I

25   think Steve Brent was there, I can't remember all the people.

D9p3ban4                              Thomas - direct

1    I can't remember if I was on the phone or in person.  I think I
2    was on the phone for this one.
3    Q.  You say, "My confidence that we have the right leaders goes
4    down each day."  Do you see that?
5    A.  I do.
6    Q.  What did you mean by that?
7    A.  I was -- this, again, timeframe I was very frustrated.  We
8    had made changes to the Hustle process.  I just felt like
9    all -- I mean, all the data was there at this point.  We had
10   the pilot results, we had QA findings, we had QC findings, and
11   we hadn't done anything.  So, we had some organizational
12   changes, you know, and I just felt like we didn't have the
13   right leaders in place.  I was very frustrated at this point.
14   Q.  In the next line you say, "Today, I felt like Rebecca
15   didn't really didn't understand the organization or the
16   process.  So she has no ideas how to fix it, other than her
17   obvious observations like 'we can't have anymore issues.'"
18            Do you see that?
19   A.  I do.
20   Q.  Did you say that as a result of anything that was said in
21   that meeting that we were discussing now?
22   A.  I think my recollection is that was the constructive
23   comment that was made, is we can't have anymore issues.
24   Q.  Who made that comment?
25   A.  Rebecca.

1    Q.  Further down you said, "Greg was all over the place."

2              Can you just tell us what you mean by that?

3    A.  Sure.  My recollection is we were going over some of the

4    quality control reports.  And, you know, at one point in the

5    review he's like this is too detailed.  We need higher leveled

6    information.  At other points he said this isn't enough.  We

7    need to go deeper.  I'm creating the reports, so I'm frustrated

8    with which way do I go.

9    Q.  Could we just go to the top e-mail.  On the first page.

10   A.  Okay.

11   Q.  It says "Brent said Rebecca rolled her eyes quite a bit

12   when I confirmed the issue is not a behavioral problem but a

13   process problem."

14             Who is Brent?

15   A.  Steve Brent.

16   Q.  When you write that you confirmed the issue is not a

17   behavioral problem but a process problem, what did you mean by

18   that?

19   A.  So, my recollection is that we were looking at some of the

20   breakdowns in the process, and one of the theories was this was

21   a behavioral problem, just a fear of, you know, comfort with

22   the new process.  That's what was slowing things down.

23             I think I pointed out some specific process problems,

24   most likely related to turn time.  One of the things we looked

25   at was where was the slow down in the process.  And a lot of

1    the slow down was just at the processor level, and didn't

2    really have anything to do with the handoffs in the past.

3              So it was just like, it felt like the process was

4    still broken in Hustle.  And from a turn time perspective.

5    Q.  When you said you had confirmed that the issue was not a

6    behavioral problem but a process problem, when did you confirm

7    that?

8    A.  I think I'm referring to in the meeting itself, bringing up

9    some of the points.

10   Q.  Mr. Thomas, to your knowledge, were any changes made in the

11   High-Speed Swim Lane as a result of any of the concerns that

12   you expressed?

13   A.  I think there were some changes.  I mean, it was kind of a

14   living process.  So there were changes, but my main concerns

15   were not addressed, no.

16   Q.  Your main concerns were?

17   A.  Having the different organizations, underwriting and

18   processing organizations reporting separately.  The checks of

19   especially CLUES information going in, being done by a separate

20   person, and then the person putting in the information.  And

21   ultimately just the underwriters' involvement.  Job aids.

22   Things -- all the concerns we've mentioned.

23   Q.  Can you just turn back to Exhibit 46, the first page.

24   A.  Okay.

25   Q.  Could you blow up the first e-mail there from Loren

D9p3ban4                        Thomas - direct

1   Rodriguez.  When was this e-mail sent?

2   A.  I'm sorry.  I was on the wrong page.  This e-mail was sent

3   August 9, 2007.

4   Q.  When was that in relation to that August e-mail that you

5   sent?

6   A.  It was the following day.

7   Q.  Did you send your original August e-mail to Loren

8   Rodriguez?

9   A.  I did not.

10  Q.  Why didn't you?

11  A.  Because again I thought that Anson and Mark were the ones I

12  sent it to.  I thought they would listen so those are the two I

13  sent it to.

14  Q.  Mr. Rodriguez says, "Should we huddle on your concerns.  I

15  want to ensure you folks are comfortable with the process flow.

16  Just let me know, thanks."

17          Did that huddle occur?

18  A.  I can't remember specifically if we did huddle.  I'm sure

19  if he suggested that we should, I'm sure we did.  I don't

20  recall how that huddle took place.

21  Q.  Do you recall any changes made between August 9 and the

22  rollout of the High-Speed Swim Lane to address your concerns?

23  A.  No.  The Hustle rolled out as planned.

24          MR. CORDARO:  May I have a moment, your Honor?

25          THE COURT:  Yes.

D9p3ban4                     Thomas - direct

```
 1    Q.  Mr. Thomas, this August e-mail.

 2    A.  Yes.

 3    Q.  Did you send it to Rebecca Mairone?

 4    A.  I did not.

 5    Q.  Why didn't you send it to Ms. Mairone?

 6    A.  When we expressed concerns throughout this pilot process, I

 7    didn't feel like those concerns were being addressed.  So I

 8    just felt like, you know, the dissent didn't want to be heard

 9    again, so I just avoided that controversy.

10         MR. HEFTER:  Your Honor, objection.  I move to strike

11    that.

12         THE COURT:  No.  There was no objection to the

13    question which was why didn't you send it to Ms. Mairone, which

14    called for the operations of his mind.  And the answer isn't

15    being offered for whether in fact the dissent didn't want to be

16    heard again, but rather as to what his mental processes were

17    that caused him not to send it.  Overruled.

18         MR. CORDARO:  May I take one more moment, your Honor.

19    Nothing further from the United States on direct.

20         THE COURT:  All right.  Cross-examination.

21    CROSS-EXAMINATION

22    BY MR. SULLIVAN:

23    Q.  Good afternoon, sir.

24    A.  Good afternoon.

25    Q.  My name is Brendan Sullivan and I'll be asking questions
```

1   this afternoon for Bank of America and Countrywide.

2   A.   Okay.

3   Q.   Any time you don't understand my question, just stop me.

4   A.   Okay.

5   Q.   All right.  It is true, isn't it, that you thought that the

6   concept and the intent behind the process of the HSSL program

7   was good?

8            MR. CORDARO:  Objection.

9            THE COURT:  Ground?

10           MR. CORDARO:  It is vague.

11           THE COURT:  Compound.  Do you want to break it down.

12  Q.   Let's take a look at plaintiff's exhibit that you have

13  right in front of you in which you wrote those similar words.

14  Plaintiff's 46.  Take a look, sir, at page three.  Let me read

15  to you where you should look.

16  A.   Okay.

17  Q.   Ask that it be put up on the screen and yellow that

18  paragraph with the word "now."  Let's just focus, if you just

19  yellow up to the word "correct" for a moment, please for me,

20  Alex, so we can focus.  That's good.

21           I'm asking you to direct your attention to the

22  Government Exhibit Plaintiff's 46, page three, where it says,

23  "Now, that being said, I think the concept and the intent

24  behind the process is correct."

25           Are those your words?

1  A.  They are.

2  Q.  And that is focusing on the High-Speed Swim Lane process,

3  am I correct?

4  A.  It's focused on the concept of more efficiency.  Which was

5  part of the High-Speed Swim Lane.

6  Q.  Those are your words, aren't they?

7  A.  They are.

8  Q.  Let's focus on the two things.  Concept and intent.  Let's

9  focus just on concept for a minute.  Tell the jury why you

10  thought the concept of the High-Speed Swim Lane was correct.

11  A.  I would say that in the initial design enhancement phase,

12  when we were looking for ways to improve efficiency, I agree

13  with that concept.  In process of improvement, we always look

14  to improve efficiency.  Not at the expense of anything else,

15  but improved efficiency is a good thing.

16  Q.  Understood.  You participated with a lot of people in

17  arriving at the concept, am I correct?

18  A.  Various concepts, yeah.  There were a lot of concepts in

19  the design phase.

20  Q.  I'm talking about the concept that originally came up with

21  the term High-Speed Swim Lane.  Do you prefer I use the word

22  Hustle?

23  A.  It doesn't matter.

24  Q.  Hustle is not a bad word, is it?

25  A.  No.

1            MR. CORDARO:  Objection.

2   Q.  You don't mean it pejoratively or as a bad word when you

3   use it, do you?

4   A.  For us it was a pronunciation of HSSL.

5   Q.  Fine.  You probably played sports.  Did you hear your

6   coaches use the word "hustle"?

7   A.  Yeah.

8            MR. CORDARO:  Objection, your Honor.

9            THE COURT:  When there is an objection, you have to

10  wait before you answer.

11           THE WITNESS:  I'm sorry.

12           THE COURT:  But go ahead.

13  Q.  So in other words, the word "hustle" has no bad

14  connotation.  It was just a word that people used because the

15  letters are hard to say like HSSL, am I correct?

16           MR. CORDARO:  Objection.

17           THE COURT:  I think he has already answered that in

18  your previous questions.  Unless you want to have him opine on

19  whether the reason they used Hustle was that HSSL was hard to

20  say.  Which it may be or it may not be.  I'm not sure he's

21  competent to offer an opinion on that.

22  Q.  Let me ask him perhaps why did you use the word Hustle?

23  A.  I did or didn't?

24  Q.  As opposed to the letters HSSL?

25  A.  I don't recall why I chose to use it.  It was just common.

d9p3ban4                          Thomas - cross

1   Commonplace to say Hustle.

2   Q.  An easy way to say it?

3              MR. CORDARO:  Objection.

4              THE COURT:  Ground?

5              MR. CORDARO:  Again, your Honor.  It's vague.

6              THE COURT:  No, it's not vague.  I take it, so we can

7   move this along, this was the common usage?

8              THE WITNESS:  Yes, it was.

9              THE COURT:  And that to the best of your

10  understanding, it wasn't being used in a pejorative sense?

11             THE WITNESS:  I know that I didn't use it in a

12  pejorative sense.

13             THE COURT:  All right.

14  Q.  Going back to the concept, is it fair to say that maybe 20

15  or 30 people within the division participated and gave input

16  into what the concept should be?

17  A.  I think that's probably on the high end, but yeah, that

18  sounds about right.

19  Q.  You pick the number.  How many executives got together in

20  these various meetings and designed the concept known as the

21  High-Speed Swim Lane project?

22  A.  So executives, what do you mean by executives?

23  Q.  Let's say employees then.

24  A.  Employees?  I would say -- I would probably put it closer

25  to 10 to 15.  But different -- you would seek subject matter

1   expertise from different people.

2   Q.  Tell us how many disciplines of skills were brought

3   together to design the High-Speed Swim Lane.

4           Why don't you name the people and what their expertise

5   was.

6   A.  The main involvement was from the process design team.  So

7   those were Loren Rodriguez, Mark Barnett, Anson Gong, Peter

8   Tinaglia, kind of operation support team.

9   Q.  What is the term for those people?

10  A.  I called them operation support.  They worked for Rebecca

11  Mairone, chief operations officer.

12  Q.  Did they have skill and background in designing process and

13  work plans?

14  A.  They have -- depending on who the individual is.  But like

15  Mark Barnett was a process engineering person, and he was new

16  to the mortgage industry so he didn't have the mortgage

17  experience.  But had process engineering or process management

18  experience.

19  Q.  How about the other persons you mentioned.  What were the

20  areas of expertise when they designed or participate in the

21  designing the concept of a High-Speed Swim Lane?

22  A.  In addition to project management type experience, some of

23  the individuals, because they had dealt with the processing

24  functions, had knowledge of the processing role.

25  Q.  Who, for example, draws out these very detailed work plans

1   that look like tracings?

2   A.  Well, it depends.  If you're talking about like charts of

3   when things get done and how, as far as the project goes, the

4   project plan, I would say Mark Barnett would have been one that

5   would do that.  That's a project management skill set.

6   Q.  Okay.  And the others that you mentioned so far, what did

7   they bring to this process?

8   A.  They also had some project management experience or working

9   on process improvement projects, but specifically, dealing with

10  operations or processing.  So that was the interface they

11  normally had with the business was on that side.

12  Q.  Who else participated in designing the concept or at least

13  had input to it within the people in the division?

14  A.  Well, first I should say I'm a little uncomfortable with

15  the word "concept."  There are multiple concepts within the

16  Hustle process.  So not just one concept per se.

17  Q.  Sir, excuse me.

18          Can I interrupt?

19          THE COURT:  Go ahead.

20  Q.  You used the word, quote, concept.  I'm just picking up

21  your word.  You said "I think the concept we're talking about,"

22  your words, the concept.

23  A.  Yeah.  The concept I was referring to in saying that was

24  the concept of improved efficiency.

25  Q.  Did that include High-Speed Swim Lane?

d9p3ban4                          Thomas - cross

1   A.   That was part of -- that was one of the concepts in

2   High-Speed Swim Lane.

3   Q.   So we're focusing on the concept High-Speed Swim Lane for a

4   moment.   That part of it that you included in your half

5   sentence.   Okay?

6   A.   Okay.

7   Q.   All right.   So tell us who else had input into the

8   High-Speed Swim Lane concept.

9   A.   So myself, I would bring some expertise or knowledge of the

10  underwriting and funding sides.   And there -- I can't remember

11  names or individuals that came in from the different

12  disciplines, but we would have or could have had processors

13  come in and give some opinions, or we would interview them on

14  their process.   Things like that.

15  Q.   How about higher ranking executives.   Was this passed

16  before the executives?

17  A.   We would give progress update, yes, to Rebecca, Loren, Ed,

18  Cliff, Greg.

19  Q.   Would you mind reminding the jury again who Ed and Cliff

20  and Greg are.   They are at the top of the company, aren't they?

21  A.   Greg is the CEO of the Full Spectrum Division, yes.

22  Q.   He is the boss over everybody within that division?

23  A.   Yes.

24  Q.   I take it you had high regard for him?

25  A.   Not always the decisions that he made, but yes, I found

1   him -- I respected him, yeah.

2   Q.  You regarded him as an honest, straightforward person?

3            MR. CORDARO:  Objection.

4            THE COURT:  Sustained.

5   Q.  What were Greg's specific duties?

6   A.  He was the chief executive officer.

7   Q.  Was he fully aware of the High-Speed Swim Lane concept?

8            MR. CORDARO:  Objection.

9            THE COURT:  Sustained.

10  Q.  Were you in meetings with Mr. Greg Lumsden in which the

11  High-Speed Swim Lane was discussed?

12  A.  I don't recall a specific meeting with Greg himself.  Well,

13  I'm sure there were some meetings.

14  Q.  You're not suggesting that the High-Speed Swim Lane could

15  have functioned without Greg's approval, are you, sir?

16            MR. CORDARO:  Objection.

17            THE COURT:  Sustained.

18  Q.  Do you know whether or not the CEO participated and

19  approved the High-Speed Swim Lane process, sir?

20  A.  I don't have direct knowledge of that.

21  Q.  Who under him would have approved it, besides Rebecca?

22            MR. CORDARO:  Objection.

23            MR. SULLIVAN:  Could I ask another question?

24  Q.  I just want to know who participated in arriving at this

25  decision that there should be a High-Speed Swim Lane process

d9p3ban4                          Thomas - cross

1   that we've been talking about for two days now.

2               Do you not understand my question?

3   A.  I do.  I just can't tell you who approved it, I don't know

4   what the approval process was.  So we would put forth ideas,

5   and and I would specifically show data of how -- what we were

6   seeing, but I don't know who said, okay, go forward.

7   Q.  You were in some of the meetings, weren't you?

8   A.  We gave process updates, progress updates.  But --

9   Q.  Tell us about Mr. O'Donnell's role whom you just mentioned.

10  A.  He was my supervisor.  I do remember him being in some of

11  the meetings as well.  But again, he would provide the

12  centralized underwriting, centralized funding expertise.

13  Q.  How about Cliff that you mentioned.  He's not even in the

14  division.  He's above the division, right?

15  A.  No, Cliff is in the division as well.  He is the chief

16  credit officer of Full Spectrum.

17  Q.  What is his rank?

18  A.  He reported to Greg Lumsden.

19  Q.  Did he participate in meetings with respect to the

20  High-Speed Swim Lane discussions?

21  A.  At my level, there may have been some in some of those

22  executive updates.  But, I can't recall specifically.

23               (Continued on next page)

24

25

D9PTBAN6                        Thomas - cross

BY MR. SULLIVAN:

Q.  Now reflecting again on the concept, was the concept
designed to deal with the fact that Full Spectrum Lending had a
basically new product called the prime loan as opposed to
subprime?

A.  Not really, because we had that product already.

Q.  What was the concept, in your own words?

A.  The concept or the direction at the outset from when we
started to look for efficiency was, as we moved more towards
prime, are there ways to make the process more efficient.

Q.  And was it decided there were ways to make it more
efficient?

A.  There were numerous ways that we thought we could either
test or try or at least evaluate to see if they improved
efficiency.

Q.  What were those ways that were thought to improve
efficiency?

        MR. CORDARO:  Objection, your Honor.

        THE COURT:  Well, phrased it's sustained, but there
probably are conversations that can be inquired into.

Q.  Did you have conversations about how to make the process
more efficient?

A.  We did.

Q.  And was it decided that there were some methods that could
be used to make it more efficient?

D9PTBAN6                        Thomas - cross

 1          MR. CORDARO:  Objection, your Honor.

 2          THE COURT:  I think part of the problem we're having

 3   is a certain uncertainty about the decision-making process.  So

 4   who had to approve what in connection with placing the HSSL

 5   program into place, to your knowledge?

 6          THE WITNESS:  That's the part I'm really not clear on

 7   is who ultimately had to sign off on --

 8          THE COURT:  Let me ask it a different way.  From your

 9   personal knowledge of meetings, who was the highest level

10   person who had to sign off before this was put in place?

11          THE WITNESS:  From my perspective I think it would

12   have been Rebecca Mairone as chief operations officer.

13          THE COURT:  So do I understand that you know that much

14   from your personal knowledge, but you don't know whether or not

15   someone higher also had to approve?

16          THE WITNESS:  That's correct.

17   BY MR. SULLIVAN:

18   Q.  Who else participated in the process to design the concept?

19   A.  I think I've named most of the people I can remember being

20   in those meetings.  I know some technology folks may have been

21   involved if there were technology questions, but I can't recall

22   any specifics that I haven't mentioned, I don't think.

23   Q.  Focusing back on the first part of the sentence you wrote

24   in your own words, you indicate that the intent behind the

25   process is correct.  Tell us what the intent was that you were

D9PTBAN6                        Thomas - cross

1    referring to there in your own handwriting in August of 2007.

2    A.  So the intent, as I understood it, as we started designing

3    this process was efficiency, to create efficiency.

4    Q.  Sir, I want to work backwards a little bit in some of the

5    charts that you looked at late today upon the government's

6    question.  If you please go to the exhibit I think you still

7    have up there in the government's binder, Government

8    Exhibit 297.  Do you see that?

9    A.  I do.

10   Q.  If you look at one of the final charts you were provided,

11   at page 2, I believe, let's see if we can do our best to put

12   this very difficult exhibit the government put into the record

13   to make it seem, whether it's --

14            MR. CORDARO:  Objection, your Honor.

15            MR. SULLIVAN:  I'll ask it again.

16            THE COURT:  Yes.

17   Q.  It's a little difficult to read, but we'll struggle through

18   it, sir.

19            This is the exhibit we looked at just a little bit --

20   a while ago, am I correct?

21   A.  Yes, we did.

22   Q.  And this is a work product that you put together as part of

23   your responsibility, is that also correct?

24   A.  It is.

25   Q.  If we look at the very bottom part of the chart, let's say

1   the bottom third, FSL, do you see the FSL part of the chart?

2   A.  I do.

3   Q.  Now tell us what this portion of the chart, and I'm looking

4   at the first three columns in, do you see where it says EA?

5   A.  Yes.

6   Q.  And if you look over three blocks to the right, it has a 00

7   there.  Do you see that?

8   A.  I see that.

9   Q.  Now what does the 00 represent?

10  A.  So that means out of the 17 loans in quarter four 2007 that

11  were expanded approval, there were no findings.

12  Q.  And that's about as good as you can get, isn't it?

13  A.  Zero findings out of 17.

14  Q.  That's a defect rate, isn't it?

15  A.  That is.

16  Q.  In the examination with the government we saw a lot of high

17  numbers this morning, we didn't look at the low numbers, did

18  we?

19          MR. CORDARO:  Objection.

20          THE COURT:  Sustained.

21  Q.  Take a look, sir, at the number below that.  First all, EA

22  what does EA mean?

23  A.  EA means expanded approval.  It's a program from Fannie

24  Mae.

25  Q.  In other words, Fannie Mae actually designed that program.

1    I think you explained on direct examination that it was a

2    program that was different and less requirements than other

3    loans that were sold to Fannie Mae, am I correct?

4    A.  I can't recall if it had less requirements or if it was

5    just expanded guidelines or maybe different criteria.  I can't

6    remember if it was actually less requirements to go by.

7    Q.  But it was a product that Fannie Mae designed and wanted

8    Countrywide to supply to it, is that correct?

9    A.  It is a Fannie Mae program, yes.

10   Q.  Now if you look down to the conforming line, do you see

11   where the word "conforming" is?

12   A.  Yes.

13   Q.  If you go over once again three columns, what percent do

14   you see?

15   A.  3.3 percent.

16   Q.  And that's a good score as well, isn't it?

17   A.  It is below the 4 percent, yes.

18   Q.  Now to be clear, that is the final score for 2007 in

19   quarter four, am I correct?

20   A.  That is correct.

21   Q.  That's kind of like the ninth inning score, isn't it?

22          MR. CORDARO:  Objection.

23          THE COURT:  There's an objection presumably because

24   government counsel doesn't like sports analogies when the

25   Yankees are doing so terribly, but I will allow the question

D9PTBAN6                          Thomas - cross

1    nevertheless.

2    Q.  You know what I mean by that, I mean final means final.  We

3    all know what "final" means, right?

4    A.  It was, yes, the final determination of those audits that

5    were done, yes.

6    Q.  And you said that you believe that the industry standard of

7    acceptable defect rates was around 4 percent, am I correct?

8    A.  That's correct.

9    Q.  And this would be actually the first quarter that would

10   have any HSSL loans in it, am I correct?

11              MR. CORDARO:  Objection.

12   A.  The first --

13              THE WITNESS:  Was there --

14              THE COURT:  There's no objection, just there was just

15   a cough, I think.  Did you say objection?

16              MR. CORDARO:  There was an objection.

17              THE COURT:  Forgive me.

18              MR. CORDARO:  Lack of foundation.

19              THE COURT:  If you know, you may answer.

20   A.  Sorry, state the question one more time?

21   Q.  This was the first quarter in which there would be some

22   HSSL loans included in these designations, am I correct?

23   A.  The Hustle roll out -- the Hustle did roll out in quarter

24   four.  My knowledge of these audits also, though, I remember

25   that quarter four audits, as you look at which ones were Hustle

D9PTBAN6                        Thomas - cross

1  and which ones were not Hustle, there were only a handful of

2  Hustle loans included in these audits.

3  Q.  Did you put a footnote to that effect here?

4  A.  I did not.  This was a report of all loans.

5  Q.  A report of all loans.  If you look at the other

6  designations under HSSL and went to non-conforming, for

7  example, that was not a Hustle loan, right?

8  A.  That's correct.

9  Q.  And government was not a Hustle loan, am I correct?

10              MR. CORDARO:  Objection, your Honor.  The Court ruled

11  on this issue, already, unless I'm misunderstanding.

12              THE COURT:  No, but I think when an exhibit is in

13  evidence then the defendant has a right to point out what is

14  the significance or non-significance of particular entries.  So

15  the objection is overruled.

16  Q.  Asked another way -- can you answer the question?

17  A.  Can you repeat it again?

18  Q.  The non-conforming and government, they would not have

19  included Hustle loans, correct?

20  A.  Non-conforming would not include Hustle loans.

21  Q.  It's a different type of loan, because the Hustle loan was

22  only a prime loan, am I correct?

23  A.  That's correct.  Now they definitely wouldn't have been

24  sold to Fannie or Freddie, non-conforming.  I can't remember

25  the guidelines specifically to say whether some non-conforming

1   loans may have gotten a prime CLUES accept.  If that's true,

2   that would go into Hustle as well.

3   Q.  My question is Hustle was not considered non-conforming at

4   any time, correct?  It was a prime loan.

5   A.  It was a prime CLUES accept.

6   Q.  PCA, right?

7   A.  Correct.  I'm just not certain that all non-conforming

8   loans were also -- if those were all refers or if -- I think

9   theoretically you could get prime CLUES accept on a

10  non-conforming loan, but it wouldn't be sold to Fannie or

11  Freddie.

12  Q.  But when you look at the chart, it's clear that any Hustle

13  loan will be included the first two categories, EA or

14  conforming, correct?

15  A.  I can't say that for sure.

16  Q.  But when you describe other portions of the chart to the

17  right of this column, you were talking about HSSL loans,

18  correct?

19  A.  Yes.  So I can say for certain that EA and conforming loans

20  were Hustle loans, I just am not sure I can say that all the

21  others were not Hustle loans.

22  Q.  Thank you.  Now that quarter --

23          MR. SULLIVAN:  If you go back to the top of the chart,

24  please, Alex.

25  Q.  -- that quarter very top where it says 207 quarter four.

1    Yes?

2    A.  OK.

3    Q.  That is the only column down there where things are final,

4    am I correct?

5    A.  That is correct.

6    Q.  So that nothing to the right of that column, which reads

7    2087 Q4, is final, all of those are in process to the right, am

8    I correct?

9    A.  That's not correct.  The last column for quarter one 2008

10   are final, the middle column includes final plus initial.

11   Q.  Let's address the middle column for a second.  I think

12   we're looking at 16 or 18 percent?

13   A.  Looks like 18.2 percent.

14   Q.  That's what you were directed to by the government on

15   direct examination, am that correct?

16   A.  I believe I answered both questions, both the completed

17   plus initial and just the completed.

18   Q.  We'll look at one at a time there.  Let's look at the 18.2

19   percent.  Do you see that?

20   A.  I do.

21   Q.  Then down below that is a 9.5 percent for conforming,

22   right?

23   A.  That's correct.

24   Q.  Now it's clear, is it not, that those are not final

25   numbers?

D9PTBAN6                    Thomas - cross

1   A.  Those are not.

2   Q.  Because there's the whole rebuttal process to go through

3   before you get a final number, am I correct?

4   A.  For some of those numbers the rebuttal process was still in

5   effect.

6   Q.  But by definition it's not complete, it's not a complete

7   final number, is it?

8   A.  The best way to describe this is to look at them in tandem,

9   so the completed SUS shows 16 percent for EA, the final number

10  would be somewhere in between 16 percent and 18.2 percent.

11  Q.  And how about non-conforming?

12  A.  For non-conforming 9.8 percent to 12.4 percent.

13  Q.  Now if you look over at the furthest column for a second,

14  where it says 208 quarter one, completed SUS only, correct?

15  A.  Correct.

16  Q.  Do you see those figures?

17  A.  I do.

18  Q.  16 and 82, am I right, yellowed right there, and 82?

19  A.  Yes.

20  Q.  And that is not the final number for all loans during that

21  period, is it?

22  A.  That's the best case scenario.

23  Q.  And the fact of the matter is when the final numbers

24  arrived they were better than that, weren't they?

25  A.  I do not -- that shouldn't be the case.

1  Q.  Let's take a look at -- let me hand you a binder if I

2  could.

3          MR. SULLIVAN:  May I approach?

4          THE COURT:  Yes, but after we finish this one section

5  we're going to give the jury their mid-afternoon break.

6          MR. SULLIVAN:  OK.

7  Q.  Look at tab 2 for us, sir, marked as Defendant's 1133?

8  A.  OK.

9  Q.  This is your work product as well, is it not?

10  A.  I believe so.

11  Q.  Well, you're in charge of these kinds of statistics and

12  this would could have from your office, am I correct?

13  A.  Actually, I'm not sure if this would come from me or from

14  corporate QC.  Corporate QC also ran reports as well.  The

15  reason I say that is the headers don't look as familiar to me,

16  but it's possible.

17  Q.  You see the FSL column down there.  Do you recognize this

18  as containing information prepared by your company with respect

19  to the same kind of statistics we were just looking at?

20  A.  Yes.

21          MR. SULLIVAN:  I ask that 1133 be admitted, please.

22          MR. ARMAND:  No objection.

23          THE COURT:  Sorry, this is 1133?

24          MR. SULLIVAN:  DX 1133.

25          THE COURT:  All right, because what we have says DX

D9PTBAN6                          Thomas – cross

1    73.

2              MR. CADY:  1133 is 73 also.

3              THE COURT:  I heard your colleague say that 1133 is

4    73, which is an interesting arithmetic approach, but the

5    question is for purposes of this trial, what do you want to

6    call it, 1133 or 73?

7              MR. SULLIVAN:  73.  Take the low number.

8              THE COURT:  73 is received, Defendant's 73.

9              (Defendant's Exhibit 73 received in evidence)

10             THE COURT:  I'm sorry, was there any objection?

11             MR. SULLIVAN:  There was no objection under the larger

12   number.

13             MR. CORDARO:  No objection.

14             THE COURT:  All right.  73 is received.

15   BY MR. SULLIVAN:

16   Q.  If we look down to FSL column and you look over to calendar

17   year 2007, quarter four, do you see that?

18   A.  I do.

19   Q.  And if you go down the column you see a number of

20   5.4 percent.  Do you see that?

21   A.  I see that.  It's under divisionally responsible, SUS.

22   Q.  This is now under divisionally responsible, 5.4.  You see

23   that?

24   A.  Yes.

25   Q.  And look to the left, you see a 13.4?

1    A.  I do.

2    Q.  And to the left of that you see 6.2?

3    A.  I do.

4    Q.  Now those numbers represented the complete score, defect

5    score of SUS, severely unsatisfactory, am I correct?

6    A.  I think so, yes.

7    Q.  And then if you look at the number to the right of 5.4 you

8    see 9.8 percent, am I correct?

9    A.  Correct.

10   Q.  And that is for calendar your 2008 first quarter, am I

11   right?

12   A.  Correct.

13   Q.  And then one more column calendar year 2008 for quarter two

14   is 4.4 percent, correct?

15   A.  Correct.

16   Q.  Those were the final numbers after the rebuttal process to

17   correct the severely unsatisfactory initial findings, am I

18   correct?

19   A.  Those are the final numbers for all of FSL weighted to the

20   percentages of what type of products were audited.

21            MR. SULLIVAN:  That's correct.  Thank you very much.

22            THE COURT:  All right.  So we'll take a 15-minute

23   break at this time, ladies and gentlemen.

24            (Jury not present)

25            THE COURT:  Anything else?  Anything to take up at

1    this time?

2            MR. ARMAND:  Your Honor, with regard to the

3    defendants' exhibit list, there were -- our understanding is

4    there were no exhibit numbers for 1 through 100.  Their list

5    has about somewhere upwards of 3,000 exhibits on it, and we

6    have not even been able to get through to review all of it.  It

7    required us to empty the toner from both the civil and the

8    criminal divisions to print them out.  We expected that they

9    would whittle down their exhibit list for trial, but it appears

10   that there is a separate list of 100 exhibits.  So to extent

11   those are the ones they're actually going to use during the

12   trial, we request that those be identified so we can separate

13   the wheat from the chaff.

14           MR. JONES:  Your Honor --

15           THE COURT:  You don't need too much toner to separate

16   wheat from chaff, but you do need to fix your metaphors.

17           MR. JONES:  Your Honor, those exhibits were identified

18   in the exhibit list that was provided.

19           THE COURT:  Wait.  So to help a simple barefoot judge

20   like myself, is there a list somewhere that -- of the numbers

21   that the defense is going to use in introducing exhibits in

22   this trial?  Yes or no.

23           MR. JONES:  Your Honor, we provide --

24           THE COURT:  No, I want a yes or no to my question.  Is

25   there a list somewhere of the numbers that the defense is going

1    to use in the exhibits they are going to introduce in this

2    trial?

3              MR. JONES:  No, there is not.

4              THE COURT:  There is not.  There will be by tomorrow

5    morning at 9:00 a.m., and I will want a copy of it.

6              MR. JONES:  Yes, your Honor.

7              THE COURT:  We'll see you in 15 minutes.

8              (Recess taken)

9              THE COURT:  I received from my courtroom deputy a note

10   which we'll mark as Juror Note Number 1.  This is from Juror

11   Number 5, Carl Sanders, "I currently bowl in a league that

12   starts 6:30 p.m. on Mondays.  Although I can still make it out

13   to Queens in time if court ends at 5:00 p.m., I would have to

14   bring my equipment (shoes, aids, et cetera) with me to court on

15   those dates.  However, if court ends no lower than 4:00 p.m. on

16   Monday, I would have time to go home, pick up the equipment and

17   freshen up.  So if possible, if the Court knows on Fridays

18   whether or not Monday will be a late day, it will help me

19   better prepare if they would inform me.  Thank you."

20             So although I think, given the size of this courtroom,

21   we could easily move the bowling alley here, as it turns out

22   this coming Monday we'll have to stop at 3:45 in any event

23   because I have to give a speech at 4:30 elsewhere and the

24   following Monday we are closed.  And I wanted to note that for

25   you, this Court always celebrates Columbus Day because many of

D9PTBAN6                        Thomas - cross

1    the judges were present here in 1492.  So I think we can for

2    sure accommodate Mr. Sanders for the next -- for two of the

3    Mondays involved and play the other ones by ear.  So rather

4    than do all that in front of the jury, I will just, unless

5    anyone objects, have my courtroom deputy tell him that for sure

6    next Monday and for sure October 14th, and the two other

7    Mondays that may be involved we'll have to play it by ear.  OK?

8               Very good.  Bring in the jury and let's get the

9    witness back on the stand.

10              Because of another matter I have, we're going to stop

11   today at 4:45, so we'll have a full hour until we stop.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D9PTBAN6                          Thomas - cross

1          (Jury present)

2          THE COURT:  Mr. Sanders, we have your note.  Thank you

3    very much.  We will be able to accommodate that, but only on

4    your promise that you score an average of at least 280 every

5    game.

6          JUROR:  No problem.

7          THE COURT:  Very good.  Counsel.

8    BY MR. SULLIVAN:

9    Q.  Sir, would you look in the government binder at Government

10   Exhibit 296, please.

11         You indicated this was a bi-weekly report that you

12   sent around the division and other places, am I correct?

13   A.  That's correct.

14   Q.  Approximately how many people in the company would have

15   received your reports from time to time?

16   A.  So --

17         MR. CORDARO:  Objection, your Honor, that's vague.

18         THE COURT:  Well, if he can give a reasonable estimate

19   from his knowledge, I will allow it.  It may turn on which

20   report or whatever, but I think this witness is capable of

21   clarifying that.  Overruled.

22   A.  The full presentation of the deck I'm not sure the

23   distribution for that, but the report on page 2 is the one I

24   would send out via email every couple of weeks.  My

25   recollection is the distribution was pretty large with Full

D9PTBAN6                     Thomas - cross

1    Spectrum and others, I would estimate maybe 20, 25.

2    Q.  So 25 people in the company would have received a bi-weekly

3    report such as the one reflected in 296?

4    A.  Yes.

5    Q.  And your job was really to gather data and make such

6    reports, am I correct?

7    A.  That was one of my responsibilities.

8    Q.  You were not an underwriter?

9    A.  I was not, no.

10   Q.  You did not process loans in any way, am I correct?

11   A.  I did not.

12   Q.  How would you describe your exact expertise and function at

13   the division?

14   A.  So I was in a support function, so I would support the

15   underwriting and funding groups through recording analytics and

16   process improvement.

17   Q.  So if I turn to page 3 of this exhibit, look at the

18   headline on there, Quality Control Update Rebuttal Project.  Do

19   you see that caption?

20   A.  Yes.

21   Q.  And I take it this was an effort to demonstrate to many

22   people in the company that the rebuttal process was ongoing and

23   that you were making progress as reflected in the two-week

24   reports that you would send, am I right?

25   A.  So just to clarify, the distribution I was referring to

D9PTBAN6                        Thomas - cross

1    earlier with the 25 was just the report on page 2.  This deck

2    was -- we would use those reports in these decks, so I'm not

3    sure who all saw these.  So I wanted to clarify that.

4            So page 3 is a report where I would track the rebuttal

5    process for quarter one 2008, which is the quarter where we

6    instituted the sprint incentive.

7    Q.  Did you from time to time make reports similar to this

8    during the sprint incentive?

9    A.  Yes, I think I did reports maybe daily on the sprint

10   incentive.

11   Q.  To whom would you have sent such reports as reflected here

12   on page 3 of Exhibit 296?

13   A.  This specific report I'm not sure, but I did similar

14   reports.  The one I remember most often was looking at where

15   rebuttals were, what part of the stage rebuttals were in.  And

16   I would send those to the managers of the quality assurance and

17   control team that were doing rebuttals and the individuals

18   themselves so they could kind of see the progress along the

19   way.

20   Q.  How many people in the division would have been involved in

21   the rebuttal process itself in order to overturn the severely

22   unsatisfactory ratings that were found by corporate quality

23   control?

24   A.  It would depend on the actual issues being argued.  Some

25   would get overturned early, so the corporate QC auditor may

1    have referred to the individual who made the error and they

2    could have corrected it.  And in some, it may have been

3    escalated all the way up to Ed O'Donnell ultimately.

4    Q.  And part of my question is how many people are involved in

5    the process of going through this rebuttal process to correct

6    the errors that have been found?

7    A.  The only one I know for sure is quarter one 2008, because

8    that's the sprint incentive, and we had 36 employees that were

9    part of that incentive.  So there were 36 people actually doing

10   the rebuttals.  Definitely they wouldn't do the same rebuttal,

11   but one person would do one rebuttal and there were 36

12   employees.

13   Q.  And I take it this rebuttal process is an important part of

14   the function in order to have a quality product, am I correct?

15   A.  Yeah, I would say the rebuttal process was an important

16   final step to validate and ensure that the final ratings were

17   correct.

18   Q.  And all along the way before you get to the final step you

19   had first, of course, the quality assurance program that looked

20   at some of the things you already testified about, right?

21   A.  Correct.

22   Q.  And this is a very different function, quality control,

23   isn't it?

24   A.  The best way I would describe it is it is applied by a

25   different group and at a different time and looking at slightly

1    different things because the loan is in different points in the

2    process.

3    Q.   How many people would you say were involved at the quality

4    control level in order to assure that you had a quality

5    product?

6             MR. CORDARO:  Objection, your Honor.

7             MR. SULLIVAN:  Pardon me?

8             THE COURT:  Sustained.

9    Q.   How many people were involved in quality control generally

10   within the division?

11   A.   Quality control at this stage would have been at the

12   corporate level, so the Countrywide level, and I don't know how

13   many people were involved.

14   Q.   Could you give us any idea?  Is it more than a couple or is

15   it a staff of a dozen?

16   A.   I don't know.  I looked at the data, I didn't interact with

17   those teams.  I'm not sure where they're located actually.

18   Q.   Take a look at page 7.  I see a lot of people listed there

19   on that chart.  Were all those people involved in the rebuttal

20   process?

21   A.   Yes.

22   Q.   Is that what you -- do you call them the quality control

23   people?

24   A.   No, this would be what I call the quality assurance and

25   control team.  So this is Full Spectrum Lending's employees

D9PTBAN6                         Thomas - cross

1    that would look at the findings from the quality control, the

2    corporate quality control.

3    Q.  Were these persons involved in the rebuttal process at the

4    very end of the process here?

5    A.  They were involved in the rebuttal process, yes.

6    Q.  Are these some of the persons who would have been

7    benefiting from the compensation bonus as a result of their

8    work on the process?

9    A.  These are the individuals that obtained the sprint

10   incentive.

11   Q.  Now an incentive is simply -- strike that.

12           I take it it was an enormous task to go through those

13   files which had received a rating of severely unsatisfactory,

14   am I correct?

15   A.  To go through an individual one, I'm not sure how enormous

16   the task was, for quarter one 2008 the task was large because

17   there was a large volume of audits.

18   Q.  So it was a large task and at least 36 people focused on

19   that task, am I correct?

20   A.  That's correct.

21   Q.  And it was important enough for you and Mr. Ed O'Donnell to

22   decide and recommend that there actually be a bonus program for

23   the work that you were asking these 36 people to undertake, am

24   I correct?

25   A.  That's correct.  The concern was that the volume was so

1   high there was potential that they may not effectively go

2   through the rebuttal process just because the volume was so

3   high.  You had a time limit that you could rebut these loans.

4   Q.  And there was extensive progress made during that rebuttal

5   process, wasn't there?

6   A.  By progress you mean?

7   Q.  The errors were found and overturned.

8   A.  There were a number of -- I can't remember exactly how many

9   were overturned, but yes, a number were.

10  Q.  You know what the final number was?

11  A.  Yes.

12  Q.  What was it?

13  A.  I think we said about nine percent.

14  Q.  If you look, for example, at the next page, page 8, you

15  actually charted what it would take in order to achieve the

16  ideal rate of defect at four percent, am I correct?

17  A.  Correct.

18  Q.  Was this chart shared with others in the company?

19  A.  Yes.

20  Q.  And I take it that when you recommended this incentive

21  program you certainly did so in good faith, am I correct?

22  A.  I didn't recommend the incentive, I created the metrics

23  around the incentive program.

24  Q.  So you agreed with Mr. Ed O'Donnell, your boss at

25  Countrywide and now your boss at Fannie Mae, that it was a good

1    idea to have the incentive program and to award compensation

2    for the good work that this crew would do, am I correct?

3    A.  I did not object it, no.

4              (Continued on next page)

D9P3BAN6                          Thomas – cross

1   BY MR. SULLIVAN:

2   Q.  You certainly didn't stand by and participate in the

3   compensation award which would induce people to correct the

4   files erroneously, am I correct?

5   A.  I didn't anticipate that.  I mean, like I said, hindsight

6   is always 20/20.  There may have been better ways to guard

7   against that, because potentially that could happen.  But I

8   didn't anticipate that.  And one of the reasons being that

9   those QC employees were separate from the operations.

10  Q.  So you had faith in them.

11  A.  I did.

12  Q.  Did anyone suggest that these people weren't worthy of a

13  bonus for this work that they were doing?  A bonus for the work

14  that they were doing?

15  A.  I don't remember anybody objecting.

16  Q.  Certainly your boss O'Donnell wanted a compensation bonus

17  for the people that worked on overturning these findings, am I

18  correct?

19  A.  I'd say that's fair.

20  Q.  I'd like to focus, go back a little bit more, sir, and

21  focus on the quality assurance program.

22          It is true, isn't it, that the quality assurance

23  program developed at this division was intended to result in a

24  better product, one that had quality, am I right?

25  A.  It was -- it was intended to measure the quality before it

1    was too late.  Before it would end up in a QC finding, yes.

2    Q.  So there was no requirement by the customer, Fannie Mae or

3    Freddie Mac, that you have a quality assurance program, am I

4    correct?

5    A.  I couldn't say for sure.  I would guess not because there

6    was a point in time we didn't have a quality assurance program.

7    Q.  So someone in your company decided in order to have a

8    quality product, they would assign people the task of quality

9    assurance, am I correct?

10            MR. CORDARO:  Objection.

11            THE COURT:  Sustained.

12   Q.  How many people in the division focused their time and

13   energy on quality assurance details?

14   A.  I'm not sure.

15   Q.  Have any idea?  We talking two people or 10 or 20?

16            MR. CORDARO:  Objection, your Honor.

17            THE COURT:  Well, if he has knowledge bearing on that,

18   he may answer.

19   A.  I know for the offshore resources, we had 25 offshore

20   resources at one point and the number fluctuated.

21   Q.  Let's talk about the offshore resources.  Someone in the

22   division decided to have some of this work outsourced to India

23   apparently, is that correct?

24            MR. CORDARO:  Objection.

25            THE COURT:  Sustained.

D9P3BAN6                    Thomas - cross

1    Q.  Did you have people in India doing quality assurance?

2    A.  We did.

3    Q.  You said you had 25 people, correct?

4    A.  Correct.

5    Q.  Did you have any contact with them?

6    A.  Yes.

7    Q.  Did you get the result of their audits?

8    A.  Yes.

9    Q.  When you got the result of their audits, did you have

10   internal quality assurance people check their audits to see if

11   they were accurate?

12   A.  I didn't.  But that was done.

13   Q.  That was done and you knew about it and it was reported to

14   you, am I correct?

15   A.  I did get -- we reviewed some of the e-mails.

16   Q.  Who checked on the work of the 25 auditors out there in

17   India that were out there looking at your files?

18   A.  The quality assurance and control team at Full Spectrum.

19   Q.  What does that team consist of?

20   A.  I don't remember how many people were in that team.  But I

21   think it would have been that same -- probably that same group

22   that was involved in the sprint incentive.  Somewhere -- I

23   don't know all of those employees were.  And again, those

24   numbers fluctuated from time to time.  So but -- so I'm not

25   sure exactly how many people were in that group, or how many

1   were dedicated to reviewing QA audits.

2   Q.  Let's focus on the group in India.  Wasn't their function

3   to look at computerized files on loans to see if they detected

4   some problem or issue that should be identified and fixed?

5   A.  So their role was to look at the image file, and we had

6   specific questions in the QA audit that they would look at.

7   They would not look at everything, because they didn't have the

8   context to review everything in the file.  But we would have

9   specific items for them to check.

10  Q.  What would those be, for example?

11  A.  Mostly documentation.  Were documents in the file that

12  needed to be in the file.  Were they in the right place.  At

13  the very onset, they looked at other things that we pulled back

14  because we could determine from looking at their results that

15  they didn't have the context to answer those questions.

16  Q.  Is it fair to say that their focus was not on the final

17  quality control score, or the final quality, but was on the

18  process itself as it went along step by step?

19           MR. CORDARO:  Objection.

20           THE COURT:  Ground?

21           MR. CORDARO:  Your Honor, I think it is confusing and

22  vague.

23           THE COURT:  Pardon?

24           MR. CORDARO:  It's vague.

25           THE COURT:  I think this witness can, if he knows the

1    answer, can give it.  Overruled.

2    A.  Can you repeat the question?

3    Q.  Wasn't quality assurance focusing on the very process, the

4    steps that were taken along the way before actual completion?

5    A.  The quality assurance was in line quality assurance, which

6    meant that it was before funding, yes.

7    Q.  In fact, if they identified a problem in that quality

8    assurance function, the goal was to identify it and fix it, am

9    I right?

10   A.  You would fix -- obviously you would fix the problem.

11   They're not looking at all the files.  But, if you found a

12   problem, you would definitely fix it since it hadn't been

13   funded yet.

14          But the real intent was to look at issues in the

15   process that may cause larger issues down the road or affect

16   more files so you can correct the process.

17   Q.  In other words, if they found an issue that was a problem

18   in the process itself, and was generating a concern, like those

19   fraud indicators you mentioned, they would fix it, right?

20   A.  Correct.

21   Q.  In that example that you testified to to the government,

22   those actually were a mistake of the India audits.  They saw

23   that as a problem, where in fact that wasn't a problem because

24   that didn't have to be addressed until after funding.  Am I

25   correct?

1    A.   Yeah.   Looks like from the e-mail it was not only a mistake

2    in India, but the quality assurance control group identified

3    that what the underwriters' communication was or the team's

4    communication to the processors didn't match what was written

5    in the procedures.   So, the procedures didn't require that

6    screen to be in the file until after phase code three.

7    Q.   That's why you were optimistic about dealing with all those

8    reports that came out of India indicating a problem with the

9    quality assurance stage, am I correct?

10   A.   I wouldn't say all those reports.   I was confident that

11   that particular finding wasn't a concern.

12   Q.   Whose job was it to fix what India or other quality

13   assurance people found was wrong in the file or the process?

14   A.   It depended on what the issue or the process was.   So, if

15   it was a training need, then we would recommend training.   If

16   it was just clarification of what the process should be, we

17   might put out a bulletin on what it should be.

18        And then things like income and appraisal were issues

19   that we would see the most frequently.   So, income is

20   something, we at one point had an income calculator that would

21   try to standardize how income was calculated.   So, but, if it

22   was a processor-related issue, then the operations group would

23   try to fix it.   Different recommendations would come from

24   various people.

25   Q.   Switching to quality control again, at the end of the

1   process, is it also fair to say that that effort was to

2   identify problems and fix them?

3   A.  No.

4   Q.  No?

5   A.  The quality --

6   Q.  What was it for?

7   A.  The quality control process was to identify problems to

8   make sure the overall quality was maintained.  You couldn't fix

9   those loans.  They were already funded and sold.

10  Q.  Well, if you had filed, you still have the file and there

11  was something missing, you could put the title in the file,

12  couldn't you?

13  A.  My understanding is at that point we wouldn't have the

14  file.  The file would already be with the investor.  Now, the

15  investor may, if they review the file and say they have a

16  problem with it, they may come back to the company and say can

17  you supply this information.

18  Q.  One thing is certain, and that is, your company and your

19  division wanted to correct and rebut the outstanding SUS files,

20  correct?

21  A.  So the rebuttal is a little bit different because the

22  rebuttal is from the initial finding to the final finding.  So,

23  that part of the process, yes, they would try to make sure that

24  those findings that had been identified were correct.

25  Q.  Your team, in this whole process, your team was the team

1   that gathered the data from all of these efforts to bring

2   quality to the product.  Am I correct?

3   A.  Yes, I would use the corporate QC data.

4   Q.  Then you would disseminate that data so people could see

5   how to improve the product?

6   A.  Or trends.  A lot of it was looking at the trends in

7   quality.

8   Q.  Then, you indicated in your direct testimony that at one

9   point you stopped sending those reports, do you recall?

10  A.  The QC divisional comparison reports specifically, yes.

11  Q.  Yes.  That was in -- I think you said in mid-year 2008.  Am

12  I correct?

13  A.  That's my recollection as the timing.

14  Q.  That's what you said before.  Mid 2008.  You do realize by

15  that time the Hustle process had essentially over, am I

16  correct?

17  A.  I wouldn't say the Hustle process was over.  It is hard to

18  say when.  I mean, the process contained multiple facets, and

19  now by that time a lot of loans went through the government

20  program, FHFA program, which was not Hustle.  Loans through

21  Hustle may have been less, but I don't remember specific -- we

22  didn't put back the old PCA process.  That didn't come back and

23  we didn't have separate organizations.

24          So it's hard to say when you say the Hustle ended,

25  that's a hard thing to define for me.

1   Q.  You do know as of April 27, 2008, underwriters were

2   returned to the process, correct?

3   A.  I don't recall specifically whether underwriters were put

4   back.  I remember being shown a document where a clear to close

5   checklist was used for stated income loans but --

6   Q.  That document you just mentioned was a bulletin 08-195

7   dated April 25, 2008, which you were surprised to see.  Am I

8   correct?

9   A.  Surprised to --

10  Q.  When you first saw it, in 2013, you hadn't recalled the

11  document from way back five or six years ago.  Am I correct?

12  A.  I would say I didn't recall it.  I don't know that I would

13  be surprised.  But I didn't recall it.

14  Q.  You didn't recall it.  You didn't recall that document.

15  You didn't recall the bulletin on May 21, 2008, which in

16  addition returned human underwriters to the process.  Am I

17  correct?

18  A.  I don't remember that -- I may have been shown that

19  document, I don't remember the details of that document today.

20  I should point out at that point in time --

21  Q.  I'm not sure you should be pointing out.  You should just

22  be answering my questions.

23          THE COURT:  Yes, the question was answered.

24          THE WITNESS:  Okay, sorry.

25  Q.  I gather, sir, that with respect to the town hall meeting

1    which you talked about this morning or yesterday or this

2    morning on direct examination, I gather from time to time there

3    are large meetings, there were large meetings five or six years

4    ago in which announcements are made to a number of employees,

5    am I correct?

6    A.   I don't remember a lot of large meetings.  But, this was a

7    big change in the process, so it warranted a large meeting.

8    Q.   That's the meeting you described there were at least 100

9    people present, right?

10   A.   Yes.

11   Q.   You told us about questions that were asked by some of the

12   processors because it was the loan specialist job that would be

13   changed, am I right?

14   A.   That's correct.

15   Q.   What happened in the meeting after the process was

16   described, is the human reaction that people working on the

17   loans thought, uh-oh, I've got more responsibility, am I going

18   to lose pay because I make a mistake.  Am I right?

19             MR. CORDARO:  Objection.

20             THE COURT:  Sustained.

21   Q.   Do you recall indicating that a question was asked of

22   Rebecca Mairone at the meeting dealing with getting a

23   compensation hit?

24   A.   Yes.

25   Q.   What is a compensation hit?

1   A.  That means a reduction in their pay.

2   Q.  So, was there a system set up at the company, even before

3   Hustle, in which you tried to get employees to produce the best

4   possible product by having a reverse incentive, so to speak?

5   Namely, if they make mistakes, they would be docked?

6   A.  Yes, that was the one that was removed.

7   Q.  Is that an effort to produce a quality product?

8   A.  When it was in place, yes.

9   Q.  Yes.  It work both ways.  It could be a negative, a hit to

10  compensation, or it could be a positive bonus.  Correct?

11  A.  My recollection of the way it worked is for quality of

12  grade score you started with the top level score and you went

13  down from there.  So, I can't remember if in the bonus plans

14  they could get additional compensation, or if it was just a

15  reduction from the pool that they would normally get if they

16  had a perfect score.

17  Q.  It wasn't the case that an individual mistake would cause

18  one to be docked pay directly, one mistake, one docked pay; am

19  I right?

20  A.  No, that was the case.

21  Q.  How much, what was the formula?

22  A.  The formula for a QoG --

23  Q.  Tell us what that is.

24  A.  QoG is the quality of grade score.  The formula I believe

25  it started at a four or five was kind of the base level score,

1  which is your top score.  If you had an audit, it depended on

2  what type of error you had.  You would get docked either half a

3  point or a point from that score.  That score was then applied

4  to your bonus.  One mistake would hurt your compensation.

5  Q.  So, there was a natural human reaction going on that people

6  were concerned maybe their compensation would be hurt, is that

7  correct?

8          MR. CORDARO:  Objection, your Honor.

9          THE COURT:  Sustained.

10 Q.  Whose job is it within the division to decide what mistakes

11 would be docked and which were not to be docked?

12 A.  I don't know for sure who made the determination of what

13 the deductions were or but I would -- I can only guess as to

14 who --

15 Q.  Don't guess.  Whose job is it to decide whether to get a

16 sprint compensation bonus?

17 A.  The sprint incentive dealing with rebuttals was a separate

18 group of people.  And that, that reported up to Cliff

19 Kitashima, those quality assurance and control people.  It

20 would have been Ed and Cliff that would decide that bonus for

21 their employees.

22 Q.  That received approval from the top people in the quality

23 end of the division, am I right?

24         MR. CORDARO:  Objection.

25 Q.  Is that approved by Cliff Kitashima?

 1    A.  I'm waiting on the objection.

 2              THE COURT:  Ground?

 3              MR. CORDARO:  I guess I withdraw the objection as to

 4    the first question and then I'm not objecting to the follow-up

 5    question with respect to Cliff Kitashima.

 6              THE COURT:  Okay.

 7    A.  Can you repeat the last question?

 8    Q.  Isn't it a fact that the sprint bonus program received

 9    approval from top levels of the division?

10              MR. CORDARO:  Objection, your Honor.

11              THE COURT:  Ground?

12              MR. CORDARO:  "The top levels of the division."

13    Q.  Who approved it?

14    A.  I don't know.

15    Q.  One of the problems that developed under the new Hustle

16    process was that, in fact, prime CLUES accepted loans were

17    going through the process too slowly, am I correct?

18    A.  That was -- that was kind of the -- the origination of

19    trying to come up with the High-Speed Swim Lane, the Hustle

20    process was to move those loans more quickly.  So I would say

21    that we felt like those loans could move more quickly because

22    they didn't need the manual underwriting.

23    Q.  Why didn't they need the manual underwriting?

24    A.  CLUES determined that it was an acceptable quality loan

25    based on the information that was put into CLUES, so you didn't

have to redecision the file.  You didn't have to reanalyze the

criteria of the loan.  You just had to validate that the

information that was used in CLUES was correct and documented

appropriately.

Q.  You had no problem with the function that CLUES performed,

am I correct?

A.  No.

Q.  It was a great tool for Countrywide to be using in order to

decide whether a loan should be accepted with conditions or

referred?

A.  Yes, I think CLUES was a good system.

Q.  It was accepted widely in the industry that automated

underwriting was used and had to be used in big companies like

yourself, like your own?

A.  Yes.

Q.  It was widely accepted by Fannie Mae and Freddie Mac as a

useful tool, am I correct?

A.  My -- yes, that's my understanding.

Q.  Under the new system of Hustle, CLUES actually became the

underwriter, am I correct?

A.  CLUES did not perform the functions, all the functions of

the underwriter.  Again, the underwriter had to validate the

data that was in CLUES.  Because I could say whatever I want

into the system, but I need to document that with proper

documentation.  CLUES couldn't do that.

1   Q.  Well, garbage in, there is always garbage out, as we all

2   know.

3           The fact of the matter is you assume your people are

4   doing the right job to put the right information into CLUES,

5   correct?  That's what you check with quality assurance?

6   A.  Well, that's where I would say no.  Because that's the

7   whole reason I had an underwriting validator in the first place

8   was to check the work that the processor did.

9   Q.  But the management of the company decided that in the

10  Hustle program, CLUES itself would be the underwriter, am I

11  correct?

12  A.  Sometimes we would refer -- say CLUES is the underwriter.

13  And what we meant by that is, when CLUES -- when you -- when an

14  underwriter got a CLUES accept, we didn't want the underwriter

15  to redecision that file.  We didn't want them to second guess

16  the rules that were built into CLUES.  So, we didn't -- we

17  didn't want them to change the decision.  We wanted them to

18  verify the information.

19          So that was a lot of times we used CLUES as the

20  underwriter, because underwriters, especially when they're used

21  to dealing with subprime loans or more complex loans like

22  refers, they want to apply that, you know, manual underwriting,

23  all the decision-making criteria that they normally would do.

24          We didn't want them to do that on prime CLUES accepts.

25  So we just wanted them to verify the data that went into CLUES

1   and it was appropriately documented.

2   Q.  As a matter of fact, you yourself used the term CLUES is

3   the underwriter.  Am I correct?

4   A.  I'm sure I did, yes.

5   Q.  It was used widely in the company to mean that, in fact,

6   the computer program would be the underwriter, rather than have

7   the human contact that you were trying to eliminate so

8   frequently on prime CLUES accept loans.  Am I correct?

9            MR. CORDARO:  Objection.

10            THE COURT:  Sustained, although there are parts of

11   that that could be properly asked.

12   Q.  What loans did you anticipate -- strike that.

13            What loans did the design anticipate would go through

14   CLUES?

15   A.  Essentially all loans went through CLUES.  Desktop

16   Underwriter was a system like CLUES that Fannie Mae would use

17   for the EA programs.  But both of them were automated

18   underwriting programs.

19   Q.  Freddie Mac had its own automated underwriting system,

20   didn't it?

21   A.  I think so.  I don't remember what it was.  I don't

22   remember specific Freddie Mac programs.

23   Q.  When you use the term CLUES is the underwriter, what did

24   you mean?

25   A.  When I used the term CLUES is the underwriter, what I

1    was -- that was usually when I was conveying to underwriting,

2    what I meant was if you get a CLUES accept, don't second guess

3    the rules that are built into CLUES.  If CLUES says that's an

4    acceptable income level, don't second guess that's an

5    acceptable income level.  Just make sure that the income that's

6    put into the system is documented appropriately.

7            So, you know, it is not -- CLUES didn't take away all

8    the human contact necessary to process that file and to

9    underwrite that file.  It just determined whether it was an

10   acceptable quality, and somebody had to check the information

11   was correct.

12   Q.  Under the Hustle system, who was it that was supposed to

13   check whether the information was correct?

14   A.  The person putting in the information.

15   Q.  Who was that, the loan specialist?

16   A.  The loan specialist.

17   Q.  That was your philosophical difference which you kept

18   explaining to people in the company, correct?

19   A.  One of them, yes.

20   Q.  You worked by consensus in the Full Spectrum Lending

21   Division, did you not?

22           MR. CORDARO:  Objection.

23           THE COURT:  Overruled.

24   A.  I don't know if I would call it a consensus organization or

25   not.  Certainly I could be overruled.

1    Q.  That's life.

2    A.  I would still bring up my objections.

3    Q.  You would raise your suggestions any time that you thought

4    were appropriate, right, and you made your views known?

5    A.  If I felt it was appropriate and I felt like I could, yes.

6    Q.  We've seen them in e-mails.  You made your views known,

7    correct?

8    A.  Correct.

9    Q.  You're not timid?

10   A.  Usually not.

11   Q.  Right.  You made them known, which you should.  And people

12   above you evaluated them, am I correct?

13   A.  I can't say what they did specifically.  But I would hope

14   so.

15   Q.  The head of this division was Glen, am I right?  Or Greg I

16   mean, Greg Lumsden?

17   A.  Yes.

18   Q.  How many years had you worked with him?

19   A.  He was there in 2003 when I started, so from 2003 then off

20   and on until I left.

21   Q.  Did you from time to time make your views known to him?

22   A.  When appropriate.  Most of the time I would make my views

23   known to the appropriate chain of command.  I would tell my

24   supervisor and so forth.  But if I was in a meeting with Greg,

25   you know, Greg could be rough sometimes too, so you pick and

1   choose the times that you wanted to object.

2   Q.  You had no hesitancy to tell your immediate boss

3   Mr. O'Donnell what your concerns were, am I correct?

4   A.  No, I didn't.

5   Q.  In fact, you had a very good relationship with his boss,

6   Cliff Kitashima, right?

7   A.  I did.

8   Q.  You felt free to explain your concerns about the system to

9   him, didn't you?

10  A.  I did.

11  Q.  In fact, even Mr. O'Donnell told you at one time, listen,

12  make your views known, but you can't make the decisions.

13  A.  I don't recall that.  I don't dispute it.

14  Q.  Is it fair to say that you always were upfront with Cliff

15  Kitashima, the head of the risk function of the company?

16  A.  I don't recall ever not being upfront.  I don't think I

17  would ever have a problem --

18  Q.  Did he ever tell you stop raising your concerns or did he

19  listen?

20  A.  Cliff, Cliff would listen.

21  Q.  So would Mr. O'Donnell, right?

22  A.  Yeah.

23  Q.  All the things you told us about your concerns, you

24  expressed to them on a regular basis, am I correct?

25  A.  And others, yes.

D9P3BAN6                         Thomas – cross

1   Q.  As a matter of fact, by March of 2008, and April of 2008,

2   there were dramatic changes in the process and the company went

3   back to more involvement with human underwriters, am I correct?

4              MR. CORDARO:  Objection.

5              THE COURT:  Compound.  Sustained.

6   Q.  Do you remember human -- do you remember there being a

7   directive that underwriters should get involved with each loan

8   file as early as April 25, 2008?

9   A.  The only thing I remember is what I've seen in this process

10  which was that clear to close checklist being introduced.

11  Which I didn't see the checklist itself, but what that meant

12  was there was something on that checklist that an underwriter

13  needed to check.

14  Q.  But you were there, were you not, in March of 2008?

15  A.  I was there, but I was much less involved in this process

16  at that point.

17  Q.  You were there in April 2008, am I correct?

18  A.  I was there.

19  Q.  Didn't we see a memo already here introduced by the

20  government when you used words to the effect of "we are doing a

21  complete about face"?

22  A.  I said I heard that the old PCA process may come back.  But

23  that did not happen.

24  Q.  In other words, you heard that there would be a significant

25  change?

1   A.  I heard that that was a probability.

2   Q.  But you never knew about the change that actually was

3   required by two bulletins in March and April 2008?

4   A.  Well, I didn't see the old process come back because I

5   didn't see a central underwriting or funding organization

6   reestablished.  I didn't see -- I didn't see underwriting

7   validators put back into place.  So no, I didn't see that.

8   Q.  In other words, some of these quality things you thought

9   were important you did not see return; is that what your

10  testimony is?

11  A.  Yes.  What I would call the PCA process was not returned.

12  Q.  If you look in your book, the defense binder there for me,

13  sir, and go to tab number nine.  And see if you can locate

14  Defense Exhibit 58.

15  A.  Yes, I see that.

16  Q.  All right.  Do you see that this is a bulletin?

17  A.  I do.

18  Q.  On that bulletin, dated March 17, 2008, that dealt with the

19  income reasonability issue, am I correct?

20  A.  Yes.

21  Q.  This is something you know came from your company, am I

22  right?

23  A.  Yes.

24          MR. SULLIVAN:  All right.  Could I ask it be admitted.

25          MR. CORDARO:  No objection, your Honor.

D9P3BAN6                          Thomas - cross

1              THE COURT:  Received.

2              (Defendant's Exhibit 58 received in evidence)

3              MR. SULLIVAN:  Could we put that on the screen,

4    please.

5    Q.  Tell the jurors, what is an operations bulletin?

6    A.  It was a bulletin to communicate changes in the process or

7    clarifications of the process.

8    Q.  In other words, this states company policy, am I correct?

9    A.  It does.

10   Q.  Do you happen to notice it is on St. Patrick's Day; it was

11   issued March 17, 2008?

12   A.  Okay.

13   Q.  One of your concerns, indeed a large concern, was that in

14   stated income loans, it was always a difficult issue to somehow

15   confirm or make a judgment about whether the income the

16   borrower stated was reasonable.  Am I correct?

17   A.  I would say that was a major concern for stated income

18   loans.

19   Q.  Correct.

20   A.  But not one of -- there were a lot of other concerns I had

21   for other loans.

22   Q.  Let's talk about one at a time.  Stated income loans were

23   high on your radar screen as a potential concern, am I correct?

24   A.  They were one of the concerns.  I don't want to say that

25   they were the highest of others.  Because --

D9P3BAN6                         Thomas - cross

1   Q.  It's one of your concerns then?

2   A.  Yes.

3   Q.  It is a serious concern.

4   A.  Stated income loans were a serious concern.  I have to

5   agree with that.

6   Q.  Countrywide and Full Spectrum Lending didn't invent stated

7   income loans, did they?

8   A.  Not -- I know other companies did it.  I don't know who was

9   the first to market with it.

10  Q.  Stated income loans were a widespread -- strike that.

11          Stated income loans were produced by almost every bank

12  and accepted by Fannie Mae and Freddie Mac, were they not?

13  A.  I believe so.  I don't know for sure what the requirements

14  for stated were with Fannie and Freddie.

15  Q.  Define for us what a stated income loan is, sir.

16  A.  Stated income loan is a loan where, when the loan processor

17  would call the borrower, they would state their income.  No

18  verification of that income.  So I could tell you I make

19  $200,000 and that's what you would write down on the

20  application.

21  Q.  There were rules associated with that.  You're not supposed

22  to ask for tax returns or paystubs in stated income, am I

23  correct?

24  A.  I would say you're not required to ask for anything,

25  because the program didn't require it.

1   Q.  The program was widely accepted and approved by Fannie Mae

2   and Freddie Mac, is that not true?

3   A.  I can't say.

4           MR. CORDARO:  Objection.

5   A.  I can't say for sure what their acceptance rates were of

6   this type of loan.

7   Q.  I didn't ask about acceptance rates.  I asked whether

8   Fannie Mae and Freddie Mac willingly accepted and purchased

9   stated income loans.

10          MR. CORDARO:  Objection.

11          THE COURT:  Well, I think the question may be a little

12  vague.

13          But, was it your understanding that Freddie Mac and

14  Fannie Mae accepted this kind of loan?  Namely, a loan in which

15  the applicant stated his or her income but there was no

16  verification?

17          THE WITNESS:  My -- I would assume so, but --

18          THE COURT:  Do you know whether they did or not?

19          THE WITNESS:  I don't know for sure.  I didn't know

20  what Fannie and Freddie actually --

21          THE COURT:  Put another question.

22  Q.  Do you know whether Hustle loans included stated income

23  loans?

24  A.  That I do know.

25  Q.  Do you know that Hustle loans were sold to Fannie Mae and

D9P3BAN6                          Thomas - cross

1   Freddie Mac?

2   A.   Some Hustle loans were sold to Fannie Mae and Freddie Mac,

3   but I don't know that all Hustle loans -- in fact, I'm pretty

4   sure not all Hustle loans were sold.

5   Q.   Do you have any reason to believe that no stated income

6   loans were sold to Freddie Mac or Fannie Mae?

7   A.   I don't have reason to believe that.

8   Q.   At least we can agree you had a problem and you wanted

9   controls so steps would be taken somehow to verify what the

10  borrower said, am I right?

11  A.   Yes.  Some steps needed to be taken, correct.

12  Q.   You were an advocate of taking those steps in order to

13  bring quality to the product, am I correct?

14  A.   For that product, yes.

15  Q.   Did you have a role in convincing management to put out a

16  bulletin that directed that certain steps should be taken?

17  A.   I don't remember my specific role.  They could have used

18  some data that I put together to determine it.  But I don't

19  know for sure.

20  Q.   Wasn't this one of the things you were telling management

21  all along that this was a problem and it should be corrected?

22              MR. CORDARO:  Objection.

23              THE COURT:  Ground?

24              MR. CORDARO:  It's vague, your Honor.

25              THE COURT:  As to what "this" is.  All right.

1  Q.  "This" is income reasonability.  Do you understand what I'm

2  talking about, sir?

3  A.  Yes.

4  Q.  Why don't we just do this.  Tell the jury what income

5  reasonability is and how you thought it should be checked.

6  A.  Okay.  So, income reasonability is if somebody does tell me

7  what they make, then there is some thought process in

8  determining is that a logical income for that type of position,

9  for, you know, does it seem reasonable.

10      So, there were different tools along the way that

11  underwriters would use when they did this process to determine

12  that.  You could -- salary.com was one we used for a while and

13  then stopped.  But you could look at average income for that

14  job title, things like that.

15      But, I remember, I remember it being a problem.  And I

16  remember an example in the QA environment where somebody said

17  they made 200 something thousand dollars in New England as an

18  ice cream truck driver.  But, that was -- somebody's got to

19  apply some reasonability standards to what a borrower says.

20  Q.  You're using that as a concrete example or an illustration?

21  A.  I remember it went through our QA process in India, and

22  India didn't catch it originally.  Because the very beginning

23  of the QA process we had them looking at income reasonability,

24  and determined that they didn't have the context to do that.

25  That didn't raise a red flag to them.

1    Q.  Was it caught?

2    A.  I don't recall if it was caught or not.

3    Q.  Let's look at the document itself and see what we can learn

4    from this policy.  It states, quote, Updated Procedures for

5    Income Reasonability II.  Do you see that the headline?

6    A.  Yes.

7    Q.  Then, apparently the bulletin supersedes another one.  Then

8    it goes through summary of changes.  Do you see that?

9    A.  Yes.

10   Q.  These are changes that presumably are made to deal with the

11   problem of stated income in order to produce a product which is

12   a quality product, am I correct?

13   A.  It looks like they -- they made some changes to have the

14   underwriter participate in the reasonability test.

15   Q.  I gather that's something you would approve of?

16   A.  Yes.

17   Q.  So this is a positive thing?

18   A.  It is a positive, yes.

19   Q.  Let's go to the effective immediately here.  Just read that

20   first paragraph to you.  Effective immediately.  What did they

21   really say had to be done?

22   A.  It says "In order to ensure that the reasonability of

23   income is accurately documented and supported on stated

24   documentation loan programs, underwriting must now review the

25   stated reasonability worksheet within the income calculator

D9P3BAN6                          Thomas - cross

1   earlier in the loan process on all stated documentation loans."

2   Q.  So it was a new policy in the company.  Am I correct?

3   A.  Yes.

4   Q.  Then it mentions in there income calculator.  Would you

5   tell us what that is?

6   A.  Income calculator was a worksheet, basically a spreadsheet

7   that was developed to walk someone through all the aspects that

8   they needed to calculate income correctly.  Oftentimes you

9   would have somebody look at a paystub, and whether it's

10  biweekly or twice a month paychecks, they could come up with a

11  different income.  And so this was kind of standardizing that

12  process, so it was calculated the same every time.

13  Q.  Income calculator, is that basically a computer program or

14  a step by step?

15  A.  Spreadsheet, yes.

16  Q.  It is a spreadsheet.  Who designed that?

17  A.  I believe Michael Burns.

18  Q.  The person in your department?

19  A.  Yes.

20  Q.  Was that design to take steps to have a quality product?

21  A.  Yes.

22  Q.  Would you read the the very next paragraph, please.  Income

23  verification.

24  A.  "Income verification producers are provided below for all

25  production functions and are implemented immediately for all

1   stated documentation loan programs, including those with a PCA

2   decision.  All stated loans will be monitored."

3   Q.  All right.  So that's the company word.  That's the policy

4   of the company.  Am I correct?

5   A.  Correct.

6   Q.  When it says "PCA decision," that means after CLUES has

7   made a accept, possibly with conditions, this process applies

8   at that stage, am I right?

9   A.  Yes.

10  Q.  It says "all stated loans will be monitored."  You

11  understood that to mean actually all, am I correct?

12  A.  Yes.

13  Q.  So this was human underwriter contact coming back in to

14  deal with perceived quality assurance problems or quality

15  control problems, am I correct?

16  A.  Yes.  For that program it was.

17  Q.  This was what we call the stated income program within

18  Hustle, right?

19  A.  Correct.

20  Q.  Then if you go to page -- well, the pages are not marked.

21  But paragraph number five at the very top.  Next to the last

22  page.  You see that?

23  A.  "If the income is reasonable."

24  Q.  No.  The next to the last page.  You see the title

25  Processing Reasonability Review?

1    A.   Yes.

2    Q.   All right.   Then without reading them, it goes and lists

3    three specific things that should be done to do the best you

4    can to assure that the stated income, the income stated by the

5    borrower under oath is within reason.   Am I correct?

6    A.   So, it looks like the loan specialist had to put in the

7    worksheet the stated reasonability workout into the VLF, is the

8    virtual loan file.   That's just the loan file, and request

9    underwriting to review it.

10   Q.   And the next one, clear to close and funding procedures, it

11   further says what happens with respect to that, am I correct?

12   A.   Yes.

13   Q.   Sir, now go, if you would, to the tab number 11 and see the

14   Defendant's Exhibit 61.   This is another bulletin in the

15   company stating policy as of April 25, 2008, am I correct?

16   A.   Yes.

17           MR. SULLIVAN:   I ask it be admitted.

18           MR. CORDARO:   No objection, your Honor.

19           THE COURT:   Received.

20           (Defendant's Exhibit 61 received in evidence)

21           THE COURT:   Keep in mind, Mr. Sullivan, we are going

22   to break in five minutes.

23           MR. SULLIVAN:   Yes, your Honor, thank you.

24   Q.   Take a look at this.

25   A.   Okay.

1   Q.   This new procedure.  This was the bulletin that you

2   actually had not remembered seeing, am I correct?

3   A.   That's correct.

4   Q.   So you're in the company and you've been urging underwriter

5   involvement in these loans, but you do not recall five or six

6   years ago seeing this document, is that correct?

7   A.   I just didn't -- yes, I didn't remember this document.

8   Q.   All right.  Now its effective date is April 28, 2008.  Am I

9   correct?

10   A.   Correct.

11   Q.   Read the first paragraph for us.

12   A.   "To enhance loan quality and saleability, Full Spectrum

13   Lending Division is implementing a new clear to close process

14   for both field offices and central fulfillment teams.  Prior to

15   requesting doc draw, all loans must be submitted to

16   underwriting for a clear to close approval.  A new clear to

17   close checklist has been implemented to ensure underwriting is

18   validating critical quality requirements.  In this new process,

19   all submissions require a clear to close before a request for

20   doc draw can be submitted."

21   Q.   So that human underwriters were brought once again into the

22   process to deal with the issues here.  Am I correct?

23   A.   This is where I said I don't know what's on the clear to

24   close checklist.  So, but the underwriter would be required to

25   check whatever was on that checklist.

1   Q.  Just go to the caption underwriting and tell us what the

2   underwriter is supposed to do at this stage.

3   A.  "Review all items on the new clear to close checklist prior

4   to issuing a clear to close.  If any outstanding conditions

5   exist, return the clear to close request for the loan

6   specialist as a declination of clear to close with comments."

7   Q.  So what did that actually require -- strike that.

8        This was another step to bring quality to the product,

9   am I correct?

10  A.  It was a step.

11  Q.  Getting closer to your concerns, at least the underwriters

12  are back on the scene in March 17, back on the scene here for a

13  different issue, am I correct?

14  A.  For, yeah, like I said, for whatever on the clear to close

15  checklist.

16  Q.  This is a positive, isn't it, in your mind?

17  A.  It's a positive.

18  Q.  It was a decision made by management to improve the quality

19  of the product, am I correct?

20        MR. CORDARO:  Objection.

21        THE COURT:  Sustained.

22  Q.  In your view, would it return -- strike that.

23        Is it a good step to enhance the quality of your

24  product by having the underwriter back in the process as

25  described here in this exhibit?

D9P3BAN6                          Thomas - cross

1    A.  I think it is a good step, yes.

2            MR. SULLIVAN:  Thank you, your Honor.  That would be

3    good for the day.

4            THE COURT:  All right, ladies and gentlemen.  I know

5    it is going to break your heart but we are going to let you go

6    15 minutes early.  Don't take it as a precedent.  But, I do

7    want to ask you to be sure to be here at 9:30 tomorrow and

8    we'll start promptly then.

9            Have a very good evening.  We'll see you tomorrow.

10           (Jury excused)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9P3BAN6

```
 1              THE COURT:  My law clerk tells me that someone, maybe
 2    it was a joint call, I don't know, he received yesterday asking
 3    what was the Court's rules of whether a party can speak to its
 4    own witness during direct or during cross.
 5              The answer is you can speak to your own witness during
 6    direct.  You cannot speak to your own witness during cross.
 7              Also, I took note, Mr. Sullivan, of the fact that you
 8    brought out that Exhibit 58 was authored on St. Patrick's Day.
 9    I assume that was an act of uncontrollable ethnocentrism on
10    your part.
11              Is there anything else counsel needs to raise with me?
12    Yes.
13              MR. CORDARO:  Only one thing, your Honor.  Mr. Thomas
14    is going to have to change his travel plans as a result of his
15    testimony going over to tomorrow.
16              THE COURT:  Actually, I knew there was one other thing
17    I wanted to ask.  Mr. Sullivan, how much longer do you have on
18    cross?
19              MR. SULLIVAN:  I think it is going to be two hours,
20    but I am going to try to keep it within that.
21              THE COURT:  I think that would probably be the
22    maximum.  So let's keep it within that.
23              And how about counsel for Ms. Mairone?
24              MR. HEFTER:  Less than a half hour, your Honor.
25              MR. CORDARO:  With the Court's permission, your Honor,
```

D9P3BAN6

1   Mr. Thomas is going to have to make some alternative travel

2   arrangements.  There is someone from our office that's helping

3   him make those arrangements.  None of the lawyers --

4           THE COURT:  That doesn't violate my rule.

5           MR. CORDARO:  Thank you, your Honor.

6           THE COURT:  Yes.

7           MR. MUKASEY:  Just to flag an issue, Judge, before

8   your Honor takes a look at the I think newly designated John

9   Boland deposition excerpts, we're going to be putting in a

10  letter, probably tomorrow morning, objecting to a substantial

11  portion of Mr. Boland's proposed testimony.

12          THE COURT:  You're doing that because in accordance

13  with my rules you've already asked for permission to put in

14  that letter and I've granted it?

15          MR. MUKASEY:  I'm asking you to view this application

16  in that manner.  I think this is an issue --

17          THE COURT:  I'll grant that nunc pro tunc at this

18  time.

19          MR. MUKASEY:  Thank you, Judge.  I think this is an

20  issue that has been raised previously.  Your Honor commented on

21  the possibility of the admissibility of the testimony that

22  we're protesting during the summary judgment argument, so I

23  don't think it will be a brand new out of left field issue.

24  But I appreciate the chance to submit that.

25          MS. NAWADAY:  Your Honor, I just wanted to bring to

D9P3BAN6

1   the Court's attention one issue that arose during

2   Mr. O'Donnell's deposition this morning.  We understood the

3   Court's instruction to be that the deposition was to be limited

4   to one hour and also limited to the scope of Mr. O'Donnell's

5   FIRREA declaration.

6          THE COURT:  Correct.

7          MS. NAWADAY:  We wanted to raise with the Court that

8   in fact, Mr. O'Donnell was asked this morning:  "Mr. O'Donnell,

9   did you fill this affidavit out before or after you were

10  arrested for DWI.  And did you fill this document out before or

11  after you were sued for fraud."

12         And we wanted to ask that the Court exclude

13  questioning on either of these topics when Mr. O'Donnell takes

14  the stand.

15         THE COURT:  Of course the question asked in the

16  deposition, in addition to exceeding the permitted scope, was

17  also of course defective as to form since it was a compound

18  question.  So that question is not going to come into evidence.

19  I have no idea what the answer was.

20         But, who put that question?

21         MR. HEFTER:  I did, your Honor.

22         THE COURT:  Before we reach whether there can be any

23  examination on those subjects, how possibly could you have put

24  that question in light of my ruling as to scope?

25         MR. HEFTER:  Well, your Honor, I think it went to the

D9P3BAN6

1  veracity of the witness with respect to the declaration.

2          THE COURT:  On that theory, anything goes.  And there

3  might as well not be any limits on scope.

4          MR. MUKASEY:  I suggested that he ask the question.

5  He shouldn't take the fault.

6          THE COURT:  Plague on both your houses then.

7          MR. HEFTER:  In any event, we do not -- we understand

8  your Honor's ruling, but we do not intend to ask those

9  questions at trial tomorrow.

10         MS. MAINIGI:  Your Honor, I realize you have another

11 matter right now.  But could we come in earlier tomorrow to see

12 if there could be resolution had on the pending Cindy Simantel

13 motion in limine, simply because her testimony is potentially

14 upcoming.

15         THE COURT:  I think that's a good idea.  I have

16 another matter and I teach at Columbia not only on Tuesday but

17 also on Wednesday.  So I'm anxious to get to that other matter.

18 I think tomorrow I think we may stop as early as 4 o'clock.  So

19 why don't we reconvene at 9 a.m. tomorrow.  That will give us a

20 half hour to take up any matters before the jury starts.

21         MS. MAINIGI:  That would be fine, your Honor.  Could I

22 offer one point of clarification and we can pick this back up

23 tomorrow if you choose.  With respect to the questioning

24 related to our exhibit list, we certainly did provide your

25 Honor an exhibit list in accordance with the rules and as part

D9P3BAN6

1    of the joint pretrial consent order.  In fact, what we did was

2    we highlighted some of our work product even by putting in the

3    first 77 slots what the documents we thought would be most

4    frequently used, and that accounted for the confusion between

5    two documents that appeared to be the same.

6           Now, I certainly understand what your Honor is saying

7    is that at this point in the trial you would like to have our

8    exhibit list which was longer before, and a couple of thousand

9    documents, that you would like to see us shorten that.  And

10   that's what we will endeavor to do.

11          But I did want to clarify in fact we did provide an

12   exhibit list in accordance with the rules.

13          THE COURT:  I don't think that was the issue.  The

14   issue was, so far as the Court was concerned, was the confusion

15   over the numbering.  But, if you want me to tell the jury that

16   you're planning to put in 1,000 or more documents but you

17   haven't yet provided them with the full number, I'll be happy

18   to do that of course.

19          MS. MAINIGI:  We will decline on that offer, your

20   Honor.  Thank you though.

21          THE COURT:  See you all tomorrow.

22          Counsel in the criminal matter, you can set up.

23          (Adjourned until September 26, 2013, at 9 a.m.)

24

25

```
1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    MICHAEL THOMAS

4    Direct By Mr. Cordaro . . . . . . . . . . . 133

5    Cross By Mr. Sullivan . . . . . . . . . . . 251

6                          PLAINTIFF EXHIBITS

7    Exhibit No.                               Received

8     46    . . . . . . . . . . . . . . . . . . 161

9     19    . . . . . . . . . . . . . . . . . . 191

10    58    . . . . . . . . . . . . . . . . . . 203

11    129   . . . . . . . . . . . . . . . . . . 219

12    296   . . . . . . . . . . . . . . . . . . 225

13    297   . . . . . . . . . . . . . . . . . . 232

14    10    . . . . . . . . . . . . . . . . . . 238

15    109   . . . . . . . . . . . . . . . . . . 239

16    108   . . . . . . . . . . . . . . . . . . 241

17    74    . . . . . . . . . . . . . . . . . . 243

18    80    . . . . . . . . . . . . . . . . . . 245

19                          DEFENDANT EXHIBITS

20   Exhibit No.                               Received

21    73    . . . . . . . . . . . . . . . . . . 272

22    58    . . . . . . . . . . . . . . . . . . 306

23    61    . . . . . . . . . . . . . . . . . . 314

24

25
```