D9Q3BAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                              12 CV 1422 (JSR)

BANK OF AMERICA CORPORATION,
successor to Countrywide
Financial Corporation,
Countrywide Home Loans, Inc.,
and Full Spectrum Lending, et
al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          September 26, 2013
                                          9:45 a.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge

D9Q3BAN1

1                                    APPEARANCES

2   PREET BHARARA
         United States Attorney for the
3        Southern District of New York
    PIERRE G. ARMAND
4   JAIMIE LEESER NAWADAY
    JOSEPH N. CORDARO
5   CARINA H. SCHOENBERGER
    ELLEN M. LONDON
6        Assistant United States Attorneys

7

    WILLIAMS & CONNOLLY
8        Attorneys for Defendant Bank of America
    BRENDAN V. SULLIVAN, JR.
9   ENU MAINIGI
    MALACHI B. JONES
10  KENNETH SMURZYNSKI
    CRAIG D. SINGER
11  ALLISON B. JONES
    STEVEN M. CADY
12  JENNIFER WIMSATT PUSATERI

13

    GOODWIN PROCTOR
14       Attorneys for Defendants Countrywide
    RICHARD M. STRASSBERG
15  WILLIAM HARRINGTON

16

    BRACEWELL & GIULIANI
17       Attorneys for Defendant Mairone
    MARC L. MUKASEY
18  MICHAEL HEFTER
    RUSSELL ZWERIN
19  RYAN M. PHILP
    SETH M. COHEN
20  CHRISTINA JARDINE

21

22

23

24

25

D9Q3BAN1

1          (In open court; jury not present)

2          THE COURT:  Good morning.  The jurors were better than

3    yesterday, the last one just arrived, so we're all set to

4    continue, and we'll take up other matters at the midmorning

5    break.

6          (Jury present)

7          THE COURT:  Good morning, ladies and gentlemen.  Thank

8    you for being here reasonably promptly.  I have to tell you I

9    am a devoted Yankees fan and they were eliminated last night

10   from playoffs, and that's the only reason I'm wearing a black

11   robe of course.  We're ready to continue.

12         Counsel.

13    MICHAEL THOMAS,

14   CROSS-EXAMINATION

15   BY MR. SULLIVAN:

16   Q.  Good morning, sir.

17   A.  Good morning.

18   Q.  We were looking at a bulletin dated April 25, 2008, sent by

19   your division, am I correct?

20   A.  That's correct.

21   Q.  I'd like you to look at tab number 19, sir.  Do you have

22   there a Defendant's Exhibit 66 which is another bulletin?

23         MR. CORDARO:  Excuse me, I don't have a tab number 19

24   in my binder.

25         MR. CADY:  Counsel, I handed you an update to your

D9Q3BAN1                          Thomas - cross

1    binder this morning.

2              MR. SULLIVAN:  We can provide one quickly.

3    Q.  Do you have tab 19, do you see number 66?

4    A.  I do.

5    Q.  Sir, is that also a bulletin issued by the division which

6    states what company policy is?

7    A.  Yes.

8              MR. SULLIVAN:  I ask that 66 be admitted, please.

9              MR. CORDARO:  No objection, your Honor.

10             THE COURT:  Received.

11             (Defendant's Exhibit 66 received in evidence)

12             MR. SULLIVAN:  Alex, would you put that on the board.

13   Q.  Read the title of this bulletin, please.

14   A.  Sure.  "New clear to close approval process for field

15   offices and central fulfillment."

16   Q.  The date of is April 21, 2008 correct?

17   A.  May 21.

18   Q.  May 21, 2008, this bulletin number 08-237, am I correct?

19   A.  Correct.

20   Q.  Do you recall at the time you lived it, five or six years

21   ago, receiving this bulletin?

22   A.  I don't remember it specifically, but I'm sure I did.

23   Q.  You've looked at it since then, am I correct?

24   A.  I'm not positive I've looked at this one.

25   Q.  Let's look at it together then.  Please highlight the first

D9Q3BAN1                          Thomas - cross

1   paragraph.  And read that slowly for the court reporter and

2   tell us what this is.

3   A.   Sure.  "The bulletin 08-195 and 08-223 introduced the new

4   clear to close process that requires loan specialists to submit

5   every loan to underwriting for a clear to close approval.  This

6   bulletin contains additional information about processing,

7   underwriting and funding loans using the new clear to close

8   process, and introduces additional job aids and reference tools

9   that will facilitate compliance."

10  Q.   Did you participate in any way, as one of the members of

11  the division, in bringing about this change?

12  A.   I don't remember participating in this.

13  Q.   Take a look at the next sentence, please, and read that for

14  us.

15  A.   "The new clear to close process applies to any loan that is

16  cleared to close original or resubmission on or after May 22."

17  Q.   All right.  If you go down to the first bullet point, just

18  read that first bullet point.

19  A.   "All loans are now submitted to underwriting for a clear to

20  close decision and approval."

21  Q.   Sir, what then affected this half on the Hustle loan

22  process?

23  A.   So, it appears the last bulletin we looked at showed a

24  clear to close checklist, and this is ensuring that maybe they

25  redesigned the clear to close checklist, but it's another

1    statement of what the clear to close requirements are.

2    Q.  I see.  Other than reading this, you are not aware in your

3    recollection back then that they actually redesigned it?

4    A.  I can't remember specifically.  This was about 10 months

5    after I had raised my concerns from Drew's e-mail.  At this

6    point in time I was -- I didn't have a team anymore.  And I

7    think most of my folks had found positions elsewhere in the

8    organization.  So, I really wasn't as involved at this point.

9    Q.  What, sir?

10   A.  As involved at this point.

11   Q.  I see.  All right.  Let's look at what the change does.  If

12   we could go down just to the fourth bullet point, please.  Read

13   that for us, the one under it.

14   A.  Sure.  "So underwriting will now review all doc and

15   underwriting doc conditions to ensure that source documentation

16   used to satisfy the condition is acceptable."

17   Q.  What is the source documentation?

18   A.  That would be the documentation used to clear the

19   condition.

20   Q.  And the next bullet points, please.

21   A.  "A new underwriting SUS checklist has been created to

22   ensure that the underwriter pays particular attention to those

23   areas associated with a high number of SUS findings.  The

24   completed underwriting SUS checklist is a required document in

25   VLF," which is a virtual loan file.

D9Q3BAN1                         Thomas - cross

1    Q.  By virtual loan file, you mean the one on the computer?

2    A.  Correct.

3    Q.  The one in CLUES?

4    A.  Well, the CLUES report would have been in the virtual loan

5    file.

6    Q.  All right.  Turning the page for us, read the second and

7    third bullet points, please.

8    A.  "The LS must prepare the loan file for doc draw before

9    requesting the clear to close.  A clear to close will not be

10   issued unless all requirements have been satisfied."

11   Q.  Jumping down further where it says "procedures and loan

12   specialists."  Does the list below loan specialist provide for

13   the new procedures that they are to engage in, in the

14   processing of loans?

15   A.  It looks like it, yes.

16   Q.  Look, please, if you would, over to paragraph number six,

17   find that at the bottom of the page.  Turn the page one more

18   time.

19   A.  Okay.

20   Q.  You see the heading where it says "underwriting two review

21   process"?

22   A.  In step number six?

23   Q.  Find paragraph six and way at the bottom of the page and

24   then turn the page.

25   A.  Okay.

D9Q3BAN1                      Thomas - cross

1   Q.  Then you'll find a title saying "underwriting two review

2   process."

3   A.  Yes.

4   Q.  All right.  What does the term "stated docs" mean under

5   that?

6   A.  I assume that means docs for a stated income loan, I'm

7   guessing.

8   Q.  Okay.  Well, let's not guess.  Look down there where it

9   says "two UW reviews."  Can you spot that?

10  A.  Yes.

11  Q.  Read that sentence and let's see if it clarifies whether

12  we're talking about stated income loans or not.

13  A.  Sure.  "Two underwriting reviews are required to be

14  documented in the stated income worksheet that supports the

15  reasonability of income before a stated loan can be cleared to

16  close."

17  Q.  All right.  Yesterday we talked about the reasonability of

18  income procedures, am I correct?

19  A.  Yes.

20  Q.  We actually reviewed a bulletin dated March 17, 2008, that

21  dealt with that change in procedure, am I correct?

22  A.  Yes.

23  Q.  Do you now understand then the term "stated docs" refers to

24  documents in connection with the stated income loan?

25  A.  Yes.

1    Q.  Yesterday, by the way, I think you used the term liar's

2    loan.  Do you remember that?

3    A.  Yes.

4    Q.  Was that a term used in the industry in connection with

5    stated income loans?

6    A.  It was a frequent term, kind of a nickname for those loans.

7    Q.  Wasn't the term because there was concern that when

8    borrowers had the right to apply for a stated income loan, that

9    you were really relying on just their word, without

10   documentation?

11   A.  That's correct.

12   Q.  That was a widespread practice in the industry, wasn't it?

13   A.  I can't say how widespread.  I don't know what the volume

14   was of those loans in relation to others, but it was -- stated

15   income loans were common in different companies.

16   Q.  Well, you worked at another bank, I think at one time, am I

17   right, when you had that commute issue?

18   A.  Yes, I worked at Washington Mutual.

19   Q.  What did you do there?

20   A.  I worked on a project on their origination system.

21   Q.  Did they have stated income loans?

22   A.  I can't say for sure.  I would -- because they were a large

23   bank I would have assumed, but I can't say for sure.

24   Q.  At any rate, stated income loans were something we're

25   generally familiar with not only at Countrywide but in the

D9Q3BAN1                          Thomas - cross

1    industry?

2    A.  Sure.

3    Q.  So tell us then what changes are made here with respect to

4    the stated income loans that were designed to improve the

5    quality of your product?

6             MR. CORDARO:  Objection, your Honor.

7             THE COURT:  Are you referring by "here" to the

8    document that he said he's not sure he previously reviewed?

9             MR. SULLIVAN:  Yes.  But he has the document right in

10   front of him.

11            THE COURT:  I know, but then you can make your

12   arguments from the document.  I don't think he has shown he has

13   further knowledge.  You can inquire of that.

14   Q.  As you read the document today, can you conclude that this

15   new policy was intended to focus on quality issues, with

16   respect to stated income loans?

17            MR. CORDARO:  Objection.

18            THE COURT:  Ground?

19            MR. CORDARO:  I believe it was the same foundation

20   problem.

21            THE COURT:  I think it is a permissible question.

22   Overruled.

23   A.  It looks from the documentation, it looks like it was a

24   step to make sure underwriting reviewed the income

25   reasonability for stated loans.

1    Q.  Would you read then that "two underwriters" full paragraph

2    for us.

3    A.  "Two underwriting reviews are required to be documented in

4    the stated income worksheet.  That supports the reasonability

5    of income before a stated loan can be cleared to close.  Prior

6    to clear to closing the file, the clear to close underwriter

7    must ensure that an underwriter previously reviewed the

8    reasonability of income and documented their decision in the

9    stated income worksheet prior to phase code two."

10   Q.  All right, sir.  Thank you.  I believe yesterday you were

11   asked some questions by government counsel that focused on the

12   central fulfillment centers, the four of them.  Do you remember

13   that?

14   A.  Yes.

15   Q.  You were asked to list the four centers and you told us

16   they were Rosemead, California; Chandler, Arizona; Richardson,

17   Texas; and Hatboro, Pennsylvania; am I correct?

18   A.  That's correct.

19   Q.  Is that where the central fulfillment teams were located

20   that would do the processing and the funding of those

21   High-Speed Swim Lane loans?

22   A.  Yes.

23   Q.  You also testified that the processing and the funding of

24   those Hustle loans did not take place in any other centers,

25   other than those four, so far as you knew?

D9Q3BAN1                          Thomas - cross

1    A.  That would be the normal practice, that's correct.

2    Q.  Do I understand that you also testified that Countrywide --

3    strike that.

4              Is it a fact that Countrywide -- strike that.

5              You did testify that Countrywide kept data associated

6    with loans in those four centers, am I correct?

7    A.  Correct, they kept data on all loans.

8    Q.  Right.  In other words, the data was by code number and

9    team number, right?

10   A.  Yeah, they had a lot of different identifiers in the data.

11   They could have location identifiers, branch numbers, you would

12   have a branch number for the loan officers that originated the

13   file, branch numbers for the processing branches that did the

14   central fulfillment, and then you could have underwriter

15   manager name, several different fields in the data.

16   Q.  You testified about that yesterday, indicating that

17   Countrywide kept this data and it reflected the processing

18   branch numbers, am I correct?

19   A.  Correct.

20   Q.  What is the processing branch number?

21   A.  So, basically in the system that we used, called Edge, they

22   had different branch numbers which just meant the location of

23   the electronic file.  Not the virtual loan file, but the Edge

24   system.  And each processing team or group had its own branch

25   number.

D9Q3BAN1                          Thomas - cross

1    Q.  So, in January of this year, you recall that you faxed to

2    the government about a 14-page list containing those branch

3    numbers, am I correct?

4    A.  I do recall that, yes.

5    Q.  The last contained some central fulfillment branch numbers,

6    am I correct?

7    A.  I believe so.

8    Q.  It was the central fulfillment branches where the Hustle

9    loans were processed, am I right?

10   A.  Correct.

11   Q.  The list also contained many field branches, am I correct

12   there?

13   A.  If I remember correctly, without looking at the document, I

14   think that I -- I did show both central fulfillment in a

15   section and field fulfillment in a section.

16   Q.  And the field branches did not process Hustle loans, is

17   that correct?

18   A.  Traditionally no.  Sometimes there would be workload

19   balancing, so I can't say for sure, but there are times because

20   the files were electronic that if one group was overwhelmed

21   with volume, we could move volume from one place to another.

22   Q.  But generally, the field branches did not use the procedure

23   that was used for the production of Hustle loans, am I correct?

24   A.  That's correct.

25   Q.  If you'd look in your binder at tab number 18, you'll see

D9Q3BAN1                      Thomas - cross

1   Plaintiff's Exhibit 232.  I ask you if that is the list that

2   you provided to the government by fax in January of 2013.

3   A.  It does appear to be so.

4   Q.  You were merely trying to provide information requested at

5   that time, am I correct?

6   A.  This was from the corporate QC data that I had, that I had

7   already turned over to the government.  This was kind of a

8   summary of that which is the branch numbers.

9   Q.  All right.  I count that to be a 14-page document of a

10  detailed list, am I correct?

11  A.  It sounds about right.

12  Q.  You indicated to the government that the central

13  fulfillment ones were the ones that processed the Hustle loans,

14  am I correct?

15  A.  I believe so.

16          MR. SULLIVAN:  Let me admit it first, your Honor.

17  Plaintiff's 232, please.

18          MR. CORDARO:  No objection from the government.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 232 received in evidence)

21  Q.  If we look at the list here, it's now on the board.  The

22  first page of the list, which actually for our convenience

23  we'll call page three because that's the bottom of the document

24  for you, and I can talk about it.  Is that all right?

25  A.  Sure.

1    Q.  I'm looking at the page marked page 03 which is a fax

2    number, am I correct?

3    A.  Yes.

4    Q.  This was faxed to the government on January 9, 2013.

5    Correct?

6    A.  Yes.

7    Q.  The term do you see up in the right-hand column the words

8    "branch fulfillment," do you see branch fulfillment right

9    there?

10   A.  I do.

11   Q.  All right.  That would be a field operation, would it not?

12   A.  Yes.

13   Q.  If you look several pages forward to page 06, do you see in

14   the top-left column the CF initial for central fulfillment, am

15   I correct?  You see central fulfillment?

16   A.  Yes.

17   Q.  Circled there?

18   A.  Yes.

19   Q.  So it is the central fulfillment branches listed here that

20   would have done the Hustle loans that you testified about, am I

21   correct?

22   A.  Correct.

23   Q.  If we look back at the very first page, which we're marking

24   as page 03, the fax is marked page 03, if we look down the

25   first list and indeed down the next page all the way to the

D9Q3BAN1                          Thomas - cross

1   bottom, all those would be field office operations, am I

2   correct, until you get to the word "central fulfillment" way at

3   the bottom?

4   A.   Correct.  So down at the bottom of the first page starts

5   the central fulfillment.

6   Q.   Let's focus on that for just a minute.  Central fulfillment

7   the bottom of page marked 04, am I correct?

8   A.   Yes.

9   Q.   So everything below there, those code numbers -- tell the

10  jury what those code numbers mean.

11  A.   So all the code numbers again are the branch numbers in the

12  Edge system.

13  Q.   These would be the branches that did use the Hustle

14  process, am I right?

15  A.   Central fulfillment, yes.

16  Q.   Central fulfillment.  If we turn the page, we're now

17  looking at page 05, that's all central fulfillment loans branch

18  numbers listed, correct?

19  A.   It may not be all the branch numbers that were central

20  fulfillment.  You have to remember that this list was generated

21  from an audit report.  So, it would have only included branches

22  that had files that were audited in that report.  So I couldn't

23  say that this was a comprehensive list of branch numbers, but

24  it is the ones that would show up on that report.

25  Q.   You sent it to the government?

D9Q3BAN1                          Thomas - cross

1   A.  It's the only data I had was around the audits that were

2   performed, so I could only show that.

3   Q.  We are looking at page 05.  All those are central

4   fulfillment branch numbers, right?

5   A.  Correct.

6   Q.  On the next page, 06, those would all be central

7   fulfillment, am I right?

8   A.  Correct.

9   Q.  The same is true of page 07, all central fulfillment codes,

10  am I right?

11  A.  Correct.

12  Q.  And then to go to the next page, 08, there are a couple of

13  codes right at the top that are central fulfillment.

14  A.  Correct.

15  Q.  Right?  Just a couple of them.  That would be right under

16  the CF and the two branches to the right, 6392 and 6393, am I

17  right?

18  A.  Correct.

19  Q.  Everything below that you see the word "field"?

20  A.  I do.

21  Q.  Everything below that, for every page for the rest of the

22  document, page eight, page nine, page 10, page 11, page 12,

23  page 13, page 14, page 15, and page 16 are all field

24  operations, am I correct?

25  A.  Correct.

D9Q3BAN1                    Thomas - cross

1    Q.  They are not central fulfillment operations, am I correct?

2    A.  In general, yes.  I should say also that some branch

3    numbers at times during this time period were reused.  So if

4    for some reason we closed a branch, and didn't need that branch

5    number anymore, it could be repurposed for a central

6    fulfillment branch.  I can't conclusively say that there is not

7    some crossover there between.

8    Q.  That's the list you sent to the government.  It is the best

9    and most accurate list you had, am I right?

10   A.  This is the most accurate that I could come up with from

11   the reports that I had.

12   Q.  Thank you very much.  Close that up now, sir, if you would.

13          Sir, yesterday on direct examination, you spoke about

14   the sprint incentive.  I wanted you to turn, please, to tab

15   number 15.

16   A.  Okay.

17   Q.  Do you see there at tab number 15 an e-mail from your boss

18   to you?

19   A.  I do.  It looks like an e-mail from Ed to me with some

20   other folks copied, yes.

21   Q.  Is this defendant's marked 1060?

22   A.  Yes.

23          MR. SULLIVAN:  I ask it be admitted, please.

24          MR. CORDARO:  No objection.

25          THE COURT:  Received.

D9Q3BAN1                      Thomas - cross

1          (Defendant's Exhibit 1060 received in evidence)

2     Q.  Let's take a look at this memo if you would.  It is dated

3     May 21, 2008, am I correct?

4     A.  That's correct.

5     Q.  In fact, that's very near in date to the document we just

6     looked at, right?  This is May.  Try to focus us back in those

7     days May 2008 now.

8     A.  Yeah.

9     Q.  All right.  You're writing -- Mr. O'Donnell is writing to

10    you, and a bunch of other people are listed there, right?  Just

11    remind us who these people are.

12    A.  So, it looks like Cliff Kitashima, the chief credit

13    officer; FSL QC management, which would have been the people

14    doing the rebuttals.

15    Q.  Is that the 36 people we looked at yesterday on the list?

16    A.  From the -- that's an e-mail list, and I don't know for

17    sure what the distribution -- it could have been just the

18    managers.

19    Q.  All right.  Go ahead.

20    A.  Pamela Richards who worked for me.  Steve Brent who was the

21    head of quality assurance and control, those folks that do the

22    rebuttals worked for.  Wade Comeaux who ran central

23    fulfillment.  Robert Price, Jim White and David Sallis, I can't

24    remember the exact positions they held at the time.  They were

25    underwriting center managers in the past.  I can't remember how

1    they folded into the central fulfillment organization.

2    Q.  Tell us what this is addressed to the re section, please.

3    A.  FSL QC daily reporting package.

4    Q.  Just read the very first sentence of the memo itself.

5    A.  "Very solid progress yesterday with concluding and

6    successfully reducing initial SUS files.  We need to keep that

7    same pace today and tomorrow to ensure we achieve our goal of

8    eliminating any backlog of initial SUS findings received by

9    May 1st."

10   Q.  Is this the rebuttal process that you spoke about on direct

11   examination?

12   A.  Yes.

13   Q.  Were many offices within the company focused on the

14   severely unsatisfactory rating of some loans in order to

15   address that issue and eliminate that category severely

16   unsatisfactory, am I right?

17   A.  Yeah, they would review the initial SUS to make sure it was

18   valid.

19   Q.  All right.  If you would just read the last sentence of the

20   next paragraph, "the entire group."

21   A.  "The entire group has a chance to earn some extra bucks for

22   the effort.  Let's make sure" I'm guessing that should be "they

23   see the direct connection between reduced random ratings and

24   increased paychecks."

25   Q.  That's the compensation program where you talked about in

344

D9Q3BAN1                              Thomas - cross

1    order to get this team to focus with diligence on the severely

2    unsatisfactory loans that had that rating, right?

3    A.   That's correct.

4    Q.   And then he further says "Great day yesterday, keep it up."

5    And then there is some highlights for random files.  Do you see

6    that?

7    A.   Yes.

8    Q.   Does random files mean random audit -- in other words,

9    files that resulted from the random audit?

10   A.   I think so, yes.

11   Q.   The random audit process is one that is done by the

12   corporate level, not by the division level itself, am I right?

13   A.   That's correct.  The entire QC, corporate QC process was

14   done at the corporate levels.

15   Q.   In other words, it's a corporate team plus an in-house

16   quality control team?

17   A.   The corporate team would come up with the ratings.  The FSL

18   team that was involved in the sprint incentive would be kind of

19   the liaison between the corporate QC auditor that did the

20   finding and whoever was -- noted as grading the finding.

21   Q.   Then he gives the next line "highlights for random file,"

22   correct?

23   A.   Correct.

24   Q.   He makes a report.  Would you read what his report is.  Is

25   this the status, the progress of being made as of the date of

D9Q3BAN1                         Thomas - cross

1    that memo in dealing with this volume of severely

2    unsatisfactory loan files?

3             MR. CORDARO:  Objection, your Honor.  It's compound.

4             MR. SULLIVAN:  I could ask it another way.

5             THE COURT:  Yes.

6    Q.  What is it?

7    A.  It looks like a report of the progress that the rebuttal

8    team as made.

9    Q.  If you flip the page here, two-thirds of the way down the

10   page you see where it says "highlights random audits"?

11   A.  Yes.

12   Q.  Is that too a report of the progress being made by this

13   team of people focusing on this project?

14   A.  It appears so.

15   Q.  Would you just tell us, read the first four lines for us,

16   please.

17   A.  "135 initial SUS files have been overturned.  21 initial

18   SUS files have been finalized as SUS.  A total of 239 SUS files

19   have progressed past stage six, in other words, received a

20   rebuttal response from corporate QC.  A total of 196 initial

21   SUS files have not progressed past stage five, in other words,

22   no rebuttal sent to CQC."

23   Q.  Okay.  Now, we're dealing in this rough period of 2007,

24   2008.  Approximately how many loans went through the division

25   during that period of time?

D9Q3BAN1                           Thomas – cross

1   A.  I can't recall in units.  I remember for Full Spectrum

2   Lending, when I started in 2003 we were about $300 million a

3   month in loan volume.  I think we peaked, I'm not sure when the

4   peak was, maybe around 2007, at about $3 billion per month.  I

5   don't know at this time.  But I can't remember how many loans

6   that was.

7   Q.  Tell us approximately how many people did it take to

8   process that volume of loans at the time period you just

9   referred to?

10  A.  Without looking at any staffing reports, I can't remember

11  how many people were in the division at that point.

12  Q.  Do you have any sense at all?  We are talking thousands,

13  aren't we?

14  A.  I would guess, but I don't -- I can't remember.

15  Thousands -- all people involved in Full Spectrum sounds right.

16  Q.  Yeah.  Was most of this -- strike that.

17          All right, sir.  Just to look, would these reports of

18  the random audit files, were they widely circulated among

19  people who were involved in the project in your division?

20  A.  For the rebuttal process?

21  Q.  Yes.

22  A.  They were circulated to the people involved in the rebuttal

23  process.  I know I did progress reports I think daily for them.

24  Q.  How many days did it take roughly to go through this whole

25  project?

D9Q3BAN1                           Thomas - cross

```
 1              MR. CORDARO:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3   Q.  Do you remember how many daily reports you would have sent

 4   out?

 5   A.  I don't remember.  It would have been probably until the

 6   quarter one reviews were complete.  But I can't remember how

 7   many days that was.

 8   Q.  Now turn to the tab number three if you would, sir.

 9   A.  Number?

10   Q.  Three.

11   A.  Three.

12   Q.  Would you identify this, sir?  Is this a memorandum from

13   you dated July 19, to a -- who is that to, several people

14   including yourself, right?

15   A.  Yeah.  Yeah, I'm not sure.

16   Q.  Sometimes do you include yourself among the addressees in

17   order to have it in the file?

18   A.  It looks like it was addressed to Loren Rodriguez.

19   Q.  Is it marked Defendant's Exhibit 193?

20   A.  Yes.

21              MR. SULLIVAN:  Ask that it be admitted, please.

22              MR. CORDARO:  No objection, your Honor.

23   Q.  I take it this document --

24              THE COURT:  I'm sorry.  What was the number?

25              MR. SULLIVAN:  DX 193, your Honor.
```

D9Q3BAN1                      Thomas - cross

1        THE COURT:  Thank you.

2        (Defendant's Exhibit 193 received in evidence)

3   Q.  I take it this is actually before the pilot started,

4   July 19, 2007, am I right?

5   A.  Yes, I think this appears to be some documentation around

6   some initial discussions that we had on the design team about

7   how to improve the process in general.

8   Q.  You were involved in it at that time, you were sending

9   along your ideas, like a lot of other people were, am I right?

10  A.  I believe this document, if I look down the document, it's

11  probably a summary of ideas that we discussed.  In those

12  design -- I don't necessarily think all these ideas were mine.

13  But we definitely discussed these.  It was kind of a notes from

14  one of the design meetings.

15  Q.  There were a lot of pages of notes which we'll get to.

16  These are some of the initial suggestions on how to use

17  different lanes for prime and subprime loans, am I right?

18  A.  That's correct.

19  Q.  This was the group you spoke about.  These are ideas from

20  many in the group as to how to better the process, and deal

21  with the prime loans that needed less hands-on touching, am I

22  right?

23  A.  The hands-on touching, I wouldn't say that definitively,

24  but yes, it was a project design to treat those types of loans

25  differently.  To figure out if we could have efficiencies in

D9Q3BAN1                        Thomas - cross

1    both processes.

2    Q.  It is true, isn't it, that subprime lines had to have a lot

3    of involvement and discretion of an underwriter?  By that I

4    mean a human underwriter.

5    A.  I would say that's true.  Subprime loans could also get a

6    CLUES accept which wouldn't necessarily have as much

7    underwriting involvement as far as that same discretion.  It

8    would have been similar to a prime CLUES accept in how they

9    processed it.  But, yes, subprime loans would have more

10   underwriting involvement or higher risk loan.

11   Q.  Would you sometimes call that manual review?

12   A.  Yeah, we could call it manual underwriting.

13   Q.  By that we mean a human being manually underwriting?

14   A.  True.  We could have a prime CLUES refer.  If CLUES

15   couldn't decision it, an underwriter would have to manually

16   review it.

17   Q.  This whole process of colleagues coming together and giving

18   different ideas was an effort to design a process that dealt

19   with a better quality of loan, namely a prime loan versus a

20   subprime loan, am I right?

21   A.  It -- I believe it was to deal with the prime loan

22   specifically, which would have been a lower risk loan.

23   Q.  A low risk loan?

24   A.  Lower.

25   Q.  Lower risk.  And that's what prompted the ideas.  Can we

D9Q3BAN1                     Thomas - cross

1   handle these lower risk loans more efficiently, right?

2   A.  I think that's fair.

3   Q.  You of course were open minded to handling it more

4   efficiently, correct?

5   A.  Yes.

6   Q.  In fact, I think you were the one that suggested whenever

7   you can get something handled more efficiently, it is lower

8   cost to the company, am I right?

9   A.  That's true.

10  Q.  A noble goal always, am I right?

11  A.  I think so.

12  Q.  Take a look at the document.  It is titled "process

13  improvement ideas."  And just read for us what's on the front

14  page there.  Then we'll flip over.

15  A.  "One obvious suggestion that I forgot to put on our list:

16  Build separate organizations to handle prime and subprime or

17  the defined Swim Lanes."

18  Q.  Hold that right there.  Could you explain that a little bit

19  to us.  Is this your idea or were you reporting someone else's

20  idea?

21  A.  I think this was an idea from the group that I forgot to

22  put on the initial list.

23  Q.  Okay.  And is it possible -- strike that.

24        Did you come up with the idea of Swim Lanes?

25  A.  I don't know that I came up with it specifically.  We may

D9Q3BAN1                         Thomas - cross

1   have discussed it.  It kind of came out of the concept of prime

2   CLUES accept we already in underwriting, we already had

3   different processes and we called -- just to give you an idea

4   of what we called Swim Lanes, when you designed out the

5   process, each kind of horizontal in that process map we call a

6   Swim Lane.  So it just meant it follows a different process

7   than the other.

8   Q.  In other words, Swim Lane, the term Swim Lane was not first

9   used with Hustle, but it is something that you used at work

10  before that?

11  A.  Swim Lane was just a project management term when you read

12  the work flow charts.

13  Q.  It was a term that existed before the so-called Hustle

14  loans, am I right?

15  A.  Sure.

16  Q.  You used it frequently to describe a particular lane in

17  which a loan traveled, am I right?

18  A.  I think that's true.

19  Q.  Then someone came up with the idea of adding the word

20  high-speed, so you have a High-Speed Swim Lane.  Is that what

21  happened?

22           MR. CORDARO:  Objection.

23           THE COURT:  Sustained.

24  Q.  Let's flip a couple of pages over if we could.  See page

25  three there?

D9Q3BAN1                          Thomas - cross

1    A.  I do.

2    Q.  Is Loren the chief person, Loren Rodriguez, who is on the

3    design team?

4    A.  He's the head of the operations support team, or was the

5    head.  And so Mark Barnett, who was kind of the lead, project

6    lead on this project, reported to Loren.

7    Q.  So he's sending you a thank you I guess.  Isn't it right

8    there when he says "I know we can rely on you"?

9    A.  Sure.

10   Q.  Read what it says.  This is Loren's note to you after you

11   send him this list of ideas, am I right?

12   A.  Yes, it appears he's replying to my notes.

13   Q.  Just read that for us where it says "knew we could."

14   A.  "Knew we could rely on you, Michael.  Thanks for the

15   input."

16   Q.  What he's thanking you for is everything that comes below

17   there on this e-mail, am I right?

18            MR. CORDARO:  Objection.

19   Q.  What's he thanking you for?

20            MR. CORDARO:  Objection.

21   Q.  If you know?

22            THE COURT:  Sustained.

23   Q.  Let's look below near the end of page three.  Tell us what

24   you write there in that introductory paragraph next to the word

25   "Loren."

 1   A.  "Loren here's a general list of topics that we've discussed

 2   around improving prime work flow.  Some can be applied to lower

 3   FICO processes as well.  Many of these we have touched on

 4   already."

 5   Q.  I think we have a new initials.  FICO.  You want to tell us

 6   what that is?

 7   A.  FICO is the credit score of the borrower.

 8   Q.  What does it actually mean?

 9   A.  Actually I can't remember what the --

10   Q.  Neither can I, but one of my associates will know.

11           One of those initials that's like IBM, you forget.

12   A.  Right, you forget.

13   Q.  Let's look at the list itself there.  At page three.  Let's

14   look at the first heading.  Read the first head heading for us.

15   A.  "Reduce touches/rework."

16   Q.  What do you mean by the word "touches"?

17   A.  How many times a file or something would move to a

18   different person or how many times it required somebody to

19   touch it, basically.

20   Q.  That gets back to the manual versus the non-manual

21   underwriting concept, doesn't it?

22   A.  That could be one touch.  There are lots of other touches.

23   If you're, let's say you had processing, and you had different

24   people processing different parts of the file, that would be a

25   process with a lot of touches where you might want just one

D9Q3BAN1                          Thomas - cross

1   processor looking at all the things to reduce touches.

2   Q.  We are not going to read all this list.  I'd like just to

3   refer to a couple of them.  Look at page four, just read the

4   top line for us.

5   A.  Page four, top line says "Lloyd's approach -- no file goes

6   backward, just to the side for specialized exception

7   processing."

8   Q.  Who is Lloyd?

9   A.  Lloyd was the head of the sales organization.

10  Q.  Then three lines down, read that for us.

11  A.  Which three lines from the top?

12  Q.  "Keep authority."

13  A.  "Keep authority at lowest levels to avoid escalations."

14  Q.  This was one of the suggestions that was made by either you

15  or someone in the group?

16  A.  Yeah, I think it was one of the topics that was discussed.

17  Q.  Then if you go down a little further where it says "time

18  delays."  Do you see that?

19  A.  Yes.

20  Q.  Read that for us.

21  A.  "Time delays due to back and forth."

22  Q.  What do you mean by that in your memo?

23  A.  So, when a file moves back and forth between individuals,

24  either in the same team or different teams, you lose time.

25  It's got -- typically, because when it goes to somebody else it

D9Q3BAN1                     Thomas - cross

1  goes into their queue of work, and so there is not

2  necessarily -- they are not going to immediately look at it.

3  Q.  I see.

4  A.  There is a lot of lead time.

5  Q.  If you have a good prime loan that should move faster, it

6  could get lost behind other loans that would take more hands-on

7  manual care and be slower?

8  A.  Basically that was the concept we used in underwriting with

9  prime CLUES accept.

10  Q.  If you go down to where it says "eliminate communication."

11  Do you see that?  Read us those three lines there.

12  A.  "Eliminate communication and hand offs for high FICO loans.

13  Find ways to fulfill loans in one place.  In other words, use

14  income calculator and remove validation in favor of percent of

15  audits."

16  Q.  The further loans listed down that whole page, and, excuse

17  me, further suggestions down the whole page.  Then on the next

18  page, there is still further single spaced suggestions as

19  people come together and give ideas about how to design the new

20  project, am I correct?

21              MR. CORDARO:  Objection.

22              THE COURT:  Sustained.

23              (Continued on next page)

24

25

D9QTBAN2                          Thomas - cross

1    BY MR. SULLIVAN:

2    Q.  Were these items listed here something you put together

3    based upon your being present at the meeting?

4    A.  It appears they were my notes from the meeting, yes.

5    Q.  And you're putting the ideas in one place to facilitate the

6    design project?

7    A.  Typically at the beginning of a process design project

8    you're taught no idea is a bad idea, list every idea that comes

9    up, and that's where you start.

10   Q.  All right.  Turn to tab 4, if you would.

11   A.  OK.

12   Q.  Now tab 4 you see another email which is dated December 19,

13   2007.

14   A.  December 19, 2007, yes.

15   Q.  And this is Defendant's Exhibit 752, am I correct?

16   A.  Yes.

17            MR. SULLIVAN:  I ask that it be admitted.

18            MR. CORDARO:  No objection.

19            THE COURT:  Received.

20            (Defendant's Exhibit 752 received in evidence)

21   Q.  In this exhibit you are writing to Mary Thomas, who I

22   assume is no relative, right?

23   A.  No relative.

24   Q.  And to Loren you're writing as well, and the title of your

25   email is what?

1   A.   Clarification of PCA at clear to close process.  PCA is

2   prime CLUES accept.

3   Q.   Prime CLUES accept.

4            Now sir, tell us, who is Mary Thomas?

5   A.   So Mary Thomas worked in Loren's organization.  My

6   recollection is she was responsible for the bulletins that

7   would come out.

8   Q.   Are you trying to assist her here with writing a bulletin

9   on or about December 19, 2007?

10  A.   It looks like I'm clarifying some points that may be going

11  into a bulletin.

12  Q.   Read the first paragraph for us, please.

13  A.   Here are the main topics that we addressed in our regional

14  BOM -- which is Branch Operation Manager -- calls last week.

15  The bulletin clarifying the process should include these

16  points.  Per our discussion we may want to -- it should be

17  "to" -- integrate these points directly into a revised version

18  of the original bulletin which may require some wordsmithing,

19  too.

20  Q.   In other words, she's charged with the responsibility of

21  actually writing up the bulletin, some of which we have seen.

22  A.   Correct.  This was specific to the branch process, not

23  central fulfillment.  This was pre-Hustle.

24  Q.   What time did the Hustle project start?

25  A.   The Hustle project started in September of 2007, but this

was not for the central fulfillment organization that employed

the Hustle, this was for the branch process that still had the

prime CLUES accept process, which was the process we had before

Hustle.

Q.  So are you suggesting this had nothing to do with Hustle?

A.  I am.

Q.  Look at the paragraph number CLUES.  Do you see it, 2,

CLUES?

A.  Yes.

Q.  Read the first sentence for us.

A.  CLUES is the underwriter.

Q.  And explain what you meant when you used that phrase?

A.  So typically when I said CLUES is the underwriter, I think

I mentioned earlier in testimony that one of the issues that

some underwriters would have is even when CLUES gave an accept

on a loan, they would try to re-decision the rules that were in

CLUES.  So we didn't want that to happen.  The rules in CLUES

were tested, they were valid, they were accepted.  So we just

wanted to validate the information that went into CLUES, we

didn't want them to re-underwrite the file.

Q.  Now in the High-Speed Swim Lane, CLUES was also the

underwriter, wasn't it?

A.  CLUES did the same function in Hustle as it did in the PCA

process, yes.

Q.  So in the Hustle program, that sentence "CLUES is the

```
1    underwriter," applies just as validly as it does in the PCA

2    loan, correct?

3    A.   In the way it was meant here, yes.

4    Q.   Thank you.  Turn, please, to tab 5.  This is another email

5    from you directed to your boss, Mr. O'Donnell, right?

6    A.   Correct.

7    Q.   It's dated July 24, 2007?

8    A.   Yes.

9    Q.   And that is actually before the pilot program for Hustle

10   began, am I right?

11   A.   I can't remember the specific date that the pilot began,

12   but this would have been in the time period.  If it hadn't

13   began, it would been in the discussion of what the process

14   change may be.

15   Q.   Certainly before the so-called roll out of the Hustle?

16   A.   Yes, that's correct.

17   Q.   Now look, this is Defendant's 217, am I right?

18   A.   It is.

19           MR. SULLIVAN:  I ask that it be admitted.

20           MR. CORDARO:  No objection.

21           THE COURT:  Received.

22           (Defendant's Exhibit 217 received in evidence)

23   Q.   Here we are talking about the high High-Speed Swim Lane

24   directly, are we not?

25   A.   We are.
```

D9QTBAN2                          Thomas - cross

1    Q.  Just read the subject line.

2    A.  It's a forwarded email, it says prime High-Speed Swim Lane

3    session docs for Tuesday, July 24 meeting.

4    Q.  Just read the paragraph where it begins "In summary."

5    A.  In summary, the work flow is directionally correct with

6    where we want to go on high FICO loans, but I raised concerns

7    with the challenges of managing it.  There are a lot of

8    parallel process steps, and I'm not sure we have the work flow

9    process to manage what to do, by who, and when, for each step.

10   Q.  And this, consistent with your earlier step, is an example

11   of you bringing up concerns, as a member of the division, with

12   the process as it's being designed, right?

13   A.  Yes.

14   Q.  And your further concerns are listed here, if you read the

15   second sentence of the next paragraph.

16   A.  I responded by saying that we do want to remove excess

17   controls from the low risk process, but that the control isn't

18   the only or the biggest issue.

19   Q.  OK.  Then the following paragraph, just the first two

20   sentences, please.

21   A.  Anyway, this all looks great on paper, but I don't think

22   it's going to be easily implemented.  The end result may be the

23   additional -- must be "addition" -- of the income calculator

24   which may allow us to remove up-front validation.

25   Q.  That sentence needs explaining.  What do you mean by the

D9QTBAN2                           Thomas - cross

1    income calculator?

2    A.   So one of the topics that could create some back and forth

3    with underwriting, I think we talked a little bit about it, but

4    the income could be calculated slightly differently between the

5    processor and the underwriter, and that would cause some back

6    and forth and wasted time.  So the income calculator was

7    intended to standardize the approach of how you calculated

8    income so that you wouldn't have to do that recalculation of

9    income at the next step, you could just follow the calculator.

10   Q.   And when you say it may allow us to remove up-front

11   validation, what did you mean there?

12   A.   That meant the validation of the income calculation.  So

13   typically the underwriter would validate how the processor

14   calculated income, so that step wouldn't need to be done

15   because they would do it in the income calculator.

16   Q.   If you look at the last page of the exhibit, there's a note

17   there from one of your colleagues where it says, "We must."  Do

18   you see that?

19   A.   Yes, I think this is from Mark Barnett.

20   Q.   He's the chief of the group?

21   A.   He was the process engineer, yes.

22   Q.   And what is he telling you and others on this email?

23   A.   It says we must move quickly to meet the aggressive

24   timeline for this project.  Please review the next steps page

25   and begin your tasks ASAP.  If you have any questions about

D9QTBAN2                          Thomas - cross

1    those, please let me know.

2    Q.  All right, sir.  If you turn to tab number 6.

3    A.  OK.

4    Q.  This is an email from Mark Barnett to you, and it is dated

5    August 31, 2007, correct?

6    A.  Yes.

7    Q.  Now the Swim Lane pilot was ongoing for about two weeks at

8    that point, am I right?

9    A.  Again, I'm not completely certain on the timeline of the

10   pilot, but I don't dispute that.

11           MR. SULLIVAN:  I ask that Defendant's 378 be admitted,

12   please.

13           MR. CORDARO:  No objection.

14           THE COURT:  Received.

15           (Defendant's Exhibit 378 received in evidence)

16   Q.  Tell us -- this is another email.  Now he's responding.

17   Read what he says back to you.

18   A.  He says I am in agreement with Michael.  We deliberately

19   designed the process to minimize hand offs and potential for

20   back and forth that breeds delays and miscommunications and

21   therefore rework and duplicate work.

22   Q.  If you look down the chain, there's an email from you

23   August 30, 2007 to Mark and your boss, Mr. O'Donnell, am I

24   right?

25   A.  Yes.

D9QTBAN2                           Thomas - cross

1   Q.  And read what you say in the first paragraph?

2   A.  In the first paragraph I say:  I agree that we need to

3   define the roles more clearly, but a have a different opinion

4   than Audrey's below.  Ultimately I think this is the difference

5   between Richardson and Chandler models.

6   Q.  Let's skip to the paragraph beginning with the word,

7   "When."

8   A.  When it comes to fulfilling the loan, I don't think LS and

9   underwriter roles should be separated.  From our file reviews,

10  it is clear that an LS processing condition without underwriter

11  knowledge ends up just chasing what CLUES spits out.  A

12  validator just validates what LS and AE has entered into the

13  system.  When both do their jobs separately, we have seen

14  delays and missed opportunities.  What Hustle can bring with

15  the combined role and skill set is the ability for the LS to

16  use underwriting principles and clearing conditions, such as

17  condition avoidance or alternative conditions.  Plus, there is

18  not a need for validation in the more account management

19  process that is outlined in the Hustle flow and piloting in

20  Chandler.

21  Q.  Finish up with the next two sentence.

22  A.  I'm concerned that the two different roles lead us right

23  back to the hands off -- excuse me, to the hand offs, and the

24  lack of accountability we had.  The only change from the

25  current process would be the cubicle location.

D9QTBAN2                         Thomas - cross

1    Q.  Turn to the tab 7.

2    A.  Can you explain what I meant by that?

3    Q.  Sure.

4    A.  OK.

5    Q.  If it's all right with the Judge.  Usually you wait for a

6    question.

7                THE COURT:  Go ahead.

8    Q.  If you would like to explain, go ahead, sure.

9    A.  So at the time we had two different centers piloting this

10   process, and we were trying to test the Hustle concept of

11   having the roles combined into one.  The pilot had kind of

12   migrated to two different processes where one center was doing

13   it the way that we had designed the process, the other center

14   had gone back to kind of separate roles because they felt

15   comfortable doing that.  So this was a discussion of that where

16   Audrey, for example, said hey, this process of the separate

17   roles is working great, I think we need to move forward with

18   that, and I was saying the Hustle design was designed this way

19   and this is what we need to test in the pilot.

20   Q.  Thank you for that explanation.

21              Now we're looking at tab number 7.  And here is

22   another bulletin dated October 4, 2007, am I correct?

23   A.  October 4, yes.

24   Q.  This is a time period where the Hustle is actually ongoing

25   in central fulfillment, am I correct?

D9QTBAN2                         Thomas - cross

1    A.  Yes, it would have been after the roll out.

2    Q.  After the roll out.  So this is another bulletin marked

3    07515.  Read the heading and the first sentence, please.

4    A.  The heading is condition sign off authority levels matrix

5    and underwriting approval level authority matrix.

6    Q.  What is a matrix?

7    A.  Basically a chart that shows who would have what authority

8    level or what they could do.

9    Q.  So read us that, please.

10   A.  The condition sign off authority levels matrix and the FSLD

11   underwriting approval level authority matrix have been updated

12   in the operating procedures.

13   Q.  OK.  So that there was a change in who could sign off, is

14   that basically what this is about?

15   A.  Yes, the matrixes had been updated.

16   Q.  Did you participate in any way in formulating of this

17   policy as reflected in the bulletin?

18   A.  I wouldn't have updated -- I wouldn't -- I didn't deal with

19   the authority levels or who should have authority levels and

20   what they could do.  I wouldn't have specifically.

21   Q.  Turn to tab 8, please.

22   A.  OK.

23   Q.  Now tab 8 you'll see a document which is been introduced as

24   Plaintiff's Number 46, same document.  Do you see that?

25   A.  Yes.

D9QTBAN2                    Thomas - cross

1   Q.  And this is a Loren Rodriguez email to you of August 9,

2   2007.

3   A.  Yes.

4   Q.  It's also sent to your boss and to Mark Barnett.  And read

5   the first line.

6   A.  Should we huddle on your concerns?  I want to ensure you

7   folks are comfortable with the process flow.  Just let me know.

8   Thanks.

9   Q.  All right.  Now if we turn two pages over, we find that

10  very sentence that you and I started to talk about when the

11  cross-examination began.  Do you see it with the words, "Now

12  that being said?"

13  A.  Yes.

14  Q.  Page 3?

15  A.  Yes.

16  Q.  You and I focused on the first part of that sentence, and I

17  want to focus just on the last part now.

18  A.  Sure.

19  Q.  Go ahead and read the full sentence for us.

20  A.  Now that being said, I think the concept and intent behind

21  the process is correct, but I'm concerned that we are removing

22  or reducing too many controls and not focused enough on

23  manufacturing better quality at the front of the process.

24  Q.  You may continued.

25  A.  I absolutely want to inject speed into the overall process

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9QTBAN2                          Thomas - cross

1    to increase pull through -- which is productivity -- and make

2    the overall process more cost efficient.  But we may need to

3    look at points where the process really slows down.  We'll want

4    to keep this in mind as we tweak the work flow along the way.

5    Q.  Now sir, go to tab number 10, if you would.  This was

6    Plaintiff's Exhibit 58 introduced in your direct examination.

7    Do you see it?

8    A.  OK.

9    Q.  Now if you look at the second page -- first off, I wanted

10   to focus on all these people that are addressed on the memo.

11   Who is the memo from and to?

12   A.  Are you talking about the second part?

13   Q.  Yes.

14   A.  So it's an email from Don Harris to his boss Steve Brent as

15   well as Cheri Shine, who had I think at this point I can't

16   remember when she moved from centralized funding into the

17   central fulfillment organization.

18   Q.  What does this email address?

19   A.  High-Speed Swim Lane weekly review summary through

20   September 16, 2007.

21   Q.  We talked a little bit about this in your direct

22   examination, I believe.  If you look at the page where it has

23   there are 129 separate findings.  Do you remember talking about

24   that in your examination?

25   A.  Yes.

D9QTBAN2                        Thomas - cross

1   Q.  And then below that -- do you see that?  Below that there

2   are several lines in which problems are identified, correct?

3   A.  Correct.

4   Q.  And in the first one it says 53 hall screens and fraud

5   detectors are complete in VHF.  We talked about that yesterday?

6   A.  Yes.

7   Q.  The other items, are those various problems listed in the

8   system?

9   A.  Listed in the system?

10  Q.  Varies problems that have been identified?

11  A.  Yes.

12  Q.  And the problems that are being identified in these

13  quantities are put in the memo for people to address and make

14  whatever changes they believe are appropriate, am I right?

15  A.  I think this was -- this memo meant to, yes, highlight what

16  problems were highest on the list, and then you could adjust

17  the process or see what was causing those issues.  This didn't

18  have the detail of the individual loans to correct in, but it

19  was more the macro level.

20  Q.  And am I right that it looks to be about 20 different

21  people that are sent copies so that everybody knows exactly

22  what the problems are?

23  A.  It looks like about that many people copied, and I would

24  say they know what the audit findings are.  The problems -- you

25  may have had to look deeper into the process for the problems.

D9QTBAN2                          Thomas - cross

1   Q.  Sorry, I missed the last part of your answer.

2   A.  You may have to look deeper into the process to find the

3   actual problems causing the issues.

4   Q.  And somebody had a job to look at the process, I assume?

5   A.  Depending on what the issue was, different people may

6   look -- may look at the issue.

7   Q.  Now if you would turn to tab number 12, please.

8           Tab 12 is a memo from your boss, Mr. O'Donnell, to you

9   dated May 5th, 2008, am I correct?

10  A.  Correct.

11  Q.  And this, too, relates to the sprint incentive that you

12  talked about, am I right?

13  A.  Let met read it real quick just to to make sure.

14  Q.  Take a look at the subject line.

15  A.  This says SUS update with Greg.  That doesn't suggest the

16  sprint incentive to me, but I see incentive proposal in the

17  text.

18  Q.  Now first off, remind us who Greg is.

19  A.  Greg Lumsden was the CEO of Full Spectrum Lending.

20  Q.  The top person in the division, am I right?

21  A.  In the division, yes.

22  Q.  Read this note to the jury.

23          THE COURT:  Is this in evidence?

24          MR. SULLIVAN:  Sorry, please admitted 64.

25          MR. CORDARO:  No objection.

D9QTBAN2                         Thomas - cross

1            THE COURT:  Received.

2            (Defendant's Exhibit 64 received in evidence)

3    A.  For tomorrow's meeting Cliff asked that we include the most

4    recent loan perform data from Mark Miller.  I'll call you in

5    the morning to discuss.  We also want to build in a slide on

6    the incentive proposal we were toying around with earlier.  I

7    am thinking we structure so that auditors earn a per overturn

8    spif beginning at audits that take us below 15 percent, but pay

9    out does not take place until we achieve less than 10 percent

10   in total.

11   Q.  So would this be the beginning idea of how to incentivize

12   people to focus on the rebuttal project to reverse the SUS

13   findings?

14   A.  Yes.

15   Q.  And I think we all know, but the word "spif," does it mean

16   tip?

17   A.  It means extra income.

18   Q.  Extra income.  Is that a common word in the industry?

19   A.  I didn't hear it as much in the mortgage industry, but I

20   heard it when I worked in retail.

21   Q.  So your boss is asking to you prepare a slide on the

22   incentive proposal that you were toying with earlier.  Was it

23   you and he that sat down and came up with the incentive

24   proposal?

25   A.  I think what he was referring to here is we were looking at

D9QTBAN2                              Thomas - cross

```
 1   different levels.  I think I had showed him how many overturns
 2   it may take to get to different levels, so I think that is what
 3   he was referring to there.
 4   Q.  Did people work overtime to get this project done?
 5   A.  That I don't remember for sure.  They could have.  I don't
 6   know if those employees were hourly or salaried employees.
 7   Q.  And is this the 36 employees we talked about before?
 8   A.  That's what I'm referring to, yes.
 9   Q.  Sir, if you turn to tab number 13.
10   A.  13?
11   Q.  13.
12   A.  OK.
13   Q.  There's another email from you, but this time to a person
14   named Robert Zavala, Z-A-V-A-L-A.  Am I correct?
15   A.  That's correct.
16   Q.  This is dated May 16, 2008.
17   A.  Correct.
18   Q.  Marked Defendant's Exhibit 1045.
19           MR. SULLIVAN:  I ask that it be admitted.
20           MR. CORDARO:  No objection.
21           THE COURT:  Received.
22           (Defendant's Exhibit 1045 received in evidence)
23   Q.  Tell us who Mr. Zavala is.
24   A.  Robert Zavala headed up the bonus administration
25   department.
```

D9QTBAN2                          Thomas - cross

1    Q.  Where is that department located in relation to Full

2    Spectrum Lending division?

3    A.  I think it was part of Full Spectrum Lending.  I can't

4    remember if it was corporate.  I think it would have been Full

5    Spectrum Lending.

6    Q.  What did you call his office?

7    A.  Bonus administration.  He basically -- his team put

8    together the final calculations for people's bonuses.

9    Q.  And your belief is that actually is an office in the

10   division that focuses on the administrative issues such as

11   providing bonuses and incentives to employees in your company?

12   A.  Yes, it was probably part of the finance group or

13   something.  I can't remember exactly where he reported.

14   Q.  At any rate, you're writing to him in the RE column.  Tell

15   us what it says?

16   A.  QC sprint incentive Q1 2008.

17   Q.  Now as I see in this email, a half dozen people are listed,

18   right, as copied, receiving copies down at the bottom?

19   A.  Yes.  Are you talking about the top email or --

20   Q.  The next email down.

21   A.  From Robert to me?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And those are people who we are familiar with, with the

25   exception, I think, of Mr. Holder.  Who is he?

D9QTBAN2                        Thomas - cross

1    A.  Tim Holder.

2    Q.  Do you recall him?

3    A.  The name sounds familiar but I can't recall.

4    Q.  How about Mr. Whelan?

5    A.  Again, that name sounds familiar, but I'm not sure.

6    Q.  Now Mr. Zavala, executive vice president for incentive

7    compensation, Countrywide Bank, Full Spectrum Lending division.

8    So he is in your division?

9    A.  Yes, it appears so.

10   Q.  Now you wrote him a memo or email which caused him to write

11   this one, am I correct?

12   A.  It looks that way, yes.

13   Q.  Let's go to yours, which is on page 3, and you address it

14   to Robert.  Tell us what you say in the first two paragraphs.

15   A.  Sure.  I believe I'm explaining the sprint incentive.  I

16   had to calculate all the metrics to go into the bonus programs,

17   and I would explain that to Robert.

18   Q.  So tell us what you're telling Robert here, please, the man

19   charged with administering the bonus programs.

20   A.  Here's the sprint incentive that I left you a message about

21   earlier.  The goal here is to provide a short-term incentive

22   for the QC results of quarter one 2008.  These audits are

23   currently in the review rebuttal process by FSL QC.  In order

24   to achieve our goals for quarter one QC ratings, we require an

25   increase in the intensity of review and number of findings

D9QTBAN2                         Thomas - cross

1  overturned.  This incentive is meant to drive that goal.

2  Q.  And if you look down, you actually described the plan

3  further down, where it says "overturns," am I right?

4  A.  Correct.

5  Q.  Read that six lines or so for us.

6  A.  Overturns are equal to the number of random audits with

7  initial SUS for quarter one 2008 that were downgraded by

8  corporate QC to a lower rating.  Metrics will be taken at the

9  conclusion of quarter one 2008 random audits, finalized by the

10 division and corporate QC.  Pay out per employee will be given

11 to all 36 QC employees.

12 Q.  Now this is the proposal, I gather, that you and

13 Mr. O'Donnell wanted to propose, and you're bringing it to the

14 technical expert, I guess, as what, asking permission or asking

15 him to put it into effect?

16 A.  I can't remember if anybody else had agreed to this at this

17 point.  It sounds more -- it is more of a final proposal that

18 we would send to Robert to say here's how we plan to calculate

19 it, he would have to agree to it and say OK, I think that's

20 appropriate or not.

21 Q.  Now would you have spoken -- other than with Mr. O'Donnell,

22 would you have spoken to other people in the company about this

23 proposal?

24          MR. CORDARO:  Objection, your Honor.

25          THE COURT:  As phrased, sustained.

375

D9QTBAN2                        Thomas - cross

1    Q.  Did you get permission to initiate the proposal other than

2    from Mr. O'Donnell?

3    A.  Sorry, what do you mean by "initiate the proposal?"

4    Q.  Did you get -- is this something that you and Mr. O'Donnell

5    did, or were there discussions and approvals at a higher level

6    in the company?

7              MR. CORDARO:  Objection.

8              THE COURT:  Overruled.

9    A.  So I believe I provided Ed with the metrics on this.  He

10   may have -- I remember including it in decks or presentations

11   that Ed presented, but I don't know who Ed presented it to or

12   who ultimately had to approve it.

13   Q.  So let's go to Mr. Zavala's response to you, and just read

14   the first paragraph, please.

15   A.  Starting with number one?

16   Q.  Yes, please, just above that.

17   A.  Per my decision with Michael, here are some questions we

18   will need clarified.  One, effective date.  We are assuming May

19   production, payable end of June, and I will need an end date

20   for now.  We can always extend this later if needed.  The first

21   pay out would be for quarter one SUSs, but yes, it is largely

22   May's work for these auditors and will need to make it payable

23   end of June.  Ed, what would you say the end date would be

24   after we create the monthly MBO -- which stood for management

25   by objective, it's kind of a goal that would go into bonuses --

D9QTBAN2                    Thomas - cross

1    after this initial pay out.  Maybe September 2008?

2    Q.  All right.  Now jumping to paragraph four, just read that,

3    please.

4    A.  We will need for you to provide the results for this by the

5    8th business day of the month following the production period.

6    For May production we'll he need the data by the 8th business

7    day of June.  This will ensure that they are paid timely.  Ed,

8    do you think we'll be able to have the pipeline completed by

9    8th business day of June?

10   Q.  All right, sir.  If you would jump to tab 17, please.

11   A.  OK.

12   Q.  There you have an email from your boss, Mr. O'Donnell, to

13   you.  This is dated April 25, 2008, am I right?

14   A.  Yes.

15   Q.  All right.  Would you read that for us, please.

16   A.  Read what Ed wrote to me?

17            MR. CORDARO:  Objection, your Honor, I don't believe

18   it's in evidence yet.

19            MR. SULLIVAN:  Sorry.  Defendant's 1012.

20            MR. CORDARO:  No objection.

21            THE COURT:  Received.

22            (Defendant's Exhibit 1012 received in evidence)

23   Q.  Would you like to start with your memo one, read it in

24   correct order, sir, your note to him, then him back.

25   A.  So my note to Ed --

D9QTBAN2                        Thomas - cross

1   Q.  That starts at -- you go ahead and read your note to Ed on

2   April 25.

3   A.  Looks like there's some correspondence before that about a

4   technology issue, and I said:  No one knows.  I think he asked:

5   Who is on the hook for the technology issue?  No one knows.

6           Just talked to Cliff.  He was just as frustrated.

7   Brent said Rebecca rolled her eyes quite a bit when I confirmed

8   that the issue is not a behavioral problem but a process

9   problem.  It gave me comfort just to know I got under her skin

10  a little.

11  Q.  There's a little tiny smile there?

12  A.  Smiley face.

13  Q.  And this is just -- is this kind of office humor?

14  A.  Well, this was again the point -- this is April of 2008

15  where I was -- I think we looked at several emails where I said

16  OK, six, seven months later we've got the same problems we knew

17  existed in August, so I was pretty frustrated by that, and it

18  took us seven months to step up to the plate.  And so I was

19  happy that at least we got some concurrence that there's a

20  process problem.

21  Q.  There was some friction between Rebecca and your boss, Ed

22  O'Donnell, because he didn't get one particular job that he

23  sought, am I correct?

24          MR. CORDARO:  Objection.

25          THE COURT:  Sustained.

D9QTBAN2                           Thomas - cross

1   Q.  Read the note from Mr. O'Donnell back to you.

2   A.  He said:  I know the feeling.  She's got rubber bullets in

3   her gun and we are going nuclear.

4                MR. SULLIVAN:  All right, sir, that's all I have.

5                THE COURT:  All right.  Why don't we give -- well,

6   we'll start at least any cross from Ms. Mairone's counsel.

7                MR. SULLIVAN:  Your Honor, I was told I was moving so

8   fast I did not formally admit the Defendant's Exhibit DX 33.

9   Let the record reflect that is a bulletin of October 4th, 2007.

10               MR. CORDARO:  Could I have the tab number, please?

11               MR. SULLIVAN:  Tab 7.

12               MR. CORDARO:  No objection.

13               THE COURT:  Received.

14               (Defendant's Exhibit 33 received in evidence)

15               MR. SULLIVAN:  Thank you.

16               MR. HEFTER:  Your Honor, I was going to ask your Honor

17  if we could take a break now because I will be using documents

18  and binders, and it may make sense to streamline everything

19  to --

20               THE COURT:  All right.  Ladies and gentlemen, we'll

21  take our mid-morning break now for about ten or fifteen

22  minutes.

23               (Continued on next page)

24

25

D9QTBAN2                        Thomas - cross

1          (Jury not present)

2          THE COURT:  Did I hear earlier that no one knew what

3     FICO stands for?  So it stands for Fair Isaac Company.  It's a

4     company put together by two economists, Mr. Fair and

5     Mr. Isaac -- Fair Isaac is not an Old Testament reference --

6     and they came up with a credit score formally that's been used

7     ever since.  I thought everyone knew that.

8          Anyway, there was some applications I have received.

9     First from Ms. Mairone's counsel, a letter brief seeking to

10    strike certain testimony from the Boland deposition, but I

11    don't know if it's offered yet because I haven't received the

12    new Boland marked up transcript.

13         MR. MUKASEY:  I thought the new designations had been

14    put in by both sides.  I'm not sure when --

15         THE COURT:  Let me ask if my law clerk has it.  Maybe

16    he has it.  I haven't received, I know that.

17         MS. SCHOENBERGER:  It hasn't been offered yet.

18         THE COURT:  So it is, in that sense, premature.  But

19    might as well find out, is the government going to offer that

20    testimony?

21         MS. SCHOENBERGER:  Yes, your Honor.

22         THE COURT:  So the testimony is, from the deposition

23    of Mr. Boland, beginning at page 98, and it's referring to a

24    so-called town hall meeting at which employees pose questions

25    to, among others, Ms. Mairone, and Mr. Neal Ballance,

380

D9QTBAN2                         Thomas - cross

1    B-A-L-L-A-N-C-E, according to Mr. Boland, who was particularly

2    outspoken and raised a comparison between the statements of

3    Angelo Mozilo to Congress and what allegedly was being said by

4    the executives at the meeting, and in particular Ms. Mairone's

5    statements regarding the Hustle initiative.  And after he said

6    that representations -- what was being said by Mr. Mozilo and

7    what was being said by Ms. Mairone was "very, very different,"

8    there was the following testimony from Mr. Boland at page 99,

9    beginning line 6:

10   "Q.  And what was Ms. Mairone's response to that?

11   "A.  She was -- she was visibly upset, I think she felt

12   challenged, and in her -- her response, there was an expletive

13   that sent a message to the team that questions like that were

14   not -- not welcome."

15            There was an objection made on the record improperly

16   that, "Objection, is non-responsive."  Of course, that

17   objection is not preserved.  That's not an objection to form,

18   which is the only kind of objection that should ever be stated

19   on the record at a deposition.  But putting aside that mistake,

20   which was repeated repeatedly by defense counsel throughout

21   this colloquy, the next question is by the government:

22   "Q.  What expletive was used?

23   "A.  I don't recall the exact expletive, but it was so shocking

24   that I remember a word of profanity being used.  I had never

25   seen an executive use profanity, even in a closed meeting like

1    that, in my years in the professional world, so it was shocking
2    to me and it stood out in my mind."
3           So it goes on, but that's the gist of it.  And clearly
4    Mr. Boland leads a quite sheltered life, but what possible
5    relevance does this have?
6           MS. SCHOENBERGER:  To be clear, your Honor, the
7    portions of the testimony that the government would be offering
8    would be starting on page 98 at line 3 and stopping at page 99
9    at line 11.  And it was actually the defendants who appeared to
10   be offering lines 14 to 21.
11          The government would also offer --
12          THE COURT:  Let's just take -- so page 98, line 3, to
13   page 99, line 11, what's the relevance of any of that?
14          MS. SCHOENBERGER:  The relevance is there was concern
15   about the Hustle and its impact on quality, and those were
16   raised to senior management within the company.
17          THE COURT:  The only thing that's said in this
18   testimony is that Mr. Ballance felt that there was an
19   inconsistency between what Mr. Mozilo said to Congress and what
20   Ms. Mairone had been saying to folks at Countrywide in
21   connection with Hustle.  But all that's asserted is that the
22   question was that those presentations were "very, very
23   different," and she was asked to reconcile that.
24          And he never says at any point what she actually said.
25   What he says instead, the testimony you just said you wanted to

D9QTBAN2                              Thomas - cross

1    offer, beginning at page 99, line 8:  She was visibly upset.  I

2    think she felt challenged.  This is because of Mr. Ballance's

3    deep intuition into someone else's mental state.  "In her

4    response, there was an expletive that sent a message to the

5    team that questions like that were not welcome."  This is

6    obviously opinion evidence which is not formally admissible.

7              MS. SCHOENBERGER:  Well, the main relevance of this

8    passage here is the fact that there was concerns.  And while

9    Mr. Boland doesn't specifically say that the reason that the

10   Hustle isn't reconcilable with the statements before Congress

11   is because of quality, the suggestion is there because the

12   statements refer to Countrywide's commitment to quality, and

13   asking that to be reconciled with the Hustle suggests that the

14   Hustle is not quality.  So the fact that the underwriters on

15   the ground were having these types of concerns and those

16   concerns were raised to management is relevant.

17             THE COURT:  If the assertion is that Mr. Ballance was

18   concerned that Mr. Mozilo was lying to Congress, that's

19   irrelevant to any issue in this case.  I don't see -- if this

20   is being offered with respect to Ms. Mairone, which is

21   seemingly the purpose of the offer, I don't see how you draw

22   the inference you have just drawn.  The most you can say about

23   this is that in Mr. Ballance, according to Mr. Boland, who

24   apparently is incapable of actually repeating a conversation

25   but only makes characterizations, summary conclusions and the

D9QTBAN2                       Thomas - cross

1    like, says Mr. Ballance raised a comparison between the

2    statements of Angela Mozilo to Congress that was on C-SPAN the

3    evening prior, and Mr. Mozilo made affirmative statements about

4    Countrywide's commitment to quality, their processes, doing the

5    right thing.  Let me pause there.  No indication that that had

6    to do with Hustle necessarily.  He answered a number of

7    questions that would lead you to believe that Countrywide was

8    doing business as usual, the way we have always, ethically and

9    honestly and following their principles.  And Neal phrased a

10   question to Ms. Mairone and compared the statements of

11   Mr. Mozilo the night before to the Hustle and the initiative

12   that she was championing and wanted a reaction from her about

13   if Angelo says these things to Congress and you say these

14   things, they're very, very different, how do you reconcile

15   that?

16        Now no juror can even really understand what

17   specifically is being referred to there because there is no

18   specification, it's all very vague.  And in response, we get

19   just one opinion after another.  Answer:  She was visibly

20   upset.  That might conceivably come in as a lay perception, but

21   then he follows it with:  I think she felt challenged.  No

22   witness is going to testify to that.  And in her response there

23   was an expletive.  Which he can't remember, by the way, but

24   shocked him to the deep marrow of his core, that, quote, sent a

25   message to the team that questions like that were not welcome.

D9QTBAN2                         Thomas - cross

 1          How the heck -- because I don't want to use an

 2     expletive -- can he possibly infer that in any way that would

 3     make it more than just an opinion that would not be admissible

 4     from a percipient witness?

 5          MS. SCHOENBERGER:  It would be his opinions based on

 6     his perception of what occurred at the meeting.

 7          THE COURT:  All right.  Well, you have made your best

 8     shot, but -- tried your best shot, but I am going to sustain

 9     the objection.

10          All right.

11          MR. MUKASEY:  We'll therefore withdraw our counter

12     designations with respect to the passage.

13          THE COURT:  OK.

14          MS. SCHOENBERGER:  And there is continued testimony

15     regarding this I believe on page 99, line 24, to --

16          THE COURT:  Sorry?

17          MS. SCHOENBERGER:  -- 109.  I'm not sure if

18     Ms. Mairone's counsel's brief refers to that.

19          MR. MUKASEY:  The brief only refers, Judge, to the

20     section you just analyzed and the counter designations on page

21     99.

22          THE COURT:  When I see the actual deposition I will

23     rule on the rest of it, but I wanted to hear from the

24     government.  But I get the general idea.  And I will take a

25     look at it in the context of anything else that is offered and

D9QTBAN2                        Thomas - cross

1    objected to.

2              MS. SCHOENBERGER:  Understood.  And with respect to

3    the transcript, we expect that to be finalized and we could

4    submit that in the morning.

5              THE COURT:  OK.  That's fine.

6              Now I received the bank defendants' witness list,

7    which was certainly not what I expected.  When I had a

8    telephone call with counsel at the government's initiative

9    shortly before the start of trial, the government said that the

10   bank had designated something like 56 or some witnesses, I

11   can't remember the exact number, but a very large number of

12   witnesses.  And that the government had deep doubts whether

13   this was anything other than a tactic to force the government

14   to prepare for all sorts of witnesses who the government

15   suspected were not going to be called; an argument to which the

16   defense, of course, should be sympathetic, since they made much

17   the same argument yesterday with respect to Mr. Boland, that

18   they spent all this time preparing for Mr. Boland's live

19   testimony and now they were finding out that he wasn't going to

20   be presented live.

21             The defense counsel responded that, first, even if all

22   their witnesses were called, they were confident that they

23   would be -- including any cross-examination, redirect and the

24   like -- completed within the three weeks that they had asked

25   for their case.  And I assure you, that representation will be

D9QTBAN2                         Thomas – cross

1    enforced in stone, and if we are in the middle of a witness

2    when the defenses' three weeks is over, we will stop that

3    witness right then and there, unless it's on the government's

4    cross, and no further witnesses will be called.

5          But defense counsel also said that she thought that

6    after I ruled on the motions in limine that many of these

7    witnesses, or at least some of these witnesses, would no longer

8    need to be called.  I ruled on the motions in limine, and I

9    think the common denominator of most of my rulings was to

10   narrow the case.  But instead, here we have an endless list of

11   witnesses, of which only one is indicated as, quote, likely

12   out, that's Nancy Bush.  There's listed, for example,

13   Dr. Christopher James, even though my recollection was that he

14   was being called to rebut Dr. McFadden and the government has

15   withdrawn Dr. McFadden.

16         But let me hear from defense counsel.

17         (Continued on next page)

18

19

20

21

22

23

24

25

D9q3ban4

1           MS. MAINIGI:  Yes, your Honor.  This list of names is

2    confusing.  There are several people that have been eliminated

3    from this list, your Honor, since the last time I believe you

4    saw it.  Some of those people include Mr. O'Donnell, who the

5    government is obviously calling in their case, the Fannie Mae

6    corporate representative has been eliminated as a result of the

7    ruling on the 30(b)(6) motion.  We expect to remove John

8    Forlines from the list, because the government intends to call

9    Mr. Forlines in their case.  Mr. Tanabe, same issue, we expect

10   to remove him because the government intends to call

11   Mr. Tanabe.  The Freddie Mac corporate representative, your

12   Honor, has been fully removed from our list as well.  Nancy

13   Bush, the qualification was put in there simply because

14   depending upon what comes in on the repurchase issue, we may

15   pull her all together, but we would like the opportunity to

16   wait for the government's case to close there first.

17           Then, towards the back of the list obviously

18   Mr. Armand is removed, Mr. Phil Wertz was removed as a result

19   of the indemnification issue coming out of the case,

20   Mr. Jonathan Walker, one of our experts was removed as a result

21   of penalties coming out of the case that the jury hears.  The

22   FHFA entity was removed also as a result of the ruling on the

23   30(b)(6) motion, your Honor.

24           With respect to Mr. Sobczak, we think he will come out

25   of our case as well because the government intends to call him.

388

D9q3ban4

1    I missed him on the first round.

2             There are a large number of witnesses, your Honor,

3    that are in essentially the middle of our witness list that I

4    believe I represented to your Honor last week on the telephone,

5    and this remains true, that these are very quick witnesses.

6    These are folks that were on the ground during the High-Speed

7    Swim Lane in a variety of roles in a variety of the different

8    centers that implemented the High-Speed Swim Lane.  All of

9    these people are critical to our case in terms of our defense

10   here, to show essentially the normalcy of the process, what

11   people were thinking, the people's intent, and how it all came

12   together.  We very much believe we can put on our case in three

13   weeks.

14             THE COURT:  No.  Whether you believe it or not.

15   That's --

16             MS. MAINIGI:  We understand.  We are getting cut off.

17   That's fine.  We'll take that.

18             THE COURT:  What about Dr. James?

19             MS. MAINIGI:  May I ask my colleague Mr. Smurzynski to

20   address that, please.

21             MR. SMURZYNSKI:  There are two issues.

22             THE COURT:  You need to identify yourself.

23             MR. SMURZYNSKI:  Ken Smurzynski.  With respect to

24   Dr. James, he was not strictly a rebuttal witness to

25   Dr. McFadden, although it addressed Dr. McFadden's opinions.

D9q3ban4

```
 1   There are other things that Dr. James opines on that are

 2   relevant, including if Mr. Holt is allowed to testify and

 3   Dr. Cowen is allowed to testify, about whether the material

 4   defects in fact were with respect to loans that had an

 5   increased risk.  He analyzes those and identifies the fact that

 6   when you control for borrow characteristics, loan

 7   characteristics, you see that there was not in fact an

 8   increased risk of loss with those loans.

 9              So, we believe that's a basis for striking Mr. Holt,

10   that was our Daubert motion.  I understand that hasn't been

11   resolved yet.  But that's one issue.

12              THE COURT:  All right.  I'm skeptical that he'll end

13   up testifying, but thank you for letting me know that.

14              By the way, in the second page of what you gave me,

15   you have Charles Grice but you don't list him as an expert.

16   Wasn't he --

17              MS. MAINIGI:  Your Honor, that's clearly an oversight

18   on our part.

19              THE COURT:  Also, I'm not sure, two people you do list

20   as experts, Mr. Broeksmit and Mr. Lucco, what are they

21   testifying about?

22              MS. MAINIGI:  They speak towards the underwriting that

23   Mr. Holt did.

24              THE COURT:  I see.  All right.  Let me hear from the

25   government.
```

D9q3ban4

<pre>
 1              MR. ARMAND:  Your Honor, I think in addition to some
 2     issues we just discussed, there's I think Pauline Munro-Kennedy
 3     was a person that had been put on their list regarding
 4     repurchasing, and since that topic is out, I am not sure why
 5     she's still on the list.
 6              THE COURT:  Where is that?
 7              MR. ARMAND:  In the middle.  Right above Dr. --
 8              THE COURT:  Yes.  Okay.
 9              MR. ARMAND:  There were other witnesses during the
10     fact discovery who were represented to us who were unable to
11     travel.  This was before we made the application about having
12     current employees travel to New York for depositions.  There
13     were certain people, because of their personal circumstances,
14     Cheri Shine and Adela Zamarripa, that they weren't able to
15     travel.  We agreed we would travel to them.  Or at least we
16     ended up not deposing Ms. Shine, but we did travel out for
17     Ms. Zamarripa.  I'm surprised the two of them are on the list.
18     But I think just the length of the list, I think what we are
19     going to have here is just a lot of cumulative repetitive
20     testimony.
21              THE COURT:  I suspect that's right.  But I don't think
22     I can rule on that yet.  So I'm not going to take further
23     action yet.  But it is an issue very much in the Court's mind,
24     and we will revisit it no later than the start of the defense
25     case.  I understand that you're being placed in an awkward
</pre>

D9q3ban4

```
 1    position and I'm sympathetic to that and that will be factored

 2    into any rulings I make.

 3              But let me ask defense counsel what about

 4    Munro-Kennedy?

 5              MS. MAINIGI:  Ms. Munro-Kennedy in fact was not going

 6    to testify regarding repurchases.  She was the relationship

 7    manager between Countrywide and the GSEs.  She had quite a bit

 8    of day-to-day interaction with the GSEs, and given that the

 9    GSEs are the alleged victim here, we obviously think that's

10    critical.

11              THE COURT:  Okay.  Then finally, you list Ms. Mairone.

12    Isn't she being called on the government's case?

13              MS. MAINIGI:  That was the original intention.  The

14    government has since informed us that they do not intend to

15    call her anymore.

16              THE COURT:  So, if this is the order in which you are

17    going to call witnesses, you may not get to Ms. Mairone.  But

18    I'm sure the jury won't mind that.  As long as they're able to

19    hear from the LaCrecia Whirl, Laurie Ann Smith, Donna Braaten,

20    and Rachel Doty.

21              I know there are other matters.  We'll have to take

22    them up at the next break.

23              MS. MAINIGI:  That's fine, your Honor.  Thank you.

24              (Recess)

25              (Continued on next page)
```

D9q3ban4

1           (In open court; jury present)

2           MR. HEFTER:  May I proceed, your Honor?

3           Ladies and gentlemen of the jury, your Honor, Michael

4    Hefter on behalf of Rebecca Mairone.

5    CROSS-EXAMINATION

6    BY MR. HEFTER:

7    Q.  Mr. Thomas, good morning.

8    A.  Good morning.

9    Q.  We've never met before, correct?

10   A.  No.

11   Q.  I want to get a sense of the organizational structure of

12   the FSL division of Countrywide.  Is that okay?

13   A.  Sure.

14   Q.  First of all, you worked out of Richardson, Texas, correct?

15   A.  Yes, when I moved to Texas.

16   Q.  Right.  So from the time that you moved to Texas all the

17   way through the time that you left the bank, you worked in

18   Richardson, Texas, correct?

19   A.  Correct.

20   Q.  That's where one of the central fulfillment centers was

21   located, is that correct?

22   A.  Correct.

23   Q.  I think you testified there were other fulfillment centers

24   as well?

25   A.  Correct.

D9q3ban4                        Thomas - cross

1   Q.  That is not where the headquarters of the Full Spectrum

2   Lending Division was located, is that correct?

3   A.  That's correct.

4   Q.  That location was Pasadena, California, correct?

5   A.  Correct.

6   Q.  Few miles from the Rose Bowl?

7   A.  Yeah, I worked at that office for a while as well.

8   Q.  At the time of the High-Speed Swim Lane pilot, you worked

9   out of the Richardson, Texas, facility, correct?

10  A.  That's correct.

11  Q.  During that time period, Rebecca Mairone worked out of the

12  Pasadena office, correct?

13  A.  I believe so.

14  Q.  That's where her main office was, right?

15  A.  Correct.

16  Q.  That's where Mr. Lumsden the president and CEO of Full

17  Spectrum Lending, that's where his office was, correct?

18  A.  That's correct.

19  Q.  That's where Mr. Kitashima, the chief credit officer, the

20  person directly responsible for credit quality in the

21  organization, he was located in Pasadena as well?

22  A.  That's correct.

23  Q.  That's where Mr. Kucma, the chief financial officer of the

24  organization, had his office as well, correct?

25  A.  Yes.  When he was there, yeah.  He left I think before

D9q3ban4                          Thomas - cross

1   that.

2   Q.   Then there was another chief financial officer as well,

3   correct?

4   A.   Correct.

5   Q.   What was his name?

6   A.   Ron Staake.

7   Q.   Thank you.  Mr. Sergeant, Lloyd Sergeant, you remember him?

8   A.   Yes.

9   Q.   He was the head of the sales force, correct?

10  A.   Correct.

11  Q.   Where was his office located?

12  A.   I believe he also had an office in Pasadena.

13  Q.   So the entire senior management organization of FSL

14  Countrywide Division was located in Pasadena, correct?

15  A.   Correct.

16  Q.   You worked out of Richardson, right?

17  A.   I did.  At that time.

18  Q.   I'm just trying to get a sense where you sat on the

19  organizational chart.  What was your title?

20  A.   My title at that timeframe, 2007, 2008, was first vice

21  president of risk management.

22  Q.   You reported directly to Mr. Ed O'Donnell, correct?

23  A.   Correct.

24  Q.   Mr. O'Donnell's office was located in Texas, right?

25  A.   It was.

D9q3ban4                      Thomas - cross

1   Q.  Mr. O'Donnell reported to Mr. Kitashima?

2   A.  Yes.

3   Q.  By order of magnitude, do you know how many first vice

4   presidents there were?

5   A.  I don't.  I don't remember.

6   Q.  More than 20?

7   A.  Probably.  Definitely Countrywide over all.  I don't

8   remember how many in Full Spectrum.

9            MR. HEFTER:  If I can put up -- I'm sorry.  If I can

10  hand the witness, your Honor, DX 4036.

11           THE COURT:  Okay.

12           MR. HEFTER:  I think I mentioned, your Honor, that

13  most of the documents I'll be using were already in the

14  government's binders or the bank's binders.  This is not one of

15  them.

16  Q.  Mr. Thomas --

17           THE COURT:  That's all right.  A number like 4036, you

18  know will just stick in everyone's memory like that.

19  Q.  Mr. Thomas, have you ever seen this document before?

20  A.  It looks -- all these documents look familiar.  It's

21  possible that I've seen this document before.  I don't know for

22  sure.

23  Q.  This document DX 4036 is something called a slide deck, is

24  that correct?

25  A.  Yeah, we called them a deck, yeah.

1   Q.  Can you just describe for the jury what a deck is.

2   A.  A presentation.

3   Q.  This is something called like a PowerPoint presentation?

4   A.  Yes.

5   Q.  These things were regularly conducted at Countrywide at the

6   time?

7   A.  Yes.

8   Q.  This one is authored by Mr. Kitashima and Mr. Brent?

9   A.  It appears so, yes.

10          MR. HEFTER:  We'll offer DX 4036 into evidence.

11          MR. CORDARO:  No objection.

12          THE COURT:  Received.

13          (Defendant's Exhibit 4036 received in evidence)

14  Q.  What I really want to do, Mr. Thomas, is take a look at the

15  third page of the exhibit, the second page of the slide deck,

16  you see that?

17  A.  Yes.

18  Q.  Now if you look down at the bottom there is a notation that

19  says REV 9/4/07.  Do you see that?

20  A.  Yes.

21  Q.  Does this indicate to you that this was the organizational

22  chart of Full Spectrum Lending in or around September 4, 2007?

23  A.  Yes, I would assume.

24          MR. HEFTER:  If we go up to the top, if we highlight

25  Alex, if we can go down to the next level, too.

D9q3ban4                    Thomas - cross

1   Q.  This shows the senior level management of Full Spectrum

2   Lending as you just testified, correct?

3   A.  Correct.

4   Q.  At that time.  So if you go to the left, it says Clifford

5   Kitashima M.D. chief credit slash compliance officer.  Do you

6   see that?

7   A.  Yes.

8   Q.  What's an M.D.?

9   A.  Managing director.

10  Q.  It's not a medical doctor, right?

11  A.  Not a medical doctor, no.

12  Q.  So Mr. Kitashima was a managing director.  Do you know how

13  many managing directors were in Countrywide?

14  A.  Not in Countrywide.  This would have been the four in Full

15  Spectrums.

16  Q.  There would have been managing directors at the other

17  divisions, wholesale lending division, CMV, correct?

18  A.  Correct.

19          MR. HEFTER:  If you just highlight, Alex, if you will

20  just right below Mr. Kitashima, just do the whole stack of

21  people there.

22  Q.  Do you recognize those people?

23  A.  I do.

24  Q.  Mr. Jaraba was the senior vice president in charge of risk

25  management?

D9q3ban4                         Thomas - cross

1    A.  Yes, sir.

2    Q.  Mr. Brent was the senior vice president of quality

3    assurance and control at the time?

4    A.  Yes.

5    Q.  Mr. O'Donnell was the executive vice president of central

6    services slash underwriting?

7    A.  Yes.

8    Q.  It says central services there.  Tell me what central

9    services was at this point in time?

10   A.  So central services was the centralized underwriting team

11   and the centralized funding team.

12   Q.  That all reported up through Mr. O'Donnell at the time,

13   correct?

14   A.  At that time, yes.  Because it looks like previously Cheri

15   Shine was overall the centralized funding, and she's over in

16   Lloyd Sergeant's chain of command here.

17   Q.  We'll get to Lloyd Sergeant in a second.  You have Alice

18   Basmadjian.  She was an executive vice president of compliance

19   and fair lending.  You see that?

20   A.  Yes.

21   Q.  All those people worked in central service, right?

22   A.  Well, they worked for Cliff Kitashima.

23   Q.  Let's turn our attention to the next column of people.  So,

24   at the top is Lloyd Sergeant, right?

25   A.  Correct.

D9q3ban4                          Thomas - cross

1    Q.   He's the managing director of production, sales and

2    marketing, you see that?

3    A.   Yes.

4    Q.   This is September 4, 2007, right?

5    A.   Yes.

6    Q.   In or around this period of time, this is right before the

7    time that the High-Speed Swim Lane pilot is operating, correct?

8    A.   Correct.

9    Q.   It says managing director of sales.  Right, you see that?

10   A.   Yes.

11   Q.   Sales are the account executives, correct?

12   A.   Correct.

13   Q.   That's what you called it at Countrywide, account

14   executive, right?

15   A.   Like loan officer.  Somebody you would go to, to get a

16   loan.

17   Q.   If I want a loan in Countrywide at this point in time,

18   there's an 800 number, right?

19   A.   Yes.

20   Q.   You pick up the phone, you call the 800 number, and an

21   account executive picks up the phone, right?

22   A.   That's correct.

23   Q.   Says how can I help you, would you like a loan, or

24   something to that effect?

25   A.   Yes.

1    Q.  I'm sure they worked off a script, right?

2    A.  Probably.

3    Q.  All those salespeople reported ultimately up to

4    Mr. Sergeant, correct?

5    A.  That's correct.

6    Q.  None of those salespeople, the people who the borrower

7    talks to for the first time, reported through Rebecca Mairone,

8    correct?

9    A.  That's correct.  At that time.

10   Q.  Okay.  Production.  Production is different than sales,

11   correct?

12   A.  I would call it the same thing.

13   Q.  Okay.  So, at this point in time, it is true, is it not,

14   the loan processors or loan specialists at this point in time

15   reported up through Mr. Sergeant's organization, correct?

16   A.  I believe that's correct.  Before central fulfillment

17   organization, I think that is true.  Processers and salespeople

18   were in the branches together, they reported up to the same

19   people.

20   Q.  Okay.  Fair point.  I'm talking about prior to central

21   fulfillment.  Let's be clear about that.  Central fulfillment

22   was another initiative within the company, correct?

23   A.  It was a reorganization, yes.

24   Q.  That reorganization went into effect after the High-Speed

25   Swim Lane pilot, correct?

D9q3ban4                        Thomas - cross

1    A.  I can't remember the exact timing.  My recollection is they

2    were fairly close to each other.  The intent was to use the

3    High-Speed Swim Lane in the central fulfillment organization

4    and so the organization was changed around that model.

5    Q.  So, let me put a finer point on it then.  Mr. Wade Comeaux

6    ultimately was selected as the person to head the central

7    fulfillment reorganization, correct?

8    A.  That's my recollection, yes.

9    Q.  Mr. Comeaux prior to that time lived in or worked out of

10   the Pasadena office, right?

11   A.  I don't recall, because I remember meeting with him a lot

12   in Texas, so I thought he had a Texas office.

13   Q.  He was relocated though to Texas at some point?

14   A.  That may be true.

15   Q.  Was this in connection with central fulfillment?

16   A.  Yes.

17   Q.  You don't know when he uprooted from California and moved

18   to Texas to take on that role?

19   A.  I don't.

20   Q.  That was the part of the process of the rollout of the

21   central fulfillment to move people around, around the concept

22   of the central fulfillment, right?

23   A.  Sure.  I'm not sure if he started that role when he was in

24   California and then moved, or you know, if it was exactly when

25   he started in that position.

D9q3ban4                    Thomas - cross

1    Q.  Let's put aside Mr. Comeaux for a second.  As part of the

2    restructuring, people were moved around the company, correct?

3    A.  In different roles and things?  Yes.

4    Q.  Yes?

5    A.  Yes.

6    Q.  And in different locations as well, correct?

7    A.  Could be.

8    Q.  You could have a loan specialist who worked on the fifth

9    floor who was then moved to a central fulfillment team on the

10   fourth floor, correct?

11   A.  That could be, yes.

12   Q.  Well, you worked out of Richardson, Texas.  About this time

13   were people moving cubicles?

14   A.  We were always moving cubicles, even without

15   reorganizations.

16   Q.  At this point in time, the loan specialists reported

17   through Mr. Sergeant, correct?

18   A.  Yes.  Pre-central fulfillment, that's correct.

19   Q.  During July when you were studying the concept of the

20   High-Speed Swim Lane, the loan specialists reported up through

21   Mr. Sergeant, correct?

22   A.  That's correct.

23   Q.  During the pilot in August and September, prior to central

24   fulfillment, the loan specialists reported up through

25   Mr. Sergeant, correct?

D9q3ban4                         Thomas - cross

1    A.  Yes.  Whenever -- until whenever the central fulfillment

2    rolled out.

3    Q.  Let's move to the next column if you will.  This is

4    Mr. Kucma, correct?

5    A.  Correct.

6    Q.  He was the managing director as well?

7    A.  Correct.

8    Q.  He was basically responsible for reporting the finances of

9    the division, right?

10   A.  Correct.  He had previously been the chief operating

11   officer before Rebecca joined.

12   Q.  I think you testified yesterday that operations was

13   responsible for production.  Did you say that?

14   A.  I'm -- I may have.

15   Q.  But at this point in time, at the time the High-Speed Swim

16   Lane production reported through Mr. Sergeant and not

17   Ms. Mairone?

18   A.  The processors themselves reported up through Lloyd.  The

19   operations support group, which supported the processors and

20   did the process design for the processors and other technology,

21   other components operations support reported up through

22   Rebecca.

23   Q.  That was a support role for Mr. Sergeant's organization in

24   production, is that right?

25   A.  I think that's fair.

D9q3ban4                          Thomas - cross

1   Q.   Let's go to Ms. Mairone's responsibilities.  That's a

2   pretty long list of things she was responsible for, would you

3   agree?

4   A.   Yeah, it's -- seems like a chief operating officer's role.

5   Q.   So, underneath Ms. Mairone there is a woman by the name of

6   Whitney Shelley, correct?

7   A.   Correct.

8   Q.   She was the executive vice president of HR.  That's human

9   resources?

10  A.   That's correct.

11  Q.   There is Robert Phelps, EVP of technology, right?

12  A.   Correct.

13  Q.   He was responsible for all the technology, right?

14  A.   That's correct.

15  Q.   Let me ask you something about technology.  We've talked

16  about CLUES and we've talked about Edge, we've talked about

17  virtual loan file.  These are all computer programs, right?

18  A.   Yes.

19  Q.   Pipeline manager, that's another one we'll talk about,

20  right?  That's a computer program?

21  A.   Yes.

22  Q.   And the GSE's loan guidelines, for example, are built into

23  the CLUES process, right, the CLUES computer system?

24            MR. CORDARO:  Objection.

25            THE COURT:  Sustained.

D9q3ban4                           Thomas – cross

1    Q.  What is your understanding, Mr. Thomas, about how the GSE's

2    loan guidelines are written into the computer programs at Full

3    Spectrum Lending?

4    A.  So, my understanding is there would be certain business

5    rules that would use the guidelines for Fannie or Freddie, so

6    it may have certain guidelines and they would turn it into

7    business rules and put that into CLUES.

8    Q.  So when you say a business rule --

9    A.  Yeah.

10   Q.  Would that be an algorithm in the computer process?

11   A.  It basically would say something like, you know, if the

12   income is between these levels, then you know it is acceptable.

13   Or if it's outside of these levels, it's referred.  That kind

14   of thing.

15   Q.  Those Fannie and Freddie guidelines are built into the

16   CLUES system, is that right?

17   A.  Yeah.  I think that's one of the things that would be

18   booked in.

19   Q.  One of Mr. Phelps's responsibilities, who reported to

20   Ms. Mairone, was to make sure that the Fannie and Freddie

21   guidelines were appropriately built into the CLUES system?

22             MR. CORDARO:  Objection.

23             THE COURT:  Sustained.

24   Q.  Next we've got Mr. Rodriguez.  That says EVP of operations,

25   do you see that?

D9q3ban4                         Thomas - cross

1   A.  Yes.

2   Q.  At this point in time, Mr. Rodriguez reported to

3   Ms. Mairone, correct?

4   A.  That's correct.

5   Q.  Is it your understanding that as of central fulfillment his

6   reporting obligations changed and he reported to Mr. Kitashima?

7   A.  I don't recall that.  But I don't recall the work chart

8   specifically after central fulfillment.

9   Q.  Then we've got a whole bunch of different other people who

10  are listed.  We've got Patricia Maguire-Feltch and other

11  operations, and we've got process engineering and programs.

12          I think that you testified when you were at Washington

13  Mutual you worked on process engineering as well, correct?

14  A.  Yes.

15  Q.  So give the jury a sense of what process engineering is.

16  A.  In the general sense, and I don't remember Richard Lang in

17  this role.  In a general sense, process engineering is looking

18  at processes to see either to design them, or to improve them,

19  that kind of thing.

20  Q.  At Full Spectrum Lending, can you give us an example of a

21  process engineering design that was for the purpose of

22  improving things as you testified?

23  A.  It could be different examples.  You could look at the

24  processing operation and/or the process and determine if

25  something needed to be changed or -- I'm not sure what

1   Mr. Lang -- his responsibilities were.

2   Q.  Mr. Barnett, who we talked about, was a process engineer as

3   well, correct?

4   A.  Correct, yes.

5   Q.  Lent his skill set to the High-Speed Swim Lane design team,

6   correct?

7   A.  Yes, that's what he worked on, yes.

8   Q.  So, what was his role as a process engineer in connection

9   with the High-Speed Swim Lane?

10  A.  So, for Loren, he, he did basically -- I call it project

11  management facilitation.  So, he would do -- the work flow, get

12  feedback from folks and, you know, plan out the project

13  timeline, those kinds of project management functions.

14  Q.  We'll get to that.  Let me see if I can understand it.

15  When you say get people together.  Do you mean calling

16  meetings?

17  A.  Yes.

18  Q.  When you say putting together timelines, do you mean we

19  need to get something done the first two weeks of August and

20  the first two weeks of September, mapping out the project?

21  A.  Correct.

22  Q.  It was Mr. Barnett and Mr. Rodriguez's role was to get all

23  the people together to talk about High-Speed Swim Lane, right?

24  A.  That was one of the functions, yes.

25  Q.  And you also talked about subject matter experts, right?

1   A.  Yes.

2   Q.  I think you testified that you were a subject matter

3   expert?

4   A.  Yes.

5   Q.  In connection with the High-Speed Swim Lane, Mr. Rodriguez

6   and Mr. Barnett got all the subject matter experts that were

7   necessary to design the new process, correct?

8   A.  They would, yes.

9   Q.  And the subject matter experts that dealt with credit

10  quality in the High-Speed Swim Lane came out of Mr. Kitashima's

11  organization, correct?

12  A.  That would be correct.

13  Q.  So, Mr. Rodriguez and Mr. Barnett, when they were

14  organizing meetings, included people from Mr. Kitashima's

15  organization like yourself, Mr. O'Donnell, Mr. Brent,

16  Mr. Aliano, Mr. Jaraba.  The key people who were in place to

17  look out for credit quality were included in those meetings,

18  correct?

19  A.  Yes.  Our job was to raise the concerns that we saw from a

20  credit quality standpoint.

21  Q.  And give input into the process, right?

22  A.  Sure.

23  Q.  And raise concerns as you said, right?

24  A.  Yes.

25  Q.  You weren't excluded from that process, were you?

D9q3ban4                    Thomas - cross

1  A.  At the beginning, I was not.

2           MR. HEFTER:  Your Honor, if I can approach and hand

3  the witness DX 4014.  Another 4,000 number.

4           THE COURT:  Ladies and gentlemen, by the way, I should

5  let you know that all the exhibits will be brought to you at

6  the start of your deliberations so you'll have them all there.

7  I'm also, since I think we may need several large vans to

8  deliver them all to you, I'm going to ask counsel to prepare

9  indices so you can find what you want quickly.  Go ahead.

10          MR. HEFTER:  Thank you, your Honor.

11 Q.  Mr. Thomas, have you seen DX 4014 before?

12 A.  I recall some slides in here.  I probably did see this at

13 some point.

14 Q.  This is a slide deck that was prepared at Countrywide FSL

15 during July 2007 timeframe?

16 A.  It appears so.

17          MR. HEFTER:  We offer it into evidence, your Honor.

18          MR. CORDARO:  No objection, your Honor.

19          THE COURT:  Received.

20          (Defendant's Exhibit 4014 received in evidence)

21 Q.  If you just blow up the first page and the little note

22 below.  Thank you.

23          Mr. Thomas, this document's titled "Prime High-Speed

24 Swim Lane Design Review July 26, 2007."  You see that?

25 A.  I do.

D9q3ban4                          Thomas - cross

1    Q.  Again, this is a slide deck.  At the bottom, it says "I

2    made the font type consistent with the rest of the

3    presentation."  Do you see that?

4    A.  I do.

5    Q.  I want to ask you a general question about that.  You're

6    familiar with the way slide decks work because you prepared

7    some yourself, right?

8    A.  I have.

9    Q.  Computer program allows the presenter of the material to

10   make notes to himself or herself when they present the slide

11   deck, correct?

12   A.  You can use a notes view to create notes.

13   Q.  Is it your understanding that the note below is a note that

14   someone would make to themself about the presentation they were

15   making?

16   A.  It could be to themselves or it could be to somebody

17   reviewing or editing the document.

18   Q.  I think yesterday the government showed you another slide

19   deck and was reading from the notes, do you recall that?

20   A.  I sort of recall that, yes.

21   Q.  So, when it says "I made the font type consistent with the

22   rest of the presentation," was that your words?

23   A.  I can't tell if that's -- this is me or not.

24   Q.  Do you know who that was?

25   A.  I don't.  I'm looking through to see.  But I don't see any

D9q3ban4                        Thomas - cross

1    identification of who it might be.

2    Q.   Seven years later it's hard to recall, right?

3             MR. CORDARO:  Objection.

4             MR. HEFTER:  Your Honor, I believe there was an

5    objection.

6             THE COURT:  I didn't hear it.  Forgive me.

7             MR. HEFTER:  I'll withdraw the question, your Honor.

8    Q.   If you look at page one of the document.  If you can blow

9    up just the top portion.  It says "design session held

10   July 19," do you see that?

11   A.   I do.

12   Q.   It says Rebecca, Lloyd, Cliff, Loren, Cheri, Jim K, Ed,

13   Rick Lang, Jim M, Patrick A, Anson, Chris Baumer, Mark,

14   facilitating, do you see that?

15   A.   Yes.

16   Q.   That was Mark Barnett who was facilitating the meeting, is

17   that correct?

18   A.   That's correct.

19   Q.   Were you at this meeting?

20   A.   I don't recall if I was at this meeting.  It doesn't look

21   like I was, given the list.

22   Q.   You wouldn't think Mr. Barnett would exclude you from the

23   list?

24   A.   It depends on what --

25             MR. CORDARO:  Objection.

D9q3ban4                         Thomas - cross

1   A.  -- you know, what stage this meeting was.  It could have

2   been a meeting -- these were executives in the meeting.  I may

3   have not either been there, or this also looked like all people

4   who may have been at Pasadena at the time.  I'm just not sure.

5   Q.  Fair enough.  Do you know if you were in Pasadena or

6   Richardson, Texas on July 19, 2007?

7   A.  I was in Texas.  I don't know -- I lived in Texas.  I don't

8   know -- I did travel to Pasadena sometimes.

9   Q.  This list indicates that Ms. Mairone, Mr. Sergeant,

10  Mr. Kitashima, Mr. Rodriguez, Ms. Shine, Jim K -- who is Jim K?

11  A.  Jim Kee.

12  Q.  What was his role?

13  A.  I believe at the time he was support for the sales

14  organization.

15  Q.  So he was a sales guy.  Rick Lang, he was a process

16  engineer based on the chart, right?

17  A.  Yeah, I just don't remember him at all.

18  Q.  Jim M?

19  A.  I don't know who that might be.

20  Q.  Patrick A is Patrick Aliano, correct?

21  A.  Probably, yes.

22  Q.  Anson Gong?

23  A.  Yes.

24  Q.  You talked about him yesterday.  So, you had Mr. Kitashima

25  and Mr. O'Donnell and Mr. Aliano from the risk team at this

1    meeting, correct?

2    A.   Correct.

3    Q.   You had operations people, correct?

4    A.   Yeah.  I wouldn't say I had them.  I don't know if I was

5    even there.  But yes, they were there.

6    Q.   You have the sales team executives as well, correct?

7    A.   The sales, yes.

8    Q.   This is a collaborative process where the design session

9    meeting was held on July 19?

10   A.   It appears there were several people there for that, yes.

11   Q.   In fact, throughout the entire time of studying the

12   High-Speed Swim Lane, it was a collaborative effort from people

13   from operations, from production and sales, and from

14   underwriting and credit quality, correct?

15   A.   I wouldn't say for the entire -- for myself personally, I

16   wouldn't say for the entire time.  I was much more involved at

17   the beginning, but I remember not really being invited to some

18   of the later meetings after I had raised some objections.

19   Q.   I think you testified yesterday that you don't know, for

20   example, with respect to quality of grade, you didn't know who

21   the ultimate decisionmaker was with respect to that, correct?

22   A.   The actual individual, no.  The department would have been

23   like Steve Brent's department.  Somebody in that quality

24   control compliance.

25   Q.   That was not an organization that reported to Ms. Mairone,

1    correct?

2    A.  No.

3    Q.  So you don't know, standing here today, one way or the

4    other, whether with respect to the quality of grade temporary

5    suspension, whether Mr. Lumsden made the ultimate decision or

6    Mr. Kitashima made the ultimate decision, or whether

7    Mr. Sergeant made the ultimate decision or anybody else,

8    correct?

9    A.  I don't know who made the ultimate decisions.  I know that

10   Rebecca requested as part of the operations dealing with the

11   central fulfillment operations.  But I don't know who had to

12   approve it or how that worked.

13   Q.  Is it your testimony that you were in a meeting where

14   Ms. Mairone requested that?

15   A.  I don't remember the specific meetings.  I know we

16   discussed even in the pilot when we discussed kind of the fear

17   of making the decisions and, you know, the quality hits, and I

18   think I testified to the kickoff meeting.  But, other than

19   those, I don't remember a specific directive or anything.

20   Q.  In fact, you weren't in all the meetings relating to

21   High-Speed Swim Lane, correct?

22   A.  No.

23   Q.  You weren't in the meetings between Ms. Mairone

24   Mr. Lumsden, Mr. Kitashima regarding the High-Speed Swim Lane,

25   correct?

D9q3ban4                         Thomas - cross

1    A.  I'm sure they had some meetings where I wasn't involved.

2    Q.  You weren't in the meetings with Mr. Mairone, Mr. Lumsden,

3    Mr. Kitashima and others relating to central fulfillment,

4    correct?

5    A.  No, I wouldn't have been in every meeting.

6    Q.  That wasn't at your level, correct?

7    A.  It depends on what was talked about.  But I'm sure the

8    executives had meetings where I wasn't included.

9    Q.  Well, in fact, you were never on their level, correct?

10   A.  On their --

11   Q.  On their level in the organizational chart?

12   A.  I was never a managing director.  I think my highest title

13   before I left was senior vice president.

14   Q.  Let's turn to Plaintiff's Exhibit 19, which I think is in

15   your binder that was provided to you by the government.

16          MR. HEFTER:  Your Honor, I believe it's already in

17   evidence.

18   A.  You said 19?

19   Q.  Yes.

20   A.  Okay.

21   Q.  Could you turn to page seven.  I'm sorry.  Yes.  Page

22   seven.  And blow up the note at the bottom, please.  It says in

23   the bottom "This project has broad scope and impact and an

24   aggressive timeline."  Do you see that?

25   A.  Yes.

D9q3ban4                          Thomas - cross

1    Q.  In fact the government asked you questions about that

2    yesterday, right?

3    A.  I believe so.

4    Q.  Let's turn now to the first page of the exhibit.  Or the

5    second page of the exhibit.  Go to the top.  This is a page

6    that the government didn't show you.  "Design objective."  Do

7    you see that?

8    A.  I do.

9    Q.  It says "Develop prime High-Speed Swim Lane with minimum

10   set of gates as requirements for loans in this lane."  Correct?

11   A.  Yes.

12   Q.  So the concept and the intent here was that only loans that

13   were eligible for the High-Speed Swim Lane could enter it,

14   correct?

15            MR. CORDARO:  Objection.

16            THE COURT:  Sustained.

17   Q.  Was it your understanding that the design and intent of the

18   High-Speed Swim Lane was that only loans that met the

19   requirements were eligible for the High-Speed Swim Lane?

20            MR. CORDARO:  Objection.

21            THE COURT:  Ground?

22            MR. CORDARO:  Your Honor, the phrase "the

23   requirements."  I don't know which requirements.

24            THE COURT:  All right.  Sustained.  Do you want to

25   clarify.

D9q3ban4                           Thomas - cross

1              MR. HEFTER:  Yes.

2    Q.  Was it your understanding, Mr. Thomas, that the intent and

3    concept of the High-Speed Swim Lane was that only certain

4    eligible loans would enter it?

5    A.  So, the design of the process was designed for specific

6    loan types.  Those loan types changed over time, but, yeah only

7    loans that were designed to go through the process, were

8    designed to go through the process.

9    Q.  Right.  And it says here "The design objective was target

10   efficiency, velocity and quality."  Do you see that?

11   A.  I do.

12   Q.  That was your understanding of the design objectives,

13   correct?

14   A.  Yes, in -- that was -- I would have specifically been

15   concerned about the quality side.

16   Q.  That was your understanding of the design objective at the

17   start of the High-Speed Swim Lane, correct?

18   A.  Yes, that's my understanding.

19   Q.  If you go down and it says "Prime CLUES accepts," do you

20   see that?

21   A.  I do.

22   Q.  Then it says "FICO 660."  You see that?

23   A.  Yes.

24   Q.  It might say 860, I'm being reminded here.  You can barely

25   read it so I apologize.  Then it says "CLTV less than

1  90 percent."  Do you see that?

2  A.  Yes.

3  Q.  Can you explain what CLTV means to the jury.

4  A.  So CLTV or LTV stands for loan to value.  So, meaning if a

5  property is worth $100,000 and the loan is $80,000, it would

6  have a loan to value of 80 percent.

7  Q.  Loan to value was one metric to determine the relative risk

8  of a loan, correct?

9  A.  It was one characteristic, yes.

10  Q.  If you had a loan to value of less than 80 percent, that

11  would be relatively a safer loan than an LTV of 120 percent,

12  correct?

13  A.  That's correct.  Because if the bank or the mortgage lender

14  ended up having to take the property from the borrower, you're

15  more likely to recover your losses or more of your losses if

16  the property is worth more than what's owed on the property.

17         MR. HEFTER:  Thank you.  Let's turn our attention to

18  DX 193, which I believe is in evidence, your Honor.  If I may

19  have an assist from bank's counsel as to what tab that is in

20  your binder.

21  Q.  Tab three, sir.

22  A.  Okay.

23  Q.  Mr. Sullivan asked you some questions about this document.

24  I just want to turn your attention to page four of the document

25  at the top.

D9q3ban4                        Thomas - cross

1    A.  Okay.

2    Q.  It says "Lloyd's approach."

3    A.  Yes.

4    Q.  This is your attempt to put down in writing your notes from

5    the design meeting, correct?

6    A.  That's correct.

7    Q.  Then you distributed it to the people who were involved in

8    the process, correct?

9    A.  I believe so, yes.

10   Q.  This is a meeting that occurred on or about July 18, 2007?

11   A.  Probably, yes.

12   Q.  This is an e-mail you did not send to Ms. Mairone, correct?

13   A.  No, I sent this to Loren who reported to Rebecca.

14   Q.  In fact, Ms. Mairone was not at this design meeting,

15   correct?

16   A.  I imagine she -- I don't know for sure, but I imagine she

17   would not be.  This looked more like a process level, so more

18   subject matter experts.

19   Q.  This is a collection of subject matter experts, correct?

20   This is your attempt to put this in writing, put the notes in

21   writing.  It says at the top "Lloyd's approach no file goes

22   backward, just to the side for specialized exception

23   processing."  Do you see that?

24   A.  I do.

25   Q.  Is it your recollection sitting here today that

420

D9q3ban4                          Thomas – cross

1   Mr. Sergeant managing director's approach was that no files go

2   backward, just to the side for specialized exception

3   processing?  Do you see that?

4   A.  I see it, yes.

5   Q.  That was discussed at this design meeting with the subject

6   matter expert, right?

7   A.  It appears so.

8   Q.  It says "No file goes backward, just to the side for

9   specialized exception processing."

10          Was it your understanding in the High-Speed Swim Lane

11  if there was something about the loan that it could not move

12  forward, it would go off the High-Speed Swim Lane and on to a

13  different process?

14  A.  Not a different process, the -- I think when we were

15  flipping through one of the presentations I saw a slide we

16  showed kind of a road, loans move forward never backwards, but

17  they could take a pit stop.  That was the analogy.  The concept

18  was don't send it back to somebody else, but fix whatever it is

19  and keep moving it forward.

20  Q.  It wasn't if there was a problem or an issue, ram it

21  through.  That was not the concept of the design, right?

22  A.  In the design, no.  That wouldn't have been a design

23  concept.

24  Q.  In fact --

25  A.  It may have been an implementation problem.  You may see

D9q3ban4                          Thomas - cross

1     that, but I don't think we would design that.

2     Q.  But the concept of Mr. Sergeant's approach of no files go

3     backward, just to the side.  If there was an issue, it had to

4     be placed on the side before it could move forward in the

5     process to funding, correct?

6     A.  I can't say in the actual process.  In the design, because

7     I don't remember even how we identified pit stops or anything

8     like that.  But, I do remember discussing that concept in the

9     design phase.

10    Q.  I think that was my question, sir.  In the design.

11    A.  Okay.

12    Q.  It was intended that if there was an issue with the loan,

13    it would be moved to the side, it wouldn't move forward until

14    that issue was resolved, correct?

15    A.  At this point in the design I believe that's correct.

16    Q.  Thank you.  In fact, to determine that the loan got a prime

17    CLUES accept, that was not eligible or did not meet the

18    eligibility criteria for the High-Speed Swim Lane, it would

19    need to be put to the side for different treatment, correct?

20    A.  I would say if it didn't meet the eligibility requirement

21    it wouldn't -- it wouldn't step aside, it would actually go to

22    a different process.

23    Q.  If it didn't meet the eligibility criteria, it was

24    ineligible for the High-Speed Swim Lane, and had to go to a

25    different process all together?

D9q3ban4                          Thomas - cross

1    A.  It should, yes.

2    Q.  Thank you.

3           MR. HEFTER:  Your Honor, may I approach to show the

4    witness DX 4001.

5           THE COURT:  Yes.

6    Q.  Sir, before we go there just go back to the previous

7    document.  DX 193.

8    A.  Which was that?

9    Q.  Tab three.

10   A.  Okay.

11   Q.  If you go to the back, there is an e-mail from you to

12   Mr. Rodriguez.  Do you see that?

13   A.  Yes.

14   Q.  July 18, around 11:18 a.m.?

15   A.  Yes.

16   Q.  You write "Loren, Ed asked me to collect our brainstorm

17   thoughts for process improvements and send to you before

18   tomorrow's meeting."  Do you see that?

19   A.  I do.

20   Q.  Do you recall Mr. O'Donnell asking you to collect our

21   brainstorm thoughts for process improvement?

22   A.  I assume he did from reading the e-mail.

23   Q.  That was something that Mr. O'Donnell had asked you to do

24   during this process to get involved and lend your subject

25   matter expertise for subject approval, right?

D9q3ban4                          Thomas - cross

1    A.  Yes.

2    Q.  Now turn to DX 4001 and let me ask you, this is an e-mail

3    exchange between you and Mr. O'Donnell, you see that?

4    A.  Yes.

5    Q.  Do you recall these e-mails between you and Mr. O'Donnell?

6    A.  Not specifically, but I see them here.

7    Q.  You have no reason to believe that you didn't send or

8    receive these e-mails?

9    A.  No.

10              MR. HEFTER:  We move DX 4001 into evidence, your

11   Honor.

12              MR. CORDARO:  No objection.

13              THE COURT:  Received.

14              (Defendant's Exhibit 4001 received in evidence)

15              THE COURT:  Counsel, how much longer are you going to

16   go?

17              MR. HEFTER:  I probably have 20 minutes, your Honor.

18              THE COURT:  Come to the side bar.

19              (Continued on next page)

20

21

22

23

24

25

D9q3ban4                              Thomas – cross

1              (At the side bar)

2              THE COURT:  When I asked yesterday, you said a half

3    hour.  That was I understand a ballpark analysis.  But in 20

4    minutes you'll have gone over an hour.  I will not allow this

5    to continue.  I am going to let you have your 20 minutes, not

6    21.  From now on we will set specific time limits.  I can't

7    have counsel being that far off on their predictions.

8              MR. HEFTER:  I apologize, your Honor.  I appreciate

9    that.  Thank you very much.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

425

D9QTBAN4                          Thomas - cross

1              (In open court)

2    BY MR. HEFTER:

3    Q.  Mr. Thomas, let me focus your attention on just the top

4    portion just to give the jury a sense of the timing.

5    A.  OK.

6    Q.  Now this is an email from Mr. O'Donnell to yourself dated

7    March 8, 2006.  Do you see that?

8    A.  Yes.

9    Q.  Now let me turn your attention to the second page of the

10   exhibit.  Do you see that on the bottom?

11   A.  OK.

12   Q.  And on the bottom it says this is an email from you to

13   Mr. O'Donnell on March 8, 2006.  Do you see that?

14   A.  Yes.

15   Q.  And it says on the bottom paragraph:  I'm working on a plan

16   and meeting with my staff this week to prioritize.  Per meeting

17   with Cliff on Friday, this is the only number one priority, so

18   we'll be putting a lot of resources on it.  Do you see that?

19   A.  Yes.

20   Q.  Do you know what you were referring to there?

21   A.  I don't.  From the timing it may have been the prime CLUES

22   accept.  Something around the prime CLUES accept process.

23   Q.  And this is the beginning of March 2006, correct?

24   A.  Correct.

25   Q.  And this was an effort by you and Mr. O'Donnell and others

1   to implement Mr. Lumsden's direction to have a new process for

2   processing prime loans, correct?

3   A.  This would have been what I discussed with the prime CLUES

4   accept process, which was kind of separating those workloads

5   for the underwriters.

6   Q.  And this occurred back in March 2006, correct?

7   A.  I can't remember -- this email did.  I can't remember at

8   what point we started doing some of the prime CLUES accept

9   processing.

10  Q.  And those discussions relating to separating out the

11  workloads for prime loans that occurred prior to March 2006 as

12  well, correct?

13  A.  Probably.  My recollection is the prime CLUES accept

14  process was in 2006.

15  Q.  Your recollection, based on this document, is prior to this

16  time, March 8, 2006, you were having those discussions?

17  A.  Correct.  I would think so, because I'm talking about

18  organizing a plan.  I don't know exactly when the discussions

19  were.

20  Q.  I'm going to turn your attention to DX 1045, tab 12 in the

21  binder.  Tab 13, I apologize.  You can go to the top.

22  A.  Yes.

23  Q.  This is -- Mr. Sullivan asked you questions about this in

24  connection with the sprint incentive, correct?

25  A.  Yes, I believe so.

D9QTBAN4                          Thomas - cross

```
 1   Q.  Mr. Zavala was a person in the chief financial officer's
 2   organization, correct?
 3   A.  I think so.  I didn't check on -- when we looked at it, but
 4   he was incentive compensation.
 5   Q.  And that was not Ms. Mairone's organization, correct?
 6   A.  I don't believe so, no.
 7   Q.  And in fact, Ms. Mairone had nothing to do with the sprint
 8   incentive and its design, correct?
 9   A.  I don't know if there were any discussions with Rebecca on
10   it, but it was -- the employees that it affected were not in
11   her organization.
12   Q.  Let me turn your attention --
13           MR. HEFTER:  Sorry, may I approach, your Honor?
14           THE COURT:  Yes.
15   Q.  I hand you, Mr. Thomas, Plaintiff's Exhibit 199, which is
16   an email from you to Mr. O'Donnell, copied to Mr. Kitashima.
17   Do you see that?
18   A.  I do.
19           THE COURT:  Is there a mistake?  It's only three
20   digits?
21           MR. HEFTER:  I see that, your Honor.
22   Q.  Did you send this email to Mr. O'Donnell on or about
23   March 18?
24   A.  March 13.
25   Q.  2008?
```

1   A.  March 13, 2008, yes, it appears so.

2           MR. HEFTER:  We move Plaintiff's 199 into the

3   evidence, your Honor.

4           MR. CORDARO:  We have no objection to our exhibit.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 199 received in evidence)

7   BY MR. HEFTER:

8   Q.  So Mr. Thomas, let me see if I understand this, this is

9   March 13, 2008, correct?

10  A.  Correct.

11  Q.  And you were putting together a presentation for a meeting

12  between Mr. Lumsden and Mr. Gissinger, is that correct?

13  A.  I believe I see in the email here where I said something

14  about Drew being in the audience, so I assume -- I don't know

15  if I put the whole deck together or parts together and

16  finalized it.

17  Q.  You are aware that Mr. Kitashima, Mr. O'Donnell,

18  Ms. Mairone and Mr. Lumsden had a meeting with Mr. Gissinger on

19  March 17, 2008.  You are aware of that, correct?

20  A.  I don't recall a specific meeting.  I can't say it didn't

21  happen, but I don't recall specifically.

22  Q.  Putting aside whether there was a meeting or not,

23  Mr. O'Donnell asked you to build a slide deck for him, correct?

24  A.  Yes.

25  Q.  Now I want to turn to your note on page 2 of the exhibit.

1   Let me just blow up at the bottom.  Sorry, in the middle it

2   says -- why don't you read the first paragraph into the record.

3   A.   The first paragraph.  As I'm building the new slides, you

4   may want to review the old slides.  I think my wording is too

5   negative for Drew to an audience.  I went through and

6   highlighted things to bring to Wade and Rebecca's attention,

7   but we probably want to reword to be a little more positive on

8   FSL.  Do you agree?

9   Q.   So it was your thought at the time that you wanted the

10  presentation to be a little more positive on FSL for

11  Mr. Gissinger, correct?

12  A.   It appears that I may have thought some of the comments

13  that I may have put in originally might be a little too

14  controversial or harsh, I don't know.

15  Q.   And you removed those slides, correct, the ones that you

16  felt might have been too controversial or harsh, as you say?

17  A.   It doesn't appear that I chose what slides to remove, it

18  looks like, as I take a look, I removed the pages we identified

19  to remove.  So I don't know if I was told to remove certain

20  slides or what that was, but I would have been building the

21  deck so I would have done whatever was asked.

22  Q.   At this point in time there's competition between the

23  divisions, correct?

24  A.   There was always competition between divisions.

25  Q.   And you wanted FSL to be seen in the most positive light,

1    correct?

2    A.  Well, I think I probably thought that in any presentation

3    with executive management you would want to highlight your

4    strengths or look as good as you could, just like you would

5    meeting with any boss.

6    Q.  And you in fact did that by removing some slides and

7    recommending that some slides be removed to Mr. O'Donnell?

8    A.  It looks like I identified things to bring to Wade and

9    Rebecca's attention.  And I said, you may want to reword.  I

10   wouldn't be the one deciding how to word things or what slides

11   to include.

12   Q.  But that was going through your mind at the time, that you

13   thought some slides should be removed to make FSL be seen in a

14   more positive light?

15           MR. CORDARO:  Objection, your Honor.

16           THE COURT:  Sustained.

17   Q.  Let me move on to Plaintiff's Exhibit 80, which is in the

18   government's book.  Do you see that?  We talked about this

19   document already.

20   A.  Yes.

21   Q.  And it says just talked to Cliff.  He was just as

22   frustrated.  Brent said Rebecca rolled her eyes quite a bit

23   when I confirmed that the issue was not a behavioral problem

24   but process problem.  Do you see that?

25   A.  Yes.

D9QTBAN4                           Thomas - cross

 1   Q.  And that was a debate that was going on in the division
 2   whether what was happening in the underwriting process, or
 3   issues with respect to that, were related to behavioral or
 4   people issues or something that was clogging the process,
 5   correct?
 6   A.  I wouldn't say underwriting, because this would have been
 7   the Hustle process, it was probably the processors' behavior.
 8   But my recollection is was it the whole concept, is the process
 9   broken, or is it just people are afraid to use the new
10   authority.
11   Q.  So you had a process, people and behavioral and technology,
12   those were things that you were always looking at to see where
13   you could make more efficiencies, correct?
14   A.  Yes, I think we always have a combination of factors.
15   Q.  Now at the bottom there's a little colon and a caret,
16   that's a smiley face, right, that's what you testified to?
17   A.  Yes, it is.
18   Q.  So you were happy at the time that you got under -- or
19   Mr. Brent got under Ms. Mairone's skin at that meeting,
20   correct?
21   A.  I think I was pleased that, one, that we at least got some
22   concession on the process issues, that there with were process
23   issues.  And since I was not successful for a long period of
24   time getting those concerns recognized, I was pleased.
25   Q.  You were pleased that you got under her skin, correct?

1   A.  Because I think I was getting my point across.

2   Q.  And at this point in time, central services had been

3   effectively replaced, correct, by the central fulfillment

4   model?

5   A.  I believe so, yes.

6   Q.  And you were in the central services --

7   A.  I shouldn't say replaced, because for central fulfillment

8   organization, yes, underwriting and funding were in central

9   fulfillment, the branch organizations still used underwriting.

10  Q.  Mr. Thomas, the central services where you previously

11  reported up through had been replaced as a result of central

12  fulfillment, is that correct?

13  A.  Not entirely.  The central fulfillment operations -- sorry,

14  the central services operations for central fulfillment were

15  now absorbed into central fulfillment.  The central services

16  organization to support the field operations still existed.

17  Q.  But not with respect to the national sales centers,

18  correct?

19  A.  That's correct.

20  Q.  And you wanted Mr. O'Donnell to have the position of having

21  central fulfillment, correct?

22  A.  I really didn't have an opinion one way or the other as

23  long as I was still working for him.

24  Q.  And you were upset when he didn't get --

25  A.  I think my recollection at the time was that I thought that

1    that was probably our best chance to get some quality back into

2    the central process.

3    Q.  You would have preferred Mr. O'Donnell to have that role

4    instead of Mr. Comeaux?

5    A.  I would have preferred Ed to have the role.  I wouldn't say

6    over Wade.  I didn't know Wade, so -- until after that point.

7              MR. HEFTER:  Pass the witness, your Honor.

8              THE COURT:  All right.  Any redirect?

9              MR. CORDARO:  Yes, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. CORDARO:

12   Q.  Good afternoon, Mr. Thomas.

13   A.  Good afternoon.

14   Q.  Could you open the plaintiff's binder to Plaintiff's

15   Exhibit 46, please.

16   A.  OK.

17   Q.  I would like to focus your attention on the third page of

18   the exhibit.

19   A.  OK.

20   Q.  I will read you the line that I am interested in, I think

21   it will sound familiar to you.  The line is:  Now that being

22   said, I think the concept and intent behind the process is

23   correct.

24             Do you see that line?

25   A.  I do.

1   Q.   You were asked a number of questions yesterday about the

2   word "concept."  Could you explain to us what you meant by

3   "concept" in the context of this email?

4   A.   So in the context of this email, I was saying I agree with

5   improving efficiency, but I'm concerned about the quality,

6   basically is what I was saying in that sentence.

7   Q.   And was there only one concept, to your knowledge, with

8   respect to the High-Speed Swim Lane?

9   A.   No, there was a lot of concepts as part of that -- as part

10  of the design and as part of the roll out and continuation,

11  there were a lot of factors and concepts.

12  Q.   And did you agree with all of the concepts in the design

13  and the roll out?

14  A.   No.

15  Q.   Did could you tell us which concepts you disagreed with?

16  A.   So especially as we started measuring the pilot and things,

17  I disagreed with the concept of having the processor do some of

18  the underwriting functions, because it didn't appear from the

19  data they were comfortable with that.  So things like that.  I

20  didn't agree with concept of removing job aids or certification

21  check lists that were in the file.  That was something that was

22  kind of, in my mind, a minimum check, you wanted at least to

23  say that they did the work.

24  Q.   Did you agree with the concept of removing underwriters

25  from the clear to close process?

1    A.  No, I remember thinking in the design phase that that part

2    of the process, having an underwriter check at the end, was

3    important, and that wouldn't have caused a significant clay in

4    the process because that's not where a lot of rework was.

5    Q.  Mr. Thomas, you did testify that you believed in the

6    concept of improving efficiency?

7    A.  Yes.

8    Q.  Did you believe in a concept of improving efficiency

9    without any quality bounds?

10               MR. HEFTER:  Objection.

11               THE COURT:  Ground?

12               MR. HEFTER:  Leading, your Honor.

13               THE COURT:  Well, it is, but within limits on redirect

14   I will allow it.  Overruled.

15   A.  Absolutely not.  I didn't agree with improving efficiency

16   at the expense of quality.  That's what I was saying in that

17   sentence.

18   Q.  We were discussing the concept of clear to close.  Could we

19   just step back.  In prime CLUES accept model, who handled the

20   clear to close?

21   A.  The underwriter.

22   Q.  Was that an underwriting validator or an underwriter?

23   A.  That was an underwriter.  So the validator would have been

24   earlier in the process validating the data in CLUES.  The

25   underwriter would have been a more senior underwriter.

1    Validators were usually more a junior underwriter.  A more

2    senior underwriter would go through the clear to close.

3    Typically there were some more complex issues there around

4    title and appraisal that you would want a more senior

5    underwriter to look at.

6    Q.  Could a loan fund with any conditions -- withdrawn.

7         Could a loan fund before it was cleared to close?

8    A.  No.

9    Q.  Why not?

10   A.  An underwriter would have to clear to close before it could

11   move into the funding organization.

12   Q.  Now I believe you talked about the fact that there could be

13   some complex conditions that the underwriter might have to deal

14   with in making the clear to close decision.

15   A.  Yes.

16   Q.  Did I remember that accurately?

17        Did that change when the High-Speed Swim Lane was

18   implemented with respect to clearing to close?

19   A.  The complex conditions were still there, and that was part

20   of the duties of the processor in the Hustle process.

21   Q.  So with respect to the conditions themselves, did the

22   complexity change from prime CLUES accept to the High-Speed

23   Swim Lane?

24   A.  No.

25   Q.  But did who handles those conditions change between prime

1  CLUES accept and the High-Speed Swim Lane?

2  A.  Yes.

3  Q.  And the person handling the task of clearing to close in

4  the High-Speed Swim Lane was?

5  A.  The processor.

6  Q.  The processor and underwriter?

7  A.  No.

8  Q.  Was the processor someone who received the training that

9  underwriters received in the prime CLUES accept model?

10  A.  In the prime CLUES accept model they were supposed to be

11  required to do the training.  I think we talked about that the

12  certification was given even before some of the training was

13  completed or the file reviewed.

14  Q.  Certification for who?

15  A.  For the processor in the Hustle process.

16  Q.  Now you were speaking about the underwriting validator

17  before the clear to close.

18  A.  Yes.

19  Q.  So let's go back prime CLUES accept for a second.  If CLUES

20  spat out an accept with conditions, who could work on the

21  conditions putting aside the clear to close later?

22  A.  Sure.  So it depended on the type of condition.  Some

23  conditions the processor would collect documentation and they

24  could actually sign off on those conditions saying they did,

25  they collected those documents.  Some we called underwriter doc

1    conditions, which meant the processor could collect the

2    conditions but the underwriter needed to review the

3    documentation, and they needed to sign off on it, and there

4    were underwriting conditions that they may have been looking,

5    interpreting something.  And then there are even conditions in

6    the funding organization as well if something had to be done

7    before funding.

8    Q.  Was that the underwriting validator in prime CLUES accept

9    model or the underwriter?

10   A.  Doing?

11   Q.  Looking at the conditions before the clear to close.

12   A.  Before the clear to close, looking at conditions would have

13   been -- the ones the underwriter was responsible for would have

14   been the underwriter, not the validator.  The validator was

15   validating CLUES input.

16   Q.  So in prime CLUES accept, did the CLUES ever displace the

17   presence of a human underwriter somewhere in that process?

18   A.  No.

19   Q.  And when you used the term "CLUES is the underwriter," what

20   did you mean against that backdrop?

21   A.  So that meant that the underwriter should not re-decision

22   the rules that CLUES had decisioned.  So don't second guess the

23   rules that CLUES used.  Still got to do the other parts of your

24   job, validating the information, clearing the conditions, but

25   CLUES rules were OK, you didn't have to reevaluate those rules.

D9QTBAN4                    Thomas - redirect

1   Q.  Did that have anything to do with clear to close?

2   A.  No.

3   Q.  Mr. Thomas, you were asked a number of questions yesterday

4   about certain steps that would purportedly lead to a quality

5   product.  Do you remember those questions?

6   A.  Yes.

7   Q.  So I'm going oh ask you a similar question.  In prime CLUES

8   accept, the process by which an underwriter would clear to

9   close, what, if anything, would that have to do with producing

10  a quality product?

11  A.  If an underwriter was clearing to close?

12  Q.  Yes.

13  A.  They would be -- in the old process and the PCA process or

14  before, they would be validating that all the conditions are

15  cleared correctly and cleared to close or clearing conditions

16  that they were supposed to clear, and that would mean that the

17  underwriter was comfortable with that process.

18  Q.  Why an underwriter?  Why not someone else?

19  A.  They're skilled at understanding the underwriting

20  guidelines.  They're more experienced employees.  They just

21  have the expertise to understand the quality, they're quality

22  employees, their job is assessing risk.

23  Q.  Who did the underwriters report to?

24  A.  Ultimately Cliff Kitashima, the chief credit compliance

25  officer.

1    Q.   Was that the same reporting line as the loan specialists?

2    A.   No.

3    Q.   Stepping back to the question I just asked you, does that

4    process have anything to do with producing a quality product?

5    A.   Yes.

6    Q.   Why?

7    A.   When you have a separate organization responsible for the

8    risk versus the organization that's responsible for the volume,

9    that's a good back and forth, because one is incentivized on

10   volume, one is incentivized on quality.  So if one decides I

11   want to push as much volume through, the other says wait a

12   second, there's quality issues here.  So you have somebody

13   checking someone else's work, but they also report separately.

14   And that guards against, among other things, fraud, because you

15   have two entirely different organizations aligned to do that.

16   Q.   What happened in that back and forth process in the

17   High-Speed Swim Lane?

18   A.   It was just one organization.

19   Q.   And what do you mean by that?

20   A.   Meaning the central fulfillment had a processor,

21   underwriter, funder -- well, processing underwriting in one

22   role, funder in a different role, funder compliance specialist

23   combined in that role, and they reported up the same chain of

24   command.  They both would have the same manager.

25   Q.   By the way, stepping back to the underwriting validator on

1    prime CLUES accept, you testified their task was to validate

2    the information that went into CLUES, correct?

3    A.  Correct.

4    Q.  And was that an important job?

5    A.  Yes, absolutely.

6    Q.  Why?

7    A.  Well, garbage in, garbage out.  You could put whatever you

8    want into CLUES, but if that information is not documented and

9    correct, then you're going to get the wrong answer.  So it's

10   very important to have somebody else check that work.  If I was

11   putting information in CLUES and then also responsible for

12   putting the documentation in the file, I wouldn't have to put

13   that in the file, I could clear the condition saying I put it

14   in the file.  I could clear it to close.  I could send it to

15   funding.

16   Q.  And what, if anything, did having independent eyes of the

17   underwriting -- sorry, the underwriting validator, have to do

18   with producing a quality product?

19   A.  Because they could check somebody else's work and make sure

20   it was correct.

21   Q.  What happened to that work, checking by the second set of

22   eyes in the High-Speed Swim Lane?

23   A.  It didn't exist.

24   Q.  By the second set of eyes I mean the underwriting

25   validator, correct?

1   A.  Correct.

2            THE COURT:  Counsel, find a appropriate spot to break

3   and we'll give the jury their lunch break.

4            MR. CORDARO:  This is it, your Honor.

5            THE COURT:  Very good, ladies and gentlemen, so we'll

6   take our lunch break now and see you at 2 o'clock.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury not present)

2                THE COURT:  Please be seated.

3           So as I explained to counsel at the side bar, because

4     there had been a considerable deviation between the predicted

5     time for the cross of the witness by Ms. Mairone's counsel and

6     the actual time, I am going to start enforcing more strictly

7     when counsel tells me is their time frame.

8           So let me ask the government, how much longer do you

9     have on redirect?

10               MR. CORDARO:  Your Honor, I would hope to wrap this up

11    in 40 minutes.  I need to study the documents over lunch and

12    see what I have.  I understand this witness has been on the

13    stand for a while.

14               THE COURT:  If it's more than 40 minutes, you let me

15    know before we start at 2 o'clock.

16               MR. CORDARO:  Thank you, your Honor, I appreciate it.

17               THE COURT:  And I don't anticipate that there will be

18    more than a very few minutes of recross, but we'll see what

19    happens.

20          Who is the next witness?

21               MS. NAWADAY:  Edward O'Donnell.

22               THE COURT:  And how long will he be on direct?

23               MS. NAWADAY:  We estimate approximately four hours,

24    your Honor.

25               THE COURT:  OK.  I would estimate that's the most

D9QTBAN4                          Thomas - redirect

1    you're going to get.

2            MS. NAWADAY:  Understood, your Honor.

3            THE COURT:  Now there were other matters counsel

4    wanted to raise with the Court?

5            MR. MUKASEY:  Judge, this is sort of an end of the day

6    matter, but I want to the plant the seed in your Honor's mind

7    now.  There is a rather prominent article in the Wall Street

8    Journal today that is entitled "The Star of the Hustle," and

9    it's got a big picture of Ms. Mairone.  And it's an article

10   that contains allegations from the government's complaint, a

11   little bit about the testimony yesterday.  I don't want your

12   Honor obviously to tell the jury not to think about the pink

13   elephant in the room and force them to think about the pink

14   elephant, I'm wondering -- and I defer to the Court in terms of

15   process -- perhaps when you dismiss them at the end of the day,

16   casually you might say:  I remind you to --

17           THE COURT:  That sounds fine.  Must not have been

18   quite as prominent as you think since I get the Wall Street

19   Journal and I didn't see it, but maybe it was in a later

20   edition or something like that.

21           MR. MUKASEY:  When you're the subject of it, it's

22   always prominent.

23           THE COURT:  Let me make a note to remind the jury.

24           Anything else?

25           MS. MAINIGI:  Your Honor, we mentioned to your law

clerk this morning that we were determining whether there could

be an earlier resolution of that still-pending motion in limine

related to Cindy Simantel.  I think, your Honor, you saw it

arise during summary judgment.  It has to do with the eleven

loans what were subprime loans that were not out of FSL but

were out of a different division all together.

          And the reason -- I completely understand why your

Honor held it, as you did, with the motion in limine.  The

reason it has become more timely issue is the government had

put Cindy Simantel on their witness list.  We did not put her

on the witness list.  She may be the only one that we did not

intend to bring to this case.  But the government has issue

indicated that if in fact the motion in limine is granted, they

may possibly not bring Ms. Simantel live, so if they are not

allowed to bring in that particular document, they may chose to

not bring in Ms. Simantel.

          I was wondering, it doesn't have to be right now, but

whether there could be a time set aside prior to the early part

of the next week where we could have that discussion.

          THE COURT:  Why do you care?  I could see why she

might care and why the government might care.  Why do you care?

          MS. MAINIGI:  She would be coming across the country,

your Honor, from California to come here, and we feel that that

document itself is fairly prejudicial.

          THE COURT:  I know all that.

1          MS. MAINIGI:  It's irrelevant.

2          THE COURT:  I'm not understanding why you think -- I

3    understand why she might not want to come across the country to

4    testify and then learn that it was unnecessary, but I'm not

5    understanding what your concern is.

6          MS. MAINIGI:  Well, your Honor, I think as a practical

7    matter that email is an issue unto itself, so I think for both

8    sides there will be a completely different approach with

9    Ms. Simantel if the email is in or the email is out.  I know

10   your Honor's general rule is if there's a particular document

11   or witness that has an issue that you prefer to deal with it at

12   that time.  If that's what you choose to do, that's fine.  I

13   think with this particular email it may even determine whether

14   she needs to come out at all.

15         THE COURT:  I understand that, but I'm still not sure

16   why that affects you.  Is it because you would otherwise have

17   to prepare for her like the government will have to prepare for

18   all your witnesses, some of whom may not be called, or is it

19   because you would like to narrow the government's list of

20   witnesses, much as the government would like to narrow your

21   quite extensive list of witnesses?  You see my point.

22         MS. MAINIGI:  I do.  And with all due respect, in our

23   view it's a different situation, your Honor, it's a very

24   discrete issue.  And I think both parties would benefit from

25   knowing whether that issue was in or whether it was out.  If

D9QTBAN4                         Thomas - redirect

1    your Honor prefers to bring her here, we can certainly proceed

2    in that way, but if it made sense at some point prior to the

3    early part of next week to deal with it, I actually think it

4    would be more efficient for both sides to know that.

5            THE COURT:  I will take that under consideration.

6    Thank you.

7            MS. MAINIGI:  Thank you.  One other matter, your

8    Honor, we would like to seek leave to file a short motion with

9    your chambers regarding the issue of the $165 million that was

10   referenced in the opening statement.

11           THE COURT:  Yeah.

12           MS. MAINIGI:  And we would like to move to exclude it.

13           THE COURT:  Why?  What ground?  Mr. Sullivan objected

14   at the time.  I considered the matter and overruled his

15   objection.  But what is your ground?

16           MS. MAINIGI:  There are two grounds, your Honor, the

17   165 number is essentially a back door number for damages.  The

18   165 million refers to the pecuniary gain.  And it's referenced

19   actually in the penalties section of the government's joint

20   pretrial statement, their section of that.  So the 165 million,

21   just as all the other damages numbers, is very much a damages

22   number.  And while it might be stated in the form of a gain as

23   opposed to a loss, it is still a damages number, and --

24           THE COURT:  No, I think you're missing the point.  The

25   government has to prove that misrepresentations were made for

1    the purpose of obtaining money or property, and there may be,

2    although we need to discuss this perhaps more, a question of

3    materiality and things like that of representations.  So it

4    seems to me that the fact that they obtained this property,

5    namely this money, is part of their proof of that element of

6    the offense.

7              MS. MAINIGI:  Your Honor, if we could have the

8    opportunity to brief the issue, we respectfully disagree.

9              THE COURT:  Of course I'm delighted to have you brief

10   the issue.  I was extremely worried that now that the Yankees

11   are out of the playoffs I would have absolutely nothing to do

12   this weekend, so this will brighten my day.  When would you

13   like to put in that brief?

14             MS. MAINIGI:  We could do it later today.

15             THE COURT:  That's fine.  If the government wants to

16   respond, you will let me know when you want to respond by, but

17   certainly no later than Monday at the latest.

18             MR. ARMAND:  Your Honor, would it be possible to

19   resolve it orally and without having to do briefing?  This

20   seems like a pretty straightforward issue.

21             THE COURT:  I never forbid a party from putting in a

22   written brief, provided, of course, that they ask for

23   permission in advance, because they need to make their record

24   for any appeal and things like that, and written briefs can do

25   that with more particularization and nuance than an oral

D9QTBAN4                          Thomas - redirect

1    presentation.  But having said that, let me hear from you if

2    you wanted to say anything on the subject now.

3              MR. ARMAND:  Well, just that with regard to the 165

4    million, it's from the bank's own financial records.  It shows

5    the profit motive that is part of the mail and wire fraud claim

6    that we have brought.  And so without --

7              THE COURT:  I think that's a fair point, too.  Motive

8    is certainly relevant.  As you can tell from the fact that I

9    overruled Mr. Sullivan's objection at the time, I am inclined

10   to think that it should come in, but I'm not going to forbid

11   them from putting in a brief.  And if you feel, after reading

12   their brief, that you can respond to it purely orally, I'm not

13   going to force you to put in a brief in response.

14             My law clerk, who is much, much tougher than I am, and

15   thank God, says -- he just handed me a note, "Do you want to

16   limit it to three pages?"

17             MR. ARMAND:  That was -- my next question was going to

18   be page limit.

19             THE COURT:  How long were you contemplating?

20             MS. MAINIGI:  Single spaced or double?

21             THE COURT:  I would say single spaced.

22             MS. MAINIGI:  We can do it.

23             THE COURT:  Very good.  We'll see you all at

24   2 o'clock.

25             (Luncheon recess taken)

D9Q3BAN5

AFTERNOON SESSION

2:15 p.m.

1 (In open court; jury not present)

 THE COURT:  I told my courtroom deputy to tell the
jury that to make up for some lost time and to accommodate
matters that I have at the end of the day, we're going to go
without a break starting now, and we'll go for two hours to
4:20 and that will conclude for today.

 So let's get the witness back on the stand and let's
bring in the jury.

 (Jury present)

 THE COURT:  Ladies and gentlemen, in recognition of
your undoubted desire to avoid the kind of snacks that we
provide, we're going to go without a midafternoon break, but we
will end at 4:20.  So go ahead, counsel.

 MR. CORDARO:  Thank you, your Honor.

BY MR. CORDARO:

Q.  Mr. Thomas, would you mind turning to Defendant's Exhibit
58 in evidence, which is tab nine in the defendants binder.

A.  Yes.  Okay.

Q.  Mr. Thomas, do you recall seeing this memorandum yesterday?

A.  I do.

Q.  Is this the St. Patrick's Day memorandum?

A.  Yes, I believe that's what it was referred to.

Q.  What year was this memorandum issued?

1   A.  2008.

2   Q.  Approximately how long after the start of the Hustle was

3   St. Patrick's Day of 2008?

4   A.  About seven months.

5   Q.  This memorandum refers to certain kinds of loans, does it

6   not?

7   A.  It does.

8   Q.  What kinds of loans?

9   A.  Stated income loans.

10  Q.  You discussed stated income loans earlier today, didn't

11  you?

12  A.  Yes.

13  Q.  In fact, you used a nickname for them.  Could you use that

14  nickname again?

15  A.  Sure.  Liar's loan.

16  Q.  Did stated income loans carry a certain kind of risk?

17  A.  Yes.

18  Q.  What kind of risk is that?

19  A.  They were obviously higher risk than a loan you could

20  validate income.

21  Q.  Were stated income loans included in the High-Speed Swim

22  Lane?

23  A.  Yes.

24  Q.  Were they included in the High-Speed Swim Lane prior to the

25  issuance of this memo?

D9Q3BAN5                        Thomas - redirect

```
 1   A.   Yes.

 2   Q.   What does this memo purport to do?

 3   A.   It I believe it reinstitutes some kind of underwriting

 4   review, reasonability review for stated income loans.

 5   Q.   Just to be clear, the prime CLUES accept process, there

 6   would have been underwriter involvement in the process

 7   regardless if it was a stated income loan, is that correct?

 8   A.   That's correct.

 9   Q.   Could you turn to tab 11, please.

10   A.   Sure.  Okay.

11   Q.   This is Defendant's Exhibit 61 in evidence.

12   A.   Yes.

13   Q.   What is the date on this memorandum?

14   A.   April 25, 2008.

15   Q.   So is it fair to say this was issued about five weeks after

16   the prior memorandum?

17   A.   That's correct.

18   Q.   The previous memorandum was Defendant's Exhibit 58?

19   A.   Yes.

20   Q.   What did this memorandum purport to do, if you know?

21   A.   It appears that was a cleared to close checklist that was

22   required from underwriting.  It was putting that back into

23   place.

24   Q.   In the High-Speed Swim Lane, was there any underwriting

25   involvement in the cleared to close process prior to whatever
```

D9Q3BAN5                         Thomas - redirect

1    this memo did?

2    A.   No.

3    Q.   This memo contains a line that says it has been superseded

4    by operations bulletin 08-237.  Do you see that language about

5    a third of the way down?

6    A.   I do.

7    Q.   Could you explain to us what that means.

8    A.   That means that when bulletin 08-237 came out, this

9    bulletin was no longer in effect.

10   Q.   So could you turn to tab 19, please.

11   A.   Okay.

12   Q.   This is Defendant's Exhibit 66 in evidence.  Is this

13   bulletin 08-237?

14   A.   It is.

15   Q.   Is this the bulletin that superseded Defendant's Exhibit

16   61?

17   A.   Yes.

18   Q.   What date was this bulletin issued?

19   A.   May 21, 2008.

20   Q.   So this one came a little under a month after the previous

21   bulletin we discussed?

22   A.   Yes.  About 10 months after.

23   Q.   What did this bulletin purport to do?

24   A.   This bulletin had some additional cleared to close

25   clarification for what underwriting was required to do at

1   cleared to close.

2   Q.  When you say what underwriting was required to do for

3   cleared to close, is that a change from the High-Speed Swim

4   Lane model?

5   A.  Yes.

6   Q.  Who was doing cleared to close in the High-Speed Swim Lane?

7   A.  The processor.

8   Q.  Mr. Thomas, yesterday you were asked some questions about

9   quality assurance by both sides.

10  A.  Yes.

11  Q.  Could we just step back for a second.  Was quality

12  assurance at FSL performed on every loan that went from

13  application to funding?

14  A.  No.

15  Q.  Why not?

16  A.  It was just too many loans to review, so you'd review a

17  sampling of loans to try to get an understanding of the issues.

18  Q.  Do you have any sense of the size of the sample for any

19  given set of loans?

20  A.  We looked at some numbers.  There were 60 loans here, 129

21  loans there.

22  Q.  I think that you are referring to Plaintiff's Exhibit 58.

23  So if we go to plaintiff's binder, I'm sorry I'm going to run

24  you back and forth between the binders.

25  A.  That's okay.

D9Q3BAN5                              Thomas - redirect

1   Q.  If you could go to the third page of that exhibit.  Is that

2   the 60-loan review to which you were referring?

3   A.  Yes.

4   Q.  First of all, just to take this.  You were asked some

5   questions earlier today about this very e-mail and I believe

6   the word that counsel used was "problems."

7        With respect to the issues on the bottom of the page,

8   is "problems" the accurate word in quality assurance?

9   A.  No.  "Findings" would be the right word.

10  Q.  In this particular review, 59 out of 60 loans were deemed

11  to be what?

12  A.  High risk.

13  Q.  All of these findings on the bottom here, with the

14  exception of the 53 fraud detecters which we talked about were

15  erroneous, the rest of those findings, did those contribute to

16  that high risk number?

17        MR. HEFTER:  Objection, your Honor.  Foundation.  I

18  believe based on the witness's testimony and your ruling on my

19  objection along the same lines yesterday.

20        THE COURT:  I'm not sure it is exactly the same, but I

21  do think you need to lay a foundation.

22        MR. CORDARO:  Thank you, your Honor.

23  Q.  Mr. Thomas, were you familiar with the quality assurance

24  process at FSL?

25  A.  Yes.

1   Q.  How were you familiar with it?

2   A.  Michael Burns, who reported to me, ran the quality

3   assurance process.

4   Q.  Did you have any familiarity with this particular quality

5   assurance review?

6   A.  Yes, it was a review that our India folks had done, and

7   then the quality assurance and control group had rereviewed

8   those loans.

9   Q.  What kind of loans were being reviewed?

10  A.  Hustle loans.

11  Q.  Who is Don Harris?

12  A.  Don Harris reports to Steve Brent in the quality assurance

13  and control group.

14  Q.  Did you ever discuss quality assurance with Don Harris?

15  A.  Yes.

16  Q.  Going back to my question.  Are you familiar with what high

17  risk means?

18  A.  Yes.

19  Q.  What does high risk mean?

20  A.  So that would have been a finding in the QA report that the

21  quality assurance and control or QA group would determine a

22  high risk question.

23  Q.  There were 60 loans in this process, correct?

24  A.  Correct.

25  Q.  If you add up these numbers down here, at the bottom of the

1   page and over to the next page, that comes out to a lot more

2   than 60.  What is the explanation for that?

3   A.  It comes up to about 129 findings.  So one loan could have

4   multiple findings.

5   Q.  Did these findings contribute to the high risk number in

6   the middle of this third page of the exhibit?

7   A.  Yes.

8   Q.  You testified that QA was only a sample.  If these 60

9   loans -- I'll step back for a second.

10          What was the purpose of having these findings in the

11   first place?

12   A.  So the purpose was to look at the process to make sure that

13   there weren't any breakdowns, or if there were more prevalent

14   issues in one area or another, you could look at that part of

15   the process and try to see what was going on.

16   Q.  Just with respect to these 60 loans?

17   A.  No, with the same process.  It was a sampling.  So if you

18   had a high number of income findings, for example, you would

19   look at the process for how you're calculating income or

20   documenting income.

21   Q.  You testified earlier today in response to a question from

22   counsel about the amount of business that FSL was doing in the

23   mid 2000s.  Do you remember that testimony?

24   A.  Yes.

25   Q.  Could you give those numbers to us again.

1   A.   Sure.  About, we peaked out over $3 billion in loans per

2   month.

3   Q.   I'd like to ask you a few questions about quality control.

4   A.   Sure.

5   Q.   Let's stay in this binder and go to Exhibit 297.

6   A.   Okay.

7   Q.   Were you familiar with quality control process?

8   A.   Yes.

9   Q.   Did you prepare this second page of Exhibit 197, the

10  divisional comparison?

11  A.   Yes.

12  Q.   I think we looked at yesterday, I'll ask Ms. Michaud to

13  blow up the portion that says FSL all the way past -- yes.

14  Thank you.

15          We looked at the SUS numbers for EA and conforming

16  loans in particular yesterday.  And could you just give us a

17  refresher on what SUS means?

18  A.   Yes.  That means severely unsatisfactory loan.

19  Q.   What is the implication of a severely unsatisfactory loan?

20  A.   So that would mean it's unsalable to an investor.

21  Q.   But at what point is the quality control process being

22  done?

23  A.   After funding and after being sold.

24  Q.   So the loan has been sold?

25  A.   Yes.

D9Q3BAN5                    Thomas - redirect

1    Q.  Which of the loans in this group here were eligible for

2    sale to the Fannie Mae and Freddie Mac?

3    A.  So the expanded approval EA and conforming.

4    Q.  We went over those numbers yesterday.  Now I want to focus

5    your attention on that bar, and you don't have to blow it up,

6    Ms. Michaud.  There is that bar on the bottom that's blue.  It

7    says non-weighted and weighted.

8              Could you explain quickly what those two rows are

9    measuring?

10   A.  So the non-weighted is simply the mathematical percentage

11   of how many findings, how many loans with SUS versus how many

12   loans were audited.  But if you look at the last column, it

13   says unit percent, that is the percentage of all fundings in

14   that quarter that would fall into that bucket.

15             So, for example, in quarter one 2008, 81 and a half

16   percent of the loans funded in that quarter were conforming

17   loans.

18   Q.  Let's stick with the rows though.  What does weighted mean?

19   A.  Weighted just means that we would weight the findings by

20   the bucket.  So 81 -- you basically say 81.5 percent of that

21   conforming rating would go into that factor.

22   Q.  Was either the non-weighted or the weighted number

23   considered the final number was one or the other more final?

24   A.  Weighted.

25             MR. CORDARO:  Ms. Michaud, could you just curser to

D9Q3BAN5                     Thomas - redirect

1   the top of this box here and pull it up slightly so I can see

2   what's above that light blue -- yes.  You are about to do it.

3   Why don't you take it off.  There you go.

4   Q.  On the very top, there is a row and there are two columns

5   on the right side.  One of them says completed plus initial SUS

6   and one that says completed SUS only, correct?

7   A.  Correct.

8   Q.  For which time period is this?

9   A.  Quarter one 2008.

10  Q.  Could you just explain quickly the relationship between the

11  numbers in the completed plus initial and the relationship

12  between the numbers in the completed SUS?

13  A.  Sure.  So the completed SUS only, only included files where

14  the audit had been confirmed.  So the rebuttal process was

15  over.  And then the completed plus initial included those loans

16  plus the initial SUSs that hadn't finished the rebuttal

17  process.  So the final number would always end up somewhere in

18  between the completed, that was the low end, that was the

19  minimum you could get, because those were already final, and

20  then the high end was completed plus initial.  That means

21  nothing else was overturned, that's what the number would be.

22  So the final number would be in between.

23  Q.  For weighted, and at the bottom row weighted, does that

24  stand for all FSL?

25  A.  Yes, that's all FSL.

D9Q3BAN5                           Thomas - redirect

1    Q.   There are two numbers there.   One says 10.3 percent and the
2    other says 8.9 percent?
3    A.   Yes.
4    Q.   When you were talking about the expectation of being in
5    between those two numbers, would it be between those two
6    numbers?
7    A.   That's correct.
8    Q.   Could we look at Defendant's Exhibit 2.   That is tab two in
9    defendant's binder.   Defendant's Exhibit 73 in evidence.
10           Before we blow anything up, let's focus on the column
11   that has the 2008 quarter one results.   We were just looking at
12   that, correct, Mr. Thomas?
13   A.   Correct.   That's what would match up with the other report.
14   Q.   We look at FSL.   And do you see the gray bar?
15   A.   Yes.
16   Q.   What is the number for FSL for quarter one 2008?
17   A.   9.8 percent.
18   Q.   Is that the number that Mr. Sullivan was showing you
19   yesterday?
20   A.   Yes.
21   Q.   Is that number between the two ranges on plaintiff's
22   exhibit that we were just discussing?
23   A.   Yes.
24   Q.   Is that the final number?
25   A.   Yes.

D9Q3BAN5                    Thomas - redirect

1    Q.  Mr. Thomas, is the FSL number in Defendant's Exhibit 73

2    broken out by EA conforming or any other type of loan?

3    A.  No.

4    Q.  So what does that number represent?

5    A.  This is the total weighted SUS for all of Full Spectrum.

6    Q.  Remind us again what was the standard within Countrywide

7    for a quality control?

8    A.  4 percent.

9    Q.  Mr. Thomas, you noticed, if you look, that in the FSL there

10   is a row there that says "completed audit."  Do you see that?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  That's the total number of audits that were completed for

14   the quarter.

15   Q.  In the fourth quarter of 2007, there were looks like 408

16   completed audits?

17   A.  That's correct.

18   Q.  The first quarter of 2008, there were 1,742 completed

19   audits?

20   A.  That's correct.

21   Q.  Do you have any understanding as to why the number jumped

22   by approximately 1330 audits?

23   A.  My understanding is two fold.  They would always look at

24   the previous quarter to determine what the audit or what kinds

25   of programs to audit.  And that was also the time period that

1    Bank of America was doing some due diligence on the acquisition

2    of Countrywide.  So that may have driven up audits as well.

3    Q.  Mr. Thomas, could you look at tab three, which is

4    Defendant's Exhibit 193.

5    A.  Yes.

6    Q.  If you look at the third page of that exhibit, there is a

7    phrase in your e-mail that says "reduce touches."

8    A.  Yes.

9    Q.  You remember being asked about that?

10   A.  I do.

11   Q.  What do you mean by "reduce touches" in this context?

12   A.  In this context it means to reduce the rework or how many

13   times the back and forth had to go.  So how many touches you

14   had on a file.

15   Q.  I believe -- what was the date of this e-mail?

16   A.  July 18, 2007.

17   Q.  So where does this date sit in relationship to the

18   High-Speed Swim Lane?

19   A.  This was before the High-Speed Swim Lane, kind of in the

20   pilot design.

21   Q.  What was the purpose of this e-mail?

22   A.  The purpose of this e-mail was to document all the ideas

23   that were discussed in the initial design meeting that I was

24   involved in.

25   Q.  With respect to reducing touches, could you get more

D9Q3BAN5                          Thomas - redirect

1    specific within the loan origination process as to where we're

2    talking about reducing touches here?

3    A.  So, this specific -- some of the examples underneath this

4    talked about returns, so typically called a return when

5    something was submitted to underwriting, there was an issue and

6    it was returned back to processing to do some kind of fix.  So

7    if there were a lot of returns, that means there was some

8    problems in the building of the file.

9    Q.  At the time you wrote this e-mail, would you have

10   considered the cleared to close process a touch?

11   A.  Technically it is a touch.  Not a touch I was talking about

12   in this part of the process.

13   Q.  Look at Defendant's Exhibit 752, tab four, please.

14   A.  Okay.

15   Q.  This e-mail makes reference to the branch.  Do you see

16   that?

17   A.  Yes.

18   Q.  Could you just explain to us what the branch means in

19   relationship to the High-Speed Swim Lane, if anything?

20   A.  So branches, actual branches were locations, like in a

21   strip mall or somewhere where you'd actually go into a location

22   to do a loan.  And they did not employ the High-Speed Swim Lane

23   to my recollection.  They were also much smaller in size than

24   let's say a call center.  Call centers could have a

25   significant -- significantly more amount of volume than a

D9Q3BAN5                        Thomas - redirect

```
 1   single branch.
 2   Q.  Would an application that started in a call center be
 3   eligible for the High-Speed Swim Lane?
 4   A.  It would, yes.
 5   Q.  Could you look at tab six, Defendant's Exhibit 378.
 6   A.  Okay.
 7   Q.  Actually, we can move past that.
 8           Let's go to plaintiff's exhibits.  Oh, I've covered
 9   that too.
10           Do we have Defendant's Exhibit 4036?  Okay.  This is
11   where we'll need a technology change, your Honor.  Hopefully
12   very briefly, otherwise we'll go back and do it the old
13   fashioned way.
14           THE COURT:  Do defendants have it on their machine?
15           MR. CORDARO:  I would assume so.
16           THE COURT:  Why don't you put it up now.  Why don't
17   they put it up.
18           MR. CORDARO:  No, I'm sorry.  That is not the correct
19   exhibit -- yes, it is.  I'm sorry.  Could you turn to the page
20   that had the organizational chart.  I want the same page that
21   counsel showed to the jury and just that page.  Perfect.  Thank
22   you.  I appreciate that.
23   Q.  Mr. Thomas, is this the organizational chart that you were
24   shown earlier today?
25   A.  Yes.
```

1    Q.  Do you know what the time period for this organizational

2    chart was?

3    A.  The date on here says September 4, 2007.

4    Q.  Did the organizational chart at FSL change at all after

5    central fulfillment came into existence?

6    A.  Definitely, yes.

7    Q.  Okay.

8              MR. CORDARO:  Now we will use the Elmo.  Before it

9    goes up on the Elmo, I would like to mark for identification as

10   Plaintiff's Exhibit 426 a demonstrative exhibit, a

11   demonstrative that counsel for the bank defendants showed to

12   the jury during his opening statement.  I would like to show it

13   to the witness.

14             THE COURT:  Okay.

15             MR. CORDARO:  It should be 427.  May I approach, your

16   Honor?

17             THE COURT:  Yes.

18             MR. CORDARO:  I would move Plaintiff's Exhibit 427

19   into evidence, please.

20             MR. SULLIVAN:  No objection.

21             MR. HEFTER:  No objection, your Honor.  I am just

22   requesting the Court if we can get a copy of it.

23             MR. CORDARO:  Of course, certainly.

24             THE COURT:  Received.

25             (Plaintiff's Exhibit 427 received in evidence)

1   Q.  Mr. Thomas, are you familiar with the reporting structure

2   at FSL post central fulfillment?

3   A.  Yes.

4   Q.  If you look at the dark gray boxes.  There are three of

5   them.

6   A.  Yes.

7   Q.  Each one of them has a city attached to it, is that

8   correct?

9   A.  Yes.

10  Q.  What is the significance of those cities?

11  A.  Those are areas that we have the central fulfillment teams.

12  Q.  What is the significance of those cities with respect to

13  the High-Speed Swim Lane?

14  A.  Those would have been the locations that employed the

15  High-Speed Swim Lane.

16  Q.  Are there any other locations that you know of that

17  employed the High-Speed Swim Lane?

18  A.  Hatboro, Pennsylvania.

19  Q.  It's not on this particular exhibit?

20  A.  It was a smaller location.

21  Q.  Was it part of central fulfillment?

22  A.  Yes.

23  Q.  You see just below the word central fulfillment, there is

24  the name Wade Comeaux EVP?

25  A.  Yes.

D9Q3BAN5                          Thomas - redirect

1    Q.  Who is Mr. Comeaux?

2    A.  So he was hired to run central fulfillment.

3    Q.  Do you recall when that happened?

4    A.  I don't recall the exact date but it was I think in late

5    2007.

6    Q.  Below him there are four SVPs.  What does SVP stand for?

7    A.  Senior vice president.

8    Q.  This entire group here, this central fulfillment group,

9    correct me if I use the wrong term, but what division of FSL is

10   this?

11   A.  Full Spectrum Lending.

12   Q.  For example, is this the same line of reporting as the

13   underwriters?

14   A.  Central fulfillment?

15   Q.  Right.

16   A.  In -- no, not -- the traditional pre-Hustle would have

17   flowed up through Cliff Kitashima.  In the Hustle the

18   underwriting functions now would report up through this.

19   Q.  You can see that there is a somewhat lighter gray box that

20   overlays the dark gray box?

21   A.  Yes.

22   Q.  Do you know what the lighter gray box is meant to depict

23   here?

24   A.  The entire central fulfillment.

25   Q.  Who does the entire central fulfillment report to directly?

D9Q3BAN5                              Thomas - redirect

1    A.  Rebecca Mairone.

2    Q.  What was her title?

3    A.  Managing director, chief operating officer.

4            MR. CORDARO:  Your Honor, the United States has

5    nothing further on direct.

6            THE COURT:  Any recross?

7    RECROSS EXAMINATION

8    BY MR. SULLIVAN:

9    Q.  Am I missing something, sir?  Are you on this chart at all?

10   A.  What's that?

11   Q.  Are you on this chart at all?

12   A.  No.

13           MR. SULLIVAN:  Thank you.  No further questions.

14           MR. HEFTER:  I have one question or a few questions

15   related to the chart, your Honor.

16           THE COURT:  Okay.

17   RECROSS EXAMINATION

18   BY MR. HEFTER:

19   Q.  Going to the chart, Mr. Thomas, James White, senior vice

20   president.  He was an underwriter, correct?

21   A.  He was previously ran an underwriting center.

22   Q.  He ran an underwriting center.  He was the senior

23   underwriter in the company?

24   A.  He was the underwriting site manager.

25   Q.  Armand Massie, he was an underwriter too, correct?

1   A.  I don't think Armand was.  I don't remember his previous

2   experience.  He was kind of at least new to our part of the

3   organization.  But I don't remember his experience.

4   Q.  David Sallis was an underwriter, correct?

5   A.  He was an underwriting site manager.

6   Q.  But his previous job he was actually in fact an

7   underwriter, correct?

8   A.  He was an underwriting site manager.

9   Q.  He had underwriting training, correct?

10           MR. CORDARO:  Objection, your Honor.

11           THE COURT:  Sustained.

12  Q.  Mr. Robert Price was an underwriter, correct?

13  A.  He was an underwriting site manager.

14  Q.  He had underwriting training, correct?

15           MR. CORDARO:  Objection.

16           THE COURT:  Sustained.

17  Q.  He previously was an underwriter before central

18  fulfillment, correct?

19           MR. CORDARO:  Objection.

20           THE COURT:  Sustained.  Hearsay.

21  Q.  Mr. Price was an underwriting manager and ran a team of

22  underwriters prior to central fulfillment, correct?

23           MR. CORDARO:  Objection.

24           THE COURT:  Sustained.

25           MR. HEFTER:  No further questions, your Honor.

D9Q3BAN5                          Thomas - recross

1          THE COURT:  Thank you so much.  You may step down.

2          (Witness excused)

3          THE COURT:  Please call your next witness.

4          MS. NAWADAY:  Your Honor, the government calls Edward

5     O'Donnell.

6          THE DEPUTY CLERK:  Please take the witness stand.

7     Please remain standing, raise your right hand.

8          (Witness sworn)

9          THE DEPUTY CLERK:  Please be seated.  State your name

10    and spell it slowly for the record.

11         THE WITNESS:  My name is Edward O'Donnell.

12    E-D-W-A-R-D O-D-O-N-N-E-L-L.

13     EDWARD O'DONNELL,

14         called as a witness by the Government,

15         having been duly sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MS. NAWADAY:

18    Q.  Good afternoon, Mr. O'Donnell.

19    A.  Good afternoon.

20    Q.  Can you tell the jury where you currently live.

21    A.  I live in Pittsburgh, Pennsylvania.

22    Q.  Does anyone live there with you?

23    A.  Yes, I live with my wife, seven-year-old stepson, and my

24    mother-in-law.

25    Q.  Can you tell us about your educational history beginning

1    with college.

2    A.   Sure.  I grew up in New Haven, Connecticut, went to school

3    in Connecticut at Southern Connecticut State University and

4    Fairfield University.

5    Q.   Did you graduate from college?

6    A.   I did.  I studied a bachelor's in political science and

7    economics.

8    Q.   Are you currently employed?

9    A.   I am.

10   Q.   Who do you work for?

11   A.   I work for Fannie Mae in -- I work out of Pittsburgh, but I

12   also work in Dallas, Texas, and Washington, D.C.

13   Q.   What is your current title at Fannie Mae?

14   A.   My official title is vice president of credit risk

15   management.

16   Q.   Can you describe for the jury your responsibilities.

17   A.   The group I lead basically provides risk support for the

18   for the loan servicing organizations.  So, we provide products

19   and guidelines and policies regarding servicing the loans or

20   collecting payments on loans that Fannie Mae has purchased.

21   Q.   Can you explain what you mean by servicing a loan.

22   A.   Servicing in its basic form is collecting the payments on a

23   monthly basis and applying them to a loan.  If a borrower

24   should get in trouble, we have products to help the borrower

25   try to resume payments, get something more affordable, and stay

D9Q3BAN5                        O'Donnell - direct

```
 1   in their home.
 2   Q.  What are you referring to when you say "products"?
 3   A.  Probably the most common product that's been used is a loan
 4   modification.  So that's an instance where the borrower's rate
 5   is lowered or the term might be extended, or both, to try to
 6   make the payment more affordable so they can avoid having to
 7   sell the home, or worst case, experience a foreclosure.
 8   Q.  Were you employed in 2007?
 9   A.  I was.
10   Q.  Who did you work for in 2007?
11   A.  In 2007 I worked for Countrywide Home Loans, specifically
12   the Full Spectrum Lending Division.
13   Q.  Let's step back a little further in time.  When were you
14   first employed in the mortgage lending industry?
15   A.  I started in the lending industry in the late '80s.  For
16   the first 10 years of my career I worked at a company called
17   Associates Financial.  We made consumer loans and we also made
18   mortgage loans.
19   Q.  How long did you work for Associates Financial?
20   A.  Roughly 10 years.
21   Q.  Can you describe for the jury in general terms what you did
22   during those 10 years?
23   A.  It's been a long time.  I started as a loan officer where I
24   made loans directly to borrowers.  We also did the servicing of
25   the loans or the collecting of the loan payments back on a
```

D9Q3BAN5                        O'Donnell - direct

1   monthly basis.  And while I was at Associates I also

2   supervised, eventually managed the branch and supervised

3   multiple branches in a region.

4   Q.  What was your next job after Associates?

5   A.  After I left Associates, I briefly spent a year at

6   Transamerica in the southeastern part of the country where I

7   did basically the same thing.  I supervised a number of branch

8   loan sales branches.  In four states in the southeast.

9   Q.  What was your next position after that?

10  A.  I joined Conseco Financial as a general manager for the

11  central region, in the central part of the United States.  I

12  had about 30 branch offices, a couple hundred people across the

13  Midwest where we made mortgage loans.  In that role, I also

14  supervised the underwriting of loans, loan processing, and some

15  compliance.

16  Q.  How long were you at Conseco?

17  A.  I was at Conseco roughly three years.

18  Q.  Where did you go next?

19  A.  My last job at Conseco was to run or start and run a

20  central fulfillment operation.  So my role changed.  When I got

21  in that job, I was contacted by Countrywide Financial to take a

22  very similar role with their company, in a division that was

23  planned to have a lot of growth.

24  Q.  What division was that?

25  A.  Full Spectrum Lending.

1    Q.  Did you move to -- did you join Full Spectrum Lending?

2    A.  I did.  I relocated to Dallas.  Joined Full Spectrum

3    Lending as a senior vice president of underwriting.

4    Q.  What year was that?

5    A.  That was January of 2003.

6    Q.  What was your title when you first joined Full Spectrum

7    Lending?

8    A.  I joined as a senior vice president of underwriting.

9    Q.  How long did you hold that position?

10   A.  I held that position until 2005.  I was promoted in 2005 to

11   executive vice president, and I picked up the additional

12   responsibility of running not only the central underwriting

13   group, but also the central funding group.

14   Q.  How long did you hold that position?

15   A.  I held that position until the summer of 2007, when my role

16   changed, and I took over a risk management role.  It was more

17   focused on quality and compliance and data and analytics.

18   Q.  During the time you were executive vice president of

19   central services, who did you report to?

20   A.  I reported to Cliff Kitashima who was the chief credit and

21   chief risk officer.

22   Q.  What were your responsibilities as executive vice president

23   of central services?

24   A.  I supervised centers across the U.S.  There was one in

25   Rosemead, California; one in Chicago; one in Chandler, Arizona,

1    which is right outside of Phoenix; and one in Plano, Texas, and

2    that moved to Richardson, Texas.  So I supervised all the

3    employees there, the underwriting activities, and the funding

4    of loans.

5            In addition to that, I supervised a small quality

6    assurance team and a data and analytics team that kind of

7    provided all the reporting and metrics that we used to run and

8    assess the business.

9    Q.  I just want to back up a little bit.  You mentioned the

10   data and analytics group.  Can you explain in a little more

11   data what that did?

12   A.  Full Spectrum underwent dramatic growth from the time I

13   started all the way through 2007.  And the group specifically

14   that I ran, I started in the underwriting group, we had about

15   97 employees.  The size of that group grew to over 400.  The

16   funding group at the same time, I didn't supervise that

17   initially, but eventually they had over 300 people in the

18   funding group.  So with 700 employees, you need to know what

19   they're doing.  We tracked a lot of things.  We tracked their

20   productivity.  We tracked how many loan files they reviewed,

21   which loan files they reviewed, what kind of authority they

22   had, what kind of decisions they made, how quickly the loans

23   moved through the pipeline from application to funding.  And

24   ultimately what the quality of those loans looked like.

25   Q.  I believe you testified you were based in Texas during that

D9Q3BAN5                      O'Donnell - direct

1    time?

2    A.  Yes.  I lived in Plano, Texas, which is just outside of

3    Dallas.

4    Q.  You mentioned that you supervised funding centers across

5    the country, is that right?

6    A.  That's right.

7    Q.  So I gather that you supervised -- withdrawn.

8           Employees you supervised were not all based in Texas?

9    A.  No.  I generally would spend a couple weeks a month

10   traveling to the fulfillment centers, visiting the underwriting

11   and funding teams, checking on how well things were running,

12   addressing any issues that might come up.

13   Q.  Did you have any involvement in hiring employees for the

14   centers that you supervised?

15   A.  I did.  I would say in two ways.  I set the criteria for

16   the underwriting employees when I first started because of the

17   growth plans that we had.  And then I also hired some of the

18   key managers that report directly to me that ran the centers

19   themselves in Chandler and in Richardson.

20   Q.  Who were the key managers that you hired?

21   A.  James White.  Jim White ran the Chandler, Arizona, center

22   first for underwriting and then for underwriting and funding.

23   And Robert Price I hired in Plano, Texas, and then he

24   ultimately -- to run underwriting and he ultimately ended up

25   running the funding operation in Richardson, Texas, as well.

D9QTBAN5                          O'Donnell - direct

1    Q.   What did you mean when you said that you also set the

2    criteria for other hires?

3    A.   The criteria for what kind of employee we would want to

4    hire, so what level of experience, what kind of background, how

5    much we would pay them, where we would locate them, how large

6    the teams would be, how large the span of control a manager

7    will be asked to manage.  Basically all the elements of how the

8    center would run and who would be in it.

9    Q.   Did you set the criteria for hiring underwriters in the

10   2007 time frame?

11   A.   Prior to that, yes, so we -- I was doing it then, but we

12   had done it from the time I joined in 2003.

13   Q.   And what type of experience were you looking for in

14   underwriters that you were involved with hiring?

15   A.   Well, we had two different types of underwriters, we had

16   more of a junior underwriter that we called a underwriting

17   associate.  That would be more entry level, one to three years

18   of underwriting experience, and they might have some or

19   experience in the industry as a processor or salesperson before

20   that.  The other position that we had -- and we had multiple

21   grades, but we had underwriters, and there I was looking for

22   more like five years or more experience with an underwriter.

23   Generally they might have worked for our competition, or even

24   beyond that on the sales or processing side of the business as

25   well.

1   Q.  And did the underwriters that you supervised generally have

2   that level of experience?

3   A.  They did.

4   Q.  Can you describe for us generally the types of loans that

5   Full Spectrum processed in 2007?

6   A.  In 2007 we were rapidly moving mostly toward a prime model,

7   but we had done subprime for a long time and we were trying to

8   make a transition to prime loans.

9   Q.  Do you have an understanding of the reason for that

10  transition into prime loans?

11  A.  The market was really changing, so the desire by investors

12  to buy subprime loans was drying up.  So prime loans were much

13  more attractive for investors and quickly almost becoming the

14  only game in town.

15  Q.  Are you familiar with something called a new customer

16  acquisition group or NCA?

17  A.  Yes.

18  Q.  Could you explain to us what that is?

19  A.  The NCA was a group that was part of the Countrywide, but

20  in a different division.  So there was another retail division,

21  if you will, so they made loans to customers directly, and NCA

22  was part of that group.  They joined that group Full Spectrum

23  sometime in the early to middle 2006 time frame.

24  Q.  And what division was the new customer acquisition group

25  initially a part of?

1  A.  They were part of consumer markets division or CMD, as we

2  commonly referred to it.

3  Q.  And do you have an understanding of the reason why the NCA

4  group moved into Full Spectrum?

5  A.  NCA had more of a traditional prime processing model.  They

6  relied more on loan processors and less on underwriters.  Full

7  Spectrum had had a heavy reliance on underwriters in its

8  existing model, and the thought was that NCA joining Full

9  Spectrum would help jump start our move toward the prime

10 business.

11 Q.  Are you familiar with the work flow in the NCA model?

12 A.  I am.  Before NCA officially joined Full Spectrum, both

13 myself and my boss at the time, Cliff Kitashima, spent some

14 time in NCA.  We visited the center in Plano, Texas, and we met

15 with a management team asked about their business model and

16 kind of how things worked, how did the loan go from application

17 to funding.  And we sat physically sat side by side with some

18 of the employees and watched what they did, looked at the

19 systems they used, which were slightly different than ours.  We

20 asked them about their authority and how they tracked

21 productivity and how long it took to get a loan through the

22 process.  And then we looked at how they used underwriters

23 differently than we were using them in Full Spectrum.

24 Q.  How were they using underwriters in NCA?

25 A.  In that model underwriters were more of an escalation

1    point, so the processor would kind own the loan from start to

2    finish, but if he or she had a problem on the loan or didn't

3    have the right authority or maybe had something that was

4    complex and was not really sure what to do, they could route

5    that loan to an underwriter.  If the loan started out as an

6    acceptable loan or prime CLUES accept and it for some reason

7    changed to refer and had some exceptions on it, it would be

8    routed for review as well.

9    Q.  Would you remind us what prime CLUES accept is?

10   A.  It's simply an output from the automated underwriting

11   engine that basically say from the data that's been put in, it

12   look like the loan is acceptable to the guidelines or

13   ultimately an investor.

14   Q.  And did NCA work with prime CLUES accept loans?

15   A.  They worked with both prime CLUES accept and refers.

16   Q.  And can you describe the work flow of prime CLUES accept

17   loan through the NCA work flow?

18   A.  It was sort of a -- if you can imagine, a cradle to grave

19   approach.  So a loan would be assigned to a processor and that

20   processor would documents from the borrower, they would receive

21   reports like title reports and appraisal reports from

22   third-party companies, and they would make determinations about

23   whether the documentation was appropriate, acceptable.  And in

24   the model as it came over to us, they could actually draw the

25   loan documents themselves, arrange a closing, get the loan

1    closing documents back and fund the loan.

2    Q.   You referred to a loan processor a minute ago.  Was there

3    any difference between a loan processor and loan specialist?

4    A.   In full Spectrum we called them loan specialists, but that

5    was not their title in NCA, they were loan processors.

6    Q.   Besides the difference in title, was there any other

7    difference between a loan processor and a loan specialist?

8    A.   The title was one difference.  The real difference was in

9    level of experience.  The NCA loan processors were closer to

10   what the industry looked like.  So they had more experience.

11   They weren't hiring the same type of people we were hiring in

12   Full Spectrum because they were asking them to do different

13   work.  In the Full Spectrum the loan specialist was more of a

14   clerk, so they would gather documents.  They would communicate

15   with borrowers for non-critical information, but they were not

16   asked to make decisions like the loan processor was asked to

17   make in NCA.

18   Q.   And you testified a minute ago that you were involved in

19   studying the NCA work flow, is that correct?

20   A.   Yeah, we made a couple of visits, at least -- cliff

21   Kitashima and I made a couple of visits at least to the NCA in

22   Texas to look at their work flow and meet with management.

23   Q.   Can you explain to us why you were studying the work flow?

24   A.   I didn't have a very large prime loan background.  I only

25   worked for one other company, Conseco, that really made prime

1    loans.  So it was an opportunity to see how CMT did things.

2    And Countrywide was the largest lender in the United States and

3    CMD was the biggest division in Countrywide, so it was an

4    opportunity go over there and steal their brain power on how a

5    prime model should operate.

6    Q.  And at that time, was the NCA work flow different in any

7    way from the way Full Spectrum processed prime CLUES accept

8    loans?

9    A.  Yeah.  So this was 2006 when NCA came over, so it was very

10   different.  Full Spectrum was just getting into prime lending,

11   and we didn't have the same level of talent, we had a

12   different -- completely different model.  So we processed prime

13   loans still using underwriters in a couple of different stages

14   in the process.

15   Q.  We'll take it one step at a time.  You said underwriters

16   were involved in a couple of different stages.  What was the

17   first stage in which you might have an underwriter involved?

18   A.  So for prime CLUES accept, which means the information goes

19   into the system, the black box or the underwriting box we

20   called CLUES said this loan looks like it's acceptable.  We

21   knew that our salespeople who were dealing with the customer on

22   the front end who would be running the initial run of CLUES

23   didn't have a lot of prime experience.  We knew the loan

24   specialists didn't have a lot of experience, and frankly knew

25   the underwriters didn't have a lot of experience.  So we were

D9QTBAN5                         O'Donnell - direct

1  concerned that we were maybe communicating approvals to

2  borrowers that may not be correct.  So we might be telling you

3  you're qualified for a prime loan and here's a pretty good rate

4  and price, only to learn later that someone had made a mistake

5  and you didn't qualify, and we would come back to you and say

6  sorry, you don't qualify, the price is now significantly

7  higher, and that would obviously make people kind of upset.

8           So we put up a step toward the front of the process

9  right after application called validation.  And we had a group

10  of underwriters that we trained to make sure the CLUES output

11  was valid so the data looked right, calculations were correct,

12  and if there was any documentation that came in with the

13  application, that the documentation supported what was used to

14  get the CLUES accept.

15  Q.  Was there any other part of the work flow that had an

16  underwriter involved at that time?

17  A.  Yeah.  So we used something that we had used successfully

18  before, which was an underwriter at the clear to close point in

19  the process.  So clear to close basically means that you're

20  committing to the borrower you're going to draw documents and

21  arrange a closing and money will go out the door at some point.

22  So we knew that we need to make sure that all of the conditions

23  that CLUES had required as part of the approval had been met.

24  So we had the validation up front and a gathering phase that

25  the processor would do or loan specialist would to, and the

underwriter would review all that documentation, and if he or

she thought it was appropriate, they would issue a clear to

close.

Q.  What do you mean by "conditions?"

A.  Conditions are simply stipulations, so it's the CLUES

approval up front is a conditional approval.  So if you really

do make the amount of money that you say you do, if the house

is worth what the projected value is said to be, if we are

going to pay off all the debts that we outlined in the

beginning of application stage, if all that happens and all

documentation is there that is supposed to be there in the end,

then the loan is approved.  But the underwriter would have to

go through the process and approve the documents and make

assessments about whether the documentation was there, number

one, and if it there, if it met the standards and was

appropriate.

Q.  Were you involved in any discussions about the quality of

loans coming out of the NCA work flow say in the summer of

2007?

A.  I was.  Once NCA moved over to Full Spectrum, they kind of

were subject to all of our normal processes, which included

getting quality reports from corporate QC.  So the corporate QC

department would review loans after they funded, basically

re-underwrite the loan and make sure the underwriter,

processor, whoever made decisions to let that loan go to the

1   table to sign and fund had done the right thing.  What I saw in

2   terms of the quality at NCA was subpar.

3   Q.  Can you tell me who specifically you had discussions with

4   concerning the quality of NCA loans?

5   A.  I spoke to a number of people.  My boss, obviously, Cliff

6   Kitashima, he ultimately had responsibility for credit and risk

7   management at the company, but I supervised the groups that did

8   the underwriting and funding of loans.  Additionally, in

9   Richardson, Texas, we at one point moved the NCA kind of into

10  the funding group in Richardson.  So we made a work flow change

11  because of the quality I was seeing and required the funding of

12  loans to go through our standard funding group.

13  Q.  Let's back up to discussions with Mr. Kitashima first.

14  What discussions -- when did you discuss the quality of NCA

15  loans with Mr. Kitashima?

16  A.  On a monthly basis we would receive reports from corporate,

17  the quality control department, and they would identify loans

18  that were initially in the process of being underwritten by the

19  QC group and loans that had been finalized.  And I discussed

20  both with him, the finalized QC ratings and the initial ratings

21  on a monthly basis, just as I did for the other centers.

22  Q.  Can you tell us what Mr. Kitashima said specifically about

23  the quality of NCA loans in any of these meetings?

24  A.  We were both concerned about the quality of the NCA loans

25  and the fact that, since they were now part of our division, if

D9QTBAN5                         O'Donnell - direct

1   off-target quality continued it would impact the overall

2   quality of Full Spectrum's loans.  And since both of our jobs

3   were in part measured -- success for our jobs was measured by

4   the quality ratings, we were concerned and wanted to see that

5   change.

6   Q.  Did you express any concerns about the NCA work flow to

7   Mr. Kitashima?

8   A.  I did.

9   Q.  Can you tell us what you said?

10  A.  I thought that the talent level at the NCA was

11  inconsistent.  While they certainly had more experience than

12  Full Spectrum, they weren't able to execute their role

13  appropriately, and I based that on the fact that the loans had

14  problems.  And so I talked to him about the fact that we were

15  thinking about adopting the NCA's model with people that

16  arguably had less experience, and I was seeing people that were

17  in a role with more experience today in a similar role struggle

18  to get the quality mark managed correctly.

19  Q.  And did Mr. Kitashima respond to you in any way when you

20  expressed these concerns?

21  A.  He did, and he was supportive of a move that I suggested to

22  require that the NCA no longer be able to fund their own loans.

23  So we required that instead of being able for the processor to

24  take the loan from cradle to grave, they would instead get to

25  the clear to close stage, and then after they issued a clear to

1   close, it would be routed to another group.  So we would have a

2   little bit of separation of duty.  And that other group would

3   make sure all the conditions had in fact been cleared and

4   signed off on before loan documents were drawn and a closing

5   could take place.

6   Q.  Did you have discussions with anyone else about NCA and

7   loan quality in the summer of 2007 time frame?

8   A.  I did.  I received feedback.  Part of my job was to get

9   feedback from the folks who really ran the day to day, managed

10  the teams in underwriting, managed the teams in funding.  And I

11  got a lot of feedback from two of the senior managers in the

12  Richardson center, John Boland and Robert Price.

13  Q.  And let's start with Mr. Boland.  What was his role?

14  A.  John at first was -- he was a manager in underwriting when

15  I first met him in Chicago.  He was later promoted and

16  relocated to Texas to take over part of the underwriting group

17  there.  And at the time he supervised several teams of

18  underwriters who were responsible for doing the prime CLUES

19  accept model for Full Spectrum, doing the validation and clear

20  to close.  And he also had a team eventually that was

21  co-located in the NCA location that issued the clear to closes

22  for them.

23  Q.  And what discussions did you have with Mr. Boland

24  concerning loan quality at NCA?

25          MR. HEFTER:  Objection, your Honor.

1          THE COURT:  Well, did you have conversations with

2    Mr. Boland concerning loan quality at NCA?

3          THE WITNESS:  I did.

4          THE COURT:  And when -- approximately how many

5    conversations, if you can estimate, did you have?

6          THE WITNESS:  Numerous, your Honor.

7          THE COURT:  And approximately when did these

8    conversations begin?

9          THE WITNESS:  They began late 2006 and into 2007.

10         THE COURT:  Do you have a specific recollection of

11   particular things that were said or is it a more general

12   recollection?

13         THE WITNESS:  I would say both.  I have --

14         THE COURT:  So counsel, why don't you start with the

15   first specific recollection and move from there.

16         MS. NAWADAY:  Thank you, your Honor.

17   BY MS. NAWADAY:

18   Q.  Can you tell us about the first conversation that you had a

19   specific recollection of in which Mr. Boland and you discussed

20   NCA loan quality?

21   A.   John Boland and I were located -- we officed in the same

22   building on the same floor, and he brought to my attention that

23   there had been a couple of instances where loans had been

24   cleared to close by a loan specialist after an underwriter in

25   his group had said the loan was not ready for closing.  And it

1   had been asserted that it was done intentionally and that we

2   were letting a loan go to closing that was not ready, and it

3   was a problem.

4   Q.  And why would that be a problem?

5   A.  Because we knew the loan stipulations or conditions had not

6   been received and cleared.

7   Q.  And what do you mean that conditions had not been cleared?

8   A.  So someone had, in John's underwriting group, an

9   underwriter, had reviewed the file, reviewed the conditions

10  that were submitted by the processor as evidence that the loan

11  was ready, reviewed the conditions and disagreed and said the

12  loan is not ready to close, go back and get X, Y and Z, and

13  they did not issue a clear to close.  So then the processor

14  turned around cleared those conditions themselves in the system

15  and issued the clear to close and OK'ed the loan to go to the

16  table.

17  Q.  Did you have any discussions with Robert Price surrounding

18  NCA loan quality?

19  A.  I did.  Robert also officed --

20          MR. HEFTER:  Your Honor, same objection.  This part is

21  non-responsive.

22          MS. NAWADAY:  I'll back up, your Honor.

23          THE COURT:  OK.

24  Q.  Can you tell us about a specific -- a conversation that you

25  specifically recall or an exchange that you specifically recall

1   with Mr. Price concerning NCA loan quality?

2           MS. MAINIGI:  Objection, your Honor.  This entire line

3   of questioning is really not relevant to High-Speed Swim Lane.

4           THE COURT:  I think it may have some relevance.

5           When was this conversation that you're about to tell

6   us about?  Approximately when did it occur?

7           THE WITNESS:  2007, your Honor.

8           THE COURT:  All right.  Overruled.

9           MR. HEFTER:  Your Honor, if I may, we would like a

10  limiting instruction with respect to Mr. O'Donnell's testimony

11  regarding any conversations he had with Mr. Price.

12          THE COURT:  This conversation will be received only as

13  to the bank defendants, not Ms. Mairone.

14          Go ahead.

15  A.  Would you repeat the question?

16  Q.  Sure.  Can you tell us about a conversation or exchange you

17  specifically recall with Mr. Price concerning loan quality?

18  A.  Robert copied me on an email that he sent to Cheri Shine

19  who was assisting in the NCA -- running of the NCA division.

20  Q.  If I could stop you to clarify, who was Cheri Shine?

21  A.  Cheri Shine was a peer of mine.  She was also an EVP for

22  Full Spectrum.  She previously had run the funding operation

23  before I took it over.  And Cheri was really kind of a project

24  specialist.  She did a lot of different things for the company,

25  but in this instance she was assisting in the NCA.

1    Q.  What do you mean she was assisting in the NCA?

2    A.  She was providing some supervision to some of the teams.

3            Robert copied me on an email where he was alerting her

4    to a fact that we had had two instances within NCA of people

5    violating their authority, this exact same instance where they

6    were issuing clear to closes when an underwriter had already

7    determined that the loan was in fact not ready to go to the

8    table.  And he saw it as a big problem, and so the authority

9    had been taken away from that particular team.

10   Q.  What do you mean that the loan specialists were violating

11   their authority?

12   A.  They were making decisions that they were not entitled or

13   approved to make.

14   Q.  And specifically, what were those decisions?

15   A.  They were issuing clear to close decisions.

16           MS. NAWADAY:  Your Honor, may I approach the witness?

17           THE COURT:  Yes.

18   Q.  Mr. O'Donnell, I'll ask you to turn to tab 49 in the binder

19   I just handed you.

20   A.  OK.

21   Q.  And without getting into the substance of the document, can

22   you tell us whether you recognize this?

23   A.  Yes, this is the email I was referring to from Robert Price

24   to Cheri Shine.

25   Q.  And you see your name on this email?

D9QTBAN5                          O'Donnell - direct

1    A.  I'm carbon copied on the email from June of 2007.

2    Q.  Sorry, I missed the last part of the answer.  What is the

3    date of the email?

4    A.  June 25, 2007.

5              MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

6    49 into evidence.

7              MS. MAINIGI:  Objection, your Honor.  This has to do

8    with NCA, it has nothing to do with High-Speed Swim Lane at

9    all.  It precedes the start of the High-Speed Swim Lane.

10             THE COURT:  Come to the side bar.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9QTBAN5                          O'Donnell - direct

 1                (At side bar)

 2                THE COURT:  Go ahead.

 3                MS. NAWADAY:  The NCA process was merged into the

 4     High-Speed Swim Lane specifically.

 5                THE COURT:  I took it to be appropriate background.

 6           But do I want to ask counsel, when you have

 7     objections, really should just be one or two words, like

 8     "relevance."  If I don't understand what you're getting at or

 9     you think it requires further explanation, you can ask for a

10     side bar, and usually I will accommodate that.  But in effect,

11     an objection of the sort you just raised is a sort of argument

12     to the jury:  Don't pay any attention to this, this doesn't

13     have anything to do with Hustle, which I think is not the

14     government's position.  And the Court's position is that the

15     jury could find that this is appropriate background information

16     to Hustle.  So the objection is overruled.

17                (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  The objection is overruled.  You offered

3    the exhibit.  The exhibit is received, 49 is received.

4          (Plaintiff's Exhibit 49 received in evidence)

5    BY MS. NAWADAY:

6    Q.  Mr. O'Donnell, do you see in this document any reference to

7    the NCA process or an NCA loan specialist?

8    A.  There's a note from Paul Everwine, who was an underwriter

9    in John Boland's group, and he identifies the NCA operations

10   team manager Sarah Haser.  Sarah was the manager over the team.

11   Q.  If you could direct your attention to the bottom of the

12   second page of this email chain, there's an email from Audrey

13   Knabe?

14   A.  Yes.

15   Q.  Who is Audrey Knabe?

16   A.  Audrey Knabe was a branch operations manager, I believe.

17   Q.  Can you read for us the first paragraph of Ms. Knabe's

18   email?

19   A.  She says:  Hi there.  Here are the results of an audit from

20   one of the -- one of your files.  This particular file was

21   approved by underwriting at 3:53 p.m. then cleared to close by

22   you at 4:06 the same day.  The underwriter name was also

23   changed to your name.  This throws a red flag to either the

24   underwriter not signing off on the conditions there were in the

25   file, or you blindly signing off on the conditions in order to

D9QTBAN5                         O'Donnell - direct

1    get a CTC.

2    Q.   Thank you.   This email was sent by Ms. Knabe to Jessica

3    Isbell?

4    A.   Yes.

5    Q.   Who is Ms. Isbell?

6    A.   I believe she was a processor in the NCA.

7    Q.   And I would like to go through some of the more technical

8    terms in this paragraph that you just read and some of the

9    parts that are a little difficult to understand.   You read:

10   The underwriter name was also changed to your name.

11        Do you have any understanding of what Ms. Knabe meant

12   by that?

13   A.   We had a system where we recorded all the conditions

14   management we called status bar.   And in that system it would

15   keep track of who was clearing the conditions, who was the loan

16   processor, who was underwriter, so we could identify who did

17   what.   In this case, it appears that the loan processor had

18   their name in as both the loan processor and took the

19   underwriter's name out and put their name in as the

20   underwriter.

21        MR. HEFTER:   Your Honor, I move to strike as

22   non-responsive and the witness's answer is speculation.

23        THE COURT:   Well, the last sentence will be stricken

24   as non-responsive, the rest will stay.

25   Q.   Your answer is proceeded a little quickly.   Can you explain

1   again what exactly -- you referred to something called status

2   bar.  Can you explain to us what that is?

3   A.  Yes, status bar was what we called the conditions

4   management system, so it kept track of all of the stages of the

5   loan.  So when a loan got approved by an underwriter, it

6   captured who did it and at what time.  When a loan was cleared

7   to close, it captured who did it and at what time.  In this

8   case the loan was approved by an underwriter at 3:53 and then

9   it looks like 13 minutes later the loan was cleared to close,

10  which would hardly be time for someone to review all the

11  required conditions and determine that the loan was truly ready

12  to close.

13  Q.  I'm sorry, if I could back up, you got a little ahead of me

14  again.  You read this particular file was approved by the

15  underwriter at 3:53, then cleared to close as 4:06.  Is there

16  any reason that would be unusual or surprising?

17  A.  Yeah, it would be very rare that a loan, if ever, could go

18  from underwriter approval to a clear to close in 13 minutes.

19  Q.  Why is that?

20  A.  It would not be time to gather conditions, review

21  conditions appropriately and determine that everything was

22  there in the file.

23  Q.  And what type of conditions in particular?

24  A.  Title report, which would show who owned the home; the

25  appraisal report, which would show the value and which other

1   homes in a particular neighborhood the house was being compared

2   to; income, either reviewing income pay stubs or tax returns,

3   or if the borrow was stating their income, determining if the

4   income was reasonable or not; assets, determine if the borrower

5   had a cushion should they get into trouble they could make

6   payments if something happened in a short period of time if

7   they were having difficulty.  Simple things like homeowner's

8   insurance to make sure the right level of coverage was in

9   place, or determining if the property was in a flood zone and

10  flood insurance was required.  There's a lot to do, and 13

11  minutes wouldn't be enough time to do very much of it at all.

12  Q.  I would like to ask you specifically about some conditions

13  you mentioned.  Can you explain what involved in reviewing and

14  clearing a condition on title?

15  A.  On title it's important to make sure, number one, the that

16  the borrowers on the application actually owned the home, that

17  the names are the same, the vesting in those names is correct.

18  And then you have to also identify if there are mortgages

19  already on the property, and if they are on the property, are

20  they being paid off as part of this transaction.  And you also

21  are determining whether or not real estate property taxes had

22  been paid or need to be paid if they're delinquent.  Those are

23  the major things on the title review condition.

24  Q.  You also mentioned a condition on appraisal, can you

25  explain what you meant by that?

1   A.   So ultimately the house is the collateral for the loan.

2   It's important to know that the value of the home that the

3   appraiser has identified is accurate.  So what an underwriter

4   or anyone who is making that decision is asked to do is to look

5   at the work done by the underwriter and make sure it's been

6   thorough, that they haven't missed anything.  If they have made

7   comparisons between the properties to determine the value, to

8   make sure the comparisons are the same or appropriate.  An

9   example would be if the house we were going to make a loan on

10  had three bedrooms, that they don't use four or five or six

11  bedroom homes to try to get value up higher, or if the house

12  was located near the railroad tracks but they went to a better

13  neighborhood to pick better homes to try to substantiate the

14  value.

15  Q.   You mentioned conditions on income, could there be multiple

16  conditions on income?

17  A.   There could be depending on the borrowers.  If there were

18  two borrowers you had to check the income on both pay stubs,

19  401(k) statements, tax returns in some instances if they were

20  self-employed or had unusual income, or assets if we were

21  asking for proof of bank deposits, or gift money if it was a

22  purchase transaction.

23  Q.   So I'm sorry, you're speaking a little too quickly for me.

24  I would like you to explain slowly what is involved in

25  reviewing and clearing an income condition.

1    A.  You're looking for -- first you're looking to see if the

2    borrower is providing the conditions that were requested.  So

3    if you're supposed to have two pay stubs, do you have two pay

4    stubs.  Then the underwriter has to look at the pay stub and

5    make sure it's real, that the Social Security numbers match,

6    that the deductions for things like income taxes and Social

7    Security are appropriate, the right percentages, so there's no

8    fraud.  So these days it's very easy to create a pay stub, and

9    we did catch instances of that in underwriting.  So they would

10   do all the normal fraud screens and make sure the borrower

11   made -- like we talked about on the validation stage, they made

12   what was originally used to determine the CLUES approval and

13   that those two things were in sync.

14   Q.  You also referred to a condition involving reasonability.

15   Can you explain what you meant by that?

16   A.  Reasonability came into play if the borrower was starting

17   their income.  So both in subprime and in prime we had products

18   where it was OK to state your income, and an underwriter had to

19   determine if what was stated made sense for the type of job on

20   the application.

21   Q.  How would an underwriter determine whether the income was

22   reasonable?

23   A.  It's not an easy process and it's not an exact process, but

24   they would use the borrower's general credit profile to

25   determine if the income seemed reasonable.  So for example, if

1   a borrower said they made $20,000 a month but all of their

2   credit cards were maxed out and they had late payments on their

3   automobile or late payments on the mortgage and they didn't

4   have anything in their checking or savings account in their

5   application, then that wouldn't sound right to an underwriter.

6   And they would question that and ask for additional

7   information, like proof that a borrower had more money in their

8   checking or savings account, or ultimately they would decide,

9   if they couldn't get comfortable with the income being stated,

10  they would say that the borrower had to provide full

11  documentation.

12  Q.  You also mentioned a condition on assets.  Can you tell us

13  what that is?

14  A.  Some programs required a minimum number of assets called

15  reserves, and that simply some number of months, might be two

16  months or three months or four months of kind of reserve

17  mortgage payments.  So if the borrower got into some short-term

18  trouble, there was some comfort level they could draw on those

19  assets to make a couple of months of mortgages payments until

20  things kind of went back to normal.

21  Q.  So what's involved in reviewing and clearing a condition on

22  assets?

23  A.  Actually getting the bank statement or the savings

24  statement or a 401(k) even, and doing the same type of thing

25  you would do on a check stub or pay stub, making sure it was in

1      fact the borrower's and wasn't from some business or someone

2      else, looking at the Social Security number, the balances,

3      seeing if there were any exceptionally large recent deposits

4      that were kind of odd, and just determining if the document and

5      the income or the -- excuse me, the reserves were acceptable.

6      Q.  You also mentioned a condition on homeowners insurance?

7      A.  Right.  All loans were required to have homeowner's

8      insurance, so we wanted to make sure the borrower had

9      sufficient level of insurance, should something happen to the

10     property, that the loan could be paid off.

11     Q.  And a condition on flood insurance?

12     A.  Right.  Not for every loan, but if a borrower lived in a

13     flood zone, and the underwriter would have to determine whether

14     they did or didn't, then flood insurance was required by the

15     program guidelines.  And same type of thing, that meant there

16     was a higher chance there could be a flood event where that

17     borrower lived and he had to have special flood insurance to

18     cover that because your normal homeowner's insurance doesn't

19     cover events of flood.

20     Q.  Are there any other examples of conditions on the loan that

21     you can give us?

22     A.  There's employment conditions.  So if a borrower says they

23     work at Fannie Mae, they would have to provide some proof that

24     they do in fact work at Fannie Mae, what their job is, how long

25     they had been there, the date they started, their title.  And

1    you might have that for multiple jobs if the borrower hadn't

2    and at their job for a long period of time.

3    Q.  How would a condition on employment be reviewed and

4    cleared?

5    A.  There is a specific form that was sent out by the processor

6    to employer.  The employer would fill that out and it would be

7    received back.  The underwriter would go through the document

8    and do kind of the same thing, make sure that the name matched,

9    that the title that was on the document that had come back from

10   the employer matched the title that was on the application.

11   And same thing for the income and the time on the job and all

12   the details, kind of taking it and tying it all together.

13   Q.  Any other examples of conditions that you can think of?

14   A.  The major conditions were around the collateral, which

15   would be the appraisal, the title and the requisite insurances,

16   the borrower's ability to pay, and then their credit.  So if

17   they had any collections on their credit bureau or judgments,

18   those type of things, the underwriter would have to get

19   documentation to determine if those needed to be paid off or if

20   they had in fact already been paid by the borrower and it was

21   nothing to worry about.

22   Q.  If we could blow up the paragraph right below the one

23   that's currently blown up near the top of page 3.  If you could

24   read that paragraph for us, Mr. O'Donnell?

25   A.  It says I'm expecting and hoping you indeed have conditions

```
1    in which you have acknowledged having reviewed.  Otherwise,
2    this represents fraud on your behalf, as you have cleared
3    conditions that have not been met.  As I'm sure you are aware,
4    such behavior is strictly prohibited and is not tolerated, as
5    fraud is a serious matter.
6    Q.  And was Ms. Knabe's email then forwarded by Mr. Boland?
7    A.  It was.
8    Q.  And who did he send the email to?
9    A.  John sent the email on to his boss, Robert Price.
10   Q.  And Robert Price was one of your direct reports?
11   A.  He was.
12          MS. NAWADAY:  If we could blow up the section of
13   Mr. Boland's email to Mr. Price, the last two sentences of the
14   email that begins, "After speaking with."
15   Q.  Mr. O'Donnell, could you read the bottom portion of the
16   blow up for us, begins "After speaking with."
17   A.  Yes.  After speaking with the BOM, she informed me there
18   was considerable pressure to close loans.  She was told she
19   could not leave until her quota was met.  In order to hit the
20   quota, she felt the below action was necessary.  Sarah also
21   told me she felt this behavior was common among others with
22   signing authority.
23   Q.  Are you aware of any quotas on funding loans that existed
24   within the NCA process?
25   A.  There were goals established on a monthly basis for all of
```

D9QTBAN5                      O'Donnell - direct

1   the production teams to fund loans.  My understanding is that

2   within NCA there was a general goal of funding one loan per

3   person per day.

4   Q.  And now if I could draw your attention to the first page of

5   the email, the email from Mr. Price to Cheri Shine on which

6   you're copied, can you read Mr. Price's -- the first paragraph

7   of his email for us?

8   A.  See below.  I thought you should see this.  I've been

9   digging into this and asked John to send me a note on others

10  and let me know what may be triggering it.  Aaron and Todd have

11  done similar checks as well.  The overwhelming response is that

12  the pressure to hit numbers, oftentimes before they're allowed

13  to leave, no matter what time it is, is driving some of this

14  behavior.  I don't disagree with driving targeted goals, but

15  the ones they're being given right now with staff they have and

16  the disarray they're in is obviously contributing to this.

17  It's not uncommon for employees feeling pressure to take

18  shortcuts and make poor decisions to hit numbers.

19  Q.  Thank you.  When Mr. Price says I've been digging into

20  this, do you have an understanding what he meant by "this?"

21          MR. HEFTER:  Objection, your Honor.

22          THE COURT:  Sustained.

23  Q.  Mr. O'Donnell, you see the reference to Aaron in the email

24  you just read?

25  A.  Yes.

D9QTBAN5                          O'Donnell - direct

1    Q.  Can you tell us who Aaron is?

2    A.  Aaron Kalosis.  He was an underwriter manager in the

3    Richardson Center, also worked for John Boland.

4    Q.  And you see the reference Todd?

5    A.  Yes.

6    Q.  Can you tell us who Todd is?

7    A.  Todd Green was an underwriting manager in Richardson as

8    well -- excuse me, I said Aaron was an underwriting manager, he

9    was the funding manager.  Todd Green was the underwriting

10   manager.  And they both reported to Robert in Richardson.

11   Q.  Do you recall having a conversations with Mr. Price about

12   loan specialists improperly clearing conditions?

13   A.  I do.

14   Q.  What is the first conversation that you had a specific

15   recollection of?

16   A.  It was around this time.  Robert officed right next to door

17   to me.  We spent a lot of time together talking about all

18   things quality for all the teams he supervised.  And this was

19   uncommon since we didn't have this model with loan specialists

20   having the ability to do this at Full Spectrum.  And he was

21   bringing it to my attention saying there is this problem with

22   this model, there's no separation of duties and employees can

23   override decisions made by underwriters and move loans to

24   closing when there's nothing to stop it.

25   Q.  You testified a minute ago that he said this was uncommon.

D9QTBAN5                         O'Donnell – direct

1   What specifically were you referring to when you said this was

2   uncommon?

3   A.   Instances such as this where a loan would be —— an

4   underwriter's decision would be overriden by a loan specialist

5   or loan processor and the loan would be cleared to close when

6   an underwriter said it should not be.

7              MR. HEFTER:  Your Honor, I object, and I would like to

8   approach if that's ——

9              THE COURT:  All right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At side bar)

2           MR. HEFTER:  Your Honor, the question that was posed

3    originally was when is the first time you recollect having a

4    conversation, he then launched into his entire answer.  And the

5    question is when, the question of timing.

6           THE COURT:  That wasn't -- no objection was made to

7    that question.  The question was:  What is the first

8    conversation you had a specific recollection of?  And the

9    answer.  Then the question was:  You testified a minute ago

10   that he said this was uncommon, what specifically were you

11   referring to when you said this was uncommon?  And he gave his

12   answer to that question, and that's when you raised your

13   objection.

14          MR. HEFTER:  Right.

15          THE COURT:  So I don't think you objected to the

16   question that you're now -- the objection you're now raising

17   should have been made, if at all, to an earlier question.

18          MR. HEFTER:  I understand, but there's a pattern here.

19          THE COURT:  Well, that's --

20          MR. HEFTER:  That's why I wanted to side bar.

21          THE COURT:  I do think that's true.  I think he is not

22   narrowing his answers to the question put.  I think maybe I'll

23   give him a brief instruction on that right now, let's see how

24   it goes.

25          MS. MAINIGI:  Your Honor, may I raise one issue?  I

D9QTBAN5                        O'Donnell - direct

1    want to put, for the purpose of the record, an ongoing

2    objection about not only the irrelevance of this line of

3    questioning, but the prejudicial nature of it.  Because the

4    government is trying to create some sort of inference that if

5    one bad instance happened before, that it must have happened

6    again in High-Speed Swim Lane.

7              THE COURT:  Well, I don't know about that.  But you're

8    free to cross-examine on that, or if you prefer, you can save

9    it for argument.  I don't think it's any ground for excluding

10   the testimony that's been given so far, but feel free to pursue

11   that on cross.

12             MR. HEFTER:  Can I raise one more issue, briefly?

13             THE COURT:  Yeah.

14             MR. HEFTER:  That is these conversations that don't

15   come in against Ms. Mairone, I have been trying not to object.

16             THE COURT:  You have been very good on that.  Maybe we

17   should agree, since this really is only going to be of

18   relevance largely on summations, and maybe I'll have to give a

19   general instruction to the jury, but when you haven't objected

20   so far and asked for a limiting instruction, it's come in

21   against everyone.  But if you want a continuing objection that

22   any hearsay that is offered for its truth coming from employee

23   of the bank, which therefore comes in against the bank as an

24   admission, does not come in against Ms. Mairone, I'm happy to

25   treat it as a continuing objection, which I sustain.  But then

1    the jury won't hear the limiting instruction each and every

2    time.  So you have to choose which you prefer.  One way to

3    handle it is to simply say -- I'll give you several options.

4    You tell me what you prefer.

5         You could simply have here at the side bar a

6    continuing objection, which I would sustain, and so it would be

7    the understanding, which all counsel would abide by, on

8    summation that nothing that was hearsay as to Ms. Mairone,

9    therefore can be referred to on summation.  And we might be

10   able to devise an instruction to the jury in the final

11   instructions, although it might be difficult, but I think the

12   fact that summations would be limited in that way may be

13   sufficient for your purposes.

14        Or I could give them an instruction now, which may or

15   may not be still in their minds a week from now, but I would

16   explain to them why this comes in against the bank but not

17   against Ms. Mairone, and instruct them that that continues as

18   to all such hearsay.

19        Or we could leave it to you, as you have so far, to

20   just object when you really thought it was something

21   sufficiently important that you wanted to make sure that the

22   jury got the limiting instruction at the very time when that

23   particular item was coming in.

24        So the last, of course, is the way traditionally it's

25   done, but I'm happy for your convenience if you prefer to do it

D9QTBAN5                          O'Donnell – direct

1   either the other two ways.

2                MR. HEFTER:  Since, your Honor, it is 4 o'clock and I

3   know we're breaking at 4:20, could I think about it and I will

4   employ the latter of -- the third option for the next 20

5   minutes?

6                THE COURT:  All right.  So I think as to the last

7   answer we need a limiting instruction.

8                MR. HEFTER:  Yes.  Thank you.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9Q3BAN7                       O'Donnell - direct

1              (In open court)

2              THE COURT:  Is the name of the fellow Robert

3     Richardson?

4              MS. NAWADAY:  Robert Price.

5              THE COURT:  Okay.  It needs some correction in the

6     transcript.

7              So, ladies and gentlemen, as to the conversation with

8     Mr. Price that the witness just testified about, that again is

9     received and you may consider it for all purposes against the

10    bank defendants, but not against Ms. Mairone.

11             I'll try to explain this a little to you.  It is kind

12    of technical, and I don't want to make you into lawyers because

13    that's a fate I wouldn't wish on any of you.  But, when a

14    corporation or a company or a bank or another institution is a

15    party to a case as Countrywide and Bank of America are here,

16    the statements of its employees made in the course of their

17    employment are evidence against that bank or that institution.

18    So if the witness is reporting what someone at the bank said,

19    you may consider it and give it whatever weight you think it

20    warrants against the banks.

21             But, as to an individual, in this case Ms. Mairone, it

22    is what we call hearsay, it cannot be considered as to her for

23    technical reasons that are important, but which don't warrant a

24    lengthy explanation.

25             So, that's the basic line that needs to be drawn.  So

D9Q3BAN7                        O'Donnell - direct

1    this last conversation can be considered against the banks, but

2    not against Ms. Mairone.

3            Now, this is all going to be made a lot easier for you

4    when we get to summations, because when the parties summarize

5    the evidence, and they get to summarize what the evidence is

6    against the banks, or conversely, a lack of evidence, they will

7    be referring to all the evidence that was admitted.  But when

8    they get to summing up with respect to Ms. Mairone, they will

9    have to limit themselves to what was admitted against

10   Ms. Mairone.  So you'll have a much better way of how this

11   plays out at that time.  But I wanted to give you a little bit

12   of a heads up.

13           Now that I know you're fully expert on this matter,

14   we'll continue.  Go ahead.

15           MR. HEFTER:  I would just remind you also about the

16   witness.

17           THE COURT:  Yes.  Thank you very much.  Let me remind

18   the witness to listen carefully to the questions put and be

19   sure to limit your answer to the questions put.

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Very good.

22   BY MS. NAWADAY:

23   Q.  Mr. O'Donnell, apart from this e-mail exchange, did

24   Mr. Price express concerns to you about the NCA process?

25   A.  He did.

1    Q.  Can you tell me, did you have conversations with Mr. Price

2    about the NCA process?

3    A.  I did.

4    Q.  Can you tell me specifically what concern he expressed.

5              MR. HEFTER:  Objection, your Honor, as to Ms. Mairone.

6              THE COURT:  So again, this is an example of evidence

7    that will be received as to the banks, but not as to

8    Ms. Mairone.

9    A.  Robert expressed concern that loans were going to funding,

10   so going through the cleared to close process, loan documents

11   out the door, being signed, money being given out, that didn't

12   qualify.  Because conditions had not been appropriately

13   cleared.  And the loan ultimately wasn't of investment quality.

14   Q.  You said the loans didn't qualify.  What did you mean by

15   that?

16   A.  They weren't ready yet, so the conditions that were

17   required by the loan program, by CLUES, were not in the file,

18   had not been received and reviewed by an underwriter.

19   Q.  When did Mr. Price express that concern to you?

20   A.  He expressed that concern when he saw instances like this.

21   He's sending this e-mail expressing that concern, but I met

22   with Robert regularly about his operation.  As I expressed

23   earlier, that was part of my job to go to the centers, meet

24   with management, review metrics, performance, including the

25   quality of loans, and reports that we were receiving from

1    corporate QC where loans were being identified as having

2    problems.

3            MR. HEFTER:  I move to strike as non-responsive.

4            THE COURT:  This is a good example, Mr. O'Donnell.

5    The question was "When did Mr. Price express that concern to

6    you."  And you began your answer "He expressed that concern

7    when he saw instances like this."  But then you went on to talk

8    about it was part of your job to go to centers and meet with

9    management, review metrics, performance, including the quality

10   of loans and reports we were receiving from corporate QC where

11   loans were being identified as having problems.

12           The question was when did Mr. Price express that

13   concern to you.  And that's the only question that you should

14   answer.

15           So, the objection is sustained.  The jury will

16   disregard all but the first sentence of the previous answer.

17   Q.  Mr. O'Donnell, did you pass along the concern that

18   Mr. Price expressed to you to anyone else?

19   A.  I did.

20   Q.  Who did you discuss Mr. Price's concern with?

21   A.  My boss, Cliff Kitashima.

22   Q.  What did you say to Mr. Kitashima?

23   A.  I alerted him to the fact that we had seen an instance like

24   this.  That there were loans that were being made, finalized,

25   closed and signed and funded, that did not meet our standards

1    and had problems.

2    Q.   When did you have that conversation with Mr. Kitashima?

3    A.   Around this time in June of 2007.

4    Q.   Did you make any recommendations to Mr. Kitashima about

5    changes to the NCA work flow?

6    A.   I made two recommendations.  I recommended that all NCA

7    loans funded through Robert Price's center.  So, at this period

8    of time, Robert Price's team only supported the NCA for funding

9    on an overflow basis.  So at month end when there was a lot of

10   volume, they would help.  But I wanted that -- my

11   recommendation was that all loans be funded through Robert's

12   center so we would have better control to determine whether or

13   not the conditions had been cleared appropriately.  And the

14   cleared to close was valid.

15   Q.   What was the second recommendation that you made?

16   A.   That the loan processors or loan specialists no longer be

17   able to issue cleared to closes, that they go through the

18   standard process and full effect of having an underwriter do

19   that.

20   Q.   Why did you make that recommendation?

21   A.   I saw these instances as a problem.  I wanted to have

22   better quality and better control.  We had had great experience

23   with underwriters reviewing conditions and clearing loans

24   appropriately.  And we had that availability and capacity to do

25   it for NCA, and I recommended that we apply that work flow to

1    the existing NCA process.

2    Q.  Were either of your recommendations followed?

3    A.  The recommendation to fund all loans through the Richardson

4    center was followed.

5    Q.  Can you explain what you mean by funding through the

6    Richardson center?

7    A.  So, before we instituted that control, the loan processor

8    could do the whole process themselves.  They could clear the

9    conditions, issue a cleared to close, draw the loan documents,

10   and ultimately send money out the door.  Fund the loan.

11            When we instituted the control, they could do

12   everything up to reviewing the conditions and issuing the

13   cleared to close, but they had to transfer the loan to the

14   funding team who would make sure the cleared to close was valid

15   first, then draw the actual loan documents, and they managed

16   the process of funding the loan at the very end.

17   Q.  Did there come a time when any other changes were made to

18   the NCA process?

19   A.  Ultimately the NCA process was absorbed into the Richardson

20   fulfillment operation.

21   Q.  What do you mean by the Richardson fulfillment operation?

22   A.  It became part of central fulfillment later in 2007.

23   Q.  Mr. O'Donnell, are you familiar with something called a

24   High-Speed Swim Lane?

25   A.  I am.

1    Q.  Can you tell us what that is.

2    A.  The High-Speed Swim Lane was a work flow designed within

3    Full Spectrum to help us move to a prime processing model.  It

4    was specifically designed to take lower risk loans, and process

5    them more quickly.

6    Q.  What, if any, involvement did you have in the High-Speed

7    Swim Lane?

8    A.  I was involved both in the High-Speed Swim Lane steering

9    committee, and in the working group that worked on the project

10   of developing a prime model for Full Spectrum.

11   Q.  What was the steering committee?

12   A.  The steering committee was made up of the leadership team

13   within Full Spectrum.  So, the managing directors who were the

14   highest level of the company, Greg Lumsden, my boss Cliff

15   Kitashima, Rebecca Mairone and others, myself included, Loren

16   Rodriquez, I believe Jim Kee from production, Scott Bridges and

17   Lloyd Sergeant from production, and we worked together to set

18   out the strategy to develop a prime processing model.

19   Q.  How, if at all, was that different from the working group

20   that you mentioned?

21   A.  The working group was much more detailed oriented.  So we

22   worked on how the whole process would actually be built.  The

23   criteria for which loans would go into the process, what roles

24   and which employees would be involved, and we built a pilot to

25   test the model we came up with.

1   Q.  Did the High-Speed Swim Lane go by any other names?

2   A.  It was called the Hustle as well.

3   Q.  Was there any one person in charge or in any leadership

4   role with respect to the steering committee?

5          MR. HEFTER:  Objection, your Honor.  Compound.

6          THE COURT:  I think those are effectively synonyms.

7   If you want to examine him for more particularization, I'll

8   allow it.  But I think that's an okay question.  Overruled.

9   A.  The project of developing and implementing a new prime

10  high-speed process was headed up by Rebecca Mairone.

11  Q.  Mr. O'Donnell, are you familiar with the phrase turn time?

12  A.  I am.

13  Q.  Can you explain what turn time is?

14  A.  In the simplest form, turn time is simply the number of

15  days it takes from an application, a loan application to go

16  from the starting phase all way through to funding.

17  Q.  Did the High-Speed Swim Lane set any goals with respect to

18  turn time?

19  A.  The general goal was to fund loans in less than 15 days.

20  Q.  Do you have an understanding of why that goal was set?

21  A.  Well, Full Spectrum and Countrywide, for that matter,

22  employed an originate and sell model.  So we would originate

23  the loans and then sell it to investors.  And the faster you

24  could get loans through the pipeline and sell them, the more

25  loans you could do in a month, the more profits you could make,

1    the more revenue available for the company.

2    Q.  What, if any, role did underwriters have in the High-Speed

3    Swim Lane?

4    A.  Similarly to the NCA model that I talked about earlier,

5    underwriters served as an escalation point in the high speed or

6    the Hustle.

7    Q.  What do you mean by escalation point?

8    A.  A loan processor would escalate a file to an underwriter if

9    the loan file -- the CLUES accept changed to a refer.  So if

10   there was a problem with the loan or if there was an exception,

11   or if there was something complex they couldn't figure out, or

12   if they didn't have the right level of authority to make a

13   particular decision.

14   Q.  Did underwriters have any role, apart from the escalation

15   point that you just mentioned?

16   A.  No.

17   Q.  Was an underwriter required to review a High-Speed Swim

18   Lane loan at any point in the work flow?

19   A.  No.  If the loan was a prime CLUES accept, and if it met

20   the criteria, then there was no reason for the loan to go to an

21   underwriter.

22   Q.  What role did loan specialists play in the High-Speed Swim

23   Lane?

24   A.  They managed the pipeline for -- or they managed a pipeline

25   of loans.  So they own that loan from cradle to grave, A to Z.

1   Their job was to take the loan shortly after application, work

2   with the borrower to get it all the way through to funding.

3   That would include reviewing the conditions, gathering

4   documents from the borrower or third parties like a title

5   company or flood insurance company or appraiser, reviewing the

6   documents, making sure that all the right conditions were

7   there, signing off on those conditions, and issuing the cleared

8   to close.

9   Q.  How, if at all, was the role of loan specialist in the

10  High-Speed Swim Lane different from the role of loan specialist

11  in the NCA work flow?

12  A.  It was essentially the same as the NCA work flow before we

13  made adjustments to it.  So there was no separation of duty.

14  They owned the process themselves as the loan processor.

15  Q.  I believe you testified a minute ago that the High-Speed

16  Swim Lane started out as a pilot.  Is that correct?

17  A.  That's right.

18  Q.  Can you explain what you mean by that?

19  A.  Full Spectrum frequently used pilots to test out new

20  concepts or new processes.  As I think I mentioned earlier, the

21  company was growing very quickly.  We had gone from funding two

22  or 3,000 -- 3,000 loans when I joined a month to more than

23  20,000 loans at one point.  And that meant we had to change

24  things.  We had to constantly be developing new processes.  We

25  would often use a pilot, which would give us the opportunity to

1    test that in a smaller group for a period of time to determine

2    if our plan would really work, and would function well.

3    Q.   Were you involved in selecting loan specialists for the

4    High-Speed Swim Lane pilot?

5    A.   I wasn't.  The loan specialists didn't report to me.  So I

6    didn't know them individually very well.  I knew some of them

7    because they were in the centers where I worked and visited

8    other groups that reported to me, but I didn't have a hand in

9    selecting who would be part of the pilot.

10   Q.   Did you have an understanding of how loan specialists were

11   selected for the pilot?

12   A.   The pilot was relatively small, so we tried to take people

13   that had more experience.  Because it was going to be a new

14   process, we were going to be giving them authority, and we

15   thought the people that had the best experience or most

16   experience would be the best group to help test the process.

17   Q.   Do you have an understanding of what, if any, training was

18   given to loan specialists as part of the Hustle pilot?

19   A.   For the pilot, really there wasn't any special training.

20   The only training was on the new work flow itself.  But beyond

21   that, there wasn't really anything, any special kind of

22   training.

23   Q.   What do you mean that the only training was on the new work

24   flow itself?

25   A.   All the employees in Full Spectrum were used to one, one

1   work flow or one model of business processing loans.  We were

2   making changes to that.  So we, the managers over these teams,

3   gathered them together and said, okay, these are the new steps

4   that we are going to follow to process loans.  This is what

5   your role will be in that process.  So it was just a matter of

6   explaining.  That served as the training.

7   Q.  Was there a set time period for the Hustle pilot?

8   A.  I believe the Hustle pilot ran from the middle of August

9   through the end of September in 2007.

10  Q.  Where was the Hustle pilot implemented?

11  A.  The pilot ran in two of the centers, in Chandler, Arizona,

12  and Richardson, Texas.

13  Q.  When the Hustle pilot was implemented, was the NCA work

14  flow still in operation?

15  A.  It was, with slight adjustments.

16  Q.  Was the NCA work flow still in operation in Richardson?

17  A.  It was.  That's where the NCA was located.

18          THE COURT:  Counsel, find a point in the next five

19  minutes where it is convenient to break and we'll let the jury

20  go for tonight.

21          MS. NAWADAY:  I'm actually at a change of topics right

22  now.

23          THE COURT:  That's what I was guessing.  So, ladies

24  and gentlemen, we will break for today.  We'll start at 9:30

25  tomorrow.  Let me take the liberty of reminding you that you

D9Q3BAN7                    O'Donnell – direct

1    should not discuss the case with anyone else.  You should not

2    discuss the case even among yourselves.  You should not try to

3    do any Google research or any thing like that.  You need to

4    decide this case solely on the evidence here in the court.  If

5    you see anything by any unlikely chance in the media, turn away

6    from it, don't pay any attention to it.  And the most important

7    thing is to have a good evening.  We'll see you tomorrow.

8              (Jury excused)

9              THE COURT:  Mr. O'Donnell, you can step down.  We'll

10   see you at 9:30 tomorrow.

11             THE WITNESS:  Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D9Q3BAN7

 1          THE COURT:  Please be seated.  Anything counsel needs
 2     to raise with the Court?
 3          MR. ARMAND:  Your Honor, with regard to the
 4     application that the defense made about Ms. Simantel's e-mail,
 5     it is true it is possible the Court's ruling will impact our
 6     decision making with respect to calling her, and she does live
 7     in California.  And so, if there is a chance she may not fly
 8     out for her testimony based on the Court's ruling, it probably
 9     does make sense to save her the trip.
10          THE COURT:  The pressure is really on me now.  So when
11     were you planning to call her?
12          MR. ARMAND:  It would probably be Monday or Tuesday,
13     depending on how quickly we go.
14          THE COURT:  We'll have argument on it tomorrow.
15     Because to ask her to come all the way to New York and possibly
16     be forced to go to the theater or walk in Central Park or any
17     of those terrible things would certainly be a hardship that I
18     don't want to have to subject her to that.
19          All right.  Anything else?  We'll see you tomorrow at
20     9:30.
21          (Adjourned until September 27, 2013, at 9:30 a.m.)
22
23
24
25

INDEX OF EXAMINATION

Examination of:                              Page

MICHAEL THOMAS

Cross By Mr. Sullivan . . . . . . . . . . . 326

Cross By Mr. Hefter . . . . . . . . . . . . 392

Redirect By Mr. Cordaro . . . . . . . . . . 433

Recross By Mr. Sullivan . . . . . . . . . . 469

Recross By Mr. Hefter . . . . . . . . . . . 469

EDWARD O'DONNELL

Direct By Ms. Nawaday . . . . . . . . . . . 471

527

```
1                         PLAINTIFF EXHIBITS

2    Exhibit No.                                      Received

3      232   . . . . . . . . . . . . . . . . . . . 337

4      199   . . . . . . . . . . . . . . . . . . . 428

5      427   . . . . . . . . . . . . . . . . . . . 466

6      49    . . . . . . . . . . . . . . . . . . . 495

7                        DEFENDANT EXHIBITS

8    Exhibit No.                                      Received

9      66    . . . . . . . . . . . . . . . . . . . 327

10     1060  . . . . . . . . . . . . . . . . . . . 342

11     193   . . . . . . . . . . . . . . . . . . . 348

12     752   . . . . . . . . . . . . . . . . . . . 356

13     217   . . . . . . . . . . . . . . . . . . . 359

14     378   . . . . . . . . . . . . . . . . . . . 362

15     64    . . . . . . . . . . . . . . . . . . . 370

16     1045  . . . . . . . . . . . . . . . . . . . 371

17     1012  . . . . . . . . . . . . . . . . . . . 376

18     33    . . . . . . . . . . . . . . . . . . . 378

19     4036  . . . . . . . . . . . . . . . . . . . 396

20     4014  . . . . . . . . . . . . . . . . . . . 409

21     4001  . . . . . . . . . . . . . . . . . . . 423

22

23

24

25
```