D9R3BAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                Plaintiff,

5        v.                              12 CV 1422 (JSR)

6   BANK OF AMERICA CORPORATION,
7   *successor to Countrywide*
    *Financial Corporation,*
8   *Countrywide Home Loans, Inc.,*
    *and Full Spectrum Lending, et*
9   *al.,*

10               Defendants.

11  ------------------------------x
                                        New York, N.Y.
12                                      September 27, 2013
                                        9:45 a.m.
13
    Before:
14
                         HON. JED S. RAKOFF,
15
                                        District Judge
16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9R3BAN1

1                                    APPEARANCES

2     PREET BHARARA
           United States Attorney for the
3          Southern District of New York
      PIERRE G. ARMAND
4     JAIMIE LEESER NAWADAY
      JOSEPH N. CORDARO
5     CARINA H. SCHOENBERGER
      ELLEN M. LONDON
6          Assistant United States Attorneys

7

      WILLIAMS & CONNOLLY
8          Attorneys for Defendant Bank of America
      BRENDAN V. SULLIVAN, JR.
9     ENU MAINIGI
      MALACHI B. JONES
10    KENNETH SMURZYNSKI
      CRAIG D. SINGER
11    ALLISON B. JONES
      STEVEN M. CADY
12    JENNIFER WIMSATT PUSATERI

13

      GOODWIN PROCTOR
14         Attorneys for Defendants Countrywide
      RICHARD M. STRASSBERG
15    WILLIAM HARRINGTON

16

      BRACEWELL & GIULIANI
17         Attorneys for Defendant Mairone
      MARC L. MUKASEY
18    MICHAEL HEFTER
      RUSSELL ZWERIN
19    RYAN M. PHILP
      SETH M. COHEN
20    CHRISTINA JARDINE

21

22

23

24

25

D9R3BAN1

1           (In open court; jury present)

2           THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you for your promptness.  I was a little late this morning, and

4    after giving you such a hard time, I thought maybe I should

5    hold myself in contempt of court.  I considered that

6    judiciously, but then I made a mercy pitch to myself on my

7    behalf that was so moving, that I decided to let myself off the

8    hook this time.  But I'm sorry for the delay.

9           We're ready to continue, counsel.

10   EDWARD O'DONNELL,

11       called as a witness by the Government,

12       having been previously sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MS. NAWADAY:

15   Q.  Good morning, Mr. O'Donnell.

16   A.  Good morning.

17   Q.  Yesterday we were talking about the NCA work flow, and I

18   had forgotten to ask you, was there any one person in charge of

19   the NCA work flow?

20   A.  The NCA organization reported to Rebecca Mairone.

21   Q.  Let's shift gears to talk about compensation issues now.

22   Do you have an understanding of how loan specialists were

23   compensated in 2007 before the Hustle pilot?

24   A.  Yes.  Although they didn't report for me, I was aware of

25   how they were compensated.  Loan specialists basically earn a

1    base salary, and then they could also earn incentive bonuses

2    based on the number of loans that they were involved in

3    funding.

4    Q.  Was there any quality component to a loan specialist's

5    compensation?

6    A.  There was.  All areas of Full Spectrum had quality

7    components in their compensation.

8    Q.  Was there a name for that quality component?

9    A.  It was called quality of grade.

10   Q.  Can you explain to us how quality of grade affected

11   compensation?

12   A.  If a loan specialist in this case made mistakes on their

13   loan and they were identified in an audit after the loan had

14   funded, there would be subtractions from a score.  Everyone

15   started just very simply with a baseline score of a four.  And

16   four was kind of the perfect score.  If you made errors, then

17   there could be deductions from the four that would impact your

18   bonus compensation.

19   Q.  Did there come a time in 2007 when the quality of grade

20   component changed in some way?

21   A.  In the pilot in 2007 the QoG, quality of grade, impacts

22   were suspended.

23   Q.  Could you explain what that meant?

24   A.  It basically meant that if loans were identified with

25   problems or issues that made them not investment quality, then

1    there wouldn't be any impact to the loan specialist's bonus.

2    They'd get their full bonus.

3    Q.  When did this change occur?

4    A.  It was done in conjunction with the test or the pilot we

5    rolled out for the Hustle.

6    Q.  Do you have an understanding of the reason for that change?

7    A.  We recognized that it was a new work flow, and that for a

8    couple months, short period of time, we were going to be

9    testing that pilot.  And we didn't want the small number of

10   employees that were involved in it to be negatively impacted.

11   Because we recognized we could have made errors or

12   misassumptions in how that work flow would play out.

13   Q.  Were there any other changes to loan specialists'

14   compensation around August of 2007?

15   A.  The QoG was later -- the suspension of the impact of the

16   QoG was later expanded company wide.

17   Q.  Fixing your attention on August of 2007.  Were there any

18   other compensation changes that applied to loan specialists in

19   or around August of 2007?

20   A.  There were.  Outside the pilot as well, loan specialists

21   were given production goals, so there was an extra bonus that

22   would be earned if the company hit certain levels of funding.

23   There was also what we refer to as a wrapper around the bonus,

24   which was related to turn time.  So, the greater percentage of

25   loans that funded more quickly, people could earn more

1   compensation if that was achieved.

2   Q.  I want to separate out the different components of your

3   answer.  Could you explain separately -- you've explained the

4   funding bonus.  Can you explain what you meant by the turn time

5   bonus?

6   A.  In the simplest form, the faster the loan funds, the more

7   money would be paid in bonus.

8   Q.  Mr. O'Donnell, could you turn in your binder to tab 31.

9   A.  Okay.

10  Q.  Do you recognize this document?

11  A.  I do.

12        MS. NAWADAY:  Your Honor, I believe there is no

13  objection to this exhibit so we would offer it in evidence.

14        MS. MAINIGI:  No objection.

15        THE COURT:  Is that right?

16        MS. MAINIGI:  No objection.

17        MR. HEFTER:  No objection, your Honor.

18        THE COURT:  Received.

19        (Plaintiff's Exhibit 31 received in evidence)

20  Q.  Mr. O'Donnell, could you explain to us what this is.

21  A.  This is an announcement from the compensation management

22  group, which was part of our human resources and finance

23  groups.  It is announcing the turn time modifier to monthly

24  bonus pilots.

25  Q.  Turn to tab 266 in your binder.  Do you recognize that

D9R3BAN1                     O'DONNELL - DIRECT

1    document?

2    A.  I do.  It is an e-mail from me.

3          MS. NAWADAY:  I believe there is no objection to this

4    exhibit so we offer it into evidence.

5          MS. MAINIGI:  No objection.

6          MR. HEFTER:  No objection, your Honor.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 266 received in evidence)

9    Q.  Mr. O'Donnell, could you tell us what this document is?

10   A.  This is an e-mail that I wrote at the very beginning of

11   August in 2007 announcing changes to the compensation plan for

12   central services, specifically the incentive plans.  Central

13   services was the group I managed in underwriting and funding.

14   Q.  Can I direct your attention to page two of the document,

15   and can we blow up the first full paragraph that begins

16   "enhancement opportunity."

17         Mr. O'Donnell, can you read that for the jury.

18   A.  "Enhancement opportunity.  If we fund $3.1 billion or

19   higher, and prime funding volume is 2.6 or higher, an

20   additional 25 percent bonus will take place.  If the total

21   fundings are $3.1 billion or higher but prime funding volume is

22   less than $2.6 billion, an additional 10 percent bonus will be

23   paid."

24   Q.  Thank you.  I note that you are the author of this e-mail,

25   correct?

1   A.  I am.

2   Q.  Were you the person responsible for putting in place the

3   funding bonus?

4   A.  No.  In this e-mail I'm announcing the bonus, but I did not

5   have authority to rollout new compensation plans.

6   Q.  Who did have that authority?

7   A.  Compensation plans had to be approved through our CFO and

8   ultimately Greg Lumsden.

9   Q.  Mr. O'Donnell, did anyone express concerns to you about the

10  compensation changes you just described?

11  A.  They did.  My direct reports and others expressed concerns.

12  Q.  Who in particular among your direct reports?

13  A.  Jim White who ran the Chandler, Arizona fulfillment center;

14  Robert Price, who ran Richardson, Texas; David Sallis, who ran

15  Chicago, Illinois.

16  Q.  Let let's start with Mr. Price.  What did he tell you?

17             MR. HEFTER:  Objection, your Honor, as to Ms. Mairone.

18             THE COURT:  Come to the side bar.

19             (Continued on next page)

20

21

22

23

24

25

1           (At the side bar)

2           THE COURT:  So you were going to tell me this morning

3   which of the options you elected, although you will recall I

4   did give the jury a general overview yesterday.

5           MR. HEFTER:  I apologize, your Honor.

6           THE COURT:  Go ahead.

7           MR. HEFTER:  I said you did.  I remember that.

8           THE COURT:  So now, are you going to object each time

9   or do you want a continuing objection or what do you want?

10          MR. HEFTER:  Could we have 10 seconds to confer, your

11  Honor?

12          THE COURT:  Yes.

13          (Pause)

14          MR. HEFTER:  Your Honor, I think we'll do it for now

15  on a case-by-case basis.

16          THE COURT:  Okay.  Now, on a separate matter, I

17  received just now from my courtroom deputy, as the jury was

18  coming in, a note was received which we've marked as Juror Note

19  Number 2, but it's from Mr. Chinchar, Juror Number 10.  "There

20  was a man in the courtroom yesterday who I later saw at lunch"

21  and I can't quite make out the next word but it looks like

22  "bringing with him a professional large camera.  At the end of

23  the day, he followed Juror Number 2 and I as we left the

24  building after giving us a slight grin as we came through the

25  door.  I turned to look at him and stopped and he stopped

D9R3BAN1                        O'DONNELL – DIRECT

1    following us.  In addition, I saw that defense was checking on

2    me on social media.  I feel intimidated and don't feel I could

3    be objective."

4              MS. MAINIGI:  We did do jury research at the time,

5    your Honor.

6              THE COURT:  I gave you permission to do jury research

7    when we were choosing the jury.

8              MS. MAINIGI:  And as far as I understand, that's what

9    we did, your Honor.  I don't know --

10             THE COURT:  Has someone been hired by you to take

11   pictures of the jurors?

12             MR. HEFTER:  No.

13             MS. MAINIGI:  I saw the same gentleman when we were

14   leaving.

15             THE COURT:  Is he in the courtroom now?

16             MS. MAINIGI:  I don't believe so.  No.  No --

17             THE COURT:  I'm going to want to have a full inquiry

18   about this of every single lawyer who was here yesterday at the

19   next break.

20             (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE COURT:  So, this evidence will be received as to

3     the banks but not as to Ms. Mairone.

4     BY MS. NAWADAY:

5     Q.  Mr. O'Donnell, what did Mr. Price tell you?

6     A.  Mr. Price was concerned that in this announcement of the

7     updated central services incentive plans there was no mention

8     of quality.  It was purely about the funding volume of loans.

9     Q.  When did he tell you this?

10    A.  Robert -- it was immediately after I published this note.

11    Robert and I office next door to each other in Richardson, and

12    he frequently -- too frequently sometimes -- spent time in my

13    office airing his concerns and complaints.  But I asked him to

14    get feedback as I did with my other center managers to my note,

15    so that I could understand what specifically he and others were

16    concerned about.

17    Q.  How did you ask him to gather feedback?

18    A.  They had floor meetings with their staff.  Generally when

19    we had large announcements, the center manager or the team

20    managers would gather the staff together and review the changes

21    or details that we were sharing.

22    Q.  You also mentioned Mr. White expressed concerns to you, is

23    that right?

24    A.  He did.

25    Q.  What did he say to you?

1    A.  Mr. White sent me an e-mail outlining his concerns that he

2    was interpreting my note to mean that it was only about

3    funding, and that quality didn't matter.  He was making that

4    question, does quality still matter.  He was concerned that

5    people could interpret this the wrong way.  And wanted to

6    understand what we were going to do to make sure that quality

7    wasn't jeopardized.

8    Q.  What, if anything, did you say in response?

9    A.  I told him I heard his concerns, and I asked him to do the

10   same as I had asked Robert.  Talk to the staff, get the

11   feedback, and then let's talk.

12   Q.  Did anyone else express concerns to you?

13   A.  David Sallis who ran the Chicago operation.

14   Q.  What did he say?

15   A.  David had the same concern, that he was confused by the

16   memo.  He thought it was unusual that we would have an

17   announcement for only the central services group.  He had

18   talked to people in production, the sales operations that he

19   supported, and they had not received any such memo.  So he was

20   concerned that a bonus for volume was only being given to

21   underwriters and funders.

22   Q.  Did you pass along this feedback to anyone else?

23   A.  I did.

24   Q.  Who did you pass it along to?

25   A.  I passed it along in an e-mail to Rebecca Mairone with a

1      copy to my boss Cliff Kitashima.

2      Q.  Did Ms. Mairone respond to your e-mail?

3      A.  She did.

4      Q.  What did she say?

5      A.  Her response confused me a bit.  I had -- I had organized

6      the questions that I received from my staff in four or five

7      different areas.  And I think I even noted in the e-mail that I

8      didn't apply much of a filter.  I didn't put people's names in.

9      Generally my practice was to be the one to carry the message

10     and not single folks out who were raising concerns.

11          But she didn't address any of my specific concerns.

12     And she interpreted it as feedback that it sounded like the

13     staff was on board and this might work.

14     Q.  Can I --

15          MR. HEFTER:  I move to strike as non-responsive.

16          THE COURT:  Sustained.  The jury will disregard the

17     last answer.  Please listen carefully to the question.  Only

18     answer the question put.

19          THE WITNESS:  Yes, sir.

20     Q.  Mr. O'Donnell, can you turn in your binder to tab 52.

21     A.  Okay.

22     Q.  Again without getting into the substance, if I can direct

23     your attention to halfway down the first page.  Do you

24     recognize this document?

25     A.  I do.

1          MS. NAWADAY:  Your Honor, I believe there is no

2     objection to this exhibit so we offer it into evidence.

3          THE COURT:  You don't need to keep saying that.  All

4     you need to say is we offer exhibit whatever the number is and

5     then we'll find out if there is any objection.

6          MS. NAWADAY:  Understood, your Honor.

7          THE COURT:  What is the exhibit number?

8          MS. NAWADAY:  52.

9          THE COURT:  Any objection?

10         MS. MAINIGI:  Your Honor, we have an objection just to

11    one part of it.  It is on the second page.

12         THE COURT:  Is this objection noted in the pretrial

13    order?

14         MS. MAINIGI:  I believe it is, your Honor.  There is

15    an objection, your Honor.

16         THE COURT:  Okay.  By paragraph or --

17         MS. MAINIGI:  Just the second page, your Honor, the

18    page marked two at the bottom and just the second half of that

19    e-mail.

20         THE COURT:  Yes.  And the ground is?

21         MS. MAINIGI:  Hearsay, your Honor.

22         THE COURT:  Yes.  But why isn't this an ordinary

23    business record?

24         MS. MAINIGI:  Your Honor, I think -- may I approach?

25         THE COURT:  Yes.

D9R3BAN1                        O'DONNELL – DIRECT

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9R3BAN1                           O'DONNELL – DIRECT

1        (At the side bar)

2        THE COURT:  So that the record is clear, what we have

3   first is an e-mail from Mr. O'Donnell to Ms. Mairone, then a

4   response from Ms. Mairone which would make no sense if you

5   didn't see the e-mail from Mr. O'Donnell to begin with.  And

6   then there is some further shorter e-mails about all this.

7        So, my question is first, why doesn't it come in in

8   order to make sense of Ms. Mairone's e-mail?  And independent

9   of that, why isn't this an ordinary business record?

10       MS. MAINIGI:  Your Honor, we objected, it was one of

11  the few documents we objected to out of being an ordinary

12  business record because of the compilation of comments here,

13  it's unclear who said these comments to Mr. O'Donnell.  So we

14  understand the general position with respect to the party

15  opponents as well as the business records.

16       THE COURT:  So just again so the record is clear, he

17  was apparently asked by Ms. Mairone to provide her with an

18  update on meetings that the SVPs had with their management team

19  as well as other employees, all with respect to the program

20  that was coming into play.

21       He reported back what the various employees had to

22  say.  That included, of course, what would otherwise be hearsay

23  statements.

24       First, before you even get to business record, all of

25  these are statements of employees of the banks in the course of

1     their business.  So, I think on that ground alone they're not

2     hearsay.  But secondly, this is clearly being done as part of

3     the ordinary business of the banks as well as it's basically a

4     fact gathering process that he was undertaking as an employee

5     as directed, and as directed by Ms. Mairone no less.

6              And then, putting all that aside, this would at a

7     minimum be relevant to what was in Ms. Mairone's head, and her

8     intent is of course very much an element of the case, and the

9     bank's intent as well.  And, there would be no meaning to the

10    rest of the exhibit, to which no objection was lodged, if you

11    didn't have this initial e-mail from Mr. O'Donnell.  So, the

12    objection is overruled.

13             MR. HEFTER:  Can I just make one point on the

14    document, your Honor.  And I don't think the document actually

15    implies that Ms. Mairone directed Mr. O'Donnell, but that's

16    neither here nor there.

17             THE COURT:  I think you can argue it does, but I agree

18    it is not critical to the point.

19             MR. HEFTER:  The other thing is with respect to the

20    top document between Ms. Mairone and Mr. Lumsden, I have no

21    idea what the government intends to ask Mr. O'Donnell about

22    that.

23             MS. NAWADAY:  I don't intend to ask him anything.

24             MR. HEFTER:  You can imagine my lack of foundation

25    objection that would be coming.

1              (In open court)

2              THE COURT:  52 is received.

3              (Plaintiff's Exhibit 52 received in evidence)

4    Q.  Mr. O'Donnell, I'd like to direct your attention to the

5    second page of this document.  First, is this the e-mail that

6    you were describing a minute ago in which you gathered

7    feedback?

8    A.  This is the e-mail that I wrote to Rebecca and carboned

9    Cliff.

10             MS. NAWADAY:  If we can blow up the two paragraphs,

11   the second and third paragraph of that e-mail.

12   Q.  Mr. O'Donnell, can you please read for us the blown up

13   portion beginning with "I've gathered feedback."

14   A.  "I've gathered feedback from each of the respective groups

15   and have summarized the main themes below.  Quality:  The

16   number one question was about quality.  'Does the freeze of QoG

17   and the request to move loans mean we no longer care about

18   quality?'  'Should I be worried that we are trying to get more

19   aggressive when we read that companies can't sell loans and are

20   closing as a result?'  'Mr. Sambol just wrote us about the

21   importance of making good loans.  How does this fit with his

22   comments?'  'What are the boundaries, is it just fund

23   everything and worry about it later?'  'Will I get an SUS from

24   corporate when there are defaults or the loan can't be sold and

25   how will that impact my job or my comp?'"

D9R3BAN1                    O'DONNELL - DIRECT

1   Q.  Thank you.  Can you remind us what an SUS is referred to in

2   that paragraph?

3   A.  An SUS would be a loan that had been rated as

4   non-investment quality by our corporate QC group after

5   completing a post-funding audit.

6   Q.  Do you know who the Mr. Sambol who is referred to in that

7   paragraph?

8   A.  Mr. Sambol was one of the top executives at Countrywide.

9   Q.  Did Ms. Mairone respond to your e-mail?

10  A.  She did.

11  Q.  Can we turn to the first page of the document and blow up

12  the last sentence on the first page.  Ms. Mairone responded to

13  you "So it sounds like it may work.  Is that what I'm hearing?"

14  A.  Yes.

15  Q.  Did you agree with her interpretation of the feedback?

16  A.  No.

17  Q.  Why not?

18  A.  I was confused by this answer.  I had heard concerns from

19  the people that worked for me about the program that was being

20  rolled out relating to incentive comp.  And I didn't think she

21  was understanding what I was saying.  That, the questions that

22  were raising were the people that are in charge of underwriting

23  and funding loans, think we're sending them a message that

24  quality doesn't matter.

25  Q.  Did you have any other discussions with Ms. Mairone about

1    this e-mail?

2    A.  I don't recall whether I did or not.

3    Q.  Now focusing specifically on the Hustle pilot.  Did anyone

4    express concerns to you about the Hustle pilot?

5    A.  They did.

6    Q.  Who in particular raised concerns?

7    A.  My direct reports, Jim White, Robert Price, and David

8    Sallis.

9    Q.  Anyone else?

10   A.  Michael Thomas who also worked for me on the data and

11   metrics side.  Other people that worked in Cliff's

12   organization.  Patrick Aliano specifically, Patrick had

13   responsibility for sort of our secondary marketing and

14   interaction with corporate risk management.

15   Q.  Let's start with Mr. Aliano.  When did he express concern

16   to you?

17   A.  He had heard about the pilot that we were building, the

18   steering committee in the discussions.  So July of 2007 when

19   those conversations were starting, I met with Patrick as a

20   regular course of my interactions in Pasadena when I visited,

21   and he expressed concern and asked about the direction of the

22   prime loans.

23        MR. HEFTER:  I move to strike as non-responsive as

24   well as the -- at least the last part of it.

25        THE COURT:  I think this was reasonably responsive.

1    Overruled.

2    Q.  What, if anything, did you say in response to Mr. Aliano?

3    A.  I told him to share his concerns with me more directly, and

4    I would take those messages to the steering committee and to

5    our boss.  He also worked for Cliff.

6    Q.  Did you pass along his concerns?

7    A.  I did.

8    Q.  To whom to?

9    A.  Mr. Kitashima and also to members of the steering

10   committee.

11   Q.  Did you express his concerns in a steering committee

12   meeting or to particular individuals in the steering committee?

13   A.  In the steering committee meeting and also in individual

14   interactions with Mr. Kitashima.

15   Q.  Did you express his concerns to anyone else in the steering

16   committee?

17   A.  Yes.  All the members that were present at the steering

18   committee meetings.

19   Q.  So that would include Mr. Lumsden?

20   A.  It would.

21   Q.  What about Ms. Mairone?

22   A.  It would.

23   Q.  You also mentioned Robert Price.  Again, what did Mr. Price

24   say to you?

25   A.  Robert also had received feedback from his team and shared

1    it with me.  He was concerned about being asked to run the

2    pilot in Richardson.  And what that meant to his career if the

3    loans weren't manufactured well.

4    Q.  Did he express a particular concern about his career if the

5    loans turned out to be of poor quality?

6            MR. HEFTER:  Objection.  Leading.

7            THE COURT:  Sustained.

8    Q.  What concern specifically did Mr. Price express about his

9    career?

10   A.  Mr. Price dealt more directly with the loan specialists

11   than I did.  His teams interacted on a daily basis in

12   underwriting and in funding with individual loan specialists

13   that worked for the production or sales side of the house.  And

14   he was concerned that they would not have the ability to

15   process loans and underwrite loans like an underwriter would.

16   Q.  What were the concerns he expressed about his career?

17   A.  Managers such as Robert were basically graded based on how

18   well the loans were audited that came out of their center.  And

19   negative performance in terms of high SUS rates could impact

20   whether or not they could stay with the company.

21   Q.  What did you say in response to Mr. Price?

22   A.  I told him that he should trust the process we always used.

23   We were going to try a new process.  There was a valid business

24   reason to do that.  We would use metrics and data to monitor

25   what happened to quality and turn time and other goals

1   associated with our move to a prime model.  And I was confident

2   that we would adjust if things were out of kilter.

3   Q.  Did anyone else express concerns to you about the Hustle

4   pilot?

5   A.  In my visits to the individual underwriting and funding

6   centers line staff, so underwriters, funders, and the team

7   managers echoed the same concerns that they had given already

8   to their bosses to me about quality and about the message that

9   they had received in the note.

10  Q.  I think you mentioned Mr. Thomas earlier.  What did

11  Mr. Thomas express to you about the Hustle pilot?

12          MR. HEFTER:  Objection, your Honor.  Limiting

13  instruction, please.

14          THE COURT:  This is received only as to the banks, not

15  as to Ms. Mairone.

16  A.  Mr. Thomas was concerned with the pace of the change that

17  we were trying to implement.  That this was a major model

18  shift, we were trying to do it very aggressively, very quickly,

19  and the changes were -- were really fluid.

20  Q.  How did Mr. Thomas communicate that to you?

21  A.  Michael did that both in e-mail and personally he officed

22  down the hall from me in Richardson and I met with him very

23  frequently.

24  Q.  I think you also mentioned Mr. White previously.

25  A.  Yes, Jim White who ran Chandler, Arizona.

D9R3BAN1                          O'DONNELL - DIRECT

1   Q.  What, if anything, did Mr. White say to you about the

2   Hustle pilot?

3   A.  Jim was very --

4           MR. HEFTER:  Same instruction, please.

5           THE COURT:  Yes.  Same instruction, ladies and

6   gentlemen.

7   A.  Jim was very vocal.  He had worked for me at a prior

8   company and we had a long-standing relationship.  He felt

9   comfortable raising concerns to me.  He told me directly that

10  he was very concerned about the message, the way it was

11  received by his staff, and he thought based on comments he had

12  heard, that people might start to believe there was a real

13  confidence about whether the company needed to fund loans

14  quickly to pay the bills.

15  Q.  Did you pass along Mr. White's concerns to anyone else?

16  A.  I did.

17  Q.  To whom?

18  A.  I passed them along in this e-mail, and also at the

19  steering committee, and in individual discussions with my boss.

20  Q.  Did you pass along Mr. Price's concerns to anyone else?

21  A.  I did.

22  Q.  To whom?

23  A.  They're part of this e-mail where I summarized the concerns

24  that I had received, and also to the steering committee, the

25  working group, and my boss.

D9R3BAN1                     O'DONNELL - DIRECT

1    Q.  Did you yourself have any concerns about the Hustle pilot?

2    A.  I did.

3    Q.  What were those?

4    A.  There were, there were three primary concerns that I had.

5    The people that were going to be involved, number one, I was

6    concerned that the loan specialists wouldn't be up to the task.

7         Secondly, the pace, we were trying to make a major

8    model shift from a subprime company to a prime processing model

9    in a very heated market where loan quality was at a premium.

10        And then the third really was which products were we

11   talking about, what type of loans would be allowed to go

12   through this process.  Would it really be only low risk loans

13   or would that subset be expanded to include a lot more.

14   Q.  You referenced a concern about loan specialists being up to

15   the task.  What did you mean by that?

16   A.  I think I talked earlier about the fact that in our model,

17   loan specialists were really clerks.  They did a good job of

18   gathering documents and talking to borrowers about basic

19   issues, but we had never asked them to make credit decisions or

20   act as an underwriter.  And now we were about to ask them to do

21   that.

22   Q.  Did you express your concern to anyone else?

23   A.  I did.

24   Q.  To whom?

25   A.  I expressed my concern in the steering committee meetings

1    and also to my boss Cliff Kitashima.

2    Q.  You also referenced a concern about products.  Can you

3    explain again what that was?

4    A.  So there are a number of products in the prime side of the

5    business.  That even though they're prime loans, they carry

6    various different levels of risk.  Some are truly very unrisky

7    loans, for lack of a better term.  The chance of a loan having

8    a problem is relatively low.  But there are different types of

9    prime loans, and some carry larger risks than others.

10   Q.  Did you pass along that concern to anyone else?

11   A.  I did.

12   Q.  Who did you pass along your concern to?

13   A.  I passed that concern along to the members of our working

14   group, where we had a lot of discussion about which loans

15   should be in or not in the pilot, to my boss and also to

16   members of the steering committee.

17   Q.  Did anyone respond to either of those concerns?

18   A.  There was general discussion that we needed to test the

19   pilot.  We needed to go forward with the pilot and allow the

20   process to be tested.  And then figure out what we needed to

21   adjust.

22   Q.  Did you ultimately approve moving forward with the pilot?

23   A.  I gave a conditional approval on the pilot, and the

24   condition was that we would look at the loans as they came

25   through the pilot, determine what happened with the two basic

D9R3BAN1                              O'DONNELL - DIRECT

1    goals.  Speed and quality.

2    Q.  What, if any, monitoring was done of Hustle loans during

3    the pilot?

4    A.  One of the groups that reported to me was the quality

5    assurance group.  That in conjunction with the pilot, they

6    looked at loans before and after they funded.

7    Q.  Apart from the quality assurance reports, was there any

8    other reporting on Hustle loans during the pilot?

9    A.  There was a standard kind of approach to reporting that we

10   used in Full Spectrum.  We looked at, along with the quality of

11   the loan, we looked at the turn time, so how long it took to go

12   from application to funding.  We looked at the individual

13   productivity of the employees, so how many loans did Johnny

14   fund, how many loans did Suzy have a part in funding.  We

15   looked at what types of loans were funding and the particular

16   characteristics to make sure that what was going through the

17   High-Speed Swim Lane was really the type of loan that was

18   supposed to go through.

19   Q.  What did the production reports show on the High-Speed Swim

20   Lane loans during the pilot?

21   A.  They showed that the pilot was successful in helping loans

22   to move more quickly through the process as compared to our

23   prior model.

24            (Continued on next page)

25

```
 1    BY MS. NAWADAY:
 2    Q.   And how quickly were they moving?
 3    A.   I don't remember the exact number of days but it was deemed
 4    a success based on the difference between our normal kind of
 5    processing time and what we were getting through the Hustle.
 6    Q.   What was the normal processing time before the Hustle?
 7    A.   In the mid to high 20 days, 20 to 30 days to process a
 8    prime to accept.
 9    Q.   What were the short-term goals for the Hustle?
10    A.   The overarching goal was 15 days or less.
11    Q.   Was that goal achieved?
12    A.   It was.
13    Q.   Turning now to the quality assurance reports, what
14    specifically were the quality assurance reports measuring?
15    A.   They were measuring whether or not the loan would be
16    investment quality and whether the loans had funded under the
17    terms of the pilot.
18    Q.   What do you mean whether they funded under the terms of the
19    pilot?
20    A.   So did the loan processor follow the right steps to get the
21    loan through a manufacturing process, did they follow all the
22    right steps to follow the loan has been properly underwritten
23    and the conditions were cleared appropriately.
24    Q.   Were quality assurance reports prepared at your direction?
25    A.   They were.
```

1   Q.  What did the quality assurance reports show on Hustle

2   loans?

3   A.  Unfortunately they showed that the process in terms of

4   managing the quality didn't work, that there was a very high

5   what we would call defect rate with the loans, which meant that

6   there was something materially wrong with the file.

7   Q.  And did you share the quality assurance reports with anyone

8   else?

9   A.  We did.

10  Q.  Who did you share them with?

11  A.  We shared those reports with the steering committee and the

12  working group, as well as the center managers and the team

13  managers and employees involved in the pilot.

14  Q.  Mr. O'Donnell, could you please turn to tab 56 of your

15  binder.  Do you recognize this document?

16  A.  I do.

17          MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

18  56 into evidence.

19          MS. MAINIGI:  No objection, your Honor.

20          MR. HEFTER:  No objection, your Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 56 received in evidence)

23  Q.  Mr. O'Donnell, can you explain to us what this document is?

24  A.  This is a document prepared by a group that reported to me,

25  the quality assurance group, and it's an overview of the

1    quality assurance results, the audit results from loans that

2    went through the Hustle process.

3    Q.  Do you know who prepared this document?

4    A.  This would have been prepared by Don Harris.

5    Q.  Do you see near the bottom of the page it says application

6    since August 13, 2007?

7    A.  Yes.

8    Q.  What, if any, significance is there that date?

9    A.  That's the date that the Hustle was introduced.

10   Q.  Can you explain to us what high risk means?

11   A.  High risk in the scope of the QA audit meant that there was

12   defects on the loan that if they were not corrected, the loan

13   would likely be rated as severely unsat, so something

14   materially wrong with the loan.

15   Q.  In the first sentence of the document there's a reference

16   to phase code three.  Can you explain what that means?

17   A.  Yes, we –– Full Spectrum, along with other divisions in

18   Countrywide, managed our pipeline by phases.  Phase code three

19   was the phase where the loan had been cleared to close, so

20   whoever the underwriter or processor, loan specialist in this

21   case, had made a determination that this loan was OK to go to

22   the table and sign.

23   Q.  So what, if any, steps in loan processing occur after phase

24   code three?

25   A.  After phase code three, after a loan is cleared to close,

1   the loan documents were drawn, the closing with the borrower

2   and the title company or their attorneys is scheduled, then

3   after -- we did a lot of refinance business, so it would be a

4   three-day waiting period, then the loan would fund.

5   Q.  So the initial audit reviewed 42 loans for the Hustle

6   pilot, is that correct?

7   A.  Yes.

8   Q.  And 41 percent of them were found to be high risk?

9   A.  Yes.

10  Q.  How did that finding compare to what you had seen

11  historically in quality assurance reports?

12  A.  It was significantly higher.  Quality assurance results in

13  our normal process would have been probably more the six to

14  eight percent range.

15  Q.  And what, if any, reaction did you have to this report?

16  A.  I was very concerned.

17  Q.  And did you share this report with anyone else?

18  A.  I did.  This report was shared with the steering committee,

19  the working group, the center managers Robert Price and Jim

20  White, who were involved in managing the pilot teams, and also

21  the individual team managers and employees that were involved.

22  Q.  When did you share this report with them?

23  A.  We did this type of reporting on a weekly basis.

24  Q.  You did the reporting -- you distributed the reports on a

25  weekly basis?

1    A.  We completed the reports on a weekly basis, and if we

2    completed a report today, being Friday, then we would share the

3    report the following week with the teams involved.

4    Q.  I'm trying to understand, how did you share the report, was

5    it by email or in the course of a meeting?

6    A.  We would generally share it by email and have a conference

7    call and go over the results.

8    Q.  Did you discuss this specific report on a conference call

9    with the steering committee?

10   A.  We did.

11   Q.  What, if any, reaction did the steering committee have with

12   the report?

13   A.  People were concerned, but they wanted to have more time to

14   let people settle into their new roles and asked us to continue

15   to audit the loans, provide feedback.  There was also a lot of

16   discussion about the process, so the QA process, and to some

17   extent a lot of criticism.

18   Q.  And who in particular expressed criticism?

19   A.  Members of the steering committee, Greg Lumsden, Rebecca

20   Mairone.

21   Q.  And do you remember specifically what Mr. Lumsden said?

22   A.  Mr. Lumsden was a difficult boss.  I like Greg, but he was

23   difficult.  And he always wanted us, he would say, to manage

24   the business an inch off the ground.  So he wanted to

25   understand exactly what we are doing in the QA process,

1   understand all the steps and what we were looking at, and how

2   that would equate to end quality.

3   Q.  And do you remember anything specifically said by

4   Ms. Mairone?

5   A.  Ms. Mairone was very focused on this, too.  This was an

6   issue she was in charge of, and she was concerned about the QA

7   process as well.  She voiced concern about sharing the results,

8   she voiced concern about how the auditors were looking at loans

9   and how we were determining which loans were high risk and

10  which were no risk or limited risk.

11  Q.  Did you recommend any changes to the Hustle pilot to the

12  steering committee based on this report?

13  A.  At this first stage, no, not at this first stage.

14  Q.  Were any changes made to the Hustle pilot around the time

15  this report was distributed?

16  A.  No, there were no changes.

17  Q.  Did there come a time when there was a change to the Hustle

18  pilot?

19  A.  After September when the pilot sort of concluded the

20  process, the Hustle process was rolled out across all of Full

21  Spectrum.

22  Q.  What do you mean it was rolled out across all of Full

23  Spectrum?

24  A.  It became the new model for processing loans.

25  Q.  Did you support that change?

1    A.  I did not.

2    Q.  Why not?

3    A.  I was concerned that we had learned in the pilot that

4    quality had been negatively impacted.  I wanted to continue the

5    pilot so that we could make adjustments to it before we made a

6    broader decision to roll it out everywhere.

7    Q.  Were any changed made to it before it was rolled out

8    everywhere?

9    A.  The only significant change is that more loans were allowed

10   into the process than had originally had been drawn up in the

11   pilot for test.

12   Q.  What do you mean more loans were added?

13   A.  Different types of loans, higher risk loans.

14   Q.  Any particular types of loans that you recall that were

15   added?

16   A.  Stated income type loans.  There was a program that Fannie

17   Mae offered at the time called expanded approval, which is

18   their version of subprime loans, so they had lower FICO scores

19   and higher loan to value ratios, and those loans were added in

20   as well.

21   Q.  Did you support adding the stated income loans into the

22   Hustle work flow?

23   A.  No.

24   Q.  Why not?

25   A.  I was concerned, after seeing the pilot results, that loan

1  specialists were not trained and prepared to make

2  determinations about what level of stated income was really

3  reasonable.

4  Q.  And did you express that concern in meetings with the

5  steering committee?

6  A.  I did.

7  Q.  Did you support including expanded approval loans into the

8  Hustle work flow?

9  A.  No, I did not.

10  Q.  Why not?

11  A.  For the same reason.  The Hustle was supposed to be for low

12  risk loans, and we were now talking about loans that carried

13  nearly the same level risk as the subprime business that we

14  were moving away from.

15  Q.  And why was it your view that expanded approval loans were

16  higher risk?

17  A.  At one time in Full Spectrum we treated EA loans, expanded

18  approval loans, as subprime, and I equated them with subprime;

19  borrowers who had lower FICO scores, who had a history of

20  having trouble making payments on their mortgage or other

21  bills.  They performed more like subprime loans than prime

22  loans.  And the high-speed process, the fast check-out lane in

23  the grocery store was supposed to be for low risk.

24  Q.  When the Hustle was rolled out across Full Spectrum, was

25  there a new role for underwriters in any way?

1    A.   The role for underwriters was diminished.  They were only

2    used as an escalation point when loans either became CLUES

3    refers and were not eligible, or the loan specialist needed to

4    escalate that file based on their own determination and review.

5    Q.   Can you remind us what a CLUES refer is?

6    A.   CLUES refer is the output that comes from CLUES, which is

7    the automated underwriter.  And it basically says that based on

8    the data that was put into the underwriting engine, it doesn't

9    look like the loan will fit the box or will be acceptable to an

10   investor as investment grade.

11   Q.   Did the role of loan specialist change in any way in the

12   Hustle pilot when it was rolled out across Full Spectrum?

13   A.   It did.  It changed significantly.  They were tasked with

14   underwriting, making credit decisions and engaging the entire

15   process.  So from application to cleared to close they were in

16   charge of determining whether that loan was going to be made by

17   Full Spectrum or not.

18   Q.   When the Hustle pilot was rolled out across Full Spectrum,

19   did it undergo any kind of a name change?

20   A.   I don't remember if the program itself underwent a name

21   change, but the organization -- there was an organizational

22   change.  The central services group that I had managed was

23   disbanded or changed dramatically, and a new organization was

24   set up to replace it called Central Fulfillment.

25   Q.   What, if any, involvement did you have in the management of

1  Central Fulfillment?

2  A.  I didn't have any involvement in the day-to-day managing of

3  Central Fulfillment.

4  Q.  Did you ever apply to have a managing position in Central

5  Fulfillment?

6  A.  I did.

7  Q.  Why did you apply for that position?

8  A.  I thought it was kind of the natural progression for my

9  career.  When I started at Full Spectrum I was hired as the

10  senior vice president of underwriting.  I was promoted and took

11  over the funding operation as well, so at that time I had the

12  fulfillment responsibilities for the company.  And now we were

13  changing the fulfillment model to add processing to that, and I

14  thought that my skills would be needed.  I had led changes in

15  our model and our process before, and I thought that I could

16  really help.  I knew this was a big shift for Full Spectrum and

17  I wanted to be part of it as a leader.

18  Q.  When did you apply for that position?

19  A.  It was in the summer, late summer of -- or September of

20  2007.

21  Q.  Were you selected?

22  A.  I was not.

23  Q.  Who was?

24  A.  Wade Comeaux.

25  Q.  And who is Mr. Comeaux?

1   A.   Wade was a peer of mine in Full Spectrum, and he ran the

2   sales organization for the central part of the United States.

3   So he ran branches and regions that were in charge of selling

4   or producing loans.

5   Q.   Did you have any role with respect to quality assurance in

6   the Central Fulfillment organization?

7   A.   I did.  My group was part of the risk management

8   organization, and we had responsibility for providing support

9   and oversight for the quality assurance measurement of Central

10  Fulfillment, along with the data and metrics and reporting

11  around the Central Fulfillment activities.

12  Q.   So did you monitor loans that went through the Central

13  Fulfillment model throughout the fall of 2007?

14  A.   We did.  My group monitored all loans for Full Spectrum

15  during that time frame, including the field branches, which

16  were separate from Central Fulfillment.

17  Q.   And what did you observe over the course of the fall of

18  2007 from the quality assurance reports?

19  A.   There was a rapid deterioration in the quality, so in terms

20  of the QA measurements or the loans that my team audited and

21  reviewed, we saw the defect findings rate for loans that were

22  not investment quality go up significantly.

23  Q.   Mr. O'Donnell, I will ask you to turn to tab 406 in your

24  binder.  Do you recognize this document?

25  A.   I do.

1              MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

2       406 into evidence.

3              MS. MAINIGI:  No objection, your Honor.

4              MR. HEFTER:  No objection.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 406 received in evidence)

7       Q.  If you go to page 2 of this document, Mr. O'Donnell, could

8       you tell us what this document is?

9       A.  This is one of the quality assurance reports that would

10      have been completed by a team that reported up to me.

11      Q.  And go to page -- the next page of the document.  Can you

12      tell us what was the time period of this the review for these

13      loans?

14      A.  The results of this review are for the period of October 19

15      to October 25th, 2007.

16      Q.  And what percentage of loans in that period were determined

17      to be high risk?

18      A.  According to the report, 92.3 percent of the loans were

19      labeled as high risk.

20      Q.  I would like you to turn next to tab 388 in your binder.

21      Do you recognize that document?

22      A.  I do.

23              MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

24      388 into evidence.

25              MS. MAINIGI:  No objection.

1          MR. HEFTER:  No objection, your Honor.

2          THE COURT:  Received.

3          (Plaintiff's Exhibit 388 received in evidence)

4  Q.  Go first to page 2 of the document -- sorry, page 3 of the

5  document where the presentation begins.  And one more page, I'm

6  sorry.

7          What's the time period for this review, Mr. O'Donnell?

8  A.  These are phase code four reviews from October 1st through

9  October 31st.

10 Q.  What is phase code four?

11 A.  In phase code four, loans would have already been funded.

12 Q.  And I see a reference to action required.  Can you explain

13 what action required is?

14 A.  Action required was the label that the quality assurance

15 team had put on a loan prefunding, so in phase code three.  And

16 that meant that they had identified that the loan had a defect

17 on it that needed to be corrected, or if it funded in its

18 current state it would likely be labeled a severely

19 unsatisfactory loan by corporate QC if audited.

20 Q.  What, if any, difference is there between a high risk

21 finding and an action required finding?

22 A.  They're synonymous.

23 Q.  What percentage of loans were deemed to have action

24 required?

25 A.  Sorry, can you blow it up a little bit more?

1           Looks like 79.6 percent of the loans reviewed were

2    deemed action required.

3    Q.  Can we go to the next page of the document.  Page 3 of the

4    presentation.  You see the reference to Richardson, Chandler

5    and Rosemead?

6    A.  Yes.

7    Q.  Were those centers -- we talked about Richardson and

8    Chandler before, can you explain why Rosemad is included in

9    this report?

10   A.  Rosemead was also participating in the now -- Rosemead was

11   also participating now as part of Central Fulfillment, so they

12   applied the Hustle process to their loan processing.

13   Q.  And which of these three centers was the largest?

14   A.  Chandler, Arizona produced the largest number of loans

15   and -- reviewed and funded the largest number of loans on a

16   monthly basis.

17   Q.  At this point were you still having regular conference

18   calls concerning quality assurance reports?

19   A.  We were.

20   Q.  We'll do one more.  Please turn to tab 408.  Do you

21   recognize that document?

22   A.  I do.

23           MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

24   408 into evidence.

25           MS. MAINIGI:  No objection, your Honor.

1          MR. HEFTER:  No objection, your Honor.

2          THE COURT:  Received.

3          (Plaintiff's Exhibit 408 received in evidence)

4     Q.  Could we go to page 2 of the presentation, please.  This

5     audit covers loans funded in what time period, Mr. O'Donnell?

6     A.  This is from November 2nd through November 8, 2007.

7     Q.  And what stage of the loan processing were these reviews

8     conducted?

9     A.  This review looked at loans in phase code three, so

10    prefunding.

11    Q.  And what percentage of loans were determined to be action

12    required?

13    A.  87.5 percent are labeled as action required.

14    Q.  We talked about phase code three reviews and phase code

15    four reviews.  Can you explain to us what's the purpose of

16    reviewing loans at those two different stages?

17    A.  Phase code three is to try to identify loans that are a

18    problem before they fund so that action can be taken to correct

19    it.  So if someone basically made a mistake or made a bad

20    decision, there is still time to fix it before the loan funds,

21    and make sure if it does fund, it funds as investment quality.

22          Phase code four is after the loan is already funded,

23    so the borrower is likely to receive their cash, and the loan

24    is set to be sold to an investor.

25    Q.  Can you turn next to tab 63 in your binder.  Do you

1   recognize this document?

2   A.  I do.

3           MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

4   63 into evidence.

5           MS. MAINIGI:  No objection, your Honor.

6           MR. HEFTER:  No objection, your Honor.

7           THE COURT:  Received.

8           (Plaintiff's Exhibit 63 received in evidence)

9           THE COURT:  Counsel, we're going to, at 11 o'clock,

10  give the jury their mid-morning break.  So keep that in mind.

11  Q.  Mr. O'Donnell, can you tell us what this, the email from

12  Mr. Brent, relates to?

13  A.  This is an email from Mr. Brent to Wade Comeaux who ran

14  Central Fulfillment, with a copy to myself and other

15  executives.  And it's highlighting the fact that corrections

16  are not being made to loans that have been identified as a

17  problem or action required prefunding in phase code three.

18  Q.  So is this an audit that was conducted at two different

19  stages on the same loans?

20  A.  That's true.

21  Q.  And what did the review conclude?

22  A.  That when we looked at -- we looked at a subset of loans in

23  phase code three, then looked at them again after they funded.

24  Those loans in phase code three had been identified as needing

25  action or action required, and when we did the comparison only

1   five percent of the time did the corrections actually get made.

2   Q.  If we could turn to page 2 of the document.  Blow up the

3   chart at the top.  Where do you see what you said reflected in

4   the chart?

5   A.  So in the fourth column down from the top, initial results

6   at phase code three, percent of loans with findings 85 percent,

7   and then the same column one over to the right, final results

8   at phase code four, percent of loans with finding 80 percent.

9   Q.  If we could go a little further down the page where it says

10  the data from our initial review, and then four points

11  underneath, can you blow that up, please.

12          Mr. O'Donnell can you read the top sentence and point

13  one for us.

14  A.  The data from our initial review of phase code four

15  performance is telling us that either, one, the QA emails are

16  not getting pushed down to the loan specialist/underwriters

17  within each Central Fulfillment team and/or.

18  Q.  Can you explain what that means?  There's a lot of

19  abbreviations there.

20          MR. HEFTER:  Objection, lack of foundation.

21          THE COURT:  Do you want to lay a foundation?

22  Q.  Mr. O'Donnell, were you copied on this email from Steve

23  Brent in the first page of the document?

24  A.  I was.

25  Q.  And did Steve Brent report to you?

1   A.  He did.

2   Q.  And did he prepare these reports at your direction?

3   A.  He and his team, yes.

4   Q.  And did he discuss the reports with you?

5   A.  He did.

6   Q.  Do you have an understanding of what Mr. Brent meant when

7   he said the QA emails are not getting pushed down to the loan

8   specialist/underwriters within each Central Fulfillment team?

9   A.  Yes.

10  Q.  Can you explain how you interpreted that?

11  A.  The lack of a higher percentage of loans being corrected --

12  with only five percent of the loans being corrected, he was

13  concerned that the work done by his team to identify and share

14  the specific problems on loans, that information was not being

15  shared, and it was resulting in loans not being corrected.

16  Q.  Who did you think the findings should be shared with

17  specifically?

18  A.  My prior practice was to share it with the people that made

19  the mistakes.  So in order for the loan specialist and/or

20  underwriter, whoever was reviewing the file, to learn they had

21  to be provided with the review of the loans and specifically

22  pointed to where they had made errors or mistakes.

23          MS. NAWADAY:  If we could blow up the sentences in

24  bold.

25          THE COURT:  Well, I'll tell you what, why don't we

1    take the break at this time.

2             So ladies and gentlemen, we'll take a 15-minute break

3    at this time.

4             (Jury not present)

5             THE COURT:  So as the jury was entering this morning,

6    my courtroom deputy received a note from juror number ten that

7    I have already read to counsel at side bar, but I will give

8    counsel copies of it right now and read it again.

9             MR. SULLIVAN:  Excuse me, your Honor, sorry to

10   interrupt, could we do this at side bar?

11            THE COURT:  No, absolutely not.

12            MR. SULLIVAN:  Very well.  I didn't want to embarrass

13   the juror.

14            THE COURT:  We're not going to embarrass the juror,

15   but we may have to embarrass counsel.

16            MR. SULLIVAN:  I doubt it, your Honor.

17            THE COURT:  Well, I'm glad to hear that.

18            So the jury note says:  Your Honor, there was a man in

19   the courtroom yesterday who I later saw at lunch break with a

20   professional large camera.  At the end of the day, he followed

21   juror number two and I as we left the building after giving us

22   a slight grin as we came through the door.  I turned to look at

23   him and stopped, then he stopped following us.

24            In addition, I saw that defense was checking on me on

25   social media.  I feel intimidated and don't feel I can be

1  objective.

2              Signed, juror number ten.

3              Now did anyone witness this person with the camera?

4              MR. SULLIVAN:  Not yesterday.  As I entered the

5  courtroom this morning, the court building this morning about

6  8 o'clock, at the entrance where the statue is I noticed one

7  photographer standing there all alone waiting for someone to

8  appear.

9              THE COURT:  This is -- we're bringing juror number ten

10 in in a minute, but it appears that this was someone who had a

11 professional large camera in the courtroom building?

12             MR. SULLIVAN:  No, sir, not that I know of.

13             Let me state one thing, the thing I'm most proud of in

14 40 years of my profession, I never talked to a reporter about a

15 case in court.  I'm the lone person left, I think, and I would

16 never talk to a reporter about a case in court ever, much less

17 a photographer.  I wanted to make that clear.

18             THE COURT:  You didn't need to say that, Mr. Sullivan,

19 because, as everyone knows, your reputation is impeccable and

20 it's always a privilege to have you in my courtroom.  But

21 that's not really the point, the question is -- the immediate

22 question is to identify who this person was.  If it was a

23 person who had a camera in the courthouse, does anyone in the

24 courtroom know -- does anyone seated in the audience know

25 anything about this?

 1          Yes

 2          MR. RAYMOND:  Your Honor, Nate Raymond with Reuters.

 3   We have a photographer, we use him for many cases to photograph

 4   witnesses and stuff.  My understanding is he hasn't brought a

 5   camera into the courtroom though.

 6          THE COURT:  Why don't you come on up so we can all

 7   hear you.

 8          MR. RAYMOND:  As typical practice with high profile

 9   cases, we have a photographer to take photographs of witnesses

10   that we're going to write about from time to time.  We do have

11   photographer.  He was here today.

12          THE COURT:  Did he have his camera in the court?

13          MR. RAYMOND:  I don't believe so.

14          MR. SULLIVAN:  He's right here apparently.

15          MR. RAYMOND:  I believe he had to check it at the

16   door.

17          THE COURT:  This is the photographer you're referring

18   to?

19          Do you want to come forward, sir,

20          Just identify yourself for the record.

21          MR. MILIC:  Zoran Milic, photographer with Reuters.

22          THE COURT:  Did you have a camera in the court?

23          MR. MILIC:  No, we have to check it at the door

24   downstairs.

25          THE COURT:  So did you, quote, follow jurors number

D9RTBAN2                         O'Donnell - direct

1   two and ten yesterday?

2           MR. MILIC:  Absolutely not, sir.

3           THE COURT:  All right.  Thank you very much.

4           DEPUTY CLERK:  Please spell your name for the record.

5           MR. MILIC:  Z-O-R-A-N  M-I-L-I-C.

6           THE COURT:  The usual spelling.

7           MR. RAYMOND:  N-A-T-H-A-N-I-E-L  R-A-Y-M-O-N-D.

8           THE COURT:  Any relation to Nate Raymond?

9           MR. RAYMOND:  I go by Nate also.

10          MS. MAINIGI:  Your Honor, the only thing I would add

11  is I saw that same photographer outside yesterday.

12          THE COURT:  So I mean one thing I'm beginning to be

13  concerned about is whether we have some misperceptions by juror

14  number ten.

15          MR. SULLIVAN:  Yes, your Honor.

16          THE COURT:  Now the next question I have is were

17  counsel who were checking, with the Court's permission, on

18  Google while the jury -- but the permission was to check while

19  the jury was being selected, was there any checking done

20  thereafter?

21          MR. SULLIVAN:  Your Honor, I'm the last person to know

22  anything about computers.

23          THE COURT:  I'm asking not just you, Mr. Sullivan, I'm

24  asking your colleagues who have already demonstrated

25  considerably greater technical skills.

1            MR. SULLIVAN:  If any of my colleagues can answer that

2       question, they certainly are able to do so.

3            THE COURT:  All right.

4            MR. HEFTER:  Your Honor, we can represent that we did

5       not do any online searching after the jury selection.

6            MS. MAINIGI:  I believe -- your Honor, I'm not aware

7       of exactly what it was, but I believe that there was some

8       online searching.  I don't know specifically.

9            THE COURT:  Who did that?

10           MS. MAINIGI:  I would have to get that information.

11           THE COURT:  Is it someone here in the courtroom?

12           MS. MAINIGI:  I'm not exactly sure.

13           MR. CADY:  Judge, I do know.  I think we may have done

14      additional online research later that day after the jury was

15      seated.  I don't know if we stopped right when it was seated.

16           THE COURT:  Did you do any yesterday?

17           MR. CADY:  I don't believe so.

18           THE COURT:  Where were you seated when you were doing

19      this?

20           MR. CADY:  I think -- it wasn't actually me, it was a

21      colleague of mine.

22           THE COURT:  Who was that?

23           MR. CADY:  I don't think he's here today.

24           THE COURT:  Who was that?

25           MR. CADY:  I'm not sure which of our colleagues.

 1              THE COURT:  Who are the possibilities?

 2              MR. CADY:  I think it could have been Stewart Ackerly

 3     or Matthew Monihan.

 4              THE COURT:  Where are they today?

 5              MR. CADY:  I believe they are in a hotel today.

 6              Sorry, Judge, Matthew is here.

 7              THE COURT:  Did you do any checking of jurors after

 8     the jury selection.

 9              MR. MONIHAN:  We had research compiled from

10     individuals at the firm.  I'm not sure when it was done.  I

11     reviewed it yesterday.

12              THE COURT:  Did you do any of that checking here in

13     court?

14              MR. MONIHAN:  No, sir.

15              THE COURT:  And how about the other gentleman?  He's

16     back at your hotel, you say?

17              MR. CADY:  I think that's right.

18              THE COURT:  So you'll get him here by lunch.

19              MS. MAINIGI:  Yes, your Honor.

20              MR. SULLIVAN:  And your Honor, I can represent to the

21     Court that at the end of the day I will make a full inquiry if

22     the Court needs to know the facts about when and what, if

23     anything, was done.  This is the first case I've heard of where

24     there actually was computer research done, and, as you know, we

25     asked permission to do it.  I had no sense whatsoever there was

D9RTBAN2                         O'Donnell - direct

1    a time limitation on that.  I assumed one could go on the

2    computer and find out about jurors like anybody.  We'll find

3    out for the Court.

4            THE COURT:  As you know, my prior policy and the

5    policy of many judges was not to allow that precisely because

6    of the fear that it would invade -- that it would intimidate

7    jurors, in the sense that it's hard enough for people to agree

8    to be jurors, which is a substantial inconvenience lasting over

9    many -- in this case, many weeks.  To feel that they're also

10   putting their own persons on the line, albeit with matters that

11   are in some sense public because they're on the social media,

12   is a further impediment to the jury system that one needs to be

13   mindful of.

14           But beginning in a previous trial, and now again in

15   this trial, I permitted, at request of defense counsel, Google

16   searches to be done during the jury selection process so that

17   if there was something that wasn't picked up by the Court's

18   questions but nevertheless might disqualify someone from being

19   a juror, we would find it out sooner rather than later.  And

20   the helpfulness of that was borne out in this very case,

21   because there was a prospective juror, not one who wound up on

22   the jury finally, but a prospective juror who, according to

23   what was on the Web, might have had a prior criminal problem.

24   And we were able, therefore, to put questions to the panel and

25   establish that that was not a problem and did not require his

1    removal from the panel.

2              But the balance is still a close one, and if I did not

3    make this clear -- and I frankly thought I had, but if I had

4    not made this clear, the only permission I was granting to

5    search into juror -- information about jurors relating to their

6    personalities, their social relations or whatever, matters

7    available on the Web, was for the limited purpose of making

8    sure that the jury selection process was advanced, not to allow

9    a more sweeping invasion of their -- it may not be technically

10   privacy, it's probably not technically privacy, but it's

11   certainly their personal space in some sense.  So any further

12   such research will stop forthwith.

13             But let's now bring in juror number ten.  This we will

14   do at the side bar.

15             MR. CORDARO:  Your Honor, may the government be heard

16   briefly on this note?  And it may color the Court's questions.

17             THE COURT:  Yes.

18             MR. CORDARO:  The juror makes a representation to

19   social media, and I may be a little bit behind on Googling and

20   Google's capabilities, but my understanding is if you Google

21   someone on the internet that person is not going to know that

22   you are looking for them.  I read social media as more

23   Facebook, Linked In, that sort of thing where --

24             THE COURT:  Good point.  So you're saying that

25   someone, you think, may have misused their access to obtain

1    information that would not be generally available?

2              MR. CORDARO:  It's possible, your Honor.  Again, I do

3    not profess to be an expert, but I do know if you're using

4    Linked In and you're a member and you access somebody's page --

5    I know when I do it I could be leaving a footprint on that page

6    for the person to see.  And I also know the recipient might

7    know I'm leaving a footprint and might know when I'm leaving

8    that footprint.

9              THE COURT:  Let me ask counsel, was anything like that

10   done?

11             MR. CADY:  Judge, this is something that we were aware

12   of, and when we were designing what type of internet search we

13   were going to do, our directive was make sure we don't leave

14   any footprints.  It's Google, maybe Linked In, but we would

15   have it switched off so it wouldn't leave footprints.  And

16   there's a way to do it.  I have my account switched off.

17             THE COURT:  I guess, if nothing else, you have all

18   successfully convinced me never to allow this again.

19             MR. HEFTER:  Your Honor, from our perspective, and to

20   follow up with what Mr. Sullivan said, I don't believe we did

21   that at all, but I will make a full inquiry of my firm.

22             MR. SULLIVAN:  You might be interested to know I'm not

23   on Facebook, so no one can leave footprints.

24             Your Honor, could I make a practical suggestion here?

25   No matter what the juror says, it would be helpful from our

D9RTBAN2                          O'Donnell – direct

1    perspective if you make it known during the colloquy the

2    permission was asked, the Court gave permission, and by the

3    way, whatever was found was obviously favorable at the time,

4    because we accepted the jurors.

5         THE COURT:  Well, we'll take the colloquy one step at

6    a time.  We'll see what comes up.  I think the colloquy will be

7    done on the record but in the robing room -- we'll decide

8    whether or not to seal it or not afterwards -- with one counsel

9    from each party.

10        MR. SULLIVAN:  Your Honor, would you ask him during

11   the colloquy whether he said anything to the other jurors about

12   this, too?

13        THE COURT:  Yes, of course.  That is part of my

14   concern.

15        MR. SULLIVAN:  Thank you.

16        THE COURT:  Let's bring in juror number ten.  And

17   counsel come with me in the robing room with the reporter.

18        (Continued on next page)

19

20

21

22

23

24

25

1          (In robing room with one counsel from each party and

2     juror present)

3          THE COURT:  Thank you for your note, actually.  So we

4     need to put this on the record, obviously.

5          JUROR:  Sure.

6          THE COURT:  But going to the first part of it --

7          JUROR:  I have something to add.  He was here today.

8     Now he's wearing a media badge and sat in the media section.

9     He wasn't wearing it yesterday.

10         THE COURT:  Did you see him with a camera in the

11    courthouse?

12         JUROR:  No, he was outside against the wall across the

13    street with a camera.  I initially assumed he was press, and

14    then he started following us.  And that disturbed me a lot,

15    obviously.  He didn't follow us far, but when I stopped and

16    turned, he kind of turned and stopped.

17         THE COURT:  So I mean I think we know who -- he's part

18    of the media, but they like to take pictures outside the

19    courthouse of the witnesses, not of the jurors.

20         JUROR:  I didn't see him taking a picture.

21         THE COURT:  Maybe he thought you were a witness and

22    then he realized he was wrong or something.  I don't know, we

23    can inquire of him, but I don't think he was trying to stalk

24    you is my point.  And in any event, he had nothing to do with

25    the parties, he's a media guy.

1          JUROR:  I didn't initially know that.  I saw him walk

2    in this morning again with a big media pass and he sat in the

3    media section.  Yesterday he wasn't in the media section.  He

4    looked kind of shifty to me, looked around at everybody like he

5    was memorizing faces.  That's why I noticed him initially.

6          THE COURT:  Well, I don't know about shifty, but I

7    think the job of most media people is to be inquisitive.

8          JUROR:  Sure.

9          THE COURT:  So now what was this about checking on the

10   social media?

11         JUROR:  I went on Linked In last night and saw some

12   attorneys had searched my name.  I eliminated my name.  I

13   removed my name from Linked In last night.

14         THE COURT:  Do you know which attorneys?

15         JUROR:  I think it was Giuliani & Bracwell, and it

16   looked to me -- I kind of was freaked out a little bit, so I

17   got my name off it.  Unfortunately, they have something new,

18   when you remove your name you can no longer trace who looked at

19   you.  When you make yourself anonymous, others become

20   anonymous, but I saw it briefly.

21         THE COURT:  During the voir dire -- that's the process

22   where the jurors are being selected -- the lawyers, with

23   permission of the Court, can go on social media, the general

24   Google to find out like if you have been convicted of a crime

25   or stuff like that, because that's often helpful.  No

1    permission was given to anyone to go after the --

2               JUROR:  I don't know when it was.  It doesn't really

3    say when it was.

4               THE COURT:  So you're saying it could have been from

5    that earlier period?

6               JUROR:  I didn't check it until last night.

7               THE COURT:  What makes you think, now that we have

8    sort of -- because I have noticed you've been an incredibly

9    attentive juror and we don't want to lose you, but you

10   indicated that you didn't feel you could be objective.

11              JUROR:  I just thought -- I have never been followed

12   before, and when I felt someone was following --

13              THE COURT:  That, of course, was not the parties.

14              JUROR:  The media.  I didn't know that at the time.

15   He had no media credit on.

16              THE COURT:  Now that you know, you're OK?

17              JUROR:  Yeah, a little safe.

18              THE COURT:  By the way, did you discuss this with your

19   fellow jurors?

20              JUROR:  No.

21              THE COURT:  So you shouldn't, because --

22              JUROR:  But other people mentioned they have been

23   tracked on Linked In, too, so it seems to be a concern.

24              THE COURT:  I will inquire much more into that.  But

25   anyway, thank you so much.

D9RTBAN2                        O'Donnell - direct

1          JUROR:  I didn't mention my note.

2          THE COURT:  You can go back, thank you so much.

3          (Juror not present)

4          MR. SULLIVAN:  Could I make a suggestion?

5          THE COURT:  No, I want to say something first and make

6     an inquiry.  First of all, I see no reason to excuse juror

7     number ten given what I just heard.

8          MR. MUKASEY:  I want to be heard on that.

9          THE COURT:  I want to be heard on what he just said,

10    which is flatly contrary to the representation your partner

11    made to me about two minutes ago.

12         MR. MUKASEY:  This is brand new to me.  I think he

13    made a quick inquiry of the people in the courtroom.  I

14    obviously have to go back and figure this out.  I think we were

15    acting within our understanding of the Court's --

16         THE COURT:  First of all, I went back and looked at

17    the request, which was not made by you at all, it was made by

18    Williams & Connolly, and it was limited -- I just checked it

19    out, it was limited to voir dire.  First sentence of the

20    request was limited to voir dire.  So let's be clear of that.

21    No permission was given to anything after voir dire.

22         Secondly, the use of Linked In is a far more intrusive

23    thing.

24         Thirdly, your partner just represented repeatedly that

25    whatever else might have been done, nothing like this was done

D9RTBAN2                          O'Donnell - direct

1    by your firm.  So I'm not much interested in your suggestion,

2    Mr. Mukasey, but go ahead and make it.

3             MR. MUKASEY:  I don't have a suggestion.  I will give

4    you my understanding, my very, very limited understanding.  I

5    am told by one of the younger and more facile-with-technology

6    associates that when you Google, you can Google somebody's name

7    and get access or get ability to their -- to see their Linked

8    In or their Facebook or something.  So I think there may have

9    been an understanding or misunderstanding that that fell within

10   the bounds of Googling.  I don't think anybody hacked into a

11   Linked In account.  I think that comes up when you Google Marc

12   Mukasey, if I had a Facebook page or a Linked In page or a

13   Twitter, that comes up as part of the Google.  So I don't think

14   anybody was trying to exceed the Court's --

15            THE COURT:  We'll see.

16            MR. MUKASEY:  I can't answer and can't speak

17   intelligently to this.

18            MR. SULLIVAN:  Your Honor, could I make a suggestion?

19            THE COURT:  Yes.

20            MR. MUKASEY:  Nor do I know when it was done.

21            MR. SULLIVAN:  First off, I can write an email and

22   type it up.  Is it possible this whole thing could be calmed by

23   the Court saying something to the effect that my jury process

24   is very efficient -- I have been in jury selections that take a

25   day or two, you do it very quickly, and I think it was good in

D9RTBAN2                          O'Donnell – direct

 1   that sense, although I agree with you I wouldn't do it in the

 2   future, to give people the opportunity to use the Web to find

 3   out.  If they think you gave permission and nothing further was

 4   done, my sense is that that will calm everybody.

 5          THE COURT:  Well, I need to find out more first what

 6   was done.  And I think what has to happen is that over the

 7   lunch break, if not sooner, folks from Bracewell & Giuliani

 8   need to make a much more thorough inquiry and report back

 9   before the end of the lunch break to the Court.  And then your

10   suggestion may well be a good one, but I don't want to follow

11   up on that suggestion now until I find out more about the

12   facts.

13          MR. SULLIVAN:  Because as it sits now, he says other

14   jurors have noticed it.  So if other jurors are concerned, we

15   could be in a real mess unless they're totally calmed down.

16          THE COURT:  But I don't want to calm them down if what

17   was done was not proper.  So let's find out what was done.

18          Let's go back.

19          (Continued on next page)

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  We had inquiry of juror number ten.  He

3   was not aware that the photographer, who is the gentleman who

4   introduced himself earlier, was a media person.  But the

5   incident where he thought he was being followed occurred

6   outside the courthouse.  So I was very glad to hear all of

7   that.  He did regard your photographer, who is a very large

8   fellow, as a bit intimidating, but I'm sure that perception was

9   no different from the way all of us feel about photographers

10  from the media.

11          With respect to the social media search, though, it

12  was a much more disturbing revelation.  He indicated that he

13  had received notification yesterday that he -- that Linked In

14  contact had been made with his information by lawyers from

15  Bracewell & Giuliani, contrary to the -- if he's accurate,

16  contrary to the representation that was made to this Court just

17  a few minutes ago.  And he indicated that while he had not

18  discussed any of this with his fellow jurors, that other jurors

19  had indicated that they had received similar notifications from

20  Linked In.  So we need to get to the bottom of this and find

21  out exactly what happened sooner rather than later.

22          All right.  Unless anyone needs a further break, we'll

23  bring the jury back in and bring the witness back in.

24          I will also state for the record, as I stated in the

25  robing room, that I went back and reviewed the letter from

1    Williams & Connolly asking permission to Google, and it was

2    limited to voir dire.  It's the very first sentence.  So any

3    Googling that went on after that is without permission of the

4    Court.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Jury present)

 2          THE COURT:  Ladies and gentlemen, some of you have

 3    heard the term legal fiction.  The definition of legal fiction

 4    is when the Court says you'll have a 15-minute break and he

 5    gives you a half hour.  Anyway, we're ready to continue.

 6    BY MS. NAWADAY:

 7    Q.  Ms. Michaud, can you blow up the paragraph in bold.

 8          Mr. O'Donnell, can you read that paragraph for us.

 9    A.  "What is your suggestion on getting better performance and

10    attention paid to the loan manufacturing quality within CF?  I

11    defer to you and your team to advise.  FYI, I have received

12    some feedback from your group that I feel that the QA e-mails

13    should be going to directly to the processing staff.

14    Q.  Did you have an understanding of what QA e-mails were?

15    A.  Those were individual e-mails that came out about a

16    particular loan.  So if we had a review of a loan file, an

17    e-mail would go out to share the information about whether that

18    loan was acceptably underwritten or not.

19    Q.  Who did the processing staff include?

20    A.  Those would be the loan specialists and their managers.

21    Q.  So QA e-mails went directly to the processing staff, is

22    that -- what would be the purpose of sending QA e-mails

23    directly to the processing staff?

24    A.  To provide them direct feedback on their performance.  How

25    well they had done on a particular loan file.

1   Q.  Would the QA e-mail provide the feedback on the specific

2   loan a processor was handling?

3   A.  It would.

4   Q.  And identify any mistakes that were made by the processor?

5   A.  It would.

6   Q.  Did you believe QA e-mails should be going directly to the

7   processing staff?

8   A.  I did.  That was a practice I used in my prior role with

9   underwriters, provided them direct feedback on their

10  performance.

11  Q.  Did you express that view to anyone?

12  A.  I did.

13  Q.  Who?

14  A.  I expressed it in the steering group -- excuse me.

15  Steering committee and working group formats as well as to my

16  boss.

17  Q.  Who in particular?

18  A.  Cliff Kitashima who was my boss, Greg Lumsden who was the

19  president of the division, and Rebecca Mairone who was in

20  charge of the organization.  Central Fulfillment.

21  Q.  I believe you said you were still having weekly meetings

22  surrounding the quality assurance reports at this time.

23  A.  We were.  We were having weekly meetings specifically about

24  quality assurance.  And other meetings relating to the work

25  flow and Central Fulfillment.

D9R3BAN3                          O'Donnell - direct

1   Q.  What kind of feedback, if any, were you getting from

2   members of the steering committee about the quality assurance

3   process in or around the time the date of this e-mail?

4   A.  There was a lot of noise.  There was a sort of a

5   kill-the-messenger mentality.  Rather than, as I had hoped,

6   that we would focus on the results of what my group was

7   finding.  Instead, the focus was turned on my group and we were

8   told that our audits were overreaching that the results weren't

9   valid, that we needed to go back and work on our own process,

10  that no changes were going to be made.

11  Q.  Who in particular said that?

12  A.  Rebecca Mairone and Greg Lumsden.

13  Q.  Did there come a time when the distribution of quality

14  assurance reports changed in some way?

15  A.  There did.

16  Q.  What was that change?

17  A.  The change was my group was asked to stop, told to stop

18  sending out the reports to everyone in Central Fulfillment.

19  They could no longer be -- the quality assurance reports, the

20  quality control reports, or any information relating to the way

21  loans were performing could not be shared.

22  Q.  Who made that decision?

23  A.  Rebecca Mairone.

24  Q.  How do you know that?

25  A.  I received an e-mail instructing us not to do that.

594

1    Q.  Did she give you any reason for the change in distribution

2    of the reports?

3    A.  Yes.

4    Q.  What reason did she give you?

5    A.  The view was that the reports were distracting the folks in

6    Central Fulfillment, the line employees and their managers from

7    adapting to the new loan processing model.  And slowing things

8    down.  We were scaring them.

9    Q.  You were scaring whom?

10   A.  We were scaring the members of Central Fulfillment with our

11   audits.

12   Q.  How so?

13   A.  Because of the high defect rate, the employees were scared

14   they might lose their jobs.

15   Q.  You mentioned that Ms. Mairone communicated a change in the

16   distribution concerning the reports in an e-mail.  Did you also

17   discuss the quality assurance reports with her around this

18   time?

19   A.  I did.

20   Q.  Did these discussions happen at the regular quality

21   assurance meetings that you referred to earlier?

22   A.  They did.  Generally we had those meetings in Pasadena in

23   the board room.

24   Q.  What did Ms. Mairone say during those meetings?

25   A.  She was frustrated with the audit process, disagreed with

1   the findings, thought our rates were too severe, and didn't

2   want them shared with the team anymore.  She wanted the reports

3   to go solely to her.

4   Q.  Did you say anything in response?

5   A.  I disagreed.  Tried to share the value that I had

6   experienced previously in my prior role with sharing

7   information, and I thought that cutting people off from

8   receiving this kind of specific information about their work

9   wasn't going to help them get any better.  And it wasn't going

10  to correct our quality problem.

11  Q.  Mr. O'Donnell, can you please turn to tab 68 in your

12  binder.  Do you recognize this document?

13  A.  I do.

14          MS. NAWADAY:  We offer Plaintiff's Exhibit 68 into

15  evidence.

16          MS. MAINIGI:  No objection, your Honor.

17          MR. HEFTER:  No objection, your Honor.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 68 received in evidence)

20  Q.  Mr. O'Donnell, can you tell us generally what this document

21  is to begin with.

22  A.  This is an e-mail from Wade Comeaux to Rebecca Mairone and

23  also tagged to an e-mail from Rebecca Mairone to Wade, the

24  leadership of Central Fulfillment, and other executives

25  including myself.

D9R3BAN3                          O'Donnell - direct

1    Q.  I'll focus your attention on the e-mail in which you're

2    copied which is the 11/29 e-mail from Ms. Mairone.  Can you

3    tell us what that concerns.

4    A.  This is the request that we no longer send and distribute

5    reports directly to the employees in Central Fulfillment.

6    Q.  Can you read for us the first paragraph in the blown up

7    portion of the document.

8    A.  "I have discussed with both Greg and Cliff the following

9    items and a change in process and direction.  The purpose of

10   these changes is to immediately increase the focus on funding

11   loans and working the pipeline, as well as streamlining the

12   processing requirements for prime loans."

13   Q.  Do you have an understanding of what Ms. Mairone meant by

14   saying "the purpose of these changes is to immediately increase

15   the focus on funding loans"?

16   A.  She was concerned with getting loans funded.

17   Q.  Did you have discussions with Ms. Mairone around

18   November 2007 concerning increasing the focus on production?

19   A.  I did.  I was concerned that by cutting off the

20   communication about loan quality, employees wouldn't know how

21   to gauge their performance, whether it was positive or

22   negative.  By saying we're solely going to focus on production,

23   and not giving them any information about quality, we're

24   sending a strong message that quality didn't matter.

25   Q.  Did anyone communicate to you there should be a increased

1  focus on production?

2  A.  I heard we need to meet our funding goals.  There were

3  bonus programs in place specifically tied to turn times and

4  funding volume.

5  Q.  Who in particular communicated that to you?

6  A.  Greg Lumsden, Rebecca Mairone, Cliff Kitashima.

7  Q.  Directing your attention to tab 65 in the binder.

8           MS. NAWADAY:  We offer Plaintiff's Exhibit 65 into

9  evidence.

10          MS. MAINIGI:  No objection, your Honor.

11          MR. HEFTER:  If I could just have one moment, your

12  Honor.

13          THE COURT:  Yes.

14          MR. HEFTER:  No objection, your Honor.

15          THE COURT:  Received.

16          (Plaintiff's Exhibit 65 received in evidence)

17  Q.  Can we blow up the first two paragraphs in the top e-mail.

18  Mr. O'Donnell, can you read the blown up portion of the

19  document for us.

20  A.  "See below.  We have to pick up productivity in all areas.

21  We have to improve quantity and have reasonable prime quality.

22  But at the moment we have to increase velocity fundings with

23  velocity.  No rationalizations.  We own it.  While showing

24  respect to other departments, we have to take ownership of

25  funding a hell of a lot more loans in December.  This week, I'm

1  going to be digging into the pipelines and bringing light to

2  areas where we may be missing the boat.  Hopefully we will

3  catch people doing it right but we will be candid either way."

4  Q.  Thank you.  Can you turn next to tab 67 in your binder.

5          MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

6  67 into evidence.

7          MS. MAINIGI:  No objection, your Honor.

8          MR. HEFTER:  Your Honor, we'll raise a hearsay

9  objection to this document.

10          THE COURT:  This is 67?

11          MS. NAWADAY:  Yes, 67, your Honor.

12          THE COURT:  For some reason my binder does not have --

13          MR. HEFTER:  I'm going to withdraw the objection.  I

14  apologize.  No objection.

15          THE COURT:  67 is received.

16          (Plaintiff's Exhibit 67 received in evidence)

17  Q.  Directing your attention down the lower part of the

18  document, there is an e-mail from Greg Lumsden to Cliff

19  Kitashima dated 11/29/2007.  Do you see that, Mr. O'Donnell?

20  A.  I do.

21  Q.  Can you go to page two of the document.  And can you blow

22  up the first two sentences in the first paragraph.

23          Mr. O'Donnell, can you read the first two sentences in

24  the blown up portion of the document.

25          MS. MAINIGI:  Objection, your Honor.  May I approach?

599

D9R3BAN3                        O'Donnell – direct

1              THE COURT:  Okay.

2              (Continued on next page)

1          (At the side bar)

2          MS. MAINIGI:  Your Honor, I object.  Mr. O'Donnell is

3     not on that particular portion of the e-mail.  We have no

4     objection to the document, but to have him basically read out

5     loud a passage from an e-mail that he never received.

6          THE COURT:  I assume that's foundational to a question

7     you are going to ask him about that.

8          MS. NAWADAY:  Also, your Honor when we discussed

9     previously about admitting documents into evidence if they're

10    not objected to but we don't have a live witness who is copied

11    on the document, your Honor suggested we introduce it at a

12    point during a live witness in the testimony where it would

13    make more sense to the jury.

14         MS. MAINIGI:  I didn't object to the last document

15    because counsel did the same thing on the last document.  It

16    was an e-mail.  We have no problem bringing it in as a business

17    record.  But the passage that's being read, he had no

18    involvement in.

19         THE COURT:  It's in evidence, it is in front of the

20    jury.  I think if he's being asked to just read a sentence or

21    two, I think it can facilitate the natural flow into whatever

22    the next question put to him is.

23         I agree with defense counsel, if this were to become a

24    more elaborate process that simply had the effect of

25    emphasizing some fact about which the witness knows nothing, it

D9R3BAN3                          O'Donnell – direct

1    could become a problem.  But I don't see it being a problem for

2    this limited purpose so I will allow it.

3               But I think if the document is in front of the jury,

4    you can just ask the jury to read the given paragraph, rather

5    than asking the witness to read it.  But it is in evidence.

6               MS. NAWADAY:  I plan to move on after asking him to

7    read these two sentences.  I'll move on, your Honor.

8               THE COURT:  Okay.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9R3BAN3                          O'Donnell - direct

1           (In open court)

2    BY MS. NAWADAY:

3    Q.  Mr. O'Donnell, turning back to the e-mail from Mr. Lumsden

4    to Mr. Kitashima, can you read just the first two sentences of

5    that blown up portion of the e-mail.

6    A.  "We have more than one problem here.  If we do not fund the

7    volumes per our budget, we will not to worry about QC and QA

8    for FSL."

9    Q.  Thank you.  We can now turn back, if we can pull up

10   Plaintiff's Exhibit 68.  If we can blow up point one of

11   Ms. Mairone's e-mail.

12          Mr. O'Donnell, can you read the first three sentences

13   of point one.

14   A.  "The QA communication to Central Fulfillment will stop

15   immediately 11/29/07.  The communication will be directed to

16   only Rebecca Mairone for the next 30 days.  I will meet with

17   the compliance and quality groups solely, as we work through

18   the process, reporting and communication plan for the Central

19   Fulfillment group."

20   Q.  Actually if you can proceed to read the rest of the

21   paragraph and then I'll ask you about it.

22   A.  "I will determine based on my meetings with compliance and

23   QA group, how and when we will update the CF management team,

24   and any other CF employees as necessary.  In other words, Wade,

25   Robert, Jim and Armand will not be required to attend any

1   conference calls with quality/risk for the next 30 days to

2   completely empower them to focus on production."

3   Q.  Now if we can just go back, I'll ask you about some of the

4   names in that paragraph.  Is the Wade referred to there Wade

5   Comeaux?

6   A.  Yes.

7   Q.  Again what was his role at this time?

8   A.  He was the leader of the Central Fulfillment organization.

9   Q.  Is the Robert Robert Price that you referenced earlier?

10  A.  It is.

11  Q.  He's one of your direct reports?

12  A.  At this time no, he reported directly to Wade.

13  Q.  Is Jim Jim White?

14  A.  Yes.

15  Q.  Who did Jim White report to at that time?

16  A.  He reported to Wade Comeaux.

17  Q.  Who did Mr. Comeaux report to?

18  A.  Wade reported to Rebecca Mairone.

19  Q.  Who is the Armand referred to?

20  A.  That's Armand Massie.  He reported to Wade Comeaux.

21  Q.  What was his role?

22  A.  He was a senior vice president of Central Fulfillment

23  operations, so he helped manage the overall process, but he

24  didn't have a specific center that he led.

25  Q.  Did you express disagreement with this change?

1   A.  I did.

2   Q.  You expressed that disagreement to whom?

3   A.  To my boss, Cliff Kitashima, to the steering committee,

4   Rebecca Mairone, Greg Lumsden, Loren Rodriguez.

5   Q.  Did anyone express disagreement to you about this change?

6   A.  Yes.  My former direct reports, Jim White, Robert Price.

7   Q.  What did Mr. Price say to you?

8   A.  He asked that I continue to provide him with the quality

9   assurance reporting.

10  Q.  Did he give a reason for asking that the quality reports

11  continue to be distributed to him?

12  A.  He wanted to continue to be aware of how his teams were

13  doing and where, if there were problems, where they were so he

14  could address them.

15  Q.  What did Mr. White say to you?

16  A.  He wanted the reports.  He wanted to be able to receive

17  them, even though it was being mandated that I not share them.

18  Q.  Did he give you a reason for wanting the reports?

19  A.  So that he could address any problems with the teams that

20  worked -- reported to him.  Worked in his center.

21  Q.  Do you know whether it was part of Mr. Price's or

22  Mr. White's typical responsibilities to attend conference calls

23  with quality/risk as it was referred to here?

24  A.  It was.

25  Q.  Do you have an understanding of what took place on those

1    conference calls?

2    A.  I did.  My teams conducted those conference calls.

3    Q.  What did you discuss on those conference calls?

4    A.  We would look at the overall results from the audits my

5    teams completed on both funded and loans that were prefunded.

6    We would describe and give examples of the problems and defects

7    we were finding.  And we would ask questions about what could

8    be done to improve the loan quality.

9    Q.  So if Wade, Robert, Jim, and Armand were not attending

10   those conference calls, who was attending those conference

11   calls?

12   A.  The conference calls didn't continue.

13   Q.  Can we blow up point two in the document on page two.

14   Mr. O'Donnell, can you read that paragraph for us.

15   A.  "The QC communication to Central Fulfillment will also be

16   directed to myself on behalf of the CF management team for the

17   next 30 days.  We will revise the QA process to focus solely on

18   SUS items, not process or SOPs.  We will not conduct any

19   on-site reviews until further notice.  Therefore, the 12/1

20   start date will be delayed.  We are evaluating that process

21   until further notice.  The feedback from QA will be biweekly,

22   high level data with loan level to back it up."

23   Q.  The sentence that says "we will not conduct any on-site

24   reviews until further notice."  Do you have an understanding of

25   what on-site reviews were?

1   A.  On-site reviews were conducted by management, actually

2   visiting the center, and discussing -- meeting with employees,

3   looking at the work flow, reviewing results, basically to go

4   and see what was happening, what was working, what was not

5   working.

6   Q.  You said they were conducted by management.  Who would

7   participate in on-site reviews?

8   A.  I participated, my boss Cliff Kitashima participated, it

9   was a regular occurrence.  Even Greg Lumsden would go to the

10  field and go to centers, sit down next to underwriters or loan

11  specialists and watch them process files.

12  Q.  What, if anything, did you learn in the course of these

13  on-site reviews typically?

14  A.  We learned a lot.  We learned where the process might be

15  broken, we learned where we were asking people to do things

16  that might have been in conflict with the way the work flow

17  should operate.  We learned where there are training

18  opportunities or where changes that had been communicated

19  hadn't been understood by the line staff or where they had made

20  up their own process to account for things we hadn't thought

21  of.

22  Q.  Did the on-site reviews continue after the date of this

23  e-mail?

24  A.  I did -- I did continue to conduct on-site reviews when I

25  traveled to Chandler because I had a team there.  But, I don't

D9R3BAN3                        O'Donnell - direct

1   believe anyone else conducted on-site reviews.

2   Q.   Why did you continue to conduct on-site reviews?

3   A.   I wanted to continue to know what was happening with the

4   process, and I saw high value in that kind of interaction with

5   line level employees who could tell me the way it was.

6   Q.   If we can blow up the third paragraph.  I won't ask you to

7   read the paragraph in its entirety.  I'll direct your

8   attention, actually can you read the first two sentences of

9   that paragraph.

10  A.   "Effective 12/15/07 may review to implement sooner the

11  income calculator will be the only worksheet separate from Edge

12  inputs that will be required on all prime and EA loans.  The

13  other types of income worksheets and any checklists for income

14  will be eliminated."

15  Q.   That's a fairly technical first two sentences.  Can you

16  explain what that means?

17          MR. HEFTER:  For the sake of completeness, can he read

18  the rest of the paragraph.

19          THE COURT:  Yes, please read the rest.

20  A.   "The LSs will need to use the new stated income

21  reasonability worksheet as a job aid for all stated loans.

22  This document will not be required to be signed or input into

23  the VLF file.  There will be enhancements to the income

24  calculator to incorporate the stated income reasonability items

25  on to a single form.  Both NSC and field operations."

1   Q.  Mr. O'Donnell, I am going to need some help interpreting

2   some of this.  Can you explain what is the worksheet that's

3   being referred to in the first sentence of the paragraph?

4   A.  The income calculator was simply a database, an Excel

5   spreadsheet-like document where an underwriter or processor

6   could make inputs to help them calculate the income correctly.

7   Q.  Was the worksheet a requirement?

8   A.  It was a requirement.

9   Q.  Do you have an understanding of why it was a requirement?

10  A.  Historically our highest level of SUS findings had come

11  from the area of income calculation.

12  Q.  So, how if at all did having a worksheet on income

13  calculation address that?

14  A.  It helped to standardize the approach.  So it was, you

15  know, filling out sequential boxes with information, so we knew

16  that it was instructing the underwriter or loan specialist that

17  might be using it how to correctly calculate income.  So we

18  could reduce errors and get better consistency.

19  Q.  A few sentences into that where it says "the new stated

20  income reasonability worksheet as a job aid for all stated

21  loans."

22          Is there any difference between a job aid and a

23  worksheet that you just described?

24  A.  The job aid would serve as a reference tool.  So it was not

25  something that was mandatory.  It was something that if a loan

1    specialist or underwriter chose to use it as a tool to help

2    guide them, they could.

3    Q.  The next sentence reads "this document will not be required

4    to be signed or be inputted into the VLF file."  What is the

5    VLF file?

6    A.  Full Spectrum had nearly a completely paperless process.

7    And that stands for virtual loan file.  It is the electronic

8    file that would replace a paper file that traditionally is used

9    in mortgage lending.

10   Q.  Was a worksheet in the virtual loan file something that

11   someone reviewing the loan file at a later time might consider?

12   A.  Only if the worksheet or document had been uploaded into

13   the electronic file.  Otherwise it wouldn't be available for

14   anybody to see.

15   Q.  So how, if at all, could an auditor sort of, for lack of a

16   better phrase, check the work of a loan specialist without

17   uploading a worksheet into the virtual loan file?

18   A.  If the loan specialist had not completed and uploaded the

19   worksheet, it would not be available for anybody to review to

20   see if they had done it or not.

21   Q.  Can we now blow up point four of the document.  Can you

22   read that for us, Mr. O'Donnell.

23   A.  The whole thing?

24   Q.  Yes.  Please.

25   A.  "Effective immediately, 11/29/07, the prime property

1    assessment review and certified value property assessment

2    review checklists will become job aids for all loans.  These

3    worksheets will no longer be required to be signed or input

4    into VLF, but will need to be followed as a job aid.  They will

5    include all prime and agency loan appraisals, including the new

6    certified appraisals from Landsafe.  Both NSC and field

7    operations."

8    Q.  Is this paragraph addressing worksheets as well?

9    A.  It is.  Worksheets relating to the review of property

10   appraisals.

11   Q.  Did you have discussions around November of 2007 with the

12   steering committee concerning either the income or appraisal

13   worksheets?

14   A.  I did.

15   Q.  Did you agree with eliminating either the income or the

16   appraisal worksheet as checklists?

17   A.  I did not.

18   Q.  Why not?

19   A.  We had put these worksheets and checklists in place for

20   underwriters, people with a lot more experience than loan

21   specialists.  When we did it because underwriters made

22   mistakes, and we knew that from loans that had been previously

23   reviewed as part of our QC process and QA process.  So we

24   developed these specifically to address where underwriters had

25   learning gaps, or having problems in making mistakes.

D9R3BAN3                         O'Donnell - direct

1              So to remove these type of checklists for a loan

2     specialist who didn't have anywhere near the technical

3     expertise of an underwriter, was asking for trouble in my view.

4     Q.  Did you express that view to anyone?

5     A.  I did.

6     Q.  Who did you express your view to?

7     A.  I expressed it to the members of the leadership of Central

8     Fulfillment, the site manager, Jim, Robert, David Sallis, to

9     Wade Comeaux, to Loren Rodriguez, to my boss Cliff Kitashima,

10    and to Rebecca and Greg.

11    Q.  Finally can we blow up point five in the document.  Can you

12    read that for us, Mr. O'Donnell.

13    A.  "We will prepare a note to all CF employees to help them

14    understand they should feel confident in using their authority

15    and that we will have a QoG comp hit reprieve through the end

16    of January, and they will no longer receive direct QA feedback

17    until further notice.  The feedback they will receive will come

18    from their supervisors only."

19    Q.  Can you explain generally how you interpret this paragraph,

20    Mr. O'Donnell.

21    A.  It's stating there is going to be a note prepared to go out

22    to the employees of Central Fulfillment, encouraging them to

23    confidently use their authority.  And also that the suspension

24    of any impact negative impact to their bonus based on quality

25    would extend through the end of January.  They would not get

D9R3BAN3                          O'Donnell - direct

1    any further feedback directly from my area, the risk management

2    area, in quality assurance.

3    Q.  Did you agree with that change?

4    A.  No, I did not.

5    Q.  Why not?

6    A.  At this point we were seeing rapid deterioration in our QC

7    and QA scores.  We were seeing mistakes being made on a very

8    high number of loans.  And to extend the reprieve from any kind

9    of compensation hit in conjunction with taking away any

10   information that would help people get better at their job, I

11   thought was irresponsible.

12   Q.  Did you communicate that to anyone?

13   A.  I did.

14   Q.  Who did you communicate that to?

15   A.  To my boss directly, Cliff Kitashima, to members of the

16   steering committee, including Greg and Rebecca, to members of

17   the working group that was still working on implementing the

18   Hustle process in Central Fulfillment, and to the leaders of

19   Central Fulfillment, some of whom were my former direct

20   reports.

21   Q.  Did any of those individuals respond to your concern in any

22   way?

23   A.  It was kind of more of the same.  I was, you know, being

24   seen as someone who was making a lot of noise about the

25   quality, and it was shoot-the-messenger type of response.

1    Q.  In the first sentence of paragraph five it refers to the

2    change applying to Central Fulfillment employees.  Were there

3    any further changes to the QoG comp hit reprieve around this

4    time?

5    A.  Just that it was extended to all employees, not just

6    Central Fulfillment.  There was no QoG hit for any employees in

7    Full Spectrum, including the sales and production people.

8    Q.  Did you have any understanding of who made the decision to

9    extend the quality of grade comp hit reprieve throughout Full

10   Spectrum Lending?

11   A.  Based on this note, it is a directive from Rebecca Mairone.

12   Q.  Mr. O'Donnell, can you please turn to tab 20 of your

13   binder.  Do you recognize this?

14   A.  I do.  It is an e-mail that I wrote.

15           MS. NAWADAY:  We offer Plaintiff's Exhibit 20 into

16   evidence.

17           MS. MAINIGI:  No objection, your Honor.

18           MR. HEFTER:  No objection, your Honor.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 20 received in evidence)

21   Q.  Mr. O'Donnell, I will direct your attention first to the

22   e-mail dated December 12, 2007 from Ms. Mairone.  Do you see

23   yourself as one of the recipients of this e-mail?

24   A.  The e-mail from Ms. Mairone?

25   Q.  Yes.

 1    A.  I would have received this e-mail as I was one of the

 2    employees under FSL Underwriting Richardson.  That's where my

 3    office was located.

 4    Q.  Can we go to the second page of the document, please.  Blow

 5    up the top paragraph on the second page.

 6           Can you read that for us, Mr. O'Donnell.

 7    A.  "We understand many of our employees are in new roles, have

 8    new responsibilities and are learning new skills.  We want you

 9    to feel confident and excited about these new opportunities.

10    If you have recently earned a new level of lending authority,

11    you recently began completing compliance reviews, or you are

12    now signing off on conditions, we want you to know that each

13    FSL employee will have a QoG reprieve on all funded units

14    completed through 12/31/07.  This will be in effect for

15    funders, underwriters, validators, and loan specialists, and

16    any other FSL employee who is monitored and scored by QoG.  In

17    other words, your compensation will not be adversely affected

18    on any loans funded on or by the last day of 12/31/07."

19    Q.  Do you have an understanding of why this decision was made,

20    Mr. O'Donnell?

21    A.  It was an effort to increase production before the year

22    end.

23    Q.  How do you know that?

24    A.  Well, the decision earlier was to extend it through

25    January, and this message is saying the reprieve would go

1    through 12/31/07, year end.  The message is if you fund loans

2    throughout the end of the year, you won't have any negative

3    impact if there is a problem.  But conversely, if you fund it

4    after, it is unclear about whether you would or not.

5    Q.  Can you blow up the next sentence, the first sentence of

6    the next paragraph.  Can you read the first sentence for us,

7    Mr. O'Donnell.

8    A.  "CLUES is the underwriter.  We should trust it and validate

9    the conditions requested."

10   Q.  How, if at all, is validating conditions different from

11   clearing conditions?

12   A.  There are different types of conditions.  Some require

13   simple validation, there is not much interpretation or study to

14   be done.  Others require a lot more intensive scrutiny like the

15   appraisal work or calculating income.

16   Q.  If I could direct your attention now to the top e-mail, the

17   one from you.  You sent the note to Steve Brent, Javier Jaraba,

18   Michael Thomas and Vincenzo Santucci.  Do you see that?

19   A.  Yes.

20   Q.  Who is Javier Jaraba?

21   A.  He was in the risk management organization.  He also

22   reported to Cliff.  He had previously run the QC and QA process

23   for Full Spectrum.

24   Q.  Who is Mr. Santucci?

25   A.  Vince Santucci reported directly to me.  He ran Full

1    Spectrum's structured loan desk, which was an underwriting

2    group that reviewed loans that had significant exceptions.  So

3    CLUES refers that a normal underwriter in the center could not

4    approve.

5    Q.  Why did you forward the e-mail to those four recipients?

6    A.  I wanted to make sure they were aware of the QoG reprieve.

7    Q.  Why did you want to make them aware of the QoG reprieve?

8    A.  It was important for them to know.  Steve currently managed

9    the quality process, Javier ran the fraud control unit and had

10   a lot of interaction with the fraud group, fraud control group

11   at corporate.  Michael did all the reporting for both Central

12   Fulfillment and for my group.  And Vince looked at very

13   difficult loans.  I wanted him to be aware of it as well.

14   Q.  If we can move forward to early 2008.  Did you have an

15   understanding of how the quality control review process

16   operated in the, say the first quarter of 2008?

17   A.  Quality control, the corporate quality control?

18   Q.  Yes.

19   A.  Yes, I did.

20   Q.  Can you explain how that worked?

21   A.  Corporate would select randomly and in some cases a

22   targeted fashion a percentage of the loans funded from a prior

23   month.  They would review those loans and underwrite them just

24   as the underwriter should have, and determine whether or not

25   those loans were of investment grade.  Then they would provide

1    feedback to each division, including Full Spectrum, about the

2    results.

3    Q.  How did they provide feedback about the results?

4    A.  They sent us weekly reports of loans that they had

5    completed preliminary audits on, and they would ask us for

6    feedback.  If they had any questions or had spotted issues on

7    the loans.

8    Q.  What type of feedback did they ask for?

9    A.  Sometimes it was as simple as asking for a missing document

10   that they couldn't find in the loan file.  Other times it would

11   be asking for information from the underwriter or processor

12   about what he or she was thinking when they made the decision

13   about calculating income or accepting an explanation of credit

14   or making an exception on the loan.

15   Q.  Did there come a time in around the first quarter of 2008

16   when you noticed some kind of a change in the feedback that you

17   were receiving from corporate quality control?

18   A.  The level of feedback went up significantly.  The volume of

19   loans that was coming back from corporate QC was much higher

20   than we were used to.

21   Q.  How did you in particular become aware of that?

22   A.  The group that interacted on a regular basis with corporate

23   QC reported to me.  It was led by Steve Brent.

24   Q.  The initial feedback that you received from the corporate

25   quality control, did those contain initial findings on loans?

D9R3BAN3                          O'Donnell - direct

1    A.  They did.  They contained both initial findings and loans

2    that had been finalized with a particular rating.

3    Q.  Is there a term for the initial finding that you received?

4    A.  No.  We would see the loan -- the audit had been completed

5    and a response was requested from corporate QC.  So they would

6    tell us that preliminarily it might be graded as an SUS, but

7    that rating or any other rating applied wouldn't be finalized

8    until they had kind of closed the case.

9    Q.  The initial feedback that you received, is that what's

10   called a potential SUS or an initial SUS?

11   A.  Initial SUS, yes.

12   Q.  Is what you observed an increase in a number of initial SUS

13   findings?

14   A.  Yes.

15           MS. MAINIGI:  Objection.

16           THE COURT:  Overruled.

17   A.  Yes.  To the point that we had to move additional staff

18   into our Full Spectrum's corporate QC group.

19   Q.  Why did you have to move additional staff?

20   A.  We didn't have the capacity to handle the volume of loans

21   that were being sent to us to coordinate responses and get back

22   to corporate QC on.

23   Q.  At that point did you make any recommendations to anyone to

24   address the increase in initial SUS findings?

25   A.  In the first quarter?

1   Q.  Yes.

2   A.  I continued to make the same recommendations.  I wanted to

3   change the process in Central Fulfillment to reintroduce

4   underwriters and improve the loan quality.

5   Q.  Were underwriters brought back into the process at that

6   time?

7   A.  They were not.  Unfortunately, we had laid off a high

8   number of underwriters, and the decision was made to maintain

9   the current Central Fulfillment model.

10  Q.  Did you have any regular meetings about quality issues with

11  any Full Spectrum executives around the first quarter of 2008?

12  A.  We had regular monthly meetings on loan quality.  Whenever

13  we had corporate QC results get finalized for a particular

14  month, we would share those results inside the management team

15  at Full Spectrum.

16  Q.  Which executives attended those regular meetings?

17  A.  The managing directors of Greg Lumsden, Rebecca Mairone,

18  Cliff Kitashima, Lloyd Sergeant, Scott Bridges, myself, Loren

19  Rodriguez, Ron Staake, who is our CFO, top members of my team

20  like Steve Brent or Michael Burns, who would actually be

21  presenting the data, and some members from -- Wade Comeaux and

22  some members, not every time, but often from his team as well.

23  Q.  Is Ms. Mairone attend any of those meetings?

24  A.  She did.

25  Q.  Did she attend those meetings regularly?

D9R3BAN3                          O'Donnell - direct

1    A.  She did.

2    Q.  Did there come a time when Greg Lumsden, Mr. Lumsden

3    expressed a reaction to you about the initial SUS findings in

4    the first quarter of 2008?

5    A.  Yes.

6    Q.  What did he say to you?

7              MR. HEFTER:  Objection, your Honor, as to Ms. Mairone.

8              THE COURT:  This will be received as to the banks but

9    not Ms. Mairone.

10   A.  Mr. Lumsden wrote an e-mail to me and others stating that

11   Full Spectrum had a reputation for no longer fighting very hard

12   on corporate QC audits, and that we needed to do a lot of work

13   to get our corporate QC rating back in line.  And that he

14   wanted me to take a look at my resources, put more people into

15   the review process, and fix the problem with our QC ratings.

16   Q.  Mr. O'Donnell, ask you to turn to tab 264 in your binder.

17   Do you recognize that document?

18   A.  I do.

19             MS. NAWADAY:  We offer Plaintiff's Exhibit 264 into

20   evidence.

21             MS. MAINIGI:  No objection, your Honor.

22             MR. HEFTER:  No objection, your Honor.

23             THE COURT:  Received.

24             (Plaintiff's Exhibit 264 received in evidence)

25   Q.  Ms. Michaud, can we go to page three of the document and

1    blow up the first paragraph.

2              Mr. O'Donnell, can you read that paragraph for us.

3    A.   "This is in addition to the issues we have with stated.

4    First, corporate has stated now that our quality from

5    approximately August through December is the worst of any

6    division.  Part of the data comes not just from our overall SUS

7    ratings, but from EPDs, early payment defaults.  Second, our

8    new business model and our ability to manage quality are now in

9    question.  Third, corporate states that FSL no longer fights

10   like it used to on the SUSs.  FSL just gives in, quote unquote.

11   Fourth, we must not worry about expenses in getting our house

12   in order on this topic."

13   Q.   Mr. O'Donnell, do you have an understanding of what EPDs or

14   early payment defaults are?

15   A.   Those are loans where the borrower has fallen delinquent

16   within the first 60 or 90 days after receiving the loan.  Right

17   out of the box they're having trouble in making payments.

18   Q.   Why would an increase in early payment defaults be of a

19   concern?

20   A.   It would indicate that loans are being made to people who

21   can't afford the loan.

22   Q.   If I can direct your attention to "corporate states that

23   FSL no longer fights like it used to on the SUSs."  What did

24   you understand that to mean?

25   A.   That corporate -- Greg is talking about my group here,

1    because my group was responsible for meeting with corporate QC

2    and handling the rebuttal process.  And he's saying we were no

3    longer fighting that hard.  We're just giving in and rolling

4    over and accepting whatever rating that's been given initially

5    by corporate QC.

6    Q.  What does it mean to fight on an SUS?

7    A.  I think he's referring to the rebuttal process.  So,

8    corporate QC, like any auditor, you're never happy to see them

9    come, and when they come with bad results, our job was to dig

10   in on their review, and try to rebut it try to change the

11   rating.  And providing documents, having discussions about

12   the -- debate about whether the loan was truly SUS.  And try to

13   make our case that the loan rating should be reduced.

14   Q.  Can we blow up point two in the same e-mail.  Can you read

15   that for us, Mr. O'Donnell.

16   A.  "Need resources to challenge and defend our decisions on

17   SUSs with the same passion as the past.  How do we do this

18   now."

19   Q.  How did you interpret that, Mr. O'Donnell?

20   A.  It was criticism that linked to the same comment we just

21   talked about.  That the impression was that we didn't have

22   enough people, and we weren't fighting hard enough to debate

23   and rebut findings from corporate QC.

24   Q.  Are you familiar with something called the sprint

25   incentive?

1    A.  I am.

2    Q.  Can you explain what that is.

3    A.  The sprint incentive was a bonus, a temporary bonus program

4    put in place for the QC underwriters that reported to me.

5    Q.  What was the bonus offered for?

6    A.  Bonus was offered for two things.  Getting through and

7    completing the reviews and rebuttal process on the large number

8    of loans that we were faced with.  Rebutting with corporate QC

9    and overturning the rating, reducing the rating from SUS to

10   some other less negative rating.

11   Q.  Was the sprint incentive your idea or someone else's?

12   A.  It came out of my group.  So it was my idea.

13   Q.  Tell us how that idea came about.

14   A.  It was directly -- it came directly after lots of criticism

15   about how the QC process was being managed.  The fact that we

16   were being overrun with volume, and the impression was that we

17   weren't fighting hard enough.  We were being judged negatively

18   by the level of QC SUSs for our division, and I put something

19   in place to try to attack that QC rating and drive it down.

20   Q.  At that time did you express any concerns about the sprint

21   incentive?

22   A.  I did.

23   Q.  Who did you express those concerns to?

24   A.  To my boss Cliff Kitashima.

25   Q.  What did you say?

1    A.  Even though I supported the sprint incentive, I recognized

2    the fact that it created some conflict with having one QC

3    underwriter try to overturn the finding of another QC

4    underwriter.

5    Q.  Why would that be a conflict?

6    A.  Because it didn't change the overall quality of the

7    production, the loans within Full Spectrum.  It would only

8    serve to drive down the rating on the loans that had been

9    reviewed.  It didn't fix the problem, it just improved the

10   perception of how bad or how good we were doing.

11   Q.  Around this same time period, did you have any meetings

12   concerning loan quality with any executives at Countrywide?

13   A.  In the middle of March we were asked to come to a business

14   review meeting at Calabasas, where Countrywide was

15   headquartered, and that was a regular occurrence that there

16   were business review meetings.  In this particular case, the

17   topic of FSL's quality was on the agenda for quality.

18   Q.  When you said we were asked, who was the "we" you were

19   referring to?

20   A.  My group was asked to prepare a presentation about FSL's

21   quality.

22   Q.  Who in particular?

23   A.  Asked or asked to prepare?

24   Q.  Let's start with who was asked to come to the meeting.

25   A.  Myself and Cliff Kitashima.

1   Q.  Was anyone else invited to the meeting?

2   A.  Most of the senior executives from Full Spectrum attended

3   the meetings regularly.

4   Q.  So that would include Mr. Lumsden?

5   A.  It would.

6   Q.  And Ms. Mairone?

7   A.  It would.

8   Q.  What were you asked to prepare in advance of the meeting?

9   A.  We were asked to prepare a presentation that would outline

10  and explain what was going on with Full Spectrum's quality

11  relating to the rapid deterioration and increased SUS rates.

12  Q.  Did you prepare a presentation?

13  A.  I did with my team prepare a deck, a presentation that

14  outlined the requested information.

15  Q.  Who assisted you in preparing the presentation?

16  A.  A number of people.  Steve Brent from FSL QC department,

17  and Michael Thomas frequently did most of the decks that came

18  out of my area because it included the data and metrics.

19  Q.  Did you share the presentation with anyone?

20  A.  I did.  A head of the meeting in Calabasas, I shared the

21  presentation with my boss, Cliff Kitashima, and then with

22  Rebecca Mairone and then with Greg Lumsden as well.

23  Q.  When you shared the presentation with Mr. Kitashima, did he

24  have any reaction to the presentation?

25  A.  He did.  He anticipated that the way that I had built the

1    presentation was going to be controversial within FSL.  Because

2    I was pointing to the Central Fulfillment model and the change

3    that we had made in processing as the reason for the -- the

4    primary reason for the problem SUS files that we were seeing.

5              MR. HEFTER:  I move to strike as non-responsive.

6              THE COURT:  I'm going to sustain that objection, but

7    on a different ground.  I've been troubled that many of the

8    questions call for an opinion, in effect, opinions or

9    characterizations as opposed to conversations.

10             So I will infer that your belatedly raised objection

11   was an objection to the question, and I will sustain the

12   objection and strike the answer.

13             MR. HEFTER:  Thank you, your Honor.

14   Q.  Mr. O'Donnell, did you share the presentation with

15   Mr. Kitashima?

16   A.  I did.

17   Q.  What, if anything, did he say to you after reviewing the

18   presentation?

19             MR. HEFTER:  Your Honor, hearsay as to Ms. Mairone.

20             THE COURT:  Yes.  This will be received only as to the

21   banks.  Go ahead.

22   A.  He instructed me that I should expect a lot of push back

23   about the content of the presentation.

24   Q.  Did you say anything in response to him?

25   A.  I did.

D9R3BAN3                        O'Donnell - direct

1    Q.  What did you say?

2    A.  I told him that I was confident that the data was accurate

3    that it told the right story about what was going on with our

4    quality, and I was prepared to take whatever feedback, positive

5    or negative, resulted.

6    Q.  You mentioned you shared the presentation with Ms. Mairone?

7    A.  I did.

8    Q.  Did Ms. Mairone review the presentation?

9    A.  She did.  We reviewed it together over the phone.

10   Q.  Did she say anything in response -- did she say anything to

11   you about the presentation?

12   A.  She did.

13   Q.  What did she say?

14   A.  She took issue with several slides within the deck and

15   asked that they be removed.

16   Q.  Did she give you a reason?

17           MR. HEFTER:  Your Honor, I'll move to strike as

18   non-responsive as well as the objection that you --

19           THE COURT:  No, I don't think so.  I think this was in

20   conformity with the Court's instructions.  Overruled.  Go

21   ahead.

22   Q.  What, if anything, did Ms. Mairone say to you about the

23   presentation?

24   A.  She took issue with the FSL QC and QA, the review we had

25   done on loan files.  She felt that process still was

1    insufficient and unreliable.  And she didn't want us to be

2    focused on that in any way in the deck, and she wanted those

3    slides removed.

4    Q.  Did you say anything in response to her?

5    A.  I tried to show her the value.  To explain where the data

6    came from.  And we were in disagreement about the content.

7    Q.  You said you tried to show her the value, but did you

8    actually say anything in response to Ms. Mairone?

9    A.  I took a list of all the slides that she wanted to remove,

10   made notes on my copy of the presentation where she had asked

11   that they be reviewed, I drew lines through them.

12   Q.  What happened next?

13   A.  The call ended.  I prepared for the meeting the next day.

14   And in the morning of that day, Greg requested that we come to

15   his office, Rebecca, Cliff and I, to review the deck that we

16   intended to share at the meeting in Calabasas.

17   Q.  Had you made any presentations -- sorry.

18        Did you make any changes to the presentation prior to

19   that meeting?

20   A.  I didn't make any material changes to the presentation, no.

21   Q.  Who was in attendance at the meeting?

22   A.  In Greg's office?

23   Q.  Yes.

24   A.  Greg Lumsden, Cliff Kitashima, Rebecca and myself, and

25   perhaps David Swain who was a pricing executive.

D9R3BAN3                          O'Donnell - direct

1   Q.  What happened at the meeting?

2   A.  We were waiting for Greg to finish a phone call.  Rebecca

3   and Cliff were both paging through the deck while we waited.

4   She noticed I had not removed the slides, and she commented to

5   me, I thought I told you to remove those slides.  And I said I

6   chose not to.  Decided not to.

7   Q.  What, if anything, did Ms. Mairone say in response?

8   A.  She was angry and she said if -- if you won't listen, then

9   we'll get somebody who will.

10  Q.  Did Mr. Kitashima say anything at this meeting?

11  A.  At the meeting, he did.

12  Q.  What did he say?

13  A.  He tried to play kind of arbiter between us as we explained

14  the deck to Greg.  And tried to be supportive of me to make

15  sure the information stayed in the deck.  And explained why it

16  was important to share the full story of what was happening

17  with our quality.  And the reasons behind it.

18  Q.  Did Mr. Lumsden speak at that meeting?

19  A.  He did.

20  Q.  What did Mr. Lumsden say?

21  A.  Greg requested that a number of the slides that Rebecca had

22  issues with, rather than be removed, they be put in the

23  appendix of the deck.

24  Q.  Did you move those slides to the appendix?

25  A.  I did.

D9R3BAN3                          O'Donnell - direct

1   Q.  Was your presentation shown to anyone else?

2   A.  At that meeting, no.

3   Q.  Was there a meeting that followed with any Countrywide

4   executives?

5   A.  There was.  At the business review meeting.

6   Q.  Who was in attendance at that meeting?

7   A.  Drew Gissinger chaired that meeting.  He was the president

8   of Countrywide Home Loans.  In attendances was most of the

9   executives from Full Spectrum.

10  Q.  Where did that meeting tack place?

11  A.  In the board room in Calabasas, California.

12  Q.  Was your presentation shown to Mr. Gissinger?

13  A.  He had a copy of the presentation, yes.

14  Q.  Did anyone walk through the presentation at that meeting?

15  A.  My recollection is we didn't get very far through the

16  presentation at all, maybe a couple of -- or few pages.

17  Q.  Did you conduct the presentation?

18  A.  I did not.  I did not speak at the meeting.

19  Q.  Who did?

20  A.  Cliff Kitashima was responsible for walking us through the

21  deck.

22  Q.  What, if anything, did Mr. Gissinger say?

23  A.  He was very angry.  Didn't pay much attention to the

24  presentation itself.  He was basing his concern about Full

25  Spectrum, the corporate QC reports that he had apparently seen.

1    And he made it very clear he was unhappy with --

2            THE COURT:  So Mr. O'Donnell, this is an example of an

3    issue I need to ask your assistance on.  You're not a lawyer

4    and therefore you're not familiar with the rules of evidence,

5    but they are quite strict.  And they have a purpose, which is

6    to sharpen and clarify what is received in evidence in a court

7    of law, which is very different from every day conversations.

8            So the question was:  What, if anything, did

9    Mr. Gissinger say.

10           And your answer was:  He was very angry.  Didn't pay

11   much attention to the presentation itself.  He was basing his

12   concern about Full Spectrum on the corporate QC reports that he

13   had apparently seen, and made it very clear he was unhappy

14   with -- and then I interrupted.

15           No person could ascertain from that answer what

16   portion of your answer is referring to what he said, and what

17   portion of your answer was referring to your perceptions or

18   your opinions or whatever.

19           Now, no one can be expected to remember exact words of

20   a conversation, except for in very unusual circumstances.  But

21   one can remember, if one remembers the conversation, what was

22   said, as opposed to how one might characterize what was said.

23   So, I need to ask your help in making that distinction.

24           So let's put the question again.  What, if anything,

25   did Mr. Gissinger say?

D9R3BAN3                          O'Donnell - direct

1              MR. HEFTER:  Your Honor may we approach on this issue?

2              THE COURT:  All right.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At side bar)

2            MR. HEFTER:  As your Honor pointed out, this has been

3    a pattern in his testimony, and I think the way your Honor

4    approaching is fine for now.  And we'll move to strike that

5    last answer as non-responsive as well as hearsay, consistent

6    with your ruling with respect to John Boland.  And so I think

7    with respect to this answer, I think your Honor is pretty clear

8    with the witness and he can answer about anything he said.  I

9    just point out, your Honor, this has been a recurring pattern.

10           THE COURT:  Wait a minute.  You're not a potted plant,

11   you could have brought this to -- I wonder who first said that.

12   You could have brought this to the Court's attention much

13   earlier, which you didn't.  You didn't even move to strike that

14   last answer until now at the side bar.  So I don't know what it

15   is that you're saying, but the burden is on you.

16           MR. HEFTER:  I understand.

17           (Continued on next page)

18

19

20

21

22

23

24

25

D9RTBAN4                     O'Donnell - direct

 1              (In open court)

 2              THE COURT:  To be clear, we will strike the last

 3      answer, but put the question again.

 4              What did he say?

 5              THE WITNESS:  He said if we didn't improve our QC

 6      results, and I don't remember the exact wording, but it was

 7      game over, the division could not continue to exist.

 8              THE COURT:  OK.  Go ahead, counsel.

 9      BY MS. NAWADAY:

10      Q.  Did you discuss what happened at the meeting with

11      Mr. Kitashima?

12      A.  I did.

13      Q.  When was that?

14      A.  Cliff and I rode to the meeting together and we rode back

15      to Pasadena together from Calabasas.  We discussed the meeting

16      in the car on the way back.

17      Q.  And what, if anything, did you say to Mr. Kitashima?

18              MR. HEFTER:  Your Honor, hearsay to Ms. Mairone.

19      Apologize, withdrawn.

20              THE COURT:  Pardon?

21              MR. HEFTER:  Withdrawn.

22              THE COURT:  OK.  Go ahead.

23      Q.  What, if anything, did you say to Mr. Kitashima?

24      A.  I said that Drew had failed to understand that Cliff and I

25      were no longer in charge of the day-to-day loan manufacturing

1    process.  He was blaming us for the quality of the loans at

2    Full Spectrum when we didn't run the business, and I was very

3    concerned that I particularly was going to be held responsible.

4    Q.  What, if anything, did Mr. Kitashima say to you?

5              MR. HEFTER:  Now I raise it, your Honor, hearsay to

6    Ms. Mairone.

7              THE COURT:  Yes.  So this answer will be received as

8    to the banks but not to Ms. Mairone.

9    A.  He told me he was concerned as well.  I don't remember the

10   exact words, but Cliff was concerned, and he didn't reassure me

11   the way he normally did.  I think he -- well, he said that the

12   beating that we had taken at the meeting left him feeling the

13   same way, that we were going to be blamed for the quality.

14   Q.  You said you didn't run the business any more.  What did

15   you mean by that?

16   A.  Didn't have responsibility for supervising the underwriters

17   and funders as I had previously.  We were only in an oversight

18   and monitoring function in the company.

19   Q.  And who did have that responsibility?

20   A.  The leadership of Central Fulfillment, Wade Comeaux and

21   Rebecca Mairone.

22   Q.  What happened when you got back to Pasadena?

23   A.  I don't remember if it was that night or the next, but I

24   put my concerns down in writing to Cliff in an email.

25   Q.  And what concerns did you put down in writing?

1    A.   Coming off the meeting the prior day, I was concerned that

2    FSF quality was to the point where some bad things were going

3    to happen, including us being -- he and I, specifically me

4    being held accountable, and that our new owners, Bank of

5    America, were not going to be impressed with the ability -- my

6    ability to manage quality, and I probably wouldn't have a role

7    in the organization going forward.  I would lose my job.

8    Q.   Did you send that email to anyone?

9    A.   I didn't.

10   Q.   Did you show it to anyone or share it in any way?

11   A.   I did.  When I finished that email, I noticed that Cliff

12   was still in his office in Pasadena, and I walked into his

13   office and sat down in front of him and read it to him.

14   Q.   And what, if anything, did he say in response?

15   A.   He was sympathetic.  He didn't disagree.  And he encouraged

16   me to think before I sent that email and consider the likely

17   implications.

18   Q.   Did he say what the likely implications were?

19   A.   I think I voiced what I thought the implications were

20   first, that I thought that sending the email would be slitting

21   my own throat at Full Spectrum.

22   Q.   Mr. O'Donnell, can you direct your attention to tab 81 of

23   your binder.  Do you recognize this document?

24   A.   I do.

25             MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

D9RTBAN4                    O'Donnell - direct

```
 1   81 into evidence.

 2              MS. MAINIGI:  No objection.

 3              MR. HEFTER:  No objection, your Honor.

 4              THE COURT:  Received.

 5              (Plaintiff's Exhibit 81 received in evidence)

 6   Q.  Mr. O'Donnell, can you tell us what this document is?

 7   A.  This is the draft email that I was just referring to.

 8   Q.  Could we blow up the first two paragraphs of the email.

 9              Mr. O'Donnell, can you read that passage for us.

10   A.  I am very concerned about the way loan quality is presently

11   being managed.  Since early December, we produced daily, weekly

12   and monthly reports that clearly demonstrate the level of

13   manufacturing quality coming from the line is substandard.

14   While a short term dip in quality was factored into the

15   decision to radically change our fulfillment model, we show no

16   signs of improvement.  In fact, we see continued deterioration

17   and increased exposure to investor kick outs due to poor file

18   quality.

19              Both you and I have been very vocal about the poor

20   quality being produced and the potential risk this presents to

21   the division.  However, we have not seen any evidence that our

22   warnings are being taken seriously, and I'm certain that

23   nothing is going to changes as long as Rebecca continues in her

24   present role.  In my opinion, her tenure with FSL has been the

25   epitome of operational negligence.  The remaining 5,000
```

1  employees within FSL are being placed at risk due to her lack

2  of concern for the very basics of our business.

3  Q.  What was the risk that you were referring to here?

4  A.  They would lose their jobs.

5  Q.  Did you discuss this email with anyone else or share it

6  with anyone else?

7  A.  I don't believe I did.

8  Q.  Did there come a point when you approached the United

9  States Attorney's Office with information about the Hustle?

10 A.  Yes.

11 Q.  And when, approximately, was that?

12 A.  In February, late February of 2012.

13 Q.  Did you provide documents to the government?

14 A.  I did.

15 Q.  Did you prepare any declarations?

16 A.  I did.

17 Q.  Do you have any potential for financial gain if the United

18 States is successful in its action?

19 A.  I do.

20 Q.  And what is your understanding of that?

21 A.  My understanding is that if the government is awarded some

22 form of damages that I can earn a percentage of those damages

23 up to a maximum of $1.6 million.

24 Q.  Mr. O'Donnell, why did you decide to present information

25 concerning the Hustle to the United States Attorney's Office?

D9RTBAN4                     O'Donnell – direct

A.   I had seen and read in the media reports of a settlement

that was being worked on, for lack of a better term, between

the government and a number of large banks.

          MS. MAINIGI:  Objection, your Honor.

          THE COURT:  Come to the side bar.

          (Continued on next page)

D9RTBAN4                          O'Donnell - direct

1           (At side bar)

2           THE COURT:  This obviously would not come in normally

3   on direct unless it's anticipation of rebutting some cross.  So

4   I assume you're going to be inquiring into his motivations for

5   bringing this action.

6           MS. MAINIGI:  Well, I think the government has

7   inquired.  I was going to ask whether he was a whistleblower,

8   obviously, and whether he stood to gain financially from the

9   matter.  But in terms of asking open-ended questions about his

10  motivations, I was really going to rely more on the documents

11  that exist in the record.

12          THE COURT:  So what's he going to say?

13          MS. NAWADAY:  Well, Mr. O'Donnell has been deposed

14  twice on his motivations for being a whistleblower, so I did

15  anticipate that he would be cross-examined on exactly that.

16          THE COURT:  But what's he going to say specifically in

17  the pending question?

18          MS. NAWADAY:  I anticipate what he will say is that he

19  saw something about the service of settlement between the

20  Department of Justice and several large banks, and he saw they

21  concerned FHA loans, and he thought there were big problems

22  that had been missed concerning loans sold to Fannie Mae and

23  Freddie Mac.

24          MS. MAINIGI:  Your Honor, this is also the subject of

25  a motion in limine.  It's severely prejudicial to bring this in

1   in the middle of Mr. O'Donnell's testimony.

2            THE COURT:  The settlements with the other banks?

3            MS. MAINIGI:  Correct.

4            THE COURT:  I think the way to handle it is I will

5   allow him to say that, from what he had read in the media, he

6   felt that the government might have missed or might not have

7   the information that he had about this matter, and so he came

8   forward.  That I would permit.  But I don't think he should get

9   into the government's settlements with other banks and things

10  like that.  I do think that is potentially prejudicial and not

11  particularly probative.  So on a 403 basis, I will limit it in

12  that fashion.

13           Do you want to talk to him for a second and give him a

14  heads up on that so he can confine his answers accordingly?

15           MS. NAWADAY:  Sure.

16           THE COURT:  Or another way to do it is by leading

17  questions, which I would allow for that purpose.

18           MS. MAINIGI:  We prefer that.

19           THE COURT:  OK.

20           MR. HEFTER:  Could we have a quick second?

21           THE COURT:  Yes.

22           (Pause)

23           THE COURT:  I assume your direct is going to end in

24  about five minutes or so?

25           MS. NAWADAY:  This was the last question.

D9RTBAN4                       O'Donnell – direct

1              THE COURT:  That's fine.  So we'll break for lunch at

2     that time.  Now at some point I need to tell the jury –– and

3     maybe this is a good time to tell them, but if you prefer, I

4     will hold it for now –– that the question of damages is not

5     before them.  So maybe this is a good time.

6              MS. MAINIGI:  You mean after Mr. O'Donnell is done?

7              THE COURT:  Yeah.

8              MR. HEFTER:  Thank you.

9              (Continued on next page)

1              (In open court)

2              THE COURT:  Go ahead, counsel.

3     BY MS. NAWADAY:

4     Q.  Mr. O'Donnell, without getting into anything that you saw

5     in the media or anything like that, can you just tell us why

6     you became a whistleblower, and was there any information you

7     believe was not currently at that time in the government's

8     possession?

9     A.  I believe the government didn't have any information about

10    the Hustle and the fact that loans had been sold to GSEs and

11    others that clearly didn't qualify, and that because they were

12    unaware of it, no one was being held accountable.

13    Q.  And who in particular do you mean by the GSEs?

14    A.  Fannie Mae and Freddie Mac.

15    Q.  And you said the loans didn't qualify.  Can you clarify

16    what you meant by that?

17    A.  They were not investment grade.

18             MS. NAWADAY:  Your Honor, may I have a moment to

19    confer, please?

20             THE COURT:  Yes.

21             MS. NAWADAY:  We pass the witness, your Honor.

22             THE COURT:  All right.  So Mr. O'Donnell, why don't

23    you step down for now.  I'm going to excuse the jury in a

24    minute for lunch, and you should be back at 2 o'clock.

25             THE WITNESS:  Yes, sir.

D9RTBAN4

1          THE COURT:  Ladies and gentlemen, I wanted to mention

2     one thing.  The witness made a reference to damages or monetary

3     recovery at the end of the case.  The law in this kind of case

4     is that what you need to determine is whether or not any given

5     party is liable for fraud.  That's called liability.  If you

6     determine there is liability, then I determine what amounts of

7     money are to be paid.  So you don't have to worry about that

8     part of the case.  Under the law, that's for me, not for you.

9     So for you, it's just a question -- not "just a question," it's

10    a hotly disputed question, the question for you is whether or

11    not any given defendant is liable on these fraud charges.

12          However, you now have, over lunch, your first

13    deliberation, and it is on the following important issue.  We

14    could either go from two to four without a break, like we did

15    yesterday, or we could go from two to like quarter of five with

16    a break.  So either is fine with me.  I have other matters, but

17    I will take them up after you're gone.  But you have now seen

18    it both ways, with a break or without a break.  So why don't

19    you confer among yourselves and let me know before we start at

20    2 o'clock.  Just so let my courtroom deputy know if -- the

21    advantage, if you go without a break, we end earlier, the

22    disadvantage is it's two hours without a break.  So either one

23    is fine with me.  You let me know right before lunch and we'll

24    proceed accordingly.

25          We'll see you back here at 2 o'clock.

D9RTBAN4

1          (Jury not present)

2          THE COURT:  So several items to discuss.  First, how

3     long does bank counsel want on cross?

4          MS. MAINIGI:  Your Honor, we're anticipating

5     approximately four hours.

6          THE COURT:  Well, it will be, as I told the

7     government, not approximately, it will be four hours or less

8     for sure.  The government only took three hours and 45 minutes,

9     so they were very modest in their use of their time.

10          And how about counsel for Ms. Mairone?

11          MR. HEFTER:  Your Honor, we request three hours.  And

12     hopefully that amount of time will shorten, shrink, given what

13     the bank's counsel does.  And I would just --

14          THE COURT:  Obviously this is a very important witness

15     and I will give you three hours if that's what you're

16     requesting.  But I find it hard to believe, given how similar

17     the issues are, that it wouldn't be repetitive of what they

18     would cover in their four hours.

19          Have you conferred?

20          MR. HEFTER:  We will confer, and I will try to be not

21     repetitive or cumulative in my questioning.  I would say, your

22     Honor, as pointed out, this is a very important witness.

23          THE COURT:  That's why, tempted though I was -- let me

24     put it this way.  There is no precedential value whatsoever to

25     the fact I gave the government four hours on direct or you

D9RTBAN4

1    folks seven hours on cross.  This is an unusual witness.

2            Yes.

3            MR. MUKASEY:  Judge, may I raise or return to the

4    issue of the Googling of the juror?

5            THE COURT:  Yes.

6            MR. MUKASEY:  Your Honor should direct your wrath at

7    me and nobody else.  There was a misunderstanding on our team,

8    and I take responsibility for that as the leader of the team,

9    that the Googling was limited to the in-house, in-court voir

10   dire process.  There was Googling done after court for the

11   purpose, which we understood to be permitted, of checking on

12   whether any juror had a disqualifying issue that may not have

13   been raised during jury selection.

14           THE COURT:  Before you continue, let me place on the

15   record the only -- this question first came up in the telephone

16   conversation and I allowed defense counsel and all counsel to

17   put in briefing, and the only briefing I received was on

18   September 23rd, 2013 from Williams & Connolly, but on behalf of

19   all defendants:  And the first paragraph reads as follows:

20           "At the Court's invitation, we write in support of

21   defendants' request for leave to conduct internet research of

22   potential jurors during voir dire.  The Court permitted such

23   research last year in *United States v. Gupta*.  As in that case,

24   the Court shall permit internet research to discover any

25   information that may require disqualifying a juror and to

D9RTBAN4

```
1    permit counsel to make informed use of their peremptory

2    challenges.  Internet research during voir dire is now a widely

3    accepted practice, and as discussed below, lawyers are

4    sometimes criticized for not using such a readily available

5    resource."

6             So I don't see how there could have been any

7    misunderstanding that this was to be during voir dire for the

8    purpose of allowing you to exercise your peremptory challenges

9    to the fullest reasonable extent.

10            MR. MUKASEY:  If it makes any difference, and I agree

11   with you, your Honor.  That is clear, and we were not attentive

12   to it.  And again, I will take responsibility for that.  If

13   it's of any mitigation, my understanding, because I'm a bit of

14   a dinosaur in this area, is that it is possible to do searches

15   and make yourself as the searcher anonymous.  And the person at

16   my firm who performed the search did not do that.  There was no

17   attempt to be evasive or hide this fact, which I hope goes to

18   the fact that it was a good faith misunderstanding and not an

19   attempt to secretly circumvent the Court's ruling.

20            THE COURT:  I'm not inferring, but I want to question

21   the person who did this.

22            MR. SULLIVAN:  Your Honor, could I just -- I haven't

23   read it yet, but I have a fascinating opinion was just handed

24   to me from the New York State Bar Association Committee on

25   Professional Ethics that the Court might find informative.
```

D9RTBAN4

| | |
|---|---|
| 1 | THE COURT:  It's referenced in the letter.  It is, in |
| 2 | my view, totally irrelevant, but I will get back to that in a |
| 3 | minute.  I want it finish my conversation with Mr. Mukasey. |
| 4 | MR. SULLIVAN:  Sorry. |
| 5 | THE COURT:  So I'm going to need to question -- I |
| 6 | understand your accepting responsibility, but I need to |
| 7 | question the person who did the actual research, the actual |
| 8 | search. |
| 9 | MR. MUKASEY:  I want you to know it was me who said |
| 10 | let's Google the jurors.  It was my misunderstanding. |
| 11 | THE COURT:  You know, even without going through all |
| 12 | the requirements of the Federal Rules of Criminal Procedure, I |
| 13 | accept your guilty plea. |
| 14 | MR. MUKASEY:  I don't have the 40 years of impeccable |
| 15 | reputation that Mr. Sullivan does, but I hope I have about 20, |
| 16 | and I hope your Honor will take this -- |
| 17 | THE COURT:  Mr. Mukasey, you have an excellent |
| 18 | reputation, and I have had the great privilege of having you |
| 19 | before me, and you have always conducted yourself in good |
| 20 | faith.  So I don't question your good faith.  In order to see |
| 21 | what action, if any -- and I'm hoping the answer will be none |
| 22 | or very little, but to see what action, if any, I need to take |
| 23 | with respect to the jury, I need to question -- I need to find |
| 24 | out exactly what your associate did. |
| 25 | MR. MUKASEY:  I think I have the answer. |

D9RTBAN4

```
 1          THE COURT:  OK.

 2          MR. MUKASEY:  Jurors were Googled off of Google as --

 3          THE COURT:  When was this?

 4          MR. MUKASEY:  Tuesday afternoon.

 5          THE COURT:  Sorry?

 6          MR. MUKASEY:  Tuesday afternoon or evening.

 7          THE COURT:  After the jury had been selected.

 8          MR. MUKASEY:  Jurors were Googled.  To the extent that

 9   Google allows being linked or being transferred to social

10   media, including Linked In, that was done.  I gather you can do

11   Facebook or Twitter.  I don't know any of the results here.  I

12   personally I don't know any of the results of any of this

13   stuff.  I don't think Mr. Hefter or I do.

14          MR. HEFTER:  I confirm that, your Honor.

15          MR. MUKASEY:  And searches of public databases were

16   done, again for the purpose of making sure we didn't miss a

17   criminal conviction, we didn't miss somebody who worked for

18   Bank of America with Ms. Mairone or with Ms. Mairone at JP

19   Morgan.  So I don't think that falls into the same category.

20   But there were social media that are available through a Google

21   search that were looked at.

22          MR. SULLIVAN:  Your Honor, could I bring one thing to

23   the Court's attention?  Because I know all of us have one goal,

24   and that is to save this jury and not have an impact on the

25   jury and put this fire out.
```

D9RTBAN4

1          First off, I know this is the first trial that I have

2     Googled, I think.  I have not -- I don't Google, but we did

3     Google.  We sought permission.

4          THE COURT:  I know your partners are undoubtedly very

5     upset about your technical deficiencies.

6          MR. SULLIVAN:  I have gotten away with not knowing for

7     so long because they're so good.  But let me bring to your

8     attention that the New York Bar Association Committee on

9     Professional Ethics actually says -- I'll read you two lines,

10    and I admit I haven't read the rest of it -- the committee

11    concludes that attorneys may use search engines and social

12    media services to research potential and sitting jurors without

13    violating the rules as long as no communication with the juror

14    occurs.

15         And my suggestion is if we tell the jurors that we

16    have a brief and efficient jury selection process, that the

17    rules provide that counsel can check, and the Court let them

18    check during voir dire, that might be the end of it and we can

19    all have peace and save this jury.  I'm just troubled if it's

20    not addressed that way that we're all going to wonder what

21    they're thinking.

22         THE COURT:  Well, first of all, what you're reading,

23    which, needless to say, is not binding on this Court.

24         MR. SULLIVAN:  Of course, your Honor.

25         THE COURT:  But in any event, the New York State Bar

D9RTBAN4

```
 1   Association on Professional Ethics, according to your letter --
 2   I haven't seen the underlying opinion but I'm sure this is an
 3   accurate quote -- concluded that, "An attorney may research
 4   potential or sitting jurors using social media services or web
 5   sites, provided that a communication with the juror does not
 6   occur."
 7           Of course, here a communication with the juror did
 8   occur in the sense that they became aware that the attorneys
 9   for one of the parties had tapped in to their social media.  So
10   even under this opinion, I am not sure that there was
11   conformance with this opinion.
12           MR. SULLIVAN:  I'm not arguing the point.  I read only
13   four lines of it.  I would make it available, but it is an
14   indication that someone has thought about post voir dire.
15   That's my only point.
16           MR. MUKASEY:  And to the extent you're able to use
17   these services to actually communicate by some sort of message
18   or note, obviously that didn't happen.  That would be
19   outrageous.  I would focus, just for purposes of protecting the
20   jury and Ms. Mairone, and frankly my co-defendants, on the
21   portion of that juror's note that said he felt intimidated.
22   I'm not sure that is referring to the photographer.
23           THE COURT:  He made clear in the robing room, and that
24   was one of the things that gave me some confidence that it was
25   the photographer that he felt intimidated by.
```

D9RTBAN4

1          MR. MUKASEY:  Not the cyber stalking.

2          THE COURT:  Right.  But your term is an interesting

3    one.  And I think I made a bad joke at the time about just how

4    physically intimidating that particular individual is.  But

5    that was -- I think it's clear from the robing room conference

6    that that was his concern.  That's why I totally agree with

7    Mr. Sullivan that I think we can save this jury.  The question

8    is what we need to do to make sure that everyone's rights are

9    protected and that the Court is assured that this jury has not

10   been materially influenced in any negative respect.

11         MR. MUKASEY:  Could we possibly submit maybe a draft

12   instruction during the lunch break for your Honor's

13   consideration?

14         THE COURT:  That would be fine.  But let me tell you

15   what I'm thinking offhand.  I want to hear from the government

16   as well.  I'm thinking that the thing to do is to bring the

17   jury out after lunch, or when they come out normally right

18   after lunch, to tell them that through an inadvertent mistake

19   on the part of counsel there was some interaction with their

20   social media a couple of days ago, that that was simply a

21   mistake and it won't happen again, and no one should pay any

22   heed to it, and then ask them does any juror have any problem

23   about that they want to the raise with the Court.  If they do,

24   we are to question that juror in the robing room.  That's sort

25   of the way I think maybe we should go, off the top of my head.

D9RTBAN4

1           MR. MUKASEY:  I think that's a good start.  I might

2    mention or think it would be helpful to mention if your Honor

3    were to introduce that mistake by saying there was permission

4    given to do limited research, electronic research, and then

5    sort of the mistake was made in interpreting that permission.

6           THE COURT:  I'll think about that.

7           MR. MUKASEY:  I don't want them to think we're --

8           THE COURT:  I don't -- I understand what you're

9    saying, but implicit in that is clearly in my view not the

10   case, which is that any reasonable person could ever have

11   interpreted my permission to conclude what your associate did.

12   I am accepting that it was inadvertent and not in bad faith,

13   but I am not accepting that it was remotely within the

14   reasonable confines of the permission given.  So I'm not

15   inclined to really give it that aura that your suggestion is

16   contemplating.

17          Let me hear from the government.

18          MR. ARMAND:  Your Honor, the government also wants to

19   keep this jury and do everything we can to make sure that we

20   can keep the jury.  But I think we would like to get a little

21   bit more information, if we could, about what exactly happened

22   and how and when.  And there is some information about Googling

23   and social media, but juror number ten indicated there were a

24   number of other jurors who experienced the same thing.  So I

25   think we need to find out what exactly happened, when, and how,

D9RTBAN4

1    and then figure out what type of instruction would be best to

2    give them.

3               THE COURT:  Why don't we do this, who is the associate

4    that did this?

5               MR. MUKASEY:  She's a first-year associate.

6               THE COURT:  I understand that you are, as the

7    excellent person you are, taking the rap, but she has the

8    information we need.

9               MR. MUKASEY:  I'll get her.

10              THE COURT:  I think we need to have her here just to

11   get information.  So we will, unless she's here now --

12              MR. MUKASEY:  She is here now, but I would like to

13   download the information we need.

14              THE COURT:  We'll talk with her here in court why

15   don't we say five minutes before 2 o'clock.  That will give

16   everyone a chance to reflect on all this.

17              MR. CORDARO:  Your Honor, there is one other issue I

18   would like to raise with the Court.  And I only raise this now

19   because I would like to do it before Mr. O'Donnell's cross

20   starts.

21              The government made motions in limine to preclude

22   evidence under 404(a) pertaining to witness opinion statements

23   about certain people being honest at Countrywide.  The Court

24   granted that motion.

25              The United States made a motion in limine to preclude

D9RTBAN4

1   evidence from witnesses -- lay witnesses offering legal

2   conclusions pertaining to fraud.  The Court granted that

3   motion.

4         During Mr. Thomas' cross-examination, Mr. Sullivan

5   asked him at one point if he thought -- speaking of

6   Mr. Lumsden, he regarded him as an honest, straightforward

7   person.  The government objected, the Court sustained the

8   objection.  That was within the scope of the order, but we

9   figured it was an accident and we let it go.

10         However, I have seen some paperwork now that suggests

11   it was perhaps not an accident, because we now have the

12   deposition testimony designated by the defense for John Boland.

13   And if you look at some of the testimony that the defense has

14   designated, it reads, in response to a question:  Were there

15   others in Full Spectrum Lending whose judgment you trusted?

16   Yes.  Who were those?  There were many people at Full Spectrum.

17   Full Spectrum was a great company -- I mean a great division

18   inside Countrywide, which was a great company.  I generally

19   trusted the people, and people for the most part did the right

20   thing the majority of the time.  I mean people were honest.

21         That all has been designated.

22         THE COURT:  I get the idea, because clearly that is

23   totally contrary to the motion in limine that I granted.  So I

24   think you've placed your adversary on notice that the Court

25   will, if there is any violation further of my ruling, will take

D9RTBAN4

1    appropriate action.

2              While we're on that subject, that really dovetails in

3    part with the question about Ms. Simantel's -- is that the

4    right person, the person you wanted the ruling on?

5              MS. MAINIGI:  Yes, your Honor.

6              THE COURT:  And one of the government's arguments for

7    the admission of that, we'll talk more about this later, but --

8    I don't want argument now, but one of the government's

9    arguments was that it was necessary rebuttal to the kind of

10   stuff that you just read me from the deposition, arguments of

11   the defendants.

12             So let me put the defense on notice that the

13   government really has a tactical choice here in the motion in

14   limine.  I have excluded all that was just read.  It seems to

15   me self-evident everything just read was excluded by the motion

16   in limine.  But since you're offering it, and if the

17   government, instead of maintaining its position that it's

18   inadmissible, wants to admit it, then there's no question

19   whatsoever at that point that the Simantel email will come into

20   evidence.  So you don't have to -- the government doesn't have

21   to speak about that now, I want to alert you to the dangerous

22   situation that the defense is placing itself in.

23             With respect to the letter I received this morning

24   from defense counsel on the $165 million income or monies that

25   the bank defendants received, I thought defense made this a

D9RTBAN4

```
 1    closer call than I had originally imagined.  So we'll have
 2    argument on this maybe not until Monday, the government doesn't
 3    have to put in a response, but if they wish to put in a
 4    response, they're welcome to say by Monday morning.
 5            I note for the defense that you did not, however,
 6    directly address motive, which was one of the arguments the
 7    government made.  I don't want anything further in writing, but
 8    you may be able to address it orally.
 9            Anything else?
10            MR. CORDARO:  No, your Honor.
11            MS. MAINIGI:  So you'll hear the Simantel motion this
12    afternoon after you adjourn the jury?
13            THE COURT:  Yes.
14            MR. MUKASEY:  I'm sorry to go back to my sad issue.
15    Juror ten wrote at the end of his --
16            THE COURT:  Yes, you were kind enough to hand me your
17    copy.
18            MR. MUKASEY:  If I remember correctly, it says I can't
19    be objective.
20            THE COURT:  And I questioned him about that and he no
21    longer was saying that.
22            MR. MUKASEY:  I wasn't clear about that.
23            THE COURT:  It may have been partly because he did it
24    partly through a nod of the head, but I think the record will
25    be clear.  But if anyone thinks it's unclear, I will question
```

D9RTBAN4

1    him again.  But I think that it was crystal clear that once he

2    learned the photographer, which was the main source of his

3    feeling of intimidation, was sent by -- was a media person,

4    that that made him feel he could continue, and also coupled

5    with -- because I did tell him about the Court giving

6    permission to Google during voir dire.

7              MR. MUKASEY:  My fear was once he recognized it was my

8    firm that did that he could no longer be objective to us.

9              THE COURT:  I think he clearly indicated that he no

10   longer had a problem, but I'm willing to question him again on

11   that.

12             You really want me to put that question to him?

13             MR. MUKASEY:  Let me think about it over lunch.

14             THE COURT:  OK.  Very good, we'll see you at five

15   minutes to two.

16             (Luncheon recess taken)

17             (Continued on next page)

18

19

20

21

22

23

24

25

D9RTBAN4

                          AFTERNOON SESSION

                              (2:15 p.m.)

 3          (After luncheon recess)

 4          (Jury not present)

 5          THE COURT:  The jury has elected to go without a

 6   break, but I think we need to bring this matter to a head

 7   before we excuse them for the weekend.  So I have told my

 8   courtroom deputy to tell them that we would go without a break,

 9   but we will start a little later because we have some matters

10   to discuss.  And we will end at 4 o'clock, so far as they are

11   concerned, no matter what.

12          So I do want to keep this as efficient as possible.

13          MR. SULLIVAN:  Your Honor, I have an instruction that

14   might help to work with the Court --

15          THE COURT:  OK.

16          MR. SULLIVAN:  -- to calm things down here.  It's

17   actually one of the few instructions I have written myself.

18          THE COURT:  And here I thought you were a potted

19   plant.

20          MR. SULLIVAN:  I am when it comes to this.

21          And by the way, all parties for the defense agree that

22   could be a way to solve the problem.

23          THE COURT:  Well, I will adopt this in part, but I

24   don't think I'll use, for example, "Social media is a strange

25   new phenomenon that is not well understood by people of my

D9RTBAN4

1    generation."  Maybe your generation.

2              MR. SULLIVAN:  I accept that correction.

3              THE COURT:  But I think something similar to this is

4    probably called for.  But let me -- the government wanted to

5    put some questions, I think, to the associate, so let's have

6    her come the microphone.

7              MR. MUKASEY:  I have a full debrief from her, so I

8    prefer to be the deponent.

9              THE COURT:  No.

10             MR. MUKASEY:  OK.  Judge, this is Kate Sullivan.

11             THE COURT:  Good name.

12             MR. MUKASEY:  No relation.

13             MS. SULLIVAN:  Hello, your Honor.

14             THE COURT:  So Ms. Sullivan, when was the last web

15   search you did for any of the jurors?

16             MS. SULLIVAN:  I believe it was about 10 o'clock on

17   Tuesday night.

18             THE COURT:  On Tuesday night?

19             MS. SULLIVAN:  Yes.

20             THE COURT:  So none since then?

21             MS. SULLIVAN:  None since then.

22             THE COURT:  In terms of Linked In, did you attempt to

23   make access there to all of the jurors?

24             MS. SULLIVAN:  I did a search within Google and where

25   Linked In came in, I followed the link.

D9RTBAN4

```
 1              THE COURT:  Were you successful with -- how many

 2   jurors were you successful with the Linked In?

 3              MS. SULLIVAN:  I don't remember exactly, your Honor.

 4              THE COURT:  Was it like most of them or very few of

 5   them?

 6              MS. SULLIVAN:  I would say probably about half, your

 7   Honor.

 8              THE COURT:  And was there any other search that you

 9   made that would have, at their end, been something they would

10   have been aware of?

11              MS. SULLIVAN:  Not to my knowledge.

12              THE COURT:  Facebook or something like that.

13              MS. SULLIVAN:  Not to my knowledge, your Honor.

14              THE COURT:  And in the Linked In portion, you were

15   identified by your name and Bracewell & Giuliani or how -- if

16   you had been at their end what would have come up?

17              MS. SULLIVAN:  Your Honor, I don't know exactly,

18   except from my own experience with Linked In.

19              THE COURT:  You're the right generation.

20              MS. SULLIVAN:  My understanding is from time to time

21   Linked In will email Linked In members a marketing email asking

22   them if they would like to sign up for Links Premium, and the

23   sort of come on, the hook is that you can see who had viewed

24   your profile and have sort of a more involved membership.  In

25   such emails they would often say your profile has been viewed
```

D9RTBAN4

1    six times and you have the opportunity to see the organization

2    from which the person who looked at your profile works.

3            THE COURT:  OK.  Did the government want to put some

4    further questions?

5            MR. ARMAND:  No, your Honor.

6            THE COURT:  OK.  Very good.  Thanks very much.  See,

7    that wasn't so bad, was it.

8            All right.

9            MR. MUKASEY:  She's done more at this trial than

10   Strassberg now.

11           THE COURT:  Let's bring in the jury.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D9RTBAN4

1           (Jury present)

2           THE COURT:  So ladies and gentlemen, congratulations

3    on reaching a verdict, we will only go to 4 o'clock today.

4           A matter has come up that I wanted to raise with you.

5    It's not uncommon when jurors are being selected that counsel,

6    with the permission of the Court, will attempt to gain any

7    piece of information they can about you.  They go on Google

8    because they want to make sure that the jurors they're

9    selecting are fair and impartial.  Obviously, every party here

10   was extremely pleased with every one of you.  They all

11   recognized that, and that's why they didn't strike you or -- by

12   strike we mean use their peremptory challenges, not physically

13   strike.

14          But through inadvertence, apparently, a young lawyer

15   went and continued that search during Tuesday, and so some of

16   you may receive information on Linked In or something that a

17   lawyer has accessed your profile or something like that.  It's

18   not because they're about to offer you a job or anything like

19   it, it's just they were carrying out this checking and they

20   just went beyond the time when it was permitted.  And those

21   mistakes happen, young lawyers make mistakes like that.  I just

22   want to make sure that you knew that nothing improper was being

23   done, it was all innocent, and that you should not infer

24   anything whatsoever about anything in the world if you see that

25   your profile was accessed on Linked In or anything like that.

D9RTBAN4

1    And I know sometimes these notifications you only find out

2    several days later, but this actually ended on Tuesday and it

3    won't continue at any time.

4          Is there anything about that situation that creates a

5    problem for any juror?

6          Very good.

7          All right.  Anything counsel needs to raise at side

8    bar?

9          MR. MUKASEY:  No, Judge.

10         MR. SULLIVAN:  No, your Honor.

11         MR. ARMAND:  No, your Honor.

12         THE COURT:  Very good.  Let's get the witness back on

13   the stand.

14         Cross-examination.

15   CROSS-EXAMINATION

16   BY MS. MAINIGI:

17   Q.  Good afternoon, Mr. O'Donnell.

18   A.  Good afternoon.

19   Q.  My name is Enu Mainigi and I represent the Bank of America

20   defendants in this matter, and I will be asking you some

21   questions.

22         We met before, correct, Mr. O'Donnell?

23   A.  We have.

24   Q.  We met at your deposition a few months ago, correct?

25   A.  In April.

1    Q.  And then a subsequent deposition.

2            I'm going to start first with some of the documents

3    that the government showed you, actually, and try to review

4    some of those.  Do you still have the binder in front of you?

5    A.  I do.

6    Q.  Let's go ahead and start with tab 20, please.  I think it's

7    the second page, Plaintiff's Exhibit 20, which has already been

8    admitted, and I believe that originally you took a look at the

9    first paragraph, does that sound right, Mr. O'Donnell, with the

10   government?

11   A.  Earlier today?

12   Q.  Yes.

13   A.  Yes, I believe that's correct.

14   Q.  And there was some discussion of this QoG reprieve, is that

15   fair?

16   A.  We did discuss the QoG reprieve, yes.

17   Q.  And this email was from Rebecca Mairone, is that right?

18   A.  Well, the starter email was from me to several others.

19   Q.  Well, the starter email is the email at the bottom,

20   correct?

21   A.  I'm sorry, you're right, the original email would have been

22   Rebecca's.

23   Q.  And that was Ms. Mairone going out to a number of people

24   within Countrywide, is that fair?

25   A.  That's correct, yes.

D9RTBAN4                         O'Donnell – cross

1    Q.  Now let's take a look at the paragraph -- the third

2    paragraph in that second page.  Could you read that?  Let's

3    highlight that third paragraph.  And Mr. O'Donnell, can you

4    read that paragraph out loud for us, please?

5    A.  This does not mean that we should not be prudent and

6    protect the compliance and quality standards of the company,

7    but we do want you to feel less of a need to double and triple

8    check your work.  We also want you to comfortably adapt to

9    using many of the former required checklists and worksheets as

10   job aids like other prime divisions of Countrywide.  If we

11   remove a checklist as a requirement in writing, you should not

12   upload it to VLF and only complete it if you feel it's

13   necessary in any point in your development.

14   Q.  Let's blow up the next paragraph and read that out loud,

15   please.

16   A.  In the end, we must be far more efficient, fund loans with

17   more velocity and have more confidence in our decisions while

18   maintaining prime quality and compliance standards.

19               (Continued on next page)

20

21

22

23

24

25

1   Q.  So, Ms. Mairone in this e-mail is advocating both efficient

2   funding of loans as well as maintaining quality and compliance,

3   is that fair?

4        Is that what she says, Mr. O'Donnell, in this e-mail?

5   A.  Among other things, that's correct.

6   Q.  Okay.  Now, in the prior paragraph I think you had some

7   mention of job aids and checklists.  Do you remember discussing

8   that with Ms. Nawaday?

9   A.  Earlier today we did, yes.  We did discuss job aids and

10   checklists and the difference.

11   Q.  Ms. Mairone mentions job aids and checklists in the first

12   paragraph you read, correct?

13   A.  She does, yes.

14   Q.  What she says is that some of the former required

15   checklists and worksheets are going to be job aids, is that

16   fair?

17   A.  It says -- she's asking the employees to adapt to using

18   former checklists and job aids or former checklists and

19   worksheets as job aids.

20   Q.  She makes reference to other prime divisions of

21   Countrywide.  Do you see that?

22   A.  Yes.

23   Q.  That would be perhaps the consumer market division of

24   Countrywide?

25   A.  That was the other consumer -- directed consumer division,

1    yes.

2    Q.  CMD, as it's sometimes known, had for quite a long time

3    always processed prime loans, correct?

4    A.  That's true.  They were the largest prime loan division at

5    Countrywide.

6    Q.  In fact, they were the largest prime loan retailer in the

7    country for some period of time, correct?

8            MS. NAWADAY:  Objection, your Honor.

9            THE COURT:  Sustained.

10   Q.  With respect to CMD, is it fair to say that in the

11   processing of prime loans, they used job aids to assist with

12   that processing?

13           MS. NAWADAY:  Objection, your Honor.

14           THE COURT:  Ground?

15           MS. NAWADAY:  Foundation.

16           THE COURT:  Lay a foundation.

17   Q.  Mr. O'Donnell, you testified earlier with the government

18   you were familiar with what's been marked as Plaintiff's

19   Exhibit 20, correct?

20   A.  Yes.

21   Q.  You received a copy of this e-mail, correct?

22   A.  I did.

23   Q.  For various periods of time, you were head of underwriting

24   at FSL, is that fair?

25   A.  I was head of underwriting from 2005 through the middle of

1    2007.

2    Q.  I believe as head of underwriting for FSL, you had some

3    general familiarity with processing at CMD, one of the sister

4    divisions.  Is that fair?

5    A.  I did learn about CMD's process when I visited the

6    division, yes.

7    Q.  In fact, there were other times, as I recall you telling me

8    earlier, you also learned about CMD.  Is that fair?

9    A.  I did have a general knowledge for what CMD did in terms of

10   how they originated their loans, and how that business was

11   structured.

12   Q.  Is it fair to say in processing prime loans within CMD,

13   instead of requiring mandatory checklists, they had job aids

14   that served as a point of reference for their loan processors?

15   A.  I don't recall the exact worksheets or job aids they might

16   have leveraged.  We had different -- slightly different

17   computer systems than they had.  I am not exactly familiar with

18   what type of job aids or worksheets they used.

19   Q.  I'm less focused on the specific checklists and job aids

20   that they used.  Just the fact -- the inference is clear from

21   the e-mail, I think, that in the other prime division, that

22   they utilized job aids that were a point of reference as

23   opposed to mandatory checklists.

24          THE COURT:  You can't testify as to what you think is

25   inferrible.  So sustained as to form.

```
 1   Q.  Is it fair to say within the subprime structure of FSL,
 2   there was a need for checklists?
 3   A.  Within the subprime structure, underwriting and funding
 4   structure in FSL, we did leverage checklists.
 5   Q.  Those checklists were mandatory as far as needing to be
 6   filled out?
 7   A.  Some of them were mandatory, that's true.
 8   Q.  When you shifted over to the prime processes, some of those
 9   checklists were found to be unnecessary, fair?
10   A.  I think there were varying opinions.  I would not agree
11   that they were unnecessary, but some I believe did believe they
12   were unnecessary.
13   Q.  So some checklists after -- was there a discussion had
14   about should we keep this checklist, should we not keep this
15   checklist?
16   A.  There were many discussions about the checklists
17   themselves.
18   Q.  Ultimately someone made the decision that, okay, we are
19   going to get rid of this particular checklist, correct?
20           MS. NAWADAY:  Objection.
21           THE COURT:  If he knows, I'll allow him to answer.
22   A.  Ultimately there were some checklists that were either done
23   away with entirely or converted to job aid status.
24   Q.  By converting them to job aid status, what occurred is the
25   checklist still remained available for reference, is that
```

1   right?

2   A.  It was -- the checklist, once it became a job aid, it was

3   no longer mandatory.  It was optional for the employee to use

4   or not to use, their choice.

5   Q.  Let's take a look at Exhibit 264.  Plaintiff's Exhibit 264

6   which is also admitted.  I believe you spoke to Ms. Nawaday

7   about this exhibit as it related to the issue of the rebuttals

8   to the SUS.  Do you recall that earlier today, Mr. O'Donnell?

9   A.  I do recall talking about this exhibit earlier today, yes.

10  Q.  Okay.  Let's take a look at -- I just want to ask you to

11  look at some other things that are on that same page.  If we

12  can take a look at the last page, please.

13          Could you give us the context again, Mr. O'Donnell,

14  for this e-mail exchange.

15  A.  This is in March of 2008.  And I'm making recommendations

16  to Greg about steps we can take to address the issues that he's

17  raising.

18  Q.  Is it fair to say that certain quality issues had been

19  brought to Mr. Lumsden's attention in the March 2008 time

20  period?

21  A.  Well, Mr. Lumsden was receiving the reports and information

22  about quality every month.

23  Q.  But in particular, is it fair to say that either you or a

24  combination of you and Mr. Kitashima brought a set of quality

25  issues to Mr. Lumsden's attention in this March 2008 time

D9R3BAN5                          O'Donnell - cross

 1   period?

 2   A.   I think he heard -- well, I know he heard from Cliff and I

 3   on a regular basis and others as well during this timeframe.

 4   Q.   Were there a set of quality concerns that you brought to

 5   Mr. Lumsden in this March 2008 time period?

 6   A.   Yes.  Consistent with the same approach I had used in prior

 7   months, the QA and the corporate QC reports.

 8   Q.   But was it a greater set of concerns that you brought in

 9   the March time period?  Because he's responding to some of your

10   e-mails here, correct?

11   A.   I think I'm responding to his initial e-mail.  And the

12   topic is quality in FSL.

13   Q.   Is it fair to say that your view was that Mr. Lumsden

14   always had his eye on quality?

15               MS. NAWADAY:  Objection.

16               THE COURT:  Sustained.

17   Q.   Was Mr. Lumsden concerned about quality within FSL?

18               MS. NAWADAY:  Objection.

19               THE COURT:  Sustained.

20   Q.   Let's go take a look at that paragraph.  Let's blow up that

21   top paragraph.  That's the one that we looked at before.  Now,

22   after that paragraph, Mr. Lumsden has a set of ideas for you

23   there, is that fair?

24   A.   He's -- I think he's laying out his thoughts.  He says a

25   couple things come to mind, yes.

1    Q.  Could you read number one, please.

2    A.  "Number one.  Our plan on stated looks solid."

3    Q.  Did you understand him to be referring to stated income

4    loans?

5    A.  Yes, I believe that would be related to stated income

6    loans.

7    Q.  So there had been some quality issues that had been raised

8    with respect to stated income loans, is that right?

9    A.   That's true.  We were having high -- a high percentage of

10   our overall SUS finding levels were coming in the area of

11   stated income.

12   Q.  Is it fair to say, and you may not have the exact date

13   committed to memory, Mr. O'Donnell.  But is it fair to say that

14   by March 17, there was a new plan for stated income loans and

15   that underwriters were required to review stated income loans

16   starting with that date?

17               MS. NAWADAY:  Objection.

18               THE COURT:  Ground?

19               MS. NAWADAY:  Vague and foundation.

20               THE COURT:  Pardon?

21               MS. NAWADAY:  Vague and foundation.

22               THE COURT:  I think the vagueness comes from the fact

23   that it is a compound question.

24               MS. MAINIGI:  I can break it down, your Honor.

25               THE COURT:  Why don't you rephrase and we'll see if

1    there is a foundation issue.

2    Q.  Mr. O'Donnell, you are aware of action taken with respect

3    to stated income loans in the March 2008 time period, correct?

4    A.  I'm aware of recommendations we made for a new stated work

5    flow, yes, as outlined in this note.

6    Q.  Are you aware that there was a change in policy within FSL

7    that required underwriters to review all stated income loans in

8    the March 2008 time period?

9    A.  I'm not sure of the exact timeframe but I know that

10   underwriters became reinvolved in reviewing stated income

11   loans.

12   Q.  I take it as someone who had oversight over underwriting,

13   that was something that you thought was a positive move?

14   A.  That was something that I had been recommending for quite

15   sometime, yes.

16   Q.  Number two is the one that you read earlier.  Is that

17   right?

18   A.  Yes.  That's true.

19   Q.  Let's go ahead and read number three now.  Again, these are

20   Mr. Lumsden's recommendations to you, correct?

21   A.  They're his comments, yes.

22   Q.  Number three, please.

23   A.  "We have many experienced senior level underwriters in many

24   different jobs.  We need to marshal their services and

25   experience."

1    Q.  I take it over the next couple of months, those senior

2    level underwriters in many different jobs were marshaled in a

3    variety of ways, is that right?

4              MS. NAWADAY:  Objection.

5              THE COURT:  Sustained.

6    Q.  Mr. O'Donnell, underwriters were brought back in to stated

7    income loans in March 2008, correct?

8    A.  I don't know the exact timeframe, but they were brought

9    back at some point, yes.

10   Q.  Underwriters were brought back to all loans at the cleared

11   to close process by April 2008, correct?

12   A.  At some point they were brought back, yes.

13   Q.  Then by May 2008, underwriters had to review the entire

14   loan file, is that fair?

15   A.  I believe that's true, yes.

16   Q.  Let's read his number four, please, out loud.

17   A.  "What else can we do to improve quality for other products?

18   What do the current stats tell us about non-stated business?

19   Can we pull 50 random files funded in February for a quick

20   look?"

21   Q.  So is it fair to say that Mr. Lumsden was looking for other

22   ideas on how to improve quality?

23             MS. NAWADAY:  Objection.

24             THE COURT:  Sustained.

25   Q.  Did you give Mr. Lumsden any other ideas that month to

D9R3BAN5                           O'Donnell - cross

1    improve quality for the other products?

2    A.  I was pretty consistent in voicing ideas on what we could

3    do to improve quality beginning in the fall of 2007.

4    Q.  In response to number four, do you recall specifically

5    whether you gave Mr. Lumsden any additional ideas?

6    A.  I don't recall specifically what I -- if I responded

7    directly to this question.

8    Q.  Let's read number five, please.

9    A.  "Should we do more with QA?"

10   Q.  QA is referring to quality assurance?

11   A.  That's true.

12   Q.  So, is it fair to say that right around this time, there

13   were significant changes that were going on with the QA

14   process?

15   A.  I don't know how you would define "significant."

16   Q.  Well, I think there was, is it fair to say there was an

17   attempt to take the QA process and make it more of a predictor

18   of QC during this time period with Mike Burns and his group?

19               MS. NAWADAY:  Objection.

20               THE COURT:  Sustained.

21   Q.  Was a group put together in the spring of 2008 to study the

22   QA process?

23   A.  The QA process, as we talked about a little bit earlier

24   today, was under constant review beginning in the summer of

25   2007.

D9R3BAN5                          O'Donnell - cross

1    Q.  My question was a bit more focused.  Was there more of a

2    focus in the spring of 2008 on the QA process, Mr. O'Donnell,

3    to your recollection?

4    A.  I don't recall there being more of a focus, no.

5    Q.  You've always felt it was always a focus, QA?

6               MS. NAWADAY:  Objection.

7               THE COURT:  Overruled.

8    A.  My experience, very personal, was that the QA process got

9    plenty of focus from many levels.

10   Q.  Could you take a look at number six and please read that

11   out loud.

12   A.  "All turn time goals should be suspended and related comp

13   topics."

14   Q.  What do you understand that to mean?

15   A.  That the goals that had been put in place to move loans

16   more quickly, it's an acknowledgment that they've led to a

17   deterioration in quality.

18   Q.  Well, let's focus on all turn time goals should be

19   suspended.  What does that mean to you, Mr. O'Donnell?

20   A.  That turn time goals that had been introduced previously

21   were being suspended.

22   Q.  Okay.  And did you execute on that?

23   A.  My group wouldn't have had turn time goals, and I wasn't in

24   charge of comp time.  So this would not be something that I

25   would execute on.

D9R3BAN5                         O'Donnell - cross

1    Q.  To your knowledge, was this done?

2    A.  I believe it was, yes.

3    Q.  Take a look at Exhibit 266 which the government also showed

4    you earlier, Mr. O'Donnell.

5            MS. MAINIGI:  I believe, Alex, let's take a look at

6    page two, first.  I believe if I remember correctly it is the

7    paragraph that starts with "enhancement."  Let's blow that up.

8    Q.  I think you read this with Ms. Nawaday.  Do you recall

9    reading that paragraph earlier today, Mr. O'Donnell?

10   A.  Yes, I believe we read this earlier today.

11   Q.  Let's go ahead and turn to the first page now, please.  The

12   date of this e-mail, well, e-mail is from you, is that right,

13   Mr. O'Donnell?

14   A.  That's correct.

15   Q.  It is dated August 1st, 2007, is that fair?

16   A.  That's correct.

17   Q.  Just as a frame of reference, is that a couple of weeks

18   before you're about to embark on the pilot for the High-Speed

19   Swim Lane?

20   A.  The -- yes, just about two weeks before.

21   Q.  Who are you sending this e-mail out to?

22   A.  This is being sent to the employees that worked in Central

23   Fulfillment, underwriting, and CFC, which was the central

24   funding group.

25   Q.  Did the central funding -- you were head of the central

1   funding group?

2   A.  I was head of central services, yes, which was underwriting

3   and funding.

4   Q.  Did that group essentially become Central Fulfillment then

5   in the October time period?

6   A.  Central Fulfillment was really more of a processing.  The

7   funders moved into the Central Fulfillment organization.  But

8   they only handled the loans that actually funded, not the loans

9   that were just processed or underwritten in the pipeline.

10  Q.  So, I take it the purpose of this e-mail is to announce

11  that there are going to be some new work flows such as the HSSL

12  pilot that will be going into effect.  Is that fair?

13  A.  This e-mail is announcing central service's incentive plan.

14  Q.  Well, let's take a look at the first paragraph.  If you

15  could read that paragraph out loud, please.

16  A.  "As you know, FSL has seen explosive growth in prime

17  fundings over the last several quarters.  Although that growth

18  has allowed us to absorb some of the impact relating to

19  deterioration of the subprime market, our struggle to make the

20  full leap to becoming a prime lender is placing significant

21  pressure on our revenues and profits.  It is essential that we

22  take significant and immediate steps to grow our total volume,

23  improve our prime application to funding ratios, and reduce our

24  costs per loan.  We must have all employees focus on delivering

25  immediate improvements to our prime applications flow throughs,

D9R3BAN5                         O'Donnell - cross

1    turn time, and total funded loan volume."

2    Q.  Take a look at the second paragraph please, and read that

3    out loud as well.

4    A.  "To that end we will be introducing updated work flows

5    designed to move loans through the pipeline rapidly in early

6    August.  The focus will be on eliminating unnecessary delays or

7    subprime process steps for prime applications.  In many ways,

8    we continue to manufacture prime loans by sending them through

9    a work flow originally built for subprime.  This adds cost and

10   time which negatively impact our flow throughs of applications

11   to funding and allow competitors to steal loans that languish

12   in the pipeline."

13   Q.  So this is, I take it, announcing essentially the HSSL work

14   flow, Mr. O'Donnell?

15   A.  It says we are going to introduce updated work flows, so

16   the Hustle would have been one of those work flows.

17   Q.  That was the work flow that was still in the design phase

18   or about to come out of the design phase in this period of

19   time, correct?

20   A.  Right.  It was -- the pilot was just about to kickoff in a

21   couple of weeks.

22   Q.  One of the motivations for it is, it says, allow

23   competitors to steal loans that languish in the pipeline.  Do

24   you see that?

25   A.  I do.

1    Q.  Did FSL have a concern at that point in time that loans

2    were taking too long to process, and that in the interim,

3    customers were going to other competitors?

4            MS. NAWADAY:  Objection.

5    Q.  Is that what the concern was?

6            MS. NAWADAY:  Objection.

7            THE COURT:  Sustained.

8    Q.  Can you explain to me what that last sentence means,

9    Mr. O'Donnell.

10   A.  That if loans languished in the pipeline unfunded, there

11   would be an opportunity for another lender to contact the same

12   borrower and solicit them to take a loan with that bank or that

13   mortgage company.

14   Q.  Was that happening to your recollection?

15   A.  I didn't manage the pipeline in processing at this time.  I

16   only managed the underwriting and funding.  But, anecdotally,

17   there were stories that this could happen.  That's what I

18   recall.

19   Q.  Were you aware of it actually happening, Mr. O'Donnell?

20   A.  It was -- it was reported, but I didn't see loan files

21   where that had actually happened.

22   Q.  Who did you get the reports from?

23   A.  The -- the production management team.

24   Q.  There is also reference in that paragraph to subprime

25   process steps.  Do you see that?

D9R3BAN5                          O'Donnell - cross

1    A.  I do.

2    Q.  FSL, Full Spectrum Lending, had historically been

3    Countrywide's subprime shop, correct?

4    A.  That's true.  The division was originally started to make

5    just exclusively subprime loans.

6    Q.  Now it always had a few prime loans that it processed, is

7    that fair?

8    A.  I don't know about always.  But at some point we started to

9    have the ability to process and fund some prime loans.

10   Q.  I think we referred to earlier the sister shop CMD is the

11   entity that really was processing a lot of the prime loans for

12   the years prior to 2007, is that fair?

13   A.  Their primary focus was the prime market and EA, yes.

14   Q.  As a general matter, subprime loans are riskier than prime

15   loans, is that right?

16   A.  Generally, that's true.

17   Q.  And partly for that reason, subprime loans and prime loans

18   are processed differently, is that right?

19   A.  In FSL they were processed differently, yes.

20   Q.  To your knowledge generally in the industry, are subprime

21   loans and prime loans processed differently?

22           MS. NAWADAY:  Objection.

23           THE COURT:  Sustained.

24   Q.  FSL had built a process to -- that was a process to process

25   the subprime loan going into 2007, is that right?

1   A.  Can -- I'm not sure I understand.

2   Q.  That was a poor question.

3          The model for processing loans that FSL had in the

4   summer of 2007 was essentially a subprime process, is that

5   fair?

6   A.  It was both.  We were doing both prime and subprime at that

7   time.  We had distinct work flows for both.

8   Q.  Basically, in the 2007 summer time period, a working group

9   that you're referring to as a steering committee working group

10  was put together to design the High-Speed Swim Lane, is that

11  right?

12  A.  The steering committee was put together to develop the

13  strategy of what we would do to move from subprime model to a

14  prime model.

15  Q.  That's because the subprime market had essentially dried up

16  by the summer of 2007?

17  A.  It -- my recollection it was well on its way to drying up,

18  it's true.

19  Q.  You were on that steering committee, is that right?

20  A.  I was.

21  Q.  So the reference, coming back to this document, the

22  reference here to eliminating unnecessary delays or subprime

23  process steps for prime applications is referring to the

24  mandate essentially of the working group for High-Speed Swim

25  Lane, is that right?

1    A.  In part, I think that's true.

2    Q.  Let me ask you to turn to another document you looked at

3    with counsel I believe yesterday, PX 49.  Was this the document

4    that was referring to some incident that occurred at NCA where

5    a loan processor had cleared something to close?

6    A.  Right.  This is the one we talked about yesterday

7    afternoon.

8    Q.  Okay.  Now, this involved a couple of loan processors, is

9    that right?

10   A.  Yes, I think this is -- it was written to highlight two

11   instances.

12   Q.  A couple of instances of loan processors doing something

13   that they shouldn't be doing, is that right?

14   A.  That's correct.

15   Q.  It's an incident involving loan processors within NCA,

16   fair?

17   A.  That's true.

18   Q.  And not loan processors that are in the High-Speed Swim

19   Lane, is that fair?

20   A.  It didn't exist at that time.

21   Q.  Now, if you take a look at the e-mail, let's take a look at

22   the top e-mail.  The pages are not numbered.  Top of page five.

23   Let's focus on the e-mail there to John Boland, cc Robert Price

24   from Phyllis Gilliard.  Could you read that out loud, please

25   Mr. O'Donnell.

1   A.  "I support any findings that these be sent directly to

2   Javier for investigation.  I spoke with Jessica regarding her

3   incident and the excuse was not acceptable to me.  I have taken

4   all authority from Jessica and Sarah's entire team."

5   Q.  Okay.  Now, who is Ms. Gilliard?  What was her role at the

6   time?

7   A.  Phyllis was a Full Spectrum employee.  She had been

8   assigned to the NCA group to help with their assimilation into

9   Full Spectrum.  She worked in underwriting previously and had

10  operations experience as well.

11  Q.  So, who is the Javier referenced there?

12  A.  That's Javier Jaraba.  He was in charge, among other

13  things, of a fraud investigations unit for Full Spectrum.

14  Q.  It looks like Ms. Gilliard sent this matter for

15  investigation to Mr. Jaraba then, is that right?

16  A.  I think she's saying she would support it if someone was

17  going to send it to Javier.

18  Q.  Do you know what happened with this incident,

19  Mr. O'Donnell?

20  A.  I don't know outcome of the investigation, no.

21  Q.  Did you do any follow up on this incident at the time to

22  see what had happened?

23  A.  I don't recall what I did in terms of follow up.

24  Q.  It certainly appears that someone is contemplating sending

25  this for investigation, right?

1          MS. NAWADAY:  Objection.

2          THE COURT:  Sustained.

3    Q.  The last sentence "I have taken all authority from

4    Jessica's and Sarah's entire team."  What's your understanding

5    of what that means?

6    A.  I am not sure what that means.  Phyllis would not have been

7    in a position to suspend authority from anyone.  She could make

8    a recommendation to FSL risk management, but I am not sure what

9    she was saying she had done here.

10   Q.  It would be authority to do what?

11   A.  I am not sure.  It says all authority.

12   Q.  So, essentially the entire team, she's at least making a

13   recommendation to suspend all authority for the entire team, is

14   that right?

15         MS. NAWADAY:  Objection.

16         THE COURT:  Sustained.

17   Q.  Is it fair to say that, in your estimation -- this e-mail

18   was ultimately forwarded to you, Mr. O'Donnell, right?

19   A.  It was.  I believe Robert Price copied me on the note he

20   sent to Cheri Shine.

21   Q.  Do you know why you were copied on this?

22   A.  At the time Robert reported to me.

23   Q.  Let's take a look at the first page, please.  And the

24   e-mail at the bottom in the last paragraph.  If we can blow up

25   that paragraph right there.  This is from Mr. Price who

D9R3BAN5                    O'Donnell - cross

1    reported to you.

2            Could you read that out loud, Mr. O'Donnell.

3    A.  "In short, along with the strong message about moving loans

4    which is good, we must mention that doing the right thing is

5    equally important part of the recipe for success.  Thanks."

6    Q.  Let me come back, Mr. O'Donnell, to something you discussed

7    yesterday.  Do you remember discussing the prime CLUES accept

8    process with Ms. Nawaday?

9    A.  Yes, yes, yesterday, I do.

10   Q.  The prime CLUES accept -- prime CLUES accept has two

11   meanings, is that correct?

12   A.  Has two meanings?

13   Q.  Prime CLUES accept can refer to the output from CLUES, is

14   that right?

15   A.  Right, that's what that is the meaning.  Prime CLUES accept

16   is the answer from the underwriting engine for a prime loan.

17   Q.  I'm sorry.  Prime CLUES accept also referred to a work flow

18   for processing prime loans within FSL, is that right?

19   A.  We did have a work flow for processing prime CLUES accepts

20   that we did refer to as the PCA process.

21   Q.  It was a process that was used in approximately the 2006,

22   2007 time period for the prime loans that you did have within

23   FSL?

24   A.  I think that's true.  We started it -- it started to be

25   used more and more frequently beginning in 2006 as our -- the

D9R3BAN5                          O'Donnell - cross

1   level of applications for prime loans increased.

2   Q.  Loan processors and underwriters were involved in this PCA

3   work flow, right?

4   A.  That's true in the PCA, that's true.

5   Q.  You talked yesterday about clearing conditions.  Do you

6   remember that?

7   A.  I do.

8   Q.  Clearing to close also, correct?

9   A.  That was part of the PCA process, yes.

10  Q.  Every loan is cleared to close at some point, correct?

11  A.  Hopefully, yes.

12  Q.  So --

13  A.  Not every loan.  Some loans actually do get turned down.

14  Q.  That comes at the end of the process if the loan is

15  suitable to keep going; is that fair?

16  A.  That's true.  That was a critical step before you could

17  actually go to draw loan documents and go to a closing.

18  Q.  The conditions get cleared prior to cleared to close, is

19  that right?

20  A.  As it's drawn up, the conditions are supposed to be

21  gathered and cleared before a cleared to close is issued, yes.

22  Q.  In the subprime model, underwriters both cleared conditions

23  to close, excuse me.

24          In the subprime model, underwriters both cleared

25  conditions and cleared to close, is that right?

1    A.  In the subprime model, underwriters and processors could

2    clear conditions.  There were types of conditions.  They were

3    classified differently.  So based on the classifications, some

4    could be cleared by an underwriter, and some other lower level

5    conditions could in fact be cleared by a processor.

6          But ultimately you're right, the underwriter was the

7    person responsible for issuing the cleared to close.

8    Q.  Now, in the PCA work flow which was just for prime loans,

9    correct?

10   A.  Prime CLUES accepts, yes.

11   Q.  In the PCA work flow, underwriters cleared loans to close,

12   is that right?

13   A.  That's true.

14   Q.  But in the PCA work flow, loan processors were able to

15   clear certain conditions, is that right?

16   A.  The loan processor in the PCA work flow, loan processors

17   could earn condition sign off authority.  So that they could

18   review and sign off on certain conditions.

19   Q.  They could earn that authority by going through appropriate

20   training and certification?

21   A.  That's correct.

22   Q.  There was a working group within FSL that arrived at this

23   decision to put this PCA process in place, is that right, in

24   the 2006 time period?

25   A.  For the --

 1           MS. NAWADAY:  Objection.

 2           THE COURT:  I'll allow it.  You may answer.

 3   A.  Can you repeat, please?

 4   Q.  Sure.  The PCA process came into existence in about 2006,

 5   is that right?

 6   A.  That's correct.

 7   Q.  And as I understand it, was there a working group that

 8   decided to get together to come up with a right design for PCA?

 9   A.  It was a largely within the underwriting group.  I believe

10   we piloted the process in the Chandler, Arizona location under

11   Jim White.

12   Q.  Did you have various subject matter experts come together

13   from the PCA -- or excuse me -- from the underwriting group to

14   be part of this committee?

15   A.  I think the initiative started by Jim making a proposal to

16   me.  That he thought there might be a way to more effectively

17   process certain prime loans.  Specifically CLUES accepts.

18   Q.  And what was happening to the prime loans such that

19   Mr. White decided to make the recommendation to your

20   understanding?

21   A.  We -- well, as you said, Full Spectrum was a subprime,

22   largely a subprime company.  We didn't have a lot of

23   experience, anyone in the company, originating or closing,

24   processing, closing prime loans.

25           So we set up a PCA process, to make sure that where we

1    were committing to a borrower on a prime loan, they really did

2    qualify.

3    Q.  Did the PCA process speed up the amount of time it took to

4    process a prime loan?

5    A.  Speed up the -- reduce the amount of time?

6    Q.  Yes.  Did you reduce the amount of processing time for a

7    prime loan with PCA?

8    A.  We did.

9    Q.  Do you have a sense of how much?

10   A.  I don't remember exactly.  But, it was a significant

11   improvement.

12   Q.  Is it fair to say the mandate then of the High-Speed Swim

13   Lane group was to take a look at the PCA process, and study it

14   to determine how they could improve upon it?

15   A.  I think the -- the working group you are asking about?

16   Q.  Yes.

17   A.  Yeah.  The mandate of the working group was to come up with

18   an enhanced work flow.  And specifically develop speed -- speed

19   based swim lanes based on the type of loan and the risk of that

20   loan.

21   Q.  One of the things that they did, the High-Speed Swim Lane

22   work group, was look at the existing PCA process, correct?

23   A.  Yeah.  Definitely.  We looked at the PCA process to see --

24   we made strides with that already.  We were looking to see how

25   it could be adjusted to improve our ability to close prime

1    loans.

2    Q.  You, Mr. O'Donnell, viewed the PCA process to be a success,

3    is that right?

4    A.  I did.  We were funding prime loans, we were funding them

5    with good quality, and we had improved the speed with which we

6    were able to move a loan from start to finish.

7    Q.  When High-Speed Swim Lane was designed, did some of the

8    loans that used to be PCA loans go into the High-Speed Swim

9    Lane pilot?

10   A.  Well, the pilot was a small number of loans.  But yeah, I

11   would imagine some of the loans -- certainly they were all

12   supposed to be prime CLUES accepts.  So some of the loans would

13   have gone from our standard work flow to the new Hustle pilot.

14   Q.  Other PCA loans may not have gone through the High-Speed

15   Swim Lane work flow, correct?  They would have continued to be

16   cleared by an underwriter?

17   A.  During the pilot?

18   Q.  Yes.

19   A.  Yeah.  Not everybody participated in the pilot.

20   Q.  Let me jump ahead to Central Fulfillment.  High-Speed Swim

21   Lane was one of the work flows in Central Fulfillment, correct?

22   A.  That's correct.

23   Q.  And there were two other work flows within Central

24   Fulfillment, is that fair?

25   A.  There would be.  There was work flow for CLUES refers,

1    which were for loans that didn't qualify based on the initial

2    run of CLUES.  And there was a work flow for loans that were

3    excluded from the Hustle process that contain more risk.

4    Q.  Okay.  So, CLUES refers went through a different work flow

5    than High-Speed Swim Lane in Central Fulfillment, correct?

6    A.  That's correct.

7    Q.  And that work flow had an underwriter fingering the loan to

8    close, right?

9    A.  Right.  It was Countrywide's practice that if CLUES gave

10   you a refer decision, the loan had to be manually underwritten

11   by a underwriter.

12   Q.  Those CLUES refers loans that got a CLUES refer continued

13   to essentially follow the old subprime process within FSL, is

14   that right?

15   A.  Not -- not exactly the old subprime process, but there was

16   underwriter involvement in the decisions on those loans, yes.

17   Q.  Were underwriters generally clearing conditions?

18   A.  They would -- again, in that process the conditions were

19   classified differently.  And there were specific conditions

20   that only an underwriter could sign off on.

21   Q.  Then, so that's one work flow, and we've got High-Speed

22   Swim Lane.  Then there was a third work flow, is that right?

23   A.  Correct.

24   Q.  That work flow was for exclusions from the High-Speed Swim

25   Lane, is that right?

1    A.  That's right.

2    Q.  So this would be loans that had gotten a CLUES accept but

3    were excluded from the High-Speed Swim Lane?

4    A.  That's right.

5    Q.  This would include, for example, purchases?

6    A.  Purchases were one of three or four exclusion, yes.

7    Q.  So, only refinancings went through the High-Speed Swim

8    Lane, is that right?

9    A.  True.  And CMD's business was really all about purchase.

10   Full Spectrum was basically a cash out refinance business

11   model.  We didn't do a lot of purchase transactions in our

12   division.

13   Q.  So but the purchases you did do were cleared to close by an

14   underwriter, is that right?

15   A.  That's what was supposed to happen, yes.

16   Q.  What other exclusions existed that were cleared to close by

17   an underwriter?

18   A.  I think we had loans over $1 million had to involve an

19   underwriter.  And manufactured homes.  And transactions where

20   there was a -- where it was a non-arm's length transaction.  So

21   if you sold your home or to someone you were related to, not on

22   the open market, not involving a realtor or the MLS.

23   Q.  Anything else come to mind?

24   A.  The list wasn't very big.  So, I think that's -- that's

25   what I recall.

1   Q.   The High-Speed Swim Lane pilot was from mid August through

2   the end of September of 2007, right?

3   A.   That's true.

4   Q.   Then Central Fulfillment kicked off on October -- for

5   October 1st, is that right?

6   A.   Early October, yeah, I think that's correct.

7   Q.   That's when the three work flows came into place,

8   October 1st?

9   A.   Well, yeah.  For the most part I think that's true.

10  Q.   As part of Central Fulfillment, there was a reorganization

11  that occurred, is that right?

12  A.   Well, Full Spectrum went through a reorganization to

13  facilitate the rollout of Central Fulfillment.

14  Q.   So, different people -- did people switch around job titles

15  as well?

16  A.   Some people did, yes.

17  Q.   Is it fair to say that as part of the Central Fulfillment

18  re-org, that individuals that were previously known as

19  underwriters became loan specialists?

20          MS. NAWADAY:  Objection.

21          THE COURT:  If you know, you may answer.

22          THE WITNESS:  I'm sorry, your Honor.  I didn't hear.

23          THE COURT:  I'm sorry.  If you know from personal

24  knowledge, you can answer that.

25  A.   Can you repeat?

D9R3BAN5                          O'Donnell – cross

1    Q.  Sure.  I think this is an issue we talked about in your

2    deposition.  As part of Central Fulfillment, and the

3    reorganizations that were taking place, isn't it true that some

4    underwriters became loan specialists?

5    A.  Yes, that's true.

6    Q.  So one day, someone was called an underwriter, and the next

7    day they were called a loan specialist, right?

8    A.  That's true.  Their role changed from underwriter to loan

9    specialist or junior underwriter to loan specialist.  And they

10   would have had a title change.

11   Q.  That loan specialist on day two still had all of the

12   training that they had gained as an underwriter, right?

13   A.  That's true.

14           MS. MAINIGI:  Your Honor, may I approach?

15           THE COURT:  Yes.

16           MS. MAINIGI:  Alex, can you put up PX 427, please.

17   Q.  PX 427 is an org chart of Central Fulfillment.  Does it

18   look familiar to you, Mr. O'Donnell?

19   A.  I don't think I've seen this document before.  But I've

20   seen org charts that look similar to this before.

21           MS. MAINIGI:  I think it's PX 427, Alex.  I think the

22   government marked it as an exhibit.

23           THE COURT:  It is a plaintiff's exhibit already in

24   evidence.

25   Q.  Taking a look at this org chart for Central Fulfillment.

D9R3BAN5                          O'Donnell - cross

1    James White.  Mr. White was an underwriter, right?

2    A.  He was a center manager, so he ran the Chandler fulfillment

3    center.

4    Q.  But he was an underwriter, correct?

5    A.  At one time in his career?  Yes.

6    Q.  How about Mr. Sallis.  Mr. Sallis was an underwriter,

7    correct?

8    A.  At one time in his career, yes.

9    Q.  Mr. Price, he was an underwriter?

10   A.  He was.

11   Q.  How about Adela Zamarripa, was Ms. Zamarripa to your

12   knowledge an underwriter?

13   A.  She was.

14   Q.  Donna Braaten, was she an underwriter?

15   A.  She was.

16   Q.  And An Pham, was she an underwriter?

17   A.  Yes, An was an underwriter at one point.

18   Q.  Norma Frias, was she an underwriter?

19   A.  She was.

20   Q.  How about Amy Adler, was she an underwriter?

21   A.  I believe she was, yes.

22   Q.  And Beth Ahern, was she an underwriter?

23   A.  She was.

24   Q.  And Kim Knouse, was she an underwriter?

25   A.  I believe she was.

1  Q.  And Ron Gillet.  Underwriter?

2  A.  He was.

3  Q.  Ryan Solomon, was he an underwriter?

4  A.  He was.

5  Q.  And Aaron Portenier, was he an underwriter?

6  A.  Aaron was, yes.

7  Q.  Desiree Flores, was she an underwriter?

8  A.  She was.

9  Q.  How about Schuyler Yost, underwriter?

10  A.  He was.

11  Q.  And Dylan Schafer, also an underwriter?

12  A.  He was.

13  Q.  And Patrick Pigeon, underwriter?

14  A.  He was.

15  Q.  Ron Cannon, underwriter?

16  A.  He was at one time.

17  Q.  And Ryan Chiotti, also an underwriter?

18  A.  He was at one time, yes.

19  Q.  A number of people that had underwriter training were

20  involved with Central Fulfillment, is that fair?

21  A.  Yes, that's true.

22  Q.  We were talking a little bit about the quality issues that

23  came up in the spring of 2008 a little bit earlier, do you

24  recall that?

25  A.  Yes.

```
 1    Q.  It was your view, Mr. O'Donnell, that by the spring of
 2    2008, there were manufacturing quality issues within FSL, is
 3    that right?
 4    A.  It was my view that before that, but yes, they certainly
 5    existed in the spring of 2008.
 6    Q.  As we talked about earlier, you and some of your colleagues
 7    brainstormed about ways to alleviate or mitigate those quality
 8    issues, is that fair?
 9    A.  I'm not sure if I understand what you mean.
10    Q.  Did you come up with suggestions on how to alleviate the
11    quality issues?
12    A.  Yes.  I mean, that was part of my job in risk management to
13    manage risk and try to come up with solutions when there were
14    issues relating to loan quality.
15    Q.  Is one of the ways that you came up with to alleviate
16    quality issues changing the work flow model?
17    A.  Yes.  I recommended that the work flow model be change.
18    Q.  Ultimately the work flow model was changed, is that right?
19    A.  Ultimately, but long after I first made that suggestion.
20    Q.  Ultimately, the quality improved within FSL in the second
21    quarter of 2008, correct?
22    A.  That's true.  The quality began to improve in the second
23    quarter.
24              MS. MAINIGI:  Your Honor, may I approach?
25              THE COURT:  Yes.
```

1   Q.  I'm going to give you a couple of exhibits, Mr. O'Donnell.

2   A.  Thank you.

3   Q.  Mr. O'Donnell, PX 197 is an e-mail exchange with which

4   you're involved, is that right?

5   A.  Can you blow it up?  You're really challenging me now.  20

6   years ago I could read this.

7            MS. MAINIGI:  Let's go down, Alex, to the first

8   page --

9            THE COURT:  No, it's not in evidence yet.

10           MS. MAINIGI:  I'm sorry.  I don't believe there is an

11   objection to Plaintiff's Exhibit 197, your Honor.

12           THE COURT:  Let's find out.  Any objection?

13           MS. NAWADAY:  Just one moment, your Honor.  No

14   objection your Honor.

15           THE COURT:  197 is received.

16           (Plaintiff's Exhibit 197 received in evidence)

17           MS. MAINIGI:  Let's look at the first page.  And Alex,

18   let's see how much we can blow up that first paragraph, the one

19   that starts "after experiencing challenges."

20   Q.  The context for this, Mr. O'Donnell, is this an e-mail that

21   you sent to Robert Vanderberry at Bank of America, is that

22   right?

23   A.  I really can't read the paper copy so it would be helpful

24   if I could just see.

25   Q.  Sure.  Let's let you --

D9R3BAN5                          O'Donnell - cross

1    A.   Yeah.  Bob Vanderberry, yes.

2    Q.   Who was Mr. Vanderberry?

3    A.   He was a vice president or senior vice president from Bank

4    of America.  I believe he reported to Patrick McCallister.  He

5    had been assigned to help with the transition of this part of

6    Countrywide Full Spectrum into Bank of America.

7    Q.   Let's take a look at that second paragraph and feel free to

8    look at the entire e-mail, but I am going to focus on that

9    second paragraph.  Let's blow up that middle paragraph.  And

10   then if could you read that out loud for us.

11   A.   "After experiencing challenges in Q4 2007 and early

12   Q1 2008, we made changes to work flows, training content,

13   authority certification and compensation plans that have play

14   an important role in returning the division's results to the

15   target environment for quality as defined by corporate audit

16   performance.  We've effectively leveraged our central model and

17   the results demonstrate our management team's ability to be

18   responsive to rapid market shifts as well as internal standard

19   adjustments."

20   Q.   You're talking about FSL obviously in that paragraph, is

21   that right?

22   A.   I am.

23   Q.   You're reporting to Mr. Vanderberry your views on what

24   happened the prior year, correct?

25   A.   Yeah.  Bob and I had talked about this as part of his

1   orientation to our company and getting to know each other.

2   Q.  Can we go to the second page, please.  If we could blow up

3   the second paragraph at the top there.

4           Let's just back up and see.  Who is Vicki Lynn Olson,

5   Mr. O'Donnell?

6   A.  She was -- I believe she played a role at Bank of America

7   working for Bob overseeing kind of the quality reporting, kind

8   of the same kind of QA process for the old Bank of America

9   centers.

10  Q.  Had you been having a similar discussion with Ms. Olson

11  regarding quality at FSL the prior year?

12  A.  I hadn't met Vicki, but Bob had her call me and tried to

13  solicit some thoughts from me on things I had done in the past

14  to manage quality.  They were having some challenges.

15  Q.  Could you read that paragraph out loud, please.

16  A.  "The trending illustrates that the remediation enacted with

17  legacy FSL during Q1 2008 had the desired impact of bringing

18  quality back to the target environment.  We'll be finalizing Q3

19  corporate QC results by midweek, and it will be our second

20  consecutive quarter under 4.5 percent.  The early results from

21  October funded loans also appear to indicate we remain on

22  target.  Both CMD and WLD experienced sharp upticks in Q3

23  finding rates, a trend that appears to be continuing in early

24  October audit finings."

25  Q.  So essentially, is it fair to say that you're communicating

1   that the remediation efforts that were undertaken in this

2   spring of 2008 were successful?

3   A.  Yeah, I am.  I'm saying they had the desired impact on our

4   QC.

5   Q.  And QC is the quality control ratings, is that right?

6   A.  I'm sorry.  On the corporate QC SUS rates, yes.

7   Q.  You got the quality control ratings to the level that you

8   thought was appropriate, correct?

9   A.  For me I'd like to see them at zero, but that's not

10  reasonable.  But, they were much closer to the mark that we

11  were trying to reach, yes.

12          MS. MAINIGI:  Can we come back, Alex, to the first

13  page again.  Let's blow up that same middle paragraph.

14  Q.  In your view, the way that you achieved those quality

15  improvements were by all the things you state there, correct?

16  A.  Among other things, yes.

17  Q.  Let's go over those.  It says we made changes to work

18  flows.  What does that mean?

19  A.  We updated the process by which loans were funded.

20  Q.  So, does that mean you went back essentially to a subprime

21  model for work flow?

22  A.  Well, we had to make changes to our work flow during this

23  timeframe, because the products we were offering were changing

24  as well.  We began to offer FHA loans which required

25  underwriters to sign off on every loan.  So that was one of the

1    factors that ultimately helped us get our quality back in line

2    as well.

3    Q.   How about loans that were not FHA.  Did you make changes to

4    the work flows for those loans also?

5    A.   We did.

6    Q.   What were those changes?

7    A.   We brought back the underwriter being involved in the

8    cleared to close process.

9    Q.   So that was in that April time period?

10   A.   I don't remember the exact month, but it was in around that

11   time, yes.

12   Q.   Then you say training content.  What did you mean by

13   training content?

14   A.   I don't remember the exact training that was going on at

15   this time.  But it appears we made some change to the training

16   that was available.

17   Q.   You thought that had an improvement on the quality, is that

18   right?

19   A.   True.  I believe we were again sharing the results of our

20   QC and QA audits, which effectively helped to show people where

21   they were making mistakes and trained them to do a better job.

22   Q.   How about authority certification.  What does that mean?

23   A.   So, we had a pretty rigorous process through which you had

24   to pass in order to get authority.  And we made sure that

25   people who were signing off on loans had passed those tests and

1    loan file reviews and kind of a second signing process by a

2    more senior underwriter.  That they had gone through that

3    successfully.

4    Q.  What do you mean when you say, Mr. O'Donnell, we've

5    effectively leveraged our central model?

6    A.  Full Spectrum always operated under a central model.  For

7    control purposes, even when we were a subprime company, we

8    underwrote and funded our loans centrally.  It was just -- it

9    was easier to train people, it was easier to apply oversight.

10   When you want to make changes, people were located under one

11   roof so it was -- it was a lot easier for control.  And what we

12   had done is leveraged the fact that everybody was in one place,

13   or four places or five places, but we used that advantage to

14   target places -- areas where we were weak.

15   Q.  Then you indicate that the results demonstrate our

16   management team's ability to be responsive to rapid market

17   shifts as well as internal standard adjustments.  What did you

18   mean by that?

19   A.  Well, as we talked about earlier, many of the folks that

20   you pointed out on the org chart earlier I hired or even

21   supervised at other companies.  I had a lot of respect and

22   confidence in their ability to manage underwriting and funding

23   and loan quality.  So, when we gave them the tools to

24   effectively do their job again, they came through.  They

25   delivered.

D9R3BAN5                        O'Donnell - cross

1  Q.  These are the same people that had been around during the

2  subprime model, correct?

3  A.  Not all.  But many of them, yes.

4  Q.  These were the same people that were trying to make the

5  work flow High-Speed Swim Lane operate and function, correct?

6          MS. NAWADAY:  Objection.

7          THE COURT:  I'm sorry, I didn't hear the objection.

8  Forgive me.  Sustained.

9  Q.  Was it the same people that had essentially been in the

10 subprime work flow that operated the High-Speed Swim Lane work

11 flow Mr. O'Donnell?

12          MS. NAWADAY:  Objection.

13          THE COURT:  Sustained.

14 Q.  Did you bring in for the High-Speed Swim Lane work flow a

15 new set of people?

16          MS. NAWADAY:  Objection.

17          THE COURT:  Ground?

18          MS. NAWADAY:  Vague.

19          THE COURT:  I think it is a little.  Sustained.

20 Q.  So the individuals that were involved in the High-Speed

21 Swim Lane work flow, Mr. O'Donnell, in terms of the loan

22 processors, were they the same loan processors and underwriters

23 that had been involved in the subprime work flow?

24 A.  Some of them were the same, but they were operating in

25 different capacities and the senior management over the whole

D9R3BAN5                          O'Donnell - cross

1    process was completely different.

2              (Continued on next page)

D9RTBAN6                         O'Donnell - cross

1   BY MS. MAINIGI:

2   Q.  And I'm sorry if I missed it, but can you explain to me

3   what you meant by rapid market shifts?

4   A.  Well, this note was from 2009.

5   Q.  Yes.

6   A.  From probably the summer of 2007 through the middle of 2009

7   the mortgage market changed regularly, the products, the

8   companies that were involved, the standards.

9   Q.  So it was a tumultuous time?

10  A.  To say the least.

11  Q.  Now take a look at DX 73, please, Mr. O'Donnell.  And that

12  is an admitted exhibit.  This was attached to your email to

13  Mr. Vanderberi can you explain to us what it is?

14  A.  Looks like two pages this is a summary of QC random audits

15  for both stated loans and loans with all income documentation

16  type, so stated and non-stated loans, I guess.

17  Q.  And why did you forward this attachment to Mr. Vanderberi.

18  A.  At this point I don't think Bob and others from Bank of

19  America might have been receiving or even had the ability to

20  receive all the reports from our corporate QC.  So I was

21  sharing with him the comparison for our division versus the

22  other Countrywide divisions.

23  Q.  And so let's take a look -- FSL is the division, correct?

24  A.  It's one of the divisions here, yes.

25  Q.  But that's the division we're focused on?

1    A.  Correct.

2              MS. MAINIGI:  If could you blow up fourth quarter of

3    2007, that bottom number.

4    Q.  Now fourth quarter 2007 was the first quarter that

5    High-Speed Swim Lane within Central Fulfillment was in effect,

6    is that right?

7    A.  That's true.  It didn't involve all of the loans, but for

8    the Central Fulfillment, yes.

9    Q.  And that 5.4 number represents all of FSL for that time

10   period?

11   A.  I believe it does, yes.

12             MS. MAINIGI:  And just as a frame of reference, Alex,

13   can you bring in the prior three quarters.

14   Q.  So 5.4 percent, tell us what number signifies.

15   A.  That roughly five out of a hundred loans, or a little more

16   than five out of a hundred loans on a percentage basis would be

17   rated severely unsat or not investment grade.

18   Q.  And in the prior -- that fourth quarter 5.4 percent

19   High-Speed Swim Lane was in effect, correct, you said?

20   A.  For some of the loans, yes.

21   Q.  And High-Speed Swim Lane within Central Fulfillment was not

22   in effect for those prior three quarters, correct?

23   A.  That's true.

24   Q.  And so all of those quarters the SUS rate is actually

25   higher than the first quarter that Central Fulfillment had the

D9RTBAN6                        O'Donnell – cross

 1  High-Speed Swim Lane work flow, is that right?

 2  A.  That's true.

 3  Q.  Now let's go ahead to the first two quarters in 2008,

 4  please.  And actually the first -- let's do the three quarters

 5  in 2008.  So now I think that what you were highlighting to

 6  Mr. Vanderberi was in blue.  I think you were highing the 4.4

 7  and 4.6 to Mr. Vanderberi in your email to him, is that right?

 8  A.  I think that's correct, yes.

 9  Q.  What were you trying to signify by highlighting those

10  numbers in blue?

11  A.  That our quality was beginning to come back more toward the

12  target environment based on our change in products and our

13  reintroduction of better controls and a more controlled

14  process.

15  Q.  And then in that first quarter of 2008, you have the

16  9.8 percent, correct?

17  A.  Yes.

18  Q.  And were some of the early indicators of that 9.8 percent

19  what had people concerned about quality in the 2008 time

20  period?

21          MS. NAWADAY:  Objection.

22          THE COURT:  Sustained.

23  Q.  There were some early indicators of the 9.8 percent, right,

24  in the form of initial SUSs?

25  A.  Well, yes, the initial SUS rate was much higher than where

1  we ended at 9.8 percent.

2          MS. MAINIGI:  Your Honor, may I approach?

3          THE COURT:  Yes.

4  Q.  DX 9, Mr. O'Donnell, is a deck dated July 26, 2007.  Does

5  this appear to be one of the design documents for the

6  High-Speed Swim Lane?

7  A.  It looks like it, yes.

8          MS. MAINIGI:  Your Honor, I would like to ask to get

9  Exhibit 9 admitted into evidence.

10          MS. NAWADAY:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 9 received in evidence)

13  Q.  Now I take it there were a number of these types of decks

14  that were put together for design of the High-Speed Swim Lane,

15  is that right?

16  A.  Yeah, I'm sure there were more than one -- there was more

17  than one, excuse me.

18  Q.  And was it a collaborative process in your view?

19          MS. NAWADAY:  Objection.

20          THE COURT:  I'll allow it.

21  A.  It was a cross functional process, so we had representation

22  from a variety of groups within Full Spectrum.

23  Q.  Could you take a look at page 2.  There's a reference to a

24  design session being held on July 19.  Do you see that?

25  A.  I do.

D9RTBAN6                         O'Donnell - cross

1   Q.  And who was leading the design session?

2   A.  I don't know.  I don't recall exactly who led the meeting,

3   but the initiative was led by Rebecca.

4   Q.  Now it says Mark facilitating, is that Mark Barnett?

5   A.  I didn't see that, I'm sorry.

6           I believe that would be Mark Barnett.

7   Q.  So that would be Mark Barnett was perhaps leading the

8   meeting?

9   A.  Yes.

10  Q.  And he was a process engineer, is that right?

11  A.  He was.

12  Q.  And was it his role to kind of white board this whole

13  process?

14  A.  Yes.

15  Q.  And you participated in this meeting from the underwriting

16  and discipline point of view?

17  A.  I did.  I would be the Ed reference there on the top line.

18  Q.  And Lloyd, this is Lloyd Sargeant?

19  A.  Yes, Lloyd Sargeant was head of production.

20  Q.  So he's participating as a head of production, is that

21  fair?

22  A.  Yes.

23  Q.  And Cliff's role -- that's Cliff Kitashima?

24  A.  It is.

25  Q.  And what was his role within the High-Speed Swim Lane

D9RTBAN6                         O'Donnell - cross

 1    design?

 2    A.  He also represented underwriting and risk management.

 3    Q.  And Loren, is that Loren Rodriguez?

 4    A.  It is.

 5    Q.  What was his role?

 6    A.  Loren was head of -- at this time was head of FSL

 7    operations, so all the kind of process engineering stuff.

 8    Q.  And Cheri, Cheri Shine?

 9    A.  Cheri Shine.

10    Q.  What was her role?

11    A.  Cheri was kind of a special project manager.  She had done

12    a lot of things for the company.  She had run -- at one point

13    run the central funding group within Full Spectrum and ran

14    vendor management for title and appraisal companies.  I don't

15    recall at this time what her exact role was in the middle of

16    this year.

17    Q.  And Jim Kee, what was his role?

18    A.  Jim Kee.  That's Jim Kee, he was production support.  He

19    worked for Lloyd and for Scott Bridges who managed the

20    day-to-day of loan status.

21    Q.  And Rick Lang, what was his role?

22    A.  Rick was -- Rick worked in FSL operations as well, I

23    believe, as like a project manager type.

24    Q.  And Jim M?

25    A.  I think that's probably Jim Micali.  Jim was also sort of a

1   project engineer specialist.  He worked for Rebecca.

2   Q.  And Patrick A, is that Patrick Aliano?

3   A.  It is.

4   Q.  What was his role with the design of the High-Speed Swim

5   Lane?

6   A.  Patrick worked for Cliff, I think at the time, or Javier in

7   risk management, and he was really -- within Full Spectrum, he

8   was really kind of product and guidelines guru.  He came from

9   secondary marketing at Countrywide and he was a great resource

10  for all things product.

11  Q.  And Anson Gong worked with Mark Barnett?

12  A.  He did.  Anson was a project manager.

13  Q.  And Chris Baumer?

14  A.  I think Chris' role was more around reporting.  He also

15  worked for Loren and Rebecca.

16  Q.  And let's take a look at page 7, if we could for a second.

17  Can you describe to us what this was in relation to the

18  High-Speed Swim Lane?

19  A.  This is a work flow document where it describes process

20  steps, and down in the left-hand side the roles -- the

21  individual roles of who will do what, so references to

22  salespeople and processors and funders, closers.

23  Q.  And did you participate in designing this work flow?

24  A.  I participated in the team that came up with this, yes.

25  Q.  If you take a look at page 13, you see the current work

1    follow up top processes built from subprime model and then the

2    HSSL model process is clean sheet design with prime focus.

3    What does that mean?

4    A.   It's describing that the current work flow evolved from

5    what at one time was a process built for the higher risk loans,

6    I guess it's fair to say.  With this process and this working

7    group we started off kind of with the clean slate, a white

8    board where any idea was open for discussion.  Nothing was a

9    bad idea.  Any processes people had seen in other companies or

10   within Countrywide we wanted to get it up on the board and talk

11   about it and try to come up with the best options.

12   Q.   Now a key feature, as I think we talked about already of

13   the High-Speed Swim Lane work flow, was that loan processors

14   cleared loans to close, correct?

15   A.   That was one of the things they did, they managed the

16   entire process all the way through.

17             MS. MAINIGI:  May I approach, your Honor?

18             THE COURT:  Yes.

19   Q.   Defense Exhibit 13, Mr. O'Donnell, is an email from you to

20   several individuals, including Ron Cannon, Cliff Kitashima and

21   Michael Thomas, is that correct?  It's dated August 13, 2007.

22   Do you see that?

23   A.   I do.

24             MS. MAINIGI:  Your Honor I would like to move to admit

25   DX 13, please.

D9RTBAN6                          O'Donnell – cross

1          MS. NAWADAY:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 13 received in evidence)

4    Q.  Now take a look at the top email, please, and blow up that

5    first paragraph.

6          Mr. O'Donnell, could you read that out loud, please.

7    A.  Sure.  Couple of notes below.  Any new process should not

8    require underwriter involvement.  We should be thinking of

9    leveraging underwriters only on critical risk related items.

10   Sign offs should be built to be completed within processing,

11   and only when escalation is required should underwriting be

12   injected into the work flow.

13   Q.  And that was an email written by you, is that right,

14   Mr. O'Donnell?

15   A.  That's right.

16   Q.  Was that the first day the High-Speed Swim Lane pilot was

17   in effect, August 13, 2007?

18   A.  Yes.

19   Q.  And essentially you're saying that underwriters should only

20   be used for escalation, is that right?

21   A.  I am.

22   Q.  And that otherwise loan processors should handle all of the

23   conditions and clear to close as it relates to the High-Speed

24   Swim Lane loans, is that correct?

25   A.  No.

D9RTBAN6                     O'Donnell - cross

1    Q.  Why is that?

2    A.  Ron Cannon Ron ran the funding group, so my suggestions to

3    Ron are about escalations from the funders to underwriters, not

4    about the processing of loans.  So Ron would have been

5    concerned about loans after they were cleared to close.  And

6    there would be instances where an underwriter would have to

7    become involved, but I was saying it should only be on critical

8    risk-related items.

9    Q.  So it's your view that underwriters were only needed on the

10   high risk matters at that point in time?

11   A.  For loans that were being reviewed for funding, yes.  So

12   these would have been loans that Ron -- I guess a couple of

13   things are important.  Ron ran the funding process for all of

14   FSL, so this would not be just for --

15   Q.  This would have been for all loans within Full Spectrum

16   Lending?

17   A.  Yes.

18   Q.  Now you discussed quality of grade earlier with

19   Ms. Nawaday, do you remember that?

20   A.  I do.

21   Q.  And quality of grade could impact compensation, is that

22   fair?

23   A.  That was the purpose of it, yes.

24   Q.  And is it fair to say that you, as part of the High-Speed

25   Swim Lane, agreed to a temporary suspension of quality upgrade?

1    A.  As part of the pilot, yes, I did.

2    Q.  And you thought that made sense because it was a new

3    process that was being implemented, correct?

4    A.  Right.  We didn't know if the work flow was going to be the

5    right work flow or not, and so for the pilot I agreed to

6    suspend the QoG.

7    Q.  Is it fair to say that your reason for suspending the QoG

8    was people, as they move into new work flows, are going to

9    make -- potentially make mistakes?

10   A.  Well, if the pilot -- my reason are for supporting it was

11   because the work flow was what we just talked about, a white

12   board work flow was completely new to Full Spectrum, and none

13   of us knew if it was really going to be effective or not, so it

14   was going to be short duration, small number of loans, and we

15   were asking people to step out of their normal role to take on

16   this responsibility.  So I was OK with them not being dinged on

17   their comp if they made mistakes.

18   Q.  Now quality of grade still continued to be measured, is

19   that correct?

20   A.  Well, we still got the input for quality of grade, so we

21   still knew which loans had been rated SUS.

22   Q.  So it continued to be measured, it just didn't affect

23   compensation, is that right?

24   A.  I don't remember if it actually -- if the scores actually

25   were calculated or not.  I know that we had the audits.  We

1    could have easily done it.

2    Q.  And in fact, is it fair to say that you and Mr. Kitashima

3    got the quality upgrade scores?

4    A.  I don't recall if we did get the scores or not, but I know

5    that we certainly did receive the audit results.

6              THE COURT:  Counsel, I notice you looking at your

7    watch, and I infer maybe you wanted to stop at this point.

8              MS. MAINIGI:  Well, I was about to move to a new

9    section, so I was trying to determine what I could fit in

10   before with resume.

11             THE COURT:  Maybe we should take pity on the jury and

12   conclude for the day.

13             MS. MAINIGI:  That's fine, your Honor.

14             THE COURT:  So ladies and gentlemen, you have so many

15   choices this weekend, you can watch a meaningless Yankees game,

16   you can watch to see if the Giants are capable of winning a

17   game, which seems unlikely, you could see whether the Jets

18   continue to perform at a level that they're unaccustomed to, or

19   you can simply say why is this judge interested in sports when

20   there are so many other interesting things to do in New York.

21   But what you must do is have a very good weekend, and what you

22   should not do is even think about this case.  Put it aside, put

23   it out of your mind.  Obviously, as you know, don't talk about

24   it or anything like that.

25             We will resume on Monday at 9:30.  Now Monday we are

D9RTBAN6

 1    going to only go to 3:30, so it is important at that we start

 2    promptly at 9:30.

 3              We'll see you then.  Have a good weekend.

 4              (Jury not present)

 5              THE COURT:  Counsel, we have a number of things to

 6    discuss but why don't we take a five-minute break and then

 7    we'll resume.

 8              (Recess taken)

 9              THE COURT:  All right.  I think the first item I

10    wanted to mention concerns the proposed mini charge that I will

11    give the jury on Monday after hearing further from counsel.

12    I'll have a draft for you sometime Monday and we'll have

13    further comment.  But I note in the submissions from Williams &

14    Connolly that the defendants, although making a proposed

15    instruction, say their preferred position is there be no

16    instruction on the law at this stage of the proceedings.

17              And I'm inclined to overrule that objection.  One of

18    the great advantages of being a judge as opposed to a litigator

19    is you get to talk to jurors after the case is over so you can

20    find ways to improve.  And for about the first six or so years

21    I was on the bench the main complaint I heard from jurors was

22    that they really didn't know basically what the elements and

23    what the central legalist issues were until they heard the

24    Court's charge at the very end of the case, or at least heard

25    the summations and the lawyers.  And sometimes they went

D9RTBAN6

1   further and said in their opening statements counsel proposed

2   sides that were conflicting or uncertain views of what the

3   legal issues were and we were left to puzzle about them until

4   the case came to an end or near the end.

5           So at that point in time I consulted with Judge Milton

6   Pollack, who, being at that point in time in his mid-90s, had a

7   certain amount of prior experience.  And he suggested a

8   preliminary charge which he had used in many cases just giving

9   the bare bones.  And so I began doing that, and I have done it

10  ever since.  And almost without exception, every jury has told

11  me at the end of the case that they really appreciated it,

12  their only criticism in some cases has been that it should have

13  come even earlier.  But on the whole, I like to have the case

14  go at least a few days before that to give the jury some flavor

15  before we present that to them.

16          Now my recollection is that both counsel did, to some

17  extent, describe the law by using that term in their opening

18  statements -- all three, I should say.  For example, they all

19  described this as a fraud case.  Several counsel, including

20  bank defendants' counsel, if I recall correctly, made

21  reference -- or maybe it was Ms. Mairone's counsel made

22  reference to mail fraud and wire fraud, two terms that the jury

23  would not have been familiar with, and mentioned, I think, as

24  well, that they were criminal statutes, which conceivably gave

25  the jury a misimpression as to what the nature of this case

D9RTBAN6

1      was.

2           So it's not as if counsel refrained from providing

3      some legal instruction to the jury, but better, they should get

4      it from a more authoritative source.  Taken to its logical

5      extreme, the argument made by the banks' counsel in their

6      letter of September 27 would be that we should tell the jury,

7      even when they're just being selected, now this is a case,

8      we're not going to tell you if it's a civil case or criminal

9      case, we're not going to tell you what kind of civil case it

10     is, in fact we're not going to tell you anything about it until

11     the very end, other than it's a case, because anything we say

12     would necessarily not be as perfectly nuanced and full and

13     ideal as the final instruction you'll hear.  So ladies and

14     gentlemen, we're going to present you some evidence in some

15     sort of case, have fun.  This would not be, I think, a useful

16     way to proceed.

17          So in short, I will give a preliminary instruction on

18     Monday, but I, of course, will consider the drafts of both

19     sides and give you a new draft to look at on Monday that you

20     can then comment on.

21          Yes.

22          MR. ARMAND:  Your Honor, we didn't realize potentially

23     that your Honor wanted description of the elements.

24          THE COURT:  Yes, you gave me a kind of --

25          MR. ARMAND:  This is more a statement of the issues.

D9RTBAN6

1            THE COURT:  Yes, which I'm not going give.

2            MR. ARMAND:  Would it be OK if we took another stab at

3    it?

4            THE COURT:  Yeah, that's OK.  Just give it to me by

5    fax, not by email, because my law clerk may not be here.  So

6    get it to me by fax by 5:00 p.m. tomorrow.  The fax number is

7    212-805-7935.  I mention that so that counsel can check it out

8    on Linked In.

9            Now let's turn to what does have to be decided today.

10   Well, at least that's what you're all telling me, which is this

11   question of the Simantel email and related evidence.  So I have

12   the submission from -- or both sides' submissions on the

13   motions in limine, but let me hear further argument starting

14   with the government.

15           MR. ARMAND:  Thanks, your Honor.

16           I think there really are two issues from the

17   government's perspective.  I think the first one has to deal

18   with the opening of the door on issues of intent, the mental

19   state of the employees of the bank that had that occur during

20   the opening, and statements about them being well intentioned

21   and not wanting to deceive anyone.  And I believe there were as

22   well references to the extremely close relationship between

23   Countrywide and Fannie Mae and Freddie Mac, and they knew the

24   mortgages, they did their surveys and they essentially would

25   know what is going on.  So we look at the email from

D9RTBAN6

Ms. Simantel, and the other emails surrounding that about the

deletion of these loan files that should have been provided to

Freddie Mac, and the government's position is they were then

lied about.

THE COURT:  So let me pursue that a little, because

this also relates to questions that I may put to the defense.

To the extent that the defense presents, either through direct

evidence or through circumstantial evidence from which

inferences can be drawn about the general intent and practices

between the bank Countrywide and Freddie Mac and Fannie Mae and

how they dealt with each other, then the argument goes, the

government should have the right to counter that by showing

what could well be viewed as an intentional lie to -- I can't

remember, I think it was Freddie Mac, if I recall correctly.

MR. ARMAND:  Correct, your Honor.

THE COURT:  And since the Court has a strong

preference for avoiding rebuttal cases, the argument would be

if that going to be part of what the defense is going to

present, then the government should be permitted to raise it

even on their direct case.

But let's assume for the sake of argument -- and

that's what I want to ask defense about in a minute, but let's

assume for the sake of argument they manage to narrow their

presentations so that it's, rather than talking about general

character of the persons involved or their relationship with

D9RTBAN6

Freddie Mac and Fannie Mae, they talk just about the specific

intent with reference to the acts that were done with respect

to the Hustle program.  Then do you have any other ground on

which the email should come in?

MR. ARMAND:  Yes, your Honor, I think it's bound up

together with the issue of the claimed disclosure of the

High-Speed Swim Lane to Freddie Mac at the September 2007 site

visit.  And it is in that visit that the defense claims that a

presentation was given to a woman named Lori Biehler, if I'm

pronouncing her name correctly.  She's now an employee of the

bank, but at that time she worked for Freddie Mac.  But she is

also the person who Ms. Simantel repeatedly lied to in emails

about the loan file.

So to the extent that Ms. Biehler is being presented

and being the recipient of honest disclosures regarding the

High-Speed Swim Lane, I think the jury deserves to see the full

picture of what was going on at that site visit.  In

particular, Ms. Simantel, she's not just some ordinary person

at the bank, she was the spokesperson for quality control.  And

this case is about the quality of the loans.  She's the person

who had the responsibility to self report loans.  She was aware

from the quality control in March of 2008 the problems with the

quality control.  She was also the person who was making the

final decisions with regard to what loans would be severely

unsatisfactory in connection with the sprint incentive, so

D9RTBAN6

     1    someone who is very much at the center of what is going on with

     2    regarding quality of the loans.

     3            THE COURT:  So the argument is that it is, both in

     4    terms of timing and the meeting and everything, so intertwined

     5    with what was being presented about Hustle that even if it

     6    narrowly didn't relate to Hustle, a reasonable juror could

     7    infer that the government's arguments that bank was not being

     8    honest with Freddie Mac about Hustle in this presentation is

     9    corroborated by the fact that -- by admission, in effect, they

    10    were not being candid about the other materials they were

    11    presenting at this very same meeting.  I take it that's more or

    12    less the argument.

    13            MR. ARMAND:  Correct, your Honor.

    14            THE COURT:  So let me hear from defense counsel.

    15            MS. MAINIGI:  Yes, your Honor.

    16            Your Honor, with respect to the last point, two

    17    completely different things.  Ms. Simantel is in corporate.

    18    She's in corporate QC.  The presentation that the government

    19    would love the opportunity to get out of this case is the

    20    presentation where FSL executives, the FSL executives whose

    21    names are heard constantly, even in the first two witnesses,

    22    Steve Brent and Cliff Kitashima, when they, FSL, made a

    23    presentation to Fannie Mae, which happened to be around the

    24    same time period as this particular issue -- and that's the

    25    closest relationship that there is -- when they made a

D9RTBAN6

1    presentation to Freddie Mac disclosing the High-Speed Swim

2    Lane, which cuts to the heart of the fraud here.  Because if

3    you disclosed the High-Speed Swim Lane, and the fraud is the

4    High-Speed Swim Lane, according to the government, it's not

5    much of a fraud if it's been disclosed to Freddie.

6            Obviously the government has some secondary arguments

7    ultimately on the substance of it in terms of its impact and

8    was it on a really tiny piece of paper and really small print,

9    and I'm sure that they will make all of those arguments.  But

10   their focus on this is to try to get a piece of evidence out of

11   the case that is devastating to their case.

12           Ms. Simantel was asked to get together -- was asked

13   voluntarily to provide loans to Freddie Mac for what was called

14   a subprime review.  The loans that she was asked to provide

15   were subprime loans, not prime loans like the High-Speed Swim

16   Lane, there's no dispute that these are not High-Speed Swim

17   Lane loans, there's no dispute that the High-Speed Swim Lane

18   process was not in effect in the wholesale lending division or

19   the correspondent division or any other division.

20           THE COURT:  Let me ask you this, this is a meeting --

21   this is a physical meeting, right, not a telephonic meeting?

22           MS. MAINIGI:  The meeting that occurred where the FSL

23   executives, your Honor, made presentation to Freddie Mac.  Yes,

24   it was a physical meeting.  And there was a presentation made

25   which included the High-Speed Swim Lane.

D9RTBAN6

1          By contrast, in that same time period, your Honor,

2     Ms. Simantel was shepherding together certain loan files that

3     Countrywide was voluntarily providing for the purpose of

4     Freddie Mac subprime review.  And it happens that these loan

5     files have nothing to do with the High-Speed Swim Lane, were

6     not owned by Freddie Mac.

7          THE COURT:  No, I get that point.  My question is a

8     little bit narrower.  So is she at this meeting also?

9          MS. MAINIGI:  No.

10          THE COURT:  And I have got everything here, I know you

11     gave it to me, but I don't seem to have it right in front of

12     me, the email itself.

13          MS. MAINIGI:  Sure, I can give you a copy of the

14     email.

15          May I approach, your Honor?

16          THE COURT:  Yes.

17          So when she says -- I'll read it as we go along, you

18     can fill me in.

19          This is from Ms. Simantel to Rod Williams.  Remind me

20     who he is.

21          MS. MAINIGI:  He was her boss, your Honor.

22          THE COURT:  Rod, as an FYI, if it comes up as an issue

23     with FHLMC -- which I take it is Freddie Mac.

24          MS. MAINIGI:  Right.

25          THE COURT:  We did not provide them with eleven loan

D9RTBAN6

files they requested as part of their due diligence review of

subprime new originations (August fundings).

When she is referring to not providing them, is she

referring to some sort of -- was there a meeting in which they

did provide the other ones, or was this done electronically or

do you know?

MS. MAINIGI:  I believe, but I can find out for sure,

it certainly was not anywhere close to the meeting I described

to you earlier, I believe they were just provided

electronically.

THE COURT:  All right.  We did not provide all the

requested loan files, as our QC group reviewed them before

providing copies and determined significant discrepancies in

the loans, which included misrepresentation (income, assets and

credit) flips and significantly overvalued properties.  It was

my belief we were better off telling Freddie Mac we hadn't been

able to get the loan files for them, as they were not imaged

yet, than letting them look at them and determine they were

unacceptable quality.

Interesting email where she says I thought it would be

better to lie, so I did.

And it concludes:  If you disagree with this, I will,

of course, provide them the files.  Otherwise, I am going to

continue along this path.  Thanks.

Well, the road to hell is paved with many mistakes.

D9RTBAN6

 1    So let me go back to the government a minute.

 2              So this is not at the same meeting, it's not a meeting

 3    at all, at least it doesn't appear from this, when she said to

 4    them what she said to them.  The lie -- I'll characterize it

 5    modestly as a lie as opposed to a damn lie or outrageous lie or

 6    gross lie, it wasn't at the same meeting.

 7              MR. ARMAND:  The site visit was over several days.  It

 8    was arranged in advance.  And before the site visit, one of the

 9    things they were going to be doing was a loan review.  And

10    Ms. Biehler requested a sample of the loans from Ms. Simantel.

11    Ms. Simantel -- her people found that a number of the loans had

12    discrepancies, that they had the flips and other things that

13    made them unacceptable, and they removed those loans from a

14    disk and told them they weren't available, even though they

15    were.  And the site reviews, the reviews of the actual loan

16    files provided a disk, and they did the loan reviews on site,

17    and there were lots of meetings that were going on at the same

18    time.

19              THE COURT:  But what I say -- I think this is the

20    point that defense counsel is making.  OK.  Over here in

21    department X you have an employee, maybe a high level employee,

22    but you have an employee, who, during a site visit coming to

23    her about some other kinds of stuff, tells a lie.  And one

24    basically looks from the email that she tells a lie because she

25    says to herself oh, my gosh, we can't turn this over right now,

D9RTBAN6

1     but then she feels sufficiently dicey about it that she tells

2     her boss.

3              Over here -- yes, it's all the same site in some

4     sense, but over here we have the people who are involved in the

5     Hustle program making representations about Hustle, and they

6     may or may not have been misrepresenting or representing the

7     truth.  That's, of course, a disputed issue in this case.  But

8     what does this other employee's lie about something else

9     logically say, if anything, about the representations made by

10    the Hustle folks?

11             MR. ARMAND:  It was the same people who are being lied

12    to.  The AMO --

13             THE COURT:  It's the same people being lied to, but

14    that's not the point.  The relevance, if at all, is to one of

15    two things, both of which you correctly mentioned.  It's either

16    as a basis from which one could infer something about being ten

17    other people who are making -- who are involved in the Hustle

18    program, and doesn't sound like it is, or it's a rebuttal to

19    any broader claim that Countrywide -- you should find no

20    liability here because, among other things, Countrywide as a

21    whole was a quality organization that told nothing but the

22    truth, good decent people going to work every day, as I think I

23    heard about 14 times on opening statement.  And so Countrywide

24    was operating properly, as an entity, with respect to Freddie

25    Mac and Fannie Mae.

D9RTBAN6

 1            With respect to the first of those two possibilities,

 2     the intent of particular people involved in Hustle, it doesn't

 3     seem to relate to that.  We'll get to the second part in a

 4     minute.

 5            MR. ARMAND:  It's a little broader, your Honor,

 6     because Ms. Simantel is the person at Countrywide who was in

 7     charge of quality control and was aware of the quality issues

 8     in FSL because of the corporate quality control reviews that

 9     were done in the first quarter of 2008.  And so she is the

10     person who has the responsibility to self report loans that are

11     bad to Fannie and Freddie, and she's aware of high percentages,

12     but she's not turning them over.  And this is an example of her

13     doing that.  She is manipulating the percentage.

14            THE COURT:  Is the first part of what you said going

15     to be part of your evidence in this case, her role vis-a-vis

16     quality control vis-a-vis Hustle?

17            MR. ARMAND:  She's responsible for quality control for

18     the entire -- for all four divisions.

19            THE COURT:  I understand, but are you going to be able

20     to connect it up with anything she did relating to the Hustle

21     loans that were sold to Freddie Mac and Fannie Mae?

22            MR. ARMAND:  Well be able to demonstrate that she knew

23     about the -- obviously she knew about the defect rates, and

24     with regard to the loans that were coming out in Full Spectrum

25     Lending that included Hustle loans.

D9RTBAN6

1           THE COURT:  I assume no one is calling her.  How are

2    you putting this in evidence, I'm sorry?

3           MR. ARMAND:  It could come in through Ms. Simantel.

4    We have taken her deposition already and have asked her about

5    all of these emails.

6           THE COURT:  The person from California who we were --

7           MR. ARMAND:  That's Ms. Simantel.

8           THE COURT:  That is Ms. Simantel.  So you are planning

9    on calling her?

10          MR. ARMAND:  Yes, and we would ask her questions about

11   quality control and self reporting and all of those things.

12          MS. MAINIGI:  Your Honor, I completely disagree with

13   that on many levels.  The only reason that they want to call

14   her, and only thing that they asked her about in two separate

15   depositions is this email.  They didn't ask her:  Tell us about

16   quality control.  Tell us how it worked, tell us how the

17   High-Speed Swim Lane --

18          THE COURT:  That doesn't preclude them from doing it

19   here.

20          MS. MAINIGI:  With all due respect, your Honor, that's

21   clearly not, I believe, what their intentions are.  What they

22   would like is a document that somehow suggests a lie so that

23   they could create the inference that a lie over here is a lie

24   over here.

25          THE COURT:  Their strategic motivations are neither

D9RTBAN6

1   here nor there, the question is whether there's a basis for

2   introducing it in evidence, and that we would get to a 403

3   analysis if necessary, but --

4           MS. MAINIGI:  With respect to her specific role, your

5   Honor, which seems to be where we're focused, Ms. Simantel was

6   one of the people in corporate QC.  To my knowledge, she's not

7   been reporting anything to Fannie or Freddie that would relate

8   to the High-Speed Swim Lane.  She does not make an appearance

9   at all as it relates to the High-Speed Swim Lane.  The folks

10  there are multiple folks that have day-to-day contact with the

11  GSEs over the years.  She has been one of them, but she

12  doesn't -- there was no duty or obligation or anything on her

13  part to report anything having to do with the High-Speed Swim

14  Lane.  All the representations on the High-Speed Swim Lane came

15  out of FSL.  There was no one who had any communications with

16  the GSEs related to the High-Speed Swim Lane that was not

17  associated with FSL.

18          (Continued on next page)

19

20

21

22

23

24

25

D9r3ban7

         1          THE COURT:  Of course, part of the issue in any fraud

         2     case is omissions.  If a half truth is being stated or if there

         3     is a duty to not remain silent remains on the circumstances.

         4     So, they're telling me she's the head of quality control.

         5          MS. MAINIGI:  Well, I'm not sure she's the head of

         6     quality control, your Honor.  But there are multiple people

         7     that were actually involved with quality control.  There is no

         8     allegation here, your Honor, that the quality control numbers

         9     are wrong, incorrect, false in any way.  There is no allegation

        10     here that the internal corporate QC numbers were even reported

        11     to Fannie or Freddie or there was any obligation to report them

        12     to Fannie or Freddie.  These loans that are the subject of the

        13     e-mail are not loans that were owned by Freddie.  There is just

        14     no relationship whatsoever.

        15          THE COURT:  So let me pick up on the point you just

        16     made and ask the government.  You agree that there was no

        17     obligation to report these numbers to Fannie Mae and Freddie

        18     Mac?

        19          MR. ARMAND:  Are you addressing the government, your

        20     Honor.

        21          THE COURT:  Yes.

        22          MR. ARMAND:  There is a duty to self-report defective

        23     loans.  And so, and --

        24          THE COURT:  So, let me go back to defense counsel.  So

        25     they say there is.

D9r3ban7

1          MS. MAINIGI:  I think they're conflating a few

2     distinct things.  Let me go along with them, which I don't

3     agree with.

4          These loans aren't owned by Freddie.  There isn't a

5     duty to self-report loans owned by somebody else.  This has

6     nothing to do with anything here.  With respect to the idea

7     that --

8          THE COURT:  Maybe you all are so much closer to the

9     particularities of this case than obviously the Court is.  If

10    there is a duty to report defective loans, and if Ms. Simantel

11    is a person of authority who was aware the Hustle loans are

12    defective, and she does not undertake steps to report that, and

13    the government wants to show that that was intentionally so,

14    why, if you assume all those thing, then presumably one could

15    argue that proof that in a parallel contemporaneous situation

16    she purposely withheld defective loan information from Freddie

17    Mac, would be corroborative of the government's assertion that

18    she purposely did not report the defective Hustle loans.

19         MS. MAINIGI:  Your Honor, there is no obligation on

20    Ms. Simantel or Countrywide's part to provide anything as it

21    relates to these 11 loans.  So the 11 loans that are at issue

22    are not owned by Freddie Mac.  So I will go along with you, and

23    I don't agree with that, but I will accept your assumption.

24         THE COURT:  I'm saying this is hypothetical.  I'm not

25    making any rulings.

D9r3ban7

1              MS. MAINIGI:  Understood, your Honor.  We would of

2       course ask for briefing before such a ruling.  But let me go

3       along with you and say, okay, there is a duty to self-report.

4       But the duty to self-report doesn't kick in unless Freddie has

5       entitlement to those loans.

6              In this situation, Freddie came to Countrywide, as it

7       went to a number of lenders, and said hey, we're thinking about

8       buying subprime loans here in 2007.  We're thinking that might

9       be a good idea.  Can we see some of your subprime loans and see

10      what they look like.  These are subprime loans that have

11      already been sold to somebody else in many cases.  But they

12      asked for a voluntary production, simply random loan files that

13      were subprime loan files so they could do whatever sort of

14      analysis they wanted to do.

15             We are told by the people that we deposed that there

16      were other lenders that said no.  No, you can't.  You can't

17      look at our subprime loan files because you don't own them and

18      they're owned by somebody else, or we don't want to show them

19      to you.  If you want to buy subprime files from us, great.

20             I think you've got a critical factual issue here.

21             THE COURT:  I'm not so sure about that.  She might

22      have had a basis for saying we're not going to produce those,

23      because you have no right to them.  But what she said was,

24      we're not going to produce them because they're not imaged yet.

25      When that was just a cover up for her real reason.

D9r3ban7

1              But, let me ask you, let me go the other point.  What

2       about the argument that was at least hinted at in opening

3       statement -- I'm not sure any great doors were opened at that

4       point.  But, that Countrywide as an entity basically dealt fair

5       and square with Freddie Mac and Fannie Mae, and that all the

6       people involved were honest, trustworthy people and so forth.

7       If that kind of argument is going to be made, why isn't this

8       responsive to that?

9              MS. MAINIGI:  Mr. Sullivan indicates that argument was

10      not made, your Honor.

11             THE COURT:  I'll assume that argument wasn't made for

12      the sake of argument.

13             MR. SULLIVAN:  I admit to the 14 times you referenced

14      earlier.

15             THE COURT:  A total meeting of the minds.

16             My point is if that argument is going to be made, then

17      why doesn't the government have the right to anticipate it?

18             MS. MAINIGI:  Your Honor, I agree with you that an

19      argument of the type that you indicated, that Countrywide is a

20      great company, made of great people that would never do

21      anything wrong is in the narrow framework of this case not an

22      argument that we can make.

23             As you correctly point out, we are entitled to make

24      the argument, arguments that relate to the specific intent of

25      people who are involved, I believe you said, with acts done

D9r3ban7

1      regarding the High-Speed Swim Lane program.  And that's what

2      we're trying to demonstrate.  Is those people that Mr. Sullivan

3      was talking about who had no bad -- who had the communication

4      with Freddie and Fannie, and disclosed to them, frankly, that

5      they had changed their processes and they had this different

6      process for originating loans.

7              But the specific intent of those involved with the

8      High-Speed Swim Lane, we agree, is what is at issue in this

9      case.

10             THE COURT:  Let me ask both sides one last question,

11     and then we'll let it go.  What is the reason this needs to be

12     decided today when, from everything I'm hearing, the

13     admissibility or not of this evidence is substantially

14     dependent on what other evidence comes into the case either on

15     the government's case or on the defense case?

16             Let us assume for the sake of argument that the Court,

17     which said it doesn't normally allow rebuttal cases in I think

18     99.9 percent of the time, that left open of course the

19     .01 percent.  Let's assume worst case that this doesn't become

20     admissible until the defense goes, opens some door.  Or, short

21     of that, let's assume that it doesn't become admissible until

22     the government has shown in a way that the Court admits more of

23     a role or relevance of Ms. Simantel's own activities or

24     responsibilities than has been shown by any of the evidence

25     before the jury thus far.

1          Why should I make this decision now?  Because she

2    would have to fly from California later than she would have to

3    fly now?  So what?

4          MS. MAINIGI:  Our view, your Honor, with all due

5    respect, is this is not a close call.  This e-mail relates to

6    something that has absolutely nothing to do with the High-Speed

7    Swim Lane whatsoever.  Your Honor has narrowed this case.

8          THE COURT:  So if it is not a close call, I don't have

9    to decide it now because it will never come in under your

10   approach.

11         And why does the government think I have to decide

12   this now?

13         MR. ARMAND:  Your Honor, your Honor doesn't

14   necessarily have to.  And I think with regard to Ms. Simantel

15   potentially it does make sense for the government to move back

16   her testimony a little bit and see what else develops.  But

17   certainly a big part of why we wanted to call her was to walk

18   through these e-mails, which we do believe go to the very heart

19   of the relationship between Countrywide and Freddie Mac and

20   their truthfulness about the quality of their loans.

21         And I realize that in this other sample, they weren't

22   Freddie Mac's loans, but they undertook to provide them a

23   sample of loans and give them a defect rate and that defect

24   rate was inflated or it was reduced artificially.

25         THE COURT:  Forgive me for interrupting.

D9r3ban7

1          MR. ARMAND:  Sure.

2          THE COURT:  You're defining the relationship broadly,

3    I think maybe too broadly.  Defense counsel is defining it

4    narrowly, I think maybe too narrowly.  But I will have a much

5    better basis for assessing that much later in the case.  That

6    has not been really central to anything that's been discussed

7    in the testimony thus far.

8          MR. ARMAND:  The government agrees, your Honor.

9          THE COURT:  I really think I should defer on this.

10   The only reason for not deferring is that my law clerks will

11   tell me I'm a wimp, but I know that already.  So that will be

12   nothing new.  So I'm going to defer on this.  We'll see how it

13   goes.

14          Anything else counsel needs to raise today?

15          MR. ARMAND:  One other issue, your Honor.  Mr. Price,

16   we have contacted him, and he indicated that he would like to

17   come.  He wanted to check with his wife.  This was a couple of

18   days ago, but since then we have not been able to get ahold of

19   him.  And we thought if your Honor would not mind -- we would

20   very much appreciate it.  Your powers of persuasion hopefully

21   would help to bring him here.

22          MR. SULLIVAN:  Your Honor, let me raise a concern

23   about the judge calling witnesses.  Maybe you've forgotten how

24   powerful a judge is, and when a judge calls a person, it is a

25   shocking and memorable event.  I remember getting a call from a

D9r3ban7

1   famous federal judge one time, and you never forget the call

2   because you don't usually get them.

3            What I'm concerned about is what impact does the

4   judge's call on a witness have.  Does that make him think he's

5   very special?  Does that make him think he's important in the

6   case?  He is a different witness?  It presents complications,

7   your Honor, that I'd really rather not deal with.

8            THE COURT:  Let me stop you for a second.  First of

9   all, we have at least one piece of evidence to the contrary of

10  what you are saying because I called Mr. Boland and he then

11  talked with his wife, and we know the result.

12           MR. SULLIVAN:  You're batting .500.  That's perfectly

13  fine.  We didn't make an issue of it.

14           THE COURT:  I think I'm batting zero.

15           MR. SULLIVAN:  You got one and you didn't get the

16  other.  Where were you in the hundred criminal cases where I

17  have wanted the judge to call some witness and help out the

18  defense?

19           THE COURT:  You weren't before me.

20           MR. SULLIVAN:  Seriously, your Honor.  It puts factors

21  into the case which are very troublesome to me.  And I don't

22  think the judge should be reaching out and trying to help

23  either the defense or the -- I know you're not doing that.

24  You're seeking the truth.

25           THE COURT:  Just to set your mind at rest, I've done

this in other cases, and it's always been in the same

situation.  Where someone, a witness first informed one party

or both parties that he or she was going to be available live.

And then for whatever reason, chose not to do that.  And the

result was the parties were going to put in a deposition, which

is never as good as a live witness under the best of

circumstances.  But where you have an expectation that someone

is going to appear live, it's likely to be even less useful.

Because as your own counsel pointed out with respect to

Mr. Boland, there were questions that weren't put.  There was

preparations that was made based on his coming into court, etc.

That would have been different if there wasn't a reasonable

expectation he would appear live.

    It is not that I call up each and every witness.  It

is in those circumstances, my experience is when I've called

witnesses in those circumstances, sometimes they just have a

misunderstanding who is going to pay my travel expenses, can I

come at a different time, that's a terrible time.  I'm easily

able to say to them, oh, no, no, the party that's calling you

will pay your travel expenses and we will work around your

schedule and all like that.  So it is a much more mundane

situation.

    But it seems to me that where there has been a

reasonable expectation that someone would come live, that both

the jury is assisted from hearing that person live, and the

D9r3ban7

1      parties are placed in a much fairer position because of their

2      expectation that he would come live, if he or she then does

3      come live.

4              MR. SULLIVAN:  As you know, trial lawyers are a rough

5      and tumble business.  They have trouble getting witnesses.  We

6      have a deposition.  It is not like justice will not be done.

7      We have a deposition of this fellow.  By the way, it's

8      interesting to note he is a witness that what does he have to

9      offer anyway.  He can do it through deposition.  That's my

10     request.

11             MR. MUKASEY:  Can I throw one more fact.  I think I'm

12     right about this and maybe the government can confirm, I think

13     Mr. Price was always supposed to testify by video.

14             THE COURT:  I know.  And that's why I didn't talk to

15     him until there was a suggestion that he might be willing to

16     come or something like that.

17             MR. MUKASEY:  It was always our understanding --

18             THE COURT:  I don't put him in the same category as

19     Mr. Boland, I agree with you on that.  But then, what happened

20     was -- I did place a call to the number.  I did not reach him.

21     So that was neither here nor there.  Then he informed the

22     government, not me, that he was going to come live.  Then he

23     informed the government that he wanted to talk with his spouse,

24     a very prudent move in making any decision.  And now, he has

25     become unreachable.

D9r3ban7

1          By the way, did you reach him through that same

2    number?

3          MR. ARMAND:  No, your Honor.  We got a new number for

4    him.  We tried and we spoke to him once.  And at that time we

5    thought that your Honor might actually be calling him again,

6    and so in addition to requesting that he come, we gave him a

7    heads up that the Court --

8          THE COURT:  Reaching the broader question that even

9    though I've only done this in narrow circumstances in the past,

10   I'm just thinking aloud, reaching a broader question that

11   Mr. Sullivan raises.  I think it is well within the Court's

12   power and discretion to call anyone and suggest that it would

13   be helpful if they would come testify.  If, for example, there

14   was a witness who it was clear the jury wanted to hear from,

15   that neither side had chosen to call, but who was not

16   represented by counsel, and if someone is represented by

17   counsel I would always go through their counsel.

18          While the Court of course would not likely do this

19   because of respect for the strategic decisions of both sides in

20   choosing not to call this person, nevertheless, I don't think

21   there is much doubt about the power of the Court to call that

22   person, or if he or she was in the subpoena power of the Court

23   to actually subpoena them and have them brought in to testify.

24   It is akin if you will to several powers.  The power the Court

25   has to bring in material witnesses, which is both an inherent

D9r3ban7

1    power and a statutory power.  It's within the power of the

2    Court pursuant to its overriding function to see that the jury

3    is provided with everything it needs to arrive at the truth.

4    In a criminal case you might argue differently, because truth

5    is not the only issue in a criminal case.  In a civil case, it

6    is essentially the only issue.

7          But having said all that, what really drives me more

8    than anything is that a deposition, no matter if it is

9    videotaped, is never the same as live testimony.  It is never

10   the same, both because the jury can't evaluate demeanor

11   evidence as well, but also because inevitably, the questions

12   aren't as good and aren't as full, and aren't as explicable.

13   We saw that the other day just in looking at the questions and

14   answers that were put in the Boland deposition.  It is never

15   the same.  It is not close to the same in many circumstances.

16         So, having rambled on, I will leave it as follows:  I

17   will leave it to the government to make a renewed effort to

18   reach Mr. Price over the weekend.  If he is not reached over

19   the weekend, I'm inclined to reach out to him in the same way I

20   did previously with all counsel present to hear the

21   conversation some time on Monday.  And to encourage him to

22   appear.  If defense counsel has case law to the contrary, of

23   course they can present it to me before I do that on Monday.

24   So I'm flagging it for them in advance.

25         Anything else?

D9r3ban7

| | |
|---|---|
| 1 | MS. MAINIGI:  Yes, your Honor.  This goes back to the |
| 2 | schedule.  Because of the uncertainty regarding Mr. Price, |
| 3 | because we were told last night that Mr. Ballance is also not |
| 4 | coming to trial, we're looking for clarity on what the schedule |
| 5 | is looking like over the next several days, Monday, Tuesday. |
| 6 | THE COURT:  That's a good point. |
| 7 | MS. MAINIGI:  We're told that the government may want |
| 8 | to move straight into experts.  We understand schedule changes, |
| 9 | we're fine with them, but we are looking for some tiny bit of |
| 10 | notice here. |
| 11 | THE COURT:  The only thing that would bother me is if |
| 12 | we don't have another witness ready to go when we finish any |
| 13 | given witness.  That would be an unfortunate thing because it |
| 14 | would end that party's case.  Then what would I do with myself |
| 15 | for next four weeks.  So, let me hear from the government. |
| 16 | MR. ARMAND:  Yes, your Honor, we determined that we do |
| 17 | not wish to call Mr. Ballance and so we would like to proceed |
| 18 | to our next witness after that. |
| 19 | THE COURT:  Who is that? |
| 20 | MR. ARMAND:  Which would be Lars Hansen who is an FHFA |
| 21 | agent who can say what some of the data would show.  That would |
| 22 | be a relatively quick witness we think.  After that we would |
| 23 | like to present some of our experts.  We thought we would be |
| 24 | moving more quickly and they're here and they cost money so we |
| 25 | would let like to get them on. |

D9r3ban7

1          THE COURT:  Here's where we stand.  That all sounds

2     fine.  It sounds like from the estimates that the parties

3     previously gave, that the cross and redirect of Mr. O'Donnell

4     will occupy most of our time on Monday.  Then you can have the

5     short witness thereafter.  If at that point we're not yet to

6     3:30, because Monday is the day that I give a speech so we have

7     to end at 3:30.  Then I would excuse the jury a little bit

8     earlier to do any Daubert hearing that has to be done on those

9     experts.  If not, we'll do the Daubert hearing -- well, we can

10    talk about whether we want to do that after my speech is over,

11    I can come back like 8 o'clock or something like that.  I know

12    that's what you all would like to do.  Or maybe come in early

13    the following morning and the jury come in at 10 and maybe do

14    the Daubert hearing starting at 8:30 or something like that on

15    Tuesday morning so we don't detain the jury.  But, I have no

16    trouble with that order.

17         MR. ARMAND:  Thank you, your Honor.  In terms of the

18    Daubert hearings, is there a particular time limit that your

19    Honor has in mind of what we should anticipate in terms of how

20    much testimony we should be presenting to your Honor on their

21    opinions?

22         THE COURT:  Because of the motions in limine, I think

23    these are just going to be primarily questions put by the

24    Court, you don't need to do any preparation.  Well, you may

25    want to do some, but I am going to question the witness.

D9r3ban7

```
 1              MR. ARMAND:  Okay.
 2              THE COURT:  I will then allow defense counsel to put
 3    any additional questions they want within reasonable time
 4    limits.  And then I'll allow you to put any further questions
 5    that you want.  But I think most of the questioning will be
 6    done by the Court.
 7              MR. ARMAND:  Very well.  Thank you, your Honor.
 8              THE COURT:  Anything else?
 9              MS. MAINIGI:  Nothing from us.
10              THE COURT:  Very good.  Thanks so much to everyone.
11    I'll look forward to seeing you at 9:30 on Monday.
12              (Adjourned until September 30, 2013, at 9:30 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

EDWARD O'DONNELL

Direct By Ms. Nawaday  . . . . . . . . . . . 530

Cross By Ms. Mainigi . . . . . . . . . . . . 664

PLAINTIFF EXHIBITS

Exhibit No.                                                    Received

 31   . . . . . . . . . . . . . . . . . . . . 533

266   . . . . . . . . . . . . . . . . . . . . 534

 52   . . . . . . . . . . . . . . . . . . . . 545

 56   . . . . . . . . . . . . . . . . . . . . 556

406   . . . . . . . . . . . . . . . . . . . . 566

388   . . . . . . . . . . . . . . . . . . . . 567

408   . . . . . . . . . . . . . . . . . . . . 569

 63   . . . . . . . . . . . . . . . . . . . . 570

 68   . . . . . . . . . . . . . . . . . . . . 595

 65   . . . . . . . . . . . . . . . . . . . . 597

 67   . . . . . . . . . . . . . . . . . . . . 598

 20   . . . . . . . . . . . . . . . . . . . . 613

264   . . . . . . . . . . . . . . . . . . . . 620

 81   . . . . . . . . . . . . . . . . . . . . 637

197   . . . . . . . . . . . . . . . . . . . . 700

DEFENDANT EXHIBITS

Exhibit No.                                                    Received

  9   . . . . . . . . . . . . . . . . . . . 711

 13   . . . . . . . . . . . . . . . . . . . 716