D9UTBAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5            v.                              12 CV 1422 (JSR)

6    BANK OF AMERICA CORPORATION,
7    *successor to Countrywide*
     *Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                   Defendants.

11   ------------------------------x
                                             New York, N.Y.
12                                           September 30, 2013
                                             10:00 a.m.
13
     Before:
14
                        HON. JED S. RAKOFF,
15
                                             District Judge
16

17

18

19

20

21

22

23

24

25

D9UTBAN1

```
1                              APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6         Assistant United States Attorneys

7

8    WILLIAMS & CONNOLLY
          Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

14   GOODWIN PROCTOR
          Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

17   BRACEWELL & GIULIANI
          Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25
```

D9UTBAN1

1              (In open court)

2              THE COURT:  Good morning, let's bring in the jury.

3              (Jury present)

4              THE COURT:  Good morning, please be seated.

5         So I know you're all rested and ready for a week of

6    hard work.

7              So counsel.

8              MS. MAINIGI:  Thank you, your Honor.

9     EDWARD O'DONNELL,     (Continued)

10        having been previously sworn, testified as follows:

11   CROSS-EXAMINATION

12   BY MS. MAINIGI:

13   Q.  Good morning, Mr. O'Donnell.

14   A.  Good morning.

15   Q.  Mr. O'Donnell, I placed in front of you a binder, if you

16   could pull that over.

17             MS. MAINIGI:  Your Honor, there's one pushed right on

18   your ledge there.

19             THE COURT:  Thank you.

20   Q.  Please turn to DX7, Mr. O'Donnell.

21             DX7 is a July 2nd, 2007 email from you to James White,

22   Robert Price and David Sallis; is that correct?

23             THE COURT:  What is the exhibit number?

24             MS. MAINIGI:  DX7, your Honor.

25             THE COURT:  Is that in evidence?

1          MS. MAINIGI:  No, it's not.

2          THE COURT:  What's it doing up?

3          MS. MAINIGI:  I apologize.

4   Q.  Is that correct, Mr. O'Donnell?

5   A.  It is.

6          MS. MAINIGI:  Your Honor, I ask that DX7 be admitted.

7          MS. NAWADAY:  No objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit 7 received in evidence)

10  Q.  Mr. O'Donnell, this email is to your direct reports,

11  Mr. White, Mr. Price and Mr. Sallis, is that correct?

12  A.  That's true.

13  Q.  And you are announcing an organizational change, correct?

14  A.  I think the earlier email was the announcement of the

15  organizational change, yes.

16  Q.  And July 2nd, 2007 is the date of the email?

17  A.  It is.

18  Q.  And that precedes the design of the High-Speed Swim Lane,

19  is that correct?

20  A.  I don't remember when the design discussions get under way,

21  but it precedes the pilot.

22  Q.  Let's focus on the second paragraph.

23          MS. MAINIGI:  Alex, if you could highlight that.

24  Q.  And Mr. O'Donnell, please read the second paragraph out

25  loud.

D9UTBAN1                           O'Donnell - cross

1    A.  Let's face it, loans take too long to fund here, cost to

2    much to move through our process, and require far too many

3    conversations, hand offs and systems.  We have many steps in

4    our work flow that were built for another time, different

5    products, or periods when margins were much more robust.  The

6    mortgage banking world is quickly evolving, and each of us must

7    be vigilant to ensure that we fully understand the operating

8    environment, address issues proactively, and completely

9    understand the outcomes, intended and unintended, of changes in

10   to our model.

11   Q.  So July 2007 you are telling your direct reports that loans

12   take too long to fund within FSL, correct?

13   A.  Among other things.

14   Q.  And you're telling your direct reports that they cost too

15   much to move through the process and require far too many

16   conversations, is that correct?

17   A.  That's true, that's part of the email.

18   Q.  And you also tell your direct reports that you have many

19   steps in our work flow that were built for another time,

20   correct?

21   A.  I did.

22   Q.  Now Mr. O'Donnell, you agreed that one of the things you

23   needed -- that needed to be changed was the amount of time it

24   took to actually process a prime loan versus how long it took

25   to process a subprime loan in the 2007 time period, is that

1   correct?

2   A.  That's true.  I believe that beginning before 2007 prime

3   loans and subprime loans contained different levels of risk, so

4   yes, that's true.

5   Q.  With respect to the High-Speed Swim Lane, you wanted to

6   deliver a measured process that would allow Full Spectrum

7   Lending to fund good quality prime loans more quickly, is that

8   correct?

9   A.  That's true.  For some prime loans I supported them going

10  through that process.

11  Q.  And it was not your intention, Mr. O'Donnell, to design a

12  process that would fund poor quality loans, correct?

13  A.  No, quality loans were important to me, irrespective of the

14  process.

15  Q.  You can put that document aside, sir.

16          Mr. O'Donnell, please turn to DX14.  Let me know when

17  you are there.

18          DX14, Mr. O'Donnell, is an email from you to various

19  individuals, including Steve Brent, dated August 13, 2007, is

20  that correct?

21  A.  That's correct.

22          MS. MAINIGI:  I ask that DX14 be admitted into

23  evidence.

24          MS. NAWADAY:  No objection.

25          THE COURT:  Received.

D9UTBAN1                    O'Donnell – cross

1              (Defendant's Exhibit 14 received in evidence)

2    Q.  Mr. O'Donnell, I would like you to focus on the first

3    paragraph.  Please read the first paragraph out loud?

4    A.  We discussed this topic with Cliff on Thursday night.

5    We're going to move forward with allowing the LS to determine

6    reasonability.  In the event they are unsure when facing this

7    decision, they can get assistance from their OM and even the

8    underwriting support group if necessary.

9    Q.  Now August 13, Mr. O'Donnell, is the start of the

10   High-Speed Swim Lane pilot, is that correct?

11   A.  Right, I believe this email was concerning the pilot.

12   Q.  Now the reasonability that is referred to here is income

13   reasonability, is that correct?

14   A.  Yes, that's correct.

15   Q.  And that is referring to stated income loans, is than

16   correct?

17   A.  That would be true, that's what we generally called them.

18   Q.  And for stated income loans, someone has to determine the

19   reasonability of the income that the borrower puts down on the

20   application, is that right?

21   A.  That would be part of clearing the condition relating to

22   income, yes.

23   Q.  And in this email you are telling Mr. Brent that, after

24   discussions with Mr. Kitashima, the High-Speed Swim Lane pilot

25   will move forward with loan specialists determining

D9UTBAN1                           O'Donnell – cross

1  reasonability of income, correct?

2  A.  That's true.

3  Q.  And you further advised Mr. Brent that in the event that

4  these loan specialists are uncertain, they can get assistance

5  from OMs and the underwriter support group; is that right?

6  A.  That's true.  That was part of the escalation.  The

7  escalation that I'm discussing here would have part of the

8  pilot work flow.  In case they don't have confidence or they

9  can't make a decision, they could reach out for support.

10  Q.  Now Mr. O'Donnell, it was your view that allowing loan

11  specialists in the pilot to determine income reasonability and

12  then giving them the opportunity to reach out to somebody like

13  an underwriter support group if they felt they couldn't was a

14  responsible risk management practice, correct?

15          MS. NAWADAY:  Objection.

16          THE COURT:  Ground?

17          MS. NAWADAY:  Misstates testimony.

18          THE COURT:  Sorry?

19          MS. NAWADAY:  Misstates the document testimony.

20          MS. MAINIGI:  I'm not referring to the document, your

21  Honor.

22          THE COURT:  Sustained on compound.

23  Q.  Now Mr. O'Donnell, you had some knowledge regarding risk

24  management practices, is that right?

25  A.  I did.

1   Q.  And was it your -- it was your view that allowing loan

2   specialists to determine income reasonability was a responsible

3   risk management practice, correct?

4   A.  Not a loan, no.

5   Q.  Coupling that with the ability to escalate was a

6   responsible risk management practice, correct?

7   A.  Well, this was a pilot.  This was a test.  And at this

8   point, especially on the first day, I wasn't sure whether or

9   not they would be able to do that work on their own or not.  So

10  I thought having this exit ramp available to them was a good

11  work flow practice.

12  Q.  I don't believe that was my question, Mr. O'Donnell.

13  Coupling -- allowing loan specialists to determine

14  reasonability of income while allowing for escalation was a

15  reasonable risk management practice, correct?

16  A.  It was one way to manage the risk, yes.

17  Q.  And was it a reasonable risk management practice in your

18  view?

19  A.  For the pilot, yes.

20  Q.  Now as head of underwriting, you were familiar with the

21  guidelines around stated income loans, correct?

22  A.  Yes, I was.

23  Q.  Fannie and Freddie expanded their guidelines around stated

24  income products in the 2005/2006 time period, correct?

25  A.  In 2005 and 2006, as part of my role in underwriting, I

D9UTBAN1                        O'Donnell - cross

1    didn't have much to do with the guidelines.  We were primarily

2    a subprime company at that point.

3    Q.  But you were head of underwriting at that point in time,

4    correct?

5    A.  I was.

6    Q.  And you had general familiarity with the guidelines?

7    A.  I think I stated earlier that I wasn't a prime expert.  We

8    were at that point a subprime company, so I had a much higher

9    degree of knowledge around subprime than prime.

10   Q.  So then it's fair to say that you were not familiar with

11   Fannie and Freddie's guidelines in the 2005/2006 time period,

12   correct?

13   A.  Intimately, no.

14   Q.  Did you have general familiarity with whether Fannie and

15   Freddie sought out stated income loans?

16   A.  Sorry, I didn't understand.

17   Q.  Did have you general familiarity with whether Fannie and

18   Freddie sought out stated income loans?

19              MS. NAWADAY:  Objection.

20              THE COURT:  Overruled.

21   A.  I knew that Fannie and Freddie both offered stated

22   products.

23   Q.  And were you aware in the '05/'06 time period that they

24   expanded their guidelines around stated income loans?

25   A.  I didn't have intimate knowledge about Fannie and Freddie's

1  guidelines.  We didn't directly go to Fannie and Freddie's

2  guidelines, we used Countrywide's guidelines for the

3  underwriting of our loans.

4  Q.  Now Full Spectrum Lending, along with other -- well,

5  withdrawn.

6          Full Spectrum lending saw an issue with stated income

7  loans in the late 2007, early 2008 time period, correct?

8  A.  I'm not sure if I understand what you mean by "issue."

9  Q.  With respect to SUS ratings, stated income loans became an

10  issue in the late 2007, early 2008 time period, is that

11  correct?

12  A.  That's true, the SUS rates were higher than we desired.

13  Q.  Mr. O'Donnell, please turn to DX8.

14          DX8 is an email exchange dated July 23rd, 2007 with

15  other members of the High-Speed Swim Lane working group, is

16  that correct?

17  A.  Yes, that looks right.

18          MS. MAINIGI:  I ask that DX8 be admitted.

19          MS. NAWADAY:  No objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 8 received in evidence)

22  Q.  Now again, in terms of framework, Mr. O'Donnell, this is

23  prior to the pilot of the High-Speed Swim Lane, correct?

24  A.  It is, it looks like it's about three weeks before.

25  Q.  And it was during this time period that determinations

1    about the pilot are being made, correct?

2    A.  I believe so, yes.

3    Q.  Let's take a look at page 3, QoG suspension all PCAs for 90

4    days.

5            Now actually, let me ask you to go over to page 2

6    first, please.  And if you look over at the line that starts

7    with:  I figured we could send one consolidated response.

8            Is it fair to say that your notes on the next page are

9    reflected in blue, Mr. O'Donnell?

10   A.  That's what it says, yes.

11   Q.  Let's go back to page 3 then, please.

12           Number one, QoG suspension all PCAs for 90 days.  So

13   there is a question as to what to do with QoG suspension during

14   this time period, correct?

15   A.  Correct, for the -- yes, for the QoG.

16   Q.  To step back, QoG is Quality of Grade, correct?

17   A.  That's right.

18   Q.  And it's the name for the quality score assigned to loan

19   specialists and underwriters, correct?

20   A.  That's true.

21   Q.  And the Quality of Grade, you testified that the Quality of

22   Grade affected compensation, correct?

23   A.  It could if the score had a negative impact.

24   Q.  And at this point in time, there is a decision being made

25   as to whether QoG will be suspended for the new process,

1    correct?

2    A.  Yeah, what to do with it, yes.

3    Q.  If you could read your answer in blue, please.

4    A.  I am OK with the suspension for 90 days for certain

5    elements of the QoG.  We should keep those tied to areas such

6    as responsible lending, fraud, affordability, and collateral.

7    Q.  Mr. O'Donnell, you thought it made sense to suspend QoG for

8    a limited period because you wanted employees who were moving

9    to new roles with new authority to be focused on executing the

10   work flow, correct?

11   A.  That's partially true.  I think what I'm saying here is I

12   wanted to remain for certain key areas regarding the collateral

13   for the loan, among them, the borrower's ability to pay.

14   Q.  Let's look at DX12.

15            Now DX12 is an email exchange between you and James

16   White dated August 3rd, 2007, is that correct?

17   A.  Yes.  Starts earlier, but yes.

18            MS. MAINIGI:  I ask that DX12 be admitted.

19            MS. NAWADAY:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 12 received in evidence).

22   Q.  Now you testified last week, Mr. O'Donnell, that Mr. White

23   was one of your direct reports that had expressed some concern

24   to you, is that true?

25   A.  I did.

1   Q.  Turn to page 3 to 4, 3 and 4, please, of Exhibit 12.

2           Now this bottom email on page 3, Mr. O'Donnell, that

3   continues into page 4, that's the email that we looked at last

4   week that announced various changes to work flow and

5   compensation, correct?

6   A.  It is.

7   Q.  And that was in advance of the pilot, correct?

8   A.  It was.

9   Q.  Then if we take a look at the next set of emails up, we see

10  that Mr. White has sent some questions to you which you have

11  responded to, correct?

12  A.  Yes, I believe.  I can't see my responses, but I see his

13  questions.

14  Q.  And unfortunately I think on this one you didn't write your

15  responses in blue, but I think we can decipher them.

16          If we read number one, highlight that, please.

17          In response to the email that you sent to central

18  services announcing the work flows and the compensation

19  changes, Mr. White writes:  Lots of questions, and since I did

20  not know this was coming out, I am caught a little off guard.

21  Correct?

22  A.  Yes.

23  Q.  And with respect to question one, he asks a question about

24  QoG, correct?

25  A.  Yes.

1    Q.  "No QoG hits, no matter how bad," is the question he asks,

2    correct?

3    A.  Yes.  Poor question, looks more like a statement, but yes.

4    Q.  And your response, Mr. O'Donnell, is:  No QoG on prime

5    loans, fraud, responsible lending would still subject employees

6    to disciplinary action.  Remember, we are talking only about

7    prime fundings here, not subprime.  Our instance of QoG issues

8    on prime loans is very low, so we're not actually giving up

9    much.  It's more the message.

10            Is that your response, Mr. O'Donnell?

11   A.  I can't tell if that's all of my response, but it is true

12   that there were low issues with QoG loans.

13   Q.  Before you go any further, Mr. O'Donnell, does that appear

14   to be the response you gave Mr. white?

15   A.  I can't tell from the document which is his and which is

16   mine.

17   Q.  Do you have any reason to believe that response is not

18   yours?

19   A.  I believe part of it is, I just can't tell you where I

20   start and where he starts or stops.

21   Q.  Let's go to number five, please.

22            With respect to number five, Mr. White notes:  No

23   mention of quality in your note, and the first wave of

24   questions from the group was asking if quality should be

25   substituted for volume.  I know that quality and compliance are

D9UTBAN1                       O'Donnell - cross

```
 1   always an expectation of our job.  Maybe we should say that in
 2   this note?
 3           Your response, Mr. O'Donnell, is:  Very important to
 4   make it clear that we are talking about prime loans.  We don't
 5   have quality issues on prime due to the strength of the
 6   borrower.
 7           Correct?
 8           MS. NAWADAY:  Objection.
 9           THE COURT:  Ground?
10           MS. NAWADAY:  Foundation, and it's not clear from the
11   face of the document who is responding to what in this answer.
12           THE COURT:  Sustained.
13   Q.  Mr. O'Donnell, is it fair to say that your response, based
14   on your reading of this document, begins at:  Very important to
15   make it clear?
16   A.  I can't tell exactly which is Jim's and which is mine.
17   Q.  Perhaps you could read out loud for me then, "Very
18   important to make clear," until the end of that paragraph,
19   please.
20   A.  Very important to make clear that we are talking about
21   prime loans.  We don't have quality issues on prime due to the
22   strength of the borrower.  They are the quality part of the
23   deal.  The focus is on moving these deals quickly and
24   eliminating hand offs, returns, or unnecessary requirements
25   that delay signings.  Once signed, nearly every loan funds and
```

1   funds quickly.  Push is on getting deals from App to signing as

2   quickly as possible at a much higher rate, 55 percent from App

3   to fund, than we do today, 41 percent.

4   Q.  And it's your testimony now, Mr. O'Donnell, that you can't

5   tell where your comments -- where Mr. White's comments end and

6   yours begin, is that fair?

7   A.  I can't tell exactly because the font is all the same, but

8   that appears to be my answer, yes.

9   Q.  So it does appear to be your answer beginning with, "Very

10  important to make it clear that we are talking about prime

11  loans," correct?

12  A.  Again, I can't tell exactly, but I believe that's -- at

13  least part of that is my answer.

14  Q.  Please turn to DX280 in your binder.

15          DX280 is an email exchange between you and Mr. Cliff

16  Kitashima, correct?

17  A.  Yes, that's true.

18  Q.  And Mr. Kitashima was your boss at this point in time,

19  correct?

20  A.  He was.

21          MS. MAINIGI:  I ask that DX280 be.

22          MS. NAWADAY:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit 280 received in evidence)

25  Q.  Let's go to page 2, please.  And if we could blow up the

1    top paragraph, the top paragraph and the line.

2              Now the time period of this email is prior to the

3    start of the High-Speed Swim Lane pilot, correct?

4    A.  It's about a week before it, yes.

5    Q.  And you and others that are part of the working group are

6    still working on the various aspects of the pilot at this point

7    in time, correct?

8    A.  I believe that to be the case, yes.

9    Q.  Please read that email out loud.

10   A.  You will be receiving a note from Drew tonight that

11   presents a clear picture of the restrictive nature of today's

12   credit environment.  He emphasizes a need to exercise rigorous

13   underwriting discipline in our manufacturing process.  The

14   environment is also very fluid with changes to guidelines

15   coming rapidly and often.  CLUES will not be updated initially,

16   so much of the underwriting discipline will be required by

17   those who validate and CTC.  How will we ensure that loans

18   going through the Hustle process still qualify when guidelines

19   contract, and that processors will be updated and properly

20   signing off on these critical steps, validation and CTC?  I'm

21   also assuming that these processors have no underwriting

22   exception authority.  Can you please review and advise?

23   Q.  Mr. Kitashima directs this email to you, Mr. O'Donnell,

24   correct?

25   A.  He does.

D9UTBAN1                              O'Donnell - cross

1    Q.  Now the first sentence refers to receiving a note from

2    Drew.  Is that Drew Gissinger?

3    A.  Yes.

4    Q.  And Mr. Gissinger was COO of Countrywide Home Loans at the

5    time, is that correct?

6    A.  I think he was actually the president of Countrywide Home

7    Loans.

8    Q.  He was within corporate management, is that correct?

9    A.  He was.

10   Q.  And Mr. Gissinger is about to send out a note emphasizing

11   the need to exercise rigorous underwriting discipline in the

12   loan manufacturing process, correct?

13   A.  That's what Cliff's note says.

14   Q.  And Mr. Kitashima is asking you how will we ensure that

15   loans going into the High-Speed Swim Lane process still qualify

16   when guidelines contract, correct?

17   A.  Yes.

18   Q.  And let's go to the first page.

19        Now Mr. O'Donnell, at the bottom of the prior page, as

20   you read out loud, Mr. Kitashima said:  Could you please review

21   and advise.  Correct?

22   A.  Yes, that's true.

23   Q.  And on August 8, the next day, you respond:  Will do.

24   Correct?

25   A.  Yes.

```
 1    Q.  And this time period, of August 8, 2007, Mr. O'Donnell, it
 2    was your belief that FSL had no issues with quality, correct?
 3              MS. NAWADAY:  Objection.
 4              THE COURT:  Ground?
 5              MS. NAWADAY:  Foundation.
 6              THE COURT:  Overruled.
 7    A.  FSL had issues with quality.  We always had issues with
 8    quality, that's why we constantly looked at our process.
 9    Issues would be defined as SUS ratings.
10    Q.  Mr. O'Donnell, is it fair to say that during this time
11    period, the time period of this email, August 8, 2007, FSL was
12    not under intense scrutiny for its manufacturing process or
13    manufacturing quality results?
14    A.  Well, I think we looked at SUS rates from the period prior
15    to the Hustle last week, and they were actually higher than
16    goal.  We were already experiencing challenges with our SUS
17    rates before we went to the Hustle process, so no, I would not
18    agree with that.
19    Q.  Would you agree that at this point in time FSL had
20    relatively strong loan performance?
21    A.  Historically we had had strong loan performance, yes.
22              MS. MAINIGI:  Your Honor, may I approach?
23              THE COURT:  Yes.
24              MS. MAINIGI:  Your Honor, may we approach side bar?
25              THE COURT:  Yes.
```

D9UTBAN1                         O'Donnell – cross

1              (At side bar)

2              MS. MAINIGI:  Your Honor, what is your process for

3    impeachment when I have deposition testimony?

4              THE COURT:  I'm glad you raised it.  Here's what you

5    do:  After saying you remember having your deposition taken and

6    you were under oath, et cetera, then you announce the page and

7    lines that you propose to read.  Your adversary then has a few

8    seconds to object.  The only objection would be on grounds that

9    no reasonable juror could find it to be inconsistent.  If there

10   is an objection, I will look at it; if there's no objection,

11   then you may read it in the form of a question and answer.

12             MS. MAINIGI:  So just read out -- ask him to look at

13   the lines first, the lines and the pages.

14             THE COURT:  You could ask him, but more importantly

15   you have to announce so -- the point is so your adversary can

16   look at them and see if they want to object.

17             MS. MAINIGI:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2   Q.   Do you recall being deposed on April 4, 2013?

3   A.   I do.

4   Q.   Do you recall that I took your deposition?

5   A.   I do.

6   Q.   Do you remember that we discussed at that point in time

7   this e-mail exchange with Mr. Kitashima?

8   A.   I believe we did, I don't remember -- we talked about a

9   lot.

10             THE COURT:  Give him a copy of the deposition

11  transcript.  While you're doing that, ladies and gentlemen, let

12  me tell you what a deposition is.

13             Prior to the beginning of a trial, both sides get the

14  chance to question the witnesses and other relevant people in

15  their offices under oath.  There is no judicial officer there,

16  but there's a court reporter who takes down what is said.  And

17  a deposition can be introduced to you in certain circumstances.

18  The one that's relevant here is if a witness testifies here on

19  the stand to something, and at his deposition he gave an answer

20  that is arguably inconsistent, then that can be read, and then

21  it is up to you to determine whether it is inconsistent at all;

22  and secondly, if it is inconsistent, whether you think it bears

23  either on his credibility or on an issue in the case.  You can,

24  in those circumstances, consider that his testimony here in

25  court is the accurate one, his testimony back in the deposition

D9U3BAN2                          O'Donnell - cross

1   was the accurate one, if they're consistent they both were the

2   accurate ones.  So you may consider it for any and all

3   purposes.

4           There will be some other reasons why depositions are

5   introduced later in this trial, but that's the purpose that it

6   is being introduced now.

7           All right, counsel.

8           MS. MAINIGI:  Thank you, your Honor.

9   Q.  Mr. O'Donnell, I direct your attention, please, to page 213

10  and 214, and specifically I'll back up to give you the context

11  starting at line eight on page 213 and carrying forward through

12  line 13 on page 214.  213 line eight, through 214, line 13.

13          (Pause)

14  Q.  Have you had an opportunity to review it?

15  A.  I have.

16          MS. MAINIGI:  Your Honor, may I proceed?

17          THE COURT:  Yes.

18  Q.  It appears, Mr. O'Donnell on this page, that we were

19  discussing the note from Drew Gissinger, correct?

20  A.  Yes, that's true.

21  Q.  Now, starting at line 17, page 213, I ask you:

22  "Q.  And just to follow the thought process, is it fair to say

23  manufacturing quality was important.  If good quality loans

24  were not produced by Countrywide, they either might not be

25  purchased in the first place or Countrywide would have to

D9U3BAN2                        O'Donnell - cross

1    repurchase them back from the GSEs, correct?"

2              I asked you that question?

3    A.  You did.

4    Q.  Then there were some objections.  Your answer begins on

5    page 214, line 3.  Could you read your answer in its entirety

6    out loud.

7    A.  "A.  To me this is -- I would equate this to business as

8    usual for our area.  We had no issues with quality at this

9    point.  We were not under intense scrutiny for our

10   manufacturing process, or manufacturing quality results.  We

11   had, as we talked about earlier this morning relatively strong

12   loan performance, and even compared to the other divisions

13   in --" excuse me.  "We had, as we talked about earlier this

14   morning, relatively strong loan performance even compared to

15   the other divisions in different product lines.  So to me this

16   was, okay, glad everybody else is going to finally come in line

17   with us."

18   Q.  In response, Mr. O'Donnell, you're referring to the e-mail

19   that is DX 280, correct?

20   A.  Yes, I believe so.

21   Q.  You indicate that in the time period of DX 280, which is

22   August 8, 2007, prior to the start of the High-Speed Swim Lane,

23   that we, FSL, had no issues with quality at this point,

24   correct?

25   A.  I did say that in the deposition, yes.

D9U3BAN2                        O'Donnell – cross

1   Q.  You said further, we were not under intense scrutiny for

2   our manufacturing process or manufacturing quality results,

3   correct?

4   A.  That's true.

5   Q.  You go on to say that during this time period, August 8,

6   2007, we had relatively strong loan performance, even compared

7   to the other divisions in different product lines, correct?

8   A.  It's true, our subprime loans often outperformed prime

9   loans in other divisions.

10          THE COURT:  Counsel, I didn't want to interrupt you,

11  but what you provided me with is pages 1 to 93 of his

12  deposition, and then two copies of pages 528 through 751.

13          MS. MAINIGI:  I apologize, your Honor.  We must have

14  had a mixup.  We'll get that corrected right way.

15          Please put up DX 73, Alex, please.

16          Your Honor, may I approach?

17          THE COURT:  Yes.

18  Q.  If we could focus on the first three-quarters of 2007,

19  please.  Mr. O'Donnell, this is DX 73 which has been previously

20  admitted.  Do you remember looking at this last week?

21  A.  Yes, I do.

22  Q.  This has the corporate QC results for FSL as well as other

23  divisions, correct?

24  A.  It does.

25  Q.  The time period that would be preceding the start of the

1   pilot would include the first two quarters of 2007, correct?

2   A.  As well as the earlier columns, yes.

3   Q.  The numbers that are included there as the final QC results

4   for the first two quarters of 2007 are 8.8 percent and

5   6.2 percent respectively, correct?

6   A.  Yes.

7   Q.  Mr. O'Donnell, you testified about training relating to the

8   pilot last week, correct?

9   A.  I believe we talked about that, yes.

10  Q.  For the pilot, the individuals for the pilot were selected

11  because they had some level of certification already, is that

12  correct?

13  A.  I believe that's true.

14  Q.  After the pilot, you applied the existing certification

15  process that was in place for junior underwriters and

16  underwriting associates, correct?

17  A.  Yes, I think that's true.

18  Q.  They had to complete specific training modules that

19  Countrywide had in place, is that correct?

20  A.  They did, among other things.

21  Q.  They had to take compliance and ethics training, is that

22  right?

23  A.  They did.

24  Q.  They had to submit test cases, is that correct?

25  A.  They did.

D9U3BAN2                          O'Donnell - cross

1    Q.  In some cases their loans had to be second signed by

2    someone with authority, correct?

3    A.  I think that was -- that would be in all cases.  The second

4    signing was part of the review process.

5    Q.  You also testified on Friday that as part of the Central

6    Fulfillment reorganization, that individuals that had

7    previously held the title underwriter became loan specialists,

8    correct?

9    A.  Not all of them.  Some of them did, yes.

10   Q.  Please turn to DX 460.  DX 460, Mr. O'Donnell is a project

11   update for the High-Speed Swim Lane pilot, is that correct?

12   A.  Yes.  That's --

13   Q.  Dated September 20, 2007?

14   A.  Yes.

15            MS. MAINIGI:  I ask that DX 460 be admitted.

16            MS. NAWADAY:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit 460 received in evidence)

19   Q.  Turn to page 14, please.  Mr. O'Donnell, this page relates

20   to High-Speed Swim Lane team selection, correct?

21   A.  It does.

22   Q.  Could you read out loud what is there under "create teams."

23   A.  It says "Create teams.  Guiding principles.  Each team has

24   a back up for the BOM."

25   Q.  What is the BOM?

1   A.  Branch operations manager.  That was a supervisor in the

2   processing space that was part of the sales organization.

3   Q.  The back up for the BOM is to be selected from where?

4   A.  "Select from management list provided by Ed and Cheri."

5   Q.  The Ed there would be you, Mr. O'Donnell?

6   A.  Yes, I believe so.

7   Q.  What comes next?

8   A.  "Each team has at least one LS underwriter with maximum

9   underwriting authority."

10  Q.  Tell us what LS/UW means.

11  A.  It's two different types of employee.  Either a loan

12  specialist or someone from underwriting.

13  Q.  So each team has to at least have one loan specialist or

14  underwriter with maximum underwriter authority, is that right?

15  A.  That's what is being proposed, yes.

16  Q.  Could you read the next one, please.

17  A.  "Each team has at least two LS underwriters including above

18  LS underwriter?

19  Q.  And the next one, please?

20  A.  "Each team has at least one person with compliance

21  specialist skills."

22  Q.  And the final guiding principle, please?

23  A.  "Ensure senior LSs long tenured on each team."

24  Q.  You can set that aside, Mr. O'Donnell.

25          Mr. O'Donnell, you were head of central services, is

1   that correct?

2   A.  That's true.

3   Q.  Then Central Fulfillment began October 1st, 2007, is that

4   correct?

5   A.  That's correct.

6   Q.  I believe you testified last week that the High-Speed Swim

7   Lane work flow was one of three work flows within Central

8   Fulfillment, correct?

9   A.  I did.

10  Q.  You applied for the job as head of Central Fulfillment, is

11  that right?

12  A.  I did.

13  Q.  Please turn to DX 18 and 19.  DX 19 is an e-mail you sent

14  to Mr. Kitashima on September 10, 2007.  And DX 18 is its

15  attachment.  Is that correct?

16  A.  I don't have an 18 in my book.

17  Q.  I think it's right behind it, Mr. O'Donnell.

18  A.  I'm sorry.  Yes.

19          MS. MAINIGI:  Your Honor, I ask that DX 18 and 19 be

20  admitted.

21          MS. NAWADAY:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 18, 19 received in evidence)

24  Q.  Let's take a look at the organizational chart.  This is an

25  organization chart that you proposed to Mr. Kitashima for

1   Central Fulfillment, is that correct?

2   A.  Yeah, I think I was sending him a draft of what I was

3   intending to share with others.

4   Q.  Your name is at the top of this organizational chart, is

5   that right?

6   A.  It is.

7   Q.  If we take a look at your e-mail, on September 10, 2007,

8   could you read that first paragraph out loud, please.

9   A.  "Cliff, this is the draft I've put together.  I thought I'd

10  get your input before sending.  The line level structure can be

11  completed when Mark and Loren have weighted rankings completed

12  tomorrow.  Please take a look and advise.  You'll note I found

13  room to put my name on a box.  I'm going to send this to you,

14  Rebecca, Loren and Mark."

15  Q.  Ultimately, Mr. O'Donnell, you interviewed for the head of

16  Central Fulfillment job with Mr. Lumsden, is that correct?

17  A.  I did interview with Greg, yes.

18  Q.  You also interviewed for that job with Ms. Mairone, is that

19  correct?

20  A.  That's true.

21  Q.  Ultimately, you did not get the job as head of Central

22  Fulfillment, correct?

23  A.  That's right.  They selected a different leader.

24  Q.  They selected Wade Comeaux, is that right?

25  A.  They did.

D9U3BAN2                      O'Donnell - cross

1    Q.  You were surprised by that selection, correct?

2    A.  I don't know if I was surprised.  It was clear to me during

3    the interview process that that was the likely outcome, was not

4    me being selected as the leader.

5    Q.  You were surprised because you thought in effect you were

6    already -- you were essentially interviewing for your own job,

7    is that correct?

8    A.  That's true.

9    Q.  So you were disappointed and surprised when they told you

10   you had not gotten the job, is that right?

11   A.  I wasn't surprised, because it had been made pretty plain

12   to me that I was not going to be selected.  I was surprised at

13   the selection, yes.

14   Q.  Mr. O'Donnell, if you could pull out your deposition

15   transcript from April 4 again.  We're going to take a look at

16   pages 161 to 162, sir.  And specifically the question I'm going

17   to direct your attention to starts at line 18 of page 161, and

18   the answer continues through line 2 of page 162.  The question

19   that was posed Mr. O'Donnell, was as follows:

20   "Q.  Were you disappointed that you did not get the job?"

21         Could you please provide your answer.

22   A.  "A.  I was surprised, to be honest with you, at the time.

23   I wasn't aware of who the other candidates were that were being

24   interviewed, and I saw this role as effectively the job I

25   already had, so I was effectively, I thought, interviewing for

1  my own job.  And was surprised I was told that there was

2  another leader selected."

3  Q.  Thank you.  You can set that aside, Mr. O'Donnell.

4         Please turn to DX 31.  DX 31 is the bulletin

5  announcing Central Fulfillment, is that correct?

6  A.  Yes, it is.

7         MS. MAINIGI:  I ask that DX 31 be admitted.

8         MS. NAWADAY:  No objection.

9         THE COURT:  Received.

10         (Defendant's Exhibit 31 received in evidence)

11  Q.  I take it, Mr. O'Donnell, any time there is a new process

12  in place, one of these bulletins comes out, is that right?

13  A.  Bulletins was one of the ways that Full Spectrum

14  communicated process changes, yes.

15  Q.  So on October 1st, the FSL management is announcing to all

16  of FSL the new Central Fulfillment model, is that right?

17  A.  It looks that way, yes.

18  Q.  Do you recall receiving this bulletin?

19  A.  I got lots of bulletins.  I'm sure I did.  These were

20  electronically sent out within Full Spectrum.  But I don't

21  recall specifically getting it.

22  Q.  Could you read the first paragraph of this bulletin out

23  loud, please.

24  A.  "As part of Countrywide's commitment to maintaining a

25  competitive position and match the needs of a constantly

1  changing mortgage market, FSLD has developed a new NSC model

2  Central Fulfillment, designed with a streamlined flow and

3  minimal requirement gates to expedite loan processing.  The new

4  Central Fulfillment process will allow FSLD to reposition

5  itself and plan for success in a challenging environment by

6  balancing velocity, efficiency and quality."

7  Q.  If we go down to the next paragraph, is it fair to say

8  Central Fulfillment is going to be in existence in Rosemead,

9  California; Richardson, Texas; and Chandler, Arizona?

10  A.  That's what the announcement says, yes.

11  Q.  If we go further down to the key features of Central

12  Fulfillment, the second bullet indicates that loan specialists

13  have underwriter approval authority, correct?

14  A.  It does.

15  Q.  This fact that loan specialists were going to have

16  underwriter approval authority, that was published in the

17  bulletin, correct?

18  A.  It was.

19  Q.  That went to hundreds if not thousands of people within

20  Full Spectrum, correct?

21  A.  It would have, yes.

22  Q.  There is no attempt made to hide the fact that loan

23  specialists were going to have underwriter approval authority,

24  correct?

25        MS. NAWADAY:  Objection.

D9U3BAN2                    O'Donnell - cross

1              THE COURT:  Ground?

2              MS. NAWADAY:  Calls for speculation.

3              THE COURT:  Overruled.

4   A.  Can you repeat the question?

5   Q.  There is no attempt to hide the fact that loan specialists

6   were going to have underwriter approval authority, correct?

7   A.  No, internally within Full Spectrum this would have been

8   known by the bulletin, yes.

9   Q.  Let's take a look, please, at DX 35.  DX 35 is an

10  October 5, 2007 e-mail from CEO of FSL Greg Lumsden also

11  announcing Central Fulfillment, correct?

12  A.  Yes.

13             MS. MAINIGI:  Your Honor, I ask that DX 35 be

14  admitted.

15             MS. NAWADAY:  No objection.

16             THE COURT:  Received.

17             (Defendant's Exhibit 35 received in evidence)

18  Q.  DX 35 is a memo that Mr. Lumsden wrote to

19  FSLnotify@Countrywide.  Do you see that, Mr. O'Donnell?

20  A.  I do.

21  Q.  Is FSLnotify basically everyone within FSL?

22  A.  It was sort of the blast e-mail inbox, yes.

23  Q.  So Mr. Lumsden is blasting out to FSLnotify, subject

24  evolving FSL's new processing model, correct?

25  A.  That's the subject, yes.

D9U3BAN2                           O'Donnell - cross

1   Q.   Could you read Mr. Lumsden's first paragraph of his e-mail,

2   please.

3   A.   "Several months ago, we began testing several different

4   processing models to help us be more efficient with our prime

5   loans.  Since this testing began, the mortgage market has fully

6   changed, as we all know, and we are now almost exclusively a

7   prime lender.  As virtually all of us know by now, the

8   processing and underwriting of prime loans is much different

9   than non-prime.  The original test was called the High-Speed

10  Swim Lane, and was designed to allow us to create two paths for

11  our loans to follow.  One path for subprime, one path for

12  prime.  With our new business model being almost exclusively

13  prime.  It is now time to start migrating all of FSL over to a

14  prime fulfillment work flow."

15  Q.   If you can take a look at the third paragraph, please,

16  Mr. O'Donnell.  And read that out loud.

17  A.   "The new processing/fulfillment model will accept a high

18  quality loan application from sales and drive it all the way

19  through to funding.  There will be few returns to sales.  This

20  model eliminates the back and forth that existed in our

21  previous model, and allows us to follow industry best practices

22  for prime business.  This new model is now being implemented in

23  the NSCs."

24  Q.   The NSCs is referring back to Rosemead, Chandler and

25  Richardson, is that right?

D9U3BAN2                          O'Donnell - cross

1    A.  The NSCs are the national sales centers.  That would be

2    that part of the organization, yes.

3    Q.  So Rosemead, Chandler, and Richardson, correct?

4    A.  Yes, that's true.

5    Q.  Please read out loud the next paragraph, paragraph four.

6    A.  "There were new operations teams created on October 1st to

7    support the NSC sales teams.  The managers and employees that

8    were selected to comprise these NSC teams are very talented and

9    tenured employees in FSL.  These teams of processing with

10   underwriting certification and funding employees are regionally

11   aligned to better support each individual sales region.  The

12   central services groups for underwriting and funding will be

13   implementing many of the same improvement initiatives in the

14   near future, in support of the field branches.  The new

15   operations model is intended to be slightly different for our

16   call centers and branch sales, but the objectives mentioned

17   above are identical."

18   Q.  Mr. Lumsden announces that Mr. Comeaux is going to be

19   leading Central Fulfillment, correct, the last paragraph on

20   that page?

21   A.  Yes.  That's correct.

22   Q.  Let's go to the second page.  If you could read out loud

23   that first paragraph, please, Mr. O'Donnell.

24   A.  "Yes, these are big changes, but clearly are needed for us

25   to be competitive as a direct to consumer prime lender.  We

1  must be more productive across the organization with our prime

2  business, and thus a model change and many new work flows is

3  required.  Cliff Kitashima, Rebecca Mairone, Cheri Shine, Ed

4  O'Donnell, Loren Rodriguez, Mark Barnett, and many others have

5  worked with many across our organization over the last 90 days

6  to develop our new fulfillment model.  Thus we are now moving

7  into the implementation mode."

8  Q.  Thank you, Mr. O'Donnell.  If you could turn to DX 30,

9  please.  DX 30 is a town hall presentation that you actually

10 gave at the start of Central Fulfillment, is that correct?

11 A.  I don't know if I gave this presentation, no.

12 Q.  Are you familiar with the town hall presentations for

13 Central Fulfillment?

14 A.  I don't believe in this case the one on October 1st I was

15 invited to.

16 Q.  When we talked about the different work flows within

17 Central Fulfillment, you indicated that the level of risk of a

18 particular loan would determine in part which work flow it went

19 through, correct?

20 A.  We did have different work flows for different levels of

21 risk, yes.

22 Q.  Please turn to DX 22.  Is DX 22 an underwriter approval

23 authority level matrix.  That would be one of the matrices that

24 would help determine which work flow a loan was processed

25 through?

D9U3BAN2                          O'Donnell - cross

1    A.  Not solely.  This matrix is from September of '07, so it

2    would have been before we announced these changes to our work

3    flows.

4    Q.  There were work flows like this work flow in Central

5    Fulfillment, Mr. O'Donnell?

6    A.  We had -- well, we had prime and subprime, and we had the

7    PCA process that we talked about earlier and the referred

8    process we talked about earlier.

9    Q.  And are you familiar with this particular work flow,

10   Mr. O'Donnell?

11   A.  Which work flow?

12   Q.  I'm sorry.  Are you familiar with this particular matrix?

13   A.  This was the type of matrix we used to categorize

14   underwriting authority, historically for both prime and

15   subprime.

16              MS. MAINIGI:  Your Honor, I ask that DX 22 be

17   admitted.

18              MS. NAWADAY:  No objection.

19              THE COURT:  Received.

20              (Defendant's Exhibit 22 received in evidence)

21   Q.  It is a little difficult to read.  But up top under prime,

22   is it fair to say that there are six different levels of

23   underwriter level authority that one can achieve?

24   A.  Yes.

25   Q.  Depending on what level of authority is achieved by either

1   a loan specialist or an underwriter, that will determine what

2   type of loans they are able to approve, correct?

3   A.  That's true.

4   Q.  And this authority level matrix, was that put together in

5   part by the risk group at FSL?

6   A.  I believe so.  I think Patrick Aliano was the person that

7   typically did this matrix.

8   Q.  Did you have a role in approving this matrix,

9   Mr. O'Donnell?

10  A.  I don't remember if it was Cliff or I that had the final

11  send off, but it would have been come from the credit

12  organization, yes.

13          MS. MAINIGI:  We can take that down.

14  Q.  Mr. O'Donnell, you were familiar with CLUES, correct?

15  A.  I am.

16  Q.  CLUES was Countrywide's automated underwriting system,

17  correct?

18  A.  It was.

19  Q.  Had been around since the 1990s, correct?

20  A.  Or before, yes.

21  Q.  CLUES was programmed to match the Countrywide product

22  guide, correct?

23  A.  I believe that's the case.

24  Q.  To the extent that information was correctly entered into

25  CLUES, and one received a CLUES accept, that was an outcome

1    where you knew that the loan met product guide standards,
2    correct?
3    A.  Based on the inputs, yes.
4    Q.  Other than recent changes that may have been made, CLUES
5    applied the same standards that a manual underwriter would have
6    applied to the loan, correct?
7    A.  CLUES -- well, CLUES was -- was constantly being updated as
8    products were introduced, so often underwriters had to use
9    other checklists or worksheets where we told them effectively
10   what CLUES wouldn't do or wouldn't say.  So it was a
11   combination of using the CLUES output and any other job aids
12   that we provided.
13   Q.  Other than recent changes, is it fair to say CLUES applied
14   the same standards that a manual underwriter would have applied
15   to that loan?
16   A.  No.  CLUES didn't have the ability to know about conditions
17   that were not part of the algorithm.
18   Q.  Take a look at your deposition transcript from April 4,
19   Mr. O'Donnell.  Page 35, line 24, through page 36, line 9.
20            MS. NAWADAY:  Objection, your Honor.
21            MS. MAINIGI:  Your Honor page 35, line 24, through 36,
22   line 9.
23            THE COURT:  Yes.  I'm looking at it right now, thank
24   you.  Which of the dates?
25            MS. MAINIGI:  April 4, your Honor.

D9U3BAN2                          O'Donnell - cross

1           THE COURT:  It is a close call, but I'll allow it.

2  Q.  Mr. O'Donnell, the question you were asked starting on page

3  35, line 24 of your April 4 deposition is as follows:

4  "Q.  And the standards that clues applied to that loan would

5  have been the same standards that a manual underwriter would

6  have applied to that loan?"

7           Please read your answer.

8  A.  "A.  For the most part.  CLUES was not always kept

9  contemporary, so as product changes either expanding or

10  retracting, there were periods of time when we had manual

11  checklists to remind people about conditions that CLUES would

12  not require or would not fire that they had to add."

13  Q.  Thank you, Mr. O'Donnell.  You were aware, Mr. O'Donnell,

14  were you not, that Fannie and Freddie accepted a CLUES accept

15  as an indication that a loan qualified for sale to them?

16  A.  Yes, I was aware that Fannie and Freddie would purchase

17  CLUES accepts, and CLUES accept was an indication that the loan

18  conformed to guidelines.

19  Q.  Mr. O'Donnell, please turn to DX 758.  In the December 2007

20  time period, there were efforts by corporate to address stated

21  income reasonability, correct?

22  A.  Yes.

23  Q.  To come up with a more uniformed way for the entire company

24  to evaluate stated income reasonability, correct?

25  A.  Yes.

D9U3BAN2                           O'Donnell - cross

1    Q.  To that end, corporate wide, Countrywide enacted a new

2    stated income calculator in the December 2007 time period,

3    correct?

4    A.  I believe that's true.

5    Q.  In fact, Countrywide ended up using parts of Full

6    Spectrum's already existing stated income calculator to put

7    together the product for the whole company, correct?

8    A.  That's true.  I believe the calculator was built by Michael

9    Burns who ran the QA process for me.

10   Q.  Management at Countrywide thought that FSL's stated income

11   calculator in the December 2007 time period was good enough to

12   share with the whole rest of the company, correct?

13            MS. NAWADAY:  Objection.

14            THE COURT:  Sustained.

15   Q.  Taking a look at 758.  This is an e-mail exchange that you

16   had with Mr. Comeaux in the December 2007 time period, correct?

17   A.  Yes.

18            MS. MAINIGI:  Your Honor, I ask that DX 758 be

19   admitted.

20            MS. NAWADAY:  No objection.

21            THE COURT:  Received.

22            (Defendant's Exhibit 758 received in evidence)

23   Q.  Turn to page three, please, sir.  If you can read that

24   paragraph out loud at the bottom of page three.

25   A.  "Attached are the minutes of yesterday's meeting with

1  credit/QC group.  Big focus on documenting how we arrive at

2  reasonableness of stated income which Drew also echoed.  After

3  the holidays, Ed and I will pull a group together to review

4  process requirements and make appropriate recommendations.  The

5  message to Wade and group should be to use the job aid and

6  document, document, document how reasonableness was determined.

7  More is better.  Additionally, we'll also look at how FSL

8  processes SUS and consider including the center managers on the

9  initial notifications coming from corporate QC as we discussed.

10  Let me know if you have any other thoughts."

11  Q.  Mr. Kitashima here is suggesting a number of different

12  actions that he would like to take in the coming months

13  relating to quality, correct?

14  A.  He says he's going to pull a group together after the

15  holidays to discuss.  I don't know if he's making a

16  recommendation about specific things other than to document

17  decisions.

18  Q.  This would be to document stated income reasonability,

19  correct?

20  A.  Yes.

21  Q.  There is a response from Ms. Mairone right above that.

22  Could you read that.

23  A.  "We must document (answer the six questions) for all stated

24  loans.  Are we okay with this?"

25  Q.  Then let's go over to Mr. Price on page two.  Could you

D9U3BAN2                          O'Donnell - cross

1    read his response, please.

2    A.   "I think.  So if we fully utilize the income calculator and

3    make concise confident comments, we should avoid much of what

4    we are currently seeing.  If QC's differing opinion on

5    reasonability continues, we'll need to keep fighting back as

6    always."

7    Q.   Then the top e-mail from Ms. Mairone if you can read it,

8    please.

9    A.   "Agree.  Our job is to document correctly.  That is what

10   the investors are looking for."

11   Q.   That's from Ms. Mairone?

12   A.   It is.

13   Q.   Let's go to the first page of 758 and if you can read the

14   first paragraph of the e-mail that you sent in response

15   Mr. O'Donnell.

16   A.   To Wade?

17   Q.   I'm sorry.  I apologize.  Let's go back to Mr. Comeaux's

18   e-mail underneath you.  If you can read Mr. Comeaux's e-mail

19   out loud, please.

20   A.   "If you want someone on your team to team up with Ron so I

21   can send out another reminder on stated income reasonability on

22   Monday, I will be happy to do it."

23   Q.   And the rest of it, please.

24   A.   "I think it's important to keep driving home the form and

25   driving the right behavior.  We've had several training

1   exercises as well."

2   Q.  So, with respect to stated income reasonability,

3   Mr. Comeaux, as head of Central Fulfillment, is indicating he

4   can send out another reminder to his team on stated income

5   reasonability, correct?

6   A.  He is.

7   Q.  Mr. Comeaux, as head of Central Fulfillment, is saying it's

8   important to keep driving home the form and driving the right

9   behavior, correct?

10  A.  He is saying that.

11  Q.  He indicates that there are going to be several training

12  exercises as well, correct?

13  A.  He does say they've had training, yes.

14  Q.  Could you read your top paragraph, Mr. O'Donnell, please.

15  A.  "We're working collectively with other divisions, corporate

16  QC and leadership from Countrywide Securities who buy for bank

17  or manage sales to others to refine the process.  While I

18  expect some early changes in the way we approach and write up

19  decisions, the rebuild will take time.  We certainly want folks

20  from CF involved."

21  Q.  Thank you, Mr. O'Donnell.  We can put that aside.

22          You can turn, sir, to DX 774, please.  DX 774 is a

23  presentation dated January 3, 2008.  Now we're in January.  Put

24  together by Mike Burns, correct?

25  A.  Yes.

D9U3BAN2                        O'Donnell - cross

1   Q.  Mr. Burns had a significant role in the QA reviews and

2   process, correct?

3   A.  Correct.  He ran the QA underwriting -- loan underwriting

4   review team.

5           MS. MAINIGI:  Your Honor, I ask that DX 774 be

6   admitted.

7           MS. NAWADAY:  No objection.

8           THE COURT:  Received.

9           (Defendant's Exhibit 774 received in evidence)

10  Q.  Please turn to page four, Mr. O'Donnell.

11          THE COURT:  After this, counsel, we'll give the jury

12  their midmorning break.

13          MS. MAINIGI:  Yes, your Honor.

14  Q.  What is the title of this page, Mr. O'Donnell?

15  A.  "Continuing efforts to improve loan manufacturing quality."

16  Q.  Now Mr. Burns details some efforts from December 2007

17  there, correct?

18  A.  He does.

19  Q.  Then he also details some efforts for January 2008,

20  correct?

21  A.  He does.

22  Q.  Those include a proposed launch of complete QA on-site

23  reviews?

24  A.  That's what is proposed, yes.

25  Q.  And a pilot of branch fulfillment QA OCR online reviews?

D9U3BAN2                      O'Donnell - cross

1    A.  Yes.

2    Q.  And reporting on current loan manufacturing quality issues

3    and trending?

4    A.  Yes.

5    Q.  Then a QA myth buster newsletter, correct?

6    A.  Yes.

7    Q.  You can set that document aside, Mr. O'Donnell.

8             THE COURT:  Ladies and gentlemen, we'll give you a

9    15-minute break at this time, and see you soon.

10            Mr. O'Donnell, you can step down.  We'll see you in 15

11   minutes.

12            (Jury excused)

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D9U3BAN2

```
 1              THE COURT:  Please be seated.  I am mostly through and
 2    will have for you shortly my rulings on the Boland deposition.
 3    But aside from the point that was mentioned on Friday, which
 4    was that the defense designated a few items that had clearly
 5    been ruled out by my prior rulings on the motion in limine,
 6    while the defense was much better this time in not sort of
 7    raising frivolous objections, and I much appreciate that, there
 8    is one objection that continues to be raised and was also
 9    raised I think at least once here in court, that makes me think
10    that defense counsel may not be familiar with Rule 801(d)(2)(D)
11    of the Federal Rules of Evidence.  Because in the objections in
12    the Boland deposition, there were repeated hearsay objections
13    raised to Mr. Boland's recounting statements made by other
14    employees of Countrywide in the course of their employment.
15              There is no way that this is hearsay.  Rule
16    801(d)(2)(D) reads as follows:  "A statement is not hearsay if
17    the statement is offered against a party as a statement by the
18    party's agent or servant concerning a matter within the scope
19    of the agency or employment made during the existence of the
20    relationship."
21              So I don't expect to hear or see that hearsay
22    objection raised again to statements that fit within that
23    category.
24              MR. HEFTER:  If I may be heard on that, given what
25    we've seen in court, I want the record to reflect that those
```

D9U3BAN2

```
 1   statements wouldn't come in as with respect to Ms. Mairone.
 2           THE COURT:  Of course.  That's a different point.  But
 3   these were not your designations.
 4           MR. HEFTER:  I think we for efficiency sake, your
 5   Honor, I believe --
 6           THE COURT:  In any event, it was made as an
 7   across-the-board hearsay objection.  So, I don't want to do
 8   this but if I must, I must.  Who physically made those
 9   objections?
10           MR. HEFTER:  You mean in the deposition, your Honor?
11           THE COURT:  Yes.
12           MR. HEFTER:  We --
13           THE COURT:  No.  In giving me this new transcript, who
14   was it who prepared and entered those objections?
15           MR. JONES:  It was me, your Honor.  Malachi Jones.
16           THE COURT:  Yes, that's what I assumed.  You were
17   making the hearsay objection on behalf of your clients, were
18   you not?
19           MR. JONES:  That's correct, your Honor.
20           THE COURT:  Yes.  But if you want to make a separate
21   hearsay objection of the sort you've made previously, with
22   respect to any deposition that is offered in the future after
23   Mr. Boland, if you want to make any separate hearsay as to
24   Ms. Mairone, then you need to say that on the face of the
25   deposition.
```

D9U3BAN2

1           It will, since it's not hearsay, it will be played in

2     any event.  And with respect to Mr. Boland, if you want to

3     remind me about the point as it's being played, I will remind

4     the jury that it's not admissible as to Ms. Mairone.

5           MR. HEFTER:  We will make that clear, your Honor, in

6     the future on deposition transcripts.  And just so your Honor

7     knows, at the deposition itself we had an agreement with the

8     U.S. attorney's office that one objection would pertain to all

9     parties in the room.  In addition --

10          THE COURT:  No.  First of all, I'm not a party to

11    that.  And these objections were not being made then, they're

12    being made now in specific form given to me to rule on.

13          MR. HEFTER:  Understood, your Honor.

14          THE COURT:  Okay.  Did you want to say something?

15          MR. JONES:  No, your Honor.

16          THE COURT:  You've received my proposed preliminary

17    jury instruction.  Any additions or objections from the

18    government?

19          MR. ARMAND:  No, your Honor.

20          THE COURT:  Any additions or objections from counsel?

21          MR. SINGER:  Yes, your Honor.  Your Honor, I have a

22    few things and if it pleases the Court, I'll proceed in the

23    order of the draft instruction.

24          On the second paragraph beginning "this is a fraud

25    case."  We have some concern about the description of the

D9U3BAN2

```
 1    government's claim of fraud, and in particular the last clause
 2    of the paragraph "it was a misrepresentation that the loans
 3    designated for the High-Speed Swim Lane were of higher quality
 4    than they actually were and had been subjected to greater
 5    quality safeguards than they actually had."
 6              It is our belief that the government's theory in this
 7    case, and as it was articulated in opening statement and as it
 8    was articled at summary judgment, is that the loans were of
 9    poor quality.  And it is the quality of the loans that were
10    being pushed through and misrepresented that is the gravamen of
11    the government's claim.
12              So I'm concerned about confusing the jury with regard
13    to that last clause in particular.
14              THE COURT:  I think this is exactly what was both in
15    the complaint and in the government's submissions.  Overruled.
16              MR. SINGER:  The next objection is that in the third
17    paragraph, the three bank defendants are treated as a single
18    defendant, according to this instruction.  We do take issue
19    with that.  We think that the government would need to prove
20    its case separately against each of the two Countrywide
21    defendants, which are separate entities.  So we don't concede
22    they will be treated as a single defendant.  As far as Bank of
23    America, we have not contested successor liability as to Bank
24    of America.  So, we certainly agree that if the jury were to
25    find Countrywide liable, then Bank of America could be liable
```

D9U3BAN2

1     as a successor.  But we would also ask it be made clear to the

2     jury there is no allegation that Bank of America itself

3     committed any fraud or --

4              THE COURT:  What is the wording you propose?  The main

5     point of that paragraph was to point out that Ms. Mairone is a

6     separate defendant to be treated individually.  But how would

7     you like to characterize the banks?

8              MR. SINGER:  I think it would be fair to say --

9              THE COURT:  Give me your wording.

10             MR. SINGER:  Your Honor, how about this:  "For the

11    purposes of this case, the jury should consider each of the

12    defendants individually."

13             THE COURT:  No, that's clearly not true.  That is

14    clearly not true as to Bank of America.  Bank of America is

15    automatically liable as a successor in interest as everyone,

16    including your firm, has stipulated.

17             MR. SINGER:  We do agree with that.

18             THE COURT:  So then they're not treated individually.

19             MR. SINGER:  I think it could be clarified by a second

20    sentence that said --

21             THE COURT:  I don't accept your first sentence.

22             MR. SINGER:  What about "Each of the defendants, with

23    the exception of Bank of America, should be treated separately.

24    With respect to Bank of America --"

25             THE COURT:  This is the first time I'm hearing that

D9U3BAN2

```
 1   you are making a distinction.  I certainly didn't hear this in
 2   the opening statement or any question put so far between
 3   Countrywide Bank and Countrywide Home Loans.
 4           What is the distinction you're making?
 5           MR. SINGER:  The only distinction is they're separate
 6   corporate entities, and like any separate corporate entity, the
 7   government has the burden to prove liability with respect to
 8   that corporate entity.
 9           I agree with you, we didn't make an issue of the
10   difference between the two corporate entities in opening
11   statement.
12           THE COURT:  I am going to just strike the entire
13   paragraph and we'll take this up at the charging conference.
14           Go ahead.
15           MR. SINGER:  Thank you, your Honor.  In the summary of
16   the three elements, with regard to the first element, we would
17   ask that the word "significant" be replaced with "material."
18           THE COURT:  "Material" is a term that I will of course
19   define for the jury, but right now they don't know what it is.
20   It is not an every day term.  If you look in a dictionary or a
21   legal dictionary, it is defined as either important or
22   significant.
23           Which do you prefer, important or significant?  I am
24   not going to bore the jury with a legal term.
25           MR. SINGER:  Given those choices, I'll take
```

D9U3BAN2

1      "important."

2              THE COURT:  Okay.

3              MR. SINGER:  The second element on intent to defraud,

4      I would appreciate adding the language that "intent to defraud

5      includes an intent to injure or to harm."

6              THE COURT:  No.  They need to be instructed on that in

7      the final instruction.  That's really a term of art, the term

8      "harm" in this context.  So I considered, as you had requested,

9      adding that at this point, but it would mean that instead of

10     being a short simple instruction, this would be a complicated

11     one and I think would add nothing to their focus at this time.

12     So that is overruled.  But I will of course include that in my

13     final instructions to the jury.

14             MR. SINGER:  Your Honor, if I can just explain in one

15     sentence why I think that it would be helpful to add that

16     language.  My concern is that it is very difficult for the jury

17     to distinguish between an intent to deceive on the one hand and

18     an incident to harm on the other.  To state an untruth --

19             THE COURT:  No.  An intent to deceive for the purpose

20     of obtaining money and property, which is what is involved

21     here, in all but very extraordinary cases, is equivalent to an

22     intent to harm.

23             MR. SINGER:  I think that's a correct statement, your

24     Honor.  My concern is simply distinguishing between the intent

25     to deceive on the one hand and the intent to harm, say, by

D9U3BAN2

1    obtaining money or property on the other hand.  And I think I

2    am afraid the jury is not going to understand what intent to

3    defraud means.

4            THE COURT:  Well, I think what you really want, if I

5    understand your point, is going back to the first element, that

6    there existed a scheme to defraud Fannie Mae and Freddie Mac to

7    induce them to purchase mortgage loans originated through the

8    High-Speed Swim Lane by misrepresenting to them important

9    information about these mortgage loans.

10           So, it would now read that "There existed a scheme to

11   defraud Fannie Mae and Freddie Mac so as to induce them to

12   purchase mortgage loans originated through the High-Speed Swim

13   Lane by misrepresenting to them important information about

14   these mortgage loans."

15           Right?  That captures what you had in mind?

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

D9UTBAN3                        O'Donnell - cross

<pre>
 1              MR. SINGER:  I think that's an improvement, your

 2      Honor.

 3              I want to raise a couple of aspects --

 4              THE COURT:  By the way, with respect to the third

 5      element, I saw -- I can't remember whose request to charge,

 6      whether it was yours or your colleague's, but the notion that

 7      an individual defendant had to make use of the mails or

 8      interstate wires, that, of course, is not the law at all.

 9              MR. SINGER:  I agree with that, your Honor, I don't

10      think that was our intention.

11              THE COURT:  Go ahead.

12              MR. SINGER:  On the elements I want to raise a couple

13      things that aren't here.  One is an element that your Honor

14      said that we would get back to at some point, affect.

15              THE COURT:  I'm not putting that in because I'm not at

16      all sure that there's going to be a necessity to charge that to

17      the jury.  But I haven't ruled on that, and that's why I was

18      careful to say in order to establish a fraud claim as to any

19      given defendant, the government must prove, among other things.

20      And if that therefore becomes an element, it will be there in

21      the charge they get.

22              I have also made clear not once but at least twice, at

23      the very beginning and the very end of this charge, that this

24      is not the whole thing, it's just a focusing on some issues.

25              MR. SINGER:  And we do appreciate that, and I saw
</pre>

1  that, and I do want to state for the record we consider the

2  affect element --

3         THE COURT:  I don't see how, as we discussed

4  previously, how the jury could find the elements of mail fraud

5  and wire fraud without meeting the -- automatically meeting the

6  affect requirement, but we'll discuss that further.  I'm still

7  open to persuasion.

8         MR. SINGER:  Thank you, your Honor.  Whatever time is

9  convenient, we would like permission to brief that issue,

10  because I don't think --

11         THE COURT:  You would have to do it between I would

12  say now and the close of the government's case.  So I was

13  thinking maybe by lunch today, but perhaps how about Thursday?

14         MR. SINGER:  Thursday would be good.

15         The one other aspect of the elements that I wanted to

16  emphasize, and I think is going to be a big point of emphasis

17  for us when we get to the final charging conference, is

18  corporate liability, and what it takes to charge -- to find a

19  corporation liable.

20         THE COURT:  Under federal law?

21         MR. SINGER:  Under federal law, yes, your Honor.

22         THE COURT:  Where the acts of any employee are

23  automatically ascribed to the corporation?

24         MR. SINGER:  Your Honor, I respectfully disagree in a

25  case like this, and for two reasons.

 1          THE COURT:  Correct me if I'm wrong, didn't the

 2   Supreme Court of the United States in the central bank case

 3   decide this around 1890 or so?

 4          MR. SINGER:  There is a case in 1909.

 5          THE COURT:  1909.  And it's been followed slavishly

 6   ever since, notwithstanding all sorts of criticism, mostly by

 7   academics saying this is nuts.  And of course, many states such

 8   as New York State don't follow it, but it's the federal law.

 9   So you want me to overrule the Supreme Court of the United

10   States?  It's a temptation, of course.

11          MR. SINGER:  Certainly not asking for that, but with

12   all respect, that Supreme Court case dealt with the statute

13   that specifically addressed corporate liability.

14          THE COURT:  I know that, but it's been, as I said,

15   slavishly followed in a hundred different contexts ever since.

16   This is something that has been the subject of -- I mean whole

17   professors have gotten tenure on this stuff.

18          MR. SINGER:  Your Honor, I can't claim to be one of

19   those professors, but I can claim to have read quite a bit on

20   the subject, especially in the last month or so, and I promise

21   your Honor the issue is much more complicated.

22          THE COURT:  I'm thrilled to hear that, but I'm not

23   going to attempt to resolve that in this preliminary limited

24   charge.  If you want to brief that, on that one I will give you

25   until next week.

D9UTBAN3                          O'Donnell - cross

1            MR. SINGER:  Thank you, your Honor.

2            There is one other aspect of the issue, though, that I

3    don't believe was part of the Supreme Court's decision, and I

4    think it was presumed within your Honor's question, which we do

5    want to emphasize, which is someone -- put aside who that

6    someone needs to be, but someone, individual at the company,

7    has to have acted with a reckless and fraudulent intent.

8            THE COURT:  Right.  I think that's an issue that the

9    government is going to have to deal with in their proof.  Of

10   course, if it's Ms. Mairone, that's fine, but if it's not

11   Ms. Mairone, they have to find at least one other individual.

12   The view taken in the First Circuit, you can have corporate

13   intent even if you don't have any individuals, not the Second

14   Circuit and not this Court.  So you are right, but that's,

15   again, not something to be dealt with in this charge.

16           MR. SINGER:  The only concern I have to that, and your

17   Honor is several steps ahead of me of what the law is on that

18   in the Second Circuit on that subject, but my concern is the

19   jury is sitting there and they hear that corporation is

20   charged, they don't have the slightest idea what it means for a

21   corporation to have fraudulent intent.

22           THE COURT:  There are a lot of things that we haven't

23   told them about.  For example, there's probably a requirement

24   that one of the uses of the mails or uses of interstate wires

25   passed through the Southern District of New York, and so

1   there's a venue issue that they will have to be instructed

2   about and all sorts of things they would have to be instructed

3   about, but we're not dealing with them all here.

4            MR. SINGER:  It's a judgment of what is most likely to

5   be useful to them.

6            So the last point I wanted to raise is on the second

7   page in the penultimate paragraph, the reference to monetary

8   penalties.  I understand that the jury has already heard the

9   fact that that may be an issue here.

10           THE COURT:  Well, that instruction I gave after a side

11  bar, which all counsel agreed was the appropriate time to give

12  the instruction.

13           MR. SINGER:  I'm not arguing with that instruction,

14  your Honor, in connection with this, first of all, just to be

15  technical about it, it says monetary penalties must be

16  determined and imposed.  In fact, the Court, in the event of a

17  liability finding, will have discretion to impose them or not

18  impose them.  But --

19           THE COURT:  So I will put in monetary penalties, if

20  any.

21           MR. SINGER:  OK, just to throw this --

22           THE COURT:  "Must" means must be determined by the

23  Court, rather than -- doesn't mean that the Court must impose

24  any given penalty.

25           MR. SINGER:  Understood.  I simply ask that instead of

1   the reference to monetary penalties in this instruction that

2   your Honor say any sanction.

3           THE COURT:  Pardon?

4           MR. SINGER:  Your Honor might refer to any sanction

5   that may be --

6           THE COURT:  But the statute calls it penalties.

7           MR. SINGER:  The jury doesn't decide that, so I rather

8   they not focus on --

9           THE COURT:  No, thank you, but I will leave it as it

10  is.

11          MR. SINGER:  That's all.

12          THE COURT:  Thank you very much.  I will make those

13  changes.

14          Anything from Ms. Mairone's counsel?

15          MR. MUKASEY:  May I have one moment to confer with

16  Mr. Singer?

17          MR. ARMAND:  Your Honor, the government requests a

18  page limit on whatever briefing is going to be submitted on the

19  proposed instruction.

20          THE COURT:  Yes.  I will get to that in a minute.

21          MR. ARMAND:  Thank you.

22          (Pause)

23          MR. MUKASEY:  Ten more seconds, Judge, thanks.

24          (Pause)

25          MR. MUKASEY:  Thank you, Judge, nothing for

D9UTBAN3                     O'Donnell - cross

 1    Ms. Mairone.

 2              THE COURT:  So we'll give you no more than five

 3    minutes, because this took longer than I thought it was going

 4    to take, but I want to get the jury back.  But we'll take a

 5    five-minute break.

 6              While you were conferring, the government asked that

 7    there be a page limit on the further briefing that you are

 8    submitting, so I will say five single-spaced pages for each of

 9    the two briefs that you referred to.

10              MS. MAINIGI:  Thank you, your Honor.

11              MR. ARMAND:  Your Honor, the government has its

12    response to the briefing that defense submitted on the issue of

13    the $165 million gain.

14              THE COURT:  You don't have to hand it up because I got

15    a copy that I think you either faxed or was handed --

16              LAW CLERK:  On ECF.

17              THE COURT:  From my trustee law clerk, and I even

18    actually read it.

19              MR. ARMAND:  Very good, thank you, your Honor.

20              (Recess taken)

21              THE COURT:  Counsel, by my calculations you have an

22    hour and a quarter left.

23              MS. MAINIGI:  Would it be possible to borrow time from

24    my co-counsel if need be?  He kindly offered.  I don't think it

25    would be more than 15 extra minutes, to be honest.

1                THE COURT:  Well, let's see where we stand at lunch.

2                (Jury present)

3                THE COURT:  Counsel.

4     BY MS. MAINIGI:

5     Q.  Mr. O'Donnell, please turn to DX54 in your binder.

6                DX54 is the agenda for a quality control and assurance

7     summit on January 23rd, 2008, correct?

8     A.  Yes.

9                MS. MAINIGI:  Your Honor, I ask that DX54 be admitted.

10               MS. NAWADAY:  No objection.

11               THE COURT:  Received.

12               (Defendant's Exhibit 54 received in evidence)

13    Q.  The attendees at the summit included yourself, is that

14    correct, Mr. O'Donnell?

15    A.  That's correct.

16    Q.  And there were other individuals from the risk and

17    underwriting group that were representing, including

18    Mr. Kitashima, correct?

19    A.  Yes.

20    Q.  And then there were representatives from FSL's QA QC group

21    also, is that right?

22    A.  Yes, Michael Burns.

23    Q.  And those are the folks that worked on the QA reports and

24    the rebuttal to QC, is that right?

25    A.  Michael ran the QA team, he didn't take part in the

1   rebuttal to QC.

2   Q.  Mr. Brent was involved in that process, correct?

3   A.  Mr. Brent managed the team that did interact with corporate

4   QC, yes.

5   Q.  And he was there as an attendee, right?

6   A.  He's on the list, yes.

7   Q.  And your group had a role with the rebuttal process,

8   correct?

9   A.  Yes.

10  Q.  And then there were individuals there from the operations

11  leadership, is that right?

12  A.  From Central Fulfillment?

13  Q.  Right.

14  A.  Yes.

15  Q.  And that included Mr. Comeaux?

16  A.  Mr. Comeaux was on the list, yes.

17  Q.  And others, correct?

18  A.  Yes.

19  Q.  And is it fair to say that the agenda items included QC and

20  QA process review, QoG format review, and clear to close

21  responsibility, is that correct?

22  A.  Those are agenda items, yes.

23  Q.  Now take a look at DX55, please, sir.

24          DX55 is a recap of the take aways and comments from

25  the summit the couple of days prior, correct?

1    A.  Yes, it appears that way.

2            MS. MAINIGI:  Your Honor, I ask that Exhibit 55 be

3    admitted.

4            MS. NAWADAY:  No objection.

5            THE COURT:  Received.

6            (Defendant's Exhibit 55 received in evidence)

7    Q.  Now Mr. Brent -- so Mr. Brent sent around an email on

8    January 26, 2008 recapping everybody's take aways and to dos

9    essentially from the summit, correct?

10   A.  Yes, this is an email recapping the take aways.

11   Q.  Now one of the items that was discussed at the meeting is

12   communication plans Central Fulfillment, correct?

13   A.  Yes.

14   Q.  And actually we're going to go to the one that is Central

15   Fulfillment, and the communications plan Central Fulfillment

16   states daily or as published individual QA and QC SUS findings

17   to the OM.

18           What did you tell me the OM was again, Mr. O'Donnell?

19   A.  The operations manager.

20   Q.  And then it says daily/weekly recap of published reviews

21   for all QA SUS findings will go to the FVP, and the SVP/EVP

22   central Fulfillment will get the weekly recap only.

23           Do you see that?

24   A.  I do.

25   Q.  And then there's a provision for the monthly summary,

1   correct?

2   A.  Yes.

3   Q.  And it says the monthly summary of all findings to

4   FVP/SVP/EVP on QA findings.  Do you see that?

5   A.  I do.

6   Q.  Please turn to DX829.

7          Now DX829 is a loan performance and quality put

8   together by you, is that correct?

9   A.  There's nothing behind that tab in my book.

10  Q.  I apologize.

11         MS. MAINIGI:  Let me ask the government, does the

12  government have something behind it?

13         MS. NAWADAY:  Yes.

14         MS. MAINIGI:  May I approach, your Honor?

15         THE COURT:  Yes.

16  A.  Got it.

17  Q.  So DX829 is a loan performance and quality review that you

18  put together, right, Mr. O'Donnell?

19  A.  Yes, my name is on it.

20         MS. MAINIGI:  Your Honor, I ask that DX829 be

21  admitted.

22         MS. NAWADAY:  No objection.

23         THE COURT:  Received.

24         (Defendant's Exhibit 829 received in evidence)

25  Q.  This loan performance and quality review that you put

1   together, Mr. O'Donnell, is dated January 30, '08, correct?

2   A.  It is.

3   Q.  So the summit was just about a week earlier than that, is

4   that right?

5   A.  I think that's right.

6   Q.  Let me ask you to focus on page 7 and let's blow up

7   remediation.

8        If could you read that out loud, please,

9   Mr. O'Donnell?

10  A.  Communication campaign.  Holding weekly meetings to review

11  both FSL QC and FSL QA statistics with Central Fulfillment

12  management, center SVPs, Central Fulfillment ops management,

13  and CHL corporate QC beginning January 2008.

14  Q.  And could you read the next one, too, please?

15  A.  Engaging CF management on all SUS findings to help create

16  awareness beginning January 2008.

17  Q.  And CF management would be Central Fulfillment management,

18  is that correct?

19  A.  Yes.

20  Q.  Please turn to DX889.

21       DX889 is a quality update that you prepared,

22  Mr. O'Donnell, on March 3rd, 2008, correct?

23  A.  Yes, my name is on it.

24       MS. MAINIGI:  Your Honor, I ask that DX889 be

25  admitted, please.

D9UTBAN3                              O'Donnell - cross

1        MS. NAWADAY:  No objection.

2        THE COURT:  Received.

3        (Defendant's Exhibit 889 received in evidence)

4   Q.  Do you have any reason to believe you didn't prepare this

5   document?

6   A.  Typically my team would prepare the document.  I might be

7   leading the discussion so I would be listed as a speaker.

8   Q.  But you would approve the document before it went out under

9   your name, correct?

10  A.  I would have if I was going to make a presentation, yes.

11  Q.  Now as I read this document, this document has a number of

12  updated statistics on QC and QA, is that correct?

13  A.  There's definitely QC audit statistics on the first couple

14  of pages, yes.

15  Q.  Let's go to DX886, please.

16        Now before leaving DX889, that was dated March 3rd,

17  right?

18  A.  Yes.

19  Q.  Now let's go to 886.

20        DX886 is an email dated March 3rd from Greg Lumsden to

21  several individuals, including Ms. Mairone and yourself, is

22  that correct?

23  A.  I'm copied on the note, yes.

24        MS. MAINIGI:  Your Honor, I ask that DX886 be

25  admitted.

1          MS. NAWADAY:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 886 received in evidence)

4    Q.  Is it correct to say that Mr. Lumsden sent this email,

5    Mr. O'Donnell, after receiving your quality update?

6    A.  I don't know if Greg received my quality update.  It's the

7    same date later in the evening.

8    Q.  Mr. O'Donnell, Mr. Lumsden is referring to your quality

9    update in this email, correct?

10   A.  I haven't read the email.

11   Q.  Is it correct, Mr. O'Donnell, that Mr. Lumsden is referring

12   to your quality update in his email of March 3rd?

13   A.  He's referring to the attached document which is on the

14   second page, quality update 3/3/08, so yes.

15   Q.  So he's referring to the same quality update you sent that

16   day, correct?

17   A.  I believe so.

18   Q.  If we take a look at his email, sir, it is clear that he

19   has a number of questions regarding the quality information,

20   correct?

21   A.  I'm not sure if I understand that question.

22   Q.  Let me withdraw that question.

23          Let's take a look at the first paragraph.  Could you

24   read that paragraph out loud, please.

25   A.  First go to page 2 in the attached document.  These are

D9UTBAN3                          O'Donnell - cross

1   non-stated doc-type loans.  We had an SUS rating of 7.6 percent

2   in the third quarter and will come in between 11.7 and 6.8 in

3   the fourth quarter.  If you refer back to the previous five

4   quarters you will see we were under 5 percent each quarter.  In

5   this environment, the non-stated doc-type SUS goal needs to be

6   4 percent or less.

7   Q.  And read the next paragraph, please.

8   A.  Now go to page 3 in the attachment.  These are our stated

9   doc-type loans, and you will see extremely high SUS rates.

10  This is the area of greatest concern to FSL.  We have a

11  29.7 percent rating in the third quarter and a rating in the

12  fourth quarter that will be between 33.3 percent and

13  25.7 percent.  In essence, we have made no improvement in the

14  documenting and/or explaining the income or reasonableness of

15  it for the stated income doc-type loans.  Our goal is to

16  immediately improve the SUS to 5 percent.

17  Q.  Mr. Lumsden then goes on to indicate a variety of ideas and

18  thoughts on improvement, correct?

19  A.  Looks like he's referring to some of the changes that were

20  implemented, yes.

21  Q.  And he's asked that Cliff and Ed meet with operations

22  within the next 24 hours, is that right?

23  A.  Yes.

24  Q.  And consider a variety of changes to be made effective this

25  week, correct?

1    A.  That's what his note says, yes.

2    Q.  If not sooner, correct?

3    A.  Yes.

4    Q.  And he indicates corporate is also about to give us

5    requirements, but not knowing how long it will take them, I do

6    not want to wait.  Do you see that?

7    A.  I do.

8    Q.  Then he has some additional thoughts.  His first thought is

9    what, Mr. O'Donnell?

10   A.  Income calculator document must be completed by the account

11   executive on every stated income loan.

12   Q.  And the second thought that he had is what, sir?

13   A.  The loan specialist must validate the income calculator

14   worksheet coming from the AE and sign it before any additional

15   processing steps take place.  We do not wait for the opening

16   package, but no other steps are taken until the income is

17   validated.

18   Q.  And the third suggestion that he has?

19   A.  For reduced doc, the reasonability form must be completed

20   with comments and supporting documentation by both the AE and

21   LS.

22   Q.  And the fourth, sir?

23   A.  In the field, the OM is required to review and sign the

24   form before it is placed into VLF.  A similar process should

25   occur in Central Fulfillment.

D9UTBAN3                      O'Donnell - cross

1   Q.  And the fifth?

2   A.  The appropriate sign off by an OM or higher level is to

3   become a required document for funding.

4   Q.  Let's blow up the last paragraph.  If you could read that,

5   please, beginning with:  This is urgent.

6   A.  This is urgent.  Feel free to add additional thoughts and

7   ideas to this process, but we must place a stake in the ground

8   immediately.  Look forward to hearing from you in the next

9   couple of days.  Thank you.

10  Q.  And that note is from Mr. Lumsden, correct?

11  A.  It is.

12  Q.  And the CEO of FSL, correct?

13  A.  Yes.

14  Q.  The same day that you received your quality update,

15  correct?

16  A.  Yes.

17  Q.  Let's take a look at Exhibit DX56, please, sir.

18          Exhibit DX56 is also an email dated March 3rd

19  exchanged between you and Mr. Kitashima, correct?

20  A.  Yes.

21          MS. MAINIGI:  I ask that DX56 be admitted.

22          MS. NAWADAY:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit 56 received in evidence)

25  Q.  Now Mr. Lumsden asked you and Mr. Kitashima to prepare a

1    draft loan manufacturing quality memo to go out, correct?

2    A.   Yes.

3    Q.   And this was the memo that you prepared and sent to

4    Mr. Kitashima, is that correct?

5    A.   It is.

6    Q.   Would you read the first paragraph, please, sir.

7    A.   In the fourth quarter of 2007, FSL rapidly deployed a new

8    business model in direct response to the dramatic changes in

9    the marketplace and our own funding mix.  As you no doubt know,

10   FSL moved from a relatively balanced prime subprime funding mix

11   during the first half of 2007 to a prime only mix by December.

12   We saw many competitors who are unable to keep pace with the

13   changing market close their doors and exit the industry.  To

14   the credit of many within FSL, we recognized the need to

15   overhaul our business model and become a prime shop, delivering

16   quality loans to the market more productively, and faster than

17   our old subprime business model could support.

18   Q.   And next paragraph please, sir.

19   A.   The demanding market that began last summer has not quieted

20   in early 2008.  We're seeing additional retrenchment in

21   programs, increases in FICO requirements, reductions in

22   available LTVs, and intense focus on loan manufacturing

23   quality.  Investors are simply unwilling to purchase loans from

24   mortgage bankers who fail to demonstrate they can process,

25   underwrite, and fund loans that fully meet their guidelines

1   requirements.

2   Q.  And the third paragraph, please, sir.

3   A.  Our prime business model has CLUES as the centerpiece,

4   handling the vast majority of underwriting eligibility

5   decisions.  We've empowered our branch and Central Fulfillment

6   operations managers and loan specialists with authority to

7   validate CLUES input, clear a higher percentage of the

8   conditions, and prepare, or in some cases issue CTCs and nearly

9   all products when CLUES accept is received.  This additional

10  authority comes with great responsibility and accountability.

11  We simply cannot allow or tolerate any deterioration of loan

12  manufacturing quality that puts the sale of our production to

13  investors at risk.

14  Q.  Let's read the fifth paragraph, sir.

15  A.  I've spoken and written about the importance of quality and

16  its link to FSL's growth and prosperity on many occasions.  FSL

17  has employed the strongest reputation for quality among

18  Countrywide's divisions for many years.  While embracing our

19  new business model, we cannot lose sight of the critical role

20  loan manufacturing quality will play in our immediate future.

21  Therefore, I've asked the senior executives from production,

22  risk management, Central Fulfillment and operations to review

23  our work flows, job aids, training and compensation plans, to

24  ensure proper controls and procedures exist to deliver

25  on-target loan quality.

D9UTBAN3                         O'Donnell - cross

1    Q.  And the final paragraph, please.

2    A.  Loan manufacturing quality is at the very core of our

3    business and new business model.  It's my expectation that

4    throughout the company, every employee understands their

5    responsibility to deliver quality loans and embrace the changes

6    we will continue to implement as our prime business model

7    matures.

8    Q.  This email was drafted by you, Mr. O'Donnell, correct?

9    A.  Yes, it was.

10   Q.  And it was drafted for Mr. Lumsden to send out?

11   A.  It was.

12   Q.  On March 3rd, 2008?

13   A.  It was.

14   Q.  If could you turn to DX951, please.

15           You told us in your direct exam, Mr. O'Donnell, that

16   there was an important meeting that occurred on March 17, 2008,

17   with Mr. Gissinger, correct?

18   A.  I did.

19   Q.  And Mr. Lumsden was there as well?

20   A.  He was.

21   Q.  And the purpose was to discuss FSL loan quality, correct?

22   A.  Among other things.

23   Q.  Taking a look at DX951, is this the presentation that you

24   prepared?

25   A.  I believe it is.

1              MS. MAINIGI:  I ask that DX951 be admitted.

2              MS. NAWADAY:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 951 received in evidence)

5    Q.  Take a look at DX956, Mr. O'Donnell.

6              DX956 is an email exchange between you and Michael

7    Thomas and Patrick Aliano, is that correct?

8    A.  It is.

9              MS. MAINIGI:  I ask that Exhibit 956 be admitted.

10             MS. NAWADAY:  No objection.

11             THE COURT:  Received.

12             (Defendant's Exhibit 956 received in evidence)

13   Q.  Mr. O'Donnell, let's take a look at the top paragraph of

14   the first page, please.

15             Now this is the day after your meeting with

16   Mr. Gissinger and Mr. Lumsden about loan quality, correct?

17   A.  It is.

18   Q.  Could you read your paragraph out loud, please.

19   A.  Likely both.  Drew was into some of our suggestions, but

20   Greg wanted more restrictive changes.  In many ways, we need

21   the subprime process reapplied to our work flows.  Drew made it

22   very clear it's 4 percent or lower SUS for all divisions or the

23   game is over.

24   Q.  And that was your impression coming out of the meeting with

25   Mr. Gissinger and Mr. Lumsden, correct?

1   A.  It was.

2   Q.  Turn to DX58, please.

3           DX58 is admitted, and it is the bulletin with updated

4   procedures for income reasonability dated March 17, 2008, is

5   that correct, Mr. O'Donnell?

6   A.  Yes.

7   Q.  And these updated procedures came out division wide within

8   FSL the very same day that you had your quality meeting with

9   Mr. Gissinger and Mr. Lumsden, is that right?

10  A.  That's true.

11  Q.  Please turn to DX977.

12          X977 is an email exchange between you, Mr. Loren

13  Rodriguez, Mr. Comeaux, and a few other individuals within FSL,

14  correct?

15  A.  Yes.

16          MS. MAINIGI:  I ask that DX977 be admitted.

17          MS. NAWADAY:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 977 received in evidence)

20  Q.  Let's take a look at the title of DX977.

21          Now this email exchange is March 24, 2008, correct,

22  Mr. O'Donnell?

23  A.  It is.

24  Q.  And the subject line is:  Another manufacturing quality

25  summit.  Correct?

 1    A.  Manufacturing quality summit, yes.

 2    Q.  So in the March time period another manufacturing quality

 3    summit was held within FSL, correct?

 4    A.  Yes, that's the subject.

 5    Q.  And this email is actually from you to several individuals,

 6    correct?

 7    A.  It's from me to Loren Rodriguez, yes.

 8    Q.  Let me ask you to focus on the paragraph that begins with,

 9    "The QA reviews."

10        Now the QA reviews were the reviews that were first

11    done by Don Harris and then Mike Burns, is that right?

12    A.  They were first done by a different group outside of FSL

13    risk management, but both Don and Mike had a role, yes.

14    Q.  Could you please read your paragraph that begins with, "The

15    QA reviews."

16    A.  The QA reviews to date have been heavily focused on process

17    steps.  I believe it's tough to draw conclusions directly from

18    those or even QC findings alone.  Rather, I'd recommend we look

19    at the points in our process that involve sign offs on income,

20    ability to repay, collateral, insurance requirements,

21    homeowners, flood, mortgage insurance, and fraud controls, and

22    validate we have solid controls in place and well documented

23    sign offs.

24    Q.  And that was your thinking on March 24, 2008, correct?

25    A.  That's my note, yes.

1    Q.  Please turn to DX993.

2           993 is an FSL loan performance and quality review put

3    together by Cliff Kitashima, correct?

4    A.  It is.  His name is on the front.

5    Q.  Did you assist in putting this together?

6    A.  I don't recall, but based on how things normally worked, my

7    team or I probably did.

8    Q.  And it's dated April 17, 2008, correct?

9    A.  It is.

10   Q.  I would like to focus your attention starting on page 10,

11   please.

12          MS. MAINIGI:  Your Honor, I would like to move

13   DX993 -- I would like to admit DX993.

14          MS. NAWADAY:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 993 received in evidence)

17   Q.  Starting at page 10, this section summarizes the Full

18   Spectrum quality assurance program, correct?

19   A.  Page 10?

20   Q.  Page 10, yes.

21   A.  I think I'm seeing 9 on the screen.

22          Thank you.

23   Q.  This section describes the quality assurance program at

24   FSL, correct?

25   A.  It describes the purpose of quality assurance, yes.

D9UTBAN3                          O'Donnell - cross

1   Q.  Let's turn to the next page, please.

2          Now the first bullet is procedural audits.  Do you see

3   that?

4   A.  I do.

5   Q.  And do you see that it states that these procedural audits

6   were launched October 2007?

7   A.  Yes.

8   Q.  Procedural re-audits, those are the phase four audits,

9   correct?

10  A.  Yes.

11  Q.  And those were launched, according to this, when?

12  A.  November 2007.

13  Q.  Now let's take a look at the next page, please, sir.  The

14  quality audit, that was launched when?

15  A.  This bullet says launched December 2007.

16  Q.  Thank you.  You can set that aside, Mr. O'Donnell.

17         Now the email that we looked at earlier that referred

18  to the Gissinger meeting said something about going back to the

19  subprime model.  Do you recall that?

20  A.  I do.

21  Q.  And in essence, within a few days FSL essentially went back

22  to the subprime model, correct?

23              MS. NAWADAY:  Objection.

24              THE COURT:  Ground?

25              MS. NAWADAY:  Foundation.

D9UTBAN3                         O'Donnell - cross

1              THE COURT:  Sustained.

2    Q.  Let's take a look at DX61, Mr. O'Donnell.

3              DX61 is admitted in evidence.  And in bulletin O8-195,

4    new clear to close process for field offices and Central

5    Fulfillment teams.  Are you familiar with this document,

6    Mr. O'Donnell?

7    A.  Yes.

8    Q.  And through this bulletin, underwriters were brought back

9    to the clear to close process for High-Speed Swim Lane loans,

10   is that correct?

11   A.  Yes, it appears that way.

12   Q.  Let's take a look at DX66, which is also admitted.

13             This bulletin was sent out to all of FSL on May 21st,

14   2008, correct?

15   A.  It was.

16   Q.  This resulted in underwriters being required to review the

17   entire loan file prior to closing, correct?

18   A.  I'm not sure if it says the entire loan file, but it does

19   say for all underwriting doc conditions as well as the clear to

20   close.

21   Q.  And you believe, Mr. O'Donnell, that the reintroduction of

22   underwriters to the clear to close process was a significant

23   change that was a positive change, correct?

24   A.  Yes, I believed that having underwriters as part of a clear

25   to close process gives you a good quality control.

1    Q.  Please turn to DX52, Mr. O'Donnell.

2           This is an email exchange you had with Mr. Comeaux,

3    Cliff Kitashima and Rebecca Mairone in the December 18, 2007

4    time period, correct?

5    A.  It is.

6           MS. MAINIGI:  Your Honor, I move to admit DX52.

7           MS. NAWADAY:  No objection.

8           THE COURT:  Received.

9           (Defendant's Exhibit 52 received in evidence)

10   Q.  This email was sent by you, Mr. O'Donnell, correct?

11   A.  It was.

12   Q.  Let's take a look at the last paragraph, please.

13          Could you read that paragraph out loud, please, sir.

14   A.  As I discussed with Rebecca earlier, I believe we have

15   process steps and job aids in place going forward that, when

16   properly executed, will get manufacturing quality to the right

17   level.  Our challenge with Q3 is there is below the mark

18   attention to detail which, combined with anxiety in the

19   corporate about loan sales, has resulted in ballooning ratings.

20   Q.  And you sent that email in the December 2007 time period,

21   correct?

22   A.  I did.

23   Q.  Could you turn to DX50, Mr. O'Donnell.

24   A.  Sorry, I don't see a 50 in my binder.

25   Q.  I'm sorry.  Actually let's go to 51.

1              51 is an email exchange between you and Mr. Brent, is

2     that correct?

3     A.  It is.

4     Q.  And it's dated December 17, 2007?

5     A.  It is.

6     Q.  And this relates to the corporate QC rebuttal process,

7     correct?

8     A.  It does.

9              MS. MAINIGI:  I ask that DX51 be admitted, please.

10             MS. NAWADAY:  No objection.

11             THE COURT:  Received.

12             (Defendant's Exhibit 51 received in evidence)

13    Q.  Mr. O'Donnell, you thought that the rebuttal process was a

14    valuable process to get to the right number, correct?

15    A.  The right SUS number?

16    Q.  Yes.

17    A.  I thought the rebuttal process was valuable in the sense

18    that it gave us the opportunity to review with corporate QC

19    their findings, and for us to provide any input or

20    documentation if we believed the loan should have a lower

21    rating.

22    Q.  Did you think, Mr. O'Donnell, that the rebuttal process was

23    a valuable process to try to get to the right number?

24             MS. NAWADAY:  Objection.

25             THE COURT:  Ground?

835

D9UTBAN3                          O'Donnell - cross

1              MS. NAWADAY:  Vague and asked and answered.

2              THE COURT:  Sustained.

3              (Continued on next page)

1   Q.  Mr. O'Donnell, if you could pull out your deposition

2   transcript from April 4, please, sir.  Page 272, line 2 through

3   11.

4           THE COURT:  272?

5           MS. MAINIGI:  Line 2, your Honor.  Then the answer

6   through 11.

7           THE COURT:  Sustained.

8   Q.  Please turn to DX 550.  DX 550 is an e-mail exchange

9   between you and Brian Dupree.  Do you see that?

10  A.  I see I'm copied on -- actually, I'm copied on the note

11  from Brian, yes.

12  Q.  And the e-mail exchange is dated 10/16/2007, correct?

13  A.  It is.

14          MS. MAINIGI:  I ask that DX 550 be admitted.

15          MS. NAWADAY:  No objection.

16          THE COURT:  Received.

17          (Defendant's Exhibit 550 received in evidence)

18  Q.  Mr. O'Donnell, could you read the e-mail at the bottom out

19  loud, please.  That is the e-mail from you to David Asem,

20  correct?

21  A.  Yes.

22  Q.  Actually before you do, can you tell me who David Asem is?

23  A.  I don't recall exactly.  I'm looking.  He worked in

24  finance.

25  Q.  Financial within FSL?

D9U3BAN4                          O'Donnell - cross

1    A.  Yes.

2    Q.  Please read that e-mail at the bottom.

3    A.  "As we discussed briefly on the call, our work flows have

4    or will be changing dramatically due primarily to our move to

5    prime.  Many of the control functions processes that were part

6    of our former model, which called for multiple validation

7    points and sign offs, will no longer be necessary.  Production

8    employees will be empowered to complete more tasks without

9    third party underwriter or funder validation.  As a result we

10   need a full review of our work flow to determine where and how

11   control points should exist and how validation of proper

12   execution should be documented.  Michael, let's discuss how we

13   should organize an effort to update our control checks

14   leveraging LSs, OMs and new QA process and system

15   documentation.  We'll need to ensure that we have a tight

16   process that is not overly intrusive to the work flow, but

17   delivers meaningful reviews that validate controls and fully

18   utilized well documented and adequately control financial and

19   manufacturing risk."

20   Q.  The Michael you're referring to there is Mr. Thomas?

21   A.  Yes.  He's copied on the note.

22   Q.  Mr. Dupree then e-mails you back up top.  Could you please

23   read that e-mail out loud.

24   A.  It says "Below is a draft of the proposed changes to the

25   narrative that we've been working with Anson on for the Central

1    Fulfillment model.  The implementation of the CF model has

2    resulted in dual processes for CFC in the upcoming quarters.

3    Should the narratives and testing remain independent for each

4    model?  Will the results be conveyed as a whole for FSL?"

5    Q.  Take a look, keep that e-mail out if you could, sir, and

6    then take a look at DX 539, which is the attachment to that

7    document.

8              MS. MAINIGI:  I ask that DX 539 be admitted.

9              MS. NAWADAY:  No objection, your Honor.

10             THE COURT:  Received.

11             (Defendant's Exhibit 539 received in evidence)

12   Q.  With respect to Mr. Thomas, you can set that document

13   aside, Mr. O'Donnell.

14             With respect to Mr. Thomas, Mr. Thomas now works for

15   you at Fannie Mae, is that correct?

16   A.  He does.

17   Q.  In fact, you helped him get his job at Fannie Mae, correct?

18   A.  I hired him.

19   Q.  Mr. John Boland also works at Fannie Mae, is that right?

20   A.  He does.

21   Q.  We talked about Steve Brent a little bit earlier today, do

22   you recall that?

23   A.  Yes.

24   Q.  Mr. Brent was involved with the QA and QC process, is that

25   correct?

D9U3BAN4                         O'Donnell - cross

1   A.  He was.

2   Q.  At some point after the end of the High-Speed Swim Lane,

3   Mr. Brent was RIFed, is that correct?

4   A.  Right.  Steve left the company in I think around 2009.

5   Q.  He was RIFed in the 2008 time period, correct?

6   A.  I don't recall the exact date.  But yes, he was let go.

7   Q.  You signed off and approved the list that included

8   Mr. Brent, correct?

9   A.  Yes, Steve reported to me, so we couldn't find a job for

10  him, so he left the company.

11  Q.  You couldn't find a job for him when Countrywide was merged

12  into Bank of America, is that right?

13  A.  That's right.

14  Q.  Take a look at PX 137, please.  PX 137 is an e-mail

15  exchange that you had with HR at Countrywide regarding

16  Mr. Brent in the December 2008 time period, correct?

17  A.  I'm switching binders, I'm sorry.  I didn't realize we --

18  Q.  Oh.

19          THE COURT:  137.

20  Q.  PX 137.

21          THE COURT:  Plaintiff's exhibit.

22  Q.  The front of the same binder, Mr. O'Donnell.

23  A.  I'm sorry.

24          THE COURT:  Just put a copy in front of the witness or

25  direct him to the --

D9U3BAN4                              O'Donnell - cross

 1   Q.  The binder that --

 2           THE COURT:  Just come on up and point it to him.

 3   A.  I'm sorry.  I took these out just for convenience.

 4   Q.  That's fine.  All way to the front of the binder.

 5   A.  I think it is this stack.  I'm a beginner.

 6   Q.  No worries.

 7           So PX 137 is an e-mail exchange that you had with HR,

 8   correct?

 9   A.  Yes.

10           MS. MAINIGI:  I ask that PX 137 be admitted.

11           MS. NAWADAY:  No objection.

12           THE COURT:  Received.

13           (Plaintiffs' Exhibits 137 received in evidence)

14   Q.  You sent an e-mail to Kim Autry in HR on December 17, 2008?

15   A.  I did.

16   Q.  Read "As follow up to our conversation."

17   A.  "As follow up to our conversation regarding Steve Brent,

18   I'm sending you the background information you requested

19   regarding FSL's loan quality performance and how it was

20   determined that Steve should be part of the October 2008 RIF."

21   Q.  Next paragraph please, sir.

22   A.  "Steve's group was -- loan quality.  Steve's group was

23   responsible for monitoring the overall loan quality of FSL's

24   monthly production as measured by pre and post funding random

25   audits conducted by FSL auditors and corporate auditors.

1    Beginning in Q3 2007, FSL experienced a significant increase in

2    loans rated severely unsatisfactory.  The level of findings

3    rose above the targeted 4 percent SUS rate to nearly 10 percent

4    in Q1 2008.  This was different primarily by changes in market

5    tolerance within the industry and by a model and leadership

6    change within FSL fulfillment that led to challenges with

7    execution of existing risk controls."

8    Q.  Keep going, sir.

9    A.  "Steve worked closely with corporate QC and his auditors to

10   determine root causes of errors within FSL processing and/or

11   underwriting, prepared summary reports of findings, and

12   attended regular meetings where FSL quality was the agenda

13   topic.  Essentially completing the file review and finding the

14   rebuttal process with corporate and participating in the

15   preparation of update presentations to senior management was

16   one of his primary areas of responsibility.  He was very vocal

17   about the quality issues he was seeing, and although the poor

18   results he communicated were not popular, the issues he was

19   bringing to light and his concerns about quality were supported

20   by both Cliff and myself.  Ultimately, the audit data and

21   resulting remediation recommendations led to changes to work

22   flow, authority levels, and supervision that delivered improved

23   quality audit scores beginning in June of 2008 and continuing

24   today."

25   Q.  So in December 2008, you told HR that ultimately the audit

D9U3BAN4                    O'Donnell – cross

1    data and resulting remediation recommendations led to changes

2    to work flows, authority levels, and supervision that delivered

3    improved quality audit scores beginning in June 2008 and

4    continuing today.  Correct?

5    A.  I did.

6    Q.  You were truthful when you made those statements, correct?

7    A.  I was.

8    Q.  Those statements are in fact consistent with what you told

9    Mr. Vanderberry the following year, is that correct?

10   A.  In sum and substance, they are.

11   Q.  Let's take a look at PX 197 which is already admitted.

12   Blow up the middle paragraph, please, of the first page.  And

13   that the middle paragraph of that section.  Thank you.

14        Mr. O'Donnell, could you read that, please.

15   A.  "After experiencing challenges in Q4 2007 and early

16   Q1 2008, we made changes to work flows, training content,

17   authority certification and compensation plans that have played

18   an important role in returning the division's results to the

19   target environment for quality as defined by corporate audit

20   performance.  We've effectively leveraged our central model and

21   the results demonstrate our management team's ability to be

22   responsive to rapid market shifts as well as internal standard

23   adjustments."

24   Q.  You were truthful when you made those statements, correct?

25   A.  I was.

D9U3BAN4                        O'Donnell - cross

1    Q.   Those statements were made in January 2009, correct?

2    A.   They were.

3    Q.   Let's turn to DX 62.  Do you have it, Mr. O'Donnell?

4    A.   I do.

5    Q.   DX 62 is an e-mail exchange between you and Michael Thomas

6    dated May 14, 2008, is that correct?

7    A.   It is.

8    Q.   Just as a frame of reference, this is about maybe a week or

9    so before we see that May 21, 2008, bulletin where the loan

10   processors come back to review the entire -- excuse me, or

11   where underwriters come back to review the entire loan file,

12   correct?

13   A.   The key conditions, yes.

14   Q.   Take a look at page --

15            MS. MAINIGI:  I move to admit DX 62, your Honor.

16            MS. NAWADAY:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit 62 received in evidence)

19   Q.   Let's take a look at page five, please, sir.  Let's take a

20   look at the paragraph, if we can blow it up, starting with "it

21   was reassuring."

22            Mr. O'Donnell, could you read that paragraph, please.

23   A.   "It was reassuring to see all the controls we've had in

24   place over the years.  Our exposure is to manufacturing

25   quality, not fraud or unethical stuff.  I think we've reacted

D9U3BAN4                    O'Donnell - cross

1   well each time we find a trend and seal the gaps.  But it's

2   near impossible to defend yourself in this environment when the

3   facts are not important.  Noise is more popular."

4   Q.  Those were your words written on May 14, 2008, is that

5   correct Mr. O'Donnell?

6   A.  They were.

7        MS. MAINIGI:  Thank you.  I have no further questions.

8        THE COURT:  Cross-examination by Ms. Mairone's

9   counsel.

10  CROSS-EXAMINATION

11  BY MR. HEFTER:

12  Q.  Hi, Mr. O'Donnell.  How are you?

13  A.  Fine, thank you.

14  Q.  Let's turn back to PX 197, please.  If we can just take a

15  moment to blow up the same portion of the -- I believe you read

16  into the record "We effectively leveraged our central model and

17  the results demonstrate our management team's ability to be

18  responsive to rapid market shifts as well as internal standard

19  adjustments."  Do you see that?

20  A.  I do.

21  Q.  You recall reading that?

22  A.  I do.

23  Q.  Now, when you said "our management team's ability," you

24  were referring to the management team of FSL, correct?

25  A.  Yeah, I don't specifically remember whether I was talking

1   about our team or all of FSL, but --

2   Q.  But my question to you is this e-mail relates to FSL's

3   results, correct?

4   A.  Yes.

5   Q.  It doesn't relate to CMD or Wholesale Lending Division or

6   any other division, correct?

7   A.  That's correct.

8   Q.  At this point in time, which is January 12, 2009,

9   Ms. Mairone was part of the management team at FSL, correct?

10  A.  She was.

11  Q.  Thank you.

12          MR. HEFTER:  May I approach, your Honor?

13          THE COURT:  Yes.

14  Q.  Mr. O'Donnell, I've handed you a PowerPoint presentation or

15  a slide deck entitled "Central Underwriting" with your name on

16  it, do you see that?

17  A.  I do.

18  Q.  It's dated May 2007, do you see that?

19  A.  I do.

20          MR. HEFTER:  We move DX 157 into evidence.

21          MS. NAWADAY:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 157 received in evidence)

24  Q.  Mr. O'Donnell, do you recall this document?

25  A.  I don't specifically recall this document.  But I see my

1   name on the front.

2   Q.  It is dated May 8, 2007, do you see that?

3   A.  May 2007, yes.

4   Q.  It has your name on the front.  Does that mean to you that

5   you made the presentation?

6   A.  It's likely, yes.

7   Q.  Thank you.  Now, do you recall at FSL there being something

8   called regional vice presidents meetings?

9   A.  I do.

10  Q.  They were also called RVPs?

11  A.  They were.

12  Q.  That was the word that was described internally at

13  Countrywide, at FSL?

14  A.  Right, that was their title.

15  Q.  Do you recall making this presentation at the RVP meeting

16  in May of 2007?

17  A.  I know I typically -- we typically would have a time slot

18  to present at the RVP meetings.

19  Q.  Give us a sense of how many people would attend an RVP

20  meeting.

21  A.  Probably around 100.

22  Q.  Those meetings would include the senior management of FSL?

23  A.  They would.

24  Q.  It would go down to the executive vice presidents, senior

25  vice presidents, and regional vice presidents were invited?

D9U3BAN4                          O'Donnell - cross

1   A.  They were, depending on their role.

2   Q.  Let me direct your attention to page nine.  Do you see

3   that?

4   A.  I do.

5   Q.  I want to focus your attention, there is a line item in

6   orange, Alex, right there.  If you can just highlight that.

7   These were, it says PCA to fund TT.  That's prime CLUES accept

8   to funding of the loan turn time, right?

9   A.  That's right.

10  Q.  If you look at the top left, it says prime CLUES accept.

11  So this table is depicting the average turn times for prime

12  CLUES accept loans?

13  A.  Right.  This is for loans that would have gone through our

14  existing PCA process.

15  Q.  If you know, if you look at the actual numbers, is it right

16  to say that those numbers reflect the average turn times for

17  those particular months of the year in 2006 and 2007?

18  A.  I don't remember if we use the median or the average.

19  Q.  But it is one of them, the median or the average?

20  A.  It would be one of them, yes.

21  Q.  Thank you.  If we go to page 11 of the document, this says

22  "Improve process of handling returns in underwriting," do you

23  see that?

24  A.  I do.

25  Q.  Then it says down the page determine "Ways to reduce TT

D9U3BAN4                         O'Donnell - cross

1   impact on returns."  Do you see that?

2   A.  Yes.

3   Q.  This is you telling the RVPs at the time that FSL needed to

4   determine ways to reduce TT impact of returns?

5   A.  Right.  Loan files that got returned because they were

6   incomplete or missing information slowed down the process.

7   Q.  If you turn to page 16 of the document, this is in May of

8   2007, it says "Recap of UW action items."  Do you see that?

9   A.  Yes.

10  Q.  If you go down eight lines, it says "Remove hit to UW to

11  audit findings that FSL risk management and central services

12  management disagree with."  Do you see that?

13  A.  I do.

14  Q.  That was part of your PowerPoint presentation?

15  A.  It is.

16  Q.  On the next page, there is a bullet that says "Leverage

17  CLUES," do you see that?

18  A.  I do.

19  Q.  That was something that you had announced to the RVPs at

20  the meeting, correct?

21  A.  Right.  CLUES is -- CLUES tells you which conditions are

22  required.

23  Q.  If we go down to page 21.  We blow that up, please, Alex,

24  thank you.  It says "Prime sales process."  Do you see that?

25  A.  Yes.

1   Q.  Just so we're clear here, this is what you are presenting

2   to the RVPs at the time, correct?

3   A.  That's right.

4   Q.  Are you aware that Ms. Mairone was at this meeting?

5   A.  I'm sorry?

6   Q.  Were you aware at the time that Ms. Mairone was --

7   A.  Rebecca would traditionally attend the RVP meetings, yes.

8   Q.  I'm asking you whether you know she was at the May 8, 2007,

9   RVP meeting.

10  A.  I don't recall exactly who was there.  But senior

11  management typically did attend those meetings.

12  Q.  Do you know where that meeting took place?

13  A.  Typically they would be in Pasadena where Full Spectrum was

14  headquartered.

15  Q.  This meeting took place in the Westin in Pasadena, correct?

16  A.  That's normally where we would meet, yes.

17  Q.  It says "Prime sales process."  The first bullet point, can

18  you read that into the record?

19  A.  "Prime loans need low touch, low cost processing."

20  Q.  Can you read the second bullet point into the record.

21  A.  "Prime borrowers require faster turn time to keep them from

22  going elsewhere."

23  Q.  If you go down to the bottom bullet point, you can blow

24  that up, Alex.  Thank you.  You stated at the RVP meeting

25  "Level 2 and PCA authority is critical," right?

D9U3BAN4                          O'Donnell - cross

1   A.   I did.

2   Q.   Then you say "Very limited number of LSs have PCA condition

3   signing authority."  Right?

4   A.   That's true.

5   Q.   Then you also say "Risk management will provide regular

6   updates on progress on gaining authority."  Right?

7   A.   Yes, that's what it says.

8   Q.   Okay.  Thank you, you can put that aside.

9            THE COURT:  Counsel, I think now we'll take our lunch

10  break at this time.  So ladies and gentlemen, I want to remind

11  you we're going to stop at about 3:30, maybe a few minutes

12  before that today.  So, we need to have you back here promptly

13  at 2 o'clock so we can have good use of that hour and a half.

14           Have a very good lunch and we'll see you at 2 o'clock.

15           (Jury excused)

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

D9U3BAN4                         O'Donnell - cross

1          THE COURT:  I'll have my law clerk hand to government

2     counsel my rulings on the Boland deposition.  But what the

3     government should do is make a copy of this for yourself and a

4     copy for adversary counsel, and then return the original to me

5     so I can docket it.  And of course then conform the videotape

6     accordingly.

7          Anything else we need to take up?  Yes.

8          MS. MAINIGI:  Couple of housekeeping issues, your

9     Honor.  We have a few objections to Lars Hansen and his

10    expected and upcoming testimony.  He is the witness that the

11    government is putting on after Mr. O'Donnell, and so we'd like

12    just to figure out the best time to raise those issues.

13         THE COURT:  Let me find out how long is Ms. Mairone's

14    counsel going to be on cross?

15         MR. HEFTER:  Your Honor, what I would like to do is

16    significantly streamline my examination, study it over lunch.

17    Because as you instructed, we did coordinate it, but now that

18    I've heard it, I'm still unclear.

19         THE COURT:  And government I assume will have some

20    redirect.

21         MR. ARMAND:  We will, your Honor.

22         THE COURT:  So, I'm not sure we are going to reach the

23    next witness today.  But I really need to leave at 3:30 on the

24    dot because the speech I'm giving is at 4:15 so I need to get

25    there.  This relates to a witness tomorrow?

1          MS. MAINIGI:  I assume it is tomorrow, your Honor.

2          THE COURT:  Yes.  If we reach that witness today we

3     probably wouldn't reach that issue in any event.  But, if we

4     reach that issue, come to the side bar.  If we reach that

5     witness, come to the side bar and we'll take it up then.

6          MS. MAINIGI:  Our argument would have an impact

7     potentially on the entirety of the witness's testimony, your

8     Honor.

9          THE COURT:  It will be a very interesting side bar.

10         MS. MAINIGI:  It may take a while.

11         THE COURT:  I just think from what I'm hearing,

12    although I appreciate the thoughts about streamlining, we're

13    also going to read the instruction to the jury, so my guess is

14    that we're not going to get to that next witness.  So but given

15    what you say, why don't we take that up at 9 o'clock tomorrow

16    morning.  The jury doesn't come in until 9:30.  That will give

17    us plenty of time.

18         MS. MAINIGI:  That's fine.  One other housekeeping

19    matter and that is the pending Daubert hearing.  We're told by

20    the government that depending upon when your Honor ends up

21    holding that hearing and ruling, that will determine their

22    order of witnesses.  They've got one order of witnesses for

23    tomorrow if there is a Daubert hearing that is held either

24    tonight or early tomorrow morning as your Honor potentially

25    suggested, and a different order otherwise.

1        THE COURT:  Who are the witnesses as to whom you need

2    a Daubert hearing sooner rather than later?

3        MS. LONDON:  Your Honor, Dr. Cowen and Mr. Ira Holt.

4        THE COURT:  So we could do that at 7 o'clock tonight

5    or we could do it at the close of business tomorrow.  What is

6    your preference?

7        MS. LONDON:  If it is acceptable to your Honor, we

8    would prefer to do it tonight.

9        THE COURT:  Tonight?

10        MS. MAINIGI:  That's fine with us.

11        THE COURT:  So, we'll see you at 7 o'clock tonight.

12        MS. LONDON:  To clarify, if the Daubert hearing is

13    tonight, we would probably be able to present those experts'

14    testimony tomorrow?

15        THE COURT:  Well, I can't tell you.  I can't guarantee

16    that.  Because what you assume is I'll rule tonight.  That may

17    or may not happen.  So, I can't make any guarantees.

18        MS. LONDON:  Understood, your Honor.  One final

19    housekeeping issue.  We wanted to update your Honor that we

20    have not been able to reach Mr. Price.  We did try again over

21    the weekend.

22        THE COURT:  All right.  The phone numbers you now have

23    from him are work or home?

24        MS. LONDON:  Cell number.

25        THE COURT:  Pardon?

D9U3BAN4                          O'Donnell – cross

1          MS. LONDON:  A cell phone.

2          THE COURT:  Where does he reside?

3          MS. NAWADAY:  He resides in and around Dallas.

4          THE COURT:  Maybe we'll take that up and make that

5     call at 7 o'clock if I'm still inclined to make that call.

6          MS. LONDON:  Thank you, your Honor.

7          THE COURT:  Very good.  See you at 2.

8          (Recess)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9U3BAN4

AFTERNOON SESSION

2:00 p.m.

(In open court; jury not present)

THE COURT:  Looking at the schedule for tonight, I think we can start at 6:30.  We will need to end by 8:30 at the latest.

I asked my courtroom deputy to put one copy of the preliminary jury instruction on the seats of each of the jurors before we call them in, also hand a copy to the court reporter. I'll give my courtroom deputy a copy to mark as Court Exhibit 1 to docket.  And you can also give a copy of the final to counsel.  One copy to government counsel, one copy to Ms. Mairone's counsel, and I suppose three copies to the independent three defendants that we've been calling collectively the banks.

Let's bring in the jury.  No, we don't want the witness back on the stand yet.

(Jury present)

THE COURT:  Ladies and gentlemen, you may have thought that I spent the entire weekend seeing the Giants and Jets decimated, but in fact, counsel and I worked on one other thing which was a preliminary jury instruction which we're going to read together now, but which also you can take with you into the jury room for reference as we proceed.

Now that the trial of this case has gone about a week,

D9U3BAN4

1    it may be useful to focus your attention on some of the legal

2    issues involved.  We will read this preliminary instruction

3    together, and each of you will also have a copy of it for

4    reference.  However, this preliminary instruction is no

5    substitute for the more detailed instructions of law that I

6    will give you just before you begin your deliberations.

7              This is a fraud case.  Specifically, the government

8    alleges, and the defendants deny, that the defendants devised a

9    scheme to induce Fannie Mae and Freddie Mac to purchase

10   mortgage loans originated through the High-Speed Swim Lane by

11   misrepresenting that the loans were of higher quality than they

12   actually were, and had been subjected to greater quality

13   safeguards than they actually had been.

14             In order to establish its fraud claim as to any given

15   defendant, the government must prove, among other things, each

16   of three essential elements:

17             First, that there existed a scheme to induce Fannie

18   Mae and Freddie Mac to purchase mortgage loans originated

19   through the High-Speed Swim Lane by misrepresenting important

20   information about these mortgage loans;

21             Second, that the particular defendant you are

22   considering knowingly participated in this scheme with an

23   intent to defraud Fannie Mae and Freddie Mac; and

24             Third, that in the execution of this scheme, use was

25   made of the U.S. mails and/or of interstate wire communication,

D9U3BAN4

such as interstate telephone calls.

The government, in order to prevail against a given defendant, must, among other things, prove each of these three elements as to that defendant by a preponderance of the credible evidence.  To prove an element by a preponderance of the credible evidence, the government must show that it is more likely true than not true.

If the government carries its burden as to a given defendant, we say that it has established that defendant's liability.  Any monetary penalties that are then imposed on that defendant are determined, however, by the Court, not the jury.

Finally, let me remind you again that this preliminary instruction is simply intended to focus you on some of the issues you will need to decide at the end of the case.  But it is no substitute for the fuller final instructions that I will give you at the close of all the evidence.

So, as you look that over, you may indeed have some further questions.  You can save those, because there will be much more detailed questions at the end.  This is really just to give you a rough heads up to help focus your attention.

Let's get the witness back on the stand.

(Continued on next page)

1            MR. HEFTER:  During the lunch break, we prepared

2      exhibit binders.

3      BY MR. HEFTER:

4      Q.  Good afternoon, Mr. O'Donnell.

5      A.  Good afternoon.

6      Q.  Let me turn your attention to DX 200, please.  Do you have

7      it, Mr. O'Donnell?

8      A.  I do.

9      Q.  This is an e-mail from to you Mr. Price on July 23, 2007,

10     do you see that?

11     A.  It is.

12            MR. HEFTER:  We move DX 200 into evidence, your Honor.

13            MS. NAWADAY:  No objection.

14            THE COURT:  Received.

15            (Defendant's Exhibit 200 received in evidence)

16     Q.  Let's turn to the second page of the document.  If we just

17     go up and identify who is sending the document to whom.

18            You see, Mr. O'Donnell, that this is an e-mail from

19     Mr. Lumsden to a group of different people dated July 21, 2007,

20     at 7:47 a.m.  Do you see that?

21     A.  I do.

22     Q.  If you go down to the text of the document, you see where

23     Mr. Lumsden is saying, "While we develop the better swim lanes

24     for our easier to fund loans, we have to recognize that

25     implementing any new work flows will be very problematic where

```
1    a large backlog exists."  You see that?

2    A.  I do.

3    Q.  Then later in the paragraph he says, "Therefore, I want an

4    immediate relaxation of the defi item for QoG and a one month

5    incentive for funding volume."  Do you see that?

6    A.  I do.

7    Q.  You're not copied on this e-mail, correct, from

8    Mr. Lumsden?

9    A.  No, I'm not.

10   Q.  But, later in the day, Mr. Kitashima forwards it to you,

11   correct?

12   A.  He does.

13   Q.  Mr. Kitashima says to you, "FYI, please review and provide

14   your recommendation.  Thanks."  Do you see that?

15   A.  I do, yes.

16   Q.  Just so we can frame this as a matter of time, this e-mail

17   exchange occurred during the design process for the High-Speed

18   Swim Lane, correct?

19   A.  Around that time, yes.

20   Q.  Then, at the top, you send an e-mail to Mr. Price two days

21   later, at approximately 10:57 a.m., you say "I'd like your

22   thoughts --" why don't you read that paragraph into the record.

23   A.  "I'd like your thoughts along with what funding target

24   should be for an incentive to kick in.  I'm thinking we set the

25   payout to start once we hit some funded loan count.  From that
```

1   point forward, dedicated employees would get some dollar value

2   per funding thrown into a pool.  Please advise."

3   Q.  That was a discussion between you and Mr. Price about an

4   incentive around a funding target for loans?

5   A.  Right.  Mr. Price and Ron Cannon ran the funding teams that

6   supported the NCA.

7   Q.  Thank you.  Let's turn to DX 4012.

8   A.  4012?

9   Q.  I'm getting a look from the peanut gallery that it may not

10  be in your binder.

11          THE COURT:  Do the lawyers and other folks immediately

12  to counsel's right object to being referred to as the peanut

13  gallery?

14          MR. SULLIVAN:  No, your Honor.

15          MR. HEFTER:  While we're getting that document, I

16  think I can move ahead to keep things moving along.

17  Q.  Turn your attention to DX 8 which has been previously

18  admitted, which I believe is in the binder that was provided to

19  you by the bank's counsel.  Can we have DX 8 on the screen,

20  please.

21          Do you recall this morning, Mr. O'Donnell, this is the

22  document where you have your comments in blue?

23  A.  I do.

24  Q.  Do you remember that?

25          Let's go to the last page of the document.  Can we

 1   blow up the last two or three sentences, right there, yes.

 2             This is Ms. Mairone talking to you, correct?

 3   A.  Yeah, I believe so, yes.

 4   Q.  She says "I know we will be meeting on all topics related

 5   to this initiative next week.  But wanted to see if we can

 6   start to prioritize and move forward on some items.  Cliff and

 7   Ed, please weigh in on these topics above.  (4)  Thank you."

 8   Do you see that?

 9   A.  Yes, I see that.

10   Q.  This was an e-mail where Ms. Mairone is seeking your input

11   and Cliff's input as the two most senior ranking officials over

12   credit quality in the company, correct?

13   A.  On the four topics, yes.

14   Q.  If you go turn one page before, in the middle of the page,

15   it says "Other items that I had from yesterday were."  You see

16   that?

17   A.  I do.

18   Q.  Ms. Mairone says "No returns once we have them in

19   submission.  How do we do this?"  And can you read into record

20   your response.

21   A.  "See above issue number four.  I agree we can't have

22   returns in our work flow.  Files need to move forward or out of

23   the high speed lane."

24   Q.  That was the collective view of yourself and Mr. Kitashima

25   at the time?

1        MS. NAWADAY:  Objection.

2        THE COURT:  Sustained.

3   Q.  Let's go to the first page of the document.  It is on the

4   bottom.  It is from you to Ms. Mairone, copied to

5   Mr. Kitashima, Rodriguez, Barnett, and Thomas.  Do you see

6   that?

7   A.  Yes.

8   Q.  You say "Rebecca, I pulled together a draft response below

9   and Cliff and I went through it this a.m."  Do you see that?

10  A.  I do.

11  Q.  And do you recall drafting your comments in blue before or

12  after meeting with Cliff in the a.m.?

13  A.  I don't recall what the sequence was, I'm sorry.

14  Q.  Is it your understanding sitting here today that the

15  comments in blue reflected both your comments and

16  Mr. Kitashima's comments?

17  A.  I don't remember the discussion with Cliff and whether he

18  agreed with my comments or not.  But those are certainly my

19  comments.

20  Q.  Let's turn to item number four.  Ms. Mairone says "4.  Plan

21  to collect documents post funding, need the process and

22  resources to do this now."  And can you read what your response

23  was, at least the first two sentences.

24  A.  "Agree this is an immediate opportunity to inject greater

25  flexibility on high FICO deals.  Tracking is an issue given

1    today's technology.  To implement, we need the following

2    completed, all of which can be done relatively quickly."

3    Q.  When you say high FICO deals, those are loans that would be

4    for borrowers with high credit ratings, correct?

5    A.  High credit scores, yes.

6    Q.  Let's turn to DX 4012.

7            MR. HEFTER:  May I approach, your Honor?

8            THE COURT:  Yes.

9    Q.  Mr. O'Donnell, I've handed you an e-mail from yourself to

10   Mr. Price, correct?

11   A.  Yes.

12   Q.  It is dated July 23, 2007 at 10:30 a.m.?

13   A.  It is.

14           MR. HEFTER:  We move DX 4012 into evidence, your

15   Honor.

16           MS. NAWADAY:  No objection.

17           THE COURT:  Received.

18           (Defendant's Exhibit 4012 received in evidence)

19   Q.  Just so I'm getting the time right, this is the same day

20   that you're having the e-mail exchange with Ms. Mairone,

21   correct, DX 8?

22   A.  Yeah.

23   Q.  Mr. Price sends you an e-mail on July 23, at 9:27 a.m., do

24   you see that?

25   A.  Yes, I do.

1   Q.  That's a response to an e-mail to Mr. Price from yourself

2   earlier that morning.  Do you see that in the next page?

3   A.  Yes.

4   Q.  In the first paragraph you say "Just keeping you in the

5   loop on the discussions taking place tied to rebuilding our

6   model for high FICO prime."  Do you see that?

7   A.  I do.

8   Q.  Then you ask Mr. Price to not forward.  You say "Please do

9   not forward."  Do you see that?

10  A.  Yes.

11  Q.  Mr. Price responds to you in the first sentence on the

12  bottom of the first page, Alex.  "Were there any examples of

13  funding exceptions discussed?  We normally will fund most loans

14  as long as all conditions are cleared.  SOX control.  ACTC

15  exists and we are not held up due to an NORTC or NBS issues."

16  I won't ask you what that means.  Then he asks "Is the

17  authority we're talking about extending to the underwriting

18  level."  Do you see that?

19  A.  I do.

20  Q.  Can you read into the record what your response was.  Terms

21  of the -- you say "no" at the top.  Then read the second

22  sentence of that paragraph.

23  A.  "No.  The issue is not whether or not exceptions are

24  getting approved or not.  It's pushing down the escalation of

25  high FICO deals."

1    Q.  The next sentence says.

2    A.  "We want lower level employees to be empowered to make the

3    call.  The SOX controls will likely be updated to reflect the

4    new process steps that come out of the reviews.  SOX controls,

5    just like QoG, QC, compliance, compensation, etc., standards

6    are all likely to require updating as we develop a new model."

7    Q.  Thank you.  Let's turn to DX 04028.  Do you have it?

8    A.  I do.

9    Q.  This is an e-mail from yourself to Mr. Cannon on August 13,

10   2007, is that correct?

11   A.  Yes.

12            MR. HEFTER:  We move DX 04028 into evidence.

13            MS. NAWADAY:  No objection.

14            THE COURT:  Received.

15            (Defendant's Exhibit 04028 received in evidence)

16   Q.  Let's turn to the second e-mail on the second page.  This

17   is an e-mail from Mr. Cannon to Mr. Kitashima, correct?

18   A.  It is.

19   Q.  You were copied on that, right?

20   A.  I'm copied, yes.

21   Q.  And Mr. Cannon -- and tell me what his role again was?

22   A.  He ran the -- not the underwriting, but the funding teams

23   in the Richardson, Texas, fulfillment center.

24   Q.  Says "Per our discussion on Thursday, please see the note

25   below.  I strongly believe that we should be able to move

D9U3BAN4                    O'Donnell - cross

1   quickly on the following items and communicate by Tuesday that

2   these are no longer requirements.  I'm requesting your approval

3   and I will work with Sandra Frederique and Pat Jimenez to get

4   the following items updated in the funding SOPs, etc."  Do you

5   see that?

6   A.  Yes.

7   Q.  Then, you respond on August 13, which again is the first

8   day of the HSSL pilot?

9   A.  Yes.

10  Q.  You say "Couple of notes below."  What do you say next?

11  A.  "Any new process should not require underwriting

12  involvement.  We should be thinking of leveraging underwriting

13  only on critical risk related items.  Sign offs should be built

14  to be completed within processing, and only when escalation is

15  required should underwriting be injected into the work flow."

16  FBW documentation should be the responsibility of the person

17  signing off since most prime loans will not be coming to an

18  underwriting resource.  Fraud detector.  Docs --"

19  Q.  You can stop there.  Sorry about that.  Let's turn our

20  attention then to DX 580.  Do you have it?

21  A.  Yes.

22  Q.  Thank you.  This is an e-mail from Alice Basmadjian?

23  A.  Yes.

24  Q.  To Mr. Kitashima and you're copied on it dated October 30,

25  2007.  Do you see that?

1    A.  Yes.

2             MR. HEFTER:  We move DX 580 into evidence.

3             MS. NAWADAY:  No objection.

4             THE COURT:  Received.

5             (Defendant's Exhibit 580 received in evidence)

6             MR. HEFTER:  Just blow up the top part, please.

7    Q.  Remind the jury again who Ms. Basmadjian is.

8    A.  She ran compliance for FSL reporting to Cliff.

9    Q.  Give us a sense of what this compliance means in connection

10   with FSL.

11   A.  Her role was largely relating to legal aspects to lending,

12   to make sure branches had the right licensing, that they

13   complied with local or federal guidelines, and she had a lot of

14   interaction between the corporate compliance and legal groups

15   and management at Full Spectrum.

16   Q.  Okay.  If you turn to the last page in the document.  I'm

17   sorry, the third to last page.  Page nine on the bottom.  Do

18   you see where it says "Ed also reminded me of the last meeting

19   on quality"?

20   A.  Yes.

21   Q.  You see that?  "Where it was decided to also centralize the

22   compliance specialist portion of the process.  I think we had

23   previously included that part of the process in the

24   manufacturing bucket and assumed that we would train all

25   funders to do the compliance review.  However, it was agreed

1   with Cliff and he discussed with Rebecca that we would now pull

2   out of the compliance review into the centralized portion of

3   the process."  Do you see that?

4   A.  Yes.

5   Q.  This was a discussion in or around October 30, talking

6   about combining the roles of compliance specialists and

7   funders, correct?

8   A.  I think that's what we're talking about here.

9   Q.  Just so we have a sense of the timing, October 30 is after

10  the Central Fulfillment process was rolled out, correct?

11  A.  Yes.

12  Q.  That was rolled out in or around October 1st, correct?

13  A.  Yes.

14  Q.  Just so we have a sense of it, it wasn't one massive change

15  on October 1st.  It was a change that progressed over time,

16  correct?

17  A.  The Central Fulfillment model continued to change, yes.  As

18  we learned more, we made some adjustments.

19  Q.  Those adjustments were approved by management?

20          MS. NAWADAY:  Objection.

21          THE COURT:  Sustained.

22  Q.  If you go to the front page, the e-mail that you're copied

23  on to Mr. Kitashima, Ms. Basmadjian says "Compliance is willing

24  to work as a team with other FSL groups to help assess risk

25  versus gain in perhaps removing some requirements.  For

1   example, at this juncture we may elect to place less emphasis

2   on state requirements, due to the fact that many of these

3   requirements will go away in a couple of months.  Also, for

4   example, although we're eliminating the compliance specialist

5   position, we would want to be assured that the LS is using the

6   compliance specialist checklist."  Do you see that?

7   A.  I do.

8   Q.  So, this document which you're cc'd on reflects the

9   determination to eliminate the compliance specialists?

10          MS. NAWADAY:  Objection.

11          THE COURT:  Sustained.

12  Q.  Was it your understanding, Mr. O'Donnell, that the

13  compliance specialist position was eliminated in the Central

14  Fulfillment work flow after discussions among yourself and

15  others?

16  A.  It was combined with other roles, yes.

17  Q.  That occurred after consideration by yourself?

18  A.  I'm sure that I had some consideration about it, yes.

19  Q.  Let's turn to DX 4053.  Have you had a chance to look at

20  the document, Mr. O'Donnell?

21  A.  I have.

22  Q.  Thank you.  This is an e-mail from Scott Bridges to

23  Mr. Kitashima and Ms. Mairone and copied to Mr. Comeaux?

24  A.  Yes.

25  Q.  Dated November 16, 2007.  Who is Mr. Bridges?

D9U3BAN4                         O'Donnell - cross

1    A.  He ran all of sales for Full Spectrum.

2    Q.  What was his title?

3    A.  Managing director of production I believe.

4    Q.  Was he on the same level as you or a higher level?

5    A.  He was a higher level than I was.

6              MR. HEFTER:  We move DX 4053 into evidence, your

7    Honor.

8              MS. NAWADAY:  No objection.

9              THE COURT:  Received.

10             (Defendant's Exhibit 4053 received in evidence)

11   Q.  So, the subject matter of this e-mail is Rosemead visit.

12   Do you see that?

13   A.  Yes.

14   Q.  Rosemead, I think you've testified a number of times, was

15   one of the national sales centers?

16   A.  They were, yes.

17   Q.  Just so we're clear, when we talk about Central

18   Fulfillment, that reorganization only took place with respect

19   to the national sales centers, correct?

20   A.  It did impact the production centers as well, because the

21   loan specialists previously had reported to production, and

22   they moved over to Central Fulfillment.

23   Q.  I guess my question to you was relating to field offices

24   and not the national sales centers.

25   A.  Yeah, the field offices were separate from the national

D9U3BAN4                         O'Donnell - cross

1    sales centers.

2    Q.  I want this to be really clear.  What is the difference

3    between a field office and a national sales center?

4    A.  A field office is more like a retail location, and they

5    were geographically dispersed across the country.  There were a

6    couple hundred of them I believe.

7    Q.  Just so we can get a good picture of this in our mind.  If

8    you were driving down the block and there could be a

9    Countrywide office in a mall or in a building on some suburban

10   highway somewhere, correct?

11   A.  That's right.

12   Q.  And a national sales center was more like a big building

13   where you had multiple people processing loans?

14   A.  Right.  We had -- there were different folks in the

15   national sales center locations than there would have been in a

16   branch.

17                (Continued on next page)

18

19

20

21

22

23

24

25

D9UTBAN5                           O'Donnell - cross

1   BY MR. HEFTER:

2   Q.  And if you were getting a loan through the national sales

3   center, you're probably picking up a telephone, calling the 800

4   number, or going on the internet, correct?

5   A.  That's where most of the business came from.

6   Q.  And if you're in the field office, it's more likely you're

7   driving your car around and getting out of your car and walking

8   into the field office, correct?

9   A.  I think most of their stuff still got done over the phone

10  and internet, but at least that was the local office option

11  where if you needed to visit a branch, there was one down the

12  street.

13  Q.  So Rosemead visit, the document says:  Yesterday Greg and I

14  visited Rosemead to conduct the town hall meeting.

15         Were you aware of Mr. Lumsden and Mr. Bridges doing a

16  town hall meeting on November 15, 2007 at Rosemead?

17  A.  I can't honestly tell you if I was aware or not.

18  Q.  Now I wanted to direct your attention to paragraph 2.  The

19  first sentence says:  Rosemead currently has their turn time

20  number worsening, which given this is our flagship NSC, is very

21  concerning.  Do you see that?

22  A.  I do.

23  Q.  Now Mr. Bridges and Mr. Kitashima and Ms. Mairone in 2A

24  says the OMs and LSs --

25         Those are the loan specialists, correct?

1    A.  Yes.

2    Q.  -- are getting pounded by quality assurance audits to the

3    degree that they're being nailed with an 80 percent default

4    rate.  Do you see that?

5    A.  I see that.

6    Q.  Then it says Adela --

7            Who is Adela?

8    A.  Adela Zamarripa.

9    Q.  -- takes exception to the miniscule levels of data (a

10   mischecked box) being flagged by this group, and in essence

11   says the ops staff is scared straight they will make a mistake

12   and are therefore triple and quadruple checking everything.

13   This is adding major lag time.

14           Do you see that?

15   A.  I do.

16   Q.  Now I want to -- you can put that aside for now.

17           I want to focus your attention then on Plaintiff's

18   Exhibit 68, which, your Honor, is in evidence.

19           Do you have it?

20   A.  Yes, I see it.

21   Q.  Now you testified yesterday about this email when counsel

22   for the government was asking questions, correct?

23   A.  I believe so, yes.

24   Q.  Now can we just agree for the purpose of this proceeding

25   we'll call it the November 29 email?

1    A.   Sure.

2    Q.   Thanks.  Now I believe you testified that this was the

3    email where Ms. Mairone quote, unquote, directed that the QA

4    reports be sent to herself.  Do you remember that testimony?

5    A.   I think that was part of the content, yes.

6    Q.   Now I want to parse this out a little bit.  Can we blow up

7    the first paragraph, please.

8            And just so we're clear, this is November 29, correct,

9    which is after the date of Mr. Bridges' email to Mr. Lumsden

10   and Ms. Mairone -- sorry, to Mr. Kitashima and Ms. Mairone

11   about the site visit, correct?

12   A.   Yes, it's a couple weeks later.

13   Q.   Now that paragraph says:  I have discussed with both Greg

14   and Cliff the following items, and a change in process and

15   direction.  Did I read that correctly?

16   A.   Yes.

17   Q.   The purpose of these changes is to immediately increase the

18   focus on funding loans and working the pipeline, as well as

19   streamlining the process requirements for prime loans.  Do you

20   see that?

21   A.   I do.

22   Q.   That was not a portion of the document that the government

23   pointed to yesterday.  Do you remember that?

24            MR. HEFTER:  I'll withdraw it, your Honor.

25   Q.   Now it says I have discussed with both Greg and Cliff.  You

1    weren't part of those discussions, correct?

2    A.  It doesn't appear that way, no.

3    Q.  And you don't know when those discussions took place

4    between Greg and Cliff, do you?

5    A.  No, not having been a part of it, I wouldn't have any way

6    to say.

7    Q.  And Greg is the CEO of the company, correct?

8    A.  That's right.

9    Q.  And Cliff is the chief credit quality officer of the

10   company, correct?

11   A.  Yes.

12   Q.  Now if you go to paragraph one -- I mean point number one,

13   please, the document says the QA communication to Central

14   Fulfillment will stop immediately, 11/29/079.  Communication

15   will be directed to only Rebecca Mairone for the next 30 days.

16        Do you see that?

17   A.  Yes.

18   Q.  So when it says the QA communication to Central Fulfillment

19   will stop immediately, was it your understanding that the QA

20   reports would not be filtered down into the Central Fulfillment

21   organization?

22   A.  Yeah, I think that's the request here.

23   Q.  Now you weren't part of the Central Fulfillment

24   organization on the organizational chart, right?

25   A.  No, I was not.

1   Q.  So you still continued to receive the QA reports after this

2   email, correct?

3   A.  Yes, my group produced them.

4   Q.  And Mr. Kitashima continued to receive the QA reports after

5   this time, correct?

6   A.  He did.

7   Q.  And so did Mr. Lumsden, right?

8   A.  I don't remember if we sent the QA reports to Greg or only

9   summary reporting, but he got some level of reporting.

10  Q.  If he wanted those reports he could get them?

11  A.  Greg could get anything he wanted.

12  Q.  And Mr. Burns had access to these reports, right?

13  A.  His team did the audits and prepared the summaries.

14  Q.  And Mr. Brent had access to these reports, correct?

15  A.  Yes, he did.

16  Q.  Now it does say that they will be directed to only Rebecca

17  Mairone for next 30 days.  Do you see that?

18  A.  I do.

19  Q.  And then it says I will meet with the compliance and

20  quality groups solely as we work through the process, reporting

21  and communication plan for the Central Fulfillment group.  Do

22  you see that?

23  A.  I do.

24  Q.  Now you were part of meetings, were you not, Mr. O'Donnell,

25  after November 29 where you talked about improving the quality

1     assurance reports, correct?

2     A.  I was part of meetings before and after the date where we

3     talked about not only improving the results but about the QA

4     results.

5     Q.  Fair enough.  But you were part of discussions after

6     November 29 concerning improvements to the quality assurance

7     reports themselves, correct?

8     A.  I was.

9     Q.  And those discussions took place with Ms. Mairone, correct?

10    A.  And others.

11    Q.  But those conversations took place with Ms. Mairone,

12    correct?

13    A.  And others, yes.

14    Q.  And those discussions included Mr. Brent, right?

15    A.  Likely.

16    Q.  And yourself?

17    A.  Yes.

18    Q.  And Mr. Kitashima?

19    A.  Sure, Cliff would have been involved at least in some of

20    those discussions.

21    Q.  And the purpose of those discussions, among other things,

22    maybe, was to make sure that the QA reports were communicated

23    in an effective way into the Central Fulfillment organization,

24    right?

25               MS. NAWADAY:  Objection.

1            THE COURT:  Sustained.

2    Q.  Was it your understanding that the purpose of the

3    reports -- sorry, the purpose of the meetings post November 29

4    was to ensure that the QA reports were being communicated in an

5    effective way through Central Fulfillment?

6    A.  No.  Well, I couldn't say.  I didn't have a role in

7    communicating them through Central Fulfillment, I had a role in

8    communicating them to the list of folks who was able to get

9    them.

10   Q.  Now let's turn to DX701.

11            Have you had a chance to review that, Mr. O'Donnell?

12   A.  Yes.

13   Q.  Now the top email is a email from Steve Brent to yourself

14   and CC'd to others, and then attaches an email from yourself to

15   Vincent Santucci, CC'd to others, on dated September 4.  Do I

16   have that right?

17   A.  Yes.

18            MR. HEFTER:  We move DX701 into evidence.

19            MS. NAWADAY:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 701 received in evidence)

22   Q.  So the first email, Mr. O'Donnell, is an email from

23   yourself to others on December 4th at 12:24 p.m., second to

24   last page of the third to last page of the exhibit?

25   A.  Yes.

D9UTBAN5                        O'Donnell - cross

1    Q.  And this is an email from yourself to Mr. Jaraba, Brent,

2    Burns, Thomas, do you see that?

3    A.  Yes, and others.

4    Q.  And others.  And on page 3 of the exhibit it says:  As

5    Cliff mentioned yesterday, I'm gathering a list to submit to

6    Jim Micone tomorrow outlining what our collective group will do

7    to ensure FSL achieves the target of 1.9 billion in high

8    quality funding volume during December.  Do you see that?

9    A.  I do.

10   Q.  When you said as Cliff mentioned yesterday, was that in a

11   face-to-face meeting or was that in an email?

12   A.  I can't tell from this note.

13   Q.  Did that meeting include Ms. Mairone or that communication

14   include Ms. Mairone?

15   A.  I can't tell from this note.

16   Q.  Now I want to focus your attention to item number four,

17   that's entitled authority, and can you read that into the

18   record?

19   A.  Risk management will work with CF management to conclude

20   the authority certification process for the CF LS population

21   who did not meet the 11/30 deadline.  This will assist in

22   reducing hand offs and expediting validation and overall turn

23   time for prime includes accept files.

24   Q.  This is what you're saying is one of the steps necessary to

25   achieve the target of $1.9 billion in high quality funding

D9UTBAN5                          O'Donnell - cross

1   volume, correct?

2   A.   Right.   In order for the group to be at their maximum

3   efficiency, people in the process would actually have to have

4   the authority do their job.

5   Q.   And you were suggesting here that you were going to work

6   with the CF management to conclude authority certification for

7   the LSs, correct?

8            MS. NAWADAY:   Objection.

9            THE COURT:   Sustained.

10  Q.   So was it your understanding at the time, Mr. O'Donnell,

11  that an LS would require certain certifications in order to

12  approve certain loans, correct?

13  A.   They could earn certification by going through the testing

14  and training we talked about earlier.   They hadn't been able to

15  get it, so that's why we missed the November 30th deadline.   So

16  we set a new goal of trying to get it done by the end of

17  December.

18  Q.   Thank you.   Now let's turn to your point number five in

19  your email.   Now can you read that into the record, please?

20  A.   Communication.   QA risk management and compliance related

21  findings -- excuse me, related issues, findings will be

22  communicated only at the MD level for CF to avoid any

23  distractions to line employees or line management.   Regular

24  update meetings have been established to ensure quality is not

25  jeopardized and required adjustments can be quickly identified

1   and communicated through the MD.

2   Q.  Thank you.  Put that aside.

3        Let's turn our attention to DX04069.  Actually let's

4   go back to DX701.  With respect to the paragraph that we just

5   read, this is dated December 4, 2007, correct?

6   A.  Yes.

7   Q.  And this is five days after the November 29 email?

8   A.  Yes.

9   Q.  And this is your communication to the management group

10  below you in underwriting?

11  A.  Well, it's –- these are employees that either report

12  directly to me or to Cliff, not underwriting.

13  Q.  Thank you.  These are the officers in the company in credit

14  quality?

15  A.  Or compliance, yes.

16  Q.  Now let turn to DX4069.  Do you see that?

17  A.  Yes.

18  Q.  This is an email from Mr. Brent to Mr. Kitashima, yourself,

19  and Ms. Mairone, do you see that?

20  A.  It looks like a meeting invitation.

21  Q.  OK.  I'll take that.  We move DX04069 into evidence, your

22  Honor?

23        MS. NAWADAY:  No objection.

24        THE COURT:  Received.

25        (Defendant's Exhibit 04069 received in evidence)

1   Q.  Now you just told me, Mr. O'Donnell, this looks like a

2   meeting invitation.  Can you explain how you reached that

3   conclusion?

4   A.  Based on Steve's introduction about what it is, we'll use

5   this time each week.

6   Q.  OK.  Thank you.  And Mr. Brent is saying we will use this

7   time each week to review QA, QC findings for trends and next

8   steps.  Reports will be generated and published prior to to

9   this meeting.  Thanks.

10          Do you see that?

11  A.  Yes, we were publishing reports on a weekly basis.

12  Q.  And those reports were going throughout the underwriting

13  organization?

14  A.  Not at this time.  That would have stopped after the 29th.

15  Q.  My question to you is the communications were still going

16  to yourself, Mr. Burns, and others in the leadership of the

17  credit quality organization?

18  A.  Right, not in the underwriting, though.

19  Q.  Now the email is dated 1:06 a.m.  Do you see that?

20  A.  Yes.

21  Q.  So this is just a question I have, it says we'll use this

22  time each week.  Do you know if Mr. Brent was suggesting a

23  meeting at 1:00 a.m. every week?

24  A.  I would hope not, but it's more likely that there was a

25  series of -- in the invitation, a series of dates that you

1  accepted that would populate your calendar.

2  Q.  So it's your testimony that you recall that there were a

3  series of meeting discussing the QA reports subsequent to

4  November 29?

5  A.  No, that's not what I said.  I said I don't believe he was

6  suggesting the 1:06 meeting time.  There might have been other

7  dates or times attached to this weekly invitation.

8  Q.  Let's turn to DX4071.  This document is an email from

9  yourself to Mr. Aliano dated December 5th, 2007.

10  A.  Yes, it's a response to the email Patrick sent to me.

11            MR. HEFTER:  We move 4071 into evidence.

12            MS. NAWADAY:  No objection.

13            THE COURT:  Received.

14            (Defendant's Exhibit 4071 received in evidence)

15  Q.  This email is dated Wednesday, December 5th, at 10:53 p.m.

16  So this is after the November 29th email, right?

17  A.  Yes.

18  Q.  And can you read the first paragraph of the email that you

19  sent to Mr. Aliano?

20  A.  My thought is that we should surface this issue to Rebecca

21  and get direction on who the daily reporting should be sent to

22  for action.  We can make a recommendation that a resource over

23  both the field and the CF under each of the SVPs is tasked with

24  ownership and responsibility to ensure that we follow the

25  accept only mandate.

D9UTBAN5                          O'Donnell - cross

1   Q.  So on or about December 5th you were having discussions

2   within your organization about who the daily reporting should

3   be sent to?

4   A.  Well, Patrick is highlighting loans that are refers that

5   are in the accept swim lane, and I'm saying we should reach out

6   to Rebecca and say who does she want these to go to for

7   correction, because we had the edict you couldn't sent anything

8   directly.

9   Q.  And you followed up with Ms. Mairone, correct?

10  A.  I don't recall exactly what I did next.

11  Q.  And other people in your organization followed up with

12  Ms. Mairone about changing the reporting process, correct?

13            MS. NAWADAY:  Objection.

14            THE COURT:  Sustained.

15  Q.  Was it your understanding, Mr. O'Donnell, that other people

16  in your organization who reported to you reached out to

17  Ms. Mairone to discuss who the reports should be sent to?

18  A.  The majority of the discussions we had about the results

19  and the reporting took place in scheduled meetings, so I'm sure

20  we had discussion about the reporting.

21  Q.  And did those meetings take place --

22            THE COURT:  Sorry, counsel, come to the side bar.

23            (Continued on next page)

24

25

1              (At side bar)

2              THE COURT:  So because it's an adversary system, the

3     Court always hesitates to intervene when a question is not

4     objected to except in unusual circumstances.  But there's been

5     a long series now of the witness being asked did someone else

6     do something, or words to that effect, and the government

7     always objects, and I sustain the objection.

8              And then counsel for Ms. Mairone then puts the

9     question:  Was it your understanding that this other person or

10    persons did such and such?  And the government does not object.

11    And so I have allowed that question to be answered, but I'm

12    increasingly concerned because I don't understand what his

13    understanding -- what relevance that has to any issue in this

14    case about which those questions are directed.

15             MR. HEFTER:  Can I address that?

16             THE COURT:  Of course.

17             MR. HEFTER:  Our position, your Honor, is because he

18    was the -- these people reported to Mr. O'Donnell, his

19    knowledge as to whether Mr. Aliano or Mr. Jaraba met with

20    Ms. Mairone to discuss the quality of reports which the

21    government claims were suppressed, as your Honor knows, that's

22    a key part of our evidence as to why she didn't have fraudulent

23    intent, that she was actively working with others in his

24    organization to improve the reports and not to suppress them.

25    His knowledge of what those individuals did, given his role as

D9UTBAN5                    O'Donnell - cross

1    their boss, is relevant.

2            THE COURT:  I'm not sure I follow you.  Taking that as

3    an example, the question is did so-and-so meet with Ms. Mairone

4    about such-and-such.  So that's the kind of question the

5    government has objected to, and I have sustained it because

6    it's hearsay or lacks foundation.  Unless he was there at the

7    meeting, which you have not attempted to establish, he would

8    only know about it because someone told him about it, so it's

9    plain hearsay.

10           So then the follow-up question is well, did you have

11   an understanding that so-and-so met with Ms. Mairone.  And no

12   objection is made.  And so usually he says yes, sometimes he

13   says he's not sure.  What is the relevance of his

14   understanding?  It's not his knowledge.  Just what you were

15   just talking about, what is -- of his understanding that

16   so-and-so met with Ms. Mairone, it sounds to me like a

17   disguised form of hearsay.

18           So in any event --

19           MR. HEFTER:  Your Honor, I will refrain from those

20   questions, but the follow-up question was:  Did you know if

21   Ms. Aliano met with so-and-so?

22           THE COURT:  If he knows from personal knowledge,

23   because he was there or observed it or something like that, not

24   because someone told him, that's --

25           MR. HEFTER:  Fair enough.

D9UTBAN5                          O'Donnell - cross

1              THE COURT:  Now how much -- now that you have had the

2    lunch to streamline your --

3              MR. HEFTER:  I probably have another hour, your Honor.

4              THE COURT:  I think, because of my schedule, we're

5    going to stop at 3:20.

6              MR. HEFTER:  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2   BY MR. HEFTER:

 3   Q.  Mr. O'Donnell, could we turn your attention to the second

 4   paragraph.

 5              Can you read that into the record, please?

 6   A.  I believe Steve was setting up weekly meetings to cover any

 7   manufacturing quality trends.  This would be an agenda item for

 8   the first meeting.  For those meetings, we should attempt to

 9   include a solid solution alongside any issue being raised so

10   that we can quote, unquote, assist in making sure the control

11   steps will work.

12   Q.  Now did you attend any weekly meetings set up by Mr. Brent?

13   A.  Any weekly meetings, I'm sure I did.

14   Q.  Did you attend any weekly meetings that are referred to in

15   your email regarding manufacturing quality trends?

16   A.  If there was a meeting on quality and I was at work that

17   day, I'm sure that I would have tried to make it.

18   Q.  And just so we're clear, we're talking about meetings that

19   took place on this topic in or around December 5th, 2007.

20   A.  Yes.

21   Q.  Let's turn to DX04076.

22              Have you had an opportunity to review it?

23   A.  Yes.

24   Q.  This is an email from Mr. Harris to Ms. Mairone copied to

25   Mr. Brent and yourself and others on December 7, 2007.  Do you

 1    see that?

 2    A.  I do.

 3              MR. HEFTER:  We move DX4076 into evidence, your Honor.

 4              MS. NAWADAY:  No objection.

 5              THE COURT:  Received.

 6              (Defendant's Exhibit 4076 received in evidence)

 7    Q.  Now let's turn to the first paragraph of Mr. Harris' --

 8    Mr. Harris says we have consolidated the daily QA PC3 reviews

 9    into a manageable format for a more efficient review and

10    ultimate dissemination of the information.

11              Do you see that?

12    A.  I do.

13    Q.  And then:  Should have you any questions, please reach out

14    to myself or Steve.

15              Do you see that?

16    A.  I do.

17    Q.  I take it the Steve in that is Steve Brent?

18    A.  Yes, Don worked for Steve Brent.

19    Q.  So it make a reference to daily QA PC3 reviews.  Do you see

20    that?

21    A.  Yes.

22    Q.  And can you explain to us what a daily QAPC3 review was?

23    A.  Phase code three was prefunding, so the loan had not yet

24    gone out and signed.  It was cleared to close by the loan

25    specialist, but it had not been signed.  And Don's team or Mike

1    Burns' team would look at those loans on a daily basis, and the

2    results would be put into the format of a daily summary report.

3    Q.  And do you know if that daily QA PC3 review by those

4    gentlemen was being conducted between November 9 –– November 29

5    and December 7, the day of this email?

6              MS. NAWADAY:  Objection.

7              THE COURT:  Sustained.

8    Q.  Now let's turn our attention to the middle where it says

9    tab number one, pivot table which identifies the review ratings

10   by Central Fulfillment center location and branch ops team.  Do

11   you see that?

12   A.  Yes.

13   Q.  What's a pivot table?

14   A.  It's part of a spreadsheet that allows a user to sort the

15   information.

16   Q.  And then tab 2 says SUS versus procedure versus no risk.

17   Do you see that?

18   A.  Yes.

19   Q.  And then tab 3 and tab 4.

20            And in this email, Mr. Harris is attaching those four

21   tabs to the recipients of the email?

22   A.  Yes, it says there's an Excel spreadsheet attached.

23   Q.  If you look at who is copied on the email, this report is

24   going to Mr. Brent, right?

25   A.  Yes.

D9UTBAN5                          O'Donnell - cross

1    Q.  Mr. Kitashima, who is the chief credit officer of the

2    organization?

3    A.  Yes.

4    Q.  Yourself?

5    A.  Yes.

6    Q.  Mr. Jaraba?

7    A.  Yes.

8    Q.  Ms. Misirian?

9    A.  Yes.

10   Q.  Ms. Meyers -- Mayers?

11   A.  Yes.

12   Q.  Mr. Burns, Barnett and Mr. Rodriguez, right?

13   A.  Yes.

14   Q.  And Ms. Mairone is also receiving these reports, right?

15   A.  Yes, it's addressed to her.

16   Q.  And this is on December 7, 2007, right?

17   A.  It is.

18   Q.  Let's turn to DX04078.  Do you see that?

19   A.  Yes.

20   Q.  This is an email from Mr. Brent to Ms. Mairone copied to

21   some of the same people on the other email.  Do I have that

22   right?

23   A.  Yes.

24            MR. HEFTER:  We move DX4078 into evidence, your Honor.

25            MS. NAWADAY:  No objection.

 1          THE COURT:  Received.

 2          (Defendant's Exhibit 4078 received in evidence)

 3   Q.  Mr. Brent says we have consolidated the daily QA PC3

 4   reviews into a manageable format for a more efficient review

 5   and ultimate dissemination of the information.  Do you see

 6   that?

 7   A.  Yes.

 8   Q.  That sounds a lot like the email from the day before,

 9   right?

10   A.  It does.

11   Q.  And can you just look at the subject line of DX04078.  Do

12   you see that?

13   A.  Yes.

14   Q.  And that says Central Fulfillment QA PC3 daily review

15   results 12/7/07, right?

16   A.  Yes.

17   Q.  And DX04076, the one that we looked at a few moments ago,

18   has the same subject line but just a different date, right?

19   A.  That's true.

20   Q.  So the daily review occurred the following day, and this

21   was Mr. Brent forwarding it on to the same group of people, is

22   that right?

23   A.  It appears that way, yes.

24   Q.  Thank you.  Now let's look at DX04082.  Have you looked at

25   that?

1   A.  Yes.

2   Q.  This is a -- the email in the middle is an email from

3   Mr. Brent to Ms. Mairone, and you're copied on it, is that

4   correct?

5   A.  In the middle, yes.

6           MR. HEFTER:  Your Honor, we move DX04082 into

7   evidence.

8           MS. NAWADAY:  No objection.

9           THE COURT:  Received.

10          (Defendant's Exhibit 04082 received in evidence)

11  Q.  Now in the middle of the page, Mr. Brent says:  Rebecca, we

12  adjusted tab one as you requested.  Do you see that?

13  A.  Tab three, yes.

14  Q.  Tab three, thank you.

15          And if you go up top, this email from Mr. Kitashima to

16  Mr. Brent where Mr. Kitashima says:  Steve, please provide a

17  summary to everyone of today's meeting with Rebecca, including,

18  quote, take aways and next steps.  Do you see that?

19  A.  I do.

20  Q.  My question for you, Mr. O'Donnell, is do you recall

21  attending a meeting with Rebecca on or about December 10

22  concerning these subjects?

23  A.  I don't recall if there was a meeting that I attended that

24  day or not.

25  Q.  You don't recall one way or the other?

D9UTBAN5                          O'Donnell – cross

1    A.  I don't.

2    Q.  Let's turn our attention to DX4084.  This is an email from

3    Mr. Kitashima to Mr. Lumsden.  You're copied on it,

4    Mr. O'Donnell?

5    A.  Yes.

6               MR. HEFTER:  Your Honor, we move DX04084 into

7    evidence.

8               MS. NAWADAY:  No objection.

9               THE COURT:  Received.

10              (Defendant's Exhibit 04084 received in evidence)

11              THE COURT:  Is it 04084 because you plan to get into

12   the 10,000 range?

13              MR. HEFTER:  I can assure your Honor that we will not,

14   and you probably wouldn't let us either.

15   Q.  So the subject matter of this email, Mr. O'Donnell, is FSL

16   QA/QC efforts concern.  Do you see that?

17   A.  Yes.

18   Q.  And this email is dated December 12, 2007, correct?

19   A.  It is.

20   Q.  So there were multiple discussions that you were part of

21   during this time frame to discuss the QA and QC process in

22   place at FSL?

23              MS. NAWADAY:  Objection.

24              THE COURT:  Ground?

25              MS. NAWADAY:  I withdraw the objection, your Honor.

1            THE COURT:  That one.

2            Go ahead, you may answer.

3   Q.  So Mr. Kitashima is telling Mr. Lumsden, his boss, right?

4   A.  Yes.

5   Q.  So let's just get everything straight here.  Mr. Lumsden

6   was the boss in this organization, right?

7   A.  He was.

8   Q.  He was your boss, Ms. Mairone's boss, Mr. Kitashima's boss,

9   correct?

10  A.  He was president of the division, yes.

11  Q.  He says -- Mr. Kitashima says to Mr. Lumsden:  The QC/QA

12  group is brand new, and so their focus has been on developing

13  and refining their processes and communication.  Do you see

14  that?

15  A.  I do.

16  Q.  Everyone in this group clearly understands the need to

17  first positively influence the process to improve turn time and

18  productivity as well as to reduce defis and QC results.  Do you

19  see that?

20  A.  I do.

21  Q.  My first question is I have now seen that word defis twice,

22  and I don't know what it means.  Can you explain that?

23  A.  Defi, it's a missing document.

24  Q.  So then Mr. Kitashima says:  We continue to work through

25  Rebecca, and in today's meeting we agreed to formulate a

1   cross-functional team to review the top three to four QC SUS

2   findings from a process and systems perspective.  Do you see

3   that?

4   A.  I do.

5   Q.  Do you recall being at a meeting on December 12 with

6   Mr. Kitashima and Ms. Mairone to discuss this development of a

7   cross-functional team?

8   A.  I don't recall whether I was at a meeting that day or not.

9   Q.  So when Mr. Kitashima says we continue to work, you don't

10  know one way or the other whether he's referring to you or

11  others or anybody else?

12  A.  When he says "we," I'm sure he -- I think he's probably

13  referring to his organization.

14  Q.  And you're part of his organization?

15  A.  Yes.

16  Q.  Mr. Kitashima then also says near the end:  In addition,

17  QC/QA must also work on reducing the back and forth with

18  corporate and create more alignment on the QC process, right?

19  A.  Yes.

20  Q.  Then says:  We started this process with CMD over 60 days

21  ago and have a meeting scheduled with Preston, corporate QC and

22  the other division on December 20 to advance this topic.  Do

23  you see that?

24  A.  I do.

25  Q.  Do you have any idea who Preston is?

1   A.  Preston was Preston James.  He was a managing director in

2   corporate.

3   Q.  And do you know what his role or function was at the

4   corporate level?

5   A.  I don't know of his exact role, but at this time he was

6   communicating with the divisions about guideline changes and

7   things going on in the market.  He had an underwriting

8   background.

9   Q.  And Mr. Kitashima says:  We started this process with CMD

10  over 60 days ago.  Do you have a recollection of being part of

11  any discussions with CMD 60 days before this email or so around

12  this topic?

13  A.  Periodically we would talk to CMD about what they were

14  seeing from corporate QC, their results and trends.  Some of

15  that was our work done with the NCA when that group was coming

16  over, so that was not an irregular occurrence.

17  Q.  Do you know if the topic was, in connection with this

18  email, CMD's QC processes?

19  A.  I think it was more about corporate QC's processes.  We

20  were trying to get alignment between of division, so we were

21  all handling things and having interchange in a similar

22  fashion.

23          THE COURT:  Is this a good time?

24          MR. HEFTER:  This is a good time, your Honor.

25          THE COURT:  So ladies and gentlemen, as you know,

1    we're going to end early today for a number of reasons, partly

2    though, to accommodate juror number five's athletic endeavors.

3    So I want to remind juror number five there is no substitute

4    for victory.  Let's have a full report tomorrow.

5            So ladies and gentlemen, we'll see you at 9:30 and

6    we'll have a full day tomorrow.  See you at 9:30 tomorrow.

7            (Jury not present)

8            THE COURT:  All right.  So we'll see all of you folks

9    at 6:30 tonight.

10            (Recess taken)

11            (Adjourned to 6:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   EDWARD O'DONNELL

 4   Cross By Ms. Mainigi . . . . . . . . . . . 754

 5   Cross By Mr. Hefter  . . . . . . . . . . . 844

 6                    PLAINTIFF EXHIBITS

 7   Exhibit No.                           Received

 8    137  . . . . . . . . . . . . . . . . . 840

 9                    DEFENDANT EXHIBITS

10   Exhibit No.                           Received

11    7   . . . . . . . . . . . . . . . . . 755

12    14  . . . . . . . . . . . . . . . . . 758

13    8   . . . . . . . . . . . . . . . . . 762

14    12  . . . . . . . . . . . . . . . . . 764

15    280 . . . . . . . . . . . . . . . . . 768

16    460 . . . . . . . . . . . . . . . . . 778

17    18, 19  . . . . . . . . . . . . . . . 780

18    31  . . . . . . . . . . . . . . . . . 783

19    35  . . . . . . . . . . . . . . . . . 785

20    22  . . . . . . . . . . . . . . . . . 789

21    758 . . . . . . . . . . . . . . . . . 793

22    774 . . . . . . . . . . . . . . . . . 797

23    54  . . . . . . . . . . . . . . . . . 814

24    55  . . . . . . . . . . . . . . . . . 816

25    829 . . . . . . . . . . . . . . . . . 817
```

```
 1   889   . . . . . . . . . . . . . . . . . . 819

 2   886   . . . . . . . . . . . . . . . . . . 820

 3   56    . . . . . . . . . . . . . . . . . . 823

 4   951   . . . . . . . . . . . . . . . . . . 827

 5   956   . . . . . . . . . . . . . . . . . . 827

 6   977   . . . . . . . . . . . . . . . . . . 828

 7   993   . . . . . . . . . . . . . . . . . . 830

 8   52    . . . . . . . . . . . . . . . . . . 833

 9   51    . . . . . . . . . . . . . . . . . . 834

10   550   . . . . . . . . . . . . . . . . . . 836

11   539   . . . . . . . . . . . . . . . . . . 838

12   62    . . . . . . . . . . . . . . . . . . 843

13   157   . . . . . . . . . . . . . . . . . . 845

14   200   . . . . . . . . . . . . . . . . . . 858

15   4012  . . . . . . . . . . . . . . . . . . 863

16   04028 . . . . . . . . . . . . . . . . . . 865

17   580   . . . . . . . . . . . . . . . . . . 867

18   4053  . . . . . . . . . . . . . . . . . . 870

19   701   . . . . . . . . . . . . . . . . . . 878

20   04069 . . . . . . . . . . . . . . . . . . 881

21   4071  . . . . . . . . . . . . . . . . . . 883

22   4076  . . . . . . . . . . . . . . . . . . 889

23   4078  . . . . . . . . . . . . . . . . . . 892

24   04082 . . . . . . . . . . . . . . . . . . 893

25   04084 . . . . . . . . . . . . . . . . . . 894
```