DA13BAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4
                    Plaintiff,
5
               v.                        12 CV 1422 (JSR)
6
     BANK OF AMERICA CORPORATION,
7    *successor to Countrywide
     Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                  Defendants.

11   ------------------------------x
                                         New York, N.Y.
12                                       October 1, 2013
                                         9:45 a.m.
13
     Before:
14
                         HON. JED S. RAKOFF,
15
                                         District Judge
16

17

18

19

20

21

22

23

24

25

DA13BAN1

1                              APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6         Assistant United States Attorneys

7

     WILLIAMS & CONNOLLY
8         Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14        Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17        Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25

DA13BAN1

```
1              THE COURT:  Good morning.

2              (Jury present)

3              THE COURT:  We need a report on Juror No. 5.

4              A JUROR:  Good.  I wore black today.

5              THE COURT:  You have another chance next week.

6              A JUROR:  Thank you.

7              THE COURT:  And also while we're talking about sad

8     matters, I think we should out of respect observe a moment of

9     silence for the passing of a great institution.  I refer, of

10    course, to the federal government.

11             Counsel.

12             MR. HEFTER:  Thank you, your Honor.  Good morning.

13    Good morning, ladies and gentlemen.

14     EDWARD O'DONNELL,

15    CROSS-EXAMINATION

16    BY MR. HEFTER:

17    Q.  Good morning, Mr. O'Donnell.

18    A.  Good morning.

19    Q.  When we left off yesterday afternoon, we were talking about

20    the events in around December of 2007.  Do you remember that?

21    A.  I do.

22    Q.  Somebody at defense counsel table reminded me that today is

23    October 1st, correct?

24    A.  That's true.

25    Q.  Six years, six-year anniversary of the rollout of Central
```

1    Fulfillment, right?

2    A.  That's right.

3    Q.  It's been a while.  So, let's go back to December now.  And

4    if you can open up your binder to DX 4088.  Do you have it?

5    A.  I do.

6    Q.  The middle e-mail is an e-mail from Mr. Brent to

7    Ms. Mairone and you're copied on that, correct?

8    A.  That's right.

9    Q.  It's dated December 13, 2007, correct?

10   A.  The middle e-mail, yes.

11           MR. HEFTER:  I move DX 4088 into evidence, your Honor.

12           MS. NAWADAY:  No objection.

13           THE COURT:  Received.

14           (Defendant's Exhibit 4088 received in evidence)

15   Q.  If we can just call up the middle so we can see who was --

16   you can blow it up a little more.  Thank you.

17           So this is an e-mail from Mr. Brent to Ms. Mairone,

18   and copied to Mr. Kitashima, yourself, and Mr. Jaraba, correct?

19   A.  That's right.

20   Q.  If we go to the text of the e-mail at least the first few

21   lines, Mr. Brent says on top, "I wanted to recap our agreements

22   and directions from the meeting we all took part in."  Do you

23   see that?

24   A.  I do.

25   Q.  Do you recall attending a meeting with Mr. Brent,

DA13BAN1                    O'Donnell - cross

1  Mr. Kitashima, Mr. Jaraba, and Ms. Mairone in this time frame?

2  A.  I would have attended any number of meetings with that

3  group of folks, yes.

4  Q.  My question to you is do you recall attending the meeting

5  that Mr. Brent says, quote, we all took part in?

6  A.  I don't recall the specific meeting as I sit here today.

7  Q.  Let's go down to the middle of this paragraph.  It says

8  "Rebecca asked for a report that details the top 6ish SUS

9  findings that can be aligned with the findings from the QA

10  reviews."  Then it says "We will set targets on improvement

11  once we have a plan detailed by Rebecca and Wade."

12          Do you see that?

13  A.  I do.

14  Q.  Let's turn your attention to the second page.  In the

15  middle there it says "Rebecca and Cliff agreed to have a SWAT

16  team put together with representatives of tech, process

17  engineering, FSL ops, risk management, compliance QAC, CF ops,

18  training, etc., to address these top 6ish items to get them

19  resolved and show improvement first reduction in QA results and

20  QC SUS finings."  Do you see that?

21  A.  I do see that.

22          (Continued on next page)

23

24

25

D91TBAN2                         O'Donnell - cross

1   BY MR. HEFTER:

2   Q.  Now do you know what -- strike that.

3        As a reference to process engineering, do you know

4   what that is?

5   A.  I'm familiar with process engineering, yes.

6   Q.  What's your familiarity?

7   A.  It generally involves reviewing a process, checking

8   particular elements of a process and looking for ways to

9   improve it.

10  Q.  And right below it says Cliff agreed to have Mark Barnett

11  drive this SWAT team.  Do you see that?

12  A.  I do.

13  Q.  Now do you have a recollection of whether this SWAT team

14  was in fact formed?

15  A.  I don't recall whether the team was formed or not.  It

16  sound very much like the working group we had back in August.

17  Q.  And then in the bottom it says:  I hope this correctly

18  defines our next steps and who owns each piece.

19       Do you see that?

20  A.  I do.

21  Q.  Do you recall ever sending an email or any communication

22  that this did not reflect accurately what happened in the

23  meeting?

24  A.  I don't recall if I did or did not.

25  Q.  Now let's turn to DX4091.

1          Do you have this that in front of you?

2    A.  I do.

3    Q.  This is an email from Macey Vasquez to a whole group of

4    people and you're CC'd on it, correct?

5    A.  The original email is from Macey?  It's quite a number of

6    pages.

7          Look like the original email starts with Cheri Shine.

8          MR. HEFTER:  Your Honor, may I approach to see if

9    we're on the same page?

10         THE COURT:  Yes.

11   Q.  I think we're on the same page now Mr. O'Donnell, correct?

12   A.  Yes.

13   Q.  So this is an email from Macey Vasquez to a group of people

14   and you're CC'd on it?

15   A.  Yes.

16   Q.  And it's dated December 17, 2007, correct?

17   A.  It is.

18         MR. HEFTER:  We move DX4091 your Honor.

19         MS. NAWADAY:  No objection.

20         THE COURT:  Received.

21         (Defendant's Exhibit 4091 received in evidence)

22   Q.  Do you know who Macey Vasquez is?

23   A.  I knew Macey, she worked in the Chandler, Arizona site.

24   Q.  So she was an FSL employee?

25   A.  She was.

1    Q.  What was her role within FSL?

2    A.  She had various roles during the time she was there.  She

3    started as a fund manager, I believe, and then I think took on

4    more of a corporate role.

5    Q.  When you say a corporate role, do you mean employed by the

6    parent company or employed by the division?

7    A.  Employed by the division.

8    Q.  Now if you go to the second page on the bottom, right

9    before her name, it says see attached file.  Corporate QC

10   compliance audit findings 12/13/07.  Do you see that?

11   A.  I do.

12   Q.  Now let's go back to the first page.

13          So Mr. O'Donnell, does this email suggest to you that

14   Ms. Vasquez is sending a spreadsheet of corporate QC compliance

15   findings on December 17 to the attached group?

16   A.  Yes, compliance findings.

17   Q.  And the top recipient is FSL_CFE_Funding Management, do you

18   see that?

19   A.  I do.

20   Q.  That's sort of like a group of people, correct?

21   A.  It is.  They were the group that managed the actual funding

22   of loans, so the wiring of money to customers at the closings.

23   Q.  How many people would that entail within FSL in and around

24   this time frame?

25   A.  I would be guessing the exact number, but I would say there

D91TBAN2                          O'Donnell - cross

1   were probably six to eight of them in each of the fulfillment

2   centers.

3   Q.  And there were four fulfillment centers?

4   A.  At this time, four or five.

5   Q.  So approximately 20 people, you would say?

6   A.  Somewhere in that neighborhood.

7   Q.  And I also want to draw your attention to some of the CCs

8   on it, Mr. Price, Mr. Sallis and Mr. Comeaux are CC'ed here,

9   correct?

10  A.  They are.

11  Q.  And this suggests to you that Mr. Price, Sallis and Comeaux

12  are receiving the weekly corporate QC compliance audit findings

13  spreadsheet?

14  A.  Right.  This is different than the underwriting compliance,

15  this is more of a governance that we talked about with Alice

16  Basmadjian yesterday.

17  Q.  But with respect to this report, this email suggests

18  Mr. Price, Sallis and Comeaux were copied on it, correct?

19  A.  Yes.

20  Q.  Can you turn your attention to DX50, please.

21          MR. HEFTER:  May I approach?

22          THE COURT:  Yes.

23  Q.  This was a document that wasn't in our binder.  Have you

24  had a chance to review it, Mr. O'Donnell?

25  A.  Yes.

D91TBAN2                          O'Donnell - cross

1    Q.  Top email is an email to you from Mr. Brent on December 14,

2    2007, correct?

3    A.  Yes.

4           MR. HEFTER:  Your Honor, we move DX50 into evidence.

5           MS. NAWADAY:  No objection.

6           THE COURT:  Received.

7           (Defendant's Exhibit 50 received in evidence)

8    Q.  If could you blow up the first paragraph of the email.  If

9    could you read that into the record, please.

10   A.  It's hard to tell if the QC analyst has provided any

11   rebuttal comments to corporate's findings, especially on stated

12   reasonability findings.  Are there other comments that outline

13   our rebuttal someplace else, or is it a blank indicating we did

14   not respond?

15   Q.  Could you blow up the next sentence, please.

16           Could you read that, please?

17   A.  As I start to read through them, the methods corporate is

18   using to determine reasonability are more than flawed, and with

19   elbow grease they can be overcome.

20   Q.  Thank you.  Now this is your statement to Mr. Brent on or

21   about December 14, correct?

22   A.  It's part of the email, yes.

23   Q.  Now I just want to see if we can clarify things.  When you

24   say the methods corporate is using, you're referring to the

25   parent company, correct?

D91TBAN2                          O'Donnell - cross

1    A.  Yes, corporate QC.

2    Q.  And the process was that the corporate parent company had a

3    QC department, correct?

4    A.  They did.

5    Q.  And periodically they would audit loans that were sold by

6    the divisions, correct?

7    A.  Loans that originated by the divisions, yes.

8    Q.  Thank you.  And they would provide a report of those audit

9    findings to the division, correct?

10   A.  They would.

11   Q.  And the division would then have an opportunity to rebut

12   those findings, correct?

13   A.  Right.  They would have an opportunity to provide

14   additional information documents that were missing or no

15   response if they agreed.

16   Q.  So let's take an example of a missing document.  If

17   corporate QC did an audit and they found that an appraisal, for

18   example, was not in the file, they may find that to be a

19   reportable condition, correct?

20   A.  They would, yes.

21   Q.  And then the division would have the opportunity to try to

22   see if the appraisal report was either in the file or perhaps

23   not in the file but somewhere else within the division,

24   correct?

25   A.  That's right.

1   Q.  And if the division found the appraisal and satisfied

2   corporate QC that they had the document, that would be

3   something that would be rebutted and overturned, correct?

4   A.  Hopefully, yes.

5              MS. NAWADAY:  Objection.

6              THE COURT:  Sorry?

7              MS. NAWADAY:  Objection, your Honor.

8              THE COURT:  Ground?

9              MS. NAWADAY:  Foundation.

10             THE COURT:  I think that's your understanding of how

11   the process was supposed to work, is that right?

12             THE WITNESS:  It is.

13             THE COURT:  I will accept it for those purposes.

14   Q.  If we can turn to Plaintiff's Exhibit 20.

15   A.  Is that the attachment?

16   Q.  It's an email from you to Mr. Brent on December 12.  It

17   should be in the government's binder.

18   A.  20?

19   Q.  Yes.  My recollection, Mr. O'Donnell, is that it was the

20   first document in the government's binder handed to you

21   yesterday.

22   A.  137 is the first, I don't see a tab 20.

23   Q.  You may be looking at the defense binder.

24   A.  I think I've got it.

25   Q.  Do you have Plaintiff's Exhibit 20 in front of you?

D91TBAN2                    O'Donnell - cross

1   A.  I do.

2   Q.  Do you recall Ms. Nawaday asking you questions about this

3   document?

4   A.  I do.

5   Q.  I want to focus your attention, if you could have that up

6   on the screen, please, go down to the email from Ms. Mairone.

7           So you recall you were testifying about the email that

8   Ms. Mairone sent to a group of people shown there.  Do you see

9   that?

10  A.  I see the email, yes.

11  Q.  Now if you go to the second page, the first paragraph,

12  Ms. Mairone says:  If you have recently earned a new level of

13  lending authority, you recently began completing compliance

14  reviews or you are now signing off on conditions, we want you

15  to know that each FSL employee will have a QoG reprieve on all

16  funded units completed through 12/31/07.

17          In the last sentence she writes:  In other words, your

18  compensation will not be adversely affected on any loans funded

19  on or by the last date of 12/31/07.  Do you see that?

20  A.  I do.

21  Q.  And the date of this email is December 12, correct?

22  A.  That's right.

23  Q.  So according to this email, the QoG reprieve would have

24  been in effect or approximately two or three weeks?

25  A.  I'm not sure I understand.  It was in effect for longer

1    than that.

2    Q.  But according to this email, Ms. Mairone is saying that

3    your compensation will not be adversely affected on any loans

4    funded on or by the last date of 12/31/07, correct?

5    A.  Right.

6    Q.  Are you aware the reprieve was extended beyond 12/31/07?

7    A.  I believe it was extended to January.

8    Q.  But after January it ended, correct?

9    A.  I believe that's true.

10           MR. HEFTER:  May I approach, your Honor?

11           THE COURT:  Yes.

12   Q.  Mr. O'Donnell, I handed you DX4031.  Do you see that?

13   A.  Yes.

14   Q.  It's entitled High-Speed Swim Lane audit review process QA

15   results as of 8/31/07?

16   A.  That's right, it is.

17           MR. HEFTER:  We move DX4031 into evidence, your Honor.

18           MS. NAWADAY:  No objection.

19           THE COURT:  Received.

20           (Defendant's Exhibit 4031 received in evidence)

21   Q.  If you will, Mr. O'Donnell, if you could find PX56 in the

22   government's binder.

23   A.  OK.

24   Q.  And do you recall that you were asked questions regarding a

25   document marked PX56?

D91TBAN2                      O'Donnell - cross

1    A.  Yes.

2    Q.  Maybe we can pull up PX56 for a second to remind the jury.

3         Now this document reflects results of QA audits for

4    loans funded between August 13, 2007 and September 10, 2007, is

5    that correct?

6    A.  Yes, application since 8/13.

7    Q.  And you see it reflects in the middle there, at least

8    through 8/31/07, 21 percent high risk?

9    A.  Yes.

10   Q.  Also you also see it reflects 29 loans were audited or

11   reviewed?

12   A.  Right, as part of the pilot.

13   Q.  Now let's turn back to DX4031.

14        Now halfway down the page do you see that document

15   refers to 29 loans were reviewed for QA?

16   A.  Yes, adding the three together, 29.

17   Q.  And also shows that it refers to 20.7 percent high risk?

18   A.  That's right.

19   Q.  So if you round that up, that's 21 percent, right?

20   A.  Right.

21   Q.  Now your testimony was that QA reports were measuring

22   whether or not a loan was invested in quality, right?

23   A.  In part, yes.

24   Q.  Let me direct your attention to the last page of the

25   document.  If could you blow up the top part.  Can you just

1    read the definition of high risk for me?

2    A.  Will be considered on loans with serious errors.  These

3    errors are not considered errors which will make the loan

4    unsaleable.

5    Q.  Let me turn your attention, Mr. O'Donnell, to DX4133.

6    A.  41?

7    Q.  33.  If you are can't find it I have extra copies.

8    A.  I can't seem to find it.

9            MR. HEFTER:  May I approach, your Honor?

10           THE COURT:  Yes.

11           This is such an exciting moment, we're now into 4100s

12   and here I need fingers and toes to count the numbers.

13   Q.  Do you have that in front of you?

14   A.  I do.

15   Q.  And this is an email from Michael Thomas to Michelle Tull.

16   Do you see that?

17   A.  I do.

18   Q.  And you're copied on it?

19   A.  Yes.

20           MR. HEFTER:  And we move DX4133 into evidence, your

21   Honor.

22           MS. NAWADAY:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit 4133 received in evidence)

25           MR. HEFTER:  Now if we could blow up that top part,

D91TBAN2                          O'Donnell - cross

 1     please.

 2     Q.  Now I believe you testified that there was a meeting among

 3     several people with Mr. Gissinger on March 17, correct?

 4     A.  That's true.

 5     Q.  And do you know what time of day that meeting took place?

 6     A.  I don't remember the exact time, no.

 7     Q.  And you're copied on this, correct?

 8     A.  I am.

 9     Q.  And who is Michelle Tull?

10     A.  I don't recall who Michelle was.  She may have been an

11     admin assistant.

12             MR. HEFTER:  If we just blow up the text of the email,

13     please.

14     Q.  It says:  Michelle, please bring copies of those attending

15     in person.  If printing on letter size, make sure to select

16     scale to fit paper, otherwise print on legal size.  Thanks.

17             Then it says:  See attached file FSL loan performance

18     and quality update 3/17/08.V8.PPT.zip.  Do you see that?

19     A.  I do.

20     Q.  Now do you have an understanding that this is Version 8 of

21     the PowerPoint presentation?

22     A.  I believe that would be what the V8 would indicate.

23     Q.  And this is an email from Mr. Thomas to his admin saying

24     please bring copies for those attending in person.  Do you see

25     that?

1   A.  Michael didn't have an admin, I'm not sure who Michelle

2   worked for.

3   Q.  But this is an instruction to somebody within the division

4   to print out the presentation for the meeting with

5   Mr. Gissinger, correct?

6   A.  Yes, it appears that way.

7   Q.  And do you have a recollection one way or the other as to

8   whether this is the presentation that was presented to

9   Mr. Gissinger?

10  A.  I haven't looked at the entire presentation.  I do know

11  there was a deck that looks very similar to this one that was

12  presented or at least sent to the meeting.

13  Q.  And if you turn your attention to page 5, so this is at the

14  page 5 of the document, correct?

15  A.  Yes, it is, page 5.

16  Q.  And this is a quality control update?

17  A.  Yes.

18  Q.  And this is reporting in the slide deck of a rereview of 97

19  SUS findings, correct?

20  A.  That's right, they would be for the full division.

21  Q.  Thank you.  Now let me turn your attention to Plaintiff's

22  Exhibit 301.

23          MR. HEFTER:  May I approach, your Honor?

24          THE COURT:  Yes.

25          MR. HEFTER:  Your Honor we move Plaintiff's Exhibit

1    301 into evidence.

2              MS. NAWADAY:  No objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 301 received in evidence)

5    Q.  So this is a document, Mr. O'Donnell, that says FSL loan

6    performance and quality review, Cliff Kitashima, 4/21/08?  Do

7    you see that?

8    A.  I do.

9    Q.  There's handwriting up top?

10   A.  Yes.

11   Q.  That's your handwriting, correct?

12   A.  It is.

13   Q.  And in fact, if you look at the number in the bottom right

14   on the other side, the other right, meaning the left, it says

15   Relator 385.  So this is a document that you provided to the

16   government?

17   A.  That's correct.

18   Q.  And if I turn your attention to page 4, that slide is

19   crossed out.  Do you see that?

20   A.  Yes.

21   Q.  And that's your cross out, correct?

22   A.  It is.

23   Q.  And then on the next page, page 5, it says:  Yes.

24              What did you mean by "Yes?"

25   A.  I believe that meant that this slide could stay in the

1    deck.

2    Q.  And then who is providing you the instructions about what

3    was going to stay in and what was going to stay out?

4    A.  I believe this is the deck that was the follow-up to the

5    3/17 meeting, and this was based on my discussion with Rebecca.

6    Q.  Thank you.  Let me turn your attention to DX4122.  Do you

7    have 4122?

8    A.  I do not see it.  Was it a hand out or in the binder?

9    Q.  It's in the binder, I'm sorry.

10           MR. HEFTER:  I have copies, your Honor, if I could

11   approach.

12           THE COURT:  All right.

13           MR. HEFTER:  Your Honor, I believe this document is in

14   evidence already and I just -- it's marked with two different

15   numbers.  I think it was admitted as with a different number.

16           THE COURT:  What's the number?

17           MR. HEFTER:  I'm trying to figure that out to avoid

18   confusion in the record.  DX1012.

19           THE COURT:  OK.

20           MR. HEFTER:  Thank you.

21   BY MR. HEFTER:

22   Q.  This is an email from you, to Mr. Thomas, correct?

23   A.  Yes.

24   Q.  Dated April 25th, 2008, right?

25   A.  That's correct.

1  Q.  If you could read that into the record what you said to

2  Mr. Thomas on that date.

3  A.  I know the feeling.  She's got rubber bullets in her gun

4  and we're going nuclear.

5  Q.  What did you mean when you said "we?"

6  A.  The risk organization.

7  Q.  Now Mr. O'Donnell, I believe you testified in response to

8  Ms. Nawaday's questions that this came a time when you prepared

9  a declaration?

10  A.  Yes.

11  Q.  That was in or around February of 2012?

12  A.  Right, when the lawsuit was filed.

13  Q.  That was your lawsuit that you filed?

14  A.  That's right.

15  Q.  And you provided this declaration to the government?

16  A.  I did.  Well, my attorney did, to be clear.

17  Q.  So that was going to be my next question for you.  So you

18  went and you retained an attorney, correct?

19  A.  I did.

20  Q.  And you and he worked on the declaration?

21  A.  We did.

22  Q.  And then you provided that declaration to the government,

23  correct?

24  A.  David did, David Wasinger.

25  Q.  He did that on your behalf?

1    A.  He did.

2    Q.  And in the declaration you describe the High-Speed Swim

3    Lane?

4    A.  I did.

5    Q.  And in the declaration you referred to the chief operating

6    officer of FSL, correct?

7    A.  That's correct.

8    Q.  And when you referred to the chief operating officer, you

9    meant Rebecca Mairone, correct?

10   A.  That was her role, yes.

11   Q.  But in the declaration that you prepared with your lawyer,

12   when you referred to the chief operating officer you were

13   referring specifically to Ms. Mairone, correct?

14   A.  I was.

15   Q.  In the declaration, you don't refer to any other individual

16   executive or employee of FSL, is that correct?

17   A.  Directly, no.

18   Q.  Now you also spoke to a number of different former

19   colleagues of yourself in or around this time period, correct?

20   A.  Some, yes.

21   Q.  And you told them that you -- they might be expecting a

22   phone call from the government?

23   A.  I did.

24   Q.  And you reached out to Mr. Comeaux?

25   A.  I did.

D91TBAN2                          O'Donnell - cross

```
 1   Q.  And you reached out to Mr. Kitashima?

 2   A.  I did.

 3   Q.  You reached out to Mr. Jaraba?

 4   A.  I did.

 5   Q.  And you reached out to Mr. White?

 6   A.  I did.

 7   Q.  You reached out to Mr. Sallis?

 8   A.  I did.

 9   Q.  You reached out to Mr. Thomas?

10   A.  I did.

11   Q.  And you reached out to Mr. Bridges?

12   A.  I believe I did.

13   Q.  And you told all those individuals that they may be

14   receiving phone call from the government?

15           MS. NAWADAY:  Objection, your Honor.

16           THE COURT:  Ground?

17           MS. NAWADAY:  Relevance.

18           THE COURT:  Overruled.  You may answer.

19   A.  Can you repeat --

20   Q.  Sure.  You told all the individuals we just discussed they

21   may be receiving a phone call from the government, correct?

22   A.  Something along those lines.

23   Q.  Now in your declaration you also said that senior

24   executives in charge of underwriting and risk were pushed

25   aside?
```

1    A.  Yes.

2    Q.  And you faulted Ms. Mairone for that, correct?

3    A.  I didn't know if it was her decision directly, but as part

4    of the Hustle the rules were certainly minimized, yes.

5    Q.  And you faulted her for minimizing the roles of those

6    individuals?

7    A.  For my role specifically, yes.

8              MR. HEFTER:  Thank you.  I have no further questions

9    at this time, your Honor.

10             THE COURT:  All right.  Redirect.

11   REDIRECT EXAMINATION

12   BY MS. NAWADAY:

13   Q.  Good morning, Mr. O'Donnell.

14   A.  Good morning.

15   Q.  You were asked some questions about the QoG reprieve over

16   the last few days.  Do you recall that?

17   A.  I do.

18   Q.  When did the Quality of Grade reprieve first go into effect

19   for the High-Speed Swim Lane?

20   A.  When the test or pilot was rolled out in August.

21   Q.  When did it end?

22   A.  I believe the QoG reprieve ended after the first month of

23   the following year in end of January.

24   Q.  So that's -- am I right that's a six-month reprieve on

25   Quality of Grade?

D91TBAN2                        O'Donnell - redirect

1   A.  September, October, November, December, January, part of

2   August, yes.

3   Q.  Can you recall a time that Full Spectrum had a lengthier

4   Quality of Grade reprieve?

5   A.  No, I don't believe that we ever had a Quality -- a QoG

6   reprieve that long.

7   Q.  And do you still have Plaintiff's Exhibit 427 in front of

8   you?

9   A.  Is that a binder?

10  Q.  I believe it was a separate document, an organizational

11  chart.

12          MS. NAWADAY:  Your Honor, may I approach?

13          THE COURT:  Yes.

14          MS. NAWADAY:  Ms. Michaud, if we could blow up the

15  boxes label Rosemead, Chandler and Richardson.

16  Q.  Do you recall, Mr. O'Donnell, that you identified a number

17  of underwriters on this chart?

18  A.  I do recall that.

19  Q.  Were the underwriters that you identified involved in the

20  Hustle work flow in any way?

21  A.  They were not the folks that were actually underwriting the

22  loans, no.

23  Q.  Were any other underwriters involved in the Hustle work

24  flow in any way during the Hustle pilot or the Hustle work flow

25  in the Central Fulfillment model?

1           MR. HEFTER:  Objection.

2           THE COURT:  Overruled.

3  A.  No, underwriters were only involved as an escalation point

4  outside of the work flow.

5  Q.  Mr. O'Donnell, you remember you were asked a number of

6  questions about the quality assurance process?

7  A.  Yes.

8  Q.  At one point last week you testified that the QA process

9  got plenty of focus from many levels.  Do you recall that?

10 A.  I do.

11 Q.  Can you just explain what you meant by that?

12 A.  The process itself was under attack.  The results were

13 challenged.  The people involved in the results were

14 challenged, including myself, and we were asked more than once

15 to provide more information, provide more data, and update the

16 process.

17           (Continued on next page)

18

19

20

21

22

23

24

25

DA13BAN2                          O'Donnell - redirect

1   Q.  Do you still have DX 4031 in front of you?  That was one of

2   the last exhibits you were handed.

3   A.  I do.

4   Q.  Can you please turn to the fourth page of that document.

5   Prime QA underwriting audit checklist.

6   A.  Okay.

7   Q.  Could you explain to us what the prime QA underwriting

8   audit checklist was used for?

9   A.  This was to guide the loan reviewers as they went through

10  the process with focuses on what they wanted them to review.

11  Q.  Which process specifically?

12  A.  The loan file review process.

13  Q.  You recall that the ratings at the end of the document

14  include acceptable risk, high risk, and severely

15  unsatisfactory?

16  A.  Yes.

17  Q.  At this time in or around August 31, 2007, were the

18  auditors instructed to use each of those three categories?

19  A.  Initially they did, yes.

20  Q.  What do you mean initially they did?

21  A.  There was a very strong response to the severely

22  unsatisfactory label because we were not -- the team doing

23  these was not from corporate QC.  So we later eliminated that

24  category in exchange for high risk.  High risk was the worst

25  rating, if you will, that a loan could get.

DA13BAN2                           O'Donnell - redirect

1   Q.  Who specifically instructed you to eliminate the severely

2   unsatisfactory rating?

3   A.  It was an outcome of the meetings that we had with the

4   steering committee.

5   Q.  Do you recall when that meeting was?

6   A.  I don't recall the exact date that that discussion took

7   place.  But it would have been early on when we were first

8   sharing results.

9   Q.  Who was in attendance at that meeting?

10          MR. HEFTER:  Objection, your Honor.

11          THE COURT:  Ground?

12          MR. HEFTER:  Foundation.

13          THE COURT:  Overruled.  If he was there, if he

14   remembers, he remembers.  If he doesn't remember, he doesn't

15   remember.

16   A.  I don't remember who was at this specific meeting.  The

17   attendees were generally the senior executives that we talked

18   about who were part of the steering committee.

19   Q.  Including Ms. Mairone?

20   A.  Yes, she was part of the steering committee.

21          MR. HEFTER:  Objection, your Honor.

22          THE COURT:  Overruled.

23   Q.  You were previously asked about purchase transactions in

24   connection with the High-Speed Swim Lane.  Do you recall that?

25   A.  I do.

DA13BAN2                          O'Donnell - redirect

1    Q.  Can you just explain what a purchase transaction is.

2    A.  It is when a borrower or borrowers are buying a property

3    they don't presently own.  And Countrywide in this case would

4    be providing the loan or financing to help them facilitate that

5    transaction purchase.

6    Q.  You testified that purchase transactions were supposed to

7    be cleared by an underwriter.  Do you recall that?

8    A.  Yes, that was one of the types of transactions that was

9    excluded from the Hustle.

10   Q.  What did you mean when you said it was supposed to be

11   cleared by an underwriter?

12   A.  We didn't -- well, it was a high-risk transaction because

13   there were different kinds of funds and different participants

14   in the transaction, so we excluded that from a loan specialist

15   being able to sign off on that loan.

16   Q.  Who, if anybody, was responsible for enforcing that

17   exclusion?

18   A.  The loan specialists would have to escalate that type of

19   application out of the process to an underwriter.

20   Q.  So was it up to the loan specialist to enforce that

21   exclusion?

22   A.  It was.

23   Q.  What, if any, consequences were there to a loan specialist

24   who processed a purchase transaction without underwriter

25   involvement?

1   A.  Because of the QoG suspension, there would not have been

2   any consequence.

3   Q.  You were previously asked about whether in or during the

4   Central Fulfillment reorganization, some underwriters became

5   loan specialists.  Do you recall that?

6   A.  I do.

7   Q.  How did you come possible aware of that?

8   A.  We had a series of regular meetings when staffing was being

9   built out for Central Fulfillment.  I was part of those

10  meetings.

11  Q.  Who else regularly attended those meetings?

12  A.  Members of the working group.  Loren Rodriguez, Mark

13  Barnett, Michael Thomas, myself, some members of the leadership

14  team that was at that point still central services, Jim White,

15  Robert Price.  They were going to be part of the initiative.

16  Q.  At those meetings, was there any discussion about moving

17  underwriters into the role of loan specialist?

18  A.  There was.  Since underwriters were not going to be part of

19  the new work flow, they were completely available.  And if they

20  weren't selected, they faced being let go from the company.

21  Q.  Did you in fact recommend that some underwriters be moved

22  into the role of loan specialist?

23  A.  Many, yes.

24  Q.  Did anyone respond to your recommendation?

25          MR. HEFTER:  Your Honor, limiting instruction, please.

1          THE COURT:  Yes.  This will be received with respect

2     to the banks, but not as to Ms. Mairone.

3     A.  This was a topic of hot debate within the working group.

4     Many were not interested in the underwriters moving over.

5     Q.  Do you remember specifically what anyone said?

6     A.  They preferred to select process loan specialists from the

7     NSCs, from the sales division, over the junior underwriters or

8     the underwriters.

9     Q.  Who in particular expressed a preference for loan

10    specialist as opposed to underwriters?

11    A.  Loren Rodriguez generally had the strongest view.

12    Q.  Did Mr. Rodriguez give you a reason for why he preferred

13    loan specialists to underwriters?

14    A.  He thought the underwriters would be too restrictive in

15    implementing the new work flow, that they would -- it wouldn't

16    move fast enough.  They would be too concerned about their

17    former role in underwriting and apply the same things they had

18    traditionally done.

19    Q.  You also testified concerning your familiarity with the

20    Fannie and Freddie guidelines around the 2006 time frame.  Do

21    you recall that?

22    A.  Yes.

23    Q.  Over the course of the 2007 time frame, would you say that

24    you had increasing familiarity with Fannie and Freddie

25    guidelines?

1              MS. MAINIGI:  Objection, your Honor.

2              THE COURT:  Ground?

3              MS. MAINIGI:  Leading and foundation.

4              THE COURT:  Overruled.

5    A.  I became more familiar because we were now funding prime

6    loans.  In early 2007 I was in charge of the group underwriting

7    those prime loans.  So I actually participated in some monthly

8    calls that Fannie specifically would hold with us to share

9    changes they were making to product or talk about findings they

10   were seeing on loans they had purchased.

11   Q.  I'm sorry.  You said you participated in monthly calls?

12   A.  I believe they were monthly.  I didn't participate in each

13   one.

14   Q.  Did anyone else participate in those calls from Full

15   Spectrum?

16   A.  Members of the quality assurance team normally would.

17   Q.  Do you have an understanding of the purpose of those calls?

18   A.  They were seen as an opportunity for us to increase our

19   knowledge.  As I said earlier, we were largely a subprime

20   company from top to bottom.  So we saw that as an opportunity

21   to learn a bit more.

22   Q.  To learn a bit more about what specifically?

23   A.  About prime loans and what was acceptable and not

24   acceptable.  The difference between prime and subprime, really.

25   Q.  Mr. O'Donnell, do you remember being shown a Full Spectrum

1   bulletin announcing the Central Fulfillment model?  It was I

2   believe DX 31.

3   A.  Yes, I remember this.

4   Q.  Do you know whether Full Spectrum bulletins were

5   distributed to anyone outside of Full Spectrum?

6   A.  No, they went to mailboxes within Full Spectrum.

7   Q.  Mr. O'Donnell, do you have an understanding of who the

8   primary purchasers were of Hustle loans during 2007 and early

9   2008?

10  A.  I don't know which loans went to which investors, but in

11  2007, 2008, Fannie and Freddie were the largest purchaser of

12  prime production.

13  Q.  Do you have an understanding as to whether loans sold to

14  Fannie and Freddie in that time frame were sold with any

15  representations as to quality?

16  A.  Fannie and Freddie used basically a rep and warrant model.

17  Which, because of the volume of loans that they buy, they don't

18  review every loan before they buy it.  They only review a small

19  sample and they rely on the people that -- the companies that

20  sell the loans to them to stand behind the loan in case there

21  is a problem or a defect.

22  Q.  Do you have an understanding of what the basic

23  representations were as to quality?

24            MS. MAINIGI:  Objection, your Honor.

25            THE COURT:  Ground?

1          MS. MAINIGI:  Foundation.  This was not a witness on

2     cross that had much knowledge of this.

3          THE COURT:  Well, lay a foundation.

4     Q.  Mr. O'Donnell, you testified that you had increasing

5     familiarity with Fannie and Freddie guidelines in the course of

6     2007.  Is that right?

7     A.  Yes.

8     Q.  That you participated in monthly calls with the Fannie and

9     Freddie?

10    A.  Some months, yes.

11    Q.  Did you ever discuss the representation -- and you

12    testified that you were aware that there were representations

13    made to Fannie and Freddie in conjunction with selling loans to

14    them, is that correct?

15    A.  I did.  I knew from repurchase -- the repurchase process

16    that I was involved in, that it took some time for them to look

17    at loans.  They didn't look at loans when they purchased them.

18    Q.  Do you have any understanding of what any of the

19    representations as to quality were?

20    A.  Based on the loans that I saw that came back with a request

21    to repurchase, I do.

22    Q.  Can you explain what any of those representations were.

23         MS. MAINIGI:  Objection, your Honor.

24         THE COURT:  Sustained.

25    Q.  Mr. O'Donnell, you were shown some e-mails in July and

1    August of 2007 about different aspects of the Hustle pilot.  Do

2    you recall that?

3    A.  I do.

4    Q.  If I could turn your attention back to DX 8 for a moment.

5    A.  Okay.

6              MS. NAWADAY:  Ms. Michaud, if we can go to page three

7    of the document, and blow up point one, QoG suspension.

8    Q.  Mr. O'Donnell, is that your response in blue?

9    A.  I believe it is, yes.

10   Q.  Can you read that for us.

11   A.  "I am okay with a suspension for 90 days for certain

12   elements of the QoG.  We should keep those tied to key areas

13   such as responsible lending, fraud affordability and

14   collateral."

15   Q.  Can you explain what you meant by the second sentence

16   there.

17   A.  I wasn't onboard with a full suspension of the QoG.  I

18   wanted to protect against areas where we would have the greater

19   risk that either a fraud could take place, or the borrower may

20   not be able to pay, the property may not be the type or value

21   that it need to be for the transaction to work.  Or these were

22   basically things that exposed us to repurchase requests.

23   Q.  You previously testified that you gave a conditional

24   acceptance to the Hustle pilot.  Do you recall that?

25   A.  I do.

1  Q.  What did you mean by that?

2  A.  The conditional approval was basically that we would move

3  ahead with the test, and then take data, look at the loans

4  after they funded, and then react.  Make adjustments.  That was

5  a very common practice within FSL.

6  Q.  If I could turn your attention to DX 14.

7       MS. NAWADAY:  Ms. Michaud, can you blow up the first

8  paragraph, please.

9  Q.  Mr. O'Donnell, do you recall being asked about this e-mail?

10  A.  I do.

11  Q.  In particular you were asked about the sentence "We're

12  going to move forward with allowing the loan specialist to

13  determine reasonability."

14  A.  Yes, as part of the test or pilot.

15  Q.  Yes.

16  A.  Yes.

17  Q.  Did you express any views as to the impact on quality as a

18  result of allowing loan specialists to determine reasonability?

19  A.  I did.

20  Q.  Who did you express those views to?

21  A.  To my boss, Cliff Kitashima.

22  Q.  Do you recall when that was?

23  A.  When we were having this discussion about which loans would

24  be part of the pilot and which would not be.

25  Q.  What view did you specifically express to Mr. Kitashima?

1                MS. MAINIGI:  Objection.

2                THE COURT:  Ground?

3                MS. MAINIGI:  Hearsay.

4                THE COURT:  It would be hearsay if it is offered for

5       its truth.  It is unclear to me what it is being offered for.

6                MS. NAWADAY:  Your Honor, may I approach?

7                THE COURT:  Yes.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MS. NAWADAY:  Your Honor, when we asked Mr. O'Donnell

3     about concerns that he expressed and passed along, most of

4     those lines of questioning are to get concerns being raised to

5     go to defendants' intent about warnings being raised and

6     ignored concerning the risk.

7              THE COURT:  I agree with you if the purpose is to show

8     that his boss was informed by him of concerns and then arguably

9     did nothing, then it would be not offered for its truth.  It

10    would be an exception to the hearsay rule.  If that's the

11    purpose, then I will receive it as such.

12             MS. MAINIGI:  With all due respect, your Honor, I

13    guess, well, I reserve the right to strike.  It is being

14    offered to provide a view different than one on the paper.  The

15    paper expresses his contemporaneous view of his position at the

16    time.

17             THE COURT:  Let's say on paper he says the moon is

18    made of blue cheese.  And here he says, no, I informed my boss

19    that the moon is made of green cheese.  Assuming it is not

20    offered for its truth, which I assume in both of these would be

21    the case, the fact that the paper shows one thing doesn't mean

22    he can't testify that he said something else.  You of course

23    can cross-examine him.  Are you saying that what you said

24    orally such-and-such when on this paper you say something

25    different.  That's cross-examination.  But it is not a ground

DA13BAN2                        O'Donnell - redirect

1    for inadmissibility.

2              MR. HEFTER:  Is it your practice to explain to the

3    jury at this point in time or is that not your practice?

4              THE COURT:  Do you really want me to explain that?

5              MR. HEFTER:  No, that's okay.  I was just inquiring as

6    to your practice.

7              MS. MAINIGI:  I would like you to explain that it is

8    not being offered for the truth of the matter --

9              THE COURT:  But rather these alleged concerns were

10   brought to the attention of his boss.  And you may consider it

11   for that purpose, if you find it credible.  That's what I would

12   have to say.  Do you want me to say that?

13             MR. HEFTER:  We'll let the record -- we'll rely on the

14   record, your Honor.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court).

2          THE COURT:  The objection is overruled.  You may

3    answer.

4    A.  Would you repeat the question, please?

5    Q.  Sure.  What did you say to Mr. Kitashima?

6    A.  I pointed to Cliff to the struggles underwriters were

7    already having in prior -- in the two or three prior quarters

8    with stated income loans.  And I don't remember the exact words

9    I used, but I said if underwriters were already struggling,

10   untrained loan specialists were not going to be capable of

11   getting this right.

12   Q.  Did you recommend at any point that stated income loans be

13   excluded from the Hustle work flow?

14   A.  Yes.  Based on the findings that we were having, I

15   recommended that they be rerouted to underwriters.

16   Q.  Who did you make that recommendation to?

17   A.  Cliff, the working group and the steering committee.

18   Q.  You also testified previously about the role of CLUES in

19   loan processing and underwriting, do you recall that?

20   A.  I do.

21   Q.  Are there certain underwriting tasks that CLUES cannot

22   perform?

23   A.  Yes.  A number of them.

24   Q.  Can you explain what those are.

25   A.  CLUES only reads data that's put into the system basically.

1   So it can't look at an appraisal, it can't determine if fraud

2   is existing on a paystub or a tax return.  It can't read or

3   determine if a proof of employment is accurate, or whether the

4   title report shows that my wife and I really own the home that

5   we say we do.

6          So there is a lot of nuances that need to be done with

7   human hands and eyes.

8   Q.  Do you recall that you were also asked about fulfillment

9   centers in Central Fulfillment including Rosemead, Chandler and

10  Richardson?

11  A.  Yes.

12  Q.  Was there also at some point a Central Fulfillment center

13  in Hatboro, Pennsylvania?

14  A.  There was one that got opened in Hatboro, yes.

15  Q.  Was there also at some point a fulfillment center in Plano,

16  Texas?

17  A.  There was.  That's where the NCA was originally housed.

18  Q.  When you joined Full Spectrum, Mr. O'Donnell, was the Full

19  Spectrum Lending Division a part of Countrywide Home Loans?

20  A.  It was.

21  Q.  Did there come a time in 2007 when that changed?

22  A.  I believe we moved under Countrywide Bank in 2007.

23  Q.  Do you have an understanding of the reason for that change?

24  A.  I believe that was Alice Basmadjian's area of

25  responsibility.  She also worked for Cliff.  I believe the

1    reason was we could get the state exemption and work under the

2    federal exemption for compliance laws.

3    Q.  Mr. O'Donnell, do you still have DX 157 in front of you?

4    A.  Yes.

5    Q.  This presentation took place approximately three months

6    before the Hustle pilot, is that right?

7    A.  Yes.  May.  May of 2007.

8    Q.  Could you tell me what, if anything, this presentation has

9    to do with the Hustle?

10   A.  Nothing.  This is about central underwriting, one of the

11   groups that I managed.

12   Q.  Mr. O'Donnell, could you please turn next to DX 701.

13   A.  Okay.

14           MS. NAWADAY:  Ms. Michaud, can we please go to page

15   three of the document.  Can we blow up the paragraph that

16   begins "as Cliff mentioned yesterday."

17   Q.  Mr. O'Donnell, do you recall being asked about the funding

18   target of $1.9 billion?

19   A.  Yes.

20   Q.  Did you set the funding goal of $1.9 billion?

21   A.  No, I did not.

22   Q.  Do you have an understanding of who did?

23           MR. HEFTER:  Objection, your Honor.

24           THE COURT:  Sustained.

25   Q.  Mr. O'Donnell, you were also asked about DX 4053.  If you

DA13BAN2                         O'Donnell - redirect

1    could turn back to that.  Actually, Mr. O'Donnell, if we can go

2    back just to DX 701 for one second.

3    A.  Okay.

4    Q.  If we can direct your attention back to the e-mail that you

5    authored at the bottom of page two going into page three.  You

6    see that Mr. O'Donnell?

7    A.  Yes.

8    Q.  Did anyone ask you to send that e-mail?

9    A.  I believe we were asked by Greg --

10            MR. HEFTER:  Objection, your Honor.  As to

11   Ms. Mairone.

12            THE COURT:  Yes.  This answer would be received as to

13   the banks, but not Ms. Mairone.

14   A.  I believe we looked at an e-mail yesterday from Greg

15   Lumsden where he asked to know which of the leaders of each

16   area of the company were going to be to ensure we get our

17   December budget.

18   Q.  Now we can turn back to DX 4053.  You were asked about a

19   sentence in that document that says the OMs and LSs are getting

20   pounded by quality assurance audits.  Do you recall that?

21   A.  Yes.

22   Q.  Was the quality assurance process in -- that e-mail is

23   dated November 16, 2007, correct?

24   A.  Yes.

25   Q.  Was the quality assurance process new in November of 2007?

DA13BAN2                    O'Donnell - redirect

1   A.  No.

2   Q.  How long had it been around?

3   A.  It had been around predating our move to prime.  I had used

4   it specifically for my underwriters when we were underwriting

5   subprime loans.

6   Q.  Had the QA process always been under your supervision?

7   A.  Yeah, yeah, it had.  I didn't -- we had employees in India.

8   I didn't supervise them directly, but I had a dotted line to

9   the manager.

10  Q.  Prior to November 2007, were the QA results always

11  distributed to line level staff?

12  A.  They were.  We gave them the findings for the loans they

13  worked on to help increase their level of training and point

14  out places where they had made errors.

15  Q.  Mr. O'Donnell, you were also shown some e-mails from

16  December of 2007 regarding QA meetings.  And I'll draw your

17  attention to DX 4076 in particular.  Do you have that?

18  A.  I do.

19  Q.  So during this period, December 2007, were QA reports

20  distributed to loan specialists?

21  A.  No.  That stopped at the end of November.

22  Q.  Were the QA reports sent to Ms. Mairone?

23  A.  They were.

24  Q.  If I could turn your attention to DX 4078.  Were the QA

25  results attached to that e-mail sent to loan specialists?

1    A.  They were.  This is the e-mail we looked at yesterday with

2    the Excel spreadsheet with the QA results.

3    Q.  These were sent to loan specialists?

4    A.  No.

5          MS. MAINIGI:  Objection.

6          MR. HEFTER:  Objection.

7          THE COURT:  Well, I'll allow it.  Overruled.

8    A.  Can you repeat the question?

9    Q.  Sure.  Were the QA results attached to this e-mail

10   distributed to loan specialists?

11   A.  No.  The loan specialists would not have received results

12   like this after November.

13   Q.  But these QA results went to Ms. Mairone, correct?

14   A.  They did.

15   Q.  If I could turn your attention back to DX 54.  Do you

16   recall being asked about this quality control and assurance

17   summit in January 2008?

18   A.  I do.

19   Q.  Did Ms. Mairone attend this quality summit?

20   A.  I don't believe so.

21   Q.  Were underwriters brought back into the Hustle work flow as

22   a result of this quality summit?

23   A.  No, they were not.

24         MS. NAWADAY:  Your Honor, may I approach the witness?

25         THE COURT:  Yes.

1   Q.  Ms. O'Donnell, I've just handed you an e-mail chain.  The

2   top exhibit is dated January 29, 2008.  Is that correct?

3   A.  Yes.

4            MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

5   95 into evidence.

6            MR. HEFTER:  May we have a moment, your Honor?

7            THE COURT:  Yes.

8            MS. MAINIGI:  No objection, your Honor.

9            MR. HEFTER:  No objection, your Honor.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 95 received in evidence)

12           MR. HEFTER:  Your Honor, may we approach?

13           THE COURT:  Yes.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. HEFTER:  Your Honor, I don't know where the

3    government is going on this, but Mr. O'Donnell's name does not

4    appear at all in the document.  So I have no idea.

5              THE COURT:  Hold on.

6              MS. NAWADAY:  Your Honor, can I explain.

7              THE COURT:  Sure.

8              MS. NAWADAY:  Our approach with this is the same with

9    the other two exhibits that we introduced that there were no

10   objections to and we don't have a live witness.  It makes the

11   most sense in terms of the jury understanding the issues to

12   introduce it at this point in the testimony and the chronology.

13   I will not be asking him questions about the document.  I will

14   just be highlighting one portion and moving on.

15             MR. HEFTER:  Well, that's the problem with respect to

16   highlighting one portion of it.

17             MS. MAINIGI:  Hugely prejudicial.  I don't know what

18   this has to do with redirect after cross-examination.  It is

19   not a document we utilized.

20             THE COURT:  All I know is both of you, after taking a

21   minute, just said "no objection."  So it is in evidence.  So,

22   the only question now is whether it's somehow unfair to have

23   counsel read from it now as opposed to read from it later.  And

24   the reason she wants to read from it now is because it puts in

25   context other things that he is testifying about, which was

DA13BAN2                      O'Donnell – redirect

1    what the Court instructed all parties to do with a document

2    that doesn't have a witness attached to them.  So the objection

3    is overruled.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  95 is received.

 3              MS. NAWADAY:  Ms. Michaud, can we please blow up

 4   Ms. Mairone's e-mail dated January 26 and the first paragraph

 5   of that e-mail.

 6   Q.  Mr. O'Donnell, you see that this e-mail from Ms. Mairone is

 7   dated January 26, 2008?

 8   A.  I do.

 9   Q.  The quality assurance summit took place on January 3, 2008,

10   just three days earlier, is that right?

11   A.  23, yes.

12   Q.  Can you please read for us the first two sentences of

13   Ms. Mairone's e-mail.

14   A.  "Below are the operations objectives for the month of

15   February and into March.  The biggest topic is to fund 15,000

16   loans in our current pipeline and most focus will be on this

17   initiative."

18   Q.  Thank you.  You testified earlier that underwriters were

19   brought back into the Hustle work flow sometime around

20   May 2008, is that right?

21   A.  I believe that's true.

22              MS. MAINIGI:  Objection.

23              THE COURT:  I'm sorry.

24              MS. MAINIGI:  Objection, your Honor.

25              THE COURT:  No, I think that objection, which would
```

otherwise be valid, was waived by questions that were put on

cross regarding his understanding in this regard.  Overruled.

Q.  Mr. O'Donnell, approximately how long had the Hustle work

flow been in operation by May of 2008?

A.  It started in mid August and ran all the way through the

end of May.

MS. NAWADAY:  Thank you, nothing further.

THE COURT:  All right.  Anything else?

MS. MAINIGI:  One moment, your Honor.  No questions,

your Honor.

MR. HEFTER:  No questions, your Honor.

THE COURT:  Thank you very much.  You may step down.

All right, ladies and gentlemen, we'll take our

midmorning break.  Because of several matters I have to take up

with counsel, it will probably be 20 minutes.  So we'll see you

in 20 minutes.

(Witness excused)

(Jury excused)

(Continued on next page)

DA13BAN2

1        THE COURT:  Defense counsel had an objection to

2   Mr. Hansen's testimony.

3        MR. SMURZYNSKI:  Yes, your Honor.  Ken Smurzynski for

4   the bank defendants.

5        Your Honor, Mr. Hansen is a FHFA OIG senior IT

6   auditor.  He is not a percipient witness.  He has no personal

7   knowledge of the events.  We received from the government two

8   demonstrative exhibits that they indicated they intend to use

9   with Mr. Hansen.  And in reviewing them, it becomes clear that

10  he is being used as an expert witness, even though he was not

11  disclosed as an expert.

12       THE COURT:  So let me take the liberty of interrupting

13  you and find out from the government.  So what is Mr. Hansen

14  going to testify about?

15       MR. ARMAND:  Are you asking the government, your

16  Honor?

17       THE COURT:  Yes.

18       MR. ARMAND:  Yes.  Pursuant to Federal Rule of

19  Evidence 1006, he is going to be summarizing the banks' own

20  data.  We are not offering him as an expert witness.  That rule

21  specifically contemplates, and the case law supports, that as

22  long as you're not dealing with complex calculations and the

23  underlying evidence is admissible.

24       What he is going to testify is just what the data

25  shows.  The number of Hustle loans, the number of loans that

 1   were self-reported, these are all just fields that are in the

 2   data.  Also with regard to the QA, the quality assurance

 3   reports, the number of loans that went through the QA process

 4   and had high risk that were Hustle loans and the percentage of

 5   how many of those -- the percentage of high risk loans that

 6   applied to the Hustle loans.

 7           This is just a matter of sorting the data, and it is

 8   really just to make the presentation clearer for the jury.

 9   Otherwise, they can't take the data into the jury box with

10   them.

11           THE COURT:  Let me hear from defense counsel.

12           MR. SMURZYNSKI:  Your Honor, may I approach because

13   perhaps with the demonstrative in hand, some of this will be

14   clearer.  The government already has this but let me give them

15   a copy as well.  Your Honor, it has been printed on both sides

16   so those are the two demonstratives.

17           Let me start with the first, which is the one that is

18   entitled total HSSL income.  Mr. Hansen is not summarizing.

19   Mr. Hansen is testifying first about an issue that is hotly in

20   dispute, that is to say the population of the HSSL loans.

21   Number one.  And then number two, he's not simply summarizing.

22   He's manipulating the data, he is making determinations, he is

23   then presenting it.  Your Honor would not be the least bit

24   shocked to see the chart that's in front of you offered by an

25   expert witness.  In fact --

DA13BAN2

```
 1           THE COURT:  So wait a minute.  Both you folks are
 2   talking in generalities.  I need to get to the particulars
 3   before I can rule.  So, let's take the chart that you're just
 4   referring to.  And what this appears to show is the income
 5   earned on -- what does GSE stand for?
 6           MR. ARMAND:  Government sponsored enterprises.
 7           THE COURT:  All right.  Earned by who?
 8           MR. ARMAND:  By the bank.  It is one of the fields.
 9           THE COURT:  Which bank?
10           MR. ARMAND:  It's in the data.  There is an income
11   earned from Countrywide Bank.
12           THE COURT:  Because I learned the other day that the
13   defense is now making some distinction between the two
14   Countrywide entities.  What is the relationship between the two
15   Countrywide entities?
16           MR. ARMAND:  I believe that Full Spectrum was
17   initially part of Countrywide Home Loans and was then
18   transferred to part of Countrywide Bank, and this was as
19   Mr. O'Donnell just testified.  And the banks' data, we
20   requested that they provide a field for income that was earned
21   from the sale of the loans, and that's a specific field that's
22   in there.  This is just --
23           THE COURT:  So, thank you.  So then that's plotted
24   against the Hustle loans income.  So, all of that is simply a
25   plotting of voluminous data.  If this were two charts instead
```

DA13BAN2

1      of one, I don't see how there could be any objection.  We'll

2      get to the fact that it is one in a minute.

3              But do you disagree if this was two charts, there

4      could be no objection to it?

5              MR. SMURZYNSKI:  Let me first, yes, disagree with

6      that.

7              THE COURT:  Tell me why you disagree with it.

8              MR. SMURZYNSKI:  Your Honor, it's because what

9      Mr. Armand stated is in fact incorrect.  That the data here

10     does not reflect whether the income -- and we can talk about

11     that in a moment.  This income figure.  But it doesn't reflect

12     whether that's income to Countrywide Bank, FSB, Countrywide

13     Home Loans, or some other Countrywide entity.  It doesn't

14     distinguish amongst that at all.

15             THE COURT:  And I have extreme doubts as to the

16     distinction that you are making in this case about it.  But it

17     would be, since you're both defendants, this could be fairly

18     said to be their collective income.

19             MR. SMURZYNSKI:  So that's the first issue that I

20     would raise.  Secondly, your Honor, it refers to income.  It is

21     entirely unclear what Mr. Hansen is going to say about how he

22     determined this is any entity's income.

23             THE COURT:  Was this recorded as income?

24             MR. SMURZYNSKI:  No, your Honor.  It was not recorded

25     as income.

DA13BAN2

1          THE COURT:  How was it recorded?

2          MR. SMURZYNSKI:  This comes from a field within the

3     banks' data that aggregates a number of different items.  When

4     it is the origination fees --

5          THE COURT:  I don't want to know all that.  I want to

6     know how these items were recorded.

7          MR. SMURZYNSKI:  How -- the ones on what the chart

8     reflects?  The chart reflects a field in the banks' data that

9     reflects how the division tracked certain amounts associated

10    with these loans.  It doesn't tie to the general ledger.

11          Just to be clear, your Honor.  This is the problem

12    with having Mr. Hansen come in who has no familiarity with this

13    information.  He has no personal knowledge.  Come in and state

14    that this is what he thinks this means.

15          THE COURT:  Let me ask the government.  Was the bank

16    asked to supply the government with the data showing each of

17    these two income calculations?

18          MR. ARMAND:  Yes.  We asked the defendants --

19          THE COURT:  Did you expressly ask for income?

20          MR. ARMAND:  Yes, your Honor.

21          THE COURT:  And this is what you got in response?

22          MR. ARMAND:  Correct, your Honor.

23          THE COURT:  How can you possibly, let me ask defense

24    counsel, contend this is not what the banks said was income?

25          MR. SMURZYNSKI:  Let me just consult on that for a

1     second.  Because I know what the field says.  I need to check

2     on what in fact was requested by the government.

3              MR. ARMAND:  If I could also just add, your Honor, we

4     asked the banks' Rule 30(b)(6) witness at his deposition what

5     the income reflected, and he said it was fees -- I don't have

6     the testimony in front of me, but it was fees in connection

7     with the origination of the loan, and postings from the sale.

8     He said the information came from the finance team, but he

9     couldn't tell me exactly who the finance team was.  So, this is

10    the banks' information about the income and we're relying on

11    it.

12             MR. SMURZYNSKI:  Your Honor, the 30(b)(6) witness

13    testified there were two components to the number.  As

14    Mr. Armand said, one was origination fees, and the second was

15    an estimate, again, doesn't tie to the general ledger, but an

16    estimate of certain future potential revenues.

17             THE COURT:  So, whatever he said is binding on the

18    banks.

19             MR. SMURZYNSKI:  I agree with that.

20             THE COURT:  So does this data reflect that?  What he

21    said was income?

22             MR. SMURZYNSKI:  This data -- no.  The question that

23    was asked of him was what does column whatever in the data

24    field represent.  And we have his question and answer and we

25    can bring it up.  It doesn't, as I described, doesn't tie to

DA13BAN2

1     the general ledger, it is not certainly not --

2            THE COURT:  Are you saying to me that the bank doesn't

3     calculate its income?

4            MR. SMURZYNSKI:  The bank certainly calculates its

5     income in the aggregate.  It doesn't calculate the income on a

6     loan-by-loan basis such that you can tie certain amounts --

7            THE COURT:  How does it calculate its income in the

8     aggregate without having to calculate how much it is on an

9     item-by-item basis?

10           MR. SMURZYNSKI:  Because it sells pools of loans that

11    include HSSL loans and non-HSSL loans.  When it sells that pool

12    of loans, it recognizes a gain across the pool.

13           THE COURT:  So you are saying they calculate the

14    income, and they must have the capacity to break that down.  If

15    it is done across the pool, then the portion of the pool that's

16    Hustle is the Hustle income, the portion of the pool that's

17    non-Hustle is the non-Hustle income.  Although I thought these

18    pools themselves were divided into Hustle and non-Hustle pools.

19           MR. SMURZYNSKI:  Absolutely not, your Honor.

20           THE COURT:  So I go to my first point.  What would you

21    need to know to calculate income is what portion of the pool is

22    Hustle and what portion is not Hustle.

23           MR. SMURZYNSKI:  There is a potential allocation

24    someone could make.  All of this could have been explored in

25    the depositions by the government.  But what we had instead is

DA13BAN2

 1    a theory that's emerged from the government for the first time

 2    in the pretrial order with respect to gain.  We never saw that

 3    figure before.  What we have is a late attempt to put in expert

 4    testimony.

 5         THE COURT:  He presumably is going to say I took this

 6    item, this item, this item, added them up and got this.  And

 7    so, your objection, if any, is to the basis on which he labels

 8    that income, either for Hustle or non-Hustle.

 9         MR. SMURZYNSKI:  Let me get to the predicate to all

10    that, your Honor.  My first and foremost objection is to him

11    saying these are the population of HSSL loans, because there is

12    no agreement on what that population is.  So that's his first

13    opinion.  That if I apply certain characteristics, it is not

14    entirely clear what they are going to be, that my opinion is

15    those characteristics constitute a Hustle loan.  That is

16    plainly opinion.  There is no fact.  He is not going to be able

17    to -- there is no agreement on that, there is no fact on the

18    record.

19         THE COURT:  Let me hear from the government on that.

20         MR. ARMAND:  Your Honor, all he is doing is applying

21    criteria to the data and sorting it.  It is not an opinion.

22    We've heard testimony from two witnesses about when the Hustle

23    period started, so he can use that as he is going to sort it

24    based on the start date of August 13 of 2007.  We've heard

25    testimony about when it ended, May 21, 2008.  Based on that

DA13BAN2

1      bulletin, that's when it ended.  We've heard testimony about

2      the branches that were involved.  The branch codes are in there

3      and the branches are in there.  It could be sorted.  That's all

4      he is doing.  And prime CLUES accept, that's also in there, he

5      can sort it.

6              THE COURT:  So what I'm hearing from the government is

7      he was given a set of criteria, all of which are in evidence

8      already, although even, if that were not true, as long as they

9      come into evidence at some point it would be sufficient, and

10     applied those criteria.  He didn't express any opinion as to

11     whether it was the right criteria or the wrong criteria.  He

12     just applied those criterion based on other evidence which

13     you're free to ask him.  So if any of these criteria are wrong,

14     then your calculation is wrong, yes?  That would be a fair

15     question.  But he's not giving an opinion.  He's just in effect

16     operating like a computer.

17             MR. SMURZYNSKI:  Your Honor, it is not clear, but

18     perhaps after this colloquy it is, that Mr. Hansen is not

19     giving an opinion that these are in fact the population of HSSL

20     loans.  If he testifies I'm simply a human Excel machine and

21     I've applied these criteria, I have no idea whether they're

22     correct or not, that's a somewhat different matter.  But we

23     still have an objection to it.

24             THE COURT:  I think he has to put some label on it to

25     have any meaning.  So if this is what the government contends

DA13BAN2

1    are Hustle loans.  But, he can't say that's what I think are

2    the Hustle loans.  I agree with you on that.  But he certainly

3    could say this is what my understanding is the government

4    contends are the Hustle loans.

5              MR. SMURZYNSKI:  Again, your Honor, the second chart

6    is a demonstrative that purports to show the percentage of

7    Hustle loans and the 2007 QA reports that were rated high risk

8    or action required.  We've tried to replicate the government's

9    chart.  We have objections to Mr. Hansen doing that, but I

10   think we've already talked about that basic issue and you have

11   our objection to that.

12             We have a further problem with this chart in that we

13   can't replicate it.  Therefore, we believe it's inaccurate.

14             THE COURT:  Let me ask the government.  How did he

15   prepare this chart that we're now talking about, the chart

16   that's labeled 76 percent of Hustle loans in 2007 QA reports

17   were rated high risk or action required.

18             MR. ARMAND:  Yes.  So what Mr. Hansen will testify

19   that he did was that using the criterion for the Hustle loans I

20   just described that were provided to him, he determined the

21   population of what the government contends is the Hustle loans.

22   That's about 28,000 loans and change.  Using the loan ID

23   numbers, from each of those loans, he looked in the defendants'

24   own quality assurance reports, which are also listed here, and

25   found the loan by ID number which ones were Hustle loans, and

DA13BAN2

1    they also have in the database in these quality assurance

2    reports it indicates which ones have been flagged as no risk,

3    limited risk, action required, high risk.

4              THE COURT:  Let me stop you there.  So, did you try to

5    do that?

6              MR. SMURZYNSKI:  We tried to do that.  We don't get

7    the same numbers.  If there is an interim piece of work paper

8    that brings us from this enormous database to this chart, we

9    could then review it and see whether we agree that this

10   demonstrative in fact reflects an accurate summary of that

11   data.  But we can't do that based on Mr. Armand's statement

12   today.

13             THE COURT:  If you cannot replicate it because you

14   think it's wrong, in other words you think he didn't do his job

15   right, to prove that, you would have to call your own summary

16   witness who would say I did exactly what Mr. Hansen said he

17   did, and the results are different.  And I would allow you to

18   do that, if that's in fact what emerges.

19             MR. ARMAND:  Your Honor, I'm happy to work with them

20   to -- they have all of this information.  And I'll try to get

21   to the bottom of it.  We don't want to put anything up that's

22   wrong.

23             THE COURT:  When did you first get this chart?

24             MR. SMURZYNSKI:  We received it over the weekend, your

25   Honor.

DA13BAN2

```
 1            THE COURT:  This past weekend.

 2            MR. SMURZYNSKI:  Yes.

 3            THE COURT:  So they haven't had a chance to do the

 4   kind of review that they might need to do.  I encourage the

 5   government to work with them.  And if in the end they think

 6   that having run the same -- that they added together 7 and 9

 7   and 16 and 24 and 35 and come to a different total than you

 8   come to, then they can call their summary person to say that on

 9   their case.

10            So, I will allow him to testify.  Anything else?

11            MR. SMURZYNSKI:  Not on Mr. Hansen.

12            MR. MUKASEY:  Judge, I think we are going to ask for a

13   limiting instruction as to Ms. Mairone with regard to all of

14   Mr. Hansen's testimony.

15            THE COURT:  Why?

16            MR. MUKASEY:  Well, because I'm not sure that his

17   number crunching can be tied in any way to Rebecca Mairone the

18   individual.  And Rebecca Mairone the individual is the

19   defendant here.

20            THE COURT:  No.  That's like saying if in furtherance

21   of a scheme to defraud Mr. Jones used the mails in execution of

22   that scheme and Ms. Mairone didn't know about that, never even

23   knew who Mr. Jones was, that that wouldn't satisfy the mailing

24   requirement.

25            MR. MUKASEY:  I agree with that.
```

DA13BAN2

1          THE COURT:  So I don't see what the difference is

2    here.  This is intended to show not anything about

3    Ms. Mairone's intent, but rather how the Hustle loans, of which

4    her connection is not in doubt, to which her connection is not

5    in doubt, operate.

6          MR. MUKASEY:  I'm not sure --

7          THE COURT:  Whether they were risky or not, etc.

8          MR. MUKASEY:  I just don't think that the analysis

9    that, as I understand it, we are going to hear from this

10   witness --

11         THE COURT:  I'll make the analogy a little different.

12   Because I agree with you, my first one was pretty poor.

13         If, hypothetically, Ms. Mairone puts in place a

14   process that leads to loans being riskier than they're being

15   portrayed, she may not know how that played out with respect to

16   any given loan or even collectively all the loans, but she

17   would still, it would still be relevant to her liability for

18   having put that into place.  It wouldn't be sufficient to

19   establish her liability, but it would be relevant to her

20   liability.

21         MR. MUKASEY:  But if you're talking about crunching

22   numbers on Hustle loans versus non-Hustle loans and summarizing

23   those numbers, there is no connection, potentially, to

24   Ms. Mairone's activity with regard to some of the numbers that

25   Mr. Hansen is crunching.

DA13BAN2

```
 1              THE COURT:  Well, the one you said across the board.
 2     The one we were looking at last was the percentage of Hustle
 3     loans that were rated high risk.  So that doesn't raise the
 4     issue you're just now referring to at all.  The issue you're
 5     falling back on is the comparison of Hustle with -- again, it's
 6     not with non-Hustle really, it is with the total income earned
 7     over all.
 8              MR. MUKASEY:  Which can't be tied to her I don't think
 9     in any way specifically.
10              THE COURT:  Well the Hustle part could.
11              MR. MUKASEY:  I think it's --
12              THE COURT:  The income earned on the Hustle could.
13              MR. MUKASEY:  I think it's tenuous right because how
14     do you quantify one individual's connection to all the loans?
15              THE COURT:  The only part of what Mr. Mukasey is
16     saying gives me pause as to Ms. Mairone is with respect to the
17     chart that compares Hustle income to total income.  Is that
18     what that chart is comparing?
19              MR. ARMAND:  Yes, your Honor.
20              THE COURT:  So, the connection of Ms. Mairone, the
21     relevance of Hustle income to Ms. Mairone the Court believes
22     has been shown.  The question is this appears to show, if I
23     understand it, how significant Hustle income was with respect
24     in comparison with total income on purchases by Fannie Mae and
25     Freddie Mac, yes?
```

DA13BAN2

1          MR. ARMAND:  Correct.  It is just to give some context

2     to the amount of income.

3          THE COURT:  How does that tie to Ms. Mairone?

4          MR. ARMAND:  Well, because there is a push for

5     production towards the latter part of 2007 and the beginning of

6     2008.  There is the November 29 e-mail from Ms. Mairone --

7     talking about pushing --

8          THE COURT:  It is the shift from subprime to the

9     prime.

10          MR. ARMAND:  Well, they're trying to hit -- this

11     supports the view that they're trying to hit their volume

12     goals, they're pushing to produce more loans.

13          THE COURT:  Which there has already been evidence she

14     was aware of.

15          MR. ARMAND:  Correct.

16          THE COURT:  All right.  Yes, so I will overrule the

17     objection.

18          MR. MUKASEY:  Would your Honor consider giving us the

19     chance to brief it depending on how the testimony comes out?

20          THE COURT:  I've been very liberal in giving folks --

21     but I am not going to hold up a witness who was ready to

22     testify.  I thought the reason we were having this discussion

23     today is because he was like the next witness or one of the

24     next witnesses.

25          MR. ARMAND:  Yes.  Last night when we had the

DA13BAN2

1    discussion about repurchases, that was another thing that was

2    going to be in the data, and so your Honor had suggested we

3    wait to put in evidence on the repurchases until later in the

4    case.  So we're moving him later.

5         THE COURT:  So if you want to put in a brief by

6    tomorrow that will be fine.

7         MR. MUKASEY:  I appreciate that, Judge.

8         THE COURT:  Five pages single spaced.

9         MR. MUKASEY:  Thank you.

10        MR. SULLIVAN:  One other quick issue on Cindy

11   Simantel.  On Sunday one of our attorneys had a conversation

12   with her in which she said for the first time she might not be

13   able to come to trial.  Focusing on trial this week, because of

14   an injury of a child.

15        THE COURT:  Who?

16        MR. SULLIVAN:  Cindy Simantel.  Because of an injury

17   of a child and because of potential surgery.  I believe we have

18   a divergence of interest here, and I feel compelled to advise

19   her that if she wants counsel, independent counsel would be

20   provided to her.  Because I'm fearful that the next

21   conversation with her she could be asking about whether in fact

22   she has to come.  I don't want as company counsel to be

23   involved in suggesting one way or another as to whether she

24   should come, because of course there is no obligation for her

25   to come.

DA13BAN2

```
 1          Most importantly, it seems to me, given what's
 2   occurred in the court discussion on Friday, the government's
 3   emphasis on her as being a bad actor, a liar, wanting to bring
 4   her testimony into the case, it is absolutely clear to me she
 5   should have counsel to prepare her testimony, if she in fact
 6   comes.  And I for one would be very reluctant to have company
 7   counsel --
 8          THE COURT:  I think your point is well taken.  Here's
 9   what I think makes sense.  I think you should tell her that the
10   Court has not yet decided whether or not her testimony will be
11   admissible.  But that she may, given the possibility that she
12   may be called, she may want to have counsel to advise her.  And
13   if she does, it would have to be independent counsel, not you.
14   And that I assume that the bank is prepared to pay for her -- I
15   shouldn't say the bank.  The banks, all three of them.  To pay
16   for her counsel and you can so advise her of that.
17          And the only thing I'm thinking aloud about is whether
18   you should then suggest counsel to her.  Everything up to then,
19   up to that point I think is fair game.
20          MR. SULLIVAN:  May I suggest, your Honor, on that
21   point what I would anticipate saying is that there is a counsel
22   already familiar with the facts that has represented some Bank
23   of America employees.  So I would propose to say if she wanted
24   to use that counsel, she could.  But if she wanted to select
25   her own independent counsel, that would be all right as well.
```

DA13BAN2

1           THE COURT:  Who is that counsel?

2           MS. MAINIGI:  Becky Walker James, your Honor.

3           THE COURT:  Is she with a firm?

4           MS. MAINIGI:  She is I believe a solo practitioner.

5    She represents one current employee in this matter.

6           THE COURT:  Would she have a conflict between those?

7           MS. MAINIGI:  No.  Not based on our analysis of this.

8           MR. SULLIVAN:  There is one other counsel who

9    represents employees but may have conflict, so that's why we

10   have that one person.  I'll proceed along the lines that the

11   Court suggests.

12          THE COURT:  What is her position?

13          MS. MAINIGI:  You mean her title?

14          THE COURT:  What I'm trying to get at is --

15          MS. MAINIGI:  She is a VP, your Honor.

16          THE COURT:  Whether she is a sophisticated person who

17   would be able to select her own counsel or not.

18          MS. MAINIGI:  I believe she would be in a position to

19   evaluate whether Ms. Walker James was a counsel she was

20   comfortable with or whether she wanted to solicit additional

21   names or whether she wants to do this on her own.  I do believe

22   she would be able to make that determination.

23          THE COURT:  I think you should give her the names of

24   three potential counsel.

25          MR. SULLIVAN:  All right, your Honor.  No problem.

DA13BAN2

1           THE COURT:  Okay.  I'll -- yes.

2           MR. MUKASEY:  Just real quick, Judge.  I gather you

3   have not heard anything back from Mr. Price following last

4   night's telephone message.

5           THE COURT:  I have not.  I feel like the classic

6   rejected mother.  There I am waiting for the phone call, my

7   heart beating loudly, and no call has come.  But I will try to

8   bear up as best I can.

9           I'll excuse you folks for five minutes while I take

10  care of another matter.

11          (Recess)

12          (In open court)

13          THE COURT:  Government will call their next witness.

14          MR. CORDARO:  The United States calls John Forlines,

15  your Honor.

16          (Witness sworn)

17          THE DEPUTY CLERK:  Please be seated.  State your name

18  and spell your last name slowly for the record.

19          THE WITNESS:  John Forlines, F-O-R-L-I-N-E-S.

20   JOHN FORLINES,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MR. CORDARO:

25  Q.  Good morning, Mr. Forlines.  Are you employed?

1   A.  Yes.

2   Q.  Where do you work?

3   A.  Fannie Mae.

4   Q.  What is your job title at Fannie Mae?

5   A.  Senior vice president, chief credit officer for single

6   family.

7   Q.  When did you attain that position?

8   A.  In May of 2012.

9   Q.  Could you explain your current job duties, please?

10  A.  I have three primary functions, and I'm responsible for

11  credit policy for the company, which is setting the guidelines

12  for the company that are outlined in our selling guide.

13  Secondly, responsible for managing customer related risk

14  activities for all of our customers nationally.  And then

15  third, responsible for oversight of quality control functions

16  for lenders, and also the operational reviews of those lenders

17  related to selling related activities.

18  Q.  I'm going to just ask you to explain a few of the terms you

19  just used.  You said you're involved with setting guidelines

20  for selling guides.  Could you explain to us what selling

21  guides are.

22  A.  Yes.  The selling guides are the way that Fannie Mae

23  communicates to our sellers what kind of underwriting

24  guidelines they should use whenever underwriting loans that

25  will be sold to Fannie Mae.

DA13BAN2                        Forlines - direct

1  Q.  You also said you managed customer related risk activity.

2  Could you explain to us what customer related risk activities

3  are.

4  A.  Sure.  That's monitoring the profile of the business of the

5  loans that are delivered to us.  Also looking at the

6  performance of loans that have been delivered to us.  And also

7  managing any counter-party risk related activities for

8  customers.  And counter-party risks related activities would be

9  when we're having issues with a customer related to their

10  financial capacity to continue to do business with us.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA1TBAN4                    Forlines – direct

1    BY MR. CORDARO:

2    Q.  I think you made a reference also to quality control in

3    connection with your job duties.  Could you explain to us what

4    you meant by that?

5    A.  Yes, we have requirements for lenders to implement quality

6    control activities, today both prefunding and post-funding

7    quality control activities where they review the quality of

8    loans that have been underwritten to our standards to check to

9    see that those loans in fact do meet our standards.  And they

10   should use the quality control process as a key factor to help

11   make changes to their underwriting process if they find that

12   there are a consistent source of errors in their process.

13   Q.  And just to be clear, you mentioned prefunding and

14   post-funding.  Could you explain those two concepts very

15   quickly?

16   A.  Prefunding quality control would be where prior to the loan

17   actually being closed or the loan actually being given to the

18   consumer that there would be a process to check for errors in

19   the process so those errors could be corrected prior to the

20   loan actually being closed.

21        And post-funding would be after the loan has been

22   closed, and it could be either prior to delivery to Fannie Mae

23   or after delivery to Fannie Mae that they would have to review

24   a sample of the loans that they had closed to check and see if

25   there are errors in the process.  Obviously at that point there

DA1TBAN4                     Forlines - direct

 1   is nothing that they could do about changing the terms that

 2   have been already been given to the consumer, but it's a

 3   feedback loop to their process.

 4   Q.  Where geographically do you work for Fannie Mae?

 5   A.  Washington, DC.

 6   Q.  Could you give us your educational background, beginning

 7   with college, please?

 8   A.  Yes, I have a bachelor of science in business

 9   administration with a concentration in accounting from the

10   University of North Carolina at Chapel Hill, and a master's of

11   business administration with a human resource emphasis from the

12   University of Dallas.

13   Q.  What was your first job in the mortgage industry?

14   A.  My first introduction to the mortgage industry was when I

15   worked at First Virginia Bank, Inc. as an internal auditor, and

16   we had a mortgage banking subsidiary called Arlington Mortgage

17   Company.

18   Q.  Do you recall the time frame that you worked for First

19   Virginia Bank?

20   A.  It was late 1985 through late 1987.

21   Q.  When did you start at Fannie Mae?

22   A.  In December 1987.

23   Q.  Please take us through the various positions you held at

24   Fannie Mae.

25   A.  I started out with Fannie Mae as an internal auditor.  I

1    was in the internal audit department for approximately four and
2    a half years.  I transferred to the Dallas, Texas office of
3    Fannie Mae in 1992 and held a position of manager of lender
4    administration, which was essentially responsible for oversight
5    of our servicers.  I held that position of manager of lender
6    administration for approximately four, four and a half years.
7    And for the next ten years I held various positions in risk
8    management and customer management within the Dallas regional
9    office.  In June of 2006 I transferred back to Washington, DC
10   and to a credit risk management position, and I have been in a
11   credit risk management position for the last seven years.
12   Q.  What was the title of the position you attained in
13   June 2006?
14   A.  Vice president, risk management channels.
15   Q.  How long did you hold that position?
16   A.  With that exact title, it was a little less than a year.
17   Q.  What was the next title?
18   A.  It was vice president of single family credit risk
19   management.  The responsibilities were similar, but a little
20   bit more direct exposure to the customers that we did business
21   with.
22   Q.  Did your position as vice president of credit risk
23   management take you through the year 2008?
24   A.  Through 2008, yes.  And I remained in that position or a
25   similar title until approximately May of 2011 when I was vice

1    president and chief risk officer for single family, and then

2    one year later in May of 2012 I was promoted to senior vice

3    president essentially in the same position.

4    Q.  You gave us a description of the job duties of your

5    position right now.  Were those job duties similar or different

6    to the job duties you had in 2007 and 2008?

7    A.  There were some similarities.  They were all within credit

8    risk management, but in the time frame of 2007/2008, it was

9    mostly related to credit risk management of the lender, the

10   customer risk portion that I mentioned earlier.  I did not have

11   the credit policy functions and I did not have the oversight

12   functions related to quality control.

13   Q.  We'll talk about credit risk management in a second, but I

14   wanted to ask you in your current position do employees of

15   Fannie Mae report to you?

16   A.  How many employees?

17   Q.  Do employees report to you?

18   A.  Yes.

19   Q.  Do you know how many?

20   A.  Direct reports I have six, and total reports, including

21   indirect, approximately 150.

22   Q.  When you were discussing your positions with Fannie Mae you

23   made reference to oversight of servicers.  Do you remember

24   that?

25   A.  Yes.

1   Q.  Can you explain to us what a servicer is?

2   A.  A servicer is someone that collects payments from the

3   borrower directly and remits the funds then to Fannie Mae as

4   the investor of the loan.  It is also someone that pays taxes

5   and insurance on behalf of a consumer directly if that is being

6   collected as part of the payment that the consumer is sending

7   to the servicer each month.

8   Q.  Is the servicer always the same entity that originates the

9   loan or gives the mortgage?

10  A.  No.

11  Q.  Could it be the same entity?

12  A.  Yes.

13  Q.  I would just like to discuss Fannie Mae a little bit here.

14  Could you explain to us what Fannie Mae is?

15  A.  Yes, Fannie Mae is an investor in home mortgages.  We

16  basically purchase or securitize mortgages that are delivered

17  to us by approved sellers.  And the primary purpose of that is

18  so that we free up capital that the banks and mortgage bankers

19  have so that they can continue to give more loans to a

20  consumer.

21  Q.  What do you mean by freeing up capital?

22  A.  Essentially if an entity was to hold a loan for 30 years,

23  then they would have limited ability to continue to go and give

24  more loans to a consumer.  So by selling this very long-term

25  asset for that entity to Fannie Mae, it frees up their money so

DA1TBAN4                          Forlines - direct

1   they can lend to more consumers.

2   Q.  Does Fannie Mae generate income itself through this

3   process?

4   A.  Yes.

5   Q.  How does Fannie Mae do that?

6   A.  Fannie Mae's primary way of making income is through

7   guarantee fee income, which is we are paid a fee by the

8   servicer for taking on the credit risk related to the loans

9   that they are selling to us.

10  Q.  I want to come back to the term risk management.  During

11  the 2007 to 2008 time period, were you involved with risk

12  management at Fannie Mae?

13  A.  Yes.

14  Q.  Would you describe that involvement to the jury, please.

15  A.  Just what risk management is?

16       Risk management -- essentially the primary risk at

17  Fannie Mae is we're managing interest rate risk, we're managing

18  credit risk, we're managing operational risk.  And as a

19  component of credit risk, we're also managing counter party

20  risk related to the customers that we're doing business with.

21  As I he mentioned earlier, counter party risk is essentially

22  the financial capacity of the entity that we're doing business

23  with.

24  Q.  As part of your job duties during the 2007/2008 time

25  period, what was your involvement with this type of risk

1    management?

2    A.   I was primarily involved in managing the credit risk of

3    customers.  And with counter party risk, whenever we would have

4    a customer that would get in trouble financially, I would be

5    involved in that as well.  To a lesser degree, the operational

6    risk related to that particular customer.

7    Q.   Could you take us through what you mean by credit risk,

8    please?

9    A.   Credit risk is primarily the risk that the loan would

10   default.  And it would be measured by looking at the

11   characteristics of the loan, such as the loan to value ratio,

12   the FICO or the credit score, the debt to income ratio, the

13   occupancy status of the home.  There are other factors, those

14   are some the primary ones that we looked at, and essentially

15   measuring what is the risk of default when you look at the

16   combination of those various factors.

17   Q.   Could you explain what you mean by LTD ratio?

18   A.   Loan to value ratio is the ratio of the mortgage loan that

19   was provided to the consumer divided by the value of the home

20   that is collateral for the loan.

21   Q.   Is that a number?

22   A.   It is a number.  It's a percentage, essentially dividing

23   the loan by the value of the home.

24   Q.   Could you explain what FICO is?

25   A.   FICO is a credit score that is essentially used for

DA1TBAN4                    Forlines – direct

consumer lending in general.  So it measures the willingness of

a borrower to repay debts that they may take out.  And it's

essentially a proprietary model that the company FICO uses, but

it's very commonly used in the mortgage, banking environment as

well as just in consumer lending in general.

Q.  Is that a number as well?

A.  It is a number.

Q.  What about debt to income ratio, can you explain that?

A.  Debt to income ratio is looking at borrower's total monthly

obligations.  Really we're talking about debts that the

customer has, not monthly expenses, but debts that the borrower

has divided by their monthly income.

Q.  Is that a number?

A.  It's a number.

Q.  During the 2007 to 2008 time period, did risk management

embrace any kinds of risk that didn't involve straight numbers?

A.  Yes.

Q.  Could you explain what kind of risk that would be?

A.  We would also look at operational risk related to doing

business with a customer.  And we had a team of people that was

called the LARC team, which stood for Lender Assessment of Risk

and Controls.  It was a team that went out and looked at a

customer's -- I use customer and lender interchangeably --

looking at their selling and servicing guide compliance, so

essentially looking at:  Were they complying with Fannie Mae's

1    selling and servicing guides?

2    Q.  Could you explain what you mean by the term operational

3    risk?

4    A.  Operational risk could be many different things, but some

5    examples would be looking at a customer's processes and

6    procedures.  It would look at the reporting lines of how things

7    are reporting.  For example, you would want underwriting to be

8    separate from the loan officer function, you would want quality

9    control to be separate from the underwriting function, and

10   essentially looking at those sorts of things to make sure there

11   was good segregation of duties.

12   Q.  In your experience in risk management, was there ever any

13   relationship between credit risk and operational risk?

14   A.  They are very closely related, and certainly we could see

15   instances where operational risk that we would see within a

16   customer could lead to a higher risk of loans defaulting just

17   because of the process that they went through within a

18   particular seller's organization.

19   Q.  Did you -- at the time, did you have a view as to which, if

20   either, was more important than the other?

21   A.  I wouldn't say one was more important than the other, I

22   would say that they both worked very much together in tandem.

23   Q.  Did you work within a group in the 2006 to 2008 time period

24   that was dealing with risk management?

25   A.  Yes.

DA1TBAN4                          Forlines - direct

1    Q.  Did that group have a particular focus with respect to

2    single family or multifamily units?

3    A.  It was single family focused only.

4    Q.  Could you explain what single family means?

5    A.  Single family is a residential property with one to four

6    units, whereas multifamily would be a property that was five or

7    more units.

8    Q.  Did Countrywide sell mortgage loans to Fannie Mae in 2007

9    and 2008?

10   A.  Yes.

11          MR. CORDARO:  Your Honor, if I may approach the

12   witness, I would like to show him what has been marked for

13   identification as Plaintiff's Exhibit 1.

14          THE COURT:  Yes.

15          MR. CORDARO:  Your Honor, I don't believe there's an

16   objection to this.

17          THE COURT:  Are you offering it?

18          MR. SULLIVAN:  No objection.

19          MR. MUKASEY:  No objection, Judge, thanks.

20          THE COURT:  Plaintiff's 1 is received.

21          (Plaintiff's Exhibit 1 received in evidence)

22   Q.  Mr. Forlines, do you recognize Plaintiff's Exhibit 1?

23   A.  Yes.

24   Q.  What do you recognize it as?

25   A.  It's the mortgage selling and servicing contract which is a

1   standard document that all approved Fannie Mae seller service

2   servicers have to sign.

3   Q.  If could you turn to the last page of the document, page

4   23.  There's a line there that says "lender," do you see that

5   line?

6   A.  Yes.

7   Q.  And who is the lender?

8   A.  Countrywide Funding Corporation.

9   Q.  And a little further down is a signature by someone on

10  behalf of the Federal National Mortgage Association.  Do you

11  see that?

12  A.  Yes.

13  Q.  What was the Federal National Mortgage Association?

14  A.  It's the legal name for Fannie Mae.

15          MR. CORDARO:  Your Honor, if I may approach the

16  witness again, I would like to show the witness what has been

17  marked for identification as Plaintiff's Exhibit 2.

18          THE COURT:  OK.

19          MR. SULLIVAN:  No objection, your Honor.

20          MR. MUKASEY:  No objection.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 2 received in evidence)

23  Q.  Mr. Forlines, do you recognize Plaintiff's Exhibit 2?

24  A.  Yes.

25  Q.  What do you recognize it as?

DA1TBAN4                    Forlines - direct

1   A.   Mortgage selling and servicing contract.

2   Q.   If you could turn to the last page, which is page US74401,

3   who is listed as the lender?

4   A.   CWB Mortgage Ventures, LLC.

5   Q.   And once again, Federal National Mortgage Association,

6   Fannie Mae, also having signed the document?

7   A.   Yes.

8   Q.   Mr. Forlines, is it OK if I refer to these documents in

9   shorthand as the contract?

10  A.   Yes.

11  Q.   Could we turn back to Exhibit 1, please.

12            What is the purpose of a contract such as Exhibit 1?

13  A.   It's to establish the basic relationship between --

14  contractual relationship between Fannie Mae and a seller

15  servicer.

16  Q.   If you could turn to page 5 of 23.  The top of the page it

17  says sale of mortgages and participation interest lender's

18  warranties, do you see that language?

19  A.   Yes.

20  Q.   Do you have an understanding as to what is meant by

21  lender's warranties?

22  A.   Essentially lender guarantees when they are selling loans

23  to us -- we have a delegated model, we are not looking at every

24  loan that is sold to us in advance of actually funding the

25  purchase of that mortgage, and so we require that lenders

DA1TBAN4                    Forlines - direct

1    essentially guarantee to us that they're meeting certain

2    contractual terms.

3    Q.  Does that kind of guarantee have a legal type name that

4    you're familiar with?

5    A.  The representations and warranties, yes.

6    Q.  Now you said that or you made reference to a delegated

7    model.  Could you explain to us what you mean by delegated

8    model?

9    A.  We do not look at every loan prior to the purchase or

10   securitization of the loans.  We buy millions of loans in a

11   given year, and it would be cost prohibitive for us to look at

12   every loan in advance of purchasing or securitizing the loan.

13   So that is one of the primary reasons that we rely very heavily

14   on lender's quality control processes and very heavily on

15   lender representations and warranties.

16   Q.  From a risk perspective, were you aware of Fannie Mae's

17   expectations with respect to compliance by lenders with their

18   reps and warranties?

19            MR. SULLIVAN:  Objection to expectations.

20            THE COURT:  Sustained.

21   Q.  Let me be more specific.  Mr. Forlines, could we go to

22   specific warranty number one, please.

23   A.  Are you talking Roman Numeral 1 or the number one on page

24   5?

25   Q.  The Arabic numeral one in the middle of the page.

1    A.  Yes.

2    Q.  It says mortgage meets requirements.  The mortgage conforms

3    to the quality of applicable requirements in our guidelines

4    under the contract.  Do you see that language?

5    A.  Yes.

6    Q.  Do you have an understanding of what that language means?

7    A.  Yes.

8              MR. SULLIVAN:  Objection.

9              THE COURT:  Ground?

10             MR. SULLIVAN:  The reason?

11             THE COURT:  Yeah.

12             MR. SULLIVAN:  Legal test.

13             THE COURT:  Overruled.

14   Q.  Do you have an understanding of what that language means?

15   A.  Yes.

16   Q.  What is that understanding?

17   A.  That the lender is responsible for ensuring that they meet

18   the terms of everything that is outlined in this contract we're

19   referring to here, as well as in our selling and servicing

20   guides.

21   Q.  Does the contract, to your knowledge, make any reference to

22   qualifications of the employees who are performing functions

23   for the lender with respect to the loans?

24   A.  Yes.

25   Q.  Could you turn back to page 3 of 23, please.

1          MR. CORDARO:  And could we blow up Ms. Michaud, number

2     two, the first number there.

3     Q.  I'm going to read the first paragraph.  Have qualified

4     staff and adequate facilities.  The lender must at all times

5     have employees who are well trained and qualified to perform

6     the functions required of the lender under this contract.  Do

7     you see this language?

8     A.  Yes.

9     Q.  Would this provision be important --

10         MR. SULLIVAN:  Objection.

11    Q.  -- from a risk perspective?

12         MR. SULLIVAN:  Objection, leading.

13         THE COURT:  Sustained.

14    Q.  Could you explain from a risk perspective -- withdrawn.

15         Does this provision have any affect on risk?

16         MR. MUKASEY:  Objection.

17         THE COURT:  Ground?

18         MR. MUKASEY:  Vague and leading.

19         THE COURT:  Pretty hard to be both vague and leading.

20         MR. MUKASEY:  Could be leading into a vague answer.

21         THE COURT:  I'm going to overrule the objection.  You

22    may answer.

23    A.  Could you repeat the question?

24    Q.  Sure.  Does this provision -- from a risk perspective, does

25    this provision have any impact on potential risk to Fannie Mae?

1   A.  Yes.

2   Q.  What is that impact?

3   A.  We want to make sure that the employees that are performing

4   the functions that we require for this contract and the selling

5   and servicing guide have the qualifications to actually perform

6   those functions.

7   Q.  Now if you could, could we turn forward to page 8 of 23.

8             MR. CORDARO:  I will like to blow up number 17,

9   please, Ms. Michaud.

10  Q.  Mr. Forlines, is number 17 another lender's warranty?

11  A.  Yes.

12  Q.  Could you read number 17 into the record, please.

13  A.  Mortgage is an acceptable investment.  The lender knows of

14  nothing involving the mortgage, the property, the mortgager or

15  the mortgager's credit standing that can reasonably be expected

16  to cause private institutional investors to regard the mortgage

17  as an unacceptable investment, cause the mortgage to become

18  delinquent, or adversely affect the mortgage's value or

19  marketability.

20  Q.  From a risk perspective, did you have an understanding as

21  to what the term "acceptable investment" means?

22  A.  Yes.

23  Q.  What is that understanding?

24  A.  Essentially this is meant to ensure that if the seller

25  knows of information related to the particular mortgage they

1    are delivering to us they think that would have some impact on

2    what an investor would think or could cause the loan to become

3    delinquent or essentially impact the value of that particular

4    mortgage, they should not sell that mortgage to us.

5    Q.   Have you ever heard the term "investment quality?"

6    A.   Yes.

7    Q.   Does the term "investment quality" have meaning from a risk

8    perspective?

9    A.   It has a general meaning that essentially if you, again,

10   knew that it was not of the quality that you knew -- in this

11   case Fannie Mae is the investor, would want in a portfolio of

12   loans that we purchase, that you would not deliver the mortgage

13   to us.

14   Q.   And were there any actions -- if you know, were there

15   actions that a lender could take if such mortgage were

16   delivered to Fannie Mae and it was later found out that it did

17   not meet warranty number 17?

18   A.   Yes.

19            MR. SULLIVAN:  Objection.  Speculative.

20            THE COURT:  Overruled.

21   A.   Could you repeat the question?

22   Q.   Sure.  If a lender found out subsequent to the sale that a

23   particular loan or loans did not adhere to warranty number 17,

24   could the lenders take any action with respect to those loans?

25            MR. SULLIVAN:  Your Honor, hypothetical.  I think

1    that's differently phrased.  I will object on the basis of

2    hypothetical.

3              THE COURT:  Come to the side bar.

4              (At side bar)

5              THE COURT:  So is the answer repurchase?

6              MR. CORDARO:  Not quite, there's self-reporting, too.

7    I may not be phrasing this as artfully as I could have.  All I

8    want to establish is that it is not game over after the loan is

9    delivered, there are certain things the lender could do when

10   they found out the warranty has been violated after the fact.

11   It's not a game over situation.  They could do certain things,

12   repurchase is a possibility.  But before that, the lender

13   should report the loan to Fannie Mae if they find there's a

14   violation, they should report the loan.  That's really all I'm

15   trying to find out.

16             THE COURT:  So for that limited purpose, does defense

17   counsel have any objection him putting that as a leading

18   question?

19             MR. SULLIVAN:  Yes, I would rather he not.

20             MR. MUKASEY:  I do, too, Judge.  I think there's a way

21   to ask it in a proper way.

22             THE COURT:  That's fine then.  The present question

23   is, I think, not likely elicit that answer, so you need to

24   rephrase and we'll see how it goes from there.

25             MR. CORDARO:  I could ask him if the lender -- the

DA1TBAN4                    Forlines - direct

1   easy way to ask is:  Can the lender report the loan?  I shied

2   away from that because I thought I would draw a leading

3   objection using the word that's in the answer, so I will try to

4   get it at more simply.

5            THE COURT:  The fact that they object to leading

6   doesn't mean that if push comes to shove I can't allow leading.

7   I think this is something of a mountain out of a mole hill, but

8   for the moment, the objection is sustained.

9            MR. CORDARO:  Thank you, your Honor.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA1TBAN4                          Forlines - direct

1          (In open court)

2     BY MR. CORDARO:

3     Q.  Mr. Forlines, if a lender found out a loan had violated

4     representation and warranty, to your knowledge, was there a

5     process by which the lender could advise Fannie Mae of that

6     fact?

7     A.  Yes.  The lender could self report a loan that was deemed

8     by them not to meet the selling warranties.

9     Q.  I asked you previously the question about investment

10    quality, and is there any relationship between the concept of

11    investment quality and the phrase "acceptable investment" in

12    warranty number 17?

13    A.  Yes, if a loan did not meet the selling warranties, it

14    would not be considered investment quality by Fannie Mae.

15    Q.  Mr. Forlines, are you familiar with the term "variance?"

16    A.  Yes.

17    Q.  Could you explain to us what a variance is?

18    A.  A variance would essentially be a contractual exception

19    that Fannie Mae granted to our selling or servicing guides.

20    Q.  Are you familiar with any variances that were granted to

21    Countrywide by Fannie Mae?

22    A.  Yes.

23          MR. SULLIVAN:  Objection.  Time period, perhaps?

24          MR. CORDARO:  Sure.

25    Q.  Are you familiar with any variances that were either

1   granted to Countrywide or in use by Countrywide in 2007 and

2   2008?

3   A.  Yes.

4   Q.  What would be an example?

5   A.  Example would be the use of another automated underwriting

6   system which Countrywide called CLUES.

7   Q.  Do you know why -- withdrawn.

8          Generally speaking, who would request a variance,

9   Fannie Mae or the lender?

10  A.  The lender.

11  Q.  Did Fannie Mae have its own automated underwriting system?

12  A.  Yes.

13  Q.  Could you explain to the jury what that automated

14  underwriting system was?

15  A.  Our automated underwriting system during that time frame

16  and today is called Desktop Underwriter, and it is a system

17  that essentially allows a lender to get a recommendation by

18  putting in required data elements into the system and then they

19  get a recommendation.  Also have conditions for the closing of

20  the loan that need to be met.

21  Q.  And who would work with the Desktop Underwriter?  Would it

22  be Fannie Mae or the lender?

23  A.  The lender would input the data to Desktop Underwriter.

24  Q.  But if there was a variance with respect to the automated

25  underwriting system, does that mean the lender could use its

1  own underwriting system, that's what the variance was?

2  A.  Yes.

3  Q.  Did risk management play a role in Fannie Mae's decision to

4  approve variances?

5  A.  Yes, we would evaluate essentially how the lender was going

6  to operationalize or use the particular variance terms, if they

7  were going to have compensating factors that may make us more

8  comfortable with an exception that we granted to our selling

9  guide.

10  Q.  You testified earlier about credit risk.  Were you involved

11  in analyzing credit risk in 2008 to -- sorry, withdrawn.

12          You testified earlier about a credit risk.  Were you

13  involved in analyzing credit risk in the 2007 and 2008 time

14  period?

15  A.  Yes.

16  Q.  You testified earlier about operational risk.  Were you

17  involved in analyzing operational risk during the 2007/2008

18  time period?

19  A.  To a lesser degree during that time frame.  The group that

20  was responsible for doing the operational reviews of lenders,

21  as I mentioned earlier, the LARC team or the Lender Assessment

22  of Risk and Controls, that group did not report to me directly.

23  Q.  Were you familiar with the risk attributes that Freddie Mac

24  would analyze when assessing operational risk?

25  A.  I was generally familiar with the things they looked at.

1    Q.  You, in discussing operational risk, made reference to the

2    underwriting process, am I correct?

3    A.  Yes.

4    Q.  Can you explain in grader detail how underwriting process

5    factors into operational risk?

6    A.  Yes.  The underwriting process, essentially who is doing

7    that work as far as the qualifications of who is doing that

8    work, the reporting relationship of the underwriting function

9    such as where it reports within the organization, you would

10   want it to be separate from, as I think I mentioned earlier,

11   both the loan officer function as well as the quality control

12   function.

13   Q.  From a risk perspective, why would that separation be

14   important?

15   A.  The separation would be important to make sure that the

16   underwriters were making essentially an independent decision of

17   whether they think the loan should be approved.  And the same

18   for quality control, that they are making an independent review

19   of the underwriter's decision on a particular loan to make sure

20   that they think those decisions are consistent with the

21   guidelines.

22   Q.  And why would Fannie Mae look at independence from a risk

23   perspective?

24   A.  You wouldn't want the loan officers who were often paid

25   based on some sort of volume or the profitability of loans to

DA1TBAN4                    Forlines - direct

1    be influencing an underwriting decision in a way that they were

2    able to essentially help influence the underwriter to approve

3    loans that might not meet our quality requirements.

4             MR. MUKASEY:  Judge, I move to strike that answer as

5    speculative and without foundation, particularly the often

6    paid.

7             THE COURT:  Well, I think to some extent the question

8    invited that answer, so there should have been an objection

9    after the question was put.  Nevertheless, I agree that I think

10   it's -- as presently stated, there's a lot of foundation that

11   would have to be laid.  So why don't you rephrase the question.

12            MR. CORDARO:  Yes, your Honor.

13   Q.  You used the world "volume" in that last answer, could you

14   explain what you mean by volume?

15   A.  Essentially the number of loans that are closed.

16   Q.  And you also made a -- well, are certain -- to your

17   knowledge, do underwriters focus on volume for the amount of

18   loans that are closed as part of their general duties?

19            MR. MUKASEY:  Objection.

20            MR. SULLIVAN:  Objection.

21            THE COURT:  Sustained.

22   Q.  From a risk perspective, would it influence a risk analysis

23   if underwriters were focusing on volume?

24            MR. MUKASEY:  Objection.

25            MR. SULLIVAN:  Objection.

DA1TBAN4                        Forlines – direct

1              MR. MUKASEY:  Judge, may we approach?

2              THE COURT:  I was going to sustain your objection, but

3   if you would rather approach.

4              MR. MUKASEY:  No, I'll sit right here.

5   Q.  Well, why don't we step back.  Could an underwriting

6   process affect operational risk?

7              MR. SULLIVAN:  Objection.

8              THE COURT:  Overruled.

9   A.  Yes.

10  Q.  And explain to the jury how, in your experience as a risk

11  manager, the underwriting process could be relevant to

12  operational risk.

13             MR. MUKASEY:  Objection.

14             THE COURT:  Overruled.

15  A.  As far as the operational risk, as I explained earlier, who

16  is actually doing the function, where it reports within the

17  organization, making sure that the proper processes and

18  procedures are in place, those are all things that could

19  ultimately affect the quality of the loan that was originated.

20  Q.  And you spoke about independence before, and from a risk

21  management perspective, how would the concept of independence,

22  if at all, be relevant to risk with respect to underwriters?

23  A.  Again, you would want the underwriters to be making their

24  independent decision about whether they thought the loan met

25  the standards the guidelines –– I'm using those words

1   interchangeably -- essentially that it meets those guidelines

2   without being influenced by some other party.

3   Q.  And could we just step back for a second.  And when I'm

4   speaking of underwriters, could we use that as a shorthand for

5   not only people who are called underwriters but persons who may

6   be performing underwriting tasks, whatever their job title?

7   Could we use that shorthand, is that agreeable to you?

8   A.  Yes.

9   Q.  So you briefly mentioned -- you mentioned something about

10  proper processes and procedures.  Could you explain what you

11  meant by that?

12  A.  We want a lender to have written processes and procedures

13  that would document what the process was within their

14  organization, and we would want the lender to follow their

15  processes and procedures.

16  Q.  You made a reference to compensation before, and without

17  speculating to how in fact any employees are compensated, could

18  compensation of underwriters or persons performing underwriting

19  be relevant to a risk management analysis?

20              MR. MUKASEY:  Objection.

21              MR. SULLIVAN:  Objection.

22              THE COURT:  Sustained.

23  Q.  Are there any other ways, besides the ones we discussed

24  with respect to independence, that the loan -- the underwriter

25  or underwriting process could be relevant to a risk management

1   analysis?

2   A.  I'm not sure I understand the question.

3   Q.  We have discussed the independence of underwriters, so I

4   just want to know if there's anything else besides independence

5   that could be relevant to an operational risk analysis.

6   A.  It's certainly the goals of the particular group,

7   essentially how they are compensated, and essentially I

8   mentioned earlier the reporting relationship, all those could

9   have a factor.

10  Q.  When you say how they are compensated, again, without

11  speculating as to particular employees, what do you mean

12  generally by how they are compensated?

13              MR. SULLIVAN:  Objection.

14              THE COURT:  Come to the side bar, because this is

15  going in circles.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1      (At side bar)

2      THE COURT:  What do you want to bring out of this with

3   regard to this witness that is not hearsay and not speculation?

4      MR. CORDARO:  I want him to say to the extent there's

5   a compensation going on, that privileges, volume over quality,

6   that would be a risk factor they would be interested in.

7      THE COURT:  Is there any indication anywhere that that

8   is something that has to be disclosed?  That doesn't have to be

9   disclosed.  I don't see how it would ever been relevant for him

10  because he wouldn't know about it and he wouldn't expect to

11  know about it.  If he happened by chance it find out about

12  something else, but that's not -- we're dealing here in a mail

13  fraud and wire fraud case with misrepresentations, and they can

14  take any of three forms, but only three forms, outright lies,

15  half truths, and statements that are required to be made that

16  are not made.  And this doesn't seem to fit any of those

17  categories.

18      MR. CORDARO:  We would take the position that if

19  that's what is going on --

20      THE COURT:  I understand that from a motive standpoint

21  you want to argue that the underwriters were impacted.  That's

22  an argument to the jury, but that has nothing to do with this

23  witness.

24      MR. CORDARO:  And also get to acceptability of the

25  investment, and warranty 17 argues if there are compensation

DA1TBAN4                    Forlines - direct

1    packages going on when loans are being sold it could call into

2    question whether the loan is an acceptable investment.

3               THE COURT:  No, I don't think so.  The objection is

4    sustained.

5               MR. CORDARO:  Thank you, your Honor.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2    BY MR. CORDARO:

3    Q.   Mr. Forlines, you made a reference to quality control as

4    well when you were discussing operational risk, is that

5    correct?

6    A.   Yes.

7    Q.   What did you mean by quality control as it relates to

8    operational risk?

9    A.   Well, quality control, as I mentioned earlier, is a review

10   process that a lender has in place after the closing of the

11   loans to check to make sure that the loans meet the guidelines

12   that they were supposed to have been underwritten, and to

13   identify if there are issues with the underwriting of the

14   loans.  And that should be used as a feedback loop for the

15   underwriting process around additional training or additional

16   controls that may need to be put in place to improve the

17   quality of the loans.

18   Q.   Is a lender's quality control process important to risk

19   management analysis?

20   A.   Yes.

21         MR. CORDARO:  Your Honor, may I take a moment to

22   confer?

23         (Pause)

24   Q.   Mr. Forlines, in the contract we discussed a provision that

25   discussed the qualifications of the staff at the lender.  Do

 1  you recall that provision of the contract?

 2  A.  Yes.

 3  Q.  Does that -- from a risk perspective, do qualifications of

 4  the individuals performing the underwriting tasks bear on

 5  operational risk?

 6  A.  Yes.

 7  Q.  Why?

 8  A.  It's important that the personnel that is actually

 9  underwriting loans understands what the guidelines are, has

10  experience with underwriting loans according to the guidelines,

11  and they're able to identify cases where the loans may not be

12  meeting requirements.

13  Q.  Mr. Forlines, have you ever heard of something called the

14  High-Speed Swim Lane or the Hustle?

15  A.  Yes.

16  Q.  When was the first time you ever heard about it?

17  A.  The first time I heard of this is when I read the --

18          MR. SULLIVAN:  Objection.

19          THE COURT:  Sustained.

20  Q.  During the 2007 to 2008 time period, did anyone from

21  Countrywide tell you about the existence of something called

22  the High-Speed Swim Lane or the Hustle?

23          MR. SULLIVAN:  Objection.

24          MR. MUKASEY:  Objection.

25          THE COURT:  Sustained.  Since we need to have a little

DA1TBAN4                      Forlines - direct

1   bit of discussion on that point, I'm going to excuse the jury

2   now for lunch, and we will reconvene at 2 o'clock.

3            (Jury not present)

4            THE COURT:  So I assume that that question was put

5   because the government anticipates that the witness would say

6   no?

7            MR. CORDARO:  Correct, your Honor.

8            THE COURT:  Yes, so this raises the same question I

9   raised at the side bar.  I don't understand the relevance of a

10  failure to disclose something that was not required to be

11  disclosed.  So misrepresentations that underlie this case an

12  contain any of three forms, they can take the form of an

13  outright lie, they can take the form of a half truth, a

14  so-called misleading statement, in other words, one that is

15  true as far as it goes but fails to reveal what's necessary to

16  make it genuinely true, because it otherwise creates a

17  misleading impression, or third, a failure to disclose what is

18  required to be disclosed either by law or by contract.  So what

19  was the requirement that required Countrywide to reveal the

20  existence of something called the High-Speed Swim Lane to

21  Fannie Mae or Freddie Mac?

22           MR. CORDARO:  Your Honor, our position would be

23  through representations and warranties that the lender is

24  making a guarantee to Fannie Mae that the loans are an

25  acceptable investment, that there is nothing in the contract

DA1TBAN4                         Forlines - direct

1     that's been violated.  And I think there's been evidence from

2     this witness --

3                 THE COURT:  So they have to live up to that, but that

4     doesn't mean that they have to tell how they're going about

5     achieving compliance with it, does it?

6                 (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA13BAN5

1        MR. CORDARO:  That would be a contention we would

2   make, your Honor.

3        THE COURT:  Let me look, remind me, which of the

4   warrantys are we talking about?  Warrantys or representations.

5        MR. CORDARO:  Your Honor, Exhibit 1, are you asking me

6   where the rep is?  It would be Exhibit 1, page eight,

7   representation 17.

8        THE COURT:  Page eight.  Which number?

9        MR. CORDARO:  Number 17.

10        THE COURT:  All right.  So, "Mortgage is acceptable

11   investment.  The lender knows of nothing involving the

12   mortgage, the property, the mortgagor, or the mortgagor's

13   credit standing that can reasonably be expected to:  Cause a

14   private institution or investors to regard the mortgage as an

15   unacceptable investment; cause the mortgage to become

16   delinquent; or adversely affect the mortgage's value or

17   marketability."

18        So, if a lender knew that they had instituted

19   practices designed or likely to make the loans of unacceptable

20   nature, that perhaps, I'd have to know the specifics, might be

21   something they had to disclose.

22        But, all you asked him was did they ever tell you

23   about something called the High-Speed Swim Lane.  I really

24   don't see how that by itself gets you even into a generous

25   interpretation of section 17.

DA13BAN5

```
 1              MR. CORDARO:  Your Honor, two things.  It was intended
 2     really as a threshold question to lead into some of the other
 3     things.  I was intending to get more specific about it.  I
 4     wanted to know if he ever heard of the term.  I think more
 5     fundamentally, the defense has signaled that one of the things
 6     they will do is demonstrate to the jury that the High-Speed
 7     Swim Lane was in fact disclosed to the GSEs.  Some of the
 8     evidence I think they are going to use --
 9              THE COURT:  Well, I forgot that part.  Is that true?
10     That certainly was the defense's position earlier in this case.
11              MR. SULLIVAN:  We're certainly not doing it with this
12     witness.
13              THE COURT:  That doesn't matter.  Are you doing it
14     with anyone?
15              MS. MAINIGI:  It depends, your Honor.
16              THE COURT:  In fact, wasn't it in your opening?  I
17     think it was.
18              MR. SULLIVAN:  Yes, it is.
19              THE COURT:  So, now that has been recalled to my
20     attention, why aren't they free to rebut that by showing it
21     wasn't disclosed?
22              MR. SULLIVAN:  For one thing, this is just a witness
23     as if he were off the street.  He was in no job or no position
24     that related to the operations or the process.  He described in
25     his testimony LARC, the unit LARC focused on that.
```

DA13BAN5

1          He is a risk officer.  He is reaching way outside of

2     what he focused on at the time or his area of expertise.

3     That's number one.  And which the Court may not know, he

4     basically testified in his deposition that that was not his

5     function.

6          THE COURT:  All right.  So let's go back.

7          MR. SULLIVAN:  The wrong witness, your Honor.

8          THE COURT:  Let me go back to the first point you

9     make.  So, is this the person who Countrywide was dealing with

10    in the sale of the pools containing Hustle loans?  Because if

11    not -- no, I'm asking the government.  Because if not, it's

12    irrelevant whether it was disclosed to him or not.

13         MR. CORDARO:  As to the Court's first question, I

14    don't think that he was involved with those pools but I'm not

15    sure.  Whether the Hustle loans were --

16         THE COURT:  If the answer to that is no, he's still on

17    direct so you can check with him over the lunch break.  But if

18    the answer to that is no, then it is irrelevant.  It is like

19    saying, as Mr. Sullivan's first point, you call the guy from

20    the left side of the business and you say to him, did they ever

21    disclose to you X, when the people they were dealing with were

22    all on the right side of the business.  There would be no

23    reason to disclose it to this guy if he's not dealing with

24    these pools.

25         MR. CORDARO:  Your Honor, I think in this example,

DA13BAN5

1    though, the left side and the right side of the business are

2    sort of cohesive because Mr. Forlines is looking at risk writ

3    large.  So to the extent the answer is no, it was never

4    disclosed to him personally, I understand what the Court is

5    saying there because that may not get us very far, because it

6    is just John Forlines.

7              As a follow up I intended to ask him whether he had

8    heard from anybody either at Countrywide or Fannie Mae about

9    something called the High-Speed Swim Lane, and I guess the jury

10   can weigh that as --

11             THE COURT:  So, if he had heard it in his position,

12   what action, if any, would he have taken?

13             MR. CORDARO:  I can ask him about that.

14             THE COURT:  What is the answer?

15             MR. CORDARO:  I think the answer would be is he would

16   have done fact finding on --

17             THE COURT:  Maybe I'm missing the hierarchy.  What

18   role did he have in deciding whether or not to purchase the

19   pools that contained Hustle loans?

20             MR. CORDARO:  I don't know if he had a role in the

21   purchasing decision, your Honor.  I think for Mr. Forlines, he

22   was dealing with both new product and existing product.  So if

23   there was new product that Fannie Mae was looking at, his risk

24   analysis might go up the chain to the folks making the

25   purchasing decisions and making the pricing decisions.  If we

DA13BAN5

 1    are talking about existing product, then I think we are looking

 2    more at the loans have already --

 3            THE COURT:  Are you calling the people who made the

 4    purchasing decision?

 5            MR. CORDARO:  We would be calling people that are part

 6    of the decision making, your Honor.  But here I think we have

 7    prime loans that are being purchased, and this loan origination

 8    process is sort of a different way to sell prime loans.

 9            THE COURT:  When you're dealing with a

10    misrepresentation by silence, which is what you're dealing with

11    now, as opposed to affirmative misrepresentations, then the

12    question has to be was X disclosed to you?  No.  If X had been

13    disclosed to you, would you have purchased these investments or

14    would you have done something that related to the purchase of

15    the investments that you otherwise didn't do.

16            If he's not in the chain in any meaningful way with

17    regard to those two possibilities, then it is totally

18    irrelevant.

19            MR. CORDARO:  I can talk to him during the lunch break

20    and see if he's in that chain with respect to the High-Speed

21    Swim Lane.

22            THE COURT:  I flag for you, you are going to have the

23    same problem with any of these other witnesses if you are not

24    calling the people who actually made the purchasing decision.

25    Then they're going to at least have a few people who were

DA13BAN5

1    necessarily involved in some aspect of what became the

2    purchasing decision.

3           For example, I can imagine that someone who was above

4    the people who made the actual purchasing decision, but who set

5    the guidelines for determinations for them to make the

6    purchasing decision might be a relevant witness to say, if I

7    had known that, I would have ordered them not to purchase those

8    or at least without making further inquiries.  But, if it is

9    just someone who's off to the side, so to speak, and has at

10   best a tangential relationship to the decision, then I don't

11   see the relevance.

12          MR. CORDARO:  And one of the concerns the government

13   would have is that if that kind of witness is on the stand, and

14   the defense were to show that witness an exhibit that had the

15   letters HSSL in it or something else, that they would argue

16   hints at the existence of this loan origination process --

17          THE COURT:  So what?  You have to prove your case

18   regardless of what they might or might not be able to show.  If

19   you can't prove it, you can't prove it.  If that were to

20   happen, then presumably you would say, well, what did they tell

21   you about HSSL.

22          MR. CORDARO:  Yes.  That's exactly what I was going to

23   do.

24          THE COURT:  All right.  Well, how much longer do you

25   have on this witness?

DA13BAN5

1           MR. CORDARO:  Not very much, your Honor.  It could be

2    10 minutes.

3           THE COURT:  And cross?

4           MR. SULLIVAN:  An hour and a half at most.  I am

5    seeing the pattern, your Honor.  If I latch on to a figure, you

6    hold me to it.  So I'm trying to give myself a little edge.

7           THE COURT:  That sounds like quite an edge.  But an

8    hour and a half.

9           MR. MUKASEY:  Seven minutes at most.

10          THE COURT:  Seven.  Okay.  I appreciate it.  All

11   right.  None of this trading of time, gentlemen.  Let's see you

12   at 2 o'clock.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                              (2:30 p.m.)

3              (Jury not present)

4              MR. CORDARO:  Excuse me, your Honor, we have one issue

5       that we would like to bring to the Court's attention before the

6       jury.  I asked Mr. Forlines if he ever heard of something

7       called the High-Speed Swim Lane or the Hustle, and he said yes.

8       Then I asked when was first time that you heard about, and he

9       was starting the answer when there was an objection, and the

10      objection was sustained.  Then I don't know -- then I asked him

11      specifically about the 2007/2008 time period if he heard of it,

12      and there was an objection and it was sustained.

13             So as much as the jury knows, he has heard of the

14      High-Speed Swim Lane, but they don't know when, so we wouldn't

15      want them to infer that was disclosed to him during the

16      relevant time frame, because all they know is that he heard

17      about it and they're left to speculate when he heard.

18             THE COURT:  So what's your application?

19             MR. CORDARO:  To simply ask him if he heard of it

20      during the 2007/2008 time period, and then just leave it at

21      that and not purpose it further to clarify what that yes meant

22      that was not objected to.

23             MR. SULLIVAN:  I object to the question, but I have no

24      problem if the Court wants to strike the question and answer.

25             THE COURT:  Why don't we strike the question and

DA1TBAN6                    Forlines - direct

1    answer.

2              MR. SULLIVAN:  The other thing, your Honor, is I did

3    advise the government I would be much shorter than an hour and

4    a half, based on what I have seen so far.

5              THE COURT:  Much appreciated.

6              Sorry, there was another unexpected matter that I had

7    to deal with, which is why we ran a little late for lunch.  We

8    will go until 5 o'clock today.

9              MR. CORDARO:  The only thing I say, your Honor, is

10   there's a little concern here that the jury still might have

11   the impression that he heard about it at some time --

12             MR. SULLIVAN:  I wouldn't argue it either.

13             THE COURT:  Once it's stricken, no one can refer to it

14   ever after.  If the juror's memories are so good that three

15   weeks from today they can still remember that question and

16   answer then I think we should turn over the government to them.

17             Let's bring in the jury.  Let's get the witness on the

18   stand.

19             MR. CORDARO:  Thank you, your Honor.

20             (Continued on next page)

21

22

23

24

25

DA1TBAN6                          Forlines - direct

 1                (Jury present)

 2                THE COURT:  Counsel.

 3                MR. CORDARO:  Your Honor, going back to the

 4    application that was just discussed, would the Court be

 5    handling that now?

 6                THE COURT:  Yes.  There was a question regarding the

 7    witness's knowledge or not of the High-Speed Swim Lane, and

 8    that question and that answer has been stricken.  So there's

 9    nothing before the jury with regard to his knowledge or lack of

10    knowledge one way or the other on that issue.

11                Go ahead.

12                MR. CORDARO:  Thank you, your Honor.

13    BY MR. CORDARO:

14    Q.  Mr. Forlines, I will ask you to open to the last page of

15    Exhibit 1 and the last page of Exhibit 2, please.  Are there

16    some dates on the last page of Exhibit 1?

17    A.  Yes.

18    Q.  What are those dates?

19    A.  November 19, 1982.

20    Q.  And is there another date toward the bottom of the page?

21    A.  November 29, 1982.

22    Q.  What do those dates represent?

23    A.  November 19, 1982 is the date that Countrywide Funding

24    Corporation signed the contract, Lee Bartlett, and November 29,

25    1982 is the date that Norman Peterson signed the document on

DA1TBAN6                    Forlines - direct

1    behalf of Fannie Mae.

2    Q.  Now if you turn to the last page of Exhibit 2, you'll see

3    a -- two more dates, what are those dates?

4    A.  December 19, 2007 and January 4, 2008.

5    Q.  And did those dates also reflect the dates of the

6    signatures on that page?

7    A.  Yes.

8    Q.  And if you know, what is the relationship between these two

9    contracts?

10   A.  What I believe is that there was a change in the name of

11   the legal entity.  And so usually when there is a name change

12   to a legal entity, we ask them to sign a new master selling and

13   servicing contract.

14          MR. CORDARO:  Your Honor, may I approach the witness

15   with an exhibit?

16          THE COURT:  Yes.

17   Q.  Mr. Forlines, I have shown you what has been marked for

18   identification as Plaintiff's Exhibit 425.  Do you recognize

19   what Plaintiff's Exhibit 425 is?

20   A.  Yes.

21   Q.  What do you recognize it as?

22   A.  It is the credit supplement that was released in the first

23   quarter of 2013 when we released our 10Q for that particular

24   quarter.  Each quarter, when we file the 10Q or K, which is an

25   SEC filing related to our financial statements, we also produce

DA1TBAN6                          Forlines - direct

1     this document, which is a credit supplement which attempts to

2     put information about our credit portfolio in very easy-to-read

3     format.

4     Q.  Does Fannie Mae typically produce credit supplements in

5     their ordinary course of business?

6     A.  Yes.

7              MR. CORDARO:  Your Honor, I move the admission of

8     Plaintiff's Exhibit 425.

9              MR. SULLIVAN:  Objection, your Honor, relevance.

10    Dated 2013.

11             MR. CORDARO:  Your Honor, on the relevance objection,

12    if the Court would like to hear us at the side bar.

13             THE COURT:  All right.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          MR. CORDARO:  I was only planning to ask him one

3    question or maybe two, and the reason we're putting this is

4    apparently the issue of the Hustle versus the non-Hustle loan

5    has come up again.  I think the defendants are going to brief

6    it to the Court in an attempt to demonstrate they shouldn't be

7    able to compare Hustle to non-Hustle.  If they were to prevail

8    on that application, the government would make the counter

9    argument --

10         THE COURT:  So far I have ruled against them on that.

11   So you should proceed on that assumption.  If in fact I reverse

12   my rulings and you have to put this in or recall a witness or

13   something, we'll deal with that then.  But that matter was not

14   lightly considered by the Court.  I have ruled now several

15   times against the defense view of that.  I'm certainly going to

16   hear them and they're going to put in their brief for

17   reconsideration, but we can't burden this record with stuff

18   that is irrelevant.  If it becomes relevant as a result of my

19   reversing the ruling, I will certainly give the opportunity to

20   come back and make whatever additional proffers you need to at

21   that point.

22         MR. CORDARO:  Thank you, your Honor.

23         MR. MUKASEY:  Judge, again, if this is going to come

24   in, would the Court be inclined --

25         THE COURT:  I said it's not going to come in.

1           MR. MUKASEY:  OK.

2                (In open court)

3           MR. CORDARO:  Your Honor, the government passes the

4    witness.

5           THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. SULLIVAN:

8    Q.  Good afternoon, sir.

9    A.  Good afternoon.

10   Q.  My name is Brendan Sullivan, and I will be asking you a few

11   questions on behalf of the banks this afternoon.

12                First of all, when we began this morning I believe you

13   said the selling guides were an important element in Fannie's

14   relationship with lenders such as Countrywide, am I correct?

15   A.  Yes.

16   Q.  And you said, I believe, that the guides, the selling

17   guides, communicate to the sellers the guidelines for loans it

18   buys, am I correct?

19   A.  Yes.

20   Q.  And that document is about 700 pages long, is it not, the

21   selling guides?

22   A.  I believe it actually may be longer than that.

23   Q.  It's one of the biggest documents you would meet today in

24   court, right, if you had it?

25           MR. CORDARO:  Objection.

1       THE COURT:  Sustained.

2    Q.  Is it on the computer as well?

3    A.  Yes.

4    Q.  And do you distribute it to the customers such as

5    Countrywide via computer and also in hard copy or just

6    computer?

7            MR. CORDARO:  Objection.

8            THE COURT:  Overruled.

9    A.  We distribute it in hard copy upon request.  Most lenders

10   subscribe to it through a service called All Rights.

11   Q.  Now it is true, isn't it, that the selling guide, that

12   thick document we have just been talking about, did not specify

13   the process by which a loan is processed from a loan

14   origination to funding?

15   A.  That's correct.

16   Q.  Not only does it not specify a process that a company like

17   Countrywide is to use, but in fact, the lenders like

18   Countrywide have great discretion in how they actually process

19   loans, am I correct?

20           MR. CORDARO:  Objection.

21           THE COURT:  Sustained.

22   Q.  It is a fact, is it not, that Countrywide and other lenders

23   can decide what kind of a process it establishes to produce

24   loans consistent with your standards?

25           MR. CORDARO:  Objection.

```
 1              THE COURT:  I'm not sure whether you're asking for a
 2    legal conclusion, in which case, of course, he could not
 3    testify, or you're asking for something which is governed by
 4    contracts or representations or warranties or what.  So please
 5    rephrase the question.
 6    Q.  You're familiar with the contracts you have seen here as
 7    Exhibit Plaintiff 1, Plaintiff 2?
 8    A.  Yes.
 9    Q.  And you're familiar generally with the selling guidelines
10    that you referred to in your testimony?
11    A.  Yes.
12    Q.  It's clear, is it not, that there are no specific
13    guidelines -- strike that.
14              There are no specific requirements for the exact
15    process of taking a loan from origination to funding?
16              MR. CORDARO:  Objection.
17              THE COURT:  You're talking about within either
18    Exhibit 1 or Exhibit 2?
19              MR. SULLIVAN:  Yes, or the selling guidelines.
20              THE COURT:  OK.  Do you understand the question?  It's
21    limited to those items.
22              THE WITNESS:  Yes.
23              THE COURT:  All right.  So I'll allow that question.
24    A.  Yes, that is correct.
25    Q.  Thank you.  Now sir, you indicated this morning on direct
```

DA1TBAN6                        Forlines – cross

1   examination that your area of expertise is focusing on risk, am

2   I correct?

3   A.  Yes, sir.

4   Q.  And you called it risk management, is that right?

5   A.  Yes.

6   Q.  Risk management is understanding the risk of various

7   products that Fannie Mae purchases, correct?

8   A.  That's a part of it.

9   Q.  And you are not an expert on loan origination, am I

10  correct?

11          MR. CORDARO:  Objection.

12          THE COURT:  Overruled.  You may answer.

13  A.  I understand the origination process very well.  I'm not

14  sure what the definition of an expert would be.

15  Q.  What I mean is there are other persons within the Fannie

16  structure that have responsibility for focusing on origination

17  as opposed to risk.

18  A.  I'm not sure I would characterize it that way.

19  Q.  Are you an expert in the pricing?

20  A.  No.

21  Q.  Does the Fannie selling guide specifically state who has to

22  perform the underwriting of a loan?

23  A.  No.

24  Q.  The fact of the matter is the guide is not specific on that

25  topic at all, is it?

1   A.  It's not specific as to who has to do the underwriting, not

2   what the title of the person is, no.

3   Q.  It doesn't specify whether it should be a loan specialist

4   or a loan processor or an underwriter, does it?

5   A.  No.

6   Q.  Now you spoke in your examination, sir, about CLUES, which

7   is the automatic underwriting tool used by Countrywide, am I

8   correct?

9   A.  Yes.

10  Q.  And Fannie Mae has a similar tool which it called DU or

11  Desk Underwriter, am I correct?

12  A.  It's called Desktop Underwriter.

13  Q.  Desktop Underwriter, but the initials are DU, am I correct?

14  A.  Yes.

15  Q.  And the DU, the Desktop Underwriter, is a computer system

16  which Fannie designed and is a tool which measures the quality

17  of loans that are put through the system, am I correct?

18           MR. CORDARO:  Objection.

19           THE COURT:  Ground?

20           MR. CORDARO:  Put through the system, your Honor, is

21  vague.

22           THE COURT:  Sustained as to vagueness.

23  Q.  Put through the computer process.

24           THE COURT:  What does it mean to be put through?

25  Q.  How do you use Desktop Underwriter?

 1   A.  The data is input by someone within a lender's

 2   organization, and the data is essentially the application, loan

 3   application data, and then Desktop Underwriter recommends a

 4   decision.

 5   Q.  And what is CLUES?

 6   A.  As I understand it, CLUES worked very similarly.

 7   Q.  Well, is it within your area of responsibility to assure

 8   that CLUES does work similarly to Desktop Underwriter?

 9              MR. CORDARO:  Objection, your Honor.  Time frame.

10   Q.  During the period 2007 and '8.

11              THE COURT:  All right.  So the question is during the

12   period 2007 and '8, was it within your area of responsibility

13   to assure that CLUES does work similarly to Desktop

14   Underwriter?

15              Is that the question?

16              MR. SULLIVAN:  Yes, it is.

17              THE COURT:  All right.

18              MR. CORDARO:  Your Honor, the Court is putting the

19   question, then I'm not going to --

20              THE COURT:  I'm not putting the question, I wanted to

21   make sure I understood.

22              Are you objecting or not?

23              MR. CORDARO:  I am objecting.

24              THE COURT:  Sustained.

25   Q.  Does Fannie calibrate CLUES to be sure that it meets the

1    standards required by Fannie Mae?

2              MR. CORDARO:  Objection.

3              THE COURT:  You may answer.

4    A.  During the time frame that you're referring to, 2007 and

5    2008, that was part of my responsibilities to basically

6    evaluate -- my team basically to evaluate whether CLUES or any

7    automated underwriting system that we accepted through a

8    variance would essentially provide similar decisions to what

9    Desktop Underwriter would provide.

10   Q.  So is it fair to say that it was your responsibility to

11   calibrate CLUES so that it functioned consistent with the way

12   Desktop Underwriter functioned?

13   A.  We didn't like to use the word "calibrate," so I'm not

14   really sure exactly that I would use that word, but we did a

15   test file of loans that went through CLUES, and we put them

16   through a simulated version of Desktop Underwriter and

17   evaluated whether they were making similar decisions with a

18   high percentage of correlation.

19   Q.  And what conclusion did you draw from that exercise when

20   you did it?

21             MR. CORDARO:  Objection.

22             THE COURT:  Ground?

23             MR. CORDARO:  Your Honor, I think counsel is saying

24   it's one exercise, and I didn't take the witness's answer --

25   perhaps I'm incorrect.

1           THE COURT:  Overruled.  You may answer.

2    A.  The conclusion at that time, as I recall, was essentially

3    that it was acceptable to us for Countrywide to use their

4    system.

5    Q.  Was that performed in 2007 and/or 2008?

6    A.  I don't recall the exact time frame, because essentially

7    what we would do is evaluate a system, and then we would only

8    reevaluate it when there were substantial changes made to the

9    score card that was used, which essentially is the risk scoring

10   that was used in the automated underwriting system.  So I don't

11   recall when there were changes made to CLUES if it was during

12   that particular time frame.

13   Q.  Now you mentioned the group called LARC, which I believe

14   you said is Lender Assessment of Risk Controls.  Am I correct?

15   A.  Yes, sir.

16   Q.  That's a function separate from your own risk function, am

17   I right?

18   A.  I don't know if I would characterize it that way.  It was a

19   separate group at the time frame we're talking about, 2007 to

20   2008.  It did not report to me, but it was within the same

21   umbrella, for example, my boss Marianne Sullivan, that group

22   reported directly to her.  So it was within the same umbrella,

23   just didn't report correctly to me.

24   Q.  It was part of the function of that group known as LARC to

25   review the loan origination process if it wished to do so?

1   A.   That was one of the things that that group would look at.

2   Q.   Now the loan origination process is not an objective factor

3   that's considered when assigning a loan a risk score, is it?

4              MR. CORDARO:  Objection.

5              THE COURT:  Ground?

6              MR. CORDARO:  Objective factor, your Honor.

7              THE COURT:  Yeah, I think you have to either further

8   define the terms or ask the witness to define them for you,

9   then you could put that question.

10  Q.   How do you determine the risk score when you are performing

11  your duties as a risk expert on behalf of Fannie Mae?

12  A.   I can tell you how the risk score was determined by Desktop

13  Underwriter, where Desktop Underwriter would evaluate the

14  factors that -- some of them I mentioned earlier, such as loan

15  to value ratio, a borrower's credit profile, it would look at

16  the debt to income ratio, the occupancy of the loan, whether it

17  was an investor, whether it was owner occupied or investor

18  property.  It would look at the -- there's 14 different

19  factors, I don't recall all of them right now, that were a part

20  of the scoring process, and it would rate loans, score loans

21  that were the highest risk would get a higher score.

22  Q.   And is it not true that in that assessment you do not

23  consider the loan origination process because it's not an

24  objective factor that yields a score?

25             MR. CORDARO:  Objection.

1          THE COURT:  Well, let's break it down.  In the risk

2   assessment, do you consider the loan origination process?

3          THE WITNESS:  In the risk process?

4          THE COURT:  Well, you're in charge of risk assessment.

5   Do I have that right?

6          THE WITNESS:  Well, credit risk management, yes.

7          THE COURT:  Credit risk management.  Well, in managing

8   credit risk, you make risk assessments, yes?

9          THE WITNESS:  Yes.

10          THE COURT:  And when you're doing that in the context

11   of 2007, 2008, Countrywide mortgages or the like, would you

12   take account of the loan origination process?

13          THE WITNESS:  We would take account of the loan

14   origination process as far as assessing the risk of doing

15   business with a particular entity.

16          THE COURT:  All right.  Would you -- that, therefore,

17   would not be part -- it would be considered in that way and not

18   as part of a score.

19          THE WITNESS:  As part of a score of an automated

20   underwriting system, it would not be a part of that.  The

21   assumption with an automated underwriting system is that the

22   data that is input into the system is accurate data.  So part

23   of the -- how the process can factor into that is that if there

24   is information that is essentially incorrect data put into the

25   system because there's not good processes around the data

DA1TBAN6                      Forlines – cross

1    quality, then it could have an impact on the final decision

2    that comes out of the system.

3              THE COURT:  OK.

4    BY MR. SULLIVAN:

5    Q.  Now sir, it's a fact, is it not, that Fannie as an entity

6    is responsible for knowing and understanding the risks of the

7    various loans it purchases?

8    A.  It's our responsibility of knowing that information with

9    some statistical accuracy, and we do a loan sampling process to

10   be able to determine that.

11   Q.  And that was the part of your group's function, was it not,

12   to know and manage the risk associated with the loans that

13   Fannie purchased?

14   A.  I would say that is part of it.  We certainly, as part of

15   the national underwriting center where we reviewed the files,

16   that is where the loan level file reviews were done, and that

17   group would be responsible at a loan level determining whether

18   loans met our standards or not.

19   Q.  Tell us -- tell the jury what goes on at that center that

20   you just described.

21   A.  There's a review.  We select files for review, and those

22   files are reviewed and we make a determination of whether they

23   meet our eligibility requirements or not.  And if the loans

24   don't meet our eligibility requirements, then a lender would be

25   asked to repurchase those loans.

1    Q.  Now sir, with respect to the risk of loans, is it fair to

2    say that risk of loans can vary from the prime loan to the

3    subprime loan?

4    A.  There's no industry definition at the time period you

5    talked about of what is subprime, and there's not really a

6    definition of that today.  So that's really difficult to answer

7    because there really is no definition.

8    Q.  When you look at a loan product, do you make an assessment

9    of its risk prior to the time that Fannie purchases it?

10   A.  I do not make an assessment of the risk of a particular

11   loan, no, because we're not looking at the loan prior to the

12   purchase.

13   Q.  I'm not asking about a specific loan, I'm talking about a

14   class of loans, like EA loan or alt A loan, before Fannie

15   decides to buy a product that is somewhere between a prime and

16   a subprime in terms of risk, do you assess that product and

17   determine whether Fannie should buy it as a product?

18             MR. CORDARO:  Objection, your Honor.

19             THE COURT:  Overruled.

20   A.  We do make an assessment of a product to determine whether

21   we want to buy the product based on what we think is the nature

22   of the loan parameters under that product umbrella.  I will

23   tell you that the factor you mentioned, prime versus subprime,

24   I will repeat there really wasn't any distinction.  There was

25   no definition in the industry of prime or subprime, so that is

1    not part of the assessment that we made.

2    Q.  It is fair to say that the term "prime" is commonly used in

3    the industry?

4    A.  During the period of time the terms were used, but there

5    was no clear definition of what was prime and what was

6    subprime.

7    Q.  I understand that.  My question is:  Was the term "prime"

8    commonly used in the industry in '07 and '08?

9    A.  The term was used then as it is today, but what the meaning

10   of it is is not something that is clear within the industry.

11   Q.  Is the term -- was the term subprime used in '08 and '07

12   and today as well?

13   A.  Yes, the term was used, but again, there was no clear

14   definition.  In fact, Fannie Mae, in our disclosures to --

15   financial disclosures, 10Ks and Qs, we had a very specific

16   definition of how we defined it, but it was not something that

17   was specific to the industry overall.

18   Q.  Does Fannie buy products that have relatively high risk on

19   the scale of products that it buys?

20              MR. CORDARO:  Objection.

21              THE COURT:  Sustained as to form.

22   Q.  Is it generally considered that a prime loan is a lower

23   risk than a subprime loan --

24              MR. CORDARO:  Objection.

25   Q.  -- as the terms are used in the industry?

1           MR. CORDARO:  Objection.

2           THE COURT:  Sustained.  You did indicate, however,

3  that Fannie Mae has its own definition of prime or subprime or

4  both?

5           THE WITNESS:  Yes, your Honor.

6           THE COURT:  What is that definition?

7           THE WITNESS:  I don't know the specifics, but I can

8  tell you that it is generally defined by the lender, not by the

9  loan level characteristics.  And the lender list was pretty

10  much used by -- there was a HUD designation of a group of

11  subprime lenders during that period of time.  So it was

12  defined, again, at the lender level, not by the loan

13  characteristics.

14           MR. SULLIVAN:  Thank you, sir, that's all I have.

15           THE COURT:  Counsel for Ms. Mairone.

16           MR. MUKASEY:  Thank you, Judge.

17  CROSS-EXAMINATION

18  BY MR. MUKASEY:

19  Q.  Hi, Mr. Forlines, my name is Marc Mukasey and I represent

20  Rebecca Mairone.  How are you doing?

21  A.  Fine, thank you.

22  Q.  You have never met Rebecca Mairone personally, correct?

23  A.  No.

24  Q.  Never spoken with her by telephone, am I right?

25  A.  No, I haven't.

1   Q.  And you have never had any correspondence with Rebecca by

2   email, correct?

3   A.  No.

4   Q.  Never present in any meeting where Rebecca was present?

5   A.  Not that I recall.

6   Q.  And you are not aware of any statement Rebecca Mairone made

7   on behalf of Countrywide to Fannie Mae, are you?

8   A.  No.

9            MR. MUKASEY:  Thank you, Judge.

10           THE COURT:  Anything further?

11           MR. CORDARO:  Brief redirect, your Honor.

12           THE COURT:  Go ahead.

13  REDIRECT EXAMINATION

14  BY MR. CORDARO:

15  Q.  Mr. Forlines, you were asked on cross-examination about

16  whether the selling guide specifies loan origination process.

17  Do you recall those questions?

18  A.  Yes.

19  Q.  If we could turn again to representation and warranty

20  number 17 in Government's Exhibit 1.

21  A.  Do you recall the page number?

22  Q.  That's OK, Mr. Forlines, we'll move on to another topic.

23           You recall being asked on direct if the selling guide

24  or contracts are specific with respect to loan processors or

25  loan specialists or underwriters.  Do you recall those

1    questions?

2    A.   Yes.

3    Q.   Does the contract contain any provisions dealing with the

4    qualifications of staff at the lender who are working on

5    mortgages to be sold to Fannie Mae?

6    A.   Yes.

7    Q.   And do those qualifications pertain to any people, whatever

8    they are called, that are doing underwriting or loan processing

9    at the lender?

10   A.   Yes.

11   Q.   You were asked some questions about CLUES.  Do you recall

12   those questions?

13   A.   Yes.

14   Q.   With respect to CLUES, is CLUES performing all of the --

15   well, withdrawn.

16        With respect to Fannie Mae's Desktop Underwriter, is

17   the Desktop Underwriter performing all underwriting tasks for

18   the lender that would be using it?

19   A.   No.

20   Q.   Would CLUES be performing all underwriting tasks for the

21   lender that is using it?

22   A.   No.

23   Q.   Would there be certain tasks that would have to be

24   performed by a human being?

25   A.   Yes.

1  Q.  Would that human being have to be qualified pursuant to the

2  terms of the contract?

3  A.  Yes.

4  Q.  And are you familiar with conditions as they relate to an

5  automated underwriting system?

6  A.  I'm familiar generally conditions, yes.

7  Q.  What are conditions?

8  A.  The conditions in Desktop Underwriter or CLUES or whatever

9  an automated underwriting system would be used would be things

10  that would need to be clear in order for the recommendation to

11  essentially be valid.

12  Q.  And would that be -- what kind of recommendation are you

13  talking about?

14  A.  The loan approval recommendation.

15  Q.  And when you say that those conditions would have to be

16  cleared, does the automated underwriting system clear those

17  conditions?

18  A.  No.

19  Q.  Does a human being clear those conditions?

20  A.  Yes.

21  Q.  Does the human being have to be qualified pursuant to the

22  contract?

23  A.  Yes.

24  Q.  And are you familiar with the concept of clearing to close

25  a loan?

1    A.  Generally, yes.

2    Q.  What does it mean to you?

3    A.  Essentially that the conditions that were for closing,

4    whether the loan went through an automated underwriting system

5    or it was mainly underwritten, whatever the case may be, that

6    all the conditions by the underwriter or the underwriting

7    system has been cleared and the loan was ready to be closed.

8    Q.  If an automated underwriting system is being used, does the

9    automated underwriting system clear to close the loan?

10   A.  No.

11   Q.  Does a human being do it?

12   A.  Yes.

13   Q.  Does that human being have to be qualified?

14   A.  Yes.

15           MR. CORDARO:  Nothing more on redirect, your Honor.

16           MR. SULLIVAN:  Nothing, your Honor.

17           THE COURT:  Very good.  Thank you very much.  You may

18   step down.

19           Please call your next witness.

20           MS. SCHOENBERGER:  United States calls Ira Holt.

21    IRA HOLT, JR.,

22        called as a witness by the Plaintiff,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. SCHOENBERGER:

DA1TBAN6                     Holt - direct

1              DEPUTY CLERK:  State your name and spell it slowly for

2    the record.

3              THE WITNESS:  Ira Holt, Jr., H-O-L-T.

4              THE COURT:  Counsel.

5    BY MS. SCHOENBERGER:

6    Q.  Good afternoon, Mr. Holt.

7    A.  Good afternoon.

8    Q.  Can you please tell the jury your occupation.

9    A.  I am director of financial services consulting for Analytic

10   Focus LLC.

11   Q.  Mr. Holt, has the United States asked you to give an expert

12   opinion in this case?

13   A.  They have.

14   Q.  What were you asked to opine about?

15   A.  I was asked to opine regarding the origination of

16   Countrywide loans.

17   Q.  Before I ask you about your opinion, I would like to ask

18   you a little bit about your professional background.

19   A.  OK.

20   Q.  Where did you graduate from college?

21   A.  University of Alabama.

22   Q.  What was your degree in?

23   A.  I have a bachelor of science in corporate finance.

24   Q.  Since college, have you earned any additional degrees?

25   A.  I have.  I have a master of arts in public and private

1   management from Birmingham Southern College, then a graduate

2   degree in retail bank management through the University of

3   Virginia.

4   Q.  And did your graduate studies for your retail bank

5   management degree include instruction in underwriting loans?

6   A.  They did, as well as how properly underwriting loans

7   affects the income and balance sheets of financial

8   institutions.

9   Q.  Did you go to graduate school immediately after college?

10  A.  I'm sorry?

11  Q.  Did you go to graduate school immediately after college?

12  A.  No, I was working for several years and then went and

13  attained my master's degree after I had been working.  So I did

14  it after hours at nights and weekends.

15  Q.  And where did you work after college?

16  A.  I went to work right at South Trust Bank, which is -- was a

17  regional financial institution in Birmingham.

18  Q.  How long did you work at South Trust Bank?

19  A.  I was there for 13 years.

20  Q.  And what were your job responsibilities at South Trust?

21  A.  Majority of what we did back then was lending, mortgage

22  lending, because that's the main source of the income for banks

23  during that period of time.  So my chief responsibility was

24  originating loans as well as managing underwriters who were

25  also originating loans.

DA1TBAN6                          Holt - direct

1    Q.  And how frequently were you involved in loan underwriting

2    in your 13 years at South Trust Bank?

3    A.  I was doing it 90 percent of the time.

4    Q.  What year did you leave South Trust?

5    A.  I left in 1997.

6    Q.  Did you continue to work in the banking industry after

7    1997?

8    A.  I did.

9    Q.  For how long?

10   A.  Until 2009.

11   Q.  Was that about twelve years?

12   A.  That's correct.

13   Q.  How many different banks did you work for during that time?

14   A.  Five banks.

15   Q.  And what type of work did you do at those banks?

16   A.  Two of the banks I actually went and started new banks,

17   they were for larger bank holding companies, so I was asked to

18   go in and start the bank from scratch.  Two other banks I went

19   as an area executive to manage larger markets of loans and

20   people, of which one of them I was promoted to area president

21   for a whole large section of Alabama shortly after arriving

22   there.

23   Q.  And did your job responsibilities at those banks include

24   underwriting mortgage loans?

25   A.  They did.

1   Q.  Was that a significant part of your job responsibility?

2   A.  It was still upwards of 90 percent of my responsibilities.

3   Q.  By 2009, how many loans would you estimate you participated

4   in underwriting during your career to that point?

5   A.  It was upward of 10,000 loans.

6   Q.  Of those 10,000 loans, how many did you personally

7   underwrite by reviewing the loan file start to finish?

8   A.  It was right at 75 percent of those loans.

9   Q.  How did you participate in underwriting the other 25 of

10  those loans?

11  A.  As you move up, you have other responsibilities with your

12  originators, so I would look at loans that senior people would

13  have made that needed to be reviewed and signed off on.  So I

14  was working with more of the senior people in looking at the

15  loans, ensuring that they were being underwritten properly and

16  to guidelines before they were originated and then the funds

17  let out to them.

18  Q.  Were you ultimately responsible for approving or not

19  approving a loan based on your review of the underwriting work

20  of others?

21  A.  That's correct.

22  Q.  In your experience in the banking industry, was it

23  difficult to make loan approval decisions based on reviewing

24  the underwriting work of the people you supervised?

25  A.  Well, when you have senior people, they have years of

1    experience, they have been trained in underwriting, and so they

2    moved up through the ranks and their responsibilities

3    increased.  So you wouldn't look at the entire file, but you

4    would look at certain aspects of the loan file to ensure that

5    income might have been calculated correctly and we had the

6    right documents in the file and things like that.  So you rely

7    on your more senior people to be able to do that work, and then

8    your review goes on based on a minimal look at that point.

9    Q.  Where did you go to work in 2009?

10   A.  I was hired by company called Analytic Focus, LLC.

11   Q.  What does Analytic Focus do?

12   A.  They are a research organization that does a lot of

13   statistical and analytical work, research.  We do due diligence

14   for the Department of Justice and all kinds of other things

15   besides what I am charged to do in doing due diligence and loan

16   re-underwriting.

17   Q.  Do you provide litigation consulting services?

18   A.  I do.

19   Q.  How long have you worked at Analytic Focus?

20   A.  It will be four years this month.

21   Q.  What is your role there?

22   A.  I am director, so I manage a team of underwriters and

23   auditors.

24   Q.  Since you have been at the Analytic Focus, have you been

25   hired to provide expert opinions in cases besides this one?

DA1TBAN6                        Holt - direct

1   A.  I have.

2   Q.  And how many cases have you been hired to provide an expert

3   opinion?

4   A.  Ten that I have done so far, but we're working -- we have

5   six others in the process, so a total of six to eight.

6   Q.  Did any of those cases involve your opinion regarding the

7   underwriting of loans?

8   A.  Yes.

9   Q.  How many of them?

10  A.  Fourteen of the 16 did, but the other two were cases where

11  there was actually just one loan that was in question.

12  Q.  In order to provide your opinion in those cases, did you

13  have to underwrite loans?

14  A.  I did.

15  Q.  Since you have been at the Analytic Focus, how many loans

16  would you estimate that you participated in underwriting?

17  A.  We have done right at 12,000 loans over the last four

18  years.

19  Q.  Does that include both loans that you have personally

20  underwritten yourself and loans you have reviewed after an

21  initial underwriting by someone on your staff?

22  A.  That's correct.

23  Q.  Over the course of your career, how many loan files have

24  you participated in underwriting?

25  A.  Over the whole career, again, probably 75 percent of me

DA1TBAN6                      Holt - direct

1    looking at loan files and then another 25 percent would be the

2    managing and looking at other people's work.

3    Q.  Prior to joining Analytic Focus, had you ever provided an

4    expert opinion for a case before?

5    A.  I had not.

6    Q.  So all of your prior professional experience had actually

7    been working in the banking industry?

8    A.  That's correct.

9    Q.  Have you been retained by the United States to offer an

10   expert opinion in this case?

11   A.  I have.

12   Q.  Are you being compensated for your time on this case?

13   A.  I am.

14   Q.  In what way?

15   A.  Well, we have a contract or engagement or whatever you

16   would like to call it, a charge and a rate -- an hourly rate

17   based on the work I do outside of being in here, which is 425

18   an hour, and then we charge a rate of 510 for any kind of

19   testimony at depositions or at trial.

20   Q.  Is that a standard rate?

21   A.  As far as I know.  The company sets the rates for us, but I

22   believe that's pretty much standard.

23   Q.  Does the amount charged to the United States depend on

24   your -- the opinion that you give in this case?

25   A.  No, it does not.

1   Q.   Does it depend on what verdict the jury returns?

2   A.   No, ma'am.

3   Q.   What process did you use to arrive at your opinions in this

4   case?

5   A.   We looked at Countrywide's underwriting guidelines.

6   Q.   And after you looked at Countrywide's underwriting

7   guidelines, what did you do?

8   A.   We obtained all the loan files, any additional information

9   to assist us in going through the loan files to see if they met

10  the guidelines that Countrywide had in place at the time that

11  these loans were originated.

12  Q.   Was there a name for that kind of review?

13  A.   Well, we called it re-underwriting.

14  Q.   And can you describe what it means to re-underwrite a loan?

15  A.   We look at how the loan was originated at the time that the

16  borrower applied for the loan.  And we look at the what's

17  called the credit file, which is basically a story of

18  everything that has transpired from the time that the borrower

19  applies for the loan to the time that the loan is funded or

20  closed and the money went out, and then compare how that was --

21  the loan was made based on the guidelines in place during that

22  time or at the time that the loan was made.

23  Q.   In this case, did you re-underwrite loans alleged to have

24  been processed through the High-Speed Swim Lane process at

25  Countrywide?

1  A.  Yes, ma'am.

2  Q.  How did you select which loans to review?

3  A.  The loans were provided to us from Dr. Charles Cowan, so it

4  was my understanding that a sample of loans that were given to

5  us.

6  Q.  Did you play any role in selecting that sample of loans?

7  A.  No, ma'am.

8  Q.  Did the sample of loans come through -- come from a

9  specific time period?

10  A.  Yes, they were from about August 13, 2007 to May 21, 2008.

11  Q.  And how many loans did you review from that time period

12  that were alleged to have come through the Hustle process?

13  A.  There were 343.

14  Q.  What was the first step of your re-underwriting process?

15  A.  We have teams that do different projects, and so the team

16  that was going to start this project we have a kick off

17  meeting.

18  Q.  Who was on the team for this re-underwriting project?

19  A.  We had a senior credit re-underwriter, then she had four

20  re-underwriters, and then myself, so there were six total.

21  Q.  And did the size of that change at any point in the

22  process?

23  A.  It did change as we were getting into I guess the latter

24  part of the review period.

25  Q.  Did you give your team any instructions at the kick off

1    meeting you described?

2    A.   Sure, we -- when we get the files and the guidelines, once

3    they come to us we have to organize everything and put them in

4    chronological order, kind of like an index, then put those loan

5    files -- we put them on a network so that our underwriters can

6    see it.  So we'll go through that process, and talk about where

7    everything is, talk about the project, who the originator is,

8    who we should see as the originator of the loan files.  We go

9    through where the loan files are, because some of these loan

10   files can be quite large, so we want to be sure everybody knows

11   exactly where on the network system -- it's all secure, can go

12   in and find the loan files.  We talk about -- we create a

13   survey where we collect the data after review has taken place,

14   we have to have some place to put the data in a system, so we

15   have a survey system that we put the information in.

16   Q.   Did you provide instructions to your team about how to

17   re-underwrite the loans they were looking at?

18   A.   We put together a protocol sheet that explains what kind of

19   guidelines are out there and what to refer to, and then just

20   things that might be pertinent to the project.  If it's first

21   mortgages, things you ought to see, anything like that, that

22   relates back to the guidelines.  If you see them, just take

23   note of it and be sure you refer to the right guidelines.

24   Q.   Which guidelines did you use for this re-underwriting

25   project?

DA1TBAN6                         Holt - direct

1    A.  Countrywide has a conventional technical manual which they

2    call a CTM.  It tells you everything about re-underwriting

3    loans, what are good properties, how you calculate loan to

4    value, how you calculate that to income, if you have rental

5    property, how do you calculate cash flow on that.  So you have

6    all those type of different more general items.

7            Then we had a loan program guide that talks about

8    product specific 30-year fixed rates or adjustable rate

9    mortgages and things like that.  Then we had Fannie Mae's

10   seller guidelines and their servicing guidelines.  And then we

11   also had Freddie Mac's -- I think they're called selling and

12   servicing guidelines.  And the last thing is we had master

13   agreements that had been executed between Fannie Mae and

14   Freddie Mac and Countrywide at the beginning of the time period

15   these loans were being originated.

16   Q.  What time period were these guidelines from?

17   A.  They were in the same relevant period, between August of

18   2007 and May of 2008.

19   Q.  And why did you choose guidelines from those years?

20   A.  If you're going to re-underwrite loans, you want to be sure

21   you're following the right guidelines, so you want to use the

22   right ones for the loan.  So those were the time frame those

23   guidelines were in.

24   Q.  Why did you choose to use guidelines from Countrywide,

25   Fannie Mae and Freddie Mac?

DA1TBAN6                        Holt - direct

1   A.  Based on the master agreements that we had, they made

2   reference to using Countrywide guidelines, and they had

3   variances of different products.  They also reference Fannie

4   Mae's seller guidelines to refer to as well as Freddie Mac's,

5   so we wanted to be sure we had everything in place.  It's

6   easier to get it in the beginning than down the line.  So we

7   wanted to be sure we had everything that was relating to the

8   project at hand.

9   Q.  What's the purpose of underwriting guidelines?

10  A.  It's kind of like a road map.  It tells you what to do from

11  beginning to end, what kind of documents you want to obtain

12  when someone comes in and applies for a loan, getting

13  applications, what other documents that need to be obtained.

14  So if you want to verify someone's employment, there are

15  certain ways to do that, certain forms you have to get filled

16  out.  So you want to be sure you have all that in place to be

17  able to make a credit decision and make sure that the borrower

18  is willing and able to repay a loan, and that you have

19  collateral in place so if the borrower can't make the payments,

20  you have something you can liquidate and repay the loan.  And

21  that's called the three Cs of credit, is that definition of

22  ability to repay the loan, they're willing to repay the loan,

23  and you have sufficient collateral.  And it's capacity, credit

24  and collateral is what the three Cs stand for.

25  Q.  Let's start with that first C.  What is capacity?

DA1TBAN6                        Holt - direct

1   A.  Capacity is -- it talks about the ability of a borrower to

2   make the loan payments.  Do they have income?  Is that income

3   sufficient?  Is that income verified?  And you look at job

4   history and you make sure that income is good.  So that's the

5   key is can they, the borrower, repay the loan off?

6            The second part is credit, which goes back to the

7   willingness of a borrower to repay a loan.  And you can look at

8   credit history and different aspects of how they have handled

9   mortgage history, rent history, things like that.

10  Q.  And the third C, collateral, what does that mean?

11  A.  The collateral is the property being used to secure the

12  note.  In these instances, it's real estate.  So you want to be

13  sure that the property has sufficient value, that it is a good

14  piece of property, actually a piece of property out there that

15  if you had to foreclose on it's there.  Because that's your

16  last way for a lender to be able to collect on loan, so they

17  foreclose on the real estate and sell it and get the money back

18  to be able to pay off the debt on the loan that they had lent.

19  Q.  Did your team have access to the three sets of guidelines

20  that you discussed while they were re-underwriting the loans

21  they looked at?

22  A.  Yes, ma'am.

23  Q.  What was your role on the team that you assembled?

24  A.  I didn't understand you.

25  Q.  What was your role on the team that you assembled?

1    A.   I managed the whole process, so I'm director of everything.

2    So I want to be sure that the process is going smoothly, that

3    everybody has what they need to have.  There's times that come

4    up that we'll start looking at a loan file and we have no

5    guidelines for it, there's something that is different about

6    it, so I would be sure that we have the guidelines in place.

7    So I'm basically directing the whole process from beginning to

8    end to be sure that we have the resources available to do our

9    job.

10   Q.   Were all of the people on your team employees of Analytic

11   Focus?

12   A.   Yes, they were.

13   Q.   Who hired them?

14   A.   I hired them.

15   Q.   Did everyone on your team have prior mortgage underwriting

16   experience?

17   A.   They did.

18   Q.   Did you mention that your team included a senior

19   underwriter?

20   A.   That's correct.

21   Q.   What was the role of the senior underwriter on the team?

22   A.   She manages the regular re -- I shouldn't say regular,

23   junior re-underwriters to ensure that they're doing the same

24   thing, answering questions that might arise during the day.

25   She re-underwrites loans as well, and she does quality control

DA1TBAN6                         Holt - direct

```
 1  on her people's work on a daily basis.  As they go through

 2  these, she's go through and check the loans.

 3  Q.  How many years of prior mortgage underwriting experience

 4  did your senior underwriter have at the time of this project?

 5  A.  She had a little over 25 years.

 6  Q.  Did your team also include an auditor?

 7  A.  Yes, we have a head of auditing and quality control.  And

 8  that person's chief responsibility is to go through and look at

 9  loans.  And he opens loan files on every single loan and checks

10  documents and goes behind the underwriters to make sure they're

11  doing their work.  So he works in conjunction with the senior

12  underwriter and me.

13  Q.  And at the time of this project, did he have prior

14  underwriting experience?

15  A.  Yes, ma'am.

16  Q.  How many years of experience?

17  A.  I believe it was somewhere around 17 years.

18  Q.  Were any of the underwriters on your team lawyers?

19  A.  No, ma'am.

20  Q.  Is legal training necessary to be able to re-underwrite a

21  loan?

22  A.  It's not.

23  Q.  Would legal training be helpful in re-underwriting loans?

24  A.  Not that I can see.

25  Q.  Why not?
```

1   A.  I don't think that anybody that doesn't have any training

2   in re-underwriting loans, and whether they're a lawyer or a

3   doctor, they're going to be able to assess whether a borrower

4   can repay the loan, that they have the ability to repay the

5   loan, that they can look at that and look at whether a borrower

6   is willing to repay the loan or do analysis on a collateral.

7   Q.  Where was your team physically located?

8   A.  Our office is in Birmingham, Alabama.

9   Q.  And were all members of the team in the same office?

10  A.  All but two, they came on just at the end, and they are in

11  San Antonio.  We opened up a second underwriting office at our

12  home office in San Antonio.

13  Q.  Are you located in Birmingham, Alabama?

14  A.  I'm in Birmingham.

15  Q.  Were you in the same office space as the underwriters on

16  your team?

17  A.  Yes.

18  Q.  Were you available for questions if there were?

19  A.  Yes, we have our office -- the way it's set up is kind of

20  like this room, not as nice, it is all open space.  So our

21  underwriters sit behind like four-foot cubicles, they're small

22  shelfs -- or walls.  And so it's all open so they can

23  communicate with one another as well as have a little privacy

24  in the work they're doing.  So it's all open to communication

25  and chitchat and anything that is going on within a case, so

1  that the senior knows what is going on and other people can get

2  involved with conversations if need be.

3  Q.  How did that work structure compare to your work experience

4  underwriting loans in the bank industry?

5  A.  It's similar.  It depends on locations of office buildings

6  that have their set up, but most of them are open like that

7  where senior is sitting in maybe a larger cubicle or office

8  outside the underwriters that are accessible and available to

9  their people to help in different instances or situations.

10 Q.  Did you supervise the work of your underwriting team?

11 A.  I did.

12 Q.  At any point did you ask any questions regarding the review

13 materials you provided to your team to anyone outside the

14 Analytic Focus?

15 A.  Yeah, we had questions when we find things that we need

16 responses or answers to.

17 Q.  And who did you direct your questions to?

18 A.  Directed my questions to the counsel for government.

19 Q.  And did they respond to those questions?

20 A.  If they could, yes.  If not, then they would find out

21 answers.

22 Q.  And how did they facilitate finding out answers?

23 A.  There were instances where we would find things that we

24 needed responses from both Fannie Mae or Freddie Mac, and so we

25 would go through counsel to get those responses and then they

DA1TBAN6                     Holt - direct

1    would facilitate phone calls.

2    Q.  So did you speak directly to anyone at Fannie Mae or

3    Freddie Mac?

4    A.  I did.

5    Q.  Who did you speak with at Freddie Mac?

6    A.  It was a lady by the name of Pam Padgett was usually on the

7    phone call.  Sometimes we had a couple of other people, I can't

8    remember their names, but she was the main person that I spoke

9    to.

10   Q.  And who did you speak to at Fannie Mae?

11   A.  There was a lady by the name of Maria Brewster, and I

12   believe she was located in Chicago, but I could be wrong, but

13   she was the one that would get on the phone with us.  Again, we

14   might have another party on the phone call, but she was the

15   main contact.

16   Q.  How often did you or how many times did you speak to people

17   at either Fannie Mae or Freddie Mac during the course of your

18   review?

19   A.  We had weekly phone calls from the very beginning, and it

20   lasted four to five weeks, and at that point the conversations

21   ceased.

22   Q.  So you spoke to Fannie Mae and Freddie Mac about four or

23   five times each?

24   A.  That's correct.

25   Q.  And for how long did you speak with them during these

DA1TBAN6                          Holt - direct

1    conversations?

2    A.  It was very short calls, and we would only have a couple of

3    questions.  I would say 15 minutes at the most on each call.

4    Q.  And what types of questions did you ask them?

5            MR. SMURZYNSKI:  Objection, starting to get into

6    hearsay.

7            THE COURT:  Well, on that objection, I don't

8    understand how asking a question could ever be hearsay.

9            MR. SMURZYNSKI:  I'm concerned it's going to elicit

10   hearsay given the way it was posed.

11           THE COURT:  I'm concerned in a different sense, I

12   think we've spent quite a few minutes laying a foundation.  It

13   would be interesting to know what this witness actually

14   concluded.

15           MS. SCHOENBERGER:  I can move on, your Honor.

16           THE COURT:  But in order to allow you to move on to

17   that, we're going to give the jury their mid-afternoon break at

18   this time.  15 minutes and then we'll come back.

19           (Continued on next page)

20

21

22

23

24

25

DA1TBAN6                          Holt - direct

```
 1              (Jury not present)
 2              THE COURT:  Anything counsel need to raise with the
 3    Court?
 4              All right.  How long are you going to be on direct?
 5              MS. SCHOENBERGER:  It could be up to another two and a
 6    half hours, your Honor.
 7              THE COURT:  An optimum of?
 8              MS. SCHOENBERGER:  Up to two and a half hours.
 9              THE COURT:  Two and a half hours?  Did I hear you say
10    two and a half hours?
11              MS. SCHOENBERGER:  I thought you might have heard me
12    say two hours.
13              THE COURT:  My hearing is definitely improving.
14              See you in 15 minutes.
15              (Recess taken)
16              (Continued on next page)
17
18
19
20
21
22
23
24
25
```

DA1TBAN6                              Holt - direct

 1              (Jury present)

 2              THE COURT:  Counsel.

 3    BY MS. SCHOENBERGER:

 4    Q.  Mr. Holt, who is assigns loans to your underwriters to be

 5    reviewed?

 6    A.  I have an assistant, and when we get assignment of loans

 7    she just divvies them out to the different underwriters a

 8    certain number to start on.

 9    Q.  Were loans assigned in any particular order?

10    A.  No, ma'am, just from the list we have.

11    Q.  After receiving a loan assignment, what would the

12    underwriter do next?

13    A.  As I mentioned earlier, we have all the loan files on a

14    network, and so they would find the loan that has been assigned

15    to them and then they would go and find that loan.  And usually

16    it's in a folder.  It could be different, but in this instance

17    they were folders and different documents that were labeled for

18    them to start.  So they would get the beginning file, and then

19    they would start writing down every page that they found within

20    that loan file.

21    Q.  At some point in the review would the underwriter make a

22    determination about the quality of that loan?

23              MR. SMURZYNSKI:  Objection, your Honor.

24              THE COURT:  Ground?

25              MR. SMURZYNSKI:  Foundation.

1           THE COURT:  Overruled.

2    A.   During the process you have to go through and look at the

3    loan file, I mean everything in there.  Some of these loan

4    files could be a thousand pages long.  So they would find out

5    what kind of loan it is, what kind of borrower it was, find the

6    guidelines that I had mentioned earlier where we had all those

7    set out for them to go find, and they would go through the

8    re-underwriting process.  And once they found all the pertinent

9    documents and compared them to the guidelines, they would make

10   a determination whether or not the loan met the guidelines or

11   not, and then they would make that determination.

12   Q.   How many possible determinations could an underwriter make

13   in this particular review?

14   A.   There were three.

15   Q.   And what were those three determinations?

16   A.   You had investment quality, investment quality with

17   defects, and materially defective.

18   Q.   And what does investment quality mean?

19   A.   Countrywide, Fannie Mae and Freddie Mac has the same --

20   basically the same definition, and investment quality is a loan

21   to a borrower, as I mentioned earlier, who has the ability and

22   willingness to repay the loan and there's sufficient

23   collateral.  Countrywide actually says investment quality loan

24   is that, and Fannie Mae and Freddie Mac compare it to the three

25   Cs of credit, that's when they use it as I mentioned previously

1    as well.

2    Q.  Based on your review of Fannie Mae and Freddie Mac's

3    guidelines, have you developed an understanding of what level

4    of risk they will accept from purchasing loans from Countrywide

5    in the 2007, 2008 time period?

6              MR. SMURZYNSKI:  Objection.

7              THE COURT:  Ground?

8              MR. SMURZYNSKI:  Lack of foundation, amongst other

9    things, absence of 26(a)(2) report.

10             THE COURT:  OK.  The lack of foundation is overruled.

11   On the point you're now making we need to have a side bar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  So this is, I think, a form of an opinion.

3    Was it disclosed in his report?

4          MS. SCHOENBERGER:  The very definition of materially

5    defective versus investment quality goes to whether or not it

6    complies with the guidelines and could be sold to the GSEs.

7          THE COURT:  I'm sorry?

8          MS. SCHOENBERGER:  The very definition of the

9    materially defective or investment quality is based on the

10   compliance with guidelines and whether they could be sold to

11   the GSEs, and that's the basis of his report.

12         THE COURT:  So is that all he's saying in response to

13   the question?

14         MS. SCHOENBERGER:  Yes.  What I expect him to testify

15   is that an investment quality loan could be sold to the GSEs

16   and a materially defective one could not be.

17         MR. SMURZYNSKI:  I have no problem with the question

18   asking about whether it complied with the guidelines, but the

19   question was whether he knew what risk Fannie and Freddie --

20         THE COURT:  It was broadly phrased, but I think as

21   it's now been clarified, maybe the simple way to do it is for

22   her to put a leading question, since this is an expert, and

23   then we can move on, and there will be no problem.  OK?

24         MR. SMURZYNSKI:  I have no problem with that.

25         (Continued on next page)

1    BY MS. SCHOENBERGER:

2    Q.  Mr. Holt, based on your review of the Fannie Mae and

3    Freddie Mac guidelines, is an investment quality loan one that

4    could be sold to Fannie Mae or Freddie Mac?

5    A.  Yes, ma'am.

6    Q.  What does investment quality with defects mean?

7    A.  I guess you could think of it like a used car.  It has some

8    dings to it, there are some issues with it, but you got a

9    warranty, new tires, all this stuff.  So investment quality

10   with defect loan is sort of the same.  It has some glitches to

11   it.  There might be a couple of issues that might be outside

12   the guideline, but you have what they call compensating factors

13   that outweigh those risks.  So in terms of underwriting loans,

14   you want -- what you're trying to do is analyze the credit

15   risk.  So you have risk in one hand, but you had other parts

16   within the loan file that strengthen that credit risk.  So it

17   still had some hiccups to it, but it is still an investment

18   quality loan.

19   Q.  And based on your review of the guidelines, could a loan

20   that's investment quality with defects be sold to Fannie Mae or

21   Freddie Mac?

22   A.  They can, yes.

23   Q.  What does materially defective mean?

24   A.  Those are loans that, as I go back to the three Cs once

25   again, that's kind of a foundation of underwriting.  There is

1    something wrong with the borrower's ability to repay the loan,

2    he's got bad credit history where he shows he's not willing to

3    repay the loan, and there could be problems with the

4    collateral.  Now you don't have to have all three to make it

5    materially defective, but there's not enough strengths to

6    outweigh the weaknesses or the risk of the loan, so that is

7    considered a materially defective loan.

8    Q.  Based on your review of the guidelines, can a loan that is

9    materially defective be sold to Fannie Mae or Freddie Mac?

10   A.  No, ma'am.

11   Q.  Of the 343 Hustle loans that your team reviewed, how many

12   did you determine were materially defective?

13   A.  There were 185 or 53.9 percent.

14   Q.  More than half?

15   A.  Yes, ma'am.

16   Q.  After an underwriter made the determination with respect to

17   a particular loan in this review, what was the next step?

18   A.  The survey that we discussed earlier, they would access

19   that survey and put their responses into the survey so that the

20   data that's put in there could be extracted later for analysis.

21   So they would go in and fill out the survey.

22   Q.  Where did the survey come from?

23   A.  I created it.

24   Q.  Based on what?

25   A.  Based on the guidelines that were in place during the

DA1TBAN6                        Holt - direct

 1    relevant period of time, as well as the requirements of both

 2    Fannie Mae and Freddie Mac to purchase those loans.

 3            MS. SCHOENBERGER:  Your Honor, may I approach the

 4    witness?

 5            THE COURT:  Yes.

 6    Q.  Mr. Holt, I handed you what has been marked for

 7    identification as Plaintiff's Exhibit 436.  What does this

 8    document reflect?

 9    A.  When the re-underwriters completed the survey and they made

10    their determination of whether it was investment quality,

11    investment quality with defects or materially defective, if

12    they selected that it was investment quality with defects or

13    materially defective, then you would want to select the reasons

14    why.  And so this is a list of the nine material defects that

15    the re-underwriters would count.

16    Q.  Is this an accurate list of the categories in your survey?

17    A.  Yes, ma'am.

18    Q.  Would this list be helpful to illustrate your testimony

19    regarding the survey?

20    A.  Sure.

21            MS. SCHOENBERGER:  Your Honor, the United States

22    requests to use this as a demonstrative to the jury.

23            MR. SMURZYNSKI:  No objection, your Honor.

24            MR. MUKASEY:  No objection.

25    Q.  Mr. Holt, are these the nine defect categories captured by

1    the survey design?

2    A.   They are.

3    Q.   And where did these defect categories come from?

4    A.   This is a list of items from Fannie Mae and Freddie

5    Mac's -- their post-audit analysis.  So when a loan is sold,

6    these are the categories they go to look to see if it meets the

7    guidelines and their requirements to purchase a loan.

8    Q.   And just briefly, what type of defect does the first

9    category, documents, signify?

10   A.   Documents are supposed to be in the loan file, required

11   documents, whether appraisal or credit report, there's a list

12   of things they have that talks about different docs that are

13   supposed to be in the -- or documents that are supposed to be

14   in the loan file.

15   Q.   What did the second category of defect, misrepresentation,

16   what does that signify?

17   A.   That could be things like discrepancies within an

18   application or within a credit report where it might say this

19   is not the same borrower, there's issues with Social Security

20   numbers or date of births or addresses, so there's items within

21   that misrepresentation that there's something not right there.

22   Q.   And the third category, eligibility, what kind of defect

23   does that represent?

24   A.   That's more specific into the requirements of both Fannie

25   Mae and Freddie Mac and the items they're looking for in terms

1   of is this the right kind of loan product and things they would

2   actually purchase.  So there's a list of items that qualify as

3   a loan based on what they're looking for in terms of the type

4   of products.

5   Q.  And is that different from the fourth category, property

6   eligibility?

7   A.  It is different.  Property eligibility would have to do

8   with:  Can we do a loan on a manufactured house, but the house

9   is sitting on a piece of property they don't own.  Or would

10  they lend on log homes.  We have log homes down South, but

11  would they lend on them, because there's a certain amount of

12  risk.  So things like that, you're looking at whether or not it

13  is a type of urban development planning, condo, so things like

14  that whether the properties would be eligible for purchase.

15  Q.  And the fifth category, property, what does that category

16  represent?

17  A.  That's more in line with the appraisals that are in the

18  file.  They look at things like the address on the appraisal

19  doesn't meet the address of the property, or there's comps

20  within an appraisal that doesn't match the subject property.

21  There could be things like they say that the property is owned

22  by Ira Holt, but Ira Holt doesn't own the property.  So things

23  like that that are outside that might cause red flags and

24  issues, did they actually appraise the right property, is that

25  a good, valid property.

1    Q.  The sixth category, AUS, what type of defect does that

2    represent?

3    A.  That goes back to the automated underwriting system, and

4    that has to do with were items that were put into the AUS

5    correct.  So if somebody was making $3,000 a month but they

6    were only making a thousand dollars a month, were they putting

7    the right things into the AUS.  So the underwriter inputs all

8    that information, so is that correct, they go back and review

9    that.

10   Q.  The next category, the seventh there, income, what kind of

11   defect would that be?

12   A.  Goes to conditions of proving income.  Sometimes the

13   automated underwriting system would have specific requirements

14   that might be outside the guidelines, or the guidelines

15   themselves might require a certain type of approval.  And so

16   you have to go in there and look and see if the income was

17   verified and authenticated the way the guidelines state.  So

18   there's a list of four or five issues there that you have to

19   look for.

20   Q.  And the eighth category, credit defects, what kind of

21   defects are those?

22   A.  Sometimes borrowers will have judgments or liens against

23   them or charged off accounts, collections past due.  And when

24   it comes to credit, there are things you're supposed to verify,

25   is this the borrower's credit, is it somebody else's, what were

1   the reasons, should there be a letter of explanation explaining

2   why that is.  So that falls under the credit.  That's more the

3   second C, the credit part.  So you see these are starting to

4   fall into the three Cs of credit.

5   Q.  Finally the assets category, what type of defect does that

6   represent?

7   A.  That is say you are buying a house and you're going to put

8   20 percent down, so you want to verify that you have -- the

9   borrower has 20 percent.  Well, you might want to also verify

10  that they have enough money for all the closing costs that are

11  involved.  So that goes back to verifying that the borrower has

12  the assets, that they're their own assets.  They might require

13  you to have a certain amount of money in the bank after you

14  make the closing.  So that all falls within the assets.

15  Q.  Did your survey capture any information besides these nine

16  defect categories?

17  A.  It collects a lot of information from what our loan to

18  value calculations were, which is how much is lent versus the

19  value of the property.  So if you had an $80,000 loan and a

20  $100,000 piece of property, that's 80 percent loan to value.

21  We calculate loan to value, debt to income, what our true

22  calculation of income is, if it's different than what is in the

23  loan file, and all kind of other things that were in the loan

24  file that we capture, we put it in there.  And that helps us a

25  lot of times with the quality control going back and looking

1   and seeing, making sure we're putting in the right information.

2   Q.  What type of quality control did you perform in this

3   review?

4   A.  One other thing I forgot to mention if I could step back.

5   Q.  Sure.

6   A.  The last thing is we have a section at the bottom so if the

7   underwriter wants to put comments and notes in there, they can.

8   So a lot of times you can't collect everything, you just never

9   know what you're going to find, but they could put little

10  comments in there.  So I apologize.

11  Q.  Would that be an opportunity for the underwriter to write

12  in information about a particular loan?

13  A.  Right.  It's a narrative part that they type in outside of

14  the data that's corrected in the survey.

15  Q.  You mentioned quality control.  What kind of quality

16  control was performed in this review?

17  A.  We have a number of different areas of quality control.  We

18  mentioned earlier that we have a senior underwriter that

19  manages the team, and she's doing quality control daily.  She

20  looks at those comments that the underwriters write, looks at

21  what they're filling in and seeing it, making sure something

22  doesn't look outside of the norm, as you would say.  Then we

23  have -- she's doing this every day.

24          Then we have a head of quality control and auditing,

25  and he's looking at the loans, but he looks at more things from

DA1TBAN6                          Holt - direct

more of a finite sort of area.  So if it's a certain type of

documentation-type loan where say you have a full doc loan

where you're collecting everything, he might look at all the

full doc loans.  Or he might go and review a certain

underwriter, see how he's doing.  And he goes and does that

specifically, so there's like specific areas.

          Then I start doing QC from day one.  I look at the

data that's being put into the surveys.  We can export those

out and put them into a statistical program that you can run

different kind of analyses on.  So I will start running reports

and comparing data and making sure things make sense and that

they're putting in the right information.  If I see somebody

that says they have got a $10,000 loan to value, somebody

messed up or they put in a -- had a typo.  So I will start

doing that.  And during that process, I will open up loan files

and look at documents, because they might have a comment on

something, and so I want to go see what that is.  So I will

open up the files in the system and review those documents and

look at them to see what I could find.

          Then the last area of quality control, we have like a

peer analysis, where Underwriter A will underwrite a loan that

Underwriter B has already done, and Underwriter B doesn't know

Underwriter A did it, and Underwriter A doesn't know

Underwriter B has done it.  And so we'll compare the data and

the results from both of their analyses and then look and see

```
 1   if it makes sense.  If there is something that is outside the
 2   norm, then we sit both of them down and say we did a peer
 3   review quality control, let's go and see why you might have had
 4   a difference of opinion.  Then they agree upon -- because you
 5   could have thought about something a little bit differently
 6   from what was in the file, and they make a decision with the
 7   senior underwriter at that point.  So if there's any kind of
 8   conflict on the last point of decision, anything that we
 9   discussed, then I will stand up.
10   Q.  Of the 343 Hustle loans that you reviewed, how many were
11   quality control?
12   A.  They were all quality control.
13          MS. SCHOENBERGER:  Your Honor, may I approach the
14   witness?
15          THE COURT:  Yes.
16   Q.  Mr. Holt, I handed you two documents, they have been marked
17   for identification as Plaintiff's 437 and Plaintiff's
18   Exhibit 438.
19          Does Plaintiff's Exhibit 437 reflect --
20          MR. SMURZYNSKI:  Your Honor, may we approach?
21          THE COURT:  All right.
22          (Continued on next page)
23
24
25
```

1           (At side bar)

2           MR. SMURZYNSKI:   437 contains the wrong results of

3     Mr. Holt's work.  Dr. Cowan, the government's other expert,

4     says that these numbers are not correct and need to be

5     extrapolated to the population because he deliberately

6     oversampled loans that it turns out have material defects.  So

7     for example, we heard yesterday from Dr. Cowan this

8     53.9 percent number is in fact something in the magnitude of 41

9     or 42 percent.  If we show this to the jury, they're going to

10    be confused, particularly if we publish it in this fashion, and

11    believe that this is in fact the rate on --

12          THE COURT:  I don't recall Dr. Cowan saying that.  In

13    fact, I was going to raise this with you later, but in a letter

14    I received from the defense today which related to a different

15    issue, but it selectively quotes Dr. Cowan as saying something

16    that in fact he said only after he had been asked to assume

17    various hypotheses that were not necessarily warranted but,

18    just in the Court's testing of his methodology, were raised.

19    So I don't recall -- correct me if I misrecall -- Dr. Cowan

20    ever saying that this was wrong or misleading.

21          MR. SMURZYNSKI:  Perhaps Dr. Cowan didn't address that

22    precise point yesterday, but it was clear from his report that

23    he takes this number -- these numbers and extrapolates them

24    back to the population of what they claim to be Hustle loans

25    and concludes that I believe that the number is 43 percent, but

DA1TBAN6                          Holt – direct

1    it's significantly different than 53 percent.  This will

2    suggest that, for example, the majority of loans that had

3    material defects --

4              THE COURT:  I hear what you're saying, but I overrule

5    the objection.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MS. SCHOENBERGER:

3     Q.  Mr. Holt, what does Plaintiff's Exhibit 437 reflect?

4     A.  It's a pie chart of what we had already discussed about the

5     number of investment quality loans, investment quality with

6     defects and materially defective loans.  It is basically just a

7     pie chart representative of those findings.

8     Q.  And what does the second document, Plaintiff's Exhibit 438,

9     represent?

10    A.  These are from our findings of the material defects that we

11    discussed a few minutes ago, these are the most -- the ones

12    that had the highest percentage of findings after our analysis.

13    Q.  Did these two documents accurately summarize the findings

14    of your review of 343 Hustle loans?

15    A.  Yes, ma'am.

16    Q.  Would these documents be helpful to illustrate your

17    testimony regarding your findings?

18    A.  Sure.

19         MS. SCHOENBERGER:  Your Honor, the United States

20    requests leave to publish these two exhibits as demonstratives

21    to the jury.

22         THE COURT:  Go ahead.

23         MR. MUKASEY:  No objection.

24         THE COURT:  The objection made at the side bar is

25    considered preserved but overruled.

DA1TBAN6                        Holt - direct

1              MR. SMURZYNSKI:  Thank you, your Honor.

2   Q.  Mr. Holt, we already discussed your findings with respect

3   to materially defective loans.  How many loans did you

4   determine were investment quality with defects?

5   A.  66 loans were deemed investment quality with defects.

6   Q.  What percentage of the 343 that you reviewed was that?

7   A.  That would be 19.2 percent.

8   Q.  How many loans of the 343 did you determine were investment

9   quality?

10  A.  92 or 26.8 percent.

11  Q.  Of the nine categories of defects that were reported in

12  your survey, did you find some of them more frequently than

13  others?

14  A.  Yes, ma'am, we did.

15  Q.  If we could pull up Plaintiff's Exhibit 438, please.

16              Does this chart reflect the categories of defects that

17  you saw most frequently in your review?

18  A.  Yes, ma'am.

19  Q.  And what was the most predominant defect that you found in

20  your review?

21  A.  It was the AUS mistakes.  Again, that's where information

22  put into the automated underwriting system was incorrect.

23  Q.  And of the loans that you found to be materially defective,

24  what percentage had AUS mistakes?

25  A.  Between 60 and 70 percent of the loans had that finding.

1   Q.  And what types of AUS mistakes did you see in your review?

2   A.  Things like conditions to the loans that were in there were

3   not met, certain conditions, because it would tell you things

4   you're supposed to do.  Information regarding income or debts,

5   things like that that you're supposed to be putting in the AU

6   system were not correct, so that you wouldn't know -- couldn't

7   tell if the answer or the response from the AUS is valid or

8   not.  That's one of the reasons -- the AUS is only as good as

9   the information going in, so those are the items we would find

10  within that category.

11  Q.  And what percentage of the materially defective loans you

12  saw had eligibility defects?

13  A.  Between 30 and 35 percent.

14  Q.  What types of eligibility defects did you see in your

15  review?

16  A.  Certain documents that were to be in the loan file when it

17  was delivered to Fannie Mae or Freddie Mac, those would be

18  primarily in that category.  That's what it is, certain things

19  that have to be in there for it to be accepted.

20  Q.  Did the predominance of these five particular defects allow

21  you to form any opinions about the underwriting of the 343

22  loans that you saw?

23  A.  It does.

24  Q.  What opinions did you arrive at of the underwriting of

25  these Hustle loans?

1   A.  Well, based on what we saw here, it was that those people

2   that were doing the underwriting were not following the

3   guidelines in place by Countrywide and/or by Fannie Mae or

4   Freddie Mac when those loans were delivered to them.

5           MS. SCHOENBERGER:  Your Honor, may I approach the

6   witness?

7           THE COURT:  Yes.

8           THE WITNESS:  Can I move some of this?

9           THE COURT:  The other stuff?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  It's from a previous witness.  Maybe

12  counsel can come up and take all this other stuff out of the

13  way.

14          MR. CORDARO:  Your Honor, may I?

15          THE COURT:  Yes.

16          We thought while you were on the stand you might want

17  to do some light reading.

18  BY MS. SCHOENBERGER:

19  Q.  Mr. Holt, I have handed you what has been marked as

20  Plaintiff's Exhibit 434.  Are you familiar with this document?

21  A.  Yes, ma'am.

22  Q.  What is this document?

23  A.  This is a loan application for a borrower to borrow money

24  and purchase a house.

25  Q.  And just to be clear, the document that I handed you is a

DA1TBAN6                      Holt - direct

1    binder that contains one full document?

2    A.  Yes, ma'am.

3    Q.  And beyond the loan application, do you recognize anything

4    else in this document?

5    A.  Due to the size of this loan file, a cursory view looks

6    like it's the complete loan file that you would see during the

7    course of a normal review.

8    Q.  And is this a copy of one of the loan files that you

9    re-underwrote, one of the 343 loan files that you

10   re-underwrote?

11   A.  Yes, ma'am.

12   Q.  The binder that I handed you contains four lettered tabs.

13   Are those tabs original to the document that you reviewed

14   during your underwriting?

15   A.  Yes, ma'am.

16   Q.  Were they included in the loan that you received originally

17   during your re-underwriting review?

18   A.  That's correct.

19   Q.  What format did you receive loan files for this review?

20   A.  Electronic format.

21   Q.  And this is a print-out of an electronic file that you

22   reviewed?

23   A.  It is.

24   Q.  Did you form opinions about this loan file?

25   A.  Yes, ma'am.

1            MS. SCHOENBERGER:  Your Honor, the United States

2     offers into evidence Plaintiff's Exhibit 434.

3            MR. SMURZYNSKI:  No objection.

4            MR. MUKASEY:  Could we have one minute, your Honor?

5            THE COURT:  I'm unclear, counsel, is this everything

6     that's under tab A of the binder or does it also include tabs

7     B, C and D?

8            MS. SCHOENBERGER:  B, C and D.  The binder itself

9     contains the full loan file.

10           THE COURT:  So you're going to present this as a

11    binder?

12           MS. SCHOENBERGER:  Yes.

13           THE COURT:  So you want to -- you will need to then

14    mark the binder and its contents as Exhibit 434.

15           MS. SCHOENBERGER:  We'll do that, your Honor.

16           THE COURT:  Any objection?

17           MR. MUKASEY:  No objection.

18           THE COURT:  434 is received.

19           (Plaintiff's Exhibit 434 received in evidence)

20           (Continued on next page)

21

22

23

24

25

1          MS. SCHOENBERGER:  Ms. Michaud, if we can blow up the

2     top half, please.

3     Q.  Mr. Holt, is the first page of the loan file that you

4     reviewed?

5     A.  That is correct.

6     Q.  What is this document?

7     A.  It is a basic credit application.  There is different names

8     for it, like uniformed residential loan application.  But it in

9     layman's terms, it is a credit application.

10    Q.  As an underwriter, what type of information does this loan

11    application provide to you?

12    A.  It will tell you everything about the transaction, the

13    property that is being purchased, all information about the

14    borrower, the employment of that borrower, it will tell you

15    about the payments of the loan that's being made to the

16    borrower or will be made.  The borrower's financial

17    information, asset, liabilities, income.  And so just a total

18    picture of everything about the borrower and the transaction.

19    Q.  What was the amount of the loan that was sought in this

20    file?

21    A.  If you look under Roman numeral I, you can see the loan

22    amount was $209,000.

23    Q.  Is there anything about the loan application that caught

24    your attention during your review of this loan file?

25    A.  This particular section?

1    Q.  Or this particular application.

2    A.  Yes.  There were a number of things that we found through

3    the analysis and review of the application.

4            MR. SMURZYNSKI:  Your Honor, could I ask that the

5    witness be -- he switches between "you" and "we."  And it is

6    very unclear about whether he's testifying about things he's

7    done or somebody else on his team has done.  So I move to

8    either strike the answer or otherwise instruct the jury.

9            THE COURT:  All right.  Let's clarify.  Actually, I'm

10   not sure there needs clarification.  Previously the question

11   was "What was the amount of loan that was sought in this file."

12   The answer was "If you look under Roman numeral I, you can see

13   the loan amount was $209,000."

14           So "you" there, that is the equivalent of if one looks

15   under that tab.

16           Then the question was "Is there anything about the

17   loan application that caught your attention during your review

18   of this loan file."  The question was in terms of "you," but

19   the answer of course then was grammatically in terms of "we."

20   So I don't think he was switching.  I think it was a different

21   grammatical use.  Overruled.

22   Q.  Mr. Holt, have you personally reviewed every page of this

23   loan file?

24   A.  Yes, ma'am.

25   Q.  This section of this application under II titled property

1  information and purpose of loan, what type of information does

2  this provide to you as the underwriter?

3  A.   Okay.  It tells you -- it tells an underwriter that the

4  subject, where the subject property is located, and then this

5  particular instance it is at 166 Avenue in Goodyear, Arizona.

6  It then will tell you that the purpose of the loan is a

7  purchase.

8  Q.   Is there anything about this section of the loan

9  application that caught your attention while you were

10  re-underwriting it?

11  A.   Well, it doesn't tell you anything about the costs to the

12  property, what they're putting down or anything like that.

13  Some of that is left out.  But you hope that the rest of the

14  information we found later on within the application.

15  Q.   III regarding borrower information, what information does

16  that provide to you?

17  A.   It tells you the borrower's name, gives you -- it gives in

18  specific information and identification of the borrower.  So

19  you would have a Social Security number, you have telephone

20  numbers, date of birth, the years of schooling, you like to

21  know how long somebody's been in school, is it 12 years or 30

22  years or what have you.  It gives you the marital status.  This

23  particular borrower -- there is nothing in the years of

24  schooling for this borrower.  It has been left blank.  The

25  borrower is separated.  There is no dependents.  She currently

1    lives at West Willow Avenue in Peoria, Arizona.

2            And if you look to the right of that, there is two

3    boxes that indicates whether or not she owns the property or is

4    renting the property.  Both boxes are left blank.  So at this

5    point, you don't know if she owns the property or not.  But

6    then it tells you she's been living there for three years.

7    Q.  Does it matter to you whether a borrower owns or rents

8    their current residence as an underwriter?

9    A.  Sure.  You want to know if they own their property, how

10   much they owe, what is the property worth.  You want to know

11   how they've paid in the past.  What the payment record is.

12           If they're renting the property, then you want to know

13   who to go to to find out the landlord, property manager, to see

14   how they've paid.  Because a rental payment is not going to

15   show up on a credit report.  That kind of leads you into the

16   next step, where do I need to go to find out where I have to

17   get the payment history for this borrower.  It is very

18   important to see what somebody has paid on their mortgage or

19   rent payment history in the past.

20   Q.  Section IV of the application refers to employment

21   information.  Is employment information important to an

22   underwriter?

23   A.  It is extremely important.  It goes back to capacity.

24   Where is this person working.  How long have they been working

25   there.  Whatever income they're making, what is the possibility

1   that they'll continue to work.  Have they been in the field for

2   a long period of time.  There is a lot of information you take

3   from that to ensure that the borrower can make the payments.

4   So it is very critical.

5   Q.  What did you learn about this borrower's employment

6   information from the application?

7   A.  Okay.  She worked at a jewelry store.  I guess it is a

8   jewelry store because it's called Jewelry Sam.  And she's

9   self-employed and it gives you the address of where her jewelry

10  store is.  In West Camelback.  It tells you she's owned the

11  business for 10 years and two months.

12  Q.  Moving on to the next page of the loan application in this

13  file.

14          THE COURT:  You forgot counsel, these critical

15  question which I'll put to the witness.

16          What two Major League teams have their spring training

17  in Peoria, Arizona?

18          THE WITNESS:  I flunk that question, because I don't

19  know.

20          THE COURT:  Everyone knows it is San Diego Padres and

21  the Seattle Mariners.

22          THE WITNESS:  I'm a college football fan.

23  Q.  On the second page of this loan application, there is

24  monthly income and combined housing expense information.  Is

25  this important to you as an underwriter?

1    A.  It's, yeah, even though it's on page two, it is one of the

2    most important things, as well as employment.  If you look

3    under the far-left-hand side, the borrower has stated she is

4    making $18,000 a month owning her own jewelry store.

5    Q.  How much would that be annually?

6    A.  That would be $216,000 a year.

7    Q.  In your experience as an underwriter, have you developed an

8    opinion about reasonability of income for various professions?

9    A.  As you work in the industry, you start understanding what

10   people make in your markets and other markets and how to go

11   about looking for that income.  So yeah, it comes with the --

12   with the job.  As you become more trained and experienced, you

13   do learn what individuals should be making.

14   Q.  Did $18,000 a month seem to be a reasonable income for

15   someone who worked at a jewelry store?

16   A.  It was a red flag, a question that you want to investigate

17   further.  Because if they're making $18,000 a month, if they

18   own their own business, then they're actually having to make a

19   whole lot more money than that because they have to pay taxes

20   for the business, all kinds of other expenses if you own your

21   own business.  You are going to have to pay all that before you

22   can pay yourself.

23          So, to make $18,000 selling jewelry in Peoria,

24   Arizona, you would want to question that.  It could be

25   accurate.  You just want to be sure you have the right

1    documents to find.

2    Q.  Did anything else about this applicant's monthly income and

3    expenses catch your attention as you're underwriting this loan?

4    A.  If you go back to the application that we were talking

5    about, I mentioned that there was no indication as to whether

6    or not the borrower owned their own home or if they were

7    renting their property.  If they're renting, you would have

8    expected to see a rental payment in that first row.  That

9    column is present so that's what they're paying now.  So if

10   somebody is renting a condo or an apartment, that's going to be

11   replaced by a mortgage payment later.  If they're currently

12   paying for their house, then you would see P&I first mortgage,

13   which is principal and interest of the loan payments, hazard

14   insurance, taxes.  You would see what the break down of their

15   payments would be.  And then you have the proposed column,

16   which is the subject request of what her papers would be based

17   on the loan amount, taxes, and things like that.

18   Q.  What does the assets and liabilities portion of this loan

19   application tell you about the borrower?

20   A.  It tells you what the borrower owns, that's what assets

21   are.  And in the liabilities is what a borrower or any

22   individual owes.

23        In this particular asset and liabilities statement,

24   you can see near the top that she has a savings account of

25   $80,000.  $80,000 in it.  Then she has a -- she owns a house or

 1    other property down near the bottom that says 555,000.  And so

 2    those are assets that she says that she owns.

 3            Then on the right side, you have the liabilities,

 4    which are what the borrower owes.  And so, the first box says

 5    total mortgage obligations from the schedule of real estate

 6    owned.  So if somebody owns more than one piece of real estate,

 7    there is a schedule at the end that kind of breaks down

 8    everything that the borrower, the real estate that they own and

 9    payments and things like that because it can get kind of

10    detailed.

11            In this instance, she says that she has real estate

12    with an unpaid -- look on this because my eyes -- unpaid

13    balance of 431,996.  And there are payments on the left.  You

14    can look and see what her other debts are.  So she's got three

15    Chase credit cards, she has a Discover card, she has this --

16    has got to be some other kind of credit card, CBSD.  You can

17    see she has some very high balances on down that list.  So,

18    she's using her credit cards.

19            And then there is another addendum, it says attached

20    addendum because she evidently has some more debts that

21    wouldn't fit on this page right here.

22    Q.  Is that addendum a part of this loan application?

23    A.  It is.

24            MS. SCHOENBERGER:  You can go ahead two pages, please,

25    Ms. Michaud, and blow up the top half of the page.

1              THE COURT:  After we're through with this, counsel,

2     we'll stop for today.

3              MS. SCHOENBERGER:  Thank you, your Honor.

4     Q.  Mr. Holt, is this the addendum of this applicant's other

5     liabilities?

6     A.  It is.  And you can see that she has a Lowe's credit card,

7     a Chase credit card, a J.C. Penney credit card, a Broyhill

8     credit card, another JCP credit card.  WF is Wells Fargo

9     Financial, I just know that from history.  And then she has

10    three car loans to Toyota.  Not too bad of a balance on there.

11             So, she's got a lot of people she's paying.

12             MS. SCHOENBERGER:  Thank you, your Honor.

13             THE COURT:  So ladies and gentlemen, we will have

14    another full day tomorrow.  So, please be here at 9:30 and have

15    a very good evening.  We'll see you tomorrow.

16             (Jury excused)

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          THE COURT:  No word was received from Mr. Price, so my

2     batting average is now sufficiently low that I can apply to

3     play for the New York Mets.  However, that suggests to me that

4     the revised marked up deposition needs to be provided to me

5     fairly soon so counsel need to work on that.

6          I think tomorrow for sure at some appropriate place we

7     will have argument on any and all matters as to which I have

8     received fuller briefing from counsel.  There are some matters

9     that won't be completed until then, but some that have.  So I

10    want to flag that for the parties.

11         Anything else we need to take up now?

12         MS. MAINIGI:  Your Honor, just housekeeping.  If we

13    could get an understanding from the government as to who their

14    next several witnesses are.  We don't have that full

15    understanding right now.

16         THE COURT:  Yes.  So, before we get to that, how long

17    does counsel believe -- defense counsel on cross on this

18    witness?

19         MR. SMURZYNSKI:  Not having seen all the direct.

20         THE COURT:  This is not binding in the way it will be

21    when I ask you at the end of the direct.

22         MR. SMURZYNSKI:  I understand.  Your Honor, I

23    anticipate three hours.

24         THE COURT:  That's an interesting expectation.

25         MR. MUKASEY:  With Mr. Holt is the question, Judge?

1       THE COURT:  Pardon?

2       MR. MUKASEY:  With Mr. Holt.  No more than 30 minutes.

3       THE COURT:  Yes.  All right.  So, we will see about

4  those estimates.  The government has by my calculation one hour

5  and 10 minutes left.

6       Who is your witness?  If defense counsel's estimates

7  are at all within the ballpark, we won't finish this witness

8  until late tomorrow morning or perhaps early tomorrow

9  afternoon.  Who is the government's witness after that?

10      MR. ARMAND:  I believe either Mr. Tanabe from Freddie

11  Mac or Dr. Cowan, I have to confer with the rest of my team.

12      THE COURT:  It's possible we'll reach both of them.

13      MR. ARMAND:  Yes.

14      THE COURT:  So defense counsel should assume that we

15  may reach both of them.  All right?  Anything else?

16      MR. MUKASEY:  Real quick, Judge.  Obviously this is

17  not a criminal case so I raise this only for purposes of

18  courtesy to the Court.  Ms. Mairone has an unmoveable

19  professional obligation tomorrow morning.  She works at JP

20  Morgan.  We would just like to advise the Court that she may

21  miss the first hour or two tomorrow.  She doesn't wish to delay

22  the proceeding.  And she will get here as fast as she can, and

23  I wanted to alert the Court to that.

24      THE COURT:  That's fine.  Anything else?

25      MR. SMURZYNSKI:  Two issues with respect to the

DA13BAN7

1    examination of this witness.  One mundane.  We've already seen

2    one voluminous loan file come in.  On cross-examination there

3    will be certain documents we'll want to refer the witness to.

4    And as your Honor knows, within a loan file there are discrete

5    documents that are themselves documents.

6         Is your Honor's preference or insistence that we

7    provide the entire loan file and burden the witness and Court,

8    or will it be sufficient for us to provide just simply a

9    document within the loan file for purposes of the examination?

10        THE COURT:  I think you need to provide to the witness

11   the entire loan file in case there is something else he thinks

12   bears on any question you put to him that is elsewhere in the

13   file.  You don't need to mark the entire file as an exhibit

14   unless you want to.  You can mark just the individual pages

15   that you want to refer to.  I think if you mark several

16   different pages from the same loan file, they should be like

17   4209-A and 4209-B.  I'm sure you already have that Exhibit

18   4209, but I was using that for example.

19        MR. SMURZYNSKI:  We'll find some space in the range.

20   The other issue, your Honor, Mr. Holt referred a number of

21   times today to having looked at 343 Hustle loans and giving

22   opinions.  Of course all of us here know that he looked at 865

23   Hustle and non-Hustle loans.  Unless your Honor changes your

24   ruling, I'm not going to elicit from him a comparison of the

25   defect rates, though obviously to state defense counsel's

1    position, we would like to.

2           But having said that, there are certain questions he's

3    answered that on cross-examination I think it would be

4    important for the jury to understand that when he formed his

5    opinions, he wasn't looking exclusively at Hustle loans.  So

6    for example, he talked about compliance with guidelines or the

7    like, he gave a very general answer to a question there.  It

8    will be important for the jury to have a context.

9           Again, I will not, absent your Honor reconsidering his

10   ruling or changing it, refer to comparative defect rates.  But

11   I think there is an actual history that we can't ignore that's

12   relevant to his review.

13          THE COURT:  I don't think I can answer that question

14   in the abstract.  We'll see what the specific questions are.

15          MR. SMURZYNSKI:  Thank you, your Honor.

16          MR. ARMAND:  One thing we would point out is

17   Mr. Holt's review of the loans was blind as to Hustle or

18   non-Hustle.  So it shouldn't be necessary to ask any specific

19   questions about non-Hustle loan, because this witness didn't

20   know.

21          THE COURT:  Once again, I don't think I can rule on

22   that until I hear specific questions.  Okay.  Thanks very much.

23          (Adjourned until October 2, 2013, at 9:30 a.m.)

24

25

INDEX OF EXAMINATION

Examination of:                              Page

EDWARD O'DONNELL

Cross By Mr. Hefter . . . . . . . . . . . . 946

Redirect By Ms. Nawaday . . . . . . . . . . 967

JOHN FORLINES

Direct By Mr. Cordaro . . . . . . . . . . .1012

Cross By Mr. Sullivan . . . . . . . . . . .1061

Cross By Mr. Mukasey . . . . . . . . . . . .1074

Redirect By Mr. Cordaro . . . . . . . . . .1075

IRA HOLT

Direct By Ms. Schoenberger . . . . . . . . .1078

PLAINTIFF EXHIBITS

Exhibit No.                                               Received

301   . . . . . . . . . . . . . . . . . . . 962

95    . . . . . . . . . . . . . . . . . . . 989

1     . . . . . . . . . . . . . . . . . . .1024

2     . . . . . . . . . . . . . . . . . . .1025

434   . . . . . . . . . . . . . . . . . . .1120

DEFENDANT EXHIBITS

Exhibit No.                                               Received

4088  . . . . . . . . . . . . . . . . . . . 947

4091  . . . . . . . . . . . . . . . . . . . 950

50    . . . . . . . . . . . . . . . . . . . 953

4031  . . . . . . . . . . . . . . . . . . . 957

4133  . . . . . . . . . . . . . . . . . . . 959