DA2TBAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    Plaintiff,

5            v.                              12 CV 1422 (JSR)

6    BANK OF AMERICA CORPORATION,
7    *successor to Countrywide
     Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                   Defendants.

11   ------------------------------x
                                           New York, N.Y.
12                                         October 2, 2013
                                           10:00 a.m.
13
     Before:
14
                          HON. JED S. RAKOFF,
15
                                           District Judge
16

17

18

19

20

21

22

23

24

25

DA2TBAN1

APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
PIERRE G. ARMAND
JAIMIE LEESER NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN M. LONDON
        Assistant United States Attorneys


WILLIAMS & CONNOLLY
        Attorneys for Defendant Bank of America
BRENDAN V. SULLIVAN, JR.
ENU MAINIGI
MALACHI B. JONES
KENNETH SMURZYNSKI
CRAIG D. SINGER
ALLISON B. JONES
STEVEN M. CADY
JENNIFER WIMSATT PUSATERI
RYAN T. SCARBOROUGH


GOODWIN PROCTOR
        Attorneys for Defendants Countrywide
RICHARD M. STRASSBERG
WILLIAM HARRINGTON


BRACEWELL & GIULIANI
        Attorneys for Defendant Mairone
MARC L. MUKASEY
MICHAEL HEFTER
RUSSELL ZWERIN
RYAN M. PHILP
SETH M. COHEN
CHRISTINA JARDINE

DA2TBAN1                          Holt - direct

 1          (Jury present)

 2          THE COURT:  So good morning, ladies and gentlemen.  As

 3    you probably know, this is a day of considerable importance, it

 4    is juror number six's birthday, and I think it's really

 5    wonderful that she chose to spend it here.  But any way,

 6    congratulations.

 7          JUROR:  Thank you.

 8          THE COURT:  It's not every day that you turn 23.

 9          All right, counsel.

10    IRA HOLT,    (Continued)

11        having been previously sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MS. SCHOENBERGER:

14    Q.  Good morning, Mr. Holt.

15    A.  Good morning.

16    Q.  Could you please turn back to what has been marked as

17    plaintiff's Exhibit 434.

18          MS. SCHOENBERGER:  Your Honor, we have an exhibit

19    sticker for the Court's copy of the binder, if I could approach

20    with that.

21          THE COURT:  OK.

22    Q.  Mr. Holt, can you remind us again what Exhibit 434 is.

23    A.  It is a complete loan application for a borrower.

24    Q.  And this is one of the loans that you reviewed in your

25    sample of 343?

DA2TBAN1                      Holt - direct

1    A.  Yes, ma'am.

2    Q.  Yesterday we reviewed a loan application was included as

3    part of this loan file?

4    A.  Part of it, yes.

5    Q.  And generally, what type of information did you learn about

6    the borrower based on your review of the application?

7    A.  That she lived in Peoria, Arizona, and that baseball teams

8    have practice there, and she is borrowing $209,000 to purchase

9    a new home.  We uncovered that her residence or wherever she's

10   living right now, we do not know whether she owns or rents the

11   property, that she is a self-employed borrower, which means she

12   owns her own business, she is owner of a jewelry store called

13   Jewelry Sam, and she has owned it for ten years and two months.

14   She claims to make $18,000 a month, there's no previous or no

15   current housing expense for her, and in the proposed payments

16   on the new property 1,647.59.  She claimed to have $80,000 in a

17   savings account, and she has some other real estate that she

18   owns with debt, and she has a number of looks like most of them

19   are credit card debts as well as a number of automobile debts.

20          I believe that's where we stopped.

21   Q.  What would be the next document that you would turn to

22   review in this loan file?

23   A.  There's one other page on the application, and that is just

24   a schedule of real estate that she owns, and it -- you can tell

25   she owns two pieces of real estate, and they're both rental

1    properties, one of them is at 12965 North 75th Drive in Peoria,

2    the other one is at 4510 North 29th Drive in Phoenix, Arizona.

3    And if you look at the bottom, it has a total combined

4    information market value and balances on her debts, and you

5    have a net rental income which is actually a negative, so she's

6    losing 1,191.50 a month in renting her property.

7    Q.   Are you referring to the fifth page of the loan

8    application?

9    A.   Yes, I'm sorry, it's called the schedule of real estate

10   owned.

11   Q.   And is that information important to you as an underwriter?

12   A.   Yes, it helps calculate the debt to income, because on a

13   net loss you add that to the total expenses that a borrower

14   has.  If she had as income, she was making a profit of renting

15   her properties you add that to the total income amount.

16   Q.   What do you mean debt to income?

17   A.   That's the total amount that a borrower owes.  So all your

18   monthly payments for credit card debts, installment loans like

19   car loans, and any kind of real estate mortgages you might

20   have, so all combined into one total.  And then you divide it

21   by the total income to get a ratio, and it tells you -- going

22   back to the three Cs I mentioned on several occasions

23   yesterday, it goes back it capacity and whether the borrower

24   can repay the loan.

25   Q.   Is that sometimes referred to as DTI?

1    A.  Yes, debt to income or DTI is the acronym.

2    Q.  What would be the next document that you look to in

3    underwriting this loan file?

4    A.  Once the underwriter gathered the information in the

5    application, they would input it into the automated

6    underwriting system everything about the property and the

7    borrower and what they're borrowing, things of that nature,

8    they put that in there to get an automated decision.

9    Q.  Does this loan file contain a report from the automated

10   underwriting system?

11   A.  It does.

12   Q.  And is that located behind tab B in your binder?

13   A.  It is.

14   Q.  And are these double-sided pages?

15   A.  Yes, they are.

16   Q.  And does the automated underwriting system report start on

17   the second page of the first double-sided page?

18   A.  Yes, ma'am.

19   Q.  Do you know what type of automated underwriting system was

20   used for this loan file?

21   A.  Well, you couldn't tell from the first page.  Usually it's

22   all on the top of the report.  And all of this is -- all this

23   says is a loan report, so you can flip to the first page -- I'm

24   sorry, the first page that's in the loan file here, it's

25   Section 8 called bookkeeping.

1    Q.  Is that on the eleventh page of this -- pardon me.

2           Is that Section 8 of the automated underwriting

3    report?

4    A.  It's Section 8, bookkeeping, and it's the first page of the

5    tab.

6           MS. SCHOENBERGER:  Ms. Michaud, if you can blow up

7    Section 8.

8    Q.  What does this tell you about this automated underwriting

9    report?

10   A.  It just says the versions of the report, because they

11   change, just like a lot of things will have different changes

12   over time, and it -- the second line, the division, it states

13   the loan was originated through the Full Spectrum division and

14   then you have to go almost to the third from the bottom line,

15   it says underwriting based on CLUES.  So if you can't find it

16   at the top, you can go back to the bookkeeping section and it

17   will tell you what automated system it went through.

18   Q.  So is it your understanding that this is a report from the

19   Countrywide CLUES system?

20   A.  That's correct.

21   Q.  Turning back to the first page of this report, were you

22   able to determine what decision was output by CLUES?

23   A.  Yes, the credit decision was an accept.

24   Q.  And what does it mean for a credit decision to be an

25   accept?

1   A.  It means that the automated system has basically approved

2   the loan as long as all the information that was input is

3   correct, and then there's a number of conditions that the

4   underwriter has to go and do.  So as long as all the conditions

5   have been met, then the accept is kind of the green light to go

6   ahead and close.  So the underwriter has a good number of

7   items, and it depends on the loan they have to have complete.

8   Q.  Is the job of underwriting done because CLUES has

9   determined that this is an accept loan?

10  A.  No, it's not completed, it's the first step.  So once you

11  put the information in, it runs a credit report, it will do

12  background checks, it will look at the property that's being

13  purchased or refinanced.  And so it kind of helps speed the

14  process up by collecting the information, and then it will tell

15  you within that report what it's found based on the loan

16  request.

17  Q.  Does the fact that this is a CLUES accept mean that this

18  loan is ready to be sold to Fannie Mae or Freddie Mac?

19  A.  At the time the report is run, no.

20  Q.  What do you mean by "conditions?"

21  A.  It outlines things that have to be finished by the

22  underwriter.  So it might say that you have to go and get a

23  certain type of verification of employment, or it might say we

24  find issues about the property and they want you to do some

25  additional work that might be outside the guidelines.  So

1   there's just additional work that the underwriter has to do to

2   fulfill the approval and ensure that the loan is a good credit

3   risk.

4   Q.  Does this report tell the underwriter what additional work

5   needs to be done?

6   A.  It does.

7   Q.  Do you see any such instructions in this report?

8   A.  Yes, ma'am.

9   Q.  What instructions do you see?

10  A.  If you look under the first section that has the decision

11  and the information about the loan, it says that there's -- a

12  public record analysis has found red flags, please refer to

13  Section 5 for review.  So it has found a red flag within its

14  research and analysis that the underwriter now has to go and

15  research and find out what it is.

16  Q.  Are there other instructions contained in this report?

17  A.  Yes, it has underwriting conditions.  If you look under

18  Section 3, it will talk about specific things that might have

19  been found within the credit report or some things that have

20  been found about the borrower it's searched or what might have

21  been on the loan application.  So it does its own internal

22  analysis and will give conditions that the underwriter has to

23  go and research or satisfy.

24  Q.  What did the first condition listed in this report tell you

25  about this loan application?

1    A.  There's a credit issue, actually two credit issues that

2    were found when it ran the credit report.  And the first one is

3    that the borrower had some derogatory credit, and it says that

4    it's a judgment -- it doesn't give you the account name or

5    number, the judgment was filed against the borrower in 2004,

6    and it was for the amount of 2,167.  If you look right above

7    that, it says that the following derogatories must be paid off

8    as evidenced by proof of payment in full or paid off at closing

9    as noted in the closing statement.  Then it also requires that

10   there's some kind of written explanation be required in the

11   loan file.

12   Q.  Did you find such a written explanation in this loan file?

13   A.  I did not.

14   Q.  Would it be significant to you as an underwriter that there

15   was a judgment against this borrower?

16   A.  Yes, because one of the three Cs is credit or character, so

17   why couldn't this borrower pay this judgment?  It's not a large

18   amount, it's 2,167.  So you want to find out is it the

19   borrower's judgment, could it have been someone else's judgment

20   that was filed incorrectly?  But it also goes back to the

21   capacity issue, did the borrower actually make $18,000 a month?

22   Because this is a small judgment, why couldn't they have just

23   written a check and pay for it?

24   Q.  Why would a written explanation of this judgment be

25   required?

1   A.   Basically just to ensure that the borrower has satisfied

2   that debt, and if it says there's written instruction required

3   and, the debt has been satisfied, then it's acceptable within

4   the confines of the CLUES report, that you have satisfied that

5   credit problem or issue and you go on.  So it goes back to

6   where I was talking yesterday where you have a loan that has a

7   risk, but you now found compensating factors to offset it, so

8   they're telling you what you need to do to dampen that risk in

9   that loan in that judgment.

10  Q.   Did the underwriter who reviewed this loan file satisfy

11  this condition?

12  A.   There's no notice or written explanation about the

13  judgment.

14  Q.   What's the second credit condition listed in this CLUES

15  report?

16  A.   When you pull a credit report it will list inquiries on the

17  report, so what that means is if you have gone out and applied

18  for credit, then when the merchant, vendor, lender, wherever

19  you're applying for credit, when they run a credit report, it's

20  then registered within the system.  So you can look and see who

21  the individual applied for credit, when, and sometimes you can

22  tell if it's like for a car loan or mortgage.  You can't always

23  tell, but you get a long list or short list about what somebody

24  has been doing recently about applying for additional debt.

25       MS. SCHOENBERGER:  Ms. Michaud, could you please

1  scroll town to the second condition.

2              That was just on the bottom of the first page.

3  Q.  What can you see about the credit condition you just

4  described for this loan file?

5  A.  So when the CLUES report ran the credit, it found that the

6  borrower had tried to apply for credit 18 different times in

7  the last 90 days.  So she has been out trying to obtain

8  additional credit, whether credit cards, what have you, you

9  can't tell from the CLUES report.  So the underwriter then has

10  to go to the credit report and see what she had been applying

11  for.  So this step would mean that you have to go and go up to

12  the next document provided and see what it is.  Then you have

13  to get a written letter of explanation as to why she has been

14  out there applying for more debt.

15  Q.  Why would you need a written explanation like that?

16  A.  As I mentioned about debt to income, you look at the credit

17  report to see what they're paying right now, but if they have

18  applied for new debt, those new accounts might not show up on

19  the credit report if they haven't disclosed it on their

20  application.  It's possible they have already borrowed that

21  money and incurred new debt, and that has now increased their

22  debt to income ratio.  So you have now increased the credit

23  risk of the borrower being able to pay their debts.  So you

24  want to see what it is that they have been applying for.

25  Q.  Did you find such a written explanation of these credit

1    inquiries in this loan file?

2    A.   There was no letter of explanation, no.

3    Q.   Did the person who underwrote this loan file satisfy this

4    condition of the CLUES report?

5    A.   No, they did not.

6    Q.   Could you turn to the next page.  Is there another

7    condition contained at the top of the next page of this CLUES

8    report?

9    A.   Yes, there's one that says that the borrower put she had

10   $80,000 in a savings account on her application, and there's a

11   statement that says the balance increase in the following

12   account requires a written explanation and appropriate

13   documentation to meet seasoning and eligibility requirements of

14   the source of funds.  So what it's requesting -- and this is in

15   Countrywide's and Fannie Mae's and Freddie Mac's guidelines, is

16   this borrower had that 80,000 in their accounts, and they have

17   had it for two months.  And that's kind of what seasoning means

18   is that you can see that this is not some new debt or she

19   borrowed it from somewhere, that she actually had this money

20   for some time it's her money and she can use it to put down on

21   the loan and cover any closing costs after that, too.

22   Q.   Is the seasoning of funds important to you as an

23   underwriter?

24   A.   It is, because if she borrowed this money, do we know how

25   much she has to repay, what her payments are, was it a gift.

1    And there are certain guidelines about gifts from family

2    members or other entities.  So either way, is she going to have

3    to repay this?  Is this going to add to the debt to income?  It

4    was very important to see where these funds are coming from,

5    because if it's not her own funds, she might walk away from

6    this debt because she really doesn't have any skin, she doesn't

7    have any equity in the loan.  So for somebody like that, it's

8    very important to find out where those funds came from.

9    Q.  Do you see part way down this page two conditions

10   identified as generic employment?

11   A.  Yes, ma'am.

12   Q.  What does the second generic employment condition tell you

13   as an underwriter?

14   A.  If you remember, the borrower states that she owned her own

15   business and she was self-employed.  So you have to verify that

16   the borrower is self-employed.  And it tells you here verify

17   the self-employed borrower has been with the same business and

18   at the same location at least two years using such sources as a

19   business license, CPA -- that's a certified public accountant

20   where you could get a letter stating I have been doing taxes or

21   work with them for two years -- some kind of agency

22   verification, some sort of professional organization, so

23   something that they have been involved with to show that this

24   borrower actually has owned this business for the two years

25   that is required.

1  Q.  In your view of this loan file, did you find the business

2  had been verified?

3  A.  No, ma'am.

4  Q.  Had this condition been satisfied by the person who

5  underwrote this loan?

6  A.  No, ma'am.

7  Q.  Can you please look at the condition below that entitled

8  generic assets.

9  A.  OK.

10  Q.  What does this condition tell you?

11  A.  It states that it must be verified by obtaining the two

12  months most recent account statements, or VOD.  And that's a

13  Verification Of Deposit, it's a form that the lender would send

14  to the financial institution and their box that says what's the

15  current balance, what's the average balance.  So it tells that

16  the seasoning requirements and things of that nature have been

17  met.  Then it says also the assets must be the borrower's own

18  funds.  So it's saying that you have to verify that it's their

19  funds, it's not part of a business or something else, so it's

20  actually their funds, and ties back into that condition

21  question that we discussed a few minutes ago.

22  Q.  And in this loan file, did you see verification of the

23  borrower's funds?

24  A.  Well, we saw two months worth of statements, yes.

25  Q.  And did those statements satisfy the condition that the

1    assets must be the borrower's own funds?

2    A.  That part it did not, no.

3    Q.  Had this condition been satisfied by the person who

4    underwrote this loan?

5    A.  No, ma'am.

6    Q.  What does section four of this report tell you entitled

7    general loan conditions?

8    A.  It's just more general about doc type, the loan programs,

9    just the guidelines themself.  This CLUES report is not going

10   to tell you everything you have to do, the underwriter has to

11   know what the guidelines are, and other things that have to be

12   satisfied.  So they will have to know where to go to be able to

13   make sure that anything that is not satisfied in here is

14   satisfied, could be a verification of the mortgage history or

15   the rent history and other items like that, just depended on

16   the type of documentation the loan is.

17   Q.  But doesn't a CLUES accept decision mean that the loan

18   complies with the guidelines?

19   A.  It says that it complies with the information that's

20   already been inputted in there from the underwriter, but all

21   these items, as I have been discussing, the underwriter has to

22   go back and do the work.  So it's just the first step, but the

23   underwriter has to ensure that all these different issues have

24   been satisfied.

25   Q.  Please turn to the next page of this CLUES report.

1           In the middle of the page there's a general loan

2     condition.  The message ID is number 70655.  Do you see that?

3     A.  I do.

4     Q.  What does this loan condition tell the underwriter?

5     A.  There's items here they want the underwriter to ensure are

6     accurate, so you have that they want you to provide

7     verification of the applicant's address in the prior two years.

8     So you want to verify that they have lived where they lived for

9     two years, that they have -- the applicant's employment has

10    been verified for the prior two years.  The variation in the

11    applicant's name reported under the a/k/a -- or means also

12    known as -- information section of the credit report has been

13    met.  So evidently there's different names that are on the

14    credit report.  And that any indication of Social Security

15    number discrepancy or fraud in the fraud verification

16    information section.  So they want you to go and verify that

17    the Social Security number is correct and if there's any

18    variation you need to explain why.

19    Q.  What document would you look at to review whether these

20    variations exist?

21    A.  Well, you would look at the application, and you look at

22    the credit report, and then any other verifications that were

23    supposed to be obtained in the file.  So you could look at

24    those items for consistency sake.

25    Q.  Further down on this page is Section 5, titled subject

1    property evaluation.  What does that tell you about this loan

2    file?

3    A.  If you recall on the first section they said there was a

4    red flag that has to be reviewed, and it made reference to

5    Section 5, and so this is a -- they call it a fraud

6    description.  And what they are requesting is that the owner on

7    record for this property that's being sold is Saunders, I guess

8    that's Dysart Investments, LLC, does not match the seller's

9    name, LaSalle Bank, which was input by the underwriter on the

10   purchase transaction, so there's a discrepancy in who owns the

11   property.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Why does that matter?

2  A.  Well, you want to be sure that whoever has legal title of

3  the property sells the property, and you don't want somebody

4  who doesn't own the property selling property that they don't

5  own, because they'll be getting money on something they don't

6  have ownership to.  So there is a fraud situation there.  And

7  so it is very important that you find out who actually owns the

8  real estate.

9  Q.  Did you find an explanation for this discrepancy that's

10  been flagged within this loan file?

11  A.  There was no description or analysis that had been done as

12  to the owner of the property.

13  Q.  Can we take a look at the next page of the CLUES report.

14  A.  Okay.

15  Q.  Section describing FICO factors.

16  A.  Okay.

17  Q.  What does FICO mean?

18  A.  It is a credit score calculation.  So, when you have a

19  credit report run, they will run actually three different

20  reports.  But FICO stands for Fair Isaac Corporation, and is

21  basically a company that has -- takes data from your credit

22  files and credit information, and then assigns a number which

23  is like a risk number that companies use to help in their

24  assessment of credit risk.

25  Q.  What is the range of possible FICO scores?

1   A.  I think it is 300 to 850.

2   Q.  Is there some cutoff for an acceptable FICO score?

3   A.  660 is usually the break for good credit.  Or average

4   credit I guess.  So anything really as you start going over 660

5   means it is kind of an average credit that is acceptable.

6   Q.  What was this borrower's FICO score?

7   A.  Okay.  Well, the three credit bureaus that run reports,

8   TRW, Equifax, and TransUnion gave a score of 671, 709, and then

9   TransUnion gave it a 639.  But the guidelines state you use the

10  middle of the three scores.  So the middle of the three scores

11  is 671.  So that's the identifying FICO score for this

12  borrower.

13  Q.  Does that fall within the acceptable range for a FICO

14  score?

15  A.  It would be above the 660.

16  Q.  Does that mean that this loan can be approved for this

17  borrower?

18  A.  It falls within the guidelines, yes.

19  Q.  Is that the only factor that needs to be considered when

20  determining whether to approve the loan for this borrower?

21  A.  No.  All these other issues that are described have to be

22  satisfied.  So, at this point it does fall within the

23  guidelines, a 671, but it doesn't say that you can't do the

24  rest of the -- satisfy the rest of the conditions that are in

25  the loan file or in the CLUES report.

1  Q.  So although this CLUES report shows an accept and an

2  acceptable FICO score, additional underwriting work would still

3  need to be done?

4  A.  Oh, absolutely.

5  Q.  You mentioned that some of these conditions could be

6  reviewed by looking at a credit report.  Did this loan file

7  contain a credit report?

8  A.  It did.

9  Q.  Is that located behind tab C in the binder before you?

10  A.  That's correct.

11  Q.  Does this credit report tell you anything about the

12  borrower's address?

13  A.  Yes.  You look at the top part, that's one of the things we

14  wanted to investigate is the address.  Is you see the

15  information that's been inputted into the system to run a

16  credit report when you run one, you put certain personal

17  information on the borrower, and then that helps identify who

18  that borrower is, and looks for the fraud indicators discussed

19  earlier and things like that.

20        So, before the first dashed -- lot of dashes in it,

21  they input that the address is 12965 North 75th Drive in

22  Peoria, Arizona.

23  Q.  Is this the same address that was on the borrower's

24  application?

25  A.  No, it wasn't.

1  Q.  Do you recall what street was entered on the borrower's

2  application for their address?

3  A.  It was West Willow.  I don't remember the number.  But it

4  was West Willow was the name.

5  Q.  Does this credit report contain additional information

6  about the borrower's address?

7  A.  Yes.  Under the -- oh, about the address?

8  Q.  Yes.

9  A.  I'm sorry.  Yeah, the address, there is at the end of the

10  credit report, it gives a history of the borrower's addresses,

11  where they have lived previously as well as verification or

12  information about borrower's employment, and the inquiries.

13  Q.  Is that 11 pages on this credit report?

14          Ms. Michaud, that's page 23.

15  A.  Including the backside?

16  Q.  Yes.

17  A.  It does.

18  Q.  What does the credit report tell you about this borrower's

19  address?

20  A.  It says, it looks like she has lived at the 75th Drive --

21  the reported date is what's been reported into the credit

22  bureau system.  So it looks like she's lived at 75th Drive

23  reported in 2000, it was reported in 2007, it was reported in

24  2001.  You also have addresses some post office boxes, which I

25  am assuming is just where her mail is going.  Then you have

DA23BAN2                          Holt - direct

 1    some older dates of 4510 North 29th Drive, and then that other

 2    address comes up again, the 75th Drive at the bottom.

 3    Q.  Did you find any information in this credit report about

 4    the borrower's Willow Drive address?

 5    A.  I did not.

 6    Q.  Do you recall how long the borrower had said she had been

 7    living at Willow Drive?

 8    A.  I believe it was three years.

 9    Q.  Anywhere within this loan file did you find an explanation

10    regarding the borrower's claim that she lived at Willow Drive

11    for three years?

12    A.  No, I did not.

13    Q.  Was that significant to you in underwriting this loan file?

14    A.  Sure.  It goes back to from the very beginning, there was

15    questions about where does this borrower live.  Because you

16    don't know if she owns or rents.  There was no payment history.

17    There is no investigation into where this individual lives.

18    So, where someone's living is pretty important when it comes to

19    making a credit decision.

20    Q.  This page also includes entries regarding inquiries made in

21    the last 90 days.

22    A.  It does.

23    Q.  What does this part of the report tell you?

24    A.  As I was mentioning earlier, it tells the date where the

25    borrower has gone in and tried to apply for credit, which is

```
 1   that first column under date.  Then you have a credit granter,
 2   and this is the entity that had pulled the credit report and
 3   you can see what bureau they pulled it from.  And then there is
 4   information that identifies the actual credit granter that
 5   pulled the information.
 6   Q.  Does this credit report provide any explanation for why
 7   these inquiries were made?
 8   A.  No, ma'am.
 9   Q.  Did you find such an explanation elsewhere in this loan
10   file?
11   A.  I did not.
12   Q.  Can you turn to the next page of the credit report, please.
13   A.  Okay.
14   Q.  Does this portion of the report provide employment
15   information regarding the borrower?
16   A.  It does.  At the top it gives a kind of history of where
17   the borrower has been working, and there is four different
18   places of business.  The first one is San Jewelry in Peoria,
19   and but the occupation is unknown.  So you don't know if she is
20   just employed there or if she actually owns it.  It just says
21   unknown.  That was reported in 2005.
22            Then, below that is a similar name, but it is called
23   Sun Jewelry.  Occupation unknown.  And that was reported in
24   2006.
25            Then you have another employment name which is DBA, or
```

 1  doing business as, Joyeria Sam.  Again, occupation unknown, and

 2  it was reported in December of 2003.

 3          Then in September of 2003 all you have is

 4  self-employed, and again, occupation unknown.  So, gives you

 5  information on where the borrower was working, but it doesn't

 6  really tell you any more than that.

 7  Q.  Does this credit report provide information telling you

 8  where this borrower had worked for the past 10 years?

 9  A.  No.  It only goes back to 2003 which is unclear, the end of

10  2003, so that would be somewhere around five years that at

11  least you had some kind of occupation history, for employment

12  history.

13  Q.  Other than on the application, did you see any evidence

14  within the loan file showing where this borrower had worked for

15  the past 10 years as she claimed?

16  A.  There was no information, no copies of business licenses,

17  no copies of CPA letters, or accountant letters, nothing like

18  that was in the loan file.

19  Q.  Earlier you said that the loan file did contain two months'

20  worth of financial statements for this borrower.  Is that

21  right?

22  A.  That's correct.

23  Q.  Are those statements located behind tab E in your binder?

24  A.  That's correct.

25  Q.  Did these statements satisfy the condition for verifying a

DA23BAN2                            Holt - direct

1    seasoning of the funds to be used by the borrower?

2    A.  No, ma'am.

3    Q.  Why is that?

4    A.  First of all, she claimed on her application that she had

5    $80,000 in assets or in a savings account.  So, as you can tell

6    under the balance information, her current balance is

7    72,258.10.  So it is not 80,000.  It is close to 80,000, but

8    it's not $80,000.  So the amount that was reported on the

9    credit -- on the application was incorrect.

10   Q.  Could you tell from these statements whether even the

11   74,000 and change was the borrower's own funds?

12   A.  Yes.  As you can see, this statement -- and this is comes

13   from the Internet.  You can get your checking account

14   statements and everything else off your account through the

15   Internet.

16        So in February 20 she had 72,258.10 in her account.

17   So what you want to do is you go down back in time and make

18   sure and do an average to be sure that that balance is

19   consistent throughout.

20        The first thing we noted is this wasn't a savings

21   account, it was a checking account.  And both the CLUES and

22   application it says it was savings account.  If you flip to the

23   next page, you can see that on January 31, 2008, that she

24   received a Fedwire of 74,728.68.

25   Q.  What is a Fedwire?

DA23BAN2                           Holt - direct

1    A.  It is a wire system where if I wanted to send funds to my

2    son in California, then I can wire funds through the Fed system

3    to his bank in California and it goes right into his account.

4    So, somebody went into some bank, somewhere, and there is a fee

5    for it, and so they went into a bank, some kind of financial

6    institution, and wired that money to this borrower's account.

7    Q.  Was there any information contained in the loan file to

8    tell you where this wire came from?

9    A.  Just the statement right here that shows that the wire was

10   coming in.

11   Q.  Is it possible that this could have come from another

12   account held by the borrower?

13   A.  It's possible, yes.

14   Q.  Could you tell that from the contents of the loan file?

15   A.  No, ma'am.

16   Q.  Was this amount of money seasoned as you described before?

17   A.  Well, based on the guidelines and what CLUES required, it

18   had to be the borrower's own funds and it had to be seasoned.

19   So if you go down, start going back in time, you can see that

20   she had a balance of 2,314.79 prior to then.  Then if you just

21   keep going down to the next page.  Go down to the next page,

22   you can see that her balances are anywhere from 1500, up to

23   over 3600, and you can even see that on January 7, she had a

24   balance of $90 in her checking -- yes, in this checking

25   account.

1   Q.  Did you see any evidence in the loan file that prior to

2   January 31, this borrower had anywhere near $74,000 in her

3   account?

4   A.  No, ma'am.  And we didn't see anything for the $80,000

5   amount.

6   Q.  Are the balances in this account consistent with a person

7   who makes $18,000 a month?

8   A.  You would expect to see somebody who makes $18,000 a month,

9   which is $216,000 a year.  You would expect somebody with that

10  kind of income to have more money in their accounts.

11  Q.  Is it possible that the borrower had other accounts that

12  contained that money?

13  A.  It's possible.

14  Q.  Did you see any evidence of such accounts in this loan

15  file?

16  A.  I did not.

17  Q.  Did you reach a determination regarding the quality of this

18  loan?

19  A.  I did.

20  Q.  What determination did you arrive at?

21  A.  That this loan was materially defective.

22  Q.  Why was that?

23  A.  First thing is just the borrower's employment.  There is no

24  record of exactly what she does, if she owns the business at

25  all.  There is no record of that.  So you have questions about

 1    that.  The next step is if you have questions about her

 2    employment, then you have questions about her income.  And her

 3    income was $18,000 a month.  And this was a loan where they

 4    should have done some kind of due diligence on the income.  And

 5    there was none.  And the fact that you have a transaction

 6    history of a checking account, and you would expect to see

 7    pretty large deposits being made if somebody's getting $18,000

 8    a month, and when you have an average of about $2,000 a month

 9    for two months, you have questions now about the income.  That

10    goes back to the capacity of the borrower to make the payments.

11    Then you have the questions about where she lives and what

12    she's been doing.  There is absolutely nothing in the file that

13    verified that.

14            There was a lot of contradictions in the loan file.

15    And one item that we did find, that I forgot to mention, if you

16    go back to the credit report.  The address that was inputted

17    into the credit report to pull the credit was the address if

18    you recall from one of her rental properties.  So they inputted

19    the address from the rental property when they pulled the

20    credit.

21            So you have addresses issue, you have an employment

22    issue, you have an income issue, and then finally, you have the

23    asset issue where she says that she's making -- or she had

24    $80,000 in the bank and basically you just have a couple

25    thousand in the bank.  Where did this money come from.  That's

1   a lot of money that's being wired in.  Where did it come from.

2   Will she have to repay that money.  If so, what's going to be

3   her payments.  How's that going to affect her debt.

4   Q.  Was this a CLUES accept loan?

5   A.  Yes, ma'am.  It was a CLUES accept loan.

6   Q.  Do you know if Countrywide funded this loan?

7   A.  They did.

8   Q.  Do you know if Countrywide sold this loan?

9   A.  Yes, ma'am.

10  Q.  To whom did they sell it?

11  A.  That I don't know if it was sold to Fannie Mae or Freddie

12  Mac.

13  Q.  Was it sold to one or the other?

14  A.  Yes, ma'am.

15          MR. SMURZYNSKI:  Objection, your Honor.

16          THE COURT:  Overruled.

17  Q.  In your expert opinion, was this loan properly underwritten

18  at Countrywide?

19  A.  Based on what we saw and all the conditions that were

20  required to be met, and the fact that there was no verification

21  or letters of explanation on anything in the file, we -- it's,

22  you know, came to the decision that it was not underwritten.

23  Q.  Did this loan comply with Countrywide's guidelines?

24  A.  No, ma'am.

25  Q.  Did it comply with Fannie Mae's guidelines?

1    A.  No, ma'am.

2    Q.  Did this comply with Freddie Mac's guidelines?

3    A.  No, ma'am.

4            MS. SCHOENBERGER:  You can take that document down.

5    Q.  Of the 343 loans that you reviewed, how many did you

6    determine to be materially defective?

7    A.  There were 185 or 53.9 percent of the total 343.

8    Q.  In your expert opinion, did that 53.9 percent of loans

9    comply with Countrywide guidelines?

10   A.  The fact that they were materially defective represented

11   the fact that they didn't comply with Countrywide's guidelines.

12   Or the guidelines to be delivered and sold to Fannie Mae or

13   Freddie Mac.

14   Q.  Do you know if those 185 loans were sold by Countrywide?

15   A.  Yes, ma'am.

16   Q.  Do you know to whom they were sold?

17   A.  They were sold to Fannie Mae or Freddie Mac.

18           MS. SCHOENBERGER:  I have nothing further at this

19   time, your Honor.

20           THE COURT:  Cross-examination.

21   CROSS-EXAMINATION

22   BY MR. SMURZYNSKI:

23   Q.  Good morning, Mr. Holt.

24   A.  Good morning.

25   Q.  My name is Ken Smurzynski, and I'm here on behalf of the

1    banks.

2            Mr. Holt, where you found mistakes in the loan files

3    that led you to conclude that the loan was materially

4    defective, do you have an opinion as to the cause of the

5    mistake?

6    A.  Well, I surveyed what has registered those causes in the

7    previous charts would have indicated --

8    Q.  The survey would register the type of mistake, and let me

9    make sure my question is clear.

10           Do you have any opinion as to whether the mistake was

11   an innocent one or was on the basis of anyone's desire to

12   deceive anyone?

13           MS. SCHOENBERGER:  Objection.

14           THE COURT:  Sustained as to form.

15   Q.  Mr. Holt, it is correct that you have no opinion that any

16   of the mistakes you found in these loan files were the result

17   of an intent to deceive by anyone, correct?

18   A.  The information that we came to was based on how loans were

19   underwritten and what types or red flags that were in the files

20   that should have been addressed or researched further.  So

21   that's -- I don't know how to answer that.  That was our

22   engagement or what we were supposed to do.

23   Q.  That's all you did.

24   A.  That's correct.

25   Q.  You testified earlier today about HSSL loans or Hustle

1   loans, do you recall that?

2   A.  Well, yesterday and a little bit today, yes.

3   Q.  When you talk about a loan being -- which term do you

4   prefer, HSSL or Hustle?

5   A.  It's easier to say Hustle.

6   Q.  Let's say Hustle.  Mr. Holt, when you say a loan is a

7   Hustle loan, you're saying that based on something that someone

8   else has told you, is that correct?

9   A.  That is correct.

10  Q.  You have no personal knowledge about whether any particular

11  loan is a Hustle loan or is not a Hustle loan, correct?

12  A.  That's correct.

13  Q.  In the course of your review of the loans, you looked at

14  both Hustle loans and non-Hustle loans, correct?

15          MS. SCHOENBERGER:  Objection.

16          THE COURT:  Sustained.

17  Q.  Mr. Holt, when you looked at a particular loan, there was

18  nothing in that loan file that allowed you to determine whether

19  or not it was a Hustle loan?

20  A.  That is correct.

21  Q.  We spent a lot of time yesterday and today talking about

22  one loan file, PX 434.

23          THE COURT:  Counsel, just put questions.  Not

24  prefaces.

25          MR. SMURZYNSKI:  Thank you, your Honor.

1    Q.  Mr. Holt, it's correct that you did not know whether the

2    loan file that's been marked as PX 434 is in fact a Hustle

3    loan, do you?

4    A.  It was within the 434 loans -- 343 loans that we had

5    reviewed.

6    Q.  I understand that it was within the 343.  My question to

7    you is whether you know whether it was in fact a Hustle loan.

8            THE COURT:  Counsel, I say to you again, just put

9    questions.  Don't say you understand X or Y or Z.  Just put

10   questions.

11           MR. SMURZYNSKI:  Thank you, your Honor.

12   Q.  Mr. Holt, do you have personal knowledge as to whether PX

13   434 was a Hustle loan?

14   A.  It was within the loans that were provided to us that were

15   indicated to be Hustle loans.

16   Q.  PX 434 was a purchase loan, is that correct?

17   A.  Per the application, yes.

18   Q.  Do you know one way or the other, Mr. Holt, whether

19   purchase loans were part of the loans that were processed

20   through the Hustle process flow at Countrywide?

21   A.  It was my understanding, yes.

22   Q.  Your understanding is based on something that an attorney

23   for the government told you, is that correct?

24   A.  Well, the loans were in part of what loans Fannie Mae and

25   Freddie Mac were purchasing.  So, we looked at those guidelines

1   as well as guidelines from Countrywide for purchase loans.  So,

2   it was my assumption that a purchase loan was a Hustle loan.

3   But I was not told either way.

4   Q.  Within PX 434, Mr. Holt, if you turn to tab D, do you still

5   have that in front of you?

6   A.  Yes, sir.

7   Q.  I'd ask you to turn in a number of pages until you come to

8   the document that at the bottom bears a number in the

9   right-hand corner that ends in 5786.

10  A.  Okay.

11  Q.  Do you have that?  And just to make sure we are on the same

12  page it is a stated income reasonability worksheet?

13  A.  Correct.

14  Q.  You see down at the bottom of the page there is an

15  indication of who the income approver was?

16  A.  I do.

17  Q.  That's a Ms. Susan Lucaro?

18  A.  Yes, sir.

19  Q.  Do you know whether Ms. Lucaro was an underwriter or not?

20  A.  I do not know what her job title was, no.

21  Q.  Do you know whether she had underwriter training?

22  A.  I do not.

23  Q.  Mr. Holt, are you aware that there is a gentleman named Bob

24  Broeksmit who was the bank's expert who also reviewed the same

25  loans that you did?

DA23BAN2                          Holt - cross

1    A.  I read his report, yes.

2    Q.  Do you recall, Mr. Holt, that Mr. Broeksmit agreed with you

3    with respect to certain of the loan files?

4    A.  I know he did, yes, sir.

5    Q.  Did Mr. Broeksmit agree with you with respect to PX 434?

6              THE COURT:  Come to the side bar.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA23BAN2                          Holt – cross

1            (At the side bar)

2            THE COURT:  While there is no objection that's been

3       raised, it is this Court's unvarying policy to exclude

4       questions to any witness that referred to what some other

5       witness either has said or will say.  It's really a disguised

6       way of counsel putting his or her credibility behind a

7       particular non-present witness's testimony.  So, I don't see

8       how this line of questioning can properly continue.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2    Q.  Mr. Holt, you work for Dr. Charles Cowan?
 3    A.  Yes, sir.
 4    Q.  He's your boss?
 5    A.  He's my boss, yes, sir.
 6    Q.  He gave you a sample of loans to review, is that correct?
 7    A.  That's correct.
 8    Q.  He also gave you a deadline to review those loans, correct?
 9    A.  The deadline I was given was given to us by -- or given to
10    me by what the Court had assigned.
11    Q.  You worked to meet that deadline, correct?
12    A.  Correct.
13    Q.  Your plan had been to review all of the loans that
14    Dr. Cowan had provided you?
15    A.  That's correct.
16    Q.  But your team was not able to complete that review, was it?
17    A.  In the time constraints we were not able to finish every
18    loan, no, sir.
19    Q.  Why was it that you were unable to complete the review of
20    all the loans that were provided to you?
21    A.  Well, from the time that we were able to get all the
22    information and start, based on the number of loans it was --
23    from time constraint it was just not able to get finished.
24    Q.  You simply ran out of time?
25    A.  Ran out of time, yes.
```

1   Q.  In order to complete the process then, the various

2   underwriters skipped some of the loans, is that right?

3            MS. SCHOENBERGER:  Objection.

4            THE COURT:  Sustained as to form.

5   Q.  Mr. Holt, the underwriters that worked for you didn't

6   review all the loans, did they?

7   A.  Well, as I said, not all the loans were finished, correct.

8   Q.  In not finishing certain of the loans, the underwriters had

9   discretion as to which loans they would review or not review,

10  correct?

11  A.  Well, my assistant divvied the loans out as they finished,

12  so they worked through the loans that they had in place.  But,

13  they're not given any direction that you have to do this loan

14  first or that loan first.

15            So, I guess in terms of answering your question, it

16  was up to them how they wanted to underwrite a loan.

17  Q.  So I understand your answer, the underwriter has a

18  collection of loans, and it is up to the particular underwriter

19  which ones they do first and which ones they put off until

20  later?

21  A.  Sure.

22  Q.  Mr. Holt, is it the case that those underwriters would skip

23  the longer loan files when they were reviewing them?

24            MS. SCHOENBERGER:  Objection.

25            THE COURT:  Sustained.

1    Q.  Mr. Holt, was one of the defects that you found in the loan

2    files when you looked through them the absence of a form 1008?

3    A.  In the 343 loans, there were only two loans that were

4    missing either the 1008 or the 1077.

5    Q.  That's in your final report with respect to those 343

6    loans?

7    A.  That's correct.

8    Q.  Originally when you went through these, you had deemed

9    other loans that were missing form 1008s to be materially

10   defective, is that correct?

11   A.  Well, they weren't deemed to be materially defective, they

12   could be just a regular defect.  It would depend on the

13   determination of the entire loan file if it had substance to

14   it.

15   Q.  But that was one of the defects that your underwriters

16   noted, is that correct?

17   A.  It could have been, yes, sir.

18   Q.  It was more than just two out of the 343, is that correct?

19   A.  Yes, there was.

20   Q.  Okay.  So when we look at some of these loan files and you

21   were reviewing later, we're going to see instances where you

22   claim a form 1008 defect, correct?

23            MS. SCHOENBERGER:  Objection.

24            THE COURT:  Sustained.

25   Q.  Mr. Holt, I'm going to ask you to look at a binder.

1           MR. SMURZYNSKI:  Your Honor, may I approach the

2    witness?

3           THE COURT:  Yes.

4    Q.  Mr. Holt, if you'll turn to tab six of that binder.  Do you

5    have that in front of you?

6    A.  Yes, sir.

7    Q.  This is marked Plaintiff's Exhibit 229.

8    A.  Yes, sir.

9    Q.  What is Plaintiff's Exhibit 229?

10   A.  It's a, as I had mentioned, when we put the information

11   into our surveys, then you can export that into like an Excel

12   spread, a statistical program.  So these are the loans that we

13   found as being materially defective, why, and then the

14   underwriter has the ability to make comments in there.  This is

15   a copy of that.

16   Q.  This sets forth the reasons why you concluded that these

17   particular loans were materially defective, is that correct?

18   A.  Based on the agency guidelines, yes, sir.

19   Q.  Let's look together at loan number 189060126.  And your

20   description of that.  That's on page 15.

21   A.  Could you tell me the account number again, please?

22   Q.  Certainly it is 189060126.

23   A.  Okay.

24           MR. SMURZYNSKI:  Your Honor, while I don't intend to

25   admit this exhibit, I think it would be fruitful for the

1   examination and his opinions, to publish to the jury the

2   particular excerpts he's looking at.

3            MS. SCHOENBERGER:  Objection, your Honor.

4            THE COURT:  Sustained.

5            MR. SMURZYNSKI:  Well in that case I will offer

6   Plaintiff's Exhibit 229.

7            THE COURT:  Any objection?

8            MS. SCHOENBERGER:  No objection.

9            THE COURT:  Received.

10            (Plaintiff's Exhibit 229 received in evidence)

11   Q.  Mr. Holt, could you read the comments with respect to the

12   loan we've been referring to.

13   A.  It says "CLUES-5.  Borrower provided all necessary

14   documents to qualify for this loan per the loan program and doc

15   type.  However, the comps on the appraisal were 2, 10, and

16   6 miles away from the subject property.  Someone should have

17   questioned the location of the comps.  12 percent mortgage

18   insurance required.  No mortgage insurance noted on the HUD or

19   in the loan file."

20   Q.  So you noted two defects there.  One regarding an appraisal

21   and one regarding mortgage insurance, is that right?

22   A.  Yes, sir.

23   Q.  Let's start with the mortgage insurance one.  You mentioned

24   yesterday that you had conversations with Fannie and Freddie

25   about how to re-underwrite these loans?

1    A.  In some regard.

2    Q.  Was one of the things that you were informed by Fannie and

3    Freddie that as long as there was proof of mortgage insurance

4    having been paid, then there was no violation of the

5    guidelines?

6              MS. SCHOENBERGER:  Objection.

7              THE COURT:  Sustained, but only as to form.

8    Q.  Mr. Holt, did you have any conversations with Fannie or

9    Freddie about the requirements for mortgage insurance with

10   respect to these loans?

11   A.  Yes, sir.

12   Q.  In those conversations, did Fannie and Freddie express any

13   view to you as to what the requirements were for evidence of

14   mortgage insurance with respect to these loans?

15   A.  They told me that the mortgage certificate should be in the

16   loan file.

17   Q.  Is it your view that if a mortgage insurance certificate is

18   not in the loan file, that there is a material defect?

19   A.  That was our understanding from our conversations with

20   Fannie Mae and Freddie Mac.

21             MR. SMURZYNSKI:  Your Honor, if I might approach the

22   witness with a transcript.

23             THE COURT:  Yes.

24   Q.  Mr. Holt, do you recall being deposed in this case?

25   A.  I do.

DA23BAN2                          Holt - cross

1   Q.  And giving questions under oath?

2   A.  I do.

3   Q.  I'd ask you to turn to page 221 and read to yourself lines

4   one through 22.

5   A.  Okay.  I'm sorry.  Again please?

6   Q.  Sure.  Page 221, lines one through 22.

7           (Pause)

8   A.  Yes, sir.

9           MR. SMURZYNSKI:  Your Honor, may I proceed with

10  reading the question and answer?

11          MS. SCHOENBERGER:  Objection.

12          THE COURT:  Give me the page again?

13          MR. SMURZYNSKI:  It is page 221, line one through 22.

14          THE COURT:  Sustained.

15  Q.  Mr. Holt, are you familiar with how Countrywide handled the

16  placement of mortgage insurance with respect to loans?

17  A.  There is a chart in the guidelines that tells how mortgage

18  insurance is I guess requested and then obtained.  So, based on

19  that reading of the guidelines, there is a section in there

20  that says, you know, whether it's in paper form or if they can

21  request it by electronic form, and so forth and so on.  So

22  there is information in the guidelines that you can refer to.

23  Q.  If you would turn to tab seven, materials in front of you,

24  Mr. Holt.

25  A.  Okay.

1    Q.  Behind tab seven, there is a document that's been branded

2    Defendant's Exhibit 1685 and is the conventional technical

3    manual.  Do you see that?

4    A.  Yes, sir.

5    Q.  Is this a document that you used in the course of your

6    re-underwriting work?

7    A.  Yes, sir.

8              MR. SMURZYNSKI:  Your Honor, I ask that Defendant's

9    1685 be admitted.

10             MS. SCHOENBERGER:  No objection.

11             THE COURT:  I'm sorry?

12             MS. SCHOENBERGER:  No objection.

13             THE COURT:  Received.

14             (Defendant's Exhibit 1685 received in evidence)

15   Q.  Mr. Holt, this is the section that deals with mortgage

16   insurance.

17   A.  Yes, sir.

18   Q.  In the guidelines?

19   A.  Yes, sir.

20   Q.  If you turn to page three of that document.  Do you have it

21   in front of you?

22   A.  621?

23   Q.  Yes.  Exactly 621.  This is the section that talks about

24   how mortgage insurance is supposed to be placed to be in

25   compliance with the guidelines, correct?

DA23BAN2                    Holt - cross

1    A.  It's a good bit of information on there, but it gives

2    different categories about where and how the mortgage insurance

3    processing, yes, sir.

4    Q.  One of the ways in which mortgage insurance can be procured

5    in compliance with the guidelines is for it to be provided

6    after closing, is that correct?

7    A.  I believe within a day or so, yes, sir.

8    Q.  Likewise, the guidelines provide that such a certificate

9    can be maintained electronically by corporate, is that correct?

10   A.  Yes, sir.

11   Q.  If it is being maintained electronically by corporate, it

12   wouldn't be in the loan file itself, correct?

13          MS. SCHOENBERGER:  Objection.

14          THE COURT:  I think it is ambiguous.  Sustained.

15   Q.  Mr. Holt, in doing your review, if the loan file itself did

16   not contain a certificate of mortgage insurance --

17          THE COURT:  What do you mean by the loan file itself?

18   That's the problem.  Do you mean the physical paper file?  Do

19   you mean the electronic file?  That's the ambiguity.

20          MR. SMURZYNSKI:  I'll rephrase it.  Thank you, your

21   Honor.

22   Q.  Mr. Holt, in the course of your review, did you look at

23   paper files or electronic files?

24   A.  Paper files.

25   Q.  Mr. Holt, if the paper file lacked a mortgage insurance

1    certificate, did you assume that there was no mortgage

2    insurance certificate?

3    A.  That's correct.

4    Q.  Are you aware that there are mortgage certificates

5    maintained in places other than the paper files?

6    A.  Not to my knowledge, no, sir.  Besides reading this, I had

7    no other proof to say that there was one.

8    Q.  Can you turn to the next tab.  There is a document that's

9    been branded as Defendant's Exhibit 1886.

10   A.  Yes, sir.

11   Q.  Mr. Holt, do you recognize what Defendant's 1886 is?

12   A.  Well, based on my background, it looks like it is a screen

13   print of something that came off of Countrywide's -- or this

14   one says Bank of America's system.  Electronic system.

15   Q.  Mr. Holt, is this evidence of mortgage insurance with

16   respect to a loan with respect to 8536 Langmaid Road?

17   A.  Could you repeat that?  I'm sorry.

18   Q.  Certainly.  Is Defendant's Exhibit 1886 evidence of

19   mortgage insurance with respect to the property address of 8536

20   Langmaid Road?

21           MR. SMURZYNSKI:  And your Honor, I won't identify the

22   city and state for purposes of borrower privacy.

23           MS. SCHOENBERGER:  Objection, your Honor.

24           THE COURT:  I'm sorry, I didn't hear you.

25           MS. SCHOENBERGER:  Objection.

DA23BAN2                         Holt - cross

1           THE COURT:  What is the ground of the objection?

2           MS. SCHOENBERGER:  Foundation.

3           THE COURT:  Let me see the exhibit, please.

4           The question was simply is this evidence of mortgage

5    insurance with respect to a loan with respect to that -- this

6    is in evidence, right?

7           MS. SCHOENBERGER:  No, I don't believe so.

8           THE COURT:  It's not in evidence.  I'm sorry.  Is it

9    in evidence?

10          MR. SMURZYNSKI:  It is not yet, your Honor.

11          THE COURT:  Then sustained.  I'm sorry.

12          MR. SMURZYNSKI:  Your Honor, let me ask that DX 1886

13   be admitted.

14          MS. SCHOENBERGER:  Objection.

15          THE COURT:  Ladies and gentlemen, I think because I

16   have to have a discussion with counsel, rather than have a side

17   bar why don't we give you your midmorning break now and we'll

18   reconvene in about 15 minutes.

19          (Jury excused)

20          (Continued on next page)

21

22

23

24

25

1          THE COURT:  Mr. Holt, looking at 1886, just a few

2     years before I was born, have you ever seen that before?

3          THE WITNESS:  I've seen it in some of the loan files,

4     yes, sir.

5          THE COURT:  You've seen things like this?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  What are they?

8          THE WITNESS:  It is a screen print from the computer

9     system where they inputted information regarding borrower, loan

10    information that's done.  So just like on the screen, you can

11    just print the screen from the system.

12         THE COURT:  Okay.  Do you know whether or not this one

13    was one of the loans you reviewed?

14         THE WITNESS:  Not offhand, sir.

15         THE COURT:  Okay.  So, let me ask counsel, let me

16    first find out from the government, what is the nature of the

17    objection?

18         MS. SCHOENBERGER:  Your Honor, there is no evidence

19    this is -- can I speak or do we need to come to side bar?

20         THE COURT:  No.

21         MS. SCHOENBERGER:  There is no evidence this is

22    included in the loan file or any loan file that the witness

23    reviewed.

24         THE COURT:  So stop there.  So I don't see how defense

25    counsel can get it into evidence.  But if you want to put some

1    more questions to the witness, go ahead.

2              MR. SMURZYNSKI:  Do you want me to do this now?

3              THE COURT:  Yes.  So we don't waste the jury's time.

4              MR. SMURZYNSKI:  Fair enough, your Honor.

5    Q.  Mr. Holt, you have seen screens such as this within the

6    documents that were provided to you in connection with your

7    work on this case, is that correct?

8    A.  In addition to a lot of different screen prints, we see

9    these, yes.

10   Q.  In the course of your work on this case, correct?

11   A.  Yes, sir.

12   Q.  A printout of such a screen shot of mortgage insurance

13   would satisfy you that the requirement for mortgage insurance

14   had been met pursuant to the Countrywide guidelines?

15             THE COURT:  No, no.

16             MR. SMURZYNSKI:  Your Honor -- I'm sorry.

17             THE COURT:  That goes to what weight, if any, will be

18   given to this exhibit if it is received.  That was the problem

19   with your original question.  You asked him is this evidence of

20   X.  You can't ask that question until the exhibit has been

21   properly admitted, which is the problem.  The problem with its

22   admission is that there is no showing that this is one of the

23   loans that he reviewed.  Maybe counsel can agree on that during

24   the break, in which case I will admit it.  But if it is not one

25   of the ones he reviewed, then I don't see how it comes into

 1   evidence.

 2           MR. SMURZYNSKI:  Your Honor, let me elicit that.

 3   because one can tell from looking at the document the loan

 4   number.

 5           THE COURT:  Go ahead.

 6   Q.  Mr. Holt, if you will turn back to tab six, page 15, do you

 7   recall we were discussing a loan number 189060126?

 8   A.  Yes, sir.

 9   Q.  If you'll turn back now to DX 1886, behind tab eight, do

10   you see in the upper-left-hand corner an account number?

11   A.  Yes, sir.

12   Q.  Is it your understanding that that account number refers to

13   the loan number?

14   A.  Yes, sir.

15   Q.  Does that loan number match the loan number on PX 229, page

16   15, that we were discussing a minute ago?

17   A.  Yes, sir.

18           THE COURT:  Any objection now?

19           MS. SCHOENBERGER:  Yes, your Honor.  There is no

20   evidence that this document was included in the loan file.

21           THE COURT:  That's the point.  My understanding is,

22   maybe I'm wrong, counsel will tell me, that he's attempting to

23   show that there were documents that they stored electronically

24   or otherwise that were not included in the loan file.

25           MR. SMURZYNSKI:  Precisely, your Honor.

1          MS. SCHOENBERGER:  I would also note this was not an

2     exhibit that was included on the defendant's exhibit list.

3          THE COURT:  Yes.  But it is cross-examination so it

4     doesn't have to be listed.  But, however, I suppose there is a

5     question of whether if the form of your request to the bank

6     would have elicited this document and it wasn't provided.  That

7     might be a problem.  Short of that though, it seems to me a

8     foundation has now been laid for its admissibility.

9          So anyway, I have to take another short matter now.

10    So we'll excuse all counsel for the next 10 minutes.  If there

11    is anything further any counsel wants to say on this document,

12    I'll hear you when we finish the other matter.

13          Mr. Holt, you can step down.  We'll see you in 10

14    minutes or so.

15          (Recess)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

DA2TBAN3

1           THE COURT:  Any further objection to the exhibit?

2           MS. SCHOENBERGER:  Yes, your Honor, we object to the

3      exhibit.  It contains a Bates number, so we assume it's been

4      produced to us, but there's no suggestion that it was produced

5      as part of the loan files given to the expert to review.  And

6      moreover, I understood from yesterday that if the witness was

7      going to be asked about individual pieces of a loan file, he

8      would be provided with the full file.

9           THE COURT:  The witness would.

10          MS. SCHOENBERGER:  Correct.

11          THE COURT:  What about that?

12          MR. SMURZYNSKI:  Your Honor, I'm happy to provide you

13     with a copy of the entire loan file, the paper loan copy

14     indicates he reviewed --

15          THE COURT:  Was this in the loan file?

16          MR. SMURZYNSKI:  This was not in the paper loan file.

17     As the testimony elicited, pursuant to guidelines, it's

18     maintained centrally outside of a particular loan file.

19          THE COURT:  So let me just make sure I understand.

20     The government had, in their discovery, requested various loan

21     files.  Yes?

22          MS. SCHOENBERGER:  That's correct.

23          THE COURT:  And were there materials that are related

24     to a loan that were not produced as part of a loan file even if

25     they were produced separately?

DA2TBAN3

1          MR. SMURZYNSKI:  Yes, your Honor.

2          THE COURT:  What kind of nonsense is that?

3          MR. SMURZYNSKI:  Your Honor, we produced --

4          THE COURT:  Who says that a file means a paper file?

5          MR. SMURZYNSKI:  Your Honor, to be clear, we produced

6     electronic files as well.

7          THE COURT:  So was it included in the electronic file?

8          MR. SMURZYNSKI:  Perhaps my colleague could address

9     this.

10          THE COURT:  Yes, I think it's a good idea because he

11     has a great tie.

12          MR. SCARBOROUGH:  Your Honor, my wife would be happy

13     to hear that.

14          With regard to the production of loan files, as your

15     Honor may recall, there was an expedited effort to get loan

16     files produced.

17          THE COURT:  That's your adjective, not mine.

18          MR. SCARBOROUGH:  Well, it felt expedited from my

19     perspective.  What we did was we produced the electronic

20     versions of the loan files first, then we followed up by

21     selecting the paper versions of the loan files and producing

22     that.

23          THE COURT:  So when the particular file, the

24     electronic version was produced, did it include the document

25     that was presently in front of the witness?

DA2TBAN3

1          MR. SCARBOROUGH:  The document presently in front of

2     the witness does not include that because there was a paper

3     version, there was an electronic version, and then as the

4     testimony has established, according to the guidelines,

5     evidence of mortgage insurance itself was kept in a different

6     computer.  And that was something that was collected and

7     produced subsequently.  It was not produced at the time that

8     the electronic or the paper files were collected and produced,

9     that was a part of the overall effort that we made to get

10    everything produced.

11         THE COURT:  I don't understand, how can you say that a

12    mortgage insurance is not part of a loan file on any given

13    loan?

14         MR. SCARBOROUGH:  Your Honor, evidence of mortgage

15    insurance is part of the loan.  When we were collecting -- when

16    we initially went in to collect, we went to collect the loan

17    file, we did not -- at that particular point in time it was not

18    apparent to me that there was a separate computer system that

19    maintained mortgage insurance records apart from the loan file,

20    whether it was kept electronically or in paper.

21         THE COURT:  Is there anything else under mortgage

22    insurance that was somehow not part of the loan file even

23    though it related to the loan?

24         MR. SCARBOROUGH:  As I stand here at this moment, I

25    cannot think of anything.

DA2TBAN3

1          THE COURT:  So let me ask the government, were you

2     made aware that the mortgage insurances that was being produced

3     to you was being kept separately and related to the loans that

4     were the subject of the case?

5          MS. SCHOENBERGER:  I don't recall a subsequent

6     production that specifically identified documents as relating

7     to certain loan files.

8          I also note that this document appears to have been

9     accessed on April 5th, 2013.  Our expert reports were initially

10    due on May 7th, so by this time the loan review was

11    substantially complete.

12         THE COURT:  So when the mortgage insurance documents

13    were produced subsequent to the loan files, both electronic and

14    paper, were they just produced as part of a supplemental

15    production or was counsel for government informed these relate

16    to the loans that we have previously given you, quote, loan

17    files for?

18         MR. SCARBOROUGH:  I believe it was produced as part of

19    a supplemental production.  I believe the production was made

20    on April 9.  I checked at the break to see if that was in fact

21    the case, and that was the case.  The reason why the production

22    was made at that time was after the paper files had been

23    collected, we independently went forward to review them to see

24    what the contents were.  And it was at that point in time after

25    our review of all those loan files, which were a thousand, that

DA2TBAN3

1      we identified that some of those loan files did not have

2      evidence of mortgage insurance in them, which led us to ask the

3      question where is the evidence of the mortgage insurance, and

4      that led us to the database that contained the mortgage

5      insurance.

6              THE COURT:  So that's all very commendable.  My

7      question is whether you conveyed all that to the government.

8              MR. SCARBOROUGH:  We produced it on April 9.

9              THE COURT:  I know you produced --

10             MR. SCARBOROUGH:  I have no specific knowledge that it

11     was called out as these are the mortgage insurance documents

12     related to the loan files.

13             THE COURT:  Because they really are, on any ordinary

14     meaning of the term "loan file," these would have been part of

15     the loan file.  And the fact that the bank, for whatever

16     reason, I still haven't heard the reason, choose to keep them

17     in a separate database is neither here nor there.  But I

18     commend you for having found them.  It doesn't sound like it

19     was the result of anything other than your digging as opposed

20     to the bank's volunteering, but having done that, I don't

21     understand why that wasn't called to the government's

22     attention.  It's like setting them up.  I think the technical

23     term is sandbagging.  I'm going to exclude this document.

24             Bring in the jury.

25             (Continued on next page)

DA2TBAN3

1          (Jury present)

2          THE COURT:  Just your standard 15-minute break, but we

3     are ready to continue.  Go ahead, counsel.

4          MR. SMURZYNSKI:  Thank you, your Honor.

5     BY MR. SMURZYNSKI:

6     Q.  Mr. Holt, would you agree that it would be a red flag if a

7     particular re-underwriter found a hundred percent of the loans

8     that that person looked at to be materially defective?

9     A.  I'm sorry, say that again, I apologize.

10    Q.  Certainly.  Mr. Holt, would you agree that it would be a

11    red flag if one of your underwriters went in and found a

12    hundred percent of the loans that person looked at to be

13    materially defective?

14         MS. SCHOENBERGER:  Objection, your Honor, as to "red

15    flag."

16         THE COURT:  Well, although that's a common term, you

17    might want to use a term that maybe the jurors are more

18    familiar with, they may think you're referring to 1917.

19         MR. SMURZYNSKI:  I certainly wasn't referring to 1917,

20    but I will rephrase, your Honor.

21    Q.  Mr. Holt, would you be concerned about the accuracy of the

22    work of one of your re-underwriters if they went and found a

23    hundred percent of the loans they looked at to be materially

24    defective?

25    A.  It would be an item that we would add to our quality

DA2TBAN3

1  control, so it would be something that we would want to look

2  at, yes, sir.

3  Q.  Have you ever used the term "red flag" before?

4  A.  In terms of our survey, it has red flags in there, yes,

5  sir.

6  Q.  And what does the term "red flag" mean to you?

7  A.  It's something that is -- that needs to be addressed, some

8  kind of item that is drawn to your attention that needs to be

9  looked at further.

10 Q.  Because it's suspicious?

11          MS. SCHOENBERGER:  Objection.

12          THE COURT:  Overruled.

13 A.  It could be, yes, or it could be something that needs to

14 be -- brings a question to your mind that you might want to go

15 and look at.

16 Q.  Now you personally reviewed eight of the loan files here

17 from scratch, is that correct?

18 A.  That's correct.

19 Q.  And on how many of those eight did you find the loan to be

20 materially defective?

21 A.  I don't recall what my numbers are, but I believe from

22 recall almost all of them were, but I don't know the exact

23 number, I'm sorry.

24 Q.  Almost all of them?

25 A.  It was either seven or eight, I think.

DA2TBAN3

1   Q.  Now let's look at one of those eight loans together.

2           MR. SMURZYNSKI:  And Alex, if you could pull back up

3   to tab 6, page 14.

4   Q.  And Mr. Holt, do you see on that page a loan 188939173?

5   A.  On page 8, you said?

6   Q.  Sorry, on page 14, behind the tab 6.

7   A.  OK.

8   Q.  Do you have that in front of you?

9   A.  Yes, sir.

10  Q.  Mr. Holt, that was one of the loans that you re-underwrote

11  from scratch?

12  A.  I don't know.

13  Q.  Did you keep a notebook when you reviewed a loan from

14  scratch?

15  A.  Yes, sir.

16  Q.  And let me ask you to turn to tab 11 of your notebook, and

17  that's been marked as DX1537, do you see that?

18  A.  Yes, sir.

19  Q.  And Mr. Holt, are these your notes of reviewing eight

20  loans?

21  A.  They look like my handwriting.

22          MR. SMURZYNSKI:  Your Honor, I move defendant's 1537.

23          MS. SCHOENBERGER:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit 1537 received in evidence)

```
1    Q.  Mr. Holt, if you could turn to the first page of
2    handwriting within that notebook.
3    A.  OK.
4    Q.  And do you see in the upper left-hand corner a loan number?
5    A.  Yes, sir.
6    Q.  It's 188939173?
7    A.  Correct.
8    Q.  And that's the same as the loan number we were looking at
9    in your list of findings, correct?
10   A.  Yes, sir.
11   Q.  So that would indicate to you that this was one of the
12   loans that you reviewed?
13   A.  Yes, sir.
14   Q.  Now if you could read for us the comments with respect to
15   that loan?
16   A.  CLUES-8.  The CLUES was an accept.  However, there was a
17   warning on the CLUES that stated that subject property was
18   located in a soft market category one, two or three as defined
19   in the Countrywide guidelines.  If the appraisal or the
20   appraisal review indicated any of the following, decline in
21   market, oversupply or marketing time over six months, then
22   reduce the maximum allowed loan to value by five percent.  If
23   the loan to value on the loan was already at least five percent
24   lower than the maximum loan to value per guideline and no loan
25   to value reduction was necessary.  There were no appraisal or
```

DA2TBAN3

1    appraisal reviews in the loan file.

2    Q.  Let's start with the question about loan to value.  If we

3    could go to another portion of the Countrywide guidelines

4    behind tab 12, please.  And it's marked as DX1672.  Do you see

5    that?

6    A.  Yes, sir.

7    Q.  This was one of the loan program guides that you worked

8    with during the course of doing your work?

9    A.  It was, but the revision date is several years prior to the

10   relevant period.

11   Q.  That was the last revision date.  Do you have any reason to

12   believe this loan program guide was not in effect at this point

13   in time -- sorry, at the point in time that loan number

14   188939173 was originated?

15   A.  I don't recall it is, but if it was the last revision, then

16   that's what we had to use.

17          MR. SMURZYNSKI:  Your Honor, I move Defendant's

18   Exhibit 1672.

19          MS. SCHOENBERGER:  No objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 1672 received in evidence)

22   Q.  Now if you will turn to the third page of that Countrywide

23   guideline, do you see that within there there is a provision

24   with respect to the maximum loan to value or combined loan to

25   value?

```
 1   A.  Yes, sir.

 2   Q.  And do you recall what the borrower's credit score was on

 3   this loan application?

 4   A.  No, sir.

 5   Q.  Go to the next document in your binder behind tab 11.

 6   A.  OK.

 7   Q.  And that's DX1888 for identification, do you see that?

 8   A.  Sorry?

 9   Q.  Do you see that on the bottom there it says DX1888 for

10   identification?

11   A.  No, on page -- sorry, 6?

12   Q.  Tab 13, please.

13   A.  I apologize, OK.

14   Q.  Do you see up there a loan number?

15   A.  I do.

16   Q.  And this exhibit is a CLUES report, is that correct?

17   A.  That's correct.

18          MR. SMURZYNSKI:  Your Honor, I move Defendant's

19   Exhibit 1888.

20          MS. SCHOENBERGER:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 1888 received in evidence)

23   Q.  Mr. Holt, as you testified earlier today, you would look at

24   the CLUES report to find the credit score with respect to a

25   particular borrower, is that right?
```

DA2TBAN3

1    A.  That's correct.

2    Q.  If you, in the summary, you go down into section 2.0

3    summary on the first page, do you see a credit score there?

4    A.  I do, of 743.

5    Q.  Thank you.  Now going back to the loan program guide that

6    we were looking at previously, with a credit score of 743, what

7    is the maximum loan to value on this sort of --

8    A.  For a purchase and rate term it was 95/95.

9    Q.  And let's go back to that CLUES report that we were looking

10   at just a moment ago in Defendant's 1888.  And what was the

11   loan to value reported there?

12   A.  The loan to value is 76.54.

13   Q.  And your critique, as set forth in your opinions, was that

14   the loan to value number should have been reduced by five

15   percent, is that right?

16   A.  That's correct.

17   Q.  And that's the maximum loan to value?

18   A.  Well, it's the rate that's on the CLUES report.

19   Q.  So the 95 percent requirement should have been reduced to

20   90 percent, correct?

21   A.  We were basing it on how the CLUES report had put it in

22   there.

23   Q.  Mr. Holt, under the Countrywide guidelines, the maximum for

24   this type of loan was 95 percent, and then that needed to be

25   reduced by five percent, correct?

DA2TBAN3

1  A.  That's not necessarily true, because you don't know, if

2  things changed in the report, if they will approve the higher

3  loan to value or not based on the CLUES report.  So by looking

4  at the CLUES report, everything is approved based on that

5  76.54 percent.

6  Q.  That 76.54 percent simply tracks the actual LTV of this

7  borrower, correct, based on the CLUES report?

8  A.  That's based what has been inputted yes.

9  Q.  So that's not the maximum loan to value that's required or

10 allowed under this loan program, is it?

11 A.  The loan program would have 95 percent on there.

12 Q.  If you subtract five percent from 95 percent you get

13 90 percent?

14 A.  That's correct.

15 Q.  If that's the case, the 76.5 loan to value is actually

16 beneath the loan to value maximum, correct?

17           MS. SCHOENBERGER:  Objection.

18           THE COURT:  Ground?

19           MS. SCHOENBERGER:  Vague.

20           THE COURT:  All right.  Do you want to sharpen it up a

21 little bit?

22 Q.  Mr. Holt, if you assume that there is a 90 percent loan to

23 value maximum with respect to this loan program, you would

24 agree that 76.54 percent is lower, correct?

25 A.  Based on the loan program guides, yes, sir.

1   Q.  Now you also said with respect to this loan that you rated

2   it as materially defective that the loan didn't include an

3   appraisal or an appraisal review.  Do you recall that?

4   A.  Yes, sir.

5   Q.  Are you aware, Mr. Holt, of something called a property

6   inspection waiver?

7   A.  I have heard of it, yes, sir.

8   Q.  And is it the case, Mr. Holt, that under certain loan

9   programs that, rather than requiring an appraisal, the

10  guideline would require instead simply a property inspection

11  waiver?

12  A.  It could, yes, sir.

13  Q.  Let's look together at that CLUES report, and under

14  underwriting conditions on that same first page, can you read

15  what it says with regard to the appraisal condition?

16  A.  It says the submitted value estimate of this property has

17  been accepted as the property inspection waiver fee of $50.  If

18  you do not wish to exercise this option, then the 2055 exterior

19  only inspection residential appraisal report is required.  If

20  applicable, if this loan closes over 120 days from the date of

21  this report, the loan must be rerun to confirm PIW eligibility.

22  Q.  And PIW is Property Inspection Waiver?

23  A.  I believe that would be that, yes, sir.

24  Q.  So in other words, under this CLUES report, if the borrower

25  paid the $50 property inspection waiver, there was no

DA2TBAN3

1    requirement for anything with regard to the appraisal beyond

2    that, correct?

3    A.  Well, you have a warning that you have go up there and

4    inspect if the property is in a soft market or not, so would

5    you want to go and get an appraisal to see if that property is

6    in a soft market.

7    Q.  Mr. Holt, I'm asking you about the CLUES condition, because

8    you would agree that the CLUES listed as a condition something

9    that was required to close the loan, correct?

10   A.  I would want to check that red flag that's at the top.

11   That evidently is something major if they have the first

12   section that has a warning, so I would want to check that to be

13   sure that the requirements of the soft market had been

14   satisfied.

15   Q.  But that's your opinion, that's not what the CLUES accept

16   conditions are, are they?

17              MS. SCHOENBERGER:  Objection.

18              THE COURT:  Overruled.

19   A.  That is what the conditions are.  But again, you have

20   warnings up there that have to be investigated.

21   Q.  That's your opinion, Mr. Holt, but the way the CLUES report

22   works, as you testified earlier on direct, was there were

23   certain conditions that CLUES required, yes?

24   A.  That's correct.

25              MS. SCHOENBERGER:  Objection.

DA2TBAN3

1          THE COURT:  When there's an objection you have to

2     wait.

3          Sustained.

4     Q.  And Mr. Holt, the only condition with regard to appraisal

5     that is set forth in this CLUES report states that the

6     submitted value estimate of this property has been accepted as

7     the market value for this transaction.  The borrower would be

8     assessed property inspection waiver fee of $50, and only if you

9     don't wish to pay that fee would there be an appraisal

10    requirement.  That's the CLUES condition set forth, correct?

11    A.  It is a condition, yes, sir.

12    Q.  And when you reached your conclusion as to this loan being

13    materially defective, did you look to see whether that $50

14    property inspection waiver fee had been paid?

15    A.  No, sir, I looked at whether or not the soft market

16    analysis had been addressed and identified.

17    Q.  Even though that was not a condition set forth in the CLUES

18    accept?

19          MS. SCHOENBERGER:  Objection.

20          THE COURT:  Ground?

21          MS. SCHOENBERGER:  Misstates testimony.

22          THE COURT:  It's a question.  Perhaps it wasn't -- the

23    intonation didn't have a sufficiently interrogative aspect, but

24    it was a question.  So overruled, you may answer.

25          You may answer.

1    A.   Sorry, can you ask the question again?

2    Q.   You didn't look to see whether there was a $50 property

3    inspection waiver paid in connection with this loan because

4    rather than look at the underwriting conditions set forth for

5    appraisal, you choose to look at some other requirement that

6    you --

7              MS. SCHOENBERGER:  Objection.

8              THE COURT:  Well, that wasn't the question, but since

9    you put that question, the objection is sustained.

10             MR. SMURZYNSKI:  I will go back to my prior question,

11   your Honor, if I could only remember it.

12             Your Honor, I'll move on.

13             THE COURT:  OK.

14   Q.   Now Mr. Holt, many of the defects that you found with

15   respect to these loans involved a missing copy of the

16   appraiser's license, is that correct?

17   A.   That's correct.

18   Q.   And when you say that's a defect, you're not saying that

19   those appraisers actually lacked a license, you're just saying

20   you didn't see a copy of that license in the file?

21   A.   That's correct.

22   Q.   And it's the case, is it not, that those appraisals, when

23   they're signed, indicate the appraiser's certification?

24   A.   It does.

25   Q.   And you nonetheless treated as a material defect the fact

DA2TBAN3

1    that that paper copy of the appraisal certificate was not in

2    the file, correct?

3                MS. SCHOENBERGER:  Objection.

4                THE COURT:  Ground?

5                MS. SCHOENBERGER:  May I approach?

6                THE COURT:  All right.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  You think this is going to be down that

3     same road?

4          MS. SCHOENBERGER:  Well, I think --

5          THE COURT:  That's why -- what I was told by defense

6     counsel a few minutes ago outside the presence of the jury was

7     the only thing that wasn't in the loan file was this insurance

8     mortgage insurance, to the best of his knowledge.  So is there

9     something else?

10          MR. SMURZYNSKI:  No, your Honor, this is my last

11     question.  I want to see whether he treated as material defect

12     the fact that there wasn't an appraisal certificate in the

13     file, even though there is an indication that the appraiser was

14     licensed in the file.  That's all I'm going to ask him.

15          MS. SCHOENBERGER:  I'm also objecting because the

16     question is vague and confusing because it conflates material

17     defect and defect.

18          THE COURT:  This witness can make that distinction.  I

19     will allow it.  You may want to, since you had this

20     interruption, start again.

21          MR. SMURZYNSKI:  Sure.

22          THE COURT:  But I have no problem with that.

23          MR. SMURZYNSKI:  Thank you, your Honor.

24          (Continued on next page)

25

DA2TBAN3

1           (In open court)

2           MR. SMURZYNSKI:  Let me try to remember the question.

3   BY MR. SMURZYNSKI:

4   Q.  Mr. Holt, when you found there to be a defect because the

5   file was missing a copy of the appraiser's license, you did

6   that notwithstanding the fact that the appraiser's state

7   license number and signature was on the appraisal, correct?

8           MS. SCHOENBERGER:  Objection.

9           THE COURT:  I'll allow that.  You may answer.

10  A.  The requirements from Fannie and Freddie for delivery and

11  for -- in the CLUES reports when they required it asked for the

12  license, and it is an actual certificate that you see in the

13  appraisal file.  So the loan file was absent that.  Even though

14  you saw it in the signature line, there's no way to tell if

15  that was accurate or what.  So you would want to see the actual

16  certificate of his license.

17  Q.  There were times you called that a material defect, is that

18  correct?

19  A.  That's correct.

20  Q.  Now you mentioned on direct examination yesterday that you

21  submitted reports in ten cases to date, expert reports, is that

22  right?

23  A.  I have given ten reports.  I don't know if they have been

24  put into court or not, but in ten different cases, yes, sir.

25  Q.  In almost all of them you did an exercise like this, a

1   re-underwriting exercise?

2   A.  Yes, sir.

3   Q.  In every instance in which you have done that underwriting

4   exercise, your opinions have been offered against the party

5   that originated the loans, correct?

6           MS. SCHOENBERGER:  Objection.

7           THE COURT:  Overruled.

8   A.  There's one I'm thinking about, so give me one second.

9           Yes, that would be accurate, yes, sir.

10  Q.  When you started your work in this case, you developed a

11  protocol for the other underwriters to follow, is that right?

12  A.  Yes, sir.

13  Q.  And one of the first things you do was you submitted it to

14  Fannie Mae and Freddie Mac?

15  A.  That's correct.

16  Q.  And you wanted to make sure that Fannie Mae and Freddie Mac

17  approved what you were doing in this case, is that right?

18          MS. SCHOENBERGER:  Objection.

19          THE COURT:  Well, it's somewhat ambiguous, but I will

20  allow the witness to answer it.

21  A.  The purpose was to let them know what we had involved, what

22  kind of guidelines, master agreements, all the different

23  documentation, and then to show them the different exercises

24  that we go through depending on loan type or document type to

25  be sure it matches up and that they were happy with it.  And we

DA2TBAN3

 1    did that.  So that's what we submitted to them for their

 2    review.

 3    Q.  You submitted that to Fannie and Freddie.  Did you submit

 4    anything to Countrywide to ask them about their views of

 5    whether they agreed with your protocol?

 6              MS. SCHOENBERGER:  Objection.

 7              THE COURT:  Ground?

 8              MS. SCHOENBERGER:  Relevance.

 9              THE COURT:  Overruled.

10    A.  No, sir.

11    Q.  Now you didn't just submit this to Fannie and Freddie, you

12    had conversations with them by telephone, correct?

13    A.  Yes, sir.

14    Q.  And yesterday you testified that those calls did not exceed

15    15 minutes each, is that right?

16    A.  Based on my knowledge, that's what I'm assuming it was,

17    yes, sir.

18    Q.  Is it possible that they lasted for more than an hour?

19    A.  It could have, but I don't recall that, no, sir.

20    Q.  Would you have had a better recollection of how long they

21    lasted closer in time to when those calls occurred?

22    A.  I'm sorry, I don't understand the question.

23    Q.  You testified that these calls occurred in the spring of

24    2013, correct?

25    A.  It would have been late winter, the first of the year, yes,

DA2TBAN3

1    sir.

2    Q.  And would you have had a better recollection of how long

3    these calls occurred back in say June of 2013 than today in

4    October of 2013?

5    A.  Should have, since it was closer to that period of time.

6             MR. SMURZYNSKI:  Your Honor, I ask the witness -- you

7    have in front of you a deposition transcript, if you would look

8    at page 13, lines 5 through 8.

9             THE COURT:  OK.

10            MR. SMURZYNSKI:  For context, if the witness would

11   like to begin reading at page 12, line 5 to himself.

12            MS. SCHOENBERGER:  Objection.

13            THE COURT:  Ground?

14            MS. SCHOENBERGER:  Not inconsistent.

15            THE COURT:  Well, I don't understand that objection.

16   If you want to come to the side bar, otherwise I'm going to

17   allow it.

18            MS. SCHOENBERGER:  I'll withdraw.

19            THE COURT:  OK, you may read it.

20            MR. SMURZYNSKI:  Your Honor, should I begin at page

21   12, line 5, or just the question and answer on 13, 5 to 8?

22            THE COURT:  Well, I think what you need to do is --

23            MR. SMURZYNSKI:  Could I try it this way, your

24   Honor --

25            THE COURT:  I think page 12, lines 5 through 10 with

DA2TBAN3

1    the exception, of course, of line 8, and then page 12, line 24

2    through page 13, line 8.

3              MR. SMURZYNSKI:  Very good, your Honor.

4    BY MR. SMURZYNSKI:

5    Q.  Mr. Holt, do you recall giving the following testimony and

6    response to my questions.

7    "Q.  Did you have open lines of communication with Fannie Mae

8    and Freddie Mac while you were doing this review?

9    "A.  I did have communication with them on a weekly basis.

10   "Q.  Did you communicate with them by email?

11   "A.  By telephone.

12   "Q.  By telephone.  And you had weekly calls with them?

13   "A.  I did.

14   "Q.  How long did those calls last?

15   "A.  Just depended.  Sometimes they were 15 minutes, sometimes

16   they were over an hour."

17             Mr. Holt, does that refresh your recollection that

18   your conversations with Fannie Mae and Freddie Mac at times

19   exceeded an hour?

20   A.  From what I was saying here, it would refresh my memory,

21   but I don't think -- over an hour might have been the first

22   time from an introductory standpoint, but there on out it was

23   pretty short and sweet.  So it is possible the first call was

24   over an hour, but after that it was not very lengthy.

25   Q.  On direct, Mr. Holt, you said you had four or five calls

DA2TBAN3

1    with each of Fannie and Freddie?

2    A.  If I recall that was the amount of time that we spoke with

3    them, yes, sir.

4    Q.  And is it possible that you had weekly calls with them from

5    January to April?

6    A.  Weekly calls?  I don't recall it being that long a period,

7    no, sir.  I could be mistaken, but from my recollection it was

8    more in the very beginning.

9             MR. SMURZYNSKI:  Your Honor, I would like to direct

10   the witness's attention to page 30, line 17, through page 31,

11   line 16.

12            THE COURT:  Any objection?

13            MS. SCHOENBERGER:  Same objection, your Honor.

14            THE COURT:  As the one you withdrew?

15            MS. SCHOENBERGER:  That's correct.  I'll try again.

16            THE COURT:  And the objection is not you think it's

17   not inconsistent?

18            MS. SCHOENBERGER:  That's correct.

19            THE COURT:  Recognizing that, of course, it's up to

20   the jury to determine whether it's inconsistent.  The only

21   question is whether any reasonable juror could conceivably

22   reasonably find it to be inconsistent.  So that's the standard.

23   And you persist in your objection?

24            MS. SCHOENBERGER:  I'll withdraw this one.

25            THE COURT:  That's all right.  Don't let your

DA2TBAN3

1    colleagues intimidate you.

2              MS. SCHOENBERGER:  It's like The Price is Right, but

3    I'll withdraw.

4              THE COURT:  Go ahead, counsel.

5    BY MR. SMURZYNSKI:

6    Q.  Mr. Holt, do you recall giving the following testimony in

7    June of 2013.

8    "Q.  So to make sure I understand it fairly, from January --

9    from sometime in January through sometime around April, you

10   were having weekly conversations with Fannie Mae, correct?

11   "A.  I don't know exactly, as I mentioned earlier, when it

12   started, but it was once we started getting all the information

13   we needed and looking at the guidelines and the files, at that

14   point we needed to start having weekly conversations.  I can't

15   be honest and tell you when we actually started.

16   "Q.  Would it be fair in saying it's roughly sometime in

17   January to sometime in April?

18   "A.  Yes.

19   "Q.  Same thing for Freddie Mac, you were having weekly

20   conversations with somebody from Freddie Mac, too?

21   "A.  Yes.

22   "Q.  And those conversations occurred in that same time frame?

23   "A.  That's correct."

24              Does that refresh your recollection, Mr. Holt?

25   A.  From what I testified to, yes, sir.

1  Q.  Now you didn't keep any notes of these conversations, is

2  that right?

3  A.  That's correct.

4  Q.  We talked a little bit earlier about appraisal licenses,

5  and was one of the things that the GSEs told you in these

6  conversations that you should claim a loan file was defective

7  if it was missing a copy of the appraiser's license?

8  A.  I don't recall if it was in our conversations, but it would

9  have been in their guidelines.  So I can't recollect if that's

10  yes or no, and I apologize.

11  Q.  Mr. Holt, my question wasn't about what is or isn't in the

12  guidelines, my question is about these conversations you had

13  with Fannie Mae and Freddie Mac.

14  A.  It's possible that we discussed --

15  Q.  It's possible that you discussed that with Fannie Mae and

16  Freddie Mac?

17  A.  At this point I don't recall if that was one of the topics

18  going back almost a year ago.  As I said, I didn't keep any

19  notes.  It's possible we talked about it, but I can't answer

20  truthfully in terms of knowing if I did talk to them about it

21  or not.

22        MR. SMURZYNSKI:  Your Honor, I would like to refresh

23  the witness by referring to page 262, line 15 through 21 of his

24  deposition.

25        THE COURT:  You can show it to him for purpose of

 1   refreshment, you can't read it.

 2            MR. SMURZYNSKI:  Fair enough.

 3   Q.  Mr. Holt, can you turn to those lines?

 4   A.  I'm trying to find it.  Can you repeat that again, please?

 5   Q.  Certainly.  Does reviewing lines 15 through 21 of page 262

 6   of your deposition transcript refresh your recollection as to

 7   whether you had any conversations with Fannie Mae and Freddie

 8   Mac in which they told you that every loan had to have an

 9   appraiser license in a file?

10   A.  Yes.  Based on my testimony here, that's what I said, so my

11   recollection evidently was clearer then than it is now.  So

12   that would have been what they would have told us.

13   Q.  Thank you.  And you accepted what they told you in that

14   regard, correct?

15   A.  Yes, sir.

16   Q.  Have you ever heard of an entity named Land Safe?

17   A.  Yes.

18   Q.  And Land Safe provides appraisal services, is that right?

19   A.  If I'm correct, it's a subsidiary of some sort of

20   Countrywide and they do, besides other things, provide

21   appraisal services.

22   Q.  But among other things they provide appraisal services, is

23   that right?

24   A.  Yes, sir.

25   Q.  And one of the -- strike that.

DA2TBAN3

```
1          Do you know whether under the Countrywide guidelines
2    if there was a Land Safe appraisal the appraisal's license had
3    to be in the file?
4    A.   Under the guidelines, if it was a Land Safe appraisal, then
5    the appraisal license was not required.
6    Q.   Are there loans that you treated as having defects that
7    lacked appraiser licenses notwithstanding the fact that it was
8    a Land Safe appraisal?
9    A.   We did if it was noted on the CLUES as a condition that you
10   have the appraisal's license.
11   Q.   Notwithstanding the provision in the guidelines?
12   A.   Well, CLUES can outweigh the guidelines, that's why they're
13   in there.  So they can change things.  If a guidelines says the
14   borrower only needs two months of reserves, CLUES can come back
15   and say no, we need six months of reserves.  So if it had a
16   requirement for an appraiser license, then we would accept the
17   appraiser's license as the condition requirement.
18   Q.   Mr. Holt, let's go back to the collection of findings you
19   had, and that's behind tab 6, Plaintiff's Exhibit 229, if you
20   could turn to page 37.
21   A.   Sorry, tell me that again.
22   Q.   Sure, page 37 of tab 6 of your binder, Plaintiff's Exhibit
23   229.  Do you have that in front you have, Mr. Holt?
24   A.   Yes, sir.
25   Q.   And I'm referring you to the loan that's on the top of that
```

1    page, 188675731.

2    A.  Yes, sir.

3    Q.  And because it's on this report, it's materially defective

     in your view, correct?

5    A.  That's correct.

6    Q.  With regard to this you found there to be a documentation

7    defect, correct?

8    A.  Yes, sir.

9    Q.  And if you could read the description that appears in your

10   report with regard to this particular loan.

11   A.  The 1003, which is the application, stated that the

12   borrower also worked a part-time job in addition to drawing a

13   pension check.  The borrower did not provide a 4506T, and the

14   file was missing a 1008.

15   Q.  I want to go back.  You talked a little earlier about the

16   1008s.  Is it your position that the absence of a 1008 from

17   this file is a defect?

18   A.  Not in the 343s, no, sir.

19   Q.  So we should -- the jury should just disregard that in this

20   portion, correct?

21           MS. SCHOENBERGER:  Objection.

22           THE COURT:  Sustained.

23   Q.  Let's talk about the first item, a part-time job in

24   addition to drawing a pension check.  There's nothing

25   apparently suspicious about something having a pension and also

1218

DA2TBAN3

1    having a part-time job, is there?

2    A.   There's not, no, sir.

3    Q.   Then let's talk about this missing 4506.  What's a 4506?

4    A.   It's a form that a borrower signs so that they, the lender,

5    can send the form off to the IRS and get a transcript of their

6    last two years tax returns.  It's not the whole tax return but

7    an outline transcript of it.

8              (Continued on next page)

1           MR. SMURZYNSKI:  Your Honor, if I might provide the

2   witness with the entire loan file with regard to this so he has

3   it in case there's any questions.

4           THE COURT:  Yes.  That's fine.

5           MR. SMURZYNSKI:  May I approach the witness?

6   Q.  Mr. Holt, I am going to try to spare you with having to

7   deal with this cumbersome document.  But there it is if you'd

8   like it.

9           Mr. Holt, if you could turn to tab 26 in the binder in

10  front of you.  This is a document that has been marked for

11  identification as Defendant's 1895.  Do you see that?

12  A.  Yes, sir.

13  Q.  Is this a form 4506?

14  A.  It is.

15  Q.  In the upper-right-hand corner is there a loan number for

16  it?

17  A.  Yes, sir.

18  Q.  Could you read that loan number, please.

19  A.  188675731.

20          MR. SMURZYNSKI:  Your Honor, I ask to admit DX 1895.

21          MS. SCHOENBERGER:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 1895 received in evidence)

24  Q.  Mr. Holt, is this the form 4506 that you state was missing

25  from the loan file and was the basis for finding this loan to

```
 1  be materially defective?

 2             MS. SCHOENBERGER:  Objection.

 3             THE COURT:  Overruled.

 4  A.  I can't tell if it is signed or not.  But if it is signed,

 5  this would be the 4506.

 6             MR. SMURZYNSKI:  Your Honor, we redacted the signature

 7  for privacy purposes.  The full loan file the witness has, has

 8  it.  I'm happy to have him look at it, but I'm mindful of

 9  borrower privacy.

10             THE COURT:  We can proceed in that fashion.  You can

11  look at it.

12             MR. SMURZYNSKI:  Maybe if I can take the document and

13  find it for witness as opposed to have him fumble through it.

14  Q.  Mr. Holt, without reading the name, does the document you

15  now have in front of you have the complete name and signature

16  of the borrower?

17  A.  It looks to be, yes, sir.

18  Q.  Let's go back to tab six again and page 29.  Do you have

19  that in front of you, Mr. Holt?

20  A.  Yes, sir.

21  Q.  Here is another loan number 192256005, in which you again

22  asserted a document defect, is that correct?

23  A.  Yes, sir.  I had to read it.

24  Q.  Have you had time to read it now?

25  A.  Yes, sir.
```

DA23BAN4                    Holt - cross

1   Q.  Here again you claim there was a document that was missing

2   from the file, is that correct?

3   A.  It says that it was missing a pay and close letter from Key

4   Bank.

5           MR. SMURZYNSKI:  Your Honor, if I may approach the

6   witness with the full loan file.

7           THE COURT:  Yes.

8   Q.  If you would turn to tab 27.  Tab 27, Mr. Holt, is a

9   communication from Key Bank, is that correct?

10  A.  Yes, sir.

11  Q.  It's Defendant's Exhibit 1896 for identification.  Do you

12  see that marked on the bottom?

13  A.  No, sir.  Yes, sir, I'm sorry.

14  Q.  Thank you.

15          MR. SMURZYNSKI:  Your Honor, defendants would move DX

16  1896.

17          MS. SCHOENBERGER:  Can we confirm this is a document

18  that's coming out of the full loan file that's been given to

19  the witness.

20          MR. SMURZYNSKI:  We can certainly do that.

21          THE COURT:  Okay.

22          MR. SMURZYNSKI:  My colleague is far ahead of me.

23  Q.  There is a tab on this document, Mr. Holt.  If you can turn

24  to that.

25          THE COURT:  Counsel, do you want to go take a look?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DA23BAN4                          Holt - cross

1          MS. SCHOENBERGER:  May I approach?

2          THE COURT:  Yes.

3          MS. SCHOENBERGER:  No objection.

4          THE COURT:  Received.

5          (Defendant's Exhibit 1896 received in evidence)

6   Q.  Mr. Holt, is this document, Defendant Exhibit 1896, the

7   document that you said was missing in your report?

8   A.  It seems to be, yes, sir.

9   Q.  Let's go back to tab six again and be mindful of the time

10  but let's do another.  Page 27.  If you would look down the

11  page there, there is an entry number 1897330731.

12  A.  Okay.

13  Q.  There you list a number of items, one is the missing

14  appraiser's license we talked about that before.  One is the

15  form 1008, we've talked about that before.  Then there is the

16  statement copy of business license to verify she has been in

17  business at least two years.  Do you see that?

18  A.  Yes, sir.

19          MS. SCHOENBERGER:  Objection.

20          THE COURT:  Ground?

21          MS. SCHOENBERGER:  Compound.  And misstates testimony.

22          THE COURT:  It is compound.  Or otherwise, it's

23  counsel testifying as to the first part and then asking a

24  question as to the second part.  Sustained.

25  Q.  Mr. Holt, do you see in the description here a reference to

1    copy of business license to verify she has been in business at

2    least two years?

3    A.  Yes, sir.

4    Q.  Earlier today, when you were giving testimony, you talked

5    about that portion of CLUES that addressed self-employed

6    borrowers, do you recall that?

7    A.  Yes, sir.

8    Q.  Mr. Holt, if you could turn to DX 1898 which is behind tab

9    29, please.

10   A.  Okay.

11   Q.  Mr. Holt, this is another example of a CLUES report, is

12   that right?

13   A.  Yes, sir.

14   Q.  It is with respect to the loan we're talking about

15   189733031?

16   A.  Yes, sir.

17           MR. SMURZYNSKI:  Your Honor, I ask that DX 1898 be

18   moved into evidence.

19           MS. SCHOENBERGER:  Again, your Honor, if we can

20   confirm this is part of the larger loan file.

21           THE COURT:  So go through that process.

22           MS. SCHOENBERGER:  No objection.

23           THE COURT:  Received.

24           (Defendant's Exhibit 1898 received in evidence)

25   Q.  Mr. Holt, if you will turn to the second page of DX 1898,

DA23BAN4                    Holt - cross

1   here you see conditions with respect to income and employment.

2   A.  Yes, sir.

3   Q.  While it is a different CLUES report, it is the same

4   language as what we looked at or you looked at with

5   government's counsel earlier today.

6           MS. SCHOENBERGER:  Objection.

7           THE COURT:  Sustained.

8   Q.  Mr. Holt, could you please read the CLUES report condition

9   with regard to income and employment with respect to this loan

10  that's in front of you?

11  A.  "Income and employment:  Verify that the self-employed

12  borrower, Maira, has been with the same business and at the

13  same location at least two years using such sources as a

14  business license, CPA, regulatory agency, or professional

15  organization.  Note:  When verifying employment, no income may

16  be disclosed."

17  Q.  Just to be clear, we obscured the borrower's last name for

18  privacy purposes.

19          Mr. Holt, what is a CPA?

20  A.  It is a certified public accountant.  An accountant.

21  Q.  When you were reviewing this loan to determine whether

22  income and employment had been verified, did you look into the

23  loan file to see if there was a copy of a letter from the

24  borrower's CPA?

25  A.  That is part of our process, yes, sir.  My process, yes,

1    sir.

2    Q.  Do you know whether there is a letter from the borrower's

3    CPA in this loan file?

4    A.  Not from looking at this right here, no, sir.

5    Q.  Let me first hand to counsel --

6          THE COURT:  Bear in mind we are going to break for

7    lunch in two minutes, if you can do this in two minutes.

8          MR. SMURZYNSKI:  I think I can do this in two minutes,

9    your Honor.

10          THE COURT:  Very good.

11          MS. SCHOENBERGER:  No objection.

12          THE COURT:  I'm sorry.  Has that been admitted?

13          MR. SMURZYNSKI:  It hasn't.  I wanted to first show it

14    to counsel.  That same document that's in the loan file we've

15    marked as DX 1899 and I ask it be admitted.

16          THE COURT:  Okay.  You're offering?

17          MR. SMURZYNSKI:  I'm sorry.  I'm offering DX 1899.

18          THE COURT:  Is that the one you said no objection.

19          MS. SCHOENBERGER:  No objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 1899 received in evidence)

22    Q.  Mr. Holt, do you have that in front of you now?

23    A.  I do.

24    Q.  Is this a letter from a CPA that satisfies that CLUES

25    condition?

1   A.   It says -- and I know this loan file.  It says that the --

2   I was going to look at the -- can I look at this loan file for

3   a second?

4          THE COURT:  Go ahead.

5   A.   You can't tell it is an accounting firm.  It says Mi Pueblo

6   Services, Inc.  They do write they are an accountant at the

7   bottom.  They do have a license there.

8          The issue we had with this was that the person that

9   was signing this letter, his name was in the loan file

10  elsewhere.  And so there was the instance that, possibly, the

11  person doing the taxes was related in some form or fashion with

12  the borrower.  So, that is why that we questioned the

13  authenticity of the letter.

14         So even though it's there, we still do due diligence

15  to be sure that it's accurate or not.  Could it be accurate?

16  Yes.  But there were items in the loan file that made us

17  question whether or not Mi Pueblo Services didn't have any kind

18  of relations with the borrower.  So it was an issue in that

19  step.

20  Q.   In your appendix B behind tab six you didn't describe that

21  problem, did you, sir?

22  A.   No, sir.  The comments are not to describe everything.  It

23  is just to sort of connect the dots, and we don't put the

24  entire findings of the loan file in the comments.  Comments are

25  just to connect the dots and hopefully explain to somebody who

DA23BAN4                          Holt - cross

1    is looking at the file what's going on.  But, we would have

2    pages and pages of comments that we did that.  So that is not

3    always outlined in the comments of our survey.  So no, sir.  It

4    is not in there.

5              MR. SMURZYNSKI:  Your Honor, this would be an

6    appropriate place to break for lunch.

7              THE COURT:  Ladies and gentlemen, we'll take a lunch

8    break at this time.  We'll see you at 2 o'clock.

9              (Jury excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA23BAN4                    Holt – cross

1              THE COURT:  Please be seated.  How much longer,

2      counsel, do you have?

3              MR. SMURZYNSKI:  Not more than 15 minutes.

4              THE COURT:  Who is the government's next witness?

5              MR. ARMAND:  Mr. Tanabe.

6              THE COURT:  I think as I indicated yesterday, we're

7      going to hear oral argument on those matters as to which the

8      letter briefing has been completed.  There is some as to which

9      the letter briefing has not been completed.  I'm inclined,

10     rather than to try to do that during the break, to do it at

11     4:30.  So we'll probably end at 4:30 and then take a half hour

12     or so for those items.  See you at 2 o'clock.

13              (Recess)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                           2:00 p.m.

 3            (In open court; jury not present)

 4            MR. SMURZYNSKI:  Your Honor, I'm not going to have any

 5   further cross-examination, I've informed the government.

 6            Just before the jury is brought in, you had in the

 7   midmorning break asked a question about what the government had

 8   been informed about particular documents, including one that

 9   included DX 1886.  If I may approach, we've now had a chance to

10   find the document.  The transmittal of it that accompanied that

11   document.  I'm not asking you to revise your ruling in any

12   fashion.

13            THE COURT:  Let me just take a look at it.  Please be

14   seated.

15            All right.  So, having now seen that, I would permit

16   you to cross-examine with that document if you would like.

17            MR. SMURZYNSKI:  Okay, your Honor.  Your Honor, then I

18   think I will ask him just a handful of questions.

19            THE COURT:  Just so the record is clear, this is a

20   letter dated April 15, 2013, Mr. Sullivan always remembers St.

21   Patrick's Day.  I of course always remember income tax day.

22            MR. SULLIVAN:  I remember that one too, your Honor.

23            THE COURT:  Among other things it says in the second

24   paragraph:  Included within this production are certain

25   documents that have been recently identified and may be
```

DA23BAN4                        Holt - cross

1   relevant to the origination of particular loans in the U.S.

2   attorney's sample.  Each reflects in its metadata and also

3   often on the face of the document the pertinent loan number.

4           So, I think that was enough to put the government on

5   notice that there might be something of the sort that was

6   introduced or attempted to be introduced earlier.  So I will

7   reverse my ruling on that, and I take it counsel reverses his

8   statement of five minutes ago he didn't want any further

9   cross-examination.

10          MR. SMURZYNSKI:  I do, thank you, your Honor.

11          THE COURT:  All right.  So let's bring in the jury.

12          MS. MAINIGI:  There is one housekeeping issue before

13   we do that.  I know your Honor was going to dismiss the jury at

14   4:30 today.  As I understand in consultation with the

15   government, the next witness I think between the two of us

16   would probably be a little bit over two hours together.

17          THE COURT:  We could go until 5.

18          MS. MAINIGI:  I think that witness might want to fly

19   home tonight.

20          THE COURT:  We'll have to have the argument on the

21   legal issues tomorrow though, because I teach at Columbia on

22   Tuesdays and Wednesdays.

23          MS. MAINIGI:  If we finish early, can we reserve our

24   time for argument?

25          THE COURT:  I have to be out of here at 5.

1    MS. MAINIGI:  Understood, your Honor.

2    THE COURT:  So let's get the witness back on the stand

3 and let's bring in the jury.

4              (Continued on next page)

DA23BAN4                         Holt - cross

 1              (Jury present)

 2              THE COURT:  Counsel.

 3              MR. SMURZYNSKI:  Thank you.

 4    BY MR. SMURZYNSKI:

 5    Q.  Mr. Holt, let's go back to a loan that we were looking at

 6    earlier this morning on tab six, which is Plaintiff's Exhibit

 7    229, page 15, it's the loan that has the number 189060126.

 8    Mr. Holt, in your review of this loan, did you look at the

 9    paper loan file, the electronic file, or --

10    A.  I'm sorry.  I was still flipping.  Can you give me the

11    number.

12    Q.  I apologize.  When you get there --

13    A.  I'm here.  Page 15.

14    Q.  Okay.  Again we are talking about loan 189060126.

15    A.  Okay.

16    Q.  My question for you, Mr. Holt, is in your review of this

17    loan, did you look at the paper file, the electronic file, or

18    both?

19    A.  Well, the files that we received were electronic files.

20    Q.  Okay.  Your conclusion as to this loan, among other things,

21    you said there was no mortgage insurance.

22    A.  That's correct.

23    Q.  If you would turn to tab eight, what you have in your

24    binder in front of you.  Do you have that in front of you?

25    A.  Yes, sir.

DA23BAN4                        Holt - cross

1    Q.  This is a screen shot and it is marked DX 1886, do you see

2    that?

3    A.  Yes, sir.

4            MR. SMURZYNSKI:  Your Honor, the defendants move

5    Defendant's Exhibit 1886.

6            THE COURT:  For the reasons stated outside the

7    presence of the jury, that is received.

8            (Defendant's Exhibit 1886 received in evidence)

9    Q.  Mr. Holt, if you'll look in the upper-left-hand corner of

10   this document, there is an account number.  Do you see that?

11   A.  Yes, sir.

12   Q.  Is that the same account number as the loan in question

13   that we were looking at?

14   A.  Yes, sir.

15   Q.  Is this Exhibit 8 evidence that there is mortgage insurance

16   with respect to that loan?

17   A.  Well, it is a screen shot that says it is on there.  But

18   per the requirements to deliver loans, you had to have the

19   actual certificate.  It does have information on here, but I

20   can't tell it is the actual -- if it is a true representation

21   of mortgage insurance.

22   Q.  So with this certificate in hand, you would conclude there

23   was a defect in the loan?

24           MS. SCHOENBERGER:  Objection.

25           THE COURT:  Sustained.

DA23BAN4                          Holt - cross

1    A.  Yes.  Without the actual certificate, we would say the

2    insurance is not in --

3           THE COURT:  That's interesting, but I sustained the

4    objection, which means you don't answer.

5           MS. SCHOENBERGER:  Your Honor, we ask that response be

6    stricken.

7           THE COURT:  Yes.

8           THE WITNESS:  I apologize.

9    Q.  The other item noted on tab six with respect to this loan

10   had to do with the appraisal on the property.  Do you see that?

11   A.  Yes, sir.

12   Q.  We talked earlier about appraiser certificates.  Here, you

13   have a question about the substance of the appraisal, is that

14   right?

15   A.  That's correct.

16   Q.  Mr. Holt, you're not a licensed appraiser, are you?

17   A.  No, sir.

18   Q.  None of the people on the team you worked with were

19   licensed appraisers?

20   A.  That is correct.

21   Q.  There are standards for becoming an appraiser that you are

22   familiar with?

23   A.  Yes, sir.

24   Q.  You haven't passed any of those standards, have you?

25   A.  I have not taken any of them, no, sir.

1  Q.  You are not familiar with the appraiser's institute of code

2  of professional ethics?

3  A.  I've read them before, yes, sir.

4  Q.  You've never sat for that exam?

5  A.  No, sir.

6  Q.  Your critique of the loan was that the comps on the

7  appraisal were 2, 10 and 6 miles away from the subject

8  property.  You see that?

9  A.  Yes, sir.

10  Q.  Is it the case that ideally you want the comparables to be

11  within a mile of the property?

12  A.  Countrywide's guidelines have what's called a valuation red

13  flag section.  And within that section, it outlines the things

14  that you should be looking for in terms of distance from the

15  subject property, when was the last transaction or sale of the

16  property, there's other items in there.  So, the guidelines do

17  instruct the things that you ought to be looking for when you

18  receive an appraisal and review it.

19  Q.  It is not always the case you can find comparables within a

20  mile of the subject property that are feasible, is that right?

21  A.  It's possible.  Yes.

22  Q.  You could turn to tab 10.  Mr. Holt, this has been marked

23  for identification as Defendant's 1887.  What is this?

24  A.  It is what's called a Fannie Mae 1004.  It is an appraisal

25  report.  It is a standard form.

DA23BAN4                          Holt - cross

1    Q.  We can pull the full file for you, Mr. Holt.

2             MR. SMURZYNSKI:  I apologize, your Honor.  It will be

3    just a second.  Let me show this to government counsel, first.

4    Your Honor, if I may approach the witness?

5             THE COURT:  Yes.

6             MR. SMURZYNSKI:  Thank you.

7    Q.  Mr. Holt, we were looking behind tab 10 at Defendant's

8    Exhibit 1887.  This is the appraisal that appears in the full

9    loan file.

10   A.  As far as I know, yes, sir.

11            MR. SMURZYNSKI:  Your Honor, that we ask Defendant's

12   Exhibit 1887 be admitted.

13            MS. SCHOENBERGER:  No objection.

14            THE COURT:  Received.

15            (Defendant's Exhibit 1887 received in evidence)

16   Q.  If you turn to the second page of DX 1887, you'll see there

17   is a discussion there called summary of sales comparison

18   approach.

19   A.  I do.

20   Q.  Could you read into the record what the appraiser said with

21   respect to those comparables.

22   A.  "The comparables selected are considered the best available

23   for the purpose of this analysis.  They are similar in style

24   and utility.  Comparable 1 is the only sale in the small area

25   of Newark in the last 12 months which is also comparable.  It

1   was necessary to go to the nearest adjacent markets area,

2   Berlin and Snowhill, comparables 2 and 3 are the most recent

3   sales for these towns.  Adjustments for locational differences

4   are based on land only.  Tax assessments comparable 1 is given

5   the most weight in this analysis.  However, it is the low end

6   of the value range due to the condition of the lot and

7   accumulated debris."

8   Q.  That was the opinion of the licensed appraiser, is that

9   correct?

10  A.  Based on the sales comparison approach, that's correct.

11  Q.  Mr. Holt, is it the case that you would defer to the

12  determination of a licensed appraiser when it came to a

13  property valuation?

14           MS. SCHOENBERGER:  Objection.

15           THE COURT:  Overruled.

16  A.  At this point, someone who is a more senior underwriter

17  would have to review it and accept it.  Not just because it is

18  in the appraisal, which it is.  But somebody is supposed to

19  look at this and make the determination that the summary

20  approach is acceptable.  Someone should sign off on it that

21  these are in here, they're outside of the guidelines.  He's

22  made the statement, but somebody needs to sign off on it.

23  Q.  In that instance that someone is not the appraiser who is

24  set forth in this document, is that correct?

25  A.  I'm sorry.  Can you -- I didn't understand your question.

DA23BAN4                        Holt - cross

1    Q.  Let me rephrase it.  It was a terrible question.

2           Mr. Holt, in finding this loan to have a defect with

3    respect to appraisal, you are substituting your judgment for

4    that of the appraiser, is that correct?

5           MS. SCHOENBERGER:  Objection.

6           THE COURT:  Sustained.

7    Q.  Mr. Holt, you have no basis to conclude that the appraisal

8    that you just read was inaccurate in any way, do you?

9    A.  The only basis I have is that somebody should have reviewed

10   it, that there was instances that was outside of the

11   guidelines, somebody should reviewed it and accepted the

12   appraiser's analysis.  If they did, they should have noted it.

13   If not, then they should have gone back to the appraiser and

14   asked for additional information.

15   Q.  But that's not a critique of the appraisal itself, correct?

16          MS. SCHOENBERGER:  Objection.

17          THE COURT:  Sustained.

18          MR. SMURZYNSKI:  Your Honor, I have no further

19   questions.

20          THE COURT:  Thank you.  Counsel for Ms. Mairone.

21   CROSS-EXAMINATION

22   BY MR. MUKASEY:

23   Q.  Good afternoon, Mr. Holt.  My name is Marc Mukasey and I

24   represent Rebecca Mairone.

25   A.  Okay.  Good afternoon.

DA23BAN4                        Holt - cross

1    Q.  Good afternoon.  You testified, Mr. Holt, yesterday about

2    some of the training that you had before you ascended to your

3    current job, do you remember that?

4    A.  Yes, sir.

5    Q.  It's correct, is it not, sir, that there is no one standard

6    way to train someone to underwrite a loan, right?

7              MS. SCHOENBERGER:  Objection.

8              THE COURT:  Ground?

9              MS. SCHOENBERGER:  Vague and exceeds scope.

10             THE COURT:  I'm sorry?

11             MS. SCHOENBERGER:  Vague and exceeds scope.

12             THE COURT:  Overruled.

13   Q.  You can answer.

14   A.  There are basic standards, yes.  And in terms of what I was

15   describing earlier of how to calculate a borrower's income, how

16   to calculate borrower's debt, looking at collateral, looking at

17   credit, so yeah, there are standards out there and training.

18   And even in my position I have conducted those training

19   classes.

20             So, there are things that are out there that tells you

21   how to do these things.  When there are instances where there

22   are not, that's where you refer to the guidelines to direct you

23   further outside of something that you might not be --

24   Q.  Understood.  Understood.  Let me rephrase the question this

25   way.  There is no standard curriculum, let's say, that an

DA23BAN4                          Holt - cross

```
 1   individual would have to pass in order to be called an

 2   underwriter, correct?

 3   A.   Depending on what they're doing.  There are curriculums and

 4   there are tests.  If you are going to be approved to say

 5   underwrite for FHA there are designations you have to go

 6   through and be tested and all of that.

 7   Q.   We are not talking about FHA.

 8   A.   I understand.

 9   Q.   With respect to the kinds of loans that you reviewed in

10   connection with this case, there is no standardized curriculum,

11   is there?

12          MS. SCHOENBERGER:  Objection.

13          THE COURT:  I'll allow it.  You may answer.

14          THE WITNESS:  Okay.

15   A.   Besides what I said that is the standardized curriculum.

16   Each organization will have their own way of training people.

17   But I don't know if you are going to go get a degree in

18   marketing, if you have a degree in marketing, it's going to be

19   the same.

20   Q.   As you say, each organization can have their own way of

21   training people, right?

22   A.   Correct.

23   Q.   So for example, you don't have to go to a special school to

24   be an underwriter, correct?

25   A.   Not that I am aware of a specific school that's out there,
```

1    correct.

2    Q.  You don't need to have a specific degree to be called an

3    underwriter, correct?

4    A.  Not besides going through whatever the steps that the

5    organization is to be designated that particular area, correct.

6    Q.  You don't have to pass a standardized test to be called an

7    underwriter with respect to the kinds of loan we are talking

8    about in this case?

9    A.  As I said, specific to the organization they have, each one

10   has their own guidelines.  You are asking for a standardized, I

11   am not aware of one of those.

12   Q.  Thank you.  Now, based on your experience as an underwriter

13   and I guess a re-underwriter, would you agree with me that

14   training a person who is performing underwriting tasks is a

15   responsible business practice?

16            MS. SCHOENBERGER:  Objection.

17            THE COURT:  Sustained.

18   Q.  Would you agree with me, sir, that having a more junior

19   underwriter trained by a more senior underwriter is a

20   responsible business practice?

21            MS. SCHOENBERGER:  Objection.

22            THE COURT:  Sustained.

23   Q.  Mr. Holt, you don't know, do you, whether any of the

24   Countrywide underwriters that worked on any of the loans that

25   you reviewed received training after reviewing any of these

DA23BAN4                         Holt - cross

1   loan files?

2   A.  I do know there is an audit process in place where loans

3   are reviewed, and they're I guess held responsible for what

4   they've done.  But from that point on, on what kind of training

5   and exercise they go through, I do not know.  I've not seen

6   anything in place.

7   Q.  Thank you.  In connection with your work, sir, you didn't

8   review the Full Spectrum Lending Division's quality assurance

9   criteria, did you?

10  A.  I don't -- I don't believe that was provided to me, no,

11  sir.

12          MR. MUKASEY:  If I may approach, Judge, very briefly

13  for my final couple of questions.

14          THE COURT:  Go ahead.

15  Q.  Do you have Government Exhibit 434 in front of you which is

16  the big loan file that you went through.  If not, I'm happy to

17  hand you mine.  It's 434.

18  A.  Yes, sir.  Here it is.

19  Q.  Could I ask you to please flip to the third to last page

20  from the back.  Third to last.  There you go.

21  A.  Okay.

22  Q.  I'm going to direct your attention to the name on the

23  upper-left-hand corner of that page.  Can you read that name

24  into the record.  After the words "prepared by."

25  A.  Susan I guess that's Lucero.

DA23BAN4                          Holt - cross

1   Q.  Do you know anything about her employment history at

2   Countrywide?

3   A.  I do not.

4   Q.  Do you know anything about her training at Countrywide?

5   A.  I do not.

6           MR. MUKASEY:  Thank you, your Honor.  Nothing further.

7           THE COURT:  All right.  Redirect.

8   REDIRECT EXAMINATION

9   BY MS. SCHOENBERGER:

10  Q.  Good afternoon, Mr. Holt.

11  A.  Good afternoon.

12  Q.  Did anyone at Fannie Mae or Freddie Mac review the final

13  determinations that you made regarding the 343 loans that you

14  reviewed?

15  A.  No, ma'am.

16  Q.  Can we please turn to the exhibit that has been offered as

17  Plaintiff's Exhibit 229, and this is behind tab six in the

18  binder that defendant's counsel gave to you.

19  A.  Bear with me.  Okay.  Tab six?

20  Q.  Yes.  Can you explain to the jury what this document is.

21  A.  This is Exhibit 229?  I'm on the right page?

22  Q.  That's correct.

23  A.  Okay.  This outlines the account number of the loan, the

24  agency number.  When the loan is sold to Fannie Mae or Freddie

25  Mac, they got their own account number that was assigned.

1   Then, you have the nine agency findings that has been tagged by

2   the re-underwriters, myself.  Then you have the comments of the

3   underwriter that gives the atmospheric approach of what they

4   found connecting the dots, whatever they feel like is necessary

5   to add there.

6   Q.  Was this document generated based on a survey that your

7   underwriting team filled out?

8   A.  That's correct.

9   Q.  Does this document include all of the 185 loans that you

10  determined to be materially defective?

11  A.  Yes, ma'am.

12  Q.  Counsel talked to you about five of those loans today, is

13  that right?

14  A.  I believe that's correct, yes, ma'am.  I wasn't counting

15  but I think that's right.

16  Q.  Can you please turn to page 14 of this document and look at

17  the entry for one loan discussed, 188939173.  Do you see that?

18  A.  Yes, ma'am.

19  Q.  Based on the comments here, what was the basis for

20  determining that this was a materially defective loan?

21  A.  Are you asking me to read it or just read through it and

22  give my response?

23  Q.  If you can read it and describe it.

24  A.  Okay.  Out loud?  To myself?

25  Q.  Sorry.  I'll withdraw the question and ask again.

1    A.  Okay.

2    Q.  After reviewing the comments based on this loan, can you

3    describe to us what the basis was for determining it was a

4    materially defective loan?

5    A.  Okay.  It was a CLUES accept, which means it is approved by

6    with conditions.  There was a warning on the CLUES statement

7    that indicated that the subject property was located in a soft

8    market category one, two or three, as defined in Countrywide's

9    guidelines.  And at this point I can't tell you what the

10   differences are in the soft market categories.  Then it says if

11   the appraisal or the appraiser review indicated any of the

12   following, declining market, oversupply, or marketing time over

13   six months, then you have to reduce the maximum allowed loan to

14   value by 5 percent.  If the loan to value on the loan was

15   already at least 5 percent lower than the maximum loan to value

16   per guideline, and no loan to value reduction was necessary,

17   there were no appraisal or appraisal reviews -- I'm sorry.

18   There was no appraisal or appraisal reviews in the loan file.

19   Q.  Defense counsel showed you the CLUES report for this loan,

20   is that right?

21   A.  Yes, ma'am.

22   Q.  That's located under tab 13 of the binder in front of you.

23   A.  Yes, ma'am.

24   Q.  Specifically, did you look at the entries regarding loan to

25   value?

1    A.  Yes, ma'am.

2    Q.  Did reviewing that portion of this CLUES report cause you

3    to call into question your determinations regarding whether

4    this loan was materially defective?

5    A.  Looking at the decisions on the spread, yes, ma'am.

6    Q.  You also focused on an underwriting condition regarding the

7    appraisal.

8    A.  That's correct.

9    Q.  Did you determine based on your review of the loan that

10   this condition was satisfied for this loan?

11   A.  Based on what I'm reading here, that was not satisfied, no,

12   ma'am.

13   Q.  And why is that?

14   A.  Because there was no appraisal or appraisal reviews in the

15   loan file.

16   Q.  Turning to the next page of this CLUES report, were all of

17   the general loan conditions for this loan satisfied based on

18   your review of this loan file?

19   A.  I'm sorry, turn to what page?

20   Q.  The second page of the CLUES report.

21   A.  Under tab 13?

22   Q.  Correct.  For the record, this is DX 1888.

23           MR. SMURZYNSKI:  Your Honor, objection.  May we

24   approach?

25           THE COURT:  All right.

1          (At the side bar)

2          MR. SMURZYNSKI:  Your Honor, appendix B set forth his

3   opinions.

4          THE COURT:  B as in belligerent or bouyant.

5          MR. SMURZYNSKI:  Sets forth his opinions with respect

6   to the loan under 26(a)(2).  To now hear some other colloquy

7   about what is in the loan file and what he thinks about it

8   should have been disclosed if those were his opinions.  We have

9   a very detailed collection that was provided to us, and to now

10  go into some additional reasons that we didn't hear elicited is

11  improper.

12         MS. SCHOENBERGER:  He's already explained that the

13  comments section in the survey wasn't exhaustive.  His opinions

14  are based on his reviews of these full loan files, he should be

15  able to discuss those.

16         MR. SMURZYNSKI:   The basis for his opinions and

17  conclusions, the fact he says somehow in his head I have other

18  thoughts about these loan files should have been disclosed.

19  And the fact it wasn't, he shouldn't be allowed to go into it

20  now.

21         MS. SCHOENBERGER:  His basis for the opinion is his

22  review of the loan files.  That's clear from the report.

23         THE COURT:  Well, does someone have his expert report?

24         MR. SMURZYNSKI:  Yes, your Honor.

25         THE COURT:  Let me take a look at it.

 1              MR. SMURZYNSKI:  Your Honor, I have the report but not
 2      the appendices.  You have appendix B, which has been marked --
 3              MR. MUKASEY:  I have it.
 4              MR. SMURZYNSKI:  To be clear, I have it but I don't
 5      want to hand you my marked-up copy of it.
 6              THE COURT:  I'm an expert at disregarding markups.
 7      I'm sorry, I didn't realize it would take this long.
 8              MS. SCHOENBERGER:  I don't think we're actually
 9      straying outside the comments here.  Defense counsel asked him
10      if the LTV finding satisfied one condition in the CLUES report,
11      but there's other conditions in the CLUES report, and the
12      comments don't suggest that they relate to only one or other
13      condition in the CLUES report.
14              THE COURT:  Let me see.
15              MR. MUKASEY:  Which appendix.
16              MR. SMURZYNSKI:  B is the appendix, but the entire --
17              THE COURT:  All right.  I'm sorry.  But I don't think
18      we can properly do this at a side bar.  How much more do you
19      have on your redirect?
20              MS. SCHOENBERGER:  Probably 15 minutes.
21              THE COURT:  All right.  Why don't you move to
22      something else.  I will review this, if I may have counsel's
23      copy, and then I'll call you back to the side bar.  Why don't
24      you give me the whole thing.
25              MR. MUKASEY:  This is B.

DA23BAN4                        Holt - redirect

1            THE COURT:  Actually my law clerk may have a fresh

2    copy.  I'll take this.

3            MR. MUKASEY:  Is the general report.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA23BAN4                           Holt - redirect

1                    (In open court)

2    BY MS. SCHOENBERGER:

3    Q.  For the time being let's move on to the second loan we

4    discussed today on cross exam.  That's at page 15 of

5    Plaintiff's Exhibit 229 behind tab six.

6    A.  Okay.

7    Q.  The loan here is number 18906126.  Do you see that?

8    A.  Yes, ma'am.

9    Q.  What two defects were selected to show why this loan was

10   materially defective?

11   A.  Because it was -- it met one of the categories of

12   eligibility to be sold to Fannie Mae or Freddie Mac, and then

13   there was an issue with the property.

14   Q.  So missing documents was not a basis for finding this to be

15   a materially defective loan?

16   A.  No, ma'am.

17   Q.  Defense counsel showed you a document related to this loan

18   and that's behind tab eight in your binder.  DX 1886.  Do you

19   see that?

20   A.  Yes, ma'am.

21   Q.  This document related to mortgage insurance for this loan?

22   A.  Yes, ma'am.

23   Q.  What is mortgage insurance?

24   A.  I've described what loan to value is.  You have the amount

25   of loan divided by the value of the property.  When loans that

1    have a loan to value that goes over 80 percent, they represent

2    a higher credit risk.  Because you have less equity in the

3    property.  So, mortgage companies will require that insurance

4    be taken out on the difference, and that protects the lender in

5    the event of a foreclosure.  If -- because when you foreclose

6    on a piece of property, you can expect that the value of the

7    property will go down because of how you are going to sell it.

8    People aren't going to pay market price for it.  So they want

9    to be certain that they have that insurance in place.  And not

10   all the loans require it, but the loans that do require it,

11   then you're required to get mortgage insurance and it will tell

12   you what the coverage is supposed to be.

13   Q.  Why is that important -- is that important from an

14   underwriting perspective?

15   A.  It is.

16   Q.  Why is that important from an underwriting perspective?

17   A.  From the three Cs I've been talking now.  Under the

18   collateral standpoint, you want to be sure your collateral is

19   good.  And if you had to liquidate it through foreclosure, that

20   you can get enough money out to pay off your debt.  This

21   protects the lender in the event that that happens.  So, it

22   strengthens the collateral portion of the credit risk.

23   Q.  Should evidence of mortgage insurance be included in a loan

24   file?

25   A.  That's correct.  Both Fannie Mae and Freddie Mac's

1   guidelines state that the mortgage certificate, which is the

2   actual certificate, be in the loan or credit file.

3   Q.  Why should it be included with the file?

4   A.  It just shows proof that you have insurance.  It is just

5   like any other kind of insurance policy.  You want to have the

6   insurance policy in hand.  If I died and my wife's going to

7   want to have the life insurance policy real quick.  So she's

8   going to supply that.  So, mortgage insurance is the same idea.

9           THE COURT:  Counsel, after you finish this segment,

10  I've now reviewed the materials that were handed up at the side

11  bar.  So you can go back to the earlier stuff one question at a

12  time, and I'm prepared to rule having reviewed the materials

13  that were presented at the side bar.

14          MS. SCHOENBERGER:  With your permission if I can

15  finish this loan.

16          THE COURT:  Yes.

17  Q.  Also in connection with loan 189060126, defense counsel

18  showed you Exhibit DX 1887 and that's behind tab 10 in your

19  binder.  Do you see that?

20  A.  Yes, ma'am.

21  Q.  Did you make a finding with respect to this loan based on

22  the appraisal?

23  A.  We made a determination based on the checklist that

24  Countrywide has in place regarding the comparables, and the

25  information that was on that second page regarding the bank

1    compared to the subject property, yes.

2    Q.  Did you see evidence within the loan file that the person

3    who underwrote the file had reviewed this appraisal report?

4    A.  No, we did not.

5    Q.  Was your finding based on the contents of the appraisal

6    report or was your finding based on evidence in the file based

7    on the underwriter's review of the appraisal?

8           MR. SMURZYNSKI:  Objection.  Leading.

9           THE COURT:  Sustained.

10   Q.  What was your finding regarding the appraisal report based

11   on?

12   A.  What was in the appraisal itself, and the lack of

13   documentation that addressed the section on the descriptions of

14   the use of comparable properties outside of the one-mile range.

15   Q.  Does seeing this appraisal report change your mind with

16   respect to the defect noted for this loan based on the

17   appraisal?

18   A.  It does not.

19   Q.  Turning back to the loan we discussed previously, which is

20   on page 14 of Plaintiff's Exhibit 229.  That's 1889391 --

21          THE COURT:  Hang on a minute.

22   A.  What page was it?

23   Q.  Page 14.  And the loan number is 188939173.

24   A.  Okay.

25          THE COURT:  The copy I have unfortunately does not

DA23BAN4                        Holt - redirect

 1   have page numbers.

 2            MS. SCHOENBERGER:  This is the page numbers on

 3   Plaintiff Exhibit 229.  Oh.

 4            THE COURT:  Just give me -- hold on.  Fortunately I

 5   have 10 fingers and at least four toes so I'm with you now.

 6   Give me the number again.

 7            MS. SCHOENBERGER:  188939173.

 8            THE COURT:  Go ahead.

 9            MS. SCHOENBERGER:  Ms. Michaud, can you blow this up.

10   Q.  The CLUES report associated with this loan was behind tab

11   13, and that is Defendant's Exhibit 1888.

12   A.  Okay.  I have it.

13   Q.  The question is whether you determined whether this loan

14   satisfies the general loan conditions listed under section four

15   of the CLUES report for this loan.

16   A.  I don't have it.

17   Q.  Why not?

18   A.  Because the items that were required by section four

19   general loan conditions were not in the loan file.

20   Q.  On the first page of the CLUES report, there is a warning

21   regarding the subject property being located in a soft market

22   category.  Is that correct?

23   A.  Yes, ma'am, that's correct.

24   Q.  Were you satisfied that that warning had been addressed by

25   the person who underwrote this loan?

DA23BAN4                         Holt - redirect

1    A.  We saw no proof or documentation in the loan files.

2            MR. HEFTER:  Objection.

3            THE COURT:  Overruled.

4    A.  We saw no proof or documentation that anyone identified

5    this warning.

6    Q.  So based on what you've seen today, have you changed your

7    mind with respect to your opinion that this loan was materially

8    defective?

9    A.  As of today, no, ma'am.

10   Q.  If you can turn to page 27 of Exhibit 229, which is behind

11   tab six.

12   A.  Okay.

13   Q.  Take a look at the loan with account number 189733031.

14   A.  Okay, I got it.

15   Q.  Defense counsel showed you a letter -- a document

16   associated with this loan and that's behind tab 30 of your

17   binder.  The letter from Mi Pueblo Services, Inc.  Do you see

18   that?

19   A.  I do.  I said M.I. Pueblo earlier.  So I guess it's Mi

20   Pueblo.

21   Q.  Were the only defects noted in this loan related to whether

22   or not this letter existed?

23   A.  No, ma'am.

24   Q.  Does the summary of your findings on page 27 of Exhibit 229

25   list other defects that were contained in this loan?

1    A.  Yes, ma'am.  There was missing an appraiser's license, a

2    1008 uniform underwriting form, there was no explanation as to

3    why the inquiries, the number of inquiries in the file, and I

4    had explained the risk of why there were so many inquiries you

5    would see in the credit file.  And it was missing the rate

6    improvement addendum to the note for proof of TAMI mortgage

7    insurance.  It a different type of way of obtaining mortgage

8    insurance.

9    Q.  Even if the letter behind tab 30 were authentic, would it

10   change your mind with respect to your opinion that loan

11   189733031 is materially defective?

12   A.  No, ma'am.  It was just one of the items that we had a

13   question about.  But you have other items in there relating to

14   mortgage insurance, and credit issues that you would

15   investigate.  So, no.

16   Q.  If you can turn to page 29 of Exhibit 229.

17   A.  Okay.

18   Q.  Look for the survey findings for loan 192256005.

19   A.  Okay.

20   Q.  Do you see that?

21   A.  Yes, ma'am.

22          MS. SCHOENBERGER:  Ms. Michaud, can you blow that up,

23   please.

24   Q.  Defense counsel also showed you a document related to this

25   file.  And that was a pay letter from Key Bank, do you recall

1   that?

2   A.  Correct.

3   Q.  Were there any findings that you made regarding this loan

4   that were unrelated to that pay letter?

5   A.  Yes.  Evidently the borrower had showed that he or she had

6   rental income with real estate down in Florida.  And so they

7   wanted proof via a schedule E, which is the schedule of your

8   tax returns that shows the breakdowns of income expenses.  To

9   be in the borrower's 1007 -- I'm sorry 2007 1040s, which is

10  your tax returns.  They wanted the schedule in there to prove

11  that the borrowers actually earning income off those

12  properties.

13          It was missing an appraiser's license as required by

14  CLUES.  It was also missing the credit bureau report.  However,

15  we did use the debts that were listed on the 1003 as the debts

16  for the borrower just to take a conservative approach.  Even in

17  the absence of a credit bureau report, and say we'll go ahead

18  and use what's in the application.

19  Q.  Aside from seeing that letter from Key Bank today, does

20  that change your mind with respect to whether this loan

21  192256005 is materially defective?

22  A.  Missing required verification of income, which goes to

23  capacity, and missing the credit bureau report, that goes back

24  to the borrower's credit and character.  There is no way that

25  you can say this loan was investment quality.

1   Q.  Thank you.  You can set that document aside for now.

2   A.  Thank you.

3   Q.  Anywhere within your review of the 343 loans we've been

4   discussing, was the absence of a form 1008 the sole basis for a

5   finding that any loan was materially defective?

6   A.  No, ma'am.  There might have been three, if I recall right,

7   and this is based on what I can remember.  There is only a

8   handful, less than five, where under that document -- I think I

9   have the document category, there are subcategories.  So, but

10  that's missing.  And I think the mortgage insurance falls under

11  the AUS requirements as opposed to the documents, if I'm

12  correct.

13          But, the fact that it was missing by itself did not

14  cause an additional material defect finding.

15          MR. SMURZYNSKI:  Your Honor, move to strike as

16  non-responsive.

17          THE COURT:  I think it is.  Overruled.

18  Q.  You don't have an appraiser's license, do you, Mr. Holt?

19  A.  I do not.

20  Q.  Is it necessary to have an appraiser's license in order to

21  underwrite loans?

22  A.  It is not.

23  Q.  Did Countrywide's guidelines require underwriters to have

24  appraiser's licenses?

25  A.  No.  No, ma'am.

1  Q.  Do Fannie Mae's guidelines require underwriters to have

2  appraiser's licenses?

3  A.  No, ma'am, not that I've seen.

4  Q.  Do Freddie Mac's guidelines require that underwriters have

5  appraiser's licenses?

6  A.  No, ma'am.

7  Q.  Do the guidelines set forth criteria for how to evaluate

8  appraisals while you're underwriting a loan?

9  A.  Yes.  As I mentioned earlier, Countrywide has a section

10  that's called valuation red flags that talk about the items we

11  kind of discussed earlier.  And then Fannie and Freddie have

12  something similar within their appraisal and property valuation

13  section.  I can't recall the exact category that's listed in

14  there.  But it does describe where you should see distance,

15  sales, time frame and items like that.  So they're similar and

16  they match in terminology.

17  Q.  Were you able to review all of the loans that you had

18  originally intended to by the deadline for this re-underwriting

19  project?

20  A.  No, ma'am.

21  Q.  But you did fully review the 343 loans we've been

22  discussing, correct?

23  A.  Yes, ma'am.

24  Q.  Did you make any efforts to meet the deadline in this

25  project?

DA23BAN4                          Holt - redirect

1    A.   I believe the question came up earlier about that.  So, we

2    did by adding additional staff.

3    Q.   Did you ask your underwriters to pick up their pace in

4    order to meet the deadline?

5    A.   We never do that, no, ma'am.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA2TBAN5                         Holt - redirect

1    BY MS. SCHOENBERGER:

2    Q.  Did you ask them to review more loans per day in order to

3    meet the deadline?

4    A.  We did not.

5    Q.  Why not?

6    A.  We stressed quality over quantity.  As you can see from the

7    loan file, it's pretty thick, and there's I think one we were

8    looking at was 960 pages long.  So you start going through

9    those and it's a lot of work.  So there's a lot of things that

10   could possibly be missed, so you want to BE sure to go through

11   all the documents in the file.  So I come from the world that I

12   want to be sure that our product that we're giving is of the

13   highest quality possible, and so BY rushing that you sacrifice

14   quality over the number of loans that you're producing.

15           MS. SCHOENBERGER:  Thank you, I have nothing further,

16   your Honor.

17           THE COURT:  Anything further?

18           MR. SMURZYNSKI:  Nothing from us.

19           MR. MUKASEY:  No, Judge.

20           THE COURT:  Please call your next witness.

21           MS. LONDON:  The United States calls Benjamin Tanabe.

22    BENJAMIN TANABE,

23        called as a witness by the Plaintiff,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

DA2TBAN5                      Tanabe – direct

1    BY MS. LONDON:

2              DEPUTY CLERK:  State your name and spell it slowly for

3    the record.

4              THE WITNESS:  Benjamin Tanabe, B-E-N-J-A-M-I-N, last

5    name T-A-N-A-B-E.

6    Q.  Good afternoon, Mr. Tanabe.  Are you currently employed?

7    A.  Yes.

8    Q.  Where do you currently work?

9    A.  Freddie Mac.

10   Q.  What is your current position at Freddie Mac?

11   A.  Senior credit director, customer credit management.

12   Q.  For how long have you held that position?

13   A.  In various capacities about 15 years.

14   Q.  For how long have you worked at Freddie Mac?

15   A.  Fifteen years.

16   Q.  Can you please briefly describe your educational

17   background?

18   A.  Bachelor's in finance, University of Colorado.

19   Q.  When did you first start working in the mortgage industry?

20   A.  Mid '80s.

21   Q.  And where was that?

22   A.  Columbia Savings.

23   Q.  Could you please briefly walk us through your employment

24   history beginning with Columbia Savings?

25   A.  At Columbia Savings I was the real estate administration

1    manager.  The primary job was to manage the servicing and

2    financial analysis for the construction lending group.  Worked

3    there until early '90s, moved to First Nationwide Bank where I

4    was ultimately the chief credit officer responsible for the

5    credit quality of the various lines of business.  In the mid

6    '90s moved to Freddie Mac and held a position of director of

7    credit or senior director of credit since that point in time.

8    Q.  Thank you.  What kind of entity is Freddie Mac?

9    A.  It's a company that operates in the secondary market,

10   secondary residential housing market.  What we do is provide

11   liquidity in the market by buying loans for cash from loan

12   originators.  The purpose of doing that is to allow the sellers

13   of the loans to make other loans.

14   Q.  You mentioned the secondary market.  Can you explain what

15   that is?

16   A.  There's the primary market; the primary market is defined

17   as those companies who make the loans to individuals.  The

18   secondary market doesn't deal with individual borrowers but

19   deals with the companies that close the loans.  So we buy loans

20   from banks, as an example.

21   Q.  You talked about adding liquidity to the market, is that

22   correct?

23   A.  Yes, that's one of the purposes of Freddie Mac.

24   Q.  Can you explain what that means?

25   A.  We buy loans for cash.  The banks then take that cash and

1   make another loan.  Without Freddie Mac, the bank would be

2   holding a bunch of loans but wouldn't have the same amount of

3   cash available as they do created by the existence of Freddie

4   Mac.

5   Q.  From whom does Freddie Mac buy loans?

6   A.  Thousand different entities, large banks, small banks,

7   community banks, mortgage banks, credit unions.

8   Q.  Does Freddie Mac have a charter?

9   A.  Yes, it does.

10  Q.  What does that mean?

11  A.  Freddie Mac is a government-sponsored enterprise.  What

12  that means is we were founded by the government.  The charter

13  identifies the scope of our business, and in some ways, it

14  prescribes how we do business within that scope.

15  Q.  Can you explain -- you're currently a senior credit

16  director at Freddie Mac, correct?

17  A.  Yes.

18  Q.  What are your responsibilities as senior credit director?

19  A.  My responsibilities now is to manage customer credit

20  quality for a large number of smaller customers.

21  Q.  What does it mean to manage credit quality?

22  A.  Monitor the quality of the loans that customer sells.  Are

23  they to good quality borrowers?  Is the collateral that is

24  backing the loans properly evaluated and properly valued?  Are

25  the loans sold to us by a given seller performing as expected?

1   Are the loans constructed by various sellers or customers done

2   so compliant with the contracts we have with each of them?

3   Q.  You mentioned the way that loans are constructed.  What did

4   you mean by that?

5   A.  I think in more layman's terms unwritten, was the borrower

6   properly evaluated to ensure that the borrower had enough money

7   to to pay the loan back.

8   Q.  Are there quality standards that you use in measuring the

9   credit quality?

10  A.  Absolutely.

11  Q.  Can you describe those quality standards?

12  A.  I'll describe the four primary standards.  The first

13  standard is do the loans pay on time?  How many loans default?

14  That's probably the first and most important.

15          In addition to that, we have people look at loan files

16  to make sure that the company that originated the loan or made

17  the loan did so in compliance with their contract.  Did they

18  document it properly, and did they assess the risk as

19  prescribed by the contracts?

20          The other two ways is we have various models, computer

21  models that we buy loans.  We run the loans through models.  We

22  risk assess the loan as either being adequate risk or high

23  risk.  And we do the same with the collateral, we run the loan

24  through what we call an AV, like in Victor, model, and we

25  independently determine what we think the value of that

1  property is, and then we compare that value to the value

2  presented to us by the loan originator.

3  Q.  As a senior credit director, do you play any role in the

4  process of deciding whether Freddie Mac will purchase loans

5  from a particular lender?

6  A.  I don't play any role, I -- I want to back up a little bit.

7  I play a limited role in terms of which customers are made

8  eligible by Freddie Mac.  I'm not part of the eligibility

9  group.  Once a customer becomes eligible, then I play a large

10 role in terms of what kind of terms of business that customer

11 has and whether that customer has the right, so to speak, to

12 continue to do business with Freddie Mac.

13 Q.  What does it mean for a customer to be eligible?

14 A.  In order for a customer to sell loans to Freddie Mac and

15 Freddie Mac buys those loans, a customer has to go through a

16 qualification process similar to when an individual walks into

17 a lending institution and is qualified as a loan, think of it

18 in that context, but instead of an individual, we're talking

19 about a company, most often a financial institution.

20 Q.  Can you explain a little more what you meant by the

21 statement that you play a role with regard to whether eligible

22 customers have the right to continue doing business with

23 Freddie Mac?

24 A.  Yes.  Part of my job, I want to say maybe the bulk of my

25 job is to make sure that a loan that a customer sells to us

1    meets our credit standards.  To the extent a customer, say a

2    bank, fails to meet those standards, then one of the remedies

3    for failure is pulling the contract or not offering the next

4    contract.

5    Q.  Do you provide advice as to whether or not to -- whether or

6    not Freddie Mac should employ the remedy of pulling the

7    contract for a particular lender?

8    A.  Yes.

9    Q.  Do Freddie Mac credit directors have a responsibility for

10   certain lenders?

11   A.  Yes.

12   Q.  Have your responsibilities as a Freddie Mac credit director

13   changed over time?

14   A.  Yes, they have multiple times.

15   Q.  In what ways?

16   A.  The last two times -- I will cover the last two.  Right now

17   I'm responsible for probably about a thousand customers.

18   They're all but the largest of our customers and they're spread

19   across the United States.  These include credit unions,

20   community banks primarily.  Prior to that I had the same

21   responsibilities, but my responsibilities were limited to the

22   large customer base, what we refer to as national customers.

23   Q.  Which responsibilities did you have in the 2007 to 2008

24   time period?

25   A.  National customers.

DA2TBAN5                         Tanabe – direct

1   Q.   In the 2007 to 2008 time period, did you have

2   responsibilities with regard to Countrywide?

3   A.   Yes.

4   Q.   Were you the only credit director at Freddie Mac with

5   responsibility for Countrywide?

6   A.   I was the only credit director responsible for Countrywide,

7   but we had different people with different titles in credit

8   that were also responsible.

9   Q.   Who are your main contacts at Countrywide during the 2007,

10  2008 time period?

11  A.   The primary contact at Countrywide were individuals within

12  the agency relations group.  Countrywide, like a lot of large

13  lenders, created a group whose primary job was to coordinate

14  events with investors, and that was one of the primary purposes

15  of the agency relations group.

16  Q.   Who specifically in the agency relations group did you --

17  A.   There were a number of people, but I mostly dealt with

18  Christian Ingerslev and Greg Togneri.

19  Q.   How much did you communicate with Countrywide employees

20  during the 2007 to 2008 time period?

21  A.   It varied over the course of time, based on the month, the

22  week, the quarter, but my estimate is couple times a week.

23  Q.   What topics did you discuss during this communications?

24  A.   Credit, their credit standing, credit policies, the subject

25  of credit.

1    Q.   Would that have included the discussion of contractual

2    terms?

3    A.   Yes.

4    Q.   In the 2007 to 2008 time period, who was Countrywide's main

5    contact at Freddie Mac for issues involving credit risk?

6    A.   It was a shared responsibility.   Leila Quadra was the

7    day-to-day person.   Leila Quadra is a credit manager that was

8    assigned to Countrywide.   I was Leila's supervisor, I put

9    myself in that role as well.

10   Q.   How much of your time was spent on the Countrywide account

11   in the 2007 to 2008 time period?

12   A.   Again, I want to make an estimate, it's been a while ago,

13   but I would estimate 10 to 20 percent of my time.

14   Q.   Again in the 2007 to 2008 time period, did you play any

15   role relating to the decisions at Freddie Mac regarding

16   purchasing loans from Countrywide?

17   A.   Yes.

18   Q.   What role did you play with regard to purchasing?

19              MS. MAINIGI:   Objection, asked and answered, your

20   Honor.

21              THE COURT:   I'll allow it.   You may answer.

22   A.   Dealing with credit, the provision of terms, the

23   continuation of terms, the adjustment of terms.

24   Q.   Is there a group at Freddie Mac known as the credit group?

25   A.   Yes.

1    Q.  Can you explain what that group was?

2    A.  In Freddie Mac we have I'll say relatively long names for

3    groups.  The credit group is the generic term that usually

4    refers to a credit policy group, a customer credit management

5    group that I'm a part of, typically QC group.  It's a general

6    term, not a specific term.

7    Q.  Are there regular meetings of the credit group as you just

8    described it?

9    A.  Yes.

10   Q.  When are these meetings held, how often?

11   A.  There's a multitude of meetings.  We have monthly big

12   meeting with a number of people from each of those groups that

13   I described or identified, the policy, the customer credit, and

14   the QC group meet once a month to review overall credit quality

15   stats and individual large customers.

16   Q.  Do your responsibilities as a credit director include

17   elevating credit issues to the credit group?

18   A.  Yes.

19   Q.  Under what circumstances would you elevate a credit issue

20   to the credit group?

21   A.  Most often if the customer is experiencing failure relative

22   to one of the targets that I described earlier, the performance

23   target, a QC target, failing or having excessive amount of high

24   risk loans as identified by our models.  That's probably the

25   most frequent cause of elevation.

1    Q.   You mentioned a QC group.  Is that quality control?

2    A.   Yes, it is.

3    Q.   Do you play any role with regard to the quality control

4    group at Freddie Mac?

5    A.   I'm certainly not part --

6                MR. HEFTER:  Your Honor, could we have a specification

7    as to time?

8                THE COURT:  All right.

9    Q.   Let's focus on the 2007 to 2008 time period.

10   A.   Then as now I'm not part of the QC group.  I use their

11   information when I evaluate the overall credit quality picture

12   for a customer.

13   Q.   Does the quality control group provide information on any

14   kind of regular basis, focusing on the 2007, 2008 time period?

15   A.   For the customers that I was responsible for, then the

16   answer is yes.

17   Q.   What form did that information take?

18   A.   The primary form was a monthly written report regarding the

19   results last month of the QC reviews.

20   Q.   Are you familiar with the term "overall credit conclusion?"

21   A.   I want to say yes, because it's pretty descriptive in terms

22   of meaning.

23   Q.   What does it mean?

24   A.   Credit has a number of facets that make up the entirety,

25   and the overall credit conclusion would be what conclusion a

1   person would come to in weighing all the facets that go into

2   I'll say the credit picture.

3   Q.  As a senior credit director, are part of your

4   responsibilities to participate in reaching the overall credit

5   conclusion to a particular lender?

6           MS. MAINIGI:  Objection.

7           MR. HEFTER:  Your Honor --

8           THE COURT:  Ground?

9           MS. MAINIGI:  Vague.

10          THE COURT:  Sustained.

11          MR. HEFTER:  Your Honor, I have a separate issue.  I

12  don't mean to stand up and interrupt, but if we're talking

13  about the 2007, 2008 time frame, I think I can sit here.  If

14  that's counsel's intention, that's fine.

15          THE COURT:  I took it to be that all these questions

16  are directed to that time frame, so we'll assume that now.

17          MR. HEFTER:  Thank you very much.

18  BY MS. LONDON:

19  Q.  In the 2007 to 2008 time period, did you elevate any issues

20  with regard to Countrywide to the credit group?

21  A.  Yes.

22  Q.  Can you briefly describe what those issues were?

23  A.  I won't be able to recall them all, but the ones that I do

24  remember elevating is performance issues regarding their fast

25  and easy program --

1    MS. MAINIGI:  Objection, your Honor, I apologize for

2    interrupting.  Could I have a side bar, please?

3    THE COURT:  Well, I think maybe this will give the

4    jury their mid-afternoon break at this time.

5    So ladies and gentlemen, take a 15-minute break.

6    (Jury not present)

7    THE COURT:  The Court takes note of the fact that

8    while most of the gentlemen seated in the audience are

9    appropriately wearing jackets and ties, thus identifying

10   themselves as serious people, there is one gentleman who is

11   differently dressed, and who, in contravention of the normal

12   rules, also is observed drinking some liquid while seated in

13   the audience.  The Court infers from that circumstantial

14   evidence that he must be the Court's former law clerk.

15   Now you had an objection you wanted to raise?

16   MS. MAINIGI:  I did, your Honor.  I had a concern that

17   the witness was going to talk about something that really has

18   no relevance to this case.

19   THE COURT:  What's the relevance?

20   MS. LONDON:  Your Honor, I was simply trying to

21   establish that he in fact raised issues to the credit group,

22   and I'm happy to move on.

23   THE COURT:  I think so.

24   Very good.  We'll see you in 15 minutes.

25   (Recess taken)

  1           THE COURT:  How much longer do you have on direct?

  2           MS. LONDON:  About half an hour, your Honor.

  3           (Jury present)

  4           THE COURT:  All right, counsel.

  5    BY MS. LONDON:

  6    Q.  Mr. Tanabe, you discussed earlier that there were regular

  7    meetings with Countrywide between yourself and Countrywide in

  8    the 2007 and 2008 time period in which the topic of credit was

  9    discussed.  Do you recall that?

 10    A.  Yes, I do.

 11    Q.  What were the subjects that were discussed within the topic

 12    of credit?

 13    A.  All the subjects dealt with credit in some fashion.

 14    Sometimes we talked about credit terms of business, sometimes

 15    we talked about credit quality as maybe about one of our

 16    methods, sometimes we talked about credit policies,

 17    interpreting credit policies for them.  Credit policies are

 18    those things that sometimes Freddie Mac sends out that changes

 19    our seller service guide.  So it was numerous subjects on

 20    various topics.

 21    Q.  What did you mean when you said "terms of business?"

 22    A.  Inside the contract we place contractual terms that --

 23           THE COURT:  Mr. Tanabe, why don't you get a little

 24    closer to the mic.

 25    A.  We placed contractual terms in the contract that govern the

1    method by which a particular loan type has to be either

2    underwritten or the specifications in terms of what kind of

3    credit quality we demand out of the borrower, what is the

4    maximum amount to be for a particular loan.

5    Q.  What types of information did the Countrywide

6    representatives provide to you and Freddie Mac during these

7    meetings about credit?

8            MS. MAINIGI:  Objection.

9            THE COURT:  Ground?

10           MS. MAINIGI:  Vague, general.

11           THE COURT:  Overruled.

12   A.  Could you repeat the question, please?

13   Q.  Sure.  At these meetings we have been discussing, what

14   types of information did the Countrywide representative provide

15   to you in your role as senior credit director?

16   A.  Most of the time it dealt with, I'll put it under the

17   category of their plans, their expectations, their findings,

18   regarding the Countrywide credit quality.

19   Q.  Can you give me an example of the type of plan that would

20   relate to credit quality?

21   A.  This is more hypothetical than my memory, but it's

22   something like --

23           MS. MAINIGI:  Objection, your Honor.

24           THE COURT:  Yeah, we don't want hypothetical.  If you

25   have a particular memory, you can testify to it.  If you have a

1    general memory that you're still -- that is still something you

2    actually remember, you can testify to that, but no speculation.

3            THE WITNESS:  OK.  I don't have even a general memory

4    of a particular conversation.

5    Q.  What is the purpose of the overall credit conclusion that

6    we were discussing before the break?

7    A.  It was a component of how Freddie Mac would evaluate the

8    entire relationship, and then based on our view of the entire

9    relationship we would -- I'll use the phrase "plan our next

10   steps" in terms of contract discussions, as an example.

11   Q.  Was the process of evaluating the next step something that

12   was ongoing?

13   A.  It was ongoing, but it had peaks and valleys.  And as the

14   new contract or as a contract term would come closer to the

15   end, we would increase the discussion on what we would do next

16   time.

17   Q.  And what are the different facets that went into the

18   overall credit conclusion?

19   A.  Dealt primarily with the four things that I talked about

20   earlier, the performance of the loans, the model reads, whether

21   it be the borrower level or the collateral level, and what

22   we're finding in our file reviews.

23   Q.  Was there a contractual relationship between Countrywide

24   and Freddie Mac?

25   A.  Yes.

1    Q.  Can you describe that relationship?

2    A.  I want to back up a little bit.  We have the seller

3    servicer guide which lays out our requirements for both service

4    of the loans and originating and selling the loans.  That goes

5    to every eligible Freddie Mac customer.  In addition to the

6    seller servicer guide for large customers or larger

7    customers -- they don't have to be the largest, but larger

8    customers, we have what we call variances or waivers, and what

9    that does is modify the guide.  So the combination of those two

10   things creates what we're referring to here as the contract.

11   We oftentimes refer to that as the purchase documents.

12   Q.  What is the purpose of the seller servicer guide?

13   A.  To define our requirements, which then lead to defining

14   eligibility for sale to Freddie Mac versus not.

15   Q.  Do your job responsibilities at Freddie Mac require you to

16   be familiar with the seller servicer guide?

17   A.  Deeply in parts, the credit parts, and not so much in the

18   other parts.

19   Q.  What do you mean by the credit parts?

20   A.  The seller servicer guide covers all aspects of doing

21   business with Freddie Mac.  One of the aspects is credit or

22   underwriting.  That part I have to be deeply familiar with.

23   Q.  How do you use the seller servicer guide in connection with

24   your work at Freddie Mac?

25   A.  The seller servicer guide is one of the building blocks of

DA2TBAN5                          Tanabe - direct

1    creating the purchase documents or the contract, that defines

2    eligibility, and one of the credit measures that we use is how

3    many loans are produced that are -- or what percent of loans

4    that are produced are satisfied by the purchase doc or the

5    contract.

6    Q.  When you say "eligibility," can you explain what you mean

7    by that?

8    A.  Satisfies the terms of the contract or meets the terms of

9    the contract.  It's an eligible loan.  It was underwritten well

10   and presented well or accurately.

11              MS. LONDON:  Your Honor, may I approach?

12              THE COURT:  Yes.

13   Q.  Mr. Tanabe, do you recognize the document I just handed

14   you?

15   A.  I recognize the type of document that it is.

16   Q.  What is it?

17   A.  These are revisions, additions, deletions to our guide.

18   Q.  Does it include portions of the guide as well?

19   A.  Yes.

20              MS. LONDON:  I move to admit Plaintiff's Exhibit 170

21   into evidence.

22              MS. MAINIGI:  No objection, your Honor, as long as

23   it's clear these are selected portions of the contracting

24   guide.

25              MR. HEFTER:  No objection, your Honor.

1          THE COURT:  All right.  170 is received on that

2     understanding.

3          (Plaintiff's Exhibit 170 received in evidence)

4     Q.  Mr. Tanabe, could you turn to section 6.11 in this

5     document, which is numbered page 6-15.  What is this section

6     describing?

7     A.  It's a section covering the warranties and representations

8     required to be made by sellers, which is our phrase for

9     customers, people who sell us loans.

10    Q.  Are you familiar with this section of the seller servicer

11    guide?

12    A.  Yes.

13    Q.  Is this one of the sections of the seller servicer guide

14    that you use in your role as senior credit director at Freddie

15    Mac?

16    A.  Yes.

17    Q.  Are you familiar with the term rep and warrants model?

18    A.  Yes.

19    Q.  What does that mean?

20    A.  Rep and warrant model means that as customers originate

21    loans, they underwrite loans and they sell loans to us by

22    representing that the information that they're presenting to us

23    at time of sale is accurate.  And warrant means that

24    essentially they promise that.  So a rep and warrant model

25    depends on a customer's accuracy in following the guide, and

1    they represent they have done so for the loans that they sell

2    us.

3    Q.  Why does Freddie Mac -- does Freddie Mac use the rep and

4    warrant model?

5    A.  It has for a long time.

6    Q.  Why does Freddie Mac use the rep and warrant model?

7            MS. MAINIGI:  Objection.

8            THE COURT:  Overruled.

9    A.  Freddie Mac evolved in using the rep and warrant model when

10   first founded, which is decades ago.  We used to look at each

11   and every loan before we bought it.  Over time, and caused by I

12   will say the evolution of the market and demands of customers

13   for I'll say greater access and greater speed, what we did is

14   replaced a file review by more explicit directions created by

15   the guide and contract, combined with representation and the

16   warranties by the customers that they followed those explicit

17   directions, and then thirdly, is we look at files to verify

18   that the representations and warranties made by a customer are

19   accurate.  So sort of a long answer to your question, but I

20   hope that that takes care of it.

21   Q.  Would it be possible for Freddie Mac to re-underwrite every

22   loan that it purchases?

23   A.  No.

24   Q.  Why not?

25   A.  Too many.

1    Q.  Turning back to the document, could you please read the

2    very first sentence starting with, "As of the delivery date."

3    A.  As of the delivery date, the funding date and the date of

4    any substitution of mortgages pursuant to the purchase

5    documents, the seller warrants and represents the following for

6    each mortgage purchased by Freddie Mac.

7    Q.  Thank you.  Was Countrywide required to make the

8    representations contained in Section 6.11 with regard to each

9    loan that it sold to Freddie Mac?

10   A.  Yes.

11   Q.  Would you please read number four.

12   A.  Sure.  The seller has not misstated or omitted any material

13   fact about the mortgage.

14   Q.  Do you have an understanding of what "material fact" means?

15           MS. MAINIGI:  Objection.

16           MR. HEFTER:  Objection, your Honor.

17           THE COURT:  Sustained.

18   Q.  Did Countrywide ever receive permission from Freddie Mac

19   not to abide by the references sets forth in number four

20   regarding material facts?

21   A.  No.

22   Q.  Would you turn to Section 22.2 of the seller servicer

23   guide, which is just a few pages later in the excerpts.  What

24   does Section 22.2 describe?

25   A.  It's the definition of an investment quality mortgage.

1    Q.   Is Section 22.2 one of the sections of the seller servicer

2    guide that you use in your role as credit director?

3    A.   Yes.

4    Q.   Was Countrywide required to make the representations set

5    out in Section 22.2 with regard to each loan that it sold to

6    Freddie Mac?

7    A.   Yes.

8    Q.   Would you please read for us the definition set out in

9    Section 22.2?

10   A.   Sure.  An investment quality mortgage is a mortgage that is

11   made to a borrower, from whom repayment of the debt can be

12   expected, is adequately secured by real property, and is

13   originated in accordance with the requirements of the purchase

14   documents.  The seller warrants that all mortgages sold to

15   Freddie Mac have characteristics of an investment quality

16   mortgage.

17   Q.   Did your responsibilities as senior credit director include

18   ensuring that the loans that Freddie Mac purchased were

19   investment quality loans?

20   A.   Yes.

21   Q.   What does it mean to be originated in accordance with the

22   requirements of the purchase documents?

23            MS. MAINIGI:  Objection.

24            THE COURT:  Ground?

25            MS. MAINIGI:  Calls for legal conclusion.

1    THE COURT:  Sustained.

2    Q.  Did Countrywide ever receive permission from Freddie Mac

3    not to abide by the requirements that all of the loans it sold

4    to Freddie Mac be of investment quality?

5    A.  No.

6    Q.  In your role as a senior credit director at Freddie Mac,

7    are you familiar with something known as self reporting?

8    A.  Yes.

9    Q.  What does it mean?

10   A.  It's a portion of the guide that covers the quality control

11   requirements that Freddie Mac has for all lenders who sell us

12   loans.  What this requirement entails is that if the lender in

13   their own quality control function finds a loan that is

14   ineligible because it failed some portion of the purchase

15   document, that lender is required to notify us of that loan.

16   Q.  Why did Freddie Mac require lenders to self report?

17                MS. MAINIGI:  Objection.

18                THE COURT:  Overruled.

19   A.  It provides -- well, for two reasons, one is that a

20   quality -- a functioning quality control group within each

21   lender is a requirement of Freddie Mac.  Self reporting is a

22   demonstration that that process is working.  It's insight into

23   their -- I will say their operational integrity.  The second

24   thing is that it helps manage the quality of the portfolio of

25   loans sold to us.  Our own QC group looks at just a small

DA2TBAN5                          Tanabe – direct

1   fraction of the loans.  The combination of our QC group and the

2   in-house QC group at a lender shop like Countrywide increases

3   the number of loans or file reviews performed.

4   Q.  Did the self reporting requirement apply to Countrywide?

5   A.  Yes.

6   Q.  Did Countrywide ever receive permission from Freddie Mac

7   not to abide by the self reporting requirement?

8   A.  Not to my knowledge.

9   Q.  Do you know who Cindy Simantel is?

10  A.  Yes.

11  Q.  Who is she?

12  A.  My exposure to Cindy was when she was part of a quality

13  control group at Countrywide.

14  Q.  In your role as senior credit director working with

15  Countrywide, did you work with Ms. Simantel?

16  A.  Yes.

17  Q.  What did you work with her on?

18  A.  Mostly on repurchases.

19  Q.  In her role as part of the quality control group at

20  Countrywide, was Ms. Simantel responsible for providing any

21  information to Freddie Mac?

22           MS. MAINIGI:  Objection.

23           THE COURT:  Well, I think we need a side bar.

24           (Continued on next page)

25

1          (At side bar)

2          THE COURT:  So of course this relates to the witness

3     who is still out there, so to speak.  And if I do permit you to

4     call her, either live or by deposition, won't this be covered

5     at that point?  So what's the point getting into it now?  It

6     has no relevance unless I admit her, right?

7          MS. LONDON:  We're trying to understand her role with

8     regard to self reporting.

9          THE COURT:  But that will come from her.

10          MS. LONDON:  Correct.

11          THE COURT:  I think we can move on.

12          MS. LONDON:  OK.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    BY MS. LONDON:

3    Q.  If Countrywide were to provide information to Freddie Mac

4    regarding credit, would that information have gone to you or

5    Leila Quadra?

6    A.  Most likely.

7    Q.  Is there anyone else that it would have gone to?

8    A.  Countrywide, like a lot of lenders, had a large team that

9    was covering the relationship.  There are times where I will

10   say credit information was passed to a non-credit person at a

11   convenience for the person passing the information.  It would

12   then be the responsibility of the receiver to bring it to the

13   right spot, which would be Leila and/or I.

14   Q.  You testified that your responsibilities as senior credit

15   director include determining whether loans sold to Freddie Mac

16   are investment quality, correct?

17   A.  I have to say that I did not perform the file reviews.  The

18   file reviews are key in determining the investment quality

19   because they measure a particular loan against the contractual

20   terms.  I was a consumer of that information as opposed to the

21   creator of that information.

22   Q.  What did you do with that information as the consumer of

23   it?

24              MR. HEFTER:  Objection, your Honor, vague.

25              THE COURT:  Well, overruled.

1   A.   The underwriting quality was one aspect of the credit

2   picture.  I would use the results of our QC findings to develop

3   the -- I'll say the bigger picture.

4   Q.   What do you mean by "the bigger picture?"

5   A.   The more complete credit picture that included more than

6   just that one aspect which is underwriting quality.  There were

7   other aspects to the credit picture that were important, like

8   how well did the loans perform.

9   Q.   Did the bigger picture include a determination as to the

10  investment quality of the loans that Freddie Mac was

11  purchasing?

12  A.   Yes, the underwriting process determined the eligibility or

13  the NAQ we oftentimes called it.

14  Q.   Could a loan origination process impact whether or not a

15  loan is investment quality?

16  A.   Yes.

17          MS. MAINIGI:  Objection.

18          THE COURT:  Ground?

19          MS. MAINIGI:  Foundation, speculation.

20          THE COURT:  Well, overruled.

21          Go ahead, you may answer.

22  Q.   I think you said yes.

23  A.   Yes, I did say yes.

24  Q.   If Freddie Mac knew that a loan was not investment quality,

25  would it have bought the loan?

```
 1   A.  No.

 2              MR. HEFTER:  Objection, your Honor.

 3              THE COURT:  Overruled.

 4   Q.  If a lender knows that a loan is not investment quality, is

 5   that lender allowed to sell the loan to Freddie Mac?

 6              MR. HEFTER:  Objection, your Honor.

 7              MS. MAINIGI:  Objection.

 8              THE COURT:  Sustained.

 9              MS. LONDON:  Your Honor, could I have one minute to

10   confer with counsel?

11              (Pause)

12              MS. LONDON:  Thank you.

13   BY MS. LONDON:

14   Q.  If the lender knows that a loan is not investment quality,

15   would that lender be permitted under the Freddie Mac contract

16   to sell loan to Freddie Mac?

17              MR. HEFTER:  Objection.

18              MS. MAINIGI:  Objection.

19              THE COURT:  Let me ask the witness, is there a

20   provision of the contract, to your knowledge, that bears on

21   this issue?  Yes or no or you don't know.

22              THE WITNESS:  I want to say I don't know.

23              THE COURT:  Sorry?

24              THE WITNESS:  I don't know.

25              THE COURT:  Sustained.
```

DA2TBAN5                         Tanabe - direct

1   Q.   Would a loan origination process be a material fact about

2   the loan?

3            MS. MAINIGI:  Objection, your Honor.

4            MR. HEFTER:  Objection.

5            THE COURT:  So ladies and gentlemen, when we get down

6   to the final instructions of law and you're considering the

7   various elements that have to be proved to establish liability,

8   of which I gave you a partial heads up in that particular

9   instruction the other day, one of the issues you may need to

10  consider, if you find that there were any misrepresentations

11  made by one or more of the defendants to Fannie Mae or Freddie

12  Mac, is whether those misrepresentations were what the law

13  calls material.  And I will define for you at that time the

14  legal definition of materiality.  The normal synonym for

15  materiality is important, but that doesn't tell you everything

16  that you need to know because something can be important in one

17  context and unimportant in another context.  So we're going to

18  have to deal with that with more precise ways at that time.

19            But it's a legal matter, ultimately, that is to say,

20  it's a legal definition, and therefore, I have to sustain the

21  objection here.  But I want you to understand the background

22  and the context, because you may hear that word at various

23  times during the trial.

24            Go ahead, counsel.

25            (Continued on next page)

1   Q.  In the 2007 to 2008 time period, were you aware of a new

2   loan origination process at Countrywide that was intended to

3   fund loans at high speed?

4            MS. MAINIGI:  Objection.

5            MR. HEFTER:  Objection, your Honor.

6            THE COURT:  Overruled.

7   A.  No.

8   Q.  If you had known about this new loan origination process,

9   what, if anything, would you have done?

10           MS. MAINIGI:  Objection, your Honor.  Calls for

11   speculation.  No foundation.

12           THE COURT:  Sustained.

13   Q.  If you had known about this loan origination process, would

14   it have influenced your recommendation as to whether to

15   purchase the loans being originated through the process?

16           MS. MAINIGI:  Objection, your Honor.

17           MR. HEFTER:  Objection.

18           THE COURT:  Well, it has been at least seven minutes

19   since we had a side bar, so certainly we have to have another

20   one.

21           (Continued on next page)

22

23

24

25

1           (At the side bar)

2           THE COURT:  Before we deal with the immediate

3    question, I want to make sure you all understand what I will

4    permit and will not permit on the issue of materiality.

5           You can bring out, although not through leading

6    questions, for example, whether some particular kind of

7    information might have been important to him, and if so, why it

8    would be important to him.  Would it have been a factor on the

9    decision to purchase, why would it have been a factor.  All

10   that.  It is simply the use of the word "material" which calls

11   for in effect a legal conclusion that I sustained that

12   objection.

13          Now, on the immediate question, let me hear the

14   question again.

15          MS. LONDON:  If you had known about this process,

16   would it have influenced your recommendation.

17          THE COURT:  So I allowed the question, we got into

18   this a little bit with the other witness, but this witness

19   seemed to me to be more clearly in the chain relevant.  That's

20   why I overruled the objection.  But now you're I think asking

21   him to imagine a hypothetical and which is not normally

22   permitted as to a percipient witness.  But on the other hand --

23          MS. MAINIGI:  May I address it, your Honor?  The

24   gentleman indicated that he hadn't heard of it at the time.

25   And so he doesn't have any foundation.

1        MS. LONDON:  That's the whole point.

2        THE COURT:  No.  You could have put to him a question

3   like, what kinds of things do you need to know about the

4   process to approve the process, or something like that.  That's

5   not the kind of question you're putting.  Your question is, if

6   contrary to fact, you had heard about this thing, whatever it

7   might be, what would have you done.  And that's a problematic

8   question on many levels.

9        So the question you're putting I will not permit, but

10  there are questions in this area that I'm trying to indicate

11  that would be appropriate if you want to give it another stab

12  or not, as you may choose.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court)

 2                    MS. LONDON:  If I may have one more minute.

 3                    THE COURT:  Yes.

 4       BY MS. LONDON:

 5       Q.  Mr. Tanabe, in your role as senior credit director, what

 6       kinds of information about a loan origination process would be

 7       important to you?

 8                    MS. MAINIGI:  Objection.  Foundation.

 9                    THE COURT:  Overruled.

10       A.  Those activities that govern or -- there are several

11       activities that the guide requires lenders to follow certain

12       steps.  As an example, there is a requirement that lenders look

13       at certain -- certain documentation in order to determine the

14       amount of stable income in order to a decision of loan.  That's

15       an example of a process that we would expect a lender to

16       complete successfully.

17       Q.  Would the role of underwriters in the loan origination

18       process be important to you?

19       A.  Yes.  The example I described is typically performed by an

20       underwriter.

21       Q.  Would it be important to you to know if a loan origination

22       process replaced underwriters with loan specialists who were

23       not independent of operation and sales?

24                    MR. HEFTER:  Objection.

25                    MS. MAINIGI:  Objection, your Honor.

1              THE COURT:  Sustained.

2    Q.  You testified it would be important for you to know about

3    underwriting in the loan origination process, is that correct?

4    A.  Yes.

5    Q.  Why would that be important to you?

6    A.  I go back to the purchase documents which we've called

7    contract, our contract.  In the purchase document, and in the

8    guide, there are requirements in terms of what a lender has to

9    do to ensure that the information that they place into the loan

10   decision is accurate.

11   Q.  Why would it be important for you to know this information?

12   A.  For two reasons.  One is that we want to buy good loans.

13   In order to determine whether a borrower is, quote unquote, a

14   good borrower, we demand certain research to be completed by

15   underwriters as part of the facts that the underwriter will use

16   to make that decision.  The second reason is, is that following

17   and successfully completing certain steps is a guide

18   requirement.  It is part of the purchase documents.  They have

19   to do it.

20   Q.  When you say that it is important for -- when you say you

21   want to buy good loans, how does underwriting relate to whether

22   loans are good or bad?

23   A.  Underwriting provides, I'll say, an expert independent

24   judgment on the attributes of a loan.  From that use of good

25   judgment in an independent environment organizational

1    structure, the right decisions relative to loan quality are

2    made.

3    Q.  Would the presence or absence of underwriting in the loan

4    origination process influence the decision as to whether you

5    purchase loans from a lender?

6             MS. MAINIGI:  Objection.

7             MR. HEFTER:  Objection.

8             THE COURT:  Overruled.

9    A.  The presence or absence of successfully completing certain

10   required steps would be a very large issue to us, a large and

11   negative issue to us.  Because failure to do or successfully

12   complete those required steps means that the loan is ineligible

13   for sale to Freddie Mac.  It breaches the contract.

14   Essentially what I'm talking about, it skips steps.  Instead of

15   investigating fully, it would mean to me that they would

16   investigate partially.  Partial investigation doesn't produce

17   consistently good loans.

18   Q.  How does underwriting relate to investigation?

19   A.  Underwriting is a process of investigation in my mind.  A

20   simple example would be so what is the right kind of -- what is

21   the right level of income that the underwriter should use for

22   evaluating a loan.  What our guide requires is essentially two

23   years of history, and a conclusion that whatever number is

24   arrived at, is expected to be sustained for the next three

25   years.  So, we call that the stability of income.  So it's more

1    than just how much did the guy make last month.  It -- you

2    know, far more than just a short period of time needs to be

3    taken into consideration.

4              MS. LONDON:  I apologize, your Honor.  Just one more

5    minute.  We have no further questions at this time.

6              THE COURT:  All right.  Cross-examination.

7    CROSS-EXAMINATION

8    BY MS. MAINIGI:

9    Q.  Good afternoon, Mr. Tanabe.  I'm Enu Mainigi and I

10   represent the bank defendants.

11             You would understand the contract to have what

12   components, Mr. Tanabe?  The selling guide --

13   A.  From that perspective, yeah.  We have seller service guide

14   plus any variances that would be created specifically for a

15   customer that we would include in a document that we call the

16   master agreement.  The combination of two is known as purchase

17   documents.

18   Q.  The purchase documents is essentially the guiding contract

19   of the relationship between Freddie Mac and Countrywide?

20   A.  Correct.

21   Q.  I imagine that the purchase documents are not just this

22   big, but span thousands of pages, is that fair?

23   A.  "Thousands" may be a little big or a little high.  But

24   there are a lot of pages.  A lot of pages.

25   Q.  All of those pages collectively spell out Countrywide's

DA23BAN6                    Tanabe - cross

 1  obligations to Freddie Mac, correct?

 2  A.  Correct.

 3          MS. LONDON:  Objection.

 4          THE COURT:  Ground?

 5          MS. LONDON:  Vague.

 6          THE COURT:  Overruled.

 7  Q.  Mr. Tanabe, to the extent that something is not

 8  specifically laid out in the contracting documents or guide, it

 9  is up to the business judgment of the lender, correct?

10          MS. LONDON:  Objection.

11          THE COURT:  Sustained.

12  Q.  The contract, Mr. Tanabe, does not dictate to lenders

13  exactly how they need to process loans, correct?

14          MS. LONDON:  Objection.

15          THE COURT:  Ground?

16          MS. LONDON:  "Exactly how," your Honor.

17          THE COURT:  No, I think that's permissible.

18  Overruled.

19  A.  Could you repeat the question, please?

20  Q.  Sure.  The contract does not dictate to lenders exactly how

21  they need to process loans, correct?

22  A.  In some cases, it does.  And I think a lot of it goes back

23  to what your definition of "process" means, and what my

24  definition means.

25          My definition -- and the reason I said yes is because

1    in certain cases, and I'll use income again, we require a

2    certain set of documents, we require a certain set of judgments

3    to be made.  In my mind, that could be considered a process.

4    Q.  So there are a certain set of steps that need to be

5    followed by all lenders, correct?

6    A.  Correct.

7    Q.  Different lenders may have different processes that still

8    utilize all of those steps, correct?

9    A.  Right.

10           MS. LONDON:  Objection.

11   Q.  Is that correct?

12           THE COURT:  No, there is an objection.  It is awfully

13   vague, but I will allow the answer to stand.

14   A.  Okay.  So --

15           THE COURT:  No, you answered the question.  You said

16   "yes."  But subject to further exploration either now or on

17   redirect.

18   Q.  Mr. Tanabe, there is nothing in the contract that requires

19   that someone with the title underwriter clear conditions and

20   approve loans to close, correct?

21   A.  Correct.

22   Q.  Someone can perform the underwriting steps that are in the

23   contract that does not have the title underwriter, correct?

24   A.  By contract, correct.  But it would be a typical event.

25   Q.  Different companies have different titles for people that

DA23BAN6                         Tanabe - cross

1    provide the same function, correct?

2              MS. LONDON:  Objection.

3    A.  Could be.

4              THE COURT:  Please, when there is an objection, you

5    have to wait for my ruling.  Sustained.

6    Q.  Freddie Mac is not necessarily concerned with what

7    someone's title is, correct, in performing whatever steps it

8    lays out?

9              MS. LONDON:  Objection.

10             THE COURT:  I'll allow that.

11   A.  Correct.

12   Q.  The contract doesn't dictate what level of training is

13   needed by the person performing any underwriting steps,

14   correct?

15   A.  Correct.

16   Q.  You mentioned a remedy of termination of the contract, do

17   you remember that?

18   A.  Yes, I do.

19   Q.  The contract also allows Freddie Mac the remedy of

20   requesting repurchase of any loans that they did not feel met

21   reps and warrants, correct?

22   A.  Correct.

23   Q.  That is part of the contractual framework, correct?

24   A.  Correct.

25   Q.  You mentioned a variety of ways in your direct testimony as

1  to how Freddie Mac independently checks the quality of the

2  loans that it has bought from banks, do you recall that?

3  A.  Yes, I do.

4  Q.  One of the ways as I understand it is using something

5  called LP Emulator, is that correct?

6  A.  That's correct.

7  Q.  What is that?

8  A.  LP is Freddie Mac's automated underwriting model.  And it

9  risk grades loans and puts them into two big classes.  One is

10  the accept bucket or the accept category, and the second is the

11  caution category.

12          For all loans that we buy, regardless of how the loan

13  was underwritten by the lender, we use a device that simulates

14  LP based on the data delivered by the customer in order to risk

15  grade the loans into the accept category or the not accept,

16  which is typically called the caution category.

17          So, it's -- it is our model that we apply to all loans

18  that measures the borrower level credit quality.

19  Q.  So all loans purchased from Countrywide were put through

20  the LP Emulator, is that correct, Mr. Tanabe?

21  A.  Yes.

22          THE COURT:  You really need to wait while there is an

23  objection.

24          THE WITNESS:  Okay.

25          THE COURT:  Overruled.

1    Q.   Through the LP Emulator, I take it there are certain loans

2    that get sent back to Countrywide, is that correct?

3    A.   No.

4    Q.   The second way that I believe Freddie Mac corroborates

5    quality is through something called the collateral model.

6    Could you explain that?

7              MS. LONDON:   Objection.

8              THE COURT:   Ground?

9              MS. LONDON:   Foundation.

10             THE COURT:   Are you familiar with something called the

11   collateral model?

12             THE WITNESS:   Yes.

13             THE COURT:   Overruled.

14   A.   Freddie Mac also has a model that estimates a value of

15   homes.  And when somebody sells us a loan and identifies the

16   home as having address on 123 Main, we run our model, and we

17   come up with our assessment of the value of that home.  We then

18   compare our assessment of value created by the AVM to what was

19   presented to us by the customer or the seller, and see how

20   close they match.

21   Q.   A third what I believe that you mentioned in your direct

22   testimony relates to something called NAQ rates, is that

23   correct?

24   A.   Correct.

25   Q.   This would be a third way that Freddie Mac checks the

1    quality of the roles that it purchases from lenders including

2    Countrywide, correct?

3    A.   Correct.

4    Q.   Could you tell us what the NAQ rate is?

5    A.   NAQ stands for not acceptable quality.  And it is a file

6    review conducted by Freddie Mac underwriters that look at the

7    specifics of each loan and compare those specifics to the

8    contract requirements.

9            It is a very manual process, and as a result, we only

10   look at a very small percentage of loans in this manner.  We're

11   comprehensive on our model reviews through the LP simulation,

12   the AVM process, but very, very few loans do we actually crack

13   the file.

14   Q.   So it's QC at the loan files, is that correct?

15   A.   That's correct.

16   Q.   By QC I mean quality control.

17   A.   Right.

18   Q.   Is this essentially a re-underwriting of the loan file?

19   A.   Yes.

20   Q.   In the '07-'08 time period, was there a normal NAQ rate for

21   that period?

22   A.   For Countrywide.

23   Q.   Just for whatever the industry rate was.

24            MS. LONDON:  Objection.

25            THE COURT:  It's not clear from what the reporter

1    picked up that there was an earlier objection --

2              MS. MAINIGI:  I can withdraw and start over.

3              THE COURT:  -- to the question "Was this essentially a

4    re-underwriting."  Was there an objection there?  My

5    recollection is you said "objection."  The reporter didn't pick

6    it up.  The reason the reporter didn't pick it up is because

7    you must speak louder.  If the reporter can't even hear you,

8    then the witness can't hear you, and he's going to go ahead as

9    he did and answer the question.

10             But to the later question to which an objection has

11   just been raised, that objection is sustained.  So, put another

12   question.

13   Q.  Through the NAQ rate, does Freddie Mac have insight into

14   the loan, quality of the loans that are being sold to it from a

15   particular lender?

16   A.  Yes.

17   Q.  In the '07-'08 time period, was there a base rate that you

18   looked to?

19             MS. LONDON:  Objection.

20             THE COURT:  Are all your objections in this area on

21   the grounds of relevance?

22             MS. LONDON:  Yes, your Honor.  If it would be possible

23   to do a quick side bar.

24             THE COURT:  No, because I sustain the objections on

25   relevance.  I don't see the relevance of any of this.

DA23BAN6                          Tanabe – cross

1              MS. MAINIGI:  Could we have a side bar, your Honor?

2              THE COURT:  All right.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the side bar)

2            MS. MAINIGI:  Your Honor --

3            THE COURT:  Remember, reliance is not an element of

4   mail fraud or wire fraud.

5            MS. MAINIGI:  Understood, your Honor.  But I do

6   believe that Freddie Mac's insight and intelligence and

7   communications with Countrywide as it relates to loan quality

8   goes straight to intent.  If Countrywide is sharing loan files,

9   those loan files were being reviewed, and there is a review of

10  the quality of those loan files that directly impacts intent,

11  your Honor.

12           THE COURT:  Why?

13           MS. MAINIGI:  Because Countrywide's not hiding

14  anything.  Furthermore, getting --

15           THE COURT:  First of all, hiding has nothing to do

16  with intent and has to do with whether there was a

17  misrepresentation.  So I think you're confusing elements.  If

18  everything material is disclosed, then there is no

19  misrepresentation.  You don't even reach the issue of intent.

20           But, secondly, I don't think this is -- the last few

21  sets of question as I understood them had nothing to do with

22  disclosures by Countrywide.  They had to do with alternative

23  methods of assessing the loans and so forth.  That's why I

24  didn't see the relevance.

25           MS. MAINIGI:  It goes back to the intent to deceive,

 1    your Honor.  That is an element of mail and wire fraud.  We

 2    have to have had the intent to deceive.

 3              THE COURT:  How does the fact if a bank had another

 4    method of assessing loans, and in the method that Countrywide

 5    was contractually obligated to follow, Countrywide made

 6    misrepresentations.  What would it matter that the bank had

 7    some other way of assessing it?

 8              MS. MAINIGI:  It's not a question of the bank having

 9    another way to assess it.  It is the fact that --

10              THE COURT:  I'm sorry.  Freddie Mac had another way to

11    assess it.

12              MS. MAINIGI:  I thought I understood what you meant.

13    But that Countrywide is opening up its files and knows these

14    files are subject to review by Freddie Mac.  That goes straight

15    to their intent to deceive.

16              THE COURT:  If the question is did Countrywide to your

17    knowledge provide you with X, Y or Z, that would have been --

18    assuming he's in a position to know the answer -- that would

19    have been a fair question.  But that's not the question you are

20    asking him.

21              MS. MAINIGI:  The other part of this, your Honor, that

22    I'd like to raise, is Mr. Armand in his opening argument laid

23    out an industry standard of 4 or 5 percent as essentially an

24    industry standard by which Countrywide would be measured.  He

25    laid out a baseline, basically, by virtue of doing that.  I'm

 1    trying to ask Mr. Tanabe what essentially that number was in

 2    Freddie Mac's view, because obviously that's critical.

 3            THE COURT:  Again, I didn't hear that question.  I'm

 4    not sure that the mere fact that either counsel states

 5    something in opening statement necessarily means that it

 6    becomes -- you had the full right to say it's irrelevant and it

 7    is not coming into evidence.  But if you're saying, no, we

 8    waive any objection to its coming into evidence, but dispute --

 9            MS. MAINIGI:  The number.

10            THE COURT:  Then you can put those questions.  But

11    those are the questions you can put.

12            MS. MAINIGI:  Okay.

13            THE COURT:  I don't think we are going to finish this

14    witness by 5 o'clock.

15            MS. LONDON:  Can I raise one more point.  We have

16    concern with getting into the NAQ rates.  This is getting into

17    Hustle, non-Hustle, which I realize is still up in the air.

18            THE COURT:  As I said when one of your colleagues was

19    at the side bar, the government should assume, until the Court

20    rules otherwise, that non-Hustle is not part of this case and

21    therefore will not be permitted and you don't have to introduce

22    anything.  If I'm persuaded to change my mind on that, then

23    we'll allow the government to reopen certain witnesses and

24    recall if necessary and get into stuff that is excluded at this

25    stage.  But for now, it is excluded.

1            MS. MAINIGI:  But that question is not that.

2            THE COURT:  No.

3            MS. LONDON:  I just wanted to raise it now.  If we get

4    too much into the numbers that's not specific to the Hustle.

5            MS. MAINIGI:  I am going to ask that question and move

6    on to the next question.

7            THE COURT:  I think what you'll do is ask that

8    question and end for today.

9            (Continued on next page)

1                    (In open court)

2      BY MS. MAINIGI:

3      Q.  In the 2007, 2008 time period, Mr. Tanabe, what was the

4      industry standard for that NAQ number?

5      A.  I can speak to what the Freddie Mac average in that time

6      frame was.

7      Q.  What was that number, sir?

8      A.  18 to 20 percent.

9      Q.  Thank you.

10                   THE COURT:  That's where we're going to end for today.

11     All right.  Ladies and gentlemen, we will resume tomorrow at

12     9:30.  Summer has clearly returned, so I expect you'll spend

13     tonight on the beach.  But we'll see you tomorrow.  Have a good

14     evening.

15                   (Jury excused)

16                   (Continued on next page)

17

18

19

20

21

22

23

24

25

1      THE COURT:  Anything else counsel needs to raise with

2  the Court.

3      MR. ARMAND:  Very briefly.  I know your Honor has to

4  go.  One issue is just Ms. Simantel, whether or not she's going

5  to be coming to testify is still an open issue.  I know that

6  defense counsel said they were getting her counsel.  But I

7  don't want to have a situation where we're running out the

8  clock on our case.  They indicated there was an issue about

9  whether or not she was within the jurisdiction of the court,

10  even though she is a fairly senior employee at Bank of America.

11  So I just wanted to sort of get an update as to where we were

12  with that.

13      THE COURT:  How would she not be within the

14  jurisdiction of the court?

15      MS. MAINIGI:  Your Honor, she is an employee of Bank

16  of America but she lives in California.  She's not under any

17  sort of trial subpoena in this matter.  She was coming

18  essentially voluntarily.

19      THE COURT:  So the question is whether a current

20  executive employee of a party can be compelled within the

21  court's jurisdiction to appear, even if the executive is not

22  herself a party, and even though she's beyond the otherwise

23  applicable geographic limits.  So if someone wants to give me

24  case law on that.

25      MS. MAINIGI:  We can do that, your Honor.  Actually,

DA23BAN6

1    you don't want that right now?

2            THE COURT:  No.

3            MS. MAINIGI:  We can give it to you in the morning.

4            THE COURT:  And same for the government.

5            MR. ARMAND:  And the other issue is just we're still

6    working with a 50-plus witness list from the defense, and it

7    would be helpful if we could get a revised list soon so we can

8    start planning for their case.

9            MS. MAINIGI:  Your Honor, as I told Mr. Armand

10   yesterday, that I would be more than happy -- he asked for an

11   indication of who our first five witnesses would be, and I said

12   I would be happy to give him that today and I do intend to

13   comply with that.

14           One other issue to raise in that regard, your Honor,

15   is we sense from conversations with the government that the

16   government is not going to end its case until about Friday.  We

17   had previously prepared to have some witnesses here on Friday.

18   They're from California also.  They would have to fly back

19   ultimately over the weekend.  If we could come to agreement

20   that it appears that we're probably not going to end the

21   government's case until Friday afternoon such that we could do

22   video on Friday afternoon and present our witnesses starting

23   Monday morning if need be?

24           THE COURT:  What is the line up for tomorrow?

25           MR. ARMAND:  I believe the line up for tomorrow after

DA23BAN6

```
 1   Mr. Tanabe will be Dr. Cowan, and then Ms. Brewster.
 2           MS. LONDON:  Ms. Brewster and Ms. Padgett and
 3   Mr. Sobczak, depending how far we get.
 4           MR. ARMAND:  Mr. Sobczak, there is also Mr. Hansen,
 5   and we do have two videos to play, and there is also
 6   Ms. Simantel.
 7           THE COURT:  The two videos are?
 8           MR. ARMAND:  Boland and Price.
 9           THE COURT:  I had not yet received the revised Price.
10           MR. ARMAND:  You'll have it tomorrow morning, your
11   Honor.
12           THE COURT:  Okay.  So I think on that, I think it is a
13   fair assumption that even if the government concludes its case
14   on Friday, that we'll need to spend the rest of Friday on
15   hearing motions and things of that sort.  So I don't think you
16   need to have anyone available on Friday.
17           MS. MAINIGI:  Thank you, your Honor.
18           THE COURT:  Ms. London, is this your first trial?
19           MS. LONDON:  It is, your Honor.
20           THE COURT:  So, I don't know why I thought that.
21   You're doing very well.  But I just want you to understand it
22   was partly for that reason that, to be frank, that I allowed
23   these very elaborate discussions with your colleagues.  But the
24   result of that is you went well beyond the 30 minutes you had
25   predicted.  I can't have that continue on the part of any
```

DA23BAN6

```
1    counsel in the future.  I made an exception because youth has

2    its prerogatives, but it won't be in the future.

3              MS. LONDON:  I apologize, and thank you.

4              THE COURT:  Nothing to apologize for.  Anything else?

5              Very good.  We'll see you tomorrow.

6              (Adjourned until October 3, 2013, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF EXAMINATION

Examination of:                                    Page

IRA HOLT

Direct By Ms. Schoenberger . . . . . . . . . .1138

Cross By Mr. Smurzynski  . . . . . . . . . . .1166

Cross By Mr. Mukasey . . . . . . . . . . . . .1238

Redirect By Ms. Schoenberger . . . . . . . . .1243

BENJAMIN TANABE

Direct By Ms. London . . . . . . . . . . . . .1262

Cross By Ms. Mainigi . . . . . . . . . . . . .1296

1

                         PLAINTIFF EXHIBITS

2   Exhibit No.                                    Received

3    229   . . . . . . . . . . . . . . . . . . .1177

4    170   . . . . . . . . . . . . . . . . . . .1279

5                         DEFENDANT EXHIBITS

6   Exhibit No.                                    Received

7    1685   . . . . . . . . . . . . . . . . . .1180

8    1537   . . . . . . . . . . . . . . . . . .1195

9    1672   . . . . . . . . . . . . . . . . . .1197

10   1888   . . . . . . . . . . . . . . . . . .1198

11   1895   . . . . . . . . . . . . . . . . . .1219

12   1896   . . . . . . . . . . . . . . . . . .1222

13   1898   . . . . . . . . . . . . . . . . . .1223

14   1899   . . . . . . . . . . . . . . . . . .1225

15   1886   . . . . . . . . . . . . . . . . . .1233

16   1887   . . . . . . . . . . . . . . . . . .1236

17

18

19

20

21

22

23

24

25