DA33BAN1

1     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
2     ------------------------------x

3     UNITED STATES OF AMERICA,

4

             Plaintiff,

5

         v.                    12 CV 1422 (JSR)

6

    BANK OF AMERICA CORPORATION,
7     successor to Countrywide
       Financial Corporation,
8     Countrywide Home Loans, Inc.,
       and Full Spectrum Lending, et
9     al.,

10            Defendants.

11     ------------------------------x
                           New York, N.Y.
12                            October 3, 2013
                           9:145 a.m.
13

14     Before:

                    HON. JED S. RAKOFF,
15

                           District Judge
16

17

18

19

20

21

22

23

24

25

DA33BAN1

1                                    APPEARANCES

2      PREET BHARARA
            United States Attorney for the
3           Southern District of New York
       PIERRE G. ARMAND
4      JAIMIE LEESER NAWADAY
       JOSEPH N. CORDARO
5      CARINA H. SCHOENBERGER
       ELLEN M. LONDON
6           Assistant United States Attorneys

7

       WILLIAMS & CONNOLLY
8           Attorneys for Defendant Bank of America
       BRENDAN V. SULLIVAN, JR.
9      ENU MAINIGI
       MALACHI B. JONES
10     KENNETH SMURZYNSKI
       CRAIG D. SINGER
11     ALLISON B. JONES
       STEVEN M. CADY
12     JENNIFER WIMSATT PUSATERI

13

       GOODWIN PROCTOR
14          Attorneys for Defendants Countrywide
       RICHARD M. STRASSBERG
15     WILLIAM HARRINGTON

16

       BRACEWELL & GIULIANI
17          Attorneys for Defendant Mairone
       MARC L. MUKASEY
18     MICHAEL HEFTER
       RUSSELL ZWERIN
19     RYAN M. PHILP
       SETH M. COHEN
20     CHRISTINA JARDINE

21

22

23

24

25

DA33BAN1

1            (In open court; jury not present)

2            THE COURT:  Let's get the witness on the stand and

3    bring in the jury.  I'm sorry you had to wait for the other

4    proceeding, but we're now ready to proceed with this matter.

5            (Jury present)

6            THE COURT:  Good morning, ladies and gentlemen.  We're

7    ready to begin.

8     BENJAMIN TANABE,

9    CROSS-EXAMINATION

10   BY MS. MAINIGI:

11   Q.  Good morning, Mr. Tanabe.

12   A.  Good morning.

13   Q.  I believe we left off yesterday discussing the Freddie Mac

14   average NAQ rate in the 2007, 2008 time period.  Can you remind

15   me what NAQ stands for, please?

16   A.  Non-acceptable quality.

17   Q.  Thank you.  That was the third way, the NAQ process was the

18   third way that Freddie had visibility into the processes and

19   quality of loans, correct?

20   A.  It was one of four primary ways.

21   Q.  One of them was LP Emulator which we discussed yesterday?

22   A.  Correct.

23   Q.  The other was collateral models, which we discussed

24   yesterday?

25   A.  Correct.

DA33BAN1                         Tanabe - cross

1    Q.  And obviously NAQ.  And the fourth way was review of the

2    defect rates, correct?

3    A.  The fourth way was the performance of the loans.  How many

4    defaulted, how many paid on time in the various default

5    categories.

6    Q.  One of the things you mentioned yesterday in your direct

7    testimony, Mr. Tanabe, was something called EORM review, do you

8    remember that?

9    A.  No.  But I'm familiar with the EORM reviews.

10   Q.  Can you explain what that is?

11   A.  EORM review is where we have auditors that go on-site and

12   do an audit of individuals, companies, processes, relative to

13   Freddie Mac requirements.  And also good business practices.

14   Q.  EORM stands for what, Mr. Tanabe?

15   A.  I would get this mostly right.  External operating risk

16   management.

17   Q.  I think you're right.

18   A.  Okay.  Thanks.

19   Q.  Thank you.  That is essentially an on-site type of review

20   where the Freddie auditors go on-site and do various types of

21   tasks?

22   A.  Yes.

23   Q.  I take it during an EORM review, the lender also has an

24   opportunity to affirmatively provide information to Freddie

25   Mac, is that fair?

DA33BAN1                          Tanabe - cross

1   A.  Correct.

2           MS. MAINIGI:  Your Honor, may I approach?

3           THE COURT:  Yes.

4   Q.  Mr. Tanabe, DX 43 is an external operational review,

5   correct?

6   A.  Yes.

7   Q.  And the time period is September 10 through 14, 2007, is

8   that right?

9   A.  I haven't had a chance to look at it.

10  Q.  Let me give you a moment to look at the cover page.

11  A.  It says fieldwork was performed on September 10 --

12          THE COURT:  Don't read it.

13          THE WITNESS:  Okay.  Yes.

14  Q.  Obviously this is an EORM review of Countrywide, correct?

15  A.  Correct.

16  Q.  The fieldwork for the operational review was performed in

17  the September 10 through 14th, 2007 time period, is that

18  correct?

19  A.  Yes.

20  Q.  I see that you are copied on this document, is that

21  correct?

22  A.  Correct.

23  Q.  Would you routinely receive EORM reviews of your lenders?

24  A.  Yes.

25          MS. MAINIGI:  I ask that DX 43 be admitted.

DA33BAN1                          Tanabe - cross

1           MS. LONDON:  No objection, your Honor.

2           THE COURT:  Received.

3           (Defendant's Exhibit 43 received in evidence)

4    Q.  Take a look at the first page.  If we can blow that up,

5    Alex, please.

6           These are all the individuals at Freddie Mac,

7    Mr. Tanabe, that would receive EORM reviews?

8    A.  That would receive this review.

9    Q.  The date of the review is November 15, 2007, correct?

10   A.  The date of the e-mail that distributed the review is.

11   Q.  Then it notes in that first paragraph that the time period

12   that the review was performed is September 10 through 14?

13   A.  Correct.

14   Q.  Why don't we turn to page -- the next page, page one,

15   please.  If we can blow up the summary report right there in

16   the center, Alex, please.

17          Mr. Tanabe you can follow along on that.  The summary

18   report, I take it, summarizes all of the ratings that

19   Countrywide received in this EORM review, correct?

20   A.  Correct.

21   Q.  The EORM review analyzes in part the risk associated with

22   Countrywide, correct?

23          MS. LONDON:  Objection.

24          THE COURT:  Ground?

25          MS. LONDON:  Vague.

1          THE COURT:  Sustained.

2     Q.  Tell me what the overall risk assessment is there on the

3     summary report, Mr. Tanabe.

4     A.  It is a statement about the overall quality of the

5     processes that Countrywide displayed in the categories above.

6     Q.  The categories are, sir?

7     A.  Production, underwriting, anti-predatory, quality control,

8     secondary marketing, servicing, default management, investor

9     reporting.

10    Q.  What was the rating that Countrywide received?

11    A.  A satisfactory.

12    Q.  Why don't we move ahead.  First part of this report is an

13    executive summary, Mr. Tanabe?

14    A.  Yes.

15    Q.  Why don't we move ahead to page four, please.  Let's look

16    at the issue that begins with what is the process for manually

17    underwriting loans.  Right there in the middle of the page and

18    let's blow that question and answer up.

19          What section of the review is this in, Mr. Tanabe?

20    A.  The single -- probably the underwriting section.  It would

21    be into the underwriting sections rate.

22    Q.  "Issue:  What is the process for manually underwriting

23    loans?"  Could you read the EORM response, Mr. Tanabe.

24    A.  Sure.  "All loans, from all channels of origination, are

25    initially input into CLUES, CHL's proprietary automated

DA33BAN1                    Tanabe - cross

1  underwriting system, and boarded on the CHL system so that all

2  loans are subject to automated reviews and included in

3  analytics.  Loans are then underwritten by CLUES, LP or DU.

4  Only loans that are not approved by the AUS are manually

5  underwritten."

6  Q.  Is the EORM response information that Countrywide provided

7  to Freddie Mac?

8  A.  The EORM statement in part was developed by information

9  acquired by -- from Countrywide.

10 Q.  So, through communications between Countrywide and Freddie

11 Mac as part of this EORM review, Freddie Mac certainly was

12 aware that only loans that are not approved by the AUS are

13 manually underwritten, correct?

14           MS. LONDON:  Objection.

15           THE COURT:  Ground?

16           MS. LONDON:  Misstates evidence.

17           THE COURT:  Well, it is a question.  But if the

18 objection is that he is being asked to comment on the

19 collective state of mind of Freddie Mac's awareness, then I

20 would have to sustain the objection of course.

21           MS. LONDON:  That is also a basis.

22           THE COURT:  Sustained.  Rephrase the question.

23 Q.  Mr. Tanabe, through the communications in relation to this

24 EORM review, the individuals from Freddie Mac who were present

25 for the EORM review learned that only loans that are not

1    approved by the AUS are manually underwritten, correct?

2              MS. LONDON:  Objection, your Honor.

3              THE COURT:  What is the objection?

4              MS. LONDON:  Lack of personal knowledge.

5              MS. MAINIGI:  I believe he received a copy.

6              THE COURT:  Yes, as phrased I will sustain that

7    objection.  And therefore don't have to reach the objection

8    that the document speaks for itself.

9    Q.  You received a copy of this review, correct, Mr. Tanabe?

10   A.  Yes.

11   Q.  And Countrywide was one of the large lenders that you had

12   ownership over from a credit perspective, correct?

13   A.  Yes.

14   Q.  I assume you would have reviewed this EORM report quite

15   thoroughly at the time, correct?

16   A.  Yes.

17   Q.  So you would have seen that passage that we just read, to

18   the effect that only loans that are not approved by the AUS are

19   manually underwritten, correct?

20   A.  Yes.

21   Q.  Could you turn to page 13, please, sir.

22              MS. MAINIGI:  Alex, if we could blow up first just

23   that middle part of the page that says underwriting.  And up

24   until additional information.  Actually, we just want the top

25   part first, please.

DA33BAN1                            Tanabe - cross

1   Q.  Mr. Tanabe, this is the underwriting section of the EORM

2   review?

3   A.  Yes.

4   Q.  Is that right?

5   A.  Yes.

6   Q.  What is the rating that Countrywide received?

7   A.  Satisfactory in underwriting.

8   Q.  No risks were identified, correct?

9   A.  Correct.

10  Q.  Could you read the paragraph described in rating

11  justification, please.

12  A.  "CHL maintains solid controls over the underwriting and

13  appraisal management functions.  Controls are in place to

14  monitor underwriter's performance, address processing

15  deficiencies, provide fraud control procedures, provide

16  appraisal review procedures, and ensure consistent processes

17  through the documented procedures.  CHL's controls are in line

18  with its peer group and industry standards, which supports a

19  satisfactory rating."

20  Q.  So, as someone highly placed in the risk department at

21  Freddie Mac, when you read this, you understood that CHL's

22  controls are in line with its peer group and industry

23  standards, correct?

24  A.  That would be my conclusion.

25          MS. MAINIGI:  Alex, if we could blow up the section

DA33BAN1                    Tanabe - cross

1    entitled key controls, please.  We can eliminate the top part.

2    Key controls is a little bit further down the page, correct.

3    Q.  Mr. Tanabe, if you could read the first bullet out loud,

4    please, sir.

5    A.  "Underwriting ranking is a pivotal control in the

6    decentralized underwriting system as loans are assigned to

7    underwriters based on loan complexity.  AUS approved loans with

8    typical underwriting conditions can be processed and approved

9    by junior underwriters who have no manual underwriting

10   authority."

11   Q.  So, when you read this report at the time, in 2007, you

12   would have seen that AUS approved loans with typical

13   underwriting conditions can be processed and approved by junior

14   underwriters who have no manual underwriting authority,

15   correct?

16   A.  Correct.

17   Q.  Could you read the next bullet, please.

18   A.  "All high-risk loans require a second level approval from

19   the most senior level underwriters."

20   Q.  And the next bullet, please, sir.

21   A.  "CHL performs verification of employment, income, and asset

22   on 100 percent of loans.  CHL is in the process of developing

23   currently in beta test, a checklist for testing reasonableness

24   for stated income loans."

25   Q.  And the fourth bullet, please, sir.

DA33BAN1                    Tanabe – cross

1   A.  "All loans from all channels of origination are initially

2   input into CLUES CHL's proprietary automated underwriting

3   system and boarded on CHL's systems, so all loans are subject

4   to automated reviews included in analytics.  Loans are then

5   underwritten by CLUES, LP or DU.  Only loans that are not

6   approved by the AUS are manually underwritten."

7   Q.  Those last two sentences, loans are then underwritten by

8   CLUES, LP or DU, only loans that are not approved by the AUS

9   are manually underwritten.  That's essentially the same

10  language that we saw earlier in the report, correct?

11  A.  Correct.

12  Q.  We can set that aside, Mr. Tanabe.

13           MS. MAINIGI:  May I approach, your Honor?

14           THE COURT:  Yes.

15  Q.  DX 406 is an admitted document.  This is a presentation

16  made by Full Spectrum to Freddie at the same time of the EORM

17  review.  Mr. Tanabe, please turn to page seven.

18           MS. LONDON:  Objection, your Honor.  Would it be

19  possible to approach for a side bar?

20           THE COURT:  All right.

21           (Continued on next page)

22

23

24

25

1          (At the side bar)

2          THE COURT:  We had gone 15 minutes without side bars.

3          MS. MAINIGI:  We were missing you, your Honor.

4          MS. LONDON:  This is the presentation that's come up

5     with regard to Cindy Simantel.  It's in dispute and this is the

6     presentation that lists the term High-Speed Swim Lane.

7          MS. MAINIGI:  This presentation has been admitted.

8          MS. LONDON:  We have an objection to showing it to

9     this witness who has no personal knowledge of this.  It is

10    highly prejudicial.  He testified at his deposition that he had

11    never seen it before.  In addition they have a witness, Lauren

12    Biehler who can testify to this, as well as Cliff Kitashima.

13         MS. MAINIGI:  Your Honor, Mr. Tanabe testified as the

14    30(b)(6) deponent that Hustle or High-Speed Swim Lane was

15    described to Countrywide -- or was described to Freddie Mac in

16    that presentation.  That presentation was made at the same time

17    as that EORM review that we just went over.  It was during the

18    exact same site visit that that presentation was made.  Your

19    Honor has indicated whether Mr. --

20         THE COURT:  So, there are two different questions

21    here.  If this is relevant to the area that you're questioning

22    him about, even if he doesn't have knowledge of this, then

23    consistent with what I've allowed the government to do, you can

24    read from it or have him read appropriately.

25         But, given my ruling at the beginning of the trial,

DA33BAN1                         Tanabe - cross

1   the fact that he gave testimony as a 30(b)(6) witness will not

2   be received.

3            MS. MAINIGI:  Understood, your Honor.  I'm letting you

4   know at side bar about that.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2    BY MS. MAINIGI:

3    Q.  Mr. Tanabe, turn to page seven, sir.  Actually, I'm sorry,

4    can we go back to the first page, please.  The cover page.  The

5    title page.  Let's go ahead to page seven, please.

6            Mr. Tanabe, could you read the prime subprime mix of

7    business related to Full Spectrum Lending in the July '07 time

8    period, please, sir.

9    A.  14 percent subprime, 86 percent prime.

10   Q.  This is information that was shared -- strike that.

11           Could you turn to page 10, please.  While we're doing

12   that, Mr. Tanabe, from time to time, when Freddie went on-site

13   for reviews, would lenders make presentations to Freddie on a

14   variety of different issues?

15   A.  Yes.

16   Q.  They would make presentations to Freddie on underwriting

17   issues or credit issues, is that fair?

18   A.  Yes.

19   Q.  Would they often use the vehicle of a document like this,

20   what's called a presentation deck to do it?

21   A.  Yes.

22   Q.  Is that what you would refer to this type of document, a

23   presentation deck?  Or what would you call it?

24   A.  This is the first time I've seen this document.  I'm not

25   sure how it was used.

1   Q.  But a document, PowerPoints like this were presented to

2   Freddie on a regular basis?

3               MS. LONDON:  Objection.

4               THE COURT:  Sustained.

5   Q.  Let's go to page 10.  Let's blow up CLUES, please.  Could

6   you read, Mr. Tanabe, out loud the information that is

7   contained in this Countrywide presentation on CLUES.

8   A.  "CLUES.  Countrywide loan underwriting expert system,

9   CLUES, is an automated underwriting system.  It has been

10  available for use by all divisions since February 1993.  CLUES

11  analyzes credit and financial information, and after applying

12  program specific rules, provides the user with an underwriting

13  decision of accept or a recommendation of refer to an

14  underwriter.  100 percent usage."

15  Q.  Thank you, Mr. Tanabe.  Let's turn to page 13, please, sir.

16  What is this section entitled, Mr. Tanabe?

17  A.  Underwriting controls.

18  Q.  Could you read the title of the first bullet underneath

19  that section.

20  A.  "Centralized platform moving to central operations

21  fulfillment."

22  Q.  We can blow up the bullets underneath that and if you can

23  read those out loud, please, Mr. Tanabe.

24  A.  "Supports all FSL production channels, retail branch, new

25  customer acquisition, national sales centers.  Central

DA33BAN1                    Tanabe - cross

1    operations teams are located in three centers, Chandler,

2    Richardson, and Rolling Meadows, and support national sales

3    centers.  Regional operations centers being built to support

4    field branch network.  Dedicated training staff supports new

5    hire on boarding and continuing education/authority

6    certification.  Policy and procedure enhancements are managed

7    and communicated via central bulletin database and notification

8    process."

9    Q.  Thank you.  Let's turn to page 16, please.  Let's blow up

10   the quality control section under underwriting controls.

11   Mr. Tanabe, could you read the first bullet, please.

12   A.  "Underwriting authority levels are assigned based upon

13   position and underwriting experience."

14   Q.  And the next one, sir.

15   A.  "Monthly quality rating is assigned to underwriters, middle

16   and senior underwriting managers, etc."

17   Q.  And the next one?

18   A.  "Loan files are assigned based upon individual underwriting

19   authority level and file type."

20   Q.  And the next, please.

21   A.  Authority matrix requires escalation for guideline

22   exceptions based upon signing authority.  See appendix."

23   Q.  And the next one, sir.

24   A.  "Exception approval process completed electronically,

25   capturing approver and specific exception type."

DA33BAN1                      Tanabe - cross

1   Q.  And the next one.

2   A.  "Condition sign off process completed electronically and

3   clear to close is issued once all underwriting conditions have

4   been properly cleared.  See appendix."

5   Q.  You see two references there to the appendix, correct?

6   A.  Yes.

7   Q.  Then the final bullet, please, sir.

8   A.  "Corporate risk management completes regular, random and

9   targeted audits."

10  Q.  If you can turn to page 20, please.  Page 20 is entitled

11  quality assurance and control.  Could you read the bullets

12  under quality assurance out loud, please, sir.

13  A.  "Prefunding review of loans within the manufacturing

14  process.  Earlier alerts to SOP adherence.  Selection of loans

15  after loan has been documents requested for closing.  Provides

16  opportunity to correct the missing document prior to funding."

17  Q.  Then could you also read the quality control section, the

18  QC section, please, sir.

19  A.  "Post-funding review.  Corporate completes the random and

20  target audits.  Investor kickouts are reviewed for compliance

21  and best practices.  Results are reported and used towards

22  making adjustments due to compensation and disciplinary issues.

23  Each finding is categorized SUS, high risk, limited risk, etc."

24  Q.  Thank you, Mr. Tanabe.  Let's turn now to the appendix that

25  was referenced previously.  The first part of the appendix is

```
 1   at page 26.  That's a little tough to read so we'll see how
 2   well we can blow that up.  Why don't we try to blow up the
 3   title first.
 4             Could you read that out loud, Mr. Tanabe.
 5   A.  "FSLD underwriter approval authority level matrix."
 6   Q.  Are you familiar with documents such as this, Mr. Tanabe?
 7   A.  I can't read it well enough to answer yes or no.
 8   Q.  Is it typical for lenders to have matrices that list out
 9   who can approve what type of loan?
10   A.  Typical --
11             MS. LONDON:  Objection.
12             THE COURT:  Sustained.
13   Q.  In your experience as head of credit -- I'm sorry,
14   Mr. Tanabe.  Remind me of your job title again?
15   A.  I'm a senior credit director.
16   Q.  In your experience as a senior credit director, have you
17   seen documents such as this before?
18             MS. LONDON:  Objection.
19             THE COURT:  Ground?
20             MS. LONDON:  Can we approach?
21             THE COURT:  Okay.
22             (Continued on next page)
23
24
25
```

DA33BAN1                        Tanabe - cross

1              (At the side bar)

2              THE COURT:  I had thought the prior objection was on

3    grounds of lack of personal knowledge and/or foundation.

4              MS. MAINIGI:  Me too.

5              MS. LONDON:  I thought we had an agreement that this

6    document was only going to be used for purely reading into the

7    record, and now he's starting to testify about, which I thought

8    your Honor had ruled against.

9              THE COURT:  So, the objection is to -- let me hear the

10   last question again.

11             (The record was read)

12             THE COURT:  What is the objection to that?

13             MS. LONDON:  I thought there was a representation made

14   that this document was purely being presented to him to read

15   into the record because he has no personal knowledge.  And it

16   is prejudicial.

17             THE COURT:  My understanding is it wasn't this

18   document that she was asking about, but was similar documents.

19   But actually --

20             MS. MAINIGI:  I was just trying to set the stage for

21   what a type of document like this is, your Honor.  It was a

22   purely foundational question.

23             THE COURT:  All right.  Given now that I understand

24   the whole thing, I'm going to sustain the objection.

25             (Continued on next page)

1          (In open court)

2          MS. MAINIGI:  Alex, can we blow up the title on the

3     side of the document as well, please.

4     Q.  Mr. Tanabe, could you read that out loud, please, sir?

5     A.  "Underwriting controls, centralized service control,

6     control/underwriting authority matrix."

7     Q.  Now, we'll have a challenge trying to read this document a

8     bit together.  I promise we will not spend more than a few

9     questions on it.  If we could just blow up the very top of the

10    page there, where it says prime and underwriter level one and

11    underwriter level two and so forth.  We can just blow up the

12    part that has prime there.

13          Mr. Tanabe, do you see underwriter level one through

14    underwriter level six described at the top of that chart?

15    A.  Yes.

16    Q.  If we go all the way to the bottle bottom under matrix

17    notes.  Let's blow up level one, please.  This is underwriter

18    level one.  Let's blow that up.

19          Can you read that, Mr. Tanabe, level one, barely?

20    A.  Yes.  "Associate underwriter with less than one year on job

21    time in the industry.  Level one also includes CLUES accept

22    loan specialist branch operations manager."

23    Q.  So level one indicates that level one also includes CLUES

24    accept loan specialists branch operations manager, correct?

25    A.  That's what this says.

1    Q.  Let's turn to the second page of the appendix, Mr. Tanabe.

2    What is the title of this page, Mr. Tanabe?

3    A.  "Underwriting controls, centralized services,

4    quality/condition sign off authority matrix."

5    Q.  On the left side, what are the titles?

6    A.  Authority criteria, level requirements, restrictions,

7    reason for repeal.

8    Q.  Let's blow up the title of the rows all the way across if

9    we can.  Okay.  So the first row CS condition sign off

10   authority one.  What is the title of that row?

11   A.  Condition sign off level one, CSO one.

12   Q.  And the second row, what is the title of that row?

13   A.  Condition -- the second row.  Column?

14   Q.  I'm sorry.  The second column, I apologize, yes.

15   A.  Condition sign off level two, CSO two.

16   Q.  And the third column, please, sir, what does that say?

17   A.  Prime CLUES accept CSO-PCA.

18   Q.  Okay.  And the fourth column, sir, what does that say?

19   A.  Prime CLUES accept/High-Speed Swim Lane, CSO-PCA/HSSL.

20   Q.  So the fourth column says prime CLUES accept/High-Speed

21   Swim Lane CSO-PCA/HSSL.  Correct?

22   A.  Correct.

23   Q.  Does the chart include authority criteria for High-Speed

24   Swim Lane in the first row underneath the first block

25   underneath?

1    A.   Right.   There is a row that is titled authority criteria.

2    I can't read it.

3    Q.   Could you read out loud the authority criteria for the

4    High-Speed Swim Lane.

5    A.   "Prime CLUES accept authority plus limited to max 80 LTV,

6    equal to or below 80 LTV, PCA HSSL may clear income related

7    conditions may CTC file.   Greater than 80 percent LTV must be

8    submitted to underwriting to clear income related conditions

9    and CTC file."

10    Q.   Thank you.   Is there a box for level requirements for HSSL,

11    Mr. Tanabe?

12    A.   Yes.

13    Q.   You can read that out loud, please, sir.

14    A.   "Same as prime CLUES accept CSO-PCA.   Additional required

15    training, title red flags live on line.   New.   Flood compliance

16    procedures new.   Appraisals new.   Stated income reasonability

17    to be developed.   Recommendation letter from first VP of ops

18    confirming requirements are met and recommending candidate for

19    authority."

20    Q.   Thank you.   Then is there a box for High-Speed Swim Lane

21    entitled restrictions.

22    A.   Yes.

23    Q.   If you can read that out loud, please, sir.

24    A.   "Exclusions.   EA 1/2/3.   Non-delegated mortgage insurance.

25    Flex saver ARM programs.   Loan amounts greater than 1 million.

DA33BAN1                    Tanabe - cross

1   Manufactured housing Edge property type 12.  Condominium

2   project approval purchase transaction.  Lease hold estate

3   ownership.  Trust vesting.  Non-arm's length transaction.

4   Lease option.  Purchase, CLUES refer.  Exceptions any type."

5   Q.  Thank you, Mr. Tanabe.  Then reason for repeal.  Could you

6   read that box, please.

7   A.  "Same as prime CLUES accept.  Reduction in authority at any

8   level may be based on audit findings.  Prefunding QA review of

9   randomly selected files.  Post-funding QC review of randomly

10  selected files."

11  Q.  Thank you, Mr. Tanabe.  You can set that document aside,

12  sir.

13           MS. MAINIGI:  May I approach, your Honor?

14           THE COURT:  Yes.

15  Q.  Mr. Tanabe, DX 60 is a presentation entitled manufacturing

16  quality initiatives dated April 24, 2008.  With a Countrywide

17  title on it.  Do you recognize this document?

18  A.  Yes.

19  Q.  Is this document from your files, Mr. Tanabe?

20  A.  Yes.

21  Q.  Was this presentation made to you by a set of individuals

22  from Countrywide, Mr. Tanabe?

23  A.  Yes.

24           MS. MAINIGI:  Your Honor, I ask that DX 60 be

25  admitted.

1    MS. LONDON:  No objection.

2    THE COURT:  Received.

3    (Defendant's Exhibit 60 received in evidence)

4    MS. MAINIGI:  If we can publish the first page,

5    please.

6    Q.  Was this an in-person presentation made to you, Mr. Tanabe,

7    do you recall?

8    A.  Not 100 percent certain, but I believe so.

9    Q.  There were several individuals from Countrywide that came

10   and made the presentation to you, sir?

11   A.  I believe so.

12   Q.  The presentation is entitled manufacturing quality

13   initiatives, is that right?

14   A.  Correct.

15   Q.  If you can turn to page two of that document, sir.

16   Entitled overview.  Is that right?

17   A.  Yes.

18   Q.  Could you please read the first bullet for us.

19   A.  "In response to market environment deterioration over the

20   past year, CFC has driven not only product change, but a

21   significant effort to improve manufacturing quality."

22   Q.  That was one of the things that the Countrywide people told

23   you when they made the presentation to you?

24   A.  Yes.

25   Q.  If you can read the second bullet, please.

1   A.   "Countrywide significantly updated existing controls and

2   procedures.  In addition, it has undertaken new initiatives to

3   address manufacturing quality and to reduce credit, fraud, and

4   collateral valuation risk."

5   Q.   That was another point that the Countrywide individuals

6   made to you when they made this presentation to you, sir?

7   A.   Yes.

8   Q.   The third bullet, please.

9   A.   "Particular emphasis is now being placed on ensuring that

10  for any and all programs that rely on borrower's statement of

11  their income, that income is reasonable and consistent with the

12  overall profile presented in the loan file."

13  Q.   That was another point that the Countrywide individuals

14  made to you when they presented to you, sir, correct?

15  A.   Correct.

16  Q.   The last bullet is referring to reasonability of stated

17  income essentially, is that correct?

18  A.   That's correct.

19  Q.   Stated income loans, Mr. Tanabe, were still investment

20  quality loans, correct?

21            MS. LONDON:  Objection.

22            THE COURT:  Ground?

23            MS. LONDON:  Foundation and vague.

24            THE COURT:  Sustained.

25            MS. MAINIGI:  I can establish the foundation

DA33BAN1                          Tanabe - cross

1    questions, your Honor.

2              THE COURT:   Okay.

3    Q.  As head of credit, Mr. Tanabe, I take it you were familiar

4    with stated income loans?

5    A.  Yes.

6    Q.  In fact, Freddie started purchasing stated income loans

7    back to at least the 1990s, is that correct?

8    A.  As run through our AUS, correct.

9    Q.  It purchased stated income loans from Countrywide, correct?

10   A.  Yes.

11   Q.  It purchased stated income loans from other lenders also,

12   is that right?

13   A.  Correct.

14   Q.  Is it fair to say that every large lender had its own

15   stated income type of product?

16             MS. LONDON:   Objection.

17             THE COURT:   Sustained.

18   Q.  Before buying a particular stated income product, Freddie

19   modeled that product, correct?

20   A.  We did some analytics to define what parameters the stated

21   income product had to be underwritten to, and based on those

22   parameters, we bought those loans.

23   Q.  As a general matter, stated income loans were viewed to be

24   riskier than full documentation loans, correct?

25             MS. LONDON:   Objection.

1          THE COURT:  Overruled.

2     A.  I don't -- you can't make that statement as a broad

3     statement that covers all stated income loans.  Freddie Mac had

4     a program within its LP that was a stated income that performed

5     better than full doc loans, because of the parameters that were

6     required to meet that program.

7     Q.  So there were some stated income products out there that

8     performed better than the full documentation products?

9     A.  The LP Accept Plus product.

10    Q.  Leaving that one aside, there were certainly a view that

11    stated income -- some subset of stated income loans were

12    riskier than full documentation loans, is that fair?

13          MS. LONDON:  Objection.

14          THE COURT:  Sustained on vagueness and form.

15    Q.  Was it your view, Mr. Tanabe, that certain stated income

16    products were riskier than full documentation products?

17    A.  Yes.

18    Q.  Did you understand that Freddie priced for that risk,

19    meaning it charged more to buy the stated income product from a

20    lender than the full documentation product?

21    A.  In some cases.

22    Q.  Did you understand, Mr. Tanabe, that stated income loans

23    were still investment quality loans?

24          MS. LONDON:  Objection.

25          THE COURT:  Overruled.

DA33BAN1                              Tanabe - cross

```
 1    A.  They were investment quality as long as the stated income
 2    loan was produced in compliance with the guide requirements.
 3    Not all were.  Some were.
 4    Q.  You knew Countrywide was selling stated income products to
 5    Freddie Mac, correct?
 6    A.  Correct.
 7    Q.  In fact, there are contractual provisions between the
 8    parties that allowed for that to occur, correct?
 9    A.  Correct.
10    Q.  Is it fair to say that during the time period at issue,
11    Freddie -- you understood that Freddie Mac wanted to purchase
12    stated income products?
13              MS. LONDON:  Objection.
14              THE COURT:  Ground?
15              MS. LONDON:  Relevance.
16              THE COURT:  Well, I will allow this question, although
17    I think it is a close question on relevance, but I will allow
18    this question.  If counsel is intending to go down a line of
19    questions, then I think we need a side bar.
20              MS. MAINIGI:  No, your Honor.  I can make that the
21    last one in this area.
22              THE COURT:  Okay.  You may answer.
23    A.  Could you repeat the question, please?
24    Q.  Let me try to ask it again.  Did you understand,
25    Mr. Tanabe, that Freddie Mac wanted to purchase stated income
```

1   products?

2   A.  I characterize our opinion as we did purchase stated income

3   products.  I wouldn't characterize our position as wanting to.

4   Q.  Freddie Mac and Countrywide contracted annually, is that

5   right?

6   A.  For the most part.

7   Q.  So, every year, Freddie Mac and Countrywide each made a

8   decision whether they wanted to contract with the other again,

9   is that right?

10  A.  Correct.

11  Q.  If at any time Freddie Mac was unhappy with the quality of

12  Countrywide's loans or services, it could have chosen to not

13  contract again with Countrywide, correct?

14  A.  Correct.

15  Q.  It could have chosen to terminate the contract early,

16  correct?

17  A.  With due notice.

18  Q.  But it could have chosen with due notice to cancel the

19  contract early, correct?

20  A.  Correct.

21  Q.  But is it fair to say, Mr. Tanabe, that Freddie Mac still

22  buys loans from Bank of America today?

23          MS. LONDON:  Objection.

24          THE COURT:  Sustained.

25  Q.  Does Freddie Mac still have a relationship with Bank of

DA33BAN1                    Tanabe - cross

1    America, Mr. Tanabe?

2              MS. LONDON:  Objection.

3              THE COURT:  Sustained.

4              MS. MAINIGI:  No further questions, your Honor.

5              THE COURT:  All right.  Counsel.

6              MR. HEFTER:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. HEFTER:

9    Q.  Good morning, Mr. Tanabe.  My name is Michael Hefter and I

10   represent Rebecca Mairone.

11             You have never met Ms. Mairone personally, correct?

12   A.  Correct.

13   Q.  You've never spoken to her by telephone?

14   A.  Correct.

15   Q.  You've never corresponded with her by e-mail?

16   A.  Correct.

17   Q.  Or other type of letter?

18   A.  Correct.

19   Q.  You've never had any meeting with Ms. Mairone, correct?

20   A.  Correct.

21   Q.  You were not aware of my statement Ms. Mairone made on

22   behalf of Countrywide to Freddie Mac, correct?

23   A.  Correct.

24             MR. HEFTER:  I have no further questions, your Honor.

25             THE COURT:  Any redirect?

1           MS. LONDON:  Yes, your Honor.

2           THE COURT:  Go ahead.

3    REDIRECT EXAMINATION

4    BY MS. LONDON:

5    Q.  Mr. Tanabe, can you pull out DX 43.

6    A.  I have it.

7    Q.  The information -- is the information contained in this

8    document based on information that Countrywide would have

9    provided to Freddie Mac?

10   A.  In part.

11   Q.  What else would it have been based on?

12   A.  These reviews were completed based off of a review of

13   policies and procedures as provided by Countrywide combined

14   with field testing performed by the auditor.

15   Q.  When performing a site review, what kinds of things does

16   Freddie review?

17   A.  The typical review includes those areas identified in the

18   summary report section.  We also had, I'll say, specialized

19   reviews that deviated from these areas.

20   Q.  Can you give some examples of specialized reviews.

21   A.  There is really two broad types of specialized review.  One

22   is a review of particular function more in-depth because of our

23   concern regarding that function.  Like an underwriting function

24   or those functions listed on in the summary section.  A second

25   type of different review would be those of I'll say atypical

1  lending practices.

2  Q.  Mr. Tanabe, could you also pull out Defendant's Exhibit

3  4036.  You testified you're not familiar with this document, is

4  that correct?

5  A.  Yes.

6  Q.  Even though you're not familiar with it, can you tell what

7  kind of review this was?

8  A.  Not with full confidence.

9  Q.  Were you present for this presentation?

10  A.  No.

11  Q.  To your knowledge have you ever used any of the information

12  in this presentation as part of your credit assessments?

13          MS. MAINIGI:  Objection.

14          THE COURT:  Sustained.

15  Q.  You read sections of this presentation out loud today, is

16  that correct?

17  A.  Correct.

18  Q.  Was any of the information you read out loud today

19  information that you had known prior to reading it?

20          MS. MAINIGI:  Objection.

21          THE COURT:  Ground?

22          MS. MAINIGI:  Vague.  "Any of the information."

23          THE COURT:  That was the problem with the prior

24  question, but not this one.  Overruled.

25  A.  Not specific to this review.  Some of the information was

DA33BAN1                        Tanabe - redirect

1    general industry information that I'm familiar with.

2    Q.   Turning back to 43, Defendant's Exhibit 43.  Do you have

3    that in front of you?

4    A.   Yes.

5    Q.   If you can turn to page 13.  You see the phrase in the key

6    control section it says "AUS approve loans with typical

7    underwriting conditions"?

8    A.   Yes.

9    Q.   What are typical underwriting conditions?

10   A.   Underwriting conditions are requirements that the

11   underwriter places before the loan can be closed.  It could be

12   a request like get an updated paycheck.

13   Q.   Do you see the term "junior underwriters"?

14   A.   Yes.

15   Q.   What is a junior underwriter?

16           MS. MAINIGI:  Objection.

17           THE COURT:  Overruled.

18   A.   I'm not 100 percent sure relative to the reference to

19   junior underwriters in this doc.

20   Q.   Is it a phrase that's used at Freddie Mac?

21   A.   Infrequently.

22   Q.   Do you have an understanding of what a loan specialist is?

23   A.   A general one, yes.

24   Q.   Is a loan specialist the same as a junior underwriter?

25           MS. MAINIGI:  Objection.

1          MR. HEFTER:  Objection.

2          THE COURT:  Sustained.

3   Q.  Have you ever used the term "junior underwriter" to refer

4   to a loan specialist?

5          MR. HEFTER:  Objection.

6          THE COURT:  Sustained.

7   Q.  This section we are looking at is entitled underwriting,

8   correct?

9   A.  Yes.

10  Q.  What was the purpose of looking at the underwriting as part

11  of this review?

12  A.  Proper underwriting is a key component of investment

13  quality.

14  Q.  Why is that?

15  A.  To ensure that the loan being sold to us was produced in a

16  manner consistent with our requirements.

17  Q.  Could you turn to Defendant's Exhibit 60 that you were

18  previously shown.  This is a presentation entitled

19  manufacturing quality initiatives, is that correct?

20  A.  Correct.

21  Q.  Why was Freddie Mac receiving information about

22  manufacturing quality initiatives from Countrywide?

23         MS. MAINIGI:  Objection.

24         THE COURT:  Ground?

25         MS. MAINIGI:  Foundation.

DA33BAN1                        Tanabe – redirect

1              THE COURT:  Overruled.

2   A.  Prior to the presentation of this document, Freddie Mac had

3   had conversations with Countrywide regarding their need to

4   improve their manufacturing quality.

5   Q.  What does "manufacturing quality" mean?

6   A.   It is an industry term meaning how well they produce the

7   loan.  We've used the term NAQ, or the acronym NAQ.  NAQ and

8   manufacturing quality are pointing to the same subject.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. LONDON:

2   Q.  Does manufacturing quality include how a loan is

3   originated?

4   A.  A large part.

5   Q.  Does it include underwriting?

6   A.  Yes.

7   Q.  You testified that certain stated income loans are risker

8   than other loans, is that correct?

9   A.  Yes.

10  Q.  You stated income loans require -- do they require

11  underwriting?

12  A.  Yes.

13  Q.  And do they need to be underwritten correctly?

14  A.  To be eligible for sale.

15          MS. MAINIGI:  Objection.

16          THE COURT:  I think it's vague, sustained.

17  Q.  Is the quality of underwriting important with regard to

18  stated income loans?

19          MR. HEFTER:  Objection.

20          THE COURT:  Overruled.

21  A.  More so than full document loans.

22  Q.  Is it important for a qualified personnel to underwrite

23  stated income loans?

24  A.  Yes.

25  Q.  Why is that?

1  A.  It's harder to make the judgment of income adequacy because

2  there's not a document that proves out what income a borrower

3  has made.  It's based on a reasonableness test as opposed to

4  documentation.

5  Q.  If stated income loans are not properly underwritten, is

6  there an increased risk they won't be investment quality?

7            MR. HEFTER:  Objection.

8            MS. MAINIGI:  Objection.

9            THE COURT:  Ground?

10           MR. HEFTER:  Leading, hypothetical, lack of

11 foundation.

12           MS. MAINIGI:  Speculation.

13           THE COURT:  I think given his position and knowledge

14 this is calling for a comment on his experience.  With that

15 understanding, I will allow the question.

16 A.  Could you repeat the question, please?

17 Q.  Sure.  If stated income loans are not properly

18 underwritten, is there an increased risk they won't be

19 investment quality?

20           THE COURT:  In your experience.

21           THE WITNESS:  In my experience.

22 A.  In my experience, my answer would be yes.

23 Q.  Were you ever told that Full Spectrum Lending was

24 processing stated income loans without using underwriters?

25           MR. HEFTER:  Objection, your Honor.

DA3TBAN2                          Tanabe - redirect

```
 1                THE COURT:  Ground?

 2                MR. HEFTER:  Hearsay.

 3                THE COURT:  No.

 4                MS. MAINIGI:  I have another objection.

 5                THE COURT:  I assume it's intended to get a

 6      non-hearsay response.

 7                MR. HEFTER:  Thanks.

 8                MS. MAINIGI:  Your Honor, my objection is it assumes

 9      facts that are not in evidence.

10                THE COURT:  Overruled.

11      A.  Could you repeat the question?

12      Q.  Sure.  Were you ever told that Full Spectrum Lending was

13      processing stated income loans without using underwriters?

14      A.  Not until my deposition.

15      Q.  And that's your deposition in this case, is that correct?

16      A.  Yes.

17      Q.  Could you turn back to Defendant's Exhibit 43 one more

18      time.  If could you turn to page 16, please.  Do you see a

19      section at the bottom entitled quality control?

20      A.  Yes, I do.

21      Q.  And what is the ranking for quality control that's listed?

22      A.  Marginal.

23      Q.  What does a marginal ranking mean?

24      A.  Less than satisfactory.

25      Q.  Could you read for us the description after rating
```

DA3TBAN2                        Tanabe - redirect

1    justification?

2    A.   BORM made multiple requests to review copies of

3    post-funding quality control management reports.  CHL declined

4    to provide the information.  The management reports requested

5    are key to validating representations management provided

6    during interviews.  Without this information, BORM is unable to

7    validate satisfactory controls exist throughout the entire

8    quality control process, and therefore rates the quality

9    control as marginal.

10   Q.   Were you involved in any of the requests for quality

11   control reports from Countrywide?

12   A.   Not directly.

13   Q.   Were you indirectly involved?

14   A.   I don't remember if I was indirectly involved.

15   Q.   Is Countrywide required to turn over to Freddie Mac --

16           MR. HEFTER:  Objection.

17           MS. MAINIGI:  Objection.

18           MR. HEFTER:  Calls for a legal conclusion.

19           THE COURT:  Sustained.

20   Q.   In your role as a senior credit director, do you review

21   post-funding quality control funding reports?

22   A.   Whose?

23   Q.   From Countrywide.

24   A.   No.

25   Q.   Is there a group at Freddie Mac that's responsible for

1   reviewing these management reports?

2   A.   The core group uses these reports in the production of

3   their review.

4   Q.   The core group, you said?

5   A.   Yes.   The EORM.   Core is the new name for the same group.

6   Q.   We talked a little bit about site reviews in general, is

7   that correct?

8   A.   Yes.

9   Q.   Was part of the purpose of a site review of a lender to get

10  a full picture of the credit quality of the lender?

11           MS. MAINIGI:   Objection.

12           THE COURT:   Ground?

13           MS. MAINIGI:   Leading.

14           THE COURT:   Well, it is arguably leading, but this is

15  a witness who has already shown that he is not affected by

16  leading, so overruled.

17  A.   Could repeat the question, please?

18  Q.   Sure.   Was part of the purpose of the site reviews of

19  lenders to get a full picture of the lender's credit quality?

20  A.   I think you're talking about the external operating, the

21  EORM reviews.   We had multiple types, this being one.   We also

22  did site reviews for QC.   Just relative to EORM, it was

23  intended to give a broad picture on everything, not just credit

24  but everything but relative to process.   It was a process

25  pointed review.

1    Q.   And process includes the manufacturing quality that we've

2    discussed?

3    A.   Yes.

4    Q.   And that includes underwriting?

5    A.   Yes.

6    Q.   And underwriting is relevant to credit quality, is that

7    correct?

8    A.   Yes.

9    Q.   Did the site visits that we have been discussing, did they

10   include a loan review?

11   A.   It included file testing.  I would stop short of calling it

12   a full loan review because it is very specific relative to

13   specific functions.

14   Q.   Can you explain that a little bit more?

15   A.   Sure.  In the summary report you will see the various

16   categories.  A file contains a bunch of information, including

17   the underwriting information.  The file testing that these

18   folks did was on the underwriting section of the file, not

19   necessarily the complete file.

20   Q.   Thank you.  Was the file review that was done relating to

21   underwriting an important part of assessing the underwriting

22   quality?

23   A.   The integrity of the underwriting process is the way I

24   would phrase their purpose, assessing the integrity of the

25   underwriting process.

1    Q.  What do you mean by the integrity of the underwriting

2    process?

3    A.  Do they have the right people fully trained placed in an

4    environment where good decisions could be made, good judgment

5    and decisions could be made.

6    Q.  Is it important in doing a file review that we have just

7    been discussing that a lender be forthcoming and truthful in

8    providing the information?

9            MR. HEFTER:  Objection.

10           THE COURT:  Ground?

11           MR. HEFTER:  Leading, your Honor.

12           THE COURT:  Well, that one is really fairly blatant

13   leading, although it also suffers from the platitudinous

14   quality.  But I suppose a non-leading question would be is it

15   important in doing it -- is it more important in doing a file

16   review whether the lender be truthful or untruthful?

17           MS. MAINIGI:  If you phrase it that way, your Honor, I

18   have no objection to it.

19           MR. HEFTER:  I'll withdraw.

20           THE COURT:  Anyway, you may answer the original

21   question.  Is it important in doing a file review that a lender

22   be forthcoming and truthful?  Yes or no.

23           THE WITNESS:  Clearly, yes.  The rep and warrant model

24   is built on that.

25           THE COURT:  I'm so shocked to hear that answer.

DA3TBAN2                     Tanabe - redirect

1   BY MS. LONDON:

2   Q.  In assessing the credit risks of loan origination

3   processes, are there specific aspects of the loan origination

4   process that would be of particular importance to you?

5   A.  The answer is yes, and it varies based on how the

6   underwriting is completed.  In situations where an automated

7   underwriting system is used, in my mind, a critical piece is

8   how accurate is the information that's placed into the AUS.  If

9   inaccurate information is placed in the AUS, it invalidates the

10  AUS's risk classification because it was based on inaccurate

11  information.  So in my mind that's key.  In terms of manual

12  underwriting, it becomes -- it's all important, the assessment

13  of the accuracy of the information and then the judgment as to

14  what that information leads the underwriter to conclude

15  relative to making the loan or not.

16  Q.  Focusing on the automated underwriting piece of your

17  answer, you talked about the accuracy of the information, is

18  that correct?

19  A.  Correct.

20  Q.  What are steps that lenders take to ensure that the

21  information going into the AUS is accurate?

22          MS. MAINIGI:  Objection.

23          THE COURT:  Counsel, come to the side bar.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DA3TBAN2                          Tanabe - redirect

1                    (At side bar)

2                    THE COURT:  How much longer to you have on this

3     witness?

4                    MS. LONDON:  Fifteen minutes.

5                    THE COURT:  You're doing -- that's an awful lot of

6     redirect.

7                    MS. MAINIGI:  I didn't hear what you said.

8                    MS. LONDON:  Fifteen minutes.

9                    THE COURT:  I'm going to give the jury their

10    mid-morning break because I don't think they can wait for that,

11    I thought we might be able to finish this witness, and then

12    we'll take up any objections at that time.

13                   MS. LONDON:  Thank you.

14                   (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, we're going to give

3      you your mid-morning break at this time.  We'll take 15

4      minutes.

5           (Jury not present)

6           THE COURT:  Please be seated.

7           So what was the objection to the last question?

8           MS. MAINIGI:  Your Honor, I believe the question was

9      something to the effect of what are the steps that lenders take

10     to ensure accuracy of what is going into the AUS, and it's a

11     foundational objection.

12          THE COURT:  If that was the question, then I agree

13     with that, it lacks foundation.

14          Now I think the only letter briefed matter that is

15     complete and ready for decision is the question of whether the

16     government can introduce evidence that Countrywide made

17     approximately $165 million from selling Hustle loans to Fannie

18     Mae and Freddie Mac.  So let me hear any oral argument starting

19     with defense counsel.

20          MR. SINGER:  Thank you, your Honor, Greg Singer for

21     the banks.

22          The government has submitted a response to our letter.

23     I won't repeat what's in our letter.  But the one thing that

24     was most striking to me about the government's letter is that I

25     didn't hear -- didn't see anything defending the ability to put

1    a number, an amount of gain that the banks --

2            THE COURT:  Their point is -- they have two prongs to

3    their claim that it's relevant, one is motive and one is

4    evidence of intent.  With respect to motive, how can the jury

5    assess whether the motive is a strong motive or a weak motive

6    if it doesn't know the magnitude?

7            MR. SINGER:  Your Honor, to calculate an amount going

8    to motive, the jury has no context to understand that amount.

9    That's going to open up the door to a lot of responsive

10   evidence about how 165 million plays into the overall profits,

11   revenues of the bank.  They don't have any context for that.

12           In any event, the fact of gain doesn't show motive

13   either.  Even if we were not talking about a dollar figure,

14   your Honor, even the mere fact of gain or lack thereof from

15   selling loans is not probative of motive.  Countrywide was in

16   the business of selling loans to make a profit, and there is

17   certainly nothing wrong with that.

18           THE COURT:  The government's contention is at a point

19   in time when the previous kinds of loans that they had been

20   selling was declining and coming under considerable jeopardy,

21   Countrywide attempted to repair that gap, at least in part, by

22   passing off, on the government's views, better quality loans

23   that in fact were still suspect in numerous ways.  And to show

24   that this wasn't just something that was immaterial or they did

25   accidently on occasion here or there, they want to show, for

1    both motive and intent purposes, the actual magnitude of what

2    was sold.  And that may open the door to whether that magnitude

3    was really that important in the context of the bank or this

4    department of the bank or anything else like that.  I think

5    there were already words to that effect in Mr. Sullivan's

6    opening statement, if I'm correctly recollecting.  I don't know

7    whether it opens that door or not, but I don't see why it's not

8    probative of both motive -- both the strength of the motive and

9    the nature of the intent.

10            MR. SINGER:  Your Honor, there's nothing to separate

11   the motive to profit from selling these loans from the motive

12   to profit from selling any loans.

13            THE COURT:  That's a little bit like saying if I sold

14   you -- if I'm a car dealer and I sell you good cars, I have no

15   motive to sell you lemons and pass them off as good cars.  That

16   doesn't make any sense at all.

17            MR. SINGER:  But your Honor, we're not talking

18   about -- I think it's a slightly different situation.

19            THE COURT:  Why?

20            MR. SINGER:  We're looking -- take the situation in a

21   pleading of motive and opportunity in a securities case, for

22   example, the Second Circuit has held that you can plead a

23   plausible case of intent in a securities case by pleading

24   motive and opportunity.  But what does motive and opportunity

25   mean in the corporate setting?  It is not enough simply to

1    plead that a corporate officer or corporate officers in general

2    had motives to increase the profits of their company by making

3    fraudulent statements, because the motive to increase profits

4    by making fraudulent statements is no different in kind --

5              THE COURT:  That's a totally different thing.  The

6    background on that is that the law normally requires that proof

7    of intent be pled with particularity.  If though rule 9(b)

8    doesn't require it, both the PSLRA and also case law in the

9    Second Circuit says you have to come forward with enough

10   evidence from which a reasonable person could infer a serious

11   likelihood of fraudulent intent.  The Second Circuit then

12   starting, about maybe 60, 70 years ago, if not earlier, carved

13   out an alternative to that, because it's extremely difficult to

14   make that kind of showing at the time you're pleading your

15   initial complaint, and they carved out the motive and

16   opportunity alternative.  One, incidentally, that I don't

17   believe has ever been approved by the Supreme Court, but that's

18   a different question.

19             The reason motive and opportunity were held to very

20   high standards of the sort you're now describing in that

21   context was because it was a substitute for the equally high

22   pleading requirement that had to be made in a fraud -- in a

23   securities fraud case.  It has nothing to do with the much

24   lower threshold for admissibility of evidence under Rules 401

25   and 402 as relevant to the issue of intent and motive.  It's an

DA3TBAN2                       Tanabe - redirect

1     apples and oranges comparison, or maybe in light of my prior

2     example, it's an apples and lemons comparison.

3              MR. SINGER:  Your Honor, your statement of the law of

4     how we got to motive and opportunity in securities cases I

5     entirely agree with, and I was not suggesting that standard is

6     what controls here.  What I was trying to express is in

7     discussing motive in those cases, I think the reasons why the

8     courts -- what the courts have said in considering motive to

9     profit are illuminating here, because the courts have said it

10    does not show anything out of the ordinary that a corporate

11    officer has a motive to profit.  It does not show a fraudulent

12    motive.

13              And here we have a situation where --

14              THE COURT:  All right, go ahead, please.  I didn't

15    mean to interrupt, go ahead.

16              MR. SINGER:  I think that for this to be relevant, and

17    particularly for it to be not significantly more prejudicial

18    than probative, there has to be something to the idea of a

19    profit motive, and particularly this dollar figure of profit

20    motive, that shows more than that the Countrywide FSL

21    executives had different motives or intents than any other

22    business people in the world.  Because there can't be any

23    dispute, and we're not disputing that the FSL executives wanted

24    to make a profit from selling -- for their company from selling

25    loans to Fannie and Freddie.  That's undisputed.

 1           THE COURT:  First of all, I don't see the prejudice.
 2   What you're really claiming is prejudice is a relevant fact
 3   issue, which is materiality and strength of motive.  The
 4   government in their letter points out, and this is what I was
 5   referring to a minute ago, but I see is now specifically cited
 6   in their letter, that in bank counsel's opening he refers to,
 7   "94 branches, almost 200,000 loans that they pushed through
 8   their system, 2007, to the extent of $31 billion worth."
 9           So you have that argument to make to the jury,
10   assuming you put in the appropriate evidence -- this was
11   opening statement, but assuming the evidence comes in, how
12   could this possibly have motivated them when they're selling
13   this huge number of loans?  That's an argument that the jury
14   will assess, but it's not -- it doesn't render this premise
15   prejudicial and doesn't render this -- if anything, your
16   evidence pulls the sting from any conceivable claim of
17   prejudice and doesn't render it irrelevant.
18           MR. SINGER:  We can try to take the sting away, as
19   Mr. Sullivan did in the opening statement, by saying what we
20   will say in response to it, but frankly we shouldn't have to.
21           THE COURT:  I don't see the prejudice.  I'm sorry, the
22   prejudice under the rule doesn't come from, in effect, the
23   probative value of the evidence.  If it was -- I mean all
24   you're saying is because it's a large number of dollars than
25   most jurors experience, but when they hear the much larger

1    number of dollars involved they put it in context.  I don't

2    really think there's any prejudice.

3              MR. SINGER:  Your Honor, we hope they can put it in

4    context.  We think it's difficult, when they hear large numbers

5    like that, to not be shocked by the number 165 million not in

6    overall proportion.

7              But to move to a couple other points that I think are

8    also persuasive here, your Honor has already excluded evidence

9    of a couple of other points that I think are analogous here,

10   one is the evidence of loss, and the other is evidence of

11   individual compensation.

12             THE COURT:  The loss is a totally different question.

13   I excluded that on a number of grounds, but just, for example,

14   on the ground that there was in the marketplace -- volatile

15   marketplace where this all occurred, there was no way that a

16   jury could assess the meaning of loss.  It would be entirely

17   speculative.  That's clearly not true of gain.

18             MR. SINGER:  That assumes, your Honor, that every

19   dollar that Countrywide received from selling a HSSL loan was a

20   dollar it would otherwise not have received.  And I don't think

21   that's a fair assumption because I don't think there's any

22   dispute that many, if not most, of the HSSL loans were

23   perfectly good quality loans.  Perhaps they weren't

24   underwritten the way the government believes they should have

25   been.

1            THE COURT:  If in fact these were loans that -- I mean

2     this goes again to the question of materiality, which is

3     obviously a disputed issue in this case, but if these were

4     loans that the bank either -- excuse me, that Freddie Mac and

5     Fannie Mae either would not have purchased if they had known

6     the facts, or at least would have considered that as important

7     in the mix in determining whether or not to purchase, then the

8     fact that they did purchase is a dollar gained that they

9     otherwise would not have.

10           MR. SINGER:  Put another way, hypothetically, if the

11    loans had been -- if an underwriter has been used on the same

12    pool of loans that the government claims, somebody entitled

13    "underwriter" instead of a "loan specialist," that underwriter

14    would have approved 99 percent of the same loans or 55 percent

15    of the same loans, then one cannot say that the whole $165

16    million is a gain.  So I think it's similar to your Honor's

17    view of loss.

18           THE COURT:  Talking about speculation, if your

19    argument is if some hypothetical underwriter, who is never part

20    of the approval of these loans, had in fact been asked to

21    approve these loans, he or she would have approved these loans,

22    ergo the fact that it wasn't an underwriter means that that

23    fact of it not being an underwriter is immaterial.  I have very

24    great doubts about whether you're going to get that into

25    evidence at all.

1    MR. SINGER:  Your Honor --

2    THE COURT:  But assuming you got it into evidence, I

3    don't think it takes away from the fact this is a genuine

4    disputed issue for the jury.

5    MR. SINGER:  Your Honor, the government's claim is

6    that every dollar received from HSSL loan is some kind of ill

7    gotten gain and profit motive.  I think what is speculative is

8    that proposition, because there is no evidence that we have

9    heard that all of the HSSL loans were bad, or even --

10    THE COURT:  I come back to my -- you want to dismiss

11    it, my car analogy.  So someone is a successful car salesman,

12    and he sells a lot of good cars, and then he also sells a lot

13    of lemons, which he disguises fraudulently as good cars, and

14    you're saying that because he sells lots of good cars he had no

15    motive to also gain additional money by selling lemons

16    disguised as good cars.  You're free to make that kind of

17    argument to the jury, but I suggest that it's not a basis for

18    my keeping the evidence of his motive to sell the lemons

19    disguised as good cars out of the case.

20    MR. SINGER:  Going back to my prior point, that

21    assumes that every agent that sells a loan is a lemon car.

22    THE COURT:  No, I set it up quite to the contrary.

23    The agent is selling both good cars and lemons.

24    MR. SINGER:  But the $165 million is all the cars,

25    it's not just the lemons.

1           THE COURT:  Not on the government's theory.  The

2    government's theory is these are all bad loans, or a vast

3    percentage of them are.

4           MR. SINGER:  In that case, I suggest there's no

5    evidentiary support for the government's theory.

6           THE COURT:  We just had a witness testify that what,

7    over 50 percent were.

8           MR. SINGER:  But the 165 million is a hundred percent.

9           THE COURT:  So you'll say ladies and gentlemen, it's a

10   measly 80 million.

11          MR. SINGER:  But the larger point that I'm trying to

12   make, your Honor, is you can't quantify precisely what the

13   profit is and correlate that to some motive of profitability.

14          THE COURT:  I actually don't think that's true.  If I,

15   as I must for these purposes, take all reasonable inferences

16   favorable to the government that are a reasonable juror could

17   infer, if the government contends that, say, 53 percent of the

18   loans were bad, and the total profit was 165 million, what's

19   53 percent of 165, or at least that's a close enough

20   approximation that a jury could infer whether that's enough to

21   cause the salesperson to sell lemons.

22          MR. SINGER:  At a minimum they should be saying

23   whatever 53 percent of 165 million is.

24          THE COURT:  Whenever this comes in, you'll have

25   cross-examination.

DA3TBAN2                              Tanabe - redirect

1              All right.  Anything else?

2              MR. SINGER:  Thank you.

3              THE COURT:  OK.  I will allow the government to

4     introduce evidence of the profit.

5              MR. HEFTER:  Your Honor, this is a nice launching

6     point for me to seek your Honor's guidance and permission under

7     your rules for any anticipated Rule 50 motions.

8              THE COURT:  Yes, so when the government finishes its

9     case, which judging from the matter in which it's questioning

10    the instant witness, may be 2019 or so, we will hear

11    immediately any motions at that time.

12             MR. HEFTER:  And would your Honor prefer seeking leave

13    to put in a written submission?

14             THE COURT:  You're welcome to do it in advance, but

15    I'm not going to hold things up.  I will rule right then and

16    there after hearing oral argument.  If you feel now that you

17    have a basis for saying they haven't shown X or haven't shown Y

18    and you want to put in a letter brief, sounds like they might

19    finish tomorrow, although I'm not too optimistic, but sure, I

20    will accept those briefs.  Not tons of briefs.

21             MR. HEFTER:  I understand.

22             THE COURT:  One five-page, single-spaced letter.

23             MR. SINGER:  We would also like to.

24             THE COURT:  Yes.

25             MS. MAINIGI:  Your Honor, I have the case law you

1    requested.  I will give it to Mr. King after.

2              THE COURT:  Yes, thank you very much.

3              MS. NAWADAY:  Your Honor, and we have a responsive

4    letter brief on the Hustle.

5              THE COURT:  Yes.  This is so exciting.

6              And did the government have any citations they wanted

7    to bring to my attention on the issue that defense counsel

8    just -- looks like some fairly weak case law.  There are two

9    decisions by -- well, there's a decision, there are two --

10   there's a decision by United States magistrate judge in

11   Massachusetts, that's certainly well worth looking at, and

12   there's a decision by Judge -- the late Judge Leisure of this

13   Court, who just recently passed away, who was certainly one of

14   the ornaments of this Court, a wonderful judge and a wonderful

15   human being, and I will certainly take that seriously, but then

16   we're reduced to two decisions by Judge Rakoff.  Couldn't do

17   any better than that?

18             MS. MAINIGI:  We couldn't.  That's the best we could

19   do.

20             THE COURT:  Did you give a copy to the government?

21             MS. MAINIGI:  Yes, this morning.

22             THE COURT:  So I want to decide this by the end of

23   today if possible.

24             MR. ARMAND:  Your Honor, we can provide some citations

25   later today.

DA3TBAN2                          Tanabe - redirect

1              THE COURT:  OK.  Very good.  Let's take five minutes

2    and we'll bring the jury back.

3              (Recess taken)

4              (Jury present)

5              MS. LONDON:  May I proceed?

6              THE COURT:  OK, counsel.

7    BY MS. LONDON:

8    Q.  Mr. Tanabe, as part of your role as senior credit director

9    at Freddie Mac, are you responsible for assessing the

10   manufacturing quality of lenders?

11   A.  I wasn't responsible for performing the review that led to

12   the NAQ rate, which is the indication of manufacturing quality.

13   I was a user of the information that was created by our own

14   records.

15   Q.  As part of your role, did you make a credit determination

16   about lenders?

17   A.  I was part of a group that made the credit decisions on

18   lenders, yes.

19   Q.  Would the qualifications of personnel performing

20   underwriting tasks be important to you as part of making the

21   credit determination about a lender?

22             MS. MAINIGI:  Objection.

23             THE COURT:  Overruled.

24   A.  Having qualified staff is a requirement of Freddie Mac

25   eligibility.  It's something that is on the application form.

DA3TBAN2                    Tanabe - redirect

1    It would be a concern to me.  There are others within Freddie

2    Mac that are more expert in making the judgment as to whether

3    person A is qualified or not, but it is important to me.

4              MR. HEFTER:  Objection, your Honor, I will move to

5    strike the middle sentence.

6              THE COURT:  I understand what you're saying but I will

7    let it stand.

8    Q.  Would the qualifications of personnel performing

9    underwriting tasks at a lender have been a factor in your

10   recommendations regarding purchasing loans from that lender?

11             MR. HEFTER:  Objection.

12             MS. MAINIGI:  Objection, your Honor.

13             THE COURT:  Overruled.

14             MR. HEFTER:  Your Honor, could I make a cumulative

15   objection as well?

16             THE COURT:  Pardon?

17             MR. HEFTER:  Could I make a cumulative objection as

18   well?

19             THE COURT:  Cumulative objection?

20             MR. HEFTER:  I think we have heard this from this

21   witness already.

22             THE COURT:  I see.  OK.  I wasn't sure whether you

23   were saying asked and answered or saying you wanted to object

24   repeatedly.  I will overrule that.  But I am concerned,

25   counsel, that we're getting a little bit repetitive here.  So

1  bear that in mind.  But you may answer the question.

2  A.  The competency of the people making loan decisions is

3  clearly a factor.  Incompetent people will create ineligible

4  loans which will then lead to higher NAQ rates.

5  Q.  Would the independence of these personnel have also been a

6  factor?

7        MS. MAINIGI:  Objection, your Honor.

8        MR. HEFTER:  Objection.

9        THE COURT:  Sustained.

10 Q.  Would the speed at which a loan was being processed at a

11 lender have been a factor in your recommendation regarding

12 purchasing loans from a lender?

13       MS. MAINIGI:  Objection, your Honor.

14       MR. HEFTER:  Objection.

15       THE COURT:  I'm going to allow that.  You may answer.

16 A.  Could you repeat the question, please?

17 Q.  Sure.  Would the speed at which loans had been processed

18 have been a factor in your recommendations regarding purchasing

19 loans from a lender?

20 A.  My number one consideration in this area is how well the

21 loan was underwritten.  Did it meet the guide terms or not.

22 Failure to meet the guide terms could be caused by any number

23 of different factors, including any quota in terms of the

24 number of accounts or number of loans one had to process.  So

25 in the end, it's not necessarily speed, it's the quality that

1    would be the consideration.

2    Q.  You testified yesterday that you had regular communications

3    with Countrywide representatives in the 2007 to 2008 time

4    period, correct?

5    A.  Correct.

6    Q.  Did anyone at Countrywide in the 2007 to 2008 time period

7    ever tell you about a new loan origination process in Full

8    Spectrum Lending division for prime loans?

9              MS. MAINIGI:  Objection.

10             THE COURT:  Ground?

11             MS. MAINIGI:  Well, first, foundation.  I don't think

12   we established that he had conversations with people at Full

13   Spectrum.  And second, I do think it's cumulative of what was

14   done yesterday.

15             MR. HEFTER:  And your Honor, I would add relevance.

16             THE COURT:  Well, the foundation objection is

17   overruled because assuming hypothetically, which may or may not

18   be the case, that this was a basis for an obligation to say

19   something and no one said anything, hypothetically, therefore

20   the fact that he did not have a conversations with anyone would

21   not be a foundational objection.

22             In terms of cumulative of what was said yesterday, I

23   think that's fair.  Sustained.

24   Q.  Did anyone at Countrywide in 2007 or 2008 ever tell you

25   about a loan origination process called the High-Speed Swim

DA3TBAN2                       Tanabe - redirect

```
 1   Lane?
 2            MS. MAINIGI:  Objection, your Honor, that exact
 3   question was asked yesterday.
 4            MR. HEFTER:  Objection.
 5            THE COURT:  Sustained.
 6   Q.  You mentioned yesterday that the contracts with lenders of
 7   Freddie Mac contains repurchase language, is that correct?
 8   A.  Yes.
 9   Q.  Does the fact that Freddie Mac could attempt to repurchase
10   loans from lenders in any way change the requirement that loans
11   be investment quality?
12            MR. HEFTER:  Objection.
13            THE COURT:  Overruled.
14   A.  No.
15            MS. LONDON:  I have no further questions.
16            THE COURT:  All right.
17            MS. MAINIGI:  Nothing, your Honor.
18            MR. HEFTER:  Nothing, your Honor.
19            THE COURT:  Thank you so much.  You may step down.
20   Please call your next witness.
21            MR. ARMAND:  The government calls Dr. Charles Cowan.
22            THE COURT:  And would someone like to come up and get
23   all those materials that are on the witness stand.
24            (Continued on next page)
25
```

DA3TBAN2                         Cowan – direct

1    CHARLES COWAN,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. ARMAND:

6              DEPUTY CLERK:  State your name and spell it slowly for

7    the record.

8              THE WITNESS:  Charles Douglas Cowan, C-O-W-A-N.

9              THE COURT:  Counsel.

10   BY MR. ARMAND:

11   Q.  Good morning, Dr. Cowan.

12   A.  Good morning.

13   Q.  Dr. Cowan, what is your profession?

14   A.  I'm statistician and economist.

15   Q.  Can you please describe your educational background?

16   A.  Sure, I have a doctorate in mathematical statistics, I have

17   a master's degree in economics with a specialization in

18   econometrics and a bachelor's degree in economics.

19   Q.  Dr. Cowan, could you explain generally to the jury what a

20   statistical sampling is and how it's used?

21   A.  Sure.  Statistical sampling is a method that's used when

22   you want to know something about a population, and in

23   particular a large population, you can't look at the whole

24   population, it may be too large, so you look at a sample.  And

25   from the sample, you extrapolate results to the population and

DA3TBAN2                        Cowan - direct

1    you try to find out something about the population.

2              So as an example, the government publishes information

3    about the inflation rate.  Every month there's a new report

4    from the Bureau of Labor Statistics on how much inflation has

5    gone up or gone down.  That's actually collected by

6    interviewing people throughout the United States where a sample

7    of households is drawn, interviews are conducted by people at

8    the Census Bureau, they ask questions about what did you buy,

9    how much did you pay for it, and then that information is

10   summarized and used to determine how much prices have gone up

11   and how much prices have gone up relative to what you usually

12   buy.  In addition to estimating how much prices have gone up,

13   that same survey can we used to estimate how much prices have

14   gone up for cars, for food, for housing.  So when you do a

15   survey, you don't do it just for one purpose, you try to get

16   multiple statistics; get a lot of utility out of doing the

17   survey, it's an expensive process.

18             A second example is one that you will be familiar

19   with, which is political polling.  So if you watch CNN in the

20   mornings when they have reports, you will see sometimes at the

21   bottom of CNN it says CNN/ORC polls.  ORC stands for Opinion

22   Research Corporation.  So CNN isn't doing the survey, Opinion

23   Research is doing the survey.  And what they do is they draw a

24   sample of a thousand households around the country, they call

25   them, they ask their opinions about whatever today's subject

DA3TBAN2                        Cowan - direct

1    is.  Most frequently what you'll see is political polling where

2    in the last election they would have asked the question like

3    are you more likely to vote for Mitt Romney or Barack Obama.

4    And there again, the survey is conducted in such a way that

5    they get not only that information, but they ask why would you

6    vote for one or the other.  And then it's divided up so that

7    you can determine what the rate is that people are going to

8    vote for Romney or Obama for males, for females, by religious

9    groups, by different parts of the country, and so on.  So they

10   get some idea about how much diversity there is in who people

11   are going to vote for.

12           Now I happen to know about that one, just like I knew

13   with the consumer expenditure survey, because when I was at the

14   Bureau of Census I helped design the consumer expenditure

15   survey and was I chief statistician for opinion research and I

16   did the same kind of work there drawing samples so we could

17   measure what do people think.

18           (Continued on next page)

19

20

21

22

23

24

25

DA33BAN3                          Cowan - direct

1    Q.  Why don't we talk about your professional background,

2    Dr. Cowan.  Could you take the jury briefly through your

3    professional experience with regard to the area of statistical

4    sampling.

5    A.  Sure.  I actually started at the University of Michigan

6    working for the survey research center.  Then I went to Oregon

7    State University where I was the director of -- the manager of

8    the survey research center.  From there I went to the Census

9    Bureau, and I held different positions, but one of the

10   positions I held was I was chief of survey design branch.  I

11   was responsible for the design of a number of different surveys

12   that you see published and reported on in the papers.  In

13   addition, I was responsible for the design of the evaluation of

14   the decennial census.  How many people are missed, how many

15   people are counted.  What is the differential for different

16   areas in different parts of the country.

17          After I did that, I traveled around the world and

18   helped different -- worked in different countries helping them

19   with their censuses.  I published a book on the evaluation of

20   censuses and housing surveys.

21          After I left the Census Bureau, I was the first chief

22   statistician for the Department of Education where we measured

23   different things about school systems, about students,

24   teachers, principals, what are kids learning, and I'm still

25   involved somewhat with the Department of Education doing

DA33BAN3                              Cowan - direct

1    research for them on their sample designs and how they

2    determine what kids are learning and how it differs from

3    country to country, from state to state.

4              After I was chief statistician for the Department of

5    Education, for a while I was chief statistician for Opinion

6    Research Corporation.

7              Then I came back to the government during the last

8    banking crisis in the late 1980s, early 1990s, where I was the

9    chief statistician for the Resolution Trust Corporation and for

10   the Federal Deposit Insurance Corporation.  I designed surveys

11   to determine how much of a loss there was going to be to the

12   taxpayer in terms of bad loans, closing banks, things that are

13   similar to what are being discussed in this case.

14   Q.  I'm sorry to interrupt you.  Can you explain what the

15   Resolution Trust Corporation is and the FDIC?

16   A.  Sure.  Resolution Trust Corporation is actually a federal

17   agency.  In the late 1980s, after there were so many failed

18   savings and loans --

19             MR. HEFTER:  May we approach?

20             THE COURT:  Sure.

21             (Continued on next page)

22

23

24

25

DA33BAN3                        Cowan - direct

1            (At the side bar)

2            THE COURT:  I'm not quite sure why you needed to

3    approach because if you had said the single word "objection," I

4    would have sustained it.

5            MR. HEFTER:  Thank you, your Honor.

6            THE COURT:  This is much too much.  We need to get a

7    general sense of his expertise.  We don't need the history of

8    some other organization or any other.

9            MR. ARMAND:  I understand.

10           THE COURT:  Stuff of that kind.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA33BAN3                        Cowan - direct

1          (In open court)

2    Q.  Dr. Cowan, do you have experience applying statistical

3    sampling techniques to mortgage loans?

4    A.  Yes.

5    Q.  Can you briefly explain that.

6    A.  Sure.  Well, first at the Resolution Trust Corporation, we

7    sampled thousands of mortgage loans to determine what happened

8    to the loans, what their value was.  Same thing when I was at

9    the Federal Deposit Insurance Corporation.

10         After that I went -- I had a couple more jobs, then I

11   started my own company where I was drawing samples of loans for

12   banks and looking at the results of the sampling and the

13   valuation of the -- what happened to the loans to determine

14   whether the models that were used by these banks were solid,

15   were they reliable, were they telling the banks what they

16   needed to know about how much risk was in those loans.

17         MR. SMURZYNSKI:  Objection.  Move to strike.  Can we

18   have more of a question and answer.

19         THE COURT:  Yes.  I really think we're getting much

20   too much in the way of narrative.

21         MR. ARMAND:  Understood, your Honor.

22   Q.  Dr. Cowan, what is Analytic Focus?

23   A.  It is a company I started after I left the government and

24   after I had worked outside the government for a while.  Started

25   my own company.

1   Q.   What does Analytic Focus do now?

2   A.   We do finance, statistics, economics, and we work for the

3   government, we work for private sector, I mentioned banks

4   before.  And we frequently work in litigation.

5   Q.   Have you testified as an expert in the area of economics

6   and statistics before?

7   A.   Yes.

8   Q.   How many times?

9   A.   At trial, probably a little less than 10.

10  Q.   What was Analytic Focus retained to do in this case,

11  Dr. Cowan?

12  A.   Analytic Focus, we were hired to do two things.  One was to

13  design the sample, extrapolate the sample, and come up with

14  results about what happened in the re-underwriting of the

15  loans.  Besides -- so the sample is the sample of loans from

16  the set of loans that we'll probably talk about in a minute.

17  But from the sample, the sample of loans was then

18  re-underwritten, and I believe you heard Mr. Holt testify about

19  this yesterday.

20  Q.   How did you go about identifying Hustle loans, Dr. Cowan,

21  for your sample?

22  A.   Could I have a copy of my report?

23            MR. ARMAND:  May I approach, your Honor?

24            THE COURT:  Yes.

25            MR. ARMAND:  For the record, I'm showing the witness a

1386

1    copy of -- withdrawn.

2    Q.  Dr. Cowan, what are the documents I just presented to you?

3    A.  The first one is an expert report I submitted in this case

4    May 7 of this year.

5    Q.  Did you also provide an amended report?

6    A.  I did.  That's the second document.

7    Q.  Did you also provide a declaration in this case that

8    provided additional information about your work?

9    A.  I did.  That's the third document.

10   Q.  So, Dr. Cowan, I guess first let me step back.

11           Can you explain what a statistically reliable random

12   sample is.

13   A.  Sure.  In the examples I gave you before for the surveys,

14   what you want to do is take a sample where you are randomly

15   selecting units in the population.  So in general, a random

16   sample or reliable random sample is a randomly selected set of

17   items in the population, whether it's people, whether it's

18   loans, whether it's widgets, it is whatever it is that you're

19   investigating.

20           So, the only real requirement on the sample is that it

21   be selected randomly.

22           The other requirement on the sample, there might be

23   other requirements that come about because of what you want to

24   know.  So, I gave examples before for the CNN poll.  It may be

25   that you want to divide the sample up by different parts of the

DA33BAN3                    Cowan - direct

1     country, so you can make specific statements about different

2     parts of the country.

3     Q.  Dr. Cowan, how did you go about determining or identifying

4     which loans in the data you received were Hustle loans?

5     A.  Okay.  Well, backing up a step.  The first thing that I

6     should say is that I received a large set of loans, about

7     250,000 loans, but they weren't all part of the Hustle program.

8     So, I was given parameters by the government as to what

9     qualified as a Hustle loan.  And the set of parameters that I

10    was originally given was that the loan in the set -- I guess I

11    should also explain that the full set of 250,000 loans were --

12              MR. HEFTER:  Objection.  Narrative.

13              THE COURT:  Agreed.  Put another question.

14    Q.  Dr. Cowan, can you explain how you identified -- what the

15    criterion were that you used to identify Hustle loans.

16    A.  Sure.  I was told that a loan that was funded between

17    August 1st, 2007, and December 31, 2009, would qualify as a

18    Hustle loan with some other qualifications.  The other two

19    qualifications were that the loan was accepted by an automated

20    underwriting system, and that the loan was processed or funded

21    through one of five Countrywide centers:  Chandler, Arizona;

22    Hatboro, Pennsylvania; Plano, Texas; Richardson, Texas; or

23    Rosemead, California.

24    Q.  Are you familiar with the term stratification or stratify?

25    A.  Yes.

DA33BAN3                         Cowan - direct

1   Q.  What does that mean, Dr. Cowan?

2   A.  Stratification means that I take the population that I have

3   and divide it into buckets.  And so in the case of loans, loans

4   go into mutually exclusive categories or buckets, so that you

5   would sample randomly, but from within the buckets as opposed

6   to across all of the loans.

7   Q.  Did you stratify the population of Hustle loans in this

8   case?

9   A.  I did.

10  Q.  How did you stratify them?

11  A.  Okay.  There were three criteria I used for stratification

12  of the loans.  The first criterion was whether the loan was

13  current or prepaid.  Those were combined, so that's one group.

14  Then the other group is all the rest of the loans.

15  Q.  Can I stop you there.  Why did you stratify as to the

16  status of the loan?

17  A.  I was asked to by the government as one of the factors that

18  they may or may not want to look at.

19  Q.  Were there any other stratifications that you applied?

20  A.  Yes.

21  Q.  What were the others?

22  A.  Okay.  I'm going to talk about the other stratifications

23  and then I will have to combine them all for you at the end.

24         The second stratification was dividing the loans up

25  according to the loan to value for the loan.

DA33BAN3                         Cowan - direct

1    Q.   How did you stratify it -- what is loan to value?

2    A.   Loan to value is the ratio of how much the borrower got,

3    what was the amount of the loan divided by what the value of

4    the loan was worth.  Which is usually, but not always, whatever

5    the appraisal was for the property.

6            So, it is the amount of the loan divided by what is

7    the value of the property.

8    Q.   Can you explain how you stratify for loan to value ratio?

9    A.   Yes.  I just created three categories.  If the loan to

10   value was less than 80 percent, that was category number one.

11   If the loan to value was equal to 80, that's category number

12   two.  If the loan to value is greater than 80, that's category

13   number three.

14   Q.   Why did you stratify it by loan to value ratio?

15   A.   In terms of the definitions of which loans might be or

16   might not be in the Hustle program, there was still -- my

17   understanding from the government was that there was still an

18   issue about whether certain loans were excluded because of the

19   loan to value.  So by creating these three categories, I could

20   include or exclude loans from the population, and from the

21   sample easily, and still come up with estimates as a result of

22   the sample.

23   Q.   Did you stratify the population in any other ways?

24   A.   Yes.  So the last way I stratified the sample was by credit

25   score.  And the credit score is the score that you get when you

DA33BAN3                          Cowan - direct

1    are applying for a loan.  Credit scores typically run between

2    350 and 850.  And I took whatever the range was for the FICO

3    scores, those are the credit scores, and divided that range up

4    into five equal sized groups.

5              So the first group had one-fifth of the loans, the

6    second group had one-fifth of the loans, until the last group

7    which had one-fifth of the loans.  It wasn't anything specific

8    about the credit loans, other than the loans were ordered

9    lowest credit score to highest credit score, and then I created

10   five equal sized groups.

11   Q.  Dr. Cowan, was the sample that you selected a random

12   sample?

13   A.  Yes.

14   Q.  Can you explain to the jury how large the sample was that

15   you selected?

16   A.  For the Hustle loans it was 600 loans.

17   Q.  How did you choose 600 as the number you wanted to use for

18   the sample?

19   A.  600 would be the size of the sample that I would need if I

20   wanted to achieve a 95 percent confidence interval with a plus

21   or minus 5 percent margin of error.

22   Q.  Can you explain what is a 95 percent confidence interval.

23   A.  Sure.  Okay.  When I'm drawing a sample, I can draw a

24   sample of 600 loans randomly, but I can draw a second sample of

25   600, third sample, fourth sample.  I can keep drawing samples.

1    The samples can overlap.  There's no rules about which loans

2    fall into which samples.  There are literally millions of

3    different ways of ways to draw samples of size 600 out of all

4    of the loans of the Hustle population.  Each one of those

5    samples will give me a different outcome.  The first 600 will

6    extrapolate up to some different number than the second 600.

7              As I look at the distribution of all of the possible

8    outcomes which I can calculate, what I want to know is, where

9    am I going to find the true value that I'm trying to estimate.

10   So 95 percent confidence interval means that I have 95 percent

11   confidence that the true value is inside of some range that's

12   part of the full set of outcomes that I might get.  And I also

13   have to then set up a margin of error, a range, so that I can

14   determine that it is 95 percent likely that the true value is

15   going to fall inside that range.

16   Q.  What is a margin of error?

17   A.  Okay.  Margin of error is just in -- it is indicative of

18   how much variability there is in the outcome from the sample

19   that you are going to get.  So, we talked before about the CNN

20   ORC poll that may be published with a margin of error plus or

21   minus 2 percent.  Meaning that the percentage that you are

22   trying to estimate is, whatever it is, 54 percent of the people

23   are going to vote for a presidential candidate.  But it is

24   54 percent plus or minus 2 percent, which means that the true

25   percentage in the population has a 95 percent chance of falling

DA33BAN3                    Cowan - direct

1    somewhere within that plus or minus two range.  It would go

2    from 54 minus two, to plus two.  There is a 95 percent chance

3    that the true value in the population would fall within that

4    range.

5            95 percent confidence interval goes hand in hand with

6    the margin of error in terms of determining where that

7    95 percent really is.

8    Q.  Dr. Cowan, is there an industry standard requirement or

9    definition for margin of error, what the percentage needs to

10   be?

11   A.  No.  Not for margin of error.  There are several standards,

12   but there is not one agreed-upon industry standard.

13   Q.  Is there a range that you have used in your work, either in

14   private practice or in cases that you've worked on, that is a

15   reliable range?

16   A.  Yes.  Although, I will also say that the range that I

17   choose depends on what the situation is.  But I've used plus or

18   minus 5 percent, plus or minus 10 percent, and in a couple of

19   instances I've used plus or minus 15 percent.  At the other

20   extreme, I've used plus or minus 1 percent.

21   Q.  What determines how large or small the percentage is?

22   A.  Depends on what it is that you actually want to know.  And

23   the level of precision that you need to know it.

24   Q.  Dr. Cowan, can you explain how you went about drawing the

25   600 loan sample of Hustle loans from the database you received?

DA33BAN3                        Cowan - direct

1   A.   Okay.  Well, using the criteria that we described before,

2   that I described before, I knew what the population of Hustle

3   loans was according to the definition that I've been given.

4           That population got divided up into the strata that we

5   talked about a minute ago.  Within each of the strata, I simply

6   assign a random number to each of the loans that were in a

7   particular bucket.  I ordered the loans by that random number,

8   so the loans are now in a random order.  Then I took the first

9   however many loans I needed from that bucket, I could take the

10  first, let's say, 20 loans, I could take the last 20 loans, I

11  could skip the first 20, I could take the second 20, any of

12  those is a random set.

13  Q.   What did you do after you finished drawing your 600 bucket

14  loan sample?

15  A.   I gave that list to Mr. Holt.

16  Q.   Does Mr. Holt also work at Analytic Focus?

17  A.   Yes, he does.  He's in our Birmingham office.

18  Q.   During the loan review process, was there anything that you

19  were doing with regard to the loan review?

20  A.   Not with respect to the loan review, no.

21  Q.   Who was doing the loan review?

22  A.   Mr. Holt and a variety of people working under Mr. Holt.

23  Q.   All of those people worked for Analytic Focus?

24  A.   Yes.

25  Q.   Do you know how many people were involved in the overall

1  project, both on the sampling side and on the underwriting

2  side?

3  A.  It came out to 40.  We had 40 different people at different

4  times working on this project.

5  Q.  Do you have an understanding of how many man hours were

6  expended on this project?

7  A.  About 5,430.

8  Q.  Has Analytic Focus been paid for its work in this case?

9  A.  Yes.

10  Q.  How much has Analytic Focus been paid?

11  A.  To date, a little bit under $1 million.

12  Q.  Is the payment that Analytic Focus received in this case,

13  is it in any way contingent upon any of the opinions that are

14  being provided?

15  A.  No.

16  Q.  Is any payment that's been made to Analytic Focus

17  contingent upon the result of this trial?

18  A.  No.

19  Q.  Do you have an understanding as to what the types of

20  results that would come back from Mr. Holt's group with respect

21  to the loans after they were reviewed?

22          MR. SMURZYNSKI:  Objection.

23          MR. HEFTER:  Objection.

24          THE COURT:  Overruled.  You may answer.

25          THE WITNESS:  Thank you, your Honor.

DA33BAN3                    Cowan - direct

1  A.  Actually, I'm confused by your question.  Are you asking me

2  about how it comes back to me or are you asking me what is

3  coming back to me?

4  Q.  First can you explain what the findings are in the

5  categories of findings that come back from the loan review.

6  A.  Well, what comes back to me from the loan review is a

7  relatively large database that has a summary of the findings

8  across a number of questions that Mr. Holt and his team of

9  reviewers are looking at.  So I get back something that looks

10  like what you might think of as a spreadsheet.  But it

11  summarizes a lot of different questions for every single loan.

12  Q.  Did the results have categories of what the ultimate

13  findings were from Mr. Holt as to whether the loans were

14  investment quality or not?

15  A.  Yes.  There is one specific summary item that has three

16  codes.  The loans are either of investment quality, they're

17  investment quality but they have some defects, or they're

18  considered to be materially defective.

19  Q.  Did there come a time when you instructed Mr. Holt to

20  terminate the review of the 600 loan files?

21  A.  Yes.

22  Q.  When was that?

23  A.  Towards the end of the underwriting process, Mr. Holt sent

24  me an initial database.  I had requested this because I needed

25  it to be able to set up my computer programming, be able to

DA33BAN3                          Cowan - direct

1    figure out how do I put together my formulas, how to

2    extrapolate.  So I got this data set that Mr. Holt had sent me.

3         And once I loaded it up, ran some tests, I saw that

4    the results indicated at that point we had 526 out of the 600,

5    and the results indicated that there was a fairly clear set of

6    outcomes.  And that when I look at the outcome, I thought that

7    the remaining underwriting that would continue would not be

8    very fruitful.  It wouldn't change the results much, in my

9    opinion.  And so, I instructed Mr. Holt to stop underwriting.

10   Q.  Were there any other considerations that factored into your

11   decision to terminate the loan review at that time?

12   A.  Well, at that time, for me, I was getting towards the end

13   of the time period when I needed to produce both the data set

14   and a report.  I needed to give the data set back to the

15   government, and at the same time, I needed to write the report

16   that I have in front of me.

17   Q.  Is this a common or uncommon occurrence in statistical

18   sampling for items that have been selected to ultimately not

19   provide data for your research?

20             MR. HEFTER:  Objection.

21             THE COURT:  Poorly phrased.  Sustained.

22             MR. ARMAND:  I can try again.

23   Q.  You talked earlier about surveys, Dr. Cowan.

24   A.  Yes.

25   Q.  You've conducted surveys in your work?

DA33BAN3                          Cowan - direct

1    A.  I have.

2    Q.  Is it a common or uncommon occurrence that not every person

3    who is selected to get information from a survey is not

4    contacted?

5              MR. HEFTER:  Objection.

6              THE COURT:  Sustained as to form.  Just to move this

7    along.

8              As I understand it, you originally were going to have

9    a random sample of 600 Hustle loans, yes?

10             THE WITNESS:  Yes.

11             THE COURT:  Based on the feedback you got after 500

12   and some odd loans, you decided that nothing would change if it

13   was continued through the full 600, or nothing would change

14   materially, correct?

15             THE WITNESS:  Yes.  Nothing would change materially,

16   your Honor.

17             THE COURT:  Based on time constraints and other

18   considerations, you therefore decided that you can go forward

19   on the basis of 500 and whatever, yes?

20             THE WITNESS:  Yes.

21             THE COURT:  And the question is, is that kind of

22   termination something that is commonplace in these kinds of

23   surveys, rare, something in between, or whatever?

24             THE WITNESS:  I would say it's commonplace, your

25   Honor.

DA33BAN3                          Cowan - direct

 1           THE COURT:  All right.  Go ahead, counsel.

 2   Q.  Dr. Cowan, did there come a time -- or withdrawn.

 3           What did you do with the results that Mr. Holt

 4   provided to you from the loan review?

 5   A.  I took the results from the loan review, I tabulated them

 6   using the buckets that we talked about before, there is 30

 7   buckets over all.  I took the results bucket by bucket,

 8   weighted them together in proportion to how they exist in the

 9   population, so I took a weighted average.  I added them up.

10           So, some groups in the sample had more proportionally

11   than they did in the population so they got weighted down.

12   Other groups didn't have as many in the sample as they would

13   have in the population.  They got weighted up.  By doing that

14   balancing, and taking that average, I got a reliable unbiased

15   estimate for the population.

16   Q.  Did there come a time when the definition of the High-Speed

17   Swim Lane that had been provided to you changed?

18   A.  Yes.

19   Q.  When was that?

20   A.  I was it was after I submitted my first report.  And, but I

21   don't remember the exact date, but it was sometime after

22   May 13.

23   Q.  What was the change to the definition?

24   A.  Okay.  I'm referring to my amended report.  And --

25           MR. SMURZYNSKI:  Your Honor, I move to strike.

DA33BAN3                          Cowan - direct

1          THE COURT:  The ground being?

2          MR. SMURZYNSKI:  It's not in evidence.

3          THE COURT:  All right.

4          MR. SMURZYNSKI:  It's hearsay.

5          THE COURT:  Hearsay.  That's what I thought.

6          So, do you need the report to refresh your

7     recollection?

8          THE WITNESS:  I need the report to remember exactly

9     what the dates were.  But the short answer is the dates

10    changed.

11         THE COURT:  All right.  We'll leave it at that then.

12    Go ahead, put another question.

13    Q.  Would it refresh your recollection to refer to your report?

14    A.  Yes.

15         THE COURT:  But remember, just so the witness is clear

16    and the jury is clear, if, after looking at the report, you

17    have an independent recollection that is refreshed, you can

18    testify to that.  But you can't just read from the report

19    because the report is not in evidence, because it is, as

20    counsel pointed out, hearsay.

21         So, look at the report.  If it jogs a memory, you can

22    put the report aside and tell me what your jogged memory is.

23    If it doesn't jog your memory, then it doesn't.

24         THE WITNESS:  Okay.  Thank you, your Honor.

25    A.  So, the primary change, just to keep this brief, is that

1400

DA33BAN3                        Cowan - direct

1    the earlier date on the range that I gave you before started

2    about the same, but now it was either that the loan was going

3    to be funded or it was going to be processed.  At the back end,

4    the date changed, but it moved up substantially from the end of

5    2009 to sometime in September 2008.  So more than a year got

6    cut off on the back end.

7    Q.  So, Dr. Cowan, did the period of time that you provided

8    for -- for the definition criteria of the Hustle, did it expand

9    or narrow?

10   A.  The period of time narrowed.

11   Q.  How many Hustle loans were left in your sample that had

12   been reviewed by Mr. Holt after the time period was narrowed?

13   A.  Okay.  The number that were in the sample, and also

14   reviewed by Mr. Holt, that were in this reduced time frame was

15   343 loans.

16   Q.  What was the percentage of loans that Mr. Holt identified

17   within 343 that were materially defective?

18   A.  As I remember, without looking at my report, it is

19   42.8 percent.

20         I'm sorry.  That's in the population.  You mean in the

21   sample or in the population?

22   Q.  From the sample that Mr. Holt provided to you.  Before you

23   look, do you not have -- would it help to refresh your

24   recollection to refer to your report?

25   A.  It would.  But the short answer to the question is it is

DA33BAN3                          Cowan - direct

1    over 50 percent.

2              MR. HEFTER:  Objection, your Honor.  Cumulative.

3              THE COURT:  I'll allow it.  You may finish the

4    sentence.  The short answer is?

5    A.  The short answer is over 50 percent in the sample were

6    considered by Mr. Holt to be materially defective.

7    Q.  What did you do with that percentage that Mr. Holt provided

8    to you?

9    A.  I can't answer the question exactly the way you worded it.

10   I didn't do something specific with the percentage.  What I did

11   was, the same process that I described before, which is

12   calculating defect rates within each of the strata.  And then I

13   took the weighted average across the strata to come up with a

14   new percentage.

15   Q.  What was that new percentage?

16   A.  That was the first number I gave you, 42.8 percent.

17   Q.  So, we're clear, what does the 42.8 figure represent?

18   A.  The estimate, so it is our best estimate of what the

19   materially defective loan rate is in the population of Hustle

20   loans under the new shortened time frame.

21   Q.  The fact --

22             THE COURT:  I'm sorry, counsel, we are going to have

23   to break today at in about five minutes so find an appropriate

24   spot.

25             MR. ARMAND:  Almost done, your Honor.

DA33BAN3                        Cowan - direct

1           THE COURT:  Okay.

2    Q.  The sample of Hustle loans that were ultimately reviewed,

3    the 343, was that sample large enough for you to draw

4    conclusions about the population of Hustle loans?

5    A.  Well, since the 343 or the new definition, it is the subset

6    of the old definition, samples in the new -- I'm sorry.

7           Loans sampled in the new definition are a random

8    subset of loans from the old definition.  So, yes, I can

9    extrapolate in exactly the same way, but the results are a

10   little less reliable, they're a little bit more variable,

11   because I had fewer loans in the sample.

12   Q.  Did you calculate a margin of error for the 42.8 figure

13   that you just provided?

14   A.  I actually didn't calculate it exactly for the 42.8,

15   because I used a more conservative approach that would give me

16   a larger margin of error.  So, reporting to you the largest

17   margin of error that I would get, it is about 8.8 percent,

18   8.7 percent.  Which I think we should just call 9 percent.

19   Q.  So what does it mean that it has an 8.8 percent margin of

20   error?

21   A.  If you take the estimate I gave you before, and rather than

22   carry around all these decimal places, if you take the number I

23   gave you before which is about 43 percent, and you subtract

24   9 percent, that gives you 34 percent.  Since that's the lower

25   end of that confidence range I told you, 95 percent of the time

DA33BAN3                        Cowan – direct

1    the true value is going to fall somewhere in that range.  So

2    somewhere above the 34 percent.  There is only a two and a half

3    percent chance that the true value then is below 34 percent.

4           So the interpretation of that is that 34 percent is

5    the lower end of the range, and there is only a two and a half

6    percent chance of getting a number in the population that's

7    below that.

8           MR. ARMAND:  Last question, your Honor.

9    Q.  Did you do anything to test whether or not the percentage

10   that you calculated was biased or not?

11   A.  Yes.  Do you want me to explain?

12   Q.  Yes, please.

13          THE COURT:  He didn't really mean that was his last

14   question.

15          MR. SMURZYNSKI:  Your Honor, objection.  Can we

16   approach?

17          THE COURT:  No.

18          MR. SMURZYNSKI:  Okay.

19          THE COURT:  Answer the question.

20          THE WITNESS:  Thank you, your Honor.

21   A.  Okay.  So, I didn't –– so I started with 600 loans.  We

22   only reviewed 526.  So the question is, is that a biased subset

23   of the 600, yes or no.

24          When we reduced the definition, instead of the 600

25   loans we now had only 410 loans in the new definition in the

1404

1   sample.  But I only looked at 343, or Mr. Holt only looked at

2   343.

3          Is that subset biased relative to the 410.  So I did

4   what's called a chi-square test.  It is a common test in

5   statistics.  And the result was no.  There was no bias.  You

6   can't tell statistically that there is any difference between

7   the loans that finally got reviewed and the full sample of the

8   600 or the 410 in the later definition.

9          MR. ARMAND:  Thank you.  We have nothing further, your

10  Honor.

11         THE COURT:  Ladies and gentlemen, when I said we were

12  going to break for the day, I didn't mean for the whole day, I

13  meant for lunch.  You're not off the hook.

14         But I do want to let you know this afternoon, we're

15  only going to sit until 3:50 because of another matter I have.

16  So, when you come back at 2 o'clock, we're going to sit without

17  a break from then for about an hour and 50 minutes, and then

18  we'll let you go for today.  Have a good lunch.  We'll see you

19  at 2 o'clock.

20         (Jury excused)

21         (Continued on next page)

22

23

24

25

DA33BAN3

1          THE COURT:  Let me ask defense counsel, what was the

2     matter you wanted to raise at the side bar?

3          MR. SMURZYNSKI:  On the last issue?  It was that the

4     bias test that he did was provided to us for the first time in

5     September well after the deadline for the expert reports.

6          THE COURT:  I understood that, and I factored it in in

7     overruling the objection.  You now have your record for appeal.

8     Of course, the jury fully understands after that short answer

9     exactly what a chi-square test is.

10          All right.  How long is defense going to be on cross?

11          MR. SMURZYNSKI:  Your Honor, there are a couple issues

12     I'd like to raise obviously without the witness present.

13          THE COURT:  We should excuse that witness from the

14     courtroom.

15          MR. SMURZYNSKI:  He's not here.

16          The first is the witness today on direct testified as

17     to reasons why he stopped Mr. Holt in a way that was different

18     than he testified in front of your Honor on Monday at the

19     Daubert hearing.

20          THE COURT:  You can confront him with that.

21          MR. SMURZYNSKI:  And your Honor, that would involve

22     getting into the comparison of HSSL versus non-HSSL.

23          THE COURT:  No, you will not be allowed to.

24          MR. SMURZYNSKI:  That's the problem, because his

25     answer, as your Honor may recall at the Daubert hearing, is he

DA33BAN3

1    stopped because he did a comparison between the two to

2    determine it wouldn't be helpful to the government's case and

3    therefore he figured he would stop.  Just so we have a record,

4    your Honor --

5              THE COURT:  No, I want you to make your record, you'll

6    make it at 2 o'clock.  The reason I had to stop things now is

7    because there is a judges meeting at 1 o'clock and I have to be

8    there.

9              MR. SMURZYNSKI:  Appreciate it, your Honor.

10             THE COURT:  We'll take this up at 2.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DA3TBAN4

```
 1              (Jury not present)
 2              MR. ARMAND:  Dr. Cowan is still present in the
 3    courtroom.
 4              THE COURT:  I see.  So he should go outside for a
 5    minute.
 6              So let me hear from defense counsel.
 7              MR. SMURZYNSKI:  Briefly, your Honor, on direct
 8    Dr. Cowan testified about the reason for stopping, I think it's
 9    different than the testimony he gave on September 30, 2013, and
10    I can read the page and lines to your Honor.
11              THE COURT:  If you let me just see it if you have it.
12              MR. SMURZYNSKI:  Absolutely.
13              THE COURT:  Page?
14              MR. SMURZYNSKI:  912, line 12 through 23, and page
15    916, lines --
16              THE COURT:  Wait, page 912, line --
17              MR. SMURZYNSKI:  12 through 23.
18              THE COURT:  OK.  And the other one?
19              MR. SMURZYNSKI:  Page 916, line 18 through 917, line
20    5.
21              So let me hear from the government.
22              MR. ARMAND:  Your Honor, I think because of the way
23    the questioning was that preceded this, the discussion was
24    about Hustle and non-Hustle.  And Dr. Cowan provided his
25    reasoning about stopping with regard to Hustle and non-Hustle,
```

DA3TBAN4

1    but he also testified at his deposition his reasoning with

2    regard to the Hustle loans.  And none of this is -- are

3    exclusive reasons that he's giving was this the sole reason.

4         So I think Dr. Cowan has testified here at the Daubert

5    hearing and in his deposition and here today, and there were

6    multiple considerations.  And so this isn't inconsistent, this

7    is just another reason that factored into the analysis, and the

8    reason it came out the way it did was because your Honor and

9    Dr. Cowan were discussing the Hustle and non-Hustle aspect of

10   the sample.

11        THE COURT:  I think if you read through, as I just

12   did, the entirety of his answer to the Court's questions, while

13   there is an answer here and there in response to questions the

14   Court put about both the Hustle and the non-Hustle loans that

15   are arguably different from what he said here in court, he then

16   makes clear in the following answers throughout, beginning on

17   page 913 and continuing for quite a few pages thereafter, that

18   what he actually did was calculate what the possible difference

19   would be if the remaining Hustle loans were all non-defective,

20   whereas he did not do that for the non-Hustle loans.  But he

21   did it for the Hustle loans to make sure that even on a worst

22   case scenario, it wouldn't matter to the conclusions that were

23   being drawn.

24        So I don't really think there is a basis to open this

25   up to the non-Hustle loans.  So that will not be permitted.

DA3TBAN4

1          All right.  Was there something else?

2          MR. SMURZYNSKI:  I understand your Honor's ruling,

3     obviously we disagree and we have a record on it.

4          THE COURT:  I'm hurt, of course.  I'll salve my wounds

5     with difficulty.

6          MR. SMURZYNSKI:  There is one other issue.  Dr. Cowan

7     testified that his basis for the HSSL population was entirely

8     information provided to the government.  Obviously the

9     government can tie that up at some later time in the course of

10    its case, but if they fail to, we would move to strike his

11    testimony as being unreliable and not fitting with anything

12    that's in the case, but I wanted to --

13         THE COURT:  I'm really missing the point.

14         MR. SMURZYNSKI:  I apologize.

15         THE COURT:  My fault, go ahead.

16         MR. SMURZYNSKI:  Dr. Cowan testified as to his

17    opinions based on an assumption about what the HSSL population

18    was.

19         THE COURT:  Based on what he was told by the

20    government.

21         MR. SMURZYNSKI:  Based on what he was told by the

22    government.

23         THE COURT:  So if that is -- then they changed their

24    measure.

25         MR. SMURZYNSKI:  No, I understand.  Even the changed

1410

DA3TBAN4

1    measure, the 28,000 loans, we do not believe -- there hasn't

2    been any evidence in the case yet that that's correct, and if

3    the government elicits it --

4             THE COURT:  If in the end there is not -- it

5    doesn't -- there doesn't have to be -- for an expert, the

6    evidence of that does not have to have been admitted, but it

7    has to be admissible.  So if your point is there's no

8    admissible evidence to support the government's -- what they

9    told him to assume, that would be a reason for striking his

10   testimony, although not one you raised at the Daubert hearing.

11            If you think -- if your point is that you intend to

12   prove definitively that it's something else and I am convinced

13   that no reasonable juror could conclude it was what he assumed,

14   that might also be a ground for striking his testimony, but

15   we're not there on either of those points at this point in

16   time.

17            MR. SMURZYNSKI:  I agree we're not there yet either,

18   your Honor, I want to note it so there was no question that we

19   were waiving it.

20            THE COURT:  I think there is a question as to the

21   former of the two possibilities that I mentioned, that you

22   might have waived it by not raising it at the Daubert hearing,

23   but we don't have to reach that yet.

24            MR. HEFTER:  Your Honor, so the record is clear, we

25   would join in that as well.

DA3TBAN4

```
 1              THE COURT:  Really?  Duly noted.
 2              MR. ARMAND:  And for the record, we believe evidence
 3     has been submitted to justify the government's position.
 4              THE COURT:  The record is full of notes.
 5              MR. CORDARO:  Your Honor, I wanted to bring the
 6     Court's attention to a developing scheduling issue with the
 7     next witness, Ms. Padgett, who is from Freddie Mac.
 8              THE COURT:  Let's get this witness in and see if we
 9     can finish this witness, because we have to end at 3:50, as you
10     have been informed, and we'll take up other issues.
11              MR. CORDARO:  She has a child that's a special needs
12     child, and she really needs to go home today.  I don't
13     anticipate a very lengthy direct, and I will keep it under 30
14     minutes.
15              THE COURT:  And you wanted to take her out of order?
16              MR. CORDARO:  If we could get her out of New York by
17     3:50, we would request that.
18              THE COURT:  There's no way -- as I understand the
19     scope of the cross, I haven't put a time limit on it, but I
20     assume it's not going to be less than one half hour.
21              MR. SMURZYNSKI:  No, very much will be less than half
22     an hour.
23              THE COURT:  OK.
24              MR. CORDARO:  I think it should be OK.
25              THE COURT:  And I assume we'll ask Dr. Cowan about his
```

DA3TBAN4

```
 1    intimate knowledge of Ms. Mairone, which will take about two

 2    minutes.

 3            MR. HEFTER:  Without being inconsistent with my

 4    colleague, I will limit my examination to four minutes.

 5            THE COURT:  OK.  Well, you ask a lot, but it's

 6    agreeable to the Court.

 7            Let's get the witness back and let's bring in the

 8    jury.

 9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DA3TBAN4                         Cowan - cross

1          (Jury present)

2          THE COURT:  Juror number one always starts to sit and

3   thinks no, I better stand because everybody else is standing.

4   So I should make this clear, they all have to stand because

5   they're standing in honor of you.  You can sit down whenever

6   you want.  So you don't have to wait until I say, "Please be

7   seated," that's only for them.

8   CROSS-EXAMINATION

9   BY MR. SMURZYNSKI:

10  Q.  Good afternoon, Dr. Cowan.

11  A.  Good afternoon.

12  Q.  My name Ken Smurzynski and I represent the banks.  I will

13  ask you a couple of questions this afternoon.

14          Dr. Cowan, the first step in your analysis was to pick

15  a population of HSSL loans out of the complete data set that

16  you received of all Full Spectrum lending loans, is that

17  correct?

18  A.  I think I used the word identify rather than pick, but yes.

19  Q.  And in identifying those loans, you used a definition that

20  was provided to you by one of the lawyers for the government,

21  is that correct?

22  A.  Yes.

23  Q.  And you did no independent work to determine which loans

24  were HSSL loans and which loans were not HSSL loans, correct?

25  A.  I did not.

DA3TBAN4                    Cowan - cross

1   Q.  And using the definition given to you by Mr. Armand, you

2   ultimately selected 28,882 loans, is that right?

3   A.  No, sir, I think it was larger than that, unless you're

4   talking about the amended definition.

5   Q.  I'm talking about the amended definition, thank you.  So

6   the testimony you gave today about the defect rate you found

7   was based on an amended definition of HSSL loans, correct?

8   A.  That's correct.  So I did the exercise that you described

9   twice, once with the first definition and once with the second

10  definition.

11  Q.  And in each instance the definition was provided to you by

12  Mr. Armand, the attorney for the government, correct?

13  A.  Yes.

14  Q.  And using that same definition of HSSL loans, you

15  identified the 343 loans in the sample that your colleague,

16  Mr. Holt, re-underwrote, is that correct?

17  A.  Almost.  What actually happened is that I identified all of

18  the loans in the population, and then that immediately told me

19  what was in the sample that was from the definition of Hustle.

20  Q.  But just to be clear, when Mr. Holt talks about and you

21  talk about on direct examination here the results of the 343

22  loans, those are HSSL loans based on the same definition

23  provided to you by the attorney for the government, Mr. Armand?

24  A.  Yes, sir, that's correct.

25  Q.  OK.  Now I ask you, Dr. Cowan, to assume for the moment

DA3TBAN4                    Cowan - cross

1    that those 28,882 loans were not in fact all HSSL loans.  If

2    that were the case, the numbers you provided to the jury

3    earlier today would not be correct, is that the case?

4    A.   They may not be correct, but I don't know how many more or

5    less Hustle loans this might be.

6    Q.   Assume with me that less than half of those 28,000 loans

7    were actually HSSL loans, would that change the results?

8    A.   It may or it may not.  It depends on whether the new

9    definition changes in some way the inclusion or exclusion of

10   the loans in a way that's correlated with what we're trying to

11   measure.

12   Q.   And you don't know that one way or the other?

13   A.   That's correct, I don't know that.

14   Q.   And your answer would be the same if we were to assume that

15   only two-thirds of those loans were HSSL loans, correct?

16   A.   That's correct.  Without knowing exactly which loans we're

17   talking about, I couldn't tell you anything about an

18   alternative.

19   Q.   OK.  Now I believe I heard this correctly, on direct you

20   testified that given this population of 28,882 loans, and

21   assuming that Mr. Holt did his work correctly, that the

22   material defect rate was 42.8 percent, is that right?

23   A.   Yes, that's what I remember without referring back to my

24   report.

25   Q.   And then there was a margin of error around that as well?

1    A.  Well, what I said exactly was that I computed the margin of

2    error in a more conservative fashion that led me to a slightly

3    different result, but also gave me a broader margin of error.

4    So if you apply that margin of error to the 42.8 percent, then

5    what you just said is correct.

6    Q.  So under your analysis, the material defect rate, if you

7    assume Mr. Holt was correct, could be as low as 34 percent?

8    A.  Well, as low as that, given the 95 percent confidence in it

9    all.  So I'm only making a statistical statement here.

10              MR. SMURZYNSKI:  Alex, could you put on the screen

11   PK437, which is a demonstrative used earlier in the case by the

12   government.

13   Q.  Dr. Cowan, let me address you to this demonstrative exhibit

14   that was used in Mr. Holt's examination.  This demonstrative

15   suggests that 53.9 percent of the HSSL loans were materially

16   defective.  Do you see that?

17   A.  You mean in the sample?

18   Q.  That's my question.  This is only for the sample.

19   A.  Yes, and the number I gave you was my extrapolation to the

20   population.

21   Q.  So when you're actually talking about what you believe to

22   be the population of HSSL loans, that's all of them, it's not

23   53.9 percent?

24   A.  No, it's quite a bit less than the 59.9.  The 53.9 applies

25   to only the 343 loans in the sample, but then you have to do

1   something with those numbers to project from the sample to the

2   population.

3            MR. SMURZYNSKI:  Thank you, Alex, you can take that

4   down.

5   Q.  Your intent, Dr. Cowan, was for Mr. Holt to re-underwrite

6   all the loans that you provided him in the original sample, is

7   that correct?

8   A.  That was my original intent, yes.

9   Q.  But you stopped Mr. Holt early in that process, correct?

10  A.  I did.

11  Q.  And the reason you stopped Mr. Holt was not that Mr. Holt

12  had no time left to do the work, correct?

13  A.  We could have finished the work had we continued for over

14  another week and if we started to put everyone on overtime.

15  Q.  OK.  And when you made the decision to stop the work, you

16  had looked at the results through whatever had been completed

17  at that point, correct?

18  A.  That's correct.

19  Q.  And I believe your testimony on direct was -- but correct

20  me if I'm wrong -- you thought those results were likeable to

21  you so you stopped?

22            MR. ARMAND:  Objection.

23            THE COURT:  Sustained.

24  Q.  Dr. Cowan, you don't know what Mr. Holt's results would

25  have been if he had continued to do the work on the sample, do

DA3TBAN4                          Cowan - cross

1    you.

2    A.  I can't answer that question the way you phrased it.  What

3    I knew was what the range of outcomes could be.  And we went

4    through that in my deposition about how to calculate the range

5    of potential outcomes if you consider what outcomes there could

6    have been for the remaining 74 loans out of the first 600.

7    Q.  And that range of outcomes could have been different than

8    the 42.8 percent that you gave earlier today, is that right?

9    A.  Well, that's a specific number.  The range of outcomes

10   would be a range of outcomes, so I don't know how to answer

11   your question.  That's one number, the other is a range of

12   numbers.

13              THE COURT:  I think the question was designed to get

14   at if you had continued and Mr. Holt had continued through the

15   full original number you had calculated, if I understand what

16   you're saying, that the number could have gone down to X or

17   could have gone up to Y, and that would be the range.  Do I

18   have that right?

19              THE WITNESS:  I'm sorry, it's your question, so --

20              THE COURT:  No, it's my question to you.

21              THE WITNESS:  Yes, sir, that is correct.

22   Q.  The number could have gone lower than the number?

23   A.  The number could have gone equally each way, lower or

24   higher.

25   Q.  We won't know because Mr. Holt stopped his work, correct?

DA3TBAN4                    Cowan - cross

1              MR. ARMAND:  Objection.

2     A.  Well, you would know how low or high it would be.

3              THE COURT:  There's an objection.

4              THE WITNESS:  Sorry.

5              THE COURT:  So sustained.

6              Actually I withdraw that.  I'm going to reverse myself

7     on that.  He may answer that question.

8              You know the range, but you don't know what the actual

9     result would have been?

10             THE WITNESS:  I don't know the actual result, but the

11    way you characterized it, I do know that it's within minus

12    three or plus three of the number that I actually had.

13             MR. SMURZYNSKI:  I have no further questions.

14             THE COURT:  OK.  Counsel?

15             MR. HEFTER:  We have no questions for this witness.

16             THE COURT:  Anything else?

17             MR. ARMAND:  Very quickly, your Honor.

18    REDIRECT EXAMINATION

19    BY MR. ARMAND:

20    Q.  Dr. Cowan, earlier you were asked about the change in the

21    time period that was provided to you by the government, and I

22    believe you stated it was -- that the end date was in September

23    of 2008.  If I could direct you to your report, your amended

24    report, page 29, do you still have it?

25             MR. SMURZYNSKI:  Your Honor, objection, hearsay.

1          MR. ARMAND:  I would like to give Dr. Cowan a chance

2     to refresh his recollection about the end date.

3          THE COURT:  I think you have to put a foundational

4     question.  Let's start it afresh.  After the change, what was

5     the start date and what was the end date, if you recall?

6          THE WITNESS:  The start date was very similar to the

7     earlier start date, the end date I believe I said before was

8     September, it may have been August of 2008.

9          THE COURT:  All right.  Put another question.

10    BY MR. ARMAND:

11    Q.  Would -- is the information -- the actual end date, is it

12    contained within your report?

13    A.  Yes, it is.

14    Q.  Would it refresh your recollection -- or withdrawn.

15         Did you at one time know what the end date was?

16    A.  Well, I had to know exactly what the end date was as I was

17    doing the tabulations.  Now I'm trying to work from memory as

18    to what the exact end date was, but it was around a year

19    earlier than the earlier end date.

20    Q.  Would it refresh your recollection to look in your report

21    and see what you wrote about the end date?

22    A.  Yes.

23         MR. ARMAND:  May I refresh the witness's recollection

24    with his report, your Honor?

25         THE COURT:  Yes.

DA3TBAN4                      Cowan - redirect

1    Q.  I direct you to page 29 of your report, Dr. Cowan, your

2    amended report, footnote 11.

3    A.  Yes.

4    Q.  You can't read from it, but now that you looked at it, does

5    it refresh your recollection as to the start and stop dates of

6    the Hustle definition that you were provided?

7    A.  Yes, I had my months reversed.  It started in August of

8    2007 and ended in May of 2008.

9              MR. ARMAND:  Thank you, Dr. Cowan.

10             THE COURT:  All right.  Anything else?

11   BY MR. ARMAND:

12   Q.  With regard to the 43 percent or 42.8 defect rate you

13   provided, there was a margin of error about nine percent, is

14   that correct?

15   A.  Yes.

16   Q.  And you were asked if that meant that the margin of error

17   could be -- the actual percentage could be lower, nine

18   percentage points lower than 42.8 percent, is that right?

19   A.  Yes.

20   Q.  Could it also be higher?

21   A.  It's equally likely on the other end, there is only a two

22   and a half percent chance that would be 43 plus nine or 52.

23             MR. ARMAND:  Thank you.  I have nothing further.

24             THE COURT:  Anything else?

25             MR. SMURZYNSKI:  Nothing, your Honor.

DA3TBAN4                          Padgett - direct

 1                 MR. HEFTER:  No, your Honor.

 2                 THE COURT:  Thank you very much, you may step down.

 3                 Please call your next witness.

 4                 MR. CORDARO:  The government calls Pamela Padgett.

 5      PAMELA PADGETT,

 6           called as a witness by the Plaintiff,

 7           having been duly sworn, testified as follows:

 8      DIRECT EXAMINATION

 9      BY MR. CORDARO:

10                 DEPUTY CLERK:  State your name and spell your last

11      name slowly for the record.

12                 THE WITNESS:  Pamela Padgett, P-A-D-G-E-T-T.

13      BY MR. CORDARO:

14      Q.  Good afternoon, Ms. Padgett.

15                 Are you employed?

16      A.  Yes.

17      Q.  Where do you work?

18      A.  I work for Freddie Mac.

19      Q.  What is your job title?

20      A.  I'm a vice president of single family quality control and

21      underwriting.

22      Q.  When did you attain that position?

23      A.  The title itself was December 2010.

24      Q.  Where are you based?

25      A.  McLean, Virginia.

1  Q.  Could you just explain to the jury what you mean by single

2  family?

3  A.  It's the group of residential homes that are one to four

4  family dwellings as opposed to multifamily apartment units.

5  Q.  I believe you also used the term "quality control" in your

6  job title, is that correct?

7  A.  Yes.

8  Q.  Could you explain to the jury what quality control means in

9  this context?

10  A.  In this context it would be the review of loan files to

11  ensure what the quality of the loans are against what we

12  thought we purchased as an investor.

13  Q.  Could you explain your job duties, your current job duties?

14  A.  I lead a team of underwriting staff and managers and

15  directors whose jobs are to take a look at loan files that we

16  purchase and to go through the documents, make sure that the

17  documents themselves are accurate.  They go through a

18  reverification process.  Then they review those loans to make

19  sure that the loans met the terms of the contracts under which

20  we agreed to purchase them and that those loans are of

21  investment quality.

22          I also, as part of my job, set the policies and

23  procedures for what the reviews entail.  We work to make sure

24  we're aligned, because there's a very large staff, so I want to

25  make sure that the decision on the loan, whether it's

1    investment quality, is consistent, regardless of who on my team

2    or in our contract team or vendors that help us with those

3    reviews, to make sure we get consistent decisions.

4           Also work on training to ensure that we are properly

5    using the tools that we have to determine investment quality,

6    that the calculations are consistent, and that we have

7    reporting and management discussions around our results.

8    Q.   Ms. Padgett, how big is the team that you lead?

9    A.   My underwriting team with managers and directors is

10   approximately 150 people.  They're also accountable for four

11   different underwriting vendors, the oversight of the quality of

12   originations, our reviews of those vendors as well as

13   contractors, and that would probably increase that number to

14   around 200, 220 people.

15   Q.   Ms. Padgett, could you give us your educational background

16   starting with college, please.

17   A.   Yes, I graduated from the University of Alaska, Anchorage,

18   with a degree in psychology and a minor in real estate.

19   Q.   When did you first begin working in the mortgage industry?

20   A.   1976 is when I began working.

21   Q.   Do you have any experience as an underwriter?

22   A.   Yes, I do.

23   Q.   Could you summarize for us your experience as an

24   underwriter?

25   A.   Yes, I began my career in mortgage banking in 1976, as I

1   mentioned, then in two years I moved from file clerk, file

2   reviews servicing into loan processing, and then into

3   underwriting in about 1979.  Then from that time period on I

4   held various positions with increasing levels of responsibility

5   in the underwriting and loan origination process through my

6   current position at Freddie Mac.

7   Q.  When did you start employment at Freddie Mac?

8   A.  1992.

9   Q.  Could you take us through the various positions you held at

10  Freddie Mac to the present day?

11  A.  Yes.  The first year I was at Freddie Mac I worked in the

12  institutional eligibility group, which basically means I had a

13  team of folks who looked at institutions themselves, mortgage

14  bankers, banks, other seller servicers to see whether they met

15  our requirements to be approved as a seller servicer, and that

16  included their financial strength.

17          After a year, a position opened in quality control,

18  which is really most of my background, and I was named director

19  of quality control and underwriting for Freddie Mac for the

20  regional community sellers, which is most of the customers that

21  we do business with, but the smaller ones not the larger ones.

22  I was in that position for several years, and moving up to

23  national underwriting director after approximately ten years.

24  And basically that's the same job I hold today, the same

25  responsibilities for overseeing the teams that do all of the

DA3TBAN4                     Padgett - direct

underwriting at Freddie Mac with just a different job title.

Q.  So would it be correct that you were -- you held the title
of national underwriting director during the 2007/2008 time
period?

A.  Yes.

Q.  Ms. Padgett, you touched on this a little already, but
could you please describe for the jury in some detail as to
what you were in charge of as the national underwriting
director in 2007/2008?

A.  So specifically our team would receive loan samples, so
randomly selected loans of new purchases from our seller
services, as well as loans that defaulted in certain periods.
And those loan samples would come to us and be assigned to us,
essentially, and we would request loan files from the seller
servicers.  Those files would come in.  We would run all the
documents that were used to originate the loan, employment
verifications, bank statements, anything in the file that we
could reverify.

        And when the reverifications were done they're
assigned to an underwriter, and someone on my staff would take
the file apart, basically, and recalculate income, assets,
would spend a lot of time looking at collateral to make sure
that the property values were substantiated, make sure the
borrower's credit was sufficient and income was sufficient to
be able to repay the debt.  During that time those folks that

DA3TBAN4                        Padgett - direct

underwrite the loans would engage with lenders around things we

might see around loan quality.  If we determined that there

were loans of non-investment quality, we would issue potential

repurchases.  Lenders have the opportunity to appeal.  If they

didn't understand or agree with decisions on non-investment

quality, those loans were escalated to me, among others, and I

would re-underwrite loans as well.  And we would make the

ultimate determination as to whether the loans were investment

quality for Freddie Mac and whether a repurchase or other

remedy would be appropriate.

Q.  Could you just give us a quick picture of where the loans

would be coming from that your team was reviewing?

A.  Yes, they would be coming from every seller servicer with

whom we had a relationship who had delivered loans to us in the

prior months or where we had purchased loans that were in our

portfolio and they had subsequently defaulted.

Q.  And you spoke of a sample.  Could you explain to us what

you meant by the sample?

A.  So really two samples.  One was if a lender closes a loan

to borrowers and they delivered loan to Freddie Mac, and we

would pay for the loan and move it to our portfolio.  Those

loans are newly originated loans.  And every month, the month

following our purchase of those loans, we took a random sample

of those loans from all of our sellers, at least one loan from

every seller, and would call those loan files in from those

1    sellers, as well as loans that lenders would notify us had

2    defaulted, we would call in certain of those non-performing

3    loans for review.

4    Q.  And what was the purpose of this whole operation?

5    A.  The purpose of the review, regardless of the status of the

6    loan, performing or non-performing, was to determine whether at

7    the time we purchased those loans they were investment quality

8    in accordance with our guide and contracts.

9    Q.  And what would happen if a determination were made that the

10   loan was not investment quality?

11   A.  If a loan were determined to be not investment quality, we

12   would capture that data and would issue a remedy letter to the

13   seller servicer notifying them of our finding that it was not

14   investment quality.

15   Q.  And what, if anything, would happen after that?

16   A.  As I mentioned, lenders could always appeal our decisions

17   to make sure that we had all of the information from the loan

18   file, and that we -- they clearly understood our position, or

19   if they had information that we weren't aware of we would

20   certainly reconsider that.  If they could prove to us that the

21   loan was an investment quality when we purchased it, we would

22   rescind the remedy or repurchase and keep it.  If they were

23   unable to do so, we would uphold our determination and remedy

24   request.

25   Q.  Were there any other available remedies besides repurchase?

DA3TBAN4                        Padgett - direct

1    A.  Yes.

2    Q.  Could you explain what those remedies were?

3    A.  Yes.  On the performing loan sample, if you remember,

4    that's the random based sample of loans we just purchased, in

5    those cases, unless the finding that caused the loan to be not

6    acceptable quality, not investment quality, was so egregious

7    such as a charter violation like there was not really a home on

8    the land or something really egregious, unless that occurred,

9    we issued what we called a feedback letter, which is

10   essentially outlining why the loan was not investment quality.

11   And we would tell lenders use this for training your staff, and

12   at this time we won't require repurchase, but should the loan

13   default at a later time, we would look at it and we held our

14   rights to issue repurchase at a later time.

15   Q.  Did this particular remedy apply only to performing loans

16   or to defaulted loans as well?

17   A.  Just to performing loans.

18   Q.  Ms. Padgett, do you know if Countrywide sold loans to

19   Freddie Mac during the 2007/2008 time period?

20   A.  Yes.

21   Q.  And did they?

22   A.  Yes, they did.

23   Q.  Are there any Freddie Mac documents that Countrywide had to

24   comply with as a seller of loans during that period?

25   A.  Yes.

1    Q.   What kind of documents?

2    A.   The Freddie Mac seller servicer guide and any and all

3    negotiated master agreements that we had with them.

4    Q.   Would you recognize the seller servicer guide if you saw

5    it?

6    A.   Yes.

7    Q.   Is it a big or small document?

8    A.   It's a big document.

9    Q.   If I showed you excerpts, would you recognize them, do you

10   think?

11   A.   Yes.

12          MR. CORDARO:   Your Honor, I would like to approach the

13   witness and show her Plaintiff's Exhibit 170, which has been

14   admitted into evidence.

15          THE COURT:   Go ahead.

16          MR. CORDARO:   Thank you.

17   Q.   Ms. Padgett, I placed before you Exhibit 170 in evidence.

18   Do you recognize that document?

19   A.   Yes.

20   Q.   What do you recognize it as?

21   A.   A Freddie Mac bulletin.

22   Q.   Are there any other documents attached to the bulletin?

23   A.   Yes.

24   Q.   What is attached?

25   A.   Looks like some excerpts from different chapters of the

1    Freddie Mac seller servicer guide.

2    Q.  Is that the selling servicer guide you were referring to

3    before?

4    A.  Yes.

5    Q.  If you could, could you turn to the page marked U.S.A.

6    131114.  It's about seven pages in.

7    A.  Yes.

8    Q.  Ms. Padgett, do you see section 6111?

9    A.  Yes.

10   Q.  Is this part of the seller servicer guide?

11   A.  Yes, it is.

12   Q.  There's a reference to warranties and representations by

13   the seller.  Do you see that?

14   A.  Yes.

15   Q.  Would you explain what that term means to us, please.

16   A.  Essentially this describes the promise, if you will, the

17   contract for sellers to deliver loans to Freddie Mac in

18   accordance with these terms.

19   Q.  And is this sometimes referred to as a representation and

20   warranty?

21   A.  Yes.

22   Q.  Or a rep and warrant?

23        Sorry, I didn't hear your answer.

24   A.  Yes.

25   Q.  Could you look at number one in page -- sorry, in section

1    6.11, please.  I will read it, it says:  The terms, conditions

2    and requirements stated in the purchase documents have been

3    fully satisfied.

4              Do you see that?

5    A.  Yes.

6    Q.  Is that a representation and warranty that the seller has

7    to make to Freddie Mac?

8    A.  Yes.

9    Q.  What is meant by the term "purchase documents?"

10   A.  Purchase documents would encompass the Freddie Mac guide

11   and all of the master agreements in place with the seller

12   servicer.

13   Q.  By Freddie Mac guide, do you mean the seller servicer guide

14   that's in front of you?

15   A.  Yes.

16   Q.  Now if I could ask you to turn a few more pages in to

17   Section 22.2, it's on page 131490.  Do you see Section 22.2?

18   A.  Yes.

19   Q.  Do you see the term "investment quality mortgage?"

20   A.  Yes.

21   Q.  You referred to investment quality a few times already in

22   your testimony.  Is that the same term that you were referring

23   to?

24   A.  Yes.

25   Q.  And is Section 22.2 a warranty of investment quality?

DA3TBAN4                          Padgett - direct

1    A.   Yes.

2    Q.   Could you read the last sentence into the record, please?

3    A.   The seller warrants that all mortgages sold to Freddie Mac

4    have the characteristics of an investment quality mortgage.

5    Q.   Now I just want to ask you before that sentence there is a

6    definition, is that correct?

7    A.   Yes.

8    Q.   And that definition contains the phrase "is originated in

9    accordance with the requirements of the purchase documents."

10   Do you see at that?

11   A.   Yes.

12   Q.   Does that apply to the loans that sellers sell to Freddie

13   Mac?

14   A.   Yes.

15   Q.   What does it mean for a loan to have to be originated in

16   accordance with the requirements of the purchase documents?

17            MR. STRASSBERG:  Objection, your Honor.

18            THE COURT:  Ground.

19            MR. STRASSBERG:  Legal conclusion, your Honor.

20            THE COURT:  Sustained.

21   Q.   Ms. Padgett, as a national -- in your capacity as national

22   underwriting director, was it important for you to be familiar

23   with what constituted an investment quality mortgage for

24   Freddie Mac?

25   A.   Yes.

1    Q.  Why was it important?

2    A.  The role of my team and myself was to determine whether

3    loans met that standard of investment quality.

4    Q.  And in that capacity, were you familiar with the definition

5    of an investment quality mortgage?

6    A.  Yes.

7    Q.  And would you be familiar with whether an investment

8    quality mortgage was originated with the requirements of the

9    purchase documents in making those determinations?

10   A.  Yes.

11   Q.  And based on your experience as the national underwriting

12   director, what did it mean to you when you were reviewing

13   documents that the mortgage was originated in accordance with a

14   requirements of the purchase documents?

15           MR. STRASSBERG:  Objection, your Honor.

16           THE COURT:  No, I think that's relevant.  Overruled.

17   A.  So our review -- to me what that meant was that a loan file

18   would contain sufficient evidence of the borrower's credit,

19   capacity, collateral and eligibility for the various programs.

20   So that meant that the borrower had sufficient income for a

21   sufficient period to be able to be used for the borrower to

22   repay the debt, have sufficient assets to put down, and have

23   equity into the property, that the property itself was of

24   sufficient value to support the mortgage, and that any program

25   eligibility terms were met within the credit boundaries we set

DA3TBAN4                        Padgett - direct

1    in the terms of the seller servicer guide and/or any master

2    agreements we had with the sellers.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   In your experience, did the standard of investment quality

2    vary from lender to lender or was it constant?

3    A.   It absolutely, our reviews are blind to any various

4    processes lenders might have.  The role was to review whatever

5    the specific terms of business were, relative to that loan on a

6    loan level, and hold every loan to that particular standard.

7    Q.   Based on your experience as an underwriter, and also as the

8    national underwriting director, what is the relationship, if

9    any, between the quality of a seller's underwriting and whether

10   a loan's investment quality?

11            MR. STRASSBERG:  Objection.

12            THE COURT:  Overruled.  You may answer.

13   A.   From my perspective, the quality of underwriting, having a

14   qualified underwriter, is the only way to determine whether or

15   not a loan met the standard of investment quality.  Without

16   having a sufficient qualified staff, the process can be very

17   complicated to determine what amounts of income, for instance,

18   are sufficient to be used for as long a period of time as it

19   would take for repaying a mortgage.  Same with collateral.  It

20   can be a complicated process to review an appraisal report and

21   determine whether or not the value is supported sufficiently

22   enough to support the loan.

23   Q.   Ms. Padgett, in the context of an underwriter, are you

24   familiar with the concept of independence?

25   A.   Yes.

DA33BAN5                          Padgett - direct

1    Q.  Could you explain to us in your experience as an

2    underwriter what the concept of independence means to you.

3               MR. STRASSBERG:  Objection, your Honor.

4               THE COURT:  Ground?

5               MR. STRASSBERG:  Your Honor, this is encroaching upon

6    one of your Honor's prior rulings I believe, so it would be

7    relevance.  I can explain to the side bar.

8               THE COURT:  Yes.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the side bar)

2            MR. STRASSBERG:  It is good to be able to talk, your

3     Honor.  Your Honor, this witness is not involved in any aspect

4     of the decision to purchase loans.  She is involved with the

5     repurchase decisions on the back end.  So my concern is that

6     her views of importance of underwriting, for example, are not

7     relevant to the issues that are relevant to the case.  Whereas

8     with Mr. Tanabe, and one of our colleagues we understood those

9     issues and your Honor ruled those were relevant.  Here,

10    frankly, her view may be interesting, but it is not relevant to

11    the issues we're deciding.  So that's the nature of the

12    objection.

13           MR. CORDARO:  I think to say that Ms. Padgett is only

14    involved with repurchases is cabining what it is she is doing.

15    The repurchase could happen at the end of the process.  The

16    process itself is straight underwriting, both by her team and

17    in some cases by her.  They are applying the investment quality

18    standard as the standard of underwriting.  So even though it's

19    true she's not involved in the purchase decision, she is

20    involved in a process that could culminate in a decision that

21    would affect lenders such as Countrywide.  I know the

22    repurchase end of this case is not --

23           THE COURT:  What is she going to say in answer to the

24    question about independence?

25           MR. CORDARO:  She would say it will affect --

1          THE COURT:  How will she define it?

2          MR. CORDARO:  I think she'll just say it is a matter

3     of reporting chains that we've seen before, that the

4     underwriters are not supposed to be compromised by those who

5     are on the volume end of the business.  I'm not leading her

6     into repurchasing at all.  I am bringing out --

7          THE COURT:  See, part of my concern is this.  And I'm

8     not sure whether this concern is itself relevant, but I'll

9     share it with you.

10         This would have been a relevant question to

11    Mr. Tanabe.  But it was put to Mr. Tanabe.  It was put in a

12    manner that was both confusing and defective as to form.

13    Therefore, I sustained the objection.  Counsel for the

14    government did not revisit it, did not try to rephrase the

15    question, in part I suspect because she is so new to this

16    process that she didn't focus on the possibility that a

17    question that's defective as to form can easily be reformed.

18         However, I don't know that that's a reason for letting

19    a witness as to whom it is not directly relevant answer the

20    question, except that the immediate question, which is

21    something about what do you mean by independence or something

22    like that, I can't remember the exact question, that's

23    something that she can testify to, even if she is not the

24    person who was involved.

25         It is the follow-up question that would be the one

DA33BAN5                          Padgett - direct

1    that would offend defense counsel's objection.

2              So I think I will, having now burdened the record with

3    all these errant thoughts, I will allow her to define what is

4    meant by independence, but I will not allow her to answer the

5    question of would it be important in the purchase and sale of

6    these loans or something along those lines.

7              So the first question yes, the second question no.

8              MR. CORDARO:  Thank you.

9              (Continued on next page)

1          (In open court)

2    Q.  Ms. Padgett, could you explain to us in your experience as

3    an underwriter what the concept of independence means to you?

4    A.  From an underwriter's perspective, having worked both in

5    what we call the primary market versus secondary market, so I

6    work for mortgage companies and as well as Freddie Mac.  It is

7    having an underwriting decision that is not subject to

8    influence from others that could derive some benefit from that.

9          So, for example, underwriters where borrowers' loans

10   are being processed have a loan officer who is commissioned

11   contacting you to find out what the status is or trying to

12   provide additional information or some way of influencing that.

13   Would be an example of the issue around independence.

14         Underwriters need to be able to assess independently,

15   without any influence to make that determination, as to whether

16   those loans were investment quality.

17         MR. STRASSBERG:  Objection, your Honor.  Move to

18   strike the last part of her answer.

19         THE COURT:  We'll leave it at that.  Put another

20   question.  I think that's all I am going to allow on the

21   subject.

22         MR. CORDARO:  I'll move on, your Honor.

23   Q.  Ms. Padgett could you turn to section 48.9 of the guide,

24   that's on 132055.  Do you see section 48.9 of the guide?

25   A.  Yes.

1      MR. CORDARO:  I'm sorry, Ms. Michaud, 48.9.  Thank

2  you.

3  Q.  Do you see where it says reporting requirements?

4  A.  Yes.

5  Q.  Could you explain to us what is meant by reporting

6  requirements.

7  A.  Yes.  This section of the guide references our requirements

8  for our sellers to have their own quality control program where

9  they're determining that the loans that they delivered to

10  Freddie Mac, a sample of those loans were investment quality.

11  And when they determine that they have any loans that were not

12  of investment quality, the sellers are required to report those

13  loans to us.

14  Q.  Is this sometimes referred to as a self-reporting

15  requirement?

16  A.  Yes.

17  Q.  Getting back to the process that you explained to us a few

18  minutes back.  Did self-reporting have any role in that

19  process?

20      MR. HEFTER:  Objection.  Vague.

21      MR. CORDARO:  I can rephrase the question, your Honor.

22  Q.  Ms. Padgett, you were testifying before about the review

23  that your team conducted of sampled loans.  Do you recall that

24  testimony?

25  A.  Yes.

1    Q.  Did self-reported loans have any role in that overall

2    process that you were talking about?

3    A.  No.

4    Q.  So when would a lender have to self-report a loan?

5    A.  Whenever they determined --

6            MR. STRASSBERG:  Objection, your Honor.

7            THE COURT:  Ground?

8            MR. STRASSBERG:  Legal conclusion.

9            THE COURT:  As phrased, sustained.  But I think there

10   are questions in that area that could be put.

11   Q.  Ms. Padgett, could you read the last paragraph of section

12   48.9.

13   A.  "A seller must notify Freddie Mac (see directory 2) in

14   writing within 30 days of the seller's determination that a

15   quality control finding affects the eligibility of a mortgage

16   sold to Freddie Mac.  Freddie Mac reserves the right to

17   increase the sampling or to impose other requirements on a case

18   by case basis."

19   Q.  Are you familiar what is meant by the phrase "quality

20   control finding"?

21   A.  Yes.

22   Q.  What is meant by that phrase?

23           MR. STRASSBERG:  Again, your Honor, objection.

24           THE COURT:  Overruled.

25           What is your understanding of what is meant by that

DA33BAN5                          Padgett – direct

1   phrase?

2            THE WITNESS:  This would refer to the findings from

3   their quality control review, if their quality control group

4   went back through, re-underwrote loans they had delivered to

5   Freddie Mac, and found some of those loans to be not of

6   investment quality.

7   Q.  What is your understanding of what would happen if the

8   lender self-reported any of those loans to Freddie Mac?

9            MR. STRASSBERG:  Objection.

10           MR. HEFTER:  Objection.

11           THE COURT:  Overruled.

12  A.  The process when we receive notification of a seller

13  self-reporting is generally we would call in the loan file, and

14  review the loan file ourselves, as well as any documentation

15  that they provided relative to their finding.  And make a

16  determination as to whether we concurred that was not

17  investment quality.  And if so, would apply different various

18  remedies.

19  Q.  When you say "we," who are you referring to?

20  A.  I'm sorry.  My underwriting team.

21  Q.  Would be the same underwriting team that was involved in

22  the process that we were discussing about 15 minutes ago?

23  A.  Yes.

24  Q.  Is it your understanding that the existence of this

25  self-reporting requirement meant that a lender could sell not

1    investment quality loans to Freddie Mac?

2                MR. STRASSBERG:  Objection.

3                MR. HEFTER:  Objection.

4                THE COURT:  Sustained.  Leading.

5    Q.  Section 22.2 of the selling guide describes an investment

6    quality mortgage.  Is that correct?

7    A.  Yes.

8    Q.  Is it a warranty by the seller or not that loans sold to

9    Freddie Mac must be investment quality?

10               MR. STRASSBERG:  Objection, your Honor.

11               THE COURT:  Ground?

12               MR. STRASSBERG:  It is asking for a legal conclusion,

13   your Honor.

14               THE COURT:  All these questions should be taken by the

15   witness as referring to her understanding, which in this

16   situation is relevant, unlike some other situations that we've

17   discussed at the side bar.  So with that understanding, I will

18   allow the question.

19   A.  Can you repeat the question, please?

20   Q.  Sure, I can.  Is it your understanding that section 22.2 is

21   a warranty that loans sold to Freddie Mac have the

22   characteristics of an investment quality mortgage?

23   A.  Yes.

24   Q.  Is it your understanding that the self-reporting

25   requirement alters or does not alter that particular

1    requirement?

2              MR. HEFTER:  Objection.

3              THE COURT:  Overruled.

4    A.   It's my understanding that the self-reporting does not

5    override the investment quality requirement.

6    Q.   You mentioned the remedy of repurchase earlier.  Based on

7    your understanding, does the existence of the remedy of

8    repurchase alter or not alter the investment quality

9    requirement?

10   A.   It does not.

11             MR. CORDARO:  May I confer just very briefly, your

12   Honor?

13             THE COURT:  Yes.

14             MR. CORDARO:  Nothing further on direct from the

15   United States, your Honor.

16             THE COURT:  Cross-examination.

17   CROSS-EXAMINATION

18   BY MR. STRASSBERG:

19   Q.   Good afternoon, Ms. Padgett.  My name is Richard Strassberg

20   and I represent Countrywide and the Bank of America.  And I'd

21   like to ask you some questions this afternoon.

22             Before we begin, let me make sure we understand the

23   scope of your responsibilities at Freddie Mac during the time

24   period from 2007 to 2008.

25             During that period, you were the national underwriting

1    director, correct?

2    A.  Yes.

3    Q.  In that role, you supervised the underwriting and quality

4    control staff at Freddie Mac, right?

5    A.  Yes.

6    Q.  They selected loans Freddie Mac had purchased for review,

7    correct?

8    A.  I'd like to clarify that.

9    Q.  Sure.

10   A.  The quality control in the underwriting department doesn't

11   select the sample of loans.  It is selected by a different

12   group.

13   Q.  So the different group that selects them, but your group

14   would review them?

15   A.  That's correct.

16   Q.  That included loans from Countrywide, correct?

17   A.  Yes.

18   Q.  And they included loans from the other major lenders that

19   Freddie Mac dealt with, correct?

20   A.  Yes.

21   Q.  Your review, as I think you testified, was done in order to

22   assess if the loans that Freddie Mac had purchased were of

23   investment quality, correct?

24   A.  Yes.

25   Q.  You also oversaw the repurchase negotiations that Freddie

1    Mac had with Countrywide, is that right?

2    A.  No.

3    Q.  Okay.  Well, is it fair to say that the contracts provided

4    for a repurchase remedy in the event that Freddie Mac

5    determined a loan was not investment quality?

6    A.  Yes, that was one remedy.

7    Q.  That was a remedy that was in the contract that Freddie Mac

8    had with Countrywide, right?

9    A.  Yes.

10   Q.  And it was a remedy that was in the contract that Freddie

11   Mac had with all of its lenders, right?

12   A.  Yes.

13   Q.  Before we get to some questions on this repurchase process,

14   let's again focus on the things that you were responsible for

15   in this time period.  So for all of my questions, Ms. Padgett,

16   I'm just going to focus you on 2007 to 2008, rather than what

17   you may be doing today.

18            So in the 2008 time frame, were you involved in

19   negotiating the contractual agreements that existed between

20   Freddie Mac and Countrywide?

21   A.  No.

22   Q.  Were you involved in that time period in choosing what

23   kinds of loans Freddie Mac purchased?

24   A.  No.

25   Q.  Were you involved in developing policies concerning which

DA33BAN5                          Padgett - cross

1    kinds of loans Freddie Mac purchased?

2    A.  No.

3    Q.  How about in determining credit risk in association with

4    different types of loans?

5    A.  No.

6    Q.  Were you involved in setting the market share goals that

7    Freddie Mac had for its dealings with Countrywide?

8    A.  No.

9    Q.  How about were you involved with conducting on-site reviews

10   of lenders like Countrywide?

11   A.  No.

12   Q.  Well, were there other groups at Freddie Mac that were

13   responsible for those issues that we've just gone through?

14   A.  Yes.

15   Q.  But it just wasn't yours, right?

16   A.  That's correct.

17   Q.  Am I right that Freddie Mac had a dedicated team of people

18   who conducted on-site reviews of lenders like Countrywide to

19   gather information about how the lenders processed the loans

20   that they sold?  Right?

21   A.  Yes.

22   Q.  And that group conducted due diligence reviews, correct?

23            MR. CORDARO:  Objection, your Honor.

24            THE COURT:  Ground?

25            MR. CORDARO:  Foundation.

1          THE COURT:  Do you know what is meant by the term "due
2     diligence"?
3          THE WITNESS:  That was going to be my question, is
4     what do you mean by due diligence.
5          THE COURT:  Good question.  Go ahead, counsel.
6          MR. STRASSBERG:  I'll withdraw and we can move on.
7     Q.  The group that we were talking about that conducted these
8     on-site reviews process, that was called the external
9     operations risk management group or the EORM group, right?
10    A.  Yes.
11    Q.  That group operated independently of you in your group,
12    right?
13    A.  Yes.
14    Q.  Is it fair to say, Ms. Padgett, that you did not have any
15    personal interactions with the Full Spectrum Lending Division
16    of Countrywide?
17    A.  That's correct.
18    Q.  You never visited the Full Spectrum Division's offices?
19    A.  That's correct.
20    Q.  You never spoke with anyone who was employed by Full
21    Spectrum Lending, right?
22    A.  That's correct.
23    Q.  You testified that in this time period, you supervised the
24    process that reviewed loans that Freddie Mac had purchased from
25    various lenders, including Countrywide, right?

1    A.  Yes.

2    Q.  As part of that process, Freddie Mac reviewed all of the

3    loans that had gone into default within the first few years of

4    having been bought, correct?

5    A.  Essentially.

6    Q.  Well, Freddie Mac also reviewed, in addition to loans that

7    had gone into default, loans that had chronic delinquencies in

8    payment, is that right?

9    A.  Yes.  There was a formula for determining that.  But that's

10   a good way to describe it.

11   Q.  You also testified that you did reviews of performing loans

12   that had just been purchased by Freddie Mac, correct?

13   A.  Yes.

14   Q.  That was part of the sampling that you explained was done

15   by another group, but then your group would review the results

16   of that sample, right?

17   A.  Yes.

18   Q.  And that sampling and those reviews were done roughly on a

19   monthly basis of loans as they were coming in to Freddie Mac,

20   correct?

21   A.  Yes.

22   Q.  If it was determined, as part of your review, that the loan

23   was not of investment quality, Freddie Mac could require the

24   seller to repurchase the loan, right?

25   A.  That's correct.

1  Q.  If the seller repurchased the loan, Freddie Mac would get

2  paid back for the cost of the loan, correct?

3  A.  Yes.

4  Q.  You talked about Freddie Mac having other remedies in

5  addition to the repurchase remedy that was built into the

6  contract with Countrywide, right?

7  A.  I'm not sure I understand.

8  Q.  Let me put it this way.  You testified about something

9  called the feedback program, do you remember that?

10 A.  Yes.

11 Q.  The feedback program was a program where Freddie Mac would

12 not seek to follow through on any remedy it might have had in

13 the contract, even though based on your review it might have

14 found what it considered defects in the particular loan that

15 had been sold?

16         MR. CORDARO:  Objection.

17         THE COURT:  Ground?

18         MR. CORDARO:  He's testifying, your Honor.

19         THE COURT:  Well, that is a question.  The question,

20 as I understood it, the question is, was the feedback program a

21 program such as counsel postulated in the question.  And the

22 answer is yes, no, or maybe or whatever.

23         So, do you understand the question?

24 A.  I was actually going to ask you to repeat that, please.

25 Not sure I got the question.

```
1    Q.  Well, let me try to rephrase it.  And tell me if I
2    summarize what you described correctly.
3          That Freddie Mac had a feedback program that would
4    allow it for loans that were performing to keep those loans,
5    even though your review from your quality control group might
6    have identified that those loans had defects such that they
7    might otherwise be considered not of investment quality.
8    Correct?
9    A.  Yes, but if I can clarify.  The guide allows for remedies,
10   and the feedback program was a remedy.  We issued a remedying
11   letter.  And the remedy was that, despite the non-investment
12   quality, we're retaining it with the right to go back for
13   repurchase, for educational purposes, or whatever.
14   Q.  I see.  So this was another one of the remedies, the
15   feedback program itself, that was available to you?
16   A.  That's correct.
17   Q.  The feedback program allowed Freddie Mac to keep these
18   performing loans and to profit from its possession of those
19   performing loans, right?
20          MR. CORDARO:  Objection.
21          THE COURT:  Ground?
22          MR. CORDARO:  Foundation, profit, also relevance.
23          THE COURT:  Well, I was wondering when you were going
24   to get around to relevance.  Unless counsel wants to make a
25   showing at the side bar, I don't see the relevance and I'll
```

DA33BAN5                    Padgett - cross

1    sustain the objection.

2              MR. STRASSBERG:  Your Honor, we can move on.

3              THE COURT:  Okay.

4    Q.  Ms. Padgett, you are aware that Freddie Mac chose to buy

5    stated income and stated asset loans from Countrywide, correct?

6              MR. CORDARO:  Objection, your Honor.

7              THE COURT:  Ground?

8              MR. CORDARO:  Again, foundation and relevance.

9              THE COURT:  I'll reserve on relevance, but on

10   foundation is sustained.  Lay a foundation if you can.

11   Q.  Based on your review of loans as part of the quality

12   control process, did you become aware of certain types of loans

13   that Freddie Mac purchased?

14   A.  Yes.

15   Q.  Were among those types of loans stated income stated asset

16   loans?

17   A.  Yes.

18   Q.  Did Freddie Mac purchase those types of loans from many

19   different lenders?

20   A.  Yes.

21   Q.  Including Countrywide?

22   A.  Yes.

23   Q.  Are you aware, Ms. Padgett, that Freddie Mac entered into

24   specific variances that specifically allowed Freddie Mac to

25   purchase stated income stated asset loans from Countrywide?

DA33BAN5                    Padgett - cross

1   A.  By variance, are you asking about the waiver to be able to

2   deliver those loans?

3   Q.  Is that another way you would have referred to a variance,

4   Ms. Padgett?

5   A.  Yes.

6           THE COURT:  Wait.  No.  That I will not permit.  But

7   you can rephrase.

8   Q.  So, let me rephrase the question with respect to variance.

9   Was it the case, Ms. Padgett, that Freddie Mac entered into a

10  specific written waiver with respect to Countrywide so that

11  Freddie Mac could purchase stated income and stated asset loans

12  from Countrywide?

13          MR. CORDARO:  Objection.  Foundation.

14          THE COURT:  If you know the answer, I'll allow that.

15  A.  Yes.

16  Q.  Ms. Padgett, to the extent that Freddie Mac desired that a

17  certain process be performed in a particular way, Freddie Mac

18  had the ability to reflect those requirements in that seller

19  servicer guide that you talked about on your direct

20  examination, isn't that right?

21          MR. CORDARO:  Objection.

22          THE COURT:  Overruled.

23  A.  Can you repeat the question, please?

24  Q.  Yes.  To the extent that Freddie Mac wanted a particular

25  process to be a requirement of its seller servicer guide, it

1   had the ability to put that requirement explicitly in the

2   seller servicer guide, didn't it?

3           THE COURT:  So I think the possible confusion is what

4   do you mean by "they had the ability."  Do you mean they

5   physically and mentally had the ability?  Do you mean they

6   legally had the ability, which she can't comment on.  Do you

7   mean that her understanding of the contractual relations was it

8   would permit that?  Etc.  So why don't we clarify.

9           MR. STRASSBERG:  Why don't I rephrase it.

10  Q.  Was it your understanding, Ms. Padgett, that the seller

11  servicer guide, along with any waivers and any other documents

12  that would make up the purchase documents as you defined them,

13  would reflect all the requirements that Freddie Mac demanded of

14  any seller of loans that it was going to buy loans from?

15  A.  Yes.

16  Q.  So for example, we looked, and I'm going to try if we can

17  kind of remember not to do this again, but we looked on direct

18  or you did about one of the provisions about the quality

19  control program requirements that lenders were required to

20  have.  Do you remember that?

21  A.  Yes.

22  Q.  That's an example of a particular provision that requires a

23  particular process.  Do you recall that?

24          MR. CORDARO:  Objection, your Honor.

25          THE COURT:  I think that's argumentative in effect.

1    Sustained.

2    Q.  Ms. Padgett, based on your understanding and knowledge of

3    the seller servicer guide, and just so it's clear, I know we've

4    introduced excerpts in Plaintiff's Exhibit 170, but the actual

5    seller servicer guide is something on the order of 2,000-plus

6    pages, isn't that right?

7    A.  Yes.

8    Q.  Based on your familiarity, based on your knowledge of the

9    seller servicer guide, am I correct that there is no provision

10   anywhere in those 2,000-plus pages that requires a particular

11   type of training before an employee can clear a loan to close?

12            MR. CORDARO:  Objection.

13            THE COURT:  Ground?

14            MR. CORDARO:  Well, counsel is asking about a large

15   document, and --

16            THE COURT:  Of course, I am quite shocked and

17   surprised that no counsel has bothered to introduce a

18   2,000-page document in very grave derogation of the manner in

19   which both sides have otherwise proceeded.

20            But, under those circumstances, given her familiarity

21   with the guidelines, why is this an objectionable question?

22            MR. CORDARO:  Your Honor, it is the particular type of

23   training which I find to be vague, again.  Because, again, it

24   is like, what does "particular" mean in this context.

25            THE COURT:  Well --

1          MR. CORDARO:  Does it mean --

2          THE COURT:  I guess what you're raising from your

3     first objection, as I think about it further, is a best

4     evidence objection.  How clever of you to state it that way.

5          So, does either side want to put in the 2,000-page

6     document?

7          MR. STRASSBERG:  Your Honor, we're not seeking to

8     burden --

9          THE COURT:  Here's what it comes down to.  I'm going

10    to allow this question, notwithstanding what I think is a valid

11    best evidence objection, if the government and the defense tell

12    me they don't intend to put in this document.  So it's your

13    collective and individual choice.

14         MR. STRASSBERG:  Our intention is not to, your Honor.

15         MR. SULLIVAN:  I'm leaving open the possibility of

16    putting it in.  I was afraid you'd put me in jail if I put it

17    in, it's so thick.

18         THE COURT:  Well the temptation would be great, of

19    course.

20         MR. SULLIVAN:  I know.  We don't know yet.  We'd like

21    to see the rest of the government's case.  Maybe we would put

22    it in.

23         THE COURT:  On that straightforward answer, I'm still

24    going to allow the question.  You may answer.

25    A.  To my knowledge, the guide is not prescriptive in that

1    regard.

2    Q.   Similarly, Ms. Padgett, am I right that there is no

3    provision anywhere in the guide that requires a particular

4    compensation structure for employees of a lender, isn't that

5    right?

6    A.   That's correct.

7    Q.   Similarly, there is no provision anywhere in the guide that

8    requires that an employee of a lender have a particular title

9    in order to do underwriting functions relating to a loan that

10   would be sold to Freddie Mac?

11   A.   That's correct.

12   Q.   So, now, Ms. Padgett, if you recall we looked at or you

13   looked at with the government section 6.11 of the excerpts of

14   the selling guide, the general category that says on the left

15   representations and warrantys.  Do you remember that?

16   A.   Yes.

17   Q.   Is it fair to say that your understanding of that

18   requirement is that those representations and warrantys are

19   made on a loan-by-loan basis?

20   A.   Yes, that's correct.

21   Q.   So, is it also fair to say that a particular underwriting

22   process used by a lender would be consistent with the purchase

23   documents as long as the loans produced were still of

24   investment quality?

25              MR. CORDARO:  Objection.

1        THE COURT:  Overruled.

2   A.  That's correct.

3        MR. STRASSBERG:  Thank you, your Honor.  No further

4   questions.  Thank you, Ms. Padgett.

5        MR. HEFTER:  Just to save time I am going to ask my

6   questions from here.

7   CROSS-EXAMINATION

8   BY MR. HEFTER:

9   Q.  Ms. Padgett, my name is Michael Hefter and I represent

10  Rebecca Mairone.  Good afternoon.

11       I think you testified in response to Mr. Strassberg's

12  testimony that you did not have any interaction with anybody at

13  FSL, is that correct?

14  A.  That's correct.

15  Q.  That would include Ms. Rebecca Mairone, correct?

16  A.  Yes.

17  Q.  You also said you never spoke to anyone at FSL, correct?

18  A.  Yes.

19  Q.  That would include Ms. Mairone?

20  A.  Yes.

21  Q.  That would include correspondence as well?  E-mail,

22  letters?

23  A.  That's correct.

24  Q.  You never corresponded with Ms. Mairone, that's my

25  question, correct?

DA33BAN5                              Padgett – cross

1    A.  Yes.

2    Q.  You're not aware of any representation by Ms. Mairone to

3    Freddie Mac, correct?

4    A.  That's correct.

5    Q.  I have one or two more questions.  I think you testified in

6    your background that you became an underwriter in 1979?

7    A.  That's about the year, yes.

8    Q.  About the year 1979.  You started in the mortgage industry

9    in 1976, is that correct?

10   A.  Yes.

11   Q.  Thank you.

12            THE COURT:  Redirect?

13            MR. CORDARO:  Yes, but could we have a brief side bar

14   first because I think it will move things along.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. CORDARO:  Your Honor, on the direct examination, I

3    was going to put some questions to the witness about whether

4    independence or compensation or training of underwriters could

5    affect investment quality.

6           I took the Court's ruling at the side bar to preclude

7    me from putting those questions.  However, counsel has now gone

8    into that area on his cross-examination with respect to the

9    contract when he asked questions specifically about training

10   and compensation.  And I would argue that that has now opened

11   the door to that kind of question based on her experience,

12   whether compensation or training has any relationship to

13   investment quality in her experience.

14          MR. STRASSBERG:  Your Honor, I attempted certainly to

15   very much follow your Honor's ruling.  My questions were about

16   what was or was not in the selling documents.  Because she is

17   not a person who is involved in the decision to repurchase.

18          THE COURT:  I don't think the door has been opened.

19          (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2    REDIRECT EXAMINATION

3    BY MR. CORDARO:

4    Q.  Good afternoon again, Ms. Padgett.  You were asked several

5    questions on cross-examination about certain areas that you or

6    your team were not involved in.  Do you remember those

7    questions?

8    A.  Yes.

9    Q.  Were you and your team involved in underwriting loans sold

10   by Countrywide to Freddie Mac?

11   A.  Yes.

12   Q.  You were asked on cross-examination if you had had any

13   contact with any employees of FSL.  Do you remember that

14   question?

15   A.  Yes.

16   Q.  Do you recall having any contact with any employees of

17   Countrywide in connection with your position?

18   A.  Yes.

19   Q.  Were those contacts in 2007, 2008?

20   A.  Yes.

21   Q.  Do you recall which employees you had contacts with at

22   Countrywide during that period?

23          MR. STRASSBERG:  Objection, your Honor.

24          THE COURT:  Ground?

25          MR. STRASSBERG:  Beyond the scope.

 1              THE COURT:  No, I don't think so.  Overruled.

 2   A.  The two people I had the most contact with during that time

 3   frame were Nancy Bush and Cindy Simantel.

 4   Q.  Were Ms. Bush and Ms. Simantel employees of Countrywide?

 5   A.  Yes.

 6   Q.  Without getting into the substance, could you give me a

 7   sense of how often you had contacts with Ms. Bush?

 8   A.  Very frequently.  So, I would say multiple times a month.

 9   Q.  And same question for Ms. Simantel.

10   A.  About the same level of frequency, it was typically the

11   three of us and others involved in discussions.

12   Q.  You were asked a series of questions about stated income

13   loans.  Do you recall those questions?

14   A.  Yes.

15   Q.  Could you just set out for us what a stated income loan is.

16   A.  Yes.  It would be a loan where the program allowed

17   borrowers to come in and apply for and get mortgages, where

18   they could state how much they made, as far as their income

19   amount to be used for qualification.  And that -- there were

20   requirements around particular credit scores they would have to

21   have, and there needed to be some analysis around the

22   reasonableness of what that income was relative to the type of

23   work they did and tenure.

24   Q.  In your career, did you have any experience with the

25   underwriting of stated income loans?

1    A.   Yes.

2    Q.   In your experience, does the underwriting of stated income

3    loans pose or not pose any particular challenges?

4            MR. HEFTER:  Objection, your Honor.  Relevance.

5            THE COURT:  Sustained.

6            Just so the jury is clear as to what it is and what it

7    isn't.  Prior to the advent of stated income loans, if someone

8    applied for a mortgage and said their income was $60,000, what

9    steps in your experience would a bank normally take to verify?

10           THE WITNESS:  So, prior to stated income, if someone

11   came in disclosed their income amount, we would go to the

12   employer and confirm the amount of the salary, if they were

13   salaried, or obtain tax returns to confirm the amount of income

14   if they were self-employed or had other sources of income.

15           THE COURT:  After the advent of stated income loans,

16   where stated income loans were permitted, those kind of checks

17   were not required.  Do I understand that correctly?

18           THE WITNESS:  That's correct.  Income was not

19   verified.

20           THE COURT:  Go ahead, counsel.

21   BY MR. CORDARO:

22   Q.   Based on your experience, what, if any, is the relationship

23   between the quality of underwriting and whether a stated income

24   loan could be investment quality?

25           MR. STRASSBERG:  Objection.

DA33BAN5                        Padgett - redirect

1          MR. HEFTER:  Objection.

2          THE COURT:  Ground?

3          MR. STRASSBERG:  Relevance, again.

4          MR. HEFTER:  Foundation.

5          THE COURT:  Overruled.

6   A.  Can you repeat that question, please?

7   Q.  Sure I can.  Based on your experience, what, if any, is the

8   relationship between the quality of underwriting and whether a

9   stated income loan could be an investment quality loan?

10  A.  So, the underwriting would be potentially more difficult,

11  because there would not be an income or employment document to

12  refer to for an underwriter to determine the qualifying income.

13  In the case of a stated income loan, you have to look at the

14  loan file holistically, balance out all the different pieces of

15  the loan.  So determining reasonableness of income was very

16  challenging.

17          And an example I can give is, on a loan application,

18  if the borrower says they worked for the Smith Company and

19  their title is manager, and they make $6,000 a month, there is

20  no context for that to determine whether that's a reasonable.

21  Don't know the type of employment, you don't -- you can't put

22  that into context.

23          So it was very difficult and more challenging in my

24  opinion to underwrite those loans.

25          MR. CORDARO:  Nothing further on redirect, your Honor.

1        THE COURT:  Anything further?

2        MR. STRASSBERG:  Nothing further.

3        MR. HEFTER:  No, your Honor.

4        THE COURT:  Thank you so much.  You may step down.

5        (Witness excused)

6        THE COURT:  All right, ladies and gentlemen, as

7   previously indicated, we're going to break for today.  But we

8   will resume at 9:30 tomorrow.  So have a very good evening,

9   we'll see you then.

10        (Jury excused)

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA33BAN5

1          THE COURT:  First, just for guidance, if any it may

2     have, I thought the examination and testimony of Ms. Padgett is

3     a model of how I would hope the examination and

4     cross-examination and testimony will be conducted.  All the

5     questions on both sides, even those that may ultimately have

6     led to sustained objections, were by and large models of

7     clarity and simplicity, and the result was that -- partly, I

8     suppose, because of the witness's own personality -- that she

9     was able to give straightforward, simple answers, rather than

10    convoluted or answers beyond the scope as we have had with a

11    number of witnesses.  So if you want to have a model in mind of

12    what the Court would prefer to see, you've just seen such a

13    model.

14          With respect to Ms. Simantel, I didn't get any

15    citations from the government, but is she an officer of any of

16    the defendants?

17          MS. MAINIGI:  Your Honor, her title is technically

18    SVP, but we would not view her to be an officer of the company.

19    There are upwards of 19,000 SVPs at Bank of America.

20          THE COURT:  That's the question.  If she is an officer

21    when she can be subpoenaed or noticed directed at the corporate

22    defendant can be issued to require her appearance.  If she is

23    not an officer, then it can't.  If she is just a non-officer

24    employee.

25          MS. MAINIGI:  She's not even a managing director, your

DA33BAN5

```
 1    Honor.

 2              THE COURT:  Oh my gosh.

 3              MS. MAINIGI:  She has no window in her office, your

 4    Honor.

 5              THE COURT:  But she hasn't been furloughed.

 6              So, does the government want to respond to that?

 7              MR. CORDARO:  Yes, your Honor.  I think there is broad

 8    agreement here that the only issue is whether she is an

 9    officer.  The Aristocrat case from Judge Leisure and your

10    Honor's decision set out what the issue is.

11              A senior vice president of a corporation like Bank of

12    America in our view is an officer.  We would assume if she

13    holds that title, she is a manager, that she is a decision

14    maker within her ambit, whatever that ambit is.  And therefore,

15    we would say she is an officer and can be compelled to come to

16    court here in New York.

17              THE COURT:  That's the issue.  So, anyone wants to

18    provide me with, and we want to try for her sake, among others,

19    to bring this to a head.  Did she end up with separate counsel?

20              MS. MAINIGI:  She does have separate counsel.

21              THE COURT:  You can inform -- who is the counsel?

22              MS. MAINIGI:  Becky Walker James.

23              THE COURT:  You can inform counsel that if counsel

24    wants to be heard on that issue, if she's not willing to

25    voluntarily appear, of course I haven't yet decided the
```

DA33BAN5

1  admissibility of the evidence for which she's being called.

2  That's a separate question.

3         But if counsel for the witness wants to be heard on

4  this issue whether she's an officer or not, otherwise what I'd

5  like to get from the defendants is basically job description,

6  things like that.  And from the government any evidence you

7  have that bears on whether she is an officer.

8         MR. CORDARO:  Thank you, your Honor.

9         MS. MAINIGI:  Your Honor, can we just e-mail it to

10  your law clerk this evening just so we can move this matter

11  along?

12         THE COURT:  That's fine.  Then I think that's all we

13  have outstanding at the moment.  Give me the line up again for

14  tomorrow.

15         MR. CORDARO:  Your Honor, it will be Ms. Brewster,

16  Mr. Sobczak, then Boland by video.

17         MS. SCHOENBERGER:  Price by video if we have your

18  Honor's rulings.

19         THE COURT:  I don't have the transcript.

20         MS. SCHOENBERGER:  I believe it was delivered to

21  chambers this morning.  We weren't counting on that being

22  completed.

23         THE COURT:  It may be.  I've barely been in chambers.

24         MS. SCHOENBERGER:  We'll also be prepared to call

25  Mr. Hansen.

DA33BAN5

1          MS. MAINIGI:  Does it appear, your Honor, I'm just

2     looking for clarification for the purpose of Rule 50 written

3     motions.  Does it appear to the government that they will rest

4     tomorrow or Monday?

5          THE COURT:  How long are the depositions?

6          MR. CORDARO:  Mr. Boland's is one hour, your Honor.

7     Price would be less.  I am assuming if we are resting tomorrow

8     it would be near the end of the day.  Just given that we have

9     five names here on this list.  And judging from previous

10    experience.

11         MS. MAINIGI:  Just for clarification, your Honor,

12    Mr. Sobczak is a witness that had been on our witness list as

13    well.  I suspect that whatever gets covered on direct is

14    sufficient for me as far as covering him on cross.  But I just

15    put that out there.

16         THE COURT:  As you know under my practices, if their

17    direct does not cover all that you would have covered on

18    direct, then you may, in addition to your cross, at the same

19    time, have direct, and the portion of your examination that is

20    direct has to have non-leading questions.

21         MS. MAINIGI:  Understood.  You want that whole

22    colloquy done straight after the cross --

23         THE COURT:  No, whatever you'd like.  You can mix and

24    match.

25         Yes.

DA33BAN5

1          MR. HEFTER:  I guess for further clarification, your

2     Honor, if it sounds like at the very least we are going to be

3     ending the day very late, if the government finishes its case

4     at all.  And would your Honor want argument at 5 p.m. tomorrow

5     on the Rule 50 motions or at some other point in time?

6          THE COURT:  Well, here's the issue.  I do not want to

7     impinge on good jury time.  So, say if the government finished

8     at 3 o'clock.  It sounds quite unlikely, but taking that

9     hypothetically, then yes we'd have Rule 50 right then.  If the

10    government finishes at 5 o'clock, I will give counsel the

11    choice of either doing the Rule 50 then, or doing it at 8:30 on

12    Monday morning.  And that will be defendants' choice.

13         MR. HEFTER:  Fair enough.

14         MS. MAINIGI:  One point of information.  I understand

15    Mr. Sobczak, who has been here waiting all week to testify,

16    needs to fly out tomorrow evening and cannot return on Monday.

17    So we may need to make some allowances in schedule.

18         THE COURT:  Of course.  We would always accommodate

19    that.  Okay.  Very good.  Now I have an evidentiary hearing

20    starting in three minutes, so I'll need to ask you to clear out

21    fairly quickly.

22         (Adjourned until October 4, 2013, at 9:30 a.m.)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    BENJAMIN TANABE

 4    Cross By Ms. Mainigi . . . . . . . . . . . .1318

 5    Cross By Mr. Hefter  . . . . . . . . . . . .1346

 6    Redirect By Ms. London . . . . . . . . . . .1347

 7    CHARLES COWAN

 8    Direct By Mr. Armand . . . . . . . . . . . .1378

 9    Cross By Mr. Smurzynski  . . . . . . . . . .1413

10    Redirect By Mr. Armand . . . . . . . . . . .1419

11    PAMELA PADGETT

12    Direct By Mr. Cordaro  . . . . . . . . . . .1422

13    Cross By Mr. Strassberg  . . . . . . . . . .1446

14    Cross By Mr. Hefter  . . . . . . . . . . . .1460

15    Redirect By Mr. Cordaro  . . . . . . . . . .1463

16                       DEFENDANT EXHIBITS

17    Exhibit No.                           Received

18     43    . . . . . . . . . . . . . . . . . . .1321

19     60    . . . . . . . . . . . . . . . . . . .1340

20

21

22

23

24

25
```