DA4TBAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    Plaintiff,

5              v.                          12 CV 1422 (JSR)

6   BANK OF AMERICA CORPORATION,

7   *successor to Countrywide
    Financial Corporation,*

8   *Countrywide Home Loans, Inc.,
    and Full Spectrum Lending*, et

9   al.,

10                   Defendants.

11  ------------------------------x

                                          New York, N.Y.
12                                        October 4, 2013
                                          10:00 a.m.
13

14  Before:

                         HON. JED S. RAKOFF,
15
                                          District Judge
16

17

18

19

20

21

22

23

24

25

DA4TBAN1

1                              APPEARANCES

2   PREET BHARARA
         United States Attorney for the
3        Southern District of New York
    PIERRE G. ARMAND
4   JAIMIE LEESER NAWADAY
    JOSEPH N. CORDARO
5   CARINA H. SCHOENBERGER
    ELLEN M. LONDON
6        Assistant United States Attorneys

7

    WILLIAMS & CONNOLLY
8        Attorneys for Defendant Bank of America
    BRENDAN V. SULLIVAN, JR.
9   ENU MAINIGI
    MALACHI B. JONES
10  KENNETH SMURZYNSKI
    CRAIG D. SINGER
11  ALLISON B. JONES
    STEVEN M. CADY
12  JENNIFER WIMSATT PUSATERI

13

    GOODWIN PROCTOR
14       Attorneys for Defendants Countrywide
    RICHARD M. STRASSBERG
15  WILLIAM HARRINGTON

16

    BRACEWELL & GIULIANI
17       Attorneys for Defendant Mairone
    MARC L. MUKASEY
18  MICHAEL HEFTER
    RUSSELL ZWERIN
19  RYAN M. PHILP
    SETH M. COHEN
20  CHRISTINA JARDINE

21

22

23

24

25

DA4TBAN1

```
 1              (In open court, jury present)
 2              THE COURT:  The government will call their next
 3   witness.
 4              MS. SCHOENBERGER:  The United States calls Maria
 5   Brewster.
 6    MARIA BREWSTER,
 7         called as a witness by the Plaintiff,
 8         having been duly sworn, testified as follows:
 9   DIRECT EXAMINATION
10   BY MS. SCHOENBERGER:
11              DEPUTY CLERK:  Please be seated and state your name
12   and spell your last name slowly for the record.
13              THE WITNESS:  Maria Bruehwiler Brewster,
14   B-R-E-W-S-T-E-R, B-R-U-E-H-W-I-L-E-R.
15              THE COURT:  Counsel.
16   Q.  Good morning, Ms. Brewster.
17              Ms. Brewster, are you employed?
18   A.  Yes.
19   Q.  Where do you work?
20   A.  Fannie Mae.
21   Q.  And how long have you worked at Fannie Mae?
22   A.  Fifteen years.
23   Q.  What is your title there?
24   A.  Director in the centralized repurchase team.
25   Q.  Is the centralized repurchase team part of a larger
```

1    division?

2    A.  Yes.

3    Q.  What is that division?

4    A.  The national underwriting center.

5    Q.  What is the centralized repurchase team responsible for?

6    A.  The resolution of all repurchases that go out of Fannie

7    Mae.

8    Q.  Could you describe what a repurchase is?

9    A.  A repurchase is when we find a loan that was delivered to

10   Fannie Mae that shouldn't have been delivered to us, it didn't

11   meet our guidelines, then we send it back it the lender who

12   sent it to us and we get our money back, essentially.

13   Q.  Where is your office located?

14   A.  I work out of Chicago and Dallas.

15   Q.  And what are your job responsibilities as the director of

16   the centralized repurchase team?

17   A.  I have a team of employees who report to me that work with

18   the lenders directly.  They review the rebuttals that come from

19   the lenders and work and the resolutions on each of those

20   cases.

21   Q.  Does your office review loan files?

22   A.  My particular -- can you give me some definition of what

23   you mean by review loan files?  Do you mean just look at them?

24   Q.  How does your office determine which loans to request

25   repurchase on?

1   A.  The national underwriting center, when they review the

2   files that -- they use various ways to select loans for review,

3   and when they come in, a first review is done of all those

4   loans.  When they're reviewing, if they find something that is

5   in violation of the guidelines and they feel it's the level

6   that should be a repurchase, they send it to a second review,

7   basically.  The second review team will verify yes, indeed

8   there is a violation, and it should be to the level of

9   repurchase, and then a repurchase letter will go out to the

10  lender.

11  Q.  When did you first begin working in the mortgage industry?

12  A.  1986.

13  Q.  Were you ever an underwriter of mortgage loans?

14  A.  Not personally, no.

15  Q.  Have you ever supervised the underwriting of mortgage

16  loans?

17  A.  Yes.

18  Q.  How much experience do you have supervising the

19  underwriting of mortgage loans?

20  A.  Direct experience would be about nine or ten years.

21  Q.  How long have you had the position of director of the

22  centralized repurchase team at Fannie Mae?

23  A.  Five years.

24  Q.  Is that since 2008?

25  A.  Yes.

DA4TBAN1                     Brewster - direct

1   Q.  What were your job responsibilities in 2008?

2   A.  In the centralized repurchase team, very much what they are

3   now.

4   Q.  Did you supervise a staff at that time?

5   A.  Yes.

6   Q.  Does Fannie Mae underwrite the loans that it buys before

7   purchase?

8   A.  No.

9   Q.  Why not?

10  A.  It wouldn't be economically viable for the company to

11  review every single loan that we purchase beforehand.  The

12  amount of staff needed to review every single mortgage that

13  originated would make it a huge company, and therefore it

14  wouldn't be able to keep of flow of money going through the

15  mortgage industry as quickly as possible or as economically as

16  possible.

17  Q.  Did Fannie Mae expect its lenders to underwrite the loans

18  that it sells to Fannie Mae?

19  A.  Yes.

20  Q.  Is that a requirement?

21  A.  Yes.

22  Q.  Are lenders required to promise that the loans they are

23  selling comply with Fannie Mae's guidelines?

24  A.  Yes.

25  Q.  In 2008, what documents set forth the requirements for

DA4TBAN1                          Brewster - direct

1   selling loans to Fannie Mae?

2   A.   That would be the master seller servicer contract, there

3   would be the selling guide, and then there would be the

4   individual contracts that had variances in them.

5   Q.   In 2008, did Fannie Mae have a contract with Countrywide?

6   A.   Yes.

7           MS. SCHOENBERGER:   Your Honor, may I approach the

8   witness?

9           THE COURT:   Yes.

10  Q.   Ms. Brewster, I handed you a binder.   Could you please turn

11  to the tab that's marked Exhibit 1223, and I think it may be

12  the third tab.

13          Do you recognize this document?

14  A.   Yes.

15  Q.   What is this document?

16  A.   It looks like a Fannie Mae selling guide from 2007.

17  Q.   Are you familiar with the selling guide through your work

18  at Fannie Mae?

19  A.   Yes.

20  Q.   And is this the complete copy of the selling guide in

21  effect in 2007?

22  A.   I don't believe so.

23  Q.   Do you recognize it to be an excerpt of the 2007 selling

24  guide?

25  A.   It appears to be so, yes.

1              MS. SCHOENBERGER:  Your Honor, the United States

2    offers Defendant's Exhibit 1223 into evidence.

3              MR. JONES:  No objection.

4              THE COURT:  Received.

5              MR. MUKASEY:  No objection from us.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 1223 received in evidence)

8    Q.  Ms. Brewster, does the 2007 selling guide include

9    requirements that lenders self-report certain loans that it

10   sold to Fannie Mae?

11   A.  Yes.

12   Q.  Can you please turn to Part One, Chapter 3, Section 301.01,

13   Subsection D of the selling guide.

14             MS. SCHOENBERGER:  And Ms. Michaud, I believe that's

15   on page 54, and I believe that is about the fourth page from

16   the back of the document.  Please blow up Section D, please.

17   Q.  Ms. Brewster, does this subsection contain a requirement

18   related to self-reporting?

19   A.  Yes.

20   Q.  Can you please read the second paragraph of Subsection D

21   into the record?

22   A.  We require that the results of quality assurance reviews be

23   reported to the lender's management on a regular basis,

24   preferably within 30 days after review is completed.  The

25   lender should have in place procedures to ensure that all

1   significant issues identified through the quality assurance

2   review process are satisfactorily resolved.  If the lender

3   identifies an issue that significantly affects our risk for a

4   mortgage the lender sold to us, the lender must notify us

5   immediately and then provide a written report of the findings

6   and corrective actions being taken to its lead Fannie Mae

7   regional office within 30 days.  We will work closely with the

8   lender to evaluate the facts of the case and come up with an

9   appropriate solution.

10  Q.  Did the selling guide contain additional provisions

11  relating to self-reporting?

12  A.  Yes.

13  Q.  Can you please turn to Part One, Chapter 2, Section 2.02.

14          MS. SCHOENBERGER:  And Ms. Michaud, this is page 23 of

15  the document.

16          Ms. Michaud, could you blow up the first full

17  paragraph of this page.

18  Q.  Ms. Brewster, does this section of the selling guide

19  contain a provision related to self-reporting?

20  A.  Yes.

21  Q.  Can you please read the last sentence of this the paragraph

22  into the record, beginning with, "We expect?"

23  A.  We expect a lender to advise its lead Fannie Mae regional

24  office immediately if it learns of any misrepresentation or

25  breach of a selling warranty.  This notification is required

DA4TBAN1                          Brewster - direct

```
1    for all breaches or misrepresentations, including fraud in

2    origination and underwriting processes, regardless of whether

3    the act is committed by the lender, the lender's agent, the

4    borrowers, or any other third party, and whether or not the

5    lender believes that the fraud or misrepresentation constitutes

6    a breach of its representations and warranties.

7    Q.  You can set that document aside.

8             Are files maintained with respect to the repurchase

9    requests that Fannie Mae makes?

10   A.  Yes.

11   Q.  Are they maintained by your office?

12   A.  Yes.

13   Q.  What types of documents are contained in those files?

14   A.  Those files are going to contain the documents that the

15   lender first sent in to us on the files that we're going to

16   review.  There's going to be any kind of research documentation

17   that we do, and there will be copies of any correspondence that

18   we have with the lender, the repurchase letter, any rebuttals

19   they send in, any answers we give back, as well as private

20   notes within our organization.

21   Q.  How are the files initially transmitted to Fannie Mae which

22   are eventually included in your repurchase files?

23   A.  Files can come several ways.  Some lenders will send us the

24   hard copy files, some will send CDs or disks, and others can go

25   ahead and download it right through our quality assurance
```

DA4TBAN1                          Brewster - direct

1   system.

2   Q.  Do you know how Countrywide transmitted its files to Fannie

3   Mae?

4   A.  I do not.

5   Q.  Are repurchase files routinely kept in the regular course

6   of business?

7   A.  Electronically.

8   Q.  And where are they stored?

9   A.  They're stored in what we call the quality assurance

10  system, it's our system of record.

11  Q.  Is information contained in your repurchase files compiled

12  around the same time as repurchase requests are made?

13  A.  Usually.

14  Q.  Can you please turn to the tab marked PX322 in your binder.

15          Do you recognize this document?

16  A.  Yes.

17  Q.  What is this document?

18  A.  It's some of the information on a file that was reviewed by

19  my team on a repurchase.

20  Q.  And is this document maintained in Fannie Mae's QAS system?

21  A.  Yes.

22          MS. SCHOENBERGER:  Your Honor, the United States

23  offers Plaintiff's Exhibit 322 into evidence.

24          MR. JONES:  Objection, your Honor.

25          May we approach at the side bar?

1    THE COURT:  Yes.

2         (At side bar)

3    THE COURT:  Yes.

4    MR. JONES:  Your Honor, this is a loan file that there

5  hasn't been any foundation laid, through this witness or any

6  other evidence yet, that this is a High-Speed Swim Lane loan.

7  In fact, we believe it's not a High-Speed Swim Lane loan.

8    THE COURT:  Well, is it on the government's pretrial

9  consent order list?

10   MS. SCHOENBERGER:  Yes, it is.  And also subject to

11 connection, we think we can show it's a High-Speed Swim Lane

12 loan through a witness that will testify later in trial.

13   THE COURT:  All right.  And was there a relevance

14 objection made or foundation?  What objections, if any, were

15 made in the pretrial consent order?

16   MR. JONES:  There was a relevance objection made.

17   THE COURT:  So I'll take it subject to connection

18 then.

19        (Continued on next page)

20

21

22

23

24

25

DA4TBAN1                    Brewster - direct

1                    (In open court).

2                    THE COURT:  322 is received subject to connection.

3                    (Plaintiff's Exhibit 322 received in evidence)

4    BY MS. SCHOENBERGER:

5    Q.  Ms. Brewster, can you please turn to the page that is

6    marked as U.S.A. 00071666, that's the 15th page in this

7    document.

8                    Ms. Brewster, do you recognize this document?

9    A.  Yes.

10   Q.  What is it?

11   A.  This is a repurchase letter on this particular file.

12   Q.  Is it associated with a particular loan?

13   A.  Yes.

14   Q.  Was this letter issued out of your office?

15   A.  Yes.

16   Q.  And was it prepared by your staff?

17   A.  Yes.

18   Q.  Are you identified on the third page as the underwriting

19   director?

20   A.  Yes.

21   Q.  Who sold this loan to Fannie Mae?

22   A.  It appears from the letter that it was Bank of America.

23   Q.  And who originated the loan associated with this letter?

24   A.  Based on this letter, Countrywide Bank.

25   Q.  And when was that loan originated?

DA4TBAN1                        Brewster - direct

1    A.  The letter cites January 2008, January 25th, 2008.

2    Q.  Did your office review the loan file associated with this

3    letter?

4    A.  The national underwriting center would have.

5    Q.  Did your office make a determination as to whether the loan

6    complied with Fannie Mae's guidelines?

7    A.  Yes.

8    Q.  And what determination did your office make?

9    A.  That it did not comply with our guidelines.

10   Q.  Why not?

11   A.  Two issues, misrepresentation of income and

12   misrepresentation of occupancy.

13   Q.  What's a misrepresentation of income?

14   A.  It's basically where the borrower says they made more

15   money, or it could be less money, but the amount of money they

16   put on their application and signed their final documents with

17   was not the correct income.

18   Q.  Can you please turn to the second page of this letter.

19           Does the first paragraph of this page describe the

20   income misrepresentation we discussed?

21   A.  It would be more than the first paragraph.  That first

22   section, yes.

23   Q.  Can you please read the first paragraph into the record?

24   A.  According to the loan application, the borrower was

25   employed as a doorman/hospitality with Pebble Beach Company for

DA4TBAN1                          Brewster – direct

twelve years and earned $13,000 a month.  Our review of the

documentation submitted within the loan file raised concerns

regarding the borrower's income and/or employment.  The

processing requirements are based on the results of CLUES

analysis of the transaction and the underwriter analysis of the

reasonableness of the stated income by the borrower on the

Uniform Residential Loan Application Form.  1003 is always

required.

Q.  You also mentioned there was an occupancy issue with this

file.  What was that issue?

A.  The issue was the borrower said this property was their

primary residence.  Their primary residence, this property, is

located in Fort Lauderdale, Florida.  His employment is in

Pebble Beach, California.

Q.  And how did that indicate an issue with occupancy?

A.  Well, given that his role as a doorman, that's a job that

you actually have to be physically present to do, it would be

hard to commute from Florida to California every day.

Q.  Was that discrepancy apparent on the face of the original

loan file?

A.  Yes, on the application.

Q.  Is the loan application included as part of the file that

was reviewed by Fannie Mae?

A.  Yes.

Q.  Can you please turn to the page Bates stamped U.S.A.

1    00071900.

2              MS. SCHOENBERGER:  Ms. Michaud, the last page of the

3    document.

4    Q.  Ms. Brewster, is this the loan application from the loan

5    file that was sold to Fannie Mae?

6    A.  It does appear to be a loan application for this file.

7    Q.  And what information on this loan application indicates an

8    occupancy misrepresentation to you?

9    A.  If you go to the middle of the page under the borrower

10   information it says his present address is his address in

11   Tamarac, Florida.  That's the address that is our subject

12   property.  Below that where it gives employment information, it

13   says that he works at Pebble Beach Company in Pebble Beach,

14   California as a doorman.

15   Q.  Does this application indicate whether this is a loan

16   application for a primary residence or some other type of

17   property?

18   A.  It says it's a primary residence.

19   Q.  And where do you see that on the application?

20   A.  Toward the top, property will be primary residence,

21   secondary residence or investment, they have the X by primary

22   residence.

23   Q.  Ms. Brewster, can you please turn to the tab marked PX381

24   in your binder.  Do you recognize this document, Ms. Brewster?

25   A.  Yes.

DA4TBAN1                           Brewster - direct

1    Q.  What is this document?

2    A.  It's a repurchase letter for another property, another

3    loan.

4    Q.  Is this a copy of the file maintained in your QAS system?

5    A.  It appears to be so.

6            MS. SCHOENBERGER:  Your Honor, the United States

7    offers Plaintiff's Exhibit 381 into evidence.

8            MR. JONES:  Objection.

9            THE COURT:  Pardon?

10           MR. JONES:  Objection.

11           THE COURT:  Ground?

12           MR. JONES:  Relevance.

13           MS. SCHOENBERGER:  Your Honor, this exhibit is also

14   subject to connection.

15           THE COURT:  Is the relevance objection the same we

16   discussed?

17           MR. JONES:  It is.

18           THE COURT:  So this is received subject to connection.

19           (Plaintiff's Exhibit 381 received in evidence)

20           (Continued on next page)

21

22

23

24

25

DA43BAN2                        Brewster - direct

1  Q.  Was this file reviewed by Fannie Mae for compliance with

2  Fannie Mae's guidelines?

3  A.  Yes.

4  Q.  Was a determination made as to whether this loan complied

5  with Fannie Mae's guidelines when it was sold to Fannie Mae?

6  A.  It was determined that it did not comply.

7  Q.  Why not?

8  A.  Two reasons.  They had a misrep of credit, undisclosed

9  liabilities.  Liabilities the borrower didn't tell about,

10  didn't disclose, and insufficient assets to go to closing.

11  Q.  Were any of these issues apparent on the face of the

12  original loan file?

13  A.  In the original file that the staff had reviewed, the

14  assets would have been most apparent on the original file.

15  Q.  Who sold this loan to Fannie Mae?

16  A.  The seller is listed as Bank of America.

17  Q.  Who originated this loan?

18  A.  According to the file here, Countrywide Bank.

19  Q.  When was this loan originated?

20  A.  According to the document, October 2, 2007.

21          MS. SCHOENBERGER:  Your Honor, the United States has

22  nothing further at this time.

23          THE COURT:  Cross-examination.

24  CROSS-EXAMINATION

25  BY MR. JONES:

DA43BAN2                        Brewster – cross

1  Q.  Good morning, Ms. Brewster.  My name is Malachi Jones and I

2  represent Bank of America.

3         In 2008 you were the director of the centralized

4  repurchase team within the NUC, is that right?

5  A.  Yes.

6  Q.  In that role you oversaw auditors who were conducting

7  secondary review of loan files?

8  A.  At in 2008, yes.

9  Q.  Approximately how many auditors did you have underneath you

10  who were conducting those reviews?

11  A.  I had second reviews only, and I think we had approximately

12  30 people.

13  Q.  The loans that your team was reviewing were loans that had

14  already undergone a primary review, isn't that right?

15  A.  Yes.

16  Q.  They had initially been reviewed by another team that made

17  a determination that there was a significant finding, correct?

18  A.  Correct.

19  Q.  What was the name of that other team that conducted the

20  primary review?

21  A.  It was another area of the national underwriting center.

22  We either refer to them as the QA review team, loan review

23  team, first reviews.  Any of those is how they were referred

24  to.

25  Q.  How many auditors were within that QA review team that

1   conducted the primary review?

2   A.  I don't remember.

3   Q.  Once the QA review team made a determination that there was

4   a significant finding, it was sent over to your team, the

5   centralized repurchase team for review, correct?

6   A.  Yes.

7   Q.  That was in order to make a determination whether to put

8   back a loan for repurchase, correct?

9   A.  It was to reaffirm the original decision.

10  Q.  Repurchase of a loan was a remedy that Fannie Mae had

11  available under its contractual agreements with its lenders,

12  correct?

13          MS. SCHOENBERGER:  Objection.

14          THE COURT:  Ground?

15          MS. SCHOENBERGER:  Relevance.

16          THE COURT:  Sustained.

17  Q.  The audits conducted by the centralized repurchase teams

18  included loans that had been randomly selected, correct?

19  A.  Ones where a significant finding had been found would come

20  to my area only.

21  Q.  Some of those loans were loans that initially were randomly

22  selected for auditing, is that correct?

23  A.  Correct.

24  Q.  How were they randomly selected?

25  A.  There is a division -- a model was used to make a random

DA43BAN2                        Brewster – cross

1   selection of all the deliveries that came into Fannie Mae.

2   Q.  Some of the loans that were select for initial review also

3   were targeted loans?

4   A.  Correct.

5   Q.  How were they targeted for review?

6   A.  There were several different kinds of models and different

7   kinds of targeting that would be done.  Some targeting was

8   particularly looking for stuff that we thought was bad stuff,

9   and different models were used to find those loans.  Other

10  kinds of targeting was more around a product we wanted to check

11  to see how a particular product was doing or a particular new

12  lender was doing.

13  Q.  Another group of loans that was selected for initial review

14  were loans that had defaulted, correct?

15  A.  Yes.

16  Q.  During the time that you were the director of the

17  centralized repurchase team, the audits that were conducted

18  covered loans that originated by Countrywide, correct?

19  A.  Correct.

20  Q.  As well as by other lenders, correct?

21  A.  Correct.

22  Q.  The results of the audits were sometimes there were a

23  significant findings, correct?

24  A.  Correct.

25  Q.  A significant finding is a finding that a loan has violated

DA43BAN2                      Brewster – cross

1   a contractual requirement that Fannie Mae has, correct?

2   A.   Correct.

3   Q.   The results of the audits were tracked by Fannie Mae?

4   A.   Yes.

5   Q.   There were reports that were created?

6   A.   Yes.

7   Q.   Were those reports produced monthly?

8   A.   There are many, many reports that could be generated any

9   time.  There could be a daily report, there could be a monthly

10  report, or it could be an ad hoc report.

11  Q.   You were familiar with those reports?

12  A.   Some of them.

13  Q.   Those reports included information regarding the percentage

14  of significant findings from a particular lender?

15          MS. SCHOENBERGER:  Objection.

16          THE COURT:  Ground?

17          MS. SCHOENBERGER:  Relevance.

18          THE COURT:  Overruled.

19  A.   Could you restate the question for me?

20  Q.   And those reports included information about the percentage

21  of significant findings from a particular lender?

22  A.   Yes.

23  Q.   Those reports also tracked the types of significant

24  findings that were being found, correct?

25  A.   Some did.

1    Q.   Some of those reports would be circulated to other groups

2    within Fannie Mae?

3    A.   Yes.

4    Q.   Were those reports shared with the account team?

5    A.   I don't know that I could say that.

6    Q.   Were those reports shared with the credit risk group?

7              MS. SCHOENBERGER:  Objection.

8              THE COURT:  Sustained.

9    Q.   Through those reports, Fannie Mae would have been able to

10   assess the quality of the loans that it was receiving from a

11   particular lender, correct?

12             MS. SCHOENBERGER:  Objection.

13             THE COURT:  Sustained.

14   Q.   You are not aware of a formal definition that Fannie Mae

15   has for what a significant finding is, correct?

16   A.   I'm not -- I do not recall a written one.  There was the

17   understanding a significant finding is anything that would have

18   been a violation of a contract or the guide.

19   Q.   A significant finding was a determination that a loan was

20   ineligible for sale to Fannie Mae?

21   A.   It could be.

22   Q.   Fannie Mae had three levels of significant findings, isn't

23   that correct?

24   A.   At that time, yes.

25   Q.   Level three significant finding being the most serious

1   finding, correct?

2   A.  Yes.

3   Q.  A level one significant finding would be the most minor?

4   A.  Relatively.

5   Q.  Fannie Mae did not demand repurchase on all loans that had

6   significant findings, correct?

7        MS. SCHOENBERGER:  Objection.

8        THE COURT:  Sustained.

9   Q.  The fact that a person with the title of underwriter was

10  involved in the -- was not involved with the origination of the

11  loan was not the basis for a significant finding, correct?

12  A.  Correct.

13  Q.  The fact that a loan was originated by automated

14  underwriting system with conditions cleared by a loan processor

15  was not the basis for a significant finding, correct?

16       MS. SCHOENBERGER:  Objection.

17       THE COURT:  It's defective as to form.  Is there any

18  other objection?

19       MS. SCHOENBERGER:  No, your Honor.

20       THE COURT:  So rephrase.

21  Q.  If the loan was originated by an automated underwriting

22  system, and conditions were cleared by a loan processor, that

23  was not something that would cause a significant finding to be

24  issued for a loan, correct?

25       MS. SCHOENBERGER:  Objection.

1     THE COURT:  You're saying if both those conditions

2   were met?  That it was both originated by an automated

3   underwriter and the conditions were cleared by a loan

4   processor?

5     MR. JONES:  Yes, your Honor.

6     THE COURT:  I'll allow it.

7   A.  Could you repeat again?

8   Q.  Okay.  If a loan was originated by an automated

9   underwriting system with an accept, and conditions were cleared

10  by a loan processor, that would not be the basis for a

11  significant finding, correct?

12  A.  Correct.

13  Q.  If you could turn to Plaintiff's Exhibit 322, which is one

14  of the QAS files or quality assurance files the government

15  reviewed with you.  If you can turn to the repurchase request

16  letter, I think you looked at the number in the

17  bottom-right-hand corner 71666.  It also would have the number

18  FNM BOA 41369.

19     Do you see that this letter is dated January 20, 2011?

20  A.  Yes.

21  Q.  So this is would have been approximately three years after

22  this loan had been originated?

23  A.  It appears to be.

24  Q.  You stated that one of the significant findings with

25  respect to this loan was a misrepresentation of income?

1  A.  Yes.

2  Q.  If you can read into the record the first two sentences of

3  that bottom paragraph on this page.

4  A.  "The subject mortgage was delivered under lender's alt A

5  stated income variance.  This program allowed for alternative

6  documentation to help increase processing efficiencies and did

7  not require the lender to verify the borrower's income used to

8  qualify.  However, the borrower was required to sign a loan

9  application that specifically stated that all the information

10  on the application was true and correct."

11  Q.  The stated income variance was a variance that Countrywide

12  had from Fannie Mae to originate stated income loans, correct?

13  A.  Correct.

14  Q.  For those stated income loans, Countrywide was not required

15  to verify the borrower's income, correct?

16  A.  Correct.

17  Q.  If you can turn to the second page of this letter.  Looking

18  at the top half of this letter.  In order to verify the income

19  for this borrower, Fannie Mae contacted the borrower's

20  employer, correct?

21  A.  Yes.

22  Q.  And also went to several websites, indeed.com and

23  salary.com, to gather salary information, correct?

24  A.  Correct.

25  Q.  Ms. Brewster, you don't know what a High-Speed Swim Lane

1    loan is, do you?

2    A.  Now I do.

3    Q.  In 2011, at the time that this letter was issued, you did

4    not know what a High-Speed Swim Lane loan was?

5    A.  I don't recall knowing that.

6    Q.  You don't know whether this particular loan was processed

7    through the High-Speed Swim Lane, do you?

8    A.  No.

9    Q.  If you can turn to the page of this file, looking at the

10   bottom on the bottom-right hand 72121.  Or it is also Bates

11   labeled as FNM BOA 41824.

12   A.  Could you repeat the bottom numbers again?

13   Q.  U.S.A. 72121.

14   A.  Yes, found it.

15   Q.  Do you see in the top half of this page where it says user

16   who had a note is named James Henderson?

17   A.  Yes.

18   Q.  Could you read the text of the note underneath that.

19   A.  "Income reasonably based on history 1003."

20   Q.  If you can go down to the next paragraph where there is the

21   words underwriting worksheet.  Do you see that?

22   A.  Yes.

23   Q.  If you can read starting at those two stars where it says

24   underwriting worksheet, the next two lines.

25   A.  "January 10, 08, 7:50 a.m. approved.  Income approved.

DA43BAN2                          Brewster - cross

```
 1    13,000.  Authority level four.  Title underwriter.  FBW
 2    approved.  Approved score.  Authority level four.  Title
 3    underwriter.  FBW score --"
 4    Q.  That's okay.  I just wanted you to read the next three
 5    lines.  So this loan file indicates or reflects that an
 6    underwriter approved this stated income, correct?
 7              MS. SCHOENBERGER:  Objection.
 8              THE COURT:  Ground?
 9              MS. SCHOENBERGER:  Foundation.
10              THE COURT:  Lay a foundation if you can.
11    Q.  When this loan was audited by Fannie Mae, an auditor would
12    have reviewed every page of this loan file, correct?
13    A.  Correct.
14    Q.  You yourself sometimes reviewed the loan files, correct?
15    A.  After the repurchase went out.
16    Q.  Loan files from Countrywide included the notes about the
17    origination process, correct?
18    A.  I don't know.  I can't be sure.
19    Q.  Let's move on to the other QAS file that you discussed with
20    the government.  That was Plaintiff's Exhibit 383.
21    A.  I have an Exhibit 381.
22    Q.  I'm sorry.  Yes.  Excuse me.  Plaintiff's Exhibit 381.
23              THE COURT:  381.
24              THE WITNESS:  Thank you.
25              May I clarify my answer to the previous question?
```

1                    THE COURT:  Go ahead.

2                    THE WITNESS:  Thank you, your Honor.

3                    If Countrywide or BofA had notes in the file that they

4     delivered to us, they would have been available to be reviewed.

5     But I can't say that they were reviewed absolutely or that they

6     were in all files.

7     Q.  When auditors were conducting audits, they would have had

8     to review every page in the loan file, correct?

9     A.  Correct.

10    Q.  Because one of the bases for a significant finding can be

11    there is missing documentation in the file, correct?

12    A.  Correct.

13    Q.  So, to be able to exclude the possibility there was any

14    missing documentation, the auditor would have to review every

15    single page in the file, correct?

16                   MS. SCHOENBERGER:  Objection.

17                   THE COURT:  Sustained.

18    Q.  If you can go to Plaintiff's Exhibit 381.  Ms. Brewster,

19    you don't know whether this was a loan file that was originated

20    through the High-Speed Swim Lane process, do you?

21    A.  No.

22    Q.  If you can go to the page that's numbered 41141.  That's

23    after U.S.A.

24    A.  41411?

25    Q.  41141.  At the top of that page says loan level notes.

1    Have you found the page, Ms. Brewster?

2    A.  Yes, I have, thank you.

3    Q.  Do you see the top portion where it says user who had a

4    note Daniel Krol?

5    A.  Yes.

6    Q.  If you can read that paragraph underneath there starting

7    with underwriting worksheet, read that into the record.

8    A.  "Underwriting worksheet.  September 26, 2007.  10:15 a.m.

9    Approved.  Income approved.  7950 -- $7,950.  DR is five.

10   0.47 percent.  Authority level three.  Title senior associate.

11   Underwriting Daniel J. Krol.  A paper non-conforming."

12   Q.  Ms. Brewster, if we can go back to Plaintiff's Exhibit 322.

13   This time I'm going to ask you to go to the page that's labeled

14   on the bottom-right-hand corner U.S.A. 72217.  Have you found

15   it, ma'am?

16   A.  72217?

17   Q.  That's correct.

18   A.  Yes.

19   Q.  You also see it on the screen.

20   A.  Yes, I do.  Thank you.

21   Q.  If you look at the top-right-hand corner of this document,

22   do you see where it says branch number then it has an address?

23   A.  Yes.

24   Q.  If you can read that branch number and that address into

25   the record.

DA43BAN2                        Brewster - cross

1    A.   Branch number 0006114.  Address is 15100 N.W. 67th Avenue

2    Suite 207, Miami Lakes, Florida, 33014.

3              MR. JONES:  I pass the witness, your Honor.

4              Thank you, ma'am.

5              MR. MUKASEY:  I have three or four questions.  May I

6    stand right here?

7              THE COURT:  Yes.

8    CROSS-EXAMINATION

9    BY MR. MUKASEY:

10   Q.   I'm Marc Mukasey and I represent Rebecca Mairone who is

11   sitting right here.  You don't know Rebecca, do you?

12   A.   Not that I know.

13   Q.   You've never spoken to Rebecca Mairone to the best of your

14   knowledge, correct?

15   A.   Correct.

16   Q.   You've never received any correspondence from Rebecca

17   Mairone to the best of your recollection, am I right?

18   A.   Yes.

19   Q.   When I say correspondence, I mean any e-mail

20   correspondence, have you?

21   A.   To the best of my recollection, no, I've not.

22   Q.   No postal mail correspondence, correct?

23   A.   To the best of my knowledge, no.

24             MR. MUKASEY:  Thank you very much.

25             THE COURT:  Redirect?

DA43BAN2                         Brewster - cross

1              MS. SCHOENBERGER:  Briefly, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. SCHOENBERGER:

4    Q.  Ms. Brewster, does a reasonableness analysis need to be

5    performed for a stated income loan?

6    A.  It depends on -- usually.

7    Q.  The repurchase letter that you looked at related to Exhibit

8    322 stated that it is always required.  Doesn't it?

9              MR. JONES:  Objection.

10             THE COURT:  Ground?

11             MR. JONES:  The document speaks for itself.

12             THE COURT:  Pardon?

13             MR. JONES:  The document speaks for itself.

14             THE COURT:  Yes.  Sustained.

15   Q.  Ms. Brewster, in your experience supervising underwriters,

16   can you tell us how a reasonableness analysis is performed?

17   A.  The first thing you do is you look at the job itself.  What

18   would be kind of a reasonable expectation for what a particular

19   job would make.  If you're comfortable, if you know something

20   about that profession, if you know about that particular area

21   where somebody lives and you have an idea of how long they've

22   been working at the job, you can kind of guess a general range

23   of what somebody makes.

24             From there you can use tools.  There's different tools

25   like salary.com, indeed.com, that will give you a more specific

DA43BAN2                    Brewster - redirect

1   idea of what people in that particular profession would be

2   making in that particular market.

3          Secondary things you can look at is, for instance,

4   look at their credit.  When you look at their credit, it is not

5   the credit score that will tell you what they make.  If your

6   credit card, your allowable high balances on credit cards are

7   very high, that correlates to a more higher income.  Whereas if

8   you've got lower credit limits, then obviously your income is

9   probably not quite as high in comparison.

10         So you look at it holistically.  You look at their

11  home, you look at what the value of the home, you look at their

12  other assets.  They kind of paint the picture of a profile of

13  what somebody of a particular income probably would be making.

14  Q.  Did Fannie Mae determine that $13,000 a month for the

15  doorman who applied for the loan shown in Exhibit 322 was

16  reasonable?

17             MR. MUKASEY:  Objection.

18             THE COURT:  Overruled.

19  A.  Excuse me?

20  Q.  Did Fannie Mae determine that $13,000 a month for the

21  doorman who applied for the loan that is shown in Exhibit 322

22  was reasonable?

23  A.  No, we did not believe it was reasonable.

24  Q.  Ms. Brewster, how are repurchase letters delivered to

25  lenders?

1  A.  One of several ways.  They can either be overnighted, so

2  they get a hard copy.  Other lenders can get it through the QAS

3  system if they're connected to it, it will come right through

4  the system to it.  Others may get an e-mail version of it.  A

5  very secured e-mail site that will be used to transfer the

6  information.

7  Q.  Did your role at Fannie Mae in 2008 include communications

8  with employees at Countrywide?

9  A.  Yes.

10  Q.  In what format did such communications occur?

11  A.  Most of my communication at my level would have been to

12  talk about general -- specific issues on specific cases that we

13  felt needed to be escalated and talk about them.  The

14  production between our two areas and how much flow is going

15  back and forth.  And different issues that they were having --

16  that either side might have had a conflict about and wanted to

17  talk about.

18  Q.  Were these in-person discussions?

19  A.  Some were.

20  Q.  Did such discussions occur over the phone?

21  A.  Yes.

22  Q.  Did they occur over e-mail?

23  A.  Yes.

24  Q.  Who were your central contacts at Countrywide in 2008

25  period?

1    A.  I had three main ones.  I had Nancy Bush, Cindy Simantel,

2    and Pavel Maryska.  On occasion I spoke with Mike Schloessmann

3    as well.

4             MS. SCHOENBERGER:  Thank you.  Nothing further.

5             THE COURT:  Anything else?

6             MR. JONES:  No, your Honor.

7             MR. MUKASEY:  No, Judge.

8             THE COURT:  Thank you very much.  You may step down.

9    Please call your next witness.

10            (Witness excused)

11            MR. CORDARO:  The United States calls Michael Sobczak,

12   your Honor.

13            (Witness sworn)

14            THE DEPUTY CLERK:  Please be seated.  State your name

15   and spell your last name slowly for the record.

16            THE WITNESS:  Michael Sobczak, S-O-B-C-Z-A-K.

17    MICHAEL SOBCZAK,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. CORDARO:

22   Q.  Good morning, Mr. Sobczak.  Are you employed?

23   A.  Yes, I am.

24   Q.  Who is your employer?

25   A.  PennyMac Mortgage Corporation in Moorpark, California.

DA43BAN2                              Sobczak - direct

1    Q.   What is your position?

2    A.   I'm the first vice president and the director of

3    underwriting.

4    Q.   Could you just explain to us briefly what PennyMac is?

5    A.   PennyMac is a mortgage banker.  It accepts mortgage

6    applications from the borrowing public.  We make loans.

7    Q.   When did you first begin your employment at PennyMac?

8    A.   In March of 2012.

9    Q.   For whom did you work before you were employed at PennyMac?

10   A.   For Fannie Mae.

11   Q.   What was your last position you held at Fannie Mae?

12   A.   Director of account risk management in Fannie Mae's Western

13   Business Center in Pasadena, California.

14   Q.   Approximately how long were you employed at Fannie Mae?

15   A.   Approximately 14 years.  I started there in 1997.

16   Q.   I'd like to go into your educational background if we

17   might.  Can you please describe that for the jury starting in

18   college.

19   A.   Yes.  I have a bachelor's of business administration degree

20   from the University of Wisconsin, Milwaukee, in 1975.  And a

21   master of economics degree from that same university in 1984.

22   Q.   How long have you worked in the mortgage industry?

23   A.   More than 30 years.

24   Q.   When did you first start employment at Fannie Mae?

25   A.   In 1997.

DA43BAN2                        Sobczak - direct

1    Q.  Could you take us through the positions that you held at

2    Fannie Mae starting in 1997.

3    A.  I joined Fannie Mae as the director of underwriting in

4    1997.  That position morphed into a job called director of risk

5    management.  Director of risk management then led to a job

6    called director of customer account risk management.

7    Q.  Which position did you hold during the 2007, 2008 time

8    period?

9    A.  It was the director of customer account risk management.

10   Q.  Could you explain what your job responsibilities were in

11   that role.

12   A.  My responsibility was working with my client base in

13   ensuring that the terms and agreements under which Fannie Mae

14   purchased loans were documented contractually, and I was

15   responsible for understanding how customers originated and

16   manufactured loans.

17   Q.  Could you explain to the jury a little more about what you

18   mean by understanding how customers originated and manufactured

19   loans?

20   A.  Sure.  Part of my -- a big part of my job was working with

21   customers and helping understand the processes and the

22   procedures they used in making mortgage loans.  That included

23   working with them on-site, it included visiting with them

24   on-site, that included review of performance information, that

25   also included work with clients in developing terms of business

DA43BAN2                    Sobczak - direct

1    that were acceptable to Fannie Mae.

2    Q.  Why was this important?

3    A.  It was important because Fannie Mae, as the leading

4    secondary market provider, needed to ensure that loans lenders

5    delivered met the requirements of the contracts.

6    Q.  You said your title was director of customers accounts risk

7    management, is that correct?

8    A.  Correct.

9    Q.  Could you explain what you mean by accounts risk

10   management?

11   A.  Yes.  In the Western Business Center, each of our major

12   lenders was assigned an account team.  An account team

13   comprised of Fannie Mae employees.  Within that team were

14   marketing related activities, and credit risk related

15   activities.

16        The marketing team was led by the director of

17   marketing, and the risk marketing team was responsible for

18   pricing and terms of engagement.  And I was responsible for the

19   credit risk side.

20        And together, we, we worked together to ensure that

21   the contracts and our understanding of how lenders originated

22   and sold mortgage loans to us was accurate.

23   Q.  You used the term risk both in your title and in the

24   description.  Can you explain to the jury what you mean by risk

25   in this context?

1   A.  Yes.  Risk is a broad term that is designed to detail the

2   loan eligibilities and the pricing of those loans in terms of

3   performance.  So, not every loan performs.  And those loans

4   that don't perform, and because not all the loans perform,

5   Fannie Mae extracts a guarantee for every loan that comes our

6   way.

7   Q.  What is the nature of that guarantee?

8   A.  The guarantee is expressed in basis points.  100ths of

9   1 percent.  So if a mortgage loan has an interest rate of, take

10  for example, of 5 percent.  Approximately 25 basis points of

11  that 5 percent, a quarter of a percent, Fannie Mae keeps as a

12  premium to ensure the principal and interest payment to an

13  investor that essentially invests in that loan through a

14  mortgage backed security.

15  Q.  During 2007, 2008, did Countrywide sell loans to Fannie

16  Mae?

17  A.  Yes, it did.

18  Q.  Were there any documents that governed that relationship

19  between Countrywide and Fannie Mae?

20  A.  Yes.

21  Q.  What kind of documents?

22  A.  There was the master contract.  The master contract housed

23  all the terms and conditions under which Fannie Mae would buy

24  loans from specifically Countrywide.  The selling contract was

25  a broader document, which covered how loans were expected to be

1    underwritten and delivered.  And there was also an alliance

2    agreement, which defined how Countrywide and Fannie Mae

3    conducted business together.

4    Q.  In your position as director of customer accounts, customer

5    accounts risk management, were you familiar with those

6    documents that you just described to me?

7    A.  Yes, I was.

8    Q.  Why were you familiar with them?

9    A.  I worked with them on a day-to-day basis.  I was

10   specifically responsible for ensuring that the contract was

11   accurate.  I was specifically responsible, especially when

12   Countrywide called us about a individual loan scenario, I

13   referred to the selling guide to ensure that the actual loans

14   met the conditions of the selling guide.  And also I had a

15   role, small role to play in crafting the alliance agreement.

16   Q.  During the 2008 -- 2007, 2008 time period, did you manage

17   Countrywide's customer account at Fannie Mae?

18   A.  The risk side of it, yes.  The credit risk side of it.

19   Q.  Were there any other directors in charge of the risk side

20   of Countrywide's account?

21   A.  Not from the Western Region Business Center.

22   Q.  Did you supervise anyone in connection with those duties?

23   A.  Yes, I did.

24   Q.  Could you explain to the jury who you supervised.

25   A.  Approximately six people who actually did the work.  They

1    visited the customer, they responded to customer requests, they

2    worked with our legal department to ensure that contracts were

3    correct.  They resolved issues, normal day-to-day issues that

4    came up.  I provided guidance on and supervised their

5    activities.

6    Q.  Did this team of folks have a name?

7    A.  The name of the position that I supervised was customer

8    account risk manager.

9    Q.  Could you explain to the jury what your role was in

10   relationship to this group of people?

11   A.  Again, as their manager, I supervised their work.  My role

12   was distinguished from their work in that I had different

13   contacts with Countrywide.  So I faced off with my management

14   equivalents at Countrywide, and the folks that I supervised,

15   the customer account risk management, faced off with folks that

16   reported to the Countrywide management equivalents.

17   Q.  When you say that those people faced off with the

18   Countrywide management equivalents, could you just explain to

19   us what you mean by that?

20   A.  Sure.  There was a lot of day-to-day activity.  Whether or

21   not it related to questions about loans, or questions about

22   contracts, the analytical work that went into developing new

23   terms of business, there was a lot of data analysis and data

24   reconciliation.  There was the PowerPoints that needed to be

25   generated in terms of discussions with Countrywide as with all

1    lenders there.

2            So, a simple way of saying it is, they did a lot of

3    the work, I provided guidance around the work, and I signed off

4    on their work.

5    Q.  Do you have a sense of how often your team interacted with

6    employees of Countrywide during the 2007, 2008 time period?

7    A.  Yes.  Every day.

8    Q.  What form did those interactions take, was it telephone or

9    something else?

10   A.  Telephone, e-mail.  Countrywide was just down the road,

11   there would be periodic visits.  Those were the major interface

12   forms.

13   Q.  Shifting from your team, I'd like to talk about your

14   interactions with employees of Countrywide.  Could you explain

15   to the jury the nature of those interactions during the 2007,

16   2008 time period?

17   A.  Yes.  I related and faced off with vice presidents of

18   credit risk, vice presidents of product development, and

19   sometimes their teams.

20   Q.  Do you recall any particular employees that you faced off

21   with?

22   A.  Yes.  I would say Pauline Kennedy, who was, if my memory

23   serves me correctly, vice president of credit policy, Greg

24   Togneri, who was our principal Fannie Mae interface into

25   Countrywide.  Christian Ingerslev, who was part of the product

DA43BAN2                           Sobczak - direct

1    development management team, and their staffs.

2    Q.  Did you have any particular topics that you typically

3    discussed with those people at Countrywide?

4                MS. MAINIGI:  Objection.

5                THE COURT:  Ground?

6                MS. MAINIGI:  Vague.

7                THE COURT:  No.  That's foundational.  Overruled.

8    Q.  Should I repeat the question?

9    A.  Yes, please.

10   Q.  Were there any particular topics that you discussed with

11   those employees of Countrywide during the 2007, 2008 time

12   period?

13   A.  Not particular topics, but topics that were always of

14   importance.  Countrywide would often call us for requests for

15   new -- thoughts around new products.  Countrywide would share

16   information around performance.  We would share information

17   around performance.  There was always something going on with

18   the master, the master contract, just because Countrywide was

19   very interested in ensuring it was able to do the business that

20   the borrowing public wanted.

21   Q.  During that time period, how often did you personally have

22   contact with employees of Countrywide?

23   A.  If you're saying how often did I meet with them

24   individually, I would say it varied over time.  Sometimes I was

25   there three times a week, sometimes I was there once a week,

1    but there wasn't a day -- there were very few days where I

2    didn't have some communication, whether or not it was by phone

3    or e-mail.

4    Q.  Are you familiar with the term "variance"?

5    A.  Yes.

6    Q.  Were you familiar with that term in the 2007, 2008 time

7    period?

8    A.  Yes, I was.

9    Q.  Can you explain to the jury what a variance is.

10   A.  A variance is an amendment to a standard provision of the

11   selling guide.  And a variance often led to an expanded

12   eligibility that we granted lenders, because the lender's

13   either ability or their past performance in that type of

14   expanded eligibility proved that they could originate quality

15   business.

16   Q.  In your role in risk management -- is it okay if I just

17   call that title risk management?  There are a lot of words in

18   it.  If I say risk management, I mean director of customer

19   accounts risk management.

20   A.  It works for me.

21   Q.  Okay.  So, in your role in risk management, did you play

22   any role with respect to variances for Countrywide?

23   A.  Yes, I did.

24   Q.  Could you explain what that role was.

25   A.  Again, I was the day-to-day contact.  Much of the actual or

1    variance to variance work was drafted by my team, the team of

2    risk managers.  They worked with our in-house attorneys to

3    construct the appropriate legal language which defined the

4    terms and the conditions under which Fannie Mae would buy

5    loans.

6             I was responsible for ensuring that the set of

7    variances which I'll consider -- which I'll term to be the

8    master contract, got renewed, or not, when they expired.  Were

9    analyzed and either signed off, or not, by my counterparts and

10   my bosses in D.C., and those decisions got reflected back to

11   Countrywide.

12   Q.  Did you consider any information in performing that task?

13   A.  Yes.

14   Q.  What kind of information?

15   A.  Loan performance, the lender's -- in this case

16   Countrywide's -- ability to originate quality loans, the

17   lender's ability in ensuring -- or the lender's training and

18   the lender's systemic controls to produce quality loans.  Those

19   were the most important.

20   Q.  What was the source of that information?

21   A.  It could be on-site visits, it could be conversations, it

22   could be sitting through presentations that Countrywide

23   provided around those topics.  There were several, several ways

24   to collect that background.

25   Q.  Did Countrywide ever transmit that information to you via

DA43BAN2                         Sobczak - direct

1   an electronic system or any other way?

2   A.  Yes.

3   Q.  How?

4   A.  Through PowerPoints.  Sometimes they would provide us

5   materials before we met, if there was going to be an on-site

6   meeting.  Sometimes we did something similar, so that when we

7   got together, we were looking at information not always for the

8   first time.

9   Q.  Do you recall if any of that information was ever e-mailed

10  to you?

11  A.  I recall that it was.

12  Q.  You made a reference to quality I believe with respect to

13  loans.  Could you explain to the jury what you mean by that?

14  A.  Quality is defined under the provisions or under the

15  contracts that I earlier defined.  The selling guide defines

16  quality, the master -- the set of variances embedded in the

17  master contracts define quality.  And quality is dependent on

18  systems and people and process to ensure that loans are

19  originated will perform.

20  Q.  In your role in risk management, did you have an

21  understanding as to any standard that loans had to meet in

22  order to be considered quality?

23            MR. MUKASEY:  Objection.

24            THE COURT:  Ground?

25            MR. MUKASEY:  Vague.

1    THE COURT:  Overruled.  You may answer.

2  A.  Each loan type, and there were many different loans types,

3  were held to their own performance criteria.  Fannie Mae used

4  assumptions to generate an expected default rate.  And one type

5  of a product may have -- may have different types of

6  performance expectations than others.

7        So to circle back to your question about quality,

8  quality from our perspective oftentimes started with how the

9  loans performed, versus how they were expected to perform.

10 Q.  At that time, did you have an understanding as to whether a

11 contract addressed the issue of quality?

12 A.  The contract does not address the issue of quality

13 specifically.

14 Q.  Does the selling guide address the issue of quality?

15 A.  The selling guide provides guidance around what lenders

16 need to do to help ensure that the mortgages they originate are

17 of quality nature.

18 Q.  Are you familiar with the term "investment quality"?

19 A.  Yes.

20 Q.  Were you familiar with that term back in 2007, 2008?

21 A.  Yes.

22 Q.  Based on your understanding, what did that term mean to

23 you?

24 A.  Investment quality starts with the master selling and

25 servicing contract.  And investment quality, from my

1   perspective as well as Fannie Mae's perspective, I believe, is

2   a generic term that means loans originated and sold to Fannie

3   Mae will perform.  Will pay.

4   Q.  What do you mean by "will pay"?

5   A.  That the borrower will make, if it is a 30-year mortgage,

6   will make a payment over the term of that loan.

7   Q.  Are you familiar with the term "representation and

8   warranty"?

9   A.  Yes, I am.

10  Q.  What was your understanding of that term back in 2007,

11  2008?

12  A.  That's a -- representations and warranties is an important

13  construct under which Countrywide and all lenders delivered

14  loans to Fannie Mae.  It is impossible to have a -- it is

15  impossible to provide guidance and exacting procedures that

16  lenders would need to follow for every loan type, given that

17  there are hundreds of different types of loan types, and lots

18  of different markets.

19          Representations and warranties is the overarching

20  business framework that lenders deliver loans that they

21  represent and warrant that loans meet the selling guide

22  standards, that loans meet the individual variance standards,

23  and they comply with any other agreements that are already in

24  place.

25          THE COURT:  Counsel, we're going to want to find a

DA43BAN2                         Sobczak – direct

1    appropriate spot to give the jury their midmorning break.  Is

2    this a good point?

3              MR. CORDARO:  This is it, your Honor.

4              THE COURT:  So ladies and gentlemen, we'll take a

5    15-minute break.

6              (Jury excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA43BAN2                         Sobczak – direct

1                    THE COURT:  You can go back outside.

2                    THE WITNESS:  Okay.

3                    THE COURT:  Couple items.  First, I'll have my law

4      clerk hand to government counsel my rulings on the objections

5      to the Robert Price deposition.  As I indicated with respect to

6      the Boland deposition, copies have to be made for adversary

7      counsel, and you need to use it obviously to conform the

8      videotape.  But then need to have it back so we can docket it.

9      I don't know that I've received back the Boland one yet.

10                   THE LAW CLERK:  It's here.

11                   THE COURT:  Then we need to docket it.  All right.

12                   Now, there are some guests here from Seton Hall Law

13     School, and I'm going to invite them to sit in the jury box for

14     about five minutes while I talk to them a little bit, just give

15     them some background of the case.  So you're all free to go

16     wherever you want to go, and we'll see you in 10 minutes.

17                   (Recess)

18                   (Continued on next page)

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  All right.

3    BY MR. CORDARO:

4    Q.  Mr. Sobczak, you testified earlier that a big part of your

5    job was working with customers to help understand processes and

6    procedures in making mortgage loans.  Do you recall that?

7    A.  Yes.

8    Q.  Could you explain to the jury why that was a big part of

9    your job?

10   A.  That's a big part of the job because it goes back to the

11   concept of originating and delivering investment quality

12   mortgages.

13   Q.  Could you explain that to the jury in a little more detail,

14   please.

15   A.  Sure.  Investment quality mortgages require a certain

16   lender infrastructure, systems and controls to ensure that

17   loans are -- that are originated are of investment quality.

18        So some examples may be the lender who attracts

19   qualified mortgage experts and trains their people well, a

20   lender that has adequate management controls in place, a lender

21   that has sufficient systems in place to ensure that

22   non-investment quality loans do not get originated or

23   manufactured.

24        Those are all things that, as director of customer

25   account risk management, I was interested in understanding.

1   Q.  Did you have conversations with employees at Countrywide

2   about those processes?

3   A.  Yes, I did.

4   Q.  Earlier in your testimony I think you made a reference to

5   on-site meetings?

6   A.  Yes.

7   Q.  Are you familiar with something called an operational

8   review?

9   A.  Yes, I am.

10  Q.  Was that something you were familiar with back in 2007 and

11  2008?

12  A.  Yes, I was.

13  Q.  Can you explain to the jury what an operational review is.

14  A.  An operational review is a team of Fannie Mae people,

15  including a team of experts in underwriting and servicing and

16  in accounting, that visit lenders, they actually do an on-site

17  visit to spend time with the leaders in those respective groups

18  and also to visit the operations of those areas as well.

19  Q.  Did you have any role in operational reviews?

20  A.  Yes, I did.

21  Q.  What was that role?

22  A.  I would be part of -- I could be part of the visit team,

23  since the underwriting and the risk management expertise was

24  provided oftentimes from my group.  I would review their

25  findings, sign off or edit their work.  And also then work with

DA43BAN2                    Sobczak - direct

customers such as Countrywide, if there were observations or

findings that were taken and needed to be addressed, I would be

part of the Fannie Mae team that ensures those findings were

addressed.

Q.  Based on your understanding, why did Fannie Mae conduct

operational reviews of lenders?

A.  It is one of the most important ways of ensuring that a

lender, like Countrywide, has the infrastructure in place to

originate and deliver quality mortgages, investment quality

mortgages.

Q.  Could you just explain to the jury what you mean by

infrastructure.

A.  An infrastructure could be an organization.  So, does a

lender have the right people, does the lender have enough of

the right people, does the lender have adequate training to

ensure that the right decisions are being made, does the lender

have adequate information technology systems to ensure that

loans are -- are originated correctly, they are entered into

the computer correctly.  And also, does the lender have the

appropriate management controls to ensure that the decisions

that are being made are the correct decisions.

Q.  Did Fannie Mae conduct any operational reviews of

Countrywide?

A.  Yes, it did.

Q.  Do you recall the time period that Fannie Mae conducted

1    those operational reviews?

2    A.  I can speak to the time period that I started at Fannie

3    Mae, from 1997, through the time that I left.  I know that

4    Fannie Mae did an annual operation review.  Not only for

5    Countrywide, but for other lenders that the Western Business

6    Center managed.

7    Q.  Did your team at the Western Business Center ever

8    participate in those operational reviews?

9    A.  Yes, they did.

10   Q.  During what time period?

11   A.  The time period that I'm most intimate with is between 1997

12   and approximately 2006 and 2007.  The responsibility for

13   performing operational reviews was vested in the regional

14   business centers, and Pasadena was one.  We had two other

15   regional business centers.

16           Around the approximate date of maybe 2007 or

17   thereabout, the responsibility for Fannie Mae's performing of

18   operational reviews was shifted to a central organization.  I

19   believe it was headquartered out of -- it could be either D.C.

20   or Dallas.

21           But prime responsibility for conducting reviews, to

22   make it short, was moved from the business center to a Fannie

23   Mae team dedicated to do only that.

24   Q.  Let's talk about when the business center was doing

25   reviews.  Were you involved when the Western Business Center

 1    was doing reviews?

 2    A.  Yes, I was.

 3    Q.  Could you take the jury through essentially the steps that

 4    your team would go through in performing an operational review

 5    of a lender like Countrywide.

 6    A.  So first of all, an operational --

 7              MS. MAINIGI:  Objection, your Honor.  Relevance with

 8    respect to the time period.  Because I believe the witness

 9    testified that it was 2006 and the first part of 2007.

10              MR. CORDARO:  I can connect this up a little bit.

11              THE COURT:  Why don't you put some foundational

12    questions along those lines.

13    Q.  For the reviews that were conducted by the business center,

14    what was your involvement?

15    A.  So my involvement, I had several involvements.  First of

16    all, getting them scheduled.  And operational reviews were

17    usually scheduled --

18              THE COURT:  No.  For the moment just tell us what was

19    your involvement.

20              THE WITNESS:  My involvement was to manage the

21    operational review, getting them done.

22    Q.  Did you review any information that came out of the

23    operational review in your role at that time?

24    A.  Yes.

25              MR. MUKASEY:  Objection.  Again, I think there is a

1   vagueness as to which time period we are talking about.

2            THE COURT:  Overruled.

3   Q.  We're in the business center time period right now.  Do you

4   understand that, Mr. Sobczak?

5   A.  Yes.

6   Q.  Before it went central?

7   A.  Yes.

8   Q.  Once it went central, did you continue to have any role at

9   all in the process?

10  A.  Yes, I did.

11  Q.  Could you explain that role, please.

12  A.  It was to work with my team, and the team or the

13  appropriate team at a lender, in a lender shop, to rectify any

14  findings, to correct any findings, or to remediate any issues.

15  Q.  How did you learn about any findings when the process was

16  centralized?

17  A.  I receive a copy of the final report.

18  Q.  When the process was in the business center, did you

19  receive any reports on the process?

20  A.  Since I authored that report, the answer would be yes.  Or

21  if I didn't author it, I signed off on it.

22  Q.  In the centralized process, once the report was issued, did

23  you have any role if there were findings in that report?

24  A.  I had a role as the manager of the team, the underwriting

25  team or the risk team that was given responsibility for

DA43BAN2                            Sobczak - direct

```
 1   clearing the findings under their expertise areas.
 2   Q.  Were you charged with discussing findings with any
 3   employees at Fannie Mae that may have come out of those
 4   operational reviews at the time it was centralized?
 5   A.  It wasn't that I was charged with.  I was just part of the
 6   management process over which operational or around which
 7   operational reviews were discussed.
 8   Q.  Stepping back to the time period before when it was in the
 9   regional centers and you authored the report.  Did you have to
10   do anything after the report with respect to the findings at
11   Fannie Mae -- withdrawn.
12        Did you have to talk to anybody after you authored the
13   report about any findings in that report?
14   A.  Same thing.  We worked across the Fannie Mae organization
15   and including interfacing with folks in D.C.
16        MR. CORDARO:  Your Honor, with the Court's permission,
17   I'd like to take him into the nuts and bolts of the 2005 if the
18   objection -- I'll just ask the question.
19        MS. MAINIGI:  Objection, your Honor.  2005?  I don't
20   understand.
21        THE COURT:  What he's saying is he came back in effect
22   in the later period, is my understanding of what has now been
23   produced.  But put a question.  I can't deal with it in the
24   abstract.
25   Q.  So, as I asked you before, when the operational review was
```

DA43BAN2                     Sobczak – direct

1   in the Western Management Center, in the earlier time, could

2   you describe to the jury what would be the steps involved in

3   that operational review with a lender like Countrywide?

4               MS. MAINIGI:  Objection.  Relevance.

5               THE COURT:  Come to the side bar.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA43BAN2                           Sobczak – direct

1           (At the side bar)

2           THE COURT:  As I understand it, but correct me if I'm

3    wrong, he knows what went on in that office in 2005 because he

4    was the one actually doing the reports or signing off on them

5    then.

6           The relevance to this case is that, subsequently,

7    after he moved on, the reports coming out during the relevant

8    time period were reviewed by him.  And the point is so that the

9    jury can assess what went into the report and what steps were

10   taken, to describe from his personal knowledge what they were

11   in 2005.  And there is no reason to believe the inference it

12   would be any different in 2006 or 2007 or whatever.

13          That's what I take it to be the proffer, yes?

14          MR. CORDARO:  Yes.  Just to clear the record, I

15   misspoke when I said 2005.  I don't think the witness testified

16   to that at all.  I think he testified they went up to 2006 and

17   2007.  It was my error.

18          THE COURT:  Even closer.  So what's the relevance

19   objection?

20          MS. MAINIGI:  Well, I guess it was a relevance

21   objection and a vagueness objection, because I didn't

22   understand the purpose of going through something that is 2005,

23   2006, if we are talking about subsequently.

24          THE COURT:  Because the point is when the reports are

25   received in 2007, to make sense of them, one needs to know what

1    steps were taken in the preparation of the report, which he has

2    personal knowledge of from a period very shortly before.  And

3    it is a reasonable inference.  You can of course cross-examine,

4    but it is a reasonable inference that the same basic steps were

5    taken in a immediately subsequent period.  That's what I

6    understand to be --

7            MS. MAINIGI:  As long as I can cross-examine around

8    that area.

9            THE COURT:  Of course.

10            MR. MUKASEY:  I think it was the 2005 reference that

11    drew the objection.

12            THE COURT:  Clarify that as well.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DA43BAN2                    Sobczak - direct

1          (In open court)

2   Q.  Mr. Sobczak, you testified previously about the time period

3   that the operational reviews were in the regional centers, do

4   you recall that testimony?

5   A.  I did.

6   Q.  Can you give us again what that time period was as you

7   understood it?

8   A.  As I remember it, it was when I started in 1997, and ended

9   in approximately the 2006, 2007 time period.

10  Q.  Mr. Sobczak, could you take us through the steps that your

11  team would undertake in conducting an operational review of a

12  lender such as Countrywide when it was in the regional side.

13  A.  We would schedule the review, we would send out a prework

14  questionnaire.  The lender completed the prework questionnaire

15  attaching any relevant documents.  Our team went out to

16  understand how loans are underwritten, how the organization

17  worked, talked to the management, retrieved sample reports, we

18  brought that information back.  Several weeks later, we issued

19  a report of our visit, our findings.  Our engagement or our

20  findings letter went out to the customer, which may have had

21  included recommendations for improvement and specific things a

22  lender needs to do.  The responsibility for ensuring those

23  findings were addressed was ours.  And it was concluded.

24  Q.  You mentioned underwriting in that explanation.  Do you

25  recall that?

1  A.  Yes.

2  Q.  Why was it important to understand underwriting during

3  these operational reviews?

4  A.  The nature of the person, the skill sets of the person, the

5  training that went into the underwriting team, the authority

6  levels, not all underwriters were eligible, for example, to do

7  all loan products or all loan amounts.  And the management

8  controls, especially the quality controls, that a lender had in

9  place.

10  Q.  Based on your understanding, why was it important for you

11  to gain an understanding of that information you just described

12  as part of the operational review?

13  A.  So it goes back to infrastructure.  A lender with excellent

14  infrastructure or sufficient infrastructure was deemed able to

15  originate quality mortgages.

16  Q.  Once the operational review -- withdrawn.

17          Once the on-site visit concluded, what would happen

18  next?

19  A.  Presuming we were done with the operational reviews,

20  including remediating any findings or lender taking action that

21  we had recommended, or mandated, the day-to-day relationship

22  then takes over.

23  Q.  By the day-to-day relationship, what do you mean?

24  A.  The normal -- the normal customer asks of individual

25  questions around loans, new products, data sharing, the

1   management to management interface, or the engagement that I

2   talked about prior.

3   Q.  You made a reference before to a report that you authored.

4   Do you recall that?

5   A.  Yes.

6   Q.  Could you just explain to the jury what that report was and

7   what it contained?

8   A.  Well, that was the operational review.  I wrote some of the

9   passages in it, I approved or edited contributions of others on

10  my team, and I discussed that report with my counterparts at

11  Countrywide.

12  Q.  When the operational reviews switched over to the

13  centralized office, could you explain what involvement, if any,

14  you had at that point?

15  A.  So my involvement and my team's involvement started when

16  the review was completed.  When the findings letter, when the

17  engagement letter was delivered to Countrywide or any lender.

18  If there were actions that a lender needed to take around

19  underwriting, for example, my team would work with a lender's

20  team ensuring those actions were completed.

21  Q.  In connection with any operational review, did you ever

22  hear of something called the High-Speed Swim Lane or the

23  Hustle?

24  A.  No, I didn't.

25  Q.  You made reference earlier to communications that you had

DA43BAN2                          Sobczak – direct

1    with the lender that had nothing to do with operational review.

2    Do you recall that?

3    A.  Yes.

4    Q.  Okay.  So, putting aside operational review, how often did

5    you communicate with employees at Countrywide in 2007, 2008?

6    A.  There was daily communication.  Whether or not I personally

7    did it or someone on my team did it and relayed the results of

8    those conversations to me.

9    Q.  In connection with those conversations, did you ever learn

10   from anyone at Countrywide that FSL was using a process known

11   as the High-Speed Swim Lane or the Hustle?

12            MR. MUKASEY:  Objection.  "Those conversations" is

13   vague in light of the previous answer.

14            THE COURT:  No, I think for these purposes, given what

15   I anticipate is the likely answer, that's not a problem.  If

16   the answer is different than what I anticipate, then -- you may

17   answer the question.

18   A.  Could you ask it again?

19   Q.  Sure.  Well, let me step back.  Did your conversations with

20   Countrywide employees take place in 2007 and 2008?

21   A.  Yes.

22   Q.  During those conversations, were you ever told by anyone at

23   Countrywide that about a loan origination process known as the

24   High-Speed Swim Lane or the Hustle?

25   A.  No, I wasn't.

DA43BAN2                    Sobczak - direct

1    Q.  Were you ever told about something called the HSSL?

2    A.  No.

3    Q.  Did you ever learn about anything called the HSSL in

4    connection with an operational review?

5    A.  No.

6    Q.  In your capacity in risk management, would you have

7    considered it important to know about a loan origination

8    process called the High-Speed Swim Lane?

9              MS. MAINIGI:  Objection.

10             THE COURT:  Sustained.

11   Q.  In your capacity in risk management, did you consider it

12   important or not to know about loan origination processes that

13   lenders were using?

14             MS. MAINIGI:  Objection.

15             THE COURT:  Overruled.

16   A.  It was important.

17   Q.  Why was it important?

18   A.  It goes to the issue of infrastructure.  And what I had

19   said earlier, lenders with good infrastructure usually produce

20   quality mortgages.

21   Q.  In connection with your position in risk management, would

22   you have considered it important for you to know if a lender

23   was using a loan origination process that was designed to

24   increase the speed from application to funding?

25             MS. MAINIGI:  Objection.

DA43BAN2                    Sobczak - direct

  1                MR. MUKASEY:  Objection.

  2                THE COURT:  Overruled.

  3    A.   Speed is an aspect, and speed does not necessarily result

  4    in a quality indicator.  I look at speed in underwriting, or I

  5    look at speed in loan origination as a good thing.  Provided

  6    that the controls governing the decisions, if we are -- if the

  7    lender is going to originate that mortgage or not are not

  8    compromised.

  9    Q.   If in your capacity as a risk manager, would you have

 10    considered it important for you to know if a lender was using a

 11    loan origination process that not only was seeking to increase

 12    the speed of the loans but also was if that -- withdrawn.

 13                In your capacity as loan origination manager, would

 14    you have deemed it important to know if a lender was using a

 15    loan origination process that increased speed at any expense of

 16    quality?

 17                MS. MAINIGI:  Objection.

 18                MR. MUKASEY:  Objection.

 19                THE COURT:  Sustained.

 20    Q.   In your capacity as the loan -- as a credit risk manager,

 21    would you have deemed it important to know if the lender was

 22    utilizing a loan origination process that was sacrificing

 23    quality in any way?

 24                MS. MAINIGI:  Objection.

 25                MR. MUKASEY:  Objection.

1540

DA43BAN2                          Sobczak — direct

1            THE COURT:  I will permit that.

2            MS. MAINIGI:  Your Honor, could we ask for a side bar,

3    please.

4            THE COURT:  Yes.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA43BAN2                    Sobczak - direct

1           (At the side bar)

2           MR. MUKASEY:  I'll give you my ground.  My ground is

3     argumentative.  "Sacrificing" is a characterization, not a

4     request for a factual answer.  It is imposing argument into the

5     question.

6           THE COURT:  That's why I was hesitating.  I thought it

7     was otherwise a perfectly acceptable question.  But with this

8     witness who very clearly cannot be led, it seemed to me that

9     the use of one arguably argumentative word did not negate the

10    question.  But I did consider that.

11          MS. MAINIGI:  Two bases, your Honor.  One, there is no

12    evidentiary basis that's been established in the record for any

13    of the hypotheticals he's asking.

14          THE COURT:  I don't agree with that at all.  How can

15    you say that?

16          MS. MAINIGI:  Not the general manner --

17          THE COURT:  The entire thrust of a portion of the

18    government's case has been that the Hustle program was designed

19    to and did sacrifice and reduce quality while pretending that

20    it was not doing that.  And that, if anything, it was enhancing

21    quality.  There has been ample evidence from which the jury

22    could, if it wished, could infer that.  There is obviously

23    evidence to the contrary.  So, I don't see how that objection

24    can stand.

25          MS. MAINIGI:  Your Honor, it's very general what

1    they're putting into the record.  It is not specifics really.

2              THE COURT:  Yes.  But the problem with that is, if you

3    ask a question about, as he did, about is it important to you

4    to know about speed, the witness will say, in effect, as every

5    witness is going to say, you can't tell in isolation.  You have

6    to know the entire way the program operated to assess whether

7    it is something that is a sham or not.

8              And, therefore, the only really appropriate -- I

9    wouldn't say the only appropriate question.  But a totally

10   appropriate question is taking the program as a whole, did it

11   reduce quality and was that important to you.  And that's in

12   effect the question he's now asking.

13             MR. MUKASEY:  Judge --

14             MS. MAINIGI:  Secondly, your Honor, I believe your

15   Honor indicated that the purchase stream was important.  And

16   that these types of questions were only -- or answers were only

17   significant from someone that was in the purchasing stream.

18   And I don't believe we've established that.

19             THE COURT:  No, I think I didn't limit it to the

20   purchasing stream.  What I said was, with an earlier witness

21   who was totally divorced from anything remotely connected with

22   the process, I excluded some questions there.  But this guy is

23   not in that situation.  He had daily contact with Countrywide.

24   The other witness where this came up is where the witness had

25   no contact with Countrywide.  Here is a witness, who, by his

DA43BAN2                         Sobczak – direct

1    own testimony, is having daily conversations with Countrywide.

2              MR. MUKASEY:  Your Honor, if I may.  The prior answer

3    when Mr. Cordaro posed the question, came from the witness

4    something to the effect of speed is sometimes a good thing.

5    Sometimes I look for speed as long as speed goes hand in hand

6    with quality.

7              THE COURT:  Right.

8              MR. MUKASEY:  Imposition of the word "sacrifice" of

9    the government really leads him to --

10             THE COURT:  You want to use the word "reduce"?

11             MR. CORDARO:  I can use a different word.

12             (Continued on next page)

1          (In open court)

2              MR. CORDARO:  May I proceed, your Honor?

3              THE COURT:  Yes.

4    BY MR. CORDARO:

5    Q.  Mr. Sobczak, in your accounts risk management capacity,

6    would it have been important for you to know if a lender was

7    utilizing a loan origination procedure that -- withdrawn.

8              In your capacity in risk management, would it have

9    been important for you to know if a lender was utilizing a loan

10   origination process that was reducing quality in any way?

11   A.  Yes, it would be.

12             MR. MUKASEY:  Objection.

13   Q.  Why?

14             THE COURT:  I'm sorry?

15             MR. MUKASEY:  I objected to the question, Judge.

16             THE COURT:  For reasons different than the one stated

17   at side bar?

18             MR. MUKASEY:  To preserve the record to that question.

19             THE COURT:  Well, I thought everything said at the

20   side bar is preserved, but I'm delighted to overrule your

21   objection again.

22             MR. CORDARO:  I'll put the question again, your Honor.

23             THE COURT:  He answered the question.  I think the

24   objection came too late.  But in any event, the objection is

25   preserved, the overruling is preserved, and the answer is

1    preserved.

2              And the answer was "Yes," correct?

3              THE WITNESS:  Yes.

4    Q.  Why was it important?

5    A.  It goes back to what my job was responsible for knowing and

6    doing.  It was important for me to know how lenders did

7    business under loans and originated mortgages so I could

8    critique its ability to deliver investment quality mortgages to

9    Fannie Mae.

10   Q.  You testified earlier about variances.  Do you recall that?

11   A.  Yes.

12   Q.  Could you just refresh everybody's recollection to what a

13   variance is?

14   A.  A variance is an expansion and sometimes a relaxation of

15   standard guide requirements, so if a guide required certain

16   actions to be taken or limited loans to certain terms, lenders,

17   through the variance process would ask for some relief from

18   those conditions.

19   Q.  Did you have any involvement in Countrywide variances?

20   A.  Yes, I did.

21   Q.  Did that involvement span 2007/2008?

22   A.  Yes.

23   Q.  Would you explain what that involvement was to the jury?

24   A.  Specifically for Countrywide, Countrywide had over a

25   hundred variances, and at that period of time, including

 1  rolling over into 2008, Countrywide and Bank of America entered

 2  into a definitive mortgage -- or a definitive merger agreement,

 3  and Bank of America was interested in understanding the

 4  variances, as again exceptions to the standard selling guide,

 5  that Countrywide had.  And my team and I ensured that all the

 6  variances were up to date.  We collapsed the variances which

 7  are no longer appropriate, and we presented that work to both

 8  Countrywide and Bank of America.  In short, there was a

 9  massive -- a significant, there was a significant review and

10  clean up of the master contract.

11          MS. MAINIGI:  Your Honor, I move to strike,

12  irrelevant.

13          THE COURT:  Well, let me hear the next question then I

14  will be able to tell.

15  Q.  Putting aside everything you just told us about the clean

16  up, did you have any other role prior to that with respect to

17  variances?

18  A.  Responding to Countrywide's request for variance

19  exceptions.

20  Q.  Could you explain what you mean by responding to

21  Countrywide's request for exemptions?

22  A.  So Countrywide and all lenders would approach Fannie Mae

23  for special considerations, it may have been a new product, it

24  may have been a relaxation of a credit score requirement, it

25  may have been a relaxation of documentation requirements for a

DA4TBAN3                     Sobczak – direct

1    specific loan product, and my team and I would assess those

2    requests and determine whether or not they would be entertained

3    or are feasible at all at Fannie Mae.

4            MS. MAINIGI:  Your Honor, I just request that that

5    prior answer be stricken, please.

6            THE COURT:  Well, I'm still actually mulling on that

7    because of the follow-up questions, but I hope counsel can

8    bring it to a head fair -- in the next few questions so I can

9    make that ruling one way or the other.

10   Q.  Mr. Sobczak, what specifically did you do in connection

11   with the variances that you just discussed in your previous

12   answer?

13           MS. MAINIGI:  Objection.

14           THE COURT:  Let's have a side bar, we'll sort it out.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DA4TBAN3                        Sobczak - direct

1          (At side bar)

2          THE COURT:  It's very unclear where this is going.

3          MR. CORDARO:  Your Honor, the long answer that the

4     witness gave, the one that drew the objection, I'm not going

5     into that at all.  I wanted to know was what his role was in

6     terms of variances with Countrywide during the period because

7     those are part of the contract or there are exceptions to the

8     contract, and whether or not the issues he has been discussing

9     with respect to process would have been important to him in

10    connection with that role.

11         MR. MUKASEY:  During what time period?

12         MS. MAINIGI:  That was my objection.

13         THE COURT:  So I will sustain the objection to the

14    previous question and answer that at the time that objection

15    was made, and then --

16         MS. MAINIGI:  And pending.

17         THE COURT:  Everything else is unobjectionable, and

18    give me the pending question.

19         MR. CORDARO:  I think I asked what did you do, what --

20    he said something like my team and I did.

21         THE COURT:  So --

22         MS. MAINIGI:  Our pending objection is vague and time

23    period.

24         MR. MUKASEY:  Ours as well.

25         THE COURT:  The time frame is sustained, so rephrase

1  it.

2          (In open court)

3          THE COURT:  So the question several questions back

4  that led to the answer about the clean up, that objection is

5  sustained, that answer is stricken.

6          OK, go ahead.

7          MR. CORDARO:  Thank you, your Honor.

8  BY MR. CORDARO:

9  Q.  During the 2007 to 2008 period, Mr. Sobczak, what did you

10  do with respect to the issue of variances?

11  A.  I was the primary recipient of the lenders that asked, I

12  ensured that I understood precisely what the lender was asking

13  for, I worked with my team in translating what the lenders

14  asked to contract language, and my team worked with internal

15  attorneys on drafted language that went back and forth between

16  Countrywide and the risk management team.

17  Q.  What sorts of things, if any, did you and your team

18  consider during that process?

19  A.  Related to a variance request, we would assess the lender's

20  ability to produce mortgages under the terms and the conditions

21  of that variance.  We wanted to ensure that loans delivered

22  under that variance could be identified for later performance

23  true up, and we needed to ensure that the terms are specific

24  and could be enforced.

25  Q.  Based on your understanding, if a lender was utilizing a

DA4TBAN3                          Sobczak – direct

1    loan origination process that reduced quality in any way, would

2    that be important for you to know in the context of any

3    requests for a variance?

4             MS. MAINIGI:  Objection.

5             MR. MUKASEY:  Objection.

6             THE COURT:  Overruled.  You may answer.

7    A.  That would be important to know, yes.

8    Q.  Why would it be important?

9    A.  To use your word, reduced quality would be a concern, and

10   if quality is reduced it would likely lead to possibly terms

11   and conditions of a variance or other variances that may not be

12   adhered to.

13            MR. CORDARO:  May I confer briefly, your Honor?

14            THE COURT:  Yes.

15            (Pause)

16   Q.  At any time during your employment at Fannie Mae, did

17   anyone tell you about a loan origination process known as the

18   Hustle, the High-Speed Swim Lane or the HSSL?

19            MR. MUKASEY:  Asked and answered.

20            THE COURT:  Well, it appears that at least one of the

21   government counsel is of the view that it somehow wasn't

22   covered, so I will allow it.

23            MR. CORDARO:  Thank you, your Honor.

24   A.  None of those three terms I was familiar with.

25            THE COURT:  OK.  Cross-examination.

 1   CROSS-EXAMINATION

 2   BY MS. MAINIGI:

 3   Q.  Good afternoon, Mr. Sobczak.

 4   A.  Good afternoon.

 5   Q.  Mr. Sobczak, you indicated that you were familiar with the

 6   various contract agreements that existed between Countrywide

 7   and Fannie Mae, correct?

 8   A.  Correct.

 9   Q.  And there was an alliance agreement, correct?

10   A.  Yes.

11   Q.  A master agreement?

12   A.  Yes.

13   Q.  And a selling agreement?

14   A.  Correct.

15   Q.  And what would you refer to those three sets of agreements

16   together?

17   A.  The master contract.

18   Q.  The master contract.  Thank you.

19           Now Mr. Sobczak, the master contract does not dictate

20   the title of the person who clears the loan to close, correct?

21   A.  That is correct.

22   Q.  And the master contract does not dictate the qualifications

23   of the person who clears the loan to close, correct?

24   A.  Correct.

25   Q.  The master contract does not dictate the skill set of the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1    person who clears a loan to close, correct?

2    A.  That is correct.

3    Q.  The master contract does not speak to the compensation of

4    the individuals involved with the loan process, correct?

5    A.  That is correct.

6    Q.  The master contract does not obligate lenders to discuss

7    process changes, correct?

8    A.  Correct.

9    Q.  Now as someone involved with contracting, Mr. Sobczak, you

10   are aware that Fannie Mae could have built all of these

11   requirements into the master contract, correct?

12             MR. CORDARO:  Objection.

13             THE COURT:  Sustained.

14   Q.  Mr. Sobczak, no underwriter does not mean no underwriting,

15   correct?

16             MR. CORDARO:  Objection.

17             THE COURT:  Well, sustained as to form.  Do you want

18   to connect it up?

19   Q.  Can someone other than a person with the title

20   "underwriter" underwrite a loan in your view, Mr. Sobczak?

21             MR. CORDARO:  Objection.

22             THE COURT:  Still too disconnected.  Sustained.

23   Q.  Do you know what a loan processor is, Mr. Sobczak?

24   A.  Yes, I do.

25   Q.  Do you know what a loan specialist is?

DA4TBAN3                          Sobczak – cross

1    A.  Yes.

2    Q.  Are those two terms synonymous in your view?

3    A.  Yes, they are.

4    Q.  What do you understand those two terms to mean, sir?

5              MR. CORDARO:  Objection, your Honor.

6              THE COURT:  Overruled.

7    A.  A loan processor or a loan specialist is responsible for

8    packaging a loan and sometimes approving or reviewing

9    conditions under which the loan needs to be closed and

10   approving a loan to close and fund.

11   Q.  And was that your understanding in the 2007 to 2008 time

12   period, Mr. Sobczak?

13   A.  My understanding in that time period is that those titles

14   were used interchangeably for the reasons that I mentioned.

15   Q.  And loan specialists or loan processors in the 2007/2008

16   time period cleared conditions on loans, is that correct?

17             MR. CORDARO:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.  Yes.

20   Q.  And in the 2007 to 2008 time period, loan processors and

21   specialists cleared loans to close, correct?

22             MR. CORDARO:  Objection, again, your Honor.

23             THE COURT:  Ground?

24             MR. CORDARO:  Could we have a side bar?  I'm not clear

25   on whose loan specialists.

1       MS. MAINIGI:  I can tie it up, your Honor.

2   A.  Could you repeat the question again?

3   Q.  Sure.  I'm going to withdraw that question and ask you

4   another one, Mr. Sobczak.  In the 2007/2008 time period -- but

5   let me frame the question for you.  You were asked some

6   questions as to whether you knew about the High-Speed Swim

7   Lane, correct, Mr. Sobczak?

8   A.  That's correct.

9   Q.  And you responded that you did not?

10  A.  That's correct.

11  Q.  In the 2007/2008 time period, were you aware of loan

12  specialists clearing conditions and clearing loans to close at

13  Countrywide?

14  A.  Yes, I was.

15  Q.  Could you explain that, please, sir.

16  A.  In Countrywide's consumer markets division, that was the

17  process that division used on some types of loans.

18  Q.  And what type -- did you do operation reviews of the

19  consumer market division in that time period, sir?

20  A.  Yes.

21  Q.  And what did you understand -- what types of loans was that

22  process utilized for?

23      MR. CORDARO:  Objection, your Honor, relevance.

24      THE COURT:  I can't tell yet.  I'll allow it until we

25  hear the follow up, you may answer.

1   A.   A loan that was seen by an automated underwriting system,

2   Fannie Mae's Desktop operating system or Countrywide's CLUES

3   system, that received an approval, those are the loans that a

4   loan processor, a loan specialist was expected to gather

5   conditions on and move to closing and funding.

6   Q.   Were those prime loans, Mr. Sobczak?

7   A.   Yes.

8   Q.   Now as an underwriter and risk management person reviewing

9   this process where loan processors and specialists cleared

10  loans to close, was that process acceptable to you?

11          MR. CORDARO:  Objection, relevance.

12          THE COURT:  Well, overruled as to relevance, but

13  sustained as to form.

14          But let me go back for a moment to a question just a

15  minute ago, the question was about prime loans, what is a prime

16  loan and what is a subprime loan?

17          THE WITNESS:  There is not a one size fits all

18  definition of either.

19          THE COURT:  So when you were asked the question

20  referring to the Countrywide CLUES system, et cetera, and you

21  were asked the question were those prime loans and you said

22  yes, what did you mean by that?

23          THE WITNESS:  I meant as I knew Countrywide's consumer

24  market division, and as I knew it to originate what it termed

25  to be prime loans in the marketplace, I tied the two together

1    for my answer.

2              THE COURT:  So what was your understanding of what was

3    meant in that context by the term "prime loan?"

4              THE WITNESS:  Prime loans were loans that did not go

5    through Countrywide's subprime arm Full Spectrum.

6              THE COURT:  So the only operational definition of

7    prime was it wasn't subjected to the same Full Spectrum review

8    as subprime?

9              THE WITNESS:  I wouldn't say only, I would say that

10   loans that Countrywide's consumer market division worked on

11   were considered by it and by me to have a prime moniker to it.

12             THE COURT:  Meaning?  I'm still trying to, and I think

13   the jury had this question, too, we understand that from your

14   testimony and other testimony that there is no sort of fixed

15   formal definition of prime and subprime, but we need to get a

16   feel for what, in this context of Countrywide loans, there had

17   been references to prime and subprime, what is your

18   understanding of what was being conveyed?

19             THE WITNESS:  I'll try to do my best.  A borrower with

20   very challenging credit history, a credit history that, for

21   example, may have included a recent mortgage foreclosure or

22   credit cards that went to collection, a low FICO score in the

23   500 range, that was considered to be subprime loan due to

24   borrower's past credit history.

25             A borrower that makes all their payments on time or

1    maybe didn't make all their payments on time but missed very

2    few, is current on their mortgage, pays their auto loan, that

3    would be rendered as a prime loan.

4              THE COURT:  Do I understand from that -- withdrawn.

5              When these loans were presented to Fannie Mae by

6    Countrywide, were they representative of a prime or subprime or

7    were those terms not used?

8              THE WITNESS:  Those terms were not used.

9              THE COURT:  All right.  Go ahead, counsel.

10             MS. MAINIGI:  Thank you.

11   BY MS. MAINIGI:

12   Q.  The process that was reviewed at Countrywide where loan

13   specialists and loan processors cleared loans to close, was

14   that process reviewed by the operational reviews that were

15   conducted in 2005, 2006 and 2007, Mr. Sobczak?

16   A.  Yes.

17   Q.  And to your recollection, was there ever a finding in those

18   operational reviews that that process was not acceptable?

19   A.  Not to my recollection.

20   Q.  So through the operational reviews, Fannie Mae was aware

21   that Countrywide was using loan processors and loan specialists

22   to clear loans to close, correct?

23             MR. CORDARO:  Objection.

24             THE COURT:  Overruled.

25   A.  Yes.

1          THE COURT:  Counsel, we're going to give the jury a

2    lunch break in about five minutes, so find a good spot.

3          MS. MAINIGI:  Thank you.

4    Q.  Mr. Sobczak are you familiar with the term "junior

5    underwriter?"

6    A.  Yes, I am.

7    Q.  Do you view this term to be synonymous with loan

8    specialists or loan processor?

9    A.  I do.

10   Q.  To your knowledge, do different lenders use those terms

11   synonymously?

12   A.  Interchangeably, yes.

13   Q.  Now you were asked some questions about Full Spectrum, do

14   you recall that?

15   A.  Yes.

16   Q.  Now at the time that you were doing operational reviews,

17   Full Spectrum was a subprime shop, correct?

18   A.  That is correct.

19   Q.  And that's how you understood Full Spectrum, you understood

20   it to be one of the divisions of Countrywide that processed

21   subprime loans, correct?

22   A.  Yes.

23   Q.  And at some point you understood that the subprime market

24   dried up in the 2007 time period, correct?

25   A.  That's correct.

DA4TBAN3                          Sobczak – cross

1   Q.  And by that point -- and now at that point in time in the

2   2007 time period, I believe you testified you came out of the

3   operational review world, correct?

4   A.  Yes.

5   Q.  And you continued doing work with Countrywide on behalf of

6   Fannie Mae and in other contexts, right?

7   A.  That is correct.

8   Q.  Is it fair to say that you, yourself, then were not

9   intimately involved with the Full Spectrum Lending division of

10  Countrywide when it moved over to being a prime shop?

11              MR. CORDARO:  Objection.

12              THE COURT:  Overruled.

13  A.  That's a fair statement.

14  Q.  Were there other people at -- excuse me, were there other

15  people at Fannie Mae, however, that were perhaps more

16  intimately involved with the Full Spectrum division of

17  Countrywide when it became a prime shop?

18              MR. CORDARO:  Objection.

19              THE COURT:  Overruled.

20  A.  I would expect that there was.

21              THE COURT:  Do you know who or are you just

22  speculating?

23              THE WITNESS:  I am going to say that Fannie Mae was

24  interested in subprime business, and it organized subprime

25  initiative to get more of that business.  My boss was part of

1    that initiative, others in DC were part of that initiative.

2    That's my only and direct or indirect recollection.

3              THE COURT:  The question was:  Were there other people

4    at Fannie Mae that were perhaps more intimately involved with

5    the Full Spectrum division of Countrywide when it became a

6    prime shop?  And your answer was:  I would expect that there

7    was.

8              And my question was, I was unclear from that answer

9    were you saying you're speculating or did you know whether

10   there was someone who was more involved?  If so, who?

11             THE WITNESS:  So at that point in time, my model of

12   the operational review business, I would think that whoever

13   took over the operation reviews after me would want to have an

14   understanding of how Full Spectrum was doing business, that led

15   to my answer.

16             THE COURT:  So who was that, who took over?

17             THE WITNESS:  It was the LARC team, I can't remember

18   what the acronym stood for, but the director of that team was

19   Romona O'Bannon.

20             THE COURT:  OK.

21   BY MS. MAINIGI:

22   Q.  Mr. Sobczak, if you had known in the fall of 2007 that the

23   Full Spectrum Lending division, as a result of its conversion

24   to a prime shop, began to use loan specialists to clean certain

25   low risk loans to close, what would you have thought about

DA4TBAN3                        Sobczak – cross

1     that?

2                MR. CORDARO:  Objection.

3                THE COURT:  I think he would probably think that it's

4     time to give the jury their lunch break.

5                So ladies and gentlemen, we're going to give you until

6     2 o'clock.  We're going to handle this, though, as yesterday

7     because I have several matters late in the afternoon.  So we

8     will only sit until a few minutes before four, but we will not

9     take a mid-afternoon break.  So we'll see you at 2 o'clock.

10               (Jury not present)

11               THE COURT:  I want to spend a little time talking with

12    my friends from Seton Hall, but if there's -- I know we have a

13    number of items I'm going to have to cover before the end of

14    the day, probably after we excuse the jury, but is there

15    anything counsel needs to raise right now?

16               OK.  Very good.  We'll see you at 2 o'clock.

17               (Luncheon recess taken)

18               (Continued on next page)

19

20

21

22

23

24

25

                           AFTERNOON SESSION

1                             (2:10 p.m.)

2

3           (Jury present)

4           THE COURT:  Counsel.

5           MS. MAINIGI:  Thank you, your Honor.

6    BY MS. MAINIGI:

7    Q.  Good afternoon, Mr. Sobczak.

8    A.  Good afternoon.

9    Q.  During your direct examination with Mr. Cordaro, you

10   discussed your knowledge of variance.  Do you recall that?

11   A.  Yes, I did.

12   Q.  Now Fannie Mae granted a variance to Countrywide for CLUES

13   to be used by Countrywide, is that correct?

14   A.  Correct.

15   Q.  And that wasn't in the '07, '08 time period but was in fact

16   many years ago, is that true?

17   A.  Yes.

18   Q.  And it also granted variances to other lenders to allow

19   them to use their proprietary underwriting systems, correct?

20   A.  Yes.

21   Q.  Now CLUES was Countrywide's automated underwriting system,

22   is that right, Mr. Sobczak?

23   A.  Yes, it is.

24   Q.  And CLUES was the underwriter on prime CLUES accept loans,

25   correct?

1           MR. CORDARO:  Objection.

2           THE COURT:  Ground?

3           MR. CORDARO:  Vague with respect to underwriter and

4    also lack of foundation.

5           THE COURT:  Overruled.

6    A.  CLUES rendered an approve or refer decision based on

7    information it evaluated.

8    Q.  And so on a prime CLUES accept, was CLUES the underwriter?

9    A.  Yes.

10   Q.  And you understood this in your role in underwriting and

11   risk at Fannie Mae, is that correct?

12          MR. CORDARO:  Objection.

13          THE COURT:  Overruled.

14   A.  That's correct.

15   Q.  Now Mr. Sobczak, was the fact that a trained loan

16   specialist cleared an AUS approved loan to close instead of an

17   underwriter ever the basis to not purchase a loan?

18   A.  That was never a basis for not purchasing a loan.

19   Q.  Did the fact that a loan specialist cleared a loan to close

20   mean that there was no underwriting of the loan?

21          MR. CORDARO:  Objection.

22          THE COURT:  Overruled.

23   A.  Because a loan specialist closed a loan did not mean that

24   loan was not underwritten.

25   Q.  You mentioned -- you spoke for a while, Mr. Sobczak, about

DA4TBAN3                          Sobczak - cross

1    the on-site reviews.  Do you remember that this morning?

2    A.  Yes.

3    Q.  Was there also something called a post-purchase review

4    process?

5    A.  Yes, there was.

6    Q.  And could you describe that process for us, please.

7    A.  The post-purchase review process reviewed recent Fannie

8    Mae -- was designed to review deliveries across all lenders,

9    and that post-purchase review process was conducted in our

10   Dallas office.

11   Q.  Did the post-purchase review process review actual loan

12   files from the lenders?

13   A.  Yes, considered to be a re-underwriting of a loan that was

14   already delivered to Fannie Mae.

15   Q.  And how was this -- I assume it was a sample of loans that

16   was selected, is that true?

17   A.  Yes, that's true.

18   Q.  How was the sample selected?

19   A.  There were three ways a sample was selected.  The first

20   segment was sheer random reviews that had a statistical

21   significance, so the findings based on the small sample could

22   be inferred across a larger population of loans.  The second

23   sample was known as a targeted review, where Fannie Mae wanted

24   to drill down on certain types of loans.  For example, it could

25   be high loan to value lens with low credit scores.  And the

DA4TBAN3                          Sobczak – cross

1    third sample was known as a pre-foreclosure or post-foreclosure

2    review, and these lens were either in danger of imminent

3    default or had already defaulted.

4    Q.   In the context of these re-underwriting reviews, what was

5    "significant finding," what does that term mean?

6              MR. CORDARO:  Objection, relevance.

7              THE COURT:  Overruled.

8    A.   Fannie Mae's definition of a significant finding was that

9    if Fannie Mae wanted to pursue a repurchase of a loan, it

10   believed it had the grounds to do that because there was some

11   flaw in that loan.

12   Q.   Mr. Sobczak, what was the national significant finding rate

13   in the 2007/2008 time period?

14             MR. CORDARO:  Objection.

15             THE COURT:  Sustained.

16             MS. MAINIGI:  Your Honor, may I have a side bar,

17   please?

18             THE COURT:  Yes.

19             (Continued on next page)

20

21

22

23

24

25

1          (At side bar)

2          MS. MAINIGI:  Your Honor, this is the exact same

3     question that you allowed us to ask to the Freddie Mac

4     representative the other day, there was a NIC or NAC rate that

5     Freddie Mac used, it's comparable to this.  You allowed us to

6     ask what essentially that rate was because it's the equivalent

7     of the industry standard, and that was to rebut the opening.

8     So we asked the Freddie Mac person that rate, and he gave us a

9     rate of 18 to 20 percent.  I'm now trying to get the same

10    information for Fannie Mae.

11         THE COURT:  But first of all, my recollection is that

12    there were questions that had already come out about NIC or

13    NAC.

14         MS. MAINIGI:  One or the other, can't remember which.

15         THE COURT:  And that hasn't come out here, but let me

16    hear from the government.

17         MR. CORDARO:  Your Honor, we think this is irrelevant

18    because it seems they're trying to suggest that they should

19    have been able to discover the Hustle through the defect rate,

20    which is a default rate, whatever that rate stands for, it's a

21    blaming a victim argument.

22         THE COURT:  I'm a little concerned about that,

23    although you opened this a little bit in your direct when you

24    got into -- one of your questions, maybe not intentionally,

25    elicited a default answer.  Now I'm not going to use that as a

DA4TBAN3                          Sobczak - cross

```
 1   device to open what is otherwise closed.
 2              MS. MAINIGI:  I'm not saying that he did anything, I'm
 3   happy to ask it as a direct question.  I'm not suggesting that
 4   he opened the door in his direct examination do ask this, I'm
 5   saying this balances me out here because we asked the question
 6   to Freddie Mac and there was a reason that your Honor allowed
 7   it to be asked.
 8              THE COURT:  This is a funny argument.  You're saying
 9   is you can't actually remember what the reason was.
10              MS. MAINIGI:  I do know what the reason was, the
11   reason was --
12              THE COURT:  Because my recollection, for what its
13   worth, which could be totally wrong, is that it was responsive
14   to something in the direct testimony.
15              MS. MAINIGI:  With all due respect, your Honor,
16   because I looked at it --
17              THE COURT:  That's not fair.
18              MS. MAINIGI:  I can't get in your Honor's mind, but as
19   I believe the last --
20              THE COURT:  There's nothing there.
21              MR. SULLIVAN:  It was Mr. Armand in his opening
22   statement had offered an industry standard rate of four to five
23   percent, and you allowed me then to ask --
24              THE COURT:  Yes, yes.  OK.  Thank you, that is exactly
25   right.  So I will --
```

DA4TBAN3                    Sobczak – cross

1          MS. MAINIGI:  Now I'm asking it to Fannie Mae.

2          THE COURT:  That is exactly right.  Thank you for

3     recalling that, and the fact that you had the advantage of

4     looking at the transcript isn't fair, but nevertheless that

5     will warrant it.  So on that, I will allow this question.

6          MS. MAINIGI:  Thank you, your Honor.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    BY MS. MAINIGI:

3    Q.  Mr. Sobczak, are you familiar with the national significant

4    finding rate for the 2007/2008 time period?

5    A.  Yes, I am.

6    Q.  What is that rate, sir?

7    A.  It's approximately 25 percent, give or take a couple of

8    percentage points.

9    Q.  Can you explain to us what that means?

10   A.  A significant finding, as I mentioned, is a potential

11   grounds for Fannie Mae asking a lender to repurchase a loan

12   that they delivered.  So 25 percent would mean that

13   approximately one in four loans delivered to Fannie Mae had

14   some flaw, or should Fannie Mae choose, it could choose to have

15   a lender repurchase that loan.

16   Q.  And that rate is across all lenders?

17   A.  National significant findings rate, yes.

18   Q.  So that is essentially like an industry standard rate or

19   something of that sort?

20   A.  That is Fannie Mae -- that's Fannie Mae's rate for the

21   deliveries it received.

22   Q.  I take it then, Mr. Sobczak, there was no expectation of a

23   zero defect rate, correct?

24        MR. CARDARO:  Objection.

25        THE COURT:  Sustained.

1    Q.  Now you have knowledge of the rep and warrant process,

2    correct, Mr. Sobczak?

3    A.  Correct.

4    Q.  And I believe you testified on direct that not all loans

5    perform, is that right?

6    A.  That's correct.

7    Q.  Is it fair to say that you knew at the time of the rep and

8    warrant of a certain set of loans that a certain percentage of

9    those loans would turn out to be defective?

10             MR. CORDARO:  Objection.

11             THE COURT:  Sustained.

12   Q.  The remedy, Mr. Sobczak, for defective loans is the

13   repurchase remedy, is that fair?

14             MR. CORDARO:  Objection.

15             THE COURT:  Sustained.

16   A.  That is one remedy.

17             THE COURT:  No.

18             THE WITNESS:  I'm sorry.

19   Q.  What are -- is a remedy -- strike that.

20             Let me switch over to something else, Mr. Sobczak.  As

21   a general matter, are refinancings less risky than purchases?

22   A.  Yes.

23   Q.  Do refinancings make it more likely that a borrower can pay

24   back its loan?

25             MR. CORDARO:  Objection.

1571

DA4TBAN3                          Sobczak – cross

1          THE COURT:  Sustained.  I note that in the previous

2    question, the reporter, who was otherwise absolutely perfect,

3    has the question down, quote:  Are refinancings less Ricky that

4    purchases?  I note that, near as I can, tell Ricky is not a

5    party to this case.

6          MS. MAINIGI:  Your Honor, what was the basis for

7    sustaining the objection?

8          THE COURT:  I don't see the relevance.

9          MS. MAINIGI:  Well --

10          THE COURT:  If you want to come to side bar, I will

11    hear you on that.

12          MS. MAINIGI:  I will come to the side bar on that,

13    your Honor.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DA4TBAN3                        Sobczak - cross

```
 1               (At side bar).
 2               MS. MAINIGI:  All the loans that went through
 3   High-Speed Swim Lane were refinancings.
 4               THE COURT:  Is that in evidence?
 5               MS. MAINIGI:  I believe it is with some prior
 6   witnesses.  All you have to do --
 7               MR. MUKASEY:  I think Ed O'Donnell mentioned that.
 8               THE COURT:  I had not --
 9               MS. MAINIGI:  All of the refinancings.
10               MR. MUKASEY:  I can't swear to it.
11               THE COURT:  Let me hear if there is any other
12   objection.
13               MR. CORDARO:  Could I confirm that's what
14   Mr. O'Donnell said?
15               THE COURT:  That's the question.  I had not recalled
16   that.
17               MS. MAINIGI:  That's OK.  I don't know why you haven't
18   memorized everything.
19               MR. CORDARO:  My understanding, from what I heard of
20   Mr. O'Donnell's testimony, is that he testified that there
21   was -- if it was a purchased transaction it was supposed to be
22   a kick out, but there's no guarantee that there was a kick out
23   from the High-Speed Swim Lane, so some of them may have been
24   in.  That's my understanding from what I gathered.
25               MS. MAINIGI:  But the flip side of the theory is
```

DA4TBAN3                        Sobczak – cross

1   everything was refinanced.

2            MR. MUKASEY:  It's the converse of that.

3            THE COURT:  I will allow it.  If it turns out that

4   counsel's recollection is wrong and there no predicate for it,

5   we'll strike it later.

6            MS. MAINIGI:  That's fine, your Honor.  I'm happy to

7   provide the Court with a transcript.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     BY MS. MAINIGI:

3     Q.  Mr. Sobczak, do refinancings make it more likely that a

4     borrower can pay back its loan?

5     A.  I would consider it to be more likely because the borrower

6     has a history already of making a mortgage payment.

7     Q.  And is that better for Fannie Mae?

8              MR. CORDARO:  Objection.

9              THE COURT:  Well, as phrased, sustained.

10    Q.  To your understanding, Mr. Sobczak, as someone in risk

11    management, is that better for Fannie Mae?

12             MR. CORDARO:  Objection.

13             THE COURT:  Well, "it's better for Fannie Mae" is not

14    a very precise term.

15    Q.  Is that -- would refinancings -- the fact that a borrower

16    can pay back its loan, does that put Fannie Mae in a better

17    economic position?

18    A.  Yes.

19             MS. MAINIGI:  May I approach, your Honor?

20             THE COURT:  Yes.

21    Q.  Mr. Sobczak, I handed you a packet of several documents.

22    If you could take a look at the one on top, which is marked

23    DX1319, please, sir.

24    A.  I have it.

25    Q.  This is an email from you to several of your colleagues at

1    Fannie Mae dated February 1st, 2008, is that correct?

2    A.  That's correct.

3    Q.  And this email contains an attachment, the new CLUES score

4    card that has been provided to you by Countrywide, is that

5    fair?

6    A.  That is fair.

7            MS. MAINIGI:  Your Honor, I ask DX1319 be admitted.

8            MR. CORDARO:  Objection, your Honor, foundation on the

9    attachment.

10           THE COURT:  Sustained.

11   Q.  Mr. Sobczak, is there an attachment entitled summary of

12   score card and underwriting process changes to DX1319?

13   A.  Yes, that's the header of document in this PowerPoint.

14   Q.  And I see some handwriting on this document.  Is that your

15   handwriting, sir?

16   A.  I recognize it as mine, yes.

17           MS. MAINIGI:  Your Honor, I ask again for DX1319 to be

18   admitted.

19           MR. CORDARO:  Objection, your Honor, lack of

20   foundation, also relevance.

21           MS. MAINIGI:  Your Honor, I can establish some more

22   foundation for the document if the government would like.

23           THE COURT:  Go ahead.

24   Q.  Mr. Sobczak, do you recall having received this document in

25   the February 2008 time period?

1    A.  Yes.

2    Q.  And was it that -- was Countrywide tightening up its CLUES

3    score card in this time period?

4                MR. CORDARO:  Objection.

5                THE COURT:  Sustained, but let me ask you this, what

6    is a CLUES score card?

7                THE WITNESS:  The algorithm, the empirical math behind

8    CLUES is contained in this score card.  So consider it to be

9    the math that analyzes the inputs into CLUES, LTV, credit

10   score, loan type, credit profile.

11               THE COURT:  And what is CHL?

12               THE WITNESS:  That's an abbreviation for Countrywide

13   Home Loans.

14               THE COURT:  And was this score card received at your

15   request, furnished at your request?

16               THE WITNESS:  I remember this document as an output of

17   an earlier conversation where Countrywide talked broadly about

18   the score card changes it was making, and this document is a

19   follow up to that conversation.

20               THE COURT:  So did you ask for this or was it sent

21   to -- was it volunteered?

22               THE WITNESS:  I'm not sure if I asked for it or it was

23   volunteered, but it was a collaborative effort on both sides.

24               THE COURT:  All right.  So let me ask defense counsel,

25   are you offering this score card for its truth or merely for

```
 1    the fact that it was received by Mr. Sobczak or something else?
 2              MS. MAINIGI:  The latter, your Honor.
 3              THE COURT:  All right.  I will receive it then.
 4              (Defendant's Exhibit 1319 received in evidence)
 5              THE COURT:  So ladies and gentlemen, this is not --
 6    the data on this may or may not be accurate.  The relevance, if
 7    any, is simply that it was received by Fannie Mae.
 8              MS. MAINIGI:  Thank you, your Honor.
 9    BY MS. MAINIGI:
10    Q.  If we could turn to page 1 of the deck, please.
11              Mr. Sobczak, very high level, what was your
12    understanding of what Countrywide was attempting to do here?
13    A.  My understanding of Countrywide's attempt was to reengineer
14    its score card, in other words, recalibrate its model to narrow
15    the loans, the types of loans that received a CLUES approval.
16    Q.  And was that in response to the changing guidelines in the
17    industry?
18    A.  Yes.
19    Q.  Were other lenders doing the same thing at this point in
20    time?
21    A.  Yes.
22    Q.  Did Fannie Mae support Countrywide in doing this?
23    A.  Yes.
24    Q.  You can set that aside, Mr. Sobczak.
25              If could you take a look at the next document, please,
```

 1    sir, DX59.  DX59 is another presentation that was made to

 2    you -- made to Fannie Mae by Countrywide entitled manufacturing

 3    quality initiatives, and dated April 24, 2008.  Do you

 4    recognize this document?

 5                MR. CORDARO:  Objection, your Honor.  Counsel is

 6    testifying as to the document.

 7    A.  I recognize --

 8                THE COURT:  Excuse me.

 9                Yes, I think we have to restart.

10    Q.  Mr. Sobczak, what is DX59?

11    A.  It appears to be -- or from my perspective it is a

12    Countrywide PowerPoint that summarizes quality control based

13    initiatives that Countrywide has either implemented or is

14    planning to implement.

15    Q.  What is the date of DX59, sir?

16    A.  April 24, 2008.

17    Q.  Was a presentation made to you by Countrywide related to

18    DX59?

19    A.  I'm going to say yes, but I can't verify that April 24th is

20    the date.

21    Q.  So it was maybe on or around April 24th, sir?

22    A.  It was more likely after April 24th.

23    Q.  But you do recall a presentation was made by Countrywide to

24    you and perhaps others at Countrywide?

25    A.  Yes.

1    Q.  Was that an in-person presentation?

2    A.  Yes.

3    Q.  Opening up this presentation, I see some handwriting.  Is

4    that handwriting yours?

5    A.  No.

6    Q.  Do you know whose handwriting it is?

7    A.  I can't tell.

8           MS. MAINIGI:  Your Honor, I offer DX59 into evidence

9    without the handwriting.

10          THE COURT:  And not for its truth.

11          MS. MAINIGI:  Not for its truth, your Honor.

12          THE COURT:  Received.  You'll have to redact it.

13          MS. MAINIGI:  Will do.

14          (Defendant's Exhibit 59 received in evidence)

15   BY MS. MAINIGI:

16   Q.  At a high level, Mr. Sobczak, could you describe the

17   manufacturing quality initiatives that Countrywide was

18   undertaking?

19   A.  It is a summary of various initiatives Countrywide was

20   taking to reduce the risk associated with loans of that time

21   period.  And in this document it talks about improvements to

22   fraud detection and evaluation correctness and certain

23   reasonableness initiative tests related to stated income loans.

24   Q.  This was provided by Countrywide to you in the April 2008

25   time period, sir?

1   A.  I can't vouch for April 2008, I'm thinking more May of

2   2008.

3   Q.  Got it.  Thank you.

4           The next document, DX70, if you could take a look at

5   that, sir.  Could you identify that document for us, please?

6   A.  Yes, this is something I authored.  This is an email that

7   definitely came from me.

8   Q.  And how about the attachment, did that come from you as

9   well?

10  A.  This is an attachment that I prepared.

11  Q.  And what is this email and document?

12  A.  This is an email confirming our management meeting with

13  Countrywide the following day, and this is a preview of the

14  results and topics to be discussed the following day.

15          MS. MAINIGI:  Your Honor, I offer DX70 into evidence.

16  I note there was no hearsay objection at the time.

17          MR. CORDARO:  Object on relevance grounds, your Honor.

18          MS. MAINIGI:  I can ask some more questions about it,

19  your Honor, if you would like.

20          THE COURT:  Hold on a minute.  You cleverly

21  anticipated the hearsay objection.

22          I think you need some more questions on relevance.

23  Q.  Mr. Sobczak, does this document have anything to do with

24  Countrywide and Countrywide performance?

25  A.  Yes, it does.

DA4TBAN3                      Sobczak – cross

1    Q.   Could you explain to me what that is, sir?

2    A.   It's relevant to Countrywide and its performance because it

3    summarizes how Countrywide deliveries have recently performed.

4    And there's a longer term look back on a wider range their

5    deliveries performed.  And it highlights -- further in the

6    document it highlights in the document the types of loans that

7    performed better than expected and the types of loans that

8    performed worse than expected.

9    Q.   And just so I understand, this document is a document that

10   you put together on behalf of Fannie Mae, is that correct?

11   A.   I put together as Fannie Mae's lead on the customer account

12   risk team using data from general Fannie Mae.

13   Q.   And you were able to assess how Countrywide's loans were

14   doing for a particular time period, is that fair?

15   A.   That's correct.

16   Q.   And you were providing this information to Countrywide, is

17   that fair?

18   A.   Yes.

19   Q.   And that process was part of the normal back and forth

20   day-to-day process that you referenced earlier, is that fair?

21   A.   Yes, it is.

22              MS. MAINIGI:  Your Honor, I ask that DX70 be admitted.

23              MR. CORDARO:  Your Honor, same objection, relevance.

24              THE COURT:  Sustained.

25   Q.   If you could take a look, sir, at DX396.  DX396, what is

1    the title of that document, Mr. Sobczak?

2    A.   DX396 is titled loan level notes.

3    Q.   And does it appear to be a page from a loan file?

4    A.   It could either be a page from a physical loan file or

5    snapshot of a screen print associated with a loan file.

6    Q.   But either way, it's something -- it's a page associated

7    with a loan file?

8    A.   Correct.

9    Q.   In your role as -- in your various roles at Fannie Mae, on

10   occasion would you have a reason to look at loan files?

11   A.   I would only look at loan files if there was something

12   related to a repurchase or something that related to an

13   ineligibility.

14   Q.   In the repurchase process you might look at a page from a

15   loan file?

16   A.   Yes.

17              MS. MAINIGI:  Your Honor, I move DX396.

18              MR. CORDARO:  Objection, your Honor, hearsay,

19   foundation also relevance.

20              MS. MAINIGI:  Your Honor, I would just -- I believe

21   your Honor indicated before if there is an appropriate witness

22   for a particular document that we could use any particular

23   witness for that document if it made sense with it.

24              THE COURT:  I'm not quite sure what you're saying.

25   Are you saying you're offering this subject to connection

1    through a later witness or are you saying something else?

2              MS. MAINIGI:  I'm saying that these notes are not

3    notes that were necessarily reviewed by this particular

4    witness.

5              THE COURT:  I understand that.

6              MS. MAINIGI:  But similar.

7              THE COURT:  I see.  Was this exhibit listed on the

8    pretrial consent order?

9              MS. MAINIGI:  Yes, your Honor.

10             THE COURT:  Was any objection raised?  Relevance is

11   always automatically preserved, but was any other objection

12   raised?

13             MS. MAINIGI:  No, your Honor.

14             THE COURT:  So the only objection is relevance.  If

15   that's the only objection --

16             MR. CORDARO:  Excuse me, your Honor, we would like to

17   check our exhibit list just to make sure.

18             THE COURT:  Absolutely.

19             MR. CORDARO:  Thank you, your Honor.

20             (Pause)

21             MR. CORDARO:  Your Honor, the only thing we are

22   wondering, it appears more than once on the exhibit list, we're

23   not sure the objection -- it does not appear there's an

24   objection listed here at 396, but if there was a duplicate --

25             THE COURT:  Well, if there was a hearsay objection

1  raised I might or might not sustain that, but since it appears

2  that there was not, the only reserved objection is relevance.

3  The objection is overruled.  So 396 is received.

4            (Defendant's Exhibit 396 received in evidence)

5            MS. MAINIGI:  Your Honor, may I publish?

6            THE COURT:  Yes.

7            MS. MAINIGI:  Alex, please blow up the middle text of

8  that page.

9  BY MS. MAINIGI:

10  Q.  Mr. Sobczak, these are loan level notes, correct?

11  A.  Yes.

12  Q.  And this is from a loan file that Fannie Mae had in its

13  possession, correct?

14            MR. CORDARO:  Objection.

15            MS. MAINIGI:  I'll withdraw the question, your Honor.

16  Q.  So if you take a look, Mr. Sobczak, at some of the

17  information in there, it says CLUES report.  Do you see that?

18  A.  Yes, I do.

19  Q.  And then there's a -- can you walk us through all the

20  information that is after CLUES report, please?

21            MR. CORDARO:  Objection, your Honor, document speaks

22  for itself.

23            THE COURT:  Well, I don't think so.  You can briefly

24  go through that.

25  A.  It appears this loan was presented to CLUES, Countrywide's

DA4TBAN3                        Sobczak - cross

1   automated underwriting engine.  That engine rendered an

2   approved decision.  The person that presented it to CLUES is

3   Lisa Grover, and HSSL loan specialist.  This appears to be a

4   stated income loan where the borrower claimed $3,000 a month,

5   and Ms. Grover deemed that to be reasonable based on the $1,400

6   of reserves in the bank, the time of job of ten years, and a

7   694 credit score.

8   Q.  Thank you, Mr. Sobczak, you can set that aside, please.

9           Mr. Sobczak, in the Fannie Mae contract, is there a

10  provision that relates to self-reporting?

11  A.  Yes.

12  Q.  Based on your knowledge and experience, in the 2007/2008

13  time period, did lenders regularly self-report particular loans

14  that appeared on their internal QC reports?

15          MR. CORDARO:  Objection.

16          THE COURT:  Ground?

17          MR. CORDARO:  Relevance, your Honor, among others.

18          MS. MAINIGI:  Your Honor, I'm happy to find if

19  self-reporting is not relevant.

20          THE COURT:  No, I think the point -- well, that's not

21  the point.  The question whether or not Countrywide was

22  required by contract or otherwise to self-report is not

23  affected by whether other lenders regularly did or did not do

24  so.  So sustained.

25  Q.  Mr. Sobczak, based on your experience with Countrywide, did

1    you think Countrywide had the infrastructure in place to

2    originate and deliver investment quality loans?

3            MR. CORDARO:  Objection.

4            THE COURT:  Sustained.

5            MS. MAINIGI:  I have no further questions, your Honor.

6            THE COURT:  All right.

7            Counsel.

8            MR. MUKASEY:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. MUKASEY:

11   Q.  Mr. Sobczak, my name is Marc Mukasey, I represent Rebecca

12   Mairone over there.

13           You testified on direct, sir, that you had -- and I

14   think these were your words -- contacts at Countrywide, is that

15   correct?

16   A.  That is correct.

17   Q.  And Rebecca Mairone was not one of your contacts, am I

18   right?

19   A.  That is correct.

20   Q.  And you also testified about meetings that you called face

21   offs, is that right?

22   A.  Yes.

23   Q.  And you never sought to face off with Rebecca Mairone, did

24   you?

25   A.  I have never seen Rebecca Mairone.

1    Q.  And you never -- so you never actually faced off with her?

2    A.  Correct.

3    Q.  Have you ever spoken to Ms. Mairone either by telephone or

4    in person?

5    A.  No.

6    Q.  Have you ever corresponded with her in any way by email or

7    snail mail or any other kind of mail?

8    A.  No.

9    Q.  As far as you know, Ms. Mairone was never at any

10   presentation that you attended between Countrywide and Fannie

11   Mae, correct?

12   A.  That is correct.

13   Q.  And were you ever made aware of any statements that

14   Ms. Mairone made at any presentation involving Countrywide and

15   Fannie Mae?

16   A.  I was never made aware of any statements.

17   Q.  You testified this morning about operational reviews,

18   right?

19   A.  Yes.

20   Q.  Have you ever had occasion to interact with Ms. Mairone in

21   connection with any operational review?

22   A.  No, I hadn't.

23   Q.  And finally, I think just this afternoon you talked about

24   post-purchase reviews, right?

25   A.  Yes.

DA4TBAN3                         Sobczak – cross

1    Q.  You never met with Rebecca Mairone in connection with any

2    post-purchase review, right?

3    A.  That is correct.

4    Q.  So she never made any representation to you at all, is that

5    right?

6    A.  Correct.

7              MR. MUKASEY:  Thank you.

8              THE COURT:  All right.  Redirect.

9    REDIRECT EXAMINATION

10   BY MR. CORDARO:

11   Q.  Good morning, Mr. Sobczak.

12   A.  Good afternoon.

13   Q.  You were asked questions on cross-examination about whether

14   the contract document governed qualifications of certain people

15   at Countrywide, do you recall that?

16   A.  Yes, I do.

17   Q.  Could you take a look at Plaintiff's Exhibit 1, please.

18             MR. CORDARO:  May I approach the witness, your Honor?

19             THE COURT:  Yes.

20   Q.  Do you recognize Plaintiff's Exhibit 1, Mr. Sobczak?

21   A.  Yes, I do.

22   Q.  What do you recognize it as?

23   A.  I recognize it as the mortgage selling and servicing

24   contract abbreviated MSSC.

25   Q.  And who are the signatories?

1   A.  Signatures from the last page, page 23 of page 23, is Lee

2   Bartlett and Norm Peterson.

3   Q.  Is this a mortgage selling and servicing contract involving

4   Countrywide?

5   A.  Without going through the document, it appears so, yes.

6   Q.  Does it say Countrywide Funding Corporation on the last

7   page above Ms. Bartlett's signature?

8   A.  Yes.

9   Q.  Would you take a look at page 3 of 23.  Is there any

10  provision on that page that addresses qualified staff?

11  A.  Yes.

12  Q.  Could you read that provision, please, into the record.

13  A.  It's provision A2.  Have qualified staff and adequate

14  facilities.  Lender must at all times have employees who are

15  well trained and qualified to perform the functions required of

16  the lender under this contract.

17          In addition, the lender must maintain facilities that

18  are adequate to perform its functions under this contract.

19  Q.  You were asked other questions about contractual

20  requirements.  Do you recall those questions?

21  A.  Yes.

22  Q.  Does the contract have a provision providing that the

23  mortgage must be an acceptable investment?

24  A.  There should be language using the word "investment" in

25  this MSSC, and I can't find it quickly offhand.

1    Q.  Could you turn to page 8 of 23, please.

2    A.  I have it.

3    Q.  Do you see any such language on this page?

4    A.  It's point 17, mortgage is acceptable investment.

5    Q.  Could you read that, please?

6    A.  The lender knows of nothing involving the mortgage, the

7    property, the mortgager or the mortgager's credit standing that

8    can reasonably be expected to:  Cause private institutional

9    investors to regard the mortgage as an unacceptable investment;

10   cause the mortgage to become delinquent; or adversely affect

11   the mortgage's value or marketability.

12   Q.  Mr. Sobczak, is this a representation or warranty by

13   Countrywide?

14   A.  Yes.

15   Q.  And based on your understanding, even if the contract does

16   not address certain other issues of the lender, must the lender

17   comply with this representation and warranty?

18                MS. MAINIGI:  Objection.

19                MR. MUKASEY:  Objection, your Honor.

20                THE COURT:  Sustained.

21   Q.  Mr. Sobczak, based on your understanding, what is a

22   representation and warranty?

23   A.  A representation and warranty is provided by the lender to

24   Fannie Mae that whatever is not specifically or explicitly

25   spelled out in the guide or in other contracts, they're

1   representing the mortgage to be an acceptable investment and

2   eligible for Fannie Mae purchase.

3   Q.  Mr. Sobczak, you were asked several questions about the

4   operations of something called CMD.  Do you recall those

5   questions?

6   A.  Yes.

7   Q.  And you weren't told about the High-Speed Swim Lane during

8   the time you worked for Fannie Mae, were you?

9           MS. MAINIGI:  Objection.

10          MR. MUKASEY:  Objection, asked and answered three

11  times.

12          THE COURT:  Overruled.

13  A.  I was not told about the High-Speed Swim Lane in connection

14  with your condition of CMD.

15  Q.  You didn't know how the High-Speed Swim Lane operated, did

16  you, at the time you worked at Fannie Mae?

17  A.  No, because I didn't know about it.

18  Q.  You didn't have any information while you worked at Fannie

19  Mae about how loan specialists involved in the High-Speed Swim

20  Lane were compensated, did you?

21  A.  Correct.

22  Q.  You didn't have any information while you worked at Fannie

23  Mae about how loan specialists involved with the High-Speed

24  Swim Lane were trained, did you?

25  A.  Correct.

1   Q.  You didn't have any information while you were working at

2   Fannie Mae about how loan specialists involved in the

3   High-Speed Swim Lane were reporting to their higher chain of

4   command, did you?

5   A.  That's correct.

6   Q.  You didn't have any information about how loan specialists

7   involved in the High-Speed Swim Lane were being compensated,

8   did you?

9           MS. MAINIGI:  Objection, asked and answered.

10          THE COURT:  Sustained.

11  Q.  You didn't have any information about how quality control

12  personnel involved with the High-Speed Swim Lane were being

13  compensated, did you?

14          MR. MUKASEY:  Objection, leading.

15          THE COURT:  Overruled.

16  A.  That's correct.

17  Q.  And you didn't have any information concerning any quality

18  reports relating specifically to Hustle loans while you were

19  employed at Fannie Mae, did you?

20  A.  That's a true statement.

21  Q.  Mr. Sobczak, you were asked certain questions about prime

22  CLUES accept, do you recall those questions?

23  A.  Yes.

24  Q.  And you were asked whether -- well, withdrawn.

25          Even in a prime CLUES accept situation, could there be

DA4TBAN3                        Sobczak – redirect

1    conditions that CLUES imposes with respect to the closing of

2    the loan, based on your understanding?

3              MR. MUKASEY:  Objection.

4              THE COURT:  Ground?

5              MR. MUKASEY:  Foundation, calls for speculation.

6              THE COURT:  Sustained.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Mr. Sobczak, based on your understanding, does prime CLUES

2   accept mean the loan is closed and ready for funding?

3   A.  No, it does not.

4   Q.  Are there other steps that must be completed before the

5   loan goes to funding, even in a prime CLUES accept situation?

6              MR. MUKASEY:  I'm going to make another leading

7   objection.  This is getting to be a little bit of testimony by

8   counsel.

9              THE COURT:  The vice of leading is directed towards

10  suggesting the answer to a witness.  And it presupposes,

11  therefore, a witness who can be led.  It is self-evident this

12  is a witness who can't be led, so the objection is overruled.

13  You may answer.

14  A.  Could you ask the question again?

15  Q.  Are there other steps after a prime CLUES accept before the

16  loan can close?

17  A.  Yes, there are.

18  Q.  Can CLUES clear conditions?

19  A.  No.

20  Q.  Can CLUES close a loan?

21  A.  No.

22  Q.  Does a human being have to do those two steps?

23  A.  Yes.

24  Q.  Based on your understanding of the contract, would that

25  human being have to be qualified to perform those two steps?

DA43BAN4                    Sobczak - redirect

1   A.  Yes.

2   Q.  With respect to refinancings.  Even if a refinancing goes

3   through a prime CLUES accept, can CLUES clear the conditions if

4   any?

5   A.  No, it can't.

6   Q.  Can CLUES clear the loan to close?

7   A.  No.

8   Q.  Does a human being have to take those two steps?

9   A.  Yes.

10  Q.  Based on your understanding of the contract, does this

11  human being have to be qualified to perform those tasks?

12  A.  Yes, they do.

13  Q.  I'd like you to look if it's still up there at Defendant's

14  Exhibit 59.  Does this exhibit mention the Hustle, the

15  High-Speed Swim Lane, or HSSL?

16  A.  I'll need to take a moment to look through the document.

17             MS. MAINIGI:  Objection, your Honor.

18             MR. MUKASEY:  We object as well.  This speaks for

19  itself and it's argumentative.

20             THE COURT:  No, I think under these circumstances,

21  I'll allow it.  You may take a quick look.

22  A.  I've scanned the document and I see no reference to

23  High-Speed Swim Lane, or HSSL.

24  Q.  Does this document make any references to the role of loan

25  specialists with respect to underwriting decisions?

DA43BAN4                    Sobczak – redirect

1   A.  Yes, it does.

2   Q.  Where does it say that?

3   A.  I find it on page seven, or at least one reference to it on

4   page seven.  I see other references.  Page five, there may be

5   others.

6   Q.  Where does it say the word "loan specialist"?

7   A.  It doesn't say the word "loan specialist."

8   Q.  Does this document say anything about compensation of loan

9   specialists?

10  A.  I don't see the words "compensation" mentioned.

11  Q.  Do you see anything about training?

12          THE COURT:  So I think defense counsel may have

13  misunderstood when I overruled their objection about whether it

14  said anything about Hustle.  They may have inferred that that

15  meant that they couldn't object to these other questions as

16  argumentative, disguised jury argument.

17          But, if upon clarification, they would like to raise

18  those objections on a going forward basis, including to the

19  pending question, the Court will consider those objections.

20          MS. MAINIGI:  We object, your Honor.

21          MR. MUKASEY:  As do we.

22          THE COURT:  What a surprise.  Well then, I have no

23  choice but to sustain the objection.

24          MR. CORDARO:  I will move on, your Honor.

25          THE COURT:  Thank you.  Although I will say this whole

1    process demonstrated beyond peradventure the Court's

2    observation that this witness could not be led.

3    Q.  Mr. Sobczak, could you look at page DX 396, please.

4    A.  I'm sorry, which -- oh.  I have it.

5    Q.  Mr. Sobczak, do you see that the letters HSSL?

6    A.  Yes, I do.

7    Q.  Is there anything on this page that defines what HSSL

8    means?

9    A.  No.

10            MR. CORDARO:  May I consult one second, your Honor.

11   Q.  Mr. Sobczak, are you aware of where this document would

12   ordinarily come from?

13            THE COURT:  Referring to?

14   Q.  DX 396.

15   A.  This appears to be a Countrywide generated note associated

16   with that loan.

17   Q.  Would it be associated with a loan file?

18   A.  With that -- with that loan file, loan number, borrower

19   name.  It is specific to a loan or a loan file.

20   Q.  Are you familiar with loan files?

21   A.  Yes.

22   Q.  Are you familiar with the number of pages in a typical loan

23   file?

24   A.  I've seen a lot of files, so, yes.

25   Q.  How many pages are typical in a loan file?  Withdrawn.

DA43BAN4                          Sobczak - redirect

1          Is there typically only one page in a loan file?

2               MS. MAINIGI:  Objection, your Honor.  Argumentative.

3               THE COURT:  No, I think I'll allow that.  You may

4     answer that.

5     A.  No loan file has one page.

6               MR. CORDARO:  Nothing further, your Honor.

7               THE COURT:  All right.

8               MS. MAINIGI:  Your Honor, I have no questions at this

9     time, but I would like to request a quick side bar before the

10    witness leaves.

11              THE COURT:  Sure.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MS. MAINIGI:  Your Honor, on this self-reporting

3   question, your Honor ruled that out as irrelevant, and I'd like

4   to ask for reconsideration on that.

5           The fact that that is a provision in the contract that

6   the government is relying on as part of their claims and it is

7   a provision that was honored only in the breach, is essentially

8   a modification of the contract by the course of conduct of the

9   parties.  And we ought to be able to bring in evidence of that.

10  This witness is able to speak to that issue and we ought to be

11  able to preserve that evidence.

12          MR. MUKASEY:  Moreover, the government read portions

13  of that into the record with this witness and I believe the

14  Freddie Mac witness.

15          THE COURT:  I don't understand that latter point.

16  What other evidence, if any, other than the question you

17  proposed to put to him, which also sounds to me like disguised

18  hearsay, would you have that the course of conduct modified

19  this contract?  Besides your question was originally directed

20  to lenders as a whole, not just Countrywide, so that cannot be

21  a basis for modifying the contract.

22          MS. MAINIGI:  Well, the course of conduct between

23  Fannie Mae and all lenders during that time period.

24          THE COURT:  No, no, I'm sorry.  If the claim is that

25  the course of conduct between Countrywide and Fannie Mae

DA43BAN4                           Sobczak - redirect

amended the contract between them, that might arguably be

relevant.

          MS. MAINIGI:  Okay.

          THE COURT:  That wasn't the question put.

          MS. MAINIGI:  That's correct, your Honor.

          THE COURT:  Moreover, how would he know this?  He

might know an example here or there from personal knowledge,

but to know it more generally, he would have to know it, since

it is not a matter of a writing, from having either been told

it secondhand, thirdhand, fourth-hand, so, it would be

disguised hearsay of a fairly extreme sort.

          MS. MAINIGI:  May I ask the question as it relates

just to Countrywide then?

          THE COURT:  Well, how even as to Countrywide?  You'll

have to establish a foundation that he knows it from personal

knowledge.

          MS. MAINIGI:  Can I use -- well.

          THE COURT:  I'll allow you to try that.  I'm skeptical

that you are going to be able to do it, but I don't know.  You

are a very skillful counsel, maybe you'll pull it off.

          Although I thought the high point of this entire

trial, in my view, was when government counsel asked him

whether it was a loan specialist or somebody and he said, oh,

well, it's on pages X, Y, Z, Q, and R.  All right.

          MS. MAINIGI:  Just to be clear, are you going to

DA43BAN4                    Sobczak – redirect

1    sustain an objection if I use the phrase "course of conduct"?

2              THE COURT:  I won't object to you using it ultimately

3    if you lay a foundation.  But if you use it initially, I will.

4              What is your basis for saying that this was the course

5    of conduct with Countrywide?

6              MS. MAINIGI:  It was understood, your Honor, that the

7    self-reporting requirement was really for some sort of

8    systemic -- at the time was really for some sort of systemic

9    issue, not a loan-by-loan issue.

10             THE COURT:  You can ask him.

11             MS. MAINIGI:  Can I ask him to explain his

12   understanding of --

13             THE COURT:  If he has one, and if he was in a position

14   to have such an opinion based on his personal knowledge or

15   experience, then you can put that question, I would start with

16   that.

17             (Continued on next page)

18

19

20

21

22

23

24

25

 1              (In open court)

 2              MS. MAINIGI:  May I proceed, your Honor?

 3   RECROSS EXAMINATION

 4   BY MS. MAINIGI:

 5   Q.  Just a couple of questions, Mr. Sobczak, relating to

 6   self-reporting.  We talked earlier about the self-reporting

 7   provision, do you recall that?

 8   A.  Yes.

 9   Q.  Do you have personal knowledge of Countrywide's reporting

10   related to self-reporting, Mr. Sobczak?

11   A.  I have some knowledge, yes.

12   Q.  What is your understanding of the manner in which

13   Countrywide self-reported in the 2007, 2008 time period?

14              MR. CORDARO:  Objection.

15              THE COURT:  Let's turn, counsel, remind me where the

16   self-reporting provision is.

17              MS. MAINIGI:  Your Honor, I did not actually put a

18   provision in front of him.

19              THE COURT:  Okay.  Let's do that.

20              MS. MAINIGI:  We can do that, your Honor.  Apologies,

21   your Honor.

22              THE COURT:  That's all right.

23              MS. MAINIGI:  I believe it is an admitted document,

24   your Honor, PX 2.

25              THE COURT:  Yes.  So can someone, if we can put it on

1    the screen, perhaps.  Let's get to the relevant provision.  I

2    think it is Plaintiff's 1.  But go ahead.  We'll see.  Maybe it

3    is 2.  All right.

4              Where is the relevant provision?

5              MS. MAINIGI:  Can we go to the next page, Alex.  Would

6    you blow that up so we can find it.

7              MR. CORDARO:  Your Honor, excuse me.  I think this is

8    in the selling guide, not the contract.  Exhibits 1 --

9              THE COURT:  Wherever it is, can someone -- you folks

10   have been referring to it all day.

11             MR. CORDARO:  I don't know if this was admitted.  I

12   think it might be.

13             MS. MAINIGI:  DX 1223, Alex.

14             Counsel, do you know what provision you used with, was

15   it Ms. Brewster?

16             MR. CORDARO:  I'm trying to chase that down as we

17   speak.  I believe there are two provisions, one of them is in

18   301.01 toward the end of that section.

19             THE COURT:  Let's look at that first.  In a size that

20   can be read.

21             MS. MAINIGI:  I think it is the "we require"

22   paragraph, Alex.  If we can blow that up, please.

23   Q.  Mr. Sobczak, do you know that as one of the self-reporting

24   provisions?

25   A.  From the guide at that time, yes.

1          MS. MAINIGI:  I believe there is another provision on

2     page 23.  It begins with "we expect" in the middle of the first

3     full paragraph.  Two-thirds of the way down.  "We expect the

4     lender."

5          THE COURT:  Hold on.  All right.  We'll take that one

6     first.

7          "We expect the lender to advise its lead Fannie Mae

8     regional office immediately if it learns of any

9     misrepresentation or breach of a selling warranty.  This

10    notification is required for all breaches or

11    misrepresentations, including fraud in the origination and

12    underwriting processes, regardless of whether the act is

13    committed by the lender, the lender's agent, the borrowers, or

14    any other third party, or whether or not the lender believes

15    that the fraud or misrepresentation constitutes a breach of its

16    representations and warranties."

17         So, you see that language, Mr. Sobczak?

18         THE WITNESS:  Yes.

19         THE COURT:  Were you familiar, if not necessarily that

20    exact language, with that general requirement?

21         THE WITNESS:  Yes.

22         THE COURT:  In your experience with Countrywide, did

23    Fannie Mae convey any exception to that requirement?

24         THE WITNESS:  No.

25         THE COURT:  Okay.  Let's look at the other one.

1          "We require that the results of quality assurance

2    reviews be reported to the lender's management on a regular

3    basis, preferably within 30 days after a review is completed.

4    The lender should have in place procedures to ensure that all

5    significant issues identified through the quality assurance

6    review process are satisfactorily resolved.  If the lender

7    identifies an issue that significantly affects our risk for a

8    mortgage the lender sold to us, the lender must notify us

9    immediately, and then provide a written report of the findings

10   and corrective actions being taken to its lead Fannie Mae

11   regional office within 30 days.  We will work closely with the

12   lender to evaluate the facts of the case and come up with an

13   appropriate solution."

14            You see that language, Mr. Sobczak?

15            THE WITNESS:  Yes, I do.

16            THE COURT:  If not necessarily familiar with those

17   exact words, were you familiar with that general requirement?

18            THE WITNESS:  Yes.

19            THE COURT:  To your knowledge, did Fannie Mae convey

20   to Countrywide any exception to that requirement?

21            THE WITNESS:  Not to my knowledge.

22            THE COURT:  All right.  Do you want to put some

23   further questions?

24            MS. MAINIGI:  I do, your Honor.

25   BY MS. MAINIGI:

1    Q.  What type of reporting did Countrywide provide under those

2    provisions to your knowledge, Mr. Sobczak?

3           MR. CORDARO:  Objection.

4           THE COURT:  It is a little vague, but if the witness

5    can answer it I will allow it.

6    A.  From -- from time to time, and my answer is not just

7    related to the 2007, 2008 time period, I do remember receiving

8    self-reports on individual loan findings from Countrywide.

9    Q.  Do you recall receiving reports of -- withdrawn.

10          No further questions, your Honor.  Thank you.

11          THE COURT:  All right.  Anything else?

12          MR. MUKASEY:  May we have one moment, your Honor.

13          THE COURT:  Yes.

14          (Pause)

15          MR. MUKASEY:  No, thank you, your Honor.

16          THE COURT:  You may step down.  Thank you very much.

17          (Witness excused)

18          THE COURT:  Please call your next witness.

19          MS. SCHOENBERGER:  The United States calls Joan Boland

20   by deposition testimony.

21          THE COURT:  So, ladies and gentlemen, I mentioned to

22   you before about depositions.  This is statements under oath

23   that a witness gives in a lawyer's office before trial.  And

24   both sides can take the depositions of anyone.

25          We had some deposition testimony come into evidence

DA43BAN4

1    previously for what's called possible impeachment.  Whether it

2    was a question of whether a witness who was on the stand had

3    given inconsistent testimony previously or not.

4         But there is another reason deposition testimony may

5    come into evidence, and that's because the witness is

6    unavailable to testify for a variety of legal reasons, such as

7    they're not geographically within the jurisdiction of the

8    court, for example.  So, in those cases, portions of the

9    deposition can be played, and they can be considered for you

10   for all purposes.

11        So this will be a videotape of portions of the

12   testimony given at Mr. Boland's deposition, and you can treat

13   it the same way as if he was sitting right here.  All the

14   objections have already been dealt with.  So, you can consider

15   this the same as you would a live witness.

16        MR. HEFTER:  May we just approach briefly before the

17   video is played?

18        THE COURT:  About your limiting instruction?

19        MR. HEFTER:  Yes.

20        THE COURT:  How were you going to do that?

21        MR. HEFTER:  I was going to ask your Honor that

22   question as well.  I have a list of the lines that you've

23   already ruled where a limiting instruction is appropriate.  I

24   don't know the best way of doing it.

25        THE COURT:  I think here is the way to do it.  So,

DA43BAN4

1   because there is no judicial officer present when a deposition

2   is taken, there is no one to say on the videotape that this

3   answer can only be received against the banks and not against

4   Ms. Mairone.

5           So, why don't we do this.  When we get to each point

6   where such an instruction is appropriate, just raise your hand

7   and I will say the word "limitation," and you will understand

8   that the answer that follows at that point is receivable only

9   against the banks, not Ms. Mairone.

10           MR. HEFTER:  That sounds acceptable to us, your Honor.

11           THE COURT:  But is it acceptable to your advisor?

12           MR. ARMAND:  Is there a way to know when the limiting

13   instruction stops?

14           THE COURT:  When given, it will be only as to the

15   answer that's been given to that particular question.

16           MR. ARMAND:  Understood.  Thank you, your Honor.

17           MR. HEFTER:  Your Honor, I think I understand the

18   issue.  And that is, when the deposition transcript, if you

19   will recall, was submitted to your Honor, we had not made those

20   objections separately.

21           THE COURT:  That's right.

22           MR. HEFTER:  But you permitted us to proceed in this

23   fashion.  So, we have the portions of the transcript that

24   you've permitted to be shown to the jury, but you haven't

25   considered whether it is appropriate to have a limiting

1609

DA43BAN4

1  instruction.  Based on your practice, we would expect that will

2  be -- and your rulings throughout the trial, we would expect

3  that would be the ultimate result.  But we don't know that.  So

4  I don't want to raise my hand in error, that's what I am

5  saying.  In the event that --

6          THE COURT:  Raise your hand.  And if I disagree with

7  you, I won't say to the jury the magic word "limiting."  Which

8  they will understand that instruction applies.

9          MR. HEFTER:  That's fair.  One thing.  My colleague,

10 who is the expert on Mr. Boland, I am going to have him sit

11 here and raise his hand.

12         MS. SCHOENBERGER:  We do have a copy from the video

13 vendor of the portions of the transcript that will be played.

14 And we can distribute that to the Court and also to opposing

15 counsel.

16         THE COURT:  All right.

17         MS. SCHOENBERGER:  May I approach?

18         THE COURT:  I'm told that this is about an hour, so

19 we'll hear half of it today.

20         (Video playing)

21 Q.  Good morning.  Can you please state your full name for the

22 record.

23 A.  John Boland.

24 Q.  My name is Carina Schoenberger.  I am an assistant United

25 States attorney and I represent the plaintiff in this matter

DA43BAN4                          Boland

1    the United States.

2              THE COURT:  Can everyone hear?

3    Q.  Where are you currently employed?

4    A.  Fannie Mae.

5    Q.  How long have you been at Fannie Mae?

6    A.  Since November 19, 2012.

7    Q.  What is your title there?

8    A.  Manager.

9    Q.  What do your responsibilities entail?

10   A.  I manage a team of underwriters who answer questions from

11   lenders.

12   Q.  Prior to Fannie Mae, where did you work?

13   A.  Bank of America.

14   Q.  How long had you been at Bank of America?

15   A.  14 years.

16   Q.  Was it ever known or was it always Bank of America during

17   those 14 years?

18   A.  No, it wasn't.

19   Q.  What was it previously?

20   A.  Countrywide Home Loans.

21   Q.  When did you leave Bank of America?

22   A.  October 1st.

23   Q.  Of what year?

24   A.  Of 2012.

25   Q.  Why did you leave?

DA43BAN4                          Boland

1   A.  Bank of America had chosen to separate my employment.

2   Q.  What was your understanding of why that was?

3   A.  I managed a team of 400 associates, and somebody on the

4   front line shared a password with another associate.  And so

5   several in the management chain were deemed to -- responsible

6   for that being done while on their watch.

7   Q.  Was Fannie Mae aware of this when you took your job there?

8   A.  I assume so.

9   Q.  In the summer of 2007, were you employed at Countrywide?

10  A.  Yes.

11  Q.  What was your title at that time?

12  A.  First vice president.

13  Q.  What were your responsibilities as first vice president?

14  A.  I managed a team of 140 underwriters who were underwriting

15  mortgage loans.

16  Q.  Where were you located?

17  A.  Richardson, Texas.

18  Q.  Who did you report to as first vice president?

19  A.  Robert Price.

20  Q.  Again, this is for the summer of 2007 period?

21  A.  Correct.

22  Q.  Who did Mr. Price report to?

23  A.  Ed O'Donnell.

24  Q.  What was the Full Spectrum Lending Division responsible

25  for?

1   A.   Initially, it was responsible for subprime loans.  And then

2   that changed over time.

3   Q.   Okay.  Can you tell me a little bit more about how that

4   changed over time?

5   A.   Yes.  So, Full Spectrum was designed originally, as the

6   name applies, to offer the full spectrum of products.  Whereas

7   Countrywide offer a limited, you know, section of just prime

8   loans.  Over time, that changed to offer no subprime loans and

9   only prime loans.

10  Q.   About what time period did that change occur?

11  A.   Between 2007 and 2008, roughly.

12  Q.   Are you familiar with the term High-Speed Swim Lane?

13  A.   I am.

14  Q.   What is the High-Speed Swim Lane?

15  A.   High-Speed Swim Lane was the Hustle.  It was kicked off in

16  roughly the summer of 2007, and with a lot of fanfare and it

17  was a campaign designed to speed up the loan process.

18  Q.   You referred to it as the Hustle.  Was it known as the

19  Hustle at Countrywide?

20  A.   It was.  The name Hustle.  So I recall a kickoff meeting in

21  the cafeteria at Countrywide with Rebecca Mairone and other

22  senior leaders from the NCA, and we played the Hustle music.

23  There were printed materials passed out.  There was a lot of

24  excitement.  There was a lot of fanfare.  It was fun.  And

25  management team did the best job they could to really get

1   associates to buy into what was coming.

2   Q.  Who was a part of the management team you referred to?

3   A.  I recall Cheri Shine being there, and Rebecca Mairone, and

4   the -- from NCA at that time was probably at least 200 people.

5   So, forgive me if I can't recall specific names, but the

6   entire -- the entire 200 team was there in attendance, if not

7   absent or somewhere else.  But the expectation was that

8   everyone in the site would attend this meeting.

9   Q.  Who from NCA management designed the Hustle process?

10  A.  I can see his face in my head.  And his name escapes me.

11  But I was -- I was aware of a gentleman who was the main actor

12  in developing the flow, he created the Vizio work flow, held

13  and hosted the meetings associated in the development of the

14  Hustle work flow.

15          It was a different work flow than what we had ever had

16  before.  So it was a bifurcated flow that would have normal

17  loans going down one path, and these designated Hustle loans

18  going down another path.

19          The gentleman's name, I was hoping it would come back

20  to me and it's just been so long I don't remember his name.

21  But he wasn't a lone actor.  There were multiple people

22  involved with it.  It was a collaboration.  It was a lot of

23  input gathered and feedback sought to develop the best process

24  possible.

25  Q.  What was your understanding in the summer of 2007 of how

DA43BAN4                        Boland

1    the Hustle would work?

2    A.  So the Hustle was a great -- it was a great design.  The

3    idea was well, was well thought out, and our opinion was this,

4    this could work.  This should, you know, lead to some

5    efficiencies.  And there was a lot of, you know, optimism that

6    it would actually produce what it was built to do.

7            The way I understood the Hustle's intent was to have a

8    separate swim lane for loans with reduced documentation, and

9    therefore those loans would not be hung up behind other loans

10   that required heavier documentation.

11           An example of that would be a typical loan processor

12   would carry a pipeline of 30 loans.  They can only get through

13   so much of their pipeline in any given day.  The idea of a

14   High-Speed Swim Lane is, that if I've got a very difficult loan

15   with a lot of documentation, I might take a majority of my day

16   of working on that one, while a loan with less requirements

17   sits still and doesn't get a chance to move ahead.

18           The theory would be if we put all of the easy loans

19   into one lane -- or not easy, but all of the less complicated

20   loans in one lane, they would then flow, and the others would,

21   you know, be in the normal process.  So, in theory, that flow

22   had merit.

23   Q.  How did it work in practice?

24   A.  In practice, there were breakdowns in the way it was

25   executed.

1    Q.   What types of breakdowns?

2    A.   Loans stopped -- stopped coming into -- into underwriting

3    for review of the documentation.  So an example of that would

4    be -- the reduced documentation suggests that Countrywide was

5    not going to validate the income using traditional means of

6    paystubs, W-2s, tax returns, and they were going to rely on a

7    stated amount supposedly derived from the borrower.

8           When underwriters perform that analysis, it was a very

9    skillful decision process.  And there were oftentimes layers of

10   management that would be involved to second sign stated doc

11   income.

12          I can recall specifically appointing Derek Treadwell

13   and Chuck Caprio to review stated doc loans at one point.

14   Those were people who worked for me.  Because even in

15   underwriting, reviewing stated reasonability was a complex task

16   that even underwriters needed considerable training and

17   understanding to jump.

18          For example, a fireman might assume a salary of

19   $4,000.  If it came in stated at $20,000 a month, that would

20   appear to not meet a reasonability test.  Then the underwriter

21   would then go through some analysis to evaluate whether or not

22   that 20,000 was reasonable, based on tenure, based on scope of

23   responsibility, based on complexity, a number of variety of

24   factors that were difficult to train, and required years of

25   experience to evaluate.

DA43BAN4                          Boland

1    Q.  How would that be trained?

2    A.  It would require a broad perspective after seeing many,

3    many examples.  And using how exactly it would be trained, it

4    would be trained over time in classroom, and through experience

5    and getting feedback from QC and from myself and other

6    management on what was deemed reasonable.

7         There were also post-closing reviews where actual

8    documentation was obtained after the fact, and that feedback

9    would be given to the underwriters to validate or unvalidate

10   the documentation that they had deemed acceptable.  So the

11   underwriters had considerable background in evaluating that

12   stated doc income, and whether or not it was reasonable.

13        This was a pretty major topic at the company, because

14   Countrywide was very concerned about not making loans that were

15   unreasonable.  And there was a reasonability test that was

16   required in order to proceed on a stated doc income loan.

17        So your initial question was, how did the process go

18   wrong in the beginning.  And before I started talking just now,

19   I talked about stated doc income, and that was one of the

20   things that would have been signed off by an underwriter who

21   had this skill and experience and background and expertise.

22   And it was transitioned to somebody without that skill set, and

23   therefore, that was an unanticipated breakdown.

24   Q.  Who was it transitioned to?

25   A.  Processors.

DA43BAN4                    Boland

1    Q.   Who are processers?

2    A.   Processors go by many names.  It could be a loan

3    specialist, it could be a home service specialist.  It --

4    general industry term is a loan processor.

5         So that variety of -- there are several job titles.  I

6    don't want to box it in on one.  I'm trying to use a generic

7    term loan processor.

8         But there were people outside of the underwriting

9    department, and so it is important to understand the alignment

10   of interests.

11        So there is a sales team and there's a processors team

12   that is collocated.  And their interests were in production.

13   That was the sole point of their employment, was to produce

14   loans.  Then there was an underwriting and a funding group

15   outside of the NCA, and their sole function was to protect the

16   company and the investors and safeguard the quality.  And they

17   had a different alignment of interests, and that difference is

18   critical because when you have somebody, somebody on the

19   underwriting side checking that stated reasonability, it seemed

20   to produce better results than when you had somebody on the

21   processing side.

22   Q.   Did you have the ability to send loans backwards in the

23   High-Speed Swim Lane?

24   A.   No.  There was -- there was considerable campaign

25   information when the Hustle was rolled out that loans only

DA43BAN4                    Boland

1   moved forward, they never moved back.  And that mantra was on

2   posters, it was in e-mail, it was on taglines, it was coming at

3   you in every direction.  So whether it was spoken, whether it

4   was written, whether it was painted around you, loans moved

5   forward, they never moved back.

6   Q.  During the Hustle, could a loan specialist clear conditions

7   on a loan in the High-Speed Swim Lane?

8   A.  Yes.

9   Q.  What does it mean to clear conditions?

10  A.  So you're taking responsibility in that you have evaluated

11  the accuracy, the truth of whatever it is that you're clearing.

12  So when you clear a condition, if you clear a condition for a,

13  say, a paystub, you would be affirming -- that you would be

14  affirming many things.

15        You would say that the income calculation that's input

16  into CLUES at the moment is accurate.  There is no paystub

17  loans, there is no red flags on the paystub, that the paystub

18  is from the employer, stated on the Edge system and on the

19  TAML3.  That the borrower's Social Security number is

20  accurately reflected, their name, that there are no red flags

21  related to federal withholding so the appropriate percentages

22  are deducted from the amount of the income.

23        There is a considerable amount that goes into clearing

24  each and every condition.  Clearing conditions is something

25  that Countrywide for a long time never took lightly.  And it

DA43BAN4                         Boland

 1   was well understood that when you cleared a condition, you are

 2   putting yourself in jeopardy and putting your reputation and

 3   quality rating at risk when you clear a condition.

 4            During the Hustle, the loan specialist began to sign

 5   off on much more than they had previously signed off on.

 6   Q.  Much more meaning more substantial conditions?

 7   A.  Correct.  Conditions with much more risk associated with

 8   it.

 9            THE COURT:  The reporter is having a little trouble

10   hearing it, but now it's too loud.  So, let's get it in

11   between.  And excuse me, would someone furnish a copy of the

12   transcript to the reporter as well.

13            MS. SCHOENBERGER:  She has one, your Honor.

14            THE COURT:  Go ahead.

15            (Video playing)

16   Q.  Were stated doc loans part of the High-Speed Swim Lane?

17   A.  Absolutely, yeah.  That was -- that was the main -- that

18   was the main the crux of the Hustle.  The Hustle was mainly

19   stated doc loans.  Then beyond stated doc, there were other

20   things that may not be required by the CLUES report, which is

21   our automated underwriting system such as appraisal, etc.

22   Q.  Is it a complex task to make reasonability determinations

23   for a stated doc loan?

24   A.  It usually is very complex to make a stated doc

25   reasonability decision.

1    Q.  Were there reasons not to trust CLUES?

2    A.  There were very good reasons not to trust CLUES.  It was

3    widely understood that if the data input was not accurate, the

4    results were not going to be trustworthy.  That's common --

5    that's still applicable today with any underwriting system, and

6    I don't think anyone would argue that if you put poor data into

7    the system, you will get a poor decision out of it.  But the

8    slogan was an attempt to rein in people who are concerned with

9    quality, calling out issues, raising awareness to a potential

10   risk, and to silence those people from slowing down loans so

11   that they would only go forward, and would never go back.

12   Q.  Mr. Boland, Exhibit 4 is Bate stamped BANA S.D.N.Y. E

13   001450756.  Is this an e-mail exchange between you and Audrey

14   Knabe from August 9, 2007?

15   A.  Yes, it is.

16             MS. SCHOENBERGER:  Your Honor, can we offer into

17   evidence Plaintiff's Exhibit 22, which is Boland Exhibit 4 from

18   the deposition.

19             THE COURT:  Yes.  Received.

20             MR. HEFTER:  Can I look at it first, your Honor?

21             THE COURT:  Yes.

22             MS. SCHOENBERGER:  Can we publish this to the jury

23   before we proceed?

24             MR. HEFTER:  No objection, your Honor.

25             THE COURT:  Received.

1              (Plaintiff's Exhibit 22 received in evidence)

2              (Video playing)

3    Q.  What is being requested of you in this e-mail?

4    A.  The sender is requesting that I endorse the authority for

5    two people involved with the Hustle.

6    Q.  Who is Audrey Knabe?

7    A.  She was a processing leader in the NCA.  She was in a

8    leadership capacity over multiple managers.

9    Q.  What is your response to her request?

10   A.  She's asking me for an approval, and I said I don't know

11   who these people are, indicating that I'm not qualified to

12   evaluate their ability to clear conditions.  And her response

13   is, they are assigned to the Hustle thing, come on, work with

14   me.  Indicating that this is different than it used to be.

15   Don't apply the old rules, this is the Hustle thing, I should

16   be working with her and doing things that I would not normally

17   have done.  And she's asking me to approve things that I would

18   not normally -- I wouldn't approve something without knowing

19   the qualities or the qualifications of the individuals.  But,

20   this is implying that it is not a big deal.  It is the Hustle

21   thing.

22   Q.  Did you recommend that these two individuals be given level

23   two authority?

24             THE COURT:  So excuse me.  This answer here is within

25   the limitation.  But I think really this is probably a good

DA43BAN4                    Boland

1    place to end for today.  So we'll come back to that first thing

2    Monday.

3              So, ladies and gentlemen you'll be glad to know that

4    we are right on schedule.  Monday will be the end of our second

5    week, and the government had predicted two weeks for its case,

6    and my understanding is they will complete their case on

7    Monday.

8              We will on Monday, in the greater interest of sports,

9    sit only until 3:30.  And we'll start at 9:30 promptly, so

10   we'll see you on Monday.  Have a great weekend.

11             (Jury excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DA43BAN4

1          THE COURT:  With respect to the matters that have now

2     been briefed, with one exception, I will hear final argument on

3     all of them at 9 a.m. on Monday.

4          The one that I think we need to resolve now is the

5     Simantel matter.  My tentative view, but I say this just so

6     that each side knows what it has to show, so to speak, is she

7     is an officer within the terms of the Federal Rules of Civil

8     Procedure, and that her testimony can therefore be compelled.

9          But, that there has not yet been a sufficient showing

10    to warrant its admissibility on the government's case, and that

11    therefore, we need not call her for Monday.  But, that this is

12    very much without prejudice to the possibility that it may come

13    in as rebuttal evidence.  Because, even though I don't normally

14    allow rebuttal evidence, this is clearly an exception that I

15    have flagged repeatedly, that the government in its own papers

16    has argued that it's chiefly admissible as a rebuttal to a

17    defense argument.  And all of that argument may have been

18    limbed on opening statement of the defense, that's not

19    evidence.  And so we would have to see what the defense does in

20    its actual testimony, its actual case.  So, that's my tentative

21    view.

22          So let me hear first on the officer issue if the

23    defense wants to be heard further.  I should note for the

24    record that I received submissions on this issue not only from

25    counsel for the two sides here, but also from Ms. James,

DA43BAN4

1    counsel for the witness.  So I've considered all that.  But if

2    there is anything further defense counsel wants to argue on

3    that, I'll hear now.

4            MS. MAINIGI:  Your Honor, just simply a point of

5    clarification as to the reason for your position.  Is it simply

6    because she is a senior vice president by title and the

7    designated officer that you have that view?

8            THE COURT:  No, it is not just because of that.  But I

9    think those are important circumstances to be considered.  The

10   bank itself labels her an officer.  This is not exactly an

11   unsophisticated bank.  They have to know or recognize, one can

12   infer, the legal implications, which are many, and not just

13   under this rule, of labeling someone an officer.  And she and

14   the bank have benefits from that and they take the

15   corresponding burdens.

16           But in addition, I am satisfied from the attachments

17   to the government's letter that she was in fact operating at

18   the level both in terms of responsibilities and in terms of

19   discretion and in terms of authority that are typically the

20   earmarks of an officer.  So it is all those things.

21           MS. MAINIGI:  Very well, your Honor.  And with respect

22   to the issue of just the fact that she is a designated officer

23   and an SVP, I'm sure your Honor noted that 48 percent of the

24   employees in fact fall into that role, including administrative

25   assistants and paralegals as designated officers.

DA43BAN4

```
 1            THE COURT:  And that's why it was not the only factor
 2   by any means that I took account of.  But I have to say, I
 3   think the bank and banks generally can't so blithely have it
 4   both ways.  If you're going to call a janitor a vice president,
 5   and I'm exaggerating perhaps only slightly, and hold one's self
 6   out as a vice president, of course here we have a senior vice
 7   president, you do so because you recognize that the public as a
 8   whole has an understanding that someone who is a vice
 9   president, let alone a senior vice president, is not a
10   janitorial type of person.  So, if it is a charade that banks
11   engage in, they take the burdens of that charade along with the
12   benefits.
13            MS. MAINIGI:  Your Honor, I think there is a
14   distinction between those 48 percent of the employees and for
15   the various purposes that they are designated officers, and
16   then the executive officers of the company, which number in the
17   range of 10, who are the individuals, in our view, your Honor,
18   that would be subject to Rule 45 subpoena power.
19            THE COURT:  I understand that's your view.  And I
20   certainly considered it.  But it is not the view of this Court.
21            MS. MAINIGI:  Thank you, your Honor.
22            THE COURT:  Now let me hear from the government
23   though, if you still think her testimony should be introduced
24   on your direct case.
25            MR. ARMAND:  Well, your Honor, I believe the
```

government's position was that with regard to self-reporting,

Ms. Simantel, as in connection with her role as the head of

quality control, was the one who should be self-reporting the

loans that were found to be severely unsatisfactory, including

those that came out of FSL and the ones that came out of the

High-Speed Swim Lane.

          And, the incident with Freddie Mac with failing to

report defective loans in connection with a site review, it

goes to her intent in concealing defective loans that should

have been reported.

          I realize that the self-reporting requirement does not

apply to the sample of loans.  But, the bank did undertake to

provide to Freddie Mac in connection with this visit a sample

of loans and removed the ones or certain ones that were

defective, that were known to be defective, and it is the

government's position that it was because the bank wanted to

make the percentage of loans that were defective look more

favorable than it really was.

          In connection with the self-reporting argument that

the government is making, the e-mails with Ms. Biehler which

show that Ms. Simantel was not truthful with regard to those

loans, it is relevant.

          And in addition, with regard to the site visit, the

defense has already introduced into evidence the PowerPoint

presentation which was shown to Ms. Biehler, who is now an

1    employee of Bank of America.  And in connection with the same

2    site visit.  And the people within Freddie Mac that the bank is

3    claiming that the High-Speed Swim Lane was disclosed to, the

4    very same people who were being misled, in connection with the

5    loan review, that was part of the same site visit.

6         And, so, we believe that all of this is evidence that

7    the jury should be able to consider in connection with

8    determining whether the bank's relationship with Freddie Mac

9    was one that was truthful.

10        THE COURT:  I flagged earlier in the case that in

11   order for the bank to have the requisite specific intent to

12   defraud, the jury would have to conclude that at least one

13   relevant person in the bank had a specific intent to defraud.

14   There is no collective intent.  Obviously, you're alleging

15   that's true of Ms. Mairone.  Who else are you alleging it to?

16   Or maybe more narrowly, you may have to answer that in a Rule

17   50 motion.

18        But are you alleging that Ms. Simantel is such a

19   person?

20        MR. ARMAND:  In connection with -- she was not one of

21   the people who was involved in the creation of the High-Speed

22   Swim Lane.  But, with regard to failure to self-report, it

23   would be evidence of fraudulent intent, yes.

24        (Continued on next page)

25

DA4TBAN5

```
 1              THE COURT:  No, maybe you misunderstood my question.
 2     There are different aspects of your fraud, but with respect to
 3     any of the fraud that you are claiming creates liability in
 4     this case, namely either misrepresentations or intentional
 5     failures to report when there was a duty to report, are you
 6     claiming, with respect to the Hustle loans, that Ms. Simantel,
 7     with intent to defraud, did one of those things that is a
 8     material part of your claim of fraud?
 9              MR. ARMAND:  Your Honor, we hadn't come up with a
10     specific list of individuals other than what we presented in
11     terms of our complaint in the case.
12              THE COURT:  You need to think about that, because I
13     think that will be a necessary part of the Rule 50 colloquy.
14     But if Ms. Simantel is someone you're making such a claim for,
15     then I could see the argument that this email comes in to show
16     her intent under Section 404(b) of the Federal Rules of
17     Evidence, because although it would not be in connection with
18     the Hustle loans, the question would be did she fail to
19     self-report in connection with the Hustle loans because she had
20     an intent to defraud or did she do so for some innocent reason.
21     By innocent, you could have -- "innocent" is probably the wrong
22     word, did she for some other reason.  For example, you could
23     tell a lie that is not a lie intended to defraud someone of
24     their money or property.
25              So if she were someone you were claiming had intent to
```

DA4TBAN5

defraud in connection with the Hustle loans in connection with

a material part of the misrepresentations or omissions charged

in connection with the Hustle loans, then even on your direct

case this might be relevant evidence under 404(b) as bearing on

her intent.  I would have to then consider whether it was more

prejudicial, if you will 403-type issues.  If, on the other

hand, you were not contending that as to her, then I think it

only comes in if the bank, on its case, makes some of the

broader claims that we heard on opening statement about honesty

of people, et cetera, et cetera.

Now the problem is it's Friday, and your case is

otherwise going to close on Monday, but if you want to to think

about that over the weekend, who do we have left?  We have

maybe 45 minutes or so, maybe more, but any way, worst case an

hour of Mr. Boland, complete with all the limiting

instructions, we have what I'm guessing is no more than 45

minutes of Mr. Price, from a quick look at the deposition, and

then who else do we have?

MR. ARMAND:  Lars Hansen, who is an FHA OIG agent who

is going to be discussing data, and he will also be introducing

certain exhibits for which the government did not have a live

witness that will be published to the jury with the Court's

permission.

THE COURT:  All right.  Well, I think --

MR. ARMAND:  We could get back to you this evening,

DA4TBAN5

1     your Honor.

2              THE COURT:  I think it's not fair to have Ms. Simantel

3     to come in here this weekend until she knows if she will

4     testify or not.  Let me see if this appeals to defense counsel,

5     that we decide this matter Monday morning after the government

6     has had a chance to reflect on the issue I just raised.

7              MS. MAINIGI:  That's fine, your Honor, decision on

8     Monday morning is fine.

9              THE COURT:  If we had to call her on the government's

10    direct case, we would -- assuming their direct case is finished

11    before 3:30, we would hear all Rule 50 motions except for any

12    aspect that had to do with Ms. Simantel, call her first thing

13    the following morning, and then the government's case would be

14    over and we would hear any further arguments on Rule 50 that

15    related only to her.  That way we wouldn't lose time.

16             MS. MAINIGI:  Your Honor, I would like to address

17    that.  As your Honor knows, we do not represent Ms. Simantel

18    personally.

19             THE COURT:  Right, but since you've had contact with

20    her, I think you are the natural ones to be in contact.  I mean

21    I guess if you force me to, I could have the U.S. Marshals

22    arrest her on a material witness warrant and have her brought

23    here in handcuffs over the weekend, but I suggest you might

24    prefer to be the good messenger and inform her of what the

25    Court's rulings are.

DA4TBAN5

1        MS. MAINIGI:  Your Honor, I would like to focus a

2   little on the substance here.  And I know your Honor is very

3   familiar with this, so I won't delay this, but with respect to

4   the High-Speed Swim Lane loans, there's just no dispute that

5   Cindy Simantel got nowhere near any High-Speed Swim Lane loans.

6   She's not in FSL.  She has nothing to do with the process

7   whatsoever.  She wasn't part of the design.  She testified in

8   her deposition -- she's been deposed twice, your Honor, she

9   testified twice.

10       THE COURT:  So that's why I was thinking -- precisely

11  why I was leaning on not permitting her to testify in the

12  government's case unless the door was opened in the way I

13  indicated on the defense case.  What the government just said

14  that gave me pause is they said that she was the person --

15  maybe I misunderstood -- who would have been in charge of

16  self-reporting on the Hustle loans.  Maybe I misunderstood

17  that.

18       MS. MAINIGI:  She didn't know what the Hustle loans

19  were, according to her deposition, your Honor, and I don't

20  believe -- and perhaps I'm wrong, but I have not heard any

21  evidence -- the government is nearly about to rest in their

22  case -- about Ms. Simantel's involvement in the self-reporting

23  process.  There was an opportunity to ask a Fannie

24  representative, the person who had day-to-day dealings.  Who

25  was the person who asked the self-reporting question?  I was.

DA4TBAN5

1    I don't think that was an accident, I think that was

2    deliberate.

3            They have come up with this -- in my view, your Honor,

4    and others may choose to disagree, the self-reporting issue

5    started out in the complaint, they sought nearly zero amount of

6    discovery on the self-reporting issue, and now they want to

7    bring it back in in an effort to drag in this email, because

8    frankly they have no other evidence in this case that could

9    even remotely come close to supporting anything that could be

10   called fraud.  And that email doesn't do it either, but that is

11   why they are desperate to drag that email into this case.

12           THE COURT:  I think, perhaps, that's a rather strong

13   characterization, but let me go back to the government just for

14   a minute in light of what you just said.

15           What evidence is there presently in the record that

16   suggests that she would be the one, Ms. Simantel -- probably

17   mispronouncing her name, Simantel -- Ms. Simantel, what

18   evidence is there from which a juror could reasonably infer

19   that she had the self-reporting responsibility on the Hustle

20   loans?

21           MR. ARMAND:  Your Honor, with regard to her role as

22   the head of quality control, and quality control is the

23   function that identifies the loans that need to be

24   self-reporting.  There has been testimony about discussions, I

25   believe, with Ms. Simantel, but not specifically with regard to

DA4TBAN5

1    Hustle loans.  So that --

2            THE COURT:  What evidence is there that in that

3    position she personally had knowledge of the aspects of the

4    Hustle program that you say required self-reporting?

5            MR. ARMAND:  Your Honor, I don't think -- the

6    government isn't saying that Ms. Simantel was aware of specific

7    Hustle loans, there are -- the quality control reports relate

8    to FSL overall.

9            THE COURT:  What's the evidence that she had knowledge

10   of those?

11           MR. ARMAND:  She was aware of the -- there is evidence

12   that she was aware of the sprint incentive that was going on

13   with regard to the defect rates in March of 2008.  That's not

14   something that has been elicited yet, but she certainly would

15   know what the defect rates were if she came to testify.  And

16   there is certainly evidence in the record from discovery

17   indicating that Ms. Simantel -- and would put this in

18   connection with our opposition of summary judgment -- that was

19   she was the arbiter of what would be -- what loans that were

20   from FSL would be deemed SUS or severely unsatisfactory.

21           THE COURT:  You took her deposition?

22           MR. ARMAND:  Yes, we did.

23           THE COURT:  And did you ask her about her knowledge of

24   these things you have just been talking about?

25           MR. ARMAND:  Your Honor, I will have to go back to

DA4TBAN5

 1    check the transcript exactly.  I know the depositions focused

 2    pretty much on the emails that were at issue, but I believe

 3    there were some other documents that were shown to her that

 4    dealt with quality control and quality control numbers, but

 5    we'll have to actually look at the transcript to see exactly.

 6            MS. MAINIGI:  Your Honor, if I might add something

 7    with respect to that particular point.  She was deposed.  She

 8    was deposed twice, made her available voluntarily again a

 9    second time to the government, and I think there were all of

10    maybe five to eight minutes spent on anything --

11            THE COURT:  You made her available even before she had

12    her own independent counsel in her lowly role as a mere senior

13    vice president?  That was very, very gracious of you.

14            MR. ARMAND:  The reason why we needed to depose her a

15    second time, your Honor, is we learned about six or seven other

16    emails that demonstrated she misrepresented what was going on

17    with the loans.  That's why we had to depose her a second time,

18    to ask questions about those.

19            MS. MAINIGI:  Your Honor, if they were really

20    interested in anything having to do with self-reporting -- this

21    is not a new issue, this is not an issue that they came upon in

22    the end of discovery and didn't have a chance to depose anybody

23    on.  It was in their complaint.  They chose not to pursue it.

24    They're pursuing it now because they're trying to bootstrap

25    that email and Cindy Simantel in particular somehow in their

DA4TBAN5

1    case.  That's the bottom line.  If they wanted information

2    about this, there were plenty of people they could have

3    solicited this information from, including the first deposition

4    of Cindy Simantel.  But they didn't solicit any of that

5    information from her, and the realty is they presented no

6    evidence to date in their case on that particular issue.

7         THE COURT:  Well, I continue to lean in the way I

8    indicated preliminarily, namely that she -- that there's not a

9    sufficient showing to warrant calling her on the government's

10   direct case, but totally without prejudice to her being called

11   adequate showing is made or a door is opened on rebuttal.

12   Nevertheless, if the government wants to submit something in

13   writing over the weekend on this issue, I'll leave open the

14   final determination until Monday morning.  But in the meantime,

15   counsel for the banks can advise her that, based on the Court's

16   present rulings or preliminary determinations, she does not

17   have to to come over the weekend.

18        MS. MAINIGI:  Thank you, your Honor.

19        MR. MUKASEY:  Judge, I wanted to review briefly what

20   the procedure may be for the Rule 50 motions, which I keep

21   ruling Rule 29 motions, but I'm told they're now Rule 50

22   motions in this Court.

23        THE COURT:  That's all right, at least you haven't

24   gotten up and said the government objects.

25        MR. MUKASEY:  Not yet, although I think your Honor

might have confused *U.S. v. Simantel* with *United States v. Pimentel*.

THE COURT:  Very good, yes.

MR. MUKASEY:  The Pimentel letter.

THE COURT:  Such a show off.

MR. MUKASEY:  I can only think of this case relative to the Federal Rules of Criminal Procedure.

Judge, it's our plan to submit a brief I guess Monday morning.  Even though the government's case will be incomplete, we certainly have fairly strong idea of the kind of proof that's going to come in.  And I think we would like to get a chance, consistent with respect to the time of the jury, to make some argument on that.

THE COURT:  I'm definitely going to give you time at the close of the government's case, and the only question is how to make sure it we minimize cutting into good jury time that we might otherwise use.  So I mean the fall-back scenario will be Monday night, because I have a matter starting at 3:30. Once I learned that we had to excuse a juror, I have an important matter, cannot be postponed, probably going to go from about 3:30 to 7:00.  But I would be delighted to see you back at 7:15 or so and we could go as long as you wanted.

MR. MUKASEY:  I wonder whether perhaps -- I'm anticipating this is what you're going to say -- we wait until the close of the government's case, we brief the issue Monday

DA4TBAN5

1   night, we argue it Tuesday morning.

2           MR. SINGER:  I was going to say something a little

3   different.  What I was going to suggest was we were

4   anticipating the government's case would close sometime on

5   Monday morning, I think we were still anticipating that,

6   subject to --

7           THE COURT:  If it closes say at one o'clock, we'll

8   hear argument until 3:30.

9           MR. SINGER:  That's what we would like to do.

10          THE COURT:  You know what remains, it sounds -- I'm

11  not sure how long this witness is going -- who is this witness

12  again, the one remaining live witness?

13          MR. ARMAND:  Lars Hansen, your Honor.

14          THE COURT:  Roughly how long on direct?

15          MR. ARMAND:  Most likely less than an hour, your

16  Honor.

17          THE COURT:  So sounds to me like it's largely in

18  defense hands how much you want to do on cross.

19          MR. SINGER:  Assuming -- I think this is the case,

20  that we get done by early afternoon on -- the latest on Monday,

21  we would be prepared to submit a letter at that point and argue

22  at that point.  My concern, though, is --

23          THE COURT:  Wait a minute, I do not -- one thing is

24  clear, I gave you permission yesterday when this first came out

25  to put in a letter.  I'm not going to receive it -- I'm not

DA4TBAN5

1    going to read a letter that I see two minutes before the oral

2    argument.  So if you want to get me a letter, you know exactly

3    what -- there's no evidence now that you don't basically know

4    about, so you can send me the letter and get it to me by Monday

5    morning and I will read it.

6            MR. SINGER:  Understood, your Honor.

7            THE COURT:  I don't have to watch the depositions, I

8    already read them.  But I don't want to see it Monday

9    afternoon.

10           MR. SINGER:  Understood, your Honor.  And the concern

11   is that when we put in any sort of a submission, including the

12   argument -- and this goes to the Simantel issue as well -- it's

13   never been my practice to make an argument like that prior to

14   the close of the government's case, because if you do, then of

15   course the government has an opportunity, to which it's really

16   not entitled, to try to correct and improve the case that it's

17   presenting.

18           THE COURT:  But we have already heard from them what

19   we're going to get on Monday, we're going to complete the

20   Boland deposition, you know exactly what is in it because you

21   have the transcript, we're going to hear the Price deposition,

22   you know exactly what's in there from the transcript, we're

23   going to hear from Mr. Hansen.  You must know generally what

24   he's going to say.

25           MR. SINGER:  I hope so.

DA4TBAN5

<div style="margin-left:2em">

1          THE COURT:  Was his deposition taken?

2          MS. MAINIGI:  No, your Honor, he's not in initial

3     disclosures.

4          THE COURT:  Then you're going to have to do what every

5     lawyer in your situation does, which is just make an oral

6     argument and forget about a written submission.  You know, it's

7     your choice, not mine.  You want to give me a written

8     submission, fine, give it in time so I can read it.  If you

9     don't want to give a written submission because you think the

10    government, in all its sneakiness, and will then say ah, there

11    is something that they craftily kept back from us that they

12    didn't think about and we're now arguing and now they know

13    about it and they're going to work it in for Mr. Hansen, then

14    that's OK, too.  Although, of course, remember that after

15    hearing oral argument at the close of the government's case,

16    the Court always has, before the start of the defense case, the

17    discretion to allow the government to reopen.

18         MR. SINGER:  The other wild card, though, in the issue

19    is Ms. Simantel, and that's another opportunity.  Other than

20    what she said in deposition, which as Ms. Mainigi pointed out,

21    had nothing to do with the issues the government is now

22    raising, that is another situation where we could have an oral

23    argument and put in a brief, and then the government could try

24    to elicit things from Ms. Simantel that we didn't anticipate.

25         THE COURT:  You know, the life of a trial lawyer is

</div>

DA4TBAN5

1    awfully tough.  You really should have -- you could have been

2    an accountant.  I adhere to what I said before.  Now if it

3    turns out the government's case doesn't end until 3:30, then

4    think of all the hours you'll have to deal with all this until

5    you come back to my courtroom at 7:15.

6              MR. SINGER:  And that's how I will spend those hours.

7              Your Honor, one more point of clarification for Monday

8    morning.  Your Honor said you will hear all fully briefed

9    matters at 9:00 a.m.  I'm only aware of one.

10             THE COURT:  I thought there were two, Hustle versus

11   non-Hustle matter and then --

12             MS. NAWADAY:  Your Honor, we would like to hand up a

13   response to defendants' argument concerning the affecting

14   element.

15             THE COURT:  Yes, that's the other one.

16             MR. SINGER:  I didn't have that yet.

17             THE COURT:  Those are the two, yes.

18             MR. SINGER:  Thank you.

19             THE COURT:  All right.  Anything else?

20             MS. MAINIGI:  Your Honor, I suppose in the -- with

21   respect to depending on what happens with the Rule 50, when

22   would you expect to have the first defense witness?

23             THE COURT:  Tuesday morning.

24             MS. MAINIGI:  Thank you.

25             MS. NAWADAY:  Your Honor, one other possible issue on

DA4TBAN5

1    letter briefing, your Honor mentioned -- made a comment the

2    other day that the government took to be possibly suggesting

3    that a criminal venue requirement might be applicable to this

4    case, and if that's an issue, we would like an opportunity to

5    put in a submission.

6              THE COURT:  I was really just responding -- you're

7    right it's not a criminal venue issue, I was responding to the

8    point that I wasn't, in my preliminary instruction, specifying

9    each and every thing that had to be specified, but I think on

10   reflection that example, which I picked off the top of my head,

11   is probably a poor one.  I doubt that the criminal venue

12   provisions come into play here.

13             MS. NAWADAY:  Thank you, your Honor.

14             THE COURT:  OK, anything else?

15             Very good.  Thanks so much.  I will see you all on

16   Monday.

17             (Adjourned to October 7, 2013 at 9:00 a.m.)

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    MARIA BREWSTER
 4    Direct By Ms. Schoenberger . . . . . . . . .1476
 5    Cross By Mr. Jones . . . . . . . . . . . .1491
 6    Cross By Mr. Mukasey . . . . . . . . . . .1504
 7    Redirect By Ms. Schoenberger . . . . . . . .1505
 8    MICHAEL SOBCZAK
 9    Direct By Mr. Cordaro . . . . . . . . . . .1508
10    Cross By Ms. Mainigi . . . . . . . . . . .1551
11    Cross By Mr. Mukasey . . . . . . . . . . .1586
12    Redirect By Mr. Cordaro . . . . . . . . . .1588
13    Recross By Ms. Mainigi . . . . . . . . . .1602
14                     PLAINTIFF EXHIBITS
15    Exhibit No.                          Received
16     1223    . . . . . . . . . . . . . . . . .1481
17     322    . . . . . . . . . . . . . . . . .1486
18     381    . . . . . . . . . . . . . . . . .1490
19     22    . . . . . . . . . . . . . . . . .1621
20                     DEFENDANT EXHIBITS
21    Exhibit No.                          Received
22     1319    . . . . . . . . . . . . . . . . .1577
23     59    . . . . . . . . . . . . . . . . .1579
24     396    . . . . . . . . . . . . . . . . .1584
25
```