DA73BAN1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    UNITED STATES OF AMERICA,

4
                    Plaintiff,
5
              v.                        12 CV 1422 (JSR)
6
     BANK OF AMERICA CORPORATION,
7    successor to Countrywide
     Financial Corporation,
8    Countrywide Home Loans, Inc.,
     and Full Spectrum Lending, et
9    al.,

10                  Defendants.

11   -------------------------------x
                                        New York, N.Y.
12                                      October 7, 2013
                                        9:30 a.m.
13
     Before:
14
                         HON. JED S. RAKOFF,
15
                                        District Judge
16

17

18

19

20

21

22

23

24

25
```

DA73BAN1

```
 1                             APPEARANCES

 2   PREET BHARARA
          United States Attorney for the
 3        Southern District of New York
     PIERRE G. ARMAND
 4   JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
 5   CARINA H. SCHOENBERGER
     ELLEN M. LONDON
 6        Assistant United States Attorneys

 7

     WILLIAMS & CONNOLLY
 8        Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
 9   ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14        Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17        Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25
```

DA73BAN1

1              (In open court; jury not present)

2              THE COURT:  We're still missing a juror so we can have

3      oral argument.

4              With respect to the motion reflected in defense

5      counsel's letter of October 1st, claiming that the government

6      has opened the door to present evidence that compares the

7      non-Hustle loans to the Hustle loans, I don't agree that the

8      government has opened the door.  So that application is denied.

9              I would like to hear argument on the affect issue.

10     Let me hear first from defense counsel.

11             MS. JONES:  Allison Jones for the bank defendants.  No

12     one disputes --

13             THE COURT:  When did Bank of America Corporation, or

14     whatever it was, enter into the indemnity agreement with Bank

15     of America N.A.?

16             MS. JONES:  I believe, your Honor, there were a number

17     of indemnification agreements.  There was a series of them as

18     Bank of America was considering the merger with Countrywide.

19             THE COURT:  When did Bank of America acquire

20     Countrywide?

21             MS. JONES:  July of 2008.

22             THE COURT:  At that point in time, were all the

23     indemnity agreements in place?

24             MS. JONES:  Yes, that's my understanding, your Honor.

25     I believe they also entered into -- I believe one was amended

DA73BAN1

1    later on, but at that time in order for the federal government

2    to allow the merger to take place, they had to have

3    indemnification in place.

4              THE COURT:  That's a different question.  Go ahead.

5              MS. JONES:  Your Honor, no one disputes that the

6    affecting element, an affect on a federally insured financial

7    institution is an essential element of the FIRREA claim that

8    the government must prove.  And the government has alleged only

9    one affect on a federally insured financial institution even to

10   this day.

11             THE COURT:  It's like a jurisdictional element, is it

12   not?

13             MS. JONES:  No, your Honor.  FIRREA specifically added

14   an extra element to mail and wire fraud.  It has nothing --

15   this Court has jurisdiction over mail and wire fraud.

16             THE COURT:  That's why I said like a jurisdictional

17   element, because it doesn't describe an element of the fraud.

18   It describes an aspect of its impact, or potential impact, yes?

19             MS. JONES:  That's correct.  For each of the criminal

20   statutes that are listed, in 12 U.S.C. 183(3)(a)(C)(ii),

21   Congress required that the government also prove, in addition

22   to all of the elements of the fraud or the criminal offense, an

23   affect on a federally insured financial institution.  Congress

24   is creating a new offense.  If they wanted to create civil

25   liability against a bank any time a bank commits wire fraud,

1    Congress could have done that much more clearly and simply.

2         THE COURT:  Because the reasoning would be, would it

3    not, that there was a potential impact on the government

4    operations, the government fisc, the government liability

5    indirectly, the government involvement with these institutions.

6    So, it wasn't going to cover all banks, it was going to cover

7    government insured banks.

8         MS. JONES:  That's right.  The problem that Congress

9    had in mind was related to failure of the thrifts, so

10   protecting those particular institutions and federally insured,

11   which were federally insured financial institutions, was at the

12   forefront of Congress' mind.

13        Now, here the government has only ever alleged one

14   affect.  They have claimed that Countrywide bank or BANA has

15   been affected by repurchase -- settling repurchase demands from

16   the GSEs on HSSL loans.  That's paragraph 141 of the second

17   amended complaint that they filed last month.  That's the only

18   affect that the government has ever alleged.  That is the

19   affect that the government should be required to prove, and

20   that is the affect that the defendants should be permitted to

21   defend against.

22        THE COURT:  Okay.

23        MS. JONES:  The government has never alleged that

24   simply by proving the fraud they have somehow proved the fourth

25   element.  As a matter of law, that would be incorrect for at

DA73BAN1

1      least two reasons.

2              First of all, as we mentioned in our letter, holding

3      that the fourth element, this affecting element, is proved any

4      time the government proves a fraud, would basically write that

5      element out of the statute any time --

6              THE COURT:  I don't understand why you say that.  It

7      is not clear to me why you say that.  They have to prove the

8      fraud, and if the fraud was one that by its very nature

9      affected a government insured bank, why should that not be

10     sufficient?

11             MS. JONES:  It sounds like the argument, your Honor,

12     is whenever the defendant is a federally insured financial

13     institution, this element need not be proven because the

14     defendant --

15             THE COURT:  Let's take as hypothetical, what is wrong

16     with that?

17             MS. JONES:  There are at least two things wrong with

18     that.  First of all, Congress enacted FIRREA and this provision

19     of FIRREA to protect the banks.  So it would be counter to that

20     purpose to hold that whenever the bank is a defendant, it's

21     easier to prove they have --

22             THE COURT:  That's the argument that I've already

23     rejected as a matter of the plain meaning of the statute.  That

24     you have maintained consistently, and although three judges in

25     this district how now ruled against you as well as several

DA73BAN1

1    circuits, it is very much a live issue for appeal in the Second

2    Circuit.  And though I'm sure you're hoping you never have to

3    get to that point, it is fully preserved.

4         But I have already ruled that "affect" doesn't mean

5    that you have to be the victim.

6         MS. JONES:  That's true, your Honor.  You have ruled

7    that a bank can affect itself.

8         I would point out in the other two cases that you

9    mentioned, in the Mellon case and the Wells Fargo case, the

10   government asked those courts as well to rule that this

11   particular litigation, the FIRREA litigation itself, could be

12   the affect, that the possibility of liability in that

13   litigation could be the affect.  Both of those courts denied

14   the government's invitation.

15        THE COURT:  Did they deny?  I saw that in your letter

16   and I went back and looked at Judge Furman's opinion.  And

17   particularly, footnote 25 on page 55 of his opinion, which

18   reads as follows:  "Some courts have suggested that the

19   relevant affect on a financial institution need not be

20   negative, but rather any impact, positive or negative, may

21   constitute an affect within the meaning of FIRREA.  See e.g.

22   Bank of New York Mellon, 2013 Westlaw 1749418 at * 11.  Because

23   the government has alleged sufficiently that Wells Fargo's

24   conduct negatively affected it, the Court need not address this

25   interpretation."

DA73BAN1

1           So what makes you think that he rejected that

2    argument?

3           MS. JONES:  In footnote 26, your Honor, the next

4    footnote, Judge Furman says that he's been invited to hold this

5    particular litigation is the affect.  He says although the

6    defendants argue that is what is being pursued there, he says

7    "this lawsuit per se is not the affect."

8           THE COURT:  He doesn't reach it.

9           MS. JONES:  Right.

10          THE COURT:  Footnote 26 says "Wells Fargo complains

11   that allowing the government to allege that this lawsuit is

12   itself an affect cognizable under FIRREA would allow the

13   government 'to manufacture and affect,' and therefore a FIRREA

14   violation simply by bringing suit against a federally insured

15   financial institution.  This argument misunderstands the affect

16   alleged in the amended complaint.  The negative affect the

17   government alleges is not this lawsuit per se, but rather Wells

18   Fargo's exposure to potential legal liability more generally.

19   This affect is cognizable under FIRREA.  Citing Bank of New

20   York Mellon.  Furthermore, even if the potential legal

21   liability was not a cognizable affect under FIRREA, the

22   government has, as noted above, alleged other negative

23   affects."

24          So, I ask you again, how can you say he rejected that

25   argument since it is clear he didn't reach it?

DA73BAN1

1          MS. JONES:  I did not mean that the courts held it was

2    an impermissible affect, that it could never be.  I'm merely

3    representing, your Honor, that both courts were confronted with

4    that argument, and declined to reach it.  They denied the

5    government's invitation to hold on that ground.

6          Both courts decided instead of accepting that

7    invitation to look to other litigation that had already been

8    filed against both Bank of New York Mellon and Wells Fargo.

9    That makes those cases very different from this case, your

10   Honor.

11         In this case the government cannot point to a single

12   other lawsuit that has been filed or threatened to be filed

13   about the alleged fraud under underlying the HSSL process.

14         THE COURT:  Well, before we get to the other

15   arguments, since as you now agree, the issue has not been

16   decided by other courts, not that it would be binding on me in

17   any event, why isn't it enough to say this lawsuit is the

18   affect?

19         MS. JONES:  As I mentioned before, your Honor, we

20   think it would get rid of the fourth element.

21         THE COURT:  Why?  You still have to prove your

22   lawsuit.

23         MS. JONES:  Well, in addition, your Honor the

24   government could, as Judge Furman quoted in the footnote, could

25   manufacture the fourth element, this affecting element,

DA73BAN1

1    whenever they want.

2         THE COURT:  I don't understand that either.  That's

3    what the Wells Fargo briefs say and now you're saying it but I

4    don't understand it.  The government is not manufacturing the

5    fact that federally insured banks are the defendants here.

6         MS. JONES:  They are, your Honor.  They choose who is

7    the defendant.

8         THE COURT:  No, no, no.  You were federally insured

9    long before this lawsuit was a gleam in anyone's eye.  Long

10   before any of the events occurred that are the subject of this

11   case.  Long before probably you were born.  Bank of America

12   N.A. and Countrywide were federally insured.  True?

13        MS. JONES:  I don't know if they were before I was

14   born, so I don't want to make a representation.

15        THE COURT:  Okay.  Well, for a long, long time.  So,

16   if a federally insured bank commits a FIRREA offense, why is

17   that not an affect on the federally insured bank?  I don't see

18   what's being manufactured there.

19        MS. JONES:  Your Honor, the fact that the government

20   can by bringing a lawsuit create -- so the FIRREA lawsuit

21   itself becomes their proof of an element of their claim.

22        THE COURT:  That's right.  Because assuming they prove

23   the case, if they can't prove the case, obviously the whole

24   thing goes away.  But if they can prove their case, that they

25   thereby also prove that the alleged misconduct of the defendant

DA73BAN1

```
 1    had an affect on a federally insured bank.  I don't see what's
 2    manufactured about that in any respect.
 3            MS. JONES:  Your Honor, it cuts against the statute
 4    itself.  If Congress wanted to create civil liability against a
 5    bank any time a bank commits mail or wire fraud, they could
 6    have said that quite simply.
 7            THE COURT:  No.  What they wanted to do is not only
 8    cover that, but cover other affects.  And that's why one might
 9    hypothesize they used the very broad term "affect," so that it
10    would cover not only the situation you're referring to, but
11    also a lot of other situations where the bank was not the
12    defendant.
13            MS. JONES:  But in the situations where the bank is
14    the defendant, that fourth prong serves no purpose.  That is
15    actually the situation in all three of the FIRREA litigations
16    that are currently pending in the Southern District.
17            In fact it is the situation in the large percentage of
18    the FIRREA cases that grace the federal courts.
19            We do disagree that this is a valid legal
20    interpretation of the affecting prong.  But most importantly,
21    we want to make sure it's clear that the government has never
22    alleged, never pled in any of their multiple complaints in this
23    case, that this litigation is the affect --
24            THE COURT:  That maybe is I think your strongest
25    argument.  Let me ask my law clerk to pull out a copy of the
```

DA73BAN1

1    second amended complaint.  While he's doing that, maybe it's

2    time to hear from the government.

3             MR. ARMAND:  Thank you, your Honor.

4             Government certainly hasn't limited itself to one

5    particular type of affect.  And --

6             THE COURT:  Whatever the complaint says, the complaint

7    says, right?

8             MR. ARMAND:  We'll have to pull it to say precisely

9    what the language is.  But one thing that is clear is the

10   government has always maintained that the definition of

11   "affect" is broad and can encompass a wide variety of affects.

12            THE COURT:  That may be your legal position, but what

13   your adversary is saying is you, just as you are masters of

14   your complaint, which you've amended twice, conversely, you are

15   bound by it and it puts them on notice of what your contentions

16   are.  And they should not have to respond to something that has

17   not been your contention.

18            Now, there are exceptions to that.  There is a

19   provision in the federal rules that even at the very end of the

20   trial a complaint can be amended to accord with the evidence.

21   That's rarely invoked because it creates its own difficulties.

22   I hope my law clerk will just play me out a copy of the second

23   amended complaint.

24            MR. ARMAND:  I believe in our summary judgment --

25            THE COURT:  I'm surprised neither of you have a copy.

DA73BAN1

1           MS. JONES:  I have a red line, your Honor.

2           THE COURT:  I'll take that.  Thank you.  On the other

3     hand, you should be surprised that I don't have a copy.

4           Here is a short and simple 53 pages.

5           MS. JONES:  I believe it is paragraph 141.

6           THE LAW CLERK:  143 is the affecting.

7           THE COURT:  I'm sorry, I'm not finding exactly what

8     I'm looking for.  The language you quote in your letter, where

9     is that?

10          MS. JONES:  I believe it is paragraph 141, your Honor.

11    In the red line I have it appears to be 145, but I think that

12    red line is incorrect.

13          THE COURT:  Yes.  141.  I'm sorry.  Thank you very

14    much.

15          MS. JONES:  Certainly.

16          THE COURT:  "Defendants' fraudulent conduct has

17    resulted in significant liabilities to the GSEs for, among

18    other things, repurchase claims.  To date, BANA and/or

19    Countrywide Bank has directly or indirectly paid billions to

20    settle repurchase demands from the GSEs on defective loans,

21    including HSSL loans."

22          So, the key word there I think in the first sentence

23    is "liabilities" and "among other things."

24          There is no doubt, maybe I should go back to defense

25    counsel for a moment.  Forgive me.

DA73BAN1

1        There is no doubt that liabilities were created, even

2   if they were indemnified, correct?

3        MS. JONES:  Your Honor, I think the key language is

4   significant liabilities "to the GSEs."  So the question is

5   whether the government can prove that BANA or Countrywide Bank

6   have significant liabilities to the GSEs.

7        THE COURT:  Have they not paid billions to settle

8   repurchase demands?

9        MS. JONES:  No, your Honor.

10       THE COURT:  Why do you say that?

11       MS. JONES:  Well, for one reason, Mr. Wertz, who was

12   deposed right before this trial, testified in his deposition

13   that often Bank of America Corporation, by virtue of the

14   indemnification agreement, would foresee a large expense coming

15   out.  A great example is the 2013 settlement of repurchase

16   claims with Fannie.  Bank of America Corporation arranged for

17   that to be paid, without it going through BANA.

18       THE COURT:  So what?  It is still a liability of

19   Countrywide or BANA.  Just someone else has chosen to indemnify

20   that.

21       MS. JONES:  The government is welcome to prove that as

22   a matter of fact if they can.

23       THE COURT:  What is the legal dispute as to that?  The

24   obligation of Bank of America Corporation was, as you've been

25   telling me you and your colleagues, is an indemnification,

DA73BAN1

1   right?

2           MS. JONES:  Yes, there is an indemnification.

3           THE COURT:  So you indemnified Countrywide and perhaps

4   BANA against liabilities, yes?  Against obligations that arose

5   because of liabilities, true?

6           MS. JONES:  That's one of the things they indemnified

7   them for, yes.

8           THE COURT:  That's what was involved here, yes?

9           MS. JONES:  The indemnity agreements, as I understand

10   them, cover the potential liabilities, fees, expenses, things

11   like that.

12           THE COURT:  These weren't fees or expenses.

13           MS. JONES:  Just to be clear.  They do cover more than

14   that.  Mr. Wertz has testified how the indemnification

15   agreements operate in practice.

16           THE COURT:  I don't care how they operate in practice.

17   This is a legal question.

18           MS. JONES:  I don't believe it is, your Honor.

19           THE COURT:  Wait a minute.  If Countrywide has a

20   liability arising from violations of the sort we're dealing

21   with here allegedly, and Bank of America N.A. may also have a

22   successor in interest.  And a parent corporation that's not a

23   government insured corporation enters into an agreement to

24   indemnify against those liabilities.  And when it comes time

25   for payment, just to cut out the middleman, pays directly,

DA73BAN1

1    rather than indirectly, those payments.

2             Why in any way, shape or form, is it not premised on

3    the existence of the liability?

4             (Continued on next page)

DA7TBAN2

1          MS. JONES:  The government hasn't proven --

2          THE COURT:  This wasn't a gift, this wasn't Bank of

3     America Corporation saying we love the government, we love it

4     so much and we love Fannie Mae and Freddie Mac, they are so

5     sweet that we will give them a few billion dollars out of the

6     goodness of our heart.  It wasn't that at all, was it?

7          MS. JONES:  We will stipulate to that, your Honor.

8          THE COURT:  Thank you.  So it was a payment in

9     connection with the satisfaction of a liability.

10         MS. JONES:  Your Honor, the question of who had the

11    liability I believe is a disputed factual question.

12         THE COURT:  Why?

13         MS. JONES:  The government, to my knowledge, has not

14    proven that Countrywide Bank or BANA incurred these

15    liabilities.

16         THE COURT:  They were the actors, yes?

17         MS. JONES:  I don't know.

18         THE COURT:  When Countrywide -- forgive me, maybe I

19    missed something for the last two weeks.  I thought all the

20    misconduct of which the -- that the government is alleging and

21    which it narrowed its second amended complaint to embrace only

22    was activities at Countrywide before it was acquired by Bank of

23    America, is that not right?

24         MS. JONES:  That's right.

25         THE COURT:  So the only liability at that point has to

DA7TBAN2

1   be Countrywide's, right?

2   MS. JONES:  No, your Honor, there are two Countrywide

3   defendants and only one of them is a federally insured

4   financial institution.  Countrywide Home Loans, another

5   defendant here, is not a federally insured financial

6   institution.

7   THE COURT:  So let me ask the government -- that's a

8   point that's been raised before, let me ask the government what

9   is the evidence of record that the liabilities or the

10  misconduct in this case are attributable to the insured entity

11  Countrywide Bank?

12  MR. ARMAND:  Your Honor, I don't think it's been an

13  issue in dispute.

14  THE COURT:  I disagree with that.  It came up a few --

15  came up last week when there was a whole argument that your

16  adversaries flagged they were going to move at the Rule 50

17  stage because they didn't think you had made out your case as

18  to each and every one of the three corporate entities.  And

19  when we had discussion about it, it was this very issue that

20  came up.  So I do not agree at all that this is not been a

21  matter of dispute.

22  MR. ARMAND:  With regard to the affects evidence,

23  evidence of affects, that's not something that the government

24  has put on any evidence of yet because of the Court's

25  instruction that we should wait until there's a final ruling on

DA7TBAN2

1    the issue of affects.

2              THE COURT:  You're about to get that in about two

3    minutes.

4              MR. ARMAND:  With regard to the liability, there has

5    been evidence that Full Spectrum Lending was part of

6    Countrywide Bank and was the originator of the loans, and I

7    believe in the answer that the defendants put in to the

8    government's complaint that there was acknowledgment -- if we

9    could find this -- that Countrywide was the primary originator

10   of the loans.

11             THE COURT:  All right.  Well, if that's in the answer,

12   of course you may put that into evidence.  That's the

13   equivalent of a binding admission.

14             So what about that?  Is that in your answer?

15             MS. JONES:  I don't have that answer in front of me.

16   I point out this reaffirms this is a question of fact that

17   needs to be --

18             THE COURT:  No, not if you have admitted it in your

19   answer.

20             MS. JONES:  That doesn't necessarily mean that

21   Countrywide Home Loans was not also involved or that the

22   request for repurchase, who that went to and who incurred the

23   liability for the repurchase request is another question.

24             THE COURT:  Whether the non-insured entity escapes on

25   Rule 50 is a separate issue, the question is if there's -- if

DA7TBAN2

1    any of the -- if either of the two insured entities, Bank of

2    America, NA and Countrywide Bank, are affected because there

3    were liabilities that they incurred under this analysis that we

4    have been going down now, or potential liabilities they would

5    have incurred because of their alleged misconduct, then the

6    fact that another entity was also involved is neither here nor

7    there for the purposes of the present argument.  So unless

8    you're saying that this is a factual issue that only the other

9    entity, Countrywide Home Loans is that the one --

10           MS. JONES:  I don't want to misrepresent, I'm saying

11   this is a factual dispute, and I don't know for certain which

12   of these entities were the subject of repurchase request.  But

13   I think it's important to emphasize that we're arguing not only

14   to the fact of liability, the government has alleged here

15   significant liabilities to GSEs for purchased claims that they

16   paid directly or indirectly.  And I think it's important to

17   emphasize that neither BANA nor Countrywide Bank has suffered

18   any loss for paying a purchased claim.

19           THE COURT:  That's the argument I thought you were

20   making, and I do not find that persuasive if in fact they

21   incurred the liabilities.

22           MS. JONES:  Because the Court --

23           THE COURT:  The fact someone else decided to pay them

24   as part of the overall arrangements is neither here nor there.

25           MS. JONES:  I believe it is, your Honor, if there has

DA7TBAN2

1    been no impact on them, and the Second Circuit says there must

2    be at least some impact on the institution.

3         THE COURT:  I understand.  But here where I think we

4    come out -- we need to bring in the jury, but let me rule.  The

5    only fact issue that I think needs to be addressed is whether

6    any of the actual or potential liabilities of a kind alleged in

7    paragraph 141 of the second amended complaint was incurred or

8    to be incurred by one or both of the two federally insured

9    defendants as opposed to the non-federally insured defendant.

10   If that has been answered by the adversary's answer, then you

11   can put in the answer, that paragraph, and read it to the jury.

12   That is a binding admission that you can present without any

13   witness.  If it has not been answered by the answer, then you

14   need to put in something.  It may be something that the Court

15   can take judicial notice of, depending what the nature of the

16   proof of it is, or it may not.

17        All right.  Let's bring in the jury and let me give

18   back to defense counsel the sole existing copy of the second

19   amended complaint.

20        Now we have to deal with the limiting instruction, we

21   were just up to that point, I think.

22        MR. HEFTER:  I believe so.  We coordinated over the

23   weekend and we provided the specific areas where we would

24   request a limiting instruction to the government so we wouldn't

25   have to jump up, they would know when to stop.

DA7TBAN2                     Boland

1           THE COURT:  Very good.  So someone just give me a

2     heads up when that occurs.

3           (Continued on next page)

```
 1              (Jury present)
 2              THE COURT:  Good morning, ladies and gentlemen,
 3     welcome back.  I heard on the radio coming in that there was a
 4     tornado warning, so I am grateful you are here in this very
 5     safe, tornado-proof building.  However, the announcement then
 6     went on to say that he didn't believe the weatherman.
 7              So we, if you may recall, we were in the middle of
 8     playing the deposition of Mr. Boland, so we will continue.  And
 9     there will be various places you will recall where the evidence
10     will only be admitted against the banks not against the
11     individual defendant, and I will flag that as we go along.
12              (Video recording played.)
13     Q.  Did you recommend these two individuals be given Level 2
14     authority?
15     A.  I don't remember if I did or I didn't, but based on the
16     email I doubt that I did.
17     Q.  Did you ever see conditions being cleared improperly by
18     loan specialists?
19     A.  Yes, it was common for loan specialists to clear conditions
20     improperly.
21     Q.  Can you think of a specific examples?
22     A.  Yes, I can think of a specific example where a loan
23     specialist Sarah Haser -- our manager, Sarah Haser, conveyed to
24     me that they had a requirement to do -- to move one loan per
25     day per loan specialist to closing, and if they didn't hit that
```

DA7TBAN2                          Boland

1  goal, they couldn't leave for the night.  And I said you got to

2  be kidding, you can't go home until you move a loan to closing?

3  And the response was no, this is serious, we're going to be

4  here all night, I got to find a loan to move.  And my response

5  was well, what if you don't have the conditions?  And the

6  response was well, the loan is going to move.  We need that

7  loan to move if we're going to go home whether we have the

8  conditions or not.  So I escalated that situation.

9  Q.  Who did you escalate that to?

10 A.  Escalated that to Robert Price.

11 Q.  And what happened after you informed him?

12 A.  Well, in this -- there were multiple examples of where I

13 escalated examples of processors not using their sign off

14 authority correctly, but -- and most of them did not have quick

15 action, but this one did.  And this one resulted in Sarah

16 Haser, and there was another one with Jessica Isbel, who was a

17 manager at the same time in the Hustle.  And Jessica Isbel and

18 Sarah Haser both lost their authority within quick order, I

19 would say within a couple of days to a week.

20 Q.  Was that surprising to you?

21 A.  That was mind blowing to me.

22 Q.  Why is that?

23 A.  Because processing and the production side of NCA was no

24 longer working together with underwriting in a collaborative

25 effort to generate quality loans.  They had departed from that.

DA7TBAN2                         Boland

1      And so when they actually revoked someone's authority, it was

2      surprising to me that they would take action, because concerns

3      had been raised and there was no action.

4      Q.  At any point did any Countrywide employees raise concerns

5      to you regarding the Hustle?

6      A.  Did any Countrywide employees raise concerns?

7      Q.  Yes.

8      A.  Yes, I received concerns from the processing side.  I

9      received concerns from the underwriting side.  I received

10     concerns -- I don't think there was an area that I didn't

11     receive concerns from.

12     Q.  And on the underwriting side, were there any particular

13     aspects of the Hustle that you heard concerns about?

14     A.  So with regard to Hustle, it was processors clearing

15     conditions that they were not qualified to clear.  And we spoke

16     about stated doc reasonability.  We could also talk about

17     clearing pay-off letters when the pay-off letter was not in the

18     file, which could lead to a cash out or non-cash out

19     transaction being sold to Fannie or Freddie because you don't

20     know the true pay off, the borrower could be getting cash, the

21     title impediments not being reviewed or cleared properly,

22     vesting on title not being addressed or red flags.

23     Q.  Mr. Boland, if you take a look at what has been marked as

24     Boland Exhibit 7, which is also Bates stamped BANA SDNY E

25     001390421.

DA7TBAN2                         Boland

1   A.  OK, I read the document.

2   Q.  Mr. Boland, is Exhibit 7 an email exchange between you and

3   Neal Ballance from December 20, 2007?

4   A.  Yes, ma'am.

5   Q.  Do you recall this email exchange?

6   A.  I do.

7           MS. SCHOENBERGER:  Your Honor, the United States would

8   offer into evidence Plaintiff's Exhibit 444, which is Exhibit 7

9   from this deposition.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 444 received in evidence)

12          MS. SCHOENBERGER:  We have copies to distribute to the

13   jury.  Could we hand that up?

14          THE COURT:  OK.

15          MS. SCHOENBERGER:  Your Honor, could the copies be

16   published to the jury?

17          THE COURT:  Yes.  You have copies for the jury?  Hand

18   them out.

19   Q.  What's Mr. Ballance conveying to you?

20   A.  He is crystallizing the complaint that I heard verbally

21   many times, and that is a concern over the distribution of

22   signing authority to people who were unqualified to do that,

23   meaning distribution of signing authority to loan specialist.

24   Q.  How did you respond to the concern that Mr. Ballance raises

25   in this email?

DA7TBAN2                    Boland

1    A.  Well, I escalated it to my supervisor, Robert Price.

2    Q.  Mr. Boland, besides Mr. Ballance and Mr. Chiotti, did you

3    receive complaints or concerns about the Hustle from anyone

4    else within underwriting?

5             MR. COHEN:  Your Honor, we're seeking a limiting

6    instruction.

7             THE COURT:  Sorry, I thought the government was going

8    to flag those for me.

9             Yes, so this answer will be received only as to the

10   banks.

11            MR. COHEN:  Thank you, your Honor.

12   A.  Yes, I did.

13   Q.  From whom?

14   A.  Danny Briones.

15   Q.  Who is Danny Briones?

16   A.  An underwriting manager.

17   Q.  Any other individuals that raised concerns about the Hustle

18   to you?

19   A.  Lorenzo Williamson.

20   Q.  And who is Lorenzo Williamson?

21   A.  He was a peer of Danny Briones.

22   Q.  Also within underwriting?

23   A.  Yes, ma'am.

24   Q.  And what were the nature of his concerns?

25   A.  The same, similar in nature to the ones --

DA7TBAN2                         Boland

1    Q.   Any other individuals raised concerns to you about the

2    Hustle?

3    A.   Charles Caprio, Michael Cubbin.  It was fairly widespread.

4    It was widespread concern on the underwriting side.

5    Q.   What was your response to the concerns that were brought to

6    you?

7    A.   I would escalate them through my chain of command via email

8    or through -- or verbally.

9    Q.   What was that?

10   A.   Either verbally or through email.

11   Q.   OK.  And did you raise any of your concerns to Cheri Shine?

12   A.   I did, and I raised concerns to Cheri Shine's subordinates

13   as well.

14   Q.   And were any of the concerns that you heard raised to

15   Rebecca Mairone?

16   A.   Yes.  We were afforded an opportunity to meet with the

17   catalyst of the Hustle, who is Rebecca Mairone.

18   Q.   What was discussed at the meeting?

19   A.   The purpose of the meeting was for Rebecca to clarify the

20   strategy and the vision of the Hustle because the execution

21   appeared to be different than its original intent, and the

22   outcome of the initially intended process was something

23   different, and we wanted to -- the underwriting team wanted to

24   get her response and reaction to.

25   Q.   Why did you believe Rebecca Mairone to be the catalyst of

1   the Hustle?

2   A.   She was frequently the advocate in email, the advocate in

3   meetings, the advocate in town hall settings.  So in a variety

4   of different communication channels Rebecca Mairone appeared to

5   be the leader in charge of what was happening at the time.  And

6   it appeared to us in the underwriting department she would be

7   the best one able to explain what we had been -- why what we

8   had been raising were not being addressed and why we were

9   acting inconsistently with what we thought were responsible

10  lending principals.

11  Q.   Did anyone raise specific concerns to Ms. Mairone at this

12  meeting?

13          MS. SCHOENBERGER:  Your Honor, the Mairone --

14          THE COURT:  Yes, the answer is received only as to the

15  bank defendants.

16  A.   Yes, there were there was some very specific concerns.

17  Neal Ballance was particularly outspoken, and he wasn't the --

18  I recall he wasn't the first person to speak, but I believe he

19  was the last person to speak.

20  Q.   And were any changes implemented following that meeting?

21  A.   Not to my recollection, no.

22  Q.   And did you receive any further response from Ms. Mairone

23  to any of the concerns that were raised at that meeting?

24  A.   I don't recall any response.

25  Q.   Did you receive any responses from anyone else in

1    management above you based on the concerns raised at that

2    meeting?

3    A.   I don't recall a response.

4         I would like to clarify my answer.

5    Q.   To which question?

6    A.   To did I receive a response.

7         MS. SCHOENBERGER:   And the instruction here, your

8    Honor?

9         THE COURT:   Again the same limiting instruction,

10   ladies and gentlemen.

11   A.   The response -- and the response, it came from my

12   leadership chain, it was either Robert Price or Ed O'Donnell,

13   and it was something to the effect of:   You're in control of

14   certain things, control those things with the best quality and

15   ability that you can.   But you're not in control of everything,

16   and so don't let the decisions of others, you know,

17   influence -- don't let that sway you.   There will people with

18   different opinions.   And further illuminated my mind how

19   different our vision was in what we had previously done and the

20   new world we were living in.

21   Q.   While the Hustle was in place, did you observe a decline in

22   quality of loans?

23   A.   I did.

24   Q.   And how did you make that observation?

25   A.   Through physical inspection of the files that came through

1    our department and initially through quality control reports.

2    Q.  What were quality control reports?

3    A.  So we had a monthly routine to review defects, and it was a

4    healthy routine.  Nobody enjoyed it, but we looked at all of

5    our defects.  And there could be multiple people involved on

6    the loan, so it didn't matter whether the loan officer made a

7    mistake, the LS made a mistaken or the underwriter made a

8    mistake, it was the underwriter's job, along with quality, to

9    look at the error and try to understand it and prevent it from

10   happening again.  And correct it if it could be corrected.

11   Some mistakes can't be corrected.

12   Q.  And who produced these reports?

13   A.  So we had a QC department.  It was managed by Javier

14   Jaraba, Steve Brent, Don Harris.  There were several people in

15   the QC department.

16   Q.  And did you receive these reports monthly?

17   A.  Yes.

18   Q.  At what period of time did you receive monthly quality

19   reports?

20   A.  From the time I became a manager at Countrywide until about

21   the time in question here I received a quality report ongoing

22   every month.

23   Q.  And so at point did you stop receiving monthly reports?

24   A.  I did stop receiving quality control reports at some point

25   in 2007, I would ballpark it as over the summer.

1   Q.  So other than your reviews of individual loan files, did

2   you have any other way to assess loan quality after you stopped

3   receiving quality control reports?

4   A.  Besides my personal inspection, the only other way I had

5   was the word of others that reported to me, and it would alert

6   me to that -- to their personal findings as well.  Other than

7   that, there was no official way to know what the quality was.

8   Q.  What is your understanding of who was purchasing

9   Countrywide's loans that came through the Hustle process?

10  A.  Primarily we sold our loans to Fannie Mae.  I know we sold

11  some to Freddie Mac, but the wide understanding was that they

12  were going to the GSEs.

13  Q.  My name is Steve Cady.  I represent the Bank of America

14  defendants, and I will be asking you some questions this

15  afternoon.

16          So at some point in early 2008 did you switch roles

17  from first VP of underwriting --

18  A.  Yes.

19  Q.  -- focused on NCA loans to FHA loans, is that right?

20  A.  That's right.

21  Q.  What is your next transition at the company?

22  A.  October 1st of 2012.

23  Q.  And what is your transition at that point?

24  A.  I was terminated from the bank.

25  Q.  Why were you terminated?

DA7TBAN2                    Boland

```
 1   A.  An underwriter in one of my other locations -- so I became

 2   in charge of another location in Las Colinas, still in the

 3   Dallas metro area -- shared his password, or I'm sorry, his

 4   manager shared her password with him, and he operated for a

 5   period of about a week under her password.

 6   Q.  What was the name of that manager?

 7   A.  Deanne Knox.

 8   Q.  Do I understand you correctly that Deanne Knox shared her

 9   password?

10   A.  John Fitzgerald.

11         THE COURT:  Counsel, I don't wish to interrupt.  I

12   just received an email from a judge who has a matter that I

13   need to help him with for two seconds.  So with apologies,

14   everyone just wait here, I'm just going to go deal with that.

15         (Pause)

16         THE COURT:  All right.  Next problem.  Go ahead.

17   Q.  Who also was employed in your group, correct?

18   A.  Correct.

19   Q.  Approximately when was this?

20   A.  Over the summer of 2012.

21   Q.  How did it come about that you were terminated for this?

22   A.  This was seen as happening on my watch.  I was the manager.

23   There were other people who were let go in my chain of command,

24   and while didn't agree with the decision, I was terminated.

25   Q.  I think you said this was October 1st, 2012, is that
```

1676

1   correct?

2   A.  That's correct.

3   Q.  Six, seven or so months ago, is that right?

4   A.  That's right.

5   Q.  What was your next transition?

6   A.  Job-wise was to Fannie Mae.

7   Q.  What date did you apply for a job at Fannie Mae?

8   A.  Apply.  I don't recall what day I applied.

9   Q.  Did you apply with Fannie Mae before or after you were

10  terminated from Bank of America?

11  A.  After I was terminated.

12  Q.  How quickly after?

13  A.  Very quickly after.

14  Q.  Sir, were you involved in the roll out of the High-Speed

15  Swim Lane?

16  A.  No.

17  Q.  Were you involved in the design of the High-Speed Swim

18  Lane?

19  A.  No.  I was made aware because documents were shared with

20  me, but I was not an architect or involved in -- I was not

21  allowed to influence the process.

22  Q.  Were you involved in processing loans that passed through

23  the High-Speed Swim Lane?

24  A.  No.

25  Q.  Let's mark the next exhibit.  We'll call it Defendant's 1.

DA7TBAN2                              Boland

1              MS. SCHOENBERGER:  Your Honor, I believe the

2      defendants would like to introduce an exhibit.

3              MR. JONES:  Yes, your Honor, we would like to offer

4      Plaintiff's Exhibit 37.

5              THE COURT:  Plaintiff's Exhibit 37?

6              MR. JONES:  Yes, your Honor.

7              THE COURT:  Received.

8              (Plaintiff's Exhibit 37 received in evidence)

9              MR. JONES:  If we could publish that to the jury.

10             THE COURT:  Yes.

11             MR. JONES:  Show a portion of page 2, Alex.

12     Q.  Mr. Boland, the court reporter is handing you what's been

13     marked as Defendant's Exhibit 1.  This is an email dated

14     August 8, 2007 at the top.  It's from you to handful of folks

15     with the Bates number BANA SDNY E 00007275.  Give you a moment

16     to look at that.

17             Mr. Boland, I would like to focus your attention to

18     the top of page 2 of this document.  It's a multipage email

19     chain.  Top of page 2 contains an email from rolls from the

20     bottom of page 1.  It's from Ed O'Donnell to Anson Gong, Mart

21     Barnett, Loren Rodriguez, Robert Price, you, dated August 8,

22     2007.  In this email Mr. O'Donnell suggests, quote, in addition

23     to the three underwriters involved below, please add Patrick

24     Pigeon, Debra DeGarmo and John Boland to the kick off

25     invitation.  Do you see that, sir?

1   A.   I do.

2   Q.   Were you in fact added to the kick off invitation for the

3   High-Speed Swim Lane?

4   A.   I apparently was.   I don't recall being -- I don't know if

5   I was or wasn't, but I do recall the meeting that I described

6   earlier in the cafeteria.

7   Q.   This was a meeting dated -- or about when could you place

8   that meeting?

9   A.   The cafeteria meeting?

10  Q.   Yes, sir.

11  A.   Roughly in the summer of 2007.

12  Q.   Do you recall who spoke at that meeting?

13  A.   The senior leadership spoke, so I believe it was Rebecca

14  and Cheri Shine.

15  Q.   Do you recall if at that meeting they explained to the

16  group the High-Speed Swim Lane process?

17  A.   I don't recall, but I assume that kick off meeting where

18  materials were presented there were some details of the plan

19  divulged to the group.

20  Q.   Do you recall -- strike that.

21        Did you have a favorable impression of the High-Speed

22  Swim Lane after that meeting?

23  A.   I can't recall if that meeting changed my opinion of the

24  High-Speed Swim Lane, but I testified that initially the

25  concept of a High-Speed Swim Lane seemed positive.

DA7TBAN2                    Boland

1    Q.  Your team wasn't involved, is that correct?

2    A.  What's that?

3    Q.  Your team wasn't involved, is that correct?

4    A.  Wasn't involved?

5    Q.  In processing loans through the High-Speed Swim Lane.

6    A.  Correct.  We weren't involved in the processing, but we

7    were involved in the underwriting.

8    Q.  Explain to me how your team became involved in loans that

9    were processed through the High-Speed Swim Lane process.

10   A.  We were never involved in processing the loans, so our role

11   in -- our involvement regarded underwriting the loans.

12   Q.  These are loans that were processed through the High-Speed

13   Swim Lane process but were referred out for underwriting, is

14   that correct, sir?

15   A.  That's correct.

16   Q.  And your group would be one of the groups that would handle

17   the underwriting of those loans?

18   A.  That's right.

19   Q.  Were there other such groups that handled loans that were

20   referred out from the processors to underwriters?

21   A.  I believe it was Chandler and Richardson.

22   Q.  And your group handled the High-Speed Swim Lane loans that

23   referred from the Richardson swim lane team to underwriters?

24   A.  That's the way I recall the process.  There was load

25   balancing and work sharing at various times in my tenure there,

DA7TBAN2                         Boland

1   but that was the main construct.

2   Q.  Do you have a sense of what percent of the loans that went

3   through the High-Speed Swim Lane were referred out to your

4   group for underwriting?

5   A.  Not this far after, I don't recall the percent.

6   Q.  Do you remember Lacrecia Whirl and Justin Trainor?

7   A.  I do.

8   Q.  Do you remember them as being sophisticated loan

9   specialists?

10  A.  They were capable.

11  Q.  Is it true that you endorsed them in their capacity as

12  specialists for High-Speed Swim Lane loans?

13  A.  I don't recall, but this document appears to indicate that

14  I did.

15  Q.  What was your understanding of what the endorsement meant

16  that Lacrecia Whirl and Justin Trainor would be able to do in

17  connection with their job of processing loans through the

18  High-Speed Swim Lane?

19  A.  They would use prudent, careful judgment in clearing

20  conditions.

21  Q.  Mr. Boland, does that mean they would have certain low

22  level underwriting authority?

23  A.  Correct.

24  Q.  In fact, you endorsed these two for low level underwriting

25  authority, is that correct, sir?

DA7TBAN2                    Boland

1    A.  It appears from this email that I did.  I don't recall

2    writing the email, but I don't question its authenticity

3    either.

4    Q.  And you would have done that because you thought it was

5    appropriate at the time?

6    A.  Oh, correct.  I wasn't under undue pressure to write that.

7    Q.  Were you ever involved in rebutting SUS finance from

8    corporate quality control?

9    A.  Yes.

10   Q.  What time period was that?

11   A.  I was involved -- that was a normal process of our monthly

12   routine to rebut severely unsat SUS, as you referred to them,

13   findings.  And that was ongoing.

14   Q.  Let's shift gears and talk about QA.  Did you testify about

15   quality assurance earlier this morning?

16   A.  I don't believe so.

17   Q.  Did Full Spectrum Lending have a quality assurance process?

18   A.  I'm unsure.

19   Q.  Does FHA require a certain type of underwriter be involved

20   in the origination of loans to be sold to FHA?

21   A.  Yes, a DE underwriter.

22   Q.  What does DE stand for?

23   A.  Delegated -- what it, direct endorsement.

24   Q.  What's your understanding of what a direct endorsement

25   underwriter is?

DA7TBAN2                     Boland

1    A.  A direct endorsement underwriter is someone who has

2    completed test cases on an FHA transaction, FHA loan, and

3    passed the test cases creating evidence that they're capable of

4    performing the role of a DA underwriter.

5    Q.  Are you a DE underwriter, sir?

6    A.  Yes, I am.

7    Q.  Is there a similar requirement for loans sold to the GSEs

8    that any certain type of underwriter be involved in the

9    origination of GSE loans?

10   A.  No, not to my knowledge.

11   Q.  Mr. Boland, you testified this morning that you didn't know

12   at first that loan processors would sign off on stated income

13   loans in connection with certain loans at Full Spectrum Lending

14   at some point in time, is that correct?

15   A.  That's correct.

16   Q.  What loans were you talking about in connection with that

17   testimony?

18   A.  Loans during the time period.

19   Q.  What time period is that, sir?

20   A.  2007 through early 2008.

21   Q.  Were you referring to certain types of loans or just

22   generally loans during 2007 through 2008?

23   A.  Generally loans in that period.

24   Q.  When you found that loan processors were earning low level

25   underwriting authority that would allow them to sign off on

DA7TBAN2                     Boland

1    stated income loans, what did you do, sir?

2    A.  I don't believe I did anything.

3    Q.  Sir, do you know whether certain loan processors at Full

4    Spectrum Lending between 2007 and 2009 had underwriting

5    background?

6    A.  Do I know if they had background?

7    Q.  Yes, sir.  Whether there were certain of the loan

8    specialists that did have underwriting background.

9    A.  Yes.

10   Q.  Do you have a sense of what portion of the loan specialists

11   between 2007 and 2009 at Full Spectrum Lending had an

12   underwriting background?

13   A.  I do not know the portion.  I know that there were people

14   transferred from the underwriting team into the processing team

15   at one point.

16   Q.  Did you lose underwriters from your group that transferred

17   to become processors?

18   A.  Yes.

19   Q.  Did you have an understanding of what those loan

20   specialists would be doing as loan specialists, the loan

21   specialists who used to be your underwriters?

22   A.  I assumed would they would be doing the same thing that

23   most loan specialists did, that was gather documentation for

24   loans.

25   Q.  And you testified that there is this window somewhere in

DA7TBAN2                          Boland

1    2007 and 2008 where the incentives for loan specialists had

2    changed, is that right?

3    A.   That's right.

4    Q.   And it's during this window that you felt you didn't get

5    the right answer as frequently, is that correct, sir?

6    A.   That's correct.

7    Q.   What would you do when you didn't get the right answer

8    during that window?

9    A.   So I feel like I'm repeating the same question, so forgive

10   me if this answer sounds repetitive, but we would work with the

11   front line associate, whomever noticed it would bring it up to

12   the person who cleared it.  If that wasn't reciprocated or

13   responded to in the manner expected, it would be escalated

14   through management.

15   Q.   Who did you escalate these to in management?

16   A.   Robert Price.

17   Q.   How did you make these escalations?

18   A.   Verbally in and in email.

19   Q.   When did you so verbally, was that typically on the phone

20   or would you walk over to his office?

21   A.   We sat about 50 feet apart, so it was typically in person.

22   Q.   Did you ever discuss these types of situations with Ed

23   O'Donnell?

24   A.   Yes.

25   Q.   What was Mr. Price's reaction when you discussed these

DA7TBAN2                    Boland

1   situations with Mr. Price?

2   A.   When I discussed situations with Ed, Robert was present.

3   Q.   Was what Mr. Price's reaction when you discuss these

4   situations?

5   A.   Mr. Price didn't offer a reaction because he was already

6   aware of the situation, so when I was speaking with Ed he

7   didn't -- there was no need for Robert to react.

8   Q.   What was Mr. O'Donnell's reaction when you brought these

9   types of situations to his attention?

10  A.   He was concerned, and he wanted to validate what I was

11  telling him was accurate and wanted to see how widespread or

12  frequent or how often my concern was.

13  Q.   Do you know whether Mr. O'Donnell followed up on these

14  concerns?

15  A.   I don't know for sure.

16  Q.   Were you ever asked to defraud the GSE?

17  A.   Specifically, no.

18  Q.   Mr. Boland, my name is Bill Harrington and I represent

19  Countrywide defendants.  I'm going to be asking you some

20  questions.

21  A.   OK.

22  Q.   First, I want to ask you about your testimony that you

23  understood there was a rule that loan specialists had to,

24  quote -- employee had to clear a loan per day in order to go

25  home.  Do you recall that testimony?

DA7TBAN2                          Boland

1    A.  I do recall that testimony.

2    Q.  Did you ever work for a group that had such a rule in

3    place?

4    A.  No.

5    Q.  So is your understanding of that rule based entirely on

6    what others have told you?

7    A.  Yes.

8    Q.  Who told you that such a rule existed?

9    A.  Sarah Haser.

10   Q.  And when did Sarah Haser tell you about such a rule?

11   A.  In 2007 to 2008.

12   Q.  Anyone else besides Sarah Haser?

13   A.  That's a name that I remember specifically, but it was

14   widely communicated and understood that that was a policy in

15   the NCA.  So it was communicated to me by other people, but I

16   don't recall a name.

17   Q.  So it's your view that this was widely understood, is that

18   correct?

19   A.  Yes.

20   Q.  But you can't think of a single person other than Sarah

21   Haser who told you about it, is that correct?

22   A.  That's correct.

23   Q.  Earlier you testified that you had no knowledge as to

24   whether Rebecca was -- Ms. Mairone was on the production or the

25   quality side of the business, correct?

DA7TBAN2                       Boland

1   A.  That's correct.

2   Q.  Do you know who Lloyd Sargeant is?

3   A.  I do.

4   Q.  Does hearing his name refresh your recollection that Lloyd

5   Sargeant was the executive in charge of production?

6   A.  It does.

7   Q.  I would like to turn to the March 2008 meeting in

8   Richardson, Texas.  You mentioned earlier that Mr. Ballance

9   raised a question, correct?

10  A.  Correct.

11  Q.  And did you ask any questions at that meeting?

12  A.  I'm sure I spoke up, but I don't recall what I asked.

13  Q.  Mr. Boland, did you testify earlier that Neal Ballance

14  raised concerns to you in the 2007/2008 period?

15          MS. SCHOENBERGER:  Your Honor, could we have the

16  limiting instruction?

17          THE COURT:  Yes, this will be received only as to the

18  banks, not to Ms. Mairone.

19  A.  I did.

20  Q.  And did you have any reasons to believe his complaints were

21  related to the Hustle process?

22  A.  I did.

23  Q.  What was the basis of that belief?

24  A.  They were during that time frame.

25  Q.  Anything else?

1   A.   That was it.

2   Q.   Did he complain to you specifically about any aspects of

3   the Hustle process?

4   A.   Not that I recall.

5   Q.   Did you testify earlier that Ryan Chiotti raised concerns

6   to you about the Hustle process in the 2007/2008 time period?

7   A.   I did.

8   Q.   Did you have a basis to believe that his concerns were

9   related to the Hustle process?

10  A.   I did.

11  Q.   What was the basis of your belief?

12  A.   Based on the fact they happened during that time frame.

13  Q.   And why did that make you think that it was -- their

14  concerns were related to the Hustle process?

15  A.   Because the preponderance of loans that we were doing at

16  that time and the scenarios we were talking about, such as

17  stated doc reasonability and having a loan specialist sign off

18  on those loans was happening during that time frame.

19  Q.   And that was related to the Hustle process?

20  A.   Yes, ma'am.

21  Q.   And did you also testify earlier that Michael Cubbin raised

22  concerns to you regarding the Hustle process?

23  A.   He did.

24  Q.   And what was the basis of your belief that his concerns

25  were related to the Hustle process?

DA7TBAN2                      Boland

1    A.  It was that time frame.

2    Q.  And did -- were his concerns specific to aspects of the

3    Hustle process?

4    A.  It was related to changing attitudes around quality.  And

5    it wasn't anything specific to the Hustle, but it was during at

6    that time frame.  I mean it was specific to the Hustle in terms

7    of that during the Hustle is when the HSSs signed off on those

8    conditions.

9    Q.  That's what led you to believe that his concerns were

10   related to Hustle process?

11   A.  Correct.

12   Q.  Did Lorenzo Williamson raise concerns to you regarding the

13   Hustle process?

14   A.  He did.  And my answers would be the same.  There's nothing

15   specific, but it was around that time frame.

16   Q.  So just to make our record clear, what was your basis for

17   believing that Mr. Williamson's complaints were related to the

18   Hustle process?

19   A.  Because they were during that time frame.

20   Q.  And were his complaints related to specific aspects of the

21   Hustle process?

22   A.  Loan specialists, clearing conditions, and the changing

23   attitude of the people clearing conditions to be more focused

24   on production and quality.

25   Q.  And were those issues related to the Hustle process?

1690

DA7TBAN2                          Boland

1    A.  Those were results -- those were results of the Hustle

2    process being implemented.

3    Q.  Did Todd Green raise any concerns to you regarding the

4    Hustle process?

5    A.  Yes, he did.

6    Q.  What was the basis of your belief that his concerns were

7    related to the Hustle process?

8    A.  It was during that time frame related to HSS or LS

9    processor sign off of conditions, and changing attitudes among

10   the staff which related to the quality and production.

11   Q.  Did Brian Dillon raise concerns to you regarding the Hustle

12   process?

13   A.  He did, Brian Dylan raised concerns as well.

14   Q.  And what were his concerns?

15   A.  That he was being asked to participate in -- from the

16   processing side.  Brian Dillon is on the processing side.

17   Brian Dillon was not a direct report of mine during the Hustle

18   period.

19   Q.  Why would he have raised concerns to you?

20   A.  We had an open relationship and he felt comfortable talking

21   to me about it.

22   Q.  Did other people raise concerns to you regarding the Hustle

23   process?

24   A.  Yes.

25   Q.  Approximately how many different people raised concerns to

1    you regard the Hustle process?

2    A.  Difficult to estimate, but it's more than two.

3    Q.  More than two beyond those that you just identified?

4    A.  Correct.

5    Q.  Would it be more than ten?

6    A.  It would not be more than ten that raised issues

7    specifically to me.

8    Q.  Has the fact that you were terminated from Bank of America

9    affected the truthfulness of your testimony today?

10   A.  Absolutely not.

11   Q.  In your current position do you report to Ed O'Donnell?

12   A.  I do not.

13   Q.  What does it mean for a loan to be investment quality?

14   A.  Investment quality means that the loan can be securitized

15   in the secondary market, and the lender is representing and

16   warranting, rep and warranting, that the loan has followed the

17   guideline of the entity that's buying it, typically Fannie Mae

18   or Freddie Mac.  So if you followed the policies in the selling

19   guide and you sell a loan to Fannie Mae, you are rep and

20   warranting that you followed their guidelines.

21          MS. SCHOENBERGER:  Your Honor, that's the conclusion

22   of Mr. Boland's testimony.

23          THE COURT:  All right.  My understanding is the

24   government has another videotaped deposition they wish to play?

25          MR. ARMAND:  No, your Honor, we're going to call Lars

DA7TBAN2

1    Hansen.  We do have another video to play afterwards.

2              THE COURT:  Pardon?

3              MR. ARMAND:  We do have an additional video that we're

4    going to play, but we're going to call Lars Hansen first.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA73BAN3

1        THE DEPUTY CLERK:  Please take the witness stand.

2   Remain standing, raise your right hand.

3        (Witness sworn)

4        THE DEPUTY CLERK:  Please be seated.  State your name

5   and spell your last name slowly.

6        THE WITNESS:  Yes.  My name is Erik Lars Hansen,

7   H-A-N-S-E-N.

8    ERIK LARS HANSEN,

9        called as a witness by the Plaintiff,

10       having been duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MR. ARMAND:

13  Q.  Good morning, Mr. Hansen.

14  A.  Good morning.

15       THE COURT:  Mr. Hansen, get a little closer to the

16  microphone.

17       THE WITNESS:  Sorry.

18  Q.  Are you currently employed?

19  A.  Yes, I am.

20  Q.  Who is your employer?

21  A.  The Inspector General for the Federal Housing Finance

22  Agency.

23  Q.  What is the -- could you give me the acronym?

24  A.  It is FHFA OIG.

25  Q.  What is the FHFA?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  FHFA is the regulator for Fannie Mae and Freddie Mac and

2  the 12 federal home loan banks.

3  Q.  What is the OIG or Office of Inspector General?

4  A.  The OIG is an oversight group on top of FHFA.  We review

5  their programs for efficiency and effectiveness, and also

6  prevent any -- we also try to prevent and prosecute any fraud,

7  waste and abuse within their programs, including those at

8  Fannie Mae, Freddie Mac, and the 12 federal loan banks.

9  Q.  The FHFA regulates Fannie and Freddie, is that right?

10 A.  That's correct.

11 Q.  What is the OIG's role with regard to the FHFA and Fannie

12 and Freddie?

13 A.  As I said, we oversee FHFA's programs for effectiveness and

14 efficiency, and again we try to prevent and prosecute any

15 fraud, waste and abuse within such programs, extending down to

16 the GSEs which are Fannie Mae, Freddie Mac, and the federal

17 home loan banks.

18 Q.  What is your position at the FHFA OIG?

19 A.  I'm a senior IT auditor.

20 Q.  What are your duties and responsibilities?

21 A.  On top of my IT audit work, I also was hired to help

22 implement the audit software, both Teammate, which is what we

23 document all of our work and help set up our data analytics

24 function within the office of audits.

25         MR. SMURZYNSKI:  Objection.  Move to strike, your

DA73BAN3                    Hansen - direct

1    Honor.

2              THE COURT:  Ground?

3              MR. SMURZYNSKI:  Relevance, your Honor.  Beyond the

4    scope of the question.

5              THE COURT:  Overruled.

6    Q.  How long have you worked at the FHFA OIG?

7    A.  A little over two years.  I started in July, 2011.

8    Q.  What is your educational background?

9    A.  I have a master's from Georgetown University in technology

10   management, and a bachelor's from University of Buffalo in

11   financial analysis within their business administration.

12   Q.  How many years of experience do you have in information

13   technology?

14   A.  Roughly 10 years.

15   Q.  Have you done any work on this case?

16   A.  Yes, I have.

17   Q.  What generally have you done in this case?

18   A.  The DoJ or the Southern District of New York has provided

19   me data, and I've helped analyze it and present reports for

20   them.

21   Q.  So did you receive any files containing individual loan

22   data?

23   A.  Yes, I did.  I received a file dated April 12, 2013, "loan

24   data confidential" was the file name.

25   Q.  Do you have an understanding of where that loan file came

DA73BAN3                           Hansen - direct

1    from?

2    A.   Yes.   I was provided an e-mail from counsel that stated it

3    was from Bank of America.

4    Q.   Can you explain what type of file was it, what type of

5    program?

6    A.   It was a Microsoft Excel file that contained mortgage loan

7    information, regarding loans, according to my understanding,

8    loans that were to sold either to Fannie Mae or Freddie Mac

9    through a period of 2006 through 2009.

10   Q.   Going forward, is it okay if I refer to this as the bank

11   database?

12   A.   That's correct, yes.

13   Q.   Do you have experience working with Excel?

14   A.   Extensive experience.

15   Q.   Do you know how many loans approximately were on this file?

16   A.   Around 248,000.

17   Q.   Do you have a general understanding of the time frame from

18   which the loans that were in this file were from?

19   A.   Yes.   So I used one of the fields, funding gate, and it

20   started in January 2006 and ended I believe January 6, 2010.

21   So roughly 2006 through 2009.

22          MR. ARMAND:   I'm waiting for my binders.   May I

23   approach?

24          THE COURT:   Yes.   So everyone has one but me.   I feel

25   very neglected.

DA73BAN3                        Hansen - direct

 1              MR. ARMAND:  How could I have forgotten.

 2   Q.  Mr. Hansen, could you please turn to tab 308 of the binder.

 3   A.  Yes.

 4   Q.  I'm show you what's been marked as Plaintiff's Exhibit 308.

 5   Do you see it?

 6   A.  Yes.

 7   Q.  Do you recognize Plaintiff's Exhibit 308?

 8   A.  Yes.

 9   Q.  What do you recognize it as?

10   A.  This is a subset of the original data file provided to me,

11   just the first 25 loans of that file dated April 12, 2013.

12   Just to give the example of the fields that were in here.

13   Q.  Is this an excerpt of the 250,000 loan database?

14   A.  Correct.

15   Q.  Who prepared this excerpt?

16   A.  I did.

17              MR. ARMAND:  The government offers Plaintiff's Exhibit

18   308.

19              MR. SMURZYNSKI:  No objection.

20              MR. HEFTER:  No objection.

21              THE COURT:  Received.

22              (Defendant's Exhibit 308 received in evidence)

23              MR. ARMAND:  The government would also offer the

24   entire database in evidence, although it is too large to print

25   out.

DA73BAN3                    Hansen – direct

1          THE COURT:  Any objection?

2          MR. SMURZYNSKI:  No objection.

3          MR. HEFTER:  No objection.

4          THE COURT:  Received.

5   Q.  Mr. Hansen, were you provided with any criteria to identify

6   Hustle loans in the bank database?

7   A.  Yes, I was.

8   Q.  What criteria were you provided -- let me start one at a

9   time.

10  A.  Yes.  So the first criteria I was provided was any loan

11  that had an application date of August 13, 2007 or later.  And

12  if I may, in your binders here, if you turn to page three, you

13  would see the application date.  And then --

14         MR. ARMAND:  Ms. Michaud, if you can look at page

15  three, and if you can blow up the top.

16  A.  The fourth column over.  So this was the first field I

17  used.  The second bit of criteria was having funded by May 21,

18  2008.  Any loan with an application date after August 13, 2007,

19  until funding date of May 21, 2008, filled our date criteria.

20  Q.  Where is the funding date located?

21  A.  Two more columns over from the application date.  And all

22  these fields the bank provided a glossary of terms for all

23  these fields, which was included in the spreadsheet.

24  Q.  Were there any other criteria that you were provided?

25  A.  Yes.  So if you go back -- sorry to make you flip through

DA73BAN3                         Hansen - direct

1    this.  Back on the first page.  This isn't the original layout

2    provided, that's why we are going back and forth.

3             Any branch it had to be processed or funded through

4    five branches.  Chandler, Plano, Hatboro, Richardson, and

5    Rosemead.

6    Q.  How were you able to identify those branches in the

7    database?

8    A.  There was two ways.  One you can see the branch name, so

9    you see here on the right-hand side of page one and actually

10   continues on to page two, you see the funding branch and

11   processing branch.  In addition the bank also provided an

12   e-mail with branch codes and names, so we can use the funding

13   branch numbers themselves.

14   Q.  If I can stop for a moment.  If we can go back to page one

15   of the Plaintiff's Exhibit 308.  If you can blow up the column

16   on the far right.

17            Is this one of the columns you used?

18   A.  Yes, it is.

19   Q.  Were there any other criteria that you used to identify

20   Hustle loans?

21   A.  Yes.  There was one more bit, and that was the final AUS

22   decision.  As long as it wasn't an error or refer, which was

23   the code that it would have received, then we accepted it.

24            MR. ARMAND:  If we can just go to the third page and

25   if we can blow up the third to last column on the right.

DA73BAN3                              Hansen - direct

1   A.   The fourth to last column.

2   Q.   Thank you.  Is that the data field you were talking about?

3   A.   Yes, it is.

4   Q.   You said this was AUS.  What does that stand for?

5   A.   Automatic underwriting system.

6   Q.   So once you were provided with this criteria and you looked

7   at the fields, what did you do next?

8   A.   I loaded all this data into a secure Access database.  I

9   performed some reliability assessments on the data so I was

10  comfortable with it.  Then I wrote a number of queries to

11  filter out these loans.  I wrote three different queries in

12  Access and also used the Excel file and put in the criteria to

13  come up with the Hustle loans.

14  Q.   How many Hustle loans did you ultimately identify using

15  this process?

16  A.   28,882.

17  Q.   Is there any field in the bank database indicating income

18  earned from the sale with each loan?

19  A.   Yes.  There actually was a field called "income earned from

20  sale," according to the definition of terms provided in the

21  spreadsheet.  It said this field was coming from the finance

22  department.

23  Q.   If we can go to page eight of Plaintiff's Exhibit 308.  If

24  you could blow up the seventh over from the right side.

25          Is that the field that you were speaking of?

DA73BAN3                        Hansen - direct

1    A.  Yes, it was.

2    Q.  Were you able to sum the total amount of income earned from

3    the sale that was for the Hustle population that you

4    identified?

5    A.  Yes, I was.

6    Q.  What was the total that you determined?

7    A.  165.8 million.

8    Q.  Mr. Hansen, can you turn to Plaintiff's Exhibit 429 in your

9    binder.

10             Do you recognize Plaintiff's Exhibit 429?

11   A.  Yes.  It is a chart representing that -- I developed

12   representing the income earned from sale by month on just the

13   Hustle loans.

14   Q.  This was using the same field in Plaintiff's Exhibit 308?

15   A.  Correct.

16   Q.  Who prepared Plaintiff's Exhibit 429?

17   A.  I did.

18   Q.  Was there a particular program you used to prepare it?

19   A.  Microsoft Excel.

20   Q.  Was there any information that you used to prepare this

21   chart, Plaintiff's Exhibit 429, other than the information in

22   the bank database?

23   A.  No, there was not.

24             MR. ARMAND:  The government offers Plaintiff's Exhibit

25   429.

```
 1              MR. SMURZYNSKI:  No objection, your Honor.

 2              MR. HEFTER:  No objection.

 3              THE COURT:  Received.

 4              (Plaintiff's Exhibit 429 received in evidence)

 5              MR. ARMAND:  Ms. Michaud, if we can publish

 6      Plaintiff's Exhibit 429.

 7      Q.  Mr. Hansen, can you explain to the jury what is reflected

 8      on this chart?

 9      A.  Yes.  So starting in August 2007 until May 2008, I summed

10      up the income earned from sale field by month based on the

11      funding date, and I displayed it on the chart.  That's why you

12      don't see anything from July 2007 and in June 2008 because

13      those months were excluded.

14      Q.  Mr. Hansen, was there also information in the bank database

15      regarding whether loans were self-reported?

16      A.  Yes, there was.

17      Q.  Where was that information reflected?

18      A.  There was a field in the data we were just showing a second

19      ago.

20      Q.  Why don't with you turn back to 308.

21      A.  There was a self-reported flag.

22      Q.  If we could have the third page, the column at the end on

23      the right side.

24              Is this the column that you were referring to?

25      A.  Yes, it is.
```

DA73BAN3                        Hansen - direct

1    Q.   Do you have an understanding for what the information in

2    the column at the end means?

3    A.   In the glossary of terms it stated this was a field of

4    self-reported loans to Fannie Mae or Freddie Mac.

5    Q.   Did you undertake to identify how many loans within the

6    Hustle population that you identified had a flag as having been

7    self-reported?

8    A.   Yes.

9    Q.   How many?

10   A.   Six.

11   Q.   How did you know that they were self-reported?

12   A.   They had a Y instead of the N for yes for self-reported.

13   Q.   Mr. Hansen, was there a field in the bank database

14   identifying whether a particular loan was a fast and easy loan?

15   A.   Yes, there was.

16   Q.   Can you describe what that field was?

17   A.   Yes.  There was actually, it is on this screen you have up

18   here on the very first column.  The field name is trading doc

19   type lynx.  This is where the fast and easy was identified.

20   This was also confirmed on the glossary of terms provided in

21   the spreadsheet.

22   Q.   Were you able to tally how many of the loans in the 28,000

23   some odd Hustle population you identified were fast and easy

24   loans per this column?

25   A.   Yes, I was.

DA73BAN3                    Hansen – direct

1   Q.  How many were there?

2   A.  A little over 9,000.  I believe it was 9,249.

3   Q.  Mr. Hansen, was there also information in the bank database

4   regarding the location of the subject properties related to

5   each loan?

6   A.  Yes, there was.

7   Q.  What information was there?

8   A.  The zip code and the address was provided.

9   Q.  Are you familiar with the counties that make up the

10  Southern District?

11  A.  Yes, I am.

12  Q.  Were you able to identify how many loans in the 28,000 some

13  odd Hustle population you identified were within the Southern

14  District of New York?

15  A.  Yes.

16  Q.  How did you do that?

17  A.  I took all the loans and actually put them into another

18  program.  It is a mapping program.  And just put all the

19  addresses, similar to Google Maps, and then it layers the

20  counties on top of it.  And I was able to identify the

21  properties that way that were within the eight counties of the

22  Southern District of New York.

23  Q.  Turn to tab 440.  You actually may not have one.  I'll give

24  one to you.

25          MR. ARMAND:  May I approach, your Honor?

1          THE COURT:  Yes.

2    Q.  Mr. Hansen, what is Plaintiff's Exhibit 440?

3    A.  It is a summary page I developed.

4    Q.  What information did you use to create this chart?

5    A.  All this information on here is coming from the original,

6    what we're referring to as the bank database.

7    Q.  Does Plaintiff's Exhibit 440 summarize the calculations

8    that you performed from the database?

9    A.  Yes, it does.

10   Q.  Would it be helpful to you in summarizing the work that

11   you've done with regard to the data?

12   A.  Yes.

13          MR. ARMAND:  Your Honor, the government moves

14   Plaintiff's Exhibit 440 into evidence.

15          MR. SMURZYNSKI:  No objection, your Honor.

16          MR. HEFTER:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 440 received in evidence)

19   Q.  If we can put 440 on the screen.  We can come back to it.

20   We're having some technical difficulties.  But -- we have it,

21   great.  If we can blow up the chart.

22          If you can briefly go down the chart and explain to

23   the jury what the numbers that are reflected there are.

24   A.  Yes.  So starting on line one.  Again, this is the number

25   of Hustle loans that I identified within the bank database.

DA73BAN3                           Hansen - direct

1    28,882.  Number two, which is the sum of the income earned from

2    sale field on just those 28,000 loans of 165.8 million.  Number

3    three is the self-reported loans of six.  Within -- and again,

4    all of this is based off that original 28,000 loans.  Number

5    four is the fast and easy loans within that population.  And

6    number five, this is the break out by county for the Southern

7    District of New York hustle loans.

8    Q.  Thank you.  Did you receive any other data files in

9    connection with your analysis?

10   A.  Yes, I did.

11   Q.  What additional files did you receive?

12   A.  I received 12 quality assurance files or QA files.

13   Q.  What was contained within these files?

14   A.  It was results of QA reviews that were performed.

15   Q.  If I could direct your attention to tab 394.  Plaintiff's

16   Exhibit 394.  What is Plaintiff's Exhibit 394?

17   A.  This is a screen shot of one of the 12 files I received.

18        MR. ARMAND:  The government offers Plaintiff's Exhibit

19   394 in evidence.

20        MR. HEFTER:  May we have a moment, your Honor.

21        THE COURT:  Yes.

22        MR. SMURZYNSKI:  No objection, your Honor.

23        MR. HEFTER:  Same here.

24        THE COURT:  Received.

25        (Plaintiff's Exhibit 394 received in evidence)

DA73BAN3                          Hansen - direct

1  Q.  Were there any fields that had review ratings for the

2  loans?

3  A.  Yes.  There was a field called "review rating" that was --

4  if you -- this is, so, in these spreadsheets there were

5  numerous tabs.  This is the summary of one of those tabs.

6  There was the tab that had the actual loan level detail and the

7  results for each of the loans that were QA.

8  Q.  What were the review ratings?

9  A.  There was no action, limited action, action required,

10  action recommended, high risk.  And then it had changed

11  throughout the year.  Roughly in November I received an e-mail

12  or had an e-mail describing the change of the review rating

13  titles.

14  Q.  If we can go to PX 398 in your binder.  Or actually 399.

15  Sorry.

16          Do you recognize Plaintiff's Exhibit 399?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  It is another summary page from one of the 12 QA reports.

20  This is summarizing the results of the whole, all the QAs from

21  that time period.

22          MR. ARMAND:  The government offers Plaintiff's Exhibit

23  399 in evidence.

24          MR. SMURZYNSKI:  No objection.

25          MR. HEFTER:  No objection.

DA73BAN3                          Hansen - direct

1           THE COURT:  Received.

2           (Plaintiff's Exhibit 399 received in evidence)

3   Q.  I think your binder may have only the first page but the

4   others should have the full documents.  Could you turn to tab

5   401.

6           What is Plaintiff's Exhibit 401?

7   A.  This is a list of the questions that when you went into the

8   QA files, these are the number of questions that they would

9   have any concerns about.  So you had the question number, and

10  then you would have the number of findings per question, and

11  the actual description of what each question was.

12  Q.  Is it another one of the QA files?

13          MR. HEFTER:  Your Honor, I move to strike that with

14  respect to "concerns."

15          THE COURT:  Overruled.

16  Q.  Is this one of the QA files that you received?

17  A.  Yes, it is.

18          MR. ARMAND:  The government moves Plaintiff's Exhibit

19  403 into evidence.

20          MR. SMURZYNSKI:  401.

21          MR. ARMAND:  Sorry.

22          MR. SMURZYNSKI:  No objection to 401.

23          MR. HEFTER:  No objection.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 401 received in evidence)

DA73BAN3                         Hansen - direct

1   Q.   Could we next move to Plaintiff's Exhibit 403 in your

2   binder.

3   A.   Yes.

4   Q.   What is Plaintiff's Exhibit 403?

5   A.   This is another one of the QA reports.

6            MR. ARMAND:   The government moves Plaintiff's Exhibit

7   403 into evidence as well.

8            MR. SMURZYNSKI:   No objection.

9            MR. HEFTER:   No objection.

10           THE COURT:   Received.

11           (Plaintiff's Exhibit 403 received in evidence)

12  Q.   Could you next turn to tab Exhibit 405.

13  A.   Yes.

14  Q.   Is this another one of the QA files you received?

15  A.   Yes, it is.

16           MR. ARMAND:   The government moves Plaintiff's Exhibit

17  405 into evidence.

18           MR. SMURZYNSKI:   No objection.

19           MR. HEFTER:   No objection.

20           THE COURT:   Received.

21           (Plaintiff's Exhibit 405 received in evidence)

22  Q.   Tab 407 in your binder, is that another one of the QA files

23  you received?

24  A.   Yes, it is.

25           MR. ARMAND:   The government moves it into evidence.

```
 1              MR. SMURZYNSKI:  No objection.

 2              MR. HEFTER:  No objection.

 3              THE COURT:  Received.

 4              (Plaintiff's Exhibit 407 received in evidence)

 5   Q.  Was that 409?

 6   A.  That was 407.

 7   Q.  If you can turn to 409.

 8   A.  Yes.

 9   Q.  Is that another one of the QA files you received?

10   A.  Yes, it is.

11              MR. ARMAND:  The government move it into evidence.

12              MR. SMURZYNSKI:  No objection.

13              MR. HEFTER:  No objection.

14              THE COURT:  Received.

15              (Plaintiff's Exhibit 409 received in evidence)

16              MR. ARMAND:  Maybe I can speed it along.  I can give

17   you the rest of the exhibit numbers and we can do it all in one

18   shot.  Plaintiff's Exhibit 411, 414, 416, 418, and 420.

19   Q.  Are these all QA files that you received, Mr. Hansen?

20   A.  Yes, they are.

21              MR. ARMAND:  The government moves them into evidence.

22              MR. SMURZYNSKI:  No objection.

23              MR. HEFTER:  No objection.

24              THE COURT:  Received.

25              (Plaintiff's Exhibit 411, 414, 416, 418, 420 received
```

DA73BAN3                     Hansen - direct

1    in evidence)

2    Q.  Mr. Hansen, did you --

3             THE COURT:  Counsel, if we are at an appropriate place

4    to give the jury their midmorning break, let's do it now.

5             MR. ARMAND:  We can stop here, your Honor.

6             THE COURT:  We'll take a 15-minute break.

7             (Jury excused)

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I noticed going back to an issue that we

2     referred to this morning, the paragraph 16 of the second

3     amended complaint reads as follows:  "Defendant Countrywide

4     Bank, a wholly owned subsidiary of Countrywide Financial, is a

5     federally insured financial institution with its headquarters

6     in Colorado.

7          "In 2006 and 2007, Countrywide Home Loans transitioned

8     its mortgage loan production business into Countrywide Bank.

9     As Countrywide financial stated in its form 10-K for 2007, by

10    the end of 2007, nearly all mortgage loan production occurred

11    in Countrywide Bank, rather than Countrywide Home Loans."

12         So that, so far as allegations goes, somewhat

13    addresses the issue that we were discussing earlier.  But of

14    course I haven't seen any evidence yet.

15         MR. ARMAND:  Your Honor, Ed O'Donnell had testified to

16    this evidence, the moving of Countrywide -- of Full Spectrum to

17    Countrywide Bank in the transition.

18         THE COURT:  But not in the sense of legal liabilities.

19    It is funny you marked as exhibit, or it is actually

20    Defendant's Exhibit 1423, but it was just handed up to me, the

21    form 10-K for 2006, which may or may not bear on this issue.

22         MR. ARMAND:  No, your Honor, it should have been

23    switched.  That's 2007 that should be in there.  So we'll swap

24    that out.

25         THE COURT:  What you've handed to me was 2006.

DA73BAN3

1           MR. ARMAND:  We'll swap it out and give you the
2      correct one.
3           THE COURT:  If that comes into evidence, that might
4      address the legalistic aspects of it.
5           MR. ARMAND:  Correct, your Honor.
6           THE COURT:  We'll wait and see what happens.
7           With respect to Ms. Simantel, I received the
8      government's letter.  I continue to be of the view that the
9      door has not yet been opened to the e-mail.
10          The government says there are other relevant reasons
11     that they would want to -- there are other, comma, relevant
12     reasons why they would want to call her.
13          I would think that it would be logistically not a good
14     idea to call her until the ultimate determination is made on
15     the e-mail, which will be made if the defense opens the door
16     during its presentation, which it may not.
17          However, if there is something in Ms. Simantel's
18     testimony on other matters that would be material to the Rule
19     50 motion, I would consider allowing the government to call her
20     now on its case.  At the moment I don't see that being likely.
21     But, I will give defense counsel the option, either we can call
22     Ms. Simantel now, in which case you'll have to get her on the
23     plane to be here tomorrow morning, or, if when you argue your
24     Rule 50 motions, if and only if something comes up then that
25     would be determined in a material way by her testimony, which I

DA73BAN3

1    think is very unlikely, then you will agree to let her be

2    called out of turn after the start of the defense case for that

3    purpose.  So it is your choice.

4            MS. MAINIGI:  Your Honor, if I may use the break as an

5    opportunity to confer with my colleague who is arguing a

6    directed verdict.

7            However, in the meantime, your Honor, I wonder if we

8    may submit a written response to the government's letter of

9    last night.

10           THE COURT:  Sure.

11           MS. MAINIGI:  I didn't want to submit it without

12   getting your Honor's permission.

13           THE COURT:  Always a good idea.  Do you think this

14   will change my mind about the ruling I just made in your favor?

15           MS. MAINIGI:  You never know, your Honor.  Your Honor,

16   also attached to this document for your reference are excerpts

17   from both the trial testimony, which are sparse as it relates

18   to Ms. Simantel, and excerpts from her deposition testimony,

19   your Honor.  Or not excerpts, but references to her deposition

20   testimony, as well as it relates to High-Speed Swim Lane or any

21   of the issues that are actually at issue here as opposed to the

22   e-mail.  So your Honor may find that informative.

23           We do not believe that we need anything as it relates

24   to Ms. Simantel with respect to the Rule 50 motion, your Honor.

25           THE COURT:  So, just so it's clear, I just want to

DA73BAN3

1    make sure we're all on the same wave length.  So far as the

2    e-mail aspect of Ms. Simantel's testimony, I do not believe the

3    government has laid at this point a sufficient basis for its

4    admission, but this is without prejudice to the door being

5    opened by the defense in ways that I've already sort of limbed.

6         With respect to the non-e-mail aspects of

7    Ms. Simantel's testimony, if, contrary to the Court's current

8    belief it turns out that during the Rule 50 argument that

9    something the government says in their letter she would testify

10   about would be material to a Rule 50 determination, then the

11   defense has agreed that she may be called for that purpose,

12   even though it may occur during the defense case.  And the

13   Court will take the government's representation of what it

14   believes she will say in that regard as part of its Rule 50

15   assessment.

16        Okay?  We all agreed on that?

17        MS. MAINIGI:  Your Honor, as a preliminary matter, we

18   don't believe that there would be any basis in the existing

19   record, and that is partly the purpose of the letter I just

20   submitted to your Honor, for her to be called as it relates to

21   those matters.

22        THE COURT:  I'll take a look at that over the break.

23   Assuming for the sake of argument that I find there is

24   something that could conceivably be relevant in her testimony,

25   under the very low threshold of relevance, is the defense in

DA73BAN3

1    agreement with what I just said?

2             MS. MAINIGI:  I think, your Honor, let me go ahead

3    just as a caution and take the break to consult and then be

4    right back to you at the end of the break.

5             THE COURT:  Very good.

6             MR. SINGER:  Your Honor, I just want to make sure that

7    the Court had the letters in support of the Rule 50 motions

8    that both counsel for the bank and counsel for Ms. Mairone

9    submitted.

10            THE COURT:  I do.  I've even gone so far as to read

11   them.

12            MR. SINGER:  Couldn't ask for more than that.  Thank

13   you.

14            THE COURT:  See you in 10 minutes.

15            (Recess)

16            (In open court; jury not present)

17            MS. MAINIGI:  Your Honor, we're agreeable.

18            THE COURT:  What?

19            MS. MAINIGI:  We're agreeable.

20            THE COURT:  Great.  Thanks very much.  Actually, I've

21   always found all of you very agreeable, but I assume you're

22   referring to the question I asked before the break.

23            MS. MAINIGI:  I assume so, your Honor, yes.  If you

24   pressed me, yes.

25            (Continued on next page)

1           (Jury present)

2                MR. ARMAND:  May I proceed, your Honor?

3                THE COURT:  Yes.

4    BY MR. ARMAND:

5    Q.  Mr. Hansen, before the break we were talking about the

6    quality assurance files that you reviewed.  Do you recall that?

7    A.  Yes, I do.

8    Q.  Were you able to identify the loans in the quality

9    assurance files that were part of the 28,000 some odd Hustle

10   population you identified?

11   A.  Yes.

12   Q.  How were you able to do that?

13   A.  I looked them up using the loan ID field from the QA

14   reports to the bank database.

15   Q.  Could you turn to Exhibit 430 in your binder, please.  Do

16   you have it?  Okay.

17                What is Plaintiff's Exhibit 430?

18   A.  This is a pie chart I developed.

19   Q.  Where did the information come from that you used to make

20   Plaintiff's Exhibit 430?

21   A.  It came from the 12 QA reports in addition to the bank

22   database.

23   Q.  Okay.  What, if any, program did you use to generate this

24   chart?

25   A.  I queried the data in Microsoft Access and put it into

1   Excel to generate the report.

2   Q.  Generally, what does it reflect?

3   A.  It reflects the review of the review rating field from the

4   12 QA reports, and the information from those QA fields.

5           MR. ARMAND:  The government offers Plaintiff's Exhibit

6   430.

7           MR. SMURZYNSKI:  No objection.

8           MR. HEFTER:  No objection.

9           THE COURT:  Received.

10          (Plaintiff's Exhibit 430 received in evidence)

11          MR. ARMAND:  If we can put Plaintiff's Exhibit 430 on

12  the screen.

13  Q.  Mr. Hansen, can you please explain to the jury what this

14  chart represents.

15  A.  Yes.  This represents the final risk rating or –– the

16  review rating from the QA reports.  As you see, 76 percent of

17  the loans that were considered Hustle loans were rated high

18  risk or action required.

19          (Continued on next page)

20

21

22

23

24

25

```
 1   BY MR. ARMAND:

 2   Q.  When you say considered Hustle loans, what do you mean?

 3   A.  The loans -- there were additional loans in the QA reports.

 4   Q.  But when you say Hustle loans, are you talking about the

 5   ones you identified, the 28,000 population?

 6   A.  Yes.

 7   Q.  And so at the dark blue, the largest part of the pie chart,

 8   what does that reflect?

 9   A.  The loans that were rated high risk or action required.

10   Q.  That were Hustle loans in the population you identified?

11   A.  Correct.

12   Q.  I would like to show you some specific loan files,

13   Mr. Hansen.

14           MR. ARMAND:  May I approach, your Honor?

15           THE COURT:  Yes.

16   Q.  Mr. Hansen, could you open up Plaintiff's Exhibit 434 that

17   I just give you.

18   A.  Mm-hmm.

19   Q.  What is Plaintiff's Exhibit 434?

20   A.  When I turn to tab A, this is a loan application.

21   Q.  And can you see the loan ID number on it?

22   A.  Yes, in the bottom right-hand side.

23           MR. ARMAND:  The government offers plaintiff's 434 in

24   evidence.

25           MR. COHEN:  I understand it to be in evidence.
```

DA7TBAN4                          Hansen - direct

 1              THE COURT:  It's in evidence.

 2   BY MR. ARMAND:

 3   Q.  Could we pick up -- if could you show under the property

 4   information, are you able to read that?

 5   A.  Yes, I am.

 6   Q.  Where is this property located?

 7   A.  It is located in Goodyear, Arizona.

 8              MR. ARMAND:  Ms. Michaud, if you could please blow up

 9   the employment information.

10              MR. SMURZYNSKI:  Your Honor, objection.

11              THE COURT:  Ground?

12              MR. SMURZYNSKI:  Cumulative.

13              THE COURT:  Well, little bit, but I think it's -- I'll

14   allow it.  We'll see how it goes.  For now I'll allow it.

15   Q.  If you could read what is the employment information listed

16   there?

17   A.  Jewelry Sam.

18   Q.  Could you please turn to Exhibit 442 in the first binder I

19   gave you, Mr. Hansen.

20   A.  Yes.

21   Q.  And what is Plaintiff's Exhibit -- are you there yet?

22   A.  Yes, I am.

23   Q.  What is Plaintiff's Exhibit 442?

24   A.  This is an excerpt of some of the data of the Hustle loans.

25   Q.  And where does this data come from?

DA7TBAN4                         Hansen – direct

1    A.  It comes from the original bank database.

2    Q.  And this is an excerpt of that data that you prepared?

3    A.  Correct.

4            MR. ARMAND:  The government offers Plaintiff's Exhibit

5    442 in evidence.

6            MR. SMURZYNSKI:  Your Honor, objection, and may we

7    approach?

8            THE COURT:  Sure.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA7TBAN4                          Hansen - direct

1           (At side bar)

2           MR. SMURZYNSKI:  Your Honor, the defendant has as its

3     first column HSSL loan number, which is not a column or data

4     field in the bank defendants' data.  So how it's been

5     described, it's been misdescribed to the jury.

6           THE COURT:  Let me see.

7           MR. SMURZYNSKI:  This column right here.

8           MR. ARMAND:  I didn't realize that.

9           THE COURT:  Well, of course the government has the

10    defense of illegibility here, since it is only with great

11    difficulty that one can read it, it says HSSL underscore only

12    dot lo -- loan, I see, dot loan/number, then there's a number.

13          So what's the objection?

14          MR. SMURZYNSKI:  The objection is that there's no

15    field that uses that heading term HSSL, only loan number in the

16    defendant's data, and so this is been misdescribed so far as

17    being from the defendant's data.

18          THE COURT:  Well, is it from the defendant's data and

19    just not the right title or is it not from the defendant's data

20    or do you know?

21          MR. SMURZYNSKI:  I believe that there is a field loan

22    number in the defendant's data, and this is -- it correctly

23    states the loan number, it's just the header that's been put on

24    this exhibit by the government is incorrect.

25          MR. ARMAND:  I could make that clear, your Honor.  I

1    didn't notice that it says Hustle loan number, but all it's

2    meant to do have the loan number so we could tie it to the loan

3    files that we're showing him.

4              THE COURT:  So you want to redact that?

5              MR. ARMAND:  I'm happy to redact it.

6              THE COURT:  I must say, I think the point is you're

7    only dealing here with Hustle loans.

8              MR. ARMAND:  Yes, its from his population of 28,000.

9              THE COURT:  But I think a redaction is appropriate.

10             MR. ARMAND:  Would you like us to do it now before we

11   proceed?

12             THE COURT:  If could you do it now, that would be

13   great, if you can't --

14             MR. ARMAND:  I only problem is I don't think we would

15   be able to do it on the screen and we would have to stop and

16   rescan it.

17             THE COURT:  So --

18             MR. ARMAND:  I could not -- maybe we could have them

19   not publish the loan ID number.

20             THE COURT:  Yeah, show the rest of the chart.

21             MR. ARMAND:  OK.

22             (Continued on next page)

23

24

25

DA7TBAN4                          Hansen - direct

```
 1              (In open court)

 2              THE COURT:  So 442 as we redacted is received.

 3              (Plaintiff's Exhibit 442 received in evidence)

 4   BY MR. ARMAND:

 5   Q.  Before we -- before we put up the exhibit, Mr. Hansen, is

 6   there information in the bank database identifying employees

 7   associated with particular loans?

 8   A.  Yes, there is.

 9   Q.  Did you include that information in the Plaintiff's Exhibit

10   442?

11   A.  Yes, I did.

12              MR. ARMAND:  Ms. Michaud, if you could blow up -- just

13   on the screen only publish the middle portion of Exhibit 442

14   that has the SMPC3 column and SMPC3 title column to the right

15   of it.

16   Q.  First, Mr. Hansen, is the loan that we were just looking at

17   Plaintiff's Exhibit 434, is that one of the loan files listed

18   on this chart that you prepared?

19   A.  Yes.

20   Q.  Which one is it?

21   A.  It is the third one down.

22   Q.  And could you read the person who is identified in the

23   column for SMPC3 name?

24   A.  Susan Lucero.

25   Q.  What is the column next to it, to the right, indicate as
```

1   the title?

2   A.  CFC Central Fulfillment Lending Spec.

3   Q.  I would like to show you another loan file.  Actually

4   before we do that, do you know what SMPC3 stands for?

5           MR. HEFTER:  Objection.

6           MR. ARMAND:  I can rephrase.

7           THE COURT:  All right.

8   Q.  Based on the glossary of information that you were provided

9   by the defendants, what does the SMPC3 name stand for?

10  A.  It's the person who moves it from phase code two to phase

11  code three.

12  Q.  Thank you.

13          MR. ARMAND:  May I approach, your Honor?

14          THE COURT:  Yes.

15  Q.  Mr. Hansen, I'm showing what you has been marked as

16  Plaintiff's Exhibit 431.  Do you recognize it?

17  A.  Yes.

18  Q.  What is it?

19  A.  It is another loan application.

20  Q.  And do you see the loan number?  Is there a loan number ID

21  on it?

22  A.  Yes, on the bottom right-hand side.

23          MR. ARMAND:  The government offers Plaintiff's Exhibit

24  431 in evidence.

25          MR. SMURZYNSKI:  Your Honor, I have a question of

1   government counsel about this document.

2          THE COURT:  Go ahead.

3          MR. SMURZYNSKI:  Should we do it at the side bar?

4          THE COURT:  If it's something that you can take up

5   just with him --

6          (Pause)

7          MR. SMURZYNSKI:  Your Honor, based on government's

8   representation this is one of the sample loans, we have no

9   objection.

10         THE COURT:  All right.  Received.

11         (Plaintiff's Exhibit 431 received in evidence)

12         MR. HEFTER:  Your Honor, I would also add, just

13  subject to confirmation, that is in fact the entire loan file.

14  With that caveat, no objection.

15         MR. ARMAND:  It is, your Honor.

16         THE COURT:  All right.  Based on those

17  representations, it is received.

18  Q.  Mr. Hansen, could we -- I guess first let's blow up the

19  property address.  Can you read what that says?

20  A.  Yes, it is 4105 Winecup Drive in Copperas Cove, Texas.

21  Q.  Let's move to the borrower employment information.  What

22  does that indicate?

23  A.  Los Angeles County Probation.

24  Q.  Did you undertake to determine whether this particular loan

25  file was among the 28,882 Hustle loans?

DA7TBAN4                        Hansen - direct

1    A.  Yes.

2    Q.  And what did you determine?

3    A.  I determined it was one of the Hustle loans based off the

4    loan ID and address.

5    Q.  Did you also do that with the last loan file that I showed

6    you, 434?

7    A.  Yes, I did.

8    Q.  What did you determine for that loan?

9    A.  It is also part of the 28,000 population.

10           MR. ARMAND:  Could we now go to Exhibit 442,

11   Ms. Michaud, again just please blow up just the columns in the

12   middle.

13   Q.  Plaintiff's Exhibit 431, is that a loan file one of the

14   files that is listed on Plaintiff's Exhibit 442?

15   A.  Yes, it is, it's the first one.

16   Q.  Could you read what the bank database states with regard to

17   the SMPC3, name and title?

18   A.  Aracell Perez, Central Fulfillment Lending specialist

19   senior.

20   Q.  What is Ms. Perez's title indicated in there?

21   A.  Central Fulfillment Lending specialist senior.

22   Q.  I would like to show you one last loan file, Plaintiff's

23   Exhibit 433.

24           MR. ARMAND:  May I approach, your Honor?

25           THE COURT:  Yes.

DA7TBAN4                        Hansen - direct

1    Q.  What is Plaintiff's Exhibit 433, Mr. Hansen?

2    A.  This is a loan file and application.

3    Q.  And is there a loan ID number?

4    A.  Yes, there is.

5    Q.  Did you undertake to determine whether or not this loan ID

6    number is among the loans in the 28,882 that you identified as

7    Hustle loans?

8    A.  Yes, I did.

9    Q.  What did you find?

10   A.  I confirmed based on the loan number and address it was one

11   of those Hustle loans.

12          MR. ARMAND:  The government offers Plaintiff's Exhibit

13   433 in evidence.  It's my understanding this is one of the

14   loans that was a sampled loan and that is the complete loan

15   file.

16          THE COURT:  So on the same representations that we had

17   with respect to 431, 433 is received.

18          (Plaintiff's Exhibit 433 received in evidence)

19   Q.  If you could turn to the yellow tab in the binder.

20   A.  Yes.

21   Q.  Ms. Michaud, could you bring up that page, should be a

22   yellow tab in everyone's binder.  Could you please blow up the

23   property address?  Can you read what that is?

24   A.  720 Northwest 77th Street, Tamarac, Florida.

25   Q.  And could you go down to the application, the occupation of

DA7TBAN4                         Hansen - direct

1   the borrower, please, what does that say?

2   A.  Pebble Beach Company, doorman and hospitality.

3   Q.  Could you say again?

4   A.  Pebble Beach Company, and under his position is

5   doorman/hospitality.

6   Q.  Now if could you go to 442, Plaintiff's Exhibit 442?

7           MR. ARMAND:  Ms. Michaud, if you could put that back

8   up on the screen, the middle columns.

9   Q.  Is Plaintiff's Exhibit 433, the loan file which I just

10  showed you, is that one of the loans that is listed on

11  Plaintiff's Exhibit 442?

12  A.  Yes, it is it's the second one down.

13  Q.  And what does the bank database indicate for the person who

14  moved the loan from phase code two to phase code three?

15  A.  Yamile Herrera.

16  Q.  And what does it say her title is?

17  A.  CFC loan specialist.

18  Q.  Mr. Hansen, if you could turn to page -- or Exhibit 26 of

19  your binder.

20          MR. ARMAND:  Your Honor, if I could approach, maybe I

21  could clean some of these binders away for him.

22          THE COURT:  Yes.

23          THE WITNESS:  What number did you say?

24  Q.  26.

25  A.  OK.

DA7TBAN4                         Hansen - direct

1   Q.  Mr. Hansen, can you read from the top what is this

2   document?

3   A.  This appears to be an email from Steve Brent.

4   Q.  And what is the date?

5   A.  Thursday, September 13, 2007.

6           MR. ARMAND:  The government offers Plaintiff's Exhibit

7   26 in evidence.

8           MR. SMURZYNSKI:  No objection.

9           MR. HEFTER:  No objection.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 26 received in evidence)

12          MR. ARMAND:  Ms. Michaud, if you could blow up the

13  third page, and if you could blow up those two sentences there.

14  Q.  Could you read that, please, Mr. Hansen.

15  A.  Anson, Loren has advised that all loan specialists included

16  the upcoming roll out of HSSL will receive underwriting level

17  one authority effective 10/1/2007.  Is this also your

18  understanding?

19          MR. ARMAND:  If we could go to the first page of the

20  email, and if you could blow up, Ms. Michaud, the from to and

21  the first paragraph, it says good info.

22  Q.  Could you read the paragraph that starts with "Good info?"

23  A.  Good info and THX.  But grandfathering is not an option.

24  We need to look at the proposed dumb downed UW level one and

25  then ID training gaps.  And if you notice in the weekly

DA7TBAN4                        Hansen - direct

1   findings that we publish, 60 percent of the high risk findings

2   are in Richardson, which is the center that we grandfathered in

3   for PCA/HSSL.

4   Q.  Thank you, Mr. Hansen.

5              MR. HEFTER:  Your Honor, for the purpose of

6   completeness, I would ask that another portion of the document

7   be read.

8              THE COURT:  Go ahead.

9              MR. HEFTER:  Mr. Gong's email to Ms. Coryell.

10             MR. ARMAND:  Can you blow up the second email on the

11  second page?

12  Q.  And if you could read from, "I just confirmed."

13  A.  I just confirmed with Loren.  Ed is in agreement, too.

14  These LSs will get extra post-funding QC checks.

15  Q.  Can you read the next sentence?

16  A.  We will schedule a meeting with major stakeholders to

17  discuss concerns.

18  Q.  Could we next go to Exhibit 28 in your binder, Mr. Hansen.

19  A.  Yes.

20  Q.  And what is Exhibit 28?

21  A.  This is an email from Schuyler Yost.

22  Q.  And who is it to?

23  A.  Todd Green.

24  Q.  And the date?

25  A.  11/1/2007.

1          MR. ARMAND:  The government offers Plaintiff's Exhibit

2    28 into evidence.

3          MR. SMURZYNSKI:  No objection.

4          MR. HEFTER:  No objection.

5          THE COURT:  Received.

6          (Plaintiff's Exhibit 28 received in evidence)

7          MR. ARMAND:  And if could you blow up the first three

8    paragraphs.

9    Q.  And if could you start reading from the beginning?

10   A.  We have just finished all the certification requirements.

11   Everyone still has to have 10 files reviewed.  Jennifer

12   Patterson, PCA; Tiffany Oliphant; Tony Shapoval; Shairoz Jamal,

13   PCA; Zohra Jiwani, PCA; Courtney White, PCA/HSSL CSO; Steven

14   Spross, PCA; Christi Toups.  LSSs who previously had PCA

15   authority were given professional level one UW authority.

16   However, training for these people to show them how to actually

17   underwrite a file is still forthcoming.  Ron and Meg are

18   involved in developing this training.

19   Q.  Mr. Hansen, if we could next turn to Exhibit 41.

20   A.  OK.

21   Q.  And what is Exhibit 41?

22   A.  This is an email from Loren Rodriguez.

23   Q.  To?

24   A.  Ed O'Donnell on Wednesday, August 1st, 2007.

25         MR. ARMAND:  The government offers Plaintiff's Exhibit

1733

DA7TBAN4                         Hansen – direct

1   41 in evidence.

2           MR. SMURZYNSKI:  Your Honor, may we approach the

3   bench?

4           THE COURT:  Yes.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA7TBAN4                          Hansen - direct

1           (At side bar)

2           MR. SMURZYNSKI:  I didn't say anything after the first

3    two exhibits, but if the government wishes to publish their

4    exhibits to the jury to which there's no objection we

5    understand they can do this, but this process we're going

6    through is different from that, having the witness selectively

7    read from the particular documents and nothing further, simply

8    reading.  Then if the government wants to publish, that's their

9    prerogative, but the method we are doing this through we object

10   to.

11          THE COURT:  Well, this is a nature of a summary

12   witness in effect.  I certainly will allow, as already happened

13   with your co-defendant, if there are portions left out that

14   need to be read for a couple items, that will be allowed.  But

15   I think the nature of this witness is assisted by what's

16   happened so far.  I'll when let it go for a while.  I may -- if

17   it gets too argumentative, I will intervene and you may raise

18   it again, but for now the objection is overruled.

19          MR. HEFTER:  Your Honor, could I raise another

20   objection to this document?  We have an authenticity objection

21   to it.

22          THE COURT:  Which you preserved in the pretrial?

23          MR. HEFTER:  Yes, I just confirmed.  And that is it

24   looks like this is -- looks like some sort of the email

25   conversation, but there's no evidence in the record to who is

DA7TBAN4                         Hansen - direct

1    saying what.

2             THE COURT:  Well, that's a more -- different kind of

3    objection.

4             I agree.  It's ambiguous.

5             MR. ARMAND:  I think the government is offering it to

6    show notice of concerns, and so it doesn't really matter which

7    person is stating the concerns, they're both employees of the

8    bank.

9             THE COURT:  But I don't think the jury can really

10   get -- make heads or tails of it without knowing -- this plays

11   off the point being made by bank counsel, but I think it's more

12   extreme.  In this case the jury is given no context, no

13   nothing, they don't even know who is speaking or anything about

14   this.  Sustained.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DA7TBAN4                        Hansen - direct

1            (In open court)

2    BY MR. ARMAND:

3    Q.  Mr. Hansen, could you please turn to Plaintiff's Exhibit 44

4    in your binder.

5    A.  Yes.

6    Q.  Can you read the first page of what is on Plaintiff's

7    Exhibit 44?

8    A.  Yes, it says Countrywide New Fulfillment Model, Rebecca

9    Mairone, MD, COO, Wade Comeaux, EVP Central Fulfillment, and Ed

10   O'Donnell, Central Services, dated November 13, 2007.

11           MR. ARMAND:  The government offers Plaintiff's Exhibit

12   44 in evidence.

13           MR. SMURZYNSKI:  No objection.

14           MR. HEFTER:  No objection.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 44 received in evidence)

17   Q.  Mr. Hansen, could you please turn to Exhibit 54.

18   A.  Yes.

19   Q.  What is Exhibit 54?

20   A.  It is an email from Rebecca Mairone to Freddie Espinosa on

21   Saturday, September 8, 2007.

22           MR. ARMAND:  The government offers Plaintiff's Exhibit

23   54 in evidence.

24           MR. SMURZYNSKI:  No objection.

25           MR. HEFTER:  No objection.

1           THE COURT:  Received.

2           (Plaintiff's Exhibit 54 received in evidence)

3    Q.  If we could go on the first page to the bottom two

4    sentences.  Well, why don't you read the email and we'll wait

5    and see if we can get it on the screen.

6    A.  Starting with 48 percent?

7    Q.  Starting on the second page the bottom says, "Of the

8    loans."

9    A.  Of the loans funded since the beginning of the pilot, the

10   aggressive turn time from PC --

11          MR. SMURZYNSKI:  Your Honor --

12          MR. HEFTER:  He misread.

13   A.  Sorry, I apologize.

14          Of the loans funded since the beginning of the pilot,

15   the average turn time from PC0 to fund is 14.9 days with 17.8

16   days from PCA to fund.  95.7 percent of the loans have funded

17   in 24 days or less from PCA to fund.

18          MR. ARMAND:  If we could go to the first page and blow

19   up the first sentence.  Actually if you could blow up the whole

20   top of the email, please.

21   Q.  And can you read what that says?

22   A.  Yes, the results are looking awesome.  Thank you all for

23   your efforts here so far.  We have so much more to do.

24   Q.  Next turn to page Plaintiff's Exhibit 55.

25          And what is Plaintiff's Exhibit 55?

1    A.   It is an email from Mark Barnett to Loren Rodriguez dated

2    Thursday, August 16, 2007.

3              MR. ARMAND:   The government offers Plaintiff's Exhibit

4    55.

5              MR. SMURZYNSKI:  No objection.

6              MR. HEFTER:  No objection.

7              THE COURT:   Received.

8              (Plaintiff's Exhibit 55 received in evidence)

9    Q.   If could you blow up the first three paragraphs.

10             Who is this email from?

11   A.   Mark Barnett.

12   Q.   And who is it to?

13   A.   Loren Rodriguez and CC Rebecca Mairone.

14   Q.   And could you begin reading the email?

15   A.   So you know, we're not falling down on the job here.  We

16   have just got our first CTC, one day.  The loan came in this

17   morning, was a fast and easy with property inspection waiver.

18   Woo hoo too.  Also, we've now got about 61 loans in the

19   pipeline.  We may be starting to the get close to the capacity

20   for the team at this point where the process is working well,

21   but not yet optimized.  We're not turning anything away.

22   However, keep 'em coming.

23   Q.   Next let's turn to Exhibit 72 in your binder.

24   A.   OK.

25   Q.   Actually let's skip, let's go to 78.

DA7TBAN4                          Hansen - direct

1   A.   OK.

2   Q.   What is Exhibit 78, Plaintiff's Exhibit 78?

3   A.   It is an email from Cliff Kitashima dated Thursday March 6,

4   2008 to Ed O'Donnell.

5           MR. ARMAND:  And the government offers Plaintiff's

6   Exhibit 78 in evidence.

7           MR. SMURZYNSKI:  Your Honor, we have an objection to

8   this one.

9           THE COURT:  Pardon?

10          MR. SMURZYNSKI:  We have an objection to this one.

11          THE COURT:  Ground?

12          MR. SMURZYNSKI:  With respect to the top email 403.

13          THE COURT:  Where are you referring to?

14          MR. ARMAND:  Plaintiff's Exhibit 78, your Honor.

15          THE COURT:  Yes, what do you think triggered the 403?

16          MR. SMURZYNSKI:  Your Honor, the first page of the

17  exhibit, your Honor, the email at the top of the page.

18          THE COURT:  Oh, I see.  Well, we can redact the matter

19  that is in quotes the second word there.

20          Is there anything else that you're objecting to?

21          MR. SMURZYNSKI:  No, your Honor, that's the only --

22          MR. ARMAND:  Your Honor may we approach?

23          THE COURT:  Yes.

24          (Continued on next page)

25

DA7TBAN4                        Hansen – direct

```
 1                   (At side bar)
 2                   MR. ARMAND:  I wanted to clarify, what's the word?
 3                   THE COURT:  It's "Barak," commonly referring to the
 4       President of the United States.
 5                   MR. ARMAND:  OK, we'll --
 6                   THE COURT:  So you'll just redact that one word, and
 7       if he is going to read it, tell him not to read that one word.
 8       You can point it out to him as you're leaving here at the side
 9       bar.
10                   MR. ARMAND:  Understood.
11                   MR. HEFTER:  But the whole document won't be published
12       to the jury?
13                   THE COURT:  If you can cut it off now, fine, if not
14       he'll just read it.
15                   MR. ARMAND:  Thank you.
16                   (Continued on next page)
17
18
19
20
21
22
23
24
25
```

DA7TBAN4                        Hansen – direct

1              (In open court)

2              MR. ARMAND:  So we have the redacted version of this.

3              THE COURT:  It's received as redacted.

4              (Plaintiff's Exhibit 78 received in evidence)

5    Q.  Mr. Hansen, if could you begin by --

6              MR. ARMAND:  Well, first you could blow up where it

7    says Ed O'Donnell in the middle, and that first paragraph.

8    Q.  Can you read who this email is from?

9    A.  Yes, this is from Ed O'Donnell.

10   Q.  And who is it to?

11   A.  Loren Rodriguez and Cliff Kitashima.

12   Q.  And could you read the paragraph begins with "79 percent?"

13   A.  Yes.  With 79 percent of our Q4 SUS ratings attributed to

14   income reasonability, we need a much stronger process to ensure

15   we get this weakness addressed.  The fact that this may involve

16   additional reviews is a fair trade versus losing the products

17   due to our inability to execute.  Clearly, the current process

18   is in the ditch.

19   Q.  And let's go up to the top email.

20             MR. ARMAND:  Ms. Michaud, if you could blow up the

21   top.

22   Q.  And Mr. Hansen, if -- who is this email from?

23   A.  Cliff.

24   Q.  Cliff Kitashima?

25   A.  Yes.

DA7TBAN4                           Hansen - direct

1    Q.  And if could you begin reading, but only from "Maybe."

2    A.  Maybe you could also point out that those who drove us into

3    the ditch should not have the final say on policies to get us

4    out.

5    Q.  Thank you.  We could move to Exhibit 85.  Can you read the

6    title of 85?

7    A.  CTC Checklist.

8              MR. ARMAND:  The government offers 85 in evidence.

9              MR. SMURZYNSKI:  No objection.

10             MR. HEFTER:  No objection.

11             THE COURT:  Received.

12             (Plaintiff's Exhibit 85 received evidence

13   Q.  Mr. Hansen, can you turn to tab 86 in your binder, please.

14   A.  Yes.

15   Q.  And what is Plaintiff's Exhibit 86?

16   A.  It's an email from Robert Price to Wade Comeaux, James

17   White and David Sallis dated April 29, 2008.

18             MR. ARMAND:  We offer Plaintiff's 86 in evidence.

19             MR. SMURZYNSKI:  No objection.

20             THE COURT:  Received.

21             MR. HEFTER:  No objection.

22             THE COURT:  Received.

23             (Plaintiff's Exhibit 86 received in evidence)

24             MR. ARMAND:  Could you, Ms. Michaud, if you could blow

25   up this email.

1   Q.  Who did you say this email is from?

2   A.  Robert Price.

3         MR. ARMAND:  If could you blow up the first three

4   paragraphs.

5   Q.  If you could begin reading at "Wade."

6   A.  Wade, I won't speak for Jim or David, but I do want to

7   reiterate that I feel that the new CTC process is not tight

8   enough to drive a one percent SUS rate.  Additional of the edge

9   file, in quotations, lockdown at CTC will help, but to continue

10  to allow LSs to recategorize and clear conditions while having

11  the UWs only complete a checklist without actually clearing the

12  doc and UW doc conditions themselves leaves us susceptible to

13  errors and clarity around responsibility we cannot afford at

14  this point.

15        If we're going to drive the division quality results

16  down to four percent or one percent, our chances of getting

17  there immediately would be better served by confining the key

18  controls within the group (UW) who are ultimately more

19  experienced and with less "production skin in the game."

20        I want to fund every quality loan possible, and that

21  the goal should not be impacted considering the borrower

22  profiles we now have.  This success would be much easier if our

23  focus and process is better refined around our known strengths

24  and subsequently directed at our highest priorities.  Thanks.

25  Q.  If we turn to Exhibit 102 in your binder, Mr. Hansen.  What

DA7TBAN4                          Hansen - direct

1   is -- if could you read the title of Plaintiff's Exhibit 102.

2   A.  Title is Quality Control Ratings, Loan Performance and

3   Quality Review Improvement Plan.

4            MR. ARMAND:  The government offers Plaintiff's Exhibit

5   102.

6            MR. SMURZYNSKI:  No objection.

7            MR. HEFTER:  No objection.

8            THE COURT:  Received.

9            (Plaintiff's Exhibit 102 received in evidence)

10  Q.  Could you please turn to Exhibit 104.

11  A.  Yes.

12  Q.  What is Plaintiff's Exhibit 104, Mr. Hansen?

13  A.  It's an email from Steve Brent to Ed O'Donnell on

14  Wednesday, May 28, 2008.

15           MR. ARMAND:  The government offers Plaintiff's Exhibit

16  104.

17           MR. SMURZYNSKI:  No objection.

18           MR. HEFTER:  No objection.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 104 received in evidence)

21           MR. ARMAND:  Ms. Michaud, if you could please blow up

22  the text of the email.

23  Q.  You can see where it begins "this week," could you please

24  read that?

25  A.  Starts off with?

DA7TBAN4                    Hansen - direct

1    Q.  Actually just start with "Would love."

2    A.  Would love our team to take all the credit, but CQC is

3    pushing very, very hard for us also.

4    Q.  And could you also read the subject of the email.

5    A.  Re: Continued focus on Q1/Sprint Incentive forward FSL QC

6    daily reporting package.

7    Q.  Thank you.  Could you go to the next exhibit tab 107,

8    Plaintiff's Exhibit 107.

9    A.  OK.

10   Q.  And who is this email from -- or excuse me, what is this

11   document, Plaintiff's Exhibit 107?

12   A.  This is an email from Steve Brent dated Friday, May 9,

13   2008.

14          MR. ARMAND:  The government offers Plaintiff's Exhibit

15   107 in evidence.

16   A.  It was to Don Harris.

17          MR. SMURZYNSKI:  No objection, your Honor.

18          MR. HEFTER:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 107 received in evidence)

21          MR. ARMAND:  And could you, Ms. Michaud, please blow

22   up from first sentence and sent and to and first three line of

23   that email.

24   Q.  Who did you say this email was from?

25   A.  Steve Brent.

DA7TBAN4                          Hansen - direct

1   Q.  Could you please read from, "Another note."

2   A.  Another note showing the increased focus and support to get

3   these SUS findings overturned.  Do not be confused, this is

4   becoming our number one job at FSL today.  We must execute,

5   report and overturn SUS findings.  We are being watched very

6   closely.  Drive your teams, review the loans, review the

7   productivity of your teams and make it happen today.

8   Q.  Thank you.  If we could go to 120, Plaintiff's Exhibit 10

9   in your binder, Mr. Hansen.  What is Plaintiff's Exhibit 120?

10  A.  It's an email from Wade Comeaux to Rebecca Mairone dated

11  Wednesday, May 14, 2008.

12          MR. ARMAND:  The government offers Plaintiff's Exhibit

13  120.

14          MR. SMURZYNSKI:  No objection.

15          MR. HEFTER:  Your Honor, we would ask for a limiting

16  instruction with respect to portion of the document.

17          I will withdraw that, your Honor, no objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 120 received in evidence)

20          MR. ARMAND:  Ms. Michaud, could you please put the

21  first page of the email on the screen, and just the top part.

22  Q.  Who you did you say this email was from?

23  A.  Wade Comeaux.

24  Q.  Could you begin reading from FYI?

25  A.  FYI.  LSs have been receiving no QoG feedback for months.

1    We also have no organized detail on SUS findings for LS or OM.

2    We are now, after months of pushing it, receiving QA data on an

3    LS level.

4            MR. HEFTER:  Your Honor, for the record, I think he

5    omitted a word in that sentence.

6    A.  We are now, after months of pushing for it, receiving QA

7    data on an LS level.

8    Q.  Thank you, Mr. Hansen, let's go to -- turn to Exhibit 141,

9    Plaintiff's Exhibit 141 in your binder.  Can you read the title

10   of this?

11   A.  Stated Income Reasonability Worksheet Not Mandatory.

12   Q.  And can you read above the black line?

13   A.  Bulletin 07-607 dated 12/4/2007.

14           MR. ARMAND:  The government offers Plaintiff's Exhibit

15   141 into evidence.

16           MR. SMURZYNSKI:  Could I have just a moment, your

17   Honor, to consult?

18           (Pause)

19           MR. SMURZYNSKI:  No objection, your Honor.

20           MR. HEFTER:  No objection.

21           THE COURT:  Received.

22           (Plaintiff's Exhibit 141 received in evidence)

23   Q.  Mr. Hansen, if you could turn to --

24           MR. SMURZYNSKI:  Your Honor, I'm sorry, for

25   completeness sake we had the title of this read -- I apologize,

1   I withdraw that.

2   Q.  Could we turn to Plaintiff's Exhibit 142.

3   A.  Yes.

4   Q.  And what is Plaintiff's Exhibit 142, if you could read the

5   title.

6   A.  Looks like FSLO Communications Operations Bulletin.

7   Q.  And is there a date?

8   A.  12/12/2007.

9          MR. ARMAND:  Government offers Plaintiff's Exhibit

10  142.

11         MR. SMURZYNSKI:  No objection.

12         MR. HEFTER:  No objection.

13         THE COURT:  Received.

14         (Plaintiff's Exhibit 142 received in evidence)

15  Q.  If we could go to Exhibit 423, Mr. Hansen, Plaintiff's

16  Exhibit 423.

17  A.  OK.

18  Q.  What is 423?

19  A.  It's an email from Ed O'Donnell to Wade Comeaux and Javier

20  Jaraba, it's dated May 9, 2008.

21         MR. ARMAND:  And the government offers Plaintiff's

22  Exhibit 423.

23         MR. SMURZYNSKI:  No objection.

24         MR. HEFTER:  No objection.

25         THE COURT:  Received.

1          (Plaintiff's Exhibit 423 received in evidence)

2          MR. ARMAND:  Ms. Michaud, if could you please blow up

3    the second half of the email beginning with "Ed O'Donnell."

4    Q.  And who is this email from?

5    A.  From Wade to Ed.

6    Q.  And can you read where it starts "Do?"

7    A.  Yes.  Do we always go for a quarter with no QoG score for

8    LSs?  What is different now?

9          MR. ARMAND:  If we go up to the top email,

10   Ms. Michaud.

11   Q.  Who is this email from?

12   A.  It's from Ed.

13   Q.  Sorry?

14   A.  From Ed O'Donnell to Wade.

15   Q.  And could you please give the date?

16   A.  May 9, 2008.

17   Q.  And could you read the email from Mr. O'Donnell?

18   A.  I believe the suspension of the QoG until January audits is

19   the issue . . . no carry over from Q4.

20   Q.  Thank you.  Could we please turn to Exhibit 443 in your

21   binder, Plaintiff's Exhibit 443.

22   A.  OK.

23   Q.  And if we could -- what is Plaintiff's Exhibit 443?

24   A.  It's an email from Craig Lickiss to Jerome Holmes, Robert

25   Price, Nancy Bradford, Janet Woodard, Nikki Johnson, Rachel

DA7TBAN4                    Hansen - direct

1   Doty and Anna Corder dated 3/11/2008.

2          MR. ARMAND:  The government offers Plaintiff's Exhibit

3   443 in evidence.

4          MR. SMURZYNSKI:  No objection.

5          MR. HEFTER:  One moment, your Honor.

6          No objection.

7          THE COURT:  Received.

8          (Plaintiff's Exhibit 443 received in evidence)

9          MR. ARMAND:  If we could blow up this email.

10  Q.  And again, who is this from, Mr. Hansen?

11  A.  Craig Lickiss.

12  Q.  Read the last paragraph that begins, "Finally."

13  A.  Finally this is the first QoG report I have seen since my

14  start date last June.  This coupled with the fact that it's

15  been many months since our AVPS have seen anything on QoG, I

16  think we should have a short call to understand the report, the

17  overall QoG process, response times, etc.

18  Q.  What is date of this email?

19  A.  February -- sorry, March 11, 2008.

20         (Continued on next page)

21

22

23

24

25

1     THE COURT:  I think we need to find a place to break.

2     MR. ARMAND:  This is the last one.

3     THE COURT:  Go ahead.

4  Q.  If we can go to Plaintiff's Exhibit 76.

5  A.  Okay.

6  Q.  Can you identify who this is from?

7  A.  It is an e-mail from Patrick Aliano to David Farrell.

8  Q.  And the date?

9  A.  10/24/2012.

10     MR. SMURZYNSKI:  Your Honor, we have an objection on

11  this exhibit.

12     THE COURT:  Ground?

13     MR. SMURZYNSKI:  Your Honor, might we approach?

14     THE COURT:  Well, all right.  We're going to let the

15  jury then have their lunch break.  And we'll see you at 2.

16     (Jury excused)

17     (Continued on next page)

18

19

20

21

22

23

24

25

1           THE COURT:  Let me hear the objection.

2           MR. SMURZYNSKI:  Your Honor, this was the subject of

3   motion in limine number 13 which your Honor granted.  It is one

4   of the e-mails from Mr. Aliano.

5           MR. ARMAND:  Our understanding is it wasn't one of the

6   e-mails that was included.  If we're wrong, we're happy to

7   withdraw it.  But I didn't think it was one of the e-mails that

8   was included in the motion in limine.

9           THE COURT:  In any event, what is the nature of the

10  objection?

11          MS. MAINIGI:  It is the same as the motion in limine.

12  We can check over lunch, but certainly it was intended to cover

13  that e-mail.  We believe that it did.

14          THE COURT:  That may be, but telling me that it is the

15  same as motion in limine number 13 conveys extremely limited

16  information.

17          MS. MAINIGI:  Your Honor, motion in limine number 13

18  related to e-mails from Patrick Aliano who is a current Bank of

19  America employee who sent some e-mails to Mr. O'Donnell in the

20  immediate day pretty much after he filed his complaint.  And

21  so, the objections include relevance and prejudice.

22          MR. HEFTER:  And for our part, hearsay, your Honor.

23          MS. MAINIGI:  That e-mail is not any different --

24  we'll check over lunch, your Honor, in terms of the granting.

25          THE COURT:  Well, I'll go back and take a look.  But,

1      on the face of it, the objection is very likely to be granted.

2                    MR. ARMAND:  Your Honor --

3                    THE COURT:  What is the relevance?

4                    MR. ARMAND:  Your Honor, Patrick Aliano made similar

5      e-mails that have already been introduced regarding quality

6      issues and having raised them early in the process and having

7      had the crystal ball of what would follow in terms of the poor

8      quality that happened after the Hustle.

9                    THE COURT:  I'm sorry.  Maybe I'm looking at -- this

10     is Exhibit 76, right?

11                    MR. ARMAND:  Yes, your Honor.

12                    THE COURT:  So, it begins with a e-mail from David J.

13     Wyatt to Michael J. Burns, Christopher N. Raine, Patrick

14     Aliano, Arnold Clemente, Dawn Gilbreath.  Subject:  The Hustle.

15     And the e-mail is a link having no substance whatsoever, other

16     than to show that it refers to something that was on CNN.

17                    Then, above that, we have an e-mail from Mr. Aliano to

18     Mr. Wyatt, Mr. Burns, Mr. Raine, Mr. Clemente and

19     Ms. Gilbreath, and it says the official U.S. attorney press

20     release.  Then it gives a link to the press release.

21                    And finally, we have an e-mail from David Farrell to

22     Patrick Aliano which states, which attaches what I just

23     referred to in the previous two e-mails and says proof of "we

24     told ya so."

25                    Please explain to me what a rational jurist is to make

1    of this e-mail.  There is no rational jurist.  A rational

2    juror.

3         MR. ARMAND:  Mr. Aliano here is circulating the press

4    release that was issued in connection with this lawsuit.

5         THE COURT:  Is that in evidence?

6         MR. ARMAND:  Is the press release in evidence?

7         THE COURT:  Yes.

8         MR. ARMAND:  No, it is not.

9         THE COURT:  No, and it's probably not likely to get

10   into evidence.  So no one knows -- the jurors have no idea what

11   press release is being referred to here.

12        MR. ARMAND:  No, but I think the point is that it is

13   clear it is the lawsuit that the government has filed.

14   Mr. Aliano is circulating --

15        THE COURT:  I'm not so sure that's so clear.  What is

16   it that Mr. Aliano is saying that you think is relevant?

17        MR. ARMAND:  He's saying this is consistent with his

18   prior e-mails about having warned that the Hustle would lead to

19   poor quality.  This is saying we told you so.

20        THE COURT:  Which is in quotes, although you don't

21   know what he means by those quotes, whether he's referring to

22   someone or whether he means -- I think the whole thing is

23   fraught with ambiguity.  Sustained.

24        How much longer do you have with this witness?

25        MR. ARMAND:  That was going to be my last exhibit.

1    The only other issue is the 10-K.  We've got the right one.  If

2    the Court will take judicial notice of the 10-K.

3            THE COURT:  I'll let you put it in through him if you

4    wish.

5            MR. ARMAND:  Okay.

6            THE COURT:  Is there any objection to the 10-K?

7            MR. SMURZYNSKI:  No.

8            THE COURT:  Okay.  How long is bank counsel going to

9    be on cross?

10           MR. SMURZYNSKI:  Less than an hour.

11           THE COURT:  And counsel for Ms. Mairone?

12           MR. HEFTER:  Less than 15 minutes.

13           THE COURT:  So we will finish today other than you

14   want to play the Price video?

15           MR. ARMAND:  Correct, your Honor.

16           THE COURT:  How long is that?

17           MR. ARMAND:  Under half an hour.

18           THE COURT:  I want to finish the government's case

19   today.  I have another matter starting at 3:30, but we can let

20   them wait.  We'll finish the government's case today.

21           We'll see you at 2 o'clock.

22           MR. HEFTER:  Your Honor, I just didn't want my silence

23   to be considered a waiver with respect to the 10-K.  We would

24   have an objection to the contents of the 10-K as it pertains to

25   Ms. Mairone.

1          THE COURT:  The question is whether it is hearsay at

2     all.  If it is hearsay, then of course that objection may be

3     well taken.  I have to refresh my memory on whether documents

4     of this sort constitute hearsay at all.  I'll take a look over

5     that at lunch.

6          MR. HEFTER:  I'll refresh my recollection too, your

7     Honor.

8          THE COURT:  Very good.  We'll see you all at

9     2 o'clock.

10          (Recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA73BAN5

AFTERNOON SESSION

2:15 p.m.

1    (In open court; jury not present)

THE COURT:  The relevant portion of the 2000 10-K for
Countrywide Financial is, according to the complaint, by the
end of 2007 nearly all mortgage loan production occurred in
Countrywide Bank rather than Countrywide Home Loans.

Can I see the portion of the 10-K that says that.

MR. ARMAND:  May I approach, your Honor?

THE COURT:  Yes.

MR. ARMAND:  In the middle of the first paragraph
beginning "historically."

THE COURT:  Yes.  I see this.  All right.

Historically, mortgage banking loan production has
occurred in Countrywide Home Loans.  Over the past several
years we have been transitioning this production to our bank
subsidiary Countrywide Bank FSB.  As of December 31, 2007, over
90 percent of our monthly mortgage loan production occurred in
Countrywide Bank.  Effective January 1, 2008, our production
channels have moved into the bank completing the migration of
substantially all of our loan production activities from CHL to
the bank.

This and indeed the entire 10-K, if otherwise
relevant, will be admissible against the banks as the statement
of a party adversary or its agents, etc.

DA73BAN5

1           The question was whether it would be admitted as to

2    Ms. Mairone.  On that ground, it would not be admissible as to

3    Ms. Mairone.  So then the question is, is this a fact or are

4    there at least facts of which I can take judicial notice under

5    Rule 201.   The Court may judicially notice a fact that is not

6    subject to reasonable dispute because it:

7           (1) is generally known within the trial court's

8    territorial jurisdiction; or

9           (2) can be accurately and readily determined from

10   sources whose accuracy cannot reasonably be questioned.

11          The Court may take judicial notice whether requested

12   or not, or shall take judicial notice if requested by a party

13   and supply the necessary information.  And I recall the

14   government did ask me to take judicial notice.  And judicial

15   notice can be taken at any stage of the proceeding, etc.

16          So, let me ask Ms. Mairone's counsel, why is what's

17   recited in the 10-K something that is not subject to a

18   reasonable dispute?

19          MR. MUKASEY:  May we have one moment to confer, your

20   Honor.

21          MR. ARMAND:  Your Honor, if I can point out, no

22   hearsay objection was raised as far as we can tell from the

23   joint pretrial order with regard to this document.

24          THE COURT:  Oh.  Well, that makes it easy.  If there

25   was no hearsay objection.

DA73BAN5

 1          MR. HEFTER:  Let us confirm one way or the other on

 2     that one, your Honor.

 3          THE COURT:  All right.

 4          (Pause)

 5          MR. HEFTER:  Your Honor, upon checking, we did not

 6     raise an objection in the pretrial order.

 7          THE COURT:  So it will be received.  Let's bring in

 8     the jury.

 9          (Jury present)

10          THE COURT:  Counsel, come to the side bar.

11          (At the side bar)

12          THE COURT:  First, my courtroom deputy, as you

13     probably heard, said that Juror No. 8 had just said that

14     they're closing her son's school because of possible tornado

15     activity further upstate.  She lives within the northern part

16     of the Southern District of New York.  And so she asked my

17     courtroom deputy to check with the neighbor who is going to

18     pick up the child to make sure the child is picked up, and of

19     course I said yes.

20          But in addition, we got another juror note:  Dear

21     Judge Rakoff, I'm writing to ask you if we can possibly resume

22     court at 10.  The reason being I have a doctor's appointment at

23     Sloan Kettering Hospital tomorrow morning.  I will be there at

24     8 a.m. for important blood test.  Take about a half hour, but

25     just to make sure that I make it back here on time.  Thank you,

DA73BAN5

1    Juror No. 6.

2            So, I'm inclined to think we should finish the

3    government's case today, but instead of having argument on the

4    Rule 50 motions tonight, have them tomorrow starting at 9 a.m.

5    and then we do not lose any jury time.  That works for

6    everyone?

7            MR. HEFTER:  I was going to suggest that anyway.

8            MR. ARMAND:  No objection.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA73BAN5                      Hansen - direct

```
 1              (In open court)
 2              MR. ARMAND:  May I approach the witness?
 3              THE COURT:  Yes.
 4    BY MR. ARMAND:
 5    Q.  Mr. Hansen, I'm showing you what has been marked as
 6    Plaintiff's Exhibit 126.  Can you tell me what Plaintiff's
 7    Exhibit 126 is.
 8    A.  It is a 10-K from Countrywide Financial Corporation.
 9    Q.  What is the date?
10    A.  Bear with me a second here.  2007 annual report.
11              MR. ARMAND:  The government offers Plaintiff's Exhibit
12    126 into evidence.
13              MR. SMURZYNSKI:  No objection.
14              MR. HEFTER:  No objection.
15              THE COURT:  Received.
16              (Plaintiff's Exhibit 126 received in evidence)
17    Q.  Mr. Hansen, can you please turn to page 10 of the exhibit.
18    And if you can, Ms. Michaud, blow up the first paragraph under
19    mortgage banking segment.  And Mr. Hansen, if you can please
20    begin reading in the middle of the paragraph where it states
21    "historically."
22    A.  "Historically mortgage banking loan production has occurred
23    in Countrywide Home Loans and quote CHL quote.  Over the past
24    several years we have been transitioning this production, to
25    our bank subsidiary Countrywide Bank FSB quote Countrywide Bank
```

 1    quote.  As of December 31, 2007, over 90 percent of our monthly

 2    mortgage loan production occurred in Countrywide Bank.

 3    Effective January 1, 2008, our production channels have moved

 4    into the bank completing the migration of substantially all of

 5    our loan production activities from CHL to the bank.  The

 6    mortgage loan production, the related balance sheet, and the

 7    income relating to the holding and sales of the loans is

 8    included in our mortgage banking segment, regardless of whether

 9    activity occurred in CHL or Countrywide Bank.  We group the

10    activities of our mortgage banking segment into three business

11    sectors:  Loan production, loan servicing and loan closing

12    services."

13            MR. ARMAND:  Your Honor, the government has two

14    stipulations which we would like to read.  If you would like us

15    to do it at the conclusion of the examination on the witness,

16    it is on the same topic.

17            THE COURT:  I think we should do it after the

18    cross-examination.

19            MR. ARMAND:  Understood.  I pass the witness.

20            THE COURT:  Cross-examination.

21    CROSS-EXAMINATION

22    BY MR. SMURZYNSKI:

23    Q.  Good afternoon, Mr. Hansen.

24    A.  Good afternoon.

25    Q.  My name is Ken Smurzynski.  I'm an attorney for the banks.

1    I'll ask you a number of questions this afternoon.

2               Mr. Hansen, you never worked for the Full Spectrum

3    Lending Division, did you?

4    A.  That's correct.

5    Q.  You didn't work with any of those people whose names you

6    had to read before the lunch break on those e-mails, did you?

7    A.  No, I did not.

8    Q.  You never worked at Countrywide Bank?

9    A.  Not as an employee of Countrywide Bank.

10   Q.  You never worked for Countrywide Home Loans Inc., did you

11   either?

12   A.  Not as an employee, correct.

13   Q.  You never worked at Bank of America, correct?

14   A.  That's correct.

15   Q.  The testimony you've given today is entirely based on

16   documents that you didn't create?

17   A.  Correct.

18   Q.  They're also documents you only saw for purposes of this

19   court case, correct?

20   A.  Correct.

21   Q.  If the government attorneys hadn't handed them to you, you

22   never would have seen them, is that right?

23   A.  That's correct.

24   Q.  You started your testimony this morning talking about

25   certain data with respect to the HSSL loans, do you recall

1    that?

2    A.  Yes.

3    Q.  When you did that, did you -- strike that.

4          In analyzing that data, did you give any consideration

5    to which branches of Countrywide to include as having

6    originated HSSL loans?

7    A.  As originated, no.

8    Q.  Mr. Hansen, do you have any knowledge of what the HSSL

9    process is?

10   A.  No, I do not.

11   Q.  Did the lawyers for the government tell you what the

12   Central Fulfillment process was?

13   A.  No.

14   Q.  It is a fact, isn't it, Mr. Hansen, that the entirety of

15   your testimony is based exclusively on criteria the government

16   attorneys gave you to analyze?

17   A.  Correct.

18   Q.  And on direct you mentioned four criteria.  The start date,

19   the stop date, whether the loan was given an accept by CLUES,

20   and the location of the processing or funding branch, correct?

21   A.  Yes.

22   Q.  With regard to the start date, that was the date the

23   government's attorneys gave you, right?

24   A.  Correct.

25   Q.  You have no personal knowledge as to whether that's the

DA73BAN5                    Hansen - cross

1   correct start date for figuring out whether those are HSSL

2   loans?

3   A.   Correct.

4   Q.   And same thing with the end date.  That was a date given to

5   you by the government attorneys?

6   A.   That's correct.

7   Q.   You have no personal knowledge as to whether that's the

8   correct end date, if you are trying to figure out what were the

9   HSSL loans?

10  A.   Correct.

11  Q.   You also talked about CLUES accept.  That was another

12  criteria given to you by the attorneys for the government.

13  A.   Correct.

14  Q.   Again, you have no personal knowledge as to what a CLUES

15  accept means, is that right?

16  A.   Correct.

17  Q.   You have no idea how that would fit into whether you

18  determined whether a loan is in fact an HSSL or not?

19  A.   Correct.

20  Q.   Let's talk about location.  You talked about five cities as

21  I recall on direct.

22  A.   Correct.

23  Q.   What were those five cities?

24  A.   Chandler, Plano, Hatboro, Richardson and Rosemead.

25  Q.   Do you have any knowledge, Mr. Hansen, as to whether

DA73BAN5                          Hansen - cross

1    Countrywide used a term known as, quote, branch within its

2    processes?

3    A.   The field names were located, they would say processing

4    branch and funding branch on the headers in the data that I

5    received.  So that's the extent of what branch I would have

6    known.

7    Q.   Do you have any personal knowledge, Mr. Hansen, as to

8    whether there were multiple branches within Chandler, Arizona?

9    A.   There were multiple branches within Chandler, Arizona,

10   correct.

11   Q.   The same thing would be true of the four other geographical

12   locations you gave, Hatboro, Plano, Richardson, and Rosemead?

13   A.   I believe that is correct.

14   Q.   Do you have any knowledge as to whether all of the branches

15   within Chandler utilized the High-Speed Swim Lane process?

16   A.   No, I do not.

17   Q.   When you did your work and you created your data set of

18   28,882 loans, did you treat every loan that went through

19   Chandler that met the date criteria and the accept under the

20   CLUES criteria as being an HSSL loan?

21   A.   As long as it went through the either processed or funded

22   but not originated, correct.

23   Q.   Processed or funded, regardless of the branch within

24   Chandler, is that right?

25   A.   Correct.

1    Q.  Mr. Hansen, if it turns out that not every branch within

2    Chandler was utilizing the HSSL process, your determination of

3    what were HSSL loans would be wrong, correct?

4    A.  I can't answer that.  Because there might have been

5    branches that were also in Chandler that didn't have any loans

6    that met that criteria.  So I can't answer that yes or no.

7    Q.  You don't know one way or the other?

8    A.  If you're changing the criteria, I can't answer that for

9    you.  Correct.

10   Q.  So --

11   A.  So, sorry.  If you are saying that -- let's say there was

12   10 branches in Chandler, and if you are saying a branch 111 was

13   not part of this program, I can't tell you right now if that

14   one -- if there was loans that were processed or funded through

15   branch 111 were part of the Hustle population without going and

16   analyzing my data.

17          MR. SMURZYNSKI:  Alex, if you can put up Plaintiff's

18   Exhibit 232 which is already in evidence.  If I might approach

19   the witness, your Honor.

20          THE COURT:  Yes.

21   Q.  Mr. Hansen, Plaintiff's Exhibit 232 is a document that's

22   already in evidence.  Have you seen this document before?

23   A.  I can't tell you off the top of my head if I have.  If go

24   through here, I can't recall.  It does not look familiar to me,

25   no.

1    Q.   Let's turn if you will to the sixth page of the document.

2    A.   Okay.

3             MR. SMURZYNSKI:   Alex, if you could blow up the very

4    top of that document for a moment.

5    Q.   At the very top in the upper-left-hand corner, just a bit

6    down, do you see an indication of CF slash field?

7    A.   Yes, I do.

8    Q.   Mr. Hansen, do you understand that to mean either Central

9    Fulfillment or field branches?

10            MR. ARMAND:   Objection.

11            THE COURT:   Was there an objection?

12            MR. ARMAND:   Objection.   Foundation.

13            THE COURT:   If you have a basis for answering that,

14   you may.

15   A.   I have no idea.

16   Q.   When you included loans that had been processed or funded

17   at Chandler, Richardson, Hatboro, Rosemead and Plano, did you

18   take into account whether they were a Central Fulfillment

19   branch or a field branch?

20   A.   No, I did not.

21            MR. SMURZYNSKI:   Alex, if you could highlight on page

22   six or why don't we go to the full page six, and highlight and

23   pull up the highlights of those five centers under "field."

24   Q.   So Mr. Hansen, make sure I understand, if there were loans

25   that went through these field branches at Richardson and

1  Chandler, you included them within the HSSL population,

2  correct?

3  A.  I will have to doublecheck, but it's a possibility, yes.

4  Because I don't have these branch numbers known in the top of

5  my head.  If they were included, they might have been, yes.

6  Q.  You did nothing to exclude particular field branches from

7  your analysis, correct?

8  A.  That's correct.

9  Q.  If we go to the next page, page seven of Plaintiff's 232.

10  Same thing with those?  Those were included in your HSSL

11  population?

12  A.  Like I said, I can't say one way or the other if they were

13  or were not.  But I can't just tell looking at the branch

14  number you have here and tell you definitely they are or

15  definitely they're not.

16         MR. SMURZYNSKI:  Alex, if you can turn to the next

17  page.

18  Q.  Mr. Hansen, you did nothing to exclude these field branches

19  either?

20  A.  Same as before.  I can't just tell you by looking at the

21  loan number or, sorry, the branch number if I did or did not

22  include them.

23         MR. SMURZYNSKI:  Alex, if you can turn to the next

24  page.

25  Q.  Same answer with respect to that, Mr. Hansen?

DA73BAN5                          Hansen - cross

1   A.  Yes.

2           MR. SMURZYNSKI:  Alex, if you could go about halfway

3   down the page, there is a field branch 6114.  If you can circle

4   that.

5   Q.  You see that, Mr. Hansen?

6   A.  Yes, I do.

7   Q.  Okay.  You testified earlier today about Plaintiff's

8   Exhibit 433.  It is one of these large binders.  Do you still

9   have it in front of you?

10  A.  I believe so.  You said 433?

11  Q.  433.  If you'll start at the back, and go three pages in.

12  A.  Actually, I apologize.  My 433 is just one page here.

13  Q.  There should be a binder.  Let me see it looks like it's at

14  your feet.

15          MR. SMURZYNSKI:  Your Honor, if I may approach?

16          THE COURT:  Yes.

17          MR. SMURZYNSKI:  It's down here.

18          THE WITNESS:  Thank you.

19  Q.  Mr. Hansen, if you start in the back and you go back three

20  pages.  If you're with me you have a document entitled

21  "underwriters worksheet."  Do you see that?

22  A.  Three pages from the back of this whole binder?

23  Q.  Three pages in.  It's --

24  A.  Yes, sorry.  I see it.

25  Q.  You see up top it says prepared by Veronica Gata, date

DA73BAN5                        Hansen - cross

1    January 10, 2008?

2    A.  Yes.

3    Q.  This was one of the three loans you testified this morning

4    was an HSSL loan, correct?

5    A.  Yes.

6    Q.  Based on the criteria that had been given to you by the

7    government?

8    A.  Yes.

9    Q.  If you look over on the right-hand side of the document, do

10   you see a branch number?

11   A.  Yes, I do.

12   Q.  And that's branch 6114.

13   A.  Correct.

14   Q.  That's the same branch number within the collection of

15   field branches that was on Plaintiff's Exhibit 232, correct?

16   A.  It is the same number?  6114 under branch, yes.

17            MR. SMURZYNSKI:  Alex, if you could turn to the next

18   page of 232.

19   Q.  Mr. Hansen, these are more field branches you're not sure

20   whether you included or not within -- strike that.

21            Mr. Hansen, these are more field branches that you did

22   not exclude from your criteria for determining HSSL loans,

23   correct?

24   A.  Correct.

25            MR. SMURZYNSKI:  Alex, the next page.

1    Q.  Same answer with respect to this page?

2    A.  Correct.

3           MR. SMURZYNSKI:  Alex, the next page.

4    Q.  Same answer with respect to that page, Mr. Hansen?

5           MR. ARMAND:  Objection.  It is not clear what we're

6    talking about.

7           THE COURT:  Yes.

8    Q.  Let me restate the question.

9           Mr. Hansen, you should now have in front of you what

10   has a Bates number at the bottom of ending in 2130.  Do you see

11   that?  It is in the very bottom right-hand corner.

12   A.  Ending in --

13   Q.  Second to last page of that document.

14   A.  Okay.  Would you mind showing it to me on here?

15   Q.  Sure.

16          MR. SMURZYNSKI:  If I might approach, your Honor?

17          THE COURT:  Yes.

18   Q.  There is something called a Bates number.

19   A.  Yes.  I see that at the bottom.  302130.

20   Q.  Now we are all on the same page, the field branches on this

21   page were not excluded from your criteria for an HSSL loan,

22   correct?

23   A.  Correct.

24   Q.  If you turn to the page, the final page of that exhibit,

25   Mr. Hansen, it is a fact that the field branches on the last

1   page of Exhibit 232 were not excluded from your definition of

2   HSSL loans?

3   A.  Correct.

4   Q.  Mr. Hansen, we've looked at a lot of pages.  Just make sure

5   we're clear.  Is it a fact that you did not exclude from your

6   definition of HSSL loans any of the field branches found within

7   Plaintiff's Exhibit 232?

8   A.  That is correct.

9   Q.  Earlier today, we also looked at a document, it was

10  Plaintiff's Exhibit 442 which listed three different loans.  Do

11  you recall that?

12  A.  Yes, I have it right here.

13  Q.  I don't have a copy to show the jury, so if I'll ask you to

14  help me read along with us.  On those three loans you read out

15  some of the names of people who appeared in those loan files,

16  correct?

17  A.  Yes.

18  Q.  And with respect to the loan at the very top, which was

19  loan number 179661555, can you read for me beginning with the

20  column SMPTA name, the name?

21  A.  Krol, Daniel.

22  Q.  In the next column that person's title?

23  A.  CFC underwriter associate senior.

24  Q.  The next column under SMUW HIST name, the person's name?

25  A.  It is the same name, Daniel Krol, just in reverse order.

DA73BAN5                         Hansen - cross

1    Q.  And the title?

2    A.  CFC underwriter associate senior.

3    Q.  And in the next column with regard to whether tracker A or

4    tracker approver?

5    A.  Daniel Krol.

6    Q.  And his title?

7    A.  CFC underwriter associate senior.

8    Q.  If you'll go down to the second of the three loans that you

9    listed on Plaintiff's Exhibit 442, and to the right of the

10   stuff you looked at earlier, can you read here the name of the

11   SM underwriter history name.

12   A.  James Henderson.

13   Q.  Mr. Henderson's title?

14   A.  CFC underwriter one.

15   Q.  Then next to that tracker approver?

16   A.  James K. Henderson.

17   Q.  One of the other documents we looked together at,

18   Mr. Hansen, was a chart.  Do you remember that pie chart with

19   respect QA?

20   A.  Yes, I do.

21   Q.  You have no personal knowledge of the QA process at

22   Countrywide, do you?

23   A.  No, I do not.

24   Q.  When you listed loans on that pie chart, you used the same

25   criteria as we went through just a couple minutes ago with

1  regard to what were included as HSSL loans?

2  A.  Yes.

3  Q.  You have no personal knowledge about what any particular QA

4  finding means?

5  A.  No, I did have an e-mail that was dated in November that

6  gave definitions for which the action required, action

7  requested, and low risk meant.

8  Q.  My question to you, Mr. Hansen, is you have no personal

9  knowledge?

10 A.  Personal knowledge, no.

11 Q.  You have no knowledge, for example, of when in the process

12 QA is done?

13 A.  I can't tell based on the dates in the data that was

14 provided to me.  So these loans were QA'd before the loans were

15 funded.

16 Q.  Before they were funded.  Okay.  Mr. Hansen, do you have

17 any personal knowledge of the difference between a QA finding

18 and a QC finding?

19 A.  No, I do not.

20 Q.  Mr. Hansen, do you have any knowledge as to whether a QA

21 result would -- strike that.

22         Let me ask a better question.

23         Mr. Hansen, you have no personal knowledge as to

24 whether a QA finding was addressed or not addressed prior to

25 the loan being sold to the GSEs, do you?

```
 1              MR. ARMAND:  Objection.  Cumulative, your Honor.

 2              THE COURT:  Sustained.

 3   Q.  Mr. Hansen, another document we looked at together was a

 4   chart of income earned by the FSL Division.  Do you recall

 5   that?

 6   A.  Yes.

 7   Q.  The way you generated that chart was applying your

 8   definition and looking at a particular column in the data, is

 9   that right?

10   A.   Correct.  It was the income from sale.

11   Q.   Income from sale.  Do you know how that income from sale

12   number was calculated?

13   A.   The definition from the bank says this number was provided

14   by the finance team.

15   Q.   Do you know how the finance team determined that income

16   number?

17   A.   No.

18   Q.  Mr. Hansen, are there costs associated with generating and

19   originating loans?

20              MR. ARMAND:  Objection.

21              THE COURT:  Sustained.

22   Q.  Mr. Hansen, do you know whether Countrywide Bank made any

23   profit on the loans in which you stated the income?

24              MR. ARMAND:  Objection.

25              THE COURT:  You've already established his lack of
```

DA73BAN5                        Hansen - cross

1   knowledge of these kinds of facts.  So, this is argumentative.

2   Sustained.

3   Q.  Mr. Hansen, do you know whether Countrywide Bank earned

4   income on sales of loans other than those that you put on that

5   chart?

6            MR. ARMAND:  Objection.

7            THE COURT:  Sustained.

8   Q.  Mr. Hansen, do you know one way or the other whether the

9   income that Countrywide earned on each of those HSSL loans was

10  higher or lower than it earned on other loans?

11           MR. ARMAND:  Objection.

12           THE COURT:  Counsel, I thought I had made clear the

13  basis of my ruling.  If you want a side bar, I'm happy to hear

14  you there.  Otherwise, move on.

15           MR. SMURZYNSKI:  Your Honor, this is my last question.

16           THE COURT:  All right.

17           MR. SMURZYNSKI:  I have no further questions.

18           THE WITNESS:  Thank you.

19           THE COURT:  Ms. Mairone's counsel.

20  CROSS-EXAMINATION

21  BY MR. HEFTER:

22  Q.  Mr. Hansen, my name is Michael Hefter.  I represent Rebecca

23  Mairone.

24           I think we were talking about Plaintiff's Exhibit 431.

25  Do you have that binder in front of you?

1    A.  Yes.  Give me one second.  You said 431?

2    Q.  Yes.

3    A.  Yes.

4         MR. HEFTER:  Your Honor, my understanding, I could be

5    wrong, is that some of these documents we did not have access

6    to for the purposes of the screen.  So if I can ask a favor of

7    Ms. Michaud to have it shown to the jury?

8         MR. ARMAND:  Absolutely.

9         THE COURT:  Sure.

10        MR. HEFTER:  Ms. Michaud, if we can have the first

11   page of Exhibit 431.  Thank you.

12   Q.  There is a set of very, very small boxes in the middle of

13   the page.

14   A.  Okay.

15   Q.  Purchase, instruction and the like.  Do you see that?

16   A.  Yes.  Purpose of loan?

17        MR. HEFTER:  I was asking Ms. Michaud that.

18        THE WITNESS:  I'll wait for that.

19   Q.  Do you see those boxes?

20   A.  Yes.

21   Q.  Does this indicate to you that this is a loan application

22   for the purchase of a home?

23   A.  Yes.

24   Q.  In connection with the criteria that was provided to you,

25   were you provided any distinction between a purchase and a

DA73BAN5                          Hansen - cross

1   refinance by the government?

2   A.  No.

3   Q.  If you look at the top of the page, do you see on the top

4   right on the top, sir.  There is a date stamp.

5   A.  August 28, 2007?

6   Q.  Yes.  Thank you.  This is the first page of the loan

7   application?

8   A.  It appears to be, yes.

9   Q.  From the first page of the application, can you tell how

10  much this loan application was for, the dollar amount?

11  A.  $179,925.

12  Q.  Do you know how much the property was appraised for at the

13  time?

14          MR. ARMAND:  Objection.  To the extent he's reading

15  from a document, that's fine.

16  Q.  Let me ask you this question.  Do you know one way or the

17  other?

18  A.  Looking at this on here, if I can go through the print I

19  might find it.  Sometimes it is attached on separate pages.

20  Just based off this, I do not see the appraisal value on here.

21  Q.  Let me see if I can help you.  I think it is the 12th page

22  into the binder.

23  A.  Okay.  Can you put it up on the screen here?

24  Q.  Sure.

25          MR. HEFTER:  If I can approach, maybe I can help him

DA73BAN5                         Hansen - cross

1    out.

2              THE COURT:  Yes.

3              THE WITNESS:  Sorry.  The print is pretty poor on

4    this.

5    Q.  Can you just read for the record the appraised value of the

6    subject property?

7    A.  240,000.

8    Q.  Sitting here today, do you know when this loan closed one

9    way or the other?  Just asking you whether you know.

10   A.  Off the top of my head, no, I do not.  But I have that

11   data.

12             MR. HEFTER:  Thank you very much, your Honor.  No

13   further questions.

14             THE COURT:  Any redirect?

15             MR. ARMAND:  No, your Honor.

16             THE COURT:  Thank you so much.  You may step down.

17             (Witness excused)

18             THE COURT:  All right.  I understand the government

19   wanted to play one other deposition.

20             MR. ARMAND:  Yes, your Honor.  We also have just some

21   stipulations.

22             THE COURT:  Yes, go ahead.

23             MR. HEFTER:  Before those are read, I don't know if

24   we've actually seen them.

25             MR. ARMAND:  I can show you exactly.  I want to read

DA73BAN5

1    paragraph 28, 29 and 30 from the joint pretrial order, and

2    paragraph 162 from the bank defendants' answer.

3          First I'm reading from paragraph 28 of the parties'

4    joint pretrial order in this case.  These are stipulated facts.

5          Bank of America N.A., BANA, is a federally insured

6    financial institution.

7          Paragraph 29.  On April 27, 2009, Countrywide Bank

8    merged into BANA.  Prior to the acquisition, Countrywide Bank

9    was a federally insured financial institution.

10         Paragraph 30.  BANA is the successor to Countrywide

11   bank, by de jure merger.

12         I'm now reading from the bank defendants' answer to

13   the government's complaint.

14         Paragraph 162.  Defendants do not admit any factual

15   allegations purporting to establish successor liability on

16   grounds of de facto merger, substantial continuity, or

17   assumption of liabilities.  Defendants, however, elect not to

18   contest plaintiff's successor liability claims in this action

19   given the circumstance that the great bulk of the loans at

20   issue in the instant action were originated by an entity as to

21   which BANA is the successor by de jure merger.

22         That's all.

23         THE COURT:  Okay.  Ladies and gentlemen, I should tell

24   you a stipulation is like other evidence, you can consider it

25   for any purpose.  It is something the parties have agreed to.

1    And you heard in those stipulations the terms de facto and de

2    jure, which I know you know like that.  But just in case you

3    don't.  What they were talking about is that as by operation of

4    law, that's what "de jure" means, Bank of America is the

5    successor to Countrywide.  So it is responsible in the eye of

6    the law for whatever Countrywide did, even if in fact it wasn't

7    around at the time or didn't participate at the time.

8             So, all of this is really lawyer talk, but I thought I

9    would share it with you anyway.  All right.

10            We have a deposition to be played?

11            MS. LONDON:  Yes.  The United States calls Robert

12   Price by video deposition.  May we approach with the

13   transcript?

14            THE COURT:  Yes.

15            MR. HEFTER:  Your Honor, we'll have the same protocol

16   as Mr. Boland's testimony.

17            THE COURT:  All right.

18            (Video playing)

19   Q.  Good morning.  My name is Jaimie Nawaday.  I'll be asking

20   you a series of questions today.

21            I'd like to begin a little bit with your job history.

22   Am I correct you have roughly 20 years of mortgage industry

23   experience?

24   A.  Yes.

25   Q.  You graduated college from University of Texas at Austin

DA73BAN5                          Price

1    with an economics degree?

2    A.  No.

3    Q.  Okay.  Did you graduate from college?

4    A.  No.

5    Q.  Did you attend the University of Texas at Austin?

6    A.  Yes.

7    Q.  But you do not have a degree in economics?

8    A.  No.

9    Q.  Can you tell me about your college experience.

10   A.  I studied economics at University of Texas for three years,

11   went to Southwest Texas University in my freshman year,

12   transferred to UT in my sophomore year.

13   Q.  Am I right you joined Full Spectrum Lending in 2004?

14   A.  Yes.

15   Q.  You were a first vice president of underwriting?

16   A.  Yes.

17   Q.  In 2006 you became senior vice president of central funding

18   centers, is that correct?

19   A.  Yes.

20   Q.  In 2007 you became senior vice president of underwriting

21   and funding?

22   A.  Sounds correct.

23   Q.  In that role, how many underwriters did you supervise?

24   A.  At that time I don't remember exactly how many.

25   Q.  Can you give me an approximate -- was it a few dozen, for

1    example?

2    A.  It would have been probably at least a few dozen.

3    Q.  More than 50?

4    A.  I don't recall exactly -- I had several positions over a

5    period of time in which I had larger and smaller groups.  Would

6    say probably over 50.  But I don't recall exactly how many.

7    Q.  Okay.  Can you explain to me the various positions you held

8    within Full Spectrum from the summer of 2007 through say June

9    of 2008.

10   A.  I remember being over in the Central Fulfillment group,

11   over in an FHA group that I was tasked to grow and build.  I

12   was -- I was -- that's primarily what it was, either over an

13   entire Central Fulfillment group that handled everything from

14   processing, underwriting and funding, to running an FHA group,

15   to going back and running a fulfillment group.

16            So it changed over -- certainly over a couple year

17   period of time.

18   Q.  Okay.  When you were running a fulfillment group, who were

19   you supervising besides underwriters?

20   A.  Processors and funders.

21   Q.  How many processors did you supervise?

22   A.  Again, I don't remember the exact amount.  I'm going to

23   guess probably between six and 10 teams of six or eight per

24   team.

25   Q.  You said six or eight per team.  Is it six or eight loan

DA73BAN5                    Price

1    processors per team?

2    A.  Yes.

3    Q.  Was there anyone else who made up a team besides loan

4    processors?

5    A.  There would have been underwriters and funders.

6    Q.  How many underwriters per team?

7    A.  There was normally between six and 10.

8    Q.  Six and -- so, I'm sorry.  I need to back up a little bit.

9    I'm confused.  You said you supervised how many teams when you

10   were in charge of a fulfillment center?

11   A.  All together?

12   Q.  Yes.

13   A.  Again, I don't remember the exact size.  I am going to say

14   it was probably six to eight groups or teams that consisted of

15   underwriters, funders and processors.

16   Q.  Okay.

17   A.  But it varied.  So, it is hard to pin a number down on it,

18   depending on the size and the product or the sales group that

19   it supported.

20   Q.  So within -- so you supervised six to eight teams, on

21   average, and they consisted of underwriters, processers,

22   funders, is that right?

23   A.  Yes.

24           (Continued on next page)

25

DA7TBAN6                        Price

1   Q.  And how many underwriters did you say per team?

2   A.  Six to ten.  It would have varied.

3   Q.  And how many processors per team?

4   A.  Usually about the same.

5   Q.  And what about the funders?

6   A.  Funders were a smaller team, normally it was a team of six

7   or eight, but you only had one team usually against maybe three

8   processing teams and an underwriting team or two underwriting

9   teams.

10  Q.  When you were supervising these teams let's say around

11  2007, what was the basic job of the processors on that team?

12  A.  Again, six years ago, so I don't remember exactly.

13  Normally the processor is the one who gathers the information,

14  talks to the borrower, updates the mortgage operating system

15  with the data they receive from the borrower and the third

16  parties and then primarily submit that to the underwriters to

17  validate and make sure that it's correct.

18  Q.  And then what was the job of the underwriter?

19  A.  The underwriter was to make sure that the information and

20  the operating system matched the documents it was provided.

21  Q.  What about the funder?

22  A.  The funder's job was to take the loan as it was cleared to

23  close by the underwriter, all the terms had been locked down,

24  and they basically drew the documents, reviewed the documents,

25  and sent them out to the title company, made sure that the

1   settlement statement was correct, and then reviewed the signed

2   documents when they came back to make sure they met regulatory

3   compliance and internal process requirements.

4   Q.  And in the summer of 2007 time frame when you were in

5   charge of the fulfillment center, who did you report to?

6   A.  I remember reporting to Ed O'Donnell most of my time there.

7   Q.  Who did Mr. O'Donnell report to?

8   A.  Cliff Kitashima.

9   Q.  What do you remember about your conversations with

10  Mr. O'Donnell?

11  A.  I remember Neal was very passionate about --

12          MS. LONDON:  Pause for a request for limiting

13  instruction.

14          THE COURT:  Yes, this answer is received only against

15  the bank defendants.

16  A.  -- his feeling that underwriting authority should remain

17  with underwriters.

18  Q.  And he brought that concern to you on more than one

19  occasion?

20  A.  Yes.

21  Q.  I'll be more specific, I'm sorry.  Full Spectrum did adopt

22  the practice of allowing loan processors to clear conditions?

23  A.  Yes.

24  Q.  Do you recall when that happened?

25  A.  Not specifically.  I mean I don't remember the date in

DA7TBAN6                        Price

```
 1   which we completely changed directions from what we were doing,
 2   and I think it was more of a gradual process, if I remember
 3   correctly, but I don't remember exactly when and when we, I
 4   guess for a lack of a better term, flipped a switch on it.
 5   Q.  You mentioned previously something about this was the
 6   direction that was -- or the directive handed down, what did
 7   you mean by that?
 8   A.  Well, I mean when we changed processes and the changes
 9   began to take place of us transitioning from subprime to prime,
10   the leaders of the division were making the decisions and
11   basically saying here's what we decided to do and here's what
12   we decided, how we're going to do it.
13   Q.  Did you pass along the concerns that Mr. Ballance expressed
14   to you to anyone else, Mr. O'Donnell or anyone else?
15   A.  I spoke to Ed about concerns, and I would have shared -- I
16   remember sharing Neal's concerns because of Neal himself, which
17   is not meant to be bad.
18   Q.  What do you mean by "because of Neal himself?"
19   A.  Neal is very passionate, very rigid, and he's very
20   opinionated when he feels strongly about something.
21   Q.  Are you aware of a program called the High-Speed Swim Lane?
22   A.  Yes.
23   Q.  And the High-Speed Swim Lane involved giving loan
24   processors the authority to clear conditions on loans, is that
25   right?
```

1789

1   A.   Correct.

2   Q.   Do you know who is involved in the design of the High-Speed

3   Swim Lane?

4   A.   I don't remember exactly who the actual designers were.

5   There was a lot of people involved with input, but I don't

6   remember exactly who the individuals were that were in a room

7   putting a Vizio together with workflow-type items for us to

8   use, no.

9   Q.   Do you remember who was involved?

10  A.   I just said no, I don't know who -- oh, who would have been

11  involved?

12  Q.   I think --

13  A.   There's a number of people that would have been involved,

14  but I can't tell you that they specifically were the ones that

15  drew it up.  There was a lot of input from a lot of people.

16  Q.   Where did input come from?

17  A.   It would have come from Ron Cannon, probably Michael

18  Thomas, maybe.  I mean they were more involved with that type

19  of design and implementation work.

20  Q.   Were you involved in the High-Speed Swim Lane?

21  A.   I don't remember sitting down going box to box and

22  reviewing, approving or adding to the process, no.

23  Q.   So is it fair to say that you weren't involved in the

24  design of the High-Speed Swim Lane?

25  A.   No.

DA7TBAN6                    Price

1    Q.  And who was involved in the implementation?

2    A.  The implementation would have been the fulfillment

3    management group.

4    Q.  Who was in the fulfillment management group?

5    A.  It would have been Ed, and then Ed's direct reports and

6    then all of the fulfillment management down to the individuals

7    who actually executed the process.

8    Q.  So were you involved in the implementation?

9    A.  I would have been involved in rolling the process out, yes.

10   Q.  And James White, would he have been involved as well?

11   A.  Mm-hmm.

12   Q.  Do you remember any concerns being raised about a possible

13   effect on loan quality as a result of the High-Speed Swim Lane?

14       MS. LONDON:  Your Honor, there's a request for a

15   limiting instruction for the next three questions.

16       THE COURT:  All right, ladies and gentlemen, the

17   answers to the next three questions will be received only

18   against the bank defendants.

19   A.  Well, I think the concerns were around the impact on loan

20   quality generally.

21   Q.  What do you remember about that?

22   A.  There was concerns about the loan quality based on the

23   process and the fact that the loan processors were being

24   allowed to clear conditions.

25   Q.  And was there another part of the concern?

1   A.  Well, I mean the concern -- I think that the process and

2   the authority that was being given and the time in which --

3   that we had to prepare and launch it were also concerns.

4   Q.  Couldn't a loan processor be trained to do the same job?

5   A.  I'm sure they have and I'm sure they can.

6   Q.  And why did you think that the training of loan specialists

7   was not adequate within the process?

8   A.  I didn't say it wasn't.  We didn't talk about the training.

9   Q.  Did you believe than loan specialists were going to be

10  adequately trained to act with authority in the process?

11  A.  I don't remember the specific training modules that were

12  used and what type of loans they applied to.  I don't remember

13  right now what those were, so I can't really tell you whether I

14  felt at the time the training was specifically adequate or

15  inadequate.

16  Q.  Part of the High-Speed Swim Lane was having loan

17  specialists take over the tasks previously performed by

18  underwriters, correct?

19  A.  Correct.

20  Q.  What was your concern of having loan specialists perform

21  those tasks?

22  A.  The level of experience to clear underwriting conditions

23  that normally were cleared by underwriters, and the lack of

24  experience for the most part that most of them had in that

25  area.

DA7TBAN6                    Price

1   Q.  Were you concerned that they could not competently perform

2   those tasks?

3   A.  They could collectively, yes.  I'm sure there were and are

4   individual loan processors that could do a great job of

5   clearing conditions.  But that point in time, based on what we

6   had to work with and the changes we were implementing, I was

7   concerned that they were not be able to quickly do what we had

8   an underwriter there to do already.

9   Q.  By that point you -- at that point in time, you mean around

10  the time of the roll out of the High-Speed Swim Lane?

11  A.  I don't remember when.  I mean I would have raised concerns

12  when I felt I was concerned about it prior to, during, after.

13  I don't remember exactly when, I just know I did.

14  Q.  And did you express these concerns to anyone?

15  A.  Primarily Ed.

16  Q.  And what did -- how did he respond?

17          MS. LONDON:  We have another request for a limiting

18  instruction, your Honor.

19          THE COURT:  Yes, ladies and gentlemen, the next answer

20  will be limited to the bank defendants.

21  A.  I think he was in agreement.

22  Q.  Did others express the same concern that you had to you?

23  A.  Neal did definitely.  Vaguely Todd and Aaron, you know,

24  bringing it up.  I don't remember any specific individuals on

25  the teams coming in, although they may have.

1793

DA7TBAN6                    Price

1   Q.   What backstops did you ask to have in put in place?

2   A.   Well, the inline QA process to look at loans before we got

3   the feedback from the QC corporate QC group.

4   Q.   And this was something that you wanted to put in place

5   specifically with respect to High-Speed Swim Lane loans?

6   A.   I remember that, yes.

7   Q.   So you requested that an inline QA process be put in place

8   with respect to High-Speed Swim Lane loans?

9   A.   Did I request it or did you say the collectively "we?"

10  Q.   Either one, did you or it Mr. --

11  A.   I don't know if I came up with the idea.  I agreed that was

12  good way to get a realtime pulse on the quality of the loans

13  that we couldn't get from corporate QC because of the lag time

14  it took to get the results.

15  Q.   So it was a practice that you supported?

16  A.   Yes.

17  Q.   And was that put in place?

18  A.   Yes.

19  Q.   And who initiated that or who put that into place?

20  A.   Ed would have been the one that put it into place.  I

21  think, if I remember, correctly Mike Burns was involved in kind

22  of executing it.

23  Q.   What was the larger group?

24  A.   The underwriters, the processors, and the people actually

25  doing the work.

1   Q.  And who directed that the QA results be limited to the

2   smaller group?

3   A.  You mean who made the decision that it be -- that it only

4   be given to the smaller group?

5   Q.  Yes.

6   A.  I believe Rebecca.

7   Q.  Why do you believe that?

8   A.  I just remember her agreeing to the process but making sure

9   that the specific data was looked at by a smaller group first

10   and not communicated broadly out like the QC results had been

11   historically.

12   Q.  So is it fair to say that she gave conditional approval to

13   the QA process?

14   A.  I remember it that way.

15   Q.  And her approval was conditioned on not widely

16   communicating the results of the QA process?

17   A.  Again, yes.

18   Q.  Can you explain what a compliance specialist was?

19   A.  If I remember correctly, the funder primarily -- either the

20   funder -- trying to think was the process, the compliance

21   specialist's primary role was document -- executed document

22   review for regulatory compliance.  So they would look to make

23   sure that the notice of right to cancel, the dates were

24   correct, that the truth in lending was signed and dated

25   correctly and the note was signed and dated correctly, that any

DA7TBAN6                      Price

1   scratch outs were initialed and dated, so that the document

2   would be considered good document from a saleability

3   perspective.  The funders, I believe normally what they did was

4   they drew the documents, they did the preliminary HUD, and then

5   after the compliance review is over they would then go in and

6   clear any final conditions they had the authority for and issue

7   a funding number to the title company send a wire, fund the

8   loan.

9   Q.  So as part of the High-Speed Swim Lane, did the funder take

10  over the role of the compliance specialist?

11  A.  It appears that that's what happened.  I don't specifically

12  remember that happening.  I mean it wouldn't have been a huge

13  change because a lot of the work that was done on the funding

14  teams was kind of intermingled anyway.  If you had a compliance

15  specialist out, you know, the funder on the team could do the

16  compliance review of the loan.  The process was laid out to

17  separate the two, but the functionality within the team often

18  times wasn't too dissimilar.

19  Q.  Mr. Price, you have just been handed Government Exhibit 10

20  with Bates stamp BANA SDNY E 001342869, and let me know if you

21  finished reviewing the document.

22  A.  OK.

23  Q.  Do you remember receiving this email?

24  A.  No.

25  Q.  Any reason to believe it wasn't sent to you on February 6?

DA7TBAN6                          Price

1   A.  No.

2          MS. LONDON:  Your Honor, we move to admit Plaintiff's

3   Exhibit 103 into evidence.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 103 received in evidence)

6          MS. LONDON:  May I approach to publish to the jury?

7          THE COURT:  Yes.

8   Q.  What is a potential SUS finding?

9   A.  That's one where the QA auditor, which is different than

10  the corporate QC auditors, identified something that they think

11  the corporate auditors would identify as an SUS.

12  Q.  Is that different from -- are you familiar with a high risk

13  funding in the QA process?

14  A.  Well, I don't remember specifically what the ratings were

15  in the QA process.  I assume they were similar or the same they

16  were in the QC.  Severely unsats is considered the highest

17  level of defect, high risk would be considered a high risk item

18  that you address that it wouldn't be considered something that

19  rows to the level of SUS, which could -- which could rise to a

20  repurchase type of defect.  Then you have -- I think there may

21  have been medium and low risk as well, or may have just been

22  low risk, high risk and SUS.  I don't remember which ones.

23  There were different categories of risk.  Normally the lower

24  risk items were not really ever discussed, they were just

25  highlighted and noted and you looked at the report, but the

1    things that were really drilled down to were the SUSs.

2    Q.  Was the potential SUS finding the most severe finding that

3    you could receive for a QA result?

4    A.  It would have been the highest level of concern around a

5    defect.

6    Q.  And near the bottom of the page where it talks about

7    Central Fulfillment branch, it has says Richardson/CF has the

8    highest percentage of action required accessible findings.  Of

9    the 515 files reviewed, 428 were identified with action

10   required.  Potential SUS findings equal to 83.11 percent.  428

11   out of 515.  What would you expect to see?

12   A.  The final standard that we were tasked with was three

13   percent.

14   Q.  You were tasked with a standard of three percent SUS rate?

15   A.  Final corporate QC I believe three or four percent was

16   considered the -- where they wanted to be on defect

17   perspective.

18   Q.  And did this 83.11 percent potential SUS finding rate apply

19   to High-Speed Swim Lane loans?

20   A.  I don't see that this specifically is citing just the

21   High-Speed Swim Lane loans.  I don't -- unless I'm missing it,

22   I'm not seeing that is specifically being cited as a hundred

23   percent of the audit pool.  I don't know.

24   Q.  Good afternoon, Mr. Price, I'm Malachi Jones.  I represent

25   the Bank of America defendants and I have a few questions for

DA7TBAN6                              Price

1    you.

2              MR. JONES:  At this point the defendants offer

3    Defendant's Exhibit 446 into evidence.

4              THE COURT:  Received.

5              (Defendant's Exhibit 446 received in evidence)

6              MR. JONES:  Request permission to publish to the jury.

7              THE COURT:  Yes.

8    Q.  If we could go to Exhibit 4, which is matrix for condition

9    sign off authority levels.  And do you see that on the left

10   side of this matrix it lists authority criteria, level

11   requirements, restrictions, reasons for appeal, and then on the

12   far right is prime CLUES accept and High-Speed Swim Lane

13   authority.  Do you see that?

14   A.  Yes.

15   Q.  And that authority is limited to max 80 percent LTV,

16   correct?

17   A.  Max 80, LTV, yes.

18   Q.  Meaning that someone with that authority wouldn't be able

19   to clear a loan that had an LTD higher than 80 percent correct?

20   A.  Correct.

21   Q.  In addition, if you move down one box to the level one

22   requirements, in order to get that authority there's certain

23   training that is identified that must be completed, correct?

24   A.  Yes.

25   Q.  Including training on title red flags, correct?

DA7TBAN6                       Price

1    A.  Yes.

2    Q.  Flood compliance procedures, correct?

3    A.  Correct.

4    Q.  Appraisals, correct?

5    A.  Correct.

6    Q.  And also says stated income reasonability training to be

7    developed?

8    A.  Yes.

9    Q.  But in any event, that was to be a future requirement, do I

10   understand?

11   A.  Yes.

12   Q.  And then a person who would have prime CLUES accept for

13   High-Speed Swim Lane authority would have certain restrictions.

14   Do you see that in the box listed under exclusions?

15   A.  Yes.

16   Q.  Including that they would not be -- have the authority to

17   clear conditions on expanded approval loans?

18   A.  Yes.

19   Q.  And going further down, they also would not have the

20   authority to clear conditions for purchase, purchase loans,

21   correct?

22   A.  Correct.

23   Q.  And then under reasons for appeal, it identifies reasons

24   that a person could lose their authority, correct?

25   A.  Correct.

DA7TBAN6                         Price

1    Q.   Including that it could be based on audit findings from

2    prefunding, QA audits or QC audits, correct?

3    A.   Correct.

4    Q.   At least when they started out, where these QA reviews

5    mostly process focused?

6    A.   I remember them being pretty heavily process focused.

7    Q.   And in your experience, were the QA audits, the findings

8    sometimes erroneous?

9    A.   They were erroneous from QA and QC.

10   Q.   And for QC there was a formal rebuttal process to rebut

11   those findings before they were finalized, correct?

12   A.   Yes.

13   Q.   But there was no similar formal rebuttal process for the QA

14   process, was there?

15   A.   I don't remember it being as formal, but I don't remember

16   exactly what the process was.

17   Q.   Mr. Price, you testified earlier that you don't recall

18   having any direct communication with Rebecca Mairone concerning

19   HSSL, correct?

20   A.   Not individual specific discussion, no.

21   Q.   Centralized fulfillment involved a different way that Full

22   Spectrum Lending originated all loans underwritten by FSL,

23   correct?

24   A.   Well, Central Fulfillment fulfilled the loans that were

25   originated by call centers.

DA7TBAN6                        Price

1    Q.  So it wasn't just related to HSSL loans, right?

2    A.  I don't believe it was only HSSL related.

3    Q.  Is it fair to say that you don't recall specifics regarding

4    the HSSL workflow?

5    A.  I would say that's fair.

6    Q.  I'd like to direct your attention back to Exhibit 10.  Are

7    these the potential SUS finding of 83 percent that are

8    discussed here, you mentioned that these are not final quality

9    control findings, correct?

10   A.  Correct.

11   Q.  But you nevertheless were very concerned that the potential

12   SUS findings was 83 percent, is that right?

13   A.  Correct, these initial findings would be very concerning

14   just on the surface, yeah.

15              MS. LONDON:  We're finished.

16              THE COURT:  All right.  Anything else from the

17   government?

18              MR. ARMAND:  No, your Honor, the government rests.

19              THE COURT:  Very good.  So ladies and gentlemen, we

20   will let you go for today, and I think it's a good thing

21   because it hasn't started raining yet but I understand it will.

22   And tomorrow, to accommodate juror number six we will start at

23   10 o'clock, so please be here at 10 o'clock, I hope you have a

24   good evening.  We'll see you tomorrow.

25              (Continued on next page)

DA7TBAN6

1            (Jury not present).

2            THE COURT:  Someone needs to come up and clear the

3     stuff on the witness stand because I have a bench trial

4     starting in a few minutes.

5            MR. ARMAND:  We'll take care of it, your Honor.

6            THE COURT:  Anything that counsel needs to take up?

7     Very good.

8            MR. ARMAND:  Your Honor, there is one issue.

9            THE COURT:  Go ahead.

10           MR. ARMAND:  It's the witness list that the defense

11    has provided.  It provide an updated witness list last night

12    and still has 40-some-odd witnesses on it.  And a number of the

13    witnesses are individuals that during discovery the government

14    did not even get document discovery from because they were not

15    identified as people who we have documents that would be

16    relevant to the claims and defenses at issue in this case.

17           THE COURT:  Let me see the witness list, please.

18           MS. MAINIGI:  I have one, your Honor.

19           THE COURT:  Who are you calling tomorrow?

20           MS. MAINIGI:  Your Honor, Jack Shakett and Cliff

21    Kitashima are the two.  I don't think we'll get done with

22    Mr. Kitashima, he will be a long witness, but certainly hope to

23    be done with Mr. Shakett and begin a big chunk of

24    Mr. Kitashima.

25           THE COURT:  Were their depositions taken?

1          MS. MAINIGI:  Mr. Kitashima's was, and Mr. Shakett was

2     identified, the government didn't take his deposition.

3          THE COURT:  Who is Mr. Shakett?

4          MS. MAINIGI:  Mr. Shakett is the former COO of

5     Countrywide, your Honor, of the corporate, of corporate.

6          MR. ARMAND:  The government notes Mr. Shakett was not

7     listed on the 26(a) disclosures, as far as we could tell.

8          MS. MAINIGI:  I believe he was incorporated into the

9     26(a) disclosures.

10          THE COURT:  Well, I'm glad you're in agreement.  So

11     which is it?

12          MS. MAINIGI:  We're happy -- I don't have them at my

13     fingertips, your Honor, I'm happy to send them over to

14     Mr. Armand tonight.  This is the first he raised any issue.

15          THE COURT:  Are you planning to put any exhibits to

16     Mr. Shakett?

17          MS. MAINIGI:  There might be a couple, your Honor.

18          THE COURT:  So you'll need to get that to government

19     counsel tonight as well.

20          MS. MAINIGI:  Demonstratives, your Honor, or exhibits?

21          THE COURT:  Well, both.

22          MS. MAINIGI:  That's fine, your Honor.

23          THE COURT:  All right.  Now who -- on the next day we

24     have Lori Peffer, who is she?

25          MS. MAINIGI:  Ms. Peffer will be speaking about CLUES,

DA7TBAN6

```
 1    your Honor.
 2              THE COURT:  And was she -- was her deposition taken?
 3              MS. MAINIGI:  No.
 4              THE COURT:  Was she identified?
 5              MS. MAINIGI:  Yes.
 6              MR. ARMAND:  She's not a -- both Mr. Shakett and
 7    Ms. Peffer, Mr. Ho, Ms. Heinecke, all of these are individuals
 8    that we don't -- we didn't get document discovery from.
 9              THE COURT:  Well, did you subpoena documents?
10              MR. ARMAND:  Well, yeah, we served the bank with
11    document requests, and during the discussions about which
12    custodians would be produced these were not witnesses that were
13    identified as people who would have relevant information.
14              THE COURT:  Well, I don't understand.  Are they called
15    as custodians?
16              MS. MAINIGI:  Your Honor, we negotiated for weeks and
17    weeks and weeks, I think even as your Honor is painfully aware,
18    because we called you a couple of times over the scope of
19    discovery, these individual were identified by us.  They chose
20    not solicit various forms of discovery from them, whether it be
21    depositions or whether it be specific documents.  A lot of
22    these individuals did in fact produce documents and they're in
23    the production, but --
24              THE COURT:  Well, with respect to any person who is
25    identified in the Rule 26 disclosures but whose deposition was
```

DA7TBAN6

1    not taken, the defense should supply the government in advance

2    24 hours before that person is called, except for the two

3    obviously tomorrow, with a list of what exhibits, because I

4    assume the exhibits are already listed and have been supplied,

5    but a list of which exhibits are being introduced through each

6    specific witness.

7           With respect to anyone who was not disclosed under

8    Rule 26 disclosures, then I want to take that up, but so far

9    there seems to be only one disagreement about that, which is

10   Mr. Shakett.  So we'll need to find out the story on that.

11          It is a long list, but --

12          MS. MAINIGI:  Your Honor --

13          THE COURT:  Excuse me.

14          MS. MAINIGI:  I'm sorry.

15          THE COURT:  But on the several occasions when I

16   inquired of the defense with respect to this list, the defense

17   I thought made a reasonable argument as to the relevance and

18   non-cumulative nature of many of these witnesses.  Now we

19   didn't discuss them all, and if it turns out any one or more of

20   them are cumulative, we'll have to consider that then.  But I'm

21   not going to arbitrarily cut down the defense list given the

22   representations that were made, most of which struck the Court

23   as reasonable.

24          With respect to timing, however, the defense will

25   remember, I'm sure, the representation that, including

DA7TBAN6

1    reasonable time for cross-examination, that the entire defense

2    case will take no more than three weeks.  So beyond that, I'm

3    not prepared to strike anyone at this time, but we'll have to

4    inquire on a daily basis.  I do think it's only fair, as with

5    respect to any witness, particularly a witness that the

6    government has not deposed, but really to any witness that the

7    government have at least 24 hours to know which exhibits are

8    being introduced through which witness that will help them to

9    prepare.  And that would also include any demonstratives that

10   are not listed per se.

11          All right.  What we do need to settle, not only to

12   Mr. Shakett but anyone else on the list, if there is someone on

13   the list who was not disclosed in Rule 26 disclosures, that may

14   or may not present a separate problem.

15          MR. ARMAND:  Your Honor, we didn't check their

16   interrogatory responses for Mr. Shakett.  If they're

17   representing he was in their interrogatory responses, we'll

18   accept that.

19          MS. MAINIGI:  I believe that is the case, but will

20   have to check that.

21          THE COURT:  That's good enough.  OK.  Just everyone

22   should check that overnight and make sure, because at least as

23   to Mr. Shakett, I would have to deal with that problem

24   immediately tomorrow if he wasn't.

25          MS. MAINIGI:  We'll confirm as soon as we get back,

 1    your Honor.

 2              THE COURT:  Very good.  Anything else?

 3              All right.  Thanks.  So we will have oral argument on

 4    Rule 50 motions, as I indicated on the side bar, at 9:00 a.m.

 5    tomorrow and the jury will be here at 10.

 6              And I'm sorry, one last thing, because the defense has

 7    submitted letters, I would expect oral argument from the

 8    defense to be relatively short.  If the government wishes to

 9    submit a letter, there's no requirement, you're welcome to,

10    just make sure you get it in by 9 a.m. tomorrow, the

11    government.  But I think essentially the way I think this

12    should play out is we should take the defense letters as being

13    essentially opening argument of the defense.  So we'll hear

14    first from the government and then we'll hear from the defense

15    in rebuttal unless there's something that was not included in

16    the letter that defense counsel wants to raise.

17              All right.

18              MR. ARMAND:  Thank you, your Honor.

19              (Adjourned to October 8, 2013 at 9:00 a.m.)

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    ERIK LARS HANSEN

 4    Direct By Mr. Armand . . . . . . . . . . . .1693

 5    Cross By Mr. Smurzynski  . . . . . . . . . .1762

 6    Cross By Mr. Hefter  . . . . . . . . . . . .1777

 7                    PLAINTIFF EXHIBITS

 8    Exhibit No.                          Received

 9     444  . . . . . . . . . . . . . . . . . .1668

10     37  . . . . . . . . . . . . . . . . . . .1677

11     429  . . . . . . . . . . . . . . . . . .1702

12     440  . . . . . . . . . . . . . . . . . .1705

13     394  . . . . . . . . . . . . . . . . . .1706

14     399  . . . . . . . . . . . . . . . . . .1708

15     401  . . . . . . . . . . . . . . . . . .1708

16     403  . . . . . . . . . . . . . . . . . .1709

17     405  . . . . . . . . . . . . . . . . . .1709

18     407  . . . . . . . . . . . . . . . . . .1710

19     409  . . . . . . . . . . . . . . . . . .1710

20     411, 414, 416, 418, 420  . . . . . . . .1710

21     430  . . . . . . . . . . . . . . . . . .1718

22     442  . . . . . . . . . . . . . . . . . .1724

23     431  . . . . . . . . . . . . . . . . . .1726

24     433  . . . . . . . . . . . . . . . . . .1728

25     26  . . . . . . . . . . . . . . . . . . .1730
```

1    28    . . . . . . . . . . . . . . . . . . .1732

2    44    . . . . . . . . . . . . . . . . . . .1736

3    54    . . . . . . . . . . . . . . . . . . .1737

4    55    . . . . . . . . . . . . . . . . . . .1738

5    78    . . . . . . . . . . . . . . . . . . .1741

6    85    . . . . . . . . . . . . . . . . . . .1742

7    86    . . . . . . . . . . . . . . . . . . .1742

8    102   . . . . . . . . . . . . . . . . . . .1744

9    104   . . . . . . . . . . . . . . . . . . .1744

10   107   . . . . . . . . . . . . . . . . . . .1745

11   120   . . . . . . . . . . . . . . . . . . .1746

12   141   . . . . . . . . . . . . . . . . . . .1747

13   142   . . . . . . . . . . . . . . . . . . .1748

14   423   . . . . . . . . . . . . . . . . . . .1749

15   443   . . . . . . . . . . . . . . . . . . .1750

16   126   . . . . . . . . . . . . . . . . . . .1761

17   103   . . . . . . . . . . . . . . . . . . .1796

18                        DEFENDANT EXHIBITS

19   Exhibit No.                              Received

20   308   . . . . . . . . . . . . . . . . . . .1697

21   446   . . . . . . . . . . . . . . . . . . .1798

22

23

24

25