DA8TBAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    Plaintiff,

5            v.                          12 CV 1422 (JSR)

6   BANK OF AMERICA CORPORATION,
7   *successor to Countrywide*
    *Financial Corporation,*
8   *Countrywide Home Loans, Inc.,*
    *and Full Spectrum Lending*, et
9   al.,

10                   Defendants.

11  ------------------------------x
                                    New York, N.Y.
12                                  October 8, 2013
                                    9:45 a.m.
13
    Before:
14
                        HON. JED S. RAKOFF,
15
                                        District Judge
16

17

18

19

20

21

22

23

24

25

DA8TBAN1

1                                    APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6         Assistant United States Attorneys

7

     WILLIAMS & CONNOLLY
8         Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14        Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17        Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25

DA8TBAN1

1              (Jury not present)

2              THE COURT:  Good morning, please be seated.

3          On the motions, let me hear from the government.

4              MR. SINGER:  Your Honor, very quickly before the

5      government starts, your Honor said if we had anything on

6      defense side to add to what was in our letter you might want to

7      hear that.

8              THE COURT:  That's a good point.  Let me hear what was

9      not in your letter.

10             MR. SINGER:  Thank you, your Honor.  There are a few

11     points that came up in particular yesterday so they weren't

12     covered by the letter.  The first is that on the scheme to

13     defraud element, in addition to all the reasons we did explain

14     in our letter for why that element isn't met, Mr. Hansen's

15     testimony yesterday, I think speaks to that issue, because we

16     heard yesterday from Mr. Hansen that the government's

17     population of Hustle loans is wildly overbroad.  And as a

18     result of that, that's the same definition that the

19     government's experts relied on.

20             So when the government's experts are measuring a

21     material defect rate out of population of Hustle loans, if that

22     population is much larger, which in fact it is, the population

23     the experts measured is much larger than any evidence suggests

24     that the actual population of Hustle loans was, then the

25     experts' percentage is meaningless.  The experts cannot be

DA8TBAN1

```
 1   relied on for anything for that reason.  And the evidence is

 2   undisputed, it's completely one sided what the actual

 3   population of loans is, or more accurately, it's more accurate

 4   to say that it is undisputed that the experts' population of

 5   Hustle loans is much, much broader than what the actual

 6   definition could possibly be.  So that is the first point.

 7           The second point is that on the intent element, your

 8   Honor over the weekend invited the government to specify who

 9   the people are, the individuals are at Countrywide who they are

10   claiming acted with an intent to defraud.  And I'm hoping that

11   the government will enlighten us today to who the individuals

12   are.  They have not done so yet, but if we do have to put on a

13   defense case, certainly we should be entitled to know whether

14   the government is claiming any of our witnesses committed a

15   criminal fraud, so we could be prepared to rebut that in their

16   testimony.  But in any event, we believe the evidence is not

17   sufficient in the government's case to show any individual

18   acted with the requisite intent.

19           So there are several other elements that I would

20   address that yesterday's testimony may relate to.  I'm happy to

21   do that now or later, but those are the two principal things I

22   wanted to bring to the Court's attention.

23           THE COURT:  All right.  Thank you.

24           MS. NAWADAY:  Thank you, your Honor.

25           Your Honor, defendant's letter suggested that we're
```

DA8TBAN1

1   still dealing with a breach of contract here and some kind of

2   honest business dispute.  Defendants suggest that sure, a few

3   bad loans may have slipped throughout cracks, and that's

4   inevitable, and there's a repurchase remedy for that.  But

5   that's not why we're here.

6          We're here because the Hustle loans were bad.  The

7   defendants knew the Hustle loans were bad, and they passed them

8   off as quality loans to cheat Fannie and Freddie out of money.

9   That's why we're here, that's what we have shown, and that is

10  fraud, your Honor.

11         The evidentiary story that the government has put on

12  started with NCA.  That was the process that Mr. O'Donnell

13  described that originated prime loans and allowed loan

14  processors to clear conditions.  Mr. O'Donnell went to study

15  that work flow for possible implementation in Full Spectrum,

16  and what he found, quite simply, was a train wreck.  He found

17  numerous instances of loan processors fraudulently clearing

18  conditions, clearing loans to close in just 13 minutes.  And

19  Robert Price asked his managers to investigate this practice,

20  then found that, quote, the pressure to hit numbers was driving

21  that behavior and that behavior is clearly fraud.

22         And who managed the NCA?  That was Rebecca Mairone.

23  NCA was the first warning sign of the problems that the Hustle

24  would lead to.  But in that case, as Mr. O'Donnell testified,

25  he was able to adjust the process, he was able to step in and

DA8TBAN1

stop bad loans from going out the door by putting an

independent check on the loan processors before the loans were

funded and sold.

        With the Hustle, as we have shown, everything was

different.  John Boland testified that he was asked to sign off

on an expansion of underwriting authority for loan processors

he didn't even know, and when he pushed back was told come on,

work with me, this is the Hustle.

        Michael Thomas testified that he complained to others

about the Hustle and said this process is taking us in exactly

the wrong direction, it's removing controls at precisely the

time the market is demanding greater controls.

        And in August of 2007 we have a unique laying of risk

with the Hustle.  We have a new turn time bonus put into place

in Full Spectrum.  We have a new funding bonus put into place

in Full Spectrum, and we have the removal, of course, as we

emphasized, of the Quality of Grade penalty.  And that removal

of the Quality of Grade penalty was not just limited to a few

loans, a few loan specialists in the Hustle pilot, that Quality

of Grade penalty ended up being suspended for an entire six

months, half a year with no penalty for poor quality.

        Immediately, as we have shown, employees began to

raise questions about the consequences of all this.

Mr. O'Donnell's direct reports started complaining to him what

does this mean?  Does this mean we don't care about quality?

DA8TBAN1

1    Does this mean we fund everything now and worry about it later?

2    And the "it," of course was quality.  As we have shown

3    Mr. O'Donnell passed these concerns along to Rebecca Mairone.

4            And what was Ms. Mairone's response?  Not to take

5    those concerns seriously, but to say, astonishingly, it sounds

6    like the process may work.  And it's clear that the process

7    didn't work, because as soon as the pilot was rolled out, the

8    negative quality reports came in, and they showed week after

9    week and month after month that the owes loans were poor

10   quality.

11           And now defendants want dismiss all of that and say

12   there was always criticism about the quality assurance process.

13   People questioned the reliability of these reports.  They were

14   pummeling the loan specialists with too much information.  But

15   those complaints weren't heard before the Hustle, your Honor.

16   The quality assurance process was in place for a long time, and

17   no one was complaining about loan specialists being pummeled

18   with negative information until they started making a bunch of

19   mistakes.

20           The Hustle loans were tracked, as we have shown, very

21   closely from the start.  Full Spectrum tracked funding volume,

22   tracked turn time and quality.  What did the results show?

23   They showed great marks for speed and poor marks for quality,

24   but because speed is what mattered, Mairone and others decided

25   to push forward with the Hustle.

DA8TBAN1

1            And your Honor, throughout the fall, our story is well

2     known.  The quality reports continued to get negative and the

3     message is the same.  There's a continued push for volume, and

4     we see that through Greg Lumsden and Rebecca Mairone in

5     particular.  And Mr. Singer invited us to identify the specific

6     individuals who we claim would have fraudulent intent.  I

7     didn't understand your Honor to be inviting to us do that over

8     the weekend, I apologize if you were, I thought that was a

9     matter to be addressed at this hearing.  And the individuals

10    who we would assert fraudulent intent as to would be Rebecca

11    Mairone, Greg Lumsden and Cliff Kitashima.  And that should be

12    clear from our numerous discussions in eliciting testimony

13    about the steering committee, and the three individuals

14    principally in charge of the steering committee were Lumsden,

15    Mairone and Kitashima.

16            And although Mairone's counsel points out that Mairone

17    wasn't acting alone in a lot of the decisions that we

18    highlighted, particularly in November 2007, we agree with that.

19    We're not saying that Mairone acted alone, but that doesn't

20    mean Ms. Mairone didn't participate in a scheme to defraud.  It

21    doesn't mean that Mairone didn't have fraudulent intent, it

22    just means that those who acted with her also had fraudulent

23    intent.

24            And so in November, your Honor, we see that the

25    steering committee is informed, that most of the prefunding

DA8TBAN1

1    defects in the loans are not being corrected before the loans

2    go out the door.  And in response, again, rather than say all

3    right, let's give these people better training, let's make an

4    adjustment to the process, Mairone says, after discussing with

5    Lumsden and Kitashima, direct all the quality assurance reports

6    to me, direct all the quality control reports to me, stop the

7    on-site reviews at the fulfillment center, let's stop sitting

8    down with these people and teaching them how to do a better

9    job, let's remove the checklists that are helping to educate

10   these people and walk through the process in a more effective

11   way.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DA83BAN2

1              MS. NAWADAY:  Finally, she says let agencies give

2       another extension of the quality of grade reprieve.  She

3       doesn't stop there.  She doesn't limit it just to Central

4       Fulfillment.  Of course, we see a few days later the quality of

5       grade reprieve is extended to all of Full Spectrum.

6              And although defendants want to point out that there

7       was a quality summit in early 2008, Ms. Mairone wasn't even

8       there.  At that point she is telling Greg Lumsden our number

9       one priority for February is to fund 15,000 loans.

10             We see also in November Greg Lumsden in particular is

11      saying if we don't fund the loans per budget, we won't have QA

12      and QC to worry about.  And Mr. Kitashima is, among all of the

13      members of the steering committee, is the chief credit risk

14      officer.  He more than anyone else knows what's coming.  He's

15      telling O'Donnell, well let's just keep giving people the data,

16      they'll see, they'll come around.  He is not doing anything to

17      stop the process.  Ultimately, he's part of the scheme as well.

18             What we see when they are told, when Kitashima is told

19      we won't have QA and QC to worry about.  Ultimately they didn't

20      worry about QA and QC.  They did continue to fund the loans

21      until Mr. Lumsden is yelled at by his boss sometime in the

22      spring of 2008.

23             Then defendants want to take credit for this renewed

24      focus on quality.  What does Mr. Lumsden do then?  That's the

25      point he turns to Mr. O'Donnell and says things have to change,

DA83BAN2

1    we don't fight these SUS numbers the way we used to.  We need

2    to start driving these defect rates down.  That's what leads to

3    sprint incentive.

4           In the sprint incentive, although defendants pointed

5    to the fact that numerous people were involved or numerous

6    people thought it was a good idea at the time, that doesn't

7    matter.  It clear when the sprint incentive was doing.  The

8    sprint incentive was creating a false appearance of quality.

9           Those quality control reports are also relevant to

10   defendants' self-reporting obligation.  Because as Maria

11   Brewster testified, the self-reporting obligation really has

12   two components.  There's an individual loan-by-loan we've

13   identified this problem loan, here it is, here are the reasons

14   that we think there are problems with it.

15          But there is also the general requirement to provide

16   timely and accurate quality control reports.  And by

17   manipulating the quality control findings, defendants knew they

18   didn't have quality control reports that were accurate and

19   those could not be provided to the GSEs.

20          Your Honor, just briefly on some of the other

21   elements.  We've obviously shown, although we only need to show

22   the use of mail or wire for our FIRREA claim, we haven't

23   highlighted use of the mail as much, but the evidence of

24   mailings is in the record, it is in the individual loan files.

25   There is abundant evidence of mailings between borrowers and

DA83BAN2

1  Full Spectrum employees.

2          As to the interstate wire communications, obviously

3  we've put e-mails into evidence of interstate e-mails, and the

4  telephone calls have been described interstate.  So we've

5  satisfied the mail and wire elements as well.

6          THE COURT:  Do you want to say anything about the

7  point that was raised this morning about whether your

8  definition of the Hustle is supported by the evidence?

9          MS. NAWADAY:  Yes, your Honor.  Our definition of the

10  Hustle is absolutely supported by the evidence.  It is

11  supported by the testimony of Michael Thomas, of Ed O'Donnell,

12  in terms of what the entry criteria for Hustle loans were.

13  That were working with CLUES accept loans that were processed

14  or funded through one of four fulfillment centers.

15          Although defendants might have a dispute about

16  particular branch codes or whether the definition might be

17  slightly over-inclusive, that's an argument they can make to

18  the jury.  That's something that might go to whether a

19  particular loan is Hustle or non-Hustle, but that's certainly

20  not a reason for a directed verdict.

21          THE COURT:  All right.  Let me hear from defense

22  counsel.

23          MR. SINGER:  Thank you, your Honor.  I think that I'd

24  like to proceed just by taking it element by element.  I'll try

25  to respond to things that Ms. Nawaday said in the process the

DA83BAN2

1     best I can keep track of them.

2                    First of all, the scheme to defraud element, I didn't

3     hear virtually anything from Ms. Nawaday about the scheme to

4     defraud element.

5                    THE COURT:  Maybe I misheard, but I thought what she

6     said was that these loans were of a poorer quality than they

7     were being represented.  So there was both affirmative lies in

8     the sense that they did not meet what they were being sold as,

9     and there was also a lie by omission in the failure to

10    self-report.

11                   MR. SINGER:  To the extent that the argument is that

12    the loans were of lower quality than represented, the evidence

13    of what was represented is that the contracts require

14    investment quality.  The loans be investment quality.  It is

15    undisputed that that requirement does not mean that every loan

16    submitted to Fannie and Freddie needs to be investment quality

17    loan, because it is undisputed that --

18                   THE COURT:  I saw that argument in your letter, and I

19    didn't understand it.

20                   MR. SINGER:  Let me try --

21                   THE COURT:  Excuse me.  If you know you are presenting

22    a non-investment quality loan to the person who believes they

23    are purchasing investment quality loans, the fact that by sheer

24    circumstance, negligence, or accident, the person knows that

25    not every loan that they will be obtaining is investment

DA83BAN2

 1    quality, is neither here nor there.  What they know is that by

 2    happenstance, not every loan will be investment quality.

 3            What they don't know is that, on the government's

 4    theory, that the defendants have purposely put into the mix

 5    loans that the defendants know are not investment quality.

 6    That's a totally different situation.

 7            MR. SINGER:  The way I would look at it, your Honor,

 8    is we've got two elements that we're talking about.  We have

 9    the question of whether there is a misrepresentation in the

10    first place, and then we have a question of whether there was

11    an intent to misrepresent and an intent to harm.  And --

12            THE COURT:  There is a difference between is the

13    intent to harm, defraud, whatever.  That also has to be shown.

14    But, another aspect is whether a misrepresentation was made

15    knowingly or not, which is what I'm focusing on.

16            MR. SINGER:  Understood, your Honor.

17            THE COURT:  This is a little bit like saying, if I

18    understand your argument, it is like saying if I know that when

19    I purchase blue M&Ms, by accident there may be a red M&M that

20    makes its way into the bag, that means I'm not defrauded when I

21    purchased blue M&Ms and someone has intentionally put some red

22    M&Ms in the bag.  If I may mix my metaphors, it is apples and

23    oranges.

24            MR. SINGER:  I think the point, your Honor, that I

25    would agree with is that you would have to know that there are

DA83BAN2

```
 1    more non-investment quality loans in the pool than there should
 2    be.  You have to know the pools are worse.
 3            THE COURT:  You can make that argument until the cows
 4    come home, but I don't accept it.  You have it for appeal.
 5            MR. SINGER:  Let me go to the intent element.
 6    Everything we heard on the issue of quality and what people
 7    intended to think at Countrywide about quality, and
 8    particularly the three individuals Ms. Nawaday named, is they
 9    heard concerns, and that they didn't respond quickly enough to
10    the concerns.  There were concerns, there were questions
11    raised.
12            THE COURT:  That certainly is an argument you can make
13    to the jury.  But, a reasonable juror could infer, for example,
14    that when Ms. Mairone heard numerous reports of problems, and
15    instead of responding in a way that the jury might find
16    reasonable, she actually eliminated it and took within her own
17    purview -- she eliminated some of the checks and steps that
18    should have been taken, and instead brought this all within her
19    own purview so that, the argument would go, none of these
20    checks would be implemented.  If all that is true, a reasonable
21    juror could easily infer intent to defraud.
22            MR. SINGER:  I think what the evidence as to what
23    Ms. Mairone did is she allegedly restricted distribution of
24    certain quality reporting to the line individuals performing
25    the jobs, but that doesn't -- I'm not sure that that can be
```

DA83BAN2

1   fairly described as stopping any checks.  It just means that

2   employees were not being told.

3   THE COURT:  It certainly could be viewed by a juror as

4   an intent to restrict knowledge of the quality of these loans.

5   MR. SINGER:  Restrict to the line employees who are

6   performing the -- who are reviewing the loan files, but not to

7   Fannie and Freddie.  The issue is did she have an intention --

8   THE COURT:  No.  The affect, if you assume, as to

9   which there is ample evidence, albeit all disputed, that there

10  were repeated indications that the loans were not of good

11  quality, and that one of the reasons this was happening was

12  because the combination of speed and eliminating human

13  underwriters and so forth led to defective loans slipping

14  through.  Then one can infer that when Ms. Mairone learns this,

15  and decides to no longer make it known to all but a limited

16  number of employees, it was because she wanted to cover it up.

17  That's not by any means the only inference, but it is a

18  perfectly reasonable one.

19  MR. SINGER:  The first assumption in that theory is

20  that what Ms. Mairone is learning is fact as opposed to

21  opinions.  When what I think the evidence has shown --

22  THE COURT:  Since when is that a requirement?

23  MR. SINGER:  Because --

24  THE COURT:  If 10 people come to you, you're the boss

25  in my hypothetical, and say all our cows are suffering from mad

DA83BAN2

1   cow disease.  They really need to be checked.  And you say, on

2   your hypothetical, oh, well, I'm not going to check that,

3   that's just your opinion, you're not a doctor.  You're not a

4   veterinarian.  I'm not going to bother myself, because all

5   you're giving me is opinions.  Then it turns out the cows do

6   have mad cow disease.

7        Are you saying intent could not be inferred in that

8   situation?

9        MR. SINGER:  I think in that hypothetical, perhaps.

10  But here the evidence is there was discussion, concerns were

11  aired, there were disagreements about the concerns, there were

12  things done to start remedying things.  And eventually, when it

13  was concluded that those things weren't working, then they went

14  back to the very system that Mr. O'Donnell is --

15       THE COURT:  There is no doubt that there are

16  substantial defenses in this case.  And everything you just

17  said is I'm sure part of what will be argued to the jury.

18       But I have to take the inferences most favorable to

19  the government, I have to take the evidence that's most

20  favorable to the government.  I don't look at your evidence.  I

21  look at their evidence.  I don't look at facts that may be

22  helpful to you, I look at the facts that are helpful to them,

23  and then I decide whether any reasonable juror can infer fraud.

24       MR. SINGER:  Right.  Well, I think the question at

25  this stage is whether any reasonable juror, having heard all

1    the evidence so far presented in the government's case, could

2    conclude that Ms. Mairone or Mr. Lumsden or Mr. Kitashima had

3    an actual intent to deceive and harm Fannie and Freddie.

4              THE COURT:  They only have to show one.

5              MR. SINGER:  One of the three.

6              THE COURT:  Right.

7              MR. SINGER:  Yes.  And the evidence does not show

8    that.  The evidence shows that they heard concerns from people

9    from underwriting, that they took steps, they didn't take

10   enough steps, according to Mr. O'Donnell, they didn't take

11   enough steps quickly enough, according to Mr. O'Donnell and

12   Mr. Thomas.  But there is no evidence they actually intended

13   for their steps not to work.  Or for --

14             THE COURT:  I don't understand what that means.  This

15   is a circumstantial case.  It is actually fairly rare in fraud

16   cases, except where there is a tape recording or something like

17   that, to hear a defendant say, you know what?  I think we ought

18   to go out and defraud those folks.  Here's how we should do it.

19   And 99 percent of these cases are circumstantial cases.

20             So, you're saying this combination of circumstances,

21   you think, can be explained as at worst negligence.  They're

22   saying, oh, no, if you look at it in the fashion most favorable

23   to the government, it reeks of fraud.  That's a classic jury

24   question.

25             MR. SINGER:  What I am saying, your Honor, is that no

DA83BAN2

1    reasonable jury could find it reeks of fraud.

2            THE COURT:  I understand you're saying that.  But I

3    don't understand how you can say that.

4            MR. SINGER:  The evidence at best is equivocal.  The

5    people who heard quality concerns did not act on them fast

6    enough.  Typically any fraud case you'll see something, some

7    e-mail from somebody contemporaneously alleging fraud, thinking

8    fraud, telling a lie, something.  We've got nothing like that.

9            THE COURT:  Number one, I'm not sure that's true.

10   Number two, it is of course not required.  And number three, of

11   course if you want to see if anyone set out to intentionally

12   lie from Countrywide to the government, perhaps we should call

13   Ms. Simantel.

14           MR. SINGER:  No one is going to claim they lied about

15   the HSSL process.

16           THE COURT:  Oh.  So we want to cabin it.  I supported

17   that so far.  But it seems to me that your argument is really a

18   funny one here, which is that because no one -- since we have

19   excluded her so far -- since no one says outright, my gosh, I

20   lied today to Fannie Mae and Freddie Mac, and this is unfair to

21   Ms. Simantel's e-mail, but it comes close.  I'm proud of it.

22           No, since we don't have that in evidence, we don't

23   have a fraud.  That's not the law.

24           MR. SINGER:  Obviously I'm only talk about the HSSL

25   process, not about Countrywide in general.  So I do want to

DA83BAN2

 1   make that clear.

 2           THE COURT:  I do understand.

 3           MR. SINGER:  I agree with you it is not the law that

 4   you have to have somebody confess to the fraud or a lie.  But I

 5   think in a fraud case, there has to be evidence that a lie was

 6   actually told intentionally.  I don't think that that's met

 7   here.

 8           I also don't think that the actual evidence that the

 9   quality was bad is there.  You heard earlier about the experts.

10   What Ms. Nawaday said about the experts and Mr. Thomas is

11   utterly wrong.  Mr. Thomas specifically testified right here in

12   this courtroom that the very document that was shown to

13   Mr. Hansen yesterday, the field branches were not employing the

14   HSSL process.  That was his testimony.  And that's almost

15   half -- we're talking about half of their Hustle population

16   comes out of the field branches and out of the AUS findings

17   that were not actually included in the Hustle.  Between those

18   two things, you can cut down the population by almost half.

19   That comes directly out of testimony in this courtroom.  And

20   their experts relied on the field branches and they included

21   the field branches and they included all of the AUS findings.

22   Almost doubled the population.

23           So you cannot rely.  And if this case goes forward,

24   your Honor, we would like permission to brief whether the

25   experts should be stricken in their entirety for that reason.

DA83BAN2

 1   But putting that aside for this moment, you can't rely on the

 2   expert testimony.

 3            THE COURT:  Remind me.  Did you move before he

 4   testified --

 5            MR. SINGER:  The evidence wasn't in the record --

 6            THE COURT:  -- to exclude his testimony?

 7            MR. SINGER:  The evidence that I'm talking about now

 8   was not in the record until Mr. Hansen's cross-examination to

 9   do that.

10            THE COURT:  After it came out, and before the

11   government closed, that is to say before the government was not

12   in a position to repair any problems, did you move to strike

13   his testimony?

14            MR. SINGER:  No, your Honor.

15            THE COURT:  I'm not sure that at this late stage you

16   can do so.

17            MR. SINGER:  I'm not aware of a waiver issue with

18   that, your Honor.  But we would be happy to brief that as well

19   if your Honor permitted it.  In any event --

20            THE COURT:  One thing I've learned in this case is

21   that the brilliant lawyers at Williams & Connolly are delighted

22   to brief everything.  So I'm happy to have you brief anything

23   you like.

24            MR. SINGER:  I will confess to liability for that

25   charge, your Honor.  But I do appreciate it.

DA83BAN2

1          But for purposes of this argument, striking the

2     experts or not striking the experts, the point is they don't

3     prove anything.  Because they've used a wildly inaccurate

4     population.  So that doesn't show poor quality.

5          QA results don't show poor quality because they're

6     interim.  The QC results, the only final QC results that we've

7     seen in this case show good quality.  So to say that bad

8     quality warnings were ignored or people had knowledge of bad

9     quality is simply unsupported.  The actual quality was good,

10    according to all the evidence.

11         Now, in terms of the self-reporting, I do want to say

12    a few words about that.  If there is nothing else that the

13    Court grants directed verdict on, or judgment on today, I would

14    ask that the Court grant a judgment on that.  Because, let's

15    assume for the sake of this argument that there is a duty to

16    self-report and that that duty was breached, although I would

17    submit there is insufficient evidence of that in the record.

18         But even assuming that, there is no evidence in the

19    record that any particular loan that was supposed to be

20    self-reported was not, or why it was not, or who at Countrywide

21    knew that they were supposed to self-report, or why they didn't

22    self-report.

23         And finally, none of this self-reporting stuff has

24    anything to do with HSSL, because there is no evidence that any

25    of the FSL executives who were involved in HSSL had anything to

DA83BAN2

1   do with self-reporting or even thought about it.  So, I would

2   submit there is absolutely no evidence to support a charge

3   based on self-reporting.

4          A couple of other elements to talk about.  You heard

5   about the mailings and the wirings.

6          THE COURT:  I'm sorry.  Hold on just a minute.

7          MR. SINGER:  There is no evidence in the record --

8          THE COURT:  Linda, tell them we're having legal

9   argument, it will be another 15 minutes.

10         MR. SINGER:  Starting with the mailings, there has

11  been no evidence in the record that anything was mailed.  Let

12  alone that any mailing was done in furtherance of a scheme.

13  So, I think the mail fraud --

14         THE COURT:  You're saying there is nothing in the

15  individual loan files to indicate there was mailings?

16         MR. SINGER:  There may or may not be mailings in the

17  loan files.  It has to be a mailing in connection with a

18  furtherance of the scheme to defraud.  If a borrower mails

19  something as part of their loan application, I don't think

20  that --

21         THE COURT:  We'd have to look at the individual

22  mailings.  What about the wires.

23         MR. SINGER:  There have been plenty of e-mails that

24  have been introduced into evidence.  There has to be evidence

25  that they've been sent interstate.  I don't doubt there were,

DA83BAN2

 1    but that's part of the government's burden, and they haven't

 2    submitted any evidence on that.

 3           THE COURT:  Well, aren't there e-mails that go from

 4    branches and things like that?

 5           MR. SINGER:  The evidence as to where the person was

 6    actually sitting when he sent the e-mail, we just don't know.

 7           THE COURT:  Okay.

 8           MR. SINGER:  On the issue of the separate Countrywide

 9    entities, we've discussed Countrywide Bank at some length

10    yesterday.  We didn't hear anything about Countrywide Home

11    Loans.  And the 10-K that was submitted yesterday suggests that

12    operations were moved to Countrywide Bank completely by the

13    beginning of 2008.  But, there is no evidence, no discussion of

14    what happened at Countrywide Home Loans.  So we would suggest

15    that the burden has not been met as to them in this case.

16           Finally, on affecting, the government's only

17    evidence --

18           THE COURT:  Where do you say the Hustle loans, what

19    entity sold the Hustle loans to Fannie Mae and Freddie Mac,

20    according to you?

21           MR. SINGER:  I don't at this moment have a position on

22    that, your Honor.

23           THE COURT:  You don't have a position?

24           MR. SINGER:  My only argument today is I'm not stating

25    to you as a matter of fact that Countrywide Home Loans did not

DA83BAN2

1      sell Hustle loans.  I'm only saying it's part of the

2      government's burden in this case to prove that somebody at

3      Countrywide Home Loans committed a fraud.  And the record does

4      not have that evidence in it.  That's my only argument.

5              As to affecting, the only evidence put into the record

6      yesterday, as your Honor well knows, is the 2007 10-K which

7      does say that Countrywide Bank was producing loans as of

8      January 1st or apparently producing substantially all of the

9      Countrywide loans as of January 1st, 2008.

10             But the government's allegation in the complaint is

11     that the bank incurred repurchase liabilities on Hustle loans.

12     There has been no evidence of that.

13             And that is all I have, thank you.

14             THE COURT:  Very good.  Let me hear from counsel for

15     Ms. Mairone and we'll hear from the government in rebuttal.

16             MR. HEFTER:  Good morning, your Honor.

17             THE COURT:  Good morning.

18             MR. HEFTER:  So I noted to myself this morning that

19     this was probably the third time that you and I have had this

20     discussion about Ms. Mairone's intent, and I was constrained by

21     Rule 12 the first time, I was constrained by Rule 56, and now

22     I'm told and know I'm constrained by Rule 50(a) at this point.

23     And what I thought was going --

24             THE COURT:  Life is just full of constraints.

25             MR. HEFTER:  What I thought was going to be a

DA83BAN2

1    High-Speed Swim Lane towards a Rule 50 directed verdict today

2    sounds like from your colloquy I'm on the exit ramp, based on

3    your colloquy with Mr. Singer.  That being said, I will make my

4    record, your Honor.

5            Our position is that there is not a shred of evidence

6    in the record as presented by the government that Ms. Mairone

7    acted with fraudulent intent, with an intent to deceive, or an

8    intent to harm Fannie Mae or Freddie Mac.  Our position is well

9    laid out in our letter.

10           But, I do want to talk briefly about a number of the

11   things that Ms. Nawaday mentioned in her fanciful story that

12   she presented this morning.  Because I think at this point,

13   your Honor, we are constrained as to what is actually in the

14   record and what is before you and actually what's been admitted

15   into evidence as to Ms. Mairone as opposed to potentially

16   what's been admitted against the bank.

17           So, the concept of NCA.  There is a passing reference

18   in Mr. O'Donnell's testimony that Rebecca Mairone managed NCA.

19   He doesn't explain it.  We don't know what that is.  But who

20   cares.  So what?  She managed NCA.  They point to in the

21   evidence one instance where one or two loan processors may have

22   engaged in some sort of wrongful conduct.  The record is

23   absolutely clear, your Honor, that the company took corrective

24   action against those individuals.  There is absolutely no

25   evidence in the record that that practice was widespread, and,

DA83BAN2

     1    there is actually no evidence in the record that Ms. Mairone

     2    was aware of that circumstance.  There is no evidence in the

     3    record that Ms. Mairone was not aware that there were controls

     4    in place.  We're not talking about somebody who was a line

     5    manager, your Honor.  If in fact she was the manager of NCA,

     6    she was at the top of a large organization.  So the notion that

     7    they are imputing knowledge of the individual loan processor's

     8    fraud on Ms. Mairone is not only wrong as a matter of law, it

     9    is not supported by anything in the record.

    10         They talk about one of the things she said in ticking

    11    off her story.  She said Mr. Thomas testified they were going

    12    in the wrong direction.  That testimony is not admissible in

    13    the record against Ms. Mairone.  There is absolutely no

    14    evidence in the record that Mr. Thomas had any conversations

    15    with Ms. Mairone.  The only evidence in the record is that

    16    Mr. O'Donnell took a number of his direct reports' concerns and

    17    put it in an e-mail, which is PX 52.  Then they draw the

    18    conclusion, by pointing to Ms. Mairone's comment "So it sounds

    19    like it may work.  Is that what I'm hearing?"

    20         Well, there is a lot of things in this e-mail.  To

    21    draw the inference that Ms. Mairone had a fraudulent intent by

    22    virtue of that statement in PX 52 is unreasonable, your Honor.

    23    It is an unreasonable inference for you to draw that at this

    24    point on a Rule 50.

    25         Your Honor is correct that you are under the Supreme

DA83BAN2

1   Court's case in <u>Reeves</u>, that you are required to draw the

2   inferences against the moving party.  But you are not required

3   to draw unreasonable inferences against the moving party.  And

4   that is for the one example where the government makes an

5   unreasonable inference that because Ms. Mairone said in an

6   e-mail in response to a number of different issues that

7   Mr. O'Donnell raised, that the very notion "And so it sounds

8   like it may work, is that what I'm hearing?"  Is that the

9   evidence in the record that draws the conclusion that

10  Ms. Mairone acted with fraudulent intent?

11          Also in that e-mail that some of the employees said

12  many thought we should be funding more than 3.1 billion and

13  wanted to know about the 25 percent kicker.

14          So, some people are saying we should fund more loans.

15  Other people are saying, well, we have some issues maybe with

16  quality.  So, what Ms. Mairone says "So it sounds like it may

17  work, is that what I'm hearing?"  Is one part of the e-mail.

18  If you read the rest of it, it certainly negates the inference

19  that the government wants you to draw.

20          So what else is in there in the record that

21  Ms. Mairone was the catalyst, according to Mr. Boland?  That

22  Ms. Mairone -- that the High-Speed Swim Lane that was under her

23  direction.  But we dispute those facts, your Honor.  Taking

24  those facts as true, it means nothing.  It means a hill of

25  beans as to whether Ms. Mairone acted with requisite intent.

DA83BAN2

1     What else do they say.

2            THE COURT:  I am not quite sure I understand that

3     argument.  If a reasonable juror could find that the manner in

4     which Hustle loans were being processed was designed to let not

5     investment quality loans pass through, and Ms. Mairone had

6     overall knowledge of how the program was operating, why

7     couldn't a reasonable juror infer that she knew and understood

8     that the probable consequence of continuing in this matter was

9     that non-quality loans would get through?

10           MR. HEFTER:  I'll address that in two ways, your

11    Honor.  First, directly with respect to the assumption in your

12    question, which is that whether it was designed for that

13    purpose.  And I think the evidence is unequivocal with respect

14    to Mr. Thomas and Mr. O'Donnell that it was not designed for

15    that purpose.  And in fact, again, I'll point your Honor to the

16    reasons --

17           THE COURT:  There is evidence, if I recall correctly,

18    that everything was speeded up.  And that if I recall

19    correctly, that was at Ms. Mairone's behest or certainly with

20    her approval.  And that while speed in and of itself in the

21    abstract was not a bad thing, it was quickly apparent that when

22    coupled with all the other aspects, like the use of loan

23    processors instead of human underwriters and so forth, that it

24    was leading to severe problems.  But, she continued it.  If

25    anything, accelerated it.

DA83BAN2

1          MR. HEFTER:  I think that -- were you done, your

2     Honor?

3          THE COURT:  Yes.

4          MR. HEFTER:  I think that addresses the second part of

5     where I was going, because it goes to the natural and probable

6     consequences point.  My point is at the inception of this

7     thing, there is no evidence in the record now -- in fact, the

8     record is to the contrary, that the design of it was

9     well-intentioned and in good faith.

10         Now, then the question becomes, they roll out the

11    pilot and there is evidence that quality assurance reports

12    showed high defect rates.  And then the question becomes, and I

13    think what your Honor is saying is, once she saw that

14    information, and with her knowledge of the process, let it go,

15    so to speak.

16         Would a reasonable juror draw an inference from that

17    that she acted with a wrong --

18         THE COURT:  Especially since she had a motive to do

19    so.

20         MR. HEFTER:  Well, I'm not sure there is any evidence

21    in the record she had any motive to do that, your Honor.

22         THE COURT:  I think the evidence in the record is that

23    Countrywide was no longer able to sell subprime loans, and they

24    had to now shift their market into prime loans, and she was

25    part of that shift.

DA83BAN2

1          MR. HEFTER:  I don't necessarily think, your Honor,

2     that reflects a motive on her part.

3          THE COURT:  I think I disagree.

4          MR. HEFTER:  Fair enough, your Honor.  Let's go back

5     to the hypothetical.  Whether that an inference of fraudulent

6     intent based on that set of alleged hypothetical facts.

7          The first point, your Honor, is actually what was said

8     about the QA reports.  And the only person that we have that

9     talked to in the record -- right now, that talked to

10    Ms. Mairone about the QA reports is Mr. O'Donnell.  So let's

11    see what he actually said as opposed to speculating about that.

12    So, on page 560 of the transcript.  And the question is:

13    "Q.  Do you remember anything specifically said by

14    Ms. Mairone?" This does relate to the bad QA.

15    "A.  Ms. Mairone was very focused on this too.  This was an

16    issue she was in charge of, and she was concerned about the QA

17    process as well.  She voiced concern about sharing the results,

18    she voiced concern about how the auditors were looking at

19    loans.  And how we were determining which loans were high risk

20    and which were no risk or limited risk."

21          That's it, your Honor.  That's the entirety of the

22    evidence as to --

23          THE COURT:  When you couple that she was concerned

24    about sharing the results with the efforts that she took to

25    narrow the number of people who would be familiar with the

DA83BAN2

1   problems, why isn't it hypothetically just that?

2              MR. HEFTER:  I was predicting you would ask that

3   question.

4              THE COURT:  I'm very predictable.

5              MR. HEFTER:  Not always, your Honor.  But what I would

6   say is, again, let's be very clear and specific what we're

7   talking about.  This statement was in relationship to the

8   August 3, 2008, audit results relating to the pilot of the --

9   the August 3 -- no.  I want to be exact.  October, it was the

10  first week of October.  I can get the exhibit number, it's in

11  my pile, but I won't delay it.

12             This discussion related to the results in the

13  beginning of October of the Central Fulfillment.  The

14  November 29 e-mail doesn't come out for approximately seven

15  more weeks.  So, when she says she was concerned about the

16  process, she voiced concern about sharing the results, there is

17  a disconnect between the government's conflating the two time

18  periods.  So therefore, those QA reports --

19             THE COURT:  Forgive me for interrupting.  I don't

20  quite understand the argument you're making now.  At this point

21  she is just voicing concern about sharing it.  More and more

22  problems arise and she just cuts off --

23             MR. HEFTER:  Well --

24             THE COURT:  -- communication.

25             MR. HEFTER:  We dispute that communications were cut

DA83BAN2

1    off.  But understanding that we're dealing with the

2    hypothetical situation.

3              THE COURT:  I don't understand why the seven week

4    pause is probative of the two things being disconnected.

5              MR. HEFTER:  Right.  Because the reality, your Honor,

6    is that there was a discussion about whether those quality

7    assurance reports reflected anything about loan quality.  So

8    therefore, your Honor, the government is making the leap that

9    because a QA report, which is different than a QC report, and

10   it has nothing to do with self-reporting which measured

11   process, and there is evidence in the record, there are

12   documents in the record, including documents from

13   Mr. O'Donnell, which show that this was measuring process.

14   Whether somebody checked a box or not.  And the government has

15   provided no linkage between a QA finding and a loan that is not

16   investment quality pursuant to the guidelines.  So --

17             THE COURT:  I think the government's theory, and

18   they'll speak for themselves in a minute, with apologies, we do

19   have to move this along.

20             MR. HEFTER:  I understand, your Honor.

21             THE COURT:  But I think their theory, at least in

22   part, is that if there was any doubt that the process was not

23   working the way it was intended, the QA reports showed that.

24   And then it wasn't fixed in the government's view.  That's of

25   course the defense view.

DA83BAN2

1              But the government's view is, on the contrary, all the

2    things that should have been fixed were not fixed.  And it just

3    went on, thus guaranteeing the poor results.  So, the

4    significance of the QA reports, even though they're interim, is

5    that they would have alerted someone to problems and in the --

6    actually both sides seem to agree they did alert people to

7    problems.  The difference to the two sides, the defense says

8    they were fixed and the government says, on the contrary, they

9    went on.

10             MR. HEFTER:  That's only half the story, your Honor.

11   I want to make this clear and I know the jury is waiting.  But,

12   the defense position is not only that they were fixed, but that

13   any reasonable person in Countrywide at the time reading them

14   could not draw any conclusion that those defect rates related

15   in any way to salability or investment quality.  In fact, if

16   you look at the e-mails, Mr. Thomas says --

17             THE COURT:  What was the problem you said was fixed?

18             MR. HEFTER:  Pardon me?

19             THE COURT:  You said part of what the defense is

20   contending and you're contending is that the problems shown by

21   QA by the QA reports is fixed.  What is the problem that you

22   say was fixed?

23             MR. HEFTER:  There were a number of things that --

24   there were a number of things that were fixed in the process,

25   your Honor.

DA83BAN2

1          THE COURT:  Yes.  Why didn't those things relate to

2     ultimate quality?

3          MR. HEFTER:  Well, your Honor, I think we're probably

4     getting into the defense case right now.  But to answer your

5     question, I'll give you an example.  You'll hear it from

6     witnesses.  There were any number of different process steps

7     that could have led to a defect.

8          So if a loan processor at the end of the day didn't

9     take the worksheet checkmark list and put it into a database,

10    they could have been flagged as a defect.  It has nothing to do

11    with the saleability of the loan.

12         THE COURT:  That's a whole other thing we haven't

13    really gotten into.  But the loan processors were not,

14    according to the government's evidence, well trained for these

15    purposes.  They were not underwriters, they didn't have

16    meaningful training.  So they were not calculated to pick up

17    some of the defects the government says were there.

18         MR. HEFTER:  We highly dispute that.

19         THE COURT:  I understand that.

20         MR. HEFTER:  But your Honor, with respect to

21    Ms. Mairone, there is absolutely no evidence that she had any

22    knowledge that loan processors or specialists were not trained.

23    And there is no evidence in the record that she intended them

24    not to be trained.  And there is no evidence in the record as

25    to her state of mind regarding the qualifications of those

DA83BAN2

1    individuals to process high quality prime loans.

2              THE COURT:  All right.  I do need to bring this to a

3    close.  Let me hear briefly from the government if they want to

4    respond.

5              MS. NAWADAY:  Thank you, your Honor.  Just a few quick

6    points.  First on the self-reporting, obviously we don't have a

7    separate claim for self-reporting.  We've asserted it is part

8    of the overall scheme, because the lie is already out there.

9    The loan is out the door.  They have said it's investment

10   quality, and they know it's not.

11             When they have the quality control findings in front

12   of them, they at that point have an opportunity to correct

13   their misstatement, and they don't.

14             They also have an obligation to maintain accurate

15   quality reports, and they don't, and that's shown through the

16   sprint incentive.

17             As to the evidence of interstate wire, I think we have

18   clearly established that Mairone and Lumsden were in

19   California; Thomas and O'Donnell were in Texas.  So even within

20   Full Spectrum, there are interstate wire communications.  There

21   has also been testimony from the Freddie and Fannie witnesses

22   about telephone calls and e-mails with people from Countrywide

23   in different states.  The D.C. to California communications,

24   for example.

25             As to the Countrywide Home Loans to Countrywide Bank

DA83BAN2

1    point the defendants raised, there is testimony that Full

2    Spectrum moved specifically from Countrywide Home Loans to

3    Countrywide Bank in 2007.  And we know of course from the 10-K

4    that the origination function of Countrywide Home Loans was

5    moved into Countrywide Bank in 2007.  So Mairone, Kitashima and

6    Lumsden were all employees of Countrywide Home Loans the early

7    part of 2007, became employees of Countrywide Bank by the end

8    of 2007.

9            And in the portion of the answer that we read

10   yesterday into the record, defendants acknowledge that the bulk

11   of the loans at issue here were originated by Countrywide Bank.

12   That's the bulk of the loans.  The remaining loans originated

13   from Countrywide Home Loans.  Those are really the only two

14   options.  I don't think there is any dispute about that.

15           Finally as to the affect point, through Ms. Brewster's

16   testimony we showed some repurchase letters.  In those

17   repurchase demand letters, the loans were originated by

18   Countrywide Bank, they were sold by BANA, and the demand was

19   made to BANA to repurchase the loan.  And I don't think there

20   can really be any dispute that the repurchase demands were made

21   to BANA.  That's the whole reason that defendants wanted to put

22   in indemnification agreements saying BANA didn't in fact,

23   although repurchase demands were made, suffer any actual loss

24   because they were covered by Bank of America Corporation.

25           THE COURT:  All right.  As is evident both from their

DA83BAN2

1    letters and their excellent oral arguments, there is virtually

2    no issue in this case that the defendants do not dispute.  And

3    certainly, because this is a circumstantial case, this motion

4    is far from being a frivolous one.

5           Nevertheless, I have to view the evidence in the light

6    most favorable to the government, including drawing all

7    reasonable inferences in their favor.  And the standard that

8    they need to meet is simply preponderance as to each of the

9    elements we've discussed.

10          So, against that standard, as the colloquy I think has

11   already made evident, the Court is obliged to deny the motions

12   from each of the defendants.

13          Now, there was a question that was left open last

14   night about whether the first defense witness had been

15   prosecutorial noticed what has that been resolved.

16          MS. MAINIGI:  Yes, your Honor.  In fact the first

17   defense witness, Jack Schakett, was incorporated into our

18   initial disclosures and the incorporation was from the

19   plaintiff's responses to interrogatories, meaning that the

20   government identified Mr. Schakett as a witness of note here.

21   And we incorporated that into our initial disclosures.

22          THE COURT:  All right.  So let's get the jury in.

23          MR. HEFTER:  Your Honor, one issue before the jury

24   comes in.  That is, in connection with the bank defendants'

25   witness list, we as Mairone's counsel would like the

DA83BAN2

```
 1   opportunity to ask questions of some of those witnesses, by all
 2   means not all of them.
 3             THE COURT:  Before they go?
 4             MR. HEFTER:  Yes.
 5             THE COURT:  Of course.
 6             MR. HEFTER:  I'll make the representation to you it
 7   will not be all witnesses.
 8             THE COURT:  That's fine.  That's no problem.
 9             MR. SULLIVAN:  May I approach to give the Court the
10   next binder, your Honor.  A thin one for a change.
11             (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DA83BAN2

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  When

3    the one side rests, the government yesterday rested, you will

4    recall, I need to hear various legal arguments that are made at

5    that point.  And it took longer than I had anticipated, so

6    that's why we're just getting started now.  Thank you for your

7    patience.  So we're ready to hear the defense case.  The

8    defense will call their first witness.

9          MR. SULLIVAN:  The defense calls Jack Schakett.

10         THE DEPUTY CLERK:  Please take the witness stand.

11         (Witness sworn)

12         THE DEPUTY CLERK:  Please be seated.  State your name

13   and spell your last name slowly for the record.

14         THE WITNESS:  Jack Schakett, S-C-H-A-K-E-T-T.

15    JACK SCHAKETT,

16       called as a witness by the Defendant,

17       having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. SULLIVAN:

20   Q.  Where do you reside, sir?

21   A.  In California.

22   Q.  Would you tell the jury about your educational background.

23   A.  Yes.  I went to school at Sam Houston State University.  It

24   is a small college in Huntsville, Texas.  I graduated with a

25   BBA in finance and accounting in 1975.

DA83BAN2                    Schakett - direct

1   Q.  After you received your degree, did you become a certified

2   public accountant?

3   A.  I did.

4   Q.  How was that accomplished?

5   A.  I went to work for Ernst & Young, which was one of the four

6   largest accounting firms in the world, or least is now, and got

7   my CPA with them.  I started off as a staff accountant, and I

8   worked for them for 17 years.

9   Q.  Would you trace for us, please, the experience you had in

10  business or in the field of accounting up to the time you

11  joined Countrywide.

12  A.  Yes.  So with Ernst & Young, I started off as a typical

13  staff accountant.  Made partner after 10 years with the firm.

14  So I was a partner for seven years with Ernst & Young.  And in

15  the last 12 years of my time with Ernst & Young, I've spent

16  time in the real estate and mortgage banking field.  And as a

17  partner, I was their actual national director of mortgage

18  banking.  So, I was responsible for all of the client services

19  they provided to the mortgage banking clients of Ernst & Young.

20  Q.  When did you first join Countrywide?

21  A.  I joined Countrywide in '95.

22  Q.  How many years were you at Countrywide, and part of that

23  time Bank of America?

24  A.  15 years total between Bank of America and the two years --

25  with Countrywide, and the two years I was with Bank of America.

DA83BAN2                        Schakett - direct

 1   Q.  During the 15 years you were there, would you please trace

 2   for us each of the positions you had.  The first one was what?

 3   A.  I was first the chief operating officer of the

 4   correspondent lending division.

 5           MR. SULLIVAN:  Your Honor, request permission to put

 6   on the demonstrative that we used in opening.  I don't care to

 7   mark it as an exhibit.  It is just the Countrywide

 8   demonstrative.

 9           THE COURT:  All right.

10   Q.  Have you seen this demonstrative, sir?

11   A.  Yes, sir, I have.

12   Q.  Just indicated your first position was the chief operating

13   officer of the correspondent lending division.  Do you see that

14   division on that demonstrative?

15   A.  Yes, it is the second one from the right.

16   Q.  Describe for us what the nature of your duties were as the

17   chief operating officer of that particular division?  First,

18   after what time period were you there, roughly?

19   A.  That was -- I had that job from '95 to about 2000.  But I

20   had some expansion of duties during that time period.

21   Q.  Tell us about the areas of responsibility that you had at

22   that time.

23   A.  At that time, the chief operating officer was responsible

24   for all of operations.  So, all of the individuals that worked

25   on purchasing loans, and reviewing loans, worked up through me.

1   I was responsible for risk management, I was responsible for

2   the finance and accounting function, and I was responsible for

3   technology.

4   Q.  Approximately how many people worked for you in your

5   capacity as the chief operating officer of that division?

6   A.  At that time about 2,000 people.

7   Q.  Did you have a second job with Countrywide?

8   A.  Well, yes.  During from '98 to 2000, while I was still

9   performing the chief operating officer duties of the

10  correspondent division, they expanded my duties to include the

11  CEO or chief executive officer of the warehouse lending group,

12  and became the CEO of the landsafe closing group.

13  Q.  Describe briefly what those are?

14  A.  The warehouse lending group was a group that made loans to

15  other mortgage companies to finance their inventory before they

16  sold them into the secondary market.  And the landsafe closing

17  division had three different functions.  It provided mainly

18  production support.  They did appraisal services, they did

19  flood certifications, and they did credits reports services.

20  Q.  Now with those new additional responsibilities added to

21  your responsibility as COO of correspondent lending division,

22  approximately how many people would you be responsible for at

23  the company?

24  A.  Probably 35,00 at that time.

25  Q.  Was there a third job that you had at Countrywide?

1   A.   Yes.   I became the chief operations officer of Countrywide

2   Home Loans.

3   Q.   Approximately what years did that cover, sir?

4   A.   That was the years, like, 2000 to 2003.

5   Q.   Would you describe for us the nature of your

6   responsibilities in that capacity.

7   A.   Yes.   As the chief operations officer of Countrywide Home

8   Loans, my largest responsibility, or the one that had the most

9   people in it, was in charge of the loan servicing operation.   I

10   also picked up application technology for Countrywide Home

11   Loans, I had a group called production and risk management,

12   another group called business transformation services.   And

13   then I had indirect operations -- I'm sorry.   The operating

14   personnel of the divisions indirectly reported to me.

15   Q.   Approximately, in that capacity, the third job at

16   Countrywide, approximately how many people were you responsible

17   for at that time?

18   A.   In excess of 20,000.

19   Q.   Did you have a further and final position at Countrywide?

20   A.   Yes.   I became the chief operations officer of Countrywide

21   Financial Corporation.

22   Q.   What dates did that cover?

23   A.   So that was in the 2005 to 2008 range.

24   Q.   Would you tell the jury, please, what areas of

25   responsibility you had at that time.

DA83BAN2                          Schakett - direct

1   A.  So I retained the same responsibility I had as the chief

2   operations officer of Countrywide Home Loans, but since

3   Countrywide had three other subsidiaries, it had an insurance

4   company, it had a capital mortgage group, it had a banking

5   group, those three groups became part of my operating

6   responsibilities.

7   Q.  I'm sorry --

8   A.  I'm sorry.  And also I picked up, I don't know if I

9   mentioned earlier, global operations reported to me.  That was

10  actually my previous role, I think I failed to mention it.  And

11  I also picked up the infrastructure part of technology.

12  Q.  What is the global operations you mentioned?

13  A.  Global operations had two primary functions.  One we had a

14  technology group that did software programming for us in India.

15  And then we had a production support group in India that

16  provided production support services, including in-line quality

17  assurance for the production divisions.

18  Q.  In that last capacity, approximately how many people would

19  you have been responsible for as the chief operating officer of

20  Countrywide Financial Corporation?

21  A.  I think at the peak about 30,000 people.

22  Q.  On the demonstrative, Full Spectrum Lending is right there

23  with the yellow color.  During these various positions, did you

24  have some responsibility for Full Spectrum Lending?

25  A.  Yes.  All three divisions had both a president, there was a

1    senior managing director for the company, and then they had

2    chief operations officer.  Like Full Spectrum, for instance,

3    had Greg Lumsden as their senior managing director, Rebecca

4    Mairone as their chief operations officer.  And as my role as

5    chief operations officer of Countrywide Financial Corporation,

6    the chief operation officers of the individual divisions, like

7    Rebecca, reported indirectly to me.

8    Q.  In your capacity as the chief operating officer, did you

9    have responsibility for production risk management as you've

10   indicated?

11   A.  Yes.  Production risk management role was my primary tool.

12   I actually managed my indirect responsibility for the

13   production provisions.

14   Q.  Can you describe exactly what your responsibility was in

15   production risk management.

16   A.  Production risk management was a role that kind of set

17   between two other roles.  Countrywide Financial Corporation and

18   Countrywide Home Loans had a chief credit officer role.  That

19   was headed by John McMurray at the time.  And the credit risk

20   officer role was to set kind of all credit policy and

21   procedures for their operating decisions.  In this case the

22   four divisions you see on the chart.  So he was the ultimate

23   risk officer of the company.

24           The production divisions, as depicted in the chart,

25   again were responsible for their own operations.  So, the

DA83BAN2                    Schakett - direct

 1    people directly in line reported to their senior management,

 2    and they reported to chief production officer, and their final

 3    disposition.  That was Drew Gissinger at the time that we're

 4    discussing.

 5            So, my role, production risk management, was between

 6    those two roles.  What I mean by that is, we were responsible

 7    for working with the credit risk management group to look at

 8    trends and analysis and how the production divisions were

 9    doing.  And if there was some concern raised by either the

10    credit risk group, or if I myself observed some trend that I

11    didn't like how it was going, our group would spend time

12    analyzing what we considered was the root cause for that

13    problem.  To do deep dives into the data to figure out what we

14    think was causing it.  And we were responsible for working with

15    the production divisions directly to solve that problem.  To

16    develop a new technology, to develop another worksheet, do

17    something to actually solve the problem.

18            So again, we had this role, both trying to make

19    operational changes to make them more efficient, and primarily

20    to gain control manufacturing quality of other divisions.

21    Q.  What was the credit risk committee?

22    A.  Credit risk committee was one for Home Loans and one for

23    CFC, that I set on.  John McMurray chaired that committee.

24    Dave Sambol, Drew Gissinger, the other executive managing

25    directors, were part that was committee.  It was responsible

DA83BAN2                        Schakett – direct

1   for making the highest level decisions as it relates to credit

2   risk in the company.

3   Q.  Now, sir, I'd like you to turn to tab two in your binder.

4   And there you'll find Plaintiff's Exhibit 46 already introduced

5   into evidence.  Do you have it handy?

6   A.  I do.

7   Q.  I'd like you to look at that portion of the memo where Drew

8   Gissinger is sending a memo to all the employees.  Do you see

9   it?

10  A.  Beginning on page four?

11  Q.  Yes.

12  A.  Yes, I see it.

13  Q.  First off, tell us who Drew is, please.

14  A.  Again, Drew Gissinger was the chief production officer of

15  Countrywide Financial Corporation.  He was the executive

16  managing director, the same level I was in the organization.

17  Reported to Dave Sambol, like I did.  And the people on the

18  chart that you showed a minute ago, the four divisions, their

19  senior managers reported directly to Drew.

20              (Continued on next page)

21

22

23

24

25

1    BY MR. SULLIVAN:

2    Q.  Now were you and Drew on the same level of the corporate

3    structure?

4    A.  We were all recording directly to Dave Sambol.

5    Q.  Is it fair to say that you or several people held the

6    position of number two in terms of the corporate structure?

7    A.  Yes, Drew and I had -- about 90 percent of the people at

8    all of Countrywide reported to either Drew or I, so we had the

9    vast majority of the individuals working for us.  But there

10   were other three other senior executives at the same level,

11   John McMurray, which was the credit risk officer I mentioned

12   earlier, Kevin Bartlett was the chief investment officer, and

13   Carlos Garcia was the chief financial officer.  So we had about

14   five people at the executive management director position all

15   sat on the executive's committees and made the most high level

16   strategic decisions for the company.

17   Q.  Could you define for us clearly the difference between your

18   duties and the one hand and Drew's on the other.

19   A.  Yes, so Drew had basically both the sales force working for

20   him, so effectively all the people that actually created loans

21   for the company in any of the divisions reporting to him, and

22   then the operating people that actually made those loans that

23   the salespeople created were for Drew.  So in my duties, again,

24   I had servicing function, which was after the loan is made by

25   the production division, the loan is sold in a security

1    primarily into the secondary market to a Fannie Mae or a

2    Freddie Mac, and then Countrywide retained the servicing rights

3    in that loan, which means they retained their obligation to

4    actually collect payments from the consumers, handle their

5    escrows, tax and insurance and things like that.  So that was

6    the other large operating group I had.

7           So then again as my role as chief operations officer,

8    I had this indirect responsibility over Drew's operating

9    people.  So he had direct responsibility, I had indirect

10   responsibility, and again, I used my production risk management

11   and the business transformation group to kind of assert my

12   authority over them.

13   Q.  Did you interface with him directly on a regular basis?

14   A.  Yes.  He officed two doors down from me.  We obviously had

15   to be partner in almost all of these responsibilities.  We sat

16   on all the same committees and went to committee meetings

17   together, and I just had, of course, a very professional and

18   important relationship with Drew.

19   Q.  Now directing your attention to tab 2, Plaintiff's Exhibit

20   46, which is Drew's memo, do you see that the memo is from

21   Andrew Gissinger dated August 7, 2007?  Do you see that?

22   A.  Yes, I do.

23   Q.  And it is entitled, quote, Memorandum to Countrywide Home

24   Loan Employees, end of quote.  Do you see that?

25   A.  Yes, I do.

DA8TBAN3                          Schakett - direct

1   Q.  Did you actually receive that memo at the time it was sent?

2   A.  I did.

3   Q.  Did you talk to Drew about the memo before it was sent as

4   it was contemplated being sent?

5   A.  Yes, I definitely remember this memo quite well.  It was a

6   rather important and timely memo to issue to the staff, and

7   thus Drew brought me into discussions about his willingness of

8   wanting to send the memo out and wanted to get my thoughts on

9   the memo before it went out.

10  Q.  Let's look at the memo itself, please.  Would you read the

11  first two sentences of the memo for us as we go through it.

12  A.  As you know, our entire industry is being impacted by the

13  changes we are seeing in the market which we have long expected

14  and predicted.  This is the result of the shake out among our

15  competitors that we have also anticipated.

16  Q.  Now continue with the next two sentences, please.

17  A.  The disruption that we have seen in the secondary markets

18  over the past several weeks is continuing.  It is not yet clear

19  when we will see a return to what we would characterize as a

20  normalized market.

21  Q.  And the following sentence and then stop.

22  A.  In response to these rapid changes, we have revised our

23  product offerings and guidelines, and our competitors have as

24  well.

25  Q.  All right.  Now focusing on that sentence, the particularly

1  the words "rapid changes," what did you understand the rapid

2  changes to be?

3          MR. CORDARO:  Objection.

4          THE COURT:  Ground?

5          MR. CORDARO:  I think he's going to rely on hearsay.

6          THE COURT:  Pardon?

7          MR. CORDARO:  I think it will rely on hearsay given

8  the foundational questions that led up to it.

9          THE COURT:  You received this note?

10         THE WITNESS:  Yes, I did.

11         THE COURT:  I'll allow it.

12 Q.  What did you understand by the term "rapid changes?"

13 A.  Yes, I knew what he meant because, again, I was involved

14 with discussing what he wanted to communicate in the memo.

15         THE COURT:  No, no, just what did you understand.

16 Q.  What did you understand?

17 A.  Rapid changes were what was going on in the secondary

18 market as in the subprime market was going away, people were no

19 longer buying subprime loans or beginning to stop buying

20 subprime loans, and people started changing the guidelines on

21 Alt A loans.

22 Q.  Now sir, it indicates further in the sentence that

23 Countrywide revised their product offerings.  Do you see that?

24 A.  Yes, I do.

25 Q.  Did you understand that Countrywide had revised product

1   offerings at the time this memo was sent?

2   A.   Yes, we did.

3   Q.   What revisions were there?

4   A.   As I just alluded to, because the secondary market was

5   stopping buying subprime loans, we had to stop -- we had to

6   revise our guidelines to no longer offer those products, and

7   for the Alt A products, which are primarily stated income type

8   loans, they were changing the guidelines on those, and thus we

9   had to change our guidelines to match the loans the secondary

10  market would buy.

11  Q.   Who changes guidelines?

12  A.   Guidelines start with changing by the secondary market.

13  And I say "the secondary market," that means people that are

14  buying our loans.  And people that were buying Countrywide

15  loans were both Fannie Mae, Freddie Mac, also putting the

16  Ginnie Mae securities, then private investors were buying our

17  loans.

18  Q.   Now read the next sentence, please.

19  A.   There has been a particular significant pull back from

20  subprime, Alt A, and now prime non-conforming loans.

21  Q.   What did you understand of the term "pull back from

22  subprime" to be?

23  A.   Means that people -- many groups were no longer buying

24  subprime loans.

25  Q.   How did that affect Countrywide?

1    A.  Countrywide can only produce what it can sell.  So we were

2    a conduit.  The secondary market decides what it wants to buy,

3    Countrywide produces the products that the secondary market

4    would buy.  The secondary market wasn't buying subprime loans,

5    we could no longer produce subprime loans.

6    Q.  What is Alt A as reflected in that document?

7    A.  Alt A is a group of loans that were in a category of prime

8    borrowers, so they had good credit scores, but the type of

9    documentation wasn't full documentation.  So stated income

10   loans were part of the Alt A loans.

11   Q.  What was, quote, prime non-conforming loans?  Would you

12   define that for us?

13   A.  Yes, conforming loans were loans that were the loan size

14   that Fannie Mae and Freddie Mac would buy, and non-conforming

15   loans were loans that were in excess of the size that Fannie

16   Mae and Freddie Mac would buy.

17   Q.  Read the next sentence for us, please.

18   A.  We must ensure that our guidelines are fully in sync with

19   the secondary market, and therefore, we will be continuing to

20   announce guidelines changes when we need to align ourselves to

21   the overall market.

22   Q.  And were there, during this period of time, '07 and '08,

23   continued guideline changes made by Countrywide?

24   A.  Yes, there were, many of them.

25   Q.  Were there guideline changes made by purchases of

1   Countrywide products such as Fannie Mae and Freddie Mac?

2           MR. CORDARO:  Objection.

3           THE COURT:  Ground?

4           MR. CORDARO:  Foundation.

5           THE COURT:  You may lay a foundation, if you can.

6   Q.  Did you work with -- in your capacity as the chief

7   operating officer, were you aware of guidelines set by Fannie

8   Mae and Freddie Mac?

9   A.  Yes, I was.

10  Q.  Did those guidelines change from time to time?

11  A.  Yes, they did.

12  Q.  How many years experience did you have in your dealings

13  with Fannie Mae and Freddie Mac?

14  A.  At least twelve.

15  Q.  What did -- during this period of time, did Fannie Mae and

16  Freddie Mac change their guidelines on products that

17  Countrywide was offering?

18  A.  Yes, they did.

19  Q.  How did they do so?

20  A.  They basically tightened the guidelines.  And I say

21  tightened the guidelines, just guidelines themself is a

22  combination of rules that put maximum limits on what you could

23  make.  So for instance, on a new loan they may say for this

24  loan to value ratio of 95 percent we expect the credit score to

25  be at least 640, and we will only do those on loans that are

1    owner occupied, those are the three guidelines, just as an

2    example.  So when I say they tightened the guidelines, that

3    means they either lowered the LTV requirement, took it from 95

4    to 90, or they raised the credit score requirement from 640 to

5    680 for certain documentation types.

6    Q.  Now read the next sentence, please.

7    A.  Our success in the environment is absolutely contingent on

8    our ability to employ rigorous underwriting discipline.

9    Q.  Now what do you understand the term "underwriting

10   discipline" to mean?

11   A.  Really is another way to describe manufacturing quality.

12   It means the process of actually processing loans and closing

13   loans, we needed to be as accurate as possible and have the

14   right documentation in the files to support our underwriting

15   decision.

16   Q.  And read the following sentence, please.

17   A.  We need to adapt our business to new market realities which

18   require ongoing manufacturing quality enhancement and further

19   operating controls.

20   Q.  Now what did you understand the term "manufacturing quality

21   enhancement" to mean?

22   A.  It means a series of controls that we have to make sure

23   that we are producing the best quality product possible to

24   increase those controls, whether it be checklists, additional

25   training, new technology, things that would make it more likely

1  we would have the best manufacturing quality possible.

2  Q.  And was manufacturing quality enhancement part of your

3  responsibility as chief operating officer?

4  A.  Yes, it really fell into two groups.  I mentioned earlier

5  that I had a business transformation group reporting to me.

6  That group was responsible for a big projects for the company,

7  so any large project that required project management people to

8  work on, my group worked on.  And then production risk

9  management again was responsible for enhancing manufacturing

10  quality in the first place.  So my group would be responsible

11  for making changes that would enhance the risk management

12  function.

13  Q.  How frequently does an officer at your level or Drew

14  Gissinger's level send such a memo to Countrywide personnel

15  during the time frame of '07, '08?

16         MR. CORDARO:  Objection.

17         THE COURT:  Ground?

18         MR. CORDARO:  It speaks to other officers, so

19  competence and foundation.

20         MR. SULLIVAN:  I didn't hear that.

21         MR. CORDARO:  It's a little vague, it speaks to other

22  officers.

23         THE COURT:  I think -- overruled.  You may answer.

24  A.  Yes, this was unusual for Drew to write a memo to all of

25  Countrywide home loans.  Usually his memos would go to his

1   direct staff or just his group that reported directly to him.

2   So this was definitely an unusual memo.  That's why it's one

3   that I remember discussing with him.

4   Q.  Were you in favor of sending the memo?

5   A.  I was.

6   Q.  Was sending of the memo stating essentially what company

7   policy was with regard to the content of the memo?

8   A.  Yes, this memo was also approved by his boss, Dave Sambol.

9   Q.  Now sir, I would like to focus you on the time period 2007

10  and 2008 on the division known as Full Spectrum Lending.

11  Remind us what your responsibility was for that division that

12  we saw on the chart of the demonstrative a few moments ago.

13  A.  Again, the chief operations officers of that division would

14  have been indirectly reporting to me, and I would have been

15  responsible for both large projects that they were involved

16  with, they needed help with my business transformation group,

17  and I would have been responsible for my production risk

18  management group to oversee their production quality.

19  Q.  Now historically, what was Full Spectrum Lending's loan

20  product?

21  A.  They were predominately a subprime lender.

22  Q.  Could you explain a little more what that means in terms of

23  their division function?

24  A.  Yes, subprime was a term of art that basically meant all

25  loans that weren't prime.  Some people called them non-prime,

1    but subprime became the industry term for them.

2    Q.  Could you define that for us, sir?

3    A.  In a prime loan there's not any kind of bright line of what

4    a prime loan versus subprime is, but there's some gray areas

5    where you could see where it falls.  A prime loan is someone

6    that had good credit, good credit history, deep credit, and

7    thus was paying the mortgages and other things on time, and

8    thus ended up with a good credit store.

9         A subprime loan is someone that had something damaged

10   in their credit history, enough damage to bring down their FICO

11   score to a lower level that was below some magic number -- and

12   I say a "magic number" because historically you might have said

13   a loan below 620 was a subprime loan and one above 620 would be

14   a prime loan, but the truth is over time the number changed.

15   Maybe at another point in time the cut off was 600 or 580 even.

16   So not a bright line where the cut off was, but clearly

17   subprime was loans where the person had some damaged credit and

18   could not get the same rates and the quality loan that a prime

19   borrower could.

20   Q.  What was the purpose of having one division focused just on

21   subprime loans?

22   A.  Well, subprime was a different customer base, required

23   different customer handling, it required every loan was kind of

24   a story to some extent, the underwriters had to be adapt at

25   understanding what caused the person to become kind of a

1    subprime borrower, what their needs were, and thus it required

2    a different focus than prime borrowing, and it would make sense

3    to have a different separate division that focuses on that.

4    Q.  How many years prior to '07/'08 at Full Spectrum focused on

5    the subprime product only?

6    A.  Well, when I joined them, they were doing subprime

7    products.  I don't know how long they were before I joined

8    them, but for the full time I was there they were doing

9    subprime loans.

10   Q.  And did there come a time when a subprime product was no

11   longer viable in the market?

12   A.  Yes, as alluded to in Drew's memo that we discussed a

13   minute ago, during the 2007 time period the housing market

14   started depreciating or not appreciating in late '06 and early

15   '07, and subprime loans started seeing the first effective

16   increased delinquencies, and the secondary market started

17   stopping making subprime loans, which again forced Countrywide

18   to stop making subprime loans.

19   Q.  Now once that occurred in the marketplace and the division

20   could no longer make subprime loans because they were no longer

21   viable, was a decision made at the company as to what Full

22   Spectrum should do instead of subprime loans?

23              MR. CORDARO:  Objection.

24              THE COURT:  Ground?

25              MR. CORDARO:  Well, it's leading.

```
 1              THE COURT:  No, I don't think it's leading.
 2    Overruled.
 3    A.  Yes, the company had to make a relatively important
 4    decision.  They had a group that was focusing, like you say, on
 5    subprime loans.  That marketplace had gone away.  There was a
 6    good number of people working in that division, and we had to
 7    decide basically to convert them to a prime lender or actually
 8    take the senior management and the best level people we had and
 9    move them into one of the other divisions.
10    Q.  And who made that decision, sir?
11    A.  Well, Dave Sambol ultimately made the decision, but there
12    was three of the us that were in the discussions over it.
13    Myself, Drew Gissinger and Dave Sambol had some nice friendly
14    debates on that topic.
15    Q.  This was the decision made, approximately?
16    A.  It was made during that middle of '07.
17    Q.  And what was the decision finally made?
18    A.  The decision was to keep Full Spectrum and to convert them
19    to a prime lending base.
20    Q.  After the decision was made, how did you effect the
21    decision?
22    A.  Well, we effected the decision by, one, they had to adopt
23    obviously all the prime lending guidelines, and they had to
24    start embarking a process where they converted to all the prime
25    lending processes that the other divisions had.
```

1  Q.  Did you have a role with respect to the change over from

2  prime focus to subprime focus?

3  A.  I had a role as in my individuals that worked for me were

4  working with the division to actually help make that change

5  over, and I certainly had a role in monitoring the progress of

6  that change over.

7  Q.  And could you describe the nature of the change over from a

8  high level?

9  A.  Yes, again, as I maybe I alluded to earlier, subprime loans

10  were different underwriting animal.  They required kind of a

11  story with every loan, and that required very intense, very

12  experienced underwriters to actually do the underwriting.

13          The prime loans is quite a difference.  Prime loans,

14  most loans the underwriting itself is done by an automated

15  underwriting process, and the people that are working the

16  divisions are primarily documenting, supporting the information

17  necessary to support the automated underwriting decision.  And

18  for prime loans, the people that you are working with expect

19  quick answers.

20          For subprime, there's more tolerance for time because

21  they understand they have a credit that is less than stellar,

22  and they're just appreciative of getting a loan, and they will

23  give you as much time as you need to finish the underwriting

24  process, wherein the prime loan world people, are used to quick

25  decisions and thus we had to make -- convert to a world of

1    making a quicker decisions and be more efficient in the process

2    to make prime loans.

3    Q.  Now in connection with the transition, was there more or

4    less quality control focus on Full Spectrum lending?

5    A.  Well, there was more quality control focus from the point

6    of view of any company going through a large transition, and

7    going from subprime to prime was a significant transition.  And

8    there were debates on whether we should have had Full Spectrum

9    in the first place, so many people were concerned and watching

10   how they turned out, could they make that conversion

11   successfully, and could they keep the quality levels that we

12   needed in the organization to be successful.

13   Q.  Now sir, would you define for us essentially what is

14   underwriting a loan?

15   A.  Well, again underwriting a loan historically used to think

16   of a underwriter underwriting a loan, a person looking at a

17   loan file making a credit decision, deciding whether I should

18   say yes to this loan or no to the loan.

19          In the last 10 or 15 years that process has been

20   delegated primarily, for prime loans at least, to the automated

21   world.  And I say the "automated world," that is using a system

22   to look at all the variables that go into loan performance in

23   deciding whether or not there's enough points on the board to

24   approve this loan.

25          And let me make a little deeper dive there just for

consumption.  How a loan performs relates to many factors,

things like credit score, loan to value ratio, the debt to

income ratio, whether the primary resident is the borrower or

not, is it a purchase versus a refi, all different attributes

that actually make a difference.  And there's not like well,

just one LTV is important or -- sorry, loan to value is

important or one credit score, it's the combination of all

those things that matter.

        And it's difficult for a human to kind of know the

exact trade offs.  Is it more important to have a higher LTV or

a higher FICO score?  A machine can look at all the historical

data and make that decision much better, so people rely on an

underwriting decision on the automated basis.  So underwriting

has become in the real world relegated to the automated

systems, and only loans that the system says no to would go to

a manual underwriter to look at.

        MR. CORDARO:  Your Honor, I move to strike everything

from the phrase, I want to make a -- "let me make a little

deeper dive on" is non-responsive.

        THE COURT:  Yes, the jury will disregard that.  But

let me just suggest to the government that if you think a

witness is going beyond the scope of the question, the time to

intervene is that point rather than at the end of the question.

But the jury will disregard the last part of his answer.

        MR. CORDARO:  I will do so.  Thank you, your Honor.

DA8TBAN3                    Schakett - direct

1    Q.  Does underwriting require a person with the title

2    "underwriter" to perform underwriting tasks?

3    A.  No.

4    Q.  Explain.

5    A.  Again, once an underwriting decision has been rendered by a

6    computer in this case to except what we're looking for, then

7    who actually does the work to make sure that the data fed into

8    the computer just needs to be a person with the appropriate

9    level to do that function.

10   Q.  Could it be a loan specialist?

11   A.  The title really doesn't matter.  It's not about titles,

12   it's about job experience.  So loan specialists, loan

13   processor, junior underwriter, call them what they want, it

14   needs to be a person that has enough experience at that time to

15   be able to have the judgment to be able to test what's in the

16   system.

17   Q.  All right.  Now were you personally involved in developing

18   policies and procedures which dealt with the authority given to

19   various employees in the underwriting of loans?

20   A.  Yes, I chaired and drove a group for Bank of America,

21   Countrywide at the time, to actually develop a new system that

22   would do some enforcement of making sure the right person

23   signed off on every loan.

24   Q.  What was that system called?

25   A.  It was called SASE.

1   Q.  And is that an acronym for Signing Authority Signature

2   Enforcement?

3   A.  Yes, it is.

4   Q.  Are you responsible for that name?

5   A.  Somebody in my group was.  I kind of hate that because I

6   have trouble remembering what it stood for.

7   Q.  How would you define SASE?  Tell us what it is.

8   A.  It was a system that was developed to make sure that the

9   most experienced underwriters looked at the most difficult

10  loans.  And what I mean by that is again every loan has a

11  different level of risk, and every loan has a different

12  complexity level.  A self-employed return is more complex than

13  a W-2 borrower.  A person with high credit more likely to make

14  payments.

15          MR. CORDARO:  Objection, your Honor, the question was

16  tell us what SASE is.

17          THE COURT:  Well, I'm going to leave it, but I want to

18  caution the witness to confine your answers just to the

19  question.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  I was under the illusion that SASE was an

22  adjective mostly applied to lawyers, but I guess I'm wrong.

23          MR. SULLIVAN:  That's why I took such trouble to

24  define it.

25  Q.  Now as COO, ranking up there with a few others as number

1   two in the company, was this your personal project?

2   A.  Yes, this was my personal project.

3   Q.  Why was this important to you as COO?

4   A.  Because our organization, like all organizations, only had

5   limited resources.  We only had so many people work for us.

6   And as you're hiring new people, you have inexperienced people,

7   you have to train them, and you have people that are very

8   experienced.  So to make sure we used the right resources on

9   the right loans, in order to mitigate our risk of making bad

10  loans, we wanted to make sure the most complex loans were

11  reviewed by the most capable people and the easiest loans were

12  reviewed by the people that were less experienced.

13  Q.  All right.  Turn to tab number 3 in your binder, please.

14  This is Defendant's Exhibit 22 already admitted.  Would you

15  please tell us what this hard-to-read chart is.

16  A.  It's in my tab 4, but OK.

17  Q.  Tab 3, sir, sorry.

18  A.  This chart shows the first manual implementation of SASE.

19  So it was intended to show the different criteria that went

20  into making a decision on how complex the loan was or what the

21  risk nature of the loan was.  And it shows, based upon those

22  attributes, which underwriting level of experience you would

23  need to have to be able to underwrite that loan.

24  Q.  Let's look at the very first column in yellow on the left

25  called risk tier level.  Do you see that?

1   A.  I do.

2   Q.  Explain what that means.

3   A.  The risk tier is the level of risk that the computer

4   calculator as I was describing earlier assigns to the loan.  So

5   the loans with the lowest risk number, risk tier number one,

6   were the loans that were least risky.  So they had the best

7   attributes of any of our prime loans being made.  Risk tier

8   five on the chart would be the ones that were actually most

9   risky; so still loans that were acceptable to us, but had a

10  higher probability of default.

11  Q.  All right.  Now would you go over to the far right of this

12  column, and we see some writing that's up and down there under

13  the word "prime," do you see that?

14  A.  Yes, I do.

15          MR. SULLIVAN:  Would you highlight that?

16  Q.  Now explain to us what those levels are and how it

17  correlates to the yes and no answers found below that in the

18  blocks still called risk tier level.

19  A.  Again as you can see, there are six levels of underwriting

20  experience required on this chart, and the individuals with

21  level six experience were our most experienced underwriters.

22  And as you can see by the yes column, they could obviously

23  review the most risky loans, they could review all the loans

24  tiers one through five.  Where if you go down to the opposite

25  extreme, the person with level one experience, which could have

1    been a loan specialist or a somebody else in the group that

2    wasn't a senior underwriter, that person was restricted to only

3    approving loans that were in risk tier one and two, the least

4    risky loans.

5    Q.  Now let's go down to loan amount, the next on the left

6    there, and just explain generally what that is by looking at

7    the middle of the exhibit.  Why is that a factor here on the

8    SASE matrix?

9              MR. CORDARO:  Objection, your Honor, lack of

10   foundation as to SASE.

11             THE COURT:  Overruled.

12   A.  One other risk factors we factored into developing SASE,

13   was loan amount.  As shown on this chart, the larger the loan

14   the more risk to organization; smaller the loan, the least

15   risk.

16   Q.  Now if we looked over at the chart and I went down to the

17   million five level two up from the bottom, and went over to the

18   word "no," what in essence is that saying about the authority

19   of an underwriter at level one?

20   A.  Regardless of any other attribute in the loan, if the loan

21   size was greater than a million and a half then a level one

22   underwriter could not do the review.

23   Q.  Is a level one underwriter in fact an underwriter or could

24   that person be a loan processor or loan specialist?

25   A.  Processor, specialist, the terminology doesn't matter, it's

DA8TBAN3                          Schakett - direct

1   someone with some experience processing loans.

2   Q.  In essence -- or strike that.

3           Did the matrix change from time to time?

4   A.  Yes, this matrix -- as we tried to make sure we aligned our

5   risk with our personnel, we changed the matrix quite often.

6   Q.  Did SASE and the principals articulated by SASE as

7   reflected on this exhibit comply to the Full Spectrum loan

8   division?

9   A.  Yes, it did apply to all divisions.

10  Q.  Did it apply to the Full Spectrum loan division in '07 and

11  '08 when they were transitioning from the subprime to a prime

12  product?

13  A.  Yes.  Again, eventually we computerized SASE, but we had a

14  manual implementation requirement of SASE in this time period,

15  and this was Full Spectrum's evidence they were doing that.

16          MR. CORDARO:  Objection, your Honor, to that last

17  statement.

18          THE COURT:  Sustained.  The jury will disregard the

19  last statement.

20  Q.  Would you expect in a transition that executives engaged in

21  the Full Spectrum transition from prime -- subprime to prime

22  would adhere to the standards and philosophy of SASE?

23          MR. CORDARO:  Objection.

24          THE COURT:  Sustained.

25  Q.  When you issued SASE, did you anticipate that employees of

1   Countrywide would abide by it?

2              MR. CORDARO:  Objection, foundation.

3              THE COURT:  I will allow that.

4   A.  Yes, they were required to comply with it.

5   Q.  Did Fannie Mae and Freddie Mac approve the use of CLUES,

6   which you've talked about a few minutes ago?

7   A.  Yes, Fannie Mae allowed us to use Countrywide's own

8   automated underwriting system.

9   Q.  Did Fannie Mae calibrate or test CLUES in some way from

10  time to time to assure it contained the various guidelines that

11  it wanted?

12  A.  Yes, we tested CLUES for Fannie Mae and showed them the

13  results how our automated underwriting system, CLUES, compared

14  to their automated underwriting system, DU.

15  Q.  Now sir, focusing you still on Full Spectrum lending and

16  the time period '07 and '08, prior to the time this lawsuit was

17  filed, had you ever heard the term "High Speed Swim Lane" in

18  conjunction with Full Spectrum lending?

19  A.  No, sir.

20  Q.  Have you been familiar with the term "swim lane" as used in

21  the design of mortgage production processes?

22  A.  Yes.

23  Q.  Please explain.

24  A.  Swim lane was a typical way that people, when they did flow

25  charts of how a process moved from one group to another, a swim

DA8TBAN3                    Schakett - direct

1    lane was designated as usually one group.  So you might have

2    had the sales staff in one group and the operations people in

3    another group, and thus each would be in their own swim lane,

4    so to speak.  So when you're flowing out the flows, you could

5    understand how it moved from one group to another.

6    Q.  At your level as COO, were you generally familiar with the

7    efforts made by Full Spectrum Lending to adapt to the new prime

8    market?

9    A.  Yes, I was generally aware of their efforts, and again, I

10   often saw reports and such that actually supported how they

11   were doing on a quality front.

12   Q.  Were you, for example, aware that they had a pilot program

13   before the roll out of what was called High-Speed Swim Lane?

14          MR. CORDARO:  Objection.

15          THE COURT:  Sustained, leading.

16   Q.  Are pilot programs common in your industry?

17   A.  Yes, any significant change from one process to another

18   almost always is accompanied by some pilot to test it to make

19   sure it's working well before you roll it out on a scale basis.

20   Q.  Were you aware whether or not there was a pilot program

21   involved in any of Full Spectrum's work during '07 and '08?

22          MR. CORDARO:  Objection, relevance.

23          THE COURT:  Sustained, at least without a further

24   showing.

25          Also we need to find a place in the next few minutes

 1   to give the jury their mid-morning break.

 2            MR. SULLIVAN:  How about right now?

 3            THE COURT:  Very good.  Ladies and gentlemen, because

 4   we started late, we'll try to keep this to about ten minutes or

 5   so.

 6            (Jury not present)

 7            THE COURT:  We'll see you all in ten to fifteen

 8   minutes.

 9            (Recess taken)

10            (Jury present)

11            THE COURT:  Counsel.

12   BY MR. SULLIVAN:

13   Q.  Was Full Spectrum a central fulfillment model?

14   A.  Yes, it had -- it used a central fulfillment model to

15   perform its operating functions.

16   Q.  What are the elements of a central fulfillment model.

17   A.  Central fulfillment model meant they had one location or

18   several locations where they had a significant skill set of

19   people to perform all the operating functions.  That's compared

20   to a non-centralized model would have small groups of people

21   throughout the country located close to where the loans were

22   being made, where a centralized model had fewer locations,

23   larger groups of people, and the loans had to go from one

24   geographic area to that location to be processed.

25   Q.  Now sir, in 2007 and '8 was there a company-wide effort to

1    address concerns about stated income loans?

2    A.  Yes, there was.

3    Q.  What is a stated income loan?

4    A.  An income loan that is where the borrower of the loan,

5    instead of documenting how much income he had, he actually told

6    you -- represented how much income he had, and you used that in

7    your underwriting process.

8    Q.  How long had the stated income loan been a product prior to

9    years 2007 and '8?

10   A.  I don't know when it first started, but I know it was there

11   for all the 2000s, so at least by the year 2000 on.

12   Q.  Did Fannie Mae and Freddie Mac buy stated income loans?

13   A.  Yes, they did.

14   Q.  And did Countrywide produce stated income loans to meet

15   that market?

16   A.  Yes, they did.

17   Q.  Now when underwriting a stated income loan, sir, were

18   underwriters permitted to just ask the borrower or the

19   applicant to provide payment stubs or tax returns to verify the

20   income that was stated?

21            MR. CORDARO:  Objection.

22            THE COURT:  Overruled.

23   A.  No, they were not allowed to fully document the income if

24   it was stated.

25   Q.  They were not allowed to ask for W-2s or tax returns?

1   A.   That's correct.

2   Q.   Why?

3   A.   Fannie Mae policy prohibited it, and the reason they

4   prohibited it was if you got everything that you needed for a

5   full documentation loan, well, then you should classify it as a

6   full documented income loan.   Stated income loans had a charge,

7   basically a penalty for the borrower.   If you stated income, it

8   wasn't be fair to charge them a penalty for stated income loan

9   if you were then going to ask for full documentation.

10  Q.   How did stated income loans historically perform?

11  A.   Historically performed almost as well as full documented

12  loans.   They performed very well.

13  Q.   Did there come a time when there was a change in the

14  performance of stated income loans?

15  A.   Yes, in the year 2007, after the housing prices starting

16  declining in late 2006 and 2007, we showed a much higher

17  delinquency rate on stated income loans than we expected.

18  Q.   How did Countrywide react to the changing market for stated

19  income loans once it was observed that they were not performing

20  as they did historically?

21          MR. CORDARO:   Objection.

22          THE COURT:   Ground?

23          MR. CORDARO:   Assumes facts.

24          THE COURT:   Overruled.

25  A.   Countrywide primarily did two things to try to mitigate the

1   risk of stated income loan delinquencies.  One, the guidelines

2   that we discussed earlier were already changing, so who could

3   qualify for stated income loan was more difficult.  So we made

4   the changes in the marketplace required in that area.  Then

5   two, we developed tools for the underwriters to determine the

6   reasonableness of somebody's stated income.

7   Q.  What is stated income reasonability?

8   A.  It's when you somebody tells you how much money they made

9   and what job they had, we developed tools to look at

10  corroborative evidence to see if that made sense in light of

11  other factors.  For instance, if the person says they made

12  $6,000 a month and their payments on their other house before

13  was 3,000, did they have money in the bank account to show for

14  the excess money they said they were making.  Could they -- so

15  things like that looking for evidence other than income that

16  would corroborate whether they were making that level of

17  income.

18           (Continued on next page)

19

20

21

22

23

24

25

1  Q.  When guidelines were changed by Countrywide, did Fannie Mae

2  and Freddie Mac approve those changes?

3  A.  Fannie Mae and Freddie Mac drove those changes, which we

4  then adopted.

5  Q.  With respect to stated income reasonability, did

6  Countrywide develop tests and procedures?

7  A.  Yes, my production risk management group, working with the

8  production divisions, developed new tools to help document how

9  we determined whether the income was reasonable or not.

10  Q.  Did there come a time when stated income loans were

11  discontinued?

12  A.  Yes, eventually, either late 2007 or early 2008, markets

13  stopped buying stated income loans.  And thus Countrywide

14  stopped producing them.

15  Q.  Now, sir, again focusing on 2007 and 8.  Particularly,

16  during that period of time, as chief operating officer, ranking

17  number two or with others in the company, did you receive

18  reports reflecting quality control audits?

19  A.  Yes, I did.  Monthly.

20  Q.  Look at, please, I think it is tab number three.  Do you

21  see Defendant's Exhibit 73 already admitted?

22  A.  I have it.

23  Q.  Is that the kind of report that you received on a regular

24  basis during 2007 and 2008?

25  A.  Yes, it is.

DA83BAN4                     Schakett – direct

1   Q.  Remind us now what is a SUS or severely unsatisfactory

2   rating.

3   A.  It is when a quality control group, working under the

4   credit risk management group, has a group of underwriters,

5   would do a random sample of the production business loans, and

6   determine whether that loan met the Countrywide standards.  And

7   if it didn't, it was considered severely unsatisfactory.

8   Q.  In connection with your duties, did you regularly receive

9   these kinds of reports, like DX 73?

10  A.  Yes, I did.

11  Q.  Were you familiar with the process that arrived at

12  producing these reports?

13  A.  Yes.

14  Q.  Did you review the details of the reports, when you

15  received them?

16  A.  Yes, I did.

17  Q.  Let's look at the report itself for a moment, please.

18          MR. SULLIVAN:  If we go to the left side, Alex, and

19  color in the block labeled FSL and completed audits right next

20  to it on the right.  One block right of the FSL.  The whole

21  block.  Good.

22  Q.  All right, sir, now go over, if you would, and look under

23  calendar year 2007 quarter 4.  And mark that, Alex, please.

24          And go down, do you see the figure of 5.4 percent on

25  there, sir?

1   A.  I do. That's Full Spectrum Lending Division's

2   responsibility SUS for fourth quarter, 2007.

3   Q.  You would have actually received this report sometime after

4   it was issued, am I correct?

5   A.  That's correct.

6   Q.  Tell us what you understood by the meaning 5.4 percent.

7   A.  So, of the 408 loans that they sampled that month for Full

8   Spectrum --

9   Q.  May I interrupt you one second, sir.  Where do you get the

10  number 408?

11  A.  It is under the column called completed audits.

12  Q.  Describe what that is, essentially.

13  A.  They took a sample of loans for the production of month or

14  for the monthly quarter, and they randomly pulled 408 loans to

15  look at.

16          MR. SULLIVAN:  Could you circle that, Alex, please.

17  408.

18  Q.  All right.  Go ahead then with your explanation with

19  respect to the 5.4 percent SUS.

20  A.  So 5.4 percent, of those 408 loans, probably some 22 or so

21  loans met the criteria of several unsatisfactory.

22  Q.  Is there a standard or target that was common at

23  Countrywide that was acceptable?

24  A.  Yes, it was in the 4 to 5 percent range.

25  Q.  If you'd look at the next figure, sir, 9.8 percent.  What

DA83BAN4                    Schakett - direct

1   does that represent to the right?

2   A.  Represents the same computation, except you can see the

3   loans sampled went to 1,742.

4   Q.  Sir, why did the loan sampling increase from 408 in the

5   prior quarter to 1,742 in the next quarter marked 2008 quarter

6   1?

7   A.  The company, Countrywide, was intently focused on

8   manufacturing quality during this period.  And we had means to

9   try to decide what all things we could do to assure we were

10  getting the manufactured quality that we desired.  And one of

11  the best ways to do it was to increase the sample size.  So in

12  this quarter, we almost quadrupled the sample size for all the

13  divisions.

14  Q.  Having quadrupled the sample of audits in that division,

15  what does the figure 9.8 percent represent?

16  A.  That 1,740 loans, 9.8 percent of them actually now has

17  severely unsat rating.

18  Q.  Do you recall receiving that information at the time?

19  A.  I do.

20  Q.  What was your reaction?

21  A.  We were concerned.  The first quarter after the conversion

22  from subprime to prime, it was looking very encouraging at a

23  previous quarter, the 5.4 percent.  And now one quarter later,

24  it had risen to 9.8 percent.  So there was definitely concern

25  on what was happening in Full Spectrum that was causing the

DA83BAN4                          Schakett – direct

1    rate to rise.

2    Q.  Did you take any steps as a result of that concern?

3    A.  I had production risk management group do what we call root

4    cause analysis to go in and discover what loans are creating

5    the problems, what's giving rise to the higher SUS rate, with

6    Rebecca and her group of Full Spectrum to see if they agreed

7    with what the root causes is.  And to develop a plan to try to

8    get the numbers back in line.

9    Q.  Let's look at the next quarter marked 2008 Q2.  If you

10   would highlight the 4.4 and the number of loans.

11           How many random loans were conducted in this quarter

12   as reflected in Defendant's Exhibit 73?

13   A.  1,386.

14   Q.  What was the percentage of SUS?

15   A.  Back down to 4.4 percent.

16   Q.  Did you draw any conclusions when you received that report

17   of the SUS findings?

18   A.  It was very encouraging.  It certainly appeared that the

19   evidence that Full Spectrum had gotten control of the error

20   rates and solved the problems they had that rose to the high

21   13.8.

22   Q.  Sir, in your capacity as the chief operating officer, were

23   you familiar with the quality control rebuttal process?

24   A.  Yes, I was.

25   Q.  What is that process?

DA83BAN4                      Schakett - direct

A.  It's a process where the John McMurray group that performed

the SAS work, the underwriting work to determine if the loans

were severely unsatisfactory.

         Once they had their preliminary results or findings,

they would then give those loans to the division for them to

look at.  That was for two purposes.  One, to see if the

division agreed with the finding.  We need the division to buy

into the findings, unless they had a support -- they had to

make sure they agreed with the decision.  And if they didn't

agree with the decision, they were given a right to state their

reasons why they didn't agree with it.  And if they didn't

agree with it, they would state their reasons.  That process

would have been given back to the QC group, to look at the

reasons the division gave for their disagreement.  And if they

agreed with them, they would actually overturn the SUS, saying

that should no longer be marked as an SUS.

         If they disagreed with their rebuttal, they would

leave the SUS finding as it was.

         So, a primary purpose of the process was to make sure

that the loans were marked SUS really were severely

unsatisfactory.  And the division would support the conclusion.

Q.  Did Countrywide retain loan files for the purpose of

servicing them after the sale of loan files?

A.  Yes, they did.

Q.  Explain that.

1   A.   Again, as servicer of the files, they had to retain all of

2   the primary records, both the collateral records, underwriting

3   files, and the other servicing information.  So they retained

4   those in their files as servicer.

5   Q.   In the rebuttal process, if it was determined that an error

6   was made that could be corrected, was it Countrywide policy to

7   correct it in the file?

8   A.   Yes, it was.

9   Q.   Did an SUS QC finding mean that a loan could not be sold to

10  Fannie or Freddie?

11  A.   No, it did not.

12  Q.   Are you familiar with the in-line quality assurance --

13  A.   Yes.

14  Q.   -- program?

15  A.   I'm familiar with each of the divisions had some form of an

16  in-line quality assurance program.

17  Q.   Exactly what did you understand that to be?

18  A.   Well, the quality control program that we were just

19  discussing is an after-the-fact review.  It is after the loan

20  is closed, already sold to Fannie Mae or Freddie Mac or another

21  investor.  Testing to see whether or not the loan met all the

22  criteria.

23        And in-line quality assurance process is different

24  checkpoints during the closing of the loan, during the

25  processing a loan, to check to see if everything was being

1    manufactured correctly at that point in time.  It is tended to

2    improve the final result before you get to closing.

3    Q.  Was there a requirement by Fannie Mae or Freddie Mac that

4    you even have an in-line quality assurance program?

5    A.  No.

6    Q.  You indicated when discussing your duties in the various

7    four jobs that you had, that at one point you were in charge of

8    global.  Did that include responsibility for the outsourcing of

9    quality assurance function to India?

10   A.  Yes.  Some of the divisions, like Full Spectrum, used India

11   to do their in-line quality assurance function for them, or a

12   part of it for them.

13   Q.  Why use people in India as opposed to local people for such

14   a function?

15            MR. CORDARO:  Objection.

16            THE COURT:  Sustained.

17   Q.  Was there an advantage to using someone on a different time

18   zone?

19            MR. CORDARO:  Objection.

20            THE COURT:  Sustained.  Relevance.

21   Q.  Can you describe the nature of the work done by the quality

22   assurance people in India on Full Spectrum Lending's loans.

23            MR. CORDARO:  Objection.

24            THE COURT:  Overruled.

25   A.  Yes.  Full Spectrum would take -- would have four or five

DA83BAN4                         Schakett - direct

1    different check points that they wanted to see the proper

2    things were signed off on and completed at that time.  At the

3    end of their workday, it would send those loans over to India

4    in an imaged format.  India operational personnel reporting to

5    me would then review those loans, and give the results back, so

6    the next morning when Full Spectrum got to work, they had the

7    results of their quality assurance program, and they did not

8    lose any time in the process.

9             MR. SULLIVAN:  Your Honor, permission to display a

10   demonstrative?  It was used in the opening.

11            THE COURT:  Yes.

12            MR. SULLIVAN:  This would be tab five, Alex.  It is

13   the same as this chart.  May I come forward and use this chart?

14            MR. CORDARO:  Your Honor, I object.

15            THE COURT:  Ground?

16            MR. CORDARO:  We've already had testimony from the

17   witness that he was not familiar with High-Speed Swim Lane.

18            MR. SULLIVAN:  I'm not going to ask him about that.

19            THE COURT:  Then if you're not going to ask him about

20   that, then I don't know that this chart is relevant, because it

21   says it is a High-Speed Swim Lane timeline.

22            MR. SULLIVAN:  I am going to ask him about some of the

23   things he knows about the chart.

24            THE COURT:  The ones in red?  Is that what you are

25   talking about?

 1              MR. SULLIVAN:  Yes.

 2              MR. CORDARO:  Your Honor --

 3              THE COURT:  So you may ask him about the links in red.

 4     Let's just do it that way on the screen.

 5     Q.  Were you familiar in your capacity as chief operating

 6     officer with changes in and improvements that were made in Full

 7     Spectrum Lending during the months of December through March --

 8     December through April?

 9     A.  Yes, my group, I worked with the production division at

10     Full Spectrum to make changes to improve their severely

11     unsatisfactory rating.

12     Q.  In December, were you aware of any changes made in

13     December 2007?

14              MR. CORDARO:  Objection.  I haven't heard a question

15     about anything in red in the chart yet, and the chart is on

16     display.

17              MR. SULLIVAN:  I can't even read the red from here,

18     unfortunately.  May I see it?

19              THE COURT:  However, if you can't read it, neither can

20     the jury.

21              MR. SULLIVAN:  That's probably true.  Except I think

22     they have it on their screens.  I don't need the chart.  Make

23     it easy.  Forget the chart.  Close the book.  Let me just ask

24     you a quick question.

25     Q.  In December 2007 were you aware that changes in Full

 1   Spectrum were made with respect to stated income reasonability

 2   job aids?

 3   A.   Yes.  We referred to that earlier.  Our group developed

 4   with the division a stated income reasonableness test that

 5   would be easier for the underwriters to determine whether

 6   stated income was reasonable.  And Full Spectrum deployed this

 7   in December of that year.

 8   Q.   Were you aware as COO that the number of audits, random

 9   audits jumped in January 2008?

10   A.   Yes, that's the quarter that we quadrupled the size of our

11   random audits to get more confidence in the quality of the

12   loans that we were producing.

13   Q.   As COO, were you familiar in February of 2008 with the

14   communication of quality assurance procedural audit results?

15   A.   Yes.  We definitely had feedback, a very big feedback loop

16   as we were analyzing severely unsats to make sure that

17   everybody was aware of the mistakes that were being made and

18   looking for improvements in that area.

19   Q.   In March of 2008, were you aware of changes to the

20   mandatory stated income responsibility training procedures?

21   A.   Yes.  I remember our group going back and discovering once

22   we still were having errors in stated income, to mandate

23   additional training at the different divisions for stated

24   income.

25               MR. SULLIVAN:  Thank you, sir.

 1            THE COURT:  Any questions from counsel for

 2    Ms. Mairone?

 3            MR. HEFTER:  No, your Honor.

 4            THE COURT:  Cross-examination.

 5    CROSS-EXAMINATION

 6    BY MR. CORDARO:

 7    Q.  Good afternoon, Mr. Schakett.

 8    A.  Good afternoon.

 9    Q.  Could you tell me again what position you held at

10    Countrywide during 2007, 2008?

11    A.  I was executive managing director, chief operations officer

12    of Countrywide Financial Corporation.

13    Q.  In that capacity, was someone at FSL ultimately responsible

14    for reporting to you?

15    A.  Only indirectly.  So, Rebecca, the chief operations officer

16    of that division, indirectly reported to me, not directly.

17    Q.  As such, Ms. Mairone is your counterpart of at FSL.  She

18    was the chief operations officer at FSL?

19    A.  No.  She was the chief operating officer at a division.  So

20    she was a managing director, she had a boss of a senior

21    managing director, he had a boss of an executive managing

22    director.  She was two levels down on the organization.

23    Q.  This was Mr. Lumsden between Ms. Mairone and you?

24    A.  Yes.

25    Q.  He was the chief executive officer of FSL, is that correct?

1  A.  He was at least president and senior managing director.  I

2  don't know if he had the CEO title, but he was a president and

3  senior managing director.

4  Q.  If we could I'd like you to go back to tab two in your

5  binder, which is Plaintiff's Exhibit 46.  You were testifying

6  on direct examination about Mr. Gissinger's memo, do you recall

7  that?

8  A.  Yes, I do.

9         MR. CORDARO:  Ms. Michaud, if we can just bring that

10  memo up on the screen.

11  Q.  Mr. Gissinger talked about rapid changes in the market,

12  didn't he?

13  A.  Yes, he did.

14  Q.  Mr. Gissinger said that we must ensure that our guidelines

15  are fully in sync with secondary markets, didn't he?

16  A.  Yes, sir.

17  Q.  And he said that they're going to be continuing to announce

18  guideline changes to align ourselves to the overall market.

19  Didn't he?

20  A.  Yes, sir.

21  Q.  This is in August of 2007, isn't it?

22  A.  That's correct.

23  Q.  I believe you testified that the market was somewhat

24  tightening at that time, wasn't it?

25  A.  That's correct.

1  Q.  Mr. Gissinger said that our success in the environment is

2  absolutely contingent on our ability to employ rigorous

3  underwriting discipline.  Isn't that correct?

4  A.  That's correct.

5  Q.  Rigorous underwriting discipline meaning that corners

6  should not be cut with respect to underwriting, isn't that

7  correct?

8  A.  I'm sorry.  Ask the question again?

9  Q.  Rigorous underwriting discipline meaning that corners

10  should not be cut with respect to underwriting, doesn't it?

11  A.  Well, corners being cut, I am not exactly sure what that

12  term means.  It means what it says, to have a rigorous

13  underwriting discipline, to try to do the best job we could

14  underwriting the loans.

15  Q.  In light of all this, you testified that you weren't told

16  about the High-Speed Swim Lane in 2007 or 2008, were you?

17  A.  I don't remember anything about the High-Speed Swim Lane.

18  Q.  You weren't told about it?

19  A.  I don't recall being told about it.

20  Q.  So, if you weren't told about it, you weren't familiar at

21  the time with how CLUES is being used in the High-Speed Swim

22  Lane, were you?

23  A.  I wasn't familiar with exactly how CLUES was being used in

24  the High-Speed Swim Lane.  I was familiar with, as we had

25  testified earlier, how CLUES was being used to comply with the

DA83BAN4                       Schakett - cross

1   SASE requirements.

2   Q.  So, you familiar with the fact that CLUES is an automated

3   underwriting system, is that correct?

4   A.  Yes, sir.

5   Q.  You are familiar with the fact that Fannie Mae and Freddie

6   Mac granted variance for CLUES, is that correct?

7   A.  Variance to guidelines, not necessarily to CLUES.  But

8   variance for guidelines.

9   Q.  You're familiar with the fact that Countrywide was using

10  CLUES for loans being sold to Fannie and Freddie, aren't you?

11  A.  Yes, sir.

12  Q.  And you are familiar with the fact that manual underwriting

13  is a very important part of CLUES itself as a process, aren't

14  you?

15  A.  Depends on the term I guess "manual underwriting" you used.

16  As I use the term underwriting, if CLUES has a CLUES accept,

17  the underwriting decision has been made, and now it's

18  documenting the parts of the decision that went into the

19  decision.

20  Q.  Sir, are you telling me that manual underwriting is not a

21  very important part of the CLUES process?

22          MR. HEFTER:  Objection.

23          THE COURT:  Overruled.

24  A.  I am saying depending what you're describing as manual

25  underwriting, I'm being very careful.  Underwriting itself is

 1   making the decision to accept or review the loan.  If the loan

 2   had already been approved on an automated underwriting system,

 3   then there was no, quote, manual underwriting to do.  It was

 4   instead only work to be done to document that the input that

 5   went into the automated underwriting was correct.

 6   Q.  Do you recall giving a series of depositions in front of

 7   the Securities and Exchange Commission, the SEC?

 8   A.  Yes.

 9   Q.  Do you recall that one of those depositions --

10           MR. HEFTER:  Your Honor, objection.

11           THE COURT:  Overruled so far.

12   Q.  Do you recall that one of those depositions took place in

13   2010?

14   A.  Sounds right.

15           MR. CORDARO:  Your Honor, I'd like to hand the witness

16   what's been marked for identification as Plaintiff's Exhibit

17   470.

18           THE COURT:  Okay.

19   Q.  Mr. Schakett, I've handed you what's been marked as

20   Plaintiff's Exhibit 470 for identification.  Is that the

21   deposition to which I was referring before the SEC on June 4,

22   2010?

23   A.  It appears to be.

24   Q.  Please could you turn to page 96.  Directing your attention

25   to page 96, line 19, through page 97, line five.

DA83BAN4                      Schakett – cross

1   A.  Mine goes from 94 -- here's 96.  Sorry.  It's four in a

2   page.  Okay.

3   Q.  I am going to direct your attention to the text starting at

4   line 19, going to the next page line five.

5   A.  Okay.

6   Q.  Were you asked these questions did you give this answer.

7              MR. HEFTER:  Objection.

8              THE COURT:  Ground?

9              MR. SULLIVAN:  It is identical to his testimony.  It

10   is not impeachment.

11             THE COURT:  I don't agree.  Of course it will be for

12   the jury to decide if there is any inconsistency.  But, there

13   is an arguable one sufficient to meet the minimal threshold of

14   admissibility.  Overruled.  You may read.

15   Q.  "Q.  Was there any benefit to using manual underwriting as

16   opposed to CLUES to underwrite a loan?

17   "A.  The manual underwriting, first of all, is necessary just

18   to make sure the inputs in CLUES were correct.  The system

19   itself doesn't know if we have gathered the right documentation

20   to put at tributes in that -- I'm sorry.  The system itself

21   does not know if we have gathered right documentation to put

22   the attributes in that will be scored.  So there is definitely

23   a manual underwriting that is very, very important part of

24   CLUES itself."

25             Did I read that correctly?

DA83BAN4                    Schakett - cross

1    A.  Yes.

2    Q.  So manual underwriting is an important part of CLUES?

3    A.  I said depends what you are calling manual underwriting.  I

4    said before verifying the inputs in CLUES is very important.

5    If you are calling the manual underwriting decision a yes or no

6    decision, CLUES had already made that decision.

7    Q.  I see.  So manual underwriting in your view doesn't mean

8    the actual decision by CLUES itself.  It means what's going on

9    before the loan goes into CLUES, is that correct?

10   A.  Or, goes on after the loan goes into CLUES to verify the

11   inputs were correct in CLUES.

12   Q.  Okay.  So what goes on after the loan comes out of CLUES is

13   that there are conditions, potentially even if it is a CLUES

14   accept, isn't that correct?

15   A.  That's correct.

16   Q.  Somebody has to clear those conditions?

17   A.  That's correct.

18   Q.  CLUES doesn't do that?

19   A.  That's correct.

20   Q.  That's a human being who does that?

21   A.  Correct.

22   Q.  That person has got to be qualified?

23   A.  Yes.  You need the right level of person to clear those

24   conditions.

25   Q.  That person's got to be trained?

1   A.  Person has to have some training, of course.

2   Q.  After that process, someone has to clear the loan to close

3   before it can funded, isn't that correct?

4   A.  That's the normal process, yes.

5   Q.  That's not done by CLUES either, is it?

6   A.  No.  Humans do those things.

7           MR. SULLIVAN:  Excuse me, your Honor.

8           THE COURT:  You need to let the witness finish his

9   answer.

10  Q.  I'm sorry.  You can finish your answer.

11  A.  Yes.  CLUES is a computer.  It is a computer that actually

12  makes the underwriting decision, and it produces both -- and it

13  produces conditions that say the underwriting condition

14  approval was subject to these conditions, and then a human

15  needs to see if those conditions were actually cleared.

16  Q.  That human has to be trained, correct?

17  A.  Unless they have prior experience, he would have training

18  experience at some point in time.

19  Q.  They need to be qualified?

20  A.  They need to be qualified to do the function we are asking

21  them to do.

22  Q.  You don't know anything about the training of those human

23  beings with respect to the High-Speed Swim Lane, is that

24  correct?

25  A.  Not familiar with the term High-Speed Swim Lane.  Certainly

DA83BAN4                         Schakett - cross

1   familiar with Full Spectrum's training and Full Spectrum's

2   grading of people on one through six.

3   Q.   I'm asking you with respect to the personnel handling these

4   tasks in the High-Speed Swim Lane, you don't have knowledge

5   with specific respect to the High-Speed Swim Lane, is that

6   correct?

7   A.   I don't have specific knowledge with respect to the

8   High-Speed Swim Lane.  I have specific knowledge of how they

9   fulfill loans at Full Spectrum.

10  Q.   If you have no recollection of the High-Speed Swim Lane,

11  you don't know which employees were performing which tasks

12  within the High-Speed Swim Lane, do you?

13            MR. SULLIVAN:  Objection.  It is not the testimony.

14  May I have a side bar?

15            THE COURT:  No, I don't think you need a side bar.

16  You can ask the second part of that question.

17            Do you know which employees were performing which

18  tasks within the High-Speed Swim Lane?

19            MR. CORDARO:  I'll withdraw it.  I'm sorry, you asked

20  that.

21            THE COURT:  That was the question.

22            THE WITNESS:  No, I'm not familiar with the term

23  High-Speed Swim Lane.

24            THE COURT:  So the answer is no.

25  Q.   I was going to put a time frame on that too.  In 2007,

DA83BAN4                    Schakett - cross

1    2008, you didn't know that information, correct?

2    A.  Not in connection with what you are calling the High-Speed

3    Swim Lane.

4    Q.  Mr. Schakett, you talked about severely unsatisfactory.

5    Correct?

6    A.  That's correct.

7    Q.  A severely unsatisfactory refers to a failure on the loan

8    to meet the requirements that Countrywide believed should have

9    been used to make the loan, doesn't it?

10   A.  That's correct.

11   Q.  So it is failure?

12   A.  It's a failure to fully document what we required.

13   Q.  It is a loan that doesn't even meet Countrywide's own

14   quality standards, isn't that correct?

15   A.  It is a loan, those loans do not meet the standards that

16   Countrywide set out, that's correct.

17   Q.  It is a loan that may not be sellable to the secondary

18   investor, isn't that correct?

19   A.  It is not direct correlation between the two.  But it may

20   or may not be sellable to an investor.

21   Q.  So it is a loan that may not be investment quality, isn't

22   that correct?

23   A.  It may or may not be investment quality.

24   Q.  Well, to your knowledge, Countrywide was obligated to sell

25   only investment quality loans to Fannie Mae and Freddie Mac,

DA83BAN4                     Schakett - cross

1   isn't that correct?

2   A.  We were required to sell them loans that met their

3   guidelines, that's correct.  I'm sorry.  Unless we had a waiver

4   to the guidelines.

5   Q.  Well, you're familiar with the rep and warrant model,

6   aren't you?

7   A.  Yes.

8   Q.  And Countrywide and Fannie Mae operated pursuant to the rep

9   and warrant model with respect to sale, didn't they?

10  A.  That's correct.

11  Q.  The same for Freddie Mac, isn't it?

12  A.  That's correct.

13  Q.  And the purpose of the rep and warrant model is to make

14  representations and guarantees to Fannie and Freddie that the

15  loans that they are receiving are going to be acceptable

16  quality, isn't that correct?

17  A.  That's correct.

18  Q.  Fannie Mae and Freddie Mac could not possibly review all of

19  those loans before they purchased them, correct?

20  A.  They do not review them all, that's correct.

21  Q.  With respect to stated income loans, back in the 2006, 2007

22  time frame, Countrywide determined that one of the reasons for

23  the increase in SUSs is stated income loans, is that correct?

24  A.  That's correct.

25  Q.  In fact, stated income loans were started to perform more

DA83BAN4                      Schakett - cross

1   poorly at that time, weren't they?

2   A.   They were.

3   Q.   In fact, you were starting to see early payment defaults in

4   stated income loans at that time weren't you?

5   A.   That's correct.

6   Q.   Basically an early payment default is when a loan goes

7   delinquent at some point in the first year?

8   A.   That's right.  Probably in the first six months.

9   Q.   A stated income loan could be a prime loan, couldn't it?

10  A.   Say that again?

11  Q.   A stated income loan could be a prime loan, couldn't it?

12  A.   Yes.

13  Q.   But a stated income loan, ultimately, is riskier than a

14  loan that has full documentation, isn't it?

15           MR. HEFTER:  Objection.

16           THE COURT:  Overruled.

17  A.   Yes.  As I testified earlier, if it is one of the

18  attributes to the loan, along with all of the other attributes

19  like loan-to-value ratio and credit score, etc.  So that one

20  attribute was more risky, and because of that, they required

21  other attributes to be more positive to still make the loan.

22  Q.   Not only other attributes, it would require qualified

23  underwriting, wouldn't it?

24  A.   It would have to be approved by the automated underwriting

25  system.

1   Q.  I wasn't talking about the automated underwriting system.

2   You would need qualified underwriting, isn't that correct?

3   A.  Again, we're having semantics here.  When you say qualified

4   underwriting.  Underwriting itself is first done by the

5   automated system.  The documentation of the conditions is done

6   by human people.

7           So, yes, you need to have the system approve it, and

8   then you have the conditions that the system asked for be

9   signed off on by qualified humans.

10  Q.  And the qualified humans who are performing the manual

11  underwriting tasks, even where CLUES is involved, need to be

12  trained to handle stated income loans, don't they?

13  A.  They needed to be trained to handle all loans, including

14  stated income loans.

15  Q.  Stated income loans have risk factors that full

16  documentation loans do not, isn't that correct?

17  A.  It has a risk factor that full doc loans don't have.  It is

18  stated income.

19  Q.  In 2007, 2008 you had no knowledge of the kinds of loans

20  that were being sent through the High-Speed Swim Lane, did you?

21  A.  As I testified earlier, I was not familiar with the term

22  High-Speed Swim Lane.

23  Q.  So you wouldn't have known at that time if stated income

24  loans were going into the High-Speed Swim Lane as well, is that

25  correct?

1  A.  Again, since I did not know about the High-Speed Swim Lane,

2  I did not know what loans would be going through that term.

3  Q.  Countrywide's divisions had goals to keep severely

4  unsatisfactory rates at certain levels, didn't they?

5  A.  Yes.  As I testified earlier, we felt an acceptable level

6  was in the 4 to 5 percent range for all the divisions.

7  Q.  Some divisions even had compensation adjustments pertaining

8  to severely unsatisfactory, didn't they?

9  A.  I'm not sure about that.

10  Q.  Would looking at your deposition testimony refresh your

11  recollection?

12  A.  Sure.  You can tell me what I said.

13  Q.  Sure.  Take the same deposition that's in front of you and

14  look at page 33, line 25 to page 34, five, but don't read it

15  aloud.  Just read it to yourself, please.

16  A.  I'm sorry.  33 which lines, sir?

17  Q.  33:25 to 34:15.

18  A.  So ask the question again.

19  Q.  Sure.  Does that refresh your recollection as to whether

20  some divisions had compensation adjustment for severely

21  unsatisfactory?

22  A.  Yes.  They definitely had negative compensation adjustment

23  for too high a severely unsat rates.

24  Q.  Full Spectrum Lending was one of those divisions?

25  A.  Yes.

DA83BAN4                          Schakett - cross

```
 1   Q.  The purpose of such a compensation impact is to penalize
 2   employees who made loans that didn't have quality, is that
 3   correct?
 4   A.  Yes, it was to encourage high quality loans.
 5   Q.  So you weren't aware, though, that a compensation impact
 6   with respect to quality was suspended during the time of the
 7   High-Speed Swim Lane, were you?
 8   A.  I'm not aware of that.  It wouldn't surprise me, but I'm
 9   not aware of it.
10   Q.  Would you agree that a compensation impact directly tied to
11   quality is an incentive to quality, isn't it?
12           MR. HEFTER:  Objection.
13   A.  It is and you --
14           THE COURT:  There is an objection.
15           THE WITNESS:  I'm sorry.
16           MR. HEFTER:  Vague, your Honor.
17           THE COURT:  I think with this witness he was primed to
18   answer it, so to speak.  You may answer.
19   A.  Yes.  I agree that overall, negative compensation
20   consequences of making unsatisfactory loans is a positive thing
21   to have in your arsenal, but certainly during periods of
22   rolling out programs, it is not unusual to waive them.
23   Q.  You wouldn't suggest that a waiver of a compensation hit
24   based on quality is an appropriate long term goal, would you?
25   A.  No, not a long term goal.
```

DA83BAN4                         Schakett - cross

1   Q.  It stands to reason, Mr. Schakett, that a compensation

2   package that focuses on quality incentivizes quality.  And a

3   compensation package that focuses on volume would incentivize

4   volume, wouldn't it?

5   A.  Yes.  A compensation package that incentivizes volume,

6   incentivizes volume, that's correct.

7   Q.  Mr. Schakett, I would like to just take you through a few

8   of the exhibits from before.  Could you turn to tab four,

9   please.  This is DX 22.

10         MR. CORDARO:  I would ask the indulgence of defense

11  counsel just to display these on the screen.  Thank you.

12  Q.  Mr. Schakett, you testified that this grid is the manual

13  SASE.  Is that correct?

14  A.  Yes.  It is Full Spectrum's manual version of SASE at the

15  time this was produced.

16  Q.  SASE stands for?

17  A.  Signature -- signature enforcement.  So signature

18  identification and signature enforcement.

19  Q.  What does the A stand for?

20  A.  I testified earlier.  I told you, I confuse the name.

21  Okay, so, signing authority, signature enforcement.  There we

22  go.

23  Q.  Mr. Schakett, as far as this grid is concerned, you're not

24  familiar with the applicability of any of this matter in here

25  to the actual High-Speed Swim Lane, are you?

1    A.   This was an overlay required for all the processing at Full

2    Spectrum regardless of how they wanted to call it or what they

3    wanted to do. So they were required to perform this function

4    this way, no matter what they wanted to call it a High-Speed

5    Swim Lane or some other method.  This was a requirement for the

6    company to perform this process.

7    Q.   Are you familiar with the term grandfather?

8    A.   Yes.

9    Q.   Are you aware that loan specialists were being

10   grandfathered with respect to their authority with respect to

11   the High-Speed Swim Lane?

12   A.   Grandfathered in what way?  I know what grandfathered

13   means, but what context are you using that in?

14   Q.   Did you have an awareness that loan specialists were being

15   given certain authorities prior to having completed their

16   training during the High-Speed Swim Lane?

17             MR. HEFTER:  Objection.

18             THE COURT:  Sustained.

19   Q.   Were you aware of any exceptions to any authority levels as

20   part of the High-Speed Swim Lane at the time?

21   A.   As I testified earlier, I'm not familiar with the

22   High-Speed Swim Lane at all.  So I certainly wouldn't be aware

23   of any exceptions to it.

24   Q.   Can we turn to tab three, please.  This is Defendant's

25   Exhibit 73.  And again I would just request that this be put up

1   on the board.  If we could just highlight the FSL -- that's

2   fine.

3            Mr. Schakett, first of all, you testified that the

4   internal standard at Countrywide was 4 to 5 percent for SUSs,

5   isn't that correct?

6   A.  That was the goal.

7   Q.  In quarter 4 2007 it was 5.4 percent.  That was higher,

8   isn't it?

9   A.  A little high, but also as they were converting --

10  Q.  No.  My question is that's higher, isn't it?

11           MR. SULLIVAN:  Your Honor, he interfered with the

12  answer, please.

13           THE COURT:  I'm sorry, were you through -- why don't

14  you go ahead and finish your answer.

15  A.  Yes.  5.4 percent is higher than 4 percent.

16  Q.  In the first quarter of 2008, it was 9.8 percent.  Isn't

17  that correct?

18  A.  That is correct.

19  Q.  That's higher, isn't it?

20  A.  Yes, it is.

21  Q.  Now this is the number for all of FSL, isn't it?

22  A.  That's correct.

23  Q.  It is not broken out by the kinds of loans that would be

24  eligible for sale to Fannie Mae and Freddie Mac, isn't that

25  right?

1915

1   A.  That's correct.

2   Q.  It is not broken out for the kinds of loans that would be

3   eligible for use in the High-Speed Swim Lane, isn't it?

4   A.  There is no breakout in the schedule.  This is all the

5   loans.  They produced a random sample of those loans.

6   Q.  You testified that the audits, the number of audits rose

7   from quarter 4 2007 to 408, to quarter 1 2008 to 1742.  Isn't

8   that correct?

9   A.  Yes, sir.

10  Q.  The reason you gave was that the company was concerned

11  about quality.  That's essentially what you said, wasn't it?

12  A.  I wouldn't use those terms.  But I said the company wanted

13  to assure it had the best quality ever during this time period,

14  and one way to assure that was to increase the level of loans

15  we were auditing.

16  Q.  One of the concerns was that 5.4 percent number, right?

17  A.  No, that -- you see all the divisions had an increase of

18  almost 400 percent.  Full Spectrum wasn't picked on.  The whole

19  company, we had an increase call to quality, and we increased

20  all the random audits for all the divisions.

21  Q.  I see.  So then, but stepping back to the quarter 3, 2007,

22  at Full Spectrum Lending, SUS percentage was 13.4 percent,

23  wasn't it?

24  A.  Yes, it was.

25  Q.  That's higher than 5 percent?

1   A.  Yes.

2   Q.  And actually, between quarter 3 and quarter 4, the number

3   of audits decreased, didn't it?

4   A.  De minimus amount.  437 to 408.

5   Q.  It decreased, didn't it?

6   A.  Small decrease, yes.  They probably had less volume also.

7   Q.  And from quarter 4 to quarter 1, 2008, that's when you had

8   the increase, the 1,700, right?

9   A.  That's correct.

10  Q.  After that increase, the number went up to 9.8 percent?

11  A.  Yes, it did.

12  Q.  Mr. Schakett, you testified about quality assurance.

13  A.  Yes, sir.

14  Q.  You weren't aware of any of the quality assurance that was

15  being performed specifically with respect to the Hustle loans,

16  isn't that correct?

17  A.  That's correct.

18  Q.  So, you weren't aware that there was a quality assurance

19  test on Hustle loans that focused on 60 loans, is that correct?

20  A.  No.  I was only aware that they had a quality assurance

21  program for all their production.  And if Hustle loans were

22  part of the production, Hustle loans should have been included.

23  Q.  You weren't aware what those quality assurance reports

24  showed, do you?

25  A.  I don't recall what it showed.

DA83BAN4                         Schakett - cross

1   Q.  That wasn't reported to you, was it?

2   A.  I don't recall if it was reported or not.

3            MR. CORDARO:  Nothing further on cross.

4            THE COURT:  Any redirect?

5            MR. SULLIVAN:  Yes, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. SULLIVAN:

8   Q.  Sir, you never heard the term High-Speed Swim Lane,

9   correct?

10  A.  That's correct.  I had not heard it before this trial.

11  Q.  Had you ever heard of the term Hustle before this trial?

12  A.  No, sir, not in this context.

13  Q.  Were you aware of the origination process in Full Spectrum

14  Lending?

15  A.  Yes, I was.

16  Q.  Were you aware of all of the products that Full Spectrum

17  Lending produced during '07 and '08?

18  A.  Yes, sir.

19  Q.  Is it your testimony you simply didn't hear the term, is

20  that correct?

21            MR. CORDARO:  Objection.

22  A.  I've never heard --

23            THE COURT:  There was an objection.

24            MR. CORDARO:  Just to clarify "term," your Honor.

25            THE COURT:  Do you want to rephrase the question?

1   Q.  Your testimony is you were familiar with their process and

2   the loans they produced.  Is that correct?

3   A.  Yes, sir.

4   Q.  What is your testimony with respect to whether you heard

5   the term Hustle or High-Speed Swim Lane with respect to those

6   loans?

7   A.  Again, I never heard of the term used to me, Full Spectrum

8   High-Speed Swim Lane.  To me it was their normal process, but I

9   was never -- I don't remember that term being used.

10          MR. SULLIVAN:  Thank you, sir.

11          THE COURT:  Anything else?

12          MR. HEFTER:  No questions, your Honor.

13          THE COURT:  Thank you so much.  You may step down.

14          (Witness excused)

15          THE COURT:  Ladies and gentlemen, I think we will let

16   you go to lunch at this time.  When you come back at 2, we're

17   going to go until 3:50 without a break and then end for the

18   day.  So it will be similar to what we've done some days.  It

19   will be a little less than two hours and we'll break for today

20   because I have another matter at 4 o'clock.  So we'll see you

21   then.

22          (Jury excused)

23          (Continued on next page)

24

25

DA83BAN4

1    THE COURT:  Anything counsel need to raise with the

2    Court?

3         Let me just raise one small item.  Throughout this

4    trial, some of the lawyers questioning witnesses have I think

5    probably only half consciously given their reactions to the

6    witness's answer.  So for example, yesterday one of the lawyers

7    after a witness would say what the lawyer was hoping he would

8    say, would always say "right," and then go on to the next

9    question.  And similarly today, when on cross-examination, the

10   witness was giving an answer that perhaps the questioner was

11   skeptical of, the questioner would say "I see."

12        I've had occasion to interrupt much more egregious

13   comments, preludes, soliloquies on the part of questioners, and

14   I'm glad to see none of that is going on anymore.  But even

15   those very modest reactions are improper, because it is not the

16   lawyer who is testifying and it is not the lawyer who is

17   supposed to be giving his reactions or her reactions to a

18   witness.

19        The sole role of the lawyer during examination and

20   cross-examination is to ask questions.

21        Now, this tendency that I just have referred to was

22   sufficiently modest compared to earlier missteps that I didn't

23   feel warrant interrupting in front of the jury.  But if it

24   reoccurs, I will.

25        MR. CORDARO:  I apologize, your Honor.  It won't

1920

DA83BAN4

1     happen again on my part.

2               THE COURT:  Okay.  Very good.  Thanks a lot.  See you

3     at 2.

4               (Recess)

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                                (2:10 p.m.)

3              (Jury present)

4              THE COURT:  Please call your next witness.

5              MS. MAINIGI:  Your Honor, the defense calls Cliff

6    Kitashima.

7     CLIFFORD KITASHIMA,

8         called as a witness by the Defendants,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. MAINIGI:

12             DEPUTY CLERK:  State your name and spell it slowly for

13   the record.

14             THE WITNESS:  Clifford Kitashima, K-I-T-A-S-H-I-M-A.

15             THE COURT:  Counsel.

16             MS. MAINIGI:  Thank you, your Honor.

17   BY MS. MAINIGI:

18   Q.  Good afternoon, Mr. Kitashima, my name is Enu Mainigi and

19   represent the bank defendants.

20             Mr. Kitashima, are you currently employed?

21   A.  No, I am not.

22   Q.  Are you retired?

23   A.  Yes, I am.

24   Q.  Where do you live, sir?

25   A.  I live in Bend, Oregon.

1    Q.  Who lives there with you in Bend, Oregon, sir?

2    A.  I live with my wife, four children live nearby and six

3    grandchildren live even closer.

4    Q.  Mr. Kitashima, who was your last employer?

5    A.  Bank of America.

6    Q.  And how long did you work for Bank of America?

7    A.  Technically Bank of America was purchased, Bank of America

8    purchased Countrywide, so I worked for Countrywide from 1998 to

9    2008.

10   Q.  And prior to Countrywide, could you give us a brief history

11   of your jobs prior to Countrywide?

12   A.  Well, it would be brief in one sense, that I only really

13   worked for one other employer before joining Countrywide, and

14   that was AVCO Financial Services.

15   Q.  How long did you work there, Mr. Kitashima?

16   A.  I was there for 29 years.

17   Q.  And what type of role did you play there, Mr. Kitashima?

18   A.  Well, I started off as entry level making loans, I was a

19   loan officer actually, and just doing everything that had to do

20   with making loans.  It was primarily consumer based, consumer-

21   oriented type loans, including personal loans and mortgage

22   loans and all types of loans that dealt with consumers, and

23   eventually promoted to branch manager and regional supervisor

24   and continued to advance.

25   Q.  Why did you leave AVCO, sir?

1   A.  I had entertained offers throughout my career, and at that

2   time a head hunter contacted me and sounded interesting, so I

3   talked to him and basically got a chance to interview with

4   Countrywide.

5   Q.  And Mr. Kitashima, could you briefly tell us about your

6   educational background?

7   A.  Got a business degree from University of Utah.  That's the

8   extent of my education.

9   Q.  Now you said you got to Countrywide, sir, in 1998, is that

10  right?

11  A.  Yes.

12  Q.  And what division of Countrywide did you go to work for in

13  1998?

14  A.  Full Spectrum Lending division.

15  Q.  About how long had the Full Spectrum Lending division been

16  around?

17  A.  I want to say maybe a couple of years.  It wasn't in

18  existence very long.

19  Q.  Now within the Full Spectrum Lending division in that time

20  period, what type of loans did Full Spectrum process?

21  A.  Full Spectrum was primarily focused on subprime mortgage

22  loans.

23  Q.  Now you said subprime mortgage loans.  Could you tell us,

24  Mr. Kitashima, the difference between a prime loan and a

25  subprime loan?

1    A.  Yes, it's a little bit of a moving target over the years,

2    but back in those days subprime borrowers were usually

3    characterized by borrowers who had higher risk characteristics

4    primarily measured by things like FICO scores, credit scores,

5    how they paid their bills, less down payments on purchase

6    loans, as compared to a prime borrower who had very well

7    established credit, paid their bills on time, had lots to put

8    down.  So helping people that had a little more challenging

9    credit backgrounds.

10   Q.  In terms of FICO, what does that stand for, Mr. Kitashima?

11   A.  I believe it stands for Fair Isaac is the company, and it's

12   pretty much industry standard to use the FICO score as a way to

13   determine credit worthiness.

14   Q.  With respect to prime and subprime loans, recognizing that

15   maybe this shifts, is there a cut-off point or point of

16   prediction between prime loans and subprime loans as it related

17   to FICO scores?

18   A.  Yes, it is again a bit of a moving target from time to

19   time, but I think back in those days 620 was generally --

20   that's a FICO score, was generally used as sort of a soft

21   cut-off point where borrowers who had scores higher than 620

22   potentially could be a prime customer versus what was below

23   there analyze them from a subprime point of view.

24   Q.  Now Mr. Kitashima, did there come a time when the Full

25   Spectrum Lending division began to process not just subprime

1    loans but prime loans also?

2    A.  Yes, over the course of time period that I was there we had

3    occasions where prime borrowers were -- we took applications

4    from prime borrowers.  At first we referred to them to our

5    sister division, Countrywide Home Loans, but over a period of

6    time we had more and more customers that appeared to be prime

7    customers and were in fact prime customers.  So we did make

8    prime loans pretty much all along.  It started to increase in

9    the late 2006, early 2007 time frame when the markets were

10   beginning to change and less and less subprime products were

11   available.  So it increased significantly during that period of

12   time.

13   Q.  Mr. Kitashima, I put in front of you a notebook that has

14   some exhibits right there, right in front of you.

15           MS. MAINIGI:  And I believe, your Honor, there was one

16   left near there for you.

17           THE COURT:  I have one.

18   Q.  If I could ask you to turn to DX436, please, Mr. Kitashima.

19           MS. MAINIGI:  And DX436, your Honor, is already

20   admitted into evidence.  So I ask, Alex, if you could put that

21   up on the screen, and let's look at the cover page first and

22   then we'll go to page 7.

23   Q.  Mr. Kitashima, after you have had a chance to turn to this

24   exhibit, could you tell us what this presentation is?  And I'm

25   sorry, let me let you turn to it first.

1        Mr. Kitashima, I apologize, it's apparently in the

2   side pocket.

3   A.   Got it.

4   Q.   What is this presentation, Mr. Kitashima?

5   A.   This is a presentation that I made to Freddie Mac, one of

6   the agencies, GSEs, back in September 12, 2007.

7   Q.   Turn to page 7 please, of the presentation.

8        MS. MAINIGI:  Alex, if you could blow up the top is

9   section that says prime/subprime mix of business.

10  Q.   Mr. Kitashima, could you describe what you see there,

11  please, sir.

12  A.   Yes, during the period from July 2005 through July 2007 you

13  could see a steady increase in percentage of prime loans that

14  Full Spectrum completed.  In July of 2005 we were at 37 percent

15  prime, in July 06, 2006 it went to 79 percent, and by July 2007

16  we were 86 percent prime.

17  Q.   And are those numbers consistent with your recollection of

18  the time, Mr. Kitashima?

19  A.   Yes.

20  Q.   Now you mentioned a sister division of Full Spectrum.  Do

21  you remember that?

22  A.   Yes.

23  Q.   What was the name -- was that a division that -- what type

24  of loans did that division process?

25  A.   Strictly prime loans.

1   Q.  And what was the name of that division again, sir?

2   A.  Consumer markets division.  We called it CMD, which stands

3   for consumer markets division.

4   Q.  Now why didn't FSL Full Spectrum send loans over to the

5   consumer market division for processing?  Prime loans I mean,

6   sir.

7   A.  Yeah, as I said, we did for a period of time, but as the

8   volume increased it became apparent, at least from a customer's

9   point of view that talking to somebody on one hand and later on

10  being switched to someone else, it wasn't ideal from a customer

11  point of view.  And we felt that it was much more efficient to

12  be able to process these loans with one phone call from Loren.

13  So we looked very closely at our processings and wanted to

14  determine what it would take to transition our operations to

15  manage or process more prime loans.

16  Q.  And so during this time period, let's say in the 2006 time

17  period, did the Full Spectrum division process prime loans and

18  subprime loans the same way or differently?

19  A.  No, they would be processed very, very differently.

20  Q.  Could you explain that, please.

21  A.  Yes.  Well, in the subprime world, just for illustration

22  purposes, there might be 20 steps from application to funding,

23  requiring verifications, a lot of steps that were reflective of

24  the fact that these customers may have had some challenges in

25  getting a loan.  On the prime side of the business, instead of

1   20 steps you might end up with ten or less steps in terms of

2   processing a loan from application to funding.  And we wanted

3   to be careful in moving from a subprime processing model to a

4   prime processing model in fact that we, first of all, wanted to

5   make sure that prime customers were being treated and managed

6   and had a level of service that they could get at other prime

7   shops.  On the other hand, we didn't want to just slap loans

8   together and put it out there, we wanted to be very thorough.

9           MR. ARMAND:  Objection, your Honor, non-responsive.

10          MS. MAINIGI:  I could interject a question.

11          THE COURT:  Yes, I think it's really not that it was

12  unresponsive, it was that it was becoming a narrative.

13          MS. MAINIGI:  I can move on, your Honor.

14          THE COURT:  All right.

15  Q.  Mr. Kitashima, was there -- what was the prime CLUES accept

16  work flow?

17  A.  The prime CLUES accept work flow was our the work flow that

18  we utilized to process prime loans.

19  Q.  And let's put a time period on it.  This is around what

20  time period, sir?

21  A.  Early 2006 time period, I want to say, maybe that time

22  frame.

23  Q.  Was that work flow different than the work flow that you

24  used for subprime loans that were in Full Spectrum lending?

25  A.  Yes.

1    Q.  Now did the prime CLUES accept work flow that was used in

2    the 2006 time period give greater underwriting authority to

3    loan processors, sir?

4              MR. ARMAND:  Objection, foundation.

5              THE COURT:  No, I think he can answer that.

6    Overruled.

7    Q.  You can answer, sir.

8    A.  Can you repeat the question, again?

9    Q.  Sure.  Did the prime CLUES accept work flow that was in

10   place in the 2006 time period, did that give loan processors

11   greater underwriting authority?

12   A.  Yes, if you consider that signing off on various conditions

13   under which the approval was granted, that would entail

14   expanded authority.

15   Q.  So the prime CLUES accept work flow loan processors were

16   able to sign off on conditions?

17   A.  Yes.

18   Q.  What did underwriters do, if anything, as part of that work

19   flow?

20   A.  Underwriters during that time period did two things, one,

21   they handled applications that fell out of the prime category

22   after investigation, and two, they signed off on what is called

23   clear to close, meaning the last step before the loan is

24   funded, closed and funded.

25   Q.  Now did FSL, Full Spectrum Lending, continue using the

1   prime CLUES accept work flow through all of 2006, to your

2   knowledge, Mr. Kitashima?

3   A.  Well, yes, I think for the most part all of our prime loans

4   went through that process during that time frame.

5   Q.  And let's step back with respect to your role in that time

6   period.  Tell us what your role or your title was in the

7   2006/2007 time period, sir.

8   A.  I was chief credit and compliance officer.

9   Q.  What did your responsibilities include in that role?

10  A.  Primarily I was responsible for the development, design and

11  implementation of processes that would ensure that loans being

12  made within the division met Countrywide's guidelines with

13  regard to credit quality and compliance regulations.

14  Q.  Who did you report to, Mr. Kitashima, in that time period?

15  A.  I reported to Greg Lumsden.

16      MS. MAINIGI:  Actually, in the same document, could we

17  put up page 2, Alex?  I believe there's organizational chart

18  there.

19  Q.  It's a bit hard to see, Mr. Kitashima, but I think your

20  name is over there to the left.  Is that right?

21  A.  Yes, I have a copy in front of me here.

22  Q.  And what departments or people reported in to you,

23  Mr. Kitashima, in that time period?

24  A.  First of all, Javier Jaraba, a senior vice president in

25  charge of risk management; Steve Brent, senior vice president

DA8TBAN5                          Kitashima - direct

1    in charge of quality assurance; Ed O'Donnell, who was executive

2    vice president in charge of central services and underwriting;

3    and Alice Basmadjian, who was an EVP who had responsibility for

4    compliance and fair lending.

5    Q.  Now Mr. Kitashima, were you at the same level as Rebecca

6    Mairone?

7    A.  Yes, I was.

8    Q.  And you both reported in to Mr. Lumsden?

9    A.  That's correct.

10   Q.  Did you have occasion to work together on various projects

11   or did you basically have separate responsibilities?

12   A.  No, we worked quite closely together on many topics, many

13   subjects, many projects, if you will.  It was not untypical for

14   us to be communicating regularly on a daily basis.

15   Q.  How would you describe your working win with Ms. Mairone?

16   A.  Open, open and collaborative.  I think we exchanged ideas

17   quite often.  It was -- there was no barriers to what we did.

18   I think we both respected one another and helped try to

19   accomplish each other's objectives as well as the company's

20   objectives.

21   Q.  Now in terms of other managing directors that were in Full

22   Spectrum at that time, was that your title, Mr. Kitashima,

23   managing director?

24   A.  Yes.

25   Q.  And Ms. Mairone was also a managing director?

1    A.  Correct.

2    Q.  Were there other managing directors also?

3    A.  Yes, there were two others, Lloyd Sargeant, managing

4    director, target production sales and marketing, and Pete

5    Kuoma, who was the chief financial officer.

6    Q.  Now you indicated, Mr. Kitashima, that Ed O'Donnell

7    reported in to you, sir?

8    A.  Yes.

9    Q.  And what was Mr. O'Donnell's area of responsibility?

10   A.  Primarily underwriting.  I hired Ed, and his chief

11   responsibility was to manage day-to-day underwriting of all

12   applications coming into Full Spectrum.

13   Q.  And how would you describe your working relationship with

14   Mr. O'Donnell?

15   A.  Very good.  I mean Ed and I I think all along had the same

16   perspective on things.  We had open communication.  I don't

17   think there was any barriers.  We talked several times each

18   day.  We had a very close relationship.  I believe there was

19   mutual respect between the two of us.  I felt he was very

20   competent and relied on him to ensure that the underwriting

21   tasks and responsibilities, particularly from a quality

22   perspective, was being met.

23   Q.  Now in the 2007 time period, Full Spectrum Lending designed

24   a process called the High-Speed Swim Lane.  Are you familiar

25   with that, Mr. Kitashima?

1    A.   Yes, I am.

2    Q.   Can you tell us how the High-Speed Swim Lane came about?

3    A.   Well, as I mentioned earlier, it was pretty apparent to us

4    that the market was changing, and that we would be doing more

5    and more prime business.  And as I pointed out, in the subprime

6    world there's, I said, 20 steps and the prime world would be

7    ten.  So we had a higher quality of customer requiring less

8    hand holding and hand offs.  We knew that making that

9    transition had some challenges in it, so we started to take a

10   look at our processes.

11   Q.   Was a working group put together to investigate and design

12   a process?

13   A.   Yes.

14   Q.   Were you part of that working group, Mr. Kitashima?

15   A.   Yes.

16   Q.   Now whose idea was the High-Speed Swim Lane?  Was it any

17   particular person's idea or was it something that came out of

18   the group?

19   A.   Well, I think everything that we did at Full Spectrum

20   involved collaboration.  It was really a participative

21   management environment.  We exchanged ideas pretty openly, we

22   shared our thoughts pretty openly.  So the project team that

23   was put together to address this issue consisted of a cross

24   functional team of many, many people from every department in

25   the organization.  And our idea was to try to come up with a

1   plan to transition as well as a work flow that people could be

2   using.  But we also wanted to have input on the different --

3   from the different perspectives, including --

4            MR. ARMAND:  Objection, your Honor, narrative.

5            THE COURT:  Yes, put another question.

6            MS. MAINIGI:  Yes, your Honor.

7   Q.  Mr. Kitashima, I'm going to ask you to turn to DX221,

8   please, sir.

9   A.  OK, I got it.

10  Q.  Can you describe for us what DX221 is, please.

11  A.  Yes, it's a document from Mark Barnett to members primarily

12  of my team asking for input regarding the High-Speed Swim Lane.

13           MS. MAINIGI:  Your Honor, there is no objection to

14  DX221, I ask that it be admitted.

15           MR. ARMAND:  No objection.

16           MR. HEFTER:  No objection.

17           THE COURT:  Received.

18           (Defendant's Exhibit 221 received in evidence)

19           MS. MAINIGI:  If could you blow up that top email,

20  please.

21  Q.  Mr. Kitashima, could you read out loud the sentence that

22  begins with "Cliff asked?"

23  A.  Yes, Cliff asked me to send this document to you to review

24  from risk perspective.  This is the present version of the

25  prime High-Speed Swim Lane.  Both documents are the same except

1    one is in Word in case you don't have Visio.

2    Q.  Why did you want this document going out to these

3    particular individuals, sir?

4    A.  Because each of these individuals had responsibility for

5    either quality and/or compliance in my organization, and I

6    wanted to ensure that they had a chance to provide feedback and

7    input, and if they saw issues they could raise them if they

8    felt so inclined.

9    Q.  If we could take a look at page 1, the title is

10   introduction --

11   A.  OK.

12   Q.  -- of the document.

13            MS. MAINIGI:  And if we could blow up the part that

14   says design session held July 19.

15   Q.  And Mr. Kitashima, you indicated you were involved with the

16   design of the High-Speed Swim Lane, is that correct?

17   A.  Yes.

18   Q.  Would you identify the other individuals that were present

19   for this design session on July 19?

20   A.  Rebecca, Lloyd, Loren, Cheri, Jim Kee, Ed, Patrick A.

21   Q.  And I'm sorry, Rebecca would be Ms. Mairone?

22   A.  Yes.

23   Q.  And Lloyd would be?

24   A.  Lloyd Sargeant.

25   Q.  And Cliff would be yourself, obviously.

1    A.   Yes.

2    Q.   Loren would be who, sir?

3    A.   Loren Rodriguez.  He was our operations officer.

4    Q.   And Cheri is who?

5    A.   Cheri was part of the strategic development department.

6    Q.   And Jim Kee?

7    A.   Jim Kee was also part of the -- I believe part, I'm not

8    really sure exactly what he was doing at that time, but he was

9    part of a strategic development.

10   Q.   And then Ed is referring to Mr. O'Donnell?

11   A.   Ed O'Donnell, yes.

12   Q.   Patrick A is referring to?

13   A.   Patrick Aliano.  He worked under my department in the risk

14   management area.

15   Q.   Now how -- could you explain to us, Mr. Kitashima, how the

16   team -- you said a high level, how the team arrived at a

17   structure that became the High-Speed Swim Lane?

18   A.   Well, as I mentioned earlier, we realized that we were

19   going to be writing more prime loans, meaning better customers,

20   better quality customers, better credit scores, less staff

21   hand-offs, and the realization that we were going from a very

22   high-touch environment to an environment that, again, requires

23   those kinds of changes.  So we wanted to ensure that it was

24   done properly and thoughtfully and involved the participation

25   of everyone involved.  Much of the direction that we took in

1    that area came from Greg Lumsden, who was our president, and

2    certainly was involved in directing us in this direction.

3    Q.  Who led the working group?

4    A.  Mark Barnett, whose skill set was one of project

5    management.  He was a project manager.

6    Q.  Ask you to turn to DX424, sir.

7    A.  OK.

8    Q.  Would you identify that document for us, please?

9    A.  Yes, it was a document that Greg Lumsden wrote to myself

10   regarding realignment processing, underwriting and funding

11   support.

12   Q.  And the date is 9/11/2007, sir?

13   A.  That's correct.

14        MS. MAINIGI:  Your Honor, DX424 has no objection to

15   it, I ask that it be admitted.

16        MR. ARMAND:  No objection.

17        THE COURT:  Received.

18        (Defendant's Exhibit 424 received in evidence)

19   Q.  Take a look at the second.  So this email is to you

20   Mr. Kitashima, with the CC to Ms. Mairone from Mr. Lumsden,

21   correct?

22   A.  Correct.

23        (Continued on next page)

24

25

DA83BAN6                     Kitashima - direct

1    Q.  The second paragraph if we can blow up that paragraph of

2    the e-mail, please.  Could you read the second sentence of that

3    paragraph, please.

4    A.  "This total prime model requires major changes to our work

5    flows and time is our enemy.  I want us to move quickly toward

6    the prime model in processing, underwriting and funding

7    followed by Countrywide i.e. ROCs, Chase, WaMu, etc.

8    Because we have both call centers and field branches, we will

9    have two types of operating models for the foreseeable future."

10   Q.  There is a reference here to the ROCs at Countrywide.  Do

11   you understand that reference?

12   A.  Yes.

13   Q.  Could you explain it please, sir.

14   A.  ROCs I believe stands for regional operating centers.  And

15   these were centers that were primarily focused on processing

16   loans for distributed branches.

17   Q.  Were those in the consumer market division?

18   A.  Yes.

19          MR. ARMAND:  Objection.  Leading.

20          THE COURT:  Sustained.

21   Q.  What division were the ROCs, Mr. Kitashima?

22   A.  In the consumer markets division.

23   Q.  Mr. Kitashima, as head of risk and credit and compliance

24   for Full Spectrum, did you have a general sense as to how other

25   divisions processed prime loans within Countrywide?

1    A.  Yes, I did.

2    Q.  What was your general sense of how CMD processed prime

3    loans within Countrywide?

4    A.  Well, first and foremost, I think CMD was very, very good

5    at processing prime customers.  They were one of the largest

6    producers of prime loans.

7            MR. ARMAND:  Objection.  Non-responsive, your Honor.

8            THE COURT:  Sustained.

9    Q.  Mr. Kitashima, if you could just tell us at a high level

10   your impression of how CMD processed prime loans, sir.

11           MR. ARMAND:  Objection.

12           THE COURT:  Sustained.

13   Q.  You indicated, Mr. Kitashima, that you had an understanding

14   as to how the CMD division processed prime loans?

15   A.  At a high level, yes.

16   Q.  What was that understanding?

17   A.  Loans were taken, applications were taken, and the loans

18   basically went through our automated underwriting system called

19   CLUES.  If there were approved, the loans stayed within that

20   processing unit and everything was done to get that loan or

21   process that loan through closing and funding.

22   Q.  Were loan processers or loan specialists utilized to clear

23   loans to close in CMD to your knowledge?

24           MR. ARMAND:  Objection.

25           THE COURT:  Sustained.

1  Q.  Mr. Kitashima, did you have an understanding as to the

2  High-Speed Swim Lane -- strike that.

3         The High-Speed Swim Lane process that ultimately

4  materialized, did you have an understanding as to whether it

5  was based in part on CMD or some other structure?

6         MR. ARMAND:  Objection.

7         THE COURT:  Sustained.

8  Q.  What was the High-Speed Swim Lane process based on,

9  Mr. Kitashima?

10 A.  Well, we certainly used what was being used by our sister

11 division, consumer markets division, as a proxy for us to start

12 with.  And we looked at how they processed loans, who had

13 signing authority, how it went through our process, who signed

14 off on conditions, so forth and so on.

15 Q.  Mr. Kitashima, you were the chief risk officer for Full

16 Spectrum at this point in time, correct?

17 A.  Yes.

18 Q.  Did you have a view at the time as you were involved with

19 the High-Speed Swim Lane as to the risk associated with moving

20 to a process already in existence in another division?

21        MR. ARMAND:  Objection.

22        THE COURT:  Sustained.

23        MS. MAINIGI:  Your Honor, could I ask for a side bar

24 on that, please?

25        THE COURT:  Sure.  But the trouble with your question

```
 1    was that it was argumentative, leading, and had other formal

 2    defects.

 3                MS. MAINIGI:  Okay.  I will hold off on the side bar

 4    then, your Honor.

 5    Q.  Was one of your roles within the design structure of the

 6    High-Speed Swim Lane to evaluate the risk associated with that

 7    process, Mr. Kitashima?

 8    A.  Yes.

 9    Q.  What was your evaluation of the risk associated with moving

10    to the High-Speed Swim Lane?

11    A.  I felt like we needed to ensure that all loans that went

12    through the High-Speed Swim Lane met all quality and risk --

13    quality risk requirements, met the guidelines, were properly

14    processed, documentation was complete, and that the loans met

15    the company's guidelines with regard to risk.

16    Q.  Do you believe that the High-Speed Swim Lane design process

17    met that?

18    A.  In my opinion, yes, it did.

19    Q.  Now, Mr. Kitashima, have you heard of something called NCA?

20    A.  Yes.

21    Q.  Was NCA the model for the High-Speed Swim Lane?

22                MR. ARMAND:  Objection.

23                THE COURT:  Ground?

24                MR. ARMAND:  Foundation.  Leading.

25                THE COURT:  Well, it clearly was leading.  But I think
```

DA83BAN6                      Kitashima - direct

1    foundation may be also relevant.  So lay a foundation.

2    Q.  Mr. Kitashima, was NCA a work flow that had been utilized

3    within parts of Countrywide to your knowledge?

4                MR. ARMAND:  Objection, leading.

5                THE COURT:  Sustained.

6    Q.  What was NCA to your recollection, Mr. Kitashima?

7    A.  NCA was a early referral point for subprime branches from

8    the standpoint of prime applications.  If they came across a

9    prime application applicant, they would refer it to NCA for

10   processing.

11   Q.  Was NCA within Full Spectrum for some period of time?

12   A.  At the beginning, no.  It was part of the consumer markets

13   division.

14   Q.  Did it come to Full Spectrum?

15   A.  Eventually it was transferred into Full Spectrum, yes.

16   Q.  Did you have some familiarity with its work flow?

17   A.  Yes.  I had some familiarity with its work flow.

18   Q.  To your understanding, did the NCA work flow -- strike

19   that.

20               To your understanding, was the NCA work flow a model

21   for the High-Speed Swim Lane?

22   A.  No.  It was not.

23   Q.  Mr. Kitashima, with respect to the High-Speed Swim Lane

24   design, did you intend to produce poor quality loans through

25   the High-Speed Swim Lane design?

1            MR. ARMAND:  Objection.

2            THE COURT:  Ground?

3            MR. ARMAND:  Speculation.  Relevance.

4            THE COURT:  Overruled.

5   A.  Absolutely not.

6   Q.  Mr. Kitashima, did you intend to deceive investors such as

7   Fannie and Freddie as part of the design of the High-Speed Swim

8   Lane?

9            MR. ARMAND:  Objection.

10           THE COURT:  Ground?

11           MR. ARMAND:  Same ground, your Honor.

12           THE COURT:  Same ruling.  You may answer.

13  A.  Absolutely not.

14  Q.  What is your view, Mr. Kitashima, on the quality of loans

15  that came out of the High-Speed Swim Lane?

16  A.  They met company guidelines, we were fully confident that

17  these loans would perform.  They were very high quality

18  customers.  These were the best customers that were coming to

19  us from a credit standpoint, FICO scores, debt to income

20  ratios, and loan to value.  These were very good customers.

21  Q.  Mr. Kitashima, please take a look at DX 292.

22  A.  Okay.

23  Q.  What is that document, sir?

24  A.  It is an e-mail from Michael Thomas to myself and others

25  regarding High-Speed Swim Lane Central Services review meeting

 1    notes.

 2    Q.  It is dated 8/10/2007?

 3    A.  Correct.

 4              MS. MAINIGI:  I ask DX 292 be admitted.

 5              MR. ARMAND:  No objection.

 6              THE COURT:  Received.

 7              (Defendant's Exhibit 292 received in evidence)

 8    Q.  August 10, 2007.  Was that right before the pilot of the

 9    High-Speed Swim Lane?

10    A.  Yes.

11    Q.  Can you describe the meeting that occurred in relation to

12    this e-mail.

13    A.  Yes.  This is right before the rollout of the High-Speed

14    Swim Lane, and I wanted to at that time make sure that we had

15    sort of the final draft of the work flow responsibilities and

16    all issues.

17              Right before we went forward with it, I wanted to make

18    sure, from a credit and compliance point of view, so only the

19    people that reported to me are in this meeting, that there was

20    no issues.  There was no challenges.  There was no concerns

21    that we hadn't previously addressed or.  Or if we --

22              MR. ARMAND:  Objection.  Narrative.

23              THE COURT:  This one is truly non-responsive.

24              I need to caution the witness, listen to the question

25    and just answer the question.  The question was to describe the

1  meeting.  Not what you intended, not what was the background.

2  But the meeting that occurred.

3            THE WITNESS:  Sorry, your Honor.

4            MS. MAINIGI:  I can withdraw the question, your Honor.

5            THE COURT:  All right.

6  Q.  Mr. Kitashima, can you briefly describe the purpose of the

7  meeting, please, sir.

8  A.  The purpose of the meeting was to allow the credit risk

9  people to review the proposed High-Speed Swim Lane and

10 encourage or provide them with a forum to voice any issues or

11 concerns.

12 Q.  Who attended the meeting Mr. Kitashima?

13 A.  Ed O'Donnell, David Sallis, James White, Robert Price,

14 Michael Thomas, Vince Santucci, Matt Wimer, Ron Cannon and

15 Aaron Kalosis.  These were all managers in the underwriting

16 department.

17 Q.  To your recollection, were any concerns or issues raised by

18 this group?

19            MR. ARMAND:  Objection, hearsay.  Or calls for

20 hearsay.

21            THE COURT:  Well, it is hard to tell, so I will

22 sustain the objection.  There may be some non-hearsay that can

23 be elicited here.

24 Q.  Was anyone, Mr. Kitashima, was anyone opposed to moving

25 forward with the High-Speed Swim Lane at this meeting?

1       MR. ARMAND:  Objection.

2       THE COURT:  Ground?

3       MR. ARMAND:  Vague.

4       THE COURT:  Overruled.

5    A.  No.

6    Q.  Did individuals at the meeting raise ideas for improvement,

7    Mr. Kitashima?

8    A.  Yes.

9       MS. MAINIGI:  We can take that down, Alex.

10   Q.  Mr. Kitashima, with respect to the loans that could go

11   through the High-Speed Swim Lane, what type of loans could go

12   through it?

13      MR. ARMAND:  Objection.  Vague.

14      MS. MAINIGI:  Let me withdraw.

15   Q.  Could subprime loans go through the High-Speed Swim Lane?

16   A.  No.

17   Q.  Did subprime loans, to your knowledge, ever go through the

18   High-Speed Swim Lane?

19   A.  No.

20   Q.  Did purchase transactions go through the High-Speed Swim

21   Lane, Mr. Kitashima?

22      MR. ARMAND:  Objection.  Leading, your Honor.

23      THE COURT:  I'll allow it.

24   A.  No.

25   Q.  Did refinancings go through the High-Speed Swim Lane,

DA83BAN6                           Kitashima - direct

1   Mr. Kitashima?

2   A.  Yes.

3   Q.  Let me turn to DX 311, please, sir.  Could you describe

4   that document, please.

5   A.  This is an e-mail sent from Ed O'Donnell to Loren

6   Rodriguez, who was our head of operations, regarding simple

7   prime High-Speed Swim Lane HSSL entry criteria.

8        MS. MAINIGI:  Your Honor, I ask that DX 311 be

9   admitted.

10       MR. ARMAND:  No objection.

11       THE COURT:  Received.

12       (Defendant's Exhibit 311 received in evidence)

13  Q.  Let's go ahead and blow up the to from, please.

14       Mr. Kitashima, could you tell us again who the from

15  and the to is on this e-mail?

16  A.  Yes.  It was from Ed O'Donnell, and Loren Rodriguez is the

17  recipient, head of operations.  Copied on the e-mail was Cheri

18  Shine, myself, Janet Godby, Mark Barnett, Rebecca Mairone.

19  Q.  Please read the first sentence of the e-mail from

20  Mr. O'Donnell out loud, please.

21  A.  "I recommend that we continue to exclude purchases, loans

22  greater than $1 million, and non-arm's length.  I agree with

23  the remainder of the list."

24  Q.  To your understanding, did this relate to the pilot?

25  A.  Yes.

1    Q.  Were Mr. O'Donnell's recommendations followed?

2    A.  Yes, I believe so.

3    Q.  Did purchases or loans greater than $1 million go through

4    the High-Speed Swim Lane?

5    A.  No.

6    Q.  Mr. Kitashima, did stated -- let me step back.

7            Are you familiar with stated income loans?

8    A.  Yes.

9    Q.  Did Full Spectrum process stated income loans?

10   A.  Yes.

11   Q.  Do you know whether stated income loans went through the

12   High-Speed Swim Lane?

13   A.  Yes.

14   Q.  Did they go through the High-Speed Swim Lane, sir?

15   A.  Yes.

16   Q.  You can turn to DX 14, please, sir.

17   A.  Okay.

18   Q.  Actually before I get there.  Mr. Kitashima, were stated

19   income loans prime loans or subprime loans?

20   A.  Through the HSSL they were all prime loans.

21   Q.  As head of credit and risk, did you give consideration as

22   to whether stated income loans should in fact go through the

23   High-Speed Swim Lane?

24   A.  Yes, I did.

25   Q.  What was your view?

1  A.  My view was, again, these were the highest quality loans.

2  Very low risk in my opinion.  High FICO scores.

3          MR. ARMAND:  Objection, your Honor, to the extent this

4  is seeking opinion testimony.

5          THE COURT:  Sustained.

6  Q.  As head of credit and risk for Full Spectrum,

7  Mr. Kitashima, were you comfortable with stated income loans

8  going through the High-Speed Swim Lane or not?

9          MR. ARMAND:  Objection.

10          THE COURT:  Sustained.

11  Q.  Mr. Kitashima, as head of credit and risk, did you approve

12  stated income loan products going through the High-Speed Swim

13  Lane?

14  A.  Yes.

15  Q.  Why is that?

16  A.  Because they were products that were offered to the very

17  highest quality of customer.  Very acceptable in the open

18  market.  And they were considered fairly low risk.

19  Q.  Take a look at DX 14, now, sir, and I believe DX 14 is an

20  admitted document.

21          Can you describe the document, please, sir.

22  A.  This is a note from Ed O'Donnell to Steve Brent regarding a

23  proposed proposal on conditioned authority related to the

24  High-Speed Swim Lane.

25  Q.  Did this note deal with reasonability of stated income?

1   A.  Yes, it did.

2   Q.  Could you describe that for us, please.  What does

3   reasonability of stated income mean?

4   A.  Well, it was to determine whether an income stated on the

5   application that qualified for this particular product made

6   sense.  Because no income verification was required, i.e. in

7   form of a tax return or a paystub.  And there was a sort of a

8   reasonability test that we asked loan specialists to just make

9   sure that they felt the income was reasonable.

10  Q.  As part of the High-Speed Swim Lane, were loan specialists

11  to make that determination or underwriters as to stated income

12  reasonability?

13  A.  Loan specialists.

14  Q.  Did the credit and risk department evaluate that prior to

15  giving approval?

16  A.  Yes.

17  Q.  You can set aside that document, Mr. Kitashima.

18  Mr. Kitashima, to your understanding, why was the High-Speed

19  Swim Lane begun as a pilot?

20  A.  Well, as I mentioned earlier, this was a fairly significant

21  change to our processing model.  Under subprime it was high

22  touch, a lot of steps, a lot of verification.  Going to a

23  processing model that required less steps, needed to happen

24  quickly because of the customers' expectations on these loans.

25  They were the very best quality loans that were out there.

1           MR. ARMAND:  Objection, your Honor.  Narrative.

2           THE COURT:  Sustained.

3   Q.  To your knowledge, had FSL, Mr. Kitashima, previously had

4   pilots for any sort of new projects?

5           MR. ARMAND:  Objection.

6           THE COURT:  Ground?

7           MR. ARMAND:  Vague, your Honor.  New projects, sort of

8   new projects.

9           THE COURT:  All right.

10          MS. MAINIGI:  I'll withdraw, your Honor.

11  Q.  Mr. Kitashima, to your recollection, had the Full Spectrum

12  Division previously had pilot projects?

13  A.  Yes.

14  Q.  For what sorts of things?

15  A.  Any new process.  Even product offerings.  We, many, many

16  times tested it to ensure that people understood it, that it

17  was -- we were able to offer it in an efficient manner.  Wasn't

18  unusual for us to pilot things.

19  Q.  Mr. Kitashima, what role did CLUES play with High-Speed

20  Swim Lane loans?

21  A.  CLUES was the underwriter.  Basically, the application data

22  was put into CLUES, CLUES evaluated the data, ran a credit

23  check, determined the FICO score, and basically issued a

24  decision on that loan.

25  Q.  As the head of risk, was this acceptable to you?

1          MR. ARMAND:  Objection, your Honor.  Calls for

2   opinion.

3          MS. MAINIGI:  I'll withdraw it.

4   Q.  Did you approve this, Mr. Kitashima?  Did you approve CLUES

5   as the underwriter as part of the High-Speed Swim Lane?

6   A.  Yes.

7   Q.  Why is that?

8   A.  CLUES was not a new -- not new technology.  CLUES had been

9   around for many, many years.  It was used extensively with our

10  sister division, consumer markets, as well as other divisions

11  within Countrywide.  It was accepted by the GSEs.  And it was

12  no mystery to us.  This was not reinventing the wheel.  And I

13  believe that CLUES was accurate in its decision making.

14  Q.  When a loan received a CLUES accept, Mr. Kitashima, what

15  did that signify?

16  A.  That signified that the loan was approved, subject to

17  usually conditions that had to be met prior to close.

18  Q.  Mr. Kitashima, did you intend to produce poor quality loans

19  through the use of CLUES?

20  A.  No.

21  Q.  Did you intend to deceive investors such as Fannie and

22  Freddie through the use of CLUES?

23          MR. ARMAND:  Objection.  Leading, your Honor.

24          THE COURT:  Sustained.

25  Q.  Do you know what Countrywide guidelines are, Mr. Kitashima?

1    A.  Credit guidelines?  Underwriting guidelines?

2    Q.  Yes.  What are those?

3    A.  Those are guidelines, my understanding, that were developed

4    in concert with our investors.  In other words, those

5    guidelines, if met, would be acceptable to investors as far as

6    selling these loans to the investors.

7    Q.  Did CLUES, to your knowledge, have any relationship to the

8    guidelines?

9    A.  Yes.  CLUES, CLUES underwrote loans according to

10   Countrywide's guidelines.

11   Q.  You can take a look, sir, at DX 31, please.  Could you

12   describe to us -- DX 31 was admitted last week, I believe.

13            THE COURT:  Okay.

14   Q.  Could you describe to us what this document is,

15   Mr. Kitashima.

16   A.  It is a bulletin that announced the rollout of the central

17   fulfillment model for NSCs dated October 2, 2007.

18            MS. MAINIGI:  If we can scroll down to the key

19   features, Alex.

20   A.  Okay.

21   Q.  The second bullet, please, Mr. Kitashima, could you read

22   that out loud.

23   A.  "Loan specialists have underwriting approval authority."

24   Q.  What is your understanding of what that meant?

25   A.  That loan specialists could sign off on conditions as well

1    as clear to close.

2    Q.   When you say conditions, what do you mean by that?

3    A.   When a CLUES issues an approval, it issues an approval

4    concerning the meeting of certain conditions.  And once those

5    conditions are met, the loan specialists would have the

6    authority to approve those conditions and move to the next

7    step.

8    Q.   And what is the next step thereafter?

9    A.   Generally it is a clear to close, which would allow the

10   loan to be -- documents to be drawn and the borrower would come

11   in and sign and the loan would be funded.

12   Q.   Did you approve, as part of the High-Speed Swim Lane

13   design, loan processors clearing loans to close, sir?

14   A.   Yes, I did.

15   Q.   Did you approve, as part of the High-Speed Swim Lane

16   process, loan processors clearing conditions?

17   A.   Yes.

18   Q.   Why did you do that?

19   A.   Because CLUES -- first of all, these were again very high

20   quality loans.  CLUES was the underwriter, and the task and

21   responsibilities for loan specialists was to ensure that the

22   conditions of the approval were being met.

23        Additionally, this was not something new.  This was

24   very typical for -- in other areas of -- other companies,

25   including CMD and other companies.

1        MR. ARMAND:  Objection, your Honor.  Speculation.

2        THE COURT:  Sustained.  The jury will disregard the

3    last two sentences.

4    Q.  Mr. Kitashima, were you familiar with the experience level

5    of Full Spectrum Lending loan specialists?

6    A.  Yes.

7    Q.  Can you describe the level of experience you understood

8    them to have.

9        MR. ARMAND:  Foundation.  And vague.

10       THE COURT:  Overruled.  You may answer.

11   A.  In my opinion, loan specialists at Full Spectrum were very

12   well experienced --

13       THE COURT:  No, that's not --

14       MR. ARMAND:  Objection.

15       THE WITNESS:  What was the question?

16       THE COURT:  The question was can you describe the

17   level of experience you understood the Full Spectrum Lending

18   loan specialists to have.

19       Let me ask you, I thought there was some foundation.

20   But maybe I was wrong.  Did you know what kind of experience

21   they had?

22       THE WITNESS:  Yes.

23       THE COURT:  All right.  So what kind of experience did

24   they have?

25       THE WITNESS:  Very good experience.

1           THE COURT:  What does that mean?

2           THE WITNESS:  That means in the -- to me, it means in

3   the subprime --

4           THE COURT:  When you say very good, tell us what

5   kind -- you said you knew what kind of experience they had,

6   yes?

7           THE WITNESS:  Yes.

8           THE COURT:  So, in non-opinion terms, what kind of

9   experience did they have?

10          THE WITNESS:  They processed loans which had many,

11  many steps and requirements.  Much more than prime loans.

12  Therefore, their experience level was very high.

13          THE COURT:  So this was on-the-job experience?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.

16  Q.  The loan processors that were part of the High-Speed Swim

17  Lane design and then Central Fulfillment, were these loan

18  processors that had existed in the subprime processing role at

19  FSL generally?

20  A.  Yes.

21  Q.  Can you describe at a high level, Mr. Kitashima, the type

22  of work that a loan processor in the subprime world does.

23          MR. ARMAND:  Objection, your Honor.  "Subprime world."

24          THE COURT:  I think this is relevant.  Overruled.

25  A.  A processor under subprime processing would gather

1  documents, they would be an interface to the customer on

2  questions, they would seek requirements as outlined by

3  underwriting, and present them or have underwriting either

4  accept or approve the meeting of conditions.

5  Q.  How did that compare to loan specialists with respect to

6  prime loans, Mr. Kitashima, prior to High-Speed Swim Lane?

7  A.  Under prime loans, loan specialists had more autonomy, they

8  could sign off on various conditions.

9        But, in Full Spectrum, anyway, the final decision or

10  final clear to close decision was signed off by an underwriter.

11  Q.  Let me ask you about the level of training, since there was

12  a question about that, that loan specialists got.  What is your

13  understanding of the training that loan specialists associated

14  with the High-Speed Swim Lane received?

15  A.  Very extensive training.  Many certifications, on-the-job

16  training, formal training programs that they had to complete.

17  Reviews of work.  Several, several steps that they had to

18  complete.

19  Q.  Mr. Kitashima, turn to DX 34 if you would, please, sir.

20  Can you identify that document for us, please.

21  A.  It is a training matrix for conditions sign off and

22  underwriting training.

23  Q.  Was this the training matrix utilized in relation to the

24  High-Speed Swim Lane, sir?

25        MR. ARMAND:  Objection.  Leading.

1      THE COURT:  I think it is foundational.  Overruled.

2    A.  Yes.

3      MS. MAINIGI:  Your Honor, I ask that DX 34 be

4    admitted.

5      MR. ARMAND:  No objection.

6      THE COURT:  Received.

7      (Defendant's Exhibit 34 received in evidence)

8    Q.  It is a bit difficult to read, Mr. Kitashima, but at a high

9    level, referencing this document, can you explain to us the

10   types of training that loan specialists received.

11     MR. ARMAND:  Objection, foundation.

12     MS. MAINIGI:  I think he's already told us, your

13   Honor, that he's familiar with this document.  But I can ask

14   him again.

15     THE COURT:  Sustained.  Well, why don't you ask him

16   again.  I don't recall whether he said it.

17   Q.  Mr. Kitashima, are you familiar with the requirements in DX

18   34?

19   A.  Yes.

20   Q.  Who were the individuals involved with training in relation

21   to the High-Speed Swim Lane?

22   A.  Senior underwriters and -- who was involved in the

23   training?

24   Q.  Let me ask it another way.  Did the people who were

25   involved with training for the High-Speed Swim Lane, did they

1    report in to you, sir, or did they report in to somebody else?

2    A.  They reported in to me.

3    Q.  Could you explain to us the types of training as described

4    in DX 34 then, please, sir.

5    A.  Yes.  It covered, as you can see, a number of training

6    courses that were deemed to be important in their jobs.

7    Including how to work with the system, calculation of income,

8    ethics and compliance, introduction to mortgage banking is one

9    of the courses as well.  So it covered a very wide range of

10   topics.  And upon completion, we felt very confident that these

11   loan specialists would be able to do their jobs.

12          MR. ARMAND:  Objection.  Move to strike the last

13   sentence.

14          THE COURT:  Yes.  The jury will disregard the last

15   sentence.

16   Q.  Mr. Kitashima, if you can turn to DX 33, please.

17   A.  Okay.

18   Q.  What is DX 33?

19   A.  It is a bulletin that was issued October 4, 2007, regarding

20   condition sign off authority levels matrix and underwriting

21   approval level authority matrix.

22   Q.  Are you familiar with this document, Mr. Kitashima?

23   A.  Yes.

24   Q.  Did the individuals who put this document together report

25   in to you ultimately?

1    A.  The people that were involved in putting this together

2    certainly involved my group, people that reported directly to

3    me as well as other parts of the organization.

4              MS. MAINIGI:  Your Honor, I ask that DX 33 be

5    admitted.

6              MR. ARMAND:  No objection.

7              THE COURT:  Received.

8              (Defendant's Exhibit 33 received in evidence)

9    Q.  Mr. Kitashima, is this also a bulletin under FSL?

10   A.  Yes.

11   Q.  What were the bulletins that came out of FSL?

12   A.  They were general distribution, went to all employees,

13   every employee, generally.

14   Q.  If we take a look at the section that starts with within

15   the central fulfillment teams.  If we can blow that up, please.

16   A.  Okay.

17   Q.  Mr. Kitashima, could you please read out loud those two

18   bullets.

19   A.  "Loan specialists who currently hold PCA loan signing

20   authority will be granted provisional underwriting level one

21   approval authority with validation, but must qualify for it by

22   completing the training/certification requirements by 11/15."

23   Q.  Let me stop you right there before you go to the next

24   bullet.  Can you tell us what PCA loan signing authority means?

25   A.  It is condition sign off authority.  Signing off on

1  conditions.

2  Q.  What does PCA refer to?

3  A.  Prime CLUES accepts.

4  Q.  What does provisional underwriting authority mean?

5  A.  It means that they are granted the authority, but they must

6  complete the training certification by November 15.

7  Q.  If you can read the next bullet, please, sir.

8  A.  "Loan specialists with no authority level, CSO-1 or CSO-2

9  must complete all of the training/certification requirements

10 before being granted level one underwriting authority."

11 Q.  And do you have an understanding, Mr. Kitashima, of what

12 level one underwriting authority meant?

13 A.  Yes.

14 Q.  Could you tell us, please.

15 A.  Yes.  It involved the ability for that individual to sign

16 off on certain conditions.  You know, on the loan.

17 Q.  If you can take a look at the bullet that is right under

18 significant changes in the underwriting approval level

19 authority.  If you can read that first bullet out loud, please.

20 A.  "Underwriting level one approval authority was revised to

21 apply only to prime loans with LTV/CLTVs less than or equal to

22 80 percent.  Underwriting level one approval authority now

23 excludes DU approval-eligible, expanded approval loans, and all

24 purchase transactions."

25 Q.  Can you tell us what LTV/CLTVs less than or equal to

DA83BAN6                    Kitashima - direct

1   80 percent means?

2   A.  Yes.  That's the ratio of the amount of mortgage to the

3   value of the property.

4   Q.  So, could you give us an example of that, sir?

5   A.  For example, in -- if a property was valued at $100,000,

6   80 percent LTV would be an $80,000 mortgage.

7   Q.  Thank you.  Level one approval authority, according to this

8   document, were level ones allowed to approve purchase

9   transactions or were they not?

10  A.  They were not.

11  Q.  You can set that aside, Mr. Kitashima.

12          Mr. Kitashima, what is quality of grade?

13  A.  Quality of grade was developed by our corporate quality

14  risk management group.  And it was a way to grade loans on a

15  risk basis.

16  Q.  Was there a time that quality of grade was suspended in any

17  manner in conjunction with the High-Speed Swim Lane?

18  A.  Yes.

19  Q.  Could you describe that, please.

20          MR. ARMAND:  Objection.  Calls for narrative.

21  Q.  Could you tell us briefly, Mr. Kitashima.  What happened.

22          MR. ARMAND:  Same objection, your Honor.

23          THE COURT:  If he can describe it in four sentences,

24  I'll allow the answer.

25          THE WITNESS:  Pressure.

```
 1            THE COURT:  The life of a witness is tough.
 2   A.  Can you repeat the question?
 3   Q.  Sure.  Was quality of grade suspended for some period of
 4   time in association with the High-Speed Swim Lane?
 5   A.  Yes.  During the initial rollout --
 6   Q.  I'm sorry.  Let me interrupt you because I asked you a
 7   different question.  I'm sorry.  What was the reason --
 8            THE COURT:  That was very clever though.
 9   Q.  What was the reason it was suspended, Mr. Kitashima?
10   A.  To allow a grace period for employees involved in the
11   High-Speed Swim Lane to focus on the changes to their jobs.
12   Q.  Did you approve that grace period, Mr. Kitashima?
13   A.  Yes.
14   Q.  Why?
15   A.  One, we continued to monitor quality very closely.  Two,
16   these were loans that were of the highest quality.  It was very
17   little risk in the types of loans we were putting through the
18   High-Speed Swim Lane.  And three, we would be continuing to
19   communicate any findings that we thought were concerning to all
20   levels of management.
21   Q.  To whom did the quality of grade suspension apply,
22   Mr. Kitashima?
23   A.  It applied only to those that were directly involved in the
24   processing of those loans in the High-Speed Swim Lane pilot.
25   Q.  Was there any grace period associated with Central
```

1    Fulfillment or no?

2    A.   No.

3    Q.   Mr. Kitashima, did the suspension of quality of grade apply

4    to you?

5    A.   No.

6    Q.   What did that mean, that it didn't apply to you?

7    A.   That means any quality-related issues that rose to the

8    level of a QoG would still affect my compensation.

9    Q.   Did the quality of grade suspension apply to all findings?

10   A.   No, it did not.  Findings that included egregious-type

11   issues, such as fraud or misrepresentation or anything that was

12   definitely a serious problem, was exempt from that suspension.

13   Meaning the employee would be held accountable.

14   Q.   If we can take a look, Mr. Kitashima, first, at DX 250,

15   sir.  What is that document, Mr. Kitashima?

16   A.   I'm still trying to locate it.

17   Q.   I'm sorry.

18   A.   Okay I've got it.

19   Q.   Okay.

20   A.   This document is an e-mail from myself to Ed O'Donnell and

21   those that reported to him regarding central services incentive

22   plans dated August 2, 2007.

23             MS. MAINIGI:  Your Honor, I ask that DX 250 be

24   admitted.

25             MR. ARMAND:  No objection.

1    THE COURT:  Received.

2    (Defendant's Exhibit 250 received in evidence)

3    Q.  Why don't we take a look at page two, please, sir.  There

4    is a long e-mail from Mr. O'Donnell there.  If we can focus in

5    on paragraph four, please.

6    A.  Okay.

7    Q.  It says "in addition to the wrappers outlined below."  Can

8    you read that out loud, please, sir?

9    A.  "In addition to the wrappers outlined below, we'll also be

10   suspending QoG hits on prime loans for the next two months for

11   all monthly incentive plans.  The components of your existing

12   monthly bonus plans will remain unchanged, however payout is

13   contingent upon achieving the targets outlined below."

14   Q.  Do you know, Mr. Kitashima, whether this was in relation to

15   the pilot or not?

16   A.  Yes.  I believe this was related to the pilot.

17   Q.  If you can take a look at DX 479, please, sir.

18   A.  Okay.

19   Q.  Describe that document for us, please.

20   A.  The main document is feedback we -- it is and e-mail from

21   Scott Bridges to myself and Rebecca Mairone on a visit that he

22   made to one of our --

23   Q.  Let me stop you, Mr. Kitashima.  I may have given you the

24   wrong number.  I apologize.  479, please, sir.

25   A.  I'm sorry.  479.  Okay.

1    Q.  Tell us what that document is.

2    A.  479.  This is an e-mail from Javier Jaraba to myself

3    regarding Central Fulfillment review.

4                MS. MAINIGI:  Your Honor, I move DX 479 into evidence.

5                MR. ARMAND:  No objection.

6                THE COURT:  Received.

7                (Defendant's Exhibit 479 received in evidence)

8    Q.  If we can blow up the first two paragraphs under "temporary

9    QoG process," please.

10               Mr. Kitashima, could you read that first paragraph out

11   loud.

12   A.  "For the production months of August 7 through January 8, a

13   moratorium will be granted for any quality and/compliance SUS

14   violations with the exception of an egregious SUS."

15   Q.  Was that October or August?

16   A.  It was October.  Sorry.

17   Q.  Did this, to your understanding, did this apply to Central

18   Fulfillment?

19   A.  Yes, it did.

20   Q.  It says "with the exception of an egregious SUS."  What

21   does that mean?

22   A.  That means what I described earlier as anything that was

23   fraud or misrepresentation or anything that was dishonest in

24   any way, those things the employee would be held accountable

25   for.

1   Q.  The next paragraph, could you read that out loud, please,

2   sir.

3   A.  "The normal audit results for both quality control and

4   compliance will be reported and tracked through the normal QoG

5   process.  However, the final QoG score will not be reported to

6   bonus administration for any bonus impact."

7   Q.  What is your understanding of where it says "the normal

8   audit results for both quality control and compliance will be

9   reported and tracked through the normal QoG process"?

10            MR. ARMAND:  Objection.  Foundation.

11            THE COURT:  Overruled.

12  A.  I can answer that?

13  Q.  Yes, you can.

14  A.  Okay.  That means that even though we had this moratorium

15  on QoGs, we would continue to do all the quality control

16  functions as usual.  Meaning we would continue to do audits, we

17  would continue to identify loans that were, you know, subject

18  to a QoG, and we would report them accordingly.  So we still

19  kept track of everything that was being done.

20  Q.  Did you evaluate the QoG moratorium from a risk

21  perspective, Mr. Kitashima?

22  A.  Yes.

23  Q.  What was your conclusion?

24  A.  In my opinion, it was a prudent thing to do.

25  Q.  Why is that, sir?

1    A.   Because the moratorium was for a short period of time,

2    involving loans that were of the best quality, and we would

3    continue to track and report any problems that might have taken

4    place during the pilot program.

5              THE COURT:   Counsel, find a place in the next few

6    minutes to stop.

7              MS. MAINIGI:   I think I'm done with QoG, your Honor.

8    Let me just check one thing.

9              We can stop here.

10             THE COURT:   Okay.   So, ladies and gentlemen, tomorrow

11   I have a matter at 9 o'clock, so we're going to start at

12   10 o'clock as we did today.   So have a good evening and I'll

13   see you at 10 o'clock.

14             (Jury excused)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DA83BAN6

```
 1              THE COURT:  How much more do you have on direct?

 2              MS. MAINIGI:  Your Honor, I believe I have about an

 3     hour and a half.

 4              THE COURT:  All right.  And who else do we have as

 5     defense witnesses?

 6              MS. MAINIGI:  Your Honor, we will be calling Laurie

 7     Peffer and Anthony Ho thereafter, depending upon whether or not

 8     we get done with Mr. Peffer.

 9              MR. CORDARO:  One thing, your Honor, with respect to

10     the exchange of exhibits for witnesses that haven't been

11     deposed.  The 24-hour window I am assuming that that also means

12     that the government has to be notified of exhibit numbers on

13     the exhibit list and things of that nature, or have the exhibit

14     attached to the e-mail if there is no exhibit number.  It is

15     not sufficient to simply describe the exhibit.  We'd like to

16     know what exhibit.

17              THE COURT:  No.  I assume they will either give you

18     the preexisting number in accordance with their most recent

19     list, or they will give you the exhibit.

20              MR. CORDARO:  Thank you, your Honor.

21              MS. MAINIGI:  Your Honor, with respect to that, that's

22     fine.  We're happy to give them the exhibit number for those

23     witnesses that the government chose not to depose.

24              With respect to the timing, we'll have a number of

25     witnesses that may end up being very short witnesses.  I'm not
```

DA83BAN6

1  sure we will always be in a position to make a decision on

2  which exhibits we intend to use with them 24 hours in advance.

3          THE COURT:  Why is that?

4          MS. MAINIGI:  Well, I think there will be several

5  witnesses where we may be able to get four or five witnesses in

6  a particular day.

7          THE COURT:  I understand that.  Why don't you give

8  them all of the exhibits for each of those witnesses now, and

9  then it doesn't matter.

10         MS. MAINIGI:  I don't think we've made that

11  determination yet, your Honor.  What I'm asking, your Honor is

12  with respect to those witnesses, if we can give them the

13  primary set of exhibits that we would perhaps intend to use,

14  and if there are follow on exhibits, we'll just send those

15  along later if we come across those in our preparation.

16         THE COURT:  No.  If, despite all good faith efforts,

17  you wind up calling someone who you haven't yet turned over

18  exhibits or you only turned it over like an hour or two before,

19  and it is a very short witness or something they can deal with

20  it, that's fine.  But if they tell me, no, we need more time,

21  we wanted the exhibits 24 hours in advance, and though we're

22  not blaming anyone, we only got these exhibits two hours

23  before, then I'm going to delay the appearance of that witness.

24         MS. MAINIGI:  Okay.

25         MR. ARMAND:  One final question, your Honor.  I wanted

DA83BAN6

1    to clarify whether the government can introduce exhibits during

2    the defense, during the defense case.  To the extent --

3              THE COURT:  On cross?

4              MR. ARMAND:  Yes.

5              THE COURT:  As long as they're cross, sure.  The rule,

6    I think I mentioned this about two weeks ago.  No one ever has

7    to list exhibits that they are using for cross-examination.

8    That would destroy the point of cross-examination, which is

9    often to confront a witness with something that contradicts

10   what they said and thus tests their credibility.

11             It doesn't mean, though, you can put in an exhibit,

12   we've had a number of, if you will, free-floating exhibits that

13   have been introduced because they were appropriate for the

14   narrative at a given point in time.  Those won't come in under

15   this rule of not having to list in advance.

16             If they've been listed in advance, they may or may not

17   come in, depending upon the situation.  But the only exhibits

18   that haven't been listed in advance that are admissible are the

19   exhibits that come in through cross-examination.  Okay?

20             MR. ARMAND:  Understood.  Thank you, your Honor.

21             THE COURT:  Anything else?  Very good.

22             (Adjourned until October 9, 2013, at 10 a.m.)

23

24

25

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     JACK SCHAKETT

 4     Direct By Mr. Sullivan . . . . . . . . . . .1849

 5     Cross By Mr. Cordaro . . . . . . . . . . . .1897

 6     Redirect By Mr. Sullivan . . . . . . . . . .1917

 7     CLIFFORD KITASHIMA

 8     Direct By Ms. Mainigi  . . . . . . . . . . .1921

 9                          DEFENDANT EXHIBITS

10     Exhibit No.                              Received

11      221   . . . . . . . . . . . . . . . . . . .1934

12      424   . . . . . . . . . . . . . . . . . . .1937

13      292   . . . . . . . . . . . . . . . . . . .1944

14      311   . . . . . . . . . . . . . . . . . . .1947

15      34    . . . . . . . . . . . . . . . . . . .1958

16      33    . . . . . . . . . . . . . . . . . . .1960

17      250   . . . . . . . . . . . . . . . . . . .1965

18      479   . . . . . . . . . . . . . . . . . . .1966

19

20

21

22

23

24

25
```