DA93BAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,

        v.                       12 CV 1422 (JSR)

BANK OF AMERICA CORPORATION,
*successor to Countrywide
Financial Corporation,
Countrywide Home Loans, Inc.,
and Full Spectrum Lending*, et
al.,

                Defendants.

------------------------------x

                              New York, N.Y.
                              October 9, 2013
                              10:15 a.m.

Before:

                    HON. JED S. RAKOFF,

                              District Judge

DA93BAN1

APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
PIERRE G. ARMAND
JAIMIE LEESER NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN M. LONDON
     Assistant United States Attorneys


WILLIAMS & CONNOLLY
     Attorneys for Defendant Bank of America
BRENDAN V. SULLIVAN, JR.
ENU MAINIGI
MALACHI B. JONES
KENNETH SMURZYNSKI
CRAIG D. SINGER
ALLISON B. JONES
STEVEN M. CADY
JENNIFER WIMSATT PUSATERI


GOODWIN PROCTOR
     Attorneys for Defendants Countrywide
RICHARD M. STRASSBERG
WILLIAM HARRINGTON


BRACEWELL & GIULIANI
     Attorneys for Defendant Mairone
MARC L. MUKASEY
MICHAEL HEFTER
RUSSELL ZWERIN
RYAN M. PHILP
SETH M. COHEN
CHRISTINA JARDINE

DA93BAN1

1           (In open court; jury present)

2           THE COURT:  I never have a chance to ask Juror No. 5,

3    do any better this week?

4           JUROR NO. 5:  Not much better.

5           THE COURT:  All right.  Well, you're so lucky that

6    this trial is so long.  You'll have many opportunities.

7     CLIFFORD KITASHIMA,

8         called as a witness by the Defendant,

9         having been perviously sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. MAINIGI:

12   Q.  Good morning, Mr. Kitashima.

13   A.  Good morning.

14   Q.  Could you pull your binder back out, please, sir.  And turn

15   to DX 28.

16          What is DX 28, please?

17   A.  This is a presentation that was made to update Central

18   Fulfillment.

19   Q.  I'm sorry.  To update Central Fulfillment?

20   A.  To update NCA Central Fulfillment dated September 27, 2007.

21   Q.  Did you have a role in the Central Fulfillment process?

22   A.  Yes.

23   Q.  Did the individuals that reported in to you play a role

24   with the Central Fulfillment process?

25   A.  Yes, most certainly.

DA93BAN1                    Kitashima - direct

1   Q.  What was the goal of Central Fulfillment?

2   A.  It was to centralize processing resources on to specific

3   teams to facilitate efficient communication and handling of

4   processing of loans.

5           MS. MAINIGI:  Your Honor, I ask that DX 28 be

6   admitted.

7           MR. ARMAND:  No objection.

8           THE COURT:  Received.

9           (Defendant's Exhibit 28 received in evidence)

10  Q.  Take a look at page four.

11          MS. MAINIGI:  Alex, if you could blow up that chart or

12  the picture that's right there.

13  Q.  Mr. Kitashima, could you describe for us what that is in

14  relation to Central Fulfillment.

15  A.  It is actually an org chart for the team which was part of

16  the Central Fulfillment organization.

17  Q.  LS/UW.  What does that signify on the team?

18  A.  Those are processors that had certain underwriting

19  capabilities, authority.

20  Q.  Were there within Central Fulfillment any loan specialists

21  that had prior underwriter training?

22  A.  Certainly.  Those underwriters -- those loan specialists

23  may have even been former underwriters who had transitioned

24  over to loan specialists.  But, for the most part, they had

25  some initial underwriting training and experience.

DA93BAN1                           Kitashima – direct

1   Q.   Why did some underwriters transition over to loan

2   specialists?

3   A.   Well, I think there was a number of reasons.  One of which

4   had to do with the fact that we were moving from a subprime

5   based market to a prime based market, and the need for

6   underwriters, especially junior underwriters or underwriters

7   who had just gotten into our organization, they could see that

8   the thrust was going to be more towards prime.  And thus, the

9   jobs for prime –– on the prime side of the business was much

10  more attractive from a longevity standpoint.

11          MR. ARMAND:  Objection.  Move to strike the last

12  statement about characterizing ––

13          THE COURT:  Yes, the jury will disregard the last

14  part.

15  Q.   Mr. Kitashima, underwriting support in this org chart, what

16  function did that group play?

17  A.   Underwriting support provided additional authority for

18  loans that fell outside of the responsibility of the loan

19  specialist slash underwriters.  They also provided training

20  support to individuals in Central Fulfillment.  And they act as

21  a liaison between Central Fulfillment teams and the

22  underwriting organization.

23  Q.   This structure within Central Fulfillment, Mr. Kitashima,

24  did you approve this structure?

25  A.   Yes.

DA93BAN1                         Kitashima – direct

1    Q.  Was the High-Speed Swim Lane -- we can take that off the

2    screen.

3            Was the High-Speed Swim Lane the only work flow within

4    Central Fulfillment?

5    A.  No, it was not.  High-Speed Swim Lane, as I testified

6    earlier, was reserved for just the very best quality loans.

7    Those that did not meet those high standards were processed in

8    another work flow within Central Fulfillment.

9    Q.  Let me interrupt you, Mr. Kitashima.  Can you describe how

10   many other work flows were there?

11   A.  There was at least two others beside the High-Speed Swim

12   Lane.

13   Q.  At a high level, could you describe those two work flows

14   for me, please.

15   A.  Yes.  Those involved prime loans that did not meet the

16   qualifications of the High-Speed Swim Lane, and potentially

17   even subprime loans were processed by Central Fulfillment.

18   Q.  Did those work flows involve loan processors or

19   underwriters at the cleared to close stage?

20   A.  Underwriters at the cleared to close stage.

21   Q.  Mr. Kitashima, as head of credit and compliance for Full

22   Spectrum, did you assess the quality of the loans being

23   processed through Full Spectrum?

24   A.  Yes.

25   Q.  At the time you approved Central Fulfillment, did you think

DA93BAN1                          Kitashima - direct

1   it would produce poor quality loans?

2           MR. ARMAND:  Objection.

3           THE COURT:  Ground?

4           MR. ARMAND:  Calls for opinion, your Honor.

5           THE COURT:  No, it calls for his state of mind, which

6   in the case of this particular witness, is in dispute.

7   Overruled.  You may answer.

8   Q.  Do you need me to --

9           At the time you approved Central Fulfillment, did you

10  think it would produce poor quality loans?

11  A.  Absolutely not.

12  Q.  Did Central Fulfillment produce poor quality loans?

13  A.  Absolutely not.

14  Q.  Take a look, Mr. Kitashima, at DX 73 which is an admitted

15  document on the inside of your binder I believe, sir.  Do you

16  have it in front of you?

17  A.  Yes, I do.

18  Q.  Can you identify DX 73 for us, please.

19  A.  Yes.  It is a report that was produced by corporate risk

20  management and quality that reports the severely unsat

21  percentages for each of the divisions within Countrywide.

22  Q.  Let me back up.  How was loan quality measured within

23  Countrywide?

24  A.  For all practical purposes, by this report.  This is the

25  main standard by which quality is measured in Countrywide.

1  Q.  Did you review these types of reports in your role as head

2  of credit and compliance for Full Spectrum, sir?

3  A.  Yes, I did.  It was very, very important to me.

4  Q.  Let's focus on FSL and let's take a look at the last

5  quarter of 2007 and the first two quarters of 2008, please.

6  A.  Okay.

7          MS. MAINIGI:  Alex, we're going to go across for FSL.

8  Thank you.

9  Q.  Now, you mentioned a severely unsatisfactory -- the term

10  severely unsatisfactory.  Could you define that for us, please.

11  A.  These were deemed -- these were determined as a result of

12  corporate audits, both random and targeted audits, on business

13  that was produced in that particular month.  And they were

14  deemed as a defect such that it was probably not salable to

15  GSEs and other investors.

16  Q.  The first quarter that Central Fulfillment was rolled out,

17  what was the severely unsatisfactory rate, Mr. Kitashima?

18  A.  The first quarter would have been quarter 4 2007 in blue.

19  And the severely unsat rate was 5.4 percent for that quarter.

20  Q.  What was your assessment of that number?

21  A.  I thought it was -- well, certainly not perfect, and room

22  for improvement.  It was acceptable, considering the change

23  that we were going through.

24  Q.  What was the second quarter that Central Fulfillment was in

25  existence, Mr. Kitashima?

DA93BAN1                         Kitashima - direct

1    A.  That would be the first quarter of 2008 in orange.

2    Q.  What was the SUS rate for that quarter, sir?

3    A.  It rose to 9.8 percent.

4    Q.  What was your assessment of this number?

5    A.  Well, I think the definitely the markets were changing.

6    There was a higher emphasis on ensuring that no loans were

7    being produced outside of the guidelines and quality.  You will

8    note that the amount of audits in Q1 2008 rose to 1742 audits,

9    versus 408 audits in 2000 -- Q4 2007.  So there was definitely

10   more focus, more emphasis on these audits, and we were

11   experiencing higher --

12              MR. ARMAND:  Objection.  Narrative, your Honor.

13              THE COURT:  Yes.  Now, there was no objection to the

14   question, which was a bit broad.  But I agree this is beyond

15   the scope of the question.

16              The question was what was your assessment of this

17   number, namely 9.8 percent.

18              THE WITNESS:  It was elevated.

19              THE COURT:  All right.

20   Q.  Let me ask you another question, Mr. Kitashima.  With

21   respect to the number of audits, if we take a look at those two

22   numbers, do you have an understanding, Mr. Kitashima, as to why

23   the number of audits increased from 408 to 1,742?

24   A.  I recall --

25              MR. ARMAND:  Objection.  Foundation.

1          THE COURT:  The immediate question was do you have an

2    understanding as to why the number of audits increased from 408

3    to 1,742.  I think that's a yes or no question.

4          Do you have an understanding?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Is that understanding based on

7    personal knowledge?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  Then you may answer the

10   implicit explanation, which is, what was your understanding?

11         MS. MAINIGI:  Thank you, your Honor.

12   A.  We were advised by corporate QC that the number of audits

13   would increase, and the focus of those audits would increase.

14   Both, in terms of numbers, as well as changing the actual audit

15   plan.

16         MR. ARMAND:  Objection, your Honor.  Hearsay.

17         THE COURT:  Sustained.  I'm sorry I didn't make clear

18   what I meant by personal knowledge.  This is what you're being

19   told by someone else.  Sustained.

20   Q.  Mr. Kitashima, let's take a look at the second quarter of

21   2008.  What was the SUS rate for the second quarter of 2008?

22   A.  That would be in green, 4.4 percent.

23   Q.  As head of credit and compliance for Full Spectrum Lending,

24   what was your assessment of that number?

25   A.  It was very, very positive.

1    Q.   Why is that?

2    A.   Because the actions that we were taking to address the

3    higher quality ratings, or I should say the lower quality

4    ratings in Q3 and Q1, were taking effect.  They were having an

5    impact, and our quality was improving.

6    Q.   Were there actions you and your group were taking in

7    Q4 2007 forward to improve quality?

8    A.   Absolutely.

9    Q.   What type of actions did you take, Mr. Kitashima, at a high

10   level?

11   A.   At a high level, we were addressing the audit issues, and

12   instituting additional changes to our work flow.  We had

13   assignment changes.  I believe during that period of time, we

14   made a change to involve underwriters more frequently in the

15   process to ensure steps were not being missed or that the

16   functions were being performed properly.  As I stated, this was

17   the main measure of quality.

18            MR. ARMAND:  Objection.  Narrative.

19            THE COURT:  Sustained.

20            MS. MAINIGI:  Your Honor, may I approach?

21            THE COURT:  Yes.

22   Q.   Mr. Kitashima, I have put DX 58 and DX 61 in front of you.

23   Both documents have been previously admitted.  DX 58.  Let's

24   put that on the screen, please.

25            What is this document, Mr. Kitashima?

1    A.  It is a bulletin that went out broadly to all FSL Full

2    Spectrum Lending employees.

3    Q.  What is the date of this document?

4    A.  March 17, 2008.

5    Q.  What is the significance of this document, Mr. Kitashima?

6    A.  Well, it announced updated procedures for income

7    reasonability, and this was an area of concern from the

8    standpoint of making sure that these types of loans had the

9    appropriate review.

10   Q.  What specifically was done with respect to the assessment

11   of income reasonability procedures?

12   A.  We involved underwriting.  We involved -- underwriting was

13   now responsible for determining the income reasonability.

14   Q.  Is that as of the date of this bulletin, Mr. Kitashima?

15   A.  Yes.

16   Q.  Now let's take a look at DX 61.  Could you tell us what

17   that is, please, sir.

18   A.  This is another bulletin announcing near cleared to close

19   processes for field offices and Central Fulfillment teams.

20   Q.  As of what date, sir?

21   A.  April 25, 2008.

22   Q.  What change was made in regard to this bulletin?

23   A.  This was a change that required underwriters to review all

24   items on the cleared to close checklist prior to clear to

25   close.  And once the clear to close was issued, uploading a

1  copy of the clear to close process to VLF, which is a virtual

2  loan file.  And requiring underwriters to sign off on clear to

3  close.

4  Q.  Did you approve both of these changes, Mr. Kitashima?

5  A.  Yes, I did.

6  Q.  Were these the types of changes that you were referring to

7  earlier?

8  A.  Yes.

9  Q.  Were there other types of changes that were also affected

10  during this time period, Mr. Kitashima?

11  A.  Yes.  There was.

12  Q.  Why did FSL affect changes of the type reflected in DX 58

13  and 61 to your understanding as head of credit and compliance

14  for FSL?

15            MR. ARMAND:  Objection, your Honor.

16            THE COURT:  Ground?

17            MR. ARMAND:  Foundation, speculation.

18            THE COURT:  Well, sustained.  You may be able to lay a

19  better foundation.

20  Q.  Mr. Kitashima, you were head of credit and compliance for

21  Full Spectrum Lending during this time period, correct?

22  A.  Yes.

23  Q.  In that position, did you have a significant role in the

24  management of risk?

25  A.  Yes.

1   Q.  Did you have a significant role in the management of

2   bulletins of the type that we have just looked at?

3   A.  Yes.

4   Q.  Do you have an understanding as to why the changes that

5   were in bulletins DX 58 --

6           THE COURT:  Forgive me, counsel.  Did you have a role

7   in affecting these changes?

8           THE WITNESS:  Yes.

9           THE COURT:  What was that role?

10          THE WITNESS:  To review the value and gain a total

11  understanding of the impact it would have on quality.

12          THE COURT:  With that foundation, the objection is

13  overruled.  Go ahead, counsel.

14          MS. MAINIGI:  Thank you, your Honor.

15  Q.  Mr. Kitashima, why were changes of the type reflected in DX

16  58 and 61 affected?

17  A.  Well, as I stated earlier, during this period of time,

18  quality standard were being raised significantly in the

19  marketplace.  Things were changing, we were held to a higher

20  standard of quality, and I wanted to ensure that Full

21  Spectrum's business was going to be acceptable for purchase and

22  sale to investors and GSEs.

23  Q.  You can set those documents aside, Mr. Kitashima.

24          Mr. Kitashima, in your role as chief credit and

25  compliance officer for FSL, did you have interaction with

1    Fannie or Freddie?

2    A.   Not on a normal basis, no.

3    Q.   Did you have any involvement in the sale of loans to Fannie

4    or Freddie?

5    A.   No.

6    Q.   Did you have any involvement in the rep and warrant process

7    related to Fannie or Freddie?

8    A.   No.

9    Q.   In your time as chief credit and compliance officer, did

10   you ever meet with someone from Fannie or Freddie?

11   A.   Yes, I did.

12   Q.   When was that, Mr. Kitashima?

13   A.   Sometime in 2007, I believe.

14   Q.   If you could pull out DX 4036, please, sir.  This is a

15   document already in evidence.  It may be in your side pocket,

16   sir.

17   A.   Okay.

18   Q.   If you don't have a copy, I have another one here.

19   A.   Got it.

20   Q.   Does this presentation relate to the meeting that you

21   referenced?

22   A.   Yes.

23   Q.   What is the date of the presentation?

24   A.   September 12, 2007.

25   Q.   How does that date relate to the High-Speed Swim Lane

1   implementation?

2   A.  We had just started it.  It was just at the very beginning

3   of the High-Speed Swim Lane days.

4   Q.  If you remember, can you tell us how this meeting came

5   about?

6   A.  We were contacted by corporate risk, advising us that

7   Freddie was going to be out to make reviews, not just with Full

8   Spectrum but for other divisions as well.  And that they

9   requested that we prepare a high-level review of our

10  operations.

11  Q.  Did you make this presentation in person, sir?

12  A.  Yes.  I did.

13  Q.  Was anyone else from Countrywide present for this

14  presentation besides yourself?

15  A.  No.  Not that I recall.

16  Q.  Was there anyone that attended from Freddie Mac?

17  A.  Yes.

18  Q.  Who attended from Freddie Mac, I should say.

19  A.  Yes.  Two other people, I don't know their -- I don't

20  remember their names.  But two other people.

21  Q.  If we can take a look at page 10, please, sir.

22  Mr. Kitashima, did you have a role in putting this presentation

23  together for the purpose of this meeting?

24  A.  Yes, I did.

25  Q.  Taking a look at the section on CLUES on page 10, what did

1    you intend to communicate to Freddie on this page regarding

2    CLUES?

3    A.  Well, that we were using CLUES 100 percent of the time.

4    CLUES was our underwriter.  That it was a system that was --

5    had been in use for several years, 1993.  And basically what

6    CLUES did, to analyze and provide decisions, either accept or a

7    recommendation to refer to an underwriter for further review.

8    Q.  Please turn to page 16.  I'm sorry.  Sir, let's turn to

9    page 13, first.

10           MS. MAINIGI:  If we can blow up the section on

11   centralized platform, please.

12   Q.  What did you intend to communicate to Freddie on this page

13   with regards to Central Fulfillment Mr. Kitashima?

14           MR. ARMAND:  Objection, your Honor.  The document

15   speaks for itself.

16           THE COURT:  Sustained.

17   Q.  Mr. Kitashima, could you please read the section on

18   centralized platform moving to central operations fulfillment

19   out loud.

20   A.  "Centralized platform moving to central operations

21   fulfillment.  Supports all FSL production channels, retail

22   branch, new customer acquisitions, national sales centers.

23   Central operations teams are located in three centers,

24   Chandler, Richardson, Rolling Meadows, and support national

25   sales centers.  Regional operations centers being built to

1  support field branch network.  Dedicated training staff

2  supports new hire on boarding and continuing education and

3  authority certification.  Policy and procedure enhancements are

4  managed and communicated via central bulletin database and

5  notification process."

6  Q.  What was the date approximately that FSL moved to the

7  Central Fulfillment platform to your recollection?

8  A.  September, October timeframe.  We were in the process of

9  doing that.  So this is what that was communicating, that we

10 were letting them know that we were developing a Central

11 Fulfillment model.

12 Q.  You can turn to page 16, please, sir.

13      MS. MAINIGI:  Alex, if we can blow up under

14 underwriting controls, quality controls.

15 Q.  Mr. Kitashima, if you could read what is under quality

16 control out loud, please, sir.

17 A.  "Underwriting authority levels are assigned based upon

18 position and underwriting experience.  Monthly quality rating

19 is assigned to underwriters, middle and senior underwriting

20 managers, etc.  Loan files are assigned based upon individual

21 underwriter authority level and file type.  Authority matrix

22 requires escalation for guideline exceptions based upon signing

23 authority.  See appendix.  Exception approval process completed

24 electronically capturing approver and specific exception type.

25 Condition sign off process completed electronically, and clear

1    to close is issued once all underwriting conditions have been

2    properly cleared.  Corporate risk management completes regular

3    random and targeted audits."

4    Q.  Is this consistent with your understanding of quality

5    control as it related to underwriting at the time at FSL?

6    A.  Yes, it does.

7    Q.  Now turn to page 20, please.  What is that page titled,

8    sir?

9    A.  Quality assurance and control QAC.

10   Q.  Let's divide this up.  Let's take first the section on

11   quality assurance, please.  If we can blow that up.

12           Before we get there, Mr. Kitashima, what was the

13   quality assurance process?

14   A.  It was to measure the effectiveness of process in the

15   organization.

16   Q.  Was a quality assurance process in place at this point in

17   September 2007?

18   A.  Yes.

19   Q.  Could you please read the bullets under quality assurance.

20   A.  "Prefunding review of loans within the manufacturing

21   process.  Earlier alerts to SOP, or standard operating

22   procedure, adherence.  Selection of loans after loan has been

23   documents registered for closing."

24   Q.  Is that "requested," sir?

25   A.  Document requested, sorry, for closing.  "Provides

1    opportunity to correct the missing document prior to funding."

2    Q.  Was this description of quality assurance consistent with

3    your understanding of quality assurance at the time?

4    A.  Yes, it was.

5    Q.  Let's go to the quality control section, right underneath

6    it, please.  Was quality control, is that the chart we looked

7    at before, Mr. Kitashima?

8    A.  Yes, it was.

9    Q.  Could you read to us what was written here, please.

10   A.  "Post-funding review.  Corporate completes the random and

11   targeted audits.  Investor kick outs are reviewed for

12   compliance and best practices.  Results are reported and used

13   toward making adjustments due to compensation and disciplinary

14   issues.  Each finding is categorized.  SUS, high risk, limited

15   risk, etc."

16   Q.  Was this description consistent with your understanding,

17   Mr. Kitashima?

18   A.  Yes, it was.

19   Q.  Let's turn to the appendix, please, sir, which I believe is

20   at page 26.

21           I don't know how much we can blow that up or not,

22   Alex.

23           But Mr. Kitashima, what is this chart that's here?

24   A.  It is a chart of underwriting controls for centralized

25   servicing or Central Fulfillment.  It is a quality control and

1   underwriting authority matrix.

2   Q.  Was this matrix in use at FSL during this time period, to

3   your knowledge?

4   A.  Yes, it was.

5   Q.  What was it used for?

6   A.  It was used to communicate what types of underwriting

7   related issues had to be reviewed by what authority level.  So

8   authority levels were attached to characteristics of loans.

9   Q.  So, would a riskier loan be reviewed by a certain authority

10  level?

11          MR. ARMAND:  Objection.

12          MS. MAINIGI:  Withdrawn.

13  Q.  Can you provide me with an example, Mr. Kitashima.

14  A.  For example, higher risk characteristics would require a

15  higher level of authority.

16  Q.  Can you provide me with an example of what a higher risk

17  characteristic might be?

18  A.  Well, if you just take the first box, risk tier level, you

19  can see as the risk tier levels go up, which means higher risk,

20  you can see that the requirement for a higher underwriting

21  level goes up as well.

22  Q.  What about dollar amount of the loan, Mr. Kitashima, is

23  that or is that not a risk characteristic?

24  A.  Yes.  I think that's the box right beneath that.  So,

25  likewise, you can see as the dollar amount of the loan

DA93BAN1                    Kitashima – direct

1   increases, the requirement for a higher level underwriting

2   would also increase.

3   Q.  To your knowledge, would the higher level underwriting also

4   come with any sort of increased training or would it not?

5   A.  Certainly.  Training and/or experience.

6   Q.  You can look under matrix notes, and I'm not sure how clear

7   it will be to read.

8   A.  I can't read the paper copy, that's for sure.

9   Q.  There we go.  I think Alex was able to blow that up.  How

10  many underwriter authority levels were there associated with

11  this chart?

12  A.  At that time there were six levels.

13  Q.  Is that consistent with your recollection at the time?

14  A.  Yes.

15  Q.  If you take a look at level one.  Could you read that out

16  loud, please.

17  A.  "Associate underwriter with less than one year on the job

18  or time in the industry.  Level one also includes CLUES accept

19  loan specialist branch operations manager."

20  Q.  Level one, was that the lowest level?

21  A.  Yes.

22  Q.  Can you tell us what that description means.

23  A.  Well, it means that to have this level, you must have at

24  least a year on the job or time in the industry, or hold the

25  title of loan specialist or branch operations manager to have

1   that authority level.

2   Q.  Thank you, Mr. Kitashima.  If you can turn to page 27,

3   which is the second page of the appendix, sir.  And if you

4   could identify that type of document, please.

5   A.  It is entitled "Underwriting Controls Centralized Services

6   Quality/Condition Sign Off Authority Matrix."

7                  (Continued on next page)

1   BY MS. MAINIGI:

2   Q.  What is a condition sign off authority matrix, to your

3   understanding?

4   A.  It defines what people with authority level can do, can

5   approve.

6   Q.  So am I reading this correctly that there are four

7   authority levels that are indicated here?

8   A.  Yes.

9   Q.  What is the first authority level?

10  A.  The first authority level is level one.

11  Q.  That's CSO1?

12  A.  Yes.

13  Q.  What's the second authority level?

14  A.  CSO2.  This is a condition signing authority, it's a

15  condition signing authority matrix.  So once the loan has been

16  approved, as I testified yesterday, there are conditions that

17  come with that approval.  So this is a matrix that addresses

18  the ability for loan specialists particularly to sign off on

19  each of these conditions.  So that's what the different CSOs

20  are.

21  Q.  And the third CSO level, sir?

22  A.  The third CSO level is PCA/HSSL, which means High-Speed

23  Swim Lane.

24  Q.  That's the fourth one, right?

25  A.  Yes, you were talking about the third one?

1    Q.  Sorry, the prime CLUES accept, the third one.

2    A.  The third one is for PCA.

3    Q.  Was that the work flow you referenced yesterday?

4    A.  Yes, it was.

5    Q.  And then the fourth one, sir, if could you read at that

6    again?

7    A.  That was for High-Speed Swim Lane, HSSL.

8    Q.  And that was a work flow in effect at FSL at that point in

9    time?

10   A.  Yes, we wanted to inform the --

11            MR. ARMAND:  Objection.

12            THE COURT:  Sustained.

13   Q.  To your understanding, Mr. Kitashima, this condition sign

14   off authority document which contains HSSL, was that provided

15   to Freddie?

16   A.  Yes, it was.

17   Q.  Please turn to DX729.

18   A.  OK, I have it.

19   Q.  Can you identify this document, please?

20   A.  This is a presentation that was prepared for a site review

21   by Fannie Mae dated December 13, 2007.

22   Q.  Who prepared this presentation, to your knowledge,

23   Mr. Kitashima?

24   A.  It was prepared by those -- by individuals working for me

25   under my direction.

1   Q.  Do you know whether this presentation bears any similarity

2   to the Freddie presentation we just reviewed?

3           MR. ARMAND:  Objection, document speaks for itself.

4           THE COURT:  Sustained.

5   Q.  Are you familiar with this presentation, Mr. Kitashima?

6   A.  Yes, I am.

7           MS. MAINIGI:  Your Honor, I ask that DX729 be

8   admitted.

9           MR. ARMAND:  No objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit 729 received in evidence)

12  Q.  FNMA site review stands for what Mr. Kitashima?

13  A.  Fannie Mae, the government sponsor.

14  Q.  And the date of that presentation is what, sir?

15  A.  December 13, 2007.

16  Q.  You can set that aside for now, please.

17          Mr. Kitashima, did the quality assurance group report

18  up to you?

19  A.  Yes.

20  Q.  And when did the quality assurance process as it existed in

21  the September '07 time period, when did that come into

22  existence, to your recollection?

23  A.  I would say early summer of 2007.

24  Q.  What was the objective of the quality assurance audits that

25  were conducted by the QA group?

1    A.   Its primary and only purpose was to measure process, how

2    the process was being executed.

3    Q.   And by "process," what do you mean, sir?

4    A.   Meaning once the loan has been approved, the steps that

5    were involved between the approval and funding, it went through

6    a process generally done by a loan specialist.   And our quality

7    assurance was really trying to determine whether they were

8    following the process and making sure that all of the steps

9    were being done properly.

10   Q.   Were the quality assurance audits related in any manner to

11   the corporate quality control audits?

12   A.   Not at all.

13   Q.   Was the quality assurance process required by Fannie or

14   Freddie, to your knowledge?

15   A.   No, they were not.

16          MR. ARMAND:   Objection.

17          THE COURT:   Sustained.

18   Q.   Were the quality assurance -- was the quality assurance

19   process required by corporate management to your knowledge as

20   head of credit and compliance at FSL, Mr. Kitashima?

21          MR. ARMAND:   Objection.

22          THE COURT:   Ground?

23          MR. ARMAND:   Foundation.

24          THE COURT:   No, not this one.   Overruled.

25   A.   No, it was not required by corporate quality and risk

1   management.

2   Q.  Did you receive copies of the quality assurance audits on a

3   regular basis, Mr. Kitashima?

4   A.  Yes, I did.

5   Q.  Please turn to DX537, sir.

6   A.  OK.

7   Q.  What is this document, sir?

8   A.  It's an overview and update of the central fulfillment

9   initiative dated December -- September 2007.

10  Q.  Is it a QA audit?

11          MR. ARMAND:  Objection, leading.

12          THE COURT:  It is, but I'll allow it.  Overruled.

13  A.  It's not an audit itself, it's a review of the findings of

14  audits.

15  Q.  Thank you, sir.  Turn to page 3, please.

16          MS. MAINIGI:  Your Honor, I ask that DX537 be

17  admitted.

18          MR. ARMAND:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 537 received in evidence)

21  Q.  Now this says QA PC3.  What is PC3?

22  A.  PC3 stands for phase code three, which is a designation

23  given on where a loan is, and in this particular case, PC3 is

24  prior to funding, it's before documents are drawn and the loan

25  closed, before that.

1    Q.  Is there another phase code after phase code three?

2    A.  Yes, phase code four, which is funding.

3    Q.  Is that the last phase code?

4    A.  In the process, yes.

5    Q.  Now when -- what the date?  Can you tell when this was

6    prepared?

7    A.  It looks like October 8, 2007.

8    Q.  Now if we take a look at page 3, please, sir, the term high

9    risk is used there.  Do you see that?

10   A.  Yes.

11   Q.  Did you have an understanding as to what that term meant in

12   this context?

13   A.  Yes.

14   Q.  Could you explain, please?

15   A.  Yes, these had to do with fundings of where we felt some

16   action would be necessary from a process standpoint, meaning it

17   was an evaluation of the quality of the process.

18   Q.  Did high risk have any relationship to the quality of the

19   loan?

20   A.  No.

21   Q.  Do you know what the term "investment quality" means,

22   Mr. Kitashima?

23   A.  Yes.

24   Q.  Did the term "high risk" relate to the term "investment

25   quality" in any manner?

1    A.  Not at all.

2    Q.  The findings that are included on this page, what did you

3    understand these findings to mean?

4    A.  It meant that we were receiving findings that indicated

5    that there was some evaluation or investigation into what was

6    happening with the process on findings that were included in

7    the report.

8    Q.  At the time that you received these reports, did you have a

9    concern that the HSSL pilot was producing loans that were of

10   poor quality?

11   A.  Absolutely not.

12   Q.  Why not?

13   A.  Because this report does not -- is not an indication of

14   quality from the standpoint of an investment grade, it's really

15   to determine whether the process was being followed.  It was a

16   new process for people, so that's why it was a pilot.  So we

17   wanted to make sure that they understood their jobs and they

18   did what they were doing -- what they were supposed to do as

19   outlined by the work flow.  So it was more process, it was all

20   process.

21   Q.  You can set that to the side, please.

22           If you could turn, please, to DX963.

23   A.  OK.

24   Q.  What is this document, sir?

25   A.  It's another review of QA procedural reaudits, phase code

1   four.

2   Q.  Did this document also come out of your quality assurance

3   group, sir?

4   A.  Yes, it did, March 19, 2008.

5           MS. MAINIGI:  I ask that DX963 be admitted.

6           MR. ARMAND:  Sorry, this exhibit is missing from the

7   binder.

8           MS. MAINIGI:  I'm sorry.  Let me get you another copy.

9   Q.  Do you have it in your binder?

10  A.  Yes, I do.

11          MR. ARMAND:  Thank you.

12          MS. MAINIGI:  Your Honor, do you have that exhibit?

13          THE COURT:  Yes.  Would you like --

14          MR. ARMAND:  No objection.

15          THE COURT:  You have it now?

16          MR. ARMAND:  I do.

17          THE COURT:  Received.

18          (Defendant's Exhibit 963 received in evidence)

19  Q.  Take a look at the summary page on page 3, please.

20          MS. NAWADAY:  Let's blow up that top bullet with a

21  couple of bullets underneath it, please.

22  Q.  Mr. Kitashima, could you read that out loud, please?

23  A.  The leading cause of findings for each question accounted

24  for the following percentage of all findings.  Leading cause of

25  findings, page 3, red boxes.  Document not in VLF,

 1   56.57 percent of finding.  Document in correct location in VLF,

 2   43.43 percent of findings.

 3   Q.  What did you understand this to mean, Mr. Kitashima?

 4   A.  Well, in the first instance what it meant is the document

 5   was in the paper file but had not been transferred to the

 6   virtual loan file.

 7   Q.  And that's what --

 8   A.  It's a process-related finding only.

 9   Q.  VLF is virtual loan?

10   A.  Virtual loan file, yes.  A requirement or step was to

11   convert the paper file to a virtual loan file or the computer

12   file, if you will, and in 56 percent of the time the findings

13   related to that.

14        In 43 percent of the time the document was in the

15   right place in the VLF, so I -- so that was an error, this

16   basically was an error by the auditor when they initially did

17   the audit.  So in 43 percent of the time it was in an auditor

18   error rather than loan specialist or someone who was actually

19   doing --

20        MR. ARMAND:  Objection, your Honor, non-responsive.

21        MS. MAINIGI:  I believe, your Honor, I asked him what

22   that meant.

23        THE COURT:  I think the question was:  VLF is virtual

24   loan?  And the answer was:  Virtual loan file, yes.

25        And then --

1             MS. MAINIGI:  I can ask the question again.  I think

2      he was still answering the prior question, your Honor.  Let me

3      ask the question again.

4      Q.  Document in correct location in VLF, 43.43 percent of

5      findings.  Explain to us briefly, Mr. Kitashima, what that

6      means.

7      A.  That just means that the document was in the right place at

8      the right time in 43 percent of the cases.  So that means that

9      was an audit error.

10     Q.  And by audit error --

11     A.  The original --

12     Q.  -- what do you mean?

13     A.  I think the original audit reflected the fact that it was

14     not in the right place, it was not in VLF, so 43 percent of the

15     times the reaudit revealed that it was.

16     Q.  These are the quality assurance audits, Mr. Kitashima, that

17     you're referring to?

18     A.  Yes.

19     Q.  You can set that document aside, sir.

20             Please turn to DX639.

21     A.  OK.

22     Q.  What is this document, sir?

23     A.  This is an email from Scott Bridges to myself and Rebecca

24     Mairone, with a copy to Wade Comeaux, reporting on his visit to

25     one of our sales centers in Rosemead, California, dated

```
 1   November --
 2   Q.  What's the date of the email?
 3   A.  Dated November 16, 2007.
 4   Q.  Please read out -- excuse me.
 5           MS. MAINIGI:  Your Honor, I ask that DX639 be
 6   admitted.
 7           MR. ARMAND:  No objection.
 8           THE COURT:  Received.
 9           (Defendant's Exhibit 639 received in evidence)
10           MS. MAINIGI:  Go to page 2, please, Alex.  And if we
11   could blow up the letter A under 2.
12           Actually I'm sorry, let me backtrack, I apologize.
13   Let's blow up the first paragraph first.
14   Q.  Could you read that out loud, Mr. Kitashima?
15   A.  Yesterday Greg and I visited Rosemead to conduct the town
16   hall meeting.  After the meeting, we spent a few hours with
17   Sean Welcher and Adela to review the state of the central
18   fulfillment union.  Here's some of the key take aways from the
19   meeting that we need your clarity on.  I reviewed some of this
20   with Wade already.
21   Q.  Now Rosemead -- was Rosemead one of the centers that had
22   central fulfillment in place at this point of time in November?
23   A.  Yes.
24   Q.  Adela, do you know who that is referencing?
25   A.  Yes, I know who Adela was.
```

1   Q.  Let's go down to the letter A under 2, if could you read at
2   that out loud, please.
3   A.  The OMs and LSs are getting pounded by quality assurance
4   audits to the degree that they are being nailed with an
5   80 percent default rate.  Adela takes exception to the
6   miniscule levels of data (a missed checked box) being flagged
7   by this group, and in essence says the OPS staff is scared
8   straight they will make a mistake, and are therefore triple and
9   quadruple checking everything.  This is adding major lag time.
10  Q.  Do you recall whether you were receiving other similar
11  reports in this time period?
12  A.  Yes.
13  Q.  Can you describe the issue?
14  A.  Well --
15          MR. ARMAND:  Objection, calls for a narrative, your
16  Honor.
17          THE COURT:  Sustained.
18  Q.  Briefly describe the particular issue that you were
19  receiving reports on, Mr. Kitashima.
20  A.  The QA audits were being done and producing results that,
21  while accurate, seemed to be irrelevant to the overall process.
22          MR. ARMAND:  Your Honor, move to strike as opinion.
23          THE COURT:  Sustained.
24  Q.  Mr. Kitashima, could you please describe briefly the
25  particular issue that you were receiving reports on as it

1   related to the QA audits, just the issue.

2   A.   Some of the findings of the audits did not add to the

3   objective of analyzing processing.

4   Q.   Were the loan processors at Rosemead the line employees?

5   Is that what is referenced as line employees?

6   A.   Yes.

7   Q.   Were there communications that were occurring at that point

8   in time between the QA auditors and the line employees?

9               MR. ARMAND:  Objection, leading.

10              I'll withdraw it, your Honor.

11              THE COURT:  I'll overrule it any way.

12              You may answer.

13  Q.   Were the QA auditors in communication with these line

14  employees at this point in time?

15  A.   Correct, yes.

16  Q.   Could you briefly describe how -- what was occurring in

17  that regard?

18              MR. ARMAND:  Objection, calls for hearsay, your Honor.

19              MS. MAINIGI:  I'm not asking for him to state what

20  anybody said, your Honor.

21              THE COURT:  Well, I'm not sure what the question is.

22  Q.   Mr. Kitashima, what issues were the QA employees

23  communicating with the line employees about, to your knowledge?

24              MR. ARMAND:  Objection, hearsay, your Honor, calls for

25  hearsay.

1          THE COURT:  Well, this is a variance on something what

2     came up yesterday when if what you are inquiring about is

3     whether certain issues were raised, in the sense of concern, so

4     that the conversations are not being offered for their truth

5     but just to flag what issues were brought to his attention,

6     that would be permissible because it would not offend the

7     hearsay rule.  But if, on the other hand, what you're offering

8     are conversations for the fact that certain things occurred or

9     out-of-court people reported to him that certain things

10    occurred and you're offering them for the truth, that is to say

11    for the fact they occurred, then that would offend the hearsay

12    rule.  So if you need a side bar I will give it to you, but

13    with that guidance maybe you can rephrase the question.

14         MS. MAINIGI:  Absolutely, and it was for the purpose

15    of the former, not the latter.

16         THE COURT:  So maybe the way to put it is in

17    communications between you and X, what concerns were raised,

18    something like that.

19         MS. MAINIGI:  That's fine, your Honor.

20    Q.  Mr. Kitashima, what concerns were raised in communications

21    between the QA auditors on the one hand and the line employees

22    on the other?

23    A.  That the findings had mixed value for the line employees.

24         THE COURT:  No, that I think is just what -- that's

25    not a concern, that's an assertion of a fact, so that is --

2010

DA9TBAN2                        Kitashima - direct

1   that would be stricken.  Put another question.

2   Q.  The line employees were raising -- did the line employees

3   raise issues with their team leads about the contact from the

4   QA auditors?

5   A.  Yes.

6   Q.  What was that issue they were raising?

7   A.  They were raising the issue that the amount of time they

8   were spending answering the QA's results was taking an

9   inordinate amount of time.

10  Q.  Did you agree with halting on a temporary basis the

11  distribution of QA results to line employees?

12  A.  Yes, I did.

13  Q.  Why?

14  A.  For this reason, that it was disrupting the flow of loan

15  processing.

16  Q.  Did QA results continue to get communicated to individuals

17  other than line employees, to your knowledge?

18  A.  Yes.

19          MR. ARMAND:  Objection, leading.

20          THE COURT:  Well, I'm going to allow it to move it

21  along.  The answer was yes.  Put another question.

22  Q.  Did you get the QA results, Mr. Kitashima?

23  A.  Yes, I did.

24  Q.  Take a look at DX670, please, sir.  Can you identify for us

25  what that email is, please?

1    A.  This is a response from me to Rebecca wherein she asks for

2    my input on communication that she was about to send out to her

3    organization, central fulfillment.

4            MS. MAINIGI:  Your Honor, I ask that DX670 be

5    admitted.

6            MR. ARMAND:  No objection.

7            THE COURT:  Received.

8            (Defendant's Exhibit 670 received in evidence)

9    Q.  Look at the date of the email, please.  What's the date of

10   the email, Mr. Kitashima?

11   A.  November 29, 2007.

12   Q.  Now if we could work backwards, since this is an email,

13   let's take a look at the email that she sent to you first in

14   red, if we could blow up that part.

15           Could you read that out loud, please Mr. Kitashima?

16   A.  Cliff, can you review and rewrite, where needed, the email

17   below?  Thanks.

18           MS. MAINIGI:  Alex, we could go to page 2 now, and

19   blow up the first paragraph.

20   Q.  What does that say, Mr. Kitashima?

21   A.  I have discussed with Greg and the Cliff the following

22   items and a change in process and direction.  The purpose of

23   these changes is to immediately impact the focus on funding

24   loans and working the pipeline, as well as streamlining the

25   processing requirements for prime loans.

1   Q.  Thank you.  Let's blow up number one.  If you could read

2   that out loud, please, sir.

3   A.  Number one, the QA communication to central fulfillment

4   will stop immediately, 11/29.  The communication will be

5   directed to Rebecca Mairone only for the next 30 days.  I will

6   meet with the compliance and quality group solely as we work

7   through the process, reporting and communication plan for the

8   fulfillment group -- central fulfillment group.  I will

9   determine, based on my meetings with compliance and QA groups

10  how and when we will update the CF or central fulfillment

11  management team and other CF employees as necessary.

12  Q.  Thank you.  And was that part of the email that Ms. Mairone

13  was looking for approval on from you, Mr. Kitashima?

14  A.  Yes.

15  Q.  Did you have any changes or edits to that section, as far

16  as you can tell from this email?

17  A.  It was just one minor change to that I made.

18  Q.  And that was?

19  A.  Item number four, being more specific on the checklist that

20  we were talking about.

21  Q.  Now if could you blow up the top comment, see my comments

22  in blue, please, if we could take a look at that.  That was

23  your response to Ms. Mairone, Mr. Kitashima?

24  A.  Yes.

25  Q.  You can set that document aside, sir.

1          Did you and your team make efforts to improve the

2     quality assurance process?

3     A.  Yes, we did.

4     Q.  Please turn to DX774.  DX774 is an admitted document.

5          If you could turn to page 4 of the document, sir.

6     What does this page indicate, Mr. Kitashima?

7     A.  It included some of the efforts we were making to improve

8     loan manufacturing quality.

9     Q.  Did these efforts relate to the QA process?

10    A.  Yes, they did.

11    Q.  And could you describe the efforts that are listed here,

12    could you -- let's blow it up.

13         If you could read simply the gray text.

14    A.  Provide most critical findings related to SUS to senior

15    management, central fulfillment, 262 reviews.  That was one

16    bullet.  Then the next bullet was branch fulfillment review

17    pilot, 135 reviews.

18    Q.  Let's go to January 2008, and let's walk through if you

19    could read for us what was being proposed at this point in time

20    for January 2008, please.

21    A.  Proposed launch of complete QA on-site reviews.  Pilot of

22    branch fulfillment QA OSR online reviews.  Reporting on current

23    loan manufacturing quality issues and trending.  And QA myth

24    busters newsletter.

25    Q.  You could set that document aside, Mr. Kitashima.

1          Turn next to, please, DX795.  What is that document,

2     Mr. Kitashima?

3     A.  This is a presentation regarding central fulfillment QA

4     mediation issues dated January 18, 2008.

5     Q.  Was that prepared by someone that reports to you or did

6     report to you?

7     A.  Yes.

8     Q.  What was the purpose of this document, to your

9     understanding, Mr. Kitashima?

10    A.  It was to communicate to the organization things that we

11    were seeing, issues that were being determined in the QA audits

12    and suggested remediation efforts.

13    Q.  If you could turn to page 8, please.

14          MS. MAINIGI:  Your Honor, I ask that DX795 be

15    admitted.

16          MR. ARMAND:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 795 received in evidence)

19          THE COURT:  Counsel, we need to find a stop in the

20    next few minutes to give the jury the mid-morning break.

21          MS. MAINIGI:  Yes, your Honor, I should be done with

22    this document momentarily.

23          THE COURT:  OK.

24    Q.  CF QA remediations, page 8.  Mr. Kitashima, please review

25    for us some of the solutions that are described there, please.

DA9TBAN2                    Kitashima - direct

1    A.  Yes, it was recommended that center coaches spot check --

2            MR. ARMAND:  Objection, your Honor, the document

3    speaks for itself.

4            THE COURT:  Sustained.

5    Q.  Mr. Kitashima, under proposed solutions, could you read the

6    first bullet?

7    A.  Recommend that center coaches spot check a loan in phase

8    code three or phase code four for each LS to ensure that prime

9    income calculator is being completed.

10   Q.  To your understanding, was that one of the issues that was

11   found on the QA audit?

12   A.  Yes.

13   Q.  Could you read the second bullet, please?

14   A.  Recommend that center coaches spot check a reduced doc loan

15   in phase code three or phase code four for each LS for

16   reasonability.

17   Q.  Is that another issue that was found on the QA audits?

18   A.  Yes.

19   Q.  Could you read the next bullet, please?

20   A.  Central fulfillment quick advice that outlines the proper

21   process for all four items.  These should be reviewed by QA

22   group prior to distribution.  Funding should verify that all of

23   fraud detector is completed prior to doc draw.

24   Q.  And then the last two bullets, please, sir?

25   A.  Central fulfillment quick advices to address the additional

DA9TBAN2                      Kitashima - direct

1     issues identified on slide seven.  These should be reviewed by

2     QA group prior to distribution.  Coach from each center to

3     coordinate and conduct team meetings around the quick advices.

4     Review future QA findings to monitor progress.

5              MS. MAINIGI:  Thank you, Mr. Kitashima.

6              Now would be a good time, your Honor.

7              THE COURT:  So ladies and gentlemen, we'll take a

8     15-minute break.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  The witness can step down.  We'll see you

3    in 15 minutes.

4              Anything counsel needs to raise with Court?

5              How much more do you have on direct?

6              MS. MAINIGI:  I think I'm on track, your Honor, for

7    another 15, 20 minutes, then I'm done.

8              THE COURT:  Very good.

9              MR. JONES:  I wanted to hand up a revised deposition

10   designation for Anson Gong.

11             THE COURT:  OK.

12             Very good.  You're all excused.

13             (Recess taken)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Counsel.

3          MS. MAINIGI:  Thank you, your Honor.

4    BY MS. MAINIGI:

5    Q.  Mr. Kitashima, Mr. O'Donnell reported in to you, is that

6    correct?

7    A.  Yes.

8    Q.  Did Mr. O'Donnell ever tell you that he thought the loans

9    coming out of the High-Speed Swim Lane were poor quality?

10   A.  No.

11   Q.  Did Mr. O'Donnell ever tell you that he thought that loan

12   specialists were not qualified?

13   A.  No.

14          MR. ARMAND:  Objection.  Calls for hearsay, your

15   Honor.

16          THE COURT:  I don't think so.  I'm taking a wild

17   speculation that the answer of this series is going to be no,

18   no, no, no.  So there would be no hearsay involved.  Overruled.

19   Q.  Did Mr. O'Donnell ever express concern to you about loan

20   specialists determining the reasonability of income?

21   A.  No.

22   Q.  Did Mr. O'Donnell ever express concerns to you about the

23   sprint incentive?

24   A.  No.

25   Q.  Mr. Kitashima, earlier you mentioned that besides DX 58 and

1   61, there were other processes or improvements that had been

2   enacted in the spring of 2008, do you recall that?

3   A.  Yes.

4   Q.  Can you turn to DX 993, please sir.  And 993 is an admitted

5   document, Alex, so let's go ahead and put it up.

6           What is this document, Mr. Kitashima?

7   A.  It is a presentation entitled "FSL Loan Performance and

8   Quality Review" dated April 17, 2008.

9   Q.  Did you or someone underneath you prepare this

10  presentation, Mr. Kitashima?

11  A.  Yes.

12  Q.  I'm going to ask you to turn to pages 13 and 14, sir.

13  Let's start with 13.  It says "residential credit risk

14  committee."  Do you remember what that was?

15  A.  Vaguely.

16  Q.  Is that a corporate committee?

17  A.  I believe so, yes.

18  Q.  What is the title of this page, sir?

19  A.  "Fulfillment process corrective actions."

20  Q.  Could you read the first bullet, please.

21  A.  "FSL has identified eight areas for corrective actions in

22  the fulfillment process.  Resources.  12/07 added coaches in

23  Central Fulfillment group to address training and SOP execution

24  needs.  Income calculator.  December '07 implemented income

25  calculator for use on all full doc loans."

DA93BAN3                    Kitashima - direct

1    Q.  Let me stop you right there, Mr. Kitashima.  What is an

2    income calculator?

3    A.  It is an aid to help our loan specialists compute income.

4    Q.  Thank you.  Could you read the next bullet, please.

5    A.  "Job aid that guides LS or UW to input borrower income

6    information from pay stub or W-2 to determine income for use to

7    obtain CLUES decision.  Stated income worksheet.  1/08

8    implemented worksheets for use on stated income files.  Job aid

9    requires LS or underwriter to determine reasonability based

10   upon borrower's credit profile, employment, assets/reserves,

11   and income information from any CHL loan originated in prior 12

12   months.  Income reasonability training --"

13   Q.  Let me stop you there, Mr. Kitashima.  The reference to job

14   aids.  Does that mean job aids were put into place in both of

15   those areas?

16   A.  Yes.

17   Q.  Sorry.  Keep going.  "Income reasonable training," sir.

18   A.  "3/08 updated and launched income reasonability training.

19   All production and operations employees are required to

20   complete training in March."

21   Q.  The income reasonability.  Could you explain to us what

22   that means.

23   A.  Income reasonability was a step in processing that the

24   underwriter or qualified loan specialist would determine

25   whether a stated income was reasonable or not.

1    Q.   Thank you.  Next bullet, please.

2    A.   "Training provides detailed guidance on determining

3    reasonability of stated income and those documenting

4    decisions."

5    Q.   Thank you.  Let's go over to page 14, please, sir.  QoG

6    update.  If you can read the bullet underneath that.

7    A.   "1/08 implemented QoG update."  All the bullets?

8    Q.   Let me ask you about that.  What was your testimony, if you

9    recall yesterday, Mr. Kitashima, as far as how long QoG was

10   suspended?

11   A.   It was suspended for a period of -- from October 2007

12   through January 2008.

13   Q.   Is this indicating that QoG is now affecting compensation

14   again?

15            MR. ARMAND:  Objection.  Leading.  The document speaks

16   for itself.

17            THE COURT:  Sustained.

18   Q.   Mr. Kitashima, "implemented QoG update."  What does that

19   mean?

20   A.   That means the QoGs were being computed and implemented

21   into compensation plans.

22   Q.   Next bullet, please.

23   A.   "Production and operations employees incentive income is

24   negatively impacted by corporate QC findings, investor reject,

25   loan level deficiency, compliance SUS findings or responsible

1    lending findings.  LS and UW employees received monthly score

2    which impacts their individual incentive payout."

3    Q.  "Work flows," please.  If you could read the bullets

4    underneath there.

5    A.  "3/08 implemented new work flow procedures for processing

6    stated income loans.  AE documents --"

7    Q.  If I could stop you there, Mr. Kitashima.  Do you know

8    whether the new work flow that's referenced here, is that the

9    same as the bulletin that we looked at earlier or is it

10   something different?

11   A.  No, I believe that's what it refers to.

12   Q.  Thank you.  Sorry.  If you can read the second one.

13   A.  "AE documents income reasonability in AdvantEdge and

14   manager reviews reasonability on every stated loan.  After

15   opening package is created, an underwriter reviews income

16   reasonability.  Loan does not continue without underwriting

17   approval.  LS completes stated income reasonability worksheet.

18   Underwriter reviews worksheet and approves or declines income

19   reasonability.  At clear to close underwriter reviews for final

20   income reasonability before clearing the loan for documents to

21   be signed."

22   Q.  Finally under "authority certification," Mr. Kitashima?

23   A.  "3/08 launched authority certification requiring all

24   employees with approval authority to be recertified."

25           MS. MAINIGI:  Thank you very much, Mr. Kitashima.  I

1      have no more questions.

2                  THE COURT:  Counsel.

3      DIRECT EXAMINATION

4      BY MR. HEFTER:

5      Q.  Mr. Kitashima, Michael Hefter on behalf of Rebecca Mairone.

6      How are you?

7      A.  Fine.  Thank you.

8      Q.  You testified yesterday that you were a member of the

9      steering committee for the High-Speed Swim Lane pilot?

10     A.  Yes.

11     Q.  Who made the determination who was going to be on the

12     steering committee?

13     A.  Well ultimately, the message came from Greg Lumsden that we

14     were all -- had ownership for the development of the project.

15     So everyone who had responsibility in the organization was

16     involved.

17     Q.  Did the steering committee have a chairperson?

18     A.  Yes.

19     Q.  Who was that?

20     A.  That was Mark Barnett.

21     Q.  Give me a sense of how decisions on the steering committee

22     were made.

23     A.  Well, the main project team would develop proposals on

24     various aspects of the process.  And senior management would

25     review, and each person would be able to provide input, their

2024

DA93BAN3                          Kitashima - direct

1    input.  They would have their departments review the process to

2    ensure that quality and compliance was acceptable.  And so it

3    was a collaborative or participative approach.

4    Q.  Was there a formal voting process?

5    A.  No.

6    Q.  What was Mr. Lumsden's role in connection with the steering

7    committee?

8    A.  He -- his role was really directional.  Making sure that we

9    were, you know, hit it in the direction in which he had

10   outlined that we had needed to be.  Not so much directly

11   involved in the day-to-day meetings of the project team.

12   Q.  Was he involved in the changes that were made in connection

13   with the High-Speed Swim Lane?

14   A.  Yes, he was well aware of all changes.

15   Q.  Did any one person on the steering committee have any

16   greater say than any other person?

17   A.  No, no.

18   Q.  Did anybody on the steering committee have a veto power

19   over any action taken at this steering committee?

20   A.  Well, I think we all -- if we had concerns, we wouldn't

21   proceed until those concerns were reviewed with everyone and

22   addressed and the concern resolved.  Or if it was truly a

23   showstopper, we would come up with another plan.

24   Q.  Did anybody on the steering committee have any power or

25   authority to make changes to underwriting without your

2025

 1  approval?

 2  A.  No.

 3  Q.  If we can turn for a second to a document that you have

 4  been asked questions about, DX 4036.  If we go to page 27.

 5          MR. HEFTER:  Alex, if we can blow up the fourth

 6  column.

 7  Q.  I believe you testified, Mr. Kitashima, that this was the

 8  condition sign off authority for PCA/HSSL?

 9  A.  Correct.

10  Q.  I want to go down to the third row or third box.  Blow that

11  up, please.  This box says "exclusions."

12          Do you have an understanding of what this box is

13  showing?

14  A.  Yes.

15  Q.  What is your understanding?

16          MR. ARMAND:  Objection, your Honor.  The document

17  speaks for itself.

18          THE COURT:  Sustained.

19  Q.  There is a line item that says "EA 1/2/3.  Do you see that?

20  A.  Yes.

21  Q.  Do you know what that refers to?

22  A.  Yes.

23  Q.  What does that refer to?

24  A.  It refers to a product called expanded approval that was

25  being offered by Countrywide at that time.  It included loans

1   that were not pure prime loans, but had -- had some issue that

2   we needed to pay closer attention to.

3   Q.  Was it your understanding that EA 1/2/3 loans were excluded

4   from the conditions sign off authority of the PCA/HSSL?

5   A.  Yes.

6   Q.  Let's go down to "purchase."  Do you have an understanding

7   of what purchase means in connection with the exclusions?

8   A.  Yes.

9   Q.  What does that mean?

10  A.  Well, these involved transactions where borrowers were

11  actually buying a piece of property, and the purchase

12  transaction involved slightly different steps and different

13  requirements.  So we didn't want to put that through HSSL.

14  Q.  So, who made the decision to have certain loans included in

15  the HSSL and certain loans excluded from the HSSL?

16  A.  Well, it started with my group to review, to ensure that we

17  were comfortable with the types of loans that were going

18  through HSSL.  We put that out to the project team for input

19  and received feedback from various departments.  And after that

20  input, we made a decision to use these exclusions.

21  Q.  When you say we made the decision, was that a decision at

22  the steering committee level?

23  A.  Yes.  It was ultimately my decision to what was included

24  and not included.  But it involved the project team as well.

25  Q.  You mentioned the project team.  Is that something

1    different than the steering committee?

2    A.  No.

3    Q.  Thank you.  Do you have an understanding of the term

4    "subject matter experts"?

5    A.  Yes.

6    Q.  What is your understanding of the term subject matter

7    experts in connection with the High-Speed Swim Lane pilot?

8    A.  These were people that had specific experience and

9    knowledge for things like underwriting or loan processing that

10   we used for training and coaching purposes.

11   Q.  Were those people involved in connection with determining

12   what was going to be included and excluded from the High-Speed

13   Swim Lane?

14   A.  No, I don't think so.

15   Q.  That was a project team?

16   A.  Team thing, yes.

17   Q.  Did Ms. Mairone have any involvement in determining what

18   was included or excluded from the High-Speed Swim Lane?

19   A.  As I mentioned earlier, you know, the recommendation was

20   distributed, and I would think Rebecca would have had an

21   opportunity to --

22           MR. ARMAND:  Objection.  Speculation, your Honor.

23           THE COURT:  Sustained.

24   Q.  So let's go back and just clarify for me.  What was

25   Ms. Mairone's role in connection with determining what should

1    be included or excluded from the High-Speed Swim Lane?

2    A.   She would provide input and her thoughts on what should be

3    included and not included in the High-Speed Swim Lane.

4    Q.   Could she make a decision to include something in the

5    High-Speed Swim Lane without your approval?

6    A.   No.

7    Q.   We also heard testimony from you yesterday that loan

8    specialists in the High-Speed Swim Lane pilot had authority to

9    clear certain conditions.  Do you remember that?

10   A.   Yes.

11   Q.   How was that decision made?

12   A.   In the same way.  My department provided the basic policy,

13   and we allowed that to be circulated among the project team.

14   And after getting input, we made the decision to allow that.

15   Q.   What was Ms. Mairone's role in connection with determining

16   that loan specialists in the High-Speed Swim Lane pilot had

17   authority to clear certain conditions?

18   A.   She had the opportunity to provide input.

19   Q.   Did she have any authority to approve that without your

20   authority?

21   A.   No.

22           MR. ARMAND:  Objection.

23           THE COURT:  Ground?

24           MR. ARMAND:  I'll withdraw it, your Honor.

25           THE COURT:  Okay.  The answer stands.

DA93BAN3                    Kitashima - direct

1   Q.  Let me turn your attention to PX 427.

2              MR. HEFTER:  Your Honor, may I ask Ms. Michaud on the

3   government's legal team to put PX 427 on the screen?

4              THE COURT:  Yes.

5              MR. HEFTER:  Ms. Michaud, if you will, on the top left

6   there is a box with Mr. Kitashima's name on it.

7   Q.  Mr. Kitashima, do you see your name on this box?

8   A.  Yes.

9   Q.  I believe it was your testimony that Central Fulfillment

10  started somewhere in the September to October timeframe, do you

11  recall that?

12  A.  Yes.

13  Q.  Can you describe for the ladies and gentlemen of the jury

14  your role in connection with Central Fulfillment.

15  A.  I was responsible for the quality and compliance related

16  controls on the development on that High-Speed Swim Lane.

17  Q.  Prior to Central Fulfillment, what was your role in

18  connection with the company?

19  A.  It was similar.  You know, I had overall responsibility for

20  the quality controls and compliance controls that were

21  necessary for us to fund loans in Full Spectrum.

22  Q.  Did your role change in any way upon the implementation of

23  Central Fulfillment?

24  A.  Not necessarily.  Not high level.  I think my role was the

25  same.  You know, I was still very much responsible for the

1   quality and compliance for the organization.  So it didn't

2   change.

3            MR. HEFTER:  Ms. Michaud, if we can blow up another

4   section of the organizational chart.  The one under Central

5   Fulfillment there is a box with Mr. Comeaux's name and the four

6   boxes below that.  Thank you.

7   Q.  Mr. Kitashima, one of the persons listed there is James

8   White.  Do you know James White?

9   A.  Yes, I do.

10  Q.  Who is James White?

11  A.  He was an underwriting manager for our Phoenix location.

12  Q.  Did he have underwriting experience?

13  A.  Yes, he did.

14  Q.  Prior to Central Fulfillment, who did Mr. White report to?

15  A.  Ed O'Donnell.

16  Q.  After Central Fulfillment, who did he report to?

17  A.  Wade Comeaux.

18  Q.  Mr. Sallis and Mr. Price are also listed there as well.

19  Were they underwriters?

20  A.  Yes, they were.

21  Q.  Prior to Central Fulfillment, who did they report to?

22  A.  They reported to Ed O'Donnell.

23  Q.  Subsequent to Central Fulfillment, who did they report to?

24  A.  Wade Comeaux.

25  Q.  Are you aware of a decision that was made to bring those

DA93BAN3                        Kitashima - direct

1    individuals from the underwriting group to Central Fulfillment?

2    A.  Yes.

3    Q.  What is your understanding of that decision?

4    A.  Well, that was to facilitate the completion of moving

5    underwriting and funding and processing together under one

6    team.

7    Q.  Are you familiar generally with a concept called "dotted

8    line reporting"?

9    A.  Yes.

10   Q.  What is your understanding of dotted line reporting?

11   A.  Well, the individual who had -- has dotted line

12   responsibility to another individual basically does not report

13   directly to that individual, but may take direction from that

14   individual.

15   Q.  Did you have a dotted line supervisory role in connection

16   with Central Fulfillment?

17   A.  No, I really didn't have any dotted line responsibilities.

18   Q.  Did you have dotted line responsibility over underwriting

19   in Central Fulfillment?

20   A.  Ed O'Donnell, who was over underwriting before Central

21   Fulfillment, continued to report to me after Central

22   Fulfillment was in place.  And he had a dotted line

23   responsibility to these individuals.

24             MR. HEFTER:  If we can put up DX 424, Alex.  Thank

25   you, Ms. Michaud.  If we can blow up that middle box, please.

1   Q.  Mr. Kitashima, this is an e-mail from Mr. Lumsden to

2   yourself, do you see that?

3   A.  Yes, I do.

4   Q.  If you can turn to the second page of the document.  If we

5   can blow up the paragraph that says "your group."

6   A.  Okay.

7   Q.  Can you read the first sentence, please.

8   A.  "Your group would have the responsibility for managing the

9   overall credit risk and compliance and thus a dotted line to

10  the underwriters in the central ops organization.  In addition,

11  the SLD would now be used for subprime underwriting, but that

12  would continue to report directly to your group.  In essence,

13  our new central ops model would be managed in a manner similar

14  to the CMD model."

15  Q.  With respect to Mr. Lumsden's use of dotted line, does that

16  refresh your recollection in terms of your organization's role

17  in connection with Central Fulfillment?

18  A.  Yes.  Yes.

19  Q.  What is your recollection?

20  A.  Well, again, that the underwriter in the central ops group,

21  the Central Fulfillment group, had dotted line responsibilities

22  to Ed O'Donnell in this case, who reported to me.

23  Q.  Do you know if Ms. Mairone had any involvement in the

24  decision to transfer Messrs. White, Sallis and Price to Central

25  Fulfillment?

DA93BAN3                          Kitashima - direct

1    A.  I'm sure she had input into that decision.

2    Q.  Did you have input into that decision?

3    A.  Yes, I did.

4    Q.  Did you approve that decision?

5    A.  I was part of the approval process in terms of buy off.

6    Q.  What do you mean by "buy off"?

7    A.  That I agree.

8    Q.  Do you know who made the ultimate decision to make that

9    transfer of personnel?

10   A.  Greg Lumsden.

11   Q.  Let me turn your attention, Mr. Kitashima, to Plaintiff's

12   exhibit 68.  Actually, I'll withdraw that to make this go

13   faster.

14            MR. HEFTER:  Alex, if we can have DX 670.

15   Q.  Do you recall being asked questions by the bank's counsel

16   about this document, Mr. Kitashima?

17   A.  Yes, I do.

18   Q.  First I want to turn to the second page of the document.

19   If we can just blow up the first paragraph.  It says "I have

20   discussed with Greg and the Cliff the following items and a

21   change in process and direction."  Do you see that?

22   A.  Yes.

23   Q.  Do you recall having discussions with Ms. Mairone and

24   Mr. Lumsden prior to the date of this e-mail?

25   A.  Considering it was seven years ago, I don't remember

1    specifics, but I do remember having discussions prior to this.

2    Q.  Let me be clear, because that was probably slightly vague.

3           Do you recall having discussions in advance of

4    November 29 about the subject matter that's reflected in this

5    draft e-mail?

6    A.  Yes.

7    Q.  What is your recollection of those discussions?

8    A.  Well, it was -- there was feedback coming from the field

9    that indicated challenges with QA reports that were being done

10   at the time.  And we needed to determine really whether the

11   QA -- what parts of the QA needed to be revised, if any.

12   Q.  Thank you.  Then, I think you testified in red Ms. Mairone

13   asked you "can you review and rewrite where needed the e-mail

14   below."  Do you see that?

15   A.  Yes.

16   Q.  The November 29 e-mail that was sent out by Ms. Mairone,

17   you approved of that distribution, correct?

18   A.  Yes.

19   Q.  That e-mail went out after discussion between you and

20   Mr. Lumsden and Ms. Mairone?

21   A.  Yes.

22   Q.  Mr. Lumsden approved of that as well?

23   A.  Yes.

24   Q.  Let me turn your attention to DX 4082.  I don't believe you

25   have it in your binder.

 1            MR. HEFTER:  May I approach, your Honor?

 2            THE COURT:  Yes.

 3            MR. HEFTER:  Can we have DX 4082 published to the

 4    jury.  It's in evidence, your Honor.

 5            THE COURT:  All right.

 6            MR. HEFTER:  If we can have the top part of the e-mail

 7    just blown up.

 8    Q.  Do you see that, Mr. Kitashima?

 9    A.  Yes, I do.

10    Q.  At the top it is "Central Fulfillment QA PC3 daily review

11    results."  Do you see that?

12    A.  Yes.

13    Q.  I believe you testified about the results of PC3 audits, is

14    that correct?

15    A.  Yes.

16    Q.  It says "Steve, please provide a summary to everyone of

17    today's meeting with Rebecca including take aways and next

18    steps."

19            Do you recall having meetings in the mid-December

20    timeframe about the PC3 daily review with Ms. Mairone and

21    others?

22    A.  Yes.

23    Q.  What is your recollection of those meetings?

24    A.  I thought they were productive.  I thought it gave us the

25    opportunity to air concerns and discuss issues that were

DA93BAN3                          Kitashima - direct

1    related to this particular audit.  And we were making

2    adjustments.

3    Q.  If we can turn your attention to DX 4084.  If we can have

4    that blown up, please.

5              MR. HEFTER:  May I approach, your Honor?

6              THE COURT:  Yes.

7              MR. HEFTER:  Your Honor, this exhibit is in evidence

8    already, but if the witness prefers to see it in hard copy, I'm

9    giving him a copy.

10             THE WITNESS:  Okay.

11   Q.  Mr. Kitashima, can you read, there is a sentence in the

12   middle that says "we continue to work through."

13   A.  Yes.  "We continue to work through Rebecca and in today's

14   meeting we agreed to formulated a cross functional team to

15   review the top three to four QC SUS findings from a process and

16   systems perspectives."

17   Q.  Do you recall during this timeframe of working with

18   Ms. Mairone to formulate a cross functional team?

19   A.  Yes.

20   Q.  What is your recollection of those discussions?

21   A.  Again, productive.  It was moving in the right direction.

22             MR. ARMAND:  Objection.  Opinion.

23             THE COURT:  Sustained.

24   Q.  Do you recall anything that was specifically said between

25   you and Ms. Mairone in connection with those discussions?

1          MR. ARMAND:  Objection, calls for hearsay.

2          THE COURT:  Sustained.

3    Q.  Was there ever a time, Mr. Kitashima, that you asked

4    Ms. Mairone for a QA or QC report that she didn't provide it to

5    you?

6    A.  No.

7    Q.  Mr. Kitashima, do you know what a checklist is in

8    connection with loan processing at FSL?

9    A.  Yes.

10   Q.  What is a checklist?

11   A.  It is a requirement that needs to be completed by someone

12   in the processing of a loan, where they would complete certain

13   tasks and sign off and date that they've done it.

14   Q.  What is a job aid?

15   A.  A job aid is similar to a checklist, it could be a former

16   checklist, but it is more of a training aid or guide.  The

17   steps still need to be completed, but the requirement for

18   actual checking the box and signing it is not necessary.

19   Q.  Were there any checklists eliminated as a result of the

20   High-Speed Swim Lane?

21   A.  Yes.  Most of the checklists that we eliminated with the

22   High-Speed Swim Lane related to subprime work flows, which as I

23   testified earlier, involved more steps, more involvement, more

24   checks.  So when we went to the High-Speed Swim Lane, which was

25   focused on very high quality loans, a lot of those checklists

1    were not --

2                MR. ARMAND:  Objection.  Narrative, your Honor.

3                THE COURT:  Sustained.

4    Q.  Why were checklists eliminated in the High-Speed Swim Lane

5    process?

6    A.  They were no longer needed for these types of loans.

7    Q.  Great.  Did you approve of this elimination?

8    A.  Yes.

9    Q.  Did your group review the elimination from a risk

10   perspective?

11   A.  Yes.

12   Q.  What was the determination of your group?

13   A.  It offered no threat to risk.

14   Q.  Were there any checklists that were converted to job aids?

15   A.  Many of them were still kept in place as job aids.

16   Q.  Why was that done?

17   A.  Just to help with the transition.  Help with the transition

18   from, you know, subprime processing to prime.

19   Q.  How would it help with the transition?

20   A.  It would act as a, you know, a reminder, in some cases.  In

21   other cases, other checklists were eliminated because they were

22   no longer needed.

23   Q.  Did you approve of the conversion of checklist to job aids?

24   A.  Yes.

25   Q.  Did your group assess the conversion of taking checklists

1  and making them into job aids?

2  A.  Yes.

3  Q.  What was your group's conclusion in that regard?

4  A.  Again, that they were not needed in the new work flow.

5  Q.  What was Ms. Mairone's role in connection with the

6  determination of converting checklists into job aids?

7  A.  She had the same opportunity to provide input on her side.

8  But in the end, the decision was made within my group.

9  Q.  Now, did you conclude at the time that the conversion of

10  checklists to job aids would lead to poor quality loans?

11  A.  No.  Not at all.

12          MR. HEFTER:  Your Honor, I mark for identification DX

13  720, which is in the binder.

14  Q.  Mr. Kitashima, I've handed you -- what have I handed you?

15  A.  This is a note from me to Loren Rodriguez.

16  Q.  What is the date of it?

17  A.  It is dated December 11, 2007.

18          MR. HEFTER:  We move DX 720 into evidence.

19          MR. ARMAND:  No objection.

20          THE COURT:  Received.

21          (Defendant's Exhibit 720 received in evidence)

22  Q.  If we go to the top of the e-mail.  We can blow that out,

23  please.

24          So this is an e-mail, Mr. Kitashima, from you to

25  Mr. Rodriguez on December 11, and it is copied to Mr. O'Donnell

1   and Ms. Mairone.  Do you see that?

2   A.  Yes.

3   Q.  Can you read the first sentence into the record, please.

4   A.  "I got your voice mail.  Here are my initial thoughts in

5   green.  Please review and let me know your thoughts."

6   Q.  Thanks.  If we go to the next e-mail, just blow up the --

7   this is an e-mail from Ms. Mairone to you, Mr. Rodriguez, and

8   Mr. Comeaux.  Do you see that?

9   A.  Yes.

10  Q.  It says "Central Fulfillment changes to the prime

11  processing team notice 12/11 draft."  Do you see that?

12  A.  Yes.

13  Q.  Do you recall having discussions about changes to the prime

14  processing team notice in or around this timeframe?

15  A.  Hmm-hmm, yes.

16  Q.  And the portion in red says -- well, why don't you read

17  that, please.

18  A.  "Cliff, Loren, Wade.  Please review this draft memo I would

19  like to send to the CF and branch operations management team

20  tomorrow.  Please send back any changes.  Thanks."

21  Q.  Do you recall Ms. Mairone seeking your input with respect

22  to the matters discussed in this draft?

23  A.  Yes.

24  Q.  If we can turn to number one.  See that?

25  A.  Yes, I do.

1  Q.  It says "Effective 12/11 title checklist.  Change the

2  purpose of this required checklist to a job aid used for

3  reference."  Do you see that?

4  A.  Yes.

5  Q.  I believe you testified that your comment is in green,

6  right?

7  A.  Correct.

8  Q.  So can you read your comment in response to Ms. Mairone's

9  seeking your input on this matter.

10  A.  "The requirements of the job aid must continue to be

11  properly completed and/or addressed before signing off on the

12  title related conditions."

13  Q.  Do you know if that occurred?

14  A.  Yes.

15  Q.  Now, let's turn to paragraph six, please.  It says

16  "Effective 12/15 stated income analysis.  Remove this checklist

17  requirement.  Since a majority of the questions are formatted

18  toward subprime loans yet required on all stated income prime

19  programs, the appropriate prime related questions should be

20  incorporated into the prime calculator.  In other words, they

21  should be on the same form prime calculator and we will ignore

22  them if it is not a stated loan."  Do you see that?

23  A.  Yes, I do.

24  Q.  What is your response?

25  A.  That I agreed.

DA93BAN3                          Kitashima - direct

1   Q.  Do you have a recollection of agreeing with Ms. Mairone as

2   reflected in paragraph six?

3   A.  Yes, I do.

4   Q.  If we can turn to DX 993.  I believe this was a document

5   that Ms. Mainigi had asked you questions about.  Do you recall

6   that?

7   A.  Yes.

8   Q.  Let's turn to page 14.  Do you see that?

9   A.  Yes, I do.

10  Q.  I believe you testified about certain fulfillment process

11  corrective actions.  Do you see that?

12  A.  Yes.

13  Q.  Do you remember your testimony?

14  A.  Yes.

15  Q.  What was Ms. Mairone's involvement in connection with the

16  process corrective actions listed on this page?

17  A.  Well, it was, it was very standard for her to have the

18  opportunity to provide input, give her thoughts.  And we

19  sought, you know, sought --

20          MR. ARMAND:  Objection.  Non-responsive.

21          THE COURT:  Sustained.

22  A.  She didn't have authority --

23  Q.  Hold on.

24          THE COURT:  Sustained.

25          MR. HEFTER:  I heard that, your Honor.

1   Q.  Did you have discussions with Ms. Mairone concerning the

2   corrective actions that are listed on page 14 of this document?

3   A.  Yes.

4   Q.  Did she have input into those discussions -- these

5   corrective actions?

6   A.  Yes, she did.

7   Q.  Who made the determination to implement these corrective

8   actions?

9   A.  The final decision was my decision.

10  Q.  Your decision, after input from Mr. Lumsden and

11  Ms. Mairone?

12  A.  Yes.

13          MR. HEFTER:  Your Honor, I have no further questions.

14          THE COURT:  All right.  So we will break for lunch at

15  this time, ladies and gentlemen, and we will resume at

16  2 o'clock.

17          (Jury excused)

18

19

20

21

22

23

24

25

DA93BAN3

1          THE COURT:  Anything counsel needs to raise with the

2     Court?

3          MS. MAINIGI:  Your Honor, could we just solicit an

4     understanding from the government as to how long they might

5     take on cross so we can plan accordingly for witnesses.

6          THE COURT:  Yes.

7          MR. ARMAND:  Probably an hour.  Maybe hour and a half.

8          THE COURT:  Okay.  So it sounds like we'll get to at

9     least one more witness and maybe two.

10         MS. MAINIGI:  Thank you.

11         THE COURT:  Very good.  Thanks a lot.

12         (Recess)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DA93BAN3

<div align="center">AFTERNOON SESSION</div>

<div align="center">(2:10 p.m.)</div>

1    (Jury present)

2    MR. ARMAND:  May I proceed, your Honor?

3    THE COURT:  Please.

CROSS-EXAMINATION

BY MR. ARMAND:

Q.  Good afternoon, Mr. Kitashima.

A.  Good afternoon.

Q.  My name Pierre Armand, I'm going to being asking questions on behalf of the United States.

Mr. Kitashima, yesterday you were asked questions about Quality of Grade scores.  Do you recall that?

A.  Yes.

Q.  And you were asked some of those questions today about Quality of Grade, correct?

A.  Correct.

Q.  Now Quality of Grade was a component of compensation, was it not?

A.  Yes, it was.

Q.  And the more SUS findings or severe unsatisfactory findings an employee, had the lower the Quality of Grade score, correct?

A.  That's correct.

Q.  And the lower the Quality of Grade score, the bigger hit to their pay or their bonus, correct?

DA93BAN1                    Kitashima - cross

1   A.   Yes.

2   Q.   Yesterday you were shown Defendant's Exhibit 479 in your

3   binder.  Do you still have that up with you?  We need to put it

4   up, but Mr. Kitashima, do you recall testimony you gave

5   yesterday about a moratorium on Quality of Grade?

6   A.   Yes.

7   Q.   And first during the Hustle pilot, Quality of Grade was

8   suspended during the period of time of the pilot, correct?

9   A.   Yes.

10  Q.   Then there was a moratorium that continued from October of

11  2007 to January 2008, correct?

12  A.   Yes.

13  Q.   And you testified yesterday that you reviewed the

14  moratorium from a credit risk perspective, correct?

15  A.   Yes.

16  Q.   And you also said that you concluded that it was a prudent

17  thing to do, correct?

18  A.   Based on the assessment of what I saw, yes.

19  Q.   And you said that was because the loans were of the best

20  quality, correct?

21  A.   That was part of it, yes.

22  Q.   OK.  And this was during Central Fulfillment, correct, this

23  time period, when the moratorium was in effect?

24  A.   Yes.

25  Q.   Were you deposed in this case, Mr. Kitashima?

DA93BAN1                       Kitashima - cross

1    A.  Yes.

2    Q.  And were you deposed on or about June 20th, 2013?

3    A.  Yes.

4              MR. ARMAND:  May I approach, your Honor?

5              THE COURT:  Yes.

6    Q.  I would like to direct the witness' attention, your Honor,

7    to starting on page 97 of the transcript, line 21, going down

8    to page 98, line 19.

9              THE COURT:  I'm sorry, give that to me one more time.

10             MR. ARMAND:  Page 97, starting at line 21, going down

11   to page 98, line 19.

12             THE COURT:  OK.

13   Q.  Do you have it, Mr. Kitashima?

14   A.  I think I do, yes.

15   Q.  I'm reading from page 97, line 21.

16   "Q.  You see item number five?

17             MS. MAINIGI:  Objection, your Honor, I don't -- I

18   assume Mr. Armand is using.

19             MR. ARMAND:  Should we have a side bar?

20             MS. MAINIGI:  Perhaps we ought to.

21             THE COURT:  Hold on a minute.

22             I'm not sure why we need a side bar.  Is there an

23   objection to his reading those lines?

24             MS. MAINIGI:  There would be an objection because I

25   don't know what the purpose would be for reading the lines,

DA93BAN1                     Kitashima - cross

1    your Honor, I'm not seeing the issue that Mr. Armand is seeing

2    here.

3              THE COURT:  All right.  Come to the side bar.

4              (At side bar)

5              THE COURT:  Just so we're on the same page, after

6    counsel says what page and lines he's going to read, and we

7    pause for a few and seconds, and then if there is an objection

8    I will assume that objection is on the grounds that adversary

9    counsel does not think it is even arguably inconsistent.  That

10   would be the normal objection.  And then I don't need a side

11   bar, I can rule on it.  But if there's some other objection you

12   have, then --

13             MS. MAINIGI:  That is the objection, your Honor.

14             THE COURT:  So since we're here at the side bar, it

15   does seem to me arguably inconsistent.  The test is whether any

16   reasonable juror taking this testimony could find that it is in

17   any material respect inconsistent with the testimony given here

18   in court.  And the testimony that was given in court, which

19   Mr. Armand re-elicited, in effect, from the witness just a few

20   minutes ago was at a minimum far more certain than anything

21   that the answer reveals.  There may be other inconsistencies

22   but that alone I think is sufficient to warrant admissibility.

23   When a witness says on the stand I saw the car and it was red,

24   and he says in his deposition I think I saw the car, and I'm

25   not totally sure, though I believe it was red, that's an

1    inconsistency enough for admissibility.  Of course if the jury

2    determines it's consistent, then it's favorable to the

3    adversary counsel.

4         MS. MAINIGI:  I don't see where it is inconsistent,

5    your Honor, in that prudent for us to go slower on extending it

6    any further.

7         THE COURT:  He says, quote, I'm not really sure

8    whether that happened or not, maybe it did, et cetera, et

9    cetera.

10        I mean it's a very vague answer.

11        MS. MAINIGI:  Exactly.

12        MR. ARMAND:  But he does say on direct and again here

13   on cross, he stated that he supported having the Quality of

14   Grade reprieve go through January, in this testimony he says

15   the loans were for good quality.  In this answer he says that

16   he thought they should go more slowly in extending because of

17   the quality issues they were having at that time and it deals

18   specifically with that January time frame, so it is

19   inconsistent.

20        THE COURT:  In addition, he still is employed by

21   the --

22        MS. MAINIGI:  No, no he's retired.

23        THE COURT:  Was he employed at the time of this?

24        MS. MAINIGI:  No.

25        THE COURT:  So that's an interesting issue.  So then

1    we get into a case which I know you all know like the tip of

2    your tongue called *Diners Club*, which was written by Judge

3    Friendly, and can a former employee make a binding admission,

4    that is to say an admission -- "binding" is the wrong word, is

5    the statement of a former employee an admission that can be

6    against the hearsay objection introduced in evidence against

7    his employer, his employer being lead defendant, if it relates

8    to matters that occurred while he was an employee.  And while I

9    might have thought the answer would be no, the Second Circuit

10   says the answer is yes.  So this independently comes in as an

11   admission of a party adversary irrespective of the

12   inconsistency issue.

13            MR. HEFTER:  That wouldn't come in against Ms. Mairone

14   though.

15            THE COURT:  That's true.  Where as an inconsistency it

16   does, because there was no objection to the testimony when it

17   was given, either when it was given on direct or when it was

18   given now.

19            So you're right, but in any event -- so you are very

20   clever, you posed the dilemma and I resolved my dilemma by

21   saying it's arguably inconsistent.

22            MS. MAINIGI:  Your Honor, you're saying a deposition

23   transcript of any employee or former employee could come in as

24   the admission of a party opponent?

25            THE COURT:  There are some exceptions, if the employee

DA93BAN1                    Kitashima - cross

1    is an cooperator of the government and so on.  But I always had

2    my doubts about the case that even though it's the law of the

3    Second Circuit, and I invite you to take a look at it, I have

4    not rested on that, and now that counsel for Ms. Mairone chose

5    that it's probably not going to be helpful to rest on that, I

6    will rest on the arguable inconsistency.

7            MR. ARMAND:  Thank you.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open court)

2          THE COURT:  All right.  Counsel, you can read that.

3    BY MR. ARMAND:

4    "Q.  You see item number 5 says we will prepare a note to all

5    CF employees and help them understand they should feel

6    confident in using their authority, and that we will have a QoG

7    comp hit reprieve through the end of January and they will no

8    longer receive direct QA feedback until further notice.  What

9    feedback did you provide on that item?

10   "A.  I don't know specifically what I told her, but my feelings

11   on this was that I thought extending the reprieve, as she puts

12   it, to the end of January needed more analysis.  I'm not really

13   sure whether that happened or not, maybe it did, but you know,

14   further extension of QoG impact in my opinion needed to have

15   more analysis.

16   "Q.  Why is that?

17   "A.  Well, I think we had the -- we had originally agreed to

18   have the suspension last for a period of time, and arguably we

19   still had issues that were related to quality coming up at that

20   point in time.  So I thought that it was prudent for us to go

21   slower on extending it any further."

22          Was that your testimony at your deposition, sir?

23   A.  Yes.

24   Q.  Mr. Kitashima, you testified that despite the suspension of

25   the quality of grade to compensation you continued to track

1   Quality of Grade scores and report that, is that correct?

2   A.  We continued to track Quality of Grade ratings, correct.

3   Q.  And --

4   A.  And communicate them.

5   Q.  And so when you say "communicate them," you mean

6   communicate them to the employees?

7   A.  We communicated to all levels of management.

8   Q.  And did that -- did you communicate them to the employees?

9   A.  Not to the employees that had the reprieve.

10  Q.  So were reports generated that were reflecting the Quality

11  of Grade scores so you could monitor them?

12  A.  The Quality of Grade scores for employees where the

13  reprieve did not apply, we continued to do that.  But for

14  employees where the Quality of Grade scores were not applied,

15  we -- I don't know if we actually kept track of those.  So

16  everyone in the organization that the reprieve did not apply

17  for we tracked, and obviously compensation was affected by

18  those.

19  Q.  So you're saying you did not track it for people that --

20  for which it applied to?

21  A.  I don't remember.

22          THE COURT:  There's an objection.

23          MR. HEFTER:  Mischaracterizes the testimony.

24          THE COURT:  Overruled.

25          You may answer.

MR. ARMAND: May I approach, your Honor?

THE COURT: Yes.

Q. Mr. Kitashima, I'm showing you what has been marked for identification as Plaintiff's Exhibit 473. And for the record, this is a native printout of a spreadsheet Bates stamped BANA-SDNY-E 000657717.

Mr. Kitashima, this is an internal spreadsheet from Countrywide, is it not?

A. It appears that way, yes.

Q. If you could turn to the second page. Do you see in the second column under SVP name?

A. Yes.

Q. It says James White and Robert Price?

THE COURT: Is this in evidence?

MR. ARMAND: Not yet, your Honor.

THE COURT: How can you refer to it?

MR. ARMAND: I was trying to get him to identify it, your Honor. I won't read from the document then, apologies, your Honor.

Q. Does it identify employees of Countrywide and Full Spectrum Lending division?

A. Yes, it does.

Q. And if you turn to the third page, does it list additional employees and have categories for fundings and turn time and QoG?

DA93BAN1                    Kitashima - cross

1  A.  Yes.

2                MR. ARMAND:  I offer, your Honor, Plaintiff's Exhibit

3  473 in evidence.

4                MS. MAINIGI:  Objection, your Honor, I don't see this

5  on plaintiff's exhibit list.

6                THE COURT:  Doesn't have to be for cross-examination.

7                MS. MAINIGI:  I understand, your Honor, but we're

8  looking at it for the purpose of authenticity.

9                Your Honor, we object to the admission of this

10  document and happy to do a side bar.

11                MR. HEFTER:  Objection, your Honor.

12                THE COURT:  Before we have a side bar, as much as I

13  know the jury would enjoy that, give me the general ground

14  you're objecting on, like relevance, hearsay, foundation.

15                MS. MAINIGI:  Authenticity.

16                THE COURT:  Authenticity.

17                MR. SULLIVAN:  Relevance.

18                MR. HEFTER:  Hearsay.

19                THE COURT:  All right.  So let me just to move this

20  along.  Are you familiar with this kind of document?

21                THE WITNESS:  Yes.

22                THE COURT:  And generically what kind of document is

23  this?

24                THE WITNESS:  This appears to be a document that

25  summarizes rankings of employees.

DA93BAN1                    Kitashima – cross

1           THE COURT:  Were these -- were such documents prepared

2    normally in the course of your business?

3           THE WITNESS:  Yes.

4           THE COURT:  And were they kept and maintained in the

5    course of the business?

6           THE WITNESS:  Yes.

7           THE COURT:  And were they made at or about the time of

8    the events they refer to?

9           THE WITNESS:  Yes, but I can I explain a little about

10   this document.

11          THE COURT:  Well, I just -- so the hearsay objection

12   is overruled.  Now what was the rest?

13          MS. MAINIGI:  Well, there is an authenticity

14   objection.  I can raise it here, your Honor, I could raise it

15   at side bar.

16          THE COURT:  Come to the side bar.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  Before we get to that, it takes a fair

3     amount to get this Court upset, but this on its face, as the

4     witness just confirmed, is an ordinary business record, and it

5     was produced, as the Bates stamps indicate, by Bank of New

6     York -- excuse me, Bank of America.  And so why counsel for

7     Ms. Mairone is raising a hearsay objection and what counsel's

8     good faith basis was for raising a hearsay objection I have

9     questions about.

10         MR. HEFTER:  I raise that, your Honor, because this is

11    not a document from Ms. Mairone.  If anything, it's the bank's

12    document.  And I don't know whether it's being offered for the

13    truth of the data or statistics that are in here.

14         THE COURT:  So you're saying hearsay to Ms. Mairone?

15         MR. HEFTER:  Yes, your Honor, I wasn't raising it --

16         THE COURT:  My apologies.

17         MR. HEFTER:  I wasn't raising it for any other

18    purpose.

19         THE COURT:  I misunderstood, I apologize.

20         MR. HEFTER:  And take it from your last ruling, in

21    light of the waiver rules in this court, that's why I raised it

22    that way.

23         THE COURT:  All right.  So what's the authenticity

24    objection?

25         MS. MAINIGI:  Your Honor, there was a QoG document

1    that the government wished to use previously that we advised

2    the government was a mock document, meaning the data on it was

3    made up, it was done for some sort of training exercise or

4    something.  It was in the government's production.  I have some

5    concern this might be a similar type document.  I checked with

6    the individuals around us who are familiar with the document

7    production.  We have never seen this document before.

8             THE COURT:  Wait, a minute, I thought the

9    government -- maybe I misheard.  I thought the government said

10   that this was -- you read off Bates stamps indicating it had

11   come from Bank of America.

12            MR. ARMAND:  Correct.

13            MS. MAINIGI:  I didn't hear any Bates stamps.

14            MR. ARMAND:  I read it into the record.

15            THE COURT:  Less than five minutes ago.

16            MS. MAINIGI:  Do you know this is an authentic

17   document or mock document?

18            MR. ARMAND:  To respond to that, in our summary

19   judgment motion we provide a QoG list that had scores of loan

20   specialists, and we learned right before we were going to use

21   that document on our case at trial that it was actually a fake

22   document, a mock.  And so we were sandbagged right before we

23   were going to use it.  So we demanded that they identify all of

24   the QoG reports.  They provided a declaration right before --

25   the day before Mr. O'Donnell was going to testify, and we could

1    couldn't use it because it looked like it was a mock.

2              This is this is one of their documents that shows all

3    of the loan specialists are getting ranked number one in

4    Quality of Grade, they all have scores of three.  This

5    indicates that they're not tracking anything, contrary to what

6    Mr. Kitashima said that they were tracking these so they could

7    monitor them and checked on the quality.

8              THE COURT:  By the way, let me go back to the hearsay

9    objection.  I don't see how it's hearsay to Ms. Mairone.

10   Hearsay to Ms. Mairone is when a statement is received in

11   evidence as the statement as an admission of a party, and

12   therefore, it's hearsay as to the other party.  But this is

13   being received as an ordinary business record.  That's not a

14   hearsay exception as to which Ms. Mairone has any standing to

15   object, so the hearsay objection is overruled.

16             And now on what you just heard, is there any further

17   objection?

18             MS. MAINIGI:  Your Honor, I will maintain our

19   objection, we understand you may overrule it, your Honor, we'll

20   just reserve the right to go back and seek testimony if it

21   turns out --

22             THE COURT:  If you come back and say yes, on checking

23   we find out this is still another of the fake documents that

24   we --

25             MS. MAINIGI:  Mock document.

DA93BAN1                    Kitashima - cross

1          THE COURT:  -- the, quote, training documents.  You

2     know, at the time you produced the training document that you

3     were referring to to the government, did you tell them that it

4     was a training document and not an accurate document?

5          MS. MAINIGI:  Your Honor --

6          THE COURT:  Sounds like you didn't.

7          MS. MAINIGI:  Well, I don't know the full history

8     behind that, your Honor, but it was one of millions of pages,

9     so I suspect it got produced along with everything else that

10    was responsive.

11         THE COURT:  Anyway, 473 is received.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DA93BAN1                    Kitashima - cross

```
 1              (In open court)

 2              THE COURT:  473 is received.

 3              (Plaintiff's Exhibit 473 received in evidence)

 4   BY MR. ARMAND:

 5   Q.  Mr. Kitashima, could you please turn to the first -- your

 6   document should be tabbed to the first tab, the first

 7   spreadsheet.

 8              MR. ARMAND:  And Ms. Michaud, if you could blow up the

 9   first say four columns, if you can, about ten people in there.

10   Q.  So the first column says overall rank, does it not,

11   Mr. Kitashima, on the far left?

12   A.  Yes.

13   Q.  And the next column says LS name?

14   A.  Yes.

15   Q.  Which means loan specialist name, does it not?

16   A.  Yes, I have never -- I wouldn't be privy to this document.

17   Q.  I asked you LS name.  Withdrawn.

18              LS, is that a term that was typically used within

19   Countrywide to identify loan specialists?

20   A.  Yes.

21   Q.  Thank you.  If we could move to the third column, and the

22   date there it says 12/2007 fundings, is that correct?

23   A.  Yes.

24   Q.  And then underneath there you see a number different

25   numbers, correct?
```

DA93BAN1                    Kitashima - cross

1    A.   Yes.

2    Q.   Where the employees are ranked by funding, correct?

3            MS. MAINIGI:  Objection.

4    Q.   Withdrawn.  Where it's indicating the number of fundings,

5    correct?

6            MS. MAINIGI:  Objection, foundation.

7            THE COURT:  This witness presumably knows if the

8    answer is yes or no, so what's the answer?

9    A.   It looks like it's the number of fundings.  I don't know

10   what that means, though.  This is not a report that applies to

11   me or my people that report to me.

12   Q.   You don't know what fundings means?

13   A.   I do know what fundings means, but I'm not sure what they

14   mean by the numbers underneath of it.

15   Q.   It has the date 12/2007 fundings then lists the number of

16   fundings, so would that indicate to you that this is the

17   fundings by each loan specialist during that time period?

18           MS. MAINIGI:  Objection.

19           THE COURT:  Overruled.

20   A.   Could mean they participated in that funding with others.

21   Q.   Let's look to the next column, rank fundings.  Do you see

22   that?

23   A.   Yes.

24   Q.   This column is ranking them based on their fundings,

25   correct?

1   A.  I don't know.  I really don't know.

2   Q.  Well, let's go to the next column, it says 12/2007, turn

3   time, PCA percentage less than 24 days.  Do you see that?

4   A.  Yes.

5   Q.  And they all have different percentages listed next to the

6   names of the loan specialists.  Do you see that?

7   A.  Yes.

8   Q.  And so that would indicate to you, would it not, sir, that

9   the loan specialists are being ranked by the turn time, how

10  fast their turn time is?

11          MR. HEFTER:  Objection.

12          MS. MAINIGI:  Objection, foundation, argumentative.

13  A.  As I say --

14          THE COURT:  There was an objection.

15          MR. ARMAND:  I can rephrase, your Honor.

16          THE COURT:  The objection on grounds of argumentative

17  is overruled.  I think foundation you may need to explore With

18  this witness.

19  Q.  Mr. Kitashima, you were aware there was a turn time bonus

20  in effect in Full Spectrum Lending starting August 1st, 2007,

21  correct?

22          MS. MAINIGI:  Objection, outside the scope.

23          THE COURT:  Overruled.

24  A.  I didn't know the components of the LS bonus plans.

25  Q.  You testified that you approved the Quality of Grade

DA93BAN1                        Kitashima - cross

1    reprieve, correct?

2    A.   Yes, that portion of it.

3              (Continued on next page)

1   Q.  You didn't know about whether or not there was a turn time
2   bonus in effect at the same time?
3   A.  I didn't know the other components of the LS compensation
4   plan.
5   Q.  So you didn't know that loan specialists were having their
6   bonus either increased or decreased based on turn time,
7   correct?
8          MR. HEFTER:  Objection.
9   A.  As I said, I didn't --
10         THE COURT:  No, there was an objection.  Ground?
11         MR. HEFTER:  Assumes facts not in evidence.
12         THE COURT:  Overruled.
13  A.  As I said, I did not know the components of all of the
14  components of the loan specialists' compensation plan.
15  Q.  So, when you approved the suspension of QoG hits, you
16  didn't realize that loan specialists were at the same time
17  being incentivized with a turn time bonus, correct?
18         MR. HEFTER:  Objection.
19         THE COURT:  Overruled.
20  A.  I didn't consider that, no.
21  Q.  Well, let's look at the next column.  It says rank turn
22  time, do you see that?
23  A.  Yes.
24  Q.  All of the employees are being ranked by turn time, were
25  they not?

1              MS. MAINIGI:  Objection.  Foundation.

2              THE COURT:  Have you seen documents like this when you

3     were at Countrywide?

4              THE WITNESS:  Your Honor, I --

5              THE COURT:  That's a yes or no question.

6              THE WITNESS:  Yes.

7              THE COURT:  Did these documents include rankings of

8     employees?

9              THE WITNESS:  No, I don't believe so.

10             THE COURT:  So, you have never seen documents ranking

11    employees by any kind of performance?

12             THE WITNESS:  Not compensation-wise.

13             THE COURT:  What kind of rankings did you see, if any?

14             THE WITNESS:  It was typical to see rankings of top

15    producers.

16             THE COURT:  How would you determine the top producers?

17             THE WITNESS:  Number of fundings.

18             THE COURT:  Okay.  Is the portion of this that

19    corresponded to funding such a ranking or not?  Or can't you

20    tell?

21             THE WITNESS:  I can't tell.

22             THE COURT:  Why is that?

23             THE WITNESS:  Because these have to -- the rankings I

24    saw had to do with salespeople.  This is processing people.

25             THE COURT:  I see.  Okay.  Go ahead, counsel.

DA93BAN5                    Kitashima - cross

```
 1   BY MR. ARMAND:
 2   Q.  Mr. Kitashima, why don't we look over to the third column
 3   from the right.  Do you see that says 12/2007 QoG.  You see
 4   that?
 5   A.  Yes.
 6   Q.  QoG you testified stands for quality of grade, correct?
 7   A.  Yes.
 8   Q.  In this column, unlike the other columns that I showed to
 9   you dealing with turn time and fundings, all of these scores
10   are the same, are they not?
11   A.  Yes.
12   Q.  They're all scores of three, correct?
13   A.  Yes.
14   Q.  So all the loan specialists on this chart in the column,
15   they've been given the exact same quality of grade score,
16   correct?
17   A.  Yes.
18   Q.  Then let's look over to the right column, where they're
19   being ranked.  Rank QoG, do you see that?
20   A.  Yes.
21   Q.  Every single loan specialist on here has been given number
22   one ranking in quality of grade, correct?
23   A.  Yes.
24   Q.  How many loan specialists are on this chart?
25   A.  203.
```

DA93BAN5                    Kitashima - cross

1    Q.  All ranked number one quality of grade, correct?

2    A.  Yes, but I can explain.

3    Q.  You also testified, Mr. Kitashima, just a minute ago, you

4    said you didn't remember whether quality of grade was tracked

5    for employees for whom quality of grade had been suspended?

6    A.  Yes.

7            MR. ARMAND:  Your Honor, I'd like to direct

8    Mr. Kitashima to his deposition transcript page 145, starting

9    at line 19.

10           THE COURT:  To?

11           MR. ARMAND:  Now --

12           THE COURT:  From there?

13           MR. ARMAND:  Down to 146, line 22.

14           THE COURT:  All right.  Was there any objection?

15           MS. MAINIGI:  There is an objection.  Usual grounds

16   for the objection, your Honor.

17           MR. HEFTER:  Same.

18           THE COURT:  Yes.  I think you'll need to lay a clearer

19   foundation.  Maybe you want to ask the witness again to be

20   clear as to what his testimony is that you then seek to

21   introduce this with respect.

22           MR. ARMAND:  Happy to, your Honor.

23   Q.  So Mr. Kitashima, is it your testimony that despite the

24   quality of grade suspension or hit suspension, that you

25   continued to calculate and monitor the quality of grade scores

DA93BAN5                     Kitashima - cross

1   of the loan specialists who were in the High-Speed Swim Lane?

2   A.  I -- I couldn't remember if we did or not.

3           THE COURT:  That's what you're saying now?  You

4   currently don't remember.

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  You may read that.

7           MR. ARMAND:  Okay.

8   Q.  "Q.  The quality of grade scores, the suspension related to

9   the quality of grade results hitting compensation, correct?

10  "A.  Yes.

11  "Q.  Did the quality of grade results continue to be

12  calculated?

13  "A. Yes.

14  "Q.  Did those quality of grade results continue to get

15  reviewed by individuals that reported up to you?

16  "A.  Yes.

17  "Q.  Did you reevaluate the quality of grade suspension on a

18  periodic basis?

19  "A.  Well, considering that the quality of grade suspension was

20  designed to be in place for a set period of time, the actual

21  quality of grade results were, you know, were computed as I

22  pointed out, and we also continued to monitor and report

23  components that fed into the quality of grade rating.  So we

24  didn't stop anything in terms of our oversight of the quality

25  of grade side of the business.  I don't know if I answered that

DA93BAN5                    Kitashima - cross

1   question or not."

2           Was that your testimony on June 26, 2013?

3   A.  Yes.

4   Q.  As you just saw in Plaintiff's Exhibit 473, the loan

5   specialists here all had threes, did they not?

6   A.  Yes, but I can explain.

7   Q.  And they were all ranked number one, were they not?

8   A.  Yes, but I can explain what that means.

9           MS. MAINIGI:  Your Honor, can the witness --

10          THE COURT:  No.  That's why we have redirect.

11  Q.  Do you know who Craig Lickiss is, Mr. Kitashima?

12  A.  Excuse me?

13  Q.  Do you know who Craig Lickiss is?

14  A.  No, I don't.

15          MR. ARMAND:  May I approach, your Honor, the witness

16  with a binder?

17          THE COURT:  Yes.

18  Q.  Could you please turn to Plaintiff's Exhibit 443 in your

19  binder, please.  It may not be in your binder.

20          MR. ARMAND:  May I approach, your Honor?

21          THE COURT:  Yes.

22  Q.  I believe Plaintiff's Exhibit 443 is in evidence.

23  Mr. Kitashima, this is an e-mail from Craig Lickiss to Jerome

24  Holmes, do you see that?

25  A.  Yes.

1   Q.  Dated March 11, 2008, do you see that?

2   A.  Yes.

3   Q.  And let's just blow up the first sentence.  Mr. Lickiss

4   says "Jerome I have a number of questions relating to February

5   QoG report sent out Friday."  Do you see that?

6   A.  Yes.

7   Q.  And if we go down to the third asterisk, it says "All the

8   LSs have a score of four.  All funders have a score of two, and

9   all FVPS/AVPS have a score of three."  Do you see that?

10  A.  Yes.

11  Q.  Then if we go down to the last paragraph, which starts

12  "finally," it says "Finally, this is the first QoG report I've

13  seen since my start date last June."  And the date of this

14  e-mail is March 11, 2008, is that correct?

15          MS. MAINIGI:  Objection, your Honor.  I believe

16  Mr. Armand at this point is just testifying.  The witness is

17  not on this e-mail.

18          THE COURT:  If there is a question, you need to get to

19  it.

20  Q.  Would you turn to Plaintiff's Exhibit 120 in your binder.

21  A.  You said 120?

22  Q.  Yes, sir.

23  A.  I don't see it.  I have 102, 107 and then it jumps to 133.

24          THE COURT:  Counsel?

25          MR. ARMAND:  We'll have to come back to this.

1    Q.  Mr. Kitashima, there was also a 25 percent bonus that was

2    in effect during the High-Speed Swim Lane for funding, is that

3    correct?

4            MS. MAINIGI:  Objection.  Outside scope.

5            THE COURT:  No, just so that all counsel are aware, I

6    will, except in the most extreme cases, never sustain an

7    objection if it is outside the scope.  Counsel of course will

8    have all opportunity to examine the witness on any matter, and

9    we'll have necessary recross, redirect, re-redirect.  As far as

10   this Court is concerned, whichever witness has relevant

11   knowledge, it doesn't matter if it was within the scope or not.

12           MS. MAINIGI:  Thank you, your Honor.

13   Q.  Mr. Kitashima?

14   A.  Yes.

15   Q.  There was a 25 percent bonus that was in effect, a funding

16   bonus, during the High-Speed Swim Lane, is that correct?

17   A.  I don't remember.

18   Q.  It was one of the exhibits you were shown yesterday.

19   Defendant's Exhibit 250.

20   A.  Okay.  Yes, I see it.

21   Q.  Okay.  So there was a 25 percent bonus in effect?

22   A.  On one component, yes.

23   Q.  That was a funding bonus, correct?

24   A.  It was -- it had to do with funding, yes.

25   Q.  You approved the quality of grade suspension at the same

DA93BAN5                     Kitashima - cross

1   time that this funding bonus was in effect, correct?

2   A.  I'm not sure that quality of grade suspension applied to

3   all of these employees.

4   Q.  It applied to employees involved in the High-Speed Swim

5   Lane, did it not?

6   A.  Correct.  But these -- this note where the 25 percent bonus

7   is highlighted is going to all underwriters.

8   Q.  So is it your testimony that loan specialists were not

9   given a funding bonus in connection with the High-Speed Swim

10  Lane?

11  A.  I don't know.  I don't know how to answer that question.  I

12  didn't have responsibility for the bonus plans for loan

13  specialists.

14  Q.  Okay.  So, you don't know one way or the other if it

15  applied to loan specialists?

16  A.  I don't know if there was an additional 25 percent bonus

17  applied to loan specialists, no.

18  Q.  But in any event, you approved the quality of grade

19  suspension hit, correct?  Or you approved the suspension of the

20  quality of grade hit, correct?

21  A.  For certain employees in Central Fulfillment.

22  Q.  Mr. Kitashima, you were aware, were you not, that FSL

23  employees raised concerns about the changes to compensation in

24  connection with the High-Speed Swim Lane, were you not?

25  A.  Yes.

1    Q.  If you can turn to Plaintiff's Exhibit 52 in your binder.

2    52.  I believe this is in evidence.

3         MR. ARMAND:  Ms. Michaud, can you put that on the

4    screen, please.  If you can go to the second page in the middle

5    of the page.  And if you can blow up the e-mail there.

6    Q.  It is an e-mail that you received from Ed O'Donnell on or

7    about August 3, 2007, is that correct?

8    A.  Yes.

9    Q.  In this e-mail, Mr. O'Donnell is communicating to you

10   concerns that were raised by employees to the changes in

11   compensation, correct?

12   A.  Yes.

13   Q.  If we could blow up the paragraph that says "quality."  It

14   is the third paragraph from the bottom.  Can you please read

15   that, Mr. Kitashima.

16   A.  "Quality.  The number one question was about quality.  Does

17   the freeze on QoG and the request to move loans mean we no

18   longer care about quality?  Should I be worried that we are

19   trying to get more aggressive when we read that companies can't

20   sell loans and are closing as a result?  Mr. Sambol just wrote

21   us about the importance of making good loans.  How does this

22   fit with his comments?  What are the boundaries, is it just

23   fund everything and worry about it later?  Will I get an SUS

24   from corporate when there are defaults or the loan can't be

25   sold and how will that impact my job or my comp?"

DA93BAN5                         Kitashima - cross

1    Q.  These were concerns that were communicated to you, correct?

2              MR. HEFTER:  Objection.

3              THE COURT:  Ground?

4              MR. HEFTER:  Hearsay, your Honor, as to Ms. Mairone.

5              MR. ARMAND:  Offered for notice, your Honor.

6              THE COURT:  It is not hearsay.  We went through this

7    before.  If someone says "I think X is a problem," that's

8    hearsay.  If someone says "Is X a problem?"  That's not

9    hearsay.  And I understand this to be the latter type of

10   question.

11             MR. HEFTER:  Okay, your Honor.

12             THE COURT:  Overruled.

13             MS. MAINIGI:  Your Honor, I'm only objecting because

14   Mr. Armand indicated this was provided for notice, so I'm

15   objecting on relevance grounds because of the particular dates

16   involved.

17             THE COURT:  I'm sorry.  I missed the date.  So what is

18   the date?

19             MS. MAINIGI:  The date is early August, preceding the

20   start.

21             THE COURT:  I see.

22             MS. MAINIGI:  I don't know how it could be offered for

23   notice.

24             THE COURT:  Overruled.  I understand the objection,

25   but overruled.  You may answer.

1    A.  Can you restate the question?

2    Q.  You received these concerns from FSL employees, did you

3    not, Mr. Kitashima?

4              MS. MAINIGI:  Objection.

5              MR. HEFTER:  Objection.

6    A.  Yes.

7              THE COURT:  Ground?

8              MR. HEFTER:  Misstates the testimony and misstates the

9    document.

10             THE COURT:  It was a question.  Overruled.

11   A.  Yes.

12   Q.  Ms. Mairone received a copy of this e-mail as well, did she

13   not?

14   A.  Yes, it appears so.

15   Q.  If you could turn to the first page, and if we could blow

16   up the e-mail in the middle of the page.  This is a response

17   from Ms. Mairone to Mr. O'Donnell copying you, correct?

18   A.  Yes.

19   Q.  If we could go down to the last sentence of the e-mail,

20   Ms. Mairone says to you "So it sounds like it may work.  Is

21   that what I am hearing?"  Do you see that?

22   A.  Yes, I see that.

23   Q.  The High-Speed Swim Lane pilot went ahead, did it not?

24   A.  Yes.

25   Q.  Mr. Kitashima, you testified that in connection with the

1   High-Speed Swim Lane, CLUES was the underwriter, is that right?

2   A.  Yes.

3   Q.  But, CLUES is not able to clear its own conditions,

4   correct?

5   A.  Correct.

6   Q.  A human being has to do that?

7   A.  Excuse me?

8   Q.  A human being has to do that?

9   A.  Yes.

10  Q.  CLUES cannot clear a loan to close, correct?

11  A.  Yes.

12  Q.  It can't validate the data that's been input to it,

13  correct?

14  A.  Yes.

15  Q.  All of those tasks need to be done by a qualified human

16  being, is that not correct?

17  A.  That is correct.

18  Q.  You testified yesterday that Full Spectrum already had a

19  process in place before the High-Speed Swim Lane for prime

20  CLUES accept loans, correct?

21  A.  Yes.

22  Q.  That was called the PCA process, correct?

23  A.  Correct.

24  Q.  The PCA process used underwriters to clear the loan to

25  close, correct?

1    A.  Yes.

2    Q.  You testified yesterday that the prime CLUES accept work

3    flow was what Full Spectrum Lending used to process prime CLUES

4    accept loans during all of 2006, correct?

5    A.  The prime CLUES accept work flow was developed during a

6    time that we started to experience more prime loans.  There was

7    an entity that we -- or prime CLUES accept --

8    Q.  I'm sorry to interrupt.  But my question was, you

9    testified, did you not, that the prime CLUES accept work flow

10   was used by Full Spectrum for prime CLUES accept loans during

11   all of 2006, correct?

12   A.  Yes.

13   Q.  Okay.  By July of 2006, almost 80 percent of Full Spectrum

14   Lending's loan volume was prime, is that correct?

15   A.  That's sounds right, yes.

16   Q.  And that was a year before the start of the High-Speed Swim

17   Lane, correct?  More than a year.

18   A.  High-Speed Swim Lane started in the summer of 2007,

19   correct.

20   Q.  The quality assurance process.  You discussed that in your

21   testimony, did you not?

22   A.  Yes.

23   Q.  That was one of the things that you relied upon in agreeing

24   to the Hustle design, is that correct?

25   A.  Yes, it was a monitoring tool.

DA93BAN5                    Kitashima - cross

1    Q.  You believed that it was a valuable process, did you not?

2    A.  Yes.  It was valuable.

3    Q.  You've told the credit risk committee that it was a

4    valuable process, correct?

5    A.  Yes.

6    Q.  That it was valuable because of the immediate feedback that

7    it allowed FSL, and it allowed FSL to address issues

8    immediately, correct?

9    A.  Process issues, correct.

10   Q.  The quality assurance audits, those were prepared by people

11   who reported up to you, correct?

12   A.  Yes.

13   Q.  You received those reports on a regular basis, correct?

14   A.  Yes.

15   Q.  You reviewed them, correct?

16   A.  Yes.

17   Q.  In September of 2007, the quality assurance audits of the

18   High-Speed Swim Lane showed that as many as 41 percent of the

19   loans had been flagged as high risk, is that right?

20   A.  From a process standpoint, that's correct.

21   Q.  But they had been flagged as high risk, correct?

22   A.  Related to process, yes.

23   Q.  You were shown during your testimony today Defendant's

24   Exhibit 537.

25            Do we have that?

1           This is one of the quality assurance reviews from

2    September 2007, correct?

3    A.  Yes.

4    Q.  If we can go to page three.  If we can blow up the middle

5    where it says through 9/07/2007.  And it says 41 percent high

6    risk, correct?

7    A.  Yes.

8    Q.  Not high risk for process, just says high risk, correct?

9    A.  It was high risk for process.

10   Q.  But the document says high risk, correct?

11   A.  This is a QA report.  It is at the top, QA, which is

12   process.

13           MR. ARMAND:  Move to strike as non-responsive.

14           THE COURT:  Sustained.

15   Q.  Your testimony is that the quality assurance audits did not

16   reflect quality?

17   A.  Reflected quality of process.  But not -- the only measure

18   of quality was corporate QC.

19   Q.  So, elevated quality assurance findings, in your view,

20   didn't have an impact on whether or not a loan would be

21   investment quality?  Is that your testimony?

22   A.  Quality assurance equals process related issues.

23   Q.  Okay.  Well, let's look at some of the issues that are

24   flagged if we go down to QA results/common findings.  It says

25   four income related finding.

 1              Your testimony is that has nothing to do with whether
 2      the loan is investment quality as it relates to income?
 3              MS. MAINIGI:  Objection.
 4      Q.  My question is a yes or no question.
 5              THE COURT:  There was an objection.
 6              Overruled.  Is that your testimony, yes or no?
 7              THE WITNESS:  Say again?  Sorry.
 8              THE COURT:  You ought to put the question again.
 9      Q.  Is it your testimony that this high risk finding, the high
10      risk findings that are listed here for income have nothing to
11      do with whether the loan is investment quality?
12      A.  Yes.
13      Q.  Okay.  Let's go down and read the note at the bottom.  It
14      states the LSs -- that means loan specialists, correct?
15      A.  Yes.
16      Q.  "Were grandfathered in with PCA/hustle condition sign off
17      authority without training or Hustle certification
18      requirements.  As a result, our quality was challenged."
19              Did I read that correctly?
20      A.  Yes.
21      Q.  But it is your testimony that the quality assurance reports
22      have nothing to do with whether or not a loan is investment
23      quality?
24      A.  Yes.
25      Q.  You testified yesterday that loan specialists were given

1  provisional underwriting authority, correct?

2  A.  Yes, I think we were talking about those who had PCA

3  authority.  Is that what you're referring to?

4  Q.  Yes.  And you testified that provisional underwriting

5  authority meant that they could originate loans, but they had

6  to finish training within a certain period of time, correct?

7  A.  Yes.

8  Q.  So, it began on the rollout of Central Fulfillment on

9  October 1, 2007, correct?

10  A.  I believe so.

11  Q.  The loan specialists who were given underwriting authority

12  had until November 15 to complete the training, correct?

13  A.  Yes, I believe so.

14  Q.  Okay.  Would you agree with me from a credit risk

15  perspective, it is better to get people trained upfront than

16  train them after they've made errors, correct?

17  A.  Yes.

18  Q.  I'd like to show you Plaintiff's Exhibit 28.  That may not

19  be in your binder.

20         MR. ARMAND:  May I approach, your Honor?

21         THE COURT:  Yes.  After you finish this matter, we're

22  going to give the jury their midafternoon break.

23         MR. ARMAND:  Understood.

24  Q.  Mr. Kitashima, I'm showing you Plaintiff's Exhibit 28 in

25  evidence.  If we could blow up the top part of the e-mail

1    showing the to and from.

2              This is an e-mail from someone named Schuyler Yost to

3    Todd Green.  Do you see that?

4    A.  Yes.

5    Q.  Dated November 1, 2007, correct?

6    A.  Yes.

7    Q.  Do you know who Schuyler Yost is?

8    A.  The name looks and sounds familiar, yes.

9    Q.  Okay.  Well, let's go down to the beginning.  It says "We

10   have just finished all of the certification requirements,

11   everyone will still have to have 10 files reviewed."  Then it

12   lists the names.  Do you see that?

13   A.  Yes.

14   Q.  If we blow up the bottom paragraph, it says LSs -- that

15   means loan specialists, right?

16   A.  Yes.

17   Q.  "LSs who previously had PCA authority were given

18   provisional level one UW authority."  That means underwriting

19   authority, right?

20   A.  Hmm-hmm, yes.

21   Q.  "However, training for these people to show them how to

22   actually underwrite a file is still forthcoming."

23              Did I read that correctly?

24   A.  Yes.

25              MR. ARMAND:  I guess this is a good stopping point,

DA93BAN5                       Kitashima – cross

1       your Honor.

2                  THE COURT:  Ladies and gentlemen, we're only going to

3       go to 4:30 today.  So let's try to keep this break to about 10

4       minutes.

5                  (Jury excused)

6                  (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA93BAN5                              Kitashima - cross

1                  THE COURT:  How much more do you have on cross?

2                  MR. ARMAND:  I used up a good amount of time on side

3      bars, your Honor.

4                  THE COURT:  I took that into account, so I'll give you

5      a little bit more than you originally asked for, because there

6      was extensive side bars.  But how much more do you want?

7                  MR. ARMAND:  Probably half an hour to 45 minutes, your

8      Honor.

9                  THE COURT:  All right.  Well, let's see if we can keep

10     it closer to a half an hour.

11                 MR. ARMAND:  Understood.

12                 THE COURT:  Let me have my law clerk give to defense

13     counsel my rulings on the deposition of Mr. Gong.  As with

14     plaintiff's counsel, you need to first make copies for your

15     adversary; second, use it to make the changes in the

16     videotape -- or was this a videotape?

17                 MR. JONES:  Yes, your Honor.

18                 THE COURT:  And third, return it to my law clerk so we

19     can docket.  All right?  Return the original.

20                 Anything else?  See you in 10 minutes.

21                 (Recess)

22                 (Continued on next page)

23

24

25

1            (In open court; jury present)

2            THE COURT:  Counsel.

3            MR. ARMAND:  Thank you, your Honor.

4   BY MR. ARMAND:

5   Q.  Welcome back, Mr. Kitashima.  I just want to briefly go

6   back to quality of grade for a moment.  If we can go back to

7   Plaintiff's Exhibit 473.  I forgot to ask you about the second

8   tab.  There was a first tab and if you go to the second

9   Post-it.  And this is a similar spreadsheet to the prior

10  spreadsheet I showed to you that dealt with December 2007,

11  right?  It looks about the same, is that fair?

12  A.  Yeah.

13  Q.  If you'll look over to the middle column where it says

14  1/2008.  Would it be fair to say this is the same sort of

15  chart, it is just now for January 2008?

16  A.  Yes.

17  Q.  Okay.  And if we can just blow up the rankings there for

18  QoG.

19            MR. ARMAND:  Ms. Michaud, I'm sorry.  I didn't ask you

20  to blow it up.  Do we not have it?  473.  It's okay.

21  Q.  It is the same as the month before, they're all ranked

22  number one, right?

23  A.  Yes.

24  Q.  They all have QoG scores of three, right?

25  A.  Yes.  But I can explain.

1   Q.   Now, January of 2008, that's when you guys were doing that

2   quality summit you talked about?

3   A.   The quality summit you said?  I didn't hear you, I'm sorry.

4   Q.   January 2008, that's when you were doing the quality

5   summit.  You were asked about a quality summit?

6        MS. MAINIGI:  Objection.  I don't actually believe

7   that was in his testimony.

8        THE COURT:  I don't recall.

9        MR. ARMAND:  That's fine.

10  Q.   Is it true, Mr. Kitashima, that you were concerned in

11  November 2007 about audit results that were reflecting higher

12  SUS findings?

13  A.   Are you referring to a document?

14  Q.   I'm just asking you now.  Were you concerned about higher

15  audit results showing higher SUS findings in or about November

16  of 2007?

17       MS. MAINIGI:  Objection.

18       THE COURT:  Ground?

19       MS. MAINIGI:  Vague.  It's unclear.

20       THE COURT:  I understand the objection.  Sustained.

21  Q.   We'll come back to that exhibit.

22       Now, there was an exhibit I wanted to show to you

23  earlier but I wasn't able to find it.

24       MR. ARMAND:  If I may approach, your Honor.

25       THE COURT:  Yes.

1    Q.  Mr. Kitashima, you know who Wade Comeaux is?

2    A.  Yes.

3    Q.  You know he reported to Rebecca Mairone, is that correct?

4    A.  Yes.

5    Q.  This is an e-mail from Mr. Comeaux to Ms. Mairone sent on

6    or about May 14, 2008, is that right?

7    A.  Yes.

8             MR. ARMAND:  We offer it in evidence.

9             MS. MAINIGI:  No objection, your Honor.

10            MR. HEFTER:  No objection.

11            THE COURT:  Received.

12            (Plaintiff's Exhibit 120 received in evidence)

13            MS. MAINIGI:  I believe this document is admitted.

14            MR. ARMAND:  So it's been received twice.

15            THE COURT:  If the Giants could make two receptions,

16   they would make a lot of people happy.

17   Q.  In this e-mail Mr. Comeaux says to Rebecca Mairone "FYI,

18   LSs --" that's loan specialists, right, Mr. Kitashima?

19   A.  Yes.

20   Q.  So LSs means loan specialists, correct?

21   A.  Correct.

22   Q.  "FYI.  LSs have been receiving no QoG feedback for months.

23   We also have no organized detail on SUS findings per LS or OM."

24   And so this is May 14, 2008, correct?

25   A.  Yes.

1   Q.  No quality of grade feedback for months, correct?

2              MS. MAINIGI:  Objection, foundation.

3              MR. HEFTER:  Objection.

4              MR. ARMAND:  Withdrawn.

5   Q.  Loan processors involved in the High-Speed Swim Lane, they

6   reported up to Rebecca Mairone, correct?

7              MR. HEFTER:  Objection.  Vague as to time.

8              THE COURT:  Do you want to put a timeframe on it?

9   Q.  Loan specialists involved in the High-Speed Swim Lane pilot

10  reported up to Rebecca Mairone, correct?

11  A.  I don't think so.  Not at that time.

12  Q.  Is it your testimony that loan specialists in the

13  High-Speed Swim Lane reported to Rebecca Mairone only during

14  Central Fulfillment?

15             MR. HEFTER:  Objection.

16             THE COURT:  Overruled.

17  A.  That's when the organizational structure was changed, and

18  Rebecca Mairone was put in charge of Full Spectrum -- of

19  Central Fulfillment.  Sorry.

20  Q.  So it is your testimony that during Central Fulfillment,

21  when it was rolled out October 1, 2007, at that time loan

22  specialists reported up to Rebecca Mairone, right?

23  A.  Yes.

24  Q.  But not before that time?

25  A.  No.

1    Q.  Mr. Kitashima, now, the High-Speed Swim Lane, under the

2    High-Speed Swim Lane a loan could come in, a loan application

3    to Full Spectrum could come in on day one, and be cleared to

4    close on that same day, correct?

5    A.  Very unlikely.

6    Q.  Okay.  Let's turn to Plaintiff's Exhibit 55 in your book.

7    I believe this is in evidence.  So we can go ahead and put that

8    up, Ms. Michaud.

9         You know who Mark Barnett is, Mr. Kitashima?

10   A.  Mark Barnett, yes.

11   Q.  This is an e-mail from Mark Barnett August 16, 2007, to

12   Loren Rodriguez, right?

13   A.  I'm sorry, I must have the wrong one.  I have DX 55.

14   Q.  It's PX, sorry.

15   A.  Okay.

16   Q.  Do you have it?

17   A.  Yes, I do.

18   Q.  Okay.  So, and Ms. Mairone is copied on this e-mail as

19   well, correct?

20   A.  Yes.

21   Q.  So Mr. Barnett says in this e-mail so you know we're --

22        MS. MAINIGI:  Objection, your Honor.  I apologize for

23   interrupting, but once again I think this is Mr. Armand

24   testifying.  Mr. Kitashima is nowhere on this e-mail.

25        THE COURT:  I agreed with you last time.  This time I

1    understand this is just foundational to the question he's about

2    to put.

3              Do I have that right or wrong?  If I have it wrong,

4    then I sustain the objection.

5    Q.  Mr. Kitashima, during the High-Speed Swim Lane pilot, you

6    were monitoring the results of the loans as they progressed

7    through the swim lane, correct?

8    A.  Yes.

9    Q.  So you would be in a position to know if there was a loan

10   that came in on day one, and was cleared to close during that

11   same day, correct?

12   A.  I didn't monitor every loan, no.  So I wouldn't normally

13   know what every loan was doing that came into the Swim Lane.

14   Q.  Is it your testimony, Mr. Kitashima, that a loan that came

15   in the High-Speed Swim Lane, it couldn't come in, enter the

16   High-Speed Swim Lane, and be cleared to close in the same day?

17             MS. MAINIGI:  Objection.

18             MR. HEFTER:  Objection.  Vague.  Speculation.

19             THE COURT:  Sustained.

20             MR. ARMAND:  You can take it down.  I'll move on.

21   Q.  Mr. Kitashima, you testified that stated income loans were

22   included in the High-Speed Swim Lane, is that right?

23   A.  Yes.

24   Q.  I believe you testified yesterday that you thought stated

25   income loans were the highest quality and fairly low risk,

1   right?

2   A.   Loans that went through the High-Speed Swim Lane were high

3   quality, fairly low risk, yes.

4   Q.   You are saying that includes stated income loans?

5   A.   Certain stated income loans, yes.  There were other

6   criteria around stated income loans that may have qualified

7   that for High-Speed Swim Lane.

8   Q.   How many years do you have in the mortgage business,

9   Mr. Kitashima?

10  A.   30, 35 years.

11  Q.   You've heard the expression "liar loan"?

12  A.   Liar loan, yes.

13  Q.   That applies to stated income loans, right?

14  A.   No.

15  Q.   Okay.  Stated income loans are loans where borrowers aren't

16  required to provide documentation for their income, right?

17  A.   Stated loans usually do not require income documentation.

18  Q.   Okay.  So, you need a person to review the stated income

19  and make a determination about whether or not it's reasonable,

20  right?

21  A.   That's correct.

22  Q.   That person needs to be qualified, right?

23  A.   Correct.

24  Q.   You determined that loan specialists could do that for the

25  High-Speed Swim Lane, correct?

1  A.  At a certain time, yes.

2  Q.  That was because you said they were highest quality, fairly

3  low risk, right?

4  A.  Yes.

5  Q.  Were you aware that stated income loans were

6  experiencing -- that Countrywide had originated -- were

7  experiencing early payment defaults in 2007 and 2008?

8  A.  I was aware of the guidelines that Countrywide had asked us

9  to underwrite loans to, and I was responsible for making sure

10  that loans that we did put through the High-Speed Swim Lane, or

11  for that matter any work flow, met those guidelines.  And I was

12  very certain that the loans going through the High-Speed Swim

13  Lane --

14        MR. ARMAND:  Your Honor, move to strike as not

15  responsive.

16        THE COURT:  Sustained.

17  Q.  You were aware, were you not, Mr. Kitashima, that stated

18  income loans that Countrywide was originating in 2007 and 2008

19  were experiencing early payment defaults, correct?

20  A.  Yes, but I can explain.

21  Q.  You approved putting them in the High-Speed Swim Lane,

22  correct?

23  A.  Yes, but I'd like to explain.

24  Q.  Thank you.

25        MS. MAINIGI:  Your Honor, he keeps cutting him off

DA93BAN5                        Kitashima – cross

1    with the answer to the question.

2                THE COURT:  The rules of the game, and I should

3    explain this to the witness and to counsel and to the jury.  Is

4    that on cross-examination, if a question is of the kind that

5    can be answered yes or no, then the witness must answer yes or

6    no.  If there is a further explanation that he wishes to give,

7    it will be the job of adversary counsel on redirect to say was

8    there something further you wanted to explain.  And assuming it

9    is properly admissible, that would be the time to have it.

10               Now, there are some questions that can't be answered

11   yes or no.  In which case the witness can say, I can't answer

12   that yes or no.  Then if the questioner wishes to get an answer

13   to the question, the questioner can go forward and say, well,

14   give us your answer.

15               This has been the rules of cross-examination I believe

16   for at least 200 years.  And being a very traditional sort of

17   guy, I'm going to follow it here.

18               MS. MAINIGI:  Thank you, your Honor.

19               (Continued on next page)

20

21

22

23

24

25

1    BY MR. ARMAND:

2    Q.  Mr. Kitashima, I believe you testified earlier this morning

3    that expanded approval loans were excluded from the High-Speed

4    Swim Lane?

5    A.  Initially, yes.

6    Q.  Only talking about during the pilot, right?

7    A.  It may have been put through Central Fulfillment, and I'm

8    not sure when, but what the guidelines were all the way through

9    that process.

10   Q.  As long as -- during Central Fulfillment, as long as the

11   loan specialist had been given underwriter level one or

12   underwriter level two, they could approve expanded approval

13   loans, right?

14   A.  No, it was excluded from the High-Speed Swim Lane.

15   Q.  Even in Central Fulfillment?

16   A.  During -- in Central Fulfillment, frankly I don't remember

17   exactly what they could approve and couldn't approve with

18   regard to EA.

19   Q.  You don't know one way or the other?

20   A.  No, I don't.

21   Q.  Fair enough.  Mr. Kitashima, now you knew that quality

22   assurance findings of action required weren't being corrected

23   before those loans were funded, right?

24              MS. MAINIGI:  Objection.

25              THE COURT:  Ground?

DA9TBAN6                          Kitashima - cross

1             MS. MAINIGI:  Vague.

2             MR. ARMAND:  I can rephrase.

3             THE COURT:  I think so.

4   Q.  Mr. Kitashima, in or about November of 2007 you were aware,

5   were you not, that loans that went through the quality

6   assurance process and had been flagged as high risk or action

7   required were not being fixed before the loans funded, correct?

8             MR. HEFTER:  Objection, vague as to "fixed."

9             THE COURT:  No, I think in context that's reasonably

10  clear.  Overruled.

11            THE WITNESS:  I can't say definitively yes or no, I

12  think some were corrected, some were not.

13  Q.  If we could turn to Plaintiff's Exhibit 63 in your binder

14  please, Mr. Kitashima.  Do you have that, sir?

15  A.  Yes, I do.

16  Q.  This is an email from -- I believe this is in evidence, the

17  top email is from Rebecca Mairone to Wade Comeaux on

18  November 12, 2007, right?

19  A.  Yes.

20  Q.  And below that there's an email November 12, 2007, earlier

21  same day, and it's from Wade Comeaux and copies you.  Do you

22  see your name there?

23  A.  Yes, I do.

24  Q.  And this is an email from Steve Brent, right?

25  A.  Yes.

1   Q.  Steve Brent worked for you, right?

2   A.  Correct.

3   Q.  So let's see what Mr. Brent says.  If you go down --

4          MR. ARMAND:  And why don't you blow up the first

5   sentence there and the two bullet points.

6   Q.  Says:  Wade, we have some challenges with the process and

7   need to address ASAP.  We are going to produce some detailed

8   reports for your team either today or tomorrow first thing.

9   Then a bullet:  It appears that the funded loan files for CF --

10         CF means Central Fulfillment, right?

11  A.  Yes.

12  Q.  For CF are not compete and could create much higher SUS

13  rates.

14         Next bullet.

15         MR. HEFTER:  Your Honor, let the record reflect

16  there's quotation marks around --

17         MR. ARMAND:  That's true, it is in quotes, could.

18  Q.  Only five percent of the initial findings on the PC3

19  review --

20         PC3 means clear to close, right?

21  A.  PC3.

22  Q.  Phase code three, right?

23  A.  It has not been -- well, phase code three means it's there

24  to review clear to close.

25  Q.  So I'm sorry, so you're saying that phase code three is not

1    the clear to close in status mart?

2    A.  I take that back, I'm not really sure.  I don't remember

3    exactly what.

4    Q.  You don't remember?

5    A.  No.

6    Q.  That's fine.  Well, the PC3 review are ultimately being

7    completed and made part of the funded loan files.

8            If you go to the second page and blow up this chart,

9    we have here in the first column initial results of PC3 and go

10   down to the bottom and got percent of loans with findings and

11   says loans reviewed, 532 loans, 85 percent with findings.  Do

12   you see that?

13   A.  Yes, I do.

14   Q.  And let's go over to the other one, the other column on the

15   right, PC4, which means the loans are funded, right?

16   A.  Yes.

17   Q.  "Funded" means they're out the door, they're gone, they

18   have been sold, right?

19   A.  No.

20   Q.  OK.  So 80 percent is what it says now, percent of loans

21   with fundings, so gone from 85 down to 80 percent, meaning only

22   five percent, as Mr. Brent indicated, are being completed.

23            MS. MAINIGI:  Objection.

24   Q.  Correct?

25            MS. MAINIGI:  Objection.

1           THE COURT:  Pardon?

2           MS. MAINIGI:  Objection, your Honor.

3           THE COURT:  Ground?

4           MS. MAINIGI:  Vague, foundation.

5           MR. HEFTER:  Argumentative.

6           THE COURT:  Of course if it were vague it could not

7    likely be argumentative, but in any event, the objection is

8    overruled.

9    A.  What was the question?

10   Q.  That's the five percent that Mr. Brent -- sorry, withdrawn.

11          The five percent that Mr. Brent is referring to on the

12   first page, that's the difference between the 85 percent and

13   the PC3 category with findings and the 80 percent in PC4 with

14   findings, correct?

15   A.  Yes, but there's an explanation.

16   Q.  Now let's go down to the bottom where it says "note," and

17   Mr. Brent says:  Note, there is very similar to the issue --

18   sorry, this is very similar to the issue of the SUS findings on

19   our random and targeted CQC audits from corporate.

20          "CQC" means corporate quality control, right,

21   Mr. Kitashima?

22   A.  Yes.

23   Q.  OK.  Says in the past and currently, we have seen an

24   increase in our SUS findings from the UW group.

25          "UW group," that's underwriting group, right?

1    A.  Yes.

2    Q.  When we stop sending the initial SUS finding directly to

3    the UW'ers.

4          That means underwriters, right?

5    A.  Yes.

6    Q.  Versus only to the center heads.  It is just a different

7    perspective taken by the line staff.  Management is just too

8    busy to forward every note and ensure compliant notes are

9    funded by FSL.  Is that right?  Did I read that right?

10   A.  That's what it says.

11   Q.  And you were saying earlier today --

12          MS. MAINIGI:  Objection, your Honor, again, Mr. Armand

13   is just testifying from the documents.

14          THE COURT:  Well, I think no, because he's just

15   about -- he's about to put to the witness a question about an

16   alleged difference between what he just read and what he

17   recollects being said by the witness earlier.  Overruled.

18   Q.  Mr. Kitashima, you testified earlier today that loan

19   specialists were complaining that they were -- that the quality

20   assurance findings that they were getting was -- it took too

21   long to respond to, is that right?

22   A.  I think some of the quality assurance findings was noise.

23   Q.  That's not what I asked you, Mr. Kitashima, sorry.  My

24   question was there were complaints from loan specialists that

25   it was taking too long to respond to the quality assurance,

1   correct?  I believe you said an inordinate amount of time.

2   A.  That was some of the feedback we were getting.

3   Q.  Mr. Brent here is suggesting that there is a different

4   perspective -- withdrawn.

5        Mr. Brent, however, is suggesting that the line staff

6   were producing the loans should receive this information

7   because it will have a positive impact on SUS findings,

8   correct?

9        MR. HEFTER:  Objection, foundation, document speaks

10  for itself.

11       THE COURT:  Sustained.

12  Q.  Mr. Kitashima, you were aware that at this time that

13  Countrywide was reselling loans that FSL was originating to the

14  Fannie Mae and Freddie Mac, weren't you?

15  A.  That was my understanding.

16  Q.  And you knew that the loans that were being sold to Fannie

17  Mae and Freddie Mac that were originated by FSL, they came with

18  a representation they were investment quality, correct?

19       MS. MAINIGI:  Objection.

20       THE COURT:  Ground?

21       MS. MAINIGI:  Calls for a legal conclusion, your

22  Honor.

23       THE COURT:  No.  Overruled.

24       You may answer.

25  A.  As I testified earlier, I didn't know -- I didn't have any

1  dealings with the investor or GSEs, my job was to ensure that

2  loans were written according to Countrywide's underwriting

3  guidelines, so I -- that was my focus.

4  Q.  But you knew the loans that were -- that Countrywide was

5  selling to Fannie and Freddie needed to be investment quality,

6  right?

7  A.  I knew they were being sold to Fannie and Freddie, but I

8  didn't know the entire arrangement or agreement with Fannie or

9  Freddie.

10 Q.  So you --

11 A.  Other than the guidelines we were asked to write to.

12 Q.  So you thought it was OK for Countrywide to sell

13 non-investment quality loans to Fannie and Freddie?

14         MR. HEFTER:  Objection.

15         THE COURT:  Overruled.

16 A.  Absolutely not.

17 Q.  So you understood that the loans that Countrywide was

18 selling to Fannie and Freddie needed to be investment quality,

19 is that fair?

20 A.  That was my understanding.

21 Q.  Thank you.  Now in late November of 2007 you received

22 information from Greg Lumsden about profitability at Full

23 Spectrum, is that correct?

24         MS. MAINIGI:  Objection.

25         THE COURT:  Ground?

1            MS. MAINIGI:  Vague, foundation.

2            MR. ARMAND:  I can withdraw.

3            THE COURT:  All right.  Keep in mind that you need to

4   bring this to a completion fairly soon.

5            MR. ARMAND:  Understood, your Honor.

6   Q.  Mr. Kitashima, you were shown -- there was the email that

7   Ms. Mairone sent to a number of Countrywide employees on

8   November 29, 2007.  Do you recall that?

9   A.  Did this have to do -- what was the --

10  Q.  You received a draft and gave comments before it went out?

11  A.  Yes.

12  Q.  And one of the points was that quality assurance

13  communications would be directed solely to Ms. Mairone?

14  A.  Yeah, as it relates to her organization, yes.

15  Q.  And you didn't have any comments on that?

16  A.  Not that part.

17  Q.  And you didn't have any comments on the directive that the

18  quality control information would be sent only to Ms. Mairone,

19  correct?

20  A.  The quality assurance?

21  Q.  The quality control, quality control communications.?

22           MR. HEFTER:  Objection.  Mischaracterizes the

23  document.

24           MR. ARMAND:  I'll withdraw and move quickly.

25  Q.  Now Mr. Kitashima, you were shown a presentation, a

1   subprime review to Freddie Mac, is that right?

2   A.  Yes.

3   Q.  That's DX4036, do you recall seeing that presentation

4   earlier?

5   A.  I recall the Freddie Mac, I don't know what the number was.

6   Q.  It's DX4036.  And this was for part of a subprime review,

7   correct?

8           The people from Freddie Mac that you were presenting

9   to were there to review subprime business, correct?

10  A.  No.

11  Q.  Now if you could open your book to -- the defense book to

12  Exhibit 4036.

13  A.  Yes, I got it.

14  Q.  And the title is FHLMC.  That's Freddie Mac, right?

15  A.  Yes.

16  Q.  Subprime review, correct?

17  A.  Full Spectrum was a subprime division for Countrywide, and

18  that's the only reason why it included subprime.  At the time,

19  from Freddie Mac's perspective, Full Spectrum was the

20  subprime -- retail subprime department.

21  Q.  OK.  But the people who were there for the presentation

22  were there to hear about subprime?

23  A.  They were there to hear a high level review of what Full

24  Spectrum was doing.

25  Q.  Mr. Kitashima, the reference to the High-Speed Swim Lane,

1    that appeared only in the appendix, right?

2    A.  I didn't hear that.

3    Q.  The reference to the High-Speed Swim Lane in this

4    presentation referred only -- it was referred to only in an

5    appendix, correct?

6    A.  It was discussed.

7    Q.  That's not what I asked.  Sorry to interrupt, but I asked:

8    It appears only in the appendix, correct?

9    A.  I think --

10   Q.  It's all right, Mr. Kitashima, let's turn to page 20.

11   A.  OK.

12           MR. ARMAND:  Put up page 20.

13   A.  All right.

14   Q.  Under quality assurance, the first bullet there, focus of

15   FSL's QAC group is to -- and then it says provide

16   direction/feedback to production and senior management.

17           Do you see that?

18   A.  This is page 20 under what?  I see, under focus.

19           Yes, I see that.

20   Q.  That was what was told to Freddie Mac, correct?

21   A.  Yes.

22   Q.  And then we go down under quality control, the second to

23   last bullet it says report -- results are reported and used

24   toward making adjustments due to compensation and disciplinary

25   issues.  Do you see that?

1   A.  Yes.

2   Q.  It doesn't make any reference to a suspension of Quality of

3   Grade, correct?

4   A.  Yes, but I can explain.

5   Q.  Mr. Kitashima, you were shown a number of quality control

6   results in your testimony earlier today, correct?

7   A.  Yes.

8   Q.  And those were final quality control results?

9   A.  The ones I was shown, yes.

10  Q.  And that was after FSL had had an opportunity to rebut the

11  findings, right?

12  A.  Yes.

13  Q.  OK.  And if could you turn to page -- Exhibit 476.

14  A.  DX?

15  Q.  PX476 in the plaintiff's binder.

16  A.  PX.

17  Q.  Now this is an email from you to Ed O'Donnell in March of

18  2008, correct?

19  A.  Yes.

20  Q.  And if we could --

21          MR. ARMAND:  The government offers it in evidence.

22          MS. MAINIGI:  No objection, your Honor.

23  Q.  Now this email --

24          THE COURT:  Any objection from Ms. Mairone's counsel?

25          MR. ARMAND:  Sorry, your Honor?

DA9TBAN6                          Kitashima - cross

```
 1              MR. HEFTER:  Could we have a second, your Honor?

 2              No objection, your Honor.

 3              THE COURT:  Received.

 4              (Plaintiff's Exhibit 476 received in evidence)

 5   BY MR. ARMAND:

 6   Q.  And this email discusses rebuttals during the third and

 7   fourth quarter of 2007, right?

 8   A.  Yes.

 9   Q.  And if we go down to the first paragraph, that's an email

10   from Ed O'Donnell on March 13, 2008.  Do you see the first

11   paragraph where it starts "Through?"

12   A.  Yes.

13   Q.  And says:  Through our SUS review meetings with Cindy --

14              That's Cindy Simantel?

15   A.  I would think so, yes.

16   Q.  She was in charge of quality control, right?

17   A.  I'm not sure what her title and responsibilities were.

18   Q.  Over the last two days 37 to 45 SUS findings have been

19   reduced.

20   A.  32.

21   Q.  So --

22   A.  45, right.

23   Q.  So this indicates to you, does it not, that in March of

24   2008 FSL was going back and rebutting SUS findings, prior SUS

25   findings, right?
```

DA9TBAN6                    Kitashima - cross

1          MR. HEFTER:  Objection.

2          MS. MAINIGI:  Objection.

3          MR. HEFTER:  Vague.

4          THE COURT:  Overruled.

5    A.  Yes, SUS findings were rebutted.

6    Q.  Now in the first quarter of 2008 the SUS findings -- the

7    initial SUS findings were very high, were they not?

8    A.  For the first quarter you said?

9    Q.  The first quarter of 2008, the initial SUS findings were

10   very high, were they not?

11         MS. MAINIGI:  Objection.

12         THE COURT:  Overruled.

13   A.  I don't remember first quarter 2008 what they were.

14   Q.  You don't remember.  OK.

15   A.  No.

16   Q.  And do you remember there was a process called the sprint

17   incentive to rebut those findings?

18   A.  Yes, I do, yes.

19   Q.  But in March of 2008 you thought that quality -- withdrawn.

20         In March of 2008 you thought that the current process

21   in Full Spectrum was in a ditch, right?

22         MS. MAINIGI:  Objection.

23   A.  No.  Sorry.

24   Q.  If we could --

25         THE COURT:  There was an objection.

DA9TBAN6                        Kitashima - cross

1          Sustained.

2    Q.  Could we turn to Plaintiff's Exhibit 78 in your binder,

3    Mr. O'Donnell -- sorry, Mr. Kitashima.  Sorry about that.

4    A.  By the way, I'm mistaken for Mr. O'Donnell quite often.

5    Q.  Sorry about that.  Were you able to find it?

6    A.  Yes, I have it here.

7          MR. ARMAND:  This is in evidence.  Ms. Michaud,

8    please --

9    Q.  First there's an email March 5th, 2008 in the middle of the

10   page from Mr. O'Donnell to you.  Do you see that?

11   A.  Yes.

12   Q.  And Mr. O'Donnell says to you:  With 79 percent of our Q4

13   SUS ratings attributed to income reasonability --

14          "Income reasonability,"that's stated income loans,

15   right?

16          MR. HEFTER:  Objection.

17          THE COURT:  Ground?

18          MR. HEFTER:  Vague.

19          THE COURT:  Overruled.

20   A.  Repeat the question again, please?

21   Q.  Income reasonability, that's a determination made for

22   stated income loans, right?

23   A.  Yes.

24   Q.  OK.  So saying Q4 SUS ratings attributed to income

25   reasonableness, we need a much stronger process to ensure we

1   get this weakness addressed.  The fact that this may involve

2   additional reviews is a fair trade versus losing the products

3   due to our inability to execute.  Clearly the current process

4   is in the ditch.

5           And do you see that, Mr. Kitashima?  Did I read that

6   correctly?

7   A.  Yes, you did.

8   Q.  And then you respond.  Could you read your response from

9   "Maybe?"

10  A.  Maybe you could also point out that those who drove us into

11  the ditch should have the -- shouldn't have the final say on

12  the policies to get us out.

13  Q.  Mr. Kitashima, you were also shown a presentation that was

14  given to Fannie Mae in or about December of 2007, is that

15  right?

16          MS. MAINIGI:  Objection, your Honor.  Are we going to

17  wind this up soon?

18          MR. ARMAND:  This will be my last document, your

19  Honor.

20          THE COURT:  Well, if you think you can do it in two

21  minutes, you have two minutes left.  Otherwise, we'll have to

22  consider whether or not to permit to you do it tomorrow.

23  Q.  Mr. Kitashima, this was DX729 in your book, and this was --

24  there's no -- DX729, this presentation to Fannie Mae, there's

25  no appendix here dealing with the High-Speed Swim Lane, right?

DA9TBAN6                          Kitashima - cross

1    A.   Yes, but that's because it was --

2    Q.   Sorry, to interrupt, but my question is:  There wasn't any

3    appendix with regard to this document, right?

4              MS. MAINIGI:  Objection, your Honor.

5              THE COURT:  Overruled.

6    Q.   And --

7              THE COURT:  He didn't answer the question.

8              MR. ARMAND:  I'm trying to go so fast.

9              THE COURT:  I'll tell you what, rather than compress

10   this we'll take this up outside the presence of the jury.

11             Ladies and gentlemen, we'll see you tomorrow at 9:30.

12             MS. MAINIGI:  Your Honor, may we have a side bar?

13             THE COURT:  Before we excuse the jury?

14             MS. MAINIGI:  Yes, your Honor.

15             THE COURT:  Come to the side bar.

16             MS. MAINIGI:  I apologize.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1           (At side bar)

2           MS. MAINIGI:  Your Honor, I ask the Court and the

3    jury's indulgence, I think Mr. Armand is almost done.  We're

4    willing to to ask no questions.  This guy is trying to get home

5    to Oregon tonight.

6           THE COURT:  No, I have another matter which was for

7    4 o'clock, based on the representations, which I find were less

8    than fulfilled.  But based on the representations, I extended

9    it to 4:30, even though I teach at Columbia tonight, because I

10   thought that Mr. Armand would be through by 4:15 and you would

11   probably have more than 15 minutes of redirect.  I was

12   mistaken.  It's not your fault, it's his fault.

13          MR. ARMAND:  Sorry, your Honor.

14          THE COURT:  But I cannot, consistent with my

15   obligations, let this go one minute more.

16          MR. HEFTER:  Your Honor, we reserve our right to

17   redirect if we decide to do, so but we were --

18          MS. MAINIGI:  Yes, your Honor.

19          THE COURT:  Of course, you'll have full redirect

20   tomorrow morning.

21          MR. HEFTER:  Thank you.

22          (Continued on next page)

23

24

25

DA9TBAN6

```
 1            (In open court)

 2            THE COURT:  So counsel for all the parties were

 3  begging me to let this continue because they were having so

 4  much fun, and they knew we were, too, but this is a court of

 5  law, we can't have fun here.  So we will continue tomorrow at

 6  9:30.  You're excused until then.

 7            (Jury not present)

 8            THE COURT:  So because the government's original time

 9  estimate did not take account of extensive side bars, I allowed

10  the government to go longer.  The government then said 30 to 45

11  minutes.  I urged the government to keep it to 30 minutes, but

12  in fact, it exceeded 45 minutes.  I will give you five minutes

13  tomorrow, and at one second after five minutes your cross will

14  be brought to a close by the Court, and I will not permit

15  further misestimates of this kind.  I understand that it's not

16  always possible to give a perfect estimate because you don't

17  know what objections will be raised, you don't know whether

18  there will be side bars or whatever, but you need to err on the

19  side of liberality because from now on I will not err on the

20  side of liberality.

21            Anything else counsel wants to raise?

22            MR. ARMAND:  I just want to apologize, your Honor.

23            THE COURT:  No problem.  We'll see you tomorrow at

24  9:30.

25            (Adjourned to October 10, 2013 at 9:30)
```

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   CLIFFORD KITASHIMA

 4   Direct By Ms. Mainigi  . . . . . . . . . .1975

 5   Direct By Mr. Hefter . . . . . . . . . . .2023

 6   Cross By Mr. Armand  . . . . . . . . . . .2045

 7                    PLAINTIFF EXHIBITS

 8   Exhibit No.                            Received

 9    473   . . . . . . . . . . . . . . . . .2061

10    120   . . . . . . . . . . . . . . . . .2088

11    476   . . . . . . . . . . . . . . . . .2107

12                    DEFENDANT EXHIBITS

13   Exhibit No.                            Received

14    28   . . . . . . . . . . . . . . . . . .1976

15    729   . . . . . . . . . . . . . . . . .1998

16    537   . . . . . . . . . . . . . . . . .2000

17    963   . . . . . . . . . . . . . . . . .2003

18    639   . . . . . . . . . . . . . . . . .2006

19    670   . . . . . . . . . . . . . . . . .2011

20    795   . . . . . . . . . . . . . . . . .2014

21    720   . . . . . . . . . . . . . . . . .2039

22

23

24

25
```