DAB3BAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    Plaintiff,

              v.                          12 CV 1422 (JSR)

BANK OF AMERICA CORPORATION,
successor to Countrywide
Financial Corporation,
Countrywide Home Loans, Inc.,
and Full Spectrum Lending, et
al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          October 11, 2013
                                          9:45 a.m.

Before:

                    HON. JED S. RAKOFF,

                                          District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAB3BAN1

1                                APPEARANCES

2     PREET BHARARA
           United States Attorney for the
3          Southern District of New York
      PIERRE G. ARMAND
4     JAIMIE LEESER NAWADAY
      JOSEPH N. CORDARO
5     CARINA H. SCHOENBERGER
      ELLEN M. LONDON
6          Assistant United States Attorneys

7

      WILLIAMS & CONNOLLY
8          Attorneys for Defendant Bank of America
      BRENDAN V. SULLIVAN, JR.
9     ENU MAINIGI
      MALACHI B. JONES
10    KENNETH SMURZYNSKI
      CRAIG D. SINGER
11    ALLISON B. JONES
      STEVEN M. CADY
12    JENNIFER WIMSATT PUSATERI

13

      GOODWIN PROCTOR
14         Attorneys for Defendants Countrywide
      RICHARD M. STRASSBERG
15    WILLIAM HARRINGTON

16

      BRACEWELL & GIULIANI
17         Attorneys for Defendant Mairone
      MARC L. MUKASEY
18    MICHAEL HEFTER
      RUSSELL ZWERIN
19    RYAN M. PHILP
      SETH M. COHEN
20    CHRISTINA JARDINE

21

22

23

24

25

2292

DAB3BAN1

1              (In open court; jury not present)

2              THE COURT:  We have a note from Juror No. 8.  "Would

3     it be possible to get out around 3:30 p.m. on Friday,

4     October 18, I would like to take my son to a flashlight corn

5     maze activity in Rockland County.  It will enable me to get

6     home to northern Rockland County by 6 p.m.  Thank you for your

7     consideration."

8              So I'm going to have my courtroom deputy tell the

9     juror that's fine.  I don't think it would be fair to ever

10    deprive someone of a flashlight corn maze activity.  There are

11    several of course on Broadway.

12             Let's bring in the jury.

13             (Jury present)

14             THE COURT:  Good morning, ladies and gentlemen.  Juror

15    No. 8, that's fine.

16             All right.  Please continue.

17             MS. MAINIGI:  Thank you, your Honor.

18     MARK BARNETT,

19         called as a witness by the Defendant,

20         having been previously sworn, testified as follows:

21    DIRECT EXAMINATION

22    BY MS. MAINIGI:

23    Q.  Good morning, Mr. Barnett.

24    A.  Good morning.

25    Q.  I think when we left off yesterday we were looking at DX

DAB3BAN1                    Barnett - direct

1   202, an admitted exhibit.  Can you just remind us briefly what

2   this document is, Mr. Barnett.

3   A.  Yes.  Okay.  So, this document was a PowerPoint

4   presentation given towards the end of July, July 23, about the

5   visit that a couple of my members of my team made to some of

6   the CMD regional operating centers.

7   Q.  How did this relate to the High-Speed Swim Lane design,

8   Mr. Barnett?

9   A.  We wanted to make sure that we were -- that we understood

10  and benchmarked against what some of the best practices were in

11  our own company in CMD.

12          MS. NAWADAY:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Take a look at page 15, Mr. Barnett.

15          MS. MAINIGI:  Alex, if we can blow up the section that

16  says "underwriting is done."  And one right underneath it.

17  Q.  Do you have your copy of the presentation there also,

18  Mr. Barnett?

19  A.  I do.  Just a little out of order here.  Yes.

20  Q.  If you could read that out loud first, please, sir.

21  A.  Sure.  "Underwriting is done by underwriter, team managers

22  and LSs.  LS have CLUES accept authority first, and refer

23  authority up to $1 million."

24  Q.  Within the High-Speed Swim Lane design, did loan

25  specialists have CLUES accept authority?

DAB3BAN1                         Barnett - direct

1   A.   They had CLUES accept authority, yes.

2   Q.   Within the High-Speed Swim Lane design, did loan

3   specialists have refer authority up to $1 million?

4   A.   No, they did not.

5   Q.   Why is that?

6   A.   Because we felt that those were higher risk loans, and we

7   did not want those loans in the High-Speed Swim Lane.

8   Q.   You can turn to page 16, please.

9           MS. MAINIGI:   Alex, if we can blow up the top at the

10  very bottom "CMD visits support the seating arrangement

11  concept."

12  Q.   Mr. Barnett, can you read that out loud, please.

13  A.   Sure.   "CMD visits support the seat arrangement concept

14  already in place in some centers e.g. moving at least

15  underwriters sit with the dedicated prime ops people to share

16  knowledge, provide feedback, troubleshoot in realtime."

17  Q.   Within the High-Speed Swim Lane design or the subsequent

18  Central Fulfillment, was there a seating arrangement component

19  to it?

20  A.   Yes, absolutely there was.

21  Q.   Could you explain that, please.

22  A.   Yeah.   One of the -- because we were moving to this, what

23  we called the cradle to grave approach, which meant that the

24  same team handled the loans from when they came from sales

25  through all the way through funding or withdrawal.   We wanted

1   to seat the team together so that they, first of all, got the

2   benefit of being a team.  But also could benefit from the lower

3   level people could pick up knowledge or turn to the higher

4   level people in getting answers to questions quickly --

5               MS. NAWADAY:  Objection, your Honor.

6               THE COURT:  Sustained.

7   Q.  Who were the members of the team, Mr. Barnett?

8   A.  The roles in the team?

9   Q.  Just the titles, yes.

10  A.  So on the team we had the LSs, loan specialists, we had

11  funders, well, we had -- we had closers, funders and closers,

12  sort of a combined role.  We had underwriter -- either

13  underwriters or underwriting LSs with underwriting authority.

14  And we had an ops manager, a manager managing the team.

15  Q.  How would you describe the seating arrangement as it

16  related to all of those different types?

17              MS. NAWADAY:  Objection.

18              THE COURT:  Sustained.

19  Q.  What was the seating arrangement within the High-Speed Swim

20  Lane for those individuals?

21  A.  All of the individuals were collocated in the same physical

22  area, desks nearby, and so on.

23  Q.  You can set aside that document.  I think you testified

24  yesterday that there was a design meeting around July 19, 2007,

25  of the steering committee?

DAB3BAN1                         Barnett - direct

1    A.  That's correct.

2    Q.  Were there subsequent meetings with the design team after

3    July 19?

4    A.  Yes.

5            MS. NAWADAY:  Objection, your Honor.

6            THE COURT:  Ground?

7            MS. NAWADAY:  Asked and answered several times

8    yesterday.

9            THE COURT:  I'll let the answer stand.  The answer was

10   "yes."

11   Q.  What was the purpose of the meetings?

12   A.  Basically to continue to develop the design, to improve the

13   design, as we -- well, first of all, before the pilot, and then

14   during the pilot, we continued to have meetings as we were

15   learning through observing what was happening as people were

16   processing loans.  That was our intent all along.

17   Q.  Take a look within the binder, Mr. Barnett, that's in front

18   of you at DX 365, please.

19   A.  I've got that.

20   Q.  Do you have it, sir?

21   A.  Yes, I do.

22   Q.  Could you identify that document?

23   A.  This is a PowerPoint presentation dated August 27, 2007, it

24   was a project update on the High-Speed Swim Lane project.

25           MS. MAINIGI:  Your Honor, I ask that DX 365 be

DAB3BAN1                    Barnett – direct

1    admitted.

2                MS. NAWADAY:  No objection.

3                THE COURT:  Received.

4                (Defendant's Exhibit 365 received in evidence)

5    Q.  If you flip all the way to the very last page, please, page

6    24.

7    A.  Okay.

8                MS. MAINIGI:  Alex, if you can try to blow that up a

9    bit.

10   Q.  This is a page called "project organization structure."

11   Was this the organizational structure of the High-Speed Swim

12   Lane design team?

13   A.  Yes, it was.

14   Q.  Who was on the executive oversight committee?

15   A.  It was Rebecca Mairone, Cliff Kitashima, Scott Bridges,

16   Lloyd Sergeant, Ed O'Donnell, and Cheri Shine.

17   Q.  Then the box over to the right, could you tell us what SME

18   and functional support means.

19   A.  Sure.  SME means subject matter experts.  Means these were

20   the experts in each of the various areas that we needed to

21   include in the team to design this process.  And functional

22   support meant that these were areas, if they weren't subject

23   matter experts, they their areas would need to support the

24   team, like technology is an example.

25   Q.  Was there someone from training involved?

1    A.  Yes.  That was David Couper.

2    Q.  Then if we can go down to the bottom, the on-site pilot

3    team.  What was that?

4    A.  Yes.  So, the decision was made to do the pilot with a

5    couple of teams, processing teams.  And so Barbara Heinecke and

6    LaCrecia Whirl were the operations managers for those two

7    teams.  And then because the teams are supported by central

8    services, for example, underwriting support, we had the

9    individuals responsible for that also as members of the pilot

10   team.

11   Q.  How many pilot teams were there, Mr. Barnett?

12   A.  There were two pilot teams.

13   Q.  Were they in different locations?

14   A.  Yes, they were.

15   Q.  What were the locations?

16   A.  Chandler, Arizona, and -- and the Texas location.  Plano.

17   Not Plano.

18   Q.  Richardson?

19   A.  Richardson, yes, thank you.

20   Q.  Could you describe the composition of the team if you

21   recall it for the pilot?

22            MS. NAWADAY:  Objection.

23            THE COURT:  Ground?

24            MS. NAWADAY:  Vague and calls for narrative.

25            MS. MAINIGI:  I can rephrase, your Honor.  I'm looking

1   for the titles.

2           THE COURT:  I think the problem has been that

3   sometimes when you put questions that I understood had the

4   narrow intent that you described, the witness, not being a

5   lawyer, has misconstrued and given a narrative response.  So I

6   think probably a more pointed question is in order.

7           MS. MAINIGI:  That's fine, your Honor.

8   Q.  With respect to the two pilot teams, Mr. Barnett, what were

9   the titles of the individuals that composed the pilot teams?

10  A.  Sure.  Operations manager, loan specialist, I think it was

11  funder or closer, I honestly don't recall the exact title of

12  that role.  And then we had the support people, they weren't

13  necessarily sitting with the team.

14  Q.  By "support people," you mean people with what title?

15  A.  Underwriting support, underwriters.

16  Q.  What was their role as it related to the pilot teams,

17  underwriting support?

18  A.  Yes.  If there were any questions from members of the team,

19  underwriting related questions that they couldn't answer, they

20  were supposed to go to underwriting support to get those

21  answers.

22  Q.  The team leader was called again?

23  A.  I neglected to say it.  Operations manager.  They were part

24  of the team as well.

25  Q.  Was there one operations manager for each team?

DAB3BAN1                           Barnett - direct

1   A.  That's correct.

2   Q.  How many loan specialists for each team, do you recall?

3   A.  It would have been probably in the order of three to four,

4   but again, it is a while ago.  I don't recall.

5   Q.  Do you recall how many funders?

6   A.  If there were three to four, it would have been one to two

7   funders probably, and there also was a role called set up.

8   Q.  What was the purpose of set up?

9   A.  They took the initial loan from sales and basically set it

10  up in CLUES and in the other systems.  I just don't recall, I

11  think early on -- I don't recall them being collocated.  I'm

12  just not certain.

13  Q.  The individuals involved in the larger chart here on page

14  24.  Did those individuals stay involved during the High-Speed

15  Swim Lane design process?

16  A.  Yes, they did.

17  Q.  Were those individuals also involved during the transition

18  to the Central Fulfillment process?

19           MS. NAWADAY:  Objection.

20           THE COURT:  Ground?

21           MS. NAWADAY:  Vague and foundation.

22           THE COURT:  Overruled as to vague.  Sustained as to

23  foundation.

24  Q.  Mr. Barnett, are you familiar with a term called Central

25  Fulfillment?

DAB3BAN1                           Barnett - direct

1    A.  Yes, I am.

2    Q.  What is that?

3    A.  Central Fulfillment was the sort of next step in the

4    evolution of FSL loan processing after the High-Speed Swim Lane

5    pilot.

6    Q.  What was your role with Central Fulfillment?

7    A.  I continued in the solution lead role for that.

8    Q.  Did the individuals on this chart also continue with you as

9    it related to Central Fulfillment?

10   A.  Most, if not all.  Yes.

11   Q.  You can set that aside.  Actually, I apologize.  Let's put

12   that back up on the screen.  If you could turn to page nine.

13   A.  Okay.

14   Q.  This page is titled "functional approach."  What does that

15   mean, functional approach?

16   A.  Functions refer to the different areas that supported the

17   team.  So this was the approach at a very high level of how

18   they operated together.

19   Q.  This is referring to the High-Speed Swim Lane approach?

20   A.  Yes, it is.

21   Q.  Could you read out loud the bullet point and what follows,

22   please?

23   A.  Yes.  "Align with industry prime processing model.  CLUES

24   is the underwriter.  Centralized fulfillment with expanded

25   authority in line staff.  One FSL model."

DAB3BAN1                    Barnett - direct

1    Q.  What did "industry prime processing model" mean?

2    A.  It meant that, as we discussed yesterday, we were moving

3    towards a prime model versus subprime.  So, we wanted to

4    reflect industry standard practices in that model.  And that's

5    what these sub-bullets represent, by and large.

6    Q.  CLUES is the underwriter.  What did that mean?

7    A.  That means for, particularly for the lowest risk loans,

8    that automated underwriting is an industry standard practice.

9    Q.  Centralized fulfillment with expanded authority in line

10   staff.  What does that mean?

11   A.  That meant that having a team structure, like we had just

12   described, and pushing underwriting authority down into that

13   team, was standard practice.

14   Q.  One FSL model.  What did that mean?

15   A.  That meant we wanted to have a consistent approach across

16   the entire organization.

17   Q.  There is a picture underneath there, Mr. Barnett, where you

18   have an arrow from sales to centralized fulfillment with a

19   dotted line in between.  Can you explain the significance of

20   the dotted line?

21   A.  Yes.  The significance of the dotted line is we wanted to

22   basically have a break between the two organizations to avoid

23   what we had observed in the past, which was sort of undue

24   influence of sales on the priority of which loans got processed

25   by the processors.

DAB3BAN1                      Barnett - direct

1   Q.  If you can turn to page 23, please.  This chart is entitled

2   "condition sign off authority levels."  What does this mean?

3   A.  It basically was saying what level of authority an

4   individual would have to sign off on various conditions that

5   could be placed on loans, based on their background, their

6   training, and so forth.

7              MS. MAINIGI:  If we can blow up, Alex, just the very

8   top set of headings for the columns, please.

9   Q.  Based on this chart, Mr. Barnett, how many sign off

10  authority levels were there at this point in time?

11  A.  There were four.

12  Q.  What were they, please?

13  A.  There were condition sign off level one, condition sign off

14  level two, prime CLUES accept, and prime CLUES accept

15  High-Speed Swim Lane.

16  Q.  How did a loan processor or an underwriter qualify for one

17  of these authority levels?

18  A.  It would be based on training, passing some tests, and on

19  generally having a manager sign off that they were ready to

20  process these loans.

21  Q.  You can set aside that document, sir.

22              How was the criteria for entry into the High-Speed

23  Swim Lane determined?

24  A.  Largely it was a risk based criteria.  So, the risk

25  organization primarily had input on that.  But everyone looked

DAB3BAN1                        Barnett - direct

 1   at those criteria.

 2   Q.  Was Mr. O'Donnell consulted with respect to the entry

 3   criteria into the High-Speed Swim Lane?

 4   A.  Yes, he was.

 5   Q.  Who is Patrick Aliano?

 6   A.  Patrick Aliano was a member of Ed O'Donnell's risk team.

 7   Q.  Was he involved with risk management?

 8   A.  Yes.

 9   Q.  Take a look, please at DX 380.

10          MS. MAINIGI:  I don't think this is admitted, Alex,

11   I'm sorry.

12   Q.  What is this document, Mr. Barnett?

13   A.  I don't know that I have this in front of me.

14   Q.  In the binder.

15   A.  Oh, in the binder.  I'm sorry.

16   Q.  I apologize.

17   A.  This is an e-mail from Patrick Aliano to Steve Brent and

18   cc'ing a number of other people, including myself, on the

19   subject of High-Speed Swim Lane exclusions based on marketplace

20   and performance and so on, yeah.

21   Q.  What is the date of the e-mail?

22   A.  The date of the e-mail is August 31, 2007.

23          MS. MAINIGI:  Your Honor, I ask that DX 380 be

24   admitted.

25          MS. NAWADAY:  No objection.

DAB3BAN1                    Barnett - direct

1              THE COURT:  Received.

2              (Defendant's Exhibit 380 received in evidence)

3              MS. MAINIGI:  If we can blow up the top paragraph

4    there, Alex.

5    Q.  You can read out loud the first sentence of that e-mail,

6    please, Mr. Barnett.

7    A.  Sure.  "I'm okay with fast track being included into HSSL

8    since that's exactly the type of product HSSL is designed for,

9    e.g. fast and easy plus appraisal waivers equals fast close."

10   Q.  This is an e-mail from Mr. Aliano to several people?

11   A.  That's correct.

12   Q.  What is fast and easy?

13   A.  Fast and easy is a product, essentially.

14   Q.  Do you know whether fast and easy went into the High-Speed

15   Swim Lane?

16   A.  Yes, it did.

17   Q.  Do you know what type of product fast and easy is?

18   A.  A low risk product is the way I characterize it.

19   Q.  You can set that aside, Mr. Barnett.

20              In designing the High-Speed Swim Lane, did you use any

21   process design principles?

22   A.  Yes, of course.

23   Q.  Very briefly, what were some of those principles?

24   A.  Principles like minimizing the number of hand offs between

25   different roles in the process, trying to use, for example,

DAB3BAN1                    Barnett - direct

 1   what we call concurrent processing.  If you do steps, you
 2   didn't have to do them one after another.  Do that.  Minimize
 3   interruptions in the process.  Simplify rules and take away
 4   steps that were unnecessary, added time but no value to the
 5   process.
 6   Q.  Does compensation of individuals play any role when
 7   designing a new process?
 8   A.  Yes, it does.
 9           MS. NAWADAY:  Objection.
10           THE COURT:  Ground?
11           MS. NAWADAY:  Vague and foundation.
12           THE COURT:  Overruled.
13   Q.  Could you explain briefly, Mr. Barnett.
14   A.  Sure.  Basically compensation drives behavior.  What you
15   compensate people for is what they do.  Their behaviors are
16   compensated for --
17           THE COURT:  No.  We weren't asking for your views of
18   psychological theory.  Just tell us what you can of what the
19   specifics of this situation were.
20   A.  We wanted to --
21           THE COURT:  Who is "we"?
22           THE WITNESS:  The organization as a whole who was
23   responsible for --
24           THE COURT:  I reverse my previous ruling.  The
25   objection is sustained.  Come to the side bar.

1              (At the side bar).

2              THE COURT:  I don't blame counsel for either side for

3    this.  But without being purely scientific, I would say

4    approximately 56 percent of this witness's answers are

5    non-evidentiary.  I think we ought to move to questions like

6    who was present at such and such a meeting, what happened next,

7    who said what to whom, and things like that.

8              He apparently believes he can speak for entire

9    organizations.  He apparently believes that he, in this last

10   answer, that Freud was a junior compared to him.

11             Counsel for the government has rather belatedly

12   sometimes objected on grounds of narrative after the -- I was

13   going to say the horse is out the barn, but in this case it is

14   probably more like an elephant.

15             So, we've got to bring this under control.

16             MS. MAINIGI:  Your Honor, that's perfectly fine.  The

17   area I was moving into, and that was simply a foundational

18   question, was QoG which is obviously an issue in this case.

19             THE COURT:  I have no problem with your questions, but

20   he's defining them much more broadly than I know is your

21   intent.  And I think you've got to find a way to just narrow

22   the questions.

23             MS. MAINIGI:  I'm happy to do that, your Honor, and I

24   will do that.  All I'll say just for the purpose of the

25   record --

1          THE COURT:  You don't have to be happy to do it as

2     long as you do it.

3          MS. MAINIGI:  I will not be happy to do it, your

4     Honor, but I will do it because you so ordered.

5          But the reason I believe he's giving this background

6     is this is the guy that was the designer of the High-Speed Swim

7     Lane.  And he's a process design guy.  He's not a mortgage guy.

8     So that is the point of view he's bringing here.  So I don't

9     think --

10          THE COURT:  But the question, which I initially

11     overruled, was, how did compensation relate to -- I can't

12     remember now what was asked.  That calls for like a specific

13     question.  Well, if they did X, they would get compensated for

14     Y.  He goes off on, well, you know, motivation of human beings

15     is, I mean give me a break.

16          MS. MAINIGI:  Okay.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MS. MAINIGI:

3     Q.  Mr. Barnett, can you turn to DX 221, please, which is an

4     admitted exhibit, Alex.

5     A.  Okay.

6     Q.  Do you recall looking at this document yesterday?

7     A.  Yes, I do.

8     Q.  Just to very briefly orient, what is this document, sir?

9     A.  This is an e-mail that I sent to members of the risk

10    organization on July 25, on the subject of the design of the

11    prime High-Speed Swim Lane.

12    Q.  Turn to page two, please.  This would be page two of the

13    attachment.

14    A.  Okay.

15    Q.  There is a section entitled "pilot guiding principles."

16    Alex, can we blow that up.

17          If you could read the first two bullets, please,

18    Mr. Barnett.

19    A.  Yes.  "A team will be designated and dedicate to the pilot.

20    This is their only priority.  Eliminate any angst about

21    conflicts with their normal performance measures."

22    Q.  What does "angst about conflicts with their normal

23    performance measures" mean, sir?

24    A.  They're normally measured on a number of parameters related

25    to how well they're performing the process.  For example, and

2310

DAB3BAN1                    Barnett - direct

1    because it is a new process, and we know that when you

2    introduce a new process, you have -- everyone has a learning

3    curve.

4              MS. NAWADAY:  Objection.  Narrative and opinion, your

5    Honor.

6              THE COURT:  Maybe I need to make clear to the witness.

7    In a lawsuit in a court, we have very strict rules of evidence.

8    Everyday conversation is not permitted.  General theories about

9    how people are motivated or what their learning curve is or

10   anything like that, you may have your opinions, we all have our

11   opinions.  They're not part of evidence here.

12             The evidence consists of what you said to someone, if

13   it doesn't offense the hearsay rule, what someone said to you.

14   What facts you observed.  Facts, not theories, not

15   generalizations, not characterizations, and things like that.

16             I understand it is not a natural way of talking.  But

17   we have it that way because trials need to be decided on narrow

18   evidence, not on more broad things.  So, not your fault, but in

19   the future I hope you get the idea.

20             THE WITNESS:  I'll do my best.

21   Q.  Let me ask the question again, Mr. Barnett.  With respect

22   to the phrase that is in your presentation, "eliminate any

23   angst about conflicts with their normal performance measures,"

24   what does that specifically refer to, sir?

25   A.  Performance measures related to making mistakes, basically.

DAB3BAN1                      Barnett - direct

1   Q.  Take a look next at DX 9 which is also an admitted exhibit.

2   At page 14, specifically.

3   A.  I'm sorry, the DX number again?

4   Q.  I'm sorry.  DX 9.

5   A.  It probably helps to not have the book backwards.  Okay,

6   I've got it.

7   Q.  You have it, Mr. Barnett?

8   A.  Yes, I do.

9   Q.  Okay.  Page 14 "pilot guiding principles" again.  If we can

10  blow that up, Alex, that bottom section there.

11         Do you see something that says "suspend/revisit QoG"?

12  A.  Yes, I do.

13  Q.  What does that mean?

14  A.  That means that we were not going to use the measure of

15  making mistakes.  We were going to continue to measure it, but

16  not apply it to affect their compensation.

17  Q.  What does QoG stand for?

18  A.  Quality of grade.

19  Q.  What did you briefly understand it to be?

20  A.  A measure of basically how many mistakes people were making

21  relative to the process we were asking them to follow.

22  Q.  Why was there a recommendation to suspend/revisit it?

23  A.  Because there were going to be mistakes made with the --

24  with this new process.

25         MS. NAWADAY:  Objection.

1              THE COURT:  No, I'll allow it.  Overruled.

2     Q.  Do you know whether ultimately QoG was suspended for some

3     period of time?

4     A.  It was.

5     Q.  Did you support that as the designer of the High-Speed Swim

6     Lane?

7     A.  Yes, I did.

8     Q.  This suspend/revisit QoG is under a bullet that says "need

9     to address cultural issues."  Could you just briefly explain

10    what cultural issues means?

11    A.  It means we needed to change behaviors.

12    Q.  The first bullet under that is "get comfortable with

13    exercising authority."  Briefly, what does that mean?

14    A.  We were asking LSs in particular to assume a higher level

15    of authority, responsibility, in that role.

16    Q.  LS being loan specialists?

17    A.  Loan specialists.  Thank you, sorry.

18    Q.  The next one, "get comfortable with skipping process

19    steps." What does that mean?

20    A.  Because for the prime loan process, there were fewer steps

21    than subprime loan.  They needed to know that it was okay to

22    not do the steps they did before.

23    Q.  Take a look at page seven, Mr. Barnett.  These are

24    sprinkled throughout your presentations.  Can you just explain

25    what it is, just a couple of sentences on what this type of

DAB3BAN1                           Barnett - direct

1     thing is?

2                  MS. NAWADAY:  Objection.

3                  THE COURT:  Sustained.

4     Q.   What is the title of this page, Mr. Barnett?

5     A.   "Prime High-Speed Swim Lane end to end model."

6     Q.   What is described here?

7     A.   How the process works for High-Speed Swim Lane.

8     Q.   Did you design this process flow?

9     A.   I depicted the flow in here, yes.

10    Q.   Take a look at DX 28, please, Mr. Barnett.

11    A.   Okay.

12    Q.   What is this document, sir?

13    A.   This is a PowerPoint dated September 27, 2007, on the top

14    of NSC Central Fulfillment update.

15                 MS. MAINIGI:  Your Honor, I ask DX 28 be admitted.

16                 MS. NAWADAY:  No objection.

17                 THE COURT:  Received.

18                 (Defendant's Exhibit 28 received in evidence)

19    Q.   Turn to page three, please.

20    A.   Okay.

21    Q.   At the very bottom of that page, Mr. Barnett, it says

22    "teams built from top ranked staff from central ops and central

23    services."  Do you see that?

24    A.   Yes, I do.

25    Q.   What does it mean?

DAB3BAN1                     Barnett - direct

1   A.  At that point in time we were -- volume was shrinking, so

2   people were leaving the organization.  And what were left with

3   was our top ranked people.  So these teams were made up of

4   those individuals.

5   Q.  By these teams, what do you mean, sir?

6   A.  The Central Fulfillment processing teams.

7   Q.  Turn to page 13, please.  This page is entitled "temporary

8   QoG status."  Does this reference the suspension of QoG we

9   discussed earlier?

10  A.  Yes, it does.

11  Q.  How long was QoG suspended as part of the High-Speed Swim

12  Lane and Central Fulfillment process?

13  A.  October 1st, 2007, through January 31, 2008.

14  Q.  Did you support that suspension?

15  A.  Yes, I did.

16  Q.  Why, briefly?

17          MS. NAWADAY:  Objection.

18          THE COURT:  Sustained.

19          MS. MAINIGI:  Your Honor, could I have a side bar,

20  please.

21          THE COURT:  Sure.

22          (Continued on next page)

23

24

25

2315

DAB3BAN1                    Barnett - direct

1              (At the side bar)

2              MS. MAINIGI:  Your Honor, I would think the reason why

3    the designer of the High-Speed Swim Lane supported a temporary

4    suspension of QoG would be a very relevant fact to intent here.

5              THE COURT:  Whose intent?  His intent is not in issue,

6    as I understand the government's theory.  They identify three

7    people who they said they viewed as having criminal intent, and

8    he was not one of them.

9              MS. MAINIGI:  Well, but if those people are getting

10   recommendations from the actual designer of the High-Speed Swim

11   Lane, that's relevant to their intent.

12             THE COURT:  Of course.  So what he said to them might

13   be relevant, but not what was going in his head.

14             MS. MAINIGI:  So I can ask him what he said to Cliff

15   Kitashima?

16             THE COURT:  I have to hear the question, but as a

17   general proposition that would be fine.  Where I've been

18   drawing the line, I hope consistently, is to the state of mind

19   of those persons who the government identified as the persons

20   on whom they would hang corporate civil liability.  You can

21   inquire into their states of mind.  But other people's states

22   of mind are not relevant, except under unusual circumstances.

23             MS. MAINIGI:  I'd like to give that point some further

24   thought.  But for limited purposes here.

25             THE COURT:  Okay.

```
 1              (In open court)
 2    BY MS. MAINIGI:
 3    Q.  Mr. Barnett, were Ms. Mairone and Mr. Kitashima on your
 4    steering committee?
 5    A.  Yes, they were.
 6    Q.  This is the High-Speed Swim Lane design steering committee?
 7    A.  Yes.
 8    Q.  And in the context of your steering committee discussions,
 9    did you communicate your position on suspension of QoG?
10    A.  As part of the discussions we had, yes.
11    Q.  And did you explain your rationale for why you supported
12    the suspension of QoG?
13    A.  I don't recall that I actually explained my rationale
14    because it came from others.
15    Q.  You could set that document aside.
16              Mr. Barnett, were you familiar with the quality
17    assurance process in relation to the pilot?
18    A.  Yes.
19    Q.  What was that process, sir?
20    A.  It was a process that looked at how closely the people on
21    the teams were following the process that we put in place.
22    Q.  Who ran that process?
23    A.  I believe Steve Brent ran that process.
24    Q.  Did you look at the results associated with the QA process
25    in relation to the pilot?
```

DABTBAN2                          Barnett - direct

1    A.  Yes, I did.

2    Q.  What did you conclude?

3              MS. NAWADAY:  Objection.

4              THE COURT:  Sustained.

5    Q.  Take a look at DX537.  This is an admitted exhibit.  Is

6    this one of the QA audits that you reviewed at the time,

7    Mr. Barnett?

8    A.  Yes, it is.

9    Q.  Did you think the QA results associated with the pilot were

10   accurate?

11             MS. NAWADAY:  Objection.

12             THE COURT:  Sustained.

13   Q.  Did you have conversations and communications with the

14   individuals involved with the QA process?

15   A.  Yes, I did.

16   Q.  And did you have a understanding as a designer of the

17   High-Speed Swim Lane as to whether the QA results associated

18   with the pilot were accurate?

19             MS. NAWADAY:  Objection.

20             THE COURT:  Sustained.

21   Q.  Let's take a look at DX534.  Can you identify that

22   document, please, sir?

23   A.  Yes, it's an email from Michael Thomas to me dated

24   October 5th, 2007, on the topic of High-Speed Swim Lane weekly

25   review summary through September 16.

1            MS. MAINIGI:  Your Honor, I ask that DX534 be

2     admitted.

3            MS. NAWADAY:  No objection.

4            THE COURT:  Received.

5            (Defendant's Exhibit 534 received in evidence)

6     Q.  Is this an email from Mr. Thomas related to QA,

7     Mr. Barnett?

8     A.  Yes, it is.

9     Q.  Take a look at page 2, please.

10           MS. MAINIGI:  And if you could blow up the entire

11    bottom part of that email.

12    Q.  If you could read that email out loud, please, Mr. Barnett.

13    A.  Sure.  Steve, below are results of our phase code three QA

14    review performed by the India group and validated/reviewed by

15    our U.S. team, Jane's group in Richardson.  Remember, these

16    results are strictly based on HSSL model that is piloted with

17    our Chandler and Richardson production teams.

18           FSL quality assurance and control reviewed 60 loans in

19    phase code three with application dates beginning 09/10/07.

20    The files were reviewed for compliance with the general

21    guidelines, income, assets and property.

22           Of the 60 loans reviewed, one loan was deemed to be no

23    risk, 1.67 percent, 59 loans we are deemed to be high risk,

24    98.33 percent, zero loans were deemed to be limited risk, zero

25    percent.  Of the 59 loans deemed to be high risk, 29 were

2319

1   processed in the Chandler center, 49.15 percent, and 30 were

2   processed in the Richardson center, 50.85 percent.

3          The most common finding identified was the fraud

4   detector action.  Jane and I conducted a call with Audrey and

5   LaCrecia and they assured us they would have a meeting with

6   their teams to correct this issue.  Jane and I also spoke with

7   Robert Price and informed them that the underwriters were

8   requiring the fraud detector action be completed prior to

9   funding, which is contrary to our SOPs.  Robert stated that he

10  would make sure that the underwriters are following the SOPs,

11  which would result in the findings being eliminated.

12  Q.  Do you know what the fraud detector action is, Mr. Barnett?

13  A.  I know that -- yes, I do.

14  Q.  What is it?

15  A.  It basically was a tool.  Fraud detector was a tool that

16  was completed to try and detect fraud.

17  Q.  And is it clear to you from this email at what point the

18  fraud detector action was supposed to be taken?

19          MS. NAWADAY:  Objection.

20          THE COURT:  Sustained.

21  Q.  The email in that last sentence says:  Robert stated he

22  would make sure that the underwriters are following the SOPs.

23          Do you know to what SOPs they are referring?

24  A.  It was the fraud detector action.

25  Q.  And which would result in these findings being eliminated.

DABTBAN2                       Barnett - direct

1          Do the SOPs, to your knowledge, speak to the timing of

2     the fraud detector action, Mr. Barnett?

3          MS. NAWADAY:  Objection.

4          THE COURT:  Sustained.

5     Q.  Mr. Barnett, did you have involvement in the revision of

6     the quality assurance process?

7     A.  I had some involvement, yes.

8     Q.  Could you briefly describe what your involvement was?

9     A.  Relative to Central Fulfillment, my involvement was to work

10    with Michael Burns to develop a more accurate and effective QA

11    process.

12         MS. NAWADAY:  Objection, your Honor.

13         THE COURT:  Sustained.

14    Q.  What was -- what role did you play in the revision of the

15    QA process, Mr. Barnett?

16    A.  The role I played was ensure that the QA process integrated

17    with the Central Fulfillment process.

18    Q.  And what was the objective of the revision of the QA

19    process?

20         MS. NAWADAY:  Objection.

21         THE COURT:  Sustained.

22    Q.  Was the QA process not working?

23         MS. NAWADAY:  Objection.

24         THE COURT:  Ground?

25         MS. NAWADAY:  Foundation, vague, and calls for

DABTBAN2                          Barnett - direct

1    opinion.

2            THE COURT:  Foundation overruled, sustained on the

3    other two grounds.

4    Q.  Did you have occasion to review QA reports as they came out

5    on a regular basis?

6    A.  Yes.

7    Q.  And you reviewed them from the point of view of having been

8    someone who designed the High-Speed Swim Lane process, is that

9    right?

10   A.  Yes.

11   Q.  From that vantage point, did you think that the QA reports

12   accurately reflected the results of the pilot?

13           MS. NAWADAY:  Objection, your Honor.

14           THE COURT:  Sustained.

15   Q.  Let's take a look at DX659, please.

16           Sorry, let's look at 672 instead, Mr. Barnett.

17   A.  Is that DX672?

18   Q.  It's in the inside pocket, Mr. Barnett.

19           What time period were you working on the revision of

20   the QA process, Mr. Barnett?

21   A.  It was from perhaps August of 2007.  It was implemented in

22   Central Fulfillment, which would have been October 1, but I'm

23   sure we were looking at that process after that.

24   Q.  Take a look at DX672 and tell me if you can identify this

25   document.

DABTBAN2                          Barnett - direct

1   A.   Yes, this is a document entitled NSC Central Fulfillment

2   Project Team Status and Work Meeting dated November 29, 2007.

3   Q.   And was this a document put together by someone on your

4   team?

5   A.   Yes.

6   Q.   And what is the purpose of this document?

7           MS. NAWADAY:   Objection.

8           THE COURT:   Sustained.

9   Q.   Take a look at page 2.

10          MS. MAINIGI:   Before I do that, your Honor, I ask

11  DX672 be admitted.

12          MS. NAWADAY:   No objection.

13          THE COURT:   Received.

14          (Defendant's Exhibit 672 received in evidence)

15  Q.   Let's look at the first page and blow up the people who are

16  receiving this or attending this.

17          Were these individuals involved with the Central

18  Fulfillment design process?

19  A.   Yes, they were.

20  Q.   Take a look at on the next page, the section entitled QA

21  QC.   If could you read that out loud, please, sir?

22  A.   Process being revised to scale back scope of findings and

23  feedback.   Focus more on risk/SUS issues instead of

24  process/work flow issues.   Provide feedback to management only

25  instead of line staff.

DABTBAN2                        Barnett - direct

1   Q.  The first bullet, focus more on risk/SUS issues instead of

2   process/work flow issues, what were the process/work flow

3   issues?

4           MS. NAWADAY:  Objection, your Honor.

5           MS. MAINIGI:  I can ask a foundational question, your

6   Honor.

7   Q.  Were you involved with this revision?

8   A.  Yes.

9   Q.  This is the revision you were referring to in part?

10  A.  That's correct.

11  Q.  What were the process/work flow issues?

12  A.  Making mistakes in the procedures, following procedures.

13  Q.  I'm sorry?

14  A.  The issues were around making mistakes following the

15  procedures.  The issues were that the QA process was focused on

16  that and not always accurate.

17          MS. NAWADAY:  Objection, your Honor, move to strike

18  the last sentence.

19          THE COURT:  Sustained.

20  Q.  Risk/SUS issues, what did that refer to?

21  A.  Those are the issues that were more related to whether a

22  loan could be sold or saleable or not.

23  Q.  What was the revision that you and Mr. Burns were trying to

24  make to the QA process?

25  A.  The revision was to make it less obtrusive on the people

1   who processed the loans, and to change the focus to the risk

2   and SUS issues instead of our procedures being followed exactly

3   to the letter.

4   Q.  Let's take each one of those.  The first objective was to

5   make the QA process less obtrusive, you said?

6   A.  Yes.

7   Q.  What does that mean?

8           MS. NAWADAY:  Objection, your Honor.

9           THE COURT:  Sustained.

10  Q.  Did you work on making the QA process less obtrusive?

11  A.  Yes.

12          MS. NAWADAY:  Objection, your Honor.

13          THE COURT:  Overruled.  You can answer that yes or no.

14  A.  Yes.

15  Q.  How?

16  A.  By stopping notifying processors every time a mistake was

17  and interrupting their ability to continue to do their work

18  efficiently.

19  Q.  Why was that obtrusive?

20          MS. NAWADAY:  Objection.

21          THE COURT:  Overruled, you may answer.

22  A.  Because every time a mistake was made they were being -- a

23  phone was ringing or an email was being received saying you

24  made a mistake here, you made a mistake here.  And it was

25  slowing them down and it was a less effective way of helping

1   them do better.

2              MS. NAWADAY:  Object, your Honor, narrative.

3   Q.  With respect to the risk/SUS procedures, what changes did

4   you make, very briefly?

5   A.  It was more about what to focus on and measure than

6   anything else.

7   Q.  Sorry?

8   A.  The focus was changed to look at those things that were

9   more likely to affect the saleability of loans.

10  Q.  Such as?

11             MS. NAWADAY:  Objection, your Honor, move to strike

12  the last answer as non-responsive.

13             THE COURT:  The last answer will stand, but the

14  present question the objection is sustained.

15  Q.  What did you -- what changes did you make to focus more on

16  the risk/SUS issues?

17  A.  Eliminate or reduce the emphasis on procedural mistakes and

18  increase the emphasis on ensuring that everything that needed

19  to happen to ensure a saleable loan was done with that loan.

20  Q.  And you worked on that process with Mr. Burns?

21  A.  I did.

22  Q.  Coming back, Mr. Barnett, to Central Fulfillment, was

23  High-Speed Swim Lane a work flow in Central Fulfillment?

24  A.  I think you could look at it that way, yes.

25  Q.  Were there other work flows as well within Central

DABTBAN2                    Barnett - direct

1    Fulfillment?

2    A.   Other loans were able to be handled within Central

3    Fulfillment.

4    Q.   Did those work flows involve underwriters or loan

5    processors clearing the loan?

6    A.   It involved -- both were involved, depending on the loan.

7    Q.   Who determined whether a loan went to a loan processor

8    versus an underwriter for clearing the loan to close?

9    A.   It was either the operations manager or the loan processor

10   themself if something occurred that was outside their

11   authority.

12   Q.   Take a look, please, at DX22, which is an admitted exhibit,

13   sir.   Could you describe what that document is?

14   A.   Yes, this is what's called the Underwriter Approval

15   Authority Level Matrix.

16   Q.   And did this document play a role in the assignment of

17   loans to either a loan processor or an underwriter?

18   A.   Yes, it did.

19   Q.   Could you briefly explain how.

20   A.   In essence, every one of the rows in this describes

21   something about the loan, the amount of the loan, the risk

22   level of the loan, and so on, the property type.   And looking

23   across whether it was yes or no would determine the risk

24   overall of that loan and therefore what level of underwriting

25   authority was needed to process it.

DABTBAN2                     Barnett - direct

1    Q.  Loan specialists had what level of authority -- strike

2    that.

3            With respect to the risk tier one and two, could loan

4    specialists clear loans that were risk tier one and two?

5    A.  Yes, they could.

6    Q.  Could they clear loans that were risk level three, four or

7    five?

8    A.  Typically no.

9    Q.  Take a look, please, sir, at DX24.

10           Could you identify this document, please.

11   A.  It is an email from Anson Gong to Loren Rodriguez cc'ing a

12   number of other people, dated September 26, 2007, on the topic

13   of centralized fulfillment town hall deck.

14   Q.  And there are several attachments to the email.  Do you

15   know what those are?

16   A.  They're not in -- are they in different sections?

17   Q.  I apologize, I think that they're probably separated by

18   DX24 and also DX25, 26, and 27.

19   A.  Yes, I know what these are.

20   Q.  What are those?

21   A.  These are the team rosters for Central Fulfillment.

22           MS. MAINIGI:  Your Honor, I ask that DX24, 25, 26 and

23   27 be admitted.

24           MS. NAWADAY:  No objection.

25           THE COURT:  Received.

DABTBAN2                          Barnett - direct

1                  (Defendant's Exhibit 24, 25, 26 and 27 received in

2       evidence)

3       Q.  How were the teams organized within Central Fulfillment,

4       Mr. Barnett?

5       A.  Each time would have a manager, a number of loan

6       specialists/underwriters, would have a funder/compliance

7       specialist, as well as support from set up and the higher level

8       authority underwriters, SLD.

9       Q.  Was it a set up similar to the High-Speed Swim Lane set up

10      you described earlier?

11      A.  It was similar but it was team based.

12      Q.  Were there underwriters on the teams?

13      A.  There actually were.

14      Q.  Why is that?

15      A.  Because when we --

16                  MS. NAWADAY:  Objection.

17                  THE COURT:  Sustained.

18      Q.  Were there underwriters -- was there a reorganization that

19      took place as part of Central Fulfillment?

20      A.  Yes, there was.

21      Q.  Did that result in any changes to job titles?

22      A.  Yes, it did.

23      Q.  Could you describe that, please.

24      A.  Typically there were people who were in a higher level who

25      moved down to -- higher level job title that moved to lower

1    level job title so we could retain their expertise.

2    Q.  Did that include underwriters?

3    A.  Yes, it did.

4    Q.  What job title did certain underwriters receive in the

5    reorganization?

6    A.  Some became loan specialists.

7    Q.  And when those underwriters who became loan specialists

8    were put on teams, were they put on a team as a loan specialist

9    or as an underwriter?

10   A.  As a loan specialist with the appropriate level of

11   underwriting authority.

12   Q.  Was there an underwriter support group that existed in

13   relation to Central Fulfillment?

14   A.  Yes, there was.

15   Q.  What was the function of that group?

16   A.  To handle any loans that required a higher level of

17   underwriting authority than were on the teams.

18   Q.  Take a look at DX341, please, sir.

19   A.  OK.

20   Q.  Could you describe this document, please?

21   A.  It's an email from Edward O'Donnell to Robert Price, James

22   White and David Sallis cc'ing Loren Rodriguez and myself dated

23   August 18, 2007 on the subject of the prime High-Speed Swim

24   Lane weekly project status, 8/17.

25           MS. MAINIGI:  Your Honor, I ask that DX341 be

DABTBAN2                    Barnett - direct

```
 1   admitted.

 2              MS. NAWADAY:  No objection.

 3              THE COURT:  Received.

 4              (Defendant's Exhibit 341 received in evidence)

 5   Q.  Mr. Barnett, could you read out loud the first paragraph on

 6   the top, page 3, please, sir?

 7   A.  Yes.  FYI, week one is behind us with HSSL, and I think

 8   good initial progress was made.  It's clear that loans can move

 9   from opener to PC2 in two days if clear communication of stips

10   takes place up front.  We've even seen a loan go all the way to

11   CTC in the same week they were app'd.

12   Q.  What is the timing of this email in relation to the pilot

13   of the High-Speed Swim Lane?

14   A.  This was -- week or so, a week or two weeks into the pilot.

15   I can't recall the pilot's start date, so it's a couple of

16   weeks into the pilot.

17   Q.  And this email is from Mr. O'Donnell?

18   A.  Yes, it is.

19   Q.  What does PC2 mean?

20   A.  PC2 is when the loan is handed from the opener to the

21   processor, the LS.

22   Q.  And what does CTC in the same week mean?

23   A.  CTC is clear to close, it means that the loan was able to

24   move from the application coming over to fulfillment to clear

25   to close within five -- probably five days or so.
```

DABTBAN2                    Barnett - direct

1    Q.  Take a look, please, at PX55, sir, it may be all the way at

2    the end of your binder.

3    A.  OK.

4    Q.  I believe PX55 is an admitted exhibit.  Let's turn to the

5    second page, please.

6             And what's the date of this email, Mr. Barnett?

7    A.  The date is August 15th, 2007.

8    Q.  Now if we blow up the "Check it out, it's our first HSSL

9    file going for CTC," could you read that out loud, please?

10   A.  Yes.  Check it out, it's our first HSSL file going for CTC.

11   How many days in pipe, you ask?  Five days.  This is the result

12   of sales getting us a clean, complete app and the rest of the

13   team doing the Hustle, HSSL.  Great job, team, let's keep on

14   dancing.

15   Q.  Thank you, Mr. Barnett.

16             Mr. Barnett, with respect to training, was there

17   someone from training involved with the Central Fulfillment

18   design group?

19   A.  Yes, there was.

20   Q.  Turn to DX1770, please.  What is this document, sir?

21   A.  This is a Word document containing the notes from an

22   October 25th meeting of the team, the Central Fulfillment

23   design and deployment team.

24   Q.  Did you attend this meeting?

25   A.  Yes, I did.

DABTBAN2                        Barnett - direct

1              MS. MAINIGI:  Your Honor, I ask that DX1770 be

2       admitted.

3              MS. NAWADAY:  No objection, your Honor.

4              THE COURT:  Received.

5              (Defendant's Exhibit 1770 received in evidence)

6       Q.  Take a look at page 2, please, sir.  If you could read

7       training out loud, please.

8       A.  Training update from P. Coryell and T. Roldan.  Over 110

9       hours of training delivered since 10/1 deployment.  All

10      underwriting training classes are available with approximately

11      70 percent completion of underwriting authority training

12      requirements.  Recently added Hatboro to underwriting training

13      reports.  Need to coordinate with new underwriting authority

14      process, i.e., 10 file underwriter review managed by risk Gary

15      Bell.  Detailed training gap requirements analysis in progress.

16      Plan to deliver about 20 new courses for Central Fulfillment by

17      November 12.  Team sending daily training status memos to CF

18      managers.  The I Learn training system down time is shortened

19      to 11/7 through 12, but some training materials may not be

20      added to new system until after 11/12.  Toni is working to

21      re-prioritize CF classes to be in the new I Learn system after

22      it goes live.

23      Q.  Were training updates such as this received on a periodic

24      basis?

25      A.  Yes, they were.

DABTBAN2

1          MS. MAINIGI:  I have no further questions at this

2     time.

3          THE COURT:  All right.  We will take our mid-morning

4     break and see you in ten or fifteen minutes.

5          (Jury not present)

6          THE COURT:  We have another note, this is from juror

7     number ten:  I have a medical procedure scheduled for Monday,

8     October 28th at 9:00 a.m. at Memorial Sloan-Kettering.  Do you

9     expect the case to be completed by then or should I reschedule

10    it?  Thank you.

11         I think we should respond by saying that while the

12    case might be completed by then, we cannot say -- we cannot

13    guarantee it, so it would be prudent for him to reschedule it.

14         Everyone agreed?

15         MS. MAINIGI:  That's fine, your Honor.

16         MS. NAWADAY:  That's fine, your Honor.

17         MR. HEFTER:  That's fine, your Honor.

18         THE COURT:  I'll have my courtroom deputy relay that

19    message.

20         So I appreciate the fact that banks' counsel was much

21    shorter than her prediction, so is there going to be

22    questioning of this witness by Ms. Mairone's counsel?

23         MR. HEFTER:  Yes, your Honor, I anticipate I will be

24    45 minutes or less.

25         THE COURT:  OK.  Very good.  We'll see you all in 15

DABTBAN2

1    minutes.

2              (Recess taken)

3              (Jury present)

4     MARK BARNETT,

5    DIRECT EXAMINATION

6    BY MR. HEFTER:

7    Q.  Mr. Barnett, I'm Michael Hefter on behalf of Rebecca

8    Mairone.

9              I would like you to open up your binder to PX517,

10   please.  Do you see that?

11   A.  Yes, I do.

12   Q.  And can you describe generally what this document is?

13   A.  Document describes the process for Central Fulfillment.

14             MR. HEFTER:  Your Honor, we move DX517 into evidence.

15             MS. NAWADAY:  No objection.

16             THE COURT:  Received.

17             (Defendant's Exhibit 517 received in evidence)

18   Q.  Now Mr. Barnett, did you create this document?

19   A.  Yes, I did.

20   Q.  Now if we could go down to -- what does the first page of

21   this document show?

22   A.  First page shows the entire process from end to end very

23   high level.

24   Q.  And it says centralized fulfillment team.  What does that

25   mean?

DABTBAN2                          Barnett - direct

1    A.  That means that these boxes inside were members of the

2    centralized fulfillment team and those outside were not.

3    Q.  So we're clear, this document relates to centralized

4    fulfillment and not to the High-Speed Swim Lane pilot?

5    A.  That is correct.

6            MR. HEFTER:  Now Alex, if we could go down to the

7    bottom, there is a V18 there.

8    Q.  What does that mean, Mr. Barnett?

9    A.  It means this was version 18 of this document.

10   Q.  So does that mean this document went through, at least as

11   of 10/2/2007, 18 versions?

12   A.  That's correct.

13   Q.  Let's go back to the top, and on the left-hand side outside

14   of the yellow box there is a gray box, am I correct?

15   A.  Yes.

16   Q.  And it says AE/MC and TM.  What does that mean?

17   A.  That's the account executive team manager.  I honestly

18   forget what MC stands for.  That's basically the sales team.

19   Q.  So a loan would come into the organization through the

20   sales department?

21   A.  That's correct.

22   Q.  And then how does that loan get to the fulfillment process?

23   A.  It's entered into a system that sales uses called

24   advantage, then it is moved once the app is submitted it's

25   moved over to a system called edge for processing by, at this

DABTBAN2                         Barnett - direct

1    time, centralized fulfillment team.

2    Q.  And there's a separate team of people within the

3    organization that processes the loans before funding?

4    A.  That's correct.

5              MR. HEFTER:  Let's go to the second page of the

6    document, second page of the document, blow up that middle

7    section, the blue box.

8    Q.  Is that the process that you were describing before the

9    loan goes to the processing team?

10   A.  Yes.

11             MR. HEFTER:  Now let's see if we can blow up the right

12   side.

13   Q.  It's reference is CLUES referral, what does that mean?

14   A.  A CLUES referral basically means essentially did not get --

15   the loan did not get a CLUES accept.

16   Q.  And if the loan received a CLUES accept, at least based on

17   this chart, what would happen?

18   A.  Then the loan would move to Central Fulfillment.

19   Q.  And it says ready for submission to Central Fulfillment.

20   Do you see that?

21   A.  Yes.

22   Q.  Does that mean the loan received a CLUES accept?

23   A.  Yeah.  Yes, that's correct.

24   Q.  Now let's go to the next page.

25             MR. HEFTER:  Blow up the top, just the top part.

DABTBAN2                        Barnett - direct

1                   Your Honor, may I approach the screen?

2                   THE COURT:  Yes.

3    Q.  There's an orange box right here.  Do you see that,

4    Mr. Barnett, on the right?

5    A.  Yes, I do.

6    Q.  What does that say?

7    A.  Phase code equal one.

8    Q.  And is that your understanding that's phase code one in the

9    loan processing work flow?

10   A.  Correct.

11   Q.  And what do these other boxes depict before the loan gets

12   to phase code one?

13   A.  All of the activities that must be performed prior to that

14   point.

15   Q.  Now let's go to the next box.  There's an orange figure, I

16   forget what that is, not a square, and what does that say?

17   A.  That says phase code equal two.

18   Q.  And what are all those boxes on the left of phase code two?

19   A.  All of the activities that need to be performed between

20   phase code one prior to entering phase code two.

21   Q.  Now what is this figure over here?

22   A.  That hexagon says phase code --

23   Q.  Thank you.

24   A.  Phase code equal three.

25   Q.  And what are all these boxes here?

1    A.  Those are all the activities and decisions that must be

2    made between phase code two and phase code three.

3           THE COURT:  Is that really a hexagon?  From here it

4    looks more like a barrel of beer.

5           MR. HEFTER:  I couldn't remember what it is, your

6    Honor.

7    Q.  Could you read this rectangle here?

8    A.  Yes, it says 21B loans not in LS one or two, authority will

9    be escalated to core underwriting support, loan approval

10   condition review or CTC.

11   Q.  Now if you could also read this triangle right here, or

12   whatever it is.

13   A.  It says 13A PCA or prime CLUES refer with preapproval,

14   question mark.

15   Q.  Now what happens to that loan if it gets a prime CLUES

16   refer at that point?

17   A.  Well, if it got a prime CLUES refer without having gotten a

18   preapproval, it would follow the path down to the no.

19   Q.  And to the left of the no, what does that say?

20   A.  It says core underwriting support.

21   Q.  So if CLUES at this point said it was no longer accept, it

22   would flow down to core underwriting support?

23   A.  That's correct.

24          MR. HEFTER:  Now if we could blow up the next box,

25   please.

DABTBAN2                    Barnett - direct

1    Q.  And what does this say here, the orange figure?

2    A.  It says phase code equal four.

3    Q.  And what are these steps to the left?

4    A.  All of the activities that must be performed before the

5    loan -- between phase code three and phase code four.

6    Q.  And what is this green?

7    A.  It indicates that after phase code four the loan is funded,

8    it has been funded.

9    Q.  And am I correct in saying between phase code three and

10   phase code four that's when conditions set by CLUES would be

11   cleared to close?

12   A.  All except post-funding conditions would have to be

13   cleared.

14   Q.  Thank you.  Could we go to page 5 of the document.

15   A.  Sure.

16          MR. HEFTER:  And if we could blow up this box on the

17   right.

18   Q.  And on the left it says risk item.  Do you see that?

19   A.  Yes.

20   Q.  And it says low, medium, high?

21   A.  Yes.

22   Q.  Can you read this box right here?

23   A.  Yes.  It says approved by LS with underwriting level one

24   authority.

25   Q.  And can you describe what the authority levels were for

DABTBAN2                     Barnett – direct

1    those underwriter level one people?

2    A.  Yes, the maximum loan to value had to be less than or equal

3    to 80 percent, the risk tier either one or two, and guideline

4    type, type one.

5    Q.  And then below that it says a series of nos with the

6    exception of fast and easy.  What do those nos mean?

7    A.  It means none of those other loans –– if those were yeses

8    it would not be a low risk loan.

9    Q.  Underwriter level two, how is their authority level

10   different?

11   A.  Now they were able to handle EA loans, DU approve eligible

12   loans, fast track and Texas A6 loans.

13   Q.  But they were not allowed to process subprime, purchase

14   aggregate loan greater than one million, manufactured housing,

15   trust vesting, leasehold estate, land contract and guideline

16   exception, correct?

17   A.  Yes.

18   Q.  Were you part of the steering committee of the High-Speed

19   Swim Lane?

20   A.  Yes.

21   Q.  And in connection with the development of the High-Speed

22   Swim Lane and the Central Fulfillment model, did you have

23   occasion to have discussions with Rebecca Mairone?

24   A.  Yes.

25   Q.  Can you tell us by order of magnitude how many discussions

DABTBAN2                     Barnett - direct

1   or meetings did you have with Ms. Mairone?

2   A.   As part of the group like the steering committee would be

3   weekly, bi-weekly, sometimes more, sometimes less, depending on

4   what was going on at that time in the project.

5   Q.   And did you attend meetings of the steering committee when

6   High-Speed Swim Lane or Central Fulfillment was discussed?

7   A.   Yes.

8   Q.   Now in connection with those meetings, did you ever express

9   your views to the steering committee concerning the Quality of

10  Grade extension?

11  A.   Yes.

12  Q.   And what did you express to the steering committee?

13  A.   I thought it was a good idea to do that.

14  Q.   Did you ever express your view about the QA reports?

15  A.   I expressed my views about the QA reports, yes.

16  Q.   And you expressed those views about the QA reports to the

17  steering committee?

18  A.   Yes, I did.

19  Q.   What did you express?

20  A.   I expressed some concern that they were measuring the wrong

21  thing and that there might be inaccuracies in what they were

22  reporting.

23  Q.   In connection with your attendance at any steering

24  committee, did you ever hear any member of the steering

25  committee express any disagreement with proceeding with the

DABTBAN2                         Barnett - direct

1    High-Speed Swim Lane pilot?

2    A.  No, the steering committee was supportive.

3    Q.  In connection with your attendance at any steering

4    committee, did you hear anybody express any disagreement with

5    proceeding with Central Fulfillment?

6    A.  No.

7    Q.  In connection with your attendance at the steering

8    committee, did you ever hear any member of the steering

9    committee express any disagreement about the QoG temporary

10   suspension?

11   A.  No.

12   Q.  In connection with your attendance at the steering

13   committee, did you ever hear any member of the steering

14   committee -- strike that.

15          In connection with your attendance at the steering

16   committee, did you ever hear any member of the steering

17   committee express the view that quality of loans were not

18   important?

19   A.  No.

20   Q.  Did you ever hear any member of the steering committee

21   express the view that volume was more important than quality?

22   A.  No.

23   Q.  Did you ever hear at any meeting or telephone discussion

24   that you had with Ms. Mairone that quality was not important?

25   A.  No.

DABTBAN2                          Barnett - direct

1          MS. NAWADAY:  Objection, your Honor.

2          THE COURT:  Overruled.

3   Q.  In connection with any meeting that you had with

4   Ms. Mairone, telephone conversation or actual in-person

5   meeting, did Ms. Mairone express the view that volume was more

6   important than quality?

7   A.  No.

8   Q.  If we could turn to DX193.  Do you have it?

9   A.  Yes, I do.

10  Q.  It's been admitted, so if we could have it published to the

11  jury.

12          MR. HEFTER:  Blow up the top part.

13  Q.  This is an email, Mr. Barnett, from Mr. Thomas to several

14  people, including yourself and Mr. O'Donnell.  Do you see that?

15  A.  Yes.

16  Q.  And also Mr. Rodriguez there?

17  A.  Yes.

18  Q.  So I didn't ask you this at the beginning.  Who did you

19  report to at FSL?

20  A.  Loren Rodriguez.

21  Q.  Who did Mr. Rodriguez report to?

22  A.  Rebecca Mairone.

23  Q.  So you were a part of Ms. Mairone's organization?

24  A.  Yes, I was.

25  Q.  And you regularly advised her of your activities within

DABTBAN2                          Barnett - direct

1   FSL?

2   A.  There were meetings, steering committee meetings and so

3   forth.

4           MS. NAWADAY:  Objection, your Honor.

5           MR. HEFTER:  I'll rephrase, your Honor.

6           THE COURT:  All right.

7   Q.  Did you regularly keep Ms. Mairone informed of what you

8   were working on in connection with your role and

9   responsibilities at FSL?

10  A.  Yes, I did.

11  Q.  Now Mr. Thomas says to you and others -- why don't you read

12  the paragraph there.

13  A.  Build separate organizations to handle prime and subprime

14  for the defined swim lanes.  It may be easiest to implement

15  different work flows if we have different org structures, comp

16  plans, et cetera, to support the work flow.  A good example is

17  how difficult it is to provide incentive to sales to choose a

18  more difficult or lower potential subprime loan when they can

19  pass it to move on to the next prime loan.  If we went back to

20  having dedicated subprime sales and maybe ops/underwriting/CFC

21  where it makes sense, we may have more success at implementing

22  the work flow changes on prime.

23          (Continued on next page)

24

25

DAB3BAN3                    Barnett – direct

1   Q.  If we go to the third page of the exhibit.  Can you blow up

2   the to's and from's and the first sentence of that Ed e-mail.

3          This is an e-mail to Mr. Thomas -- from Mr. Thomas to

4   Mr. Rodriguez and yourself and Mr. O'Donnell, and he writes,

5   "Loren, here's a general list of topics that we've discussed

6   around improving the prime work flow.  Some can be applied to

7   lower FICO processes as well.  Many of these we have touched on

8   already."

9          What is the date of this document, sir?

10  A.  It is July 18, 2007.

11  Q.  This is in or around those first meetings with the steering

12  committee?

13  A.  Yes.

14  Q.  If we turn to the next page.  The next page of the

15  document, please.  193, please.  I'll move on.

16          You see in the document it says "communication hand

17  offs"?

18  A.  Yes.

19  Q.  Can you read the first three lines.  This is Mr. Thomas

20  talking, right?

21  A.  Yes, it is.  "The ops to central services hand offs have

22  identified significant file quality issues.  Time delays due to

23  back and forth ops/underwriting/CFC combination, investigate

24  including ops personnel in with underwriting and CFC."

25  Q.  Were you involved in discussions about investigating

1   including ops personnel with UW and CFC?

2   A.  Yes, that was part of the discussion of the design, yes.

3   Q.  What was the discussion around investigating including ops

4   personnel and with the UW and CFC?

5        MS. NAWADAY:  Objection, your Honor.

6        THE COURT:  Sustained.

7   Q.  What is ops/UW/CFC combination?

8   A.  It is describing in essence the team layout that we talked

9   about in Central Fulfillment earlier.

10  Q.  Thank you.  This discussion was taking place in mid July?

11  A.  Correct.

12  Q.  Mr. O'Donnell and Mr. Thomas, yourself and Mr. Rodriquez

13  were involved in this discussion?

14  A.  Yes, that's correct.

15  Q.  If we go down, there is something called "appraisal/CTC."

16  A.  Okay.

17  Q.  Can we have that blown up, please.  In the middle it says

18  "Remove appraisal review from the ops process centralized

19  review per Rebecca's suggestion."

20        Do you recall Ms. Mairone making this suggestion about

21  remove appraisal review from the ops process, centralized

22  review?

23  A.  I personally, I don't recall that, no.

24  Q.  The next it says "Initiate appraisal review from LS

25  completion not ops submission," do you see that?

DAB3BAN3                    Barnett - direct

1    A.  Yes.

2    Q.  "Best division has six day appraisal to CTC TT."  Do you

3    have an understanding of what CTC TT?

4    A.  Turn time from submission of the application from sales to

5    CTC.

6    Q.  It says "worst has 12.5 days," do you see that?

7    A.  Yes.

8    Q.  It says "NCA equals 21 days"?

9    A.  Yes.

10   Q.  Let's go down to the next page.  There is a line that says

11   "submission" near the top.

12   A.  Yes.

13   Q.  Near the top, can you blow that up.  Thank you.  It says

14   "Submission review checklists and job aids to make sure

15   requirements are high FICO specific and crystal clear."  Do you

16   see that?

17   A.  Yes, I do.

18   Q.  That was being discussed between you, Mr. O'Donnell,

19   Mr. Thomas, and Mr. Rodriguez in and around this timeframe?

20   A.  Yes, correct.

21   Q.  Do you recall whether you expressed any view about review

22   checklists and job aids to make sure requirements are high FICO

23   specific and crystal clear?

24             MS. NAWADAY:  Objection.  Leading.

25             THE COURT:  Sustained.

DAB3BAN3                    Barnett - direct

1   Q.  If we go down to the bottom.  Near the top.  Sorry.

2   "Production" it says.  You see it says "High FICO specific

3   sales script."  Do you see that?

4   A.  Yes, I do.

5   Q.  Let's go on to the next slide.  If we go to DX 14, please.

6   This is an e-mail from Mr. O'Donnell on August 13 to Mr. Brent

7   and yourself as copied, do you see that?

8   A.  Yes, I do.

9   Q.  If we can blow up the second part of the e-mail with the

10  "cut to 80 percent LTV."  Can you read Mr. O'Donnell's sentence

11  there.

12  A.  "With the cut to 80 percent LTV and the back end audit of

13  these fundings, we believe we can make adjustments if early

14  loans don't meet standards.  We're going to start with the most

15  aggressive stance."

16  Q.  Were you involved in discussions at this point in time

17  about the LTV that was appropriate for the High-Speed Swim

18  Lane?

19  A.  I participated in discussions, yes.

20  Q.  What was your role in those discussions?

21  A.  At that point as the solution lead, it really was just to

22  make sure all the pieces were fitting together consistently.

23  Q.  Did you express your view about the level of LTV that was

24  appropriate for the High-Speed Swim Lane?

25  A.  No.  I relied on risk to do so.

DAB3BAN3                           Barnett - direct

1   Q.  When you mean risk --

2   A.  Ed O'Donnell and Steve Brent.  Cliff Kitashima.

3   Q.  Between July and August, do you recall whether there was a

4   change in the eligibility criteria for entry to the High-Speed

5   Swim Lane based on LTV?

6   A.  I recall it started out at 80 percent.  It went up to

7   90 percent at some point, and went back down to 80 percent.

8   Q.  Thank you.  Turn to DX 485, please.  It is not in evidence

9   yet.  Do you have DX 485?

10  A.  Not in my folder.

11          MR. HEFTER:  May I approach, your Honor?

12          THE COURT:  Yes.

13  Q.  This is an e-mail from Mr. Jaraba to Mr. Gong, among other

14  people, dated September 26, 2007.  Do you see that?

15  A.  Yes, I do.

16          MR. HEFTER:  Your Honor, we move DX 485 into evidence.

17          MS. NAWADAY:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 485 received in evidence)

20  Q.  If we go to the top.  And at the top it is an e-mail from

21  Mr. Jaraba.  Who is Mr. Jaraba again?

22  A.  I believe Javier was one of the folks involved in risk, but

23  I'm not certain I got that 100 percent right.

24  Q.  He was not in Ms. Mairone's organization, right?

25  A.  No.

DAB3BAN3                         Barnett - direct

1   Q.  He was in Mr. Kitashima and Mr. O'Donnell's organization?

2   A.  That's what I recall.

3   Q.  The subject line is "GL Central Fulfillment review on

4   Tuesday."  Do you have an understanding of what GL is?

5   A.  I'm blanking on it.  I'm sorry.  It's been a while.

6   Q.  Let's see if I can refresh your recollection.  Let's go to

7   the back the last page of the exhibit, page six.

8   A.  Ah, okay.

9   Q.  Does that refresh your recollection?

10  A.  Yes, it's Greg Lumsden.

11  Q.  So the subject of this e-mail is "Greg Lumsden Central

12  Fulfillment review on Tuesday," right?

13  A.  Correct.

14  Q.  Now let's focus on the last page of the document.  If we

15  go -- I'm sorry, the second to last page so we can see who is

16  sending and receiving this e-mail.

17          This is an e-mail, Mr. Barnett, from Mr. Rodriguez to

18  yourself, Mr. Thomas and others, Ms. Mairone included,

19  Mr. O'Donnell and Ms. Shine.  Do you see that?

20  A.  Yes, I do.

21  Q.  This is dated sometime in late September, correct?

22  A.  Yes.

23  Q.  September 21 to be exact, right?

24  A.  Correct.

25  Q.  The first page Mr. Rodriguez writes -- if we can just blow

DAB3BAN3                    Barnett – direct

1     up the "as you know."

2             "As you know, we have a session with Greg on Tuesday

3     to review Central Fulfillment."

4             Do you recall one way or the other whether this

5     September 21 was before or after the rollout of Central

6     Fulfillment?

7     A.  This was before the rollout.

8     Q.  Then it says "There is also a prep session" brackets "with

9     RM, CK, CS and EO'D midday Monday to review where we are."  Do

10    you see that?

11    A.  Yes.

12    Q.  The RM refers to Ms. Mairone?

13    A.  That's correct.

14    Q.  CK Mr. Kitashima?

15    A.  Yes.

16    Q.  CS Cheri Shine?

17    A.  Yes.

18    Q.  And EO'D Ed O'Donnell?

19    A.  Yes.

20    Q.  "In our first session with GL, RM, CK, we discussed the

21    following eight topics."

22    A.  Yes.

23    Q.  Do you recall being in a meeting with Mr. Lumsden,

24    Ms. Mairone and Mr. Kitashima about the following eight topics?

25    A.  Yes, I would have been involved in that.

DAB3BAN3                        Barnett - direct

```
1   Q.  And this meeting was a discussion among all these
2   participants about the rollout of Central Fulfillment?
3   A.  That's correct.
4   Q.  Then your name is next to number four.  Do you see that?
5   A.  Yes, I do.
6   Q.  It says "centralized work flow updates."  Do you see that?
7   A.  Yes.
8   Q.  Were those the Visio slides we were talking about?
9   A.  Yes.
10  Q.  It also says number three, "120 day grace period status.
11  J.Jaraba."  Right?
12  A.  Hmm-hmm, correct.
13  Q.  Let's go to the first page of document, to Mr. Jaraba's
14  e-mail on Wednesday, September 26.  He says "Anson, sorry for
15  the delay.  Per our discussion, please use the following.
16  Thanks."  Then he writes "temporary QoG process."  Right?
17  A.  Correct.
18  Q.  Then can you read into the record the second paragraph of
19  the e-mail.
20  A.  The one that starts "the normal audit --"
21  Q.  Yes.  Please.
22  A.  "The normal audit results for both quality control and
23  compliance will be reported and tracked through the normal QoG
24  process.  However, the final QoG score will not be reported to
25  bonus admin for any bonus impact."
```

DAB3BAN3                      Barnett - direct

1   Q.  Then he writes "The egregious SUS will be defined as

2   violations proven to be performed with the intent to defraud,

3   mislead and/or ignore current FSL CHL and/or state, federal

4   guidelines.  Below are some examples of these types of

5   violations."  Then he gives some examples, correct?

6   A.  Correct.

7   Q.  This relates to the QoG reprieve in Central Fulfillment?

8   A.  Yes, it does.

9   Q.  This is Mr. Jaraba talking who is in the risk and quality

10  control group?

11  A.  That's correct.

12  Q.  Let's turn our attention to DX 378 which I believe has been

13  admitted.  If we could just blow up just the middle e-mail

14  first.

15          So this is an e-mail from Michael Thomas to you and

16  Mr. Gong with a copy to Mr. O'Donnell, subject "HSSL work flow

17  and UWs."  You see that?

18  A.  Yes, I do.

19  Q.  I think we've established well enough that UWs means

20  underwriters?

21  A.  Yes.

22  Q.  So, let's see what Mr. Thomas has to say to you on

23  August 30, 2007.  August 30, 2007 was in the middle of the

24  pilot, is that correct?

25  A.  That's correct.

DAB3BAN3                    Barnett - direct

1   Q.  It is after the time period that loans had started to flow

2   through the two pilot teams, correct?

3   A.  That's correct, yes.

4   Q.  Now, read for me the paragraph that says "when it comes to

5   fulfilling the loan."

6   A.  "When it comes to fulfilling the loan, I don't think the LS

7   and underwriter roles should be separated.  From our file

8   reviews it is clear that an LS processing conditions without

9   underwriting knowledge ends up just chasing for what CLUES

10  spits out.  A validator just validates what the LS and AEE has

11  entered into the system.  When both do their jobs separately,

12  we've seen delays and missed opportunity.  What HSSL can bring

13  with a combined role and skill set is the ability for the LS to

14  use underwriting principles in clearing conditions such as

15  condition avoidance or alternative conditions.  Plus there is

16  not a need for validation in the more account management

17  process that is outlined in the HSSL flow and piloting in

18  Chandler."

19  Q.  Then he writes "I'm concerned that the two distinct roles

20  leads us right back to the hand offs and the lack of

21  accountability we had.  The only change from the current

22  process would be cubicle location."

23          On the top, if you go back to -- let's look what you

24  wrote on top.  You say -- why don't you read what your response

25  was.

1   A.  "I'm in agreement with Michael.  We deliberately designed

2   the process to minimize hand offs and potential for back and

3   forth that breeds delays and miscommunications, and therefore

4   rework and duplicate work."

5   Q.  Thank you.  What did you mean when you said "I'm in

6   agreement with Michael"?

7   A.  I meant with the idea of combining the underwriter and LS

8   roles.

9   Q.  That was Mr. Thomas?

10  A.  With Michael Thomas, excuse me, yes.

11  Q.  Let's turn our attention to DX 389.

12          MR. HEFTER:  May I approach, your Honor?

13          THE COURT:  Yes.

14  A.  I don't believe I have that.

15  Q.  I've handed you what's been marked as DX 389 for

16  identification, which is an e-mail from Anson Gong to Ferdie

17  Espinosa and other people.  Dated September 5, 2007.  Subject

18  "HSSL capacity model and role/number of underwriters."

19          MR. HEFTER:  We move DX 389 into evidence.

20          MS. NAWADAY:  No objection.

21          THE COURT:  Received.

22          (Defendant's Exhibit 389 received in evidence)

23  Q.  If you can turn your attention to the second page.  There

24  is a paragraph that says "in summary."

25  A.  Yes.

1    Q.  It says "In summary, I think out of the 68 underwriters we

2    have slated for the new teams, 48 to 50 are the LS/type who

3    will be directly on the team and the 18 to 20 will be core UWs

4    which may be central support group in each location like our

5    HSSL UW support."  You see that?

6    A.  Yes.

7    Q.  Did I read that correctly?

8    A.  Yes, you did.

9    Q.  If we can turn our attention to DX 1767, please.

10   A.  I don't believe I have that.

11   Q.  I've handed you DX 1767 marked for identification which is

12   an e-mail from Ms. Mairone to Mr. Lumsden dated September 8,

13   2007.

14            MR. HEFTER:  We move DX 1767 into evidence.

15            MS. NAWADAY:  I don't believe I have that.

16            MR. HEFTER:  I apologize.  May I approach, your Honor?

17            MS. NAWADAY:  No objection.

18            THE COURT:  Received.

19            (Defendant's Exhibit 1767 received in evidence)

20   Q.  This is dated September 8, 2007, do you see that?

21   A.  Yes.

22   Q.  It says from Ms. Mairone to Mr. Lumsden, "Greg, we outlined

23   the central operations to Central Fulfillment organization plan

24   timeline for the centers today.  In the meeting were Cliff,

25   Loren, Ed Cheri, Mark Barnett."  Do you see that?

DAB3BAN3                        Barnett – direct

1   A.  Yes, I do.

2   Q.  Do you recall being in a meeting in and around this

3   timeframe where this subject was discussed?

4   A.  Yes, I do.

5   Q.  Did either Cliff, Loren, Ed, Cheri or yourself express any

6   disagreement with proceeding with Central Fulfillment?

7   A.  No.

8               MS. NAWADAY:  Objection.

9               THE COURT:  Overruled.  The answer will stand.

10              MR. HEFTER:  Your Honor, I'll refer to DX 4076.  May I

11  approach, your Honor?

12              THE COURT:  Yes.

13  Q.  Mr. Barnett, I've shown you DX 4076.  And if we can have

14  that up on the screen.  Blow up the top part.

15              This is an e-mail from Mr. Harris to Ms. Mairone,

16  copied to several people, including yourself, do you see that?

17  A.  Yes, I do.

18  Q.  This is dated 12/7/2007?

19  A.  Yes.

20  Q.  It says "Central Fulfillment QA PC3 daily review results

21  12/6/07"?

22  A.  Correct.

23  Q.  During this time period, were you receiving QA PC3 daily

24  review results?

25  A.  Yes.

1              MR. HEFTER:  I have no further questions, your Honor.

2              THE COURT:  All right.  Cross-examination.

3  CROSS-EXAMINATION

4  BY MS. NAWADAY:

5  Q.  Good afternoon, Mr. Barnett.

6  A.  Good afternoon.

7  Q.  You testified that you were the solution leader with

8  respect to the High-Speed Swim Lane.  Is that right?

9  A.  That's correct.

10  Q.  Are you familiar with the phrase "project owner" in

11  connection with the High-Speed Swim Lane?

12  A.  It would be synonymous, I would think.  I mean --

13  Q.  In fact, wasn't Rebecca Mairone the project owner for the

14  High-Speed Swim Lane?

15  A.  She was the executive sponsor.

16  Q.  Executive sponsor is the same thing as project owner, is

17  that right?

18              MR. HEFTER:  Objection.

19              THE COURT:  Overruled.

20  A.  I don't know.  I mean, multiple terminologies were used.

21  There is a document we saw earlier that had her listed as --

22              THE COURT:  No.  Just answer the question.  If the

23  answer is --

24              THE WITNESS:  I don't know is the answer.

25  Q.  You testified, Mr. Barnett, that you have a degree in

DAB3BAN3                    Barnett - cross

1    aerospace engineering, is that correct?

2    A.  That's correct.

3    Q.  You testified you joined Countrywide in February of 2007,

4    correct?

5    A.  Correct.

6    Q.  Prior to February 2007, you had no experience with

7    underwriting, is that right?

8    A.  That is correct.

9    Q.  Prior to February 2007, you had no experience with the

10   guidelines of Fannie Mae or Freddie Mac, is that right?

11   A.  That's correct.

12   Q.  Prior to February 2007, you had no experience with

13   assessing the credit risk of mortgage loans, correct?

14   A.  Correct.

15   Q.  And no experience with quality control, correct?

16   A.  In the mortgage industry, correct.

17   Q.  In fact, prior to February 2007, you had no experience

18   whatsoever with mortgages, correct?

19   A.  Except personally, yes, correct.

20   Q.  Your role in the High-Speed Swim Lane was to design the

21   process, is that right?

22   A.  That's correct.

23   Q.  You would agree with me, wouldn't you, that a work flow for

24   processing loans should have steps to guard loan quality,

25   right?

DAB3BAN3                     Barnett – cross

1    A.   I would agree.

2    Q.   You were aware that the loans resulting from the High-Speed

3    Swim Lane that you designed would be sold to Fannie Mae and

4    Freddie Mac, correct?

5    A.   I agree, yes, that's correct.

6    Q.   Were you familiar with the seller requirements of Fannie

7    Mae and Freddie Mac in July of 2007?

8    A.   I was not because that was not part of my role in the team.

9    Q.   You never looked them up to see what was required in July

10   of 2007, is that right?

11   A.   I relied on my subject matter experts on that topic.

12   Q.   So you designed the High-Speed Swim Lane process without

13   knowing the requirements of Fannie Mae and Freddie Mac, is that

14   fair?

15   A.   I just -- no, it's not fair.

16   Q.   You testified yesterday that Fannie Mae and Freddie Mac had

17   an interest in loans that were thoroughly vetted for quality,

18   is that right?

19   A.   Sure, yes.

20   Q.   In early 2007, Full Spectrum Lending already had in place a

21   work flow for processing prime loans, isn't that right?

22   A.   What was the timeframe you said?

23   Q.   In 2007.

24   A.   Sure, yes.

25   Q.   That work flow was called the prime CLUES accept work flow,

DAB3BAN3                         Barnett - cross

 1    right?

 2    A.   Correct.

 3    Q.   That work flow involved underwriters, right?

 4    A.   Are we talking about before the High-Speed Swim Lane?

 5    Q.   The prime CLUES accept work flow was a work flow that

 6    involved underwriters in the processing of prime loans,

 7    correct?

 8    A.   I'm still not sure if you are talking about the High-Speed

 9    Swim Lane timeframe or not.

10    Q.   I'm talking about in July of 2007, there was already in

11    place a processing model for prime loans, correct?

12    A.   That's correct.

13    Q.   And that was called prime CLUES accept work flow, correct?

14    A.   I don't recall.

15    Q.   There was a work flow in place, was there not, that

16    involved underwriters in the processing of prime loans,

17    correct?

18             MS. MAINIGI:   Objection.   Asked and answered.

19             THE COURT:   Overruled.

20    Q.   You can answer.

21    A.   My recollection of the predating process flow is weak.   I'm

22    going -- I'm not certain.

23    Q.   Your job was to design a faster work flow for processing

24    prime loans, correct?

25    A.   That's correct.

DAB3BAN3                    Barnett - cross

1              MS. MAINIGI:  Objection.

2              MR. HEFTER:  Objection.

3              THE COURT:  Ground?

4              MS. MAINIGI:  Vague, foundation.

5              MR. HEFTER:  Vague.

6              THE COURT:  Overruled.

7   Q.  Your role was to remove toll gates from the processing of

8   prime loans, is that correct?

9   A.  That was not the role.

10  Q.  Do you still have DX 191 in front of you?

11  A.  Yes.

12             MS. NAWADAY:  Ms. Michaud, can we put on the screen DX

13  191.  Can we go to page 12.  Can we blow up, Ms. Michaud, the

14  second portion of the document in red that begins "there should

15  be."

16  Q.  Mr. Barnett, can you read that aloud for us.

17  A.  "There should be considerably fewer gates in the swim lane

18  than prime loans currently have to navigate.  A design goal

19  should be to minimize the number of gates."

20  Q.  You would agree with me that a faster work flow means more

21  money, right?

22  A.  No.

23             MS. MAINIGI:  Objection.

24             THE COURT:  You must, if there is an objection, you

25  must not answer the question.

1           THE WITNESS:  Okay.

2           THE COURT:  Ground?

3           MS. MAINIGI:  Vague.

4           MR. HEFTER:  Vague.  Foundation.

5           THE COURT:  Sustained.

6   Q.  You testified about visiting CMD regional operating centers

7   in June of 2007, do you recall that testimony?

8   A.  Members of my staff did so, yes.

9   Q.  Do you still have DX 202 in front of you?

10  A.  Yes.

11  Q.  The purpose of this visit was to compare CMD and Full

12  Spectrum to improve Full Spectrum productivity, is that right?

13  A.  Yes, that was in part the purpose, yes.

14  Q.  And also to decrease the cost per loan, correct?

15  A.  That was not the purpose of the visit, no.

16  Q.  It was to compare -- I'm sorry.  It was to compare CMD and

17  Full Spectrum in terms of cost per loan, is that right?

18  A.  Among other things.

19  Q.  Could we go back to page two of DX 202.  Mr. Barnett, can

20  you read the top bullet for us.

21  A.  "Launch an ongoing process to compare FSL and CMD

22  operational models in order to improve FSL productivity and

23  cost per loan."

24  Q.  Improving productivity means selling more loans, is that

25  right?

DAB3BAN3                          Barnett - cross

1          MR. HEFTER:  Objection.

2          THE COURT:  Overruled.

3  A.  No, it does not.

4  Q.  Improving cost per loan means processing loans less

5  expensively, correct?

6          MR. HEFTER:  Objection.

7          THE COURT:  Overruled.

8  A.  Yes, lower cost per loan.

9  Q.  You identified in this presentation a number of advantages

10 that CMD had over Full Spectrum, is that right?

11 A.  We noted some opportunities, yes.

12 Q.  Can I direct your attention back to page four of the

13 document.  These are the advantages you observed, correct?

14 A.  Correct.

15 Q.  And you were trying to follow this CMD model that you saw

16 within the regional operating centers, is that correct?

17 A.  No, that's not correct.

18 Q.  You were studying the model for possible adoption in Full

19 Spectrum, correct?

20 A.  Not the model in whole, no.

21 Q.  The model for processing prime loans that you observed in

22 the regional operating centers, correct?

23         MS. MAINIGI:  Objection.

24 A.  I don't understand the question.

25         THE COURT:  Well, I don't need to rule on the

 1   objection because the witness said he didn't understand the
 2   question, so rephrase it.
 3   Q.  If we can turn back to page four of the document.  Can you
 4   read the first bullet for us.
 5   A.  "The observations identified during this preliminary
 6   analysis confirm the below advantages that CMD enjoys with a
 7   streamlined prime loan process."
 8   Q.  These are the advantages that you identified, correct?
 9   A.  Yes, they are.  Relative to what we had in place at the
10   time.
11   Q.  And loan quality wasn't one of the advantages that you
12   identified, is that fair?
13   A.  That's correct.
14   Q.  In fact, at the time of your visit, this CMD regional
15   operating centers were having problems with quality, weren't
16   they?
17            MS. MAINIGI:  Objection.
18            THE COURT:  Ground?
19            MS. MAINIGI:  Foundation.
20            THE COURT:  If you know you may answer.  If you had
21   personal knowledge of that, you may answer.
22            THE WITNESS:  I don't have personal knowledge.
23            MS. NAWADAY:  Your Honor, may I approach the witness?
24            THE COURT:  Yes.
25   Q.  Mr. Barnett, if you could please turn in your binder to DX

DAB3BAN3                         Barnett - cross

1    279.  Is this an e-mail sent to you on August 8, 2007?

2    A.  Yes, it is.

3              MS. NAWADAY:  Your Honor, we offer DX 279 into

4    evidence.

5              MS. MAINIGI:  No objection, your Honor.

6              MR. HEFTER:  No objection.

7              THE COURT:  Received.

8              (Defendant's Exhibit 279 received in evidence)

9    Q.  Mr. Barnett, can you remind us who Peter Tinaglia is?

10   A.  He was a member of my team.

11   Q.  Can you turn to page two of the document, please.  And can

12   we blow up the top paragraph on the second page.  This is --

13   I'm sorry, let me just back up for one moment.

14             This is coming from an e-mail sent to you from Michael

15   Thomas on August 8, 2007, is that right?

16   A.  That's correct.

17   Q.  Mr. Thomas says, and now we can go back to page two.

18   Mr. Thomas says to you at the bottom of that paragraph, "If FSL

19   quality declines, and we have the same quality issues that the

20   CMD regional operating centers are having, I don't think we

21   would want Drew to see this process design."  Did I read that

22   correctly?

23   A.  Yes, you did.

24   Q.  Who is the Drew referred to there?

25   A.  Drew Gissinger.

DAB3BAN3                    Barnett - cross

1    Q.  So Mr. Thomas told you that quality was a problem for the

2    CMD regional operating centers in August of 2007, correct?

3    A.  He said that the quality was less than what FSL currently

4    had.

5    Q.  Mr. Barnett, can you turn in your binder to Plaintiff's

6    Exhibit 255.

7    A.  Yes.

8    Q.  Is this an e-mail that you sent on August 13, 2007?

9    A.  Yes, it is.

10   Q.  And the e-mail that you forwarded is from Donna Braaten?

11   A.  That's correct.

12   Q.  Who is Donna Braaten?

13   A.  She was underwriting -- she was the VP of underwriting for

14   Chandler.

15          MS. NAWADAY:  We offer Plaintiff's Exhibit 255 into

16   evidence.

17          MS. MAINIGI:  No objection.

18          MR. HEFTER:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 255 received in evidence)

21   Q.  Can we blow up the bottom paragraph of this e-mail.  This

22   is Ms. Braaten's note to you, is that right, Mr. Barnett?

23   A.  That's correct.

24   Q.  Can you please read that paragraph for us.

25   A.  Yes.  "Just a reminder.  The HSSL project starts today in

1    the Chandler NSC and NCA world.  Your names were provided as

2    underwriting support.  Thus, the meeting last week.  Please be

3    aware that you may be receiving phone call from the ops staff

4    where they may need some help.  When answering their questions,

5    always keep in mind the HSSL perimeters and think move that

6    loan forward at lightning speed."

7    Q.  The ops staff referred to in that section would include

8    loan specialists, is that correct?

9    A.  That's correct.

10   Q.  NCA is the new customer acquisition group, is that right?

11   A.  That's correct.

12   Q.  So the Hustle was -- the High-Speed Swim Lane was rolling

13   out through the NCA group, is that right?

14            MS. MAINIGI:  Objection.

15            THE COURT:  Overruled.

16   A.  It was not rolling out through the NCA group, no.  That's

17   not a correct statement, I don't believe.

18   Q.  But the NCA group was supplying loans into the High-Speed

19   Swim Lane pilot, correct?

20   A.  That would be sales from NCA, yes.

21   Q.  "Move that loan forward at lightning speed" was a phrase

22   commonly used around this time, isn't that right?

23            MR. HEFTER:  Objection.

24            THE COURT:  Sustained.

25   Q.  Mr. Barnett, you also set funding goals for the High-Speed

DAB3BAN3                      Barnett – cross

1   Swim Lane is that right?

2   A.  I did not set funding goals.

3          MS. MAINIGI:  Objection.

4          THE COURT:  Ground?

5          MS. MAINIGI:  Foundation.

6          THE COURT:  Given the answer, I'll let it stand.

7   Q.  Can you turn in your binder to Plaintiff's Exhibit 272,

8   Mr. Barnett.  Is this an e-mail that you sent to Anson Gong on

9   August 16, 2007?

10  A.  Yes, it is.

11  Q.  This is roughly a week after the e-mail that Mr. Thomas

12  sent to you, is that right?

13  A.  Yes, correct.

14         MS. NAWADAY:  We offer Plaintiff's Exhibit 272 into

15  evidence.

16         MS. MAINIGI:  No objection, your Honor.

17         MR. HEFTER:  No objection.

18         THE COURT:  Received.

19         (Plaintiff's Exhibit 272 received in evidence)

20  Q.  If we can blow up the e-mail from Peter Tinaglia.  You said

21  that Peter Tinaglia reported to you, is that right?

22  A.  That's correct.

23  Q.  Can you read for us the first two sentences of

24  Mr. Tinaglia's e-mail to you.

25  A.  "Per the HSSL presentation, our goal was 30 fundings per

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    HSSL LS per month.  I'll be aggressive and target 35 fundings

2    per HSSL LS per month.  Breaking that down, we have the

3    following."  There's a figure.  "If we get -- if each LS got 10

4    files per day, that should translate into six fundings per day.

5    Assuming a 60 percent app to fund rate.  Six fundings times 21

6    days in a month equals 126 fundings per month per LS.  That's

7    over 3.5 times the goal advertised."

8    Q.  I'd like to go back to another e-mail that you've already

9    talked about, that's Plaintiff's Exhibit 55 already in

10   evidence.  If we can blow up the first two paragraphs of

11   Mr. Barnett's e-mail.

12           This is an e-mail you sent to Mr. Rodriguez and

13   Ms. Mairone, correct?

14   A.  That's correct.

15   Q.  Can you read the first sentence of your e-mail, please.

16   A.  "So you know we're not falling down on the job here, we

17   just got our first CTC one day.  The loan came in this morning,

18   was a fast and easy with property inspection waiver."

19   Q.  Is it fair to say you were excited about the clear to close

20   in one day?

21           MS. MAINIGI:  Objection.

22           MR. HEFTER:  Objection.

23           THE COURT:  Sustained.

24   Q.  You would agree with me, wouldn't you, that a loan that was

25   cleared to close in one day could not be thoroughly vetted for

DAB3BAN3                     Barnett - cross

1    quality?

2    A.  I disagree.

3            MR. HEFTER:  Objection.

4            THE COURT:  Sustained.

5    Q.  You had no mortgage experience prior to February 2007,

6    correct?

7    A.  That's correct.

8            MS. MAINIGI:  Objection.

9    Q.  You don't know --

10           THE COURT:  Now, look.  There are rules here that seem

11   to have been lost on a number of the participants.  First, when

12   an objection is made, you must not answer until I've ruled on

13   the objections.  Do you understand that, sir?

14           THE WITNESS:  Yes, I do.

15           THE COURT:  And please stop doing it.

16           And counsel, you put a question while there was an

17   objection pending, which was improper as well.

18           MS. NAWADAY:  I apologize, your Honor.  I didn't hear

19   the objection.

20           THE COURT:  Sustained.  Put a new question.

21   Q.  Mr. Barnett, you don't know the quality of the loan in this

22   e-mail, correct?

23   A.  I do know the quality of the loan in this e-mail.

24   Q.  Let's move forward a few days to August 20, 2007.  Can you

25   please turn in your binder to Plaintiff's Exhibit 481.

1   Mr. Barnett, is this an e-mail you sent to Adam Felker on

2   August 20, 2007?

3   A.  Yes, it is.

4           MS. NAWADAY:  We offer Plaintiff's Exhibit 481 into

5   evidence.

6           MS. MAINIGI:  No objection, your Honor.

7           MR. HEFTER:  No objection, your Honor.

8           THE COURT:  Received.

9           (Plaintiff's Exhibit 481 received in evidence)

10  Q.  Mr. Barnett, you sent this e-mail to Adam Felker, correct?

11  A.  Correct.

12  Q.  Adam Felker was in charge of an NCA group, is that correct?

13  A.  That's correct.

14  Q.  You see the reference, if we can blow up the first

15  paragraph of the e-mail.  You see a reference to two loans that

16  have quality problems?

17  A.  Yes, I do.

18  Q.  Then if we can blow up the second paragraph, you see that

19  one of those problems is described in the second paragraph?

20  A.  Yes.

21  Q.  Can you read the paragraph beginning "the other one" for

22  us, please.

23          MR. HEFTER:  Objection.

24          THE COURT:  Ground?

25          MR. HEFTER:  Relevance.

DAB3BAN3                           Barnett - cross

1          THE COURT:  No, overruled.  You may read it.

2     A.  "The other one was a situation where in order to get the

3     LTV where it needed to be, the home value was highly inflated

4     on the application.  314K versus 177K from Value Finder.  Isn't

5     the MC supposed to check Value Finder?  I'll give you that this

6     may not be quality problem per se, but if VF shows such a low

7     value, should this loan be pushed forward on a wing and a

8     prayer that the appraisal will come back in so far over the VF

9     value?"

10    Q.  Mr. Barnett, what is Value Finder?

11    A.  Value Finder is a, I believe it was an online system that

12    allows you to put in an address and get back an estimated value

13    for a property.

14    Q.  You testified to an LTV limit initially on loans in the

15    Hustle pilot, is that right?

16    A.  That's correct.

17    Q.  You would agree with me, wouldn't you, if a borrower's home

18    value is inflated, that affects the LTV, correct?

19    A.  Yes.

20    Q.  Here, in this e-mail you agree that the value of the

21    borrower's home was highly inflated, correct?

22          MR. HEFTER:  Objection.

23          THE COURT:  Ground?

24          MR. HEFTER:  Vague and assumes facts not in evidence.

25          THE COURT:  Overruled.

DAB3BAN3                          Barnett - cross

1              MS. MAINIGI:  Your Honor, another objection.  The

2    document speaks for itself.

3              THE COURT:  Sustained.

4    Q.  You would agree with me --

5              THE COURT:  If you try again, sooner or later you'll

6    hit one.

7    Q.  You would agree with me, Mr. Barnett, if the borrower's

8    home value is highly inflated, that makes the LTV unreliable,

9    correct?

10             MR. HEFTER:  Objection.

11             THE COURT:  Sustained.  Counsel, we're going to let

12   the jury go a little bit earlier for lunch today.  So in about

13   five minutes, find a spot to break for lunch.

14   Q.  Mr. Barnett, if I could direct your attention to the next

15   paragraph, the one that begins "this isn't just one MC in NCA."

16   You say "This isn't just one MC in NCA.  As I have said before,

17   the quality of the NCA apps is consistently below what we get

18   from NSC in general.  How can we change this?  How can I help

19   change this?  These issues are having a material impact on the

20   HSSL team's ability to move these loans quickly."  Did I read

21   that correctly?

22   A.  You read that correctly, yes.  But it doesn't --

23   Q.  Thank you.

24   A.  Sorry.

25             MS. NAWADAY:  This is a good stopping point, your

2375

DAB3BAN3                          Barnett – cross

1    Honor.

2              THE COURT:  So, ladies and gentlemen, we're going to

3    break for lunch until 2 o'clock.  This will be another day in

4    which we will go after lunch for two hours without break, and

5    then we'll end for the day.  So what I'm hoping is we'll end

6    sometime between 4 and 4:15, depending how soon we get going

7    right after lunch.

8              Have a good lunch and we'll see you at 2.

9              (Jury excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAB3BAN3

```
1            THE COURT:  I received from bank's counsel this

2    morning, and they had requested permission to submit this,

3    their letter brief on corporate liability in terms of imputing

4    liability on the basis of an agent.  It is quite an interesting

5    letter.  I'm sure the government will want to respond.

6            But, I guess Mr. Singer.  So, with reference to the

7    Koppers case, you say correctly that the Second Circuit

8    declined to adopt the high managerial agent standard, which is

9    certainly true.  They not only declined to adopt it, they

10   expressly rejected the appellant's claim that that's what

11   should have been given.

12           But you tried to distinguish that, because you want me

13   to adopt the high managerial standard, yes?

14           MR. SINGER:  Yes.

15           THE COURT:  You say that the Court's reasoning was

16   based, at least in part, on the fact that the applicable

17   statute, the Sherman Act, was clearly intended to make

18   corporations criminally liable.  And you use that same

19   distinction in various other ways.

20           Now, I don't see in Koppers, on a quick reading, where

21   that was the ground in any respect of the Court's rejection of

22   the high managerial agent standard.  It was, in fact, a Sherman

23   Act case, and that may still be relevant.  But that was not a

24   ground that they expressly stated at all.

25           MR. SINGER:  Let me go back and make sure I'm right
```

DAB3BAN3

1     about that, your Honor.  If I'm not, I'll correct that.

2                  I do remember one specific thing on that point, which

3     is the section of the model penal code that the Koppers Court

4     cites is the section that refers to when a statute specifically

5     refers to corporate liability as opposed to --

6                  THE COURT:  There is no doubt that the model penal

7     code is helpful to your position.  But of course the model

8     penal code is not a law.  But here's what they say in Koppers.

9     I don't want to spend a lot of time on this because we'll have

10    a more extended discussion later.

11                 "Koppers would have us find that liability can only be

12    extended to the action of high managerial agents.  Meaning

13    having those having duties of such responsibility that their

14    conduct may fairly be assumed to represent the policy of the

15    corporation.  We decline the invitation.  The standard for

16    imputation of liability given by the Court below is amply

17    supported."  And they cite what I will call all the usual

18    suspects in this particular area of law.  But the Hilton Hotels

19    case and the American Radiator case and so forth.  And they

20    continue.  "Nothing in the Supreme Court's decision in the

21    Gypsum case altered the standard.  Nor does the model penal

22    code support Koppers' position."

23                 MR. SINGER:  Right.

24                 THE COURT:  "In fact, on all issues relevant to this

25    case, the code suggests the standard of imputed liability in

DAB3BAN3

1   antitrust case to cases as precisely the one followed by the

2   District Court."

3          So you're reading into that an adverse inference?

4   That they're saying that because they said that that means

5   that, the Court meant that it would be different in

6   non-antitrust cases?

7          MR. SINGER:  No, I'm not saying that at all.  I am

8   saying their reasoning is specific to antitrust cases.  You can

9   tell that -- without having the case in front of me.

10          THE COURT:  All those cases they cite included several

11   that are not antitrust cases.

12          MR. SINGER:  But when they talk about the model penal

13   code, they specifically say antitrust cases, and they cite to

14   the portion of the model penal code which is a different

15   section than the high managerial agent section which applies

16   when a statute specifically imposes corporate liability.  And

17   they do not --

18          THE COURT:  I hear you, but I'm not persuaded.  That

19   doesn't mean you may not have other arguments, but just on that

20   one point.

21          The other point I wanted to ask you about, before the

22   government responds, the District Court's instruction that

23   Koppers affirmed says, I'm reading again from the appellate

24   court decision, "The court charged that a corporation can be

25   criminally held liable for the acts of its managerial agents

DAB3BAN3

```
 1    'not on behalf of and to the benefit of the corporation and
 2    directly related to the performance of the duty, the employee
 3    has authority to perform.  By managerial agent, I mean an
 4    officer of the corporation or an agent of the corporation
 5    having duties of such responsibility that his conduct may
 6    fairly be assumed to represent the corporation.'"
 7              Now, that was not challenged in Koppers, because the
 8    government of course wasn't appealing at all.  And the
 9    defendant was saying it should be high managerial.
10              So I'm not sure that the law in the Second Circuit
11    goes as far as that instruction of the District Court.  But
12    assuming for the sake of argument that it did, is that the
13    definition of managerial agent that you want the Court to
14    adopt?
15              MR. SINGER:  In our alternative request, if the Court
16    doesn't adopt the high managerial agent, which I agree with
17    you, the Second Circuit did not review a challenge to that
18    language, but did seem to approve the instruction, and some
19    other District Courts have understood it the same way.
20              THE COURT:  So the three people that the government
21    identified previously, is there any dispute that they fit the
22    definition of managerial agent under that definition?
23              MR. SINGER:  Well, I don't know, your Honor.
24              THE COURT:  I think there seems to have been some
25    misunderstanding earlier when we were talking about some other
```

DAB3BAN3

1    issues.  But let me make it clear.  In a civil case, under the

2    very well-established law of this circuit, a Court is not

3    required to charge the jury on any matter as to which there is

4    no genuine dispute, even if it hasn't been the subject of a

5    summary judgment motion.

6          So, the parties need to be prepared to tell me before

7    the charging conference, or at the latest at the charging

8    conference itself, whether there is any dispute.

9          So, on this particular point, is it the position of

10   the defendants that under the definition that defendants wish

11   this Court to adopt, that any of the three persons on whom the

12   government is relying to impute corporate liability were not

13   managerial agents under the defendants' definition?  Because

14   I'm not going to bother the jury with an instruction on this if

15   there is no dispute.

16         MR. SINGER:  Your Honor, I think there are a couple of

17   issues there.  First is, the Court I think will need to give

18   some instruction about whose intent could be imputed.

19         THE COURT:  Yes, of course.  And if there was no

20   dispute on this issue we're now discussing, I would just say

21   it's X, Y and Z.  Which is a lot easier for the jury to deal

22   with than some more general instruction.

23         Now the government may come back and, now that the

24   case is all in, we're going to add someone else and that one

25   may be a more disputable person and they would be buying

2381

DAB3BAN3

1    themselves an instruction.  Right now, there is just three.

2              MR. SINGER:  I would appreciate an opportunity to

3    confer before requesting a particular instruction.

4              THE COURT:  Okay.  So the government anyway will

5    presumably want to put in an answer to the submission from the

6    defense.  It is conceivable to me we might get to a charging

7    conference next week.  Maybe that's just a Pollyanna wish on my

8    part.

9              When would you like to put in that submission?

10             MR. ARMAND:  Could the government take until maybe

11   about Wednesday?

12             THE COURT:  Yes.  That's fine.  See you all at 2.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DABTBAN4                           Barnett - cross

```
 1                          AFTERNOON SESSION

 2                              (2:15 p.m.)

 3              (Jury present)

 4              THE COURT:  Counsel.

 5              MS. NAWADAY:  Thank you, your Honor.

 6    BY MS. NAWADAY:

 7    Q.  Good afternoon, Mr. Barnett.  Can you turn back to DX279,

 8    please.

 9    A.  OK.

10              MS. NAWADAY:  And Ms. Michaud, if we could turn to

11    page 2 of that document.  Blow up the first paragraph on page 2

12    again, please.

13    Q.  Mr. Barnett, the Drew reference in the last sentence of

14    that paragraph you testified, that's Drew Gissinger, correct?

15    A.  That's correct.

16    Q.  Who is Drew Gissinger?

17    A.  Drew Gissinger was I believe the COO of the entire company.

18    Q.  And Mr. Thomas' email to you when he says I don't think we

19    want to see this process design, he's referring to the Hustle

20    process design, correct?

21              MR. HEFTER:  Objection.

22              MS. MAINIGI:  Objection.

23              THE COURT:  Ground?

24              MR. HEFTER:  Foundation.

25              THE COURT:  Sustained.
```

DABTBAN4                          Barnett – cross

1    Q.  Mr. Barnett, can you turn to page 1 of the document.

2    A.  Yes.

3    Q.  And see Mr. Thomas' email to you?

4    A.  Yes.

5          MS. NAWADAY:  If we could blow up the first paragraph

6    of Mr. Thomas' email.

7    Q.  He says this note from Drew outlines the reasons that I'm

8    concerned about some parts of the Hustle process.

9          Did I read that correctly?

10          MR. HEFTER:  Objection.

11   A.  Yes.

12          THE COURT:  Ground?

13          MR. HEFTER:  It's not read correctly.

14          THE COURT:  Pardon?

15          MR. HEFTER:  It's not read correctly.

16          THE COURT:  I'm sorry, I didn't look at it.  Go ahead.

17   Do you want to read it again.

18          MS. NAWADAY:  Sure.

19   Q.  This note from Drew outlines the reasons that I'm concerned

20   about some parts of the HSSL process.

21          Did I read that correctly?

22   A.  Yes.

23          THE COURT:  Now is it read correctly?

24          MR. HEFTER:  Yes, your Honor.

25          THE COURT:  I certainly appreciate that.

DABTBAN4                         Barnett - cross

1            Go ahead, counsel.

2   Q.  Mr. Barnett, you can turn next to Plaintiff's Exhibit

3   481 -- sorry, I meant Plaintiff's Exhibit 262.

4            This is an email that you sent to Loren Rodriguez on

5   August 21, 2007, correct?

6   A.  Yes, that's correct.

7            MS. NAWADAY:  Your Honor, we offer plaintiff's 262

8   into evidence.

9            MS. MAINIGI:  No objection, your Honor.

10           MR. HEFTER:  No objection.

11           THE COURT:  Received.

12           (Plaintiff's Exhibit 262 received in evidence)

13  Q.  Mr. Barnett, do you recall having discussions with

14  Mr. O'Donnell around August 2007 concerning having underwriters

15  review appraisals on High-Speed Swim Lane loans?

16  A.  I don't recall specific conversations.

17  Q.  Can we blow up Mr. O'Donnell's email to Mr. Barnett, the

18  bottom paragraph of the first page.  This is Mr. O'Donnell's

19  email to you on August 21, 2007, correct?

20  A.  Yes, correct.

21  Q.  And you see that Mr. O'Donnell says to you:  For the

22  regions involved in the HSSL pilot, members of the central

23  underwriting group are completing appraisal reviews within 24

24  hours of the product being delivered by LSA.

25           Do you see that?

DABTBAN4                         Barnett – cross

1   A.  Yes, I do.

2   Q.  And what is LSA?

3   A.  I think it was the appraisal the company we used for some

4   aspect of the appraisal process.  I don't remember the details.

5   Q.  Would that be Landsafe Appraisal?

6   A.  That's what it is.

7   Q.  And you see your response to -- sorry, you forwarded

8   Mr. O'Donnell's email to Mr. Rodriguez, correct?

9   A.  Yes, I did.

10  Q.  And you respond to Mr. Rodriguez:  FYI, this is not in the

11  spirit of the minimizing hand offs/delays.  I don't know why we

12  would want to back off on that principle here, we already had

13  it in place.

14          Is that right?

15  A.  That's correct.

16  Q.  You testified earlier that the discussion surrounding the

17  Hustle process were collaborative.  Do you remember that

18  testimony?

19  A.  Correct.

20  Q.  But in fact, weren't you having confidential discussions

21  around August and September 2007 concerning the Hustle process?

22          MR. HEFTER:  Objection, vague.

23          THE COURT:  Overruled.

24  A.  I'm not sure what you mean by confidential.

25  Q.  Can you turn, please, to Plaintiff's Exhibit 253.

DABTBAN4                        Barnett – cross

1              And this is an email from to you Peter Tinaglia dated

2     August 29, 2007, correct?

3     A.   Correct.

4     Q.   And you marked this email "private," correct?

5     A.   Correct.

6              MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

7     253 into evidence.

8              MS. MAINIGI:  No objection, your Honor.

9              MR. HEFTER:  Limiting instruction, your Honor?

10             THE COURT:  Yes.  Well, let me take a look.

11             Yes, this is be received against the bank defendants,

12    not Ms. Mairone.  253 is received.

13             (Plaintiff's Exhibit 253 received in evidence)

14             MS. NAWADAY:  Could we blow up the top two paragraphs

15    of the email.

16    Q.   Mr. Barnett, in the first paragraph you say to

17    Mr. Tenaglia:  I'm just replying to you because this might be

18    considered by some to be sensitive, although I did have a

19    confidential conversation with Barbara and Amy Cratch about

20    this.  Did I read that correctly?

21    A.   You read that correctly.

22    Q.   Who is the Barbara that you refer to there?

23    A.   Either have been Barbara Heinecke or -- I'm not sure,

24    probably there was a Barbara from underwriting I believe as

25    well.  I'm not sure, I don't recall.

1    Q.  Who is Amy Cratch?

2    A.  Amy Cratch was a member of -- I think in Chandler, she was

3    a manager I believe at one of the support teams.

4    Q.  And in the second paragraph of your email you say:  The

5    bottom line is this will be a moot point shortly because the

6    direction that we are headed now, driven by Rebecca, is that

7    the HSSL teams will be taking and keeping all loans that are

8    prime, or put another way, all loans that are not non-prime,

9    not subprime, depending on which vocabulary book you use and

10   what day of the week it is.  That means any CLTV, any FICO, et

11   cetera, et cetera.

12          Did I read that correctly?

13   A.  You read that correctly.

14   Q.  Is the Rebecca referred to here Rebecca Mairone?

15   A.  It is.

16   Q.  And by this point, August 29, 2007, Michael Thomas has

17   expressed concerns to you about the quality of Hustle loans, is

18   that fair?

19          MR. HEFTER:  Objection as to Ms. Mairone.

20          THE COURT:  Yes, this will be received only against

21   the banks.

22          You may answer.

23   A.  I'm sorry, could you repeat the question?

24   Q.  Sure.  By this point, Michael Thomas had expressed concerns

25   to you about the quality of Hustle loans, is that fair?

 1          MS. MAINIGI:  Objection.

 2          THE COURT:  Ground?

 3          MS. MAINIGI:  Relevance.

 4          THE COURT:  Overruled.

 5  A.  Michael expressed concerns as a member of the risk team all

 6  the time.

 7  Q.  And Ed O'Donnell expressed concerns to you about the

 8  quality of Hustle loans, is that fair?

 9          MR. HEFTER:  Same instruction, your Honor, please.

10          THE COURT:  This will be limited to the banks.

11          You may answer.

12  A.  Not to the extent that Michael Thomas had.

13  Q.  And you were having a confidential conversation with

14  Barbara and Amy Cratch about expanding the Hustle process, is

15  that fair?

16  A.  It wasn't so much -- no, it's actually not, it's --

17  Q.  Mr. Barnett, bank's counsel showed you Exhibits DX25, 26

18  and 27, if you still have those handy.

19          You described these as team rosters for Central

20  Fulfillment, right?

21  A.  That's correct.

22  Q.  And each of these documents is dated as of September 26,

23  2007, is that right?

24  A.  Yes, that's correct.

25  Q.  You didn't create these rosters, did you, Mr. Barnett?

DABTBAN4                          Barnett - cross

1    A.  No, I did not personally.

2    Q.  And you don't know if these were the only teams that ever

3    existed within Central Fulfillment, do you?

4    A.  I believe these were the first Central Fulfillment teams we

5    created.

6    Q.  But you don't know whether these are the only Central

7    Fulfillment teams, correct?

8    A.  I'm not aware of any others, and I would have been.

9    Q.  Mr. Barnett, if you could turn back to the smaller binder,

10   Plaintiff's Exhibit 482.

11          Mr. Barnett, is this an email that you sent to Loren

12   Rodriguez dated August 31, 2007?

13   A.  Yes, it is.

14          MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

15   482 into evidence.

16          MS. MAINIGI:  No objection, your Honor.

17          MR. HEFTER:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 482 received in evidence)

20          MS. NAWADAY:  Ms. Michaud, if we could go to page 2 of

21   the document and blow up the top paragraph.

22   Q.  This is an email from Joshua Lambert, is that correct?

23   A.  Yes.

24   Q.  And who is Joshua Lambert?

25   A.  I don't recall the name.

1    Q.  And Mr. Lambert writes:  Now if this is how HSSL is going

2    to work, then this is going to be awesome.  Lock to CTC in

3    three days.

4                Do you see that?

5    A.  Yes, I do.

6    Q.  Then you forward a series of emails to Mr. Rodriguez,

7    Mr. Gong and some others, is that right?

8    A.  That's correct.

9                MS. NAWADAY:  And can we blow up Mr. Barnett's top

10   email on page 1.

11   Q.  And you respond:  Now that is impressive.  I think we'll

12   have no problem winning folks over with stuff like this, so

13   long as we don't degrade performance at full volume.

14               Did I read that correctly?

15   A.  Yes, you did.

16   Q.  And am I right that you needed to win folks over because

17   they expressed concerns about the loan quality in the Hustle?

18               MS. MAINIGI:  Objection.

19               MR. HEFTER:  Objection.

20               THE COURT:  Ground?

21               MS. MAINIGI:  Vague, foundation.

22               THE COURT:  Sustained.

23   Q.  You were aware, Mr. Barnett, there were weekly quality

24   assurance reports produced on Hustle loans, correct?

25   A.  That's correct.

DABTBAN4                        Barnett – cross

1   Q.  So you were aware that the quality assurance high risk

2   finding for Hustle loans increased more than 90 percent,

3   correct?

4           MR. HEFTER:  Objection.

5           THE COURT:  Ground?

6           MR. HEFTER:  Vague.

7           THE COURT:  Overruled.

8   A.  Yes, and there were some problems with those findings.

9   Q.  And you testified that you were involved in revising the

10  quality assurance process, correct?

11          THE COURT:  Counsel, come to the side bar.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At side bar)

2           THE COURT:  Despite my having given the witness

3    several admonitions, he apparently is determined to play by his

4    rules rather than the rules of the United States federal

5    system, federal judicial system.  So repeatedly when asked a

6    sample question, he volunteers some self-serving response after

7    he answers it, and then adds something more like he just did

8    with the question put.  The question was:  Were you aware of

9    the 90 percent problem, and his answer was yes, but there were

10   problems with that, or something like that, which was totally

11   unresponsive and about the 14th or maybe more accurately the

12   40th time he has played that game.

13          Now what I suggest is that bank's counsel, whose

14   witness he is, take him aside or go up to him now and convey to

15   him that he needs to just answer the question, or I will do it.

16   I would much prefer not having to do it, but I'm not going to

17   let this continue.

18          MS. MAINIGI:  Your Honor, may I address this issue?  I

19   understand what you're saying and I do agree with you in terms

20   of some prior circumstances.  I do believe, respectfully, your

21   Honor, this is different, this particular Q and A is different

22   because Ms. Nawaday was trying to get Mr. Barnett to agree that

23   the reports say 90 percent, where the entire crux of what he

24   was trying to say earlier is the 90 percent is completely

25   wrong.  And I think that one at worst is in the gray area, your

DABTBAN4                          Barnett - cross

1    Honor, in terms of issue here.

2              THE COURT:  No, that's the point, this happens all the

3    time.  This is the difference between cross and redirect.  In

4    cross-examination you're asking questions that usually could be

5    answered yes, no, or very shortly, and the witness invariably

6    thinks that's misleading, that's unfair, there's more to it.

7    And that's why we have redirect.

8              Now that's the way the adversary system has been

9    designed, because otherwise counsel on cross is never able to

10   get straightforward answers to his or her questions.  If the

11   question leads to a misleading impression because the answer

12   gives only part of the story, then, as we had just the other

13   day, on redirect the explanation is given and then the jury has

14   it before them.  But he is not allowed to take it to his own

15   hands determining what the rules of procedure are for a court

16   of law.

17             The only reason I have hesitated to say more to him is

18   because, first, I appreciate he's not a lawyer; second, because

19   I was hopeful that my earlier admonitions had carried some

20   force, and I do think he's probably doing better now than he

21   was doing earlier; and third, it's always problematic for a

22   Court to inject itself into a proceeding unless you absolutely

23   have to, and that's why I called the side bar.

24             But I cannot allow this to go on.  So I think the best

25   thing is for you to go over, and I'll explain to the jury we're

DABTBAN4                    Barnett - cross

1      just going to take a minute for counsel to explain something to

2      the witness so it won't look like you're doing anything without

3      the permission of the Court.

4              MS. MAINIGI:  Could I ask for one more opportunity,

5      your Honor?  I think this particular one was a bit in the gray.

6              THE COURT:  I'll give him one more chance.

7              MR. HEFTER:  Your Honor, I wanted to explain the basis

8      of my objection, I know you overruled it, and that is the

9      question was something to the effect of were you aware of

10     increased -- there was an increased level to 90 percent, and my

11     objection --

12             THE COURT:  Was to the word "increased."

13             MR. HEFTER:  There's nothing related to what it's

14     increased from.

15             THE COURT:  That's fair.  And I will say if ever you

16     think that maybe the Court has not picked up the nuance of your

17     objection, you can say something like objection to the word

18     increase or something like that.  I don't want you to do that

19     as a regular practice, but in a case like that, that's a fair

20     point.  Much better objection than the one contrasting Hustle

21     to HSSL.

22             MR. HEFTER:  You know the background of that.

23             THE COURT:  Yes, I learned from this case that you're

24     all very proud of the word "hustle."

25             MS. MAINIGI:  It's not a bad word.

1            MS. NAWADAY:  Could I also move to strike the last

2    portion of the last answer as non-responsive?

3            THE COURT:  I think I'm going to leave it all alone

4    because I think, if I understood fully the objection, I might

5    have sustained the objection, but if you want, I can strike the

6    question and answer in its entirety and start again.  But I

7    think it's better to leave it, and it can be developed in

8    redirect if you feel it's worth the candle.

9            MS. MAINIGI:  While I have you at side bar, we have a

10   concern that the line of questioning -- and we did just object

11   on relevance -- is now wandering into Mr. Barnett's state of

12   mind in terms of, for example, what Mr. Thomas told him.

13           THE COURT:  So it's different when it's on cross in

14   the following sense, if his state of mind relates to some

15   matter that bears on his credibility, then I will permit it,

16   but if, for example, the government asked the question about

17   weren't you excited and I sustained the objection because that

18   did not go to credibility, there could also -- I hesitated on

19   that because arguably it could go to motive, but I decided that

20   it was too remote for that purpose.

21           I will let the government know if questions are put

22   about state of mind that don't bear on credibility or some

23   other narrow issue, and they take the risk that if there's no

24   objection and therefore the question goes forward, it may open

25   the door to some of the stuff I excluded earlier.

DABTBAN4                          Barnett - cross

1              MS. NAWADAY:  Your Honor, if I could address it, he

2     testified, as I recall on direct examination, that no concerns

3     effectively were raised to him about the Hustle process, and

4     that's why we explored that on cross.

5              THE COURT:  It's not that, it's the questions about --

6     and that's correct to the extent that was -- I don't really

7     consider that state of mind in the same sense we have been

8     talking about.

9              MS. NAWADAY:  Right.

10             (Continued on next page)

DABTBAN4                    Barnett - cross

1              (In open court)

2      BY MS. NAWADAY:

3      Q.  Mr. Barnett, you testified earlier about the Hustle

4      eligibility criteria.  Do you recall that?

5      A.  Yes, I do.

6      Q.  And I believe you said that you relied on the experts in

7      credit risk to supply those criteria, is that correct?

8      A.  That's correct.

9      Q.  You also testified that you were involved in revising the

10     quality assurance process, is that right?

11     A.  I was.

12     Q.  But you had no prior experience with quality assurance, is

13     that right?

14     A.  That's correct.

15     Q.  And yet you didn't rely on the credit risk experts to

16     revise the quality assurance process, is that fair?

17     A.  That's not correct.

18     Q.  You testified that you were a solution leader with respect

19     to the Hustle, is that right?

20     A.  That's correct.

21     Q.  Would you agree with me that a solution leader is trying to

22     solve a problem?

23     A.  Is leading a team in solving a problem.

24     Q.  And the problem that you were trying to solve is that loans

25     didn't move quickly enough, correct?

DABTBAN4                         Barnett - cross

1          MS. MAINIGI:  Objection.

2          THE COURT:  I think we have been down this road

3    before.  Sounds like it's cumulative.  If you have some new

4    aspect you want to develop, I will allow the question, but if

5    not, I'll sustain the objection.

6          MS. NAWADAY:  Thank you, your Honor, nothing further.

7          THE COURT:  All right.  Redirect.

8    REDIRECT EXAMINATION

9    BY MS. MAINIGI:

10   Q.  Good afternoon, Mr. Barnett.

11   A.  Good afternoon.

12   Q.  Turn to PX272, sir, I believe that's in the plaintiff's

13   binder.  You were asked some questions by government counsel

14   about funding goals.  Do you recall that, sir?

15   A.  Yes, I do.

16   Q.  Could you explain briefly, please, what funding goals are?

17   A.  Funding goals relate to productivity, so how many fundings

18   per each role on the process team.

19   Q.  Take a look at PX481, please.

20          MS. MAINIGI:  Now let's blow up the subject line.

21   Q.  What is the subject line, Mr. Barnett?

22   A.  Quality of submissions.

23   Q.  And I believe you were asked some questions about this

24   email also by the government, correct?

25   A.  Yes, that's correct.

DABTBAN4                        Barnett - redirect

1    Q.  This is one of the areas that you were trying to give an

2    additional answer to one of the emails?

3    A.  I believe so.

4    Q.  Let's blow up the third paragraph which I believe you were

5    only asked a partially to read.  If you could read the entire

6    paragraph out loud, sir.

7    A.  This isn't just one MC and NCA.  As I have said before, the

8    quality of NCA apps is consistently below what we get from NSC

9    in general.  How can we change this?  How can I help change

10   this?  These issue are having a material impact on the HSSL

11   team's ability to move these loans quickly.  I am pretty

12   certain one thing we're going to conclude out of this pilot,

13   where now NSC and NCA loans are processed by the same teams,

14   that those coming from NCA will have longer TTs than those from

15   NSC, and the only place to look for the difference will be

16   sales/production submission quality.

17   Q.  What loans are you referencing here, Mr. Barnett?

18   A.  These are loans that were submitted for the High-Speed Swim

19   Lane process.

20   Q.  And they were submitted from the NCA sales group, is that

21   right?

22   A.  Correct.

23   Q.  These are not loans that had yet made it through the

24   High-Speed Swim Lane, correct?

25   A.  That's correct.

2400

DABTBAN4                    Barnett - redirect

1   Q.  Do you know whether these loans would have even made it all

2   the way through the High-Speed Swim Lane or not?

3           MS. NAWADAY:  Objection, your Honor.

4           THE COURT:  Sustained.

5   Q.  Do you know one way or the other, Mr. Barnett, whether

6   these loans went through the High-Speed Swim Lane?

7           MS. NAWADAY:  Objection.

8           THE COURT:  Ground?

9           MS. NAWADAY:  Leading, your Honor.

10          THE COURT:  Overruled.  You may answer.

11  A.  Can you ask the question again?

12  Q.  Do you know one way or the other whether the loans, the two

13  loans referenced in this email, actually went all the way

14  through the High-Speed Swim Lane?

15  A.  I don't know off the top of my head, no.

16  Q.  Take a look at PX55, please.  And I believe PX55 is in the

17  defendant's binder.  Does PX55 have anything to do with the

18  last email we just looked at?

19  A.  I don't know.  I don't assume so.

20          MS. MAINIGI:  Your Honor, may I approach?

21          THE COURT:  Yes.

22  Q.  PX308 is already in evidence.  And Mr. Barnett, I have just

23  handed you several pages of an excerpt from PX308.

24          MS. MAINIGI:  If you could put PX55 back up, please,

25  Alex.

DABTBAN4                    Barnett - redirect

1   Q.  Now Mr. Barnett, I ask you to compare the loan number in

2   PX55, which is towards the end of that email, with the loan

3   number in PX308, the excerpt.

4   A.  OK.  Yes.

5   Q.  Are they the same loan number or different?

6   A.  I see the same loan number in both.

7   Q.  Now taking a look at -- now PX55 indicates, if you turn to

8   the second page, if you could read out loud the email from

9   Audrey Knabe up until, "Five days."

10  A.  Check it out.  It's our first HSSL file going to CTC.  How

11  many days in pipe you ask?  Five days.

12  Q.  What do you understand pipe to mean?

13  A.  Pipe means from the time the loan is submitted over from

14  sales to fulfillment until, in this case, CT -- cleared to

15  close, CTC.

16  Q.  Now if you take a look at PX308, what is the FICO score

17  associated with this loan?

18  A.  Sorry, could you ask the question again?

19  Q.  What is the FICO score associated with this loan?

20  A.  774.

21  Q.  And in relation to the FICO scores you saw in the

22  High-Speed Swim Lane, was this a loan, based at least on this

23  FICO score, that would qualify for the High-Speed Swim Lane?

24  A.  Yes.

25  Q.  What is the LTV on this loan, sir?

DABTBAN4                         Barnett — redirect

1    A.  The LTV is 45.97.

2    Q.  Could you define LTV for us, please?

3    A.  Loan to value.

4    Q.  What is that a calculation of?

5    A.  It's the amount that the borrower is requesting for divided

6    by the value of the property that they're asking for the loan

7    on.

8    Q.  What was the entry criteria into the High-Speed Swim Lane

9    for LTV, do you recall?

10   A.  Yes, it was 80 percent.

11   Q.  80 percent or less?

12   A.  Or less.

13   Q.  This is 46 percent?

14   A.  Yes.

15   Q.  Was this a refinancing?

16   A.  Yes.

17   Q.  Do you view this to be a good quality loan, Mr. Barnett?

18          MS. NAWADAY:  Objection.

19          THE COURT:  Sustained.

20   Q.  Mr. Barnett, at PX55, your first email, the top of that

21   page says:  So you know we're not falling down on the job here,

22   we just got our first CTC one day.

23          Do you see that, sir?

24   A.  Yes, I do.

25   Q.  What did you mean by, "We just got our first CTC one day?"

```
 1   A.  It was our first clear to close in introducing the pilot
 2   process for HSSL, and it meant that the last portion of the
 3   process before clear to close was executed in one day.
 4   Q.  Do you remember being asked about a confidential
 5   conversation a few minutes ago?
 6   A.  Yes, I do.
 7   Q.  If you could turn to DX394, please.
 8   A.  Was that PX?
 9   Q.  Sorry, DX, so that would be in the defendant's binder.
10   A.  OK.
11   Q.  If we could take a look at page 4, please.
12            MS. MAINIGI:  Blow up that whole email.
13   Q.  And Mr. Barnett, I'm going to ask you to read it out loud,
14   please.
15   A.  Sure.  Patrick, I probably should have not have been so
16   brief.  It would have been inaccurate to say all loans will
17   follow the same process as the current PCAs with CLTV less than
18   or equal to 80 percent.  What would be accurate would be to say
19   that all loans will go to teams that will be formed to follow
20   the HSSL process for all loans that fit that process, and a
21   modified process for all others where the modifications will
22   follow the same principle used to design the HSSL process,
23   minimize hand offs and back and forths of the loan, minimize
24   the gates the loan has to hurdle to fund, but all the while
25   maintaining quality and compliance.
```

DABTBAN4                          Barnett – redirect

1    Q.  Mr. Barnett, let me interject for one second.

2              MS. MAINIGI:  Apparently DX394 has not been admitted.

3    Let me take it off the screen and ask to move 394 into

4    evidence.

5              MS. NAWADAY:  No objection.

6              THE COURT:  Received.

7              (Defendant's Exhibit 394 received in evidence)

8              MS. MAINIGI:  Let's put that back up, Alex.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAB3BAN5                    Barnett - redirect

1   Q.  If could you pick up where you left off.

2   A.  "So for example, we cannot treat prime CLUES refers

3   identically to accepts.  LSs/OMs will engage core underwriting

4   wherever required to properly process a deal.  Please let me

5   know about any concerns or questions.  Thanks, Mark."

6   Q.  Was there some sort of misunderstanding between you and

7   Mr. Aliano as to the scope of the High-Speed Swim Lane?

8              MS. NAWADAY:  Objection.

9              THE COURT:  Sustained.

10  Q.  With respect to your e-mail there, "it would be inaccurate

11  to say all loans will follow the same process as the current

12  PCAs with CLTV less than 80 percent."

13             Tell me what that relates to.

14  A.  There was some misunderstanding about which loans --

15             MS. NAWADAY:  Objection, your Honor.

16             MS. MAINIGI:  Let me withdraw the question and

17  reframe, your Honor.

18  Q.  "The same process as the current PCA with CLTV less than or

19  equal to the 80 percent."  Was that the entry criteria to the

20  High-Speed Swim Lane?

21  A.  Yes.

22  Q.  Did all loans go through the High-Speed Swim Lane work flow

23  within Central Fulfillment?

24  A.  No.

25  Q.  What other work flows existed?

DAB3BAN5                    Barnett - redirect

1          MS. NAWADAY:  Objection.  Cumulative.

2          THE COURT:  Sustained.

3    Q.  If you can read -- let's go to page two.  And there is an

4    e-mail at the bottom of that page.  "Sorry about that."  Let's

5    blow that up.

6          This is an e-mail from you to Mr. Aliano, is that

7    correct, Mr. Barnett?

8    A.  That's correct.

9    Q.  Could you read that out loud, please.

10   A.  "Sorry about that.  Going forward I will try to be more

11   explicit.  I'm getting to where I am better able to understand

12   what your concerns are/will be so will do my best to try to

13   proactively address them where I am able."

14   Q.  You were asked some questions about Mr. Thomas.  Is that

15   right?

16   A.  Correct.

17   Q.  You were asked some questions as to what Mr. Thomas had

18   told you, do you remember that?

19   A.  Yes.

20   Q.  Take a look at DX 289, please.

21          MS. MAINIGI:  Let's not put it up yet, please.

22   Q.  Mr. Barnett, is this an e-mail from Mr. Rodriguez to

23   Mr. O'Donnell, Mr. Thomas, and yourself dated August 9, 2007?

24   A.  Yes, it is.

25          MS. MAINIGI:  I ask that DX 289 be admitted.

DAB3BAN5                    Barnett - redirect

1          MS. NAWADAY:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 289 received in evidence)

4   Q.  Taking a look at page two and three, are those the same

5   pages from Mr. Thomas' e-mail that Ms. Nawaday showed you?

6   A.  Yes, they are.

7   Q.  At the top of the page, the first page of the e-mail, this

8   would be the top of page one.  Mr. Rodriguez responds to

9   Mr. Thomas and copies you on that e-mail.  Let's go ahead and

10  blow up the top e-mail.

11         So this is a response to Mr. Thomas' e-mail, correct?

12  A.  That's correct.

13  Q.  Could you read that response out loud, please.

14  A.  "Should we huddle on your concerns?  I want to ensure you

15  folks are comfortable with the process flow.  Just let me know.

16  Thanks."

17  Q.  Do you know whether Mr. Thomas ever came to huddle on his

18  concerns?

19  A.  I don't recall.

20  Q.  Have you seen any record of Mr. Thomas coming to huddle on

21  his concerns?

22         MS. NAWADAY:  Objection.

23         THE COURT:  Sustained.

24  Q.  You were asked some questions about quality at CMD versus

25  FSL, do you remember that, Mr. Barnett?

DAB3BAN5                    Barnett – redirect

1  A.  Yes.

2  Q.  Let's put up admitted exhibit DX 73, please.

3         MS. MAINIGI:  May I approach, your Honor?

4         THE COURT:  Yes.

5  Q.  I believe the question was specifically geared to quality

6  at CMD in the August 2007 time period.  Do you remember that?

7  A.  Yes.

8  Q.  What quarter of the year is August 2007?

9  A.  It would be the third quarter of the year.

10  Q.  The third quarter of 2007, Central Fulfillment had not yet

11  begun, correct?

12  A.  Correct.

13  Q.  Mr. Thomas was expressing a concern that FSL quality would

14  deteriorate, correct?

15  A.  Correct.

16  Q.  Are you familiar with the quality control scores from

17  corporate, Mr. Barnett?

18  A.  I'm familiar that the quality control process exists.  I

19  wasn't deeply familiar with the scoring process.

20  Q.  Had you seen quality control reports previously?

21  A.  Yes.

22  Q.  Let's take a look at DX 73.  And if we focus on the third

23  quarter prior to the start of Central Fulfillment.  Let's look

24  at the number for FSL versus the number for CMD, please.  Could

25  you tell me what those two numbers are.  This is CMD versus

```
 1   FSL.
 2              MS. NAWADAY:  Objection, your Honor.
 3              MS. MAINIGI:  I can rephrase the question, your Honor.
 4   If it is a form --
 5              THE COURT:  It's slightly defective as to form, so why
 6   don't you rephrase it.
 7   Q.  Mr. Barnett, the third quarter of 2007, what was the SUS
 8   rate for CMD?
 9   A.  8.0 percent.
10   Q.  For CMD?  If you take a look at division responsible SUS
11   number, that bottom line number, what is that number?
12   A.  Division responsible.  I'm sorry.  6.7 percent.
13   Q.  What is the same type of number for FSL?
14              MS. NAWADAY:  Objection, your Honor.
15              THE COURT:  The more I see what's going on, the more I
16   think this is not for this witness.  Sustained.
17   Q.  You were asked about quality assurance reports or revisions
18   and your involvement in those, correct?
19   A.  Correct.
20   Q.  Who is the person that took the lead on revising the
21   quality assurance reports?
22   A.  That was Steve Brent.
23   Q.  Who was the person that revised the quality assurance
24   reports?
25   A.  I'm sorry.  Repeat?
```

DAB3BAN5                       Barnett - redirect

1   Q.  That's a poor question.

2           You testified that you had assisted in the revision

3   process for the quality assurance reports, do you remember

4   that?

5   A.  Not for the reports themselves.  For the processing, what

6   was reported out of it.

7   Q.  Thank you.

8   A.  I'm sorry, it is a small distinction.

9   Q.  Not a problem.  Who led the revision of the process for QA?

10  A.  Michael Burns.

11  Q.  Who did Mr. Burns report to, to your knowledge?

12  A.  To my knowledge, I believe Steve Brent.

13  Q.  Was he in the risk area?

14  A.  Yes.

15          MS. MAINIGI:  I have no questions.

16          THE COURT:  All right.  Counsel?

17          MR. HEFTER:  Thank you.

18  REDIRECT EXAMINATION

19  BY MR. HEFTER:

20  Q.  If we can have PX 481 put back on the screen, please.  If

21  we can just blow up the middle paragraph.  The second

22  paragraph, I should say.

23          There is a reference, Mr. Barnett to Value Finder.  Do

24  you see that?

25  A.  Yes.

2411

DAB3BAN5                        Barnett - redirect

1   Q.   What was Value Finder?

2   A.   Value Finder was a system that was used to determine the

3   value of a property.

4   Q.   This refers to something called an MC at NCA.  Do you see

5   that?

6   A.   Correct.

7   Q.   I think that was the term that you couldn't recall what the

8   acronym meant earlier, correct?

9   A.   Correct.

10  Q.   Great.  Now I am going to pull up DX 517, please.  If you

11  look at the gray box to the left, it says AE/MC ampersand TM.

12  Do you see that?

13  A.   Yes, I do.

14  Q.   In your e-mail PX 481 you are referring to MC's use of

15  Value Finder, correct?

16  A.   Correct.

17  Q.   Does that refresh your recollection that you were referring

18  to the use of Value Finder by people in the sales force?

19  A.   That's correct, yes.

20  Q.   So, we're not talking about Value Finder being used in the

21  fulfillment process once it jumps over the line, correct?

22             MS. NAWADAY:  Objection, your Honor.

23             THE COURT:  Sustained.

24  Q.   Let's turn our attention to the fifth page or page seven of

25  the flow charts.

1        MR. HEFTER:  May I approach the screen again, your

2   Honor?

3        THE COURT:  Yes.

4   Q.  If we can blow up these set of shapes over here.  And if we

5   look at the trapezoid on the top.

6        MR. HEFTER:  I did my homework over the lunch break,

7   your Honor.

8        THE COURT:  I can see that.

9        MR. HEFTER:  I know it's not a rhombus.

10  Q.  At that point in time, this is before phase code one, sir?

11  A.  Yes, it is.

12  Q.  This is the time when the file's assigned to the loan

13  specialist?

14  A.  That's correct.

15  Q.  If we look at the rectangle, the second rectangle.  It says

16  what?

17  A.  "Check appraisal ordered against CLUES appraisal type and

18  that correct title product ordered."

19  Q.  The square below says what?

20  A.  "Run CLUES in Edge."

21  Q.  So at this point in time, after the sales force submits the

22  loan to the loan specialist, CLUES is run again, correct?

23  A.  That's correct.

24  Q.  What happens if at that time, after the appraisal is

25  ordered, the LTV based on an appraisal goes above 80 percent?

1              MS. NAWADAY:  Objection, your Honor.

2              THE COURT:  Ground?

3              MS. NAWADAY:  Leading.

4              THE COURT:  It is a bit, but I will allow it this

5    time.

6    A.  That loan would no longer be qualified to be treated as a

7    low risk loan.

8    Q.  Would the loan at that point be out of the High-Speed Swim

9    Lane or not?

10             MS. NAWADAY:  Objection, your Honor.

11             THE COURT:  Ground?

12             MS. NAWADAY:  Speculation.

13             THE COURT:  On the present state of the record,

14   sustained.

15   Q.  You designed the work flow, correct?

16   A.  That's correct.  I was -- I led the team that designed the

17   work flow.

18   Q.  Fair enough.  Now, according to the work flow, if a

19   CLUES -- CLUES is run in the High-Speed Swim Lane and the LTV

20   was changed and the CLUES gave the referral, what would happen

21   to the loan?

22   A.  First of all, High-Speed Swim Lane, I just want to be

23   clear, didn't exist at this point because this was centralized

24   fulfillment.

25   Q.  In centralized fulfillment, what would happen?

DAB3BAN5                       Barnett - redirect

1   A.  The loan would have to move to a person, an individual who

2   had the proper level of authority to handle that loan.  So out

3   of the low risk lane.

4   Q.  Let's turn to PX 272.  You were asked some questions -- do

5   you have it?

6   A.  Yes.

7   Q.  You were asked some questions about the e-mail from you to

8   Mr. Gong.

9   A.  Yes.

10  Q.  Let's blow up the text of that e-mail.  It says "FYI, Jim

11  W."  Do you know who you were referring to as Jim W.?

12  A.  Jim White.

13  Q.  Who was he?

14  A.  Jim White basically ran underwriting for Chandler.

15  Q.  "Jim W. is taking this analysis to Ed," who is Ed?

16  A.  Ed O'Donnell.

17  Q.  "And will hopefully get him to see that the number they

18  quoted is way out of line with what's doable."  Who did you

19  mean by "they" in that e-mail?

20  A.  The small number of people in risk who were raising some

21  alarms.

22  Q.  You were referring to the -- I'll move on.

23          Let's turn to PX 253.  Do you recall being asked some

24  questions about 253?

25  A.  Yes, I do.

1   Q.  I believe you were asked a question whether you were

2   referring to the expansion of the HSSL process to other loans,

3   do you remember that question?

4   A.  I do.

5   Q.  Your answer was -- I think the question was is it fair, and

6   you answered it was not fair.  Do you remember that?

7   A.  That's correct.

8   Q.  Can you explain your answer that it was not fair?

9   A.  Yes.  Because the conversation here was not about the

10  pilot, which was HSSL.  It was about Central Fulfillment which

11  was the next step in evolving the processes at FSL.

12           MR. HEFTER:  Thank you very much.

13           THE COURT:  Any further cross?

14           MS. NAWADAY:  No, your Honor.

15           THE COURT:  Thank you very much, you may step down.

16           THE WITNESS:  Thank you.

17           (Witness excused)

18           THE COURT:  Please call your next witness.

19           MS. MAINIGI:  Your Honor, we call Anson Gong by video.

20           THE COURT:  So, ladies and gentlemen, we're going to

21  have another theater date now.  This is a deposition and once

22  again you can consider this testimony for all purposes.

23           MR. JONES:  Your Honor we have copies of the

24  transcript.

25           (Video playing)

1   Q.  Jennifer Wimsatt Pusateri with Williams & Connolly on

2   behalf of Bank of America.  My colleague Malachi Jones is also

3   present with me.

4         So I think I'd like to start with some background

5   about you.  Could you start by telling me what your education

6   is.

7   A.  I have a bachelor's from Cornell University, graduated in

8   1988.  And a doctorate in biology from UCLA, graduated in 1995.

9   Q.  What did you study?

10  A.  At Cornell I studied biology, and at UCLA I also studied

11  biology for my doctorate.

12  Q.  How did you come to be employed in the mortgage industry?

13  A.  I worked in consulting after graduate school for a company

14  called Andersen Consulting, which became Accenture and was

15  employed primarily in projects with financial services clients

16  on West Coast and throughout the country.

17        I left Accenture after six years as a consultant and

18  joined Countrywide in 2004 where I joined the Full Spectrum

19  Division.

20  Q.  How long did you remain at Full Spectrum?

21  A.  I worked there from 2004 through the acquisition by Bank of

22  America, and left Bank of America last August where I joined my

23  current employer, which is One West Bank.  So for a total of

24  eight years I was with Countrywide slash Bank of America.

25  Q.  So I'd like to focus on the time between 2006 and 2009.

1   What were you doing in 2006 for Full Spectrum Lending?

2   A.   Okay.  So 2006, if I recall correctly, I was, I think, in

3   the process design group.

4   Q.   How long did you remain in that group?

5   A.   Until the acquisition by Bank of America, which was middle

6   of 2008.

7   Q.   What were your primary responsibilities in that role?

8   A.   Helping design and some cases manage new processes, managed

9   projects for Full Spectrum, and provide general operation

10  support to Full Spectrum.

11  Q.   Who did you report to?

12  A.   I reported to Mark Barnett.

13  Q.   Did you report to Mark for the entire time period in which

14  you were in that role?

15  A.   I believe so.

16  Q.   You mentioned the High-Speed Swim Lane process.  Do you

17  remember a process called the High-Speed Swim Lane?

18  A.   Yes.

19  Q.   How did you come to be involved in that process?

20  A.   That was a project that we were asked, me and Mark, was

21  asked to help work with a cross-functional team of people,

22  subject matter experts, to design, pilot test, in 2007.

23  Q.   Did you have an understanding of what the goal of the

24  process was to be?

25  A.   The process was part of a greater effort by the division to

1    change our processes to move to a more of a prime lending

2    model.  And so it was a process to adopt some of the practices

3    that we could follow from CMD, which was our prime sister

4    division of Countrywide, to finance, you know, prime loan

5    customers.  And change the processes to improve productivity

6    and turn time, but maintain quality in supporting more of a

7    prime based customer base.

8    Q.  In addition to you and Mark, who else was involved in this

9    project?

10   A.  From the initial discussion of potential designs and

11   visiting CMD locations, to pilot and implementation, we were

12   involved with all the senior groups -- I mean, senior subject

13   matter experts and executives, including sales, fulfillment,

14   compliance, risk, underwriting, closing and funding, you know,

15   training even, and senior management.

16   Q.  Do you remember any specific individuals from any of those

17   groups?

18   A.  Sure.  Well, senior executives, Rebecca Mairone, Greg

19   Lumsden, Cliff Kitashima.  From underwriting, Robert Price, Ed

20   O'Donnell, Michael Thomas, Jim White.  Risk and compliance,

21   Patrick Aliano, Javier Jaraba.  Sales, Jim Kee.  Closing and

22   funding, Cheri Shine.  Loren from operations.

23   Q.  Loren who?

24   A.  Rodriguez.

25   Q.  What about compliance?

DAB3BAN5                         Gong

1   A.   Javier Jaraba.

2   Q.   You mentioned before a visit to CMDs ROCs.  Can you tell us

3   what a ROC is?

4   A.   CMD is our sister division.  What I mean by sister

5   division, another division of Countrywide that also did loans,

6   and they focused on the prime customer loan.  And a ROC, which

7   stands for regional operation center, was basically a location

8   of processing folks that were also paired with a sales group.

9   It was basically a loan processing center.

10          They had ROCs all over the country.  Our early phase

11  of the project was finding out how they processed prime loans

12  and what we could possibly leverage for our new High-Speed Swim

13  Lane process.  So a number of us visited different ROCs around

14  the country.  I personally visited the ROC in Pasadena.  Some

15  other people visited the ROC in New York and other locations.

16          And we just went there and talked to the CMD

17  management, observe, you know, how they processed loans, how

18  they organized their teams.  And shared some of the findings

19  back with the larger project team.

20  Q.   I'm going to mark a document here.  The document is

21  BANA-SDNY-E009027917.

22          MR. JONES:  Your Honor, Defendant's Exhibit 202 is

23  already in evidence, but I would like to provide copies for the

24  jurors.

25          THE COURT:  Go ahead.

1                (Video playing)

2     Q.  Do you remember this document?

3     A.  Yes, I do.  This was kind of a comparison of process and

4     even role differences between Full Spectrum at the time and CMD

5     ROCs that we visited.  So it talks about some of the high level

6     metric differences and process differences.  So on page four,

7     for example, some of the high level differences that we

8     summarized was that in CMD ROCs, compared to Full Spectrum,

9     there are fewer people touching a file during processing, fewer

10    hand offs in the CMD prime model, and more accountability and

11    authority at the loan specialist level for these loans.  They

12    also have differences in reporting and pipeline management over

13    our management of that center.

14    Q.  If you can turn to page 15.

15    A.  Okay.

16    Q.  If could you just read into the record beginning with

17    "observation highlights."

18    A.  "Observation highlights.  Process and roles.  Very little

19    product or functional specialization, with the exception of the

20    general roles in the model, RDA, LS, underwriter, FPC, shipper.

21    There was, however, the opinion from the field that the

22    opening/disclosing function be separated from the LS II to a

23    temp LS or RDA.  Underwriting is done by underwriting, team

24    managers, and loan specialists.  LS.  Loan specialists have

25    CLUES accept authority first and refer authority up to $1

DAB3BAN5                    Gong

1    million.  Most underwriting exceptions can be approved in

2    house.  Team managers have more authority than FSL's

3    equivalent, e.g. can approve changes to the loan terms at

4    prefunding in seconds.  Teams are specialized by branch, B2C,

5    fast close, and in some instances,

6    multicultural/onboarding/specialty products.  ROCs tend to vary

7    on purchase/refi ratios.  New York 50 to 60 percent refi,

8    Pasadena is 10 percent refi."

9    Q.  The bullet point beneath that it says "LS have CLUES accept

10   authority."  First, what is CLUES accept authority?

11   A.  So CLUES accept authority means that the loan specialists

12   has authority to review and approve the CLUES accept decision

13   for that file.  And the second part of that statement says

14   "referral authority up to one million."  They can also review

15   and approve a loan if it has a refer decision from CLUES up to

16   the size of the loan that's -- up to the million dollar size of

17   the loan.

18   Q.  Do you recall whether CMD loan specialists had authority to

19   handle loans from start to finish that were prime CLUES accept?

20   A.  Yes, they do.  Primarily they, especially in this context

21   where they have CLUES accept authority, they can handle loans

22   from start to finish.  From what I remember from my visit in

23   this presentation.

24   Q.  Would someone with the title of underwriter have been

25   required to review those loans?

1    A.  Only if there was an issue, or they wanted, you know,

2    someone with authority higher than that loan specialist, or if

3    the loan in this case was, you know, above a million or if it

4    was special circumstances.  It depends on the loan and the

5    situation.

6    Q.  From your recollection, in CMD, would someone with the

7    title of underwriter have to review a cookie cutter prime CLUES

8    accept loan?

9    A.  No, not that I recall.

10   Q.  You mentioned design sessions.  Do you remember

11   approximately when these design sessions would have began?

12   A.  If I recall correctly, it was about July 2007 when we first

13   started having a series of process mapping and process design

14   sessions with key subject matter experts from different parts

15   of Full Spectrum, leveraging, you know, the visit notes to the

16   ROCs and what we currently had in place at Full Spectrum.  This

17   included people from sales, processing, underwriting, closing,

18   funding, risk.  It was a very broad collaborative, you know,

19   cross-functional set of meetings.

20   Q.  Do you remember what would have been discussed in those

21   meetings?

22   A.  If I recall correctly, Mark Barnett facilitated some of the

23   early design sessions.  He was kind of the process lead design

24   facilitator.  We started off with general guidelines of what we

25   were trying to achieve, you know, improve productivity and turn

1   time, but maintain quality.  If we are now moving toward a

2   prime based process model like CMD, what we can leverage from

3   CMD in terms of fewer hand offs, more authority with -- more

4   underwriting authority with loan specialists.  Well, we could

5   not need any more from the old subprime Full Spectrum process,

6   what steps or things that are not necessary when you're dealing

7   with prime customers with prime CLUES accepts, for example.

8   Those are kind of the general parameters for the design

9   sessions.

10  Q.  Do you remember whether input was considered from each of

11  those different subject matter experts that you referenced in

12  these design sessions?

13  A.  I believe we had input from everybody in one session or

14  another or through e-mails or subsequent discussions.  It was,

15  again, a very collaborative process for designing the

16  High-Speed Swim Lane model, for pilot testing and eventual

17  deployment.

18  Q.  Do you ever recall a time where someone from the risk

19  management group expressed a concern that wasn't considered by

20  the larger group?

21  A.  No, I do not.

22  Q.  Do you ever remember Ed O'Donnell raising any concerns with

23  the process?

24  A.  I do not recall him voicing any concerns with the process

25  that we designed.

1    Q.  Was there ever a time that risk management was excluded

2    from design sessions?

3    A.  I do not recall that.  I don't think so.

4    Q.  Was the process that you were designing ever modified based

5    on the input of others?

6    A.  Oh, sure.  It was -- it was never designed in one form and

7    just stayed there.  It was always tinkering and taking input

8    from different, you know, what I call stakeholders and not

9    fixed, I should say.

10   Q.  Why were you doing that?

11   A.  It's a iterative process, you know, and it was a group

12   collaborative effort.

13   Q.  Do you recall whether anyone looked at the NCA model as a

14   possible model on which to base the High-Speed Swim Lane?

15   A.  No, I do not recall looking at the NCA model as a source of

16   input to design the High-Speed Swim Lane.

17   Q.  Do you recall what the High-Speed Swim Lane ultimately

18   looked like?

19   A.  At a high level, from my recollection, it was basically

20   primarily focusing on prime loans, and primarily focusing on

21   high speed process, where most of the loans that enter are

22   prime CLUES accepts, as defined by the CLUES underwriting

23   engine.  And it would be primarily processed with minimal hand

24   offs by the loan specialists with sufficient what we call prime

25   CLUES accept authority, which they get after sufficient

DAB3BAN5                         Gong

```
 1   training and so forth.

 2           If there was any issues or potential problems with the

 3   loan, or it was higher risk tiers or needed additional manual

 4   underwriting by someone from the underwriting group, then it

 5   would be taken off what we call the High-Speed Swim Lane

 6   process into a different process flow for proper review and

 7   processing.

 8   Q.  To the extent that you know, can you describe for us the

 9   difference between underwriting validation of prime CLUES

10   accept files and underwriting that might have been done on a

11   subprime file?

12   A.  Well, subprime -- a subprime file you may not necessarily

13   have a prime CLUES accept.  But if it meets sufficient

14   criteria, it still will be eligible for review by manual --

15   manual review by an underwriter rather than necessarily

16   rejecting out of hand.

17           Prime CLUES accept validation, you're basically

18   validating that what was entered into CLUES to get the prime

19   CLUES accept is correct and valid.  Nothing has changed.  And

20   you go with the underwriting decision by CLUES for approving

21   that loan.

22   Q.  Mr. Gong, just before the break I handed you what has been

23   marked Exhibit 2 and 2A I believe.

24           MR. JONES:  Your Honor, defendant's move for the

25   admission of Defendant's Exhibit 246 and 266.
```

DAB3BAN5                          Gong

1        THE COURT:  All right.  Received.

2        MR. JONES:  I've got copies for the Court and the

3   jurors.

4        THE COURT:  Okay.

5        (Defendant's Exhibit 246, 266 received in evidence)

6        (Video playing)

7   Q.  Let's focus on the second of those documents.  2A.  Do you

8   remember this document?

9   A.  Yes.

10  Q.  Can you tell us in general terms what this document is.

11  A.  It was a presentation of the proposed High-Speed Swim Lane

12  process model after a number of design sessions but before the

13  pilot.  And talks about overall high level characteristics of

14  the design for High-Speed Swim Lane and some of the key

15  differences -- I'm looking at page five -- between the current

16  process at that time for Full Spectrum and the proposed new

17  process.  Then some really detailed proposed swim lane process

18  flows that Mark put together for the proposed High-Speed Swim

19  Lane process.

20  Q.  Do you remember whether it was a priority of FSL to ensure

21  that every loan fully conformed with all guidelines and

22  requirements?

23  A.  Yes.

24  Q.  Let's look at page four.  Would you read into the record,

25  please, the four bullet points after the word "process."

DAB3BAN5                    Gong

1   A.   "Loans move forward, never backward.  If loan cannot move

2   forward without significant rework, exit the High-Speed Swim

3   Lane.  Minimize waits slash delays.  Maximize parallel tasks.

4   Maximize authority level of key roles minimize hand offs.

5   CLUES is the underwriter."

6   Q.   What does it mean in the first bullet point where it says

7   "loans move forward, never backward"?

8   A.   That was a design principle that we wanted to have the

9   High-Speed Swim Lane process follow in terms of loans keep

10  moving forward, either in the High-Speed Swim Lane process or

11  alternate process, unless it needs to be canceled or then it

12  would exit the process or it's declined at some point.

13          The contrast is not move backwards in terms of the old

14  process, where you have all sorts of back and forth

15  discussions, and files going back and forth between sales and

16  processing, or even sales and underwriting, to try to make a

17  loan work for the customer's benefit.  But you unfortunately

18  have delays in the back and forth, especially with sales

19  involved.  And we wanted to not have sales involved in the

20  processing part of the process, but still focus on sales.  So

21  that's kind of the idea behind loans move forward, never

22  backward.

23  Q.   You've talked a bit today about swim lanes.  Is it fair to

24  say that when we refer to the High-Speed Swim Lane, you're

25  referring to the High-Speed Swim Lane pilot?

1   A.  I'm referring to the High-Speed Swim Lane, either the

2   design, the pilot, or what version was eventually implemented

3   and deployed.

4   Q.  What does it mean in the fourth bullet point where it says

5   "CLUES is the underwriter"?

6   A.  So CLUES is the underwriting engine, proprietary engine for

7   Countrywide.  And it is still today for Bank of America, as far

8   as I understand.  Where it basically takes information from the

9   borrower and the characteristics of the loan they are applying

10   for, and it determines whether it should be approved for that

11   borrower, for that loan, for those terms and conditions.  And

12   if it's not, then they will be rejected or what we call refer

13   for a manual review and underwriting.

14        So CLUES is basically the underwriting engine.  All

15   major lenders have an underwriting engine that they either have

16   in house, or they use Fannie or Freddie's underwriting engines

17   like DU or LP.

18   Q.  Can you explain what the phrase in the third bullet point

19   means, "combine loan processor and underwriter validator

20   roles"?

21   A.  That was a principle to combine those functions into one

22   person or one role, similar to the CMD ROC model we had visited

23   and looked at for specific types of loans.  In this case the

24   proposal was for clean prime, prime CLUES accept loans where

25   the processor would do the underwriting validation function

1    within their authority.

2    Q.  The last bullet point, "underwriting support available via

3    underwriting floater or help desk model."  Do you ever recall a

4    time at FSL during the High-Speed Swim Lane pilot or during the

5    Central Fulfillment model when underwriters were not available

6    in a support role?

7    A.  No, I do not recall.  There were always designed to be

8    available, especially for loans where the loan specialist did

9    not have the appropriate authority or had a question or wanted

10   the, you know, expert's second opinion, for example.

11   Q.  Can you look at page seven of the PowerPoint, please.  Can

12   you describe for us what kind of program, if you know, was used

13   to create this chart on page seven?

14   A.  The computer program?  I believe it's Visio.

15   Q.  Do you know what the term would have been for the three

16   different rows in the program?

17   A.  These rows, going from left to right, are generally called,

18   in process design terms, swim lanes.  Like a swim lane in a

19   swimming pool.  Where you have a swimmer follow his or her swim

20   lane and not get in another person's swim lane like in a

21   swimming race.

22          Here swim lanes, and generally in process design

23   documentations like this, you have a swim lane that's unique to

24   that particular role or person or even group.

25          So the first swim lane here at the very top is called

DAB3BAN5                    Gong

1    AE/T M.  That's the swim lane that represents those functions,

2    activities done by the AE or team manager.  So it is a sales

3    group of activities.  And logically you would have each swim

4    lane kind of showing that activities or the process steps only

5    to that row that's on the left-hand side of that diagram.  It

6    is a general process design, you know, format for process

7    flows.

8    Q.  Is it fair to say that the term "swim lane" is common among

9    process designers?

10   A.  Yes.  I've been doing process design for probably over 10

11   years.  And I have a six sigma black belt in process

12   improvement.  It's very broadly accepted as a term for process

13   mapping and process design.

14   Q.  Do you remember whether you had any concerns about the

15   quality of the loans that would flow through this process at

16   the time you designed it in 2007?

17   A.  No, assuming that the information input into CLUES is

18   correct, the CLUES engine is correct, and CLUES is the

19   underwriting engine for Countrywide at the time, including CMD,

20   so I would not have any concerns.

21   Q.  What about at any point in the design discussion, do you

22   remember anyone saying that they thought that the High-Speed

23   Swim Lane would result in poor quality loans?

24   A.  No.

25   Q.  Do you remember that the High-Speed Swim Lane was initially

DAB3BAN5                        Gong

1    rolled out in a pilot?

2    A.  Yes, we wanted to pilot test.  We wanted to pilot test the

3    proposed design, looking at impacts on productivity and

4    quality, and how people would, you know, use their additional

5    authority and so forth.

6    Q.  Do you remember whether there was a reorganization going on

7    in the fall of 2007 at Full Spectrum?

8    A.  Yes.  There was another project that was going on shortly

9    after the summer.  It was called Central Fulfillment project or

10   model.  It was soon after High-Speed Swim Lane was piloted and

11   deployed and I was involved with that.  It was primarily a

12   reorganization of key processes and groups within Full

13   Spectrum, combined with layoffs planned towards the end of the

14   year.  And some process changes as well coincident with the

15   reorganization and layoffs.

16   Q.  Do you recall the process used in the High-Speed Swim Lane

17   being the same as what was used in Central Fulfillment?

18   A.  It was a little different.  Central Fulfillment was after

19   the High-Speed Swim Lane, so there was additional changes to

20   the process on top of the reorg and subsequent layoffs.  But

21   they were very distinct initiatives and distinct changes to the

22   Full Spectrum business model.

23   Q.  Let's set aside that document.  I'm going to mark another

24   document.  Two documents.  The first is BANA-SDNY-E008673733.

25   That would be Exhibit 3.  And Exhibit 3A would be its

1  attachment, BANA-SDNY-E008673736.

2          MR. JONES:  Your Honor, I have two exhibits,

3  Defendant's Exhibit 24 has already been admitted, and

4  defendants are offering Defendant's Exhibit 498.

5          THE COURT:  Received.

6          MR. JONES:  I have copies for the jury.

7          (Defendant's Exhibit 498 received in evidence)

8          (Video playing)

9  Q.  Can you describe for us what Exhibit 3A is.

10  A.  This is a presentation scheduled for a town hall meeting

11  with fulfillment staff to introduce them to the new Central

12  Fulfillment model and the changes, process changes,

13  organizational changes in the Central Fulfillment process.  And

14  how it would be implemented, including training and other

15  changes.

16  Q.  Do you remember whether FSL conducted layoffs around

17  September of 2007?

18  A.  It was around September, October I believe.

19  Q.  Do you remember whether some loan specialists in Central

20  Fulfillment had previously been underwriters?

21  A.  Yes, I recall that was one of the possible options for

22  keeping people, that they would maybe have been a former

23  underwriter but now have a loan specialist or manager become

24  more of a staff role during this reorg/layoff process.

25  Q.  Could loan specialists in Central Fulfillment handle loans

1    outside of their authority levels?

2    A.  No.  They would have had to escalate to a higher level

3    underwriter.

4    Q.  To your knowledge, could loan specialists in Central

5    Fulfillment process refers from start to finish?

6    A.  No.  Not to my knowledge.

7    Q.  What was the underwriter's role in Central Fulfillment?

8    A.  Basically underwriting, reviewing loans that needed higher

9    level authority.

10   Q.  Were underwriters available in a support role to loan

11   specialists in Central Fulfillment?

12   A.  Yes, I believe so.

13   Q.  You mentioned that the compliance specialist and funder

14   role was merged in Central Fulfillment.  Do you recall why that

15   was the case?

16   A.  I recall, I believe one of the reasons was we wanted to

17   fully move away, fully move into the prime model, and

18   compliance specialist was mor a subprime model.  CMD did not

19   have that.  So, that role was merged into the funder role, so

20   you have one less headcount.  And some of the activities and

21   checklist items in the compliance specialist was merged into

22   the new funder role in the checklist in the Central Fulfillment

23   model.

24   Q.  To the extent that compliance specialist responsibilities

25   were still relevant to the prime processing model, were those

DAB3BAN5                        Gong

1    responsibilities completed by the funder in Central

2    Fulfillment?

3    A.  Yes, that is the design, that they would still keep the

4    relevant, you know, checklists items or activities in the

5    Central Fulfillment process, but now reside with the funder

6    position.

7    Q.  To your knowledge, were any aspects of the compliance

8    specialist role that remained relevant to prime processing

9    eliminated?

10   A.  I do not recall any of that being eliminated.

11   Q.  Let's look at page five.  Could you read the contents of

12   the little starburst thing there around the center of the page.

13   A.  "Central Fulfillment model, streamline work flow reducing

14   hand offs, processors with underwriting approval authority,

15   dedicated team funders, escalate to underwriting for high risk

16   loans only, best of the best staff."

17   Q.  Is it fair to say that when the phrase "best of the best

18   staff" was used, that's referring to the fact that the

19   individuals who remained after the layoffs were the highest

20   quality and the best performers, best performing employees?

21   A.  Yes, that's very correct.

22   Q.  Did you have any concern with the quality of loans that

23   were going to be processed through the Central Fulfillment

24   model?

25   A.  I do not recall having any concerns.

DAB3BAN5                      Gong

1    Q.  Do you recall any loan specialists in Central Fulfillment

2    handling loans outside their authority level?

3    A.  No, I do not recall that.

4    Q.  Do you recall anyone expressing concerns that in Central

5    Fulfillment the loan specialists would have a merged processing

6    underwriting function?

7    A.  No.  Not that I recall.  It is similar to the CMD ROC

8    model.

9    Q.  So it would be fair to say that any loan that was handed

10   off from manual underwriting did not flow through the

11   High-Speed Swim Lane?

12   A.  Correct.  High-Speed Swim Lane was trying to get basically

13   prime loans that meet the criteria, minimal touches, especially

14   in terms of not having to escalate to an underwriter, which

15   could lead to delays in the high speed process.  So loans that

16   would not go through end to end with a loan processor would be

17   kicked out to a higher level authority person, which may take

18   time, but you want to have the appropriate level review from a

19   quality underwriter perspective.

20   Q.  Do you ever recall a time when individuals from risk or

21   compliance were excluded from discussions related to the

22   Central Fulfillment model?

23   A.  No, I do not.

24   Q.  Would you say that Cliff Kitashima was someone involved in

25   risk and compliance?

1    A.  Oh, yes.

2    Q.  Do you remember whether Cliff Kitashima was involved in the

3    design or approval of the Central Fulfillment model?

4    A.  Yes, he was.

5    Q.  Would it be fair to say that Javier Jaraba was involved in

6    risk or compliance?

7    A.  Yes.

8    Q.  Do you recall whether he was involved in the design or

9    approval of the Central Fulfillment model?

10   A.  I believe so.

11   Q.  Would it be fair to say that Patrick Aliano was an

12   individual involved in risk or compliance?

13   A.  Yes.

14   Q.  Do you remember whether Patrick Aliano was involved in the

15   design or approval of the Central Fulfillment model?

16   A.  I don't recall him exactly being involved in approval.  But

17   in the input, yes.

18   Q.  Do you recall whether Patrick Aliano provided input for the

19   conditioned sign off and authority matrix that was ultimately

20   used in the Central Fulfillment model?

21   A.  I believe I recall.

22   Q.  Would you say any one person was driving the High-Speed

23   Swim Lane design?

24   A.  No, there was no one main driver.  It was a very iterative,

25   collaborative process with many different disciplines, subject

DAB3BAN5                          Gong

1    matter experts involved.

2    Q.   Would you say that any one person was driving the design of

3    the Central Fulfillment model?

4    A.   No.   Again, it was a very broad based initiative by senior

5    management and fulfillment.

6    Q.   Could you look at the chart on page six of the PowerPoint

7    we were looking at earlier, Exhibit 3A.

8    A.   Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DABTBAN6                         Gong

1    Q.  Does this chart on the right-hand side of this page reflect

2    that operations was separate from sales in the Central

3    Fulfillment model?

4    A.  Yes, separate management and separate processes and

5    activities.

6    Q.  Do you recall whether the same was true of the High-Speed

7    Swim Lane pilot?

8    A.  Yes, sales was always separate from fulfillment in either

9    process model.

10   Q.  My name is Michael Hector, I met you earlier today, and I

11   am counsel for Rebecca Mairone in this matter.  Do you know who

12   Rebecca Mairone is?

13   A.  Yes.

14   Q.  Who is she?

15   A.  She was at Full Spectrum during this time, High-Speed Swim

16   Lane and other projects.  I can't remember exactly when she

17   joined Full Spectrum, but it was 2006, I believe, I can't

18   remember, but she was in charge of operations when I was there.

19   Q.  And can you describe for me your own words what operations

20   was at Full Spectrum lending?

21   A.  It was basically corporate groups, including the policy and

22   procedures group, training, process design, which is what I was

23   part of during this time period, and also fulfillment which is

24   the loan processors.  Not sales, not underwriting, not closing

25   and funding and not compliance and risk.

DABTBAN6                    Gong

1    Q.  I believe you used the term earlier in your testimony

2    "production," do you recall that?

3    A.  Yes.

4    Q.  And can you describe for me what production was at FSL?

5    A.  When I used the term "production" generally I'm referring

6    to those groups that handle directly loan sales and

7    fulfillment, so sales, loan processors, underwriting, closing

8    and funding.  So production as opposed to corporate functions,

9    which is the area that I was part of.

10   Q.  Now I want to take you to the point in time that you were

11   having discussions with others about the design of the

12   High-Speed Swim Lane.  Is that OK?

13   A.  Yes.

14   Q.  Is it correct or incorrect that at that point in time

15   underwriting was not a function that was under operations or

16   Rebecca Mairone?

17   A.  Correct.  At that time underwriting, which was led by Ed

18   O'Donnell, was reporting to Cliff Kitashima.

19   Q.  And Mr. Kitashima was a managing director at the same level

20   of title as Ms. Mairone, is that correct?

21   A.  I believe he was also managing director.

22   Q.  You also indicated that at that time that there was sales?

23   A.  Right.  That's correct.

24   Q.  And do you recall who the managing director of sales was?

25   A.  The name is blanked out right now for me, but -- I know

2440

DABTBAN6                         Gong

1   what he looks like, but I just can't recall the name.

2   Q.  That's fine.  Is it fair to say that at the time there was

3   an individual who was called the managing director of sales?

4   A.  That is correct.

5   Q.  And sales force reported up --

6               THE COURT:  Sorry, do you want to stop.

7               Counsel come to the side bar.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DABTBAN6                         Gong

1           (At side bar)

2           THE COURT:  So for the first time ever during this

3    trial I noticed a juror beginning to nod off, juror number one,

4    just in the last two minutes, and I am impressed at her ability

5    to stay awake this long.  But since it seems to me clear we

6    won't finish this videotape before 4:15, it's already almost

7    five after, my suggestion is that we just finish, I think just

8    a couple more questions on the videotape from Mr. Hefter.

9           MR. HEFTER:  I think that's correct.

10          THE COURT:  Stop it for today and let's pick it up on

11   Tuesday.

12          MR. HEFTER:  It was pretty clear she was falling

13   asleep during my titillating examination.

14          THE COURT:  I don't draw any inferences.

15          (Continued on next page)

DABTBAN6                          Gong

1              (In open court)

2    Q.   -- though the organization to that individual?

3    A.   Yes.

4    Q.   And those individuals in sales did not report up through --

5    to Rebecca Mairone, is that correct?

6    A.   That is correct.

7    Q.   And just so I close the loop on it, the people who were in

8    underwriting, the underwriting department, those people

9    reported up through the organization to Cliff Kitashima, is

10   that correct?

11   A.   Right.  And actually I remember now the managing director

12   of sales is Lloyd Sargeant.

13   Q.   I forgot the name, too, but I couldn't say whether I

14   recognize what he looked like, but thank you.

15             And is it also fair to say that the individuals in the

16   organizations that reported up through Mr. Kitashima did not

17   report to Ms. Mairone?

18   A.   Yes.

19             THE COURT:  All right.  So ladies and gentlemen,

20   there's still more of this videotape to be played, but I think

21   that this is a good place to stop it for today.

22             Now as you probably know, the courthouse is closed on

23   Monday.  Some of you may think that it's because of Columbus

24   Day, actually it's because in honor of the juror number five's

25   first victory, which will occur on that afternoon, thus putting

DABTBAN6

1    him one up on the New York Giants.  So we will resume on

2    Tuesday at 9:30.  So have a terrific weekend, and we'll see you

3    Tuesday at 9:30.

4              (Jury not present)

5              THE COURT:  I have another matter in a few minutes,

6    but is there anything counsel needs to raise with the Court?

7              MR. ARMAND:  One issue, your Honor.  The government

8    has requested that the defense provide the back up that we

9    could use to replicate their population of Hustle loans.  We

10   would used the exhibit from the expert report and the testimony

11   from Mr. Ho, but we're still not able to replicate the

12   analysis.  So we have asked for it.  It hasn't been provided

13   yet, so we're raising it.

14             THE COURT:  All right.

15             MR. SMURZYNSKI:  Mr. Armand raised this on the lunch

16   break.  I responded to Ms. Schoenberger by email half an hour

17   ago.  I'm happy to hand Mr. Armand the criteria that is

18   identified in the same email.  I don't think we have an issue.

19             THE COURT:  OK.  So it sounds like you now have what

20   you need.  If it's not what you need, I will be here until

21   10 o'clock at night tonight, so you can call me if there's any

22   problem getting that.

23             MR. ARMAND:  Thank you, your Honor.

24             MS. MAINIGI:  Your Honor, one quick issue.  We have a

25   witness, Wade Comeaux, who we were expecting to call in this

DABTBAN6

1    matter, and he no longer works for the bank, he's a small

2    business owner.  He indicated that he is able to come on the

3    21st, which is a week from Monday.  That's certainly fine with

4    our schedule, we wanted to check with your Honor to make sure

5    that if we -- what we'll try to do is take --

6              THE COURT:  If we have to interrupt to take him,

7    that's fine.

8              MS. MAINIGI:  Thank you, your Honor.

9              THE COURT:  So I have a question for you, which has

10   nothing do with the case but has everything to do with my

11   curiosity, because I did my master's degree on the history of

12   India.  So what part of India are your parents from?

13             MS. MAINIGI:  New Delhi.

14             THE COURT:  That's very disappointing.  I was hoping

15   for something more exotic.

16             MS. MAINIGI:  No.

17             MR. JONES:  Your Honor, I have a revised copy of the

18   deposition designations for Donald Harris.

19             THE COURT:  OK, hand it up.

20             MR. ARMAND:  Your Honor, could we take the transcript

21   back?  We wanted to take one more quick look at it.

22             THE COURT:  Yes, I will be here for a while.

23             (Adjourned to October 15, 2013, at 9:30 a.m.)

24

25

```
1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    MARK BARNETT

4    Direct By Ms. Mainigi  . . . . . . . . . . .2292

5    MARK BARNETT

6    Direct By Mr. Hefter . . . . . . . . . . . .2334

7    Cross By Ms. Nawaday . . . . . . . . . . . .2358

8    Redirect By Ms. Mainigi  . . . . . . . . . .2398

9    Redirect By Mr. Hefter . . . . . . . . . . .2410

10                         PLAINTIFF EXHIBITS

11   Exhibit No.                               Received

12    255   . . . . . . . . . . . . . . . . . . .2367

13    272   . . . . . . . . . . . . . . . . . . .2369

14    481   . . . . . . . . . . . . . . . . . . .2372

15    262   . . . . . . . . . . . . . . . . . . .2384

16    253   . . . . . . . . . . . . . . . . . . .2386

17    482   . . . . . . . . . . . . . . . . . . .2389

18                         DEFENDANT EXHIBITS

19   Exhibit No.                               Received

20    365   . . . . . . . . . . . . . . . . . . .2297

21    380   . . . . . . . . . . . . . . . . . . .2305

22    28   . . . . . . . . . . . . . . . . . . . .2313

23    534   . . . . . . . . . . . . . . . . . . .2318

24    672   . . . . . . . . . . . . . . . . . . .2322

25    24, 25, 26 and 27   . . . . . . . . . . . .2328
```

1   341      . . . . . . . . . . . . . . . . . .2330

2   1770     . . . . . . . . . . . . . . . . . .2332

3   517      . . . . . . . . . . . . . . . . . .2334

4   485      . . . . . . . . . . . . . . . . . .2349

5   389      . . . . . . . . . . . . . . . . . .2355

6   1767     . . . . . . . . . . . . . . . . . .2356

7   279      . . . . . . . . . . . . . . . . . .2366

8   394      . . . . . . . . . . . . . . . . . .2404

9   289      . . . . . . . . . . . . . . . . . .2407

10  246, 266   . . . . . . . . . . . . . . . .2426

11  498      . . . . . . . . . . . . . . . . . .2432

12

13

14

15

16

17

18

19

20

21

22

23

24

25