DAFTBAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4
                   Plaintiff,
5
              v.                          12 CV 1422 (JSR)
6
     BANK OF AMERICA CORPORATION,
7    *successor to Countrywide
     Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                 Defendants.

11   ------------------------------x
                                          New York, N.Y.
12                                        October 15, 2013
                                          10:00 a.m.
13
     Before:
14
                        HON. JED S. RAKOFF,
15
                                          District Judge
16

17

18

19

20

21

22

23

24

25

DAFTBAN1

1                                   APPEARANCES

2   PREET BHARARA
         United States Attorney for the
3        Southern District of New York
    PIERRE G. ARMAND
4   JAIMIE LEESER NAWADAY
    JOSEPH N. CORDARO
5   CARINA H. SCHOENBERGER
    ELLEN M. LONDON
6        Assistant United States Attorneys

7

    WILLIAMS & CONNOLLY
8        Attorneys for Defendant Bank of America
    BRENDAN V. SULLIVAN, JR.
9   ENU MAINIGI
    MALACHI B. JONES
10  KENNETH SMURZYNSKI
    CRAIG D. SINGER
11  ALLISON B. JONES
    STEVEN M. CADY
12  JENNIFER WIMSATT PUSATERI

13

    GOODWIN PROCTOR
14       Attorneys for Defendants Countrywide
    RICHARD M. STRASSBERG
15  WILLIAM HARRINGTON

16

    BRACEWELL & GIULIANI
17       Attorneys for Defendant Mairone
    MARC L. MUKASEY
18  MICHAEL HEFTER
    RUSSELL ZWERIN
19  RYAN M. PHILP
    SETH M. COHEN
20  CHRISTINA JARDINE

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.

3   Welcome back to the last civil trial of the history of the

4   federal government.  Consider yourself an endangered species.

5          We're ready to continue with the video.

6          (Video recording played)

7   Q.  Now when you say you helped put in place the High-Speed

8   Swim Lane, can you give me some more clarity in terms of what

9   you did in your role with respect to High-Speed Swim Lane?

10  A.  I was involved with some of the process design sessions

11  with Mark, visited ROCs like the one in Pasadena, helped get

12  project plans, manage issues list, help set up and facilitate

13  meetings, helped put together implementation plans.  Basically

14  being a typical project manager and coordinator among all the

15  different subject matter experts and groups involved with the

16  project.

17  Q.  Were you a subject matter expert on the underwriting

18  functions or changes to the underwriting functions that were

19  ushered in by the High-Speed Swim Lane?

20  A.  No, I was not.  We had subject matter experts from the

21  various functions who provided input, such as Ed and his direct

22  reports, like Robert Price, Jim White from underwriting

23  perspective.  We also had subject matter experts from risk,

24  closing of funding, sales, et cetera.

25  Q.  Was Ms. Mairone a subject matter expert on any of the

DAFTBAN1                        Gong

1   underwriting functions?

2   A.  No, I would not -- I did not consider her expert on

3   underwriting.

4   Q.  Who had the authority ultimately to approve any changes to

5   the underwriting function as a result of the High-Speed Swim

6   Lane?

7   A.  Ultimate authority would have been managing directors like

8   Cliff Kitashima, which includes his -- his area include

9   underwriting.  And also overall above Cliff would have been

10  Greg Lumsden.

11  Q.  I'm going to mark as Exhibit 4 a document with a Bates

12  number of BANA SDNY E 000091627.

13          MR. JONES:  Defendants offer Defendant's 367 into

14  evidence.

15          THE COURT:  Received.

16          (Defendant's Exhibit 367 received in evidence)

17          MR. JONES:  I have a copy for the Court and the

18  jurors.

19          THE COURT:  Go ahead.

20  Q.  And the document indicates that there was a meeting --

21  these are meeting notes of 8/23.  Do you see that?

22  A.  Yes.

23  Q.  And it lists a number of people that were present at the

24  meeting.  Do you recognize who these people are?

25  A.  I recognize many of these names.

DAFTBAN1                         Gong

1  Q.  Were these people involved in the studying of the

2  High-Speed Swim Lane?

3  A.  They're involved in the project from a pilot perspective

4  and roll-out perspective from different groups, training, IT,

5  underwriting, operations.  Lots of groups represented here by

6  these names.

7  Q.  Is this an example of the collaborative process that you

8  described in earlier testimony?

9  A.  Oh, yes, we had lots of representation from different parts

10  of the company and functional areas.  And as you can see by the

11  notes, we had lots of people attending this meeting on

12  August 23rd and a lot of the take-aways and assignments were

13  also distributed across cross functional areas.

14  Q.  Now Mr. Gong, did you have an opportunity while you were at

15  FSL to interact with Rebecca Mairone?

16  A.  Yes, very much.

17  Q.  Did your involvement continue throughout the length of the

18  High-Speed Swim Lane?

19  A.  Could you clarify what you mean by "the life of the

20  High-Speed Swim Lane?"

21  Q.  Well, from beginning to end, whenever that end was.

22  A.  I was involved with the early phase from the design and

23  pilot through implementation during that summer and early fall

24  of 2007.

25  Q.  Could you put a date range around that early phase of your

DAFTBAN1                    Gong

1    involvement?

2    A.  I can't recall exactly what specific day I was initially

3    involved.  Approximately early summer, June or July is my

4    estimate.

5    Q.  When did you cease to become involved?

6    A.  My recollection would be about September, October, when I

7    moved on to focusing on the Central Fulfillment initiative.

8    Q.  Would that be September and October of 2007?

9    A.  That's correct.

10   Q.  Is it fair to say that your testimony at this deposition is

11   based on knowledge you obtained during your involvement with

12   the High-Speed Swim Lane from early summer of 2007 through

13   approximately October of 2007?

14   A.  That is when I was involved with the High-Speed Swim Lane

15   initiative, that time period that you just stated.

16   Q.  OK.  And during -- after October 2007 you were not involved

17   with the High-Speed Swim Lane?

18   A.  That is correct, yes.

19   Q.  So any changes made to the design of the High-Speed Swim

20   Lane after October of 2007 you wouldn't have been involved with

21   those changes, is that correct?

22   A.  I do not believe, if I recall correctly, I was involved

23   after that, October 2007.

24   Q.  While you were involved with the High-Speed Swim Lane,

25   would your approval have been needed to make any changes to the

DAFTBAN1                          Gong

1    design?

2    A.  No, it would not have been just my approval, it would have

3    been input from various subject matter experts and senior

4    management.

5    Q.  After October 2007, if any changes were going to be made to

6    the High-Speed Swim Lane design, would your approval have been

7    needed?

8    A.  I do not recall that my approval would have been needed

9    after October 2007.

10   Q.  Do you recall being consulted by anyone after October 2007

11   about changes to the design of the High-Speed Swim Lane?

12   A.  No, I do not.

13   Q.  Mr. Gong, you testified that one of the goals of the

14   High-Speed Swim Lane was to improve productivity but maintain

15   quality, is that correct?

16   A.  That's one of the design goals.

17   Q.  Was that one of the design goals?

18   A.  Yes, to improve productivity while maintaining quality.

19   Q.  Why was it important to maintain quality?

20   A.  Well, it was important to maintain quality to make sure

21   that while we improved productivity to make the loan process go

22   faster, we're not sacrificing the quality of the loan that we

23   close and sell to our investors.

24   Q.  And what do you mean when you say "sacrificing quality of

25   the loan at close?"

DAFTBAN1                          Gong

1    A.  Well, we did not want to sacrifice quality in the sense of

2    speed the process or make things go faster while necessarily

3    giving up controls and quality of the underwriting and quality

4    of the loan that was closed.

5    Q.  What do you understand the phrase "CLUES is the

6    underwriter" to mean?

7    A.  It means CLUES results would give you the underwriting

8    results of that file based on the parameters inputted for that

9    loan type.  So if a CLUES result is an accept, that means it

10   meets acceptable underwriting criteria as programmed in the

11   CLUES engine.  CLUES refer means it does not meet the CLUES

12   criteria as it was run at that point, it may need a manual

13   review, manual underwriting as a secondary review.

14   Q.  For CLUES to perform those tasks that you just described to

15   me, it would have to rely on the data that was entered into it

16   for a particular loan file, wouldn't it?

17   A.  It would have to use whatever data is inputted into the

18   CLUES run at that time.

19   Q.  Other than the person who is entering the data into CLUES,

20   which is performing the function of an underwriter, was there

21   any check in the design for the accuracy of the data entered

22   into CLUES with respect to the High-Speed Swim Lane?

23   A.  I don't recall a specific design from the High-Speed Swim

24   Lane project that validates that the CLUES data entered is

25   accurate and correct.

DAFTBAN1                     Gong

```
 1   Q.  Do you ever recall during your involvement with the design

 2   of the High-Speed Swim Lane anyone expressing any concern that

 3   salespeople or anyone else would manipulate data to get a CLUES

 4   accept?

 5   A.  I don't recall specific concerns about manipulating data.

 6   There was always a concern even before High-Speed Swim Lane

 7   that people may put incorrect data or incomplete data in CLUES

 8   based on the information they had at the time.

 9   Q.  And notwithstanding that concern -- withdrawn.

10        Notwithstanding that concern, you don't recall as part

11   of the design whether a check was imposed on folks who were

12   entering data into CLUES to ensure that data was accurate?

13   A.  I don't recall having a design to check on that -- on

14   accuracy of CLUES data as part of High-Speed Swim Lane.

15   Q.  What was Ms. Mairone's involvement, if any?

16   A.  I believe she was involved in -- only in terms of the

17   overall executive stakeholder, like Cliff, like Lloyd Sargeant,

18   any of the other managing directors.  Her main deputy or direct

19   report that was involved much more closely was Loren on the

20   project.

21   Q.  You testified earlier today that you were not in a position

22   to reject input from senior executives.  Do you remember that

23   testimony?

24   A.  I don't remember exactly what I said.

25             (Continued on next page)
```

DAF3BAN2                          Gong

1    Q.   I'll ask it as a question.  Were you in a position during

2    this time to reject input from senior executives?

3    A.   I don't think I would have rejected input from a senior

4    executive out of hand, if that's your question.  Because

5    they're subject matter experts, they're senior stakeholders.  I

6    was just basically a process design project manager guy

7    coordinating lots of different input and -- on feedback and

8    stakeholders, so I don't think if I was getting the input from

9    a senior stakeholder -- I would sort of treated as important

10   and not reject it out of hand.

11   Q.   Did you have any control or decision-making authority over

12   the kinds of loans that went into the High-Speed Swim Lane?

13   A.   You are asking from a specific loan perspective or from a

14   design perspective?

15   Q.   From a loan perspective.

16   A.   No, I was not involved with specific loan processing or

17   fulfillment, so I did not directly work with loans, if that's

18   what you are asking.

19   Q.   Mr. Gong, at any time during your involvement with the

20   High-Speed Swim Lane, did you ever have any concerns that loan

21   specialists were not qualified to perform the tasks that they

22   were performing within the swim lane?

23   A.   I do not recall having any of those concerns.

24   Q.   Do you ever recall the term grandfathering with respect to

25   loan specialists in the High-Speed Swim Lane?

DAF3BAN2                    Gong

1   A.  No, not specifically grandfathering loan specialists in the

2   High-Speed Swim Lane.

3   Q.  When you say "not specifically," are you saying you don't

4   recall what that means?

5   A.  Right.  I know what grandfathering means, but I don't

6   recall specifically grandfathering related to loan specialists.

7   Q.  Mr. Gong, did you have any role in the decision as to what

8   training would be provided for loan specialists who were

9   working within the High-Speed Swim Lane?

10  A.  No.

11  Q.  My question was, has the witness made any arrangements with

12  Bank of America concerning the compensation of his counsel

13  Mr. Athey in this matter?

14  A.  So my understanding is Bank of America is paying for Joel's

15  services due to the fact that I'm a former employer and it is

16  in their articles of incorporation or bylaws to provide counsel

17  for former employers in cases involving work that they did when

18  they were employed by the bank.

19  Q.  You said "former employer" a couple of times.  Did you mean

20  former employee?

21  A.  Sorry.  Former employee.  Thank you.

22  Q.  Okay.  So Bank of America is paying for your counsel?

23  A.  That is my understanding.

24  Q.  I am going to first take you back to Exhibit 2A that we

25  looked at earlier.  I'd like to look specifically at page four.

DAF3BAN2                         Gong

1   And the government asked you earlier about the fourth bullet

2   point under process, CLUES is the underwriter.  Do you remember

3   that?

4   A.  Yes.

5   Q.  Is it fair to say that your testimony today is that CLUES

6   was the automated underwriting system?

7   A.  Right.  CLUES is the underwriting engine used by

8   Countrywide.

9   Q.  Did someone, either a loan specialist or an underwriter,

10  continue to validate the data that was input into CLUES?

11  A.  That's correct.  CLUES is run by a number of times during

12  the process, including by the loan specialist, to validate

13  information that was initially entered or subsequently

14  available by the borrower or the third-party services.  And

15  they can validate and rerun CLUES a number of times, even after

16  the initial run by the AE, to validate and/or get a more

17  correct CLUES run with the latest and/or correct information by

18  the borrower or other third parties.

19  Q.  So is it fair to say in fact CLUES is the underwriter, but

20  a human being with underwriting authority is responsible for

21  validating the data that's input into CLUES?

22  A.  Even though CLUES is the underwriting engine that produces

23  the CLUES result, you would need validation by a person for

24  CLUES accepts, or in the cases of a CLUES refers, a manual

25  underwriting by a person.

DAF3BAN2                          Gong

1   Q.  Is it fair to say that one of the aspects of the High-Speed

2   Swim Lane was that loan specialists would be trusted with

3   additional authority?

4   A.  Yes, that is one of the strong assumptions, that they would

5   be able to handle additional authority with sufficient training

6   and management.

7   Q.  Is it fair to say that one of the aspects of the High-Speed

8   Swim Lane was that loan specialists would be trusted to ensure

9   that the data ultimately input into CLUES is correct?

10  A.  That would be true, regardless of it being the High-Speed

11  Swim Lane process or not.

12  Q.  Would this have been true as well in Central Fulfillment?

13  A.  Yes.

14  Q.  If a loan had entered the High-Speed Swim Lane with an

15  inappropriate CLUES accept, and when CLUES was rerun it

16  received a refer, would it have been part of the design for

17  that loan to leave the High-Speed Swim Lane?

18  A.  Yes, that would be correct.

19  Q.  Do you recall that the loan specialists would have been

20  charged with only approving loans within their authority level?

21  A.  Yes.  Yes, that was part of the design.

22  Q.  Do you recall that a loan specialist would have been

23  responsible for referring to someone with the appropriate

24  authority level any loans that were outside of their authority

25  level?

DAF3BAN2                    Gong

1    A.  Yes, that is part of the design at the time.

2             (Video ends)

3             THE COURT:  All right.  Please call your next witness.

4             MR. MUKASEY:  Your Honor, the defense calls Rebecca

5    Mairone.

6             THE COURT:  Please raise your right hand.

7             (Witness sworn)

8             THE COURT:  State your full name and spell your last

9    name.

10            THE WITNESS:  Rebecca Mairone.  M-A-I-R-O-N-E.

11            MR. MUKASEY:  Judge, I have a couple of binders to

12   pass out.

13            THE COURT:  Why am I not surprised.

14    REBECCA MAIRONE,

15        called as a witness by the Defendant,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MUKASEY:

19   Q.  Rebecca, I am going to ask you to direct your attention

20   back to the period between 2006 and 2008.  Where did you work

21   during that time?

22   A.  At Countrywide Full Spectrum Division.

23   Q.  What was your title at Countrywide Full Spectrum Division?

24   A.  It was chief operating officer.

25   Q.  Rebecca, please tell the ladies and gentlemen of the jury

1   whether, while you were COO of Full Spectrum, you ever intended

2   FSL to sell poor quality loans to Fannie Mae.

3   A.  No.  Never.

4   Q.  Please tell the jury whether you ever intended to cause FSL

5   to sell poor quality loans to Freddie Mac.

6   A.  No, never.

7   Q.  Tell us whether you ever intended to mislead any government

8   sponsored entity when you worked at FSL.

9   A.  No.

10  Q.  Please tell us whether you knew about any scheme to sell

11  poor quality loans to Fannie Mae or Freddie Mac.

12  A.  There was no scheme.

13  Q.  Please tell us whether you ever told a lie or something

14  that was only half true to Fannie Mae or to Freddie Mac.

15  A.  No.

16  Q.  Did you ever send an e-mail or make a phone call or send a

17  letter to Fannie Mae or Freddie Mac that contained anything

18  that wasn't true?

19  A.  No.

20  Q.  Did you ever ask anyone to lie to Fannie Mae or Freddie

21  Mac?

22          MS. NAWADAY:  Objection, your Honor.

23          THE COURT:  Ground?

24          MS. NAWADAY:  Cumulative.

25          THE COURT:  Yes.  I didn't quite understand the

1    question about the mailings and wires, since that element of

2    the charge is not dependent on the defendant having sent a mail

3    or a wire, and it is not dependent on the mailing or wires

4    having contained any false statement.

5            Since there was no objection, it will stand.  But, the

6    objection to the present question sustained.

7            MR. MUKASEY:  Thank you, Judge.

8    Q.  Rebecca, did you ever intend to conceal or hide any

9    information from Fannie Mae or Freddie Mac?

10   A.  No.

11   Q.  Did you ever intend to harm either Fannie or Freddie in any

12   way?

13           MS. NAWADAY:  Objection, your Honor.

14           THE COURT:  I'll allow it.  You may answer.

15   A.  No.

16   Q.  I'm going to ask you a lot more questions this morning

17   about your work in 2006, 7 and 8.  But first I'd like you to

18   tell the jury a little bit about your background.

19           THE COURT:  Mr. Mukasey, I tried to get across to each

20   and every lawyer questioning witnesses here, without apparent

21   success, that the only job of a questioner is to put questions.

22   Not to give any speeches.  Please put questions.

23   Q.  Rebecca, how old are you?

24   A.  I'm 46.

25   Q.  Are you married or are you single?

DAF3BAN2                          Mairone - direct

1    A.  I'm single.

2    Q.  Do you have any children?

3    A.  Yes, I have two.

4    Q.  How many -- that's two.  What are their names?

5    A.  Michael and Maria.

6    Q.  How old is Michael?

7    A.  Michael is 19.

8    Q.  How about Maria?

9    A.  She's 14.

10   Q.  Rebecca, where were you born?

11   A.  In Charleston, West Virginia.

12   Q.  Were you raised there?

13   A.  I was not raised there.

14   Q.  Where were you raised?

15   A.  Most of my young childhood was in Texas outside Houston,

16   Texas.

17   Q.  Where did you go to college, Rebecca?

18   A.  I went to Drexel University in Philadelphia, Pennsylvania.

19   Q.  What kind of degree did you get from Drexel University?

20   A.  I have a chemical engineering degree.

21   Q.  When did you graduate from Drexel?

22   A.  In June of 1990.

23   Q.  Did you continue studies after Drexel?

24   A.  I did.

25   Q.  Where?

1    A.  I went to Villanova University, also right outside

2    Philadelphia.

3    Q.  What did you study there?

4    A.  I got my MBA.

5    Q.  In what subject?

6    A.  Business administration.

7    Q.  Were you working during your graduate studies?

8    A.  I was.

9    Q.  Where were you working?

10   A.  I was working at FMC Corporation in Philadelphia.

11   Q.  What kind of business is FMC Corporation?

12   A.  It is a chemical and machinery company.

13   Q.  What particularly did you do for the FMC Corporation?

14   A.  I was working in process and project engineering for a

15   product called hydrogen peroxide.

16   Q.  Can you explain what you did as a process engineer or

17   process manager at FMC?

18   A.  Sure.  I ran processes, I looked at way that the chemical

19   could be improved.  Extraction of metals and different

20   applications of hydrogen peroxide, like bleaching and

21   semiconductor cleaning.

22   Q.  How long did you stay at the FMC Corp.?

23   A.  I was there about six years.

24   Q.  What caused you to leave FMC?

25   A.  I was -- my son was two years old, and I was actually

1  looking for a little bit more work and family balance.  I was

2  having to do a lot of international travel to outside the

3  country, which took me way from my family a little too much.

4  So I decided to leave FMC.

5  Q.  Where did you work next?

6  A.  I took a job with the company called Teknion.  It is a

7  cubicle manufacturing company.

8  Q.  Where was Teknion located?

9  A.  That was in Marlton, New Jersey.

10  Q.  Where were you living at the time?

11  A.  In Philadelphia.

12  Q.  What kind of work did you do at Teknion?

13  A.  At Teknion I ran their order management process and

14  customer service process for selling furniture.

15  Q.  Can you tell us what order management services is.

16  A.  So we had most of our clients were big high-tech companies

17  like 3Com and Cisco and Netscape, and we were putting furniture

18  in their buildings.  They were growing very quickly.

19        My job was to take the orders from these companies,

20  design the furniture to put in their buildings on each floor,

21  and then make sure those orders got there on a timely basis and

22  got installed correctly.

23  Q.  How long did you remain doing this work?

24  A.  It was about two years.

25  Q.  What caused you to leave Teknion?

DAF3BAN2                    Mairone - direct

1  A.  These clients were moving to Europe.  3Com was growing and

2  Cisco was growing in Europe.  They asked me to take a job in

3  Europe, in London.  And again, my kids and family were here,

4  and so I left Teknion because of that.

5  Q.  Did you take another job?

6  A.  I did.

7  Q.  Where?

8  A.  At a company called Cendant Mortgage.

9  Q.  Tell us what kind of company Cendant was?

10  A.  It was a mortgage company that made first mortgage or

11  residential mortgages to customers directly.

12  Q.  Where was it located?

13  A.  It was in New Jersey.

14  Q.  What do you particularly do at Cendant?

15  A.  I took a job as a project engineer or process design

16  engineer.  So I was managing projects for the mortgage company.

17  Q.  What kinds of projects?  Just give us an example.

18  A.  So how to make the sales process better.  How to integrate

19  technology throughout, you know, end to end.  So fulfillment

20  processing, underwriting and servicing of the mortgages.  So I

21  worked on all areas of the mortgage, and I really learned sort

22  of the nuts and bolts of the mortgage company there.

23  Q.  Did you have occasion during your time at Cendant to become

24  familiar with the loan application work flow at Cendant?

25  A.  I did, yes.

DAF3BAN2                     Mairone - direct

```
1   Q.  Did Cendant use an automated underwriting system?

2   A.  Yes, they did.

3   Q.  What was it called?

4   A.  It was called Force.

5   Q.  Who cleared conditions for low-risk prime loans at Cendant?

6           MS. NAWADAY:  Objection.

7           THE COURT:  Sustained.

8   Q.  Rebecca, how long did you stay at Cendant?

9   A.  About two and a half years.

10  Q.  What was the reason you left Cendant Mortgage?

11          MS. NAWADAY:  Objection, your Honor.

12          THE COURT:  Overruled.

13  A.  I left for a new opportunity.

14  Q.  Where?

15  A.  At a company called Advanta Mortgage.

16  Q.  What did you do there?

17  A.  They had asked me and needed someone to come help their

18  business, so they needed someone to sell their mortgage

19  company.

20  Q.  Who did they sell to?

21  A.  Chase Mortgage.

22  Q.  Did there come a time when you took a job at Chase?

23  A.  I did.  We sold the business to Chase and I went with it.

24  Q.  What did you do at Chase?

25  A.  I actually took over some of their call center operations
```

 1   and their call center sales operations for the mortgage

 2   business.

 3   Q.  Can you give us approximate date you started at Chase, just

 4   for some context?

 5   A.  It was roughly 2001.  And in March or April I think.

 6   Q.  Did Chase have an automated underwriting system?

 7   A.  Yes, they did.

 8   Q.  What was it called?

 9   A.  It's called Zippy.

10   Q.  How long did you end up staying at Chase?

11   A.  I stayed at Chase almost six years.

12   Q.  What was the reason you left Chase?

13   A.  We were looking, me and my family were looking to actually

14   move to the West Coast, so we had been in New Jersey for a long

15   time, and decided that that might be interesting to move to

16   California.

17   Q.  So where was your next stop?

18   A.  It was Countrywide.

19   Q.  During what years were you at Countrywide?

20   A.  I started at Countrywide in early 2006 through June 2008.

21   Q.  When Bank of America took over Countrywide, did you stay?

22   A.  I did, yes.

23   Q.  Can you run through just quickly the list of different

24   positions you had at Bank of America.

25   A.  At Bank of America, my first position was running their

1   sales organization for mortgage lending for the retail

2   consumer.  And then I took on a national servicing role for the

3   mortgage company, which was managing the payments that the

4   customers would send in, and then applying those payments.  I

5   also managed the default servicing area, and at the time, it

6   was really growing.  It was everything from loan modifications

7   through collections through foreclosure bankruptcy in real

8   estate.

9   Q.  When did you leave Bank of America?

10  A.  I left in March of 2012.

11  Q.  For what reason?

12  A.  I wanted to move back to New York and New Jersey.  I have

13  some family here, so myself and my kids moved back here.

14  Q.  Where do you work now?

15  A.  I work at JPMorgan Chase.

16  Q.  What do you do at JPMorgan?

17  A.  I'm head of their operations for procurement and sourcing

18  now, so all the purchasing that they do globally.

19  Q.  Rebecca, tell us precisely when you started at Countrywide.

20  A.  I started on February 26, 2006.

21  Q.  How did it come about that you got the job at Full Spectrum

22  Lending?

23  A.  A Countrywide recruiter call me sometime in late 2005 and

24  said that they had some really interesting jobs in the retail

25  mortgage company, and they were looking for leadership in

1   California.

2   Q.  Did you end up interviewing with anybody?

3   A.  I did.  I interviewed with Greg Lumsden, Drew Gissinger,

4   and Dave Sambol.

5   Q.  Where were you living at the time?

6   A.  I was living in southern New Jersey.

7   Q.  When you got the job as COO, you had to move?

8   A.  Yes, I did.

9   Q.  Where did you move to?

10  A.  I moved right outside of Pasadena, California.

11           MR. MUKASEY:  Alex, can I ask for 4036, page two,

12  please.  It's in evidence.  The next page, too.  Thank you.

13  Q.  Rebecca, we have on the screen the chart.  Can you give us

14  a sense of how big FSL was when you started working there in

15  February of '06.

16  A.  FSL had about 8,000 employees in that division at that

17  time.

18  Q.  How many different locations were those 8,000 people spread

19  out over?

20  A.  There were more than five very large call centers, and then

21  there were a couple hundred, maybe more, branches.

22  Q.  You said you were the COO.  Tell us what your duties and

23  responsibilities were as the chief operating officer of the

24  Full Spectrum Lending Division.

25  A.  My responsibilities included supporting all of the other

1  groups, so the sales and production organization, the

2  underwriting and risk organization, so I had a supporting role.

3  Q.  If you take a look at the right side, the right most stack

4  of boxes, that's your name on the top, right?

5  A.  Yes.

6  Q.  Underneath you is Whitney Shelley.  Tell us what she did in

7  your organization.

8  A.  I hired Whitney Shelley to run the human resources

9  organization.

10 Q.  What is the human resources aspect of your job?

11 A.  That was all of the different functions within human

12 resources.  It included recruiting, staffing, it also included

13 training for the entire division and various other HR duties.

14 Q.  If you move down, the next box says Robert Phelps, EVP

15 technology.  Can you tell us a little about your oversight of

16 the technology group at FSL.

17 A.  Yeah.  Bob ran the technology group for all the

18 applications that Full Spectrum Lending Division used.

19 Countrywide was a technology company.  There was a lot of

20 technology, from everything from the sales organization to

21 processing to underwriting to CLUES for FSL.  There is a

22 virtual loan file, which was really an imaging system where you

23 could see the loan file electronically.  There was a lot of

24 applications.  We wrote business requirements.  We made changes

25 to those systems.  And we did user testing as well.

1           MR. MUKASEY:  Alex, can you give me page nine of this

2       exhibit, please.

3       Q.  Rebecca, in the course of your work as COO and overseeing

4       technology, did you become familiar with some of the

5       applications you mentioned?

6       A.  I did, yes.

7       Q.  Is another word for application "program"?

8       A.  Yeah, it could be a program I think.

9       Q.  Just quickly, tell us what the Edge system did at FSL.

10      A.  The Edge system housed all of the information from the

11      customer.  So the application data, everything that you needed

12      in order to really close that loan.  It also included the loan

13      closing documents.

14      Q.  If you skip down to virtual loan file system.  What is the

15      acronym they used for virtual loan file?

16      A.  That's VLF.

17      Q.  What is the VLF system and where is it located, who used

18      it?

19      A.  VLF was used by primarily processing, but also sometimes

20      underwriting, and certainly closing.

21           And the virtual loan file was a relatively new

22      application where, instead of having stacks of paper files,

23      those files actually were in the electronic system.  It wasn't

24      all automated at the time, and we were working towards that

25      automation, but that was the image system.

1           MR. MUKASEY:  Can you go to page 10, Alex, please.

2    Q.  The second bullet point references CLUES which we've heard

3    a lot about.  Just tell us from your technology perspective and

4    oversight a little bit about CLUES.

5    A.  Well, we made sure that CLUES was working every day

6    correctly.  We worked with the corporate team, Jack Schakett's

7    organization, to make sure CLUES was programmed correctly, that

8    it was tested, any changes to conditions, we made sure we

9    worked with the corporate team closely so that FSL had those

10   changes on a timely basis.  And that the users were trained in

11   any of the changes.

12   Q.  If we go back to page two of the chart.  Loren Rodriguez is

13   listed as the EVP of operations.  What did Loren do for the

14   organization?

15   A.  Loren was the head of project management.  And project

16   management was very important.  It really was focused on

17   solving the problems that we were experiencing or any changes

18   that happened across the division.  We supported those changes.

19          MS. NAWADAY:  Objection, your Honor.

20          THE COURT:  Overruled.

21   Q.  Were you finished?

22   A.  No, I wasn't quite.  So, any complex changes that included

23   technology, there is a lot of planning involved and timeline

24   tracking and other things we did in support of the entire

25   division.

DAF3BAN2                    Mairone - direct

1    Q.  Rebecca, between say February of '06 and October of 2007,

2    approximately how many people did you supervise in total?

3    A.  It was approximately 500 people.

4    Q.  After October 1, 2007, approximately how many people did

5    you supervise?

6    A.  It was approximately a couple thousand people.

7    Q.  I want to move left to right across the chart.  I'm sorry.

8    Right to left across the chart.  Pete Kucma, what position did

9    he have?

10   A.  He was the chief financial officer for the division.

11   Q.  At what level was he?

12   A.  He was a managing director and a peer of mine.

13   Q.  Were you a managing director?

14   A.  Yes, I was.

15   Q.  As we move to the next box.  Lloyd Sergeant.  Tell us how

16   you interacted with Lloyd Sergeant.

17   A.  Lloyd Sergeant was a colleague and a peer of mine, and I

18   supported the sales and production organization with projects

19   human resources within recruiting, primarily.

20   Q.  Did you consult with Lloyd Sergeant with regard to the

21   development of the High-Speed Swim Lane?

22   A.  Yes, I did.

23   Q.  How about with regard to Central Fulfillment?

24   A.  Yes.

25   Q.  Take a look at the next box.  Thank you.  Clifford

1    Kitashima.  How did your group interact with Mr. Kitashima's

2    group?

3    A.  My group also supported Cliff's group and projects, process

4    design, recruiting, staffing, and training.

5    Q.  Did you consult with Mr. Kitashima about the High-Speed

6    Swim Lane project?

7    A.  Yes, I did.

8    Q.  How about Central Fulfillment?

9    A.  Yes, absolutely.

10   Q.  And the last person I am going to ask you about is Scott

11   Bridges.

12   A.  Scott Bridges was a managing director who ran and was

13   responsible for production in the sales organization for the

14   division.

15   Q.  Did you consult with him on the High-Speed Swim Lane at

16   Central Fulfillment?

17   A.  Yes, I did.

18   Q.  Rebecca, how often did the managing directors meet amongst

19   themselves?

20   A.  We met formally once a week, but informally more often than

21   that.

22   Q.  Just give us a general sense of what kinds of issues the

23   managing directors talked about in their weekly meeting.

24   A.  We talked about production issues, customer issues, any

25   technology changes that happened to be going on, any project

DAF3BAN2                    Mairone - direct

1    issues, we certainly talked about employees and staffing quite

2    a bit as well.

3    Q.  Over all, how would you describe your relationship with

4    your fellow managing directors?

5    A.  It was a very open, direct, we did a lot of collaboration,

6    and that includes with Greg Lumsden as well.  We shared ideas,

7    we listened to each other, it was -- and it wasn't that we

8    agreed all the time, but it was that kind of open dialogue

9    always.

10   Q.  All the managing directors were located where?

11   A.  We were all in the same building in Pasadena.

12   Q.  The other people on this chart, I'm not going to go through

13   them, but did you have occasion to work with other people on

14   this chart?

15   A.  I have worked with every single person on this chart.

16   Q.  You worked on NCA, the new customer acquisition project, is

17   that right?

18   A.  Yes, I did.

19   Q.  Who were the people on this chart that you worked with on

20   NCA?

21   A.  I worked with every single person on this chart for NCA as

22   well.

23   Q.  Who were the people that you worked with on this chart on

24   the High-Speed Swim Lane?

25   A.  Everyone on this chart worked on High-Speed Swim Lane.

2477

DAF3BAN2                     Mairone - direct

1    Q.  Who on this chart did you work with for the Central

2    Fulfillment initiative?

3    A.  Everyone on this chart.

4    Q.  Rebecca, you heard the concept of loan quality at this

5    trial.  What did the concept of loan quality mean to you in

6    '06, '07, and '08?

7    A.  Loan quality was the foundation of what we did everyday.

8    You could not produce a loan without understanding the

9    requirements, following procedure and policy, and doing things

10   the right way.  That was the culture.  So every, every person

11   cared about quality.

12   Q.  Of all the people on this chart, who were the people whose

13   jobs concerned loan quality?

14   A.  They all concerned loan quality.

15           MR. MUKASEY:  Alex, could I ask you to show me 4001,

16   please.  DX 4001.  It is the page Bate stamped 1831.

17   Q.  Rebecca, you started working at FSL on which day in

18   February?

19   A.  February 26, 2006.

20   Q.  I am going to ask you to look at an e-mail dated March 2,

21   2006 from Ed O'Donnell to James White.  Bottom-right-hand side

22   of the page is Bate stamped 1831.

23           Do you have that, Rebecca?

24   A.  I do.

25   Q.  Can you read from the words "I think" for the next couple

1   of sentences.

2   A.   "I think we need to find a way to ensure that a few things

3   change with the way prime business is managed in the centers.

4   As you know, Greg's direction and our role change focus is that

5   prime deals are never touched by an underwriter."

6   Q.   You can skip now to the second paragraph on the next page.

7   1832.  Beginning with "as you know."

8   A.   "As you know, revenue on prime loans is significantly less

9   than subprime, as is the credit risk.  Therefore, it makes

10  sense to increase the management of the role change to reduce

11  underwriting involvement in prime CLUES accepts and prime CTCs.

12  Unless there is some issue with the file that requires more

13  expertise (complex income, etc.) we should increase the effort

14  to keep all activities for the prime accept loans away from

15  underwriters."

16  Q.   Those are whose words?

17  A.   I believe those are Ed O'Donnell's words.

18  Q.   Just give me one more sentence.  Not the next paragraph but

19  the paragraph that begins "18 miles away."

20  A.   "18 miles away in Plano we are growing a group of

21  processors that will handle all prime accepts for the NCA from

22  sub to funding."

23  Q.   Now, where did Ed O'Donnell work in 2006?

24  A.   Ed O'Donnell worked in the Richardson, Texas site.

25  Q.   Did you come to be familiar with the NCA group in Plano?

1    A.  Yes, I did.

2    Q.  Where was the other NCA group?

3    A.  The other NCA group was in Plano, Texas.

4    Q.  Was there an additional NCA group?

5    A.  Oh, there was an additional one in Richardson, Texas, I'm

6    sorry.

7    Q.  Tell us how it is that you became involved in the new

8    customer acquisition project.

9    A.  Greg Lumsden asked me to take that on as a project when I

10   first arrived.

11   Q.  Was that a permanent project or a temporary assignment?

12   A.  It was a temporary assignment.

13   Q.  How long did your involvement in the NCA project last?

14   A.  It lasted about nine months.

15   Q.  Did you start up NCA or was it in existence when you got

16   there?

17   A.  NCA was already in existence when I got there.

18   Q.  What was the goal of your work on the new customer

19   acquisition?

20   A.  My goal and my task was to pull together a working team so

21   we can take a look at both the sales and the marketing

22   organization, as well as the fulfillment and processing

23   organization.

24   Q.  What kinds of customers was NCA seeking?

25   A.  NCA was a new business unit for Countrywide, and they were

1   focused on attracting, through specialized marketing of TV and

2   radio and primarily -- and Internet, new high quality prime

3   customers that were not already Countrywide customers.

4   Q.  How did that differ from FSL's focus or marketing?

5   A.  FSL had been focused in the past on referrals from the CMD

6   division, which was their prime sister division, and also on

7   portfolios so they would market to current Countrywide

8   customers for potential refinance opportunities.

9   Q.  When you started working on NCA, can you tell us what kind

10  of work flow process there was in place at NCA.

11  A.  Well, there were two work flows, because we took one team

12  from the CMD division, and they had their own prime work flow,

13  and we had one team from Richardson, Texas which was an FSL

14  team.  And that had a prime CLUES accept work flow.  So two

15  different.

16  Q.  Let me back you up just for a second.  You said there was

17  one team in Plano and one team in Richardson, is that right?

18  A.  Yes.

19  Q.  What kind of work flow did they have in Plano?

20  A.  In Plano they had a prime work flow that included

21  processors signing off on conditions.

22  Q.  Were there underwriters involved in that work flow?

23  A.  No.

24  Q.  You said the other group was in Richardson.  What kind of

25  work flow did they have?

1   A.   The Richardson teams had a work flow called prime CLUES

2   accept.   That was used across FSL for prime loans.

3   Q.   Who cleared conditions in that work flow?

4   A.   The processor cleared some conditions, and the underwriter

5   cleared other conditions.

6   Q.   How long did NCA continue with one work flow in Plano and

7   one work flow in Richardson?

8   A.   Those work flows -- we combined those work flows in a few

9   months to one single work flow.

10  Q.   When you say "we," who were you working with?

11  A.   We were working with the project team which included Loren

12  Rodriguez, he helped manage the project, and also Cliff

13  Kitashima and Ed O'Donnell, amongst others.

14  Q.   Who was it who decided which work flow was going to be the

15  chosen one?

16  A.   We went through a rigorous review of both types of work

17  flows.   Both types of technologies what would be used.   And

18  ended up determining that the FSL prime CLUES accept work flow

19  was the best work flow to move toward.

20  Q.   Who had input into that decision?

21  A.   Cliff Kitashima and Ed O'Donnell.

22  Q.   When you were involved with NCA, were you getting quality

23  control reports on NCA loans?

24  A.   Yes.

25  Q.   Did you review those?

DAF3BAN2                    Mairone – direct

1   A.  Yes, I did.

2   Q.  How would you characterize the quality of the loans that

3   NCA was producing during your period there?

4   A.  The quality of loans was good.  It was within the

5   acceptable tolerance of all the QC reports.

6           MR. MUKASEY:  Alex, can you show me DX 73, please.

7   Q.  Do you have that, Rebecca?

8   A.  I'm looking for it.

9   Q.  It is in the back of the binder.

10  A.  Yes, I have it.

11  Q.  What were the quarters that you were involved in NCA?

12  A.  It was primarily the second quarter of 2006 and the third

13  quarter of 2006.

14          MR. MUKASEY:  Do you have that?

15          MS. NAWADAY:  I'm sorry, I don't have that.

16  Q.  Rebecca, you said the two quarters you were involved with

17  NCA were the second quarter of '06 and the third quarter of

18  '06?

19  A.  Yes.

20  Q.  So take a look at the FSL division down the left-hand side

21  of the column and to the shaded area that says division

22  response SUS percentage.

23  A.  Yes.

24  Q.  What was the division response SUS percentage in the second

25  quarter of '06?

1            MS. NAWADAY:  Objection, your Honor.

2            THE COURT:  Ground?

3            MS. NAWADAY:  Relevance.

4            THE COURT:  I don't see the relevance.  But if counsel

5   wants to make a showing at side bar.  I'll hear him.

6            MR. MUKASEY:  Absolutely.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. MUKASEY:  Judge, part of the government's theory

3     here is that Ms. Mairone took control of NCA.  NCA was, to

4     quote Ms. Nawaday, a train wreck when she took it over and

5     moved into the High-Speed Swim Lane.  The NCA served as a

6     precursor or model for a High-Speed Swim Lane, which

7     Ms. Mairone also took over, and what she's going to

8     characterize as similarly dysfunctional, and on to Central

9     Fulfillment.

10         If your Honor looks at the Rule 50 arguments that

11    Ms. Nawaday made, I believe the first sentence out of her mouth

12    was NCA was a train wreck under Ms. Mairone.  I'd like to show

13    that --

14         THE COURT:  Of course, the Rule 50 is not binding on

15    anyone because it is -- it's binding in some sense, but it

16    doesn't determine relevancy before the jury.

17         MR. MUKASEY:  Certainly.

18         THE COURT:  But I see your point, so let me hear from

19    you.

20         MS. NAWADAY:  Your Honor, my objection is based on we

21    have no sense of the scope of NCA at this point.  There has

22    been testimony that it began at CMD and it moved into FSL.  We

23    have no sense of the volume of NCA loans within each division.

24    We're not being shown NCA specific quality reports.  This

25    report pertains to each division as a whole.  So it is both

DAF3BAN2                    Mairone – direct

1    misleading and irrelevant.

2            MR. MUKASEY:  Wouldn't that go to weight rather than

3    admissibility?

4            THE COURT:  I think so.  But I'm not going to allow

5    much on this topic.

6            MR. MUKASEY:  I am going to read two numbers.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     Q.   Rebecca, what was the decision response SUS percentage for

3     the second quarter of '06?

4     A.   It was 0.3 percent.

5     Q.   What was it for the third quarter of '06?

6     A.   2.0 percent.

7     Q.   When was it that you moved on from your NCA assignment?

8     A.   It was in the fourth quarter of 2006.

9     Q.   What was the reason that you moved on from it?

10    A.   Because we really wanted to move on to other projects, and

11    the NCA, now that it was up and working well, was being

12    transitioned to the production and sales organization, which

13    was Lloyd Sergeant's organization.

14    Q.   Were you part of production and sales?

15    A.   No, I wasn't.

16    Q.   One last question on the NCA.  Was NCA the model for the

17    High-Speed Swim Lane?

18    A.   No.

19    Q.   Rebecca, between '06 and '07, did you come to be familiar

20    with the prime CLUES accept work flow at FSL?

21    A.   Yes, I did.

22    Q.   Did you ever have occasion during that time period to visit

23    FSL sales centers?

24    A.   Yes.

25    Q.   Did you ever have occasion to interview employees?

1  A.  Yes.  I actually sat with salespeople, processers,

2  underwriters and funders, so I could understand how they were

3  doing their job.

4  Q.  What about interviewing customers?

5  A.  Yes, I heard from customers as well.

6  Q.  So, I'd ask you to please take us through the steps, just

7  summary form, of a loan application file.  Where it starts,

8  where it ends, where it goes in between, under the prime CLUES

9  accept work flow.

10  A.  For the prime CLUES accept work, it really started with a

11  customer calling a call center primarily.  A salesperson called

12  an account executive who would pick up the phone and spend

13  about 45 minutes with a customer sort of walking them through

14  the basic information, name, address, Social Security number,

15  all the way through the completion of that sales application,

16  and then they ran a preliminary CLUES run.

17  Q.  What happened next?

18  A.  At that point, they actually virtually handed that off for

19  assignment to loan processing.

20  Q.  What do you mean by virtually handed that off?

21  A.  In the system Edge, they would transfer the loan

22  application into that Edge system.  And a loan processor would

23  be assigned, it could be generally in a different state or in a

24  different center, and usually it was about a two-day assignment

25  process.

DAF3BAN2                    Mairone - direct

1    Q.  What was the next step after that virtual hand off?

2    A.  After the loan processor got that, they would go through

3    the sales application again.  So they would go through the

4    data, they would make sure it was correct and it matched, and

5    they would rerun CLUES.

6    Q.  Next step?

7    A.  They would start to look at conditions.  And they would

8    submit those conditions in the information to an underwriter,

9    so virtually again assigning and requesting for an underwriter

10   to be assigned.

11   Q.  Would that underwriter be in the same location as the

12   processor or somewhere else?

13   A.  No, it was usually somewhere else.  It may be a different

14   building or a different state.

15   Q.  How did the loan processor go about getting the information

16   to this underwriter in another state?

17   A.  It was queued up in an underwriter assignment tool.  Then

18   an underwriter, next available underwriter with the right

19   authority would be assigned to that.

20   Q.  What does it mean to be queued up in an assignment queue?

21   A.  It mean that the application was completed by the loan

22   processor, and that's a specific step in the prime CLUES accept

23   work flow.  And an underwriting manager would have to assign

24   that to an underwriter for them to review that loan

25   application.

1   Q.  Carry us through the rest of the process.

2   A.  So the underwriter would again pull up the information,

3   they would look at the application, they may rerun CLUES, they

4   would make sure the income was correct.  And then they would

5   send it back to the loan processor.  If there was additional

6   questions, it might go back to the salesperson as well.  So an

7   underwriter was making that determination on where that went.

8   Q.  Rebecca, could you give us an idea of the physical location

9   or layout where the loan processors worked?

10  A.  The loan processors generally worked in large call centers,

11  so they had cubicles in a large call center.

12  Q.  What did they have in the cubicles?

13  A.  They would have their desk organized around customer loan

14  files.

15  Q.  How many loan files, ballpark, would a loan processor

16  handle?

17  A.  A loan processor might handle anywhere from 20 to 40 loans

18  at any given time.

19  Q.  About how many documents -- I don't know if you can answer

20  this.  But how many documents would there be in a typical loan

21  file?

22  A.  On average for a prime file, you might have 100 page, maybe

23  more.

24  Q.  Was their work confined to their cubicle area?

25  A.  No, it wasn't.

DAF3BAN2                    Mairone - direct

1   Q.  Where else did they have to go?

2   A.  There was a lot of printing involved.  So, they were up and

3   down to the printer a lot.  And they were also up and down to

4   the fax machine a lot.

5   Q.  Faxing things where?

6   A.  They primarily faxed things to themselves.

7   Q.  Why did they have to fax things to themselves?

8   A.  I know that sounds a little crazy.  With the virtual loan

9   file, in order to get a customer document or one of the manual

10  checklists into this electronic file, they would fax it to

11  their desktops so they could get that in an image.  They would

12  take that image and then put that into the virtual loan file,

13  attach it.

14  Q.  In this process you've just described, who was the

15  customer's point of contact?

16  A.  The customer really didn't have a point of contact.

17  Q.  Why was that?

18  A.  Because there was no one really that owned the customer.

19  The salesperson talked to the customer, the loan processor also

20  talked to the customer.  A manager might talk to the customer.

21  And even an underwriter at times might talk to a customer.  So

22  it was confusing for the customer.

23  Q.  Did there come a time when FSL management decided to review

24  this process for prime loans?

25  A.  Yes, there was.

1   Q.  Directing your attention to May of 2007.  Did there come a

2   time when you attended a meeting at the Westin Hotel in

3   Pasadena?

4   A.  Yes.

5   Q.  Who else was at that meeting?

6   A.  It was the entire Full Spectrum Lending Division management

7   team.  All the managing directors, and a lot of the executive

8   vice presidents were there, and all of the regional vice

9   presidents from sales were there as well.

10  Q.  Was anything discussed at all about this prime loan

11  processing process?

12  A.  Yes.  The primary conversation was the prime CLUES accept

13  process as it stood at that time.

14          MR. MUKASEY:  Alex, can you give me 157, please.  Page

15  21.

16  Q.  Do you have that in your binder?

17  A.  I'm sorry, what number?

18  Q.  DX 157, page 21.  Do you recognize this presentation that's

19  in evidence as 157, Rebecca?

20  A.  Yes, I do.

21  Q.  Did you attend this presentation at the Westin?

22  A.  I did.

23  Q.  Who gave this presentation at the Westin?

24  A.  This was Ed O'Donnell.

25  Q.  Mr. O'Donnell's presentation says on page 21 "Prime sales

1    process."  The first entry is "Prime loans need low touch, low

2    cost processing."

3            At the time you heard that, did you agree with it?

4    A.  Yes, I did.

5    Q.  Next bullet says "Prime borrowers require faster TT."

6    That's turn time, right?

7    A.  Yes.

8    Q.  "To keep them from going elsewhere."  Did you agree with

9    that?

10   A.  Yes.

11   Q.  Why did you agree with that?

12   A.  Because the refinances at the current time in the division

13   were taking far longer than they needed to.  There was a lot of

14   unnecessary delays in the process, and borrowers were

15   complaining.

16   Q.  The fourth bullet says "Level two and PCA authority is

17   critical."  Did you agree with that?

18   A.  Yes.

19   Q.  Tell us why.

20   A.  Because for the high quality low risk loans, the prime

21   loans that we're talking about here, we needed to have more

22   authority for those sign offs and those underwriting

23   conditions.

24   Q.  What was the reason you thought you needed to have more

25   authority?

1    A.  Because prime business was growing.

2    Q.  As you left this Westin meeting, what kind of marching

3    orders did you have?

4    A.  We had marching orders to create a process -- a project

5    team.

6    Q.  Who gave you those orders?

7    A.  Greg Lumsden.

8    Q.  Did there come a time when the team was formed?

9    A.  Yes.

10   Q.  What was the goal of the project team?

11   A.  The goal of the team was to create a much better prime

12   process for our highest quality, lowest risk customers.

13   Q.  Was it a goal of the team to create a process that would

14   sell bad loans to Fannie or Freddie?

15            MS. NAWADAY:  Objection.

16            THE COURT:  Sustained.

17            MR. MUKASEY:  Let's go to DX 365, please.  Alex, can

18   we go to page 24.  And zoom in on the -- there you go.

19   Q.  Rebecca, is this box at the top of the page a team that you

20   were referring to?

21   A.  Yes, this is the executive team.

22   Q.  Your name is located in two spots on this chart.  Directing

23   your attention to the middle of the chart, left-hand side.  You

24   are both executive oversight and executive sponsor.

25            Can you explain the different roles that you played in

1   each of those positions.

2   A.  Sure.  Executive oversight was I was part of the FSL

3   management team that would be part of the decision making,

4   depending on your function and subject.

5           On the executive sponsor, which is in that orange box,

6   I ran project management and process design.  So related to

7   those two areas of this project, I was leading that.

8   Q.  Who asked you to lead it?

9   A.  Greg Lumsden asked me to lead that.

10  Q.  In leading both the project and being a member of executive

11  oversight, was it your goal to create a process that would sell

12  bad loans to government entities?

13  A.  No.

14  Q.  With respect to the executive members, Rebecca, at the top

15  of the page, which member, if any, had authority, if you will,

16  ultimate authority, over the group?

17  A.  None of the executive oversight had ultimate authority over

18  decisions.

19          MR. MUKASEY:  Alex, if you can give us DX 4014, the

20  second page.

21  Q.  This is a prime High-Speed Swim Lane review dated July 26,

22  2007.  Rebecca, you see the second page refers to a design

23  session held on July 19.  Were you at that design session?

24  A.  Yes, I was.

25  Q.  Quickly read off for us who else was there with you.

DAF3BAN2                        Mairone - direct

1  A.  Lloyd, Cliff, Loren, Cheri, Jim K, Ed, Rick Lang, Jim M,

2  Patrick A, Anson, Chris Baumer, Mark facilitating.

3  Q.  Who was Mark?

4  A.  That was Mark Barnett.

5  Q.  This PowerPoint is called High-Speed Swim Lane design

6  review.  Had you ever had heard the term swim lane before this

7  meeting?

8  A.  Yes.

9  Q.  When did you first hear it?

10  A.  I first heard it when I was a process engineer in FMC

11  Corporation.

12  Q.  In what process?

13  A.  We used a process map basically for everything related to

14  the chemical flow.  So, for example, it might be hydrogen

15  peroxide goes through the heating element, it goes through

16  distillation and it goes through dryers to extract metals.  And

17  those three groups would be called swim lanes.

18  Q.  Who came up with the term "swim lane" for the process you

19  were all designing in 2007?

20  A.  Mark Barnett.

21  Q.  Take a look at page three of 4014.  You see the diagram

22  we've seen a couple times.  Do you have it?

23  A.  Yes.

24  Q.  Who drew that up?

25  A.  That's a Mark Barnett design.

1  Q.  And the next page has a bunch of design principles.  Who

2  participated in coming up with these design principles?

3  A.  Collectively the work team and the executive team worked

4  together.

5  Q.  Were you part of that?

6  A.  Yes, I was.

7  Q.  The first principle is "loans move forward, never

8  backwards."  What did that mean?

9  A.  That meant if, for our highest prime customers, lowest

10  risk, if they continued to send all their information and there

11  were no changes, that it would close on the High-Speed Swim

12  Lane without any unnecessary delays.

13  Q.  What would cause a loan not to move forward?

14  A.  An example might be a change in income, that an income was

15  reduced.  So that now I went from a prime CLUES accept to a

16  refer.  That would be moved off of the swim lane, and assigned

17  to someone who could handle that.

18  Q.  In your mind, in July of 2007, would loans moving forward

19  and never backward lead to the production of poor quality

20  loans?

21  A.  No.

22  Q.  Why not?

23  A.  I just take an example of myself.  If I was making a loan

24  application for a refinance, and I submitted all my documents

25  and I was correct in those documents.  That I shouldn't have to

1    wait behind someone who either wasn't submitting their

2    documents or didn't order their appraisal on time.  I'd like to

3    close as fast as I can.  So from a customer perspective, I

4    thought it was also a very important design.

5    Q.  Take a look at the fourth bullet which is "minimize hand

6    offs."  Tell us what you and the design team meant by

7    minimizing hand offs.

8              MS. NAWADAY:  Objection.

9    Q.  Tell us what you meant by minimizing hand offs.

10   A.  I meant reducing from the prime CLUES accept work flow that

11   we talked about where loan processing goes back to underwriting

12   back to loan processing, and all the various days that that

13   causes delays for the customer.  I wanted that to be removed so

14   we wanted to really minimize that type of delay.

15   Q.  What, if any, affect would the minimization of hand offs

16   have on loan quality?

17   A.  We thought it would improve loan quality.

18   Q.  Why?

19   A.  Because whenever you hand something off, one, you have a

20   lack of ownership.  And two, it causes confusion and more

21   difficult processing of that loan.

22   Q.  I want to go to the next bullet point which says "CLUES is

23   the underwriter."  What did you intend to convey with that

24   bullet point, Rebecca?

25   A.  That for prime CLUES accept, and for prime CLUES refers,

1  those decisions come from CLUES.  So CLUES was the tool that we

2  used, not only to input the application data into, but also,

3  there was risk models built into that.  So the risk model one

4  through five, one being the lowest, was all assessed by CLUES.

5  Additionally, CLUES had built in the requirements for the

6  investors and the GSE, thousands of pages, so it was very

7  sophisticated math as I recall it.

8  Q.  Were you concerned that CLUES being the underwriter would

9  compromise loan quality?

10  A.  No.  I thought it would help loan quality.

11  Q.  Explain why.

12  A.  Because it was doing the math on very sophisticated

13  calculations that it would be very, very difficult for a human

14  being to do.  So the fact that CLUES was programmed with

15  thousands of pages of requirements, with very sophisticated

16  risk models, and with inputs from third parties like the credit

17  reports, appraisal reports, all the other things that you would

18  have to look at to assess risk and whether a customer was

19  eligible for a program, CLUES did that work.  They did the

20  heavy lifting.

21  Q.  How, if at all, would human beings be involved if CLUES was

22  the underwriter?

23  A.  Well, human beings are also very important in this process.

24  But they're not performing those calculations.

25  Q.  What are they doing?

1    A.  They're actually checking and inputting the data that CLUES

2    needs in order to run their models.

3    Q.  Let me break that down a little bit.  Have you --

4    withdrawn.

5          Who makes the first CLUES entry, the entry of data in

6    CLUES?

7    A.  That would be the salesperson, the account executive.

8    Q.  You've heard the term garbage in garbage out?

9    A.  Yes.

10   Q.  Who checked that garbage didn't go into CLUES?

11   A.  Well, it was very important that the sales work was

12   checked.  There were a lot of salespeople, and so we put in a

13   process called desking.  100 percent of the loans needed to be

14   desked by the sales manager.  What desking means is that every

15   input to CLUES from the loan application was checked by a

16   manager and validated before it was assigned to a loan

17   processor.

18   Q.  If CLUES is the underwriter, who actually communicates with

19   a customer?

20   A.  A person would communicate with a customer.

21   Q.  By the way, who performs desking?

22   A.  Desking was a sales manager.

23   Q.  Who acts as a funder?  Would that be a computer or a

24   person?

25   A.  That would be a person too.  The funder is also a person

DAF3BAN2                    Mairone - direct

1    that sets up the closing, draws the closing docs, and makes

2    sure that the scheduled appointment is made.

3    Q.  Who clears conditions to close?

4    A.  That would be a loan processor or an underwriter.

5    Q.  Not a computer?

6    A.  Not a computer, no.

7    Q.  Who acts as a point of contact under the High-Speed Swim

8    Lane that you all were designing for the customer?

9    A.  The salesperson or the loan specialist in this case.

10   Q.  As of July 2007, did you believe that using CLUES as the

11   underwriter supported by humans in the capacities you just

12   talked about would result in the production of poor quality

13   loans?

14   A.  No.  Not at all.

15   Q.  Rebecca, in mid 2007, did there come a time when you were

16   involved in discussions that related to compensation plans --

17            THE COURT:  Counsel, I sense you're about to go on to

18   a different topic.  Why don't we give the jury their midmorning

19   break at this time.

20            (Jury excused)

21            THE COURT:  Anything counsel needs to raise?  We'll

22   see you in 15 minutes.

23            (Recess)

24            (Continued on next page)

25

1          (Jury present)

2          THE COURT:  Counsel.

3     BY MR. MUKASEY:

4     Q.  Rebecca, in your capacity as head of human resources at

5     FSL, did you become familiar with something called a Quality of

6     Grade measurement?

7     A.  Yes, I did.

8     Q.  Tell us -- remind us what the QoG is.

9     A.  The QoG was a report that was used to track underwriting

10    performance related to QC errors, so SUSs.  So SUSs would be

11    assigned at the either underwriter or loan specialist level and

12    then those would roll up at the end of the quarter.

13    Q.  And what was the impact of a QoG finding or QoG

14    determination as to an individual employee?

15    A.  The impact would assess whether or not they were performing

16    well on the quality following the quality requirements.

17    Q.  And if you performed well, what would happen?

18    A.  You would have -- related to comp, you would have a little

19    bit more in your bonus pay out.

20    Q.  And if you performed poorly, what would happen?

21    A.  Then you would -- part of your bonus would be taken away.

22    Q.  Now what is a QoG reprieve or QoG suspension?

23    A.  That's when the QoG actually comes out of the comp plan for

24    a short period of time.

25    Q.  In other words, it doesn't apply?

1    A.  It doesn't apply, correct.

2    Q.  Now separate and apart from the HSSL or Central

3    Fulfillment, can you give us an example of a time when the QoG

4    would be suspended?

5    A.  For new employees when they come in and they're learning

6    their job, then there would be time for them to actually learn

7    and practice before that would apply to their compensation.

8    Q.  What was the reason that the QoG would be lifted or

9    suspended for a new employee?

10              MS. NAWADAY:  Objection.

11              THE COURT:  Ground?

12              MS. NAWADAY:  Foundation, and speculation.

13              THE COURT:  Lay a foundation.

14   Q.  In your capacity as head of human resources, did you

15   come -- become familiar with various compensation plans and

16   initiatives?

17   A.  Yes.

18   Q.  And did you become familiar with those for all FSL

19   employees?

20   A.  Yes, I did.

21   Q.  Would that include new employees as well as current

22   employees?

23   A.  Yes.

24   Q.  Tell us what you did to become familiar with in particular

25   the QoG measure.  How did you get to know about it?

DAFTBAN3                           Mairone - direct

1    A.  I reviewed that as part of the compensation plan, and I

2    reviewed that with Cliff Kitashima and Ed O'Donnell's groups.

3    Q.  Now with respect to new employees, you said sometimes there

4    would be a QoG suspension.  What's the reason that you did

5    that?

6    A.  It's the fair thing to do to allow a new employee time to

7    actually learn their job and practice their job before you

8    impacted their compensation.

9    Q.  Now was a QoG suspension put in place for the High-Speed

10   Swim Lane?

11   A.  Yes.

12   Q.  And did you have input into that?

13   A.  I did.

14   Q.  With respect to your input, was the QoG suspension part of

15   a plan to deceive Fannie Mae or Freddie Mac?

16   A.  No.

17   Q.  Tell us how the QoG suspension came to be put in place for

18   the swim lane.

19   A.  For the High-Speed Swim Lane there were employees taking on

20   new assignments and new roles.  They had to be trained and they

21   had to practice those skills.  So it's determined the fair

22   thing to do was like a new employee, that because they were

23   taking on a new role we would allow a short suspension for them

24   to come up to speed with their new functions.

25   Q.  You mentioned you had input into that, is that right?

DAFTBAN3                        Mairone - direct

 1   A.  Yes.

 2   Q.  Who else had input into that?

 3   A.  Cliff Kitashima and Ed O'Donnell.

 4   Q.  Can you take a look at DX8, please.  And we're going to go

 5   to the third page in.  It's an email from Rebecca to Loren

 6   Rodriguez, among others.  And that's dated July 20, '07.

 7            Rebecca, could you read your words beginning with, "I

 8   thought."

 9   A.  I thought the work flow fast swim lane meeting was good

10   yesterday.  I wanted to give you a couple of suggestions from

11   my notes.

12   Q.  Now go to number one, QoG.  Could you read that and the

13   next sentence?

14   A.  QoG suspension, all PCAs for 90 days or water down the

15   impact for document collection/compliance in order to get us

16   moving faster and not afraid of mistakes.

17   Q.  What did you mean there?

18   A.  What I meant was I was supporting, in order to be fair and

19   allow these -- there were about twelve individuals in the

20   High-Speed Swim Lane pilot, to come up to speed, I was

21   supporting a suspension for a 90 days for the QoG component of

22   the comp plan.

23   Q.  After sending this email to, among others, Cliff Kitashima

24   and Ed O'Donnell, what did you get back?

25   A.  I have their comments back.

1   Q.  And are their comments noted in blue?

2   A.  Yes, they are.

3   Q.  And if you flip to the previous page, page 2, is it your

4   understanding they consolidated their response into one

5   response?

6   A.  Yes, Ed responded for both Ed and Cliff.

7   Q.  What did he say on page 3?

8   A.  I am OK with the suspension for 90 days for certain

9   elements of the QoG.  We should keep those tied to key areas

10  such as responsible lending, fraud, affordability and

11  collateral.

12  Q.  Were those recommendations of Ed O'Donnell's being OK with

13  suspended for 90 days and keeping those tied to the key areas

14  he mentioned, were those followed?

15  A.  Yes, they were.

16  Q.  Rebecca, I'm going to ask you to take a look at PX20 now,

17  which should be the next document in your binder.

18          When FSL moved to Central Fulfillment, was the QoG

19  reprieve expanded to apply to anybody other than the twelve

20  people that were participating in the swim lane pilot?

21  A.  Yes.

22  Q.  And who else was it expanded to?

23  A.  It was expanded to all underwriting groups and funding

24  groups and others in FSL.

25  Q.  And were you involved in part of that decision?

DAFTBAN3                        Mairone - direct

1    A.  I supported that decision.

2    Q.  Are you aware of how the decision was arrived at?

3    A.  Yes.

4    Q.  And how was the decision to extend the QoG suspension more

5    broadly, how was that arrived at?

6    A.  It was the same concept as we talked about in the

7    High-Speed Swim Lane.  For Centralized Fulfillment specifically

8    we were having a lot of people assume new roles and

9    responsibilities.  There was a significant amount of training

10   involved in that, and they needed to practice their new skills

11   that they were just learning.

12   Q.  If an employee learning a new process made a mistake while

13   there was a QoG application in place, what would have happened

14   to their comp?

15   A.  It would have been impacted negatively.

16   Q.  And what was your intention, in July of 2007 and then to

17   the extension period, what was your intention in supporting the

18   QoG reprieve?

19   A.  It was really to be fair to employees.  And we asked them

20   to take on new roles and responsibilities, they agreed to that,

21   but there was a significant amount of training.  So we wanted

22   to give them sort of time to come up to speed with that.

23   Q.  Is there an example of the kind of mistake that you could

24   give us that you would not want to penalize somebody learning a

25   new process for?

1    A.  Well, it would have been a procedural mistake.

2    Q.  Do you have an example?

3    A.  For example, yes, so maybe they forgot to put an income doc

4    in a virtual loan file; they have a W-2 pay stub and they have

5    it but they forgot to upload it to the VLF system.

6    Q.  Now let's take a look at PX20, which is an email from you

7    throughout Countrywide -- sorry, throughout Full Spectrum

8    Lending.  Can you read the first paragraph, please.

9    A.  We understand many of our employees are in new roles, have

10   new responsibilities, and are learning new skills.  We want you

11   to feel confident and excited about these new opportunities.

12   If you have recently earned a new level of lending authority,

13   you recently began completing compliance reviews, or you are

14   now signing off on conditions, we want you to know that each

15   FSL employee will have a QoG reprieve on all funded units

16   completed through 12/31/07.  This will be in effect for

17   funders, underwriters, validators and lending specialists and

18   any other FSL employee who is monitored and scored using QoG.

19   In other words, your compensation will not be adversely

20   affected on any loans funded on or by the last day of 12/31/07.

21   Q.  Now go to the third paragraph and start with the words,

22   "This does not."

23   A.  This does not mean that we should not be prudent and

24   protect the compliance and quality standards of the company,

25   but we do want you to feel less of a need to double and triple

1    check your work.  We also want you to comfortably adapt to

2    using many of the former required checklists and worksheets as

3    job aids like our other prime divisions of Countrywide.  If we

4    remove a checklist as a requirement in writing, you should not

5    upload it to VLF and only complete it if you feel it is

6    necessary at this point in your development.

7    Q.  Now who else participated, other than you, in the decision

8    to extend or expand, I should say, this QoG reprieve?

9    A.  That would be Ed O'Donnell and Cliff Kitashima.

10   Q.  Were there any people among the management team that voiced

11   disagreement about the extension?

12   A.  No, no one.

13   Q.  What was your view in the fall of '07 as to whether a QoG

14   suspension would have a negative impact on loan quality?

15   A.  I didn't believe it would have a negative impact.

16   Q.  Why not?

17   A.  Because we had several other controls in place and

18   monitoring.

19   Q.  Controls to do what?

20   A.  To make sure that things like fraud did not happen while

21   the QoG was being suspended.

22   Q.  What were those controls that you had in place?

23   A.  There was a whole fraud group that managed every loan and

24   looked behind the scenes of the data to ensure that fraud

25   wasn't being done.  In the cases where fraud was detected,

DAFTBAN3                         Mairone - direct

1    those employees would be disciplined up to and including

2    termination, and if it wasn't a termination, they certainly

3    would potentially have their lending authority revoked.

4    Q.  Was there an ethics policy in place at FSL when you were

5    there?

6    A.  There was.

7    Q.  Were you familiar with it?

8    A.  Yes, in my human resources capacity.

9    Q.  Was the ethics policy suspended during the QoG reprieve?

10   A.  No, it wasn't.

11   Q.  It remained applicable?

12   A.  Yes, and the assigned code of conduct as well.

13   Q.  I want to turn to the turn time modifier aspect of

14   compensation.  Could we take a look at PX31.  I'm not going to

15   do you read from it, but just for the record, it is an

16   August 1, 2007 document talking about a turn time modifier.

17          Rebecca, are you familiar with the concept of a turn

18   time modifier?

19   A.  Yes.

20   Q.  How did you get familiar with that?

21   A.  In my human resources capacity primarily.

22   Q.  Remind us what a turn time modifier is.

23   A.  A turn time modifier is a part of the bonus plan where if

24   you meet objectives on turn time or do better, you get a little

25   extra pay in your bonus.  And if you do worse than what the

DAFTBAN3                     Mairone - direct

1    average is, then you get a little deduction in your bonus pay

2    out for the month.

3    Q.  When you got to FSL in '06 were there turn time modifiers

4    in place?

5    A.  Yes, everyone had a turn time modifier.

6    Q.  Were loan specialists of level one eligible for a turn time

7    modifier in 2007?

8    A.  Yes, they were.

9    Q.  And are you familiar, based on your human resources work,

10   with how much -- the amount of the turn time modifier for a

11   loan specialist level one in 2007 or '8?

12   A.  Yes, I am.

13   Q.  What is the amount of the turn time modifier for a person

14   in that position?

15   A.  The maximum turn time modifier pay out would be adjusted by

16   $30 either positive or negative.

17   Q.  Now whose decision was it to apply a turn time modifier to

18   the High-Speed Swim Lane?

19   A.  I supported that decision.  It was the executive team and

20   Greg Lumsden as well.

21   Q.  And what was your intention in supporting the turn time

22   modifier for the High-Speed Swim Lane employees?

23   A.  I thought it was the right thing to do given that we had

24   new goals and objectives around the prime high-quality

25   customer, and it was one way to communicate and monitor that.

1    Q.  In your mind, in 2007 and 2008, was a turn time modifier

2    going to compromise loan quality?

3    A.  No.

4    Q.  Explain why you didn't think so.

5    A.  The controls that I talked about previously around the

6    Quality of Grade suspension were the same controls that we

7    used, and we actually had additional controls to monitor the

8    pipeline on a daily basis.

9    Q.  What were the additional controls?

10   A.  There was the sim control and pipeline manager was a new

11   application where the supervisors reviewed every single day the

12   loans, how fast they were going, that all the requirements were

13   checked off.  In addition to that, we had supervisory reviews,

14   so each supervisor was required for each of their team members

15   to pull a number of loans a day and review those loans as well.

16   Q.  Did application of the turn time modifier negate the ethics

17   policy of the company?

18           MS. NAWADAY:  Objection, your Honor.

19           THE COURT:  Sustained.

20   Q.  How, if at all, was your company's ethics policy affected

21   in light of the turn time modifier?

22   A.  There was no change to the ethics policy.

23   Q.  Was it your intention, Ms. Mairone, in supporting a turn

24   time modifier to deceive or mislead Fannie Mae or Freddie Mac?

25   A.  No.

DAFTBAN3                        Mairone - direct

1   Q.  Are you familiar with the concept of a production

2   incentive?

3   A.  Yes, I am.

4   Q.  How did you get familiar with the concept of a production

5   incentive at FSL?

6   A.  In my human resources capacity I reviewed the draft

7   production incentives.

8   Q.  What is a production incentive?

9   A.  It's a goal that is set at the division level for funding

10  and production volumes for the whole division.

11  Q.  Who was a production incentive available to?

12  A.  It was available to everyone in Full Spectrum Lending

13  division that had a bonus pay out.

14  Q.  Would that include people beyond those assigned to the

15  High-Speed Swim Lane?

16  A.  Yes, it would.

17  Q.  Take a look at PX266, please.  That's an email from Ed

18  O'Donnell on August 1, 2007, to FSL underwriting and a bunch of

19  other executives, including yourself.  Do you see that?

20  A.  Yes, I do.

21  Q.  What did you have to do with the preparation of PX266?

22  A.  I didn't really have anything to do with this one.

23  Q.  Have you reviewed this before you came to court?

24  A.  I just in my preparation only.

25  Q.  Did this email have anything to do with the High-Speed Swim

DAFTBAN3                    Mairone – direct

1   Lane?

2   A.  No, it didn't.

3   Q.  Take a look at the first paragraph and read the last

4   sentence into the record, please.

5   A.  It's essential that we take significant and immediate steps

6   to grow our total volume, improve our prime application to

7   funding ratio, and reduce our costs per loan.

8   Q.  And the next sentence?

9   A.  We must have all employees focused on delivering immediate

10  improvement to our prime application flow throughs, turn time,

11  and total funded loan volume.

12  Q.  Whose words are those?

13  A.  Ed O'Donnell.

14  Q.  If could you read the next paragraph.

15  A.  To that end, we will be introducing updated work flows

16  designed to move loans through the pipeline rapidly in early

17  August.  The focus will be on eliminating unnecessary delays or

18  subprime process steps for prime applications.  In many ways,

19  we continue to manufacture prime loans by sending them through

20  a work flow originally built for subprime.  This adds cost and

21  time which negatively impact our flow throughs of applications

22  to funding and allow competitors to steal loans that languish

23  in the pipeline.

24  Q.  And I'm only going to burden you with one last sentence, in

25  the fourth paragraph, the third sentence beginning with, "In

1    addition to the wrappers."

2    A.  In addition to the wrappers outlined below, we will also be

3    suspending QoG hits on prime loans for the next two months for

4    all monthly incentive plans.

5    Q.  Please take a look at PX52, the next document in your

6    binder, and let's start on page 2, which is an email from Ed

7    O'Donnell on August 3rd, 2007 to yourself, copied to Cliff

8    Kitashima.  Do you have that?

9    A.  Yes.

10   Q.  And to move this along, Ed O'Donnell's email refers to a

11   conversation that he had yesterday morning and the fact that he

12   wanted to provide you with feedback.  Do you see that?

13   A.  Yes.

14   Q.  And he lists the feedback that he's gathered, if you see

15   that in the subsequent paragraphs.  Go to the paragraph marked

16   quality.  Does the freeze of QoG and request to move loans mean

17   we no longer care about quality?

18           Do you see that?

19   A.  Yes, I do.

20   Q.  Go to the next paragraph.  The first entry or the first

21   sentence:  Many questions surround the fact that only Central

22   Service has been given value goals that determined bonus pay

23   out.

24           Do you see that?

25   A.  Yes, I do.

1   Q.  Stability is the last one I'm going to focus you on, third

2   paragraph and the third sentence:  Will Bank of America or

3   someone else buy us since our stock is so low?

4            Do you see that?

5   A.  Yes, I do.

6   Q.  Now these concerns are the concerns of whom?

7   A.  They're the concerns of Ed O'Donnell's staff, the

8   underwriters and the funders, I believe.

9   Q.  And those were forwarded to you, correct?

10  A.  Yes, they were.

11  Q.  Now let's go to the first page of PX52, and I want you to

12  read your response and explain, starting with, "Ed, great

13  questions from the group."

14  A.  Ed, great questions from the group.  I do agree everyone

15  needs to be on the plan, but the sales group, due to the

16  variable nature of their overall comp plan, will likely not be

17  modified with the new goals.  With that said, the more they

18  fund, the better anyway.

19  Q.  What did you mean by that?  What was your intention of

20  conveying that to Ed O'Donnell?

21  A.  There was some questions in the back about how the comp

22  plan would apply, and my intent here was to communicate that

23  from a sales perspective they're already on a production plan,

24  they already get paid for volume, so my opinion was I didn't

25  believe they should be paid again for volume.

DAFTBAN3                    Mairone - direct

1   Q.  Whose decision was it to pay them for volume?

2   A.  It was Lloyd Sargeant's.

3   Q.  Now the next sentence or the next paragraph:  Do you think

4   a global conference call to address the questions and motivate

5   towards 3.1D would be beneficial?

6        I'm going to ask you to skip that one and go to the

7   third one:  Changing behavior to fund more loans may result in

8   short-term mistakes, and I think it makes sense as long as we

9   follow good communication and process.

10  Q.  What was in your mind when you wrote that to Ed O'Donnell?

11  A.  What was going through my mind was we were going through

12  some fairly big changes, people were taking on new roles, that

13  you can't do that without communicating effectively.  In fact,

14  I call that overcommunicating, it is really, really important,

15  especially in an environment of change externally that was

16  going on as well.

17  Q.  The last sentence of your email says:  So it sounds like it

18  may work, is that what I'm hearing?  With a question mark at

19  the end.  What did you mean when you said:  So it sounds like

20  it may work?  He forwarded you all these concerns and you said

21  it sounds like it may work.  What did you mean?

22  A.  What I meant is I read through all the questions in detail,

23  and a lot of the questions were not directly applicable to the

24  process, but those that were I think we had answers for.  So

25  putting those answers in a format, maybe setting up another

1    conference call, and certainly effectively communicating

2    responses to those answers across these groups was good.  But I

3    wanted to make sure he agreed with that, so I asked for his

4    input and I also asked for his boss's input, which was Cliff

5    Kitashima.

6    Q.  And so when you said, "Is that what I'm hearing," was that

7    asking for his input?

8    A.  Yes, it was.

9    Q.  And you forward this email to Greg Lumsden.  What was the

10   reason you did that?

11   A.  Well, I wanted Greg to be able to see some of these

12   questions, because the questions included things about Dave

13   Sambol, who was a company president, it included things about

14   Bank of America, it included things about the external

15   environment, and there was an awful lot of things going on at

16   the time at Countrywide.  So I wanted Greg to see that on the

17   front line employees were worried, and not only did we need to

18   communicate about the changes with Central Fulfillment or the

19   High-Speed Swim Lane, but we also needed to communicate more

20   broadly and strategically to the employees.

21   Q.  Why did you forward the email to Greg Lumsden

22   confidentially, as it says in the first word?

23   A.  I wanted to have a conversation with him.  We didn't end up

24   having a conversation on this particular day, but I thought it

25   was best that we really sit down and talk about these questions

1    because some of them were very significant and it would have

2    some significant impacts on how we communicated to the staff.

3    Q.  Rebecca, in August of '07 or at any time, was giving a

4    production incentive part of a plan of yours to manufacture bad

5    loans and sell them to the GSEs?

6    A.  No.

7    Q.  Rebecca, when did the High-Speed Swim Lane pilot testing

8    start?

9    A.  On or around the middle of August 2007.

10   Q.  What's the reason that you run a pilot test before you roll

11   something out?

12   A.  Well, we ran pilots so we could test the process, test the

13   design, make sure people have been through the training and

14   understand it and understand any unintended consequences of

15   that change that we might need to address quickly.

16   Q.  Did there come a time when your steering committee or your

17   executive group discussed the kinds of loans that would be

18   eligible for the pilot program?

19   A.  Yes, there was.

20   Q.  And what kinds of loans were going to be eligible for the

21   swim lane pilot?

22   A.  Well, for the pilot the highest quality, lowest risk loans

23   that were prime were really focused as part of the pilot.

24   Q.  We heard something about stated income loans since you have

25   been here.  Were stated income loans going to be eligible for

DAFTBAN3                    Mairone - direct

1    the pilot?

2    A.  As long as they met the parameters of high quality and low

3    risk, yes.

4    Q.  And you also -- well, let me take a step back.  Based on

5    your experience in the industry, do you know the difference

6    between a purchase loan and refinancing?

7    A.  Yes, I do.

8    Q.  What is the difference between a purchase loan and a refi?

9    A.  A refinance means that we already know how the customer

10   pays, that the customer has been paying successfully.  We know

11   a lot more information about that customer.

12   Q.  Why do you know that on a refinance?

13   A.  Because we have the data and it's on the credit reports.

14   Q.  Is a refinance customer already holding a mortgage?

15   A.  Yes, they are already holding a mortgage and they're making

16   a monthly payment.

17   Q.  OK.  And how about a purchase loan?

18   A.  On a purchase loan it could be a new property, it could be

19   a first-time home buyer.  These are more difficult and

20   slightly -- can be slightly more risky loans, and there's

21   different steps in a purchase money loan when somebody is

22   buying new property like inspections and other things that

23   might not be -- that are not applicable to a refinance.

24   Q.  You said that a purchase loan might be more risky.  Tell us

25   why.

DAFTBAN3                          Mairone - direct

1    A.  Because we may not have a history of making a mortgage

2    payment on that borrower.

3    Q.  Now who all took part in the discussions about which loans

4    would be eligible in the swim lane pilot?

5    A.  It was the executive committee, myself, Ed O'Donnell, Cliff

6    Kitashima, Lloyd and others.

7    Q.  What did Ed O'Donnell express to you regarding the types of

8    loans that he thought should be eligible for the swim lane?

9              MS. NAWADAY:  Objection.

10             THE COURT:  Sustained.

11             MR. MUKASEY:  May I approach, Judge?

12             THE COURT:  Sure.

13             MR. MUKASEY:  Thanks.

14             THE COURT:  The problem is one of form.

15             MR. MUKASEY:  Then I don't think I need to approach.

16             THE COURT:  This a conversation.  You need to bring

17   out when, who with, where it occurred, et cetera.

18             MR. MUKASEY:  Thank you, Judge.

19   BY MR. MUKASEY:

20   Q.  Approximately when did you and Ed O'Donnell and Cliff

21   Kitashima begin discussing what kinds of loans would be

22   eligible for the swim lane?

23   A.  I believe it was in the late July, early August time frame.

24   Q.  Approximately how many conversations did you have with

25   those folks about that?

DAFTBAN3                    Mairone - direct

1   A.  We had several.  More than one.

2   Q.  And who expressed input about what kinds of loans should be

3   eligible for the swim lane pilot?

4   A.  Lots of people had input, but Ed O'Donnell was leading that

5   decision.

6   Q.  Did there come a time when you heard some of Ed O'Donnell's

7   views on what should be eligible?

8   A.  Yes, absolutely.

9   Q.  What, if anything, did Ed O'Donnell express to you in your

10  meetings about what views should be -- sorry, what loans should

11  be included in the High-Speed Swim Lane?

12  A.  He expressed concerns around purchase money, high loan

13  sizes and non-arm's length transactions, which are all

14  complicated loans, and I trusted his opinion.

15  Q.  I'm going to ask you the same question with regard to Cliff

16  Kitashima.  Did you have conversations with Cliff Kitashima

17  regarding what loans ought to be eligible?

18  A.  Yes, I had the same conversations with Cliff as well.

19  Q.  And what, if anything, did Mr. Kitashima express to you

20  about what loans he thought should be eligible?

21  A.  He agreed with the exclusions based on the potential risk

22  and complexity of those loans.

23  Q.  In getting the views of O'Donnell and Kitashima, how did

24  that affect your view on what loans should be eligible for the

25  swim lane?

1    A.  Well, it gave me a lot of confidence because they have a

2    lot of expertise.  They have managed credit risk and compliance

3    for long periods of time, so I trusted their opinion and I

4    valued it.

5    Q.  Let's go to DX14, please.  This is admitted in evidence.

6    It's an e-mail from Ed O'Donnell to Steve Brent, among others.

7    And Ms. Mairone, if you could read the first two sentences for

8    us, please.

9    A.  We discussed this topic with Cliff on Thursday night.  We

10   are going to move forward with allowing the LS to determine

11   reasonability.

12   Q.  And based on your work at Countrywide, do you know what --

13   LS stands for what?

14   A.  Loan specialist.

15   Q.  And reasonability refers to what kind of loan?

16   A.  That was the stated income loan.

17   Q.  By the way, did you have authority to make the

18   determination by yourself as to what kind of loans would be

19   eligible for the swim lane?

20            MS. NAWADAY:  Objection.

21            THE COURT:  Ground?

22            MS. NAWADAY:  Leading.

23            MR. MUKASEY:  I can rephrase.

24            THE COURT:  Overruled.

25   Q.  You can answer.

1   A.   No, I did not.

2   Q.   What impact, if any, did you think allowing low risk prime

3   loans, stated income loans into the swim lane would have on

4   loan quality?

5   A.   I didn't think it would have a negative impact on loan

6   quality.

7   Q.   What did you base that opinion on?

8   A.   Based on the training and certification that we put loan

9   specialists through, stated income reasonability was a part of

10  that training.

11  Q.   How, if at all, did the opinions of Cliff and Ed O'Donnell

12  factor into that?

13  A.   Well, the fact that both Cliff and Ed agreed and authorized

14  that change, I had a lot of confidence that we could get this

15  done and it would not impact loan quality.

16  Q.   Take a look at DX311, which actually is the next day after

17  DX14.  That's an email from Ed O'Donnell to you and others in

18  which Mr. O'Donnell says:  I'd recommend that we continue to

19  exclude purchases, loans greater than a million, and non-arm's

20  length.  I agree with the remainder of the list.

21       What was your view as to whether purchase loans, loans

22  grader than a million, and non-arm's length loans should be

23  excluded from the High-Speed Swim Lane?

24  A.   I agreed that they should be excluded given they didn't

25  meet the definition of high quality, low risk specifically.

DAFTBAN3                    Mairone - direct

1   Q.  And was Ed O'Donnell's recommendation as contained in DX311

2   followed by the oversight group?

3   A.  It was, yes.

4   Q.  Now you mentioned that the pilot the High-Speed Swim Lane

5   pilot started in August of '07.  Do you happen to know what

6   date in August?

7   A.  I believe it was August 13.

8   Q.  When did it end?

9   A.  September 30th.

10  Q.  In which locations was it run?

11  A.  It was run in Richardson, Texas and in Chandler, Arizona.

12  Q.  How many loans were actually run through the pilot program?

13  A.  A little over 350 loans.

14  Q.  How many loans specialists were involved?

15  A.  Approximately 12 loan specialists.

16  Q.  And when the pilot kicked off, what, if anything, was done

17  to monitor the loans that were going through?

18  A.  Well, there was two primary.  The project team, Mark

19  Barnett's, and the work team looked at loans every single day,

20  so followed the pipeline, watched the pipeline, had a lot of

21  details around it.  The second one was there was a new QA

22  process that was kicked off.  The QA process also was intended

23  to monitor the pilot.

24  Q.  And what does QA stand for?

25  A.  It's quality assurance.

DAFTBAN3                        Mairone - direct

1    Q.  I'm going to get there in a second, I want to ask you a

2    couple more questions about the pilot.

3              As a member of the project team, did you discuss what

4    the goals were in terms of turn time for the pilot?

5    A.  Yes, we did.

6    Q.  What goal was set for turn time in the pilot?

7    A.  The initial goal was set at 15 days.

8    Q.  Did that remain the goal?

9    A.  No, it did not.

10   Q.  What happened?

11   A.  Well, based on the pilot results and our review of the

12   process itself, we actually felt like it was prudent to add

13   some days to turn time goals because of loan specialists needed

14   those days, and quite frankly, we didn't want to rush them, so

15   we moved turn time goal to 24 days.

16   Q.  And was 24 days a hard target?

17   A.  No, it wasn't.

18   Q.  What was it?

19   A.  In fact, we only expected that it would be on average 24

20   days.  So we also allowed some loans to be longer and some

21   loans we expected to be shorter than that.

22   Q.  Was it ever your goal to have a loan clear to close in one

23   day?

24   A.  No, I honestly don't think I ever saw that before, no.

25   Q.  Take a look at PX54, please.  And tell us what 54 is,

1    Rebecca?

2    A.  It's the project team's daily tracking of the HSSL

3    pipeline, so the loans that were going through the pilot.

4    Q.  Through what date?  Look at the upper left-hand corner.

5    A.  Through the 8th?  I'm not sure.  I'm not clear on that.

6    Q.  Take a look at page 2, the upper left-hand corner.

7    A.  Sorry, page 2, September 6, 2007.

8    Q.  And go all the way down to the bottom of that page, and

9    read for us the two sentences at the bottom of the page.

10   A.  Of the loans funded since the beginning of the pilot, the

11   average turn time from PC0 to fund is 14.9 days with 17.8 days

12   from PCA to fund.  95.7 percent of the loans have funded in 24

13   days or less from PCA to fund.

14   Q.  OK.  I'm going to ask you to explain the average turn time

15   from PC0 to fund is 14.9 days.  What does that mean?

16   A.  That means that from the time the application was taken,

17   which is when PC0 applies, to the time when the loan is funded,

18   so the borrower has their closing documents, it was 14.9 days,

19   so just under 15 days.

20   Q.  And that's for the loans that went through the pilot?

21   A.  Yes.

22   Q.  If you keep reading, 17.8 days from PCA to fund, what's

23   that talking about?

24   A.  The PCA, there was a control that we added to the pilot so

25   we could understand what was the old way of monitoring days to

1  close and what was that result versus the pilot results, and

2  the 17.8 days is the PCA process to fund.

3  Q.  So the swim lane pilot loans compared how with the prime

4  CLUES accept turn time, prime CLUES accept funding, I guess?

5  A.  At this early stage of the pilot it was showing about three

6  days better than the old process.

7  Q.  Now after the swim lane pilot was complete, Rebecca, was

8  the swim lane rolled out on a larger basis?

9  A.  It was.

10  Q.  Was that roll out intended to be part of some scheme to

11  mislead Fannie Mae or Freddie Mac?

12            MS. NAWADAY:  Objection.

13            THE COURT:  Sustained.

14  Q.  Was that -- did you participate in that roll out?

15  A.  Yes, I did.

16  Q.  Was that roll out, from your intention, from your personal

17  point of view, part of some scheme of yours to deceive Fannie

18  Mae or Freddie Mac?

19  A.  No, it wasn't.

20  Q.  Did you have discussions among the leadership team of FSL

21  as to whether the High-Speed Swim Lane should be rolled out on

22  a larger basis?

23  A.  Yes, I did.

24  Q.  Who participated in those discussions?

25  A.  It was both the working group members and the executive

1   group members.

2   Q.  Among the working group members and the executive group

3   members, who objected to the roll out?

4   A.  No one objected to the roll out.

5   Q.  I want to take a look at DX459.

6          MR. MUKASEY:  It's not in evidence yet, so don't put

7   it up, please.

8   Q.  Rebecca, you have 459 in your binder?

9   A.  Yes, I do.

10  Q.  Can you take a look at it and tell me broadly what it is?

11  A.  It's a High-Speed Swim Lane project update.

12  Q.  And how do you -- have you seen it before?

13  A.  Yes.

14  Q.  When did you first see it?

15  A.  Probably the day that it came out on September 20, 2007.

16         MR. MUKASEY:  Judge, we will offer DX459 for

17  identification into evidence.

18         MS. NAWADAY:  No objection.

19         THE COURT:  Received.

20         (Defendant's Exhibit 459 received in evidence)

21  Q.  Rebecca, I'm going to ask you to turn to page 8 of this

22  document.  Did you review this in your capacity as a member of

23  both the executive oversight team and the project team of this

24  swim lane?

25  A.  Yes, I did.

2529

1   Q.  And tell us what is laid out on page 8 here, generally.

2   A.  In general, these are the steps where we looked at the

3   process and the potential risks that might come with

4   implementing this on a larger scale.  We went through those

5   with the work team in great detail in order to come up with

6   mitigation plans or plans in case an unavoided issue came up in

7   these risk areas so that we could address it as we rolled it

8   out.  So it was really proactive planning to make sure that we

9   didn't have issues and problems that could not be addressed or

10  that didn't have an action plan.

11  Q.  So take a look at the first entry under risk.  Process

12  change is significant and being done in a short time frame.

13          Tell us what the mitigation step was to offset that

14  risk.

15  A.  It was to train and communicate to staff and the management

16  as well.

17  Q.  How were you going to train and communicate to staff and

18  management to mitigate that risk?

19  A.  To make sure that, like on the communication basis, that we

20  overcommunicate and train to make sure that they understand

21  their jobs and roles as we implement it.

22  Q.  Who was in charge of training at FSL?

23  A.  I was.

24  Q.  Take a look at the second risk, which says:  HSSL

25  productivity depends on initial quality of applications

DAFTBAN3                    Mairone – direct

1   submitted by sales to processors.  What was the offsetting

2   mitigation step that you all put down on the second box on the

3   right?

4   A.  It was the desking process and also additional reporting.

5   Q.  The third bullet there says leverage pipeline manager

6   issues reporting.  What does that mean?

7   A.  That was a new application that we built in FSL technology

8   that allowed better transparency across every single loan in

9   the pipeline so that you could look across very easily either

10  manager supervisor all the way up to my –– I could look at them

11  and understand where the loans were and what issues were

12  potentially happening with those loans as we processed them.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  All right.  In the interest of brevity, is it fair to say

 2   that there were other risks noted on the left side and other

 3   mitigation steps on the right side?

 4   A.  Yes, that's true.

 5   Q.  Now, how, if at all, did this risk and mitigation chart

 6   affect your view or your comfort level with rolling out the

 7   swim lane?

 8   A.  It helped my view, it helped my confidence.  I felt we had

 9   the proper planning in place and in case something went wrong.

10   Q.  I have one last question about training.  You mentioned a

11   couple of times training.  What is training versus

12   certification?  First start with training.

13   A.  Training is more specific to the corporate or FSL Division

14   training that includes training like mortgage banking 101.  So

15   how does a loan or a customer go through the process from

16   application to funding.  It also includes fair lending

17   training, rules and regulations training related to mortgage

18   lending.  Ethics training.  There is a big curriculum that was

19   managed by a professional training staff at FSL.

20   Q.  Who ran the professional training staff?

21   A.  Well, it reported up to me.  But Debbie Glick was the head

22   of training.

23   Q.  What is certification as opposed to training?

24   A.  Certification was underwriting authority certification.

25   That was resident in Ed O'Donnell's organization.  And that is

1   also very robust, but it includes things that are a little

2   different.  Like how to calculate income, how to look at an

3   appraisal for collateral underwriting.  How to look at assets

4   and bank statements.  So it was very specific to clearing

5   conditions for an underwriting or a loan specialist.

6   Q.  You were involved, Rebecca, in the initiative known as

7   Central Fulfillment, is that right?

8   A.  Yes.

9   Q.  Were there discussions among the managing directors of FSL

10  about initiating, rolling out Central Fulfillment?

11  A.  Yes, there were.

12  Q.  About when did they begin and who did they involve?

13  A.  I think they started in really the late summer, and it

14  involved all of the managing directors.  All the people who

15  reported to Greg Lumsden.

16  Q.  What was your role going to be in the Central Fulfillment

17  reorganization?

18  A.  Well, just like in NCA, Greg Lumsden asked me to take on

19  this as a project short term.  To get it done, to get it

20  organized, to get the staffing in place and the process design

21  done.  Collaborating with the group of underwriting, risk,

22  compliance, and sales and production.

23  Q.  Before I show you any documents, can you explain in your

24  own words the concept behind Central Fulfillment.

25  A.  Sure.  It was, it was a reorganization of people.  So, in

```
 1   the old organization, underwriters all sat together, processors
 2   all sat together, and funders all sat together.  But they were
 3   in different locations, they were in different buildings, they
 4   might be on different floors of the building.
 5           The concept around centralized fulfillment was to
 6   bring and build teams of functions.  On a given team you would
 7   have a few lending specialists, a few underwriters, and a few
 8   funders on the same team.
 9   Q.  What was your view in October of '07 as to whether the
10   Central Fulfillment reorganization would compromise loan
11   quality?
12   A.  No, I thought it would actually improve loan quality.
13   Q.  Why?
14   A.  Because now you're getting rid of hand offs, and you're
15   having someone own the customer, and be responsible for the
16   customer solely.
17   Q.  Can you explain to us how Central Fulfillment's
18   reorganization was different or unrelated to the swim lane?
19   A.  The swim lane was really a process work flow.  So for prime
20   CLUES accept high quality loans, there was a process and there
21   were steps involved.  So from application to closing, that was
22   a process flow.
23           For Central Fulfillment, it was just a reorganization
24   of the people, not of the process.
25   Q.  Were there discussions among the management team about the
```

1    customer experience under Central Fulfillment?

2    A.  Yes, there were a lot of discussions around the customer.

3    Q.  Did you participate in those discussions?

4    A.  Yes, I did.

5    Q.  Who else participated in those discussions?

6    A.  All of the managing directors.  Lloyd Sergeant, Cliff

7    Kitashima, Greg Lumsden, and others.

8    Q.  Those discussions, when did they start taking place?

9    A.  We always talked about the customer, because that was a

10   goal of ours.  But these specific related to Central

11   Fulfillment I believe started in the mid to late summer

12   timeframe.

13   Q.  What was the discussion regarding the customer experience

14   as against Central Fulfillment?

15   A.  We were getting a lot of negative feedback around the

16   customer experience with not knowing who to contact, losing

17   documents, delays in closing and other things, that as a part

18   of centralized fulfillment, it was very key to try to solve

19   those customer service problems.

20   Q.  Take a look at DX 31.  That's a bulletin dated 10/2/07 and

21   then I'm seeing new NCA Central Fulfillment model.  Can you

22   read the key features of the Central Fulfillment model,

23   Rebecca, in the middle of DX 31.

24   A.  "Below are some of the key futures of Central Fulfillment

25   model.  Streamlined work flow, minimal hand offs, loan

1  specialists have underwriting approval authority.  Escalation

2  process for loans requiring higher authority levels.  No more

3  returns.  One-way traffic."

4  Q.  When this bulletin came out, were you supportive of those

5  key features?

6  A.  Yes, I was.

7  Q.  How, if at all, did you think those key features would

8  affect loan quality?

9  A.  I did not think it would impact loan quality negatively at

10  all.

11  Q.  Why not?

12  A.  Because we were really working on making sure that both

13  from a customer input and a document and the data and the

14  qualification of the underwriters, that all the things that we

15  needed were going to be on one team.

16  Q.  Take a look at page three of this document.  Read for us

17  the section entitled "fulfillment team," please.

18  A.  "The fulfillment team is managed by an operations manager.

19  All members, including funders, are located in the same area

20  and focus on fulfillment, including gathering borrower

21  documents, conducting the pre-close call, etc.  The loan

22  specialist will be responsible for obtaining underwriting

23  approval levels one and two authority.  Loans will be escalated

24  to the underwriting support team when required.  For example,

25  refers, exceptions that require level three authority or

1    higher, etc.  The funder and compliance specialist's roles have

2    been merged into one role."

3    Q.  How, if at all, would the fulfillment team set up as

4    described here affect the customer experience?

5    A.  It would improve the customer experience.

6    Q.  Explain why.

7    A.  Because the loan specialist would now be the single point

8    of contact for the customer.

9    Q.  Then go to the loan specialist section.  Down to the fifth

10   or sixth bullet where it says "conduct the welcome call."  What

11   is a welcome call?

12   A.  That was an important step in the loan specialist's job

13   which is reach out to the customer and make sure the customer

14   understands that they're their contact.  This is my name, this

15   is my phone number.  I will be handling your loan all the way

16   to closing.

17   Q.  Was that the same as in the prime CLUES accept work

18   process?

19   A.  No, it wasn't.

20   Q.  How was it different?

21   A.  It was different because the customer talked to a lot of

22   people through the process at PCA, and there wasn't one single

23   owner where someone could really handhold that customer.  It is

24   complicated.  Even doing a refinance can be complicated, so we

25   wanted to add that to the process.

DAF3BAN4                    Mairone - direct

1   Q.  Take a look at the top of the next page where it says

2   clears conditions.  That's a carryover of the loan specialist

3   duties.  Who was involved in the decision to let loan

4   specialists clear conditions in the Central Fulfillment model?

5   A.  That was the working team and project team overall,

6   including myself.

7   Q.  What view did you hold as to whether allowing the loan

8   specialist to clear conditions would hurt loan quality?

9   A.  I didn't think it would hurt loan quality at all.

10  Q.  Why not?

11  A.  Because of the training, extensive training, the extensive

12  certification, and the supervisory monitoring, the systems, the

13  reporting, all the controls that are in place to ensure high

14  quality loans were produced.

15  Q.  Was allowing loan specialists to clear conditions part of

16  your plan to defraud the GSEs?

17            MS. NAWADAY:  Objection.

18            THE COURT:  Ground?

19            MS. NAWADAY:  Calls for a legal conclusion.

20            THE COURT:  No.  I don't think so.  Overruled.

21  A.  Sorry.  Could you ask the question again?

22  Q.  I'm going to restate it.  Was your support for allowing

23  loan specialists to clear conditions under the Central

24  Fulfillment model part of any plan you had to deceive or

25  mislead the GSEs?

DAF3BAN4                          Mairone - direct

1    A.   Absolutely not.

2    Q.   Take a look at DX 427, briefly.  What's that, Rebecca?

3    A.   That's a Full Spectrum Lending Division organization chart.

4    Q.   Under which model?

5    A.   The centralized fulfillment model.

6    Q.   You mentioned I think a little earlier that you were going

7    to have a temporary position with respect to Central

8    Fulfillment, is that right?

9    A.   Yes, that's correct.

10             MR. MUKASEY:  Alex, if you can show where Rebecca is

11   in the middle of the chart.

12   Q.   Rebecca, who was your direct report in the Central

13   Fulfillment model?

14   A.   That was Wade Comeaux, he ran the operation.

15   Q.   A direct report is what?

16   A.   It is a person that is responsible for an organization that

17   reports to me.

18   Q.   Okay.  Underneath Wade Comeaux, there's four boxes:  White,

19   Massie, Sallis and Price.  Can you tell us what function they

20   served in Central Fulfillment?

21   A.   Yes.  They ran sites for the centralized fulfillment

22   organization.  So they ran teams of lending specialists,

23   underwriters, and funders in those particular sites.

24   Q.   You knew those guys?

25   A.   Yes.

DAF3BAN4                         Mairone - direct

1    Q.  You worked with them?

2    A.  Yes.

3    Q.  What kinds of qualifications did they have to lead those

4    teams?

5    A.  For Jim White, David Sallis, and Robert Price, they were

6    all former underwriters.  They ran underwriting organizations.

7    They underwrote loans themselves.  So a significant amount of

8    experience in underwriting.

9    Q.  Take a look at DX 424 in evidence.  That's an e-mail from

10   Greg Lumsden to Cliff Kitashima and yourself.  Do you see that?

11   That's in the middle of the page.

12   A.  Yes, I do.

13   Q.  First I want to ask you, were field branches part of

14   Central Fulfillment?

15   A.  No, they were not.

16   Q.  Flip the page and go to the first sentence on the second

17   page.  Lumsden says "An EVP of central ops position would be

18   created and report to Rebecca."

19        Was the EVP of central ops who reported to you Wade

20   Comeaux?

21   A.  Yes, it was.

22   Q.  Read the next sentence, please.

23   A.  "After approximately one year, this group will report to

24   Scott."

25   Q.  Did you have an understanding of who Scott was in that

1    context?

2    A.   Yeah, that was Scott Bridges who ran the sales

3    organization.

4    Q.   What was the reason that after one year Scott Bridges was

5    going to take over your position?

6    A.   Because Scott was running production, and I was not running

7    production.

8    Q.   What were you doing?

9    A.   I was running all the support organizations for the

10   division.

11   Q.   On the next paragraph it says "Your group would have the

12   responsibility for managing overall credit risk and compliance

13   and thus a dotted line to the underwriters in the central ops

14   organization."

15            Tell us what your understanding of the term dotted

16   line is as it applies there.

17   A.   As it applies here, it could mean that my organization

18   would report into Cliff Kitashima and Ed O'Donnell for all

19   credit, compliance and risk decisions.

20   Q.   By your organization, who do you mean?

21   A.   That means all of Central Fulfillment.

22   Q.   Would that include loan specialists?

23   A.   Yes.

24   Q.   Would that include underwriters?

25   A.   Yes.

1   Q.   Rebecca, during the Central Fulfillment model, who had

2   decision-making authority over credit decisions?

3   A.   That was Cliff Kitashima.

4   Q.   And risk?

5   A.   Cliff Kitashima.

6   Q.   And compliance?

7   A.   That was Cliff's group.

8   Q.   Now take a look at DX 35.  That's an e-mail dated

9   October 5, '07 from Lumsden to FSLnotify.  What is FSLnotify?

10  A.   FSLnotify was every single employee in FSL's division.

11  Q.   What was the date of Central Fulfillment going live?

12  A.   I believe it was early October.

13  Q.   If you could read the third sentence of the first paragraph

14  "as virtually all of us know by now."

15  A.   Of the first paragraph?

16  Q.   Yes.

17  A.   "As virtually all of us know by now, the processing and

18  underwriting of prime loans is much different than non-prime.

19  The original test was called the High-Speed Swim Lane and was

20  designed to allow us to create two paths for our loans to

21  follow.  One path for the subprime, and one path for the prime.

22  With our new business model being almost exclusively prime, it

23  is now time to start migrating all of FSL over to a prime

24  fulfillment work flow."

25  Q.   By "prime fulfillment," is it your understanding

1    Mr. Lumsden was talking about the Central Fulfillment model?

2    A.  Yes, I believe so.

3    Q.  Skip down three paragraphs.  "This new operations

4    organization."  Got it?

5    A.  I'm sorry, which one?

6    Q.  Paragraph that begins "this new operations organization."

7    A.  "This new operations organization will be run by Wade

8    Comeaux, the former DEVP of the central division.  His new

9    title will be EVP, Central Fulfillment.  Wade and his

10   organization will report to Rebecca Mairone, managing

11   director/COO."

12   Q.  Can you tell us how it came about that Wade Comeaux became

13   the EVP of Central Fulfillment?

14   A.  Yes.  There was an interview process for this position.  It

15   was an open position.

16   Q.  Who conducted the interviews?

17   A.  I did, along with Greg Lumsden and with Cliff's input.

18   Q.  Can you tell us best, as you can remember, the candidates

19   for the EVP position?

20   A.  There were two candidates that I recall.  One was Wade

21   Comeaux, the other was Ed O'Donnell.

22   Q.  Did you have discussions at around this time concerning Ed

23   O'Donnell's future in the organization?

24   A.  Yes, I did.

25   Q.  With whom did you have those discussions?

1  A.  With Greg Lumsden and with Cliff Kitashima.

2  Q.  What was your understanding at the time of the interview

3  process about Ed O'Donnell's future in the organization?

4  A.  We were having --

5        THE COURT:  Sustained.

6  Q.  Did those discussions that you had with Cliff and Greg

7  Lumsden concern Ed O'Donnell's future within FSL?

8  A.  Yes, they did.

9  Q.  Did you come from those conversations to have an

10 understanding of where Ed might be assigned under Central

11 Fulfillment?

12       MS. NAWADAY:  Objection.

13       THE COURT:  This all seems to me to be hearsay.

14 Disguised hearsay in the last question.  Overt hearsay in the

15 previous question that was not objected to, but I don't

16 consider that a waiver.  Sustained.

17       MR. MUKASEY:  May I make a response, Judge?  I can do

18 it from here or at the side bar.

19       THE COURT:  Sure.  Come to the side bar.

20       (Continued on next page)

21

22

23

24

25

1              (At the side bar)

2              MR. MUKASEY:  I know it sounds like a peculiar

3     question.  And as far as a proffer goes, we are not offering

4     this for the truth.  It was Rebecca's understanding that Ed

5     O'Donnell was going to ultimately take a managing director

6     position, and he was going to take over for Cliff Kitashima

7     when Mr. Kitashima retired.

8              THE COURT:  So?

9              MR. MUKASEY:  So I think it goes to the concept that

10    Ed O'Donnell had some testimony in the record that he felt

11    Ms. Mairone marginalized him.  It was one of the last things he

12    said.

13             THE COURT:  What her understanding of what was going

14    to come to him doesn't bear, except very remotely, on that

15    issue.  You can ask her what conversations did she have with Ed

16    O'Donnell about his future, if she had any, or anything like

17    that.

18             MR. MUKASEY:  You don't want the extra layer in there.

19             THE COURT:  I think, like many wedding cakes, it is

20    one layer too many.

21             MR. MUKASEY:  I stay away from wedding cakes and

22    weddings.

23             THE COURT:  I note for the record that Mr. Mukasey is

24    wearing a very provocative handkerchief in the pocket of his

25    jacket, which we all are impressed with.

DAF3BAN4                    Mairone – direct

1          MR. MUKASEY:  It seems to be provoking the guy in the

2     robe a little bit too much.

3          THE COURT:  No.  The guy in the robe is expressing his

4     admiration.  If you compare it with the very, very

5     conservatively dressed Mr. Sullivan, there is just no

6     comparison.

7          MR. MUKASEY:  Even I would not compare myself to

8     Brendan Sullivan.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     Q.  Rebecca Mairone, as between Ed O'Donnell and Wade Comeaux,

3     the two candidates, who was your preference?

4     A.  My preference was Wade Comeaux.

5     Q.  For what reason?

6     A.  Because Wade had a significant amount of operating

7     experience.  He understood the production organization, he

8     understood how to motivate employees, he understood the process

9     from application to closing, and he was very detailed oriented

10    as well.

11    Q.  Did you ever intend to marginalize or slight Ed O'Donnell?

12    A.  No, never.

13    Q.  Now, I want to ask you a few questions about loan approval

14    authority in Central Fulfillment.  Were there people called

15    underwriters on the teams in Central Fulfillment?

16    A.  Yes.

17    Q.  What role did they play?

18    A.  They approved loans that were risk grade three and higher

19    for that team.

20    Q.  How were they selected to participate in Central

21    Fulfillment?

22    A.  They were selected because they were the best of the best.

23    They were very good employees.  They were tenured, they were

24    experienced.  And we wanted to give them a new opportunity.

25    Q.  There were people, were there not, called loan specialists

1   in Central Fulfillment?

2   A.  Yes, there were.

3   Q.  What role did they play?

4   A.  They cleared conditions and did the underwriting approval

5   for risk grades one and two, which were the highest quality

6   prime customers.

7   Q.  How were the loan specialists selected to participate in

8   Central Fulfillment?

9   A.  Again, we took a look at the junior underwriters,

10  primarily.  And took what we thought were the best junior

11  underwriters, and gave them the new opportunity to become

12  lending specialists.

13  Q.  Their titles changed, is that right?

14  A.  Yes, their title changed from junior underwriter or

15  underwriter validator to loan specialist.

16  Q.  Take a look at DX 22.  We've seen DX 22 before.  Tell us

17  what it is, Rebecca.

18  A.  This is the FSL underwriting authority approval matrix.

19  Q.  What input did you have in creating this chart?

20  A.  I didn't really have any input here.

21  Q.  Did you have any decision-making authority to decide what

22  level of authority would be needed for what kind of loan?

23  A.  No, I didn't.

24  Q.  Who did?

25  A.  That was the credit and risk and compliance organization.

DAF3BAN4                    Mairone – direct

1    Q.   Did you have occasion to review DX 22 in connection with

2    the rollout of Central Fulfillment?

3    A.   Yes, I did.

4    Q.   Explain how you reviewed it and what you took from it.

5    A.   Well, I thought this was –– it gave me a lot of confidence

6    to see the level of detail here on how we were going to risk

7    assess loans.  At the front of the process, which is the risk

8    tier level at the top of this chart.  And how we were going to

9    allow and train and certify those folks who would clear

10   conditions on each risk tier, one, two, three, four and five.

11          There is a lot of detail here, and I felt like because

12   there is a lot of detail, there has been a lot of thought.  And

13   I trusted this chart to really help map the way to produce

14   quality loans.

15   Q.   You know Jack Schakett, right?

16   A.   Yes, I do.

17   Q.   Do you know whether he had input in putting this together?

18   A.   He did.

19   Q.   How, if at all, did that impact your degree of comfort with

20   how the Central Fulfillment model was going to be set up?

21   A.   I had a great deal of comfort.  I trusted his experience,

22   and also FSL's credit and compliance and risk organizations'

23   experience around this topic.

24          THE COURT:  Mr. Mukasey, we need to give the jury

25   their lunch break, if this is a good time.

DAF3BAN4                    Mairone – direct

1                 MR. MUKASEY:  This is a perfect time.

2                 THE COURT:  Ladies and gentlemen, we'll take a one

3     hour lunch break and we'll see you at 2 o'clock.

4                 (Jury excused)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Approximately how much longer do you have

2     with the witness?

3          MR. MUKASEY:  I'm going to say two hours, but I'm

4     pretty sure I can come below that.

5          THE COURT:  I won't put any restrictions, but two

6     hours sounds fine.

7          MR. MUKASEY:  Thank you.

8          THE COURT:  How about bank counsel?

9          MS. MAINIGI:  We intend to have no questions.

10          THE COURT:  We'll see you at 2 o'clock.

11          (Recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DAF3BAN4                        Mairone - direct

1                          AFTERNOON SESSION

2                             2:10 p.m.

3            (In open court; jury not present)

4            THE COURT:  We will go until 5 o'clock tonight.

5            (Jury present)

6            THE COURT:  Counsel.

7            MR. MUKASEY:  Thanks, Judge.

8    BY MR. MUKASEY:

9    Q.  Ms. Mairone, when we broke for lunch, we were talking about

10   DX 22, which is the multicolored matrix that's on the screen

11   now.

12            You were telling us a little bit about the affect it

13   had on your confidence level moving into the Central

14   Fulfillment phase with regard to who was going to be reviewing

15   which kinds of loans.

16            Can I just have you go back over that real quick.

17   A.  Sure.  For the different types of risk tiers which are in

18   the first column, and the risk tier level, then various

19   information below, it really helps lay out very specifically

20   which types of loans carries which types of risk.

21            If we move to the right under prime, it also shows

22   under risk one, two, three and four, which specific authority

23   and certification and training is required for each of those

24   individuals that would receive those loans.

25   Q.  If you go down to the second row, does it also indicate the

1   dollar amount that an underwriter level two and an underwriter

2   level one could work on in terms of a loan?

3   A.   Yes, it does.

4   Q.   What is the maximum amount that a underwriter level one or

5   two could work on for a risk tier one or two loan?

6   A.   That would be a million dollars or less.  Or less than,

7   excuse me, $1 million.

8   Q.   Without getting bogged down, if you move down to the bottom

9   of the chart.  In the green, Alex.

10          Does that set out the levels of training and authority

11   that each level underwriter needs to have?

12   A.   Yes, it does.

13   Q.   Okay.  You mentioned before we broke that Mr. Schakett

14   created this matrix?

15   A.   Yes, and corporate.

16   Q.   What was Jack Schakett's title in corporate?

17   A.   Jack was the chief operating officer of Countrywide.

18   Q.   How does his chief operating officer position relate to

19   your chief operating officer position?

20   A.   I was a dotted line responsibility into Jack.

21   Q.   Meaning what?

22   A.   I met with Jack periodically, I updated Jack on major

23   projects and initiatives, and we discussed a lot about

24   technology as well.

25   Q.   Did you conceal the High-Speed Swim Lane from Jack

1    Schakett?

2    A.  No, I didn't.

3    Q.  What, if any, conversations did you have with him around

4    October of '07 concerning work flow at FSL?

5    A.  The conversations that I had with Jack included major

6    initiatives strategically, which included the prime CLUES high

7    quality processing, and any technology changes that were going

8    along with that.

9    Q.  Any objection from him in moving in that direction?

10   A.  No.  There was support.

11   Q.  Let's take a look at DX 34 if you would, and we saw it I

12   think last week or the week before.  Can you remind us what

13   that is.

14   A.  This is the conditions sign off and underwriting training

15   matrix for Full Spectrum Lending.

16   Q.  What does that mean?

17   A.  It means this is the testing and the training that each

18   individual LS or underwriter or even processor would need to go

19   through in order to have sign off authority for any particular

20   loan.

21   Q.  Can you use this chart to compare the level of training

22   that an underwriter level one needed to have under the prime

23   CLUES accept work flow with the level that such a person needed

24   to have under Central Fulfillment?

25              MS. NAWADAY:  Objection.

1          THE COURT:  I think it's fair.  Overruled.

2     Q.  May the chart be used that way?

3     A.  Yes, it can.

4     Q.  Would you please compare for us what the chart says and how

5     it says it about the level of training you need under Central

6     Fulfillment versus PCA?

7     A.  If we look at the chart under the green column, the third

8     column to the right, it is an underwriter level one.  That

9     would be a loan specialist in the centralized fulfillment

10    organization.  Underneath that it shows a number of blocks on

11    rows, all shaded green.  All of those green blocks, if you move

12    to the right, will show you what specific training is required

13    to be completed for that particular box.

14          In the centralized fulfillment, again, level one

15    underwriter for loan specialist was required to have all of

16    those shaded green boxes completed as far as training goes.

17    Q.  What about under the prime CLUES accept work flow?

18    A.  For the prior work flow, in Full Spectrum Lending, which

19    was PCA or prime CLUES approval, the Xs in the box on that

20    green column are the ones that are required for PCA in the

21    prior prime work flow.

22    Q.  How many more training courses did you need to be an

23    underwriter level one in Central Fulfillment than you did in

24    PCA?

25    A.  There was approximately seven additional training courses

DAF3BAN4                    Mairone - direct

1    that were required for loan specialists one than for the prior

2    PCA training.

3    Q.  You testified earlier that you had a oversight role with

4    respect to training people, right?

5    A.  Yes, I did.

6    Q.  Tell us which of the certification courses or training

7    courses that are listed on the right-hand side were within your

8    bailiwick?

9    A.  There were a number of them.  If we start at the top under

10   requirements in training, it would include the HMDA

11   certification training.

12   Q.  What's that?

13   A.  That's fair lending training, so rules and regulatory

14   obligations that these employees needed to be aware of related

15   to mortgage banking.

16        Ethics and compliance training.

17   Q.  That was under your portfolio?

18   A.  Yes.  So everyone had to not only go through the ethics and

19   compliance training, again, understanding the rules and

20   obligations of mortgage lending, which there are a lot of, but

21   they also had to sign a code of conduct along with that.

22   Q.  What was else was under your oversight?

23   A.  The Edge training was another.  That was the system that

24   the loan specialists were using to process loans as a

25   technology system.

1  Q.  Okay.  Maybe just pick out a couple of others.

2  A.  Introduction to mortgage banking reading and test.  So this

3  was one where we wanted to make sure that entry-level employees

4  understood the mortgage process.  It is a fairly complicated

5  process.  So, we teach people the nuts and bolts of mortgage

6  banking, and we also test them at the end to make sure they're

7  competent and understand what mortgage banking steps are to

8  produce a quality application and then a closing.

9  Q.  With respect to the training courses listed on DX 34 that

10  were not in your group or your oversight, whose oversight were

11  those in?

12  A.  Those were in Ed O'Donnell's group where he had

13  professionals training on the certification and underwriting

14  authority training.

15  Q.  Can you give us an example from this list of something that

16  O'Donnell's group might have been responsible for training?

17  A.  Sure.  If we go about two-thirds of the way down, it would

18  be mortgage insurance training.  It would be underwriting prime

19  title certification, where you're looking at the title and

20  reviewing those conditions.  Flood compliance certification.

21  Prime appraisal certification.  And one that's very important,

22  obviously, is the calculating income training.

23  Q.  Okay.  Rebecca, what is the concept of grandfathering?

24  A.  Grandfathering --

25            MS. NAWADAY:  Objection.

1          MR. MUKASEY:  I'll lay a foundation, Judge.

2          THE COURT:  Overruled.  You may answer.

3   Q.  Thank you.  Let me ask you this.  Have you heard of the

4   concept of grandfathering?

5   A.  Yes, I have.

6   Q.  As it relates to training of Full Spectrum Lending

7   employees?

8   A.  Yes, and certification.

9   Q.  Did that come up while you were overseeing Central

10  Fulfillment?

11         THE COURT:  Here I thought you were asking about my

12  new grandchild born three weeks ago.  What a surprise you're

13  asking something relevant to this case.

14         MR. MUKASEY:  That's relevant.  I'll ask about it.

15         THE COURT:  We'll save it for later.  Maybe rebuttal.

16  Q.  Rebecca, as it relates to your work at FSL, what is the

17  concept of grandfathering?

18  A.  Grandfathering would be when an underwriter has an amount

19  of certification, we'll call it level two, that that

20  underwriter level two would not go back through the testing

21  again for authorization and they would be allowed to continue

22  in their new capacity as a loan specialist two with that same

23  authority.  Without going back through the testing.

24  Q.  Did you ever become aware while you were running Central

25  Fulfillment of any loan specialist who did not receive the

1   proper training?

2   A.  No, I did not.  I was not.

3   Q.  Rebecca, what is quality control?

4   A.  Quality control is an audit that's performed on procedures.

5   So each step of the process would be checked by an auditor, and

6   it is to ensure that the loan quality is performed, basically

7   that the loan specialist -- excuse me -- is following the

8   procedural steps appropriately.

9   Q.  Who conducts credit -- withdrawn.

10          Who conducts QC audits?

11  A.  Quality control or QC audits were performed by a group of

12  corporate underwriters.

13  Q.  When are those performed?

14  A.  After the loan is funded.

15  Q.  Just to be clear, what is quality control measure?

16  A.  It -- it measures underwriting defects and credit defects.

17  Q.  During your time in Central Fulfillment, did you receive QC

18  reports?

19  A.  Yes, I did.

20  Q.  Now I want to move away from quality control and ask about

21  quality assurance.

22          First off, when did you first become aware that there

23  was going to be a QA process for the High-Speed Swim Lane?

24  A.  It was during the summer of 2007.  It was to be a new QA

25  process, the first one that Full Spectrum Lending would have.

DAF3BAN4                        Mairone - direct

1   Q.   Had any quality assurance process existed before the summer

2   of '07?

3   A.   No.

4   Q.   Who headed up the quality assurance process at FSL?

5   A.   That was a gentleman by the name of Steven Brent.

6   Q.   Who did Steven Brent report to?

7   A.   He reported to Cliff Kitashima.

8   Q.   When you first learned there was going to be a quality

9   assurance process put in place, what was your reaction?

10   A.   I was very supportive of that.

11   Q.   Why?

12   A.   Because it gives you a lot of detail and data and

13   information about whether employees are following the

14   procedures correctly.

15   Q.   Well, when you became aware of the quality assurance

16   process, did you have an understanding as to what the aim of

17   that process was?

18   A.   Yes.  The overall aim of the QA process was to be an early

19   alert on potential quality problems that may manifest

20   themselves into QC issues later in the process.

21   Q.   When did the quality assurance reports at FSL start coming

22   out?

23   A.   The first reports were started for the HSSL pilot.

24   Q.   Did you receive those?

25   A.   Yes, I did.

1   Q.  Did you review them?

2   A.  Yes, and investigated them as well.

3   Q.  When you say you investigated them, what do you mean, what

4   did you do?

5   A.  Meaning we looked at every loan or samples of every loan

6   defect type to really understand what the root cause was of

7   that defect in QA.

8   Q.  Who did you do that with?

9   A.  I did that with the HSSL pilot team, Mark Barnett, Ferdie

10  Espinosa and others, as well as Steven Brent and his team who

11  were performing the QA tests.

12  Q.  In your capacity as COO and head of technology, did you

13  become familiar with a computer tool called fraud detector?

14  A.  Yes.

15  Q.  How did you get familiar with fraud detector?

16  A.  Well, I had to know all of the applications that were used

17  by FSL employees.  Fraud detector was a component in status

18  mart that checked -- it was an application, computer

19  application that checked fraud on every loan prior to funding.

20  Q.  How did it do that?

21  A.  It ran all the -- a bunch of data through from the customer

22  application and the processing Edge system, and it was a

23  sophisticated model that could come up with potential fraud

24  cases for review.

25  Q.  Take a look at PX 58, please, and the third page of that

1    document.

2              Rebecca, what is PX 58?  I'll direct your attention to

3    the subject line about a third of the way down on the left-hand

4    side.

5    A.  It is an e-mail.  Subject "HSSL weekly review summary

6    through September 16, 2007."

7    Q.  Did you receive copies of this HSSL weekly review summary

8    through September 16?

9    A.  Yes, I did.

10   Q.  You mentioned you investigated after you got the results.

11   Tell us what you found.

12   A.  Well, we found that there were high level of errors shown

13   on this initial report.  And what we found as a result of our

14   investigations, is that some of these were false positives.

15   Q.  What do you mean by a false positive?

16   A.  False positive would mean that the error that the auditor

17   assessed as a defect wasn't really a defect.  Or that there

18   were timing issues.  When an auditor was looking at the file,

19   they were looking at it earlier than the work was actually

20   being performed.

21   Q.  How did that affect fraud detector?

22   A.  Fraud detector screens were not complete, not in the VLF

23   system which was the image system.  That was the defect.

24   Q.  When was fraud detector to be completed, according to your

25   standard operating procedures?

1   A.   The standard operating procedures in the past were that it

2   would be completed before funding.

3   Q.   When was the QA process measuring whether fraud detector

4   had been run?

5   A.   At phase code three, which is earlier in the process at

6   clear to close.

7   Q.   What was the result of that?

8   A.   The result was nearly every single loan had an error

9   related to that timing.  Because the actual procedure was being

10  executed later than the testers were looking in the file.

11  Q.   In your mind at the time, when you realized this, did that

12  have any affect on loan quality to you?

13  A.   No, it did not.

14  Q.   Why not?

15          MS. NAWADAY:  Objection.

16          THE COURT:  Ground?

17          MS. NAWADAY:  Calls for opinion.

18          THE COURT:  Yes, but I think this fits within the

19  exception for rule 701.  Overruled.

20  Q.   Why did it not have an affect on loan quality to you?

21  A.   It didn't because the process was actually getting

22  performed.  It was just being performed a little bit later in

23  the process, but before funding.  So from a QC perspective, it

24  would have been fine in those audits later.

25  Q.   Okay.  So, if you read the paragraph on PX 58 that says

DAF3BAN4                         Mairone – direct

1    "the most common finding."

2    A.  "The most common finding identified was the fraud detector

3    action.  Jane and I conducted a call with Audrey and LaCrecia,

4    and they assured us that they would have a meeting with their

5    teams to correct this issue.  Jane and I also spoke with Robert

6    Price and informed him that the underwriters were requiring the

7    fraud detector action to be completed prior to funding, which

8    is contrary to our SOPs."

9    Q.  That's standard operating procedures?

10   A.  Yes.

11              (Continued on next page)

DAFTBAN5                          Mairone - direct

```
1    BY MR. MUKASEY:
2    Q.  Keep going.
3    A.  Robert stated that he would make sure that the underwriters
4    are following the SOPs which would result in these findings
5    being eliminated.
6    Q.  Is that consistent with what your investigation determined
7    with respect to when fraud detection was being run and why the
8    results came out as they did?
9    A.  Yes.
10   Q.  How did the results -- the quality assurance results of the
11   High-Speed Swim Lane pilot affect your willingness to move
12   forward with the High-Speed Swim Lane?
13   A.  We thought we should move forward with the High-Speed Swim
14   Lane.
15   Q.  Why?
16   A.  Because these errors -- the lion's share of these errors
17   were procedural and they were not going to impact quality.
18   Q.  Rebecca, did you also receive quality assurance results
19   from the first couple of months of Central Fulfillment?
20   A.  Yes.
21   Q.  After you got those results, what did you do with them?
22   A.  We investigated again each one.
23   Q.  Who investigated?
24   A.  My team, and in that case for Central Fulfillment it would
25   be Wade and his team, as well as Steven Brent and the team that
```

1    was performing the QA audits.

2    Q.  What did you all do to investigate the quality assurance

3    results from the beginning of Central Fulfillment?

4    A.  We looked at samples of loans of each defect area to really

5    understand the root cause and whether they would contribute to

6    potential loan quality and QC errors.

7    Q.  Based on this investigation, did you come to have an

8    understanding of what kind of defects were being found in the

9    QA process as applied to Central Fulfillment?

10   A.  Yes, I did.

11   Q.  What was that understanding?

12   A.  That, again, they were procedural in nature, and most of

13   them were related specifically to this fraud detector timing.

14   We still had that timing issue coming up for errors and

15   defects.  We also found that the virtual loan file was not

16   being updated with the images on a timely basis, so it was

17   causing defects, so the loan specialists were holding paper

18   files longer than PC3, which is phase code three, and they were

19   uploading those papers and those documents to the virtual loan

20   file before funding which contributed to defects in the

21   procedures.

22   Q.  Did that affect your willingness to go forward with Central

23   Fulfillment?

24   A.  No, it did not.

25   Q.  Why not?

```
 1    A.  Because we knew we had to make a change in procedures and
 2    training, but we also knew that these were not contributing
 3    overall to the credit quality of the ultimate loan file.
 4    Q.  Now you mentioned that the QA process looked for defects,
 5    is that right?
 6    A.  Yes.
 7    Q.  How were those defects communicated to the loan
 8    specialists?
 9    A.  Those defects were communicated directly to the loan
10    specialists and to their supervisors in emails.
11    Q.  Did you have channels to review that process?
12    A.  I did, yes.
13    Q.  Explain what happened if defects were found and how they
14    were communicated to the loan specialists.
15    A.  If defects were found, the QA auditors, the group in India,
16    would create -- for each defect they would create an email that
17    they would send on a daily basis to the loan specialist
18    informing them of that defect on that loan.  In fact, if a loan
19    had multiple defects, they would send separate emails, so if a
20    loan had three defects they would get three separate emails
21    with each individual defect shown.
22    Q.  Go to DX4053.  And this is an email from Scott Bridges to
23    Cliff Kitashima and yourself.  And can you read paragraph 2A,
24    please.
25    A.  Yes.  The OMs and LSs are getting pounded by quality
```

1   assurance audits to the degree that they are being nailed with

2   an 80 percent default rate.  Adela takes exception to the

3   miniscule levels of data, a missed checkbox being flagged by

4   this group, and in essence says the ops staff is scared

5   straight they will make a mistake and are therefore triple and

6   quadruple checking everything.  This is adding major lag time.

7   Q.  Now take a look at DX9 -- sorry, DX46, page 4.

8           Did there come a time, Rebecca, when you received the

9   document labeled DX46?

10  A.  Yes.

11  Q.  Rebecca, did you receive DX46?

12  A.  Yes, I did.

13  Q.  Did you review it?

14  A.  Yes, I did.

15  Q.  Was it created in the ordinary course of the FSL Central

16  Fulfillment business?

17  A.  Yes, it was.

18  Q.  Was it created at or about the time that it was given in

19  November 2007?

20  A.  Yes, I believe so.

21          MR. MUKASEY:  We offer DX46, your Honor.

22          MS. NAWADAY:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit 46 received in evidence)

25  Q.  Turn to page 4, please, Rebecca.  What's depicted on page

1    4?

2    A.   That's an outline of the individual defect findings from

3    the November 1st through November 30th quality audits.

4    Q.   Now 83.12 percent, all the way on the right-hand side, of

5    the defects were caused by what, Rebecca?

6    A.   This was the problem with the fraud detector that I

7    explained a little bit earlier.

8    Q.   What does it mean to say that 660 findings related to all

9    screens of fraud detector in status mart are complete or

10   reverify employment screen from fraud detector is not viewable

11   in VLF.  What does that mean?

12   A.   It means the actual fraud detector worksheet that comes out

13   of the status mart and fraud detector tool was not uploaded

14   into the VLF image system at the time that the audits were

15   performed.

16   Q.   Would a defect like that affect loan quality, according to

17   you?

18   A.   No, it would not.

19   Q.   Now was the fraud detector being completed at all by these

20   loan specialists, Rebecca?

21   A.   Yes, it was.

22   Q.   And what caused the defect?

23   A.   That all pages of the fraud detector had to be imaged and

24   uploaded to the virtual loan file during phase code three,

25   which was at clear to close, that was not happening here.

DAFTBAN5                    Mairone – direct

1    Q.  Was it happening at all?

2    A.   It was happening before phase code four, so they were still

3    performing it, but they were not uploading it in the process at

4    phase code three.

5    Q.   Go to the second bullet.  38 findings related to alt doc

6    income docs not in VLF.  Could you explain that for us?

7    A.   Yes.  This one we reviewed several examples, and what was

8    happening to produce the defect was the loan specialist was not

9    uploading those manual documents through the fax to themselves,

10   process, and then connecting into the virtual loan file at

11   phase code three.  We did the investigation and we wanted to

12   make sure, as above, the function was actually happening.  And

13   what we determined was the vast majority of the time income

14   docs were received but they were just not yet uploaded into the

15   virtual loan file for the auditors in India to actually see.

16   Q.  Now how many -- what percentage of the 794 individual

17   findings did that affect?

18   A.   That affected almost 4.8 percent.

19   Q.  Now the next finding, 31 findings related to alt doc,

20   income docs not in VLF, what does that mean?

21   A.   That's same identical finding but with a different type of

22   income, but yet the same problem.  The income docs were not yet

23   uploaded to the virtual loan file so the auditors in India had

24   no way to see those.

25   Q.  And that resulted with how many findings?

1   A.  3.9 percent.

2   Q.  22 findings related to various and appropriate income docs

3   not in VLF.  What does that mean?

4   A.  That's the same problem.  Again, the loan specialists were

5   performing their work manually.  They were creating a paper

6   customer file at their desk, and then towards the end of the

7   process when the loans were funded, then they were uploading

8   all of the docs at once to VLF.  But it was later in the

9   process so the auditors in India could not see the income

10  documents in these cases.

11  Q.  To make sure I understand, uploading to VLF means getting

12  it from paper into the computer, is that the idea?

13  A.  Yes, that's that fax process.

14  Q.  OK.  22 findings related to various and appropriate income

15  docs not in VLF that resulted in 2.77 percent of the findings.

16  What does that mean?

17  A.  That 22 findings is the same identical income docs not

18  being uploaded to the virtual loan file timely at phase code

19  three stage of the loan so the India auditors could not see

20  them.

21  Q.  Let's go to the nine findings related to documentation used

22  to calculate income not in VLF.  How, if at all, would that

23  affect loan quality?

24  A.  I don't believe that would affect loan quality either.

25  It's the same type of defect where the documentation was not

DAFTBAN5                      Mairone - direct

```
 1   being uploaded into the virtual loan file on a time -- at phase
 2   code three of the process so that the India auditors could not
 3   see these documents.
 4   Q.  So is there any bullet point or any findings here that in
 5   your view would have affected loan quality?
 6   A.  Yes.
 7   Q.  Which one?
 8   A.  That's the 14 findings related to appraisal review does not
 9   support value.
10   Q.  And how would that affect a QC finding or loan quality
11   finding?
12   A.  Those were concerns about the collateral value, that it had
13   not been reviewed appropriately potentially, and those would be
14   very clear concerns that we would want to look into every one
15   of those.
16   Q.  And what percentage of the findings were those?
17   A.  1.76 percent.
18   Q.  Now Rebecca, this DX46 is dated November '07, and the email
19   that I just had you read from was dated November 16, '07.  As
20   of that time, what did you conclude about the quality assurance
21   process that was being run?
22   A.  I concluded, as well as others, that the QC process needed
23   to be corrected.
24   Q.  How did you know others concluded that as well?
25   A.  Because we talked about that with Greg and others.
```

1                MS. NAWADAY:  Objection.

2                THE COURT:  Sustained.

3   Q.  I want to make sure you heard my question, I asked QA

4   process, what did you conclude about the QA process, just you?

5   A.  That I concluded that there was problems with the QA

6   process that needed to be corrected.

7   Q.  What steps did you take, if any, to address these QA

8   problems?

9   A.  I pulled together a team to review.

10  Q.  Who was on that team?

11  A.  The team included Wade Comeaux, some of his directs, as

12  well as Steven Brent and his group that was running the QA

13  process.

14  Q.  And in pulling together this team, what were you hoping to

15  accomplish?

16  A.  I was hoping to accomplish correcting the QA process as

17  soon as we could because it was very important to our overall

18  results, we needed those QA findings to be accurate.

19  Q.  Take a look at DX963, page 3.  In speaking with the members

20  of your team --

21                MR. MUKASEY:  Could you blow up overall causes of

22  findings, Alex?  Just the first bullet.  Blow up all three, if

23  you don't mind.

24  Q.  In getting together your team and speaking to the members

25  of your team, did you consider this summary of overall findings

DAFTBAN5                          Mairone – direct

1    that is contained in 963?

2    A.  Yes, we did.

3    Q.  Please read the overall causes of findings as laid out in

4    this document.

5    A.  Document in wrong location.

6    Q.  How many findings?

7    A.  112 findings for 22.31 percent.

8    Q.  Keep going.

9    A.  Document in correct location and auditor error, 193

10   findings, 38.45 percent.

11   Q.  And the last one.

12   A.  Document not in VLF, 197 findings, 39.24 percent.

13   Q.  What does document in wrong location mean?

14   A.  That means that the document was in VLF but because the VLF

15   tool was a little bit confusing, it was under a wrong tab, the

16   document was there, it was just under a wrong tab in VLF.

17   Q.  What does document in correct location, auditor error mean?

18   A.  That meant that the auditors in India needed to be

19   retrained on where to look for documents under specific tabs of

20   the virtual loan file system.

21   Q.  And what does document not in VLF mean?

22   A.  That means the document was not in VLF at all.

23   Q.  And your team that you pulled together reviewed these

24   findings?

25   A.  Yes, they did.

1    Q.   Did there come a time when you met with others to discuss

2    these findings?

3    A.   Yes.

4    Q.   Who did you meet with?

5    A.   I met with Cliff Kitashima and Greg Lumsden.

6    Q.   Approximately when was that?

7    A.   Approximately the end of November 2007.

8    Q.   And what were the topics that you, Greg, and Cliff

9    Kitashima talked about?

10             MS. NAWADAY:  Objection.

11             THE COURT:  Sustained.

12   Q.   What was the subject matter that you talked about?

13   A.   We talked --

14             MS. NAWADAY:  Objection.

15             THE COURT:  You think there's a difference between

16   topic and subject matter?

17             MR. MUKASEY:  You tell me.

18             THE COURT:  Since I will accept that invitation, the

19   objection is sustained.

20   Q.   Rebecca, as a result of your meeting with Cliff Kitashima

21   and Greg Lumsden, what were you tasked to do?

22   A.   We were tasked to look at the problems with the QA process

23   overall and make corrections as quickly as we could.

24   Q.   What were you in particular going to take charge of?

25   A.   I was going to draft the memo on the decisions that we made

DAFTBAN5                         Mairone – direct

```
 1    during that meeting.
 2    Q.  Take a look at DX670, please.  What is DX670?
 3    A.  I'm trying to find it, I'm sorry.
 4             I have it.
 5    Q.  What is DX670?
 6    A.  It's a draft of the Central Fulfillment changes email.
 7    Q.  What's the date?
 8    A.  Thursday, 11/29/2007.
 9    Q.  And if you flip to the second page, what's contained in the
10    second page?
11    A.  This is the draft email that was the result and action
12    steps of the meeting we had had the prior day with Greg and
13    Cliff and myself related to QA and other topics.
14    Q.  Whose language is in the black print?
15    A.  The black print would be my draft language.
16    Q.  And whose language is in the blue print?
17    A.  That's Cliff's edits to my memo.
18    Q.  What was the reason that you sent your memo to Cliff for
19    edits?
20    A.  Because Cliff and I were working in collaboration on this,
21    and from a quality, credit, risk, compliance standpoint, those
22    were his -- he had joint ownership with this on those topics.
23    Q.  Now I want to take some time with PX68.  It's in the pocket
24    of your binder.
25             Rebecca, what is PX68?
```

1    A.   This is the final email that we just looked at from a draft

2    perspective.   This would be the final that was sent out on

3    11/29/2007.

4    Q.   What was your intention in sending out this email?

5    A.   To fully communicate across broadly Central Fulfillment

6    leadership and the managing directors of the division what our

7    decisions were and our actions were.

8    Q.   Read the first sentence "I have discussed," just up to the

9    comma?

10   A.   I have discussed with both Greg and Cliff the following

11   items and a change in process and direction.

12   Q.   Now read the first sentence of the first paragraph

13   enumerated number one.

14   A.   The QA communication to Central Fulfillment will stop

15   immediately, 11/29/07.

16   Q.   Who was involved in the decision to stop the QA

17   communication to Central Fulfillment immediately, 11/29/07?

18   A.   Greg Lumsden, Cliff Kitashima and myself.

19   Q.   What did that mean?

20   A.   That meant that the QA reports were going to come to me on

21   behalf of my organization, Centralized Fulfillment.

22   Q.   What was your intention in stopping immediately the QA

23   communication to Central Fulfillment?

24   A.   That -- my intention was that we needed time to pull

25   together and make corrections to the current QA process.   And I

1    wanted to take a leadership of that, ownership of that, and be

2    the person to communicate that through the Central Fulfillment

3    organization.

4    Q.  Read the second sentence of paragraph one.

5    A.  The communication will be directed to only Rebecca Mairone

6    for the next 30 days.

7    Q.  Who was involved in making the decision the communication

8    to be directed only to Rebecca Mairone?

9    A.  Greg Lumsden, Cliff Kitashima and myself.

10   Q.  Going forward, were those communications in fact only

11   directed to you?

12   A.  They weren't only directed to me, no.

13   Q.  Where else did they go?

14   A.  The QA reports still went broadly across the FSL division.

15   I also shared those reports with my directs.

16   Q.  What was your intention, Rebecca, in stating here that the

17   communication will be directed only to you for the next 30

18   days?

19   A.  My intention is to make sure that we have time to correct

20   the issues with the QA process, so going forward we could come

21   out with a new, more effective QA process that was a true

22   indicator of quality issues.

23   Q.  Read the third sentence of paragraph one.

24   A.  I will meet with the compliance and quality groups solely

25   as we work through the process, reporting and communication

DAFTBAN5                              Mairone - direct

```
 1   plan for the Central Fulfillment group.
 2   Q.  Who was involved in deciding that you would meet with the
 3   compliance and quality groups solely as we worked through the
 4   process?
 5   A.  That was Greg Lumsden, Cliff Kitashima and myself.
 6   Q.  After November 29, the date of this email, did you in fact
 7   meet with the compliance and quality groups?
 8   A.  Yes.
 9   Q.  Go to DX4069, please.  DX4069 is an email from Steve Brent
10   to you.  Do you see that?
11   A.  Yes.
12   Q.  Read it into the record.  We will --
13   A.  We will use this time each week to review QA, QC findings
14   for trends and next steps.  Reports will be generated and
15   published prior to this meeting.
16   Q.  Go to DX4090, Rebecca.
17          MR. MUKASEY:  Don't post it yet.
18   Q.  Do you recognize this document?
19   A.  Yes, I do.
20   Q.  How do you recognize it?
21   A.  This was an email that was sent to me from Wade Comeaux --
22   or excuse me, sent from me to Wade Comeaux, Armand Massie, who
23   were on my Central Fulfillment team.
24          MR. MUKASEY:  Defense offers 4090 for identification
25   into evidence.
```

1              MS. NAWADAY:  No objection.

2              THE COURT:  Received.

3              (Defendant's Exhibit 4090 received in evidence)

4    Q.  Now Rebecca, in addition to meeting with quality assurance

5    groups, who else were you meeting with in regard to the QA

6    process?

7    A.  I was meeting with the Central Fulfillment leadership team.

8    Q.  Who are Wade Comeaux and Armand Massie?

9    A.  Wade Comeaux ran the Centralized Fulfillment operation, so

10   all sites reported to him.  And Armand Massie was the

11   operations support and training executive for Central

12   Fulfillment.

13   Q.  Going to the portion of the e-mail what says:  Rebecca,

14   here is your daily report on findings that can improve the

15   quality of the applicable loans.  Do you see that?

16   A.  Yes.

17   Q.  Who did you forward that email to?

18   A.  That email was forwarded to both Wade and Armand Massie.

19   Q.  For what purpose?

20   A.  So we could review the QA PC3 daily report in detail and we

21   could develop a plan to address the defects in descending

22   prioritization order, so the most difficult and egregious areas

23   first.

24   Q.  These are the four areas we need to develop short term and

25   longer term solutions for.  What did you mean there when you

DAFTBAN5                          Mairone - direct

1   sent that to Wade Comeaux?

2   A.  I instructed them to look at the reports and to look at the

3   four top defect areas and not only develop a short-term plan to

4   improve those four areas but also develop a longer term plan to

5   sustain those improvements.

6   Q.  Now Rebecca, when you were studying these QA results and

7   figuring out what to do -- withdrawn.

8           MR. MUKASEY:  Take a look, Alex, if you will, at the

9   day and date on which this email was sent.

10  Q.  What day of the week did you send this email about

11  following up on QA reports, Rebecca?

12  A.  That was Saturday, December 15.

13  Q.  What time of day did you do that?

14  A.  1:42 a.m.

15  Q.  Take a look at DX755.

16          MR. MUKASEY:  But don't post it yet, Alex.

17  Q.  Rebecca, do you recognize DX755 for identification?

18  A.  Yes, I do.

19  Q.  What do you recognize it to be?

20  A.  It was an email that I sent to Wade Comeaux, Robert Price,

21  Jim White and Armand Massie about the QC meeting follow-up

22  items.

23  Q.  Are you able to recognize it because it's on your typical

24  email letterhead?

25  A.  Yes.

DAFTBAN5                    Mairone - direct

1            MR. MUKASEY:  Defense offers 755 for identification

2      into evidence.

3            MS. NAWADAY:  No objection.

4            THE COURT:  Received.

5            (Defendant's Exhibit 755 received in evidence)

6   Q.  Rebecca, read the first sentence of the paragraph on the

7   bottom.  Attached --

8   A.  Attached are the minutes of yesterday's meeting with the

9   credit/QC group.

10  Q.  After receiving the minutes of the meeting with the

11  credit/QC group, what did you do with this email?

12  A.  I forwarded that to the Central Fulfillment leadership

13  team.

14  Q.  What was the reason that you forwarded the QC minutes to

15  the Central Fulfillment leadership team?

16  A.  The first reason was I wanted them to see all of the

17  information and the discussions and the results of the QC

18  meetings.  It was important for them to understand that.  Also

19  I wanted to reinforce that there's a procedure that we need to

20  pay attention to related to stated loans which was documenting

21  all of the six questions.

22  Q.  Which members of the Central Fulfillment leadership team

23  did you pass these QC results on to?

24  A.  To Wade Comeaux, Robert Price, Jim White and Armand Massie.

25  Q.  When did you do that, what day?

1    A.  Friday, December 21st.

2    Q.  At what time?

3    A.  11:44 p.m.

4    Q.  And tell us -- read for us what you wrote to them on

5    Friday, December 21st at 11:44 p.m.

6    A.  We must document, answer the six questions for all stated

7    loans.

8    Q.  Why did you put the word "must" in all capital letters?

9    A.  Because I wanted to make sure that they got the message

10   that this was a very important procedure that we cannot have

11   errors in.

12   Q.  Why did you put the word "all" in capital letters?

13   A.  For the same reason, all stated loans must have all six

14   questions answered completely.

15   Q.  Go to DX4078, please.

16         You told us earlier, Rebecca, that loan specialists

17   were receiving multiple emails a day to point out the

18   procedural defects.  Do you recall that?

19   A.  Yes.

20   Q.  Did there come a time when that changed?

21   A.  Yes, it did.

22   Q.  What caused it to change?

23   A.  I met with Steve Brent in the QA organization and I asked

24   for ideas about improving ways to distribute these emails in a

25   more effective way that the loan specialists and the

```
 1   supervisors could digest these, pull them down, read them,
 2   understand them, and then correct the defects at phase code
 3   four before it got to funding.
 4   Q.  What was your intention in asking Steve Brent to come up
 5   with this different format?
 6   A.  My intention was to make it into a simple format yet
 7   effective so we could, as soon as possible, restart the emails
 8   and get those loans corrected at phase code three where there
 9   were real defects.
10   Q.  Read what Steve Brent wrote you on Monday, December 10.
11   A.  We have consolidated the daily QA PC3 reviews into a
12   manageable format for a more efficient review and ultimate
13   dissemination of the information.
14   Q.  Go to DX4082, please.  Before we get there, I want to
15   actually flip you back to PX68, first sentence, second
16   paragraph.  Do you see that?
17   A.  Yes.
18   Q.  Read the first sentence in, please.
19   A.  The QC communication to Central Fulfillment will also be
20   directed to myself on behalf of the CF management team for the
21   next 30 days.
22   Q.  Who was involved in the decision to direct the QC
23   communication to you for the next 30 days?
24   A.  Greg Lumsden, Cliff Kitashima and myself.
25   Q.  What was your intent in that regard?
```

1    A.  My intent in that regard was to ensure that the message was

2    coming from me around QC, that it was taken seriously, and that

3    my team prioritized the QC results and those subsequent

4    corrections effectively.

5    Q.  Read the second sentence of your November 29 email,

6    paragraph 2.

7    A.  We will revise the QA process to focus solely on SUS items,

8    not process or SOPs.

9    Q.  What was your intention in writing those words?

10   A.  That the QA process, which started out with a hundred or

11   more steps on procedures, moved toward less items but that are

12   more QC SUS focused so we could really prioritize the defects

13   that would ultimately contribute to a potential SUS.

14   Q.  Go to 4088, please, DX4088.

15        What is 4088, Rebecca?

16   A.  It's an email from me to Wade Comeaux, Robert Price, Jim

17   White and Armand Massie.

18   Q.  And what are you forwarding to those guys?

19   A.  I'm forwarding the QA/QC findings, recap of our meeting on

20   12/11/2007.

21   Q.  Why are you sending to Comeaux, Price, Massie and White a

22   recap of the prior meeting?

23   A.  This is the meeting that I attended on behalf of the

24   Centralized Fulfillment organization, I believe it was the

25   prior day, and I am distributing all of the notes and

DAFTBAN5                    Mairone - direct

1    information and outcomes of that meeting to the Centralized

2    Fulfillment leadership team in preparation for a Centralized

3    Fulfillment meeting the following day.

4    Q.  Now if you look at the bottom email from Steve Brent to

5    you, he's recapping the meeting you just talked about, is that

6    right?

7    A.  Yes, he is.

8    Q.  While we all agreed that we have some challenges with our

9    new process in Central Fulfillment, we also realize some of

10   these findings would not be specific only to Central

11   Fulfillment loans, that we will probably see similar findings,

12   et cetera, et cetera.  Rebecca asked for a report that details

13   the top six-ish SUS findings.  Did you ask for such a report?

14   A.  Yes, I did.

15   Q.  What were you looking for there?

16   A.  I was looking for them to take the defects that they found

17   in the audits and align those to the most serious defects that

18   relate to SUS potential findings and de-prioritize those that

19   we knew were just strictly procedures or not as important and

20   would not potentially relate to SUS QC findings.

21   Q.  What was your intent in asking for it to be broken down

22   that way?

23   A.  My intent was so that we could clearly and quickly focus on

24   the top defects that were most problematic in the process.

25   Q.  A little further down it says:  Put together a

1    newsletter-ish document "Myth Busters" that would address

2    process and procedures perspective.

3              Did you ask for a Myth Busters document to be created?

4    A.  Yes, I did.

5    Q.  What is a Myth Busters document and what was your intent in

6    asking for one?

7    A.  A Myth Busters document is a clear communication around the

8    importance of the QA process, the changes that we were making

9    to the QA process, and the procedures that the loan specialists

10   and supervisors would need to follow.  My intent was to make

11   sure that we effectively, what I call "restart" the QA process

12   with a much more effective focus on problems and defects that

13   could contribute to SUSs, and a better way to distribute those

14   reports and work those reports on a day-to-day basis.

15   Q.  Flip the page to page 2, please.

16             The second line says:  Rebecca and Cliff agreed to

17   have a SWAT team put together with representatives of tech,

18   process engineering, FSL ops and so forth to address these top

19   six-ish items and get them resolved.

20             Do you recall agreeing to a SWAT team with Cliff

21   Kitashima?

22   A.  Yes, I do.

23   Q.  What was your purpose in wanting to form a SWAT team?

24   A.  So that we could prioritize this work to correct QA defects

25   over a lot of other work that was getting done in the division,

1   and that we would have the right team members, the most skilled

2   team members across each function to focus on these defects so

3   we had the very best results.

4   Q.   Please go to DX4091.  You mentioned in connection with

5   paragraph 2 of the November 29 email that you would receive QC

6   quality control reports for Central Fulfillment, is that right?

7   A.   Yes.

8   Q.   Were there others in your Central Fulfillment organization

9   who received them as well?

10   A.   Yes, there were.

11   Q.   Take a look at DX4091.  And tell us who in your

12   organization received these quality control reports that are

13   4091.

14   A.   The weekly corporate QC reports not only went to myself but

15   we included Wade Comeaux, Jim White, Robert Price, David

16   Sallis, all part of Central Fulfillment management team.

17   Q.   Let's go back to 4082.  In the middle of the page is an

18   email directed to you from Steve Brent where he talks about

19   adjusting tab 3, lists a bunch of tabs.  Can you explain what

20   tab 2 is in fact?

21   A.   Tab 2 was the list of defects and their associated reason

22   or outcome categorized as SUS or procedure or no risk.

23   Q.   What about tab 3, the tab that he says you requested the

24   adjustment?

25   A.   On tab number 3 I requested that we adjust tab number 3 as

DAFTBAN5                          Mairone - direct

1    follows, the question number reference guide identifies the key

2    four findings, and I also asked them to highlight those.

3    Q.  What was your intent in that regard?

4    A.  My intent was to prioritize the most problematic defects to

5    the top of the spreadsheet so people could easily see those and

6    also highlight them so they wouldn't miss those.

7    Q.  Let's go back to the November 29 email, paragraph 2.

8    Rebecca, can you read the third sentence:  We will not

9    conduct --

10   A.  We will not conduct any on-site reviews until further

11   notice.

12   Q.  First of all, what's an on-site review?

13   A.  An on-site QA review is where a QA auditor sits next to a

14   loan specialist and watches them do their work.

15   Q.  Who was involved in the decision to not conduct any on-site

16   reviews until further notice?

17   A.  It was Greg Lumsden, Cliff Kitashima and myself.

18   Q.  What was your intent in saying there should be no further

19   on-site reviews until further notice?

20   A.  My intent was to get the QA process corrected and the

21   SUS-type items and defects prioritized.  And once we did that,

22   then we could start the on-site reviews and they would be much

23   more effective.

24   Q.  Let's go to paragraph three.  Can you read the first

25   sentence, please.

1    A.  Effective 12/15/07, may review to implement sooner, the

2    income calculator will be the only worksheet separate from edge

3    inputs that will be required on all prime and EA loans.

4    Q.  Who was involved in the decision to make the income

5    calculator the only worksheet that would be required on all

6    prime and EA loans?

7    A.  That was Greg Lumsden, Cliff Kitashima and myself.

8    Q.  Remind us what the income calculator is.

9    A.  The income calculator was where the loan specialists input

10   the customer's income, and it would actually make sure that the

11   calculation of the monthly income amount was correct.  They

12   would then take that amount of monthly income and put that into

13   the edge system which would feed CLUES.

14   Q.  What was your intention in stating that the income

15   calculator effective 12/15/07 will be the only worksheet

16   required on all prime and EA loans?

17   A.  The intention was that the new income calculator, which was

18   specifically rebuilt to handle prime loans, was a much more

19   robust income calculator tool than either the prior tool or the

20   worksheet.  And we wanted all loan specialists and anyone

21   calculating the income across the division to use this new

22   robust tool.

23   Q.  Read the second sentence, please, of paragraph three.

24   A.  The other types of income worksheets and any checklists for

25   income will be eliminated.

1    Q.  Who was involved in that decision?

2    A.  Greg Lumsden, Cliff Kitashima and myself.

3    Q.  What was your purpose in eliminating those worksheets and

4    checklists?

5    A.  My purpose was for them not to be confused because the

6    prior worksheets and job aids were relating to the old

7    calculator, so we did not want confusion to happen, we wanted

8    them to go to the new, more robust income calculator.

9    Q.  When you say "they," who did you want to go?

10   A.  "They" would be loan specialists, underwriters, or anyone

11   across the division that was calculating income.

12   Q.  And go to the third sentence of the third paragraph,

13   please, and read it.

14   A.  The LSs will need to use the new stated income

15   reasonability worksheet as a job aid for all stated loans.

16   Q.  Who was involved in that decision?

17   A.  Greg Lumsden, Cliff Kitashima and myself.

18   Q.  What does it mean and what was your intent behind it?

19   A.  That means that we want the LSs to use a new stated income

20   reasonability worksheet as a job aid for all stated loans in

21   order to make sure they were following the process correctly.

22   Q.  Rebecca, during the period that on-site reviews were going

23   to be suspended, was there any review at all of loan

24   specialists?

25            MS. NAWADAY:  Objection.

1              THE COURT:  Overruled.

2     A.  Yes, there was.

3     Q.  What kind of review?

4     A.  The QA audits did continue.  We didn't feel like it was

5     prudent to stop them all together, so we continued because some

6     of the information in the defects was important to know.  So

7     the India auditors continued to perform all of the QA testing

8     as they would do normally.

9     Q.  Take a look at 695, which is not yet admitted.  Tell us

10    what it is and how you recognize it.

11    A.  This is an FSL operations bulletin.

12    Q.  How do you recognize it?  Have you seen it before?

13    A.  Yes, I have.

14              MR. MUKASEY:  The defense offer DX695 into evidence.

15              MS. NAWADAY:  No objection.

16              THE COURT:  Received.

17              (Defendant's Exhibit 695 received in evidence)

18    Q.  Rebecca, what is 695?

19    A.  It is a stated income reasonability worksheet not mandatory

20    bulletin.

21    Q.  Were you involved in preparation of this bulletin?

22    A.  Yes, I was.

23    Q.  What was the reason that the stated income reasonability

24    worksheet was no longer mandatory?

25    A.  Because we felt like with the new calculator that we could

1    use this as a job aid and that would suffice to provide enough

2    direction to the loan specialists or underwriters performing

3    stated income reasonability.

4    Q.   How does an underwriter or a loan specialist use a job aid?

5    A.   They use a job aid by following it carefully at their desk.

6    They were very used to using job aids.  When we went through

7    the training, they're trained on how to use job aids to follow

8    very specific step-by-step procedures, and the supervisors are

9    also well aware and would make sure on each loan that an

10   underwriter or a loan specialist was performing those tasks

11   accurately.

12   Q.   Is the job aid a piece of paper or is it a computer, what

13   is it?

14   A.   The job aid is a piece of paper, yes.

15   Q.   Now I want to take you to DX734.

16        MR. MUKASEY:  Don't put it up yet, Alex.

17   Q.   Do you recognize 734?

18   A.   Yes, I do.

19   Q.   Tell us generally what it is.

20   A.   This is another bulletin announcement related to stated

21   income reasonability worksheet.

22   Q.   How do you recognize it?

23   A.   My group developed this.

24        MR. MUKASEY:  Defense offers 734 for identification

25   into evidence.

1          MS. NAWADAY:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 734 received in evidence)

4    Q.  Rebecca, read the date on this, please, upper right-hand

5    corner.

6    A.  12/14/2007.

7    Q.  Effective immediately, what is going to happen?

8    A.  The stated income reasonability worksheet is no longer

9    available for use.  Going forward, branches must use the income

10   calculator worksheet low doc tab to document the reasonableness

11   of income on all stated and low documentation loan programs.

12   Q.  In your mind, was making the stated income reasonability

13   worksheet no longer available to the loan specialists a danger

14   to loan quality?

15   A.  No.

16   Q.  Why not?

17   A.  Because the new income calculator was very specific and it

18   was easy to follow.  There were step by step by steps that each

19   loan specialist or underwriter would follow in order to

20   complete the stated income reasonability.

21   Q.  Let me direct your attention to the bottom of this bulletin

22   next to questions.  It says call FSLD support at 800-470-7640.

23   What does that mean?  What is FSLD support?

24   A.  In the operations area we had a team of individuals that

25   manned a phone desk.  If there were any questions on any

1    operating bulletin, any employee across FSL could call into

2    that support line during working hours and get all of the

3    answers to their questions.

4    Q.   Who oversaw that FSLD support line?

5    A.   Loren Rodriguez's group.

6    Q.   Who did you report to?

7    A.   He reported to me.

8    Q.   Take a look at 826 for identification.  Do you recognize

9    826 for identification?

10   A.   Yes, I do.

11   Q.   What is 826?

12   A.   It is a stated income reasonability calculator.

13   Q.   How do you recognize it?

14   A.   I was involved in the roll out and communication.

15          MR. MUKASEY:  Defense offers 826 for identification

16   into evidence.

17          MS. NAWADAY:  No objection.

18          THE COURT:  Received.

19          (Defendant's Exhibit 826 received in evidence)

20   Q.   Rebecca, this is the income calculator, is that right?

21   A.   Yes, it is.

22   Q.   Who made the ultimate call on using the income calculator

23   instead of the worksheet?

24   A.   That was Cliff Kitashima from the credit risk and

25   compliance organization.

DAFTBAN5                        Mairone - direct

1   Q.  Did you have input into that?

2   A.  I had little input.

3   Q.  Were you in agreement with Cliff?

4   A.  I was supportive of this change.

5   Q.  Which in your mind was the better tool?

6   A.  This stated income reasonability calculator that you see

7   here.

8   Q.  If the loan specialist used this calculator, in your mind

9   would it have resulted in loans of poor quality being

10  manufactured?

11  A.  I did not believe so, no.

12  Q.  Why not?

13  A.  Because it's a more quantitative way that you can assess

14  the reasonability of income and then assess whether or not that

15  was risky.  If it was risky based on the score and the outcomes

16  of the particular questions, that would be escalated to an ops

17  manager or assistant vice president for further review.

18  Q.  Last paragraph of PX68, November 29th email.  Just read the

19  first sentence of paragraph five, please.

20  A.  We will prepare a note to all CF employees to help them

21  understand they should feel confident in using their authority

22  and that we will have a QoG comp hit reprieve through the end

23  of January and they will no longer receive direct QA feedback

24  until further notice.

25  Q.  Explain, please.

2596

1    A.  We wanted to make sure that we were effectively

2    communicating with the Central Fulfillment organization.

3    Because we were making changes that affected front line

4    employees, we wanted to make sure that they knew that we were

5    preparing a better QA process, that we were still focused on

6    those improvements, and just a reminder that, you know, they

7    needed to move away from their old procedures to their new loan

8    specialist procedures, and they should use the authority that

9    they earned and were certified for with that.

10   Q.  The last sentence of paragraph five says:  The feedback

11   they will receive will come from their supervisors only.

12           What was your intention in that regard?

13   A.  In this regard, because the QA process still continued, we

14   were communicating the QA feedback down to the supervisors.

15   And we wanted to make sure if there were issues with QA in the

16   interim period of this note, which was estimated to be 30 days,

17   that the supervisors would go directly to the loan specialists

18   in order to make any changes.

19   Q.  Rebecca, who did you send the November 29 email to?

20   A.  I sent that to the Central Fulfillment leadership team Wade

21   Comeaux, Robert Price, Jim White and Armand Massie, and I

22   copied the FSL division management team and some other key

23   leadership employees.

24   Q.  Including Greg Lumsden?

25   A.  Greg Lumsden, yes, including Greg Lumsden, Ed O'Donnell,

 1   Cliff Kitashima, Loren Rodriguez, Jim Kee, Lloyd Sargeant, Jim

 2   Micali and Scott Bridges.

 3   Q.  Now take a look at DX672, please.

 4           THE COURT:  Counsel, find a place in the next five

 5   minutes to break for our afternoon break.

 6           MR. MUKASEY:  Maybe three minutes, Judge.

 7           THE COURT:  That's fine.

 8   Q.  What is the date on DX672?

 9   A.  November 29, 2007.

10   Q.  Same day you send that email?

11   A.  Yes, it was.

12   Q.  Look to the second page.  At the top where it says center

13   support, i.e., coaches, what are coaches in this context?

14   A.  Coaches in this context are really trainers, but they're

15   subject matter experts.  In this case, they were operations

16   managers who were some of our most experienced operations

17   managers, and we were using them to help coach the loan

18   specialists in the Centralized Fulfillment organization, just

19   an added training and added on the job training that we felt

20   would add value.

21           (Continued on next page)

22

23

24

25

DAF3BAN6                         Mairone - direct

1   Q.  For what purpose did you insert coaches?

2   A.  In order for them to have assistance in following the

3   procedures, and using their lending authority and producing

4   high-quality loans.

5   Q.  Go down to the bottom of page two.  QA QC.  And just read

6   the first bullet and the two sub-bullets into the record,

7   please.

8   A.  "Process being revised to scale back scope of findings and

9   feedback.  Focus more on risk SUS issues instead of

10  process/work flow issues.  Provide feedback to management only

11  instead of line staff."

12  Q.  Why not line staff?

13  A.  Not until we got the distribution of the e-mails problem

14  corrected, so that they can actually have a plan, a daily plan,

15  and an e-mail that actually worked to communicate effectively

16  what the defects were they needed to work.

17          MR. MUKASEY:  This is a good breaking point, Judge.

18          THE COURT:  Ladies and gentlemen, we'll take our

19  midafternoon break and we'll see you in 15 minutes.

20          (Jury excused)

21          MR. MUKASEY:  I think 30 minutes but I'm going to say

22  45.

23          THE COURT:  Okay.  Anything counsel needs to raise

24  with the Court?  Okay.  We'll see you in 15 minutes.

25          (Recess)

1              (In open court; jury present)

2              THE COURT:  Counsel.

3              MR. MUKASEY:  Thank you, Judge.

4     BY MR. MUKASEY:

5     Q.  Rebecca, take a look at DX 54, which is an agenda for

6     quality control and assurance summit.  Do you see that?

7     A.  Yes, I do.

8     Q.  Where were you living at the time of the quality assurance

9     quality control summit?

10    A.  I was living outside of Pasadena, California.

11    Q.  With whom?

12    A.  With my children and my husband.

13    Q.  Where was the quality control and quality assurance summit

14    held?

15    A.  It was held in Richardson, Texas.

16    Q.  Did you attend the quality control and quality assurance

17    summit?

18    A.  No, I did not.

19    Q.  What was the reason you did not attend?

20    A.  It was my daughter's eighth birthday.  So I stayed home.

21    Q.  What was the date of your daughter's birthday?

22    A.  It was the 25th, so Friday.

23    Q.  Who attended this from your organization?

24    A.  My heads of centralized fulfillment which were Wade

25    Comeaux, Armand Massie, Jim White, and Robert Price I believe.

1    Yes, Robert Price, too.

2    Q.  Did you have trust in those folks to be your emissaries?

3    A.  Yes, I did.

4    Q.  When Wade Comeaux returned, did you have discussion with

5    him, yes or no?

6    A.  Yes.

7    Q.  Was your decision not to attend because of any kind of a

8    disregard for quality?

9    A.  Not at all.

10   Q.  Can you go to -- withdrawn.

11           Rebecca, did there come a time that you started to see

12   some quality control results?

13   A.  Yes.

14   Q.  Take a look at PX 297.  In particular, page two.  Tell us

15   what's reported on page two -- withdrawn.

16           Approximately when did you get quality control

17   numbers, Rebecca?

18   A.  Usually on a monthly basis.

19   Q.  Okay.  Let me direct to the year 2007, quarter four.  Under

20   FSL bottom-left-hand corner of the graph.  Can you read for us

21   in the third column from the right the percent SUS for EA.

22   A.  For EA it was 0.0 percent SUS.

23   Q.  For conforming?

24   A.  For conforming it was 3.3 percent SUS.

25   Q.  And the final weighted number at the bottom in the blue.

1    A.  The final weighted number is 5.4 percent.

2    Q.  This Q4 '07, that was the first quarter of Central

3    Fulfillment, is that correct?

4    A.  Yes, it is.

5    Q.  By quarter, we mean the last three months of '07, is that

6    right?

7    A.  Yes, October, November, December.

8    Q.  What did that tell you about the HSSL loans going through

9    Central Fulfillment?

10   A.  That they're meeting the quality thresholds for QC error

11   rates.

12   Q.  Those numbers that you read are loans that went through the

13   HSSL, correct?

14   A.  Yes.

15   Q.  Do you know, from having reviewed other documents, how

16   these numbers compared to prior quarters?

17   A.  Yes, I do.

18   Q.  How do they compare?

19   A.  They show improvements in a reduction of SUS percentage

20   findings.

21   Q.  Take a look at DX 73.  We were here before in connection

22   with NCA, but now I want to move you to 2007, quarter three,

23   under FSL all the way on the left.

24        What is the division response SUS percentage for the

25   third quarter of '07?

1   A.  13.4 percent.

2   Q.  Now move over to Q1 '08.  Actually, might as well go to Q4

3   '07 which we just did.  Number?

4   A.  5.4 percent.

5   Q.  Q1 '08?

6   A.  9.8 percent.

7   Q.  Q2 '08?

8   A.  4.4 percent.

9   Q.  And Q3 '08?

10  A.  4.6 percent.

11  Q.  What was your assessment as chief operating officer of

12  Central Fulfillment of the direction of these numbers?

13  A.  In general, very good quality in the fourth quarter of

14  2007.  Worsening quality and concerning in first quarter of

15  2008.  And significant improvement in both first and second --

16  our second and third quarter of 2008.

17  Q.  Let's go to DX 993.  As you flip there, Rebecca --

18  withdrawn.

19         Let's go to page 13 which is entitled "residential

20  credit risk committee."  It lists a bunch of what they call

21  corrective actions in the fulfillment process, do you see that?

22  A.  Yes, I do.

23  Q.  Can you read for us under "resources," the first entry,

24  12/07.

25  A.  "12/07.  Added coaches in Central Fulfillment group to

1  address training and SOP execution needs."

2  Q.  Is that related to the coaches that you mentioned a little

3  earlier?

4  A.  Yes, it is.

5  Q.  How about income calculator?

6  A.  "12/07.  Implemented income calculator for use on full doc

7  files."

8  Q.  Stated income worksheet.

9  A.  "1/08.  Implemented worksheet for use on stated income

10 files."

11 Q.  And the next one, job aid.

12 A.  "Job aid requires LS or underwriter to determine

13 reasonability based upon borrower's credit profile, employment,

14 assets/reserves, and income information from any CHL loan

15 originated in prior 12 months."

16 Q.  Now I'm going to ask you to flip to the next page, where it

17 says "QoG update."  Just read what happened in January of '08.

18 A.  "1/08.  Implemented QoG update."

19 Q.  What does that mean?

20 A.  We're reinstituting the QoG process.

21 Q.  "Under work flow implemented, new work flow procedures for

22 processing stated income loans."  What does that mean?

23 A.  That means the use of the new calculator, and it also means

24 that we were working toward procedures for review -- additional

25 reviews of stated income loans.

```
 1   Q.  Without going through all of these, were you supportive of

 2   these corrective actions?

 3   A.  Yes, I was.

 4   Q.  Tell us why.

 5   A.  Where we found our highest defect rates, some of those were

 6   around stated reasonability.  All of these corrective actions

 7   on this particular page relate to making improvements and

 8   making changes in order to get stated income reasonability

 9   defects down.

10   Q.  Were you in favor of that?

11   A.  Absolutely.

12   Q.  Go to DX 61, please.  There is a new CTC process announced

13   in 61.  And CTC is clear to close, is that right?

14   A.  Yes, it is.

15   Q.  Can you read the first sentence of the first paragraph "to

16   enhance."

17   A.  "To enhance loan quality and salability, FSLD is

18   implementing a new clear to close CTC process for both field

19   offices and Central Fulfillment teams."

20   Q.  I think if you go to procedures and read "loan specialists

21   are required to."

22   A.  "Submit a CTC request to underwriting for review, prior to

23   requesting loan docs."

24   Q.  Were you supportive of these changes?

25   A.  Yes, I was.
```

1   Q.  Why?

2   A.  Because we believed that adding extra controls in order to

3   reduce the number of defects we were seeing was a very prudent

4   and necessary thing.

5   Q.  Were you abandoning the HSSL work flow by making these

6   changes?

7   A.  Not at all.

8   Q.  Can you explain that?

9   A.  A lot of the already improvements that we had added to the

10  work flow, and the reorganization of centralized fulfillment

11  into functional teams, a lot of those best practices were

12  working well.  We decided and determined adding an extra

13  control with a sign off on CTC was necessary at this time.

14  Q.  Rebecca, you've heard testimony in this trial about a

15  rebuttal process?

16  A.  Yes, I have.

17  Q.  How, if at all, were you involved in the rebuttal process?

18  A.  I wasn't involved in the rebuttal process.

19  Q.  We've heard some testimony about something called a sprint

20  incentive.  What involvement did you have with the sprint

21  incentive?

22  A.  I didn't have any involvement in the sprint incentive.

23  Q.  Were you involved in any repurchase requests?

24  A.  No, I wasn't.

25  Q.  Was it part of your job to interact with Fannie or Freddie

 1    about loans?

 2    A.  No, it wasn't.

 3    Q.  During your time at FSL, did you ever meet with any

 4    representative of Fannie or Freddie?

 5    A.  No, I did not.

 6    Q.  Were you ever asked to?

 7    A.  No, I was not asked to either.

 8    Q.  Did you ever instruct Ed O'Donnell to remove some slides

 9    from some certain presentation?

10    A.  Not that I can remember.

11    Q.  Go to DX 1012, please.  1012 is an e-mail from Michael

12    Thomas to Ed O'Donnell and an O'Donnell response.  Can you read

13    Michael Thomas "just talked to Cliff."

14    A.  "Just talked to Cliff.  He was just as frustrated.  Brent

15    said Rebecca rolled her eyes quite a bit when I confirmed that

16    the issue is not a behavioral problem, but a process problem.

17    It gave me comfort just to know I got under her skin just a

18    little."

19    Q.  Now read O'Donnell's response.

20    A.  "I know the feeling.  She's got rubber bullets in her gun

21    and we are going nuclear."

22    Q.  Were you aware that O'Donnell and Thomas were talking about

23    you at the time?

24    A.  I had heard things, but had not addressed anything.

25    Q.  By the way, how many times have you met Michael Thomas?

1   A.  I met Michael Thomas I think one time.

2   Q.  Flip in your binder to DX 4130.

3          MR. MUKASEY:  But don't post it, Alex.

4   Q.  Rebecca, do you recognize 4130?

5   A.  Yes, I do.

6   Q.  What do you recognize it to be -- let me ask it this way.

7   Do you recognize it to be an e-mail to you from Wade Comeaux?

8   A.  Yes, it is.

9          MR. MUKASEY:  Defense offers 4130 for identification

10  into evidence.

11         MS. NAWADAY:  No objection.

12         THE COURT:  Received.

13         (Defendant's Exhibit 4130 received in evidence)

14  Q.  Rebecca, this is an e-mail from Wade Comeaux to you.  It is

15  dated June 19, 2008 at 10:48 in the morning.

16         Alex, let's go down to the paragraph that begins

17  "also."

18         And Rebecca, can you please read to us what Wade

19  Comeaux wrote to you.

20  A.  "Also, I do not want you to think I have a target on Ed,

21  but I am concerned that you do not have a true understanding of

22  how he feels about you or what he has said about you.  I have

23  heard from his mouth and from countless others regarding what

24  he has said to them about you, including many people in

25  Pasadena and all of his direct reports.  Theresa McMahon as

well.  And those things are not positive in any way.  Now that

he knows you are in a key leadership role, I'm sure he's

changing his tune to a certain degree.  But he has so strongly

held his views about you to his people and others, he is in a

really tough spot.  To truly back you, he will seem

hypocritical.  He was far too critical in the past."

Q.  Keep going.

A.  "At the end of the day, you have seen what he is capable of

when he wants something, and he was telling everyone he was

after your job as COO.  He believed you were out and he was not

afraid to say it.  To allow him to be in a key role will make

your job more difficult in the future.  I respect Ed's

experience, intelligence, and ability.  He can do great things.

Unfortunately, he has painted you into a corner.  If you allow

him to have a key role after the way he has behaved and what he

has said, it will undermine your authority in many ways.  You

will always have to wonder what he is saying or doing and keep

a close eye on every report or meeting, just as we have had to

do for the past nine months."

Q.  Last paragraph.

A.  "I am saying no matter what role I have after the

transition.  If you think I should move to sales, Ed would

still be the wrong person for a key operations role.  Not

because of his ability, but because of his past actions and

true feelings about you.  If you ask around and are able to get

1   the truth, this will be very easy to see."

2   Q.  Rebecca, what, if any, action did you take after you got

3   this e-mail from Wade Comeaux?

4   A.  I called Wade.

5   Q.  Did you ever confront Ed O'Donnell about this?

6   A.  No, I didn't.

7   Q.  Why not?

8   A.  Because I felt like, you know, it was more professional and

9   the right thing to do to step away, ignore that, and work as

10  collegial as I could with him, with Cliff, with everybody

11  across the division.

12  Q.  Rebecca, did you ever fail to take any action while you

13  were COO because you didn't care whether bad loans were sold to

14  the GSEs?

15  A.  No.

16              MR. MUKASEY:  Pass the witness, your Honor.

17              THE COURT:  All right.  Anything from bank counsel?

18              MS. MAINIGI:  No, your Honor.  No questions.

19              THE COURT:  Cross-examination.

20  CROSS-EXAMINATION

21  BY MS. NAWADAY:

22  Q.  Good afternoon, Ms. Mairone.  You testified that as COO you

23  were in a supporting role.  Do you recall that testimony?

24  A.  Yes, I do.

25  Q.  But as chief operating officer, you would agree that you

1   were also a decision maker, correct?

2   A.   There were decisions and input that I had for sure.

3   Q.   You gave some testimony about the NCA group, correct?

4   A.   Yes, I did.

5   Q.   In fact, you started the NCA division, isn't that right?

6   A.   That's not true.

7   Q.   Do you recall having your deposition taken in this case?

8   A.   I do.

9   Q.   The testimony you gave in that deposition was under oath,

10  correct?

11  A.   Yes, it was.

12          MS. NAWADAY:  Your Honor, may I approach?

13          THE COURT:  Yes.

14  Q.   I'd like to direct your attention to page nine of your

15  deposition transcript, page nine, lines 17 through 24.

16          MR. MUKASEY:  Objection.

17          THE COURT:  Overruled.

18          MR. MUKASEY:  I'll withdraw the objection.

19          THE COURT:  You may read.

20  Q.   Ms. Mairone, directing your attention to page nine, line 17

21  through 24.  I asked you the question:

22  "Q.  What were your primary responsibilities as chief operating

23  officer?

24  "A.  Primary responsibilities at the time I was hired included

25  head of technology, leading human resources, leading process

1    design, and project management, leading training and recruiting

2    for the division, and starting up the NCA division."

3              Was that your answer, Ms. Mairone?

4    A.  Yes, it was.

5    Q.  You were previously shown DX 73.  Do you still have that

6    handy?

7    A.  I do.  Yes, I have it.

8    Q.  You were shown this document in connection with your

9    testimony concerning the NCA division, do you recall that?

10   A.  Yes, I do.

11   Q.  But this document doesn't reflect any specific quality

12   control numbers specific to the NCA group, does it?

13   A.  No, it is a combined report.

14   Q.  You also testified earlier that CLUES is the underwriter,

15   do you recall that?

16   A.  Yes, I do.

17   Q.  I'd like to direct your attention back to your deposition

18   transcript, page 114, line 11 through page 115, line nine.  Do

19   you see that?

20   A.  Yes, I do.

21   Q.  And I asked you the following question --

22              MR. MUKASEY:  Objection.

23              THE COURT:  Overruled.

24   Q.  "Q.  Are you familiar with the phrase CLUES is the

25   underwriter?

1    "A.  No.  CLUES, no.

2    "Q.  You have never heard the phrase CLUES is the underwriter?

3    "A.  In general terms, yes.  But I don't believe that's

4    accurate.

5    "Q.  Why not?

6    "A.  Because CLUES is an underwriting tool, not an underwriter.

7    "Q.  Are there any underwriting tasks that CLUES cannot

8    perform?

9    "A.  Yes.

10   "Q.  What would those tasks be?

11   "A.  To look at a document and putting data into the system.

12   "Q.  Does CLUES determine reasonability of income in any way?

13   "A.  No.  I don't believe so.

14   "Q.  Does CLUES evaluate the adequacy of an appraisal in any

15   way?

16   "A.  No."

17            Was that your testimony, Ms. Mairone?

18   A.  Yes, it was.

19   Q.  You also testified concerning the training of loan

20   specialists, do you recall that?

21   A.  Vaguely.

22   Q.  I believe you testified that loan specialists were trained

23   on income reasonability, is that right?

24   A.  I don't recall what I testified to in my deposition related

25   to that.

1    Q.  I mean earlier today.  Do you recall your testimony that

2    loan specialists were trained on income reasonability?

3    A.  Yes.

4    Q.  In fact I believe you said that you were not aware of any

5    loan specialists who did not receive proper training, is that

6    right?

7    A.  That's correct.

8    Q.  Please turn back to your deposition transcript, page 75.

9    I'll direct your attention to page 75, line 12, through page

10   76, line 22.

11              MR. MUKASEY:  Objection.

12              THE COURT:  Ground?

13              MR. MUKASEY:  Not inconsistent.

14              THE COURT:  This is a party.  The statements of a

15   party adversary are admissible, if relevant, regardless of

16   whether they're consistent or inconsistent, counsel.

17              MR. MUKASEY:  Understood, Judge.

18              THE COURT:  Overruled.

19   Q.  I asked you the following question on page 75:

20   "Q.  What did the training plan consist of?

21   "A.  I don't remember.  I don't remember the specific component

22   of the training plan sitting here today.

23   "Q.  Do you remember anything about the training plan?

24   "A.  The training plan, sure, was to train on the HSSL, how to

25   perform what work to do and what changes were being made so

DAF3BAN6                          Mairone - cross

```
 1   employees were informed.
 2   "Q.  Do you remember anything about the training of loan
 3   processors in particular?
 4   "A.  There was a training program, yes.
 5   "Q.  Can you explain the training plan for loan processors for
 6   the High-Speed Swim Lane?
 7   "A.  I'm not understanding your question, sorry.
 8   "Q.  Can you explain to me what the training plan was for loan
 9   processors who were to participate in the High-Speed Swim Lane?
10   "A.  I don't recall the specific elements of the training plan
11   itself.  As we sit here today, there was a training plan, this
12   was important to train them on what work tasks they were
13   required to do."
14           That was your testimony, correct?
15   A.  Yes, and I've had a lot of time to recall --
16           THE COURT:  Excuse me.  No.  Just answer the question
17   yes or no.
18   A.  Yes, that was my testimony.
19   Q.  You also gave some testimony concerning on-site reviews
20   earlier today, do you recall that?
21   A.  Yes.
22   Q.  You testified concerning what the on-site reviews were,
23   correct?
24   A.  Yes, I did.
25   Q.  You testified concerning your reasons for discontinuing the
```

1   on-site reviews, correct?

2   A.  Yes.

3   Q.  If I could turn your attention now to page two of your

4   deposition -- sorry.  Day two of your deposition testimony.

5   Page 245.  I'll direct your attention to page 245, line 12,

6   through 248, line nine.  Do you have that in front of you?

7   A.  Yes, I do.

8   Q.  Beginning on page 245, I asked you the following:

9   "Q.  Drawing your attention back to paragraph two, in the

10  middle of that paragraph, you also say we will not conduct any

11  on-site reviews until further notice.  Do you see that?

12  "A.  Yes.

13  "Q.  What on-site reviews?  Can you just explain to me what an

14  on-site review is?

15  "A.  I'm not clear on what that on-site reviews were exactly.

16  "Q.  Can you explain what you meant by, quote, we will not

17  conduct any on-site reviews until further notice?

18  "A.  I don't recall what that was specifically about.

19  "Q.  Do you recall any on-site reviews in or around November,

20  December, in or around November 2007 as part of the quality

21  control process?

22  "A.  I'm unclear on what on-site reviews I was talking about

23  here.  I don't recall.

24  "Q.  But apart from this document, do you have an understanding

25  of what on-site reviews were conducted around November 2007 as

1    part of the quality control process?

2    "A.  There are different types of on-site reviews, which is why

3    I'm saying that.  There is an on-site review that supervisors

4    did.  There was on-site other types of quality reviews.  I'm

5    not sure what this is specifically referring to.

6    "Q.  Okay.  Well, this says we will not conduct any on-site

7    reviews until further notice, correct?

8    "A.  That's what it says.

9    "Q.  So why would you want to discontinue all on-site reviews?

10   "A.  I'm not sure that on-site reviews were not conducted.  I'm

11   not clear on this detail.

12   "Q.  Okay.  But you made the decision not to conduct any

13   on-site reviews until further notice, correct?

14   "A.  These items were actually agreed to by myself and others

15   on the management team how we handle this.

16   "Q.  But why did you think it was a good idea not to conduct

17   any on-site reviews as part of the quality control process?

18   "A.  I don't recall exactly why that was done in this case.

19   "Q.  You don't recall what your reason was for wanting to

20   discontinue on-site reviews?

21   "A.  Not exactly, no, I don't."

22            Was that your testimony?

23   A.  Yes, it was.

24   Q.  Ms. Mairone, in 2007, one of your goals as chief operating

25   officer was to manage new projects that improved turn time, is

 1   that correct?

 2   A.  Yes, that's true.

 3          MS. NAWADAY:  Your Honor, may I approach?

 4          THE COURT:  Yes.

 5   Q.  Ms. Mairone, please turn to DX 240 in your binder.  Do you

 6   see your name on this presentation?

 7   A.  Yes, I do.

 8   Q.  This is a presentation that you prepared, correct?

 9   A.  I believe so.

10          MS. NAWADAY:  Your Honor, we offer DX 240 into

11   evidence.

12          MS. MAINIGI:  No objection.

13          MR. MUKASEY:  No objection, Judge.

14          THE COURT:  Received.

15          (Defendant's Exhibit 240 received in evidence)

16          MS. NAWADAY:  If we can turn to page 18 of the

17   document, Ms. Michaud.  Can we blow up the top lines.

18   Q.  And Ms. Mairone, can you read that for us.

19   A.  "Championing key projects that will directly improve turn

20   time in 2007."

21   Q.  Can we go to page 21, please.  Can we blow up the top line

22   of page 21.

23          And Ms. Mairone, can you read that for us.

24   A.  The title?

25   Q.  The current performance, yes.

DAF3BAN6                    Mairone - cross

1    A.  "Current performance and potential TT improvement target.

2    15 day turn time."

3    Q.  So the 15 day turn time was a goal that you had set prior

4    to the High-Speed Swim Lane, correct?

5    A.  Yes, it was an initial goal for the NCA business as well.

6    Q.  In early 2007, Full Spectrum had in place a work flow for

7    processing prime loans you testified to, correct?

8    A.  Yes, we did.

9    Q.  That was called the prime CLUES accept work flow, correct?

10   A.  Yes, it was.

11   Q.  That work flow involved underwriters, correct?

12   A.  Yes, it did.

13   Q.  But the High-Speed Swim Lane was a prime loan processing

14   work flow designed to reduce turn time, correct?

15   A.  Reduce turn time from the current state, not from 15 days.

16   Q.  You were the project manager of the High-Speed Swim Lane,

17   correct?

18   A.  I was the -- I was overseeing the project, that's correct.

19   Q.  You were on the steering committee for the High-Speed Swim

20   Lane, correct?

21   A.  I was on the steering committee as well.

22   Q.  You had input into selecting Loren Rodriguez as one of the

23   managers of the High-Speed Swim Lane, correct?

24   A.  Yes, I did, and others as well.

25   Q.  You said that Mr. Rodriguez reported to you, correct?

```
 1   A.  Yes, he did.

 2   Q.  You gave some testimony about Mark Barnett earlier, do you

 3   recall that?

 4   A.  Yes, I do recall that.

 5   Q.  Mark Barnett reported to Loren Rodriguez, is that right?

 6   A.  Yes, he did.

 7   Q.  Ms. Mairone, you were asked earlier about PX 52.  Do you

 8   still have that in front of you?

 9   A.  Yes, I have it.

10   Q.  You testified that when starting a new process, more

11   communication is typically needed, correct?

12   A.  Yes, that's right.

13   Q.  In fact, you testified that you often need

14   overcommunicating when you start a new process, is that right?

15   A.  That's right, a lot of communication is definitely helpful.

16   Q.  In or around August of 2007, you had communication with

17   Drew Gissinger, is that right?

18   A.  I'm sure I talked to Drew during that timeframe at some

19   point.

20   Q.  Can you remind us who Drew Gissinger is?

21   A.  Drew Gissinger was Greg Lumsden's boss.

22   Q.  Mr. Gissinger around August of 2007 informed you of the

23   need for vigorous underwriting discipline, is that right?

24   A.  I believe Drew sent a memo related to those types of

25   topics.
```

1   Q.  You testified earlier about the turn time goals established

2   for the HSSL pilot, do you recall that?

3   A.  Yes, I do.

4   Q.  And you supported those goals, correct?

5   A.  Yes, I supported those objectives.

6   Q.  There were also funding goals for each loan specialist in

7   the High-Speed Swim Lane, is that right?

8   A.  There were some early objectives so we could measure

9   against them, yes.

10  Q.  In fact, the funding goal was 30 loans per loan specialist

11  per month, is that right?

12  A.  I believe that was the initial goal for the pilot.

13  Q.  There were production reports prepared on Hustle loans

14  during the pilot, correct?

15  A.  Yes, there were production reports.

16  Q.  The reports showed turn time averages per loan specialist,

17  correct?

18  A.  I don't recall the exact report, but there may have been by

19  loan specialist.

20  Q.  And the reports showed funding averages per loan

21  specialist, correct?

22  A.  Again there may have been.  I -- I believe there were, yes.

23  Q.  Do you still have Plaintiff's Exhibit 54 in front of you?

24  A.  Yes, I do.

25          MS. NAWADAY:  Ms. Michaud, can we put Plaintiff's

1    Exhibit 54 back up.  Can we blow up the subject line of the

2    e-mail.

3    Q.  This is a daily Hustle pipeline report, correct?

4    A.  Yes, a daily HSSL pipeline report.

5    Q.  I believe you testified earlier that the pipeline reports

6    were one of the ways that was a control point in the process,

7    is that right?

8    A.  Yes, it allows you to monitor the loans in the process.

9    Q.  But the pipeline report doesn't allow you to monitor loan

10   quality, does it?

11   A.  This particular report did not have loan quality.

12          MS. NAWADAY:  Can we turn to page two of the pipeline

13   or of the e-mail.  And can we blow up the right-hand column in

14   the top two charts.  Sorry.  The right-hand column.

15   Q.  Do you see, Ms. Mairone, it says applications on the far

16   right "applications per LS per month goal"?

17   A.  Yes, I do.

18   Q.  The number below is 60?

19   A.  Yes, that's applications, yes.

20   Q.  Below that it says "fundings per loan specialist per month

21   goal"?

22   A.  Yes, I see that.

23   Q.  And the number is 30?

24   A.  Yes, it is.

25   Q.  You supported that monthly funding goal, didn't you?

DAF3BAN6                        Mairone – cross

1    A.  Yes, as an initial target for the pilot, I did.

2               (Continued on next page)

DAFTBAN7                     Mairone - cross

1    BY MS. NAWADAY:

2    Q.  And you testified about the prefunding quality reports or

3    the quality assurance reports on Hustle loans.  Do you recall

4    that?

5    A.  Yes, I do.

6    Q.  And you said you received those reports on a regular basis,

7    correct?

8    A.  Yes, I did.

9    Q.  And you would agree that the prefunding quality assurance

10   reports provided a safeguard on quality, correct?

11   A.  Yes, as long as measuring the correct things, yes.

12   Q.  And in September of 2007 those quality assurance reports

13   showed that more than 40 percent of the loans had high-risk

14   findings, correct?

15   A.  Yes, that's what the reports showed.

16   Q.  And in October of 2007 the quality assurance reports showed

17   that more than 90 percent of the loans had high-risk findings,

18   correct?

19   A.  Yes, that was in the report.

20   Q.  And in October of 2007 that Hustle work flow was rolled out

21   as part of Central Fulfillment, correct?

22   A.  Yes, it was rolled out.

23   Q.  And you testified concerning your role in Central

24   Fulfillment, that the Central Fulfillment organization reported

25   up to you, is that correct?

DAFTBAN7                      Mairone - cross

1   A.  Yes, it did on a temporary basis.

2   Q.  And reduced turn term was also a goal of the Central

3   Fulfillment initiative, correct?

4   A.  I don't recall that being a specific design element around

5   Central Fulfillment, it was more around the reorganization of

6   the teams and the functions.

7   Q.  Do you still have your deposition transcript in front of

8   you?

9   A.  Yes, I do.

10  Q.  I'll direct your attention to page 179, page 179 line 10

11  through line 22.  Do you have that in front of you?

12  A.  Yes, I do.

13  Q.  And I asked you the following questions:

14          "Going back to page 3 of the document, you see that

15  one of the other changed drivers listed is significantly

16  reduced turn time.

17  "A.  Yes.

18  "Q.  Was that also a goal of the High-Speed Swim Lane pilot?

19  "A.  Turn time was a focus of the pilot and it was a focus of

20  Centralized Fulfillment in both place, as other items were as

21  well."

22          Was that your testimony, Ms. Mairone?

23  A.  Yes, it was.

24  Q.  And you had input into selecting Wade Comeaux as the leader

25  of Central Fulfillment you testified, correct?

1    A.  Yes, I did.

2    Q.  And as chief operating officer, you were aware of who

3    bought the loans being originated through the Central

4    Fulfillment model, correct?

5    A.  I was aware that prime loans were being sold to Fannie and

6    Freddie.

7    Q.  And you're aware -- you were aware that loans sold to

8    Fannie and Freddie were sold with representations and

9    warranties, right?

10   A.  Yes, that's correct.

11          MS. MAINIGI:  Objection, your Honor.

12          THE COURT:  Ground?

13          MS. MAINIGI:  Foundation, your Honor.

14          THE COURT:  Overruled.  The answer will stand.

15   Q.  And you were aware that loans sold to Fannie Mae and

16   Freddie Mac were sold with the representation that the loans

17   were investment quality, correct?

18   A.  That's correct.

19   Q.  During the Central Fulfillment initiative you also received

20   production reports on the loans, is that right?

21   A.  I received lots of production reports, yes, in Central

22   Fulfillment.

23   Q.  And those reports showed turn time on the loans?

24   A.  Some of them did, yes.

25   Q.  And the reports showed the number of fundings per employee?

DAFTBAN7                    Mairone - cross

1    A.  Yes, they did.

2    Q.  And the reports showed an application to fund ratio?

3    A.  Yes, that was a typical production standard.

4    Q.  And you were involved in establishing funding projections

5    for Central Fulfillment, is that right?

6    A.  Yes, I was, on a monthly basis.

7    Q.  And part of your job was to track employee progress in

8    achieving those funding goals, correct?

9    A.  Yes, we wanted to track performance and issues or where we

10   needed focus or employees needed additional help or training.

11   Q.  And you regularly reviewed the funding reports on Central

12   Fulfillment loans, correct?

13   A.  I did review them on a monthly basis.

14   Q.  And the funding reports themselves ranked employees, is

15   that right?

16   A.  That was one of the ways we looked at it.

17   Q.  Ms. Mairone, can you please turn to Plaintiff's Exhibit 503

18   in your binder.

19   A.  I'm having trouble finding that one.  503?

20            MS. NAWADAY:  Your Honor, may I approach?

21            THE COURT:  Yes.

22   Q.  Ms. Mairone, is this an email you sent to Scott Bridges and

23   Greg Lumsden on November 5th, 2007?

24   A.  Yes, it is.

25            MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

1   503 into evidence.

2            MR. MUKASEY:  No objection.

3            MS. MAINIGI:  No objection, your Honor.

4            THE COURT:  Received.

5            (Plaintiff's Exhibit 503 received in evidence)

6            MS. NAWADAY:  Ms. Michaud, could we blow up the second

7   line of the first page of the email.

8   Q.  And in your email to Scott Bridges -- and sorry, could you

9   remind us who Mr. Bridges is?

10  A.  Yes, Scott Bridges ran production for the Full Spectrum

11  lending division.

12  Q.  And you say to Mr. Bridges and Mr. Lumsden:  The objective

13  is to increase the accountability of the operations teams for

14  the forecasted fundings and conversion each month.  This is a

15  daily report.

16           Do you see that?

17  A.  Yes, I do.

18  Q.  So the funding projections reports were produced daily,

19  correct?

20  A.  Yes, these were normal production reports that tracked

21  progress and performance of each individual and each site.

22           MS. NAWADAY:  And if we could turn to page 2 of the

23  document, blow up the lines underneath "features."

24  Q.  Shows the features are track month to date fundings,

25  provide projection of how many fundings per day are needed to

DAFTBAN7                         Mairone – cross

1   meet the goal, shows efficiency funding per LS, for SVP, FVP

2   and OM, and ranking for FVP, OM and LS due November 9, 2007.

3          Did I read that correctly?

4   A.  Yes, you did.

5   Q.  You also had approval authority for incentive plans for

6   Central Fulfillment employees, is that right?

7   A.  I had input and I was one of the approvers but not the only

8   approver.

9   Q.  Can you turn, please, to Plaintiff's Exhibit 492.  Is this

10  an email from Wade Comeaux to you on November 26, 2007?

11  A.  Yes, it is.

12         MS. NAWADAY:  Your Honor, we offer Plaintiff's Exhibit

13  492 into evidence.

14         MR. MUKASEY:  No objection.

15         MS. MAINIGI:  No objection, your Honor.

16         THE COURT:  Received.

17         (Plaintiff's Exhibit 492 received in evidence)

18         MS. NAWADAY:  Can we blow up the top email from

19  Mr. Comeaux.

20  Q.  Ms. Mairone, can you read the top email for us,

21  Mr. Comeaux's email to you?

22  A.  Rebecca, here are the comp plans.  Please approve as soon

23  as possible.  We are setting up calls for Wednesday and

24  Thursday to roll these out.

25  Q.  And you see the subject is CF incentive plan updates?

1    A.  Yes, I do.

2    Q.  Can you remind us what an incentive plan is?

3    A.  Incentive plan is a monthly bonus plan.

4    Q.  And then if we could blow up the bottom email, the email

5    from Tim Holder.  And who is Mr. Holder?

6    A.  He was one of the executives in the compensation area for

7    Full Spectrum Lending.

8    Q.  Ms. Mairone, can you read the top paragraph of Mr. Holder's

9    email?

10   A.  Here are the latest drafts of the CF incentive plans.

11   These versions incorporate the change in target productivity

12   level from 30 to 25 loans for the senior lending specialist

13   position.  The plans with loans per FTE were also scaled back

14   according, as were the funding specialist plans.

15   Q.  And then you see a series of attached files underneath

16   that?

17   A.  Yes, I see that.

18   Q.  And one says incentive plan for lending specialist?

19   A.  Yes.

20   Q.  And the second one is lending -- incentive plan for lending

21   specialist senior?

22   A.  Yes, I see that.

23   Q.  And you see the next one is an incentive plan for an

24   operations manager?

25   A.  Yes, I see that.

1    Q.  The next one is an incentive plan for AVP operations?

2    A.  Yes, I see that.

3    Q.  The next one is incentive plan for an PVF?

4    A.  Yes, I see that, too.

5    Q.  And then the next one is an incentive plan for an SVP,

6    correct?

7    A.  Yes, it is.

8    Q.  If I could turn your attention now to PX493 in the binder.

9    Do you recognize that document?

10   A.  Yes, it's a compensation plan for a senior funding

11   specialist.

12        MS. NAWADAY:  We offer Plaintiff's Exhibit 493 into

13   evidence.

14        MR. MUKASEY:  Judge, may we have one moment to confer

15   among counsel?

16        THE COURT:  Yes.

17        MS. MAINIGI:  Your Honor, could we have a side bar?

18        THE COURT:  All right.

19        (Continued on next page)

20

21

22

23

24

25

 1              (At side bar)

 2              MS. MAINIGI:  We have two concerns, your Honor, one

 3     relates to the motion in limine on compensation, exactly --

 4              THE COURT:  Sorry?

 5              MS. MAINIGI:  One relates to the motion in limine on

 6     compensation, exactly where the government may be going with

 7     respect to this particular issue on compensation.  The second

 8     relates to a senior funding specialist, and no foundation has

 9     been established that a senior funding specialist has any

10     relevance here.

11              MR. MUKASEY:  Judge, I add for the record that while

12     clearly the government has been exploring the notion of what

13     kind of incentives incentivize people, this document actually

14     lays out numbers and salaries, and I'm not sure that that has

15     any particular relevance.  The notion -- I accept that, but the

16     actual dollar amounts people are making leads to --

17              THE COURT:  Well, depends on the magnitude, doesn't

18     it?  One has a different motivation if you are being paid a

19     minimum wage than if you're being paid a very substantial

20     salary.  But let me take a look, hold on.

21              MS. NAWADAY:  Your Honor, I could add something.

22              THE COURT:  Yes.

23              MS. NAWADAY:  Also Ms. Mairone testified on direct as

24     a result of the turn time bonus, loan specialists only stood to

25     gain about $30.  This also goes to that testimony, and also to

1   the authority she held within Central Fulfillment and their

2   general approval authority with respect to incentive plans for

3   all employees within Central Fulfillment.  And of course, we

4   also discussed a lot the incentives that were created by the

5   bonus plans, and so we want to show also we're not getting into

6   individual employee's wealth, it's a matter of compensation

7   structure we're exploring here.

8           MS. MAINIGI:  What does a senior funding specialist

9   have to do with a loan specialist?  We have not laid any

10  foundation whatsoever.

11          MS. NAWADAY:  There are attachments to the email.  So

12  we propose to offer into evidence both the attachments, but

13  we'll be focusing on the senior lending specialist, the AVP and

14  the OM.

15          THE COURT:  Let me take a look at it.  Hold on.

16          MS. MAINIGI:  Your Honor, these titles have nothing to

17  do in terms of relevance to this case.  They're being offered

18  simply to prejudice the defendant, and we don't know whether

19  any sort of incentive plans exists for loan specialists.  Why

20  doesn't she ask that question first of the witness?

21          MR. MUKASEY:  I also add that putting in the actual

22  dollar amount that someone is making under her supervision

23  leads to a slippery slope towards what the loan specialist is

24  making she is probably making three times that or two times

25  that.

1            THE COURT:  My recollection of the motion in limine is

2     that while I suggested that the specific dollar amount might

3     not be necessarily, I certainly overruled the basic thrust of

4     the defense motion in limine which was to keep out questions of

5     compensation all together because it was motivational.  So I'm

6     not sure that a court has ever made a ruling that the specific

7     amounts can't come in.  I agree with you that one has to see

8     whether there's prejudice, and if so, whether it substantially

9     outweighs the probative value.  But of course the Second

10    Circuit gloss on that, on Rule 403, is the rule is tilted

11    towards evidence coming in, not being excluded.  But I will

12    adopt bank counsel's suggestion, whose name I dare not give

13    because I always mispronounce it, but I'm told I cannot do

14    that, that is Ms. Mainigi.

15            MS. MAINIGI:  Close enough.

16            THE COURT:  Anyway, that you ask a foundational

17    question first.  But my inclination is to let it in, but we'll

18    see.

19            (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2    BY MS. NAWADAY:

3    Q.  Ms. Mairone, if we could back out a moment to Plaintiff's

4    Exhibit 492, and you mentioned the incentive plan.  Do you see

5    attached file CF incentive plan lending specialist?

6              A lending specialist was an employee of Central

7    Fulfillment, correct?

8    A.  Yes, it was.

9    Q.  And lending specialists reported up to you, correct?

10   A.  Yes, they did in Centralized Fulfillment.

11   Q.  And did lending specialists have a compensation structure

12   that was comprised both of compensation and bonus?

13   A.  Their compensation structure was a base salary and a

14   monthly bonus.

15   Q.  So lending specialists had an incentive plan and were

16   paid -- they had modifier on their base salary, correct?

17   A.  No, they had a separate monthly bonus plan that was

18   separate from their base salary.

19   Q.  And a lending specialist senior, that was also a Central

20   Fulfillment employee, correct?

21   A.  Yes, it was.

22   Q.  And a lending specialist senior also reported up to you,

23   correct?

24   A.  Yes, they were in the Central Fulfillment organization.

25   Q.  And they also received a monthly bonus, correct?

1   A.  Yes, they had a monthly bonus and a base salary.

2   Q.  And operations managers also reported to you as Central

3   Fulfillment employees, correct?

4   A.  Yes.

5   Q.  And they also received a monthly bonus, correct?

6   A.  Yes, I believe so.

7   Q.  And can you remind us what an AVP of operations is?

8   A.  An AVP of operations has several operations managers that

9   report to them, so they're the boss of the operations managers.

10  Q.  And AVPs of operations report to you as well, correct?

11  A.  They reported up through the Central Fulfillment

12  organization.

13  Q.  And they also received monthly bonuses, correct?

14  A.  I believe so.

15  Q.  And you see the reference to FVP in the attached file as

16  well, correct?

17  A.  Yes, I do.

18  Q.  And FVPs within Central Fulfillment also reported to you,

19  correct?

20  A.  Yes, they did.

21  Q.  And they also received a monthly bonus, correct?

22  A.  Yes, they did.

23  Q.  And is that also true for SVPs or senior vice presidents,

24  they also reported to you?

25  A.  Yes, they did.

DAFTBAN7                    Mairone - cross

1   Q.  And also received a monthly bonus?

2   A.  I don't recall whether it was monthly or quarterly at this

3   point.

4   Q.  And what about funding specialists, did funding specialists

5   also report to you within Central Fulfillment?

6   A.  Yes, funding specialists were part of the Central

7   Fulfillment teams.

8   Q.  And they also received monthly bonuses, correct?

9   A.  Yes, they did.

10  Q.  And what about senior -- or funding specialists senior, did

11  they also report to you?

12  A.  Yes, they did.

13  Q.  And they also received monthly bonuses, correct?

14  A.  I believe so, yes.

15  Q.  And can you remind us what an opening ops manager is?

16  A.  The opening manager managed the teams that did the initial

17  customer letters, and they were part of operations.

18  Q.  And so they reported to you, correct?

19  A.  They were part of the Central Fulfillment organization.

20  Q.  And they received monthly bonuses as well, correct?

21  A.  I believe they did.

22  Q.  And what about AVP, AVPs of opening, they also reported to

23  you?

24  A.  Yes.

25  Q.  And received monthly bonuses, correct?

1   A.  I believe they did.

2   Q.  And did post-funding specialists also report to you?

3   A.  Post-funding specialists, I don't recall exactly whether

4   they were in the operations organization or they were in

5   Cliff's organization, one or the other.

6   Q.  Did they receive monthly bonuses?

7   A.  I believe they did.

8   Q.  And what about -- there's a reference to AVP post-fund, do

9   you know what that refers to?

10  A.  That would be the post-funding specialist manager.

11  Q.  And did that person report to you?

12  A.  Like I said, I'm not sure if it reported to me or to Cliff,

13  but it was part of the operations.

14  Q.  And they also received monthly bonuses?

15  A.  I believe they did.

16  Q.  Now could we turn back to Plaintiff's Exhibit 493.  You

17  said you recognized this document, correct?

18  A.  It's the basic template for a compensation plan for Full

19  Spectrum Lending.

20          MS. NAWADAY:  Your Honor, we offer Plaintiff's 493 in

21  evidence.

22          MS. MAINIGI:  Your Honor, we maintain our objection

23  that we noted at side bar.

24          MR. MUKASEY:  Subject to the objection.

25          THE COURT:  Yes, the objections are noted and

 1   preserved but overruled.  493 is received.

 2              (Plaintiff's Exhibit 493 received in evidence)

 3   Q.  Can you turn next to Plaintiff's Exhibit 494.

 4              THE COURT:  Counsel, find a spot in the next five

 5   minutes to break for the day.

 6              MS. NAWADAY:  Thank you, your Honor.

 7   Q.  Ms. Mairone, do you also recognize Plaintiff's Exhibit 494?

 8   A.  Yes, it's compensation structure template.

 9              MS. NAWADAY:  We offer Plaintiff's Exhibit 494 into

10   evidence.

11              MR. MUKASEY:  Same objection.

12              THE COURT:  I assume the same objection for both

13   sides, same ruling.  494 is received.

14              (Plaintiff's Exhibit 494 received in evidence)

15   Q.  Ms. Mairone, if you could you turn to Plaintiff's Exhibit

16   495.

17              THE COURT:  How many are in this series?

18              MS. NAWADAY:  495, 496, 497, 498, 499 and 500.

19              THE COURT:  All right.  So I'm going to assume that

20   the same objections are raised to all of them.  I'm going to

21   assume that my ruling stays the same, and they are all

22   received.

23              (Plaintiffs' Exhibits 495 through 500 are received in

24   evidence)

25              THE COURT:  However, after we excuse the jury, if

DAFTBAN7                      Mairone - cross

 1    there are individual objections to any one of those, I will

 2    hear those outside the presence of the jury.  I don't want to

 3    take the time now.  So conditionally those are all received.

 4            And on that very exciting note, ladies and gentlemen,

 5    we will let you go for today, but we will resume at 9:30

 6    tomorrow.  I think it will be a real 9:30, so we'll see you

 7    then.

 8            (Jury not present)

 9            THE COURT:  Counsel, take a few minutes and look at

10    those other exhibits, and then tell me if you have any

11    objections other than the ones that are preserved already.

12            I'll note for the record that these were all

13    referenced at the side bar as the exhibits, but when we were

14    discussing the 493 counsel referred to the attached exhibits,

15    but they were actually marked as separate documents.  So they,

16    near as I could tell, present the same issues, but if there is

17    any special issue regarding any of them, I'm happy to hear that

18    now.

19            MS. MAINIGI:  Your Honor, our argument remains

20    primarily that there still has been no foundation laid for any

21    of these in that I am assuming where the government is going is

22    they're trying to say that those loan processors who had

23    ownership of these loans and were subject to these turn time

24    obligations were churning out loans quickly and that they got

25    bonuses as a result, but we have not seen one single document

2640

DAFTBAN7

1     that demonstrates a bonus related to a loan specialist.  We

2     have seen around it in Central Fulfillment, but there is no

3     document that relates to the person who supposedly was turning

4     around bonuses or was turning around loans.

5            MR. MUKASEY:  Judge, I'm just going to note for the

6     record that --

7            THE COURT:  Just so I understand, you think that there

8     was a different compensation system for those loan specialists

9     as opposed to the universe of people that was just covered by

10    the questions to Ms. Mairone?

11           MS. MAINIGI:  I do.  I would like to go back and

12    investigate that, your Honor.

13           THE COURT:  Do you have any basis for saying that?

14           MS. MAINIGI:  I don't see the title loan specialist.

15           THE COURT:  The first was senior loan specialist.

16           MS. MAINIGI:  No, lending specialist, your Honor,

17    which is a different position.

18           THE COURT:  That's true.

19           Let me hear from Mr. Mukasey then I will hear from the

20    government.

21           MR. MUKASEY:  Judge, with respect to some of the

22    questions that Ms. Nawaday asked in that litany of positions, I

23    think Ms. Mairone said she wasn't necessarily sure, so I think

24    these have to be authenticated obviously by her.

25           With respect to the point that I made at the side

DAFTBAN7

1    bar --

2              THE COURT:  No, it wasn't -- she said she believed so,

3    I don't think -- as to whether monthly or quarterly, in one

4    case quarterly, on the rest monthly.  I don't think she said

5    anything about the authenticity of the documents.

6              MR. MUKASEY:  She didn't see the documents.

7              In any event, I want to sort of add a bit to the

8    objection I made at the side bar, which is sort of the slippery

9    slope objection.  The first of these documents that speaks

10   to --

11             THE COURT:  I'm glad to hear you, but I must say, I

12   often wonder whether anyone listens to me.  I know my children

13   don't listen to me, but I sort of had hopes that counsel might

14   listen to me.  And what I said a minute ago was your objections

15   given at the side bar were preserved.  If you had some specific

16   objections to specific ones of these, because you didn't have a

17   chance to look at them except in a very generic sense, I would

18   hear you.  But instead, what I'm hearing, first from bank

19   counsel and now from you, is a repeat of what you said at side

20   bar.  So repeat away.

21             MR. MUKASEY:  Judge, I'm not repeating what I said

22   about the document we were discussing at side bar.  What I'm

23   simply pointing out is --

24             THE COURT:  You made the slippery slope argument at

25   side bar.

DAFTBAN7

1          MR. MUKASEY:  I hadn't seen it.

2          THE COURT:  You made the slippery slope argument as to

3     these kinds of documents.  You made the same -- by adopting

4     your objections, you made -- you and bank counsel made it to

5     not only 493, which we discussed at the side bar, but 494,

6     which we had a full opportunity to look at, and 495.

7          And then we got into this question of the others,

8     which are, the record will reflect, identical form, identical

9     form, just deal with different categories of employees.  And I

10    gave you the opportunity, which I'm happy to give you right

11    now, to find out if there were other objections other than the

12    ones that you made at the side bar that related to a specific

13    document, because none of us had a chance to look at them.  And

14    if you have them, I'm very happy to hear you, and if you want

15    to elaborate on what you said at the side bar, I'm not happy,

16    but I'm willing to hear you.

17         MR. MUKASEY:  I only want you to be happy, so I simply

18    want to make sure -- and your Honor has just clarified, thank

19    you -- that the same objection applies even to those documents

20    that we hadn't seen at the side bar.

21         THE COURT:  Yes, all your objections given to 493 are

22    preserved through all exhibits from 493 to 500.

23         Now I do want to hear if the government wants to say

24    anything further just and only on the point just elaborated

25    further by bank counsel.

DAFTBAN7

```
 1              MS. NAWADAY:  Just very briefly, your Honor.  I don't
 2     think there's any basis to believe that lending specialist and
 3     loan specialist is a different position.  The point is that all
 4     of the employees within Central Fulfillment reported to her,
 5     were paid monthly bonuses.  All of this is relevant.  On direct
 6     Ms. Mairone testified that the turn time bonus provided only
 7     something like $30 worth of an incentive to a loan
 8     specialist -- for loan specialists or lending specialists.
 9     Last week we heard Mr. Barnett testify as to his opinion that
10     compensation drives behavior, so these charts are clearly
11     relevant in terms of the compensation structure.
12              THE COURT:  I think I struck Mr. Barnett's testimony.
13              MS. NAWADAY:  I apologize, your Honor.
14              THE COURT:  But let me, just to complete the circle,
15     let me ask bank counsel what is your basis for believing that a
16     lending specialist is different from a loan specialist?
17              MS. MAINIGI:  Your Honor, I have not seen anything in
18     the record that ties those two terms together.  I'm happy to
19     look into it, but I certainly didn't hear that question asked
20     of Ms. Mairone during this entire dialogue.
21              THE COURT:  To the extent that that's -- where is
22     Ms. Mairone?
23              There's one rational person who escaped.
24              MR. HEFTER:  She probably thought she had to leave the
25     courtroom.
```

DAFTBAN7

1          THE COURT:  You should explain to her that a party

2     never has to leave the courtroom.

3          MR. HEFTER:  I think I did explain that, your Honor.

4          THE COURT:  All right.  So let's see if she's still

5     around.

6          (Pause)

7          MR. HEFTER:  I got her in the nick of time, as you can

8     tell, your Honor.

9          THE COURT:  Ms. Mairone, you were foolish enough to

10    think that we wouldn't victimize you further, so come on up.

11         THE WITNESS:  OK.

12         THE COURT:  And the Court reminds you you're still

13    under oath.

14         Please be seated.

15         Is there a difference between a lending specialist and

16    a loan specialist?

17         THE WITNESS:  No, there's not.

18         THE COURT:  There is not?

19         THE WITNESS:  There is not.

20         THE COURT:  OK.  Thank you very much.  You may step

21    down.

22         MS. MAINIGI:  Thank you, your Honor.

23         THE COURT:  You're welcome.  So the Court adheres to

24    its prior ruling.

25         Anything else counsel wants to raise with the Court?

```
 1                Very good.
 2                MR. CORDARO:  Excuse me, your Honor, just two brief
 3   things.  Number one, I believe the government has a letter due
 4   tomorrow to the Court with respect to --
 5                THE COURT:  A letter.
 6                MR. CORDARO:  With the Court's permission, we would
 7   like to submit that letter in afternoon.
 8                THE COURT:  That's all right.
 9                What do I get to read in the morning during the trial?
10   There are several novels I have.
11                MR. CORDARO:  And then I guess the only other question
12   we have is the witness line up after Ms. Mairone.
13                THE COURT:  Yes.  Well, of course, that's the
14   dependent, so you want to give me -- this is non-binding given
15   the circumstance, but what is your ballpark as to how long you
16   will be on cross?
17                MS. NAWADAY:  Ballpark, your Honor, an hour and 15
18   minutes.
19                THE COURT:  OK.  And presumably be some redirect, so
20   let's say two hours.  So that means we will have witnesses
21   tomorrow.
22                MS. MAINIGI:  Yes, and they're the same set of
23   witnesses that I informed Ms. Nawaday about this morning.
24                THE COURT:  Well, do you want to give me a hint?
25                MS. MAINIGI:  Yes, your Honor, Desirae Flores, Andrew
```

DAFTBAN7

1    Portek and Barbara Heinecke.

2              THE COURT:  OK.

3              MS. MAINIGI:  So your Honor knows, we told the

4    government over the weekend about this, but we have one witness

5    who needs to testify by Friday, so we'll probably try to put

6    him on the stand by Thursday afternoon.

7              THE COURT:  All right.  And we should start thinking

8    about when we want to have a charging conference because I

9    anticipate that will take several hours given some of the

10   controversies that have come up.  So we can talk about that

11   tomorrow.

12             MS. MAINIGI:  Your Honor, do you expect you will go

13   until 5 o'clock tomorrow?

14             THE COURT:  Yes.

15             MS. MAINIGI:  Thank you.

16             THE COURT:  There is next week -- and I'm glad to say

17   I think we're moving at a reasonable pace now.  So I don't know

18   how much into next week you are planning to go, but I think

19   it's next Wednesday, I will double-check tonight, there is one

20   day when I will be giving a speech in Cleveland, so I will be

21   out all day.  Whatever day that is next week, I will let you

22   know tomorrow.

23             MS. MAINIGI:  Thank you, your Honor.

24             THE COURT:  Anything else?  Very good.

25             (Adjourned to October 16, 2013 at 9:30 a.m.)

```
1                      INDEX OF EXAMINATION

2   Examination of:                        Page

3   REBECCA MAIRONE

4   Direct By Mr. Mukasey  . . . . . . . . . . .2460

5   Cross By Ms. Nawaday . . . . . . . . . . . .2609

6                     PLAINTIFF EXHIBITS

7   Exhibit No.                           Received

8    503  . . . . . . . . . . . . . . . . . .2627

9    492  . . . . . . . . . . . . . . . . . .2628

10   493  . . . . . . . . . . . . . . . . . .2638

11   494  . . . . . . . . . . . . . . . . . .2638

12   495 through 500 are  . . . . . . . . . .2638

13                    DEFENDANT EXHIBITS

14  Exhibit No.                           Received

15   367  . . . . . . . . . . . . . . . . . .2450

16   459  . . . . . . . . . . . . . . . . . .2528

17   46  . . . . . . . . . . . . . . . . . . .2567

18   4090  . . . . . . . . . . . . . . . . . .2579

19   755  . . . . . . . . . . . . . . . . . .2581

20   695  . . . . . . . . . . . . . . . . . .2591

21   734  . . . . . . . . . . . . . . . . . .2593

22   826  . . . . . . . . . . . . . . . . . .2594

23   4130  . . . . . . . . . . . . . . . . . .2607

24   240  . . . . . . . . . . . . . . . . . .2617

25
```