DAHTBAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4
                    Plaintiff,
5
            v.                              12 CV 1422 (JSR)
6
    BANK OF AMERICA CORPORATION,
7   *successor to Countrywide
    Financial Corporation,*
8   *Countrywide Home Loans, Inc.,*
    *and Full Spectrum Lending*, et
9   al.,

10                  Defendants.

11  ------------------------------x
                                            New York, N.Y.
12                                          October 17, 2013
                                            10:00 a.m.
13
    Before:
14
                        HON. JED S. RAKOFF,
15
                                            District Judge
16

17

18

19

20

21

22

23

24

25

DAHTBAN1

1                                  APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6         Assistant United States Attorneys

7

     WILLIAMS & CONNOLLY
8         Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14        Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17        Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25

DAHTBAN1

1               (Jury not present)

2               THE COURT:  Good morning, my condolences to the

3      assistant U.S. attorneys who as of twelve or something last

4      night are no longer essential.

5               Also I have an important note from juror number five,

6      "Good news.  My league bowling team won all three games this

7      week.  We needed it, especially after the Giants and Jets.

8      Thank you for giving us Monday off, and hopefully you'll do the

9      same for us next week."  With a smiley face.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2843

DAHTBAN1

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.

3            Juror number five, we have taken your note under

4   consideration.  Congratulations on your win.

5            JUROR:  Thank you.

6            THE COURT:  All right, please call the next witness.

7            MR. JONES:  The defendants call Ron Gillet.

8    RON GILLET,

9        called as a witness by the Defendants,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. JONES:

13            DEPUTY CLERK:  Please state your name and spell your

14   last name for the record.

15            THE WITNESS:  Ron Gillet, G-I-L-L-E-T.

16   Q.  Good morning, Mr. Gillet, my name is Malachi Jones, I

17   represent Bank of America.

18            Are you currently employed?

19   A.  Yes, I am.

20   Q.  And where do you work?

21   A.  I work at State Farm Bank.

22   Q.  And what is your position there?

23   A.  I'm bank operations manager.

24   Q.  And how long have you worked for State Farm?

25   A.  Since last December.

DAHTBAN1                    Gillet

1   Q.  And where did you work prior to working at State Farm?

2   A.  Bank of America.

3   Q.  And how long had you worked at Bank of America?

4   A.  Just a little under ten years.

5   Q.  And was it called Bank of America when you started there?

6   A.  No, it was not.

7   Q.  What was your last position when you were employed by Bank

8   of America?

9   A.  I was vice president and fulfillment unit leader.

10  Q.  In that role, how many employees reported to you,

11  approximately?

12  A.  I had five managers that reported to me directly and about

13  60 employees that reported to me indirectly.

14  Q.  When did you begin working in the mortgage industry?

15  A.  In 1982.

16  Q.  And can you briefly walk through the positions that you

17  held in the mortgage industry leading up to working for

18  Countrywide?

19  A.  Yes.  After working for a small community bank in Missoula,

20  Montana, I joined Beneficial Finance and was assistant branch

21  manager for about two and a half years.  Subsequent to that I

22  moved to Arizona where I went to work for a company called

23  Manufacturers Hanover Consumer Services, which later became

24  American General Finance.  In that company I began as an

25  assistant branch manager and I progressed up through the ranks

DAHTBAN1                    Gillet

```
 1   to a branch manager and then a district manager.
 2   Q.  What was the next position you held in the mortgage
 3   industry?
 4   A.  I went to work for a company called Mortgage Lenders
 5   Network as a wholesale underwriter.
 6   Q.  And what did you do after that?
 7   A.  After Mortgage Lenders Network I joined a company called
 8   Conseco Finance.  I worked for their correspondent lending
 9   division as a senior correspondent underwriter.
10   Q.  How long did you work for Conseco?
11   A.  I worked for Conseco a total of seven and a half years.  At
12   first I worked for the correspondent lending division, then I
13   worked for the direct to consumer group.  In the direct to
14   consumer group I managed a team of underwriters.  I was an
15   underwriting supervisor.
16   Q.  When you were in the direct to consumer lending group, who
17   did you report to?
18   A.  I reported to a gentleman by the name of Jim White.
19   Q.  Who did he report to?
20   A.  A gentleman by the name of Ed O'Donnell.
21   Q.  Where did you go after working for Conseco?
22   A.  After Conseco I went to work for a company called
23   Countrywide Full Spectrum Lending.
24   Q.  How did that come about?
25   A.  Ed O'Donnell moved to Countrywide several months before I
```

DAHTBAN1                    Gillet

1    left, and he was starting an underwriting operation in

2    Chandler, Arizona.  And I was among a group of about 20

3    underwriters and leaders that were selected to go from Conseco

4    over to Countrywide to start that underwriting operation.

5    Q.  Can you briefly describe the positions you held at

6    Countrywide up until 2007?

7    A.  Yes.  I was initially hired as an AVP and underwriting

8    supervisor.  In that position I managed a team of about twelve

9    underwriters.  I was subsequently promoted to the position of

10   vice president and underwriting manager where I managed a team

11   of managers that managed underwriters.  There were four teams,

12   I believe, and each manager had between eight and ten

13   underwriters apiece.  Then subsequent to that I was promoted to

14   the position of first vice president and fulfillment unit

15   leader.

16            MR. JONES:  May I approach the witness, your Honor?

17            THE COURT:  Yes.

18   Q.  Mr. Gillet, are you familiar with the High-Speed Swim Lane?

19   A.  Yes, I am.

20   Q.  Did you play a role with respect to the High-Speed Swim

21   Lane pilot process?

22   A.  Yes, I did.

23   Q.  If you could turn to tab 2 in your binder, document marked

24   as Defendant's Exhibit 339, are you familiar with this

25   document?

DAHTBAN1                    Gillet

1    A.  Yes.

2    Q.  Is this a document you would have received during the -- is

3    this a document you did receive during the High-Speed Swim Lane

4    pilot process?

5    A.  Yes.

6              MR. JONES:  Defendants move for the admission of it

7    Defendant's Exhibit 339.

8              MS. LONDON:  No objection.

9              THE COURT:  Received.

10             (Defendant's Exhibit 339 received in evidence)

11   Q.  Mr. Gillet, what is this document?

12   A.  It's a weekly project status.

13   Q.  For what project?

14   A.  From the High-Speed Swim Lane.

15   Q.  And when did the High-Speed Swim Lane pilot begin?

16   A.  Began in mid August of 2007.

17   Q.  And if you could read the line under High-Speed Swim Lane

18   pilot that what starts "Chandler."

19   A.  Yes, Chandler one ops team, Barbara Heinecke receiving a

20   loan from two sales teams headed by Eric Johnson NCA and Ryan

21   Dayala NSC.

22   Q.  If you could read the first bullet under onsite support

23   provided by.

24   A.  Central ops, in parentheses, Ron Gillet FVP Chandler,

25   Audrey Knabe AVP Richardson.

2848

DAHTBAN1                    Gillet

1    Q.  Mr. Gillet, what was your role with respect to the

2    High-Speed Swim Lane pilot?

3    A.  I oversaw a pilot team of processors that were processing

4    loans under the High-Speed Swim Lane pilot project.

5    Q.  And where was that team located?

6    A.  In Chandler, Arizona.

7    Q.  And how many processing teams were there in Chandler in the

8    High-Speed Swim Lane pilot?

9    A.  In Chandler there was just the one.

10   Q.  How many individuals were on that team approximately?

11   A.  There was one team leader operations manager and three

12   processors.

13   Q.  Did you play any role if the selection of the individuals

14   who were on that pilot team?

15   A.  Yes, I did.

16   Q.  And what was your role in the selection process?

17   A.  I hand selected the individuals that were on the team and

18   made recommendations to my supervisor that they should be

19   included in the pilot.

20   Q.  And who did you recommend to be the team lead?

21   A.  I recommended that Barbara Heinecke serve as the team lead

22   for that pilot team.

23   Q.  What was the basis for that recommendation?

24   A.  I supervised Barbara for several years both as a processor

25   and as an operations manager/team lead.  And in every position

2849

DAHTBAN1                    Gillet

1    that she held that I supervised her in, she did very well.

2    Q.  Did you recommend any other individuals for the pilot team?

3    A.  Yes, there were three processors that I hand selected to be

4    on that team.

5    Q.  Who were they?

6    A.  One was Lisa Grove, another was Lori Smith, and the final

7    one was Crystal Lynn Largo.

8    Q.  What was your basis for recommending those individuals for

9    the pilot team?

10   A.  I also supervised those individuals as processors for

11   several years, and during that time they always performed well

12   in the areas of productivity, quality, and customer service.

13   Q.  And were those individuals in fact on the pilot team?

14   A.  Yes, they were.

15          MR. JONES:  We can take that document down.

16   Q.  At some point in time was there a kick-off meeting for the

17   High-Speed Swim Lane pilot?

18   A.  Yes, there was.

19   Q.  Approximately when was that?

20   A.  It was in the middle of August of 2007.

21   Q.  And where did that meeting take place?

22   A.  In Chandler and in Richardson.

23   Q.  And who led the meeting?

24   A.  The meetings were led by myself and Janet Godby in Texas.

25   Q.  What was the agenda for that kick-off meeting?

DAHTBAN1                    Gillet

1    A.  The agenda was to introduce the High-Speed Swim Lane

2    process to the individuals that were selected to be on the

3    pilot team, and to help them understand both why the process

4    was being implemented as well as what the process would look

5    like and what their role would be in implementing the pilot.

6    Q.  Could you turn to tab 1 in your binder, what's been marked

7    as Plaintiff's Exhibit 252.  Can you just briefly identify what

8    this document is?

9    A.  Yes, it's an email dated Thursday, August 9, from Mark

10   Barnett to myself and a variety of other people.

11            MR. JONES:  Defendants offer Plaintiff's Exhibit 252.

12            MS. LONDON:  No objection.

13            THE COURT:  Received.

14            (Plaintiff's Exhibit 252 received in evidence)

15   Q.  Mr. Gillet, who attended the kick-off meeting in Chandler?

16   A.  The meeting was attended by all of the pilot participants

17   as well as leadership from the mortgage fulfillment group.

18            MR. JONES:  Alex, go down to the talking points.

19   Q.  And Mr. Gillet, if you could -- under where it says, "We're

20   doing this because," if you could read those first three points

21   into the record.

22   A.  Yes.  Says FSL is no longer a subprime shop.  85 to

23   90 percent prime now.  We built our processes for subprime.

24   Too costly to be profitable in the long run, must change the

25   business model to be better fit for what we have become,

DAHTBAN1                        Gillet

1    majority prime shop.

2    Q.  And the next point on the next line?

3    A.  Says our competitors are doing this.  Cannot compete if we

4    don't change our model.

5    Q.  And were these topics discussed at the kick-off meeting

6    that you attended?

7    A.  Yes.

8    Q.  If you could turn to page 2.

9           MR. JONES:  And could we have the top half of the

10   document, please, Alex.

11   Q.  Mr. Gillet, if you look where it says, "Design principles

12   used," if you could read the line that starts with the word,

13   "Goals" underneath there?

14   A.  Says the approach we took was to take a clean sheet

15   approach to redesigning the loan origination process.  Goals

16   are velocity, efficiency and quality.

17   Q.  And was that discussed at the kick-off meeting?

18   A.  Yes, it was discussed multiple times.

19   Q.  If you could read the next line.

20   A.  Design for cleaner loans, PCA, FICO greater than 660, CLTV

21   greater than 80 percent.

22   Q.  Can you explain what the items are within the parenthesis?

23   A.  PCA stands for prime CLUES accept, FICO greater than 660

24   means credit score, and CLTV stands for combined loan to value.

25   Q.  And what was the significance of those items with respect

DAHTBAN1                    Gillet

```
 1    to the High-Speed Swim Lane?

 2              MS. LONDON:  Objection.

 3              THE COURT:  Overruled.

 4    A.  The significance was those were the minimum thresholds that

 5    determined whether or not a loan would say in the High-Speed

 6    Swim Lane process or be moved to an alternate work flow.

 7    Q.  OK.  If we could turn to the next page, page 3, and focus

 8    on the center section of that page where it says fulfillment

 9    specific session.  Do you see that, Mr. Gillet?

10    A.  Yes, I do.

11    Q.  What was the fulfillment specific section?

12    A.  Referenced myself and Janet Godby as the hosts.  It talked

13    about who the attendees were and made reference to the topics

14    that would be covered during the session.

15    Q.  About how long was the kick-off meeting in total, if you

16    recall?

17    A.  It was about an hour in length, if I recall correctly.

18    Q.  And if you could go down underneath there where there's

19    talking points that are listed, and if you could read the two

20    talking points starting with the "Shift in thinking needed."

21    A.  Says shift in the thinking needed.  Unlearn what we did as

22    a subprime shop and get comfortable leaving out steps we did in

23    the past.  Goals of everyone from sales to funding need to be

24    velocity, efficiency, and quality.

25    Q.  Was that discussed at the kick-off meeting?
```

1    A.  Yes, it was, several times.

2    Q.  And if you could read the next talking point.

3    A.  It says pilot participants are also process designers.  We

4    have given you the starting point, you need to help us find the

5    answer, the process that will give us V, E and Q.

6    Q.  And what is V, E and Q there?

7    A.  That stands for velocity, efficiency, and quality.

8    Q.  And what does it mean that the pilot participants are also

9    process designers?

10   A.  Well, because they were working on the front line and had

11   daily exposure to the process, we wanted them to give us

12   feedback about how the process was working, what obstacles they

13   were running into, what roadblocks they seemed to be facing,

14   and we wanted them to be active participants in that way to

15   help us improve the process.

16   Q.  What were your responsibilities as unit lead for the

17   High-Speed Swim Lane pilot team in Chandler?

18   A.  My role was to oversee the processors and the team lead

19   that were assigned to me in the pilot and make sure that they

20   were doing the process the right way and to monitor the results

21   of the process.

22   Q.  Did part of your responsibility involve making assessments

23   about the functioning of the pilot?

24   A.  Yes.

25   Q.  And what did you do to monitor the pilot?

DAHTBAN1                    Gillet

1    A.  I would review periodic reports that would be sent to me on

2    a weekly and monthly basis.  I would also do direct interaction

3    on a daily or more frequent basis with my team leader, Barbara

4    Heinecke, to talk about how things were going and what

5    obstacles our processors were running into.  And then probably

6    several times a week I would actually go and do side by sides

7    with the processors where I would sit down next to them and

8    actually observe them doing the job under the process, how they

9    did what they did, what they did, and allow them to ask me

10   questions, give me feedback directly on how things were going.

11   And I would do that probably twice or three times weekly with

12   those three processors.

13   Q.  And did you review loan files that were being processed in

14   the pilot?

15   A.  Yes, I did.

16   Q.  Where was the pilot processing team located with respect to

17   where your office was?

18   A.  Well, Barbara and the team that were in the pilot sat right

19   outside my office door, so very close proximity.

20   Q.  And based on your observations, were you able to assess the

21   ability of the loan specialists to clear loans to close in the

22   High-Speed Swim Lane pilot?

23   A.  Yes, I was.

24            MS. LONDON:  Objection.

25            THE COURT:  Excuse me, when there's an objection, you

2855

DAHTBAN1                    Gillet

1  have to wait for the Court to rule.

2           The objection is sustained.  The answer is stricken.

3           THE WITNESS:  Yes, your Honor.

4  Q.  Based on your position as unit lead for the High-Speed Swim

5  Lane pilot team, did you draw any conclusions about the quality

6  of the loans in the pilot?

7           MS. LONDON:  Objection, your Honor.

8           THE COURT:  Sustained.

9           MR. JONES:  May we have a side bar, your Honor?

10          THE COURT:  Sure.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              THE COURT:  So I'm happy to have Ms. Mainigi also

3     speak at this side bar because this raises the issues that were

4     the subject of the materials that were handed up yesterday.

5              For the record, there was handed up three cases all

6     from the Second Circuit, *United States v. Schultz*, *United*

7     *States v. Kaplan*, and *United States v. Kozeny*, K-O-Z-E-N-Y.

8     And I am grateful to defendant's counsel for highlighting the

9     portions of those otherwise somewhat verbose decisions as to

10    the part that were relevant for my purposes, but I don't really

11    think that any of those cases dealt in any meaningful way with

12    the issue presented at the side bar.

13             More pertinently, the defense counsel handed me

14    yesterday two transcripts from earlier in this case, one was

15    pages 2315 -- that was basically it, 2315 through 17 in the

16    testimony of Mr. Barnett and certain objections I had

17    sustained.

18             And then the only one that I really honestly think is

19    relevant to this side bar, which is the testimony at pages 209

20    through 210 of the government's examination on direct of

21    Mr. Thomas, Mr. Thomas was asked with respect to certain high

22    risk findings, whether that, "Did that number concern you?"

23             Did that number concern you?

24             Answer:  Yes.

25             Why did that concern you?

DAHTBAN1                          Gillet

 1            There was no objection to any of those questions.

 2            But then there was.  Question:  If such loan were to

 3    fund, how would it affect the risk associated with that loan?

 4            And there was an objection on the grounds that it was

 5    hypothetical, and I overruled that objection.

 6            And finally there was the question:  And if something

 7    that was not done correctly was not corrected, how would that

 8    affect the quality of the loan, if at all?

 9            Objection again on the grounds of hypothetical, and

10    that objection was again overruled.

11            So the allegation or the argument is that that somehow

12    opened the door.  I don't really think that is true.  I'm not

13    sure what it opened the door to, but it's certainly not to the

14    question that is pending before the Court now.

15            So with that long-winded background, let me hear first

16    from bank counsel and then from the government.

17            MS. MAINIGI:  Thank you, your Honor.  With respect to

18    the cases, we think the cases actually are quite relevant to

19    this particular issue.  The issue is the state of mind --

20            THE COURT:  For example, in Schultz, which was my case

21    below, what you highlighted was testimony that was permitted on

22    the question of Egyptian law.

23            MS. MAINIGI:  But your Honor, as I understood the

24    case -- and obviously you would know it better than I, but as I

25    understood it, you allowed in testimony from individuals other

1    than the defendant as to whether they would have known

2    generally within their industry as to particulars of a law that

3    perhaps did not allow the doing of whatever the defendant did.

4    That's probably inarticulate, but I think you get my point.

5           That's the exact issue here, because we have other

6    people taking the QA reports.  The government stated and the

7    Court has endorsed that this case is about whether the banks

8    and Ms. Mairone knowingly sold bad loans to the GSEs.

9    Furthermore, it has stated that the QA reports are a critical

10   basis for that knowledge element.  Others besides the

11   defendants or the individual defendant and the co-conspirators

12   received those QA reports, others like Mr. Gillet and others

13   like Mr. Barnett --

14          THE COURT:  I need to interrupt you just for a moment.

15   Just taking Schultz first, the question in Schultz was whether

16   an Egyptian law that made the property of the government of

17   Egypt any antiquity over a hundred years old that was found

18   anywhere in Egypt was a law that was known generally to people

19   in the field of the defendant, who was a dealer in antiquities.

20   And I don't see what that has to do at all with the pending

21   question.  The pending question is his opinion as to the

22   quality of certain loans in his department or whatever.  I

23   don't see how that remotely relates to anything in the Schultz

24   case or more generally anything that was opened by the

25   testimony that you referred to in Mr. Thomas.

DAHTBAN1                    Gillet

1              MS. MAINIGI:  Assume, your Honor, hypothetically that

2      a question was posed similar to the one posed to Mr. Thomas,

3      basically to the effect of if -- did you receive these QA

4      reports?  Yes.  If you -- what was your take away, essentially,

5      from the QA reports?  Did it concern you?  Did they lead you to

6      think that the loans that were being sold were not investment

7      quality loans?  Then I think it falls squarely within --

8              THE COURT:  No, I don't see that at all.  And

9      moreover, when it was put to Mr. Thomas, as I say, first the

10     basic question was not objected to at all, the objections were

11     to hypotheticals, but this all related to, if you will,

12     explaining what the significance was of his concern, and the

13     concern had, as I said, not been objected to.

14             Now your colleague raised a question about

15     significance earlier in the testimony of this witness to which

16     this was an objection that I overruled, so that came in.  But

17     this is a totally different question.  This is a question about

18     his opinion.

19             MS. MAINIGI:  But your Honor, with respect to the

20     Kaplan case, the Kaplan case in discussing Schultz notes that

21     in Schultz the nature of the fraud or the relationship of the

22     parties from which to conclude that the defendant would have

23     the same knowledge.  And furthermore --

24             THE COURT:  What does that have to do with the pending

25     question?

DAHTBAN1                    Gillet

1           MS. MAINIGI:  The Schultz case goes on to say evidence

2    of others' knowledge would have been highly relevant had it

3    been supplemented by evidence supporting the conclusion that

4    such knowledge was communicated to Kaplan or that Kaplan had

5    been exposed to the same sources from which these others

6    derived.

7           THE COURT:  I think you're talking about Kaplan, not

8    Schultz.

9           MS. MAINIGI:  Kaplan discussed Schultz.

10          THE COURT:  But I think what you're talking about is

11   in the context of Kaplan, not Schultz.  But I don't see how

12   that relates to the pending question.  If he were to testify --

13   and I doubt very much that this is testimony, but you tell me

14   if I have it wrong -- after I looked at the reports I said boy,

15   this is great quality, this is the best stuff we ever produced,

16   this is super prime, I can't believe how this new process is

17   turning out such a fine non-risky, absolutely wonderful

18   product, I'm not sure I would allow that.  But that's not the

19   pending testimony.

20          MS. MAINIGI:  But I think we were foundationally

21   getting to that.

22          THE COURT:  What --

23          MS. MAINIGI:  If I could state my reason for why.

24          THE COURT:  Absolutely.

25          MS. MAINIGI:  And then you can turn to Mr. Jones.

 1              The reason why is there are multiple people besides

 2     the co-conspirators that received this QA reports on a regular

 3     basis, the same QA reports that the government uses as the

 4     basis for its knowledge that these loans were bad.  If all of

 5     these other people that received these reports essentially have

 6     the same point of view as the co-conspirators, that while these

 7     reports were concerning, they were about process, they had

 8     nothing to do with loan quality or saleability to the GSEs,

 9     that is a significant fact.  That puts into context the

10     individual defendant's knowledge as well as the

11     co-conspirator's knowledge, and that's what --

12              THE COURT:  Of course some of that is already in

13     evidence, the very things you said, but it depends on who is

14     being asked and how relevant that knowledge is to anything in

15     this case.  I mean, if anything, you have just made a good case

16     for striking this witness as cumulative because he is less

17     important in the very issue that you have already gotten that

18     very evidence from.

19              MS. MAINIGI:  From whom did we get that evidence from?

20              THE COURT:  We had some of that just yesterday.

21              But let me hear -- first of all have the reporter, if

22     he can find the pending question, or maybe Mr. Jones you can

23     repeat it.

24              MR. JONES:  Yes, the question was based on his

25     position as a unit lead, did he draw any conclusions about the

DAHTBAN1                    Gillet

1    quality of the loans produced in the High-Speed Swim Lane

2    pilot.

3              THE COURT:  So it's not even this report.  He's being

4    asked --

5              MS. MAINIGI:  He hasn't gotten to the QA report.

6              THE COURT:  I'm dealing with the --

7              MS. MAINIGI:  I understand.

8              THE COURT:  So it's not responsive to the point you

9    just made because he's just saying as a general matter, and

10   some of this is sounds like total hearsay, how he has knowledge

11   of it.  But in any event, he's going to say Jiminy Cricket,

12   that was great quality.

13             MS. MAINIGI:  He might, and that's relevant and

14   probative.

15             THE COURT:  Of what?

16             MS. MAINIGI:  He was the guy in Chandler that had to

17   sign off the loans, your Honor.  He is quite relevant.  There

18   were two people running the pilot and he was one of them.

19             THE COURT:  What was your next question going to be?

20   Assuming he answered it and said, without Jiminy Cricket, said

21   this is fine quality?

22             MR. JONES:  Well, did he pass on that assessment to --

23   or who, if anybody, did he pass that assessment on to.

24             THE COURT:  And who did he pass it on to?

25             MR. JONES:  He would say his superiors, including

DAHTBAN1                    Gillet

1    Cheri Shine and Jim White, I believe, and the High-Speed Swim

2    Lane design team.

3               MS. MAINIGI:  And the design team contains our people,

4    our co-conspirators.

5               THE COURT:  Does the government want to be heard on

6    any of this?

7               MS. LONDON:  The only thing I think we add is the

8    distinction we make is Michael Thomas is trying to get out the

9    fact that complaints were made and concerns underlying the

10   complaints.  He's different, it's not the same as every single

11   person expressed their opinion about the loans.  That's not

12   relevant.

13              THE COURT:  I think it is totally different, but in

14   any event, I have no doubt that the pending question is

15   defective in foundation, in concealed hearsay, and in opinion

16   evidence, but I will allow you to narrow the question and try

17   it again given in colloquy.

18              MS. MAINIGI:  Would you allow us to try the QA type of

19   questions that I have been laying out, your Honor?

20              THE COURT:  I'm not going to give advisory rulings.

21   That's why -- you were quite right to raise this earlier today.

22   The record should reflect that bank counsel asked to be heard

23   about this before we brought in the jury, and my response

24   through my law clerk was it can't be dealt with generically, it

25   has to be dealt with on a question-by-question basis.  For the

DAHTBAN1                        Gillet

1    moment, for the pending question the objection is sustained.

2              MS. MAINIGI:  Your Honor, I apologize for delaying

3    this, but could you articulate perhaps again, I'm sorry, why

4    you don't think his state of mind is relevant?  I want to make

5    sure we try to thread our needle here.

6              THE COURT:  There are two different points you're

7    making.  One is the question you're making of whether this is

8    relevant irrespective of whether any door has been opened, and

9    the second is whether the door has been opened.

10             So dealing with the first first, someone's opinion of

11   the quality of what they see that is not articulated would not

12   be relevant at all.  I don't see what their internal thought

13   process as they look and say to themselves at the time,

14   according to their testimony now:  Looks OK to me.  I don't see

15   the relevance of any of that.

16             If they articulated it to others, what is the reason

17   that that is being offered in evidence?  It doesn't make the

18   loans more or less quality or lack of quality.  That is an

19   opinion.  So the claim is that it relates to the intent.  But

20   the intent, as you have already indicated in this case given

21   the government's position, is the intent of three people, not

22   the intent of all these other people, it's the intent of

23   Ms. Mairone and her two immediate superiors.  Those are the

24   intents in question.  So that's why I don't see its relevant.

25             Now again to the second point, opened the door, first,

DAHTBAN1                    Gillet

1    I don't think three questions of the sort that were mentioned

2    would open the door any more than the question that was put

3    yesterday by defense counsel as I held was not sufficient by

4    itself to open the door to Ms. Simantel's rebuttal testimony.

5    But second of all, putting that aside, the first question was

6    not objected to at all, and the two questions that were

7    objected to, which were objected to on the grounds of

8    hypothetical, were really designed to show the nature of his

9    concern.  But the purpose of the fact that he raised the

10   concern was to show -- which is one of the government's main

11   theme -- that some people did raise concerns that were

12   communicated to the people who they say have the intent to

13   defraud and that those people did not do anything.

14          MS. MAINIGI:  Well, Mr. Thomas' concerns were raised

15   to Mr. O'Donnell, and that's what he testified to.  They

16   weren't raised to Ms. Mairone or Mr. Lumsden or Mr. Kitashima.

17          THE COURT:  Well, I have to go back and check that.

18   But in any event, I have tried to articulate for your benefit

19   as much as I can.

20          MS. MAINIGI:  Thank you very much.

21          (Continued on next page)

22

23

24

25

2866

DAH3BAN2                          Gillet - direct

1           (In open court)

2           THE COURT:  Boy, you must be having so much fun.

3   You're working so hard today.

4   BY MR. JONES:

5   Q.  Mr. Gillet, you mentioned that you conducted side-by-side

6   reviews with the loan specialists in the High-Speed Swim Lane

7   pilot.  Can you describe what a side-by-side review is?

8   A.  That's where I would go out on the floor and I would pull

9   up a chair by the processor, side by side, and actually watch

10  them while they did their job.  What they did, how they did it.

11  The processor would have the opportunity to ask me questions if

12  they ran into an issue.  They would have a chance to give me

13  feedback while I was sitting with them.

14          It was a chance for me to kind of see how the

15  processor is working in terms of how they were doing their jobs

16  and what kind of obstacles or roadblocks they would face as

17  they did it in the process.

18  Q.  Did you also review loan files that were processed through

19  the High-Speed Swim Lane pilot?

20  A.  Yes, I did.  I did random reviews of loan files every week.

21  And in addition to that, any time I would have a communication

22  that had to do with loan quality, through a QC finding or with

23  a process issue that may have come up in a QA finding, I would

24  actually go in and review that loan to see what I could about

25  what happened.

DAH3BAN2                         Gillet - direct

1          So I did a lot of different kinds of loan reviews, but

2     those are just two examples.

3     Q.  Based on your side-by-side reviews and your loan file

4     review, did you come to any conclusions about the quality of

5     the loans processed in the High-Speed Swim Lane pilot?

6          MS. LONDON:  Objection, your Honor.

7          THE COURT:  The question is not on my screen, so let

8     me have the reporter read it back, please.

9          (The record was read)

10         THE COURT:  Sustained.

11    Q.  Mr. Gillet, what did loan specialists in the High-Speed

12    Swim Lane pilot do if they had a question about a loan?

13    A.  Well, their first avenue was to go to their manager Barbara

14    Heinecke.  If Barbara was unavailable or if they felt they

15    needed to, they could bring the issue directly or question

16    directly to me.

17         And we also had underwriters stationed very close by

18    to where they were sitting, and they could go directly to an

19    underwriter if there was an underwriting question or issue they

20    felt they needed to discuss or get answers to.

21    Q.  Would loans sometimes fall out of the High-Speed Swim Lane

22    pilot?

23    A.  Yes, that happened with some frequency.

24    Q.  What could cause a loan to fall out of the pilot's process?

25    A.  Well, either through the loan review done by the loan

1   specialist or because of some other feedback, we would see that

2   the loan didn't meet the minimum requirements, didn't meet the

3   thresholds necessary to stay in the High-Speed Swim Lane.  And

4   either because if it didn't meet the FICO requirement or the

5   LTV was too high or some other complexity that was in the loan.

6   Q.  What happened to those loans?

7   A.  The loan specialists would take that issue to Barbara or

8   myself, and a determination would be made as to whether or not

9   that loan should stay within the High-Speed Swim Lane loan

10  process or if it was to go into a different work flow, the more

11  traditional work flow of processing and underwriting.

12  Q.  Are you familiar with Central Fulfillment?

13  A.  Yes.

14  Q.  Did you have a role or a position in Central Fulfillment?

15  A.  Yes, I did.

16  Q.  If you could flip to tab seven in your binder.  Plaintiff's

17  Exhibit 427.

18          MR. JONES:  It has been admitted so if we can put that

19  on the screen, Alex.

20  Q.  Mr. Gillet, what does this document reflect?

21  A.  This is a Full Spectrum Lending Division Central

22  Fulfillment org chart.

23  Q.  Does this reflect your position in Central Fulfillment?

24  A.  Yes, it does.

25  Q.  If you look in the center in Chandler, Arizona -- Alex, if

DAH3BAN2                        Gillet - direct

1   you could circle Ron Gillet.

2             As a unit lead in Central Fulfillment, who did you

3   have oversight of?

4   A.  I had oversight over four operations managers, AVP and

5   operations managers, as well as their employees.

6   Q.  What is the position of an operation manager, what do they

7   do?

8   A.  Basically they are a team leader, and each of them had

9   between eight and 12 loan processors that reported to them and

10  that were accountable to the manager.

11  Q.  Did you have a role in the selection of the team leads for

12  Central Fulfillment?

13  A.  Yes, I did.

14  Q.  What was your role?

15  A.  I hand selected these four people and made a recommendation

16  to my supervisors that they be put in the position of team lead

17  and operations manager.

18  Q.  What was the basis of your recommendation?

19             MS. LONDON:  Objection.

20             THE COURT:  As phrased, sustained.

21             Did you say anything in making this recommendation?

22  Just answer that yes or no.

23             THE WITNESS:  Yes.

24             THE COURT:  To whom?

25             THE WITNESS:  To my supervisor.

DAH3BAN2                          Gillet - direct

1          THE COURT:  Who was that?

2          THE WITNESS:  Jim White.

3          THE COURT:  Was this in writing or oral?

4          THE WITNESS:  Both.

5          THE COURT:  When, approximately?

6          THE WITNESS:  During the timeframe leading up to

7    October 1st when we went into the Central Fulfillment model.

8          THE COURT:  So are we talking September --

9          THE WITNESS:  September.

10         THE COURT:  All right.  What did you say to him?

11         THE WITNESS:  I told him why I felt that these four

12   individuals were qualified to have those positions.

13         THE COURT:  Specifically what did you say?

14         THE WITNESS:  That I had supervised all four of them

15   in different positions, either in underwriting or in

16   processing.  And that in all four cases, that they had

17   performed exceedingly well.

18         THE COURT:  All right.  Go ahead, counsel.

19   Q.  Mr. Gillet, specifically with respect to Ryan Solomon, what

20   was the basis for your recommendation?

21         THE COURT:  No, counsel, I just tried to show you how

22   to do it right.  But I don't seem to have gotten my message

23   across.

24         His basis for doing anything is not evidence.  What is

25   evidence, if otherwise relevant, is what he said to someone.

DAH3BAN2                        Gillet - direct

1    If he said something to someone and it is relevant to an issue

2    in this case, I will allow that.  But I will not allow the

3    statement about what his basis was.  Understood?

4            MR. JONES:  Yes, your Honor.

5            THE COURT:  Very good.

6    Q.  Mr. Gillet, did you communicate your recommendation

7    regarding Ryan Solomon to Jim White?

8    A.  Yes, I did.

9    Q.  What did you communicate in that recommendation regarding

10   Ryan Solomon?

11   A.  That he had been an underwriter for me for several years

12   dating back to when we were in Conseco, and that he performed

13   well as an underwriter.  He was subsequently promoted to

14   position of AVP and operations manager in NCA, and he performed

15   very well in that position.  And based upon his performance and

16   my direct observation of how he did, that he should be put into

17   that position.

18   Q.  Did you communicate your recommendation regarding Barbara

19   Heinecke to Mr. Jim White?

20   A.  Yes, I did.

21   Q.  What did you communicate regarding your recommendation for

22   Barbara Heinecke?

23   A.  That she had been a processor under my supervision for two

24   or three years.  And that in the area of efficiency as well as

25   loan quality and customer service, she had performed

1    exceedingly well.  And based upon that, she had been promoted

2    to a processing team leader under my direction.  And that she

3    had also performed very well in that position.  Based on that,

4    she should be put on to the team as a AVP operations manager.

5    Q.  Did you communicate your recommendation regarding Aaron

6    Portenier to Mr. Jim White?

7    A.  Yes, I did.

8    Q.  What did you communicate regarding Mr. Portenier?

9    A.  I had worked with Aaron as an underwriter at Conseco and

10   supervised him for about a year and a half.  And he was

11   subsequently promoted to the position of AVP and operations

12   manager under my supervision and done very well in that

13   position.  And based upon that, I suggested that he should be

14   put on to the team as a team leader.

15   Q.  Did you communicate your recommendation regarding Desirae

16   Flores to Mr. White?

17   A.  Yes, I did.

18   Q.  What did you communicate regarding Ms. Flores?

19   A.  I had hired Desirae Flores as an admin at Conseco and she

20   had worked her way up through the ranks as an underwriter and

21   subsequently worked in various parts of the operation,

22   including an operations team lead under my supervision.  She

23   had always performed exceedingly well, and based upon her past

24   performance, she should be given the position of AVP and

25   operations manager in the Central Fulfillment model.

DAH3BAN2                          Gillet - direct

1            MS. LONDON:  Objection to the last statements.

2            THE COURT:  There is an objection to?

3            MS. LONDON:  It is unclear if the statement was what

4     did you communicate as opposed to general thoughts in the

5     answer.

6            THE COURT:  Yes.  Well, I'll let it stand.  But I

7     think, if I may take the liberty of suggesting to counsel that

8     the best question would be to say what did you say to so and

9     so.  Since "communicate" may be ambiguous.

10           And conversely, let me instruct the witness, all you

11    should testify to in response to a question like that is what,

12    to the best of your recollection, you actually remember saying.

13    Not what your thought processes were or what your bases were,

14    but just what you said, okay?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Very good.  Go ahead.

17    Q.  If you could go to tab four in your binder, Mr. Gillet.

18    Defendant's Exhibit 27.  It has been admitted so if we can have

19    it on the screen, Alex, please.

20           Mr. Gillet, do you recognize this document?

21    A.  Yes, this is a team list including all the employees for

22    the teams in Central Fulfillment in Chandler.

23    Q.  Did you have oversight of any of these teams?

24    A.  Yes, I did.

25    Q.  Which teams did you have over sight of?

DAH3BAN2                        Gillet - direct

```
 1    A.   The team headed by Aaron Portenier, Desirae Flores, Ryan

 2    Solomon, and Barbara Heinecke.

 3    Q.   Did you have a role in the selection of the individual loan

 4    specialists for those teams?

 5    A.   Yes.

 6    Q.   What was your role?

 7    A.   I told Jim White that I had some of these people I had

 8    hired, and some of them I had supervised, and in all cases they

 9    had done very well in the past positions they had held.  That

10    they had the diverse experience that we were looking for in

11    terms of creating the teams and staffing the teams.  Some had

12    underwriting background, some had fairly deep --

13              MS. LONDON:  Objection, your Honor.  Non-responsive

14    and narrative.

15              THE COURT:  Do you have an actual recollection of the

16    conversation?

17              THE WITNESS:  Yes, I do.

18              THE COURT:  Tell me what did you say, what words did

19    you say as best you can remember.

20              THE WITNESS:  I said all of these people were

21    qualified to be in the positions of processor because of their

22    experience and background and how they performed in those jobs.

23              THE COURT:  Okay.  Very good.  Go ahead, counsel.

24    Q.   In the position of unit lead in Central Fulfillment, what

25    responsibilities did you have?
```

DAH3BAN2                          Gillet - direct

1   A.  My responsibility was to oversee the work of the teams

2   under my direction, and make sure that they were doing their

3   work efficiently and that they were also making sure that they

4   manufactured quality loans.

5   Q.  Are you familiar with the quality assurance process?

6   A.  Yes, I am.

7   Q.  When were you first introduced to that process?

8   A.  It was at the time that we began the High-Speed Swim Lane

9   pilot.

10  Q.  Were you familiar with audit results from that process?

11  A.  Yes, I was.

12  Q.  How were you familiar with those results?

13  A.  I received weekly, monthly reports, as well as e-mails on

14  each of the individual findings that affected members of the

15  teams under my direction.

16  Q.  If you could turn to tab three in your binder.  A document

17  which has been marked as Defendant's Exhibit 537.  It is not in

18  evidence.  But let me ask you.  Do you recognize this document?

19  A.  Yes, I do.

20  Q.  Did you receive this document in October 2007?

21  A.  Yes, I did.

22          MR. JONES:  Defendants offer Defendant's Exhibit 537.

23          MS. LONDON:  No objection but this might be in

24  evidence already.

25          THE COURT:  I'm sorry?

DAH3BAN2                    Gillet - direct

1            MS. LONDON:  No objection, but it might be in evidence

2      already.

3            MR. JONES:  Okay, well, I guess it's been offered

4      twice.  I apologize, your Honor.

5            THE COURT:  We welcome it again with open arms.

6            MR. JONES:  At least we're being consistent.

7            (Defendant's Exhibit 537 received in evidence)

8      Q.  What is this document, Mr. Gillet?

9      A.  It is an overview and update of the Central Fulfillment QA

10     findings.

11     Q.  If you could go to page two of this document.  If you can

12     blow up the top half, Alex, please.  If you could read

13     beginning under quality assurance, Mr. Gillet, what it says,

14     review high percentage?

15     A.  "Review high percentage of all loans that go into phase

16     code three within HSSL operations teams.  Focus is on the

17     manufacturing process.  Are required documents complete?  Are

18     required and completed documents in VLF?"

19     Q.  Okay.  What time period did this report cover?

20     A.  It covers -- the report is dated September 2007.  So if it

21     covered HSSL, it was probably August and September of 2007.

22            MR. JONES:  Could we go to page three, Alex.

23            MS. LONDON:  Objection, your Honor.  Cumulative.

24            THE COURT:  What is cumulative?  The pending question

25     is could we go to page three.

1           MS. LONDON:  My understanding is we've been through

2    this document before with other witnesses.

3           THE COURT:  Pardon?

4           MS. LONDON:  My understanding is we've been through

5    this document with other witnesses.

6           THE COURT:  We have.  We have.  So let's hear the next

7    question and then I'll consider the objection.

8           MR. HEFTER:  Just for the record, your Honor, I don't

9    believe we have gone through this document.  There are two

10   dates.

11          THE COURT:  You're saying we've been through a similar

12   document but not this one?

13          MR. HEFTER:  I believe that's the case, your Honor.

14          THE COURT:  Okay.  So maybe it wasn't received.  Do

15   you think it was received before or not?

16          MR. HEFTER:  Can Mr. Mukasey talk.

17          THE COURT:  This is such a critical question.

18          MR. MUKASEY:  That's why they call me in.  We went

19   through a document very, very similar to this during

20   Ms. Mairone's examination.  It covered a different time period.

21   So that would be the response to any cumulative objection.

22          THE COURT:  All right.  On that representation, I will

23   allow it.  You can go forward.  Go ahead.

24   Q.  Mr. Gillet, what were the types of ratings that the quality

25   assurance audits would provide or result in?

1   A.  There were three categories of ratings.  The first one was

2   no risk, the second one was limited risk, and the third one was

3   high risk.

4   Q.  What types of items did the quality assurance audits focus

5   on?

6   A.  It focused on whether we were following the process that we

7   were supposed to be following in the High-Speed Swim Lane.

8   Q.  How were you familiar with what the audits focused on?

9   A.  Not only did I receive the loan level findings in e-mails,

10  but I also received reports that summarized those findings and

11  laid out categories of findings that were identified.

12  Q.  Are you familiar with the term "investment quality"?

13  A.  Yes, I am.

14  Q.  What does that mean?

15  A.  That means when a loan is finally funded, whether or not

16  it's funded with the type of quality that would allow it to be

17  sold to a secondary market investor or to a GSE like Fannie Mae

18  or Freddie Mac.

19  Q.  Was the quality assurance process a measure of investment

20  quality?

21  A.  No, it was not.

22            MS. LONDON:  Objection.

23            THE COURT:  Ground?

24            MS. LONDON:  Opinion, your Honor.

25            THE COURT:  Well, I think it is within his ken to

1    answer that.  I'll allow it.

2    Q.  Could you just say your answer again?  I think it got cut

3    off.

4             THE COURT:  The answer was "No, it was not."

5             Why not?

6             THE WITNESS:  Because it focused on our adherence to

7    the process, rather than focusing on things like whether or not

8    we had documentation to be able to show the customer could pay

9    the loan back or be an indicator of loan performance.

10   Q.  Were you familiar with quality control audits conducted by

11   corporate QC?

12   A.  Yes, I am.

13   Q.  Are you familiar with a severely unsatisfactory rating by

14   corporate QC?

15   A.  Yes.

16   Q.  How were you familiar with that rating?

17   A.  Again, I would be sent e-mails from the QC department which

18   identified those severely unsatisfactory findings and why those

19   findings were made.  In addition, I received weekly and monthly

20   reporting that summarized those findings.

21   Q.  Would a high risk finding for a quality assurance audit

22   mean that a loan would get a severely unsatisfactory rating

23   from corporate QC?

24             MS. LONDON:  Objection.

25             THE COURT:  Sustained.

DAH3BAN2                          Gillet - direct

1   Q.  Looking at the page that's on the screen.  What were the

2   percentage of loans that were high risk through September 7,

3   2007.  What percentage?

4   A.  The report says that 41 percent were identified as having

5   high risk ratings assigned to them.

6   Q.  Did that percentage of high risk loans in the High-Speed

7   Swim Lane give you concerns about the quality of the loans

8   produced in the High-Speed Swim Lane?

9           MS. LONDON:  Objection.

10          THE COURT:  Sustained.

11  Q.  Mr. Gillet, who were the audit results for the quality

12  assurance process communicated to?

13  A.  They were communicated to the individual that the finding

14  was assessed against as well as the team leader, myself as the

15  unit leader, and executive leadership in various departments

16  across the division.

17  Q.  What did you do when you got an individual quality

18  assurance audit finding?

19  A.  The first thing I would do --

20          MS. LONDON:  Objection.

21          THE COURT:  Overruled.

22  Q.  You can answer.

23  A.  The first thing I would do is I would review the loan

24  myself to see if I could readily ascertain what had happened.

25  Subsequent to that, I would meet with the team leader and go

DAH3BAN2                    Gillet - direct

1    over the finding with them and request that they meet

2    individually with the processor that the finding was assessed

3    against with a view towards determining what happened and why.

4    And then report back to me.

5    Q.  What did you do once that assessment had been made

6    regarding the quality assurance finding?

7    A.  I would take that information and either, if the finding

8    was determined to be accurate, then I would request that the

9    team leader sit down and do some kind of coaching with the

10   processor involved.  Or if there had been errors that

11   presented -- seemed to present a pattern, I would ask them to

12   proceed with some kind of performance management or

13   disciplinary action.  If the response was found to be

14   inaccurate, then I would request the team leader prepare a

15   response for the QA auditing group that summarized why we found

16   that the finding was inaccurate.

17   Q.  How could a quality assurance audit finding be inaccurate?

18         MS. LONDON:  Objection.

19         THE COURT:  Overruled.

20   A.  There were one of a number of ways it could be determined

21   to be inaccurate.  Number one, if the auditor had looked for

22   the documentation in VLF, it could be somewhere else they had

23   not looked.  They might have looked in one area and the

24   document might have been actually put into a different area in

25   the file.  Or, despite the fact we had scanned the document

1    into VLF, you know, we had a number of issues where the system

2    didn't work the way it was supposed to.  And so, we might have

3    the hard copy document in a shadow file, and we would be able

4    to produce it and thereby overturn the finding.  Or we would

5    just find that the finding was actually inaccurate in terms of

6    the interpretation of whether or not the document had been

7    completed.

8    Q.  Did you observe what loan specialists on your processing

9    teams would do with individual audit findings?

10   A.  In my side by sides, what I would observe is they would --

11   they would be working on a current loan, and they would have to

12   stop what they were doing, get out of that loan file in the

13   system, go to the loan file that the finding had been on, do

14   some fairly detailed and in-depth research on what had

15   happened, and then prepare some kind of a response that they

16   could communicate to their team leader about what happened.

17   Q.  How did that impact the work of the loan specialists on

18   their pipeline?

19              MS. LONDON:  Objection, your Honor.

20              THE COURT:  Sustained.

21              MR. JONES:  Pass the witness, your Honor.

22              THE COURT:  Anything from counsel for Ms. Mairone?

23   DIRECT EXAMINATION

24   BY MR. HEFTER:

25   Q.  Mr. Gillet, Michael Hefter on behalf of Rebecca Mairone.

DAH3BAN2                      Gillet - direct

1    Very briefly, do you recall your testimony about the rollout

2    meeting for the High-Speed Swim Lane pilot?

3    A.  Yes, I do.

4    Q.  Do you know whether Ms. Mairone was at that meeting or not?

5    A.  I -- don't believe she was there in person.  She may have

6    been there by conference call, teleconference.

7    Q.  You don't have personal knowledge whether she was on a

8    conference call?

9    A.  I don't recall.

10           MR. HEFTER:  Thank you very much.  No further

11   questions, your Honor.

12           THE COURT:  Cross-examination.

13   CROSS-EXAMINATION

14   BY MS. LONDON:

15   Q.  Good morning, Mr. Gillet.

16   A.  Good morning.

17   Q.  In the 2007 to 2008 time period, you were a first vice

18   president and fulfillment leader in Central Fulfillment, is

19   that right?

20   A.  That's correct.

21   Q.  In that role you reported to Jim White, is that correct?

22   A.  Yes.

23   Q.  Mr. White reported to Wade Comeaux, is that correct?

24   A.  Yes, he did.

25   Q.  Mr. Comeaux reported to Rebecca Mairone, didn't he?

1    A.  I believe he did, yes.

2    Q.  In the 2007 and 2008 time period, who reported to you?

3    A.  There were four -- I'm sorry.  Could you clarify the

4    question again?

5    Q.  Sure.  In the 2007 to 2008 time period, who reported to

6    you?

7    A.  Well, a lot of different people reported to me.  Can you be

8    more specific?

9    Q.  Who were your direct reports?

10   A.  Beginning in October 1st, there were four team leaders that

11   reported to me.  Ryan Solomon, Aaron Portenier, Barbara

12   Heinecke, and Desirae Flores.

13   Q.  You mentioned that you left Conseco and went to FSL after

14   Ed O'Donnell joined FSL.  Is that correct?

15   A.  Yes, it is.

16   Q.  How many others moved from Conseco to FSL around the same

17   time period?

18   A.  It was between 20 and 22 I believe.

19   Q.  In your role in Central Fulfillment, you monitored the

20   number of loans that were being funded, is that right?

21   A.  Yes, I did.

22   Q.  You testified one of your responsibilities included

23   ensuring that the people under you were working efficiently, is

24   that correct?

25   A.  Yes, it was.  Among other things.

 1   Q.  In your role you were required to take steps to increase

 2   the number of loans that were funded, is that correct?

 3   A.  Yes, that was part of my job.

 4           MR. HEFTER:  Objection.

 5           THE COURT:  Excuse me.  There is an objection.

 6           Overruled.  The answer will stand.  Put another

 7   question.

 8   Q.  In the late 2007, early 2008 time period, you were under

 9   pressure from Mr. White to increase the number of loans funded,

10   correct?

11           MR. JONES:  Objection.

12           THE COURT:  Overruled.

13   Q.  You can answer, sir.

14   A.  I'm sorry.  I was under instruction and authority to do a

15   number of things, and one of them was to have my people work

16   more efficiently, yes.

17   Q.  In response you put pressure on the people who reported to

18   you to increase the number of loans that were funded, isn't

19   that right?

20           MR. HEFTER:  Objection.

21           THE COURT:  Overruled.

22   A.  I don't know if putting pressure on them would be the right

23   characterization.  Did I employ tactics to motivate them to

24   operate more efficiently?  Yes.  In cases where they were not

25   performing up to expectations, were there conversations,

DAH3BAN2                    Gillet - cross

1    coaching conversations and performance management

2    conversations?  Yes.  But there were also conversations about

3    quality and other things.

4    Q.  Okay.  It is your testimony that you employed tactics to

5    motivate the people that reported to you, is that correct?

6    A.  Yes.

7                MS. LONDON:  Your Honor, may I approach?

8                THE COURT:  Yes.

9                What tactics?

10               THE WITNESS:  They would range from one-on-one

11   conversations with the employees to e-mails sent to the entire

12   group recognizing some of them for their performance.

13   Encouraging them as a group.  So it could be a variety of

14   different ways.

15               THE COURT:  All right.  Go ahead, counsel.

16   Q.  In November of 2007 -- strike that.

17               One of the steps to increase funding in Central

18   Fulfillment included a new funding reporting system, is that

19   correct?

20   A.  I'm sorry.  Could you repeat the question?

21   Q.  One of the steps to increase funding in Central Fulfillment

22   included a new funding reporting system, is that correct?

23               MR. JONES:  Objection.

24               THE COURT:  Ground?

25               MR. JONES:  Vague.  Foundation.

DAH3BAN2                      Gillet - cross

1              THE COURT:  Overruled.

2   A.  I'd have to see the report.  But I assume that's possible,

3   yes.

4   Q.  You could turn in your binder to PX 538.

5   A.  Okay.

6   Q.  This is an e-mail from Jeffrey Ngo to Wade Comeaux, you,

7   and Donna Braaten, and several others dated November 5, 2007,

8   is that correct?

9   A.  Yes, it is.

10             MS. LONDON:  We move to admit PX 538 into evidence.

11             MR. JONES:  No objection.

12             MR. HEFTER:  No objection, your Honor.

13             THE COURT:  Received.

14             (Plaintiff's Exhibit 538 received in evidence)

15  Q.  Who is Jeffrey Ngo, if I'm pronouncing it correctly?

16  A.  I believe he was a business analyst.  But I don't really

17  recall.

18  Q.  Who is Donna Braaten?

19  A.  Donna Braaten was a fellow first vice president and

20  fulfillment unit leader.

21  Q.  The subject line of this e-mail is "Introducing the new

22  Central Fulfillment funding projection report."  Correct?

23  A.  Yes, it is.

24  Q.  The first --

25             THE COURT:  So, I will take it on faith that that is

DAH3BAN2                         Gillet - cross

```
 1    right.  Because even with the blow up, what is this, size 2
 2    font? .2?  You might want to just consider blowing it up a
 3    little bit more.
 4             MS. LONDON:  Ms. Michaud, are we able to blow it up
 5    any more?  I'm afraid our technology might be too limited.
 6             THE COURT:  Go ahead.
 7             MS. LONDON:  Thank you, your Honor.
 8    Q.  The first name on this cc line of this e-mail is Rebecca
 9    Mairone, is that correct?
10    A.  Yes, it is.
11    Q.  Please turn to the third page of this exhibit.
12    A.  Okay.
13    Q.  The top box refers to a new funding projection report.
14    Correct?
15    A.  Yes.
16    Q.  Please read the first sentence in this box starting with
17    the report is.
18    A.  "The report is intended to provide a view of the number of
19    fundings needed to meet the goal set at the beginning of each
20    month.  Each month, each SVPs."
21    Q.  Sorry, you can stop.  Thank you.
22    A.  Okay.
23    Q.  There was a goal set at the beginning of each month in
24    Central Fulfillment for loans funded, is that correct?
25    A.  Yes.
```

1    Q.  You can read the next sentence.

2    A.  "Each month, each SVP will work with their teams to

3    establish funding goals at the OM level based upon existing

4    pipeline."

5    Q.  What is an SVP?

6    A.  Senior vice president.

7    Q.  What is an OM?

8    A.  Operations manager.

9    Q.  What is a pipeline?

10   A.  Pipeline is the number of loans in process at any given

11   point in time.

12   Q.  According to this document, the reporting was going to be

13   daily, correct?

14   A.  I can't determine that from the report.  So I -- and I

15   don't recall if it was daily.

16   Q.  I'll just point it out to you under reporting schedule.  Do

17   you see that under --

18   A.  Okay.  Okay.  Daily.  I see it.

19   Q.  Reports were to be generated Monday to Friday at 7 a.m., do

20   you see that?

21   A.  Yes.

22   Q.  A few lines down the document describes changes to the

23   production report.  Is that correct?

24   A.  Yes, it does.

25   Q.  These changes included a new ranking by LS, OM, and FVP, a

DAH3BAN2                        Gillet - cross

1     new drill down hierarchy, and other features.  Is that correct?

2     A.   Yes.

3     Q.   What is a drill down hierarchy?

4     A.   That means the reporting levels that the report would cover

5     by position type.

6     Q.   Two boxes down from the top there is a description of month

7     to date fundings.  Is that correct?

8     A.   Yes, that's what it says.

9     Q.   Please read the first sentence in that box starting with

10    total fundings.

11    A.   "Total fundings month to date and computed average is

12    shown."

13    Q.   Actually, if you could finish that paragraph, please.

14    A.   Okay.  "The third column shows the difference between goal

15    and total fundings month to date.  Finally, the last column

16    shows the required number of fundings per day to meet the

17    goal."

18    Q.   The next box down is labeled "55 percent fundings

19    expectations."  Correct?

20    A.   Correct.

21    Q.   This box states that "FSL set an expectation of funding

22    55 percent of apps to improve efficiency."  Is that correct?

23    A.   That's --

24         MR. HEFTER:  Objection, your Honor.  Document speaks

25    for itself.

2891

1          THE COURT:  I agree with that.  I'm not sure what the

2     question is.  "Is that correct."  Do you mean were you reading

3     it correctly?

4          MS. LONDON:  Yes, your Honor.

5          MR. HEFTER:  That's a different question, your Honor.

6          THE COURT:  There was an ambiguity in the question.

7          MR. HEFTER:  That's an ambiguity that infected a

8     number of these questions.

9          THE COURT:  We certainly don't want the infection to

10    spread.  So, we'll just leave it where it is and move on.

11    Q.   What does it mean to fund 55 percent of apps?

12         MR. HEFTER:  Objection.  Lack of foundation.

13         THE COURT:  Overruled.

14    A.   What that means is that we set a target to try to fund

15    55 percent of the loan applications taken by our account

16    executives or mortgage loan officers.

17    Q.   Please read the contents of the next box down.

18    A.   The one that says "SVP, FVP, and OM efficiency"?

19    Q.   Correct.

20    A.   It says "The last two columns show the average funds per

21    employee."

22    Q.   What is an FVP?

23    A.   An FVP?  First vice president.

24    Q.   That was the position that you held, correct?

25    A.   That is correct.

DAH3BAN2                    Gillet - cross

1    Q.  Please read the contents of the last box.

2    A.  The box that is titled "Changes to Central Fulfillment

3    production report"?

4           "Ranking by FVP, OM and LS.  Shows the best performing

5    FVP, OM, and LS.  Highest average movement for prior day" in

6    parentheses.

7    Q.  You can set that aside now.

8           You instructed the managers in your group that they

9    had to decrease their turn time in November of 2007, correct?

10   A.  Yes, I did tell them that that was one of our targets, yes.

11   Q.  You told them that their turn time needed to decrease from

12   20 days to five days, correct?

13   A.  I don't recall that, no.

14   Q.  If you could turn to PX 489 in your binder.  This is

15   already in evidence.

16   A.  Okay.

17   Q.  This is an e-mail that you sent to managers that you

18   supervised on November 6, 2007, correct?

19   A.  That's correct.

20   Q.  You cc'd Jim White, correct?

21   A.  Yes, I did.

22   Q.  Can you read the first sentence after managers.

23          MR. HEFTER:  Your Honor, just we have a limiting

24   instruction from a previous ruling of yours, your Honor, on

25   this document.

DAH3BAN2                          Gillet - cross

```
 1              THE COURT:  It's already in evidence.  If no objection
 2     was raised when it was introduced, there wouldn't be one now.
 3     If there was one and I gave a limiting instruction then, I
 4     would be happy to repeat it.  Which is it?
 5              MR. HEFTER:  It is the latter.
 6              THE COURT:  This will be received only as to the
 7     banks.
 8     Q.  Can you please read the first sentence after managers.
 9     A.  It says "We've got to have a major improvement in our turn
10     time in November."
11     Q.  Please read the third paragraph starting with our turn time
12     is at 20.
13     A.  "Our turn time is at 20 days from appraisal to CTC now
14     worst in NSC.  Our goal for November is five days.  We need to
15     get there in November.  This means we will go from worse in
16     class to best in class."
17              You want me to read on?
18     Q.  Yes.
19     A.  "I will need you all over this with your teams.  You will
20     be hearing from me, e-mail, meetings, checking and sending
21     notes.  You can count on me to be on this like white on rice."
22     Q.  You did in fact follow up with the managers in your group
23     frequently, correct?
24     A.  Yes, on our appraisal to clear to close turn time.
25     Typically we received appraisals anywhere from 10 days to two
```

DAH3BAN2                          Gillet - cross

1    weeks after the application was taken.  And our goal, our

2    target, was to try to shorten the turn time from that point

3    forward in the process.

4    Q.  Mr. White checked up on turn time frequently as well,

5    didn't he?

6              MR. JONES:  Objection.

7    A.  Yes.

8              THE COURT:  Sustained.

9    Q.  Could you turn to PX 539 in your binder.

10   A.  Okay.

11   Q.  This is an e-mail from Mr. White to you dated November 7,

12   2007, correct?

13   A.  Yes, it is.

14   Q.  This is the day after the prior e-mail that we looked at,

15   is that correct?

16   A.  Yes.

17             MS. LONDON:  We move to admit PX 539 into evidence.

18             MR. JONES:  No objection.

19             MR. HEFTER:  Limiting instruction, your Honor, please.

20             THE COURT:  No.  539 is received against all

21   defendants.

22             (Plaintiff's Exhibit 539 received in evidence)

23             MS. LONDON:  Ms. Michaud, if you can blow up the top

24   e-mail.

25   Q.  At the top of this e-mail, Mr. White wrote "Ron, could you

DAH3BAN2                         Gillet - cross

1    explain how Ryan's entire team of eight LSs in an eight hour

2    day only moved five loans?  How do you project 40 and move

3    five."

4             Did I read that correctly?

5    A.  Yes, it is.

6    Q.  Who was Ryan?

7    A.  Ryan was Ryan Solomon.

8    Q.  What does it mean to move loans?

9    A.  It meant tracking the movement between from one phase code

10   to another in the pipeline.

11   Q.  Mr. White also wrote -- and I'm looking at the second

12   paragraph.  "Do not get me wrong.  Not a big fan of tracking

13   movements.  But honestly, five movements in one day is

14   something we cannot defend.  What is holding us back."

15            Did I read that correctly?

16   A.  Yes, you did.

17   Q.  You can set that document aside.  Mr. White also tracked

18   funding numbers for individual loan specialists, didn't he?

19   A.  Yes, he did.  And he did a number of things.

20   Q.  If you could turn to PX 540 in your binder.

21   A.  Okay.

22   Q.  This is an e-mail from Mr. White to you and Donna Braaten

23   dated January 19, 2008, correct?

24   A.  Yes, it is.

25            MS. LONDON:  We move to admit this exhibit into

DAH3BAN2                     Gillet - cross

1    evidence.

2              MR. JONES:  No objection.

3              MR. HEFTER:  No objection, your Honor.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 540 received in evidence)

6              THE COURT:  Counsel, find a spot where we can give the

7    jury their midmorning break.

8              MS. LONDON:  We can stop here, your Honor.

9              THE COURT:  We'll take a 15-minute break at this time.

10             (Jury excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAH3BAN2

```
 1              THE COURT:  I have received the government's letter
 2      yesterday in response to the defendants' view that the jury
 3      should be instructed that only a, quote, high managerial agent
 4      can bind the corporation.  I continue to be of the view that
 5      that is not the correct standard.
 6              I admire, genuinely, the creative -- and I don't mean
 7      that pejoratively, I mean the very interesting argument that
 8      defense counsel made as to why prior cases in this area from
 9      the Second Circuit should be limited.  But I'm not persuaded
10      that it is the law of the Second Circuit.  I'm also not
11      persuaded at all by the position taken by some other courts
12      outside this circuit on the RICO analogy.  But in any event, it
13      is an inapt analogy.
14              But I note, for what it's worth, that I think those
15      courts were acting in contravention of the Supreme Court's
16      decision in the RICO case of United States v. Turkette.
17              This leaves the question, however, of whether I should
18      instruct the jury about the lesser standard defense counsel
19      argues for which is managerial employee, as opposed to simply
20      employee or something of that sort.  And I had asked defense
21      counsel to tell me whether they were contending whether any of
22      the three people involved were not managerial employees.
23              So what's the answer?
24              MR. SINGER:  Your Honor, we have given that some
25      thought since the last time we spoke, and we would be
```

DAH3BAN2

1    content -- if your Honor is rejecting the high managerial agent

2    standard -- we would be content with an instruction that the

3    jury would have to find that one of the three individuals that

4    the government has identified committed a fraud with the

5    requisite mental state.

6         THE COURT:  So we don't have to get into the issue

7    with the jury.  Thanks very much.  That is very helpful.  I

8    won't reach that subordinate issue, managerial versus whatever

9    the lesser view is of the government in this case.

10        In terms of the charging conference, Ms. Mainigi, you

11   put me in the horns of a dilemma, because my wife reminded me

12   because I canceled our dancing date this past Monday, that I

13   promised to take her dancing this Friday.  Which was when you

14   had suggested, and of course we might be able to get it done

15   earlier, but I have some other matters already lined up for

16   4 o'clock and so forth.  So I think we'll do it sometime early

17   next week.

18        But, let me ask you this:  Do you have an estimate as

19   to when your case is going to conclude?

20        MS. MAINIGI:  It is a good question, your Honor.  We

21   are daily evaluating, and I think as long as we're not held to

22   it, because obviously we don't know what the government will do

23   in terms of cross-examination.  But, we are trying to wrap up

24   our case in the first half of next week and perhaps even

25   earlier.  So, we would certainly welcome, if there was an

DAH3BAN2

1    opportunity to make a dent at least in the charging conference

2    this week, we're happy to stay later today, or get an hour in

3    perhaps tomorrow.

4            For that same reason, your Honor, while I'm up I might

5    mention that we do have several witnesses that are stacked up

6    waiting to testify.  And to the extent --

7            THE COURT:  They may be a little uncomfortable in that

8    position.

9            MS. MAINIGI:  They are very uncomfortable, especially

10   the ones that have flown from California.  Because we have such

11   a short day tomorrow, if there is a way for us to get the

12   witness in the box and the jury seated by 9:30 in the box.  So

13   we can actually meet our goal.

14           THE COURT:  So you are the soul of diplomacy.  A

15   better or accurate statement would be, Judge, the jury's here

16   at 9:30 every day.  The lawyers are here at 9:30 every day.

17   Where the heck are you.

18           MS. MAINIGI:  That never crossed my mind, Judge.

19           THE COURT:  Well, it has crossed mine.  But I of

20   course repressed it.  Okay.  Fair enough.  We will start a real

21   9:30 tomorrow.

22           In terms of the charging conference, I think your

23   suggestion, I don't know whether it will work in terms of

24   tomorrow, but I think the suggestion that we do it early next

25   week, and, if necessary, an hour here and an hour there, would

DAH3BAN2

1    get it done.  Given what you've just projected is fine.  So,

2    we'll find a way to do that.  I don't think we can do an hour

3    tomorrow though.

4           I will be sure to get both sides before the close of

5    business tomorrow a draft charge so you can look it over during

6    the weekend.  My recommendation is you start looking at it at

7    9:30 a.m. on Saturday morning.  But in any event, I think that

8    will expedite things so when we have the charging conference,

9    I'll be able to get your comments right off the bat.  Yes.

10          MR. SINGER:  Your Honor, we obviously submitted, both

11    sides did, some proposed charges before trial.  As the trial

12    has progressed, we have several, not many, supplemental charges

13    we would like to propose.

14          THE COURT:  Well, I've already pretty much drafted the

15    charge.  If you are going to get those to me, you better give

16    them to me today.

17          MR. SINGER:  We'll get them --

18          THE COURT:  This evening would be okay.  No later than

19    that.

20          MR. ARMAND:  Your Honor, very briefly.  If the defense

21    is going to be wrapping up their case in the early part of next

22    week, we're still looking at a witness list that has 30-plus

23    names on it.

24          THE COURT:  They still have to tell you 24 hours in

25    advance and so forth.  I don't have any criticism of the

DAH3BAN2

1    the defense has handled this.  It is an important case.  They

2    convinced me when you first raised this issue that while some

3    of their witnesses might be cumulative, there is no witness who

4    is irrelevant or inappropriate.  I have required them to give

5    you sufficient notice both of who it is and what the exhibits

6    are to prepare.

7         I understand you've got many other things on your

8    plate, as do they.  And while of course I encourage them as a

9    matter of professional courtesy to be as responsive as they can

10   be to who else they're going to call, I'm not going to change

11   any of the guidelines beyond those that I've already set.

12        MR. ARMAND:  I wasn't asking your Honor to -- I wasn't

13   reopening the question of whether to exclude witnesses.  It is

14   just a question of having the adequate time to prepare and --

15        THE COURT:  The 24 hour rule of course when it comes

16   to the weekend means Friday.  The people they are going to call

17   Monday, they need to let you know that by Friday evening.

18        MR. ARMAND:  Fantastic.

19        THE COURT:  Very good.

20        MS. LONDON:  Your Honor, as to one of the exhibits

21   that just came in, I believe the limiting instruction was not

22   supposed to be applied to Plaintiff Exhibit 489.  I have a

23   transcript saying --

24        THE COURT:  I was surprised at that, too.  But I

25   didn't have a recollection one way or the other.

DAH3BAN2

1          MR. HEFTER:  I was relying, your Honor, on our daily

2     chart that we put together.  We can confirm that.

3          THE COURT:  Why don't you mutually work that out.

4          MR. HEFTER:  We can work that out.  I recall that it

5     was.  But if my recollection is mistaken and the chart we

6     prepared is mistaken, I'll work that out with government

7     counsel.

8          MS. MAINIGI:  Your Honor, on that topic, one minor

9     request.  Generally your Honor states "received against the

10    banks."  Would you be willing to consider "received as to the

11    banks"?

12         THE COURT:  Sure.

13         MS. MAINIGI:  Thank you.

14         THE COURT:  I am even willing to say "received for the

15    banks," but I'm not sure you want that.

16         MS. MAINIGI:  I think ours is good.

17         THE COURT:  That's fine.

18         (Recess)

19         (Continued on next page)

20

21

22

23

24

25

DAHTBAN3                         Gillet - cross

 1                (Jury not present)

 2                THE COURT:  So I have made the following arrangements

 3      with respect to the charging conference.  We will sit with the

 4      jury on Monday to 3:30.  I will then take two other matters

 5      that I have just informed counsel those other matters must end

 6      by 5:30.  We will start the charging conference at 5:30 and go

 7      without limitation as long as it takes.  So it won't be an hour

 8      here or an hour there, so it will be the entire charging

 9      conference.

10                MS. MAINIGI:  Would there be any flexibility on the

11      3:30?  We're still making final decisions who we will call on

12      Monday.

13                THE COURT:  We can have the jury sit later, but then I

14      just told --

15                MS. MAINIGI:  You still have other matters.

16                THE COURT:  Whatever time we go beyond 3:30 means

17      we'll start later with the charging conference.

18                MS. MAINIGI:  That is certainly fine with us, so we

19      could maximize our witness time with the jury.

20                THE COURT:  Yes.

21                MR. HEFTER:  One other matter, I did coordinate with

22      government's counsel.  Your Honor did give a limiting

23      instruction, then on the next page of the transcript reversed

24      that, so I was mistaken.

25                THE COURT:  Very good.

DAHTBAN3                    Gillet - cross

1          I don't know that we have to burden the jury with

2     that, we'll just know it for purposes of summation.

3               MR. HEFTER:  Yes.

4               (Jury present)

5               THE COURT:  Counsel.

6               MS. LONDON:  Thank you, your Honor.

7     BY MS. LONDON:

8     Q.  Mr. Gillet, we were on PX540.  Would you please turn back

9     to that.

10    A.  OK.

11    Q.  Please turn to the fourth page of this document.  There's

12    an email from Mr. White to Natalie Esterly at the top, correct?

13    A.  Yes.

14    Q.  Please read that email.

15    A.  Says Natalie, could I have a list of LSs that funded three

16    loans or less for Chandler and Rosemead?  I would like to

17    address the loan production with the OMs.

18    Q.  Who is Natalie Esterly?

19    A.  I'm not sure.  She might be another business analyst.  I'm

20    not actually sure.

21    Q.  Please turn to the first page of the document.  The bottom

22    half there's an email from Ms. Esterly to Mr. white.  Do you

23    see that?

24    A.  Yes.

25    Q.  The first sentence of that email states:  Several of the

DAHTBAN3                      Gillet - cross

1    individuals have processed one or two for other branches, so to

2    make it easier to compile I had to list the proc branch after

3    the LS.  Did I read that correctly?

4    A.  Yes.

5    Q.  Mr. White forwarded this email chain to you and

6    Ms. Braaten, is that correct?

7    A.  That's correct.

8    Q.  Please read that email from Mr. White.

9    A.  I know you are aware, but here is the list of the LSs with

10   the lowest month to date fundings.  Make sure you are getting a

11   good beat on what it taking place.  Ron, you mentioned you were

12   going to dig into Janell's pipes since her fundings were so

13   low.  What did you come up with on this review?  We are looking

14   for a nice increase in the number of fundings per LS.  For this

15   to happen, we need big numbers for all LSs.  Stay on it.

16   Q.  Who is Janell?

17   A.  Janell is Janell Hartsough.

18   Q.  She's a loan specialist; that correct?

19   A.  That is correct.

20   Q.  Mr. Gillet, you encouraged loan specialists to move loans

21   at lightning speed in early 2008, correct?

22   A.  Yes, I encouraged them to move loans with efficiency.  I

23   don't recall if I used that term, but yes.

24   Q.  The term "lightning speed" meant that loans were funded in

25   24 days or less, correct?

DAHTBAN3                        Gillet - cross

1   A.  I don't know that that was ever a definition of lightning

2   speed.  It meant with efficiency.  I don't think that there was

3   a date metric attached to it.

4   Q.  And you described -- strike that.

5          If you could turn to PX486 in your binder.  This is

6   already in evidence.

7   A.  OK.

8   Q.  Turn to the second page.  There are a series of lines at

9   the bottom of the page.  Do you see that?  One of those lines

10  states:  Lightning speed loans fund in 24 days or less.

11         Do you see that?

12  A.  Yes.  I don't know that -- again, that was just a term, a

13  phrase --

14         THE COURT:  No, the question was --

15  A.  -- generally defining it in 24 days.

16         THE COURT:  Excuse me.  Please just answer the

17  question.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Thank you.

20  Q.  Turning back to the first page of this document, this is an

21  email from you, Mr. Gillet, dated January 28, 2008, correct?

22  A.  Yes, it is.

23  Q.  The subject of the email is CF fundings MTD lightning speed

24  top funder reports for 1/28, correct?

25  A.  Yes, it is.

1   Q.  CF fundings MTD means Central Fulfillment fundings month to

2   date, is that correct?

3   A.  That is correct.

4   Q.  The first paragraph of the email states:  Team, Janell

5   Hartsough has sprinted around the challengers, is now in first

6   place by five fundings headed into the final turn.  I don't

7   think anyone can catch her.

8           Did I read that correctly?

9   A.  Yes.

10  Q.  This is the same Janell Hartsough who previously was

11  mentioned by Mr. White for having low funding numbers, correct?

12  A.  Yes, it is.

13  Q.  The next paragraph states:  Lori Smith, Barbara Heinecke,

14  Isbell Zamarripa and David Grant are all still on the leader

15  board.

16          Did I read that correctly?

17  A.  Yes, it is.

18  Q.  These individuals were all loan specialists, correct?

19  A.  At that time, yes.

20  Q.  And at this time you were motivating these loans

21  specialists to compete with each other, correct?

22  A.  We did encourage a spirit of the competition, sure,

23  friendly competition.

24  Q.  If you could now turn to PX487, which is also in evidence.

25  This is an email from you dated January 30, 2008, correct?

DAHTBAN3                          Gillet - cross

1   A.  Yes, it is.

2   Q.  This was sent two days after the email we just looked at,

3   correct?

4   A.  Yes.

5   Q.  The subject of the email is CF fundings MTD lightning speed

6   top funder reports for 1/28, correct?

7   A.  Actually for 1/30, but yes.

8   Q.  Thank you.  The first line of the email states:  Janell

9   Hartsough still holds a narrow one-loan lead over her closest

10  challenger.  Can she hang on?

11          Did I read that correctly?

12          MR. JONES:  Objection.

13          THE COURT:  Sorry?  What was the objection?

14          MR. JONES:  Cumulative, your Honor.

15          THE COURT:  A little bit.  I'll allow it, but I do

16  think that is a bit of a concern.

17          MS. LONDON:  Understood, your Honor.

18  Q.  This is the same Janell Hartsough that we have been

19  discussing, correct?

20  A.  Yes.

21  Q.  Please turn to PX542 in your binder.

22  A.  OK.

23  Q.  This is an email from to you Mr. White dated February 4th,

24  2008, correct?

25  A.  Yes, it is.

DAHTBAN3                        Gillet - cross

1              MS. LONDON:  We move to admit 542 into evidence.

2              MR. JONES:  No objection.

3              MR. HEFTER:  Your Honor, may I have a side bar on

4    this, please?

5              THE COURT:  All right.

6              (At side bar)

7              MR. HEFTER:  Your Honor, I wanted to raise the same

8    issue that I raised yesterday -- I'm not asking you to revise

9    your ruling -- with the debate that we had about the 19th

10   century hearsay rule.

11             THE COURT:  No, as you will recall, without admitting

12   or denying the correctness of your argument, I did treat as a

13   non-business record one portion of one exhibit.

14             MR. HEFTER:  Right.

15             THE COURT:  And so each exhibit has to be looked at on

16   its own terms.  With respect to the one at that came in earlier

17   with this witness, I did consider that issue and determined it

18   was a business record.  Let me take a look at this one.

19             Are you raising that with respect to the entire

20   exhibit?

21             MR. HEFTER:  No, your Honor.  Let me take a look at

22   it.  Really my reaction is to the subject matter of the re line

23   really, on fire in February.

24             THE COURT:  The subject matter?

25             MS. LONDON:  It's the name of the contest.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAHTBAN3                        Gillet - cross

```
 1            THE COURT:  The on fire in February?  Well, given that
 2    the rest of it is clearly, in my view, a business record, I
 3    don't think that is sufficient to warrant carving out that one
 4    line.  You're free, of course, to inquire of this witness about
 5    that line since it's his email, so I will receive this as to
 6    all parties for now.  If, as a result of your colloquy you
 7    change my mind on that one line, we can always instruct the
 8    jury.
 9            MR. HEFTER:  That's fine, your Honor.  So I'm clear,
10    we'll go on a document-by-document basis?
11            THE COURT:  Yeah, all you need to say is objection,
12    limitation, and I'll just look over so we don't need a side
13    bar.
14            MR. HEFTER:  That's fine.  That was my only purpose in
15    coming up.
16            (Continued on next page)
17
18
19
20
21
22
23
24
25
```

DAHTBAN3                      Gillet - cross

1           (In open court)

2           THE COURT:  Plaintiff's Exhibit 542 is received.

3           (Plaintiff's Exhibit 542 received in evidence)

4   BY MS. LONDON:

5   Q.  Please turn to the second to last page of this document,

6   Mr. Gillet.

7   A.  OK.

8   Q.  The bottom half of this is an email from Mr. Comeaux to FSL

9   CF FVPs, correct?

10  A.  Yes.

11  Q.  And that included you, correct?

12  A.  Yes, it did.

13  Q.  Mr. Comeaux instructed you to send the email to all loan

14  specialists and their management only, is that correct?

15  A.  Yes, we were intending to communicate this to our

16  processors, yeah.

17  Q.  Please turn to the last page of the document.

18  A.  OK.

19  Q.  Please read the first three sentences.

20  A.  First I want to thank you again for your dedication and

21  commitment to making January a strong month considering the

22  pipeline with which we started the month.  February is an

23  entirely different situation.  We are starting the month with a

24  massive pipeline that should support a monumental February.  In

25  order to achieve our true potential, we must have an

DAHTBAN3                    Gillet - cross

1   outstanding performance in the first two weeks of the month and

2   we must have more daily focus on docs out than ever before.

3   Q.   Thank you.  The fourth paragraph states we wanted to

4   provide tremendous early month intensity so we are running the

5   following contest for all bonusable LS positions.

6        Do you see that?

7   A.   Yes.

8   Q.   What does the term "bonusable LS positions" mean?

9   A.   It means it applies to LSs that are eligible for incentive

10  compensation.

11  Q.   Please read the three lines starting with the words "First,

12  in order."

13  A.   First, in order to qualify for the bonus, the LS must fund

14  eight units minimum by 2/15.  If that happens, we will pay $50

15  for all loans that fund by 2/8 and $25 for all loans that fund

16  by 2/15 for the month of February.  This contest is approved by

17  senior FSL management and will be paid along with February

18  production bonus at the end of March.

19  Q.   And a few lines down Mr. Comeaux provides four pieces of

20  advice, is that correct?

21  A.   Yes.

22  Q.   Please read the third item.

23  A.   Never assume you do not have the loans to get to the

24  number.  We are routinely funding loans in two, three and four

25  days from receipt on many more of our more quickly closing

DAHTBAN3                     Gillet - cross

1    products.  You could receive three fast and easy locks tomorrow

2    or you could rescue a tough deal today.

3    Q.  You can set that aside and please turn to PX541 in your

4    binder.

5    A.  OK.

6    Q.  This is an email from Mr. White to you dated March 6, 2008,

7    correct?

8    A.  Yes, it is.

9              MS. LONDON:  We move to admit PX541 into evidence.

10             MR. JONES:  No objection.

11             MR. HEFTER:  No objection.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 541 received in evidence).

14   Q.  Please turn to the second page of this document.  This is

15   an email from you to Mr. White describing loans moved to PC2,

16   correct?

17   A.  Yes, describes loans that we moved to PC2 that day, yes.

18   Q.  There's a reference to Courtney about halfway down the

19   page, correct?

20   A.  That's correct.

21   Q.  Courtney is a loan specialist, is that correct?

22   A.  Yes, she was.

23   Q.  You wrote:  Courtney, nothing.  Courtney did not have

24   computer access until after 1 p.m. today.  She is still here

25   trying to make something happen.  Did I read that correctly?

DAHTBAN3                    Gillet - cross

1   A.  Yes.

2   Q.  You sent that email at 6:50 p.m., correct?

3   A.  Yes.

4   Q.  And on the first page of this document Mr. White responded

5   later that same evening, correct?

6   A.  Well, I would like to clarify.  Yes, that looks like the

7   right time line, yes.

8   Q.  Looking at Mr. White's email, he writes:  Thanks for the

9   effort, but this is light.  We have 1300 loans in the pipe and

10  we need to move more than 18 per day.  Otherwise, big problems.

11          Did I read that correctly?

12  A.  That's what it says, yes.

13  Q.  Mr. White went on to state:  Make sure we nail the

14  following, nobody leaves until they move at least one loan into

15  PC2.

16          Did I read that correctly?

17  A.  Yes, you did.

18  Q.  Mr. White also wrote:  This pipe has to move.  400 is your

19  number and you are very far behind.  One question for you, what

20  is the major issue keeping you from moving loans, the one major

21  issue?

22          Did I read that correctly?

23  A.  Yes, you did.

24  Q.  You can set that aside.

25          Briefly turn back to 542.  Do you have that?

DAHTBAN3                          Gillet - cross

1    A.  Yes, I do.

2    Q.  If you could turn to the last page of the document.

3    A.  OK.

4    Q.  And there's a line about four lines up from the bottom that

5    states:  Take control of your destiny today and add a nice pop

6    to your February commission check.

7            Did I read that line correctly?

8    A.  Yes.

9    Q.  And turning back to the first page of this document, this

10   is an email from to you Mr. White, is that correct?

11   A.  Yes, it is.

12   Q.  And you wrote to Mr. White:  I would assume it will be a

13   cash payment.

14           Do you see that?

15   A.  Yes.

16   Q.  Could you read the sentence that starts with the line I

17   just read?

18   A.  Sorry, what did you want me to read again?

19   Q.  If you could read the sentence starting with, "I would

20   assume."

21   A.  I would assume it would be a cash payment that will

22   probably take the form of a discretionary bonus.  And I would

23   also assume that it will be paid out at the end of the month of

24   February —— at the end of the month in February or possibly the

25   end of March with the LS's regular bonus payment.

DAHTBAN3                    Gillet - cross

1    Q.  What is the subject line of this email chain?

2    A.  It says:  FW; on fire in February.

3    Q.  And the phrase "On fire in February" was the subject of

4    Mr. Comeaux's email.  That was the original email in this

5    chain, is that correct?

6    A.  Yes.

7    Q.  Mr. Gillet, you testified that the QA process had nothing

8    to do with quality, is that correct?

9    A.  Yes, except in a few rare instances, that was correct.

10   Q.  If you to turn to your other binder, tab 3.

11           MS. LONDON:  And Ms. Michaud, this is Defendant's

12   Exhibit 537.

13   A.  OK.

14   Q.  Looking at the third page.

15   A.  OK.

16   Q.  The high risk findings included 17 total loans, is that

17   correct?

18   A.  That's correct.

19   Q.  And this is part of the QA results, is that correct?

20   A.  Yes.

21   Q.  Could you please read the rest of this paragraph under QA

22   results/common findings.

23   A.  It says LSs grandfathered with PCA/HSSL condition sign-off

24   authority.  Seven appraisal related findings, 30.4 percent.

25   Five asset related findings, 21.7 percent.  Four fraud detector

DAHTBAN3                    Gillet - cross

1    findings, 17.4 percent.  Four income related findings,

2    17.4 percent.  Two general guidelines related findings, 8.7.

3    One HSSL phase code three requirement, 4.4 percent.

4    Q.  This is the list of the types of findings that were found

5    as a result of QA results, correct?

6    A.  Yes.

7    Q.  If could you read the note at the end.

8    A.  It says the LSs were grandfathered in with PCA/HSSL

9    condition sign-off authority without training or HSSL

10   certification requirements.  As a result, our quality was

11   challenged.

12           MS. LONDON:  I have no further questions.

13           THE COURT:  Anything else?

14           MR. JONES:  Yes, your Honor.

15           THE COURT:  Go ahead.

16   REDIRECT EXAMINATION

17   BY MR. JONES:

18   Q.  Mr. Gillet, if you could stay on that document, Defendant's

19   Exhibit 537, and page 3 you were just directed to, the bottom

20   half.

21           Who are the loan specialists in the Chandler pilot?

22   A.  Lori Smith, Lisa Grover, and Crystal Lynn Largo.

23   Q.  And were those loan specialists that you recommended?

24   A.  Yes, they were.

25   Q.  If you could go to in the binder the government gave you,

1    Plaintiff's Exhibit 542, do you recognize this is the email you

2    were asked about with the subject "On fire in February?"

3    A.  Yes.

4    Q.  And what's the date of this email?

5    A.  Monday, February 4, 2008.

6    Q.  And if you could go to page 5 of this document.

7    A.  OK.

8    Q.  If we could have the center portion blown up, it says,

9    "First, in order to qualify."

10        Do you recall being asked to read portions of this

11   email regarding a bonus for a loan specialist?

12   A.  Yes, I do.

13   Q.  Do you know whether at this point in February 2008 loan

14   specialists were subject to a Quality of Grade hit for an SUS

15   finding?

16        MS. LONDON:  Objection.

17        THE COURT:  Sustained.

18   Q.  Mr. Gillet, you were asked about the tactics that you used

19   to motivate your employees, do you recall that?

20   A.  Yes, I do.

21   Q.  What did you do to motivate your employees to ensure the

22   quality of the loans they produced in Central Fulfillment?

23        MS. LONDON:  Objection.

24        THE COURT:  Overruled.

25   A.  Well, some of the tactics were similar to the other

1   motivational tactics I used in that I sent out emails to the

2   team, I met with individual LSs, as well as their team leader

3   to talk about the findings that were coming up and any trends

4   that they might represent.  And I also encouraged them to be

5   vigilant around the issues that we were seeing, whether they

6   were process lapses in terms of getting the documents that were

7   supposed to be in the file into the file, or making sure the

8   documents were complete, making sure generally that they were

9   adhering to the process, following our SOPs, and just being

10  vigilant around anything that had to do with process,

11  appearance, or quality.

12          MR. JONES:  Pass the witness.

13          MR. HEFTER:  No questions, your Honor.

14          MS. LONDON:  Nothing further, your Honor.

15          THE COURT:  Thank you very much, you may step down.

16          Please call your next witness.

17          MS. MAINIGI:  Yes, your Honor, the defense calls

18  expert Robert Broeksmit.

19          THE COURT:  Before we start with this witness, could

20  counsel for both sides remove the materials that are beginning

21  to overcome the face of the witness.

22          (Continued on next page)

23

24

25

DAHTBAN3                          Broeksmit - direct

1    ROBERT BROEKSMIT,

2          called as a witness by the Defendants,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. SMURZYNSKI:

6              DEPUTY CLERK:  Please be seated.  State your name and

7    spell your last name slowly for the record.

8              THE WITNESS:  My name is Robert Broeksmit,

9    B-R-O-E-K-S-M-I-T.

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  Mr. Broeksmit, where do you live?

13   A.  I live in Maryland.

14   Q.  Where did you go to school?

15   A.  I attended public schools in Illinois and graduated from

16   Yale University.

17   Q.  When did you graduate from college?

18   A.  1985.

19   Q.  After you finished college, what job did you take?

20   A.  My first job after college was at The Money Store in New

21   Jersey.

22   Q.  What was The Money Store?

23   A.  The Money Store was a firm that lent money to borrowers in

24   the form of student loans and mortgages, and I worked in their

25   residential mortgage division.

DAHTBAN3                          Broeksmit - direct

1   Q.  Could you sketch for the jury briefly the next jobs you

2   took after that?

3   A.  I worked for Investors Residential Mortgage, which was a

4   Texas-based company, in its New Jersey office, and then moved

5   with that firm to Austin.

6   Q.  And after that?

7   A.  That firm was acquired by a Boston-based company called

8   Krupp Residential Mortgage, and I moved to Boston with that

9   firm.

10  Q.  What was your next job?

11  A.  My next job was with Prudential Home Mortgage in Maryland.

12  Q.  And what was your next job after Prudential?

13  A.  In 1996 I joined Chevy Chase Bank in Bethesda, Maryland.

14  Q.  How long were you at Chevy Chase Bank?

15  A.  I was there for 14 years.

16  Q.  Please briefly state for the jury the various positions you

17  held with Chevy Chase Bank.

18  A.  I first was in charge of its direct to consumer mortgage

19  lending business, and then I ran its retail mortgage lending

20  business, and then in October of 1997 I became president of the

21  mortgage subsidiary of Chevy Chase Bank.

22  Q.  Of the jobs you described, Mr. Broeksmit, which of those

23  involved the origination of residential mortgages?

24  A.  All of them.

25  Q.  In your time working at those banks, how many loans did you

DAHTBAN3                          Broeksmit - direct

1   personally underwrite?

2   A.  I personally underwrote thousands of loans during that

3   period.

4   Q.  And during that period, approximately how many additional

5   loans did you have responsibility for the underwriting of?

6   A.  That would have numbered in the tens of thousands.

7   Q.  Were any of those loans loans that were underwritten using

8   the Fannie Mae or Freddie Mac guidelines?

9   A.  Yes, they were frequently under Fannie Mae or Freddie Mac

10  guidelines.

11  Q.  Were any of those loans sold to Fannie Mae or Freddie Mac?

12  A.  Yes, again that was a regular part of the business.

13  Q.  In the course of this loan origination process, did you use

14  automated underwriting systems?

15  A.  Yes, we did.

16  Q.  What is the Freddie Mac Hall of Fame?

17  A.  The Freddie Mac Hall of Fame is an award given to mortgage

18  servicers for exceeding Freddie Mac's standards for several

19  years in a row.

20  Q.  Did any of the organizations that you worked for ever

21  receive the Freddie Mac Hall of Fame designation?

22          MS. SCHOENBERGER:  Objection.

23          THE COURT:  Sustained.

24  Q.  What is the Fannie Mae National Advisory Council?

25  A.  The Fannie Mae National Advisory Counsel is a group of

DAHTBAN3                              Broeksmit - direct

1    people appointed by Fannie Mae who are active in the lending

2    industry to advise it on various industry matters.

3    Q.  How many members are there of the Fannie Mae National

4    Advisory Council at any time?

5    A.  15 to 20.

6    Q.  Have you ever been a member of the Fannie Mae National

7    Advisory Council?

8    A.  Yes, I was appointed to serve a two-year term on that

9    council.

10   Q.  Where do you presently work?

11   A.  I work at Treliant Risk Advisors.

12   Q.  How long have you been at Treliant Risk Advisors?

13   A.  For two and a half years.

14   Q.  Does Treliant do any work with respect to loan reviews?

15   A.  Yes, it does.

16   Q.  Have you ever served as an expert witness before,

17   Mr. Broeksmit?

18   A.  No, I have not.

19   Q.  Would you briefly explain what you were asked to do in this

20   case?

21   A.  Yes, I was asked to review the loans in the sample and to

22   review the findings that Mr. Holt, the plaintiff's expert,

23   found and determine whether they were correct.

24   Q.  And briefly, what were the main things you did in the

25   course of that work.

1    A.  I reviewed each of the loans.  I had a team of people

2    working with me, but I reviewed each of the loans and had of

3    access to all of the documents in those loan files and looked

4    at the allegations of Mr. Holt and recorded my findings of

5    whether I agreed with them or not.

6    Q.  In addition to the loan files, were there any other general

7    types of materials that you looked at in the course of your

8    work?

9    A.  Yes.

10   Q.  What were those?

11   A.  I looked at the guidelines pertaining to the origination of

12   the loans from Countrywide as well as various documents from

13   say variances that Countrywide negotiated with Fannie Mae, for

14   instance.

15   Q.  What standards did Mr. Holt use in determining whether a

16   loan was materially defective?

17             MS. SCHOENBERGER:  Objection.

18             THE COURT:  Ground?

19             MS. SCHOENBERGER:  Foundation.

20             THE COURT:  Overruled.

21   A.  Mr. Holt's standard for materially defective was that if a

22   loan deviated from the applicable underwriting guidelines in a

23   way that materially increased the risk of the loan, he found it

24   to be materially defective.

25   Q.  Do you apply the same standard in your review?

DAHTBAN3                          Broeksmit - direct

1    A.  Yes, I did.

2    Q.  Did anybody assist you in this review of the loan files?

3    A.  Yes.

4    Q.  How many people were on your team?

5    A.  24.

6    Q.  And how is your team structured?

7    A.  The first level of reviewers, who we call level one

8    reviewers, there were about 17 of those, and they looked at the

9    loan at each of the findings of Mr. Holt in the loan and tagged

10   documents in the file and in the guidelines that were pertinent

11   to those findings.

12   Q.  And was there a further level of review?

13   A.  Yes, there was.

14   Q.  And who are the people -- what was the title of the people

15   who did that second level of review?

16   A.  We called them the quality control reviewers.

17   Q.  What did they do?

18   A.  They looked at the work that the level one reviewers had

19   done to ensure that it was accurate and that the appropriate

20   citations to the file were made.

21   Q.  Was there anyone who came above the QC reviewers in the

22   structure?

23   A.  Yes, there was.

24   Q.  And what was the title for those folks?

25   A.  Those were our director level reviewers.

DAHTBAN3                         Broeksmit - direct

1    Q.   And how many of them were there?

2    A.   There were three.

3    Q.   And what task did the directors perform?

4    A.   The directors reviewed the work of the level one reviewers

5    and the quality control reviewers and synthesized that work via

6    a narrative and recommended to me a decision on the loan as a

7    whole.

8    Q.   And who was above the directors in the structure?

9    A.   I was.

10   Q.   And what task did you do in general?

11   A.   I looked at each of the loans after they had been reviewed

12   by the level one reviewers, the quality control reviewers and

13   the director, and I had access to all of the documents.  I

14   looked at the work that had been produced and edited the

15   findings when necessary and made a final determination on each

16   of the loans.

17   Q.   What sort of experience did the level one reviewers have?

18   A.   The level one reviewers averaged about ten years of

19   underwriting experience per person.

20   Q.   And what sort of experience did the QC reviewers have?

21   A.   The QC reviewers had also reviewed substantial numbers of

22   loans, each of them.

23   Q.   What sort of experience did the directors have?

24   A.   The directors had each individually reviewed thousands of

25   loans before.

DAHTBAN3                          Broeksmit - direct

1   Q.  Did any of the directors happen to have legal training?

2   A.  Yes, two of the three did.

3   Q.  Was that why they were hired for that task?

4   A.  No, the legal training was not a prerequisite for being

5   hired for that task.

6   Q.  At the start of the project, did you conduct any training?

7   A.  Yes, we did.

8   Q.  Tell the jury about that training that you conducted.

9   A.  We developed a manual that went through the review process

10  and the sorts of things that we were expecting the reviewers to

11  find and document, and I edited and approved that manual.  And

12  we also had several meetings and went through some test cases

13  with the reviewers before the review commenced.

14  Q.  Mr. Broeksmit, was Treliant compensated to its work in

15  connection with this project?

16  A.  Yes, we were.

17  Q.  Approximately how much?

18  A.  About $800,000.

19  Q.  Was that compensation dependent in any way on the

20  conclusions you reached?

21  A.  No, not at all.

22          MR. SMURZYNSKI:  Your Honor, if I might what approach

23  the witness.

24          THE COURT:  Yes.

25  Q.  Mr. Broeksmit, what portion of the loans that Mr. Holt

 1   determined to be materially defective did you personally

 2   review?

 3   A.   100 percent.

 4   Q.   Did you create any sort of summary of your conclusions with

 5   regard to that review?

 6   A.   Yes, I did.

 7   Q.   And if you would turn to tab 4 in the binder you have in

 8   front of you, briefly could you describe what tab 4 is or what

 9   is behind tab 4?

10   A.   Behind tab 4 is a spreadsheet which is a summary of each of

11   the loans that Mr. Holt determined were materially defective.

12   And it has the loan number and Mr. Holt's findings, my

13   conclusion, and then a narrative summary of my findings.

14            MR. SMURZYNSKI:  Your Honor, defendants ask that

15   Defendant's 1556 be admitted.

16            MS. SCHOENBERGER:  No objection.

17            THE COURT:  Received.

18            (Defendant's Exhibit 1556 received in evidence)

19   Q.   Could you blow up a portion of it, and rather than strain

20   the jury's eyes, Mr. Broeksmit, could you describe what you are

21   doing in this document?

22   A.   Yes, first column on the left is the loan number, and the

23   second, where it says "Government Survey Narrative" is

24   Mr. Holt's narrative finding.  The loan level conclusion is my

25   conclusion, and then the loan level narrative is the

1    explanation for my conclusion, and then if there are further

2    notes about the file, those are in the final column.

3    Q.  Based on your review of Mr. Holt's work, were you able to

4    identify the most common defects that Mr. Holt had asserted?

5    A.  Yes, I was.

6    Q.  Please turn to tab 5 in your binder.  And without reciting

7    the details, can you describe what tab 5 is.

8    A.  Tab 5 is a list of the common defects claimed by Mr. Holt.

9    Q.  And Mr. Broeksmit, would this list be helpful to illustrate

10   the findings of Mr. Holt that you responded to?

11   A.  Yes, it would.

12           MR. SMURZYNSKI:  Your Honor, I ask that a

13   demonstrative be allowed to be published to the jury,

14   Defendant's Exhibit 1930.

15           MS. SCHOENBERGER:  No objection.

16           THE COURT:  As a demonstrative?

17           MR. SMURZYNSKI:  As a demonstrative.

18           THE COURT:  Yes, that's fine.

19   Q.  Mr. Broeksmit, could you describe what is listed on DX1930.

20   A.  Yes, missing appraiser license was noted by Mr. Holt 41

21   times; missing mortgage insurance, 59; missing 1008, which is

22   an underwriting transmittal form, 116 times; missing title

23   insurance, 29 times; hazard insurance, 16 times; and other

24   missing documents, 27 times.

25   Q.  For how many of the loans did Mr. Holt allege a material

DAHTBAN3                          Broeksmit - direct

1    defect based on unreasonable stated income?

2    A.   Mr. Holt alleged that defect based on unreasonable stated

3    income only 13 times.

4    Q.   Mr. Broeksmit, let me address you to that first category

5    there, missing appraiser licenses.  Into what category of

6    defect did Mr. Holt place those sorts of defects?

7    A.   Mr. Holt considered those to be AUS defects.

8    Q.   Do you have an opinion as to whether an appraisal license

9    is required to be in the loan file?

10   A.   Yes, I do.

11   Q.   And what is that opinion?

12   A.   That opinion is that it is not required to be placed in the

13   loan file.

14   Q.   What requirements, if any, are there with respect to the

15   credentials of the appraiser with respect to an appraisal?

16   A.   The appraiser is required to list on the appraisal form

17   itself the license or certification number issued by the state

18   that oversees the licensing of appraisers.

19   Q.   Please turn to tab 7 in your binder, and that's been marked

20   as DX1223.  And briefly what is behind tab 7?

21   A.   Tab 7 comes from the Fannie Mae selling guide.

22        MR. SMURZYNSKI:  Your Honor, defendants move for the

23   admission of Defendant's 1223A.

24        MS. SCHOENBERGER:  No objection.

25        THE COURT:  Received.

DAHTBAN3                              Broeksmit - direct

1              (Defendant's Exhibit 1223A received in evidence)

2              MR. SMURZYNSKI:  Alex, if you could turn to the second

3     page of that exhibit, and under the heading Roman Numeral XI

4     blow up that paragraph.

5     Q.  Then Mr. Broeksmit, if you could read from that paragraph

6     beginning in the middle where it says, "The lender must

7     document."

8     A.  The lender must document that the appraisers it uses are

9     licensed or certified as appropriate under the applicable state

10    law, either by including the license or certification number

11    with the appraiser's list of qualifications that the lender has

12    on file or by retaining a copy of the license or certification

13    in the file the lender maintains for the appraiser.  The

14    appraiser must note his or her license or certification number

15    on the individual appraisal report forms.

16    Q.  Did the appraisals you reviewed in the course of your work

17    in this matter provide the appraiser's certification number and

18    state of licensure?

19              MS. SCHOENBERGER:  Objection.

20              THE COURT:  Ground?

21              MS. SCHOENBERGER:  Ambiguous as to which appraisals

22    we're discussing.

23              THE COURT:  Do you want to clarify that?

24    Q.  Mr. Broeksmit, of the appraisals in the loan files you

25    reviewed where Mr. Holt claimed there to be a defect because of

1    the lack of an appraiser certification, were you able to

2    determine whether the appraiser certification number and state

3    of licensure was on the appraisals or not?

4    A.  Yes, I was.

5    Q.  And what were you able to determine?

6    A.  I was able to determine that they were in fact on the

7    appraisal.

8    Q.  With respect to those same appraisals, what did you

9    determine about whether those appraisals were signed or not?

10   A.  I determined that the appraisals were signed.

11   Q.  In your review of Mr. Holt's work, when Mr. Holt asserted

12   this defect, that is, the lack of an appraisal certification in

13   the file, did he ever assert that the person who did appraisal

14   was not in fact a licensed appraiser?

15   A.  No, he did not.

16             MS. SCHOENBERGER:  Objection.

17             THE COURT:  Sustained.

18   Q.  Mr. Broeksmit, in reviewing the findings Mr. Holt had made,

19   were there any instances where Mr. Holt had asserted that the

20   appraiser was not licensed?

21   A.  No.

22   Q.  What is your opinion of Mr. Holt's decision to find loans

23   defective if they are missing a copy of the appraiser's license

24   in the loan file?

25   A.  My opinion is that that is an invalid finding.

DAHTBAN3                            Broeksmit - direct

1    Q.   Why is that?

2    A.   Because proof of licensure was in the file and was also

3    obtained -- we obtained evidence of licensure on each one of

4    those cases.

5    Q.   How did you go about determining whether those appraisers

6    were in fact licensed?

7    A.   I directed Mr. Lucco, an appraisal expert retained in this

8    matter, to check with each of the state licensing bodies.  And

9    we did obtain such proof from each of them that the appraisers

10   were duly licensed at the time the appraisals were completed.

11   Q.   Mr. Broeksmit, what is CLUES?

12   A.   CLUES is Countrywide's automated underwriting system.

13   Q.   If you will turn to tab 10 in your binder, there's a

14   document marked as DX2429B.  What is --

15            THE COURT:  I wonder, Counsel, if you're about to

16   start a new matter, whether we should give the jury their lunch

17   break at this time.

18            MR. SMURZYNSKI:  I never interfere with that.

19            THE COURT:  Very good.  Ladies and gentlemen, we'll

20   take a break until 2 o'clock and we'll see you then.

21            (Jury not present)

22            THE COURT:  Anything counsel need to raise to the

23   Court?

24            We'll see you at 2 o'clock.

25            (Luncheon recess taken)

DAH3BAN4                         Broeksmit - direct

1                          AFTERNOON SESSION

2                              2:10 p.m.

3              (In open court; jury not present)

4              THE COURT:  I want Ms. Mainigi to note that I am only

5    10 minutes late so I'm doing much better.

6              MS. MAINIGI:  Your Honor, I'm not keeping score at

7    all.

8              THE COURT:  I just saw something I didn't think I'd

9    ever see, which is Brendan Sullivan smile.  There goes the

10   reputation.

11             MR. SULLIVAN:  I don't smile at the rulings.

12             THE COURT:  Who cares about that.

13             About how long do you expect to be on direct?

14             MR. SMURZYNSKI:  I would say perhaps a little more

15   than an hour.  Hopefully just an hour, but perhaps a little

16   more.

17             (Continued on next page)

18

19

20

21

22

23

24

25

 1                  (Jury present)

 2                  THE COURT:  Counsel.

 3       BY MR. SMURZYNSKI:

 4       Q.  Mr. Broeksmit, If you would turn behind tab 10 of the

 5       binder in front of you.  Can you briefly describe what's there.

 6       A.  This is a CLUES report for loan 181611279.

 7                  MR. SMURZYNSKI:  Defendants ask that Defendant's

 8       Exhibit 2429B be admitted into evidence.

 9                  MS. SCHOENBERGER:  No objection.

10                  THE COURT:  Received.

11                  (Defendant's Exhibit 2429B received in evidence)

12       Q.  If you can turn to the second page of that document and

13       under the heading 4.0.

14                  MR. SMURZYNSKI:  Alex, if you can bring up the third

15       paragraph in particular there that says "if any loan

16       information."

17       Q.  Mr. Broeksmit, what is that information on the screen in

18       the CLUES report that's up being published to the jury?

19       A.  This is language that shows the tolerances for CLUES and

20       under what circumstances a CLUES report would have to be rerun.

21       Q.  What role, if any, did CLUES tolerances play in your review

22       of Mr. Holt's work?

23       A.  I found that there were several instances in which the loan

24       -- the CLUES findings stayed within these tolerances, yet

25       Mr. Holt found the loan to be defective because the CLUES had

DAH3BAN4                    Broeksmit - direct

```
 1   not been rerun.
 2            MR. SMURZYNSKI:  Alex, if you can turn to Plaintiff's
 3   Exhibit 229 which is already in evidence, and at page 12 pull
 4   up the loan that we've been talking about which is 181611279.
 5   In particular -- there we go.
 6   Q.  Mr. Broeksmit, did Mr. Holt assert an AUS defect with
 7   regard to this loan?
 8   A.  Yes, he did.
 9   Q.  What did you determine with regard to that claim of defect?
10   A.  I found that his assertion of an AUS defect was incorrect.
11   Q.  Why was that?
12   A.  Because Mr. Holt recalculated to what he called a more
13   conservative monthly income by lowering the income by about
14   $150 a month, which was only 4 percent below what the
15   Countrywide origination process had used.  Which means that it
16   was within that 5 percent CLUES tolerance for income.
17   Q.  Were there any other loans where Mr. Holt found AUS defects
18   even though the difference was within the tolerance set forth
19   in CLUES?
20   A.  Yes, we saw this several times through our review.
21   Q.  What is Fast Track?
22   A.  Fast Track is a program that allows borrowers who are
23   already being serviced by Countrywide to get a new refinance
24   loan with less documentation and through a speedier process.
25   Q.  Did Mr. Holt identify or allege any defects with respect to
```

DAH3BAN4                         Broeksmit - direct

1    Fast Track loans?

2    A.  Yes, he did.

3    Q.  What was the general nature of those defects?

4           MS. SCHOENBERGER:  Objection.

5           THE COURT:  Overruled.

6    A.  The general nature of the defects that Mr. Holt cited with

7    regard to the Fast Track loans were requiring things such as a

8    verification of employment, or a debt to income ratio

9    calculation that were not required by the program.

10   Q.  Were there any special rules in the Countrywide and Fannie

11   Mae guidelines for refinance programs?

12   A.  Yes, there were.

13   Q.  Why are there special rules for refinance programs?

14          MS. SCHOENBERGER:  Objection.

15          THE COURT:  Sustained.

16   Q.  Mr. Broeksmit, if you could turn to tab 11, please.  What

17   is behind tab 11?

18   A.  Tab 11 is a variance that was negotiated between Fannie Mae

19   and Countrywide concerning consolidated enhanced streamlined

20   refinances.

21          MR. SMURZYNSKI:  Defendants ask that Defendant's

22   Exhibit 1730A be admitted into evidence.

23          MS. SCHOENBERGER:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit 1730A received in evidence)

1              MR. SMURZYNSKI:  Alex, if you could pull that document

2     up.

3     Q.  Before we look at that together, Mr. Broeksmit, what is a

4     variance?

5     A.  A variance is an amendment to the agreement between Fannie

6     Mae and in this case Countrywide that amends the selling guide

7     and memorializes an agreement about how certain parts of the

8     loan process are to be done.

9              MR. SMURZYNSKI:  Alex, if you can turn to page three

10    of document, please, and highlight the very top sentence.

11    Q.  Mr. Broeksmit, if you could read that for us, please.

12    A.  "The lender may sell streamlined refinance mortgages that

13    comply with the terms and conditions described below."

14    Q.  Mr. Broeksmit, how does this variance interact with the

15    Fannie Mae and Countrywide guidelines?

16    A.  This variance sets the terms by which Countrywide can

17    process these sorts of loans and make them eligible for

18    purchase by Fannie Mae.

19             MR. SMURZYNSKI:  Alex, if you could turn to page 16,

20    please, and highlight the language under item nine.

21    Q.  Mr. Broeksmit, could you read what is under item nine

22    there.

23    A.  Yes.  This section says that the income is not verified,

24    the assets are not verified, and no verification of the

25    borrower's employment is required.

1   Q.  Did this variance play any role in your review of

2   Mr. Holt's findings in this case?

3   A.  Yes.  This variance provided the -- it showed the basis on

4   which the Countrywide loan program guidelines were modeled and

5   governed the Fast Track refinance program.

6           MR. SMURZYNSKI:  Alex, if you can turn to PX 229

7   already in evidence at page 15, and let's look at the loan

8   that's under 188349910.

9   Q.  Mr. Broeksmit, what does Mr. Holt allege with regard to

10  this loan?

11  A.  Mr. Holt alleges that the loan is missing the verbal

12  verification of employment, and he also writes that all the

13  lender had to obtain on a SISA loan, which means stated income

14  stated assets, is the VVOE, or verbal verification of

15  employment.

16  Q.  Was a verbal verification of employment required for this

17  loan?

18  A.  No, it was not.

19  Q.  Why not?

20  A.  Because it was a Fast Track loan which does not require it.

21  Q.  Was this loan materially defective, Mr. Broeksmit?

22  A.  No, it was not.

23          MR. SMURZYNSKI:  Alex, if you can on PX 229 turn to

24  page 24 now.  In particular the loan number 191881634.

25  Q.  What were the allegations with regard to this loan,

1    Mr. Broeksmit?

2    A.  The first allegation is that the debt to income ratio was

3    incorrectly calculated.  And the second was related to assets.

4    It said that the IRA assets were entered into CLUES as liquid,

5    as a liquid asset and used 100 percent of the value.

6    Q.  If you look behind tab 13 in your binder, what is behind

7    tab 13?

8    A.  Behind tab 13 is the CLUES report for this same loan.

9            MR. SMURZYNSKI:  Defendants ask to be moved into

10   evidence Defendant's Exhibit 2812A.

11           MS. SCHOENBERGER:  No objection.

12           THE COURT:  Received.

13           (Defendant's Exhibit 2812A received in evidence)

14   Q.  Starting with Mr. Holt's first allegation regarding this

15   loan, if the calculation of the debt to income ratio were

16   wrong, would this loan be defective?

17   A.  No, it would not.

18   Q.  Why is that?

19   A.  Because this is also a Fast Track loan which did not

20   require requalification of the borrower.

21   Q.  Turning to the second allegation of Mr. Holt's.  Do you

22   agree with that allegation?

23           MS. SCHOENBERGER:  Objection.

24           MR. SMURZYNSKI:  I'll restate it, your Honor.

25           THE COURT:  Go ahead.

1   Q.  With respect to the IRA asset allegation of Mr. Holt with

2   respect to this loan, do you agree with that?

3            MS. SCHOENBERGER:  Objection.

4            THE COURT:  Ground?

5            MS. SCHOENBERGER:  Argumentative with respect to

6   allegation.

7            THE COURT:  No.  Overruled.

8   Q.  Can we start over, Mr. Broeksmit.

9            With regard to the second allegation involving the IRA

10  asset, do you agree with Mr. Holt's allegation?

11  A.  No, I do not.

12  Q.  Why is that?

13  A.  Because this was a Fast Track loan, and assets were not

14  required to be verified.

15  Q.  Is this loan materially defective?

16  A.  No, it is not.

17  Q.  Were there other loans that Mr. Holt determined to be

18  materially defective where there are Fast Track refinances in

19  place?

20  A.  Yes, there are.

21            MR. SMURZYNSKI:  Alex, if can you pull up DX 1930

22  again.

23  Q.  What was the second common defect that Mr. Holt claimed

24  with regard to the loans?

25  A.  Missing mortgage insurance, which he cited 59 times.

1    Q.  Does the conventional technical manual of Countrywide

2    address the circumstances under which mortgage insurance

3    evidence must be kept in a file?

4    A.  Yes, it does.

5          MR. SMURZYNSKI:  Alex, if can you pull up DX 1685

6    which is already in evidence.

7    Q.  Very briefly, what is this document?

8    A.  This is a chapter from Countrywide's conventional technical

9    manual that describes mortgage insurance.

10          MR. SMURZYNSKI:  Alex, if you would turn to page three

11   of that document, please, and blow up the chart on the bottom

12   of the page.

13   Q.  Mr. Broeksmit, this chart refers to centralized mortgage

14   insurance, you'll see in the second column.  What is that?

15   A.  Centralized mortgage insurance is a process by which the

16   mortgage insurance is placed by a central group within

17   Countrywide rather than in the branches.

18   Q.  What does the guidelines say about how to obtain the MI

19   certificate in those circumstances?

20   A.  It says that the CMI unit will process the request for an

21   MI certificate.

22   Q.  When, according to this guideline, is the mortgage

23   insurance certificate to be obtained?

24   A.  After closing.

25   Q.  Where was that certificate supposed to be kept?

1    A.   The MI certificate is maintained electronically by

2    corporate.

3    Q.   Of the 59 loans that you mentioned where Mr. Holt claimed

4    there were missing mortgage insurance, what portion of them in

5    fact had mortgage insurance?

6    A.   58 of the 59 loans.

7    Q.   How do you know that?

8    A.   Because there was evidence in each of those 58 loans that

9    mortgage insurance was in place.

10   Q.   What about the 59th of those loans?

11   A.   The 59th loan had a loan to value ratio of 75 percent, and

12   therefore did not require mortgage insurance.

13   Q.   What is behind tab 18?

14   A.   Behind tab 18 are two screen prints from Countrywide

15   servicing system showing that mortgage insurance is in place.

16          MR. SMURZYNSKI:  Your Honor, defendants ask that

17   Defendant's Exhibit 2577A be admitted into evidence.

18          MS. SCHOENBERGER:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 2577A received in evidence)

21   Q.   Mr. Broeksmit, what does this document DX 2577A tell you

22   about the mortgage insurance for this particular loan?

23   A.   It tells me the percentage of coverage in the lower right

24   where it says PMI 12, PMI percent 12.  And -- go ahead.

25   Q.   I didn't mean to interrupt you.

1    A.  That's all that page is showing.

2    Q.  Is this an example of one of the 58 mortgage certificates

3    that you were able to find in the file?

4    A.  Yes.  What I was going to say is the second page behind

5    there also has the certificate number and the company that did

6    the insuring.

7            MR. SMURZYNSKI:  Alex, if you could show that.  Thank

8    you.  Alex, if you could go back to Defendant's Exhibit 1930.

9    Q.  This is the third category of common defects claimed in

10   Mr. Holt's appendix B.  What was the third category of defects

11   claimed in Mr. Holt's appendix B?

12   A.  The third one was missing 1008 or underwriting transmittal

13   form.

14   Q.  What is that form used for?

15   A.  The transmittal form is a summary of the loan's

16   characteristics, and it is designed to show why a mortgage loan

17   was approved.

18   Q.  Where there has been an approval from an automated

19   underwriting system such as CLUES, what, if any, is the

20   requirement for a form 1008?

21   A.  The form 1008 is not required if the loan has had an

22   automated underwriting system approval.

23   Q.  In his original report, did Mr. Holt make any allegations

24   regarding the form 1008s?

25            MS. SCHOENBERGER:  Objection.

 1          THE COURT:  Sustained.

 2     Q.  Mr. Broeksmit, what were the next two categories of common

 3     defects alleged by Mr. Holt?

 4     A.  The next two categories had to do with different types of

 5     insurance.  The first was missing title insurance and the

 6     second was missing hazard insurance.

 7     Q.  What did you find with regard to Mr. Holt's claims of

 8     missing title and hazard insurance in the loan files?

 9     A.  I found in most cases that the evidence of the title or the

10     hazard insurance was in fact in the file.

11          MR. SMURZYNSKI:  Alex, if you can turn to Exhibit 229

12     again at page one, and the loan number 192792622.

13     Q.  What allegation regarding title insurance did Mr. Holt make

14     with respect to that loan?

15     A.  Mr. Holt wrote that CLUES required a review of the title

16     commitment, but this was missing from the loan file.  In

17     addition, the final title policy was also missing, so vesting,

18     liens, taxes, etc., could not be properly evaluated, so the

19     loan was deemed materially defective.

20     Q.  If you could turn behind tab 21 of your binder.  What do

21     you see there?

22     A.  A residential title loan policy for this loan number.

23          MR. SMURZYNSKI:  Defendants ask that Defendant's

24     Exhibit 2852B be admitted into evidence.

25          MS. SCHOENBERGER:  No objection.

DAH3BAN4                        Broeksmit - direct

1          THE COURT:  Received.

2          (Defendant's Exhibit 2852B received in evidence)

3          MR. SMURZYNSKI:  Alex, if you could publish that.

4   Q.  What is --

5          THE COURT:  Is there some reason that you want to

6   share with us why some of these exhibits are A and B?

7          MR. SMURZYNSKI:  I'm happy to, your Honor.  They come

8   from larger loan files, so these are just particular pages.

9          THE COURT:  Okay.  Go ahead.

10  Q.  Mr. Broeksmit, what is DX 2852?

11  A.  It is a title policy on the loan we're discussing.

12  Q.  If you'll turn behind tab 20 of your binder, what is that

13  document?

14  A.  That is a title commitment for this loan.

15         MR. SMURZYNSKI:  Your Honor, defendants ask that DX

16  2852A be admitted into evidence.

17         MS. SCHOENBERGER:  No objection.

18         THE COURT:  Received.

19         (Defendant's Exhibit 2852A received in evidence)

20  Q.  Mr. Broeksmit, even if the title commitment hadn't been in

21  the file, would there have been a material defect with respect

22  to it here?

23  A.  No.  As long as the title policy were in the file, there

24  would not have been.

25  Q.  Same question with regard to the title policy.  If it had

1    been missing, would that have been a material defect?

2    A.  No.  As long as the title commitment were in the file, one

3    or the other would have sufficed.

4    Q.  What was your conclusion with regard to the other claimed

5    defect on this loan, that is, the missing appraiser license?

6    A.  As we've discussed before, I find that that allegation is

7    incorrect.  And that there was proof of licensure of the

8    appraiser.

9    Q.  Do you agree with Mr. Holt that this loan was materially

10   defective?

11   A.  No, I do not.

12        MR. SMURZYNSKI:  Alex, if you could go back to the

13   demonstrative, please.

14   Q.  Before I move on to the last category, with regard to the

15   missing 1008s, do you understand that Mr. Holt no longer

16   contends that that is a defect within the loan files?

17   A.  I understand that he in his revised report said that he had

18   withdrawn those.  But, there are still dozens of instances in

19   the narrative attached to his report that cites that missing

20   document.

21   Q.  With regard to the missing document other category, what

22   general opinions did you form with regard to Mr. Holt's missing

23   document claims?

24   A.  With regard to those other missing document claims, I

25   generally found either that the document was in fact in the

1     file, or that it was not the required to be in the file, or

2     that it was a hyper-technical document or allegation that did

3     not materially affect the loan.

4     Q.  Turn, please, to the document behind tab 22.  What is

5     behind tab 22?

6     A.  A note for a loan.

7               MR. SMURZYNSKI:  Defendants ask that Defendant's

8     Exhibit 2436A be admitted into evidence.

9               MS. SCHOENBERGER:  No objection.

10              THE COURT:  Received.

11              (Defendant's Exhibit 2436A received in evidence)

12              MR. SMURZYNSKI:  Alex, if you can blow up the entire

13    top half of that document all the way from the top.

14    Q.  Mr. Broeksmit, what happened here?

15              MS. SCHOENBERGER:  Objection.

16              THE COURT:  Sustained.

17    Q.  Mr. Broeksmit, based on your experience in loan

18    underwriting, what does this document show to you?

19    A.  It shows me that the first page of the note is in the file,

20    and when the document was being imaged, it looks as though the

21    second page, which is visible at the top part, was stuck behind

22    it and the full image did not get made.

23              MS. SCHOENBERGER:  Objection, your Honor.  Move to

24    strike as speculation.

25              THE COURT:  Overruled.

1    Q.  What did Mr. Holt claim with regard to this note?

2    A.  Mr. Holt claimed that the signature page of the note was

3    missing from the file.

4    Q.  In your opinion, is it a fair criticism to have made of

5    that?

6              MS. SCHOENBERGER:  Objection.

7              THE COURT:  Sustained.

8    Q.  In your opinion, Mr. Broeksmit, was there a material defect

9    as a result of the document you are looking at on the screen?

10   A.  No, there was not.

11   Q.  What is a right of recision form?

12   A.  A right of recision form gives borrowers who are

13   refinancing their primary residence three days after they sign

14   the documents to refinance before the funds are disbursed, in

15   case they want to change their mind about the transaction.

16   Q.  Did Mr. Holt allege any defects based on missing right of

17   recision forms?

18   A.  Yes, he did.

19   Q.  How many times did he do that?

20   A.  He did that three times.

21   Q.  Of those, how many instances were there where a right of

22   recision form was actually required?

23   A.  Zero.

24   Q.  Why was that?

25   A.  In one case, the property was a second home.  And a second

1    case the property was an investor home.  And in the third case,

2    it was a purchase loan.  And in none of those circumstances is

3    the right of recision required.

4            MR. SMURZYNSKI:  Alex, if you can turn to Plaintiff's

5    Exhibit 229 at page 38, and pull up Mr. Holt's statement with

6    regard to loan 188296625.

7    Q.  Mr. Broeksmit, what was the nature of Mr. Holt's claim of

8    an income condition defect?

9    A.  Mr. Holt asserted that the paystubs in the file has all

10   dates cut off, so cannot be used.  Technically, there is no

11   proof of current employment without this, either.

12   Q.  In your view, was Mr. Holt right to claim there was an

13   income defect with respect to this loan?

14   A.  No.  He was not.

15   Q.  If you look behind tab 23, what is that?

16   A.  This is the loan application for this loan.

17           MR. SMURZYNSKI:  Defendants ask that DX 2567A be moved

18   into evidence.

19           MS. SCHOENBERGER:  No objection.

20           THE COURT:  Received.

21           (Defendant's Exhibit 2567A received in evidence)

22           MR. SMURZYNSKI:  Alex, if you can go down to the

23   borrower's name about two-thirds of the way down the document

24   and blow it up.

25   Q.  We've redacted the full name of the borrower for borrower

1   privacy purposes.  What is the borrower's name, just the first

2   name?

3   A.  Luis.

4   Q.  Where does it indicate that the borrower worked?  I'm

5   sorry, if you can scroll down.

6   A.  It indicates that he worked for Brad Reynolds in

7   construction.

8   Q.  On the next page of that document, what does it state his

9   income was?

10  A.  $4,344.01 per month.

11  Q.  If you turn to the document behind tab 24 in your binder,

12  what is this?

13  A.  These are copies of two paystubs from this borrower.

14          MR. SMURZYNSKI:  Defendants ask that Defendant's

15  Exhibit 2567B be moved into evidence.

16          MS. SCHOENBERGER:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 2567B received in evidence)

19          MR. SMURZYNSKI:  Alex, if you could highlight the

20  portion where the name of the employee appears or the employer.

21  Q.  Could you read that, Mr. Broeksmit.

22  A.  Brad Reynolds Construction, Inc.

23          MR. SMURZYNSKI:  If you could now highlight the name

24  of the employee.

25  Q.  What does the second paystub here show for gross year to

DAH3BAN4                    Broeksmit - direct

1   date income?

2   A.  $49,886.

3   Q.  Is that consistent with the monthly income on the mortgage

4   application with respect to this loan?

5   A.  Yes, it is.

6   Q.  What are the dates on the paystub that have been provided?

7   A.  The top paystub runs from November 16 to November 30 of

8   2007.  And the next one is from December 1st to December 15 of

9   2007.

10  Q.  Are the dates cut off in your view?

11  A.  No, they are not.

12  Q.  Is there any problem documenting the borrower's income with

13  respect to this loan?

14  A.  No, there is not.

15  Q.  Do you agree with Mr. Holt's conclusion that this loan was

16  materially defective because the income was not properly

17  documented?

18  A.  No, I disagree with that.

19  Q.  With respect to the other alleged defect of Mr. Holt

20  regarding mortgage insurance, what is your opinion?

21  A.  My opinion is that that is erroneous, as we've shown that

22  mortgage insurance was in fact in place.

23  Q.  Do you agree with Mr. Holt that this loan was materially

24  defective?

25  A.  No, I do not.

1          MR. SMURZYNSKI:  Alex, if you could move to PX 229 at

2    page 36, and particularly loan number 187440828.

3    Q.  What was the nature of Mr. Holt's asset defect allegation

4    with respect to this loan?

5    A.  Missing the verification of money market funds per CLUES

6    requirement.

7    Q.  What is behind tab 28 of your binder?

8    A.  A CLUES report for this loan.

9          MR. SMURZYNSKI:  Defendants ask that DX 2514A be moved

10   into evidence.

11         MS. SCHOENBERGER:  No objection.

12         THE COURT:  Received.

13         (Defendant's Exhibit 2514A received in evidence)

14         MR. SMURZYNSKI:  Turn to page two of 2514A, please.

15   And there is a section entitled assets in the top of the second

16   page there.  If we can blow that up.

17   Q.  Mr. Broeksmit, what did CLUES require with regard to the

18   assets here?

19   A.  The most recent monthly statement to verify funds for two

20   accounts.  Both of them money markets, one with $3,951 and one

21   with $7,132.

22   Q.  Turn behind tab 29 of your binder.  What is this document?

23   A.  It is a statement from Sun Trust.

24         MR. SMURZYNSKI:  Defendants ask that DX 2514B be

25   accepted into evidence.

1          MS. SCHOENBERGER:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 2514B received in evidence)

4    Q.  What is behind tab 30?

5    A.  Tab 30 is a Sun Trust statement as well.

6          MR. SMURZYNSKI:  Defendants ask that DX 2514C be

7    accepted into evidence.

8          MS. SCHOENBERGER:  No objection.

9          THE COURT:  2514C?  This is so exciting.  Received.

10         (Defendant's Exhibit 2415C received in evidence)

11   Q.  What do these documents show, Mr. Broeksmit?

12   A.  These documents show that the borrower had the $7,132 and

13   the $3,951 in money market accounts via a monthly statement as

14   required by the CLUES condition.

15   Q.  If you go back to PX 229 at page 36, what were the other

16   allegations that Mr. Holt had raised with respect to this loan?

17   A.  The appraiser license and the rate of improvement addendum.

18   There is a note which is not a claim that says that the paystub

19   showed more monthly income than what was used for qualifying,

20   making the ratios slightly less.

21   Q.  What did you conclude with respect to this loan?

22   A.  I concluded that it was not materially defective because

23   none of these claims were accurate.

24   Q.  When it comes to assets, are all types of assets treated

25   the same way for purposes of loan origination?

1    A.  Not necessarily, no.

2    Q.  Do lenders in some cases need to discount certain types of

3    assets?

4              MS. SCHOENBERGER:  Objection.

5              THE COURT:  Sustained.

6    Q.  Are there circumstances under which 100 percent of an asset

7    cannot be taken into account with respect to a loan?

8    A.  Yes, there are.

9    Q.  What are examples of those?

10   A.  There are certain types of assets, particularly that in a

11   401(k) account or some other sorts of retirement accounts that

12   cannot be liquidated without paying a penalty or a tax, excise

13   tax.  And in those cases, some lenders require that they not be

14   counted at 100 percent of their value.

15   Q.  If you turn to tab 15, please.  What is the document behind

16   tab 15?

17   A.  Tab 15 is another variance that was negotiated between

18   Fannie Mae and Countrywide.

19             MR. SMURZYNSKI:  Defendants ask that Defendant Exhibit

20   1730B be admitted into evidence.

21             MS. SCHOENBERGER:  No objection.

22             THE COURT:  Received.

23             (Defendant's Exhibit 1730B received in evidence)

24   Q.  Please explain what this variance is.

25   A.  This variance allows Countrywide to count IRA accounts at

DAH3BAN4                      Broeksmit - direct

1    full value, rather than discounting them by 30 percent.  And it

2    also provides calculations for 401(k) and other types of

3    retirement accounts.

4    Q.  Did this variance impact any of your conclusions with

5    regard to Mr. Holt's allegations of asset defects?

6    A.  Yes, it did.

7    Q.  How did it?

8    A.  There were times when Mr. Holt found a defect because a

9    retirement account was not discounted.  And this variance

10   permitted Countrywide to count those retirement accounts at

11   100 percent of their value.

12   Q.  What overall conclusion did you reach with respect to

13   Mr. Holt's asset defect claims?

14           MS. SCHOENBERGER:  Objection.

15           THE COURT:  Sustained.  What is the number of the

16   exhibit we were just looking at?

17           MR. SMURZYNSKI:  Your Honor, it is DX 1730B.

18           THE COURT:  Okay.  Thank you.

19   Q.  In reviewing the work of Mr. Holt, did you identify any

20   differences in the conclusions reached by his various

21   reviewers?

22   A.  Yes, I did.

23   Q.  What did you observe?

24           MS. SCHOENBERGER:  Objection.

25           THE COURT:  Ground?

1          MS. SCHOENBERGER:  Ambiguous.  Calls for narrative.

2          THE COURT:  Yes.  No.  The calls for narrative, no.

3     But ambiguous, yes.

4          MR. SMURZYNSKI:  Let me restate it.

5     Q.  What differences did you observe with respect to the

6     conclusions reached by Mr. Holt's various re-underwriters?

7     A.  I found a very wide variance in the percentage of loans

8     that Mr. Holt's reviewers found to be materially defective.

9     Q.  When you say wide variance, what do you mean by that?

10    A.  I mean that for reviewers who did a significant number of

11    loans, the low end in terms of loans they found to be

12    materially defective was in the 20s, about 24 percent, up to

13    the high end, about 67 percent.  And there were some reviewers

14    who found 100 percent of the loans defective, including

15    Mr. Holt himself.

16    Q.  What conclusion did you draw from these variations in the

17    defect rates that the reviewers found?

18    A.  I concluded that re-underwriting and looking at a loan

19    years after the fact is a subjective exercise that is prone to

20    differences in outcome.  And I also concluded that there were

21    some reviewers in Mr. Holt's team who were more apt to find

22    loans materially defective than others were.

23         MR. SMURZYNSKI:  Alex, if could you pull up PX 434A,

24    which is a portion of a document that's already in evidence.

25    Q.  What is PX 434A, Mr. Broeksmit?

1   A.  It is a loan application.

2   Q.  Is this one of the loans that you reviewed?

3   A.  Yes, it is.

4   Q.  Can you briefly describe this loan.

5   A.  Yes.

6           MS. SCHOENBERGER:  Objection.

7           THE COURT:  Ground?

8           MS. SCHOENBERGER:  Again, ambiguous.

9           THE COURT:  No, I think I'll allow that.

10  A.  Yes.  This loan is somewhat unusual in the sample because

11  it is a purchase loan, rather than a refinance, and only about

12  4 percent of the loans in the sample were purchase loans.  And

13  it is for a property in Arizona.

14  Q.  On the first page of the application, there is an entry for

15  original cost.  Do you see that?  I should say on the form

16  there is a space for original cost.

17  A.  Yes.

18          MR. SMURZYNSKI:  Alex, if you can highlight it.  There

19  we go.

20  Q.  Based on your experience as a mortgage underwriter, would

21  you expect on this sort of loan for that question to be filled

22  in?

23  A.  No, I would not.

24  Q.  Why not?

25  A.  Because if you look just above there, there is a

DAH3BAN4                          Broeksmit - direct

 1    instruction that covers that whole line on the form.  Which

 2    says complete this line -- sorry.  Complete this line if

 3    construction -- wait.  It should be a line below on the form.

 4    Sorry.

 5    Q.  You're right.  There are two places on the form where that

 6    appears.

 7              MR. SMURZYNSKI:  Alex, if you can highlight the one

 8    below it as well.

 9    A.  So that's the one I was looking for.  Where it says

10    complete this line if this is a refinance loan.

11    Q.  Why therefore would you expect to see this box empty on

12    this loan application?

13              MS. SCHOENBERGER:  Objection, your Honor.  This line

14    of questioning exceeds the scope of the expert's opinion.

15              THE COURT:  All right.  I guess we need to have a side

16    bar on that.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. SCHOENBERGER:  The only opinions he put forth were

3    about loans that he disagreed with Mr. Holt's finding of

4    materially defective, and this is a loan that he agreed with as

5    to the defectiveness.

6          MR. SMURZYNSKI:  He's not going to say he disagrees

7    with it being defective.  But he opined on all the loans he

8    reviewed.  He reached conclusions on all of them.  He is going

9    to explain why he agreed with Mr. Holt on this one.

10         MS. SCHOENBERGER:  He also stated he didn't conduct

11   full file reviews of any of these loans.

12         MR. SMURZYNSKI:  He is going to explain why he agreed

13   with Mr. Holt with this.

14         THE COURT:  The relevant question isn't whether he

15   agreed or disagreed.  The relevant question is whether it was

16   fairly contained within the scope of his report or not.  That's

17   the only question.  It doesn't have anything to do with

18   agreement or disagreement.

19         So, tell me precisely what was it in his report that

20   this is within the scope of.

21         MR. SMURZYNSKI:  Let me grab his appendix.

22         THE COURT:  Okay.

23         MR. SMURZYNSKI:  I apologize.

24         THE COURT:  No problem.

25         MR. SMURZYNSKI:  Flipping through here.

1          THE COURT:  While counsel is looking, am I correct

2     there was no Daubert motion made with respect to this witness?

3          MS. SCHOENBERGER:  That's correct.

4          THE COURT:  Because he just testified that looking at

5     a loan file years after the fact for these purposes is a

6     subjective exercise.  Which presumably applies equally to him

7     as to Mr. Holt.  So on that theory, I wonder if I should have

8     stricken them both.  But, at this point, no party has asked for

9     it.  So it is neither here nor there.

10          Go ahead.

11          MR. SMURZYNSKI:  So, Mr. Broeksmit's report indicates

12     that he does not disagree with Mr. Holt's findings with regard

13     to this loan.  It doesn't go into detail as to why that is the

14     case.  I would note that Mr. Holt was allowed to testify about

15     this very same loan based on the same level of information in

16     his report.

17          THE COURT:  I don't recall any objection being raised.

18     But in any event --

19          MR. SMURZYNSKI:  I think the door is open on it.

20          THE COURT:  Where the door is open, it's where it is

21     necessary for the jury to have the complete picture about

22     something that otherwise would not have come into evidence.

23     But here, according to you, all you are going to say is he

24     agrees with Mr. Holt.  So, nothing is being added.

25          MR. SMURZYNSKI:  Well, he's going to agree with

DAH3BAN4                          Broeksmit - direct

1    certain of Mr. Holt's findings and disagrees with others.

2              THE COURT:  No, I am going to sustain the objection.

3              (Continued on next page)

1                    (In open court)

2    BY MR. SMURZYNSKI:

3    Q.  You can take that down.

4         Mr. Broeksmit, were there times when Mr. Holt stated

5    that the income in the origination file was unreasonable?

6    A.  Yes, there were some.

7    Q.  Of the 343 loans in Mr. Holt's sample, how many times did

8    he state that the income that was stated was unreasonable?

9    A.  Only 13 times.

10   Q.  In those 13 times, did Mr. Holt ever rely on the Bureau of

11   Labor Statistics?

12   A.  Yes, he did.

13   Q.  In those times when he relied on the Bureau of Labor

14   Statistics, did he ever opine with respect to the

15   reasonableness of a self-employed borrower?

16            MS. SCHOENBERGER:  Objection.

17            THE COURT:  Ground?

18            MS. SCHOENBERGER:  Leading.

19            THE COURT:  It is, but I think with this witness, and

20   to move things along, I will allow it.  Overruled.

21   Q.  You can answer the question.

22   A.  Yes, he did.

23   Q.  What is your opinion as to whether the Bureau of Labor

24   Statistics information should be used to determine the

25   reasonableness of a self-employed borrower?

DAH3BAN4                    Broeksmit - direct

1   A.   My opinion is that it is not an acceptable source for that,

2   because self-employed borrowers' information is not contained

3   in that database.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. SMURZYNSKI:

Q.   In your opinion, Mr. Broeksmit, are there any limitations
when it comes to trying to re-underwrite a loan after the fact?

A.   Yes, there are.

Q.   What are those limitations?

A.   Well, when one is looking at a file that is five or six
years old, one cannot have all the information that was
available to the lender when the loan was made.  For instance,
there are conversations that the employees of the lenders may
have had with the borrower or with the real estate agent
involved or others involved in the transaction that are not
memorialized in the file, and some of the documents that were
in the file at the time may not still be in the electronic
file.

          MR. SMURZYNSKI:  Alex, if you could pull up PX229, and
at page 15 in particular, the loan at 189060126.

Q.   Who re-underwrote this loan on behalf of Mr. Holt's team?

A.   Mr. Holt personally did this one.

Q.   What did he allege with respect to this loan?

A.   Well, he acknowledged that the borrower provided all
necessary documents to qualify for this loan for the loan
program and doc type.  He alleged that the comps, which are the
comparable sales on the appraisal, were two, ten and six miles
away from the subject property, and someone should have
questioned the location of the comps.

DAHTBAN5                        Broeksmit - direct

1   Q.  And after that, if you could continue.

2   A.  He also stated that 12 percent mortgage insurance was

3   required and that no mortgage insurance was noted on the HUD or

4   in the loan file.

5   Q.  With regard to that mortgage insurance allegation, is this

6   the same issue we discussed earlier?

7   A.  Yes, it is.

8   Q.  Did this loan have mortgage insurance?

9   A.  Yes, it did.

10  Q.  How do you know that?

11  A.  I know that because the file contains evidence that that

12  coverage was in place.

13          MR. SMURZYNSKI:  Alex, if you could show 1886, which

14  is already in evidence.

15  Q.  And that's behind tab 35 for you as well, it may be easier

16  to read there.  What is that document, DX1886?

17  A.  This is a screen print from the servicing system showing

18  the mortgage insurance in place.

19  Q.  With regard to the appraisal issue, what did you determine

20  with respect to this loan?

21  A.  I determined that the -- while Mr. Holt was correct that

22  the comparables were I believe it was two, six and ten miles

23  away, the appraiser noted why that was the case, and it was

24  that they were appropriate comparable sales.

25          MR. SMURZYNSKI:  Alex, if you could bring up DX1887,

1    which is already in evidence and is behind tab 37 in your

2    notebook.

3    Q.   If you could turn to the second page on the bottom two

4    thirds, there's a section that begins summary of the sales

5    comparison approach.

6            Mr. Broeksmit, were you able to determine whether the

7    appraiser was justified in using these comparable sales?

8    A.   Yes, I was.

9    Q.   How did you determine that?

10   A.   I read the appraiser's comment here which says that the

11   comparables selected are considered the best available for the

12   purpose of this analysis.  And he goes on to say that because

13   of the lack of sales in the small town of Newark, Maryland,

14   which has about 360 people in it, it was necessary to go to

15   neighboring towns.

16   Q.   Do you agree with Mr. Holt's determination this loan is

17   materially defective?

18   A.   No, I do not agree with that.

19           MR. SMURZYNSKI:  Alex, if you could go back to PX229

20   at page 14, particularly the loan at 188939173.

21   Q.   Mr. Broeksmit, who underwrote this loan?

22   A.   Mr. Holt also re-underwrote this loan himself.

23   Q.   Did Mr. Holt find this loan to be materially defective in

24   his view?

25   A.   Yes, he did.

1    Q.  And if you could generally state what his allegations were

2    of defects on this loan.

3    A.  Mr. Holt alleged that because the property was identified

4    on the CLUES report as being in a soft market that the loan to

5    value ratio should have been reduced, in other words the loan

6    amount should have been dropped.

7          MR. SMURZYNSKI:  And if you could put on the screen

8    DX1672, which is already in evidence, and in particular the

9    third page of that document.

10   Q.  Mr. Broeksmit, what is this document that we're looking at

11   together on the screen, DX1672?

12   A.  This is a loan program guide from Countrywide's guidelines

13   for the fast and easy program.

14         MR. SMURZYNSKI:  And then Alex, if you turn to page 3,

15   what does the section that has the heading maximum LTV CLTV

16   indicate to you as a mortgage originator?

17   A.  That it's -- LTV is loan to value ratio and CLTV is

18   combined loan to value ratio, and this shows the maximum for

19   this program at 95 percent.

20         MR. SMURZYNSKI:  Alex, if you could bring up DX1888,

21   which is already in evidence, and if you could circle the

22   credit score that appears about halfway through that loan.

23   Q.  Mr. Broeksmit was the LTV reduction -- let me restate that.

24         Was the LTV reduction that Mr. Holt claimed was

25   necessary with respect to this loan one that needed to be made?

1    A.  No, it was not.

2    Q.  Why not?

3    A.  Because the loan to value a little bit lower on the form

4    says 76.54 percent, and the soft market requirement was that

5    the loan to value be at least five percent below the maximum,

6    which was 95.  So anything up to 90 would have been OK, and

7    this is 76.54.

8                MR. SMURZYNSKI:  And Alex, if you could on that same

9    document show the soft market under "Warning" up at the top of

10   the page.

11   Q.  What does that warning involve, Mr. Broeksmit?

12   A.  It describes the circumstances under which the loan to

13   value might have to be reduced, but if you look at the last

14   sentence it says if the LTV on this loan is already at least

15   five percent lower than the maximum LTV per guideline, no LTV

16   reduction is necessary.

17   Q.  Was there other instances where Mr. Holt made an allegation

18   based on the soft market warning?

19   A.  Yes, there were.

20   Q.  What was your conclusion with regard to those?

21   A.  In some cases Mr. Holt's reviewers cited the soft market

22   and appropriately applied the condition and did not find it as

23   a defect, but in other cases like this one he inappropriately

24   cited it as a defect.

25   Q.  What was the other allegation that Mr. Holt raised with

DAHTBAN5                          Broeksmit - direct

1    respect to this loan?

2            MR. SMURZYNSKI:  Alex, if you could turn us back to

3    page 14 of PX229, it's 188939173.

4    A.  The entirety of the allegation had to do with this

5    appraisal issue.

6    Q.  Was an appraisal or appraisal review required for this

7    property?

8    A.  No, it was not.

9            MR. SMURZYNSKI:  Alex, if you could go back to the

10   CLUES report DX1888, highlight the language with regard to

11   appraisal eligibility.  Should be down the page.

12   Q.  And what does that say with respect to the necessity, if

13   any, for an appraisal?

14   A.  It says that the submitted value estimate of this property

15   has been accepted as the market value for this transaction.

16   The borrower will be assessed a property inspection waiver fee

17   of $50.  What that means is that in lieu of an appraisal, the

18   automated underwriting system accepted the value, so an

19   appraisal was not required.

20   Q.  Did you determine whether a property inspection waiver fee

21   had been paid with respect to this loan?

22   A.  Yes, I did.

23   Q.  Turn to tab 40.  What is the document behind tab 40?

24   A.  This is the HUD-1 settlement statement.

25   Q.  For which loan?

DAHTBAN5                        Broeksmit - direct

1   A.  For the loan that we're discussing.

2            MR. SMURZYNSKI:  Your Honor, the defense asks DX2612A

3   be admitted into evidence.

4            MS. SCHOENBERGER:  No objection.

5            THE COURT:  Sorry, did you say no objection?

6            MS. SCHOENBERGER:  No objection.

7            THE COURT:  Received.

8            (Defendant's Exhibit 2612A received in evidence)

9   Q.  On the first page, if you could blow up line 808, what does

10  line 808 indicate to you?

11  A.  Line 808 indicates that the borrower had paid a fee and was

12  refunded all of it except $50.  And you see in parenthesis PIW,

13  which stands for that property inspection waiver fee.

14           MR. SMURZYNSKI:  Alex if you could go to PX229, and

15  let's look at one last loan, page 36, in particular loan

16  18200863.

17  Q.  If could you read the description in the narrative or the

18  claim of material defect.  Or read the entirety of the

19  narrative.

20  A.  CLUES 5.  Reason for the materially defective is because

21  the rate improvement addendum to the note is not in the file.

22  Also, missing the 1008 and a copy of appraiser's license.  It

23  is a good loan.

24  Q.  What is a rate improvement addendum?

25  A.  A rate improvement addendum is a document associated with

DAHTBAN5                          Broeksmit - direct

1   mortgage insurance.

2   Q.  When is it required?

3   A.  It is required for certain types of loans that are not

4   eligible for sale to Fannie Mae or Freddie Mac.

5   Q.  Did this loan require a rate improvement addendum?

6   A.  No, it did not.

7   Q.  What was the second reason set forth in this narrative to

8   why Mr. Holt asserted it was materially defective?

9   A.  Missing 1008.

10  Q.  Is that a legitimate reason to find this loan materially

11  defective?

12  A.  No, it is not.

13  Q.  What was the final reason stated with respect to this loan?

14  A.  A copy of appraiser's license.

15  Q.  Is that a legitimate reason to find a loan materially

16  defective?

17  A.  No, it is not.

18  Q.  Why not?

19  A.  Because the appraisal -- as we discussed before, the

20  appraisal shows that the appraiser was certified and licensed

21  appropriately at the time.

22  Q.  Was this a good loan?

23  A.  I agree with Mr. Holt's reviewer that it was a good loan.

24  Q.  Was it materially defective?

25  A.  No, it was not.

DAHTBAN5                          Broeksmit - direct

1              MR. SMURZYNSKI:  Alex, if could you put up PX438,

2       which has already been used in the case by the plaintiffs.

3       Q.  Mr. Broeksmit, on this slide are listed the most common

4       defects that Mr. Holt found within the materially defective

5       loans, AUS mistakes, eligibility, loan documents missing,

6       income conditions and unsupported assets.

7              Did you form an opinion regarding those allegations of

8       Mr. Holt?

9       A.  Yes, I did.

10      Q.  And what was it?

11      A.  My opinion is that in the vast majority of these cases

12      Mr. Holt's defect allegations were either incorrect or were

13      highly technical and did not materially increase the risk of

14      the loan.

15      Q.  If you turn to tab 47 of the notebook in front of you.

16             Without reciting the details, what does this document

17      generally reflect?

18      A.  It generally reflects the percentage -- the number and

19      percentage of the time when Mr. Holt found a loan in this

20      sample to be materially defective and when I did.

21      Q.  Would this document be helpful to you to illustrate to the

22      jury to your conclusions in respect to the loan files you

23      reviewed?

24      A.  Yes, I think it would.

25             MR. SMURZYNSKI:  I ask that DX1931 be published to the

DAHTBAN5                         Broeksmit - direct

1    jury as a demonstrative.

2              MS. SCHOENBERGER:  As a demonstrative?

3              MR. SMURZYNSKI:  As a demonstrative.

4              MS. SCHOENBERGER:  No objection.

5              THE COURT:  OK.

6    Q.  Of the 343 loans that Mr. Holt reviewed, how many did you

7    determine were investment quality?

8    A.  312.

9    Q.  How many were you unable to reach that conclusion?

10   A.  31.

11   Q.  What is your understanding of whether or not the 343 loans

12   in the sample are representative of the population that the

13   government claimed to be HSSL loans?

14   A.  I understand that it was not representative.

15   Q.  Did you ask any expert to convert your findings into one

16   for the population as alleged by the government?

17   A.  Yes, I did.

18   Q.  Who was that?

19   A.  That was Professor Barnett.

20   Q.  And what did -- who is Professor Barnett?

21   A.  Professor Barnett is a statistician at MIT.

22   Q.  What percentage did Mr. Barnett inform you was the adjusted

23   percentage when you extrapolate back to the population?

24             MS. SCHOENBERGER:  Objection.

25             THE COURT:  Sustained.

1              MR. SMURZYNSKI:  Your Honor, may we approach?

2              THE COURT:  Sure.

3              (At side bar)

4              THE COURT:  I could sustain the objection on the

5      ground that you told me that you would be an hour, or at most

6      just a few minutes over, and that time has already been

7      exceeded.  How long are you going to be?

8              MR. SMURZYNSKI:  Maybe another minute and a half.

9              THE COURT:  That seems within the bare realm of

10     reasonable.

11             MR. SMURZYNSKI:  I have tried to be efficient.

12             THE COURT:  Go ahead.  What's the ground for this?

13             MR. SMURZYNSKI:  The ground is Mr. Broeksmit is an

14     expert, he's relying on material from other experts.  It's in

15     his expert report.  This is not a surprise.  Frankly, I'm

16     trying to spare the need to bring Mr. Barnett, a second expert,

17     here, but this is fair ground for him to rely on as an expert.

18     And I'm not going to ask a further question simply beyond

19     getting out this percentage is one that Mr. Barnett calculated

20     and provided to him.

21             THE COURT:  It is true that in certain circumstances

22     experts can rely on other experts, but I'm not sure that fits

23     this situation.

24             But let me hear from -- the objection, if any, from

25     the government.

1          MS. SCHOENBERGER:  If he's about to give an opinion

2     about somebody else's opinion --

3          THE COURT:  It can't be cross-examined.  That's the

4     problem.

5          MR. SMURZYNSKI:  I don't think there's any controversy

6     about the 6.8 percent figure.  It occurs in Broeksmit's report.

7     And Mr. Barnett's report, frankly, followed the same

8     methodology that Dr. Cowan did in terms of extrapolating.  If

9     the government is going to represent that it disagrees with

10    that extrapolation number, we could have a discussion, but I

11    think the government is not going to represent that.

12         THE COURT:  I don't recall that it was left to you to

13    ask a question of the government to what they represented or

14    not, I think that is the prerogative of the Court.

15         MR. SMURZYNSKI:  I apologize, your Honor.

16         MR. MUKASEY:  Judge, may we take ten seconds to

17    converse?

18         THE COURT:  Yes.

19         (Pause)

20         THE COURT:  Well, let's look at the rule.

21         In your report did you -- in his report, excuse me,

22    this witness' report, did he disclose -- what's the name of the

23    other expert?

24         MR. SMURZYNSKI:  Professor Barnett.

25         THE COURT:  Did he disclose Professor Barnett's

1    methodology?

2              MR. SMURZYNSKI:  He did not.  In his report it

3    disclosed the number and Mr. Barnett provided a separate

4    report.

5              THE COURT:  But you're not calling Barnett.

6              MR. SMURZYNSKI:  I will call Barnett if necessary.  My

7    hope was, candidly, to spare him having to to come and put

8    another witness up on the stand for five minutes.

9              THE COURT:  I understand, but I don't really see if

10   the methodology wasn't disclosed in this expert's report and

11   therefore there's no way of knowing whether he can be

12   meaningfully questioned about Professor Barnett's methodology,

13   I don't see how this could be received.

14             If you want to call Professor Barnett, that's your

15   option, but the objection is sustained.

16             (Continued on next page)

DAHTBAN5                        Broeksmit - direct

1                    (In open court)

2     BY MR. SMURZYNSKI:

3     Q.  Mr. Broeksmit, in doing your work in this case, did you see

4     any pattern of lack of care by Countrywide personnel that

5     underwrote the loans?

6               MS. SCHOENBERGER:  Objection.

7               THE COURT:  Sustained.

8     Q.  When you weren't able to resolve Mr. Holt's allegation that

9     a loan was materially defective, what did that mean?

10    A.  I'm sorry, could you repeat the question?

11    Q.  Certainly.  When you were unable to resolve Mr. Holt's

12    allegations that a loan was materially defective, did that mean

13    the loan was a bad loan?

14    A.  No.

15    Q.  In your experience, is it possible to have a loan

16    origination process that generates investment quality loans

17    100 percent of the time?

18              MS. SCHOENBERGER:  Objection.

19              THE COURT:  I'll allow it.

20    A.  In my experience, no, that's not possible, because you have

21    a process that involves human beings and human judgment and it

22    will not yield 100 percent perfect results.

23              MR. SMURZYNSKI:  I have no further questions.

24              THE COURT:  Anything from Ms. Mairone's counsel?

25              MR. MUKASEY:  No, Judge.

DAHTBAN5                          Broeksmit - direct

1           THE COURT:  Cross-examination.

2    BY MS. SCHOENBERGER:

3    Q.  Good afternoon.

4           MR. SMURZYNSKI:  I apologize.  After consulting, I

5    just want to make sure that I have asked a question that I

6    think I did but perhaps -- I apologize for the interruption.

7           THE COURT:  OK, go ahead.

8    BY MR. SMURZYNSKI:

9    Q.  So we can have a complete record, Mr. Broeksmit, of the 343

10   loans, how many did you determine were investment quality?

11   A.  312.

12   Q.  How many were you unable to resolve?

13   A.  31.

14          MR. SMURZYNSKI:  Thank you.

15          THE COURT:  Further cross-examination?

16          MR. SMURZYNSKI:  I apologize.

17   CROSS-EXAMINATION

18   BY MS. SCHOENBERGER:

19   Q.  Good afternoon again, Mr. Broeksmit.

20   A.  Good afternoon.

21   Q.  You testified that your team for this project included 42

22   people in addition to yourself, is that right?

23          MR. SMURZYNSKI:  Objection.

24          THE COURT:  Ground?

25          MR. SMURZYNSKI:  Misstates the evidence, your Honor.

DAHTBAN5                          Broeksmit - cross

1              THE COURT:  Then he can say no.

2              So is that right or wrong?

3              THE WITNESS:  That number is not correct.

4    Q.  How many people were on your team?

5    A.  We had 24.

6    Q.  And your office is located in Washington, DC, is that

7    right?

8    A.  Yes, it is.

9    Q.  But not all 24 members of your team were located in your

10   office, were they?

11   A.  No, they were not.

12   Q.  And not all 24 of them were even located in Washington, DC,

13   isn't that right?

14   A.  Yes, that is correct.

15   Q.  During the course of this project, you did not meet face to

16   face with any of the 17 level one reviewers, did you?

17   A.  I don't recall -- I may have with one or two, but I don't

18   recall.

19   Q.  The only time you spoke with them was during two telephone

20   conferences that were held at the beginning of the project,

21   isn't that right?

22   A.  With the level one reviewers, yes, that's correct.

23   Q.  And you didn't directly interact with any of your four

24   quality control reviewers after the loan review project began,

25   did you?

DAHTBAN5                    Broeksmit - cross

1    A.  Not directly, no.

2    Q.  And you don't know whether the level one reviewers

3    communicated with each other at all during this project, do

4    you?

5    A.  I don't have direct knowledge of that, no.

6    Q.  And you don't know whether the quality control reviewers

7    talked to each other during this project either, do you?

8    A.  I don't have direct knowledge of that either, no.

9    Q.  Mr. Broeksmit, your hourly rate for this project was $700

10   per hour, is that right?

11   A.  That's correct.

12   Q.  And as of June of this year, Treliant had billed over

13   $850,000 for this project, right?

14   A.  That sounds about right.  I testified to 800, I believe.

15   Q.  And you have continued to work on this project since then,

16   right?

17   A.  Yes, I have.

18   Q.  You have submitted a corrected report in September of this

19   year, right?

20            MR. SMURZYNSKI:  Objection.

21            THE COURT:  Ground?

22            MR. SMURZYNSKI:  Misstates the record.

23            THE COURT:  Then the answer is going to be no.  I

24   don't see that as grounds for an objection.  She is asking a

25   question.  Overruled.

DAHTBAN5                          Broeksmit - cross

 1  A.  Sorry, could you restate the question?

 2  Q.  Sure.  You submitted a new report in this case in September

 3  of this year, right?

 4  A.  Yes, I responded to Mr. Holt's revised report in September.

 5  Q.  And you're being paid for your time at trial, too, right?

 6  A.  Yes, I am.

 7  Q.  Now Mr. Broeksmit, you were retained in this case to opine

 8  on re-underwriting decisions of Mr. Holt, isn't that right?

 9  A.  Yes.

10  Q.  And you didn't review your own sample of loans that went

11  through Countrywide's High-Speed Swim Lane, right?

12  A.  I'm not sure what you mean by that, my own sample.

13  Q.  All you did was review Mr. Holt's ultimate findings,

14  correct?

15  A.  Yes, I reviewed the loans that Mr. Holt found to be

16  materially defective.

17  Q.  And you didn't review some separate pool of loans, correct?

18  A.  That's correct.

19  Q.  And it's your understanding that Mr. Holt conducted a file

20  review that contained 343 loans that were alleged to have gone

21  through the High-Speed Swim Lane, right?

22  A.  My understanding is that he reviewed a larger sample but

23  that that's what is at issue now.

24  Q.  And of those 343, it's your understanding that Mr. Holt

25  concluded that 185 of those loans are materially defective,

DAHTBAN5                      Broeksmit - cross

```
 1   correct?

 2   A.   Yes.

 3   Q.   And that's about 53 percent of the 343, right?

 4   A.   I haven't checked the math, but that sounds right.

 5   Q.   And your opinions in this case are related solely to the

 6   loans that Mr. Holt determined were materially defective,

 7   right?

 8   A.   That's correct.

 9   Q.   So it's the 185 loans that were deemed materially

10   defective, right?

11   A.   Correct.

12   Q.   You did not opine on all 343 loans that Mr. Holt reviewed,

13   correct?

14   A.   That's right.  If he did not find they would to be

15   materially defective, I did not review them.

16   Q.   So you don't have any opinions regarding the loans that he

17   determined were investment quality, right?

18   A.   That's correct.

19   Q.   And you don't have any opinions about the loans that he

20   determined were investment quality with defects, right?

21   A.   That's right.

22   Q.   And you didn't conduct any review of those loans at all,

23   right?

24   A.   That's right.

25   Q.   Your assignment was limited to whether you could disprove
```

1    Mr. Holt's materially defective determinations, correct?

2    A.  I wouldn't put it quite that way, it was to review all of

3    the findings of Mr. Holt and to determine whether they were

4    accurate.

5    Q.  Because you only reviewed the materially defective loans in

6    the sample of 343, it would have been impossible for you to

7    have concluded that the sample contained more materially

8    defective loans than Mr. Holt concluded, correct?

9    A.  That's right, if Mr. Holt did not find it to be materially

10   defective I did not review the loan to determine whether his

11   findings were accurate.

12   Q.  Mr. Broeksmit, was your team provided with any sort of

13   additional compensation for each materially defective finding

14   that it could overturn?

15   A.  Absolutely not.

16   Q.  Is that because it would have created an improper incentive

17   to overturn those findings?

18   A.  I can't speculate about that but we were not paid that way.

19   Q.  Of the 185 loans that you did consider, you didn't conduct

20   a full re-underwriting of those loan files, did you?

21   A.  When you say a full re-underwriting, what do you mean?

22   Q.  Did anyone on your team re-underwrite the loans in the 185

23   that Mr. Holt deemed to be materially defective?

24   A.  I guess I'd ask the same question, what do you mean by --

25          THE COURT:  You had used that term earlier in your

1    testimony.  What do you understand by re-underwriting?

2              THE WITNESS:  I understand re-underwriting, in the way

3    Mr. Holt approached it, to be taking the file and going through

4    the documents to determine whether there were defects.  And we

5    did not fully go through every document in the file when we

6    were reviewing Mr. Holt's findings.

7    Q.  So when you testified earlier that you reviewed each of

8    these loans, you did not mean that you did a full file review

9    of each of these loans, did you?

10   A.  That's correct.  What I mean is that when Mr. Holt made an

11   allegation --

12   Q.  Thank you.

13             THE COURT:  You have answered the question.

14             MS. SCHOENBERGER:  Your Honor, may I approach the

15   witness with a binder?

16             THE COURT:  Yes.

17   Q.  Mr. Broeksmit, can you please look at the tab that's marked

18   as PX532.

19   A.  OK.

20   Q.  Do you recognize the document that's been marked as

21   Plaintiff's Exhibit 532?

22   A.  Yes, I do.

23   Q.  Is this the Treliant loan review manual that your company

24   prepared for this project?

25   A.  Yes, it is.

DAHTBAN5                      Broeksmit - cross

1              MS. SCHOENBERGER:  Your Honor, the United States

2       offers Plaintiff's Exhibit 532 into evidence.

3              MR. SMURZYNSKI:  No objection.

4              THE COURT:  Received.

5              MR. MUKASEY:  No objection here either.

6              THE COURT:  Forgive me, received.

7              (Plaintiff's Exhibit 532 received in evidence)

8       Q.  Mr. Broeksmit, this document consists of the written

9       instructions that you gave to your team on this project, right?

10      A.  Yes, it does.

11      Q.  And pages 14 to 24 contain a claims analysis, is that

12      right?

13      A.  Yes.

14      Q.  And this claims analysis instructs your team as to the

15      types of defects that the United States expert might find in

16      each loan file, right?

17      A.  This was our anticipation of what those might be.  This was

18      prepared before we had the government's report.

19      Q.  And this claims analysis also includes the types of

20      arguments or documents that could be used to rebut claims

21      defects, right?

22      A.  It contains the types of steps that our reviewer should go

23      through to analyze them.

24      Q.  And does it identify eight different possible defects?

25      A.  Yes, it does.

DAHTBAN5                         Broeksmit - cross

1    Q.  And for each one, the instructions provide six or seven

2    possible arguments that could be made to rebut that defect,

3    right?

4    A.  I'm not sure I would put it that way.  It gives the steps

5    that reviewers should go through to determine the correctness

6    of the findings.

7    Q.  This claims analysis was drafted by your company, is that

8    right?

9    A.  Yes, it was.

10   Q.  And the third page of this document includes an

11   introduction, correct?

12            MS. SCHOENBERGER:  Ms. Michaud, if you could blow up

13   the third paragraph of this introduction, please.

14   Q.  Mr. Broeksmit, can you please read the first three

15   sentences of this paragraph.

16   A.  We will address the specific loan level claims asserted by

17   the government.  As a result, the scope of our review will be

18   determined by the scope of the claims asserted by the

19   government.  We will not be conducting a full re-underwrite of

20   the loan files.

21   Q.  Thank you.  Now after receiving these instructions, your

22   level one reviewers were assigned certain loan files, right?

23   A.  Yes.

24   Q.  And the level one reviewers then looked at Mr. Holt's

25   report for his determinations about that particular loan,

 1    right?

 2    A.   That's correct.

 3    Q.   And did they use the survey results that have been marked

 4    as Plaintiff's Exhibit 229 which we looked at earlier?  I

 5    believe that's in defendant's binder at tab 9.

 6    A.   The written claims in that comments column were part of

 7    what they reviewed.

 8    Q.   And your level one reviewers then identified the documents

 9    in the loan file that pertained to Mr. Holt's findings,

10    correct?

11    A.   That was one of the steps they did, yes.

12    Q.   And did the level one reviewers assume that the comments in

13    Plaintiff's Exhibit 229 exhaustively describe Mr. Holt's

14    determinations for his findings on loans?

15    A.   No, they did not.

16    Q.   Did they also look at the contents of Mr. Holt's report?

17    A.   Which report?  I'm sorry.

18    Q.   The report describing his findings regarding the loan

19    quality.

20    A.   Do you mean this Appendix B?

21    Q.   Yes, Appendix B and the report it was attached to.

22    A.   I'm afraid I'm not familiar with the report it was attached

23    to.

24    Q.   After the loan -- the level one reviewers had located

25    documents in the files, did they make any determination about

1    the quality of the loan file?

2    A.   They made -- well, they reviewed the claims individually.

3    In some cases there would only be one, in some cases there

4    would be several.  And then they looked through the loan file

5    to get the documents that pertained to them, and then they were

6    able to make some analysis of each individual claim.

7    Q.   But they didn't make any recommendation as to whether or

8    not the loan file they were looking at was materially

9    defective, did they?

10   A.   That's right.  They did not make loan level recommendation,

11   they did analysis at the claim level.

12   Q.   And they passed on the loan file with the documents they

13   found flagged the quality control reviewers, right?

14   A.   Yes, with the documents flagged and also in some cases some

15   written analysis.

16   Q.   There were four quality control reviewers on your team,

17   right?

18   A.   That's correct.

19   Q.   And one of them was a lawyer, right?

20   A.   I believe one of them had legal training.  He was not

21   serving in the capacity as a lawyer, but I believe one had a

22   law degree.

23   Q.   And that reviewer didn't have any prior experience directly

24   underwriting loans, did he?

25   A.   He did not have experience as an origination underwriter,

DAHTBAN5                          Broeksmit - cross

1   no.

2   Q.   And one of the four quality control reviewers was a former

3   Bank of America employee, right?

4   A.   That's correct.

5   Q.   And the quality control reviewers' instructions were also

6   contained in Treliant's loan review manual, right?

7   A.   I believe that's correct.

8   Q.   And the quality control reviewers were responsible for

9   determining whether the documents that were flagged by the

10  level one reviewers responded to Mr. Holt's claims, right?

11  A.   That was part of their responsibility, yes.

12  Q.   And the quality control reviewers did not conduct their own

13  re-underwriting review to look for any other defects in the

14  files, right?

15  A.   The quality control reviewers did not do a full

16  re-underwriting.  Is that what you mean?

17  Q.   They didn't fully re-underwrite the loan files.

18  A.   That's true.

19  Q.   And the quality control reviewers didn't make any

20  determination as to the overall quality of the loan file, did

21  they?

22  A.   That's correct.  They made recommendations and a finding --

23  they analyzed at a finding level but not a loan level.

24  Q.   And they didn't make any recommendation to you about

25  whether or not Mr. Holt's materially defective determination

1    was correct, right?

2    A.  That's true.

3    Q.  Instead, the quality control reviewers passed the loan file

4    up to the directors on your team, right?

5    A.  Yes, the directors.

6    Q.  And it was these three directors who were the first ones

7    who made any recommendation as to whether or not the loan file

8    should be considered materially defective, right?

9    A.  That's true.

10   Q.  And the directors drafted the conclusion and the loan level

11   narrative that described those conclusions in your report,

12   correct?

13   A.  That's right, they drafted that.

14   Q.  And those were the comments that are listed in Defendant's

15   Exhibit 1556, which is behind tab 4 in defendant's binder, is

16   that right?

17   A.  That exhibit has the final comments rather than the draft,

18   but yes -- well, so no, this is the final version, these are

19   my --

20   Q.  Because you revised the draft that was prepared by the

21   directors, right?

22   A.  That's correct.

23   Q.  None of the directors on your team are underwriters, are

24   they?

25   A.  When you say "are underwriters," you mean currently?

DAHTBAN5                          Broeksmit - cross

1   Q.  Have they ever served as loan origination underwriters?

2   A.  No.

3   Q.  And they had no experience directly underwriting loans, did

4   they?

5   A.  Well, one of the three had extensive experience in

6   underwriting loans as they pertain to securitization deals.

7   The other two did not have origination underwriting experience.

8           THE COURT:  Counsel, I just want to -- I'm going to

9   let the jury go in about five minutes, so find a good spot to

10  end for the day.

11          MS. SCHOENBERGER:  Just a couple more questions, your

12  Honor.

13          THE COURT:  Sure.

14  Q.  In fact, two of the three directors on your team were

15  lawyers, right?

16  A.  Yes, two of the three had been to law school and were you

17  lawyers.

18  Q.  And in fact, they're former defense lawyers, right?

19          MR. SMURZYNSKI:  Objection.

20          MR. MUKASEY:  Objection.

21          THE COURT:  Ground?

22          MR. SMURZYNSKI:  Relevance.

23          THE COURT:  Sustained.

24          MS. SCHOENBERGER:  I can stop for now, your Honor.

25          THE COURT:  So ladies and gentlemen, we're going to

1    let you go for today.  Tomorrow we will -- actually this is a

2    different juror that has the problem, but we will end sometime

3    between 3:30 and 4, I'm hoping closer to 3:30.

4            I was taken to the wood shed earlier by counsel who

5    said in effect:  Judge, you tell the jury to come in at 9:30,

6    and they are here promptly and they have been better and better

7    as this case goes on.  Judge, you tell the lawyers to come at

8    9:30 and they are always here ready to go.  And Judge, where

9    the heck are you?  So duly chastened, I will make every effort

10   to see you at 9:30 tomorrow, so we'll start promptly at 9:30.

11           (Jury not present)

12           THE COURT:  I'll excuse the witness, we'll see you

13   tomorrow.

14           So I feel compelled to note for the record that if a

15   challenge had been made by the government under Rule 702 to

16   this witness's testimony, based on what I just heard on

17   cross-examination, I think there is a reasonable possibility

18   that I would have stricken his testimony.  It appears that,

19   although he is being held out perhaps as an objective witness

20   conducting an objective inquiry with the help of others, that

21   in fact his assignment, as relayed to his team, was to do

22   everything possible to find errors in the government witness's

23   report and opinions.  Now that, of course, if done by a lawyer

24   on cross-examination of the government's witness is more than

25   fair game.  I have serious questions whether it justifies

DAHTBAN5

1    someone coming before a jury and being held out, in effect, as

2    an objective expert.  I distinguish this from what is of course

3    standard fare, which is to accuse any expert of being biased

4    because he is being paid by one side or the other.

5              But in this case, in contravention of every precept of

6    how to conduct an objective review that I have ever seen on the

7    part of any expert who has ever testified before this Court in

8    the nearly 18 years that I have been on the bench, there was

9    not even remotely an attempt to be objective.  The staff was

10   told from the very get go how the client, Bank of America,

11   wanted to come out, and that their job was to, with the help of

12   lots of suggestions set forth in this manual, find flaws in the

13   government's expert's report.  Then having thus been primed to

14   be biased, they were then asked to undertake a review for

15   which, from what I just heard, it seems they were not qualified

16   to undertake.

17             But I'm saying all this outside the presence of the

18   jury because the government has not moved -- and it's much too

19   late for them to move now -- to strike this gentleman's

20   testimony, and so it will not be stricken.  But that doesn't

21   mean that the Court isn't frankly a bit shocked.

22             MR. SMURZYNSKI:  Your Honor, may I respond to this?

23             THE COURT:  Of course.  I was waiting.

24             MR. SMURZYNSKI:  I wanted to make sure you had

25   finished.

DAHTBAN5

1           THE COURT:  Don't be sure.

2           MR. SMURZYNSKI:  Or at least paused.

3           Mr. Broeksmit is a rebuttal expert.  This is an issue

4   on which the government has the burden of proof.  Mr. Broeksmit

5   is no different than a damages expert who comes in after the

6   plaintiff is says damages are X and the defendant's expert

7   comes in and says here are the flaws in the plaintiff's

8   expert's approach, without saying if I had started from the

9   beginning and looked at this problem what my conclusion would

10  have been.  We believe in those circumstances that the approach

11  was appropriate.

12          THE COURT:  Apparently the government agrees with you

13  since they didn't challenge, but for example, I have never seen

14  a rebuttal expert who said to his team:  Now I want you to do a

15  review of these files or this subject matter or whatever the

16  case may be, and here's how you need to come out.  And I think

17  this is very close to that, very, very close to that.  But it's

18  neither here nor there.

19          MR. SMURZYNSKI:  Respectfully, your Honor, I don't

20  think that is what was done here.  There was an indication that

21  there would be claims coming from the government's expert, and

22  that the staff was to review them and determine whether there

23  was grounds to challenge those claims.  They weren't told what

24  to find.  They weren't told what to find in the sense of you

25  must conclude the claims are improper.  And as noted, there are

DAHTBAN5

1    loans here where Mr. Broeksmit agreed with Mr. Holt.  So in our

2    view, the manual which was disclosed to the government which

3    they had, and as you note they did not move on the basis of,

4    was a legitimate way for an expert who is doing a rebuttal to

5    behave.

6            THE COURT:  There's been a great deal of criticism

7    over at least the last 20 years of the American adversarial

8    system's use of experts.  Indeed, this is why there's embodied

9    in the Federal Rules of Evidence the opportunity for the court

10   to appoint its own expert.  But that, most judges have found,

11   is presented with its own problems, the most obvious one being

12   that the court is not given funds to retain its own expert in a

13   civil case.

14           The accusation that is normally made is that the

15   experts are nothing but hired guns.  That's the nicest word

16   that's used.  Words like prostitutes are also sometimes used,

17   in which case they certainly are being paid well.  And the

18   drafters of the Federal Rules of Evidence, are mindful of that

19   danger, felt that the gate keeping function given to federal

20   courts, which led to the amendment of Rule 702 as encapsulating

21   Daubert, would allow courts, among much else, to only permit

22   into evidence experts whose methodology and its application met

23   at least minimal standards of reliability.  Those are the words

24   of the rule itself.

25           What you're describing was, of course, the sad state

DAHTBAN5

1    of affairs pre-Daubert.  I do not think it correctly states

2    what is permissible today.  But I accept -- I don't question --

3    of course I'm not questioning that anyone on the defense team,

4    all of them have nothing but the admiration of this Court, set

5    out to consciously violate the rule.  My point is that the law

6    here has changed, but not yesterday, it changed when Rule 702

7    was amended.  And I do not believe the kind of expert that you

8    think is routine -- and that in some states, of course, which

9    haven't adopted the change still is routine -- is now what is

10   normally permitted in federal court, but in this case it will

11   be because no challenge was made.

12          All right.  Is there anything else you want to say?

13          MR. SMURZYNSKI:  Your Honor, we could have a

14   fascinating discussion on this, but I'm not interested in

15   further engaging on it at this time.

16          THE COURT:  Well, feel free to take it up after the

17   trial.

18          MR. SMURZYNSKI:  Thank you, your Honor.

19          THE COURT:  Very good.  We'll see you tomorrow.

20          (Adjourned to October 18, 2013 at 9:30 a.m.)

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    RON GILLET

 4    Direct By Mr. Jones  . . . . . . . . . . . .2843

 5    Direct By Mr. Hefter . . . . . . . . . . . .2882

 6    Cross By Ms. London  . . . . . . . . . . . .2883

 7    Redirect By Mr. Jones  . . . . . . . . . . .2917

 8    ROBERT BROEKSMIT

 9    Direct By Mr. Smurzynski . . . . . . . . . .2920

10    Cross By Ms. Schoenberger  . . . . . . . . .2979

11                     PLAINTIFF EXHIBITS

12    Exhibit No.                           Received

13     252   . . . . . . . . . . . . . . . . . . .2850

14     538   . . . . . . . . . . . . . . . . . . .2887

15     539   . . . . . . . . . . . . . . . . . . .2894

16     540   . . . . . . . . . . . . . . . . . . .2896

17     542   . . . . . . . . . . . . . . . . . . .2911

18     541   . . . . . . . . . . . . . . . . . . .2913

19     532   . . . . . . . . . . . . . . . . . . .2986

20

21

22

23

24

25
```

2999

```
1                        DEFENDANT EXHIBITS

2    Exhibit No.                                     Received

3    339    . . . . . . . . . . . . . . . . . .2847

4    537    . . . . . . . . . . . . . . . . . .2876

5    1556   . . . . . . . . . . . . . . . . . .2928

6    1223A  . . . . . . . . . . . . . . . . . .2931

7    2429B  . . . . . . . . . . . . . . . . . .2935

8    1730A  . . . . . . . . . . . . . . . . . .2937

9    2812A  . . . . . . . . . . . . . . . . . .2940

10   2577A  . . . . . . . . . . . . . . . . . .2943

11   2852B  . . . . . . . . . . . . . . . . . .2946

12   2852A  . . . . . . . . . . . . . . . . . .2946

13   2436A  . . . . . . . . . . . . . . . . . .2948

14   2567A  . . . . . . . . . . . . . . . . . .2950

15   2567B  . . . . . . . . . . . . . . . . . .2951

16   2514A  . . . . . . . . . . . . . . . . . .2953

17   2514B  . . . . . . . . . . . . . . . . . .2954

18   2415C  . . . . . . . . . . . . . . . . . .2954

19   1730B  . . . . . . . . . . . . . . . . . .2955

20   2612A  . . . . . . . . . . . . . . . . . .2971

21

22

23

24

25
```