DAI3BAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4
                    Plaintiff,
5
             v.                              12 CV 1422 (JSR)
6
     BANK OF AMERICA CORPORATION,
7    *successor to Countrywide
     Financial Corporation,*
8    *Countrywide Home Loans, Inc.,*
     *and Full Spectrum Lending*, et
9    al.,

10                  Defendants.

11   ------------------------------x
                                             New York, N.Y.
12                                           October 18, 2013
                                             9:40 a.m.
13
     Before:
14
                         HON. JED S. RAKOFF,
15
                                             District Judge
16

17

18

19

20

21

22

23

24

25

DAI3BAN1

1                                    APPEARANCES

2     PREET BHARARA
           United States Attorney for the
3          Southern District of New York
      PIERRE G. ARMAND
4     JAIMIE LEESER NAWADAY
      JOSEPH N. CORDARO
5     CARINA H. SCHOENBERGER
      ELLEN M. LONDON
6          Assistant United States Attorneys

7

      WILLIAMS & CONNOLLY
8          Attorneys for Defendant Bank of America
      BRENDAN V. SULLIVAN, JR.
9     ENU MAINIGI
      MALACHI B. JONES
10    KENNETH SMURZYNSKI
      CRAIG D. SINGER
11    ALLISON B. JONES
      STEVEN M. CADY
12    JENNIFER WIMSATT PUSATERI

13

      GOODWIN PROCTOR
14         Attorneys for Defendants Countrywide
      RICHARD M. STRASSBERG
15    WILLIAM HARRINGTON

16

      BRACEWELL & GIULIANI
17         Attorneys for Defendant Mairone
      MARC L. MUKASEY
18    MICHAEL HEFTER
      RUSSELL ZWERIN
19    RYAN M. PHILP
      SETH M. COHEN
20    CHRISTINA JARDINE

21

22

23

24

25

DAI3BAN1

```
 1               (In open court; jury not present)

 2               THE COURT:  We are missing one juror which of course

 3     is music to my ears.  But we did get a note this morning from

 4     Juror No. 3.  It reads as follows:  I am concerned because of

 5     upcoming conflicts I am facing with my work.  Although I have

 6     given up a semester of teaching and week of freelance work, my

 7     only contracted position begins soon.  That is as principal

 8     harp for the American Ballet Theater.  I know there is no way

 9     to predict exactly when we will finish, and I've secured

10     someone to cover my first rehearsal on Friday, October 25, if

11     needed.  There is another rehearsal on Tuesday, October 29,

12     which I need to be at if I am to play opening night at Lincoln

13     Center.  Just looking for advice on this.  My principal harp

14     position and students are my only guaranteed work during the

15     year.

16               So, it seems to me from what I heard yesterday that we

17     will have summations and charge probably around Wednesday of

18     next week, yes?

19               MS. MAINIGI:  Your Honor, yes, or the early part of

20     the week is our goal and our hope.

21               THE COURT:  So, I think what I can tell her, and maybe

22     tell the jury as a whole, that we expect the evidence to be

23     completed early next week, and then it will be submitted for

24     their consideration, and I think that should give her some

25     solace.  I don't think I will tell her, but I think if it
```

DAI3BAN1

1    really came to this, if the jury was still deliberating we

2    might consider excusing her to make this or maybe have them

3    deliberate a half day so she can make her rehearsal.  We have

4    many other options.

5            But I think we should at least tell her that the

6    likelihood is the case will be submitted to the jury early to

7    mid next week.  Any problem with that?

8            MS. MAINIGI:  I think that will work.  I don't see

9    there would be any interference here given these dates.  I

10   don't know what your Honor is doing with respect to next

11   Friday.

12           THE COURT:  Next Friday I'm gone.  If the jury is

13   still deliberating, in theory they could come in and I could

14   handle any notes by telephone.  But, I'm more inclined to

15   think -- we'll see where we're at.

16           MS. MAINIGI:  That's fine, your Honor.

17           THE COURT:  I will let them know early next week we

18   won't be sitting on Friday, or unlikely to be sitting on

19   Friday.

20           MS. MAINIGI:  Thank you, your Honor.

21           THE COURT:  And they're all here so let's get the

22   witness on the stand and let's bring in the jury.  And let me

23   give counsel the rulings on the deposition transcript of

24   Mr. Harris.  You know how to handle them.

25           MS. MAINIGI:  I can grab them, your Honor.

DAI3BAN1

```
 1              (Jury present)
 2              THE COURT:  So, we have, in addition to a note from
 3     Juror No. 3, thank you very much, we have the following note
 4     from the jury.  Of course since I was here at 9:30, I am too
 5     exhausted to read.  But I'll do my best.
 6              The jury collectively requests the following
 7     information regarding this case:  One.  What inning are we in?
 8     Two.  Approximately how many relief pitchers does the defense
 9     have left in the bullpen?  Three.  Can we limit the number of
10     side bars to 16 per session.  Four and finally, which position
11     does Fannie Mae play on the St. Louis Cardinals.
12              Who are the St. Louis Cardinals?
13              So, coincidently, counsel and I were discussing this
14     very issue this morning.  We are confident that the case will
15     be given to you for your deliberations either early or at
16     latest the middle of this coming week.  How long it takes you
17     to reach a verdict, if you can, is entirely up to you.  But, we
18     are at least in the bottom of the eighth.
19              With respect to side bars, and I know that's
20     frustrating.  You sit there waiting for us to finish.  But let
21     me explain what goes on at the side bar and why we sometimes
22     have to have them.  When one party or another believes that
23     either evidence that where I've sustained an objection,
24     evidence should come in because of things that I don't know
25     that will be gotten into later in the case, or conversely,
```

DAI3BAN1

where a party thinks that even though I'm admitting evidence,
it should be ruled out because of things that will be coming up
later in the case.  They need to discuss that with me at side
bar, because it would be totally inappropriate for you to be
hearing evidence that's coming later in the case that I might
rule out.

So, someone might say at the side bar, in a
hypothetical case, let's say the case of the Yankees versus the
Red Sox.  And someone might say at the side bar, Judge, you
should let that evidence in because I have proof that Alex
Rodriguez never used illegal substances.  And supposing I said
that's completely inadmissible, but you would have heard that
purported evidence from the lawyers discussing it.

So it would unfairly prejudice the jury, is my point.
That's why we have side bars, so they can discuss things that
you may never hear if I rule them out.  Sometimes I rule them
in and you will hear it.

Nevertheless, I think implicit in your note is the
notion that we should try to keep those side bars to a minimum.
So I will ask counsel for all parties to try to minimize those
side bars, and I thank you very much for bringing it to our
attention.

You should understand that when a lawyer, just like
when a lawyer objects to questions, they're doing their duty.
This is not, they're not trying to delay the proceedings or

3006

DAI3BAN1

1   obstruct anything.  The rules of evidence, as you've heard me

2   tell a number of witnesses, are very strict.  They're very old.

3   Very old.  Like 4 or 500 years old.  And they come down to us

4   from England, because it was realized early on that in the real

5   outside world, you hear all sorts of gossip and rumors and

6   hearsay and stuff that, you know, you may take into account and

7   may not take into account.  But in a court of law, you really

8   have to concentrate on finding the truth.  That's your ultimate

9   obligation, is to find the truth.

10          It is very important that all the dross be excluded

11  and nothing but evidence that passes the minimal thresholds of

12  something that at least you can consider properly is presented

13  to you.  That's why we have all these complicated rules.

14          And I know it's, you know, it delays things and it

15  interferes with your focus and I apologize for that.  But it is

16  serving the greater interest of truth, and that's why we have

17  those rules and that's why we have these side bars.

18          All right, counsel, with that long-winded explanation,

19  let's proceed.

20   ROBERT BROEKSMIT,

21  CROSS-EXAMINATION

22  BY MS. SCHOENBERGER:

23  Q.  Good morning, Mr. Broeksmit.

24  A.  Good morning.

25  Q.  You testified yesterday that the three directors on your

 1    team were the ones who made recommendations to you as to

 2    whether a loan file was materially defective, right?

 3    A.   Yes.

 4    Q.   You handpicked the three directors for your team, right?

 5    A.   Yes, I did.

 6    Q.   You chose them based on their qualifications, right?

 7    A.   Their qualifications and experience, yes.

 8    Q.   You reviewed their résumés to determine if they were

 9    qualified, right?

10    A.   I did.

11    Q.   You did not consider prior loan underwriting experience to

12    be a prerequisite to being a director on this project, did you?

13    A.   I did not consider prior origination underwriting

14    experience to be a prerequisite.

15    Q.   You were mainly interested in the directors' writing

16    skills, right?

17    A.   I would not put it that way, no.

18    Q.   You testified yesterday that two of the three directors

19    were lawyers, right?

20    A.   Yes.

21    Q.   In fact, immediately before they came to work at Treliant,

22    they were lawyers at the same law firm, right?

23    A.   Yes, they were.

24    Q.   One was the responsible partner supervising defense of

25    complex and high volume mortgage origination and servicing

DAI3BAN1                    Broeksmit – cross

1    claims and litigation until 2012, right?

2            MR. SMURZYNSKI:   your Honor.

3            THE COURT:  Overruled.

4    A.  Yes.

5    Q.  The other was an associate attorney who managed up to 100

6    consumer finance litigation matters, including defense of

7    statewide multi-loan origination claims until January of 2013,

8    right?

9    A.  Yes.

10   Q.  In this project you only rarely overruled a director's

11   recommendation for a loan finding, isn't that right?

12   A.  Yes.

13   Q.  Yesterday you testified that your team was given the

14   Treliant loan review manual to guide their review, correct?

15   A.  That's correct.

16   Q.  Your team was also provided with Countrywide's loan program

17   guide, right?

18   A.  Yes, we were.

19   Q.  Countrywide's conventional technical manual too, right?

20   A.  Yes.

21           MS. SCHOENBERGER:  Your Honor, may I approach the

22   witness?

23           THE COURT:  Yes.

24   Q.  Do you recognize this document, Mr. Broeksmit?

25   A.  Yes, I do.

1    Q.  Is this the Countrywide conventional technical manual

2    section related to investment quality underwriting criteria?

3    A.  That's the first heading, but it's relating to automated

4    underwriting systems.

5    Q.  This was one of the documents that you provided to your

6    team?

7    A.  Yes.

8            MS. SCHOENBERGER:  Your Honor, the United States

9    offers Plaintiff's Exhibit 4 into evidence.

10           MR. SMURZYNSKI:  Your Honor we have an objection.

11   Relevance based on date.

12           MS. SCHOENBERGER:  There were no objections to this

13   exhibit in the pretrial order.

14           THE COURT:  Relevance is always preserved.  Given the

15   fact that he provided this to his team, the objection is

16   overruled.  4 is received.

17           (Plaintiff's Exhibit 4 received in evidence)

18   Q.  Mr. Broeksmit, the members of your team were not provided

19   with Freddie Mac's underwriting guidelines, were they?

20   A.  No, they were not.

21   Q.  They were not provided with Fannie Mae's underwriting

22   guidelines, right?

23   A.  The -- that's correct for the level one reviewers and

24   quality control reviewers.

25   Q.  Yesterday you were asked a few questions about Fannie Mae's

DAI3BAN1                      Broeksmit - cross

1    guidelines.  Do you recall that?

2    A.  Yes.

3    Q.  But you yourself didn't review Fannie Mae's guidelines for

4    the project related to litigation, did you?

5    A.  I reviewed them after reading Mr. Holt's revised report,

6    but not before I wrote my initial report.

7    Q.  You didn't review Freddie Mac's guidelines for this

8    project, did you?

9    A.  No, I did not.

10   Q.  Mr. Broeksmit, yesterday you looked at a demonstrative

11   exhibit that listed some defects Mr. Holt found in the Hustle

12   loans he reviewed, do you recall that?

13   A.  Yes, I do.

14          MS. SCHOENBERGER:  Ms. Michaud, can you please pull up

15   the demonstrative marked as Defendant's Exhibit 1930.

16   Q.  This exhibit shows common defects found by Mr. Holt, right?

17   A.  Right.

18   Q.  But it is not the most common defects that he found, right?

19   A.  My impression is that they are the most common defects

20   found.

21   Q.  But these are actually just subcategories of the nine

22   categories of defects that Mr. Holt looked at, aren't they?

23   A.  Mr. Holt categorized his defects into categories, as we

24   discussed yesterday, and these were some of the specific

25   defects that mapped into those categories.

1    Q.  They don't correspond directly with the nine categories

2    that Mr. Holt looked at, right?

3    A.  I'm not sure what you mean by correspond.  They are all

4    subsets of those.

5    Q.  Many of the loans that Mr. Holt ran had multiple defects in

6    combination, right?

7    A.  Mr. Holt alleged multiple defects on some of the loans,

8    yes.

9    Q.  His finding that any loan was materially defective was

10   based on a complete file review, correct?

11   A.  Yes, it was.

12   Q.  Not necessarily on the presence or absence of just one of

13   the defects on this exhibit, right?

14   A.  That's true in some circumstances.  In others, it is not

15   true.

16   Q.  The source for this exhibit is the corrected expert report

17   of Ira Holt, right?

18   A.  That's right.

19   Q.  This exhibit says that the defect of missing 1008 was

20   claimed 116 times by Mr. Holt, right?

21   A.  Yes, it says that.

22   Q.  But isn't it the case that the corrected expert report of

23   Ira Holt expressly states that he removed any findings based on

24   missing 1008s in the loan file?

25   A.  The body of the report says that, but the attachment

1   contradicts it.

2   Q.  And the body of the report also says that removing the

3   findings of the missing 1008 did not impact the ultimate

4   determination of any individual loan, right?

5   A.  Yes, that's true.

6   Q.  So the number here for missing 1008s should actually be

7   zero, shouldn't it?

8   A.  I don't agree with that, no.

9   Q.  Mr. Broeksmit, it is your understanding that CLUES was

10  Countrywide's own underwriting system, right?

11  A.  It was, yes, it was developed by Countrywide.

12  Q.  It is your understanding that CLUES was programmed

13  according to the requirements of Countrywide's guidelines,

14  right?

15  A.  Yes, that's right.

16  Q.  Meaning that the conditions that CLUES reported for a loan

17  reflected Countrywide's requirements for that loan, right?

18  A.  Yes, that's right.

19  Q.  This exhibit includes a category showing that Mr. Holt

20  found loan files with missing appraiser licenses, right?

21  A.  Yes, it does.

22  Q.  You testified yesterday that it is your opinion that it is

23  not a requirement for a loan file to have an appraiser's

24  license, right?

25  A.  That's right.

1   Q.  Yesterday you looked at a binder provided by the

2   defendants.  Do you have that available to you now?

3   A.  No, I do not.

4            MS. SCHOENBERGER:  Your Honor, can we ask the

5   defendants to provide their binder of exhibits to the witness.

6            THE COURT:  Yes.

7            MR. SMURZYNSKI:  Your Honor, it may have been cleared

8   away given the proceedings after our case.

9   Q.  Mr. Broeksmit, can you please turn to what was marked as

10  Defendant's Exhibit 2429B.  That's behind tab 10.  This is a

11  CLUES report you looked at yesterday, right?

12  A.  Yes.

13  Q.  The second page of this report lists general loan

14  conditions that must be cleared before funding, right?

15  A.  Yes.

16  Q.  And this section states "obtain a copy of the appraiser's

17  current valid state license," doesn't it?

18  A.  Yes.

19  Q.  Can you please turn to what's been marked as Defendant's

20  Exhibit 2812A.  That's behind tab 13.  This is another CLUES

21  report that you looked at yesterday, right?

22  A.  Right.

23  Q.  The second page of this report lists as a loan condition

24  "obtain a copy of the appraiser's current valid state license,"

25  right?

1   A.  Yes.  It does not say where to put it, but it --

2   Q.  Thank you.  Can you please turn to what's been marked as

3   Defendant's Exhibit 2514A, and that's behind tab 28 in the

4   defendant's binder.  This is also a CLUES report that you

5   looked at yesterday, right?

6   A.  Yes.

7   Q.  The third page of this report lists as a loan condition

8   "obtain a copy of the appraiser's current valid state license,"

9   right?

10  A.  Yes.

11  Q.  Yesterday you testified that you verified that certain

12  appraisers who performed the appraisals in some loan files were

13  in fact licensed, right?

14  A.  Yes.

15  Q.  In order to come to that conclusion, you had to enlist the

16  help of another expert, right?

17  A.  No, I wouldn't say it that way.  Because we also had the

18  proof on each appraisal with the certification or license

19  number from the state.

20  Q.  But you had another expert look with a state licensing body

21  to find out whether the appraiser was in fact licensed?

22  A.  We had him confirm what was on the appraisal, yes.

23  Q.  That's because the appraisers' licenses were not in the

24  file, right?

25  A.  No, that's not why.

DAI3BAN1                     Broeksmit - cross

1   Q.  For this project you said that you didn't review Freddie

2   Mac's guidelines, correct?

3   A.  That's correct.

4   Q.  So you didn't review Freddie Mac's guidelines regarding

5   appraisers' licenses, right?

6   A.  That's true.

7   Q.  Prior to preparing your first report, you didn't review

8   Fannie Mae's guidelines regarding appraisers' licenses, did

9   you?

10  A.  No.

11         MS. SCHOENBERGER:  Ms. Michaud, if you can pull up

12  Defendant's Exhibit 1930 again.

13  Q.  Mr. Broeksmit, this exhibit shows that Mr. Holt found loans

14  with missing mortgage insurance, right?

15  A.  Right.

16  Q.  You testified yesterday that a mortgage insurance

17  certificate doesn't have to be kept in the loan file, right?

18  A.  In the origination loan file, right.

19  Q.  But Mr. Holt's determination that it is required is based

20  on the guidelines of Fannie Mae and Freddie Mac as well as

21  Countrywide, correct?

22  A.  No, I don't agree with that.

23  Q.  Mr. Holt reviewed all three of those guidelines to come to

24  his conclusions, didn't he?

25  A.  I don't know.

DAI3BAN1                    Broeksmit - cross

1   Q.  Again, you did not review Fannie Mae or Freddie Mac's

2   guidelines regarding mortgage insurance certificates in forming

3   your opinion, did you?

4   A.  I did not review them before my initial report was written.

5   Q.  Yesterday defense counsel asked you a number of different

6   questions about particular loans, do you recall that?

7   A.  Yes, I do.

8   Q.  For several of them, you were asked whether, in your

9   opinion, the loan was materially defective, do you recall that?

10  A.  Yes, I do.

11  Q.  You said that the loans were not materially defective,

12  right?

13  A.  Right.

14  Q.  You even said that one loan was a, quote, good loan, right?

15  A.  I agreed with Mr. Holt's reviewer on that case, yes.

16  Q.  You didn't conduct a full file review for a single one of

17  those loans, did you?

18  A.  We did not start from scratch on a single loan, no.

19  Q.  All your team did was look to see if you could rebut the

20  individual defects that Mr. Holt expressly called out on his

21  report, right?

22  A.  We did more than that.  In that, in the process of

23  determining whether we could do that, we looked at many more

24  documents and considered the overall strengths and weaknesses

25  of the file and whatever compensating factors could be

1    determined from a review of the rest of the documents.

2    Q.  Compensating factors just based on the defects that

3    Mr. Holt had expressly identified in his report, correct?

4    A.  No, that's not correct.  Compensating factors would be

5    involved with the entire strength and weakness of the file, not

6    just on the points raised by Mr. Holt.

7    Q.  You didn't make any independent assessment of whether a

8    loan was materially defective or not based on a full file

9    review, right?

10   A.  I don't agree with that.  Because in the course of the more

11   complex cases, we looked at virtually every document in the

12   file to determine, both at the claim level and at the entire

13   file level, what our findings would be.  In some cases when the

14   allegation was very straightforward, for instance, this file

15   doesn't have mortgage insurance, we would determine that it had

16   mortgage insurance and not look at other documents in the file.

17   But in the more complex ones, it was a much more complete

18   review.

19   Q.  For those missing document cases, you concluded that the

20   file was not materially defective simply because you found that

21   document, right?

22   A.  I concluded it was not materially defective because the

23   only reason Mr. Holt cited for that defect was proven to be not

24   correct.

25   Q.  Mr. Broeksmit, can you please turn to what's been marked as

1     Defendant's Exhibit 1556.  That's behind tab four in

2     defendant's binder.  This is a spreadsheet of your findings in

3     this case, right?

4     A.  Yes, it is.

5     Q.  Page 71 of this spreadsheet has your allegations with

6     respect to loan number 192689112, right?

7     A.  No, it doesn't have my allegations.

8     Q.  This has your findings with respect to rebutting Mr. Holt's

9     defect claim, correct?

10    A.  Yes, it does.

11    Q.  This is a refinance loan, right?  Number 192689112?

12    A.  May I have a minute to get familiar with it?

13    Q.  Of course.

14    A.  I don't see from the information available to me whether

15    the loan was a refinance or not.

16    Q.  Can I direct your attention to the loan notes on the far

17    right column of this document.

18    A.  Oh.  Yes.  Sorry.  Yes, it is a refinance.

19    Q.  That mean that the borrower is refinancing a loan that the

20    borrower already has on the property, right?

21    A.  Yes.

22          MS. SCHOENBERGER:  Your Honor, may I approach the

23    witness?

24          THE COURT:  Yes.

25    Q.  Mr. Broeksmit, can you please look at the United States

1    binder there.  It is the smaller one.  And turn to tab PX 534.

2    This is the CLUES report for loan file 192689112, right?

3                  MR. SMURZYNSKI:  Objection.

4                  THE COURT:  Ground?

5                  MR. SMURZYNSKI:  Authenticity.  The document is cut

6    off.  There are no Bates numbers.

7                  THE COURT:  Was this listed in the pretrial order?

8                  MS. SCHOENBERGER:  I don't believe it was, your Honor.

9    We have a full copy of the loan file if you want to look at

10   this document in the context of that.  Not all the pages had

11   Bates numbers.

12                 THE COURT:  Do you want to offer the whole loan file?

13                 MS. SCHOENBERGER:  I can do that or I can just satisfy

14   defense counsel that this is a page from within it.

15                 THE COURT:  Do you want the whole loan file?

16                 MR. SMURZYNSKI:  I don't want the whole loan file.  I

17   would like to take a look at it to understand, because this

18   document lacks any Bates number and it is cut off.

19                 THE COURT:  Take a look at it.

20                 MR. SMURZYNSKI:  I continue to have a concern because

21   the document is cut off.  It is not complete based on my review

22   of it as offered by the government here.

23                 THE COURT:  Let me see it.

24                 MS. SCHOENBERGER:  May I approach?

25                 THE COURT:  Yes.  What do you mean it's cut off?

1          MR. SMURZYNSKI:  If you look at, for example, on the

2     second page at the bottom, it reads "if applicable provide

3     satisfactory documentation to explain any."  And then there's

4     no further words.  On the carry over page, they're not there.

5          MS. SCHOENBERGER:  Your Honor, this is a printout of

6     the electronic file that was produced to the government from

7     the defendants.

8          THE COURT:  I think for the purposes that I understand

9     it's being offered, it is not an incomplete document.  So it

10    will be received.  Counsel of course is free to cross-examine

11    on redirect on this issue.

12         MR. SMURZYNSKI:  Thank you, your Honor.

13         THE COURT:  Give me the number again?

14         MS. SCHOENBERGER:  Plaintiff's Exhibit 534.  And your

15    Honor, the United States offers this into evidence.

16         MR. SMURZYNSKI:  Same objection.

17         THE COURT:  Overruled.  Received.

18         (Plaintiff's Exhibit 534 received in evidence)

19    Q.  Mr. Broeksmit, this report identifies the property address

20    at 10 Coastal View Court, right?

21    A.  Yes.

22    Q.  It says the property will be used as a primary residence,

23    right?

24    A.  Yes.

25    Q.  The decision section at the top of the page there

 1   identifies the previous loan number as 75837581.  Right?

 2   A.  Yes.

 3   Q.  Can you please turn to tab PX 535 in the United States

 4   binder.

 5            MS. SCHOENBERGER:  Again, I'm happy to show the

 6   defendant the entire loan file.

 7   Q.  This is a Fast Track report for loan number 7587581.

 8   Right?

 9   A.  I think you missed a digit there.

10   Q.  75837581.  Correct?

11   A.  Yes.

12            MS. SCHOENBERGER:  Your Honor, the United States

13   offers Plaintiff's Exhibit 535 into evidence.

14            MR. SMURZYNSKI:  No objection.

15            MR. MUKASEY:  No objection.

16            THE COURT:  Received.

17            (Plaintiff's Exhibit 535 received in evidence)

18   Q.  This loan is the original loan that's being refinanced in

19   this loan file, right?

20   A.  I'd have to see the more of the file to determine that.

21   Q.  So simply looking at the CLUES report wasn't enough to show

22   whether this is the original loan being refinanced?

23   A.  Right.

24   Q.  This report says that the property address is 116 Coastal

25   View Drive, right?

1   A.  This shows that address on this form, yes.

2   Q.  And not 10 Coastal View Court, right?

3   A.  The address on the form is 116 Coastal View Drive.

4   Q.  And this report says that the property is an investor

5   non-owner occupied property, right?

6   A.  Yes.

7   Q.  And not the borrower's primary residence, right?

8   A.  Right.

9   Q.  But, you disagreed with Mr. Holt's expert opinion that loan

10  number 192689112 is materially defective, right?

11  A.  That's correct.

12  Q.  Can you please turn back to the spreadsheet of your

13  findings at Defendant's Exhibit 1556.  Can you please look at

14  page 59 of your findings.

15          Page 59 includes your findings with respect to loan

16  number 189733031 at the top of the page, isn't that right?

17  A.  Yes.

18  Q.  One of your findings was that a letter from the borrower's

19  accountant verified the existence and operation of her

20  business, right?

21  A.  Yes.

22  Q.  Can you please look behind defendant's tab marked DX 1899

23  in the United States binder there.

24          MS. SCHOENBERGER:  Ms. Michaud, can you please pull up

25  this document.  It's already in evidence.

DAI3BAN1                        Broeksmit - cross

1    A.  What was the tab?

2    Q.  DX 1899.

3    A.  I don't have that tab.

4    Q.  At the very back of the smallest binder.

5    A.  Oh, I'm sorry.

6    Q.  Do you have that in front of you?

7    A.  I do, I'm sorry.

8    Q.  This is a copy of the letter that you found in loan file

9    number 189733031, right?

10   A.  189733031, yes.

11   Q.  This letter is from Mi Pueblo Services, Inc., right?

12   A.  That's right.

13   Q.  Mi Pueblo Services isn't identified as an accounting firm,

14   right?

15   A.  That's right.

16   Q.  Indeed, the word "accountant" is misspelled in the

17   signature block, isn't it?

18   A.  Yes, it is.

19   Q.  You didn't conduct a full file review to see if this

20   purported accountant's name appeared anywhere else in the file,

21   did you?

22   A.  Yes, I did.

23   Q.  Did you find that accountant's name elsewhere in the file?

24   A.  Yes, in one other place.

25   Q.  You concluded this letter was sufficient to verify the

DAI3BAN1                        Broeksmit - cross

1    borrower's business?

2    A.   That's correct.

3    Q.   So you found that this file was not materially defective?

4    A.   That's right.

5            MS. SCHOENBERGER:  Ms. Michaud, can you please pull up

6    Defendant's Exhibit 1931 which is a demonstrative that was used

7    yesterday.

8    Q.   Mr. Broeksmit, you testified yesterday that of the 343

9    Hustle loans that Mr. Holt reviewed, you determined that 312 of

10   them were investment quality, do you remember that?

11   A.   Yes, I do.

12   Q.   But you never looked at all 343 of those loans, did you?

13   A.   That's incorrect.  I looked at all 343 of the loans.

14           MS. SCHOENBERGER:  Your Honor, may I approach the

15   witness with a transcript of yesterday's proceedings?

16           THE COURT:  Yes.

17   Q.   Can I please direct your attention to page 2983 of this

18   transcript.  And do you recall me asking you at line 19 through

19   24:

20   "Q.   And you don't --"

21           MR. SMURZYNSKI:  Your Honor, I object.  If she's going

22   to direct to a particular line of a prior testimony, I think

23   this examination is in its current form is improper.

24           THE COURT:  Is what?

25           MR. SMURZYNSKI:  Is improper.

 1              THE COURT:  Ground?

 2              MR. SMURZYNSKI:  It doesn't satisfy the requirements

 3     that first we haven't heard the line and page yet.  We haven't

 4     allowed the witness to read it yet.  On that basis it violates

 5     the rules of evidence as I understand it.

 6              THE COURT:  What lines do you want to read?

 7              MS. SCHOENBERGER:  Your Honor, I'm at page 2983, lines

 8     12 through 24.

 9              THE COURT:  2983, lines?

10              MS. SCHOENBERGER:  12 to 24.

11              THE COURT:  12 to 24.  All right.  Still any

12     objection?

13              MR. SMURZYNSKI:  No, your Honor.  I just wanted to

14     understand what the line and page was.

15              THE COURT:  Go ahead.

16     Q.  "Q.  You did not opine on all 343 loans that Mr. Holt

17     reviewed, correct?

18     "A.  That's right.  If he did not find they would be materially

19     defective, I did not review them.

20     "Q.  So you don't have any opinions regarding the loans that he

21     determined were investment quality, right?

22     "A.  That's correct.

23     "Q.  And you don't have any opinions about the loans that he

24     determined were investment quality with defects, right?

25     "A.  That's right.

1    "Q.  And you didn't conduct any review of those loans at all,

2    right?

3    "A.  That's right."

4            Was that your testimony yesterday?

5    A.  Yes.

6    Q.  But this exhibit, Defendant's 1931, seems to indicate that

7    you made findings regarding 343 loans, doesn't it?

8    A.  Yes.

9    Q.  But that's not accurate, is it?

10   A.  Let me think a minute.  Because we've reviewed all of the

11   loans that Mr. Holt originally deemed materially defective

12   which was 397 I believe.  And then that number was reduced --

13   Q.  But, Mr. Broeksmit, the 343 loans, as you can see by this

14   chart, included 158 that Mr. Holt deemed were either investment

15   quality or investment quality with defect, isn't that right?

16   A.  Yes, it is.

17   Q.  You did not review all of the 343 loans that Mr. Holt

18   reviewed, did you?

19   A.  That's right.  If I did not review the ones he did not find

20   materially defective.

21   Q.  The unresolved loans here referred to loans where you did

22   not disagree with Mr. Holt's finding, right?

23   A.  The unresolved loans were ones where, based on the

24   documentation and information available in the file today, I

25   was unable to resolve Mr. Holt's findings.

DAI3BAN1                          Broeksmit - cross

1   Q.  So, the 31 unresolved loans that are shown in this pie

2   chart are actually 31 out of the 185 materially defective loans

3   that Mr. Holt found, right?

4   A.  I wouldn't put it that way, because what I'm saying is that

5   if Mr. Holt did not allege a material defect, which he did

6   frequently, that I did not -- that assumed it did not have a

7   material defect as well.

8   Q.  But you couldn't have had any unresolved loans about the

9   unresolved loans for the loans that Mr. Holt didn't determine

10  were materially defective, right?

11  A.  I couldn't --

12  Q.  Because you didn't look at those?

13  A.  I couldn't consider something unresolved if nothing were

14  asserted, so that's correct.

15  Q.  31 out of 185 is a lot more than 6.8 percent, isn't that

16  right?

17  A.  31 out of 185 is more than 9 percent, yes.

18          MS. SCHOENBERGER:  Ms. Michaud, you can take that

19  down, please.

20  Q.  Mr. Broeksmit, you've participated in other loan review

21  assignments at Treliant, right?

22  A.  Yes, I have.

23  Q.  All those other assignments involved full re-underwriting

24  of loan files, isn't that right?

25  A.  All meaning two, yes.

DAITBAN2                    Broeksmit - cross

1   Q.  And neither of those involved a review that was structured

2   like this one, right?

3   A.  Right.

4   Q.  And both of those assignments were for the defense side of

5   the matter at issue, right?

6   A.  Yes, they were.

7          MS. SCHOENBERGER:  Your Honor, I have nothing further

8   at this time.

9          THE COURT:  All right.  Anything?

10          MR. SMURZYNSKI:  Yes, your Honor.

11          THE COURT:  Go ahead.

12          MR. SMURZYNSKI:  Your Honor, if I might approach the

13   witness.

14          THE COURT:  Yes.

15   REDIRECT EXAMINATION

16   BY MR. SMURZYNSKI:

17   Q.  Good morning, Mr. Broeksmit.

18   A.  Good morning.

19   Q.  The government showed you earlier this morning loan number

20   192689112.

21          MR. SMURZYNSKI:  And Alex, if you could pull up on the

22   screen Plaintiff's Exhibit 229 at page 22.

23   Q.  Mr. Broeksmit, did Mr. Holt make any allegation about the

24   occupancy with respect to that loan?

25   A.  No, he did not.

DAITBAN2                    Broeksmit - redirect

1   Q.  Will you turn to tab 3 in your binder.  I'm sorry, could

2   you turn to page -- tab 2 in your binder.  And it's been marked

3   for identification as DX2848E.  What is DX2848E?

4   A.  It's loan level notes from the Countrywide system.

5   Q.  And for what loan is it?

6   A.  192689112.

7           MR. SMURZYNSKI:  Your Honor, defendants ask that

8   DX2848E be moved into evidence.

9           MS. SCHOENBERGER:  No objection, your Honor.

10          THE COURT:  Received.

11          (Defendant's Exhibit 2848E received in evidence)

12  Q.  Mr. Broeksmit, if you turn to the second page of this

13  document.

14          MR. SMURZYNSKI:  And Alex, if you could blow up the

15  first of those two notes there.

16  Q.  What are the doc level notes with regard to this loan that

17  you see on this exhibit, Mr. Broeksmit?

18  A.  They read this is the correct mailing address reflected on

19  AS400, 10 Coastal View Court, Number 116, borrower address

20  changed for 911 purposes, document in file.

21  Q.  And if you could turn to tab 3, and what's behind tab 3?

22  A.  Tab 3 is a letter to Countrywide concerning this property.

23          MR. SMURZYNSKI:  We ask defendant's 2848D be moved

24  into evidence.

25          MS. SCHOENBERGER:  We ask this be shown as part of the

DAITBAN2                          Broeksmit - redirect

1   larger loan file.

2                MR. SMURZYNSKI:  Certainly, this is a loan file that

3   you have.

4                MS. SCHOENBERGER:  Right.

5                No objection, your Honor.

6                THE COURT:  All right.  Received.

7                (Defendant's Exhibit 2848D received in evidence)

8                MR. SMURZYNSKI:  Alex, if you could put that up on the

9   screen.

10  Q.  Mr. Broeksmit, what is this letter that's DX2848D say with

11  respect to the address of the loan in question?

12  A.  This says that the address has changed.  Please be advised

13  that due to a 911 address change, 116 Coastal View Drive is now

14  known as 10 Coastal View Court, Unit 116.  Both references

15  refer to the same property.  Our office has confirmed same with

16  the City of Cutler.

17  Q.  Turn behind tab 4 in your binder which has been marked for

18  identification as DX2848G.  What is this document?

19  A.  This is an appraisal of the property.

20               MR. SMURZYNSKI:  Your Honor, defendants ask that

21  defendant's 2848G be moved into evidence.

22               MS. SCHOENBERGER:  No objection, your Honor.

23               THE COURT:  Received.

24               (Defendant's Exhibit 2848G received in evidence)

25               MR. SMURZYNSKI:  Alex, if could you put that on the

1   screen and proceed to the fifth page of the document.

2   Q.  Mr. Broeksmit, what is the nature of this document we're

3   looking at on page 5?

4   A.  It's the -- it's a portion of the appraisal for a

5   condominium unit.

6   Q.  And if you look at the top of that document under the same

7   page, page 5, under subject, there's a line that reads

8   occupant.  What is checked in that box?

9   A.  Owner is checked in the occupant box.

10  Q.  And if you go about two-thirds of the way down the page in

11  the middle of project information, right after it says project,

12  primary occupancy.

13          MR. SMURZYNSKI:  Alex, if you could pull that up and

14  bring it wider to the right.

15  Q.  Mr. Broeksmit, what does it say there in the appraisal

16  regarding the status of the occupancy of the property?

17  A.  It says project, primary occupancy, principle residence is

18  checked.

19  Q.  The government asked you some questions with regard to

20  DX1899.

21          MR. SMURZYNSKI:  And Alex, if you could bring that up

22  on the screen.

23  Q.  Do you recall that?

24  A.  Yes, I do.

25  Q.  And could you turn to tab 9 behind your binder.  What is

DAITBAN2                    Broeksmit - redirect

1  behind tab 9 of your binder which has been marked for

2  identification as DX2657B?

3  A.   These are called document level notes from the Countrywide

4  system.

5  Q.   For what loan do they relate?

6  A.   This loan we are discussion, 189733031.

7         MR. SMURZYNSKI:   Your Honor, defendants ask that

8  DX2657B be moved into evidence.

9         MS. SCHOENBERGER:   Your Honor, we object unless we can

10 see this is part of a larger loan file.

11        THE COURT:   Take a look.

12        MR. SMURZYNSKI:   Your Honor, we have it, we'll get it

13 and it will be reviewed in a minute.  I apologize for the

14 interruption.

15        THE COURT:   All right.

16        MR. SMURZYNSKI:   Your Honor, we don't appear to have a

17 complete copy of the loan file.  The government examined the

18 witness on this file.  Perhaps the government has a complete

19 copy of the loan file with them.

20        MS. SCHOENBERGER:   We do not, your Honor.

21        THE COURT:   Well, I will receive the exhibit

22 contingent on the government having the opportunity to move

23 subsequently to strike it if after review of the loan file they

24 see some defect that prevents its appropriate admission.  But

25 for now, it will be contingently received.

1          MR. SMURZYNSKI:  Thank you, your Honor.

2          (Defendant's Exhibit 2657B received in evidence)

3   BY MR. SMURZYNSKI:

4   Q.  Mr. Broeksmit, what is this document?

5   A.  This is document level note from Countrywide system

6   concerning the loan we have been discussing.

7   Q.  Was this the document in the file you were referring to

8   when you were being examined by the government earlier today?

9   A.  Yes, when they asked whether I had seen this name elsewhere

10  in the file.

11  Q.  And what does this document indicate to you as a mortgage

12  origination specialist?

13  A.  The document shows me that the Countrywide employee

14  involved with the origination of the loan verified with Celia

15  Velasquez that she had prepared these tax returns for at least

16  the past two years, and they verified she was in fact a

17  certified tax preparer and confirmed through an independent

18  means, in this case 411.com, that the phone number on the

19  letter signed by the accountant was in fact a valid phone

20  number.

21  Q.  Mr. Broeksmit, why did you review the Countrywide

22  guidelines as opposed to the Fannie Mae and Freddie Mac

23  guidelines in the course of your loan review?

24  A.  There were two main reasons.  One is that those are the

25  guidelines that the Countrywide origination employees would

1    have had available to them when they were making the loans, and

2    their charge was to follow those guidelines.  And the second is

3    that the Countrywide guidelines were the ones that incorporated

4    the Fannie Mae selling guide as amended by any of the variances

5    that were negotiated between the parties.  So those were the

6    operative guidelines for these loans.

7    Q.  Mr. Broeksmit, when Mr. Holt made the determination that a

8    loan was investment quality, why did you decide not to further

9    review that loan?

10   A.  Well, as I understood it, Mr. Holt reviewed the loans, and

11   if he came to the conclusion that they did not contain

12   deficiencies that materially increased the risk of the loan, he

13   did not cite them.  And I did not see the need to try to see if

14   he had missed a defect in a loan that he had not asserted was

15   materially deficient.

16           MR. SMURZYNSKI:  Your Honor, I have no further

17   questions.

18           THE COURT:  All right.  Anything else?

19           MS. SCHOENBERGER:  Just two questions, your Honor.

20           THE COURT:  Sorry, was there anything from

21   Ms. Mairone's counsel?

22           MR. MUKASEY:  No, Judge, thanks.

23           (Continued on next page)

24

25

DAITBAN2                    Broeksmit - recross

RECROSS EXAMINATION

BY MS. SCHOENBERGER:

Q.  Mr. Broeksmit, you trusted Mr. Holt's judgment for all of

the loans that he determined were not materially defective,

didn't you?

A.  I wouldn't put it that way.  I did not respond to

assertions that he didn't make.

Q.  So you only questioned his judgment on loans that you

determined were materially defective, right?

A.  We confined our review to the loans that he considered

materially defective.

Q.  And loans could not be sold by Countrywide to Fannie Mae or

Freddie Mac unless those loans complied with Fannie Mae or

Freddie Mac's guidelines, could they?

A.  I wouldn't say it that way because Fannie Mae and Freddie

Mac's guidelines are done uniformly for sellers -- originators

and sellers to Fannie Mae and Freddie Mac, but they are amended

through agreements and variances that then make up their

agreement with Fannie Mae and Freddie Mac to sell the loans.

Q.  And the loans have to comply with all of Fannie Mae's and

Freddie Mac's guidelines for variances reached with a lender,

correct?

A.  That's right.

            MS. SCHOENBERGER:  I have nothing further, your Honor.

            THE COURT:  Anything else?

DAITBAN2

1              MR. SMURZYNSKI:  No, your Honor.

2              THE COURT:  Thank you very much, you may step down.

3              Please call your next witness.

4              MR. SMURZYNSKI:  Your Honor, before we call our next

5    witness, the defense would like to make a proffer.

6              THE COURT:  Come to the side bar.

7              So this is an example, ladies and gentlemen, why we

8    have sidebars.  They're going to tell me what they expect to

9    put into evidence and ask for an advanced ruling whether it

10   could be received or not.  And if I were to rule against them,

11   you would have heard already the evidence and the cat would be

12   out of the bag, so that's why we have a side bar.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DAITBAN2

1                (At side bar)

2                THE COURT:  Nevertheless, the clear message from the

3      jury was to keep sidebars to a minimum.

4                MR. SMURZYNSKI:  Your Honor, given we are in the case

5      we wanted to make a proffer with respect to evidence that we

6      would elicit from our expert witnesses if we were permitted to

7      do so.  We understand obviously your Honor's rulings on the

8      motions in limine and --

9                THE COURT:  These are things that I already ruled on

10     you want to make your record?

11               MR. SMURZYNSKI:  We want to be clear about the record,

12     yes.

13               THE COURT:  Why don't you do that at the break.

14               MR. SMURZYNSKI:  We'll do it at the break.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DAITBAN2                          Battany – direct

 1              (In open court)

 2              THE COURT:  Please call your next witness.

 3              MS. MAINIGI:  Your Honor, the defense calls David

 4     Battany.

 5      DAVID BATTANY,

 6          called as a witness by the Defendants,

 7          having been duly sworn, testified as follows:

 8     DIRECT EXAMINATION

 9     BY MS. MAINIGI:

10              DEPUTY CLERK:  State your name and spell your last

11     name slowly for the record.

12              THE WITNESS:  My name is David Battany, B-A-T-T-A-N-Y.

13              MS. MAINIGI:  Your Honor, may I proceed?

14              THE COURT:  Yes.

15     Q.  Mr. Battany, what is your profession?

16     A.  Mortgage banking.

17     Q.  Where do you work?

18     A.  Company called PennyMac.

19     Q.  How long have you worked for PennyMac?

20     A.  Almost two years.

21     Q.  And prior to PennyMac, for whom did you work?

22     A.  I worked with Fannie Mae.

23     Q.  How long did you work for Fannie Mae?

24     A.  For 22 years.

25     Q.  Where did you live, Mr. Battany, when you worked for Fannie

DAITBAN2                        Battany - direct

1    Mae?

2    A.  I lived in Pasadena, California.

3    Q.  Is that where you still live?

4    A.  Yes.

5    Q.  Who do you live with?

6    A.  My wife and three children.

7    Q.  Do you hold any volunteer positions?

8            MR. CORDARO:  Objection, relevance.

9            THE COURT:  Sustained.

10           MS. MAINIGI:  Your Honor, background.

11           THE COURT:  Well, this is not background, this is some

12   position he currently holds as a volunteer.  I really don't see

13   how that's relevant.  Sustained.

14   Q.  Mr. Battany, please remind the jury what Fannie Mae does.

15   A.  Fannie Mae is a government sponsored enterprise.  Fannie

16   Mae's objective is to buy mortgage loans from mortgage lenders

17   and help lenders have liquidity to provide more funds to

18   continue lending to borrowers to buy homes and refinance homes.

19   Q.  How does Fannie Mae make money?

20   A.  Fannie Mae charges what is called a guarantee fee, which is

21   an amount paid to Fannie Mae on every loan that they buy, and

22   it serves like an insurance premium to help Fannie Mae earn

23   income to cover losses when borrowers default on the loans that

24   Fannie Mae purchases.

25   Q.  How does Fannie Mae decide how much to charge for its fees?

DAITBAN2                        Battany - direct

1    A.  Fannie Mae looks at each loan individually and creates an

2    individual price for each loan based on the expected losses of

3    any given loan, and then rolls up to an average price it

4    charges to each lender when they deliver the loan to Fannie

5    Mae.

6    Q.  Now Mr. Battany, you were at Fannie Mae for 22 years, is

7    that right?

8    A.  Yes, that's correct.

9    Q.  Could you briefly review for us the various positions that

10   you held while you were at Fannie Mae?

11   A.  My first position in 1990 was called sales representative,

12   and that is a position on an account team.  An account team is

13   a group of people at Fannie Mae who have the customer-facing

14   relationship.  They would be the primary point of the contact

15   for a customer on any issues they had with Fannie Mae.  So

16   sales rep was the most junior position on the team.

17   Q.  And your next position?

18   A.  I was later -- my first position was marketing services

19   rep, my second position was sales rep, which was the same

20   position just a more senior level.

21        After that, my next position was negotiator, which was

22   a more senior level position, a promotion.  And a negotiator is

23   involved with negotiating what the lender the terms of their

24   contracts and the pricing for those contracts with the lender.

25   Q.  And your next position?

DAITBAN2                    Battany - direct

1   A.  After that I was promoted to a customer account manager.

2   This is a person who has overall responsibility as the point

3   person between lender and Fannie Mae.

4   Q.  And the lender being an entity like Countrywide?

5   A.  Yes.

6   Q.  And your next position?

7   A.  My next position was director, and director manages the

8   teams of people who are the account teams in the roles I just

9   mentioned before.

10  Q.  Now Mr. Battany, were you in something called the western

11  business center?

12  A.  Yes, that is the Fannie Mae office located in Pasadena,

13  California.

14  Q.  At your time while you were at Fannie Mae, did you have

15  occasion to have interaction with Countrywide?

16  A.  Yes, I managed Fannie Mae's Countrywide relationship from

17  the early 2000s, around 2001 to the middle of 2008.

18  Q.  And what does that mean that you managed the Countrywide

19  relationship?

20  A.  So Countrywide was one of Fannie Mae's largest customers,

21  so Fannie Mae had an account team dedicated solely to

22  Countrywide, and my responsibility was to manage that account

23  team.  So Countrywide was my only customer responsibility at

24  that point in time.

25  Q.  So you spent all of your time on the Countrywide account?

DAITBAN2                    Battany - direct

```
 1   A.   100 percent was on Countrywide, yes.

 2   Q.   Now why did you ultimately leave the account?

 3   A.   Fannie Mae has a tradition of rotating their account teams

 4   to different lender groups.  So in my career at Fannie Mae I

 5   covered small accounts, medium accounts, large accounts, and

 6   also different segments.  So every few years myself and the

 7   different customer teams are rotated to different types of

 8   accounts to give us a diverse background to different Fannie

 9   Mae customers.

10   Q.   And just to confirm, you were head of the Countrywide

11   account from what year to what year, Mr. Battany?

12   A.   Probably starting in 2001 or 2002 up through 2008.

13   Q.   As it relates to Countrywide, at a higher level what did

14   your responsibilities include?

15             MR. CORDARO:  Objection.

16             THE COURT:  Ground?

17             MR. CORDARO:  "High level" is vague, calls for

18   narrative.

19             MS. MAINIGI:  I can take out "high level," your Honor.

20             THE COURT:  OK.

21   Q.   Mr. Battany, what were your responsibilities with respect

22   to the --

23   A.   I was responsible for making sure the pricing for

24   Countrywide's loans matched the risk of the loans and for

25   monitoring and measuring the risk of loan deliveries from
```

1    Countrywide to Fannie Mae, as well as being the manager of the

2    account team, being the supervisory role for all of the account

3    team members who faced off with Countrywide.

4    Q.  Did you have a role with the negotiation of contracts?

5    A.  Yes, I was the primary lead person for all contract

6    negotiations with Countrywide.

7    Q.  Would you call yourself the relationship lead for the

8    Countrywide account?

9    A.  Yes, that would be accurate.

10   Q.  Now with respect to the account team associated with the

11   Countrywide account that reported in to you, how many people

12   served on that account team?

13   A.  We had what we called the standard account team, which

14   might be around ten people or so, eight to ten.  And there was

15   called an extended account team, which may include people that

16   weren't directly involved with Countrywide but were very

17   involved with Countrywide, and that would be people throughout

18   the company, and that might be an additional eight or ten

19   people at different points in time.

20   Q.  Mr. Battany, how did your role relate to the role that

21   Mr. Sobczak held within Fannie Mae?

22   A.  Mr. Sobczak was also a director, so he was a peer

23   equivalent in terms of our titles.  His role and background was

24   focused more on underwriting, and he was more an expert on loan

25   level risk.  And my role and background was pricing risk from a

DAITBAN2                     Battany - direct

1   pricing modeling perspective and from a contract negotiation

2   perspective.  So we worked together on the team, and he was a

3   colleague who I worked with on managing the overall

4   relationship.

5   Q.  During the time you were the relationship lead, were you

6   involved in all contract negotiations?

7   A.  Yes.

8   Q.  Did you have a role in deciding whether to continue to

9   contract with Countrywide?

10  A.  Yes.

11  Q.  Did you have a role in deciding what types of loans to

12  purchase from Countrywide?

13  A.  Yes.

14  Q.  Did you have a role in setting the price for such loans?

15  A.  Yes.

16  Q.  Did you have a role in negotiating variances?

17  A.  Yes.

18  Q.  Tell us what a variance is, please.

19  A.  Fannie Mae has what's called a selling guide which

20  describes -- it's a three-inch binder, and it describes all of

21  the requirements a lender must meet for a loan to be eligible

22  for sale to Fannie Mae.  So those are the basic guidelines that

23  any Fannie Mae approved lender would use.  So Fannie Mae, on

24  top of that, would negotiate with lenders to do things that are

25  beyond what the guide would allow, and those are called

variances to the guide.  So if a lender wanted to do a special

loan program that was not allowed under the regular guide, the

lender would have to negotiate with Fannie Mae for a variance

to allow a certain feature or program to be delivered to Fannie

Mae.

Q.  With respect to the different contracting documents, you

indicated that there was a set of guidelines, is that right?

A.  That's correct.

Q.  That's part of the contract?

A.  Yes.

Q.  And variances, are they also part of the contract?

A.  Yes, that's correct.

Q.  Is there anything else that makes up the contract?

A.  So the contractual agreements between Fannie Mae and a

lender would include a base agreement, which is sometimes

called an MSSC, which is an agreement every lender signs when

they're first approved by Fannie Mae.  It's a one-time only

document, just a standard document that every lender signs and

contains the basic terms that an approved lender is required to

abide by.

     There is another document called the selling guide,

and every lender is required to meet all the terms of the

selling guide, and larger lenders -- most medium and large

lenders had what is called a master contract which would give a

lender additional terms for additional eligibility beyond the

DAITBAN2                        Battany - direct

```
 1   selling guide, and those master contracts would contain a list
 2   of variances.  So a lender would have -- in most interactions
 3   would have the variances with the master contract as well as
 4   the standard selling guide as the most applicable documents
 5   that we use in our daily discussions with lenders.
 6   Q.  Did you have a term for collectively referring to these
 7   documents?
 8   A.  Sometimes we refer to them as just the contracts or
 9   sometimes as the master or the typical -- was a loan eligible
10   for the contracts or the eligible for the master was a typical
11   way we describes these in our internal discussions as well as
12   our discussions with customers.
13   Q.  Did the master contain all of Countrywide's obligations to
14   Fannie Mae?
15             MR. CORDARO:  Objection.
16             THE COURT:  Ground?
17             MR. CORDARO:  Leading.
18             THE COURT:  Sustained.
19   Q.  As relationship lead, did you consult these contracts on a
20   regular basis?
21   A.  Yes, we would internally, also with Countrywide discuss the
22   contracts --
23             MR. CORDARO:  Objection, your Honor, narrative.
24             THE COURT:  Yeah, the answer was yes.  Put another
25   question.
```

1    Q.  Can you describe when you would be consulting these various

2    contracts?

3    A.  We would review and consult the contracts probably on a

4    weekly basis.  The account team would be very consistently

5    engaged with Countrywide as they had questions or issues

6    related to anything within the Countrywide contract.  The

7    Countrywide contract itself was a very large itself on --

8              MR. CORDARO:  Objection, your Honor.

9              THE COURT:  Just confine yourself to answering the

10   questions, please.

11   Q.  Were there obligations beyond the contracts that

12   Countrywide had?

13             MR. CORDARO:  Objection.  Foundation, hearsay.

14             THE COURT:  Sustained.  Also may possibly, depending

15   how it was meant, may call for a legal conclusion.

16             Why don't you rephrase.

17   Q.  Actually let me go somewhere else first.

18             Mr. Battany, in the 2007/2008 time period, did Fannie

19   Mae operate on a rep and warrant model?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  Rep and warrant stands for representation and warranties.

23   And that was Fannie Mae's basic business model, which meant

24   that any lender delivering loans to Fannie Mae had to represent

25   to Fannie Mae that the loans they delivered complied with the

1   terms of the selling guide or any master contracts.  Any loans

2   that did not meet those terms, the lender had a warranty to

3   either repurchase the loans back from Fannie Mae or to provide

4   Fannie Mae with indemnification or recourse, meaning if the

5   loan did default, the lender would have to pay to Fannie Mae

6   the costs or losses that Fannie Mae suffered on that loan.

7   Q.  As the relationship lead, were you familiar with the rep

8   and warrant process?

9   A.  Yes, it was the foundation of our relationship with all of

10  our customers.

11  Q.  Now as the relationship lead, did you have an understanding

12  as to whether all loans purchased by Fannie would in fact meet

13  the reps and warrants?

14          MR. CORDARO:  Objection, lack of foundation.

15          THE COURT:  And I don't see what his understanding

16  would be relevant to in any event.  Sustained.

17  Q.  Did Fannie Mae monitor whether loans it bought complied

18  with the reps and warrants?

19          MR. CORDARO:  Objection, lack of foundation and

20  hearsay.

21          THE COURT:  Well, I can't rule on the hearsay part of

22  the objection until I hear what, if any, foundation there is.

23  So if you want to try to lay a foundation, you may do so.

24  Q.  Were you involved in the -- well, you indicated you were

25  involved with the rep and warrant process, is that correct,

1    Mr. Battany?

2    A.  Yes, that's correct.

3    Q.  Were you aware of the compliance associated with the rep

4    and warrant process?

5    A.  Yes.

6    Q.  What did that compliance entail?

7            MR. CORDARO:  Objection.

8            THE COURT:  Were you personally involved in the

9    compliance?

10            THE WITNESS:  Yes.

11            THE COURT:  In what respect?

12            THE WITNESS:  The monitoring of the lender's quality,

13    and how their defect rate, in terms of meeting our requirement,

14    was is a key element of --

15            THE COURT:  No, my question is:  What was your

16    personal involvement in the compliance process?

17            THE WITNESS:  I would review the results of the

18    compliance reviews, and that would be a key element in the both

19    the pricing decisions I would make as well as the credit

20    eligible decisions I would make on what we would buy from

21    Countrywide.

22            THE COURT:  All right.  I think that is sufficient to

23    allow the question to which there was an objection which is now

24    overruled.  The question was:  What did that compliance entail?

25            Do you want to put the question again?

DAITBAN2                          Battany - direct

1              MS. MAINIGI:  Sure, your Honor.

2    BY MS. MAINIGI:

3    Q.  Mr. Battany, what did the compliance in relation to --

4    well, strike that.

5              How did Fannie Mae monitor compliance with the rep and

6    warrant process?

7              MR. CORDARO:  Objection, your Honor.  Again, vague as

8    to who the lender is, and relevance as well.

9    Q.  As it relates to Countrywide, Mr. Bentley.

10             THE COURT:  I'm afraid, with apologies to the jury, we

11   need a side bar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DAITBAN2                    Battany - direct

1          (At side bar)

2          THE COURT:  So it's the last part of what counsel

3    raises an objection that I'm having problems with.  What's the

4    relevance?

5          MS. MAINIGI:  Sorry, your Honor?

6          THE COURT:  What's the relevance?

7          MS. MAINIGI:  Well, compliance with the rep and

8    warrant process gives Fannie information on the disclosures.

9    Part of this case is what are the disclosures, as you pointed

10   out, the half truths, the disclosures, the omissions that have

11   been made to Fannie as part of this process, that is directly

12   relevant.

13         THE COURT:  So with respect to any of the alleged

14   misrepresentations that were made in this case, does he have

15   any personal knowledge?

16         MS. MAINIGI:  With respect to -- well, he's involved

17   directly in the purchasing decisions, your Honor.

18         THE COURT:  I understand, but I'm still not -- I don't

19   understand what element of the cause of action his testimony is

20   relevant to.

21         MS. MAINIGI:  He was --

22         THE COURT:  If there was a misrepresentation to Fannie

23   Mae and he knew it was a misrepresentation, of course that

24   would be relevant, then they wouldn't have been defrauded.  I

25   can conceive perhaps his testimony would go to materiality if,

1     for example, he were to testify that they didn't give a damn

2     whether an appraiser was certified or not, something like that.

3            MS. MAINIGI:  That certainly is a significant part of

4     this.

5            THE COURT:  But right now all we're getting is some

6     very general stuff about their compliance or lack of compliance

7     processes, which I don't think are relevant to any issue in

8     this case in any direct sense.

9            MS. MAINIGI:  They're relevant, your Honor, to

10    establish the baseline as to how information was provided back

11    and forth between the two entities.

12           THE COURT:  So what?  How you tie that to the claims

13    in this case?

14           MS. MAINIGI:  To the extent that Fannie Mae knows what

15    is going on with these loans, number one, or doesn't care if it

16    had known, that's relevant to this case.

17           THE COURT:  So as to, first of all, to the extent that

18    it knows what's going on, does he have any personal knowledge

19    with respect to any of the misrepresentations that are alleged

20    in this case?  Otherwise he's just giving hearsay.  With

21    respect to doesn't care, how can he speak for Fannie Mae and

22    Freddie Mac?

23           MS. MAINIGI:  He doesn't speak for Fannie Mae and

24    Freddie Mac, and the types of questions that we're prepared to

25    ask him are exactly the types of questions that both sides were

 1    allowed to ask during all the other GSE depositions that took

 2    place during the government's case.  For example, questions to

 3    the effect of -- questions to the effect of if you knew X,

 4    would that have affected your purchasing decision.

 5            THE COURT:  Well, that's not a question you put to

 6    him.

 7            MS. MAINIGI:  Correct, not yet.

 8            THE COURT:  So I'm only dealing with the questions

 9    that are before me now, none of which seem to me to be

10    relevant.  But if we get to the question now, was he the

11    purchaser --

12            MS. MAINIGI:  Yes.

13            THE COURT:  -- on any of the loans that are issue

14    here?

15            MS. MAINIGI:  Yes.

16            THE COURT:  So what could be -- and I want to hear

17    from the government if they have an objection to the question:

18    If you had known that the following fact -- whatever defect you

19    want to refer him to -- if you had known of that defect, would

20    that have affected your purchasing decision?  I think that may

21    be a permissible question.  But it's got to be like that, not

22    all the stuff about compliance and so forth, which again I

23    think is irrelevant, let alone the hearsay, but irrelevant.

24            Now let me find out, since we're at the side bar and

25    the jury doesn't like side bars, if she puts the question if

DAITBAN2                      Battany - direct

1    you had known that -- were you the purchasing agent on loans X,

2    Y and Z?  Yes.  If you had known that they had been deemed

3    defective in the following ways, would that have affected your

4    purchasing decision?  Do you have an objection to that

5    question?

6             MR. CORDARO:  I do, your Honor.

7             THE COURT:  What's the ground?

8             MR. CORDARO:  First of all, I don't think it's been

9    established that he was person with the purchasing decision.

10            THE COURT:  I agree, that's a foundational question.

11   I'm assuming that for the sake of argument.  If he can't

12   establish that, obviously you can't ask the other questions.

13            MS. MAINIGI:  Your Honor, those questions were allowed

14   to be asked all during the government's case.  They did ask

15   them.  Your Honor actually in fact gave the formulation for

16   those questions in the side bar.  I can -- at the break I can

17   point that out to everyone.  But I don't see how in the world

18   there could be any objection to the formulation that your Honor

19   offered and everybody adopted in this case.

20            THE COURT:  I don't know what you're talking about

21   when you say "everyone."

22            MS. MAINIGI:  Both sides used that formulation, your

23   Honor.

24            THE COURT:  But you have to lay the foundation.  There

25   has to be some relevance to the purchasing decision.

 1              So assuming that she can lay that foundation, what's

 2     your objection to the question?

 3              MR. CORDARO:  Well, I think that furthermore --

 4              THE COURT:  OK.

 5              MR. CORDARO:  I'm trying to piece through.  What his

 6     role is in purchasing I think we need some foundation as to

 7     exactly what he was doing with respect to purchasing.

 8              THE COURT:  That doesn't go to the ultimate question.

 9     Right now I'm sustaining the objection to this stuff about

10     compliance, but if you want to get to were you the person who

11     made the purchasing decision or were involved in the purchasing

12     decision of loans X, Y and Z and the answer to that is yes,

13     then you can put your if you had known blah, blah, blah.

14              MS. MAINIGI:  Your Honor, he already testified from

15     '01 to '08 he was the lead purchaser.  It's not as if the

16     High-Speed Swim Lane loans got sold in some separate packet to

17     him, they got sold along with other loans in that same time

18     period and he was the purchaser.

19              MR. CORDARO:  Sorry, your Honor, I don't think it's

20     clear from his testimony.

21              THE COURT:  I don't think it's clear either, but if

22     you want to clarify.

23              MS. MAINIGI:  On rep and warrant, your Honor, the

24     government usually asks a whole litany of questions on the rep

25     and warrant process.  I think that it certainly seems the very

1    least unfair, your Honor, that they have been allowed to ask a

2    series of questions on the rep and warrant process and we can't

3    inquire as to compliance with the rep and warrant process.

4              THE COURT:  I'm sorry, if you're referring to a

5    previous question that I sustained an objection to, the way it

6    was phrased -- it was a formal defect, it wasn't a defect of

7    relevance or the like, it was a formal defect.

8              MS. MAINIGI:  Good, so I can ask --

9              THE COURT:  If you put a proper question, I will

10   overrule any objection.

11             MS. MAINIGI:  I could ask if Fannie monitored -- did

12   Fannie monitor whether loans it bought complied with the reps

13   and warrants?

14             THE COURT:  Well, with each of these, you have to

15   establish, as just did with respect to compliance, but I don't

16   see -- what's the relevance of that?

17             MS. MAINIGI:  The relevance is that that's a critical

18   part of the government's case here.  The government's case is

19   based --

20             THE COURT:  I think you're missing the point.  That's

21   why I sustained the objection partly on calls for a legal

22   conclusion, if you recall.  If there's a legal obligation to

23   meet certain representations and warranties, and Fannie Mae in

24   its methodology of looking into whether a party has met

25   representations and warranties misses something or something

DAITBAN2                         Battany - direct

 1   like that, it's neither here nor there, they have still

 2   breached the representation and warranty.

 3            Now the question that you can ask is if -- again, you

 4   can ask if you had known, if you, the purchaser, had known that

 5   the representation and warranty was breached and was allegedly

 6   breached in the following way, would that have affected your

 7   purchase.  That goes to materiality, and that is why I'm

 8   allowing those questions.

 9            MS. MAINIGI:  OK.

10            MR. CORDARO:  Before I object to something else, I

11   think that on that construction that this goes to Mr. Battany's

12   personal knowledge, he's not speaking to Fannie Mae.  To the

13   extent that counsel asked --

14            THE COURT:  It has to be phrased in terms of "you,"

15   can't be phrased in terms of Fannie Mae.

16            MS. MAINIGI:  The lead purchasing agent.

17            THE COURT:  You'll establish all that.

18            (Continued on next page)

19

20

21

22

23

24

25

1                 (In open court)

2     BY MS. MAINIGI:

3     Q.  Mr. Battany, coming back to your role with respect to

4     purchasing, what was your role with respect to the purchase of

5     loans from Countrywide in the 2007/2008 time period?

6     A.  So I was the primary person that would negotiate the annual

7     contract with Countrywide which would contain the pricing and

8     eligibility of the types of loans that Countrywide could

9     deliver to Fannie Mae on an annual basis.

10    Q.  In that time period did you have a role in setting the

11    price for such loans?

12    A.  Yes.

13    Q.  In that time period, 2007/2008, did you have a role in

14    deciding what type of loans to purchase from Countrywide?

15    A.  Yes.

16    Q.  In that time period of 2007 and 2008, did you have a role

17    in deciding whether to continue to contract with Countrywide?

18    A.  Yes.

19    Q.  Were you involved in all contract negotiations during that

20    time period?

21    A.  Yes.

22    Q.  To the extent any variances were negotiated during that

23    time period, did you have a role in negotiating those

24    variances?

25    A.  My role was the lead on all variance negotiations, yes.

DAITBAN2                          Battany - direct

1   Q.  With respect to the contracts that exist, are you aware of

2   any provisions requiring Countrywide to disclose changes to its

3   loan origination processes?

4              MR. CORDARO:  Objection.

5              THE COURT:  Sustained.

6   Q.  Are you aware of any provisions in the contract requiring

7   Countrywide to notify Fannie about changes to its internal loan

8   origination process?

9              MR. CORDARO:  Objection.

10             THE COURT:  This calls for a legal conclusion,

11  clearly.

12             MS. MAINIGI:  Your Honor, I hesitate to ask for

13  another side bar.  I believe that is a question that has been

14  allowed to be asked before.

15             THE COURT:  Ms. Mairone, I'm not going to revisit it

16  at a side bar.  If at the next break -- I'm sure we're not

17  going to finish this witness before the next break -- you want

18  to ask me to reconsider a ruling on any given matter, you may.

19  But I tried to explain at the side bar the questions that I

20  would permit, and I urge you to go to those questions.

21             I'm sorry, I said Ms. Mairone, I meant Ms. Mainigi.

22  BY MS. MAINIGI:

23  Q.  Let me go ahead --

24             MS. MAINIGI:  May I approach, your Honor?

25             THE COURT:  Yes.

1    Q.  Mr. Battany, please take a look at PX2, which is an

2    admitted exhibit.  Could you identify this document for us,

3    sir?

4    A.  So PX2 is described or often called the MSSC.  It is the

5    base agreement that every lender signs with Fannie Mae when

6    they're first approved.  It's a one-time document that is

7    signed as part of a lender's approval process, and it's not

8    signed again unless something were to change.

9    Q.  Are you familiar with this document as your role as the

10   relationship lead for Countrywide in the '07/'08 time period?

11   A.  Yes.

12   Q.  Please take a look at section 2A2 of the document.  What is

13   this provision, sir?

14          MR. CORDARO:  Objection.

15          MS. MAINIGI:  I'll withdraw it.

16   Q.  Mr. Bentley, could you read that provision out loud,

17   please?

18   A.  Yes, just one moment.

19          2A2 says:  The lender must have qualified staff and

20   adequate facilities.  The lender must at all times have

21   employees who are well trained and qualified to perform the

22   functions required of the lender under this contract.  In

23   addition, the lender must maintain facilities that are adequate

24   to perform its functions under this contract.

25   Q.  What is "qualified staff?"

1              MR. CORDARO:  Objection.

2              THE COURT:  Ground?

3              MR. CORDARO:  Lack of foundation, could call for legal

4    conclusion.

5              THE COURT:  Lay a foundation.

6    Q.  Mr. Bentley, are you familiar with this provision as your

7    role as relationship lead for Countrywide?

8    A.  Yes.

9    Q.  Did you consult this provision of the contract during your

10   time at Fannie Mae?

11   A.  This was not a document that we typically referenced very

12   often.

13   Q.  Do you know whether any contracts that exist define

14   "qualified staff" within the Fannie Mae contracts?

15   A.  I'm not aware of that being required in any of the Fannie

16   Mae contract documents.

17   Q.  Do you know who makes the decision as to whether staff is

18   qualified?

19             MR. CORDARO:  Objection.

20             THE COURT:  Ground?

21             MR. CORDARO:  Again, foundation.

22             THE COURT:  You may answer that question yes or no.

23   Do you know who makes that determination?

24             THE WITNESS:  Yes.

25             THE COURT:  And how do you know that?

DAITBAN2                          Battany - direct

1          THE WITNESS:  Because I know that Fannie Mae does not

2     perform that function.  Fannie Mae does not evaluate lender's

3     employees, training or standards to make a decision whether

4     they are or are not qualified.

5          THE COURT:  Why not?

6          THE WITNESS:  It's beyond the scope of Fannie Mae.

7     Fannie Mae at that time was probably about 6,000 employees.

8     Managing probably the employee's lenders would probably be in

9     the hundred of thousands, so it was beyond the capability of

10    Fannie Mae to have requirements or to review individual lending

11    company employees in terms of was a given employee qualified to

12    do any given task.

13         THE COURT:  So you as the lead purchasing agent would

14    rely on whom to make that determination?

15         THE WITNESS:  We rely upon the lenders to make sure

16    the staff it had doing the various functions had the required

17    training or expertise to allow them to perform the function

18    adequately.

19         THE COURT:  And if they didn't, how would you know

20    that?

21         THE WITNESS:  We would know that through two possible

22    processes.  One is we do an annual on-site review for large

23    lenders, such as Countrywide, where we go in with a team once a

24    year and do a very thorough review of their entire process.  If

25    we identified areas of concern, that would be something we

1    would elevate to the lender and potentially impact our

2    relationship.  And secondly, which is more indirectly, is if we

3    saw a higher defect rate from a customer, we would dive in to

4    finding out what is driving the higher defect rate, which might

5    be due to -- potentially to unqualified staff.

6            THE COURT:  So do I understand that in any given case

7    you might not know one way or the other?

8            THE WITNESS:  I'm not sure if I understand the

9    question.

10           THE COURT:  If in any given case, since you yourself

11   didn't do the evaluation but relied on Countrywide or whoever

12   was selling you the mortgage to do -- to make the evaluation as

13   to who was qualified, in any given case you might or might not

14   know whether the person was qualified.

15           THE WITNESS:  That's correct, we would not know if a

16   person was or was not qualified, no.

17           THE COURT:  Go ahead, counsel.

18   BY MS. MAINIGI:

19   Q.  You mentioned, Mr. Battany, the on-site reviews.  Could you

20   describe that process, please, as it relates to evaluation of

21   the lender?

22   A.  This was an annual process --

23           MR. CORDARO:  Objection.  When you say "the lender,"

24   is it always Countrywide or is it --

25           MS. MAINIGI:  I will stipulate when I ask these

DAITBAN2                          Battany - direct

1   questions it is Countrywide.

2            MR. CORDARO:  Thank you.

3            THE COURT:  Go ahead.  So the question is:  Could you

4   describe the process of on-site reviews as it relates to the

5   evaluation of Countrywide, what in 2007?

6            MS. MAINIGI:  2007/2008, your Honor.

7            THE COURT:  OK.  Go ahead.

8            THE WITNESS:  This would be a process where a large

9   team from Fannie Mae would go on site to Countrywide and

10  effectively try to review all of their processes from

11  origination, servicing, every aspect of how they originated and

12  serviced a mortgage loan.  So the teams would be experienced in

13  underwriting, origination, quality control, servicing, all

14  aspects of the process.  They would be on site, interview

15  Countrywide employees, review policies, procedures, review

16  Countrywide's internal reports, and then come back to Fannie

17  Mae's account team with conclusion on how they viewed

18  Countrywide as a lender in terms of average quality, below

19  average, above average, what areas were their corporate

20  strengths and what areas were their corporate weaknesses.

21  Q.  Did you indicate, Mr. Battany, that the loan origination

22  process would be reviewed during these on-site reviews?

23           MR. CORDARO:  Objection.

24           THE COURT:  Ground?

25           MR. CORDARO:  Leading.

DAITBAN2                         Battany - direct

1          THE COURT:  Well, it is.  I'll allow it.  Then we'll

2    give the jury their mid-morning break.

3          You may answer.

4    A.  Yes, I did mention that the origination process is included

5    in that the review -- is comprehensive and does include that,

6    yes.

7          THE COURT:  All right.  Ladies and gentlemen, we'll

8    take a 15-minute break.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAI3BAN3

1              THE COURT:  The witness should go outside.

2              So just to repeat what was at the side bar, because I

3      do want to adhere to the jurors' request that we minimize side

4      bars.

5              Assuming you can or have already established that he

6      was the person in charge of purchasing the loans that are

7      involved in this case or a meaningful portion of them, then you

8      can put the question as to any given type of defect, if you had

9      known that the person was unqualified to evaluate the loan,

10     would that have affected your purchasing decision.  That goes

11     to materiality, and I'm going to allow those questions.

12             There was a different question which you wanted to

13     put, which I sustained the objection, but you wanted to be

14     heard further on that, Ms. Mainigi.  What did you want to say

15     on that?

16             MS. MAINIGI:  Your Honor, I was just looking in the

17     record for the citations.  I believe the provisions -- during

18     the GSE depositions that occurred in the government's case, I

19     think both sides asked questions --

20             THE COURT:  Depositions?

21             MS. MAINIGI:  The trial testimony that occurred in the

22     government's case, both sides asked questions to the effect of

23     is there an obligation in the contract to do this or does the

24     contract speak to X, Y or Z.  I can find those citations and

25     provide them to you at the end of the break.

DAI3BAN3

1          THE COURT:  My recollection of those, and the contract

2     was in evidence, up on the screen, and they were just simply

3     pointing to a provision.  But if there is something else.  The

4     fact that a question has been asked in a given form with

5     respect to some other witness is only the beginning of the

6     inquiry, because you have to see the entire context and also

7     find out whether there was an objection.  But, there have been

8     dozens of technically objectionable questions asked by both

9     sides during this trial that one side or the other has chosen

10     not to object.  That doesn't create any precedent for anyone.

11     But if I overruled an objection and it is an identical or close

12     to identical situation, of course that's a different story.

13          So, where do you want me to look?

14          MS. MAINIGI:  I will take a look through at the break

15     and give you a citation.

16          THE COURT:  Very good.  I would add that although

17     there have been dozens of objectionable questions to which no

18     objection has been put, I will say I don't think I've ever

19     encountered a trial where there have been so many objections

20     made by both sides.  Which is, of course, the duty and

21     obligation of counsel.  I'm not faulting anyone in that regard.

22     That's perfectly proper.  But, it certainly kept the Court

23     alert.

24          MR. CORDARO:  Excuse me, your Honor.  In the interest

25     of efficiency for the jury, I would just note at this time that

DAI3BAN3

 1    with respect to the questions that your Honor suggested at the

 2    side bar that you would allow, I believe that the foundation

 3    still has not been laid for that yet with respect to

 4    Mr. Battany's knowledge.  The testimony is that he was the lead

 5    negotiator and he similarly had a role in setting --

 6              THE COURT:  I must say, I was surprised when there was

 7    not a follow-up question.  He was asked did you have a role in

 8    this and did you have a role in that, but you never asked him

 9    what his role was.  If his role was, well, I sat in the room,

10    or I was -- take an absurd example -- I was there serving

11    coffee or something like that, then the foundation would not

12    have been laid.  So I think we need to maybe go back and

13    specify what his role is.

14              MS. MAINIGI:  We can do that, your Honor.  I do

15    believe he said several times though he was the lead person on

16    all negotiations which I would think does not involve serving

17    coffee.

18              THE COURT:  That is true, which is why I think you

19    will be able to lay a foundation.  But you had specified more

20    particular aspects that were directly relevant to the objection

21    that's now being raised, but you never brought out what his

22    role was.

23              MS. MAINIGI:  We can do that after the break.

24              MR. CORDARO:  In his deposition, Mr. Battany was asked

25    on page 13 by bank counsel:  Were you the top person in

DAI3BAN3

marketing dealing with the Countrywide account at that time?
And I believe at that time was starting in 2002 when he became
director of marketing.  His answer was:  No, there was another
person that was a vice president who had been the top person in
marketing that would have been primarily responsible for
Countrywide.

          So it is not clear if that answer spans the entire
time period we are looking at here.  Clearly there is somebody
above his head.

          THE COURT:  That of course is fodder for
cross-examination.  If he says the magic words here in court,
the evidence comes in and then you can cross.

          MS. MAINIGI:  I believe my questions have been fairly
restricted to the '07, '08 time period, your Honor, not the '02
time period.

          THE COURT:  Very good.  See you in a few minutes.

          (Recess)

          (In open court; jury not present)

          MR. SMURZYNSKI:  Two quick things.  First, the exhibit
that was conditionally admitted during Mr. Broeksmit's
redirect, DX 2267B, I've consulted with the government, they
have no objection, so I ask it be admitted unconditionally.

          THE COURT:  It will be so received.

          MR. SMURZYNSKI:  Then the second issue, your Honor, is
defendants have a proffer to make with regard to expert witness

DAI3BAN3

1    evidence that they would like to put on.  We understand your

2    Honor's rulings, but we want to be clear about the record.  We

3    understand your Honor has granted in limine number one.  The

4    defendants also sent an October 1st letter to the Court, and

5    that was ruled on by your Honor.  In the course of the Daubert

6    hearing of Mr. Holt --

7         THE COURT:  Wait a minute.  In the motions in limine,

8    you presented papers saying what it was that you wished to put

9    into evidence, and the government, being the moving party, put

10   in first its argument against it and I ruled.

11        So I don't understand what basis there is for making a

12   further proffer at this time.  The ruling was made on the basis

13   of what you and they presented at the time.  Not on the basis

14   of something you now come up with subsequently.

15        MR. SMURZYNSKI:  Your Honor, I would add in the course

16   of the trial we've had evidence come in, that evidence elicited

17   by the government that in the defendant's view has opened the

18   door.  So there is more of a record at this point in time

19   certainly than there was at the time of the motion in limine.

20        THE COURT:  I think the proper way to do this, if you

21   think it is a question of door opening, you can send me a

22   letter.  I'll be here all weekend.  So you can send me a

23   letter, fax it to chambers by 5 o'clock tomorrow.  And if I

24   agree that it changes the situation, you can call these people

25   on Monday.

DAI3BAN3

1           MR. SMURZYNSKI:  If I can have one last item and

2   perhaps you want it to be handled in the same fashion.

3           At the conclusion of the Daubert hearing with regard

4   Mr. Holt, your Honor made a statement about whether Dr. James

5   would be allowed to testify as to certain things.  As to that

6   issue, there was no presentation by defendant, other than what

7   they intended to cross-examine Mr. Holt --

8           THE COURT:  I agree that's still open.

9           MR. SMURZYNSKI:  Your Honor --

10          THE COURT:  That's not a question of proffer.  Do you

11  want to call him or not?

12          MR. SMURZYNSKI:  I would like to call Dr. James.

13          THE COURT:  As we did with other similar situations,

14  you want to get him here and I'll inquire outside the presence

15  of the jury and we'll make a determination.

16          MR. ARMAND:  The only thing, your Honor --

17          THE COURT:  I think it is infinitely superior to a

18  proffer, where I can't ask questions that might be necessary

19  for me to see whether it is relevant or not.  Go ahead.

20          MR. ARMAND:  With regard to Dr. James, he is a

21  causation expert, so I'm not understanding what evidence --

22          THE COURT:  I don't remember the colloquy you're

23  referring to, but maybe you can point me to that.

24          MR. SMURZYNSKI:  Certainly the evidence that Dr. James

25  would present, and it is from his expert report, paragraph 79

DAI3BAN3

1    and Exhibit 25, is that the Hustle loans identified by Mr. Holt

2    as materially defective did not have a higher probability of

3    becoming delinquent than the non-Hustle loans.

4         THE COURT:  I have ruled on that.  I don't think there

5    is anything left open on that.

6         MS. MAINIGI:  On the other point, transcript pages

7    1297, 1298 and 1299.

8         THE COURT:  Let me get my law clerk to pull those for

9    me.

10        MS. MAINIGI:  We have copies right here.  I have my

11   copy right here, your Honor, if you don't mind the handwriting

12   on it.

13        THE COURT:  No, that's fine.  So the first question

14   that you've circled is your question on cross.  These are all

15   defense questions on cross.

16   "Q.  The contract, Mr. Tanabe, does not dictate to the lenders

17   exactly how they need to process loans, correct?"

18   "Ms. London:  Objection.

19   "The Court:  Ground?

20   "Ms. London:  "Exactly how," your Honor."

21        So that was an objection to form which I overruled.

22   It has nothing to do with the issue that's being raised now.

23   The next question you've circled is:

24   "Q.  Different lenders may have different processes that still

25   utilize all of these steps, correct?

DAI3BAN3

1    "Ms. London:  Objection.

2    "Q.  Is that correct?

3    "The Court:  No, there is an objection.  It is awfully vague

4    but I will allow the answer to stand."

5              MS. MAINIGI:  I think there are a couple more --

6              THE COURT:  This has nothing to do with the issue

7    you've been discussing.

8              MS. MAINIGI:  There are several questions on that

9    page, your Honor.

10             THE COURT:  I'll keep going.

11             MS. MAINIGI:  There are a lot of things circled on

12   that page, but the questions I'm specifically referencing are

13   those that involve questioning the witness as to whether they

14   are aware of any provision of the contract speaking to a

15   particular issue.

16             THE COURT:  "Q.  The contract didn't dictate what

17   level of training is needed by the person performing any

18   underwriting steps, correct?"  No objection.

19   "A.  Correct."

20             There is nothing to rule on.  It was your question,

21   they didn't object.  That didn't mean they opened the door for

22   you asking that question forever.  They just didn't object to

23   that question.  That's true of all of the rest of the questions

24   here.  So, it is apples and oranges.

25             MS. MAINIGI:  Okay.

DAI3BAN3

```
1              THE COURT:  Or asparagus and broccoli.

2              MS. MAINIGI:  We definitely believe we ought to be

3    entitled to ask those questions, your Honor.  But obviously if

4    you rule otherwise, that's fine.

5              THE COURT:  Where they objected, it was objections on

6    vagueness grounds.  I overruled that.  I didn't have to reach

7    the question of whether it called for a legal conclusion.  In

8    other questions you asked, they didn't object at all so I

9    didn't have to reach that question.

10             But now, they've raised it.  And so, together with

11   other objections I didn't rule on before.  So, no door was

12   opened.  Let me hand back --

13             MS. MAINIGI:  I'll take that.

14             THE COURT:  Let's bring in the jury and let's get the

15   witness back on the stand.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25
```

 1              (Jury present)

 2              THE COURT:  Counsel.

 3              MS. MAINIGI:  Thank you.

 4    BY MS. MAINIGI:

 5    Q.  Mr. Battany, coming back to your role as contracting in the

 6    2007, 2008 time period, could you describe your role in the

 7    contracting and purchasing process as it relates to

 8    Countrywide?

 9    A.  I was the lead person for all contract negotiation, so I

10    would be the starting point when either Countrywide would have

11    a request to Fannie Mae, or Fannie Mae would have a request to

12    Countrywide.  So, my activity and my role was to discuss the

13    issue, to then bring in different experts within Fannie Mae

14    that would have more expertise in any particular area, whether

15    it was, for example, servicing or credit, and then formulate

16    the Fannie Mae response to the request from Countrywide.  Or

17    present and continue to pursue a Fannie Mae request, if we had

18    an issue that we were trying to negotiate with Countrywide that

19    we had initiated.

20    Q.  Did you provide advice as to whether particular contract

21    provisions should be entered?

22    A.  Yes.  My -- one of my primary functions was every year we

23    would renew the Countrywide contract.  This was a very key

24    point for Fannie Mae.  It was an annual process.  There was a

25    point in time when Fannie Mae reassessed its overall

DAI3BAN3                     Battany - direct

1   relationship with Countrywide.  We reassessed pricing and the

2   terms.

3         MR. CORDARO:  Objection, your Honor.  It is

4   non-responsive.

5         THE COURT:  Sustained.

6   Q.  Did you let me ask the question again, Mr. Battany.  Did

7   you provide advice as to whether -- let me back up.

8         Did you provide advice as to whether Fannie Mae should

9   purchase loans from Countrywide in the '07, '08 time period?

10  A.  Yes.

11  Q.  Did you make recommendations as to whether Fannie Mae

12  should purchase loans from Countrywide in the '07, '08 time

13  period?

14  A.  Yes.

15  Q.  With respect to contracting, did you provide advice as to

16  various provisions of the contracts that were being entered in

17  the '07, '08 time period?

18  A.  Yes.

19  Q.  Did you provide advice and recommendations as to whether

20  variances should be entered with Countrywide in that time

21  period?

22  A.  Yes.

23  Q.  Did you provide advice and recommendation as to whether

24  variances should be maintained during that time period?

25  A.  Yes.

DAI3BAN3                    Battany - direct

1   Q.  Did you provide advice and recommendations as to the price

2   to charge for the loans that were being purchased?

3   A.  Yes.

4   Q.  For avoidance of doubt, did you have a role in deciding

5   what types of loans to purchase from Countrywide?

6   A.  Yes.

7   Q.  Could you explain that, please.

8   A.  We would look --

9   Q.  And just by explain that, I mean what was your role, sir?

10  A.  So my role was to review the loans we already bought from

11  Countrywide and consider any new requests for new loans from

12  Countrywide, and make a recommendation internally based on the

13  credit risk, and what other benefits might bring to Fannie Mae

14  in terms of revenue or profitability to Fannie Mae.

15  Q.  With respect to your role in setting the price for such

16  loans, could you describe briefly what your role was.

17  A.  My role was to review monthly reports that Fannie Mae

18  produces that show their credit modeling, reports that show the

19  risk of the loans coming in each month relative to the price

20  Fannie Mae charged, to determine if Fannie Mae was charging the

21  right price for the risk.  So my role was to review those

22  reports every month and then make changes to our strategy based

23  on the trends in those reports.

24  Q.  Were you in the position to make the recommendation to not

25  purchase loans any longer from Countrywide?

1   A.  Yes.

2   Q.  Do you know what CLUES is, Mr. Battany?

3   A.  Yes.

4   Q.  What is it?

5   A.  CLUES is Countrywide's proprietary automated underwriting

6   system.  It is basically an electronic system that makes a

7   decision to approve or not approve a loan.

8   Q.  Do you know what a CLUES accept is?

9   A.  So CLUES accept is a loan that's been submitted through the

10  CLUES system and received an approved finding from CLUES, which

11  means that is a loan that can be funded and closed with the

12  borrower.

13  Q.  Did Countrywide have a contractual relationship with Fannie

14  to utilize CLUES?

15  A.  Yes, we provided Countrywide with a special variance that

16  allowed Countrywide to deliver loans to Fannie Mae that had a

17  CLUES approval -- a CLUES accept rating.

18  Q.  What is Desktop Underwriter?

19  A.  Desktop Underwriter is sometimes called DU.  That is Fannie

20  Mae's version of Fannie Mae's proprietary automated

21  underwriting system.  It is similar to CLUES.  The only

22  difference is Fannie Mae maintains and owns the system, whereas

23  Countrywide owns and maintains the CLUES system.

24  Q.  Could you explain the variance in relation to DU, please?

25          MR. CORDARO:  Objection, your Honor.  It is vague and

1    best evidence with respect to the variance.  Also foundation.

2              THE COURT:  Sustained.

3    Q.  Are you aware of whether any due diligence was done in

4    relation to the variance that was granted to Countrywide for

5    CLUES?

6              MR. CORDARO:  Objection.  Relevance.  Foundation.

7              THE COURT:  Sustained.

8    Q.  Mr. Battany, if you had known that a loan origination

9    process at Countrywide used loan processors to clear to close

10   loans that were CLUES accept loans, would that have affected

11   your purchasing decision?

12             MR. CORDARO:  Objection, your Honor.

13             THE COURT:  Ground?

14             MR. CORDARO:  Decision, lack of foundation.  And

15   "your" is vague.

16             MS. MAINIGI:  I didn't hear the last --

17             MR. CORDARO:  "Your" is vague in this context.

18   Basically lack of foundation on the phrase "purchasing

19   decision."

20             THE COURT:  I think that the questions that are about

21   to follow will all be about the purchasing decisions made in

22   2007 and 2008, yes, counsel?

23             MS. MAINIGI:  Yes, your Honor.

24             THE COURT:  Will relate to purchasing of loans sold by

25   Countrywide.  So you should take all the questions as being in

DAI3BAN3                         Battany - direct

 1    that context, yes?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Just so I'm totally clear on this, you

 4    were in charge of purchasing during that period?

 5              THE WITNESS:  I was in charge of the entire

 6    Countrywide relationship.  But the most important aspect was

 7    what loans we purchased under what terms and what price.

 8              THE COURT:  That's interesting, but that's not my

 9    question.

10              My question is, if a mortgage or a pool of mortgages

11    or a group of mortgages was offered by Countrywide to your

12    organization at this time, who made the decision yes, we will

13    purchase, or no, we will not purchase?

14              THE WITNESS:  Depending on the type, certain decisions

15    were within my authority.  Certain decisions I can make with

16    other individuals' concurrence.  So it would depend on the

17    volume and the size and the nature of the risks.

18              THE COURT:  Okay.  Which were the ones you could make

19    on your own authority and which did you have to do in tandem

20    with others?

21              THE WITNESS:  If loans conformed to the Fannie Mae

22    guides or within certain preset variances, that was within my

23    authority.  If loans were outside those terms, then they have

24    different levels of sign off required to make the approval

25    decision.  So it would typically be people in our credit policy

1    department.  So in that case, my role would be to write a

2    proposal, but then they would make the decision or it would

3    concur with my recommendation or not.

4              THE COURT:  With respect to the loans that were within

5    your authority, as you've just explained it, if you knew that

6    the persons who were processing these loans and evaluating

7    these loans at the Countrywide end were loan processors as

8    opposed to underwriters, would that have affected your decision

9    whether or not to purchase?

10             Is that the question, counsel?

11             MS. MAINIGI:  Yes, your Honor.

12             THE WITNESS:  It would not.  That was pretty typical

13   and common in the industry, and actually Fannie Mae expected

14   that --

15             THE COURT:  No.  I just need yes or no answers.

16             THE WITNESS:  No, it would not affect it.

17             THE COURT:  Go ahead.

18             MS. MAINIGI:  Thank you.

19   Q.  Why would it have not affected your purchasing decision,

20   Mr. Battany?

21   A.  Using processors to operate either CLUES or DU was common

22   in the industry.  And Fannie Mae was aware of it, as I recall

23   bringing this to Fannie Mae's attention.  And it was understood

24   by Fannie Mae that automated underwriting systems like DU would

25   potentially eliminate lenders' needs to have human

```
 1   underwriters, and Fannie Mae viewed this as an intentional --
 2             THE COURT:  No.
 3             MS. MAINIGI:  I'll pose another question.
 4             THE COURT:  All these questions are directed at you.
 5   Why in your role as purchasing agent it would have been
 6   important to you or would not have been important to you.  Not
 7   some abstract about Fannie Mae or the market or anything.  So
 8   just confine it to your personal knowledge.
 9             THE WITNESS:  Thanks.
10             THE COURT:  Go ahead, counsel.
11   Q.  You mentioned, Mr. Battany, conforming to Fannie Mae
12   guides.  Did CLUES accept loans conform or not conform to
13   Fannie Mae guides?
14             MR. CORDARO:  Objection.
15             THE COURT:  I'll allow that.
16             THE WITNESS:  I'm sorry, should I answer?
17             THE COURT:  Yes.
18   A.  CLUES loans did conform.  Fannie Mae approved a special
19   variance for Countrywide to allow CLUES loans to be delivered
20   to Fannie Mae.
21   Q.  Now let me ask you about CLUES accept loans.  Were CLUES
22   accept loans conforming to Fannie Mae's guides or not?
23             MR. CORDARO:  Objection.
24   A.  Yes.
25             THE COURT:  Overruled.  He answered it "yes."
```

1    Q.   Why is that, Mr. Battany?

2    A.   The variance to Countrywide amended Fannie Mae's guides.

3    So when Fannie Mae thinks or --

4            MR. CORDARO:  Objection, your Honor.  Again we're into

5    Fannie Mae and outside the witness's personal knowledge.

6    Q.   Mr. Battany, if you could speak just based on your own --

7    A.   From my experience, my perspective managing Countrywide,

8    the loans were eligible per our contracts which are defined as

9    the Fannie Mae selling guide plus any variances that were

10   approved for Countrywide.

11   Q.   In the 2007, 2008 time period, as the purchasing agent,

12   would you have approved for purchase from Countrywide any loan

13   that was a CLUES accept loan, provided that conditions were

14   cleared on that loan?

15           MR. CORDARO:  Objection.

16           THE COURT:  I'll allow it.

17   A.   Yes.

18   Q.   Why?

19   A.   If the conditions were cleared, then Fannie Mae viewed that

20   to be equivalent --

21           MR. CORDARO:  Objection, your Honor.

22           THE COURT:  We've got to remember.  The rules of

23   evidence distinguish between what you know or would have done

24   on your personal knowledge as opposed to what some abstract

25   entity might have or might not have done.

1          So why don't we start again.  The question was, in the

2     2007, 2008 time period, as the purchasing agent, would you have

3     approved for purchase from Countrywide any loan that was a

4     CLUES accept loan, provided that conditions were cleared on

5     that loan?  And the answer you gave was yes.  And then the

6     question was why?

7          The question is why would you have approved for

8     purchase from Countrywide a loan in those circumstances?

9          THE WITNESS:  I would have approved it because I knew

10    those loans were eligible per the contract negotiated between

11    Fannie Mae and Countrywide.

12    Q.  In the 2007, 2008 time period as the purchasing agent,

13    would you have approved for purchase a CLUES accept loan with a

14    FICO of 688?

15         MR. CORDARO:  Objection.

16         MS. MAINIGI:  Your Honor, I'm going to withdraw that.

17         THE COURT:  Okay.

18    Q.  Do you know what turn time is, Mr. Battany?

19    A.  Yes.

20    Q.  What is it?

21    A.  It is the amount of time it takes for a loan to be closed

22    from the day the borrower first applies until the day it is

23    funded and closed.

24    Q.  In the 2007, 2008 time period, as the purchasing agent,

25    would you have approved the purchase of loans that were derived

DAI3BAN3                    Battany - direct

1    from a loan origination process designed to decrease turn time?

2              MR. CORDARO:  Objection.

3              THE COURT:  I know you're going to, for reasons

4    already discussed, have objections to all these.  But for

5    reasons also already discussed at the side bar, the objection

6    is overrule.  You may answer.

7    A.  Yes.  I would have approved those loans.

8    Q.  Why would you have approved those loans, Mr. Battany?

9    A.  I would have viewed that to be a positive for the mortgage

10   industry and for borrowers to have a more efficient process.

11   And I was personally aware that the mortgage loan process has

12   many days in the timeline where loan files just sit, sometimes

13   days or weeks.  And improving the process lowers the cost to

14   the borrower and to the lender.

15             MR. CORDARO:  Objection.

16             THE COURT:  You've more than answered the question.

17   The jury will disregard everything after the first two

18   sentences of the response.

19   Q.  If a lender was using a loan origination process that had

20   an average turn time of 24 days, as the purchasing agent, would

21   you have continued to purchase those loans?

22   A.  Yes.

23   Q.  If a lender was using a loan origination process that had

24   an average turn time of 15 days, as the purchasing agent, would

25   you have continued to purchase those loans?

1              MR. CORDARO:  As the Court noted, I object to this

2    line of questioning.

3              THE COURT:  Yes, you'll have a continuing objection.

4    You may answer.

5    A.  Yes.

6    Q.  If a lender was using a loan origination process that gave

7    processors a bonus based upon reduced turn time, would you have

8    continued to purchase the loans?

9    A.  Yes.

10   Q.  Do you know what funding goals are?

11   A.  Yes.

12   Q.  What are they?

13   A.  These are goals set by lenders, either on a monthly or

14   quarterly basis, to achieve a certain total volume of loan

15   fundings.  So it would be a goal set by the division or by an

16   entire company for the people in that division to hit a certain

17   target by month end or quarter end.

18   Q.  Would Countrywide setting funding goals for its employees

19   have affected your purchasing decisions in the 2007, 2008 time

20   period?

21             MR. CORDARO:  Objection.

22             THE COURT:  Overruled.

23   A.  No.

24   Q.  Why not?

25   A.  It was typical in the industry.

DAI3BAN3                        Battany - direct

1   Q.  How did you know that?

2   A.  In my 22 years at Fannie Mae, I've worked with probably

3   every major lender in the western United States, and it was a

4   very typical behavior for mortgage lenders.

5   Q.  Are you familiar with prefunding quality assurance audits?

6   A.  Yes.

7   Q.  What are those?

8   A.  This is a process where a lender, before a loan closes,

9   examines a loan in detail to make sure that no errors have

10  occurred, either by the lender's own internal requirements or

11  the investor's requirements, in which case the investor would

12  be Fannie Mae.

13  Q.  Are prefunding quality assurance audits or processes

14  required by Fannie Mae?

15          MR. CORDARO:  Objection.

16          THE COURT:  Sustained.

17  Q.  Are prefunding quality assurance audit results disclosed to

18  Fannie Mae?

19          MR. CORDARO:  Objection.

20          THE COURT:  As phrased, sustained.

21  A.  They're not disclosed --

22          THE COURT:  No.

23          THE WITNESS:  Sorry, my bad.

24          THE COURT:  I think the question you maybe wanted to

25  put, counsel, just so we can move this along, is in the

 1    witness's experience, were prefunding quality assurance audits

 2    or processes brought to his attention or otherwise disclosed in

 3    the loans and loan situations that he oversaw.

 4              Is that the question you wanted to put?

 5              MS. MAINIGI:  That's a perfectly fine question, your

 6    Honor.

 7              THE COURT:  I'm glad.  What is the answer to that?

 8              THE WITNESS:  They would not be disclosed in the

 9    normal course of business.  But in our annual review, when we

10    look at those one time a year, they would not be something

11    disclosed in the monthly process, those reports typically done

12    on a monthly basis.  We would not see those throughout the

13    year, unless one time as part of our overall annual assessment.

14              THE COURT:  I will accept that answer, but once again

15    I want your personal knowledge.  "We" is not "you."  Just keep

16    it to you.

17              THE WITNESS:  Okay.

18    Q.  Mr. Battany, would the results of those prefunding quality

19    assurance processes affect your purchasing decision as the

20    purchasing agent?

21              MR. CORDARO:  Objection.

22              THE COURT:  I think that's a little too vague.

23              MS. MAINIGI:  I'll narrow it, your Honor.

24    Q.  With respect to Countrywide in the 2007, 2008 time period,

25    would the results of prefunding quality assurance audits have

DAI3BAN3                          Battany - direct

1    affected your decision to purchase or not purchase loans from

2    Countrywide?

3            MR. CORDARO:  Objection.

4            THE COURT:  Overruled.

5    A.  No.

6    Q.  Would your answer be different if the results of the

7    quality assurance audits showed very high error rates?

8    A.  No.

9    Q.  Why is that?

10   A.  I expected in my experience pre -- prefunding audits always

11   had higher error rates, and the reason was the factors they

12   defined as an error, including factors that were not relevant

13   to Fannie Mae.  It might be the lender's own requirements that

14   were not an issue that determined if the loan is eligible for

15   sale to Fannie Mae.

16   Q.  Are you familiar with post funding quality control audits?

17   A.  Yes.

18   Q.  How are you familiar with those?

19   A.  It is required by Fannie Mae in our contracts.

20   Q.  Would the results of post funding quality control audits

21   affect Fannie Mae's decision -- affect your decision as the

22   purchasing agent to purchase or not purchase loans?

23   A.  No.

24   Q.  If you can take a look at DX 73, please, in your binder.

25   Mr. Battany, DX 73 is an admitted exhibit.

1          Do you know whether Fannie Mae reviewed Countrywide's

2    quality control processes?

3    A.   Yes.

4    Q.   In what context?

5    A.   In the context --

6               MR. CORDARO:  Objection, your Honor.

7               THE COURT:  Ground?

8               MR. CORDARO:  Calls for hearsay, foundation.  I'm also

9    going to have an objection to this exhibit, which I may

10   sorrowfully may have to make at the side bar.

11              THE COURT:  I'm going to sustain the objection for now

12   on the grounds of vague.  And we'll see where we go.  I know

13   the jury is itching for us to have a side bar but they'll just

14   have to postpone their anticipation.

15   Q.   With respect to the quality control processes that Fannie

16   Mae reviewed, in what context did it review those processes?

17              MR. CORDARO:  Objection.

18              THE COURT:  How do you know that Fannie Mae reviewed

19   this?

20              THE WITNESS:  As part of the annual overall review of

21   Countrywide, they would look at reports from the QC process.

22              THE COURT:  This wasn't you?

23              THE WITNESS:  No.  Well, the team.  I wasn't on-site

24   doing the review, but the team that did the review would report

25   back their results in a summary format to me.  Sometimes if

1    those reports --

2              THE COURT:  Okay.  That answers my question.

3              So I think you can give me a hint about what the

4    nature of the side bar objection would be.

5              MR. CORDARO:  Yes, your Honor.  Note the date that

6    this exhibit was generated.  And it is also cumulative.  But

7    particularly with respect to this witness, the time span.

8              THE COURT:  Ah.  Okay.  So, at the moment, though,

9    there is no pending question about this exhibit.

10             MS. MAINIGI:  There is not, your Honor.

11             THE COURT:  So put another question.

12   Q.  Do you know what an SUS is, Mr. Battany?

13   A.  Yes.

14   Q.  What is it?

15   A.  It is a Countrywide term for how they defined the most

16   significant defects in their process.  I think it stood for

17   severely or significantly unsatisfactory.  It was a Countrywide

18   term, not a Fannie Mae term.

19   Q.  Were you aware the various points in time in the 2007, 2008

20   time period of Countrywide's SUS rates?

21   A.  Yes.

22   Q.  If you take a look, please, at DX 73.  And in particular, I

23   want to draw your attention to FSL for the fourth quarter of

24   2007, the first quarter of 2008, and the second quarter of

25   2008.  Do you see those numbers?

1    A.  Yes.

2    Q.  What are those numbers?

3              MR. CORDARO:  Objection, your Honor.

4              THE COURT:  Ground?

5              MR. CORDARO:  This runs up against the time period I

6    discussed before, it is also cumulative.  We have had this with

7    many witnesses.

8              THE COURT:  Isn't this in evidence?

9              MS. MAINIGI:  Yes, your Honor.

10             THE COURT:  So, I don't understand the first

11   objection.  And that just goes to weight.  As to the second

12   objection, I agreed it's cumulative, but I'm going to assume

13   that counsel is going to ask like about two or three questions.

14             MS. MAINIGI:  That's correct, your Honor.

15             THE COURT:  I'll allow it.

16             MR. CORDARO:  I do have a very specific objection that

17   I don't think I have gotten out yet.  I'm sorry.  It will be

18   very fast.

19             THE COURT:  Come to the side bar.

20             (Continued on next page)

21

22

23

24

25

1           (At the side bar)

2           MR. CORDARO:  This witness testified previously that

3    he left the Countrywide account in 2008.  This report was

4    generated in 2009 and purports to be some sort of final QC

5    number.  I don't see how he's competent to testify on it if he

6    left the account in 2008.  He couldn't possibly have seen it.

7           THE COURT:  At the moment he was just asked to read

8    it.

9           MR. CORDARO:  No, he was asked what it was.  What is

10   this number.  He wasn't asked to read it.

11          THE COURT:  I see.

12          MS. MAINIGI:  If I may respond, your Honor.  First, he

13   was asked what an SUS was and he knows that from his team at

14   Countrywide.

15          THE COURT:  I don't think there was any objection to

16   that.

17          MS. MAINIGI:  Second of all, the time period

18   referenced here is exactly the time period where he was a

19   purchasing agent.

20          THE COURT:  That's not the point counsel is making.

21   The point counsel is making is this report was generated

22   thereafter for purposes that he's not in a position to comment

23   upon, and therefore he wouldn't be able to say what in the

24   context of this document figure X represents or figure Y

25   represents, because he had been already gone when those figures

1    were generated.  And therefore, he wouldn't know the, if you

2    will, the subtext of what they were supposed to represent in

3    the context of this after-generated document.  That's what I

4    take to be the objection.

5         MS. MAINIGI:  I disagree with that, your Honor,

6    because these numbers were generated at the time.  The report

7    that happened to get used was a report -- the one that --

8         THE COURT:  How do you know that?

9         MS. MAINIGI:  Because, your Honor, for example, the

10   SUS rates for the last quarter of 2007 would have been

11   generated after that quarter.  They wouldn't have been

12   generated in 2009.  It is just this particular document happens

13   to span several quarters.

14        MR. CORDARO:  There has been ample testimony from the

15   bank's cross of the government's witnesses that this document

16   was generated after the audits were completed.  And that's why

17   the numbers were changing.  And the bank brought out that the

18   numbers were going down with this document, as opposed to some

19   of the other text that the government used that showed higher

20   numbers.  There is no doubt this was generated in 2009.  And it

21   was I think purported to be a final finding with respect to QC

22   numbers after all the audits.  That's why it's in 2009.

23        MS. MAINIGI:  Your Honor, I must say that is

24   completely wrong and misleading.  The reports that the

25   government has used were QA reports.  This is a QC report.

1           MR. CORDARO:  That's not true.

2           THE COURT:  Before either of you have a heart attack.

3           MS. MAINIGI:  I can ask him, your Honor, if you want,

4    about the numbers themselves and ask him a continuing line of

5    hypotheticals about the numbers.  I think it's silly to do

6    that.  But I can do it.

7           THE COURT:  This is a big debate over something that

8    has been covered before.

9           MS. MAINIGI:  Not with a GSE witness, your Honor.

10   Going back to your materiality point, this issue has not been

11   covered with a GSE witness.  It has been cover --

12          THE COURT:  I will allow a few questions with this.

13   Of course you can cross on what he knows or doesn't know about

14   this document.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     BY MS. MAINIGI:

3     Q.  Mr. Battany, you indicated earlier you were familiar with

4     SUS rates, correct?

5     A.  Yes.

6     Q.  Looking at the SUS rates for fourth quarter 2007, first

7     quarter 2008, and second quarter 2008 for FSL, Full Spectrum

8     Lending Division, those numbers are 5.4, 9.8, and 4.4 percent

9     respectively, is that right?

10    A.  Yes.

11    Q.  As purchasing agent for the Countrywide account in the

12    2007, 2008 time period, if you had known these SUS numbers,

13    would you have continued to purchase loans from Countrywide?

14              MR. CORDARO:  Objection.

15              THE COURT:  Presumably for the grounds stated at the

16    side bar?

17              MR. CORDARO:  Yes, your Honor.

18              THE COURT:  The objection is overruled.  You may

19    answer.

20    A.  These numbers were consistent with --

21              THE COURT:  Is the answer yes or no?

22              THE WITNESS:  Yes.

23              THE COURT:  Okay.

24    Q.  Why?

25    A.  Because these numbers were consistent with the defect rates

DAI3BAN3                      Battany - direct

1    Fannie Mae experienced --

2              MR. CORDARO:  Objection.  It is not his personal

3    knowledge.

4              THE COURT:  I think it is understood because of the

5    previous question that he's talking about why he would have

6    continued to purchase.

7              MS. MAINIGI:  If I could just ask a clean line of

8    questioning on this very point.

9              THE COURT:  All right.

10             MS. MAINIGI:  I'm worried about the record.

11   Q.  With respect to the SUS rates for fourth quarter --

12             THE COURT:  I don't think you should worry about the

13   record.  It's hopelessly confused.

14             MS. MAINIGI:  How about one question, your Honor?

15             THE COURT:  Go ahead.

16   Q.  With respect to the SUS rates for FSL for the fourth

17   quarter of 2007, first quarter of 2008, and the second quarter

18   of 2008, as purchasing agent, if you had known these SUS rates,

19   would you have continued to purchase loans from Countrywide?

20   A.  Yes.

21             MS. MAINIGI:  I have no further questions, your Honor.

22             THE COURT:  Cross-examination.  I'm sorry.

23             MR. COHEN:  A few questions.

24             THE COURT:  Yes.  Go ahead.

25   DIRECT EXAMINATION

DAI3BAN3                         Battany – direct

1    BY MR. COHEN:

2    Q.   Good afternoon, Mr. Battany.

3    A.   Hello.

4    Q.   My name is Seth Cohen and I represent Rebecca Mairone.

5    A.   Okay.

6    Q.   Mr. Battany, have you ever met Ms. Mairone personally?

7    A.   No, I have not.

8    Q.   Have you ever spoken to Ms. Mairone on the telephone?

9            MR. CORDARO:  Objection.  Relevance.

10           THE COURT:  Overruled.

11   A.   No, I have not.

12   Q.   Have you ever corresponded with Ms. Mairone by e-mail?

13   A.   No.

14   Q.   Have you ever corresponded with Ms. Mairone by any other

15   letter?

16   A.   No.

17   Q.   Have you ever had any meeting where Ms. Mairone was

18   present?

19   A.   Not to my knowledge.

20   Q.   Never met her during any of your annual on-site reviews?

21   A.   Not to my knowledge.

22   Q.   Are you aware of any statement that Ms. Mairone made to

23   Fannie Mae?

24   A.   No.

25           MR. COHEN:  Thank you, no further questions.

DAI3BAN3                    Battany - direct

1           THE COURT:  Cross-examination.

2    CROSS-EXAMINATION

3    BY MR. CORDARO:

4    Q.  Mr. Battany, would you please turn back to DX 73, please.

5           MR. CORDARO:  Ms. Michaud, can we have DX 73 on the

6    screen.  Can you highlight the first three lines on the top of

7    the exhibit, please.

8    Q.  Mr. Battany, do you see it says date as of January 5, 2009,

9    is that correct?

10   A.  Yes.

11   Q.  January 5, 2009, you had already left the Countrywide

12   account, hadn't you?

13   A.  Yes.

14   Q.  You were not working on Countrywide anymore, is that

15   correct?

16   A.  Yes.

17   Q.  You would not have seen this report, isn't that correct?

18   A.  Yes.

19   Q.  You would not have seen these numbers, isn't that correct?

20   A.  Yes.

21   Q.  These numbers could not have influenced any purchasing

22   decision or recommendation that you made with respect to

23   Countrywide, could it?

24           MS. MAINIGI:  Objection.

25           THE COURT:  Overruled.

1    A.  For the numbers after second quarter '08 I would have not

2    seen those numbers.  I would potentially have seen those

3    numbers before that date in a different report, but not this

4    actual report.

5    Q.  Thank you.  Mr. Battany, you held the position of director

6    of marketing in 2007, 2008, is that correct?

7    A.  At that time, the title had changed.  It was often referred

8    to internally as marketing director.  The technical title I

9    think was director of customer engagement or director of single

10   family business.  Internally it was often referred to as

11   marketing director.

12   Q.  Can I call it marketing director for our purposes?

13   A.  Yes.

14   Q.  In that position, did you have occasion to communicate with

15   employees of Countrywide?

16   A.  Yes.

17   Q.  Who did you have occasion to communicate with during 2007,

18   2008?

19   A.  There was a group of about 12 people that were my primary

20   contacts.  But with top two contacts were Greg Togneri or

21   Christian Ingerslev or Isa Backley.

22   Q.  Did you have any understanding of the position that Greg

23   Togneri held at Countrywide?

24   A.  He was responsible for managing GSE relationships, which is

25   defined as the Fannie Mae and Freddie Mac relationship.

DAI3BAN3                          Battany - cross

```
 1   Q.  Do you have any understanding as to the position that
 2   Christian Ingerslev held at Countrywide?
 3   A.  He was senior to Greg.  He was not the primary point
 4   person.  But he was very involved in our business relationship.
 5   Q.  The other name that you mentioned, I'm sorry I forgot it.
 6   A.  Isa Backley.
 7   Q.  Did you have any understanding as to Isa Backley's role at
 8   Countrywide?
 9   A.  She worked with Greg and Christian.  I believe she was
10   subordinate to both of them, but she was also very involved in
11   our business relationship.
12   Q.  During the 2007, 2008 time period, how often would you say
13   you had communications with Messrs. Togneri, Ingerslev, and
14   Ms. Backley?
15   A.  Usually once a day on average.
16   Q.  Some of those communications take place over the telephone?
17   A.  Yes.
18   Q.  Some of those communications take place via e-mail?
19   A.  Yes.
20   Q.  Were any of those communications in person?
21   A.  Yes.
22   Q.  At any time during the 2007, 2008 time period, did any of
23   those three individuals advise you of something called a
24   High-Speed Swim Lane at Countrywide?
25   A.  I do not recall hearing that term until I read about that
```

DAI3BAN3                    Battany – cross

1    regarding this lawsuit well after that time period.

2    Q.  During the 2007, 2008 time period, did any of those three

3    individuals advise you as to something called the Hustle at

4    Countrywide?

5    A.  I had not heard that term either until in the context of

6    this lawsuit.

7    Q.  During that time period, did any of those individuals

8    advise you of anything called the HSSL at Countrywide?

9    A.  I've not heard that either.  Other than reading about it in

10   the paper related to this lawsuit.

11   Q.  Putting aside those three individuals, did anyone at

12   Countrywide advise you of something called the High-Speed Swim

13   Lane, the Hustle, or the HSSL?

14   A.  Not to my recollection.

15   Q.  Did anyone at Countrywide describe to you a loan

16   origination process that was going into effect as a pilot in

17   August of 2007?

18   A.  Not to my recollection.

19   Q.  In your capacity as the marketing director, you became

20   familiar with certain provisions of the mortgage selling and

21   servicing contract, correct?

22   A.  Yes.

23   Q.  I'll refer to that as the MSSC or contract, is that okay?

24   A.  Yes.

25   Q.  You had familiarity with the representations and warranties

DAI3BAN3                    Battany — cross

```
1    in the contract, didn't you?

2    A.  Yes.

3    Q.  The representations and warranties are made by the lender

4    to Fannie Mae, correct?

5    A.  Yes.

6    Q.  Those representations and warranties are a bedrock of the

7    relationship between the lender and Fannie Mae, correct?

8              MS. MAINIGI:  Objection.

9              MR. COHEN:  Objection, your Honor.

10             THE COURT:  Sustained.

11   Q.  Mr. Battany, are the representations and warranties in your

12   experience important to the relationship between Fannie Mae and

13   Countrywide?

14   A.  Yes.

15   Q.  They're important because Fannie Mae could not at the time

16   review every loan that it purchased from Countrywide, correct?

17   A.  Correct.

18   Q.  So it relied on Countrywide for certain things, isn't that

19   correct?

20   A.  Yes.

21   Q.  That reliance appears in the contract as representations

22   and warranties, correct?

23             MS. MAINIGI:  Objection.

24             MR. COHEN:  Objection.

25             THE COURT:  Sustained.
```

1   Q.  Mr. Battany, could you turn to Plaintiff's Exhibit 2 in

2   your binder, please.

3   A.  Is that the same as PX 2?

4   Q.  Yes, it is.  I will ask you to turn to page marked four of

5   22.  It also has 74383 at the bottom.

6           Are you at the page, sir?

7   A.  Yes, I am.

8   Q.  You'll see the top it says sale of mortgages and

9   participation interests lender's warranties.  Do you see that

10  language?

11  A.  Yes.

12  Q.  Were you generally familiar with what lender's warranties

13  meant?

14  A.  Yes.

15  Q.  Based on your understanding, was lender's warranties

16  certain promises that the lender made to Countrywide?

17          MS. MAINIGI:  Objection.

18          THE COURT:  Ground?

19          MS. MAINIGI:  Calls for a legal conclusion, and vague.

20          THE COURT:  Well, actually, I'm going to let the jury

21  go at this point because I see something we'll need to have a

22  side bar on.

23          All right, ladies and gentlemen, we'll give you your

24  lunch break at this time and we'll resume at 2 o'clock.

25          (Jury excused)

```
 1              THE COURT:  I agreed with the objection that it calls

 2    for a legal conclusion.  I'm getting a little concerned about

 3    whether the jury has any question in their mind, and therefore

 4    whether we need to give them an instruction, that warranties

 5    and representations are contractually binding on Countrywide.

 6    Does anyone disagree with that?

 7              MS. MAINIGI:  Your Honor, that's something for the

 8    jury to decide on their own.  We absolutely --

 9              THE COURT:  That's clearly a question of law.  That's

10    why I was going to sustain the objection.

11              MS. MAINIGI:  We would disagree with it.

12              THE COURT:  What is your possible basis for

13    disagreeing with it?

14              MS. MAINIGI:  Your Honor, I think that there has been

15    plenty of evidence that has been offered in this case as to the

16    applicability of those reps and warranties, whether they have

17    any relevance here or not.

18              THE COURT:  No.  That's a different question.  There

19    is of course a question of materiality, which is what I've

20    allowed to ask all these questions to the witnesses.

21              But my point, my question is, is there any doubt in

22    your mind that, as a legal matter, when two parties enter into

23    a contract that provides that one party is making certain

24    representations and warranties to the other, that those are not

25    legally binding?
```

DAI3BAN3

1              MS. MAINIGI:  Your Honor, I think to give the jury an

2     instruction --

3              THE COURT:  Answer my question.

4              MS. MAINIGI:  I'm sorry.  Could I hear it again?

5              THE COURT:  Is there any question in your mind that

6     when two parties enter into a contract, valid on its face, in

7     which one party undertakes to comply with certain

8     representations and warranties, that they are legally obligated

9     to comply with those representations and warranties?

10             MS. MAINIGI:  As a general matter, your Honor, I would

11    think that would be true.  But I would think there would be

12    circumstances --

13             THE COURT:  What are the circumstances that you say

14    are applicable here that are before the jury in any way, shape

15    or form?

16             MS. MAINIGI:  Your Honor, I would have to give that

17    some thought certainly.  But if I may respond --

18             THE COURT:  Was there any request to charge put

19    forward by the bank defendants raising any such issue?

20             MS. MAINIGI:  Your Honor, I will have to check that

21    during the lunch break.

22             My concern with respect to this issue -- or I can

23    check with my colleague right now if you would like.  My

24    concern with this issue is that I don't think the

25    representations and warranties are relevant here.  And I think

DAI3BAN3

```
 1    to charge the jury as to them gives them a relevance that

 2    shouldn't necessarily exist if they are allowed to come to

 3    their own conclusions.

 4              THE COURT:  In what respect do you say they're

 5    irrelevant?

 6              MS. MAINIGI:  Because the reps and warranties apply on

 7    a per loan basis to each loan that is sold.  The reps and

 8    warranties don't speak to any of the issues that are at issue

 9    here.  All of the types of things I was trying to establish

10    with Mr. Battany in terms of the reps and warranties are not

11    affected by the loan origination process, and not affected by

12    loan processors versus underwriters.  They are not affected by

13    a number of different issues that are at the heart of the

14    government's case.

15              I think it would be prejudicial to us and it would

16    place an unfair and undue influence on a representation and

17    warranty that has no basis to really be of relevance in this

18    case.

19              This case is about, as your Honor pointed out, whether

20    in the first instance there was a duty to disclose something.

21    You don't even get to the point where you determine whether

22    there has been a misrepresentation or a half -- a lie, a half

23    truth, or an omission until you determine whether there is a

24    duty to disclose.  And what we've been allowed to establish

25    with other witnesses is that --
```

 1            THE COURT:  By the way, that's not true.  Just to go

 2      back to fraud 101, if you lie to someone affirmatively, or tell

 3      a half truth to someone, affirmatively with an intent to

 4      defraud, you commit fraud regardless of whether there is a duty

 5      to disclose or not.  The duty to disclose issue only arises

 6      when there is fraud by silence.  That has been the law of the

 7      United States, of every jurisdiction in the United States, of

 8      the federal law, of English law, since at least the time of the

 9      Magna Carta.

10            MS. MAINIGI:  With respect to omissions, your Honor,

11      which are I think at the heart of this case, then, the duty to

12      disclose has not been established here, your Honor, in our

13      view.  And so, whether there were any misrepresentations as it

14      relates to rep and warrants, is not relevant in our view.

15            THE COURT:  Then your objection to the question was on

16      relevancy grounds.

17            MS. MAINIGI:  No, my objection to the question was

18      along the same grounds that both parties have objected, which

19      is he's asking a layperson for a legal conclusion.

20            THE COURT:  Yes.  But I don't think you can have it

21      both ways.  If the objection, because the government clearly

22      thinks it is relevant.  So when they've objected to your

23      questions on grounds it calls for a legal conclusion, it's not

24      because they think it's irrelevant.  Therefore the jury would

25      be entitled to a legal instruction what the contract means in

DAI3BAN3

1    this regard.

2          If you are objecting on the grounds that it calls for

3    a legal conclusion, implicit in that is your agreement that the

4    Court should instruct the jury on what the law provides.  If

5    you are objecting on the grounds of relevance, that's a

6    different point.

7          MS. MAINIGI:  Then I will withdraw my legal conclusion

8    objection and put in one on relevance as well as one on the

9    document speaks for itself.  And continue my vague objection.

10   Because --

11         THE COURT:  The document speaks for itself as to what

12   the contract says, it doesn't speak for itself as to whether

13   any part of the contract is binding, which, until your argument

14   about relevance, I thought was like worth a one-sentence

15   instruction to the jury.  "Ladies and gentlemen, when two

16   parties enter into a contract, they both mutually agree to

17   carry out what the contract requires."  Something as simple as

18   that.  Which I am just utterly amazed is driving all this

19   attention.

20         But, if you're saying that the representations and

21   warranties are irrelevant, that's a different question.  I'll

22   hear the government on that.

23         MR. CORDARO:  Your Honor, the representations and

24   warranties are clearly relevant.  I think counsel is conflating

25   the concept of misrepresentation with the concept of omission.

1    The government's position has always been that these

2    representations and warranties are binding, and they go to the

3    quality of the loan, whether the loan is an acceptable

4    investment, whether the loan meets the requirements in the

5    contract and in the selling guides.  And that these --

6              THE COURT:  Actually, I always thought it went to the

7    issue, which is the very issue that this witness is being

8    questioned about, of materiality.  That is to say, the

9    government's theory, as I understand it, is because, as I think

10   everyone agrees, Fannie Mae and Freddie Mac were unable to or

11   chose not to do the underwriting and various other things

12   themselves, those poor institutions saddled with a measly 6,000

13   employees or whatever.  So, they delegated that to the lenders,

14   sort of like delegating -- this is very unfair -- delegating

15   guarding the henhouse to the fox.  But, to make sure they got

16   what they had bargained for, they included representations and

17   warranties.  That was their protection about things they

18   thought were important.  That's the government's argument.

19   There are counterarguments, obviously.  So, that's the

20   relevancy.

21        All I'm concerned with is, to the extent the questions

22   are being put about were these binding on the banks or things

23   like that, where there have been objections of -- now one was

24   withdrawn, but previously objections along the lines of calls

25   for a legal conclusion.  And I agree, it does call for a legal

1   conclusion.  And when something calls for a legal conclusion,

2   then at the request of a party, or even sua sponte if the Court

3   feels that the jury needs to know this, the Court should give a

4   simple instruction.  Which is that, as a matter of law, when

5   two parties enter into a contract, and it includes requirements

6   like the representations and warranties, those are binding.

7   That's different from whether they're material, which of course

8   is very much a contested issue.  Whether compliance with any

9   given representation, warranty mattered.  And that's what this

10  witness is being called by the defense to talk about,

11  presumably.

12          But the jury shouldn't be under any illusion that this

13  is not a binding obligation.  Its relevance is the one I just

14  described.  So, I'm inclined to give that two-sentence

15  instruction to the jury.  But let me hear if there is anything

16  further defense counsel wants to say.

17          MS. MAINIGI:  Yes, your Honor.  Then if your Honor

18  intends to do that, then we request an instruction that

19  accompanies it indicating that there is nothing in the

20  representation and warranties that required disclosure of the

21  HSSL process, which is exactly what the government did actually

22  concede in their summary judgment briefing.  I think it would

23  be severely prejudicial to point out a particular provision to

24  them, tell them that this rep and warrant agreement is binding

25  between the parties, and suggest the relevance in that manner,

DAI3BAN3

 1    not allow us to question this witness or any other --

 2              THE COURT:  What I think would be fair, and maybe the

 3    time to do it is after this witness is finished, so it doesn't

 4    relate specifically to him or his testimony, because it

 5    obviously has had many references elsewhere in the trial, is to

 6    simply say, "Ladies and gentlemen, you've heard something about

 7    representations and warranties.  Before you is the contract

 8    with the documents that contain those.  They are contractually

 9    binding on the parties.  That doesn't mean, however, that as to

10    any given item they pertain.  It doesn't mean as to any given

11    item they're material.  I just want you to know that they're

12    contractually binding."

13              MS. MAINIGI:  We're happy to suggest language to you

14    and think about that language.  It does seem we're fairly close

15    to the charging conference, and that seems like something we

16    could take up --

17              THE COURT:  No.  This is the kind of thing that I

18    don't think should be part of the instructions to the jury, the

19    formal instructions, because then it elevates it to a degree

20    that I would think you would be very concerned with.  And I'm

21    concerned because I don't like to pick out any given issue in

22    the case as opposed to, you know, the overall essential

23    elements and give them an instruction about that issue.

24              What makes much more sense to me is to tell them now

25    the basics of contract law as it applies to representations and

DAI3BAN3

1   warranties.  Both sides or neither side can refer to it in

2   their summations.  It is not a big thing.  To single it out, I

3   am very surprised you would even suggest singling it out in the

4   final instructions to the jury.  But I don't think that's a

5   sensible thing to do any more than I would single out any

6   specific dispute about some particular requirement or

7   obligation.  What I want to give them in the charge is the

8   essential elements.

9          MS. MAINIGI:  Well, with all due respect, your Honor,

10  I think our concern is singling it out even in the context of

11  this particular witness, whether he is on the stand, off the

12  stand, we think it gives undue weight to something that we

13  strongly believe is irrelevant.

14         If your Honor intends to do that, however, we

15  certainly renew our request to be able to ask this witness

16  while he's here whether he is aware of particular provisions in

17  the contract or the selling guides and the reps and warrants

18  that even speak to any of the issues here.  So the confirmation

19  that there is nothing that speaks --

20         THE COURT:  Then I have to give the instruction right

21  after lunch.  So if both sides want to present me with proposed

22  instructions, you can handwrite them and hand them up and I'll

23  look at them at 2 o'clock.

24         MR. HEFTER:  I was going to raise two issues, sort of

25  food for thought for you to digest during the lunch hour in

DAI3BAN3

1    terms of the instruction.  One is with respect to --

2             THE COURT:  I was sort of hoping for chocolate, but

3    all right.

4             MR. HEFTER:  One issue is that consistent with the

5    common law, a contract can be modified by a course of conduct.

6    Which would not be reflected in such charge.  That's one thing

7    to consider.  And two, with respect to the specific

8    representations and warranties in the contract --

9             THE COURT:  First of all, I don't think there has been

10   any real suggestion of that.  I think the real suggestion is,

11   and it may come down to the same testimony, is that it is one

12   of materiality.

13            MR. HEFTER:  That's true, your Honor.  The second

14   thing I wanted you to consider was that in connection with any

15   contract, two parties can dispute the interpretation and

16   meaning of any particular word in --

17            THE COURT:  In which case, I would have to give

18   another legal instruction to the jury, because that's also a

19   matter of law, not a matter of fact.

20            MR. HEFTER:  That's why I was going --

21            THE COURT:  I don't think those are issues.  There is

22   no suggestion, I haven't heard anything from anyone, that

23   Fannie Mae consciously chose to modify the contract in the

24   course of conduct.  When they want to make a modification, they

25   do a variance.  But immateriality is of course something else.

DAI3BAN3

1   They didn't care whether this representation was complied with

2   or not.  That's fair game.  That's what this witness has been

3   testifying about.

4          And as to the interpretation of the particular words

5   in the contract, whether Fannie Mae and Freddie Mac on the one

6   hand and Countrywide on the other hand had different

7   interpretations, I haven't heard a smidgen of testimony about

8   that.  But, if that were a genuine dispute, it would have to be

9   resolved as a matter of law.

10          MR. HEFTER:  Fair enough.  I was going to suggest

11   we'll confer.

12          MS. MAINIGI:  Just one factual overlay, and this is a

13   line of questioning that we would be happy to pose to

14   Mr. Battany.  I think underpinning these reps and warrants is a

15   clear understanding that not -- while the reps and warrants are

16   on a per loan basis, there is an expectation that there are

17   going to be breaches of the reps and warrants.  That is the

18   course of dealing and the course of conduct that exists between

19   the parties.  The parties understand that at some point down

20   the road, some percentage of these loans will breach the

21   representations and warranties.

22          THE COURT:  Of course that's what you've already been

23   questioning about that.  But it is really, again, it is a

24   question of materiality.  That's what makes it relevant to this

25   case.  It is not as if Fannie Mae or Freddie Mac is saying, go

DAI3BAN3

1   ahead, breach the representations and warranties, you have our

2   blessing.  That's not it at all.  It is that they understand

3   that in the give and take of things, in this situation, there

4   will be some defects, some -- just as this witness has already

5   testified, with the Court's permission.  We're not expecting

6   perfection here at Fannie Mae.  And so we're going to approve

7   this anyway, and then there can be cross-examination about,

8   well, would you approve it if this kind of breach or that kind

9   of breach.  This is fair game.  All relates to materiality.

10  That's what it relates to.

11              Okay.  I'll see you at 2 o'clock.

12          (Recess)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DAITBAN4                          Battany – cross

                              AFTERNOON SESSION

 1                              (2:15 p.m.)

 2          (Jury not present)

 3          THE COURT:  So did counsel have something they wanted

 4  to hand up?

 5          MS. MAINIGI:  Yes, your Honor.  In the interest of

 6  time, however, with respect to Mr. Battany, who has to catch a

 7  flight later today, we would withdraw any request we previously

 8  made to try to question him on the issues.

 9          THE COURT:  So we can hold off on that.

10          MS. MAINIGI:  Yes.

11          THE COURT:  I will ask my law clerk to bring the jury

12  in, and let's get the witness on the stand.

13          We're going to go to whenever we finish this witness

14  and probably break for the day.  How much more do you have?

15          MR. CORDARO:  30 to 40 minutes, your Honor, but I will

16  try to and keep it --

17          MR. SULLIVAN:  We wanted announce after this witness

18  we will close our case.

19          THE COURT:  Oh.

20          MR. SULLIVAN:  We would like to make the announcement

21  today and it will be happy news to the jury.

22          THE COURT:  All right.  Then I guess we won't be

23  calling another witness.

24          MR. SULLIVAN:  I didn't want you to let them know

25

DAITBAN4                          Battany – cross

1    without thinking what you wanted to do.

2              THE COURT:  Yes.  So I can mull about that.  Why don't

3    you both hand up what you have, but we'll continue with the

4    witness.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury present)

 2                THE COURT:  Go ahead, counsel.

 3   BY MR. CORDARO:

 4   Q.  Good afternoon, Mr. Battany.

 5   A.  Good afternoon.

 6   Q.  Mr. Battany, if you could turn back to PX2, please,

 7   specifically page 422.  In your capacity as marketing director,

 8   were you generally familiar with lender's warranties?

 9   A.  Yes.

10   Q.  And what was your understanding what a lender's warranty

11   was?

12   A.  The warranty was that the loans met the guidelines of

13   Fannie Mae's selling guide and/or contracts.

14   Q.  More basically, what was a warranty?

15                THE COURT:  I'm going to -- ladies and gentlemen,

16   every once in a while you heard an objection sustained on the

17   grounds that it calls for a legal conclusion.  Let me tell you

18   what that's about in this context.

19                The parties entered into various contracts between

20   Countrywide on the one hand and Freddie Mac and Fannie Mae on

21   the other.  And part of the contractual promises were that

22   certain warranties and representations would be adhered to.

23   And those are all in evidence and you can look at them.  All

24   the exhibits, of course, will be available to you when you

25   start your deliberations.  Those are binding on the parties,
```

DAITBAN4                         Battany - cross

1    but that doesn't necessarily mean they're relevant to any issue

2    in the case.  This is not a breach of contract case, it's a

3    fraud case.  But you can consider for various reasons that

4    will, I think, become obvious when you hear the summations of

5    the parties whether or not these representations and warranties

6    are relevant or not to any particular issue that may come up.

7            My only point is to make you aware that, because these

8    were valid contracts, these warranties and representations were

9    binding.  I just want to make you aware that's a matter of law,

10   not a matter of fact, but whether it's relevant to any of your

11   consideration will be for you to determine after hearing a lot

12   more from me and others at the end of the case.

13           Go ahead.

14           MR. CORDARO:  Thank you, your Honor.

15   BY MR. CORDARO:

16   Q.  Mr. Battany, if you could focus now on the second paragraph

17   which says "These warranties," and there are six bullet points

18   there.  Do you see that?

19   A.  Yes.

20   Q.  Could you read the first bullet point into the record,

21   please.

22   A.  Applied to each mortgage sold to us in its entirety.

23   Q.  Was it your understanding that the representations and

24   warranties in the contract applied to all mortgages that

25   Countrywide sold to Fannie Mae?

1              MR. COHEN:  Objection, your Honor.

2              THE COURT:  Ground?

3              MR. COHEN:  Document speaks for itself.

4              THE COURT:  The document doesn't really necessarily

5    speak for itself.  It could -- if you want me, I could instruct

6    as a matter of law on this, but maybe you would prefer to just

7    withdraw your objection.

8              MR. COHEN:  Sure, your Honor.

9    Q.  Mr. Battany, if you look a little further down the page at

10   number one, contract says mortgage meets requirements.  The

11   mortgage conforms to all the applicable requirements in our

12   guides and this contract.

13             Do you see that language?

14   A.  Yes.

15   Q.  While you were the director of marketing at Fannie Mae,

16   were you generally familiar with this warranty?

17   A.  Yes.

18   Q.  Did you ever convey to anyone at Countrywide that Fannie

19   Mae had waived this warranty?

20   A.  No.

21   Q.  To your knowledge, did anyone at Fannie Mae convey to

22   Countrywide any waiver of this warranty?

23   A.  No.

24   Q.  This warranty applies to the mortgages that Countrywide

25   sold to Fannie Mae, correct?

DAITBAN4                        Battany - cross

1   A.  Yes.

2   Q.  And if you look up a couple of lines, it says warranties

3   may be waived, but only by us in writing.

4            Do you see that language?

5   A.  Yes.

6   Q.  Did you have an understanding to what that meant?

7   A.  There could be instances where it could be waived, such as

8   I could think of an example.  I don't know if it's too much

9   information.  In certain scenarios it could be waived.

10  Q.  Could they be waived verbally?

11  A.  No.

12  Q.  It would have to be waived in writing, is that correct?

13  A.  Correct.

14  Q.  Now was it your -- in your capacity as marketing director,

15  was it your understanding that Fannie only wanted to buy loans

16  that met the requirements in the guides and the contract, is

17  that correct?

18  A.  That's correct.

19  Q.  And if you were aware that a lender was selling -- was

20  attempting to sell to Fannie Mae a loan that did not meet the

21  requirements in the guides and the contract, would that factor

22  into your decision to purchase that loan?

23  A.  If a lender was intentionally selling a loan it knew was

24  not eligible, that would factor in.

25  Q.  Would that have influenced your pricing decision if you

DAITBAN4                    Battany - cross

1   were making a pricing decision?

2   A.  Yes, it would have.

3   Q.  Mr. Battany, could you turn two pages to page 7 of 22,

4   please.  I apologize, I need to make you go back.  I am sorry,

5   could you go back to 2 of 22.

6           Under number 2, it says:  Have qualified staff and

7   adequate facilities.  The lender must at all times have

8   employees who are well trained and qualified to perform the

9   functions required of the lender under this contract.

10          Do you see that language, Mr. Battany?

11  A.  Yes.

12  Q.  Even if you weren't familiar with those exact words at the

13  time you were marketing director, were you generally familiar

14  with this requirement?

15  A.  Yes.

16  Q.  Did you ever convey to anyone at Countrywide a waiver of

17  this requirement?

18  A.  No.

19  Q.  To your knowledge, did anybody at Fannie Mae ever convey to

20  Countrywide a waiver of this requirement?

21  A.  No.

22  Q.  And going back to the representation and warranty we were

23  just discussing, the one that says mortgage conforms to all the

24  applicable requirements in our guides in this contract, do you

25  remember that?

1    A.   Yes.

2    Q.   This requirement that we were discussing about qualified

3    staff and adequate facilities, is that a contractual

4    requirement to your understanding?

5    A.   Yes.

6    Q.   Could we go forward, please, to page 7 of 22.

7             MR. CORDARO:  And Ms. Michaud, could you blow up

8    number 17.

9    Q.   Mr. Battany, number 17 says:  Mortgage is an acceptable

10   investment.  The lender knows of nothing involving the

11   mortgage, the property, the mortgager or the mortgager's credit

12   standing that can reasonably be expected to cause private

13   institutional investors to regard the mortgage as an

14   unacceptable investment, cause the mortgage to become

15   delinquent or adversely affect the mortgage's value or

16   marketability.

17            Do you see that language?

18   A.   Yes.

19   Q.   Were you familiar generally with that requirement when you

20   were the director of marketing?

21   A.   Yes.

22   Q.   Did you ever convey to anyone at Countrywide a waiver by

23   Fannie Mae of that representation?

24   A.   No.

25   Q.   To your knowledge, did anyone at Fannie Mae convey to

1   Countrywide a waiver of that representation?

2   A.   No.

3   Q.   In your capacity as marketing director, if you were aware

4   that a lender was selling -- was attempting to sell to Fannie

5   Mae a mortgage that was not an acceptable investment, would

6   that influence your purchasing decision?

7   A.   If the lender had knowledge of it, it would.  If it was a

8   defect the lender was not aware of, it would not.

9   Q.   In your capacity as marketing director, if the lender knew

10  that it was selling -- that it was attempting to sell to Fannie

11  Mae a mortgage that was not an acceptable investment, would

12  that affect your pricing decision?

13  A.   Yes.

14  Q.   In your experience as marketing director, if you know,

15  would Fannie Mae buy a loan that was knowingly -- that

16  withdrawn.

17           In your experience as marketing director, would Fannie

18  Mae want to buy a loan that the lender knew was not an

19  acceptable investment?

20           MS. MAINIGI:  Objection.

21           MR. COHEN:  Objection.

22           THE COURT:  Ground?

23           MR. COHEN:  Your Honor, the question is going to what

24  Fannie Mae wanted as opposed to what the individual --

25           THE COURT:  On that ground I will sustain.  You can

DAITBAN4                           Battany – cross

1   rephrase it.

2                    MR. CORDARO:   Thank you, your Honor.

3   BY MR. CORDARO:

4   Q.   In your experience as marketing director, would you want to

5   buy a loan that the lender knew was not an acceptable

6   investment?

7   A.   No.

8   Q.   Mr. Battany, you were asked some questions about CLUES on

9   your direct examination, is that correct?

10  A.   Yes.

11  Q.   And in your capacity as marketing director, did you have an

12  understanding of how CLUES worked?

13  A.   Yes.

14  Q.   And Mr. Battany, in your experience, could a loan that

15  received a CLUES accept also have certain conditions that had

16  to be closed prior to funding?

17  A.   Yes.

18  Q.   And in your experience, was CLUES the engine to close those

19  conditions?

20  A.   No, CLUES would identify the conditions, but a person would

21  close the conditions.

22  Q.   And if you know, could one of the conditions on a loan be

23  an income reasonability determination on a stated income loan?

24  A.   I'm not aware if that was always a requirement, but that

25  may have been a requirement.   I don't know what the list was of

1    what was and was not their requirements.

2    Q.  If it were a condition, to your knowledge, would that be a

3    condition that CLUES could close?

4    A.  No, if that were a condition, that would require a human to

5    look at that and make that determination.

6    Q.  It would require a qualified human, would it not?

7    A.  Yes.

8    Q.  Mr. Battany, you're not an underwriter yourself, is that

9    correct?

10   A.  Correct.

11   Q.  Mr. Battany, do you know who Michael Sobczak is?

12   A.  Yes.

13   Q.  Did you ever work with Michael Sobczak at Fannie Mae?

14   A.  Yes, he was my peer during the time I managed the

15   Countrywide account.

16   Q.  And did you have occasion to observe Mr. Sobczak's work?

17   A.  Yes.

18   Q.  Did Mr. Sobczak have any particular focus that differed

19   from yours?

20   A.  Mike's background -- Mr. Sobczak's background was more on

21   low level underwriting, and my background was more on bond

22   level pricing.

23   Q.  And was Mr. Sobczak's background more in the area of risk

24   than yours?

25              MR. COHEN:  Objection, your Honor.

DAITBAN4                           Battany - cross

1              THE COURT:  Sustained.

2    Q.  Mr. Battany, in your observation of Mr. Sobczak's work, did

3    you ever have occasion to observe Mr. Sobczak handling matters

4    concerning risk?

5    A.  Yes.

6              MR. COHEN:  Objection, your Honor.

7              THE COURT:  Overruled.

8    Q.  And with respect to risk, would that have been loan level

9    risk?

10   A.  Yes.

11   Q.  As between you and Mr. Sobczak, if you had a view, who had

12   the deeper knowledge with respect to loan level risk?

13             MR. COHEN:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.  Was your focus solely risk?

16   A.  Risk was probably 50 percent of my focus, and my focus on

17   risk was on the credit modeling and pricing of the risk which

18   did include loan level analysis.  It was more on the modeling

19   of expected risk of a loan, less so than the documentation in

20   the file that made an underwriting decision approvable or not.

21   Q.  Was that latter area Mr. Sobczak's area?

22   A.  Yes.

23   Q.  Mr. Battany, are you familiar with what a refinance is?

24   A.  Yes.

25   Q.  Could you explain to us what a refinance is?

1  A.   A refinance is when a borrower takes their current loan and

2  creates a new loan to pay off the old loan, usually with the

3  purpose of getting a lower rate in payment or the purpose of

4  getting more cash back to them.  It's called either a rate turn

5  refinance or a cash out refi, cash out refinance.

6  Q.   In your capacity as marketing director, did you have any

7  familiarity with the risk posed by refinances?

8  A.   Yes.

9  Q.   And would a refinancing necessarily pose more or less of a

10 risk than an actual purchase loan?

11 A.   With all else being equal, a rate term refinance is

12 typically more risky than a purchase.

13 Q.   Can you explain to the jury what a rate term refinance is?

14 A.   This is when the borrower is not taking additional cash

15 out, either the loan value stays the same or within a few

16 thousand dollars of where it was before.  And the main purpose

17 of a rate term refinance is to get the lower rate or a

18 different maturity term of the mortgage.

19 Q.   And are you familiar with something called a cash out

20 refinance?

21 A.   Yes.

22 Q.   Could you explain what a cash out refinance is?

23 A.   A cash out is when the borrower would increase their

24 mortgage balance, have a larger loan amount and typically a

25 higher payment, but the borrower would get the extra cash

DAITBAN4                    Battany – cross

1     balance paid out to them with a check at the closing table.

2     Q.  Based on your experience, did you have any familiarity with

3     the risk posed out by a cash out refinance as opposed to a

4     purchase loan?

5     A.  If all other factors were equal, a cash out refinance was

6     more risky than a purchase loan.

7     Q.  Mr. Battany, you were asked several questions on direct

8     about certain aspects of a loan origination process and whether

9     they would have influenced your purchasing decision.  Do you

10    recall those questions?

11    A.  Yes.

12    Q.  Mr. Battany, with respect to a loan origination process

13    designed to decrease time, if you were aware that a lender put

14    into place a loan origination process designed to decrease time

15    that also had an adverse effect on the quality of the loan,

16    would that be something you would take into consideration in

17    making a purchasing decision?

18    A.  If a lender did something that adversely affected the

19    quality, that would be taken into account.  The timing would

20    not really be that critical, it would be the quality of the

21    loan meeting the guidelines.

22    Q.  So if a lender put into place a loan origination process

23    with an average turn time of 15 days, and that loan origination

24    process negatively affected the quality of the loan, would you

25    take that into account in making your purchasing decision?

DAITBAN4                    Battany - cross

1          MS. MAINIGI:  Objection.

2          THE COURT:  Overruled.

3    A.   The 15 days would not be a factor.  Their actions to reduce

4    the quality would be a factor.

5    Q.   And if a lender was using an automated underwriting system

6    but clearing conditions in such a way that the clearing of

7    those conditions affected the quality of the loan negatively,

8    would you take that into account in making your purchasing

9    decision?

10         MS. MAINIGI:  Objection.

11         MR. COHEN:  Objection.

12         THE COURT:  Overruled.

13   A.   If the manner in which the conditions were cleared affected

14   negatively the quality of the loan, then that would be a

15   factor.

16   Q.   If the lender was using a quality assurance process and

17   that quality assurance process indicated that the loans were of

18   poor quality, would that be something you might take into

19   account in making a purchasing decision?

20         MS. MAINIGI:  Objection.

21         MR. COHEN:  Objection, your Honor.

22         THE COURT:  Ground?

23         MS. MAINIGI:  Vague and assumes facts not in evidence.

24         THE COURT:  Overruled.

25   A.   If the definition that you're using of quality assurance is

DAITBAN4                        Battany - cross

1   intended to be a prefunding quality control process, it would

2   be a relative question.  So say the loans were of poor quality

3   would be viewed on a relative basis to what Fannie would expect

4   of a given profile of loans.  Fannie Mae does not expect every

5   loan to be perfect, so in my pricing I would have assumed

6   defect rates.  So if the ultimate Fannie Mae defect rate was

7   higher than my assumption, it would affect the pricing.  If the

8   Fannie Mae defect rate was less than my assumption, then it

9   would have no or a positive affect on the pricing.

10  Q.  So if the quality assurance process indicated a number that

11  was higher than Fannie Mae's expectations, that would affect

12  your pricing decision, would it not?

13            MS. MAINIGI:  Objection.

14            MR. COHEN:  Objection.

15            MR. CORDARO:  I'll withdraw that question, your Honor.

16            THE COURT:  All right.

17  Q.  Mr. Battany, with respect to any incentives that a lender

18  gave to its employees with respect to the funding, the analysis

19  of loans, if you were aware that those incentives negatively

20  affected the quality of the loan the lender was attempting to

21  sell to Fannie Mae, would you take that into account in making

22  your pricing or purchase decision?

23            MS. MAINIGI:  Objection.

24            MR. COHEN:  Objection, your Honor.

25            THE COURT:  Overruled.

DAITBAN4                         Battany - cross

1     A.   So I did not take into account a lender's incentives or

2     compensation structure in a pricing decision, but anything the

3     lender did that result in a worse quality loan to be delivered

4     would be.  So if that action or any other action ultimately

5     resulted in a worse profile, that would be a factor.  So the

6     pricing decision was based on the profile and the defect rate.

7     Q.   So anything that the lender does that negatively affects

8     the quality of a loan is something you would take into account

9     in making a pricing or purchasing decision, is that correct?

10    A.   That is correct.

11    Q.   Mr. Battany, could you open the binder again and go to tab

12    DX1223, it's marked as 1223B.

13              MR. CORDARO:  I do believe this is in evidence.  Is

14    that correct, counsel?

15              Thank you.  Ms. Michaud, I will ask you to put up on

16    the screen for the jury page 23 of part one of 1223.

17              Sorry, your Honor, it looks like a technology glitch,

18    so I will continue while we try to resolve it.

19    Q.   Mr. Battany, directing your attention to the first full

20    paragraph, the one that begins "Contractual warranties,"

21    starting six lines from the bottom, where the sentence that

22    begins, "We expect," do you see that sentence?

23    A.   I'm not sure if I'm on the right page.

24    Q.   Sorry, I don't believe I gave you the page number.  If you

25    can turn two pages and it will be on the right-hand page, and

DAITBAN4                    Battany - cross

1    at the bottom of that page it says 202.01.  Do you see that?

2    A.  Yes.

3    Q.  Now if you go further up the page to the first full

4    paragraph, the one that begins, "Contractual warranties," do

5    you see that paragraph, sir?

6    A.  Yes.

7    Q.  About six lines from the bottom of that paragraph towards

8    the right-hand side of the page there's a sentence that begins

9    "We expect," do you see that?

10   A.  Yes.

11   Q.  The sentence reads:  We expect a lender to advise its lead

12   Fannie Mae regional office immediately if it learns of any

13   misrepresentation or breach of a selling warranty.  This

14   notification is required for all breaches or

15   misrepresentations, including fraud in the origination and

16   underwriting processes, regardless of whether the act is

17   committed by the lender, the lender's agent, the borrowers or

18   any other third party and whether or not the lender believes

19   that the fraud or misrepresentation constitutes a breach of its

20   representations and warranties.

21           Do you see that language?

22   A.  Yes.

23   Q.  While you were director of marketing, even if you were not

24   familiar with those exact words, did you have a general

25   understanding of that requirement?

DAITBAN4                      Battany - cross

1   A.  Yes.

2   Q.  While you were director of marketing, did you convey to

3   anyone at Countrywide a waiver of that requirement?

4   A.  No.

5   Q.  To your knowledge, did anyone at Fannie Mae convey to

6   Countrywide a waiver of that requirement?

7   A.  No.

8           MR. CORDARO:  Your Honor, may I have five seconds to

9   confer with my colleagues?

10          THE COURT:  Yes.

11          MR. CORDARO:  Nothing more from the United States on

12  cross, your Honor.

13          THE COURT:  All right.  Redirect.

14          MS. MAINIGI:  Just a couple of key questions, your

15  Honor.

16  REDIRECT EXAMINATION

17  BY MS. MAINIGI:

18  Q.  Mr. Battany, you were asked a number of questions as to

19  whether people that you dealt with on a regular basis at

20  Countrywide should have advised you about the High-Speed Swim

21  Lane.  Do you remember that?

22  A.  Yes.

23          MR. CORDARO:  Objection, your Honor.

24          MS. MAINIGI:  I was trying to orient him, your Honor,

25  so we could move along.

DAITBAN4                        Battany - redirect

1                MR. CORDARO:  I object to "should have."

2                THE COURT:  You remember a number of questions in this

3       sort of area?

4                THE WITNESS:  Yes.

5                THE COURT:  Put another question.

6       BY MS. MAINIGI:

7       Q.  Did you expect them to tell you about the High-Speed Swim

8       Lane?

9                MR. CORDARO:  Objection.

10               THE COURT:  Well, I think, as phrased, sustained,

11      although there may be questions that can be put in this area.

12      Q.  Do you understand what the High-Speed Swim Lane is?

13               MR. CORDARO:  Objection.

14               THE COURT:  Overruled.  You may answer that yes or no.

15      A.  Yes.

16      Q.  What do you understand it to be?

17      A.  It was an effort made by Countrywide to expedite the time

18      delay in the process of funding a loan to try to get a loan

19      funding in a more quicker pace.

20               THE COURT:  How do you know this?

21               THE WITNESS:  This is from what I learned through the

22      trial and depositions.  This was not something --

23               THE COURT:  Forgive me, I reverse my prior ruling

24      then.  The jury will disregard the last two questions and

25      answers.

1   Q.  If you had known about a change to the loan origination

2   process in the 2007/2008 time period, would you have advised

3   Fannie to stop buying loans from Countrywide?

4   A.  No.

5   Q.  You were asked a couple of questions, Mr. Battany, about

6   self reporting right now.  Do you recall that?

7   A.  Yes.

8   Q.  Based on your understanding of the self reporting

9   provision, was Countrywide required to self report every loan

10  with an SUS to Fannie?

11          MR. CORDARO:  Objection.

12          THE COURT:  Sustained.  But I think along the lines of

13  conversations and suggestions the Court has made, both before

14  the lunch break and thereafter, there is a way to get at what I

15  believe is the issue you're trying to get at, but now through

16  that question, sustained.

17  Q.  What is an SUS, Mr. Battany?

18  A.  It is a term that Countrywide used to identify defects in

19  their quality control process.

20  Q.  Does every SUS mean there has been a violation of Fannie

21  guidelines?

22          MR. CORDARO:  Objection.

23          THE COURT:  Sustained.  Was it important to you that

24  every violation -- excuse me, that every SUS be reported with

25  respect to loans that you were the purchasing agent on or not?

DAITBAN4                    Battany - redirect

1              THE WITNESS:  Only the SUSs that correlated to a

2      Fannie Mae significant finding or Fannie Mae defect had to be

3      reported.

4              THE COURT:  So do I understand it depends?

5              THE WITNESS:  Yes.

6              THE COURT:  Go ahead.

7              MS. MAINIGI:  No more questions, your Honor.

8              MR. COHEN:  I'll be very brief.

9              THE COURT:  Very good.

10     REDIRECT EXAMINATION

11     BY MR. COHEN:

12     Q.  Mr. Battany, during the 2007 to 2008 time frame, as

13     marketing director at Fannie Mae do you recall testifying that

14     you approved the purchase of conforming loans from Countrywide

15     within your authority?

16             MR. CORDARO:  Objection.

17             THE COURT:  Sustained, hearsay.

18     Q.  Mr. Battany, based on your knowledge, did Fannie Mae

19     continue to purchase loans from Countrywide during 2007 and

20     2008?

21             MR. CORDARO:  Objection.

22             THE COURT:  Wait, we haven't heard the question.  Is

23     that --

24             MR. COHEN:  That was the question.

25             THE COURT:  The question is based on your knowledge

DAITBAN4                    Battany - redirect

1   did Fannie Mae continue to purchase loans from Countrywide, his

2   knowledge -- well, anyway, sustained on multiple grounds.

3            MR. COHEN:  No more questions.

4            MR. CORDARO:  One more question.

5   RECROSS EXAMINATION

6   BY MR. CORDARO:

7   Q.  Mr. Battany, if you knew about a change to a loan

8   origination process by a lender that adversely affected the

9   quality of the loans the lender was selling to Fannie Mae,

10  would that have factored into your pricing or purchasing

11  decision?

12           MR. COHEN:  Objection, your Honor, asked and answered.

13           THE COURT:  I'll allow it.  You may answer.

14  A.  If that action adversely affected the quality of loans that

15  Fannie bought that would be a factor we would consider.

16           MR. CORDARO:  Nothing further from the United States.

17           THE COURT:  Anything else?

18           MS. MAINIGI:  No, your Honor.

19           THE COURT:  Thank you very much.  You may step down.

20           Anything further from the defense?

21           MR. MUKASEY:  Judge, may we have 60 seconds with

22  everyone sort of not moving so we can check a couple of things

23  and talk to the government and the defense?

24           THE COURT:  Yes.  You may get 65.

25           (Pause)

DAITBAN4

1          MR. SULLIVAN:  Your Honor, it turns out we are in the

2    ninth inning.  On behalf of the banks, the defense rests.

3          THE COURT:  Ms. Mairone?

4          MR. MUKASEY:  Your Honor, on behalf of the defendant

5    Rebecca Mairone, we rest.

6          THE COURT:  Very good.  Ladies and gentlemen, you can

7    see that your note had a terrifying effect on all concerned.

8          When the evidence is concluded in a case, as it now

9    is, the Court needs to take up many legal issues with counsel.

10   And that's going to occupy not only some time today but some

11   time on Monday.  So I think the sensible thing is to give you

12   Monday off because we would need to end early on Monday anyway.

13         When you come in on Tuesday --

14         Sorry, yes?

15         MR. ARMAND:  Terribly sorry to interrupt, your Honor,

16   could we approach for one moment?  There was an outstanding

17   issue with regard to reopening that we wanted to address.

18         THE COURT:  I am so sorry, come to the side bar.

19         (At side bar)

20         THE COURT:  With respect to your expert?

21         MR. ARMAND:  No, the Ms. Simantel issue.

22         THE COURT:  I have considered that before I started

23   talking to the jury, and I don't see that there is a basis for

24   calling her based on what the defense presented, but if you

25   want to make a two-minute pitch, you can.

DAITBAN4

1          MR. ARMAND:  Your Honor, I would like to have an

2     opportunity to provide some examples from the testimony from

3     Mr. Barnett and from Ms. Mairone.  There were statements

4     regarding the ethical conduct of Countrywide which we think

5     opened the door sufficiently.

6          THE COURT:  No, the one and only place that I saw was

7     the one that the Court mentioned and not the government, and I

8     specifically ruled that was not sufficient to open the door.

9          If there are other ones that you think raised that

10    problem, I may cabin the summations appropriately, but I will

11    not -- I don't think the door has been opened for her, and I

12    certainly I am not going to ask the jury to come in on Monday

13    on the hypothesis that a briefing over the weekend might

14    convince me to change that ruling.

15         MR. ARMAND:  I understand, your Honor.  We were going

16    to wait until -- we were under the impression there were going

17    to be additional witnesses, and we wanted to wait until it was

18    done.

19         THE COURT:  I understand that defense engaged in a bit

20    of tactical maneuvering here.

21         MR. ARMAND:  And that's fine.

22         THE COURT:  But I still don't think -- I will take

23    your submission on the different issue of whether there are

24    such statements in the record whether defense counsel has to be

25    cabined in the way they refer to them on summation.

DAITBAN4

1           MS. MAINIGI:  Cabined with respect to what, your

2      Honor?

3           THE COURT:  For example, Mr. Sullivan, who just got

4      his big moment, in his opening was talking all about these are

5      decent people, blah, blah, blah, and there was that one

6      question and answer that came up the other day that I

7      mentioned.  I think you need to make sure that there is not an

8      argument being made about the overall credibility of

9      Countrywide people in this period or in context generally as

10     opposed to in this specific context of Hustle program.

11          MR. MUKASEY:  So the graphic that I was going to use

12     with Countrywide with a big halo on top, that's out probably.

13          THE COURT:  I think you can use that if you put it up

14     alongside one with horns and say it's up to you, ladies and

15     gentlemen.

16          MS. MAINIGI:  We understand that, your Honor.

17          MR. MUKASEY:  We reached agreement with the government

18     in this little break we took, each side may move into the

19     record some documents by agreement, by consent.

20          THE COURT:  That will be fine, and we'll let the jury

21     know that.  Very good.

22               (Continued on next page)

23

24

25

DAI3BAN5

```
 1              (In open court)

 2              THE COURT:  I'm glad that in the interest of

 3    tradition, before I could complete that sentence, we had a side

 4    bar.

 5              So, anyway, we will not sit on Monday.  When you come

 6    on Tuesday, we will have the closing arguments of counsel, and

 7    my instructions of law.  And then this case will be yours to

 8    decide.  So, you can expect, I haven't yet talked to counsel

 9    about how long they want for closing arguments, but I would

10    guess that closing arguments will probably take at least the

11    entire morning and probably part of the afternoon.  So you'll

12    probably get the case late on the afternoon of Tuesday, and

13    then it is entirely up to you how long you take for your

14    deliberations.

15              But I wanted you to know that schedule so you can see

16    that we are in good shape schedule-wise.

17              Even at this point, please do not talk among

18    yourselves about the case, and obviously don't talk about it

19    with anyone else.  And so you will have another three-day

20    weekend.  Boy oh boy.  Let's see what you can do with the

21    weekend.  You can watch -- what is the all-time record for

22    Giants' losses?  I'm sure it's coming up.  Or you can watch

23    some foreign teams play baseball in what is called the World

24    Series.

25              Have a very good weekend and we'll see you on Tuesday,
```

DAI3BAN5

```
 1   at 9:30.

 2               (Jury excused)

 3               THE COURT:  I will send you before the end of the day,

 4   I haven't quite finished it, but I'm getting close, my draft

 5   charge.  So you will have it over the entire weekend to pick

 6   at.  And we'll have the charging conference on Monday, but I

 7   think we should take up now any motions.  And just so that I

 8   don't forget it, assuming for the sake of argument that the

 9   motions do not dispose of the case, how long does the

10   government want on summation?

11               MS. NAWADAY:  Would it be appropriate to ask for an

12   hour and a half, your Honor?

13               THE COURT:  It would certainly be appropriate.  How

14   long does defense counsel want?

15               MR. SULLIVAN:  Your Honor, I was going to ask for

16   three, but I have reduced it down for two.  I was hoping

17   against hope that I could have two.

18               THE COURT:  All right.

19               MR. HEFTER:  Your Honor, we would request an hour for

20   Ms. Mairone.

21               THE COURT:  Then I am going to give the government

22   more.  The government can, if it wishes, take up to two and a

23   half hours.

24               I'll hear counsel in a minute on the question of

25   whether some portion of that should be allowed as rebuttal.
```

DAI3BAN5

Just so you know the state of the law in that regard.  There is
no prevailing custom in this district, and in fact, the judges
vary widely.  And the law of the United States is that both the
order of summations and whether or not there is a rebuttal is
within the very, very broad discretion of the Court.

          But some of my colleagues have the practice of
defendant first, plaintiff second, because that is the practice
in New York State, the universal practice in New York State.
Maybe proving that New York is a backwards state.  The theory
of it is that the party with the burden of proof should go
last.  That's the way it used to be in criminal cases as well
in the federal system.

          It never made any sense, because the party with the
burden really should be laying out their case, and the other
side should be shooting at it, so to speak.

          So my practice has been, normally, and it's in my
rules, to have plaintiff go first, and defendants second.

          However, I tried a case this past June in the Eastern
District of California, Fresno, and there the practice was to
give a rebuttal.  And it seemed to me that that made sense in
that case in Fresno because it was a lengthy, complicated case.
So, I'm open to the possibility of the government having, given
the very substantial time that the defendants fairly are asking
for, government having, say, two and a half hours, of which two
hours say would be opening summation and half hour be rebuttal.

DAI3BAN5

1    But I also can be talked out of that.

2              So let me hear whether anyone wants to say anything

3    about it.

4              MR. SULLIVAN:  Well, I'm a traditional guy, your

5    Honor.  I've had a whole career without rebuttal in a civil

6    case.  I'd kind of like to wind up my career that way.  So if

7    the government couldn't get rebuttal, call it a day.

8    Recognizing the wide discretion you have, certainly be my

9    preference.

10             THE COURT:  I would never, ever be party to allowing

11   you to end your career and call it a day.  I think that would

12   be depriving the legal system of the United States of one of

13   its superstars, but I get the point.

14             MR. MUKASEY:  Judge, I would simply add, I echo

15   Mr. Sullivan's comment.  And then in a case where the burden of

16   proof is so low, I mean, it is really dramatically different

17   than a criminal case.  And the government's going to take two

18   hours or two and a half hours, I would object to the rebuttal

19   after that.

20             MR. CORDARO:  Your Honor, I think it probably comes as

21   no surprise to you that the government would request the

22   rebuttal time for the reason that the Court stated with respect

23   to the Fresno case.  This has been a lengthy and complicated

24   case.

25             Secondly, there is a tradition or a commonplace where

DAI3BAN5

1  the party with the burden of proof, regardless of what that

2  burden of proof is, has the last word before the case goes into

3  the jury, with the understanding though that the Court has very

4  broad discretion to regulate that.

5          I would point out that the underlying statute here is

6  in Title 18 of the United States Code, so we would request 30

7  minutes of rebuttal in this case.

8          THE COURT:  I am not sure which argument is more

9  irrelevant, yours or Mr. Sullivan's.

10          MR. MUKASEY:  If it is in Title 18, we invite them to

11  prove it beyond a reasonable doubt.

12          THE COURT:  I will mull this while we're going on and

13  talking about the motions and let you know before we finish

14  today.

15          Moving right along, that will obviously take up the

16  great bulk of Tuesday.  I think we will have time for my charge

17  as well.  I think if we start promptly at 9:30, as you know I

18  will, we can get it all done, including the charge by the end

19  of the day.  We'll sit until 5 o'clock.  Then they will be

20  fresh when they start deliberations Wednesday.

21          I decided not to mention to them about Friday, let's

22  see what happens and we'll play that by ear.

23          Now let me hear any motions.

24          MR. SINGER:  Good afternoon, your Honor.  The bank

25  defendants would like to renew our motion for judgment as a

DAI3BAN5

1    matter of law under Rule 50.

2            THE COURT:  Sir, just to push you a little, is there

3    any new argument you want to make?  Because obviously I am not

4    going to repeat all that we had in the colloquy at the close of

5    the government's case.

6            MR. SINGER:  Understood, your Honor.  The first thing

7    I was going to say is we would like to incorporate right now

8    all of the arguments we previously made.

9            THE COURT:  Absolutely.

10           MR. SINGER:  Including in our letter of October 7.

11           THE COURT:  Yes.  I remind counsel for both sides that

12   if they want any letters docketed, they need to present them to

13   me in a package.  We've now reached the point where it would be

14   inappropriate say right after I charge the jury to do that.

15   And that I would also note for the record that could include if

16   you want the things that were handed up today.  There was the

17   proposed charge from the government was "When parties enter

18   into a contract containing representations and warranties,

19   those representations and warranties are legally binding on the

20   parties."

21           The proposal from the defense was considerably longer,

22   so I won't try to read it all into the record.  But I'll note

23   for the record that I gave most of what the defense had

24   requested but not quite all.  Go ahead.

25           MR. SINGER:  For the record, I take credit for all the

DAI3BAN5

1    verbosity.

2           THE COURT:  Then you succeeded.  My only point is if

3    either one of you wants to have this filed, you should include

4    that in the package with your letters.

5           MR. SINGER:  Makes sense.  Thank you, your Honor.

6           So starting with the arguments that have already been

7    made and I won't repeat them.  We do have a few more things to

8    say, given that there has now been a couple of weeks of

9    additional testimony in the defense case.  Which makes clear

10   that no reasonable juror hearing all of the testimony in the

11   case, and that's what is relevant at this stage, whether a

12   reasonable juror, having heard all of the evidence presented by

13   both sides in the case, could conclude that the elements of the

14   FIRREA claim have been established here.  A reasonable juror

15   could not so conclude.

16          We discussed each of the elements of the FIRREA claim

17   in our letter the first time around.  Let me talk about some of

18   the new evidence that's come out since the first time I stood

19   up and made a similar argument to your Honor.

20          First of all, we've heard from numerous Countrywide

21   witnesses about how the HSSL or Hustle process really worked.

22   We've heard the loan processors were closely monitored.  We've

23   heard the underwriters were always available.  We've heard only

24   the best loans were intended to go through the Hustle process.

25   And we've heard the loan processors received extensive

DAI3BAN5

training.

We've also heard quite a bit of testimony about the so-called QA or quality assurance findings, which are at the heart of the government's claim of fraudulent intent here. The government's claim is that any one inside of Countrywide who saw these QA results should have realized that the loans were bad loans and should not be sold to Fannie and Freddie. But the evidence is entirely to the contrary.

The witnesses have testified that the QA results were about process, and did not equate to investment quality. They've also testified that the QA results were prefunding, and did not show the quality of the loans at the time of sale. The data on the quality of the loans at the time of sale was uniformly good.

Ms. Mairone in particular explained what each of the categories of QA findings meant. And putting aside any subjectivity, obviously her intent is what the government is trying to prove in this case, but what she testified about the QA findings is not in dispute.

And it is clear that the vast majority of the QA findings were highly technical issues, such as documents missing from a file or being in the wrong place in a file, but not documents that didn't exist. Or that went to the actual quality of the loan. And none of these findings could have reasonably led anyone to conclude that the loans were of poor

DAI3BAN5

1     quality.

2          Mr. Kitashima and other witnesses have testified to

3     the same effect.

4          So the notion that seeing these QA findings must have

5     led -- not only should have, but did lead Ms. Mairone,

6     Mr. Kitashima, Mr. Lumsden, who are the only people who matter

7     for the purposes of this argument, to conclude that the loans

8     were bad and should not be sold to Fannie and Freddie, that

9     they should shut down the FSL Division, which is essentially

10    what the government's argument is, is outlandish based on the

11    testimony that has been submitted in this case.

12         It is not fraud.  I think it is common ground here it

13    is not fraud.  Unless Mr. Lumsden, Ms. Mairone, or

14    Mr. Kitashima subjectively knew and intended that the loans

15    being sold to Fannie and Freddie were poor quality loans.  QA

16    results do not come close to establishing that.

17         Now, we heard also from -- zeroing in on the quality

18    of the loans, again, we heard from Mr. Battany today from

19    Fannie Mae.  And it was clear from his testimony that the only

20    thing that would have affected his decision making with regard

21    to any of the issues in the HSSL process was the quality of the

22    loans.

23         He testified that it was not an issue for him that

24    loan processors had the roles that they did.  It was fine for

25    loan processors to clear CLUES accept loans to close.  It was

DAI3BAN5

1    fine for CLUES to be used as the underwriter.  It was fine to

2    have a turn time of 24 days on average for loans.  It was fine

3    to have a turn time for 15 days.  15 days for loans on average.

4    Funding goals for employees for processors, no problem.

5    Incentives --

6              THE COURT:  With all that you are telling me, this is

7    a good example.  What I think became evident was that in

8    isolation, a delay of or a speed of X days or Y days would not

9    have been important to him.  But, that if he knew that as a

10   result of that, the quality of the loan was affected, it would

11   have been important to him.

12             So, I think there was something for both sides in his

13   testimony.  But I don't know why, for these purposes, why I

14   should just focus on the part that was good for you so to

15   speak.

16             MR. SINGER:  I agree, your Honor.  The testimony that

17   I just described is exactly the point that I'm making.  If

18   there was a process in place that caused the loan quality to

19   suffer, he cared about the loan quality suffering.  He did not

20   care about the process in isolation.  What mattered to him was

21   the quality of the loans.  So that's what is material.

22             THE COURT:  But, I guess maybe put it a different way.

23   I am not sure this question was put to him.  But it has been

24   implicit if not explicit in the government's presentation.

25   Their position in part is that in order to get more loans

DAI3BAN5

 1    approved and sold to Fannie Mae and Freddie Mac as quickly as

 2    possible, for reasons related both to the company's financial

 3    interests and their own financial interest, they designed a

 4    program that no one element of which was necessarily

 5    problematic.  But in tandem was calculated to produce

 6    sub-quality loans.

 7         So of course if you were to pick that apart, say,

 8    well, this one didn't matter and that one didn't matter and

 9    that one didn't matter, you might be right.

10         But the key question would be, in tandem, would they

11    have led a reasonable purchaser to believe that quality was

12    being affected.

13         MR. SINGER:  That last point, your Honor, is the

14    point.  Was quality affected.  Because it was utterly clear

15    from Mr. Battany's testimony, and he is not the only one, he is

16    the one we are focused on right now.  It was utterly clear from

17    his testimony that each of the components of the HSSL process

18    that he was asked about was common in the industry, did not

19    cause him any heartburn.

20         What would worry him is, hypothetically, if something

21    that happened in the process caused a quality problem.  So

22    whether it be one of those one of those processes, or all of

23    them in tandem, it is quality that mattered to him.

24         What the government has not proven, among other

25    things, is there was any actual quality defect or any actual

 1   quality impact to any aspect of the HSSL process or all of the

 2   aspects together.

 3          And that brings us to the government's evidence from

 4   their experts, which is their only evidence on loan quality.

 5   Obviously we've asked your Honor to put in evidence of the

 6   quality of other loans and to compare the two and that's been

 7   denied to us.

 8          THE COURT:  I never heard that from you before.  What

 9   a surprise.  The next thing you are going to say is you need to

10   raise it here because it hasn't been preserved for the record,

11   oh, except for 40 other times.  Go ahead.

12          MR. SINGER:  I am going to mark that page of the

13   transcript and bring it up to the Second Circuit.  I am going

14   to hear all kinds of waiver on this.

15          But in any event, the issue of the experts.  The

16   government's only evidence of the quality of the loans comes

17   from Mr. Holt.  And as I did explain, I don't need to get into

18   great detail in this today, Mr. Holt's review was based on a

19   sample of loans that was not HSSL loans.  Some of them were,

20   many of them weren't.  You cannot rely on anything coming out

21   of that sample.  It is not the right universe.  So, it can't be

22   relied on for anything for that reason.

23          Beyond that, in the defense case, we've now learned

24   that Mr. Holt's findings themselves are unreliable for other

25   reasons as well.  Whatever you may conclude about

DAI3BAN5

1   Mr. Broeksmit's testimony, and I think we obviously have some

2   different views on that, at a minimum it showed it --

3           THE COURT:  My views had nothing to do with this

4   motion.  I was commenting, and I adhere to my comments, but I

5   purposely made those comments outside of the presence of the

6   jury and they have nothing to do with this motion either.

7   Because Mr. Broeksmit's testimony is fully before the court.

8   I'm looking forward to the discussion I am going to have with

9   your colleague after this trial is over as to what the Daubert

10  case and the amendment to Rule 702 contemplated.

11          MR. SINGER:  He is loaded for that discussion.

12          THE COURT:  I bet he is.

13          MR. SINGER:  What Mr. Broeksmit's testimony did show

14  is that Mr. Holt's re-underwriting, even if it had

15  re-underwritten HSSL loans as opposed to some hybrid sample, is

16  not reliable.  Most of his findings of material defects were

17  not material defects at all.  So that is the sum total of the

18  government's evidence that there was any quality issue

19  whatsoever in the HSSL loans, and it is no evidence.  There is

20  none.

21          So if what we are talking about is quality, there is

22  no evidence that quality suffered as a result of HSSL.  And

23  that defeats the materiality component, the misrepresentation

24  component, and the intent component of the mail and wire fraud.

25  So let me now move on --

1            THE COURT:  Only with the mailings and wirings.

2            MR. SINGER:  That was next.  The mailings and wirings

3     are next.  Because there haven't been any mailings and wirings

4     shown that are covered by the statute.  I've made the argument

5     the first time around.  The government still has introduced no

6     evidence at all that the mails were used in furtherance of the

7     scheme to defraud.  They've introduced no evidence at all that

8     any telephone calls or e-mails, of which there are many,

9     crossed state lines.  That's hard to imagine, your Honor.

10            THE COURT:  Given that various people said that they

11    were working out of various offices in various states, and

12    there were e-mails going between them, why isn't that

13    sufficient?

14            MR. SINGER:  It's not, your Honor.  We don't know

15    where they were when they sent the particular e-mails.

16            THE COURT:  Why isn't that a question of

17    circumstantial evidence?  If I know you normally work in an

18    office in California, and I know you're sending an e-mail to

19    someone who the evidence shows normally works in Texas, and the

20    e-mail concerns business, the business that each of you are

21    normally involved in, and the jury sees 10 such e-mails, why

22    would it not be appropriate for the jury to infer on the

23    preponderance standard that it is more likely than not that at

24    least one of those e-mails crossed state lines?

25            MR. SINGER:  I think it is not an inference.  It's

DAI3BAN5

1    speculation, unless there is actual evidence of it.

2              THE COURT:  I don't see why that's not a logical

3    inference.

4              MR. SINGER:  Your Honor, I can tell you I've never

5    seen anything like this in a criminal case where --

6              THE COURT:  But a criminal case, you have to prove it

7    beyond a reasonable doubt.

8              MR. SINGER:  Inferences are inferences, your Honor.

9    Whether it is an inference beyond a reasonable doubt or an

10   inference by a preponderance of the evidence, there still has

11   to be evidence from which one can draw the inference.

12             THE COURT:  So the instruction which I am going to

13   give the jury which is hallowed in most courthouses, is that

14   it's sunny, the courtroom shades are drawn, and then you see

15   someone walk in with a dripping wet raincoat, and you see

16   someone else walk in and deposit an umbrella or whatever.  And

17   you infer that it's raining out.

18             Now, it's possible that the fellow who has the

19   dripping wet raincoat was the subject of someone was walking

20   down the courthouse steps and accidently tripped and threw a

21   bottle of water on him.  And it's possible the guy with the

22   umbrella, he likes to carry his umbrellas around sort of as a

23   way of putting it to the marshals.  But, the jury could

24   reasonably infer, in a criminal case that same inference is

25   allowed beyond a reasonable doubt, it is raining out.

1              What is the difference here?

2              MR. SINGER:  The difference is the inference isn't as

3    strong.  I agree with you about the raining inference.  Here,

4    everywhere in the world except for this courtroom, I carry with

5    me a cell phone.  IPhone that can send e-mails from wherever I

6    am.  So, it would not be fair, unless I were in this courtroom

7    sending an e-mail, it would not be fair to infer because an

8    e-mail comes from Craig Singer's e-mail account to somewhere,

9    that I was sitting in my office in Washington, D.C.  And that's

10   why in criminal cases, courts, in my experience, always require

11   actual proof of interstate transmissions and not just

12   inferences from the fact that e-mails were sent.

13             THE COURT:  You've led such a sheltered life.  I

14   understand your argument.

15             MR. SINGER:  Fair enough.  A couple other quick

16   elements.  The affecting elements.  The government, as I

17   understand your Honor's prior rulings, had to prove the fraud

18   exposed Countrywide Bank or BANA to liabilities for repurchase

19   claims, which is the only effect that the government has

20   alleged.

21             I reiterate our position there is no proof of such an

22   effect in the record.

23             Then finally, the evidence continues to be

24   insufficient as to the roles of the two particular Countrywide

25   entities that are defendants in this case.  There has been no

1    specific evidence about them.

2              THE COURT:  Thank you very much.

3              Yes.  You join in all that?

4              MR. HEFTER:  I join in all that.  I can do this right

5    here.  We will incorporate all the arguments made in our letter

6    brief to you and in oral argument before.

7              There is one point I do want to raise.  It is the

8    hypothetical, your Honor, that you raised in the Rule 50(a)

9    motion in connection with the -- I think you were talking

10   hypotheticals of whether Ms. Mairone suppressed any information

11   in connection with the November 29 e-mail.

12             Our only point here, your Honor, pointing that out

13   specifically I think the evidence is unequivocal that

14   Ms. Mairone did not suppress any information in connection with

15   the November 29 e-mail for the purpose of deceiving anyway.

16   There were rational reasons for that e-mail that had nothing to

17   do with any scheme to defraud or any intent on her part to

18   defraud anybody.

19             And the post November 29 period establishes

20   unequivocally that those reports were shared with many people

21   within the company.  To be sure, as the record stands, they may

22   not have been shared with the low-level loan specialists, but

23   they were shared outside of Central Fulfillment with multiple

24   people, for the purposes of coming up with a better process and

25   a better process and a new line of communication was rolled out

DAI3BAN5

1    in January.

2         If you put all of that together, it clearly and

3    unequivocally negates any intent to defraud, your Honor.  So I

4    just raise that issue.  I think all the other arguments that we

5    have raised --

6         THE COURT:  However, even assuming arguendo that I

7    were to accept that part of it.  Now that she's testified, and

8    clearly her credibility was challenged on a number of items,

9    you have the problem for Rule 50 purposes of the adverse

10   inference.  If the jury were to determine that she was not

11   candid on the stand, they could also infer that the reason she

12   was not candid on the stand was because she was covering up an

13   intent to defraud.  That would not be sufficient of itself, the

14   law is clear that is not sufficient by itself to warrant

15   liability.  But it adds to the mix.

16        So, while you're better off in some respects as a

17   result of where we now stand, you're also not as well off in

18   other respects, depending on the jury's determination.  For

19   these purposes, of course, I have to take everything most

20   favorably to the government.  Let me hear from the

21   government --

22        MR. HEFTER:  Just one more point.  I understand that

23   point, your Honor, but I think if you look at the testimony of

24   other individuals, and actual documents that are now in

25   evidence, it negates the requisite --

DAI3BAN5

1          THE COURT:  I understood that as to the point you were

2     making.  That was the positive part.  I wanted to throw into

3     the mix the adverse inference as well.

4          Okay.  Let me hear from the government.

5          MR. ARMAND:  Thank you, your Honor.  Not sure how much

6     you want to hear.  But briefly, what the evidence has shown is

7     that from the beginning, defendants had a prime --

8          THE COURT:  I was going to say my time is your time,

9     but that's a line usually given by one incarcerated defendant

10    to another.  Go ahead.

11         MR. ARMAND:  Understood.  So there was a prime process

12    that was in place, the PCA process, and it was doing fine.  And

13    because they wanted to make more money, they sped up the

14    process with the High-Speed Swim Lane and removed the

15    underwriters from the process.

16         We have seen evidence that they compensated the

17    employees based solely on volume, that they tracked them based

18    on turn time, based on their fundings, and they pushed these

19    employees to move the loans as quickly as possible and at

20    lightning speed.  And that they were going to stay on them like

21    white on rice.  They were pushing these folks to produce the

22    loans as quickly as possible, and the result was lots of poor

23    quality loans.  That was known from, we see it from the quality

24    assurance reports --

25         THE COURT:  What is it that you claim needed to be

DAI3BAN5

1  made known to Fannie Mae and Freddie Mac?  Was it what you say

2  is in effect the bottom line fact that it led to poor quality

3  loans, or was it why, in your view, poor quality loans were

4  being produced, or both?

5       MR. ARMAND:  Ultimately, your Honor, this is a case

6  about misrepresentations.  It is about the reps and warrants

7  that the loans were investment quality, and the loans weren't

8  investment quality.

9       THE COURT:  I understand the quality argument.  I'm

10 just saying, I think it has never been totally clear to me

11 whether the government is saying that there were

12 misrepresentations either in the sense of half truths or

13 omissions where there was a duty to speak.  I'm not sure

14 whether anything fits that latter category.  Not only about the

15 quality of the loans, but also about the process that on the

16 government's view led to the poor quality of the loans.

17      MR. ARMAND:  It is primarily the latter, your Honor.

18 But the representations and --

19      THE COURT:  The latter, which do you mean, the process

20 or the quality?

21      MR. ARMAND:  The quality.  It is mostly --

22      THE COURT:  The former actually.

23      MR. ARMAND:  I'm sorry, I got confused.

24      THE COURT:  I knew what you meant.

25      MR. ARMAND:  It is the quality of the loans and

DAI3BAN5

1    misrepresenting that.  And then knowing about through their

2    quality control reports and the QA reports about the defects

3    and not self-reporting those defects.  But the reps and

4    warrants can also be read to require disclosures of any

5    activities or processes that should be put in place that are

6    going to negatively impact the quality.

7                   So we argue that all the practices that are part of

8    the High-Speed Swim Lane process which negatively impacted the

9    quality, should have been disclosed as well.

10                  THE COURT:  Which warranty or representation are you

11   relying on in that latter category?

12                  MR. ARMAND:  In the rep and warrant for Fannie, it is

13   the acceptable investment -- the lender knows of nothing about

14   the mortgage that would lead an investor to conclude it is not

15   an acceptable investment.  And we argue that the fact that

16   they've got this process in place --

17                  THE COURT:  Let me, forgive me.  That's very helpful.

18   Let us assume for the sake of argument the following hypothesis

19   which is just not this case.  But this is just to understand

20   your theories.

21                  Supposing people at Countrywide set about to create a

22   system that would lead to low quality loans.  But, they were so

23   incompetent that all the loans they produced were high quality

24   loans.  This is needless to say an unlikely scenario.

25                  Given the representations and warranties and so forth,

DAI3BAN5

1    would there be anything that would have to be disclosed in that

2    situation?

3              MR. ARMAND:  Well, that's not this case.

4              THE COURT:  I understand that.

5              MR. ARMAND:  But if what your Honor is saying they

6    have the fraudulent intent, they --

7              THE COURT:  They put together, in my hypo, they said

8    no loan will be approved if it is not approved in three minutes

9    or less.  We will put all the people who will be processing the

10   loans will be janitors or aerospace engineers, etc., etc.  But

11   lo and behold, everything that came out was fine.

12             MR. ARMAND:  I don't think the fortuitous outcome that

13   the victim was not harmed from the fraudulent scheme, that

14   doesn't negate the fraudulent intent.  So there wouldn't --

15             THE COURT:  So your position is they had a duty not

16   only to disclose that the loans in your view were low quality,

17   but independent of that, there are two possibilities.  Either

18   independent of that they had to disclose processes that were

19   reasonably calculated to lead to low quality loans, whether

20   they did or not.

21             MR. ARMAND:  Correct, your Honor.  But the main

22   argument is obviously misrepresentations.  The

23   misrepresentations about the quality.

24             THE COURT:  I want to think about that a little bit.

25   This will relate I think probably more to my charge than

DAI3BAN5

anything on this motion.  But go ahead.  Did you want to say

anything on the more specific things that were raised by your

adversaries?

MR. ARMAND:  Sure.  In regard to the quality

assurance, the documents themselves show that they related to

quality.  That high risk or action required was a potential SUS

finding, and it wasn't just at phase code three, before

funding.  There was a November 12, 2007, e-mail where

Ms. Mairone and others were put on notice that the loans were

actually funded with these defects.

And in addition, there are e-mails where internally

they're discussing there are quality issues with the loans that

are being originated.

And also you can tell from the initial quality control

numbers themselves, from December -- the first quarter of 2008,

which is really the first time that a significant portion of

the High-Speed Swim Lane loans are being QC'd.  The numbers

shoot through the roof.

And there has been evidence that's been introduced

from instances like the poker run, and the sprint incentive,

where the company was taking steps to drive down the numbers

artificially, and so, but in any event, shows that they knew

that the loans that they were originating were poor quality

during all this time, they know that they're selling these

loans, these loans are being sold to the GSEs with the

DAI3BAN5

1     representations and warranties about the quality of loans.

2     They didn't do anything to stop that.  Nobody calls up Fannie

3     and Freddie and tells them that there are issues with quality

4     of the loans.  They keep selling them.

5           With regard to the mail and wire point.  Obviously we

6     put in --

7           THE COURT:  I don't think you need to pursue that.

8     Did you want to say something about the argument for

9     Ms. Mairone?

10          MR. ARMAND:  Yes.  There has been substantial evidence

11    that has been introduced that Ms. Mairone was central to the

12    process of the High-Speed Swim Lane.  She was involved in all

13    of the significant decisions having to do with the process,

14    with its design, with its implementation, with regard to the

15    compensation of the employees, with regard to the funding

16    goals.  And in November of 2007, when it was brought to her

17    attention that there were issues with the quality, she and two

18    other people that the government has alleged fraudulent intent

19    decided to go forward and push for more volume.  And the e-mail

20    itself indicates that the reason for the taking of all of the

21    quality information, to making herself the point of contact,

22    was to focus on production.  Free up these employees to focus

23    solely on production, because the evidence shows that during

24    this timeframe, FSL needed to make money in order to hit their

25    volume targets, and that's precisely what they did.

DAI3BAN5

1          This continued until everything -- it hit the fan in

2     March of 2008 when the initial SUS findings came out that they

3     were above 30 percent.  And then after that, the company itself

4     acknowledged that all of this was a bad idea and they brought

5     back the underwriters.

6          THE COURT:  I've heard enough.  I continue to adhere

7     to my prior rulings and deny the motions.

8          I think, however, that there are legal aspects of this

9     case that still need to be resolved as part of the charging

10    conference.  Such as the one I was just discussing with

11    Mr. Armand, and I'll give you another one just so you can start

12    thinking about these kind of questions.

13         For purposes of this motion, they either need a

14    mailing or an interstate wire.  They only need one.  But, for

15    purposes of instructing the jury, I want to make sure that

16    there is nothing unnecessary.  That if there is no mailing that

17    has been shown, maybe there has, but if there is no mailing, I

18    am just going to talk to them about interstate communications

19    and not about mailings.

20         So, when you see my charge, my draft charge, you'll

21    see it is, as is always the case with my charges, quite short.

22    Because I try to narrow it down to what the jury needs to

23    evaluate this case and nothing more, nothing less.  But I think

24    we'll need to talk during the charging conference as to exactly

25    what can be argued and what can't.  That relates not just to

DAI3BAN5

1    the charging conference, but I think on Monday we should plan

2    also to discuss any limitations on summation that may need to

3    be imposed.

4           Now, I think I am going to allow the government a

5    brief rebuttal.  I'll limit it to 20 minutes.  I think that in

6    a case like this, with so many exhibits, so many details, so

7    many witnesses, to have the jury as the last thing they heard

8    hear three uninterrupted hours of defense argument without the

9    government having the opportunity to maybe hit a few of the

10   highlights that from their standpoint they wish to rebut, would

11   be unfair.

12          At the same time, I think it would be unfair to the

13   defense to allow a lengthy rebuttal.  I think by limiting it to

14   20 minutes, which will be strictly enforced, it will require

15   the government to just focus on what it thinks are the most

16   critical issues that it seeks to rebut.

17          So, the government will have two hours and 10 minutes

18   for opening summation, 20 minutes for rebuttal.  The banks will

19   have two hours.  Ms. Mairone will have one hour.  And that will

20   be the time limits.

21          Exercising a rare moment of realism, I'm going to

22   suggest we get together at 10 o'clock on Monday morning.

23          Anything else that we need to discuss now?

24          MR. ARMAND:  Your Honor, the government wanted to make

25   sure we, for the reasons I just stated, we want to make our own

DAI3BAN5

1     affirmative Rule 50 motion.

2                THE COURT:  Yes.  That is denied.

3                MR. ARMAND:  Just preserving the record, your Honor.

4                THE COURT:  I will tell you, I don't know what you all

5     think, when you are a trial lawyer you get so into your case it

6     is very, very hard to remain objective.  I think this is one of

7     the closer cases I've seen in a long time.  I have really no

8     idea at this point in time who is going to prevail.  And that's

9     very rare.  I usually have a pretty good sense of who is going

10    to prevail.  I think this is one heck of a close case, and that

11    makes it fun for me and not fun for you.

12               MR. ARMAND:  Your Honor, we also just wanted to note

13    we do believe that there has evidence has been presented that

14    there has been an affect on the --

15               THE COURT:  I am going to read that as not a matter to

16    charge the jury on.  Of course I'll let your adversary be heard

17    on that further before I make my absolute final decision.  As

18    of right now, as you see in my draft charge when you get it

19    later this afternoon, I don't charge that element at all.

20    Because I think it has been established as a matter of law.

21               MR. ARMAND:  Understood, your Honor.  The other point

22    I just wanted to make, given that the preference your Honor had

23    expressed earlier, we had refrained from putting on additional

24    evidence that we otherwise would have regarding the affect.

25               THE COURT:  I can't help you there because I was wrong

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAI3BAN5

1    on the law.  It is too late now for you to repair that damage.

2    But, there it is.  Now you're really stuck.  You're stuck with

3    my ruling.  But anyway, that is my ruling.

4             MR. ARMAND:  Understood.

5             THE COURT:  Very good.  We'll see you on Monday.

6             (Adjourned until October 21, 2013, at 10 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3      ROBERT BROEKSMIT

4      Cross By Ms. Schoenberger  . . . . . . . . . .3006

5      Redirect By Mr. Smurzynski . . . . . . . . . .3028

6      Recross By Ms. Schoenberger  . . . . . . . .3035

7      DAVID BATTANY

8      Direct By Ms. Mainigi  . . . . . . . . . . .3038

9      Direct By Mr. Cohen  . . . . . . . . . . . .3098

10     Cross By Mr. Cordaro . . . . . . . . . . . .3099

11     Redirect By Ms. Mainigi  . . . . . . . . . .3135

12     Redirect By Mr. Cohen  . . . . . . . . . . .3138

13     Recross By Mr. Cordaro . . . . . . . . . . .3139

14                        PLAINTIFF EXHIBITS

15     Exhibit No.                               Received

16      4   . . . . . . . . . . . . . . . . . . .3009

17      534  . . . . . . . . . . . . . . . . . . .3020

18      535  . . . . . . . . . . . . . . . . . . .3021

19                        DEFENDANT EXHIBITS

20     Exhibit No.                              Received

21      2848E  . . . . . . . . . . . . . . . . . .3029

22      2848D  . . . . . . . . . . . . . . . . . .3030

23      2848G  . . . . . . . . . . . . . . . . . .3030

24      2657B  . . . . . . . . . . . . . . . . . .3033

25