DALTBAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   Plaintiff,

5           v.                          12 CV 1422 (JSR)

6   BANK OF AMERICA CORPORATION,
7   *successor to Countrywide
    Financial Corporation,*
8   *Countrywide Home Loans, Inc.,
    and Full Spectrum Lending*, et
9   al.,

10                  Defendants.

11  ------------------------------x
                                        New York, N.Y.
12                                      October 21, 2013
                                        10:30 a.m.
13
    Before:
14
                        HON. JED S. RAKOFF,
15
                                        District Judge
16

17

18

19

20

21

22

23

24

25

DALTBAN1

1                                     APPEARANCES

2    PREET BHARARA
           United States Attorney for the
3          Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6          Assistant United States Attorneys

7

     WILLIAMS & CONNOLLY
8          Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14         Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17         Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  All right.  With respect to the proposed

3   jury instructions one through seven, are there any objections

4   edits, or additions from the government?

5          MR. ARMAND:  With regard to one through seven, I don't

6   believe so.  I think the only thing we noted on instruction

7   number seven was that it listed some witnesses, experts from

8   the defense who didn't testify.

9          THE COURT:  That's true, right.

10          MR. ARMAND:  Arnold Barnett and Charles Rice are

11   listed there.

12          THE WITNESS:  Right, just Robert Broeksmit.

13          THE COURT:  All right.  Anything from bank counsel?

14          MR. SINGER:  Few things, your Honor.  With regard

15   to -- these are all, I think, in the nature of proposed

16   additions as opposed to objections to the language that's

17   there.

18          In instruction number one, I wonder if it would make

19   sense to remind the jurors that the preliminary instruction

20   that they received the first week is -- they should essentially

21   disregard that.

22          THE COURT:  I saw that in your proposal.  Actually, I

23   don't see anything in my current instructions that is any way,

24   shape, or form inconsistent with the preliminary instructions,

25   so I see no need for that.  If I had changed something that

1    would have been different, but preliminary instructions, of

2    course, say on their face they are no substitute for the final

3    instructions.  But I think to say anything further at this

4    point would wrongly convey to the jurors that there was some

5    change from the preliminary instructions where there is not.

6         MR. SINGER:  This is one that I don't feel

7    particularly strongly.  The instinct I has was only to remind

8    them because of the brevity of the preliminary instructions

9    that they're obviously incomplete as opposed to these

10   instructions.

11        THE COURT:  Yes, although -- well, all right.  Let me

12   see.  How about this, in the first paragraph on page 1, after

13   the second sentence, which the second sentence reads:  Before

14   you retire to deliberate, it is my duty to instruct you as to

15   the law that will govern your deliberations.  Then insert

16   following sentence:  These are the final and binding

17   instructions and entirely replace the preliminary instructions

18   I gave you earlier.

19        MR. SINGER:  That would be fine, thank you.

20        THE COURT:  OK.

21        MR. MUKASEY:  Before Mr. Singer goes on, I want to

22   note that defendant Mairone will join in the exceptions taken

23   by the bank and the suggestions offered by the bank, and then

24   we'll have some specific requests of her own.

25        THE COURT:  OK.

1          MR. SINGER:  And instruction number two, a few

2     suggestions.  We had requested an instruction that the jurors

3     should use their common sense in weighing the evidence.  The

4     term "common sense" is one that appeals to us as a matter of

5     jury argument and seems to be a correct instruction, so we

6     request that.

7          THE COURT:  Where are you referring to?

8          MR. SINGER:  Our instruction request number two.  The

9     language was:  You should use your common sense in weighing the

10    evidence, consider the evidence in light of your everyday

11    experience with people and events, and give it whatever weight

12    you believe it deserves.

13         THE COURT:  Well, you're free to say that on

14    summation.  I actually don't know a single case that actually

15    says that.  Do you have a citation?

16         MR. SINGER:  I think we got it from the O'Malley

17    pattern instructions.

18         THE COURT:  Yes, I saw you were reduced to O'Malley as

19    opposed to Sand, et al. for that purpose.  I don't believe it

20    is an instruction that should be given.

21         MR. SINGER:  Also in instruction number two there's a

22    reference to -- the second page, might be the first page,

23    there's a reference to the paragraph beginning:  Testimony

24    consists of the answers that were given by the witnesses.  And

25    there's a reference to depositions that were read into

1    evidence.  I think given the way that things have progressed it

2    should say something like deposition videos.

3              THE COURT:  Thank you.  Or in the depositions that

4    were presented.  OK.

5              MR. SINGER:  Then we also ask an instruction of the

6    jury should not speculate about matters not in evidence.  And

7    for this one, this is another one that we requested.

8              THE COURT:  I would agree with that.  Where do you

9    want to put that?

10             MR. SINGER:  I recommend that it come after the

11   paragraph we were just looking at, so before the paragraph

12   beginning:  It is the duty of the attorney.

13             And the specific language that we requested reads:

14   Also you should be careful not to speculate about matters not

15   in evidence.  Rather, your focus should be entirely on

16   assessing the evidence that was presented, and not on

17   speculating as to what other evidence, if any, might or might

18   not --

19             THE COURT:  Yes, I like that instruction since you

20   copied it from one of mine.

21             MR. SINGER:  Imitation is the sincerest form of

22   flattery.

23             THE COURT:  Where would you put that?

24             MR. SINGER:  I don't feel terribly strongly about

25   where it goes, but we where thought about putting it is after

the paragraph beginning, "Testimony consists of," and before

the paragraph beginning "It is the duty of the attorney for

each party."

THE COURT:  OK.  I think that's the right place.  Read

me the language once again so that my very talented law clerk

can write it down.

MR. SINGER:  Do you want the commas or not?

Also, you should be careful not to speculate about

matters not in evidence.  Rather, your focus should be entirely

on assessing the evidence that was presented, and not on

speculating as to what other evidence, if any, might or might

not have been obtained.

THE COURT:  I don't like the last word, might or might

not.  I'll play with it, but aside from finding an appropriate

synonym for the last word, I will give that instruction.

MR. SINGER:  Then on instruction number five, two

things in the nature of this, the first line reads, "In

deciding whether a party's burden of proof," the only party

with the burden of proof is the government.

THE COURT:  All right.  In deciding whether the

government has met its burden of proof.  OK.

MR. SINGER:  And then I wonder if, when we say --

Page 6, first line of the instruction.

THE COURT:  I got it.

MR. SINGER:  Then at the end of that instruction, the

1   second sentence of the last paragraph, circumstantial evidence

2   is of no less value than direct evidence, we think it will be

3   more correct to say that it is of no more or less value.  In

4   other words, we may be making a suggestion to the jury that it

5   would be more value.

6          THE COURT:  No, I don't think that adds anything.

7   Denied.

8          MR. SINGER:  That was all that I had for one through

9   seven.

10          THE COURT:  Very good.  Counsel for Ms. Mairone?

11          MR. MUKASEY:  Nothing, Judge, thanks.

12          THE COURT:  All right.  So now let's turn to

13   instruction number eight.  Any objections, edits or additions

14   from the government?

15          MR. ARMAND:  Not through instruction eight, your

16   Honor.

17          THE COURT:  Bank counsel?

18          MR. SINGER:  Yes, your Honor, this has come up before

19   and I apologize if we're plowing old ground here, but I do

20   believe that we have an instruction that each of the bank

21   defendants except for Bank of America, NA should be treated as

22   an independent --

23          THE COURT:  Now you are right to raise that because

24   that's an issue that you have raised before but I have never

25   fully understood, so let me make sure I understand your

DALTBAN1                    Charge conference

1    argument and then we'll hear from the government.

2              You agree entirely that Bank of America is the

3    successor to these entities, yes?

4              MR. SINGER:  For the purposes of this case we conceded

5    and continue to concede that Bank of America, NA is the legal

6    successor to Countrywide Bank, so if Countrywide Bank is liable

7    we agree that Bank of America, NA is liable.

8              THE COURT:  And it is -- are you saying that Bank of

9    America is not liable if Countrywide Home Loans is liable?

10             MR. SINGER:  I don't believe that's been alleged or

11   admitted one way or the other.

12             THE COURT:  And this is something that I think can be

13   determined by judicial notice.  What is the relationship, legal

14   relationship of --

15             Does Countrywide Home Loans, Inc. still exist?

16             MR. SINGER:  I don't believe that it's an entity in

17   operation, your Honor.  I don't know what its precise legal

18   status is.

19             THE COURT:  For all practical purposes, was it not

20   absorbed by Countrywide Bank?

21             MR. SINGER:  I don't believe so, your Honor.

22             THE COURT:  For all practical purposes, was it just

23   made defunct?

24             MR. SINGER:  At the time --

25             THE COURT:  Well, someone in the defense knows the

1   answer to this.

2           MR. SINGER:  My understanding, your Honor --

3           THE COURT:  Do I have to call a witness from the bank

4   this afternoon in this court to get answer to the legal

5   situation of these three defendants?

6           This is not a matter for the jury, this is a matter of

7   judicial notice of what the legal relations are, something

8   intimately known by the defense, and certainly after four weeks

9   plus of trial when this issue has been raised you should know

10  the answer.

11          MR. SINGER:  My understanding, your Honor, is at the

12  time that the merger occurred between Bank of America and

13  Countrywide, the merger was between -- as far as Bank of

14  America, NA was concerned, Countrywide Bank was merged into

15  Bank of America, NA.

16          I do not believe -- and I can confirm this, but I do

17  not believe that Countrywide Home Loans per se was merged into

18  Bank of America, NA.  There are other Bank of America entities,

19  one of which was previously sued in the case.

20          THE COURT:  Who is here for Countrywide?  Where is

21  counsel for Countrywide?

22          MR. STRASSBERG:  Are you talking about us as outside

23  counsel?

24          THE COURT:  Yes.  So what's the answer?

25          MR. STRASSBERG:  Your Honor, with respect to --

DALTBAN1                    Charge conference

1           THE COURT:  You don't know the status of your own

2    clients?

3           MR. STRASSBERG:  We can consult clearly with in-house

4    counsel and we can have a short break.

5           THE COURT:  We'll take a short break right now.  I

6    want the answer.

7           (Recess taken)

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  Let me hear from Countrywide's counsel.

3        MR. STRASSBERG:  Your Honor, the short answer is

Countrywide Home Loans is a separate entity.  It was not merged

in with Countrywide Bank at the time that Countrywide Bank was

merged into Bank of America.  I believe counsel for the bank

would explain.  I can state it first, that the banks are not

trying to suggest that Bank of America is not nonetheless

liable as successor for the purposes of this case for either

entity.  I think the only point they were making is they are a

separate entity.  Countrywide Home Loans continues to exist.

It has servicing that it does.  It has repurchase claims that

it's handling.  It has litigation.

14        THE COURT:  Who is the CEO of Countrywide Home Loans,

Inc.?

16        MR. STRASSBERG:  Your Honor, for all of those detailed

questions, I would have to consult back with --

18        THE COURT:  Good.  I want someone who can answer any

and all questions about Countrywide Home Loans in my court as

soon as possible.  Go make a call.  And I want someone in

authority.  If there is a general counsel, if there is a CEO or

anyone.  I suspect there may not be anyone but a janitor.

23        MR. SINGER:  If it would solve the problem, we're

happy to withdraw our objection on this instruction.

25        THE COURT:  All right.  That's fine.

1          Now, do you have any other objections to instruction

2     number eight?

3          MR. SINGER:  Not an objection, your Honor, but a

4     suggestion, which can either come in this instruction or a

5     different one.  We have requested an instruction just to remind

6     the jurors that the question of any possible penalties or

7     sanctions is not for them but it is for the Court.

8          THE COURT:  I think that's fair.

9          How about this in the first paragraph, the end of the

10    first paragraph after the sentence "this is known as

11    establishing liability," let me add the following sentence:  I

12    remind you that, if liability is found for any defendant, the

13    issue of how much damages or penalties, if any, are to be

14    imposed is for the Court.

15         MR. SINGER:  Your Honor, conceptually I'm fine.  I

16    guess I would prefer, all things being equal, I would prefer

17    there not be a reference to damages or money, just penalties.

18         THE COURT:  I think the statute, although it is

19    couched in terms of penalties, also refers to damages, does it

20    not?

21         MR. SINGER:  I don't recall it that way.  The reason I

22    have a concern about it, your Honor, is not just because of the

23    word "damages" per se, but because it is a reference to money

24    and I just --

25         THE COURT:  What other kind of penalties do you

1   suggest I can impose?

2           MR. SINGER:  I wasn't going to ask for any, your

3   Honor.  But the question of what the jury needs to know and

4   hear --

5           THE COURT:  Don't you think they should know this is

6   not a question of like, for example, sending Ms. Mairone to

7   jail or anything like that?  That we're talking about money.

8           MR. SINGER:  At the end of the day, we are talking

9   about money.

10          THE COURT:  Shall I use the word "money"?

11          MR. SINGER:  I prefer just "penalties," but it has to

12  be "damages," we'll take damages.

13          THE COURT:  I was giving you both.  How about money?

14  The issue of damages, how much money, if any, to be imposed is

15  for the court.

16          MR. SINGER:  I prefer the first formulation.

17          MR. MUKASEY:  Can I propose a possible intermediate.

18  The concept of civil penalties.

19          THE COURT:  I think that conjures up all sorts of

20  notions that are really well beyond what the Court can impose

21  in this case.  I think we are talking about money.

22          MR. ARMAND:  In terms of the statute, I think it only

23  references civil penalties.  It is clear we are talking about

24  money.  So I think the government's proposition would be "money

25  in the form of civil penalties," because I don't think the jury

DAL3BAN2                        Charge conference

 1    is going to understand what civil penalties are.

 2               THE COURT:  Yes.  That's my fear too.

 3               MR. SINGER:  The whole point of the instruction is for

 4    the jury not to be considering the issue of what penalties, if

 5    any, are going to be provided.

 6               THE COURT:  That's why I'm giving them the sentence

 7    you asked for.

 8               MR. SINGER:  I reason I asked for it --

 9               THE COURT:  So, you prefer a sentence that says

10    whatever civil penalties may mean, and you have no idea what it

11    means, but we'd like to give you an instruction that is

12    meaningless, here is in a meaningless instruction which you are

13    not to consider.

14               MR. SINGER:  I wouldn't put it exactly that way, your

15    Honor.  The jury obviously knows that something is going to

16    happen to these defendants if it finds them liable.  The point

17    of the sentence is really to tell them it is none of their

18    business what that something is.

19               THE COURT:  So in the preliminary instructions that

20    all counsel agreed to, albeit it was not binding on these final

21    instructions, what you all agreed to then was the following

22    sentence:

23               Any monetary penalties that are then imposed on the

24    defendant are determined however by the Court, not the jury.

25               So, I think the sentence here should read:  I remind

1    you that if liability is found for any defendant, the issue of

2    what monetary penalties, if any, are to be imposed is for the

3    Court.

4            Anything else?

5            MR. MUKASEY:  Yes, Judge.  In the third paragraph of

6    this instruction, where you devote the attention to

7    Ms. Mairone, my concern is that it's not intuitive that

8    Ms. Mairone through her conduct can bind the banks, but the

9    banks need not necessarily bind Ms. Mairone, because there are

10   other managerial agents who --

11           THE COURT:  I will consider something, but I don't

12   think this is the place for that.  The place is later on, I

13   think it is the very next instruction, where we talk about who

14   can bind the bank.

15           MR. MUKASEY:  It is instruction nine.  The reason I

16   raise it here, your Honor, where your Honor has it in nine is

17   sort of towards the back of nine.  And my concern is that the

18   language is couched -- all the language of fraud and specific

19   intent and knowledge and representations is couched in the

20   language of an individual.  It is not intuitive to a juror or

21   really to anybody that a corporation can make a misstatement or

22   a corporation can have intent.  And my request is --

23           THE COURT:  Have you conveyed those thoughts to

24   JPMorgan?

25           MR. MUKASEY:  I don't want to think about JPMorgan

1    right now.  But, my request is, as early as possible, possibly

2    here, possibly earlier in charge nine, you convey to the jury

3    the notion --

4              THE COURT:  No.  You have an hour's worth of

5    summation.  These are incredibly short instructions.

6              MR. MUKASEY:  They are.

7              THE COURT:  And the reason for that is so that nothing

8    gets lost and nothing gets confused.  If we had, as some of my

9    colleagues do, an 80-page instruction describing the history of

10   the universe, I might see your point.  But I don't see it now.

11   Denied.  We will take it up in instruction number nine.

12             Turning to instruction number nine.  Anything from the

13   government?

14             MR. ARMAND:  Yes, your Honor.  The government had two

15   requests for additions.  One is from our request number eight

16   which deals with the concept of originating the scheme, and

17   that any particular person who is alleged to have intent, it is

18   not necessary the government prove that that person originated

19   the scheme.

20             And so what we would propose to add is "In order to

21   establish the existence of the scheme, the government is not

22   required to establish that any person with the requisite intent

23   originated or created the scheme to defraud.  The government is

24   required only --"

25             THE COURT:  I want to think about.  What is your

1    authority for that?

2              MR. ARMAND:  I think it is the Ragosta case.  If you

3    give me a moment I can pull it up.

4              THE COURT:  Yes.  Go ahead.

5              MR. ARMAND:  I think this is also something we briefed

6    in connection with the summary judgment motions.  This was an

7    issue that Ms. Mairone's counsel had raised in their papers

8    that she didn't create the scheme.  And our response was, well,

9    you don't necessarily have to create the scheme.  You just have

10   to be a knowing participant in the scheme.

11             THE COURT:  I agree with you that you don't have to

12   create the scheme.  But you're going a step further and saying

13   that you don't have to have an intent to defraud to create the

14   scheme.  I don't think that's right.  At least, I'm not aware

15   of any authority.  How could it be a scheme to defraud if there

16   wasn't intent to defraud?

17             MR. ARMAND:  Well, it is really first sentence.  "In

18   order to establish the existence of a scheme, the government is

19   not required to establish that any person with the requisite

20   intent originated or created the scheme to defraud."

21             THE COURT:  I hear what you are saying.  I want to

22   know what your authority is for that.

23             MR. ARMAND:  All right.  Your Honor, maybe if we can

24   come back to it and I'll find it.

25             THE COURT:  Come back means during this charging

DAL3BAN2                        Charge conference

1   conference.

2              MR. ARMAND:  Absolutely.  I'll provide a citation for

3   you.

4              THE COURT:  What was the other thing you had?

5              MR. ARMAND:  The second is we had a requested charge

6   with regard to the necessary result inferring intent from the

7   necessary results of the scheme.

8              THE COURT:  Yes.  I don't think that is the law.  I

9   know there is an occasional case that has said that.  My

10  recollection is there are numerous cases that question that.  I

11  know it would not be permitted under Second Circuit law in a

12  criminal case, and since the civil liability here is premised

13  on violation of a criminal statute, I don't see how it can be

14  true in a civil case.

15             MR. ARMAND:  The government is relying on I think

16  there were two cases.  The United States v. Chacko case which

17  is a Second Circuit case, and also the Ausa Life case, which is

18  also a Second Circuit case.

19             THE COURT:  My law clerk will take a look at that.

20  Give the citations.

21             MR. ARMAND:  Sure.  Chacko, 169 F.3d 140.  Ausa Life

22  is 206 F.3d 202.  In Chacko, it is a mortgage fraud case.

23             THE COURT:  All right.  Are either or both of these

24  FIRREA cases?

25             MR. ARMAND:  No, neither of them are FIRREA cases.

DAL3BAN2                    Charge conference

1          THE COURT:  I think that can make a difference.

2    Because where you have a pure, ordinary civil case, civil fraud

3    case, the remedial purposes of the statute allows a broader

4    scope for inferring things.  For example, you can infer in an

5    every day civil fraud case, you can have what is called

6    constructive fraud.  Something is not itself a fraud, but it

7    acts as if it were a fraud.

8          This is represented, for example, in the third

9    subdivision of Rule 10b-5 which has been invoked, only the

10   third subdivision, only in civil cases.   Another example is

11   injunctive relief.

12         I'm saying this off the top of my head, so I could be

13   corrected by any case that you have.  But where you have, as in

14   FIRREA, a civil penalty that attaches as a result of violation

15   of a criminal statute, albeit shown only to a civil burden of

16   proof, then, it seems to me, the ordinary principles of how one

17   construes liability under that are governed, other than as to

18   burden of proof, by the criminal law.

19         I believe that in criminal case, under the wire and

20   mail fraud statutes, the instruction that someone intends the

21   natural probable consequences of his acts have been expressly

22   disapproved by the Second Circuit.  Therefore, I don't see how

23   it should be relevant in this FIRREA case.

24         MR. ARMAND:  Well, there are so very few FIRREA

25   prosecutions so there is --

DAL3BAN2                    Charge conference

 1          THE COURT:  I'm sure there is a reasonable possibility
 2   this issue has not come up.
 3          MR. ARMAND:  Correct.
 4          THE COURT:  Now you have my preliminary view.  If you
 5   want to shoot at it, sure.  But we'll see what my law clerk
 6   comes up with in a minute.  I'm quite confident that that
 7   instruction has not been permitted -- has been expressly
 8   disavowed in the criminal context in the Second Circuit and
 9   elsewhere.
10          There is a short matter I'm going to take in a few
11   minutes, and I'll give both sides an opportunity to do some
12   research during that time, then we'll resume.  But, for the
13   moment I'm not inclined to adopt that.
14          On instruction number nine, let me hear from --
15          MR. ARMAND:  Your Honor, are you moving to a different
16   matter or are we still proceeding with number nine?
17          THE COURT:  Number nine.  I'm sorry, there is more,
18   yes.
19          MR. ARMAND:  Yes, your Honor.  With respect to, on the
20   second page, the fourth line down, where it is referencing a
21   reasonably prudent purchaser of mortgage loans at Fannie Mae or
22   Freddie Mac.  And the government would propose saying instead
23   "a reasonably prudent person involved in the purchase of
24   mortgage loans at Fannie Mae and Freddie Mac."  And the reason
25   for that is that it is not one single person who was handling

1    the purchasing, and there were people with different roles who

2    can contribute input into the purchasing decisions.  And so we

3    are just concerned that the jury may get hung up on who is the

4    person who was actually purchasing.  There are a chorus of

5    people.

6            THE COURT:  Subject to hearing from your adversary in

7    a minute, I'll adopt that change.

8            MR. ARMAND:  Thank you, your Honor.  I skipped one.

9    Going back to the preceding page, the paragraph that starts

10   "here specifically the government alleges."  And the fourth

11   sentence "that the loans were higher quality than they actually

12   were and/or had been subjected to greater quality safeguards."

13   We would just --

14           THE COURT:  I agree with that.

15           MR. ARMAND:  That's it for --

16           THE COURT:  By the way, there was one typo on page 13

17   in the second full paragraph, seventh line, the fourth word

18   from the end, the word should be "intended."  Past tense.

19           MR. ARMAND:  I also noticed that Clifford Kitashima, I

20   think his last name may be spelled K-I-T-A.

21           THE COURT:  K-I-T-A.  Thank you very much.

22           Bank counsel on number nine.

23           MR. SINGER:  Okay, your Honor.  Would you like me to

24   respond to any of the government's suggestions first or --

25           THE COURT:  At the moment the only ones I've accepted

1    are the and/or and the person involved in the purchase.  Do you

2    have any problem with either of those?

3              MR. SINGER:  I'm fine with and/or if we are going to

4    have that clause at all, which I'll get to in a minute.  But

5    the only issue I have with the reasonably prudent person

6    involved with the purchasing is "involved" makes it sound like

7    it could be anyone.  It should be somebody who is actually

8    making the purchase decision.  I'm okay with the concept of

9    what I think the government counsel was suggesting, which is it

10   has to be a person.  But it shouldn't just be anyone at the

11   company.  It has to be the responsible person.

12             THE COURT:  So I agree with that.  What words would

13   you suggest?

14             MR. SINGER:  What language?  I'm sorry.

15             THE COURT:  Beginning at the very bottom of page 12,

16   "and that these misrepresentations were material because a

17   reasonably prudent person involved in the purchase of mortgage

18   loans," etc.

19             MR. SINGER:  How about "deciding whether to purchase."

20             THE COURT:  "Involved in the decision to purchase"?

21             MR. SINGER:  I think "involved" is --

22             THE COURT:  It is "involved" that you are having a

23   problem with and I'm sympathetic to that.  We're not going to

24   say "materially involved."

25             MR. SINGER:  How about "the person purchasing."

1              THE COURT:  The point is it was more than one person

2    who made the decision.  That's their point.

3              MR. SINGER:  I'm not sure that there is evidence in

4    the record for that.  But it could be so.  But I think the

5    point I'm trying to make is that the relevant person is not

6    just somebody who may have had some involvement in the

7    decision.  The relevant person at Freddie and Fannie.

8              THE COURT:  I can remember testimony of at least one

9    and maybe two witnesses saying that decisions were sometimes

10   arrived at through consultation.

11             Well, I'll think about, we need a word instead of

12   "involved."

13             MR. SINGER:  "Responsible for" would be another

14   option.  My concern is that "involved" suggests that somebody

15   who had minimal responsibility --

16             THE COURT:  That's the issue.  Let me think about

17   that.  If someone can come up with a good word, I'll accept

18   that change.  What else?

19             MR. SINGER:  So then harkening back to a point your

20   Honor just made in colloquy with the government counsel, we

21   would like -- I have a concern that the jury is being told this

22   is in effect a civil fraud claim.  While that is partly true,

23   it is certainly a civil claim and it is certainly based on

24   fraud, the government has to prove that the defendants violated

25   criminal mail and wire fraud statutes.

1          THE COURT:  Only civilly.

2          MR. SINGER:  Say again, your Honor?

3          THE COURT:  Only civilly.

4          MR. SINGER:  It's true that the claim is a civil

5     claim.  But in order to prove the defendants are liable for the

6     civil claim, they have to show a violation of 18 U.S.C. Section

7     1341 or 18 U.S.C. Section 1343, which makes it, in my view, a

8     very unusual civil claim, and one that is predicated like a

9     RICO --

10         THE COURT:  RICO is of course a predecessor to this.

11    In a civil RICO case, the jury is not -- at least in the cases

12    that have occurred before me, have not been told that these are

13    criminal statutes.  They've just been told what the elements

14    are.

15         MR. SINGER:  One of the elements is a pattern of acts

16    of racketeering.  In that instance it is fairly clear in a RICO

17    case the defendant is being charged -- it isn't always criminal

18    in a RICO case, but it has to be a pattern of acts of

19    racketeering, many of which are criminal, and often those are

20    proved as criminal charges to the jury.

21         THE COURT:  What is it you're asking for?

22         MR. SINGER:  We had proposed language in our proposed

23    instruction number 13 and we can take that or something

24    shorter.  I would point out the government also proposed very

25    similar language to what we proposed.

1            THE COURT:  Let me just say, so everyone remembers

2     this.  The clear law of the Second Circuit, reiterated, at

3     least to my knowledge, 20 times over the course of decades, is

4     that if a submitted request to charge misstates the law in any

5     respect, the Court is free to disregard the entire charge.

6     Therefore, I won't burden the record with the fact that a great

7     many of the charges submitted by each of the parties here in

8     their original request to charge in one or more respects

9     misstated the law.

10           But I'm giving you an opportunity that the Second

11    Circuit doesn't require, but that I think is only fair, which

12    is, regardless of what you asked for before, which in many

13    respects went on for many sentences and was often right in some

14    of the sentences and wrong in some of the other sentences.  If

15    you have a specific wording you want to give me now, on this

16    charge, I will consider that wording.  But just to refer back

17    to charge 13 won't do me or you any good.

18           MR. SINGER:  Understood.  Let me give you some

19    language that's actually shorter than what we originally

20    proposed.  So it may be more palatable.  It would read:

21    Although this is a civil case, to prove its claim the

22    government must prove that the defendants committed -- or I

23    would say each of the defendants committed a criminal offense

24    of mail or wire fraud.

25           THE COURT:  That is denied.  I agree that succinctly

1   makes the point you would urge upon Court.  I believe it is

2   extraordinarily contrary to the notions underlying FIRREA.

3   That to suggests to the jury that they somehow have to find

4   something else, something of a criminal nature in an inherent

5   way beyond the elements they actually have to find.  And

6   therefore, it is misleading and prejudicial.  So I will not

7   give that.  But your record is preserved.

8            MR. SINGER:  Thank you, your Honor.  Next suggestion

9   is in the first element, where elements are being summarized in

10  the first paragraph, first that there existed a scheme to

11  defraud Fannie Mae and Freddie Mac, I would suggest adding the

12  words "of money or property."  Just to track the statutory

13  language.

14           THE COURT:  It should be "and/or Freddie Mac," but I

15  agree that to add "of money or property" is good.

16           MR. SINGER:  Continuing on, by false or fraudulent

17  pretense, representations or promises.  We would ask to replace

18  the word "representations" with the word "statements."  Not

19  because "representations" is legally incorrect, but because the

20  jury has heard so much about representations and warranties in

21  this case that we're concerned they will be confused when they

22  hear the word "representations" in this context it somehow

23  means the same thing, which obviously it does not.

24           THE COURT:  It is the language of the statute.  If you

25  want to have me add something later on further defining it, I'm

1  happy to consider that.  I don't think I should tamper with the

2  language in the statute in the first overview.

3          MR. SINGER:  We'll give that some thought.  It make

4  sense perhaps to tell the jury at this point that by the word

5  representation, I don't mean to say a contractual

6  representation and warranty.  That means something different.

7          THE COURT:  I understand the point.  When we get down

8  to the bottom of the page 12, I'll consider language there.  I

9  just want to make sure we stay on course.  If that's the next

10 thing you have, I'll take that up now.  If you have something

11 else before that on page 12, you should raise it first.

12         MR. SINGER:  Okay.  Next one in the materiality

13 section, we would request an instruction after the language

14 that's there now -- the language there now is "a statement is

15 material if it relates to a fact that a reasonably prudent

16 person would consider important in making a decision."

17         We would ask to add the language "to be material,

18 information misrepresented must be of some independent value or

19 bear on the ultimate value of the transaction."

20         THE COURT:  First of all, there again, if at all, I

21 would take that up at the end of the next paragraph.

22         Just so you understand, I'm outlining the first in the

23 most abstract way the three elements.  That's the first half of

24 page 12.  Then, I give a further discussion of the first

25 element, also in an abstract way.  And then in the second

1    paragraph, beginning with "here specifically," that's where we

2    get to the particulars.  So if it goes anywhere, that's where

3    it would go.  Let's take up then the two points you've just

4    raised and we'll see.

5            You want to put in, first, on the issue of

6    misrepresentations what?  I don't think there is any danger,

7    now that I look at it, that "misrepresentations" will be taken

8    to somehow be a reference to representations and warranties.

9    Although representations and warranties are of course a form of

10   representation.

11           MR. SINGER:  Actually, it leads into a related concern

12   that we also had which is that we would ask for an instruction

13   that failure to abide by a contract or an agreement is not in

14   and of itself fraud.  I think that's implicit in the

15   instructions but really needs to be explicit because so much of

16   the testimony --

17           THE COURT:  That one I would consider.  But it is not

18   doing me any use to have this sort of scattershot approach.

19           MR. SINGER:  I understand.

20           THE COURT:  On your request regarding substituting

21   "statements" for "misrepresentation," that's denied.

22           On your request that the materiality have the sentence

23   you were saying, I don't see what that adds to what is on the

24   top of page 13.  And any prudent person involved -- or some

25   better word -- in the purchase of mortgage loans at Fannie Mae

1    or Freddie Mac would have considered the true facts important

2    in deciding whether to purchase or how to price the loans.

3                MR. SINGER:  The difference, your Honor, is that just

4    the fact that somebody might have considered important or may

5    have wanted to know about a particular process, for example,

6    that Countrywide was involved in, does not make it material.

7    It has to have actually affected the value of the transaction.

8    That's how I read the --

9                THE COURT:  In this context, "materiality" means that

10   it is important to the mix of information that the purchaser

11   would take account of in deciding whether to purchase or

12   whether to price at a given price.  I think that's the clear

13   law.  I don't know of any contrary authority.  But if you have

14   contrary authority, let me know.

15               Since we've given all you folks the request to come up

16   with some further authority, why don't we take a 10-minute

17   break while I take up this other matter that I have and then

18   we'll resume.  You will need to leave the table, however.  And

19   we'll call you back in about 10 minutes.

20               (Recess)

21               (Continued on next page)

22

23

24

25

DALTBAN3                    Charge conference

1          THE COURT:  Well, the government is not here, so we

2     can proceed without them.

3          MR. SINGER:  Your Honor, I have a few more requests I

4     would like to add.

5          THE COURT:  We'll wait a minute or two.

6          So I agree with defense counsel that the government's

7     time for summation has to be limited to two minutes.

8          Oh, here's the government.

9          MR. ARMAND:  We were in the conference room.

10          THE COURT:  All right.  So before we turn to other

11     things, did the government want to say anything more on the two

12     points that I had not accepted but which they said were

13     reflected in the <u>Chacko</u> case and the <u>AUSA Life Insurance</u> case.

14     It's a great name for a life insurance company.

15          MR. ARMAND:  I like it.  I think with regard to the

16     <u>Chacko</u> case, it's a criminal case, it's a mortgage fraud case.

17     And in that one the borrower had taken out loans that it was

18     clear he would not be able to pay back, and the court held that

19     it was appropriate to infer fraudulent intent from the fact

20     that the necessary result of having taken out this loan --

21          THE COURT:  Where are you looking at?

22          MR. ARMAND:  Where in the case specifically?

23          THE COURT:  Yes.

24          MR. ARMAND:  I don't have a copy of the case, but --

25          THE COURT:  Sorry, I don't see that there was anything

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    in the jury instruction there.

2              MR. ARMAND:  It's not specific --

3              THE COURT:  It says the question of sufficiency of the

4    evidence on defendant's intent to defraud, and the language in

5    the case is, "When it is clear that a scheme viewed broadly is

6    necessarily going to injure, it can't be presumed that the

7    schemer had the requisite intent to defraud."  Citing Regent

8    Office Supply Company and United States v. D'Amato.  If you

9    read that through to the end, however, what they're really

10   saying is that circumstantial evidence can carry the day on a

11   sufficiency challenge, which of course is unquestionably true.

12   It says nothing about any charge to the jury.

13             So I don't think that changed my mind on that issue.

14   What about the other case?

15             MR. ARMAND:  Well, I think AUSA Life is similar.

16   Neither of the cases dealt with jury instructions, but they do

17   speak to the general precept of mail and wire fraud when the

18   government is proving fraudulent intent that circumstantial

19   evidence in the scheme itself can be used to show --

20             THE COURT:  Yes, so let's get a little clearer on

21   this.  The forbidden instruction, I went back and searched my

22   memory, always an arduous task, and I now remember that the

23   forbidden instruction is an instruction that you can presume

24   fraudulent -- you can presume someone intends the probable

25   consequences of their acts, or words to that effect.  It was

1    the word "presumption" that ultimately led to that instruction

2    being held improper, harking back, as you're to young to

3    remember to the famous Supreme Court case involving Timothy

4    Leary, and if you don't know who he is, you have led a

5    sheltered life, but I urge you to look him up.  I see that

6    slightly older counsel is nodding his head.

7              MS. MAINIGI:  Me, your Honor?

8              THE COURT:  No, your colleague on the right.

9              But in any event, so I think if we cut out the

10   presumption language, it might be accurate as far as it goes,

11   but I don't see why one should, for either side, single out one

12   aspect of circumstantial evidence over any other.  So I still

13   reject the instruction.

14             MR. ARMAND:  Understood, your Honor.

15             Did your Honor wish to go back to bank counsel to

16   continue with their --

17             THE COURT:  Yes.

18             MR. ARMAND:  And I'll have some responses to some of

19   their arguments.

20             THE COURT:  Yes, I will come back to you in a minute.

21   I want to hear from bank counsel and counsel for Ms. Mairone.

22             MR. SINGER:  I think where we left off we were talking

23   about the materiality, particularly the instruction that we

24   requested that to be material the information misrepresented

25   must be of some independent value or bear on the ultimate value

DALTBAN3                         Charge conference

1    of the transaction.

2              THE COURT:  First of all, I don't know what the heck

3    that means, for a start, but go ahead you were going to give me

4    a citation.

5              MR. SINGER:  I can try to explain it, but the who

6    citations that use that formulation and almost those exact

7    words -- or not almost, but in those exact words, U.S. v.

8    Rigas, 490 F.3d 208, and U.S. v. Mittelstaedt, 31 F.3d 1208,

9    and I think --

10             THE COURT:  Rigas is a Second Circuit case, the other

11   is a Second Circuit case?

12             MR. SINGER:  Both Second Circuit cases.  I think what

13   the cases are getting at is there can be testimony that a

14   person in a position to transact or purchase thinks that some

15   information that was not revealed to them or was misrepresented

16   to them is important, and says gee, I would want to know that.

17   In Mittelstaedt, I think the situation was I wouldn't want to

18   do business with someone who was dishonest, so I would have

19   wanted to know that the person I was transacting business with

20   was doing bad stuff.  And court holds in both cases that what

21   really matters is are you getting what you paid for in the

22   transaction?  And is what is going on -- is the information

23   that is being misrepresented having an actual effect on the

24   value of the transaction?

25             And so here it's an important instruction, because we

1    have a lot of testimony, and I expect we'll hear a lot of

2    argument tomorrow about the how the HSSL process was a bad

3    thing and gee, we should have told Fannie and Freddie about the

4    process and the changes to the process.  But what is really

5    important, and think this came out in Mr. Battany's testimony

6    on Friday in particular, is did it affect the quality of the

7    loans --

8            THE COURT:  Let me see if I understand this, because I

9    have a vague recollection not of -- Rigas is a famous case but

10   there have been a number of cases in this area.  So we have to

11   again distinguish, of course, as to all fraud cases between

12   omissions when there's no duty to speak and misrepresentations.

13   So I am selling you an interest, security interest in my

14   company, and I don't reveal that I have been convicted

15   previously for securities fraud.  There was no duty, it's an

16   arm's length transaction, so we don't reach the question of

17   materiality, there's no duty.  But now I say to you, in this

18   hypothetical transaction, you can trust me because I'm known in

19   the community as someone who deals honestly and

20   straightforward, and so even though this is a fairly new

21   company and there's not too much I can show you in terms of

22   hard data, trust me on this because of my reputation, and I

23   fail to reveal in saying that that my reputation is really

24   lousy because I have been convicted three times for securities

25   fraud.  And you're saying that that would not be material, even

1    though a reasonable purchaser would consider that very

2    important in those circumstances in this issue whether or not

3    to purchase the security?

4            MR. SINGER:  I think I need to know a little more or

5    we need to know some more facts about the transaction.

6            THE COURT:  Since I'm that making up this

7    hypothetical, ask me any question you want.

8            MR. SINGER:  I will tell you what might be important

9    and what might not be.  If the issue is the seller lied about

10   his reputation, lied about not having previous convictions when

11   in fact he did, but the company he's selling and the company

12   that the buyer is buying is worth the same amount regardless,

13   doesn't affect the value of the transaction, then I would say

14   it's not material.

15           THE COURT:  That's the issue.  So I will have my law

16   clerk pull those cases and we'll take a look.

17           DEPUTY CLERK:  The second site again?

18           MR. SINGER:  Mittelstaedt is 31 F.3d 1208.  And while

19   we're at it, I can also give you U.S. v. Starr, 816 F.2d 94.

20           THE COURT:  We'll put that on hold for a minute.

21           Go ahead.

22           MR. SINGER:  Then moving on to the paragraph beginning

23   here specifically "The government alleges," we have the

24   sentence that reads or the portion that reads that a scheme was

25   devised to induce Fannie Mae and Freddie Mac to purchase

1    mortgage loans originated through the High-Speed Swim Lane by

2    misrepresenting the loans were of higher quality than they

3    actually were, and I think --

4                THE COURT:  And/or.

5                MR. SINGER:   -- and/or had been subjected to greater

6    quality safeguards then they actually had been.  This relates

7    to the materiality discussion that we have been having because

8    the government hasn't articulated -- and this came up on Friday

9    on the Rule 50 hearing as well, that the government has not

10   articulated how safeguards were misrepresented or how the

11   safeguards -- the idea is that the safeguards or the lack

12   thereof supposedly impaired the quality of the loans.  And

13   that's what Mr. Battany cared about, and that's been the

14   government's theory all along and.  Mr. Armand said this on

15   Friday, what the government is arguing is yes, the HSSL process

16   was bad, but the reason it was bad is because it had an adverse

17   effect on the quality of the loans and it's the quality of the

18   loans that the government is claiming was being misrepresented.

19               THE COURT:  I think we went through this a little bit

20   on the Rule 50, and there is testimony in the record both ways

21   on this, but if for example, in my hypothetical, you designed a

22   way of processing loans that was calculated to eliminate any

23   checks whatsoever on bad loans so that the risk of a given loan

24   being bad was hugely increased, but in my hypothetical -- oh,

25   and then you represented to your purchaser that we're doing all

1    the quality controls that you wanted us to do but by a fluke

2    the particular mortgage loan that in my simple hypothetical

3    involving a single loan was sold to the purchaser was good, the

4    purchaser testifies in my hypothetical I did get a loan that

5    happened to be what I had bargained for, but I never would have

6    bought it if I had known these facts because it was too big a

7    risk and I didn't want to assume, I would have never wanted to

8    assume that risk.  Fraud or no fraud?

9             MR. SINGER:  I think we're talking about two elements

10   and I want to distinguish them, if I can, in my answer before I

11   give you the bottom line, which is there is the question of

12   whether there's a misrepresentation and there's a question of

13   whether it's material.  And I think --

14            THE COURT:  See I think, just to interrupt you, I

15   think that is a scheme to defraud, meets all the elements of

16   scheme to defraud.  Your damages, if this were a civil damages

17   civil action, might be zero, but there was a scheme to defraud

18   I think is clear.

19            MR. SINGER:  The point I was making about this

20   instruction, though, is something that your Honor's

21   hypothetical has which this case is missing which is a

22   representation a false representation about process, where in

23   your hypothetical --

24            THE COURT:  So that's a different point.  I agree with

25   you that they have to show that there was a misrepresentation

DALTBAN3                    Charge conference

1    about process and they have to have testimony which a

2    reasonable juror could infer that if that misrepresentation

3    were false it would have been material to the purchaser or

4    someone, quote, involved, closed quoted, in purchase.  We'll

5    still have to come up with a better word than "involved."

6         Let me ask the government, so what were the

7    misrepresentations that were made regarding the quality of the

8    process?

9         MR. ARMAND:  Your Honor, with regard to the process, I

10   think the government's main position has always been that there

11   was no -- in terms of the duty to disclose, it was more of a

12   defensive argument, and the bank was claiming that they

13   disclosed the process.  We were saying no, you did not disclose

14   the process.

15        THE COURT:  So are you saying you're limiting your

16   claim to misrepresentations regarding the quality of the loans?

17        MR. ARMAND:  Not with regard to the quality of the

18   loans.  The misrepresentation about the quality of the loans is

19   in the rep and warrants which says they have to be quality

20   investments, they have to be investment quality.  But with

21   regard to the misrepresentation about the process, to the

22   extent that they were making statements, the bank personnel

23   were making statements about the process, those statements

24   needed to be true and accurate.

25        THE COURT:  Those are the statements I'm asking you to

DALTBAN3                          Charge conference

1      identify.  What are those statements?

2                  MR. ARMAND:  Those are in the presentations that they

3      made, they claim they made to Freddie and Fannie about the

4      process.  That did not completely disclose what they were

5      doing.  There were statements in the presentations about how

6      they would continue to track Quality of Grade or quality scores

7      so they could make changes to people's compensation.  During

8      that time there was a suspension of Quality of Grade.  And so

9      it's really the statements that are in those --

10                 THE COURT:  Which exhibits are those?

11                 MR. ARMAND:  I could find them for you.  I don't have

12     know the numbers off the top of my head, but there are two

13     presentations, one to Fannie and one to Freddie.  They were

14     both used in Mr. Kitashima's testimony.

15                 THE COURT:  Forgive me, I must admit that in contrast

16     to my ordinary congenial, low-keyed manner, I have been quite

17     irritated at what has occurred here this morning on both sides.

18     You had the whole weekend.  I got this you this charge on

19     Friday, early evening, people come in here and they say oh,

20     that's the case law but we don't know what case, we'll have to

21     look it up.  People come in here and say, as right now, well,

22     there's some exhibit out there we are relying on but we don't

23     know off the top which exhibit it is.  These are precisely the

24     kinds of issues that you all knew would come up at a charging

25     conference and I gave you the whole weekend to do it.  And I'm

just taken aback that we're constantly having:  Can we get back

to you on the role of Countrywide?  Can we get back to you on

citations?  Can we get back to you on what exhibits?

        Now this is a question, the question that we're now

discussing is one that has been raised by the defense from day

one, and you're telling me that you satisfy your alternative

prong, that's what it is, your alleging there was fraud either

because there was misrepresentations that the loans were of

higher quality than they actually were and/or, as you a half

hour ago asked me to substitute, have been subjected to greater

quality safeguards than they actually had been.

        So my question is:  What are the misrepresentations

that the loans had been subjected to greater quality safeguards

than they actually had been?  And your initial response is a

more or less nebulous reference to certain presentations, and I

would like to know what specifically you're arguing and what

specifically is going to be argued in your summation as to

which were the misrepresentations made in those presentations.

And I would like to see the presentation and have you identify

exactly which they are.

        So we'll take another five-minute break and you can do

that for me.

        (Recess taken)

        THE COURT:  The exhibits are?

        MR. ARMAND:  Your Honor, the presentations are --

3213

DALTBAN3                    Charge conference

1    DX729 is the Fannie Mae presentation and the Freddie Mac

2    presentation is DX4036, both of them are in the Cliff Kitashima

3    binder which is --

4             THE COURT:  OK, let's get that out.

5             Government has recouped something by the way they just

6    showed up my law clerk.  That's always a good thing.  Anyway,

7    729.

8             MR. ARMAND:  I guess, your Honor, before we get to the

9    exhibits, the reason why we're referencing the exhibits is just

10   to show that the extent they were giving information -- the

11   bank was giving information to Fannie or Freddie about their

12   processes that they needed to be accurate.  With regard to the

13   misrepresentation about subjected to greater quality

14   safeguards, there isn't really a specific misrepresentation

15   that goes to that.  It's more the representation about the

16   loans being investment quality and --

17            THE COURT:  Well, are you withdrawing the alternative

18   theory?  I go back to the bottom of page 12, "Here specifically

19   the government alleges and the defendants deny that one or more

20   of the defendants devised a scheme to induce Fannie Mae" -- and

21   I guess there should be and/or Freddie Mac -- "to purchase

22   mortgage loans through the High-Speed Swim Lane by

23   misrepresenting that the loans were of higher quality than they

24   actually were" -- that you clearly alleged -- "and/or have been

25   subjected to greater quality safeguards than they actually had

1    been."

2            Are you withdrawing the latter part of that?

3            MR. ARMAND:  No, your Honor, the language -- the

4    representation about being investment quality, it can be read

5    to include that the loans were subjected to proper quality

6    safeguards, because there's language that says that you're not

7    omitting anything material about the loan and that you don't

8    know of anything about the loan that would lead an investor to

9    conclude that it wasn't a quality investment.  So that's why we

10   initially left it in.  But the thrust of our --

11           THE COURT:  Wait a minute.  So that has nothing to do

12   with these presentations, you're talking about the general

13   language in the contract.

14           MR. ARMAND:  Correct.

15           THE COURT:  And let me hear that language again.

16           MR. ARMAND:  It is with regard to Fannie Mae, it's

17   that there is -- it has to be a quality investment, the

18   investor knows --

19           THE COURT:  This is contractual language, so --

20           MR. ARMAND:  Correct.

21           THE COURT:  Can we have the exhibit?

22           MR. ARMAND:  Fannie Mae is PX1.

23           THE COURT:  That shouldn't be too difficult to find.

24           MS. MAINIGI:  Battany binder should have it, and

25   Sobczak binder.

1              THE COURT:  By the way, I remind counsel, while we're

2      talking about exhibits, we need to have indices and we also

3      need -- you need to be able to give my courtroom deputy at the

4      close of summations all the originals so that they can be

5      wheeled in to the jury as soon as my charge is completed.

6              MR. ARMAND:  The parties are working to compile that,

7      your Honor.

8              THE COURT:  Very good.  So my law clerk just handed me

9      PX2, showing that he's arithmetically challenged.

10             Normally I would never beat up on a law clerk, but

11     this particular law clerk, Austin King, is not only incredibly

12     brilliant but has a very tough skin, so what the hell.

13             DEPUTY CLERK:  I think PX2 is Fannie Mae, I think PX1

14     is Freddie Mac.

15             THE COURT:  Is PX2 the same thing?

16             MS. JONES:  Yes.

17             THE COURT:  Point me in PX2 what you're referring to.

18             MR. ARMAND:  Page 8, item 17.

19             THE COURT:  17.  The lender knows of nothing involving

20     a mortgage, the property, the mortgager, the mortgager's credit

21     standing that can be reasonably expected to cause private

22     institutional investors to regard the mortgage as an

23     unacceptable investment, cause the mortgage to become

24     delinquent, or adversely affect the mortgage's value or

25     marketability.

1              I will read that again and interrupt as necessary.

2     "The lender knows of nothing involving the mortgage, the

3     property, the mortgager, or the mortgager's credit standing --"

4     Let me pause there.  Nothing directly in that process there at

5     all.  Continuing -- "that can reasonably be expected to cause

6     private institutional investors to regard the mortgage as an

7     unacceptable investment, cause the mortgage to become

8     delinquent, or adversely affect the mortgager's value or

9     marketability."

10             And your position is that implicit in that is the

11    representation that we have not skewed the process so as to

12    maximize chance of mortgages that will become delinquent be

13    defective, be unacceptable to occur.

14             MR. ARMAND:  Correct, your Honor.

15             THE COURT:  Surely doesn't say that.  This was drafted

16    presumably by Fannie Mae, needs to be read against them as a

17    matter of law.  If that's protection they had wanted they could

18    easily have said that.

19             MR. ARMAND:  It's the "knowing nothing involving the

20    mortgage," and that could be read to include a loan origination

21    process that is negatively impacting the quality of the loan.

22             THE COURT:  It could be, but the question is whether

23    there's a basis on which this jury can infer that that is the

24    way it would have been read by the persons who allegedly

25    created the fraudulent process.  Now I believe, correct me if

1    I'm wrong -- is there any evidence that Ms. Mairone, let's

2    start with her, ever read this contract?

3           MR. ARMAND:  I think she testified that she was aware

4    that the loans were sold with representations and warranties.

5    I don't believe she was specifically shown this provision.

6           THE COURT:  Was she asked whether that included her

7    understanding that there had to be a disclosure if the process

8    was defective, or words to that effect?

9           MR. ARMAND:  I don't believe so, your Honor.

10          THE COURT:  What about Mr. Kitashima?

11          MR. ARMAND:  He testified that he was aware that the

12   loans that were sold to Fannie Mae and Freddie Mac needed to

13   be -- they came with representations and warranties, and they

14   needed to be investment quality, but he also was not shown the

15   specific provision and asked did you understand this to include

16   process or not.  So I agree with your Honor, it's not -- the

17   record is not strong on this point, and we're not going to be

18   arguing it in the closing, and so ultimately --

19          THE COURT:  If you're not going to argue it at closing

20   then we better not charge the jury about it.

21          MR. ARMAND:  So ultimately I think we probably

22   could --

23          THE COURT:  So I'm going to strike that part of.  And

24   that, by the way, makes much more relevant the language which I

25   prudently added about the preliminary instructions no longer

1    being binding.  So I think there are -- so the sentence now

2    reads here:  Specifically the government alleges and the

3    defendants deny that one or more of the defendants devised a

4    scheme to induce Fannie Mae and/or Freddie Mac to purchase

5    mortgage loans originated through the High-Speed Swim Lane by

6    misrepresenting that the loans were of higher quality than they

7    actually were, and that these misrepresentations were material

8    because a reasonably prudent person involved in the purchase of

9    mortgage loans of Fannie Mae or Freddie Mac would have

10   considered the true facts important to decide whether to

11   purchase the loans.

12       Now I think that eliminates also your business about

13   materiality, but for what it's worth, the extra sentence that

14   you wanted to add, I don't see it in any of the cases you cited

15   to me.

16       MR. SINGER:  Let me give you the cites, your Honor, it

17   is in the Rigas case, it's on page 231, quoting we have also

18   held that, "To be material, the information withheld either

19   must be of some independent value --"

20       THE COURT:  Where?

21       MR. SINGER:  The bottom of the left hand column of

22   231.

23       THE COURT:  Yes.  So they say there, they're talking

24   about -- first of all, this is has nothing to do with the

25   holding that they get to on the materiality five pages later,

1   but in any event I will read the whole paragraph:  The scheme

2   to defraud clause requires that the defendant engage in a

3   pattern or course of conduct designed to deceive a federally

4   chartered or insured financial institution to releasing

5   property with the intent to victimize an institution by

6   exposing it to actual or potential loss.  Citing a case called

7   Stavroulakis.  First, the government must prove that the

8   defendant engaged in a deceptive course of conduct by making

9   material misrepresentations.  Citing several cases.  A false

10  statement is material if it has a natural tendency to influence

11  or is capable of influencing a decision of a decision-making

12  body to which it is addressed.

13          I notice you haven't asked for that language about the

14  natural tendency, et cetera.  Then it says we have also held

15  that to be material, quote, the information withheld either

16  must be of some independent value or must bear on the ultimate

17  value of the transaction, whatever that means, citing United

18  Services quoting United States v. Mittelstaedt.  Analysis of

19  the misrepresentation must be in the context in which they were

20  made.  Quote, materiality must be judged by the facts and

21  circumstances in the particular case.

22          Now with my great apologies to the learned panel of

23  the Second Circuit, this bears all the earmarks of some law

24  clerk being asked to go out and collect all the boilerplate on

25  materiality and throw it in here since it has very little to do

1    with the discussion that proceeds later about materiality about

2    the specific Rigas.  But they're quoting Mittelstaedt, so the

3    source of all this language is supposedly Mittelstaedt.

4              MR. SINGER:  The quote is accurate.  It's on page 1217

5    of Mittelstaedt on the right-hand column.

6              THE COURT:  I don't have Mittelstaedt for some reason.

7              MR. SINGER:  I would be happy to pass it up.

8              THE COURT:  Here it is.  I'm sorry, here it is.  So

9    where is it in Mittelstaedt?

10             MR. SINGER:  1217 on the bottom right.

11             THE COURT:  1217.

12             MR. SINGER:  First sentence of the paragraph that ends

13   the page.

14             THE COURT:  To be material, the information withheld

15   either must be of some independent value or must bear on the

16   ultimate value of the transaction.  See Carpenter v. United

17   States, 484 U.S. 19.  And I have some familiarity with that

18   case since I represented Mr. Carpenter, and it says nothing of

19   the kind.  What they say -- they quoted from Carpenter, and the

20   quote is:  The words "to defraud" in the mail fraud statute

21   have the common understanding of wronging one in his property

22   rights by dishonest methods or schemes and usually signify the

23   deprivation of something of value."  That, of course, is

24   unexceptionable, but doesn't really support.  But in any event,

25   I don't understand, now that we have cut out the clause about

1    the process, I don't understand how what you're saying adds

2    anything.

3              MR. SINGER:  I think cutting out the clause on the

4    process helps with the problem because it does go to the same

5    issue, which is that I'm concerned that the jury is going to be

6    confused by all the testimony about the process, which took up

7    a lot of the case, and they're going to think that if --

8              THE COURT:  Certainly bears on intent.

9              MR. SINGER:  I'm not arguing for at least right now

10   that the testimony should have been excluded, all I'm saying is

11   for the purposes of this instruction I don't want the jury to

12   come away with the view just because somebody at Fannie Mae or

13   Freddie Mac might have cared about the process means that it

14   was material.

15             THE COURT:  But as it now reads, the instruction is:

16   Here specifically the government alleges and the defendants

17   deny that one or more of the defendants devised a scheme to

18   induce Fannie Mae and/or Freddie Mac to purchase mortgage loans

19   originated through the High-Speed Swim Lane by misrepresenting

20   that the loans were of higher quality than they actually were.

21             That seems unequivocal.  And also materiality then is

22   about whether the quality of the misalleged -- if they had

23   known the true facts about the quality, that would have caused

24   them not to purchase, which is what the sentence goes on to

25   say.  So I don't think anything further is necessary.

1          MR. SINGER:  One more quibble about the end of that

2     sentence.  The reference to the facts important in deciding

3     whether to purchase or how to price the loans, the government

4     has never alleged that the HSSL process or any fraud in this

5     case led to Fannie and Freddie paying an unfair price.  It's

6     not a question of pricing, the theory --

7          THE COURT:  There has certainly been testimony about

8     that.

9          MR. SINGER:  I don't think so.  I think there was

10    testimony from Mr. Battany --

11         THE COURT:  For example, I recall testimony where

12    government said if you had known X and Y, would that have been

13    important?  Yes, it would have affected the purchase or the

14    pricing.

15         MR. SINGER:  In cross-examining Mr. Battany they asked

16    a question in terms of purchase and pricing.  I think that's

17    the first and only time they did that, because Mr. Battany

18    testified --

19         THE COURT:  So all they need is one.

20         MR. SINGER:  The issue is what is their claim in this

21    case.  It has always been that the HSSL process made the loans

22    not investment quality so they could not be sold under the

23    contracts.  The contracts specified that the loans have to be

24    investment quality to be sold, and if they're not investment

25    quality, the government's theory has been they shouldn't be

1     sold at all.  They have never alleged in the case that Fannie

2     or Freddie paid too high a price for the loans or they should

3     have paid a lower price, the issue is:  Could they be sold at

4     all?

5                 THE COURT:  Let me hear the government on that.

6                 MR. ARMAND:  I think, your Honor, our argument is that

7     it would have been important to their purchasing decision

8     generally, which would include pricing.  We haven't tried to

9     put in evidence to assess --

10                THE COURT:  It may -- they shouldn't have offered it

11    at all, but if they did, the bank, Fannie Mae and Freddie Mac,

12    could either say, you know, you're selling us a used car

13    instead of a new car, but we'll pay you a used car price.  I

14    think that's consistent with the claims in this case.

15                MR. ARMAND:  And your Honor, I believe there is some

16    testimony from Mr. Sobczak and Tanabe on the issue of pricing,

17    and that these would have impacted their decisions, including

18    pricing.  But the government has not been trying to limit

19    itself to simply the argument that the loans couldn't have been

20    purchased at all, it's just if you had this information about

21    the quality of the loans, the lack of quality of the loans,

22    would it have been important to you in making your decision.

23    The decision could be to not purchase them at all or it could

24    be to charge a different price.  It's all about getting the

25    information, and what you do with it is the prerogative of the

1   buyer, but they need to have it.

2              THE COURT:  Yes.

3              MR. SINGER:  It's an interesting theory.  It's the

4   first time we're hearing it.  It's not in the complaint.  It's

5   not asserted in the opposition to any motions.  I never heard

6   it mentioned by the government.  It come up a few times off

7   hand in testimony, the issue of how the GSEs priced the loans

8   and Mr. Battany's involvement in the process, but it has never

9   been the government's claim, and we're defending against it now

10  for the first time.  I don't think that's fair.

11             MR. ARMAND:  This was an issue that was part of the

12  discovery.

13             THE COURT:  If I had a nickel for every time one

14  counsel or another in this case told me in open court or the

15  side bar that something was unfair I would be a very wealthy

16  fellow.  I don't think -- the last I checked, I have to decide

17  these matters as a matter of law, not a matter of equity.  And

18  it's hard for me to believe that anything in this case at this

19  stage could be fairly said to be unfair.  There was plenty of

20  testimony about it.  I agree the testimony was later, but long

21  before the defense originally was going to rest its case.

22             But let's see, I think the operative document here is

23  the complaint.  Let me see if I can find a copy of the

24  complaint.  I will say there is one other relevant document,

25  which is the pretrial consent order where the government puts

1    forth its statement of disputed facts, but let me look first at

2    the complaint.

3              Well, the complaint goes on for --

4              MR. ARMAND:  Your Honor, I could direct your Honor to

5    paragraph 33 does mention pricing.

6              THE COURT:  33 of the complaint?

7              MR. ARMAND:  Of the complaint, yes.

8              THE COURT:  Let me take a look at that.

9              Yes, that's true.

10             MR. ARMAND:  But I think also it's generally part of

11   the government's argument that the information is material, the

12   quality of the loans is materially their decision.  And earlier

13   in paragraph 33 discussing the rep and warrant model and what

14   they're used for it talks about pricing.

15             THE COURT:  Well, I'm inclined to leave it in for now.

16   I will think a little bit more about it as we discuss it, but I

17   am inclined to leave it in for now.

18             MR. SINGER:  The last citation, paragraph 183, is the

19   charging language of the complaint.

20             THE COURT:  183?

21             MR. SINGER:  Looks to me like it's talking about

22   misrepresentations that the loans complied with the guidelines,

23   which would make them unsaleable, not that it would change the

24   price.

25             MR. ARMAND:  I would add, your Honor, that the whole

3226

1    idea of variances is dealing with the situations where loan

2    products fall outside of the guidelines, and they're making

3    pricing decisions.  Maybe Freddie or Fannie are willing to

4    purchase the loans outside the guidelines for some price.

5            THE COURT:  That paragraph has nothing to do with the

6    issue here, the issue here is the definition of materiality.

7            MR. SINGER:  The entire claim is about

8    misrepresentations that took the loans outside the guidelines

9    and therefore made them ineligible for sale.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Yes, but you have had a great deal of

2     evidence that they didn't care about this.  They expected a

3     certain amount of problems, which I allowed in on the issue of

4     materiality.  And the government's response is, they did care

5     about it.  It was important to them.  Either because it would

6     have affected the purchase itself, or, it would have affected

7     the price of the purchase.

8          I don't see anything in that paragraph that's

9     addresses that at all.  It is a different issue.

10          MR. SINGER:  I agree that the paragraph doesn't deal

11     directly with materiality.  It just deals with what the

12     government's claim is about what was misrepresented.

13          THE COURT:  Where this comes up is on the issue of

14     materiality.

15          MR. SINGER:  Materiality only matters if it is tied to

16     what was misrepresented.

17          THE COURT:  The misrepresentation is the quality of

18     the loans.  But not every representation or misrepresentation

19     of the quality of the loans is material.  So the question then

20     is, how does the jury decide what's material.

21          Under your approach, to be material, the information

22     withheld either must be of some independent value, or, must

23     bear on the ultimate value of the transaction.  United States

24     v. Rigas; citing United States v. Autuori; citing United States

25     v. Mittelstaedt.

1          If we accept your view, pricing is absolutely

2     involved.  It bears on the ultimate value of the transaction.

3          MR. SINGER:  I would concede that under my view

4     pricing would bear on the ultimate value.  The argument I'm

5     making now is it depends on what the misrepresentation is that

6     the government alleges.  The question is whether that

7     misrepresentation is material.

8          THE COURT:  Would you rather I take out the language

9     about the reasonable purchaser who considered the true facts

10    important in deciding whether to purchase or how to price the

11    loans, and substitute that a reasonable person involved in the

12    purchase would have considered the true facts important as

13    bearing on the ultimate value of the transaction?

14         MR. SINGER:  No, I prefer what's in there now.

15         THE COURT:  I thought you would.  Let's move on.

16         MR. SINGER:  All right.  Circling back to something

17    that I think this is now the time for.  I had mentioned earlier

18    that we'd like an instruction that says the failure to abide by

19    a contract or an agreement is not itself fraud.

20         THE COURT:  All right.  I just realized from looking

21    at the clock that we need to take our lunch break now because

22    I'm meeting another judge for lunch.  We are going to go as

23    long as necessary until we finish all this, and I'm sorry for

24    all the breaks.  But we'll continue at 2 o'clock.

25         MR. SINGER:  Thank you.

1          (Recess)

2          (In open court)

3          THE COURT:  So, I think we're up to any other edits,

4   etc., you have or bank counsel has for instruction number nine.

5          MR. SINGER:  Yes, your Honor.  We'd like an

6   instruction that failure to abide by a contract or breach of

7   contract is not by itself fraud.

8          THE COURT:  Well, what is the government's view on

9   that?

10          MR. ARMAND:  Your Honor, we would oppose an

11   instruction with regard to breach of contract.  I think whether

12   or not there is a breach of contract is irrelevant to the

13   question of fraud.  The government has to prove the elements of

14   mail and wire fraud.  If we do that, we have proven fraud.  The

15   existence of a contract is irrelevant.

16          Now, to the extent we start delving into, well, if you

17   don't comply with certain parts of your contract, even if it is

18   intentional, it is not fraud.  We would have to instruct the

19   jury on aspects of a breach that could be fraud.  If you never

20   intend to comply with your promises under your contract, that's

21   fraud.  If you misrepresent a present fact, for example, like

22   your Honor's cow hypothetical, or misrepresenting the quality

23   of loans that you are selling at that particular time, that

24   also could be fraud.

25          So if we now have to start giving the jury information

1    about how to navigate a breach of contract and whether or not

2    it could rise to fraud or not, it is really going to confuse

3    them.

4            THE COURT:  What you're saying is to the extent we got

5    into this at all, which seems totally unnecessary given the

6    very simple instructions they've received about what

7    constitutes fraud, it would be a very complicated and detailed

8    and probably confusing instruction.

9            Let me hear from defense counsel.

10           MR. SINGER:  I don't think we are asking for anything

11   complicated.  I'm just asking for a simple statement that a

12   breach of contract in itself is not fraud.  Fraud has to meet

13   the elements that your Honor will be instructing on.  I was

14   very interested to hear that contract provisions are not

15   relevant in this case, since they were projected up on the

16   screen for the jury.

17           THE COURT:  No, I don't think he said that.

18           MR. SINGER:  If I may, your Honor --

19           THE COURT:  The difficulty I think is this.  It is of

20   course correct that breach of contract is not a fraud.  The

21   ambiguity arises from some of the activities that were

22   undertaken that the government alleges constituted fraud, could

23   also be arguably construed as breaches of contract.  So, there

24   is a potential for a misunderstanding of such an instruction.

25   Hang on just a second.

1          How about this at the end of the first full paragraph

2     on page 13.  That paragraph now reads:  While the government

3     must prove that a scheme to defraud Fannie Mae or Freddie Mac

4     existed, the government is not required to prove that the

5     scheme to defraud actually succeeded, that a given defendant

6     personally benefited from the scheme to defraud, or that any

7     victim actually suffered any loss as a result of the scheme to

8     defraud.

9          Then I would add the following:  However, a mere

10    breach of contract by itself is not fraud; there must be,

11    instead, an intentional plan and purpose to defraud.

12         MR. SINGER:  That works for me, your Honor.

13         THE COURT:  I will adopt that.  Go ahead.

14         MR. ARMAND:  Your Honor, if I could just make a record

15    on this point.  We do think it would be prejudicial to have an

16    instruction with regard to breach of contract.  What we're

17    concerned about is because of the fact that the particular

18    misrepresentation that we're honing in on in this case are in

19    contracts, that the jury will conclude that just because those

20    representations weren't complied with, that the fact that they

21    weren't complied with means there is no fraud.

22         I understand your Honor has added the semicolon to

23    make clear there needs to be more.  What we're concerned about

24    is they will hear that because there is a contract, that's

25    where the misrepresentations are, and if they weren't complied

1   with, that that can't be fraud.  They will be confused --

2              THE COURT:  I don't know that they will.  I think the

3   defense is going to argue, and I think this is a fair argument,

4   if there were mistakes made here, ladies and gentlemen, and as

5   a result, there were breaches of the contract, that's not

6   enough to find us liable.  As the Court will tell you, a mere

7   breach of contract by itself is not fraud.  There has to be an

8   intentional plan or purpose to defraud.

9              I think that is a material part -- you'll forgive the

10  term -- of the defense in this case, is that they don't

11  necessarily agree that any mistakes were made, but to the

12  extent there were, and to the extent there were breaches in the

13  contract, it was non-intentional.

14             I'll think about all this a little bit more as we go

15  on this afternoon but for now I'm leaving it in.

16             MR. ARMAND:  Understood.  The jury may be confused

17  about what a breach of contract actually is.  Seeing as though

18  this isn't a breach of contract case.

19             THE COURT:  That's a fair point, except that so far as

20  it concerns this case, I think -- breach of contract is a

21  fairly simple, every day kind of concept.

22             Who is giving the closing argument for the banks?

23             MR. SINGER:  Mr. Sullivan.

24             THE COURT:  That's what I figured and he unfortunately

25  is not here.  I think I can see dangers if defense counsel

1    misused this instruction in their summation.  Which, as I

2    indicated yesterday, we're going to talk about limits on both

3    summations anyway, which I'm sure will be conveyed to

4    Mr. Sullivan and others.

5            MR. SINGER:  The danger I see, your Honor, goes the

6    other way.  If we didn't have an instruction like this, the

7    jury is going to feel like they've seen these references to

8    contract provisions, the government's argued they were

9    breached, and that's a fraud.

10            THE COURT:  Remember, I already at an earlier stage in

11    the case instructed the jury about how contracts are binding

12    and so forth.  I forget the exact context in which that arose.

13    But that had to be explained to the jury.

14            For the moment I'm going to leave it.  Let's move on

15    but I'll hear further on this before we close for today.

16            MR. SINGER:  Okay.  Your Honor, the next comment we

17    had is in the next paragraph, just a small wording suggestion.

18    There is a reference the words "any victim."  Could we --

19            THE COURT:  Where is this?

20            MR. SINGER:  Sorry.  It is in the next paragraph.

21    Beginning "while the government must prove that the scheme to

22    defraud Fannie Mae and Freddie Mac existed, the government is

23    not required to prove that the scheme to defraud actually

24    succeeded, that a given defendant personally benefited from the

25    scheme to defraud, or that any victim actually suffered any

1    loss as a result of the scheme to defraud."

2              We would just ask that the word "any victim" be

3    changed to the words Fannie Mae or Freddie Mac.  Since those

4    are the only entities at issue here.

5              THE COURT:  I'll give you that.  Or that Fannie Mae or

6    Freddie Mac.  Go ahead.

7              MR. SINGER:  Okay.  Then going into the second

8    element, the next paragraph, toward the last sentence of the

9    paragraph, and I just want to preserve our record on this since

10   we've already discussed it when it was referenced earlier,

11   there is a reference to affecting the pricing loans.  I just

12   want to preserve an objection to that language.

13             THE COURT:  Where are you talking about now?

14             MR. SINGER:  The sentence beginning similarly.

15   Similarly --

16             THE COURT:  Requires that the given defendant you are

17   considering purposely intended to deceive either May or Freddie

18   Mac or both by seeking to sell them mortgage loans or affecting

19   the pricing of those loans through false.

20             Yes, you are preserving your objection to the pricing.

21             MR. SINGER:  Yes.  The last word of that sentence I

22   mentioned earlier that I'm concerned about the word

23   representations, and it gets back to the contract point.  Is

24   that a fair place to change "representation" to "statements"

25   since we're not quoting the statute anymore?

1          THE COURT:  No, I'm going to leave it as is.  I think

2     it's clearly throughout, and I think to change it here would

3     lead the jury to believe that somehow it's something different

4     from what was referred to earlier.  So I'm going to leave as

5     is.

6          MR. SINGER:  The next sentence as to the bank

7     defendants, and the only issue we had with this one is that it

8     appears to be limited to intent.  We would like it to say that

9     the bank defendants -- liability can be established only if one

10    of those three persons participated in a scheme to defraud with

11    fraudulent intent just described.

12         Because I think what we are really talking about is

13    imputation of fraudulent conduct, which covers more than just

14    intent.  It also covers the participation the acts of the

15    individual.

16         THE COURT:  All right.  So, this would be revised as

17    follows:  As to the bank defendants, such an intent can be

18    imputed to them if but only if at least one of three managerial

19    persons, Rebecca Mairone, Clifford Kitashima, or Greg Lumsden,

20    participated in the fraudulent scheme with such an intent.

21         Right?  That's what you want?

22         MR. SINGER:  That would work, yes, your Honor.

23         THE COURT:  All right.  As to Ms. Mairone, however, it

24    can be found personally liable only if she personally

25    participated in such a scheme.  Such a fraudulent scheme with

DAL3BAN4                    Charge conference

1  such intent.  Right?

2           I'm just saving time so that Mr. Mukasey won't have to

3  raise that later.

4           MR. MUKASEY:  No, I'm going to actually -- are you

5  done with the second element?

6           MR. SINGER:  Yes.

7           MR. MUKASEY:  Because I have a couple of thoughts.

8           MR. ARMAND:  Are we -- if we're still sort -- I'm

9  sorry to interrupt.  The government wanted to lodge an

10  objection to the change.

11          THE COURT:  Why?

12          MR. ARMAND:  Just it's arguably redundant, if we are

13  talking about --

14          THE COURT:  It is arguably redundant, but I think it

15  is not verbosely so.  And it could possibly clarify some

16  possible doubt or questions.  So I don't see the harm.

17          MR. ARMAND:  I guess my only point was that we've

18  already talked about what scheme to defraud is and it concludes

19  that the intent to defraud.

20          THE COURT:  Yes, yes, yes that's all true.  But I

21  think this is fine.  Thank you.

22          MR. MUKASEY:  Judge, this is sort of a nitpick just in

23  terms of the linguistics.

24          THE COURT:  That has not stopped any of your

25  colleagues.

1          MR. MUKASEY:  The second full sentence in the second

2    element, paragraph one that begins it is not enough.  It ought

3    to say "it is not enough that the defendant you are

4    considering" as opposed to it is not enough that defendant.

5          THE COURT:  Yes, all right.  I agree.

6          MR. MUKASEY:  Now, towards the last sentence of this,

7    and I appreciate the changes that your Honor has just made.  My

8    concern, obviously, is that it is confusing to the jury that

9    Kitashima, Lumsden, and Mairone all can bind the banks through

10   the principle of respondeat superior, yet Mairone is the only

11   one sitting here at the table.  And I'm wondering if we could

12   not add some language that says the fact that Ms. Mairone is

13   named as a defendant should not weigh in your determination

14   of --

15         THE COURT:  No, I'm not going to give that charge.

16   But there was something else you had mentioned earlier that I

17   thought had more colorable --

18         MR. MUKASEY:  My original thought, until your Honor

19   shot it down this morning, was to move the concept of the

20   managerial agent earlier in --

21         THE COURT:  Yes.  That's still shot down.  But I wish

22   when I shoot that they would stay dead.  But I thought --

23         MR. MUKASEY:  You raised it.

24         THE COURT:  I thought the point you made earlier that

25   maybe should come in here, was something sort of summing up the

1   point.  In other words, if Ms. Mairone is liable, that can bind

2   the bank.  The fact that the bank is liable does not bind

3   Ms. Mairone.

4          MR. MUKASEY:  Right.  I have a good place to put it.

5   It is essentially, we just sort of looked it up the best we

6   could find sort of a basic proposition, but the best we could

7   find is the restatement of torts.  You have correctly and we

8   have all correctly encompassed the idea of respondeat superior.

9   The jury should be told there is no such thing as respondeat

10  inferior.

11          Before the last sentence of the second element which

12  you just revised, I thought you could put in "a finding that

13  one or more of the bank defendants is liable does not mean you

14  must find that Ms. Mairone is liable."  Then your final

15  sentence which you just revised, Ms. Mairone may be found

16  liable if etc., etc.  So it would be the second to last

17  sentence of this element.  You sort of say --

18          THE COURT:  All right.  Give me a minute here.

19          MR. MUKASEY:  Sure.

20          THE COURT:  Here's what I think would encapsulate

21  that.  I'm not sure whether the other parties including the

22  bank defendants want this.  But, I would put this at the very

23  end of that paragraph, right after the word "intent."

24          "In other words, if you find Ms. Mairone liable, you

25  must also find the banking defendants liable; but the banking

1   defendants may be liable even if you find Ms. Mairone not

2   liable.

3           Let me make sure before I hear from the other parties,

4   that's what you wanted in essence, yes, Mr. Mukasey?  Do you

5   want me to read it again?

6           MR. MUKASEY:  I'm reading it off the screen if you

7   just give me one second, Judge.

8           THE COURT:  Yes.

9           MR. MUKASEY:  Right.  No.  I understand the banks

10  don't want that, and that's actually not really what I was

11  asking for.

12          THE COURT:  Isn't that the point?

13          MR. MUKASEY:  But I think that that point is made in

14  the second to last sentence as you have it now.  As to the bank

15  defendants, such an intent can be imputed to them if one of the

16  three had the necessary intent and participated in the scheme.

17  But, the converse is not true.

18          THE COURT:  That's there right now.

19          MR. MUKASEY:  A finding that one or more of the bank

20  defendants is liable doesn't mean you must find that

21  Ms. Mairone is liable.

22          THE COURT:  But what is different between what you

23  just said and what the present second sentence says?

24  Ms. Mairone, however, can be found personally liable only if

25  she personally participated in such a fraudulent scheme with

1    such intent?  Isn't that exactly substantively the same as what

2    you just read.

3         MR. MUKASEY:  I think it is probably substantively the

4    same.  I think it is more understandable using my language.

5    But I'd offer that with great respect, obviously.

6         THE COURT:  All right.  I'm going to stick then with

7    the original because I infer that the bank defendants were not

8    thrilled at my suggestion.

9         MR. ARMAND:  The government would be fine with your

10   suggestion.

11        THE COURT:  All right.  I wouldn't be surprised if the

12   jury at some point asks us whether they can find the banks

13   liable even if they don't find Ms. Mairone liable, and then we

14   would instruct them yes, but only if you find Mr. Kitashima or

15   Mr. Lumsden to have the requisite intent, etc.

16        MR. ARMAND:  Your Honor, one other related point.  I

17   am not sure if this is the right place for it.  But with regard

18   to the limiting instruction that's been placed on certain

19   evidence hearsay with regards to Ms. Mairone, it can be used as

20   against the banks.  With regard to Ms. Mairone's intent for

21   imputing liability to the bank, we would think the limiting

22   instruction would not apply.  It would only apply for purposes

23   of her liability personally.

24        THE COURT:  I understand the point and it is an

25   interesting point, but I don't think it's right.  Because if

DAL3BAN4                    Charge conference

evidence that was introduced only against the bank but not

against her were used to infer her intent or her participation,

even if it was only for the purpose of then imputing that in

respondeat superior to the bank, it would still mean -- well, I

don't know.  Actually, that's a really interesting question.

         However, let me start with this.  It's going to be

endlessly confusing, is it not, to try to make that

distinction?

         MR. ARMAND:  We could try to come up with some

language.

         THE COURT:  How can you make an argument in summation,

and it goes like this, if I understand.  Now, in assessing

whether Ms. Mairone is liable, you cannot consider what this

hearsay evidence shows about her intent or her participation or

her scheme to defraud.  But, ladies and gentlemen, you can

consider it as to her intent, as to her participation in the

scheme to defraud, etc., etc., for purposes of determining

whether the government has made out its case as to her for the

limited purpose of imputing liability on that basis to the

bank.

         MR. ARMAND:  It is really --

         THE COURT:  While you're at it, ladies and gentlemen,

we have several philosophical conundrums we'd like to present

to you.

         I just think it will be endlessly awkward to instruct

1    them on that.

2            MR. ARMAND:  There may be a way to do it with regard

3    to the limitation, for purposes of liability, yes, for her own

4    personal liability we agree that it can't be used to show her

5    personal liability.  But, she should otherwise, for purposes of

6    holding the bank liable, be treated the same as Mr. Comeaux --

7    I'm sorry.  Mr. Lumsden or Mr. Kitashima.

8            THE COURT:  I understand the point.  I'm not quite

9    sure what the case law is.  I'll bet there is none.  I think

10   you could argue it fairly both ways.  In some ways the

11   government brings it on itself by naming an individual.  On the

12   other hand, the argument the other way is that doesn't mean the

13   government should be deprived of the evidentiary rights it

14   would have against the bank.  If the bank were the only

15   defendant, then none of this would have been hearsay.  It

16   wasn't hearsay as to the banks.  It would come in even if the

17   jury could infer something about Ms. Mairone or anyone else.

18           On the other hand, here, it raises I think a very

19   distinct danger of creating a dichotomy that jurors as

20   non-lawyers would have difficulty applying, and therefore might

21   very well trench on Ms. Mairone's rights not to have this used

22   against her personally.

23           So, I think it is, if you will, akin to a 403-type

24   problem.  I think you may be right on the law, but I worry

25   about how we could ever put this before a jury in a way that

1    would be so easy for them to distinguish and apply that we

2    could have confidence in it.

3           Do you have some proposed language in that regard?

4           MR. ARMAND:  I can for you, your Honor, in a few

5    moments.

6           THE COURT:  Okay.  For now I'm going to deny without

7    prejudice to your raising it at the end of the hearing.

8           MR. ARMAND:  Thank you, your Honor.

9           MR. SINGER:  Your Honor, I think we're ready for the

10   third element if you are.

11          THE COURT:  I'm just glad we are not dealing with the

12   periodic table.

13          MR. SINGER:  I couldn't tell you what the third

14   element is.  That's my chemistry education speaking.

15          THE COURT:  You're much too young, I guess to know the

16   songs of Tom Lehrer.

17          MR. SINGER:  I could tell you some of them, but not

18   that one.

19          THE COURT:  Tom Lehrer, still alive and living in

20   Cambridge, Massachusetts, took all the elements of the periodic

21   table and found out which ones rhyme, and put them together to

22   the tune of "I Am the Very Model of a Modern Major General."

23   That's a song by Gilbert and Sullivan.  You may not know who

24   they are either.  And performed it in his last public

25   performance in 1973 on PBS.

1              Anything else you'd like to know about it?

2              MR. SINGER:  No.

3              MR. MUKASEY:  You are sure that's not Timothy Leary?

4              THE COURT:  They were neighbors.

5              MR. SINGER:  On the use of the mails and the wires,

6     just a couple of wording suggestions.  The language after the

7     dashes, after the clause "such interstate communication

8     includes, among other things, interstate telephone calls and

9     interstate e-mails."

10             Two requests on that.  Just to avoid confusion and

11    consistent with some other instructions, instead of

12    "interstate," I'd much rather use "telephone calls between

13    people in two different states and e-mails between people in

14    two different states."  That's the way that the Sand

15    instruction phrases it and that's the way that your Honor's

16    Rodin instruction phrased it.  I think it is clear to the

17    jurors what interstate means in this context.

18             The other suggestion would be just to take out the

19    words "among other things" because I don't think there are

20    other things alleged.

21             THE COURT:  The second point I certainly want to hear

22    if there is any other thing that they're alleging.

23             MR. ARMAND:  I believe there are facsimiles in the

24    loan files.

25             THE COURT:  Then we'll leave it in.  If what you want

1    to say is "such interstate communication includes, among other

2    things. telephone calls and e-mails that traveled between two

3    states."

4              MR. SINGER:  That would work, yes.

5              THE COURT:  All right.

6              MR. SINGER:  Instead of among other things, if the

7    other things are facsimiles, we would could just add facsimile

8    to the list and take out the among other things.

9              MR. ARMAND:  There are also wire transfers I believe.

10             THE COURT:  The government will have to refer to these

11   on its summation or the jury may send us a note if they have

12   any questions about it.  But, I'm inclined not to give a

13   laundry list on that, so we'll leave it "among other things."

14             MR. SINGER:  I'm done with number nine, your Honor.

15             THE COURT:  All right.

16             MR. MUKASEY:  May I have a moment to confer with

17   Mr. Singer for a second.

18             THE COURT:  Yes.

19             MR. MUKASEY:  Thank you, Judge.

20             THE COURT:  All right.  Anything from government

21   counsel -- we'll go back to things we left open in a minute.

22   But anything about instructions 10 or 11?

23             MR. ARMAND:  Not with regard to 10 and 11.  We still

24   do have a couple of things to go back to on nine.

25             THE COURT:  Yes.  We'll do that in a second.  Anything

1   from bank counsel on 10 or 11?

2                MR. SINGER:  Only one thing, your Honor.  On number 10

3   there is, in the second paragraph, the third line refers to

4   exhibits that were admitted into evidence except for the video

5   depositions.  Just technically speaking, the video depositions

6   are not exhibits.  They're testimony.  So I think we should

7   just strike that language.

8                THE COURT:  We didn't mark the physical tapes as

9   exhibits?

10               MR. SINGER:  I don't think so, your Honor.  The next

11   sentence refers to them anyway.  So I think we can --

12               THE COURT:  All right.  Then I think it should read as

13   follows.  "In addition we will send into the jury room all the

14   exhibits that were admitted into evidence along with indices to

15   the exhibits.  If you want to see any of the video depositions

16   replayed, let us know and we will bring you back to the

17   courtroom for that purpose.  If you want any of the other

18   testimony," right?

19               MR. SINGER:  Yes.

20               THE COURT:  All right.  Very good.  Anything from

21   Ms. Mairone on 10 or 11?

22               MR. MUKASEY:  No, thanks.

23               THE COURT:  Let's go back to the government.

24               MR. ARMAND:  Two things, your Honor.  With regard to

25   the reasonable purchaser language, and Mr. Singer had raised an

DAL3BAN4                    Charge conference

 1    issue with regard to "involved" and that it might be too broad

 2    so we wanted to offer some alternative language.

 3         We would say:  A reasonably prudent person with the

 4    authority to participate in the decision.  I'm sorry.  A

 5    reasonably prudent person participating in the decision of

 6    whether.

 7         A reasonably prudent person participating in the

 8    decision of whether to purchase or how to price the loans.

 9         THE COURT:  Yes, I like that.  Reasonably --

10    participating in the decision of whether to purchase mortgage

11    loans, etc.  Yes.

12         MR. SINGER:  To me that word is no different than

13    involved.  It really raises the same issue if you're

14    participating in.

15         THE COURT:  No.  It focuses on the person who is

16    involved in the decision, which is I think sufficient for

17    materiality purposes.

18         MR. SINGER:  For the record, we would prefer

19    "responsible for."  That actually focuses on --

20         THE COURT:  In many instances there was no one person

21    responsible for.  And moreover, even if there had been, if

22    someone who parlayed the information to him, but was

23    meaningfully involved in the process, would, if told of the

24    omitted information, have made a different presentation, that

25    still would show materiality.

1          A lot of this is very abstract.  In the context of

2     this case we know the few people we're talking about, and both

3     sides I'm sure will focus on that in their summations.  I think

4     the government's suggestion is fine.

5          MR. SINGER:  Could we get around the singular plural

6     issue by saying "persons responsible for" or something to that

7     effect?

8          THE COURT:  I think it now accurately states the law

9     as applied to the facts of this case so I'm going to leave it

10    at that.  Go ahead.

11         MR. ARMAND:  The other, your Honor, just coming back

12    to the breach of contract, the mere breach of contract itself

13    not being fraud.  Again, we're very concerned this could give

14    the jury the impression that the fact that the reps and

15    warrants are not being complied with, that they'll conclude

16    that there can be no fraud.  It could be confusing to them.

17         However, if the Court is inclined to use this

18    language, we would suggest including between mere and breach,

19    including unintentional.  So it would be, however, a mere

20    unintentional breach of contract by itself is not fraud.

21         THE COURT:  That's not really the point.  Or that's

22    only part of the point.  But I see what you're driving at.  Let

23    me think about this for a minute.

24         How about in place of what we had before, how about at

25    the end of the previous paragraph, and let me read the previous

1    paragraph because I made one other tiny non-substantive change.

2    This begins at the bottom of page 12.

3           Here, specifically, the government alleges, and the

4    defendants deny, that one or more of the defendants devised a

5    scheme to induce Fannie Mae and/or Freddie Mac to purchase

6    mortgage loans originated through the High-Speed Swim Lane by

7    misrepresenting that the loans were of higher quality than they

8    actually were.

9           The government further alleges that these

10   misrepresentations were material because a reasonably prudent

11   person participating in the decision of whether to purchase

12   mortgage loans at Fannie Mae or Freddie Mac would have

13   considered the true facts important in deciding whether to

14   purchase or how to price the loans.

15          Then I would add the following:  Incidentally, the

16   fact that some of these alleged misrepresentations may have

17   constituted a breach of the contracts between the bank

18   defendants and Fannie Mae or Freddie Mac is neither here nor

19   there; your focus should be on whether there was a scheme to

20   defraud.

21          This would replace the language that we previously had

22   later about, however, a mere breach of contract.  So I'll read

23   that new sentence once again.

24          Incidentally, the fact that some of these alleged

25   misrepresentations may have constituted a breach of the

1   contracts between the bank defendants and -- it should be may

2   have constituted breaches of the contracts between the bank

3   defendants and Fannie Mae or Freddie Mac is neither here nor

4   there; your focus should be on whether there was a scheme to

5   defraud.

6           Let me ask the government, do you prefer that to the

7   sentence previous?

8           MR. ARMAND:  We definitely prefer this to the prior

9   sentence, your Honor.  However, we would still like to preserve

10  our objection to having any reference to breach of contract at

11  all.

12          THE COURT:  Duly preserved.

13          MR. ARMAND:  Thank you, your Honor.

14          MR. SINGER:  Your Honor, the only additional

15  suggestion we would have is where it says may have constituted

16  a breach of the contracts, I think it should say may or may not

17  have.  There has been no --

18          THE COURT:  That's why I said alleged

19  misrepresentations and may -- between alleged and may, you

20  don't need to add -- it's like the old grammatical point.  You

21  don't have to say "whether or not" because "whether" implies

22  "whether or not."  But you knew that.

23          MR. SINGER:  Irregardless, your Honor.

24          THE COURT:  All right.  Very good.  So I think we've

25  reached the end on the instructions, other than the ones that

1   are here that anyone wants to consider adding.

2              This is on any and all purposes, this is your last

3   bite at the charge.  So go ahead.

4              MR. ARMAND:  Your Honor, I do have some proposed

5   language for the limiting instruction issue that the government

6   raised.  We would propose "evidence that I have instructed you

7   may not be considered for purposes of determining Ms. Mairone's

8   personal liability, may nevertheless be considered by you for

9   purposes of imputing Ms. Mairone's intent to the bank

10  defendants in connection with determining the bank defendants'

11  liability."

12             THE COURT:  Well, it's as good as one I suppose could

13  get at that nice distinction.  I'm still concerned, but let me

14  hear from defense counsel.

15             MR. MUKASEY:  Judge, I think it is an instruction that

16  swallows the purpose of the limitation.  What it really says

17  is, you cannot consider it against Ms. Mairone, but you can

18  consider it against Ms. Mairone to the extent you're applying

19  it against the banks.  And I think that requires a how many

20  angels can dance on the head of a pin determination.

21             THE COURT:  Actually, I would have thought, but this

22  is an adversary system, that you would not be unhappy with

23  that, and that the bank defendants would be unhappy, because it

24  almost invites a way of the jury, if they feel sympathetic to

25  Ms. Mairone --

1             MR. MUKASEY:  I certainly hear what you are saying.  I

2    do think, however, it is extremely hard for a juror to say I

3    can consider this limited --

4             THE COURT:  As a practical matter, you are saying that

5    they would have to think like lawyers, and I don't wish that

6    upon my worst enemy.  I think that's really right.  And I think

7    the government has done a pretty good job of coming up with a

8    proposed instruction.  And it accurately states the law I

9    believe.

10            But, I do think it will be, as a practical matter,

11   confusing to the jury rather than helpful because of the

12   difficulty they will have as laypersons making that kind of

13   distinction.  Yes.

14            MR. ARMAND:  Just one final point, your Honor.  I

15   think it does give the bank defendants a windfall here with

16   regard to the hearsay evidence that would show Ms. Mairone's

17   intent.  That's why we're asking for this.  So we are doing

18   her --

19            THE COURT:  That is true.  That is absolutely true.

20   Let me hear again the language one last time.  I'll ask my

21   never-failing law clerk who is perfection himself to copy it

22   down.

23            MR. ARMAND:  "Evidence that I have instructed you may

24   not be considered for purposes of determining Ms. Mairone's

25   personal liability may nevertheless be considered by you for

1    purposes of imputing Ms. Mairone's intent to the bank

2    defendants in connection with determining the bank defendants'

3    liability."

4           THE COURT:  It's a good job.  In the absence of it,

5    they do get a windfall.  But any juror reading that and hearing

6    that is going to shake their head.

7           I really think that one of the reasons my

8    instructions, which, for better or worse I'm very proud of, are

9    so much shorter than so many jury instructions that are given

10   these days is because I really believe that jurors, if they

11   have instructions that they can understand and follow, will

12   follow.  That's been my experience.

13          It is interesting in large parts of this country,

14   jurors are not furnished with a copy of the written

15   instructions, jurors are not allowed to ask for testimony to be

16   read back or sent in by way of transcript.  Jurors are told,

17   basically, in response to just about any note they send out,

18   your recollection controls.  And that's because of a view that,

19   in reality, we don't think jurors can really deal with the

20   niceties of the trial process.  They should instead sort of

21   just be the voice of community expressing their gut reaction to

22   the massive instructions and evidence that they have been

23   presented with.  And I acknowledge that there are even federal

24   courts that take that position.  But it's, to me, antithetical

25   to what the jury process is all about.

1          My entire endeavor through this trial and in these

2     instructions is to make things sufficiently clear and

3     comprehensible to the jury that they will have no difficulty in

4     undertaking their critical role.

5          So with acknowledgment to the government that the

6     point that they're making is not without considerable force,

7     I'm still going to deny that instruction.

8          Anything else from the government?

9          MR. ARMAND:  Your Honor, there were two additional

10    instructions the government had proposed.  This was request

11    number 15 in the government's proposed charges.  Negligence of

12    the victim not a defense.  This was on page 23 of our request

13    to charge.

14         THE COURT:  So if I put in something about that, this

15    would come in the first paragraph of page 13.  The government

16    is not required to prove that the scheme to defraud actually

17    succeeded, that a given defendant personally benefited from a

18    scheme to defraud, that Fannie Mae or Freddie Mac actually

19    suffered any loss as a result of the scheme to defraud, or that

20    Fannie Mae or Freddie Mac were themselves free from fault.

21         Right?  That's the gist of what you want?

22         MR. ARMAND:  Yes, your Honor.

23         THE COURT:  You probably gave me a whole long thing on

24    it.  You think that's the gist of it, right?

25         MR. ARMAND:  Yes.  It is just there have been some

1   suggestions through the questioning that Fannie and Freddie

2   through their own due diligence could have figured out what was

3   going on.  And so, that's sort of the thrust.  So, I think that

4   would work, your Honor.

5            THE COURT:  Let me just find out if there is any

6   objection.  So we're adding the words at the very end of that

7   sentence "or that Fannie Mae or Freddie Mac were themselves

8   free from fault."

9            MR. SINGER:  Your Honor, if the concept is going to be

10  added, I don't have a problem with the wording.  But I do think

11  the concept does not need to be added because there has been no

12  suggestion and there will be no argument that Fannie and

13  Freddie were at fault.

14           THE COURT:  I think there is the danger the government

15  refers to.  So I'm going to put that in.  Okay.

16           Your other one?

17           MR. ARMAND:  The last one was request number 16.

18  There is a pattern charge from Sand that deals with persons not

19  on trial.  This was on page 24 of our request to charge number

20  16.

21           THE COURT:  Let me pull that out.

22           MR. ARMAND:  I can read it if you like as well.

23           THE COURT:  I've got it.  Page 24?

24           MR. ARMAND:  Correct, your Honor.  The only change we

25  would make to this request is just in the last paragraph where

1    it references the United States attorney, we would want to

2    substitute that for the government generally.  Because in a

3    civil case --

4           THE COURT:  I really think this one, I'm not sure I

5    would give it in any case, but I'm certainly not going to give

6    it in this case.  I think is a red herring.  This one hasn't

7    been raised at all.  There has been no claim why isn't X here,

8    why isn't Y here, why isn't Z here.

9           I assume Mr. Sullivan or Mr. Mukasey, you're giving

10   the closing argument?

11          MR. MUKASEY:  I'm not.  Mr. Hefter is.

12          THE COURT:  Is he going to make the argument how, if

13   they're responsible, how come Mr. Kitashima or Mr. Lumsden

14   wasn't named?  That would be an outrageous argument, and would

15   lead me to the very unfortunate result of having to hold

16   whoever was making that statement in contempt right in the

17   presence of the jury.  And as he was led away by the marshals,

18   I would of course advise him of his right to counsel.

19          MR. MUKASEY:  I would hire Rick Strassberg right away.

20          THE COURT:  So I don't think we need this instruction.

21          MR. ARMAND:  Very well, your Honor.

22          THE COURT:  Bank counsel?

23          MR. SINGER:  We have just one other charge.  I am

24   going to ask my colleague Ms. Jones to handle this one since

25   she actually understands it.

1              MS. JONES:  Your Honor, it can only mean one thing.

2      Both parties have requested an instruction of the affecting

3      prong of FIRREA that the jury, to find the defendants liable,

4      that they have to find that the fraud affected a federally

5      insured financial institution.

6              THE COURT:  I'm glad you raised that.  Because I'm not

7      going to redo that, as you know.  But I think, technically, I

8      have made in the course of this charging conference two Rule 50

9      partial determinations.  I have ruled under Rule 50 that there

10     is no basis to go to the jury on the affect element.  And I

11     have ruled with the government's consent that there is no basis

12     to go to the jury on what we've been calling the process issues

13     as a basis for liability as opposed to evidence of intent.  So

14     now that I've ruled against you, what would you like to say?

15             MS. JONES:  If I just may preserve one argument.  We

16     didn't get a chance to respond.  At the Rule 50 motion

17     Ms. Nawaday pointed to two exhibits that she thought proved or

18     were the government's evidence that they had put forward an

19     affect as alleged in paragraph 141 of their complaint.  Those

20     exhibits were repurchase letters and PX 322 and PX 381.  The

21     defendants argue that neither of those is an HSSL loan.  So

22     that's why we think there is an issue to go to the jury on

23     whether the government has proven that.

24             THE COURT:  Even assuming that were true or there was

25     an issue about that, I would still come out the same way.  The

DAL3BAN4                        Charge conference

1   more I've thought about this, the more it seems to me that if a

2   bank engages in violations of the mail fraud or wire fraud

3   statute, that as a matter of law, it affects the bank.  If it

4   is a federally insured bank, then it affects a federally

5   insured institution.

6          The argument was made by the defense, among other

7   things, that this proves too much.  If the misconduct is on the

8   part of a not insured person or entity, and it then impacts a

9   federally insured entity, which may also be present in this

10  very case, then the element would still be in the statute.  But

11  where it is the insured entity itself which is doing the

12  misconduct, it as a matter of law subjects itself to the

13  increased liability and risk.

14         Therefore, there are other reasons that I've already

15  given on the record, but for that reason alone, it is no longer

16  a matter to be presented to the jury.

17         I also have, though there may be case law to the

18  contrary, I didn't look into this, I also have a little

19  question in my mind as to whether the affect element, even if

20  genuinely disputed in some respect, is a jury issue as opposed

21  to a judge issue.

22         The determination of under what statute is a jury

23  issue or a judge issue is often very difficult.  For years, for

24  example, materiality was thought to be a judge issue and

25  ultimately the Supreme Court decided it was a jury issue.  On

1   the other hand, in many commercial areas, like in the

2   determination of claim construction under a patent, which I'm

3   sure you're intimately familiar with, though it often involves

4   factual disputes, has been held by the federal circuit to be an

5   issue of law for the Court.

6           I don't have to reach that, because even if it were

7   arguendo an issue for the jury in the abstract, I'm finding on

8   the facts of this case as a matter of law it is not.

9           But, I do have a little question in my mind being that

10  there may be case law on that point of whether it is a jury

11  issue or a judge issue.

12          And actually, while we're at it, someone needs to

13  educate me -- I assume there is case law on this maybe in the

14  statute.  This is a statute that at least one way or the other

15  could be read as a statute providing equitable remedies.

16  That's why the penalty phase is for the Court.  Is it crystal

17  clear that the liability phase is for the jury?  I think I

18  would come out that way, so I'm not going to tell the jury to

19  go home at this point.  But, I wonder if that's so crystal

20  clear.

21          Anyway, I don't know if you want to comment on any of

22  those ramblings.

23          MS. JONES:  They're all very interesting, your Honor.

24  We understand your ruling.

25          THE COURT:  But the application is denied.

1          MS. JONES:  Thank you.

2          MR. ARMAND:  Your Honor, if I can just make one point

3    in response.  There is more evidence in the record concerning

4    affect than the two exhibits that were just referenced.

5          THE COURT:  You're not limited -- in my view on

6    virtually any view of the standard, there is no way a

7    reasonable juror could have a genuine dispute over the affect

8    issue.  So, you're entitled to summary judgment, you're

9    entitled to Rule 50, you're entitled to whatever you want to

10   call it.  It is not for the jury in this case.

11         MR. ARMAND:  I understand.  The only point I wanted to

12   make for the record is Plaintiff's Exhibit 308 contains

13   evidence of specific repurchases that were made by BANA, and

14   repurchase demands that were sent both to Countrywide Bank and

15   to BANA, and those are constitute additional evidence of affect

16   on those two institutions.

17         THE COURT:  All right.  Anything further from

18   Ms. Mairone's counsel?

19         MR. MUKASEY:  No.  Not until we get to the verdict

20   sheet, Judge.

21         THE COURT:  Okay.  So let's go to the verdict sheet.

22         MR. MUKASEY:  Just a little typo.

23         THE COURT:  Yes.

24         MR. MUKASEY:  On the government's claim against

25   Rebecca Mairone, there is an extra the.  We the jury find the

DAL3BAN4                          Charge conference

1   Rebecca Mairone.  If you can just strike that.  So part of our

2   theme here is that she's an individual.

3           THE COURT:  You don't understand.  It is The Rebecca

4   Mairone, as opposed to all those other ones out there.

5           MR. MUKASEY:  Judge, after your Honor takes comments

6   on the rest of the verdict sheet, I am going to try to persuade

7   your Honor to reconsider the rebuttal issue.

8           THE COURT:  Okay.  Any other comments on the verdict

9   sheet?  Thank you for catching that typo.  Anything from the

10  government?

11          MR. ARMAND:  No, your Honor.

12          THE COURT:  Anything from bank defendant?

13          MR. SINGER:  No, your Honor.

14          THE COURT:  Very good.  Before we turn to your issue,

15  Mr. Mukasey, I just want to find out where do we stand on the

16  indices?

17          MS. MAINIGI:  I think we're ready to go, your Honor.

18  We have our exhibits ready and the indices ready, and in fact

19  we were hoping we could just leave them here tonight.

20          THE COURT:  Sure, you can.  In fact, what is in that

21  cart over there?

22          MR. ARMAND:  This one?  It is our cart, but nothing

23  that can't be removed.

24          THE COURT:  Okay.  If you don't mind, why don't we

25  just leave the cart here or do you need it to take stuff back?

DAL3BAN4                          Charge conference

1          MR. ARMAND:  Not necessarily.  We're happy to leave it

2     here.

3          THE COURT:  Before you leave today, just put your

4     stuff in there and the government can put theirs in tomorrow.

5          MR. ARMAND:  We may be ready to do it today.

6          THE COURT:  That's fine.  Have you exchanged your

7     indices?

8          MR. ARMAND:  Yes.

9          MS. MAINIGI:  Yes.

10         THE COURT:  Terrific.

11         MS. MAINIGI:  Your Honor, I can go after Mr. Mukasey.

12    I don't know whether you want to view it with jury instructions

13    or separately as part of limitations on closings, but the issue

14    is the self-reporting issue.  And our view that there is a

15    complete absence of evidence to proceed on that issue.  And

16    that to allow the government --

17         THE COURT:  We'll hold that thought.

18         MS. MAINIGI:  Yes.

19         THE COURT:  Mr. Mukasey.

20         MR. MUKASEY:  I am going to go to the podium because

21    it seems to add a level of gravitas to the argument.  Judge,

22    knowing --

23         THE COURT:  I take it this is why your pocket

24    handkerchief today is --

25         MR. MUKASEY:  White.

1          THE COURT:  And formal because it adds to the weight

2     of the argument.

3          MR. MUKASEY:  That's exactly right.

4          Your Honor recognized on Friday that this is one of

5     the closer cases that the Court has seen in a while.  And I

6     agree with that, at least from my perspective.  Your Honor also

7     recognized that it is within your broad discretion,

8     unquestionably, to permit the order of closing arguments in any

9     manner that the Court deems fair and helps the jury to

10    understand the case best.

11         We did a real survey of almost every circuit over the

12    weekend, and I can't say honestly that we found anything that

13    calls into question anything your Honor said about that.  One

14    thing we did find, however, is that all circuits and many

15    district courts found the power of the rebuttal to be

16    extraordinary.  And that normally comes up, as I'm sure your

17    Honor has experienced, when the government is giving rebuttal

18    summation in a criminal case and all of a sudden some divine

19    inspiration comes down on the prosecutor and he makes an

20    argument that is really over the line.  And that often will

21    cause either a rebuke from the judge or the circuit or a

22    reversal.

23         My only point there is that the power of the rebuttal

24    being the last voice the jury hears is extraordinary.  And I

25    believe it is understandable and necessary that in the case

1   where the burden is beyond a reasonable doubt, especially in a

2   complex case, that the government ought to get that last word.

3        But, in a case where an extra feather or two on the

4   scale can tip the balance, such as this one, the rebuttal seems

5   to have outsized and disproportionate strength.  It is somewhat

6   of a nuclear device in a case where you only have to prove it

7   by a preponderance.

8        I don't suggest that the government doesn't have a

9   burden to carry.  They have a burden to carry.  But carrying

10  that burden with the extra weapon in their back pocket of being

11  the last voice that the jury hears, and being able to have the

12  last word, really seems, and again, I don't have authority for

13  this, although I am going to cite something in a minute.  But

14  it does seem to be a disproportionate advantage in a case where

15  the burden is by a preponderance.

16       Your Honor, the only authority that I could find to

17  quote to the Court is your Honor's own rules.  Which clearly

18  state that in civil trials, plaintiff's counsel will sum up

19  first followed by defendant's counsel.  No rebuttal will be

20  allowed unless defense counsel makes an argument that

21  plaintiff's counsel could not reasonably have anticipated and

22  dealt with in summation.  That's rule number 11.

23       Obviously your Honor is free to disregard your own

24  rules.  And I'm not even going to stand here and say we relied

25  on that in preparing the case or anything.  But, given the fact

1    that this is the norm in your case, it is the norm in other

2    civil cases, even civil cases brought by the U.S. attorney's

3    office, and given the fact that the rebuttal has been

4    recognized by every circuit as a wildly powerful tool, we would

5    ask your Honor to reconsider the ruling that the government

6    ought to be able to have a rebuttal in this case.

7             THE COURT:  Well, thank you for that eloquent

8    presentation, and I'm glad you picked up your handkerchief and

9    I hope you won't hesitate to use it if I rule against you.

10            MR. MUKASEY:  Or wave it as a white flag.

11            THE COURT:  This is not a football game.  Or a

12   baseball game.  Although you notice that the Dodgers in their

13   losing effort had their fans waving blue handkerchiefs.  That

14   really goes beyond the pale.

15            To get serious, one of the most surprising discoveries

16   for me when I've talked to juries after trials since becoming a

17   judge, and either I or my law clerks talk to the jury after

18   every case, and my main question to them is always about my

19   instructions, whether they're clear and so forth.  But is how

20   little the order of witnesses, order of summations, things like

21   that, have upon the outcome of the case.

22            Your assertion, which is certainly to be found in much

23   of the case law, that rebuttals, last person to be heard, has

24   an unusual weight, is in fact not borne out by what jurors have

25   told me, and for what it's worth, not borne out by the

DAL3BAN4                    Charge conference

1    sociological studies that have been done by criminologists and

2    sociologists looking into jury verdicts.

3          Now, I'm not sure that those studies are very

4    reliable, because they tend to rely on mock juries, and a mock

5    jury is never really the same as a real jury.  For example,

6    those studies tend to say that one of the most important things

7    in the outcome of the case are opening statements.  In which

8    case, you've had an incredible advantage because yours was the

9    last opening.  And the government has in vain tried to overcome

10   that meteor, that atomic bomb, that nuclear advantage that you

11   obtained through having the last opening statement.  But I'm

12   not sure there is anything much to those studies.

13         My point is, the assumption that a number of courts

14   have made in the opinions that you're referring to is I think a

15   speculation at best.  Not borne out, at least in my experience,

16   either by the sociological studies or to my conversations with

17   jurors.

18         One of the reasons for that is that the last thing the

19   jurors hear is not the lawyers at all.  It is the Court giving

20   them instructions of law, which they know is the most important

21   thing that they have to pay attention to before their

22   deliberations.

23         If I had a misgiving about any of the innumerable

24   different approaches taken in all the courts in the United

25   States on this kind of issue, it is to those courts, for

1   example, in the State of Oregon, where the judge is required to

2   give the instructions of law before the summations.  The theory

3   being that that will help the jurors to understand the

4   summations better.  But then, it is really truly one party or

5   the other that is the last that's heard by the jury, and that's

6   not true where the judge gives the instructions last.

7           There is also the aspect in this case that the

8   government's rebuttal will be at the very end of a very full

9   day of summations.  And an argument could well be made that at

10  4:30 in the afternoon, having heard summations all day long,

11  the impact of a 20-minute rebuttal will be considerably

12  reduced.

13          And finally, it was because I thought there was maybe

14  something to the point you were making, which I intuited in

15  advance, that I cut them down to 20 minutes.  That will mean

16  that they won't be able to respond to lots and lots of stuff

17  that will be in everyone's summations.  They will have to pick

18  and choose what they consider to be the most critical points to

19  respond to.  And I think given the burden of proof, that's only

20  fair.

21          So, your point is not frivolous.  But I adhere to my

22  original decision.

23          Now, that reminds me that in order that all the

24  summations be completed tomorrow, we need to start promptly at

25  9:30.  I'm glad I'm telling you folks that.  But, I will be

DAL3BAN4                         Charge conference

1   here at 9:30.

2              MS. MAINIGI:  Us too, your Honor.

3              MR. MUKASEY:  Judge, could I ask a quick question.

4   You had mentioned, and we may want to burn this bridge when we

5   get to it.  You had mentioned you were not around on Friday.

6   Were we going to discuss a procedure for Friday.

7              THE COURT:  Let's get to that in a second.  Let me

8   just map out tomorrow.

9              So, the government has two hours and 10 minutes for

10  its opening summation.  Normally, we would take a break as we

11  usually do around 11, 11:15.  I'm more inclined to let you go

12  through your entire summation, but if you would prefer to take

13  the midmorning break say an hour and a half into your

14  summation, I will accommodate that.  So let me know that by

15  tomorrow morning.

16             MR. ARMAND:  Will do, your Honor.

17             THE COURT:  Assuming you want to go through it, we

18  will then take the break immediately after your summation.  But

19  I'm going to hold these breaks much more strictly than

20  previously to 15 minutes.

21             So, let's say we start at 9:35.  Two hours and 10

22  minutes would take us to 11:45.  We would then have a 15 minute

23  break.  And then we will split the bank defendants' summation

24  into two halves, so there it will be an hour before lunch, an

25  hour after lunch.  At 3 o'clock I think the only thing fair

1    thing -- you tell me, Mr. Mukasey.  You want to go straight

2    without a break into your summation or do you want a 10 minute

3    break?

4                MR. MUKASEY:  I think a 10 minute break would be

5    great.

6                THE COURT:  We'll take a 10 minute break.  That will

7    take us to 3:10.  You would then go to 4:10.  We would then

8    take another 10 minute break.  And 4:20, and we'd hear the

9    government's closing arguments until 4:40.

10               I'm inclined to think that if everyone takes their

11   full amount of time, we will do my charge to the jury first

12   thing Wednesday morning.  If things move faster, because people

13   don't use their full time, then we will have our charge to the

14   jury at the end of the afternoon.

15               I promised the jury we will always break at five or

16   earlier, never go beyond five, so I want to be true to that.

17   And in addition I'm supposed to give a speech at the Bar

18   Association at six.  So, I wouldn't want to go past five in any

19   event.

20               Now the question comes up then whether we should tell

21   the jury when I excuse them to start deliberating at the very

22   end of tomorrow afternoon or very early on Wednesday morning,

23   that we're not sitting on Friday, if we're not sitting.  Or

24   that we are sitting but that the verdict cannot be returned on

25   Friday.  I think those are the two options.  I could handle

DAL3BAN4                          Charge conference

1   notes by phone, but not a verdict.

2           MS. MAINIGI:  I think, your Honor, our preference

3   would be to simply wait and see what happens, as your Honor

4   originally suggested.

5           THE COURT:  I think the trouble with telling them in

6   advance is that it puts pressure on them.

7           MR. MUKASEY:  I'm not advocating.  I just wanted to

8   know for our purposes.

9           THE COURT:  On the other hand, I'm not real keen about

10   doing notes by phone.  Although I have done it in the past, it

11   can be done.  I agree with you what you've just said.  We'll

12   just play it by ear and we'll see where we are midday Thursday.

13           MR. ARMAND:  Government agrees to that as well.

14           THE COURT:  Very good.  Anything else we need to take

15   up this afternoon?

16           MS. MAINIGI:  Self-reporting, your Honor.

17           THE COURT:  Yes.

18           MS. MAINIGI:  If I could be heard on that briefly.

19   The issue here is the same as the issue I think that your Honor

20   reached on affects as well.

21           THE COURT:  I'm sorry.  We do have a whole other area

22   to take up and self-reporting is a part of it, which is ground

23   rules for summation.  And there are some folks who have been

24   waiting here for a 3:30 matter that will take about 20 minutes.

25   Unless you all think we can deal with all the summation issues

1    in 10 or 15 minutes, I would take that matter and then go back

2    to you.  But if you think we can, I'll finish it now.  Do you

3    all think we can?

4            MS. MAINIGI:  I'll be very brief, your Honor.

5            Your Honor, the self-reporting issue came up obviously

6    in opening statements.  I think since that time, it has been a

7    theory in search of some facts.  In short, we don't believe

8    that there are any facts in evidence that really give any

9    support to that area in particular, as it relates to the intent

10   element that would be needed.  There is no one that has

11   testified as to -- no one has even been identified as to who

12   the self-reporting person is.  Did they know about the

13   High-Speed Swim Lane?  Did they do anything about the

14   self-reporting vis-a-vis Fannie and Freddie?  Did they know

15   about the requirement, did they intentionally not self-report?

16   Then we have this whole issue of the SUSs and --

17           THE COURT:  Now that the process part is out, not of

18   the case since it still bears on intent, but out of the case as

19   a separate theory of liability, I am not sure how this comes

20   up.  If they represented that the loans were investment

21   quality, and the evidence shows that they're not investment

22   quality, or that that was misleading, given what they really

23   were, it is not a question of self-reporting, right?  It is a

24   question of a misstatement.

25           MS. MAINIGI:  Well, I would agree with you, your

1    Honor.  That's why in order to avoid the confusing the jury

2    tomorrow, I don't think that the government should launch any

3    sort of separate argument in their closing statement relating

4    to self-reporting.

5           THE COURT:  Let's hear what they plan to say.  That's

6    why we want to save it for the summation.  Who is giving the

7    government's summation?

8           MR. ARMAND:  Ms. Nawaday.

9           THE COURT:  And rebuttal as well?

10          MR. ARMAND:  No.  Mr. Cordaro is doing the rebuttal.

11          THE COURT:  I must say this has got to be the full

12   employment case of the century.  Anyway, go ahead.

13          MR. ARMAND:  The reporting issue, the self-reporting

14   issue goes to the duty to correct misrepresentations.  They

15   were selling loans as quality loans they knew were bad loans.

16   As a result, the contracts specifically provide that they have

17   to report these.

18          But separate and apart from that contractual duty, as

19   a matter of law they had a duty to correct material

20   misrepresentations that they made to Fannie and Freddie.  So

21   the fact that they only self-reported six of the loans is

22   certainly relevant.

23          THE COURT:  So let me go back to defense counsel.

24   What they're calling self-reporting is maybe a terminology

25   debate.  If you make a statement that is a half truth, a

DAL3BAN4                         Charge conference

1    classic half truth, and you fail to give the other half, and it

2    creates a misleading impression.  Then as I've already charged

3    the jury in my draft charge, you have liability.

4            So, now, it may be relevant in terms of intent that

5    someone knew, if they did know, I can't remember what the

6    evidence is in that regard.  That they had a duty to

7    self-report or something like that.

8            But, putting that aside for the second, what the

9    government is saying is, they misrepresented X, they arguably

10   corrected it in some respects in a few cases, but that's not

11   enough to escape liability because they didn't correct it in

12   all the other cases.  So, it was a false or misleading

13   statement.

14           Why isn't that just the basic law?

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            MS. MAINIGI:  Your Honor, it certainly could state a

2      theory, but our point is the stuff that we're leaving aside is

3      the stuff that matters.  There's no evidence in the record to

4      support it.  What they have put into the record are several

5      folks from the GSEs essentially reading out the self reporting

6      provision then Mr. Battany who says with respect to SUSs, as

7      your Honor said the other day, he essentially testified that an

8      SUS on the corporate QC results might be something that is

9      reported or might not be something that is reported depending

10     on whether that particular loan or material defect violated

11     Fannie's guidelines as opposed to Countrywide's guidelines.

12     And there's been no effort made here to tie any particular SUS

13     to a violation of Fannie's guidelines such that one could

14     create even an inference of self reporting.

15            Furthermore, we don't even have evidence in the record

16     to who is responsible for this self reporting.  Did that person

17     know about the High-Speed Swim Lane?  Did they know about any

18     of the loans going through the High-Speed Swim Lane?  Did they

19     have conversations with Rebecca Mairone, Cliff Kitashima and

20     Greg Lumsden?

21            THE COURT:  Maybe this all turns on terminology.  If

22     the argument were made by the government on summation, you

23     heard how the defendants told Fannie Mae and Freddie Mac X,

24     they knew that was only half the story, or they may say they

25     knew it was untrue but I'm dealing with the half truth

1   situation, they knew it was only half the story and they never

2   told them the other half that would have been necessary to make

3   the representations true and accurate and not misleading.

4   There can be no objection to that argument.  That would be a

5   classic argument for a misleading misrepresentation.

6            Now I take it what you're objecting to is not that.

7   If you're objecting to what I just said then we have a problem,

8   but assuming --

9            MS. MAINIGI:  I'm not objecting to the theory.

10           THE COURT:  You're objecting that they're going

11  further and saying and not only did they conceal the other half

12  of the truth, but they did so knowing they had a duty to report

13  the other half because here it is on the self reporting thing.

14  So that is an argument they could only make if there is

15  evidence of knowledge of that self reporting.  It really goes

16  to intent.  And so if there is such evidence, I think they

17  could make that argument.  If not, I think they can't.

18           MS. MAINIGI:  And we endeavored to pull from the

19  evidence, the transcripts evidence that relates to the

20  self-reporting issue, and we're happy to have your Honor

21  consider it at your convenience this evening, but we absolutely

22  agree that is the issue as defined.

23           THE COURT:  Hand it up.

24           MR. ARMAND:  Could I speak, your Honor?  So we'll take

25  a look and to the extent -- if there are additional citations

1    we'll provide them to you as well, your Honor.  But regardless,

2    to the extent government wants to show that the folks who knew

3    that the loans were bad were sold with misrepresentations, I

4    just want to make sure we can still --

5           THE COURT:  And they never took steps to apprise

6    Fannie Mae or Freddie Mac or make sure that Fannie Mae or

7    Freddie Mac were apprised of this, I can hear all the arguments

8    purposely because they knew it was blah, blah, blah.  Sure,

9    that argument is not a problem, it's only with respect to this

10   more particularized, quote, duty to self report.  If they

11   didn't know about it, then it doesn't bear on their intent.

12          MR. ARMAND:  OK.  But at least -- I understand your

13   Honor, but with respect to the fact of the six loans being --

14   that those are the only Hustle loans that were reported, what I

15   want to make sure that fact is still something that can be

16   presented in connection with their intent, not knowledge of the

17   duty to disclose, but in terms of correcting their own

18   knowledge of the misrepresentations.

19          THE COURT:  Yeah.  In other words, because that's in

20   effect something that because of the very strict limitations on

21   rebuttal time you need to put up front, because it's

22   anticipating an argument that fairly could be made by the other

23   side, the thing that everything was disclosed, everything that

24   needed to be disclosed was disclosed.

25          MS. MAINIGI:  Your Honor, with respect to that issue,

1   we would obviously oppose the government being able to

2   reference the six loans that were allegedly self reported

3   because that is in essence the issue.  What they said in their

4   opening is there was a duty to self report and they reported

5   only six loans, the inference being that we are going to show

6   you evidence at trial that demonstrates that they had a duty

7   and knowledge and intent to disclose more.  They didn't

8   demonstrate that, your Honor.

9            THE COURT:  But this is why I know you folks are so

10  focused on this that I think you missed the woods for the

11  trees.  If there were no duty to self report whatsoever, the

12  fact that a misrepresentation was made and the facts that would

13  correct the misrepresentation were not conveyed, that would

14  arise as a matter of law.  As a matter of law, you can't

15  tell -- it is no defense, it is no defense in a fraud case that

16  what you did tell was the truth if it create as a false

17  impression and you fail to give the other half of the truth.

18  That's the most fundamental law of the law of misleading as

19  opposed to affirmatively false representation.  That's what

20  that law is all about.

21           There are three possibilities in fraud.  This is the

22  law since at least Lord Mansfield, who I'm sure you remember,

23  but in case you didn't, the great common law judge of the

24  latter part of the 18th century.  If you tell a lie, you're

25  liable in fraud, putting aside all the limitations like

1   materiality and so forth.  If you are silent, the fact that you

2   know some other facts is neither here nor there unless you have

3   a fiduciary or similar duty to report.  So silence ordinarily

4   is not.  Then we come to the mid case, the mid case is the half

5   truth where what you say is true but it creates a misleading

6   impression to a reasonable person, then you are obligated to

7   give the other half.  And if you fail to do so, you committed

8   the act of fraud.  And then, of course, the question then

9   becomes did you do so intentionally, in which case the burden

10  is on the plaintiff to show that you held back that other half

11  intentionally.  So that's the law of misleading as opposed to a

12  flat-out false statement, they're true but only a half truth.

13          So to the extent the government is saying what was

14  revealed to the banks was true but only the half truth, then

15  it's highly relevant that the other half was concealed.  If the

16  other half was revealed in six cases, the government of course

17  has to bring that out so it's not open to the argument:  What

18  are you talking about, there were these six cases where we

19  revealed the truth.  If there's a duty to self report, that

20  becomes relevant, however -- by that I mean a contractual duty

21  as opposed to the overall legal duty I just explained.  If

22  there's a contractual duty to self report that would only be

23  pertinent if the person had knowledge of that duty.

24          So the argument would be they knew they were only

25  giving half the truth when they committed fraud and the fact

1    that in six cases they let the truth slip out, ladies and

2    gentlemen, the fact they let it slip out in the other cases but

3    it's worse is the kind of argument, assuming they have the

4    evidence, they knew they had a contractual duty to self report,

5    they knew that they -- it wasn't even a question of the overall

6    law, it's a question of the specific knowledge and they failed

7    to do that.  And why did they fail to do it?  Because they

8    wanted to defraud, blah, blah, blah.  If they didn't have that

9    knowledge, I don't see how the self reporting requirement comes

10   in.

11             MS. MAINIGI:  I agree that they don't have that

12   knowledge, your Honor, but I don't necessarily agree that this

13   is a half truth situation.  This is an omission situation.  Why

14   in the world --

15             THE COURT:  No, the representation broadly stated is

16   these loans are of investment quality, and as every witness has

17   testified, that's not a self defining term.  And there are a

18   lot of aspects to it, so some were revealed and some were not

19   revealed.

20             MS. MAINIGI:  But I think with respect to whether

21   there was any obligation to reveal any of the High-Speed Swim

22   Lane loans because they did not match up with the Fannie

23   guidelines such that there was an affirmative obligation to

24   report that, there's a complete absence of proof on that, your

25   Honor.  There's an absence of proof in terms of identifying

3280

1     those particular loans and then an absence of proof in terms of

2     identifying particular people at Countrywide who would actually

3     have knowledge and intent.

4             THE COURT:  All of this makes me think that we're

5     never going to finish this discussion in 15 minutes.  So with

6     apologies, I'm going to take a break, I'm going to take another

7     matter, and we will resume in approximately 20 minutes or so.

8             (Recess taken)

9             THE COURT:  So let me hear some more self reporting

10    from defense counsel.

11            MS. MAINIGI:  Your Honor, if your Honor is willing to

12    consider it, we might be able to solve this issue with a

13    sentence in the jury instructions on self reporting.  We

14    drafted something during the break, and it could come right

15    after the breach of contract language, that you add:  You may

16    not find that any defendant is liable on the basis of any

17    alleged failure by the defendants to self report HSSL loans to

18    Fannie Mae or Freddie Mac.

19            THE COURT:  No.  I thank you for your good try, I

20    think that creates more problems than it solves.

21            But let me go back to the charging conference.  Let me

22    hear exactly or as close to exactly as the government can say

23    as to what it plans to say on the subject of the contractual

24    self reporting obligation.  I repeat what I said previously

25    that there is, as a matter of law, a liability that attaches

1   when you only tell half the truth.  But that's not what we're

2   talking about here, we're talking about arguments concerning a

3   specific contractual duty to self report.

4           And remind me, where is that in that same exhibit we

5   were looking at earlier, PX2?

6           MS. MAINIGI:  Your Honor, I attached the provisions to

7   the book I provided you, the book the Fannie and Freddie

8   provisions.

9           THE COURT:  Thank you very much.  So the first one,

10  which is paragraph or Section 48.9 --

11          MS. MAINIGI:  That's Freddie Mac, your Honor.

12          THE COURT:  That's Freddie Mac.  The seller's quality

13  control program must provide that all quality control

14  activities be fully documented in writing and reviewed by

15  management on a regular basis.  The results of quality control

16  reviews must be reported in writing to the seller's senior

17  management within 90 days of selection of the mortgage files

18  for review.  The seller must thoroughly analyze findings

19  affecting the acceptability or eligibility of mortgages and

20  initiate any corrective actions.  A seller must notify Freddie

21  Mac (see Directory 2) in writing within 30 days of the seller's

22  determination that a quality control finding affects the

23  eligibility of a mortgage sold to Freddie Mac.  Freddie Mac

24  reserves the right to increase the sampling or to impose other

25  requirements on a case-by-case basis.

1          Then there's a page here that doesn't have a heading,

2     so I don't know where it's coming from.

3          MS. MAINIGI:  That the two pages, your Honor?

4          THE COURT:  Yes.

5          MS. MAINIGI:  That's the Fannie Mae language.

6          THE COURT:  So this is for Fannie Mae, quote:  We

7     expect a lender to advise its lead Fannie Mae regional office

8     immediately if it learns of any misrepresentation of breach of

9     a selling warranty.  This notification is required for all

10    breaches or misrepresentations, including fraud in the

11    origination and underwriting processes, regardless of whether

12    the act is committed by the lender and the lender's agent, the

13    borrower, or any other third party, and whether or not the

14    lender believes that the fraud or misrepresentation constitutes

15    a breach of its representations and warranties.  And there's a

16    similar language on the second page of what you handed me.

17         So putting aside the legal implications under the

18    doctrine of fraud as to failure to make disclosures necessary

19    to make what has been represented true and accurate in the

20    circumstances, we have here a contractual duty.  And the

21    question is:  What does the government want to say about the

22    contractual duty that bears on any of the elements of the fraud

23    claim?

24         MR. ARMAND:  Your Honor, I think first and foremost,

25    regardless of what is in the contract we do argue that there is

1    a duty to correct the false or misleading statements that were

2    made about the quality of the loans that were being sold to

3    Fannie and Freddie, and that --

4              THE COURT:  But that's a little artificial to speak of

5    it as a duty.  It really comes down to, if we're talking

6    independent of a contractual duty, we're talking about if you

7    intentionally tell someone that is true as far as it goes but

8    creates a false impression, then, unless you tell them what is

9    missing, you committed fraud.  So I have no problem with your

10   saying it's kind of a duty, but it really comes back -- the

11   gravamen of the crime is the telling of the misleading half

12   truth.

13             MR. ARMAND:  Correct.

14             THE COURT:  And as with all frauds, of course, if you

15   correct it before it's too late, you may get yourself off the

16   hook.  So if you told an outright lie, I represent to you,

17   Mr. Inhabitant of Bangladesh, that the Yankees have won the

18   World Series and you better put your -- get your bet in before

19   the world learns of this, then you call them up two minutes

20   later and say:  Just a joke, looks like the Red Sox are going

21   to win the World Series, my gosh, what has the world come to,

22   you're off the hook, if you did it quickly enough under all the

23   facts and circumstances before you took any action or whatever.

24   So it's the same with half truths.  It's not so much as to say

25   you're not wrong to talk about it as a duty, but the reality is

1    can't tell misleading half truths.  That's the bottom line.

2              Now you want to say something though that goes beyond

3    that about --

4              MR. ARMAND:  The contractual responsibilities.

5              THE COURT:  The contractual duty as having relevance

6    to their assessment of one or more elements of the fraud claim.

7    What is it you want to say about contractual?

8              MR. ARMAND:  I think there is circumstantial evidence

9    from which the jury could conclude that Ms. Mairone and

10   Mr. Kitashima and Mr. Lumsden were aware of the duty to

11   disclose, less so with Mr. Lumsden because he wasn't here to

12   testify.  But specifically with regard to Ms. Mairone and

13   Mr. Kitashima, they were aware that the loans that they were

14   selling were subject to the contracts, to the guidelines, and

15   that should be enough for the jury to conclude that they were

16   aware of the specific requirement about the duty to disclose if

17   one of the loans was not of quality.

18             THE COURT:  If I understand what you're saying, this

19   is the argument I was hypothesizing earlier.  It goes to

20   intent.  The argument would be once they learned about the real

21   quality of these loans and what their process had made of the

22   real quality of these loans, they knew that what had been

23   represented to Fannie Mae and Freddie Mac was not true but they

24   took no steps to correct it.  You can infer they did that

25   intentionally and with an intent to defraud, and if you have

1    any doubt about it, it's corroborated by the fact that they

2    knew that they had a specific contractual requirement to report

3    and they didn't do that.

4          Now we're not talking, ladies and gentlemen, about

5    breach of contract, but we're saying to you -- this is the

6    argument -- that any doubt you have about whether they were

7    acting intentionally in failing to correct what they now knew

8    was a material misrepresentation should be cast aside when you

9    realize that they knew they had a contractual duty to correct

10   this and they didn't even follow up on that.

11         That's the kind of argument I take it you want to

12   make.  Yes?

13         MR. ARMAND:  Yes, your Honor.  And in particular with

14   Mr. Kitashima, he said he understood that he was not permitted

15   to sell loans that weren't investment quality to the GSEs.  So

16   he certainly should have taken steps to remedy the fact that he

17   was aware that at that time they were in fact selling loans

18   that were not investment quality.

19         THE COURT:  So your adversary says that there's no

20   evidence that any of the three people we're concerned with here

21   knew about this self-reporting provision.  I know you said

22   generally they were asked about their familiarity with

23   representations and warranties in the abstract or in the global

24   sense, is there any -- were they ever asked about did they

25   recognize they had a duty to report in these circumstances?

1          MR. ARMAND:  I don't think any of them were asked

2     specifically about whether or not they knew that the duty to

3     self report.

4          THE COURT:  What would be the basis on which a jury

5     could infer that they knew about this provision?

6          MR. ARMAND:  Because they were aware that the

7     representations and warranties would apply, that they needed to

8     be sold pursuant to the guidelines, that they -- this program

9     was specifically designed to sell loans to the GSEs and that

10    these provisions exist.  So there isn't specific evidence that

11    they were shown the provisions and did you know about this, but

12    the fact that they knew these guidelines applied.

13         THE COURT:  You could -- the burden, of course, is on

14    the government.  You could have asked them, regardless of

15    whether you had seen this particular wording, did you

16    understand if there were problems in the representations that

17    have been made that were discovered that you had a duty to

18    report them.  But you didn't ask that apparently.  So now there

19    are a whole host of representations and warranties and

20    contractual provisions, and how can a reasonable juror infer

21    that any of these folks specifically knew about the self

22    reporting?

23         MR. ARMAND:  Your Honor, there is not direct evidence

24    that they -- that was elicited during the trial that they knew

25    about these provisions, and the jury would need to infer based

1   on --

2           THE COURT:  I understand circumstantially, but the

3   difference between circumstantial inference, which is

4   permissible, and something that is just gross speculation is

5   the line we need to draw.

6           MR. ARMAND:  It's kind of a fundamental aspect of the

7   relationship.  If you are selling loans that you are

8   representing are investment quality, it's a basic assumption

9   that you're going to need -- you have specific knowledge that

10  loans that you're selling are actually not investment quality

11  and that the representations that should be made are false or

12  misleading.

13          THE COURT:  You're missing my point.  There's nothing

14  that is going to prevent you from saying they misrepresented

15  loan quality and they never took the slightest step to correct

16  that misimpression, and we ask you to infer they did that

17  because they had an intent to defraud.  That argument is

18  absolutely permissible.

19          It's the furtherer argument you want to make, which is

20  that this inference is further corroborated by their breach of

21  the self reporting requirement because it shows they had a

22  heightened knowledge, if you will, of the need to bring this to

23  the purchaser's attention and failed to do that.  And what your

24  adversary has handed up, you have lots and lots of witnesses

25  who talk about from the other side how the contract creates a

1    self-reporting requirement, but I don't see anything from the

2    Countrywide side.  I'm looking at this very quickly, so I may

3    be missing --

4              MS. MAINIGI:  No, your Honor, there's nothing there.

5    With respect to Mr. Kitashima's testimony as I recall it,

6    generally, I believe I asked him as to whether he had any

7    awareness of the reps and warrants process with Fannie or

8    Freddie, and he indicated that he did not because he was not

9    involved with the sale of loans to Fannie and Freddie.

10             THE COURT:  And what about Ms. Mairone?

11             MR. MUKASEY:  We found some testimony, Judge, that

12   says simply that she was aware that loans were sold to Fannie

13   and Freddie with the representation that they were of

14   investment quality, nothing more particular than that.

15             THE COURT:  That establishes the first part of it but

16   not the second.

17             MS. MAINIGI:  Here's the exact Q and A.

18   "Q.  Mr. Kitashima, in your role as chief credit and compliance

19   officer for FSL, did you have interaction with Fannie or

20   Freddie?

21   "A.  Not on a normal basis, no.

22   "Q.  Did you have any involvement in the sale of loans to

23   Fannie or Freddie?

24   "A.  No.

25   "Q.  Did you have any involvement in the rep and warrant

1   process related to Fannie or Freddie?

2   "A.  No."

3            MR. MUKASEY:  To further complete the record, at page

4   2625 of the transcript, similarly Ms. Mairone, who had noted

5   previously I believe that she had no contact at all with Fannie

6   or Freddie, she was aware loans were sold to Fannie and Freddie

7   with reps and warranties but nothing beyond that.

8            THE COURT:  The lack of contact is not dispositive.

9            MR. MUKASEY:  I understand that, I am adding that for

10  context.

11           THE COURT:  For the moment, I am not going to allow

12  that argument by the government because it lacks the factual

13  predicate in the testimony.  However, when the government is

14  preparing its summation tonight, if it finds testimony that it

15  believes provide more of a predicate than I have heard so far,

16  I will reconsider that ruling, in which case counsel, because

17  you obviously need to know this before tomorrow morning,

18  counsel, for that purpose only, should call chambers jointly no

19  later than 8 o'clock, and I'll hear you on that if there is

20  such testimony.

21           Now in terms --

22           MS. MAINIGI:  I apologize, your Honor, no later than

23  8 o'clock tonight?

24           THE COURT:  Yes, 8 o'clock tonight, because

25  Mr. Sullivan is probably in bed by 9.  If he's absent, I'm

1    going to take my shots while I can.

2           I have already indicated that no defense counsel can

3    make any sort of argument along the lines of why wasn't

4    so-and-so named, why wasn't Mr. Lumsden named and Mr. Kitashima

5    named and so forth.

6           Also no defense counsel -- I already highlighted this

7    previous on days -- can make a general argument about the

8    honesty and credibility of Countrywide people across the board.

9    That doesn't preclude arguments about the people in this case

10   dealing with the Hustle loan.  It's perfectly appropriate to

11   say, "As you heard, Ms. Mairone was totally truthful and candid

12   with everyone she dealt with in the Hustle loan program," but

13   nothing beyond that.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Now, the other areas I want to give some

2     general instructions about closing arguments, but anything else

3     any counsel wanted to raise?

4          MR. ARMAND:  A handful, your Honor.  In addition,

5     during the opening, there was some references from the defense

6     for the bank defendants about the relationship between

7     Countrywide and the GSEs being a close relationship and that

8     the GSEs were experts.  And I guess really two things.  One

9     goes to what the jury instructions that we just requested that

10    they should have been able to figure this out on their own

11    based on their close relationship and their due diligence.  And

12    the second thing is any suggestion that there was some general

13    honest and fair dealing between the Countrywide and the GSEs,

14    that would open the door to the Ms. Simantel issue.

15         THE COURT:  I agree with all that.  Anything else?

16         MR. ARMAND:  Yes, your Honor.  In addition, there was

17    some references to Bank of America not having done anything

18    wrong in connection with this case.  And the only thing --

19    that's true.  We're not alleging that Bank of America did

20    anything wrong.

21         To the extent all the bank defendants are being lumped

22    together, we don't want a juror to say, if we have to treat

23    them all the same and it is agreed that the Bank of America

24    didn't do anything wrong, then no one did anything wrong.

25         THE COURT:  I agree with that.  I have no problem,

1    however, with any counsel repeating verbatim what is in my

2    instructions.  So if counsel wants to say Bank of America as

3    successor in liability -- the language along the lines of the

4    instruction, just so that the jury is clear on the relations

5    between the banking defendants, that's fine.

6           But the vice in what you're referring to is the

7    implicit suggestion that because Bank of America didn't do

8    anything wrong, there shouldn't be any liability here.  Which

9    is not going to be permitted.

10           MR. ARMAND:  Understood.  Thank you, your Honor.

11           Another issue was just there were statements during

12   Ms. Mairone's counsel's opening about Ms. Mairone not having

13   originated the scheme to defraud.  She didn't create it, she

14   came after the idea was already out there within Full Spectrum

15   Lending.  And this was an issue I had requested an instruction

16   on.  I've actually found the specific provision.  It is

17   actually from Sand, the pattern jury instructions.  The

18   government is not required to prove that the defendant

19   personally originated the scheme to defraud.

20           THE COURT:  That's different from what you were

21   arguing.  You were arguing that no one with intent has to

22   originate this scheme to defraud.  That it is just a

23   free-floating scheme to defraud that came out of the miasma and

24   then someone joined into it.

25           You can't have a scheme to defraud without someone

with fraudulent intent putting it together.  That doesn't mean

that someone can't take advantage of circumstances that are

there and lead them into a scheme to defraud.  And it certainly

doesn't mean that the defendant you are considering has to be

the person who first concocted the scheme to defraud.  But, it

is not a scheme to defraud unless someone concocted it as a

scheme to defraud.

          MR. ARMAND:  That's fair, your Honor.  Understood.

          Then I think what we would request is that we would

have just an instruction that would be limited to Ms. Mairone,

and so that it is not necessary that the government prove that

Ms. Mairone originated the scheme.

          THE COURT:  The general thing is, I think that's

already implicit in the instructions.  Because the instructions

say there first has to be a scheme to defraud, and then the

defendant you are considering has to join it, has to

participate in it.  No suggestion that that person was the

originator.  And you can certainly say that.  You just can't

say it the way you said it earlier, which was that it can be a

scheme to defraud that no one concocted.

          MR. ARMAND:  Understood, your Honor.

          Just another issue is just to the extent there are --

the government is a little concerned that there are going to be

repeated references to the mail and wire fraud statutes being

criminal statutes and it is --

1            THE COURT:  I don't see why there should be any

2    references to that.

3            MR. ARMAND:  Actually, we agree, your Honor.

4            THE COURT:  I thought you might.  Let me hear if

5    anyone is planning to make those references.

6            MR. SINGER:  Well, I think we were until the charging

7    conference.

8            THE COURT:  Now you know better.

9            MR. SINGER:  Your Honor pretty much told us we can't.

10           THE COURT:  Yes.  You cannot.

11           MR. SINGER:  Can I ask for some clarification on the

12   first limitation that Mr. Armand mentioned.  I understand that

13   we're not allowed to say that Fannie and Freddie should have

14   figured this out for themselves and were negligent in not doing

15   so.  I think that's what the instruction says.

16           But, it may be relevant to the defendants' intent.  I

17   don't know what Mr. Sullivan is exactly planning to say about

18   this, if anything.  It may be relevant to the defendants'

19   intent that they understood that Fannie and Freddie were

20   sophisticated in matters of loans.

21           THE COURT:  Obviously, since he's not here, I can't

22   address this totally.  But, if the argument is, it is not that

23   they were intending to defraud.  They didn't feel any need to

24   disclose these material undisclosed facts necessary to give

25   Fannie Mae and Freddie Mac the truth because they knew they

 1    were dealing with sophisticated institutions who somehow would

 2    stumble upon the truth anyway.

 3              If that's the argument you want to make, it's not

 4    going to be allowed.

 5              MR. SINGER:  No.  I certainly don't think that's the

 6    argument we want to make.  The argument might be -- and again,

 7    I'm hypothesizing -- but I think it would be fair to say that

 8    any time you are saying anything to anyone, context matters.

 9    If you understand that the person you're talking to already

10    knows a lot about loans, for example, it is not an omission, a

11    material omission to say, hey, by the way, these loans were

12    originated from borrowers.  So, there are certain things that

13    the person speaking may have a reasonable understanding of the

14    person listening knows and understands.  If two sophisticated

15    people are talking, that can be considered in terms of

16    someone's intent to deceive.

17              THE COURT:  I would only have allowed that if, and

18    even then I would have some questions, but I would only allow

19    it if Ms. Mairone or Mr. Kitashima, because we didn't hear from

20    the third guy, said in their testimony in this case, well, the

21    reason I didn't tell or cause Fannie Mae or cause Countrywide

22    to tell Fannie Mae or Freddie Mac X or Y or Z was because I

23    believed they already knew that.  I don't recall any testimony

24    like that.

25              MR. SINGER:  No.  Because those people didn't speak to

1   Fannie and Freddie.

2           THE COURT:  No.  But also because you never asked

3   them, you collectively never asked them, did you assume that

4   Fannie or Freddie already knew X or Y or Z.

5           MR. SINGER:  There was testimony, however, on the

6   other side of the equation from the Fannie and Freddie

7   witnesses that they understood that loan processors, for

8   example, cleared loans to close.  So, the understanding in the

9   industry, it seems to me, is relevant.

10          THE COURT:  If there is a specific argument along

11  these lines that the two absent speechifiers want to raise with

12  me, they can do so at 8 o'clock tonight.  But, nothing I've

13  heard so far supports an argument along those lines.

14          MR. ARMAND:  In addition, your Honor, I think this is

15  in the same vein.  The argument that the GSEs expected that a

16  certain percentage of loans would default and their remedy

17  under the contract would be a repurchase request.  There were

18  multiple times during the trial when this type of questioning

19  was -- attempts to elicit this information, and the Court

20  sustained objections from the government.  So we would request

21  that arguments along those lines would not be allowed either.

22          THE COURT:  Yes, I agree.

23          MS. MAINIGI:  Your Honor, we would certainly --

24  there's obviously objections that were sustained and that

25  evidence is not admissible.  But to the extent the Court

1    allowed in testimony as to any particular topic, that would be

2    fair game.

3          THE COURT:  That goes only so far.  Because we have

4    clarified through the jury instructions certain things.  So for

5    example, the government has lots of evidence about the process

6    that it's now going to be able to refer to only in limited

7    respects as going to intent, because you convinced me that we

8    should not make that a separate claim.  Now, so the mere fact

9    that something is in evidence doesn't mean that if something

10   has now been precluded by the charging conference that you can

11   override those rulings.

12         MS. MAINIGI:  I understand.  Just as a general matter.

13         THE COURT:  Yes.  I agree with you as a general

14   matter.

15         So, but in this issue we're just discussing, it better

16   be brought up before 8 o'clock if there is an argument someone

17   wants to make about that a certain percentage of the loans are

18   going to default anyway, I don't see how that is consistent

19   with the Court's charge.  But I'll hear whatever anyone wants

20   to say about it.

21         MR. ARMAND:  Very last one.  There were references in

22   the opening from Ms. Mairone's counsel that suggested it was a

23   blame the new girl, sort of a suggestion that Ms. Mairone was

24   being singled out because of her gender, either by government

25   witnesses or by the government in this case.  And just want to

1    make sure --

2              THE COURT:  I don't recall the gender, but I do recall

3    the new person in town or something like that.

4              MR. MUKASEY:  I think it was new girl on the block or

5    something.  But we argued --

6              THE COURT:  I do think the use of the term "girl" was

7    quite sexist.

8              MR. MUKASEY:  I cleared it with the client before I

9    opened.

10             THE COURT:  That means she'll only have to apologize

11   to a few billion people.

12             MR. MUKASEY:  The only point, I am not sure whether we

13   are going to say it in summation, we are not going to make a

14   gender issue out of this.  We are going to make an issue of the

15   fact that Mr. O'Donnell had some personal problems with her,

16   professional problems with her, which he testified to.

17             THE COURT:  His alleged bias in that regard is of

18   course fair game.

19             MR. MUKASEY:  We're not going to make a gender issue

20   out of it.

21             THE COURT:  Okay.  Anything else?  All right.  Let me

22   give you some general guidelines for summations.

23             It is often said, and I agree with this to a degree,

24   that as a matter of professional courtesy, counsel do not like

25   to interrupt opposing counsel's closing arguments.

1           The exception is where the only meaningful correction

2      can be made at the time when the statement is made.  So I'll

3      give you two examples.  If some counsel states something that

4      is completely outside the record.  I'm not talking about

5      competing inferences as to what the circumstantial evidence

6      might or might not permit one to infer.  But something

7      completely outside the record, like, I'll give you a bad

8      example, but the defendant here is Countrywide, you all know

9      about Countrywide, you've heard in the radio or television what

10     Countrywide is like.  Something like that.  I want an

11     objection.  In that extreme case, the Court sua sponte will

12     object.

13          In something a little bit more sophisticated, an

14     argument that is made that I'm sure is very unlikely to happen

15     with counsel as good as the counsel we have in this case.  But

16     I have seen it occur in other cases.  Where someone just says

17     something that has no support in the evidence.  Just

18     completely, you know, out of their head.  The time to object to

19     that is then and there.  That doesn't mean I won't give a

20     corrective instruction if it is brought to me later.  But it

21     will be much less helpful to the jury if that is not brought to

22     my attention immediately.  So, if something that extreme

23     occurs, someone should object.

24          The second example is a misstatement of law.  There

25     used to be in some jurisdictions, maybe still is, a rule that

1   you can't refer to the law on summation.  I don't agree with

2   that.  You can refer to my instructions.  That's the law of

3   this case.  So feel free to refer to my instructions.  But you

4   better get them right.  And if you state a principle of law

5   other than my instructions, you're taking the law into your own

6   hands and you may get a sua sponte objection from me, but you

7   will certainly risk an objection from counsel.

8           So my point is, you have permission and indeed

9   encouragement to object right in the middle of summation in

10  those two circumstances.  A statement of fact that is

11  completely without support in the record, completely, or a

12  statement of law that is completely erroneous.

13          Anything else, I leave it to your professionalism.  If

14  there is some matter, and I will at the close of any summation,

15  even if we're moving immediately into another summation, I'll

16  give you the opportunity to approach the bench if you need to

17  raise that kind of objection after the summation.  But, in the

18  two extremes that I mentioned, it is much better to have the

19  correction at the time.

20          MR. MUKASEY:  Judge, is Mr. King going to send around

21  another copy sometime this evening?  Is your law clerk going to

22  send another copy of the charge this evening?

23          THE COURT:  Yes, he certainly is.  He's already done

24  part of that and he will work on it some more now while I take

25  another matter.  Anything else?  Very good.  I will be involved

DAL3BAN6                    Charge conference

1    in another matter for the next hour and a half.  So, do not

2    call chambers -- it is now 5:35.  Do not call chambers until

3    sometime after 7, but any time after 8 is fine.  If you don't

4    call, I won't be here.  We'll see you tomorrow morning at 9:15.

5              (Adjourned until October 22, 2013, at 9:15 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25