DAM3BAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4
                    Plaintiff,
5
              v.                        12 CV 1422 (JSR)
6
    BANK OF AMERICA CORPORATION,
7   *successor to Countrywide
    Financial Corporation,*
8   *Countrywide Home Loans, Inc.,*
    *and Full Spectrum Lending*, et
9   al.,

10                  Defendants.

11  ------------------------------x
                                        New York, N.Y.
12                                      October 22, 2013
                                        9:30 a.m.
13
    Before:
14
                        HON. JED S. RAKOFF,
15
                                        District Judge
16

17

18

19

20

21

22

23

24

25

DAM3BAN1

1                          APPEARANCES

2    PREET BHARARA
          United States Attorney for the
3         Southern District of New York
     PIERRE G. ARMAND
4    JAIMIE LEESER NAWADAY
     JOSEPH N. CORDARO
5    CARINA H. SCHOENBERGER
     ELLEN M. LONDON
6         Assistant United States Attorneys

7

     WILLIAMS & CONNOLLY
8         Attorneys for Defendant Bank of America
     BRENDAN V. SULLIVAN, JR.
9    ENU MAINIGI
     MALACHI B. JONES
10   KENNETH SMURZYNSKI
     CRAIG D. SINGER
11   ALLISON B. JONES
     STEVEN M. CADY
12   JENNIFER WIMSATT PUSATERI

13

     GOODWIN PROCTOR
14        Attorneys for Defendants Countrywide
     RICHARD M. STRASSBERG
15   WILLIAM HARRINGTON

16

     BRACEWELL & GIULIANI
17        Attorneys for Defendant Mairone
     MARC L. MUKASEY
18   MICHAEL HEFTER
     RUSSELL ZWERIN
19   RYAN M. PHILP
     SETH M. COHEN
20   CHRISTINA JARDINE

21

22

23

24

25

DAM3BAN1

1          (In open court; jury not present)

2          THE COURT:  Ms. Nawaday, do you want to take a break

3    midway through your summation or not?

4          MS. NAWADAY:  I would prefer not to, your Honor.

5          THE COURT:  All right.

6          MR. ARMAND:  There may be a microphone that goes with

7    the podium.  I noticed it over there.  Would it be possible to

8    put it on the podium?

9          THE COURT:  That's the interpreter's microphone.

10         (Jury present)

11         THE COURT:  Good morning, ladies and gentlemen.  We

12   are now about to hear closing arguments of counsel.  I want to

13   remind you, as I did before opening statements, that nothing

14   that counsel says is evidence.  The evidence which is now fully

15   before you came from the witnesses, from the few exhibits, from

16   the stipulations that we occasionally had when the parties

17   agreed to a fact.  There was also a few times when you were

18   read what are called legal admissions, formal admissions.  That

19   is like a stipulation.  Those are the only sources of evidence.

20         But now that the evidence is fully before you, it may

21   be useful for you to hear what each side believes the evidence

22   shows or fails to show.  Obviously they are going to disagree

23   on what they think the evidence shows or fails to show, but it

24   may be useful to consider their arguments, their insights,

25   their perspective, before you undertake the job of forming your

DAM3BAN1

1      own opinions in this case.

2              Now, the whole day is going to be taken up with these

3      closing arguments.  The government begins their allotted two

4      hours and 10 minutes.  We'll then take a midmorning break.  The

5      bank defendants are allotted two hours.  They'll take one hour

6      before lunch and one hour after lunch.  Then Ms. Mairone's

7      counsel will take an hour.  And finally there will be a short

8      20 minute rebuttal from the government.  So we have a full day

9      in front of us.

10             So let's begin with counsel from the government.

11             MS. NAWADAY:  Thank you, your Honor.

12             Good morning, ladies and gentlemen.  My name is Jaimie

13     Nawaday and I represent the United States.

14             After four weeks of evidence and testimony, this is

15     still a case about greed and lies.  It is about people at

16     Countrywide saying to each other that their loan quality is in

17     the ditch, while telling Fannie Mae and Freddie Mac that their

18     loans are investment quality.  It is about rolling out a new

19     business model called the Hustle, in the midst of a financial

20     crisis to make a quick profit at the expense of Fannie Mae and

21     Freddie Mac.

22             The Hustle was all about speed, lightning speed and

23     volume, and never about quality.

24             As we told you, the Hustle sidelined the underwriters

25     in favor of loan specialists, who were entry-level clerks

DAM3BAN1                    Summation - Ms. Nawaday

1    pushed and paid and even ranked based on achieving funding

2    goals and speed goals.  They weren't paid based on quality.

3    They weren't punished based on quality.  And they weren't

4    ranked on quality.

5           In fact, when the reports on Hustle loans showed that

6    they were of terrible quality, the loan specialists stopped

7    being told about quality all together.  Defendants saw quality

8    as a distraction from the goal of funding.  Something that

9    slowed down the work of loan specialists.

10          So while Countrywide managers discussed the bad

11   quality reports among themselves, they told the loan

12   specialists to keep funding the loans.

13          As the defect rates on those loans rose higher and

14   higher, Countrywide managers set up funding contests for loan

15   specialists, pushing them to fund loans at lightning speed.

16   Funding contests, but not quality contests.  They sold those

17   loans to Fannie Mae and Freddie Mac with lies that they were

18   investment quality loans.  That's why we're here.  That's what

19   we've shown, and that is fraud, ladies and gentlemen.

20          Mr. Armand promised you in his opening statement that

21   we would demonstrate the fraud, that we would demonstrate that

22   the Hustle was about speed and volume and not about quality,

23   that we would demonstrate that Hustle loans were sold with lies

24   about their quality.  We've proven these facts.  We made

25   promises to you and we kept them.

1                How did we show you that the Hustle was all about

2       speed and volume?  We showed you how the Hustle swapped out

3       underwriters for loan specialists, entry-level clerks with

4       little to no mortgage industry experience.  We showed you the

5       Hustle turn time goal of 15 days.  15 days to move a loan from

6       application to funding.  We showed you the funding goals of 30

7       loans per loan specialist per month or one loan a day.  And we

8       showed you why the loan specialists were striving to hit these

9       goals, because they were pressured to hit them and they were

10      paid to hit them.  But they weren't paid anything for quality.

11      And for six months their pay was never hit for bad quality.

12               And who is pushing for this?  The chief operating

13      officer, Rebecca Mairone.  And why did Countrywide push for

14      this model?  Greed.  Because Countrywide doesn't hold on to the

15      loans it makes.  It originates them, and then it sells them.

16      And the more quickly it does this, the more quickly it gets

17      paid.  So it unloaded Hustle loans as fast as possible to

18      Fannie Mae and Freddie Mac, the only major purchasers of

19      Countrywide loans in 2007 and 2008.

20               But Fannie Mae and Freddie Mac couldn't possibly

21      inspect all those loans before buying them.  They rely on

22      lenders to inspect the loans, to underwrite them, and represent

23      that the loans are investment quality.  In the case of Hustle

24      loan, those representations were lies and defendants knew it.

25               As we showed you, defendants knew the Hustle process

1   would lead to poor quality loans.  Employees told them so and

2   their own reports told them so.  But Mairone and others at

3   Countrywide gave the direction to pursue profit instead.  So

4   while warnings were raised, and bad quality reports rolled in,

5   defendants expanded the Hustle.  They added volume and they

6   added riskier loans, and Mairone and others looked at the

7   production reports on those loans and said they were looking

8   fantastic.

9           Those reports show that they were hitting their speed

10  goals.  But the quality reports told a different story.  Week

11  after week, they showed defect rates on the loans climbing, at

12  one point to more than 90 percent.  But defendants didn't want

13  to hear about those reports.  The speed and the funding reports

14  looked too good.  So they keep the focus on funding.  They sent

15  out daily funding reports to hold loan specialists accountable

16  for production targets.  Accountable for production targets,

17  but again, the quality reports were a different story.  Those

18  stopped going out to loan specialists.  They were called a

19  distraction.  That's how we know this was about speed and

20  volume and not quality.

21          And although they claim they continued to track the

22  quality by each employee, we know that isn't true.  We showed

23  you charts of loan specialists and other employees where

24  everyone was ranked on turn time and everyone one was ranked on

25  fundings.  Remember what they showed on quality?  On quality

1    everyone was ranked number one.

2              The employee warnings and the quality assurance

3    reports were right in predicting disaster.  Bad quality

4    assurance reports turned into bad quality control reports the

5    next quarter.  They showed that the loans that went out the

6    door as investment quality loans to Fannie and Freddie had

7    material defect rates or severely unsatisfactory rates of

8    approximately 30 percent.  According to Countrywide's own

9    reports, one out of every three loans they were selling to

10   Fannie and Freddie were not investment quality.

11             How did defendants respond?  By starting contests to

12   fund more loans and contests to rebut defect findings.  Quality

13   had become a joke.

14             The experts in this case confirmed that quality was a

15   joke.  Our experts told that you more than 43 percent of the

16   loans sold to Fannie Mae and Freddie Mac were materially

17   defective and should never have been sold as investment

18   quality.

19             And what did the defense underwriting expert tell you

20   about the loans?  Do you remember?  He can't tell you anything

21   about the loans.  He wasn't even allowed to really look at

22   them.  His only job was to rebut the defect findings made by

23   our expert.  You've heard something like that before.

24   Something that Countrywide did with high defect rates in 2008.

25   It was called the sprint incentive.  Paying people to drive

DAM3BAN1                    Summation – Ms. Nawaday

1    down defect rates.  That's what they did in 2008 and that's

2    what they're doing today.

3           But this was no joke to Fannie Mae and Freddie Mac who

4    were lied to about the quality of the loans.  And it was no

5    joke to borrowers who were given those loans for their homes.

6    Greed and lies have consequences.

7           And now that all the evidence has come in, this case

8    still comes down to a few simple facts.  First, the Hustle

9    loans were bad.  Second, the defendants knew the Hustle loans

10   were bad.  And third, the defendants passed the Hustle loans

11   off as good loans anyway to cheat Fannie and Freddie out of

12   money.  And we've proven those facts to you as promised.

13          Contrast the promises we made and the evidence that

14   supports them against the promises made to you by defense

15   counsel in their openings.

16          At the beginning of this case, defense counsel

17   promised that when you see the documents, and you hear the

18   witnesses, you would find the focus on quality and correcting

19   quality problems almost overwhelming.  They also promised you

20   that everything Ms. Mairone did was the opposite of somebody

21   who wanted to sell bad loans to Fannie Mae and Freddie Mac.

22   These were bold promises, but they haven't kept them.  The

23   evidence does not support them.

24          Ladies and gentlemen, this is my opportunity to review

25   some of the evidence that you've heard at trial.  Before I go

1    any further, I am going to give you a short roadmap of what

2    I'll be talking about this morning.

3            First I am going to go over briefly what the

4    government must prove.  Second, I am going to review the

5    evidence you've heard and seen and how that evidence proves the

6    government's fraud claims.  And while I go through the

7    evidence, I'll address some of the arguments I expect defense

8    counsel will raise in their summations.

9            So what does the government need to prove?  We have

10   two identical fraud claims here.  One against the bank

11   defendants and one against Ms. Mairone.

12           Now, Judge Rakoff is the one who tells you about the

13   law.  So if I stumble and say something different from what

14   Judge Rakoff says, forget what I say.  But we expect he is

15   going to instruct you that the government must prove three

16   elements on each of its claims.

17           First, that there was a scheme to defraud Fannie Mae

18   and Freddie Mac.  Second, that the defendant at issue

19   participated in that scheme with knowledge of its fraudulent

20   nature and specific intent to defraud.  And third, that the

21   defendant used the U.S. mail or an interstate wire, like a

22   telephone call or an e-mail, in furtherance of the fraud.

23           The government needs to prove its claims by a

24   preponderance of the evidence.  That means that we have to show

25   you that it is more likely than not that the defendants

1    committed fraud.  And surely we have shown you that.  So when

2    we're through, I will ask you to reach the only conclusion that

3    is consistent with the evidence, and return a verdict for the

4    United States.

5            Now let's go back to the summer of 2007 as the

6    financial crisis unfolded.  You'll recall that Countrywide's

7    Full Spectrum Lending Division was looking to boost its

8    profits.  Full Spectrum needed a quick boost of cash, and the

9    market was changing.  Full Spectrum was moving from a subprime

10   business to a prime business.  But that has never explained the

11   Hustle.  Full Spectrum already had in place a model for

12   processing prime loans, and you heard about this.  It was

13   called the prime CLUES accept work flow.  You heard Michael

14   Thomas and Edward O'Donnell explain how it worked.  It involved

15   underwriters in the process.  Underwriters validated the

16   information put into CLUES, and underwriters cleared those

17   loans to close.  And this process produced quality loans.

18           And throughout this trial, we never really heard

19   anything wrong with this work flow.  What was wrong with the

20   prime CLUES accept work flow?  We know what was wrong with it,

21   according to defendants.  It just wasn't fast enough.  That's

22   why they wanted the Hustle.  They wanted more speed, and more

23   volume.

24           And you heard from Mr. Thomas that he was immediately

25   concerned about the Hustle model and he said so.  He told you

1    that he saw the tightening market.  He read a company-wide

2    e-mail sent by Drew Gissinger, the president of Countrywide

3    Home Loans, that said rigorous underwriting discipline was

4    critical to the company's success.  Mr. Thomas said this new

5    Hustle model would take them in the wrong direction.

6            Now let me show you DX 279.  Mr. Thomas said that

7    they've been down this road before.  He had seen other

8    processes like those in CMD and NCA designed without controls

9    and without quality checkpoint, and those processes led to bad

10   loans.  He warned if FSL quality declines and we have the same

11   quality issues that CMD regional operating centers are having,

12   I don't think we'd want Drew to see this process design.  And

13   he warned that NCA is a real-life example of what happens to

14   quality when we remove or reduce the current control points.

15   He sent his concerns to Mark Barnett and Anson Gong, engineers

16   you heard from who helped design the Hustle process.

17           What kind of process did these engineers design?  One

18   for speed.  Mr. Barnett told you that himself.  This was his

19   design.  Pushing loans through at high speed without hand offs

20   and without toll gates.  Mr. Barnett told you about going to

21   CMD and studying their process.  He created a presentation that

22   we saw on what he liked about the CMD model.  Fewer hand offs,

23   less training required for each individual, faster turn time.

24           But what did he leave out of his presentation?

25   Quality.  And Mr. Barnett talked about diagrams like this.

1    Remember seeing these diagrams?  He talked about this diagram

2    as evidence of something, though it's not clear what.  What

3    does this chart tell us about quality?  Nothing.  And what did

4    Mr. Barnett know about quality?  Nothing.  He testified he had

5    no experience in underwriting.  He had no experience in quality

6    control.  He had no experience with the guidelines of Fannie

7    Mae and Freddie Mac.  He had no experience in the mortgage

8    industry whatsoever.  But Mr. Barnett didn't have to know

9    anything about quality to follow his mandate, did he?  His

10   mandate was to design a process for speed.

11        And we told you about a cautionary tale from NCA,

12   another process designed for speed and managed by Rebecca

13   Mairone.  It involved loan processors who are allowed to clear

14   loans to close.  As you heard, those loan processors were given

15   funding quotas, one loan per day.  As we showed you, we showed

16   you this e-mail involving Robert Price who said that the loan

17   processors were under pressure to hit numbers oftentimes before

18   they were allowed to leave, no matter what time it is.  He said

19   that the pressure was driving loan processors to take shortcuts

20   and make poor decisions to hit numbers.  What Mr. Price called

21   "shortcuts" really was just lies.  A loan specialist saying she

22   reviewed a loan and cleared conditions when she hadn't.

23        And besides Michael Thomas and Ed O'Donnell, you heard

24   from Mr. Price and you heard from John Boland about their

25   concerns with loan specialists.  All of these witnesses told

1    you about the lack of experience that loan specialists had in

2    Full Spectrum.  And he had told you that loan specialists were

3    outside of the underwriting and credit risk organizations.

4    Instead, they were on the production and operations side of the

5    company.  And they told you that they warned that funding

6    pressures drove bad quality.

7            Did the defendants listen?  No.  They designed a model

8    that they knew was a recipe for disaster.  They took away

9    underwriters, they gave underwriting authority to loan

10   specialists, and created a compensation plan to drive the loan

11   specialists toward volume and speed at the expense of quality.

12           The evidence showed that in August of 2007, loan

13   specialists had a turn time bonus rewarding them for moving

14   loans quickly.  They also had a funding bonus rewarding them

15   for moving a lot of loans.  But they had no quality bonus and

16   they had no quality penalty.

17           As you heard from Mr. Thomas, at an initial kickoff

18   meeting for the Hustle, the loan specialists raised concerns.

19   They raised concerns about whether they were up to their tasks.

20   And they asked Ms. Mairone how their pay would be affected if

21   they made mistakes.  And as Mr. Thomas told you, Ms. Mairone

22   reassured them.  But she didn't say we'll do all we can to

23   train you and prevent mistakes.  She said their compensation

24   would not be hit for a few quality mistakes.  And Ms. Mairone

25   ended up suspending that hit for a total of six months.

1              Ms. Mairone didn't act alone in approving these

2     things.  You heard a lot about a steering committee with the

3     Hustle.  That the steering committee approved the Hustle.  But

4     at the top of that steering committee, along with Ms. Mairone,

5     were Greg Lumsden, the president of Full Spectrum Lending, and

6     Cliff Kitashima, the chief credit officer.  And together, these

7     three sold the Hustle as a pilot, as a test.  So you heard that

8     Mr. O'Donnell signed on believing that if things didn't work,

9     adjustments would be made.

10             Even with NCA when things got bad, Mr. O'Donnell had

11    been able to step in and add checkpoints to address the poor

12    quality.  But in fact, the Hustle was a test of one thing only,

13    and that was speed.

14             There were all sorts of reports on Hustle loans

15    showing average fundings per loan specialist, average turn time

16    per loan specialist, percentage of loans moved from application

17    to funding.  And Countrywide and Ms. Mairone watched those

18    reports closely.  They looked at what percentage of loans were

19    hitting the turn time goals of 15 days initially, and then 24

20    days, and you saw the funding goals and those reports of 30

21    loans per loan specialist per month.

22             And remember this e-mail from Mr. Barnett?

23    Mr. Barnett patted himself on the back to Ms. Mairone after the

24    Hustle started saying so you know we're not falling down on the

25    job here, we just got our first clear to close.  One day.

1           Why is he highlighting clear to close in one day?  So

2    Ms. Mairone knows he's not falling down on the job.  And what

3    was his job?  To design a process for speed.

4           These were big changes.  An entirely different

5    culture, a culture that focused only on speed and volume, but

6    not quality.  So some employees spoke up.  We showed you the

7    memo where Ed O'Donnell summarized feedback that he heard from

8    his senior vice presidents and sent it along to Ms. Mairone.

9    And Mr. O'Donnell said that the number one question he heard

10   was about quality.  Does the freeze of quality of grade and the

11   request to move loans mean we no longer care about quality?

12   And what was Ms. Mairone's response?  Sounds like it may work.

13   Sounds like it may work.

14          Why did she say that?  Because, in fact, she and the

15   bank did not care about quality.  They were going to roll out

16   this Hustle loan process no matter what.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          MS. NAWADAY:  You also heard about the Hustle culture

2     change from John Boland.  He told you about Audrey Knabe, who

3     managed loan processors, and how Ms. Knabe asked him to approve

4     loan processors for underwriting authority for the Hustle.  Do

5     you remember what Mr. Boland said about this?  He basically

6     said I don't know who these people are.  So how could he know

7     about the quality of their work?  But he was told they're the

8     guys assigned to the Hustle thing, come on, work with me.  How

9     did Mr. Boland say that he interpreted that?  There was a new

10    culture and a new set of rules for the Hustle.

11         When the defense witnesses talked about the Hustle

12    pilot, they talked about how collaborative the process was.

13    You heard that word a lot, "collaborative," from Mr. Kitashima,

14    Mr. Barnett and Mr. Gong.  But ask yourself, why did they use

15    that word so many times?  Your common sense is the most

16    important asset that you bring to this process.  You know when

17    somebody makes sense, and you know when somebody is trying to

18    hard to convince you of something that isn't true.

19         And while there were meetings about the Hustle that

20    included a lot of people, that doesn't mean that the process

21    was collaborative.  Did the bank and Ms. Mairone listen and

22    respond to those who advocated controls?  No.  Because the

23    process was rigged.

24         And remember when we asked Mr. Barnett whether his

25    goal was to remove tollgates from processing loans?  And he

said no, that wasn't my goal.  And then we put up this exhibit

that showed that in fact his goal was to minimize the number of

tollgates and push speed.

          In fact, you recall that Mr. O'Donnell emailed him and

suggested having underwriters look at appraisals, saying they

could get them turned around in less than 24 hours.  But

mr. Barnett saw that delay as to counter to his goals.  And

when we asked Mr. Barnett if he set funding goals for the

Hustle, he said no, I didn't set funding goals.  Then we put up

this exhibit which shows his involvement in setting a funding

goal of 30 to 35 fundings per loan specialist per month.

          So ask yourself, did Mr. Barnett just forget to

mention that he wanted to remove tollgates?  Did he just forget

to mention the funding goals?  No, he didn't forget.  He didn't

want to tell you that part.  He didn't want to admit that it

was all about funding, speed and volume.

          Mr. Barnett dodged around on another issue as well.

He testified on direct examination by defense counsel that in

attending steering committee meetings he never heard anyone

express disagreement with proceeding with the Hustle pilot.  He

never heard anyone express disagreement with expanding it to

Central Fulfillment.  Do you remember that?

          Then we asked him about this exhibit.  At the end of

August, Mr. Barnett was having confidential conversations about

expanding the Hustle work into Central Fulfillment.  And he

1    said that this information might be considered by some to be

2    sensitive.  But if everyone was so on board with the Hustle, if

3    this was such a great loan process, why was this information so

4    sensitive?

5          You already know the answer.  Quality.  The

6    information was sensitive because Ed O'Donnell and Michael

7    Thomas and others had expressed concerns about the pilot to

8    him, concerns about the quality of the loans the Hustle would

9    produce.  Those concerns were based not only on what they had

10   seen in NCA, but on the very first quality assurance report.

11   That report, as we showed up, showed that more than 40 percent

12   of the Hustle loans were flagged as high risk.  And

13   Mr. O'Donnell told you this was way above what he had seen in

14   the past.  And he said that the 40 percent high risk finding

15   was a big problem because the pilot was supposed to be using

16   the most experienced loan specialists and the highest quality

17   loans.

18         So Mr. O'Donnell took these results to the steering

19   committee, and he took them in particular to Ms. Mairone and

20   Mr. Lumsden.  And how did they react?  Ms. Mairone asked who

21   the reports were being distributed to, and she attacked the

22   finding.  She didn't want to hear that the process wasn't

23   working.  She didn't want to hear that the loans were bad

24   quality.  For Ms. Mairone, the pilot was never a test of

25   anything but speed.  As Mr. Barnett told us in his email, the

DAMTBAN2                       Summation - Ms. Nawaday

1   direction driven by Rebecca was that the Hustle teams would be

2   taking and keeping all loans.  And as you heard, by early

3   October the Hustle expanded into what is called Central

4   Fulfillment.

5           In the face of this terrible quality results, loan

6   specialists were given more authority, and they were allowed to

7   process higher risk loans, like the stated income loans and the

8   expanded approval loans that you heard about which were more

9   like subprime loans.  Expanded approval loans and stated income

10  loans were not the highest quality, lowest risk prime loans

11  that the Hustle was supposedly designed for, and defendants

12  knew that.  Mr. O'Donnell told you that he said that these

13  loans should stay out of the Hustle, but they were added

14  anyway.

15          And we know who was in charge of Central Fulfillment

16  because we saw this chart many times during the trial, and

17  Ms. Mairone admitted on the stand that she knew that Central

18  Fulfillment loans were being sold to Fannie Mae and Freddie

19  Mac.  She knew that those loans were sold with representations

20  that the loans were investment quality.  The one thing she

21  wouldn't admit but we now know from the evidence is that she

22  knew that the representations about investment quality were

23  lies and the loans were very poor quality.

24          And you heard that Ms. Mairone, with Mr. Lumsden and

25  Mr. Kitashima, picked Wade Comeaux to manage Central

1    Fulfillment.  Mr. Comeaux was a sales guy, somebody who was

2    touted as bringing a true production perspective to Central

3    Fulfillment.  And Mr. Comeaux certainly did live up to that,

4    pushing to fund, quote, a hell of a lot of loans in the fall of

5    2007.  And even when quality assurance reports continued to

6    show high finding rates, 80 and 90 percent high risk findings,

7    Mr. Comeaux never took his eye off those production goals.

8            And defendants tried one excuse after another for

9    ignoring these quality assurance reports.  One excuse was that

10   the reports just looked at loans prefunding at a point when

11   mistakes can be corrected.  But then we showed you that the

12   quality assurance group tested loans in both the prefunding and

13   post funding stage.  And what did it find?  The vast majority

14   of mistakes were not being fixed.  We saw that in an email from

15   Steve Brent to Ms. Mairone in November of 2007 telling

16   Ms. Mairone and Mr. Kitashima that only five percent of the

17   findings were being corrected.  And in this email, Brent warned

18   this could create much higher SUS rates, severely

19   unsatisfactory rates.

20           And did Mairone listen?  Did Ms. Mairone listen?

21   Let's look at what she said.  Rather than respond to Mr. Brent,

22   Mairone suggests to Mr. Comeaux that they discuss the issue

23   offline.  Now you heard testimony from Ms. Mairone that all she

24   ever wanted to do was improve the quality assurance process.

25   But if that's what she wanted to do, why did she ask for an

1    offline discussion with Mr. Comeaux?  Ask yourself what type of

2    discussion does a person typically take offline?

3            Were Mr. Brent's warnings heeded?  No.  What we see

4    from November 2007 is that quality was nothing more than a

5    distraction.  You heard testimony from Ms. Mairone and

6    Mr. Kitashima that there supposedly was overcommunication about

7    quality assurance.  And you saw an email from Scott Bridges,

8    another production guy, complaining that loan specialists were

9    getting pounded with quality reports.  Concerns about quality

10   were distracting these loan specialists, supposedly, from

11   focusing on production.  But no one seemed to be complaining

12   about overcommunication about production.  As you saw during

13   Ms. Mairone's testimony, she sent out daily reports on funding

14   production, on funding projections, and she said the purpose of

15   those reports was to increase the accountability of the

16   operations teams for the forecasted fundings.

17           So at Countrywide it's OK to pound people with daily

18   reports when you want to hold them accountable for fundings but

19   not when you want to hold them accountable for quality.  And

20   the low loan specialists were pounded about turn time.

21   Remember that email from November 2007 from defense witness Ron

22   Gillet?  He set a new turn time goal for his team of five days

23   from the time the individual received the appraisal on a loan

24   to the time that loan cleared to close.  And you might remember

25   what he said to his reports, because it was so colorful.  You

DAMTBAN2                    Summation - Ms. Nawaday

1    will be hearing from me, emails, meetings, checking and sending

2    notes.  You can count on me to be on this like white on rice.

3          And it wasn't only the quality assurance group that

4    expressed concerns, you saw emails from others.  You heard

5    testimony from John Boland and Robert Price about concerns

6    expressed to them that they passed along.  And one email in

7    particular that they both received was this one from Neal

8    Ballance, who was an underwriting manager in Richardson.

9          And Mr. Ballance complained:  It seems we're making up

10   for a loss in subprime by becoming overly aggressive, reckless

11   with prime.  And haven't we already seen where this will go?  I

12   recall the recent meltdown with NCA.  Those branches were given

13   authority to clear almost everything.  That resulted in branch

14   operation managers clearing to close files that were never

15   cleared, funding loans before they were approved by

16   underwriting, ignoring conditions, et cetera.  I don't

17   understand.  This mentality will eventually lead us down the

18   same road as subprime.  When did erring on the side of caution

19   ever become a bad thing?  How will investors and now, more than

20   ever, fed regulators react when they learn that total authority

21   for all aspects of a loan lies solely within a branch, a branch

22   run by only and responsible only to production management?

23   Time will tell.

24         When you read this email, I want you to remember the

25   defense counsel's promise.  They said that when you see the

3325

1    documents and you hear the witnesses, you will find the focus

2    on quality and correcting quality problems almost overwhelming.

3    Ladies and gentlemen, do you find this overwhelming?

4            Defendants, of course, did not stop there.  At

5    Mr. Lumsden's suggestion, Ms. Mairone agreed to lower base pay

6    so that their compensation would be more heavily dependent on

7    bonuses.  And bonus pay, as we know, was based on volume and

8    speed but not quality.

9            And again, Ms. Mairone did not act alone in pushing

10   funding, we also heard from Greg Lumsden through his November

11   emails.  And Mr. Lumsden said, as you heard, that if Full

12   Spectrum does not fund the volumes per its budget, it will not

13   have to worry about QA and QC.  And Mr. Lumsden's point could

14   not be clearer:  Forget about quality, just crank up

15   production.  And you heard him say to hit their numbers they

16   should watch for and eliminate any distractions.  What

17   distractions?  Anything that slows down the production of

18   loans, like quality checkpoints and QA reports.

19           And Mr. Comeaux and Ms. Mairone were on board.

20   Mr. Comeaux, as you know, told his direct reports that they had

21   to, quote, take ownership of funding a hell of a lot more loans

22   in December.

23           And immediately after that, Ms. Mairone told her

24   reports that they needed to hit $1.75 billion in fundings.  She

25   sent that email on November 29.  And we know what else

1      Ms. Mairone did on November 29th because you heard plenty of

2      testimony about it.  She ordered that all QA communication be

3      directed solely to her.  She ordered that all QC communication

4      be directed solely to her.  She suspended on-site reviews that

5      provided feedback about quality to loan specialists.  She

6      eliminated mandatory checklists that guided those loan

7      specialists through their tasks, and she extended the Quality

8      of Grade reprieve.

9          There's no dispute that Ms. Mairone sent her email --

10     sent her November 29 email with the approval of Greg Lumsden

11     and Cliff Kitashima.  In fact, she admitted that on the stand.

12     So why did Ms. Mairone support these changes?  You can believe

13     her words then or you can believe her words now, because during

14     her testimony we went on a fantastical voyage between two

15     realities, what she said in the past and what she said on the

16     stand.

17         Back then Ms. Mairone declared that the purpose of

18     these changes is to immediately increase the focus on funding

19     loans and working the pipeline.  And that makes sense because

20     each of the changes that she announced removed a distraction to

21     allow loans to be funded faster.  You heard about how the QA

22     fundings supposedly slowed down the loan specialists who were

23     shown their mistakes.  Defense counsel showed you an email from

24     Scott Bridges, the head of production, complaining about this.

25     So stopping the reports sped up production.  You heard

1   Mr. O'Donnell explain on-site reviews, the process of sitting

2   down with the loan specialist and teaching that person how to

3   do things correctly.  But that teaching would distract loan

4   specialists from moving loans, so suspending the site reviews

5   sped up production.

6          And you heard Ms. Mairone testify that it took time to

7   complete these checklists and upload them into the loan files.

8   So Ms. Mairone eliminated a lot of those checklists, and that

9   sped up production.  And finally, Ms. Mairone extended the free

10  pass for poor quality and announced that employees would no

11  longer even receive direct QA feedback until further notice.

12  What better way to send the message to keep driving towards

13  speed and volume?

14         Now Ms. Mairone says she took those actions to improve

15  the focus on quality and to be fair to employees learning new

16  roles, and she testified again and again that she thought the

17  changes she put in place would have either no affect on or

18  would in fact improve loan quality.  Ask yourselves, does that

19  make any sense?

20         Let me give you a few examples.  When asked what, if

21  any, effect minimizing hand offs would have on loan quality,

22  Ms. Mairone answered:  We thought it would improve loan

23  quality.  Really?  Does that make sense?

24         When asked if relying on CLUES as the underwriter

25  would compromise loan quality, Ms. Mairone answered no, I

1    thought it would help loan quality.  Does that make sense?

2           When asked whether she thought that allowing the loan

3    specialists to clear conditions on loans would hurt loan

4    quality, she said:  I didn't think it would hurt loan quality

5    at all.  Does that make any sense, that replacing experienced

6    underwriters with loan specialists wouldn't hurt loan quality?

7           And when asked why, she pointed to the quality

8    reporting, the reporting that she attacked and she ignored.

9    And she also pointed to all the controls in place, although

10   nearly all the controls had been eliminated on her watch.

11          Ms. Mairone's answers don't make sense because they

12   aren't true.  Ms. Mairone was not worried about loan quality,

13   she was concerned about speed and production.

14          And let's look at Mr. Comeaux's response to

15   Ms. Mairone's November 29 email.  Does he say great job, this

16   will really help loan quality?  Of course not.  He says:  Great

17   job.  This is huge.  But reminder, we still have around nine

18   checklists and a few other friction points not yet addressed.

19   When will we get those removed?

20          Ask yourselves, does that sound like a focus on

21   quality or a focus on speed?

22          Now was the quality assurance process debated?  Of

23   course it was.  And I expect you'll hear plenty more about QA

24   from defense counsel today.  But was the quality assurance

25   process so controversial before the Hustle?  No.  As

1   Mr. O'Donnell testified, findings were typically shared with

2   the people working the line, the people that made mistakes, so

3   that they could learn from those mistakes.  But by

4   November 2007, there were simply too many mistakes.  That was

5   the problem.

6           And while you heard from some defense witnesses that

7   they disagreed with the QA findings and believed that there

8   were some false positives, was it right for them to ignore the

9   findings entirely?  Was it right for them to just keep funding

10  loans when the high risk findings climbed to more than

11  90 percent?  You may recall that Ms. Mairone testified that she

12  wanted to investigate QA and determine the root causes of

13  defects.  She said to the quality assurance group, in effect,

14  these are just your opinions on the findings, and I think

15  they're wrong, and I'm going to go about business as usual in

16  funding loans.  Ask yourself:  Why did she do that?  What can

17  you infer from that?

18          Ladies and gentlemen, I submit that when you consider

19  Ms. Mairone's email, her November 29 email and the emails

20  around the same time, you will conclude that her testimony last

21  week concerning her focus on quality was completely ridiculous.

22  And I want to remind you of just a few examples.  When asked

23  under oath about on-site reviews during her deposition, she

24  said she could not even remember what they were.  When asked

25  about them during trial, she claimed to recall not only what

1    the onside reviews were, but also that in suspending them her

2    intent was to get the QA process corrected and the SUS type

3    items prioritized.

4            She wants to you believe that her memory is that much

5    better now.  According to Ms. Mairone now, there was no problem

6    with quality in November of 2007.  The only problem was with

7    the reporting on quality.  But if that were true, if the loan

8    specialists were not struggling and making tons of mistakes,

9    then why did she approve a Quality of Grade suspension that

10   ultimately went on for six months?

11           And remember what she said about the training of loan

12   specialists?  At her deposition she knew nothing about the

13   training, she knew only that there was a training plan.  At

14   trial she recalled the components of the training plan.  She

15   even testified that she was not even aware of a single loan

16   specialist who did not receive proper training.  Again, that's

17   quite a change.  It's also just plan wrong.  We showed you the

18   results of the file reviews for the Central Fulfillment loan

19   specialists in November.  In some cases, such as Barbara

20   Heinecke's team in Chandler, Arizona, one of the Hustle

21   centers, the loan specialists failed nearly half of the loan

22   files that they were tested on.

23           How about Ms. Mairone's testimony that the changes she

24   announced in her November 29 email were made only after she

25   reviewed the findings set forth in Defendant's Exhibit 963?

1      That testimony created problems for her when we pointed out on

2      cross-examination that the findings in DX93 were from March of

3      2008, three months after her November 29 email.  And you heard

4      Ms. Mairone later try to talk her way out of that testimony by

5      saying she saw similar reports earlier.  But where are those

6      reports?  Whatever report she was referring to, we haven't seen

7      it, have we?  The presentation she said she relied on doesn't

8      go back in time.  This addresses only March of 2008.  You know

9      when something doesn't make sense, when you are hearing

10     something false, the closer you pay attention to it, the more

11     confusing it gets.  That's a sign.  Listen to your common

12     sense.

13          You might hear defense counsel try to claim credit for

14     certain changes made to stated income loans in November 2007.

15     They told you about a new tool in determining reasonability of

16     stated income, but this wasn't a change spearheaded by

17     Ms. Mairone or by anyone at Full Spectrum Lending.  That

18     change, like other changes, was driven we Drew Gissinger, an

19     executive at Countrywide Home Loans, the same Drew Gissinger

20     who demanded rigorous underwriting in August 2007 who is

21     outside of Full Spectrum and above Ms. Mairone, Mr. Lumsden and

22     Mr. Kitashima.

23          That's what we see in DX755.  This was an email shown

24     to you by Mr. Mukasey.  Attached are the minutes of yesterday's

25     meeting with the credit/quality control group.  Big focus on

1    documenting how we arrive at reasonableness of stated income,

2    which Drew also echoed.

3            And whatever the debate was about quality assurance,

4    we know that in fact it was an early warning sign.  You heard

5    that prediction from Mr. O'Donnell, from Mr. Thomas, and from

6    Mr. Brent's emails.  The high quality assurance ratings in the

7    fourth quarter of 2007 turned into high quality control

8    findings in the first quarter of 2008.  That's when they go

9    from talking about high risk to talking about severely

10   unsatisfactory or materially defective.  And the quality

11   control reports showed initial severely unsatisfactory rates of

12   approximately 30 percent.  That means the quality assurance

13   reports were on to something.

14           You heard testimony from defense counsel witnesses who

15   tried to tell you the quality assurance had nothing to do with

16   quality.  But that's just wrong.  It's called quality assurance

17   for a reason.  The evidence of poor quality in the first

18   quarter of 2008 is overwhelming.  We see it in the reports, we

19   see it in the emails, we see it in presentations.

20           Remember when Ms. Mairone talked about investigating

21   the root causes of defects?  There were in fact investigations

22   into the root causes of these high defect rates.  And do you

23   remember what they found?  That the root causes of poor quality

24   were the very changes that Ms. Mairone, Mr. Lumsden and

25   Mr. Kitashima supported, the Central Fulfillment model, the

3333

1    suspension of Quality of Grade, the restricted communication on

2    quality control findings, and the restricted communication on

3    quality assurance findings.

4         Now if Ms. Mairone cared about loan quality, we should

5    have seen her driving big changes in the first quarter of 2008.

6    But that's not what we saw, is it?  Did Ms. Mairone and

7    Mr. Comeaux question this new model?  No.  They pushed for

8    funding contests.  Mr. Comeaux proposed to fund 15,000 loans

9    for the month of February, and he suggested that they continue

10   to provide daily feedback on turn time and roll out a contest

11   for mid month funding.  And Ms. Mairone approved that contest,

12   and you heard about it, it was called the On Fire in February

13   contest.  In fact, as she testified, Mr. Comeaux could not

14   implement a funding contest without her approval.  And you

15   heard about and saw emails about how closely the loan

16   specialists fundings were tracked during that period.  You saw

17   an email from Ron Gillet comparing the loan specialists funding

18   competition to a horse race and encouraging them to fund the

19   loans at lightning speed.

20        Of course, it was all fun and games if you were

21   funding lots of loans, but not if you were a low producer.  Do

22   you remember that email from James White who ran the Central

23   Fulfillment Center in Chandler, Arizona?  He told his group

24   that nobody leaves until they move at least one loan into phase

25   code two.

1          And during this time, we never heard anything about

2     contests for quality, did we?  Because there were none.  And

3     you know the reason why, because it was all about speed and

4     volume and never quality.  And while they were tracking

5     fundings and turn times and application to funding ratios, were

6     they tracking the quality of loan specialists?  They said they

7     were.  As you heard, Cliff Kitashima testified at his

8     deposition that even while Quality of Grade penalties were

9     suspended, they continued to track the quality.  Was that true?

10         Well, we showed you this chart during Mr. Kitashima's

11    testimony, and we can see on this chart that they tracked

12    funding.  And we see on the chart that they tracked turn time.

13    But is this what Mr. Kitashima meant when he said they tracked

14    the quality, that everyone was ranked number one?  And even in

15    the spring of 2008 when the Quality of Grade hit supposedly

16    return, did we see any evidence of that?  No.  Where are the

17    Quality of Grade tracking reports?  We never saw any, did we?

18         What we saw were emails like this from February in

19    which a Central Fulfillment manager says:  It's the first QoG

20    report he's seen since he started in June.  And he points out

21    all the the loan specialists on the report have the same score.

22    And let's go back to this email from May in which Mr. Comeaux

23    observes that loan specialists have been receiving no Quality

24    of Grade feedback for months and that they have no organized

25    detail on SUS fundings per loan specialist.

1          But the evidence showed plenty of organized detail on

2     funding rates and turn time averages for the loan specialists.

3     Again, do you find the focus on quality overwhelming, as

4     defense counsel promised?  Michael Thomas and Ed O'Donnell,

5     among others, knew the reason that quality was bad during this

6     time, and we know the reason, too.  The reason was the Hustle.

7          So in March of 2008, Michael Thomas recirculated the

8     email that we showed you from August this time saying:  This is

9     my plan of attack.  Oh, wait, this is what we suggested last

10    August.  And you saw the responses to that email.  We showed

11    you several responses, and in each one people responded in one

12    way or another, basically you were right.  Biren Desai, Pamela

13    Richards and Patrick Aliano.

14         Mr. Desai responded:  Is the benefit of improved turn

15    time due to control reduction worth the cost of deteriorating

16    quality?  At this point, it seems you have your answer, and

17    it's a resounding no.

18         And Patrick Aliano, a risk manager involved in the

19    Hustle design meetings, replied and changed the subject line of

20    his reply to HSSL August.  And what does he say?  Let's look.

21    Ed will tell you when we sat in the room in July, these were

22    some of the same concerns that we expressed.  I want you to

23    remember this email from Mr. Aliano because it shows that he

24    and Mr. O'Donnell and Mr. Thomas all raised concerns from the

25    start of the Hustle.  Ask yourself:  Does Mr. Aliano have any

1    reason not to be truthful in this email?  Think about that and

2    weigh that against the testimony you hear now from defense

3    witnesses claiming that no one ever expressed any concern about

4    the Hustle.

5           As Mr. Thomas explained in his email, it wasn't rocket

6    science to see what was coming.  But Mr. Lumsden and

7    Ms. Mairone and Mr. Kitashima didn't listen.  That's because

8    they purposely entered into this scheme to churn out bad loans

9    and sell them to Fannie Mae and Freddie Mac.  And the scheme

10   would have continued if not for someone above them and outside

11   of FSL, again, Drew Gissinger, who got wind of what was going

12   on within Full Spectrum, and he ordered a meeting with

13   Mr. Lumsden, Ms. Mairone and Mr. Kitashima and Mr. O'Donnell

14   about Full Spectrum's quality issues.

15          And even then, did they straighten up right away?  No.

16   First they blamed others and then tried to avoid blame

17   themselves.  Mr. Lumsden told Mr. O'Donnell that Full Spectrum

18   no longer fights like it used to on the SUSs, and he directed

19   Mr. O'Donnell to get the defect rates down.  And Mr. Comeaux at

20   that point complained to Ms. Mairone that ever since

21   Mr. Gissinger became involved he was no longer winning process

22   disagreements against Mr. O'Donnell.

23          And where was Cliff Kitashima in all this?  Where was

24   the director of credit risk, the person above all others tasked

25   with guarding loan quality?  He was biding his time, waiting to

1   retire in a few months.  According to Mr. Kitashima, there were

2   no real problems.  According to Mr. Kitashima, quality

3   assurance had no connection to loan quality.  So the high

4   findings -- the high findings rates didn't worry him.  Stated

5   income loans didn't worry him either.

6           Mr. Kitashima told you that he believed they were

7   among the highest quality, lowest risk loans.  In fact, he

8   might be the only person you heard from who believed that.

9   After all, Michael Thomas told us that stated income loans were

10  sometimes referred to as liar loans.  Do you remember that?

11  And Benjamin Tanabe, Freddie Mac's director of credit risk,

12  told us stated income loans are risker and require more careful

13  underwriting.

14          Even Mr. Kitashima acknowledged that at that time, in

15  2007 and 2008, stated income loans were experiencing high rates

16  of early payment defaults.  Those were loans defaulting in the

17  first six months of funding.  But Mr. Kitashima still admitted

18  no worries.  And according to him, neither did Mr. O'Donnell.

19  He told us that Mr. O'Donnell never even expressed concern that

20  Hustle loans were a poor quality, that Mr. O'Donnell never

21  expressed concern that loan specialists were not qualified, and

22  never expressed concern that loan specialists were determining

23  reasonability of income.

24          Why did he say he remembers none of that?  Because he

25  knew that quality was in the ditch, as did Ms. Mairone and

DAMTBAN2                    Summation - Ms. Nawaday

1   Mr. Lumsden, and he did nothing.  We showed you this email,

2   PX78, in which Mr. O'Donnell tells him the current process for

3   determining income reasonability is in the ditch.  And you

4   heard from other witnesses, like Michael Thomas and Robert

5   Price, that Mr. O'Donnell raised concerns about these issues to

6   Mr. Kitashima.  Do you find Mr. Kitashima's focus on quality

7   overwhelming?

8           And what did Ms. Mairone do when Mr. Gissinger

9   recognized the problem with Full Spectrum quality?  She first

10  tried to keep some of the bad news away from Mr. Gissinger.

11  She ordered Ed O'Donnell to remove some slides from a

12  presentation.  And O'Donnell, when O'Donnell refused, she told

13  him that if he didn't follow her direction, she would find

14  someone who would.  You heard Mr. O'Donnell's testimony on

15  that, and he said Mr. Kitashima was there as well.  Did

16  Mr. Kitashima say anything contrary when the defense called him

17  to testify?  No.  In fact, when asked about Mr. O'Donnell,

18  Mr. Kitashima testified that Mr. O'Donnell was very competent,

19  that he relied on him, and there was mutual respect between

20  them.

21          And even when Ms. Mairone was asked about whether she

22  ever ordered Mr. O'Donnell to remove some slides from a certain

23  presentation, she didn't say absolutely not, I would never do

24  that, all she said was not that I remember.  But Ed O'Donnell

25  remembers.  He told you that she ordered him to remove those

slides.  And as you heard, the meeting that ended up happening

with Gissinger was basically a train wreck, and Mr. Kitashima

and Mr. O'Donnell got the blame.

        As Mr. O'Donnell told you, by that point he had had

enough.  He had been pushing for more controls for months, he

had been ignored, and now he was the fall guy for it.  For

months he said that the focus was all about speed and volume

rather than quality.  So he drafted an email and laid out the

quality problems and identified the person he saw as driving

the changes that led to those problems, Rebecca Mairone.

        And then he helped set up the sprint incentive based

on Mr. Lumsden's directive to drive down the defect rates, a

bonus incentive that paid quality control employees for

overturning SUS findings from the first quarter of 2008.

Rebuttals led to increased paychecks.  Employees were paid more

the closer they got to reducing the 30 percent number down to

the industry standard rate of four percent.

        At the same time, there was another rebuttal incentive

in place that we told you about, the Full Spectrum poker run.

We showed you this email from James White saying that those who

overturned the most SUS findings would get a seat at the Snake

Pit Casino.  And defense witness Andrew Porteck described that

contest as kind of a fun little game that we played.  And those

incentives did drive down the defect rates into at least the

single digits.  And defendants now hold those numbers up in

1   this chart that you have seen so many times during this trial

2   as proof of quality instead of proof of lies.  The quality

3   chart that defendants have shown repeatedly during trial

4   reflects the numbers long after these rebuttal incentives had

5   their desired effect.  Ask yourself whether these numbers are

6   the ones that you can trust.

7            And let's also remember that there were losers in that

8   fun little game that Andrew Portek described:  The borrowers on

9   those loans.  At the other end of these loans, which were just

10  part of some contest, were real people with real homes.  And

11  the other losers were the purchasers of those loans, Fannie Mae

12  and Freddie Mac, who were told that every loan was investment

13  quality but ended up with loans like the one Maria Brewster

14  described.  It was made to the doorman whose application said

15  he made $13,000 a month.  You heard her testify that in fact he

16  made only a third of that and worked in Pebble Beach,

17  California, but was buying a property as his primary residence

18  in Fort Lauderdale, Florida.  And as Ms. Brewster explained, a

19  doorman is a job that you actually have to be physically

20  present to do.  It would be hard to commute from Florida to

21  California every day.

22           And in the loan files we showed you, you will see lots

23  of evidence of mailings between the borrower and Countrywide,

24  such as a loan file pages like this.  And I point that out

25  because we talked earlier about use of the mail and use of

1    interstate wire.  So there's obviously a use of mails here in

2    furtherance of defendant's scheme, which is one of the elements

3    you'll be instructed on.

4         And all of the interstate emails that you saw between

5    folks in Texas like Mr. Thomas and Mr. O'Donnell and Mr. Price,

6    and those in California, like Mr. Lumsden, Mr. Kitashima, and

7    Ms. Mairone, were emails that are addressed to all of Full

8    Spectrum Lending, like this one that went to offices in

9    different states, demonstrate the use of interstate wire in

10   furtherance of the scheme as well.

11        Now let me turn back to Fannie and Freddie.  Of all

12   the representations and warranties we talked about in the last

13   four weeks, one should stand out:  Every loan is investment

14   quality, which means that the borrower is able or likely to

15   repay.  You heard that explanation from Michael Sobczak, among

16   others.  That requirement of investment quality was never

17   waived.  There was no variance from the requirement of

18   investment quality.

19        And that requirement was critical to Fannie and

20   Freddie.  Fannie Mae and Freddie Mac were buying millions of

21   loans, and they didn't have the ability to review those loans

22   before buying them, so they relied on the bank's

23   representation, a promise about quality.  And you heard from

24   Benjamin Tanabe, Pam Padgett, John Forlines, Maria Brewster,

25   Michael Sobczak, and defense witness David Battany.  They each

1   talked about their different responsibilities about the

2   different provisions of the contracts, but each one said that

3   the representation that a loan is investment quality matters to

4   them.  And you heard from these witnesses that the

5   representation is critical because Fannie and Freddie buy too

6   many loans to underwrite those loans themselves, and Fannie and

7   Freddie don't want to buy junk.

8          And even though Countrywide sold every loan to Fannie

9   and Freddie with the representation that it was investment

10  quality, only six times did defendants identify a bad Hustle

11  loan for them and say wait we need to correct what we said,

12  that was actually a bad loan.  And why is that important?

13  Because it shows that defendants had no intention to correct

14  their false and misleading representations about quality.  They

15  intended to deceive Fannie and Freddie.  They kept Fannie and

16  Freddie in the dark about the quality of the Hustle loans they

17  sold them, loans sold with lies.

18         Now defense counsel may get up and argue all the

19  things that didn't matter to Fannie and Freddie, and they might

20  argue they disclosed some particular aspect of the Hustle

21  process in tiny print in an appendix to a presentation they

22  showed you.  But this is nonsense.  No one from Fannie Mae or

23  Freddie Mac testified they ever even saw such a presentation.

24         And they might argue that Fannie Mae and Freddie Mac

25  loved CLUES.  This doesn't matter.  The fraud was not CLUES,

DAMTBAN2                    Summation - Ms. Nawaday

1    the fraud was selling bad loans as good loans to make a quick

2    profit.  Defendants never disclosed that they were doing that.

3    They never disclosed that they knew that their bad loans were

4    sold to Fannie and Freddie as good loans, period.

5         What other proof is there that the Hustle loans were

6    terrible quality?  That's where the experts came in, and you

7    heard from two in our case.  You heard from Ira Holt, an

8    underwriting expert, who explained his methods, how nearly

9    every member of his team of underwriters worked together in one

10   office in Alabama re-underwriting all the Hustle loans.  He

11   hired his own underwriters, he trained them, and he had

12   constant dialogue with them about the loans.  His methods made

13   sense, and he answered questions about his methods in a

14   straightforward way.  And what he found was that more than half

15   of the loans in the sample of 343 loans provided to him,

16   53 percent, were materially defective, meaning they were not

17   investment quality.

18        Now our second expert, Dr. Charles Cowan, was a

19   statistician.  So he took that number from Mr. Holt and he did

20   what is called an extrapolation, and he told you what that

21   means.  He told you what he does is sort of like estimating the

22   outcome of a political election based on random polling.  So he

23   took the defect rate of 53 percent from a random sample of 343,

24   and he projected what that would mean for the entire population

25   of Hustle loans sold to Fannie Mae and Freddie Mac.  And

1     Dr. Cowan concluded that approximately 43 percent of those

2     loans were materially defective.  And again, by "materially

3     defective," we mean that the loans were not investment quality

4     and should not have been sold to Fannie Mae and Freddie Mac.

5             Finally, Lars Hansen, our witness from FHFA, Office of

6     Inspector General, explained the data that the banks provided

7     on Hustle loans, and he talked us through some charts, charts

8     like this one showing that the bank earned more than $165

9     million on Hustle loans.  And he talked us through this chart,

10    PX430, showing us that more than 75 percent of Hustle loans

11    between August of 2007 and January of 2008 were rated high risk

12    or action required by the quality assurance group.

13            Now the defense might say that our sample of Hustle

14    loans is overbroad, that it included loans that never in fact

15    went through the Hustle process.  And they called Anthony Ho in

16    their case to testify about how Hustle loans should be defined.

17    And Mr. Ho gave some technical arguments about data and what he

18    believed the Hustle population really consists of based on

19    branch center codes and things like that.  But Mr. Ho admitted

20    that he had no personal knowledge of the criteria that should

21    be used to identify Hustle loans.  He was never involved with

22    the Hustle.  Mr. Ho's criteria were based on documents provided

23    to him by bank counsel, as he explained to you.

24            And as you heard, the bank's loan data that Mr. Ho

25    relied on and testified about in fact contained a Hustle flag.

DAMTBAN2                    Summation - Ms. Nawaday

1    Now you would think that a Hustle flag in the data could be

2    used to identify Hustle loans, wouldn't you?  But as Mr. Ho

3    tried to explain, the bank considered the flag to be

4    unreliable, because they found it flagged loans incorrectly.

5         All of these technical arguments are just designed to

6    move your focus away from the experts' loan quality findings.

7    Whatever the exact number of Hustle loans, and we say it's

8    28,800, the proof is overwhelming that the Hustle loans were

9    terrible and sold to the GSEs with lies.  And if anyone has

10   made that clear to you, how bad the loans were, it was the

11   underwriting expert called by the defense, Robert Broeksmit.

12        Mr. Broeksmit told you that his job was only to rebut

13   Mr. Holt's findings.  And not all of his findings, only the

14   loans that Mr. Holt found to be investment -- sorry, to be

15   materially defective.  Does this sound familiar?  Does this

16   sound like the sprint incentive?  Does this sound like another

17   round of the FSL poker run?

18        And Mr. Broeksmit's methods made no sense.  He

19   admitted that he and his staff never looked at all the loan

20   files.  They didn't do a full re-underwriting of any loan.  He

21   told you that he never met most of the underwriters on his

22   team, and he stayed in touch mostly with his three top level

23   reviewers.  And what were the qualifications of the three top

24   level reviewers to do this expert job?  As you heard, two of

25   them were defense lawyers, defense lawyers instead of

1    underwriters.  Mr. Broeksmit admitted that they had no direct

2    underwriting experience.  That wasn't a prerequisite for the

3    job.  And of course, Mr. Broeksmit rarely had to overrule their

4    recommendations.

5          And we also showed you Mr. Broeksmit's instructions to

6    his team.  These were the instructions that he gave them before

7    they started their review, and those instructions gave his

8    reviewers a road map on how to rebut the findings made by the

9    government's expert.  That's not an objective review, that's

10   just a method designed to artificially drive down the defect

11   rate.  And Mr. Broeksmit also admitted there was no possible

12   way he could arrive at a higher defect rate than our expert.

13         So ladies and gentlemen, ask yourselves this, if they

14   think their loans are so good, why didn't they let their own

15   expert review them?  That's the question they don't want you to

16   ask, and that's the question they can't answer.  But you can

17   use your common sense and arrive at your own answer, because

18   they do know the loans are bad and they also knew why they were

19   bad.  That's why they were ordered to finally bring back the

20   underwriters in May of 2008 after thousands and thousands of

21   bad loans had been sold to Fannie Mae and Freddie Mac.

22         You saw that recognition not just from Mr. O'Donnell,

23   Mr. Thomas and Aliano, but from Wade Comeaux, the manager of

24   Central Fulfillment, who told Greg Lumsden that they had to,

25   quote, change the culture that was highly focused on turn time,

1   a culture that was created at the direction of Ms. Mairone,

2   Mr. Comeaux, Mr. Kitashima and Mr. Lumsden.

3           I just want to talk for one more minute about

4   Mr. O'Donnell, because I expect you will be hearing more about

5   him in the defense summations.  I expect you'll be instructed

6   by Judge Rakoff on assessing the credibility of witnesses, and

7   you should, of course, evaluate Mr. O'Donnell's credibility as

8   you would any other witness.  Consider his knowledge of the

9   facts, consider how he testified on direct and cross-

10  examination.  He endured seven hours of cross-examination by

11  very experienced lawyers.  You saw how his demeanor remained

12  calm, and how he remained forthcoming in his answers.  He told

13  you that he was the whistleblower.  He told you he gave

14  conditional approval to the Hustle pilot.  He told you,

15  frankly, that he had disagreements with Ms. Mairone and that he

16  continued to speak out about quality issues.  He told you that

17  he was in a tight spot in the spring of 2008 and that he helped

18  start the sprint incentive.  Defendants might fault him for

19  that.  But Mr. O'Donnell doesn't have to be perfect to be

20  credible.  His testimony, unlike that of Ms. Mairone and

21  Mr. Kitashima, is corroborated by his own documents in 2007 and

22  2008.

23          In their opening statement, defense counsel suggested

24  that somehow Mr. O'Donnell lived one life then and sees things

25  differently now.  I urge you to test that.  Look back at

1    Mr. O'Donnell's draft email and look to see how similar in fact

2    it is to what he said on the stand.  And remember that his

3    testimony is also corroborated by the testimony of Michael

4    Thomas, Robert Price and John Boland.

5         And let me also say a few words about some of the

6    other witnesses that you heard from in the last few weeks, and

7    in particular, who else you heard from from the defense.  Jack

8    Schakett.  Throughout opening statements on both sides, and

9    throughout the government's case, I don't think we ever heard

10   the name Jack Schakett.  So you might have wondered why he was

11   the kick off witness for the defense.  He was a Countrywide

12   employee, but he wasn't a Full Spectrum employee.  And he

13   testified that he never heard of the High Speed Swim Lane in

14   2007 and 2008.  The defense case started with a witness you

15   never heard of who knew nothing about the High-Speed Swim Lane.

16   What does that tell you, ladies and gentlemen?

17        You also heard from Lori Peffer, another witness whose

18   name probably never surfaced during the first two weeks of the

19   trial.  And Ms. Peffer testified on direct examination about

20   how CLUES works.  And she said that if a loan receives a CLUES

21   accept, it's considered to be investment quality.  That seemed

22   like a pretty sweeping statement, didn't it?  Maybe that's what

23   defendants have to say to argue that they sold good loans.

24   Maybe they have to argue that all CLUES accept loans are good

25   loans.

1           But that's just false.  We know that is false because

2      we heard testimony about how -- about all the things, frankly,

3      that CLUES can't do.  CLUES cannot clear conditions on a loan.

4      You heard how CLUES cannot evaluate an appraisal.  You heard

5      how CLUES cannot determine reasonability of income.  And in

6      fact, Countrywide's own underwriting guidelines even set out

7      these steps in explaining how to underwrite a CLUES accept.  So

8      how could you have an investment quality loan that does none of

9      these things?  Answer:  You couldn't.

10          And that's ultimately what Ms. Peffer admitted on

11     cross-examination.  She admitted that you need a qualified,

12     trained human being to look at the conditions on the loan, to

13     review the appraisal, to address any issues with the appraisal.

14     And ultimately, she completely contradicted her direct exam

15     testimony.  She admitted that a CLUES accept does not mean that

16     a loan is investment quality.  Because, as you heard from

17     numerous witnesses, underwriting involves judgment calls, and

18     you need qualified people to make those calls.

19          So why was Ms. Peffer trying to convince us that a

20     CLUES accept was all we needed for a good loan?  Because she

21     wanted you to believe that you don't need underwriters.

22     Because if you don't need underwriters, then maybe the Hustle

23     won't look so bad.  But it does look bad, and it was bad

24     because it was fraud.

25          And before I complete my remarks, I just want to thank

DAMTBAN2                    Summation - Ms. Nawaday

1    you on behalf of myself, all the lawyers and staff for the

2    United States, and all the lawyers and staff for the defendants

3    for the patience and attention that you have shown to all of us

4    as you heard all of the evidence come in.  We know this has

5    been a long road for all of you and we know that you have had

6    to make sacrifices to be here for the last four weeks.

7         As we promised at the beginning of this trial, the

8    evidence has proven that the defendants committed fraud by

9    putting speed and volume over quality and selling loans with

10   lies.  And now it's your turn to evaluate that evidence for

11   yourselves.  So in doing so, we ask you now, as we asked you at

12   the beginning of this case, to listen closely to Judge Rakoff's

13   instructions on the law and to follow them.  And we ask you

14   now, as we asked you at the beginning of this case, to use your

15   common sense.

16        If you do those things, the defendants will get a fair

17   trial, the government will get a fair trial, and you will

18   return a verdict that is fair and just.  And the verdict the

19   government respectfully asks you to reach, the verdict the

20   evidence compels, is that the defendants are liable for fraud.

21        Thank you.

22        THE COURT:  Thank you very much.  All right.  Ladies

23   and gentlemen, we'll take a 15-minute break.

24        (Jury not present)

25        THE COURT:  All right.  Well, I am delighted that the

DAMTBAN2

1    government counsel only took two-thirds of her allotted time.

2    I hope that's a good precedent.

3            Anything counsel needs to raise with the Court?

4            MR. SULLIVAN:  Given the early time, I still plan to

5    split one hour, one hour.  Is that OK with the Court?

6            THE COURT:  Yes.  So what we'll do is we'll take an

7    early lunch then, so we'll start again at approximately 11:30

8    and go to 12:30, take lunch to 1:30 and then give you your

9    second hour right after lunch.

10            Very good.  See you in 15 minutes.

11            (Recess taken)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAM3BAN3

1            (In open court; jury not present)

2            MR. MUKASEY:  Judge, may I raise one quick issue.  I

3    wanted to go back and check the record before I raised it,

4    Judge.

5            THE COURT:  Please be seated.

6            MR. MUKASEY:  As you know, I'm not one of the orators

7    today, but hopefully wearing my jury hat, the jury charge

8    conference had raised this.

9            There was a moment during Ms. Nawaday's summation when

10   she was referring to DX 963, which is a PowerPoint

11   presentation, where she asked of Ms. Mairone -- and I think I'm

12   quoting pretty closely here -- where is the proof of the

13   documents that Ms. Mairone looked at.  Where are the records,

14   where are the reports.

15           Judge, I think credibility attacks obviously when

16   Ms. Mairone takes the witness stand are in bounds, but burden

17   shifting is not.  And asking why she didn't produce reports or

18   records is really an improper shifting of the burden in a case

19   where the defendant has no burden.

20           THE COURT:  No, I think where a party makes

21   assertions, as you did on your opening with respect to

22   Ms. Mairone, and she did herself in her testimony, which are

23   either uncorroborated or not corroborated through the obvious

24   corroboration that the jury could find was reasonably

25   available, I think it's fair comment to point out the absence

DAM3BAN3

1   of such corroboration.  That's what I took the statement to be

2   made.

3          Now, of course, there will be included in the

4   instructions, indeed it was I think in your request that it was

5   added to the instruction -- no, it was bank defendants'

6   request, but anyway, that they should not speculate about

7   matters outside of the evidence, and you can of course refer to

8   that if you wish on your summation.

9          But, I think there is a difference between saying that

10  the burden is on the government and saying that some evidence

11  that would be available to a party to corroborate assertions

12  that have been affirmatively made by that party has not been

13  produced.  So I think that was fair comment.

14         MR. MUKASEY:  I certainly agree that asking where in

15  the record is the proof of X is fair comment.  Asking why the

16  defendant didn't produce it is the issue I want to flag and

17  preserve.

18         THE COURT:  I hear what you are saying.  But I think

19  the reasonable way that the jury took it was along the lines of

20  how certainly I interpreted it when I heard it.

21         Thank you for raising it, but I don't think it

22  requires any further action by the Court.

23         Let's bring in the jury.

24         (Jury present)

25         THE COURT:  All right, ladies and gentlemen, we will

DAM3BAN3

 1    now hear from counsel for the bank defendants.  He has been

 2    allotted two hours.  He's going to take one hour now and we'll

 3    take lunch a little bit early and have the second part after

 4    lunch.

 5            Mr. Sullivan.

 6            MR. SULLIVAN:  Thank you, your Honor, counsel for the

 7    government.

 8            No fraud.  Those were the first two words I spoke to

 9    you at open.  The first two words I speak to you today, because

10    this case is totally absent of fraud.  The government is right

11    in closing argument that I promised you an enormous amount of

12    quality.  I stick by that promise, and I'm going to take you

13    through it in painstaking detail to show you the concern for

14    quality in the company.

15            Counsel for the government says we're in the

16    fantastical voyage two realities.  That's absolutely true.  I

17    agree with counsel 100 percent.  We have been dragged down the

18    rabbit hole into Alice in Wonderland.  We've been asked to look

19    for evidence for four weeks that the government says is fraud,

20    and I suggest to you that what it is, is men and women at work

21    in the mortgage industry doing their jobs.

22            So let's begin.  The government brought a very

23    narrowly focused case here.  It focuses on High-Speed Swim Lane

24    loans.  As it turns out, there aren't 28,000 of them as the

25    government suggests.  There are actually only 11,000.  But

1   who's counting.  This is a fraud case about quality.  We'll

2   demonstrate how the government is wrong by 17,000 loans.

3           No evidence of fraud, no scheme to defraud, no

4   misrepresentation, no violation of law.  The government has the

5   burden of proof, and the defense has none.  Yet, we have

6   essentially proven that there is no fraud and that there is

7   quality.  I'm not taking on the burden, but in essence that's

8   what happened.

9           It is very hard to describe nothing.  When I say

10  nothing, I'm talking about weeks of evidence that amount to

11  nothing when it comes to fraud.  Nothing.  I think of, to

12  continue the baseball analogy, I think of Yankee Stadium on a

13  snowy day.  Picture the stadium, all the pictures we see,

14  they're filled with fans.  But an empty stadium, I think of a

15  car running out of gas.  Empty tanks.  I think of the bottles

16  piled up in the hallway.  There are just empty water bottles

17  with nothing in it.  That's what this case is in terms of

18  fraud.  What fraud is.

19          Indeed, when the government tried to present witnesses

20  who actually worked in the industry, either at Countrywide, or

21  worked at Fannie and Freddie, their testimony, each and every

22  time and their documents negate fraud.  They bring witnesses

23  that turn out to be witnesses favorable to the defense, and the

24  evidence always points back to one thing.  Reality.  Reality.

25  Men and women at work.

 1              I think of riding down a highway, how many times have

 2      we seen the sign men at work.  Slow down.  Men at work.  That's

 3      all this evidence shows.  When you think about it back there in

 4      the jury room, it's men and women at work doing their jobs in a

 5      difficult industry, the tedious processing of loans.

 6              What we've seen here, really, is a government theory

 7      in search of evidence.  And it is a very difficult burden,

 8      because the government's chief witness, Mr. O'Donnell, seeking

 9      a-million-six-five in money reward, he wrote a document saying

10      there was no fraud when he lived it.

11              It is easy here in the 14th floor of a courthouse in

12      New York to look back five or six years on the lives of men and

13      women who were on the front line doing business, all of a

14      sudden say this is fraud.

15              The government calls witnesses such as O'Donnell,

16      Thomas, Boland, and Price, and what do they all do?  They speak

17      in normal tones of every day business.  What's going on.  One

18      person thinks this, one person thinks that.  Government counsel

19      makes a joke of collegiality.  The one thing that stunned me is

20      it's pretty collegial.  Everybody has an idea, they send a

21      memo, they think this, they think that.  Everybody listens to

22      each other.  They don't do anything without getting a meeting

23      with 20 people together.  They have a 10, 12, 15 person

24      committee to talk things out.

25              They bring expert witnesses, of course, that are

DAM3BAN3                    Summation - Mr. Sullivan

working off statistics that they think are 28,000 loans, when

they're actually wrong by about 17,000.

Each time this theory in search of evidence hits a

brick wall, and I call that wall reality, so that's why I agree

with the government that we really are in two different worlds.

Counsel calls it a fantastical voyage into reality.

It is even implausible the case they make.  It doesn't

even sound like fraud.  You would not expect a fraud to begin

with two PhDs and a large steering committee and weeks of

consultation with many persons in the company with different

experience, different expertise.  You would not expect the

government's witness to say the plan was a good idea and had

merit.  But that's what happened in this case.

You would not normally design a pilot program to see

if the fraud worked.  You would not normally announce the fraud

at a town hall meeting with 200 people present, play the Hustle

dance, dance, and as one government witness said, it was fun.

That's a very strange way to kickoff a fraud.

You wouldn't normally have a vigorous quality

assurance program, including 20 people in India looking at the

loan files at night after the workers in America had finished

their work, to see how the fraud's going.  To find the mistakes

in the process.

You would not normally have a vigorous quality control

program looking at loans that were produced by the so-called

1    fraud.  Seems inconsistent with a scheme to defraud, to have

2    people doing quality control checks and getting these high

3    statistics on them.

4          It seems inconsistent with the fraud to increase your

5    number of audits during the midst of it from 408 to 1,742

6    audits.  Why would you do that if you didn't care about

7    control?

8          You would not normally make repeated changes.  If

9    there is one thing you see in this record for month after

10   month, beginning in September, October, November, right through

11   the end, you see changes, adjustments, changes, memos, e-mails

12   and meetings to change the system to deal with some of the

13   quality issues that they do find.

14         Finally, if it is really a fraud, you'd think you'd

15   have a victim of the fraud who complained about something the

16   defendants did or did not do in 2007 and 2008.  They brought

17   five witnesses from Fannie and Freddie Mac.  Not one of them

18   said anything negative about Hustle loans or about the process.

19   Not one of them.  They all failed to support the allegations of

20   fraud.

21         I'd like to dive right into the evidence with you by

22   focusing on their early witnesses.  The government alleges that

23   the indices of fraud are to be found in the speeding up of the

24   loan production via Hustle in Central Fulfillment.  The

25   removing the underwriters and using loan specialists.

1          To this day, after all these weeks, the government

2     doesn't seem to acknowledge that there actually were

3     underwriters on this team.  Remember the witnesses that

4     circled?  There was a reduction in force in the company and

5     some of the underwriters no longer could have a job, so they

6     went to be loan specialists.  That's why you see these loan

7     specialists -- underwriters showing up on the team.

8          By the way, your Honor.  I lost track of the time.

9     What time did we start so I'll know when we finish?

10          THE COURT:  You started at 11:40.

11          MR. SULLIVAN:  Thank you, sir.

12          The government doesn't seem to want to acknowledge

13     that every time they demean the people in the company by saying

14     they're clerks, that loan specialists were there doing the job

15     but some of the people who carried the title loan specialist

16     were former underwriters, you saw that every time someone was

17     circled.

18          How does the defense reply to these allegations?

19     First off, the government's chief witness, Mr. O'Donnell, the

20     whistle blower, actually approved many of these initiatives.

21     If he's the good guy, he approved them.  That's consistent with

22     no fraud.  His testimony negates the allegations of fraud.  It

23     doesn't support them.  And remarkably, as I'll show you in a

24     second, he says there was no fraud.  Actually wrote it in a

25     memorandum.  And in another memorandum he brags about the good

1    work that he and others had done over this period of time.

2          Let's look first at slide number one, Alex, please.

3    What did O'Donnell think about the High-Speed Swim Lane as he

4    lived it?  On May 14, Mr. O'Donnell wrote an e-mail saying that

5    there was no fraud.  Look at it.  This is Defendant's 62.  I'm

6    quoting:  It was reassuring to see all the controls we've had

7    in place over the years.  Sounds positive.  Our exposure is to

8    manufacturing quality, not fraud.

9          Why would a man write that if he ever thought there

10   was fraud?  Or unethical stuff, he says.  He's writing to his

11   colleague, Mr. Thomas.  Here he says:  I think we've reacted

12   well each time we find a trend and seal the gaps.

13         That's exactly what happened.  That was what was going

14   on.  As they worked through a process that they were putting in

15   place that was a new process.

16         Mr. Thomas, the government's first witness responded

17   to that e-mail.  What did he say?  Defendant's 62, page four.

18   "Yes, that's what's difficult.  All that noise cheapens the

19   efforts everyone has made over the years in making sure we are

20   doing the right things."

21         I almost want to sit down and do nothing more in the

22   case.  But of course, lawyers are dogs with a bone.  I can't

23   stop until my time runs out.

24         But that's the start.  Hold on to that, think to

25   yourself, whenever there is a suggestion about someone says

1    something about fraud, that Mr. O'Donnell, the million-six man

2    himself says there is no fraud as he lived it.

3          By the way, he doesn't say much different today.  You

4    could take his testimony.  He looks like he tried to do his

5    best.  He didn't even come in here and say there was -- give

6    evidence from which one could conclude there was fraud.  So

7    let's proceed.

8          Eight months later on January 12, O'Donnell wrote

9    another e-mail in which he bragged about the good job done by

10   the people in his division.  Plaintiff's 1, slide three,

11   please.

12         Here he's telling -- this is just six months after the

13   Hustle is over.  Listen to his words:  After experiencing

14   challenges in Q4 2007 and early Q1 2008, we made changes to

15   work flows, training content, authority certification and

16   compensation plans that have played an important role in the

17   returning division's results to target environment for quality

18   as defined by corporate audit performance.  We've effectively

19   leveraged our central model and the results demonstrate our

20   management team's ability to be responsive to rapid market

21   shifts as well as internal standard adjustments.

22         That's what he said when he lived it.  He praised the

23   performance of his colleagues in the same document at page 75

24   of 197:  The trending illustrates that the remediation enacted

25   with legacy FSL during Q1 2008 had the desired impact of

1    bringing quality back to the target environment.  We will be

2    finalizing Q3 QC results by midweek and it will be our second

3    consecutive quarter under 4.5.  Which is the target that they

4    had.

5            On August 18, one week into the Hustle program,

6    Mr. O'Donnell wrote an e-mail praising the process and bragging

7    about the improvements.  Look at this, at slide five.  This is

8    O'Donnell talking:  Week one is behind us with Hustle and I

9    think good initial progress was made.  He closes by saying

10   we've even seen a loan go clear to close in the same week they

11   were approved.

12           He testified that designing the Hustle was a

13   collaborative effort.  He said it was a cross functional

14   process they had.  They brought experts in from all areas.  He

15   testified that the results of the Hustle design process were

16   announced to hundreds of people.  He testified that he actually

17   approved many of the practices and procedures.

18           The government now says it is an indicia of the fraud.

19   For example, he wanted to streamline it, speed up the process.

20   Look at this e-mail he wrote just before the process went into

21   effect.  This is July 2nd, 2007.  Slide six, please.  This is

22   O'Donnell.  Sounds like normal business.  Normal concerns.

23   Life as they lived it.

24           He says:  Let's face it.  Loans take too long to fund

25   here.  Cost too much to move through our process and require

1    far too many conversations

2            I got to hand it to you.  They had a lot of

3    conversations in that company.

4            Listen:  Far too many conversations.  Hand offs and

5    systems.  This is O'Donnell talking.  He says we have many

6    steps in our work flow that were built for another time.

7            Yes.  What is the other time?  The subprime market

8    that that division handled.  He said built for another time.

9    Different products or periods where margins were much more

10   robust.

11           That's Mr. O'Donnell as he lived it.  He further

12   testified that he was asked, for example, a question:

13   Mr. O'Donnell, you agreed that one of the things that needed to

14   be changed was the amount of time it took to actually process a

15   prime loan versus how long it took to process a subprime loan

16   in the 2007 time period, is that correct?

17   His answer:  That's true.  I believe that beginning before

18   2007, prime loans and subprime loans contained different levels

19   of risk, so yes, that's true.

20   "Q.  With respect to the High-Speed Swim Lane, you wanted to

21   deliver a measured process that would allow Full Spectrum

22   Lending to fund good quality prime loans more quickly, is that

23   correct?

24   "A.  That's true.  For some prime loans I supported them going

25   through the process."

1          Ladies and gentlemen, it took me until today to

2   understand, really, what the flaw in the government's argument

3   is.  The basic flaw in the argument that I suggest you ponder

4   in your deliberations.  If I can find it.  It's here.  Here it

5   is.

6          The failed logic in the argument is this.  Now, I'm no

7   expert at manufacturing anything.  But the government told you

8   to use your common sense, and here's where I ask you to use it.

9   The flaw in the logic of the government, and you see it in the

10  argument is this:  The government thinks speed trumps quality.

11  That speed wipes out quality.  That speed negates quality.  The

12  government's argument is speed instead of quality.  That's the

13  flaw.  That's the central flaw in the government's case.

14         When General Motors builds a car, do you think they

15  know how long it takes from day one to whatever the day is it

16  drives off the lot, I don't know, 10, 15, 40, I don't know.

17  Does General Motors look at the process all the time to figure

18  out how to build and robots and so forth a better car faster?

19  Of course they do.  But they don't end up by speeding up their

20  line and developing a car that's not a quality car.  Their goal

21  always is a quality car.

22         The focus on speed is perfectly natural.  Any

23  manufacturing process has to focus on how long does it take to

24  do it.  Can we do it better.  And that's what you've seen here.

25         How about a house.  I don't know how long it takes to

1    build a house.  A year?  18 months?  Well, if you built a house

2    and it took three years, you're bound to lose money.  So

3    anybody who ever made anything has to focus on speed and

4    quality.

5         That's what these people were doing.  They had to

6    produce quality loans.  It is all over their documents.  All

7    over their conversations.  Quality was always on their mind.

8    But they also had to speed it up.  As some people said, one of

9    the reasons you speed things up is for customer satisfaction.

10   When customers want to buy a house or refinance a house, they

11   don't want to sit there for 25, 40 days until they get it

12   processed.  So it is a combination.

13        By the way, let me correct the record.  Counsel

14   unfortunately mentioned borrowers being victimized.  Please.

15   This case has not one word of evidence with respect to

16   borrowers.  It is not about borrowers.  Borrowers applied for

17   loans because they want money.  This is a process to get them

18   money for their refinancing.  That's what this is about.  This

19   is not about borrowers.  This is about the High-Speed Swim Lane

20   loans.

21        Here's another one.  Slide seven.  From Mr. O'Donnell.

22   He confirmed the importance of speed in a deck prepared by him.

23   This is May 2007.  Look what he says:  Prime loans need low

24   touch, low cost processing.  Prime borrowers require faster

25   turn time to keep them from going elsewhere.

 1              We just listened to an argument in which turn time is

 2     a sin.  It is a crime.  It's indicia of crime.  I don't mean

 3     crime.  It is an indicia of fraud.  Here's Mr. O'Donnell

 4     recognizing you need a better turn time.

 5              The government says that it is an indication of fraud

 6     that Countrywide had loan specialists handle stated income

 7     loans.  It was Mr. O'Donnell that said it was a reasonable

 8     management practice to handle stated income loans.

 9              The government claims that the removal of quality of

10     grade penalty was tantamount to fraud.  You heard that today in

11     the argument.  Mr. O'Donnell testified that he approved of

12     quality -- QoG they call it -- quality of grade suspension

13     during the pilot program at HSSL.  It was explained to you

14     there is a reason for that.  You got new workers taking on new

15     responsibilities, it is a good thing to say to them, do your

16     best, do get the product done, increase the speed, and by the

17     way, in this new process we are not going to ding your

18     compensation X dollars.  That is a management decision.  That

19     is not an indicia of fraud.

20              By the way, the government still at this late stage

21     ridicules the rebuttal process and the suggestion that the

22     rebuttal process is a fraud.  They talk about it as if it's

23     dirty somehow.  Rebuttal process is when you have a lot of SUS

24     findings, severely unsatisfactory, and now you're supposed to

25     address them and see what you can do about them.  It was a

1    process that Mr. O'Donnell and all the other witnesses thought

2    was a good process.  You're supposed to look at it.  You're

3    supposed to correct it.  Look at what Mr. O'Donnell says on

4    transcript eight, please:

5    "Q.  Mr. O'Donnell, you thought that the rebuttal process was a

6    valuable process to get to the right number, correct?

7    "A.  The right SUS number?

8    "Q.  Yes."

9         Look at these words, ladies and gentlemen.  Why are we

10   talking about this four weeks into the case as something bad?

11   "A.  I thought the rebuttal process was valuable in the sense

12   that it gave us the opportunity to review with corporate QC

13   their findings, and for us to provide any input or

14   documentation if we believed the loan should have a lower

15   rating."

16        How many of these things can you hear from the

17   government about being bad, when their own witnesses, and this

18   is Mr. good guy, says it is a valuable process.  And don't

19   think they talk about it just as it was normal because it was

20   normal.  This is the way they lived it.  This was part of their

21   work.

22        The government also claims that the sprint incentive

23   was an indication of fraud.  Sprint incentive, oh my goodness.

24   Poker night down there at work.  Or an Outback gift certificate

25   is somehow dirty.  Think about this.  That's why I agree it is

DAM3BAN3                    Summation - Mr. Sullivan

1    a fantastical voyage.  The sprint incentive was designed -- and

2    it was the idea of Mr. O'Donnell -- in order to get people

3    enthusiastic about addressing the high SUS findings, so they

4    that they could correct them and they did correct them in large

5    measure.

6           Look, slide nine, Alex, please.  Here's Mr. O'Donnell

7    talking again.  Very solid progress, he says.  Very solid

8    progress yesterday with concluding and successfully reducing

9    initial SUS files.  Need to keep that same pace today and

10   tomorrow to ensure we achieve our goal of eliminating any

11   backlog on initial SUS findings received by 5/1.

12          How can this at this stage in the game be talked about

13   as bad?  Looked further.  The entire group, by the way, he says

14   the entire group has a chance to earn some extra bucks for the

15   effort.  Let's make sure they see the direct connection between

16   reduced random ratings and increased paychecks.  Great day

17   yesterday.  Keep it up.

18          How can we any longer think about the rebuttal process

19   or the sprint incentive as being wrong or an indicia of fraud?

20   It was treated in the normal course.  No witness testified that

21   it was bad.  No witness said they didn't think it should be

22   done.

23          And the next witnesses we see, Boland and Price and

24   all the rest of them, they were enthusiastically in favor of

25   it.  Mr. Boland, another chief witnesses of the government,

 1    he's writing memos asking the comptroller to approve the

 2    metrics in the bonus system.  Government says that high scores

 3    in the QA is evidence of fraud.  But Mr. O'Donnell confirmed

 4    the QA was mostly about process.

 5            I hope by now we understand this.  Quality assurance

 6    was dealing with the process.  How do you make the table.  How

 7    do you make the camera.  Make it, 10 days to make it, watch the

 8    process, did they solder it the right way.  It is not even up

 9    to the end product.  Quality assurance they do that.

10            Quality control is once you've got it all made, now

11    you look at it.  Very different things.  Very different.

12            And the government today says, like they said in

13    opening, oh my gosh, it's so high, these process things, they

14    were so high.  They were coming in from India.  By the way,

15    they acknowledge half of them were wrong anyway.  Half of them,

16    the quality people in India were wrong.  They thought something

17    was in the file, it wasn't in the file.  But they found out the

18    standard operating procedure of the company didn't require it

19    to be in the file.

20            Listen to O'Donnell's words.  The government tried to

21    conflate the high scores in quality assurance in the process.

22    But all the witnesses say it is just process.  And the

23    witnesses, including the Fannie and Freddie witnesses, say that

24    we didn't pay any attention to that.  What they did internally,

25    we're interested in the final product.  Which makes sense, of

1     course.

2              Here's O'Donnell again on this issue.  Slide 10, Alex,

3     please.  Listen.  The QA reviews to date have been heavily

4     focused on process steps.  I believe it's tough to draw

5     conclusions directly from those.

6              The government wants you to draw conclusions to that,

7     ladies and gentlemen.  They want you to draw conclusions that

8     that's fraud.  O'Donnell says he can't even draw conclusions

9     when he lived it about its affect on the process or even the QC

10    findings alone.  He says, further, much has changed in the

11    marketplace with regard to quality standards since we started

12    discussions about HSSL last summer.

13             O'Donnell also testified that it is unreasonable to

14    expect no loans to be defective.  Even though some defects were

15    unavoidable, O'Donnell e-mails confirm that his division was

16    very serious about quality.

17             Look at this one.  DX 56, slide 11.  Our prime

18    business model has CLUES as the centerpiece handling the vast

19    majority of eligibility decisions.

20             Isn't that what the government is saying is wrong

21    here?  We empowered our branch and Central Fulfillment managers

22    and loan specialists with authority to validate CLUES input and

23    clear a higher percentage of conditions.  Isn't that what the

24    government is complaining about?  Didn't sound like he's upset

25    by it then when he lived it five or six years ago, 3,000 miles

DAM3BAN3                   Summation - Mr. Sullivan

1    away.  He says this additional authority comes with great

2    responsibility and accountability.

3          He further says, how about this one.  FSL, his

4    division, has enjoyed the strongest reputation for quality

5    among Countrywide's divisions for many years.

6          Why are they changing all of a sudden?  They are

7    adapting to changes forced upon them by market conditions.

8    They're trying to find better systems.

9          Maybe the problem is whenever you get two PhDs to

10   design something you've got problems.  Maybe it should be one

11   PhD per project.  Both of those gentlemen, did they appear

12   credible?  You saw both of the doctors on the stand.  One a

13   space engineer.  Do you think for a minute when you saw that

14   flow chart up there that that gentleman thought he was

15   designing a process to facilitate some fraud?  This is

16   ridiculous.

17         Lastly, to underscore the absurdity of the fraud

18   allegations, Mr. O'Donnell testified that he actually applied

19   for the top job in the Central Fulfillment Division.  That's

20   hardly something you would do if they were perpetrating a

21   fraud.  "I want to be the head of this fraud."  Doesn't make

22   sense.  If he's in an environment where they're doing something

23   wrong, why doesn't he leave?  Why doesn't he stand up and

24   scream like any responsible person would do.

25         What you see here is men and women at work.  Not

 1    faulting O'Donnell.  I am just saying that the twists that's

 2    being put on the life O'Donnell and others lived makes no

 3    sense.

 4         He's not alone.  Let's quickly look at some of the

 5    others.  How about Thomas, Boland and Price.  The government

 6    again says the High-Speed Swim Lane was part of a fraudulent

 7    scheme, but Thomas testified he was on the design team with

 8    lots of others.  He says, yes, I was on the original kind of

 9    design team that was coming up with ideas how to improve

10    efficiency.  Thomas testified that it was 10 or 15 people on

11    it.  Price testified there was a large group of people on it.

12    Boland testified that High-Speed Swim Lane was a collaboration

13    bringing the best people together.  Boland further testified

14    that he thought Hustle was a great design.  Let's look at slide

15    12.

16    "Q.  What was your understanding in the summer of 2007 of how

17    the Hustle would work?"

18         Look at these words as he lived it.

19    "A.  So the Hustle was great.  It was a great design.  The idea

20    was well, was well thought out.  And our opinion was this, this

21    could work."

22         He further says Hustle's intent.  Government says

23    fraud.  Here is the man that lived it.  "Hustle's intent was to

24    have a separate swim lane for loans with reduced documentation,

25    and therefore those loans would not be hung up behind other

DAM3BAN3                    Summation - Mr. Sullivan

1    loans that required heavier documentation."

2              Isn't that what all the witnesses said about this

3    process?  Yes.  Fantastical different worlds.

4              He further said, let me continue with that slide 12.

5    "The idea of a High-Speed Swim Lane is that if I've got a very

6    difficult loan with a lot of documentation, I might take a

7    majority of my day working on that one loan.  While a loan with

8    less requirements sits still and doesn't get a chance to move

9    ahead."  Boland speaking.  Government witness.  "The theory

10   would be if we put all of the easy loans into one lane, or not

11   easy, but all of the less complicated loans in one lane, they

12   would then flow and the others would, you know, be in the

13   normal process.  So in theory that flow had merit."

14             Thomas, the government witness, testified the Hustle

15   process was to move loans more quickly.  We felt like those

16   loans could move more quickly because they didn't need manual

17   underwriting.

18             Thomas again:  CLUES determined that it was an

19   acceptable quality loan based on the information that was put

20   into CLUES so you didn't have to redecision the file.  Thomas

21   testified that he supported the efforts to become more

22   efficient.

23             You know, by the way, I don't know, I guess I might

24   not understand this, that's up to you to decide it, I guess,

25   but was the government today suggesting that Cliff Kitashima

1   and Greg Lumsden were involved in this fraud?  I don't know.  I

2   think they were.  You saw Mr. Kitashima.  Laughingly suggesting

3   he didn't care because he is about to retire.  Probably worked

4   40 years.  Now the government calls him a fraudster?  What is

5   this about?  Just do that?  If that was the case, and I don't

6   know whether I heard it correctly.  If it was the case, then

7   I'll note to you that Mr. O'Donnell -- Mr. Thomas had great

8   respect for those two gentlemen.

9           Think about this now.  Government witness testified in

10   this court, two of them, that they had -- I'll read you the

11   testimony.

12   "Q.  I take it had you high regard for Mr. Lumsden.

13   "A.  Not always the decisions he made, but yes.  I found him --

14   I respected him.

15   "Q.  In fact, you had a very good relationship with his boss

16   Mr. Cliff Kitashima?

17   "A.  I did."

18           Then Mr. O'Donnell in the memo that he did not send.

19   One memo in the case he never sent, there is no date on it.  He

20   says, he wrote in that memo:  I have enormous respect for both

21   you -- he is writing to Kitashima -- and Greg, and have learned

22   a great deal working under the direction and support of both of

23   you.

24           Could you possibly say that to a person that you

25   thought was involved in a fraud?  How far can we be pressed in

1    this case to find fraud when there is none?  It is counter to

2    everything you've heard, every document you have seen.

3            How about Boland's testimony?  He was asked about loan

4    processors.

5    "Sir, do you know whether certain loan processors at Full

6    Spectrum Lending between '07 and '09 had underwriting

7    background?

8    "A.  Do I know if they had background?

9    "Q.  Yes, sir.  Whether there were certain of the loan

10   processors that had underwriting background.

11   "A.  Yes."

12           You didn't hear one word from the government about

13   that in opening or closing that in fact there were underwriters

14   there.  They want you to believe they were just clerk, idiots,

15   didn't know what they were doing.  Untrained.  Talk about

16   painting a picture that is horribly unfair.  Not only to you,

17   but to them.  The decent people, the people that came in here.

18   You heard the people that came in here, Mrs. Flores, mother of

19   four kids, travels 3,000 miles to present herself here in this

20   courtroom.  A woman of substance.  A woman proud to work for

21   Bank of America.  Told you about her job.  About her training.

22   That's what she testified about.  Acknowledges she was an

23   underwriter and people worked for her.  She put a circle on the

24   chart.

25           The government somehow suggests that Hustle was a

DAM3BAN3                    Summation - Mr. Sullivan

1    fraud because it relied on CLUES instead of human underwriters.

2    But Mr. Thomas himself wrote on December 2nd, December 19,

3    2007, the following.  Slide 15, Alex, please.  We hear this.

4    It seemed to be almost wrong to say CLUES is the underwriter.

5    There is a meaning for things said in the industry.  Look what

6    he writes.  This is Mr. Thomas.  CLUES is the underwriter.  We

7    should be clear that there is no approval of these PCA files.

8    The underwriter branch office manager or loan specialist do not

9    approve these files.  CLUES does.

10         The government claims it is an indication of fraud

11   that Countrywide would allow loan specialists to clear CLUES

12   conditions before they were funded.  But in August 30, 2007,

13   Thomas wrote he wanted loan specialists to clear CLUES

14   conditions.

15         Slide 16.  He writes in there:  I don't think the loan

16   specialists and underwriting roles should be separated.

17   Further, when both do their jobs separately, we've seen delays

18   and missed opportunities.  What Hustle can bring with a

19   combined role and skill set is the ability for the loan

20   specialist to use underwriting specialists to clear conditions.

21         Wasn't it one of the indices of fraud that loan

22   specialists should not be clearing conditions?  And that's what

23   he writes in here.  He wants them to clear conditions.

24   Mr. Thomas goes on in his testimony.  He says that quality

25   assurance was kind of an internal thing.  This is an internal

1   thing.  We might have expectations for what we thought it

2   might, should be, but there was nothing required at a certain

3   level.

4   "Q.  Wasn't quality assurance focusing on the very process, the

5   steps that were taken along the way?

6   "A.  The quality assurance was in-line quality assurance.

7   Which meant that it was before funding."

8          He went on to explain in the real world.  He said you

9   would fix, obviously, you would fix the problems.  He went on

10  to say the real intent was to look at issues in the process

11  that may cause larger issues down the road so you can correct

12  the problems.  That's what quality assurance was for.

13         Mr. Thomas testified about the rebuttal process too.

14  This awful part of the case, rebuttal and sprint incentive.  He

15  was asked -- slide 18, Alex, please.

16  "Q.  And I take it this rebuttal process is an important part

17  of the function in order to have quality product, am I correct?

18  "A.  Yeah.  I would say that the rebuttal process was an

19  important final step to validate and ensure that the final

20  ratings were correct."

21         19, please, Alex.  Look at this one.  Thinking again

22  about the opening and the closing of the government suggesting

23  that the rebuttal process is rigged final QC scores.  What did

24  he say?

25  "Q.  What were quality control reports?

1   "A.  So we had a monthly routine to review defects and it was a

2   healthy routine.  Nobody enjoyed it, but we looked at all our

3   defects and there could be multiple people involved in the

4   loan, so it didn't matter whether the loan officer made a

5   mistake, the loan specialist made the mistake or the

6   underwriter made a mistake."

7            How about this one.  Slide 20.  Still Thomas:

8   "Q.  And did you express any opinion on the sprint incentive at

9   FSL?

10  "A.  I was supportive of the sprint incentive.  I designed the

11  metrics around it,"  He says.  "I had to measure it so I

12  designed the metrics."

13           Can't we put something to rest in a case?  Do we have

14  to hear about it as bad on opening statement and bad today?

15  How can it be bad today?  That demonstrates to you the

16  credibility of the government in this case.  How can you say

17  that?  How can you look at a jury and say this is bad or an

18  indicia of fraud today after four weeks of taking all of our

19  lives in this courtroom to see the evidence.  The evidence says

20  that it is perfectly fine and they thought it was perfectly

21  fine.

22           Look at this one.  Thomas testified he helped design

23  the sprint incentive with Mr. O'Donnell.  Mr. O'Donnell

24  testified it was his idea.  His idea.

25  Question to Thomas:  It was important enough for you and

1    O'Donnell to recommend there actually be a bonus program."  Oh

2    my God, a bonus program.  "Bonus program for the work that you

3    were asking these 36 people to undertake, am I correct?

4    "A.  That's correct.  The concern was that the volume was so

5    high that there was this potential that they may not

6    effectively go through the rebuttal process just because the

7    volume was so high.  You had a time limit to rebut these loans.

8    That's the reason for the rebuttal -- the incentive.  They

9    wanted to tell people, work hard, you get extra pay if we can

10   deal with this quality control SUS findings."

11        Enough.  These are their witnesses.  These are their

12   four witnesses they brought from the company right there.  If

13   only I had the courage to just sit down.  Let you do your work

14   sooner.  But I admit, I have to keep going.

15        Let me tell you something about quality now.  I say

16   again I've been accused of making a false promise at opening.

17   I'm too old to think I can fool juries with false promises.

18   I've been in the rodeo before.  Never say anything to a jury

19   that I can't prove.

20        The quality and the concern for quality in this case

21   jumps off of every document that you've looked at.  You have

22   250 exhibits.  If you want to go and have those 250 exhibits,

23   take another four weeks of your life and read every word of

24   them out loud in there, I'll be right here waiting for you.

25   Right in the corridor.  Pacing, waiting for your decision.  And

1   as you read that, every document that you think is fraud, you

2   put in one pile, and every document you think is a genuine

3   concern and discussion about quality and how to get there, you

4   put in another.  And you'll be like that.

5          Because you can read little clips and blurbs here and

6   there, but you want take away the ocean of concern, I use the

7   word overwhelmingly.  I stick by it.  I double it.  I double

8   overwhelming if you read those documents.

9          People doing their job.  Everybody has a little

10  different focus.  The quality crew, they have their focus.  The

11  production people, they have their focus.  And that's how

12  people come together and do their business.

13         The government on the other hand calls the promise a

14  joke.  They said that the division gutted safeguards, turned a

15  blind eye, they say quality assurance 90 percent were lemons.

16  They say that quality results showed 30 percent loans were not.

17  I don't know where the 30 percent comes from.  On the figures

18  they have to deal with, 4.5, 9.8, 5.8, and the 9 figure,

19  they're right there in the record.  That's what it is.  You can

20  open the case by saying 30 percent, one in three.  I guess you

21  can close the case saying one in three, but that's not what it

22  is.

23         Let's look at slide 35.  This is a report.  This is a

24  document from Freddie Mac.  Freddie Mac by way is the victims

25  here, right?  Victims.  Every fraud has to have a victim.

1   Fannie Mae, look what does it say.  It says -- it's hard to

2   read.  I guess you can read on your screen.  This is their

3   report.

4           Underwriting satisfactory.  That's what it says

5   November 15, 2007.  That's their report.  Talk about quality.

6   Let's see the quality from their perspective.  They thought it

7   was satisfactory.  CHL maintains solid controls over the

8   underwriting and appraisal management functions.  Controls are

9   in place to monitor underwriter's performance, address

10  processing deficiencies, provide fraud control procedures,

11  provide appraisal review procedures, and ensure consistent

12  process through documented procedures.  CHL's controls are in

13  line with its peer group and industry standards, which supports

14  a satisfactory rating.

15          This is the report of the victim.  This is after a

16  five-day site visit on September 14, 10 to 14 in 2007.  Right

17  in the midst of the so-called fraud.

18          Look, quality standards were in force from the top.

19  You saw the memo of Drew Gissinger.  He emphasized the focus to

20  be on quality.  They made fun of Jack Schakett coming here.

21  The number two man.  I'm sure he just wanted to come and spend

22  a few days in New York for nothing.  He came and testified to

23  this jury.  He underscored how important quality was.  He

24  underscored it.  He testified that it was important.  That's

25  what he wanted in his company.  He said he wanted to be as

1    accurate as possible.  They wanted to ensure the controls were

2    in place to produce the best quality product.  These two men

3    oversaw about 90 percent of the employees in this company.

4            Countrywide had many procedures and systems to achieve

5    quality.

6            Let's start with the way the Hustle project was

7    designed and implemented.  Rather than just put a new process

8    in place, they put a design team together.  The design team

9    included most everybody that would have input.  Eventually the

10   process was pilot tested, because that's a reasonable thing to

11   do.

12           You know, Mr. Battany came here, a former Fannie Mae

13   fellow who had been in business for 21 years, and he was asked

14   this question:

15   "Q.  If you knew that the persons who were processing these

16   loans and evaluating these loans at Countrywide were loan

17   processors as opposed to underwriters, would that have affected

18   your decision whether or not to purchase?

19   "A.  No, it would not affect it."

20           That's the case, why are we still arguing about the

21   lack of underwriters?  When in fact the underwriters were there

22   on the same teams.

23           Mr. Battany was asked further:

24   "Q.  Why would it not have affected your purchasing decision,

25   Mr. Battany?"

1              Takes us back to the different worlds we're in.

2      "A.  Using processors to operate either CLUES or DU was common

3      in the industry.  And Fannie Mae was aware of it, as I recall

4      bringing this to Fannie Mae's attention."

5              Remember that CLUES of course is that computer that

6      Fannie and Freddie actually checked, so that they know it's

7      similar to theirs.  So if you put a loan into the CLUES

8      computer, it comes out with the same kind of answers as if you

9      put it into their own computers.  They're calibrated -- had --

10     they've got it programmed so Fannie and Freddie are satisfied.

11     You heard that from Battany.  He said that CLUES loans did

12     conform, he said that Fannie Mae approved a special variance

13     for Countrywide to allow CLUES loans to be delivered to Fannie

14     Mae.  He said from his experience, with respect to managing

15     Countrywide, the loans were eligible for the contracts and the

16     Fannie selling guide plus any variances.  That's the way it

17     worked.

18             Many loan processors were former underwriters.  By the

19     way, Ed O'Donnell identified a number of them.  Let's see slide

20     number 56.  When he testified, he actually identified, do you

21     remember that little interesting story about when he came to

22     Countrywide, he brought some people with him?  He brought some

23     people with him that he respected at his former company, and

24     they came because they liked him and they worked in the

25     company.  He brought them, we assume, because he thought that

1    they were qualified.  Not a government view five, six years

2    later that maybe the people working on these things were not.

3    He, Mr. O'Donnell, circled the underwriters that he himself

4    knew on this chart, as you may remember the testimony in order

5    to indicate which ones were former underwriters.

6              Also interesting to note, ladies and gentlemen, that

7    so much is made in the government argument, both in opening and

8    today, about the quality assurance program.  Don't forget the

9    testimony that the quality assurance program was actually

10   started in order to monitor this Hustle program.  That's why it

11   was there.  In order to see the Hustle program was functioning

12   properly and consistently.  The quality assurance program was

13   not dictated by corporate headquarters, and it was not dictated

14   by Fannie Mae or Freddie Mac.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. SULLIVAN:  By the way, do you remember Mr. Battany

2   testified about the audits that were -- he said basically these

3   quality assurance things were of little importance to them.  He

4   didn't focus on those.  Those were something that the company

5   focused on to better their process.  His focus was always on

6   the end process.

7          Now I want to take a minute here in terms of quality,

8   since we're talking about quality, and focus just a little bit

9   on something else that was brought today up before we break for

10  lunch in about ten minutes, and is about the doorman loan that

11  was talked about.

12         This exhibit here, PX, Government Exhibit 433, is the

13  loan file.  You will see it in the jury room, I guess you might

14  have to take four months to read that, both sides of the page,

15  loan file.  This is the loan file to the doorman.

16         In opening, a lot was made out of the fact that this

17  loan file was scandalous, that it showed you how bad the Hustle

18  program was.  The opening went something like:  The borrower

19  earned $13,000 a month as a doorman, but some basic

20  underwriting would have found, looking at salary.com, that a

21  doorman in that area of the country wouldn't have been making

22  more than $6,000 a month.  If they had done some basic

23  underwriting in terms of getting a verification of employment,

24  they would have found that this actual borrower only earned

25  $5,000 a month.

1          Oh, my goodness this is an attention grabber for the

2     jury.  It's an attention grabber.

3          When assessing the quality of the government's

4     evidence, in addition to assessing the fact that there is none

5     about fraud, you should be aware that sometimes the evidence

6     that the government introduces is just plain wrong.  Probably a

7     mistake.  Just plain wrong.  This is one example of just plain

8     wrong.

9          In order to talk about this file, they brought two

10    witnesses.  The first was Maria Brewster.  She testified about

11    what the number was, slide 50.  Let's take a look.  Finding the

12    number of where this file was done, this file, the testimony

13    was loan number 188677894 and the Countrywide processing branch

14    was 6114.  They then brought Lars Hansen to testify this loan

15    was in the group of Hustle loans that he had one of the 28,000.

16    He said he confirmed it.

17         But I have shocking news for you, this is not even a

18    Hustle loan.  This was brought to show you:  Oh, isn't the

19    Hustle program bad?  Not even a Hustle loan.  Just a mistake on

20    people's part, but it says something about the quality of the

21    evidence, I guess, of the SUS, severely unsatisfactory.  It was

22    not produced by a Hustle branch.

23         How do we know that?  The branch number is 6114.  It's

24    a field branch.  Field branches do not produce Hustle loans,

25    only Central Fulfillment branches produce those loans.

DAMTBAN4                      Summation - Mr. Sullivan

1              Let's take a look at slide 52.  It says right there
2    the Central Fulfillment process replaces the existing NCS model
3    for the sales volume generated by and processed within these
4    centers only.  Look at the last sentence.  Field branches and
5    other NCS branches will continue to use the existing model.  In
6    other words they didn't use the HSS model.

7              Now Mr. Thomas came and he testified, he said that
8    field branches did not process Hustle loans.  On page 11 of
9    Plaintiff's Exhibit, their own exhibit, 232, that is slide 53,
10   it shows you that 6144 is listed.

11             On Plaintiff's Exhibit 232, this document, 232 is
12   worth a look when you're in the jury room, if you can remember
13   it, because it's so boring.  It's just a list, page after page
14   of a list.  It was faxed by Mr. Thomas, according to his
15   testimony, right to the U.S. Attorney's Office on January 9,
16   2013 because they wanted to find out which were Hustle loans
17   and which were not Hustle loans.  It goes from page 03 here to
18   page 15 in the back.  As you read down it, branch fulfillment
19   is a field office, Central Fulfillment, it says, and it lists
20   numbers that's where the Hustle loans were prepared.

21             The most boring cross-examination of the whole case
22   was my examination of Mr. Thomas on this letter.  I went
23   through it page by page.  You must have thought I was nuts.  It
24   was first thing in the morning.  You couldn't have possibly
25   figured out what it was.  And I asked him this question:

DAMTBAN4                    Summation - Mr. Sullivan

1   Everything below that, for every page for the rest of the

2   document, page 8, page 9, page 10, page 11, page 12, page 13,

3   page 14, page 15, page 16 are all field operations, am I

4   correct?  Field operations do not produce Hustle loans.  This

5   is not a field operation, it is not a Hustle loan.

6          So you have been lingering for four weeks thinking

7   about oh, my goodness, the doorman's 13,000, how could the

8   Hustle project be so bad that it let that go through?  Well,

9   mistakes are made, but it's not a Hustle loan.  By mistake,

10   we're led to believe that it was.

11          If there's any doubt whatsoever, Mr. Anthony Ho, the

12   MIT grad with a facility for numbers confirmed it when he was

13   asked:  What's the branch number?  It's a bunch of zeros

14   initially, but 6114.

15   "Q.  Was this branch number among the branch numbers you

16   identified as Central Fulfillment branches?

17   "A.  No."

18          Meaning it's a field branch.  Field branches cannot

19   produce Hustle loans.

20          Sometimes mistakes are made even under the best

21   circumstances.  You know, what we have here is a theory in

22   search of evidence, and sometimes you can be too eager.  But

23   this is just one file.  What about the evidence that was relied

24   upon by their experts, which we'll get to after lunch, when

25   their experts are relying upon 28,000 Hustle loans?  In fact,

1    they're wrong by about 17,000.  We'll talk about evidence and

2    how a jury can rely on that.  We'll see that after lunch, and I

3    think it's exactly my time.

4             THE COURT:  All right.  Ladies and gentlemen, so we

5    will take an hour for lunch and reconvene at 20 minutes before

6    2.

7             (Jury not present)

8             THE COURT:  All right.  Anything that counsel needs to

9    raise to the Court?

10            MR. ARMAND:  Yes, your Honor, there were a number of

11   statements by defense counsel that went into the mental state

12   of employees of Countrywide who are not alleged to have

13   fraudulent intent in this case.  And it was our understanding

14   from the Court's rulings yesterday that was something that was

15   off limits with regard to Mr. Barnett who said --

16            THE COURT:  What I said yesterday was that I didn't

17   want statements about state of mind unrelated to the Hustle

18   program.  Now what you are referring to, which was not part of

19   my statement yesterday but did come up earlier in the case, was

20   I sustained evidentiary objections to some but not all

21   questions to persons other than the three whose intent is

22   directly in question as to their states of mind.  There were

23   exceptions to that in particular circumstances.  So I take it

24   your reference is not to what I said yesterday, which

25   apparently you misunderstood, but to those earlier rulings.

1              But the argument that Mr. Sullivan was making, as I

2      understood it, was that these people who were working on the

3      Hustle loan wouldn't have been doing the kind of work they did,

4      such as checking quality and so forth, if they had thought they

5      were really involved in a fraud.  I think that's not precluded

6      by any ruling of the Court, and I think that, within limits, is

7      an argument that can be made.  So I overrule the objection.

8              Of course, I was as surprised as anyone by

9      Mr. Sullivan's constant referral to himself as a cowardly wimp

10     who didn't have the courage to sit down after making varying

11     arguments.  This is not the Sullivan of reputation, but I have

12     a feeling that it was rhetorical.

13             In any event, anything else?

14             MR. ARMAND:  No, your Honor.

15             THE COURT:  Very good.  We'll see you all at

16     2 o'clock.

17             (Luncheon recess taken)

18             (Continued on next page)

19

20

21

22

23

24

25

DAMTBAN4                        Summation - Mr. Sullivan

1            (Jury present)

2            THE COURT:  Just so you know the line-up for this

3    afternoon, ladies and gentlemen, bank counsel have another

4    hour, we will then take a very short ten-minute break, then

5    Ms. Mairone's counsel will have an hour, and then we'll take

6    another ten-minute break, and then we'll hear from the

7    government on rebuttal.  So there will be two breaks, but they

8    will be short, to clue you into that.  Let it not be said that

9    I don't give jurors a break.

10           So, counsel.

11           MR. SULLIVAN:  I was so excited to start today that I

12   forgot to join with counsel in thanking you.  We know what

13   turmoil this creates, and we appreciate your patience.  Also

14   appreciate your humor and the tip of the hat to the relief

15   pitchers.

16           Let me focus now, as I said I would before the lunch,

17   on what we call the number of loans that the government is

18   focusing on.  As I said, this case is very narrowly focused.

19   The government focused it on the High-Speed Swim Lane loans.

20   And of course, the issue comes up:  How many?  The government

21   says 28,000.  The fact of the matter is they're way off, and

22   the reason they're way off you is will see from Exhibit 232,

23   which lists all the branches that create High-Speed Swim Lane

24   loans, only the only ones that create the High-Speed Swim Lane

25   loans are the branches called Central Fulfillment.

1           As you might imagine, we talked about Central

2     Fulfillment.  That's what -- that's where the process was.  It

3     was not in the field branches.  When you get a chance to look

4     at this exhibit in the jury room.

5           Perhaps could you put that up, 232 for a second, slide

6     48, just to give you an example, when you look at the pages in

7     it, you can go starting at page 11, for example, pick any page,

8     up on the top left hand corner it says "Field."

9           I could point out field, this is Central Fulfillment

10    and that's field.  Go to page 11 or 12 if you could and look at

11    the top left, any page that has the word "field" on it, and

12    most of those pages do at the back.  They were numbered in the

13    examination, none of them produced High-Speed Swim Lane, and

14    the problem was the government took this and they counted all

15    of them, they counted all the field branches where in fact none

16    of the field branches produced High-Speed Swim Lane loans.

17          To be exact, the government opened by saying there

18    were 30,000 loans, then they had experts testify there were

19    28,882, and the fact that it was so high is because they

20    included loans produced by the field branches and they should

21    have included only the loans produced by Central Fulfillment.

22          So in fact, there are 11,481 High-Speed Swim Lane

23    loans.  So the government is essentially off by 17,000.  That's

24    a lot of loans.  So their experts come and use as a predicate

25    and testify the whole predicate for what they're saying is

1   28,000, and the 165 million, that's predicated on 28,000 loans,

2   not 11,000 loans.  So obviously there's an extraordinary

3   difference between the two.

4        I remind you by looking at slide number 47 that DX31

5   specifically says field branches and other NCS centers will

6   continue to use the existing model, not the new model, the

7   High-Speed Swim Lane model.  One place that you find that.  On

8   Thomas' cross-examination he made it clear that it was Central

9   Fulfillment branches where the Hustle loans were processed.  He

10  was asked that question, and he gave the answer:  Correct.

11       Of course, their experts relied upon the larger

12  figure.  Another confirmation of the fact that it's 11,000 is

13  found in the testimony of Anthony Ho, who is a Bank of America

14  employee, grad of MIT, who seemed to like numbers more than

15  most of us.  And his testimony is reflected on slide number 49

16  which is Exhibit 1928.  There you'll see the number 11,481.  He

17  actually worked with the documents.  Unlike the government

18  experts he looked at the documents, he looked at the documents,

19  counted them up, and of course knows that field operations do

20  not produce Hustle loans.

21       Now for one more moment, let's look at -- the

22  government's opening statement today about experts and talked

23  about Dr. Holt and Cowan, and I remind you the predicate of

24  what they did is predicated on that population.  But the other

25  interesting thing is that our expert, Mr. Broeksmit, had a very

DAMTBAN4                     Summation - Mr. Sullivan

1   limited assignment.  Their expert essentially did this, he

2   looked at 383 loans and he found a problem with 185 of them.

3   So if you could think of that, in other words, he examined and

4   looked at 343 and found a problem with 185, and he came in and

5   told you missing appraisal licenses was 41 and so forth.  Let's

6   put that chart up there for a minute, 57.  This is basically

7   their expert's tally, so to speak.

8           And what did our expert do?  He wasn't assigned to

9   look at all the files to determine whether they were quality

10  files.  He has one narrow assignment:  Look at the expert,

11  Mr. Holt, and when he said he found problems in 185 files,

12  would you look at that and see if he's right.  And his

13  testimony, as you may recall, was that he found that he was

14  wrong 154 times.  So if you recall his testimony, just looking

15  at this chart, he said, for example, that he described some of

16  the work he did.  He said one loan was missing a required tax

17  form, according to the government expert, but it was actually

18  in the file.  That's what he did.  If he had a compliant about

19  what was in the file, he would go back and see if he could find

20  it in the file.

21          Another instance was there was one file was missing

22  pay stubs, so the government expert said oh, well, that's a

23  deficient file.  Now along comes Mr. Broeksmit, he looks in the

24  file and finds pay stubs.

25          To give you an example, Mr. Holt, the government

1    expert, said 59 of the loans were missing mortgage insurance,

2    and that's what his tally is.  Missing mortgage insurance.

3    Just as an example, you could see it up there as a second

4    column, 59 times, but our expert said it didn't have to be in

5    the file, it was located in a central place in Countrywide, we

6    call them up and get on the computer and all the information is

7    there, not in the file.  That's what the experts were

8    disputing.

9         And I point out to you that the predicate is incorrect

10   for their experts.  By the way, one of the interesting things

11   that presents in looking at files that are as thick as this,

12   there can be a lot of area for human error on the part of loan

13   processors, on the part of people that look at them five or six

14   years later, someone thinks there's a document -- not a

15   document in the file and in fact there is a document.

16   Obviously takes a lot of time and effort to go and track these

17   things down.

18        Once again, returning to the issue of quality -- your

19   Honor, would you remind me again what time I started?

20        THE COURT:  Yes, 1:53.

21        MR. SULLIVAN:  1:53.  Maybe could you give me a

22   five-minute warning?

23        THE COURT:  Sure.

24        MR. SULLIVAN:  Thank you.  When we talked about

25   quality this morning we were talking about the quality

DAMTBAN4                    Summation - Mr. Sullivan

1    assurance and we spoke briefly about errors in the quality

2    assurance by the auditors, which all the witnesses acknowledge.

3    And we talked about it as the high numbers that government uses

4    and wants to leap from there into the final end product.

5    They're very, very different animals, so to speak.  All

6    witnesses testified consistently that the quality assurance

7    process is focusing on the process itself, and the quality

8    control is focusing on the end product.  That's where you get

9    the corporate quality control looking at the files, and that's

10   where you get the rebuttal process if there's an SUS finding.

11        And as Mr. Kitashima testified, as other witnesses

12   did, QA is not an indication of quality.  It could went be

13   clearer.  It's not an indication of quality from the standpoint

14   of investment grade the.  It really is to determine whether the

15   process is being followed.  That's what I believe, and I ask

16   you to be careful of when you focus on the government's

17   argument.  They tend to conflate quality assurance and those

18   high process figures with the fact that oh, my goodness, oh,

19   how could it have a quality product if it has those issues in

20   the process itself?  But it could be corrected, and that's why

21   the end product bears no resemblance to the high numbers.

22        Now the focusing for a minute and switching from

23   quality assurance to quality control, we have already talked

24   about this a little bit, quality control measures the end

25   process.  That's the SUS finding.  During the government's

argument you heard them say that corporate QC findings was

30 percent of the Hustle loans were not investment quality, but

Countrywide undertook to make it look like it was lower.  These

allegations are flatly rejected by the evidence.  The QC review

evaluated sample loans that were already funded to determine

whether they were eligible for sale.  If a loan was found to be

SUS, Countrywide personnel would then have the opportunity to

study the loan and to take steps to correct it.  And that's

what was done.  That's what the rebuttal process is.  That's

what the witnesses call a healthy process.  Boland agrees with

it, Thomas agrees with it, and they testified consistently with

that throughout.

          Now Mr. Battany, the Fannie Mae person who has the

most contact with Countrywide, and said he virtually was in

contact with them every day.  He was asked this question:  Were

you aware of the various points in time in 207 and 208 with

regard to Countrywide's SUS rates?  Yes, I was.

          Now these results, as you remember from the chart that

you have seen many times were 5.5, 9.8 and 4.4.  And he

basically said that that would not have had an impact when he

was purchasing the loans.  The question was this to him:  With

respect to the SUS rates for the division for the fourth

quarter of '07, the first quarter of '08 and the second quarter

of '08, as purchasing agent, if you had known these SUS rates,

would you have continued to purchase loans from Countrywide?

1    Answer:  Yes.

2          The rates are there, they're the result of the

3    corporate quality control process, they're recorded, they're

4    there to see, and he said it would not have affected him.  Why?

5    Because they know that there's a certain defect rate industry

6    wide, and the Countrywide rate is within it.  Then he went to

7    say, for example, that Fannie Mae does not expect every loan to

8    be perfect.

9          Let me switch for a moment to training.  The

10   government mocks the, quote, clerks.  It suggests that they had

11   a bunch of unskilled people down there on the front line, the

12   company liked it that way, that underwriters weren't on the

13   scene and so forth.  That's far from the truth.  The company

14   made an extraordinary effort to train people and the teams were

15   made up, as you have seen through some of the witnesses, with

16   persons who formerly were underwriters.  Mr. Porteck was asked

17   about classes, he said these were the classes, he actually

18   listed them.  You may remember this, slide 39, he went down

19   this list of classes and said I took them and I had my people

20   take them.

21         Now obviously, with respect to quality, CLUES is one

22   of the biggest, most powerful tools that the company used to

23   guarantee quality because it's programmed in a way that's

24   satisfactory to Fannie and Freddie.  They check the contents of

25   it, make sure that it reacts to a particular loan the way their

DAMTBAN4                    Summation - Mr. Sullivan

own system would react.  So CLUES in itself is a piece of
equipment or a tool, a computer program that is very
sophisticated that the company uses to assure quality, because
when loans go in, the computer says this is either acceptable
with conditions or they refer it to an underwriter.

        In addition, you may remember that the COO of the
company came and described SASE, SASE, Signing Authority
Signature Enforcement, a process which is really designed to
make sure that the right person is doing the right job.  As he
explained, we want our underwriters to be working on the most
complicated loans.  We don't need people that are underwriters
working on every loan.  And that's why you saw in the evidence,
and you see it again in the jury room, these charts, level one,
level two, what they can do, can they authorize a million
dollar loan, and exactly what their authority is.

        What does that show you?  Someone goes to a lot of
effort to put those kind of controls in.  It's one of many,
many examples of quality control that the company utilized
during this period on these particular loans.  And to give you
an example, if you look at slide 58, which looks very similar
to the one I had in opening, these are some of the -- this is
just a demonstrative, you don't have this in the jury room,
it's a demonstrative, it shows you month by month what was
done.

        All of these consistent efforts to do every one of

1    these kinds of things, to add coaches, to have a new stated

2    income responsibility, job data, to have a new income

3    calculator, to quadruple the number of random audits, all of

4    these things are indications of the quality right through from

5    December '07 down through May of 2008.  Why would they be doing

6    these thing if they did not want quality product?  There's no

7    explanation for it.  And the fact is quality was achieved.  If

8    we look at the evidence in the case, they measure quality.  And

9    here is the chart, put up slide 41.  This is the one we've been

10   referring to.  If you could blow it up.

11          These are the final scores, 5.4, 9.85 and 4.4.  Those

12   are the basic quality range.  And by the way, yes, 9.8 is a

13   little high, and that's why they took aggressive action to

14   change various things.  But Alex, if you could go back one

15   quarter, there's actually a time on there where they have

16   13 percent on this chart right there.  The Hustle program was

17   not even in effect then.  This happens in business sometimes,

18   they see a spike and they correct it, and that's what the

19   evidence shows here.

20          The bottom line, when it comes to their own quality

21   scores, they know the company wasn't perfect, but it was

22   clearly acceptable to their Fannie and Freddie buyers.  Quality

23   was within the range of expectations.  As I showed you one

24   point it was 9.8, they didn't like it, and they made

25   corrections.  That's what a company does that's intending to

DAMTBAN4                    Summation - Mr. Sullivan

1    have good quality.

2            The fact of the matter is that all of these documents,

3    and you can pile them up, if you just take the documents and

4    spent a little time reading them and see what they're

5    attempting to do in making corrections, changing quality,

6    putting in controls, for every focus that they have on quality,

7    if you gave a dollar to Mr. O'Donnell, he wouldn't need the

8    million six five because there are literally hundreds of

9    examples in those records that show the effort the company is

10   making to make its product a quality product.

11           Now I want to talk to you for just a moment about --

12   would you put up transcript 26, please.  This is testimony from

13   Freddie Mac's Mr. Tanabe, and it's very instructive, and it

14   tells you something about the standards.  Counsel for the

15   government indicated that there was a four percent standard in

16   the industry defect rate.  That's what you heard this morning,

17   four percent.  Here's what the people that actually work in the

18   industry tell you.

19           This was the testimony of Mr. Tanabe:  In the 2007,

20   and '8 time period, Mr. Tanabe, what was the industry standard

21   for that NAQ number?  Reminding you that that's non-acceptable

22   quality.

23           Answer:  I can speak to what Freddie Mac's average at

24   that time frame was.

25           Question:  What was that number, sir?

1              Answer:  18 to 20 percent.

2              18 to 20 percent, ladies and gentlemen.  That is from

3    the representative of the so-called victim.  The statistics

4    that we have in the company are much less than that.  You have

5    just seen them on the board.

6              Forget Freddie for a minute and let's go to Fannie,

7    transcript 27.  Here's the testimony from Mr. Sobczak, a

8    government witness, Mr. Sobczak:  Are you familiar with the

9    national significant findings rate?  Each called a little

10   different thing.  Are you familiar with the national

11   significant finding rate for 2007 and '8 time period?

12             Answer:  Yes, I am.

13             What is the rate, sir?

14             It's approximately 25 percent, give or take a couple

15   of percentage points.

16             Can you explain to us what that means?

17             Answer:  A significant finding, as I mentioned, is a

18   potential grounds for Fannie Mae asking a lender to repurchase

19   a loan that they delivered.  So 25 percent would mean that

20   approximately one in four loans delivered to Fannie Mae had

21   some flaw, or should Fannie Mae choose, it could choose to have

22   a lender repurchase that loan.

23             Question:  And that rate is across all lenders?

24             Answer:  National significant findings rate, yes.

25             Question:  So is that essentially like an industry

1    standard rate or something like that?

2                Answer:  That is Fannie Mae, that's Fannie Mae's rate

3    for the deliveries it received.

4                So how do you weigh that with an allegation by the

5    government?  There's no evidence that we were one in four, or

6    18 to 20 percent.  FSL loans were better than that.  So what

7    are we talking about here?  Where's the fraud?  Where's the

8    evidence of fraud?

9                Every one of GSE witnesses, and they called four or

10   five of them, testified about the real world in a positive way

11   regarding the company.  Counsel for the government said this

12   morning that Fannie and Freddie could not inspect their loans,

13   they had to rely on Full Spectrum Lending.  That's not the

14   testimony.  You heard detailed testimony about how the GSEs,

15   Fannie and Freddie, come on site, see what is going on, they

16   randomly check loans, they talk about four different ways that

17   people check loans.  One was the NAQ process, a second was the

18   LP emulator, the third was the collateral models, and four was

19   the performance of loans.

20               When the government said that they could not inspect,

21   they had to rely upon Full Spectrum Lending, that's contrary to

22   everything you heard from the witness stand.  What are these

23   people doing over there?  They're not just opening mail.  They

24   have systems and people that --

25               MR. CORDARO:  Objection, your Honor.

1          THE COURT:  I'm a little concerned about this.  The

2     jury should understand, while this may be relevant for

3     impeachment purposes, Fannie Mae and Freddie Mac are not on

4     trial in this case in any respect.  The question is not what

5     they did or failed to to at all, it is purely a question of

6     what the defendants did or failed to do.

7          MR. SULLIVAN:  Yes, your Honor, and I was just

8     addressing counsel's point and that was my only point.

9          THE COURT:  Thank you.

10          MR. SULLIVAN:  Thank you.

11          I would like to address a couple of things about what

12     Mr. Battany said.  He was here testifying and he was asked the

13     following question:  You mentioned, Mr. Battany, conforming to

14     Fannie Mae guides.  Did CLUES accept loans that conformed to

15     Fannie Mae guides?

16          Answer:  CLUES loans did conform.  Fannie Mae approved

17     a special variance for Countrywide to allow CLUES loans to be

18     delivered to Fannie.

19          By the way, there's a lot of talk and conversation in

20     this case about stated income loans.  What have we learned

21     about stated income loans?  It was a product -- and I must

22     confess to you it's an unusual product.  It was a product in

23     which a borrower could actually state the income, and the rules

24     set by Fannie and Freddie were that you could not ask for

25     documentation such as pay stubs or tax returns.  Countrywide

1    didn't make the rules, but they had to follow them.  And so

2    there was much talk by the government about allowing stated

3    income loans to go through the Hustle process.

4           Interestingly enough, their expert witness, guess how

5    many stated income loans he found a problem with?  13.  I don't

6    know what the significance is except 13 in all that he looked

7    at were stated income loans he found a problem with.  You heard

8    testimony that some of the experts in the field from both the

9    company and from Fannie Mae and Freddie Mac said that stated

10   income loans were back existing around the '90s, and they

11   performed well for a long period of time.  They started to

12   perform badly during the economic crisis in '06, '07 and '08,

13   at which time you will find that Countrywide and Full Spectrum

14   Lending began on a regular basis to tighten up the controls.

15          A lot of things you will see in the documents focus on

16   tightening the controls, and mainly what they're focusing on is

17   well, if the borrower doesn't state the income, and you cannot

18   ask them to provide documentation for the income, how do you go

19   about checking?  And that's where you see in the evidence

20   several things developing, income calculators, systems to test

21   it, looking up something on dot com that will show you what a

22   typical doorman makes, typical anybody makes, and you will see

23   through the documents, many of the documents dealing with that

24   kind of an issue in stated income.

25          The fact of the matter is stated income is simply a

1   loan that is stated income.  If you do require the borrower to

2   provide something, it's not a stated income loan.  Fannie and

3   Freddie set the market for that product.

4            Now also of interest in terms of the government's

5   closing today, they still are talking about turn time and other

6   contests and so forth.  Let's remember what Mr. Battany

7   testified about.  For example, he was asked the following

8   question:  In 2007 and '8 time period, as a purchasing agent,

9   would you have approved the purchase of loans that were derived

10  from a loan origination process designed to decrease turn time?

11  This is one of the sins I think that the government keeps

12  talking about, turn time, speed.

13           His answer is:  Yes, I would have approved those

14  loans.

15           Question:  Why would you have approved those loans

16  Mr. Battany?

17           Answer:  I would have viewed that to be a positive for

18  the mortgage industry and borrowers to have a more efficient

19  process.  And I was personally aware that the mortgage loan

20  process has many days in the timeline where loan files just sit

21  and sometimes take days or weeks.

22           You see the difference between being on the 14th floor

23  of a New York building and having lived 22 years in the

24  mortgage industry 3,000 miles from here?  He's in the real

25  world.  Up here we're talking about two different worlds,

1    lawyers looking at what happened five or six years ago and

2    second guessing people on the front line.

3              Mr. Battany is further asked:  If a lender was using a

4    loan origination process that gave processors a bonus based

5    upon reduced turn time, would you have continued to purchase

6    the loan?

7              Answer:  Yes.

8              He goes on.  Question:  Would Countrywide, setting

9    funding goals for employees -- for its employees have affected

10   your purchasing decisions in 2007, 2008 time period?

11             Answer:  No.

12             Question:  Why not?

13             Answer:  It was typical in the industry.

14             So we come to court here and we hear about contests

15   and poker and other things as if it's a dirty part of a

16   business.  The fact of the matter is some businesses have those

17   kinds of corporate employee benefits.  Mostly fun, certainly.

18   What do we expect?  Do we expect -- is there the suggestion

19   that for an Outback $50 certificate that somebody out there in

20   California five years ago was sending millions of dollars of

21   loans out to borrowers because they were hungry and wanted a

22   certificate?  Is the Bloomin' Onion worth that much nowadays?

23   Why?  What kind of unrealistic assessment is that?  Why is that

24   wrong?  Why is that?

25             You know why?  You know why?  Because there's no

evidence of fraud, and you have to reach for things like that

in a courtroom.  You reach out there and you say to a woman

that came here, Ms. Flores, well, what about this horse race,

this poker game?  She was flabbergasted.  You could see it on

her face.  She said I don't even know how to play poker.  That

was a quote.

          You see the difference between living life five and

six years later?  She thought this was all about her work and

her team and her people and doing her job, and she's getting

questions about poker this kind of craziness.  It happens only

when you don't have evidence and when you have a theory and

you're searching for evidence.  And that's what this case is

about, and sometimes you see it in the littlest things like

that that says so much about the case.  That says no case, that

says no fraud.

          I didn't finish Mr. Battany's answer I stopped in the

middle.  He said, answer:  It was typical in the industry.

          "How do you know that," the question was.

          Answer:  In my 22 years at Fannie Mae, I worked with

probably every major lender in the western United States, and

it was very typical behavior for mortgage lenders.

          And maybe the best of all:  If you knew that persons

who were processing these loans and evaluating these loans at

Countrywide were loan processors as opposed to underwriters,

would that have affected your decision whether or not to

1    purchase?

2              You heard this this morning.  Answer:  No, it would

3    not affect it.

4              Question:  Why would it not have affected your

5    purchasing decision, Mr. Battany?

6              Answer:  Using processors to operator either CLUES or

7    DU, Desk Underwriter, was common in the industry.  Fannie Mae

8    was aware of it, and I recall bringing this to their attention.

9              I want to talk to you briefly about stated income just

10   because there's been so much discussion of it.  It must be

11   remembered that the GSEs and Countrywide testified that the

12   loans were common, that the rules were set by Fannie and

13   Freddie, they were produced to accommodate the borrowers that

14   wanted stated income loans.  By the way, borrowers, as you

15   heard from one expert, who wanted stated income loans paid a

16   little more.  Remember, there's a higher risk.  People that set

17   risk prices associated with a loan, they charge a little more.

18             So people -- it doesn't matter if you and I were bank

19   presidents, maybe we wouldn't like those loans, but that's how

20   it was done five or six years ago.  But it sounds like it's

21   some product we invented.  We're just in the marketplace.

22             By the way, just to give you an idea, here's a

23   question that was asked.  Question:  Now when underwriting a

24   stated income loan, sir, were underwriters permitted to just

25   ask the borrower or the applicant to provide payment stubs or

1    tax returns to verify the income that was stated?

2              The answer:  No.  They were not allowed to fully

3    document the income if it was stated.

4              Question:  They were not allowed to ask for W-2s, tax

5    returns?

6              Answer:  That's correct.

7              That's Mr. Schakett's testimony.

8              Stated income loans is just another product.  The

9    government's theme is that the High-Speed Swim Lane was somehow

10   fraudulent in its creation and its operation.  And they used

11   stated income loans, I guess, to say that somehow they didn't

12   belong in High-Speed Swim Lanes.  But who permitted the

13   High-Speed Swim Lanes?  Mr. O'Donnell did.  He said it was OK.

14             So what conclusions do we draw from this whole stated

15   income issue?  Does it show fraud?  It simply shows Countrywide

16   handling another product.  And by the way, when economic times

17   changed and when these loans started to show up defaulting more

18   than they had over the years, what did they do?  They

19   recognized the problem, they discussed the problem to death,

20   they found solutions to the problems as much as they could,

21   changed things, they made changes all hand in hand with the

22   GSEs, Freddie and Fannie Mae participating with them.

23             And the problem -- eventually they decided not to have

24   stated income loans, but that was Fannie and Freddie's

25   decision.  Once they make a decision we're not going to deal

with that kind of loan, then obviously Countrywide can't

produce that kind of loan.  So what do we have after four

weeks?  I said we don't have fraud.  So what do we have?  What

does the evidence show?  It shows men and women at work.  And

there's this attitude, I guess, by the government that nothing

is good about the process or the men and women, I guess, no one

I guess did their job.

          The government thinks that loan specialists or clerks

are not smart enough.  They think tracking the numbers of loans

is bad.  They think bonuses for line level employees is bad.

They think bonuses for senior people, sprint incentives, are

bad.  They think rebutting the QC SUS findings is bad.  They

think poker is bad, office contests are bad, leader boards are

bad, cards and gambling are bad, Outback Steakhouse gifts, very

bad.  White on rice bad, but funny.  Got to say that once in a

while.  You have to laugh at some of this stuff.  There's

material for Saturday Night Live, but the saddest thing about

it is we're in a fraud case and people, at least Rebecca

Mairone, and companies, are being charged with fraud by our

government.

          So what does the real world show?  Take all the

witnesses and assume good faith on the part of all the

witnesses, the government witnesses and so forth.  Michael

Thomas, the risk analysis.  He doesn't provide evidence that

there was fraud.  And it was four things that we talked about

1    today.  Mark Barnett, PhD, designed it.  Sidekick, Anson Gong,

2    another PhD who worked with him.  Lori Peffer who she spent ten

3    years of her life focusing on CLUES.  That was her assignment,

4    CLUES.  Anthony Ho, the MIT fellow, comes and identifies the

5    loans looking at the documents, and you find that it's not

6    28,000, it's 11,000.  Mr. Boland, government witness, thought

7    the process was a great design, a great process.  Price had

8    little to say, but certainly no evidence of fraud.

9         And then come people on the front line, like Desirae

10   Flores, Desirae Flores.  And remember Desirae, she had the

11   team.  Could we see DX5001 for a second?  Could you pull that

12   up possibly, Alex?

13        She was the woman who came and probably told you that

14   four people -- could you circle the same people she circled?

15   Jeffrey Brown, Michael Money, Susan Lucero, Bernabe Garcia.

16   Those were the former underwriters on her team.  To hear the

17   government's opening or even the closing today you wouldn't

18   think there were underwriters out there in the world.  These

19   are the ones that worked with her, and she was an underwriter.

20        Andrew Portek came and he told us about the training,

21   how he took the training with his people.  Ron Gillet came and

22   talked about the Hustle pilot team that he supervised.  And you

23   heard the testimony about Rebecca.  You will hear more from her

24   counsel.  What were they all doing? Working to process loans,

25   they were attending meetings, they were conferring about the

process, e-mailing, participating in conference calls.  Sounded

like a pretty healthy business atmosphere, collegial.  And when

I mentioned that this morning, since when did collegial -- how

do you attack collegial?  That was attacked by the government

this morning.  Collegial I thought was good, people listening

to each other, giving opinions, making decisions, not all of

them right, and working in their business.

          Bottom line is that the government's case hits a brick

wall.  I call the brick wall reality.  And just don't see the

world the way it actually was.

          You know, to make allegations of fraud or scheme to

defraud or misrepresentation violations of law, it seems to me

carries with it a responsibility to produce the evidence to

prove it.  And the record is devoid of cases, is an empty

container after four weeks.  I don't think a fraud case should

be an Easter egg hunt.

          MR. CORDARO:  Objection, your Honor.

          THE COURT:  Ground?

          MR. CORDARO:  It's the "I don't think," your Honor.

          THE COURT:  Pardon?

          MR. CORDARO:  It's "I don't think," we're getting

into --

          THE COURT:  This is not -- this is a rhetorical

device.  I don't believe that Mr. Sullivan was holding himself

as an expert on Easter egg hunts.

1              MR. SULLIVAN:  That's true, I was trying to make a

2      point that fraud case needs evidence, it's not an Easter egg

3      hunt, it's not going fishing, it's not panning for gold in

4      Utah.  You need a lot of proof to charge fraud.  You will hear

5      the standard of proof from the Court.

6              One of the things that, by the way, is significant

7      that I will ask you to -- you will be instructed on the Court

8      about this, too, is the unanimity requirement of the jury.  Our

9      juries have to decide things unanimously.  When you think about

10     it, there's nowhere else in America, business, the Supreme

11     Court decides things five to four, everything we have grown up

12     with family dinners you decide three want to go for ice cream,

13     two want to go somewhere else.  Why do we require everybody to

14     agree on a jury?  It's kind of a control point, isn't it?  It's

15     because no one wants the wrong decision to be made.  We want

16     jurors to consult.  We want them to agree.  If they can't

17     agree, of course the government can't win.

18             Here what we have is a case in which when you look at

19     what happened you see the day-to-day work, the insight of men

20     and woman in the mortgage industry.  It's not exactly the most

21     exciting thing to see, it's not going to make a TV reality

22     show, sure of that.  But the bottom line is that the

23     government's fraud theory in this case is really implausible

24     from the start.  Fraud needs real perpetrators.  Rebecca

25     Mairone running a fraud?  I don't know who else the government

DAMTBAN4                        Summation - Mr. Sullivan

1    thinks might be involved in the fraud.

2            Fraud needs a victim, too.  The victims here --

3    intended victims are Fannie and Freddie.  But when they come

4    here they don't sound like victims.  Instead, the GSE witnesses

5    provide testimony inconsistent with the government theory of

6    fraud favorable to the defendants.  Did Rebecca on her own

7    mastermind some fraud with all these other executives above

8    her, below her, beside her?  Is that realistic?  Is the

9    government really saying that Cliff Kitashima and Greg Lumsden

10   were supposed fraudsters?  I don't know.

11           Among the best indicators of no fraud is Mr. O'Donnell

12   himself.  He certainly wants a million six.  Why not come to

13   court and testify a little more robustly for a million six?

14   Why not really sound like he lived through a fraud?  There's a

15   reason, you know, he can't provide that kind of pop testimony.

16   The reason is twofold.  One, there is no fraud, and two, he's

17   fenced in.  He's fenced in by his documents, by the way he

18   lived it, by what other people say in the same circumstance.

19   He's fenced in to basically the truth when he wrote that memo

20   and said no fraud, no ethical problems.

21           That's why you get testimony that is blah, and you sit

22   there and wonder what the heck did they say and how does that

23   fit into allegations of fraud?  Reminds me of a great saying by

24   a former President, in a different context, of course, when he

25   said you can't think and run, but they can't hide.  He can try

1   to run from the past, he can try to sound a little bit helpful

2   to the government, but he really can't because there are too

3   many documents and too many things that show the way that men

4   and women lived it out in those days.

5        You know, it was absolutely fascinating, I never heard

6   it before, but when you folks were worried about you're all

7   assembled in the room and worried about becoming jurors and

8   hoping it wouldn't be the case that I really focused on the

9   words that judge said about the juror's responsibility and how

10  the power to be a juror comes from our Constitution, and talked

11  about the glories of the United States.  And one of them he

12  said is that we entrust this awesome power, this power of

13  justice, to you.

14       It's not often we citizens have any real power.  You

15  have the power.  You have the power to do justice.  You have

16  the power to prevent injustice.  Injustice is an awful thing.

17  It burns in the soul of its victims.  It never goes away.  It

18  can only be prevented.  It can never be cured.  Some diseases

19  can be cured.  You can't cure injustice.  It cannot be undone.

20  So as citizens on a jury, you have your duties.  You will hear

21  them from the Court and you will hear the law.  I leave you

22  with the same two words I started with four weeks ago:  No

23  fraud.  No fraud.

24       Return a verdict of not liable for the bank defendants

25  and for our employee, Rebecca Mairone.  Thank you very much.

3417

DAMTBAN4

1            THE COURT:  Thank you very much.

2            All right, ladies and gentlemen, we will take a

3  ten-minute break at this time.

4            (Jury not present)

5            THE COURT:  Anything counsel need to raise with the

6  Court?

7            All right.  We'll see you in ten minutes.

8            (Recess taken)

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury not present)
 2                MR. HEFTER:  Your Honor, I will take a five-minute
 3      warning also, if that's okay.
 4                THE COURT:  Sure.  Do you want a whistle, a siren?
 5                MR. MUKASEY:  Just throw something at his head.
 6                (Jury present)
 7                MR. HEFTER:  May I proceed, your Honor?
 8                THE COURT:  Yes.
 9                MR. HEFTER:  Counsel, Rebecca, ladies and gentlemen,
10      good afternoon.
11                Rebecca, prime loans need low touch, low cost
12      processors and prime borrowers need faster turn time to keep
13      them from going elsewhere.
14                Rebecca, I am okay with the suspension for 90 days of
15      certain elements of QoG.
16                Rebecca, there are very few loans in my estimation
17      that we would not have or should not have made.
18                Rebecca, I believe we have the process steps and job
19      aids in place going forward, that when properly executed, will
20      get manufacturing quality to the right level.
21                Rebecca, I am okay with Fast Track being included in
22      the HSSL since that is exactly the type of product it is
23      designed for.
24                Rebecca, the QA reviews to date have been heavily
25      focused on process steps.  I believe it is tough to draw
```

DAM3BAN5                     Summation - Mr. Hefter

1  conclusions directly from those or even the QC findings alone.

2          Who told Rebecca Mairone that?  Those are all direct

3  quotes from documents that you have seen out of the mouths and

4  lips of people within FSL.  Who are those people?  Those people

5  are the management of the credit risk and quality at FSL.

6          How can the government say that Ms. Mairone, Rebecca,

7  committed fraud, when the top people in the company in charge

8  of controlling risk approved the High-Speed Swim Lane, and

9  Central Fulfillment?

10          How can they say that Rebecca intended to harm Fannie

11 Mae or Freddie Mac when she spent months trying to put together

12 a quality assurance program?

13          How can they say she concealed any information

14 regarding quality assurance when she was the person who put

15 together the SWAT team to look into the quality assurance

16 results?

17          Quality had become a joke?  Quality had become a joke?

18 That's what I heard out of the mouths of the government this

19 morning.  And it's flatly false.

20          How can they say that she intended to commit fraud

21 when she implemented, approved, and supported each and every

22 measure to improve quality in late 2007 and early 2008 on her

23 watch?

24          The government is fond of saying that Rebecca Mairone

25 was the head of Central Fulfillment.  She was.  We do not

dispute that.  But if she's going to get blamed for what

happened in Central Fulfillment, she better get credit for what

happened on her watch.  All of the quality improvements that

the government has talked about, that the bank's counsel have

talked about, took place on her watch.

So the answer to all those questions, how can she be

held liable, is she can't be.

There is absolutely no evidence, ladies and gentlemen,

that she participated in a scheme to defraud knowingly with a

specific intent to defraud at any point.

Judge Rakoff will instruct you as to what those terms

mean.  He will tell you, and he's going to tell you whatever

comes out of his mouth is the law.  I hope I'm getting it

right.  He will tell you that the claim against Ms. Mairone

must be decided solely on the evidence that relates to her.

And sometimes in this trial, ladies and gentlemen, I thought my

only role was to stand up and say "limiting instruction,

please."

And it will be very difficult for you to parse all

that out.  And I'm not going to stand up here today and try to

parse it out for you, because there was no fraud.

He will also tell you that to act knowingly means to

act consciously and deliberately, rather than mistakenly or

inadvertently.  But in this context it also means that

Ms. Mairone had knowledge that she was participating in a

1    fraudulent scheme.  To act with a specific intent to defraud

2    requires that Rebecca purposely intended to deceive and harm

3    either Fannie Mae or Freddie Mac, or both, by seeking to sell

4    them mortgage loans or by seeking to affect the pricing of

5    those loans through false or misleading representations.

6           And where is the evidence, ladies and gentlemen, that

7    she personally wanted to deceive and harm Fannie Mae and

8    Freddie Mac?  There is none.  Where is the evidence that she

9    wanted to sell bad loans to Fannie Mae and Freddie Mac?  There

10   is none.  Where is the evidence that she knew in her mind that

11   the HSSL or Central Fulfillment would lead to the sale of poor

12   quality loans to the GSEs?  There is none.  Not even the

13   government's star witnesses, Ed O'Donnell and Michael Thomas,

14   testified that she wanted to sell bad loans to Fannie Mae or

15   Freddie Mac.  There is not a single witness who testified that

16   Rebecca instructed them to ignore quality.  Have you seen a

17   single document where Rebecca says that quality does not

18   matter?  It doesn't exist.

19          Ladies and gentlemen, take a look at her 2007

20   strategic plan for FSL.

21          Am I doing this or are you doing this?  I am.  Okay.

22   Next.

23          This is a PowerPoint presentation.  DX 240.  Rebecca

24   Mairone is the presenter.  2007 FSL strategic priorities of the

25   priority objectives.  So the first page for her priority

1    objectives -- as you might noticed, it is hard for me to read.

2    So what she says is develop and promote a divisional culture in

3    which, quote, doing the right thing is second nature.

4    Routinely bringing us the highest compliance and quality rating

5    possible.

6              Those are the words of Rebecca Mairone in a PowerPoint

7    presentation where she sets out her strategic priorities for

8    the company.

9              After reading that, you cannot conclude that

10   Ms. Mairone did not care about quality.  It is exactly opposite

11   of somebody who would want to intend to harm another person.

12             The government continues to talk about speed.  And I

13   believe that the government's counsel this morning said she

14   wanted to pursue profit instead of quality.  Where is the

15   evidence of that?  What witness testified to that?  Not even

16   the government's witness testified to that.  Where is there a

17   document that says that?

18             In any event, her intent was to streamline the process

19   for prime borrowers so that their files would not get stuck

20   behind more complex files.  She believed that the High-Speed

21   Swim Lane was designed to reduce turn time by minimizing hand

22   offs and reducing unnecessary steps in the process from the

23   subprime model.

24             There is nothing fraudulent about wanting to make a

25   more efficient process.  Increasing efficiency in the process

1    by reducing turn time does not mean that she personally wanted

2    and desired the process to generate defective loans.  And there

3    is no evidence that she did.  It is not fraudulent to send

4    around a production goal.  Businesses do that all the time.  In

5    fact, it is pretty standard.

6           Everybody knows that a Girl Scout wants to sell more

7    cookies in one year than the year before.  It is pretty

8    standard that businesses try to figure out how much they're

9    going to sell in the next month, quarter or week or a day.

10   There is nothing fraudulent about that.  There is no evidence

11   that she intended to harm anyone.

12          So why is Ms. Mairone sitting here in this courtroom

13   in the first place?  I think you know the answer.  Years ago,

14   Mr. O'Donnell, the government's chief witness, had it out for

15   Ms. Mairone, and now he's playing it out here.  The evidence

16   before you, however, shows that his testimony in this case does

17   not fit with his own words and conduct six years before.  So

18   Mr. O'Donnell came into this courtroom as a man with a grudge

19   and a mission.

20          Consider the following:  You already heard about the

21   $1.6 million.  I won't dwell on that.  He works at Fannie Mae,

22   you know that.  But also, right from the words of his mouth, he

23   says:

24   "Q.  And you faulted her for minimizing the roles of those

25   individuals?

1    "A.  For my role specifically, yes."

2          Clear as day.  He also put his name in to run Central

3    Fulfillment.  He wanted that job.  He didn't get that job.  He

4    believes he didn't get the job because of Ms. Mairone.  He

5    blames Ms. Mairone for that.

6          So this is Mr. O'Donnell in April of 2008.  Where

7    Mr. Thomas in his e-mail says "It gave me comfort just to know

8    I got under her skin just a little bit."  Then Mr. O'Donnell

9    says, I know the feeling.  She's got rubber bullets in her gun

10   and we are going nuclear."

11         "We are going nuclear."  That's pretty clear as to

12   what that means.

13         Then let's look at this e-mail from Mr. Comeaux to her

14   in June.  Where he says to Ms. Mairone, to Rebecca, you do not

15   have a true understanding how he feels about you or what he has

16   said about you.

17         Mr. O'Donnell has a grudge and he came into this court

18   with a mission.  His entire testimony is tainted by that bias,

19   ladies and gentlemen.

20         Now the government says in attacking Ms. Mairone's

21   credibility, look at what she testified at her deposition

22   compared to look what she testified in court.  They point to a

23   few instances where she couldn't recollect something at her

24   deposition, but now she recollects it on the stand.

25         The reason for that, ladies and gentlemen, is that she

DAM3BAN5                    Summation - Mr. Hefter

1    has sat here, day in, day out, every single day of this trial,

2    she spent numerous hours with us preparing for this trial in

3    the period between the deposition and now.  Now you know why

4    she's able to testify about certain things that she may not

5    have had a recollection at her deposition.

6          Did Rebecca Mairone ignore concerns that were raised

7    about the High-Speed Swim Lane?  No.  This is a really key

8    point, because this morning, government counsel threw out all

9    these names about how they were raising concerns.  This is an

10   area where I do want to focus on what they said and what the

11   evidence was.

12         There is only a single person in the entire record who

13   had direct contact with Ms. Mairone about the High-Speed Swim

14   Lane.  Mr. Price could have raised concerns, other people could

15   have raised concerns, Mr. Aliano, Mr. Brent, Mr. Thomas.  The

16   only person who had direct contact with Ms. Mairone in the

17   record, the evidence, is Mr. O'Donnell.

18         Mr. O'Donnell's testimony is that he expressed his

19   concern at steering committee meetings.  He doesn't identify

20   the date of those meetings, he doesn't identify who was there,

21   we're left to assume that Rebecca was at every single one of

22   those meetings.  So let's just say she was.  Let's say she was

23   at all of those meetings.  It still doesn't prove what the

24   government wants you to think.  The government wants you to

25   believe she ignored concerns raised by Mr. O'Donnell.

1              Let's look at what he said at the time in his own

2    words as to whether it's believable that he actually expressed

3    concerns to her.

4              August 13, the day that the High-Speed Swim Lane

5    Hustle began.  Mr. O'Donnell to Mr. Cannon and others,

6    Mr. Kitashima, Thomas, Price.  Couple of notes below.  Any new

7    process should not require underwriting involvement.  We should

8    be thinking of leveraging underwriting only on critical risk

9    related items.

10             Is it believable that he was raising those concerns in

11   a steering committee meeting in or around that time if he

12   didn't think that underwriters should have that involvement?

13             August 13, same day.  We discussed this topic with

14   Cliff -- that's Mr. Kitashima -- on Thursday night.  We're

15   going to move forward with allowing the loan specialists to

16   determine reasonability.

17             That's income reasonability on the stated income loan.

18   We know that.

19             Is it actually believable, is his testimony in this

20   court believable?  Let's see what he said.

21             Number one, I was concerned that loan specialists

22   wouldn't be up to the task.  How does that square with his

23   statements in the documents at the time?  It doesn't, ladies

24   and gentlemen.

25             The government showed him also PX 52.  Or showed us PX

52.  This is the e-mail on 8/3 where Rebecca says to Ed so it
sounds like it may work.  Is that what I am hearing?  Question
mark.

         You recall, ladies and gentlemen, that Mr. O'Donnell
had assembled a bunch of questions from people out in the field
in the national sales center.  He was summarizing those
comments and he was forwarding them to Rebecca.  And his
testimony about this, when he was asked the question, so it
sounds like it may work, was "I was confused by that answer."
That was his testimony.  "I was confused by the answer."  Is
that fraud when she asked the question It sounds like it may
work.  Is that what I am hearing?  Is that fraud?  And also
there is a question mark there.  What was he confused about?
He had already responded to all these people that he did not
believe that quality was an issue with the High-Speed Swim
Lane.  This is on August 3.

         On August 1st, he responds to an e-mail to James White
and he says:  Very important to make it clear that we are
talking about prime loans.  We don't have quality issues on
prime due to the strength of the borrower.  They are the
quality part of the deal.  The focus is on moving the deals
quickly and eliminating hand offs, returns or unnecessary
requirements that delay signings.

         So is it believable that he was confused about
Ms. Mairone's response on August 3 when two days before he was

1    he's telling James White, a member of his organization, don't

2    worry about it?  We've got this covered?  The prime borrower is

3    the quality part of the deal.  It's not believable.

4           Also, if he was confused about Ms. Mairone's question,

5    if he thought she wasn't understanding, which I think was his

6    testimony in this courthouse, did he call her?  Or send an

7    e-mail?  Asking her what she meant?  No.  There is no evidence

8    of that.  None.  Why?  There was no reason to.  He had already

9    told his people that they should not have any concerns.

10          You heard government counsel make a big deal of PX 52

11   and Ms. Mairone's question.  That's what the government says is

12   fraud or part of their fraud case.  They completely ignore the

13   next page of the document.  Well, I don't think we have it up

14   there.  But I'll tell you what it says.  In the same document,

15   after she says I think it may work.  She also asks Cliff, she

16   sends Cliff a question.  Cliff, what do you think?

17          So this is part of the collaborative process.

18   Ms. Mairone, Rebecca, talking to Cliff and Ed about any issue

19   relating to the rollout of the High-Speed Swim Lane.

20          You also heard talk about Michael Thomas' concern

21   about the High-Speed Swim Lane.  He's an interesting witness

22   because, as you've heard, he works at Fannie Mae, he got his

23   job through Ed O'Donnell.  There is absolutely no evidence that

24   he raised any concerns about the High-Speed Swim Lane to

25   Rebecca at any time.  Nothing.

 1              The government believes that Mr. Thomas' August 8

 2     e-mail is a smoking gun.  They want you to believe that

 3     Mr. Thomas' concerns were ignored by Rebecca.  That's

 4     interesting, because there is absolutely no evidence that she

 5     received an e-mail.  There is no evidence that he sent it to

 6     Greg Lumsden, Cliff Kitashima, Rebecca, or Ed O'Donnell.  Ed

 7     received it from somebody else.

 8              Also, remember Mr. Thomas' testimony.  When you look

 9     at his testimony, he doesn't know who was making decisions, who

10     were in any of the meetings, and he wasn't there.

11              So five days after Mr. Thomas' e-mail lands in

12     Mr. O'Donnell's e-mail box, Mr. O'Donnell is sending this

13     e-mail to Rebecca and others.  "I'd recommend that we continue

14     to exclude purchases, loans greater than 1 million, and

15     non-arm's length.  I agree with the remainder of the list."

16     He's telling everybody let's move forward as long as we have

17     certain loans excluded.  Mr. O'Donnell's suggestion was

18     followed.  Those type of loans were excluded from the

19     High-Speed Swim Lane pilot.

20              So, for the government to say Mr. Thomas' August 8th

21     e-mail is relevant, it's not, because Mr. O'Donnell is telling

22     Rebecca multiple days later let's go forward.  And we know

23     there is no evidence that Mr. O'Donnell didn't want to go

24     forward.  The government claims that he gave conditional

25     approval.  Show me a document where he says that.  There is

1    none back then.

2              Also, the government showed you this morning an e-mail

3    from Mr. Barnett.  I think this is very important because it

4    goes to what loans were going into the High-Speed Swim Lane.

5    Okay.  This is what they showed you this morning.  This is

6    Mr. Barnett to a group of people.  I apologize I don't have it

7    on the screen.  He says as of September 12, the HSSL teams will

8    get all loans regardless of criteria.

9              That's what was showed to you this morning.  Okay.

10   Mr. Aliano, one of the risk guys, responds.  "All loans

11   regardless of criteria are going to the High-Speed Swim Lane"

12   question mark, question mark, question mark, question mark.

13   That's a risk issue.  Mr. Aliano is doing his job.  Then, the

14   part that the government doesn't show you, after Mr. Aliano

15   raises that question, "Patrick," this is Mr. Barnett.  "I

16   probably should not have been so brief.  It would be inaccurate

17   to say all loans will follow the same process as the current

18   PCAs and CLTV less than 80 percent."  That's what he says.

19             He made a mistake.  That's not fraud.  For the

20   government not to show you that and only the previous ones is a

21   gimmick.  Like most of their arguments is a gimmick.  Like the

22   argument that they wanted two days to go from PC0 to PC2.

23   That's a gimmick.  That's not the time you get an application

24   to funding.  It has to go through PC0, PC1, PC2, PC3, PC4, and

25   then funding.

1          Mr. Gillet's e-mail where they're talking about going

2     from appraisal to CTC.  That's not a measure of going from PC0

3     to PC4.  That doesn't measure turn time.  Turn time is app to

4     funding.  Appraisal to CTC is within that work flow.

5          So for somebody to be saying we got to shorten that

6     time doesn't mean they were looking to shorten everything else.

7     It's misleading.  So, let's keep this -- I'm sorry.  Let's keep

8     this e-mail up here for a second.

9          Mr. O'Donnell is making a recommendation to the entire

10    group as the head of underwriting.  He is a subject matter

11    expert.  A senior one.  There were others, Brent, Aliano,

12    Jaraba.  These were the people within the company whose job it

13    was to check and monitor quality.  Of course, it was Rebecca's

14    job to focus on quality as well.  But there was a separate

15    organization that was specifically there to focus on quality.

16    None of those individuals objected to the rollout of the

17    High-Speed Swim Lane pilot or Central Fulfillment.

18          As for Ms. Mairone, she checked with them every step

19    of the way.  And why would you consult with the risk guys if

20    you wanted to commit a fraud?  Doesn't make sense.  Why would

21    she have all these conversations, all these e-mails?  Doesn't

22    make sense.  Doesn't add up.  Why is she saying in this e-mail,

23    you know the e-mail where Cliff and Ed's comments are in blue.

24    You know that e-mail.  That's an e-mail when Rebecca is seeking

25    Ed and Cliff's input on all of the issues regarding the design

1    of the High-Speed Swim Lane.  What do they say?  In blue.  "I

2    am okay with the suspension for 90 days for certain elements of

3    the QoG.  We should keep those tied to key areas such as

4    responsible lending, fraud, affordability and collateral."

5    Well, that's what happened.  No one took out the fraud program.

6    That was still there.

7              Flash forward a month.  This is Mr. Aliano on

8    August 31.  Rebecca's on it.  Aliano's one of the risk guys.

9    It is another instance of collaboration, of talking about the

10   various risks that could come up.  He says "I'm okay with Fast

11   Track being included into HSSL since that's exactly the type of

12   product it's designed for."  Then it says "Fast and Easy

13   appraisal waivers equals fast close."

14             We've heard a little bit about Fast and Easy.

15   Mr. Aliano, the risk guy, is saying he's okay with Fast Track

16   going into the High-Speed Swim Lane.

17             That type of discussion and debate as to what should

18   be in, what should be out, what's the appropriate turn time, is

19   it 15 days or 24 days, is the normal nature of business and

20   discussion.  It is inconsistent with anybody committing or

21   trying to commit a fraud.

22             The government argued this morning that there were bad

23   QA results from the pilot.  They argue that, or they want you

24   to think that Rebecca and others should have stopped the pilot

25   at that point in time.  The government wants you to believe

DAM3BAN5                    Summation - Mr. Hefter

1    that Ms. Mairone was advised that the rollout into Central

2    Fulfillment was ill-advised.  That's just false.  Let's look at

3    that.

4         All right.  So this is on September 21.  September 21.

5    This is a week and a half before the rollout of Central

6    Fulfillment on October 1st.  This is from Loren Rodriguez to a

7    group of people, a large group of people, including Rebecca,

8    Cliff, Ed, Cheri Shine.  "As you know, we have a session with

9    Greg on Tuesday to review Central Fulfillment.  There is also a

10   prep session with Rebecca, Cliff, Cheri, and Ed midday Monday

11   to review where we are."

12        All of them discussed it.  Why would you be having all

13   these meetings out in the open with 15, 20 people if you were

14   trying to commit a fraud?  No one was behind closed doors and

15   back rooms trying to sell bad loans here.  This was all out in

16   the open.  Out in the sunshine.  Or if you were Rebecca,

17   working at 1 o'clock in the morning, the middle of the night,

18   worried about quality.

19        And nobody, there is not a single piece of evidence in

20   this case, testimony or e-mail, in which she was advised that

21   the rollout would lead to the sale of riskier loans to the

22   GSEs.  That she was advised.  What was going through her mind.

23   That is the only thing that matters with respect to Rebecca.

24   No one knows what's going through her mind.  We don't have a

25   magic machine that can do that.  We're not psychics.  But we

1     can look at all this evidence and say there is no way that she

2     had an intent to defraud and harm Fannie Mae and Freddie Mac

3     based on all this evidence.

4             Let's look at Mr. O'Donnell.  November 13, 2007,

5     Central Fulfillment is six weeks old at this point in time.

6     And he does a presentation with Rebecca and Wade Comeaux about

7     the new fulfillment model.  If you objected so much, if you

8     found it was so offensive that you gave your conditional

9     approval to the pilot, why put your name on a presentation?

10    You don't like it?  You don't put your name on it.  But he did.

11    It shows you at the time he was in favor of it.

12            Right then and there, in Mr. O'Donnell's and

13    Ms. Mairone's presentation, key target goals in today's

14    challenging environment.  Yes.  Increased philosophy target 24

15    days turn time.  App to fund.  24 days.  They intended to rush

16    the process?  Improve efficiency.

17            This is a good one.  You probably can't read it.  I

18    can't read it either, but it's something like 55 to 65 percent

19    fund re.  What does that mean?  That's the app to fund re.

20    That means they didn't intend to fund 100 percent of the

21    applications they got.  They just wanted to get to 50 to

22    60 percent.

23            If you were trying to sell bad loans to GSEs, if you

24    were trying to commit a fraud, why not sell 100 percent of the

25    applications?  Don't do anything.  There is no fraud.

1          Maintain quality.  It is a balance, ladies and

2     gentlemen.  That's what the mortgage business is.  It is a

3     balance, and they were all focused on it, and Rebecca was

4     focused on it, importantly.

5          What about the QA results from the pilot.  Okay, those

6     weren't that good.  We heard about this sort of debate.  About

7     whether QA means QC, QC means SUS.  QA means SUS.  It is all

8     confusing.

9          But all the witnesses, including Mr. O'Donnell at the

10    time, believed the QA process, the prefunding QA process

11    measured process steps.  So let's look at this.  This is the

12    PC3 review.

13         In virtually all of these findings, meant that there

14    was not a piece of paper in the virtual loan file.  It didn't

15    mean it didn't exist.  It is a double negative, I think.  It

16    didn't mean -- it didn't mean that they did not have an

17    appraisal.  Someone put it in the wrong file.  That's what

18    those find.  Ms. Mairone testified she was concerned about one

19    of the aspects of it.  14 findings related to appraisal review

20    does not support value.  She testified about that.  That is

21    what she was concerned about.  1.76.

22         We know that Michael Burns, who reports to Michael

23    Thomas, said in March that the leading cause of the findings

24    was document not in VLF.  Document in wrong location.  Document

25    in correct location, but the auditor made an error.  Document

1    not in VLF.  We don't need to debate this here.  But what we do

2    need to think about is that in her mind, as she was thinking

3    about rolling out the High-Speed Swim Lane, when she was

4    thinking about Central Fulfillment, in her mind, she believed

5    these results measured process.  And she was proven right when

6    Michael Burns said, months later, that they did measure process

7    and these things did not relate to items that could lead to a

8    SUS.

9          What does Mr. O'Donnell say?  I've already said that

10   so I am going to gloss over this.  But he does say at the time

11   in March of 2008 the QA reviews have been heavily focused on

12   process steps.  That's Mr. O'Donnell saying it.  Everybody

13   agreed with him.

14         So now he stands in court and states under oath that

15   the QA results measured investment quality.  No one at the time

16   believed that to be the case.  And in fact, no one,

17   Mr. O'Donnell, not Mr. Thomas, not Mr. Boland, not Mr. Price,

18   stood up and said we should stop the rollout of the High-Speed

19   Swim Lane into Central Fulfillment.  No one.  That was after

20   the initial High-Speed Swim Lane results came out.

21         Now, the government seizes on a single e-mail.  A

22   single e-mail that Ms. Mairone sent out in November 29.  It is

23   the crux of their case.  Ah-ha.  It is a theory in search of

24   evidence and we've combed the file and we found the hot

25   document.  The November 29 e-mail.

1            I want to talk about that.  Because the notion that

2    Ms. Mairone hid anything, concealed anything, attempted to

3    commit a fraud, was part of the fraud as a result of the

4    November 29 e-mail is false.  We've proved it to be false.  She

5    did not intend that e-mail to be part of a fraud, to conceal

6    anything, to make sure that QA reports weren't being studied,

7    to lock the QA reports in her drawer so they would never be

8    seen by anybody.  It's just false.  We know that.  All right.

9            So, I have a timeline here.  I'm not going to go

10   through every single piece of the timeline, but it shows

11   specifically the reasons for the November 29 e-mail.  That she

12   met with Greg Lumsden and Cliff Kitashima, and they determined

13   that she would be tasked with sending out the e-mail because

14   the QA reports had become a distraction at the line level and

15   they were confusing.  And Scott Bridges, the head of sales,

16   says that people are getting bombarded.  We need to fix it.

17   That's 11/16.

18           11/28 meeting with Lumsden, Kitashima and Mairone.

19   Mairone's e-mail.

20           On December 4, however, weekly QA/QC meetings are

21   established.  Reports to be published in advance.

22           We know, ladies and gentlemen, that the reports were

23   sent out, they were sent to Mr. Kitashima, they were sent

24   outside of Central Fulfillment.  They were sent to everybody

25   who were in the credit quality and risk.  They were studying it

1    at the time.  And Rebecca was taking a leading role.  She said

2    I want a SWAT team.  I want to figure out what the SUSs are.

3    We must do everything on income reasonability.  I am going to

4    show you that here.  That is not consistent with somebody who

5    was trying to commit a fraud.  Somebody who was trying to or

6    intending to harm or deceive anybody.  That's consistent with

7    legitimate behavior of a businessperson who tried to get to the

8    bottom of an issue.

9            What does Mr. O'Donnell say about it?  Can we pull it

10   up?  This is on December 4.  He's sending this to Mr. Jaraba,

11   Brent, and the risk guys.  He's saying QA risk management and

12   compliance related issues findings will be communicated only at

13   the MD level for Central Fulfillment to avoid any distractions

14   to line employees or line management.

15           Everybody believed the employees were distracted at

16   the time.  They were trying to figure out how best to

17   communicate with them.  So let's keep on going.

18           At her direction, at Rebecca's direction on the 7th,

19   QA daily reports are sent out and consolidated in manageable

20   format.  Consolidated QA reports are sent to her, and other

21   members of risk/compliance.  These reports weren't put in a

22   drawer.  These reports weren't hidden from people.  They were

23   studied.

24           Keep on going.  Rebecca requests that she wants the

25   four key findings.  She didn't care about quality?  Why is she

1   asking Mr. Brent to go out and get the four key findings.  And

2   ladies and gentlemen, you have all these documents.  Or you

3   will have them.

4           She has a meeting on the 11th with Cliff and Ed,

5   Javier and Steve.  What is the purpose of that meeting? You're

6   trying to commit a fraud by hiding the QA results, why do you

7   have a meeting with the key risk people?  They're trying to do

8   the right thing.

9           This is a key one.  Can I have that.  On the 11th,

10  Rebecca asks for a report that details the five top six-ish SUS

11  findings that can be aligned with the findings from the QA

12  reviews.  She's asking for that.  What she's saying is okay, we

13  have all these QA results, which are the important ones that

14  might lead to a bad loan.  Some are noise, some are not.  I

15  want to find out.  That's what she's saying.

16          She says put together a newsletter-ish document Myth

17  Busters that would address process and procedures perspective.

18  Rebecca and Cliff agreed to have a SWAT team put together with

19  representatives of tech, process engineering, FSL, risk

20  management, compliance, QAC, FSL, training, etc. to address the

21  top six issues relating to credit quality.

22          Who does that if you want to commit a fraud?  Who does

23  that if you want to intend to deceive and harm somebody?  You

24  don't.  They were trying to get to the bottom of what all these

25  results meant in a very turbulent time.  Very turbulent time.

1          The government points out to you this morning that in

2    connection with an e-mail that Steve Brent sent to Wade,

3    Rebecca says let's discuss offline.  And they say when someone

4    says let's discuss offline in an e-mail, they draw the

5    conclusion, the government draws the conclusion that it was

6    intended to jeopardize quality?  How many people say let's

7    discuss this offline.  I don't know how they can draw that

8    inference.  It is impossible to draw that inference from that,

9    let's discuss offline.

10         Then, she sends a recap of the meeting to Comeaux,

11   Price, White, and Massie.  For our QA meeting tomorrow.

12   Another meeting to discuss QA.  Out in the open.  Rebecca tells

13   them to develop short and longer term solutions for key QA

14   findings.  Why is she doing that?  Because she cares about

15   quality.

16         On the 17th, weekly corporate QC findings are sent to

17   over 40 people.  Was there ever an intent to hide those

18   reports?

19         The documents speak for themselves, ladies and

20   gentlemen.  The government's assertions here do not fit the

21   evidence.

22         Then, she tells all of her people we must document

23   (answer the six questions) for all stated loans.  She's

24   directing her team we must document for all stated loans.  At

25   this point Price, Sallis, and White are reporting up through

her.  She's telling them in Central Fulfillment, they must tell

their teams to document all stated loans.  That was going

through her mind.  Not anybody else's mind.  Not Jim White or

Ron Gillet down in Richardson, Texas or anybody in Chandler.

Talking about poker tournaments or anything like that.

          Which all related to, by the way, the poker

tournaments all related to the sprint incentive, and there is

no evidence in the record that Rebecca had anything to do with

the sprint incentive.  They don't tell you that.

          Then she says on the same day, in another e-mail, "Our

job is to document correctly.  That is what the investors are

looking for."

          If you don't care about the investors or Fannie Mae

and Freddie Mac for the most part, at this point in time why

would you say we need to document, that's what our investors

are looking for.  Think about it.  What's going through her

mind?

          I forgot to mention, one of these documents, it's

around 1 o'clock in the morning.  1 o'clock in the morning

she's sending an e-mail, one of these e-mails out in the dead

of night.  Caring about quality.

          Quality had become a joke?  That's what I heard the

government say?

          This entire timeline of QA summit in Richardson,

Texas.  The government criticizes her because she wasn't there.

1    Well, we know the truth.  It was her daughter's birthday.

2    That's not fraud.  This negates fraud and any inference of it.

3              Let's take a look at PX 120 if I can quickly get that.

4    The government showed you this document.  I don't have it on

5    the screen.  This is from Wade to Rebecca:  FYI, LSs have been

6    receiving no QoG feedback for months.  We also have no

7    organized detail on SUS findings per LS or OM.

8              They showed that to you.  What they don't show you is

9    Wade saying:  Rebecca, we are now, after months of pushing for

10   it, receiving QA data on LS level.

11             After months of pushing for it.  We.  After months of

12   pushing for it.  They didn't show you that part of the

13   document.

14             Now, we also heard about controls in the system.  That

15   was incredibly important to Rebecca.  You have seen this

16   before.  And with due apologies to Mr. Sullivan, we had some

17   interaction here, so I just had to use it.  All these people

18   who now are part of the Central Fulfillment management team

19   came out of Ed O'Donnell's organization.  Look at what they

20   are.  They're majority -- I was about to say all, but that

21   would be wrong.  Majority of them are underwriters prior to

22   Central Fulfillment, especially White, Sallis, and Price.  The

23   senior guys.

24             So when they built the system, think about what's

25   going through her mind.  When they built the system, they took

1    the underwriters who reported up through Mr. O'Donnell, and

2    they put them in charge of the whole organization.  How is that

3    increasing risk?  That was responsible.

4         And you notice something, which is an important point.

5    None of these people reported to Lloyd Sergeant.  He was the

6    sales guy.  He was the real sales guy and he continued to

7    manage the sales organization.  Production is not sales.  It's

8    different.

9         Now, I had to bring this out.  I urge you when you are

10   in the jury room to study this chart and the rhombuses and the

11   triangles and the like.  Because if you look at the specific

12   steps that every single loan had to go through and how they

13   built this, you cannot draw any inference that anybody wanted

14   to deceive or harm anybody.  By building it this way, negates

15   an inference of Rebecca's intent.

16        You also saw this.  August 27, deployment risk and

17   mitigation steps.  Why would you need mitigation steps if you

18   were attempting to commit a fraud and you didn't care about

19   quality?  That's what they were thinking about.

20        We've seen the training matrix.  You've seen the CF

21   authority matrix.  All of these things were built to control

22   for the inherent risk of running a mortgage business.  The

23   inherent risk of running a mortgage business.  And as the head

24   of Central Fulfillment, she was involved in all of these steps

25   to control that risk.  Who would perpetrate a fraud this way?

1              So what happened when the market dramatically changed

2       in 2007?  How did FSL respond?  They responded in many ways.

3       And there are many PowerPoint presentations that you will have

4       at your disposal that show it.  Again, ask yourself, why would

5       you put all these things in PowerPoint presentations of all the

6       things you are doing to correct things that were challenging

7       your quality if you were trying to hide something.  You

8       wouldn't.

9              And this time, Mr. Sullivan actually had a better

10      chart because he had it all organized.  But as the head of

11      Central Fulfillment, Ms. Mairone was involved in everything

12      relating to the remedial measures that were put in place at CF.

13             Before I close, your Honor, and ladies and gentlemen,

14      I do want to hit just very quickly, two things.  One is, the

15      concept that Rebecca's involvement with NCA had anything to do

16      with the High-Speed Swim Lane.  The government points to one

17      document where somebody in one of the NCA processing centers

18      did something wrong.  If you study the dates and you study

19      Rebecca's testimony, she had nothing to do with NCA at the

20      time.  So for the government to pick out one document where one

21      person who ultimately was disciplined and then to draw this

22      broad conclusion that everybody involved with NCA over all of

23      time somehow is tainted with that is unfair.

24             I would also say, the second point is, this whole

25      notion about slide removal.  The evidence is clear that

1    whatever Mr. O'Donnell is making up about Ms. Mairone

2    instructing him to remove slides is false.  Because we showed

3    him the final -- here we go.  This is the document the

4    government used with him.  It's not.  Is this the final?  Thank

5    you.

6            This is the final version that was provided to Drew

7    Gissinger.  Mr. Kitashima confirmed it.  This was the final

8    version.  It is not the one that Mr. O'Donnell believes was

9    provided to Mr. Gissinger on that date.  And you can see on

10   page five, quality control update was provided.  Page six,

11   quality control update.  Page seven.  FSLD quality assurance on

12   page 17.

13           There was never, ever, any instruction by Rebecca to

14   remove slides.  It is made up.

15           Now I noticed that I don't have the five-minute

16   warning yet, but I'm going to start with my finale.

17           THE COURT:  Well, you beat me to the punch.

18           MR. HEFTER:  Thank you, your Honor.

19           Ladies and gentlemen, my time is up now.  When you go

20   back to deliberate, did you hear any evidence that Rebecca

21   wanted to hurt or harm Fannie or Freddie?  You can tell by her

22   testimony that she is a determined and she was a focused

23   executive.  You saw that when she wanted compliance and loan

24   quality to be a foundation at FSL.

25           Now we are far away from Pasadena, California in this

1    courtroom.  You've not seen a single document or heard from a

2    witness saying that Rebecca was trying to trick anyone or hide

3    anything.  The intent to defraud, the bad intent, is just not

4    there.  There is nothing, no piece of evidence from which you

5    can draw any conclusion that in her mind she thought that she

6    was acting to harm or deceive Fannie or Freddie.

7         The case is brought in the name of the United States

8    of America.  And these lawyers work at the Justice Department.

9    And in the Justice Department, there are the words in the

10   rotunda "The United States wins its case whenever justice is

11   done one of its citizens in the courts."

12        Ladies and gentlemen, if you do justice and return a

13   defense verdict for Rebecca, the United States will win.  It

14   will win because she will be free, one of its citizens will be

15   freed from these unjust and unfair charges.  And ladies and

16   gentlemen, the laws of this country give you that power.  Use

17   that power to free Rebecca of these charges.  Hold the

18   government's feet to the fire.  Ask them why their witnesses

19   had no specifics.  Ask yourselves why did those witnesses say

20   one thing then and another thing now.  Ask them why not a

21   single witness could testify that Rebecca acted improperly.

22        Remember her words and conduct now.  She was there in

23   good faith for productivity, client satisfaction, and quality.

24   We are the last voice you'll hear for Rebecca before you

25   deliberate.  We have no rebuttal.  The government does.  When

1    you hear their rebuttal, just ask yourself what would I say in

2    response to their rebuttal.

3                Rebecca, it's been has been honor to represent you.

4                Six years ago she tried as hard as she could in

5    perfectly good faith to fix whatever problems that her

6    colleagues and bosses threw at her.  She didn't do anything to

7    defraud.  Now she finds herself in this terrible spot.  Only

8    you can free her from it.

9                I ask you, ladies and gentlemen, please do so in the

10   name of fairness and justice and return a verdict of not liable

11   for Ms. Mairone.  I thank you.

12               THE COURT:  Thank you very much.  We will take another

13   10 minute break.

14               (Jury excused)

15               THE COURT:  I noticed that with his usual sense of

16   perfect timing, the U.S. attorney entered the courtroom just as

17   we were taking a break.

18               Anyway, anything counsel needs to raise with the

19   Court?  We'll see you in 10 minutes.

20               (Recess)

21               (Continued on next page)

22

23

24

25

1            (Jury present)

2            THE COURT:  Ladies and gentlemen, the government,

3       because it has the burden of proof, is given a brief 20-minute

4       rebuttal.

5            Counsel.

6            MR. CORDARO:  Good afternoon, ladies and gentlemen.  I

7       know you have been sitting here a long time today and I want to

8       thank you for your attention today and throughout this trial.

9       You have put your lives on hold for quite some time and we are

10      all grateful.

11           Ladies and gentlemen of the jury, let's get back to

12      what this case is really all about.  This case is about lies.

13      This case is about deception.  This case is about the Hustle.

14      This case is about lies that Countrywide told Fannie Mae and

15      Freddie Mac about the quality of their loans.  You saw the

16      misrepresentations.  You saw the promises and the contracts.

17      Those lies are fraud.  That's the kernel of the case here.

18           The evidence is overwhelming that the defendants put

19      into place a loan origination process that was designed to push

20      loans through at high speed.  Their own documents use those

21      terms, straight through at high speed.  The evidence is

22      overwhelming, they knew that the loans that were going through

23      that process were poor quality loans.  And the evidence is

24      overwhelming that, despite that knowledge, they sold those

25      loans to Fannie Mae and Freddie Mac with lies that the loans

1    were investment quality.  That is fraud.

2         Mr. Sullivan made an allusion to Alice in Wonderland,

3    suggesting that the government is not dealing in reality here.

4    Well, in the real world, fraud is illegal.  Let me tell you

5    what is happening in the real world here.  The High-Speed Swim

6    Lane, emphasis on speed and volume, removal of quality

7    checkpoint, removal of underwriters, faster turn times, turn

8    time bonuses, funding quota, funding bonuses, terrible QA

9    reports, terrible QC reports, suspension of quality and grade,

10   sprint incentive, poker run, horse racing, that's all reality.

11   That's not fantasy.  It's in the evidence.  And one more

12   reality, the lies that the defendants told Fannie Mae and

13   Freddie Mac about the quality of those loans.  That is the

14   brick wall that Mr. Sullivan was referring to.  But it's not

15   government's case that hits that brick wall, it's the

16   defendant's.

17        Ladies and gentlemen, counsel for the defense talked

18   about men and women working hard.  The government does not

19   dispute that.  We're not disputing that Desirae Flores and

20   people like her worked hard.  But that's a distraction.  It's a

21   distraction designed to deflect your attention from the

22   evidence.  It's a distraction designed to deflect your

23   attention from the people who participated in this fraud,

24   people like Ms. Mairone and Mr. Lumsden and Mr. Kitashima who

25   knew about the fraud and acted with intent and pushed forward

1    anyway.  People like Ms. Flores, they were pawns in the

2    process.  They were part of a culture that pushed funding,

3    funding, funding.

4          We're not saying that Desirae Flores committed fraud,

5    but the bank did.  We're not saying that Desirae Flores or

6    people like her or people who were eating Bloomin' Onions in

7    Outback knew about the misrepresentations that the defendants

8    were making to Fannie Mae and Freddie Mac.  But Rebecca Mairone

9    did.  That's the fraud.

10         You heard a lot of discussion about loan specialists

11   and their qualifications.  And we heard a lot of talk about how

12   loan specialists were former underwriters.  So I put a question

13   to you, if it's so great that some loan specialists were former

14   underwriters, why remove them from the process in the first

15   place?  Why kick them out of the process for CLUES accept

16   loans?  Underwriters are the guardians of quality.  Apparently

17   their presence was not wanted in the High-Speed Swim Lane for

18   CLUES accept loans.

19         And if the loan specialists were so qualified, why did

20   Ms. Mairone have to suspend the Quality of Grade?  Why did she

21   have to extend that reprieve for six months?  If they were so

22   qualified, why did some of them have to grandfathered into

23   their level one authority, as Mr. Thomas discussed?  If they

24   were so qualified, why did the high risk QA findings on Hustle

25   loans reach 98 percent?  If they were so qualified, why

DAMTBAN6                    Rebuttal summation - Mr. Cordaro

1    decrease the number of file reviews they had to go through to

2    get their level two authority?  And finally, if the loans

3    specialists were so qualified, why, at the end of the process,

4    when the quality had gone down the drain and Drew Gissinger

5    exploded, did they bring back the underwriters?  They want to

6    take credit for that.  But they don't get a free pass for the

7    nine months that they had been selling loans to Fannie Mae and

8    Freddie Mac with lies about their quality.  That is fraud.

9            We've head heard quite a bit about QA.  Mr. Hefter in

10   his closing statement himself admitted:  Wasn't that good.

11   They know it's not that good.  In fact, it's worse than not

12   that good, it's terrible.  So what do they do?  They concoct

13   this story that quality assurance is not about quality.  It has

14   nothing to do with quality, it's process.

15           And you saw what happened when Mr. Sullivan tried to

16   construct an analogy for you with the table and the projector,

17   he fell all over it because the analogy made no sense.  He said

18   something about soldering a table.  That sure sounds like it

19   goes to quality to me, because I want my table to be soldered

20   right.  He started talking about cars at GM.  If my car

21   manufacturer was pushing through cars and removing quality

22   checkpoints, that sounds a little more than process, I think

23   that would get to the quality.  And if they were doing quality

24   assurance tests on those cars and they were finding 98 percent

25   severe findings, that sounds a little bit more like quality

1   than process to me.

2          Those chairs you're sitting in were constructed by

3   somebody.  The process to manufacture those chairs has nothing

4   to do with quality?  It's easy for a lawyer standing in the

5   well, tell that to the person sitting in the chair.  Oh, and by

6   the way, what happens if you sell that chair to the person with

7   the representation that the chair is quality and yet you know

8   from your own internal documents that the chairs coming out of

9   that process are garbage?  That's a fraud.  That's a lie.

10         There's been much talk about the QC results.  And what

11  has to be understood about them is that they're unreliable.

12  That document that you keep seeing, Defendant's Exhibit 73, the

13  one that they keep waving like a magic wand hoping that it will

14  make all the other evidence disappear, well, that's after the

15  poker run, after all the incentives, after the focus on the

16  rebuttal of SUSs.  But it's interesting that the number for the

17  first quarter 2008 is still 9.8 percent.  Sounds like they want

18  to take credit for that.

19         Do you remember what Michael Thomas said?  Cliff

20  Kitashima told him the internal standard at Countrywide was

21  four percent.  Four.  This is the final QC number that the

22  defendants are trumping, 9.8 percent.  It's more than twice as

23  much.  And these are loans that are being sold to Fannie Mae

24  and Freddie Mac with lies.

25         Who knew about these lies?  We heard both in the

1    opening statement and again today that this process wasn't

2    taking place behind closed doors, it was out in the open, out

3    in the sunshine.  Really?  Did one witness from Fannie Mae or

4    Freddie Mac tell you that this process was out in the sunshine

5    to them?  Did anybody tell them about this process?  And more

6    to that, the very first witness for the defense, the COO of

7    CFC, Jack Schakett, testified that he didn't know about it.  So

8    how could you believe them when they tell you this process was

9    out in the sunshine?

10          You heard a lot today about what's a Hustle loan and

11   what isn't.  We say there are over 28,000 Hustle loans.  The

12   defendants disagree.  They say it's less.  They wave Michael

13   Thomas' fax at you as if it was some ah-hah document.  It's

14   not.  The government relied on the bank's own data for its

15   definition.  And by the way, that data says that a loan

16   specialist cleared to close the Florida doorman loan, and we

17   have heard a lot in this trial about the role of loan

18   specialists in the High-Speed Swim Lane.

19          But be that as it may, the fraud here is the lie.  The

20   fraud has to do with the quality of the loans.  Even the

21   defense's own expert, Mr. Broeksmit, didn't look at the loans

22   for quality.  He wasn't assigned to look at the loan files for

23   quality.  He pulled a sprint incentive on them.  And why?

24   Well, I guess that's a question for the defendants, but the

25   bottom line is:  Why does anybody bury their head in the sand?

1    Maybe because they're afraid of what they're going to see.

2            Now I would like to talk briefly about Fannie Mae and

3    Freddie Mac.  Even Mr. Battany, called by the defense,

4    testified that if he were aware of anything, anything about the

5    loan to process that negatively affected quality, that would

6    have factored into his pricing decision.  That would have

7    factored into his purchase decision.  Quality.  You have seen

8    the evidence on the High-Speed Swim Lane.  You have seen the QA

9    and QC reports.  Ladies and gentlemen, it's up to you to decide

10   if poor quality loans came out of the High-Speed Swim Lane.

11   We're very confident in what the evidence shows.  Mr. Battany

12   never knew anything about it at the time because no one told

13   him.

14           So the defendants try to take refuge in these other

15   numbers that Fannie and Freddie allegedly claim are industry

16   standards.  Those weren't SUS numbers.  Those weren't

17   investment quality representations.  Remember what the fraud

18   is.  It doesn't matter what Fannie and Freddie knew about other

19   loans from other lenders and other numbers.  This case is about

20   what the defendants were doing, and what they were doing was

21   selling poor quality loans from the Hustle with the lie that

22   they were investment quality, and they knew it, and that's

23   fraud.

24           With respect to Rebecca Mairone, I'm not going to

25   repeat everything that was said by my colleague, Ms. Nawaday,

1    this morning.  I do not have the time.  The bottom line is her

2    counsel would have you believe she was essentially an innocent

3    bystander in all this.  That is ridiculous.  Maybe Ms. Mairone

4    didn't write an email that says:  Hey, everyone, let's commit a

5    fraud.

6            But that's not what the government needs to prove its

7    case.  She knew about this scheme.  She participated in it.

8    She encouraged it.  She was the chief operating officer of the

9    division that spawned it.  She was on the steering committee.

10   She led the kick off meetings and told loan specialists not to

11   worry about the QoG hits they might get for quality mistakes,

12   and she extended the reprieve.  She pushed the funding goals.

13   She ordered the QA communications be directed to her.  She said

14   employees would get no QA feedback until further notice,

15   dispensed with checklists, and she was the one who had the

16   approval over the funding contests.  Bottom line is she and

17   Mr. Lumsden and Mr. Kitashima had the intent, they knew about

18   the scheme, and they didn't stop it, and they didn't tell

19   anyone.  And all the while on her watch, loan after loan after

20   loan after loan being sold to the GSEs, those same

21   misrepresentations, and they made money off of it, about $165

22   million worth.

23           Finally, we get to Ed O'Donnell.  He was attacked by

24   counsel today because he's the whistleblower.  They want you to

25   be upset because he may receive money if the United States

prevails in this lawsuit.  Ladies and gentlemen, I agree you
should be upset.  You should be upset.  But not for the reason
my adversary gave you.  You should be upset that it took Ed
O'Donnell's blowing of the whistle to bring this brazen fraud
to light.  It took Ed O'Donnell to bring this fraud to public
attention, to public scrutiny in this courtroom, a fraud that
Fannie and Freddie didn't know about, and a fraud that CFC's
own COO didn't know about.  You should be upset by the secrecy
that ensured that no one knew about it.

        To the extent the defense is inviting you to become
resentful toward Mr. O'Donnell because he may realize some
money from this lawsuit, I ask you to decline this invitation.
This is a court of law, and it's the law that provides for the
possibility that Mr. O'Donnell might be compensated.

        Mr. Sullivan called his credibility into attack, as
did Mr. Hefter.  Ladies and gentlemen, credibility
determination is yours.  You saw all the witnesses at the
trial.  You saw who was on the level and who was evasive.  You
saw who answered the questions straightforwardly and who gave
carefully rehearsed speeches that went way beyond the question.
And you saw Ed O'Donnell.  Did the defendants muster one single
lie that he told?  And let's not forget about Michael Thomas
who also came forward and testified at this trial.  Ladies and
gentlemen, you saw the witnesses, and we'll leave it to you to
decide who was telling the truth and who wasn't.

1             THE COURT:  Counsel, you have about two minutes.

2             MR. CORDARO:  Thank you.

3             One last thing, the Wade Comeaux email to Ms. Mairone

4    about Mr. O'Donnell, Ms. Mairone's direct report during a time

5    of uncertainty with respect to the Bank of America merger.  And

6    even if you take those comments at face value, it says nothing

7    different from what Mr. O'Donnell was telling you, that

8    Ms. Mairone's leadership was under severe question, and worse

9    than that, Ms. Mairone was a participant in a fraud.

10            Members of the jury, I am almost finished.  Once I sit

11   down, the Court is going to give you final instructions

12   tomorrow and then the case is yours.  You will speak louder

13   with your verdict than any lawyer possibly could.  We will ask

14   you to find that it was wrong for the defendants to commit

15   fraud.  Don't let them fool you.  Don't let them get away with

16   it.  Hold them accountable for their actions and return a

17   verdict for the United States.  Thank you.

18            THE COURT:  Thank you very much.

19            So ladies and gentlemen, you have heard the expression

20   that it ain't over until the fat lady sings.  For these

21   purposes, I'm the fat lady.  And I think we have time to give

22   you my instructions of law today.  I think that would be useful

23   to end the day, and then you could deliberate fresh starting

24   tomorrow.  So I will ask my courtroom deputy to hand out to all

25   the jurors and the court reporter so everyone has copies of my

DAMTBAN6                        Charge

1   instructions.

2          Ladies and gentlemen, we're going to read these

3   together now, and then you will have them to take with you into

4   the jury room and have them throughout your deliberations.  If

5   you turn to the table of contents, you will see the

6   instructions are divided into three parts.  First, there are

7   general instructions.  Those are all about how you go about

8   evaluating the evidence and things like that.  Then there are

9   the instructions on the specific elements of the charge in this

10  case, that's called the liability instructions, and then

11  there's some concluding instructions about how you fill out

12  your verdict form and the like.

13         So let's turn to the first instruction on page one.

14         We are now approaching the most important part of this

15  case, your deliberations.  You have heard all of the evidence

16  in the case, as well as the final arguments of the lawyers for

17  the parties.  Before you retire to deliberate, it is my duty to

18  instruct you as to the law that will govern your deliberations.

19  These are the final and binding instructions, which entirely

20  replace the preliminary instructions I gave you earlier.  As I

21  told you at the start of this case, and as you agreed, it is

22  your duty to accept my instructions of law and apply them to

23  the facts as you determine them.

24         Regardless of any opinion that you may have as to what

25  the law may be or ought to be, it is your sworn duty to follow

1    the law as I give it to you.  Also, if any attorney or other

2    person has stated a legal principle different from any that I

3    state to you in my instructions, it is my instructions that you

4    must follow.

5        Because my instructions cover many points, I have

6    provided each of you with a copy of them not only so that you

7    can follow them as I read them to you now, but also so that you

8    can have them with you for reference throughout your

9    deliberations.  In listening to them now and reviewing them

10   later, you should not single out any particular instruction as

11   alone stating the law, but you should instead consider my

12   instructions as a whole.

13       Your duty is to decide the fact issues in the case and

14   arrive, if you can, at a verdict.  You, the members of the

15   jury, are the sole and exclusive judges of facts.  You pass

16   upon the weight of the evidence; you determine the credibility

17   of the witnesses; you resolve such conflicts as there may be in

18   the testimony; and you draw whatever reasonable inferences you

19   decide to draw from the facts as you determine them.

20       In determining the facts, you must rely upon your own

21   recollection of the evidence.  To aid your recollection, we

22   will send you all the exhibits at the start of your

23   deliberations, and if you need to review particular items of

24   testimony, we can also arrange to provide them to you in

25   transcript or readback form.  But please remember that none of

1    what the lawyers have said in their opening statements and

2    their closing arguments, in their objections, or in their

3    questions, is evidence, nor is anything I may have said

4    evidence.

5         The evidence before you consists of three things: the

6    testimony given by witnesses that was received in evidence, the

7    exhibits that were received in evidence, and the stipulations

8    and formal legal admissions of parties that were received in

9    evidence.

10        Testimony consists of the answers that were given by

11   the witnesses to the questions that were permitted either here

12   in court or in the depositions that were presented.  Please

13   remember that questions, although they may provide the context

14   for answers, are not themselves evidence, only answers are

15   evidence, and you should therefore disregard any question to

16   which I sustained an objection.  Also, you may not consider any

17   answer that I directed you to disregard or that I directed be

18   stricken from the record.  Likewise, you may not consider

19   anything you heard about the contents of any exhibit that was

20   not received in evidence.  Also, you should be careful not to

21   speculate about matters not in evidence.  Rather, your focus

22   should be entirely on assessing the evidence that was

23   presented, and not on speculating about what other evidence, if

24   any, might have been obtained.

25        It is the duty of the attorney for each party of a

1   case to object when the other side offers testimony or other

2   evidence that the attorney believes is not properly admissible

3   or asks a question the attorney believes is inappropriate.

4   Counsel have the right and duty to ask the Court to make

5   rulings of law and to request conferences at the side bar out

6   of the hearing of the jury.  All such questions of law must be

7   decided by me.  You should not show any prejudice against any

8   attorney or party because the attorney objected to a question

9   or to the admissibility of evidence or asked for a conference

10  out of the hearing of the jury or asked me for a ruling on the

11  law.

12          Finally, I ask you to draw no inference from my

13  rulings or from the fact that occasionally I asked questions of

14  certain witnesses.  My rulings were no more than applications

15  of the law, and my questions were only intended for

16  clarification or to expedite matters.  You are expressly to

17  understand that I have no opinion as to the verdict you should

18  render in this case.

19          You are to perform your duty of finding the facts

20  without bias or prejudice or sympathy as to any party, for all

21  parties are equal under the law.  The fact that the plaintiff

22  is the United States of America entitles it to no more or less

23  consideration than that given any other party.  Similarly, the

24  fact that some of the defendants are corporations does not mean

25  they are entitled to any greater or lesser consideration than

1      that given any other party.  All parties, including the

2      government, corporations, and individuals, stand as equals at

3      the bar justice.

4              You are to perform your final duty in an attitude of

5      complete fairness and impartiality.  You are not to be swayed

6      by rhetoric or emotional appeals.  It must be clear to you that

7      if you were to let prejudice or bias or sympathy interfere with

8      your thinking, there would be a risk that you would not arrive

9      at a true and just verdict.  So do not be guided by anything

10     except clear thinking and calm analysis of the evidence.

11             As you know, this is a civil case in which the United

12     States, as plaintiff, is bringing a claim of fraud against

13     several defendants.  The plaintiff, as the party bringing the

14     claim, has what we call the "burden of proof," which is the

15     burden of establishing as to each defendant you are considering

16     each of the essential elements of its claim by preponderance of

17     the credible evidence.

18             The "credible evidence" means such testimony,

19     exhibits, stipulations, or legal admissions that you find

20     worthy of belief.  To establish an element of a claim by a

21     "preponderance" of the credible evidence means to prove that

22     the element is more likely true than not true.  It does not

23     mean the greater number of witnesses, or how much time either

24     side employs in the trial.  The phrase refers to the quality of

25     the evidence, its persuasiveness in convincing you of its

1    truth.

2              In deciding whether the government has met its burden

3    of proof, you may consider both direct evidence and

4    circumstantial evidence.

5              Direct evidence is evidence that proves a disputed

6    fact directly.  For example, where a witness testifies to what

7    he or she saw, heard or observed, that is called direct

8    evidence.

9              Circumstantial evidence is evidence that tends to

10   prove a disputed fact by proof of other facts.  To give a

11   simple example, suppose when you came into the courthouse today

12   the sun was shining and it was a nice day, but the courtroom

13   blinds were drawn and you could not look outside.  Then later,

14   as you were sitting here, someone walked in with a dripping wet

15   umbrella, and soon after someone else walked in with a dripping

16   wet raincoat.  Now, on our assumed facts, you cannot look

17   outside the courtroom and you cannot see whether or not it is

18   raining, so you have no direct evidence of that fact.  But on

19   the combination of the facts about the umbrella and the

20   raincoat, it would be reasonable for you to infer that it had

21   begun raining.

22             That is all there is to circumstantial evidence.

23   Using your reason and experience, you infer from established

24   facts the existence or non-existence of some other fact.

25   Please note, however, it is not a matter of speculation or

1    guess, it is a matter of logical inference.

2            The law makes no distinction between direct and

3    circumstantial evidence.  Circumstantial evidence is of no less

4    value than direct evidence, and you may consider either or

5    both, and may give them such weight as you conclude is

6    warranted.

7            It must be clear to you by now that counsel for the

8    opposing parties are asking you to draw very different

9    conclusions about various factual issues in the case.  An

10   important part of that decision will involve making judgments

11   about the testimony of the witnesses you have listened to and

12   observed.  In making these judgments, you should carefully

13   scrutinize all the testimony of each witness, the circumstances

14   under which each witness testified, and any other matter in

15   evidence that may help you decide the truth and importance of

16   each witness's testimony.

17           Your decision whether or not to believe a witness may

18   depend on how that witness impressed you.  How did the witness

19   appear to you?  Was the witness candid, frank and forthright;

20   or did the witness seem to be evasive or suspect in some way?

21   How did the way a witness testified on direct examination

22   compare with how the witness testified on cross-examination?

23   Was the witness consistent, or contradictory?  Did the witness

24   appear to know what he or she was talking about?  Did the

25   witness strike you as someone who was trying to report his or

1    her knowledge accurately?  These are examples of the kinds of

2    common sense questions you should ask yourselves in deciding

3    whether a witness is or is not truthful.

4            How much you choose to believe a witness may also be

5    influenced by the witness's bias.  Does the witness have a

6    relationship with any of the parties that may affect how he or

7    she testified?  Does the witness have some interest, incentive,

8    loyalty, or motive that might cause him or her to shade the

9    truth?  Does the witness have some bias, prejudice or hostility

10   that may cause the witness to give you something other than a

11   completely accurate account of the facts he or she testified

12   to?

13           You should also consider whether the witness had an

14   opportunity to observe the facts he or she testified about, and

15   whether the witness's recollection of the facts stands up in

16   light of the other evidence in the case.

17           In other words, what you must try to do in deciding

18   credibility is to size up a person just as you would in any

19   important matter where you were trying to decide if a person is

20   truthful, straightforward and accurate in his or her

21   recollection.

22           The law permits parties to offer opinion testimony

23   from witnesses who were not involved in the underlying events

24   of the case but who, by education or experience, have expertise

25   in a specialized area of knowledge.  In this case, Charles

3466

DAMTBAN6                        Charge

1     Cowan and Ira Holt were offered as such witnesses by the

2     government, while Robert Broeksmit was offered as such a

3     witness by the defendants.  Specialized testimony is presented

4     to you on the theory that someone who is learned in the field

5     may be able to assist you in understanding the specialized

6     aspects of the evidence.

7          However, your role in judging credibility and

8     assessing weight applies just as much to these witnesses as to

9     other witnesses.  When you consider the specialized opinions

10    that were received in evidence in this case, you may give them

11    as much or as little weight as you think they deserve.  For

12    example, a specialized witness necessarily bases his or her

13    opinions, in part or in whole, on what the witness learned from

14    others, and you may conclude the weight given the witness's

15    opinions may be affected by how accurate or inaccurate that

16    underlying information is.  More generally, if you find that

17    the opinions of specialized witnesses were not based on

18    sufficient data, education or experience, or if you should

19    conclude that the trustworthiness or credibility of such a

20    witness is questionable, or if the opinion of the witness is

21    outweighed in your judgment by the other evidence in the case,

22    then you may, if you wish, disregard the opinions of that

23    witness, either entirely or in part.  On the other hand, if you

24    find that a specialized witness is credible, and the witness's

25    opinions are based on sufficient data, education, and

1    experience, and that other evidence does not give you reason to

2    doubt the witness's conclusions, you may, if you wish, rely on

3    that witness's opinions and give them whatever weight you deem

4    appropriate.

5         Applying the general principles that I have just

6    discussed, you must now determine, in accordance with my

7    instructions, whether the government has established its claim

8    of fraud against any or all of the defendants by preponderance

9    of the credible evidence.  This is known as establishing

10   "liability."  I remind you that if liability is found as to any

11   defendant, the issue of monetary penalties, if any are to be

12   imposed, is an issue for the Court, not the jury.

13        Although there are three bank defendants here,

14   Countrywide Home Loans, Inc., Countrywide Bank, FSB, and Bank

15   of America, NA, you may treat them as one for your purposes,

16   because Bank of America, NA is the successor to Countrywide

17   Bank, FSB, which in turn took over responsibility for

18   residential loan origination from Countrywide Home Loans, Inc.

19   I shall therefore refer to them jointly as "Bank Defendants."

20        Separately, however, the government also assets its

21   claim against an individual, Rebecca Mairone.  The claim

22   against Ms. Mairone must be decided solely on the evidence that

23   relates to her.  In that regard, you will recall that certain

24   evidence was received with regard to the Bank Defendants but

25   not as to Ms. Mairone, and therefore, you cannot consider such

1    evidence as to her.

2              To establish its fraud claim against the Bank

3    Defendants, Ms. Mairone or both, the government must establish,

4    by a preponderance of the credible evidence, each of three

5    elements:

6              First, that there existed a scheme to defraud Fannie

7    Mae and/or Freddie Mac of money or property by means of false

8    or fraudulent pretenses, representations or promises;

9              Second, that the defendant you are considering

10   participated in the scheme to defraud with knowledge of its

11   fraudulent nature and with a specific intent to defraud;

12             Third, that in the execution of the scheme to defraud,

13   at least one use was made of the U.S. mails or of interstate

14   wire communications.

15             We will consider these three elements in turn.

16             As to the first element, a "scheme to defraud" is a

17   plan or design to obtain money or property by means of one or

18   more false or misleading statements of a material fact.  A

19   statement is false if it is an outright lie.  It is misleading

20   if it is true as far as it goes but creates a false impression

21   by omitting information necessary to correct the false

22   impression.  A statement is "material" if it relates to a fact

23   that a reasonably prudent person would consider important in

24   making a decision.

25             Here, specifically, the government alleges, and the

1    defendants deny, that one or more of the defendants devised a

2    scheme to induce Fannie Mae and/or Freddie Mac to purchase

3    mortgage loans originated through the High-Speed Swim Lane by

4    misrepresenting that the loans were of higher quality than they

5    actually were.  The government further alleges that these

6    misrepresentations were material because a reasonably prudent

7    person participating in the decision of whether to purchase

8    mortgage loans at Fannie Mae or Freddie Mac would have

9    considered the true facts important in deciding whether to

10   purchase or how to price the loans.

11          Incidentally, the fact that some of these alleged

12   misrepresentations may have constituted breaches of the

13   contracts between the Bank Defendants and Fannie Mae or Freddie

14   Mac is neither here nor there, your focus should be on whether

15   there was a scheme to defraud.

16          While the government must prove that the scheme to

17   defraud Fannie Mae or Freddie Mac existed, the government is

18   not required to prove that the scheme to defraud actually

19   succeeded, that a given defendant personally benefited from the

20   scheme to defraud, that Fannie Mae or Freddie Mac actually

21   suffered any loss as a result of the scheme to defraud, or that

22   Fannie Mae or Freddie Mac were themselves free from fault.

23          As to the second element, that the defendant you are

24   considering participated at some point in the scheme knowingly

25   and with a specific intent to defraud, to act "knowingly" means

1    to act consciously and deliberately rather than mistakenly or

2    inadvertently, but in this context it also means that the

3    defendant had knowledge that the defendant was participating in

4    a fraudulent scheme.  It is not enough that the defendant you

5    are considering may have participated in a fraudulent scheme

6    carelessly, negligently, or otherwise unknowingly.  Similarly,

7    to act with a specific intent to defraud requires that the

8    given defendant you are considering purposely intended to

9    deceive and harm either Fannie Mae or Freddie Mac or both by

10   seeking to sell them mortgage loans or by seeking to affect the

11   pricing of those loans through false or misleading

12   representations.

13           As to the Bank Defendants, such an intent can be

14   imputed to them if, but only if, at least one of three

15   managerial persons, Rebecca Mairone, Clifford Kitashima or Greg

16   Lumsden, participated in such a fraudulent scheme with such

17   intent.  Ms. Mairone, however, can be found personally liable

18   only if she personally participated in such a fraudulent scheme

19   with such intent.

20           As to the third element, that in the execution of the

21   scheme to defraud at least one use was made of the U.S. mails

22   or of interstate wire communication, such interstate

23   communication includes, among other things, telephone calls and

24   emails that travel between two states.  It is not necessary

25   that the interstate wire communication or use of the mails

1    itself contain a fraudulent representation; rather, it is

2    sufficient if it was used to further or assist in carrying out

3    the scheme to defraud.  Also, to "cause" the use of the mail or

4    interstate wire communication, it is not necessary for a given

5    defendant to be directly or personally involved in sending the

6    mail or interstate communication, as long as the communication

7    was reasonably foreseeable in the execution of the scheme to

8    defraud.

9            You will shortly retire to the jury room to begin your

10   deliberations.  As soon as you get to the jury room, please

11   select one of your number as the foreperson to preside over

12   your deliberations and to serve as your spokesperson if you

13   need to communicate with the Court.

14           You will be bringing with you into the jury room a

15   copy of my instructions of law, and a verdict form on which to

16   record your verdict.

17           Let me pause there, ladies and gentlemen, and show you

18   the verdict form.  It's a very simple, one-page document, and

19   it asks you just two questions, whether the Bank Defendants are

20   liable or not liable, and whether Ms. Mairone is liable or not

21   liable.  You will check the appropriate box, and then whoever

22   is your foreperson will sign it, date it, seal it in this

23   envelope very cleverly marked "Verdict," and that will be

24   brought to me by the marshal, and I will not open it until you

25   come back into the courtroom, and then we will open it and I

1    will ask each of you individually if that is your verdict.  And

2    the reason we go through all those formalities is to be

3    absolutely sure we have your verdict as you decided.

4            Let's go back to the instructions.

5            In addition, we will send into the jury room all of

6    the exhibits that were admitted into evidence, along with

7    indices to the exhibits.  If you want to see any of the video

8    depositions replayed, let us know and we will bring you back to

9    the courtroom for that purpose.  If you want any of the other

10   testimony, that can also be provided in transcript or readback

11   form, but please remember that it is not always easy to locate

12   what you might want, so be as specific as you possibly can in

13   requesting portions of testimony.

14           Any of your questions, in fact any communication with

15   the Court, should be made to me in writing signed by your

16   foreperson and given to the marshal who will be available

17   outside the jury room throughout your deliberations.  After

18   consulting with counsel, I will respond to any question or

19   request you have as promptly as possible, either in writing or

20   by having you return to the courtroom so that I can speak with

21   you in person.

22           You should not, however, tell me or anyone else how

23   the jury stands on any issue until you have reached your

24   verdict and recorded it on your verdict form.

25           Each of you must decide the case for yourself after

1    consideration with your fellow jurors of the evidence in the

2    case, and your verdict must be unanimous.  In deliberating,

3    bear in mind that while each juror is entitled to his or her

4    opinion, each should exchange views with his or her fellow

5    jurors.  That is the very purpose of jury deliberation, to

6    discuss and consider the evidence, to listen to the arguments

7    of fellow jurors, to present your individual views, to consult

8    with one another, and to reach a verdict based solely and

9    wholly on the evidence.

10         If, after carefully considering all the evidence and

11   the arguments of your fellow jurors, you entertain a

12   conscientious view that differs from the others, you are not to

13   yield your view simply because you are outnumbered.  On the

14   other hand, you should not hesitate to change or modify an

15   earlier opinion which, after discussion with your fellow

16   jurors, now appears to you to be erroneous.

17         In short, your verdict must reflect your individual

18   views and must also be unanimous.

19         This completes my instructions of law.

20         So ladies and gentlemen, we're now going to swear the

21   marshal who will be safeguarding you throughout your

22   deliberations.  You will then return to the jury room, and the

23   only thing you need to do today is select your foreperson.  And

24   you can leave, go home, and when you come back at 9:30 tomorrow

25   morning to begin your deliberations, it will be up to your

 1   foreperson to make sure that all ten of you are in the jury

 2   room before you start your deliberations.  That's the

 3   foreperson's job.  We'll make sure that all the exhibits and

 4   the indices are waiting there for you.

 5           So let's swear in the marshal.

 6           (Marshal sworn)

 7           DEPUTY CLERK:  Jurors, please follow the marshal.

 8           (Jury retired, time noted, 4:55 p.m.)

 9           (Jury not present)

10           THE COURT:  I will note for the record that any

11   objections that were previously made to my charge are deemed to

12   have been remade at this time so that they're fully preserved

13   for appeal.

14           Anything else that counsel needs to raise with the

15   Court?

16           Let me tell you my practices with respect to jury

17   deliberation.  I want at all times beginning at 9:30 at least

18   one lawyer from each party who is authorized to respond to any

19   jury note present on this floor.  You can be in the courtroom

20   or you can be out in the hallway, but you cannot be anywhere

21   else.  That's so that when we get a note we can respond

22   immediately, we don't have to go searching for you folks.  The

23   exception will be between 1:00 and 2:00 p.m. when you are

24   excused for lunch.

25           I will also give my law clerk to give to my courtroom

DAMTBAN6

1    deputy a copy of my charge to be docketed as Court Exhibit

2    Number 1.

3            And the only other thing I want to say is to me it is

4    always thrilling to hear such fine summations as I heard in

5    this case.  This is what the legal process is all about:

6    Tough-minded but fair-minded professionals having worked hard

7    to present their cases bring it all together in a way that I

8    thought on the part of all lawyers was crystal clear and

9    immensely helpful to the jury in reaching their determination.

10   So you have the thanks of the Court for those very excellent

11   closing arguments.

12           We'll see you tomorrow at 9:30.

13           (Adjourned to October 23, 2013 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25