DANTBAN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                12 CV 1422 (JSR)

BANK OF AMERICA CORPORATION,
*successor to Countrywide*
*Financial Corporation,*
*Countrywide Home Loans, Inc.,*
*and Full Spectrum Lending*, et
al.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 23, 2013
                                        12:15 p.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge

DANTBAN1

APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
PIERRE G. ARMAND
JAIMIE LEESER NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN M. LONDON
        Assistant United States Attorneys


WILLIAMS & CONNOLLY
        Attorneys for Defendant Bank of America
BRENDAN V. SULLIVAN, JR.
ENU MAINIGI
MALACHI B. JONES
KENNETH SMURZYNSKI
CRAIG D. SINGER
ALLISON B. JONES
STEVEN M. CADY
JENNIFER WIMSATT PUSATERI


GOODWIN PROCTOR
        Attorneys for Defendants Countrywide
RICHARD M. STRASSBERG
WILLIAM HARRINGTON


BRACEWELL & GIULIANI
        Attorneys for Defendant Mairone
MARC L. MUKASEY
MICHAEL HEFTER
RUSSELL ZWERIN
RYAN M. PHILP
SETH M. COHEN
CHRISTINA JARDINE

DANTBAN1

1           (In open court, jury not present)

2           THE COURT:  So first of all, last night we got a note

3    as the jurors were leaving, which we marked as Jury Note Number

4    9, which simply says that Frank Verni, juror number seven, has

5    been selected as the foreperson.

6           Now we have just received at 12:01 a jury note which

7    we marked as Jury Note Number 10.

8           1.  Why are three people named as managerial on page

9    12 of the instructions and only one person is charged?

10          2.  We would like to review the video of John Boland.

11          Taking the last point first, how long a video is that?

12          MS. SCHOENBERGER:  It's about 55 minutes, your Honor.

13          THE COURT:  So I'm inclined to tell them we will show

14   them that video right after lunch at 2 o'clock.

15          With respect to number one, I'm inclined to first

16   point them to the instructions that said -- portion of the

17   instruction that the defense presciently asked me to include

18   about don't speculate about matters not in evidence, and then

19   simply to say that this is not their concern.  But let me hear

20   from either side if they want to be heard on this.

21          MS. MAINIGI:  We have no objection to that, your

22   Honor.

23          MR. ARMAND:  No objection from the government, your

24   Honor.

25          MR. MUKASEY:  Judge, could I have just 30 more seconds

DANTBAN1

1    to confer?  I'm inclined to agree with your Honor but I want to

2    make sure that nothing comes out that suggests that --

3              THE COURT:  I will work out the wording right now.

4              In rethinking, I'm wondering if we should call them in

5    now and play the first, say, 20 minutes or so of the video and

6    so we can get that moving, and then they will only have to --

7    because I hate to wait until 2 o'clock to play the whole thing.

8              MR. MUKASEY:  That's fine, certainly, with us.

9              THE COURT:  So I will give them orally an instruction.

10   Is there anything further you wanted me to say?

11             MR. MUKASEY:  I wanted to make sure that nothing

12   suggests to the jury that the person who is named is somehow

13   more culpable than the other two that were not named.

14             THE COURT:  Yes.

15             MR. MUKASEY:  Or that somehow leaves them with the

16   impression that the other two managerial agents, Lumsden or

17   Kitashima, settled or cut a deal or somehow got their way out

18   of this thing.  I want them to be left with the impression

19   that --

20             THE COURT:  I think the less we say, therefore, the

21   better, tell them that it's, in effect, none of their business.

22   I'm happy, but I don't know why anyone would want me to do

23   this, to say these are matters of discretion that involve all

24   sorts of matters, none of which are before you that -- but I

25   think that would be a big mistake.  I think just point them to

DANTBAN1

the portion of the charge which begins at the bottom of page 2,

"Also, you should be careful not to speculate about matters not

in evidence.  Rather, your focus should be entirely on

assessing the evidence that was presented, and not on

speculating about what other evidence, if any, might have been

obtained."  And then simply add that applies equally to your

question about why only one person was charged.  I think to add

anything more to that is to invite the very speculation we're

asking them not to.

            MR. MUKASEY:  Understood.

            THE COURT:  Agreed?

            MR. MUKASEY:  Yeah.

            MS. MAINIGI:  That's fine, your Honor.  On the video,

our preference would be for the jurors to hear the video in one

sitting as opposed to breaking it up over lunch.

            THE COURT:  That was my original intent, but then --

I'll tell you what, why don't we bring them in and we'll ask

them whether they want to hear half now and half after lunch or

hear the whole thing after lunch.  My concern is that they not

feel we're leaving them hanging for an hour and 40 minutes.

            MS. MAINIGI:  Could you ask if they would be willing

to delay lunch for a little bit and hear the whole thing?

            THE COURT:  Yes, I have a meeting that I can't delay,

but in theory I don't have to be here, right?

            MS. MAINIGI:  We would rather not break up their

DANTBAN1

```
 1 │  hearing of the video.
 2 │           MR. HEFTER:  I have an issue with respect to the
 3 │  video.  You will recall there are a number of limiting
 4 │  instructions within the video about -- in fact Mr. Cohen stood
 5 │  up --
 6 │           THE COURT:  So I may have to be here.
 7 │           MR. HEFTER:  You may have to be here.
 8 │           THE COURT:  So the choice now is half now and half
 9 │  later or all later.
10 │           Let's bring in the jury.
11 │           There's one other possibility, which is we could send
12 │  in a transcript of the video if anyone would prefer that.  That
13 │  would include, if the transcript was the one here in court, the
14 │  limiting instructions are right there.
15 │           MR. ARMAND:  I think the government's preference would
16 │  be to play the video.
17 │           THE COURT:  OK.
18 │           (Jury present)
19 │           THE COURT:  So good morning, ladies and gentlemen,
20 │  thank you for your notes.  And let me express my condolences to
21 │  juror number seven on being selected foreperson.
22 │           So with respect to the first part of your note, which
23 │  reads, "Why are three people named as managerial on page 12 of
24 │  the instructions and only one person is charged," the short
25 │  answer is it's none of your business.  But the longer answer is
```

DANTBAN1

1    I want to remind you that beginning at the very bottom of page

2    2 of instructions, the instruction reads, "Also, you should be

3    careful not to speculate about matters not in evidence.

4    Rather, your focus should be entirely on assessing the evidence

5    that was presented and not on speculating about what other

6    evidence, if any, might have been obtained."  And there's no

7    evidence whatsoever on this issue that's addressed by your

8    first question, and it's not your concern.  You need to decide

9    this matter based on the evidence before you and not be

10   concerned with speculating about matters that are not in

11   evidence.

12           With respect to your second request, "We would like to

13   review the video of John Boland," we're of course happy to

14   accommodate that.  And there are two possibilities, it takes

15   about 55 minutes, and unfortunately I need to be at a luncheon

16   meeting shortly before one o'clock.  So we could do part of it

17   now and part of it after lunch, or we could do all of it

18   starting at two o'clock.

19           So Mr. Foreperson, do you have a preference in that

20   regard?

21           THE FOREPERSON:  Yes, we'll see half of it now.

22           THE COURT:  Everyone else agree?

23           JUROR:  Yes.

24           THE COURT:  So let's start the video.

25           To save our court reporter to have to record it again,

DANTBAN1

```
1     it will be exactly as before with the same -- and I will

2     intersperse the same limiting instructions upon request of

3     defense counsel.

4                MR. HEFTER:  Thank you, your Honor.

5                If we could pause for one second so we could find the

6     transcript so we could follow along in order to enable us to do

7     that.

8                THE COURT:  Yes.  I will tell you what, counsel, take

9     my copy.

10               MR. HEFTER:  That's fine, your Honor, thank you.

11               THE COURT:  All right.

12               (Video recording played).

13               THE COURT:  Hold it for a minute.  Counsel, come to

14    the side bar.

15               (Video recording paused)

16               (At Side bar)

17               THE COURT:  Mr. Mukasey, I didn't want to embarrass

18    you folks.  Your two guys are sitting here rifling through

19    papers, making a lot of sound.  I can hear them all the way up

20    here distracting the jury, distracting the Court.

21               MR. MUKASEY:  We'll take care of it.

22               THE COURT:  Tell them to sit down and stop moving.

23               MR. MUKASEY:  Got it.

24               (In open court)

25               THE COURT:  Go ahead.
```

DANTBAN1

1          (Video recording played)

2          MR. HEFTER:  Your Honor --

3          THE COURT:  All right.

4          (Video recording paused)

5          MS. SCHOENBERGER:  I'm following along in the court

6     transcript, I don't think there's an instruction here.

7          THE COURT:  Sorry?

8          MS. SCHOENBERGER:  I'm following along in the court

9     transcript and I don't believe there's an instruction here.

10          MR. HEFTER:  I believe if you follow further in the

11     transcript --

12          THE COURT:  I have given my only copy to -- sorry,

13     yes, we should look at the court transcript.

14          What page is it of the court transcript?

15          MS. SCHOENBERGER:  1621.

16          MR. HEFTER:  Your Honor, may I approach counsel and

17     maybe we can work this out?

18          THE COURT:  Yes.  1621, did you say?

19          MS. SCHOENBERGER:  1621, and I believe we're at line

20     9, or maybe line 3.

21          THE COURT:  If you look at 24, line 24 on 1621, it

22     seems to be that's what defense counsel is referring to.

23          MR. HEFTER:  Yeah, your Honor, and I believe the

24     limitation was sought subsequent to the prior answer, and I

25     believe your Honor --

DANTBAN1

```
 1              THE COURT:  Retroactively.

 2              MR. HEFTER:  -- retroactively applied the instruction.

 3              THE COURT:  All right.  So I think this is probably a

 4     good place to stop anyway, and we'll pick up with that

 5     instruction when we resume.

 6              So ladies and gentlemen, we'll hear the rest of it at

 7     2 o'clock.

 8              (Jury not present)

 9              THE COURT:  All right.  I will see you all.

10              (Luncheon recess taken)

11              (Jury not present)

12              THE COURT:  So are counsel now agreed as to the

13     limiting instruction on the last question?

14              MS. SCHOENBERGER:  Yes, I think we'll just back up to

15     that question and pause it.

16              THE COURT:  Yes, we should go back to the question.

17              MS. SCHOENBERGER:  Your Honor, we have the video

18     queued up to where he's shown the document, and we'll pause

19     after the question:  And what's your response to her request?

20              THE COURT:  Yes, all right.  Very good.

21              MR. HEFTER:  And your Honor, I have your copy that you

22     handed me if you would like that back.

23              THE COURT:  I was hoping I might see it again.  Thank

24     you.

25              MR. HEFTER:  I will apologize for one thing, I think I
```

DANTBAN1

```
 1    have one or more lines where I thought the instructions were

 2    on, just for my reference.

 3              THE COURT:  Yes, that's fine.  I was hoping for an

 4    autograph.

 5              MR. HEFTER:  There's no editorial comment.

 6              THE COURT:  All right.  Let's bring in the jury.

 7              (Jury present)

 8              THE COURT:  All right.  Ladies and gentlemen, we're

 9    ready to continue.  You will have the pleasure of watching the

10    movie and all the lawyers will be carefully looking at you

11    hoping for some hint as to what you're thinking, but don't give

12    them any.

13              Please continue.

14              (Video recording played)

15              (Video recording paused)

16              THE COURT:  So the answer that's about to come up,

17    ladies and gentlemen, is received against the bank defendants

18    only.

19              Go ahead.

20              (Video recording played)

21              (Video recording paused)

22              MR. HEFTER:  Your Honor.

23              THE COURT:  And the next answer will be received as to

24    the bank defendants only.

25              (Video recording played)
```

DANTBAN1

```
 1              (Video recording paused)

 2              MR. HEFTER:  Your Honor.

 3              THE COURT:  Yes, I'm sorry, once again, ladies and

 4    gentlemen, the same limiting instruction as to the next answer.

 5              (Video recording played)

 6              (Video recording paused)

 7              MR. HEFTER:  Your Honor.

 8              THE COURT:  Same limitation as to the next answer.

 9              (Video recording played)

10              (Video recording paused)

11              MR. HEFTER:  Your Honor.

12              THE COURT:  Same limiting instruction as to the next

13    answer.

14              (Video recording played)

15              (Video recording paused)

16              THE COURT:  All right.  So ladies and gentlemen, that

17    concludes the videotape deposition.  So you should go back and

18    continue your deliberations and let us know if we can be of any

19    further assistance to you.

20              (Jury not present)

21              THE COURT:  Anything else we need to take up?

22              MS. MAINIGI:  No, your Honor.

23              MR. ARMAND:  No, your Honor.

24              THE COURT:  Very good, we'll see you whenever.

25              (Recess taken)
```

DANTBAN1

1     (Jury not present)

2     THE COURT:  I understand we have a verdict.  Let's

3 bring in the jury.  The note says, "We have reached a verdict."

4 That will be marked as Jury Note Number 12.

5     Let's bring in the jury.

6     Now the lawyers should be aware that -- I'll say this

7 afterwards.

8     (Jury present)

9     (Time noted, 3:28 p.m.)

10     THE COURT:  So ladies and gentlemen, we understand you

11 have reached a verdict.  In a minute we will take the verdict

12 form your foreperson, and I will open it and then we will take

13 the reading of the verdict.

14     I will not comment on the verdict because the

15 determination of the verdict is your job, not mine, but I,

16 before I see the verdict, I do want to comment on what a

17 splendid jury you were.  I had occasion, of course, to watch

18 you out of the corner of my eye, and I was just really so

19 impressed how carefully you all followed the witness.  Many of

20 you were taking notes; those that weren't were equally

21 attentive.  You were very prompt, unlike some judges I know,

22 and all in all you did a really splendid job.

23     I have another trial starting soon, I thought maybe --

24 you'll be glad to know the law does not permit that.  In fact,

25 you will be excused for jury service for four years.

DANTBAN1

1          So we will get the verdict form now from your

2     foreperson.

3          DEPUTY CLERK:  Mr. Foreperson, please rise.

4          You say you have agreed upon a verdict?

5          THE FOREPERSON:  We've agreed upon a verdict.

6          THE COURT:  All right.  The verdict is in proper form.

7     I will give it to my courtroom deputy to take the reading of

8     the verdict.

9          Mr. Foreperson, please rise.

10         DEPUTY CLERK:  Mr. Foreperson, you say, as to United

11    States of America versus Countrywide Home Loans, Incorporated,

12    Countrywide Bank, FSB, Bank of America and Rebecca Mairone,

13    docket number 12 Civil 1422.

14         Question 1.  The government's claim against the Bank

15    Defendants on the government's claim of fraud, you, the jury,

16    find the bank defendants liable or not liable.  You say?

17         THE FOREPERSON:  Liable.

18         DEPUTY CLERK:  Question 2.  The government's claim

19    against Rebecca Mairone on the government's claim of fraud,

20    you, the jury, find Rebecca Mairone liable or not liable.  You

21    say?

22         THE FOREPERSON:  Liable.

23         DEPUTY CLERK:  Listen to your verdict as it stands

24    recorded.  As to United States of America versus Countrywide:

25         Question 1, the government's claim against the Bank

DANTBAN1

1   Defendants on the government's claim of fraud you, the jury,

2   find the Bank Defendants liable.

3            Question 2.  Government's claim against Rebecca

4   Mairone on the government's claim of fraud you, the jury, find

5   Rebecca Mairone liable.

6            Juror number one, is that your verdict?

7            JUROR:  Yes.

8            DEPUTY CLERK:  Juror number two, is that your verdict?

9            JUROR:  Yes.

10           DEPUTY CLERK:  Juror number three, is that your

11   verdict?

12           JUROR:  Yes.

13           DEPUTY CLERK:  Juror number four, is that your

14   verdict?

15           JUROR:  Yes.

16           DEPUTY CLERK:  Juror number five, is that your

17   verdict?

18           JUROR:  Yes.

19           DEPUTY CLERK:  Juror number six, is that your verdict?

20           JUROR:  Yes.

21           DEPUTY CLERK:  Juror number seven, is that your

22   verdict?

23           JUROR:  Yes.

24           DEPUTY CLERK:  Juror number eight, is that your

25   verdict?

DANTBAN1

1              JUROR:  Yes.

2              DEPUTY CLERK:  Juror number nine, is that your

3     verdict?

4              JUROR:  Yes.

5              DEPUTY CLERK:  Juror number ten, is that your verdict?

6              JUROR:  Yes.

7              DEPUTY CLERK:  Jury polled, your Honor, verdict

8     unanimous.

9              THE COURT:  Very good.  We'll take the original

10    verdict form back from the foreperson.

11             Ladies and gentlemen, once again I want to express my

12    very great thanks to you.

13             One last housekeeping item.  It's natural for the

14    lawyers sometimes to want to talk to the jurors.  The law in

15    this Court is that the only time they can talk to you without

16    permission of the Court is as you're leaving the jury room.  So

17    if any lawyer is there and says I would like to talk to you,

18    it's up to you whether you want to talk to them or not.

19             Similarly, you may be approached by members of the

20    media.  I have no control over them and they are free to

21    approach you, but they, too, I am sure, will respect your

22    wishes.  On the one hand, it's perfectly natural for them to

23    want to know what is going on, on the other hand, there are

24    good reasons why the jury process is confidential.  And so it's

25    totally up to you whether you want to talk to them or not, but

DANTBAN1

1    I just wanted you to be aware of the possibility that they may

2    seek to talk to you.  As I say, I'm quite confident if you say

3    no to them they will respect that as well.

4              Again, all my great thanks, and you are now excused.

5              (Jury excused)

6              THE COURT:  All right.  So we need to now schedule the

7    penalty phase.  Does either side wish to present testimony with

8    respect to that phase or do you just want to have paper

9    submissions?

10             MS. MAINIGI:  We would like to have an evidentiary

11   phase, your Honor.

12             THE COURT:  All right.  I would be ready to start it

13   forthwith, but --

14             MS. MAINIGI:  We're prepared to start.

15             THE COURT:  That's impressive.  Who do you want to

16   call?

17             MS. MAINIGI:  Our experts and Mr. Tom Scrivener.

18             THE COURT:  How about Ms. Mairone, are you planning on

19   calling -- is counsel for Ms. Mairone planning on calling

20   anyone?

21             MR. MUKASEY:  I think we plan to reserve our right and

22   we will let the Court know as soon as possible.

23             THE COURT:  No, we have to schedule this now.  I

24   indicated at the very outset that we would start immediately.

25             MR. MUKASEY:  I apologize.

DANTBAN1

1          THE COURT:  I stated it on the record.  But fair

2     enough, I mean it's been a long four weeks, I don't want to put

3     anyone in an impossible position.

4          I will tell you what, do you think you would know the

5     answer by tomorrow morning?

6          MR. MUKASEY:  Yes, Judge.

7          THE COURT:  Why don't you call chambers jointly at

8     10:30 tomorrow morning and we will -- I want a definitive list

9     from all sides as to who they want to call and we will schedule

10    it.  It is certainly going to be within the next two weeks,

11    worst case.  I'm hoping to do better than that.  That would be

12    the outside.

13         MS. MAINIGI:  Your Honor, it would be our request,

14    your Honor, that we understood "immediately" to mean

15    immediately, and so it would certainly be our request that we

16    proceed as early as tomorrow if your Honor would allow.

17         THE COURT:  Yeah, the problem, of course, is that

18    since this trial has gone on for four weeks, when the jury went

19    out I scheduled a bunch of things for tomorrow thinking they

20    would still be deliberating, and I'm going to be in Chicago, as

21    you know, on Friday.  But Monday might be a possibility.  We

22    might be able to take one witness tomorrow.

23         What's the government's --

24         MR. ARMAND:  Your Honor, I don't think we would be

25    ready to proceed tomorrow, but Monday I believe -- it's just

DANTBAN1

 1    that we have to coordinate with our expert, Dr. Joseph Mason,

 2    just to make sure that he's available tomorrow, and we need to

 3    meet with him first.  So it would be preferable for us to start

 4    on Monday.

 5              THE COURT:  Let's see what we -- I know that Tuesday

 6    and Wednesday of next week are not good, but Monday I think

 7    is --

 8              What do we have on Monday?

 9              (Pause)

10              THE COURT:  I have a bunch of things on Monday, but

11    they could possibly be moved.  Most of them were moved once

12    already because of the trial, but they could be moved again.

13    Why don't we do this, we will tentatively plan on Monday, but

14    you should call tomorrow -- let's make it a little later, why

15    don't we say noon tomorrow.  That will give me a chance to

16    contact the lawyers in the other matters and make sure I can

17    move those things around.  And I want to know definitively at

18    noon tomorrow who is calling whom.  We should -- you should

19    also think about if anyone wants to make written submissions

20    and then we'll work out a schedule for those as well.

21              MR. ARMAND:  Question, your Honor, in terms of

22    listening to defense counsel, the witnesses that they intend to

23    call, is causation an aspect of the evidentiary hearing that

24    your Honor would like to hear evidence on?

25              THE COURT:  Certainly I left open that possibility.

DANTBAN1

```
1    That was when I ruled on the motion in limine I made clear that
2    that wasn't part of liability but it could conceivably bear on
3    penalty.  I want to go back and look tonight.  It seems -- this
4    is an unusual statute in that it talks of penalty but then it
5    talks of certain measures for assessing the penalty.  So I want
6    to take a greater look at that before I answer your question
7    dispositively, but for now you should assume that everything is
8    open, but I will let you know more dispositively when we talk
9    at noon tomorrow.
10        MR. ARMAND:  Your Honor, I am thinking it might make
11   sense, for the same reasons we did not think that causation was
12   appropriate for the mail and wire fraud charge, and also don't
13   think it's appropriate for the penalties phase.
14        THE COURT:  Well, I think if anything it cuts the
15   other way.  I have been of the view from day one that the
16   reason -- that it required a fair degree of speculation to
17   determine the relationship between the fraud and the loss.
18        Let's pull out the statute.  Remind me, what's the
19   section that bears on penalty?
20        MR. ARMAND:  It's 12, USC, 1833, I think B -- 1833(a),
21   Paragraph B that lists the penalties.
22        THE COURT:  I don't have a copy of it up here.  Do you
23   have a copy?
24        MR. ARMAND:  I usually keep FIRREA in my back pocket,
25   but not today.
```

DANTBAN1

1          THE COURT:  You never know when you could be pick

2     pocketed.

3          Never mind, I will look at it overnight.

4          Anything else we need to take up right now?

5          MR. ARMAND:  Would your Honor consider briefing on the

6     causation issue with regard to the penalties hearing?

7          THE COURT:  I think -- I'm sorry I don't have the

8     statute in front of me right now.  Let me see if one of my law

9     clerks could lay it out so we can -- I would rather not leave

10    you hanging until tomorrow morning.  So give me the section

11    again?

12         MR. ARMAND:  12, USC, 1833(a) Paragraph B.

13         THE COURT:  OK.

14         MS. MAINIGI:  While we're waiting, we would like to

15    docket all of our letter submissions.

16         THE COURT:  Yes.  Hand them up and I will give them to

17    my courtroom deputy.

18         Does any other party have anything they want to

19    docket?

20         MS. MAINIGI:  I believe these include the government's

21    and Ms. Mairone's submissions as well.

22         MR. HEFTER:  I believe that's true.

23         THE COURT:  OK.  Great.

24         You are all obviously much stronger lawyers than I

25    ever was.  When I lost a case I wanted to get drunk and when I

DANTBAN1

1   won a case I wanted to get drunk, but you want to do good hard

2   work, and all the more credit to you.

3           MR. MUKASEY:  I want to get drunk.

4           THE COURT:  So I will turn this volume of letters --

5   the government already looked at this as well?

6           MR. ARMAND:  Yes, your Honor.  They're not all

7   letters, I think there are also the proposed instructions that

8   your Honor requested.

9           THE COURT:  These are items that both sides want to

10  have docketed?

11          MR. ARMAND:  We were not offering the draft

12  instructions, but obviously I don't think we have -- we don't

13  take any position one way or the other.

14          THE COURT:  Anything that was submitted to the Court

15  that any party wants to have docketed I will docket.

16          MR. ARMAND:  Very well, your Honor.

17          THE COURT:  So there they are.

18          All right.  I mention again, just so everyone is aware

19  of it because it's not the rule in every courthouse.  Under a

20  Second Circuit case, lawyers can only interview jurors with the

21  express prior permission of the Court, except as they're

22  leaving the jury room.  I don't know that anyone would need or

23  want do that, but I mention that.

24          So let's see.  The relevant part of the statute reads

25  as follows, this is 12, USC, Section 1833(a), Subsection B,

DANTBAN1

1    maximum amount of penalty.

2            1.   Generally, the amount of the civil penalty shall

3    not exceed $1 million.

4            2.   Special rule for continuing violations.   In the

5    case of a continuing violation, the amount of the civil penalty

6    may exceed the amount described in paragraph one but may not

7    exceed the lesser of $1 million per day or $5 million.

8            3.   Special rule for violations creating gain or loss.

9    If any person derives pecuniary gain from the violation, or if

10   the violation results in pecuniary loss to a person other than

11   the violator, the amount of the civil penalty may exceed the

12   amounts described in paragraphs one and two but may not exceed

13   the amount of such gain or loss.

14           As used in this paragraph, the term "persons" includes

15   the Bank Insurance Fund the Savings Association Insurance Fund,

16   and after the merger of such funds, the Deposit Insurance Fund

17   and the National Credit Union Shared Insurance Fund.

18           So let me ask the government, it says it can exceed

19   one and two but only if the violation results in a pecuniary

20   loss to a person other than the violator, but "person" is then

21   defined to include -- I don't know whether that means

22   exclusively or more likely in addition -- the bank insurance,

23   et cetera.   So what's your view of that provision?

24           MR. ARMAND:   We read "person" to be from 1 USC 1 to

25   apply broadly to anyone that is not the violator, and so that

DANTBAN1

1    would include the GSEs.

2              THE COURT:  And I take it you are seeking, at least as

3    to the bank, a penalty in excess of $5 million?

4              MR. ARMAND:  Yes, your Honor.

5              THE COURT:  All right.  Are you seeking a penalty in

6    excess of $5 million as to Ms. Mairone?

7              MR. ARMAND:  I think the government is generally

8    seeking the maximum penalty.  However, I think we would like to

9    confer to -- frankly, we haven't discussed in terms of the

10   specific amount we would be seeking with regard to Ms. Mairone.

11             THE COURT:  I think that would be worthy of your

12   further consideration.

13             MR. ARMAND:  Absolutely.  And there's information yet

14   that we don't yet have from Ms. Mairone that we would like to

15   consider before making that application.

16             THE COURT:  Now so at least with respect to the bank

17   defendants, if any person derives pecuniary gain from the

18   violation, I think we already know the amount of gain was --

19   what was it, one million something or other?

20             MR. ARMAND:  For all Hustle loans, approximately $165

21   million.

22             THE COURT:  Sorry.  And are you saying that the loss

23   is greater than that?

24             MR. ARMAND:  Yes, your Honor.

25             THE COURT:  Why is that?

DANTBAN1

1          MR. ARMAND:  The losses to the GSEs from the purchase

2     of Hustle loans depending on if you're looking at the gross

3     loss figure or the net loss figure.  If you are looking at all

4     the Hustle loans, regardless of whether they were defective, I

5     believe the number is about $840 million, according to our

6     expert, Dr. Mason.

7          If you are looking at the gross losses from solely

8     defective Hustle loans, it's in the neighborhood of $500

9     million.

10          And if you're looking at net losses, net losses for

11     defective Hustle loans -- and I'm talking about gross versus

12     net, gross is the amount as of the time of the default, which

13     is the unpaid balance which was essentially stuck with the GSEs

14     at that time, the loss at that time, but through the

15     foreclosure or liquidation process there were perhaps some

16     insurance, they were able to get some of the money back after

17     the property is foreclosed, and the net loss for the defective

18     Hustle loans after all of these funds had been recouped is

19     approximately 130 million for the defective Hustle loans.

20          THE COURT:  So if we were taking -- if we were taking

21     the net loss, that is a figure less than the gain.

22          MR. ARMAND:  Yes, if you're talking about net loss,

23     yes.

24          THE COURT:  So it sounds to me like we ought to decide

25     first whether the appropriate measure is net loss or gross

3501

DANTBAN1

1    loss, because if it's net loss we don't have to have an

2    evidentiary hearing at all, do we?  Unless there's a dispute

3    over the amount of the gain.

4              MR. ARMAND:  In terms of just -- would your Honor want

5    either still a presentation in terms of what the experts --

6    they have their own expert report about what they believe the

7    correct numbers are.

8              THE COURT:  I understand that, but I'm trying to

9    figure out how we proceed.  Assuming for the sake of

10   argument -- I have no opinion on this, as just the layout of

11   the land, assuming for sake of argument the net loss is a more

12   appropriate measure than gross loss, then the government would

13   be seeking, would it not, gain, because that would be the

14   higher figure?

15             MR. ARMAND:  Yes, your Honor.

16             THE COURT:  And is there any dispute about the amount

17   of gain?

18             MR. SMURZYNSKI:  Your Honor, if that's addressed to

19   the bank defendants, the answer is yes, there's a dispute to

20   the amount of the gain.

21             THE COURT:  What's the basis of that dispute?

22             MR. SMURZYNSKI:  There are multiple bases.  I would be

23   happy to outline them.

24             THE COURT:  I'm delighted.

25             MR. SMURZYNSKI:  The first issue is:  What is the

population of HSSL loans?  There's nothing in the verdict of
the jury that determines that amount, so that is still an open
question, whether it's 28,882 loans or something else.  That's
number one.

          Number two, the government's theory was not that the
process was the fraud and the failure to disclose the process,
but the government's theory as explained in the charging
conference and the jury instructions was that the
misrepresentations were on a loan-by-loan basis, and the
government's theory is that 57 percent of the loans were not
defective, and so we'll have to figure out what portion is
that.

          Finally, the number that was presented in the
liability phase was an income number, not a gain number, not a
profit number, and what the actual profit is for purposes of
the statute is still an open question.

          THE COURT:  Well, except possibly as to the last of
the items you mentioned, all the relevant evidence is already
before me, right?

          MR. SMURZYNSKI:  I agree, but there's still a factual
determination to be made.  But I agree with regard to the
population and with regard to what is the defect -- what is the
defective portion of the population.

          THE COURT:  So I agree we have to decide whether your
version of that or their version of that is the right measure

DANTBAN1

1    and so forth, but all the evidence that bears on that is fully

2    before me, and so it would be in effect an arithmetic

3    calculation once I made those determinations.

4            MR. SMURZYNSKI:  Right, and we would appreciate the

5    opportunity to make argument to your Honor on that.  But in

6    terms of creating a further record, there's no need on those

7    two issues.

8            On the third issue, whether there was a gain or

9    whether there was a profit is not an element of the offense,

10   and therefore the defendants chose not to raise that issue in

11   the liability phase, but now that we're in the penalty phase

12   and it's become relevant potentially --

13           THE COURT:  What is your basis for saying that

14   pecuniary gain is just profit as opposed to proceeds?

15           MR. SMURZYNSKI:  Your Honor, I appreciate the

16   opportunity to brief that issue, but looking at the cases, our

17   belief is that the proper way to interpret the statute is that

18   that is a profit number.

19           THE COURT:  But that's a question of law, yes?

20           MR. SMURZYNSKI:  I agree it's a question of law.

21           THE COURT:  So again, it doesn't require an

22   evidentiary hearing, it requires briefing.

23           MR. SMURZYNSKI:  Correct.  But if you agree with our

24   position, then there remains the question:  What is the profit?

25           THE COURT:  Yes, that might require a -- but a much

DANTBAN1

1    more constricted evidentiary hearing than what we have been

2    talking about so far.

3              Thank you very much, that's very helpful.

4              Let me go back to the question of gross versus net,

5    because we only -- gross versus net loss, because we only reach

6    that question if gross loss is the proper measure, otherwise

7    we're concerned with gain.  And the question then is:  Is loss

8    to be measured as an approximate loss or is it to be measured

9    on the theory that if one commits fraud one is responsible for

10   the consequences even if other factors may have contributed to

11   the result?  You take your pick, unless you find it's not quite

12   that concept but something akin to that.  That seems to be the

13   big question of law as well, right?

14             MR. ARMAND:  Yes, your Honor.  There's one other

15   issue, whether or not we're talking about all Hustle loans or

16   just ones that ended up being defective, because the reps and

17   warrants of investment quality are to all of them.

18             THE COURT:  These are all --

19             MR. ARMAND:  It's a legal issue.

20             THE COURT:  -- difficult and interesting, and I am

21   thrilled that I get to see more of all the good lawyers here in

22   my courtroom, but I'm not hearing any basis yet for an

23   evidentiary hearing.

24             MR. SMURZYNSKI:  Your Honor, when I spoke before I was

25   addressing simply the gain issue.  Under the statute,

DANTBAN1

```
1    everything you described sets forth a cap, and then your Honor
2    will have discretion to the penalty that you impose.  And there
3    are various facts that we think would come out in an
4    evidentiary hearing with respect to the application of that
5    discretion.
6              THE COURT:  Like what?
7              MR. SMURZYNSKI:  For example, off the top of my head I
8    apologize for not having more here, there are certain facts
9    that came out in the liability phase but, for example, beyond
10   that, factors such as whether the victim has resolved its
11   claims with the defendant, the ongoing relationship between the
12   victim and the defendant, issues like successor liability.
13   Some of those may be established on the record facts, but there
14   may be others that require the taking of evidence.
15             THE COURT:  Well, I mean what I'm hearing is that the
16   only issue that it seemed to me there was -- well, let me
17   rephrase this.  It seems to me that I don't see how I could
18   hold an evidentiary hearing that would be useful until I
19   resolve all these legal issues that have now surfaced.  Because
20   while there will probably be, from what you're saying, some
21   legal issues left, depending on my rulings there may be many or
22   may be few, and why go through the whole business sort of the
23   blindly without having resolved those legal issues first?
24             MR. SMURZYNSKI:  We agree with you, your Honor.
25             THE COURT:  So why don't we set a schedule then for
```

DANTBAN1

1    briefing of the legal issues and then we don't have to worry

2    about calling your experts yet or calling me.

3              So the government has the burden, of course.  So when

4    would you like to get in your papers which would address all

5    the legal issues -- maybe get a copy of the transcript -- that

6    have just surfaced, and you can ask your adversary to flag for

7    you any additional legal issues that they're planning to raise

8    so that you -- they're all addressed in your moving papers.

9    How long would you like for that?

10             MR. ARMAND:  Would the end of next week be

11   appropriate?

12             THE COURT:  Yes.  So that would be November 1st.

13             And how long would defense counsel like?

14             MR. SMURZYNSKI:  Your Honor, could we have ten days to

15   respond to that?

16             THE COURT:  Yes, that's fine.  So that is

17   November 11th.  Actually November 11th I think the courthouse

18   is closed.  Yes.  So November 12th.

19             And how long does the government want for reply?

20             MR. ARMAND:  A week, your Honor, please?

21             THE COURT:  Yes, so that would be November 19th.

22             MR. ARMAND:  Your Honor, would it be possible to get a

23   deadline for the defense to flag any issues?

24             THE COURT:  Yes.  How long does defense want for that

25   purpose?

DANTBAN1

1          MR. SMURZYNSKI:  Your Honor, could we have until

2     Monday to do that?

3          THE COURT:  Yes, close of business Monday.  And then

4     why don't we have oral argument on Monday, November 25th.

5     That's Thanksgiving week, so I want to have it early in the

6     week.  Let's see what is available.

7          3:30 on the 25th.

8          MR. SINGER:  Your Honor, this is a personal plea, I

9     have a long planned family vacation that week.  Would it be

10    possible to do it after Thanksgiving?

11         THE COURT:  Yes.

12         MR. SINGER:  I am supposed to return the Monday

13    following Thanksgiving.

14         THE COURT:  December 2nd.  I hate to do it on Tuesdays

15    and Wednesdays because of Columbia.  How about December 5th,

16    4:00 p.m.  I can imagine that argument going some length, so

17    we'll put aside until 7 o'clock that evening for that argument.

18         And I will undertake to rule on any and all issues so

19    presented by December 31st, so if there is a need for an

20    evidentiary hearing it will be in early January, so you can at

21    least alert your experts as to that possibility.

22         All right.  Anything else we need to take up today?

23         All right.  Thanks very much.

24         (Trial concluded)

25