**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL, <br><br>      Plaintiff, <br><br>         v. <br><br> COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE, <br><br>      Defendants. |

12 Civ. 1422 (JSR)

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN SUPPORT OF IMPOSITION OF CIVIL PENALTIES

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y.  10007
Tel. No.:  (212) 637-2800
Fax No.:  (212) 637-2730

PIERRE G. ARMAND
JAIMIE L. NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN LONDON
Assistant United States Attorneys
     -Of Counsel-

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ........................................................................................................2

    A.    Facts Proven at Trial ...........................................................................2

            1.    The HSSL's Push for Speed and Volume over Quality ...............2

            2.    Defendants' Expansion of the HSSL Despite Knowledge of Poor
                 Loan Quality ...........................................................................4

            3.    Reports and Emails Identify the HSSL as the Cause of Poor
                 Quality ....................................................................................7

            4.    Defendants' Implausible Testimony at Trial About the Culture of
                 Quality ....................................................................................8

ARGUMENT ............................................................................................................9

    A.    Applicable Standard for Determining Civil Penalties under FIRREA ................10

    B.    The Maximum Civil Penalty under FIRREA Is the Greater of the Gross
         Loss or the Gross Gain Resulting from the Fraud .................................................12

            1.    The Standard for Computing Loss or Gain .................................13

             2.    Measure of Pecuniary Loss or Gain Is Gross Loss or Gain ....................13

    C.    Civil Penalties under FIRREA Extend to All Reasonably Foreseeable
         Losses or Gains from the Fraud ............................................................17

    D.    The Gross Losses and Gains from HSSL Loans ............................................20

    E.    Application of Discretionary Factors to the Defendants ....................................24

            1.    Defendants' Culpability and Bad Faith ....................................24

2.    Public Harm from Defendants' Conduct ..................................................26

3.    Defendants' Ability to Pay........................................................................27

CONCLUSION..............................................................................................................27

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Advance Pharm., Inc. v. United States*,
    391 F.3d 377 (2d Cir. 2004)......................................................................11, 14

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    08 Civ. 3966 (CBA), 2013 WL 3187049 (E.D.N.Y. June 20, 2013)................................13

*F.T.C. v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011)...............................................................................23

*Hudson v. United States*,
    522 U.S. 93 (1997)...........................................................................................14

*SEC v. Gupta*,
    11 Civ. 7566 (JSR), 2013 WL 3784138 (S.D.N.Y. July 17, 2013) ............................11, 26

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007)....................................................................14

*SEC v. Patel*,
    61 F.3d 137 (2d Cir. 1995)..............................................................................12, 23

*SEC v. Rajaratnam*,
    822 F. Supp. 2d 432 (S.D.N.Y. 2011)...................................................................13

*SEC v. Razmilovic*,
    728 F.3d 71 (2d Cir. 2013).................................................................................23

*Tull v. United States*,
    481 U.S. 412 (1987).........................................................................................15

*United States v. Bank of New York Mellon*,
    11 Civ. 696 (LAK), 2013 WL 1749418 (S.D.N.Y. April 24, 2013)................................13

*United States v. Fleishman*,
    11 Cr. 32 (JSR), 2012 WL 1611375 (S.D.N.Y. May 7, 2012) ...................................12, 17

*United States v. Fruchter*,
    411 F.3d 377 (2d Cir. 2005)..................................................................17

*United States v. Goldstein*,
    442 F.3d 777 (2d Cir. 2006)..................................................................15

*United States v. Ghavami*,
    10 Civ. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ..............13

*United States v. Kumar*,
    617 F.3d 612 (2d Cir. 2010)..................................................................12

*United States v. Lane*,
    194 F. Supp. 2d 758 (N.D. Ill. 2002) .......................................................15

*United States v. Lizza Industrial, Inc.*,
    775 F.2d 492 (2d Cir. 1985)..............................................................14, 16

*United States v. Menendez*,
    11 Civ. 06313, 2013 WL 828926 (C.D. Cal. March 6, 2013) ....................10, 11

*United States v. Millar*,
    79 F.3d 338 (2d Cir. 1996)....................................................................15

*United States v. Serpico*,
    320 F.3d 691 (7th Cir. 2003) .................................................................13

*United States v. Turk*,
    626 F.3d 743 (2d Cir. 2010).........................................................17, 19, 20

*United States v. Uddin*,
    551 F.3d 176 (2d Cir. 2009)..................................................................12

## FEDERAL STATUTES

12 U.S.C. § 1833(b)(3) ...........................................................................11

12 U.S.C. § 1833a ..................................................................................10

18 U.S.C. § 842(c) .................................................................................14

18 U.S.C. § 981(a)(2)...........................................................................................................16

Plaintiff the United States of America (the "Government") respectfully submits this memorandum in support of its request for the imposition of civil penalties against Countrywide Home Loans, Inc., Countrywide Bank, FSB (collectively, "Countrywide"), and Bank of America, N.A. (together with Countrywide, the "Bank Defendants"), and Rebecca Mairone (collectively, "Defendants").

## PRELIMINARY STATEMENT

Defendants' fraud was simple but brazen.  They made bad loans and they knowingly sold those bad loans as good loans to cheat Fannie Mae and Freddie Mac out of money.

The evidence established that Defendants implemented a new loan processing model, the High Speed Swim Lane ("HSSL" or the "Hustle"), which emphasized speed and volume while removing the quality checkpoints.  Through the HSSL, Defendants originated loans without underwriter involvement, leaving underwriting tasks to loan specialists, entry level clerks who were pushed and paid based on achieving funding goals and speed goals.  Defendants did not pay the loan specialists based on quality and did not even track their quality.  All that mattered was speed and volume.

The focus on speed and volume predictably led to poor quality loans and Defendants knew it.  Defendants knew that the HSSL loans were bad and they knew the reason they were bad, as indicated by the quality assurance reports, quality control reports, and internal emails discussing the HSSL that the Government introduced at trial.  But Defendants nevertheless sold the HSSL loans to Fannie Mae and Freddie Mac with lies that they were investment quality loans.

At trial, Defendants attempted to counter these established facts by offering overreaching and implausible testimony that *everyone* at Countrywide cared about quality and supported the

HSSL, and characterizing the Government's case as a trip "down the rabbit hole" and a whole lot of nothing. The jury rightly found otherwise. And Defendants should be ordered to pay a civil penalty that reflects their culpability and bad faith and the public harm caused by their mortgage fraud.

For the reasons set forth below, the Government respectfully requests that the Court impose the maximum penalty on the Bank Defendants, which corresponds to the gross loss incurred by Fannie Mae and Freddie Mac from defaults on HSSL loans, and a penalty on Ms. Mairone commensurate with her ability to pay.

## BACKGROUND

### A. Facts Proven at Trial

On October 23, 2013, the jury returned a verdict finding all Defendants liable for fraud. The evidence at trial established that Countrywide and Ms. Mairone defrauded Fannie Mae and Freddie Mac by selling them thousands of bad loans with knowing misrepresentations as to their quality. The evidence also established that the Defendants originated these loans through a new business model called the High Speed Swim Lane that operated between August of 2007 and May of 2008, and was designed to push speed and volume at the expense of loan quality.

### 1. The HSSL's Push for Speed and Volume over Quality

As shown at trial, in the summer of 2007, Countrywide's Full Spectrum Lending ("FSL") division needed to boost its profitability and, in particular, to increase its prime business. Although FSL had in place an origination model for prime loans—the Prime CLUES Accept work flow—it sought to implement a faster work flow by eliminating quality checkpoints. FSL sought this faster model at a time when Drew Gissinger, the president of Countrywide Home Loans, warned employees that, in light of the changing market conditions, "rigorous

2

underwriting discipline" was critical to the company's success.  (PX 10.)  Defendant Rebecca Mairone was the driving force behind the new HSSL work flow.  Trial Tr. 1670:16-17 (Boland direct examination) (describing Mairone as "the catalyst of the Hustle")

Some employees, like Michael Thomas, immediately raised concerns about the HSSL design in light of lessons learned from other processes that pushed turn time at the expense of quality, like those operated in the CMD Regional Operating Centers ("ROCs") and the New Customer Acquisition group ("NCA").  (PX 10.)  As witnesses testified, NCA in particular was known to have produced bad loans as a result of imposing funding quotas on loan processors and allowing them to clear loans to close; in some cases loan processors were not even allowed to leave at night before clearing a loan to close.   Trial Tr. 485:17-486:12; 505:11-14 (Edward O'Donnell direct examination); Trial Tr. 1665:22-1666:15 (John Boland direct examination) (PX 49.)  The evidence established that employees complained that this pressure drove some loan processors to fraudulently clear conditions on loans.  (PX 49.)  Nevertheless, the HSSL followed a similar design and employed many of the same loan processors and managers from NCA.  Trial Tr. 517:17-22; 521:9-14 (O'Donnell direct examination); Trial Tr. 1612:18-1613:24 (Boland direct examination) (describing NCA management's involvement in the HSSL).

As demonstrated at trial, the HSSL process layered risk to maximize speed; the HSSL removed underwriters (the independent checks on loan quality) and replaced them with poorly trained loan specialists who reported to operations (and ultimately Ms. Mairone), set funding goals of 30 loans per loan specialist per month, established "lightning speed" turn time goals of 15 days per loan, and created a compensation plan to focus the loan specialists on volume and speed instead of quality.  (DX 191; PX 262.)  Specifically, in August of 2007, FSL implemented a turn time bonus that rewarded loan specialists for moving loans quickly, and a funding bonus

that rewarded them for moving a large volume of loans.  (PX 31; PX 266.)  But FSL had no quality bonus and no quality penalty.  Indeed, Defendants suspended the quality penalty on compensation (the "quality of grade" or "QOG" hit) for an entire six-month period, from August of 2007 through January of 2008.  Trial Tr. 967:18-968:6 (O'Donnell redirect examination); (PX 20).  And when Mr. O'Donnell forwarded to Ms. Mairone the concern he heard from employees that the QOG suspension and "the request to move loans" meant the company "no longer care[d] about quality," Ms. Mairone brushed off the concern by responding, "sounds like it may work." (PX 52.)

### 2.  Defendants' Expansion of the HSSL Despite Knowledge of Poor Loan Quality

Although the HSSL purportedly started as a test, the evidence established that for all of the reports generated on the HSSL loans, it was a test only of funding and turn time.  (PX 54; PX 55.)  The directive given to the designers of the HSSL was to create a process for speed, and the turn time reports showed that they achieved their goal.  Trial Tr. 2361:23-2362:19 (Mark Barnett cross examination); PX 54; PX 55.

The evidence established that the HSSL operated under a new set of rules and a different culture.  Those who spoke out about the apparent disregard for quality were ignored (PX 52), and an employee (John Boland) who balked when asked to approve underwriting authority for loan specialists he did not even know was told to get with the program (Trial Tr. 1621:3-21 (Boland direct examination); PX 22.  The evidence showed that employees repeatedly raised concerns about the quality of the HSSL loans originated during the pilot period and thereafter, and that the expansion of the HSSL was a "sensitive" subject (PX 253).  Nevertheless, defense witnesses tried to claim at trial that no one had any problem with the HSSL, and that everyone cared about

quality and supported the HSSL.  Trial Tr. 1963:12-20; 1979:9-13; 2018:8-24 (Cliff Kitashima direct examination); Trial Tr. 2477:4-11 (Rebecca Mairone direct examination).

The evidence showed that notwithstanding initial quality reports demonstrating that more than 40% of the HSSL pilot loans were flagged as high risk (PX 56), the direction "driven by" Ms. Mairone and others was to expand the HSSL process to more loans and higher risk loans, like stated income loans and Expanded Approval ("EA") loans, which were more like subprime loans.  (PX 253.)  Accordingly, the HSSL work flow was rolled out to Central Fulfillment and Mairone specifically selected Wade Comeaux to run the expanded version of the HSSL because of his production background.  (PX 45.)  What followed the expansion of the HSSL was a continuing decline in loan quality, as shown initially by the pre-funding quality assurance reports, and later by the post-funding quality control reports.  The quality assurance reports, which were perpetually ignored and/or criticized by FSL management (including Ms. Mairone), as focusing only on trivial "process" issues and not loan quality, showed defect rates during the Fall of 2007 in excess of 90%, and revealed that the vast majority of defects identified at the pre-funding stage were not being corrected. (PX 56; PX 406; PX 408; PX 63.)  Based on these reviews, the quality assurance managers warned that the high rates of findings in the pre-funding reviews could lead to much higher severely unsatisfactory ("SUS") rates.   (PX 63.)  Nevertheless, as the evidence showed, FSL management responded by eliminating additional quality checks that they viewed as "distractions" from hitting funding goals.  (PX 67; PX 65; PX 523.)

In November 2007, Ms. Mairone, with approval from Cliff Kitashima and Greg Lumsden, instituted a number of changes to further increase the focus on production.  Specifically, she ordered that quality assurance and quality control reports be directed solely to

her, that loan specialists no longer be notified of the errors they made on HSSL loans, that "on site reviews," which provided feedback and coaching to loan specialists, be suspended, that mandatory checklists that provided guidance to loan specialists on how to properly complete underwriting tasks be eliminated, and that the QOG reprieve be extended.   (PX 68.)   And although QOG was supposed to be monitored regardless of the penalty on compensation, the evidence established that QOG was not monitored at all, and that Defendants tracked only funding and turn time.  (PX 473.)  Indeed, as loan defect rates were rising and Ms. Mairone was ordering that quality reporting go only to her, Defendants instituted additional changes to further increase the focus on production, including sending out daily reports on funding projections to "increase the accountability of the operations teams for the forecasted fundings" (PX 503), pressuring loan specialists to further reduce turn times (PX 489), and lowering employee base pay so that their compensation would be more heavily dependent on bonuses (PX 524).

### 3.   Reports and Emails Identify the HSSL as the Cause of Poor Quality

The impact of Defendants' continued focus on speed and volume over quality was seen throughout the HSSL period and in particular in the first quarter of 2008.  During that quarter, FSL's SUS rates (or material defect rates) increased dramatically and a review was conducted to determine the "root causes" of deteriorating loan quality.  That review placed responsibility for the dramatically deteriorating loan quality on the changes Ms. Mairone put in place.  (PX 102.) Likewise, internal emails among FSL employees discussing the poor loan quality in the first quarter of 2008 also pointed to the HSSL as the cause.  (PX 108; PX 109; PX 74.)

Just as obvious during the first quarter of 2008 was Defendants' continued focus on funding, setting aggressive new funding goals as the top priority for Central Fulfillment.  During this time, FSL also instituted funding contests, such as the "On Fire February" contest, to

motivate loan specialists to clear to close more loans despite deteriorating loan quality.  (PX 486; PX 519, PX 542.)  And although the QOG penalty was supposed to return in the first quarter of 2008, internal emails from that time period indicated that the loan specialists received no QOG feedback and that QOG scores were not even calculated.  (PX 443; PX 120.)

Defendants' response to the escalating defect rates in the first quarter of 2008 demonstrated that their testimony about the purported "culture of quality" was preposterous.  In March 2008, FSL president Greg Lumsden told Edward O'Donnell that FSL no longer fought the SUS findings by corporate quality control like it used to, and he instructed Mr. O'Donnell to devote more resources to rebuttals of the SUS findings.   (PX 264.)  In response, Mr. O'Donnell and others instituted the Sprint Incentive and the FSL Poker Run to incentivize employees to overturn SUS findings and make FSL's defect rate appear closer to the industry standard of 4%.  (PX 491.)  Meanwhile, Ms. Mairone instructed Mr. O'Donnell to alter a slide presentation to Countrywide Home Loans president Drew Gissinger so that FSL quality would not appear to look as bad as it was.  Trial Tr. 627:13-629:9 (Edward O'Donnell direct examination).  And throughout the HSSL period, Defendants never told Fannie Mae or Freddie Mac about the poor quality of the HSSL loans and, in fact, only six defective HSSL loans were self-reported to Fannie Mae or Freddie Mac out of the thousands known to be defective.  Trial Tr. 1703:5-10 (Lars Hansen direct examination).

The evidence and testimony from the Government's experts confirmed the poor quality of HSSL loans, as the expert evidence showed that approximately 43% of the HSSL loans were materially defective, *i.e.*, not investment quality.  Trial Tr. 1400:16-1401:20 (Dr. Charles Cowan direct examination).  At the same time, the trial testimony demonstrated that FSL employees, including Mairone, knew that HSSL loans were sold to Fannie Mae and Freddie Mac, and that

each such loan was sold with a representation that it was investment quality. Trial Tr. 2625:2-18 (Mairone cross-examination). Witnesses from Fannie Mae and Freddie Mac testified that the requirement of investment quality was never waived and was critical to Fannie and Freddie. *See, e.g.*, Trial Tr. 3121:9-3122:1; 3124:9-3125:2 (David Battany cross examination); Trial Tr. 1283:2-5; 1287:24-1288:1 (Benjamin Tanabe direct examination).

In short, the evidence established that Defendants boosted FSL's profits by selling bad loans to Fannie Mae and Freddie Mac with lies as to their quality.

### 4. Defendants' Implausible Testimony at Trial About the Culture of Quality

Numerous defense witnesses provided trial testimony that was inconsistent with their own documents from the relevant time period or with their prior deposition testimony. Indeed, defense witnesses repeatedly and implausibly maintained that they believed that HSSL loans were of the highest quality and that FSL had an established culture of quality. FSL executives also implausibly testified that no one expressed concerns to them about the HSSL work flow or its expansion into Central Fulfillment. The following are just a few examples of such testimony:

- Cliff Kitashima testified that he thought the HSSL produced good quality loans, that stated income loans were of the highest quality, that Mr. O'Donnell never expressed concern that HSSL loans were of poor quality, never expressed concern that loan specialists were not qualified, and never expressed concern that loan specialists were determining reasonability of income, notwithstanding that Mr. Kitashima received an email from Mr. O'Donnell in which he complained that the process for determining reasonability "is in the ditch." Trial Tr. 1963:12-20; 1979:9-13; 2018:8-24 (Cliff Kitashima direct examination); PX 78.

- Several defense witnesses pointed to a 2009 quality control report as evidence of FSL's good loan quality although the report reflected artificially deflated defect rates following the Sprint Incentive. (DX 73) Trial Tr. 1886:20-1887:20 (Jack Shackett direct examination); Trial Tr. 1979:14-19 (Cliff Kitashima direct examination); Trial Tr. 2408:2-10 (Mark Barnett direct examination); Trial Tr. 2482:6-22 (Rebecca Mairone direct examination).

- Rebecca Mairone testified that she believed that minimizing hand offs to underwriters "would improve loan quality" (Trial Tr. 2497:15-17); that relying

on CLUES as the underwriter "would help loan quality" (Trial Tr. 2498:8-10); and that allowing the loan specialists to clear conditions on loans would not "hurt loan quality at all" (Trial Tr. 2537:7-14 (Mairone direct examination)).

- Ms. Mairone also testified that the changes she announced in her November 29, 2007, email were all made for the sake of loan quality (Trial Tr. 2583:22-2584:13; 2588:18-2590:8), and were made only after she reviewed the findings set forth in DX 963, although the findings in that exhibit were from March of 2008, over three months after her November 29 email, (Trial Tr. 2572:2-2574:7 (Mairone direct examination).)

- Ms. Mairone repeatedly contradicted her deposition testimony and painted a rosy picture of Countrywide's culture in which "[l]oan quality was the foundation of what we did everyday. . . That was the culture. So every, every person cared about quality." Trial Tr. 2477:4-11 (Mairone direct examination).

Finally, at the beginning of trial, defense counsel insisted that there was "no fraud in this case, and I mean none," (Trial Tr. 65:1 (opening statement by Brendan Sullivan)), that there would be no evidence about "any secret meeting in the middle of the night in [a] dark alley," (Trial Tr. 89:24-25 (opening statement by Marc Mukasey)), and that the evidence would in fact show nothing more than "very decent, normal people getting up in the morning, putting the kids out to school, going to work, working in a mortgage application business. . ." (Trial Tr. 65:2-5 (opening statement by Brendan Sullivan). Defendants were correct that this case was not about meetings in dark alleys; it was about high-level FSL executives going to work every day in the mortgage business, implementing a loan origination process that focused nearly entirely on speed and volume without quality checkpoints, and passing off the resulting bad loans as good loans to Fannie Mae and Freddie Mac to make a profit. That, unfortunately, was the business as usual, and that was the fraud.

## ARGUMENT

Determining the amount of a civil penalty under FIRREA is effectively a two-step process. As explained below, the statute itself sets forth the method by which a court should set

the ceiling or maximum amount of any penalty.  Although FIRREA is silent as to the method by

which a court should determine the actual amount of any penalty once the maximum has been

established, the Second Circuit has announced several factors that courts can properly consider in

determining an appropriate amount of civil penalty.  Those factors include the degree or

egregiousness of a defendant's culpability, the public injury caused by a defendant's conduct,

and the defendant's ability to pay.  For the reasons discussed below, application of these

statutory and common law factors supports a significant civil penalty against the Bank

Defendants corresponding to the gross losses resulting from the HSSL loans, and against Ms.

Mairone in amount to be determined after considering her ability to pay.

### A.  Applicable Standard for Determining Civil Penalties under FIRREA

FIRREA contains three basic rules regarding the maximum amount of civil penalties for

violations of the mail or wire fraud statutes.  12 U.S.C. § 1833a.  First, it provides as a general

rule that "the amount of the civil penalty shall not exceed $1,000,000."  *Id.* § 1833a(b)(1).

Second, it provides that "[i]n the case of a continuing violation, the amount of the civil penalty

may exceed the amount described in paragraph (1) but may not exceed the lesser of $1,000,000

per day or $5,000,000."  *Id.* § 1833a(b)(2).  Finally, FIRREA contains a specific rule for

"violations creating gain or loss," which provides that "[i]f any person derives pecuniary gain

from the violation, or if the violation results in pecuniary loss to a person other than the violator,

the amount of the civil penalty may exceed the amounts described in paragraphs (1) and (2) but

may not exceed the amount of such gain or loss."  *Id.* § 1833(b)(3).

Although FIRREA sets a maximum amount of penalty, it sets no minimum.  There is also

a dearth of case law providing guidance on the factors to be considered in arriving at an ultimate

determination on the amount of the penalty to impose under § 1833a.  The only reported decision

discussing such factors is *United States v. Menendez*, 11 Civ. 06313 (MMM), 2013 WL 828926 (C.D. Cal. March 6, 2013).  In *Menendez* the district court looked to factors courts applied in other contexts involving the assessment of civil penalties.  *Id*. at *5.  The court determined that other courts had considered "(1) the good or bad faith of the defendant and the degree of his scienter; (2) the injury to the public, and whether the defendant's conduct created substantial loss or the risk of substantial loss to other persons; (3) the egregiousness of the violation; (4) the isolated or repeated nature of the violation; and (5) the defendant's financial condition and ability to pay."  *Id*. at *5 (citing cases).

The Second Circuit similarly has pointed to three factors a district court may properly consider "in determining the size of a civil penalty, including the good or bad faith of the defendants, the injury to the public, and the defendants' ability to pay."  *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399-400 (2d Cir. 2004) (internal citation and quotation marks omitted).  Finally, courts in this district have applied five similar factors in arriving at an amount of civil penalty in securities fraud cases.  *See SEC v. Gupta*, 11 Civ. 7566 (JSR), 2013 WL 3784138, at *1 (S.D.N.Y. July 17, 2013) (penalties under the Securities Exchange Act) ("In determining the appropriate amount of a civil penalty courts in this District are typically guided by the factors set forth in *Haligiannis*, to wit: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.").

**B.   The Maximum Civil Penalty under FIRREA Is the Greater of the Gross Loss or the Gross Gain Resulting from the Fraud**

### 1.   The Standard for Computing Loss or Gain

As noted above, Section 1833(b)(3) provides that the civil penalty may not exceed the greater of the "pecuniary loss to a person other than the violator," or the "pecuniary gain [to any person] from the violation."  12 U.S.C § 1833(b)(3).  In computing loss or gain for the purpose of assessing civil penalties, a court needs to make only a reasonable estimate of the loss or gain. Although FIRREA itself does not set forth this rule, the "reasonable estimate" standard of loss computation is well established in similar contexts.  For instance, the Second Circuit has stated that in calculating a gain or loss from a fraud for criminal sentencing purposes, a court "is not required to compute the loss  . . . with precision," but rather need make only a "reasonable estimate" of the gain or loss.   *United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010) (internal citation and quotation marks omitted).   The same standard applies in computing gain for purposes of ordering disgorgement or forfeiture.  *See SEC v. Patel,* 61 F.3d 137, 139 (2d Cir. 1995) ("[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation"); *United States v. Fleishman*, 11 Cr. 32 (JSR), 2012 WL 1611375, at *1 (S.D.N.Y. May 7, 2012) ("The calculation of forfeiture amounts is not an exact science," and courts may "use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence") (internal citation and quotation marks omitted); *United States v. Uddin,* 551 F.3d 176, 180 (2d Cir. 2009) (courts calculating forfeiture amounts "need only make a reasonable estimate of the loss, given the available information") (internal citation and quotation marks omitted).

There is no reason to require greater precision in calculating loss or gain for the purpose of assessing a civil penalty than for the purpose of criminal sentencing or forfeiture. Indeed, given that the predicate acts supporting the FIRREA claims in this case are criminal fraud predicates, it is appropriate for the court to consult loss calculations in the criminal fraud context for guidance.

### 2.   Measure of Pecuniary Loss or Gain Is Gross Loss or Gain

Although FIRREA itself is silent as to whether the "loss" and "gain" in Section 1833a(b)(3) are "gross" or "net," the punitive purpose of FIRREA penalties (and civil penalties generally) dictates that "gross" measures should govern. FIRREA was "passed in direct response to the 1980's savings and loan crisis" and with the aim of preventing a similar economic crisis. *United States v. Bank of New York Mellon*, 11 Civ. 696 (LAK), 2013 WL 1749418, **9-10 (S.D.N.Y. April 24, 2013) (quoting FIRREA Section 101(10)). It therefore aims to deter the type of fraud that puts federally insured financial institutions at risk by "strengthen[ing] the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." *Id.* at **9-10 (emphasis removed). Accordingly, FIRREA's penalty provisions should be construed broadly to effectuate the statute's purpose. *United States v. Ghavami*, 10 Cr. 1217 (KMW), 2012 WL 2878126, at *6 (S.D.N.Y. July 13, 2012) (noting that one of FIRREA's purposes is to protect financial institutions, a goal it tries to accomplish by, *inter alia*, "deterring would-be criminals from including financial institutions in their schemes. Deterrence is best served by a broad reading of the statute rather than a narrow one") (internal citation and quotation marks omitted); *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003) ("Just as society punishes someone who recklessly fires a gun, whether or

not he hits anyone, protection for financial institutions is much more effective if there's a cost to putting those institutions at risk. . .").

A broad construction of FIRREA's penalty provisions also comports with the deterrence purpose of civil penalties and forfeiture generally. *See SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 433-36 (S.D.N.Y. 2011) ("SEC civil penalties, most especially in a case involving such lucrative misconduct as insider trading, are designed, most importantly, to make such unlawful trading a money-losing proposition not just for this defendant, but for all who would consider it, by showing that if you get caught . . . you are going to pay severely in monetary terms.") (internal quotation marks omitted); *City of New York v. Golden Feather Smoke Shop, Inc.*, 08 Civ. 3966 (CBA)(JMA), 2013 WL 3187049, at **37-38 (E.D.N.Y. June 20, 2013) ("Civil penalties can serve as a rough form of liquidated damages for the public harms caused by the defendant's conduct.") (internal quotation marks omitted); *see also Hudson v. United States,* 522 U.S. 93, 102 (1997) ("[A]ll civil penalties have some deterrent effect."); *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) ("Civil penalties are designed to punish the individual violator and deter future violations. . . .").

For instance, in the civil RICO context, the Second Circuit has held that forfeiture provisions should be broadly construed because "[f]orfeiture under RICO is a punitive, not a restitutive, measure" and "RICO's object is to prevent the practice of racketeering, not to make the punishment so slight that the economic risk of being caught is worth the potential gain." *United States v. Lizza Indus.*, 775 F.2d 492, 498-99 (2d Cir. 1985). Thus, in *Lizza*, the Second Circuit rejected a challenge to a district court's forfeiture order on the basis that it computed the forfeiture from gross profits. *Id.* at 499. While recognizing that the district court's method of calculation left "open a possibility that defendants will be forfeiting profits that they would have

made outside of their criminal activities," *id*. at 498, the Second Circuit affirmed the method of computation, holding that "[u]sing net profits as the measure for forfeiture could tip such business decisions in favor of illegal conduct," *id.  See also Advance Pharm.*, 391 F.3d at 399-400 (affirming district court's adoption of a gross profits figure in calculating penalties under 18 U.S.C. § 842(c) and reiterating that  "[u]sing net profits as the measure for forfeiture could tip [certain] business decisions in favor of illegal conduct") (internal citation and quotation marks omitted).

The Court should also reject a net loss measurement because it would permit a victim's successful efforts to mitigate her losses to inure to the benefit of a defendant, thereby contravening the purpose of the penalties.  After all, the fact that a victim mitigates her losses neither negates a defendant's culpability nor diminishes its egregiousness.  Accordingly, because penalties punish in proportion to culpability, they should not be reduced based on victim self-help, which has nothing to do with the defendant's scienter or culpability.  *See Tull v. United States,* 481 U.S. 412, 422 (1987) (stating that civil penalties are designed in part "to punish culpable individuals," and not "simply to extract compensation or restore the status quo").

Indeed, victims of massive frauds who incur significant gross losses might be especially motivated to mitigate their losses and thus fraudsters would be provided with a perverse reward if net loss were adopted as the measure of FIRREA penalties.  For similar reasons, in calculating losses from criminal fraud for purposes of determining a sentencing guidelines range, courts do not consider a victim's efforts to mitigate or similar reductions in losses.  *See United States v. Goldstein*, 442 F.3d 777, 786 (2d Cir. 2006) (criminal fraud) (rejecting defendant's argument that loss calculation should be discounted for "amounts [defrauded] customers were credited through refunds or chargebacks" because "[t]he law in this circuit is to the contrary") (internal

citations omitted); *United States v. Millar*, 79 F.3d 338, 345-46 (2d Cir. 1996) (sentencing guideline enhancement applied for affecting a financial institution even though defrauded bank was insured against the loss); *United States v. Lane,* 194 F. Supp. 2d 758, 772 (N.D. Ill. 2002) (internal citations omitted) ("Loss calculation analysis with its graduated punishment scheme properly focuses on the objective financial risk to victims caused by the defendant's criminal conduct, without consideration of third party guarantees or that the full exposure of risk did not come to pass.").  As the *Lane* court explained, "[t]hat a victim . . . was able to mitigate its losses through the good faith performance of a third party guarantor is an event that does not inure to the benefit of the perpetrator of the fraud." *Id.*[1]   Nor do courts permit defendants to reduce the amount of civil penalties by simply compensating victims after their fraud is discovered.  *See, e.g., Rajaratnam*, 822 F. Supp. 2d at 434 (rejecting defendant's argument that his payment of penalties in a criminal case made further civil penalties unwarranted because it "misapprehends both the nature of this parallel proceeding and the purposes of civil penalties").   Indeed, permitting defendants to do so would allow perpetrators of fraud to avoid civil penalties entirely.

Moreover, if Congress wished to impose a net loss or net gain maximum it could have done so expressly, as it has in other cases.  For instance, the forfeiture statute provides differing definitions of "proceeds" depending on whether a case involves illegal goods or services or lawful goods or services sold in an illegal manner, providing that in the latter instance, "the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the

---

[1] Of course, certain "economic realities" of a defendant's conduct can be considered in determining whether a downward departure from a sentencing range is appropriate.  *Lane*, 194 F. Supp. 2d at 771 ("The Seventh Circuit instructs that the time to take into account the economic realities of the defendant's conduct is in considering a downward departure, rather than in loss calculation.").  Likewise, in setting a maximum penalty, the Court should not consider offsets from gross loss or gross gain but could consider such reductions in determining the *ultimate* penalty amount Defendants are ordered to pay.

forfeiture, *less the direct costs* incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B) (emphasis added). The statute further sets forth that the claimant has the "burden of proof with respect to the issue of direct costs" and what shall be excluded from the concept of "direct costs." *Id.*

FIRREA provides no such guidance on how net gain or loss would even be computed, further suggesting that a gross measure should be applied. Indeed, using net loss and net gain would likely involve complex and speculative calculations and would require a level of complexity and precision that contravenes the "reasonable estimate" standard. *See Lizza Indus.*, 775 F.2d at 498-99 (affirming district court's method of computing gain for purpose of RICO forfeiture based on gross rather than net profits) ("Often proof of overhead expenses and the like is subject to bookkeeping conjecture and is therefore speculative. RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced.").

In view of the broad deterrent intent behind FIRREA and the "gross loss/gross gain" approach in similar contexts, Section 1833a should be read to provide for gross loss or gross gain as the maximum allowable penalty.

## C. Civil Penalties under FIRREA Extend to All Reasonably Foreseeable Losses or Gains from the Fraud

In assessing the pecuniary loss that "results" from the fraud pursuant to Section 1833a(b)(3)(A), the Court should consider all the reasonably foreseeable pecuniary harm or pecuniary gain that resulted from the violation. The "reasonably foreseeable" standard is applied in calculating loss or gain from criminal fraud for sentencing and forfeiture purposes, and the Court should not apply a more stringent causation standard here. 18 U.S.C. U.S.S.G. § 2B1.1; *Fleishman*, 2012 WL 1611375, at *1 (observing that the Government could require defendant "to

17

forfeit all of the conspiracy's gains that he could have foreseen"); *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) (construing RICO forfeiture provision) ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as "proceeds" of racketeering activity, it seems plain that they can . . . So long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment."). "Reasonably foreseeable pecuniary harm" is defined as "'pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense'." *United States v. Turk*, 626 F.3d 743, 749-51 (2d Cir. 2010) (quoting 18 U.S.C. U.S.S.G. § 2B1.1, App. Note 3(A)(iv)).

Here, the pecuniary harm that the Defendants knew or reasonably should have known was a potential result of their scheme to defraud was the loss of unpaid principal balance on all loans that went through the HSSL process. As the evidence established, Defendants knew that the HSSL process they were instituting was all about speed and volume and not about quality. In the design phase, they were warned about the effect on the quality of the loans caused by removing quality checkpoints, setting funding and turn time targets, and paying bonuses based solely on speed and volume. But Defendants chose to ignore those warnings. And in the pilot phase, when the HSSL process was supposedly being tested, Defendants received numerous quality assurance reports showing extremely high rates of defective loans at the pre-funding stage, yet Defendants expanded the HSSL into Central Fulfillment and added more volume and riskier products. *See* PX 52; PX 22; PX 253.

After they expanded the HSSL, Defendants received additional quality assurance reports demonstrating that the defects identified were not being corrected before the loans funded. *See* PX 56; PX 63; PX 406; PX 408. As more warnings were raised about the high SUS rates to come, Defendants nonetheless redoubled their focus on production by setting new funding goals and eliminating purported distractions from production, including reporting on quality, providing feedback on quality, and impacting employees' bonuses based on poor quality. PX 68; PX 503; PX 523; PX 524. When the high SUS rates that were foretold became a reality, reports and internal emails identified the cause as the HSSL loan process and other changes that Ms. Mairone implemented. *See* PX 102; PX 108; PX 109; PX 74; Trial Tr. 2665:4-2666:25 (Mairone cross-examination). Yet Defendants never notified Fannie Mae or Freddie Mac of the poor quality and continued to fund and sell HSSL loans, even instituting new funding contests. Trial Tr. 2663:7-23 (Rebecca Mairone cross-examination); PX 516. In short, Defendants knew that their scheme would lead to the origination of thousands of bad quality HSSL loans, that those loans would be sold as investment quality to Fannie Mae and Freddie Mac, and that Fannie Mae and Freddie Mac would incur losses in the form of the unpaid principal balance on the HSSL loans after they defaulted. *See Turk*, 626 F.3d at 749-51 (mortgage fraud) (holding that foreseeability analysis required for calculating loss in accordance with the Sentencing Guidelines required foreseeability only of the loss of unpaid principal on the loan).

In *Turk*, the defendant argued that to the extent the losses of unpaid principal balance were foreseeable, so was the sale of collateral to offset those losses, an argument the Second Circuit rejected. The court explained that "a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct" and that to "accept [defendant's] argument would be to encourage would-be

fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." *Id*. at 750.  The Second Circuit therefore held that its foreseeability analysis was "necessary to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct." *Id*. at 750.

Likewise, although defendants may try to argue that the HSSL loans could have defaulted for other reasons (such as the general downturn in the economic market) and that the court should segregate the various potential causes of losses, *Turk* rejected this argument as well.  In doing so, it stated that such a segregation of causal factors, while sometimes appropriate in assessing market fluctuations in securities fraud cases, is inappropriate in the mortgage fraud context.  *Id.*  Specifically, the Second Circuit reasoned that, "[a] loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Turk*, 626 F.3d at 751.

### D.  The Gross Losses and Gains from HSSL Loans

The gross loss incurred by Fannie Mae and Freddie Mac from all HSSL loans was $863,634,538.  Although the Bank Defendants apparently intend to argue that the amount of the gross loss is less because the Government's definition of HSSL loans is overly inclusive, the evidence showed that the Government's definition is sufficiently reliable to provide a reasonable estimate of losses from HSSL loans.  The Government's definition, which was described by Lars Hansen, encompassed AUS-accepted loans originated by Full Spectrum Lending from the start of the HSSL pilot in August of 2007 through Countrywide's announcement that, beginning on May 22, 2008, underwriters would be reintroduced to the loan process to review all conditions

20

and clear loans to close.  Trial Tr. 1698:5-1699:23 (Lars Hansen direct examination); DX 66 (Bulletin 08-237).  The Government's definition tracked loans based on the branch identification codes provided by the Bank Defendants as corresponding to Countrywide's National Sales Centers ("NSC") in Richardson, Texas; Chandler, Arizona; Rosemead, California; Plano, Texas; and Hatboro, Pennsylvania.  Trial Tr. 1699:6-13 (Lars Hansen direct examination); Trial Tr. 984:8-17 (Edward O'Donnell re-direct examination) (describing five fulfillment centers as Richardson, Chandler, Rosemead, Plano, and Hatboro).  Trial testimony demonstrated that the majority of loans processed through the NSCs at that time were HSSL loans.  Trial Tr. 1688:15-18 (John Boland redirect examination) (testifying that the HSSL accounted for "the preponderance of the loans that we were doing at that time"); Trial Tr. 235:14-21 (Michael Thomas direct examination) (HSSL expanded to include Prime CLUES Accept, EA, and stated income loans).

In contrast, the evidence at trial demonstrated that the Bank Defendants employed an under-inclusive and unreliable definition of HSSL loans.  With respect to date range, the Bank Defendants excluded all loans funded on or after April 27, 2008, corresponding to the date on which a new clear to close checklist was implemented, but prior to the time that underwriters were required to review all conditions and clear loans to close.  Trial Tr. 2248:11-2249:17 (Anthony Ho cross-examination).  And as defense witness Anthony Ho testified, the Bank Defendants selected their branch identification codes based on "planning spreadsheets" and "server numbers" that Ho determined were associated with HSSL branches.  Trial Tr. 2226:11-16; Trial Tr. 2227:5-13 (Anthony Ho direct examination).  However, no evidence was introduced to show that such spreadsheets provided a complete and accurate list of all branches that processed HSSL loans and Mr. Ho acknowledged that he had no personal knowledge of the

HSSL process or branches.  Moreover, the Bank Defendants chose to look at only one column of processing branch code data and ignored the fact that HSSL loans could move between various types of branches due to workload balancing.[2]

Moreover, the Bank Defendants included a wholly arbitrary limitation in their definition of the HSSL population.  Specifically, if the name of any person who had a title that included the word "underwriter," or if the letters "UW" appeared in *any field* in the data for a loan, then that loan was automatically excluded from the population of HSSL loans.  Trial Tr. 2250:17-2251:7 (Anthony Ho cross-examination).  Such a blanket limitation lacks any evidentiary foundation given that (a) the data fields themselves do not indicate what function the purported underwriter served for a particular loan, and (b) it is undisputed that a loan could be elevated to an underwriter for a specific question without removing a loan from the HSSL, and the loan could thus be cleared to close by a loan specialist.[3]  The Bank Defendants in fact excluded from their HSSL population Loan Number 179661555, which the data show was cleared to close (at Phase

---

[2] *Compare* Ho Cross, Trial Tr. 2253:23-2254:8 ("Q.  But in determining which loans fell within the bank's criteria for loans that were processed through the High-Speed Swim Lane, you looked only to processing branches, isn't that right?  A.  Yes.  Q.  So if a branch code that you identified as employing the High-Speed Swim Lane appeared in origination branch or funding branch, you didn't consider that to be a loan that came through the High-Speed Swim Lane unless it was also in the processing field, is that right?  A.  Yes."); Ho Direct, Trial Tr. 2221:13-21 (explaining that Bank Defendants only looked at branch numbers listed in one database field titled "PROCBRNUM_SM"), *with* Cross Examination of Michael Thomas, Trial Tr. 336:16-21 ("Q.  And the field branches did not process Hustle loans, is that correct?  A.  Traditionally no.  Sometimes there would be workload balancing, so I can't say for sure, but there are times because the files were electronic that if one group was overwhelmed with volume, we could move volume from one place to another.").

[3] *See* Trial Tr. 2251:8-15 (Anthony Ho cross-examination) ("Q.  That didn't necessarily mean that an underwriter had reviewed the loan file, did it?  A.  I don't think you can know for sure, we just know the system captured these persons were involved with the loan and they happened to have underwriter titles.  Q.  And it didn't mean an underwriter cleared the loan to close, right?  A.  No, not necessarily."); Trial Tr. 2710:3-16 (Desirae Flores direct examination) (stating that underwriters were available to her HSSL team "for escalations, Q and A, any difficult scenario maybe we hadn't come across before" and "in the event we needed additional assistance").

Code 3) by a "Central Fulfill Lend Spec."   PX 442 (listing loan data for Loan Number 179661555); Trial Tr. 2238:6-15 (Anthony Ho direct examination) (testifying that Loan Number 179661555 was not included in the Bank Defendants' HSSL population).   Indeed, of the loans that fall within the Government's HSSL population but appear outside the Bank Defendants' definition, more than sixteen thousand of them appear to have been cleared to close by loan specialists.   PX 308 (loan database).

Finally, any uncertainty in the definition of HSSL loans should be placed at the feet of the Bank Defendants, who for months contended that they were unable to identify HSSL loans, then produced updated loan data in April of 2013, along with a "HSSL" flag, which they nevertheless professed was unreliable.   *See* Nawaday Letter to Court dated August 22, 2013. Defendants should not be rewarded for their dilatory and evasive conduct during discovery by now attacking the Government's definition of HSSL loans as overly inclusive in order to reduce their exposure to civil penalties.   *See SEC v. Razmilovic*, 728 F.3d 71, 88 (2d Cir. 2013) ("So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty") (internal citation and quotation marks omitted); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 364 (2d Cir. 2011) ("When defendants' lack of record keeping renders it impossible to distinguish between just and unjust gains, the risk of the uncertainty falls on the wrongdoer."); *SEC v. Patel,* 61 F.3d 137, 140 (2d Cir. 1995) (stating that risk of uncertainty should fall on the wrongdoer whose conduct created that uncertainty and emphasizing that "[d]istrict courts must be given wide latitude in these matters").

Accordingly, as the amount of gross losses from HSSL loans exceeds the amount of gross gain from HSSL loans, the Court should set the maximum penalty amount that Defendants are subject to as the amount of gross losses from all HSSL loans, or $863,634,548.[4]

### E. Application of Discretionary Factors to the Defendants

For the reasons discussed below, Defendants' illegal conduct warrants a significant penalty. Specifically, the Government respectfully requests the maximum penalty against the Bank Defendants and a penalty against Ms. Mairone that reflects her degree of culpability but takes into account professional and financial consequences she already faces as well as her ability to pay, assuming the Bank Defendants do not intend to indemnify Ms. Mairone for any civil penalty amount the Court orders her to pay.

#### 1. Defendants' Culpability and Bad Faith

As discussed above, Defendants knowingly sold bad loans masquerading as good loans to make a profit during the worsening financial crisis. They set up a loan process that emphasized speed and volume while at the same time removing nearly all of the quality checkpoints. They ignored warnings of bad quality in the pilot phase and ignored reports showing bad quality month after month after the rollout of the HSSL in Central Fulfillment, while removing additional quality checks and instituting funding contests to increase production. All the while, Defendants knew those bad quality loans were being sold to Fannie Mae and Freddie Mac with lies that they were investment quality.

At trial, Defendants frequently defied both the evidence and common sense as they repeatedly insisted that there was no evidence of fraud and that the evidence of their concern for

---

[4] Dr. Mason calculated total gross losses to the GSEs by reference to the unpaid balances owed at the time of default. Dr. Mason further calculated the net losses that the GSEs incurred from such loans as totaling approximately $248,358,021 after accounting for the liquidation and insurance proceeds the GSEs subsequently realized in mitigating their losses as well as settlements with Countrywide or Bank of America.

HSSL loan quality would be "almost overwhelming."  Trial Tr. 68:19-22 (opening by Brendan Sullivan).  To take just a few examples, Defendants called a Countrywide Home Loans executive to testify to the company's commitment to loan quality who had never even heard of the HSSL.  Trial Tr. 1899:15-19 (cross examination of Jack Shackett).  Several defense witnesses pointed to a 2009 quality control report as evidence of the HSSL's good loan quality even though the report reflected artificially reduced defect rates following the Sprint Incentive and did not separate out HSSL loan quality.  (DX 73.)  Cliff Kitashima testified that he never thought the HSSL would produce poor quality loans, that it never did produce poor quality loans, and that Mr. O'Donnell never complained to him that it produced poor quality loans.  Trial Tr. 1963:12-20; 1979:9-13; 2018:8-21 (Kitashima direct examination).  This testimony was echoed by Ms. Mairone.  Trial Tr. 2460:25-2461:19 (Mairone direct examination).  *See also* Trial Tr. 65:1-5 (opening argument by Sullivan) ("So if there is no fraud in this case, and I mean none, what will the evidence show?  It will show very decent, normal people getting up in the morning, putting the kids out to school, going to work, working in a mortgage application business…"); Trial Tr. 3355:3-19 (Summation by Brendan Sullivan) ("No evidence of fraud, no scheme to defraud . . . [W]e have essentially proven that there is no fraud and that there is quality . . . I'm talking about weeks of evidence that amount to nothing when it comes to fraud.  Nothing. . . There are just empty water bottles with nothing in it.  That's what this case is in terms of fraud.").  Those statements were flatly inconsistent with the trial evidence.

Additionally, and as detailed above, Ms. Mairone repeatedly contradicted her deposition testimony in professing that nearly every change she ordered was for the sake of quality and fancifully described Countrywide as a place in which "[l]oan quality was the foundation of what we did everyday. . . That was the culture.  So every, every person cared about quality."  Trial Tr.

2477:4-11 (Mairone direct examination).   Indeed, Ms. Mairone provided this testimony even after the Government introduced evidence of all the quality checkpoints which had been removed, including that quality of grade was not even being monitored for loan specialists who were underwriting the HSSL loans (PX 473, PX 443, PX 420).[5]   The nature and circumstances of Defendants' conduct demonstrates an unyielding and brazen arrogance as well as an attempt to conceal their fraud from the jury and the public.   This factor weighs in favor of a significant penalty.

### 2.  Public Harm from Defendants' Conduct

The consideration of public harm bears heavily on the need to afford adequate deterrence. In a case involving knowingly passing off bad loans as good loans to cheat investors out of money, particularly in the midst of the mortgage crisis, there is a substantial risk of public harm. And here, Defendants were knowingly passing off these bad loans to government sponsored enterprises at a time when these enterprises were slipping toward insolvency, culminating in a Government rescue that risked more than a hundred billion dollars of taxpayer money to save the enterprises from collapse.   The harm to the public is further evidenced by the fact that more than 6,000 HSSL loans defaulted, approximately one-third of which ended up in foreclosure.   *See* PX 308.

Given the inherent difficulties in detecting and prosecuting mortgage fraud, there is a substantial need to impose a penalty to achieve the goal of general deterrence.   Future bank defendants facing FIRREA or other claims for mortgage fraud will surely compare their conduct to that of the Bank Defendants and argue that the penalties imposed here set the benchmark

---

[5] Ms. Mairone's testimony as to "every person" was also discredited by (among other things) the email by Cindy Simantel in which Ms. Simantel informs her boss that she lied to Freddie Mac about the availability of loan files in order to conceal their poor quality (PX 114). Although Ms. Simantel's email was never admitted into evidence, it should be considered for the purpose of evaluating Defendants' bad faith as a factor in setting the amount of civil penalties.

against which their conduct should be measured.  And other corporate executives will almost certainly look to the penalty imposed on Ms. Mairone for the message as to how seriously courts will punish individual executives for their roles in corporate mortgage fraud.  Thus, to effect the goal of general deterrence, the Court should impose a significant penalty to deter other corporate actors from thinking that fraud for corporate profit is acceptable business as usual.  *Cf. SEC v. Gupta*, 11 Civ. 7566 (JSR), 2013 WL 3784138, at *2 (S.D.N.Y. July 17, 2013) (holding that, notwithstanding criminal penalties already imposed, "imposition of an additional civil penalty is called for here in order to effectuate Congress's purpose of making insider trading a money-losing proposition, both for Mr. Gupta and for those who would consider it").

### 3.  Defendants' Ability to Pay

As to the Bank Defendants, there is no dispute as to their ability to pay far more than the maximum allowable penalty and therefore no reason to impose less than the maximum in light of the factors discussed.  As to Ms. Mairone, the Government intends to recommend a penalty based on her ability to pay but received the complete financial disclosure form it requested from Ms. Mairone on November 8, 2013.  Accordingly, the Government respectfully requests the maximum allowable penalty as to the Bank Defendants and a penalty as to Ms. Mairone commensurate with her ability to pay and the other professional and financial consequences she faces as a result of the verdict, but in an amount that the Government will recommend upon analyzing the newly-received information concerning Ms. Mairone's financial situation.

### CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose the maximum penalty on the Bank Defendants and a penalty on Ms. Mairone commensurate with her ability to pay.  Such penalties are necessary to punish Defendants for their culpability and

ongoing bad faith, and to send a clear and unambiguous message that mortgage fraud for profit will not be tolerated.

Dated: New York, New York
   November 8, 2013

        Respectfully submitted,

        PREET BHARARA
        United States Attorney for the
        Southern District of New York


By:   _/s/  *Jaimie L. Nawaday*_____
        PIERRE G. ARMAND
        JAIMIE L. NAWADAY
        JOSEPH N. CORDARO
        CARINA H. SCHOENBERGER
        ELLEN LONDON
        Assistant United States Attorneys
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel:  (212) 637-2800
        Fax:  (212) 637-2730
        Email: Pierre.Armand@usdoj.gov
           Jaimie.Nawaday@usdoj.gov
           Joseph.Cordaro@usdoj.gov
           Carina.Schoenberger@usdoj.gov
           Ellen.London@usdoj.gov

28