**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL, <br><br> Plaintiff, <br><br> − v. − <br><br> BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING, <br><br> Defendants. | |
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Intervenor, <br><br> − v. − <br><br> COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE, <br><br> Defendants. | **Case No. 12-cv-1422 (JSR)** <br><br> ECF Case |

## BANK DEFENDANTS' MEMORANDUM OF LAW REGARDING PENALTIES

Brendan V. Sullivan, Jr.
Enu A. Mainigi
Craig D. Singer
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
*Counsel for Defendant*
*Bank of America, N.A.*

Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
*Counsel for Defendants Countrywide Bank,*
*FSB, and Countrywide Home Loans, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

THE LEGAL FRAMEWORK .................................................................................................4

ARGUMENT ..........................................................................................................................5

I.    The Government Cannot Show that Any Losses Resulted from the Violation, and Thus the General Rule Requires that the Penalty Not Exceed $1,100,000. ...............................................................................................5

    A.    The "Pecuniary Loss" Provision Requires a Showing of Proximate Cause. ..................................................................................5

    B.    The Government Has No Evidence of Proximate Causation in This Case. ...........................................................................................8

II.    The Government Cannot Recover Penalties on the Basis of So-Called "Gross" Loss. ..................................................................................................12

III.    The Government's Penalty Figures Are Vastly Overstated Because They Are Based on an Incorrect Population of "HSSL Loans." ...................................18

    A.    The Government's Proffered HSSL Population Is Wrong. .......................18

    B.    The Actual HSSL Population Is 11,481 Loans. ........................................20

    C.    The Government Cannot Blame Defendants for Its Inaccurate HSSL Calculation. ...................................................................................22

IV.    The Government Cannot Recover a Penalty for Losses on HSSL Loans that Were Not Misrepresented. .......................................................................24

V.    Dr. Mason's Calculation of Losses Is Unreliable for Many Additional Reasons. ..........................................................................................................27

VI.    The Government Has Not Argued the Basis for a Penalty Based on "Pecuniary Gain" and Therefore Has Waived Any Such Argument. ...................28

VII.    The Court Should Award a Penalty Below the Statutory Maximum. ..................29

EVIDENTIARY HEARING .................................................................................................35

CONCLUSION .....................................................................................................................35

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008) ..............................17

*Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 70 (2d Cir. 1990) ............................................17

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ..............................................................7

*FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954) ......................................................................17

*Feine v. McGowan*, 188 F.2d 738, 740 (2d Cir. 1951) ..................................................................28

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768-69 (2d Cir. 1994) ...............8, 13

*In re Refco Inc. Sec. Litig.*, No. 07 MDL 1902 (JSR), 2013 WL 2526661, at *3
   (S.D.N.Y. June 6, 2013)..........................................................................................................16

*Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)...............................................................................17

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) ............................................7

*Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169-70 (2d Cir. 1999)...............................................8

*Nussle v. Willette*, 224 F.3d 95, 99 (2d Cir. 2000)........................................................................17

*SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 509 (S.D.N.Y. 2009)......................................30

*SEC v. Forest Res. Mgmt. Corp.*, No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at *2
   (S.D.N.Y. May 18, 2010).........................................................................................................29

*SEC v. Johnson*, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *10
   (S.D.N.Y. July 24, 2006) .........................................................................................................33

*SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007)..........................................29

*Tucker v. Arthur Andersen & Co*, 646 F.2d 721, 729 (2d Cir. 1981) ...........................................21

*United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 87-88 (2d Cir. 2012)...........................13

*United States v. Anchor Mortgage Corp.*, 711 F.3d 745, 749 (7th Cir. 2013) ..............................13

*United States v. Aumais*, 656 F.3d 147, 153 (2d Cir. 2011) ...........................................................6

*United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999)...........................................................4

*United States v. BP Prods. N.A. Inc.*, 610 F. Supp. 2d 655, 687-88 (S.D. Tex. 2009)...............6, 7

*United States v. Davis*, 726 F.3d 357, 370-71 (2d Cir. 2013)......................................21

*United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)..........................................7

*United States v. Goldstein*, 442 F.3d 777, 786 (2d Cir. 2006).....................................15

*United States v. Khedr*, 343 F.3d 96, 101-02 (2d Cir. 2003).......................................15

*United States v. Lane*, 194 F. Supp. 2d 758, 771 (N.D. Ill. 2002)...............................15

*United States v. Lizza Industries, Inc.*, 775 F.2d 492, 498 (2d Cir. 1985)...............15, 16

*United States v. Menendez*, No. CV 11-06313 (MMM), 2013 WL 828926, at *5, *7
   (C.D. Cal. Mar. 6, 2013) ........................................................................5, 13, 29

*United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011) ....................................6

*United States v. Myerson*, 18 F.3d 153, 162 n.10 (2d Cir. 1994) ...............................2

*United States v. RePass*, 688 F.2d 154, 157 (2d Cir. 1982).......................................29

*United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007)......................................7

*United States v. Salameh*, 152 F.3d 88, 133 (2d Cir. 1998)........................................2

*United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 150, 152 (D.D.C. 2012)...........6, 7, 28

*United States v. Siddons*, 660 F.3d 699, 705 (3d Cir. 2011)........................................4

*United States v. Turk*, 626 F.3d 743, 745-46, 748-51 (2d Cir. 2010) ......................11, 15

*United States v. Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995), *aff'd*, 96 F.3d 1491
   (D.C. Cir. 1996) .............................................................................................7, 17

## OTHER AUTHORITIES

28 C.F.R. 85.3(a)(7) ...................................................................................................4

7 U.S.C. § 7734(b)(1)(B) .........................................................................................14

7 U.S.C. § 8313(b)(1)(B) .........................................................................................14

12 U.S.C. § 1833a ............................................................................................ passim

12 U.S.C. § 1833a(b)(1)...........................................................................................4

12 U.S.C. § 1833a(b)(2)...........................................................................................4

12 U.S.C. § 1833a(b)(3)..................................................................................... passim

12 U.S.C. § 1833a(c)................................................................................................4

12 U.S.C. § 1833a(f).................................................................................................5

18 U.S.C. 3571(d)............................................................................................6, 7, 14

28 U.S.C. § 2461 note..............................................................................................4

Black's Law Dictionary 747, 1030 (9th ed. 2009)................................................29, 13

Fed. R. Civ. P. 26(e)(1)...........................................................................................28

Pub. L. No. 101-73, § 101(10), 103 Stat. 183, 187 (1989).........................................31

U.S.S.G. § 2B1.1 App. Note 3(A)...............................................................................8

U.S.S.G. § 2B1.1 App. Note 3(E)..............................................................................15

## INTRODUCTION

The Bank Defendants respectfully submit that the penalties in this matter should not exceed the general statutory maximum of $1.1 million and, given the facts of this case, should be zero.

**No Proof of Proximate Cause**:  The maximum penalty under FIRREA, 12 U.S.C. § 1833a is $1.1 million unless the government can show an entitlement to the special rule for a higher penalty based on the amount of pecuniary loss caused by the violation.[1]  To secure a penalty beyond $1.1 million, the government has the burden to prove that Defendants' scheme to misrepresent the quality of HSSL loans, and not other factors, *proximately caused* a pecuniary loss to Fannie Mae or Freddie Mac.  The government cannot do so.  All mortgage loans present default risk, especially in the economic environment of the past five years.  The government cannot show that any loss suffered by Fannie and Freddie in connection with HSSL loans proximately resulted from a misrepresentation by Countrywide about the loans, as opposed to other factors such as the worldwide mortgage crisis, which had an enormous effect on mortgage loans purchased by Fannie and Freddie during the relevant time period.  This conclusion is underscored by evidence that HSSL loans with alleged "material defects" performed no differently than HSSL loans without such defects, and that HSSL loans performed no differently than other loans Fannie and Freddie purchased from Countrywide or from third parties.

Tellingly, the government completely fails to address proximate cause in its brief—the phrase appears nowhere in the government's submission.  This is especially astonishing because Defendants gave the government advance notice that they intended to raise the issue.  *See* Email from C. Singer to Govt. Counsel (Oct. 28, 2013) (Singer Decl. Ex. 22).  The Court had directed

---

[1] The government's brief does not present any argument as to "pecuniary gain" and thus it has waived any argument on that basis.

Defendants to provide notice "so that . . . [the legal issues would be] all addressed in [the government's] moving papers."  Trial Tr. 3506:6-8 (Oct. 23, 2013) (Singer Decl. Ex. 1).[2]  Perhaps the government decided it could not address proximate causation because, as recently as four years ago, the government expressly *agreed* that the relevant language of § 1833a, when used in the Alternative Fines Act, requires proof of proximate causation.

**A "Gross" Measure of Penalties Is Improper Under FIRREA**:  Even if the government could show proximate causation (it cannot), it could only seek a penalty based on the net loss, after subtracting recoveries on collateral.  Net loss, not gross loss, is the norm in civil litigation unless Congress specifies otherwise, and it did not do so in enacting FIRREA.  Similarly, the criminal Sentencing Guidelines, on which the government relies heavily in its brief, require netting the value of collateral in fraud cases.  In arguing for a departure from the norm, the government ignores the economic reality that Fannie and Freddie have the right to the collateral that secures defaulted loans.

**The Government Calculates Loss on a Population It Knows Is Incorrect**:  It is disingenuous for the government to continue to rely on a population of 28,882 so-called "HSSL loans" when discovery and trial revealed that number to be completely wrong.[3]  As outlined in greater detail below, there is no evidence in the record to support that number.  The government was on notice of this issue as early as January 9, 2013, when Michael Thomas wrote to government counsel, and certainly by the time of Anthony Ho's corporate depositions on April 26 and June 7 and Defendants' June 18 expert reports.  In an apparent effort to avoid

---

[2] All trial transcript excerpts cited herein are attached to the Singer Declaration as Exhibit 1 and are hereafter referred to only as "Trial Tr."

[3] "[T]he prosecutor has a special duty not to mislead; the government should . . . never make affirmative statements contrary to what it knows to be the truth."  *United States v. Salameh*, 152 F.3d 88, 133 (2d Cir. 1998) (quoting *United States v. Myerson*, 18 F.3d 153, 162 n.10 (2d Cir. 1994)).

embarrassment in front of the jury, the government made the strategic decision to ignore its gross error at trial, but at the penalty phase it cannot continue to ignore the undisputed facts. The correct population of HSSL loans is 11,481.

**The Government Cannot Obtain a Penalty on Investment Quality Loans**: The government's only theory of fraud is that Defendants misrepresented to Fannie and Freddie that HSSL loans were investment quality when they were not. Even according to the government's own expert, the majority of HSSL loans were investment quality and thus were not sold with actionable misrepresentations. Yet the government seeks to recover penalties based on losses from *all* HSSL loans, no matter what their quality. This is obviously improper.

**Discretionary Factors**: The Court has discretion to award an amount lower than the maximum penalty. The government agrees that there is no minimum penalty. Govt. Br. 10. For many reasons, the Court should exercise its discretion in this case. As the government recognizes, the company that would pay any penalty, Bank of America, committed no fraud.[4] Bank of America was an innocent acquirer in this case. It purchased a financially distressed Countrywide during the worldwide economic crisis—*after* all of the alleged wrongdoing in this case was over. Even as to Countrywide, the evidence showed that FSL executives designed the HSSL process in good faith as a means of transitioning to prime processing. The HSSL loans did not actually harm Fannie and Freddie; they performed as well as other loans. The alleged victims, Fannie and Freddie, have settled their differences with Bank of America and continue to do business with the Bank to this day.

---

[4] The government initially claimed that Bank of America itself was a wrongdoer in connection with the HSSL process. It ultimately had to retract that allegation after discovery showed unmistakably that the HSSL process ended before Bank of America acquired Countrywide. The government has never explained how it could have alleged that Bank of America was a wrongdoer when it investigated this case for months before filing its complaint.

According to the government, Bank of America committed the offense of taking this case to trial, arguing that there was no fraud, and putting the government to its proof.  *See* Govt. Br. 24-25.  The government's argument is offensive, suggesting a defendant should be more severely punished when it dares to defend itself against allegations of fraud which it truly believed were baseless—and still does.  For all these reasons, as explained in more detail below, the penalties in this matter should be zero.

## THE LEGAL FRAMEWORK

Upon a jury's finding that a defendant has violated 12 U.S.C. § 1833a(c), the Court has discretion to decide the amount of any civil penalties, within the maximum amounts prescribed by the statute.  In general, "[t]he amount of the civil penalty shall not exceed $1,000,000."  12 U.S.C. § 1833a(b)(1).  This maximum amount has been adjusted for inflation to $1.1 million.  *See* 28 C.F.R. 85.3(a)(7); 28 U.S.C. § 2461 note.

The statute includes two "[s]pecial rule[s]" that permit higher penalties in specified situations.  12 U.S.C. § 1833a(b)(2), (3).  First, a court may award up to $5 million "[i]n the case of a continuing violation."  *Id.* § 1833a(b)(2).  Mail and wire fraud are not continuing violations, so this "special rule" does not apply, and the government does not argue otherwise.  *See*, *e.g.*, *United States v. Siddons*, 660 F.3d 699, 705 (3d Cir. 2011); *United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999).

Second, "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty may exceed the amounts described in paragraphs (1) and (2) but may not exceed the amount of such gain or loss."  12 U.S.C. § 1833a(b)(3)(A).  In its brief, the government seeks a penalty in excess of the $1.1 million cap on the basis of "pecuniary loss" to the GSEs resulting from the HSSL fraud, allegedly in the amount of $863,634,538.  Govt. Br. 12.  The government bears the burden

4

of proving the facts establishing such a loss.  12 U.S.C. § 1833a(f) ("In a civil action to recover a

civil penalty under this section, the Attorney General must establish the right to recovery by a

preponderance of the evidence.").  For the reasons explained below, the government cannot

prove that the violation "result[ed] in pecuniary loss" and, accordingly, the $1.1 million statutory

maximum penalty applies.

In addition, the Court has discretion to impose a penalty below the statutory maximum.

*See United States v. Menendez*, No. CV 11-06313 (MMM), 2013 WL 828926, at *5 (C.D. Cal.

Mar. 6, 2013).  As explained more fully below, the circumstances of this case weigh in favor of a

penalty well below the statutory maximum.

## ARGUMENT

### I.    The Government Cannot Show that Any Losses Resulted from the Violation, and Thus the General Rule Requires that the Penalty Not Exceed $1,100,000.

Under § 1833a(b)(3), the government can recover a penalty up to the amount of a

"pecuniary loss" only if it can show that Fannie or Freddie actually suffered pecuniary loss and

that such loss was *proximately caused* by the FIRREA violation.  The government has no such

evidence.  Even though the Court raised the issue of causation on the first and last days of trial

and Defendants raised the issue in their pre-trial motions and in their statement of issues for the

penalty phase, the government does not argue in its brief that it could make such a showing.

Indeed, as discussed below, the government's loss expert *concedes* that he did not take into

account whether any losses to Fannie or Freddie were caused by the loans' material defects as

opposed to other factors such as the worldwide mortgage crisis.

### A.    The "Pecuniary Loss" Provision Requires a Showing of Proximate Cause.

The proximate causation requirement is clear from the language of § 1833a(b)(3) and

fundamental principles of tort and criminal law.  The statute permits an increased maximum

penalty if a person "derives pecuniary gain from the violation" or "the violation results in pecuniary loss." 12 U.S.C. § 1833a(b)(3)(A). No court has interpreted that language in § 1833a, but courts interpreting identical language in the Alternative Fines Act, 18 U.S.C. § 3571(d), have held that it requires proof that "a given monetary amount (either a gain or a loss) was proximately caused by the conduct of the charged offense." *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 152 (D.D.C. 2012); *United States v. BP Prods. N.A. Inc.*, 610 F. Supp. 2d 655, 688 (S.D. Tex. 2009) (same). These courts reasoned that the statutory language invokes the "'bedrock rule of both tort and criminal law that a defendant is only liable for harms he proximately caused.'" *Sanford Ltd.*, 878 F. Supp. 2d at 150 (quoting *United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011)).

It is a well-established principle of common law that a statutory violation or other wrongful act typically can be considered to have resulted in a particular injury or loss only when it is the proximate cause of that injury or loss. *See United States v. Aumais*, 656 F.3d 147, 153 (2d Cir. 2011) ("[P]roximate cause is a deeply rooted principle in both tort and criminal law."). As the Court observed at the summary judgment hearing:

> [B]oth the law of proximate causation and the law of materiality are always there because they are put there by operation of common-law principles. Congress doesn't need to repeat, and never does repeat, in statute after statute after statute such things as materiality or proximate causation because those are implicit in all statutes of this sort, tort statutes; and the mail fraud becomes a tort statute in this context, by operation of law.

Summ. J. Hr'g Tr. 103:11-18 (Aug. 13, 2013) (Singer Decl. Ex. 20).

The government itself argued in the 2009 *BP Products* case that the identical "results in pecuniary loss" language should be interpreted to require proximate causation. *See BP Prods.*, 610 F. Supp. 2d at 687. A few years later, the court in *Sanford Ltd.* also accepted the government's interpretation, stating: "Based on its litigation position in *BP Products*, the Court

6

has little doubt that the government concurs that proximate cause is the appropriate standard under § 3571(d)." 878 F. Supp. 2d at 152. The government's brief in this case, however, nowhere mentions the Alternative Fines Act.

The relevant language of FIRREA's pecuniary loss provision is identical to that of the Alternative Fines Act, and the same interpretation should apply. So too, the criminal predicates and punitive nature of FIRREA implicate the same background principle as the Alternative Fines Act, that "[p]unitive statutes, such as FIRREA, are to be narrowly construed." *United States v. Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996).

Thus, the statutory language means that any gain or loss "must be causally linked to the offense," that is, to the proven criminal acts, not to uncharged conduct of the defendant or other circumstances. *BP Prods.*, 610 F. Supp. 2d at 687. Proximate causation requires isolating the losses caused by the violation, and excluding any losses caused by market factors or other causes. *See United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (holding in securities fraud case that "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud," and "[i]n such cases, '[l]osses from causes other than the fraud must be excluded from the loss calculation'" (quoting *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006))); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (holding that proximate causation analysis requires determining what amount of loss was caused by the misrepresentation, as opposed to other factors).

Proximate causation requires more than mere "transaction causation" or "but for" causation. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008). Thus, in addition to "showing that but for the defendant's misrepresentations the transaction would not have come about," there must be proof of proximate causation: that "the misstatements were the

reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994); *see also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169-70 (2d Cir. 1999) (causation under RICO requires both transaction causation and loss causation, meaning proximate cause).

Ignoring all of the above, the government's brief argues for a standard that would penalize a defendant for all potential losses that are "reasonably foreseeable"—whether or not such losses actually occurred or actually were proximately caused by the defendant's conduct. Govt. Br. 17-20.  Although reasonable foreseeability is one aspect of proximate causation, a penalty under § 1833a based on loss is permissible only "*if the violation results in pecuniary loss*," and "*may not exceed the amount of such . . . loss*."  12 U.S.C. § 1833a(b)(3)(A) (emphasis added).  FIRREA thus caps the allowable penalty at the amount of *actual losses* resulting from the violation, not potential or "foreseeable" losses that did not materialize or were not caused by the offense.  In that respect, FIRREA is entirely different from the criminal Sentencing Guideline 2B1.1 on which the government relies, which measures loss by "the greater of actual loss *or intended loss*."  U.S.S.G. § 2B1.1 App. Note 3(A) (emphasis added).

### B.    The Government Has No Evidence of Proximate Causation in This Case.

The only FIRREA violation that the jury could have found, based on the Court's instructions, was that Defendants engaged in a scheme to misrepresent the quality of HSSL loans.  The government has no evidence that Fannie Mae or Freddie Mac suffered any loss proximately caused by fraudulent misrepresentation of the quality of HSSL loans.

The government's only evidence of loss is the analysis conducted by its expert, Dr. Joseph Mason.  At the government's request, Dr. Mason confined his analysis to calculating the past and projected losses on HSSL loans.  *See* Second Updated Expert Report of Dr. Joseph R. Mason ¶ 9 (Aug. 23, 2013) ("Mason Rep.") (Singer Decl. Ex. 11).  He did not employ any

method, such as regression analysis, to isolate the losses attributable to the fraud alleged by the government, nor did he introduce any variables into his analysis to remove the influence of factors unrelated to fraud.  He simply purported to calculate losses on HSSL loans, regardless of why those losses may have occurred.  *See* Mason Dep. 34:9-20 (June 6, 2013) (Singer Decl. Ex. 10).  In short, his calculations "did not consider" causation issues.  *Id.* at 94:20–95:4.

In other words, Dr. Mason's analysis of the loss to Fannie and Freddie did not address whether the loan losses were caused by alleged defects in the loans, or instead were caused by factors wholly unrelated to the alleged fraud.  Dr. Mason did not consider the effect of the nationwide mortgage crisis and economic collapse, which obviously caused many mortgages to default that otherwise would not have.  Nor did he consider any of the multitude of reasons a particular loan might default in any era, such as the borrower becoming unemployed after the loan is funded.  *See id.* at 34:9-20, 94:20–95:4.

Because they ignore proximate causation, Dr. Mason's opinions are wholly irrelevant to assessing penalties under FIRREA.  Indeed, they are not a meaningful measure of any kind of damages attributable to fraud.  The government's own causation expert, Professor Daniel L. McFadden, agreed.  He testified in his deposition that a damage model that does not take into account non-fraud factors, such as the impact of changing housing prices, "would be incorrect" and would *not* measure the loss attributable to the allegedly fraudulent practices.  McFadden Dep. 43:19–44:15 (June 11, 2013) (Singer Decl. Ex. 12).[5]  When those factors are in fact considered, the evidence shows that loans with material defects performed no differently than those without them.  Updated Expert Report of Christopher M. James ¶ 79 (Sept. 23, 2013)

---

[5] Perhaps for this reason, the government chose not to call Dr. McFadden—who it described in its August 22, 2013 letter to the Court as its "causation expert"—as a trial witness.  *See* Letter from J. Nawaday to the Court 2 (Aug. 22, 2013) (Singer Decl. Ex. 21).

("James Rep.") (Singer Decl. Ex. 9).  In other words, misrepresentations as to loan quality were not the cause of the losses.  Dr. Hubbard's work further confirms this conclusion.  A comparison of HSSL loans to loans sold by third parties to the GSEs shows that HSSL loans performed no differently.  *See* Expert Report of Robert Glenn Hubbard ¶¶ 42-44 (Sept. 23, 2013) ("Hubbard Rep.") (Singer Decl. Ex. 7).

The Court previously addressed proximate causation in finding that Dr. Mason's "loss" analysis was not admissible in the liability phase.  In response to the government's argument that "loss resulting from fraudulent conduct is still admissible to show intent," the Court observed:

> THE COURT:  Is it?  Loss can occur for hundreds of reasons in this kind of a market.  There are certain circumstances where the only rational or plausible reason for assuming loss is a fraud, and then it might be admissible.  But here there are multiple market reasons why loss could occur for other reasons.

Trial Tr. 20:12-17 (Sept. 24, 2013).[6]  Similarly, after the verdict, the Court disagreed with the government's suggestion that it could ignore causation in the penalty phase:

> THE COURT:  Well, I think if anything it cuts the other way.  I have been of the view from day one that the reason – that it required a fair degree of speculation to determine the relationship between the fraud and the loss.

*Id.* at 3495:14-17 (Oct. 23, 2013).  As Dr. Mason admitted, he did nothing in his analysis to determine the causal relationship, if any, between the loss he calculated and the alleged fraud.  Drawing such a connection would be pure speculation.

The nature of the requisite proximate cause analysis flows from the particular FIRREA violation the government alleged in this case.  The government's only claim was that Countrywide misrepresented that loans sold through the HSSL process "were of higher quality than they actually were."  Jury Instr. No. 9.  Thus, the only losses that could be pertinent to a

---

[6] The Court thus concluded, "I think the whole thing is irrelevant on the facts of this case, so far as the jury is concerned."  Trial Tr. 20:22-24 (Sept. 24, 2013).  While the Court allowed for the possibility that such evidence "may bear on my computation of damages if we get there," *id.*, the Court did not address the elements of civil penalties at that time.

civil penalty are losses to the GSEs proximately caused by material defects in HSSL loans at the time of sale. All mortgage loans present default risk. To measure pecuniary loss from the alleged fraud, Dr. Mason would have to measure the *incremental* loss, if any, to the GSEs that resulted from material defects in HSSL loans, over and above the losses that would have occurred without the alleged fraudulent scheme. *See* Updated Report of Jonathan L. Walker 3-4 (Sept. 23, 2013) ("Walker Rep.") (Singer Decl. Ex. 13). Because he did not attempt to isolate those incremental losses, Dr. Mason's analysis does not speak to the losses caused by the alleged fraud.

The government argues that it does not matter that the losses Dr. Mason calculated were caused by factors other than the alleged fraud because "segregation of causal factors . . . is inappropriate in the mortgage fraud context." Govt. Br. 20. This argument flies in the face of the statutory language and a substantial body of law, as discussed above. The one case on which the government relies says nothing of the sort. In *United States v. Turk*, the defendant persuaded individuals to lend her money, purportedly for renovating apartment buildings. 626 F.3d 743, 745 (2d Cir. 2010). Turk promised the individual investors that, as collateral for their loans, they would hold recorded first mortgages in the buildings, but in reality she did not record their mortgages. When the scheme unraveled, the depreciated value of the buildings was sufficient to repay only the secured interests of the banks, and the unsecured investors lost nearly all of their investment. *Id.* at 746. The Second Circuit rejected Turk's argument that the investors' losses were caused by the depreciation of the buildings, because she never collateralized the investor's loans. Thus, the proper measure of their loss was not the declining value of the buildings because, thanks to Turk, they had no interest in the buildings as collateral. *Id.* at 750-51. That is nothing like this case, where Fannie and Freddie held a secured interest in the residences

11

collateralizing the HSSL loans they purchased, and numerous factors unrelated to the alleged fraud affected whether those loans would be repaid in full.  *Turk* in no way relieves the government from proving that its claimed loss was proximately caused by the fraud, a burden it has not carried.

## II.     The Government Cannot Recover Penalties on the Basis of So-Called "Gross" Loss.

The government's calculation of loss (however caused) is vastly overstated because it is based on the entire unpaid principal balance of delinquent loans without taking into account Fannie's and Freddie's right to (and receipt of) the loan collateral and its proceeds.  The $863 million figure, which the government terms "gross loss," reflects only "the liquidated unpaid principal balance . . . of the mortgage[s] at the time of default."  Mason Rep. ¶ 21 (Singer Decl. Ex. 11).  By its express terms, the figure excludes the proceeds Fannie and Freddie receive "after sale of [the] propert[ies] following foreclosure."  *Id.*  As the government's own expert acknowledges, the GSEs do not measure losses by what the government calls the "gross loss" figure; they instead record what the government calls the "net loss" number, which does take into account the value of the collateral.  *Id.*

Not only do Fannie and Freddie record this net loss figure as their loss, using a figure that takes into account the collateral value is the only rational way to view loss given the actual economics.  When a GSE bought a loan originated by Countrywide, the GSE obtained a right to a stream of loan payments stretching out long into the future (over the term of the loan, perhaps ten or thirty years) along with a security interest in the loan collateral.  Upon a delinquency by the borrower, the GSE could no longer expect to receive that stream of future payments, but instead realized its right to the collateral, including its right to the proceeds from the sale of the collateral.  In such circumstances, the collateral (and its proceeds) may be worth less than the outstanding principal balance, and there may be a loss.  But the actual "pecuniary loss" to Fannie

Mae or Freddie Mac must take into account the value of the collateral, that is, be what the

government terms "net loss" rather than "gross loss."

"Basing damages on net loss is the norm in civil litigation." *United States v. Anchor*

*Mortgage Corp.*, 711 F.3d 745, 749 (7th Cir. 2013). In *Anchor Mortgage*, the Seventh Circuit

held that the district court erred in using "gross loss" to measure damages under the False Claims

Act ("FCA"). The court reasoned that, although the FCA did not specify either a gross or net

approach, it did not "signal a departure from the norm—and the norm is net." *Id.* The Second

Circuit agrees that net loss is the normal measure of damages. *See United States ex rel. Feldman*

*v. van Gorp*, 697 F.3d 78, 87-88 (2d Cir. 2012) (stating that when the government has paid for

"goods or services that return a tangible benefit to the government," the measure of damages is

"the difference between the value that the government received and the amount that it paid");

*First Nationwide Bank*, 27 F.3d at 768 ("In determining fraud damages, any amount recovered

by the fraudulently induced lender necessarily reduces the damages that can be claimed as a

result of the fraud."); *see also* Black's Law Dictionary 1030 (9th ed. 2009) ("[T]he usual method

of calculating the loss is to ascertain the amount by which a thing's original cost exceeds its later

selling price.").

Section 1833a, like the FCA, gives no indication of a departure from the normal, net,

measure of "pecuniary loss." Indeed, the one court that has discussed a penalty under § 1833a in

any detail used net, not gross, loss when assessing the penalty. *See Menendez*, 2013 WL 828926,

at *7 (noting in the penalty analysis "that HUD suffered a loss equal to the difference between

the outstanding principal, unpaid interest, and foreclosure costs, on the one hand, and the amount

it received through the short sale, on the other").

When Congress intends to depart from the norm and indicate a "gross" measure of loss, including in the civil penalty context, it specifically says so. *See, e.g.*, 7 U.S.C. § 7734(b)(1)(B) (authorizing a civil penalty of twice the "gross loss" or "gross gain" for violation of the Plant Protection Act); 7 U.S.C. § 8313(b)(1)(B) (same for violation of animal health protection laws). Of particular significance here, Congress *did* specifically elect a "gross" measure of loss in the Alternative Fines Act, the statute that in other respects most closely tracks the "pecuniary loss" language of § 1833a. The relevant Alternative Fines Act provision was enacted in 1987, two years before FIRREA, and evidently was the model for FIRREA's pecuniary gain or loss penalty provisions. The language of the Alternative Fines Act is materially identical to § 1833a insofar as it authorizes a penalty "[i]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant." 18 U.S.C. § 3571(d). But in stark contrast to § 1833a, which goes on to provide that the penalty "may not exceed the amount of such gain or loss," 12 U.S.C. § 1833a(b)(3)(A), the Alternative Fines Act instead authorizes a fine up to twice the "*gross* loss" or "*gross* gain" from the violation, 18 U.S.C. § 3571(d) (emphases added). When Congress enacted § 1833a, therefore, it chose to mirror the Act's "pecuniary loss" language but to depart from its "gross loss" language. The government's interpretation, which would have these two statutes mean the same thing, is obviously wrong.

The government seeks to analogize to the criminal Sentencing Guidelines, but the Guidelines also demonstrate that net loss, not gross loss, is the appropriate measure. Of particular significance here, *recoveries from collateral* are specifically required to be netted in a Guidelines loss calculation. To calculate the Guidelines loss resulting from fraud, the trial judge *must* reduce the loss by "(i) [t]he money returned, and the fair market value of the property returned and the service rendered, by the defendant . . . to the victim before the offense was

14

detected" and "(ii) [i]n a case involving collateral pledged or otherwise provided by the

defendant, the amount the victim has recovered at the time of sentencing from disposition of the

collateral, or if the collateral has not been disposed of by that time, the fair market value of the

collateral at the time of sentencing."  U.S.S.G. § 2B1.1 App. Note 3(E).

The government's brief never mentions this collateral netting provision, even as it relies

on the very same Sentencing Guideline that contains that provision.  Govt. Br. 15-18.  In

addition, while the government cites and discusses Guidelines cases in which courts conducted

that very netting analysis, the government incorrectly states that courts *do not* consider

"reductions in losses" in calculating a sentencing guidelines range.  Govt. Br. 15.  The cited

cases do not support that statement—and some of them directly contradict it.  For example, in

*United States v. Lane*, 194 F. Supp. 2d 758 (N.D. Ill. 2002), the court correctly "subtracted the

value of any assets pledged to secure the loan" from "the amount of the loans outstanding at the

time the fraud was discovered."  *Id.* at 771.  *United States v. Goldstein* holds that the term "gross

receipts" as used in a sentencing enhancement "is not the equivalent of 'net profits.'"  442 F.3d

777, 786 (2d Cir. 2006) (quoting *United States v. Khedr*, 343 F.3d 96, 101-02 (2d Cir. 2003)).

The government fails to mention that the *Goldstein* court was interpreting the phrase "gross

receipts" and not rejecting net calculations as a whole.  *See* Govt. Br. 15.  Similarly, in *Turk*, the

Second Circuit specifically recognized that "a defendant may receive a credit against the loss

for" the value of collateral, 626 F.3d at 748, but Turk herself was not entitled to a credit because

she never collateralized the loans with the property as promised and, even if she had, the

property was worth nothing by the time of her sentencing, *id.* at 748-49.

The government seeks to analogize to RICO, citing *United States v. Lizza Industries, Inc.*,

775 F.2d 492 (2d Cir. 1985).  *See* Govt. Br. 14-15.  *Lizza* discusses RICO's *forfeiture* provision,

15

not any civil penalty or other damage for which proximate causation is required.  In that case, the Second Circuit held that calculating forfeiture based on "gross profit" was "consistent with the purposes of" the RICO statute.  775 F.2d at 498; *see id.* (quoting RICO as permitting forfeiture of "any interest [the defendant] has acquired or maintained in violation of [the law]").  Importantly, even while it adopted a "gross profit" measure, the court still "deduct[ed] from the money received on the illegal contracts . . . the direct costs incurred in performing those contracts."  *Id.*  The court distinguished "gross profits" from "net profits," which would involve deducting not only the direct costs from each contract but also "an allocated portion of the overall indirect operating expenses" and "taxes paid on the profits."  *Id.* at 498.  Thus, even if the *Lizza* analysis applied to § 1833a (which it does not), it would still require netting direct offsets, such as the value of the collateral, from the loss calculation.

As these examples show, the concept of net loss is far different from the concept of mitigation, to which the government seeks to analogize.  It may be that, at least in some circumstances, a victim's efforts to mitigate his losses after he is defrauded may not speak to the degree of the defendant's culpability.  But it *is* relevant to the defendant's culpability that the victim *actually receives something of value* as part of the allegedly fraudulent transaction.

More to the point, since the amount of the FIRREA penalty is capped at actual *pecuniary loss*, it makes no sense to disregard the value of collateral in calculating that loss.  A mortgage default precipitates both a negative event, the mortgage holder's loss of its expected future repayment of the principal balance, and a positive event, the mortgage holder's entitlement to the loan collateral.  *See* Walker Rep. 20 (Singer Decl. Ex. 13).  It is inaccurate to assess the impact of a default as if only the negative event occurred and Fannie or Freddie did not acquire an offsetting claim to the collateral or title to valuable property.  *Cf. In re Refco Inc. Sec. Litig.*, No.

16

07 MDL 1902 (JSR), 2013 WL 2526661, at *3 (S.D.N.Y. June 6, 2013) ("It is settled law that, in

an action for fraud under New York law, plaintiffs are limited to recovering their actual losses,

defined as actual pecuniary loss sustained as a direct result of the wrong.  Thus a plaintiff may

not recover for losses, but ignore his profits, where both result from a single wrong." (internal

quotation marks omitted)).

The government argues that the Court should interpret the loss provision broadly because

FIRREA is a punitive statute.  This argument gets the familiar legal maxim exactly backwards:

"Punitive statutes, such as FIRREA, are to be *narrowly* construed."  *Vanoosterhout*, 898 F. Supp.

at 30 (emphasis added); *see FCC v. Am. Broad. Co.*, 347 U.S. 284, 296 (1954) ("[P]enal statutes

are to be construed strictly," even when applied in noncriminal contexts.); *Leocal v. Ashcroft*,

543 U.S. 1, 11 n.8 (2004) (same regarding rule of lenity); *Cresswell v. Sullivan & Cromwell*, 922

F.2d 60, 70 (2d Cir. 1990) ("[A] statute with a punitive thrust . . . is to be strictly construed.").

The pecuniary loss provision of the statute also should be narrowly construed for the independent

reason that it is an *exception* to the general rule in § 1833a that penalties may not exceed $1.1

million.  *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008)

(affirming "the 'interpretive principle that statutory exceptions are to be construed narrowly in

order to preserve the primary operation of the general rule'" (quoting *Nussle v. Willette*, 224 F.3d

95, 99 (2d Cir. 2000))).

Finally, the government argues that net loss would be insurmountably difficult to

calculate, Govt. Br. 17, but its own expert already presents a "net" figure of $134 million.[7]  *See*

Mason Rep. ¶ 10 (Singer Decl. Ex. 11).  Indeed, Fannie Mae and Freddie Mac actually record a

net loss amount on a loan-level basis, and they provided that data in this case.  *Id.* ¶ 21; *see id.*

---

[7] This figure reflects Dr. Mason's calculation of net losses on the allegedly "materially
defective" portion of the alleged "HSSL" population of 28,882 loans.

17

¶ 26.  It is the "gross loss" figure that Dr. Mason had to extrapolate from other data, because the GSEs did not keep a record of "gross loss" on defaulted loans.  *See id.* ¶ 24.  In short, the government's requested "gross loss" figure is not a correct or appropriate penalty measure.

## III.   The Government's Penalty Figures Are Vastly Overstated Because They Are Based on an Incorrect Population of "HSSL Loans."

The government's loss calculation assumes that 28,882 loans were "HSSL loans."  That loan population is the basis of all of the government's calculations of HSSL loan defects and their consequences, including Dr. Mason's "loss" calculations.  The government's loan population is vastly overstated and incorrect, and the government well knows it.  It is, frankly, shocking and disingenuous that the government continues to assert that the HSSL population numbers 28,882 loans when all of the evidence, including the testimony from the government's own witnesses, clearly shows that the real universe is far smaller.

### A.   The Government's Proffered HSSL Population Is Wrong.

The 28,882 figure comes from Lars Hansen, a data analyst from the Federal Housing Finance Agency Office of Inspector General, who derived the "HSSL loan" population from the bank data by applying criteria that government counsel provided to him prior to trial.  The government told Mr. Hansen to assume that a loan was originated through the HSSL process if it met three criteria:  first, that it had an application date on or after August 13, 2007 and a mortgage funding date on or before May 21, 2008; second, that the loan was processed or funded in one of five geographic centers (Chandler, Plano, Hatboro, Richardson or Rosemead); and third, that it had an automated underwriting system ("AUS") accept code.  Trial Tr. 1698:5–1700:5, 1700:19-23 (Oct. 7, 2013).

Mr. Hansen, a summary witness, admitted that he had *no* personal knowledge of the facts defining what loans were originated through the HSSL process.  *Id.* at 1764:14-17.  He had no

personal knowledge as to whether the assumptions given to him by the government were correct. *Id.* at 1764:22–1765:3 (start date), 1765:4-10 (end date), 1765:11-19 (AUS code), 1765:20–1770:6 (location).  It was incumbent on the government, therefore, to establish through other evidence that the criteria Mr. Hansen used to define the HSSL population were the correct ones.

As it happened, the government introduced *no* evidence to support the assumptions it provided to Mr. Hansen.  On the contrary, all of the record evidence from government and defense witnesses alike shows that the assumptions given to Mr. Hansen substantially over-counted the number of loans originated through the HSSL process.  Most significantly, Mr. Hansen admitted that the criteria he used did not differentiate between Field branches and Central Fulfillment branches.  *Id.* at 1767:1–1770:1.  Including Field branches was directly contrary to the testimony of government witness Michael Thomas, who testified that only Central Fulfillment branches, and not Field branches, originated loans through the HSSL process.  *Id.* at 334:10–341:11 (Sept. 26, 2013).[8]  Other evidence corroborated Mr. Thomas: Most notably, the Countrywide bulletin that announced the start of the Central Fulfillment process clearly provided that "Field branches and other NSC centers will continue to use the existing model."  DX 31 (Singer Decl. Ex. 2).[9]  In addition, Mr. Hansen's criteria egregiously overstate the number of loans during the two-month pilot period.  While only two branches participated in the pilot, Trial Tr. 2220:24–2221:5 (Oct. 10, 2013); DX 339, Mr. Hansen includes

---

[8] The government cites Mr. Thomas's testimony to the effect that "if one group was overwhelmed with volume, we could move volume [of loans] from one place to another."  Trial Tr. 336:16-21 (Sept. 26, 2013) (cited at Govt Br. 22. n.2).  To suggest that some loans *could* have been processed in Field branches is a long way from testifying that this actually happened.  Far less does Mr. Thomas's vague speculation amount to competent proof that thousands of particular loans processed in Field branches were HSSL loans.

[9] All trial exhibits cited herein are included in Exhibit 2 to the Singer Declaration and are hereinafter cited only as "PX" or "DX" as appropriate.

thousands of loans that went through the dozens of other branches operating in the five geographic centers during the pilot.

None of this was a secret from the government at the time Mr. Thomas testified at trial that Field branches did not process HSSL loans or when, a week later, the government called Mr. Hansen to testify that *all* loans processed or funded through the five geographic centers were HSSL loans.  In fact, Mr. Thomas had informed the government no later than *January 9, 2013* that only Central Fulfillment branches processed HSSL loans.  PX 232.

### B.   The Actual HSSL Population Is 11,481 Loans.

The actual HSSL population is far smaller than that assumed by Mr. Hansen.  The most reliable description of the true population is the testimony of defense witness Anthony Ho, who testified that the HSSL population is 11,481 loans.  Trial Tr. 2233:24–2234:16 (Oct. 10, 2013); DX 1928.  Mr. Ho's determination was based on a review of Countrywide documents setting forth the branches where the HSSL process was in fact utilized, and excluding those loans that were originated with underwriter involvement.[10]  In particular, Mr. Ho examined the QA results from the HSSL pilot project to determine the loans originated through that process, Trial Tr. 2220:24–2221:21 (Oct 10, 2013); he looked at the Countrywide bulletins that announced the start and effective end dates of the program, *id.* at 2223:5-16, 2224:25–2225:22; he reviewed the internal Countrywide documents to determine which Countrywide branches actually processed HSSL loans, *id.* at 2227:5-13; and he looked at the loan data to determine whether an underwriter had actually processed the loans, *id.* at 2231:5-7.  By applying these criteria to the data, Mr. Ho determined that 11,481 loans were originated through the HSSL process.  *Id.* at 2233:24–2234:16.

---

[10] Mr. Ho further testified that, if loans with evidence of underwriter involvement were included as HSSL loans, the count would be approximately 13,800.  Trial Tr. 2230:4-10 (Oct. 10, 2013).

The government contends that Mr. Ho should not have excluded all loans with underwriter involvement.  Of course, the government's claim in this case has always been based primarily on the contention that the HSSL process produced poor quality loans because underwriters were removed from the process and replaced with unqualified loan specialists.  *See* Govt. Br. 1; Trial Tr. 3307:2-4 (Oct. 22, 2013).  Where an underwriter was involved in processing a loan, it makes sense to exclude that loan from the allegedly fraudulent population.  Even if one were to include all loans processed by Central Fulfillment branches (but not Field branches), regardless of whether an underwriter participated in the loan's origination, the population would be far lower than the government's figure.[11]  The jury's verdict does not establish the HSSL loan population.  While the jury heard conflicting versions of the population, it rendered a general verdict.  The government invited the jury to find defendants liable even if it did not accept the government's population.  Trial Tr. 3345:7-9 (Oct. 22, 2013) ("*Whatever the exact number of Hustle loans*, and we say it's 28,800, the proof is overwhelming that the Hustle loans were terrible and sold to the GSEs with lies." (emphasis added)).  Accordingly, the jury's verdict does not constrain the Court, in the penalty phase, from finding facts with respect to the calculation of HSSL loans based on the evidence before it.  *See United States v. Davis*, 726 F.3d 357, 370-71 (2d Cir. 2013) (sentencing court should infer from general verdict only what was "necessarily decided" by the jury); *Tucker v. Arthur Andersen & Co*, 646 F.2d 721, 729 (2d Cir. 1981) (similar rule for preclusion in civil case).

---

[11] Accepting Mr. Thomas's identification of the Central Fulfillment branches, PX 232, the population would be 17,718 loans using the government's preferred end date of May 2008, and 16,641 loans using the end date of April 27, 2008 when underwriters were required to clear every loan to close.

When Dr. Mason's net loss figure is corrected for population only, the figure falls from $134 million to approximately $46 million.  When both the population and the material-defect rate are corrected (*see infra* Part IV), the net loss figure is approximately $6 million.

### C.   The Government Cannot Blame Defendants for Its Inaccurate HSSL Calculation.

Instead of accepting the truth—that it disregarded the information it received from its own witness, Michael Thomas—the government incredibly argues that "any uncertainty in the definition of HSSL loans should be placed at the feet of Bank Defendants," who it claims engaged in "dilatory and evasive conduct."  Gov. Br. 23.  But, as the Court is already aware, *see* Trial Tr. 2209:11–2210:7 (Oct. 10, 2013), this characterization is utterly false.  Defendants were neither dilatory nor evasive, and repeatedly told the government what it needed to know to fix its incorrect HSSL definition.

Contrary to the government's assertion, the Bank Defendants never represented that they were unable to identify the loans originated through the HSSL process.  Rather, during document discovery, defense counsel correctly pointed out that there was no simple way to query their databases for "HSSL" loans and that they were willing to work with the government to identify an agreed-upon universe of loans based on objective criteria.  The parties had several discussions along these lines, did not reach agreement, and in fact agreed to disagree in deference to what discovery would reveal.

When the Bank Defendants learned that some loans in the bank database contained a "HSSL" flag, they informed the government, even though it was quickly apparent that this flag did not accurately identify the HSSL population.  It was used only in 2007 (most heavily during the HSSL pilot) and, even during that short period, was not a reliable indicator of whether or not the loan was originated through the HSSL process; it was both under- and over-inclusive.  The

government referenced the HSSL flag in its brief and, surprisingly, seemed to suggest at

summation that the flag supported its HSSL population and that *Defendants* were misleading the

jury by suggesting that the flag was unreliable.  Trial Tr. 3344:24–3345:4 (Oct. 22, 2013).  Yet

the government has never asserted that the flag defines the population, presumably because if the

HSSL flag defined HSSL loans, the population of "HSSL loans" would be far smaller than either

party's population, as only 4,775 loans contained a "HSSL" flag—and, of those, only 3,069

match the government's definition of a HSSL loan.

The government's unwarranted attack on defense counsel cannot obscure who is really at

fault for "any uncertainty," as the government now puts it, "in the definition of HSSL loans."

Govt. Br. 23.

- On January 9, 2013, government witness Michael Thomas faxed his HSSL definition to government counsel.  While the government received this fax in January, it did not see fit to produce a copy to Defendants until April 1, 2013.  That fax clearly distinguished between Field branches and Central Fulfillment branches.  PX 232; USA-00302116 (Singer Decl. Ex. 16); Trial Tr. 334:10–341:11 (Sept. 26, 2013).  From this document alone, the government should have understood that its current definition is wrong.

- On April 26, 2013 and June 7, 2013, government counsel deposed the Bank Defendants' corporate representative, Mr. Ho.  The government had the opportunity to ask Mr. Ho whatever questions it wished about the HSSL loan population.  Mr. Ho testified to the limitations of the HSSL data flag discussed above.  Ho Dep. Tr. 12:10–23:18 (Apr. 26, 2013) (Singer Decl. Ex. 4).  He further explained how the Bank Defendants identified HSSL loans.  *Id.* at 297:6–310:5 (June 7, 2013).  In fact, in this testimony, he discussed in detail the use of branch and server codes associated with Central Fulfillment.  *Id.* at 298:25–305:13.

- On June 18, 2013, long before trial, Defendants precisely defined HSSL loans in two separate expert reports.  *See* Expert Report of Christopher M. James, Ex. D (June 18, 2013) (Singer Decl. Ex. 8); Expert Report of Robert Glenn Hubbard, App'x B (June 18, 2013) (Singer Decl. Ex. 6).  This was not lost on the government:  The government *cited* the relevant portion of the James Report in its July 30, 2013 opposition to Defendants' motion for summary judgment.  *See* U.S. Resp. to Rule 56.1 Statement 23 (July 30, 2013).

- Finally, on June 29, 2013, Defendants responded to the government's request for admission by identifying *by loan number* each of the 11,481 loans they contended were originated through the HSSL process.  *See* Bank Resp. to RFA, Ex. A (June 29, 2013) (Singer Decl. Ex. 19).

During trial, the government complained of surprise from Mr. Ho's testimony that the population of HSSL loans was less than the government claimed.  Based on the above disclosures, the Court denied the government's motion to preclude Mr. Ho's testimony, and invited the government to move for leave to reopen its experts' testimony if it so wished.  Trial Tr. 2211:8–2212:10 (Oct. 10, 2013).  The government never did.

In short, the Bank Defendants provided the government with a vast amount of information, on repeated occasions, from which it should have understood both Defendants' position about the universe of HSSL loans and the errors in the government's position.  The information Defendants provided was consistent with the information the government received from its own witness, Mr. Thomas, in January 2013.  That the government persisted in presenting its inaccurate definition to the jury is the government's fault.  That the government persists in arguing for a civil penalty based on that inaccurate definition today is inexcusable and ignores the limits of proper advocacy.

## IV.    The Government Cannot Recover a Penalty for Losses on HSSL Loans that Were Not Misrepresented.

The government's $863,634,538 figure is based on "*all* HSSL loans," whether or not the loans were materially defective.  Dr. Mason's report separately calculates losses on "all HSSL loans" and losses on what the government claims to be the "defective HSSL loans," which includes "the proportion of all HSSL loans purchased by the GSEs that have been estimated to be materially defective by" the government.  Mason Rep. ¶ 9 (Singer Decl. Ex. 11).  The calculations for "all HSSL loans," therefore, include losses on HSSL loans that the government

24

admits were of investment quality.  Even the government's expert concedes that a majority of the loans (57.2%) were investment quality.  Trial Tr. 1401:7-20 (Oct. 3, 2013).

The government is not entitled to recover a civil penalty based on losses from HSSL loans that were not materially defective at the time of sale, because any such losses cannot have been proximately caused by the FIRREA violation the jury found.  That proposition is indisputable.  The only fraud the jury could have found in this case is that Defendants misrepresented the quality of HSSL loans.  *See* Jury Instr. No. 9.  Specifically, Defendants allegedly schemed to violate contractual representations and warranties that the loans sold to Fannie and Freddie were investment quality.  *E.g.*, Trial Tr. 3342:8-17 (Oct. 22, 2013).  Selling investment quality loans to Fannie and Freddie—i.e., loans that did not violate any contractual representation or warranty at the time of sale—obviously did not violate the mail or wire fraud statutes, even if those loans later happened to default.  Thus, any losses on those investment quality loans did not "result" from a statutory violation, 12 U.S.C. § 1833a(b)(3)(A), and cannot be included in any penalty.

There remains the question of what portion of the HSSL loans were materially defective at the time of sale.  Dr. Mason's calculation is based on Mr. Holt's underwriting and Dr. Cowan's sampling.  *See* Mason Rep. ¶ 22 (Singer Decl. Ex. 11).  To begin with, using that work is unreliable because it was not derived from the actual HSSL population but instead from a population that included thousands of non-HSSL loans.  *See supra* Part III.  As the government's statistician conceded, if the 28,882 loans from which the sample was drawn were not HSSL loans then the defect rate for HSSL loans was unknowable.  Trial Tr. 1414:20–1415:13 (Oct. 3, 2013).  But even putting that fundamental problem aside, the government's rate is vastly overstated because of the flaws in Mr. Holt's underwriting, as Defendants demonstrated at trial.

Mr. Holt testified at trial that 185 of the set of 343 loans he re-underwrote were materially defective. *Id.* at 1104:11-13 (Oct. 1, 2013). Mr. Holt defines a loan as "materially defective" where he concludes that the loan deviated from the applicable underwriting guidelines in a way that materially increased the risk of the loan. Corrected Expert Report of Ira H. Holt, Jr. 3 (Aug. 16, 2013) (Singer Decl. Ex. 5). In fact, Mr. Holt's material defect findings were based primarily on allegedly missing items from the loan files. Most of these items were neither missing nor required. In particular:

*Appraiser licenses.* There is no requirement under the guidelines that the loan file contain a copy of the appraiser license. Trial Tr. 2930:8–2931:13 (Oct. 17, 2013); DX 1223A. Rather, such licenses may be maintained centrally, with the appraiser noting his or her license number on the appraisal itself. Trial Tr. 2930:14–2931:18 (Oct. 17, 2013). Each of the appraisals that Mr. Holt held defective in fact contained the appraiser's licensure information on the appraisal itself. *Id.* at 2931:24–2932:10.

*Mortgage Insurance.* Mr. Holt asserted that evidence of mortgage insurance was missing from 59 of the loan files. *Id.* at 2941:23-25. As to 58 of the files, he was simply wrong. In accordance with the pertinent guidelines, mortgage insurance certificates could be, and were, maintained centrally. *Id.* at 2942:1–2943:9. As to the 59th file, given the loan-to-value ratio of the loan, mortgage insurance was simply not required. *Id.* at 2943:10-12; DX 2577A.

*Title and Hazard Insurance.* Like Mr. Holt's mortgage insurance claims, his claims of missing title and hazard insurance were incorrect. Trial Tr. 2945:2-10 (Oct. 17, 2013). Where Mr. Holt claimed evidence of insurance was missing, it was plainly present. *Compare* PX 229 (Holt claim of missing title insurance on loan 192792622) *with* DX 2852A (title commitment for same loan) *and* DX 2852B (title policy for same loan).

In sum, once the myriad errors made by Mr. Holt are corrected, his opinion that a loan was "materially defective" at the time of sale is justified for only 31 of the 343 loans in the sample, or 6.8% of the population when extrapolated.  Trial Tr. 2974:6-10 (Oct. 17, 2013).[12] Making only that change to Dr. Mason's net loss calculation reduces his "net loss" figure from $134 million to approximately $17 million.

## V.    Dr. Mason's Calculation of Losses Is Unreliable for Many Additional Reasons.

Dr. Mason's calculations are incorrect for a variety of other reasons and, when these additional shortcomings are considered, the losses to Fannie and Freddie are zero.  Indeed, Dr. Mason's calculations include projected future "losses" on loans that are actively performing today, over five years after the loans were sold to Fannie and Freddie.  Mason Rep. ¶¶ 34-44 (Singer Decl. Ex. 11).

Defendants intend to present the testimony of Dr. Jonathan Walker, who will explain that Dr. Mason's analysis 1) fails to account for the fee and interest income Fannie and Freddie earned from the HSSL loans; 2) fails to account for monies Fannie and Freddie recovered in settlements with Bank of America; 3) undercounts the number of loans that paid in full and overcounts the number of loans that are delinquent or otherwise not performing; 4) fails to account for loans that became delinquent but subsequently became current or paid in full; 5) uses *ad hoc* methods to estimate the future default costs of loans that are currently performing, which are inconsistent with the observed delinquency data; 6) uses an unreliable "adverse defect rate" to estimate the proportion of historic default costs that are attributed to HSSL loans that contain

---

[12] Because the government's sample was not proportionately drawn, the sample defect rate of 31/343 (or 9%) as found by Mr. Broeksmit is not necessarily the same as the defect rate for the population from which it was drawn.  Trial Tr. 1416:13–1417:2 (Oct. 3, 2013).  Defense expert Dr. Arnold Barnett would testify that if the defect rate for the sample as found by Mr. Broeksmit is extrapolated to the government's HSSL population, the rate is 6.8% +/- 4.1%.  *See* Amended Expert Report of Arnold Barnett ¶¶ 44-45 & Ex. 3 (Sept. 23, 2013) (Singer Decl. Ex. 3).

material defects; 7) fails to account properly for future house price appreciation; 8) assumes an

unreasonable loss severity rate on defaulted loans; 9) includes default costs for HARP loans,

which are not at issue in this litigation; and 10) assumes substantial costs in future years that are

not likely related to the alleged underwriting defects, because losses that are the result of

underwriting defects tend to manifest themselves within the first two years of the life of a loan.

*See* Walker Rep. (Singer Decl. Ex. 13).

## VI.   The Government Has Not Argued the Basis for a Penalty Based on "Pecuniary Gain" and Therefore Has Waived Any Such Argument.

While the government's brief alludes to pecuniary gain, it never addresses the legal

impediments to a gain-based penalty that Defendants identified at the October 23, 2013 colloquy,

Trial Tr. 3499:16–3504:17, and in their October 31 statement of issues.  The government's brief

likewise fails to present any factual basis for a calculation of gain here.  The government has thus

waived any argument for a penalty based on gain.  Indeed, the government long ago waived any

"gain"-based penalty because it did not timely disclose such a theory in response to its many

discovery obligations.[13]  When the government belatedly asserted a "gain" theory on the eve of

trial and in its opening statement, it relied on an "income" figure that does not reflect "pecuniary

gain" as that term is used in FIRREA's civil penalty provision.[14]

---

[13] The government's November 6, 2012 Rule 26(a)(1) initial disclosures claimed a penalty based solely on pecuniary loss, Pls.' Initial Disclosures 6-7 (Singer Decl. Ex. 14); and, despite the Rule's clear requirement to update initial disclosures, Fed. R. Civ. P. 26(e)(1), the government never amended its disclosures to claim any theory of penalties other than pecuniary loss, *see* Pls.' Am. Initial Disclosures 7-8 (Apr. 26, 2013) (Singer Decl. Ex. 18).  Similarly, the government exclusively relied on a loss theory in response to the Bank Defendants' Interrogatory 14, which asked the government to "[p]rovide [its] computation of each category of damage alleged."  *See* Pls.' Resp. to Defs.' First Set of Interrogs. 21-23 (Dec. 3, 2012) (Singer Decl. Ex. 15); Pls.' Supp. Resp. to Defs.' First Set of Interrogs. 25-26 (Jan. 18, 2013) (same) (Singer Decl. Ex. 17).

[14] The $165 million figure discussed at trial was based on the sum of the "income earned from sale" field of the Bank Defendants' loan database for each of the 28,882 loans the government assumed to be "HSSL loans."  Trial Tr. 1700:17–1701:7 (Oct. 7, 2013).  In addition to using the

**VII.    The Court Should Award a Penalty Below the Statutory Maximum.**

While FIRREA sets the maximum permissible penalty, there is no minimum, Govt. Br.

10, and the Court has discretion to order a penalty in a lower amount.  *See Menendez*, 2013 WL

828926, at *5.  In *Menendez*, the court noted that "there appears to be no case law outlining the

factors that the court should consider in assessing a civil penalty pursuant to § 1833a," but

looked for guidance "to the factors courts apply in other contexts involving the assessment of

civil penalties."  *Id.*  The court applied a totality of the circumstances approach, considering such

factors as: the seriousness of the misconduct and whether it was isolated or recurrent, the scienter

of the defendants, injury to the public from the violation, whether the conduct resulted in

substantial third-party losses, and the defendant's ability to pay.[15]  These factors are among the

type of considerations courts commonly consider in analogous civil penalty cases.  *See*, *e.g.*, *SEC*

*v. Forest Res. Mgmt. Corp.*, No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at *2 (S.D.N.Y. May

18, 2010).

This is a model case for such discretion.  Any penalty will be paid not by the violator but

by an innocent acquirer, Bank of America.  For this reason, and given the narrow scope of the

violation, a penalty will serve no deterrent or retributive purpose.  *See SEC v. Opulentica, LLC*,

479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (discussing deterrent and retributive purposes of civil

penalties in securities context).  Nor does a FIRREA penalty serve any restitutionary purpose,

unlike penalty provisions under some other statutes that sometimes justify large awards.  *See*

---

wrong population of "HSSL loans," and counting all loans whether materially defective or not
(*see supra* Parts III and IV), the government's calculation is further flawed because it measures
income, not profit.  The Second Circuit has long recognized that "pecuniary gain" and profit are
equivalent terms.  *Feine v. McGowan*, 188 F.2d 738, 740 (2d Cir. 1951); *see also Sanford Ltd.*,
878 F. Supp. 2d at 150 (noting "the natural equivalence of 'gain' with 'profit'"); Black's Law
Dictionary 747 (9th ed. 2009) ("gain" defined as "[e]xcess of receipts over expenditures or of
sale price over cost," that is, "profit").

[15] The Bank Defendants are not seeking a penalty reduction based on inability to pay.

*United States v. RePass*, 688 F.2d 154, 157 (2d Cir. 1982) ("The chief purpose of the civil penalties of the [False Claims Act] is to provide for restitution to the government of money taken from it by fraud." (internal quotation marks omitted)).  Here, a penalty will not provide restitution to any victim, as the penalty will be paid to the United States Treasury, while Fannie and Freddie have already been compensated for any losses through repurchases and civil settlements.  Other factors that we ask the Court to consider are referenced briefly below.

       1.     *Any penalty will be paid by Bank of America, which was not found to have committed fraud.*  The government conceded at summary judgment, after lengthy investigation and discovery, that the HSSL process ended before Bank of America acquired Countrywide.  *See* Mem. of Law in Opp. to Defs.' Mots. for Summ. J. 27 & n.9 (July 30, 2013).  Bank of America, therefore, did nothing wrong and is liable only as a successor in interest to Countrywide.[16]  The only three individual Countrywide executives accused of wrongdoing no longer work for the merged entity.  From the standpoint of deterrence or retribution, therefore, there is no reason to punish Bank of America.  Any penalty will be felt only by the innocent shareholders, employees and other constituents of a public company whose only relevant act was to purchase Countrywide.  *Cf. SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 509 (S.D.N.Y. 2009) (finding that proposed settlement "is not fair, first and foremost, because it does not comport with the most elementary notions of justice and morality, in that it proposes that the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct").  Penalizing the innocent acquirer would turn the concept of deterrence on its head, as the only conduct a substantial penalty would deter is the acquisition of distressed financial institutions by

---

[16] In this case, Bank of America's liability arose solely from the fact that Countrywide Bank, FSB, was merged *de jure* into Bank of America, N.A. in 2009.  For this reason only, Bank of America did not contest successor-in-interest liability in this case.

innocent purchasers.  At the time of the Bank of America-Countrywide merger, moreover, in

July, 2008, there was no way for Bank of America to know that it would be subjected to a civil

penalty under FIRREA § 1833a, as the government had hardly used the statute since its 1989

enactment.[17]

       2.     *Bank of America is the "affected" entity.*  The Court found that the fraudulent

HSSL loans "affected" a federally insured financial institution within the meaning of FIRREA

§ 1833a because *Bank of America, N.A. itself* was "affected" by liabilities for Countrywide's

fraudulent conduct.  This harm, or potential harm, to Bank of America is the very basis for the

federal cause of action in this case.  Perversely, however, Bank of America or its affiliates will

pay any penalty on account of the very offense for which it was allegedly victimized as an

"affected" entity.  A statute designed to protect financial institutions has thus been transformed

into a weapon against them.  *See* Pub. L. No. 101-73, § 101(10), 103 Stat. 183, 187 (1989)

(articulating statutory purpose to "strengthen the civil sanctions and criminal penalties for

defrauding or otherwise damaging depository institutions and their depositors").

       3.     *Egregiousness of the offense/scienter of Defendants.*  As discussed above, courts

in civil penalty cases may consider the egregiousness of the offense and the scienter of the

defendants.  In that regard, the following *undisputed* facts from trial may be relevant:  The

duration of the HSSL process was, at most, nine months.  It was used only by certain branches

within a single Countrywide division, Full Spectrum Lending.  It was tested in pilot form first.

---

[17] In fact, Bank of America is the true victim here, as whistleblower Ed O'Donnell endorsed the
very corporate QC numbers that the government now claims were misleading to Bank of
America, telling the Bank shortly after the merger that FSL had "deep experience in managing
Loan Quality" and that "the remediation enacted with Legacy FSL during Q1 2008 had the
desired impact of bringing quality back to the target environment . . . . [with] our second
consecutive quarter under 4.5%."  PX 197.  At no point did O'Donnell tell Bank of America that
he thought the QC numbers were not accurate or unreliable.  If, as the government now suggests,
the actual quality was worse than they reflect, it is Bank of America that was duped.

No government witness disputed the need for a design change (in the move from subprime to prime loans); nor did any government witness dispute that the HSSL process was *designed* in good faith in the first instance.  *See* Trial Tr. 253:8-15 (Sept. 25, 2013) (Michael Thomas); *id.* at 757:11-14 (Sept. 30, 2013) (Ed O'Donnell); *id.* at 1613:25–1614:10 (Oct. 4, 2013) (John Boland).  The new workflow was based on one that had been in place at FSL's sister division, CMD, for years.  *Id.* at 2417:23–2418:7 (Oct. 11, 2013).  In the new organization, many underwriting managers had leadership roles, *id.* at 696:17–698:21 (Sept. 27, 2013), and many former underwriters had their titles changed to become loan specialists, *id.* at 2547:7-15 (Oct. 15, 2013).  The final Quality Control numbers that the executives received were in line with prior quality control numbers.  *See* DX 73.  When Countrywide executives developed concerns about loan quality, changes were made to the HSSL process.  *See* PX 197.[18]

The Court itself commented, at the close of the evidence, that this was "one heck of a close case."  Trial Tr. 3169:10 (Oct. 18, 2013).  The Court also remarked that Defendants' Rule

---

[18] The government devotes nearly eight pages of its brief to recounting *disputed* facts it claims were proven at trial.  The jury rendered a general verdict, however, and there is no indication that the jury accepted whole cloth the government's recitation of the facts.  In fact, many of the government's characterizations in its brief are completely unsupported by the actual trial evidence.  For example, the government claims that FSL instituted the Sprint Incentive to encourage employees to overturn SUS findings and make FSL's defect rate *appear* closer to the industry standard rate of 4%.  Govt. Br. 7.  This is demonstrably wrong on two counts.  First, the trial evidence was unanimous that the Sprint Incentive and rebuttal process reflected an effort to ensure the quality numbers *were accurate*, to overturn incorrect findings, and provide documents to complete the file where those documents were missing.  *See* Trial Tr. 280:13-17 (Sept. 25, 2013) (Michael Thomas); *id.* at 834:13-21 (Sept. 30, 2013) (Edward O'Donnell).  That this process was about accuracy, not appearances, is evidenced by the fact that the final number was around 9%, not 4%.  *See id.* at 283:4-13 (Sept. 25, 2013) (Michael Thomas).  Second, as the GSE witnesses testified, 4% was not the industry standard.  The industry standard, according to the GSEs, was somewhere between 18 and 25%.  *Id.* at 1569:3-15 (Oct. 5, 2013) (Sobczak testimony that about 25% of loans delivered to Fannie were flawed); *id.* at 1309:3-9 (Oct. 2, 2013) (Tanabe testimony that Freddie Mac's average rate of not-acceptable-quality loans across all lenders was approximately 18% to 20%).

50 directed verdict motions were "far from being . . . frivolous." *Id.* at 1847:3-4 (Oct. 8, 2013). This is not a case that warrants any penalty, let alone one of any significance.

   4. *There is no evidence that the HSSL process actually produced poor quality loans.* While the government's theory at trial apparently was that FSL executives intentionally disregarded internal quality assurance results, those were interim results.  Whatever conclusions may be drawn from those results (which Defendants dispute), they did not establish that the HSSL loans actually sold to the GSEs were of poorer quality than other loans. *See* James Rep. 3-4 (Singer Decl. Ex. 9); Hubbard Rep. 8-9 (Singer Decl. Ex. 7).  Nor does the government's expert evidence so prove:  On the contrary, Dr. Cowan's effort to determine whether HSSL loans had a higher rate of material defects than non-HSSL loans showed the opposite, and led him to stop his work on that project. Trial Tr. 912:12-23 (Sept. 30, 2013) (*Daubert* Hrg.).  At all times during the HSSL, FSL's final quality control rates were under 10%, which is far below the industry standard defect rates according to witnesses from both Fannie (25%) and Freddie (18-20%). *Id.* at 1569:6-15 (Oct. 4, 2013) (Fannie Mae national significant finding rate); *id* at 1309:3-8 (Oct. 2, 2013) (Freddie Mac not-acceptable-quality rate).

   5. *Fannie and Freddie suffered no loss resulting from any fraud in HSSL loans.*  As discussed in Part I above, there is no evidence that material defects in HSSL loans proximately caused any losses to Fannie and Freddie. *Cf. SEC v. Johnson*, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *10 (S.D.N.Y. July 24, 2006) (imposing a lower SEC penalty because there was no substantial risk of loss where defendant issued false and misleading reports to "highly sophisticated investors").  In fact, the undisputed testimony of the lead "purchaser" for Fannie was that in the 2007 to 2008 time period, he would have approved for purchase *any* loan that received a CLUES "Accept," provided that the conditions for that loan were cleared.  Trial Tr.

3083:11-17 (Oct. 18, 2013).  He would have done so because any loan that received a CLUES

"Accept" was eligible for sale to Fannie Mae pursuant to the contract negotiated between Fannie

Mae and Countrywide.  *Id.* at 3084:1-11.  He further testified that FSL's quality control numbers

during HSSL were "consistent with the defect rates Fannie Mae experienced" and he would not

have stopped purchasing loans from Countrywide had he seen these numbers.  *Id.* at 3096:11–

3097:1; *see id.* at 3132:4-6. ("Fannie Mae does not expect every loan to be perfect, so in my

pricing I would have assumed defect rates.").  Finally, that loan processors instead of

underwriters were clearing loans to close would not have caused him to stop buying

Countrywide loans, because it was "pretty typical and common in the industry and actually

Fannie Mae expected that."  *Id.* at 3081:12-14.

    6.    *Fannie and Freddie have resolved their differences with Bank of America*

*stemming from Countrywide loans.*  While HSSL loans were of no lower quality than other like

loans, Fannie and Freddie did suffer losses from these and other loans as part of the worldwide

financial crisis.  All such claims have been settled through the repurchase process or in global

resolutions.

    7.    *Fannie and Freddie continue to do business with Bank of America*.  Fannie and

Freddie remain business partners with Bank of America.  Both Fannie and Freddie continue to

purchase billions of dollars worth of loans from Bank of America every year.

    8.    *There is no proof of "public harm."*  Contrary to the government's current

suggestion that Defendants contributed to the GSEs' insolvency, Govt. Br. 26-27, that is

precisely the theory of "affects" that the government *dropped* when it realized after discovery

that it had no proof of such harm.  In fact, the evidence clearly shows that the defective HSSL

loans did *not* contribute to Fannie or Freddie's insolvency or conservatorship.  *See* Defs.' Mem.

34

in Support of Summ. J. 29-33.  Instead of pursuing the conservatorship theory, as discussed in item 2, above, the allegedly "affected" entity is Bank of America itself.

For all of these reasons, the Court should exercise its discretion to award a penalty, if any, far below the statutory maximum.

## EVIDENTIARY HEARING

The Bank Defendants believe that the government's inability to demonstrate proximate causation makes an evidentiary hearing unnecessary because the penalty is capped at $1.1 million as a matter of law.  In the event the Court does not adopt the $1.1 million maximum penalty as a matter of law based on the briefs, the Bank Defendants request an evidentiary hearing to address the issues of the maximum penalty and the discretionary factors.

## CONCLUSION

For the reasons discussed in this memorandum, the Court should award no penalty, or at most a nominal penalty, against the Bank Defendants in this case.


Date:   November 20, 2013                                Respectfully submitted,


                                                        WILLIAMS & CONNOLLY LLP

                                                        By:  s/Brendan V. Sullivan
                                                        Brendan V. Sullivan (admitted *pro hac vice*)
                                                        Enu A. Mainigi (admitted *pro hac vice*)
                                                        Craig D. Singer (admitted *pro hac vice*)
                                                        725 Twelfth Street, NW
                                                        Washington, DC  20005
                                                        Tel: (202) 434-5000
                                                        Fax: (202) 434-5029

                                                        *Counsel for Defendant*
                                                        *Bank of America, N.A.*

By:  s/Richard M. Strassberg
Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333

*Counsel for Defendants Countrywide Home
Loans, Inc., and Countrywide Bank, FSB*