**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,<br><br>    Plaintiff,<br><br>    v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE,<br><br>    Defendants. | 12 Civ. 1422 (JSR) |

**THE GOVERNMENT'S REPLY MEMORANDUM**
**IN FURTHER SUPPORT OF FIRREA CIVIL PENALTIES**

 

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y.  10007
Tel. No.:  (212) 637-2800
Fax No.:  (212) 637-2730

PIERRE G. ARMAND
JAIMIE L. NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
ELLEN M. LONDON
Assistant United States Attorneys
      -Of Counsel-

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................. 1

    A.    Civil Penalties Should Extend to All Reasonably Foreseeable Losses
           or Gains ............................................................................................................. 1

    B.    The Maximum Civil Penalty Should Be Based on Gross Loss
           or Gross Gain ................................................................................................... 4

    C.    The Population of HSSL Loans Identified by the Government Is
           Reliable............................................................................................................. 5

    D.    Civil Penalties May Be Based on GSE Losses from Non-Defective HSSL
           Loans ................................................................................................................ 7

    E.    The Opinions of the Government's Underwriting Expert are Reliable................... 7

    F.    Dr. Mason Reliably Calculated the Losses Caused by the Fraud ........................... 8

    G.    The Court Should Impose the Maximum Penalty on the Bank and Impose
           a Penalty on Ms. Mairone Commensurate with Her Ability to Pay........................ 9

CONCLUSION ........................................................................................................................ 10

## TABLE OF AUTHORITIES

**CASES**                                                                                                                                             **PAGE**

*Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*,
    275 F.3d 384 (4th Cir. 2001) .................................................................................................. 1

*Hughey v. United States*,
    495 U.S. 411 (1990) ................................................................................................................ 1

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) .................................................................................................... 3

*Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc.*,
    369 F.3d 645 (2d Cir. 2004) ................................................................................................ 4, 5

*S.E.C. v. Rajaratnam*,
    822 F. Supp. 2d 432 (S.D.N.Y. 2011) ............................................................................. Passim

*United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*,
    297 F. Supp. 2d 272 (D.D.C. 2004) ....................................................................................... 4

*United States v. Aumais*,
    656 F.3d 147 (2d Cir. 2011) ................................................................................................ 1, 3

*United States v. BP Products N.A. Inc.*,
    610 F. Supp. 2d 655 (S.D. Tex. 2009) .................................................................................. 1, 2

*United States v. Countrywide Finan. Corp.*, --,
    F. Supp. 2d -- 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013) ............................................... 9

*United States v. Lundquist*,
    731 F.3d 124 (2d Cir. 2013) .................................................................................................... 3

*United States v. Menendez*,
    11 Civ. 06313, 2013 WL 828926 (C.D. Cal. March 6, 2013) .......................................... 4, 5

*United States v. Sanford Ltd.*,
    878 F. Supp. 2d 137 (D.D.C. 2012) ....................................................................................... 2

*United States v. Turk*,
  626 F.3d 743 (2d Cir. 2010) ............................................................................................. 2, 7

**STATUTES**

31 U.S.C. § 3729(a) ............................................................................................................... 4

18 U.S.C. § 3572 ................................................................................................................... 2

# ARGUMENT

## A. Civil Penalties Should Extend to All Reasonably Foreseeable Losses or Gains

In arguing that FIRREA's "pecuniary loss" provision requires a showing of proximate cause, the Bank ignores that we are in the civil penalty phase of this case. The fact that (as the Bank argues) proximate cause is a "bedrock principle" of tort liability is irrelevant. BoA Br. at 6. The Government has already established liability.

Even when citing to cases in the post-liability stage, the Bank mistakenly relies on cases dealing with damages or restitution,[1] which are inapposite because damages and restitution are essentially compensatory, whereas penalties are essentially punitive. *See* Opening Brief ("Br.") 13-14; *S.E.C. v. Rajaratnam*, 822 F. Supp. 2d 432, 433-36 (S.D.N.Y. 2011). Although the Bank also relies on two cases addressing fines under the Alternative Fines Act, neither provides any reason to import a proximate cause requirement into FIRREA. In *United States v. BP Prods. N.Am. Inc.*, 610 F. Supp. 2d 655, 688 (S.D. Tex. 2009), the parties submitted a plea agreement for the court's approval and argued that the proposed fine was reasonable because, if the case were litigated, the Government would have to show that losses were proximately caused by the violation of environmental law. In agreeing that proximate cause rather than but-for cause applied, the court discussed the proximate cause requirement in criminal and tort liability as well as *Hughey v. United States,* 495 U.S. 411 (1990), in which the Supreme Court held that an order of restitution should be based on "damages caused by the offense of conviction." *BP Prods.*, 610 F. Supp. 2d at 688 (internal quotation marks omitted). But the fact that proximate cause is an element of liability or a calculation for an order of restitution has no bearing on whether it should

---

[1] For instance, *United States v. Aumais*, 656 F.3d 147, 153-54 (2d Cir. 2011), involved review of an order of restitution to a victim in a child pornography case under the Mandatory Victim Restitution Act.

factor into a loss calculation for the purpose of assessing civil penalties, and the district court in *BP Products* erred in concluding otherwise. The district court in *United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 152 (D.D.C. 2012), repeats this error by relying on *BP Products* as the only case interpreting § 3571(d) of the Alternative Fines Act. *See id*. at 152 ("The Court finds the reasoning of *BP Products* persuasive and concludes that the term "derive[d] ... from" requires that the government prove that a given monetary amount . . . was proximately caused by the conduct of the charged offense. . .").

Moreover, the Alternative Fines Act at issue in *BP Products*, 18 U.S.C. § 3572, is distinguishable from FIRREA despite containing some similar language. A fine under § 3572 is simply one among other punitive and remedial measures a court may use in combination in the criminal context, such as a prison sentence § 3551(b) or an order of restitution, § 3572(b). Indeed, the statute requires a court to consider whether restitution has been ordered, § 3572(a)(4), and, where it has been ordered, the statute prohibits imposition of a fine that could impair a defendant's ability to pay restitution, § 3572(b). In contrast, FIRREA's penalty provision provides the sole mechanism through which violators are punished and its provision should therefore be construed broadly.

Alternatively, even if the Court were to apply a proximate cause standard, it should reject the rigid standard put forth by the Bank, which would require the Government to "isolate[] the losses caused by the violation, and exclude[] any losses caused by market factors or other causes." BoA Br. at 7. In support of this contention, the Bank cites only to securities fraud cases. *See id*. But as explained in the Government's opening brief, the Second Circuit has rejected applying the securities fraud standard to a mortgage fraud case. Br. at 19-20.[2] Further,

---

[2] Although the Bank attempts to distinguish *United States v. Turk*, 626 F.3d 743, 745 (2d Cir. 2010), on its facts, they ignore its general rationale that "[a] loan cannot be compared to a stock

2

Defendants perpetrated their fraud as the mortgage crisis was unfolding, a fact that increases their culpability. They should not now be permitted to get the benefit of those foreseeable market factors to *reduce* their exposure to penalties.

Contrary to the Bank's strict notion of proximate cause, the Second Circuit has made clear that proximate cause is context-specific and driven by "what justice demands" or "what is administratively possible and convenient." *Aumais,* 656 F.3d at 154 (internal quotation marks omitted). Further, determining what justice demands for purposes of assessing proximate cause "is heavily dependent on the circumstances." *United States v. Lundquist*, 731 F.3d 124, 134 (2d Cir. 2013). Accordingly, proximate cause only requires "some direct relation between the injury asserted and the injurious conduct alleged." *Aumais,* 656 F.3d at 154 (internal quotation marks omitted). In this case, foreseeability provides a sufficiently direct relation. The evidence at trial established that Defendants designed a process that they knew would originate poor quality loans, targeted Fannie Mae and Freddie Mac as the purchasers of those bad loans, and sold the bad loans with lies about their quality in the midst of a worsening financial crisis. The losses incurred by Fannie Mae and Freddie Mac were a natural and foreseeable consequence of, and thus were proximately caused by, Defendants' fraud. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123-24 (2d Cir. 2003) (Those whose injuries are "reasonably foreseeable or anticipated as a natural consequence" generally include "the targets . . . [and] intended victims . . .") (internal quotation marks omitted); U.S.S.G. § 2B1.1 app. note 3(A)(i) (defining "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense").

---

because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Turk*, 626 F.3d at 751. The Bank's attack on Dr. Joseph Mason's analysis for failing to "consider the effect of the nationwide mortgage crisis and economic collapse. . ." (BoA Br. at 9) is therefore misplaced. The Government is not required to disentangle the various causal influences on the loan defaults.

**B.     The Maximum Civil Penalty Should Be Based on Gross Loss or Gross Gain**

Like its argument for proximate cause, the Bank's opposition to gross loss is based on faulty inferences from compensatory damages cases. For instance, in arguing that "[b]asing damages on net loss is the norm in civil litigation" (BoA Br. at 13), the Bank again ignores that the Court is determining the amount of civil penalties, not damages. *See* BoA Br. at 13-15. The Bank's discussion of damages cases under the False Claims Act ("FCA") is thus irrelevant (BoA Br. 13) and the Bank fails to mention that the FCA mandates civil penalties even where there has been no loss. *See* 31 U.S.C. § 3729(a); *United States ex rel. Bettis v. Odebrecht Contractors of Calif., Inc.*, 297 F. Supp. 2d 272, 278 (D.D.C. 2004). Although the court in *United States v. Menendez*, 11 Civ. 06313, 2013 WL 828926 (C.D. Cal. March 6, 2013), considered the amount of net loss, it did so in assessing the civil penalty to be imposed in that particular case, not the maximum allowable penalty, and is therefore distinguishable. *Id*. at *5. *Menendez* contains no discussion of the maximum allowable penalty at all.

In setting the maximum allowable penalty, the Court should adopt the more inclusive measure of gross loss to effectuate FIRREA's purpose. *See* Br. at 12-13.[3] A more inclusive measure is consistent with the Second Circuit's treatment of civil contempt sanctions, which serve the dual purpose of securing "compliance with court orders" and compensating "the party that has been wronged." *Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Inform. Tech., Inc.*, 369 F.3d 645, 657-58 (2d Cir. 2004). As the Second Circuit has explained, when "a contempt sanction is coercive, the court has broad discretion to design a remedy that

---

[3] In arguing for both proximate causation and net losses, the Bank also points to the general rule of statutory construction that punitive statutes such as FIRREA are to be "narrowly construed." BoA Br. 7, 17. That rule of construction, however, should not be applied where Defendants' conduct is squarely within the statute's reach and the only issue to be decided is the appropriate penalty.

4

will bring about compliance." *Id.* (internal quotation marks omitted).  When, however, "the fine is compensatory in purpose, the district court has less discretion" and "the sanction should correspond at least to some degree with the amount of damages." *Id.*  A more inclusive measure of loss is also consistent with the approach adopted in *Rajaratnam*, in which civil penalties were ordered notwithstanding a pre-existing order of restitution.  822 F. Supp. 2d at 436.

Finally, the Bank should not be given credit for its settlement payment to Fannie Mae (BoA Br. at 34), which was made only *after* the Government filed its lawsuit.  Indeed, crediting such payments to victims and using net loss as the *maximum* allowable penalty could allow perpetrators of fraud to avoid FIRREA penalties entirely.  *See* Br. at 16.[4]

**C. The Population of HSSL Loans Identified by the Government Is Reliable**

The Bank also launches multiple baseless attacks on the Government's HSSL loan population.  *First*, the Bank asserts that the Government "introduced *no* evidence" to support its HSSL definition.  BoA Br. at 19 (emphasis in original). But that simply ignores the ample trial evidence substantiating the Government's HSSL criteria.[5]

---

[4] The Government has not waived, as the Bank claims, its right to recover a FIRREA penalty based on pecuniary gain to the Bank.  BoA Br. at 28.  First, contrary to the Bank's contention, Rule 26(a) requires disclosure only of the computation of "damages," not civil penalties.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii); *Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) (civil penalties are not damages).  Second, Lars Hansen testified at trial that the Bank earned $165.8 million in income from the sale of HSSL loans.  *See* Trial Tr. 1701:2-7, 1705:19-1706:2, PX 440.  The Bank offers no support for its argument that this amount does not constitute "pecuniary gain" for FIRREA purposes, and proposes no alternative number.

[5] For example, the evidence showed that the HSSL ran from August 13, 2007 to May 21, 2008, which is the date range the Government used for its definition, *see* Trial Tr. 758:9-11 (O'Donnell testimony); DX 66.  While the Bank contends that the HSSL ended in April 2008, the evidence showed that underwriters were brought back to fill out a short checklist, not clear conditions or underwrite loans themselves as they had done prior to the HSSL.  *See* DX61 (April 25, 2008 Bulletin announcing new clear-to-close checklist); PX 85 (clear-to-close checklist); PX 86 (April 28, 2008 Email from Robert Price) (complaining that "to continue to allow LSs to re-categorize and clear conditions while having the UWs only complete a checklist without actually clearing the doc and UW doc conditions themselves leaves us susceptible to errors and clarity

5

*Second*, the Bank erroneously argues that the Government should have excluded field branches from its HSSL population. BoA Br. at 19. The HSSL expanded to the field branches, leading to large volumes of defective loans that were sold to the GSEs with misrepresentations. S*ee* Trial Tr. 336:16-21 (Thomas testimony); Declaration of Lars Hansen ("Hansen Decl.") ¶ 5 (86 percent of the loans in Government HSSL population with field branch codes were cleared to close by loan specialists).[6] Thus, field branch loans were properly included.

*Finally*, the Bank's proffered HSSL population of 11,481 loans is clearly underinclusive. BoA Br. at 20-21. Although the Bank claims that Anthony Ho determined which branches and underwriters "actually processed" HSSL loans (*id.* at 20), Mr. Ho had no personal knowledge of which branches or personnel processed HSSL loans, and instead worked with the Bank's lawyers to generate the HSSL population. Trial Tr. 2245:5-14; 2247:20-2248:7; 2252:6-2253:8.[7] Mr. Ho excluded every loan where an underwriter name appeared anywhere in the loan data without knowing whether any of those individuals underwrote the loan files. Trial Tr. 2251:8-24, 2246:21-23. He apparently also failed to consider that most of these loans (87 percent) were cleared to close by loan specialists, indicating that they were correctly included as HSSL loans.

---

around responsibility we cannot afford at this point."). The evidence further showed that loans with a CLUES "Accept" rating went through the HSSL process (*see, e.g.*, Trial Tr. 146:10-148:25 (Thomas testimony)) and that HSSL loans were originated at five branches (Chandler, Plano, Hatboro, Richardson or Rosemead), *see* Trial Tr. 984:8-17 (O'Donnell testimony).

[6] In December 2007, FSL expanded the HSSL to the field branches, including the removal of underwriters, the reliance on CLUES and the use of loan specialists to perform underwriting tasks. *See* U.S. Rule 56.1 Counterstatement [Docket No. 139] ¶ 343. When personnel in the field branches raised concerns about the negative impact this would have on loan quality, Loren Rodriguez responded that there was a "moratorium" on pay reductions for QOG. *Id.* As warned, the field branch loans had high defect rates – over 66 percent – in January 2008. *See* PX103.

[7] The Bank further complains that the Government definition should not have included loans processed during the HSSL pilot at branches other than Chandler and Richardson. BoA Br. at 19. But this discrepancy affects only 665 loans, 84 percent of which were cleared to close by loan specialists and thus were properly included irrespective of branch code. Hansen Decl. ¶ 6.

6

Hansen Decl. ¶ 7.

### D. Civil Penalties May Be Based on GSE Losses from Non-Defective HSSL Loans

The Bank's argument that it cannot be penalized for GSE losses on HSSL loans that turned out not to be defective is also without merit. BoA Br. at 24-25. As explained above, civil penalties under FIRREA are punitive and thus the Defendants should be held accountable for all reasonably foreseeable losses the GSEs suffered. *See supra* at 4. As established at trial, through the HSSL, the Defendants schemed to defraud the GSEs by selling them bad loans with lies that they were quality investments. The GSEs would not have purchased any of these loans but for the representation that the loans were investment quality. *See* Gov. Br. 8-9. The Defendants knew that the GSEs would be harmed by this scheme, regardless of which specific loans were defective or why they defaulted. Indeed, the jury found that the Defendants *intended* to harm the GSEs through this fraudulent scheme. Affording the Defendants a reduction for losses on HSSL loans that ended up not being defective runs counter to the punitive purpose of FIRREA.[8]

### E. The Opinions of the Government's Underwriting Expert Are Reliable

The Bank's attempt to undermine the expert analysis of the Government's underwriting expert, Ira Holt, likewise fails. BoA Br. at 26. Contrary to the Bank's assertion, the most prevalent defects that Mr. Holt found related to CLUES errors and loan eligibility, not missing documents. PX 438; Trial Tr. 1116:15-1117:23. Furthermore, many of the loans that Mr. Holt found to be materially defective had multiple defects and therefore locating a missing document

---

[8] To the extent the Court concludes that the Government must establish that materially defective HSSL loans were more likely to default, the evidence shows that this is the case. *See* August 21, 2013 Expert Report of Dr. Charles Cowan [Docket No. 207] ¶ 77 (materially defective HSSL loans exhibit a statistically significantly higher default rate than non-materially defective HSSL loans). There is no basis for the Bank's position that the Government must establish that HSSL loans were more likely to default than non-HSSL loans within FSL, especially given the evidence that the HSSL was expanded to the rest of FSL.

might not affect the ultimate determination on a loan. *See* Trial Tr. 1255:6-1256:15; DX 1556. Further, the Bank's effort to dismiss Mr. Holt's defect findings based on the lack of appraiser licenses in the loans files, BoA Br. at 26, fails to mention that having the licenses in the file was required by both the GSEs and CLUES. Trial Tr. 1207:4-16; 1214:4-10. Similarly, GSE guidelines required the Bank to keep mortgage insurance certificates in the loan file, which it failed to do. Trial Tr. 1177:10-1178:20. Finally, the Bank's assertion that the defect rate for HSSL loans was only 6 percent is based on the unreliable testimony of its underwriting expert, Robert Broeksmit, who failed to conduct an independent review of the loan files and failed to consult the GSE guidelines. Trial Tr. 2984:22-2985:12, 2983:12-24, 2986:8-2992:18, 3015:1-6.

### F. Dr. Mason Reliably Calculated the Losses Caused by the Fraud

The Bank's attacks on Dr. Mason's calculation of the GSE losses incurred from the HSSL are unavailing as his analysis is both comprehensive and reliable. Dr. Mason's report includes historic losses on inactive loans and projected losses on active loans. The Bank is simply wrong in contending that losses on active, performing loans should not count toward the civil penalty. *See* BoA Br. at 27. Dr. Mason used an established methodology in the structured finance industry to project losses on active, performing loans—the "rep line" analysis. *See* Second Updated Expert Report of Dr. Joseph R. Mason (Aug. 23, 2013) at ¶ 35 & n.7. This calculation yields expected losses on performing loans based on the actual historical performance of HSSL loans. The Bank offers no justification for erasing those projected losses.

The Bank's remaining arguments likewise fail. *See* BoA Br. at 27-28. Dr. Mason correctly categorized the HSSL loans based on the Bank's delinquency data. He computed historical losses based on actual loan-level information supplied by the GSEs. To calculate projected losses, Dr. Mason utilized historical HSSL loan performance, which accounts for home

price appreciation trends, loss severity rates, and other economic factors affecting the HSSL loans. As discussed, the Bank is not entitled to credit for paying money to the GSEs in connection with settlements. With respect to HARP loans, the Bank has not identified any such loans that should be removed from the Government's HSSL population, upon which Dr. Mason relied. Finally, there is no basis for the argument that future losses should be limited because losses related to underwriting defects "tend to" occur within the first two years of the loan's life. This is pure speculation. As discussed, Dr. Mason's projected losses are based on historical data and derive from a reliable methodology.

### G. The Court Should Impose the Maximum Penalty on the Bank and Impose a Penalty on Ms. Mairone Commensurate with Her Ability to Pay

Defendants close their eyes to four weeks of evidence and testimony in arguing that the only appropriate penalty is no penalty whatsoever and their suggestion that "Bank of America is the true victim here" is preposterous. BoA Br. at 31 n.17. None of the Bank's arguments for a nominal penalty has merit. The Bank's assertion that any penalty will be paid by an "innocent acquirer" (BoA Br. at 29) seeks to erase the doctrine of successor liability. And its claim that there is something "perverse" about being both the "affected entity" and the punished entity merely recycles what the Court has already rejected. *See United States v. Countrywide Fin. Corp.*, -- F. Supp. 2d --, 2013 WL 4437232, at *5 (S.D.N.Y. Aug. 16, 2013).

In arguing for a low degree of culpability, the Bank makes assertions which the jury has already rejected: that the HSSL was designed in good faith (BoA Br. at 32), that the HSSL did not produce poor quality loans (*id*. at 33), and that changes to the HSSL process were promptly made in response to concerns about loan quality (*id*. at 32). The Bank's remaining arguments against a penalty rely on mostly irrelevant facts or assumptions and should be rejected. For instance, its argument that "Fannie and Freddie suffered no loss resulting from any fraud in

9

HSSL loans" (*id.* at 33) relies on a tortured conception of "resulting from" and an improper assumption that the GSEs would have purchased other terrible loans had they not purchased HSSL loans.  That Fannie and Freddie continue to do business with Bank of America also has no relevance, and the Bank's only argument that there is no public harm likewise relies on the irrelevant fact that the Government elected not to pursue the derivative "affects" theory of FIRREA liability, which alleged a link between the HSSL and the GSEs' conservatorship.

Ms. Mairone's arguments against a civil penalty similarly seek to retry aspects of this case, contending that Ms. Mairone "acted in good faith with respect to the QA process" (Mairone Br. at 4) and that she "did not have authority to authorize any of the allegedly fraudulent aspects of the HSSL" (*id*. at 6).  Ms. Mairone points to other facts that the Government does not dispute, such as that there was no evidence that she personally profited from the HSSL, or that her work on the HSSL "was but one aspect of her responsibilities as COO" (*id*. at 9), but those facts do not support her argument that she should be relieved from paying any civil penalty.  And in arguing that specific deterrence is not an issue and general deterrence has been achieved by the media coverage of this case (*id*. at 12-13), she suggests in effect that the Court should impose a penalty amount in inverse proportion to the extent of media coverage a case has received; the higher the profile, the lower the penalty.  That cannot be the guiding principle.

Based on its evaluation of the information received from Ms. Mairone, the Government submits that she should be ordered to pay a civil penalty of at least $1.1 million.  The Government's recommendation takes into account the economic realities of Ms. Mairone's professional and personal circumstances.  Such a penalty is fair and just.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's application.

Dated: New York, New York
November 27, 2013

                                                                     Respectfully submitted,

                                                                     PREET BHARARA
                                                                     United States Attorney for the
                                                                     Southern District of New York


By:     /s/    *Jaimie L. Nawaday*
           PIERRE G. ARMAND
           JAIMIE L. NAWADAY
           JOSEPH N. CORDARO
           CARINA H. SCHOENBERGER
           ELLEN M. LONDON
           Assistant United States Attorneys
           86 Chambers Street, 3rd Floor
           New York, New York 10007
           Tel:    (212) 637-2800
           Fax:    (212) 637-2730
           Email: Pierre.Armand@usdoj.gov
                     Jaimie.Nawaday@usdoj.gov
                     Joseph.Cordaro@usdoj.gov
                     Carina.Schoenberger@usdoj.gov
                     Ellen.London@usdoj.gov