UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL,

  Plaintiff,

  v.

COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE BANK, FSB; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; and REBECCA MAIRONE,

  Defendants.

12 Civ. 1422 (JSR)

# THE GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OF LAW
# IN SUPPORT OF IMPOSITION OF CIVIL PENALTIES

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street – 3rd Floor
New York, N.Y. 10007
Tel. No.: (212) 637-2800
Fax No.: (212) 637-2730

PIERRE G. ARMAND
JAIMIE L. NAWADAY
JOSEPH N. CORDARO
CARINA H. SCHOENBERGER
Assistant United States Attorneys
  -Of Counsel-


**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .................................................................................................................................. 2

THE COURT SHOULD IMPOSE THE MAXIMUM CIVIL PENALTY
BASED ON THE PECUNIARY GAIN DERIVED FROM THE FRAUD ................................... 2

    A.    The Maximum Civil Penalty Should Be the Gross Revenues
          That the Bank Derived From the Fraud ........................................................................ 2

    B.    The Gross Revenues Derived from the Fraud Are $2.1 Billion..................................... 8

CONCLUSION ............................................................................................................................... 9


## TABLE OF AUTHORITIES

**Cases**                                                                                                          Page

*Commodity Futures Trading Comm'n v. Vartuli*,
    228 F.3d 94 (2d Cir. 2000) ................................................................................................. 4

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011) ................................................................................................ 3

*FTC v. Verity Intern., Ltd.*,
    443 F.3d 48 (2d Cir. 2006) .................................................................................................. 3

*SEC v. Bilzerian*,
    814 F. Supp. 116 (D.D.C. 1993) ......................................................................................... 5

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ................................................................................................ 3

*SEC v. DiBella*,
    587 F.3d 553 (2d Cir.2009) ................................................................................................. 3

*SEC v. Haligiannis*,
    470 F. Supp. 2d 373 (S.D.N.Y. 2007) ................................................................................. 2

*SEC v. Rajaratnam*,
    822 F. Supp. 2d 432 (S.D.N.Y. 2011) ................................................................................. 2

*United States v. Bader*,
    No. 07 Cr. 00338, 2010 WL 2681707 (D. Colo. Jul. 7, 2010) ............................................ 5

*United States v. BP Prods. N. Am.*,
    610 F. Supp. 2d 655 (S.D. Tex. 2009) ........................................................................... 5, 6

*United States v. Citgo Petroleum Corp.*,
    908 F. Supp. 2d 812 (S.D. Tex. 2012) ................................................................................ 6

*United States v. Foote*,
    2003 WL 22466158 (D. Kan. Jul. 31, 2003) ...................................................................... 5

*United States v. Lizza Industrial, Inc.*,
   775 F.2d 492 (2d Cir. 1985) .................................................................................. 3, 7

*United States v. McNair*,
   605 F.3d 1152 (11th Cir. 2010) ................................................................................... 5

*United States v. Sanford, Ltd*,
   878 F. Supp. 2d 137 (D.D.C. 2012) ............................................................... 4, 5, 6, 7

*United States v. Serpico*,
   320 F.3d 691 (7th Cir. 2003) ....................................................................................... 3

**Statutes**

   12 U.S.C. § 1833a ......................................................................................................... 1

   18 U.S.C. § 3571(d) ......................................................................................... 4, 5, 6, 7

Plaintiff the United States of America (the "Government") respectfully submits this supplemental memorandum in support of its request for the imposition of civil penalties against Countrywide Home Loans, Inc., Countrywide Bank, FSB, and Bank of America, N.A. (collectively, the "Bank"), and Rebecca Mairone (together with the Bank, "Defendants").

## PRELIMINARY STATEMENT

The Government submits this supplemental brief pursuant to the Court's request at oral argument on December 5, 2013, for a more complete presentation of the amount of pecuniary gain derived from Defendants' scheme to defraud for purposes of determining the appropriate civil penalty to be imposed under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. Oral Argument Tr. 72:10-73:5. Section 1833a(b) of FIRREA states that "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty may . . . not exceed the amount of such gain or loss." *Id.* § 1833a(b)(3). As set forth below, the Government requests that the Court impose the maximum civil penalty of $2.1 billion based on the pecuniary gain the Bank derived from the fraud.

First, the Court should use gross gain, rather than net gain, as the benchmark for the maximum allowable penalty. Using a net measure as a ceiling for civil penalties would frustrate the punitive and deterrent purpose of FIRREA, as such a limited measure could be regarded as simply a cost of doing business. For the same reason, the Court should construe "gain" under FIRREA to apply to all revenues or proceeds derived from the wrongdoing, as opposed to the net profit standard the Bank proffers.

Second, based on the financial data provided by the Bank, as well as Fannie Mae and Freddie Mac (the "GSEs"), the Government has estimated the pecuniary gain derived from the

HSSL loans. As set forth in the accompanying declaration of Dr. Joseph R. Mason ("Mason Decl."), the gross proceeds that the Bank received from defective HSSL loans, including cash and securities obtained from the GSEs, as well as origination and servicing income, total approximately $2.1 billion.

To punish Defendants for their culpability and bad faith, and to deter financial institutions and their executives who would engage in similar fraudulent mortgage schemes, the Court should impose the maximum penalty on the Bank and a penalty on Ms. Mairone commensurate with her ability to pay.

## ARGUMENT

### THE COURT SHOULD IMPOSE THE MAXIMUM CIVIL PENALTY BASED ON THE PECUNIARY GAIN DERIVED FROM THE FRAUD

**A.     The Maximum Civil Penalty Should Be the Gross Revenues Derived from the Fraud**

Although the FIRREA statute does not define whether gross or net measures should apply to "pecuniary gain" in assessing a maximum civil penalty, FIRREA's central purpose of punishment and deterrence dictates that gross measures should govern. As set forth in the Government's Memorandum of Law in Support of Imposition of Penalties [Docket No. 311] ("Gov. Br."), a primary purpose of FIRREA, passed in the wake of a financial crisis involving a massive federal bailout of the savings and loan industry, was to punish and thus deter frauds involving financial institutions that put federally insured deposits at risk. Gov. Br. at 13-14. Indeed, civil penalties are generally designed to not only punish the individual violator, but also deter future violations by showing that violators will "pay severely in monetary terms." *SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 433-36 (S.D.N.Y. 2011); *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007); *see also* Gov. Br. at 13-14.

Accordingly, the Court should construe the FIRREA penalty provision broadly to effectuate this legislative goal. Gov. Br. at 13-14; *see also United States v. Ghavami*. No. 10 Cr. 12172012 WL 2878126, at *5 (S.D.N.Y. Jul. 13, 2012) ("Deterrence is best served by a broad reading of the [FIRREA] statute rather than a narrow one."); *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003). Civil penalties must be severe enough to make the risk of being caught not worth the economic gain. That is the same logic the Second Circuit and other courts have employed in applying a gross measurement to forfeiture in civil RICO cases. *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498-99 (2d Cir. 1985) ("Using net profits as the measure for forfeiture could tip such business decisions in favor of illegal conduct.").

Construing gain broadly to apply to the gross revenues or proceeds that Defendants derived from the fraud is further consistent with the way the Second Circuit and other courts have calculated disgorgement. It is "well established that defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011); *SEC v. Cavanagh,* No. 98 Civ. 1818, 2004 WL 1594818, at *30 (S.D.N.Y. Jul. 16, 2004), aff'd, 445 F.3d 105 (2d Cir. 2006). The Second Circuit has explained that disgorgement of profits still may be appropriate "in many securities fraud cases [where] the wrongdoer receives no direct monetary transfer from his victims," and thus "the defendant's ill-gotten gains are equal to the profits of his unlawful trading." *Bronson Partners*, 654 F.3d at 374-75. However, "where the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the larger sum." *Id.* (internal citations and quotations omitted); *see also SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009) (disgorgement was not limited to profits from securities laws violation, but included fees related thereto); *FTC v. Verity Intern., Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006) (disgorgement could be based on the

3

"amount of the . . . total billings that the defendants-appellants received . . . , without deducting monies paid by the defendants-appellants to other parties").

Likewise, in this case, gain should be construed to mean revenues: the $2.1 billion in proceeds received from fraud victims Fannie Mae and Freddie Mac. Mason Decl. ¶ 6. Given that revenues may be the measure of gain for purposes of disgorgement, which is a "nonpunitive equitable remedy," *Commodity Futures Trading Comm'n v. Vartuli,* 228 F.3d 94, 113 (2d Cir. 2000), it is even more appropriate for purposes of determining civil penalties, which are meant to punish offenders.

The Bank erroneously contends that the Court should interpret the word "gain" to mean profit as opposed to revenues, relying upon *United States v. Sanford, Ltd.*, 878 F. Supp. 2d 137 (D.D.C. 2012) (Oral Argument Tr. 25:7-15) (Bank Br. at 29, n.14), a case involving a different statute and inapposite facts. In *Sanford*, the defendants were charged with environmental crimes for dumping waste from a fishing boat that had not been run through an oily water separator. Pursuant to the Alternative Fines Act, the Government sought a criminal fine of twice the defendants' gross revenue from fish cargo (*i.e.*, two times $24 million).[1] Relying upon the U.S. Sentencing Guidelines and section 3571(d)'s legislative history, the *Sanford* court interpreted gross gain to mean "any before-tax profit to the defendant that derives from the relevant conduct of the offense." *Sanford*, 878 F. Supp. 2d at 148, 150 (quoting U.S. Sentencing Guidelines Manual § 8A1.2 cmt. 3(H)). For multiple reasons, the *Sanford* case and section 3571(d) are inapplicable here.

---

[1] The Alternative Fines Act authorizes criminal fines of up to "twice the gross gain or twice the gross loss, unless imposition of this subsection would unduly complicate or prolong the sentencing process." 18 U.S.C. § 3571(d).

As the court in *Sanford* acknowledged, 878 F. Supp. 2d. at 149-50, courts have interpreted gain in a variety of ways depending upon the case. At least two courts have used gross revenues or proceeds as the measure of gross gain under section 3571(d), and not profits. *See United States v. Bader*, No. 07 Cr. 00338, 2010 WL 2681707, at *7 (D. Colo. Jul. 7, 2010) (holding that gross gain means proceeds and that Congress intended that "criminally-obtained revenue should be punished at $2 for every $1 gained"); *United States v. Foote*, No. 00-20091, 2003 WL 22466158, at *7 (D. Kan. Jul. 31, 2003) (holding that gross gain from sale of counterfeit goods was amount of bank deposits that defendant received from the unlawful sales). Conversely, two other cases suggest that profit may be used instead of proceeds,[2] and another court adopted neither approach, instead using cost savings to measure gross gain under section 3571(d).[3]

It is not surprising that courts have reached different conclusions in light of case-specific circumstances. For example, in *Sanford*, there were multiple factors that made revenues a less desirable measure of gross gain: the gain was to be determined by the jury and there was concern of unfair prejudice; the gross revenues were not obtained from victims of the crime, but rather reflected all income the defendants obtained from the otherwise lawful sale of fish; the $24 million gross revenues figure was presumably much larger than whatever savings defendants realized from failing to install and/or utilize an oily water separator; and the gross gain amount

---

[2] *See United States v. McNair*, 605 F.3d 1152, 1217, 1224 (11th Cir. 2010) (noting that presentence report defined "gross gain" as "net profit"); *SEC v. Bilzerian*, 814 F. Supp. 116, 120 (D.D.C. 1993) (suggesting that the gross gain was defendant's "illicit profit" from illegal securities transaction).

[3] *See United States v. BP Prods. N. Am.*, 610 F. Supp. 2d 655, 695-96 (S.D. Tex. 2009) (accepting plea agreement between government and defendant arising from oil refinery explosion in which the fine was measured by the $50 million in costs defendant saved in not replacing a chimney-like apparatus believed to be the principal cause of explosion, as opposed to the plant's $450 million in profits).

was to be doubled.  878 F. Supp. 2d at 146-50.  Similarly, the court's acceptance of a cost savings measure of gain in the *BP* plea agreement is understandable, given that, had the Government proceeded to trial, there was a "significant likelihood" that the complex facts would have triggered section 3571(d)'s complexity exception and resulted in a maximum fine of only $500,000.  *BP*, 610 F. Supp. 2d at 728.[4]

No such issues exist here.  In this case, a jury has already concluded that defendants engaged in fraud and the Court will estimate the gain; and the gross revenues that derived from defective HSSL loans came directly from victims, namely the GSEs who purchased the loans based on misrepresentations and borrowers who paid origination fees for loans they could not afford to pay back.

Further, the *Sanford* court's interpretation of gain is of limited value because it adopts a definition of pecuniary gain set forth in the U.S. Sentencing Guidelines.  Gains and losses should be construed more narrowly when they are being used to determine the length of a defendant's term of imprisonment.  For example, as the Court pointed out at the December 5 oral argument, causation and losses are construed narrowly under the U.S. Sentencing Guidelines in securities cases to avoid unreasonably lengthy terms of imprisonment. Oral Argument Tr. 18:2-15.  Here, however, gain should be accorded a broader construction, as the Court is imposing a civil monetary penalty amount under FIRREA, not deciding a term of imprisonment.

---

[4] That is precisely what happened in *United States v. Citgo Petroleum Corp.*, 908 F. Supp. 2d 812 (S.D. Tex. 2012), in which the defendant was charged with environmental crimes for operating an oil water separator without proper emission control devices.  The Government sought twice the defendant's gross revenues under section 3571(d), and the defendant argued that it earned no gain at all.  But the court found that the complexity trigger applied, citing the "myriad practical complexities that can arise in proving a 'gross gain' to an organizational defendant in an environmental crime case." *Id.* at 820.

6

Moreover, the legislative history of section 3571(d) that the *Sanford* court relied upon is immaterial.  The Bank cannot identify anything in the FIRREA statute, legislative history, or case law suggesting that Congress intended for "pecuniary gain" to be synonymous with profit or any other net measurement.  Nor has the Bank shown that Congress relied upon the criminal fine provision of section 3571(d) in drafting the FIRREA civil penalty provision.[5]

Finally, construing FIRREA's penalty provision to limit civil penalties to net gains or profits would frustrate the punitive and deterrent purpose of the statute.  Defendants should not be permitted to reduce or avoid their exposure to civil penalties simply by virtue of the fact that they had to incur costs in order to execute their fraud, particularly in cases where the proceeds have come directly from fraud victims, as opposed to a fraud on the market in a securities case.  Basing civil penalties on net calculations also opens the door to complex and speculative calculations that undermine the court's ability to make a reasonable assessment of the pecuniary gain.  *See Lizza*, 775 F.2d at 498-99.[6]

---

[5] In further distinguishing 3571(d) in its Reply Memorandum dated November 27, 2012, the Government stated that a fine under that provision "is simply one among other punitive and remedial measures a court may use in combination in the criminal context" and that because "FIRREA's penalty provision provides the sole mechanism through which violators are punished," its provision should be broadly construed.  Reply Br. at 2.  To clarify, the Government maintains only that FIRREA's penalty provision provides the sole punitive mechanism in this case, not that FIRREA's penalty provision provides the only punitive mechanism in every civil fraud action brought under FIRREA.  For instance, as the predicate offenses enumerated in FIRREA are also enumerated in the civil forfeiture statute, 18 U.S.C. § 981, civil forfeiture might provide an additional remedy in certain FIRREA actions.

[6] The Bank's pecuniary gain must also "derive from" the offense.  Here, there can be no dispute that the revenues the Bank obtained in connection with the defective HSSL loans were derived from the fraud.  Defendants fraudulently originated and sold thousands of defective loans to the GSEs with misrepresentations that the loans were investment quality.  The Bank earned revenues flowing directly from these defective loans in the form of cash and securities paid by the GSEs, plus origination and servicing fees.

7

B.     **The Gross Revenues Derived from the Fraud Are $2.1 Billion**

As set forth in the Government's moving brief, the Court need only make a reasonable estimate of the pecuniary gain derived from the fraud. Gov. Br. at 12-13. The Government's expert economist, Dr. Joseph R. Mason, has estimated that the gross proceeds derived from defective HSSL loans sold to the GSEs are approximately $2.1 billion. This estimate is based upon the total mortgage-backed securities ("MBS") and cash amounts that the GSEs exchanged for the HSSL loans at the time of sale, plus income the Bank received from sources other than the GSEs, represented by the "IncomeEarnedFromSale" ("IEFS") field in the loan-level data provided by the Bank. Mason Decl. ¶¶ 4-9. According to Anthony Ho, the Bank's corporate representative, and the loan data produced by the Bank, the IEFS figure, calculated by the Bank at the time of origination and sale, is comprised of borrower fees, the net present value of servicing rights, and net pricing margin, which includes net amounts from sale of the MBS certificates. Ho Dep. 79:18-80:23 (attached to Government's December 27, 2013 Letter to the Court); Mason Decl. ¶¶ 7-9, n.4.

The total cash and MBS amount for all HSSL loans is $4,855,602,953. Mason Decl. ¶ 5. The total IEFS from the Bank's data on HSSL loans is $165,700.766. *Id*. ¶ 6.[7] The total gross proceeds derived from all HSSL loans are therefore $5,021,303,719, and the total gross proceeds derived from approximately 43 percent of HSSL loans that were determined by the Government's sampling and underwriting experts (Dr. Charles Cowan and Ira Holt, respectively) to have been defective and sold with misrepresentations is $2,149,620,122. *Id*. ¶ 6. As Dr.

---

[7] The loan data produced by the Bank during discovery showed total IEFS for the Government's population of 28,882 HSSL loans of approximately $165.8 million. (PX 308). The supplemental data produced by the Bank on January 8, 2014, however, indicates IEFS of only $165.7 million for the same group of loans. Mason Decl. at 2, n.4. The Bank has not provided an explanation for this apparent discrepancy, but the Government has adopted the lower revised figure.

Mason explains, this figure is conservative in that it does not include other pecuniary benefits, such as not having to incur the cost of capital associated with retaining funds to back the loans, avoiding losses on the loans, and increasing the Bank's capacity to generate more loans. *Id*. ¶¶ 10-11.

As detailed in the Government's moving brief, Gov. Br. at 2-8, 24-27, because of the egregious nature of this vast mortgage fraud scheme, perpetrated in the midst of a looming financial crisis, the Government seeks the maximum $2.1 billion civil penalty. The Government's prior request for a $1.1 million penalty for Ms. Mairone based upon her ability to pay remains unchanged.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose the maximum penalty on the Bank and a penalty on Ms. Mairone commensurate with her ability to pay.

Dated: New York, New York
      January 29, 2014

                                            Respectfully submitted,

                                            PREET BHARARA
                                            United States Attorney for the
                                            Southern District of New York

                               By*:*     */s/   Pierre G. Armand*
                                            PIERRE G. ARMAND
                                            JAIMIE L. NAWADAY
                                            JOSEPH N. CORDARO
                                            CARINA H. SCHOENBERGER
                                            Assistant United States Attorneys
                                            86 Chambers Street, 3rd Floor
                                            New York, New York 10007
                                            Tel:   (212) 637-2800
                                            Fax:  (212) 637-2730
                                            Email: Pierre.Armand@usdoj.gov
                                                         Jaimie.Nawaday@usdoj.gov
                                                         Joseph.Cordaro@usdoj.gov
                                                         Carina.Schoenberger@usdoj.gov