UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :
         Plaintiff,                 :
                                    :
         -v-                        :
                                    :
COUNTRYWIDE FINANCIAL CORPORATION;  :
COUNTRYWIDE HOME LOANS, INC.;       :    12 Civ. 1422 (JSR)
COUNTRYWIDE BANK, FSB; BANK OF      :
AMERICA CORPORATION; BANK OF        :    OPINION
AMERICA, NA.; and REBECCA MAIRONE,  :
                                    :
         Defendants.                :
------------------------------------x



On August 27, 2013, the Court denied, by "bottom-line" Order, the motion of the Bank Defendants[1] and individual defendant Rebecca Mairone ("Mairone") for summary judgment in the above-captioned case and ordered the parties to proceed to trial. The Court noted that it would subsequently issue an Opinion detailing the reasons for its ruling and would also indicate whether, notwithstanding the denial of summary judgment, any of the Government's theories of liability under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a, were no longer legally viable on the facts of this case. See Order, 12 Civ. 1422, ECF No. 150 (S.D.N.Y. Aug. 27, 2013). This latter commitment was mooted, however, when, one week after the Court issued its bottom-

---

[1] Following the convention of the parties, throughout this Opinion the Court refers to defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Bank of America Corporation, and Bank of America, NA, collectively as the "Bank Defendants."

line Order, the Government amended its complaint to remove its alternative theory of FIRREA liability premised upon the claim that the defendants' alleged offenses "indirectly" affected federally insured financial institutions.[2] Instead, the Government limited itself to the so-called "self-affecting" theory of FIRREA liability, see Second Amended Complaint, 12 Civ. 1422, ECF No. 154, ¶¶ 140-141, the basic premises of which had already been approved by the Court in its Opinion denying defendants' motion to dismiss, familiarity with which is here presumed. See <u>United States v. Countrywide Financial Corp. et al.</u>, 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013). Accord <u>United States v. Wells Fargo Bank N.A.</u>, 12 Civ. 7527, 2013 WL 5312564, at *29 (S.D.N.Y. Sept. 24, 2013); <u>United States v. Bank of New York Mellon</u>, 941 F. Supp. 2d 438, 456-57 (S.D.N.Y. 2013).

The case then proceeded to trial, and the Bank Defendants, as well as Ms. Mairone, were found liable. In the course of the trial, however, the Court not only elaborated on its earlier ruling that the Government's self-affecting theory was legally viable but also concluded, both as a matter of summary judgment on uncontested facts and again as a matter of law at the close of all

---

[2] Under its "indirect" theory, the Government had argued that defendants' allegedly fraudulent scheme constituted an offense "affecting a federally insured financial institution" because it allegedly caused the conservatorship of two Government-sponsored entities, Fannie Mae and Freddie Mac, which in turn caused several federally insured banks to fail. See First Amended Complaint, 12 Civ. 1422, ECF No. 40, ¶¶ 151-58.

2

the evidence, that, if the other elements of liability were found, the requisite "affecting" would necessarily exist in this case (so that there was no need to charge the jury on the "affecting issue). This Opinion will further elaborate that conclusion.

Based on the charge as given to the jury, the jury, by finding liability, necessarily found that the defendants intentionally induced two government-sponsored entities, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), to purchase from the Bank Defendants thousands of loans that Fannie Mae and Freddie Mac would not otherwise have purchased. The defendants did so, the jury necessarily found, by misrepresenting that the loans they were selling were "investment quality" and that they knew of nothing that might cause investors to regard the mortgages as poor investments, when in fact the defendants knew that their underwriting process, known as the "High Speed Swim Lane," "HSSL," or "Hustle," was calculated to produce loans that were not of investment quality.

FIRREA imposes civil penalties for substantive violations of, or conspiracies to violate, a number of criminal offenses, including mail and wire fraud, "affecting a federally insured financial institution." See 12 U.S.C. §§ 1833a(c)(2) & (e). As the Court ruled in denying the motions to dismiss, "the key term, 'affect,' is a simple English word, defined in Webster's as 'to

3

have an effect on.' " Countrywide, 2013 WL 4437232, at *5. As the Court further noted, the fraud here in question, perpetrated by the Countrywide defendants and Ms. Mairone, had a huge effect on Bank of America defendants, which, as a result of Bank of America's purchase of Countrywide, paid, directly or through affiliates, billions of dollars to settle repurchase claims brought by Fannie Mae and Freddie Mac. Id.

At both the summary judgment stage and at trial, defendants argued that this prior conclusion by the Court glossed over the fact that the actual purchase, on July 1, 2008, was of Countrywide Financial Corporation ("CFC") by Bank of America Corporation ("BAC"), neither of which is a federally insured entity. But it was undisputed at all times that these two entities are, in essence, the parent companies of the federally insured bank defendants, Bank of America, N.A. ("BANA"), Countrywide Home Loans, Inc. ("CHL"), and Countrywide Bank, FSB. Moreover, as part of the accompanying merger of Countrywide Bank into BANA, BANA and its parent company, BAC, signed an indemnification agreement, which caused BAC to indemnify BANA for losses arising from Countrywide's High Speed Swim Lane program. Although defendants argue that, as a result, BANA itself never realized losses, in fact what their argument shows, beyond dispute, is that BANA was hugely affected by Countrywide's fraud in the sense of having huge liabilities resulting therefrom, and that it escaped having to pay

4

for such liabilities only by having its parent bail it out. Indeed, the contractual predicate for indemnity under the agreement between BANA and BAC is that BANA incur "a loss or losses on any asset or assets" transferred to it during the transaction. See June 30, 2008, Asset Contribution Indemnification Agreement, at 83.

It is highly improbable that Congress would have intended to place beyond the reach of FIRREA those defendants whose misconduct "affects" federally insured banks that have the great fortune to be fully insured for such losses. Even less so can it be imagined that the device of having BAC indemnify BANA for losses that otherwise would result from Countrywide's fraud immunizes Countrywide from liability under FIRREA. Indeed, defendants' labeling of this theory of liability as the "self-affecting" theory is something of a misnomer: Countrywide's fraud, which culminated before the merger with BANA, directly affected, not just Countrywide, but its merger partner, BANA, as well. While the effect on Countrywide might be "self-affecting," the effect on BANA was not.

Independently of all this, moreover, even if one were to focus only on the effects of Countrywide's fraud on the two Countrywide federally insured defendants (and treat the other defendants as liable only vicariously or as successors in interest), even such "self-inflicting" effects were not only

5

sufficient to satisfy the statutory requirement that a federally insured entity be affected, but also were here sufficient to warrant being found by the Court as a matter of law. This is because the underlying predicates in this case, as found by the jury, were mail fraud and wire fraud. Any federally insured entity that commits these offenses automatically exposes itself to potential civil and criminal liabilities as a matter of law. See, e.g., 18 U.S.C §§ 1341, 1343, 1344, 1962. Such potential liability is enough to satisfy FIRREA, since even the threat of criminal liability (let alone, as here, the actuality of civil liabilities) is bound to affect any federally insured entity in material fashion.[3] Indeed, as Judge Furman has noted, "Courts have repeatedly held that in order to allege such an effect, the Government need not allege actual harm, but only facts that would demonstrate that the bank suffered an increased risk of loss due to its conduct. See, e.g., United States v. Serpico, 320 F.3d 691, 694-95 (7th Cir. 2003); United States v. Mullins, 613 F.3d 1273, 1278-79 (10th Cir. 2010); Bank of New York Mellon [Westlaw citation]; [United States v.] Ghavami, 2012 WL 2878126, at *5 [(S.D.N.Y. July 13, 2012)]." Wells Fargo Bank, 2013 WL 5312564, at *29.

---

[3] This does not render the "affect" language of FIRREA surplusage, since there will be many cases in which the defendant is not itself a federally insured entity.

In short, on each of several alternative grounds, the Court confirms its finding that the "affect" requirement was established in this case as a matter of law.[4]

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, NY
          February 17, 2014

---

[4] The Court therefore need not reach the interesting question of whether, in a case in which the facts of "affect" are genuinely disputed, the issue is for the Court (because it is a quasi-jurisdictional issue and because FIRREA sounds at least as much in equity as in law) or for the jury (the presumptive default position).

7