UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
UNITED STATES OF AMERICA ex rel.    :
EDWARD O'DONNELL,                    :
                                     :
        Plaintiff,                   :
                                     :
        -v-                          :
                                     :
COUNTRYWIDE HOME LOANS, INC.,        :    12-cv-1422 (JSR)
COUNTRYWIDE BANK, FSB, BANK OF       :
AMERICA, N.A., and REBECCA MAIRONE,  :    OPINION AND ORDER
                                     :
        Defendants.                  :
--------------------------------------x
JED S. RAKOFF, U.S.D.J.

        Early in the Great Recession, the Securities and Exchange

Commission brought suit against the three most senior executives

of Countrywide Financial Corporation,[1] alleging that the company,

at their behest, had falsely assured investors that, in the period

from 2005 to 2007, it was primarily a prime quality mortgage

lender, when in fact, "Countrywide was writing riskier and risker

loans." Compl. ¶ 4, SEC v. Mozilo, No. 09-cv-3994 (C.D. Cal. filed

June 4, 2009). The case was settled without the defendants

admitting or denying the allegations, and the Department of

---

[1] Countrywide Financial Corporation, originally named as a
defendant in this action, was dismissed on consent at the start of
trial. While there were a number of affiliated companies operating
under the Countrywide umbrella, this Opinion and Order uses the
term "Countrywide" to refer to remaining defendants Countrywide
Home Loans, Inc. and Countrywide Bank, FSB, except where the
context indicates otherwise.

Justice chose not to bring any criminal charges. But in 2012, a "whistleblower," Edward O'Donnell, a former Countrywide Vice President, filed a qui tam action alleging that another Countrywide program, known as the "High Speed Swim Lane" (or "HSSL" or "Hustle"), was the vehicle by which Countrywide had perpetrated a subsequent fraudulent scheme from August 2007 to May 2008.[2]

Eventually, the U.S. Attorney's Office took charge of the case, and proved, as the jury found, that Countrywide and one of its officers, Rebecca Mairone, had engaged in an intentional scheme to misrepresent the quality of the mortgage loans that it processed through the HSSL program and sold to Fannie Mae and Freddie Mac during the aforesaid nine-month period. As a result, the jury found Countrywide and its successor in interest, Bank of America, N.A. (collectively, the "Bank Defendants"), along with Ms. Mairone, civilly liable for fraud in violation of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a. See Jury's Verdict, ECF No. 312.

It is now up to the Court to determine what civil penalties should be imposed for that violation. See 12 U.S.C. § 1833a(a). This is no easy task, for the provision of the statute specifying

---

[2] See Government's Rebuttal Summation Tr. 3456:5-6, ECF No. 307 ("It took Ed O'Donnell to bring this fraud to public attention, to public scrutiny in this courtroom . . . .").

the monetary penalty to be imposed in cases like the instant one simply states that "[i]f any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty . . . may not exceed the amount of such gain or loss." Id. § 1833a(b)(3). The statute provides no guidance, however, as to how to calculate such gain or loss or how to choose a penalty within the broad range permitted.

The parties and the Court have unearthed only one case that discusses this choice under FIRREA: United States v. Menendez, No. 11-cv-6313, 2013 WL 828926 (C.D. Cal. Mar. 6, 2013). Finding no precedent on point, Menendez looked to the case law of arguably analogous civil penalty statutes and suggested five factors to consider: "(1) the good or bad faith of the defendant and the degree of his scienter; (2) the injury to the public, and whether the defendant's conduct created substantial loss or the risk of substantial loss to other persons; (3) the egregiousness of the violation; (4) the isolated or repeated nature of the violation; and (5) the defendant's financial condition and ability to pay." Id. at *5 (citing Fed. Election Comm'n v. Furgatch, 869 F.2d 1256, 1258 (9th Cir. 1989)). Similarly, in discussing arguably analogous civil penalties in a non-FIRREA context, the Second Circuit has directed district courts to consider "the good or bad faith of the defendants, the injury to the public, and the defendants' ability

3

to pay." Advance Pharm., Inc. v. United States, 391 F.3d 377, 399–
400 (2d Cir. 2004) (internal citation and quotation marks
omitted). A similar list of factors is also used in determining
civil penalties under the Securities Exchange Act. See SEC v.
Gupta, No. 11-cv-7566, 2013 WL 3784138, at *1 (S.D.N.Y. July 17,
2013) ("In determining the appropriate amount of a civil penalty,
courts in this District are typically guided by the factors set
forth in Haligiannis, to wit: '(1) the egregiousness of the
defendants' conduct; (2) the degree of the defendant's scienter;
(3) whether the defendant's conduct created substantial losses or
the risk of substantial losses to other persons; (4) whether the
defendant's conduct was isolated or recurrent; and (5) whether the
penalty should be reduced due to the defendant's demonstrated
current and future financial condition.'" (citing SEC v.
Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)). But while
these cases provide some general guidance as to what factors bear
on what the penalty should be after the "cap" of gain or loss is
determined, they do not speak to how "gain" or "loss" are defined
or calculated.

At the invitation of the Court, therefore, the parties
provided extensive briefing and oral argument on how "gain" and
"loss" should be calculated and what these calculations should be.
See ECF Nos. 311, 314, 315, 319, 322, 325, 329, 333, 337. After

4

reviewing these submissions, as well as the extensive evidence presented at trial, the Court finds as follows:[3]

FIRREA is a so-called "hybrid" statute, predicating civil liability on the Government's proving criminal violations (here, mail fraud and wire fraud) by a preponderance of the evidence. Unlike private civil actions, therefore, a FIRREA action is not primarily intended to serve compensatory functions but rather to serve quasi-civil punitive and deterrent functions. This is demonstrated on the face of the statute by the fact, inter alia, that the statute describes the monies to be paid, not as compensation to be paid to the immediate victim of the misconduct, but as a "penalty" to be paid to the Government. At the same time, because there is no threat of imprisonment nor the stigma associated with a criminal charge, the burden of proof is preponderance of the evidence and the so-called "rule of lenity" has no application. In short, FIRREA seeks to impose substantial civil penalties for criminal misconduct affecting federally insured financial institutions. 12 U.S.C. § 1833a(c)(2).

---

[3] The Court's calculations, like the parties', are not perfectly precise at every step, relying instead on reasonable estimates where appropriate. The use of reasonable estimates or approximations is well established in analogous contexts. See, e.g., United States v. Kumar, 617 F.3d 612, 632 (2d Cir. 2010) (sentencing); SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995) (disgorgement); United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009) (forfeiture).

In determining the appropriate penalty, therefore, as well as the appropriate definition and calculation of loss and/or gain, attention must be paid to precisely what predicate crime has been proved and what its essential elements are. Here, the essential crime found by the jury was "a scheme to induce Fannie Mae and/or Freddie Mac to purchase mortgage loans originated through the High Speed Swim Lane by misrepresenting that the loans were of higher quality than they actually were." Ct.'s Instructions of Law to the Jury at 11, ECF No. 265.[4] The HSSL program implemented this scheme by, inter alia, transferring primary responsibility for approving loans from quality-focused underwriters to volume-focused loan specialists employing automated underwriting software, eliminating the quality-assurance checklist, suspending the "quality of grade" compensation reduction that previously provided disincentives to low-quality loan origination, and reducing the "turn time" for loan funding from 45-60 days to 15 days. See, e.g., Defendants' trial exhibit ("DX") 191; Plaintiff's trial exhibit ("PX") 262; PX 31; PX 2661; PX 65; PX 67; Trial Transcript ("Tr.") 967:18-968:6, ECF Nos. 267-309. The Chief Operating Officer of the Full Spectrum

---

[4] The scheme was Countrywide's, but, after the events giving rise to this suit, defendant Bank of America, N.A. or its affiliates purchased Countrywide and thereby subsumed its liabilities. Although one of these affiliates, Bank of America Corp., was dismissed as a defendant in this action, Bank of America, N.A. does not contest successor-in-interest liability for purposes of this case.

6

Lending division of Countrywide, Rebecca Mairone, was a leader in designing and implementing the HSSL program. See, e.g., Tr. 1670:16-17.

Since the essence of the crime proved was a fraudulent scheme to induce Fannie Mae and Freddie Mac into purchasing risky mortgages originated through the HSSL program, the first thing the Court must determine in calculating loss or gain is how many HSSL loans were sold by Countrywide to Fannie Mae and Freddie Mac. The Government asserts that there were 28,882 such loans, while the Bank Defendants argue that there were only 11,481. This difference is the product of three factual disputes that the Court now resolves.

First, while both sides agree that the HSSL process began on August 13, 2007,[5] they disagree as to when the program ended. The Bank Defendants argue that the HSSL program ended in April 2008 when Countrywide reintroduced the quality-assurance checklist, while the Government contends that the HSSL ended only when underwriters were once again required to clear the loans for closing, beginning May 22, 2008. The Court agrees with the Government that the removal of experienced underwriters and their

---

[5] The Court finds, however, that 107 loans from the "pilot" period at the outset of the HSSL project should be excluded from the total. See Decl. of Lars Hansen dated Nov. 27, 2013 ¶ 6, ECF No. 320 (of 665 loans Bank Defendants urge excluded on this basis, 558 were cleared to close by a loan specialist).

7

continued absence from the clear-to-close process was at the heart of the HSSL scheme, and accordingly concludes that May 21, 2008 is the appropriate end date for defining the HSSL population.

Second, the Bank Defendants argue that, even within this period, there were loans that were in some degree reviewed by an underwriter at some point in the process and should therefore be excluded from the total. But even in these cases, it was the less experienced, less punctilious "loan specialists" who, relying chiefly on software, cleared the loans for closing, the critical tollgate on this high-speed highway. The Court will not exclude a loan from the HSSL population if it was cleared to close by a loan specialist merely because at some point in the origination process an underwriter glanced at it.

Third, the Bank Defendants contend that the Government's HSSL population wrongly includes non-HSSL loans processed through field branches. It is undisputed that the HSSL process was implemented at five "Central Fulfillment" ("CF") branches, which handled mortgage applications by telephone or electronically, as opposed to "field branches" where a potential borrower could walk in off the street. The CF branches were located in Richardson, Texas; Chandler, Arizona; Rosemead, California; Plano, Texas; and Hatboro, Pennsylvania. Tr. 1699:3-5. But there also existed field branches at these locations, and the Bank Defendants argue that the Government wrongly included in its population of HSSL loans

8

some 11,057 loans that were the product of activities by the field branches in each of the five cities and that did not proceed through the HSSL process. Bank Defs.' Loss Mem. at 20 (citing Tr. 2227:5-13). Indeed, the Government's own witness confirmed as much. Tr. 336:22-24 ("Q: But generally, the field branches did not use the procedure that was used for the production of Hustle loans, am I correct? A: That's correct."). While the quality of these non-HSSL loans may also have been overstated, this was not the subject of any proof at trial. Accordingly, the Court will consider the HSSL population to include only those loans processed or funded by CF branches rather than by field branches.

The result of the foregoing determinations is that the population of HSSL loans for purposes of determining loss or gain is 17,611 (see Bank Defs.' Loss Mem. at 21 & n.11, less the 107 loans that the Government concedes should be excluded from the pilot period).

But how much was the "gain" or "loss" on the fraudulent sale of these 17,611 HSSL loans? The result varies hugely depending on how broadly or narrowly one construes these terms, and what purposes they are intended to serve. FIRREA itself does not provide an adjective to modify either gain or loss other than "pecuniary." Some other statutes do, but not in a way that allows the Court to draw a coherent inference from these imperfect

9

analogies. Nor is the legislative history particularly illuminating.

The Bank Defendants place great weight on the Alternative Fines Act, which contains some language similar to FIRREA and was enacted only two years earlier. Specifically, the relevant section of the Alternative Fines Act states: "If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." 18 U.S.C. § 3571(d). Where the Alternative Fines Act uses "twice the gross gain or twice the gross loss" (emphasis supplied), FIRREA uses only "such gain or loss," leading the Bank Defendants to draw the negative inference that FIRREA's naked "gain" must be a "net" gain.[6] But as the Government points out,

---

[6] The Bank Defendants rely heavily for their "net" argument on United States v. Sanford Ltd., 878 F. Supp. 2d 137 (D.D.C. 2012), which concerned environmental violations by a fishing outfit under the Alternative Fines Act — a context that self-evidently does not lend itself to an easy analogy here. Similarly inapt are the precedents that the Bank Defendants marshal to suggest a "norm" of netting in the False Claims Act or other civil contexts calculating "damages." A FIRREA civil penalty, in contrast to a court's calculation of damages caused to the Government in an ordinary False Claims Act case, is calibrated to deter and punish, not to restore a victim to the status quo ex ante.

10

when Congress means to permit certain costs to be netted out, it is quite capable of stating so expressly. Compare 18 U.S.C. § 981(a)(2)(A) (civil forfeiture involving illegal goods or services "not limited to the net gain or profit realized from the offense") with id. § 981(a)(2)(B) (permitting a defendant convicted of illegally selling only legal goods or services to subtract from proceeds "the direct costs incurred in providing the goods or services" for forfeiture).[7] If, as the defendants assume, the penalty provisions of FIRREA were intended to take the opposite tack from those of the Alternative Fines Act, Congress could easily have so stated, either in the words of the statute itself or in its legislative history. This failure to do so strongly suggests that the Bank Defendants' negative inference argument is flawed or at least too conjectural to be relied on.

Moreover, as detailed above, FIRREA is in certain respects a unique statute, and, accordingly, the Court returns to the general principles referenced earlier: the civil penalty provisions of FIRREA are designed to serve punitive and deterrent purposes and should be construed in accordance with those purposes. This strongly cuts in favor of the Government's position that both gain

---

[7] Moreover, when Congress does see fit to deploy an adjective like "gross" or "net" to modify "gain" or "loss," it is not self-evident what specific costs are intended to be "netted" out.

11

and loss should be viewed simply in terms of how much money the
defendants fraudulently induced the victims to pay to them.[8]

While no analogy is perfect, a simple one will illustrate the
point. If I sold you a cow for $100 saying it was a healthy dairy
cow when I knew it had foot-and-mouth disease, you would in theory
have a net loss of less than $100 since the cow would still be
worth something as dead meat. But if you had known the truth, or,
short of that, had known that I as the seller was intentionally
lying to you about a material matter, you would never have bought
the cow in the first place, so your out-of-pocket loss of $100 is
really more reflective of the misconduct perpetrated upon you.
Similarly, since I would have spent some money to purchase or
raise the cow before I discovered it was diseased and duped you
into buying it, my net gain from the sale would have been less
than $100. But since you would have never purchased the cow from
me if you knew that it had foot-and-mouth disease or that I had
intentionally lied to you in trying to induce you to part with
your $100, the $100 I received, that is, my gross gain, is far

---

[8] Were the Court to accept the defendants' "netting" theory, then a
rebounding housing market could render FIRREA's penalty provisions
a nullity if a diligent fraud victim managed to recover more than
the principal owed at a foreclosure sale. Similarly, Fannie Mae's
and Freddie Mac's contractual right to require the Bank Defendants
to repurchase faulty mortgages could wipe out any penalty. Such a
reading of the penalty provision would thwart Congress's intent to
deter and punish FIRREA violators.

12

more reflective of the essential nature of my fraudulent misconduct than my "net" gain.[9]

It follows that, in this case, the amount of the victims' loss and the defendants' gain is identical, and consists of the price that Fannie Mae and Freddie Mac paid to Countrywide for the fraudulently misrepresented loans. The population of fraudulently misrepresented loans, moreover, consists not just of some subset of the 17,611 HSSL loans sold to Fannie Mae and Freddie Mac, but all of them. For even though, despite the defective processing, some of the HSSL loans may in fact have been of high quality (as described below), what the Government charged, and what the jury found, was an intentional scheme to defraud Fannie Mae and Freddie Mac brought about by designing a system of processing, the HSSL, that the defendants knew and intended would lead to loans being

---

[9] Analogies aside, it bears mentioning that by virtue of this fraud the Bank Defendants managed to unload a vast portfolio of risky assets on unwitting buyers and were thereby able to reduce the risk on their own balance sheet at a crucial moment in time. Indeed, Countrywide's introduction of the HSSL program coincided with a severe contraction of the market for riskier mortgages and Countrywide's understanding that it would no longer find willing buyers for the subprime mortgages that the Full Spectrum Lending division had churned out for years. Given that large, systemically risky portfolios of similarly dubious mortgage-backed assets were a significant contributor to the financial crisis, it strains credulity to imagine that FIRREA would require the Court to close its eyes to the overarching fraud and ask, "Yes, but what did the victims manage to recover in foreclosure?" The use of a "net" amount to calculate gain or loss would therefore fundamentally misconstrue the nature of the fraud and undermine Congress's directive that the Court penalize and thereby deter this serious misconduct.

13

represented to be of a materially higher quality than they
actually were. The happenstance that some of the loans may have
still been of high quality should not relieve the defendants of
bearing responsibility for the full payments they received from
the scheme, at least not if the purposes of the penalty are
punishment and deterrence. Relatedly, if the victims had known
that the defendants were lying to them about the quality of the
loans produced by the HSSL process, they would never have
purchased any of the loans so generated, or parted with any of
their money, so the happenstance that some of the loans turned out
to be of high quality would be irrelevant from a deterrence
standpoint.

In short, the proper measure of both loss and gain in this
case is the amount Fannie Mae and Freddie Mac paid to Countrywide
for the entire 17,611 HSSL-generated loans. This sum is
$2,960,737,608.[10]

While this sets the upper limit for the penalty, the Court,
in its discretion, may impose a lesser penalty after consideration
of the relevant mitigating factors. In the Court's view, however,

[10] This sum is arrived at by taking the ratio that 17,611 bears to
28,882 and multiplying it by the $4,855,602,953 that the
Government represents was the amount that was paid to Countrywide
for the 28,882 loans. See Declaration of Dr. Joseph R. Mason dated
Jan. 29, 2014 ("Mason Decl.") ¶ 5, ECF No. 326. This assumes that
the average price of the 17,611 loans was not materially different
from the average for the 28,882 loans, an assumption shared by
both parties' briefing.

14

only one of the direct and indirect economic effects on which the
Bank Defendants place such emphasis in their mistaken argument for
net gain and net loss is a worthy candidate for mitigating the
penalty. Specifically, while Fannie Mae and Freddie Mac would
never have purchased any loans from the Bank Defendants if they
had known that Countrywide had intentionally lied to them about
the loans' quality and had, indeed, created a program for
processing the loans that virtually assured that many of the loans
would be of lesser quality than represented — and even though, as
indicated above, determination of a FIRREA penalty is primarily a
matter of punishment and deterrence, rather than compensation of
the victims — still, the fact that a meaningful number of the HSSL
loans that Fannie Mae and Freddie Mac purchased turned out to be
of acceptable quality is an appropriate factor for the Court to
consider in assessing the egregiousness of the offense. Here, the
Government's own expert concluded, in testimony the Court credits,
that 57.19% of the HSSL loans proved, in the end, not to be
materially defective. See Mason Decl. ¶ 6. On this basis, the
Court will reduce the penalty to be imposed to 42.81% of the
statutory maximum, or $1,267,491,770.

Turning to other mitigation factors, however, the Court finds
none that warrants a further reduction in the Bank Defendants'
penalty. Although at one point in the trial the Court, momentarily
mesmerized by defendants' superb attorneys, commented that this

was a "close case," Tr. 3169:10, the careful review of the

evidence that the Court has conducted in connection with

determining the penalty has convinced the Court, as it did the

jury, that the evidence of the defendants' fraudulent scheme and

fraudulent intent was ample. That evidence, coupled with the

adverse inferences to be drawn from the implausible testimony of

Ms. Mairone and other defense witnesses, proved convincingly that

the defendants were fully prepared to jettison reasonable steps to

assure loan quality in favor of volume, speed, and profits. Even

when Countrywide's own internal quality reports evidenced

deteriorating loan quality, see, e.g., PX 56, PX 406, PX 408 —

concerns echoed by Mairone's own front-line staff, see, e.g., PX

52 — the defendants shunted critics and criticisms aside, doubled

down on their risky behavior, and applied ever more pressure on

loan specialists to ignore loan quality concerns, see, e.g., PX

253, PX 262, PX 489, PX 524. Furthermore, defendants purposefully

ignored their contractual obligations to report to Fannie and

Freddie all loans-identified as defective, reporting only six HSSL

loans as such, when, in fact, there were thousands. See, e.g., Tr.

1703:5-10.

In short, while the HSSL process lasted only nine months, it

was from start to finish the vehicle for a brazen fraud by the

defendants, driven by a hunger for profits and oblivious to the

harms thereby visited, not just on the immediate victims but also

16

on the financial system as a whole.[11] The HSSL fraud, simply by itself, more than warrants a penalty of $1,267,491,770.

Having completed the determination of the penalty with respect to the Bank Defendants, the Court turns to Ms. Mairone. Not a little of the responsibility for this fraud can be laid at her doorstep. Despite her implausible testimony to the contrary, from which the Court draws an adverse inference, there was convincing evidence that Ms. Mairone — the relatively new employee who had to prove herself — most aggressively pushed forward the HSSL fraud and most scathingly denounced those who raised concerns. Thus, for example, when Mr. O'Donnell relayed to Ms. Mairone a lengthy list of concerns about the erosion of loan quality under the HSSL program, she not only gave his concerns the back of her hand but also directed thereafter that quality assurance reports be sent only to her rather than distributed more widely, that loan specialists no longer be notified of errors in their HSSL loans, that the quality-assurance checklist be

---

[11] Whether the HSSL program was symptomatic of more pervasive fraud at Countrywide, the Court cannot say, since, as noted, the SEC's case against its highest officers was settled without the defendants admitting or denying liability. See Settlement Agreements, SEC v. Mozilo, No. 09-cv-3994, ECF Nos. 481, 482, 483 (C.D. Cal. Oct. 15, 2010). While, moreover, the Government proffered in the instant case an email from another Countrywide executive, Cindy Simantel, in which she informs Countrywide's Chief Credit Officer Rod Williams that she lied to Freddie Mac to conceal the awful quality of certain non-HSSL loans, see ECF No. 165, Decl. of Malachi Jones, Ex. A, the Court excluded the email from introduction at trial and will not consider it here.

eliminated, and that other changes be made to increase volume and sales at the expense of quality. See, e.g., PX 68.

In his instant papers, Ms. Mairone's excellent counsel argues, among much else, that Ms. Mairone did not act alone and that many of her actions and others were taken in consultation with her division's Chief Executive Officer and Chief Credit Officer. See ECF No. 314. Indeed, the jury itself wanted to know why these other officers were not also named as defendants. See Tr. 3478:8-9. But the fact that other, higher-level individuals arguably participated in the fraud but were, for whatever reason, not charged by the Government, does not significantly lessen Ms. Mairone's culpability for her leading role in the fraud. She was, in the eyes of Countrywide's own employees, the HSSL's "catalyst." Tr. 1670:16-17.

There is one obvious difference, however, between Ms. Mairone and the Bank Defendants, and that is in ability to pay a substantial penalty. Chiefly for this reason, the Government itself seeks to impose on her a penalty of no more than $1,200,000. See Mar. 13 Hr'g Tr. 4:11, ECF No. 337. Furthermore, the Court has personally reviewed Ms. Mairone's financial records submitted under seal, and finds that, while she is certainly not a candidate for welfare, and is likely to remain employed in lucrative positions for the foreseeable future, to impose on her the lump sum payment of $1,200,000 million requested by the

18

Government would strain her resources to the limit. Accordingly, the Court orders that she pay a total of only $1,000,000, and over a period of time. Specifically, she is to make quarterly payments of 20% of her gross income for the previous three months until the full $1,000,000 is paid.

For the foregoing reasons, the Clerk of the Court is directed to enter Final Judgment directing Bank of America, N.A., on behalf of the Bank Defendants, to pay to the Government by no later than September 2, 2014 the sum of $1,267,491,770 and directing Ms. Mairone to pay the Government quarterly payments of at least 20% of her gross income for the previous three months, such payments to be made within one month of the end of each such quarter beginning with the quarter ending September 30, 2014 and continuing until she has paid a total of $1,000,000.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:     New York, NY
           July 30, 2014

19