**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor,<br><br>– v. –<br><br>COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE,<br><br><br>Defendants. | Case No. 12-cv-1422 (JSR)<br><br>ECF Case |

**DEFENDANT REBECCA MAIRONE'S**
**MEMORANDUM OF LAW IN SUPPORT OF HER RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**
**PURSUANT TO RULE 50(B) OR, IN THE ALTERNATIVE,**
**MOTION FOR A NEW TRIAL PURSUANT TO RULE 59**

Marc L. Mukasey
Michael C. Hefter
Stan Chelney
Ryan M. Philp
Seth M. Cohen
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Tel:  (212) 508-6100
Fax: (800) 404-3970

*Attorneys for Defendant Rebecca Mairone*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

GOVERNING LEGAL STANDARDS............................................................................3

ARGUMENT ..................................................................................................................5

    I.     THE GOVERNMENT FAILED TO INTRODUCE SUFFICIENT
          EVIDENCE THAT MAIRONE KNOWINGLY PARTICIPATED IN A
          SCHEME DESIGNED TO SELL HSSL LOANS THAT WERE NOT
          INVESTMENT QUALITY ...........................................................................5

          A.     The Government Failed To Introduce Sufficient Evidence That
                  Mairone Knew That HSSL Loans Violated The Contractual
                  Representations For Sale To The GSEs.......................................................5

          B.     The Government Failed To Introduce Sufficient Evidence That
                  Mairone's Receipt Of QA Findings Put Her On Notice That HSSL
                  Loans Were Not "Investment Quality".......................................................7

          C.     The Government Failed To Connect The So-Called "Concerns" of
                  Countrywide Employees To The "Investment Quality" Of HSSL
                  Loans.........................................................................................................10

          D.     The Evidence Contradicts Any Inference That Mairone Knew
                  HSSL Loans Were Not "Investment Quality"...........................................14

                1.     Countrywide's QC Results Refute Any Inference That
                         Mairone Believed That The HSSL Resulted In The Sale Of
                       Non-Investment Quality Loans....................................................14

                  2.     The Nature Of HSSL Loans Refutes Any Inference That
                         Mairone Believed That HSSL Loans Were Not "Investment
                       Quality"........................................................................................15

    II.    THERE IS NO EVIDENCE THAT MAIRONE MADE ANY
          MISREPRESENTATIONS OR PARTICIPATED IN ANY DECEPTION
          OUTSIDE THE TERMS OF COUNTRYWIDE'S CONTRACTS WITH
          FANNIE MAE AND FREDDIE MAC ................................................16

CONCLUSION.............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Brady v. Wal-Mart Stores, Inc.,
    531 F.3d 127, 133 (2d Cir. 2008)...........................................................................3, 4

ECA, Local 134 IBEW Jt. Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187, 201 (2d Cir. 2009).............................................................................13

SEC v. Ginder,
    752 F.3d 569, 574 (2d Cir. 2014).............................................................................3

Tepperwien v. Entergy Nuclear Operations, Inc.,
    663 F.3d 556, 567 (2d Cir. 2011).............................................................................4

Uni-Rty Corp. v. Guangdong Bldg., Inc.,
    No. 95 CV 09432 (GBD), 2012 WL 1901200, at *3 (S.D.N.Y. May 25, 2012)......................4

United States v. Hatfield,
    No. 06–CR–0550 (JS), 2010 WL 2838525, at *1 (E.D.N.Y. July 19, 2010) ..........................4

United States v. Lorenzo,
    534 F.3d 153, 159 (2d Cir. 2008).............................................................................4

United States v. Torres,
    604 F.3d 58, 67 (2d Cir. 2010).................................................................................4

STATUTES

12 U.S.C. § 1833a..................................................................................................1

RULES

Fed. R. Civ. P. 50............................................................................................1, 3, 4, 17

Fed. R. Civ. P. 59............................................................................................1, 4, 17

Defendant Rebecca Mairone respectfully submits this Memorandum of Law in support of her Renewed Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. Rule 50(b) or, in the alternative, Motion for a New Trial pursuant to Fed. R. Civ. P. Rule 59.

## PRELIMINARY STATEMENT

On October 23, 2013, a ten-person jury found Rebecca Mairone liable for participating in a scheme to defraud Fannie Mae and Freddie Mac (the "GSEs") in violation of 12 U.S.C. § 1833a ("FIRREA"). As set forth below, Mairone is entitled to judgment as a matter of law (notwithstanding the verdict), or in the alternative a new trial, because the evidence purportedly establishing a violation of FIRREA was legally insufficient. Specifically, among other things, there was a complete absence of proof that Mairone acted with the requisite fraudulent intent.

To establish her specific intent, the Government was required to prove that Mairone knowingly participated in a scheme to defraud the GSEs. The only representations Countrywide made to the GSEs were set forth in complex contracts, each of which incorporated voluminous selling guidelines. At trial, the Government reduced the set of representations reflected in the applicable contracts to the concept of "investment quality," arguing repeatedly that the case against Mairone was based on her purported knowledge that HSSL loans sold to the GSEs were not "investment quality." The evidence to support the Government's theory, and the jury's verdict based on it, was incredibly absent.

Trial testimony established that "investment quality" is a term used in the mortgage industry meaning, in essence, that loans are eligible for sale to the GSEs. It was undisputed that the mere fact that a loan contained errors did not disqualify it from being "investment quality." The jury's verdict should be set aside in the first instance because there was insufficient evidence for the jury to conclude that Mairone knew of any HSSL loans that were sold to the GSEs as "investment quality" despite being ineligible for sale.

Rather than proving that Mairone was aware that HSSL loans failed to meet the defined concept of "investment quality," the Government substituted the abstract term "quality" to create an inference that Mairone must have known that HSSL loans were not "investment quality."  In its opening statement, for example, the Government told the jury it would prove that "Mairone knew that they were selling bad *quality* loans to Fannie and Freddie with lies" because she saw "high risk" findings in Countrywide's "*quality* assurance process, a review of the loans to see and test the *quality* of the loans as they were being made."  Tr. at 49:5-6 (emphasis added); *id.* at 54:12-55:8 (emphasis added).  At closing, the Government told the jury:  "You heard testimony from defense counsel witnesses who tried to tell you the *quality* assurance had nothing to do with *quality*.  But that's just wrong.  It's called *quality* assurance for a reason."  Tr. at 3332: 14-17 (emphasis added).

The evidence introduced by the Government was insufficient to support its supposition that Countrywide's Quality Assurance ("QA") audits measured the eligibility of HSSL loans for sale to the GSEs.  There was no evidence that QA reports addressed whether HSSL loans complied with Fannie Mae or Freddie Mac guidelines, or that QA reports identified findings rendering any HSSL loan, or group of such loans, ineligible for sale to the GSEs under the relevant guidelines.   The initial QA report expressly stated that "high risk" findings were "*not considered errors which will make the loan unsaleable.*"  *See*, *e.g.*, DX4031 at 7 (emphasis added).  There is certainly no evidence that Mairone – or anyone else at Countrywide – believed at the time that QA audits measured "investment quality."

Absent an evidentiary link between QA results and "investment quality," the November 29, 2007 email temporarily limiting the distribution of QA reports to the Central Fulfillment organization (PX68 (the "November 29 Email")) could not support any inference that Mairone

acted with fraudulent intent.[1]  The jury's verdict likewise could not be supported by evidence of Mairone's receipt of Countrywide's Quality Control results, which showed that HSSL loans performed within the range of the GSEs' expectations.  Neither was there any basis for the jury to infer that Mairone acted with the requisite fraudulent intent based on general "concerns" of former Countrywide employees about "quality."  The Government failed to introduce evidence of a single "concern" expressed contemporaneously about the HSSL, admissible against Mairone, that would have led her to believe that HSSL loans were not "investment quality." Because there was insufficient evidence in the trial record to support the jury's verdict, Mairone is entitled to judgment as matter of law or, in the alternative, a new trial.[2]

## GOVERNING LEGAL STANDARDS

A jury verdict should be set aside pursuant to Rule 50(b) where there is a "complete absence of evidence supporting the verdict," such that "the jury's findings could only have been the result of sheer surmise and conjecture."  *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (internal quotation marks omitted).  While the Court "must give deference to all credibility determinations and reasonable inferences of the jury" and "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence," *Brady v. Wal-Mart Stores, Inc.*, 531

---

[1]  In any event, the Government's statement to the jury that Mairone was the only person to have received QA reports after the dissemination of the November 29 Email was blatantly incorrect.  The record is clear that QA reports continued to be widely distributed throughout Countrywide's Full Spectrum Lending ("FSL") Division after the November 29 Email was sent. *See*, *e.g.*, DX4076; DX4078; DX4082; Tr. at 2010:16-18 (Kitashima).  The evidence further supported Mairone's legitimate business purpose for sending the November 29 Email, which both reduced the burden on Countrywide employees, *see*, *e.g.*, DX4053; Tr. at 2010:6-15 (Kitashima), and sparked significant remedial measures aimed at improving the QA reporting process, *see* DX4069; DX4078; DX4082; DX4088; DX4090; DX54; DX55.

[2]  Moreover, as more fully discussed in the Banks' Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial ("Banks' JMOL"), in which Mairone joins, the jury's verdict cannot stand as a matter of law because the Government failed to prove the commission of a fraud distinct from a breach of contract.  Such a breach is not actionable as mail or wire fraud.  *See infra*, Part II.

F.3d 127, 133 (2d Cir. 2008) (citation omitted), the jury's verdict must be based on reasonable inferences grounded in the evidence presented at trial and not on speculation, *see Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011); *see also United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (While Court must "defer to a jury's assessments with respect to credibility and conflicting testimony, and to its choice between the competing inferences that can be drawn from the evidence, the jury's inferences must be 'reasonably based on evidence presented at trial,' not on speculation."); *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("[S]pecious inferences are not indulged.") (citation omitted); *United States v. Hatfield*, No. 06–CR–0550 (JS), 2010 WL 2838525, at *1 (E.D.N.Y. July 19, 2010) (jury could not infer defendant's fraudulent intent from the facts and circumstances surrounding defendant's actions without resorting to speculation).

"[A] Rule 59 motion for a new trial is subject to a less stringent standard" than a Rule 50(b) motion. *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, No. 95 CV 09432 (GBD), 2012 WL 1901200, at *3 (S.D.N.Y. May 25, 2012). When deciding a Rule 59 motion, "[t]he Court may independently weigh the evidence and, in doing so, the evidence need not be viewed in the light most favorable to the victorious party." *Id*. In addition, "[e]ven where there is evidence supporting the jury verdict, a new trial may still be granted if the Court is convinced that the jury has reached a seriously erroneous result, or that the verdict is a miscarriage of justice." *Id*.

-4-

## ARGUMENT

**I.     THE GOVERNMENT FAILED TO INTRODUCE SUFFICIENT EVIDENCE THAT MAIRONE KNOWINGLY PARTICIPATED IN A SCHEME DESIGNED TO SELL HSSL LOANS THAT WERE NOT INVESTMENT QUALITY**

Witnesses testified to various definitions of "investment quality," but all agreed that an "investment quality" loan is one that is eligible for sale to the GSEs.  *See*, *e.g.*, Tr. at 1034:13-14 (Forlines) ("[I]f a loan did not meet the selling warranties, it would not be considered investment quality . . . .").   According to Freddie Mac's Tanabe, a determination of "investment quality" could not be made without a granular review of specific loan files.  *See id*. at 1286:14-1288:1.  Indeed, loans did not need to be error-free to be considered "investment quality."

The Government's case against Mairone lacked sufficient evidentiary support because the Government failed to introduce evidence of any loan that Mairone knew was ineligible for sale to the GSEs despite being sold as "investment quality."   Any inference that Mairone knew that HSSL loans sold to the GSEs were not "investment quality" was speculative, given the Government's failure to establish that Mairone reviewed any loan files or GSE contracts or guidelines.   Neither was there sufficient evidence that Mairone was on notice of any facts that would have rendered HSSL loans unsaleable.

**A.     The Government Failed To Introduce Sufficient Evidence That Mairone Knew That HSSL Loans Violated The Contractual Representations For Sale To The GSEs**

Countrywide sold loans to the GSEs pursuant to highly detailed contractual arrangements.   With respect to Fannie Mae, Countrywide entered into a Mortgage Selling and Servicing Contract ("MSSC"), *see* PX1; PX2, that dictated the terms and conditions pursuant to which Countrywide could sell loans to Fannie Mae and which laid out Countrywide's representations and warranties "guarantee[ing] to [Fannie Mae] that [Countrywide was] meeting

certain contractual terms." Tr. at 1026:11-1027:15 (Forlines). The MSSC incorporated an approximately 700-page Selling Guide, *see* DX1223, which Forlines described as "the way that Fannie Mae communicates to our sellers what kind of underwriting guidelines they should use whenever underwriting loans that will be sold to Fannie Mae." Tr. at 1013:18-25.

Similarly, Countrywide's master agreement with Freddie Mac (the "Freddie Master Agreement") incorporated by reference an approximately 2,000-page Seller/Servicer Guide, *see* PX170, which "la[id] out [Freddie Mac's] requirements for both service of the loans and originating and selling the loans." Tr. at 1276:23-1277:11 (Tanabe); *id.* at 1457:2-7 (Padgett). Tanabe testified that the purpose of the guide was "[t]o define our requirements, which then lead to defining eligibility for sale to Freddie Mac versus not." *Id*. at 1277:12-4.[3]

At no point during trial did the Government attempt to establish that Mairone had any knowledge of any particular HSSL loan,[4] Fannie's MSSC, the Fannie Selling Guide, the Freddie Master Agreement or the Freddie Seller/Servicer Guide. The Government instead invited the jury to infer that Mairone must have understood the GSE contracts and selling guidelines, and then, based on that assumed knowledge, to infer further that she knew that certain HSSL loans

---

[3]   In the MSSC, Countrywide represented and warranted that it "knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to:  cause private institutional investors to regard the mortgage as an unacceptable investment; cause the mortgage to become delinquent; or adversely affect the mortgage's value or marketability." PX1 at 8; PX2 at 7.  Freddie Mac's Seller/Servicer Guide states:  "An investment quality Mortgage is a Mortgage that is made to a Borrower from whom repayment of the debt can be expected, is adequately secured by real property and is originated in accordance with the requirements of the Purchase Documents.  The Seller warrants that all Mortgages sold to Freddie Mac have the characteristics of an investment quality Mortgage." PX170 at 519.

[4]   Contractual representations and warranties made to the GSEs were made on a loan-by-loan basis, not on a bulk basis.  *See* Tr. at 1459:17-20 (Padgett).

failed to comply with those contractual commitments.  The jury could not draw those inferences without resorting to speculation.

**B.    The Government Failed To Introduce Sufficient Evidence That Mairone's Receipt Of QA Findings Put Her On Notice That HSSL Loans Were Not "Investment Quality"**

The Government argued to the jury that it could connect QA to the "quality" of HSSL loans merely because it was called "Quality Assurance."  Tr. at 3332:14-17.  The Government also expressly represented to the jury that there was a connection between "High Risk" or "Action Required" findings in the QA reports and the "investment quality" of HSSL loans.  Tr. at 56:12-16 ("High Risk" or "Action Required" "meant there was a problem with the loan, if it wasn't corrected, resulting in the loan being severely unsatisfactory.  Again, 'severely unsatisfactory' means the loan was bad, not investment quality.").  There was no evidentiary basis for the jury to draw that critical connection.

Without this link, the QA reports and, in turn, the November 29 Email, proved nothing about whether Mairone intended to sell loans that were not "investment quality" to the GSEs.  Nothing about the QA reports established that HSSL loans were not "investment quality."  There was no evidence linking the content of QA reports to any GSE contractual provision or to the Fannie Mae or Freddie Mac guidelines.  No QA report identified a single HSSL loan that the borrower would be unable to repay.  Indeed, none of the QA reports identified any severely unsatisfactory, or "SUS" loans.

The evidence instead demonstrated that QA audits were not designed to determine the ultimate question of the saleability of HSSL loans.  For example, Ron Gillett, who oversaw a team of loan specialists during the HSSL pilot, testified that QA audits "focused on whether we were following the process that we were supposed to be following in the High-Speed Swim Lane."  Tr. at 2878:6-7.  He further testified, in no uncertain terms, that the quality assurance

process was not a measure of investment quality.   Tr. at 2878:19-21 ("Q.   Was the quality assurance process a measure of investment quality?  A.   No, it was not.").   Similarly, Cliff Kitashima testified that a QA "High Risk" finding "had to do with fundings [*sic*] of where we felt some action would be necessary from a process standpoint, meaning it was an evaluation of the quality of the process[,]"  Tr. at 2001:8-17, and further testified that "High Risk" findings had no relationship whatsoever to the term "investment quality," Tr. 2001:24-2002:1.  *See*, *e.g.*, Tr. at 2002:8-20 (Kitashima was not concerned about QA findings because they were "not an indication of quality from the standpoint of an investment grade, it's really to determine whether the process was being followed"); *id.* (QA "was all process").

While the QA reports identifed "High Risk" or "Action Required" findings, there is no evidentiary basis to equate such findings with a lack of "investment quality" or saleability.  To the contrary, during the HSSL Pilot, the Prime QA Underwriting Checklist expressly defined High Risk findings as "*not considered errors which will make the loan unsaleable*."  DX4031 at 7 (emphasis added).   Later, after the rollout of Central Fulfillment, a High Risk finding was defined as "a finding within the *procedural* QA process that would Require a Correction Action be applied within the Phase Code 3 review . . . ."  DX537 at 4 (emphasis added); PX388 (listing results through October 31, 2007, "Action Required (formerly rated High Risk)"); PX408 (listing results through November 30, 2007); DX46 (same).   Thus, QA findings, on their face, related to procedural errors, such as, for example, a loan specialist's failure to fill out all screens in a tool called Fraud Detector.   *See* PX58 at 3; DX46 at 4; DX537 at 4-5; PX388 at 4; PX406 at 3;

PX408 at 3.  No witness connected these procedural issues to the "investment quality" of the loans or to compliance with Countrywide's contractual representations.  *Cf.* Tr. at 1103:6-22.[5]

      While O'Donnell testified that QA reports measured "whether or not the loan would be investment quality and whether the loans had funded under the terms of the pilot," Tr. at 555:15-17, his testimony is wholly belied by his contemporaneous emails, in which he opined that no conclusions could be drawn from QA results.  *See, e.g.*, Tr. at 970:17-19; DX977 (O'Donnell email dated March 24, 2008) ("The QA reviews, to date, have been heavily focused on process steps.  *I believe it's tough to draw conclusions directly from those* or even the QC findings alone.") (emphasis added).  O'Donnell's conclusory testimony is further undermined by his testimony on re-direct that the Prime QA Underwriting Audit Checklist (which definitively stated that High Risk was unrelated to saleability) was being used by the QA auditors:

> Q. Could you explain to us what the prime QA underwriting audit checklist was used for?  A. This was to guide the loan reviewers as they went through the process with focuses on what they wanted them to review.  Q. Which process specifically?  A. The loan file review process.  Q. You recall that the ratings at the end of the document include acceptable risk, high risk, and severely unsatisfactory?  A. Yes.  Q. At this time in or around August 31, 2007, were the auditors instructed to use each of those three categories?  A. Initially they did, yes.

Tr. at 970:7-19.  O'Donnell's only response was that the QA ratings changed at some unspecified time, and that he recalled that this change had been discussed at a steering committee

---

[5]    Beginning in December 2007, two QA reports used the terms "Action Required SUSable" and "Action Required = Potential SUS."  DX4076; PX103.  However, neither of those reports defined either term or suggested that mundane process mistakes, such as failing to fill out a worksheet completely or to upload documents into the Virtual Loan File, had been reclassified as SUS.  Mr. Price – the only witness asked about the meaning of either of these terms – did not "remember specifically what the QA ratings were in the QA process."  Tr. at 1796:14-23.

meeting.   Importantly, however, O'Donnell did not recall when that meeting took place or whether Mairone was even there.  Tr. at 970:7-971:20.[6]

Thomas's testimony likewise did not support the Government's theory.  When asked about PX58, an email exchange regarding HSSL weekly QA results as of September 16, 2007, Thomas testified that, if something done incorrectly was not corrected, "[i]t *could* make a loan outside the guidelines for selling to investors."  Tr. at 210:10-23 (emphasis added).  Not only was this testimony impermissibly speculative, it was belied by Thomas' statement that he expected at the time that "a lot [of the QA findings] will be rebutted away."  PX58 (10/4/07 email from Thomas to Desai).  Thomas conceded that "High Risk" findings related to fraud detector simply were wrong.  *See* Tr. at 208:5-18.  In any event, Thomas explicitly testified that he did *not* raise these concerns to Mairone.  Tr. at 240:11-:20; *id.* at 302:3-303:25; *id.* at 166:3-11.  Accordingly, neither Thomas's testimony nor O'Donnell's testimony regarding the QA process provided any basis to conclude that Mairone was aware that any HSSL loan sold to the GSEs failed to comply with Countrywide's contractual representations or that she knew of such a result based on the existence of QA reports.

### C.    The Government Failed To Connect The So-Called "Concerns" of Countrywide Employees To The "Investment Quality" Of HSSL Loans

The Government repeatedly mischaracterized "concerns" allegedly raised by Countrywide employees as evidence that Mairone "did not care about quality."  Tr. at 3317:4-16; *id.* at 3336:5-14.  These purported concerns, however, did not relate to HSSL loans, were not communicated to Mairone, and/or had no bearing on a loan's saleability to the GSEs.

---

[6]  Accordingly, the jury lacked any basis to determine when, if at all, Mairone formed a fraudulent intent.  Indeed, there was no evidence that the HSSL was designed for the purpose of selling non-"investment quality" loans to the GSEs.  *See* Tr. at 715:4-11 (O'Donnell); *id.* at 757:5-14 (O'Donnell).

The key piece of evidence relied on by the Government to show that "Mairone did not care about quality" was PX52, an email chain where O'Donnell forwarded to Mairone his apparent synopsis of undefined employee questions that he allgedly received in response to his announcement of a new Central Services Incentive Plan on August 1, 2007.  *See* DX250.  There was no basis for the jury to infer that any of these purported questions forwarded by O'Donnell – which covered a wide array of topics organized by O'Donnell under the headings "quality," "consistency," "stability," "fairness" and "opportunity" – related in any way to concerns regarding the quality of HSSL loans, much less their eligibility for sale to the GSEs.  In  fact, O'Donnell's email announcing the Central Services Incentive Plan pre-dated the beginning of the HSSL pilot – before a single HSSL loan had been originated.  In light of this, there was no basis for the jury to infer based on Mairone's response to O'Donnell – "So – it sounds like it may work.  Is that what I am hearing?" – that Mairone was reacting to "concerns" about HSSL loan quality, or that those questions signaled to Mairone that the HSSL process would lead to the sale of non-"investment quality" loans.

In summation, referring to PX74, an email from Thomas regarding his "concern[] about some parts of the HSSL process," the Government told the jury: "Mr. Lumsden and Ms. Mairone and Mr. Kitashima didn't listen.  That's because they purposely entered into this scheme to churn out bad loans and sell them to Fannie Mae and Freddie Mac."  Tr. at 3336:5-9.  Thomas testified, however, that he did *not* send the email containing his concerns to Mairone.  Tr. at 251:3-9.[7]  It raises a substantial issue as to how the Government could tell the jury that Mairone "didn't

---

[7]   PX74 was an email dated March 13, 2008 sent to multiple Countrywide employees, *excluding* Mairone, attaching the contents of PX46.  When pressed by the Government about why he had not shared PX46 (or PX109, a later version of PX46) with Mairone, Thomas testified that "we had raised it a number of times and had been kind of told no."  Tr. at 240:19-22.  The Court, however, struck that statement from the record.  *Id.* at 240:23-241:1.

listen" to Thomas's concerns reflected in PX74 (incorporating the contents of PX46) when Thomas himself confirmed that he did not send PX46 to her.  There is absolutely no record evidence that Thomas raised any quality concerns – relating to "investment quality" or otherwise – with Mairone.  For the jury to have reached any other conclusion would constitute a specious inference that must not be credited.  *See* Tr. at 251:3-9; *see also* PX109; Tr. at 240:19-241:1; PX108.

It was likewise speculation for the jury to have concluded that Mairone was connected in any way to discussions among "people at Countrywide saying to each other that their loan quality is in the ditch, while telling Fannie Mae and Freddie Mac that their loans are investment quality."  Tr. at 3305:14-18.  The Government was undoubtedly referring to PX78 (the only document in the case referencing a "ditch"), wherein O'Donnell stated to Kitashima and another Countrywide employee, Loren Rodriguez, that "the *current process* is in the ditch."  PX78 (emphasis added).  Aside from the fact that the document does not refer to "loan quality," as the Government conveyed to the jury in closing, there was no evidence that Mairone was part of, or made aware of, that discussion.  Further, there was no evidence that the so-called "process" referred in any way to the HSSL process, or that whatever process he was referring to related in any way to whether a loan was eligible for sale to the GSEs.[8]

---

[8]   O'Donnell's concern about "process" referred to an earlier part of the email string summarizing the CHL Corporate Quality Control reporting for Q4 2007, *see* PX78 at 2-3, which included data for the following loan types:   (i) conforming; (ii) non-conforming; (iii) HELOC/F2nd; and (iv) subprime.   Because the Government did not examine O'Donnell regarding what he meant by "the current process is in the ditch," the jury could only have speculated as to which loan type, if any, was of concern to O'Donnell in PX78.  To the extent that O'Donnell's concern related to nonconforming, HELOC and subprime loans, that concern would be irrelevant since those loans were not processed through the HSSL workflow.  *See* Tr. at 1946:15-24 (Kitashima); *id.* at 1978:3-20 (Kitashima).  To the extent that O'Donnell's concern related to conforming loans, there is no evidence in the record regarding which – or, indeed, if any – HSSL loans comprised the loans classified as "conforming" in PX78.

None of the other "concerns" that O'Donnell claimed at trial to have relayed to Mairone could serve as a basis for the jury to infer that Mairone intended for FSL to sell non-"investment quality" loans to the GSEs.  *See* Tr. at 547:15-22; *id.* at 552:14-21; *id.* at 552:7-9; *id.* at 552:10-13; *id.* at    610:19-611:10.   O'Donnell's trial testimony that he raised these concerns with Mairone at the time is belied, among other things, by his own contemporaneous documents where he supported the HSSL process.  *See, e.g.*, DX250; DX12; Tr. at 767:3-768:13.  In any event, there was no basis for the jury to infer that any of these concerns, even if they had been raised with Mairone, related to whether HSSL loans were eligible for sale to the GSEs.

Finally, the jury returned its verdict after requesting a second chance to listen to the deposition testimony of John Boland.  *See* Tr. at 3478:6-11.  While Boland testified about a "specific" concern supposedly raised to Mairone by Neil Ballance at a HSSL kick-off meeting, such testimony was ruled inadmissible against Mairone.  *See* Tr. at 1670:14-1671:19.  In the end, the record lacks any legitimate evidence that Mairone disregarded any "concern" regarding the HSSL, much less that she ignored concerns regarding whether HSSL loans were eligible for sale to the GSEs.[9]

---

[9]  The Government also urged the jury to infer Mairone's fraudulent intent from evidence regarding production initiatives.  *See, e.g.*, Tr. at 3323:12-16; *id.* at 3325:23-24; *id.* at 3333:6-14; *id.* at 2625:19-2630:11 (Mairone); *id.* at 2657:25-2658:4 (Mairone); *id.* at 2670:2-2673:2 (Mairone).  Evidence of production goals, standing alone, cannot support an inference of Mairone's fraudulent intent as a matter of law.  *See, e.g.*, *ECA, Local 134 IBEW Jt. Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009).  Critically, the Government failed to introduce sufficient evidence that production goals negatively impacted loan quality or that those goals caused HSSL loans not to be "investment quality," much less that Mairone was aware of those supposed consequences.  Likewise, there is no evidentiary basis to conclude that Mairone believed that a temporary suspension of Quality of Grade (QOG) resulted in the sale of non-"investment quality" HSSL loans to the GSEs.

**D.      The Evidence Contradicts Any Inference That Mairone Knew HSSL Loans Were Not "Investment Quality"**

**1.      Countrywide's QC Results Refute Any Inference That Mairone Believed That The HSSL Resulted In The Sale Of Non-Investment Quality Loans**

The only meaningful trial evidence regarding whether loans sold to the GSEs conformed to their guidelines was Countrywide's final Corporate Quality Control ("QC") process which, unlike the QA process, was Countrywide's internal measure of loan quality.  *See* Tr. at 1892:9-22 (Schakett); *id.* at 2558:15-16 (Mairone); *id.* at 1979:14-1983:8 (Kitashima).

As discussed in the Banks' motion, the evidence at trial was unequivocal that the GSEs did not expect that 100% of the loans that Countrywide sold to them would be "investment quality."  *See* Banks' JMOL at 5-6.  Rather, GSE witnesses testified that, based on industry norms, the GSEs expected that somewhere between 18-25% of the loans purchased by the GSEs would not be "investment quality."  *Id.*  For this reason, the contract terms provided a repurchase process, such that the GSEs could require lenders to repurchase loans that failed to comply with their guidelines.  *Id.*

No juror could infer that Mairone intended to defraud the GSEs based on her review of Countrywide's QC results.  Rather, by all accounts, the QC numbers indicated that the quality of HSSL loans easily met, and indeed exceeded, the GSEs' expectations.  Indeed, numerous witnesses testified that the only reasonable inference to be drawn from the fourth quarter 2007 QC results was that loan quality had improved in the wake of the implementation of the HSSL

and Central Fulfillment. *See* DX73; Tr. at 709:2-710:2 (O'Donnell); *id.* at 1889:20-23 (Schakett); *id.* at 1980:16-23 (Kitashima); *id.* at 2601:21-2602:16 (Mairone).[10]

### 2. The Nature Of HSSL Loans Refutes Any Inference That Mairone Believed That HSSL Loans Were Not "Investment Quality"

The HSSL program was distinguished from other loan origination programs because it was reserved for prime borrowers. *See* Tr. at 1946:15-24 (Kitashima) ("Q. Could subprime loans go through the High-Speed Swim Lane?  A. No."); *id*. at 2417:19-2418:15 (Gong) (noting that HSSL allowed Countrywide to "improve productivity and turn time, but maintain quality in supporting more of a prime based customer base").  The evidence at trial was unequivocal that underwriting safeguards could be reduced for prime borrowers without compromising likelihood of repayment.  As O'Donnell wrote in an email, "We don't have quality issues on Prime due to the strength of the borrower.  They are the 'quality' part of the deal."  DX12 at 3.  In another email, O'Donnell wrote, "As we discussed briefly on the call, our work flows have or will be changing dramatically due primarily to our move to Prime.  Many of the control functions/processes that were part of our former model, which called for multiple validation points and sign offs, will no longer be necessary."  DX550 at 1.  As O'Donnell testified, HSSL loans were made exclusively to "prime borrowers" for whom it was reasonable to relax underwriting controls and processes without any expectation of a decline in "quality."  *See* Tr. at 767:3-768:13; DX12.

O'Donnell's sentiment was echoed by other witnesses.  *See*, *e.g*., Tr. at 1936:15-23 (Kitashima) ("[W]e realized that we were going to be writing more prime loans, meaning better

---

[10]  As set forth in the Banks' motion, the Sprint Incentive provides no basis to question the accuracy of the final QC results.  Banks' JMOL at 8.  In any case, the record establishes that Mairone had no involvement in the Sprint Incentive.  Tr. at 296:15-21 (Thomas); *id.* at 2605:19-22 (Mairone).  Therefore, it provides no basis to draw any inferences regarding Mairone's state of mind.

customers, better quality customers, better credit scores, less staff hand-offs, and the realization that we were going from a very high-touch environment to an environment that, again, requires those kinds of changes."); *see id.* at 2694:9-14 (Flores); *id.* at 1556:12-1557:3 (Sobczak); *id.* at 1871:7-1872:2 (Schakett).

Moreover, the record was undisputed that that HSSL loans were predominantly refinance loans of less than $1 million, among other restrictions.  Tr. at 694:7-9 (O'Donnell); *id.* at 1946:15-1948:20 (Kitashima); DX311.  Thus, HSSL loans not only were limited to borrowers with high credit scores, but also only were extended to borrowers with a history of paying their mortgages on time.  These characteristics of HSSL loans belie the notion that Mairone had any reasonable basis to believe that HSSL loans were unsaleable.

## II.   THERE IS NO EVIDENCE THAT MAIRONE MADE ANY MISREPRESENTATIONS OR PARTICIPATED IN ANY DECEPTION OUTSIDE THE TERMS OF COUNTRYWIDE'S CONTRACTS WITH FANNIE MAE AND FREDDIE MAC

Mairone testified at trial that she never interacted with anyone at Fannie Mae or Freddie Mac regarding HSSL loans or any other topic.  Tr. at 2605:25-2606:7.  There was no evidence to the contrary.  Rather, GSE witnesses consistently testified that they never spoke to or received correspondence from Mairone, and that Mairone never made any representation of any kind to the GSEs.  *See*, *e.g.*, Tr. at 1075:6-8 (Forlines) ("Q. And you are not aware of any statement Rebecca Mairone made on behalf of Countrywide to Fannie Mae, are you?  A. No."); *id.* at 1074:19-1075:8 (Forlines) (noting that he never interacted with Mairone); *id.* at 1346:12-23 (Tanabe) (same); *id.* at 1504:10-23 (Padgett) (same); *id.* at 1504:10-23 (Brewster) (same).

Nor did the Government introduce evidence that Mairone knew of any extra-contractual representation by anyone else at Countrywide to the GSEs.  Indeed, at the charging conference, the Court specifically ruled that Countrywide did not make any representations to Fannie Mae or

Freddie Mac about its underwriting process, including regarding the characteristics of the HSSL loan origination program.  Tr. at 3207:22-3208:11.  As to Mairone, the jury's verdict cannot stand because, as detailed in the Banks' brief, there was a complete absence of any evidence that she knowingly and consciously participated in any fraud distinct from any alleged breach of contract.  *See* Banks' JMOL at Part II.

## CONCLUSION

For the foregoing reasons, Mairone respectfully requests that the Court grant her renewed motion for judgment as a matter of law pursuant to Rule 50(b) or, in the alternative, for a new trial pursuant to Rule 59.

Date:   August 28, 2014
        New York, New York

BRACEWELL & GIULIANI LLP

By:   *s/ Michael C. Hefter*
      Marc L. Mukasey
      Michael C. Hefter
      Ryan M. Philp
      Seth M. Cohen

1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 508-6100
Fax:  (212) 508-6101

*Attorneys for Defendant Rebecca Mairone*

-17-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 28, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and courtesy hard copies were sent to the Court.  I also certify that the foregoing was served via the CM/ECF system on the following counsel:

Pierre G. Armand
Jaimie L. Nawaday
Assistant United States Attorneys
86 Chambers Street, Third Floor·
New York, New York 10007
Tel: (212) 637-2724/2528
Fax: (212) 637-2730
Email: Pierre.Armand@usdoj.gov
Jaimie.Nawaday@usdoj.gov

*Attorneys for the United States of America*

Brendan V. Sullivan
Enu A. Mainigi
Williams & Connolly LLP
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
bsullivan@wc.com
emainigi@wc.com

*Attorneys for Defendants Bank of America Corp.*
*and Bank of America, N.A.*

Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018
Tel.: 212.813.8800
rstrassberg@goodwinprocter.com
wharrington@goodwinprocter.com

*Attorneys for Defendants Countrywide Financial*
*Corporation, Countrywide Homes Loans, Inc., and*
*Full Spectrum Lending*

<u>s/ Michael C. Hefter</u>
Michael C. Hefter