**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* EDWARD O'DONNELL, <br><br> Plaintiff, <br><br> — v. — <br><br> BANK OF AMERICA CORPORATION, successor to COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., and FULL SPECTRUM LENDING, <br><br> Defendants. | |
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Intervenor, <br><br> — v. — <br><br> COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE BANK, FSB, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., and REBECCA MAIRONE, <br><br> Defendants. | **Case No. 12-cv-1422 (JSR)** <br><br> ECF Case |

---

**MEMORANDUM OF LAW IN SUPPORT OF BANK DEFENDANTS'**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**
**AND ALTERNATIVE MOTION FOR A NEW TRIAL**

Brendan V. Sullivan, Jr.
Enu A. Mainigi
Craig D. Singer
Kannon K. Shanmugam
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
*Counsel for Defendants Bank of America*
*Corporation and Bank of America, N.A.*

Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
*Counsel for Defendants Countrywide*
*Financial Corporation, Countrywide Bank,*
*FSB, and Countrywide Home Loans, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD............................................................................................................1

ARGUMENT .........................................................................................................................2

I.      THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM,
        WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE
        GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF A
        MATERIAL MISREPRESENTATION.................................................................2

        A.      To Find Defendants Liable, the Jury Was Required to Find that They
                Materially Misrepresented the Quality of the HSSL Loans to Fannie Mae
                or Freddie Mac........................................................................................................3

        B.      The Evidence Showed Unequivocally That Countrywide Did Not
                Materially Misrepresent the Quality of the HSSL Loans. .....................................5

                1.      *The only meaningful evidence of loan quality at trial was
                        Countrywide's final Corporate QC numbers.*................................................6

                2.      *The government's other evidence of alleged "quality" does not
                        show that the HSSL loans were of poorer quality than Fannie and
                        Freddie reasonably expected.* ....................................................................8

II.     THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM,
        WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE
        EVIDENCE DID NOT SHOW THAT DEFENDANTS COMMITTED ANY
        FRAUD DISTINCT FROM A BREACH OF CONTRACT, WHICH IS NOT
        ACTIONABLE AS MAIL OR WIRE FRAUD. .................................................13

        A.      The Evidence Does Not Support the Verdict Under the
                *Bridgestone/Firestone* Doctrine...........................................................................14

        B.      The *Bridgestone/Firestone* Doctrine Is Entirely Consistent with the
                Supreme Court's Precedents on Mail and Wire Fraud. ........................................18

III.    THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM,
        WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE
        GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE THAT ANYONE
        AT COUNTRYWIDE KNOWINGLY PARTICIPATED IN A SCHEME
        DESIGNED TO SELL HSSL LOANS THAT WERE NOT OF INVESTMENT
        QUALITY.............................................................................................................20

CONCLUSION......................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Banco de La Republica de Colombia v. Bank of N.Y. Mellon*, No. 10 Civ. 536 (AKH), 2013 WL 3871419 (S.D.N.Y. July 26, 2013) .........................................................................16

*Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151 (6th Cir. 1987) .......................19

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) ........................................................2

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13 (2d Cir. 1996).........13, 15

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011) ........................................................................1

*Cougar Audio, Inc. v. Reich*, No. 99 Civ. 4498 LBS, 2000 WL 420546 (S.D.N.Y. Apr. 18, 2000) .......................................................................................................................................15

*DePascale v. Sylvania Elec. Prods.*, 510 F. App'x 77 (2d Cir. 2013)..............................................2

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) .........................................2

*Durland v. United States*, 161 U.S. 306 (1896)..............................................................13, 18, 19

*DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308 (S.D.N.Y. 2002) ....................................................18

*Goldfine v. Sichenzia*, 118 F. Supp. 2d 392 (S.D.N.Y. 2000) .......................................................15

*Grappo v. Alitalia Linee Aeree Italiane*, 56 F.3d 427 (2d Cir. 1995).............................................19

*Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419 (S.D.N.Y. 2004) .........15

*In re Enron Corp.*, No. 04 Civ. 1367 (NRB), 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005) .........18

*Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483 (S.D.N.Y. 1997).................19

*Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000 (S.D.N.Y. June 30, 2014) ....15, 17

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)..............................................................3, 19

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ............................17

*Neder v. United States*, 527 U.S. 1 (1999)....................................................................................19

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...............................................................2

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998).......................................................................1

*Pittman by Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998).......................................................1

*Ramey v. Dist. 141, Int'l Ass'n Machinists & Aerospace Workers*, 378 F.3d 269 (2d Cir. 2004) ...................................................................................................................1

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285 (S.D.N.Y. 1995)..............16

*Rosenblatt v. Manson & Woods, Ltd.*, No. 04 Civ. 4205 (PKC), 2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005) .................................................................................................16

*Royal Bus. Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34 (7th Cir. 1980) .......................................6

*Sampson v. Medisys Health Network, Inc.*, No. 10-cv-1342 (SJF) (ARL), 2011 WL 579155 (E.D.N.Y. Feb. 8, 2011) ..............................................................................15

*SEC v. Ginder*, 752 F.3d 569 (2d Cir. 2014) ...................................................................................2

*Torchlight Loan Servs., LLC v. Column Fin., Inc.*, No. 11 Civ. 7426 (RWS), 2012 WL 3065929 (S.D.N.Y. July 25, 2012) .............................................................................17

*U.S. Info. Sys., Inc. v. Int'l Bhd. Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004).........................................................................................12

*United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d. 438 (S.D.N.Y. 2013)...............................5

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)...............................................................15

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) .....................................................................2

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) ...........................................................4

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ......................................................................4

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1997) ........................................................................3

## STATE CASES

*First Bank of Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287 (1st Dep't 1999)...............16, 17

*J.E. Morgan Knitting Mills, Inc. v. Reeves Bros., Inc.*, 243 A.D.2d 422 (1st Dep't 1997) ...........18

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287 (1st Dep't 2011)...........16, 17

*Varo, Inc. v. Alvis PLC*, 261 A.D.2d 262 (1st Dep't 1999) ...........................................................18

## OTHER AUTHORITIES

18 U.S.C. § 1341.........................................................................................................................2, 3

18 U.S.C. § 1343.........................................................................................................................2, 3

18 U.S.C. § 1833a ..........................................................................................................1, 2

Federal Rule of Civil Procedure 50 ........................................................................1, 14

Federal Rule of Civil Procedure 59 ......................................................................1, 2, 14

Federal Rule of Civil Procedure 12(b)(6) ...................................................................13

## INTRODUCTION

The Bank Defendants respectfully renew their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50.  In the alternative, the Bank Defendants respectfully request a new trial under Federal Rule of Civil Procedure 59.[1]

The evidence at trial did not support the jury's verdict of liability for two separate reasons.  First, the evidence did not show that the Bank Defendants materially misrepresented the quality of High Speed Swim Lane ("HSSL") loans sold to Fannie Mae and Freddie Mac.  On the contrary, the evidence showed that the quality of the HSSL loans was well within the standards that Fannie and Freddie reasonably expected.  Second, the evidence did not show that the Bank Defendants committed any "fraud" distinct from a breach of contract which is not actionable as mail or wire fraud.  For either or both of these reasons, a reasonable jury could not have found the Bank Defendants liable under FIRREA § 1833a.  The Court should enter judgment for the Bank Defendants or, in the alternative, the Court should order a new trial.

## LEGAL STANDARD

Judgment as a matter of law should be granted under Rule 50(a) if, "viewing the evidence in the light most favorable to the non-movant, [the Court] concludes that a reasonable juror would have been compelled to accept the view of the moving party."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 332–33 (2d Cir. 2011) (quotation omitted).  In making that determination, the Court "must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence."

---

[1] A post-trial motion based on sufficiency of evidence is required in order to preserve such issues for appeal.  *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).  In contrast, the Court's legal and evidentiary rulings are preserved for appeal without the need for a post-trial motion. *See, e.g.*, *Pittman by Pittman v. Grayson*, 149 F.3d 111, 120 (2d Cir. 1998); *Ramey v. Dist. 141, Int'l Ass'n Machinists & Aerospace Workers*, 378 F.3d 269, 281 (2d Cir. 2004).

1

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (quotation omitted).  But when

there is a "complete absence of evidence supporting the verdict," such that "the jury's findings

could only have been the result of sheer surmise and conjecture," the motion should be granted.

*SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (quotation omitted).

Under Rule 59, "[t]he standard a district court applies in reviewing a motion for a new

trial is 'less stringent' than that for a motion for judgment as a matter of law."  *DePascale v.*

*Sylvania Elec. Prods.*, 510 F. App'x 77, 78–79 (2d Cir. 2013) (quoting *United States v. Landau*,

155 F.3d 93, 104 (2d Cir. 1998)).  The Court may grant a motion for a new trial, even when

"there is evidence to support the jury's verdict, so long as the district court determines that, in its

independent judgment, the jury has reached a seriously erroneous result or its verdict is a

miscarriage of justice."  *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (alteration

and quotation omitted).  A court's finding that "the jury's verdict is against the weight of the

evidence" is enough to support a new trial.  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d

124, 133 (2d Cir. 1998).  The Court "is free to weigh the evidence . . . and need not view it in the

light most favorable to the verdict winner."  *Id.* at 134.

## ARGUMENT

## I.  THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM, WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF A MATERIAL MISREPRESENTATION.

The government had the burden of proving, by a preponderance of the evidence, every

element of its claims under FIRREA § 1833a.  18 U.S.C. § 1833a(f).  These elements included

the elements of a claim for mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.  As the Court

instructed the jury, Defendants could be liable for mail or wire fraud only if the jury found

(among other elements) that Defendants materially misrepresented to Fannie Mae or Freddie

Mac that the HSSL loans "were of higher quality than they actually were." Thus, if the government did not prove that the HSSL loans were of lower quality than represented, there was no material misrepresentation and no fraud.

The trial evidence, even viewed in the light most favorable to the government, did not prove fraud under this standard. Instead, the evidence unambiguously showed that the HSSL loans sold to Fannie and Freddie were well within industry standards for loan quality, and thus Fannie and Freddie received exactly what they paid for.

**A.    To Find Defendants Liable, the Jury Was Required To Find that They Materially Misrepresented the Quality of the HSSL Loans to Fannie Mae or Freddie Mac.**

An essential element of the government's proof of mail or wire fraud is proof of a "scheme or artifice to defraud."  18 U.S.C. §§ 1341, 1343; *see United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1997).  To prove a scheme to defraud, the government was required to prove that Countrywide made a misrepresentation that was "reasonably calculated to deceive persons of ordinary prudence and comprehension."  *McLaughlin v. Anderson*, 962 F.2d 187, 192–93 (2d Cir. 1992) (quotation omitted).

The only "scheme" the court's instructions permitted the jury to consider was that Countrywide misrepresented to Fannie and Freddie that the HSSL loans were of investment quality, when in fact they were not.  The jury was instructed:

> [T]he government alleges, and the defendants deny, that one or more of the defendants devised a scheme to induce Fannie Mae and/or Freddie Mac to purchase mortgage loans originated through the High-Speed Swim Lane *by misrepresenting that the loans were of higher quality than they actually were.*  The government further alleges that these misrepresentations were material because a reasonably prudent person participating in the decision of whether to purchase mortgage loans at Fannie Mae or Freddie Mac would have considered the true facts important in deciding whether to purchase or how to price the loans.

Tr. 3468:25–3469:10 (emphasis added).

Thus, despite the government's suggestion that the HSSL process itself was somehow wrongful, the jury was not permitted to find liability on the basis that the process was a scheme to defraud or that the process was misrepresented. The Court specifically ruled at the charging conference that the evidence did not support such a theory of liability because Defendants did not make any misrepresentations to Fannie and Freddie about their underwriting process. Tr. 3207:22–3208:11. Only a misrepresentation about *the quality of the loans themselves* could suffice under the Court's instructions to hold Defendants liable. *See* Tr. 3468:25–3469:10.[2]

The government also was required to prove that Countrywide's deception was material, that is, that it would be important to a reasonable person in the position of Fannie and Freddie in deciding whether or not to purchase HSSL loans. *See United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007). To be material, misrepresented information "must be of some independent value or must bear on the ultimate value of the transaction." *Id.* (quotation omitted); *United States v. Mittelstaedt*, 31 F.3d 1208, 1217–18 (2d Cir. 1994).

As discussed below, the government's evidence at trial was insufficient to prove that Defendants materially misrepresented the quality of the HSSL loans. Rather, Fannie and Freddie expected, and the contracts contemplated, that many of the loans sold to them would not be investment quality; and the evidence did not show that the HSSL loans were of poorer quality than Fannie and Freddie could reasonably have expected.

---

[2] Further, the government was required to show that Countrywide misrepresented the quality of loans at the time it sold them to Fannie or Freddie, and *not* by allegedly failing to "self-report" defective loans that Countrywide had previously sold to Fannie and Freddie. The Court specifically ruled at the charging conference that the government had not presented evidence to support a fraud claim based on "self-reporting," and accordingly the government was not permitted to argue such a theory in closing arguments. Tr. 3289:11-20 (Charging Conference).

**B.     The Evidence Showed Unequivocally That Countrywide Did Not Materially Misrepresent the Quality of the HSSL Loans.**

The evidence was undisputed that Fannie and Freddie understood that not all loans Countrywide sold to them would be investment quality.  That is so even though Fannie's and Freddie's contracts with Countrywide contained the industry-standard requirement that the loans be investment quality at the time of sale — subject to a right of repurchase for those loans that were not.  As the Court's instructions to the jury made clear, it was not enough for the government to show that Defendants breached a contract.  Trial Tr. 3469:11–16 (jury charge). Thus, the jury could not reasonably have concluded that Defendants materially misrepresented the quality of HSSL loans merely because some of the HSSL loans were not investment quality. Instead, what mattered under the Court's instructions is whether the loans were sold with material misrepresentations about their quality.  There could not have been a material misrepresentation if the quality of the loans was no different than Fannie and Freddie reasonably could have expected.

The evidence from Fannie and Freddie witnesses was unanimous that, despite the contractual requirement, Fannie and Freddie did not expect that 100% of the loans that Countrywide or any other lender delivered to them would be investment quality.  *See* Tr. 3131:16–3132:9 (Battany).  On the contrary, witnesses from both Fannie and Freddie testified that they expected a significant number of loans sold to them to be non-investment quality.  *See* Tr. 1569:3–21 (Sobczak); Tr. 1309:3–8 (Tanabe).  Even the government acknowledged that it was understood throughout the industry that the investment quality requirement did not mean that every loan delivered to Fannie and Freddie was actually investment quality.  *See* Tr. 57:17–18 (Gov't Opening); *cf. United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d. 438, 466–67 (S.D.N.Y. 2013) (finding industry understanding relevant when deciding whether defendant's

representation was false or misleading); *Royal Bus. Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34, 43–45 (7th Cir. 1980) (reversing and remanding fraud finding because buyer's knowledge of seller's representations, developed over series of transactions, was relevant to deception issue).

The contracts themselves demonstrate that there was nothing deceptive about some loans being defective.  The contract terms explicitly contemplated that some of the loans would not be investment quality at the time of sale and included a specific process to require lenders to repurchase such defective loans from Fannie and Freddie.  *See* Tr. 1071:23–25 (Forlines); Tr. 3048:1–6 (Battany); Tr. 1299:19–24 (Tanabe).

Indeed, despite the industry-standard contractual provisions that loans would be investment quality at the time of sale, about 25% of all loans sold to Fannie were *not* investment quality.  Tr. 1569:3–21 (Sobczak).  And 18-20% of all loans sold to Freddie were not investment quality.  Tr. 1309:3–8 (Tanabe).  Fannie and Freddie knew as much through their own due diligence, Tr. 1071:5–25 (Forlines); Tr. 1299:25–1303:17, 1309:3–8 (Tanabe), yet they continued to purchase loans under these contracts from Countrywide and other lenders.

Because 18-25% of the loans Fannie and Freddie bought with an investment quality representation on an industrywide basis were not in fact investment quality, a reasonable purchaser in their shoes could only have been deceived if *more than* 18-25% of the HSSL loans were defective.  The evidence did not show that the HSSL loans had anywhere near that high a defect rate.  On the contrary, as discussed below, the evidence showed that *far fewer* than 18-25% of the HSSL loans were not investment quality.

### 1.    *The only meaningful evidence of loan quality at trial was Countrywide's final Corporate QC numbers.*

Countrywide's Corporate Quality Control department had the sole responsibility within Countrywide to evaluate the quality of the HSSL loans as of the time they were sold.  The

findings of the Corporate QC department were the only evidence offered at trial from which it would have been reasonable for the jury to draw any conclusions about the quality of the HSSL loans.  These Corporate QC numbers indicate that the quality of HSSL loans was far better, at all relevant times, than the loan quality Fannie and Freddie reasonably expected.

Countrywide's Corporate QC numbers were Countrywide's final and definitive internal measure of whether loans it originated and sold were investment quality.  Tr. 1890:22–1891:21 (Schakett) (corporate QC made final determination as to whether a loan was SUS); Tr. 2080:17–18 (Kitashima) ("[T]he only measure of quality was corporate QC.").  These numbers were the result of the Corporate QC group's review of the quality of loans shortly after they funded.  *See* Tr. 1887:1–7 (Schakett).  Corporate QC results were used throughout Countrywide to measure the quality of loans sold to investors.  *See* Tr. 1887:1–7, 1892:18–22 (Schakett).  Corporate QC was not part of the FSL Division, where the HSSL process took place, and there was no evidence or suggestion that anyone in the Corporate QC Group intended fraud or had any role in the HSSL process.  *See* Tr. 211:5–10 (Thomas) ("quality control was a different process [from FSL's Quality Assurance process] that was conducted at the corporate level").

Far below the 18-25% industry standard defect rate, the Corporate QC numbers for loans sold by FSL in the quarters that the HSSL process was in operation ranged from 4.4% to 9.8%.  *See* DX 73; Tr. 2602:2–16 (Mairone); Tr. 1889:14–1890:21 (Schakett).  These final QC numbers were consistent with, indeed better than, Fannie's and Freddie's reasonable expectations for loan defects.  Tr. 3096:6–3097:6, 3097:16–20 (Battany) (testifying that he would have continued to purchase loans from Countrywide if he had known the Corporate QC conclusions because these numbers were consistent with the defect rates Fannie experienced).

The government repeatedly claimed that Corporate QC results were "tainted" by the Sprint Incentive, an FSL initiative championed by government witnesses Thomas and O'Donnell to encourage FSL underwriters and loan processors to defend the quality of the loans they had approved to Corporate QC.  There was no evidence of such taint or of any other reason to question the Corporate QC numbers.  There was never any allegation—let alone any evidence—that the Corporate QC department was part of any fraud, or that Corporate QC was subject to any improper influence or duress in reaching its conclusions.  On the contrary, the only evidence was that when the Corporate QC group flagged loans as potentially defective, FSL employees did what they were supposed to do: explain to Corporate QC why they thought the loans were investment quality.  Tr. 622:11–13 (O'Donnell) ("In the rebuttal process, FSL tried to make its case for why a loan rating should be reduced by providing documents and having discussions; it was a debate about whether a loan was truly SUS.").  Corporate QC then made an *independent judgment* about the loan.  *See* Tr. 1890:22–1891:21 (Schakett).  The government's witnesses agreed that Corporate QC results were the definitive measure of quality and testified that efforts like the Sprint Incentive did not impact their reliability.  *See* Tr. 228:5–7, 231:13–15 (Thomas) (Sprint Incentive was effort to get through unusually high number of QC findings (caused by a larger sample size) and to lower FSL's overall SUS rate); Tr. 285:2–11 (Thomas) (Sprint Incentive would not have caused erroneous rebuttals).  Further, the Sprint Incentive applied only to loans funded during the first quarter of 2008, when FSL was already making significant changes to the HSSL process.  *See* Tr. 227:8–14; 280:7–9; 316:8–10 (Thomas).

> **2.     *The government's other evidence of alleged "quality" does not show that the HSSL loans were of poorer quality than Fannie and Freddie reasonably expected.***

The government relied on two pieces of evidence to show that the quality of HSSL loans was materially misrepresented to Fannie and Freddie:  FSL's internal pre-funding "Quality

Assurance" ("QA") results and the government's experts' testimony.  Neither was sufficient to show a material misrepresentation about the quality of the HSSL loans.

   a. *QA findings did not measure the quality of the loans that were sold to Fannie and Freddie.*

  The purpose of FSL's internal QA process was to reach *interim* conclusions about whether required steps had been followed during the processing of a loan.  QA tested the process before the loans had been funded or sold, and before the underwriting process was complete.  Thus, unlike Corporate QC, QA did not measure the quality of actual, funded loans.  Even the government's witnesses agreed that QA measured interim results, not final quality.  Tr. 557:10–14 (O'Donnell) ("High risk in the scope of the QA audit meant that there was defects on the loan that if they were not corrected, the loan would likely be rated as severely unsat."); *see also* Tr. 555:13–17 (O'Donnell) (QA "measure[d] whether or not the loan *would be* investment quality and whether the loans had funded under the terms of the pilot" (emphasis added)).  In addition, by their very nature, the QA results focused on the underwriting process, while Corporate QC results focused on loan quality.  Tr. 1998:24–1999:12; 2080:17–18 (Kitashima).

  Because QA reviews were conducted while a loan was in process, before all steps in the Countrywide process were complete, QA results do not evidence the actual quality of the loans that were sold to Fannie or Freddie.  *See* Tr. 2080:19–22 (Oct. 9, 2013) (Kitashima).  Indeed, a witness from Fannie testified that he understood and expected internal pre-funding quality reviews to result in much higher finding rates than a review that tested the loans post-funding, as of the time of sale.  Tr. 3089:10–15 (Battany) ("I expected in my experience pre -- prefunding audits always had higher error rates, . . . .").

  Once the loan was funded, the QA results were meaningless, as QA's value as a potential predictor of QC results evaporated once final Corporate QC results were available.  To the extent

that the QA results were different from the final QC results, it was the final QC results that spoke to the actual quality of the loan at the relevant time.  Consequently, the jury could not reasonably have found that the QA results were a reliable measure of final loan quality.

> b.      *The government's expert testimony did not show that the HSSL loans were of poor quality.*

The government's experts purported to testify at trial that the HSSL loans were of poor quality, based on Dr. Cowan's extrapolation of Mr. Holt's re-underwriting opinions.  Their testimony did not demonstrate that Countrywide misrepresented the quality of HSSL loans for the simple reason that Mr. Holt's results, and Dr. Cowan's extrapolations, were based on the wrong population of loans.

Mr. Holt informed the jury that he had reviewed a sample of 343[3] loans from a population of 28,882 that the government claimed were HSSL loans.  *See* Trial Tr. 1087:2–1088:24 (Holt).  He concluded that 185 loans in the sample were defective, and then Dr. Cowan extrapolated these results to that 28,882 loan population.  *See* 1104:11–13 (Holt).  But the government's experts used the wrong population of loans to do this work.  The Bank Defendants have previously explained at length why the government's loan population is incorrect,[4] and we incorporate those arguments by reference here as well as briefly summarize them.

The government's population included loans (1) with an application date after August 13, 2007 or funding date before May 21, 2008, (2) that were processed or funded through Central

---

[3] Cowan's sample initially contained 600 loans, Trial Tr. 1390:14-1391:15 (Cowan), and Holt's team reviewed 526 of those loans, Trial Tr. 1695:19-1396:9 (Holt).  After the government narrowed the dates of its definition of HSSL loans, only 343 loans that Holt had reviewed remained in the sample.  Trial Tr. 1400:7-15 (Cowan).

[4] For example, Bank Defendants highlighted these errors in its briefing and oral argument on penalties, Bank Defs.' Mem. Law Regarding Penalties at 18-22, R. 315; Tr. 36:8-19-39:18 (Hr'g Tr. Dec. 5, 2013), as well as during trial, *e.g.*, Tr. 2195:6-2205:16 (Oct. 10, 2013).

Fulfillment and field branches in Chandler, Arizona, Plano, Texas, Hatboro, Pennsylvania

Richardson, Texas, or Rosemead, California, and (3) that were not listed as an AUS "refer" or

"error."  Tr. 1698–1700.  The evidence at trial unequivocally showed that the government's

population (and consequently its sample) incorrectly identified both the dates of the HSSL

process and the branches through which HSSL loans were processed.  The government's experts'

population was more than double the actual population of HSSL loans.  *See* Trial Tr. 2233:24–

2234:16 (Oct. 10, 2013) (Ho testimony that population was 11,481 loans); DX 1928; Trial Tr.

1698:5–1700:5, 1700:19–23 (Oct. 7, 2013) (Hansen testimony that population was 28,882 loans).

First, only loans processed through certain Central Fulfillment branches were properly

classified as HSSL loans.  Tr. 2220–2221 (Ho) (loans in the HSSL pilot were loans processed

through branches 6205 and 6221 (one in Chandler and one in Richardson) with application dates

between August 13, 2007 and September 30, 2007); Tr. 2223–2226 (Ho) (Central Fulfillment

processed HSSL loans from October 1, 2007 to April 27, 2008, through the national sales centers

in Rosemead, Chandler, and Richardson); Tr. 2227–2230 (Ho) (starting in November 2007, some

of the branches in Hatboro also processed HSSL loans).  Yet, the government's population

included loans processed through field branches, which did not process HSSL loans.

Government witness Michael Thomas confirmed as much in his testimony.  Tr. 336–337

(Thomas) (field branches did not generally process HSSL loans).

Second, the government used the wrong dates in setting its population.  From August 13,

2007 to September 30, 2007, only two branches processed HSSL loans through the HSSL pilot.

Tr. 2220–2221.  Then, after the pilot, Central Fulfillment processed HSSL loans from October 1,

2007 to April 27, 2008, through the national sales centers in Rosemead, Chandler, and

Richardson, and for a short time some of the branches in Hatboro.  Tr. 2223–2226; *see also* Tr.

11

2227–2230.  The government's population, in contrast, included loans that were processed at all

five locations from August 13, 2007 to May 21, 2008.  *See* Tr. 1698–1700.  Loans from April 27,

2008 through May 21, 2008 should have been excluded from the population because the HSSL

process ended on April 27, 2008.  It was on that date that underwriters were again required to

review a loan prior to clearing the loan to close.  DX 61 (noting that underwriters must complete

a clear to close checklist "*prior to issuing a CTC*" (emphasis added)).[5]

Each of these errors resulted in the population studied by the governments' experts

differing substantially from that limited to HSSL loans.  Thus, Mr. Holt's opinions as to the

quality of the loans he reviewed have no bearing on the actual quality of the HSSL loans.  Dr.

Cowan himself testified that if the HSSL loan population he had used was incorrect, and instead

only half or two-thirds of those loans were HSSL loans, he could not say whether his analysis

would remain valid.  Tr. 1415:6–18.  Because the government's experts' conclusions were based

on the wrong loan population, they provide no evidence of the portion of the *HSSL loans* that

were of poor quality.  *See U.S. Info. Sys., Inc. v. Int'l Bhd. Elec. Workers Local Union No. 3,*

*AFL-CIO*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004) (excluding sampling evidence because

proponent could not "demonstrate the reliability" of data and exclude potential bias).

---

[5] The Court, in its penalty ruling, determined that the proper population of HSSL loans was
17,611 loans.  Op. at 9.  The Court agreed that loans originated by field branches should not have
been included in the HSSL population.  Op. at 7.  The Court adopted the government's May 22,
2008 end date, however, because it concluded that it was on this date that "underwriters were
once again required to clear the loans for closing."  *Id.*  The latter conclusion was incorrect.  As
the bulletin makes plain, as of April 28, 2008, *underwriters were required to clear every loan to
close.*  DX 61.  No evidence at trial contradicts this conclusion.  *See* Tr. 832:2-11 (O'Donnell)
(testifying that through the April 25, 2008 bulletin, underwriters were brought back in to the
clear to close process for HSSL loans); Tr. 315:1–316:15 (Thomas) (admitting that the bulletin
required underwriter involvement to complete a checklist, but stating that he did not recall what
was on the checklist); Tr. 1984:18-1985 (Kitashima) (bulletin required underwriters to sign off at
clear to close); Tr. 2813:1-18 (Porteck) (same).

The evidence at trial was clear:  Fannie and Freddie expected that up to 18-25% of the HSSL loans would not be investment quality, and the government did not prove that the quality of the HSSL loans was any different than Fannie and Freddie expected.  On the contrary, the only reliable measure of loan quality contradicts the government's claim.  As the evidence shows that Defendants did not materially misrepresent the quality of the HSSL loans, the Court should grant judgment as a matter of law or, at a minimum, grant Defendants a new trial.

## II.    THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM, WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE EVIDENCE DID NOT SHOW THAT DEFENDANTS COMMITTED ANY FRAUD DISTINCT FROM A BREACH OF CONTRACT, WHICH IS NOT ACTIONABLE AS MAIL OR WIRE FRAUD.

In their Motion to Dismiss under Rule 12(b)(6), the Bank Defendants argued that the government's mail and wire fraud claims were contract claims in disguise and were not actionable.  *See* Mem. in Support of Mot. to Dismiss, ECF No. 34, at 19–25 (Dec. 21, 2012); Supp. Mem. in Support of Mot. to Dismiss, ECF No. 53, at 10–14 (Feb. 28, 2013); *see Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13 (2d Cir. 1996).  The Court disagreed.  It first ruled that, unlike a common-law fraud claim, a mail- or wire-fraud claim may be based on the same set of facts as a breach-of-contract claim.  Mot. to Dismiss Op., ECF No. 148, at 16 (citing *Durland v. United States*, 161 U.S. 306 (1896)).  In an alternative holding, the Court further ruled that the conduct alleged in the Complaint satisfied one or more of the exceptions to the common-law rule barring fraud claims based on breaches of contract.  *Id.* at 18.

Defendants continue to dispute the Court's rulings as a matter of law.  But even accepting those rulings as correct for purposes of this motion, the record still does not support a finding that Defendants committed mail or wire fraud.  The evidence at trial established, at most, that Defendants breached their preexisting agreements with the GSEs.  And because that evidence is

insufficient to sustain the jury's findings, Defendants are entitled to judgment as a matter of law under Rule 50 or, in the alternative, a new trial under Rule 59.

   A.   **The Evidence Does Not Support the Verdict Under the** *Bridgestone/Firestone* **Doctrine.**

As discussed in the prior section, the government's theory of liability was that Defendants committed mail and wire fraud by "misrepresenting" the quality of the HSSL loans they sold to Fannie and Freddie.  The requisite quality of loans offered for sale was governed by preexisting contracts between Countrywide, on the one hand, and Fannie and Freddie, respectively, on the other.  The contracts required in essence that the loans be investment quality, and Countrywide warranted that the loans would be of such quality at the time of sale.

The government's sole evidence at trial of alleged "fraudulent misrepresentations" was that the HSSL loans included many loans that were not in fact investment quality, and that the Defendants knew this and sold the loans to Fannie and Freddie anyway.  The government presented a substantial amount of evidence about the parties' contracts, including the structure of the agreements, *e.g.*, Tr. 1512:18–1513:15 (Sobczak) (describing contracts between Countrywide and Fannie Mae); *id.* at 1276:23–1277:11 (Tanabe) (describing contracts between Countrywide and Freddie Mac), the reasons for that structure, *e.g. id.* at 1027:9–15 (Forlines) (explaining purpose of representation and warranty model), and the details of specific provisions, *e.g.*, *id.* at 1481:8–1483:6 (Brewster) (explaining self-reporting provisions); *id.* at 1589:13–16, 1590:6–11 (Sobczak) (discussing provision on employee training, warranty on investment quality).  The government then argued that Defendants breached those agreements by selling non-compliant loans to Fannie Mae and Freddie Mac.  *E.g.*, *id.* at 58:20–24 (opening statement).  Those breaches were "the kernel of the [government's] case."  *Id.* at 3448:15–17 (rebuttal closing

14

statement).  As government counsel put it, "the particular misrepresentation that we're honing in on in this case are [*sic*] in contracts."  Tr. at 3231:17–19.

A fraud claim based on the same set of facts as a breach of contract claim cannot lie, except in three limited circumstances:  (1) when the plaintiff demonstrates a legal duty separate from the duty to perform under the contract; (2) when the plaintiff proves that the defendant made a fraudulent misrepresentation that was collateral to, but inducement for, the contract; or (3) when the plaintiff seeks special damages that are caused by the misrepresentation, but unrecoverable in contract.  *Bridgestone/Firestone*, 98 F.3d at 20.  While *Bridgestone/Firestone* was decided under New York common law, courts have applied it (or a substantially similar rule) to mail- and wire-fraud claims.  *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) ("A breach of contract does not amount to mail fraud."); *Sampson v. Medisys Health Network, Inc.*, No. 10-cv-1342 (SJF) (ARL), 2011 WL 579155, at *6 (E.D.N.Y. Feb. 8, 2011); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 404 (S.D.N.Y. 2000); *Cougar Audio, Inc. v. Reich*, No. 99 Civ. 4498 LBS, 2000 WL 420546, at *6 (S.D.N.Y. Apr. 18, 2000).

The government's evidence did not show a basis for applying any of the three exceptions to the *Bridgestone/Firestone* rule.  There is not, and never has been, any serious suggestion that this case meets the first or third exception.  And it does not meet the second, which requires "'a fraudulent misrepresentation collateral or extraneous to the contract.'"  *Kriegel v. Donelli*, No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) (quoting *Bridgestone/Firestone*, 98 F.3d at 20).  Under the second *Bridgestone/Firestone* exception, "the primary consideration . . . is whether the contract itself speaks to the issue."  *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 427 (S.D.N.Y. 2004).  Only when a claim of fraud would not "require[] the same proof as the breach of contract claim," is the fraud claim

15

viable. *Banco de La Republica de Colombia v. Bank of N.Y. Mellon*, No. 10 Civ. 536 (AKH), 2013 WL 3871419, at *10 (S.D.N.Y. July 26, 2013).

The government's claim in this case was premised on Defendants' breach of contractual representations and warranties contained in Fannie Mae's and Freddie Mac's sales guides.  Tr. 3231:17–19, 3307:21–24 (closing statement) (arguing that HSSL loans violated representations and warranties).[6]  The government adduced no evidence of misrepresentations outside the contracts' scope.  There was no evidence, for example, that Defendants made misrepresentations about the qualities of specific loans, *cf. First Bank of Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291–92 (1st Dep't 1999) (holding that fraud claim based on breach of loan-purchase agreement could lie where defendants misrepresented specific facts about individual loans), or fraudulently induced the GSEs to enter the agreements in the first instance, *cf. MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 293–94 (1st Dep't 2011) (holding that misrepresentations that induced plaintiff to enter contract were collateral to contract, even if the misrepresentations also violated the contract's terms).

To the contrary, multiple witnesses from Fannie Mae and Freddie Mac testified, but they offered no testimony about extra-contractual statements concerning loans processed through the High Speed Swim Lane.  Tr. at 1513:12, 1516:23–1517:3 (Sobczak).  For example, neither Mr. Tanabe of Freddie nor Mr. Battany of Fannie identified any extra-contractual statements by any

---

[6] At the charging conference, the Court precluded the government from arguing that Defendants knowingly breached the contracts' self-reporting requirement because there was no evidence to substantiate that claim.  Tr. 3289:11-13.  But even if the government had presented evidence to support such an argument, any failure to self-report defective loans would be a breach of contract, not an independent fraud.  *See Rosenblatt v. Manson & Woods, Ltd.*, No. 04 Civ. 4205 (PKC), 2005 WL 2649027, at *11 (S.D.N.Y. Oct. 14, 2005), *aff'd*, 195 F. App'x 11 (2d Cir. 2006) (granting summary judgment where "alleged duty of disclosure [tied] back to the language of the contract"); *cf. Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 290 (S.D.N.Y. 1995) ("Under New York law . . . alleged concealment of a breach is insufficient to transform what would normally be a breach of contract action into one for fraud.").

Defendant, even though both testified about their respective roles in negotiating contracts and variances with Countrywide. *See, e.g.*, *id.* at 1268:23–1269:3 (Tanabe) (discussions with Countrywide involved contractual provisions and credit policies); 3044:5–3061:16 (Battany); 3102:19–3104:14, 3119:6–3124:24. In addition, the government adduced no evidence that any of the three executives who it claimed had an intent to defraud made any misstatement to Fannie Mae or Freddie Mac at any time. Tr. at 2101:25–2102:1 (Kitashima) ("I didn't have any dealings with the investor or GSEs."); 2605:25–2606:7 (Mairone) (Mairone never interacted, met with, or was asked to meet with Fannie Mae or Freddie Mac). Indeed, the record shows that Mr. Kitashima's only contact with Fannie Mae or Freddie Mac was a single presentation given in September 2007, *id.* at 1926:5–6, and that Ms. Mairone had no interactions with either agency at all, *e.g.*, *id.* at 1074:19–1075:8 (Forlines) (noting that he did not know and had never spoken to or received correspondence from Mairone); 1346:12–23 (Tanabe) (same).

To be sure, the contractual provisions at the heart of the government's case were in the form of representations and warranties. But that does not change the result. In some cases, a *collateral or extraneous* misstatement of fact may still be the basis for a fraud claim, even though it also happens to violate a representation or warranty. *See MBIA Ins. Corp.*, 87 A.D.3d at 294; *First Bank of Ams.*, 257 A.D.2d at 291–92; *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183–84 (2d Cir. 2007). But when, as here, the "*exact* representations made . . . in the warranty" are the basis of the fraud claim, or the warranty is nothing more than a promise of future performance, the "claim is wholly duplicative" of a breach of contract claim and cannot stand. *Kriegel*, 2014 WL 2936000, at *14. Federal and state courts alike routinely reaffirm that principle. *See, e.g.*, *Torchlight Loan Servs., LLC v. Column Fin., Inc.*, No. 11 Civ. 7426 (RWS), 2012 WL 3065929, at *9 (S.D.N.Y. July 25, 2012) (dismissing fraud claim as

duplicative because fraud allegations merely "recite[d] the purported breaches of representations and warranties in the MLPA"); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 325–35 (S.D.N.Y. 2002); *Varo, Inc. v. Alvis PLC*, 261 A.D.2d 262, 265 (1st Dep't 1999); *J.E. Morgan Knitting Mills, Inc. v. Reeves Bros., Inc.*, 243 A.D.2d 422, 423 (1st Dep't 1997) ("Plaintiffs' cause of action for fraud, which alleges that defendants knew at the time of contract execution that their warranty . . . against undisclosed liabilities burdening the property was false, was properly dismissed as duplicative of plaintiffs' cause of action for breach of contract."); *see also In re Enron Corp.*, No. 04 Civ. 1367 (NRB), 2005 WL 356985, at *11 n.44 (S.D.N.Y. Feb. 15, 2005).

The representations and warranties in this case are terms of the parties' complex and longstanding contracts, agreed upon well before the HSSL process came into existence. The government offered no evidence of misrepresentations collateral or extraneous to those terms by anyone, including the three executives who allegedly had a culpable state of mind. The second exception to the *Bridgestone/Firestone* doctrine thus does not apply, and the evidence did not support a mail- or wire-fraud claim.

**B.    The *Bridgestone/Firestone* Doctrine Is Entirely Consistent with the Supreme Court's Precedents on Mail and Wire Fraud.**

In *Durland*, the Supreme Court addressed the question whether a defendant committed mail fraud by inducing someone to enter a contract that the defendant did not intend to honor. The Court answered in the affirmative. It held that the common-law rule limiting the crime of false pretenses to "the misrepresentation of an existing or a past fact, [which] cannot consist of the mere intention not to carry out a contract in the future," did not apply to the mail fraud statute. *Durland*, 161 U.S. at 312–13. Instead, the Court held that the statute reaches "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Id.* at 313. "The significant fact," the Court explained, "is intent and

purpose." *Id.* If Durland "had entered [the contracts] in good faith . . . *no conviction could be sustained, no matter how visionary might seem the scheme*." *Id.* at 314 (emphasis added). But, critically, the indictment alleged (and the jury properly found) that Durland did not intend *at the time he entered the contract* to honor his agreement. *Id.* In that circumstance, the Court held, a mail-fraud claim could lie.

In other words, *Durland* teaches that a garden-variety breach of contract, even an intentional breach, is not fraud unless the promisor intended not to perform when he entered the contract.[7] 161 U.S. at 313–14; *see also McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992); *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152–53 (6th Cir. 1987). Here, there was no evidence that any Defendant, much less the three Countrywide executives alleged to have a culpable mental state, intended not to perform at the time of contract.

Nor does *Durland* alter the general rule that breaches of contract are not fraudulent misrepresentations for purposes of the mail or wire fraud statutes. In *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court analyzed *Durland* and explained that, while "*Durland* held that the mail fraud statute reaches conduct that would not have constituted 'false pretenses' at common law, it did not hold . . . that the statute encompasses more than common-law fraud." *Id.* at 24. As a result, and consistent with the common law, the Court held that materiality is an element of the mail and wire fraud statutes. *Id.* at 25. *Durland*, put simply, did not unmoor the mail- and wire-fraud statutes from their common-law roots. Common-law limitations on fraud

---

[7] At common law, the result in *Durland* might have been different. *See, e.g., Grappo v. Alitalia Linee Aeree Italiane*, 56 F.3d 427, 434 (2d Cir. 1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing."); *cf. Int'l CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F. Supp. 483, 487–88 (S.D.N.Y. 1997) (Sotomayor, J.) (discussing tension in common law with respect to fraud claims based on making contract with intention not to perform). But that distinction makes no difference here because the government presented no evidence that Defendants intended not to perform when they entered any contract with Fannie Mae or Freddie Mac.

claims, like the *Bridgestone/Firestone* rule, are still valid in the mail- and wire-fraud context. And for the reasons discussed above, the government did not produce evidence sufficient to sustain the jury's verdict under the *Bridgestone/Firestone* rule.  Thus, whether under the standard applied in *Durland* itself or under the common-law rule, which *Durland* did not disturb, that a breach of contract without more is not fraud, the evidence at trial did not support a verdict against the Bank Defendants.

**III.   THE JURY'S VERDICT WAS UNREASONABLE OR, AT A MINIMUM, WAS AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE THAT ANYONE AT COUNTRYWIDE KNOWINGLY PARTICIPATED IN A SCHEME DESIGNED TO SELL HSSL LOANS THAT WERE NOT OF INVESTMENT QUALITY.**

The Bank Defendants join in Part I of the Memorandum of Law of Rebecca Mairone.  In addition to the evidence concerning Ms. Mairone herself, the evidence was also insufficient to show that anyone else at Countrywide had fraudulent knowledge and intent.  Specifically, the same arguments in Ms. Mairone's brief apply to the evidence regarding Mr. Kitashima and Mr. Lumsden, the only other individuals at Countrywide who the government claimed were culpable for fraud.

## CONCLUSION

For the reasons stated above, the Court should grant the Bank Defendants' motion for judgment as a matter of law or, in the alternative, should order a new trial.

Date:  August 28, 2014                                                  Respectfully submitted,

                                                                        WILLIAMS & CONNOLLY LLP

                                                                        By:  s/Craig D. Singer
                                                                        Brendan V. Sullivan, Jr. (admitted *pro hac vice*)

Enu A. Mainigi (admitted *pro hac vice*)
Craig D. Singer (admitted *pro hac vice*)
Kannon K. Shanmugam (admitted *pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

*Counsel for Defendants Bank of America Corp. and Bank of America, N.A.*


By:  s/Richard M. Strassberg
Richard M. Strassberg
William J. Harrington
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax:  (212) 355-3333

*Counsel for Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Countrywide Bank, FSB*