UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA ex rel.          :
EDWARD O'DONNELL,                         :
                                          :
            Plaintiff,                    :
                                          :   12-cv-1422 (JSR)
            -v-                           :
                                          :   MEMORANDUM ORDER
COUNTRYWIDE FINANCIAL CORPORATION;        :
COUNTRYWIDE HOME LOANS, INC.;             :
COUNTRYWIDE BANK, FSB; BANK OF            :
AMERICA CORPORATION; BANK OF              :
AMERICA, N.A.; and REBECCA MAIRONE,       :
                                          :
            Defendants.                   :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

This case involves a scheme by which a division of the Countrywide Defendants,[1] headed by defendant Mairone, sold mortgage loans to government-sponsored entities[2] by representing they were investment quality when, in fact, as a result of an initiative called the High Speed Swim Lane (or "HSSL"), they had been originated in such volume, at such high speed, and at such disregard for quality assurance that it was virtually certain

---

[1] "Countrywide" or the "Countrywide Defendants" refers to defendants Countrywide Home Loans, Inc. and Countrywide Bank, FSB. Countrywide Financial Corporation and Bank of America Corporation, which were originally named as defendants in this action, were dismissed on consent at the start of trial. See Transcript dated Sept. 24, 2013 to Oct. 23, 2013 ("Tr."), at 27.

[2] In particular, the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie").

1

that many would be of inferior quality. Finding this and more, a jury, following a month-long trial, returned a verdict declaring the Countrywide Defendants and their successor-in-interest Bank of America N.A. (collectively, the "Bank Defendants"), as well as Ms. Mairone, in violation of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a, for having committed, to a civil standard, violations of the criminal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343.

The Bank Defendants and Mairone now move for judgment as a matter of law pursuant to Rule 50, Fed. R. Civ. P., or, in the alternative, a new trial pursuant to Rule 59, Fed. R. Civ. P. The motions must be denied.

A party moving for judgment as a matter of law carries a "heavy burden." Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011). "Such a motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008) (internal citation and quotation marks omitted). The Court may therefore grant judgment as a matter of law "only if it can conclude that,

2

with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007) (quoting Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993)).

To succeed on a motion for a new trial is only slightly less onerous. A new trial may be granted only where the trial court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997) (quoting Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir. 1992)). It is true that a trial judge, in making this determination, "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). Nonetheless, "trial judges must exercise their ability to weigh credibility with caution and great restraint," and "jury verdicts should be disturbed with great infrequency." Id.

Defendants have utterly failed to meet their burden on either motion. First, the Bank Defendants contend that the Government failed to introduce sufficient evidence that they made any material misrepresentation, proof of which they maintain is necessary to sustain the mail and wire fraud

3

charges. See McLaughlin v. Anderson, 962 F.2d 187, 192-93 (2d Cir. 1992).[3] Here, the Court instructed the jury at trial that the Government was required to prove that the defendants "misrepresent[ed] that the loans were of higher quality than they actually were," and that a reasonable purchaser in Fannie and Freddie's position "would have considered the true facts important in deciding whether to purchase or how to price the loans." Tr. 3468-69. The Bank Defendants now argue that the Government's evidence did not establish that the HSSL loans were of lower quality than Fannie and Freddie could have reasonably expected, and therefore that they made no misrepresentations that were material.

This argument has no merit. A representation is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999) (internal quotation marks and citation omitted). In this case, the Government's evidence showed that Countrywide's representations regarding the quality of the HSSL loans were critical to Fannie's and Freddie's decision to purchase them and at what price. This was because Fannie and Freddie purchased

---

[3] But see United States v. Thomas, 377 F.3d 232, 242-43 (2d Cir. 2004) (suggesting that the Government may prove a scheme to defraud with "no evidence of any false representation").

4

these loans on a so-called "rep and warrant" basis. As it was not feasible to scrutinize individually the multitudes of loans they purchased, they relied instead on the sellers' representations and warranties regarding the quality of the loans. Tr. 1027. They would purchase the loans here in issue only if the seller represented them to be "investment quality," meaning that they met specified quality benchmarks. Tr. 1031-34; 1282-87. This requirement was never waived. Tr. 3121-26. Having purchased the supposedly investment quality loans, Fannie and Freddie conducted only limited quality review. Tr. 1283-84. Thus, when the defendants sold Fannie and Freddie groups of loans represented to be of investment quality that in fact included a large number of non-investment quality loans, the defendants were making misrepresentations to Fannie and Freddie that were clearly material.

The fact that the contracts between Countrywide and the government-sponsored entities provided for repurchase of faulty loans does not undermine this conclusion. A seller's promise to refund the buyer's money if a defect is discovered after purchase does not render immaterial its misrepresentations about the product's quality at the time of sale. Nor is it of any import that Fannie and Freddie may have been aware that a substantial proportion of loans that they purchased from other lenders around this time were similarly defective. Perhaps that

should have made Fannie and Freddie more careful or suspicious, but the evidence at trial was more than enough to warrant the jury in finding that they continued to rely on the defendants' representations of investment quality. See United States v. Corsey, 723 F.3d 366, 373 n.3 (2d Cir. 2013) ("The question is not whether victims might smell a rotten deal before they hand over money… Instead, a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do.") (citation omitted).

The Government also presented ample evidence that a substantial proportion of the HSSL loans were of far poorer quality than promised (and that, as discussed infra, the defendants knew as much). Indeed, at and before the time of the sales, the "quality assurance" reviews undertaken by Ms. Mairone's division repeatedly found that large proportions of HSSL loans were "high risk" or "action required," meaning they had serious quality issues that, if not corrected, could result in the loans being ineligible for sale. Tr. 567. In the fall of 2007, for example, the reports showed "high risk" rates for these loans rising well over 80%. Plaintiff's Trial Exhibits ("PX") 58, 406, 408.

That the defects that were initially detected by the quality assurance reviews were not corrected was reflected in the corporate quality control audits conducted by an independent

department after the loans were funded. If a loan was found to be ineligible for sale to investors such as Fannie and Freddie, the quality control auditor would designate it as "severely unsatisfactory." Tr. 213. During the first quarter of 2008, approximately 30% of the loans sold by Ms. Mairone's division, even after including some non-HSSL loans, were found to be severely unsatisfactory. PX 129. An internal review conducted by Ms. Mairone's division found that the HSSL program's dubious practices were the "root cause" of the deteriorating loan quality, a conclusion echoed by defendants' employees in internal emails, PX 74, 102, 108, 109. Overall, as the Government's own experts testified, a remarkable 42.8% of the HSSL loans sold to Fannie and Freddie were materially defective. Tr. 1400-02; see also United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., No. 12-cv-1422, 2014 WL 3734122, at *5 (S.D.N.Y. July 30, 2014) (applying Government experts' defect rate).

  Defendants somehow seek to argue that the quality assurance reviews were irrelevant, claiming that they were directed towards procedural irregularities rather than substantive defects. They urge that the only competent evidence of the loans' ultimate quality were the final corporate quality control audits, which, unlike the quality assurance reviews, were conducted after the loans were funded by an independent

7

department. Even if that were the case, the final quality control audits clearly showed that the loans were materially defective in a substantial number of cases. But, in addition, there was ample evidence from which the jury could conclude that the quality assurance reviews were reliable indicators of whether the HSSL loans were "investment quality." A Freddie employee testified to the common sense proposition that errors in the underwriting process would impact the ultimate quality of the loans produced. Tr. 1287. Former Countrywide employees Edward O'Donnell and Michael Thomas both testified that the quality assurance reports reflected loan quality, and even Ms. Mairone admitted that aspects of the quality assurance review, such as appraisal-related findings, bore on loan quality. Tr. 210, 567, 958, 2658. Moreover, the defendants knew that only 5% of the errors leading to the "high risk" findings were being corrected before the loans were funded, and that such errors could potentially render them ineligible for sale to the government-sponsored entities. PX 63; Tr. 210, 570-72.

Taken together, this evidence is overwhelming, and defendants' continuing contention that there was insufficient evidence of a material misrepresentation to support the jury's verdict borders on the frivolous.

In a separate argument, the Bank Defendants, joined by Mairone, reprise, in the guise of a challenge to the sufficiency

of the evidence, an argument that this Court previously rejected as a matter of law — that the Government's evidence amounts to a mere breach of contract, rather than a fraud. Defendants contend, as they did on their motion to dismiss, that a contractual breach precludes a claim for mail and wire fraud unless one of the so-called "Bridgestone/Firestone" exceptions applies. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996). However, as this Court has previously explained, "[t]his argument is premised … on the fundamental error, long ago rejected by the Supreme Court, that mail fraud and wire fraud are subject to the same arcane limitations as common law fraud." United States v. Countrywide Fin. Corp., 961 F. Supp. 2d 598, 607 (S.D.N.Y. 2013) (citing Durland v. United States, 161 U.S. 306 (1896)). The mail and wire fraud statutes are "untrammeled by such common law limitations," id.; a mail or wire fraud claim is proven if the statutory elements are met, nothing more or less. Accordingly, defendants' protestations that the Government's evidence of fraud is insufficient because their misrepresentations took the form of contractual representations and warranties are to no avail.

For what it is worth, moreover, the Government's evidence did in fact satisfy the Bridgestone/Firestone exception for the kind of misrepresentations of present fact that are considered

"collateral or extraneous to the contract," and thus give rise to a separate cause of action for fraudulent inducement, even if they are incorporated into an express contractual provision. See Bridgestone/Firestone, 98 F.3d at 20; Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183-84 (2d Cir. 2007). As discussed above, the Government presented ample evidence that defendants, in order to induce Fannie and Freddie to enter into their purchase agreements with the defendants, represented to Fannie and Freddie that the loans the defendants would be selling to Fannie and Freddie were investment quality, when in fact they were not. This was the kind of affirmative misrepresentation of present fact that, even at common law, supported an independent claim of fraud, and, under applicable New York law, it clearly did so here. See MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 928 N.Y.S.2d 229, 234 (1st Dep't 2011) (holding that allegations that defendant misrepresented loan quality were not duplicative of breach of contract claim).

As a final argument, Ms. Mairone argues that the Government failed to introduce sufficient evidence that she knowingly participated in a scheme to defraud, and the Bank Defendants not only join in this argument but further contend that the evidence failed to show that anyone at Countrywide had the requisite fraudulent intent.

10

It is axiomatic that "[e]ssential to a scheme to defraud is fraudulent intent." United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994). Nonetheless, "direct proof of defendant's fraudulent intent is not necessary." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999). Rather, "a jury may bring to its analysis of intent … all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated." Id. at 130.

As discussed above, the heart of the HSSL program was to originate vast quantities of loans at high speed while bypassing customary underwriting safeguards, and then to pass them off to Fannie and Freddie as investment quality, when the combination of haste and superficial screening virtually guaranteed that many loans would be well below that quality. Mairone does not dispute that she was an enthusiastic participant in the HSSL, if not, indeed, its progenitor. But, she contends that the Government failed to introduce sufficient evidence to prove that she knew of its fraudulent nature. Specifically, she claims that she had no inkling that HSSL was producing loans that were not of the quality that Countrywide promised to the government-sponsored entities. This was because, she contends, the concept of "investment quality" is totally distinct from "quality" in the ordinary sense, and so the manifold warnings she received

about the deficient "quality" of the HSSL loans did not put her on notice that they were not "investment quality."

Mairone's argument defies both the evidence and common sense. Mairone was described as the "catalyst" of the HSSL program, and sat on its steering committee. Tr. 518, 1670. She was well aware that Countrywide sold the HSSL loans to Fannie and Freddie under representations that they were of investment quality. Tr. 2625. And there was ample evidence from which the jury could conclude that she knew these representations were almost certainly false with respect to a substantial proportion of the HSSL loans.

Early in the scheme, Mairone received repeated warnings that stripping away quality controls would invariably impact loan quality. For example, the Government introduced testimony that, during the planning phase, she brushed aside her subordinates' concerns that replacing trained underwriters with entry-level "loan specialists" would lead to large numbers of loans being designated as "severely unsatisfactory." Tr. 547-53. Following the HSSL pilot program, she received quality assurance reports showing that 41% of loans originated through the new process were high risk, but she pushed for its expansion

12

nonetheless.[4] Tr. 555-61; PX 253. After HSSL was fully rolled out, the quality assurance reports showed that over 80% of the HSSL loans were high risk. PX 58, 406, 408.

Mairone also knew that only 5% of the errors detected in the quality assurance process were corrected before funding, but she still chose to go forward with producing them for sale. Tr. 2663; PX 63. Indeed, despite numerous alarm bells, Mairone removed additional quality checkpoints, suspended the compensation penalty for poor quality, set more aggressive funding targets, approved funding contests, and made employee compensation more dependent on volume of loan production. Tr. 2653-56, 2671-72; PX 68, 523, 524.

Further still, as the signs of trouble mounted, Mairone took steps to cover them up, for example, by restricting circulation of quality assurance reports and directing O'Donnell to remove references to the quality assurance and quality control results from a presentation to Countrywide executives regarding loan quality. PX 68; Tr. 592-96, 624-30. It is thus obvious that Ms. Mairone well knew that, whatever alleged leeway there might be in the term "investment quality," the loans she was ordering produced in the face of mounting evidence of their

---

[4] For the reasons discussed above, Mairone's contention that the jury could not have relied on the quality assurance reports as evidence of non-investment quality is without merit.

overwhelming defects were not remotely of investment quality under any definition of that term. A substantial percentage of the loans were, indeed, not fit for any investment, and Mairone not only knew it but sought by her actions to hide it.

Nor is there any merit to the Bank Defendants' contention that the evidence did not support a finding of scienter as to them. The evidence of Mairone's fraudulent intent would, alone, support a finding of scienter as to the Bank Defendants. <u>AUSA Life Ins. Co. v. Ernst & Young</u>, 206 F.3d 202, 221 (2d Cir. 2000). But the trial record was rife with evidence from which the jury could conclude that fellow executives Cliff Kitashima and Greg Lumsden also knowing sold faulty loans to Fannie and Freddie. Both Kitashima and Lumsden also sat on the HSSL steering committee, which received the same quality assurance reports as Mairone and was also aware of O'Donnell's concerns. Tr. 518, 558-60, 593. Kitashima, for example, was aware that loan quality was "in the ditch." PX 78. Lumsden pressured O'Donnell to put more resources into overturning the "severely unsatisfactory" findings. PX 264; Tr. 620-22. Both Kitashima and Lumsden supported many of the procedures that were identified as "root causes" of the deterioration in loan quality, for example, restricting circulation of quality assurance and quality control reports. PX 68, 102; Tr. 2657. This evidence further supported

14

the jury's determination that Countrywide possessed the relevant fraudulent intent.

In light of all the foregoing, there is no basis for this Court to conclude that the jury's verdict was either the "result of sheer surmise and conjecture," Brady, 531 F.3d at 133, or "a miscarriage of justice," Lightfoot, 110 F.3d at 911. Rather, the jury's conclusion that this was a massive and intentional fraud was amply supported by the evidence. Accordingly, defendants' motions for judgment as a matter of law, or, in the alternative, a new trial, are denied. The Clerk is directed to close documents number 348 and 350 on the docket of this case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, NY
         February 3, 2015

15