**15-496-cv(L), 15-499-cv(Con)**
*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*

1:12-cv-01422-JSR

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————

August Term 2015

(Argued: December 16, 2015    Decided: May 23, 2016)

Docket Nos. 15-496, 15-499

UNITED STATES EX REL. EDWARD O'DONNELL,

*Plaintiff-Appellee,*

- v. -

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE BANK, FSB,
BANK OF AMERICA, N.A., and REBECCA MAIRONE,

*Defendants-Appellants,*

COUNTRYWIDE FINANCIAL CORP.
and BANK OF AMERICA CORP.,

*Defendants.*[*]

————————

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __May 23, 2016__

CERTIFIED COPY ISSUED ON 05/23/2016

Before:

     RAGGI, WESLEY, and DRONEY, *Circuit Judges*.

————————————

     Appeal from a judgment entered by the United States District Court for the Southern District of New York (Rakoff, *J.*). A jury found Defendants-Appellants liable under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 for mail or wire fraud affecting a federally insured financial institution, arising from the sale of mortgages to government-sponsored entities. At the penalty stage, the District Court imposed penalties exceeding $1.2 billion. On appeal, Defendants-Appellants argue, *inter alia*, that the proof at trial is insufficient under the mail and wire fraud statutes as a matter of law. We agree and accordingly REVERSE the judgment of the District Court.

————————————

     KANNON K. SHANMUGAM, Williams & Connolly LLP, Washington, DC (Brendan V. Sullivan, Jr., Enu A. Mainigi, Craig D. Singer, Williams & Connolly LLP, Washington, DC; Richard M. Strassberg, William J. Harrington, Goodwin Procter LLP, New York, NY, *on the brief*), *for Defendants-Appellants Countrywide Home Loans, Inc., Countrywide Bank, FSB, and Bank of America, N.A.*

     E. JOSHUA ROSENKRANZ, Orrick, Herrington & Sutcliffe LLP, New York, NY (Robert M. Loeb, Kelsi Brown Corkran, Orrick, Herrington & Sutcliffe LLP, Washington, DC; Marc L. Mukasey, Michael C. Hefter, Ryan M. Philp, Seth M. Cohen, Bracewell & Giuliani LLP, New York, NY, *on the brief*), *for Defendant-Appellant Rebecca Mairone*.

Case 1:12-cv-01422-JSR   Document 369   Filed 05/23/16   Page 3 of 31

PIERRE G. ARMAND, Assistant United States Attorney (Joseph N. Cordaro, Carina H. Schoenberger, Benjamin H. Torrance, Assistant United States Attorneys, *on the brief*), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Plaintiff-Appellee.*

Seth P. Waxman, Daniel Aguilar, Sina Kian, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC; Noah A. Levine, Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Amici Curiae The Clearing House Association, L.L.C., American Bankers Association, Financial Services Roundtable, and Chamber of Commerce of the United States of America.*

Dennis M. Kelleher, Better Markets, Inc., Washington, DC, *for Amicus Curiae Better Markets, Inc.*

––––––––––––––––

WESLEY, *Circuit Judge*:

When can a breach of contract also support a claim for fraud? This question—long an issue in common-law courts—comes before us in the context of a judgment in the United States District Court for the Southern District of New York (Rakoff, *J.*), imposing civil penalties exceeding $1.2 billion on Defendants-Appellants Countrywide Home Loans, Inc.; Countrywide Bank, FSB; Bank of America, N.A. (collectively, "Countrywide"); and Rebecca Mairone (together with Countrywide, "Defendants") under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. As the necessary predicate for these penalties, the Government alleged that Defendants violated the federal mail and wire fraud statutes by selling poor-quality mortgages to government-sponsored entities. On appeal, Defendants argue that the evidence at trial shows at most an intentional breach of contract—*i.e.*, that they

2

sold mortgages that they knew were not of the quality promised in their contracts—and is insufficient as a matter of law to find fraud. We agree, concluding that the trial evidence fails to demonstrate the contemporaneous fraudulent intent necessary to prove a scheme to defraud through contractual promises. Accordingly, we reverse with instructions to enter judgment in favor of Defendants.

## BACKGROUND

This case arises in the context of the post-financial-crisis restructuring of the Full Spectrum Lending Division ("FSL") of Countrywide Home Loans. Prior to the events at issue in this case, FSL had been the subprime lending division of Countrywide; after the collapse of the subprime market in 2007, Countrywide undertook a transformation of FSL into a prime origination division with the goal of selling prime loans[1] to two government-sponsored enterprises ("GSEs"): the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The overall reorganization of FSL was referred to as "Central Fulfillment," one component of which was a loan origination process[2] called the "High Speed Swim Lane" or "HSSL," introduced in August 2007 and expanded in October 2007. Rebecca Mairone, the only

---

[1] The terms "prime" and "subprime" refer to mortgage loans with relatively lower and higher credit risks, respectively. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 715 (2d Cir. 2013).

[2] A loan origination process refers to a "work flow"—*i.e.*, a series of operational steps taken to evaluate a particular loan application for approval. It is distinct from loan origination guidelines—*i.e.*, the criteria for approving a particular loan.

3

named individual defendant, was the Chief Operating Officer of FSL during 2007 and 2008 and was responsible for overseeing FSL's reorganization, including the implementation of HSSL.

This case originated in February 2012 as a *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, commenced by Edward O'Donnell, a former employee of Countrywide. Subsequently, the Government intervened, added claims under section 951 of FIRREA, 12 U.S.C. § 1833a—which imposes civil penalties for violations of the federal mail and wire fraud statutes that "affect[] a federally insured financial institution"—and named Countrywide Home Loans, Inc., Countrywide Financial Corp., Countrywide Bank, FSB, Bank of America Corp., Bank of America, N.A., and Mairone as defendants. As a result of a later motion to dismiss and amended complaint, the FCA claims, Bank of America Corp., and Countrywide Financial Corp. were removed from the case, leaving only FIRREA claims against the remaining defendants. It is on these claims and against these defendants that the case ultimately went to trial.

At trial, the Government presented the following evidence relevant to our consideration here.[3] Pursuant to contracts with Fannie Mae, Countrywide as the seller of mortgages represented that, "as of the date [of] transfer," the mortgages sold would be an "Acceptable Investment." J.A. 5905,

---

[3] As discussed *infra* note 9, on this appeal we draw all inferences in favor of the Government, do not make credibility determinations or weigh the evidence, and disregard all evidence favoring Defendants that the jury was not required to believe. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–51 (2000).

4

5908, 5935, 5938.[4] Similarly, Freddie Mac's selling guide[5] contained a representation by the seller—again, Countrywide— that "all Mortgages sold to Freddie Mac have the characteristics of an investment quality mortgage." J.A. 6368;[6] *see also* J.A. 6366 (representing quality "[a]s of" the date the loans were delivered to Freddie Mac). The Government adduced no evidence and made no claim that Countrywide had fraudulent intent during the negotiation or execution of these contracts.

---

[4] The contracts define "Acceptable Investment" as one for which the lender (*i.e.*, Countrywide) knows "of nothing . . . that can reasonably be expected to cause private institutional investors to regard the mortgage as an unacceptable investment; cause the mortgage to become delinquent; or adversely affect the mortgage's value or marketability." J.A. 5908.

[5] Although the specific Countrywide–Freddie Mac contract incorporating the selling guide does not appear in the record on appeal, there was trial testimony that Countrywide's contract obligated it to make the representations contained within Freddie Mac's selling guide. J.A. 2976–77.

[6] The selling guide defines an "investment quality" mortgage as one "that is made to a Borrower from whom repayment of the debt can be expected, is adequately secured by real property and is originated in accordance with the requirements of the Purchase Documents." J.A. 6368. This definition is similar to the one contained in Countrywide's Technical Manual: "An investment quality loan is one that is made to a borrower from whom timely repayment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual (CTM) and Loan Program Guides (LPGs)." J.A. 5959. Although slightly varying terms are used, no party argues there is any substantive difference between the representations; accordingly, we will refer to them all as "investment-quality representations."

The Government's theory is that Countrywide sold loans under these purchase agreements to the GSEs, knowing that the loans were not investment quality and thus intending to defraud them. To support this argument, the Government presented extensive evidence of quality problems in the loans approved through the HSSL program. *See* J.A. 1839–41, 1848–49, 1863–66, 2220–25, 2228–30, 3313–20, 4437–44, 5650, 5988, 5998. The Government also identified three FSL officers (the "Key Individuals") as to whom they alleged fraudulent intent: Mairone; Greg Lumsden, President of FSL; and Cliff Kitashima, Chief Credit Officer of FSL. J.A. 3516; *see also* J.A. 5220. To demonstrate the requisite intent, the Government presented evidence that the Key Individuals were informed of the poor quality of HSSL loans by FSL employees and internal quality control reports and nonetheless sold them to the GSEs. *See* J.A. 1890–900, 2237–43, 2250–53, 2255–62, 3416–18, 3364–70, 3486–91, 6063–66, 6716–22, 7002–05, 7019–22, 7178.[7]

With respect to the Key Individuals, the Government also presented evidence that at least Kitashima and Mairone knew of the investment-quality representations made in the contractual

---

[7] On appeal, Defendants also challenge the exclusion of certain defense witnesses, arguing that the District Court inconsistently applied its determination that only testimony from witnesses that was relevant to the Key Individuals' intent would be admitted. However, they do not argue that the testimony of the Government's witnesses should have been excluded, merely that they should have been given an opportunity to rebut that testimony with comparable witnesses. Because on sufficiency review we must disregard any evidence contesting the Government's proof in any event, *see, e.g., Reeves*, 530 U.S. at 150–51, and because we answer the sufficiency question in Defendants' favor, resolving Defendants' evidentiary arguments is not necessary for our decision here.

documents between Countrywide and the GSEs. *See* J.A. 3800–01, 4324. The Government presented no evidence that any of the Key Individuals were involved in the negotiation or execution of these contracts, nor did it present evidence that any of them communicated with either GSE regarding the loans sold; in fact, Defendants elicited testimony from GSE witnesses to the contrary. *See* J.A. 2764–65, 3041; *see also* J.A. 3800–01, 4304–05.[8] The Government's case rested upon facts showing that the Key Individuals knew of the pre-existing contractual representations, knew that the loans originated through HSSL were not consistent with those representations, and nonetheless sold HSSL loans to the GSEs pursuant to those contracts. For example, in its closing argument, the Government summarized as follows:

> And now that all the evidence has come in, this case still comes down to a few simple facts. First, the Hustle loans were bad. Second, the defendants knew the Hustle loans were bad. And third, the defendants passed the Hustle loans off as good loans anyway to cheat Fannie and Freddie out of money.

J.A. 5009; *see also* J.A. 5006–07, 5020, 5041, 5049, 5147–48, 5153.

---

[8] Although we construe all evidence in favor of the Government, we must also review the record as a whole and credit "uncontradicted and unimpeached" evidence put forth by the moving party, "at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 150–51; *accord Cameron v. City of New York*, 598 F.3d 50, 59–60 (2d Cir. 2010). The Government has not disputed—either at trial or on appeal—this characterization of the Key Individuals' interactions with the GSEs.

7

After closing arguments, the jury was charged as to the elements of federal mail and wire fraud. In particular, the jury was instructed that it had to find a scheme to defraud, which was defined as "a plan or design to obtain money or property by means of one or more false or misleading statements of a material fact." J.A. 5219. The District Court defined a false statement as "an outright lie" and a misleading statement as "true as far as it goes but creat[ing] a false impression by omitting information necessary to correct the false impression." J.A. 5219. The jury was charged that the Government's theory was that "the defendants devised a scheme to induce [the GSEs] to purchase mortgage loans originated through [HSSL] by misrepresenting that the loans were of higher quality than they actually were," and was further charged that "the fact that some of these alleged misrepresentations may have constituted breaches of the contracts . . . is neither here nor there." J.A. 5219–20. Second, the jury was charged that it needed to find that "the defendant you are considering participated at some point in the scheme knowingly and with a specific intent to defraud"—that is, "act[ed] consciously and deliberately . . . [with] knowledge that that defendant was participating in a fraudulent scheme" and "purposely intended to deceive and harm [the GSEs] by seeking to sell them mortgage loans . . . through false or misleading representations." J.A. 5220. The jury was also charged that, as to Countrywide, it could only find fraudulent intent if "at least one of [the Key Individuals] participated in such a fraudulent scheme with such intent." *Id.*

After deliberation, the jury returned a general verdict in favor of the Government, whereupon the District Court imposed civil penalties of $1 million against Mairone individually and $1.27 billion against Countrywide. *See* 12 U.S.C. § 1833a(b)(1), (b)(3)(A).

# DISCUSSION

The provision of FIRREA under which Defendants were found liable provides for civil penalties against "[w]hoever" violates or conspires to violate, *inter alia*, the federal mail or wire fraud statutes, *see* 18 U.S.C. §§ 1341, 1343, in a manner "affecting a federally insured financial institution." 12 U.S.C. § 1833a(a), (c)(2).[9] Defendants inform us that this suit is the first in the federal courts of appeals to consider the validity of a FIRREA action brought against a financial institution for so-called "self-affecting" conduct. Much of the parties' and *amici*'s briefing concerns the validity of such an action. Ultimately, however, we need not reach the issue, because Defendants have persuaded us to reverse with another argument: the Government has failed to prove the necessary FIRREA prerequisite—*i.e.*, a violation of (or conspiracy to violate) § 1341 or § 1343.[10]

---

[9] Our interpretation of the federal statutes in question is *de novo*. *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002). Following our articulation of the legal standards, however, we draw all evidentiary inferences in favor of the Government and do not make credibility determinations or weigh the evidence. *See Stampf v. Long Island R.R.*, 761 F.3d 192, 197–98 (2d Cir. 2014). Considering the evidence in this manner, we determine *de novo* whether judgment as a matter of law is warranted—*i.e.*, whether "'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on that issue.'" *Cameron*, 598 F.3d at 59 (alteration in original) (quoting Fed. R. Civ. P. 50(a)(1)). Because the proper interpretation of the contracts at issue is a question of law, we review them *de novo* as well. *See Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 720 (2d Cir. 2013).

[10] Our conclusion here thus renders immaterial the other grounds for appeal put forth by Defendants, including challenges to the District Court's evidentiary rulings and penalty calculations. As for

9

Case 1:12-cv-01422-JSR   Document 369   Filed 05/23/16   Page 11 of 31

A simple hypothetical presents the central issue in this case. Imagine that two parties—*A* and *B*—execute a contract, in which *A* agrees to provide widgets periodically to *B* during the five-year term of the agreement. *A* represents that each delivery of widgets, "as of" the date of delivery, complies with a set of standards identified as "widget specifications" in the contract. At the time of contracting, *A* intends to fulfill the bargain and provide conforming widgets. Later, after several successful and conforming deliveries to *B*, *A*'s production process experiences difficulties, and the quality of *A*'s widgets falls below the specified standards. Despite knowing the widgets are subpar, *A* decides to ship these nonconforming widgets to *B* without saying anything about their quality. When these widgets begin to break down, *B* complains, alleging that *A* has not only breached its agreement but also has committed a fraud. *B*'s fraud theory is that *A* knowingly and intentionally provided substandard widgets in violation of the contractual promise—a promise *A* made at the time of contract execution about the quality of widgets at the time of future delivery. Is *A*'s *willful* but silent noncompliance a fraud—a knowingly false statement, made with intent to defraud—or is it simply an intentional breach of contract?

This question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text. Once we do so, however, the trial record reveals a basic deficiency in proof under the statutes, and

---

Defendants' request for judicial reassignment following any remand, we need not consider that request, as our remand will require only entry of a new judgment.

accordingly, we conclude the evidence is insufficient to sustain the jury's verdict.

## I.   The Common Law's Treatment of Fraud Claims Based Upon Breaches of Contract

On appeal, Defendants argue—as they did in the District Court—that the conduct alleged and proven by the Government is, at most, a series of intentional breaches of contract. The common law, they contend, does not recognize such conduct as fraud, and as a result, the federal statutes do not either. Specifically, Defendants argue that—because the only representations involved in this case are contained within contracts—to demonstrate fraud, rather than simple breach of contract, under the common law and federal statutes, the Government had to prove that Defendants never intended to perform those contracts—*i.e.*, at the time of contract execution, Defendants knew and intended that they would not perform their future obligations thereunder.

In both pre- and post-trial decisions, the District Court concluded that the federal fraud statutes do *not* incorporate the common-law principle that actions brought in fraud cannot be premised solely upon evidence of contractual breaches—or, in the alternative, that the scheme alleged here fell into one of the recognized exceptions to this principle for actions premised on contractual breaches that nonetheless can sustain an action for fraud. *See United States ex rel. O'Donnell v. Countrywide Fin. Corp.* (*Countrywide II*), 83 F. Supp. 3d 528, 533–34 (S.D.N.Y. 2015); *United States ex rel. O'Donnell v. Countrywide Fin. Corp.* (*Countrywide I*), 961 F. Supp. 2d 598, 607–08 (S.D.N.Y. 2013). However, the law compels a different analysis that would not permit a reasonable jury to find a § 1341 or § 1343 violation on the facts of this case.

11

The federal mail and wire fraud statutes, in relevant part, impose criminal penalties on "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" uses the mail, 18 U.S.C. § 1341, or wires, *id.* § 1343, for such purposes. Thus, the essential elements of these federal fraud crimes are "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)). "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (alteration in original) (citation omitted) (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989)). The exact contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion.

It is well established that statutes employing common-law terms are presumed, "unless the statute otherwise dictates, . . . to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) (internal quotation marks omitted); *accord United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014). The Supreme Court has expressly applied this rule to the term "scheme to defraud," holding that the statutes require proof—as at common law—that the misrepresentations were material, notwithstanding the fact that a solely "natural reading of the full text" would omit such an element. *Neder v. United States*, 527 U.S. 1, 21, 25 (1999) (internal quotation marks omitted). The Court rejected certain requirements of common-law fraud (*i.e.*, reliance and damages)

Case 14-4626, Document 171, 05/23/2016, 1776773, Page84 of 141

as clearly "inconsistent" and "incompatible" with "the language of the fraud statutes," which prohibit "the 'scheme to defraud,' rather than the completed fraud." *Id.* at 25. By contrast, the Court incorporated the common-law requirement of materiality into the statutes because it was neither inconsistent nor incompatible. *Id.* Thus, our task here is to determine whether the common-law principles on which Defendants rely are incompatible with the language of the federal statutes.

As we summarized above, Defendants rely on the common-law rule that parties cannot allege or prove fraud solely on the basis of a contractual breach—*i.e.*, the common law requires more than simply "proof that a promise was made and that it was not fulfilled" to sustain a fraud claim, *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985); *see also United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). By contrast, the Government argues that any contractual relationship between the defendant and an alleged fraud victim is "irrelevant," citing as examples decisions in which this Court and others recognized a fraud claim where the parties were engaged in a contractual relationship. Gov't Br. 43–44. These cases are distinguishable, however, in that none recognize a contract breach, by itself, to constitute fraud. Rather, in each, the defendants made affirmative fraudulent misrepresentations to their contractual counterparties in the course of performance or to feign performance under the contract. *See, e.g.*, *United States v. Naiman*, 211 F.3d 40, 44, 49 (2d Cir. 2000) (submitting false certifications of compliance required by contracts with the government).

*Durland v. United States*, 161 U.S. 306 (1896), relied upon by the District Court, is also inapt because it dispensed with a completely *different* common-law rule—that promises of future performance could *never* constitute fraudulent misrepresentations—on the basis of statutory language clearly

13

designed to reach both fraudulent statements as to the present and fraudulent promises as to the future. *See id.* at 313–14. As the Supreme Court more recently clarified, *Durland* did not disturb what fraud at common law requires the Government to prove, except to the extent it is inconsistent with the statutory language. *See Neder*, 527 U.S. at 24. Thus, *Durland* has little application to the question posed by this case: what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?

In some sense, both the Government and Defendants are correct: the common law does not permit a fraud claim based solely on contractual breach; at the same time, a contractual relationship between the parties does not wholly remove a party's conduct from the scope of fraud. What fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*. As explained below, where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim. Far from being "arcane limitations," *Countrywide I*, 961 F. Supp. 2d at 607, these principles fall squarely within the core meaning of common-law fraud that neither the federal statutes nor *Durland* disrupted. *See Neder*, 527 U.S. at 24 ("[*Durland*] did not hold, as the Government argues, that the [mail fraud] statute encompasses more than common-law fraud.").

It is emphatically the case—and has been for more than a century—that a representation is fraudulent only if made with the contemporaneous intent to defraud—*i.e.*, the statement was knowingly or recklessly false and made with the intent to induce harmful reliance. While on the New York Court of Appeals, then–Chief Judge Benjamin Cardozo wrote that "[a]

representation even though knowingly false does not constitute ground for an action of deceit unless *made with the intent* to be communicated to the persons or class of persons who act upon it to their prejudice." *Ultramares Corp. v. Touche*, 255 N.Y. 170, 187 (1931) (emphasis added); *see also* RESTATEMENT (FIRST) OF TORTS §§ 526, 531 (1938). Even earlier, the highest common-law courts in the country routinely espoused the view that any party wishing to claim fraud must prove that the representation was actually made with contemporaneous fraudulent intent:

> The representation upon which [a fraud claim] is based must be shown not only to have been false and material, but that the defendant *when he made it* knew that it was false, or not knowing whether it was true or false and not caring what the fact might be, made it recklessly, paying no heed to the injury which might ensue.

*Kountze v. Kennedy*, 147 N.Y. 124, 129 (1895) (emphasis added)).

> There can be no question at this date that, in an action of deceit, the *scienter* must not only be alleged, but proved, and the jury must be satisfied that the defendant made a statement knowing it to be false, or with such conscious ignorance of its truth as to be equivalent to a falsehood. This is the general rule, and it has been declared with notable emphasis in several recent cases in this state.

*Griswold v. Gebbie*, 126 Pa. 353, 363 (1889); *see also, e.g., Shackett v. Bickford*, 74 N.H. 57 (1906); *Nw. S.S. Co. v. Dexter Horton & Co.*, 29 Wash. 565, 568–69 (1902).

15

Case 1:12-cv-01422-JSR   Document 365   Filed 05/17/16   Page 17 of 31

Of course, "fraudulent intent is rarely susceptible of direct proof, and must instead be established by legitimate inferences from circumstantial evidence." *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir. 1969). Nonetheless, where the relevant representation is made within a contract, the common law rejects any attempt to prove fraud based on inferences arising solely from the breach of a contractual promise:

> [T]hat proof that a promise was made and that it was not fulfilled is sufficient to prove fraud . . . is not, and has never been, a correct statement of the law.

*Tenzer*, 39 Cal. 3d at 30. This rule exists because, at common law, a post-agreement intent to breach the contract is not actionable as fraud:

> [I]f the promises or representations were made in good faith at the time of the contract, and the defendant subsequently changed its mind, and failed or refused to perform the promises, then such conduct of the company, originally or subsequently, would not constitute such fraud, in legal acceptation, as would justify the rescission of the contract or the cancellation of the deed.

*Chi., Tex. & Mex. Cent. Ry. Co. v. Titterington*, 84 Tex. 218, 224 (1892); *see also, e.g., Hoyle v. Bagby*, 253 N.C. 778, 781 (1961); *Citation Co. Realtors, Inc. v. Lyon*, 610 P.2d 788, 790–91 (Okla. 1980); *Lloyd v. Smith*, 150 Va. 132, 145–46 (1928). This principle has been applied in the context of fraud not only by our Court but by our sister circuits as well. *See D'Amato*, 39 F.3d at 1261 n.8; *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); *Mills v. Polar*

16

*Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993); *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 632–33 (2d Cir. 1982); *see also Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791–92 (1st Cir. 1990); *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir. 1988); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980). This prohibition is more than, as the Government attempts to characterize it, "the uncontroversial view that breach of a contract, without further evidence of fraudulent intent, does not establish a fraud claim," Gov't Br. 49 n.7. Instead, as certain of our sister circuits have convincingly explained, this principle exists because, at its core, fraud requires proof of deception, which is absent from ordinary breach of contract. *See McEvoy Travel Bureau*, 904 F.2d at 791–92; *Kreimer*, 609 F.2d at 128; *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417 (3d Cir. 1991).

Accordingly, the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation:

> It is the preconceived design of the buyer, formed *at or before the purchase*, not to pay for the thing bought, that constitutes the fraudulent concealment which renders the sale voidable, and not an intent formed after the purchase. If the purchaser forms the intent not to pay for the goods after he has received them and the title has passed, it is a mere intended breach of contract, and not such a fraud as to authorize a rescission of the sale. . . . This intent never to pay for the goods has sometimes been treated as a fraudulent representation, and sometimes as

17

> a fraudulent concealment, but *in either event
> it must precede the sale*. The distinction is
> between an intent not to pay according to
> the terms of the contract and an intent to
> obtain goods under color of a formal sale,
> upon a sham promise to pay, but with the
> design of never paying for them. The former
> is a mere intent to break a contract; the
> latter, an intent to defraud.

*Starr v. Stevenson*, 60 N.W. 217, 218 (Iowa 1894) (emphases added) (citations omitted); *accord Titterington*, 84 Tex. at 223–24.

> To constitute the fraud, there must be a
> preconceived design never to pay for the
> goods. A mere intent not to pay for the
> goods when the debt becomes due, is not
> enough; that falls short of the idea. A design
> not to pay according to the contract is not
> equivalent to an intention never to pay for
> the goods, and does not amount to an
> intention to defraud the seller outright,
> although it may be evidence of such a
> contemplated fraud.

*Burrill v. Stevens*, 73 Me. 395, 399–400 (1882). More recently, our sister circuit expressed the principle succinctly:

> Fraud requires much more than simply not
> following through on contractual or other
> promises. It requires a showing of deception
> at the time the promise is made. A
> subsequent breach, although consistent with
> deceptive intent[,] is not in and of itself
> evidence of such an intent.

*Corley*, 388 F.3d at 1007.

As already observed, our Court has consistently applied this principle: "A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor *never intended* to honor the contract." *D'Amato*, 39 F.3d at 1261 n.8 (emphasis added)); *see also Murray v. Xerox Corp.*, 811 F.2d 118, 122 (2d Cir. 1987) (holding that "a showing of fraudulent intent fails as a matter of law" where no evidence demonstrates the promisor "did not intend to comply with his promise from its inception"); *Ford v. C.E. Wilson & Co.*, 129 F.2d 614, 617 (2d Cir. 1942) (A. Hand, *J.*) (rejecting common-law fraud claim where there was no evidence of intent not to perform at the time the contract was entered (citing, *inter alia*, *In re Levi & Picard*, 148 F. 654 (S.D.N.Y. 1906); *Starr*, 60 N.W. 217; *Burrill*, 73 Me. 395)). The alternate approach—proving intent only as to the act of breaching the promise, instead of making the promise—contravenes the fundamental common-law requirement of contemporaneity between representation and fraudulent intent.

More than thirty years ago, our Court discussed the interaction between fraud and contractual promises in *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57 (2d Cir. 1985) (Friendly, *J.*). That case concerned whether a "deviation" constituted an "independent, willful tort in addition to being a breach of contract" for purposes of awarding punitive damages. *Id.* at 63. A "deviation" is a term of art in admiralty law, originally meaning "a departure from the agreed course of the voyage"; it "amount[ed] to a breach of warranty or condition precedent" and thus was considered "'no more than a breach of the contract of carriage,'" albeit "'ipso facto a more serious breach than if it had occurred on land.'" *Id.* at 63–64 (quoting *Farr v. Hain S.S. Co.*, 121 F.2d 940, 944 (2d Cir. 1941) (L. Hand, *J.*)). Notwithstanding

19

the gravity—and obvious materiality—of such a breach, Judge Friendly, writing for the Court, concluded that even the intentional and willful deviation at issue could not constitute fraud absent "an element essential to fraud, namely, an intention not to perform the promise when made." *Id.* at 65.[11] In doing so, he explained why common law courts do not consider even serious, intentional, or malicious contractual breaches to be tortious—notably, he relied on Justice Holmes's articulation of the common law's view of contracts as "simply a set of alternative promises either to perform or to pay damages for nonperformance," and on the common law's tolerance for, even encouragement of, so-called "'efficient breaches'" that increase overall wealth. *Id.* at 63 (citing, *inter alia*, OLIVER WENDELL HOLMES, THE COMMON LAW 235–36 (Mark DeWolfe Howe ed. 1963); RESTATEMENT (SECOND) OF CONTRACTS ch. 16, reporter's note (1981)); *see also Mills*, 12 F.3d at 1176 ("A contract may be breached for legitimate business reasons. Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages." (citation omitted)).

Although *Thyssen* concerned the availability of punitive damages, not the application of the federal fraud statutes, the prerequisite question was whether a breach of contract—acknowledged to be intentional and willful at the time of breach—could be tortious as a fraud at common law. *Id.* at 60, 63. The distinctions Judge Friendly identified in *Thyssen* were not, as the Government argues, merely "rooted in the desire not to

---

[11] The relevant "promise," in the context of a deviation, was the warranty contained in the contract of carriage. *See Thyssen*, 777 F.2d at 63–64. Judge Friendly concluded that the case "clearly lacked" evidence of an intent not to perform this promise when the contract was entered. *Id.* at 65.

20

inappropriately expand the scope of civil remedies under contract law," Gov't Br. 49. To the contrary, the decision not to expand civil contract remedies appears rooted in the nature of contracts and torts at common law—particularly, the nature of fraud as deceptive, *see, e.g.*, *McEvoy Travel Bureau*, 904 F.2d at 791–92—and the common law's reason for treating them differently. In essence, the Government's theory would convert every intentional or willful breach of contract in which the mails or wires were used into criminal fraud, notwithstanding the lack of proof that the promisor intended to deceive the promisee into entering the contractual relationship.[12] The reasons identified by Judge Friendly in *Thyssen* counsel with persuasive force against

---

[12] As we noted above, deception is the core of fraud and the key distinction between fraud and a contractual breach. *See, e.g.*, *Kehr Packages*, 926 F.2d at 1417; *McEvoy Travel Bureau*, 904 F.2d at 791–92; *Kreimer*, 609 F.2d at 128. The cases cited by the Government all involve deceptive conduct that was employed in a contractual relationship to hide breaches of contract or nonperformance. *See, e.g.*, *Naiman*, 211 F.3d at 49 (issuing false certifications required by contracts and misrepresenting included information); *United States v. Frank*, 156 F.3d 332, 334–36 (2d Cir. 1998) (falsifying billing records for contractual services); *First Bank of the Ams. v. Motor Car Funding*, 257 A.D.2d 287, 289, 291–92 (N.Y. 1st Dep't 1999) (misrepresenting the characteristics of loans on loan tapes to mask noncompliance with representations and warranties). In all of these cases, the purported fraudulent statements or conduct were made *outside* the four corners of the contract, albeit related to performance thereunder. The law of these cases is perfectly consistent with our holding today that fraudulent intent must be found at the time of the allegedly fraudulent conduct, and the results are consistent because, as we explain *infra* Part II, the Government only proved representations wholly within the contract.

21

such a dramatic expansion of fraud liability in circumstances like the case before us.[13]

In sum, a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud. Far from being an arcane limitation, the principle of contemporaneous intent is, like materiality, one without which "the common law could not have conceived of 'fraud.'" *Neder*, 527 U.S. at 22.

Although *Neder* does not require that a common-law principle promote the interests of the federal statute but instead presumes the common-law meaning is incorporated unless inconsistent, *see id.* at 25, we note that the contemporaneity principle does, in fact, promote those interests. Unlike fraud at common law, the federal statutes require neither reliance by nor injury to the alleged victim. *Compare, e.g., Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999) (injury); *Jones v. Title Guar. & Tr. Co.*, 277 N.Y. 415, 419 (1938) (reliance), *with Neder*, 527 U.S. at 24–25. So, unlike the common law, the statutes punish "the *scheme*, not its success." *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991). What gives a scheme its fraudulent nature is, as *Durland* explained, "the intent and purpose." 161 U.S. at 313. Thus, what matters in federal fraud cases is not reliance or injury but the scheme designed *to induce* reliance on a known

---

[13] Justice Holmes's theory of alternative promises seems particularly persuasive where, as here, the parties have a contractually determined remedy—repurchase—in place for breached obligations. In essence, the parties bargained *precisely* in an alternative fashion to provide investment-quality loans or to repurchase defective loans sold.

misrepresentation. *See D'Amato*, 39 F.3d at 1256–57; *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir. 1970).

Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation.

## II.    The Evidence Was Insufficient as a Matter of Law to Prove Fraud

Having described the proof that the federal fraud statutes require, we conclude the Government's proof at trial failed to meet its burden. The only representations alleged to be false were guarantees of future quality made in contracts as to which no proof of contemporaneous fraudulent intent was introduced at trial. The Government did not prove—in fact, did not attempt to prove—that at the time the contracts were executed Countrywide never intended to perform its promise of investment quality. Nor did it prove that Countrywide made any later misrepresentations—*i.e.*, ones not contained in the contracts—as to which fraudulent intent could be found.

Although the Government was not always clear as to what theory of fraud applied in this case, *see, e.g.*, J.A. 4861–64, the record shows that the jury was charged only as to a theory of fraud through an affirmative misstatement, *i.e.*, a statement that was either "an outright lie" or partially true but "omitt[ed] information necessary to correct [a] false impression." J.A. 5219.

23

Thus, we review the proof at trial only by reference to this charged theory, *see Yates v. Evatt*, 500 U.S. 391, 409 (1991), and we do not address whether other situations, such as silence without *any* affirmative statement while under a duty to disclose material information, can constitute fraud under the federal statutes, particularly in the context of a breach of contract, *cf. United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) (nondisclosure is actionable under the federal fraud statutes where there is a duty to speak); *United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (failure to disclose material information while in a fiduciary relationship constituted a scheme to defraud).[14]

Both to the jury and to this Court, the Government identified provisions in the contracts between Countrywide and the GSEs—and only those provisions—as the representations underlying its fraud claim, despite acknowledging that the contracts' execution pre-dated the alleged scheme to defraud. *See* Gov't Br. 43 (arguing that "the government's claims of mail and wire fraud were valid despite the preexisting contracts between the Bank and the GSEs"). In summation, the Government argued that these representations were the "lies" and "misrepresentations" that formed "the kernel of the case here." J.A. 5147; *see also id*. at 5041, 5153–54. Before this court, the Government contends that this proof was sufficient because "no case cited by defendants holds that fraudulent intent must have existed at the time of contracting, when the alleged fraud (inducing the other party to the contract to take action through a

---

[14] While the case law reaffirms that fraudulent intent must accompany silence to constitute fraud, *see Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 10 (1st Cir. 2007) (citing cases in six circuits); *Altman*, 48 F.3d at 102, we need not decide here how fraud through silence in the context of a contractual relationship would operate.

scheme to defraud) occurred later." Gov't Br. 44. Of course, freestanding "bad faith" or intent to defraud without accompanying conduct is not actionable under the federal fraud statutes; instead, the statutes apply to "everything designed to defraud *by representations* as to the past or present, or *suggestions and promises* as to the future." *Durland*, 161 U.S. at 313 (emphases added); *see also Starr*, 60 N.W. at 218 ("Fraud never consists in intention, unless it be accompanied by some act."). Thus, on the affirmative misrepresentation theory charged to the jury, the Government needed to show false or misleading statements made with fraudulent intent.

Critically, the Government presented no proof at trial that any quality guarantee was made with fraudulent intent at the time of contract execution. Nor did it offer evidence of any other representations, suggestions, or promises—separate from and post-dating execution of the initial contracts—that were made with fraudulent intent to induce the GSEs to purchase loans. In fact, at oral argument before this Court, counsel for the Government identified no representations or statements other than those contained in the contracts and instead argued that the contractual representations were "made" not at contract execution but at the point of sale.[15]

---

[15] *See* Oral Argument at 1:37:00, *United States v. Mairone*, Nos. 15-496-cv(L), 15-499-cv(Con) (argued Dec. 16, 2015) (Mr. Armand, arguing misrepresentations were made "continuously" after contract execution at each point of sale); *id.* at 1:42:40 (Mr. Armand, arguing that fraud occurred in the performance of the contract); *see also id.* at 1:39:40 (Mr. Armand, answering in the negative Judge RAGGI's question whether there were any representations that would not support a breach of contract claim).

The plain language of the contracts does not admit this characterization.[16] In the relevant contractual provisions, Countrywide "makes" or "warrants and represents" certain statements (*i.e.*, present-tense acts), including that the future transferred loan will be investment quality "as of" the transfer or delivery date. J.A. 5905, 5935, 6366, 6368; *see also id.* at 5908, 5938. The use of a present-tense verb in a contract indicates that the parties intend the act—here, the making of the representation— to occur at the time of contract execution, not in the future. *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001); *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 361 F. Supp. 2d 210, 215 (S.D.N.Y. 2005); *Fed. Home Loan Mortg. Corp. v. Kopf*, No. CV 90-2375 (RR), 1991 WL 427816, at *2 (E.D.N.Y. Jan. 30, 1991) (Raggi, J.); *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 246–47 (2014); *see also Rubenstein v. Mueller*, 19 N.Y.2d 228, 232 (1967) (holding a present-tense clause in a will indicated a present intention).

---

[16] We conduct the same inquiry when reviewing motions for judgment as a matter of law as we do reviewing motions for summary judgment. *See Reeves*, 530 U.S. at 150 ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986))). When interpreting contractual language, we "accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish," and "[o]nly where the language is unambiguous" may we construe it as a matter of law. *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (Sotomayor, J.) (internal quotation marks omitted). "The mere assertion of an ambiguity does not suffice to make an issue of fact. Ambiguity resides in a writing when—after it is viewed objectively—more than one meaning may reasonably be ascribed to the language used." *Id.* (internal quotation marks omitted).

Similarly, the phrase "as of" is "used to indicate a time or date at which something begins or ends." *As of*, Webster's New Third International Dictionary, Unabridged, http://unabridged. merriam-webster.com; *see also As of*, Oxford English Dictionary Online, www.oed.com ("[A]s things stood on (a date); (orig. *U.S.*) (in formal dating) reckoning from; from, after."). As these definitions indicate, "as of" describes the timing of a state of affairs, and a state of affairs—*i.e.*, the investment-quality status of particular loans—is precisely what is being represented in the contracts at issue.

Accordingly, the only reasonable interpretation of the contracts is that the date contained in the "as of" clause identifies the moment at which the promised fact will exist—*i.e.*, when the representation becomes effective. Where a party makes a contractual representation of quality that is effective as of a future date rather than the time of contract execution, the date of future effectiveness determines the date of performance (and, thus, breach), *see Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 866 (2d Cir. 2015), but the promisor's *intent* to perform on that promise is fixed as of contract execution, *see Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957) (concluding that a party's intent with respect to representations of future acts is a "material existing fact" at the time of contract execution upon which a fraud claim may lie).[17] The Government urges us to read the

---

[17] Not all representations of fact are made with a future effectiveness date. For example, the warranty in *ABB Industries Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 360 (2d Cir. 1997), promised "in the land-sale contract" that a piece of real property was in compliance with state and federal environmental laws as of the date of sale. In such a case, a party's intent to perform and its performance (or breach) are simultaneous—both take place at contract execution.

relevant contract provisions as, in essence, promises at execution to make *future* representations as to quality. The language of the provisions, however, constitutes a present promise, made at the time of execution, to provide investment-quality loans at the future delivery date. The plain and objective meaning of the contract simply does not support the Government's contention that Countrywide actually made these representations—rather than merely set their performance date—at the time of the subsequent sales of loans. Thus, to the extent its fraud claim is based on these contractual representations of quality, it necessarily fails for lack of proof that, at the time of contract execution, Defendants had no intent ever to honor these representations.

Because we conclude that the contracts unambiguously make the representations at the time of contract execution, extrinsic evidence—such as witness testimony—cannot vary that meaning. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Thus, we examine the other evidence presented at trial solely for the purpose of determining whether the jury had a sufficient basis for concluding that other, noncontractual fraudulent misrepresentations occurred to induce the sale of HSSL loans.[18]

The testimony of the GSE employees, as well as former Countrywide employees, focused on the meaning and

---

[18] As we noted above, the jury was not charged as to—and therefore could not have found—liability as a result of fraudulent silence. Accordingly, the Government had to prove some affirmative statement—either wholly false or partially true but misleading—as to which the requisite scienter was present. *See also supra* note 12 (discussing the Government's reliance on cases involving fraudulent conduct separate from contractual promises).

importance of the contractual representations but did not identify any promise, statement, or representation outside of the contract made to induce loan sales or to mask nonperformance. For example, an employee of Freddie Mac testified that he understood the contractual representation to mean that "the information that they're presenting to us at time of sale is accurate," which describes the timing of the representation's content, not the underlying promise itself. J.A. 2974. Other testimony from Fannie Mae and former Countrywide employees emphasized the importance of these representations to the GSEs' business models and their applicability to each loan sold—ostensibly to prove the materiality of the misrepresentations, which was hotly contested at trial. No witness identified additional promises or statements that could serve as the "false or misleading statements" the jury was charged to find. J.A. 5219. Nor, as we have noted, does the Government identify any on appeal, relying solely—as it did at trial—on the contracts themselves. Accordingly, we conclude that any finding by the jury that a post-execution representation occurred to induce the sale would be premised on a legally erroneous reading of the contracts or "the result of sheer surmise and conjecture." *Stampf*, 761 F.3d at 197 (internal quotation marks omitted).[19]

---

[19] Where, as we conclude here, the only misrepresentations alleged and proven are wholly contained within the contract, there is no factual basis to find, as the District Court did, that the exception in New York common law for "collateral misrepresentations" applies. *See, e.g., Torchlight Loan Servs., LLC v. Column Fin., Inc.*, No. 11 Civ. 7426(RWS), 2012 WL 3065929, at *9–10 (S.D.N.Y. July 25, 2012); *Varo, Inc. v. Alvis PLC*, 261 A.D.2d 262, 265 (N.Y. 1st Dep't 1999). We therefore need not determine whether this exception or others at New York common law, *see Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996), are incorporated into the federal statutes. We note

In sum, the Government has never argued—much less proved at trial—that the contractual representations at issue were executed with contemporaneous intent never to perform, and the trial record contains no evidence that the three Key Individuals—or anyone else—had such fraudulent intent in the contract negotiation or execution. Instead, the Government's proof shows only post-contractual intentional breach of the representations. Accordingly, the jury had no legally sufficient basis on which to conclude that the misrepresentations alleged were made with contemporaneous fraudulent intent. Because we construe the federal mail and wire fraud statutes to require such proof, consistent with the common law, the Government has not proven the prerequisite violation necessary to sustain an award of penalties under FIRREA.

## CONCLUSION

For the reasons stated above, we REVERSE the judgment of the District Court and REMAND the case with instructions to enter judgment for Defendants.

---

that the two cases from our Circuit on which the Government relies—*Frank* and *Naiman*—present fact patterns similar to those in cases falling within the "collateral misrepresentations" exception. However, neither *Frank* nor *Naiman* confronted an argument based on the fraud/contract distinction that Defendants make here: *Frank* concerned challenges to the jury instructions and sufficiency of the evidence on the intent to cause harm, *see* 156 F.3d at 335–37, and *Naiman* concerned sufficiency challenges as to materiality and intent to cause harm, *see* 211 F.3d at 49. Accordingly, while *Frank* and *Naiman* are certainly consistent with a theory of fraud through "collateral misrepresentations," we cannot say they have expressly approved the exception.

30

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit